# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT IN THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **JANE DOE**<br>               **Plaintiff,**<br><br>           v.<br><br>**FAIRFAX COUNTY SCHOOL BOARD;<br>SYBIL TERRY; PHILIP A. HUDSON;<br>TAMARA B. BALLOU; CHRISTIAN<br>KORNEGAY; AUGUST FRATTALI;<br>BRENDA HUMPHREY; MONIQUE<br>PATWARY-FARUQUE; MEGAN CARR;<br>FRANCIS TARRANT; JOANNE<br>FRAUNDORFER; JENNA OFANO AND<br>MIKE AND MARY ROES 1-15**<br>              **Defendants.** | CASE NO.: 1:19-cv-00917 RDA TCB |

## AFFIDAVIT OF COUNSEL IN SUPPORT OF MOTION FOR LEAVE TO PROCEED UNDER THE PSEUDONYM "JANE DOE"

I, Thomas N. Sweeney, swear under the penalties of perjury following the requirements of 28 U.S.C. §1746, that the statements contained in this Affidavit are true.

1. I am an attorney at the law offices of Messa & Associates, P.C. located at 123 S. 22nd Street in Philadelphia, Pennsylvania 19103.

2. I have been a member in good standing of the Virginia Bar since 2019 and I have never been subjected to any disciplinary proceedings in any jurisdiction in the United States or abroad.

3. I am also a member of the bar in good standing of the United States Supreme Court, the federal courts of the Third, Fourth and Eighth Circuits, the Eastern District of Pennsylvania, the Middle District of Pennsylvania, and the District of Nebraska.

4. Jane Doe is a pseudonym for the true identity of the Plaintiff, ███████████ whose date of birth is July 15, 1999.

5. Plaintiff, Jane Doe, is an adult, United States citizen, and permanent resident of the State of New York.

6. I have personal knowledge about the facts contained in this Affidavit.

7. On August 6, 2012, Plaintiff filed an Administrative Complaint against the Fairfax County Public School system. A true and correct copy of the OCR Complaint with internal exhibits included is attached hereto as Exhibit A.

8. Plaintiff supplemented her Administrative Complaint with a letter dated August 12, 2012. A true and correct copy of the August 12, 2012 Supplemental Letter, Docket No. 11-12-1529, is attached hereto as Exhibit B.

9. On August 11, 2014, the Fairfax County Public Schools entered a Voluntary Resolution Agreement with the U.S. Department of Education to resolve the allegations in Plaintiff's Administrative Complaint. A true and correct copy of the Voluntary Resolution Agreement is attached hereto as Exhibit C.

10. Plaintiff's therapist is Rose Celia Rosato, MA, LPC.

11. Therapist Rosato, MA, LPC opines:

> It is critical for ███████ s identity to be protected in all situations. In addition to her young age as the victim of violent crime, her privacy is important to her. Also, even the slightest perception that her identity and whereabouts are known by her perpetrators will potentially cause her great mental and emotional stress and harm.

12. A letter from Rose Celia Rosato is attached hereto as Exhibit D.

13. The true identity of Jane Doe's mother is ███████.

14. Jane Doe's Mother has prepared an Affidavit for the Court's consideration. A true and correct copy of the Affdavit of ███████ is attached hereto as Exhibit E.

The foregoing statements are made under penalties of perjury as required by 28 U.S.C. §1746. Signed under penalties of perjury this 19th day of 2019.

Thomas N. Sweeney, Esquire

**THE COMMONWEALTH OF PENNSYLVANIA**

Philadelphia County:                         November 19, 2019

Then personally appeared the above named Thomas Sweeney and acknowledged the foregoing instrument to be his free act and deed before me.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ELAINE M. HOPKINS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires August 16, 2020

# Exhibit "A"

**U.S. DEPARTMENT OF EDUCATION**
**OFFICE OF CIVIL RIGHTS**

U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

## ADMINISTRATIVE COMPLAINT

### COMPLAINANT



████████████ was enrolled in seventh grade at Rachel Carson Middle School ("Rachel Carson"), in the Fairfax County Public School system ("FCPS"), from August 2011 to February 2012. From October 2011 to February 2012, ████ was the target of peer-on-peer sexual harassment perpetrated primarily by two older students, which created a hostile educational environment. The nature of the sexual harassment included calling ████ sexually-offensive names, making sexually suggestive gestures towards her, spreading rumors about her sexual activities, pulling down her shirt to take pictures of her chest, and attempting to and touching her breasts and buttocks. ████ and her mother, ███████ notified the school about the sexual harassment in November 2011. The investigation undertaken by the administrators at Rachel Carson was inadequate and the school failed to implement effective protective measures and eliminate a hostile educational environment. ████ who was once an honor roll student, started getting Cs and Ds in classes in which she previously excelled. In fact, one teacher told ████████ that ████'s work had become inconsistent, "ranging from exceptional performance to mediocre." Additionally, ████ did not feel comfortable staying after school and thus was unable to partake in extracurricular activities that she would have pursued but for the sexual harassment and the school's mishandling of the investigation. These activities included tennis, Model United Nations, drama, and dance club. ████ also developed depression and anxiety, and was diagnosed with post-traumatic stress disorder. As a result, in February 2012, ████ was unable to continue attending Rachel Carson and received Homebound Instruction for the remainder of the academic year.

### COMPLAINANT'S COUNSEL

National Women's Law Center
11 Dupont Circle, NW, Suite 800
Washington, D.C. 20036
(202) 588-5180

57841523v3

**RECIPIENT**
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042

**PRELIMINARY STATEMENT**

1. This Complaint is filed by ██████ pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), and the regulations and policies promulgated therein. *See* 34 C.F.R. § 106 *et seq.* Title IX prohibits discrimination on the basis of sex, including sexual harassment, in federally funded education programs and activities.

2. As detailed in the Factual and Legal Allegations below, ██ has been subjected to a hostile educational environment which is the result of the school's failure to ensure that its students are not discriminated against on the basis of sex, including peer-on-peer sexual harassment.

3. Specifically, Rachel Carson administrators were slow to investigate or take seriously harassment that ██ and her parents reported; failed to implement effective protective measures, even in the face of evidence of continuing harassment; failed to adequately communicate with ██'s family and ██'s teachers; and ignored internal policies regarding harassment. Rachel Carson's laissez-faire attitude toward ██'s harassment in effect required ██ and her family to undertake extraordinary measures to attempt to ensure ██'s school safety in the face of an overwhelming and hostile environment.

4. In order to address these failures, ██ requests that the Washington D.C. Office of Civil Rights ("OCR"), which has jurisdiction over Fairfax County Public Schools, investigate Rachel Carson's conduct related to the peer-on-peer sexual harassment to determine whether it is meeting its obligations under Title IX and, if violations are found, take all necessary steps to remedy any unlawful conduct.

**JURISDICTION**

5. The OCR is responsible for ensuring compliance with Title IX and receiving information about, investigating, and remedying violations of Title IX and its implementing regulations and guidelines in the region. 34 C.F.R. §§ 106.71, 100.7.

6. ██ has not filed this complaint with any other agency. ██ first attempted to complain about the sexual harassment to Rachel Carson in or around late October 2011. On November 21, 2011 ██ and her mother finally met with school administrators, Sybil Terry and Phil Hudson, to inform the school of the sexual harassment. Upon receiving ██'s complaint, members of the school's administration met with ██ and ██ to address the ongoing sexual harassment. According to Rachel Carson, the administration interviewed various students, including the student ██ identified as the

57841523v3

primary harasser, Christian Kornegay.  Very little is known about the nature of the interviews and any resulting disciplinary actions, except that the harassing student may have been given a warning.  Between November 21, 2011 and February 10, 2012, ███ and Mrs. ███ complained no less than seven times, either through email or in meetings, that the sexual harassment continued and ███ was still subject to a hostile educational environment.

7. This Complaint is timely: The last incidence of sexual harassment directed towards ███ occurred on February 9, 2012.

## FACTUAL ALLEGATIONS

8. ███ enrolled as a 7th grader at Rachel Carson in August 2011.  Prior to the sexual harassment, ███ was an honor roll student and participated in various extra-curricular activities, such as tennis, Model United Nations, drama, and dance club.

9. The sexual harassment directed towards ███ started in or around mid-October 2011 and progressively worsened.  The primary harasser was an 8th grader, Christian Kornegay, who touched ███'s breasts and buttocks without her consent, spread false rumors about her sexual activity, and repeatedly called her vulgar names such as "whore" and "bitch," and also called her a "lesbian."  Eventually, even students that ███ did not know were calling her "lesbian" or making vulgar comments about her sexuality and alleged sexual activities on a daily basis, or near daily basis.

10. In late October, Christian and Jenna Ofano, another harasser, tackled ███ in a park, pulled down her shirt, and took photographs of her chest with a camera phone.  They also attempted to pull down her pants.

11. On or around November 14, 2011, ███ received a sexually explicit voicemail making reference to sexual acts, which she believes was from Christian.  The identity of the caller remains uncertain because, after listening to the message, Mrs. ███ blocked the caller from ███'s phone.  She subsequently learned from the cellular phone company that blocking a number causes all data connected to that number to disappear on the phone.  Other students also informed ███ that another 8th grader, David Neill, was spreading false rumors that ███ "gave him oral sex," "sent naked pictures," and "let anyone get in [her] shirt and pants."

12. A large part of the harassment occurred at ███'s hallway locker, before first period.  For example, Christian and David often visited ███'s locker and mimicked sexual acts, gyrating behind her and "giving [her] seductive looks."  Christian repeatedly tried to touch ███'s breasts and, at least twelve times, succeeded in doing so.  Additionally, ███'s P.E. locker was located next to Jenna, one of the key harassers, who frequently called ███ offensive, sex-based names such as "whore" and "bitch."

57841523v3

13. The most egregious sexual harassment was in the form of sexual assault. The assault was not disclosed by ████ to anyone until March 2012, but occurred on or around November 9, 2011. While at a bus stop after school, Christian asked ████ to give him $50. ████ also refused this demand. ████ continued to walk away, but Christian chased her in a neighboring yard. Christian then forcibly held her down and sodomized her. He threatened to kill ████'s family, specifically her brother, if she told anyone. He also ordered her to reply to any text messages he sent her. The next day, Christian was again waiting at ████'s bus stop and again demanded that ████ give him $50, which she did.

14. From late October through the middle of November, ████ made multiple requests to meet with guidance counselors at Rachel Carson, but was repeatedly told the guidance office was busy.

15. On November 21, ████ submitted a written statement to the school stating that she was scared to come to school and detailing the peer-on-peer sexual harassment described above (except for the rape). A copy of ████'s statement is attached as Exhibit A.[1] ████ also listed the names of students who heard the false rumors spread by David.

16. Also on November 21, ████ and her parents, at their request, met with Ms. Terry, an assistant principal, Mr. Hudson, also an assistant principal, and Ms. Brenda Humphrey, a school counselor, and described the harassment detailed in ████'s statement, including the harassment at her hallway and P.E. lockers. The ████ also discussed Christian's extortion of the $50 from ████, and explained the vulgar voicemail left on ████'s phone, including their belief that Christian was responsible for it. Ms. Terry said that she would look into the situation. At this meeting ████'s parents also requested that the school change ████'s P.E. locker because her current P.E. locker was next to the female student who was one of the key harassers, often joining in calling ████ offensive, sex-based names such as "whore" and "bitch". The school agreed to move ████'s P.E. locker to a location where she could be better supervised by a teacher, and to notify all of ████'s teachers about the sexual harassment so that she could leave class discretely if she needed to see the school counselor. Ms. Terry explicitly discouraged the ████ family from approaching Christian's family about his behavior. She told the ████ that Christian had been in enough trouble and could not afford to get into any more; she told the ████ not to "ruin a kid's life," and ensured the family that she would handle the situation.

The school has since indicated that they interviewed some students and their parents regarding the sexual harassment following the November 21 meeting. It is unclear who was interviewed, including whether the students named in ████ s written statement were interviewed. Very little is known about the nature of and the results of the investigation but, to the best of ████'s knowledge, the harassing students may have merely been given a warning.

---

[1] All of the exhibits attached to this complaint are in the form in which they were produced by the school in response to Mrs. ████ s FERPA request. Therefore, any handwritten notes on them were on the copies produced by the school.

17. On the afternoon of November 21, after meeting with Ms. Terry, Mrs. ███████ sent an email to Ms. Terry, Mr. Hudson, and Ms. Humphrey, a copy of which is attached as Exhibit B, notifying them that at least "15 unknown students [were] coming up to █ and asking if she gave oral sex to Christian and David." She also informed them that ███████would not be returning to school until after Thanksgiving, in hopes that by that time the school would have effectively handled the harassment.

18. On November 22, the following day, Ms. Terry called Mr. and Mrs. ██████ to tell them she had finished her investigation of the sexual harassment and invite them in for a meeting to discuss her findings. The ██████ met with Ms. Terry later that day. Ms. Terry stated that she had spoken with Christian and his mother and made a cavalier statement that the situation appeared to be a "boy-girl thing." She then told the ██████ that ███ may have engaged in sexual behavior that her parents were unaware of. Ms. Terry also explained that she had been able to recover the $50 that Christian extorted from ███, and jokingly told Mrs. ██████ that she needed to return the money to her before she spent it herself on Christmas shopping. It appeared to Mrs. ████that the incident was not taken seriously and that Ms. Terry was insinuating that ████was promiscuous. There is no indication that Ms. Terry or other Rachel Carson administrators ever reported the incident of extortion to a Rachel Carson school resource officer.

19. During the November 22 meeting, Ms. Terry suggested that ████take a back stairway to certain classes so she would not pass Christian in the hallways, and said she would direct teachers to be vigilant for 8th graders or other students who may be around ████'s locker.

20. Despite developing a plan that, if executed properly, might have helped to protect ███ the protective and preventive steps that were actually taken were inadequate and failed to eliminate the hostile environment. There is no indication that ███'s teachers were informed about the sexual harassment. The school's own account of its response fails to indicate that the situation was ever discussed with ███'s teachers. There are emails between teachers which discuss setting up a meeting some time after Thanksgiving to discuss ████ (no reason is given), but there is no indication that there was any follow-through after the holiday. An email, a copy of which is attached as Exhibit C, indicates that at least one of ███' teachers was not informed of the sexual harassment until as late as February 10, 2012. Additionally, ████'s P.E. locker was not changed as of December 1, 2011, nearly two weeks after the ██████ first meeting with the school, despite the school's assurance that she would have a new locker assignment after Thanksgiving. Even when ████was assigned a new locker, it was in a corner not easily visible, such that a school administrator or teacher would be unable to see ████ if she was being harassed. In December, ████ was slapped in the P.E. room, near her new locker, by the female student whom the ████████ had identified as the reason for ████'s need to change P.E. locker locations. Furthermore, ████ offered to identify in the yearbook the unknown students commenting on her sexual activities, but the school did not let ████

pursue this course of action. Rather, the school suggested that ██████identify these students by following them to class; a plan that ████was not comfortable with.

21. In early December, the sex-based name calling and rumors continued, and ████began receiving death threats at school. Students also now began to label ████ a "snitch." Numerous students, including those she did and did not know, approached ████ in the hallways and made statements such as "Christian wants to kill you" and "Christian wants to shoot you." Mrs. ████again requested to meet with Rachel Carson administrators. During the meeting, she explained the death threats and the continuing harassment. Mrs. ████████suggested that a guidance counselor shadow ██████in the hallways because of the threats, which the school agreed to do for a couple of weeks. Although Mrs. ████ informed the school that the shadowing had helped the situation, it was discontinued after two days. Mrs. ████called the school to ask why the shadowing had stopped. Ms. Humphrey protested at first that the school did not have the time or the manpower to be able to shadow ████but then agreed that the school would shadow ████whenever possible. The school told her that the shadowing would continue, but in fact it did not. ████began asking friends to escort her in the hallways.

22. In late January 2012, the sexual harassment escalated. The rumors that ████ was a lesbian and bisexual and rumors about her sexual activity continued. At one point, one of Christian's friends pushed her to the ground and called her sexually explicit names.

23. In the months of December 2011 and January 2012, only one Rachel Carson administrator, specifically Mr. Hudson, followed up with ████ and when he did, it was done only once, informally in the hallway with many other students around.

24. On January 27, 2012, ████sent an email to Rachel Carson's principal, August Frattali, in which she recounted the "sexual harassment, physical harassment, [and] name-calling" she had experienced and suggested that Rachel Carson implement a program to stop bullying. A copy of ████'s email to Mr. Frattali is attached as Exhibit D.

25. That same day, Mrs. ████requested another meeting with administrators. Mr. Frattali did not attend the meeting, which was later that day, but Mr. Hudson attended the meeting along with Tam Ballou, an assistant principal. The meeting focused only on the issue of ████'s concern that she was getting pulled out of class in a non-discrete manner and that other students were calling her a snitch. Mr. Hudson and Ms. Ballou said that they did not know what else the school could do to help ████ and Ms. Ballou suggested that ████seek help outside of the school in the form of a bullying and anxiety support group.

26. On February 8, ████was in the cafeteria and a male student she did not know called her a "douchebag," "asshole," and "bitch." The next day, the same student, again in the cafeteria, called ████the same vulgar names. When ████defended herself and repeated what he had said to her, a teacher nearby overheard and told ████to stop being rude. When████explained the situation, the teacher said "we can take it to the administration." ████readily agreed to take it to the administration, in the hope of

having someone actually listen to her and believe her. The teacher ultimately dropped the issue, however, and walked away. A copy of the email from Mrs. ███ to Principal Frattali recounting these events is attached as Exhibit E.

27. On February 9, ███ reported additional death threats to administrators. As a result of ███ reporting those threats, Ms. Ballou called Mrs. ███ to explain that there was "another incident" with ███ receiving threats. Ms. Ballou told Mrs. ███ she would have to wait until the next week to investigate the incident or discuss it further, because Ms. Ballou was leaving the school soon for the day, and told her that the threats were "just something kids say." Unsatisfied with this response, the ███ picked ███ up from school early to ensure her safety.

28. On February 10, Mrs. ███ emailed Principal Frattali, voicing her dismay at the school's mishandling of the investigation into the sexual harassment, its ineffective implementation of protective measures, and its failure to eliminate a hostile educational environment. She notified the school that, at the recommendation of ███'s doctor, she was pulling ███ out of school and demanded Homebound Instruction for the remainder of the academic year, depriving or at least limiting her participation in and benefits from many of the school's programs, both academic and extracurricular. *See* Ex. E.

29. On February 10, Mrs. ███ emailed Superintendent Jack Dale to discuss the sexual harassment to which ███ was subjected and the school's inadequate response. She was referred to Assistant Superintendent Fabio Zuluaga, who she emailed on February 13 to request a meeting. She met with Dr. Zuluaga on February 16, and he assured her that he would investigate the school's actions.

30. Over four months later, in June 2012, Mrs. ███ emailed Dr. Zuluaga asking for a status update on his investigation. On June 29, Dr. Zuluaga responded that "the incidents of harassment, inappropriate touching, and other bullying could not be verified" by school officials. He maintained that appropriate administrative action was taken in all cases.

31. There is a social worker who works at Rachel Carson who is trained to deal with bullying and sexual harassment. Despite the existence of this resource, ███ and her family were never informed of the social worker's existence. They only learned that she worked at the school once ███ was removed from school, in February 2012. Nor was the social worker informed of ███'s situation; she expressed surprise to Mrs. ███ when she first learned of the harassment in February while setting up Homebound Instruction for ███.

32. There is also a school psychologist who works at Rachel Carson who is trained to deal with bullying and sexual harassment. Despite the existence of this resource, ███ and her family were never informed of the school psychologist's existence. They only learned that she worked at the school in February 2012.

33. The Fairfax County Schools' website page on student bullying and harassment defines harassment as something that "involves emotional abuse and includes verbal or physical threats, physical assaults, bullying and theft of property." It defines sexual harassment as "unwelcomed advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" and defines hostile environment as "unwelcomed conduct that interferes with a student's school performance or creates an intimidating, hostile, offensive environment or atmosphere." It requires schools to report any suspected discrimination or harassment to the Office of Equity and Compliance. The webpage is available at http://www.fcps.edu/dss/ips/ssaw/violenceprevention/bullyinginfo/harassment.shtml and a copy is attached as Exhibit F. [2] There is no indication, based on Mr. and Mrs. ███████s communications with the school and ████s FERPA file, that the school ever reported ████'s harassment to the Office of Equity and Compliance, in violation of FCPS policy.

34. The Fairfax County Schools' website page on student bullying and harassment also lists a "Coordinator," Clarence Jones, as the point of contact. According to the website, he works in the Student Safety and Wellness Office. *See* Ex. F. The ████ were never made aware of the existence of this office or Mr. Jones, even though it appears from Fairfax County publications that his position exists to handle cases exactly like ████'s.

35. As a result of the sexual harassment, the sexual assault, and the school's inability to eliminate a hostile environment, ████ was diagnosed with depression, anxiety, and post-traumatic stress disorder (PTSD), currently sees a therapist three times a week, and was prescribed and is taking anti-depressants. Copies of two notes from ████'s doctors in support of her request for Homebound Instruction due to these conditions are attached as Exhibits G and H. ████ was also evaluated by an FCPS psychologist on or around July 19, 2012, and the eligibility committee determined that based on ████'s diagnosis of depression, PTSD, and current difficulty with social interactions, ████ suffers from an emotional disability and qualifies for an Individualized Education Program (IEP).

36. In addition to a decline in ████'s mental state, the hostile environment caused a decline in ████'s grades, and led her to drop out of school-sponsored activities. Once an honor roll student, ████ started getting Cs and Ds in classes in which she previously excelled. In fact, one teacher told Mrs. ████ that ████'s work had been inconsistent, "ranging from exceptional performance to mediocre." Additionally, ████ did not feel comfortable staying after school and thus was unable to partake in extracurricular activities that she

---

[2] The FCPS policy actually misstates the scope of the law, saying: "When bullying or harassment ... includes gender and sexual harassment of gay, lesbian, bi-sexual, and transgender individuals it is considered a violation of federal anti-discrimination laws enforced by the Office of Civil Rights." Ex. F. But Title IX prohibits sexual harassment and gender-based harassment *regardless* of the actual or perceived sexual orientation or gender identity of the victim. Nevertheless, Rachel Carson administrators would have had no reason to know or assume ████'s sexual orientation and thus, even according to its misstated policy, the school should have reported the suspected harassment to the Office of Equity and Compliance. The policy goes on to state: "Schools where such behavior is reported will take immediate action to investigate, and if discriminatory behavior has occurred will take action to end the harassment, to eliminate any hostile environment and its effects, and to prevent the harassment from recurring." *Id.*

would have pursued but for the sexual harassment and the school's mishandling of the investigation, including tennis, Model United Nations, drama, and dance club.

## LEGAL ALLEGATIONS

37. As outlined in the Factual Allegations above, Rachel Carson failed in its obligations under Title IX to conduct a thorough investigation of ████s allegations of sexual harassment and remedy the hostile educational environment caused by such harassment.

38. Title IX provides in pertinent part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. 20 U.S.C. § 1681(a).

39. Sexual harassment is a form of sex discrimination prohibited under Title IX. Sexual harassment is defined broadly to be "unwelcome conduct of a sexual nature." Sexual harassment can include "conduct such as . . . making sexual comments, jokes, or gestures; . . . calling students sexually charged names; [or] spreading sexual rumors; . . U.S. Department of Education, Office for Civil Rights, Dear Colleague Letter: Harassment and Bullying, at 6 (Oct. 26, 2010), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf (hereinafter "Dear Colleague Letter on Harassment and Bullying").

40. A school district may violate Title IX and its implementing regulations when "peer harassment based on . . . sex . . . is sufficiently serious that it creates a hostile environment and such harassment is . . . not adequately addressed by the school." Dear Colleague Letter on Harassment and Bullying, at 1.

41. The Supreme Court has held that peer-on-peer sexual harassment "creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program." *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 651 (1999). Determining whether the sexual harassment creates a hostile environment depends on a "constellation of surrounding circumstances, expectations, and relationships." *Id.*

42. The OCR has identified relevant factors to consider, including (a) the degree to which the conduct affects the student's education—including a decline in grades as well as mental or emotional stress; (b) the type, frequency, and duration of the conduct; and (c) the age and sex of the harasser(s) and harassed. *See* U.S. Department of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties 6- 7 (Jan. 2001), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf (hereinafter "Revised Sexual Harassment Guidance").

57841523v3

OCR has explained that off-campus harassment is also relevant to determining whether a hostile environment was created: "[b]ecause students often experience the continuing effects of the off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus." U.S. Department of Education, Office for Civil Rights, Dear Colleague Letter: Sexual Violence, at 4 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20 I 104.pdf (hereinafter "Dear Colleague Letter on Sexual Violence")

43. According to the OCR, a hostile environment can be created if the conduct:

> [T]akes place throughout the school, or if the taunts are made by a number of students. The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., *attempts to grab a female student's breast* . . . it need not be as persistent to create a hostile environment. *See* Revised Sexual Harassment Guidance, at 6 (emphasis added).

The sexual harassment directed towards ▮▮▮ was both pervasive and severe enough to create a hostile environment according to the OCR. The OCR Guidance also notes that younger students are more likely to be intimidated if the sexual harassment conduct is coming from an older student. *See* Revised Sexual Harassment Guidance, at 7.

As detailed above in the Factual Allegations, in addition to a decline in her grades, ▮▮▮ suffered severe mental and emotional distress, including depression and anxiety, and was diagnosed with PTSD. The stress related to the sexual harassment and the school's inadequate measures to protect her caused ▮▮▮ to miss at least ten days of school between November 21, 2011 and February 10, 2012. ▮▮▮ finally reached a point when she could no longer be in school, and at the recommendation of her doctor, she received Homebound Instruction. Additionally, on July 19, 2012 an FCPS psychologist determined that ▮▮▮ had an emotional disability and was eligible for an Individualized Education Program (IEP).

44. Title IX requires schools to take specific steps in response to allegations of sex discrimination. If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects. *See* Dear Colleague Letter on Sexual Violence, at 4.

45. When a harassed student, his or her parent, or a third party files a complaint or otherwise requests the school's assistance in dealing with harassment, the school "must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation." Dear Colleague Letter on Sexual Violence, at 4. Specifically, if the school finds that a student is being sexually harassed, it must "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." *Id.* If a school has notice but "fails to take prompt, effective action," then "the school's own inaction has

permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex." Revised Sexual Harassment Guidance, at 12.

46. If the investigation reveals that harassment has occurred, the school must take prompt and effective steps "reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." *Id.* at 15; *see also* Dear Colleague Letter on Harassment and Bullying, at 2. Appropriate steps to end harassment will depend on the circumstances, but may include providing counseling to the target and/or harasser(s), taking disciplinary action (and/or escalating consequences) against the harasser(s), providing special training for the school community, disseminating information, issuing new policy statements, or taking other steps designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports the conduct. *See* Revised Sexual Harassment Guidance, at 16; Dear Colleague Letter on Harassment and Bullying, at 3. OCR has said that:

> A school [] may be required to provide additional services to the student who was harassed in order to address the effects of the harassment, particularly if the school initially delays in responding or responds inappropriately or inadequately to information about harassment. Dear Colleague Letter on Harassment and Bullying, at 3 (emphasis added).

47. Such "additional services" may include grade changes, allowing a student to re-take a course, providing tutoring, making tuition adjustments, offering reimbursement for professional counseling, or taking "other measures that are appropriate to the circumstances." Revised Sexual Harassment Guidance, at 16-17.

48. Possible remedies that schools should consider include, but are not limited to, escorting, so the student can move safely between classes and providing counseling services. *See* Dear Colleague Letter on Sexual Violence, at 16.

49. To comply with Title IX, the school must conduct an adequate, reliable, and impartial investigation and adjudication of complaints, including the opportunity for both parties to present witnesses and other evidence; designated and reasonably prompt time frames for the major stages of the complaint process; an assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate. Dear Colleague Letter on Sexual Violence, at 9.

**RELIEF REQUESTED**

50. ████████ requests that:

    a. The Washington, D.C. OCR investigate Rachel Carson Middle School, a Fairfax County Public School ("FCPS"), to determine whether it is allowing discrimination on the basis of sex under its education program. *See* 42 U.S.C. § 1681(a).

    b. The Washington, D.C. OCR take all necessary steps to remedy any unlawful conduct identified in its investigation or otherwise on the part of Rachel Carson as required by Title IX and its implementing regulations. 34 C.F.R. § 106.3(a).

    c. If any violations are found, the Washington, D.C. OCR secure an assurance of compliance with Title IX from FCPS, as well as full remedies for the violations found. See U.S. Department of Education, Office for Civil Rights, *OCR Case Processing Manual* § 304 (Jan. 2010), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html#I_8 (setting forth guidelines for resolution agreements).

    d. The Washington, D.C. OCR monitor any resulting agreements with FCPS to ensure that compliance with Title IX is achieved.

        Respectfully submitted,

        *[signature]*

        Fatima Goss Graves
        Lara S. Kaufmann
        Devi M. Rao
        National Women's Law Center
        11 Dupont Circle, NW, Suite 800
        Washington, D.C. 20036

        Date: August 6, 2012

# Exhibit "B"



NATIONAL
WOMEN'S
LAW CENTER
EXPANDING THE POSSIBILITIES

November 1, 2012

*Via Email Josie.Evola@ed.gov and Samatha.Shofar@ed.gov*
*and U.S. Postal Service*

Josie Evola
Samantha Shofar
U.S. Department of Education
Office for Civil Rights
Region XI
400 Maryland Avenue, SW
Washington, DC 20202-1475

     **Re:**    **OCR Docket No. 11-12-1529**

Dear Ms. Evola and Ms. Shofar:

      On August, 6, 2012, the National Women's Law Center filed a complaint with OCR on behalf of our client, ███████████, and her minor daughter, ████████████ regarding ████'s treatment at Rachel Carson Middle School ("the school") in the Fairfax County Public School system ("FCPS"). OCR opened its investigation on September 19, 2012. We write to provide additional information that may assist with your investigation and to elaborate on the remedies necessary to make our client whole, which should be part of any resolution of this matter.

*FCPS's failure to investigate Bella's rape by fellow student*

      As noted in the initial complaint, Christian Kornegay forcibly sodomized ████ on or about November 9, 2011 after she was dropped off by the school bus. ████ tried to run away from Christian, but he caught her and raped her in the bushes of a private yard next to a house adjacent to the bus stop. Christian threatened to kill ████'s family if she told anyone. Consistent with the behavior of many sexual assault victims, initially ████ did not report the rape to her parents, the school, or the police.[1]

---

[1] According to the Bureau of Justice Statistics, between 2006 and 2010 nearly two-thirds (65%) of rapes and sexual assaults were not reported to the police. More than one-quarter of unreported rapes or sexual assaults were not reported because the victim was afraid of reprisal or getting the offender in trouble. *See* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice, VICTIMIZATIONS NOT REPORTED TO THE POLICE, 2006-2010, at 4 (Aug. 2012), *available at* http://www.bjs.gov/content/pub/pdf/vnrp0610.pdf.

On or about March 1, it was discovered through therapy that ███ was raped. The following morning, Friday, March 2, 2012, the ███████ filed a police report. The police officer taking the report "escalated" the case to the sex crimes division. On Monday, March 5, 2012, the ███████ met with Detective Chambers, who was assigned to the case, at the Child Help Center of Fairfax County and ███ underwent a medical evaluation.

Nurse Diane Burkart, one of the nurses who conducted the Sexual Assault Nurse Examiner (SANE) evaluation, took ███ to ███'s bedside and showed ███ with a magnifying camera where Nurse Burkart identified contusions in ███s anus. Nurse Burkart told ███ that the initial injury looked like it had tried to heal over several times, and that the results of the evaluation corroborated ███'s story of anal penetration. ███ recounted to Nurse Burkart that she had seen blood in the back of ███'s underpants the prior fall while doing laundry, but had assumed it was related to menstrual bleeding. The ███ do not have documentation of the results of the evaluation because Nurse Burkart told ███ that she was not allowed to release them.

On Tuesday, March 6th, Detective Chambers met with the principal of the school, August Frattali, to discuss the police investigation into the rape. On March 7, ███'s physician recommended to the school that she remain in homebound instruction through the end of the school year, stating "The boy who perpetrated this crime plus many of his friends who assisted him remain in Rachel Carson middle school. This is not a safe environment for her to return to mentally/emotionally" (Exhibit H to Complaint).

In a June 29, 2012 letter from FCPS Assistant Superintendent Zuluaga to Ms. ███, FCPS acknowledged that in March 2012 it learned that the ███████ had filed a police report alleging that ███ was raped outside of school by another student. FCPS admitted that it relied on the police's investigation of the allegations. It took no steps to either independently investigate the allegations or put measures in place to ensure that ███ could return to a safe and supportive school environment. Unfortunately, FCPS failed to understand its obligations under Title IX.

First, the fact that the assault occurred off school grounds does not necessarily relieve the school of its obligation to investigate. As OCR explained in its April 2011 Dear Colleague Letter:

> Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. . . . *Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged*

2

> *perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment.*[2]

Thus, as soon as it learned about the off-campus rape, FCPS should have reassessed the harassment ▮▮▮ had already reported at the hands of Christian and his friends—and its response to the harassment—in light of its newfound knowledge of the assault. Instead, it did nothing.

Further, the fact that police, as opposed to the ▮▮▮▮, initially reported the assault to the school does not absolve the school of its duty to investigate the allegations of harassment: "Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, *a school that knows . . . about possible harassment must promptly investigate* to determine what occurred and then take appropriate steps to resolve the situation."[3]

Finally, contrary to FCPS's position in its letter to Ms. ▮▮▮ the outcome of the police investigation has no bearing on the school's Title IX obligation to conduct an independent investigation using the preponderance of the evidence standard. The April 2011 Dear Colleague Letter provides that:

> Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or *reports are not determinative of whether sexual harassment or violence violates Title IX.* Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.[4]

In short, FCPS utterly failed in its obligation to promptly investigate ▮▮▮'s allegation of sexual assault.

### *Police Investigator's Conflict of Interest*

As noted above, regardless of the outcome of the police investigation, the school had its own duty to investigate. Moreover, in this case in particular, an independent investigation by the FCPS Title IX Coordinator was especially necessary due to the police investigator's potential conflict of interest.

Detective Frederick Chambers of the Fairfax County Police was assigned to investigate ▮▮▮'s allegations of harassment. He currently works in the Child Abuse

---

[2] U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Sexual Violence 4 (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (emphasis added).
[3] *Id.* (emphasis added)
[4] *Id.* at 10 (emphasis added).

Squad of the Major Crimes Division. However, until recently, Chambers was the School Resource Officer at the school.[5] During his tenure at the school, Chambers arranged for Principal Frattali to ride in a police helicopter, and Principal Frattali has praised Chambers for his work at the school.[6] The school's staff repeatedly nominated Chambers for a local award that he finally won after four years at the school.[7] Chambers' close connection with the school and its staff raises questions as to his ability to conduct an unbiased investigation regarding allegations of a violent sexual assault by a student at the award-winning[8] school.

*Remedies*

In addition to the policy changes that would bring FCPS into compliance with Title IX, FCPS must reimburse the ████ for the quantifiable costs the family has had to bear—and will continue to bear—as a result of FCPS's discriminatory treatment. As a result of the sexual harassment ███ experienced and FCPS's failure to adequately investigate and stop the conduct, the ████ have, to date, incurred approximately $12,000 in therapy, medical bills, and treatment programs to deal with ██ 's diagnosed depression, anxiety, and post-traumatic stress disorder. ███ 's treating doctor estimates she will need to continue treatment for at least two more years.

Furthermore, ███ 's parents will likely expend significant costs in providing ███ with an appropriate educational environment. At the recommendation of ███ 's psychologist, ██ is still receiving homebound instruction through FCPS, but the ████ hope ██ will be well enough to transition back to school soon. However, as confirmed by the FCPS psychologist, when ███ returns to school she should be in classes with no more than eight to ten students. The ████ believe that the FCPS system cannot provide ███ with an appropriate learning environment, and beginning next semester they hope to send ███ to a small, academically-rigorous private school for her last semester of middle school and high school—a total of 4.5 years of education at significant cost.

Finally, the ████ have endured a great deal of emotional distress based on the events that are the subject of this complaint, both at the time those events occurred, and since that time. To remedy the distress and humiliation ███ and her family suffered because of FCPS's actions, they request that FCPS apologize to ███ and issue a press release explaining the agreement it has come to with OCR and its willingness, moving forward, to address bullying, sexual harassment, and sexual assault.

---

[5] *See* Fairfax County Virginia, School Resource Officers Prepare for Back-to-School, *at* http://www.fairfaxcounty.gov/police/topics/081909sro.htm (last visited Nov. 1, 2012).
[6] *See* News Release, Fairfax County Public Schools, Fred Chambers Named FCPS 2009 Distinguished SRO (May 27, 2009), *at* http://commweb.fcps.edu/newsreleases/newsrelease.cfm?newsid=1185.
[7] *See* Mike DiCiccio, *Officer Educates While Enforcing: Rachel Carson Middle School Policeman Named School Resource Officer of the Year*, HERNDON CONNECTION, June 10, 2009, *available at* http://connection.membershipsoftware.org/article.asp?article=329547&paper=66&cat=104
[8] *See* Fairfax County Public Schools, Carson Middle School Profile, *at* http://commweb.fcps.edu/schoolprofile/profile.cfm?profile_id=171 (last visited Nov. 1, 2012).

Moreover, the National Women's Law Center is a non-profit organization that has taken on representation of the Complainant pro bono and has put in a significant amount of time working to resolve this matter over the course of the last six months, including attorney time in drafting the complaint, phone calls, and a meeting with FCPS. We have complete documentation of our time spent and expenses, and will make them available to OCR upon request.

### New Facts Regarding Bella's Harassment

Over the past couple of months, additional information about Christian's sexual violence toward ███ has come out in therapy. The ███ have not reported this information to the police or to FCPS, as they are not sure that ███ is ready yet to be interviewed regarding the newly-discovered incidents.

███ has explained that the rape reported in early March was one of multiple anal rapes occurring off-campus during a period between approximately November 1, and November 17, 2012. In more than one of these instances, Christian used a knife to frighten and intimidate ███ He cut her on her forearms and the top of her inner thighs, near her groin. ███ was able to hide the cuts and scars under long sleeves because it was fall. She was afraid that Christian would kill her or her family if she told anyone, as he had threatened to do.

******

If you have any questions, please contact either of us at (202) 588-5180 or nchaudhry@nwlc.org and lkaufmann@nwlc.org. Thank you so much for your prompt attention to this matter.

Sincerely,

Neena Chaudhry
Senior Counsel &
Director of Equal Opportunities for Athletics

Lara S. Kaufmann
Senior Counsel & Director of
Education Policy for At-Risk
Students

# Exhibit "C"

**Voluntary Resolution Agreement**
**Fairfax County Public Schools**
**OCR Complaint No. 11-12-1529**

This Resolution Agreement (Agreement) resolves a sexual harassment allegation raised in a complaint filed on September 19, 2012, with the U.S. Department of Education, District of Columbia Office for Civil Rights (OCR) against the Fairfax County Public Schools (Division), specifically the Rachel Carson Middle School (the School). The National Women's Law Center filed this complaint on behalf of a parent (Complainant) and her daughter (the Student) alleging that the Division discriminated against the Student on the basis of sex during 2011-2012 school year when it failed to promptly and appropriately respond to notice that the student was being sexually harassed by students at the School. OCR recognizes that the Division has taken several actions that reflect a good-faith effort to satisfy the requirements and the spirit of Title IX of the Education Amendments of 1972. This Agreement does not constitute an admission by the Division of any violation of Title IX of the Education Amendments of 1972 (Title IX), or any other law enforced by OCR. Further, OCR has made no determination that the Division has violated Title IX or any other law enforced by OCR, and full implementation of this Agreement by the Division resolves the allegations in OCR Complaint No. 11-12-1529.

With the understanding that this Agreement does not constitute and is not to be interpreted as any acknowledgement or admission of noncompliance with applicable law or liability on the part of the Division or its employees, this Agreement has been entered into in order to reach a more prompt resolution and to help ensure the Division's existing and future compliance with Title IX of the Education Amendments of 1972 (Title IX). This Agreement, when fully implemented, will resolve the issue(s) contained in the complaint.

## STUDENT AND COMPLAINANT PROVISIONS

1. The Division will reimburse the Complainant for certain specified, reasonable, actual otherwise unreimbursed out-of-pocket costs incurred for the Student's receipt of private counseling and certain other services which Complainant maintains have been incurred to address issues related to the sexual harassment alleged in the Complaint. The date, provider, nature, and amount of each of these expenses is specified in Addendum 1 to this Agreement It is specifically agreed and understood that this payment does not constitute any admission or agreement by FCPS of liability, or that these costs are related to any actions or omissions of FCPS or its employees. It is further understood and agreed that FCPS has agreed to pay these costs solely in a good faith effort to resolve this complaint, and that any such payment is not intended to be admissible in any legal proceeding. These costs, according to the affirmative representations of the Student's parents to OCR and OCR's independent verification of documentation as to the nature, date, and provider of the services, and amount and proof of actual payment from the Complainant, consist of:

a. Counseling services received, including inpatient counseling, that Complainant maintains are related to sexual harassment alleged in the complaint, incurred from November 21, 2011 through March 1, 2013. The total amount of reimbursement for these charges will equal $5,750, as provided in Addendum 1, and will not include any future medical or counseling costs.

b. Certain other services during the period from February 10, 2012 through March 1, 2013, during the traditional school year while the student was on homebound. The total amount of reimbursement for these charges will equal $2,131.70, as provided in Addendum 1, and will not include any future costs.

**REPORTING REQUIREMENT:** Within 90 days of the signing of this Agreement, the Division will provide OCR with documentation showing that it has complied with this section of the Agreement.

2. Within 10 calendar days of the date of this agreement, the Division will notify the Complainant in writing that:

a. It is reviewing its determinations regarding whether a sexually hostile environment occurred while the Student was enrolled at the School during the 2011-12 SY.

b. It is inviting the Student to return to school in the Division and will ensure, through the pupil placement process, that the Student has the opportunity to be enrolled at a school at which none of the alleged harassers who have been identified by OCR to counsel for the Division is enrolled. Since the Student was receiving services under an IEP at the time she withdrew from the Division, the Division will timely reevaluate the Student and, if appropriate, offer a new IEP and educational placement. Pending that reevaluation, the Student will receive educational services pursuant to her last agreed-upon IEP dated August 29, 2012. Should the Student and Complainant seek pupil placement at a school other than the Student's then-current base school pursuant to FCPS Reg. 2230.12, part IV, the Division will make all reasonable efforts to accommodate such a request, and if unable to accommodate the Complainant's placement request will provide documentation to OCR of the reason therefor. In its notice to the Complainant, the Division will also include an offer to the Complainant to provide interim measures while the Division is reinvestigating the alleged sexual assault, if the Student is attending a Division school during such period, such as ensuring that the Student is separated from the alleged harassers and designating a school employee to provide daily check-ins with the Student to ensure that she feels comfortable and to whom she can report any concerns of harassment.

c. The Division's Title IX Coordinator will ensure that an adequate safety plan is put in place and implemented for the Student.

**REPORTING REQUIREMENT:** Within 15 calendar days of the date of this agreement, the Division will provide OCR with documentation of the notice to the complainant required in this provision.

Should the Complainant decide to return to a school in the Division, within 15 calendar days of the Student's return, the Division will provide OCR a copy of a safety plan for the Student with the name and title of each individual responsible for implementing each part of the plan.

3. Within 60 calendar days of the date of this agreement, the Division will conduct a prompt and equitable further investigation of the alleged sexually hostile environment at the School while the Student was enrolled at the School during the 2011-12 SY. The Division's investigation will include a review of the alleged sexual assault at issue in the instant complaint, the opportunity for the Student and her parent to present witnesses and other evidence, a review of the disciplinary file for each accused student to determine whether other students have made allegations of unwelcome conduct of a sexual nature against the accused, an interview of each of the accused students, and interviews of all witnesses; will be documented; and will be maintained in a central database or location within the Division (see item 3.e. of the Policies and Procedures section below). The review will take into account all allegations of unwanted conduct of a sexual nature, such as spreading sexual rumors or sexual name-calling, and will include a determination as to whether the alleged sexual assault contributed to the alleged sexually hostile environment at the School. The Division will provide written notice to the parties of the outcome of the investigation and the steps it will take to prevent the recurrence of any discrimination and to correct any hostile environment created at the School.

**REPORTING REQUIREMENT:** Within 15 calendar days of the conclusion of its investigation, the Division will provide OCR with documentation of its investigation including interview notes, investigative reports, written findings, and records of any corrective action taken, including any disciplinary action.

4. Within 15 calendar days after OCR approves the Division's investigation and any proposed remedies (such as counseling or discipline for the accused harasser or counseling or compensatory education for alleged victim), the Division will provide written notice to the parties of the outcome of the investigation and, if appropriate, of any steps it will take to prevent the recurrence of discrimination and to correct the hostile environment created at the School.

**REPORTING REQUIREMENT:** Within 15 calendar days of the notice provided to the Complainant, the Division will provide OCR a copy of the written notice.

## ANTI-HARASSMENT STATEMENT

By September 2, 2014 or sixty days after the signing of this agreement (whichever occurs later), the Superintendent will issue a statement, in a form including but not limited to the content in Exhibit A, to all Division students, parents and staff via e-mail that will be posted in prominent locations at the Division's schools, and published on schools' and the Division's website, stating that the Division does not tolerate acts of sexual or gender-based harassment. The statement will encourage any student who believes he or she has been subjected to sexual or gender-based harassment to report the harassment to the Division and note the Division's commitment to conducting a prompt investigation. The statement will include the appropriate contact

information for the designated staff member to whom students and parents may report allegations of harassment. The statement will indicate that counseling and educational resources will be available to both students who are harassed and students found to have engaged in acts of sexual or gender-based harassment; it will also warn that harassers may be disciplined including, if circumstances warrant, suspension or expulsion. The statement will encourage students, parents and Division staff to work together to prevent sexual and gender-based harassment. The Division will distribute this statement in languages other than English, as necessary.

**REPORTING REQUIREMENT:** By September 17, 2014, the Division will provide a draft of the anti-harassment statement to OCR for review and approval. Within 5 days of OCR's approval of the anti-harassment statement, the Division will issue the statement as required in the immediately preceding provision, and provide OCR with links to the policy posted on school and Division web sites and documentation that parents, students and staff received the statement.

<u>POLICIES AND PROCEDURES</u>

1. By August 31, 2014, or within 30 days of approval of its proposed procedures by OCR as provided below, in consultation with the Mid-Atlantic Equity Center (MAEC) or another OCR- approved consultant, who may be a staff member of the Division, with expertise in addressing sexual harassment and sexual violence in a K-12 setting (Equity Consultant), the Division will review Regulations 4950.3 (Human Resources, Equity and Compliance, Sexual Harassment), 4952.1 (Human Resources, Equity and Compliance, Investigation of Complaints of Discrimination or Harassment Based on Race, Sex, Color, Religion, National Origin, Age or Disability, and 2601 (Student Rights and Responsibilities) to determine how to appropriately reinforce that these regulations provide for prompt and equitable resolution of allegations of sex discrimination, including sexual harassment and gender-based harassment as required by Title IX. The Division will revise these regulations as necessary or develop a new procedure applicable to allegations of student-to-student sexual harassment to, at a minimum, provide for:

   a. The definition of sexual and gender-based harassment;
   b. Notice and scope of the procedures, including who may file and who is subject to the procedures;
   c. To whom an allegation of sexual or gender-based harassment should be addressed, including name, title, and contact information;
   d. Mandatory reporting by teachers, administrators, and staff of alleged sex discrimination of which they become aware, including sexual harassment;
   e. Reasonably prompt timeframes for all major steps in the procedure;
   f. Adequate, reliable, impartial investigation;
   g. Interim measures pending the outcome of an investigation;
   h. Protection against retaliation;
   i. Confidentiality;
   j. An assurance that the Division will take steps to prevent the recurrence of any sexual and gender-based harassment and correct its discriminatory effects on the complainant, and others if appropriate, and eliminate any hostile environment;
   h. Written notice to the parties of the outcome of the investigation;
   i. If the process includes an appeal, equitable appeal rights for the parties;

Page 5 of 12 - OCR Complaint No. 11-12-1529

    j. The Name, title, and contact information at each school in the Division for the individual designated to answer questions related to the Division's Title IX policy and procedures.

    k. The Name, title, and contact information for the Division's Title IX Coordinator.

**REPORTING REQUIREMENT:** No later than thirty days after the signing of this agreement, the Division will provide OCR with its proposed procedure for review and approval.

2. Within 30 days of OCR's approval of the sexual harassment procedure as provided in item 1 above, the Division will widely publicize the policy and procedure by sending written notification to students, parents, and employees; at the next regular printing of publications directed at students and parents, publishing the policy and procedure; and posting a link to the policy and procedure in an easily accessible location on the Division's web site. In so doing, the Division will ensure that there is a clear explanation, including cross-referencing related policies and procedures, for how a parent or student may file a complaint of sexual harassment in the Division and what the procedure will be if a parent or student does so.

**REPORTING REQUIREMENT:** Within 15 days of finalizing the policies and procedures, and publicizing them pursuant to the preceding paragraph, the Division will submit to OCR documentation that it has publicized these policies and procedures, including an email link to its website evidencing publication of the policies and procedure and a copy of the written notice to students, parents and employees.

3. By no later than sixty days after the signing of this agreement, in consultation with the Equity Consultant, the Division will develop a written procedure for its staff on how to investigate and respond to complaints of sexual and gender-based harassment. The procedure will include:

    a. The definition of sexual and gender-based harassment;

    b. A clarification that mediation is not an appropriate approach for resolving complaints of sexual and gender-based harassment unless it is mutually agreeable and the allegations do not involve complaints of assaults and other sexual violence;

    c. A statement that the Division's obligation to respond to complaints of sexual and gender-based harassment does not change when the alleged student victim withdraws or graduates from the Division;

    d. A process for investigating and documenting sexual and gender-based harassment allegations, including how to conduct interviews with the alleged harasser, victim, and other witnesses; the responsibility to keep the parties informed about the status of the investigation; the implementation of any interim measures; the standard for determining whether harassment occurred; and notifying the parties of the outcome;

    e. A direction to follow the investigative procedure regardless of whether the alleged harassment is also being investigated by a law enforcement agency, unless the fact-finding process would impede the law enforcement investigation; in such cases the Division will implement appropriate interim steps to provide for the safety of the victim and the school community and the avoidance of retaliation; the Division will

promptly resume its Title IX investigation as soon as notified by the law enforcement agency that it has completed the evidence gathering portion of its proceeding;

f.  A plan, outlining steps and associated time frames, for the creation of a centralized database in the Division in which documentation of Division investigations and outcomes of sexual and gender-based harassment allegations are compiled and maintained (the Plan);

g.  The creation of an interim system of centralized data collection that documents Division investigations and outcomes of sexual and gender-based harassment allegations. The Division will implement this interim system until the plan required in provision 3.f. is fully implemented and the centralized database operational.

h.  The steps necessary to ensure that the school environment is free from harassment, including disciplinary measures for the harasser, remedies for the victim (such as counseling, expunging disciplinary records, tutoring services, and separating the students), and environmental measures for the student body; and

i.  The Division personnel (by name and title), including that of the Title IX Coordinator, responsible for coordinating schools' responses to complaints of sexual and gender-based harassment.

**REPORTING REQUIREMENT:** By August 31, 2014, the Division will provide OCR with its proposed Plan, referenced in Provision 3.f., and a description of its interim system, referenced in Provision 3.g., for OCR's review and approval.

**REPORTING REQUIREMENT:** By August 31, 2014, the Division will provide OCR with its proposed procedure for OCR's review and approval.

4.  Within 15 days of OCR's approval of the procedure, the Division will post this procedure on its website and distribute this procedure to the Title IX Coordinator, all administrators, and any individuals responsible for investigating and/or responding to sexual and gender-based harassment complaints.

5.  Immediately upon OCR's approval of the Plan interim system referenced in Provision 3.g., the Division will begin implementation of the Plan and the interim system.

**REPORTING REQUIREMENT:** Within 30 days of OCR's approval of the procedure, the Division will provide documentation to OCR that it posted this procedure on its website and distributed this procedure to the Title IX Coordinator, all administrators, and any individuals responsible for investigating and/or responding to sexual and gender-based harassment complaints.

**REPORTING REQUIREMENT:** Within 30 days of OCR's approval of the Plan, and every 60 days thereafter, the Division will provide OCR with a status update on implementation of the Plan.

6.  By August 31, 2014, the Division will ensure that its description of the Title IX Coordinator's responsibilities and training requirements, if it already has one, include, at minimum, the coordination of investigations of all Title IX complaints, and regularly developing and participating in activities designed to raise awareness in the Division's

community about student-to-student sexual and gender-based discrimination and harassment. If the Division does not already have such a description, the Division will develop one. If the Division decides to designate these responsibilities to another employee, it will make clear the scope of each designated individual's duties and will ensure that the Title IX Coordinator has ultimate oversight responsibility over such issues.

**REPORTING REQUIREMENT:** By September 15, 2014, the Division will provide OCR with documentation that it has implemented this item, including the name and title of the Title IX Coordinator or designee(s) and a copy of the job descriptions and training requirements for the position(s) for review and approval.

**REPORTING REQUIRMENT:** Within 15 days of OCR's approval of the Title IX Coordinator's description, the School will provide OCR with documentation that the Division's Title IX Coordinator has met these requirements.

## EDUCATION AND TRAINING

1. Prior to the beginning of the 2014-2015 school year, the Division will, through OCR and/or the Equity Consultant, and in conjunction with its own staff at the Division's option, provide mandatory Title IX training (including training on sexual and gender-based harassment, how to conduct and document a sexual harassment investigation, the appropriate standards to determine whether a sexually hostile environment exists and how to formulate any corrective actions) to its Title IX Coordinator and all other Division personnel involved in processing, investigating, and/or resolving complaints of sexual harassment, specifically principals and assistant principals, or who will otherwise coordinate the Division's compliance with Title IX.

   **REPORTING REQUIREMENT:** By September 30, 2014, the Division will provide OCR with a copy of the sign-in sheets or other written verification that the above-described training has occurred and the names and titles of those who attended.

2. By the end of the first semester of the 2014-15 school year, and annually thereafter, the Division will develop, with the assistance of the Equity Consultant, and provide Title IX training to all Division instructional, paraprofessional, and counseling staff. At a minimum, the training will include:
   a. guidance to increase awareness of what constitutes sexual harassment and gender-based harassment, among students or involving a student victim, including the hostile environment theory;
   b. A review of the Division's responsibility under its own policy and Title IX to address allegations of harassment, including specific guidance on the School's grievance procedures, what constitutes sexual and gender-based harassment, the Division's responsibility for responding to sexual harassment whether or not a grievance is filed and regardless of whether the actions are potentially criminal in nature, how to report possible harassment, and how to respond to sexual harassment when a student is no longer enrolled in the School; and

    c. Notice that failure to respond appropriately to notice of sexual harassment violates the Division's policy and federal law.

**REPORTING REQUIREMENT:** Within _45_ days of the training described in Item #1 above, the Division will schedule the trainings described in Item #2 above. Within 30 days of scheduling each training, the Division will provide OCR with the name and qualifications of the trainer and an outline of the training content for OCR approval. Within 30 days of the completion of each training, the Division will provide copies of sign-in sheets or other documentation of participation from each training session.

3. The Division, in consultation with the Equity Consultant, and consistent with applicable law, will continue its efforts to provide ongoing age-appropriate student education at all grade levels designed to increase awareness of sexual and gender-based harassment, inform students of the consequences of sexual and gender-based harassment, explain to students what they should do if they believe they or another student is being harassed based on sex/gender, and encourage students to report sexual harassment. The education materials will use age-appropriate terminology and the instruction will promote sensitivity to and tolerance of the diversity of the student body, and will specifically address harassment issues related to sex and gender.

**REPORTING REQUIREMENT:** By September 2, 2014, the Division will provide OCR with copies of the curriculum at each grade level or the name and description of the education materials that it intends to provide, for review and approval. At the same time, the Division will provide OCR with an estimate of the times during the 2014-2015 school year when the instruction will occur. Within 60 days of receiving OCR's comments, the Division will provide OCR with a schedule for the preparation of any additional curriculum or instruction that may need to be developed and then provide these materials for OCR's review and approval in accordance with this schedule. As the additional curriculum and instructional materials are approved by OCR and the Division, they will be provided to Division students.

**REPORTING REQUIREMENT:** Within 60 days of OCR's approval of the Division's education materials, the School will begin to implement the curriculum or education referenced in the foregoing paragraphs. The Division will provide student education during each successive year. By June 30th of the 2014-2015 and 2015-2016 school years, the Division will provide confirmation to OCR that the sessions occurred.

SCHOOL CLIMATE

1. In consultation with the Equity Consultant, and consistent with applicable law, the Division will develop or adopt, and administer at the middle and high school level, age appropriate school climate surveys, or another appropriate method of assessing school climate (which may, without limitation, include sampling methodology, focus groups or interviews), to be used on an annual basis for students and staff to assess the effectiveness of steps taken pursuant to this agreement or otherwise by the Division to ensure that it is free of sexual and gender-based harassment.

   REPORTING REQUIREMENT: By July 15, 2014, 2014 the Division will take necessary steps to ensure that the Fairfax County Youth Survey, annually beginning with the 2014 administration, includes questions on instances of being the victim, and/or perpetrator, of sexual harassment. By January 30, 2015 the Division will provide OCR a draft of further proposed changes to the state or local climate survey and/or other appropriate assessment methodology, for review and approval.

2. Based on the results of the climate assessment and in consultation with the Equity Consultant, the Division will take steps to continue to ensure that it is free of sexual and gender-based harassment.

   REPORTING REQUIREMENT: By February 15, 2015, and annually thereafter, the Division will administer the climate survey and/or other assessment methodology and provide OCR with an overview of the assessment methodology employed. By July 1, 2015, the Division will provide OCR with a summary of the results, and annually thereafter until such time as OCR closes the monitoring of this case.

   REPORTING REQUIREMENT: By September 30, 2015, and annually thereafter until such time as OCR closes the monitoring of this case, the Division will provide OCR with a list of steps it will take in response to the results of the climate assessment.

3. In order to provide the opportunity for further consultation and input concerning the issue of peer sexual harassment, the Division's Human Relations Advisory Committee, with input from community stakeholders including parents, students, and teachers, will assess the Division's efforts to eliminate any hostile environment and its effects, and prevent harassment from recurring. The Committee will have the same privileges as other Division-level advisory committees, including access to meeting space and public notice about the committee. The Committee will:
   a. Recommend strategies for preventing harassment, and for ensuring that the students understand their right to be protected from discrimination, including harassment;
   b. Provide input to Division officials regarding strategies to ensure students understand how to report possible harassment and are aware of the School's obligation to promptly and effectively respond to sexual and gender-based

Page 10 of 12 - OCR Complaint No. 11-12-1529

     harassment complaints and how, and if, outreach efforts to families can be made to obtain support for the School's anti-harassment program; and

  c. The Division will consider the recommendations of the Committee and involve the Committee in the planning, monitoring, and implementation of the recommendations the Division accepts.

**REPORTING REQUIREMENT:** By September 30, 2014, and on the same date annually throughout the course of the monitoring of this agreement, the Division will provide OCR with copies of notices and other information available to students and their families about the Committee and its meetings and activities, a list of the persons who have joined the Committee, and a report summarizing any relevant reviews and/or recommendations and the Division's responses to the recommendations and suggestions (including whether and how they were implemented). OCR will provide the Division with feedback on the recommendations, and the Division will provide OCR documentation within 30 days of each step it takes to address the recommendations of the advisory committee and OCR's feedback.

## SEXUAL HARASSMENT COMPLAINTS

1. Coordination with Local Law Enforcement Agencies
   a. The Division will explore opportunities for enhanced communication and collaboration with the Fairfax County Police Department.
   b. Efforts at improved collaboration may include mutually sharing information about:
      i. The types of complaints involving unwelcome conduct of a sexual nature the Division and local law enforcement will investigate; the standard of proof and type of evidence obtained in each type of investigation; and the type of resolution available in each type of case;
      ii. The investigative process for the Division and for local law enforcement and any areas where the Division and local law enforcement can collaborate in their investigations and/or share evidence; and
      iii. The manner in which the Division and local law enforcement releases findings and the implications of these findings.

**REPORTING REQUIREMENT:** Within 45 days of the execution date of the Agreement, the Division will provide OCR with documentation showing the Division has complied with the provisions of this section of the Agreement, including summaries of the information obtained and any actions taken in response to this information.

2. Within 30 days of the end of each school semester of the 2014-2015 and 2015-2016 school years, the Division will provide to OCR a random sample of the information maintained in the centralized database broken up by the Division's regions regarding the reporting, investigation and disposition of each incident of alleged sexual and gender-based harassment, which occurred in the immediately preceding semester in the Division. Specific information concerning individual complaints including the complaint itself,

incident report, correspondence (including e-mail) or other written description of the allegations, and a copy of any documentation of the Division's response, including interview notes, investigative reports, written findings, and records of any corrective action taken, including any disciplinary action, will be available upon request by OCR.

**REPORTING REQUIREMENT:** Within 30 days of the end of each semester until the monitoring of this Agreement ends, the Division will provide OCR with the information described above.

The Division understands that OCR will not close the monitoring of this Agreement until OCR determines that the School has fulfilled the terms of this Agreement and is in compliance with the regulation implementing the provisions Title IX of the Education Amendments of 1972 and its implementing regulation at 34 C.F.R. Part 106, which were at issue in this case. The Division understands that by signing this Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement. Further, the Division understands that during the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms of this Agreement and is in compliance with the regulation implementing the provisions of Title IX of the Education Amendments of 1972 and its implementing regulation at 34 C.F.R. Part 106, which were at issue in this case.

The Division understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of this Agreement. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce this Agreement, OCR shall give the Division written notice of the alleged breach and a minimum of sixty (60) calendar days to cure the alleged breach.

Karen K. Garza, Ph.D.                                    August 11, 2014
Superintendent of Schools                              Date
Fairfax County Public Schools

### Exhibit A: FCPS Anti-Harassment Statement

Fairfax County Public Schools ("FCPS") does not tolerate acts of sexual or gender-based harassment. Any student who believes that he or she has been subjected to sexual or gender-based harassment, any parent of such a student, or any student who believes that another student is being subjected to sexual or gender based harassment is encouraged to report the harassment to FCPS, specifically to [FCPS official & contact information]. Any administrator who believes that a student is being subjected or sexual or gender based harassment is required to report such suspected harassment to the above named individual. FCPS is committed to conducting a prompt, thorough, and impartial investigation of any such reports. Interim measures will be available to students who have alleged harassment and students accused on sexual or gender based harassment, including but not limited to separation pending the outcome of an investigation, counseling, and educational resources.

If the investigation reveals that sexual harassment created a sexually hostile environment FCPS will take prompt and effective steps to end the harassment, eliminate the hostile environment, and prevent its recurrence, including continuing the interim measures as necessary to protect the complainant and ensure his or her safety. Students found to engage in acts of harassment or other acts that create a hostile environment will be dealt with promptly, including where appropriate by discipline that may include, if circumstances warrant, suspension or expulsion. FCPS encourages students, parents and staff to work together to prevent harassment of any kind.

4852-3629-9034, v. 1

OCR Complaint No. 11-12-1529
Addendum 1

Counseling Services 11/21/11-3/1/13

| | |
|---|---|
| 3/2/12 | 140.00 – pd. Invoice |
| 3/20/12 | 135.00 – pd. Invoice |
| 3/21/12 | 135.00 – pd. Invoice |
| 3/26/12 | 135.00 – pd. Invoice |
| 6/10/12 | 125.00 – pd. Check |
| 6/18/12 | see below |
| 6/20/12 | 250.00 – pd. Check |
| 6/27/12 | 125.00 – pd. Check |
| 7/18/12 | see below |
| 7/20/12 | 250.00 – pd. Check |
| 7/30/12 | - see below |
| 8/2/12 | 250.00 – pd. Check |
| 8/8/12 | 125.00 – pd. Check |
| 8/16/12 | 125.00 – pd. Check |
| 9/17/12 | 195.00-pd. Invoice |
| 9/22/12 | 195.00-copy of check |
| 10/16/12 | 195.00-pd. Invoice |
| 11/2/12 | 195.00-pd. Invoice |
| 11/14/12 | 175.00 – pd. Invoice |
| 11/27/12 | 300.00 – cancelled check |
| 12/6/12 | 500.00 - VISA receipt |
| 12/14/12 | 175.00 – pd. Invoice |
| 12/19/12 | 175.00 – pd. Invoice |
| 1/2/13 | 175.00 - pd. Invoice |
| 1/8/13 | 175.00 – pd. Invoice |
| 1/10/13 | 195.00 - VISA receipt |
| 1/16/13 | 175.00 – pd. Invoice |
| 1/17/13 | 195.00 - VISA statement |
| 1/24/13 | 195.00 – VISA statement |
| 1/29/13 | 195.00 – VISA receipt |
| 1/30/13 | 175.00 – pd. Invoice |
| 2/7/13 | 195.00 - VISA receipt |
| 2/13/13 | 175.00 – pd. Invoice |

TOTAL:      $5,750.00

Addendum 1 Page 2-OCR No. 11-12-1529

Other Services 2/10/12-3/1/13

Music

| | |
|---|---|
| 9/18/12 | 335.38 – VISA statement |
| 10/18/12 | 53.00 – check card statement |
| 10/18/12 | 335.37 -same |
| 11/19/12 | 53.00 -same |
| 11/19/12 | 335.37- same |
| 11/30/12 | 80.00 – Citicard statement |
| 11/30/12 | 12.00 – Citicard statement |
| | |
| 12/19/12 | 53.00 - same |
| 12/19/12 | 335.38 - same |
| 1/18/13 | 53.00 - same |
| 2/19/13 | 53.00 -same |

Physical Education

| | |
|---|---|
| 11/8/12 | 77.00 – pd. receipt |
| 12/2/12 | 177.20 – Citicard statement |
| 1/4/13 | 179.00  VISA statement |

TOTAL:              $2,131.70

# Exhibit "D"

### Balance & Thrive, LLC
### Mental Health Counseling & Psychoeducation
**666 Godwin Avenue (Suite 300), Midland Park, NJ 07432**
**Phone: 201-444-8110 * Website: balanceandthrivecounseling.com**

8/22/2018

To: ███████████
███████████

Regarding: █████████, DOB: ███████

Dear ███

This letter includes my recommendation regarding ████'s privacy.

I am ██████████'s therapist. I have treated ████ for Post Traumatic Stress Disorder (PTSD) and Major Depressive Disorder (MDD). Currently, █████ is not in treatment with me, she is out of state receiving residential treatment. During this time, she will have limited access to the phone and internet.

It is critical for █████'s identity to be protected in all situations. In addition to her young age, as the victim of violent crime, her privacy is very important to her. Also, even the slightest perception that her identity and whereabouts are known by her perpetrators will potentially cause her great mental and emotional stress and harm.

Thank You. I trust this information has bene helpful

Sincerely,

Rose Celia Rosato, MA, LPC

Owner/Psychotherapist

# Exhibit "E"

## AFFIDAVIT OF ██████████

Commonwealth of Pennsylvania )
                             )
City and County of Philadelphia )

████████ swears and affirms as follows:

1. I am ████████'s mother.
2. I am an adult citizen of the United States and I am capable of making this statement under oath.
3. I am aware that my daughter wishes to pursue this matter under the Pseudonym "Jane Doe."
4. I lived with ████████ at the time of the events giving rise to the Complaint.
5. James Sheehan, an educator with the Fairfax County School System, was ███'s homebound instructor for English and History in 7th and 8th grades.
6. Mr. Sheehan advised me that the Fairfax County School System prohibited ███'s teachers from using ███'s real name.
7. Mr. Sheehan advised me that the Fairfax County School System sent an email to all of ███'s teachers instructing them not to use her real name in any communication or correspondence regarding my daughter.
8. I asked Mr. Sheehan to share this communication with me.
9. He declined because he was concerned that the Fairfax County School System would discover his disclosure to me.
10. Two of my daughter's other homebound instructors, Mariel Haig and Ana Smith, confirmed that they received the same email from the Fairfax County School system.
11. I requested a copy of this email from Ana Smith, who agreed to provide me with the email, but she was unable to locate it.
12. During the investigation of the Office of Civil Rights of the Department of Education, the Fairfax County School System was well-aware of my daughter's name.
13. Since the filing of this case, it appears that lawyers representing the Fairfax County School System have viewed my daughter's social media accounts.
14. They could only view my daughter's social media accounts using her real name.

I swear under the penalties of perjury that the information contained in this Affidavit is true and correct to the best of my knowledge, information, and belief.

/S/

Sworn to Subscribed
before me this ___ day of
_____, 2019

Notary Public

COMMONWEALTH OF PENNSYLVANIA - NOTARY SEAL
Jodi S Paulus, Notary Public
Philadelphia County
My Commission Expires 08/16/2023
Commission Number 1355790