**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **B.R.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:19-cv-917 (RDA/TCB)** |
| **F.C.S.B., et al.,** | |
| **Defendants.** | |

**SECOND AMENDED COMPLAINT**

COMES NOW Plaintiff, B.R., by counsel, and for her Complaint seeking judgment and award of execution against the Defendants, F.C.S.B.; S.T.; A.F.; P.A.H.; T.B.; B.H.; M.P.F.; M.C.; F.T.; J.F.; C.K.; and J.O.; MIKE AND MARY ROES 1-15, jointly and/or severally, states as follows:

**PARTIES**

1.      Plaintiff B.R. (fictitious and anonymous name) ("Plaintiff" or "B.R.") is an adult, citizen of the United States of America.

2.      Plaintiff is proceeding under a pseudonym as the need for anonymity outweighs the public's interest in knowing Plaintiff's identity, and maintaining Plaintiff's anonymity does not prejudice any other party as all parties are aware of her true identity. Further, Plaintiff is proceeding under the pseudonym B.R. in accordance with this Court's ruling. (Dkt. 85 at 46, 49).

3.      Defendant F.C.S.B.[1] ("FCSB") is the public school board that is responsible for overseeing operation and management of the public education system of the Fairfax County Public Schools ("FCPS"). FCSB is the body corporate for FCPS and is vested with all powers and charged with all duties, obligations, and responsibilities imposed upon FCPS. FCSB is the public body "that governs [the] school division" of FCPS within the meaning of Va. Code Ann. § 22.1-1, VA. Const., Art. VIII, § 7 ("The supervision of schools in each school division shall be vested in a school board"), Va. Code Ann. § 22.1-28 ("supervision of schools in each school division shall be vested in a school board"), and Va. Code Ann. § 22.1-71 (stating that the "school board" is the "body corporate" with the power to "sue" and "be sued"). As the corporate body for FCPS, FCSB is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a) and a "person" within the meaning of 42 U.S.C. § 1983.

4.      Defendant A.F.[2] ("Principal A.F." or "A.F.") is, and at all relevant times was, an adult and the Principal of Rachel Carson Middle School, located at 13618 McLearen Road, Herndon, Virginia 20171 ( "RCMS"). Upon information and belief, Principal A.F. resides in the Commonwealth of Virginia. At all relevant times, Principal A.F. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. Principal A.F. is sued in his individual capacity and official capacity.

---

[1] F.C.S.B. is referred to herein using its initials in accordance with this Court's prior rulings. (Dkt. 85).

[2] A.F. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

5.      Defendant S.T.[3] ("Assistant Principal S.T." or "S.T.") is, and at all relevant times was, an adult and an Assistant Principal and/or educator of RCMS. Upon information and belief, Assistant Principal S.T. resides in the Commonwealth of Virginia. At all relevant times, Assistant Principal S.T. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. Assistant Principal S.T. is sued in his individual capacity and official capacity.

6.      Defendant P.A.H. ("Assistant Principal P.A.H." or "P.A.H.") is, and at all relevant times was, an adult and Assistant Principal and/or educator of RCMS. Upon information and belief, Assistant Principal P.A.H. resides in the Commonwealth of Virginia. At all relevant times, Assistant Principal P.A.H. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. Assistant Principal P.A.H. is sued in his individual capacity and official capacity.

7.      Defendant T.B.[4] ("Assistant Principal T.B." or "T.B.") is, and at all relevant times was, an adult and Assistant Principal and/or educator of RCMS. Upon information and belief, Assistant Principal T.B. resides in the Commonwealth of Virginia. At all relevant times, Assistant Principal T.B. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. Assistant Principal T.B. is sued in his individual capacity and official capacity.

---

[3] S.T. is referred to herein using her initials in accordance with this Court's prior rulings. (Dkt. 85).

[4] T.B. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

8.      Defendant, B.H.[5] ("Counselor B.H." or "B.H.") is, and at all relevant times was, an adult and guidance counselor of RCMS. Upon information and belief, Counselor B.H. maintains an office at FCPS in Falls Church, Virginia. At all relevant times, Counselor B.H. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. Counselor B.H. is sued in his individual capacity and official capacity.

9.      Defendant J.F.[6] ("Counselor J.F." or "J.F.") is, and at all relevant times was, an adult and guidance counselor of RCMS. Upon information and belief, Counselor J.F. maintains an office at FCPS in Falls Church, Virginia. At all relevant times, Counselor J.F. was acting as an employee, agent, servant and/or ostensible agent of FCSB. Counselor J.F. is sued in his individual capacity and official capacity.

10.    Defendant M.C.[7] ("M.C.") is, and at all relevant times was, an adult and educator at RCMS. At all relevant times, M.C. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. M.C. is sued in his individual capacity and official capacity.

11.    Defendant M.P.F.[8] ("M.P.F.") is, and at all relevant times was, an adult and educator at RCMS. At all relevant times, M.P.F. was an employee, agent, servant, and/or ostensible agent of

---

[5] B.H. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

[6] J.F. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

[7] M.C.. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

[8] M.P.F. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. M.P.F. is sued in his individual capacity and official capacity.

12.     Defendant F.T.[9] ("F.T.") is, and at all relevant times was, an adult and educator at RCMS. At all relevant times, F.T. was an employee, agent, servant, and/or ostensible agent of FCSB, acting within the course and scope of his employment, agency, service, and/or ostensible agency with FCSB. F.T. is sued in his individual capacity and official capacity.

13.     FCSB is responsible for the policies, procedures, practices, and training of the principals, vice principals, teachers, staff, and other personnel, including, but not limited to, Defendants A.F., S.T., P.AH., T.B., B.H., J.F., M.C., M.P.F., and F.T. (collectively, "RCMS Employees") under the employ of the FCPS.

14.     At all relevant times, RCMS Employees were duly appointed; acting as educators, employees, agents, and/or servants on behalf of the FCPS and FCSB; and acting under the color of law and under the statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia.

15.     At all relevant times, RCMS Employees were responsible for educating, safeguarding, and protecting students of RCMS from harm, including harm from other RCMS students.

16.     At all relevant times, RCMS Employees were acting within the course and scope of their employment with RCMS and/or FCPS.

17.     RCMS Employees are being sued in their individual and official capacities.

18.     RCMS Employees were responsible for providing a safe and enabling learning environment for Plaintiff, free of discrimination and harassment based on her sex, which they

---

[9] F.T. is referred to herein using his initials in accordance with this Court's prior rulings. (Dkt. 85).

failed to do, thus, breaching their constitutional, statutory, fiduciary, and common law duties to Plaintiff.

19.     RCMS Employees not only failed to provide a safe learning environment for Plaintiff, but also failed to stop and/or prevent harm to students, including Plaintiff, despite having knowledge of the sexual harassment and verbal and physical abuse to which other students subjected Plaintiff

20.     Defendant C.K.[10] is an adult residing in Herndon, Virginia. At all relevant times, C.K. was a minor, and a student with Plaintiff at RCMS.

21.     Defendant J.O. is an adult residing in Herndon, Virginia. At all relevant times, J.O. was a minor, Plaintiff's peer, and a student with Plaintiff at RCMS.

22.     Defendants Mike/Mary Roes Nos. 1-15 are unknown students of RCMS and other individuals who, upon information and belief, and at all relevant times, participated in the physical and sexual assaults, rapes, and/or gang rapes of Plaintiff.

## JURISDICTION AND VENUE

23.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

24.     This Court has federal subject matter jurisdiction in this action, pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the laws of the United States of America, including Title IX, 20 U.S.C. §§1681-1688, 42 U.S.C. §1983, 42 U.S.C. § 1985 and the United States Constitution.

---

[10] C.K. is referred to herein using its initials in accordance with this Court's prior rulings. (Dkt. 85).

25.　　Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims , as they arise out of a common nucleus of operative facts.

26.　　Plaintiff avers state law claims and has complied with all requirements of the Virginia Tort Claims Act.

27.　　Venue is proper in the Eastern District of Virginia because Plaintiff's claims arise primarily from unlawful conduct occurring in Fairfax County, Virginia.

## GENERAL ALLEGATIONS

28.　　Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

### A.　　*NATIONAL SEXUAL HARASSMENT POLICIES FOR SCHOOLS*

29.　　In or about January 2001, the United States Department of Education Office for Civil Rights ("OCR") issued a Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties ("OCR's 2001 Guidance"). **Exhibit A.**

30.　　In or about January 2001, FCSB received and had actual or constructive knowledge of the contents of OCR's 2001 Guidance.

31.　　At all relevant times, OCR's 2001 Guidance was in effect and an accurate reflection of OCR's guidance.

32.　　OCR's 2001 Guidance described sexual harassment as any "unwelcome conduct of a sexual nature." **Exhibit A**, p. 11.

33.　　When determining whether conduct of a sexual nature qualifies as "unwelcome," OCR's 2001 Guidance advises school divisions (including FCSB) that "[i]f younger children are involved,

it may be necessary to determine the degree to which they are able to recognize that sexual conduct is sexual conduct to which they can or should reasonably object and the degree to which they can articulate an objection." **Exhibit A**, p. 17.

34.    OCR's 2001 Guidance provides that sexual harassment by other students and "third parties" may be sufficiently serious in nature to deny or limit a student's ability to participate in or benefit from educational programs. **Exhibit A**, p. 21.

35.    Thus, "schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials." **Exhibit A**, p. 22.

36.    Additionally, Title IX requires schools to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination. **Exhibit A**, p. 23. "By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences." **Exhibit A**, p. 23.

37.    OCR's 2001 Guidance warned that, without a disseminated policy and procedure, "a student does not know either of the school's policy against and obligation to address" sexual harassment and sex discrimination. **Exhibit A**, p. 23.

38.    In or about September 2008, OCR published "Sexual Harassment, *It's Not Academic*" ("2008 OCR Publication") that, again, advised and identified requirements for schools and school divisions (including FCSB) when creating policies for and responding to reports of sexual harassment. **Exhibit B**.

39.     In or about September 2008, FCSB received actual or constructive knowledge of the information contained in **Exhibit B**.

**B.     ELEVATION OF SEXUAL CRIMES IN AND AROUND FAIRFAX COUNTY**

40.     In or about September 2008, if not before, organized gangs and co-conspirators began targeting juvenile females in Fairfax and northern Virginia to intimidate and coerce them into participating in commercial sex acts. These gangs and co-conspirators targeted middle school and high school students, including FCPS students.

41.     This recruitment scheme involved students (including FCPS students) who "recruit[ed]" and "groom[ed]" juvenile female students for commercial sexual exploitation. *See* **Exhibit C**.[11]

42.     Members of the conspiracies forced, required, or caused juvenile female students (including FCPS students) to engage in sexual acts with members of the conspiracy before engaging in commercial sexual acts with customers. *See* **Exhibit C**. A leader of one of these schemes told a 16-year-old female ("Victim 1") that she "could make a lot of money by having sex with men for money," and later, as part of the common scheme of grooming and recruiting juvenile females for prostitution, he had sex with Victim 1 in the woods behind a metro station. *See* **Exhibit D**. Victim 1 was later informed that the "organization" would receive fifty dollars ($50) for vaginal sex. *See* **Exhibit D**.

---

[11] **Exhibit C** is the criminal indictment of Justin Deonta Strom for Sex Trafficking of Children Conspiracy, Sex Trafficking of a Child, and Transportation of Minors. Docket Number 1:12-cr-00159-LMB, Document 47.

43.     Similarly, Alexander Rivas, also known as "Casper," ("Rivas") of the Mara Salvatrucha 13 ("MS-13") gang located in northern Virginia trafficked juvenile females for sex in and around Fairfax County as early as November 2010. *See* **Exhibit E.**[12]

44.     Rivas began by telling members of the Hispanic community where he lived that he prostituted girls and established a prostitution clientele, which included construction workers and illegal immigrants in the area. Rivas would typically charge prostitution clients fifty dollars ($50). One of Rivas's prostitutes was a fourteen-year-old Fairfax County resident and another was also under eighteen (18) years of age. *See* **Exhibit E.**

45.     Another member of MS-13, Jose Ciro Juarez-Santamaria ("Juarez-Santamaria") was, similarly, recruiting and prostituting female juveniles in and around Fairfax County as early as October 2009, including a twelve-year-old girl. *See* **Exhibit F**[13].

46.     Strom's, Rivas', Joshua Dumas', Edwin Barcus', and Juarez-Santamaria's sex trafficking schemes exploiting female juveniles in Fairfax County represent a fraction of the sex trafficking schemes and conspiracies present in northern Virginia and Fairfax County.[14]

---

[12] **Exhibit E** is titled Affidavit in support of Criminal Complaint in the matter of United States of America v. Alexander Rivas, also known as "Casper." Docket Number 1:11-mj-00122-TRJ, Document 2.

[13] **Exhibit F** is the criminal indictment of Jose Ciro Juarez-Santamaria aka "Sniper" for conspiracy, transportation of minor to engage in prostitution, and sex trafficking a child. Docket Number 1:11-cr-00217-LO, Document 1.

[14] *See* Pamela Brown, Police bust prostitution ring in Herndon (January 11, 2013), https://wjla.com/news/local/police-bust-prostitution-ring-in-herndon--83981; U.S. Attorney's Office for the Eastern District of Virginia, Atlanta Man Admits His Role In Operating An Interstate Juvenile Sex Trafficking Enterprise (March 18, 2013), https://www.justice.gov/usao-edva/pr/atlanta-man-admits-his-role-operating-interstate-juvenile-sex-trafficking-enterprise.

47.     From 2011 until June 2013 law enforcement (including federal agents) took down twenty-eight (28) sex traffickers in the eastern district of Virginia, most just outside Washington D.C., and identified 41 victims—all of them American citizens, and many from middle- or upper-class families. *See* **Exhibit G.**[15]  Local law enforcement detectives estimated as many as 800 cases of young girls being trafficked or groomed for trafficking in and around Fairfax County and Washington D.C.

48.     Years after its actual and constructive knowledge of sex trafficking in FCPS, FCSB passed a resolution acknowledging the crisis of sex trafficking in its schools on or about January 7, 2021. Within its resolution, FCPS affirmed its knowledge that "human trafficking remains a largely unperceived threat to students of Fairfax County;" "human traffickers are known to target not only middle and high school teens but even elementary school students;" and that victims were "stalked at locations such as shopping malls and bus stops." [16]

**B.      FCSB POLICIES FOLLOWING ELEVATION OF SEXUAL CRIMES**

49.     Despite its actual or constructive knowledge of the growing threat of human and sex trafficking in and around Fairfax County targeting its middle school and high school aged students, the FCSB instituted policies that omitted guidance, protocols, or training of its employees regarding sex trafficking and human trafficking such as how to identify signs of sex trafficking of

---

[15] **Exhibit G,** Marisa M. Kashino, "You're Pretty—You Could Make Some Money" (June 10, 2013),   https://www.washingtonian.com/2013/06/10/youre-pretty-you-could-make-some-money/; Michael Lee Pope, Federal Prosecutors Uncover Schoolyard Prostitution Ring in Suburban Fairfax County (April 26, 2012)
http://www.connectionnewspapers.com/news/2012/apr/06/schoolyard-prostitution-ring/.

[16] Fairfax County Public Schools, School Board Passes Resolution Recognizing Human Trafficking Awareness Month (January 7, 2021), https://www.fcps.edu/news/school-board-passes-resolution-recognizing-human-trafficking-awareness-month.

their students, how to combat the same, and how to take reasonable precautions to maintain a safe school environment in light of the growing threat and danger within its community.

50.     Despite a budget at, around, or over three billion dollars annually ($3,000,000,000.00) at all times material and relevant herein, FCSB chose not to invest in or allocate funds to the protection of its students from human and sex trafficking aside from coopering with the creation of a documentary film.

51.     As a result of this inadequate training, some parents of trafficking survivors have spoken up about FCPS's inadequate response to sex trafficking. For example, Susan Young is the mother of a sex trafficking victim within FCPS, who was trafficked at the age of 15. Young currently serves as the Parent Coalition Director at Anti-Trafficking International. In an interview, Young claimed that she and her daughter went to her guidance counselor 22 times about the trafficking, but were told that there was nothing they could do to help her.

52.     In or about December 2013, the FCSB's Family Life Education Curriculum Advisory Committee ("FLECAC") recommended media materials be developed and produced for the education of students in grades six to twelve (including their parents) about the dangers of sex trafficking.

53.     In January 2014, Fairfax County officials launched a public awareness campaign to educate young people about the growing problem of teen sex trafficking in Northern Virginia. The "Just Ask" Prevention Project was a joint initiative by the police, FCPS, and domestic violence counselors aimed at raising awareness about sex trafficking.

54.     In early 2014, in cooperation with Fairfax County Police Department, FCPS aired a television program highlighting the dangers of sex trafficking titled "Tricked: Inside the World of Teen Sex Trafficking."

55.    FCPS's television program included an interview with Detective William "Bill" Woolf ("Detective Woolf") with Fairfax County Police, who informed FCPS that "in Fairfax County, in Northern Virginia, we've worked with victims as young as twelve. . ."[17] Detective Woolf also informed FCPS that a single group of sex traffickers, beginning in 2007, attempted to recruit more than **eight hundred** (800) girls in Fairfax County.[18]

56.    As reported to FCSB, and later reported by FCSB in its television program, sex trafficking did, in fact, occur in FCSB's middle schools and high schools.[19]

57.    By August 2011, Defendant FCSB knew or should have known sex traffickers were exploiting and targeting FCPS female middle school and high school students.

58.    On October 26, 2010, the United States Department of Education's Office for Civil Rights issued a "Dear Colleague" letter advising school boards across the United States, including FCSB, reinforcing the importance of training employees, investigating, and appropriately responding to sexual harassment and sexual misconduct in schools. The letter included a hypothetical regarding Sexual Harassment that is strikingly similar to the deliberately indifferent response to Plaintiff's sexual harassment and sexual misconduct alleged *infra*. **Exhibit H.**

59.    On or about March 24, 2011, the Virginia Department of Education published Guidelines for the Prevention of Sexual Misconduct and Abuse in Virginia Public Schools ("VDOE 2011 Guidance"). **Exhibit I**. The VDOE 2011 Guidance further emphasized that the responsibility for

---

[17] Fairfax County Public Schools, Tricked: Inside the World of Teen Sex Trafficking – Overview (February 1, 2014), https://www.youtube.com/watch?v=tK3iZuyW-fQ&list= PLGU615q8gq9zF_ JAppvRj9Onn7w B2L443

[18] Id.

[19] Id.

protecting students from sexual misconduct and abuse was, at all times material and relevant herein, the responsibility of the FCSB, its superintendent, its administrators, its teachers, and other school board employees, school volunteers, parents, state agencies, and law enforcement.

60.     Although FCSB knew its responsibilities for the prevention of sexual misconduct and abuse of its students before the VDOE 2011 Guidance, this guidance further demonstrates the focus on importance of preventing, reporting, and investigating sexual misconduct and abuse incidents within the FCSB including RCMS and the protection of Plaintiff, investigation of her reports of sexual misconduct and sexual harassment, and reporting of the same. FCSB's actions in relation to Plaintiff, as alleged herein, were inconsistent, contradicted, and violated the guidance of VDOE.

61.     On April 4, 2011, the United States Department of Education's Office for Civil Rights issued a "Dear Colleague" letter ("2011 Dear Colleague letter"). **Exhibit J**.

62.     OCR's 2011 Dear Colleague Letter explicitly advised all school districts subject to Title IX (including FCSB) that "[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX" and identified the specific Title IX requirements pertaining to sexual harassment also covering sexual violence. **Exhibit J**, p. 1.

63.     OCR's 2011 Dear Colleague Letter informed and educated FCSB, if it was not already aware, that sexual violence statistics in the United States of America were deeply troubling and a call to action for the nation, citing a report prepared for the National Institute of Justice that found about 1 in 5 women are victims of completed or attempted sexual assault while in college while emphasizing "[t]his problem is not limited to college." **Exhibit J**, p. 1.

64.     OCR's 2011 Dear Colleague Letter reemphasized guidance and applicable policy regarding sexual harassment at school districts, of which FCSB was aware for over a decade since

OCR published its 2001 Guidance. **Exhibit A**.

65.      Specifically, as explained in OCR's 2001 Guidance and reemphasized in OCR's 2011 Dear Colleague Letter, "when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program;" "[i]f a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects;" "schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures;" "schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with authority to address harassment know how to respond properly;" "training for employees should include practical information about how to identify and report sexual harassment and violence;" training should be "provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors." **Exhibit J**.

## C.      *FCPS MANAGEMENT AND STRUCTURE*

66.      At all relevant times, the supervision of RCMS, a public school within the FCPS school division, was vested in FCSB. *See* Va. Code § 22.1-28.

67.      At all relevant times, FCSB vested operational control of FCPS in the Superintendent of FCPS (the "Superintendent"). **Exhibit K**[20], p. 6.

---

[20] **Exhibit K** is titled "Fairfax County School Board Strategic Governance Manual," Effective January, 1, 2007, Last Revised: November 3, 2011.

68.     At all relevant times, the Superintendent was vested with the power and responsibility to conform the public school system to FCSB policies, Virginia Department of Education regulations, and applicable county, state, and federal laws and regulations; establish customs and practices to maintain the system; and ensure that procedures exist for the review and revisions of policies. **Exhibit K**, p. 13.

69.     FCSB empowered and instructed the Superintendent to not cause, allow, or fail to take reasonable measures to prevent, any practice, activity, decision, or organizational condition that was unlawful, unethical, unsafe, imprudent, in violation of FCSB policy, or that endangered the public image or credibility of FCPS. **Exhibit K**, p. 13.

70.     At all relevant times, FCSB vested in the Superintendent the power and authority to establish customs and practices to maintain a safe, healthful, nondiscriminatory, and respectful learning environment conducive to effective learning. Among the Superintendent's responsibilities to establish an environment conducive to effective learning, were his responsibilities to maintain a climate characterized by support and encouragement for high student achievement; ensure that student behavior expectations are clearly defined, communicated, supported and enforced; and ensure behaviors, actions, or attitudes of adults who have contact with students do not hinder the academic performance or well-being of students. **Exhibit K**, p. 18.

71.     At all relevant times, the Superintendent was responsible for ensuring all schools within the FCPS system were clean and safe.  This included the responsibility and duty to ensure that key personnel received appropriate training for the safety and security of schools and the children therein. **Exhibit K**, p. 20.

72.     At all relevant times, the Superintendent was required by law and by the FCSB to "participate annually in high-quality professional development activities at the local, state, and

national levels, including the Standards of Quality, Board of Education regulations, and the Guidelines for Uniform Performance Standards and Evaluation Criteria for Teachers, Principals, and Superintendents." Va. Code § 22.1-253.13:5.

73.     At all relevant times, all schools within the FCPS system were separated into "clusters," made up of multiple FCPS elementary, middle, and high schools.

74.     At all relevant times, FCBS retained a "Cluster Assistant Superintendent" to manage each cluster and assist the Superintendent in meeting the obligations and duties vested in the Superintendent.

75.     At all relevant times, as a result, the Cluster Assistant Superintendents were also vested with the supervisory authority of the FCSB.

76.     At all relevant times, RCMS was part of Cluster VIII of the FCPS system.

77.     To further assist the Superintendent, FCSB also employed principals and assistant principals, legally bound to provide instructional leadership in their assigned schools, in accordance with the rules and regulations (including FCSB Strategic Governance Manual, **Exhibit K**), and under the supervision of the Superintendent.

78.     At all relevant times, FCPS's principals and assistant principals (including RCMS principals and assistant principals) were responsible for the administration, operation, and management of their assigned schools and properties. *See* Va. Code § 22.1-293.

79.     At all relevant times, the Superintendent was required to develop (subject to the review of FCSB) and maintain written regulations, policies, and practices stating the legal rights and responsibilities of students in FCPS and the rules of conduct and disciplinary procedures applicable to students, which were to be provided to each student and teacher in the form of a "Student Rights and Responsibilities Booklet" (the "SR&R").

80.     At all relevant times, the responsibilities and duties of FCPS principals and assistant principals (including RCMS principals and assistant principals) included the responsibility to provide, maintain, and abide by the SR&R.

81.     At all relevant times, students attending FCPS (including Plaintiff) who believed that actions or inactions of school administration were not in their best interests could present complaints to teachers, counselors, or school administrators, who were required to make themselves available or schedule appointments to hear these complaints. **Exhibit L**[21], p. 15.

82.     At all relevant times, if a student (including Plaintiff) was not satisfied that a complaint previously presented to a member of the school staff was resolved satisfactorily, the student or the student's parent or guardian could request a meeting with the student, the parent or guardian, and the principal. **Exhibit L**, p. 15.

83.     While FCPS principals and assistant principals were vested with complete authority to manage, supervise, and operate their assigned schools and property, the SR&R provided (at all relevant times) for the right of a student, parent, or guardian to appeal a principal's or assistant principal's decision to the Cluster Assistant Superintendent. **Exhibit L**, p. 15.

### D.     *FCPS DISIPLINARY SYSTEM*

84.     At all relevant times, all RCMS school officials (including principals, assistant principals, teachers, guidance counselors, and other administrative personnel) were authorized to discipline students at RCMS (which included suspending, expelling, and excluding students from school and school-sponsored activities) for engaging in prohibited conduct occurring on school property, while attending a school-sponsored activity, or which affected students going to or returning from

---

[21] **Exhibit L** is titled Fairfax County Public Schools Student Rights and Responsibilities Grade K-12, dated August 2011.

school (including on a school bus or at a school bus top). School officials were also authorized to discipline students for acts committed away from school property and outside of school hours if the conduct was detrimental to the interest of the school, adversely affected school discipline, and/or resulted in a criminal charge or conviction. **Exhibit L**, p. 17.

85.     At all relevant times, a principal had the discretion to impose short-term suspensions of less than ten days; but, the SR&R required principals to impose longer suspensions and to recommend expulsion of students who were found to be involved in "prohibited conduct." **Exhibit L**, p. 29.

86.     Any student who committed multiple offenses (regardless of their nature) could, in the discretion of school officials, face more stringent disciplinary action in addition to any specific sanction for particular prohibited conduct. **Exhibit L**, p. 17.

87.     According to the SR&R, "prohibited conduct" encompassed "any behavior incompatible with a K-12 educational environment and good citizenship and includes but is not limited to the following: assault; disruptive or inappropriate behavior; alcohol, tobacco, and other drug violations; property violations; and weapons violations." **Exhibit L**, p. 18

88.     At all relevant times, "prohibited conduct" included sexual violence and sexual harassment.

89.     At all relevant times, "prohibited conduct" included any student who threatened or physically assaulted another student or any other person, whether or not causing injury.

90.     Any physical assault, whether or not causing injury, was required to be disciplined by school officials at RCMS up to and including a ten-day suspension and recommendation for expulsion. **Exhibit L**, p. 18.

91.     At all relevant times, "improper touching" required disciplinary measures up to and including a ten-day suspension and a recommendation for expulsion. **Exhibit L**, p. 18.

92.     At all relevant times, sexual assault or battery upon any person was required to result in a ten-day suspension from school and recommendation for expulsion. **Exhibit L**, p. 18.

93.     At all relevant times, the SR&R considered any collection or group of students assembled with the intention of committing an assault constituted a "mob." If any mob included or resulted in an assault, every student involved in the mob was also required to be held directly responsible for the assault, whether actually committed by that student or not.

94.     If an assault occurred, RCMS school officials were required to suspend any student involved in the mob for ten days and to recommend the student's expulsion. **Exhibit L**, p. 18.

95.     At all relevant times, any student cursing at, gesturing towards, or verbally abusing any person (including but not limited to abuse or harassment based on that person's sex or matters pertaining to sexuality including sexual orientation) constituted "disruptive behavior."

96.     "Disruptive behavior" required RCMS school officials to implement disciplinary actions in the discretion of the principal. **Exhibit L**, p. 19.

97.     At all relevant times, the RCMS principal was required to report incidents that **may** constitute violations of Section 22.1-279.3:1 of the Code of Virginia to the police department, including all prohibited substance and illegal drug violations, unauthorized use or possession of any weapon or explosive device (including a hoax explosive device), arson, ***assault, assault and battery with bodily injury, sexual assault***, stalking, bomb threats, threats against school personnel on school property or at school-sponsored activities, and theft or attempted theft of student prescription drugs. However, according to the FCPS, a principal could use his or her discretion when choosing to report assaults or assaults and batteries without bodily injury. **Exhibit L**, p. 26-27.

20

98.     Plaintiff began attending RCMS for the 2011 – 2012 school year. At that time, she was a seventh-grade student.

99.     As demonstrated by FCPS's Student Rights and Responsibilities handout (dated August 2011), when Plaintiff began attending RCMS, whenever Plaintiff was attending school at RCMS, school sponsored activities, or engaged in actions affecting her coming and going to RCMS including time spent on a school bus or at a school bus stop she was under the custody, control, and supervision of FCPS who maintained the power and authority to control the environments and circumstances of her attendance, coming, and going of school functions by virtue of their power and authority to discipline students engaged in prohibited behavior at these various locations and times. Effectively, Plaintiff was subject to the authority and control of FCPS and under its custody, control, and supervision when she was at schools sponsored activities and while making her way to and from school sponsored activities. *See* **Exhibit L,** p. 17.

        In October 2010, FCPS publicly released the results of its 2009 school climate survey. Roughly 39,000 of FCPS's then 170,000 students took part in the survey. Of the 39,000, 8,727 (just under 1 in 4) students reported being sexually harassed at least once in the previous year. 901 students reported being sexually harassed over 40 times in the previous year. **Exhibit M.**

100.    However, FCPS only reported 40 instances of sexual harassment to the Department of Education's Office of OCR. During that same time, FCPS also underreported to the Virginia Department of Education, in certified reporting, that there were only 101 reports of sexual assault and 69 reports of sexual harassment. **Exhibit N.**

101.    This underreporting of misconduct within its schools is indicative of a custom, policy, and practice instituted by FCSB to underreport its numbers of misconduct and sexual misconduct as

was revealed in litigation against the FCSB regarding thousands of cases of handcuffing and restraining students, which revealed the underreporting of the same.[22]

## E. PLAINTIFF'S SEXUAL HARASSMENT AND SEXUAL VIOLENCE

102.    As alleged herein, Plaintiff suffered multiple, repeated acts of sexual harassment, sexual battery, sexual assault, and sexual abuse while under the custody, control, and supervision of FCPS while attending school, school sponsored activities, and while making her way to and from school and school sponsored activities.

103.    As alleged herein, a majority of Plaintiff's sexual harassers, assailants, and abusers were students of FCPS who were also under the custody, control, and supervision of FCPS and subject to its disciplinary power and authority when harassing, assaulting, and abusing Plaintiff.

104.    In October, 2011, Plaintiff was at the home of RCMS classmate David Neill ("Neill"). Plaintiff and Neill were supposed to visit a nearby pumpkin patch with Neill's family and parents, however, due to conflicting circumstances within the Neill family, they were unable to attend the pumpkin patch and instead took Plaintiff and Neill back to the Neill residence. While at Neill's home, and outside the direct supervision of Neill's parents or other adults, Neill made unwelcomed sexual advances towards Plaintiff. Neill sexually assaulted and sexually battered Plaintiff by touching her sexually on or near her intimate body parts without her consent.

105.    The following day, in or about October, 2011, Neill and Neill's friends (all RCMS students) sexually harassed Plaintiff by spreading false rumors that Plaintiff performed oral sex on Neill and masturbated Neill by sharing with other RCMS students that Plaintiff gave Neill "blow jobs" and

---

[22] James Jarvis, Fairfax school system settles suit over seclusion, restraint, but questions remain (December 10, 2021), https://wtop.com/fairfax-county/2021/12/fairfax-school-system-settles-suit-over-seclusion-restraint-but-questions-remain.

"hand jobs."

106.    Neill and his friends then began sexually harassing Plaintiff, as alleged *supra*, Neill, his friends, and other RCMS students openly called Plaintiff sexually charged epithets including "slut," "whore," "hoe," "lesbian," and "bi-sexual."

107.    Other RCMS then students began sexually harassing Plaintiff, as alleged *supra*, several male RCMS students confronted Plaintiff at her locker before first period. The students repeated the aforementioned sexual epithets to Plaintiff's face; thrusted their pelvises and intimate body parts at Plaintiff; and otherwise sexually harassed, assaulted, and battered Plaintiff by touching and grabbing her in an unwanted, offensive, and sexually motivated manner.

108.    Almost immediately following the harassment, Plaintiff attempted to meet with her guidance counselor B.H. to report her sexual harassment, but Counselor B.H. thwarted those attempts by conveying to Plaintiff that she was too busy to see her. This continued despite repeated attempts from Plaintiff to report her sexual harassment to B.H. for the coming weeks until a November 21, 2011 meeting discussed in more detail *infra*.

109.    During this time, Plaintiff's locker was clearly visible to several RCMS teachers who stood outside their doors waiting for the students to walk into the classrooms to begin first period. These FCSB and FCPS teachers, agents, and employees knew or, with reasonable care, should have known of Plaintiff's sexual harassment. Among the teachers who knew or should have known of Plaintiff's sexual harassment at this time were Defendants M.P.F., M.C., and F.T.

110.    Having been turned away by B.H., Plaintiff began reporting her harassment to her teachers, M.P.F., M.C., and F.T. Plaintiff reported that a group of teenage boys had harassed her by calling her names, touched her, hurt her, and made her feel uncomfortable while at school and when she went to her locker.

111.    Additionally, Plaintiff reported to her homeroom teacher, M.C., that she was tardy to class because she was being "hurt" by other students at her locker.

112.    After students began sexually harassing and assaulting Plaintiff, she frequently asked teacher F.T. for help opening her locker in an effort to garner adult supervision in hopes that it would deter her harassers and assailants.

113.    After repeated attempts to meet with B.H., which were unsuccessful, Plaintiff then met with another guidance counselor, Counselor J.F., and reported that male RCMS students were bullying and sexually harassing her by calling her sexually suggestive and derogatory names, and that these students were sexually assaulting and battering her by unwantedly and offensively touching her. In response to Plaintiff's reports of sexual harassment, battery, and assault, Counselor J.F. took the affirmative action of telling Plaintiff that she was simply adapting to middle school.

114.    The sexual harassment, sexual battery, and sexual assault of Plaintiff constituted "prohibited conduct" under the SR&R, required disciplinary action, and were mandatory reporting offenses pursuant to Section 22.1-279.3:1 of the Code of Virginia. Accordingly, Counselor J.F.'s decision not to investigate, discipline, or report to authorities the reported sexual harassments, sexual assaults, and sexual batteries was in contravention of FCPS policies and promises made to students and families about how FCPS would treat this type of behavior at RCMS. Counselor J.F. had several choices following Plaintiff's reports including, but not limited to, keeping the information to herself, investigation, discipline, further and increased monitoring of Plaintiff; internal reporting to higher authorities within RCMS; and external reporting to law enforcement or superintendent(s) of FCPS. Counselor J.F. chose to keep the information and report to herself.

115.    Plaintiff sought to report the harassment to Counselor B.H., again, this time expressing to

Counselor B.H. that she needed to speak with her because she was afraid to walk the hallways of RCMS and needed Counselor B.H.'s help. Counselor B.H., again, dismissed Plaintiff's request to meet.

116.    Plaintiff approached Counselor B.H. in the hallways of RCMS and told her, again, that she felt unsafe at school and needed her help. Counselor B.H., again, chose not to meet with Plaintiff.

117.    In the coming days, Plaintiff made repeated attempts to meet with Counselor B.H. and Counselor J.F. to further report and disclose the ongoing and repeated sexual harassment committed by fellow RCMS male students against her including incidents of sexual battery and assault.

118.    The behaviors and actions taken by Counselor B.H. and Counselor J.F. demonstrate that FCPS and RCMS treat their policies, procedures, and affirmative promises to students and their parents as standards and objectives to strive for or attempt to accomplish, without the true intent or purpose of implementing these standards and objectives as daily, weekly, monthly, and yearly practices followed by all.

119.    Further, the behaviors and actions taken by Counselor B.H. and Counselor J.F. demonstrate that, despite promising and assuring students and parents that incidents of sexual harassment, assaults, and batteries are treated with care and a high level of priority, the practice and custom of agents and employees of FCPS and FCSB was to delay the prompt investigation and disciplinary process of these prohibited acts.

120.    Furthermore, the behaviors and actions taken by Counselor B.H., Counselor J.F., and teachers M.P.F., M.C., and F.T. demonstrate the absence of or significant deficiencies of training provided by FCPS and FCSB to its school officials, teachers, guidance counselors, administrators, and others interacting with children regarding sexual harassment, sexual assaults, and sexual

batteries at school including how to respond to them reasonably and appropriately to protect and care for students in their custody and supervision, including Plaintiff.

121.    These training deficiencies came in the face of significant state and federal guidance, which specifically addressing the extreme importance of "providing all students with an educational environment free from discrimination" and that "[t]he sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime." **Exhibit J**, p. 1.

122.    Despite its actual knowledge and understanding of the OCR's 2001 Guidance for over a decade, OCR's 2011 Dear Colleague Letters, and Virginia DOE guidance when adopting and publishing its Student Rights and Responsibilities handbook, FCPS and FCSB adopted unlawful and inadequate policies, and elected not to provide training or deficiently train to its agents and employees likely to witness or receive reports of sexual harassment, including Counselor B.H., Counselor J.F., and teachers M.P.F., M.C., and F.T.

123.    FCPS's and FCSB's election not to follow the guidance and advice of the OCR when adopting and publishing grievance procedures and training its agents and employees including Counselor B.H., Counselor J.F., and teachers M.P.F., M.C., and F.T., created an environment ripe for persistent, harmful, and undeterred sexual harassment and sexual violence of its students including Plaintiff who was directly suffering persistent sexual harassment and sexual violence as a result of the environment created by FCPS and FCSB.

124.    Despite her reports of sexual harassment and violence, Counselor B.H., Counselor J.F., and teachers M.P.F., M.C., and F.T. did not act immediately or reasonably and, as a result, male students at RCMS continued to subject Plaintiff to sexual harassment and violence nearly every day by offensively touching, taunting, and bullying her at RCMS.

125.     Undeterred, male students at RCMS began sexually harassing Plaintiff on her bus rides home from school, at the bus stop, and on her way home from the bus stop.

126.     In October 2011, after her reports and attempts to report sexual harassment and sexual violence to Counselor B.H., Counselor J.F., and teachers M.P.F., M.C., and F.T., Defendants C.K. and J.O. physically and sexually assaulted and battered Plaintiff on her way home from school. ("The C.K. and J.O Assault").

127.     On the day of the C.K. and J.O. Assault, J.O. approached Plaintiff in class at RCMS and invited Plaintiff to hang out with her and an older FCPS and RCMS student, C.K., after school. Plaintiff declined the invitation. C.K. and J.O. then met Plaintiff at her bus stop and again invited Plaintiff to hang out with them. Plaintiff again declined. J.O. and C.K. then tackled Plaintiff from behind, held her to the ground, and forcefully removed her clothing. C.K. and J.O. then sexually assaulted and sexually battered Plaintiff by digitally penetrating her vagina. J.O. took photographs of Plaintiff as she laid on the ground. C.K. and J.O. then forced Plaintiff to perform oral sex on C.K. and threatened to send pictures of her exposed body to other RCMS and FCPS students.

128.     The day after the C.K. and J.O. Assault, C.K. and J.O. perpetuated and intensified the sexual harassment Plaintiff experienced at RCMS by telling students at RCMS that Plaintiff was sexually active.

129.     Throughout this time, RCMS and FCPS offered at least two busing departures from RCMS at the end of the school day. One departure time was soon after the close of regularly scheduled classes at RCMS and another departure left RCMS to take students home an hour or so later. The later departure is referred to throughout this Complaint as the "late bus."

130.     Following the C.K. and J.O. Assault, C.K. continued to wait for Plaintiff at her bus stop after school. After the bus drove away, C.K. brandished a knife and threatened Plaintiff with

physical violence if she did not follow him to a secluded area nearby.

131.    C.K. led Plaintiff to a secluded nearby area outside where he wrestled Plaintiff to the ground, held her there against her will, removed her clothing, and forced Plaintiff, through threats of violence and violence, to perform oral sex on him thereby sexually assaulting and sexually battering Plaintiff. C.K.'s verbal threats included death threats against her and her family if he did not comply and remain silent about the assaults.

132.    Thereafter and until November 21, 2011, C.K. accosted Plaintiff at or near her bus stop nearly every day after school and sexually assaulted and battered her in the same or similar manner, as alleged *supra*. The violence and nature of each assault generally worsened over time and included C.K.'s use of inanimate objects to penetrate Plaintiff's vagina and anus. During these assaults C.K. told Plaintiff that he was grooming her for the enjoyment of his "friends," that his friends would "make a lot of money" off of her, and made death threats against her and her family if she ever reported the abuse.

133.    During this time, from November 9, 2011 to November 21, 2011, C.K. continued following Plaintiff between classes and participating in the ongoing aforementioned sexual harassment of Plaintiff.

134.    Again, throughout this period of time, Plaintiff repeatedly sought the assistance of RCMS and FCPS school officials who possessed the authority to discipline C.K. and other RCMS students.

135.    On or about November 14, 2011, C.K. called Plaintiff's cellular phone and left a sexually explicit and threatening voicemail. That evening, Plaintiff's mother accessed Plaintiff's phone, recognized that a voicemail was on it, and listened to the C.K. voicemail. Plaintiff's mother was shocked and horrified by the sexually explicit, violent, vile, and threatening content of C.K.'s

voicemail which included a statement by C.K. that he "was going to stick my big fat black dick up your ass deep like you like it." Plaintiff's mother immediately blocked C.K.'s number from Plaintiff's phone.

136.     On the following Monday morning, November 21, 2011, Plaintiff's mother and father, with Plaintiff at their side, walked into the administrative offices at RCMS. Before Plaintiff, her mother, or her father could express the purpose for them being there, B.H. said to the family that Plaintiff had tried to see her but that she (B.H.) had no idea it was "this serious" and that she was "busy" with beginning of the school year stuff. Plaintiff's parents then demanded a meeting with the Principal A.F regarding the persistent sexual harassment of Plaintiff.

137.     On November 21, 2011, Plaintiff's mother and father, with Plaintiff by their side, were first met by Counselor B.H. Plaintiff's mother and father informed Counselor B.H. that Plaintiff's peers were sexually harassing her and that it had severely impacted Plaintiff's ability to concentrate on her school work and make use of the resources provided by the school. Plaintiff's parents also informed Counselor B.H. of the C.K. voicemail. In response, Counselor B.H. stated that she "had no idea things had gotten that bad" implying her actual and constructive knowledge that students had been sexually harassing Plaintiff for some time.

138.     On November 21, 2011, Counselor B.H. informed Plaintiff's parents that Principal A.F. was unavailable to meet with them. Counselor B.H. then moved Plaintiff's parents and Plaintiff to an administrative office where they were met by Student Resource Officer Genus ("SRO Genus"). Plaintiff's parents also informed SRO Genus of Plaintiff's sexual harassment and together they attempted to retrieve the C.K. voicemail from Plaintiff's phone believed to have been cleared from the phone as a result of Plaintiff's mother blocking C.K.'s number.

139.     Sometime before or after SRO Genus joined the meeting with Counselor B.H., Plaintiff's

parents, and Plaintiff on November 21, 2011, Counselor B.H. informed Plaintiff's parents that Plaintiff had "been trying to see us for weeks" but that the department was "too busy" to see her because of other school events. Thereafter, Defendants Assistant Principal S.T. and Principal P.H joined the meeting and ushered Plaintiff and her parents to Assistant Principal S.T.'s office to continue the meeting.

140.    At this time, on November 21, 2011, Plaintiff provided a written report and a verbal report to Assistant Principal S.T., Assistant Principal P.A.H. and Counselor B.H. that she was "scared to come to school;" C.K. and David Neill came to her locker every morning before first period and "harass me, tease me, and give me seductive looks;" C.K. left her a "very inappropriate voicemail with lots of sexual terms;" C.K. said to her that David Neil "wants to come up to [her] and call [her] [vulgar] names like whore, bitch, and lesbian;" J.O. and C.K. call her offensive terms; J.O. calls her "bitch and makes offensive wall post on [her] Facebook calling [her] bitch and whore;" "David Neill said [she] gave him oral sex," "sent him naked pictures," and "let anyone get in [her] shirt and pants." If it was not yet clear and apparent to RCMS and FCPS school officials with the power and authority to discipline students that Plaintiff was a victim of severe, pervasive, and destructive sexual harassment at RCMS and by RCMS students, it was patently apparent at this November 21, 2011 meeting. Plaintiff's statement further informed Assistant Principal S.T., Assistant Principal A.F., and B.H. what Counselor B.H already knew: that students at RCMS were sexually harassing Plaintiff for three weeks by the time of this meeting. **Exhibit O**.[23]

141.    At this time, on November 21, 2011, Assistant Principal P.A.H. was the assistant principal at RCMS primarily responsible for student conduct and discipline for 7th grade students (Plaintiff's

---

[23] **Exhibit O** is a redacted copy of Plaintiff's written report.

grade) with complete authority of the principal to investigate and discipline students. Assistant Principal S.T. was the assistant principal at RCMS primarily responsible for student conduct and discipline for 8th grade students (C.K.'s grade) with complete authority of the principal to investigate and discipline students.

142.    During the aforementioned meeting on November 21, 2011, and in response to Plaintiff and her parents disclosing the vile and violent voice message, in detail, left by C.K. and repeated incidents of sexual harassment including the substance of Plaintiff's written statement, Assistant Principal S.T. told Plaintiff and her parents that C.K. "had a very hard life and been in enough trouble," and asked Plaintiff and her mother why they were trying to "ruin a young boy's life." Plaintiff and her parents informed Assistant Principal S.T., Assistant Principal P.A.H. and Counselor B.H. that C.K. extorted and stole fifty dollars ($50.00) from Plaintiff and threatened her with further harassment and force, including force to her brother, if Plaintiff told anyone. Assistant Principal S.T. then stated the school and its officials would "look into it" and instructed Plaintiff's parents to keep Plaintiff at home until they had an opportunity to investigate the reports.

143.    Assistant Principal S.T. effectively requested that Plaintiff rescind her report of severe sexual harassment that created a hostile environment for Plaintiff at RCMS. Assistant Principal S.T.'s response to these reports of sexual harassment demonstrate FCPS's unwritten policy and practice to diminish, ignore, and cover up reports of sexual harassment which was previously demonstrated by the actions of teachers M.P.F., F.T., and M.C. and similarly demonstrates the inadequacy or lack of training provided to Assistant Principal S.T. and other FCPS and RCMS school officials.

144.    After Assistant Principal S.T.'s request that Plaintiff and her mother rescind their reports, Assistant Principal S.T., Assistant Principal P.A.H. and Counselor B.H. assured Plaintiff and her

mother that RCMS and FCPS would investigate the reports. This assurance and promise by Assistant Principal S.T., Assistant Principal P.A.H. and Counselor B.H. amounted to an affirmative, express assumption of responsibility to care for Plaintiff by first investigating the reports of sexual harassment and violence, upon which Plaintiff and her parents relied.

145.    On or about November 21, 2011, Assistant Principal S.T. spoke with C.K. who confirmed Plaintiff's report that Neill told students that Plaintiff masturbated and performed oral sex on Neill. C.K. informed Assistant Principal S.T. that Neill told him that Plaintiff "gave him a blow job and a hand job." C.K. informed Assistant Principal S.T. that his friends and Neill's friends were calling Plaintiff a "whore" and that Neill, in the presence of other students, told Plaintiff she was "a whore and a slut."

146.    Assistant Principal S.T. then spoke with David Neill who verified that he sexually touched Plaintiff and alleged, as he has told others, that Plaintiff also touched him sexually. As a result, Assistant Principal S.T. had direct and actual knowledge of a sexual encounter between Plaintiff, 12 years old, and an older student at RCMS that Plaintiff was reporting as non-consensual.

147.    Purportedly, Assistant Principal S.T. then spoke with J.O. who, upon information and belief, verified that she called Plaintiff a slut as well. Assistant Principal S.T. then, purportedly, spoke with the parents of Neill, C.K., and J.O. C.K.'s mother verified to Assistant Principal S.T. that C.K.'s phone logs demonstrated that he made at least two calls to Plaintiff on November 14, 2011 (the date of the voicemail alleged *infra*).

148.     The following morning, on November 22, 2011, Plaintiff's mother received a phone call from Assistant Principal S.T. asking Plaintiff and Plaintiff's parents to return to the school for a meeting because of "developments" in the investigation that purportedly started the day before.

149.    In or around the early afternoon on November 22, 2011, Plaintiff's mother and father, with

Plaintiff at their side, returned to RCMS to meet with Assistant Principal S.T. and others.

150.    On November 22, 2011 Plaintiff's mother and father, with Plaintiff by their side, met with Assistant Principal S.T. in S.T.'s office where she reached into her drawer, pulled out fifty dollars ($50.00), and extended her hand with the fifty dollars towards Plaintiff's mother while laughing and stating she wanted Plaintiff's mother to have the money back "before she spent it" on Christmas shopping herself. This action woefully diminished the seriousness of the reports of sexual harassment and hostile learning environment that Plaintiff and her parents were there to address.

151.    Then, on November 22, 2011, Assistant Principal S.T., with Assistant Principal P.A.H. present, told Plaintiff and her parents that she (S.T.) visited C.K.'s home. Assistant Principal S.T. told Plaintiff and her parents that she spoke with C.K.'s mother who purportedly told Assistant Principal S.T. that C.K. was "borrowing" the fifty dollars from Plaintiff. Assistant Principal S.T. then told Plaintiff and her parents that the incidents and interactions between Plaintiff and C.K. appeared to be a "boy girl thing" and that Plaintiff was "sexually active" with C.K., but dismissed the context or lack of consensual nature of any sexual activity by telling Plaintiff's mother that sometimes parents do not know their children as well as they think they do.

152.    Plaintiff's parents took issue with Assistant Principal S.T.'s description of the sexual violence and harassment that their daughter suffered as a "boy girl thing," in light of Assistant Principal S.T.'s knowledge that the sexual assaults, batteries, and harassment suffered by Plaintiff included assaults committed by Neill and C.K. Apparently, despite performing additional investigation but failing to speak with Plaintiff again about the unwanted sexual assaults by Neill and C.K., Assistant Principal S.T. concluded that these actions amounted to a "boy girl thing."

153.    Assistant Principal S.T.'s description of events and characterization of Plaintiff's sexual

harassment as a "boy girl thing" demonstrated the woefully insufficient knowledge and understanding of sexual harassment and how to appropriately address the same. Assistant Principal S.T.'s woeful lack of understanding demonstrates the lack of training provided to Assistant Principal S.T. and others at RCMS by FCPS and FCSB regarding sexual harassment.

154.    Assistant Principal S.T.'s description statements to Plaintiff's mother that Plaintiff was "sexually active" with C.K. also demonstrates actual knowledge that Plaintiff suffered sexual violence or assault at the hands of a fellow student, but, due to her lack of training and understanding of sexual violence, Assistant Principal S.T. attempted to dismiss this as a consensual sexual act. Assistant Principal S.T.'s actions and statements demonstrate her understanding of sexual harassment and sexual violence, and how to appropriately address the same, was woefully inadequate. This demonstrates the lack of training provided to Assistant Principal S.T. and others at RCMS by FCPS and FCSB regarding sexual violence. Had she and others been provided appropriate and adequate training of sexual violence, Assistant Principal S.T. would have known, if she did not know already, that a twelve-year-old student (Plaintiff's age at this time) does not legally possess the capacity to consent to any sexual act and therefore every sexual act reported should be treated as a non-consensual act of sexual violence.

155.    During the November 22, 2011 meeting, Assistant Principals S.T. and P.A.H. made promises and assurances to Plaintiff and Plaintiff's parents that the school and its officials would keep Neill and C.K. away from Plaintiff, and that they were told to stay away from Plaintiff and that they could not go to the 7th grade area on campus. Then, in an acknowledgment of the severity of the circumstances of sexual harassment experienced by Plaintiff, Assistant Principals S.T. and P.A.H. told Plaintiff to use the "back stairs" to go to her Spanish class on the 2nd floor and instructed Plaintiff to stay home until after the upcoming break.

156.    Assistant Principal S.T. verified Neill's actions towards Plaintiff constituted "sexual assault or battery" which was required to result in, at minimum, a ten-day suspension. Despite their knowledge of this, neither Assistant Principal S.T., P.A.H., nor any other school official with actual knowledge disciplined Neill for his actions.

157.    Assistant Principal S.T. verified that Neill's, C.K.'s, and J.O.'s actions towards Plaintiff, including their cursing, gesturing, and verbally abusing of Plaintiff, constituted "disruptive behavior" that required disciplinary action at Assistant Principal S.T.'s, Assistant Principal A.F.'s, or Principal A.F.'s discretion as principals. Neither Assistant Principal S.T., Assistant Principal P.H., nor Principal A.F. disciplined Neill, C.K., or J.O.

158.    Assistant Principal S.T., Assistant Principal P.H., Counselor B.H., and Principal A.F. were aware that Plaintiff's report included a report of a collection of students who reportedly committed an assault on Plaintiff constituting a "mob." *See* **Exhibit L**, p. 18. Despite their knowledge of a mob assault on Plaintiff at her locker, Assistant Principal S.T., Assistant Principal P.A.H., B.H., Principal A.F., or any other school official at RCMS attempted to identify "each and every student who [was] part of the mob" and, as a result, the students involved in the mob were not disciplined contrary to the SR&R. **Exhibit L**, p. 30.

159.    The choice of Assistant Principal S.T., Assistant Principal A.F., Counselor B.H., and Principal A.F. not to discipline students in accordance with the SR&R policies demonstrated that the SR&R was a pretense and not the policy or custom in effect as it related to the investigation and discipline of students.

160.    In fact, FCSB had a policy and custom, as demonstrated by the actions of Assistant Principal S.T., Assistant Principal P.A.H., Counselor B.H., and Principal A.F., of performing superficial, self-serving investigations and not disciplining students for sexual violence and

harassment because the disciplinary rates were measured by governmental entities and non-profits when evaluating the performance of a school division, individual schools, and school officials. FCSB, FCPS, RCMS, Principal A.F., Assistant Principal S.T., Assistant Principal P.A.H., and T.B. were complicit and equally motivated to portray FCSB, FCPS, and RCMS as a safe environment with minimal, if any, instances of sexual violence and sexual harassment. In effect, FCSB had a policy, custom, and practice of sweeping student-on-student sexual violence and sexual harassment under the rug.

161.    Consistent with FCSB's policy, custom, and practice of sweeping sexual violence and sexual harassment under the rug, school officials at RCMS authorized to discipline students did not discipline Neill, C.K., and J.O., which operated as an affirmation of the conduct Neill, C.K., and J.O. reported to Assistant Principal S.T., including the sexual assaults, batteries, and harassment of Plaintiff.

162.    By sweeping the reports and knowledge of sexual violence and sexual harassment of Plaintiff under the rug, Assistant Principal S.T., Assistant Principal P.A.H., Counselor B.H., and Principal A.F. acted recklessly and that reckless action contributed to the violence suffered by Plaintiff after November 22, 2011, as alleged *infra*.

163.    Plaintiff returned to RCMS on or about November 28, 2011 after Thanksgiving break. Despite assurances made by Assistant Principal S.T., Principal A.F., Assistant Principal P.A.H., Counselor B.H., and Counselor J.F., Plaintiff's peers continued to harass her at school. This included at least three to five separate students between November 30th and December 5th telling Plaintiff that C.K. "has a gun and he is not afraid to kill you," "wants to shoot" her, "wants revenge," and "is going to get revenge." These threats were motivated by C.K.'s intent to produce fear in Plaintiff to restrict her freedom of speech and to silence her from making further disclosures

about C.K.'s past sexual violence committed on Plaintiff. During this time, other female students at RCMS approached Plaintiff and informed her that they too had been sexually harassed and threatened by C.K. in the past.

164.    Additionally, despite the assurances made to Plaintiff and her mother by Assistant Principal S.T., Assistant Principal P.A.H., Counselor B.H., and Principal A.F., C.K. recommenced his modus operandi of accosting Plaintiff at her bus stop on her way home from school and sexually assaulted and battering Plaintiff in the same or similar manner, as alleged *supra*.

165.    On or before December 7, 2011, Plaintiff and Plaintiff's parents reported the continued harassment and threatening comments directed towards Plaintiff while at school to FCPS agents and employees who possessed the authority to further investigate and discipline Plaintiff's harassers.

166.    On or before December 7, 2011, in response to additional reports by Plaintiff and Plaintiff's parents about continued sexual harassment, FCPS by and through its agents and employees at RCMS acting within the course and scope of their agency and employment, including Assistant Principals S.T. and P.A.H., Counselor B.H., and Counselor J.F., once again affirmatively and expressly agreed to shadow Plaintiff between the change of classes to ensure Plaintiff's safety, deter other students from sexually harassing Plaintiff, and protect Plaintiff from sexual harassment and sexual violence while on the premises of RCMS until the sexual harassment Plaintiff was experiencing simmered down.

167.    On December 8, 2011, Counselor J.F. affirmed the agreement and promise to shadow Plaintiff by email to Plaintiff's mother wherein she promised to monitor Plaintiff "between change of classes of 1ˢᵗ and 3ʳᵈ periods" on December 8 and December 9. **Exhibit P.**

168.    However, after only two days of shadowing, Plaintiff was no longer shadowed between

classes as promised, even though Plaintiff's sexual harassment had not simmered down or gone away. As a result, Plaintiff's mother called B.H. requesting an explanation for stopping the shadowing. B.H. informed Plaintiff's mother that RCMS "simply [didn't] have the resources" to shadow Plaintiff.

169.    By guaranteeing then withdrawing Plaintiff's supervision between classes two days later, Plaintiff was subjected to further preventable sexual harassment and sexual violence while at RCMS.

170.    On or around December 14, 2011, during history class, a male classmate put his hands down Plaintiff's pants thereby sexually assaulting, battering, and abusing Plaintiff.

171.    Plaintiff promptly reported the incident to her teacher, M.P.F. In response, M.P.F. told Plaintiff that she "needs to learn to be a big girl" and to "deal with the situation yourself."

172.    In December of 2011, Plaintiff stayed on campus at RCMS with her teacher for additional instruction to make up for instruction she did not receive because of absences related to her sexual harassment at RCMS alleged *supra*.

173.    After Plaintiff left the classroom, but while she was still on campus at RCMS and under the care and custody of Defendant FCSB, a male student accosted her in the hallway and forced her into a nearby closet where Plaintiff was physically assaulted and battered, sexually assaulted and battered, sexually abused, and raped by three unknown males (Mike Roes 1 – 3) consistent with the *modus operandi* of human and sexual traffickers in the Fairfax community as alleged *supra*.

174.    The aforementioned physical assault and battery, sexual assault and battery, sexual abuse, and rape of Plaintiff in December 2011 occurred after promises and assurances were made to Plaintiff and Plaintiff's parents by Defendant FCSB by and through its agents and employees with

the authority to act on its behalf that they would shadow and supervise Plaintiff on campus at RCMS to protect her from the sexual harassment and sexual violence reported by Plaintiff to Defendant FCSB's agents and employees beginning in October 2012.

175.    Following Plaintiff's aforementioned physical assault and battery, sexual assault and battery, sexual abuse, and rape in December 2011 and continuing through February 2012, Plaintiff stayed after regular school hours to take "make up" exams and receive additional instruction by her teachers at RCMS.

176.    On numerous separate and distinct occurrences while Plaintiff was on campus at RCMS after regular school hours, as alleged *supra*, from December 2011 until Plaintiff began homebound instruction in February 2012, Plaintiff was accosted by male students and/or unknown males (Mike and Mary Roes 1-15) who, following a similar *modus operandi* of Plaintiff's physical assault and battery, sexual assault and battery, sexual abuse, and rape in December 2011, forced Plaintiff into a nearby closet where they repeatedly physically assaulted and battered, sexually assaulted and battered, sexually abused, and raped Plaintiff.

177.    In or about the second or third week of January 2012 students at RCMS continued to spread rumors at school and through the internet and social media directed at Plaintiff's sex and sexuality including rumors that Plaintiff was a lesbian and bisexual, a "whore," that no one wanted her at school, and that she should "drink bleach." Additionally, Plaintiff's peers at RCMS continued to sexually harass her by accosting her at her locker before class and assaulting and battering her there.

178.    Also in January 2012, one of Plaintiff's peers at RCMS informed her that students were spreading rumors that Plaintiff "gives free oral sex."

179.    Later in January 2012 Plaintiff reported to Counselor B.H. that students were spreading

rumors and harassing her about being "bi-sexual."

180.    On January 27, 2012, Plaintiff physically went to A.F., in tears, to report her continued sexual harassment. In response, A.F. told B.R. that he "did not know what to do." This is yet another example of the woefully deficient and nonexistent training of employees at FCSB on how to recognize, respond, and prevent sexual harassment and sexual violence.

181.    Then, on January 27, 2012, Plaintiff wrote to Principal A.F. and Cheryl Weaver, Director of Student Services, complaining of "constant bullying" and requesting that RCMS take action to educate students about bullying at school with hopes that, by doing so, she may experience some relief from the harassment and bullying she was suffering.

182.    In their communications to RCMS from October 2011 forward, Plaintiff and Plaintiff's mother often used the word "bullying" to describe the sexual harassment and sexual violence Plaintiff was suffering because S.T. and T.B. informed Plaintiff and Plaintiff's mother that FCSB's policy did not include a policy on how to handle, report, or respond to sexual harassment. S.T. and T.B. informed the Plaintiff and her mother that the school could only intervene or assist with bullying. This is believed to have been another attempt by FCSB and its employees to limit the reporting of sexual harassment and sexual violence.

183.    On February 9, 2012, Plaintiff reported to Counselor B.H. that a boy made rude and inappropriate comments to her in the cafeteria during lunch on February 8th and in the cafeteria before school on February 9th. Counselor B.H. sent Plaintiff back to class and referred the report to T.B for investigation.

184.    Assistant Principal T.B. conducted an investigation that, according to information currently available to Plaintiff, included interviews of at least seven students who verified a boy in the eighth grade called Plaintiff inappropriate sexual expletives furthering the pattern of sexual

harassment she was suffering at RCMS. Among the February 8th statements that were reported to Assistant Principal T.B. were statements that Plaintiff was "a douche, a bitch, a slut, and a whore," a statement targeted at Plaintiff stating "fuck you, bitch," and a statement made to Plaintiff's friend in her presence that Plaintiff needed to "stop being a douche bag." Additionally, multiple students verified the same student approached Plaintiff the following day and again called Plaintiff a "douche bag." Though two sources (the eighth grader accused of inappropriate statements and an individual that appears to be his friend) reported the February 8th and 9th incidents were instigated by Plaintiff, they too verified inappropriate and sexually charged statements insulting and harassing Plaintiff in the presence of others were in fact made.

185.    Worse yet, during her interview of the February 8th and 9th incidents, Assistant Principal T.B. learned that the pattern of sexual harassment of Plaintiff first reported in October and November of 2011 had continued until and including the February 8th and 9th incidents. One student informed Assistant Principal T.B. that the same eighth grade student accused of harassing Plaintiff on February 8th and 9th had bullied Plaintiff in the past. Another student informed Assistant Principal T.B. that she heard two students in the hallway referring to Plaintiff as a "whore," which is consistent with the pattern of sexual harassment Plaintiff was reporting since October 2011. Despite these reports of prior incidents of sexual harassment and bullying, Assistant Principal T.B. did not investigate the pattern of sexual harassment leading up to February 8th and 9th, and in fact never interviewed the two students who reportedly called Plaintiff a "whore."

186.    Later, on February 9, 2012, Plaintiff went to her English classroom where her teacher, Tiffany Estrella, asked her what was wrong. Plaintiff then informed Estrella that she was receiving death threats. In response, Estrella called Principal A.F. Later, A.F. arrived to Plaintiff's classroom, retrieved Plaintiff, and then passed her on to guidance counselors to whom she reported

that she was receiving death threats from students who stated "everyone hates you" and "someone is going to kill you." Principal A.F. reported the threat to Assistant Principal T.B., who elected to wait until the following day, February 10, 2012, to begin investigating the threats.

187.    On February 9, 2012, Plaintiff's mother received a call from T.B. around 1 p.m. during which T.B. said that Plaintiff had been subjected to death threats. T.B. then attempted to diminish the severity of the situation by stating the threats were just what "kids say."

188.    Plaintiff's mom told T.B. that she was concerned for Plaintiff's safety and asked someone to watch Plaintiff. T.B. replied that she could not watch Plaintiff because she had a meeting off campus at district office with deputy superintendent.

189.    Plaintiff's mother then suggested that B.H. watch Plaintiff, to which T.B. agreed and said she would facilitate. However, when Plaintiff's mother called to ensure that B.H. was watching Plaintiff, Plaintiff's mother was informed that B.H. had left campus. Concerned that her child had received death threats and that PE was next scheduled class in the day, Plaintiff's parents went to RCMS to pick up Plaintiff from school.

190.    That evening, on February 9, 2012, Plaintiff reported her continued sexual harassment and the death threats to her parents who chose to keep her home the following day rather than send her to school.

191.    On February 10, 2012, Assistant Principal T.B., after learning that Plaintiff was not at school on February 10, 2012, decided she and the school were unable to follow up on her report of death threats and elected not to proceed with an investigation.

192.    On February 10, 2012, Plaintiff's mother wrote to Principal A.F. again informing him of Plaintiff's ongoing victimization by sexual harassment depriving her of her right to a safe and secure learning environment. In response, Principal A.F. informed Plaintiff's mother that

Assistant Principal T.B. was "working on this case throughout the day," but that what she found indicated Plaintiff "had a part" in making inappropriate comments to other students. Neither Assistant Principal T.B. nor Principal A.F. informed Plaintiff or her mother that over a half dozen students verified and supported Plaintiff's report of sexual harassment. Assistant Principal T.B.'s and Principal A.F.'s statement to Plaintiff's mother that Plaintiff "had a part" in the February 8-9 incidents without disclosing over a half-dozen students verified Plaintiff's reports amounted to a material misrepresentation of the investigation and a concealment of material information.

193.     Justifiably concerned that Principal A.F. and other administrators and staff were, again, shifting the blame and responsibility on Plaintiff, Plaintiff's mother forwarded the February 10, 2012 Principal A.F. email to Superintendent Dr. Jack Dale ("Superintendent Dale"). In response, Superintendent Dale referred the email to Cluster VIII Assistant Superintendent Dr. Fabio Zuluaga ("Dr. Zuluaga") and requested Dr. Zuluaga look into and respond to Plaintiff's complaints.

194.     Concerned with Plaintiff's safety, Plaintiff's mother and father kept Plaintiff home from school while they attempted to resolve the ongoing sexual harassment of their daughter.

195.     On or about February 16, 2012, Plaintiff's mother, Plaintiff's father, Plaintiff's brother, and Plaintiff met with Dr. Zuluaga and Dr. Dreyfuss to further report Plaintiff's ongoing sexual harassment and bullying at RCMS. The following day, on February 17, 2012, Plaintiff's mother assured Dr. Zuluaga and Dr. Dreyfuss that Plaintiff's physician would fax a note regarding her absences at school and the need for homebound instruction.

196.     On or about February 17, 2012, Plaintiff's mother emailed and faxed Dr. Zuluaga and Dr. Dreyfuss a note from Plaintiff's physician that Plaintiff was under psychiatric care for bullying, sexual harassment, and receiving death threats at RCMS. Plaintiff's physician

recommended Plaintiff be removed from school and suggested allowing home instruction for the near future, noting Plaintiff was emotionally unstable and her school was not a safe, secure environment for her.

197.    On or about February 23, 2012, FCPS and RCMS approved Plaintiff for homebound instruction for approximately thirty (30) days.

198.    In or about the last week of February 2012, after beginning homebound instruction, Plaintiff disclosed to her mother that she was sexually assaulted by C.K. Thereafter, Plaintiff visited a mental health professional and disclosed, again, that she was a victim of sexual assault, sexual abuse, and rape.

199.    On or about March 2, 2012, Plaintiff's mother took Plaintiff to the local Fairfax County Police Department ("FCPD") precinct where Plaintiff reported C.K. sexually assaulted, sexually abused, and raped her. After receiving the report, the on-duty uniform officer reported the sexual crimes to the FCPD sex crimes unit for further investigation.

200.    On or about March 5, 2012, Plaintiff's mother spoke, for the first time, to Detective Chambers Fred Chambers with the FCPD, the former SRO for RCMS, who instructed Plaintiff's mother to take her daughter to the Sexual Assault Nurse Examiner ("SANE") for an evaluation.

201.    Later that evening, on March 5, 2012, Plaintiff's mother, father, and brother transported Plaintiff to Child Help Center of Fairfax County where Plaintiff underwent an evaluation that revealed she suffered contusions inside her anus thereby corroborating her report of rape and sodomy.

202.    While at SANE for her evaluation, Plaintiff and Plaintiff's mother received recommendations from nursing staff and others at SANE to schedule an appointment for Plaintiff to visit her doctor.

203.     On March 6, 2012, Plaintiff's mother took Plaintiff to her physician's office for an examination and evaluation where Plaintiff, again, disclosed a fellow student at RCMS (C.K.) raped and sodomized Plaintiff.

204.     Meanwhile on March 6, 2012, unbeknownst to Plaintiff and her parents, Detective Chambers met with Principal A.F. to discuss Plaintiff's reports of rape and sodomy.

205.     On March 7, 2012, Plaintiff's medical provider wrote a letter intended for, and later received by, RCMS and FCPS that stated RCMS was not a safe environment for her mentally or emotionally because the boy who perpetrated this crime plus many of his friends who assisted him remained at RCMS.

206.     On March 7, 2012, Plaintiff's mother called and spoke with Detective Chambers who told Plaintiff's mother that he spoke with "everyone" at RCMS and there was nothing to the case, but that he wanted to meet with Plaintiff.

207.     On March 8, 2012, Plaintiff's mother took Plaintiff to the FCPD precinct where Detective Chambers insisted on meeting with Plaintiff, then 12 years old, alone behind closed doors.

208.     Detective Chambers took Plaintiff in a room without her parents present, closed the door, and accused Plaintiff of falsely reporting her rape and threatened Plaintiff with criminal action for making a false accusation of rape against C.K. despite his knowledge of corroborating evidence of the rape and sexual assaulting including (1) C.K. admitted to Detective Chambers that he walked to meet Plaintiff at her bus stop after school and did in fact meet with Plaintiff in a secluded area without anyone else present; (2) C.K. admitted to Detective Chambers that he engaged in sexual acts with Plaintiff including oral sex and groping her breasts; and (3) the nurse who performed Plaintiff's SANE explained to Detective Chambers that there was scarring on

Plaintiff's anus consistent with Plaintiff's statement to Detective Chambers regarding sexual assault and anal penetration. Additionally, Detective Chambers, as law enforcement personnel, knew or should have known the corroborated description of events provided by Plaintiff amounted to Sexual Abuse[24], Rape[25] and Object Sexual Penetration[26], among other crimes, under Virginia law.

209.    After receiving the aforementioned note from Plaintiff's physician on March 7, 2012, FCPS and RCMS approved Plaintiff for homebound instruction for an additional thirty (30) days.

210.    Plaintiff then spent the next year under homebound instruction.

211.    During the remainder of Plaintiff's seventh grade school year, students and homebound teachers were advised by FCPS employees not to discuss any matters concerning Plaintiff with anyone given the potential liability FCPS faced for their acts and omissions resulting in their failure to safeguard Plaintiff against sexual harassment and sexual assault on school property. Plaintiff was no longer permitted to engage in extracurricular activities with other students or benefit from other offerings from the public school system during this time.

212.    Under the guise of a school investigation, and in the course and scope of his authority as principal of RCMS, Principal A.F. visited Plaintiff's elementary school to dig up "dirt" on Plaintiff and inquire if she was a "troubled child."

213.    During this time, in or about April 2012, Officer Genus informed B.R.'s mom that he had substantiated a simple assault by J.O. against Plaintiff. However, despite this, FCPS never

---

[24] *See* Va. Code § 18.2-67.10(6).

[25] *See* Va. Code § 18.2-61.

[26] *See* Va. Code § 18.2-67.2.

disciplined J.O. for assault.

214.    It was not until June 29, 2012, and only upon inquiry from Plaintiff's mother, that FCPS and FCSB, by and through a letter written by Zuluaga to Plaintiff's mother, advised Plaintiff and her parents that FCPS could not verify Plaintiff's reports of sexual harassment, inappropriate touching, and other bullying, which was categorically false and misleading.

215.    Zuluaga's June 29, 2012 letter contained knowingly false statements and material misrepresentations about FCPS's and Defendant FCSB's knowledge and actions taken by FCPS and FCSB in response to reports of sexual harassment, sexual violence, and bullying made by Plaintiff.

216.    Zuluaga, in his June 29, 2012 letter, told Plaintiff and Plaintiff's mother "[t]he incidents of harassment, inappropriate touching, and other bullying could not be verified" when, in fact, as alleged *supra*, a student (believed to be C.K.) confirmed to Assistant Principal S.T. that David Neill told him that Plaintiff gave him a blow job and a hand job, that students at RCMS began saying Plaintiff was a "whore," and he overhead David Neill call Plaintiff a "whore and a slut;" David Neill reported that he touched Plaintiff sexually when Plaintiff was twelve years old and therefore unable to consent to sexual touching; and a female student (believed to be J.O.) admitted to calling Plaintiff a slut. Additionally, FCPS verified Plaintiff's reported incidents of sexual harassment and other bullying in early February after Plaintiff reported the February 8-9 incidents, as alleged *supra*, including a statement from a student on February 8, 2012 that a student "has bullied [Plaintiff]". Finally, FCPS was, upon information and belief, informed of the findings made by Detective Chambers as part of his investigation in March 2012 that C.K. reported he was sexually active with Plaintiff when Plaintiff was twelve years old.

217.    Zuluaga, in his June 29, 2012 letter, tacitly admits that Plaintiff's reports were

verified and corroborated, but attempted to downplay and diminish the severity of the corroborated reports by describing them as "name-calling incidents."

218.    Zuluaga, in his June 29, 2012 letter, told Plaintiff and her mother that FCPS advised teachers at RCMS to "watch for [Plaintiff's safety during class, in the locker pod between classes, and in the locker room" when, in fact, FCPS did not inform Plaintiff's teachers to watch for Plaintiff's safety.

219.    On or about August 13, 2012, Plaintiff's mother met with Fabio Zuluaga and A.F., along with the National Women's Law Center. The objective of the meeting was to facilitate B.R.'s return to school, her accommodations, as well as to ensure B.R. had safeguards in place to keep her safe. They also wanted to discuss what FCPS could do to improve its policies to prevent this from happening again.

220.    FCPS insisted that its policies and procedures were adequate and insisted it acted appropriately in Plaintiff's case. FCPS did not re-open the investigation, assign the case to a Title IX coordinator/investigator, or review its policies. When confronted with the fact that Plaintiff was a healthy child who now had a serious IEP and could not attend school, they insisted they did everything right. As a result, Plaintiff's mother filed an OCR complaint in September 2012.

221.    The Department of Education's Office of Civil Rights launched a two year investigation into FCPS's handling of Plaintiff's allegations. Before the investigation concluded, FCPS opted to enter into a "voluntary resolution." Although the agreement allowed FCPS to avoid admitting liability, OCR "identified" some possible concerns with the adequacy of the Division's investigation, its analysis of the information collected, and the Division's apparent treatment of the incidents of alleged harassment as discrete, isolated occurrences rather than addressing the broader issue of a potentially hostile environment at the School."

222.    OCR also conducted an audit into FCPS's pattern of responding to allegations of sexual misconduct, but wrote, "OCR found some instances in which the Division's response to the offenses may not have been prompt and appropriate under Title IX" OCR went on how to it was "unclear" if FCPS "put in place interim measures to ensure no contact between the victim and the accused during the investigation of the offenses, counseling for the victim, training for the accused or other students at the schools, or other remedies to address a sexually hostile environment. In addition, in several of the reports the school provided no written information to support its investigation and conclusion that sexual harassment had occurred."

223.    OCR stated it had "further concerns that the Division does not have a system to track reports of sexual harassment to determine whether there may be a hostile environment at a particular school, whether individual schools are responding in a prompt and appropriate manner to reports of sexual harassment, whether the Division's efforts to educate students regarding sexual harassment are effective, or whether school-based investigations of reports of sexual harassment are prompt and equitable."

224.    As a result of this probe, OCR entered into a voluntary resolution with FCSB. This included: updating the sexual harassment and Title IX policy, establishing and advertising the role of Title IX coordinator, ensuring teachers and staff have adequate Title IX training, ensuring students get appropriate anti-harassment training, and the creation of a centralized database of reports of harassment, among other things. But for FCBS to implement these reasonable, basic safeguards, Plaintiff would not have suffered grievous sexual abuse, lost her ability to attend school, and been forced to leave FCSB.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF TITLE IX**

49

**20 U.S.C. § 1681** *et. seq.*
*Plaintiff v. FCSB*

225.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

226.     Title IX of the Education Amendments of 1972 ("Title IX") 20, U.S.C. §1681(a), states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

227.     At all relevant times, Plaintiff was a student at RCMS, an educational institution receiving federal funds.

228.     FCSB had actual knowledge that Plaintiff experienced sexual assaults and sexual harassment at RCMS and under contexts which FCSB had substantial control, could have exerted substantial control, and at the hands of individuals, including other students, which FCSB could have exerted substantial control over through its disciplinary authority.

229.     FCSB was obligated to address these sexual assaults and incidents of sexual harassment because student-on-student assault and harassment are forms of sex discrimination prohibited by Title IX.

230.     FCSB was also obligated to address these sexual assaults and incidents of sexual harassment under Title IX because FCSB had substantial control over the students who sexually assaulted and harassed Plaintiff as well as the context in which the assaults and harassment occurred.

231.     The individuals with actual knowledge had the authority and ability to investigate

and take meaningful corrective action to end or prevent sexual assaults and harassment of Plaintiff but failed to do so.

232.    The sexual assaults and harassment that multiple students inflicted on Plaintiff were severe, pervasive, and objectively offensive, and effectively deprived Plaintiff of access to educational opportunities and benefits provided by RCMS.

233.    The sexual assaults and harassment Plaintiff suffered created a hostile educational environment at RCMS based on Plaintiff's sex.

234.    FCSB by its acts and omissions created a hostile educational climate and environment where male-on-female student sexual assaults and harassment were tolerated, which encouraged repeated sexual harassment and sexual assaults and proximately caused injuries to Plaintiff.

235.    By its acts and omissions, FCSB was deliberately indifferent to Plaintiff's sexual assaults, sexual harassment, and reports of the same, as well as the sexually hostile educational environment in which Plaintiff suffered sexual assaults and sexual harassment because of FCSB's failure to take meaningful corrective and preventative action. FCSB's deliberate indifference includes but is not limited to:

a.    Failing to timely address Plaintiff's October 2011 reports and November 21, 2011 written and verbal reports of sexual harassment, extortion, and physical and verbal abuse at the hands of FCPS's students, including C.K. and J.O.;

b.    Conducting a sham investigation and confirming Plaintiff's report that she was extorted by her assailant for fifty dollars ($50.00), but dismissing knowledge of the sexual contact between Plaintiff and her assailant as a "boy-girl thing" on account of FCPS's assistant principal's objectively outrageous insinuation that the then twelve year old Plaintiff was sexually promiscuous and FCPS's assistant principal's reluctance to ruin an already troubled teenage boy's life;

c.    Learning of Plaintiff's sexual assault at the hands of a male FCPS student and disregarding the assault as a "boy-girl" thing;

    d.      Discouraging Plaintiff from reporting sexual harassment, bullying, and verbal and physical abuse at the hands of her assailant by telling Plaintiff and her parents that Plaintiff engaged in consensual sexual encounters with the assailant, and implying that FCPS would not validate Plaintiff's November 21, 2011 reports of sexual harassment and abuse because it would harm the male assailant;

    e.      Electing not to take disciplinary action against Plaintiff's harassers and assailants, including C.K. and J.O.;

    f.      Emboldening Plaintiff's harassers and assailants and other FCPS students to retaliate against her for reporting her sexual harassment and bullying to FCPS's administrators;

    g.      Unreasonably delaying and electing not to implement measures promised to Plaintiff and her parents during their November 22, 2012 meeting with Assistant Principal S.T.;

    h.      Electing not to investigate Plaintiff's rape at the hands of another FCPS student;

    i.      Electing not to take disciplinary action against Plaintiff's assailants;

    j.      Not notifying Plaintiff or her parents of Plaintiff's rights under Title IX; and

236.    As a direct and proximate cause of FCSB's violation of Plaintiff's rights under Title IX, Plaintiff suffered and continues to suffer from losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, trauma, traumatic brain injury, lost future earnings and earning capacity, and expenses for past and future educational, medical and psychological care.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendant FCSB for:

    a.      Compensatory damages;

    b.      Pre- and post-judgment interest;

    c.      Costs;

    d.      Attorneys' fees pursuant to 42 U.S.C. § 1988(b), and

    e.      Such other relief as the Court may deem just and proper.

## COUNT II

**VIOLATION OF TITLE IX – RETALIATION**
**20 U.S.C. § 1681 *et seq.***
***Plaintiff v. FCSB***

237.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

238.     Title IX of the Education Amendments of 1972 ("Title IX") 20, U.S.C. §1681(a), states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…"

239.     As alleged herein, Plaintiff engaged in protected activity under Title IX by reporting sexual assaults, sexual battery, sexual abuse, and sexual harassment against her, and, as a result of such activity, Plaintiff suffered materially adverse action, including retaliatory harassment, attributable to FCSB.

240.     FCSB acted with deliberate indifference toward known instances of student-on-student retaliatory harassment of Plaintiff by students that it exercised substantial control over and in contexts in which FCSB had substantial control. FCSB's deliberate indifference includes but is not limited to:

k.     Failing to timely address Plaintiff's October 2011 and November 21, 2011 written and verbal reports of sexual harassment, extortion, physical and verbal abuse at the hands of FCPS's students, including C.K. and J.O.;

l.     Conducting a sham investigation and confirming Plaintiff's report that she was extorted by her assailant for fifty dollars ($50.00), but dismissing knowledge of a sexual relationship between Plaintiff and her assailant as a "boy-girl thing" on account of FCPS's assistant principal's objectively outrageous insinuation that the then twelve year old Plaintiff was sexually promiscuous and FCPS's assistant principal's reluctance to ruin an already troubled teenage boy's life;

53

m.     Learning of Plaintiff's sexual assault at the hands of a male FCPS student and disregarding the assault as a "boy-girl" thing;

n.     Discouraging Plaintiff from reporting sexual harassment, bullying, and verbal and physical abuse at the hands of her assailant by telling Plaintiff and her parents that Plaintiff engaged in consensual sexual encounters with the assailant, and implying that FCPS would not validate Plaintiff's November 21, 2011 reports of sexual harassment and abuse because it would harm the male assailant;

o.     Electing not to take disciplinary action against Plaintiff's harassers and assailants including C.K. and J.O.;

p.     Emboldening Plaintiff's harassers and assailants and other FCPS students to retaliate against her for reporting her sexual harassment and bullying to FCPS's administrators;

q.     Unreasonably delaying and electing not to implement measures promised to Plaintiff and her parents during their November 22, 2012 meeting with Assistant Principal S.T.;

r.     Electing not to investigate Plaintiff's rape at the hands of another FCPS student;

s.     Electing not to take disciplinary action against Plaintiff's assailants;

t.     Attempting and/or threatening to discipline Plaintiff after reports of continued harassment in January and February 2012;

u.     Not notifying Plaintiff or her parents of Plaintiff's rights under Title IX;

v.     Choosing not to order an IEP evaluation for Plaintiff which was indicated and required;

w.     Obstructing the IEP process in attempts to skew the results and implications; and

x.     Otherwise retaliating against Plaintiff and her parents for reporting peer-on-peer rape and harassment by FCPS students.

241.     As a direct and proximate cause of FCSB's violation of Plaintiff's rights under Title IX, Plaintiff suffered and continues to suffer from losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, trauma, traumatic brain injury, lost future earnings and earning capacity, and expenses for past and future medical and psychological care.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendant FCSB for:

a.      Compensatory damages;

b.      Pre- and post-judgment interest;

c.      Costs;

d.      Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

**e.**     Such other relief as the Court may deem just and proper.

**COUNT III**
**VIOLATION OF FREE SPEECH**
**U.S. CONSTITUTION FIRST AMENDMENT**
**42 U.S.C. § 1983**
***Plaintiff v. Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.***

242.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

243.     At all relevant times, Plaintiff had the First Amendment right of free speech including her right to affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.

244.     As alleged *supra*, Plaintiff made repeated reports of sexual abuse, sexual harassment, and sexual violence to Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. who were, at all times material and relevant herein, public officials.

245.     Plaintiff was engaged in protected First Amendment activities when making statements and reports of sexual abuse, sexual harassment, and sexual violence as alleged *supra* to Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

246.    Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. as alleged

*supra* took action that adversely affected her First Amendment rights including:

a.  Failing to timely address Plaintiff's October 2011 and November 21, 2011 written and verbal reports of sexual harassment, extortion, physical and verbal abuse at the hands of FCPS's students, including C.K. and J.O.;

b.  Conducting a sham investigation and confirming Plaintiff's report that she was extorted by her assailant for fifty dollars ($50.00), but dismissing knowledge of a sexual relationship between Plaintiff and her assailant as a "boy-girl thing" on account of FCPS's assistant principal's objectively outrageous insinuation that the then twelve year old Plaintiff was sexually promiscuous and FCPS's assistant principal's reluctance to ruin an already troubled teenage boy's life;

c.  Learning of Plaintiff's sexual assault at the hands of a male FCPS student and disregarding the assault as a "boy-girl" thing;

d.  Discouraging Plaintiff from reporting sexual harassment, bullying, and verbal and physical abuse at the hands of her assailant by telling Plaintiff and her parents that Plaintiff engaged in consensual sexual encounters with the assailant, and implying that FCPS would not validate Plaintiff's November 21, 2011 reports of sexual harassment and abuse because it would harm the male assailant;

e.  Electing not to take disciplinary action against Plaintiff's harassers and assailants including C.K. and J.O.;

f.  Emboldening Plaintiff's harassers and assailants and other FCPS students to retaliate against her for reporting her sexual harassment and bullying to FCPS's administrators;

g.  Unreasonably delaying and electing not to implement measures promised to Plaintiff and her parents during their November 22, 2012 meeting with Assistant Principal S.T.;

h.  Electing not to investigate Plaintiff's rape at the hands of another FCPS student;

i.  Electing not to take disciplinary action against Plaintiff's assailants;

j.  Not notifying Plaintiff or her parents of Plaintiff's rights under Title IX; and

k.  Retaliating against Plaintiff and her parents for reporting peer-on-peer rape and harassment by FCPS students.

247.     There existed a causal relationship between Plaintiff's protected activity and the Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. actions that adversely affected Plaintiff's First Amendment rights including a chilling of Plaintiff's reporting to these public officials and others of her ongoing sexual abuse, sexual harassment, and sexual violence.

248.     The actions taken by Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. would likely deter a person of ordinary firmness from exercising the of First Amendment rights in did in fact deter Plaintiff.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendants A.F., S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. for:

a.     Compensatory damages;

b.     Pre- and post-judgment interest;

c.     Costs;

d.     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

e.     Such other relief as the Court may deem just and proper.

## COUNT IV
## VIOLATION OF EQUAL PROTECTION
## U.S. CONSTITUTION FOURTEENTH AMENDMENT
## 42 U.S.C. § 1983
### *Plaintiff v. Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.*

249.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

250.     At all relevant times, Plaintiff had the right as a public school student to equal

protection of laws under the Fourteenth Amendment to the U.S. Constitution.

251.     At all relevant times, Plaintiff had the right to equal access to an educational environment free from sexual harassment, sexual assaults, and discrimination on the basis of sex under the Equal Protection Clause of the Fourteenth Amendment.

252.     At all relevant times, Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. were state actors acting under color of state law.

253.     Under the Equal Protection Clause of the Fourteenth Amendment, Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. were obligated to address known student-on-student sexual harassment, including sexual assault.

254.     As alleged *supra* and *infra*, Plaintiff was subjected to discriminatory peer harassment beginning in or about October , 2011, which began after a male student spread false rumors that Plaintiff gave him a "blow jobs" and "hand jobs" and later led to other male students calling Plaintiff a "slut," "whore," "hoe," "lesbian," and "bi-sexual." The discriminatory statements made about and to Plaintiff amounted to harassment on the basis of her sex.

255.     In or about October, 2011, Defendants M.P.F., M.C., and F.T. had knowledge of the student-on-student sexual harassment Plaintiff was experiencing by and through their observations of students making sexual gestures and calling Plaintiff sexually derogatory names near Plaintiff's locker before class on or about October 31, 2011.

256.     In or about October, 2011, Plaintiff attempted to report her sexual harassment to her guidance counselor B.H. who instructed Plaintiff she was too busy to meet with her at that time. Thereafter, on or about the same day, Plaintiff reported her sexual harassment to J.F. As a result, J.F. had knowledge of student-on-student sexual harassment committed against Plaintiff.

257.     On November 21, 2011, Plaintiff and her parents reported her sexual assaults and

sexual harassment to B.H., S.T., and P.A.H.

258.    According to FCSB internal documents purportedly prepared by T.B., by November 22, 2011, S.T. and/or P.A.H., informed all of Plaintiff's teachers, including M.P.F., M.C., and F.T., of Plaintiff's student-on-student sexual harassment. Upon information and belief, A.F. was also informed and aware of Plaintiff's student-on-student sexual harassment by November 22, 2011.

259.    As a result, by at least November 22, 2011, Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. had actual knowledge that Plaintiff experienced sexual assaults and sexual harassment at RCMS.

260.    Thereafter, Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. responded to the discriminatory peer sexual harassment with deliberate indifference by acting as alleged *supra* and *infra*.

261.    Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F., by their acts and omissions, created a hostile educational climate and environment where male-on-female student sexual assaults and harassment were consciously tolerated, which encouraged repeated sexual harassment and sexual assaults, and proximately causing injuries to Plaintiff.

262.    Defendants violated Plaintiff's right to equal protection of the laws on the basis of sex by acting with deliberate indifference in response to Plaintiff's sexual assaults, sexual harassment, reports of the same, as well as the sexually hostile educational environment in which Plaintiff suffered sexual assaults and harassment because of their failure to take meaningful corrective and preventative action.

263.    At all relevant times, A.F. was the supervisor of Defendants S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

264.     On or about November 21, 2011, as a result of the verbal and written reports made by Plaintiff and Plaintiff's parents, A.F. had actual or constructive knowledge that Plaintiff was suffering from sexual harassment and sexual violence at RCMS.

265.     On or about November 22, 2011, A.F. had actual or constructive knowledge that his subordinates S.T., P.A.H., B.H., and J.F. verified Plaintiff's reports of sexual harassment and sexual violence, but chose to dismiss the reports as a "boy girl thing" and chose not to discipline students responsible for the sexual violence and harassment. Thus, A.F. had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff.

266.     On or about November 22, 2011 and after, A.F.'s response to his actual and constructive knowledge was effectively non-existent. A.F.'s deference to his subordinates despite his knowledge that their actions violated and were likely to violated Plaintiff's constitutional and statutory rights demonstrated his deliberate indifference to or tacit authorization of the alleged offensive practices of S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

267.     As an affirmative, direct and proximate cause of A.F.'s inaction, Plaintiff continued to suffer violations to her constitutional right of equal protection following for the remainder of her time at RCMS.

268.     Defendants A.F., S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. all knew about the harassment of the Plaintiff and acquiesced in that conduct by refusing to respond to it.

269.     Defendants A.F., S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. sought to downplay the sexual harassment, sexual abuse, sexual assault, and sexual battery, and threats to Plaintiff and made no effort to stop them, which demonstrates that their deliberate indifference was motivated by a discriminatory intent.

270.     The right to be free from the deliberate indifference of Defendants A.F., S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. toward the student-on-student sexual harassment that Plaintiff suffered was clearly established at the time of their conduct in that it was settled law and clearly prohibited their conduct in the particular circumstances before them.

271.     As a direct and proximate cause of Defendants violations of Plaintiff's equal protection rights under the Fourteenth Amendment, Plaintiff suffered and continues to suffer from losses of educational opportunities and benefits, along with injuries, damages, and losses, including but not limited to, emotional distress, fear, trauma, traumatic brain injury, lost future earnings and earning capacity, and expenses for past and future medical and psychological care.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendants A.F., S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. for:

f.     Compensatory damages;

g.     Pre- and post-judgment interest;

h.     Costs;

i.     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

j.     Such other relief as the Court may deem just and proper.

**COUNT V**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**
**U.S. CONSTITUTION FOURTEENTH AMENDMENT**
**42 U.S.C. § 1983**
***Plaintiff v. S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.***

272.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

273.    Under the Fourteenth Amendment to the U.S. Constitution, Plaintiff has (and at all relevant times had) a substantive due process right against state actor conduct that deprives her of bodily integrity.

274.    Accordingly, state actions that resulted in the sexual harassment, sexual assault, sexual battery, and/or sexual abuse are actionable under 42 U.S.C. § 1983.

275.    Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F., through their affirmative acts, acted recklessly and with deliberate indifference to Plaintiff resulting in a state created danger.

276.    After receiving Plaintiff's reports of sexual harassment and assault in or about October, 2011, Defendants M.P.F., M.C., and F.T. acted with deliberate indifference by electing not to follow the SR&R requiring investigation and discipline of students who harass and assault other students. By disregarding written procedures of investigation and discipline, Defendants M.P.F., M.C., and F.T. demonstrated to RCMS students that a different custom and practice was in place when a report of sexual harassment and assault was made. More specifically, M.P.F., M.C., and F.T. demonstrated that the true custom and practice at RCMS was to treat reports of sexual harassment and assault as common "boy-girl" conflicts that would not result in discipline. As a result, and by not investigating or reporting Plaintiff's reports to senior administrative officials, M.P.F., M.C., and F.T. increased the risk of private danger to Plaintiff.

277.    Defendants S.T., A.F., P.A.H., and B.H. affirmatively acted with recklessness and deliberate indifference beginning on or about November 21, 2011 after they possessed actual knowledge that Plaintiff was a victim of sexual violence and sexual harassment, but chose not to discipline Neill, C.K., or J.O., as alleged *supra*. Further, S.T.'s statements to Plaintiff and her mother describing Plaintiff's verified sexual harassment and sexual assault as a "boy girl thing"

62

and stating Plaintiff was simply "sexually active" demonstrated a reckless disregard and indifference to Plaintiff's rights of bodily integrity and to be free from the unwanted touching, sexual or otherwise, of others. The actions of S.T., A.F., P.A.H., and B.H. increased the risk of private danger to Plaintiff.

278.     Following Plaintiff's November 21, 2011 report, S.T., P.A.H., A.F., B.H. and J.F. increased the risk of private danger to Plaintiff by failing to have adult supervision with Plaintiff between classes after promising and assuring Plaintiff and her parents that Plaintiff would have adult supervision to ensure her safety and protection at RCMS. These assurances and actions also constituted affirmative acts of recklessness and deliberate indifference. S.T., P.A.H., A.F., B.H., and J.F. knew or should have known that Plaintiff and Plaintiff's parents were relying on the promises and assurances of Plaintiff's safety and the actions that they would take to ensure Plaintiff's safety. Making assurances and promises that they knew would not be implemented demonstrates their reckless indifference to Plaintiff's rights and safety.

279.     As is alleged *supra*, the risk of private danger to Plaintiff continued after T.B. inserted herself into the investigation and disciplinary process after Plaintiff's February reports of sexual harassment. As alleged *supra* T.B. verified the reports of sexual harassment made by Plaintiff but did not act upon the verification thereby increasing the risk of private injury to Plaintiff until Plaintiff's mother removed Plaintiff from school.

280.     At all relevant times, A.F. was the supervisor of Defendants S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

281.     On or about November 21, 2011, as a result of the verbal and written reports made by Plaintiff and Plaintiff's parents, A.F. had actual or constructive knowledge that Plaintiff was suffering from sexual harassment and sexual violence at RCMS.

282.   On or about November 22, 2011, A.F. had actual or constructive knowledge that his subordinates S.T., P.A.H., B.H., and J.F. verified Plaintiff's reports of sexual harassment and sexual violence, but chose to dismiss the reports as a "boy girl thing" and chose not to discipline students responsible for the sexual violence and harassment. Thus, A.F. had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff.

283.   On or about November 22, 2011 and after, A.F.'s response to his actual and constructive knowledge was effectively non-existent. A.F.'s deference to his subordinates despite his knowledge that their actions violated and were likely to violate Plaintiff's constitutional and statutory rights demonstrated his deliberate indifference to or tacit authorization of the alleged offensive practices of S.T., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

284.   As an affirmative, direct and proximate cause of A.F.'s inaction, Plaintiff continued to suffer violations to her constitutional right of bodily integrity following for the remainder of her time at RCMS.

285.   As a direct and proximate cause of Defendants violations of Plaintiff's right to bodily integrity under the Fourteenth Amendment, Plaintiff suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages, and losses, including but not limited to, emotional distress, fear, trauma, traumatic brain injury, lost future earnings and earning capacity, and expenses for past and future medical and psychological care.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendants for:

a.     Compensatory damages;

b.     Pre- and post-judgment interest;

c.     Costs;

d.      Attorneys' fees pursuant to 42 U.S.C. § 1988(b), and

e.      Such other relief as the Court may deem just and proper.

## COUNT VI
## VIOLATION OF EQUAL PROTECTION
## U.S CONSTITUTION FOURTEENTH AMENDMENT
## 42 U.S.C. § 1983
### *Plaintiff v. FCSB*

286.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every

allegation asserted in the preceding and following paragraphs, including each and every factual

and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each

such allegation.

287.    At all relevant times, FCSB had unconstitutional customs and/or policies, of (a)

inappropriate and inadequate investigations and responses to their actual knowledge of male-on-

female student sexual harassment and sexual violence, (b) inadequate and non-existent policies

prohibiting sexual harassment and sexual assaults of female students by male students, and (c)

inadequate and non-existent training of its administrators and employees on how to recognize,

address, response to, and prevent sexual harassment and sexual violence of its students.

288.    FCSB followed these unconstitutional customs and/or policies not only with regard

to Plaintiff, but also with regard to the sexual harassment of other female students at RCMS and

other schools within its division.

289.    FCSB's unconstitutional customs and/or policies constituted disparate treatment of

female students and had a disparate impact on female students.

290.    FCSB was the policymaker charged with creating and implementing constitutional

customs and/or policies. By implementing the unconstitutional customs and/or policies of

performing inappropriate and inadequate investigations and responses to their actual knowledge

of male-on-female student sexual harassment and sexual violence; implementing inadequate and

65

non-existent policies prohibiting sexual harassment and sexual assaults of female students by male students; and failing to adequately train its administrators and employees on how to recognize, address, response to, and prevent sexual harassment and sexual violence of its students, FCSB acted with deliberate indifference to reports of male-on-female student sexual harassment and sexual assaults, including Plaintiff's report.

291.    FCSB's customs and/or policies, for responding to known incidents of sexual harassment and assaults were so clearly inadequate that they give rise to a reasonable inference that FCSB consciously acquiesced in the harassment and bullying. Notably, despite the public guidance from the OCR to adopt and implement grievance procedures for sex discrimination complaints and reports of sexual harassment, FCSB elected not to do so despite its neighboring school board's heeding the same advice from OCR and Virginia DOE. *See* **Exhibits Q and R.**

292.    The failure of FCSB to respond appropriately to known sexual harassment and sexual assaults caused Plaintiff to be subjected to repeated sexual harassment and sexual assaults that were preventable.

293.    If FCSB's training had been adequate, individual defendants would have (a) recognized Plaintiff's sexual harassment and sexual assaults; (b) recognized Plaintiff's reports of sexual assaults and sexual harassment were non-consensual and a violation of her rights; (c) properly investigated Plaintiff's reports; and (d) taken meaningful corrective action to prevent future recurrences and to permit Plaintiff to continue her education in a safe environment.

294.    As a direct and proximate cause of FCSB's violations of Plaintiff's equal protection rights under the Fourteenth Amendment, Plaintiff suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages, and losses, including but not limited to, emotional distress, fear, trauma, traumatic brain injury, lost future earnings and earning

capacity, and expenses for past and future medical and psychological care.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendant FCSB for:

a.  Compensatory damages;

b.  Pre- and post-judgment interest;

c.  Costs;

d.  Attorneys' fees pursuant to 42 U.S.C. § 1988(b), and

Such other relief as the Court may deem just and proper.

**COUNT VII**
**GROSS NEGLIGENCE**
**VIRGINIA COMMON LAW-BREACH OF DUTY OF CARE AND SUPERVISION**
*Plaintiff v. S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F*

295.  Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

296.  Plaintiff's guardian relinquished the supervision and care of Plaintiff to Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F giving rise to a duty to act with reasonable care in Plaintiff's supervision and care.

297.  Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F acted with gross negligence and, thereby, breached their duty to care for and supervise Plaintiff by acting or failing to act, as alleged *supra*, including the following acts and omissions:

y.  Failing to timely address Plaintiff's November 21, 2011 written and verbal reports of sexual harassment, extortion, physical and verbal abuse at the hands of FCPS's students, including C.K. and J.O.;

z.  Conducting a sham investigation and confirming Plaintiff's report that she was extorted by her assailant for fifty dollars ($50.00), but dismissing knowledge of sexual contact between Plaintiff and her assailant as a "boy-girl thing" on account

of FCPS's assistant principal's objectively outrageous insinuation that the then twelve year old Plaintiff was sexually promiscuous and FCPS's assistant principal's reluctance to ruin an already troubled teenage boy's life;

aa.    Learning of Plaintiff's sexual assault at the hands of a male FCPS student and disregarding the assault as a "boy-girl" thing;

bb.    Discouraging Plaintiff from reporting sexual harassment, bullying, and verbal and physical abuse at the hands of her assailant by telling Plaintiff and her parents that Plaintiff engaged in consensual sexual encounters with the assailant, and implying that FCPS would not validate Plaintiff's November 21, 2011 reports of sexual harassment and abuse because it would harm the male assailant;

cc.    Conducting a sham investigation into the identities of the older male students who harassed Plaintiff by refusing to permit Plaintiff to search an RCMS yearbook but instead recommending that Plaintiff follow her assailants to their classes after they sexually harassed her in order for her to identify the students to FCSB's staff, specifically S.T.;

dd.    Electing not to take disciplinary action against Plaintiff's harassers and assailants including C.K. and J.O.;

ee.    Emboldening Plaintiff's harassers and assailants and other FCPS students to retaliate against her for reporting her sexual harassment and bullying to FCPS's administrators;

ff.    Unreasonably delaying and electing not to implement measures promised to Plaintiff and her parents during their November 22, 2012 meeting with S.T.;

gg.    Electing not to investigate Plaintiff's rape at the hands of another FCPS student;

hh.    Electing not to take disciplinary action against Plaintiff's assailants;

ii.    Not notifying Plaintiff or her parents of Plaintiff's rights under Title IX; and

jj.    Retaliating against Plaintiff and her parents for reporting peer-on-peer rape and harassment by FCPS students;

298.    Defendants' gross negligence in failing to supervise and care for Plaintiff was a direct and proximate cause of Plaintiff's injuries, damages, and losses.

299.    As a direct and proximate result of the foregoing acts, Plaintiff suffered and continue to suffer pain and suffering, physical pain, mental anguish, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief,

humiliation, loss of enjoyment of life, inconvenience, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, physical and mental sickness, and bodily injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

**WHEREFORE**, Plaintiff, B.R., demands judgment against Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F for:

a.      Compensatory damages;

b.      Pre- and post-judgment interest;

c.      Costs; and

d.      Such other relief as the Court may deem just and proper.

**COUNT VIII**
**GROSS NEGLIGENCE**
**VIRGINIA COMMON LAW-BREACH OF ASSUMED DUTY OF CARE**
*Plaintiff v. S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F*

300.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

301.     Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F. expressly assumed to act gratuitously to render services to Plaintiff which these Defendants knew or should have recognized was necessary for Plaintiff's protection when they promised Plaintiff and her mother that they would shadow Plaintiff while she was in the hallways at RCMS so as to protect her from the sexual harassment, sexual assault, sexual battery, and sexual abuse by other students.

69

302.     Defendants S.T., A.F., P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F were negligent, grossly negligent, and reckless in their breach of the duty they assumed to exercise reasonable care to supervise and protect Plaintiff, by failing to care for and supervise her in the hallways, classrooms, cafeteria, and gym lockers, after school activities and bus stops leaving Plaintiff vulnerable to attack by students that these Defendants knew had threatened, sexually harassed, and sexually abused Plaintiff and posed a grave danger to her safety

303.     As a direct and proximate result of the foregoing acts, Plaintiff suffered and continue to suffer pain and suffering, physical pain, mental anguish, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, inconvenience, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, physical and mental sickness, and bodily injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life and has sustained and continues to sustain loss of earnings and earning capacity.

## COUNT IX
## ASSAULT AND BATTERY
## VIRGINIA COMMON LAW
### *Plaintiff v. C.K.*

304.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

305.     The acts committed by Defendant C.K. against Plaintiff described herein constitute assault and battery, actionable under Virginia law.

306.    Defendant C.K. intended to cause Plaintiff to perceive immediate apprehension of harm by his groping, physical abuse, and unwanted sexual advances.

307.    Defendant C.K. committed nonconsensual touching of Plaintiff, which resulted in harmful or offensive contact with Plaintiff's body.

308.    Specifically, Defendant C.K. committed acts that caused Plaintiff injury by subjecting her to imminent battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant C.K. had a present ability to subject Plaintiff to an immediate, intentional, offensive and harmful touching.

309.    Defendant C.K., by and through his repeated threats and violent, forcible sexual contact with Plaintiff intended to cause harmful or offensive contact with Plaintiff's person.

310.    Plaintiff reasonably believed Defendant C.K. would grope her, physically abuse her, and engage in unwelcomed sexual advances by groping her person at RCMS and elsewhere, as alleged herein.

311.    Defendant C.K. assaulted and battered Plaintiff by nonconsensual and unwanted touching, physical and sexual assault.

312.    Plaintiff did not consent to the contact by Defendant, which caused injury, damage, loss, and/or harm.

313.    As a direct, substantial, and proximate result of Defendant C.K.'s intended harmful and offensive contact with Plaintiff's person, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, physical and mental sickness, nightmares,

psychological injuries, and bodily injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendant C.K. for:

kk.     Compensatory damages;

ll.     Punitive damages;

mm.     Pre- and post-judgment interest;

nn.     Costs; and

oo.     Such other relief as the Court may deem just and proper.

**COUNT X**
**ASSAULT AND BATTERY**
**VIRGINIA COMMON LAW**
***Plaintiff v. J.O.***

314.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

315.     The acts committed by Defendant J.O. against Plaintiff described herein constitute assault and battery, actionable under Virginia law.

316.     Defendant J.O. intended to cause harmful or offensive contact with Plaintiff or the apprehension of such contact, which created a reasonable apprehension of an imminent battery in Plaintiff's mind.

317.     Defendant J.O. committed nonconsensual touching of Plaintiff, which resulted in harmful or offensive contact of Plaintiff's body.

318.    Specifically, Defendant J.O. committed acts that caused Plaintiff injury by subjecting her to imminent battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant J.O. had a present ability to subject Plaintiff to an immediate, intentional, offensive and harmful touching.

319.    Defendant assaulted and battered Plaintiff by nonconsensual and unwanted touching.

320.    Plaintiff did not consent to the contact by Defendant, which caused injury, damage, loss, and/or harm.

321.    As a direct, substantial, and proximate result of Defendant J.O.'s intended harmful and offensive contact with Plaintiff's person, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, physical and mental sickness, nightmares, psychological injuries, and bodily injuries. Plaintiff was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

**WHEREFORE**, Plaintiff B.R., demands judgment against Defendant J.O. for:

a.    Compensatory damages;

b.    Punitive damages;

c.    Pre- and post-judgment interest;

d.    Costs; and

e.    Such other relief as the Court may deem just and proper.

**DAMAGES**

73

322.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

323.    In addition to the damages alleged *inter alia*, as a direct and proximate result of the aforementioned acts and omissions of the Defendants, and each of them, Plaintiff incurred the following damages:

a.    Bodily injuries, permanent in nature, which have affected and will continue to affect her life;

b.    Past, present, and future physical pain and mental anguish;

c.    Disfigurement and/or deformity coupled with associated humiliation and embarrassment;

d.    Past and future inconvenience;

e.    Past and future lost earnings, and a lessening of earning capacity;

f.    Personal, social and financial limitations resulting from the injuries sustained by Plaintiff; and

g.    Past and future embarrassment;

h.    Past and future humiliation;

i.    Past and future loss of dignity;

j.    Past and future pain and suffering;

k.    Pelvic pain; physical deformities; and internal derangement of her vagina, cervix, uterus, and anus;

l.    Depression, anxiety, fear, emotional distress, and mental anguish;

m.    Severe acute traumatic stress disorder, severe post-traumatic Stress disorder, severe depression and anxiety, nightmares and flashbacks, eating disorders, and other psychiatric disabilities and deficits;

74

n.      Physical manifestations of emotional and psychiatric distress;

o.      Traumatic brain injury with neurological, cognitive, physical, and emotional deficits;

p.      Stress induced cardiac injuries, conditions, deformities, and deficits;

q.      Past and future loss of enjoyment of life and life's pleasures;

r.      Past and future loss of earnings;

s.      Past and future medical expenses; and

t.      Other damages allowable at law, including medical expenses incurred in the past, present, and future and attorneys' fees and costs.

**WHEREFORE**, Plaintiff respectfully moves this Honorable Court for an award of judgment and award of execution against all Defendants individually, jointly, and/or severally for compensatory damages for the unlawful acts aforesaid, plus pre- and post-judgment interest; attorneys' fees pursuant to 42 U.S.C. § 1988(b), the costs of maintaining this action, and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury on all claims, defenses, and issues.

Respectfully submitted,

**B.R., Plaintiff**

Dated: <u>June 15, 2022</u>                      <u>    /s/   Kevin Biniazan                    </u>
Kevin Biniazan (VSB No. 92109)
Jeffrey A. Breit (VSB No. 18876)
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia  23451
(757) 670-3925 Office
(757) 670-3939 Facsimile

Email: kevin@bbtrial.com
Email: jeffrey@bbtrial.com

Justin M. Sheldon (VSB No. 82632)
Lee Adair Floyd (VSB No. 88459)
BREIT BINIAZAN, PC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
Telephone: 703-517-3514
Facsimile: 757-299-8028
Email: justin@bbtrial.com
Email: lee@bbtrial.com

*Counsel for Plaintiff*