**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:19-cv-00917-RDA-TCB |
| | ) | |
| F.C.S.B., *et al.,* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| _____ | ) | |

**BRIEF IN OPPOSITION TO INDIVIDUAL SCHOOL DEFENDANTS' MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 1

ARGUMENT ................................................................................................................................ 8

  I. Standard of Review.................................................................................................................. 8

  II.  Plaintiff Plausibly Alleges a First Amendment Violation ................................................... 9

    a.  Plaintiff Engaged in Protected First Amendment Activity .............................................. 10

    b.  The Defendants Took Actions That Adversely Affected Plaintiff's First Amendment Rights and Were Causally Connected to Plaintiff's Exercise of Her Rights.................... 12

  III.  Plaintiff Plausibly Alleges a Violation of Her Rights Under the Equal Protection Clause Resulting from Disparate Treatment ................................................................................... 13

  IV.  The Plaintiff States a Substantive Due Process Claim....................................................... 16

  V.  The Individual Defendants Acted with Gross Negligence ................................................. 19

  CONCLUSION ........................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Bell Atlantic v. Twombly*,

 550 U.S. 544 (2007) ........................................................................................ 13

*Burns v. Gagnon*,

 283 Va. 657 (Va. 2012) ............................................................................... 23, 24

*Constantine v. Rectors and Visitors of George Mason Univ.*,

 411 F.3d 474 (4th Cir. 2005) ........................................................................... 13

*Davidson v. Rose*,

 19 F.4th 626 (4th Cir. 2021) ............................................................................ 14

*DJ v. Sch. Bd. of Henrico Cnty.*,

 488 F. Supp. 3d 307 (E.D. Va. 2020) .................................................... 20, 21, 22

*Doe by Watson v. Russell County School Board*,

 2017 WL 1374279, at *13 (W.D.Va. Apr. 13, 2017) ......................................... 24

*Doe v. Fairfax County School Bd.*,

 No. 19-2203 (4th Cir. 2021) ............................................................................. 12

*Doe v. Montgomery Cnty. Bd. of Educ.*,

 CIVIL 21-0356 PJM (D. Md. Dec. 23, 2021) ............................................... 21, 23

*Doe v. Rosa*,

 795 F.3d 429 (4th Cir. 2015) ........................................................................ 20, 21

*Fitzgerald v. Barnstable Sch. Comm.*,

 555 U.S. 246 (2009) ........................................................................................ 19

*Frazier v. City of Norfolk*,

 234 Va. 388 (Va. 1987) .................................................................................... 24

*Hill, By and Through Covington v. Briggs & Stratton,*

    856 F.2d 186 (4th Cir. 1988) ................................................................. 13

*Lucero v. Early,*

    873 F.3d 466 (4th Cir. 2017) ................................................................. 13

*Matherly v. Andrews*,

    859 F.3d 264 (4th Cir. 2017) ................................................................. 13

*Morrison v. Garraghty*,

    239 F.3d 648 (4th Cir. 2001) ................................................................. 18

*Owens v. Baltimore City State's Attorneys Off.*,

    767 F.3d 379 (4th Cir. 2014) ................................................................. 20

*Republican Party of N.C. v. Martin*,

    980 F.2d 943 (4th Cir. 1992) ................................................................. 13

*Sioux City Bridge Co. v. Dakota Cnty.*,

    260 U.S. 441 (1923) ................................................................. 18

*Suarez Corp. Indus. v. McGraw*,

    202 F.3d 676 (4th Cir. 2000) ................................................................. 13

*Tobey v. Jones*,

    706 F.3d 379 (4th Cir. 2013) ................................................................. 13

*Village of Willowbrook v.Olech*,

    528 U.S. 562 (2000) ................................................................. 18

*Volpe v. City of Lexington*,

    281 Va. 630 (Va. 2011) ................................................................. 23

**Statutes**

20 U.S.C. §1682 ................................................................................................ 11

Title IX of the Education Amendments Act of 1972 (2018) ........................................ 19

Va. Code § 18.2-63 ............................................................................................ 7

**Other Authorities**

"School Board Passes Resolution Recognizing Human Trafficking Awareness Month," FCPS

   News, January 7, 2021 ................................................................................ 5

Wright & Miller § 1357 (1969) .............................................................................. 13

**Rules**

Fed. R. Civ. Proc. Rule 12(b)(6) ............................................................................ 13

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................... passim

U.S. Const. amend. XIV §1 ................................................................................. 19

## INTRODUCTION

This case arises from a child being sexually abused, assaulted, and harassed at a place where she should have felt safe—a public school—and having her concerns about this atrocious treatment trivialized, ignored, and belittled by the authority figures to whom she turned for protection. As Plaintiff's pleadings and other publicly available records detail, Plaintiff is just one victim of Fairfax County Public's School's ("FCPS") pattern, practice, and custom of deliberate indifference, retaliation, and disparate treatment of sexual harassment victims.

As the Second Amended Complaint ("SAC") alleges, Plaintiff repeatedly raised concerns about her treatment. These concerns included both ongoing, pervasive sexual harassment, and sexual assault. In response, the Individual Defendants retaliated against Plaintiff, including by threatening her with disciplinary action and barring her from extracurricular activities. Moreover, as the SAC plausibly alleges, Plaintiff was subject to disparate treatment because of her gender and sexual harassment allegations. Finally, as the SAC plausibly alleges, the Individual Defendant's woefully lacking response falls below the minimal standard of "some degree of care" such that it constitutes gross negligence.

Thus, the Individual Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

In October 2011, Plaintiff was sexually abused by a fellow RCMS student at his home. SAC ¶ 106. At the time, Plaintiff was 12 years old. Soon after, that student and other RCMS students began sexually harassing Plaintiff by calling her derogatory, sexually charged epithets such as "slut," "whore," and "hoe." SAC ¶¶ 105–106. RCMS students also sexually assaulted Plaintiff by "touching and grabbing her in an unwanted, offensive, and sexually motivated

manner" at her RCMS locker in an area clearly visible to Defendants M.P.F., M.C., and F.T. SAC ¶¶ 107, 109.

Plaintiff quickly and repeatedly sought to meet with counselor B.H. to report the harassment but could not do so for several months after B.H. claimed to be too busy. SAC ¶¶ 108, 115–117. Plaintiff also quickly reported the harassment to teachers M.P.F., M.C., and F.T. SAC ¶¶ 110–112. Plaintiff also met with counselor J.F. to report the harassment and assault. SAC ¶ 113. Counselor J.F. dismissed Plaintiff's concerns, asserting she was just having trouble adapting to middle school. *Id.*

Later in October, Plaintiff was sexually assaulted by J.O. and C.K. as she arrived at her school bus stop, including being forced to engage in sex acts and being photographed in a compromising position. SAC ¶ 127. Subsequently, Defendant C.K. continued to sexually assault Plaintiff "at or near her bus stop nearly every day after school" brandished a knife, and threatened to physically harm Plaintiff and her family.  SAC ¶¶ 130–133.

On or about November 14, 2011, Defendant C.K. left a sexually explicit and threatening voicemail on Plaintiff's phone, which was discovered by Plaintiff's mother. SAC ¶ 135. On November 21, 2011, Plaintiff's parents went to the RCMS administrative offices and demanded to meet with the principal A.F.  SAC ¶ 136. Instead, they met with counselor B.H., who claimed she "had no idea things had gotten this bad," and a student resource officer ("SRO"). SAC ¶¶ 137–139. They were joined by Defendants S.T. and P.A.H., at which point Plaintiff provided school officials with a written and verbal report of pervasive sexual harassment occurring at school and involving RCMS students. SAC ¶¶ 139–140. Plaintiff's parents also reported Defendant C.K. had extorted $50 from Plaintiff after an assault. SAC ¶ 150. During this meeting,

S.T. told Plaintiff and her parents that Defendant C.K. "had a very hard life and been in enough trouble" and asked "why they were trying to 'ruin a young boy's life.'" SAC ¶ 142.

Following this meeting, S.T. spoke with C.K., who confirmed that specific students were calling Plaintiff sexually charged epithets, another student, who confirmed that she referred to Plaintiff using a sexually charged epithet, and the student who first assaulted Plaintiff in October 2011, who confirmed that he had sexual contact with Plaintiff. SAC ¶¶ 145–147. At the time, Plaintiff was 12. The minimum age of consent in Virginia is 13. *See* Va. Code § 18.2-63.

On November 22, 2011, Plaintiff and her parents met with S.T. and P.A.H., at which time S.T. claimed that interactions between C.K. and Plaintiff were a "boy girl thing" and that Plaintiff was "sexually active." SAC ¶¶ 150–158. Despite verifying that several students sexually harassed Plaintiff and substantiating sexual activity which Plaintiff alleged to be non-consensual, school officials disciplined none of the perpetrators. *See* SAC ¶¶ 154–161. When S.T. corroborated the extortion, she did not discipline C.K. and instead joked about spending the money on "Christmas shopping." SAC ¶ 150. Instead, school officials instructed Plaintiff to take the "back staircase" and to stay home from school until after the Thanksgiving break. SAC ¶ 155.

After Plaintiff returned to school, the harassing behavior continued, as did sexual assaults at or near Plaintiff's school bus stop. SAC ¶¶ 163–164. On or before December 7, 2011, Plaintiff's parents reported the continued harassment to school administrators, who represented that they would shadow Plaintiff between classes to prevent harassment. SAC ¶¶ 165–167. This shadowing concluded after two days, with school officials claiming that they lacked sufficient resources to continue. SAC ¶ 168.

On or around December 14, 2011, Plaintiff was sexually assaulted during class. SAC ¶ 170. Plaintiff reported the incident to teacher M.P.F., who told her that she "needs to learn to be a big girl" and to "deal with the situation yourself." SAC ¶ 171.

Subsequently, between December 2011 and February 2012, Plaintiff was repeatedly sexually assaulted and raped in a closet on school property by multiple unknown individuals in the "modus operandi" of human traffickers and gang members in Fairfax County. SAC ¶¶ 173–176. Moreover, sexual assaults continued by Defendant C.K., as did verbal sexual harassment and death threats from other students. SAC ¶¶ 177–179, 183–185.

On January 27 and February 9, 2012, Plaintiff once again reported continuing harassment to school administrators. SAC ¶¶ 180–183. Following the February 9 complaint, school officials once again verified that sexual harassment directed at Plaintiff continued to occur. SAC ¶¶ 184–185.

In making these reports, Plaintiff referred to her mistreatment as "bullying," in part because she was told by school officials "FCSB's policy did not include a policy on how to handle, report, or respond to sexual harassment," and that "the school could only intervene or assist with bullying." SAC ¶ 182.

Despite verifying that students were making sexually charged comments to Plaintiff, school officials represented that Plaintiff "had a part" in her own harassment when contacted by Plaintiff's parents. SAC ¶ 192. Concerned about the response from school officials, Plaintiff's family forwarded communications to the school Superintendent, the individual vested by FCSB with operational control over schools on behalf of FCSB. SAC ¶ 193. On February 17, 2012, Plaintiff's family provided an assistant Superintendent a note from Plaintiff's physician reflecting that Plaintiff was under psychiatric care for bullying, sexual harassment, and receiving

death threats at school. SAC ¶ 196. Beginning in February, Plaintiff began homebound instruction. SAC ¶ 197. She did not return to RCMS. The Individual School Defendants instructed Plaintiff's friends, peers, and teachers not to talk to her because of the possibility of legal liability, further isolating and ostracizing a child dealing with severe trauma. SAC ¶ 197. She was also precluded from participating in extracurricular activities as well as other school events. SAC ¶ 211. Principal A.F. visited her elementary school to "dig up dirt" on Plaintiff to see if she was a "troubled child." SAC ¶ 212.

In early March, Plaintiff reported her sexual abuse to the Fairfax County Police Department. SAC ¶ 199. The 12-year-old child underwent a SANE exam, which revealed internal injuries that corroborated her sexual abuse. SAC ¶201. Her treating physician then told RCMS officials, in writing, that Plaintiff had been sexually abused by C.K., assisted by his "friends." SAC ¶ 203–205. The police investigation also revealed substantial evidence that corroborated Plaintiff's allegations. SAC ¶ 208. But the former RCMS school resource officer was the investigating detective, and despite the strong evidence supporting Plaintiff's claims, the detective closed the case after speaking to "everyone" (the Individual School Defendants) at RCMS. SAC ¶ 207. On information and belief, the school district's sham investigation tainted the Fairfax County Police's investigation into the abuse. SAC ¶ 216.

On June 29, 2012, in a letter from an assistant superintendent, the school district claimed that it could not verify reports of sexual harassment, inappropriate touching, and other bullying, despite students corroborating multiple instances of derogatory sexual comments made to Plaintiff at school. SAC ¶ 214-217. These statements were knowingly false. *Id.*

In August 2012, Plaintiff's mother and the National Women's Law Center met with the Assistant Superintendent and Defendant principal A.F. to facilitate Plaintiff's safe return to

school. When confronted with the fact that Plaintiff was previously a healthy child who was now medically unable to attend school and had a serious individualized educational plan (IEP) for disabled students, the school officials insisted they did everything right. SAC ¶ 220.

In September 2012, helped by the National Women's Law Center, Plaintiff filed an administrative complaint with the US Department of Education's Office of Civil Rights (OCR). After a two-year investigation, OCR "identified" concerns with the adequacy of the Division's investigation, its analysis of the information collected, and the Division's apparent treatment of the incidents of alleged harassment as discrete, isolated occurrences rather than addressing the broader issue of a potentially hostile environment at the school. SAC ¶ 221.

OCR also conducted an audit into the school district's general practices for sexual harassment and assault and "found some instances in which the Division's response to the offenses may not have been prompt and appropriate under Title IX." SAC ¶ 222. OCR further stated it had "concerns that the Division does not have a system to track reports of sexual harassment to determine whether there may be a hostile environment at a particular school, whether individual schools are responding in a prompt and appropriate manner to reports of sexual harassment, whether the Division's efforts to educate students regarding sexual harassment are effective, or whether school-based investigations of reports of sexual harassment are prompt and equitable." SAC ¶ 223. As a result, FCSB had to enter into a "voluntary" resolution with the US Department of Education's Office of Civil Rights that required the school district revamp its policies, training, and tracking of sexual misconduct. SAC ¶ 224.[1]

_____

[1] 20 U.S.C. §1682 requires OCR to permit educational institutions to come into "voluntary" compliance with Title IX before a finding of non-compliance.

Despite the 2014 OCR "voluntary" resolution, the public record includes ample evidence that FCSB continues to face allegations of mishandling sexual harassment and sexual assault cases. FCSB has had two subsequent "voluntary" resolutions for discrimination based on sex or sexual harassment with OCR. Request for Judicial Notice ("RJN") ¶ 1, Ex. 1, 1A, 2, 2A. This includes a 2020 resolution which found, "On balance, OCR has a concern that the Division's investigation may not have been prompt, and that it may not have been equitable…" and further explained, "[FCPS]…. Did not appropriately analyze Title IX obligations." *Id.* A review of OCR's website shows, that as of July 30, 2022, there are currently three pending federal investigation into FCPS for mishandling reports of sexual harassment or retaliating against those who reported such misconduct. RJN ¶ 3, Ex. 4.

Several years ago, the nonprofit Public Justice sued on behalf of an FCPS student, alleging that FCPS was again indifferent to sexual assault. RJN ¶ 5, Ex. 6. In 2019, this Court sanctioned FCPS for failing to abide by the 2014 OCR voluntary resolution. RJN ¶ 4, Ex. 5. A jury later found that the plaintiff in that case was the victim of severe and pervasive sexual misconduct but declined to assign liability to the school district. *Id.* The Fourth Circuit overturned that decision and ordered a new trial. *Doe v. Fairfax County School Bd.*, No. 19-2203 (4th Cir. 2021).

In the past few years, multiple FCPS employees, including two principals, were criminally charged with failing to report child abuse. RJN ¶ 6, Exs. 7, 7.1, 7.1A. Despite Plaintiff's lawsuit here and the 2014 voluntary resolution, FCPS replaced one of those principals with Individual Defendant A.F., who was the RCMS principal at the time of Plaintiff's abuse. RJN ¶ 7, Ex. 8.

In 2017, a WUSA9 (CBS News Affiliate) news investigation revealed that student athletes who reported sexual harassment were thrown off their sports team. RJN ¶ 2. This led to popular outcry, a federal investigation, and the forced retirement of the principal. *Id.* at Ex. 3, 3A, 3B.

Just last year, students took to social media and TV to publicly discuss how FCPS administrators systemically ignored their reports of sexual misconduct. RJN ¶ 8, Ex 9. In the past several months, students have walked out of multiple schools across Fairfax County to protest FCPS's inadequate response to sexual misconduct. RJN ¶ 10, Ex. 11.

In July 2019, Plaintiff filed an initial Complaint.   ECF No. 1. This was followed by an Amended Complaint filed in November 2019. ECF No. 37. In March 2020, this Court granted in part and denied in part a series of motions to strike and to dismiss filed by Defendants. ECF No. 85. In June 2022, Plaintiff was granted leave to file a Second Amended Complaint, which was considered filed that same day. ECF No. 141. In response, Defendant FCSB filed a partial motion to dismiss and strike, which is now before the Court. ECF No. 162.

## ARGUMENT

### I.    Standard of Review

 "A Rule 12(b)(6) motion to dismiss 'does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses.'" *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 954 (4th Cir. 1992). "In accordance with Federal Rules liberal policy towards pleadings, '[t]he motion to dismiss for failure to state a claim is viewed with disfavor, and is rarely granted.'" *Hill, By and Through Covington v. Briggs & Stratton,* 856 F.2d 186 (4th Cir. 1988) (quoting 5 Wright & Miller § 1357 p. 598 (1969)). Accordingly, a complaint "need only 'give the defendant fair notice of what the .

. . claim is and the grounds upon which it rests.'" *Tobey*, 706 F.3d at 387 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, in assessing a complaint, the Court should accept "as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017) (quoting *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017)).

## II.    Plaintiff Plausibly Alleges a First Amendment Violation

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). "A plaintiff claiming First Amendment retaliation must demonstrate that: '(1) [she] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [her] First Amendment rights, and (3) there was a causal relationship between [her] protected activity and the defendants' conduct.'" *Davidson v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (quoting *Constantine*, 411 F.3d at 499).

Plaintiff's Second Amended Complaint sufficiently alleges that Plaintiff engaged in protected First Amendment activity by repeatedly reporting sexual harassment and assault to the Individual Defendants, that the Individual Defendants took action that adversely affected Plaintiff's First Amendment rights—including banning her from extracurricular activities while on homebound instruction—and that there was a clear causal connection between Plaintiff's First Amendment activity and the Individual Defendants' conduct.

### a. Plaintiff Engaged in Protected First Amendment Activity

The SAC repeatedly alleges that Plaintiff engaged in protected First Amendment activity. To wit, the SAC alleges that Plaintiff reported sexual harassment and sexual assault to one or more of the Individual Defendants on at least eleven occasions:

- "Having been turned away by B.H., Plaintiff began reporting her harassment to her teachers, M.P.F., M.C., and F.T. (SAC ¶ 110);

- "Additionally, Plaintiff reported to her homeroom teacher, M.C., that she was tardy to class because she was being 'hurt' by other students at her locker." (SAC ¶ 111);

- Plaintiff "met with another guidance counselor, Counselor J.F., and reported that male RCMS students were bullying and sexually harassing her." (SAC ¶ 113);

- Describing attempts to meet with B.H. to speak with her about being afraid to walk the hallways and feeling unsafe. (SAC ¶¶ 115–116);

- Describing a meeting between Plaintiff, her parents, B.H, S.T., and P.A.H., which included "a written report and a verbal report" describing sexual harassment by RCMS students. (SAC ¶¶ 136–140); Exhibit O.

- "On or before December 7, 2011, Plaintiff and Plaintiff's parents reported the continued harassment and threatening comments directed towards Plaintiff while at school to FCPS agents and employees who possessed the authority to further investigate and discipline Plaintiff's harassers." (SAC ¶ 165); Exhibit P.

- "Plaintiff promptly reported the incident [where a male classmate put his hands down Plaintiff's pants during a history class] to her teacher, M.P.F." (SAC ¶ 171);

- "Plaintiff reported to Counselor B.H. that students were spreading rumors and harassing her about being 'bi-sexual.'" (SAC ¶ 179);

- "On January 27, 2012, Plaintiff physically went to A.F., in tears, to report her continued sexual harassment." (SAC ¶ 180);

- "Then, on January 27, 2012, Plaintiff wrote to Principal A.F. . . . complaining of 'constant bullying'" and asking the school officials to redress her grievances by providing more training (SAC ¶ 181); and

- "On February 9, 2012, Plaintiff reported to Counselor B.H. that a boy made rude and inappropriate comments to her in the cafeteria." (SAC ¶ 183).

In their motion to dismiss, the Individual Defendants claim that "Plaintiff's allegations that she reported 'sexual abuse' and 'sexual violence' are not plausible" because Plaintiff first disclosed her rape to her mother after she no longer attended RCMS. *See* Motion to Dismiss (ECF No. 158). This argument is both irrelevant and belied by the pleadings.

This argument is irrelevant because the SAC alleges, and the Individual Defendants do not (and could not) dispute, that Plaintiff reported sexual harassment. Whether or not Plaintiff reported sexual abuse and sexual violence, her report of sexual harassment alone is enough to constitute protected First Amendment activity.

Moreover, unless this Court adopts the shocking position that any unwanted sexual touching short of rape cannot be sexual abuse,[2] the Individual Defendants' claim is belied by the text of the pleadings. The pleadings allege multiple instances in which the Plaintiff reported being sexually assaulted. First, the SAC alleges that Plaintiff told M.C. that she was tardy because other students "hurt" her at her locker. SAC ¶ 111. This suggests something more than

_____

[2] FCPS, after equivocation, has already admitted that sexual assault is any sort of non-consensual sexual touching. See Oral Argument at 20:00-21:00, *Doe v. Fairfax County School Board*, No. 19-2203 (4th Cir. 2021) ( https://www.ca4.uscourts.gov/OAarchive/mp3/19-2203-20210125.mp3)

mere words and, indeed, the SAC explicitly alleges that Plaintiff was physically assaulted at her locker. Second, the SAC alleges Plaintiff and her parents reported sexual harassment and assault, which a fellow RCMS student corroborated but claimed (and Plaintiff denies) was consensual. Thus, as early as November 2011, RCMS had actual notice that an older male student sexually assaulted a 12-year-old student not legally old enough to consent to sexual activity under Virginia law. SAC ¶ 146. The SAC also alleges that Individual Defendant S.T. knew of sexual battery of Plaintiff in November 2011 but dismissed it as a "boy girl" thing. SAC ¶ 151. Third, the SAC alleges that "Plaintiff promptly reported the incident [where a male classmate put his hands down Plaintiff's pants during a history class] to her teacher, M.P.F."  SAC ¶ 171.

Taking the allegations in the SAC as true, as the Court must do when evaluating the merits on a Motion to Dismiss, the SAC alleges that Plaintiff reported being sexually assaulted to multiple Individual Defendants. The Individual Defendant's minimization of sexual assault by arguing they should not be liable because Plaintiff *only* told the Individual Defendants that students had hurt her at her locker, and *only* told the Individual Defendants that another student had shoved his hand down her pants *in class* without consent, is beyond disturbing. Unfortunately, as the pleadings show, this is par for the course in this school. Plaintiff repeatedly engaged in protected First Amendment activity through reporting sexual harassment and sexual abuse to the Individual Defendants, as well as asking them to redress her grievances by providing more training to remedy a hostile school environment.

**b. The Defendants Took Actions That Adversely Affected Plaintiff's First Amendment Rights and Were Causally Connected to Plaintiff's Exercise of Her Rights**

The SAC alleges that the Individual Defendants took multiple actions that adversely impacted Plaintiff's First Amendment rights and were causally connected to Plaintiff's exercise of her First Amendment rights. When Plaintiff and her parents first reported sexual misconduct,

the Defendants instructed Plaintiff to take the "back stairs" to class rather than potentially inconveniencing her accused abusers. SAC ¶ 155. They also instructed her to stay home from school interrupting her ability to learn and receive the benefit of public education, which she did. *Id.* Later, while Plaintiff was on homebound instruction, she was excluded from extracurricular activities with other students and other offerings from the public school system. SAC ¶ 211. Individual Defendant A.F. "visited Plaintiff's elementary school to dig up 'dirt' on Plaintiff and inquire if she was a 'troubled child.'" SAC ¶ 212. And school officials threatened to discipline Plaintiff for her part in her own harassment, which only surfaced as a result of her protected First Amendment activities. *See* SAC ¶¶ 217-218. The SAC also describes how teachers and administrators instructed other students not to talk to Plaintiff because of the school's potential liability. SAC ¶ 211.

These retaliatory actions are directly related to Plaintiff's First Amendment activity: reporting pervasive sexual harassment and assault to the Individual School Defendants. Moreover, they are of a nature and kind such that they would deter any 12-year-old from similarly coming forward. Accordingly, the SAC sufficiently alleges that the Individual Defendants violated Plaintiff's First Amendment rights by retaliating against the Plaintiff for her speech.

### III.    Plaintiff Plausibly Alleges a Violation of Her Rights Under the Equal Protection Clause Resulting from Disparate Treatment

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once these elements are satisfied, the courts look "to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v.Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)). Accordingly, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id*. Further, sexual harassment "has long been recognized to be a type of gender discrimination." *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994).

In this case, Plaintiff was treated differently than the other students at RCMS, both because of her gender and arbitrarily.[3]  School counselors repeatedly declined to meet with Plaintiff. Teachers trivialized her abuse, including telling her to "be a big girl" and "deal with the situation herself." Administrators singled her out as "troubled" and sought to find "dirt" on her that might explain why she persisted in complaining about sexual harassment to any school official who would listen – and several who would not – rather than protect her.  In addition, rather than punishing her perpetrators, school officials threatened her with disciplinary action for

---

[3] Plaintiff further alleges that the Individual Defendants acted with deliberate indifference to student-on-student sexual harassment. Plaintiff acknowledges that the Court of Appeals for the Fourth Circuit ruled in *Feminist Majority* that the right to be free from student-on-student sexual harassment was not clearly established when the conduct alleged in the SAC occurred, thus, under the law binding on this court, the Individual Defendants are likely entitled to qualified immunity on this claim.  However, Plaintiff believes the Court of Appeals for the Fourth Circuit got it wrong in *Feminist Majority* when it determined that this right was not clearly established prior to 2018, and wish to preserve this issue for appeal, should an appeal become necessary or appropriate in this case. Nevertheless, as *Feminist Majority* explained, the right of sexual abuse victims in school to be free from disparate treatment was clearly established in *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009).

"her part" in her own harassment and abuse. At minimum, by threatening Plaintiff with disciplinary action for "her part" in her own harassment, the Individual Defendants treated her differently from the students who harassed her. The Individual Defendants treated Plaintiff differently by failing to allow her to participate in extracurricular activities and other benefits the public school had to offer. SAC ¶ 211. They also told other students and teachers not to talk to the Plaintiff out of fear of potential liability *Id.*. Because this disparate treatment is predicated on Plaintiff's reporting of sexual harassment and abuse to school officials, it is gender-based discrimination. *Beardsley*, 30 F. 3d at 530.

Moreover, because Plaintiff's Equal Protection claim is based on a disparate treatment allegation, the Individual Defendants are not entitled to qualified immunity. It was well established prior to 2011 that students have a constitutional right to be free of discrimination based on their gender. *See Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246 (2009).

Finally, Plaintiff's equal protection claim against the Individual Defendants is not duplicative with their claim against the school board. *Fitzgerald*, which was decided after the cases cited by the individual defendants, clarifies this point. In *Fitzgerald*, the Court held that a plaintiff could bring a claim under both Title IX and the Equal Protection Clause, "[e]ven where particular defendants are subject to both," because "the standards for establishing liability may not be wholly congruent." *Fitzgerald*, 555 U.S. at 257. Similarly, the standards for asserting an equal protection claim against the Individual Defendants and against the school board are not congruent.

That is, a constitutional right must be clearly established to overcome a defense of qualified immunity in response to a section 1983 claim against individual defendants; but municipalities cannot assert qualified immunity, meaning a constitutional right does not have to

be clearly established when the conduct occurred to prevail in a claim against a municipality. *See Owens v. Baltimore City State's Attorneys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). Moreover, there are different theories of liability applicable to the Individual Defendants and the school board. For example, Plaintiff asserts that the school board had a custom or policy and failed to properly train its employees, while Plaintiff asserts that the Individual Defendants directly engaged in disparate treatment.

## IV.     The Plaintiff States a Substantive Due Process Claim

The Constitution recognizes a right to "bodily integrity" under the doctrine of Substantive Due Process. *DJ v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 323 (E.D. Va. 2020) (citing *Doe v. Rosa*, 795 F.3d 429, 436–37 (4th Cir. 2015)). But state actors are generally not liable for the actions of third parties, with two exceptions: when there is a special relationship and when there is a state-created danger. *Id.* at 323–324. The second exception applies here.

The Fourth Circuit has explained that, "to establish liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Id.* at 439. Put another way, "state actors may not disclaim liability when they themselves throw others to the lions," *DJ.*, 488 F. Supp. 3d at 324 (citing *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015)).

*DJ. v. School Board Of Henrico County* is strongly on point. There, the complaint alleged that the school system had a culture of racial and sexual harassment. *Id.* at 320-321. The plaintiff, a male African American student, complained to school officials about racial harassment in the locker room. *Id.* at 318-319. The school officials took the affirmative act of promising to watch the situation more closely, but failed to do so. As a result, the plaintiff endured a horrific, racially

motivated sexual assault in the locker-room. After a lengthy explanation about the state-created danger doctrine, the court found that the plaintiff stated a claim for a violation of substantive due process under the "state created danger doctrine." The court concluded that "Plaintiffs must be given an opportunity, through discovery and other pretrial devices, to delve into the circumstances of this case to determine whether [defendant's] acts, omissions, or assurances are sufficient to impose liability." *Id.* at 328.

Similarly, *Doe v. Montgomery County Board of Education*, CIVIL 21-0356 PJM, (D. Md. Dec. 23, 2021) reached a similar conclusion to *DJ* in allowing a claim for violating substantive due process to proceed past the pleading stage. In *Doe*, like *DJ* and the matter at bar, the case involved the sexual abuse of a student at school. *Doe* was a student at Damascus High School in Montgomery County, Maryland, a school with a storied football team, which also had a dark history of hazing and sexual misconduct. *Id.* Knowing this, the coaches were instructed to watch students closely in the locker room and complete various anti-hazing and anti-sexual abuse trainings. However, the coaches did not do this, and thus a junior varsity player was sodomized by older teammates. Again, the court concluded that "based on the allegations in the Amended Complaints-which include details regarding Defendants …conduct and deliberate indifference-the Court concludes that further factual development is appropriate to determine whether their acts or omissions may suffice to impose liability [under the state-created danger doctrine."

Here, like *Doe* and *DJ*, the SAC details how the school officials promised to watch and protect Plaintiff. Plaintiff and her parents reported sexual misconduct to school officials. SAC Exhibit O, Exhibit L. As a result, school officials took the affirmative action of promising to protect, watch, and shadow her. SAC ¶ 165–168. Yet they all either failed to do even this bare minimum, or promptly withdrew any such protection. SAC ¶ 169. Similarly, M.P.F. told the 12-

year-old plaintiff, after she reported a sexual assault in her class to "be a big girl" and to "deal with the situation [her]self." SAC ¶171. They laughed off a substantial extortion episode, joking about spending the money on "Christmas shopping." SAC § 151. These affirmative acts led to multiple other sexual assaults, including brutal gang rapes. SAC ¶ 173. Then the principal, rather than investigating, took the affirmative actions to "dig up dirt" on Plaintiff to portray her as a troubled child, threatened to discipline her, and banned her from extracurricular activities. SAC ¶¶ 210–212. These too are affirmative actions.

Given the close nexus between the affirmative representations to protect and the subsequent violence and misconduct against Plaintiff, a court could conclude that the Individual School Defendants, "f[ed] the plaintiff to the lions." *Rosa*, 795 F.3d at 439.

Previously, this Court dismissed the state created danger claims after the First Amended Complaint. ECF No. 85. In doing so, this Court explained that the First Amended Complaint was "laced with underpinnings of inaction" rather than action. *Id.* The Court rendered its decision on March 10, 2020, before the rulings described above in *DJ. V. Sch. Bd. Of Henrico County* and *Doe v. Montgomery County Board of Education.* Without the benefit of discovery, Plaintiff cannot know for sure whether the gravamen of her injuries is attributable to action, inaction, or some combination of the two. However, the Second Amended Complaint sought to clarify for the Court the affirmative steps taken by Defendants which contributed to Plaintiff's injuries. SAC ¶¶ 165–173.

It is also not clear that deliberate indifference and gross negligence are mutually exclusive. For instance, the school's failure to respond to the initial misconduct could be characterized as deliberate indifference of inaction. SAC ¶ 126. While the conduct above could be described as affirmative acts. Similarly, the retaliatory acts described above are affirmative

actions, which do not preclude a finding of gross negligence or deliberate indifference. Both *DJ* and *Doe* concurrently allowed negligence and deliberate indifference claims to proceed. Additionally, FRCP 8(d)(2) allows for pleading in the alternative. At the motion to dismiss stage, this Court should follow *DJ* and *Doe*, avoid creating an intra-circuit split, and allow Plaintiff's claims to proceed to discovery to develop the record.

Similarly, as the Court previously ruled, any decision on qualified immunity should be withheld until after the record is more fully developed. ECF No. 85.

## V.     The Individual Defendants Acted with Gross Negligence

"'[G]ross negligence' . . . is 'the utter disregard of prudence amounting to complete neglect of safety of another.  It is a headless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care.'" *Burns v. Gagnon*, 283 Va. 657, 678 (Va. 2012) (quoting *Volpe v. City of Lexington*, 281 Va. 630, 639 (Va. 2011)).

While exercising "some degree of care" is generally sufficient to avoid being grossly negligent, not every action rises to the level of "some degree of care." For example, in *Burns*, the defendant took some action – he wrote down a name and said he would alert security about a report that there would be a fight that day. Nevertheless, the court found that whether the defendant was grossly negligent was a question for the jury. Likewise, in *Doe by Watson v. Russell County School Board*, the court found that "[a] jury could reasonably conclude that simple sitting in on a DSS interview does not amount to even slight care sufficient to undermine the gross negligence claim." 2017 WL 1374279, at *13 (W.D.Va. Apr. 13, 2017). Consistent with these rulings, "[o]rdinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury." *Burns*, 283 Va. at 678 (quoting *Frazier v. City of Norfolk*,

234 Va. 388, 393 (Va. 1987)). So it is in this case. The Individual Defendants' minimal actions, were so woefully mismatched to the moment that the question of whether they amounted to "some degree of care" is a question of fact that should be resolved by a jury, not on a motion to dismiss.

The Individual School Defendants seem to rely on the fact that they promised they would shadow Plaintiff to show that they exercised some degree of care. ECF No. 158 pg. 18. That proposition is not correct. Like the principal in *Burns* taking a report and promising to call security, simply promising to shadow a student that claims she is the victim of severe sexual harassment and death threats is not "some care." Instead, this point shows that the Defendants assumed the duty to care for Plaintiff, and then carried out said assumed duty with gross negligence.

The SAC states that only B.H. and J.F. shadowed Plaintiff. All the other Individual Defendants failed to do even this smallest of tasks. More importantly, the Individual Defendants take the allegations in the SAC out of context and draw inferences in their favor, which should be drawn in favor of Plaintiff at the pleading stage. While B.H. and J.F. did shadow Plaintiff for two days (during four months of abuse), they then recklessly withdrew that protection. SAC ¶¶ 167–168. This led to Plaintiff enduring further sexual abuse, physical abuse, sexual harassment, assault, death threats, and bullying. SAC ¶ 169. A jury could find that "guaranteeing then withdrawing Plaintiff's supervision" in the face of sexual misconduct, assaults, death threats, and severe misconduct was the absence of "slight care."

During the three months after the Individual Defendants stopped shadowing Plaintiff as they promised, the Individual Defendants did virtually nothing to help Plaintiff. The Individual Defendants also minimized the sexual assault of a 12-year-old, failed to discipline perpetrators,

and instead made insinuations about the child's sexual history, despite being under the age of consent. SAC ¶ 151. Plaintiff told A.F. that she had been assaulted, and he did nothing, instead saying he "didn't know what to do. SAC ¶179. Plaintiff told her teacher M.P.F. that a student sexually assaulted her in class, to which M.P.F. told her to "be a big girl" and "deal with the situation yourself." Similarly, Plaintiff wrote to the Individual Defendant school administrators, and non-defendant school employee Cheryl Weaver begging for more training to remedy a hostile school environment. Again, the Individual Defendants did nothing in response. SAC ¶ 180. She then went to B.H. again to report more sexual misconduct. B.H. did not act in response to these new reports. SAC ¶ 178. Then, when Plaintiff's mother reported death threats to the school, Defendant T.B. responded, "that's just what kids say." SAC ¶ 187. Later on, when Plaintiff's mother, with the National Women's Law Center, asked the Assistant Superintendent and A.F. why her healthy child was now unable to go to school and had severe PTSD, they responded that they had done everything right and didn't need to change anything. SAC ¶ 219. All of this, is sufficient to allow a jury to find that the Defendants did not even act with "slight care." This is a matter of fact which should be left for a jury to weigh.

## CONCLUSION

For these reasons, the Individual Defendants' motion to dismiss should be denied.

Dated: August 17, 2022                                Respectfully submitted,


                                                        _____/s/ David A. Warrington_____
                                                        David A. Warrington (VSB No. 72293)
                                                        Gary M. Lawkowski (VSB No. 82329)
                                                        DHILLON LAW GROUP INC.
                                                        2121 Eisenhower Avenue, Suite 402
                                                        Alexandria, VA 22314
                                                        Telephone: 703.574.1206
                                                        Facsimile: 415.520.6593

dwarrington@dhillonlaw.com
glawkowski@dhillonlaw.com

*Counsel for Plaintiff B.R.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action.

Date: August 17, 2022

By:    /s/ David A. Warrington
           David A. Warrington