IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:19-cv-917 (RDA/WEF) |
| v. | ) | |
| | ) | |
| F.C.S.B., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>**MEMORANDUM OPINION AND ORDER**</u>

This matter comes before the Court on Defendant F.C.S.B.'s Partial Motion to Dismiss and Partial Motion to Strike the Second Amended Complaint (Dkt. 161) and Defendants A.F., B.H., F.T., J.F., M.C., M.P.F., P.A.H., S.T., and T.B.'s (collectively, the "Individual School Defendants") Motion to Dismiss (Dkt. 157). This Court dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motions are now fully briefed and ripe for disposition. Having considered the Motions, the accompanying Memoranda in Support (Dkt. Nos. 158 and 162), Plaintiff's Oppositions to both Motions (Dkt. Nos. 169 and 170) and accompanying Request for Judicial Notice (Dkt. 170, Exs. 1 and 2), and Defendants' Replies in Support of their respective Motions (Dkt. Nos. 180 and 181), the Court GRANTS-IN-PART and DENIES-IN-PART Defendant F.C.S.B.'s Partial Motion to Dismiss and Partial Motion to Strike the Second Amended Complaint and GRANTS-IN-PART and DENIES-IN-PART the Individual School Defendants' Motion to Dismiss.

# I. BACKGROUND

## A. Factual Background[1]

The Court assumes familiarity with the underlying facts from the Court's opinion addressing Defendants' various motions concerning Plaintiff's First Amended Complaint (Dkt. 85, the "First Opinion") and the Fourth Circuit's opinion affirming the Court's First Opinion, *B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021).  The Court recounts below only those facts from the Second Amended Complaint that are relevant to Defendants' Motions.

In 2011, Plaintiff was a female middle school student at RCMS, a FCPS middle school. Dkt. 155 ¶¶ 1, 98, 102-103.  In October of 2011, one of Plaintiff's classmates, D.N., sexually assaulted and battered Plaintiff at his house by touching her sexually.  *Id.* ¶ 104.[2]  The next day, D.N. and his friends spread rumors that Plaintiff had conducted sexual acts on D.N. and began directing explicit sexual insults at her.  *Id.* ¶¶ 105-06.  Other students also harassed Plaintiff when she was at her locker, including by directing sexual insults at her, grabbing her, and "thrust[ing] their pelvises and intimate body parts at" her.  *Id.* ¶ 107.  Plaintiff's locker was "clearly visible" to "several RCMS teachers" including M.P.F., M.C., and F.T.  *Id.* ¶ 109.

"Almost immediately following the harassment[,]" Plaintiff tried to meet with her guidance counselor, B.H., to report the actions of her fellow students.  *Id.* ¶ 108.  B.H. told Plaintiff she was too busy to meet with her.  *Id.*  Thereafter, B.R. kept seeking assistance from B.H. but could not meet with her until November 21, 2011.  *Id.* ¶¶ 108, 113, 115-117.  Plaintiff

---

[1] For purposes of considering the Motions, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] On multiple occasions, Plaintiff implies that D.N. is older than her.  *E.g.*, Dkt. 155 ¶ 146.  However, Plaintiff does not allege D.N.'s age.

also reported what she was experiencing to some of her teachers: M.P.F., M.C., and F.T.  *Id.* ¶¶ 110-111.  Eventually, Plaintiff met with a different guidance counselor, J.F., who told her that "she was simply adapting to middle school."  *Id.* ¶ 113.  Apparently, no teachers or guidance counselors took any action.  *Id.* ¶¶ 116, 123-24.  B.R. was harassed throughout October of 2011. *Id.* ¶¶ 107, 111-12, 124.

In October 2011, B.R. was physically and sexually assaulted by C.K. and J.O.  C.K. and J.O. met Plaintiff at her bus stop, where she refused to "hang out with them."  *Id.* ¶ 127.  They then tackled B.R., removed her clothing, and sexually assaulted her by forcing her "to perform oral sex on C.K." and taking pictures of her while she was naked.  *Id.*  C.K. and J.O. then spread rumors about B.R., telling other students that she was "sexually active."  *Id.* ¶ 128.  Afterwards, C.K. continued to wait for Plaintiff at the bus stop and threatened her with a knife if she did not perform sex acts on him.  *Id.* ¶¶ 130-31.  This happened every day from October until November 21, 2011, and the "violence of each assault generally worsened over time."  *Id.* ¶¶ 131-32; *see also id.* ¶ 132 (describing C.K.'s violent acts).  B.R. "repeatedly sought the assistance of RCMS and FCPS school officials" throughout this time.  *Id.* ¶ 134.

On November 14, 2011, B.R.'s mother was concerned by a "sexually explicit" and threatening voicemail that C.K. left for B.R.  *Id.* ¶ 135.  The next Monday, November 21, 2011, B.R.'s parents went with B.R. to RCMS's administrative office to meet with Principal A.F.  *Id.* ¶ 136.  B.R.'s parents first met with B.H., where they informed her that B.R.'s peers had been sexually harassing her.  *Id.* ¶ 137.  In response, B.H. stated that "she had no idea things had gotten that bad."  *Id.*  Principal A.F. was unable to meet with Plaintiff and her parents, so they met with Assistant Principals S.T. and P.H. in addition to B.H.  *Id.* ¶ 139.  At that time, Plaintiff provided a written and verbal report of what she had been experiencing.  *Id.* ¶ 140; *see also id.*,

3

Ex. O (written report).   In response, S.T. asked Plaintiff and her mother why "they were trying to ruin a young boy's life." *Id.* ¶ 142.  S.T. told Plaintiff and her parents that the school would investigate Plaintiff's allegations and instructed Plaintiff's parents to keep her away from school until they could do so.  *Id.*

In investigating the allegations that same day, S.T. spoke with C.K., who confirmed Plaintiff's report that Plaintiff was sexually active with both D.N. and C.K.  *Id.* ¶ 145.  C.K. also confirmed that other students verbally harassed B.R.  *Id.*  D.N. and J.O. also confirmed Plaintiff's reports.  *Id.*  ¶¶ 146-47.[3]  S.T. also spoke with C.K., J.O., and D.N.'s parents.  *Id.* ¶ 147.

The next morning, November 22, 2011, S.T. asked Plaintiff and her parents to return to school because of "developments" in the investigation.  *Id.*  ¶ 148.  S.T. then told B.R.'s parents that the interactions between B.R. and C.K. "appeared to be a 'boy girl thing[,]'" but acknowledged that B.R. was sexually active with C.K.  *Id.* ¶ 151 (quotations in original).  S.T. and P.A.H (another Assistant Principal) informed Plaintiff and her parents that the school would keep D.N. and C.K. away from Plaintiff.  *Id.* ¶ 155.  They also told B.R. to use the "back stairs" to go to her Spanish class and to stay home from school until after the upcoming break.  *Id.*

Plaintiff returned to school on November 28, 2011.  *Id.* ¶ 163.  She continued to experience harassment, including "at least" three to five incidents where students informed

---

[3] Plaintiff's Complaint only alleges that D.N. confirmed he was sexually active with B.R. Dkt. 155 ¶ 146.  According to Plaintiff, this shows that S.T. "had direct and actual knowledge" of a non-consensual sexual encounter between B.R. and D.N.  *Id.*  However, Plaintiff's written report does not contain any statement that she engaged with D.N. in non-consensual sexual activity, nor does Plaintiff's Complaint contain any other allegation that she had told any member of RCMS or FCPS that she had engaged in non-consensual sexual activity with D.N. by that November 21 meeting.  In fact, Plaintiff's written statement reveals that Plaintiff told RCMS and FCPS she did not engage in sexual activity with D.N.  Dkt. 155, Ex. O.  As a result, Plaintiff's conclusory statement that S.T. had direct knowledge of a non-consensual sexual encounter between B.R. and D.N., *id.* ¶ 146, is inconsistent with the Complaint (notwithstanding Plaintiff's capacity to consent at the time).

Plaintiff that C.K. wanted to kill her.  *Id.*  In addition, C.K. continued to meet Plaintiff at her bus stop and "sexually assault[] and batter" her.  *Id.* ¶ 164.  On December 7, Plaintiff and her parents reported the continued harassment to school officials.[4]  *Id.* ¶ 165.  In response, Assistant Principals S.T. and P.A.H. and counselors B.H. and J.F. agreed to shadow Plaintiff between classes on December 8 and 9.  *Id.* ¶ 166.  That shadowing ended after December 9, and when Plaintiff's mother asked B.H. why the shadowing ceased, B.H. said that RCMS didn't have the resources to continue to shadow Plaintiff.  *Id.* ¶ 168.

Plaintiff suffered more harassment and assault thereafter, with little assistance from school employees.  For example, on December 14, 2011, a male classmate put his hands down B.R.'s pants.  *Id.* ¶ 170.  When B.R. told her teacher, M.P.F., M.P.F. responded by saying that B.R. "'needs to learn to be a big girl' and to 'deal with the situation [her]self.'"  *Id.* ¶ 171.  In January 2012, B.R.'s fellow students spread rumors about her sexual activity in person, on the internet, and via social media.  *Id.* ¶¶ 177-78.  The sexual harassment at her locker also continued.  *Id.* ¶ 177.  Plaintiff reported the rumors and sexual harassment to B.H., A.F., and C.W., the school's Director of Student Services, who all did nothing.  *Id.* ¶¶ 179-81.

Plaintiff was also raped on RCMS's campus.  In December 2011, Plaintiff had to stay late to make up for the days she had missed.  *Id.* ¶ 171.  One day, after she left the classroom, a male student forced her into a school closet where she was sexually assaulted, battered, abused, and raped by three unknown males.  *Id.* ¶ 173.  This continued to happen "[o]n numerous and

---

[4]  Plaintiff's Complaint is vague as to what specific continued harassment B.R. and her parents reported to school officials.  Dkt. 155 ¶ 165.  However, according to the Complaint, Plaintiff's parents did not learn C.K. had sexually assaulted Plaintiff until late February of 2012.  Dkt. 155 ¶ 198.  Accordingly, it is reasonable to infer that B.R. and her parents reported the harassment from her fellow students, but not C.K.'s continued sexual assault, on December 7.

separate distinct occurrences" when Plaintiff was on campus between December 2011 and February 2012. *Id.* ¶ 176.

On February 9, 2012, Plaintiff told B.H. that a boy had made "rude and inappropriate comments to her" that day and the previous day. *Id.* ¶ 183. B.H. referred the report to an Assistant Principal, T.B. *Id.* T.B. investigated and verified that a student had made various comments to Plaintiff. *Id.* ¶ 184. Through the investigation, T.B. also discovered that the sexual harassment that was originally reported in October of 2011 was persisting. *Id.* ¶ 185. That same day, Plaintiff told her English teacher that she was receiving death threats. *Id.* ¶ 186. That teacher called Principal A.F., who took B.R. to her guidance counselors, to whom B.R. reported that she was receiving death threats. *Id.* A.F. also reported the threat to T.B., who called Plaintiff's mom and told her of the threats. *Id.* ¶ 188. Plaintiff's parents eventually removed her from school that day and she remained out following day, February 10. *Id.* ¶ 190. On February 10, Plaintiff's mother wrote to A.F. about what B.R. was continuing to experience. *Id.* ¶ 192. A.F. responded to Plaintiff's mother that T.B. was investigating the case and also told her that B.R. had also made inappropriate comments to other students. *Id.*

Plaintiff's mother forwarded A.F.'s email to the Superintendent, J.D., who referred the email to an Assistant Superintendent, D.Z. *Id.* ¶ 193. On February 16, 2012, Plaintiff's family met with D.Z. and D.D. (an unspecified individual) to report the sexual harassment and bullying. *Id.* ¶ 195. The next day, Plaintiff's mother sent D.Z. and D.D. a doctor's note that B.R. was "under psychiatric care" and should be removed from school and receive at-home instruction. *Id.* ¶ 196.[5] The school approved B.R. for 30 days of at-home instruction on February 23, 2012. *Id.* ¶ 197.

---

[5] Plaintiff had not returned to school since February 10. Dkt. 155 ¶ 194.

After beginning at-home instruction, Plaintiff told her mom that C.K. had sexually assaulted her. *Id.* ¶ 198.  She then visited a mental health professional, whom she told of the sexual assault and rape she experienced. *Id.*  On March 2, 2012, Plaintiff's mother took her to the Fairfax County Police Department, where Plaintiff reported the sexual assault and rape. *Id.* ¶ 199.  On March 5, 2012, Plaintiff was evaluated by a medical professional, who concluded that she had suffered contusions inside her anus. *Id.* ¶ 201.  On March 6, 2012, Plaintiff told her doctor that a fellow student had raped and sodomized her. *Id.* ¶ 203.

The police department then investigated Plaintiff's report.  On March 6, Fairfax County Police Department ("FCPD") Detective F.C. met with A.F. to discuss Plaintiff's report. *Id.* ¶ 204.  F.C. also met with C.K., who admitted that he had met with B.R. in a secluded area and engaged in sexual acts with her. *Id.* ¶ 208.  F.C. then spoke with Plaintiff's mother and told her "there was nothing to the case." *Id.* ¶ 206.  On March 8, Plaintiff's mother took her to the FCPD, where F.C. insisted on meeting with B.R. alone. *Id.* ¶ 207.  He accused Plaintiff of falsely reporting her rape and threatened her with criminal action. *Id.* ¶ 208.

Plaintiff was approved for thirty more days of homebound instruction after Plaintiff's doctor sent the school a note on March 7, 2012. *Id.* ¶ 209.  She eventually spent the next year under homebound instruction. *Id.* ¶ 210.  According to Plaintiff, during that time, students and teachers were advised not to discuss Plaintiff's situation with anyone. *Id.* ¶ 211.  A.F. also went to Plaintiff's elementary school "to dig up 'dirt' … and inquire if [Plaintiff] was a 'troubled child.'" *Id.* ¶ 212.

Eventually, on June 29, 2012, D.Z. wrote a letter to Plaintiff's family informing them that FCPS could not "verify Plaintiff's reports of sexual harassment, inappropriate touching, and other bullying." *Id.* ¶ 214.  Plaintiff's mother then met with D.Z. and A.F. with the National

Women's Law Center on August 13, 2012 to determine how B.R. could safely return to school and how FCPS could improve its policies. *Id.* ¶ 219. D.Z. and A.F. stated that FCPS's policies were "adequate" and that the school had acted appropriately. *Id.* ¶ 220. Plaintiff's mother then filed an OCR complaint in September 2012, which FCPS voluntarily resolved before its conclusion. *Id.* ¶¶ 220-21.

According to Plaintiff, there is an "elevation of sexual crimes in and around Fairfax County." *Id.* at 9. Specifically, Plaintiff alleges that organized gangs started targeting Fairfax and other northern Virginia juvenile females in September 2008. *Id.* ¶ 40. Those gangs targeted middle and high school students, sexually trafficking and sexually assaulting them. *Id.* ¶ 41-42; *see also id.* ¶¶ 43-46 (describing instances of sex trafficking).

Plaintiff also alleges that F.C.S.B. failed to train its employees about the sex trafficking of middle and high school students. *Id.* ¶ 49. Plaintiff alleges that "F.C.S.B. chose not to invest in or allocate funds to the protection of its students from human and sex trafficking aside from coopering [sic] with the creation of a documentary film." *Id.* ¶ 50. This was despite advice from both the United States and Virginia Departments of Education on how to prevent sexual misconduct and abuse in schools. *Id.* ¶¶ 58-65.

B. Procedural Background

Plaintiff filed her Complaint on July 12, 2019. Dkt. 1. Two defendants (C.K. and J.O.) answered the Complaint (Dkt. Nos. 9; 11), while the remaining Defendants moved to dismiss for failure to state a claim on November 15, 2019 (Dkt. Nos. 17; 19). C.K. then moved to dismiss and moved to join his co-Defendants' motion. Dkt. Nos. 30; 33. Plaintiff filed an Amended Complaint on November 17, 2019, along with a motion for leave to file under pseudonym. Dkt. Nos. 37; 38. On December 2, 2019, F.C.S.B. moved to strike the Amended Complaint (Dkt. 42)

and moved to dismiss the Amended Complaint on December 4, 2019 (Dkt. 53). The Individual School Defendants also moved to dismiss the Amended Complaint on December 4 (Dkt. 56), and C.K. and J.O. filed their own Motions to Dismiss on December 10 and 11, respectively (Dkt. Nos. 59; 66). B.R. filed her Opposition to F.C.S.B.'s Motion to Strike on December 16, 2019 (Dkt. 70), and her Opposition to both the Individual School Defendants and F.C.S.B.'s Motions to Dismiss on December 18, 2019 (Dkt. Nos. 71; 72). F.C.S.B replied in support of its Motion to Strike and Motion to Dismiss on December 23, 2019 (Dkt. Nos. 73-74), while the Individual School Defendants replied in support of their Motion to Dismiss on December 24, 2019 (Dkt. 75). The Court heard argument on the various motions on January 24, 2020. After the parties filed supplemental briefs on February 27, 2020 (Dkt. Nos. 80; 81), the Court ruled on the various motions on March 10, 2020 (Dkt. 85).

The Court amended its Order concerning the various motions on November 9, 2020, certifying a question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Dkt. 114. The Court also stayed discovery pending the Fourth Circuit's decision. Dkt. 115. The Fourth Circuit affirmed this Court on November 2, 2021. Dkt. 119. Plaintiff then sought leave to file, and eventually filed, a Second Amended Complaint on June 15, 2022. Dkt. Nos. 138; 155. C.K. and J.O. separately answered the Complaint on July 27, 2022. Dkt. Nos. 153; 160. F.C.S.B. filed a Partial Motion to Dismiss and Partial Motion to Strike that same day (Dkt. 161), while the Individual School Defendants also filed Motion to Dismiss on July 27, 2022 (Dkt. 157). B.R. opposed those Motions on August 17, 2022 (Dkt. Nos. 169; 170), and the Defendants replied in support of their respective motions on September 6, 2022 (Dkt. Nos. 180; 181).

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

10

III. ANALYSIS

F.C.S.B. and the Individual School Defendants have moved to dismiss most (but not all) of Plaintiff's claims against them.  First, F.C.S.B. claims that Plaintiff has failed to allege a plausible municipal liability claim against it, arguing that she has failed to show *Monell* liability either stemming from an unlawful custom, usage, or policy, or from a failure to train.  F.C.S.B. has also moved to strike Plaintiff's request for "non-pecuniary" damages as foreclosed by the Supreme Court's recent decision in *Cummings v. Premier Rehab. Keller P.L.L.C*, 142 S. Ct. 1562 (2022).  Second, the Individual School Defendants have moved to dismiss all claims against them.  They argue that Plaintiff's First Amendment Retaliation claim is both based on "implausible allegations" and insufficient as a matter of law.  They further argue that Plaintiff cannot maintain an Equal-Protection claim premised on either disparate treatment or deliberate indifference, and that the claim is duplicative.  The Individual School Defendants also aver that Plaintiff cannot prevail, as a matter of law, on her Substantive Due Process and gross negligence claims.  Finally, they claim they are entitled to qualified immunity on Plaintiff's Section 1983 claims.

Plaintiff argues that her rights were violated in various ways, and that she has pleaded viable claims in her Second Amended Complaint.  According to Plaintiff, she has adequately pleaded that F.C.S.B. deprived her of her right to be free from sexual harassment in an educational setting, as the sexual harassment she experienced is attributable to F.C.S.B.  She also asserts that *Cummings* does not foreclose the recovery she seeks.  As to the Individual Defendants' Motion to Dismiss, she maintains that the Second Amended Complaint pleads the requisite facts to state both a First Amendment and Substantive-Due-Process claim.  Plaintiff also argues that she can succeed on an Equal-Protection claim proceeding either under a disparate

treatment or failure-to-train theory of liability.  Finally, Plaintiff claims that the gross negligence claim should survive Defendants' Motion to dismiss.

### A. F.C.S.B.'s Partial Motion to Dismiss and Motion to Strike

F.C.S.B.'s Partial Motion to Dismiss and Motion to Strike challenges two parts of Plaintiff's Second Amended Complaint: 1) her Equal-Protection claim; and 2) her claim for "emotional damages."

#### 1.  Plaintiff's Equal-Protection Claim

Count VI of Plaintiff's Second Amended Complaint alleges an Equal Protection claim against F.C.S.B.  Dkt. 155 at 65-67.  Specifically, Plaintiff asserts that her right to be free from sexual harassment and sexual assault was violated at school, and that the violation is attributable to F.C.S.B., rendering it liable under the Equal Protection Clause.

At the outset, Plaintiff emphasizes the Fourth Circuit's holding in *Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018), noting that it is "binding precedent" that affirms that a "victim of student-on-student sexual harassment can pursue an Equal-Protection claim predicated on a school administrator's deliberate indifference to such harassment."  Dkt. 169 at 9-10 (quoting *Hurley*, 911 F.3d at 701).  While that is true, the *Hurley* plaintiffs brought a different set of claims.  Critically, the Fourth Circuit addressed plaintiffs' Equal-Protection claim against an *individual*, not a municipality, the claim Plaintiff brings here.  *Hurley*, 911 F.3d at 679.  So *Hurley* is not directly on point.

To prevail on an Equal-Protection claim against F.C.S.B., Plaintiff must show (1) she was "deprived … of a constitutional right'" and (2) that the deprivation was done "under color of [a state] statute, ordinance, regulation, custom, or usage."  *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 115 (4th Cir. 2022) (cleaned up).

To be sure, Plaintiff's Second Amended Complaint sets forth sufficient allegations to show that she was deprived of a constitutional right. "[T]he Equal Protection Clause … secures a student's 'right to be free from sexual harassment in an educational setting.'" *Hurley*, 911 F.3d at 702 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007)). Plaintiff plausibly alleges that she was subjected to sexual harassment at school. For example, she alleges that fellow students subjected her to various forms of verbal sexual harassment. *See, e.g.*, Dkt. 155 ¶ 106 (allegation that students called Plaintiff "slut," "whore," and other names). She also alleges that she was subject to various forms of physical sexual assault, including rape and non-consensual touching. *See, e.g.*, *id.* ¶¶ 127, 132 (allegation that Plaintiff was raped by C.K. on multiple occasions); *id.* ¶ 170 (allegation that a male classmate put his hand down Plaintiff pants); *id.* ¶¶ 173-74 (allegation that Plaintiff was raped by unknown males on multiple occasions on RCMS's campus). There are numerous other allegations that Plaintiff has set forth that, when accepted as true (which the Court must do at this stage), are enough to show that Plaintiff was sexually harassed at school. *See, e.g.*, *id.* ¶ 107 (allegation that fellow students "thrusted their pelvises and intimate body parts" at Plaintiff at her locker). These allegations are independently sufficient to meet Plaintiff's burden to show the deprivation of a constitutional right at this stage, and so they certainly are also sufficient taken together.

But the inquiry does not end there; for liability to attach to F.C.S.B. as a result of that sexual harassment, Plaintiff "must show that the harassment was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 463 U.S. 648, 694 (1978)). Plaintiff argues that F.C.S.B. can be held liable for two independent reasons: because F.C.S.B. had "a custom of deliberate

indifference to sexual assault," and because F.C.S.B. "fail[ed] to properly train school employees[]" on sexual harassment and/or sexual assault issues.  Dkt. 169 at 11.

a. Unlawful Custom or Usage

In this regard, Plaintiff first argues that F.C.S.B. is liable because it maintained a custom or usage by "condonation."  *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987).  To support a claim premised on a theory of condonation, Plaintiff "must point to a persistent and widespread practice of municipal officials, the duration of which indicates that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to deliberate indifference."  *Owens v. Baltimore City State's Atty's Office*, 767 F.3d 379, 402 (4th Cir. 2014) (cleaned up).  The officials' practice must be "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (cleaned up).  "Isolated constitutional deprivations by municipal employees[]" are not enough.  *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984).  "Rather, there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice."  *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003).

It is important to first identify the specific custom, practice, or usage that Plaintiff alleges gives rise to liability.  In *Owens*, for example, the plaintiff alleged that the Baltimore City Police Department "had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions."  *Owens*, 767 F.3d at 403.  And in other cases that have successfully proceeded past the motion-to-dismiss stage, plaintiffs have identified a specific custom that has been made clear by a series of violations similar to the wrongs alleged in their respective complaints.  *See, e.g.*, *Moody v. City of Newport News, Va.*, 93 F. Supp. 3d 516, 543 (E.D. Va. 2015) (denying motion to dismiss Equal-Protection claim because plaintiff's

14

allegations concerning similar incidents permitted a reasonable inference that the City of

Newport News "had a custom of failing to adequately investigate excessive force claims").[6]

Here, Plaintiff argues that F.C.S.B. has a "custom of downplaying allegations of sexual

harassment and assault." Dkt. 169 at 11. Thus, to prove her "condonation" theory, Plaintiff

must allege facts showing that F.C.S.B. employees' downplaying of sexual assault was

"persistent and widespread[,]" that policymakers "had actual or constructive knowledge" that

F.C.S.B. employees downplayed sexual assault, and that the policymakers failed to correct the

practice due to "deliberate indifference." *Owens*, 767 F.3d at 402.  "Both knowledge and

indifference can be inferred from the 'extent' of [the] employees' misconduct." *Id.* at 402-03

(quoting *Spell*, 824 F.2d at 1391).

To support her assertion that F.C.S.B. had knowledge of unconstitutional conduct,

Plaintiff first focuses on the school officials' purported inadequate response to her own reports

of sexual assault and harassment. Dkt. 169 at 12-13.  While the Court accepts those facts as true

at this stage, those allegations have minimal relevance to the determination of whether there is a

*custom* of downplaying sexual assault.  Plaintiff must instead allege "numerous particular

---

[6] *See also Johnson v. Hall*, No. 3:21-0242, 2021 WL 5867413, at *3 (S.D. W. Va. Dec. 10, 2021) (denying motion to dismiss because plaintiffs alleged "separate instances" similar to theirs that supported their allegation of an unlawful pattern and practice of warrantless searches); *Booker v. City of Lynchburg*, No. 6:20-cv-11, 2021 WL 519905, at *4 (W.D. Va. Feb. 11, 2021) (denying motion to dismiss where plaintiff alleged "at least four examples of excessive use of force[,]" that could "plausibly support an inference of an unconstitutional custom of excessive use of force"); *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 535-35 (D. Md. 2020) (denying motion to dismiss because plaintiff identified specific events buttressing his assertion that "a widespread practice of evidence fabrication and suppression existed in the BPD"); *Grim v. Baltimore Police Dep't*, No. ELH-18-3864, 2019 WL 5865561, at *21-22 (D. Md. Nov. 8, 2019) (denying motion to dismiss because plaintiff identified three instances of "allegedly unlawful strip searches" that, among other factual allegations, evidenced a policy of unlawful strip searches in the BPD).

instances of unconstitutional conduct in order to establish a custom or practice." *Lytle*, 326 F.3d at 473.[7]

Apart from the allegations that are specific to B.R.'s case, she also alleges that F.C.S.B. "had sufficient knowledge to be aware of serious concerns regarding sexual harassment and sexual assault" in schools in its county and points to the plethora of data and evidence showing that sexual assault, sexual harassment, and sex trafficking were widespread issues in the county's schools.  Dkt. 169 at 13; *see also* Dkt. 155 ¶¶ 40-60, 99-100 (allegations about the issue of sexual harassment, sexual assault, and sex trafficking in F.C.S.B. schools).  She also highlights the Department of Education's guidance about remedying sexual harassment.  *E.g.*, Dkt. 155 ¶¶ 58-65.

Plaintiff misses the analytical framework.  Those allegations are not germane to whether there were "numerous particular instances of unconstitutional conduct" that establish a "custom or practice."  *Lytle*, 326 F.3d at 473.  The fact that sexual assault, sexual harassment, and sex trafficking of students are issues in the county is indeed alarming, but those facts alone do not support the assertion that F.C.S.B. employees were acting unconstitutionally in addressing those issues.  While it might be that F.C.S.B. "had sufficient information to be aware of a problem with sexual harassment," Dkt. 169 at 14, Plaintiff does not include allegations that F.C.S.B. employees, either generally or as a custom, downplayed reports of sexual assault, harassment, or sex trafficking on those occasions.  Because Plaintiff's Second Amended Complaint "does not

---

[7] Plaintiff cites *M.B. v. Chapel Hill-Carrboro City Schs. Bd. of Educ.*, No. 1:20-cv-796, 2021 WL 4412406 (M.D.N.C. Sep. 27, 2021) to support her argument that alleging that school officials downplayed sexual assault reports is enough to support an Equal-Protection claim.  Dkt. 169 at 12.  While she correctly reads *M.B.*, the plaintiff in that case only brought an Equal-Protection claim against the individual defendants, and so she did not need to plead a custom or usage.  *M.B.*, 2021 WL at *1, *4.  Accordingly, *M.B.* is not on point with the instant case.

contain sufficient factual allegations to permit the Court to make a reasonable inference that" F.C.S.B. knew that its employees downplayed sexual assault claims, Plaintiff has not met her burden of alleging that policymakers had actual or constructive knowledge that F.C.S.B. employees downplayed sexual assault. *Saub v. Phillips*, No. 3:16-cv-414, 2017 WL 1658831, at *7 (E.D. Va. May 1, 2017).

Plaintiff similarly fails to sufficiently allege that F.C.S.B. policymakers failed to correct its employees' alleged unconstitutional practices due to deliberate indifference. There are only two sets of allegations that could plausibly be construed as relevant to whether F.C.S.B. employees were acting unconstitutionally in cases similar to Plaintiff's. First, Plaintiff alleges that there was a mother who "claimed that she and her daughter went to her guidance counselor 22 times about [her daughter's] sex trafficking, but were told there was nothing [FCPS] could do to help her." Dkt. 155 ¶ 51. Second, Plaintiff discusses the Office of Civil Rights' report that resulted from her mother's complaint. *Id.* ¶¶ 221-224.

Those allegations are insufficient to buttress Plaintiff's claim that F.C.S.B. failed to correct its employees' alleged unconstitutional practice of downplaying sexual assault reports due to deliberate indifference. It is unclear how similar the other case of a mother and student going to an FCPS guidance counselor is to the case at hand: Plaintiff does not detail what the FCPS employees did (or did not) do in response to the report; it is unclear when this incident occurred; and it is unclear whether the other student experienced something akin to what B.R. experienced. Moreover, that allegation is the only specific incident that Plaintiff has pointed to as similar to hers; as a matter of law, a single like incident is insufficient to establish widespread deliberate indifference. *Munive v. Fairfax Cnty. Sch. Bd.*, Case No. 1:18-cv-1566, 2019 WL 2374869, at *5 (E.D. Va. 2019) (allegation of "two other incidents ... each over ten years old"

17

was insufficient to plead a widespread custom or practice); *Woodson v. City of Richmond, Va.*, 88 F. Supp. 3d 551, 569 (E.D. Va. 2015) (allegation of two similar instances insufficient to plead "persistent and widespread" custom).

The OCR Report also does not provide the support that Plaintiff needs to survive a motion to dismiss.  Plaintiff's own description of it does not indicate that there was any similar incident where school officials failed to act when its employees downplayed sexual assault.  Rather, the Report identified "possible concerns" with how F.C.S.B. addressed *Plaintiff's* situation, Dkt. 155 ¶ 221, noted that there were "some instances" where F.C.S.B's response "may not have been prompt and appropriate under Title IX[,]" *id.* ¶ 222, and voiced concerns about F.C.S.B's "system to track reports of sexual harassment[,]" *id.* ¶ 223.  None of those issues deal with how F.C.S.B.'s employees downplayed sexual assault on any occasions, or whether F.C.S.B. policymakers failed to cure such actions if they occurred.

Plaintiff also cannot find safe harbor in the fact that "knowledge and indifference can be inferred from the extent of [the] employees' misconduct." *Owens*, 767 F.3d at 403.  To support such an inference, Plaintiff could have presented "broader allegations" indicating that F.C.S.B. employees "routinely" downplayed sexual assault claims.  *Moody*, 93 F. Supp. 3d at 543.  Or she could have pleaded facts showing similar incidents "involv[ing] constitutional violations." *Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016).  She has not done so.  Rather, as explained above, she has relied on the facts of her own case, general allegations of the issue of sexual assault in the school district with no indication that school employees acted unconstitutionally in response, and a single additional incident that may or may not be factually similar to Plaintiff's.

At bottom, Plaintiff has not pleaded that there is a widespread custom of school employees downplaying sexual assault claims. She has also not pleaded facts sufficient to show or to permit this Court to infer that school policymakers knew about its employees' constitutional violations, or that the policymakers failed to correct any such violations due to deliberate indifference. As a result, Plaintiff cannot prevail on her Equal-Protection claim premised on an unlawful custom or practice.[8]

### b. Failure to Train

Plaintiff also claims that she can maintain an Equal-Protection claim against F.C.S.B. because of its "failure to properly train school employees." Dkt. 169 at 11. While Plaintiff appears to blend the failure-to-train analysis with the "custom or usage" analysis, the Court will separately address the failure to train theory in this analysis.

In certain circumstances, a local government's failure to train its employees can give rise to liability. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Nevertheless, to state a claim for a failure to train, a plaintiff must plead: "(1) [that] the subordinates actually violated

---

[8] Plaintiff takes issue with the fact she is placed in a "catch-22" at the pleading stage. She claims she has a "right to bolster the factual record through discovery" and that discovery could reveal "a greater number of instances of official misconduct." Dkt. 169 at 18. But that argument is of no import. At this stage, Plaintiffs must meet the pleading requirements and adequately state an Equal-Protection claim, which is indeed "easier" than *prevailing* on such a claim. *Owens*, 767 F.3d 403. Even so, Plaintiff has not met the requirements to adequately state an Equal-Protection claim resulting from an unconstitutional custom. Thus, the Court finds that her allegations are inadequate, as myriad courts have found with similarly deficient allegations in parallel contexts. *See, e.g.*, *Munive*, 2019 WL 2374869, at *5 (finding Plaintiff's allegations insufficient to support her claim of custom or usage at motion-to-dismiss stage); *Byrge v. Va. State Univ. Bd. of Visitors*, Case No. 3:13-cv-31, 2013 WL 2490183, at *5 (E.D. Va. June 10, 2013) (same).

the plaintiff's constitutional or statutory rights; (2) [that] the supervisor failed to train properly the subordinates[,] thus illustrating a deliberate indifference to the rights of the persons with whom the subordinates come into contact; and (3) [that] this failure to train actually caused the subordinates to violate the plaintiff's rights." *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014). As shown in Part III.A.1, Plaintiff has adequately pleaded the first element.

Plaintiff can plead that the School Board failed to properly train its subordinates in a manner exhibiting deliberate indifference in two ways. First, Plaintiff can plead that School Board policymakers "were aware of, and acquiesced in, a pattern of constitutional violations." *Id.* Second, Plaintiff can allege facts that show that the School Board failed to "train its employees concerning an obvious constitutional duty that the particular employees are certain to face." *Id.*

Plaintiff has not pleaded that the School Board policymakers acquiesced in a pattern of constitutional violations. To do so, Plaintiff must "establish the existence of a pattern of incidents sufficiently similar to each other, or to the one" in her case. *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 538 (E.D. Va. 2015). As the Court explained, Plaintiff has, at most, identified one incident where an F.C.S.B. employee was indifferent to a report of sexual assault. Even assuming that incident is "sufficiently similar" to Plaintiff's (an assumption for which the Second Amended Complaint provides no support), a single similar incident does not show that F.C.S.B. policymakers allowed a pattern of constitutional violations to persist. *See City of Canton, Oh.*, 489 U.S. at 397 (O'Connor, J., concurring in part and dissenting in part) (detailing that a municipality is liable for a failure to train when "a *pattern* of constitutional violations could

20

put the municipality on notice" that its employees "confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements").

Plaintiff has also not adequately pleaded that F.C.S.B. failed to "train its employees concerning an obvious constitutional duty that the particular employees are certain to face." *Gallimore*, 38 F. Supp. 3d at 726.  She focuses on the fact that F.C.S.B. "had sufficient information to be aware of a problem with sexual harassment and assault in an educational context[,]" creating a duty to train its employees on those issues.  Dkt. 169 at 14.  That may be so, but Plaintiff must also allege that F.C.S.B. *failed* to train its employees on issues related to sexual harassment and assault.  She has not done so.  While her Second Amended Complaint asserts that F.C.S.B. employees' actions evidence a lack of training, *see, e.g.*, Dkt. 25 ¶¶ 120, 143, 154, or generally states that F.C.S.B. had "training deficiencies[,]" *id.* ¶ 121, those allegations are not sufficiently specific or particularized to meet her burden at the motion-to-dismiss stage.  *Cf. Moody*, 93 F. Supp. 3d at 539-40 (holding that a specific allegation that a city did not train its officers on the use of force vis-à-vis fleeing suspects was sufficient to plead a failure-to-train claim at the motion to dismiss stage); *Johnson v. City of Richmond*, No. 3:04-cv-340, 2005 WL 1793778, at *7-10 (E.D. Va. June 24, 2005) (similar).  At most, Plaintiff's Complaint alleges inaction akin to "general laxness," which is legally insufficient to support her failure-to-train claim.  *Spell*, 824 F.3d at 1380.

Moreover, Plaintiff has not sufficiently pleaded that the School District's failure to train its employees on sexual harassment issues caused the school officials to violate her rights.  To do so, Plaintiff must allege that the School Board's training failure was "such to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run."  *Moody*, 93 F. Supp. 3d at 540.  B.R.'s Second Amended Complaint fails to identify why

any failure on F.C.S.B.'s part made these particular violations "almost bound to happen, sooner or later." *Id.* There are no allegations giving rise to a reasonable inference connecting any specific training failure on F.C.S.B.'s part to the wrongdoing B.R. alleges, meaning she has "failed to allege the requisite causal link" between F.C.S.B.'s training (or lack thereof) and the wrongdoing that occurred. *Chennault v. Mitchell*, 923 F. Supp. 2d 765, 788 (E.D. Va. 2013). Accordingly, her failure-to-train claim is legally insufficient for that alternative reason.

### 2.  F.C.S.B.'s Motion to Strike

F.C.S.B. also argues that Plaintiff's claim for emotional harm under Title IX should be struck.   In her Second Amended Complaint, Plaintiff alleges that the purported Title IX violations led her to suffer various injuries, including "emotional distress, fear, anxiety, [and] trauma." Dkt. 155 ¶ 236.   F.C.S.B. argues that those damages are "foreclosed by the U.S. Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022)."

Rule 12(f) motions to strike "are to be granted infrequently." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 247 (4th Cir. 2007).  Generally, courts view Rule 12(f) motions "with disfavor because striking a portion of a pleading is a drastic remedy." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

Some district courts in the Fourth Circuit have held that a Rule 12(f) Motion to Strike cannot be used to strike a plaintiff's demand for emotional distress damages.  *See, e.g.*, *Bocock v. Specialized Youth Servs. of Va., Inc.*, 2015 WL 1611387, at *3 (W.D. Va. April 10, 2015) ("None of the terms of Rule 12(f) … allow the striking of the plaintiff's demand for emotional distress damages."); *cf. Black v. Wells Fargo and Co.*, 2016 WL 483135, at *3, n. 2 (W.D.N.C. Feb. 5, 2016) (noting that defendant could not challenge plaintiff's claim for extracontractual

damages in a motion to strike).  While the Fourth Circuit is silent on the issue, the Ninth Circuit

has come to the same conclusion.  *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974-

75 (9th Cir. 2010) ("We therefore hold that Rule 12(f) does not authorize district courts to strike

claims for damages on the ground that such claims are precluded as a matter of law.").

Plaintiff is also seeking emotional damages for some of her non-Title IX claims.  For

example, in Counts IV and VI, which allege Equal Protection violations pursuant to 42 U.S.C. §

1983, Plaintiff seeks damages due to emotional distress, among other damages.  Dkt. 155 ¶¶ 271,

294.  She also seeks damages due to emotional distress in claiming violations of Substantive Due

Process, *id.* ¶ 285, gross negligence on the part of the Individual Defendants, *id.* ¶ 303, and in

her allegations of assault and battery, *id.* ¶¶ 313, 321.  Those claims for emotional distress have

not been challenged.

Because many courts have held that a Motion to Strike cannot be used to strike a demand

for emotional damages and because Plaintiff seeks emotional damages in many of her other

claims, this Court concludes  that it would be premature at this stage to strike Plaintiff's request

for emotional harm damages from Counts I and II.  Defendant is not precluded from again raising

this argument once the record is more fully developed and discovery into the scope of Plaintiff's

damages is complete.

### 3.  Leave to Amend and Request for Judicial Notice

Plaintiff also asks for leave to further amend her complaint should the Court find that she

has not adequately pled certain claims against F.C.S.B.  She asks the Court to take Judicial Notice

of several documents that she would add to a hypothetical Third Amended Complaint: Fall 2010

F.C.S.B. Board minutes; two other "Voluntary Resolutions" for discrimination with OCR;

documents concerning three pending federal investigations into FCPS for mishandling reports

of sexual harassment and/or related retaliation; news reports about FCPS being indifferent to allegations of teacher sexual misconduct; court filings in another case alleging deliberate indifference; documents showing criminal charges for failure to report child abuse; documents showing retaliation against other FCPS students for reporting sexual harassment; and documents about public accusations that FCPS administrators ignored complaints of sexual misconduct. *See* Dkt. No. 170-1; 170-2 (request for judicial notice and accompanying exhibits).

Plaintiff's request for Judicial Notice did not include documents "integral to and explicitly relied on in the Complaint" and so the Court could not consider them in resolving F.C.S.B.'s motion to dismiss. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). Plaintiff indicated that the Request for Judicial Notice (and the attached exhibits) were documents that "she would add to her pleadings." Dkt. 169 at 25. As a result, Plaintiff's Request for Judicial Notice is more appropriately construed as a Motion to Amend that contains the allegations and supporting documents that she believes would remedy any deficiencies in her claims against F.C.S.B.

Here, Plaintiff's two-page request for leave to amend is not a proper motion to amend her complaint. When a plaintiff seeks leave to amend, she must include a copy of the proposed amended pleading, not simply the proposed amendment. *Duncan v. Clarke*, No. 3:12-cv-482, 2015 WL 2218240, at *2 n.1 (E.D. Va. May 11, 2015). In this regard, Plaintiff has not only failed to include a copy of the proposed amended pleading, but she has not even included the proposed amendment; all she has included is descriptions of certain documents. Without the proposed Third Amended Complaint, it is difficult for Defendants (and the Court) to evaluate whether further amendment would be prejudicial and/or futile. *Mills v. City of Norfolk, Va.*, No. 2:21-cv-185, 2021 WL 3671189, at *5 n.1 (E.D. Va. Aug. 18, 2021) (describing the "long-

standing practice" of attaching a proposed amended complaint to a Motion to Amend to allow

the Defendant and the Court to be able to "review the precise language to be added"). Indeed,

those issues have not been addressed by either party. As a result, the Court will DENY Plaintiff's

Request for Judicial Notice. Plaintiff is not prejudiced in her ability to seek leave to further

amend her complaint.[9]

### B. The Individual School Defendants' Motion to Dismiss

#### 1. Plaintiff's First Amendment Retaliation Claim

The Individual School Defendants first challenge Plaintiff's claim that they violated her

First Amendment rights by retaliating against her. They argue that Plaintiff's allegations "are

not plausible," Dkt. 158 at 7-8, and that she fails to meet the second and third elements of a First

Amendment Retaliation claim, *id.* at 8-9.

The Court must start by clarifying that, in resolving the Individual School Defendant's

challenge to the "plausibility" of Plaintiff's First Amendment retaliation allegations, this Court

is not evaluating the factual veracity of the Complaint. Rather, the facts are taken true as alleged

and Plaintiff's First Amendment retaliation claim should only be dismissed if she would "not be

entitled to relief under any legal theory which might plausibly be suggested by" those allegations.

*Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also De'lonta v. Johnson*,

708 F.3d 520, 524 (4th Cir. 2013) ("In assessing the complaint's plausibility, we accept as true

all the factual allegations contained therein.").

---

[9] The Court notes that this litigation has advanced substantially, and that Plaintiff had already had two opportunities to amend her complaint. Those factors, along with the legal sufficiency of Plaintiff's proposed amendments, will be critical should Plaintiff seek leave to amend her complaint a third time. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379-380 (4th Cir. 2012) (timing of amendments and discovery relevant to determining prejudice to defendants, and legal sufficiency relevant to whether amendment would be futile).

Plaintiff must plead three elements to defeat Defendant's Motion to Dismiss her First Amendment retaliation claim.  First, that "she engaged in protected First Amendment activity[.]" *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (cleaned up).  Second, that the Individual School Defendants "took some action that adversely affected her First Amendment rights[.]" *Id.* And third, that "there was a causal relationship between her protected activity and" the Individual School Defendants' conduct.  *Id.*

a. Engagement in Protected Activity

The Individual School Defendants seem to argue that Plaintiff has not adequately pleaded that she engaged in protected First Amendment activity.  They call her allegations concerning her reports "discrepant" and "improbable."  Dkt. 158 at 8.  They claim that the allegations do not show that Plaintiff reported the "rape or sexual violence" to any Individual School Defendant, meaning that she did not engage in protected First Amendment activity.  Dkt. 180 at 3.

As a factual predicate for her claim, Plaintiff need not have reported rape or sexual violence to have engaged in activity protected by the First Amendment.  The First Amendment "provides protection from retaliation for speaking out against" sexual discrimination.  *Whitehurst v. Bedford Cnty. Sch. Bd.*, 6:19-cv-10, 2020 WL 535962, at *12 (W.D. Va. Feb. 3, 2020); *see also Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994) (holding that the First Amendment protects the right of an individual to speak out against sexual discrimination).  And sexual discrimination is not only rape or sexual violence—it can be something less severe, such as verbal or physical sexual harassment from fellow students.  *See Willey v. Bd. of Educ. Of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 659 (D. Md. 2021) ("The Supreme Court has held that for purposes of Title IX, unlawful sex discrimination includes sexual harassment and sexual

26

assault."). As a result, when Plaintiff "spoke out" against sexual harassment she was experiencing, she was engaging in protected First Amendment activity.

The Complaint adequately identifies several instances where Plaintiff spoke out against sexual harassment that she was experiencing. Specifically, the following allegations constitute protected First Amendment activity:

- B.R.'s reports in October of 2011 to M.P.F., M.C., and F.T. that "a group of teenage boys had harassed her by calling her names, touch[ing] her, and [making] her feel uncomfortable at school and when she went to her locker," Dkt. 155 ¶ 110;

- B.R.'s report to M.C. that she was "tardy to class because she was being 'hurt' by other students at her locker," *id.* ¶ 111;

- B.R.'s report to J.F. that male students were "sexually harassing her by calling her sexually suggestive and derogatory names" and that those students were "sexually assaulting and battering her by unwantedly and offensively touching her," *id.* ¶ 113;

- B.R.'s November 21, 2011 "written and oral report" to S.T., P.A.H., and B.H. that D.N. and C.K. verbally harassed her, *id.* ¶¶ 140, 142, *id.* Ex. O;[10]

- B.R.'s early December 2011 report of "continued harassment and threatening comments directed towards Plaintiff while at school to FCPS agents and employees[,]" *id.* ¶ 165;

- B.R's December 2011 report to M.P.F. that a male classmate "put his hands down [her] pants[,]" *id.* ¶¶ 170-71;

- B.R.'s January 2012 report to B.H. that students were "spreading rumors and harassing her about being 'bi-sexual[,]'" *id.* ¶ 179;

- B.R.'s January 27, 2012 report to A.F. of continued sexual harassment, *id.* ¶ 180;

- B.R.'s January 27, 2012 letter to A.F. and Cheryl Weaver complaining of "constant bullying" and asking for them to "educate students" about bullying at school in an effort to get "relief from the harassment and bullying she was suffering[,]" *id.* ¶ 181;[11]

---

[10] Neither the Complaint nor Plaintiff's written report from that November 21, 2011 meeting (attached as Exhibit O to the Complaint) show that Plaintiff reported physical harassment at that meeting.

[11] Plaintiff alleges that she reported general "bullying" in this letter, not that she reported sexual harassment, which makes it different from her other allegations. She explains this by

- B.R.'s February 9, 2012 report to B.H. that a boy had made "rude and inappropriate comments" to her in the cafeteria, *id.* ¶ 183.

- B.R.'s February 9, 2012 report to her teacher, Tiffany Estrella, and A.F., that she was receiving death threats, *id.* ¶ 186;[12]

- B.R.'s March 2, 2012 report to the Fairfax County Police Department that C.K. "sexually assaulted, sexually abused, and raped her[,]" *id.* ¶ 199, which was subsequently relayed to A.F. on March 6, 2012, *id.* ¶ 204.

As a result, Plaintiff has adequately pleaded that she engaged in protected First Amendment activity, and the first *Davison* element has been met.[13]

b. Adverse Effect on B.R.'s First Amendment Rights

Plaintiff must next show that the Individual School Defendants "took some action that adversely affected her First Amendment rights." *Davison*, 19 F.4th at 636. A plaintiff suffers adverse action if the "allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors and Visitors of*

---

asserting that she and her mother used "bullying" as a proxy for "sexual harassment and sexual violence." Dkt. 155 ¶ 182. However, even assuming the reports of "bullying" did not convey that Plaintiff was reporting sexual harassment, it would still be protected by the First Amendment, as it is well-established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969). In fact, the Supreme Court has recognized that schools have significant interests in *regulating* speech in schools if there is "serious or severe bullying or harassment targeting particular individuals[,]" which means that students can lose some First Amendment protections if the school is attempting to regulate severe bullying. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021). It follows that a student has a First Amendment right to report "serious or severe bullying" that she is experiencing, just as she has the right to report sexual discrimination that she is experiencing.

[12] This is also not a report of sexual discrimination but is akin to a report of bullying that is protected by the First Amendment. *See supra* n.11.

[13] Plaintiff claims that her "attempts to meet with B.H. to speak with her about being afraid to walk the hallways and feeling unsafe" constitute protected First Amendment activity. Dkt. 170 at 10 (citing Dkt. 155 ¶¶ 115-116). However, it is unclear from those allegations whether Plaintiff actually reported sexual harassment and/or violence on those occasions; in fact, those allegations indicate that Plaintiff did not meet with B.H. Because the Complaint does not allege that Plaintiff spoke with B.H. on those occasions, they do not constitute reports of sexual harassment that are protected by the First Amendment.

*George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  Because conduct that "tends to chill" free speech also violates the First Amendment, a plaintiff "need not actually be deprived of her First Amendment rights" to establish a violation.  *Id.*

In determining whether the Individual School Defendants' actions adversely affected B.R.'s First Amendment rights, it is important to examine the context.  Deciding whether there is an adverse effect is an objective inquiry that is conducted in light of "the circumstances presented in the particular case."  *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006).  In conducting that inquiry, the Court must determine whether the Individual School Defendants took some action that would likely deter a student that is similarly situated to B.R.  *Id.*; *see also Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 456-57 (W.D. Va. 2021) (finding that plaintiff alleged an adverse action after detailing actions that defendant took against him and that such actions would cause any student to "be reluctant to express his views").

The Individual School Defendants' failure to act is not relevant to this inquiry.  Plaintiff alleges that the school's failure to address certain complaints (*i.e.* their inaction) adversely affected her First Amendment rights.  *See id.* ¶¶ 246a, 246c, 246e, 246g, 246h, 246i, 246j (alleging that various decisions not to act were adverse actions for purposes of the First Amendment retaliation claim).  However, inaction is not an "adverse action" supporting a First Amendment retaliation claim.  *See Houston v. Schriro*, No. 11 Civ. 7374, 2013 WL4457375, at *10 (S.D.N.Y. Aug. 20, 2013) ("Ignoring grievances cannot support a First Amendment retaliation claim."); *see also Simpkins v. Roberson*, No. 19-1091-JDT, 2019 WL 5424419, at *4 (W.D. Tenn. Oct. 22, 2019) (similar) (collecting cases).

Nevertheless, B.R. has alleged that she suffered certain adverse actions.  Specifically, she alleged that A.F. visited "Plaintiff's elementary school to dig up 'dirt' on Plaintiff and inquire if

she was a 'troubled child[,]" *id.* ¶ 212, that she was required to stay home from school, *id.* ¶ 155, and that she could not engage in extracurricular activities with other students, *id.* ¶ 211.  A student faced with administrators trying to inquire about their past and/or separation from school and extracurricular activities would instinctively be dissuaded from reporting sexual harassment. Furthermore, B.R. alleged that S.T. asked her and her mother why they were "trying to ruin a young boy's life."  *Id.* ¶ 142.  Taken in the relevant context—an administrator responding to a twelve-year-old's complaint of sexual harassment by conducting an investigation of a student's scholastic history—gives rise to a reasonable inference that a similarly situated middle school student would be deterred from reporting sexual harassment when faced with such a response.

There are certain other actions that do not amount to "adverse actions."  While Detective Chambers evidently "accused Plaintiff of falsely reporting her rape and threatened [her] with criminal action" due to the allegedly false report; there is no indication that any of the Individual School Defendants did the same.[14]  *Id.* ¶ 208.  Similarly, T.B. and A.F.'s comment that Plaintiff "had a part in the February 8-9 incidents" could be construed as an implied threat of discipline for Plaintiff's report of those events.  *Id.* ¶ 192.  However, Plaintiff alleges that those statements were made to her mother and there is no allegation that the administrators made similar comments to Plaintiff; as a result, those comments (and the implication of discipline) were not adverse action that B.R. herself suffered.  Plaintiff also argues that "teachers and administrators instructed other students not to talk to Plaintiff because of the school's potential liability."  Dkt. 170 at 13 (citing Dkt. 155 ¶ 211).  But that is not precisely what her Complaint alleges.  Her Complaint states that students and teachers were advised "not to discuss any matters concerning Plaintiff with anyone."  Dkt. 155 ¶ 211.  That allegation is different than how Plaintiff describes

---

[14] No one from FCPD was named in the Second Amended Complaint.

it in her Opposition to the Motion to Dismiss, as it does not reflect Plaintiff's ostracization by her peers, but instead shows that the school sought to avoid discussion of Plaintiff's complaints. That is not an "adverse action" for First Amendment retaliation purposes.  Finally, Plaintiff argues that S.T. and P.A.H.'s instruction that she take the "back stairs" to her Spanish class constituted an adverse action. Dkt. 170 at 13.  The Court appreciates that such a response may have been a well-intentioned attempt at protecting Plaintiff from her purported harassers. Separating a victim from her alleged harassers would likely not dissuade a similarly situated student from reporting sexual harassment, and so it is not an "adverse action" for First Amendment purposes.

The only Individual School Defendants who can be liable for First Amendment retaliation are those who took adverse action against B.R.  *See Rawls-Dolin v. Riverside Reg'l Jail*, 3:19-cv-740, 2020 WL 5753963, at *11-17 (E.D. Va. Sep. 25, 2020) (dismissing First Amendment retaliation claim against some, but not all, defendants because plaintiff did not plead that certain defendants' actions had met the elements of First Amendment retaliation).  Above, the Court identified the "adverse actions" that were adequately pleaded.   A.F. took an adverse action against B.R. by allegedly inquiring about her past, and S.T. did so when she asked Plaintiff why she was trying to ruin a young boy's life. Dkt. 155 ¶¶ 142, 212.  S.T. and P.A.H. also told Plaintiff that she had to stay home from school on November 22, 2011.  *Id.* ¶ 155.  However, Plaintiff has not alleged who exactly forbid her from "engag[ing] in extracurricular activities" with other students after she reported her alleged rape.  *Id.* ¶ 211.  In sum, Plaintiff has only adequately alleged that A.F., S.T., and P.A.H. took some adverse action against her.  As a result, those are the only Individual School Defendants against whom a First Amendment retaliation claim can proceed.

c.  Causal Relationship

Finally, Plaintiff must plead that there was a causal relationship between her protected

activity and the actions that A.F., S.T., and P.A.H. took.  To do so, she must draw a connection

between the above-identified "adverse actions" and the protected First Amendment speech that

she engaged in.  At the motion-to-dismiss stage, Plaintiff need only plead two facts to establish

a causal relationship.  First, she must show "that the defendant was aware of her engaging in

protected activity."  *Constantine*, 411 F.3d at 501.  Second, she must show "some degree of

temporal proximity to suggest a causal connection."  *Id.*[15]

Plaintiff has adequately pleaded that A.F.'s inquiry into her past has a causal relationship

to her protected First Amendment activity.  A.F. was directly aware of Plaintiff's reports of

sexual harassment and other bullying in January and February of 2012.  Dkt. 155 ¶¶ 180-81, 186.

He was also indirectly aware of her reports of sexual harassment throughout those months, both

from the FCPD and his subordinates.  *See, e.g.*, *id.* ¶ 204 (allegation that Detective Chambers

discussed Plaintiff's reports of rape and sodomy with A.F. in March of 2012).  A.F. went to "dig

up dirt" on Plaintiff at her elementary school only a short time later, in April of 2012.  *Id.* ¶¶

212-13.[16]  Indeed, Plaintiff alleges that A.F. went to her elementary school "[u]nder the guise

---

[15] This standard is different from what Plaintiff must show to *prevail* on her First Amendment claim.  To do so, she must "establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury[,]" *i.e.*, she must show that the defendant's retaliatory motive was the but-for cause of the adverse action she suffered. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (cleaned up).  That is a much higher standard that the Court cannot speculate on without further discovery.  *Roncales v. Cnty. of Henrico*, 451 F. Supp. 3d 480, 495 n.11 (E.D. Va. 2020).

[16] Plaintiff does not specifically allege that A.F. went to Plaintiff's elementary school in April of 2012.  However, the subsequent allegation indicates that A.F. went to Plaintiff's elementary school around the same time that Officer Genus told Plaintiff's mother that he had substantiated a simple assault by J.O. against Plaintiff, which was in April of 2012.  Dkt. 155 ¶

of" investigating her reports of sexual assault.  *Id.* ¶ 212.  That temporal proximity, when combined with A.F.'s knowledge of many of Plaintiff's reports, is enough to state a First Amendment retaliation claim against A.F.

Plaintiff has also adequately pled that Assistant Principal S.T.'s question asking why she and her mother "were trying to ruin a young boy's life" has a causal relationship to her protected First Amendment activity.  S.T. asked that question during the very meeting where B.R. submitted a written and oral report about the harassment she was experiencing.  *Id.* ¶ 140.  Plaintiff alleges that those reports were submitted to S.T. (among others) and that S.T. responded with that question in the same meeting.  That is sufficient to support a First Amendment retaliation claim against S.T.

Similarly, B.R. has sufficiently alleged that S.T. and P.A.H.'s instruction that she stay home from school has a causal relationship to her protected First Amendment activity.  S.T. and P.A.H. told her to stay home from school on November 22, 2011, *id.* ¶ 155, the day after she submitted the written and oral reports to S.T., P.A.H., and B.H., *id.* ¶ 140.  Both Assistant Principals had the requisite knowledge of her reports and acted shortly after those reports for a First Amendment retaliation claim to survive.[17]

Thus, Plaintiff has adequately alleged a First Amendment retaliation claim against three Individual School Defendants: A.F., S.T., and P.A.H.  However, she has not sufficiently pleaded

---

213.  Accordingly, it is reasonable to infer that A.F. went to her elementary school in April of 2012.

[17] The Court recognizes that P.A.H. and S.T.'s instruction that Plaintiff stay home from school may have been an attempt to protect her from her harassers.  However, at this stage, Plaintiff need only allege that Defendants had knowledge of her complaints and that the adverse action they took had a temporal proximity to those complaints.  As stated above, Plaintiff has a much higher burden to prevail on her First Amendment claim.

a First Amendment retaliation claim against the remaining Individual School Defendants. Accordingly, Plaintiff's First Amendment retaliation claims against T.B., B.H., M.P.F., M.C., F.T. and J.F. must be dismissed.

### 2. Plaintiff's Equal-Protection Claim

Plaintiff also brings an Equal-Protection claim against the Individual School Defendants. While it is unclear from the Second Amended Complaint whether Plaintiff brings that claim against the Individual School Defendants in their official or individual capacities, an official capacity suit would be duplicative of Plaintiff's Equal-Protection claim against the School Board. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Court will construe Plaintiff's Equal-Protection claim as a claim against the Individual School Defendants in their individual capacities.

Plaintiff alleges that her rights under the Equal Protection Clause have been violated due to disparate treatment.[18] "[T]o survive a motion to dismiss an Equal-Protection claim" that is premised on allegations of disparate treatment, Plaintiff must "demonstrate plausibly that [she] was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011).

Plaintiff is correct in arguing that she can proceed without showing that others were also treated differently. The Supreme Court "has recognized the validity of 'class of one' Equal-Protection claims, 'where the plaintiff alleges that she has been intentionally treated differently

---

[18] Plaintiff also believes that her rights were violated due to the Individual School Defendants' deliberate indifference to the student harassment she was experiencing. However, she acknowledges that such a claim could not go forward in light of the 4th Circuit's decision in *Hurley*, 911 F.3d 674, as the Individual School Defendants are entitled to qualified immunity. That is explained in further detail below.

from others similarly situated and that there is no rational basis for the difference in treatment.'" *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 263 (4th Cir. 2005) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). But pleading a "class of one" claim does not excuse Plaintiff from the requirement that she allege "that she has been intentionally treated differently from others similarly situated." *Siena Corp v. Mayor and City Council of Rockville, Md.*, 873 F.3d 456, 465 (4th Cir. 2017).

Plaintiff has not adequately pleaded that she was been treated differently from similarly situated students. Plaintiff has pleaded no facts that show that male (or female) students in the same situation were treated any differently. In fact, there are few—if any—allegations describing how fellow students in her situation were treated by the Individual School Defendants. Rather, Plaintiff focuses on the inadequacies in the investigation of her own reports. *E.g.*, Dkt. 155 ¶¶ 254-262. Those inadequacies, absent any allegations about how the Individual School Defendants treated similarly situated students, are insufficient to make out an Equal-Protection claim based on disparate treatment. *See SAS Assocs. 1, LLC v. City Council for City of Chesapeake, Va.*, No. 2:21-cv-491, 2022 WL 1667050, at *4-5 (E.D. Va. May 25, 2022) (holding failure to identify similarly situated individuals was fatal to plaintiff's Equal-Protection claim); *Feminist Maj. Found. v. Univ. of Mary Washington*, 283 F. Supp. 3d 495, 502 (E.D. Va. 2017) (dismissing disparate treatment claim because plaintiffs did not allege that they were treated differently than other similarly situated students) *rev'd on other grounds sub nom Feminist Maj. Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018).

Plaintiff has also not adequately pleaded that the Individual School Defendants had discriminatory animus towards her. To do so, she "must show that the [Individual School Defendants] selected or reaffirmed a particular course of action at least in part because of its

adverse effects upon an identifiable group." *Bryce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., Va.*, 854 F. App'x 521, 532 (4th Cir. 2021). Plaintiff's Second Amended Complaint is devoid of such allegations, and that pleading failure does not "give rise to a plausible [E]qual [P]rotection claim." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021). At most, she relies on her allegations of the Individual School Defendants' purported "downplay[ing]" of her reports as evidencing that they were "motivated by a discriminatory intent." Dkt. 155 ¶ 269. Such a conclusory statement is not sufficient for Plaintiff to meet her burden of pleading discriminatory intent. *See Clear Sky Car Wash, LLC v. City of Chesapeake, Va.*, 910 F. Supp. 2d 861, 887 (E.D. Va. 2012) ("Where a plaintiff fails to plead facts 'plausibly identifying any discriminatory intent on the part of the decision makers,' [her] Equal-Protection claim must fail. (quoting *Equity in Athletics*, 639. F.3d at 108)).

Because she has not pleaded disparate treatment or a discriminatory intent, Plaintiff has not adequately stated an Equal-Protection claim against the Individual School Defendants.

### 3. Plaintiff's Substantive-Due-Process Claim

Plaintiff also brings a Substantive-Due-Process claim against the Individual School Defendants. The Court has previously dismissed Plaintiff's Substantive-Due-Process claim because Plaintiff's First Amended Complaint failed to plead facts demonstrating "an affirmative action taken by or on behalf of a state actor." *B.R. v. F.C.S.B.*, No. 19-cv-917, 2020 WL 12435689, at *16-17 (E.D. Va. Mar. 10, 2020). Plaintiff alleges that her Second Amended Complaint pleads those requisite facts.

Plaintiff's only avenue to pleading a Substantive-Due-Process violation is via the state-created danger theory. *See id.* (Plaintiff could not proceed with Substantive-Due-Process claim on a theory of "constructive expulsion"). To prevail on such a theory, Plaintiff must show that

36

the Individual School Defendants "created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).

"The state created danger exception is a narrow one." *Robinson v. Lioi*, 536 F. App'x 340, 343-44 (4th Cir. 2013). That is because the bar for what constitutes an "affirmative act" is high. *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995). This Court must take that "affirmative act" requirement seriously; as the *Pinder* Court noted, "inaction can often be artfully recharacterized 'action,'" and the Court must scrutinize Plaintiff's complaint to ensure that it meets the relevant legal standard. *Pinder*, 54 F.3d at 1176.

While this Court has already once dismissed Plaintiff's Substantive-Due-Process claims against the Individual School Defendants, Plaintiff believes her Second Amended Complaint cures the failures in her Amended Complaint. She argues that two new decisions since the Court's original Motion to Dismiss Opinion are on all fours with the instant case and indicate that she has adequately pleaded a Substantive-Due-Process claim. Dkt. 170 at 18 (citing *DJ v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 323 (E.D. Va. 2020) and *Doe v. Montgomery Cnty. Bd. of Educ.*, No. 21-0360, 2021 WL 6072813 (D. Md. Dec. 23, 2021)). She also claims that the Second Amended Complaint clarifies the "affirmative steps" that were taken by the Individual School Defendants. *Id.*

Plaintiff identifies several measures that the Individual School Defendants took that she claims are "affirmative acts" giving rise to Substantive-Due-Process liability. She primarily relies on the school officials' "affirmative action" of "promising to protect, watch, and shadow" Plaintiff. Dkt. 170 at 17; *see also* Dkt. 155 ¶ 166 (alleging that S.T., P.A.H., B.H., and J.F. "affirmatively and expressly agreed to shadow Plaintiff between the change of classes). Plaintiff

faults their withdrawal of that "shadowing" after two days as leading to additional sexual assault. She also points to some of the Individual School Defendants' reactions when Plaintiff reported what she was enduring: M.P.F. telling her to "be a big girl" and "deal with the situation [her]self[,]" Dkt. 155 ¶ 171, and S.T. joking about an apparent extortion episode, *id.* ¶ 150. According to Plaintiff, those "affirmative acts" led to "multiple other sexual assaults[,]" including gang rape. Dkt. 170 at 18. Finally, Plaintiff cites A.F.'s efforts to "dig up dirt[,]" Plaintiff's inability to participate in extracurricular activities, and A.F.'s threats of discipline as other affirmative acts. *Id.*; Dkt. 155 ¶¶ 210-212.

While Plaintiff claims the actions she has identified are similar to what the plaintiff in *DJ* alleged, there are critical differences. The *DJ* court, noting that it was a "close call," held that the plaintiff adequately pleaded a Substantive-Due-Process claim by alleging that the football coach "increased the risk of private danger" when he failed to have adult supervision in the locker room after affirmatively telling parents he would have such supervision. 488 F. Supp. 3d at 327. Distinguishing *Pinder*, the court focused on the fact that a similar incident had occurred in the locker room "one week" before the incident involving plaintiff; that students were required to practice together in the locker rooms; and that the football coach had promised to have adult supervision over the locker room. *Id.* at 327-28. Here, the only allegation that is similar is that some of the Individual School Defendants promised to shadow Plaintiff between classes following her reports of harassment and threatening comments. Dkt. 155 ¶¶ 165-67. Unlike in *DJ*, the Individual School Defendants did shadow Plaintiff for a short time after their promise. *Id.* ¶ 168. And while the supervision was later withdrawn, it did not result in an injury to Plaintiff that could have been prevented by the supervision that was promised. While Plaintiff surely alleges that she suffered severe injury following the withdrawal of that supervision—

38

unconsented touching from a classmate *during* class, *id.* ¶ 170, and gang rape *after* regular school hours, *id.* ¶¶ 172-73—those injuries could not have been prevented by the Individual School Defendants' supervision *between* classes, which is what they promised to Plaintiff. *Id.* ¶ 67; *see also id.* Ex. P (December 8, 2011 email from J.F. to Plaintiff's mother promising to monitor B.R. between 1st and 3rd period change of classes for December 8 and 9). These salient facts highlight the differences from *DJ*, where Plaintiff's injury was a replica of an incident that had happened but a week earlier, and where the school official had affirmatively promised, but not executed, supervision that could have prevented such an injury. *See DJ*, 488 F. Supp. 3d at 329 (plaintiff pleaded Substantive-Due-Process claim in alleging that school official "promised to act … in response to an incident that occurred on school grounds … after a similar incident occurred roughly one week prior in the same location").

*Doe* is similarly inapposite. The plaintiff in *Doe* alleged that for years, the school's high school football locker room was "an unchecked breeding ground for sexual assault by team members." *Doe*, 2021 WL 6072813, at *2. After suffering sexual assault in the locker room, several plaintiffs in *Doe* brought suit against the various school officials. One of the defendants who was the focus of the Substantive-Due-Process claim "was aware of the locker room assaults" for years; participated in the investigation of sexual assaults; ignored others' failure to complete mandatory training on sexual assault (despite being responsible for monitoring compliance); and "took no efforts to ensure that the supervision policy was implemented" as required by the school district. *Id.* at *11. The other defendant, the principal, failed to discipline one of the "known troublemaker[s]," eliminated a "previously required study hall for bullies," failed to implement supervision of the locker rooms "despite being directed by higher ups that she should do so[.]" and ignored the fact that coaches did not take "mandatory sensitivity training." *Id.* That set of

circumstances is much more similar to *DJ*: the school officials were aware of a particular problem occurring in a specific location, had responsibilities to take certain actions in response, and were derelict in their duties.  In sum, in *DJ* and in *Doe*, the actions that the school officials took made the plaintiffs "more vulnerable" to the dangers they were facing in school.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989).  Here, however, there is little indication that the actions Plaintiff identifies left her "more vulnerable" to what she was experiencing.

This matter is different from *DJ* and *Doe* because it lacks the requisite causal link between the Individual School Defendants' actions and the danger that resulted in Plaintiff's injuries.  The state-created danger exception only applies "when the state affirmatively acts to create or increase the risk that resulted in the victim's injury."  *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019).  That means that simply alleging an affirmative act and an injury is insufficient: there must be an allegation (or a reasonable inference) that the identified conduct "cause[d] [Plaintiff's injuries[.]"  *Burns-Fisher v. Romero-Lehrer*, 57 F.4th 421, 425 (4th Cir. 2023) (holding that plaintiff did not sufficiently allege a state-created danger claim because "the conduct [plaintiff] identified did not directly cause [her] injuries").

The conduct that Plaintiff has identified is not linked to the injuries that she suffered.  As explained above, J.F.'s decision to withdraw supervision between classes after two days is not linked to any injury Plaintiff suffered.[19]  J.F. shadowed her on December 8 and 9, and there is no allegation that Plaintiff experienced any sexual harassment or assault between classes after

---

[19] While it is a close call whether this withdrawal of supervision is an "affirmative act" or better classified as "inaction" that does not support a state-created danger claim, the Court construes this allegation as pleading an "affirmative act."

those dates.[20]  Similarly, while M.P.F's and S.T.'s comments to Plaintiff after she reported what she was experiencing may have been an inadequate (or inappropriate) response to her reports, there is no indication they *created* or *increased* the danger that Plaintiff was experiencing, which is what the state-created danger exception targets.  Dkt. 155 ¶¶ 150, 171.  Finally, A.F.'s actions in March of 2011 came *after* the various injuries that Plaintiff suffered, so they cannot be said to have "cause[d] Plaintiff's injuries."  *Burns-Fisher*, 57 F.4th at 425.  Put simply, Plaintiff has not sufficiently alleged that the affirmative acts she identified "create[d] the direct danger that cause[d] [her] injury[,]" which dooms her state-created danger claim.  *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 148 (4th Cir. 2021).

### 4. Qualified Immunity

The Individual School Defendants also claim that they are entitled to qualified immunity from Plaintiff's § 1983 claims, which are her First Amendment Retaliation claim, her Equal-Protection claim, and her Substantive-Due-Process claim.  Government officials are entitled to qualified immunity on a § 1983 claim unless "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known."  *Ridpath*, 447 F.3d at 306 (cleaned up).

Plaintiff has not adequately stated a Substantive-Due-Process claim, as explained above. *Supra* pp. 37-42.  Accordingly, she has not "substantiate[d] the violation of a federal statutory or constitutional right[,]" and Individual School Defendants are entitled to qualified immunity

---

[20] To the extent that Plaintiff claims that the Individual School Defendants' failure to supervise her after school led to her gang rape on campus, that is a mere allegation of "inaction" which does not support a Substantive-Due-Process claim, as this Court explained in its First Opinion.  *See B.R.*, 2020 WL 1435689, at *16-18 (granting motion to dismiss because the "affirmative action" that was pled was "laced with the underpinnings of inaction").

on that claim. *Ridpath*, 447 F.3d at 306. Similarly, she also has not adequately stated an Equal-Protection claim premised on a theory of disparate treatment, and the Individual School Defendant are entitled to qualified immunity on that claim, as well.

The Individual School Defendants are also entitled to qualified immunity on Plaintiff's Equal-Protection claim premised on deliberate indifference to sexual harassment, which Plaintiff acknowledges. In 2018, the Fourth Circuit held that a student's right to be free from deliberate indifference to student-on-student sexual harassment was not clearly established. *Feminist Maj. Found. v. Hurley*, 911 F.3d 674, 704-06 (4th Cir. 2018). Logically, those rights were not "clearly established" in 2011 or 2012, either. As such, Plaintiff believes that the Fourth Circuit "got it wrong" in *Hurley* and wishes to preserve this issue for appeal, but recognizes that this Court is bound by the Fourth Circuit's holding. Dkt. 170 at 14 n.3. Respectfully, this Court declines to opine whether the Fourth Circuit "got it wrong" in *Hurley*. Rather, this Court will simply choose to stay in its lane and respect the holdings of superior courts.

The Court must still determine whether A.F., S.T., and P.A.H. are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim. As explained above, Plaintiff has adequately pleaded that those three Defendants violated her First Amendment rights. The next step is for the Court to determine whether the violation was "of a clearly established right of which a reasonable person would have known." *Ridpath*, 447 F.3d at 306 (cleaned up).

The Court defers ruling on A.F., S.T., and P.A.H.'s entitlement to qualified immunity until after the record is more fully developed. While it is clear from the allegations that Plaintiff engaged in First Amendment activity, the actions that A.F., S.T., and P.A.H. took in response are less clear. Plaintiff has alleged that A.F. inquired about her past; that S.T. asked her why she was trying to ruin a young boy's life; and that S.T. and P.A.H. told her she had to stay home

from school on November 22, 2011.  Dkt. 155 ¶¶ 142, 155, 212.  However, the context of those interactions and the specific exchanges between the Defendants and Plaintiff is not yet clear. Those surrounding circumstances are critical to determining whether Defendants subjected Plaintiff to an "adverse action," as that inquiry examines whether the action would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Constantine*, 411 F.3d at 500.  Since "a clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he … is doing violates that right[,]" it is important to figure out precisely what the Defendants did before endeavoring to determine whether every reasonable official would have understood that those actions are a First Amendment violation.  *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (internal citation and quotation marks omitted).  Because the context of the Individual School Defendants' actions is critical, it is appropriate to defer ruling on the qualified immunity question.  *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (courts must undertake a qualified immunity inquiry "in light of the specific context of the case, not as a broad general proposition"); *McVey v. Stacy*, 157 F.3d 271, 278-79 (4th Cir. 1998) (affirming district court's decision to defer qualified immunity issue until the record was better developed).

## 5. Gross Negligence

The Individual School Defendants also seek to dismiss B.R.'s gross negligence claim. They argue that to prevail on a gross negligence claim pursuant to Virginia law, Plaintiff must meet a high bar.  The Individual School Defendants believe that Plaintiff cannot meet that bar, as the allegations show that they exercised some degree of care.  According to them, taking the allegations in the Second Amended Complaint as true, persons of reasonable mind could not differ as to whether the Individual School Defendants were grossly negligent.

The gross negligence standard is higher than the general negligence standard. "Gross negligence is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). To prevail on such a claim, Plaintiff must show "a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Id.* Ordinarily, this question is reserved for a jury. *Id.*

Indeed, because evaluating a gross negligence claim is a fact-laden inquiry, courts are hesitant to resolve such claims at the motion-to-dismiss stage. At this stage, a court asks whether "reasonable minds [could] differ as to whether the defendant[s] acted in a grossly negligent manner." *Kabana v. United States*, 3:20-cv-781, 2022 WL 989014, at *5 (E.D. Va. Mar. 31, 2022). "Whether or not gross negligence has been proved depends on the facts and circumstances of each case, and it is often a difficult task to determine whether the facts and reasonable inferences therefrom in a given case do or do not show gross negligence as a matter of law." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 574 (E.D. Va. 2020) (cleaned up) (quoting *Walloer v. Martin*, 144 S.E.2d 289, 292 (Va. 1965)). As a result, courts frequently deny motions to dismiss gross negligence claims as premature without the benefit of fact discovery. *See, e.g.*, *DJ*, 488 F. Supp. 3d at 343 (denying motion to dismiss gross negligence claim to allow plaintiffs to develop factual bases for claims); *Doe by Watson v. Russell Cnty. Sch. Bd.*, No. 1:16-cv-45, 2017 WL 1374279, at *13 (W.D. Va. April 13, 2017) (denying motion to dismiss gross negligence claim, noting that it was important to develop the evidence about defendants' knowledge and actions); *see also Doe by Watson v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 690, 716 (W.D. Va. 2018) (granting summary judgment on gross negligence claim after fact discovery).

Here, Plaintiff has pleaded sufficient facts for her gross negligence claims to go forward. The Individual School Defendants point to their promise to shadow Plaintiff—and two days of shadowing—as showing that they exercised "some degree of care." Dkt. 158 at 18-20; Dkt 180 at 12-13. According to them, that fact is dispositive of the gross negligence question, as showing "some degree of care" defeats a gross negligence claim. *Elliott*, 791 S.E.2d at 732. However, the Individual School Defendants do not identify any other allegations in the Second Amended Complaint that evidence some degree of care. Reasonable minds could differ as to whether shadowing Plaintiff for two days is exercising "some degree of care" in response to her various reports. That question can be better answered after discovery into which Individual School Defendants knew what, when they knew that information, and what they did (or didn't) do in response.

It is also relevant that Plaintiff has pleaded actions that indicate the Individual School Defendants failed to meet their duty to Plaintiff. The degree of negligence is not clear at this stage, and so dismissing the claim would be inappropriate. *See Canada v. Masri*, 3:21-cv-655, 2021 WL 6196998, at *3 (E.D. Va. Dec. 30, 2021) (denying motion to dismiss gross negligence claim because "discovery [was] necessary to determine whether [defendant's] conduct rose to the level of gross negligence"); *Amisi*, 469 F. Supp. 3d at 575 (denying motion to dismiss gross negligence claim because reasonable minds could differ as to the degree of negligence). Moreover, even if those actions themselves do not amount to gross negligence, they could show gross negligence when taken together. *Elliott*, 791 S.E.2d at 622. This further indicates that discovery is necessary to determine whether the Individual School Defendants acted in a grossly negligent manner.

The Court accordingly DENIES the Individual School Defendants' Motion to Dismiss Plaintiff's gross negligence claims.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED Defendant F.C.S.B.'s Partial Motion to Dismiss and Partial Motion to Strike the Second Amended Complaint is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that the Individual School Defendants' Motion to Dismiss is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Count III of the Second Amended Complaint is DISMISSED as to Defendants T.B. B.H., M.P.F., M.C., F.T., and J.F.; and it is

FURTHER ORDERED that Count IV of the Second Amended Complaint is DISMISSED as to all Defendants; and it is

FURTHER ORDERED that Count V of the Second Amended Complaint is DISMISSED as to all Defendants; and it is

FURTHER ORDERED that Count VI of the Second Amended Complaint is DISMISSED; and it is

FURTHER ORDERED that the parties contact Magistrate Judge Fitzpatrick's chambers within ten (10) days of the entry of this Order to schedule a status conference.

The Clerk is directed to forward copies of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 10, 2023

_____ /s/
Rossie D. Alston, Jr.
United States District Judge