**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

B.R.,                                    )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )          Case No. 1:19-cv-00917-RDA-WEF
                                         )
FAIRFAX COUNTY SCHOOL BOARD,             )
et al.,                                  )
                                         )
          Defendant.                     )
                                         )

**BRIEF IN SUPPORT OF**
**DEFENDANT FAIRFAX COUNTY SCHOOL BOARD'S**
**MOTION TO DISMISS FOR FRAUD ON THE COURT**

Sona Rewari (VSB No. 47327)
Ryan M. Bates (VSB No. 74661)
Scott W. Burton (VSB No. 90601)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
rbates@HuntonAK.com
burtons@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

November 8, 2023

## <u>TABLE OF CONTENTS</u>

I.  LEGAL STANDARD ............................................................................................ 3

II.  EVIDENCE ESTABLISHING PLAINTIFF'S FRAUD .................................... 4

    A.  Plaintiff's Fraud In The Litigation Pending Before This Court............................. 4

        1.  The First Complaint in this Lawsuit .......................................................... 4

        2.  The First Amended Complaint................................................................... 5

        3.  The Second Amended Complaint ("SAC") ............................................... 6

        4.  Narratives Given to Plaintiff's Experts.................................................... 7

        5.  Plaintiff's Sworn Testimony in this Case ................................................. 8

    B.  Recently-Produced Facebook Messages Reveal Plaintiff's Perjury and Falsehoods............................................................................................................. 9

    C.  Fraud on the School System, Police, and Federal Government........................... 15

        1.  Plaintiff's False Report to the School in November 2011 ....................... 16

        2.  Plaintiff's False Reports to the Police in March 2012 ............................ 16

            a)  False Statements to FCPD in Initial Interview and Statements................................................................................... 17

            b)  False Statements to the SANE Examiner.................................... 18

            c)  False Statements in Second FCPD Interview .............................. 19

        3.  Complaint to the USDOE's Office of Civil Rights (OCR)...................... 20

        4.  Amended Allegations to OCR .................................................................. 21

    D.  Plaintiff's Pattern of Prevarication and Defalcation During Discovery .............. 21

        1.  Failure to Produce the Messages or Even Identify the Account............... 21

        2.  Plaintiff's Belated and Inconsistent Excuses ........................................... 22

        3.  Other False Representations to the Court ................................................. 23

            a)  Plaintiff's False Statement to the Court on Sept. 12, 2023 .......... 23

            b)  Plaintiff's False Representations Regarding Her Psychiatric Treatment.................................................................................... 24

III.  PLAINTIFF HAS PRACTICED A MASSIVE FRAUD ON THE COURT, SO HER CASE SHOULD BE DISMISSED................................................................ 25

    A.  Courts Have Dismissed Cases Involving Lesser Frauds Than Plaintiff's. .......... 25

    B.  All the *Shaffer* Factors Weigh in Favor of Dismissal. ........................................ 27

IV.  CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABF Freight Sys., Inc. v. N.L.R.B.*,
    510 U.S. 317 (1994)................................................................26, 27

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989).........................................................4, 27

*Archibeque v. Atchison, Topeka & Santa Fe Ry. Co.*,
    70 F.3d 1172 (10th Cir. 1995) .........................................................26

*Brown v. Oil States Skagit Smatco*,
    664 F.3d 71 (5th Cir. 2011) .............................................................26

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)............................................................................4

*Chavez v. City of Albuquerque*,
    402 F.3d 1039 (10th Cir. 2005) .......................................................26

*Freddie v. Martin Transp. Ltd.*,
    428 F. App'x 801 (10th Cir. 2011) ...................................................30

*Garcia v. Berkshire Life Ins. Co. of Am.*,
    569 F.3d 1174 (10th Cir. 2009) .......................................................30

*Henrico Cnty. Sch. Bd. v. Matthews*,
    No. 3:18-CV-110, 2019 WL 4860936 (E.D. Va. Oct. 2, 2019), *aff'd sub nom.*
    *Henrico Cnty. Sch. Bd. v. Lucas*, 827 F. App'x 367 (4th Cir. 2020).......................28

*Hull v. Mun. of San Juan*,
    356 F.3d 98 (1st Cir. 2004)..............................................................26

*Liva v. County of Livingston*,
    972 F.2d 340, 1992 WL 187299 (4th Cir. 1992) ..............................27

*Martin v. DaimlerChrysler Corp.*,
    251 F.3d 691 (8th Cir. 2001) ...........................................................26

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002).............................................4

*Nichols v. Klein Tools, Inc.*,
    949 F.2d 1047 (8th Cir. 1991) .....................................................26, 27

*Projects Mgmt. Co. v. Dyncorp Int'l. LLC*,
   734 F.3d 366 (4th Cir. 2013) ........................................................................................26, 28

*United States v. Norris*,
   300 U.S. 564 (1937)..............................................................................................................26

*United States v. Shaffer Equip. Co.*,
   11 F.3d 450 (4th Cir. 1993) ......................................................................................4, 26, 28

Plaintiff, now a 24-year-old woman, alleges that she suffered horrific sexual abuse from October 2011 to February 2012, when she was a seventh grader at Rachel Carson Middle School ("RCMS").  Plaintiff has serially revised her story over the past twelve years to be progressively more gruesome.  In the latest version filed in 2022, she claims that she was "repeatedly physically assaulted and battered, sexually assaulted and battered, sexually abused" and repeatedly "gang rape[d]" by up to 15 unknown individuals operating like an established sex-trafficking ring. Second Amended Complaint ("SAC"), ECF 155 ¶¶ 22, 176.  Her alleged abuse was purportedly masterminded by a 13-year old schoolmate, C.K., whom she accuses of "rap[ing]" her "nearly every day" after school in her neighborhood.  *Id.* ¶ 132.  And Plaintiff also claims that J.O., a 12-year old seventh grade girl who was Plaintiff's best friend, allegedly participated in her first rape by C.K.  *Id.* ¶¶ 126-27.

Plaintiff has pressed her highly-improbable narrative through a revolving door of law firms and dozens of papers filed in this Court.  She testified under oath that:

- C.K. raped her "multiple times" at school and in her neighborhood between October 2011 and November 21, 2011—the date that she gave school officials a written statement that described no touching of any kind, *see id.*, Ex. O.

- By November 21, 2011, she had been raped multiple times, once by C.K. and J.O. together and multiple times by C.K. alone; extorted for money by C.K.; threatened via voicemail by C.K.; and harassed and groped at school by C.K.

- C.K. was not her boyfriend and she had no consensual sexual contact with him.

But now we know that Plaintiff's allegations against C.K.—the foundational core of this case—are utterly false.  It was only near the close of discovery that the truth was exposed—through nearly 250 pages of messages between Plaintiff and C.K., retrieved from the archives of C.K.'s Facebook account.  *See* Ex. 1.  These smoking-gun messages show that, at the same time of the "rapes" alleged by Plaintiff in her pleadings, testimony and statements to her experts, Plaintiff

actually proclaimed C.K. her "boyfriend," professed to be "in love," and initiated and welcomed

sexual contact with C.K. with messages like:

- "❤ u should fuck me ❤"
- "I'm gonna stay in ur bed and rape U ❤ haahahh love u"
- "when do u wanna fuck? cuz i rlly wanna baby"
- "I'm gonna ride ur dick so fast that I'm gonna have u orgasm loud"
- "I wanna give you a bj ❤"
- "Ur dick taste yummy ❤/"
- "haha and u should fuck my tits"

*Id*. at K_0214, 0205, 0157, 0079, 0032, 0030.

During their two-week romance, Plaintiff told C.K. in these messages that she "loved" him

nearly 100 times, urged him to go further sexually, and even joked about "raping" him.  *See, e.g.*,

*Id*. at K_0045-46, 0171, 0191, 0205.  The messages also show that her sworn testimony was false

in other ways: (i) the voicemail reported in Plaintiff's November 21, 2011, statement to the school

and purportedly quoted verbatim in the Second Amended Complaint, was not actually left by C.K.,

and it said something altogether different, *see id.* at K_0056-58; (ii) C.K. never "extorted"

Plaintiff; she offered him money to pay back a friend because he had been grounded and could not

visit her, *id.* at K_0165-74; (iii) C.K. did not harass her at her locker; instead, she repeatedly begged

him to come see her there, *id.* at K_0062, 0074, 0105, 0161; (iv) Plaintiff was not afraid of or

threatened by C.K.; instead, Plaintiff met with C.K. clandestinely and complained to **him** that her

**parents** were abusing her.  *See id.* at K_0039, 0182, 0194, 0214-17.  The messages reveal that the

romance ended when, much to Plaintiff's dismay, C.K. broke up with her on November 20, 2011.

*See id.* at K_0007-08.  It was the next morning that Plaintiff and her mother marched into the

school and accused C.K., J.O., and a third student of "bull[ying]" and "harass[ing]" Plaintiff.  *See*

SAC ¶ 136 & Ex. O thereto.

Since then, those concocted allegations have snowballed into the fantastical narrative being advanced in the pleadings, sworn depositions, and other submissions by Plaintiff. What started as a claim of name-calling morphed into a ███████████████████████████████████ ████████████████████████████████████, to Plaintiff's current allegations—that she was sex-trafficked and brutally raped ████████████ by C.K. outside of school, ███████ by members of a sex-trafficking ring, in a closet at school over a period of four months.

This is not a case of repressed or recovered memories, ████████████████████████ ████. Plaintiff does not have any disorder that affects her ability to recall, she did not forget what happened to her, and she does not have any condition that causes her to create false memories or hallucinate.

That leads to just one inescapable conclusion: fraud on this court. As is now clear from these recovered messages, Plaintiff has lied, repeatedly and intentionally, under oath and in scores of papers and pleadings, about her alleged abuse by C.K. in October and November 2011—the linchpin of her case. The Fairfax County School Board (the "School Board" or "FCSB") has spent four years, thousands of hours, and substantial legal fees and costs disproving these allegations. The material misrepresentations that Plaintiff has made to the Court are enormous and unparalleled. Such a perversion of justice cannot and should not be tolerated. Plaintiff's case should be dismissed.

## I.      LEGAL STANDARD

Courts have inherent power to dismiss a case with prejudice or issue other sanctions against a party who has perpetrated a fraud on the Court above and beyond the sanctioning power under Fed. R. Civ. P. 11, 37, and 41, and by statute. "[F]raud on the court can take many forms" for "corrupt intent knows no stylistic boundaries." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118

(1st Cir. 1989). The "essence of fraud on the court" is where "a party lies to the court and h[er] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002).

"[T]ampering with justice in [this] manner . . . involves far more than injury to a single litigant. It is a wrong against the institution set up to protect and safeguard the public." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation omitted). Punishing such misconduct is "necessary to the integrity of the courts." *Id.* Not only does a court have power to punish such fraud, but it also has the "power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Id.* at 49. "The power is organic without need of a statute or rule for its definition and it is necessary to the exercise of all other powers." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461 (4th Cir. 1993).

## II.    EVIDENCE ESTABLISHING PLAINTIFF'S FRAUD

Plaintiff has serially and dramatically changed her story before this court in the four years since this case has been pending. As we now know, each version she has told to this court and her experts, and described under oath has been false. What's more, the Facebook messages sent by Plaintiff show that this lawsuit was built upon a fraudulent administrative complaint before the U.S. Department of Education, and was preceded by attempts to defraud the Fairfax County Police Department and the School Board.

### A.    Plaintiff's Fraud In The Litigation Pending Before This Court

### 1.    The First Complaint in this Lawsuit

After Plaintiff and her parents had spent years working with attorneys or looking for attorneys to bring this case,[1] Plaintiff filed this case in July 2019, painting herself as the victim of

---

[1] *See* Ex. 2, Plaintiff Family's Privilege Log.

a shocking number of rapes, sadistic abuse, and torture—all masterminded by C.K.  Among other things, she alleged:

- In "early November of 2011" she was sexually assaulted by *both* C.K. and J.O. while walking in her neighborhood.  Complaint, ECF 1 ¶¶ 94, 97.  They removed her clothing, *digitally penetrated her vagina, and fondled her breasts.  Id.* ¶¶ 98-99. They photographed her nude and *forced her to perform oral sex on C.K.  Id.* ¶¶ 100-101.

- On November 9, 2011, C.K. was lying in wait for Plaintiff when she got off the late bus.  *Id.* ¶ 105.  He brandished "a knife" and forced her to follow him to a secluded area nearby, where he cut her with his knife, held her to the ground, and removed her clothing.  *Id.* ¶¶ 106-07.  He *forced her to perform oral sex on him* and "threatened to kill" Plaintiff and her family.  *Id.* ¶¶ 108-09.

- Thereafter, C.K. raped Plaintiff "*nearly every day after school, at or near her bus stop until November 21, 2011.*"  *Id.* ¶ 110 (emphasis added).

- On days that she tried to avoid him, C.K. "caught" her and *"beat"* her until she submitted.  *Id.* ¶ 112 (emphasis added).

- He also *burn[ed] her with his lighter and cut[] her with his knife*.  *Id.* ¶ 113 (emphasis added).

- He penetrated Plaintiff's *"vagina and anus with sex toys"* her *"vagina with his foot or his hand,"* telling her that he was *"grooming [Plaintiff] for the enjoyment of his 'friends.'"  Id.* ¶¶ 114-15 (emphases added).

- "*Beginning in December 2011 and continuing through February 2012*" *C.K. and "other students" raped Plaintiff "on RCMS campus during and after school hours."  Id.* ¶ 151 (emphases added).

**2.    The First Amended Complaint**

In November 2019, Plaintiff amended her complaint to add another shocking and entirely new allegation—a rape by *non-students*.  Plaintiff's amended complaint alleged, for the first time, that once when she stayed after school for help from a teacher in early December 2011, an unnamed student forced her into a "maintenance closet" where she was *raped* by a trio of "*unidentified Spanish speaking adult males*."  Amended Complaint, ECF 37 ¶¶ 190-93 (emphases added).

3.      **The Second Amended Complaint**

In June 2022, Plaintiff's story changed materially again in the SAC.  Now, she was the victim of attempted child sex-trafficking and organized gang activity.[2]  Moreover, her alleged abuse by C.K., J.O., and D.N.[3] was materially different from all prior versions of the story:

- Now, D.N. had also "sexually assaulted and sexually battered" her.  SAC ¶ 104.

- The alleged assault by C.K. and J.O. was changed to October 2011, not November 2011.  *Id.* ¶¶ 126-30.  So, the period of C.K.'s alleged rapes and abuse was extended. C.K. waited for her at the bus stop just "after" that first assault in October 2011.  *Id.* ¶¶ 130-31.  "Thereafter and until November 21, 2011, C.K. accosted Plaintiff at or near her bus stop ***nearly every day*** after school and sexually assaulted and battered her in the same or similar manner . . . ."  *Id.*  ¶ 132 (emphasis added).

- C.K. was a now sex trafficker who said that "his friends would 'make a lot of money' off of her . . . ."  *Id.*

- Now, C.K. had said in the November 2011 voicemail that "he 'was going to stick my big fat black dick up your ass deep like you like it.'"  *Id.* ¶ 135.

- Plaintiff and her parents no longer just reported to school administration in the November 21, 2011 meeting that C.K. "stole" $50 from Plaintiff.  *Id.* ¶ 142.  Now, they also reported that he had "threatened her with further harassment and force, including force to her brother, if Plaintiff told anyone."  *Id.*[4]

---

[2] *See, e.g.*, SAC ¶¶ 40-48 (anecdotal allegations regarding gang-related human trafficking in Virginia), ¶ 173 (allegation that three unknown defendants' behavior conformed generally with supposed "*modus operandi*" of gangs engaged in human trafficking), ¶ 176 (same).

[3] D.N. is another male former RCMS student who was not named as a defendant.

[4] The original complaint alleged that at the November 21, 2011 meeting with RCMS administration, Plaintiff's mother "notified FCPS employees that [Plaintiff] would be removed from school until after the Thanksgiving break until FCPS completed its 'investigation' into her complaints."  Complaint ¶ 130.  That was consistent with the contemporaneous records, including the November 21, 2011 email from Plaintiff's mother announcing that they were going to keep Plaintiff home from school until after the Thanksgiving break.  *See* Ex. 3, November 21, 2011 Email from Mrs. R to S.T., B.H., and P.A.H.  Yet, this allegation was retracted and materially reversed in the SAC—which alleged that school administrators had "***instructed*** Plaintiff to stay home until after the upcoming break," SAC ¶ 155 (emphasis added), an allegation that Plaintiff then touted as a fact substantiating her retaliation claim against the School Defendants.  Plaintiff's Opp'n to Motion to Dismiss, ECF 170, at 12-13.

- Plaintiff had no longer been raped by three "adult Spanish speaking males" in the maintenance closet; they were "three unknown males" acting "consistent with the *modus operandi* of human and sexual traffickers . . . ."  *Id.* ¶ 173.

- The numbers of perpetrators of Plaintiff's in-school rapes had now increased exponentially to up to *fifteen* unknown individuals.  *Id.* ¶ 176.

### 4.    Narratives Given to Plaintiff's Experts

When the case entered the discovery phase, Plaintiff ratcheted up her story yet again.  She gave nearly 16 hours of interviews to her retained forensic psychiatrist, Eileen P. Ryan, who relied on Plaintiff's accounts to form her opinions in this case.  Ex. 4, Ryan Report, at 1, 3-11; Ex. 5, Ryan Dep. Tr. at 207-10, 246-50.[5]  ██████████████████████████████

████████████████████████████████  Ex. 4, Ryan Report at 11.

Plaintiff told Dr. Ryan ████████████████████████████████

████████████████████████████.  Ex. 5, Ryan Dep. Tr., at 280-82.  She said ████████

████████████████████████████████████████

████████████████████████  Ex. 4, Ryan Report, at 5.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████  *Id.* at 6 (emphasis added).  ████████████████████

████████████████████████████████████████

████████████████████████████████  *Id.* at 7.

████████████████████████████████████████

Ex. 6, Plaintiff Dep. Tr., Vol. I, at 114-15; Ex. 4, Ryan Report, at 8 n. 2; Ex. 7, Ryan Rebuttal

Report, at 3.  ████████████████████████████████

---

[5] ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### 5.      Plaintiff's Sworn Testimony in this Case

In her sworn interrogatory answers, Plaintiff stated that: (1) J.O. and C.K. had sexually assaulted her together in October 2011; (2) between October 2011 and February 2012, C.K. had "raped" her "multiple times" in her neighborhood and on school property and had "repeatedly sexually assaulted Plaintiff at RCMS in the school hallways and at her locker through unconsented touching."  Ex. 8, Plaintiff's Amended Answer to FCSB's Interrogatory No. 4.

In her deposition, Plaintiff flatly denied that she and C.K. were ever romantically involved:

> Q.      Okay. Did you ever consider him to be your boyfriend?
> **A.      I would not say so, sir.**

Ex. 9,  Plaintiff Dep. Tr., Vol. II, at 262 (emphasis added).  Plaintiff testified that C.K. was raping her "on a regular basis" by November 21, 2011—the day that she and her mother met with school officials, and she wrote a statement accusing C.K., J.O., and D.N. of harassing and bullying her. *Id.* at 45, 311-14.  She also testified that C.K. and J.O. assaulted her together in a park near her house in October 2011, and that during that assault, ███████████████████████████ ███████████████████████████  *Id.* at 260-61, 348-62.[6]

Plaintiff also testified that she had been raped "multiple" times by C.K. before the November 21, 2011 meeting with school officials.  *Id.* at 311-14.  She expressly testified that:

- C.K. raped her by himself in October 2011, behind the sign marking the entrance to her neighborhood, after she got off the school bus.  *Id.* at 276-78, 289-90.  In that attack,

---

[6] This version of the alleged J.O. and C.K. assault does not match any other versions of this incident that Plaintiff has given in other contexts, including what she told her own expert, Dr. Ryan, or what is alleged in the SAC.

-8-

██████████████████████████████████████████████

- After that second rape but before the November 21, 2011 meeting with school officials, C.K. raped her in the woods by her house after forcing her to go into the woods with a knife to her back. *Id.* at 315-18.

- In "early" November 2011, C.K. extorted $50 from her because he needed the money to pay D.N. for his lost longboard. *Id.* at 33-35, 42-51. C.K. forced her to give him the money by brandishing a knife and threatening to kill her and her family. *Id.*

- By November 21, 2011, C.K. had also been "hurting" and "touching" her at school, and had groped her breast and buttocks by her locker at school. *Id.* at 321-25.

- By November 21, 2011, C.K. had threatened to hurt her and her family. *Id.* at 306.

When asked whether Plaintiff told school officials about one of the pre-November 21 assaults by C.K., Plaintiff testified that, "sometime soon after [the second alleged rape]," she went to the school to "try to report the assault to specifically my guidance counselor, at the time, B.H." *Id*. at 293-97. Plaintiff testified that she told B.H., "Ms. B.H., I'm really scared. C.K. is touching me. He's hurting me, and I feel really scared" and gestured to her body parts. *Id*. at 297-98. When asked whether she reported to B.H. that C.K had raped her twice, Plaintiff responded: "[T]he word rape, at 12, was not in my vocabulary. But I made it extremely clear to the adults around me that I was being hurt and that I was being abused . . . ." *Id*. at 298-99. Plaintiff continued: "I told her in the hallway: C.K.'s hurting me. I'm scared. . . . [S]he told me that she was really busy and that she would get to me." *Id*. at 299-300.

## B.   Recently-Produced Facebook Messages Reveal Plaintiff's Perjury and Falsehoods

Two weeks after Plaintiff's deposition, C.K. located in his Facebook archive approximately 250 pages of time-stamped direct messages with Plaintiff from November 3 to 20, 2011.[7] These

---

[7] The messages are between an account in C.K.'s name and a "Facebook user" which indicates that the account has been deactivated on Facebook. In the messages, C.K. initially does not recognize the sender but "Facebook User" gives him hints and he realizes it is Plaintiff and calls her by her real first name. Ex. 1 at K_0253-55. They continue to use her first name in later

messages reveal that the core of Plaintiff's claims in this case—that C.K. "repeatedly" raped her in October and November 2011—are utterly false.  The messages show that Plaintiff committed perjury in her deposition.  Below is a summary of the key discrepancies between these messages and Plaintiff's sworn testimony.

      ***Plaintiff considered C.K. her "boyfriend" and was in love with him***.  Plaintiff testified that C.K. was not her boyfriend and that, prior to being assaulted by him, she had only "seen him a few times around J.O."  *See* Ex. 9, Plaintiff Dep. Tr., Vol. II, at 262.  Contrary to that testimony, the messages show that Plaintiff and C.K. were boyfriend and girlfriend until he broke up with her on November 20, 2011.  *E.g.*, Ex. 1, at K_0035 ("ur my amazing boyfriend <333"); K_0234 ("Yes ur my boyfriend ❤").  Plaintiff ***initiated*** their romantic relationship on November 5, 2011, telling C.K. that she liked him "more than a friend."  *Id.* at K_0246.  In just these Facebook messages alone, Plaintiff told C.K. that she loved him nearly 100 times in two weeks.[8]  *See generally id.*

      ***Plaintiff offered C.K. oral sex.***  Plaintiff testified ██████████████████████

████████████████████████████████████████████████████████

Contrary to that testimony, the messages show that Plaintiff ***offered*** C.K. oral sex numerous times after they began dating.  *E.g.*, Ex. 1 at *e.g.*, K_0133.  After performing oral sex on C.K. *for the first time* on November 14, 2011, Plaintiff marveled:  "today was amazing . . . . [s]o we had oral sex :P ❤ hahaha."  *Id.* at K_0051.  C.K. later confirmed that this was the first time he had oral sex with Plaintiff or anyone else.  *Id.* at K_0030 ("was I the first gurl u had oral with"; CK:  "yeah").

---

messages.  *Id.* at K_0111, 165, 171, 230, 252.  C.K. has also produced Facebook messages with other students in the same time period that also refer to Plaintiff by name and discuss the fact that they were dating.  *See, e.g.,* Ex. 10, C.K. Messages with unnamed student, at K_0275; Ex. 11, C.K. Messages with J.O., at K_0438.

    [8] They also were communicating in person and by phone, text message, and other applications, including TinyChat and Skype.  *See, e.g.,* Ex. 1 at K_0010-11, 0136, 0138, 0140, 0142, 0219-20, 0225, 0232, 0239.

***Prior to the November 21 school meeting, Plaintiff offered, invited, and enthusiastically participated in sexual activity with C.K.***   Plaintiff testified that she was being "sexually abused" and "sexually assaulted" on a "regular basis" by C.K. and that he had "raped" her "multiple times" by November 21, 2011.   Ex. 9, Plaintiff Dep. Tr., Vol. II, at 45-46, 312-14, 320.   Plaintiff additionally testified that she had no consensual sexual contact before C.K. "raped" her.   *See id.* at 187.   Contrary to that testimony, the messages show that Plaintiff invited C.K. to engage in sexual activity from the start of their relationship, saying things such as: "do u wanna have sex" (Ex. 1 at K_0216); "when do u wanna fuck? cuz i rlly wanna baby" (*id.* at K_0157); "I wanna give you a bj" (*id.* at K_0079); "haha and u should fuck my tits"  (*id.* at K_0030); "r u gonna bring a condom" (*id.* at K_0238); and "Whatever u want I'm cool with anything" (*id.* at K_0233).   The messages show that Plaintiff raved after sexual encounters with C.K. about how much she had enjoyed them. *E.g.*, *id. at* K_0195  ("ur really good kisser"), K_0026-28 ("that . . . was fun . . . did u like your bj ;)"); K_0032 ("Ur dick taste yummy ♥/").

***The alleged rape by the bus stop did not happen.***   Plaintiff testified ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████   Contrary to that testimony, the messages show that Plaintiff told C.K. in ***mid-November*** that she was a virgin and invited him to be her first sexual partner.   *See* Ex. 1 at K_0050 (November 14, 2011: "hahaha do u wanna eat me out and this time go all the way to pop my cherry[?]"), K_0030 (November 15, 2011: "When u pop my cherry it may bleed a lil cuz I've never popped it").

***Plaintiff joked that she would "rape" C.K.***   Plaintiff testified that she did not tell anyone about C.K.'s alleged rapes because "the word rape, at [age] 12 was not in my vocabulary." Ex. 9, Plaintiff Dep. Tr., Vol. II, at 298.   Contrary to that testimony, the messages show that Plaintiff

used the word liberally in these messages, even joking that she was going to rape C.K.:  "I'm gonna rape you ♥ hehe" (Ex. 1 at K_0171); "I'm gonna stay in ur bed and rape U ♥ haahahh love u" (*id.* at K_0205); "imm gonna rape u 2marrow ;))" (*id.* at K_0045); "rapee ♥" (*id.* at K_0191); "Hehe ♥ rape Jkjk ♥" (*id.* at K_0203).[9]

   **Plaintiff was not forced into the woods; she suggested it.**  Plaintiff testified that prior to the November 21, 2011 meeting, C.K. had forced her at knifepoint to a wooded location where he had raped her.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 314-18.  Contrary to that testimony, the messages show that Plaintiff was the one who suggested to C.K. that they go into the woods by her house to engage in sexual contact.  Ex. 1, at K_236-37 (C.K.: "where should we go to do this"; B.R.: "Idk if we went deeper in the woods ♥"),  K_234 ("we walk to woods and then yeah ;)").

   **Plaintiff begged C.K. to come to her locker.**  Plaintiff testified that C.K. had been non-consensually touching her by her locker before November 21, 2011.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 45-46, 324-25.  Contrary to that testimony, Plaintiff begged C.K. to come to her locker "cuz i need me some hugs."  Ex. 1, at K_0105; *see also id.* at K_0161 ("♥ stop by my locker more baby"), K_0105 ("stop by my lockerrr ♥"), K_0074 ("come stop by my locker before 1st"), K_0062 ("when r u gonna stop by my locker bby").  C.K. did not even know where Plaintiff's locker was before she gave him her locker number and told him how to find it.  *Id.* at K_0166.

   **C.K. did not "extort" money from Plaintiff or brandish a knife to get it.**  Plaintiff testified that Plaintiff "extorted" $50 from her and used a knife to threaten her.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 29, 33-35, 42-48.  Contrary to that testimony, the messages show that Plaintiff *offered* C.K. the money after he was grounded because he had lost D.N.'s longboard and owed him $350.  Ex.

---

[9] Plaintiff also testified that, at this time, she did not understand what the term "blow job" even meant.  Ex. 6, Plaintiff Dep. Tr., Vol. I, at 343-44.  This, too, is belied by her statements in these messages.  *See, e.g.*, K_0238 ("I give u a bj ♥") & K_0026 ("did u like ur bj ;).

1 at K_0165-74.  Plaintiff offered C.K. the money so they could continue to hang out together and because she "love[d him] sooo much."  *Id.*  She told C.K. to come to her locker to get the money, and said she wanted a "Big Ass amount of love" in repayment.  *Id.* at K_0167.

### *C.K. did not leave the sexually explicit voicemail reported to the school.*  Plaintiff testified

that, in November 2011, C.K. left a threating voicemail for her.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 309-10; Ex. 6, Plaintiff Dep. Tr., Vol. I, at 136-37.  Contrary to that testimony, the messages show that Plaintiff knew that another student D.N.—not C.K.—had left the voicemail.  Ex. 1 at K_0051-59.  And the message did not reference a "big fat black dick," much less threaten to put it up Plaintiff's "ass deep like you like it," as alleged in the SAC (and as her mother testified).  SAC ¶ 135; Ex. 12, Mrs. R. Dep. Tr., at 115; *see also id.* at 115-20.  Plaintiff told C.K. that her mom was "so pissed at [D.N.]" and had threatened to report D.N. to the school, over Plaintiff's wishes.  Ex. 1 at K_0051-57.  When C.K. urged Plaintiff to have her mom report the voicemail to the school or go to D.N.'s house, Plaintiff responded: "True true my brother flipped out he said he was gonna take a baseball bat my dad said exact words that white niggas gonna die lmfaoo."[10]  *Id.* at K_0051-53.  So, contrary to Plaintiff's and her mother's sworn testimony, neither Plaintiff nor her parents were under any illusion that C.K. was the one who had left the voicemail.

### *Plaintiff was not afraid of or threatened by C.K.*  Plaintiff testified repeatedly that she had

not told her parents about C.K.'s harassment sooner because she was "afraid" and "scared" of him, and because he had threatened to kill her family.  *E.g.*, Ex. 9, Plaintiff Dep. Tr., Vol. II, at 293-96.  Contrary to that testimony, the messages show that Plaintiff craved C.K.'s company and attention and claimed to **him** that **her parents** were abusive.  *E.g.*, Ex. 1 at K_0215 (my parents "abuse me" and "hurt me"), *id.* ("I'm running away from home"), K_0198 ("im pathetic bitch my moms

---

[10] D.N. is White while C.K., whose father was African-American, is bi-racial.

words"), K_0197 (mom said "that im gonna b failure"), K_0196 ("im a whore her words im a disgracr").  Even before she started seeing C.K., Plaintiff was in trouble with her parents at home, and her parents were threatening to pull her out of RCMS because of her behavior.  *E.g., id.* at K_0215 ("even if I'm grounded I don't care…My parents said if I continue to act this way they were gonna take me out of Carson [RCMS] wtf"), K_0216 ("I was grounded yet again").

The messages also show that Plaintiff saw C.K. secretly behind her parents' backs.  Three days after they began dating, Plaintiff snuck out of her house to meet C.K. even though she was grounded, and got in more trouble with her parents.  *Id.* at K_0215-16, K_0194.  Three days after that, she urged him to come to her house while her parents were out.  *Id.* at K_0143 ("I think if I'm home alone u should come over.").  The next week, Plaintiff laid out for C.K. a plan by which they could meet up after school; she would lie to her mom that she was staying after school on November 14, 2011, take the bus home, and then meet up with C.K.  *Id.* at K_0106-09.  That night, Plaintiff's mother checked Plaintiff's cell phone records and discovered that Plaintiff and C.K. had talked for "a long time."  *Id.* at K_0058-59.  The next day, November 15, 2011, Plaintiff's mom asked if Plaintiff had "been sleeping around" and if she was "prego."  *Id.* at K_0047.

### ***Plaintiff did not want to complain to the school before the November 21 meeting.***

Plaintiff testified that, sometime before the November 21, 2011 meeting with school officials, she told four teachers and counselors about issues she was having with D.N.  Ex. 6, Plaintiff Dep. Tr., Vol. I, at 343-44.  To the contrary, the messages show that Plaintiff was adamantly opposed to involving the school before the November 21, 2011 meeting.  When C.K. urged Plaintiff on November 14, 2011 to report the voicemail from D.N. to the school, Plaintiff's response was: "Why we[']re all gonna get screwed."  She then modified that to: "Well u won't but yeah I can cuz he [D.N.] can yell me for tellin him off."  Ex. 1 at K_0055-56.  Plaintiff told C.K. that she did

not want her mother to report it to the school:  "I was like no and started crying and ran."  *Id.* at
K_0057.

**_C.K. broke up with Plaintiff the night before she complained to the school._**  Plaintiff
testified that she and her mother met with school officials on November 21, 2011, because the
alleged harassment had reached a tipping point: "I had been sustaining severe sexual harassment
and bullying, and also I was -- had been assaulted, by this point."  Ex. 9, Plaintiff Dep. Tr., Vol.
II, at 12.  In reality, as the messages show, Plaintiff was upset with C.K. because he had broken up
with her the previous night.  Ex. 1 at K_0007 (C.K: "i think we should be friends … the reason is
because u like 3 other guys while ur dating me . . . .").  She had tried to change his mind: "i don't
like anyone . . . except 4 u."  *Id.*  But C.K. did not reply.  *Id.*  The messages also show that Plaintiff
blamed J.O. for C.K. breaking up with her:  "u listened to [J.O.'s] crap."  *Id.*  The very next
morning, Plaintiff and her mother went to school and complained that C.K., J.O., and D.N. had
been "bull[ying]" and "harassing" Plaintiff and that C.K. had left Plaintiff an "inappropriate
voicemail."  *See* SAC ¶¶ 135, 137, 140 & Ex. O thereto.

**C.**     **Fraud on the School System, Police, and Federal Government**

The C.K. messages have revealed that Plaintiff's story has been a hoax from the start.  In
the eight years leading to the filing of this case, Plaintiff has offered materially different, and
progressively more gruesome, versions of her story, including to school officials, the Fairfax
County Police Department, and to the U.S. Department of Education's Office of Civil Rights.[11]
None of these versions were true, as Plaintiff's Facebook messages with C.K. have now revealed.
This evolving story demonstrates a larger plan to impede discovery of the truth.

---

[11] A demonstrative timeline of Plaintiff's evolving allegations is attached as Ex. 13.

1.      **Plaintiff's False Report to the School in November 2011**

Plaintiff's accusations against C.K. began on November 21, 2011, when Plaintiff and her mother came to the school and accused three students—C.K., J.O., and D.N.—of being "bullies" to Plaintiff.  The statement ***did not describe any touching, let alone sexual assault,*** by C.K., J.O., D.N. or anyone else.[12]  SAC, Ex. O.  In that statement, Plaintiff wrote, in relevant part:

> I am scared to come to school for the following reasons:  [C.K.] and [D.N.] come to my locker every morning before first pd. . . . They . . . harass me, tease me, and give me seductive looks. [C.K.] left me a very inappropriate voicemail with lots of sexual terms. [C.K.] says [D.N.] wants to come up to me and call me volgur names like whore, bitch, and lesbian. [J.O.] + [C.K.] make fun of me for being half Indian and basically say offensive terms.  [J.O.] calls me bitch and makes offensive wall post on my facebook calling me bitch and a whore.

*Id.*[13]  Plaintiff also said "it all started 3 weeks ago but really escalated 2 weeks to present." *Id.*  As we now know, "2 weeks" was the length of Plaintiff's romance with C.K. and "present" was the morning after C.K. had dumped her.[14]

2.      **Plaintiff's False Reports to the Police in March 2012**

On February 10, 2012, her parents pulled her out of RCMS, as the Facebook messages reveal they had been threatening to do so for months.  SAC, ¶ 194; Ex. 1, K_0215 ("My parents said if *I continue to act this way* they were gonna take me out of Carson [RCMS] wtf . . . ."

---

[12] The Court has already noted this incongruity:  "Neither the Complaint nor Plaintiff's written report from that November 21, 2011 meeting (attached as Exhibit O to the Complaint) show that Plaintiff reported physical harassment at that meeting."  Memorandum Opinion and Order, ECF 236, at 27 n.10.

[13] By Plaintiff's own allegation, RCMS administrators immediately investigated the claims in this statement, met with Plaintiff and her parents the next day, and gave them their findings and plan for corrective action.  *See* SAC ¶¶ 148-155 (allegations regarding November 22, 2011 meeting, findings, and plan); FCSB's Answer, ECF 239, ¶¶ 148-155 (admitting investigation, November 22, 2011 meeting, and that steps were taken to limit contact and interaction).

[14] Plaintiff and her mother thereafter made additional written reports to the school from December 2011 through February 2012, but none of those claimed that C.K., J.O., or anyone else had touched her sexually.

-16-

(emphasis added)).  Three weeks later, her mother made a complaint to the Fairfax County Police Department ("FCPD") against C.K.

As described below, even that version of the story—which bears little resemblance to any of the versions Plaintiff has given in this case— ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ Plaintiff's messages with C.K. have now confirmed that much if not all of what Plaintiff told the FCPD was untrue.

### a)    False Statements to FCPD in Initial Interview and Statements

On March 2, 2012, Plaintiff's mother went to FCPD and relayed that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████

Plaintiff  also  reported  in  a  three-page  statement  ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ "Jenni Taylor" had first contacted Co.K. in late February 2012. Ex. 16, Co.K. Dep. Tr., at 80-81; Ex. 17, "Jenni Taylor"/Co.K Facebook chat messages.  "Jenni

Taylor" also posted publicly that she "hate[d]" Plaintiff and that Plaintiff should "go die."  Ex. 17 at 1, 4; Ex. 16, Co.K. Dep. Tr., at 89-90.

In the chats, "Jenni Taylor" said Plaintiff "gives bj [blow jobs] to everyone," is a "slut," is "meant to b a prostitute [a]nd give lap dances," is a "hoe," and should commit "suicide."  Ex. 17 at 2-3, 13.  As Co.K. defended Plaintiff, "Jenni Taylor" became even more explicit and violent, including:  "we loveee raping dat bitch," "i love fucking dat sexy ass of hers," "I love eating dat Pussy," "i love oral with her," "you can fuck your gf's ass while I fuck her pussy u hold her arms and i tie her legs . . . and we use a dildo and vibrator . . . and we can do double penetration."  *Id.* at 9, 14-17.  "Jenni Taylor" hinted that she was actually C.K. or J.O.  *Id.* at 3.  ████████████

████████████████████████████████████████████████████████

████████████████████████████████

      **b)**      **False Statements to the SANE Examiner**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

FCPD Detective Fred Chambers then met with Plaintiff's parents, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

### c) False Statements in Second FCPD Interview

On March 8, 2012, Det. Chambers conducted videorecorded interviews of Plaintiff, C.K., and their mothers.[15]

---

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

### 3.      Complaint to the USDOE's Office of Civil Rights (OCR)

Months later, in August 2012, Plaintiff and her mother, represented by two law firms, filed

a Title IX complaint with the U.S. Department of Education's Office of Civil Rights ("OCR").

The complaint contained a new version of the story—another iteration that is contradicted by

Plaintiff's Facebook messages with C.K. ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

       ████████████████████████████████████

███████████████████████████████████████████

---

[16] Though not produced by Plaintiff in discovery, copies of this complaint and her November 1, 2012 supplemental letter to OCR, were filed by Plaintiff under seal, at ECF 40.

### 4.      Amended Allegations to OCR

In November 2012, ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

Seven years later, Plaintiff filed this lawsuit, claiming that RCMS school officials had been "deliberately indifferent" to her alleged repeated rapes and sexual abuse.

### D.      **Plaintiff's Pattern of Prevarication, Obfuscation, and Falsehoods During Discovery**

### 1.      Failure to Produce the Messages or Even Identify the Account

Plaintiff produced no Facebook messages with C.K. or anyone else from the time period of her alleged abuse.[17]  In her deposition, she claimed she could not recall whether she had ever been friends with C.K. on Facebook.  Ex. 6, Plaintiff Dep. Tr., Vol. I, at 354.  She testified that she had exchanged text messages with C.K., Ex. 9, Plaintiff Dep. Tr., Vol. II, at 264, but she produced no such messages.  Plaintiff also testified that she had no fake Facebook profiles before she created "Jenni Taylor" in 2012.  *Id.* at 94-95.  She repeated this in her sworn interrogatory answers.  Ex. 23, Plaintiff's Amended Answer to Interrogatory No. 10.

---

[17]  Plaintiff recently revealed that two of her Facebook accounts from the 2011-2012 academic year were intentionally deleted by her mother in 2013.  The spoliation of that and other key evidence will be addressed in a separate motion.

Plaintiff also did not produce any of the disturbing messages she sent from the "Facebook User" account or as "Jenni Taylor" and in which she falsely cast suspicion on C.K. and J.O. as being the ones behind the account.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 94-100; FCSB's Br. in Supp. of Motion to Compel, ECF 360, at 5.  Plaintiff's mother did not produce them either, despite that she undisputedly had dozens of the Jenni Taylor/Co.K. messages in her possession in 2012 when she was preparing to sue the School Board.[18]  The School Board only obtained these messages through subpoenas to the FCPD and Co.K.

The School Board obtained two Court orders requiring Plaintiff to produce all relevant social media, text and email messages, and disclose all such accounts.  ECF 372, 404.  Yet, she still did not disclose, or produce any material from, the Facebook account through which the Facebook messages were sent.  *See* Ex. 23, Plaintiff's Amended Answer to Interrogatory No. 10. She continued to not even disclose that account.  *Id.*

### 2.     Plaintiff's Belated and Inconsistent Excuses

After C.K. produced the aforementioned messages in August 2023, defense counsel had a call with Plaintiff's now-former counsel to inquire how they believed they could continue to press her claims while still abiding by their duties as officers of the court.  One law firm responded that it was going to move to withdraw from the case.  The second firm stated that the authenticity of the messages had yet to be established, and that Plaintiff does not recall sending them.

The next week, Plaintiff fired the second firm and sent letters to Magistrate Judge Fitzpatrick complaining that she had been "sandbagged" by the messages.  ECF 425-4 at 8.  She also offered internally inconsistent explanations to attempt to blunt their devastating effect:  the messages "look super fake;" they are not relevant because she was only 12 years old at the time

---

[18] Co.K. emailed his chat with "Jenni Taylor" to Plaintiff's family, after learning that they were "getting ready to sue FCPS."  Ex. 16, Co.K. Dep. Tr., at 77-81.

and unable to legally consent to sex; she does not have "any recollection of these particular messages"; and she was "forced" by C.K. to send messages to "placate him" and make it seem like she was his girlfriend so no one would believe her.  *See* ECF 425-3 at 6; ECF 425-4 at 8.

### 3.    Other False Representations to the Court

Plaintiff has made other material misrepresentations to impede discovery of the truth.

#### a)    Plaintiff's False Statement to the Court on Sept. 12, 2023

For instance, in a letter to the Court in September 2023, Plaintiff represented that she had told her mother that she was behind the Jenni Taylor chats "[a]s soon as [she] was pulled out of school" in February 2012, and that together she and her mother had "turned them over to the police."  ECF 425-4 at 7.  But that, too, was false— ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████  Ex. 14 at 3, 6-8; Ex. 20, Tr. of Plaintiff FCPD Interview, at 80-81; Ex. 24, Tr. of Mrs. R. FCPD Interview, at 35-40.  Two months before her letter to the Court, Plaintiff had admitted under oath that she began posing as Jenni Taylor only ***after*** she was pulled out of school, and only "came clean" to her mother about being Jenni Taylor ***after*** her mother reported the messages to the FCPD and ***after*** Chambers began investigating her mother's report against C.K.  Ex. 9, Plaintiff Dep. Tr., Vol. II, at 96-98, 106-07.

In the same letter, Plaintiff also said:  "I then turned these chats over to my lawyers in this litigation."  ECF 425-4, at 7.  That, too, appears to have been untrue because no Jenni Taylor chats were ever produced by any of her lawyers, despite that they have certified the completeness of her production under Rule 26(g).

**b)   Plaintiff's False Representations Regarding Her Psychiatric Treatment**

As another example, on May 5, 2023, Plaintiff filed a sworn declaration in support of a motion to foreclose the defense's access to her ongoing therapy records, asserting that she needed "additional support and/or a higher level of care" but had been "unable to find a new provider willing to see me due to threat of being part of a lawsuit."  ECF 257-1 ¶ 6.

That statement was demonstrably false.  At the time Plaintiff signed that declaration, she had disclosed two current mental health providers in discovery:  Dr. Rachel Ward (psychiatrist) and Kristie Trahan (clinical social worker).   Plaintiff did not, however, disclose another psychiatrist, Dr. Amy Motamed, whom she had begun seeing *eight months earlier*, in September 2022.  *See, e.g.*, Ex. 25, September 19, 2022, Notes of Treatment.  Plaintiff repeatedly concealed Dr. Motamed during discovery, including omitting her from her sworn interrogatory answers, amended interrogatory answers, supplemental initial disclosures, and second amended interrogatory answers.[19]  Not only was Plaintiff obligated to disclose Dr. Motamed in discovery, she was required to disclose her by the Amended Protective Order which required that "if Plaintiff changes her current treating mental health physicians or counselors, Plaintiff shall advise Defendants' counsel within three days of such changes."  ECF 205 at 4.

Plaintiff had been treating with Dr. Motamed for eight months, and had seen her just days before she falsely told the Court that she has been "unable to find a new provider willing to see

---

[19] The School Board has since learned that Dr. Motamed is not the only health care provider whose treatment of Plaintiff was concealed from the defense during discovery.  After the Court, on September 29, 2023, granted the School Board's motion to subpoena six belatedly-disclosed providers, Plaintiff disclosed an astonishing number of other providers who treated her during or prior to this case **for physical or mental conditions described in the SAC, Plaintiff's testimony, or her interviews with her experts.**  The School Board was recently authorized by the Court to subpoena these newly-disclosed providers for Plaintiff's records, and will present these serious nondisclosures to the Court by separate motion(s) once that process is complete.

me . . . ." ECF 257-1 ¶ 6.  Not only did Plaintiff present that false testimony to the Court, but she repeatedly argued in five briefs and three hearings that Defendants' access to her therapy records was preventing her from being able to get treatment.[20]  *See* ECF 257, 267, 325, 346, 434 (briefs); Apr. 19, 2023 Hrg. Tr., ECF 289, at 40; May 19, 2023 Hrg. Tr., ECF 288, at 25; July 28, 2023 Hrg. Tr., ECF 358, at 12-16.

## III.   PLAINTIFF HAS PRACTICED A MASSIVE FRAUD ON THE COURT, SO HER CASE SHOULD BE DISMISSED

### A.   Courts Have Dismissed Cases Involving Lesser Frauds Than Plaintiff's

The Fourth Circuit has observed that "[o]rders of dismissal are appropriate 'when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process.'"  *Projects Mgmt. Co. v. Dyncorp Int'l. LLC*, 734 F.3d 366, 373 (4th Cir. 2013) (quoting *Shaffer*, 11 F.3d at 461).  "[F]alse testimony in a formal proceeding is intolerable" and "a 'flagrant affront' to the truth-seeking function of adversary proceedings."  *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994).  Perjury by a party puts her adversaries to "the disadvantage, hindrance, and delay of ultimately extracting the truth by cross-examination, by extraneous investigation, or other collateral means."  *Id.* (quoting *United States v. Norris,* 300 U.S. 564, 574 (1937)).

False testimony by a plaintiff on matters central to her case is a quintessential fraud upon the court, and grounds for dismissal with prejudice.  *See, e.g., Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 80 (5th Cir. 2011) (dismissal of claim appropriate where plaintiff's deposition

---

[20] At the hearing on Plaintiff's motion following submission of this declaration, Plaintiff's counsel argued "[t]he problem is and what this will solve, by having a protective order, she will be able to, God hoping, get a ***psychiatrist***, because the ***psychiatrists*** that she has reached out to to find new ***psychiatry treatment***, which she desperately needs to get through this discovery process, have not agreed to treat her because they don't want to be involved in the litigation process . . . ." May 19, 2023 Hrg. Tr., ECF 288, at 25 (emphases added).

answers directly contradicted prior testimony in another case); *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1046 (10th Cir. 2005) (affirming dismissal of case after jury verdict in favor of plaintiff who perjured himself during discovery); *Hull v. Mun. of San Juan*, 356 F.3d 98, 100-03 (1st Cir. 2004) (affirming fraud on the court finding where plaintiff failed to disclose in his deposition material facts about his prior injuries and treatment); *Martin v. DaimlerChrysler Corp.,* 251 F.3d 691, 694 (8th Cir. 2001) (dismissal appropriate where plaintiff "willfully withheld information directly responsive" to deposition and interrogatory questions and failed to disclose her prior lawsuit and providers); *Archibeque v. Atchison, Topeka & Santa Fe Ry. Co*., 70 F.3d 1172, 1174 (10th Cir. 1995) (affirming dismissal with prejudice of a plaintiff's FELA claim where the plaintiff lied about the extent of previous medical treatment to the allegedly injured body part); *Nichols v. Klein Tools, Inc.,* 949 F.2d 1047, 1048-49 (8th Cir. 1991) (dismissal appropriate where plaintiff had "repeatedly" lied under oath).

A deliberate scheme to lie and pervert the administration of justice is extraordinarily rare. But such cases prove why the inherent power to sanction exists: "Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." *Aoude*, 892 F.2d at 1118.

In *Liva v. County of Livingston*, 972 F.2d 340, 1992 WL 187299, at *1 (4th Cir. 1992), for example, the plaintiff alleged paralysis of his lower body as a result of the events alleged in the complaint, claimed $2 million in damages due to the paralysis, and testified that he could not move his legs. But the defense produced eyewitness testimony and videotape showing that the plaintiff could walk before and after the deposition. *Id.* The Fourth Circuit affirmed the trial court's finding of fraud on the court and its dismissal of the plaintiff's case in its entirety. *Id.* at *2.

In *Nichols,* as another example, the plaintiff in a products liability case who alleged that

the defendant's hook caused his injuries at work had testified repeatedly that he was using the defendant's hook, vehemently denied having a homemade hook, and even called a witness who testified that he saw him wearing a homemade hook a "liar." 949 F.2d at 1048. It was only after three more witnesses testified that he had a homemade hook, and his lawyer acknowledged that the witnesses were correct, that Nichols admitted that he did have a homemade hook. *Id.* The trial court found that Nichols had perpetrated a fraud on the court and dismissed his case. *Id*. Affirming, the Eighth Circuit held that the plaintiff had "repeatedly concealed a material fact," "fabricated testimony in order to prevent [the defendant] from presenting its case," and no "alternative penalty" would have corrected the wrongs. *Id.*

These frauds pale in comparison to the one perpetrated by Plaintiff, as explained below.

**B.    All the *Shaffer* Factors Weigh in Favor of Dismissal**

The Fourth Circuit has instructed courts to consider the following factors in exercising their inherent power to sanction fraud on the court or other bad-faith litigation conduct: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by her attorney; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest. *Shaffer Equip. Co.*, 11 F.3d at 462-63.

Trial courts facing such a motion are well-advised to look at the whole case, and to conduct an evidentiary hearing as necessary to investigate the alleged fraud on the court. *See Projects Mgmt. Co.*, 734 F.3d at 375 (affirming order dismissing case for false interrogatory answer, false testimony, and other discovery defalcations); *Henrico Cnty. Sch. Bd. v. Matthews*, No. 3:18-CV-110, 2019 WL 4860936, at *4 (E.D. Va. Oct. 2, 2019) (holding evidentiary hearing on motion for sanctions), *aff'd sub nom. Henrico Cnty. Sch. Bd. v. Lucas*, 827 F. App'x 367 (4th Cir. 2020).

-27-

As the School Board has detailed, and can demonstrate at an evidentiary hearing, all of these factors weigh in favor of dismissal.  Though Plaintiff has been represented by a revolving-door of lawyers (now the sixth and seventh law firms in this case), the culpability and blame for this enormous fraud lies primarily with Plaintiff.  She invented a false narrative, revised it, repackaged it, and shopped it to a variety of lawyers.  And she pressed it through false interrogatory answers, false deposition testimony, and false information to her providers and experts.

Plaintiff's falsehoods go to the heart of this case.  For years, and until the revelation of the C.K. messages in August 2023, Plaintiff has maintained that she never had a romantic relationship or even a friendship with C.K., and that all sexual contact by him was unwelcome and unsolicited.  As we now know, Plaintiff not only welcomed sexual attention from C.K. but *she initiated it*.  C.K. broke up with Plaintiff *the day before* she and her mother went to the school and falsely complained that C.K. was bothering Plaintiff at her locker and had left her an inappropriate voicemail.  Plaintiff lied about her relationship with C.K. to school officials, the police, her doctors, her therapists, and the U.S. Office of Civil Rights, to name just a few.  Then she repeatedly and intentionally lied under oath in this case.

Not only has Plaintiff alleged a false story, she destroyed and buried evidence that would reveal the truth.  Her graphic communications professing her "love" for C.K. and her desire to engage in sexual activity with him were contained in a fake Facebook account whose existence Plaintiff never disclosed during discovery.  Even after the Court issued two orders—both *after* C.K. produced the Facebook messages with Plaintiff—requiring Plaintiff to disclose all prior social media accounts, she *still* did not disclose the Facebook account through which she sent these messages or produce the messages.  *See* Ex. 23, Plaintiff's Amended Answer to Interrogatory No. 10.  Nor did she produce any of the messages that she says that she did send to C.K.

Not only did she give false evidence and file scores of pleadings and papers advancing a knowingly false narrative, but she has also given false information to her providers and experts.[21] She has also provided the same false information to the defense experts conducting their Rule 35 exams. *See* Ex. 26, Report of Jonathan DeRight, Ph.D, at 6-10; Ex. 27, Report of Seth Tuwiner, M.D., at 1-2. The falsehoods regarding Plaintiff's history with C.K are inextricable from the way this case has been litigated for the past four years.

The prejudice to the School Board and the School Defendants cannot be overstated. Unquestionably, Plaintiff's false testimony regarding her history with C.K. brings into serious doubt the veracity of all other parts of Plaintiff's testimony, her sworn interrogatory answers and declarations, and the reliability and completeness of her discovery responses. *See, e.g.*, *Freddie v. Martin Transp. Ltd.*, 428 F. App'x 801, 804 (10th Cir. 2011) (false and misleading evidence "substantially prejudices an opposing party by casting doubt on the veracity of all the culpable party's submissions throughout litigation") (quoting *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009)).

After years of litigation and months of intensive discovery, the School Board has been placed in the wholly untenable position of having to either "attempt independent corroboration of each submission, at substantial expense of time or money, or accept the possibility that every document or statement submitted [by Plaintiff] is incomplete or inaccurate." *Id.* (alteration in original; internal quotation omitted). Plaintiff's perjury and fraud has also prejudiced the School Board by foreclosing its ability to seek summary judgment on her Title IX claims. ███████

---

[21] Seven of Plaintiff's eight experts based their reports on Plaintiff's false history of abuse by C.K. She was directly interviewed by five of her experts, Dr. Ryan, Sidney Binks, Gary Young, Bill Woolf, and Nancy Cantalupo, and gave them each a story of abuse by C.K. that is directly contradicted by the Facebook messages with him. Two other of Plaintiff's experts, Joshua Cisler and Alex Karras, relied on her other experts' reports to reach their opinions.

████████████████████████████████████████████████

███████████████████████████████████

Plaintiff's fraud is breathtakingly expansive and has tainted the entire record in this case. The defense has spent four years and taxpayer funds investigating and defending fantastical allegations that look nothing like Plaintiff's initial reports to the school of name-calling and rumors. It has had to rely heavily on third-party discovery to uncover the truth. It is now crystal-clear that the entire case has been litigated on false premises.

The prejudice to the defense and the harm to the public cannot be remedied. Plaintiff's fraud has already cost taxpayers a hefty sum and done untold harm to Defendants.[22] Her fraud will undoubtedly make it harder for actual victims of sexual abuse to obtain justice. An award of fees will be wholly inadequate to remedy those harms. And it will be ineffective, for Plaintiff has repeatedly told the Court her resources are very limited. But even if such an award were collectible, Plaintiff's perjury and concealment regarding her history with C.K. cannot be excised from this case. Dismissal of her lawsuit with prejudice is the only appropriate and just sanction.

## IV.   CONCLUSION

For all these reasons, the School Board respectfully requests that the Court grant this Motion and dismiss Plaintiff's case in its entirety.

---

[22] Not only has Plaintiff made baseless accusations against Defendants in court, but she has also promoted those claims in the media. *See, e.g.,* Danielle Wallace, *Fairfax County Schools Accused of Covering Up 'Gang Rape' as MS-13 Traffickers Plagued District: Lawsuit*, FOX NEWS, Mar. 20, 2023, https://www.foxnews.com/us/fairfax-county-schools-accused-covering-gang-rape-ms-13-traffickers-plagued-district-lawsuit (interview with Plaintiff's counsel); Sierra Fox, *Lawsuit Claims Fairfax County Public Schools Downplayed Former Student's Rape*, FOX 5 DC, Mar. 14, 2023, https://www.fox5dc.com/news/lawsuit-claims-fairfax-county-public-schools-downplayed-former-students-rape (statements from Plaintiff and her counsel). Plaintiff's brother, who successfully persuaded this Court to also protect his identity, is the co-founder and operator of an organization that regularly uses social media to promote Plaintiff's false claims of a "cover up" of her abuse, and lambast the School Board, its witnesses, and its attorneys about this lawsuit. *See* Ex. 28, D.R. Dep. Tr. at 152-53; Ex. 29, Tweets by D.R.'s organization.

Dated:  November 8, 2023                    Respectfully submitted,

                                            By: */s/ Sona Rewari*_____
                                                Sona Rewari (VSB No. 47327)
                                                Ryan M. Bates (VSB No. 74661)
                                                Scott W. Burton (VSB No. 90601)
                                                HUNTON ANDREWS KURTH LLP
                                                2200 Pennsylvania Avenue, NW
                                                Washington, DC 20037
                                                Telephone: (202) 955-1500
                                                Facsimile: (202) 778-2201
                                                srewari@HuntonAK.com
                                                rbates@HuntonAK.com
                                                burtons@HuntonAK.com

                                            *Counsel for Defendant Fairfax County School Board*


## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2023, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record for all Parties.

                                            By:  */s/ Sona Rewari*_____
                                                 Sona Rewari