**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:19-cv-00917-RDA-WEF |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR**
**SANCTIONS DUE TO SPOLIATION**

Sona Rewari (VSB No. 47327)
Ryan M. Bates (VSB No. 74661)
Scott W. Burton (VSB No. 90601)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
rbates@HuntonAK.com
burtons@HuntonAK.com

*Counsel for Defendant Fairfax County School Board*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   RELEVANT FACTUAL BACKGROUND.......................................................................3

   A.  Plaintiff's ESI and its Obvious Importance to this Case................................................3

      1.  Plaintiff's Facebook and Cell Phone Data Have Been at the Heart of Her
          Claim Since 2011...........................................................................................4
      2.  Plaintiff Used her Cell Phone and Facebook Extensively to Communicate
          with the Parties and Witnesses........................................................................5
      3.  Plaintiff's and her Mother's March 2012 Report to the Police Was Prompted
          by a Facebook Chat.......................................................................................7

         a)  The Alleged Cyberbullying of Plaintiff by "Jenni Taylor" ...............................7
         b)  Plaintiff's Mother Gathered the Fake "Jenni Taylor" Facebook Chats to
             Make Her Report to the Police.........................................................................8
         c)  █████████████████████████████████████████ ...............9

   B.  This Lawsuit Was Anticipated by Early 2012. ..........................................................11

   C.  The School Board's Efforts to Obtain this Evidence.................................................13

   D.  The "B.R." and "Jenni Taylor" Accounts Are Not the Full Extent of Plaintiff's
       Deleted Facebook Data. .........................................................................................17

      1.  The Fake Profile Used to Message C.K. in November 2011................................17
      2.  The Fake "High School Freshman" Profile Used to Message Co.K. in
          January 2012 ...............................................................................................17
      3.  The Fake "Adrianna Capsulo" Profile Used to Message Co.K. in
          December 2012. ............................................................................................18
      4.  The Fake "Christina Affains" Profile Used to Message C.K. in January 2012. ....19

II.  ARGUMENT .......................................................................................................19

   A.  Plaintiff's Facebook, Text, and Email Data Should Have Been Preserved.................21

      1.  Plaintiff Was Under A Duty to Preserve Relevant Evidence Well
          Before 2013..................................................................................................21
      2.  Plaintiff's Facebook, Phone, and Email Data Were Evidence That Should
          Have Been Preserved. ...................................................................................24

   B.  Plaintiff's Facebook, Cell Phone, and Email Data Were Lost Due to Intentional
       Conduct or Failure to Preserve ...............................................................................24

   C.  Plaintiff's Facebook, Phone, and Email Data Have Been Irreplaceably Lost. ...........26

D.  The Court Should Order Measures to Remedy the Prejudice.......................................26

    1.   The Spoliation Has Been Prejudicial to the Defense. ............................................27
    2.   The Court Should Mitigate the Prejudice to the Defense. ....................................29

III.     CONCLUSION.............................................................................................................30

CERTIFICATE OF SERVICE ....................................................................................................31

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*,
    No. 14-1064 (JDB), 2017 WL 1214424 (D.D.C. Mar. 30, 2017)...........................................26

*Barsoum v. N.Y.C. Hous. Auth.*,
    202 F.R.D. 396 (S.D.N.Y. 2001) ........................................................................................22

*Borum v. Brentwood Vill., LLC*,
    332 F.R.D. 38 (D.D.C. 2019)................................................................................................26

*Brewer v. Leprino Foods Co., Inc.*,
    No. CV-1:16-1091-SMM, 2019 WL 356657 (E.D. Cal. Jan. 29, 2019)...........................22, 25

*Cahill v. Dart*,
    No. 13-cv-361, 2016 WL 7034139 (N.D. Ill. Dec. 2, 2016)................................................30

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991).............................................................................................................19

*ChampionsWorld, LLC v. U.S. Soccer Fed'n*,
    276 F.R.D. 577 (N.D. Ill. 2011)..........................................................................................22

*E.I. Du Pont De Nemours v. Kolon Indus., Inc.*,
    No. 3:09cv58, 2011 WL 1597528 (E.D. Va. Apr. 27, 2011).................................................24

*Edwards v. Junior State of Am. Found.*,
    No. 4:19-CV-140-SDJ, 2021 WL 1600282 (E.D. Tex. Apr. 23, 2021)..................................30

*Fast v. GoDaddy.com LLC*,
    340 F.R.D. 326 (D. Ariz. 2022) .......................................................................................21, 25

*Goodman v. Praxair Servs., Inc.*,
    632 F. Supp. 2d 494 (D. Md. 2009) ....................................................................................23

*Karsch v. Blink Health Ltd.*,
    No. 17-CV-3880 (VM) (BCM), 2019 WL 2708125 (S.D.N.Y. June 20, 2019)....................21

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
    323 F. Supp. 3d 837 (S.D.W. Va. 2018)..............................................................................20

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ...............................................................................27

*N.J. Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.*,
   No. 3:06-CV-2234, 2008 WL 2571227 (M.D. Pa. June 25, 2008)........................................23

*Ottoson v. SMBC Leasing & Fin., Inc.*,
   268 F. Supp. 3d 570 (S.D.N.Y. 2017)......................................................................................21

*Paisley Park Enters., Inc. v. Boxill*,
   330 F.R.D. 226 (D. Minn. 2019).......................................................................................25, 27

*Ronnie Van Zant, Inc. v. Pyle*,
   270 F. Supp. 3d 656 (S.D.N.Y. 2017)......................................................................................29

*Sanders v. Univ. of Idaho, Coll. of L.*,
   634 F. Supp. 3d 936 (D. Idaho 2022) .....................................................................................22

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*,
   No. 07-CV-5855, 2010 WL 2652412 (D.N.J. July 1, 2010), *aff'd* 748 F.3d
   1354 (Fed. Cir. 2014)...............................................................................................................22

*Schmalz v. Vill. of N. Riverside*,
   No. 13 C 8012, 2018 WL 1704109 (N.D. Ill. Mar. 23, 2018) ..................................................29

*Silvestri v. Gen. Motors Corp.*,
   271 F.3d 583 (4th Cir. 2001) ...............................................................................19, 21, 23

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   327 F.R.D. 96 (E.D. Va. 2018) ..............................................................................................20

*Thompson v. Clarke*,
   No. 7:11-cv-111, 2019 WL 4039634 (W.D. Va. Aug. 27, 2019)..............................................20

*TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez–Toledo*,
   No. 15-2121 (BJM), 2017 WL 1155743 (D.P.R. Mar. 27, 2017)..............................................27

*Tyson v. Dep't of Energy & Env't Prot.*,
   No. 3:21-cv-736 (JAM), 2022 WL 16949396 (D. Conn. Nov. 15, 2022) ....................21, 22, 30

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
   269 F.R.D. 497 (D. Md. 2010).................................................................................................21

*Vodusek v. Bayliner Marine Corp.*,
   71 F.3d 148 (4th Cir. 1995) .....................................................................................................24

*Youngevity Int'l v. Smith*,
   No. 3:16-cv-704-BTM-JLB, 2020 WL 7048687 (S.D. Cal. July 28, 2020)..............................25

**Statutes and Other Authorities**

Fed. R. Civ. P. 37(e) ........................................................................................20, 21, 27

Fed. R. Civ. P. 37(e)(1)...................................................................................... *passim*

Fed. R. Civ. P. 37(e)(2)....................................................................................20, 30

Va. Code §§ 64.2-1700 ...........................................................................................23

Plaintiff claims that she was subjected to repeated rapes and severe sexual harassment by students and unknown individuals at Rachel Carson Middle School ("RCMS") over the course of several months during the 2011-12 school year.  She stopped coming to the school in February 2012, and within weeks, she and her parents began preparing to sue the Fairfax County School Board (the "School Board").  In early 2012, they retained two sets of attorneys, created documents claimed to be "in anticipation of litigation," and told third parties that they were getting ready to sue the school system.  In summer 2012, Plaintiff filed an administrative Title IX complaint.  To date, Plaintiff has been continuously either represented by, or looking for, counsel for this case.

Though her current allegations are wildly different from what she previously told school officials and initially alleged, Plaintiff's electronically-stored information ("ESI") has consistently been highly relevant to her claims.  Her initial statement to school officials accused Defendant C.K. of leaving a vulgar voicemail on her cell phone and Defendant J.O. of name-calling on Facebook.  Plaintiff admits that there were phone calls, text messages, and Facebook interactions with C.K., as well as with other RCMS students during this time.  She claims that she received "tons" of harassing Facebook messages for "months" and "a lot" of death threats via text messages.  Ex. 1, Plaintiff Dep. Tr., Vol. I, at 132-36, 142.  Some proportion of these alleged messages, perhaps even the vast majority, were actually sent by Plaintiff herself through at least one fake Facebook account—an astounding fact that the School Board only learned through discovery in this case, but one that Plaintiff and her mother knew in 2012.

Despite that they anticipated litigation against the school system in 2012, Plaintiff and her mother failed to preserve ***every single electronic device and account*** used by Plaintiff while she was an RCMS student and during her alleged abuse.  They saved those messages and emails that could be helpful to them and destroyed everything else.  This includes Plaintiff's cellular phone,

text messages, Facebook data, e-mails, computer, and an iTouch device.  By her own admission, Plaintiff did not preserve ***any relevant electronic devices until 2019*** (*see* ECF 341).

The School Board has gone to great lengths to try to ascertain what happened to Plaintiff's ESI and secure its production.  On August 11, 2023, the Court ordered Plaintiff, through her counsel, to review and produce her ESI, including her social media, text messages, and emails, and to account for any such data sources that cannot be searched because they are no longer accessible.  Weeks later, Plaintiff finally disclosed that ***all*** of her ESI from this time period was lost and that these losses of ESI occurred only ***after*** this lawsuit was already in the works.

The loss of this ESI was not accidental.  Plaintiff's mother—who was Plaintiff's legal guardian and representative at the time—deliberately deleted two of Plaintiff's Facebook accounts in 2013.  Plaintiff's cell phone was replaced in or after 2013, without any effort to preserve any of its data.  Plaintiff disclaims using other fake Facebook accounts, and claims she no longer can access her email account (which she would have needed to set up those Facebook accounts).  Yet, other evidence indicates that she had multiple fake accounts when she was an RCMS student, and she was still using the same email account when this lawsuit was being planned.  She also claims she never had an iTouch, but other evidence shows that she did and that she used it to secretly communicate with C.K. in 2011.

What was destroyed and what was saved is telling.  So, too, is the timing of the spoliation. Plaintiff and her mother did not keep any Facebook messages sent by Plaintiff, including 250 pages of messages with Defendant C.K., showing that they were girlfriend and boyfriend, she was in "love" with him, and she explicitly invited and welcomed sexual contact with him during the same time he was allegedly raping her "nearly every day," ECF 155, Second Am. Compl. ¶ 132.  *See* ECF 497.  Plaintiff and her mother also did not keep the disturbing, violent, and sexually-explicit

Facebook messages ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ when it was really Plaintiff who had sent the messages.  What they kept was a carefully curated subset of Facebook messages from just one of Plaintiff's Facebook accounts. Even some of those messages were selectively excerpted into a separate document, while the full messages and their associated metadata were destroyed.

The prejudice to the School Board from this spoliation cannot be overstated.  Plaintiff's ESI is highly relevant to show what *was*—and what was *not*—occurring during the period that Plaintiff now claims she was being raped on a regular basis and that threats against her were "all over social media."  *Id.*; Ex. 1, Plaintiff Dep. Tr., Vol. I, at 142; Ex. 2, Plaintiff Dep. Tr., Vol. II, at 25-26, 188-89.  It is no overestimation to state that Plaintiff's spoliated ESI includes thousands of highly relevant messages.

The harm from this intentional destruction of evidence cannot be undone.  To try to mitigate this prejudice as much as possible, however, the Court should preclude Plaintiff from presenting any evidence or argument at trial regarding such messages, emails, or posts; allow the defense to present evidence regarding the spoliation of this evidence; and instruct the jury that it is permitted but not required to draw an adverse inference regarding the missing evidence.

## I.      RELEVANT FACTUAL BACKGROUND

### A.      Plaintiff's ESI and its Obvious Importance to this Case.

During the period of her alleged rapes and harassment, Plaintiff used the following electronic devices and accounts to communicate with other students, RCMS staff, and others who have been identified as witnesses in this case:  (1) a cell phone; (2) a Hotmail.com email address; (3) Facebook; (4) a computer; and (5) an iTouch.  *See* Ex. 3, Pl.'s Am. Ans. to FCSB's Interrog. Nos. 10 and 12; Ex. 4, Pl.'s Supp. Ans. To FCSB's Second Interrog. No. 20 (cell phone, email, and Facebook accounts); Plaintiff Dep. Tr., Vol. I, at 46-50, 318-21 (computer); Ex. 47, at K_0182,

K_0219 (iPod/iTouch); Ex. 5, Emails from Plaintiff's Hotmail.com account, dated 2/6/2011 to 10/17/2012.[1]

### 1.   Plaintiff's Facebook and Cell Phone Data Have Been at the Heart of Her Claim Since 2011.

Though Plaintiff's allegations have changed wildly since 2011 and 2012 (*see* ECF 497), her ESI has consistently stood out as an essential source of critical evidence.  In her first meeting with school officials on November 21, 2011, Plaintiff wrote a statement in which she alleged, among other things, that J.O. makes "offensive wall posts on my Facebook" and that C.K. had "left me a very inappropriate voicemail with lots of sexual terms."  ECF 155, Ex. O.

According to Plaintiff, by the time of this November 21 meeting, she had already been text messaging and exchanging phone calls with C.K. for weeks.  Ex. 2, Plaintiff Dep. Tr., Vol. II, at 263-64; *see also* Ex. 1, Plaintiff Dep. Tr., Vol. I, at 133-34, 354-55.

Plaintiff's mother, too, has known since November 2011 that Plaintiff's cell phone and Facebook data were critical to her allegations.  She testified that, before their November 21 meeting with the school, Plaintiff had told her that C.K. "was texting, calling her, and that she was supposed to respond . . . ."  Ex. 7, Mrs. R. Dep. Tr., at 177.  During the November 21 meeting, Plaintiff's mother reported to school officials that a "sexually explicit message from [C.K.]'s number" had been left on Plaintiff's cell phone.  Ex. 8, Email from Mrs. R., dated 11/21/2011.  She brought the phone with her to the meeting.  Ex. 7, Mrs. R. Dep. Tr., at 161.  She told the school and its assigned police officer that she was unable to retrieve the message, but could provide a log

---

[1] Though Plaintiff has stated under oath that she last used the Hotmail account in "late 2010 or early 2011," *see* Ex. 6, Pl.'s Am. Ans. to FCSB's Interrog. No. 10.—*i.e.*, during the school year *before* she started attending RCMS—that is demonstrably false.  *See* Ex. 5, Emails from Plaintiff's Hotmail.com account, dated 2/6/2011 to 10/17/2012.  Indeed, emails that Plaintiff sent to some of the Individual School Defendants during the *2011-2012 school year* are included among Plaintiff's own trial exhibits.  *See* ECF 464, Plaintiff's List of Trial Exhibits, Nos. 71, 72, 83, 93.

showing the call activity.  Ex. 8.  The next day, she gave school officials a partial call log that she

had printed out.  Ex. 7, Mrs. R. Dep. Tr., at 162-71.  In just a single day—November 14, 2011—

the log showed seven calls ***from*** Plaintiff's phone number to C.K.'s number, and just one call ***to***

Plaintiff's number from C.K.'s number.  *See* Ex. 9, Call log; Ex. 7, Mrs. R. Dep. Tr., at 168-81.

Plaintiff's mother continually believed that Facebook was an important piece of the story

as to what was occurring with her daughter.



According to Plaintiff's mother, she even went on Facebook and printed out some of the

messages, saved them in a folder, and gave them to her lawyers for this case.  *Id.* at 257-60.

### 2.   Plaintiff Used her Cell Phone and Facebook Extensively to Communicate with the Parties and Witnesses.

By all indications, Plaintiff used her cell phone extensively and was very active on

Facebook throughout her 7th grade year.  This evidence includes:

(1) The 250 pages of Facebook messages between C.K. and Plaintiff produced by C.K.  In

the span of just over two weeks in November 2011, Plaintiff sent and received thousands of direct

messages with C.K. on Facebook.  *See, generally,* Ex. 47.  In addition to the sheer number of

messages and their relative frequency, the content of these messages also indicate that Plaintiff

was a prolific user of Facebook and her cell phone during her 7th grade year.  *See, e.g.,* Ex. 47, at

K_91 ("im addicted to my phone lolol . . . .").

(2)  <u>The testimony of a non-party witness, "Co.K.," a then-eighth-grade student who started</u> <u>dating Plaintiff in January 2012</u>.  Co.K. testified that Plaintiff had a "smartphone" that could access the internet, the two of them spoke on the phone "daily," they exchanged phone text messages "daily," and they also messaged each other through Facebook.  Ex. 10, Co.K. Dep. Tr., at 45-46. Co.K. also testified that Plaintiff would post "long" "status" updates about herself on her Facebook page during this time period.  *Id.* at 136-37.

(3)  <u>Plaintiff's own testimony</u>.  Plaintiff testified that she received "tons of threats" on Facebook during the 2011-2012 school year.  Ex. 1, Plaintiff Dep. Tr., Vol. I, at 142-43.  According to Plaintiff, "it was all over social media for a period of months."  *Id*.  She testified that she received "a lot of threatening things … on text as well" from other students.  *Id.* at 132.

(4)  <u>The physical altercation surrounding Plaintiff's phone use</u>.



When asked about this incident in her deposition, Plaintiff said she had been reading "terrible" posts about herself on Facebook that said "something horrific about some sexual act [she] was doing" just before her mother came in the room.  Ex. 2, Plaintiff Dep. Tr., Vol. II, at 373-74, 376.

(5)  <u>Evidence that Plaintiff used fake Facebook accounts to communicate with RCMS</u> <u>students about herself</u>.  As explained in Sections I(A)(3)(c) and (D) below, during the time period of her alleged abuse, Plaintiff used fake Facebook profiles to communicate with RCMS students

about herself.  She has admitted in discovery to being behind one of these fake profiles—"Jenni

Taylor."  *See* Ex. 6, Pl.'s Ans. to FCSB's Interrog. No. 10.  Though Plaintiff disclaims, or claims

not to recall any of the others, other evidence points to the contrary, *see infra* Section I(D).

### 3.   Plaintiff's and her Mother's March 2012 Report to the Police Was Prompted by a Facebook Chat.

Facebook messages—only later revealed to have been sent by Plaintiff—were also at the

center of Plaintiff's initial allegation, first reported in March 2012, that ███████████████

██████

#### a)   The Alleged Cyberbullying of Plaintiff by "Jenni Taylor"

In late February 2012, a couple of weeks after Plaintiff had stopped coming to school,[2]

Plaintiff's then-boyfriend Co.K. was contacted on Facebook by someone calling themself "Jenni

Taylor."  Ex. 10, Co.K. Dep. Tr., at 56-57, 80; Ex. 12, Co.K./"Jenni Taylor" FB chats.  "Jenni

Taylor" initiated the conversation by asking him:  "hey sexy so um do you hate [Plaintiff]?"  Ex.

12, at 1.  Over the next three days, "Jenni Taylor" sent Co.K. dozens of explicit and vile messages

about Plaintiff, including that Plaintiff "gives bj [blow jobs] to everyone," "[is] a slut," is "meant

to b a prostitute [a]nd give lap dances," "is a hoe," and should "commit[] suicide."  *Id.* at 2-4, 8,

13.  As Co.K. defended Plaintiff, "Jenni Taylor" became more sexually explicit and violent, saying

such things as: "we loveee raping dat bitch," "i love fucking dat sexy ass of hers," "i love eatin dat

Pussy," "i love oral with her," "you can fuck your gf's ass while I fuck her pussy....you hold her

arms and i tie her legs…and we use a dildo and vibrator…and we can do double penetration."  *Id.*

at 9, 14-17.

---

[2] On February 10, 2012, the day after Plaintiff was involved in a name-calling incident at school with another student, "B.F.," Plaintiff's mother sent an email to the school announcing that they were going to keep Plaintiff home and requesting home instruction.  Ex. 13, Email from Mrs. R. to A.F., dated 2/10/2012.  Plaintiff did not attend classes at RCMS after February 9, 2012.  Ex. 7, Mrs. R. Dep. Tr., at 312.

Co.K. believed at the time that "Jenni Taylor" was C.K., largely because of what Plaintiff had told him about C.K. Ex. 10, Co.K. Dep. Tr., at 86-87. Plus, "Jenni Taylor" had dropped hints in their chat that she was actually C.K. Ex. 12, Co.K./"Jenni Taylor" FB chats, at 3.

All evidence indicates that Co.K. was not the only RCMS student to hear from "Jenni Taylor." For example:

- "Jenni Taylor" posted a public message on Facebook saying "[Plaintiff] go die." Ex. 10, Co.K. Dep. Tr., at 89; Ex. 12, Co.K./"Jenni Taylor" FB chats, at 4.

- Plaintiff showed Co.K. and another friend, O.B., messages that **she** had received from "Jenni Taylor." Ex. 10, Co.K. Dep. Tr., at 79-80; Ex. 14, O.B. Dep. Tr., at 66-67.

- Several RCMS students reported to the school that someone named "Jenni Taylor" had created a "hate group" about Plaintiff. *See* Ex. 15, 2/28/2012 Statement of O.B.; Ex. 16, Facebook message from O.B.; Ex. 14, O.B. Dep. Tr., at 62-65; Ex. 17, 2/28/2012 Statement of J.S.

- One student told the school that Plaintiff had directed her to the "Jenni Taylor" Facebook page. Ex. 17, 2/28/2012 Statement of J.S.

- On February 27 and 28, 2012, C.K. posted on his Facebook page questions asking who was posing as "Jenni Taylor" and complaining that people were falsely accusing him of being behind it. Ex. 18, C.K. posts re Jenni Taylor.

- Multiple students sent C.K. messages on Facebook rebuking him for creating a fake profile to "hate" on Plaintiff. *See, e.g.,* Ex. 19, C.K. Messages with T.H., E.P., S.W.

**b)      Plaintiff's Mother Gathered the Fake "Jenni Taylor" Facebook Chats to Make Her Report to the Police**





---

[3] Even after Co.K. emailed the "Jenni Taylor" chat to Plaintiff's family, "Jenni Taylor" continued to send him sexually-explicit and violent messages, such as: "FUCKKK OFF MY GIRL", "SHES MY BITCH", "WHEN I TELL HER TO GET ON MY JOCK SHE LISTENS", "U STOLE MY FUCKING GIRLFRIEND", "she's my stripper", and "when I say fuck me to her she obeys me."  Ex. 12, at 24-26; Ex. 10, Co.K. Dep. Tr., at 85-86.  Those messages were not provided to the FCPD by Plaintiff or her mother, and were produced only by Co.K. in response to the School Board's subpoena.  Ex. 10, Co.K. Dep. Tr., at 82-86.

**B.      This Lawsuit Was Anticipated by Early 2012.**

A plethora of evidence shows that this lawsuit was anticipated by March 2012, at the very latest.  Co.K. testified that he sent Plaintiff's mother the "Jenni Taylor" chats on March 1, 2012, because he was told that they were "getting ready to sue FCPS."  Ex. 10, Co.K. Dep. Tr., at 79-81; *see* Ex. 27, Email from Co.K to R. Family (showing chats were emailed to Plaintiff's family email account on March 1, 2012).

In April 2012, Plaintiff's mother began corresponding with attorneys at the NWLC.  *See* Ex. 29, Plaintiff's Privilege Log; Ex. 30, Plaintiff's Family's Privilege Log.   While this correspondence has been withheld from production under claims of attorney-client privilege and

work-product, Plaintiff's and her family's privilege logs state that these communications were in "anticipation of litigation." *Id.* In June 2012, the NWLC was formally retained to represent Plaintiff. *Id.* And, sometime in the Spring of 2012, the law firm of Arnold & Porter LLP joined Plaintiff's legal team. *Id.* In all, Plaintiff's log contains 29 entries in which documents from 2012 were withheld in "anticipation of litigation."[4] *Id.* The privilege logs show that, by the end of 2012, Plaintiff and/or her mother had (i) corresponded with counsel; (ii) created notes regarding "potential witnesses," (iii) created notes "relating to incident and witnesses," (iv) discussed with counsel an "ongoing investigation," (v) discussed "litigation strategy" with counsel; and (vi) repeatedly discussed "litigation." *See id.*

On August 3, 2012, Plaintiff's mother informed Assistant Superintendent Fabio Zuluaga that "counsel at Arnold & Porter and the National Women's Law Center" would be attending an August 2012 meeting with school officials.[5] *See* Ex. 31, Email from Mrs. R. to F. Zuluaga, dated 8/3/2012. Three days later, August 6, 2012, Plaintiff, through counsel, filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR"). ECF 38-4. The Title IX administrative proceeding continued for two years. ECF 155, ¶ 221.

Both during and after the administrative complaint was resolved, Plaintiff continued to search for lawyers to bring this case. *See* Ex. 30, Plaintiff's Family's Privilege Log; Ex. 33, Emails

---

[4] Plaintiff's privilege log does not provide the exact date of some communications or the names of the senders/recipients. The log was served in the weeks before Plaintiff fired her then-counsel, so the School Board did not have an opportunity to seek supplementation. The privilege log produced by Plaintiff's family, however, does provide dates and the parties to each communication.

[5] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ So, Plaintiff's mother knew full well in July 2012 that these chats undermined Plaintiff's allegations.

among Mrs. R., Plaintiff, and K. Saylor, dated 9/2014; Ex. 34, Email from Plaintiff to K. Saylor, dated 2/3/2015; Ex. 35, Email from Mrs. R. to Plaintiff, K. Saylor et al., dated 11/29/2016.   In 2017, Plaintiff incurred over $113,000 in legal fees, which she is now claiming as part of her damages in this lawsuit.  *See* Exhibit 36, Pl.'s Ans. to FCSB's Interrog. No. 16.  In 2018, Plaintiff retained new counsel, who filed this suit in 2019.  *See* Ex. 30, Plaintiff's Family's log.

Thus, it is beyond credible dispute that this litigation has been anticipated since early 2012.

### C.    The School Board's Efforts to Obtain this Evidence.

When this lawsuit was filed in 2019, Plaintiff's ESI remained a significant part of her claim. She expressly alleged in her original complaint that school officials had not responded properly to the "cyberbullying" alleged in her November 21, 2011 statement.  *See* ECF 1, ¶ 213(k).  That allegation was repeated in her amended complaint.  ECF 37, ¶ 278(11)(a).  In 2022, she amended her complaint again, now alleging that she was also cyberbullied and harassed by ***other*** unnamed RCMS students, and even quoted such remarks:

> In or about the second or third week of January 2012 students at RCMS continued to spread rumors at school ***and through the internet and social media*** directed at Plaintiff's sex and sexuality including rumors that Plaintiff was a lesbian and bisexual, a "whore," that no one wanted her at school, and that she should "drink bleach."

ECF 155, ¶ 177 (emphasis added).

Not surprisingly, the School Board has been seeking information regarding Plaintiff's cell phone and social media data from the very start.  *See* Ex. 37, FCSB's First RFPs to Plaintiff, Nos. 2-4, 8, 28; Exs. 3 and 4, FCSB's First Interrog. to Plaintiff, Nos. 10-12 and 20.

Plaintiff's interrogatory answers identified a single cellphone that she used from September 2011 to March 2013. Ex. 4, Pl.'s Supp. Ans. to FCSB's Interrog. No. 20.  Her sworn answer stated that "she does not know the current location of the device, whether and by whom it was disposed,

-13-

or whether its contents have ever been forensically preserved." *Id.* Plaintiff's counsel subsequently clarified that Plaintiff's cell phone used during the relevant school year was "traded in" sometime prior to 2018 and that she "no longer has access" to that phone. Ex. 38, Letter from A. Brenner to R. Bates, dated 10/9/23, at 2.

Plaintiff's interrogatory answers also identified just two Facebook accounts prior to 2013— one using her own name (the "B.R." account) and one under "Jenni Taylor." Ex. 3; Pl.'s Ans. to FCSB's Interrog. No. 10; Ex. 4, Pl.'s Supp. Ans. to FCSB's Interrog. No. 20. She produced just a handful of pages printed out from the "B.R." Facebook account in November 2011 and March 2012. *See* Ex. 39, Printed Facebook Messages. None of these showed any threats by anyone, much less by C.K. *See id.* None of them were by, or even mentioned, J.O., whom Plaintiff had accused in her November 2011 statement of having posted "offensive" remarks about her on Facebook. *See id.* Plaintiff also produced snippets of Facebook messages, apparently from other students that appeared to have been cut and pasted in a three-page "collage"; she did not produce the full messages from which those snippets had been excerpted. *See* Ex. 40, Collage of Facebook messages. These snippets show students being generally supportive of Plaintiff. *See id.*

Significantly, Plaintiff produced (1) ***no*** other Facebook messages to/from her during her time at RCMS (including none of the purported Facebook messages that she received from C.K., J.O., or anyone else alleged to have harassed or threatened her); (2) ***no*** Facebook posts made by her during her time at RCMS; (3) ***none*** of the Facebook messages that she sent to and received from other RCMS students while posing as "Jenni Taylor" (including the chats with Co.K that Plaintiff's mother gave to the FCPD); (4) ***none*** of the Facebook posts she made while posing as "Jenni Taylor" (including the "[Plaintiff] go die" post); (5) ***none*** of the "hate page[s]" that she created about herself in the guise of "Jenni Taylor."

-14-

Plaintiff's reasons for these glaring absences have continually changed during discovery. In April 2023, Plaintiff attested in her interrogatory answer that her "***mom*** shut down her personal Facebook account sometime ***in late 2011 or early 2012***" and "***Plaintiff*** took down the Jenni Taylor account in ***January 2012***."[6]  Ex. 3, Pl.'s Ans. to FCSB's Interrog. No. 11, at 17 (emphases added). But in her first deposition in June 2023, Plaintiff claimed she could not recall what happened to her "B.R." Facebook account and expressly denied that she had shut it down.  Ex. 1, Plaintiff Dep. Tr., Vol. I, at 319-20.  Then, in mid-July 2023, she told the Court in a brief that ***her family*** had "shut down" "all" of her social media accounts, and that they did so ***during*** the period of Plaintiff's alleged sexual abuse.  ECF 309, at 9.  Less than ten days later, Plaintiff testified that she had "no idea" what happened to the "B.R." Facebook account.  Ex. 2, Plaintiff Dep. Tr., Vol. II, at 22, 23. In early August 2023, Plaintiff signaled that the "Jenni Taylor" account had *not* been permanently shut down, telling the Court and the defense that she had tried to access that account but "is not able to access it and does not know what email address was used to set it up."  ECF 365, at 3.

In mid-September, Plaintiff suggested to the Court that ***both*** the "Jenni Taylor" and "B.R." account data had not been permanently lost but were just inaccessible:  "I don't have ***access*** to my accounts from when I was 12 years old… I lost ***access*** to my Facebook account…."  ECF 425-4, at 8-9 (emphases added).  Plaintiff also said that she still ***had*** the "Jenni Taylor" chats, claiming that she "turned these over to my lawyers in the litigation."  *Id.* at 7.  But the "Jenni Taylor" chats were not in the documents she produced on September 18, 2023, or in any prior production.

After Plaintiff obtained new counsel on September 19, 2023, the School Board sought to obtain the information Plaintiff was required to produce under Paragraph 5 of the Court's August

---

[6] The "Jenni Taylor" chat with Co.K. had ***started*** on February 27, 2012, *see* Ex. 12, so the "Jenni Taylor" account could not have been taken down in January 2012.

11 Order (ECF 372) regarding any inaccessible data sources.  *See* Ex. 41, Letter from R. Bates to Pl.'s Counsel, dated 10/4/2023. The School Board once again flagged the "collage" of cut-and-pasted Facebook messages from RCMS students that had been included in Plaintiff's production. *Id.* at 2.  It noted that the underlying messages had not been in the documents produced on September 18, 2023, and asked for the metadata for the "collage" document itself.  *Id.*

By letter dated October 9, 2023, Plaintiff informed the School Board that the "collage" document "is a compilation of messages Plaintiff's mother ***downloaded and saved*** from a Facebook account Plaintiff used in 2012."  *See* Ex. 38, Letter from A. Brenner to R. Bates, dated 10/9/2023, at 2 (emphasis added).  The letter also disclosed—for the first time—that Plaintiff's mother had ***deleted*** both the "B.R." and the "Jenni Taylor" Facebook accounts "***in early 2013***." *Id.* at 3 (emphases added); *see also id.* at 2.  On November 7, 2023, Plaintiff served an amended interrogatory answer, attesting that both the "B.R." and the Jenni Taylor Facebook accounts were indeed deleted in 2013.  Ex. 3, Pl.'s Amend. Ans. to FCSB's Interrog. No. 10.

In that same interrogatory answer, Plaintiff swore that her Hotmail account is "inactive," that she has "no access" to it, and that she last accessed this account in "late 2010/early 2011."  *Id*. But we know that is untrue: Plaintiff used this account during the 2011-2012 school year, including using it to communicate with her teachers and her mother about school, and was still using it as late as October 2012.  *See* Ex. 5.  If Plaintiff lost "access" to this account, that loss occurred only after October 2012.  We also know that Plaintiff did not search her Hotmail account when responding to Defendants' discovery.  *See* ECF 341; Ex. 42, Letter from A. Brenner to R. Bates, dated 9/26/2023, at 2-3.

In sum, it is now clear that Plaintiff's Facebook accounts were deleted in 2013, her phone was discarded sometime between 2013 and 2018, and her Hotmail email access was somehow

-16-

"lost" after October 2012.  These losses occurred after Plaintiff and her parents anticipated this litigation, and after they retained the NWLC and Arnold & Porter.  As a result of these data losses, none of these sources were searched for evidence pertaining to the claims or defenses in this case.

**D.**     **The "B.R." and "Jenni Taylor" Accounts Are Not the Full Extent of Plaintiff's Deleted Facebook Data.**

Though Plaintiff claims not to recall, or denies, using any fake Facebook profiles other than "Jenni Taylor," *see* Ex. 2, Plaintiff Dep. Tr., Vol. II, at 94-95, 188-89, other evidence produced in discovery strongly suggests that Plaintiff used at least four other fake Facebook profiles while she was a student at RCMS.  All but one of these have been deleted from Facebook by the person who created them or someone acting on their behalf.

**1.**     **The Fake Profile Used to Message C.K. in November 2011.**

For starters, the 250 pages of Facebook messages with C.K. were sent through a fake Facebook account.  *See, generally,* Ex. 47.  In those messages, Plaintiff also refers to having a second Facebook account.  *Id.* at K_0254.  C.K. has also produced Facebook messages with J.O. from the same time period in which he discusses messaging Plaintiff through her "fake" Facebook account.  Ex. 43, C.K./J.O. messages, at K_0431.

**2.**     **The Fake "High School Freshman" Profile Used to Message Co.K. in January 2012.**

Neither Plaintiff nor her mother ever admitted to Co.K. that "Jenni Taylor" had been Plaintiff herself, but Co.K. deduced on his own that "Jenni Taylor" was actually Plaintiff; he observed similarities in how they spelled and misspelled certain words, and one would go offline and the other would come online simultaneously.  Ex. 10, Co.K. Dep. Tr., at 87-88, 100, 138-139.  He noted the same similarities and pattern with another fake Facebook profile that had messaged him a month before "Jenni Taylor," and he also later deduced that Plaintiff had been behind those messages.  Ex. 44, Co.K/SLHS Freshman FB chats; Ex. 10, Co.K. Dep. Tr., at 66-70.

That fake Facebook profile had claimed to be a high school freshman who knew Plaintiff. Ex. 44, at 1. She told Co.K. that he is "rlly cute" and that his girlfriend "looks like a slut" and "is uglyyyyy." *Id.* The person also said such things about Plaintiff as, "If she died id b happy" and "That bitch should kill herself." *Id.* at 2. Co.K. did not know at the time who was messaging him, and he realized only later that it had been Plaintiff because the person's style of texting was "pretty much exactly like B.R.'s style of texting," including repetition of certain letters in words, certain spellings and misspellings, and that "this account and B.R.'s Facebook account would never be marked as active at the same time." Ex. 10, Co.K. Dep. Tr., at 73-76.

### 3. The Fake "Adrianna Capsulo" Profile Used to Message Co.K. in December 2012.

In December 2012, about six months after Co.K. broke up with Plaintiff and about two months after he ended all contact with her, he was contacted on Facebook by someone using the name "Adrianna Capsulo"—a name he did not recognize and that did not match anyone at his school. *Id.* at 102-05, 139-42; Ex. 45, Co.K/Adrianna Capsulo FB chats.

"Adrianna Capsulo" claimed that she was bisexual and that Plaintiff was her girlfriend. Ex. 45, at 4-7. "Adrianna Capsulo" said that Plaintiff was "really mad" at her for talking to Co.K. because Plaintiff thinks Co.K. "hates" her and does not want to "bother" him. *Id.* When Co.K. explained why he had cut off ties with Plaintiff, "Adrianna Capsulo" told him that Plaintiff had "changed," she has a "record deal," she "is a fucking model now," "her personality has blossomed," and she is having "an amazing life." *Id.* at 8-9. When Co.K. said that he did not want to speak to Plaintiff, "Adrianna Capsulo" cursed him out, adding "everyone hated you" and "so many" people "got mad at [Plaintiff] for dating you." *Id.* at 9-12. By the end of the chat, Co.K. deduced that "Adrianna Capsulo" was actually Plaintiff and told her so. *Id.* at *12; Ex. 10, Co.K. Dep. Tr., at 104-05.

-18-

### 4.    The Fake "Christina Affains" Profile Used to Message C.K. in January 2012.

Like Co.K., C.K. was also the subject of an attempted catfishing on Facebook after he broke up with Plaintiff.  In January 2012, someone using the name "Christina Affains" told C.K. on Facebook "yourrr cute!!!" and offered to "take off" her clothes and "strip" for him.  Ex. 46, at K_0264-67.  C.K. eventually deduced that "Christina Affains" was actually Plaintiff, and called her out using only her first name "B."  *Id.* at K_0260-61.  Though "Christina Affains" insisted that she was not Plaintiff, she knew immediately who "B" was, claiming "I hate her too," and added "U don't know what she did to me … so I decided to create a page just to fuck up her life."  *Id.* at K_0260.  C.K. repeated "I know it's you [B.] everyone knows its you," and "Christina Affains" gave up messaging with C.K.  *Id.*

With the exception of Adrianna Capsulo, these fake profiles have been deleted on Facebook, as they appear only as "Facebook User" in the messages, while the names of C.K. and Co.K. remain part of the chats.  None of these were produced by Plaintiff, who maintains that "to [her] recollection" she had no fake Facebook profiles other than "Jenni Taylor."  Ex. 2, at 188-89.

## II.    ARGUMENT

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  Under common law, the court has power to issue sanctions for spoliation under its "inherent power to control the judicial process and litigation" and "to redress conduct 'which abuses the judicial process.'"  *Id.* (quoting *Chambers v. NASCO, Inc*., 501 U.S. 32, 45-46 (1991)).  "The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth."  *Id.*

The spoliation of ESI is now expressly addressed in Fed. R. Civ. P. 37(e), which states:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>> (A) presume that the lost information was unfavorable to the party;

>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>> (C) dismiss the action or enter a default judgment.

Under Rule 37(e), the movant must first establish four elements:  "(1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103-04 (E.D. Va. 2018).

If this showing has been made, the "court must then consider whether the movant has established one of two options that would permit imposing sanctions." *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 837, 845 (S.D.W. Va. 2018); *see* Fed. R. Civ. P. 37(e). "First 'upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice.'" *Thompson v. Clarke*, No. 7:11-cv-111, 2019 WL 4039634, at *3 (W.D. Va. Aug. 27, 2019) (quoting Fed. R. Civ. P. 37(e)(1)). "Second, and 'only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation,' the court may presume that the lost information was unfavorable to the party who lost it, instruct the jury that it may or must so presume, or dismiss the action or enter a default judgment." *Id.* (quoting Fed. R. Civ. P. 37(e)(2)).

-20-

As explained below, the Rule 37(e) threshold showing is easily met here.  The Court should order measures "necessary to cure the prejudice" to the defense from the loss of Plaintiff's ESI.

### A.      Plaintiff's Facebook, Text, and Email Data Should Have Been Preserved

#### 1.      Plaintiff Was Under A Duty to Preserve Relevant Evidence Well Before 2013.

Rule 37(e)(1) does not identify a starting date for the duty to preserve evidence, but instead looks to the common law.  *See* Fed. R. Civ. P. 37(e)(1) adv. committee note to 2015 amendment. Under common law, the duty to preserve evidence "arises not only during litigation, but *also extends to that period before the litigation* when a party *reasonably should know* that the evidence may be relevant to *anticipated litigation*."  *Silvestri*, 271 F.3d at 591 (emphases added).  The duty to preserve also includes the obligation to "identify, locate, and maintain" evidence.  *Victor Stanley, Inc. v. Creative Pipe, Inc*., 269 F.R.D. 497, 522 (D. Md. 2010) (citation omitted).

"Courts have found that a duty to preserve evidence may arise when a plaintiff has clearly signaled an intention to pursue legal action."  *Tyson v. Dep't of Energy & Env't Prot.*, No. 3:21-cv-736 (JAM), 2022 WL 16949396, at *3 (D. Conn. Nov. 15, 2022) (plaintiff whose texts showed that he was making "concrete plans" to file a discrimination charge was under duty to preserve evidence); *Karsch v. Blink Health Ltd.*, No. 17-CV-3880 (VM) (BCM), 2019 WL 2708125, at *18 (S.D.N.Y. June 20, 2019) ("obligation to preserve arose when plaintiff sent defendant a letter demanding repayment and threatening legal action" despite that lawsuit was not filed until two years later) (collecting cases); *Ottoson v. SMBC Leasing & Fin., Inc*., 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017) ("The Plaintiff had control over the evidence and an obligation to preserve it from … the date that her counsel sent a demand letter to Defendants threatening litigation. . . .").

Once a plaintiff begins to gather evidence for a potential lawsuit, she is under a duty to preserve.  *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 336-37 (D. Ariz. 2022) (plaintiff's duty to

preserve began when she started gathering evidence for a potential lawsuit); *ChampionsWorld, LLC v. U.S. Soccer Fed'n*, 276 F.R.D. 577, 582 (N.D. Ill. 2011) (plaintiff's duty to preserve arose approximately two years before filing suit, when the plaintiff investigated possible claims against the defendant); *Barsoum v. N.Y.C. Hous. Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) (duty arose 16 months before litigation when plaintiff was receiving assistance of counsel and it was foreseeable that ESI would be relevant to future litigation).

The filing of an administrative complaint is strong evidence that a plaintiff reasonably anticipates litigation. *Brewer v. Leprino Foods Co., Inc.*, No. CV-1:16-1091-SMM, 2019 WL 356657, at *9 (E.D. Cal. Jan. 29, 2019) (plaintiff's duty to preserve arose when she filed administrative complaint that preceded lawsuit arising from same events); *Tyson*, 2022 WL 16949396, at *3 (same).

The dates of documents later claimed as attorney work-product are also strong evidence of when a party reasonably anticipated litigation. *E.g.*, *Sanders v. Univ. of Idaho, Coll. of L.*, 634 F. Supp. 3d 936, 941 (D. Idaho 2022) (finding work-product claims on privilege log bolstered conclusion that defendants were under obligation to preserve at the time of destruction of documents); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*, No. 07-CV-5855 (DMC–JAD), 2010 WL 2652412, at *5 (D.N.J. July 1, 2010) (party's duty to preserve was triggered by at least the first date on its privilege log), *aff'd* 748 F.3d 1354 (Fed. Cir. 2014).

Here, the overwhelming weight of evidence shows that Plaintiff was under a duty to preserve relevant evidence well before 2013. By March 1, 2012, Plaintiff's family had informed Co.K. that Plaintiff intended to sue FCPS and were gathering evidence to support her case. Ex. 10, Co.K. Dep. Tr., at 79-81; *see* Ex. 27, Email from Co.K. to R. Family, dated 3/1/2012.

███████████████████████████████████  By April

2012, Plaintiff was corresponding with potential attorneys on the same subject matter as the claims

in this case, and had retained lawyers by June 2012.  *See* Ex. 29, Plaintiff's Privilege Log; Ex. 30,

Plaintiff Family's Privilege Log.  Plaintiff's legal team included the multinational firm of Arnold

& Porter.  *Id.*  Plaintiff's administrative complaint under Title IX was filed just a few months later,

in August 2012.  ECF 38-4.  Plaintiff's and her family's privilege logs, which show many

communications with attorneys "in anticipation of litigation" or claimed as "work-product," only

further confirm that Plaintiff and her family anticipated litigation in early 2012.  *See* Exs. 29 & 30.

Both by law and in fact, as indicated by Plaintiff's and her family's privilege logs,

Plaintiff's mother was acting on her behalf in these matters.  *See* Va. Code §§ 64.2-1700 (parents

of minor are her natural guardians); 8.01-8 (either parent of minor may sue on her behalf as her

next friend); 8.01-271.1 (parents of minor may sign pleadings on her behalf).  As her agent,

Plaintiff's mother was subject to the same preservation duty as Plaintiff.  *E.g.*, *Goodman v. Praxair*

*Servs., Inc.,* 632 F. Supp. 2d 494, 522 n.16 (D. Md. 2009) ("A party may be held responsible for

the spoliation of relevant evidence done by its agents"); *N.J. Mfrs. Ins. Co. v. Hearth & Home*

*Techs., Inc.,* No. 3:06-CV-2234, 2008 WL 2571227, at *7 (M.D. Pa. June 25, 2008) ("A party to

a law suit, and its agents, have an affirmative responsibility to preserve relevant evidence."); 

*accord Silvestri*, 271 F.3d 583 at 592 (actions of attorney selected for plaintiff by plaintiff's family

could be imputed to plaintiff).

Plaintiff was, therefore, under a duty to preserve by no later than March 2012, and was

certainly under that preservation duty when (1) the two Facebook accounts were deleted in 2013;

(2) her cell phone was replaced in or after 2013; and (3) she lost access to her Hotmail account

sometime after October 2012.

-23-

2. **Plaintiff's Facebook, Phone, and Email Data Were Evidence That Should Have Been Preserved.**

Evidence is within the scope of a duty to preserve if "a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *E.I. Du Pont De Nemours v. Kolon Indus., Inc.*, No. 3:09cv58, 2011 WL 1597528, at *12 (E.D. Va. Apr. 27, 2011) (citation omitted).  It is not enough to preserve evidence a party considers relevant to *her* theory of the case; she must also preserve evidence that may be relevant to *other parties'* theories of *their* cases. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

By any measure, Plaintiff's Facebook, cell phone, and emails were evidence that should have been preserved.  According to Plaintiff, she received "tons" of threats on Facebook and in text messages.  Ex. 1, Plaintiff Dep. Tr., Vol I, at 132-36, 142.  She and her mother discussed Facebook and phone harassment in their first meeting with school officials and Plaintiff's written statement on November 21, 2011. *See supra* Section I(A)(1).  Her mother even brought Plaintiff's phone and partial call log to the school.  Ex. 7, Mrs. R. Dep. Tr., at 160-61.

Plaintiff and her mother knew, or reasonably should have known, that her Facebook, cell phone (including her text messages), and emails could be relevant evidence to her claims and to the School Board's defenses.  That a cherry-picked set of messages were saved, while the rest— including the explicit ones that Plaintiff sent to C.K., the "Jenni Taylor" chats, and the messages to Plaintiff's boyfriend, Co.K.—were destroyed, shows that Plaintiff and her mother recognized that Plaintiff's Facebook data was evidence relevant to her claims.

B. **Plaintiff's Facebook, Cell Phone, and Email Data Were Lost Due to Intentional Conduct or Failure to Preserve.**

While Plaintiff denies or does not recall using some other fake Facebook accounts, there is no dispute that the following ESI was Plaintiff's and has been lost:

-24-

1) all of the data associated with two of Plaintiff's Facebook accounts, the "B.R" account and the "Jenni Taylor" account, including the "tons" of "threats" that Plaintiff testified that she received on Facebook during the time period in question, the messages that her mother saved and assembled into a collage, the messages that she testified that she sent to C.K. while posing as "Jenni Taylor," and the "long" posts by Plaintiff that were described in Co.K.'s testimony and in his messages to "Adrianna Capsulo" in December 2012;

2) all text messages from C.K.,

3) all other text messages received on her cell phone; and

4) all emails sent and received by her through her Hotmail email account from middle school, including emails from Facebook regarding her account activity.

This evidence was not lost by accident.  Instead, Plaintiff's mother intentionally deleted Plaintiff's "B.R." and "Jenni Taylor" Facebook accounts and replaced her cell phone.[7]  She printed out phone logs for only one week in November, and printed handful of posts and messages by other students on Plaintiff's "B.R." account.  She even downloaded and saved some messages from that account but deleted them after cutting and pasting selected snippets of the messages into a separate document.  Plaintiff's mother apparently also deleted the email from Co.K. on March 1, 2012, ████████████████████████████████████████████████ because neither the email nor the chats were produced by Plaintiff or her mother.  Worse, this

---

[7] With respect to preserving ESI on phones or other electronic devices, courts have held that litigants must prevent destruction of ESI on such devices by backing up the data or suspending other practices under which data is auto-deleted.  *See, e.g.*, *Fast*, 340 F.R.D. at 344 ("By failing to back up her iPhone, Plaintiff failed to take reasonable steps to preserve the ESI contained on the phone."); *Youngevity Int'l v. Smith*, No. 3:16-cv-704-BTM-JLB, 2020 WL 7048687, at *2 (S.D. Cal. July 28, 2020) ("The Relevant Defendants' failure to prevent destruction by backing up their phones' contents or disabling automatic deletion functions was not reasonable because they had control over their text messages and should have taken affirmative steps to prevent their destruction when they became aware of their potential relevance."); *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (holding that defendants did not take reasonable steps to preserve ESI on their phones because they "could have taken advantage of relatively simple options to ensure that their text messages were backed up to cloud storage" but did not do so); *Brewer*, 2019 WL 356657, at *10 (similar).

appears to be emblematic of Plaintiff's approach to preservation of ESI in this case—preserve what is helpful and destroy the rest.[8]  Because the losses here were the result of intentional conduct, it easily shows a failure to take reasonable steps to preserve.

### C.    Plaintiff's Facebook, Phone, and Email Data Have Been Irreplaceably Lost.

The last element of the initial showing, namely that ESI have been irreplaceably lost, is easily met here.  ESI is irreplaceably lost if it cannot be replaced or restored through additional discovery.  *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 46 (D.D.C. 2019) (deleted emails that could not be recovered or obtained from another source were lost); *Agility Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, No. 14-1064 (JDB), 2017 WL 1214424, at *2-3 (D.D.C. Mar. 30, 2017) (missing emails were lost where they "d[id] not appear to have been stored elsewhere").

Though the School Board has obtained from third parties some of the "Jenni Taylor" messages (specifically the ones sent to Co.K.), the rest of Plaintiff's "Jenni Taylor" messages and posts have been deleted.  All of Plaintiff's "B.R." Facebook account data has been lost.  So too have been her text messages and other cell phone data.  All but a handful of Plaintiff's emails from the Hotmail account that she used when she attended RCMS are also irreplaceably lost.

### D.    The Court Should Order Measures to Remedy the Prejudice.

If the Court finds that ESI has been spoliated, it may order measures "no greater than necessary to cure the prejudice" to another party from the loss.  Fed. R. Civ. P. 37(e)(1).

---

[8] Not only were the "B.R." and "Jenni Taylor" accounts intentionally deleted, but so was the fake Facebook account that Plaintiff used for the 250 pages of messages with C.K. in November 2011, for that account is now denoted on Facebook generically only as "Facebook User."  *See* Ex. 47.  The deletion of this account—and the hundreds of messages within it—should not be overlooked.  Those messages are so central to this case and directly contravene Plaintiff's allegations and sworn testimony that their discovery led to the School Board's pending motion to dismiss this case for fraud on the court.  *See* ECF 496, 497, 530, 531, 538.  Plaintiff's failure to preserve these critical messages (and her claimed amnesia about their existence (*see* ECF 425-4)) cannot be regarded as anything other than intentional.

### 1.      The Spoliation Has Been Prejudicial to the Defense.

Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other." Fed. R. Civ. P. 37(e) adv. committee note to 2015 amendment.  Because "[d]etermining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair[,] . . . [t]he rule leaves judges with discretion to determine how best to assess prejudice in particular cases." *Id.*

To show prejudice from the spoliation, "a party must only come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been." *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez–Toledo*, No. 15-2121 (BJM), 2017 WL 1155743, at *2 (D.P.R. Mar. 27, 2017) (finding prejudice where party "plausibly suggest[ed]" that a discarded laptop "'might have' contained documents or information relevant to [the] action"); *see, e.g.*, *Boxill*, 330 F.R.D. at 236 (finding prejudice where defendants' deletion of their text messages and disposal of their phones left plaintiffs "with an incomplete record of the communications that Defendants had with both each other and third parties"); *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 430 (W.D.N.Y. 2017) (finding prejudice where lost ESI would have resolved disputed factual issue in case and it was "plausible" that would have supported movant's version of events).

The prejudice from the loss of the ESI discussed in Section II(B) above is readily apparent. The loss of Plaintiff's text messages and all the data in the "B.R" Facebook account have handicapped the School Board's ability to refute her testimony regarding her alleged sexual abuse. Indeed, despite the intensive discovery and dozens of depositions taken in this case, there is no evidence, other than Plaintiff's ever-changing stories and what she has told others over the years, that Plaintiff was ever sexually assaulted by anyone during this time. *See* ECF 497.  Given the number of Facebook messages that she traded with C.K. in just two weeks of November 2011, Plaintiff's Facebook and text messages with other students, her phone logs, her Facebook posts

and texts regarding her activities, and her Facebook comments on other students' posts all would have shown in real-time what was actually happening (and what was not) in Plaintiff's life. Plaintiff's "Jenni Taylor" Facebook data was also critical to ascertaining the extent to which Plaintiff faked her own alleged cyberbullying, as well as refuting her *post hoc* explanation for the vile messages she sent to Co.K.[9]  Because an email address is necessary to create a Facebook profile, and because Facebook uses that email address to update the user on account activity, Plaintiff's emails also would have allowed the School Board to establish which fake Facebook profiles Plaintiff used to communicate with RCMS students, with whom she communicated, and determine whether Plaintiff was, indeed, behind the four fake Facebook profiles that were used to catfish C.K. and Co.K. in 2012, as this would be more evidence of Plaintiff faking her own "cyberbullying."  *See supra* Section I(D).

There is good reason to believe that all of the missing ESI would have been favorable to the School Board and the other Defendants.  For example:

- The Facebook messages produced by C.K. contradict virtually everything Plaintiff has said about him and their history.  *See* ECF 497; Ex. 47. ███████████
████████████████████████████████████████
████████████████████████████

- Those Facebook messages also disprove many other aspects of Plaintiff's testimony regarding her dealings with school officials, including her claim that she had complained to school officials before November 21, 2011.  *See* ECF 497, at 14.

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████

- The Facebook messages produced by C.K. also reveal that Plaintiff also considered the third student accused in her November 21, 2011 statement, D.N. (allegations of sexual rumors that were morphed into a sexual assault in this lawsuit), to have been her

_____

[9] Plaintiff now claims that she first used the "Jenni Taylor" account to message C.K. to get him to confess to his sexual assaults.  *See* Ex. 2, Plaintiff Dep. Tr., Vol. II, at 97-98.

boyfriend in October and early November 2011, right before C.K., and that she had also gotten upset with D.N. over the breakup. *See* Ex. 47, at K__210, 247-51.

- Co.K., who communicated with Plaintiff daily while they were dating, also testified that Plaintiff and J.O. remained good friends until sometime in 2012, when J.O. stopped believing Plaintiff's stories. *See* Ex. 10, Co.K. Dep. Tr., at 192-93.

### 2.    The Court Should Mitigate the Prejudice to the Defense.

The "range" of measures a court may deploy to redress prejudice from spoliation of ESI is "quite broad . . . ." Fed. R. Civ. P. 37(e)(1) adv. committee note to 2015 amendment.  It  includes: (1) "forbidding the party that failed to preserve information from putting on certain evidence," (2) "exclud[ing] a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence," and/or (3) "permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument . . . ." *Id.*

The spoliation of Plaintiff's highly-relevant, real-time communications on Facebook, cell phone, and email cannot be cured by additional discovery or monetary sanctions.  As one court has observed, "[t]he content of text messages cannot be replaced simply by eliciting testimony from the [spoliator], and by having [movant] accept that testimony rather than relying on the actual messages to use as they deem fit.  Without the lost text messages, [the movant] is deprived of the opportunity to know 'the precise nature and frequency' of those private communications, which occurred during a critical time period." *Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *4 (N.D. Ill. Mar. 23, 2018) (quoting *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017) (finding prejudice when text messages were lost)).

The prejudice can only be mitigated by an Order that limits Plaintiff's ability to use the missing evidence as either a sword or a shield in her case, and that allows the jury to consider the loss of this evidence as part of its overall determination.

Specifically, the Court should rule that:  (1) Plaintiff may not present any evidence or argument at trial regarding any text messages that she allegedly received or sent; (2) she may not present any evidence or argument regarding the "collage" of Facebook messages or any other messages or posts that she allegedly received, sent, or viewed, except those specific messages and posts that have been produced in discovery; (3) the jury will be instructed that Plaintiff had a duty to retain her Facebook, phone, and email data, that the duty was violated when her Facebook accounts were deleted, her phone was replaced, and her email access was lost, that—if the jury concludes that if these were done in order to make those sources unavailable for this litigation— then it may conclude that the missing data would have disclosed information adverse to Plaintiff and undermined her claims in this case.[10]  *See, e.g.*, *Tyson*, 2022 WL 16949396, at *5 (ordering similar curative measures for loss of plaintiff's phone and photo);  *Edwards v. Junior State of Am. Found.*, No. 4:19-CV-140-SDJ, 2021 WL 1600282, at *9-10 (E.D. Tex. Apr. 23, 2021) (precluding student who alleged he received racist and homophobic Facebook messages yet deleted his Facebook account from presenting evidence of such messages); *Cahill v. Dart*, No. 13-cv-361, 2016 WL 7034139, at *5 (N.D. Ill. Dec. 2, 2016) (jury would be instructed that defendant had a duty to preserve lost video footage, and plaintiff could try to persuade jury loss was intentional).

### III.    CONCLUSION

For all of these reasons, the School Board requests the Court to grant this motion and impose sanctions calibrated to cure the prejudice resulting from the loss of Plaintiff's ESI.

---

[10] Rule 37(e)(2) permits harsher sanctions for cases in which the court can find that "the [spoliating] party acted with intent to deprive another party of the [ESI's] use in the litigation . . . ." Fed. R. Civ. P. 37(e)(2).  While the timing and nature of the deletions here indicates an intent to deprive, some of the information, including Plaintiff's mother's deletion of her Facebook accounts in 2013, was only recently revealed and the School Board has not had the opportunity to question Plaintiff or her mother on this new information.  As such, it is not yet seeking sanctions under Rule 37(e)(2) but reserves the right to request such sanctions on a more developed factual record.

Dated:  November 21, 2023        Respectfully submitted,

        By: */s/ Sona Rewari*
            Sona Rewari (VSB No. 47327)
            Ryan M. Bates (VSB No. 74661)
            Scott W. Burton (VSB No. 90601)
            HUNTON ANDREWS KURTH LLP
            2200 Pennsylvania Avenue, NW
            Washington, DC 20037
            Telephone: (202) 955-1500
            Facsimile: (202) 778-2201
            srewari@HuntonAK.com
            rbates@HuntonAK.com
            burtons@HuntonAK.com

        *Counsel for Defendant Fairfax County School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2023, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

        By:  */s/ Sona Rewari*
            Sona Rewari (VSB No. 47327)