**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00917-RDA-WEF |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF**
**DEFENDANT FAIRFAX COUNTY SCHOOL BOARD'S**
**MOTION TO DISMISS FOR FRAUD ON THE COURT**

Sona Rewari (VSB No. 47327)
Ryan M. Bates (VSB No. 74661)
Scott W. Burton (VSB No. 90601)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
rbates@HuntonAK.com
burtons@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

December 8, 2023

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     ARGUMENT ...................................................................................................... 2

     A.      Plaintiff Has Perpetrated Fraud on the Court.......................................... 2

          1.      The Facebook Messages Are Authentic and the Evidence that Plaintiff Is "Facebook user" Is Overwhelming ........................... 4

          2.      Plaintiff Presents No Evidence to Dispute the Messages' Authenticity.................................................................................. 12

     B.      Plaintiff's Age in 2011 Does Not Negate Her Fraud on the Court ...................... 14

     C.      Plaintiff Fails to Rebut the Evidence of Her Fraud................................. 15

          1.      Plaintiff's Pleadings Are Evidence of Her Fraud ..................... 16

          2.      Plaintiff's Statements to Her Experts Are Evidence of Her Fraud .......... 18

          3.      Plaintiff's Lies to the School Board, the Police, and OCR Are Evidence of Her Fraud. .............................................................. 19

     D.      The Seventh Amendment Is No Bar to Dismissal of this Case ............................ 20

III.    CONCLUSION.................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Allen v. Langley*,
  2023 WL 2588559 (E.D. Va. Mar 21, 2023) ........................................................................16

*Aoude v. Mobil Corp.*,
  892 F.2d 1115 (1st Cir. 1989) ...............................................................................................19

*Call v. Harrison*,
  No. 5:12CV00008, 2012 WL 5993732 (W.D. Va. Nov. 30, 2012) ........................................18

*Causey v. Balog*,
  162 F.3d 795 (4th Cir. 1998) .................................................................................................12

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ...........................................................................................................17, 20

*Da-Silva v. Smith's Food & Drug Ctrs., Inc.*,
  No. 2:12-CV-00595-GMN, 2013 WL 2558302 (D. Nev. June 8, 2013) ...............................18

*Devil's Advoc., LLC v. Zurich Am. Ins. Co.*,
  No. 1:13-CV-1246, 2014 WL 5161197 (E.D. Va. Oct. 10, 2014) .........................................12

*For Life Prod., LLC v. Virox Techs. Inc.*,
  No. 1:20-CV-00016, 2022 WL 1670097 (W.D. Va. May 25, 2022) ........................................2

*Holland v. United States*,
  348 U.S. 121 (1954) .................................................................................................................3

*Hull v. Mun. of San Juan*,
  356 F.3d 98 (1st Cir. 2004) ..............................................................................................3, 18

*Jennings v. Univ. of N.C.*,
  482 F.3d 686 (4th Cir. 2007) .................................................................................................14

*Jimenez v. DaimlerChrysler Corp.*,
  269 F.3d 439 (4th Cir. 2001) ...................................................................................................2

*Kempner v. Churchill*,
  75 U.S. 362 (1869) ...................................................................................................................3

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) .................................................................................................................14

*Olajuwon v. Ofogh*,
    2023 WL 3026710 (E.D. Va. Apr. 20, 2023) ........................................................16

*Pope v. Fed. Exp. Corp.*,
    974 F. 2d 982 (8th Cir. 1992) ...........................................................................20

*Rossbach v. Montefiore Med. Ctr.*,
    81 F.4th 124 (2d Cir. 2023) .............................................................................20

*Sprester v. Jones Motor Co.*,
    No. 5:05cv00021, 2006 WL 893642 (W. D. Va. Apr. 4, 2006) ...........................18

*Tesar v. Potter*,
    No. CIVA 9:05-00956 SB, 2007 WL 2783386 (D.S.C. Sept. 21, 2007)................18

*Thompson v. Bowie*,
    71 U.S. 463 (1866)............................................................................................3

*U.S. v. MacDonald*,
    No. 97-7297, 1998 WL 637184 (4th Cir. 1998) (per curiam) ...................................3

*United States v. Barlow*,
    568 F.3d 215 (5th Cir. 2015) ............................................................................12

*United States v. Barnes*,
    803 F.3d 209 (5th Cir. 2009) ............................................................................11

*United States v. Hassan*,
    742 F.3d 104 (4th Cir. 2014) .............................................................................4

*United States v. Martin*,
    523 F.3d 281 (4th Cir. 2008) .............................................................................3

*United States v. Shaffer*,
    11 F.3d 450 (4th Cir. 1993) ...............................................................16, 17, 20

*United States v. Siddiqui*,
    235 F.3d 1318 (11th Cir. 2000) .........................................................................12

*United States v. Simpson*,
    152 F.3d 1241 (10th Cir. 1998) .........................................................................12

*United States v. Tank*,
    200 F.3d 627 (9th Cir. 2000) ............................................................................12

*Yanez v. America West Airlines*,
    No. Civ.A. MJG–03–1717, 2004 WL 2434725 (D. Md. Oct. 13, 2004)................18

## **Statutes**

Va. Code § 18.2-63 ...........................................................................................................15

## **Other Authorities**

Federal Rule of Evidence 901(a) .........................................................................................4

Federal Rule of Evidence 901(b) ......................................................................................4, 5

Federal Rule of Evidence 902(7) ......................................................................................5, 6

Federal Rule of Evidence 801(d)(2)(A) ..............................................................................4

Weinstein's Federal Evid. § 900.07[3][c][i] ........................................................................5

# I.      <u>INTRODUCTION</u>

The fraud that Plaintiff has perpetrated—including falsely accusing a schoolmate of repeatedly raping her—is extraordinary.   And the evidence of this fraud is both clear and convincing.

While the Opposition questions the authenticity of the 250 pages of Facebook messages between Plaintiff and the accused student, C.K., it carefully avoids directly stating that Plaintiff did not send these messages—a non-denial denial.  Not only that, but Plaintiff also provides no evidence to support her authenticity argument.  Whether Plaintiff was the "Facebook user" in these messages is the determinative issue.  Yet, there is no evidentiary dispute or credibility contest: ***all*** the evidence before the Court shows that Plaintiff was the sender.  Indeed, for every rendezvous arranged in these messages, it was ***Plaintiff*** who showed up.

Plaintiff argues that a jury should decide whether she is the sender.  But the role of a jury is not to decide whether the justice system has been defrauded.  That is the province of the Court.  Plaintiff makes no attempt to address the cases cited by the School Board where ***courts***—not juries—summarily dismissed cases where the fraud was much less comprehensive than here.

Plaintiff next resorts to claiming the messages "establish (or reveal) nothing."  Opp'n at 16.  This is irrational hubris.  Had these Facebook messages seen the light of day at any time in the past 12 years—instead of being deleted by Plaintiff and/or her mother[1]—this case never would have been brought by any lawyer and, if it was, it would have been swiftly thrown out of court.

Plaintiff also scolds the School Board for quoting the contents of these Facebook messages in its brief.  *See, e.g., id.* at 1-2, 16-17.  Plaintiff appears to expect the Court not to read the

---

[1] The School Board's pending Motion for Spoliation Sanctions lays out how all of Plaintiff's ESI, including all of her Facebook data and the email account that she used in middle school which would have been necessary to create her Facebook accounts, was deleted or lost by Plaintiff or her mother, while they were under a duty to preserve this evidence.  ECF 547.

messages, and just blindly accept her claim that C.K. "would make" her send him messages to make her appear "like his girlfriend." ECF 425-4. But the contents of these messages—especially when juxtaposed with her testimony—disprove such a brazenly implausible tale. The School Board brought this motion only after attempts to handle it privately failed.[2] Airing these messages in a publicly filed brief may be embarrassing to Plaintiff, but the greater embarrassment would be to the justice system in allowing this case to continue to a six-week trial where those very messages will be thoroughly ventilated in open court.

Without a doubt, Plaintiff's fraud goes to the very foundation of this case. This scheme began on the first day that she met with school employees in November 2011. The messages show that those factual allegations and her sworn testimony about C.K.'s conduct in November 2011— including raping her multiple times—were false. If there were any remotely plausible explanation by which Plaintiff could have sent these Facebook messages and not be guilty of a massive fraud, it surely would be in Plaintiff's Opposition. It's not. And had Plaintiff not been the one behind these messages, she would have said so directly. She didn't. Allowing Plaintiff to practice her fraud before a jury would make a mockery of a system whose objective is getting to the truth.

## II.   ARGUMENT

### A.   Plaintiff Has Perpetrated Fraud on the Court.

The evidence of fraud by Plaintiff is clear and convincing.[3] This "intermediate" standard of proof is met when the evidence proves "the facts at issue to be 'highly probable.'" *Jimenez v.*

---

[2] The School Board's counsel privately urged Plaintiff's new legal team, and the lawyers who were her counsel at the time of this revelation, to explain how the messages can be reconciled with Plaintiff's allegations and testimony. *See* Ex. 1, Letter to A. Anderson *et al.*, dated September 26, 2023.

[3] Contrary to Plaintiff's assertion (Opp'n at 5-6), the Fourth Circuit has not determined the standard of proof to be used in exercising the court's inherent powers to sanction fraud on the court or other bad faith litigation conduct that occurs prior to a final judgment. *See, e.g., For Life Prod., LLC v. Virox Techs. Inc.,* No. 1:20-CV-00016, 2022 WL 1670097, at *8 (W.D. Va. May 25, 2022)

*DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001).  No confession or even testimonial evidence is required, for evidence in a fraud case "is almost always circumstantial."  *Kempner v. Churchill*, 75 U.S. 362, 369 (1869).  Indeed, "it is seldom that a fraud or conspiracy to cheat can be proved in any other way than by circumstantial evidence . . . ."  *Thompson v. Bowie*, 71 U.S. 463, 473 (1866).  Circumstantial evidence is no less valuable than direct evidence and "produces conviction in the mind often of more force than direct testimony."  *Kempner*, 75 U.S. at 369.  Circumstantial evidence alone can support a determination that requires proof beyond a reasonable doubt.  *E.g., Holland v. United States,* 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence."); *United States v. Martin*, 523 F.3d 281, 289 (4th Cir. 2008) ("As we have observed repeatedly, 'circumstantial evidence is not inherently less valuable or less probative than direct evidence . . . .'").

Here, the evidence clearly and convincingly shows that Plaintiff has perpetrated a scheme to defraud the justice system.  In fact, Plaintiff's Opposition does not refute that the contents of the Facebook messages are diametrically opposite to:

- her sworn deposition testimony and interrogatory answers regarding her relationship with C.K. and the events central to this case;

- the allegations made in the Second Amended Complaint (and its prior iterations);

- the information given to the experts that she intends to testify at trial and the defense experts whose examinations were conducted pursuant to a court Order;

---

("The Fourth Circuit has not determined the precise burden of proof in a motion for sanctions" for fraud on the court but noting that district courts have found the "clear and convincing" standard to be "preferred").  The unpublished Fourth Circuit case cited by Plaintiff (Opp'n at 5, 8, 18), like most of the cases cited in her Opposition, concerns a motion under Fed. R. Civ. P. 60(b)(3) to set aside a judgment due to fraud on the court.  *See U.S. v. MacDonald*, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. 1998) (per curiam) ("It is settled that the clear and convincing standard applies in Rule 60(b)(3) cases alleging fraud upon the court.").  "Finality of longstanding judgments *is a different matter* than dismissal of a current complaint."  *Hull v. Mun. of San Juan*, 356 F.3d 98, 102 (1st Cir. 2004) (emphasis added).

- her statements to school officials, the Fairfax County Police Department ("FCPD"), and U.S. Department of Education's Office of Civil Rights ("OCR").

In fact, the **only** apparent dispute with regard to the Facebook messages is whether they are what they are purported to be—messages between Plaintiff and C.K. from November 2011.  But, as explained below, the evidence before the Court readily shows that it is "highly probable" that the Facebook messages are, indeed, messages between C.K. and Plaintiff.

       1.       **The Facebook Messages Are Authentic and the Evidence that Plaintiff Is "Facebook User" Is Overwhelming**

Plaintiff argues that "there is no competent evidence . . . that the 'Facebook messages' upon which FCSB's Motion relies are authentic and/or that the 'Facebook user' taking part in those messages is Plaintiff."  Opp'n at 3-4.  That argument blinks reality.  There are no legitimate grounds to question the authenticity of the Facebook messages produced by C.K., and there is a substantial amount of credible evidence that Plaintiff is "Facebook user."[4]

"[T]he burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required."  *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014).  Federal Rule of Evidence 901(a) explains what this entails:  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Rule 901(b) provides a non-exhaustive list of examples that will suffice, and includes "[t]estimony of a witness with knowledge."  Fed. R. Evid. 901(b)(1).  This example "contemplates a broad spectrum" of circumstances under which this minimal burden may be satisfied.  *Id.*, advisory committee's note.

---

[4] Plaintiff also dismisses the Facebook messages as "hearsay," Opp'n at 16, but messages sent by Plaintiff constitute admissions of a party-opponent and thus are non-hearsay.  Fed. R. Evid. 801(d)(2)(A).

Rule 901(b)'s non-exhaustive list also notes that evidence may be authenticated by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b)(4).  The commentary to Rule 901(b)(4) explains "[t]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety," including authenticating an exhibit by showing that it came from a "particular person by virtue of its disclosing knowledge of facts known peculiarly to him," or by showing similarities in "language patterns" between the exhibit and a duly authenticated one.  Fed. R. Evid. 901(b)(4) advisory committee's note.

Rule 902(7) separately provides that evidence may be self-authenticated by "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control, or origin."  As one treatise has noted, "[u]nder Rule 902(7), labels or tags affixed in the course of business require no authentication. Business e-mails often contain information showing the origin of the transmission and identifying the employer-company. The identification marker alone may be sufficient to authenticate an e-mail under Rule 902(7)." WEINSTEIN'S FEDERAL EVID. § 900.07[3][c][i].

There is overwhelming evidence that the Facebook messages are what the School Board purports them to be—messages between C.K. and Plaintiff.

<u>First</u>, the messages were produced by C.K., a party who can readily identify them as messages with Plaintiff.  How and when he located the messages was already explained in the letter from C.K.'s counsel three months ago which stated:

> C.K. testified at his deposition concerning his efforts to obtain information from his Facebook account. After his deposition we learned that additional information could be accessed using a web-browser. On August 8, 2023, with the assistance of counsel from FCPS, C.K. was able to download the additional Facebook data that was produced in his supplemental discovery productions.

> Below is a link from Facebook that describes the process that was used to obtain the Facebook materials produced in supplemental discovery response:
>
> https://www.facebook.com/help/212802592074644?helpref=faq_content

ECF 568-2.  C.K. offered to reopen his deposition to address any questions regarding this document production, *id.*, but Plaintiff opted not to take him up on that offer.

Though Plaintiff speculates that the Facebook messages "may have been forged," the same speculation could be made about any documentary evidence.  Opp'n at 4.  And she offers no evidence—credible or otherwise—to indicate that ***these messages*** have been doctored.  Indeed, the messages bear Facebook's "inscriptions, signs, tags, or labels" and indicate "ownership, control, or origin" of the messages.  Fed. R. Evid. 902(7).  The bottom of the printed chats includes a legend, an example of which is shown below, identifying the account user who generated the collection request (C.K.), the date the collection was made, and the dates of the data captured in the search.  *See* Ex. 2 (unredacted copy of messages at ECF 497-1 & -2), at K_255.[5]

Generated by ██C.K.██ on Tuesday, August 8, 2023 at 4:20 PM UTC-04:00
Contains data from September 1, 2011 at 12:00 AM to March 31, 2012 at 11:59 PM

Furthermore, each individual message within the chats is stamped with C.K's Facebook user name or the deleted account ("Facebook user") with the date and time (down to the second) that each message was sent.  As shown below, the top of the chat includes a hyperlink to Facebook's landing

---

[5] Exhibit 2 is the unredacted messages between C.K. and "Facebook user" (redacted version at 497-1 and 497-2).  Exhibit 3 is the unredacted messages between C.K. and J.O. (redacted version at 497-12).  Exhibit 4 is the unredacted messages between C.K. and a second "Facebook user" (redacted version at 497-11).

page, and also includes C.K.'s name and a hyperlink directly to his Facebook page, *id.* at K_7. [6]



    Second, the messages make it clear that Plaintiff is the "Facebook user" chatting with C.K., as both parties use her real name ***six times*** in the chat.  On this point, Plaintiff misleads the Court by stating that "the account that is now labeled 'Facebook user'" never identified Plaintiff by name . . . ."  Opp'n at 4 n.6.  This is just not correct.  As referenced in the opening brief (ECF 497, n. 7), ***both*** "Facebook user" and C.K. use Plaintiff's name to refer to "Facebook user," and "Facebook user" responds each time C.K. refers to her by Plaintiff's first name:

- After C.K. initially does not recognize the "Facebook user" sender, he quickly realizes it is Plaintiff and calls her by her real first name, asking: "what the fuck is wrong with you <span style="background:black">**B.**</span> ???"   ECF 497-2, at K_252.   To which she responds, "everything."  *Id.*

- Minutes later, C.K. again uses her first name:  "what wrong <span style="background:black">**B.**</span> i want to know," to which she responds "what do u mean."  *Id.*

- C.K. sends a string of messages:  "call me babe," "call me," "<span style="background:black">**B.**</span>," "can you hang out now," and "ANSWER THE FONE."  She responds:  "Hehe u want a pic ? ♥" *Id.* at K_229-30.

- "Facebook user" then recounts a story as to what happened in school that day: "Today during eight pd. <span style="background:black">**J.**</span> [J.O] said <span style="background:black">**B.**</span> [B.R.] <span style="background:black">**C.**</span> [C.K.] doesn't actually likes u.. She's ughh"  *Id.* at K_171.

- About a week later, C.K. asks, "what did <span style="background:black">**J.**</span> [J.O.] say to you."  Plaintiff responds:  "Okay ♥ baby and she said <span style="background:black">**B.**</span> ur desperate bitch ur a slut ur a whore.. Ur not all that ur not pretty <span style="background:black">**C.**</span> doesn't love u :/"  *Id.* at K_165.

---

[6] Because archived messages are collected and sent by Facebook upon a user-generated request, C.K. could also demonstrate the provenance of these messages in front of the Court by just logging into his Facebook account and re-submitting his request to Facebook.

- Trying to contact her another time, C.K. says "[B.] answer me before i regret what im about to do!!!!" She responds, "baby." He then asks, "can u hang out," and she responds, "im out with my bro but i can l8 [later]." ECF 497-1, at K_111.

<u>Third</u>, the content of the messages include many other indicia, besides Plaintiff's name, that identify Plaintiff as the person messaging C.K. For example:

- "Facebook user" gives C.K. her locker number—498—in conjunction with her request to meet at her locker. ECF 497-2, at K_166. The number matches Plaintiff's locker number at this time. *See* Ex. 5, B.R. Student Record. The messages indicate that the C.K. and "Facebook user" did meet at her locker, as planned. ECF 497-2, at K_161, 165-166.

- "Facebook user" and C.K. discuss his plans to skateboard to "[redacted]." *Id.*, at K_200. Plaintiff lived in [redacted]. *See* ECF 551-9 at 8 (police report noting location of reported incident), ECF 551-12 at 2 (chronology of events authored by Mrs. R.); ECF 551-13 at 14 (Tr. of Det. Chambers' Interview of Plaintiff).

- "Facebook user" discusses her friend "[A.]." ECF 497-2, at K_245, 243, 228, 223, 219-220, 215, 214, 26. Plaintiff had a friend named [A.]. Ex. 6, E-mail from Plaintiff dated Feb. 6, 2011.

- "Facebook user" talks about her friend "[O.]" ECF 497-1, at K_26, 80, 83-85; ECF 497-2, at 198, 171. One of Plaintiff's close friends at the time was named [O.]. *Id.*; Ex. 7, Plaintiff's Answer to Interrog. No. 2.

- "Facebook user" discusses J.O. ECF 497-1, at K_7, 15, 17-18, 34, 39, 171, 118-20, 128, 130; ECF 497-2, at 136, 160-161, 165, 171, 174, 180, 202, 206-07, 246, 249. Plaintiff's other close friend at the time was J.O. Ex. 7, Plaintiff's Answer to Interrog. No. 2.

- "Facebook user" references being bothered at her locker by a "[P.]." ECF 497-2, at K_148, 162. Plaintiff testified [redacted]. Ex. 8, Pltf.'s Dep. Tr., Vol. II, at 409-12.

- "Facebook user" discusses her mother, father, and a brother. ECF 497-1, at K_33, 39, 47, 51, 53, 57, 59-60, 109; ECF 497-2, at 137, 159, 197, 216, 219, 229, 232, 241. Plaintiff [redacted]. Ex. 9, Pltf.'s Dep. Tr., Vol. I., at 308.

- "Facebook user" tells C.K. "I work for my dads busssniess . . . ." ECF 497-2, at K_168. Plaintiff's [redacted]

████████████████████████████.  ECF 551-13 at 50:14-18 (Tr. of Chambers Interview of Plaintiff).

Fourth, the events, dates, and times in the messages parallel the events, dates, and times to which Plaintiff has testified (though the messages reveal that these events happened much differently than how Plaintiff testified).  For example:

- On November 5, 2011, "Facebook user" discusses having been with J.O. the day before.  K__249.  Plaintiff testified that she went to J.O.'s birthday party around November 4, 2011.  Ex. 8, Pltf.'s Dep. Tr., Vol. II, at 87.

- On November 5, 2011, "Facebook user" discusses a breakup with "██ D. ██" that occurred on November 4, 2011.  ECF 497-2, at K_250, 253.  ████████████████████ ████████████████████████████████████  ECF 551-12.

- "Facebook user" and C.K. begin "dating" on November 5, 2011, and continue to date until November 20, 2011.  ECF 497-2, at K_245-46, K_7.  ██ D.N. ██'s statement to the school on November 21, 2011, discusses that C.K. and Plaintiff started "going out" with each other after ██ D.N. ██ and Plaintiff "broke up."  Ex. 10, D.N. Statement dated Nov. 21, 2011.

- "Facebook user" tells C.K. that a boy named "██ D. ██" "spreaded rumours that werent true . . . like i gave him a bj."  ECF 497-2, at K_150.  The Second Amended Complaint ("SAC") and Plaintiff's statement to school officials alleges that a student with the same name "spread[] false rumors that Plaintiff performed oral sex on [him]."   ECF 155, ¶ 105 & Ex. O thereto.

- On November 9, 2011, "Facebook user" offers C.K. money to help him pay "██ D. ██" back for a longboard that C.K. has lost.  ECF 497-2, at K_167-174.  On November 14, 2011, they discuss the fact that "Facebook user" has given C.K. some money.  ECF 497-1, at K_65.  Plaintiff testified that she gave C.K. $50 to pay for a longboard belonging to "██ D. ██."  Ex. 8, Pltf.'s Dep. Tr., Vol. II, at 49-52.

- On November 13, 2011, "Facebook user" directs C.K. to come straight to her neighborhood after school on November 14, 2011, and tells him that she is going to tell her mother that she is staying late at school.  ECF 497-1, at K_106-09.  The cell phone log that Plaintiff's mother gave to school officials in November 2011 shows that on November 14, 2011, there were seven calls placed from Plaintiff's cell phone to C.K.'s cell phone right after school dismissal (between 2:57 pm and 3:21 pm), and one call from Plaintiff's home to her cell phone at 4:25 p.m.  ECF 551-6.  At 4:29 pm, C.K. asks "Facebook user" "did ur mom see me?" who responds "no lolol."  ECF 497-1, at K_73.  "Facebook user" then tells C.K.:  "today was really amazingg ♥" and marvels about their sexual activity.  Id., at K_72.

- On November 14, 2011, "Facebook user" tells C.K. that her mother went through her cell phone records and saw that "Facebook user" and C.K. had talked a "long time." *Id.*, at K_59.   The number most frequently called and the longest phone call on Plaintiff's phone log that day is C.K.'s.   ECF 551-6.

- "Facebook user" tells C.K. on November 14, 2011 that "someone left me a horrible message."   *Id.*, at K_58.   Plaintiff's SAC alleges that "[o]n or about November 14, 2011, C.K. called Plaintiff's cellular phone and left a sexually explicit and threatening voicemail."   ECF 155, ¶ 135.

- "Facebook user" tells C.K. that her mother wants to report the voicemail to the school. *Id.*, at K_57-58.   Plaintiff's mother reported to the school that Plaintiff had received an offensive voicemail on November 14, 2011.   ECF 155, ¶¶ 137-38 & Ex. O.

- Facebook user" and C.K. make plans to meet on November 16, 2011.   ECF-497-1, at K_29, 31.   On the evening of November 16, 2011, "Facebook user" asks C.K. twice whether he liked his "bj" and "did i do good today ;)"   *Id.*, at K_23, 25. ███████████ ████████████████████████████████████████████████

<u>Fifth</u>, other contemporaneous records, whose authenticity Plaintiff does not question, corroborate the fact that C.K. was known to be dating Plaintiff during this very time.   For example:

- ███ **D.N.** ███'s November 21, 2011, statement to the school discusses that C.K. and Plaintiff started "going out" with each other after ███ **D.N.** ███ and Plaintiff "broke up." Ex. 10.

- On November 9, 2011, another now-deleted Facebook account asks C.K.: "so your dating ██ **B.** ██ now …?"   ECF 497-11, at K_275.   He responds:  ". . . jesus christ u are the 100th person who [h]as asked."   *Id.*, at K_274.

- On November 19, 2011, J.O. asks C.K.: "Dude are you still dating ██ **B.** ██?   She's like freaking out on me."   ECF 497-12, at K_438.   A few minutes later, J.O. asks: "No offense. But why are you dating her ? O.o."   C.K. responds:  "I liked her but now she is just pissin me off."   *Id.* at K_436.

- The same day, J.O. asks C.K. why he does not just tell Plaintiff that he no longer likes her, and C.K. responds that Plaintiff "is goin to cry" and he does not want that.   *Id.*   The next day, November 20, 2011, at 8:03:29 p.m., C.K. tells "Facebook user" that he thinks they should just be friends.   ECF 497-1, at K_7.   ***One minute later, at 8:04:46 p.m., C.K. announces to J.O. that he has messaged Plaintiff on her "faake account" and "said it."***   ECF 497-11, at K_436.

<u>Sixth,</u>  the Facebook messages are consistent with C.K.'s testimony, though he recalled that the messages were text messages and not Facebook chats.[7]  In his deposition, C.K. testified:



Ex. 11, C.K. Dep. Tr., at 76-78 (emphases added).

Far less evidence than the foregoing has been found to be adequate to authenticate emails, chats, and text messages.  *See, e.g., United States v. Barnes,* 803 F.3d 209, 215 (5th Cir. 2009)

---

[7] In the Facebook chat, C.K. and "Facebook user" also discuss that they have also been communicating via text message.  *E.g.*, K_59.  Plaintiff also recalls text messaging C.K. frequently.  *See, e.g.,* ECF 425-4 ("He would make me text him all the time so that I would look like his girlfriend….").

(Facebook messages by defendant were sufficiently authenticated by testimony from recipient of messages that she had seen defendant use Facebook, recognized his account, and the messages "matched [his] manner of communicating"; text messages were authenticated by witness's testimony that defendant's phone had texting capacity, she had spoken to defendant on the phone number that was source of texts, and the contexts of texts indicated they were from defendant); *United States v. Barlow,* 568 F.3d 215, 220 (5th Cir. 2015) (testimony by witness who participated in online chats with defendant stating that exhibit fairly and fully reproduces the chats was enough to authenticate print-outs of chat); *United States v. Siddiqui,* 235 F.3d 1318, 1322–23 (11th Cir. 2000) (e-mail adequately authenticated by circumstantial evidence, including context of email which showed familiarity with facts to which defendant testified, use of defendant's nickname, and testimony by witnesses that defendant spoke to them about the subjects contained in the e-mail); *United States v. Tank,* 200 F.3d 627, 630-31 (9th Cir. 2000) (evidence authenticating chat messages included testimony by co-conspirators that defendant was the person who showed up when a meeting was arranged with the person chatting in the messages); *United States v. Simpson,* 152 F.3d 1241, 1249-50 (10th Cir. 1998) (chat log authenticated by identifying information given by user in chat and corroborating evidence found in defendant's home near his computer).

### 2. Plaintiff Presents No Evidence to Dispute the Messages' Authenticity.

On the opposite side of the ledger, Plaintiff has offered no evidence to show that these messages are not from her. *See Devil's Advoc., LLC v. Zurich Am. Ins. Co.*, No. 1:13-CV-1246, 2014 WL 5161197, at *2 (E.D. Va. Oct. 10, 2014) (argument in brief "fail[ed] to create a factual dispute on this issue because their assertion is unsupported by record evidence"); *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (affirming grant of summary judgment because plaintiff's "conclusory statements, without specific evidentiary support," were insufficient to create a genuine issue of fact). Plaintiff could have provided a declaration attesting that she did not send the

messages. She chose not to do so. Faced with 250 pages of evidence showing that her core allegations were concocted and a lengthy brief charging her with fraud and perjury, **Plaintiff** herself stayed silent and relied solely on arguments of **counsel**. That, itself, is very telling.

Equally telling is the fact that her Opposition carefully avoids making any direct denial that she is the "Facebook user." Instead, her counsel points the Court to their client's prior assertion, made in a *pro se* letter to the Court. Opp'n at 4 ("Plaintiff *has* communicated directly to the Court that . . . ."); Opp'n at 17 ("Plaintiff *has* denied that these messages are from her . . . ."); Opp'n at 23 ("Plaintiff *has* stated that she has no recollection of these messages . . . .") (emphases added). Yet, that letter provides self-contradictory explanations without any detail, stating; that Plaintiff has "no recollection of **these particular messages**" and admits that she **did** send messages **like these** to C.K.: "He would make me **text him all the time** so that **I would look like his girlfriend**….I went along to placate him." ECF 425-4, at 8. But more to the point, if Plaintiff is denying that she is "Facebook user," then why not say so now? Why tiptoe around the million-dollar question at the center of this motion?

This non-denial "denial" is highly irregular and should not go unnoticed. It is no accident that Plaintiff relies exclusively on the arguments of counsel to question authenticity, and yet, those arguments are carefully worded to avoid assuring the Court that the messages are, indeed, not from Plaintiff. And for good reason: there is no good-faith argument by which it can be maintained that the sender of those messages was someone other than Plaintiff.

At bottom, Plaintiff has not raised any legitimate dispute about whether she is the "Facebook user" behind these messages. But if there were any serious doubt about that, then it

should be settled by a short evidentiary hearing, not a six-week jury trial at taxpayer expense.[8]

### B.   Plaintiff's Age in 2011 Does Not Negate Her Fraud on the Court.

Plaintiff argues that a twelve-year-old cannot legally consent to sexual intercourse under Virginia's criminal code.  Opp'n at 1, 17.  But that is a non-sequitur.  This is not a criminal proceeding.  This is a civil case in which Plaintiff must prove, as elements of her Title IX claim against the School Board, that she was subjected to "harassment" based on her sex and that the harassment was "sufficiently severe or pervasive as to create a hostile (or abusive) [educational] environment."  *Jennings v. Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007).  Conduct that is welcomed, invited, and in which the plaintiff participates enthusiastically, is by definition, not "harassment."  *See, e.g., Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome.").  What Virginia law considers to be the age at which one may give consent to sexual intercourse has no bearing on whether Plaintiff gave false testimony as a 24-year-old woman about what happened

---

[8] Plaintiff claims that "the evidence in the record is that students at Rachel Carson Middle School in this time period would create fake Facebook accounts and pretend to be others."  Opp'n, at 4, n.6.  Yet, other than Plaintiff's own creation of the fake "Jenni Taylor" account (which is undisputed and thoroughly discussed in the School Board's opening brief), there is no evidence of this.  Indeed, even the one example Plaintiff offers does not support her assertion. Plaintiff cites two student statements—one from J.O., in which J.O. tells school administration that another student claimed she "was hacking onto [Plaintiff's] Facebook and saying bad things about her." *See* ECF 586-1 (nonconfidential version).  J.O. then relays that people were asking if J.O and another person "had said bad things about [Plaintiff] when we didn't."  *Id.*  The second statement is from another student who reported "getting messages from someone on [Plaintiff's] account. ECF 586-2 (nonconfidential version).  This student "assumed it was [J.O.]" but later found out that "she didn't."  *Id.*  At best, these statements show that student saw or heard that ***Plaintiff's*** Facebook account was saying "bad things" about Plaintiff.  They do not show that ***other students*** would "create fake Facebook accounts."

Indeed, the only one shown to be creating fake Facebook accounts is Plaintiff.  As outlined in the School Board's Brief in Support of Spoliation Sanctions (ECF 551), the evidence shows that Plaintiff had a penchant for creating Facebook accounts to message boyfriends and ex-boyfriends.  She admits using "Jenni Taylor" to message her then-boyfriend, and her ex-boyfriends have supplied evidence of four other fake Facebook accounts that were used around the same time to message them and for which all circumstantial evidence points to Plaintiff.

-14-

between her and C.K. in 2011. Her legal argument about the age of consent in Virginia does not rationalize or excuse a 24-year-old college graduate—unafflicted by any mental condition or disorder that causes her to hallucinate or create false memories—from providing false testimony or engaging in all the other falsehoods identified in the School Board's opening brief.

Not surprisingly, Plaintiff has not cited a single case that supports her proposition that sexual activity between two students is automatically "harassment" just because they are both underage minors. She makes no effort to complete the syllogism of this fuzzy logic. And it's no wonder why: Plaintiff's and C.K.'s ages alone do nothing to show that Plaintiff was subjected to actionable harassment.[9]

Plaintiff's age in 2011 does not excuse her falsehoods in 2011 and 2012. There is no statute that deems a twelve-year-old too young to know the difference between a truth and a lie. And what Plaintiff told school officials, the FCPD, and OCR about C.K. were flat-out lies.

### C.  Plaintiff Fails to Rebut the Evidence of Her Fraud.

Not only does Plaintiff fail to deny that the Facebook messages are from her, but she makes no attempt to square her sworn testimony with the messages. Her brief fails to rebut the six pages of the School Board's Brief that detailed the numerous, direct, and material contradictions between Plaintiff's testimony and her Facebook messages. It also fails to address the direct and material contradictions between Plaintiff's interrogatory answers and her Facebook messages. That evidence, thus, is wholly uncontroverted. Indeed, once the Court determines that these messages are from her—as all the evidence shows—then her fraud has been proven. Plaintiff's selective response to other portions of the School Board's Brief does nothing to forestall that conclusion.

---

[9] In making this argument, Plaintiff ignores the fact under the statute she cites—Va. Code § 18.2-63—a thirteen-year-old like C.K. also cannot consent to sexual intercourse, even with a twelve-year-old. In other words, it would be a crime for **both** parties to have sexual intercourse.

### 1.    Plaintiff's Pleadings Are Evidence of Her Fraud.

Plaintiff argues that the SAC and two prior iterations of her lawsuit filed in this Court do not support a finding of fraud because they were not filed as verified pleadings and "[a]t most . . . are statements of counsel not chargeable to his or her client, and cannot serve as 'admissions' of the party." Opp'n at 9-10.  The two cases cited by Plaintiff are inapposite.  *Olajuwon* involved a *pro se p*laintiff who apparently attempted to respond to a motion for summary judgment by citing an unsworn complaint, which the court held was insufficient.  *Olajuwon v. Ofogh*, 2023 WL 3026710, at *2  (E.D. Va. Apr. 20, 2023).  In *Allen*, also involving a *pro se* plaintiff, the court similarly found that an unsworn complaint did not constitute admissible evidence when opposing a motion for summary judgment.  *Allen v. Langley*, 2023 WL 2588559, at *3 (E.D. Va. Mar 21, 2023).  Moreover, the existence of Federal Rule 11 belies Plaintiff's proposition that false pleadings cannot be evidence of a party's fraud on the court.

It is readily obvious that pleadings submitted through a party's lawyers can show a fraud on the court, and indeed, one of the factors to be considered on this motion is "the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney." *United States v. Shaffer*, 11 F.3d 450, 362-63 (4th Cir. 1993).  The fraud on the court finding in *Shaffer*—the only case from the School Board's Brief that Plaintiff mentions in her Opposition—centered on attorneys who violated their duty of candor to the court where they had learned that a material witness in their case had falsified his credentials and yet "continued to litigate the matter unabated." *Id.* at 459.  As the Fourth Circuit observed, "[o]ur adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice . . . . [L]awyers, who serve as officers of the court, have the first line task of assuring the integrity of the process." *Id.* at 457.  "[C]lever devices to divert the search" or "cover up that which is necessary for justice in the end" cannot be afforded

any harbor, and a lawyer's duties to maintain client confidences and advocate zealously "are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit." *Id.* at 457-58.

*Chambers*, the seminal Supreme Court case that confirmed the "inherent authority" of the courts to redress frauds on the court, also involved a scheme that was perpetrated by a party with the aid of pleadings that were filed by his attorney and whose falsity "did not become apparent until after a trial on the merits." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991). The *Chambers* court recognized that "the District Court could have employed Rule 11 to sanction [plaintiff] for filing 'false and frivolous pleadings' and that some of [his] other conduct might have been reached through other Rules." *Id.* at 50 (citation omitted). But addressing each individual paper would not have been adequate to the task for plaintiff's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court." *Id.* at 50-51. The inherent power, the Court explained, is "particularly suited to such circumstances." *Id.* at 51.

Plaintiff's arguments would have the Court pay no attention to the forest and just consider each tree individually. No one is claiming that Plaintiff's complaint was fraudulent because she added "additional facts" in an amended pleading. Opp'n at 10. But the School Board *is* arguing that the material "facts" alleged in every iteration of Plaintiff's complaint are false, given what is in the Facebook messages. Some of those alleged "facts" were also false given what Plaintiff told the FCPD and OCR, and the documents that she attached to her prior pleadings—evidence whose authenticity is undisputed. That Plaintiff began this case with a complaint that was full of false factual allegations, and then burnished those falsehoods with further amended pleadings making even more outrageously false allegations, is evidence that Plaintiff's "entire course of conduct

throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court." *Chambers*, 501 U.S. at 50-51.

### 2.    Plaintiff's Statements to Her Experts Are Evidence of Her Fraud.

A scheme to defraud also can include creating false evidence and giving false information to the witnesses whom a party expects to testify in support of her claims.  In *Hull v. Municipality of San Juan*, 356 F.3d 98 (1st Cir. 2004), the plaintiff's misstatements about his prior "injuries and treatment" during discovery were found by the court to be part of a "broader pattern of deceit" that included withholding medical information from his own doctor.  *Id.* at 100.  Likewise, in *Yanez v. America West Airlines,*  No. Civ. A. MJG–03–1717, 2004 WL 2434725 (D. Md. Oct. 13, 2004), the plaintiff was found to have "sought to perpetrate a fraud on all concerned, including the Defendant, his treating physicians . . . ., his own counsel, and the Court," in a "comprehensive fraud scheme" that included giving false and incomplete information to his treating doctors "whose records would be critical to his damages claims."  *Id.* at *3-*4, *7 & n. 4.[10]

Here, too, Plaintiff's experts and treaters were given false narratives in an attempt to bolster Plaintiff's claims and inflate her damages.  Plaintiff's Opposition discusses only one of them (Dr. Ryan) but Plaintiff's false narratives have tainted the testimony of nine expert witnesses—seven retained by Plaintiff and two retained by the School Board—plus all the treating providers whose

---

[10] *See also Da-Silva v. Smith's Food & Drug Ctrs., Inc.*, No. 2:12-CV-00595-GMN, 2013 WL 2558302, at *2–4 (D. Nev. June 8, 2013) (dismissing personal injury case where plaintiff gave "false deposition testimony, provided false and/or incomplete discovery responses, concealed evidence, and made false representations to her medical providers . . . ."); *Call v. Harrison*, No. 5:12CV00008, 2012 WL 5993732, at *10 (W.D. Va. Nov. 30, 2012) (dismissing case for fraud on the court where plaintiff concealed true nature of medical condition until near the close of discovery, including from defendant's expert); *Tesar v. Potter*, No. CIVA 9:05-00956 SB, 2007 WL 2783386, at *7 (D.S.C. Sept. 21, 2007) (dismissing case for fraud on the court, noting plaintiff had even "lied to his own expert"); *Sprester v. Jones Motor Co.,* No. 5:05cv00021, 2006 WL 893642, at *1 (W. D. Va. Apr. 4, 2006) (dismissing for fraud on court where plaintiff's misrepresentations about her medical history had tainted deposition testimony of medical experts).

names appear on Plaintiff's proposed witness list.  ECF 465.  ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████   ECF 503, at 39; 504, at 5.  ████████

████████████████████████████████████████████████████████████

████████   ECF 504, at 3, 5, 8.  While Plaintiff asserts that this is just a matter of cross-examination

for trial, she does not address how the justice system, whose foundation is the principle that this is

a search for the truth, can tolerate the presentation of testimony that is based on false information.

The false narratives given to the experts and other witnesses on both sides of this case has

profoundly tainted the record, and evidences a comprehensive scheme to defraud.

### 3. Plaintiff's Lies to the School Board, the Police, and OCR Are Evidence of Her Fraud.

If the Court determines—as all evidence shows—that the Facebook messages are from

Plaintiff, then Plaintiff indisputably gave materially false information to school officials, FCPD,

and OCR.  Plaintiff is wrong to argue that they cannot be considered part of a scheme to defraud.

First, the elaborate pattern of deceit both makes it highly unlikely that Plaintiff's falsehoods

in this lawsuit are anything other than willful and deliberate.

Second, it reveals the extent of the prejudice to the School Board who has been made "to

piece together the sordid story bit by bit."  *Aoude v. Mobil Corp.*, 892 F.2d 1115, 1119 (1st Cir.

1989) ("The only conceivable reason for [the plaintiff's] elaborate duplicity was to gain unfair

advantage, first in the dispute, thereafter in the litigation.  The tactic plainly hindered defendant's

ability to prepare and present its case, while simultaneously throwing a large monkey wrench into

the judicial machinery.")

Third, Plaintiff has made clear that she is relying on evidence of what she told the School

Board, the FCPD, and OCR to establish her claims.  *See* ECF 464, Plaintiff's Proposed Trial

Exhibit Nos. 77, 82, 118, 119, 122, 175, 176, 187, 188, 496, 500.  That Plaintiff seeks to use these prior misrepresentations to further the fraud being perpetrated in this litigation goes to several *Shaffer* factors, including "degree of the wrongdoer's culpability," "the prejudice to the judicial process and the administration of justice," and the "availability of other sanctions to rectify the wrongs."  11 F.3d at 362-63.

      **D.**    **The Seventh Amendment Is No Bar to Dismissal of this Case**.

There is no merit to Plaintiff's  argument that the Seventh Amendment requires that a jury decide whether the Facebook messages are from her and thus whether this lawsuit has been a sham.

<u>First</u>, the Seventh Amendment guarantee is not absolute.  Courts are authorized by the Federal Rule to dismiss a case without a jury trial for a variety of reasons.  *See, e.g.,* Fed. R. Civ. P. 12, 37, 41, 56.  Courts have also held expressly that "a motion for sanctions, when premised on a party's fraud on the court . . . does not implicate the Seventh Amendment's jury trial guarantee." *Rossbach v. Montefiore Med. Ctr*., 81 F.4th 124, 138 & n.8 (2d Cir. 2023) (collecting cases); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

<u>Second</u>, Plaintiff has not offered any evidence from which any rational finder of fact could conclude that the Facebook messages are from anyone other than Plaintiff.  She is not entitled to see if a jury will buy her blasé assertion that the messages change "nothing" about this case.  *See Pope v. Fed. Exp. Corp.,* 974 F.2d 982, 984 (8th Cir. 1992) (where court found evidence introduced by plaintiff had been doctored, no "merit" to Seventh Amendment argument that jury should decide whether she fabricated it or if she sincerely believed it to be genuine).

## III.   <u>CONCLUSION</u>

Allowing Plaintiff to continue her fraud on this Court threatens the integrity of the justice system.  The Court should dismiss this case in its entirety.

Dated:  December 8, 2023                    Respectfully submitted,

                                            By: */s/ Sona Rewari*
                                                Sona Rewari (VSB No. 47327)
                                                Ryan M. Bates (VSB No. 74661)
                                                Scott W. Burton (VSB No. 90601)
                                                HUNTON ANDREWS KURTH LLP
                                                2200 Pennsylvania Avenue, NW
                                                Washington, DC 20037
                                                Telephone: (202) 955-1500
                                                Facsimile: (202) 778-2201
                                                srewari@HuntonAK.com
                                                rbates@HuntonAK.com
                                                burtons@HuntonAK.com

                                            *Counsel for Defendant Fairfax County School Board*

## CERTIFICATE OF SERVICE

   I hereby certify that on December 8, 2023, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record for all Parties.

                                            By:  */s/ Sona Rewari*
                                                 Sona Rewari