# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

\- - - - - - - - - - - - - x

B.R., :

Plaintiff, :

v. : CIVIL NO.

FAIRFAX COUNTY SCHOOL : 1:19-cv-00917 (RDA/WEF)

BOARD, et al., :

Defendants. :

\- - - - - - - - - - - - - x

ZOOM DEPOSITION OF SARA JENNINGS

Tuesday, October 31, 2023

8:06 a.m.

Job No.: 54521

Pages 1 through 131

Reported by: Cassandra E. Ellis, CSR-HI #475, CSR-CA #14448, CCR-WA #3484, RPR, RMR, RDR, CRR, Realtime Systems Administrator #82384

that?

**A. Yes, I do.**

Q. Okay. Great.

Based on my review, the above findings are nonspecific. And then you say, a nonspecific finding is one that does not point towards a specific diagnosis or etiology.

Can you explain, just a little bit, in laymen's terms, what that -- what that means, a nonspecific finding is one that does not point towards a specific diagnosis or etiology?

**A. Yes. So nonspecific, in a clinical setting, means that, as a provider, whether that be a forensic nurse or another medical provider, we cannot definitively say the cause of the finding.**

**And when it says it does not point towards a specific diagnosis or etiology, so etiology meaning what the root cause of it was, specific diagnosis, to finding out what the diagnostic terminology would be, without having other abilities for differential diagnosis, it**

**would still be considered nonspecific, meaning that we're not able to say one exact cause.**

Q. Okay. And then you go on to say: It is simply not possible for an FNE -- and what is FNE, as you're using it?

**A. Sure, so FNE stands for forensic nurse examiner.**

Q. -- to determine whether the above-mentioned findings resulted from a sexual assault or any other cause.

So it's -- you're not -- your finding or opinion is not making any conclusion about whether or not the findings in the SANE report resulted from a sexual assault, either way?

MR. BATES: Object to form.

BY MS. ANDERSON:

Q. So you're not -- your opinion is not saying that these -- these findings that you cite above, related to the scar and abrasions, resulted from a sexual assault?

MR. BATES: Object to form.

**A. So in my practice, based off of what the documented findings were, they would be classified as nonspecific -- specific, meaning that as the forensic nurse, doing the medical forensic exam, I would not be able to say the cause or the etiology, other than to say they were nonspecific.**

Q. Okay. So you are -- you are not finding that those -- and it is not your opinion, that those -- the scar and the abrasions you're referencing are a result of a sexual assault?

MR. BATES: Object to form.

**A. So based on my opinion, I would not be able to say if they are from a sexual assault or if they are not from a sexual assault.**

Q. Correct. So you're not saying either way, you're not making an opinion that it is from a sexual assault and you're not making an opinion that it is not from a sexual assault?

MR. BATES: Object to form.

**A. My opinion is that they are**

**nonspecific.**

Q. Okay. And just to make sure, I just want to make sure I close the loop, but not -- by saying "nonspecific" you're saying that your -- your opinion is that you cannot say that they are related to a sexual assault or are not related to a sexual assault?

**A. So my opinion is still that they're nonspecific, meaning, that I would need other differential diagnoses, follow-up, referrals in order to further look at that, from a medical perspective, potentially, but also looking at it from a forensic perspective.**

**So there needs to be further -- further investigation and further looking into that, so my initial -- if I was seeing this patient, my initial impression and my impression based off of what was documented is that it's nonspecific.**

Q. Okay. And again, nonspecific is -- is that you cannot make a -- it is your opinion that you cannot make a finding that it is --

that these are resulting from a sexual assault or are not resulting from a sexual assault?

MR. BATES: Object to form.

THE WITNESS: Can you restate your question, please?

MS. ANDERSON: Sure.

BY MS. ANDERSON:

Q. And just to just to close the loop on this, your finding or opinion that these scars and abrasions are nonspecific is -- is the same as saying that you cannot find that they are the result of a sexual assault or that they are not the result of a sexual assault?

MR. BATES: Object to form.

**A. So my interpretation of my opinion is that they're still nonspecific findings, based off of the review of what was documented. I'm not able to determine if it was the result of a sexual assault or not a sexual assault without having the other components that I previously mentioned.**

Q. Got it. Thank you.

**A. Yes.**

Q. And are you also saying that that's true for the, what you're quoting from the

report, the SANE report, by -- by Diane Burkart, is that true, also, for the old scar at 7:00 of the anal folds?

**A. As stated in Ms. Burkart's report, using the terminology, scar, because I would not use that in my practice, yes, those exact same, what I list out, what the findings could be related to, it encompasses everything that's in that.**

Q.

**A. Correct.**

Q. Okay. So even if they stood alone, you would have -- you would list the exact same list of medical etiologies here?

**A. Correct.**

Q. Okay. And it says and/or other medical etiologies, and I apologize if I'm not pronouncing that correctly, what other medical etiologies come top of mind, anything else that

you didn't list here?

**A. So that -- when I discussed previously about differential diagnoses, when you look at other medical etiologies, it's other things that could be causing those findings. So I don't have an exhaustive list, but there are other medical things that could cause irritation and all of the above things mentioned.**

Q. Okay. And you -- but you listed what would be most top of mind or most common, in your mind?

**A. Correct.**

Q.

**A. I don't have an approximate number.**

Q. Okay. Would you say many?

**A. Again, I don't have a number, so I**

78

MR. BATES: Object to form.

**A. Again, it's very hard to define it that way. Many patients will present to a hospital setting that have an anatomical variant that has been misinterpreted by another medical provider, who's not forensically trained. And so I don't want to lump all of those into a category, but at least multiple times a year, I will give you that.**

Q. Multiple times a year? Okay.

And are you specifically talking about anatomical variants in the anal region or are you -- or when you're saying multiple times a year you're talking about the anatomical variant?

**A.**

Q. Okay. Great. Okay.

And I was going to take them in order, but I think it makes sense to just skip

79

to number three, next, to talk through this opinion.

**A. Correct, yes, that's what I wrote.**

Q. Okay. And is that true for every hospital's policies and procedures that they wouldn't describe it as a scar and, instead, would describe how it presents?

MR. BATES: Well, object. Object to the form. And Dr. Jennings is not providing expert testimony on all hospital proceeds. You can answer the question.

THE WITNESS: Could you please restate the question?

MS. ANDERSON: Sure.

BY MS. ANDERSON:

Q. Is -- you stated your finding is, is that you wouldn't say it was a scar, but that in your practice you would say it's a

80

hypopigmented and raised area; is that -- is that true for all policies and procedures in all medical facilities?

MR. BATES: Same objection.

**A. I'm not aware of every hospital in the US, their policies and procedures specific to forensic patients. So my response to that is based off of our education guidelines set forth by a professional nursing organization as well as the training that we receive.**

Q. And when you say: "We receive," who are you referring to?

**A. Forensic nurse examiners who have attended the 40-hour didactic training for sexual assault pediatric nurse examiners, pediatrics and/or adult adolescents.**

Q. Okay. And do you know if, under that guidance, the word "scar" should not have been used in 2012?

**A. I can only speak to the training that I attended in 2006, and that was not a terminology that we utilized in order to**

81

**describe findings.**

Q. Okay. And the terminology of hypopigmented and raised area, now that could be consistent with a scar; is that right?

**A. It could be, yes, but as a registered nurse in the Commonwealth of Virginia we are not able to diagnose, and by calling it a scar is diagnosing it as something that actually physically occurred that we weren't witness to.**

Q. Okay. And how would you define a scar? I just want to make sure we're sort of operating under the same assumptions.

**A. How would I define it is exactly how I described it here, as the hypopigmented, raised area. But it would also depend on what patient presented and where it was as to location, because it may have varying colors. I'm going to describe whatever it looks like on the presentation of me providing the medical forensic exam.**

Q. Okay. And I'm sorry, this was a poor question, but I guess what I'm asking is:

too, if pulling up the SANE report is helpful, please let me know and I'm happy to pull any of that up.
You go on to say: On March 29th, 2002, visit to Dr. Earl Roberts, it is noted that B.R. has a fissure in anus and in the 6:00 region; is that right?
**A. Yes.**
Q. [redacted]

**A.** [redacted]
MR. BATES: Object to form.
**A.** [redacted]

Q. Okay. In 2002 how old is B.R.?
**A. I would have to reference her date of birth. I will give you that in a moment.**
Q. And we can go ahead and pull up those records, if you're looking at those now. Are you -- are you looking at those records or just your report?
**A. I'm looking at my report, currently, and I also have the SANE report.**
MS. ANDERSON: Okay. And why don't we go ahead and mark as -- I think we're on Jennings 3, the records from Infants and Children PA.
And Ryan, if you have those.
(Exhibit No. 3 was marked for identification.)
MR. BATES: Okay. Can you note, for the record, what Bates numbering is on those? Dr. Jennings is looking at records right behind her.
MS. ANDERSON: And Ryan, on my end you're a little faint. You weren't earlier, but

maybe -- if it's the same or not for Cassandra.
MR. BATES: Okay. I will speak a little louder.
MS. ANDERSON: Okay. Thanks.
BY MS. ANDERSON:
Q. Okay. So we've got what we're marking as Jennings 3, and it's the records of Infants and Children PA, and it starts with Bates DRfamily-WR-009426, and ends in 009483.
And if we could go to Bates number 009451? And Dr. Jennings, if you can just tell me when you're there.
**A. Just a moment.**
Q. Yep.
**A. Okay. I'm there.**
Q. Okay. And this is the record that you're referring to in this finding number two; is that correct?
**A. Correct.**
Q. Okay. And if we look at this, and the top left, the date is May 29th, 2002, and what age does it say that B.R. is at that time?

CONFIDENTIAL

A. She's a little over two, it says two and three fourths.
Q. And if you look down, and see there's some boxes, and to the left of that it lists things like general, chest, heart, and do you see GU?
A. I do.
Q. And what does that stand for?
A. Genitalia urinary.
Q. Okay. And what does that mean, in laymen's terms?
A. So for the purposes of a head-to-toe exam, these are systems that are broken down for the provider.
And so for laymen's terms, that would be anything from urinary to if it was something related to, like, female-related issues and also anything bowel-related, anorectal, so it's all encompassing of that, that's that system.
Q. Okay. And from your experience, when a doctor checks a box next to GU, does that

mean that they've looked at those areas, examined those areas?
MR. BATES: Object to form.
A. I can only speak to my practice, and what I do in a head-to-toe physical exam. I can't speak to what Dr. Roberts did on his head-to-toe physical exam and what his interpretation of checking boxes meant.
Q. Okay. So in your findings in number two you're not assuming that he looked at that area?
MR. BATES: Object to form.
A. I would have to make the assumption that he looked, because he documented a finding, and without looking and visualizing you can't document something.
Q. Okay. And he checks the box under abnormal; is that right?
A. Correct.
Q. Okay. And this is where he writes: Fissure at 6:00, is that right, next to it?
A. Correct.

Q. [redacted]
A. I know that they can occur. However, I'm not a pediatrician, nor a family practice nurse practitioner, so I'm not able to say with certainty of how many times that occurs, but I do know that it does occur.
Q. [redacted]
A. Treatment-wise, the only plan on this care was to follow-up with pedes, gastroenterology.
Q. Okay.
A. And that would be considered a treatment, from a medical perspective, because they're referring to the next level of care.

Q. Now, does he anywhere recommend or put on here treatment to use an ointment or anything topical?
A. They discuss that they're using mineral oil.
Q. And it says to take, looks like, there are two tablespoons or two teaspoons of mineral oil daily; is that something --
A. It says they have been taking up two teaspoons of mineral oil daily.
Q. Right. And is that measurement generally something you're taking by the mouth?
MR. BATES: Object to form.
A. So I can't opine that, from -- based off of what's written on here. In a medical world we wouldn't measure out something IV or if it was an injection by two and a half teaspoons, so again, I have absolutely no idea what he references.
Q. Okay. But you don't see anything that is an ointment or a treatment for something that's -- that would be topical or on the skin?

94

A. Not on this piece of paper.
Q. [REDACTED]
Q. And for all of those children where it's common, does it always continue into adolescence?
A. Some can, yes.
Q. Some can? Does it always?
A. I mean, again, I wouldn't be able to say, but every patient I've seen that had a history of constipation, no, it didn't continue into their adolescence and adult life, but it doesn't mean that it cannot.
Q. Do you have an approximation of how many people it does?
A. No.
Q. If you want to -- if you can go to

95

9450, so the page before it?
A. I'm there.
Q. Okay. Looks like the date on -- on this examination is June 6th, 2002; is that correct?
A. That's what's at the top, yes.
MR. BATES: That's -- did you say June 6th, Alison?
MS. ANDERSON: I did say June 6th for the examination.
MR. BATES: Okay.
BY MS. ANDERSON:
Q. So is that correct, that that's the date that this doctor saw B.R.? And by reference, if it helps, it says: Dear Dr. Roberts, I had the pleasure of seeing B.R. on -- and then June 6th, 6th, dash '02.
Is that correct, by looking at this document, that's the date of the examination?
A. It is dated June 6th, at the top.
Q. [REDACTED]

96

[REDACTED]

97

A. [REDACTED]

### Page 98

1  minutes to take a look at my notes, here.
2      Okay.  And again, just to be -- I
3  think we've said this, but just to be clear,
4  you're not opining that -- you're not -- you're
5  not drawing an opinion, to a reasonable degree
6  of medical certainty, of what is the cause of
7  that 7:00, and as Diane Burkart refers to as old
8  scar, in the SANE report, are you?
9      A.  Correct, I'm not able to opine due
10  to the other factors of what could potentially
11  have caused the finding or may not have caused
12  the finding.
13      Q.  [redacted]
14-22  [redacted]

### Page 99

[mostly redacted]
3      A.  As a forensic nurse, I'm not able
4  to say what did or did not cause the finding.
5      Q.  Okay.  And then, so I want to go to
6  number four of your report.
7      A.  Ma'am, do I still need these
8  medical records or can I set it aside?
9      Q.  [redacted]
10-15  [redacted]
16      A.  Correct.
17      Q.  [redacted]
18-21  [redacted]
22      MR. BATES:  Object to form.

### Page 100

1      A.  [redacted]
2-6  [redacted]
7      A.  Correct.  I'm just verifying, yes,
8  but, no, she marked it as negative.
9      Q.  Yeah.  So your findings are
10  consistent with Diane Burkart's findings at the
11  time of the SANE exam?
12      A.  Yes, ma'am.
13      MR. BATES:  Object to form.
14  BY MS. ANDERSON:
15      Q.  Now, to be clear, you're not making
16  an opinion, to a reasonable degree of medical
17  certainty, as to whether or not that means B.R.
18  was or was not sexually assaulted?
19      A.  Could you please restate your
20  question?
21      Q.  Yeah, that you're not -- you're not
22  making an opinion, to a reasonable degree of

### Page 101

1  medical certainty, based off of the fact that
2  there's no acute findings related to the hymen
3  at the time of the exam, that -- that B.R.
4  was -- was or was not sexually assaulted?
5      A.  Based off of my review of the SANE
6  report, as a forensic nurse, I'm not able to
7  determine if something did or did not occur.
8      Q.  [redacted]
9-22  [redacted]