# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00917-RDA-WEF |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, et al., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN *LIMINE* TO LIMIT AND EXCLUDE PLAINTIFF'S PROPOSED EXPERT WITNESS TESTIMONY

Sona Rewari (VSB No. 47327)
Ryan M. Bates (VSB No. 74661)
Scott W. Burton (VSB No. 90601)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
rbates@HuntonAK.com
burtons@HuntonAK.com

*Counsel for Defendant*
*Fairfax County School Board*

Michael E. Kinney (VSB #65056)
MICHAEL E. KINNEY, PLC
1801 Robert Fulton Drive
Suite 120
Reston, VA 20191
Telephone: (703) 956-9377
Facsimile: (703) 956-9634
mk@kinneyesq.com

*Counsel for Defendants A.F., S.T., T.B.,*
*P.A.H., B.H., M.P.F, M.C., F.T., and J.F.*

Bruce M. Blanchard (VSB # 23778)
James P. Miller (VSB # 89409)
ODIN, FELDMAN, & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Tel: (703) 218-2102 (Blanchard direct)
(703) 218-2154 (Miller direct)
Fax: (703) 218-2160
Bruce.Blanchard@ofplaw.com
Jim.Miller@ofplaw.com

*Counsel for Defendant J.O.*

James F. Davis (VSB #41387)
JAMES F. DAVIS, P.C.
10513 Judicial Dr., Suite 200
Fairfax, VA 22030
Tel: (703) 383-3110
Fax: (571) 748-6564
jfd@jfdavislaw.com

*Counsel for Defendant C.K.*

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................. iii

Introduction ........................................................................................................................... 1

Legal Standard ...................................................................................................................... 3

Argument .............................................................................................................................. 6

I.     The Court should preclude any expert from attesting to any witness's credibility or the veracity of Plaintiff's allegations. .......................................................................... 6

II.    The Court should limit the testimony of proposed psychiatric expert Eileen Ryan to address only conclusions and diagnoses that are within her area of expertise. ........... 7

III.   The Court should exclude proposed vocational expert Gary Young. .......................... 9

      A.    Young's opinion must be excluded because his assessment of Plaintiff's current vocational capacities is unreliable. ..................................................... 11

      B.    Young's opinion must be excluded because his methodology for determining Plaintiff's lost earning capacity is unreliable. .................................................. 12

      C.    Young's opinion is irrelevant without a causal connection to her injuries. ..... 14

IV.   The Court should exclude proposed Title IX expert Nancy Cantalupo. ..................... 16

      A.    Cantalupo's testimony is irrelevant because it opines on legal conclusions regarding the School Board's compliance with Title IX. ............................... 18

      B.    Cantalupo's testimony is both irrelevant and unreliable because it relies on inapplicable regulatory and administrative standards, and she is not qualified to opine on the proper standard. ....................................................................... 20

      C.    The Court should strike Cantalupo's untimely supplemental report. ............. 21

V.    The Court should exclude proposed interviewing expert Marcella Rustioni and proposed law enforcement expert Bill Woolf. ........................................................... 23

      A.    Testimony about the efficacy of FCPD's investigation and sex trafficking is irrelevant. ..................................................................................................... 24

      B.    Testimony about FCPD's investigation should be excluded under Rule 403. 26

VI.   The Court should exclude proposed psychological expert Joshua Cisler. .................. 26

      A.    Dr. Cisler's testimony is unreliable and irrelevant because he did not examine or evaluate Plaintiff. ..................................................................................... 27

      B.    Dr. Cisler's opinion regarding the physical nature of PTSD is irrelevant. ..... 28

Conclusion .......................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Allen v. Am. Cyanamid*,
    No. 11-cv-055, 2021 WL 1086245 (E.D. Wis. Mar. 22, 2021) .................................................12

*Belville v. Ford Motor Co.*,
    919 F.3d 224 (4th Cir. 2019) ..............................................................................................5, 27

*Bresler v. Wilmington Trust Co.*,
    855 F.3d 178 (4th Cir. 2017) ......................................................................................................5

*Cordell v. Astrue*,
    No. 1:06-cv-00920, 2008 WL 906343 (S.D. W. Va. Mar. 31, 2008) ........................................7

*Cudney v. United States*,
    No. 1:17-cv-190-DBP, 2020 WL 7238227 (D. Utah Dec. 8, 2020) .........................................12

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022) ...........................................................................................................27, 29

*Daubert v. Merrell Dow Pharm.*,
    509 U.S. 579 (1993) ........................................................................................................ *passim*

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ...........................................................................................................20, 24

*Doe by Watson v. Russell Cnty. Sch. Bd.*,
    292 F. Supp. 3d 690 (W.D. Va. 2018) .....................................................................................18

*Doe v. Coastal Carolina Univ.*,
    No. 4:18-cv-268-SAL, 2021 WL 1651057 (D.S.C. Mar. 8, 2021) .....................................18, 20

*Doe v. Wharton Indep. Sch. Dist.*,
    No. 2:16-cv-48, 2017 WL 932935 (S.D. Tex. Mar. 9, 2017) ..................................................19

*Doe YZ v. Shattuck-St. Mary's School*,
    214 F. Supp. 3d 763 (D. Minn. 2016) .....................................................................................20

*Emody v. Medtronic, Inc.*,
    238 F. Supp. 2d 1291 (N.D. Ala. 2003) .....................................................................................8

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ...........................................................................................................19, 20

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................................................15

*Kadel v. Folwell*,
   620 F. Supp. 3d 339 (M.D.N.C. 2022) ......................................................................4

*Kopf v. Skyrm*,
   993 F.2d 374 (4th Cir. 1993) ......................................................................................4

*Martinez v. Brown*,
   No. 96-808, 1997 WL 124338 (Vet. App. Mar. 10, 1997) ........................................8

*McCoy v. Isidore Newman Sch.*,
   No. CV 19-1810, 2022 WL 4533773 (E.D. La. Sept. 28, 2022) .............................19

*Muccie v. Dailey*,
   No. CV-20-66-BU-BMM, 2022 WL 1746755 (D. Mont. May 31, 2022).............19, 20

*Nease v. Ford Motor Co.*,
   848 F.3d 219 (4th Cir. 2017) .........................................................................4, 15, 27

*Oglesby v. Gen. Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ....................................................................................5

*Roohbakhsh v. Bd. of Trs. of Neb. State Colls.*,
   No. 8:17CV31, 2019 WL 5653448 (D. Neb. Oct. 31, 2019)...................................19

*Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ............................................................................ *passim*

*Small v. WellDyne, Inc.*,
   927 F.3d 169 (4th Cir. 2019) ..................................................................................16

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
   29 F.3d 137 (4th Cir. 1994) ...............................................................................14, 15

*U.S. Search, LLC v. U.S. Search.com Inc.*,
   300 F.3d 517 (4th Cir. 2002) ..................................................................................17

*United States v. Barile*,
   286 F.3d 749 (4th Cir. 2002) ..................................................................................18

*United States v. Cecil*,
   836 F.2d 1431 (4th Cir. 1988) ..................................................................................6

*United States v. Lespier*,
   725 F.3d 437 (4th Cir. 2013) ....................................................................................6

*United States v. McIver*,
   470 F.3d 550 (4th Cir. 2006) ..................................................................................18

*United States v. Young*,
  916 F.3d 368 (4th Cir. 2019) ....................................................................................4

*Unknown Party v. Ariz. Bd. of Regents*,
  No. CV-18-01623-PHX-DWL, 2022 WL 4481519 (D. Ariz. Sept. 27, 2022)......................19

*Wehling v. Sandoz Pharms. Corp.*,
  162 F.3d 1158 (4th Cir. 1998) ....................................................................................5

*Zellers v. NexTech Ne., LLC*,
  533 F. App'x 192 (4th Cir. 2013) ................................................................................4

**Statutes**

20 U.S.C. § 1681(a) .......................................................................................................1

42 U.S.C. § 1983 ........................................................................................................1, 9

Va. Code § 15.2-632(1) ................................................................................................26

**Other Authorities**

Fed. R. Evid. 403 ..............................................................................................3, 25, 26

Fed. R. Evid. 702 ........................................................................................1, 4, 6, 21

Fed. R. Evid. 703 ...........................................................................................................6

Va. Const. art. VIII, § 7 ................................................................................................25

## <u>INTRODUCTION</u>

Plaintiff has sued the twelve named Defendants on allegations that she was raped, sexually assaulted, harassed, threatened, and bullied during her seventh-grade year at Rachel Carson Middle School ("RCMS") between October 2011 and February 2012.  Seven claims remain from the Plaintiff's Second Amended Complaint ("SAC"):  two claims under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), against the Fairfax County School Board (the "School Board"), SAC ¶¶ 225-41; a First Amendment claim under 42 U.S.C. § 1983 against three RCMS administrators (A.F., S.T., and P.A.H.), *id.* ¶¶ 242-48; two gross negligence claims under Virginia common law against nine RCMS administrators, counselors, and teachers, *id.* ¶¶ 295-303; and two tort claims brought against two former students, *id.* ¶¶ 304-21.

Plaintiff has identified eight experts that she expects to call at trial to prove her claims.  *See* Pl.'s Witness List, ECF No. 465, at 2.  Six of those experts are at issue here:  Dr. Eileen Ryan, a psychiatrist; Gary Young, a vocational expert; Nancy Cantalupo, a law professor; Marcella Rustioni, a social worker; Bill Woolf, a former law enforcement officer; and Dr. Joshua Cisler, a psychologist and researcher.  The scope and substance of these experts' proffered opinions exceed the bounds imposed under *Daubert* and Rule 702.

**First**, the Court should order that no expert may attest to any witness's credibility or opine on the veracity of Plaintiff's claims.  It is standard for experts to offer an opinion premised on information that favors the party proposing their testimony.  But it is impermissible for an expert to expressly opine on the credibility of the parties.  Even so, several of Plaintiff's experts have done just that.  The Court should therefore ensure that Plaintiff does not attempt to use her proposed experts to bolster her version of the hotly contested facts.

**Second**, the Court should limit the testimony of proposed psychiatric expert Eileen Ryan. As a psychiatrist, Dr. Ryan is qualified to opine on matters of mental health and mental conditions.

Yet her report strays far outside beyond those bounds, into areas of physical maladies that she admits she is not qualified to determine and that she did not undertake to investigate.

**Third**, the Court should exclude proposed vocational expert Gary Young.  Young asserts that Plaintiff has suffered millions of dollars in lost earning capacity due to the abuse she alleges, but that opinion is entirely unreliable.  Rather than undertaking a methodical analysis to analyze Plaintiff's pre-injury capacity, investigate her current capabilities, and account for other intervening events, Young simply takes Plaintiff's word for it that she is incapable of working and expressly assumes the alleged abuse from more than 10 years ago is the sole cause.  At best, Young has assembled a snapshot of Plaintiff's present-day condition, which, even if it were reliable, is irrelevant to prove damages without causation.

**Fourth**, the Court should exclude Plaintiff's proposed Title IX expert Nancy Cantalupo.  A law professor and victim's rights advocate, Cantalupo uses her opinion to argue that the School Board violated Title IX—a legal conclusion that is an impermissible subject for expert opinion testimony.  Moreover, Cantalupo's opinion is irrelevant and misleading because she does not apply the proper standard of liability for private litigation under Title IX.  While some courts have allowed Title IX experts to offer opinions regarding the relevant standard of care, Cantalupo lacks any such expertise, and her report does not attempt to compare the School Board's challenged conduct here to what other public school systems were doing during the same period of time.  If the Court does not exclude Cantalupo, it should still preclude her from testifying regarding the opinion rendered in her "supplemental report," which Plaintiff served weeks after Cantalupo's deposition and well after every deadline for discovery and disclosure imposed in this case.

**Fifth**, the Court should exclude proposed interviewing expert Marcella Rustioni and law enforcement expert Bill Woolf.  Both Rustioni and Woolf opine on the quality of the Fairfax

County Police Department's March 2012 investigation into Plaintiff's allegations. That investigation took place **after** Plaintiff stopped attending RCMS and has no connection to any factual issues the jury must consider now. The same is true for Woolf's opinion that Plaintiff's alleged abuse resembled gang-related sex trafficking. There is no evidence in this case that Plaintiff claimed to anyone, let alone any school employees, that she was being trafficked or accosted by a gang until years after she left RCMS. Nor was Woolf tasked by Plaintiff to investigate whether she was, in fact, abused or trafficked by a criminal gang. Beyond the irrelevance of these opinions, the Court should exclude them under Rule 403 because there is a significant risk that the jury will conflate Fairfax County's School Board with its Police Department or be inflamed by testimony about gangs and trafficking.

**Sixth**, the Court should exclude proposed expert Joshua Cisler. Dr. Cisler's testimony is utterly irrelevant and unreliable for the simple reason that he did not meet or evaluate Plaintiff, review any meaningful data regarding her, or even purport to opine on her psychological condition. Instead, his opinion supported the notion that Posttraumatic Stress Disorder ("PTSD") is a "physical" affliction of the brain—an opinion Plaintiff has used in attempt to skirt the Supreme Court's ruling proscribing recovery of emotional distress damages under Title IX. Even if Dr. Cisler had examined Plaintiff or examined reliable data revealing the structure of her brain, whether or not PTSD is a "physical" condition is irrelevant to the issues for trial.

## <u>LEGAL STANDARD</u>

The Federal Rules of Evidence permit expert testimony only if the proponent satisfies four conditions by a preponderance of the evidence:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).  This rule "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a **reliable** foundation and is **relevant** to the task at hand.  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275, 281 (4th Cir. 2021).  The *Daubert* standard applies to any purported experts claiming "technical or other specialized knowledge," even if the expert testimony is not strictly scientific in nature.  *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017).  Thus, proposed expert testimony is admissible only if:  (1) the expert is qualified; (2) the testimony is relevant; and (3) the testimony is based on reliable scientific methodology.  *See Daubert*, 509 U.S. at 594–95.  Critically, these are "preconditions to admissibility" for which the district court must "make explicit findings, whether by written opinion or orally on the record."  *Sardis*, 10 F.4th at 283.

An expert is qualified when he or she has "specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue."  *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019).  Although qualifications may be "liberally judged" based on "knowledge, skill, experience, training, or education," an expert's qualifications must go to "the issue for which the opinion is proffered."  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).  "[A]n expert qualified in one field may be unqualified to testify in others."  *Kadel v. Folwell*, 620 F. Supp. 3d 339, 360 (M.D.N.C. 2022); *see, e.g.*, *Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 199 (4th Cir. 2013) (holding that because a neuropsychologist and neurotoxicologist was not a medical doctor, the proposed expert was "not qualified to diagnose the cause of [plaintiff's] alleged symptoms").

An expert's testimony is relevant if it has "a valid scientific connection to the pertinent inquiry." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 592). When an expert's "opinion is not relevant to a fact at issue, Daubert requires that it be excluded." *Sardis*, 10 F.4th at 281. Indeed, an expert opinion on an issue that "does not even apply to" the facts at issue in a case "categorically lacks 'a valid scientific connection to the pertinent inquiry'" and is instead "the touchstone of irrelevancy." *Id.* at 289 (quoting *Daubert*, 509 U.S. at 592).

Finally, an expert's testimony is reliable when it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Although the reliability inquiry is "flexible" and examines only "principles and methodology," *Daubert*, 509 at 594–95, it demands that an expert's opinion is "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known," *id.* at 590. The non-exhaustive list of factors that the Supreme Court outlined in *Daubert* to guide the reliability analysis includes whether the expert's method or analysis "(1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation omitted). Without an "objective basis to satisfy the district court" that the expert's opinion derived from "reliable principles and methods," an expert's "testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Sardis*, 10 F.4th at 292. Finally, "[a]n expert 'opinion' is considered unreliable and inadmissible" when "the expert has developed the opinions expressly for purposes of testifying in the case." *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158 (Table), at *5 (4th Cir. 1998).

Critically, the party that proposes an expert witness must satisfy these standards **before** trial.  The recent amendments to Rule 702 emphasize that burden was "made necessary by courts that have failed to apply correctly the reliability requirements of that rule."  Fed. R. Evid. 702 advisory committee's note to the 2023 amendment.  Many courts have incorrectly applied the *Daubert* standard by treating "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" as credibility issues for the jury.  *Id.*  "But credibility is entirely distinct from reliability and relevancy, which are **preconditions** to the admissibility of expert testimony."  *Sardis*, 10 F.4th at 282 (emphasis added).  As the "gatekeeping" metaphor suggests, these assessments must be made **before** the jury will hear the expert testimony.

## ARGUMENT

### I.   The Court should preclude any expert from attesting to any witness's credibility or the veracity of Plaintiff's allegations.

Plaintiff's allegations regarding rampant sexual abuse are vigorously disputed.  Plaintiff's experts largely presume the truth of her version of events.  If the experts in the field would typically accept assertions of sexual abuse without seeking corroborating evidence, then making those assumptions would not render their opinions inadmissible.  *See* Fed. R. Evid. 703.

Still, that does not permit the expert to testify to the veracity of those allegations or to recite those allegations as if they were true.  "Rule 702 renders inadmissible expert testimony on issues of witness credibility."  *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013).  That assessment belongs to the jury.  *Id.*  Indeed, the Fourth Circuit has stated expressly "an opinion on the credibility of a witness by a psychiatrist is not allowable."  *United States v. Cecil*, 836 F.2d 1431, 1442 (4th Cir. 1988).

The factual underpinning of each expert's opinion is always ripe for cross-examination.  But no expert should be allowed to testify regarding their opinions regarding which witnesses are

believable and which witnesses are not.  That is an improper subject for expert testimony, and the Court should preclude Plaintiff from eliciting such statements from her experts.

## II.   The Court should limit the testimony of proposed psychiatric expert Eileen Ryan to address only conclusions and diagnoses that are within her area of expertise.

Eileen Ryan, D.O., is a psychiatrist at the Ohio State University Wexner Medical Center. *See* Ex. 1 (Ryan Rept.) at 1.[1]  Plaintiff has identified Dr. Ryan as an expert to provide an opinion about Plaintiff's mental health, symptoms, and prognosis.  Dr. Ryan's expert report includes a long recitation of the facts giving rise to Plaintiff's claims, as gathered from her interviews of Plaintiff, her mother, her brother, and her fiancé.  *See id.* at 3-14.  For nearly 11 full single-spaced pages, she recites a narrative of the alleged events and Plaintiff's history, as told to her.  The psychiatric opinions in Dr. Ryan's report comprise a concise 6 pages.  In Dr. Ryan's opinion, Plaintiff meets the criteria in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") for four conditions: ██████████████████████████████████████████████████████ ████████████████████████████████████████████████.  *See id.* at 35-36.

Dr. Ryan's opinions regarding Plaintiff's psychiatric condition were limited to the four conditions identified above: ██████████████████████████████████████████ ██████████████████████████  *Id.*  She made no other diagnoses.  Even so, her expert report contains references to numerous medical conditions supposedly diagnosed by others or reported by Plaintiff.  *See, e.g.*, *id.* at 37 (stating Plaintiff has been diagnosed or has developed chronic

---

[1] Both of Dr. Ryan's initial and rebuttal reports are attached at Exhibit 1.

musculoskeletal pain, migraines, pelvic pain, and endometriosis).[2]   Her report not only discusses those conditions as fact, but also attempts to discuss their causes and prognoses.  *Id.*

As a psychiatrist, Dr. Ryan is not qualified to opine on non-psychiatric disorders.  *See Cordell v. Astrue*, No. 1:06-cv-00920, 2008 WL 906343, at *6 (S.D. W. Va. Mar. 31, 2008) (affirming social-security ALJ determination that a psychiatrist "was not qualified to render an opinion regarding Claimant's physical condition"); *Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1295 (N.D. Ala. 2003) (noting "[a] psychiatrist would not be qualified to state any such opinion" regarding the cause of the plaintiff's physical pain or injury); *Martinez v. Brown*, No. 96-808, 1997 WL 124338, at *4 (Vet. App. Mar. 10, 1997) (holding a psychiatrist is "not qualified to render a decision as to whether the appellant's injuries were aggravated by service" so "[h]is opinion regarding the appellant's physical disabilities are not probative medical evidence").  She should be precluded from rendering any opinions that purport to diagnose Plaintiff with any non-psychiatric conditions.

Moreover, Dr. Ryan should not be allowed to testify to the alleged causation, progression, or prognosis of any non-psychiatric conditions.  For example, she admits that she made no determination that Plaintiff's endometriosis was caused by sexual assaults or sexual abuse, and she acknowledges she did not undertake to determine whether Plaintiff has a ███████████, as Plaintiff claimed to her.  *See* Ex. 2 (Ryan Dep. Excerpts) at 218:22-219:22.  Yet in her expert report, Dr. Ryan links those conditions with Plaintiff's alleged PTSD.  *See* Ex. 1 at 37 (linking PTSD to "chronic musculoskeletal pain (which she already developed), hypertension, hyperlipidemia, headaches, including migraines (which she has already developed), eating

---

[2] Though Plaintiff has designated Dr. Ryan's report as "confidential," and Defendants are filing her full report under seal with this Brief, all the portions of the Ryan Report quoted in this Brief were included in Gary Young's report which Plaintiff has publicly filed at ECF 618-2.

disorders (which she has already developed), obesity, endocrine abnormalities, pelvic pain (which

she has already developed), endometriosis (already diagnosed), and cardiovascular disease"). She

further discusses such physical conditions as part of the potential prognosis for survivors of sexual

assault. *Id.* (citing "███████████████████████████████████████████████

███████████████████████████████████████"); *id.* ("███████████████████

███████████████████████████████████████████████████████████████████

███████████████████."). Yet, when asked about the bases for these assertions, Dr. Ryan

readily admitted, "I'm not a cardiologist and I'm not a gynecologist," so she could not make any

determination as to the diagnoses or the causes of these asserted conditions in Plaintiff. Ex. 2 at

218:22-220:4.

Permitting Dr. Ryan to testify regarding the causation of any of Plaintiff's claimed non-

psychiatric condition, or render any opinions regarding the progression or prognoses of such

conditions, would confuse and mislead the jury. She is not qualified to render such opinions and

did not undertake to do so. The Court should limit Dr. Ryan's testimony to rendering her opinions

only on Plaintiff's psychiatric condition.

## III.    The Court should exclude proposed vocational expert Gary Young.

Gary Young is a vocational expert and the owner of Young Vocational Analytics. *See* Ex.

3 (Young Rept.), at 22; Ex. 4 (Young Dep. Excerpts), at 16:3-9. Young spends approximately 25

percent of his time as a vocational expert in disability hearings with the Social Security

Administration, Ex. 4 at 30:10-13, where he does not write reports but instead testifies about

"hypothetical" circumstances to determine "whether the person is able to work." *See* Ex. 4, at

33:2-19, 47:10-49:1. Another five to ten percent focus on workers' compensation benefits. *Id.* at

32:20-33:1. For his non-Social Security cases, Young writes reports based on his access to

"actual" medical records, allowing him to identify "those issues which impact the ability to work,

rather than relying on the judge to do so." *Id.* at 50:6-18.  He estimates he writes 50 reports per year.  *Id.* at 31:13-15.  He has done very few cases in his career—only about five percent, he estimates—involving pediatric injuries.  *Id.* at 35:3-7.  Other than a handful of cases involving prisoners, Young could not recall opining as an expert in any civil rights cases under Title IX or § 1983.  He estimates he has found a complete disability preventing employment in the absence of a physical disability in less than five percent of his cases.  *Id.* at 37:10-18.

Plaintiff retained Young to opine on "[h]ow this series of events impacted [Plaintiff's] ability to work."  *Id.* at 88:16-89:12.  To make his assessment, Young interviewed Plaintiff once and reviewed some documents provided by her counsel, including the expert report of Dr. Ryan.  *See* Ex. 3, at 3-4; Ex. 4, at 83:19-84:2; 101:15-19; 173:12-174:3.  Young did not conduct any of his own testing, nor did he independently determine Plaintiff's current cognitive abilities in any way. Ex. 4, at 174:4-7; 189:9-12.  Young reviewed the 2023 findings of her retained neuropsychologist, Dr. Sidney Binks, but nothing earlier.  *Id.* at 96:6-14.  His understanding was that Plaintiff had no "medical issues" or "physical issues" and her vocational capacity issues were informed only by psychiatric impairments.  *Id.* at 98:11-100:16.  He reviewed no records from her treatment providers.  *Id.* at 108:3-5.  Nor did he conduct any testing to determine what work Plaintiff could do now or research or investigate how she had performed in previous positions.  *Id.* at 114:7-18.  Instead, all the information regarding her work history and performance was relayed to him by Plaintiff herself.  *See id.* at 115:11-117:6.

Young produced a report in which he opines that Plaintiff "is not capable of working."  Ex. 3, at 14.[3]  He then boldly asserts that, if not for the alleged sexual abuse, Plaintiff could have

---

[3] Though Plaintiff designated the entire Young Report as "Confidential" during discovery, she has since publicly filed a redacted version of the report, at ECF 618-2.  The portions of the

achieved what she told him were her "vocational aspirations"—to become either an attorney or a surgeon. *Id.* at 10, 12-13. Young says she would have "thrive[d]" in those roles, *id.* at 12, and "she would have been capable of earning between $211,850 and $387,030" per year, *id.* at 3. Using those figures, and accounting for estimated medical costs and fringe benefits losses provided by other experts, Young contends that Plaintiff faces vocational losses of between approximately $8.8 million and $11.9 million over the next three decades. *See id.* at 15.[4]

### A.   Young's opinion must be excluded because his assessment of Plaintiff's current vocational capacities is unreliable.

Boiled down to its essence, Young's report focuses on Plaintiff's **current** employability but it is unreliable on that basis. He discusses how "[h]er problems impact the ability to do work in any exertional or skill level." Ex. 3, at 6. He lists basic tasks that she cannot take on—like "[b]eing able to focus on tasks and remain productive throughout the day" or "[b]eing reliable on a daily through a yearly basis"—and observes that, without those capabilities, "there is no work that is possible." *Id.*; *see also id.* at 4 ("She tires easily and is not capable of doing things such as long walks."). He repeatedly claims that Plaintiff "is not capable of working." *Id.* at 13, 14. Young testified in his deposition, "I reviewed the entire world of work, from unskilled to skilled work, and found that because of the reliability, and her continued decompensation, that she was not capable of working in any job." Ex. 4 at 174:12-16.

---

Young report quoted in this Brief were disclosed by Plaintiff in the redacted version filed at ECF 618-2. The full unredacted Young Report is being filed under seal with this Brief.

[4] Gary Young's daughter Katherine Young signed the expert report submitted by Plaintiff, *see* Ex. 3 at 16, and her resume was included as part of that submission, *see id.* at 24-25. During deposition, however, Mr. Young admitted that his daughter was included "[m]ore for marketing purposes and continuity between all the files," that "she did not do anything on this file," and that he provided her no information before she signed the report. Ex. 4 at 17:14-18:16.

Young acknowledged that vocational testing can be used "to identify potential levels that can be used in other occupations or for training." Ex. 4 at 26:4-6. But he conducted no "testing to determine what work [Plaintiff] can do." *Id.* at 114:7-9. He did not "do anything to test whether she's able to sustain focus." *Id.* at 172:16-17. He did not review any "time and attendance records from any of her prior employers to determine whether she's able to show up on time to work." *Id.* at 118:12-119:3. Nor did he review any records from Plaintiff's treating providers. *Id.* at 108:3-5. In fact, he reviewed **no** medical records. *Id.* at 97:17-98:1. Instead, all he did was review some of the retained expert reports and interview Plaintiff and assume everything she told him was true. *Id.* at 106:20-107:7. In defense of his decision to skip over any testing, Young claimed "reality is a test," pointing to Plaintiff's ability to graduate from college but her failure to sustain employment or internships. *See id.* at 173:3-8.

Young's decision to simply rely on one interview of Plaintiff and a review of some expert reports prepared for this litigation is not a reliable method to reach the significant conclusion that she is "not capable of working." Ex. 3, at 14.

**B.    Young's opinion must be excluded because his methodology for determining Plaintiff's lost earning capacity is unreliable.**

Young's opinion would be unhelpful and misleading to a jury because it is not based on any reliable methods, but rather based on an *ad hoc* methodology improvised just for this case.[5]

---

[5] Young's report refers to "PEEDS-RAPEL methodology" but he did not purport to apply that methodology, and rather just used some of its concepts. *See* Ex. 3 at 1; *see, e.g.,* Ex. 4 at 71:6-73:11 (acknowledging his variance from the PEEDS-RAPEL methodology by reducing focus on Plaintiff's parents because "she is, you know, an adult now"). PEEDS-RAPEL is a variation on a vocational assessment method called "RAPEL," which is a mnemonic that identifies various considerations the evaluator makes: Rehabilitation plan, Access to the labor market, Placeability and employability factors, Earnings capacity, and Labor force participation. *See* Ex. 3 at 1-2. The "PEEDS" components reflect additional considerations for assessing the vocational capacity of a child: Parental/family occupation, Educational attainment, Evaluation results, Developmental stage, and Synthesis. *See id.* at 2. These additional factors are used, "because there is often no vocational history from which to directly draw conclusions regarding a child's vocational or

While a vocational expert could conceivably aid a jury in a personal injury case to approximate the differential between a plaintiff's pre-injury earning capacity and her present-day capabilities, that is not what Young did here. Indeed, Young made no attempt to do so. *See* Ex. 4 at 182:13-183:3 (admitting he did not evaluate Plaintiff's vocational capacity in 2011 or 2012); *id.* at 197:8-198:15 (admitting he could not point to any documents reflecting Plaintiff's intellectual capabilities before the alleged abuse). He even admitted that he did not try to do so:

> Q:      So it's fair to say that you did not set out to come up with an earning capacity for her as a 12-year-old; right?
>
> A:      No, of course not. **Why would I do that?**

*Id.* at 231:18-22 (emphasis added). Young dismissed the need to assess a pre-injury baseline because it would be "meaningless" to try to assess a seventh-grader's earning capacity. *Id.* at 207:13-17; *id.* at 208:1-2 ("To evaluate from seventh grade is almost ludicrous from a vocational standpoint.").

Yet, his opinion regarding Plaintiff's pre-injury capacity is based on Plaintiff's "vocational aspirations" as an elementary or middle schooler, as she relayed to him during his interview of her in 2023. *See* Ex. 3, at 10. To the extent Young considered any pre-injury information, he did so simply to confirm the assumption that a seventh-grader like Plaintiff **could have** achieved her

---

rehabilitation potential." *Id.* The PEEDS-RAPEL methodology therefore "base[s] the child's likely educational and occupational achievement on that of the child's parents and other members of the child's extended family." *Cudney v. United States*, No. 1:17-cv-190-DBP, 2020 WL 7238227, at *3 (D. Utah Dec. 8, 2020); *see also Allen v. Am. Cyanamid*, No. 11-cv-055, 2021 WL 1086245, at *11 (E.D. Wis. Mar. 22, 2021) (noting that PEEDS-RAPEL addresses the "dearth of direct evidence" regarding a child's earning capacity "by approximating an individual's pre-injury earning capacity based on, among other factors, the occupations and educational attainment of the individual's immediate family"). In both form and practice, Young did not apply the PEEDS-RAPEL methodology, as he did not undertake to approximate Plaintiff's pre-injury capacity. Young also copy-and-pasted into his report multiple excerpts from federal regulations for Social Security disability claimants, but he does not analyze or apply them. *See* Ex. 3, at 7-9.

dream jobs.  "Whether she would be able to get to the level of becoming a physician is unknown," he acknowledged, "but there is nothing to, at that point, indicate that there's not a possibility."  Ex. 4, at 196:6-9.  He added:  "Prior to these events, there was no indication that she would not have been able to get to – into medical school."  *Id.* at 204:10-12.  Young knows of no studies that allow an expert to predict whether a pre-teen can become a successful doctor.  *See id.* at 194:21-195:3. Even so, he opines that "nothing in [Plaintiff's] middle school records" suggest "that she was not capable."  *Id.* at 195:16-18.  But when asked whether that meant **anybody** is capable of having a professional degree," *id.* at 171:11-12, Young demurred and pointed to Plaintiff's post-injury achievements—her graduation from Columbia and acceptance into programs with Sloan Kettering, PriceWaterhouse, and a major law firm—as evidence that she ought to have been able to follow that career path, *see id.* at 171:13-172:8.

Without conducting any independent assessment, Young also simply assumed it was true that Plaintiff could not obtain or maintain her aspirational jobs in her current state.  *See id.* at 115:11-117:14 (acknowledging information that Plaintiff "decompensated or failed after a brief period of time" in all her positions came from "my discussion with her").

## C.    Young's opinion is irrelevant without a causal connection to her injuries.

Even if it were reliable, Young's opinion about Plaintiff's current vocational capacity is irrelevant.  For tort damages like lost earning capacity, a plaintiff's current state is only half the story.  "An expert's opinion as to damages must be causally related to the alleged harm."  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  For a claim of future vocational losses, that causal connection might be shown by offering reliable opinions on the plaintiff's pre- and post-injury earning capacities and confirming that no other incidents could have contributed to the plaintiff's present state.

Of course, Young's conclusion that Plaintiff will miss out on millions of dollars from careers that were otherwise available to her as a seventh grader necessarily depends on a causal connection to Plaintiff's alleged abuse.  Young agreed his opinion reflected the view "that but for the events that occurred during middle school, she would have obtained a professional degree." Ex. 4, at 171:1-5.  That causation also appears by implication in his report, where he twice states that Plaintiff "had the ability **prior to this incident** to and to [sic] thrive as either a physician or an attorney."  Ex. 3, at 12, 16 (emphasis added).

Rather than articulate the basis for that but-for causation, however, Young admitted that he simply assumed it.  *See* Ex. 4 at 138:14-18 (Q: "[F]or purposes of your report, you assumed that anything that impacted her earnings or vocational ability negatively traces back to these events; right?"  A: "Correct.").  Young assumed "that prior to the events that are at issue in this case she had no medical issues that would affect her vocational abilities," and he "assumed that nothing else happened to her after the events that are at issue in this case that would have affected her ability to work."  *Id.* at 136:6-12; 137:8-18.  Worse yet, the source of those assumptions was Plaintiff's say-so and her experts' reports (which also are premised on Plaintiff's say-so).  *See id.* at 135:17-136-5.

"An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."  *Tyger Const.*, 29 F.3d at 142.  Experts may be free to extrapolate from other experts' data, but "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence" premised only on "the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*

Here, Young's opinion on Plaintiff's alleged vocational losses requires a causal connection that cannot be assumed away.  Testimony premised on the extraordinary leap Young makes is not reliable or helpful, and it is likely to confuse or mislead the jury.  Absent the critical causal connection, Young's opinion on Plaintiff's current employability is irrelevant.

* * *

Expert testimony "must be 'based on scientific, technical, or other specialized **knowledge** and not on belief or speculation.'"  *Sardis*, 10 F.4th at 290 (quoting *Nease*, 848 F.3d at 229).  Otherwise, the opinion amounts to "no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case."  *Nease*, 848 F.3d at 232.  Such unreliable expert testimony resembles "nothing more than proclaiming an opinion is true 'because I say so,'" and therefore must be excluded.  *Sardis*, 10 F.4th at 292 (quoting *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)).

Young's opinion is worse than "because I say so."  By taking Plaintiff's word to establish her pre- and post-injury capacity, her ideal but out-of-reach career path, and the but-for connection between her seventh-grade year and her current employability, Young's opinion is effectively "because Plaintiff said so."  Whatever label one might apply to that analysis, Young's resulting salary comparison hinges entirely on speculation and reflects little specialized knowledge.  Young's opinion is unreliable and should be excluded.

## IV.  The Court should exclude proposed Title IX expert Nancy Cantalupo.

Nancy Cantalupo is a law professor at Wayne State University.  *See* Ex. 5 (Cantalupo Rept.) at 27.  Her legal scholarship focuses on criminal law and sex discrimination.  *See id.*  She describes her area of study and expertise as "█████████████████████████████████████████████ █████████████████████████████████████."  *Id.* at 2.  She considers herself "a victim's rights

advocate."  Ex. 6 (Cantalupo Dep. Excerpts), at 114:21-115:1.  She has not given trainings to administrators of K-12 schools, has never done empirical research on how K-12 institutions respond to sexual harassment, and has not studied how school districts responded to or followed Title IX guidance in place from the Department of Education's Office of Civil Rights in 2010 and 2011.  *Id.* at 73:11-14, 109:6-110:2, 217:7-218:4.  Cantalupo has never worked in a K-12 setting. *Id.* at 95:17-96:6.  Other than a brief stint as a law firm associate, Cantalupo has worked exclusively in higher education as a professor, researcher, or administrator.  Ex. 5, at 29-30, 37-38.

Cantalupo prepared her preliminary report by reviewing deposition transcripts and documents provided by Plaintiff's counsel, meeting with B.R., B.R.'s mother, and B.R.'s brother, and compiling research.  *Id.* at 40; Ex. 6, at 146:10-13.  As Cantalupo described it, "[M]y process was, I talked with B.R. and her family members, and I got a sense of the facts of the case, and I started thinking about what – where the phenomenon that were – you know, how we can account for what happened here," that is, "what's the school's responsibility, what the individual's involved responsibility."  Ex. 6, at 134:16-135:1.  She admitted that she did not conduct any independent investigation of B.R.'s allegations but instead credited B.R.'s version of events and discounted testimony from school employees, whom she imagined had "circled the wagons" and were "trying to cover for things that they may not have done appropriately."  *Id.* at 158:11-161:16.

Through that "process," Cantalupo rendered the "expert opinion"



Ex. 5, at 3.

*Id.* at 15.  Second, Cantalupo opines that ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████.”  *Id.* at 18.

Cantalupo repeated those "two opinions" in her deposition, *see* Ex. 6 at 12:15-14:6, and reasserted

in a late-filed "supplemental report" with "a reasonable degree of professional certainty that FCPS

engaged in multiple Title IX violations" with respect to Plaintiff.  *See* Ex. 7 (Cantalupo Supp.

Rept.) at 16.

> **A.    Cantalupo's testimony is irrelevant because it opines on legal conclusions regarding the School Board's compliance with Title IX.**

Expert witnesses may not testify about the law.  *See U.S. Search, LLC v. U.S. Search.com*

*Inc.*, 300 F.3d 517, 522 n.4 (4th Cir. 2002) (noting that expert testimony constituting "legal

opinion" is inadmissible).  Indeed, "[e]xpert testimony that merely states a legal conclusion is less

likely to assist the jury in its determination."  *United States v. Barile*, 286 F.3d 749, 760 (4th Cir.

2002).  Thus, opinion testimony that states a legal standard or draws a legal conclusion is

"generally inadmissible."  *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

Despite the clear restriction against offering expert testimony on legal conclusions, the

**only** opinions Cantalupo articulates in her reports and testimony are that the School Board violated

Title IX.  *See* Ex. 5 at 3 ("███████████████████████████████████████████

███████████████████████████████████████. . . .");  *id.* at 15-18

(summarizing the first way FCPS failed to follow Title IX); *id.* at 18-25 (summarizing the second

way FCPS failed to follow Title IX); Ex. 7, at 1 (describing "the opinion [Cantalupo] offered to a

reasonable degree of professional certainty in [her] Preliminary Report that FCPS failed to follow

baseline requirements of Title IX or to heed the advice that the U.S. Department of Education's Office of Civil Rights ('OCR') had provided to schools like FCPS prior to August 2011").

District courts across the country, including in the Fourth Circuit, routinely exclude or limit the proposed testimony of Title IX experts poised to testify on whether a school violated Title IX. *See, e.g.*, *Doe v. Coastal Carolina Univ.*, No. 4:18-cv-268-SAL, 2021 WL 1651057, at *3 (D.S.C. Mar. 8, 2021) ("Because expert testimony on this issue would supplant the jury's role in evaluating and determining the facts, Bullard may not testify as to whether the University violated Title IX."); *Doe by Watson v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 718 (W.D. Va. 2018) (concluding expert's opinion that school was "'deliberately indifferent' to the risk of harm to the plaintiff and that the failure to provide adequate policy or training was a proximate cause of the sexual abuse" went "beyond the proper role of an expert witness").[6]

Because Cantalupo's opinions go solely to whether the School Board complied with Title IX, it will be unhelpful to a jury and invades the province of the Court. The Court should preclude Plaintiff from presenting her testimony at trial.

---

[6] *See also, e.g.*, *McCoy v. Isidore Newman Sch.*, No. CV 19-1810, 2022 WL 4533773, at *6 (E.D. La. Sept. 28, 2022), *on reconsideration in part*, 2022 WL 17252579 (E.D. La. Nov. 28, 2022) (explaining the court's and jury's respective roles and holding that "[t]estimony by [an expert] that Title IX or other federal regulations require a certain action and that [the school] did not perform it would usurp these roles"); *Unknown Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 4481519, at *16 (D. Ariz. Sept. 27, 2022) (excluding expert testimony "inasmuch as he seeks to testify about the legal requirements of Title IX and the application of those legal requirements to this case"); *Muccie v. Dailey*, No. CV-20-66-BU-BMM, 2022 WL 1746755, at *2 (D. Mont. May 31, 2022) (concluding that an expert's "report impermissibly opines on Title IX requirements and applies them to [the school's] conduct"); *Roohbakhsh v. Bd. of Trs. of Neb. State Colls.*, No. 8:17CV31, 2019 WL 5653448, at **4–5 (D. Neb. Oct. 31, 2019) (finding that experts' opinions whether a school's "conduct amounted to deliberate indifference is a question for the jury to determine and must be excluded"); *Doe v. Wharton Indep. Sch. Dist.*, No. 2:16-cv-48, 2017 WL 932935, at *1 (S.D. Tex. Mar. 9, 2017) (holding that proposed expert witnesses "invade the province of the Court in opining as to the legal requirements of Title IX").

**B.** **Cantalupo's testimony is both irrelevant and unreliable because it relies on inapplicable regulatory and administrative standards, and she is not qualified to opine on the proper standard.**

In reaching her opinions regarding the School Board's compliance with Title IX, Cantalupo goes into great detail about the Department of Education's guidance and administrative enforcement through its Office of Civil Rights (OCR). *See, e.g.*, Ex. 5, at 4-7. The Supreme Court has "never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of *administrative* requirements." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) (emphasis added). The only relevant issue under Title IX that the jury will be asked to decide is whether the School Board's response to Plaintiff's complaints was "clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999). Cantalupo herself admitted in her deposition that "the private right of action under Title IX is subject to a different legal standard than an administrative action under the Title IX regulations." Ex. 6 at 184:15-20. Nevertheless, her report focuses exclusively on the standards that govern the latter circumstances.

Cantalupo's testimony regarding OCR guidance and administrative enforcement mechanisms is irrelevant because Plaintiff cannot hold the School Board liable under any of those standards. *Gebser*, 524 U.S. at 292. Her testimony on those topics "would not be helpful to the jury because it would introduce a legal framework and standard that cannot be the basis of liability in this trial." *Coastal Carolina*, 2021 WL 1651057, at *2 (excluding expert testimony regarding OCR guidance and provisions of the Clery Act); *see, e.g.*, *Muccie*, 2022 WL 1746755, at *3 (prohibiting expert testimony on "specific requirements of Title IX or OCR guidance on Title IX").

In cases where courts have allowed testimony from a proffered Title IX expert, such testimony has been limited to "address[ing] the standards of care for remedying the problems that

Title IX was formulated to address." *Coastal Carolina Univ.*, 2021 WL 1651057, at *3. "Expert testimony regarding how schools effectively approach Title IX discrimination can be helpful to the jury." *Id.* Such testimony might include "the policies and procedures that other schools have implemented" in light of Title IX. *Doe YZ v. Shattuck-St. Mary's School*, 214 F. Supp. 3d 763, 781 (D. Minn. 2016). However, Cantalupo's report does not reach that potentially relevant question because she does not opine on the applicable standard of care or how it would have applied in these circumstances in 2011 and 2012. What's more, Cantalupo is not qualified by her experience to do so. Nor did she undertake to examine that question. She did not study how K-12 schools were responding to or following Title IX guidance during the relevant period. *See* Ex. 6 at 217:7-18. She could not possibly testify to the prevailing standard of care for K-12 school districts or administrators dealing with middle-schoolers or adolescents, because she admitted that she did not "compare what these administrators were doing in 2011, in 2012, with what other administrators and other school districts were doing in that same time period." *Id.* at 217:19-218:3.

Cantalupo's focus on irrelevant OCR standards and guidance, failure to opine on the applicable standard of care, and admission that she did not investigate (and therefore cannot testify regarding) the School Board's conduct relative to other school districts during the events in question make her testimony irrelevant and unreliable under Rule 702 and *Daubert.* The Court should preclude her testimony at trial.

### C. The Court should strike Cantalupo's untimely supplemental report.

Local Rule 26(D) imposes strict deadlines on the disclosure of experts. See E.D. Va. Loc. R. 26(D)(2) ("Timing of Mandatory Disclosure"). Absent permission from the Court, all expert disclosures must be made no later than 30 days following the rebuttal deadline. E.D. Va. Loc. R. 26(D)(3). The Court's Rule 16(b) Scheduling Order adopted Local Rule 26(D) and required

Plaintiff's expert disclosures no later than June 12, 2023, with any rebuttal disclosures due by July 27, 2023.  ECF 245 ¶ 6.  Discovery closed on August 10, 2023.  *Id.* ¶ 2.

Plaintiff served Cantalupo's report on June 12, 2023.  With permission from the Court, the parties conducted Cantalupo's deposition on August 14, 2023.  *See* ECF 373.  Even so, on September 11, 2023—well past every deadline for disclosure and discovery—Plaintiff, acting *pro se*, sent defense counsel  a "supplemental report" from Cantalupo.  *See* Ex. 7, at 1.  Plaintiff gave no explanation for the timing of that disclosure or its necessity.  Moreover, given that no party designated an expert on a topic related to Cantalupo's purported Title IX opinions, there also was nothing for Cantalupo to "rebut."  In her supplemental report, Cantalupo wrote, "I am submitting this supplement to discuss the effect of new evidence in this case since I submitted my Preliminary Report on the opinions I stated in that report."  *Id.*  In other words, Cantalupo's "supplemental report" is not even a rebuttal report—it is entirely new, and premised on evidence she reviewed subsequent to her deposition.

If the Court grants Defendants' request to exclude Cantalupo, the late-disclosed supplemental report is a moot issue.  But in the event she is allowed to testify, the Court should preclude her from testifying about any opinion from the "supplemental report."  That relief follows logically from the mandatory deadlines imposed by the Court and Local Rule 26(D) and the consequences for failing to abide by them under Rule 37.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  "The Fourth Circuit has made clear that excluding evidence submitted after the close of discovery is the appropriate sanction pursuant to Rule 37(c), if the untimely supplementation is not substantially justified or harmless."

*Advanced Training Grp. Worldwide, Inc. v. Proactive Techs., Inc.*, No. 1:19-cv-505, 2020 WL 2738381, at *4 (E.D. Va. Jan. 29, 2020) (Ellis, J.) (citing *Gomez v. Haystax Tech., Inc.*, 761 F. App'x 220, 229-30 (4th Cir. 2019)).

Plaintiff offered no justification for the untimely "supplemental report" from Cantalupo, much less a substantial one.  And the disclosure of new expert testimony after the close of discovery cannot be deemed harmless.  Cantalupo's responses to information reviewed after her deposition cause unfair surprise because discovery had already closed, and it would not be possible to cure that unfairness without disrupting the trial schedule.  What's more, given the irrelevance, unreliability, and unqualified nature of Cantalupo's testimony, there is no need to allow her "supplemental" thoughts at trial.  Most important, Plaintiff can offer no good excuse for why she served a supplemental report from Cantalupo.  *See Wilkins v. Montgomery*, 751 F.3d 214, 222-23 (4th Cir. 2014) (affirming the exclusion of a late-disclosed expert based on the five *Southern States* factors that guide a district court's discretion under Rule 37).  If Cantalupo is not excluded in her entirety, her testimony should be limited to preclude any opinions in her supplemental report.

## V.   The Court should exclude proposed interviewing expert Marcella Rustioni and proposed law enforcement expert Bill Woolf.

Marcella Rustioni is a Licensed Clinical Social Worker (LCSW) and certified forensic interviewer who specializes in the interviewing of child and adolescent alleged victims of abuse and witnesses to crimes.  *See* Ex. 8 (Rustioni Rept.) at 2.  She has never met or spoken to Plaintiff. Ex. 9 (Rustioni Dep. Excerpts) at 105:16-20.  Plaintiff retained Rustioni to review the video recordings of the March 8, 2012 interview of Plaintiff conducted by a detective with non-party Fairfax County Police Department (FCPD) and "share [her] thoughts on how it was conducted." *Id*. at 89:12-14.  Based on her review of the video recordings, Rustioni prepared a five-page expert report.  *See* Ex. 8.  In her report, Rustioni ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████. *See id.* at 3-4.

Bill Woolf is a former police officer and detective with experience investigating "human trafficking, missing and exploited children, gangs, and other forms of organized and financial crime." Ex. 10 (Woolf Rept.) at 2. Based on his review of the Plaintiff's allegations and records related to the FCPD investigation, as well as his personal experience, Woolf offered three expert opinions. ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ "fell below the standard of care for police detective investigations of child sex abuse allegations." *Id.* Woolf acknowledged that these findings "were based on statements made to [him] by the plaintiff" and he "did not conduct an investigation" into her claims. Ex. 11 (Woolf Depo. Excerpts) at 146:2-17.

### A. Testimony about the efficacy of FCPD's investigation and sex trafficking is irrelevant.

Although Plaintiff takes aim at the quality of FCPD's investigation and treatment of her, the FCPD is not a party to this lawsuit. The allegations regarding Plaintiff's interactions with the FCPD focus on events in March 2012. *See* SAC ¶¶ 199-208. By that time, Plaintiff had already stopped attending classes at RCMS. *See id.* ¶ 197 (noting the School Board approved thirty days of homebound instruction "on or about February 23, 2012").

Rustioni's and Woolf's opinions on police investigations are wholly irrelevant to the issues in this case. The jury will not be called upon to decide whether or not FCPD conducted an adequate investigation into Plaintiff's allegations, and will likely be confused by the injection of the

adequacy of FCPD's investigation into this case.  In claims brought under Title IX, schools can be liable for damages only for **their** own alleged misconduct.  *See Davis*, 526 U.S. at 640–41.

The same is true regarding Plaintiff's reliance on allegations and testimony related to sex trafficking.  The SAC includes "general allegations" regarding sex trafficking in northern Virginia, *see* SAC ¶¶ 40-57, but the only specific assertion that  refers back to the general allegations is the claim that unknown individuals assaulted her "consistent with the *modus operandi* of human and sexual traffickers in the Fairfax community as alleged *supra*." *Id.* ¶ 173.  Moreover, the Court has dismissed Plaintiff's claim that attempted to fault the School Board's efforts to address the problem of sex-trafficking in the region.  *See* ECF 236, Opinion and Order, at 12-22.  Though Plaintiff appears to offer Woolf to opine on the resemblance of her allegations to incidences of gang-related sex trafficking, there is no evidence or testimony in this case that Plaintiff claimed to anyone, let alone school officials, that she was being trafficked.  Moreover, Woolf was not asked to investigate, and does not opine on, whether Plaintiff herself was trafficked or raped by the members of an established gang.  *See* Ex. 11 at 291:13-293:20 (agreeing to additional steps he would have made had he been asked to investigate Plaintiff's allegations).  Instead, he was asked to offer an opinion based on "facts and circumstances" that were "presented to [him]." *Id.* at 307:20-308:3 ("I was asked to offer an opinion as to whether or not the facts and circumstances, as presented to me, were consistent with what was happening regarding sex trafficking at that time in Fairfax County, and whether or not the police investigation was sufficient").  His general experience combating the problem of gang-related sex-trafficking is not probative of any issue in this case.  Raising unfounded assertions and opinion testimony on gang-related sex trafficking would only serve to confuse or inflame the jury.

Because Rustioni's and Woolf's views on the efficacy of FCPD's investigation and Woolf's comparisons to gang activity are irrelevant, unhelpful and confusing to the jury, and do not apply to the facts at issue in this case, "*Daubert* requires that [they] be excluded." *Sardis*, 10 F.4th at 281. Moreover, if there were any relevance to the testimony, its probative value would be substantially outweighed by the risk of unfair prejudice, confusion of the issues, misleading the jury, and wasting time. Fed. R. Evid. 403(a).

**B.     Testimony about FCPD's investigation should be excluded under Rule 403.**

Even if FCPD's investigation were somehow relevant here, the Court should still exclude it under Rule 403. The School Board and FCPD are both entities within the Fairfax County government but they are independent from each other. The Constitution of Virginia vests authority in the School Board to supervise Fairfax County's schools. Va. Const. art. VIII, § 7. In contrast, FCPD exists as a division of Fairfax County. *See* Va. Code § 15.2-632(1) (granting localities the authority to establish police departments). Although a layperson may consider both public school teachers and police officers "county employees," they do not work for the same entities and are not responsible for each other's conduct. Like the sex-trafficking opinion testimony offered by Woolf, Plaintiff's plan to have experts criticize FCPD's investigation of her allegations risks unfair prejudice, confusion of the issues, misleading the jury, and wasting time. Fed. R. Evid. 403(a).

**VI.    The Court should exclude proposed psychological expert Joshua Cisler.**

Joshua Cisler, Ph.D., is a psychologist and researcher. *See* Ex. 12 (Cisler Rept.) at 21.[7] Since receiving his doctorate in 2010, Dr. Cisler has focused his research on trauma exposure, PTSD, and neurobiology. *Id.* at 2. Dr. Cisler's reports offer three opinions, all regarding the "physical" nature of PTSD. ████████████████████████████████████

---

[7] Both of Dr. Cisler's initial and rebuttal reports are attached at Exhibit 12.

 *Id.*

**A.    Dr. Cisler's testimony is unreliable and irrelevant because he did not examine or evaluate Plaintiff.**

By his own admission, Dr. Cisler failed to apply his own principles and methodology to the facts of this case.  He testified that the "primary method" on which he was trained to study brains was through the use of magnetic resonance imaging ("MRI").  Ex. 13 (Cisler Dep. Excerpts) at 25:2-11.  Dr. Cisler's published studies also rely on MRI technology to investigate the structure of their subjects' brains.  *Id.* at 58:20; *see id.* at 75:21-76:2 (Q:  "In your studies of brain structure and brain function, did you use technology other than MRI?"  A: "No.").

Yet, Dr. Cisler was not given and did not review any scan of Plaintiff's brain in rendering his opinions.  *Id.* at 82:16-18.  Indeed, by the end of his deposition, Dr. Cisler was forced to admit that he "can't say that [Plaintiff] had changes in her brain" because he had not "seen an MRI."  *Id.* at 99:5-11.  That concession betrays the unreliability of his opinion.  *See Nease*, 848 F.3d at 232 (explaining testimony fails under *Daubert* when it is not "based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case").

Moreover, what little Dr. Cisler **did** do to consider the facts of this case demonstrates the irrelevance of his opinion.  He never examined, evaluated, or even met Plaintiff.  Ex. 13 at 45:8-12.  Instead, he obtained all the information about Plaintiff that appears in his report from the expert report of Dr. Ryan, which he assumed (without verifying) was accurate.  Ex. 12 at 3; Ex.

13 at 45:13-19.  As a result, even he does not consider himself sufficiently informed to be able to render an opinion regarding Plaintiff's psychological condition or characteristics.  *Id.* at 48:17-21. If Plaintiff's own expert agrees he cannot render an opinion within his area of expertise, there can be no argument that his testimony is irrelevant.

> **B.      Dr. Cisler's opinion regarding the physical nature of PTSD is irrelevant.**

When the few statements about Plaintiff are pushed away from Dr. Cisler's report, what remains is essentially a science report on the physical character of PTSD.  That issue has no "valid scientific connection to the pertinent inquiry" that the jury will be called upon to make in this case. *Belville*, 919 F.3d at 232.[8]  Because Dr. Cisler's opinion on the physical nature of PTSD "does not even apply to" any jury question, it is "the touchstone of irrelevancy."  *Sardis*, 10 F.4th at 289.

## CONCLUSION

For the reasons discussed above, the School Board respectfully requests that the Court grant the School Board's motion and enters an order (a) precluding any expert from attesting to any witness's credibility or the veracity of Plaintiff's allegations; (b) limit the testimony of Plaintiff's proposed expert Eileen Ryan; and (c) exclude the testimony of Plaintiff's proposed experts Gary Young, Nancy Cantalupo, Marcella Rustioni, Bill Woolf, and Joshua Cisler.

Dated: January 12, 2024                     Respectfully submitted,

                                            By: */s/ Sona Rewari*
                                                Sona Rewari (VSB No. 47327)
                                                Ryan M. Bates (VSB No. 74661)
                                                Scott W. Burton (VSB No. 90601)
                                                HUNTON ANDREWS KURTH LLP
                                                2200 Pennsylvania Avenue, NW

---

[8] To be sure, Plaintiff relies upon Dr. Cisler's testimony in her attempt to skirt the bar on emotional distress damages in Title IX cases following the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).  The School Board previously explained why Dr. Cisler's testimony is of no use on that question.  *See* Def.'s Reply ISO Motion for Partial Summ. J. on Title IX Damages, ECF No. 578, at 8-9.

Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
rbates@HuntonAK.com
burtons@HuntonAK.com

*Counsel for Defendant Fairfax County School Board*

By: */s/ Michael E. Kinney*
    Michael E. Kinney (VSB #65056)
    MICHAEL E. KINNEY, PLC
    1801 Robert Fulton Drive
    Suite 120
    Reston, VA 20191
    Telephone: (703) 956-9377
    Facsimile: (703) 956-9634
    mk@kinneyesq.com

*Counsel for Defendants A.F., S.T., T.B., P.A.H., B.H., M.P.F, M.C., F.T., and J.F.*

By: */s/ James F. Davis*
    James F. Davis (VSB #41387)
    JAMES F. DAVIS, P.C.
    10513 Judicial Dr., Suite 200
    Fairfax, VA 22030
    Tel: (703) 383-3110
    Fax: (571) 748-6564
    jfd@jfdavislaw.com

*Counsel for Defendant C.K.*

By: */s/ Bruce M. Blanchard*
    Bruce M. Blanchard (VSB # 23778)
    James P. Miller (VSB # 89409)
    ODIN, FELDMAN, & PITTLEMAN, P.C.
    1775 Wiehle Avenue, Suite 400
    Reston, VA 20190
    Tel: (703) 218-2102 (Blanchard direct)
    (703) 218-2154 (Miller direct)
    Fax: (703) 218-2160
    Bruce.Blanchard@ofplaw.com
    Jim.Miller@ofplaw.com

*Counsel for Defendant J.O.*

-29-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2024, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By:  */s/ Sona Rewari*
   Sona Rewari