1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    --------------------------------x
                                     :
4    B.R.                            : Civil Action No.:
                                     : 1:19-cv-917
5                    Plaintiff,      :
            v.                       :
6                                    :
     F.C.S.B., et al.,               : March 6, 2024
7                                    :
                     Defendants.     :
8    --------------------------------x

9                 TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
10             UNITED STATES DISTRICT COURT JUDGE

11               A P P E A R A N C E S

12   FOR THE PLAINTIFF:     JONATHAN FAHEY, ESQ.
                            Holtzman Vogel Baran Torchinsky
13                          & Josefiak, Pllc
                            2300 N Street NW
14                          Suite 643a
                            Washington, DC 20037
15
                            ALISON ANDERSON, ESQ.
16                          Boies Schiller Flexner, LLP
                            2029 Century Park East
17                          Suite 1520
                            Los Angeles, CA 90067
18
                            BRITTANY ZOLL, ESQ.
19                          Boies Schiller Flexner, LLP
                            100 SE 2nd Street
20                          Suite 2800
                            Miami, FL 33131
21
                            ANDREW BRENNER, ESQ.
22                          Boies Schiller Flexner, LLP
                            100 SE 2nd Street
23                          Suite 2800
                            Miami, FL 33131
24

25
```

2

```
 1                              ROBERT KEEFE, ESQ.
                                Boies Schiller Flexner, LLP
 2                              100 SE 2nd Street
                                Suite 2800
 3                              Miami, FL 33131
       FOR THE DEFENDANT:       SONA REWARI, ESQ.
 4     (F.C.S.B)                RYAN BATES, ESQ.
                                Hunton Andrews Kurth LLP
 5                              2200 Pennsylvania Ave NW
                                Washington, DC 20037.
 6
       FOR THE DEFENDANT:       MICHAEL E. KINNEY, ESQ.
 7     (Individual             The Law Office of Michael E. Kinney
       defendants)             1801 Robert Fulton Drive
 8                              Suite 120
                                Reston, VA 20191.
 9
                                JAMES F. DAVIS, ESQ.
10     FOR THE DEFENDANT:       James F. Davis, P.C.
       (C.K.)                   10513 Judicial Drive.
11                              Suite 301.
                                Fairfax, VA 22030.
12
                                BRUCE M. BLANCHARD, ESQ.
13     FOR THE DEFENDANT:       Odin, Feldman & Pittleman, PC.
       (J.O.)                   1775 Wiehle Avenue.
14                              Suite 400.
                                Reston, VA 20190
15

16     OFFICIAL COURT REPORTER:        MS. TONIA M. HARRIS, RPR
                                       United States District Court
17                                     401 Courthouse Square
                                       Tenth Floor
18                                     Alexandria, VA 22314

19

20

21

22

23

24

25
```

B.R. v. F.C.S.B.

3

1              **P R O C E E D I N G S**

2   (Court proceedings commenced at 10:03 a.m.)

3

4              THE COURTROOM CLERK:  Civil action 2019-917.  B.R.

5   versus F.C.S.B., et al.

6              Counsel, please note your appearances for the

7   record.

8              MR. BRENNER:  Good morning, Your Honor.  Andrew

9   Brenner here from Boies Schiller on behalf of the plaintiff.

10  With me is the plaintiff, B.R.

11             Jonathan Fahey is here from the Holtzman Vogel firm.

12             MR. FAHEY:  Good morning.

13             MR. BRENNER:  I have with us two of our associates

14  from Boies Schiller, Brittany Zoll and Robby Keefe.  And a

15  third associate who was going to be here, but had a death in

16  the family last night, but Samantha Peterson.  All three of

17  them will be involved in today's hearing with Your Honor's

18  indulgence, and they will also be involved in the trial and

19  taking witnesses.

20             THE COURT:  If we could, and I appreciate it,

21  Mr. Brenner, if you could all counsel who are going to address

22  the Court, if you could simply say your name at the beginning,

23  I'll stand good with the court reporter so that will be

24  helpful.

25             MR. BRENNER:  Thank you.

B.R. v. F.C.S.B.

4

1          MS. ANDERSON:  And, Your Honor, Alison Anderson.

2          MR. BRENNER:  Oh, I'm sorry.

3          MS. ANDERSON:  No problem.

4          THE COURT:  No problem.

5          MR. BRENNER:  Alison Anderson is here too, Judge.

6          MS. REWARI:  Good morning, Your Honor.  Sona Rewari

7  here for the Fairfax County School Board from Hunton Andrews

8  Kurth.  And with me is my partner, Ryan Bates, and we also

9  have Kevin Elliker and Scott Burton from my firm.

10          THE COURT:  All right.  Same rules apply.  When you

11  come to the lectern, if you can identify yourself for the

12  record, that would be great.

13          MS. REWARI:  Thank you.

14          THE COURT:  Mr. Blanchard.

15          MR. BLANCHARD:  Good morning, Your Honor.  Bruce

16  Blanchard here from Odin, Feldman, and Pittleman here on

17  behalf of defendant, J.O.

18          THE COURT:  Good morning, sir.

19          MR. BLANCHARD:  Good morning, sir.

20          MR. KINNEY:  Good morning, Your Honor.  Michael

21  Kinney on behalf of the nine individual school defendants.

22          THE COURT:  Okay.

23          MR. DAVIS:  Good morning, Your Honor.  James Davis

24  on behalf of the defendant, C.K.

25          THE COURT:  Very good.  Good morning to all.

B.R. v. F.C.S.B.

5

1           This matter comes before the Court on several

2    matters.  I'm going to kind of give you a playbook as to how

3    the Court wants to handle everything that is before the Court.

4    First, what we'll do is we'll go through the juror exclusion.

5    And I want everyone to understand and in the context of going

6    through juror exclusion, this is an exercise during

7    traditional voir dire.  This is essentially allowing you all

8    to participate in the Court's excusal process.  So ultimately

9    it is up to the Court to decide whether to excuse a person or

10   not.

11          What we have before us is several -- are several

12   situations where the parties agree to excuse.  And what I'm

13   going to do is I'm going to identify those parties that -- I'm

14   going to identify those individuals who the parties have

15   agreed to excuse by number and you can keep track of them and

16   they should track what you all agree to.  I'm just going to go

17   through them.

18          Number one, number two, number five, number seven,

19   number 14, number 15, number 16, number 24, number 25 -- 31

20   has already been excused by the Court -- 32, 42, 43, 44, 47,

21   49, 53, 55, 56, 57, 59, 60, 61, 64, 68, 71, 73, 81, 82, 83,

22   87, 90, 94, and 98.

23          Does that comport with what the parties' record

24   show?

25          MR. BATES:  Yes, Your Honor.

———B.R. v. F.C.S.B.———

6

1          MS. ANDERSON:  Yes, Your Honor.

2          THE COURT:  As far as the Court was able to discern

3    there were three proposed exclusions by the defendant --

4    excuse me, by the plaintiff.  And four proposed exclusions by

5    the defendant.

6          Let's take a look at number nine.  This is an

7    individual who has spring break plans with their kids.  Has

8    two kids at the Fairfax County public schools.  Apparently has

9    had some training in sexual assault.  Anybody want to say

10   anything else?  The Court has its view as to the appropriate

11   disposition on that.  Anybody want to say anything in

12   particular?

13         MR. BATES:  Ryan Bates, Your Honor.  Nothing from

14   the School Board.

15         THE COURT:  Yes, sir.

16         MS. ANDERSON:  Alison Anderson, Your Honor.  Nothing

17   from the plaintiff.

18         THE COURT:  The Court's determination on number nine

19   is that that person will be excused.  Focusing specifically on

20   her spring break travel plans with her children.

21         The next one is No. 26.  This individual is an

22   executive director of the American Butter Institute, who has a

23   big meeting at the end of April out of town.  Two kids in

24   Fairfax Public School system and a brother who was the subject

25   of Title IX investigation.

———————————————————B.R. v. F.C.S.B.———————————————————

7

 1          Anyone else have anything they want to say about

 2   this person?

 3          MS. ANDERSON:  Nothing from the plaintiff, Your

 4   Honor.

 5          MR. BATES:  Nothing from the School Board, Your

 6   Honor.

 7          THE COURT:  Number 26 will be excused by the Court

 8   focusing primarily on his big meeting at the Butter Institute.

 9          The next one is 76.  A retired teacher whose wife

10   and daughter are also teachers.  He has bladder problems and a

11   partial hearing loss, and he has some clear opinions about

12   Title IX litigation.

13          Anybody else have anything else they want to say

14   about that?

15          MS. ANDERSON:  Your Honor -- Alison Anderson -- the

16   only thing that I would add is that he later said "extremely

17   hard of hearing" but that's it.  Thank you, Your Honor.

18          MR. BATES:  Your Honor, Ryan Bates.  The School

19   Board's position is this was a real borderline issue having

20   bladder issues.  It appears that the Court will be taking

21   regular breaks, but we're fine with whatever the Court decides

22   on this one.

23          THE COURT:  The Court is going to excuse 76.  I will

24   let you all know that I was teased when I was a circuit judge

25   about having an iron bladder and so one of the lawyers came up

———B.R. v. F.C.S.B.———

8

1   to me, who was a friend, and said, Judge, you know, not

2   everybody is wired like you so we need to take breaks.  So I

3   am sensitive to people who need breaks, so we're going to go

4   ahead and excuse 76.

5           Next one is Number 21.  Defendant's proposed

6   exclusion.  Anybody have anything they want to say about that

7   one?

8           MS. ANDERSON:  Your Honor, I just wanted to note on

9   defendants -- I made a mistake on number 96.  And we actually

10  would agree to dismiss 96.

11          THE COURT:  Okay.

12          MS. ANDERSON:  As far as 21, nothing to add, just

13  that more questioning might help that one.

14          THE COURT:  All right.

15          MR. BATES:  Your Honor, Ryan Bates for the School

16  Board.

17          We believe she definitely needs to be excluded.  She

18  says it takes her a long time to process words and

19  information.  And she adds that she gets distracted very

20  easily and quickly and feels like she will miss important

21  information and not understand what's going on.  And with a

22  six-week trial we feel that that's important.

23          THE COURT:  We'll talk about the six-week trial in

24  just a bit.

25          This one is close for the Court.  My concern, and

B.R. v. F.C.S.B.

9

1  all of you are experienced counsel.  My concern is that if we

2  have someone like this who starts talking during the voir dire

3  process, that's going to incentivize other people to want to

4  try to jump on the train.  So I'm going to go ahead and excuse

5  her.  Like I said, it's close.

6          85.

7          MS. ANDERSON:  Your Honor, the only thing I would

8  add for 85 is that while he says planning to move, it's at the

9  end of April may make it more difficult, he doesn't say no.

10  In relation to his wife being a victim of sexual assault, you

11  know, he doesn't indicate he can't be impartial, and I think a

12  lot of people probably know someone who has been a victim of

13  either sexual assault or harassment, so that's what I would

14  add to number 85.

15          MR. BATES:  Your Honor, Ryan Bates for the School

16  Board.

17          As counsel pointed out, this individual says he's

18  planning to move in April.  And also, equally important, is in

19  the response to 32, he says he cannot be impartial in this

20  case.

21          THE COURT:  He said -- was his specific response

22  that he could not be impartial or would struggle with being

23  impartial?

24          MR. BATES:  It says, "Do you have any reason why you

25  cannot sit impartially in this case?"  And he checks the "yes"

B.R. v. F.C.S.B.

10

1    box.

2              THE COURT:  All right.  The Court will excuse 85

3    based upon the -- primarily on the fact that he's moving in

4    April, but we won't be trying this case in April, but let's

5    excuse him.  It's close.

6              And the last one, 99.  This is an individual who has

7    English as a second language and struggles with complex

8    concepts, high blood pressure, and anxiety.  And there were

9    other issues too.

10             MS. ANDERSON:  Your Honor, this was a close one for

11   us.  We agreed to stipulate our other jurors that had

12   difficulties with English.  But she said only in relation to

13   complex ideas.  I think if this was a patent case, it may be

14   worth asking her more questions, but we're, you know, this was

15   a close one for us.

16             MR. BATES:  Judge, I think there's going to be a lot

17   of complex issues in this case that are complicated.  There

18   are several expert witnesses so, I think, if somebody cannot

19   understand English, either perfectly or near perfectly, then I

20   think that would be a problem.  So we'd ask that she be

21   excused.

22             THE COURT:  The Court will excuse 99 based upon the

23   issues -- medical issues primarily which suggest that the

24   young lady might have some struggles.

25             Has the Court addressed all of the ones that are

—B. R. v. F. C. S. B.—

11

1    part of the juror exclusion issue?

2            MR. BATES:  Yes, Your Honor.

3            THE COURT:  Very good.  With regard to the several

4    motions in limine, I'm going to ask a question that I think I

5    already know the answer to, but have you all come to any

6    agreement on any of the motions in limine?

7            MR. BRENNER:  Andrew Brenner on behalf of the

8    plaintiff.  I think other than what's reflected in the papers,

9    I think in the papers there's some partial agreements to

10   certain motions in limine, I believe on both sides, but other

11   than that we have not come to any additional agreements on the

12   motions in limine.

13           THE COURT:  All right.  Well, I will encourage the

14   parties to understand that we all work hard and cases are

15   important to all sides and it's important to the Court, but

16   the fact-finders tend not to like to get caught up in minutia.

17   It takes away the focus of what the litigation should be

18   about.  So let's try to put our best feet forward and come up

19   with ways where we can streamline this case significantly.  I

20   do agree with counsel when he says the case, with prior

21   counsel, when she says the case is not particularly

22   complicated.  It's not a patent case, but, you know, from what

23   the Court can discern from looking at all of the filings and

24   the records, and circumstances that have been presented, this

25   is going to be, essentially, a fact driven case and one side

—B.R. v. F.C.S.B.—

12

1    is going to lose pretty significantly or win pretty

2    significantly.  So just be aware of that.  There's always

3    risks in litigation.

4           The Court has had an opportunity to review each one

5    of the motions in limine and I don't really need you to, in

6    depth, go over any of the things that the Court is aware of.

7    So the way we're going to run the motions in limine is the

8    proponent of the motions in limine gets two minutes and the

9    opponent of the motion in limine gets one minute, if you need

10   it.  And so that's the way we'll conduct it.  Two minutes for

11   the proponent, one minute for the opponent.

12          All right.  Docket 634.  School disciplinary records

13   to allow evidence of February 2011, incident regarding J.O.'s

14   suspension for threatening to send nude photographs.

15          MR. BLANCHARD:  Good morning, again, Your Honor.

16   Bruce Blanchard for J.O.

17          Your Honor, I think we've addressed the issue in the

18   brief.  This is a situation where a boy had sent pictures to

19   our client.  They had exchanged them.  He threatened to show

20   them in school.  She responded back.  She got a suspension.

21   She was 11 years old in the 6th grade at a different school,

22   didn't involve the plaintiff at all, and does not in any way

23   relate to prove a fact in support of an assault a year later,

24   which is the sole count against my client.

25          MR. BRENNER:  Andrew Brenner.  Your Honor, I note

B.R. v. F.C.S.B.

13

1    that this motion is only brought by defendant J.O. and it's

2    important because while there could be some limine

3    instructions to this evidence as it relates to J.O. to the

4    extent, I think, counsel is arguing some sort of propensity

5    argument.  The issue of notice to the school about these

6    students, and this will come up in the C.K. motion too, is

7    obviously relevant.  I noticed F.C.S.B. did not join in this.

8    What the School Board knew about the particular defendants

9    when they got allegations regarding this defendant, I think --

10   I don't think it's disputed that's a relevant fact.  So to the

11   extent there's anything to be done here, it's some sort of

12   limiting instruction as to J.O. but the evidence itself is

13   relevant.

14          THE COURT:  All right.  The Court believes that the

15   fluidity of trial will dictate the circumstances regarding

16   this particular motion in limine.  So I'm going to deny the

17   motion in limine and instruct counsel that as the trial

18   progresses the motion can be renewed.  We'll see how the

19   evidence pans out, so it's denied at this point.

20          MR. BLANCHARD:  Your Honor, may I ask one question?

21          THE COURT:  Yes, sir.

22          MR. BLANCHARD:  Would it be prohibited from being

23   addressed in opening until we get to a point --

24          THE COURT:  I would think that that's probably the

25   best way because then it would require an instruction to say

———B.R. v. F.C.S.B.———

14

1  that you're supposed to disregard it.  So I would prefer to

2  let it play out and, obviously, if you need to, you can

3  address it in closing argument.

4          MR. BLANCHARD:  Okay.  So the plaintiff should not

5  mention it in opening and we will see if it comes in as it

6  comes out.

7          THE COURT:  I think that's the best way.

8          MR. BRENNER:  Just so I understand.  I want to be

9  clear, because I'll be doing the opening.  We will not

10  mention, obviously, the record or anything like that.  I think

11  we can and should mention and ask permission to mention that

12  the issue of:  You will receive evidence about what the School

13  Board knew or didn't know about particular people that are

14  alleged to have been involved and just leave it at that,

15  because I have to tee up that issue.

16          THE COURT:  You can speak about it generally, but

17  you cannot speak about this particular instance with

18  particularity.

19          MR. BRENNER:  Understand.  Thank you.

20          THE COURT:  Second one.  School disciplinary records

21  focusing not allowing evidence of J.O.'s grades, health,

22  administrative, and administrative enrollment records.

23          MR. BLANCHARD:  Good morning, Your Honor.  I don't

24  think those are relevant.  Frankly, if they are related to

25  health, grades, and other things, I really don't have any

B.R. v. F.C.S.B.

15

1   problem with those.  I just don't think they support anything.

2   My problem is is in the exhibits that they've provided us, we

3   get a packet of an exhibit with a bunch of documents and

4   they're clinical records, nurse's notes, grades, and then all

5   of a sudden there's a disciplinary record.  And particularly

6   one that we'll get to, but it is one that happened

7   after the -- the plaintiff was no longer at the school, where

8   there are anti-Semitic remarks made.  And that is my concern

9   that those documents would come in through the irrelevant

10  documents of --

11          THE COURT:  Let me ask this, and again, I'm trying

12  to be delicate when I ask this question.  Is the plaintiff of

13  the Jewish faith?

14          MR. BLANCHARD:  I don't believe so, Your Honor.

15          MR. BRENNER:  That's correct, Your Honor.

16          THE COURT:  Okay.  All right.  As I said, I think it

17  would make that situation a little more attenuated if the

18  plaintiff was Jewish and there were anti-Semitic remarks

19  directed.

20          All right.  What is the probative value of this?

21          MR. BRENNER:  Your Honor, I think what Mr. Blanchard

22  is saying is that in the exhibits sometimes we attach the file

23  of the student.  So we have no intention of going through her

24  health or her grades.  I actually don't see any way that we

25  would get into the anti-Semitism.  I say "no way" just to the

—————— B.R. v. F.C.S.B. ——————

16

1   extent of a witness says something that directly contradicts

2   something we know.  In fact, we have no interest in using that

3   affirmatively.

4           I just would like to correct one thing because it

5   will come up in other motions.  B.R. is a student in the

6   Fairfax County public school system until she leaves the

7   Fairfax County public school system, which is not when she

8   leaves in-person learning at Rachel Carson Middle School.  So

9   when Mr. Blanchard said this is after she's no longer a

10  student, I think that's technically -- I think what he's

11  trying to say is in-person learning, but that's not the

12  standard for Title IX.  We have no intention of going through

13  her health or her grades, either in testimony or in documents.

14          THE COURT:  All right.  The Court is going to grant

15  the motion in limine with the caveat that if the door is

16  opened somehow through testimony, then you can readdress that

17  with the Court.  And it would be my suggestion that the way

18  that I would prefer that to be handled is you asking to

19  approach the bench saying that we believe that the matter --

20  the door has been opened for the circumstances that have been

21  presented because of testimony, and we would like to renew our

22  request in that regard.  So that's the best way to handle it.

23          The next one is school disciplinary records.

24  Exclude records that postdate B.R.'s withdrawal from RCMS,

25  allow schools to submit records that predate B.R.'s withdrawal

B.R. v. F.C.S.B.

17

1   only when they are relevant to establish that Fairfax County

2   School Board had notice of alleged bullying and harassment,

3   prior to B.R.'s withdrawal, but not if they are relevant to

4   the assault claim against J.O.

5           B.R.'s counsel is apparently going to alert the

6   Court for a limiting instruction to such exhibits.

7           MR. BRENNER:  I understood what you said on the

8   first two would cover this as well.

9           THE COURT:  Very good.

10          MR. BLANCHARD:  Your Honor, I wasn't clear.

11          THE COURT:  Yeah, I think you won.

12          MR. BLANCHARD:  I'm not objecting.  I think there

13  were other --

14          THE COURT:  They are subparts.

15          MR. BLANCHARD:  Okay.

16          THE COURT:  Yes.  All right.

17          Social media posts.

18          MR. BLANCHARD:  Your Honor, there was social media

19  posts by my client after she was served with a suit and first

20  learned of the allegation.  She was a sophomore at VCU

21  University and at 19 years old she talked to a couple of

22  people.  I don't have, again, a problem conceptionally with

23  her being questioned about them.  I have a problem with making

24  sure that there's a completeness component.  For example, in

25  the defendants -- I mean plaintiff's brief, they quote the

18

1    first part of the sentence in one of those texts but not the

2    second part.  In all of them, my client denies that

3    this happened and she did anything.

4              And I need to just make sure that in the interest of

5    fairness if they are going to go in there, that they have to

6    be complete.

7              MR. BRENNER:  Andrew Brenner.  I think the rule of

8    completeness is a separate issue, which we can address when it

9    comes in.  To be clear what this record is -- I think what

10   Mr. Blanchard is talking about is a post from his client

11   saying that my client was, I think the term is, "hella

12   bullied."  While a student at Rachel Carson, obviously

13   relevant, obviously an admission.  I think what he's saying is

14   she also then denies the physical assault, but, again, that's

15   an issue we'll deal with as completeness when it comes up.  It

16   sounds like we're in agreement that at least that the part,

17   you know, is relevant and admissible, and we can deal with the

18   rest when it comes up.

19             THE COURT:  The completeness issue is something that

20   I think is the easy one.  If anyone is going to offer any

21   exhibit, you have to offer the entire exhibit without any

22   redaction or such.

23             MR. BRENNER:  Understood.

24             THE COURT:  Very good.  Okay.  Social media post

25   with regard to Plaintiff Exhibit 583.

B.R. v. F.C.S.B.

19

1    MR. BLANCHARD:  Your Honor, my colleague was working

2  on the case.  He isn't here.  583 is the -- is that the post

3  -- I think that's the post related to a mug shot?

4    THE COURT:  Yes.

5    MR. BLANCHARD:  Thank you, Your Honor.  I appreciate

6  the assistance.

7    It's a post about a mug shot challenge that was

8  apparently an internet thing when my client was in college.

9  That says -- she comments on the or responds to a comment on

10  this mug shot challenge that says, "Wait until they see mine."

11  It has nothing to do with this case.  It has nothing -- I will

12  tell the Court my client had -- when she was in college, she

13  was arrested one evening on a domestic assault that the

14  Commonwealth's Attorney's Office dismissed the next day

15  because they realized she was actually the victim instead of

16  the --

17    So there's no record, there's no conviction record

18  or anything else.  I don't know that this comment relates to

19  that or to anything.  It's just teenagers or young people on

20  the internet talking about a -- something going around where

21  post -- people post mug shots.  And she says, "Just wait until

22  you see mine."  But it has nothing to do with this case.

23    Again, I think the implication here is just to put

24  evidence before this jury that somehow my client is a bad

25  person.  And I think this is irrelevant and it will take us

──────────B.R. v. F.C.S.B.──────────

20

1   offline, getting to minutia of something that has nothing to

2   do with this case.  And no assistance in proving any element

3   of the one count of assault and battery when my client was 12

4   in 2011.

5          MR. BRENNER:  Your Honor, Andrew Brenner.  Subject

6   to the opening the door exception, we have no intention of

7   affirmatively using the mug shot posts until we get permission

8   from the Court to do so.  And frankly, I don't anticipate that

9   we'll be asking for it.

10          THE COURT:  The Court will take that one under

11  advisement.  Again, I accept your representation that there is

12  no intention at this time to present that.  So we'll set that

13  aside.

14          Request for ongoing limiting instructions.

15          MR. BLANCHARD:  Good morning, again, Your Honor.

16  Bruce Blanchard.

17          As the Court knows, in two minutes I can't go

18  through everything, but I think -- I don't know if it's

19  80 percent, 90 percent, 95 percent of the exhibits in the

20  plaintiff's evidence goes to their claim against the School

21  Board and that is the primary target of this case.  And so,

22  there's a whole lot of evidence in there about notice

23  requirements, duty of care.  They put in regulations that have

24  no application to my client.  It will confuse the jury.

25          They also are going to go into disciplinary records,

B.R. v. F.C.S.B.

21

1   apparently, of other students.  Again, to try and show that

2   whatever they want to show about the environment of the school

3   itself.  Not admissible against my client.

4          So all of these things -- and I don't know that it

5   has to be -- I don't think one limiting instruction works.  In

6   one of the cases they cited in their brief -- I think it's the

7   *Brawley* case.  It is a criminal case.  It was interesting.

8   The trial court in that case, which the appellate court

9   approved, required the prosecutor with respect to every

10  witness that they called before putting -- asking the question

11  to instruct the jury against which defendant the evidence was

12  intended and upon which count.

13         THE COURT:  Do you think that that could be best

14  addressed because jurors tend to do one of two things:  They

15  either intend to follow limiting instructions or they tend to

16  think, wow, that must have been important, I'm going to

17  consider it.  So I'm of a mind not to draw a lot of attention

18  to things that might cause the jury to go one way or the

19  other.  What I would suggest is at the beginning of the trial

20  when the Court gives its sort of opening remarks, I'll put in

21  something to the effect that there are several separate

22  defendants in this case and not all evidence against one

23  defendant will apply to another defendant, and the Court will

24  instruct you on that later.  Something to that effect, as

25  opposed to bogging the case down by giving a limiting

B.R. v. F.C.S.B.

22

1    instruction every time someone takes the stand.

2            MR. BLANCHARD:  I understand that, Your Honor.  I

3    think we can work through it and I can -- if the Court wants,

4    I can take a stab at drafting limiting instructions as we go.

5            THE COURT:  That's fine.

6            MR. BLANCHARD:  But in many regards, I agree with

7    the Court.  But what I don't know is because they have almost

8    800 exhibits and there are things and pieces of those that are

9    not relevant to my client that I think the jury may need to

10   know as it's coming in.  So I just didn't think that a blanket

11   rule that one limiting instruction at the opening and one at

12   the close is enough.  Especially -- and I was encouraged by

13   the judge's comments a few moments ago that we're not going to

14   be trying this case in April.  But my thought, when I filed

15   the motion was, we've got a six-week trial.  And instructions

16   given in the first day, it may be lost through the course of

17   that long a trial and if 800-and-some exhibits are put in.  So

18   this motion was one of caution to basically let the Court know

19   that there may be needs for limiting instructions with

20   particular evidence as it comes in.

21           THE COURT:  As I said, the best way in my view to

22   handle this is to use the influence and authority of the Court

23   and the Court will properly instruct the jury as to the amount

24   of weight that certain evidence should be give to certain

25   individuals involved in the case.  And I think I can handle

B.R. v. F.C.S.B.

23

1    that pretty well.

2            MR. BLANCHARD:  Yes, sir.  Thank you.

3            THE COURT:  The next motions that we're going to go

4    through are C.K.'s motion in limine.  We'll start with the

5    genital exposure incident.

6            MR. DAVIS:  Judge, that has no or little probative

7    value to the claim against C.K. is whether he assaulted B.R.

8    And it's so prejudicial and unfairly prejudicial to him that

9    it should be excluded.  And it also would tend to be other bad

10   acts or proof of other crimes or bad acts and should be

11   prohibited on those grounds as well.  So I don't think it has

12   anything to prove their claims against C.K.  And what little

13   value it does have is outweighed by prejudicial value to C.K.

14           MR. BRENNER:  Andrew Brenner, Your Honor.  I would

15   give you the same argument I made on the J.O. disciplinary

16   record regarding the use -- use of sextortion or use of

17   photos.  This one is even more so, but it's the same idea.

18   Again, the School Board hasn't joined this.  This goes to

19   notice to the School Board.  Depending on what C.K. testifies

20   to, I believe he actually probably will open the door to this,

21   but it's clearly relevant evidence.  I don't think that's

22   disputed.  If they want to request a limine instruction at the

23   time, as it relates to C.K., Your Honor, as you just said, can

24   address at the time, but it's relevant to the issue of --

25           THE COURT:  Say for the record what you believe the

―――――――― B.R. v. F.C.S.B. ――――――――

24

1  probative value of this evidence is.

2          MR. BRENNER:  Right.  So this happens in, I believe,

3  May of 2011.  And the incidents here began in October,

4  November of 2011.  This is -- so this is the main alleged -- I

5  don't know the word to use -- alleged tortfeasor.  I'll keep

6  it very generic.  So when the School Board gets a complaint

7  that, frankly, when you hear her story, it is remarkably

8  similar to what she's complaining about and, essentially,

9  decides not even to look into it, and not to talk to C.K.  It

10 goes to their notice and to their deliberative indifference to

11 her complaint.  As I said, I don't think the -- I don't think

12 F.C.S.B. disputes that.

13         THE COURT:  All right.  The Court is going to deny

14 the motion in limine.  I would ask all parties, who are all

15 lawyers, who are litigating this matter, to keep our eye on

16 the ball so to speak and not get caught up in stuff that is

17 just going to distract from the real issue in this case.

18         C.K.'s motion in limine regarding the general school

19 disciplinary records.  I think we've already addressed that in

20 one respect.

21         MR. DAVIS:  I think, Judge, I mean they don't really

22 add anything to it and they just -- they've got no probative

23 value.  I think they need to stay.

24         THE COURT:  Okay.  I think the closest you're going

25 to get is the record is essentially putting the Fairfax County

EASTERN DISTRICT OF VIRGINIA

──B.R. v. F.C.S.B.──

25

1   School Board on notice that something was going on, but,

2   generally, they are not admissible, I would think.

3           MR. BRENNER:  Andrew Brenner, Your Honor.  As I

4   said, with the J.O. motion.  For example, his grades or

5   something like that.  That is not relevant.  But his -- he

6   does have a disciplinary record with the school that would put

7   them on notice that this is a complaint that maybe -- and they

8   always should have been taken seriously -- this one even more

9   so.  But I understand Your Honor's ruling and I understand

10  Your Honor's instruction to keep it narrow and focused, and

11  we're not going to focus on issues that really don't go to

12  that, like his grades, or maybe his health records, but right

13  now it's a little broad the way that they framed their motion.

14          THE COURT:  The Court is going to grant it in part

15  and deny it in part and I'll provide some specificity in the

16  written order that the Court is going to provide.

17          MR. BRENNER:  Thank you.

18          THE COURT:  Twitter posts.

19          MR. DAVIS:  Judge, these Twitter posts have no

20  probative value to the issues.  They don't give any notice to

21  the School Board.  I think they've conceded in their reply

22  that they weren't intending to offer them in their case in

23  chief, but I don't see how they have any purpose in this

24  lawsuit, and I'll ask that you exclude them.

25          MR. BRENNER:  Your Honor, he is correct in our --

B.R. v. F.C.S.B.

26

1   Andrew Brenner, excuse me -- in our response.  We said we had

2   no intention of using these affirmatively.  I'm just a never

3   to say never guy, I don't know what the gentleman is going to

4   say in his testimony.  And if it were -- if we believed it

5   opened the door, I understand Your Honor's instructions that

6   the procedure is to ask to approach the bench and make a

7   proffer as to why we think it is, and have Your Honor give us

8   a ruling.  The jury won't hear it unless Your Honor says that

9   they should hear it.

10          THE COURT:  All right.  The Court is going to

11  acknowledge your apparent agreement on this issue.  And we'll

12  see what happens at trial.

13          Again, another request for an ongoing limiting

14  instruction.  We've kind of gone down that road before.

15          MR. DAVIS:  James Davis for C.K.

16          Judge, I think you've made your ruling clear and I

17  understand that.

18          THE COURT:  Very good.  Thank you.  Individual

19  school defendants motion in limine.  School policies and

20  regulations.

21          MR. KINNEY:  Michael Kinney, Your Honor.  It likely

22  won't escape the Court's attention that this is a similar

23  motion to the School Board's motion in limine No. 4.

24  Although, my clients challenge 68 policies and procedures that

25  have no apparent relevance to the claims against my clients.

1    The majority of which were promulgated by the School Board

2    after the plaintiff left in-person instruction at Rachel

3    Carson Middle School.  And so after --

4              THE COURT:  Would you view it at worst, from your

5    perspective, some sort of subsequent remedial measure that

6    could be suggested that that's the reason why they did this is

7    because of some other incident which, therefore, should not be

8    allowed; is that what you're suggesting?

9              MR. KINNEY:  Yes, Your Honor, it is.

10             THE COURT:  I know that was a little bit of a

11   convoluted question, but I appreciate your trying to parse out

12   what I was saying.  But what you're suggesting to the Court is

13   essentially if this was a remedy, if we even want to call it a

14   remedy that occurred, subsequent to any issues affecting this

15   particular litigation.  And so, therefore, is not admissible.

16             MR. KINNEY:  Yes, Your Honor.

17             MR. BRENNER:  Your Honor, Andrew Brenner.  The

18   motion itself is actually much broader than was just presented

19   to the Court.  So I want to make sure that Your Honor's ruling

20   addresses what we're talking about.  There's two parts of

21   their motion.  One dealt with the date issue, which goes to

22   the subsequent remedial measure.  That was the second part of

23   their motion, and that's also the similar one that F.C.S.B.

24   filed.

25             The first part of their motion -- it takes the

B.R. v. F.C.S.B.

28

1    position that policies are irrelevant because they are

2    individuals.  And the whole purpose of the individuals are the

3    ones that are -- that are implementing the school policies.  I

4    noticed that Mr. Kinney did not argue that today.  And I think

5    that has no merit whatsoever.  They are agents of the School

6    Board and they've all testified they are following the School

7    Board's policies, so it's relevant to that.

8           Now, on the subsequent remedial measure, I will just

9    make the point again regarding the leave date, meaning what

10   the subsequent remedial measure is actually in 2013 not in

11   2012 because of the matters I raised before.  And on those, as

12   I said in response to this motion and in response to the

13   School Board's motion, is we don't intend to put that in

14   affirmatively unless it goes to an issue, which is the

15   exception to subsequent remedial measure.  So, for example, if

16   they testified, well, there's no way we can have a policy like

17   this.  It would be totally impracticable.  And then we'd say,

18   well, actually we do have a policy like that now.  So that

19   would be also an opening the door situation --

20           THE COURT:  Then would you, in effect, try to read

21   the policy in or would you just use it for impeachment

22   purposes?

23           MR. BRENNER:  I guess in that situation, we would

24   ask to use it for impeachment and publish it to the jury.  And

25   I don't know what Your Honor's procedure is, whether you can

B.R. v. F.C.S.B.

29

1    publish things to the jury for impeachment and not actually

2    admit them as substantive evidence.

3            THE COURT:  I think you've got a pretty good handle

4    on what the Court's perspective is.  You can impeach with

5    pretty much anything.  That's always been my view of the rules

6    on evidence, but publishing it to the jury is dangerous,

7    because then they, you know, using, again, the rule of

8    completeness.  They need to see the whole thing.  They are

9    going to start reading it and they are going to start imposing

10   standards that have no application to our case and it gets

11   dangerous.  So I think at best if someone were to volunteer

12   that statement that you just mentioned that you would be

13   entitled to impeach, but its admissibility, I think, is a

14   whole other can of worms.

15           MR. BRENNER:  So my position is the first part of

16   the motion, which they didn't argue today, that should be

17   denied.  But as to the date, I understand, and I assume it

18   will be the same ruling as to F.C.S.B., it was a twin motion

19   on that issue.

20           THE COURT:  Let me make sure Mr. Kinney has

21   addressed everything that he wanted to address.

22           MR. KINNEY:  Your Honor, the date, with respect to

23   my clients, is the date after which they no longer had any

24   physical supervisory authority over her.  That may or may not

25   be the same date that applies to the School Board.  But from

─────B.R. v. F.C.S.B.─────

30

1  my client's perspective, the date should be February 9, 2012.

2        THE COURT:  All right.  The Court will take that one

3  under advisement.  Let me take a look at it a little bit more.

4        I will say, Mr. Brenner, at best you're only going

5  to be able to use certain aspects for impeachment purposes.  I

6  think that's the best you can hope for, but let me take a look

7  at it.

8        MR. BRENNER:  On the latter, on the postdate

9  policies?

10       THE COURT:  Yes.

11       MR. BRENNER:  Thank you.

12       THE COURT:  All right.  B.R.'s first motion in

13  limine regarding Dr. Sara Jennings.

14       MS. ANDERSON:  Your Honor, Alison Anderson for the

15  plaintiff.  If I could have permission to have our client

16  leave the courtroom just for this argument on Jennings and the

17  SANE exam, I'd appreciate that.

18       THE COURT:  It's a civil case so she doesn't need to

19  be in the courtroom.

20       MS. ANDERSON:  I just always prefer to ask

21  permission before people leave the table.

22       THE COURT:  That's fine.

23       MS. ANDERSON:  And then are you referencing our

24  Daubert or the motion in limine just so I -- on Dr. Jennings?

25       THE COURT:  Yes.  Excluding evidence from treatment

B.R. v. F.C.S.B.

31

1  providers, yes.  Docket 640.  Yes.

2          MS. ANDERSON:  Dr. Jennings?

3          THE COURT:  Yes.

4          MS. ANDERSON:  Yes, that is 640.  Apologies for the

5  exclusion.

6          I think our argument boils down to a couple of two

7  key facts.  The first issue I will say we do not dispute

8  Dr. Jennings's experience or ability to testify to the

9  findings being nonspecific.  So that is not part of our

10  objection.  What we are objecting to is Dr. Jennings being

11  permitted to testify about two things:  one is the laundry

12  list of alternative conclusions.

13          THE COURT:  Before you start.  Is there anyone here

14  from the Press?  All right.  The Court is going to direct that

15  any particularity or any specificity with regard to any of the

16  issues regarding sexual circumstances and the identity of

17  anyone who is being discussed with regard to any sexual

18  circumstances be not mentioned specifically or directly in any

19  newspaper publication.  I think you all understand what I am

20  saying.  In other words, there has been a policy that's been

21  developed and I think it's appropriate in this case to use

22  the, I guess, theory of that policy is that we don't reveal

23  the circumstances regarding alleged victims of sexual assault.

24  Again, I'm not making any determinations as to whether or not

25  one occurred here or not, but I would instruct that no names

32

1   be placed in the paper and no specificity be provided with

2   regard to any of the circumstances which we are now going to

3   discuss.  All right.

4        MS. ANDERSON:  Thank you, Your Honor.  We really

5   appreciate that.

6        So the first issue is whether or not Dr. Jennings

7   could then testify to these potential other causes.  She uses

8   words in her report like "might have," "could have," "any

9   number of causes," and we just think that's far too

10  speculative for her to be then throwing in these alternative

11  options given sort of her language around those.

12       And then the second issue that we raise that we

13  think Dr. Jennings should not be allowed to testify to is that

14  -- is pointing to two records when the plaintiff was two years

15  old to say that these records indicating a constipation as a

16  toddler and an anal fissure in the record with no picture, no

17  diagram is somehow inconsistent with her opinion.  She doesn't

18  say -- again, she doesn't say this is likely, this is probable

19  cause, she doesn't say any of that.  All she says is it's

20  consistent with her opinion that these are nonspecific

21  findings.  And we think that that's far too speculative,

22  especially given the weight that jurors put on expert

23  testimony for her to be testifying to such.

24       THE COURT:  Thank you, ma'am.

25       MS. ANDERSON:  Thank you, Your Honor.

B.R. v. F.C.S.B.

33

1          THE COURT:  Typically when we're dealing with expert

2    witnesses we're talking about specificity not possibilities.

3    And I will say that it appears that the good doctor's expert

4    opinion has been in many instances qualified.

5          Is that typically what we do when we take advantage

6    of the expertise of expert witnesses?

7          MR. ELLIKER:  Good morning, Your Honor.  Kevin

8    Elliker for the School Board.

9          I think that the most important sort of the fulcrum

10   of this issue bends around causation and whose burden it is on

11   that.  The context of Dr. Jennings's opinion is in response to

12   the hybrid witness that plaintiffs have who is the evaluator,

13   who did the evaluation in the first instance.  And that

14   individual, that witness, Diane Burkhart, will testify as to

15   what, in her view, is most likely the cause of the findings in

16   the evaluation.  Dr. Jennings's conclusion is that it's

17   nonspecific, and it's not possible to determine because there

18   could be any number of causes to this.

19         She does not go on to opine as to what the specific

20   cause is and that's not -- and that's because it's not her

21   burden.  And in the case law that's cited to the Court in the

22   briefing talks about this idea of a differential diagnosis.

23   When a plaintiff, who carries that burden, is presented with a

24   number of different possibilities that expert can come forward

25   and conduct a differential diagnosis to say here is all of

34

1   these possible options.

2            THE COURT:  Isn't the problem here, and this is one

3   that may work to both of your advantages, is that neither

4   doctor, from what the Court can tell, has come back with

5   anything specific.

6            In other words, they are theories and if you have

7   one expert saying one theory and another expert saying another

8   theory, that's just going to confuse the jury.  So why are we

9   getting into this in the first place if there isn't any, I

10  guess, foundation for either one of these opinions.

11           MR. ELLIKER:  Well, Your Honor, I think that there

12  is a foundation for her opinion, which is her opinion is that

13  you can't tell what the cause is.

14           THE COURT:  The foundation for one of the experts is

15  I don't know and the foundation for the other expert is I

16  don't know.  So why do we have either one of these experts

17  testifying?

18           MR. ELLIKER:  Your Honor, it's important because

19  they've put forward a hybrid witness who is going to say that

20  the most likely cause of the findings in the evaluation are

21  from a -- the way I'll put it, is a source outside the body.

22  And that is -- that is suggestive to the jury, as to in a SANE

23  evaluation, a finding that plaintiff's hybrid witness is going

24  to say in her opinion comes from some source outside of the

25  body suggestive of it being confirming the findings.

B.R. v. F.C.S.B.

35

1           And the other thing is that the SANE evaluation

2    itself that Ms. Burkhart filled out in 2012 checks the box to

3    say that the findings of the evaluation are consistent with

4    the allegations that were raised by the plaintiff.

5           Now, we have issues to cross-examine Ms. Burkhart

6    later on because she later on sort of says, "I wish I could be

7    a little bit more equivocal about that."  But the fact of the

8    matter is that -- that's the testimony that they want to put

9    before the jury.  And so, I think that's the reason.

10          Now, Your Honor, we'd be okay if neither one of

11   these experts are allowed to testify.  If they don't have

12   Ms. Burkhart come on and talk about any kind of, you know,

13   what the, in her opinion, what the actual cause could be,

14   which is not a part of her actual evaluation, she could

15   testify as a fact witness based on what she did at that time

16   in 2012 and testify about what her evaluation is.  And we can

17   cross-examine her on that as a fact witness.

18          But as a hybrid expert witness to come on and say,

19   here is what my opinion is now as to what could be the cause

20   of this, that is the purpose of us presenting Dr. Jennings who

21   says:  You can't tell what the cause of this is.  And when she

22   says that her opinion is validated by what else is in the

23   records, what she means is, you don't have to take my word for

24   it, look at all of these other things in the record that could

25   also have caused this which just reinforces my expert opinion

—————B.R. v. F.C.S.B.—————

36

1    that is nonspecific.

2          MS. ANDERSON:  Your Honor, if I may, I think I might

3    be able to solve something for us.  Let's see.  We would be

4    okay with not calling either expert as long as the SANE exam

5    is admitted which I don't think they objected to on the

6    exhibit list.

7          THE COURT:  I think -- again, because of the

8    nonspecific determinations that either one of these experts

9    have made, the Court is going to view that as probably

10   confusing the fact finder and so the best perspective or the

11   best approach, in the Court's view, is neither one of these

12   people testify and because -- now, the SANE exam comes in,

13   obviously, that's part of the case.  But neither one of these

14   experts testify because I don't think it even comes close to

15   meeting the Daubert standard, but setting that aside that's --

16         MS. ANDERSON:  Thank you, Your Honor.

17         MR. ELLIKER:  Well, Your Honor, if the SANE report

18   doesn't come in --

19         THE COURT:  No, the SANE report is coming in.

20         MR. ELLIKER:  Well, if the SANE report comes in,

21   Your Honor, then we need to have our expert witness who can

22   explain that the findings are nonspecific.  Because the SANE

23   report itself has a box check that says this is consistent

24   with the allegations that are -- I shouldn't say -- consistent

25   with the interview to the evaluator.

B.R. v. F.C.S.B.

37

1          THE COURT:  I think the easy answer to this question

2    is you can put your expert on to say that the SANE exam is

3    nonspecific, because that's essentially what their expert is

4    going to say also and leave it at that.  But if you start

5    getting into particularities, it's not going to help the

6    fact-finder in any way.

7          MR. ELLIKER:  Okay.

8          THE COURT:  Very good.

9          Again, I don't want anyone to perceive the Court is

10   trying to limit the presentation of relevant and probative

11   evidence.  Again, we just don't need to go down roads that are

12   not going to be helpful in resolving the main issue in this

13   case so we just need to be careful here.

14         Defendant's motion in limine to exclude evidence

15   from treating providers.  Seven treating providers that we're

16   talking about.

17         MR. ELLIKER:  Your Honor, may I be excused to get

18   our client to come back in the courtroom?

19         MR. BATES:  Good morning again, Your Honor.  Ryan

20   Bates with the School Board.

21         Did you ask how many treating providers are we

22   talking about?

23         THE COURT:  Seven.

24         MR. BATES:  Right.  So, Your Honor, the School Board

25   recognizes this as an issue about a year ago and we discussed

B.R. v. F.C.S.B.

38

1   it with plaintiff's counsel prior to the Rule 16 conference.

2   We brought it up at the Rule 16 conference.  And we just

3   wanted some clarity.  If there are treating providers who are

4   going to testify at trial, we wanted that to be disclosed.

5   And counsel said, in open court, that he understood that and

6   they would not try to slip in any providers.

7        And so, now, when the witness list was exchanged,

8   there are ten treating providers on there.  None of whom were

9   disclosed under Rule 26(a)(2)(C).  Three of the ten were never

10  disclosed at all during discovery, despite the fact that

11  plaintiff had been treating with them, two of the three of

12  them, during the discovery period.  And then the remaining 7

13  were disclosed as doctors or therapists that she had seen.

14  But, again, were not as they should have been disclosed as

15  hybrid witnesses under Rule 26(a)(2)(C).

16       And so, in 2010, the whole purpose of the rule being

17  amended was to fix the problem of -- if you have a treating

18  provider, who is going to testify at trial, based on their

19  scientific or technical expertise, a hybrid witness, they need

20  to be disclosed by that expert disclosure deadline.

21       THE COURT:  Well, let me make sure that we're

22  talking about the same thing.

23       I don't think, and if I'm wrong correct me, that you

24  don't have any problem with the testimony of Dr. Saylor, Ward,

25  and Dr. Trahan.

─────B.R. v. F.C.S.B.─────

39

1          MR. BATES:  We do, Your Honor.

2          THE COURT:  And why is that?

3          MR. BATES:  Because we were told that they would

4  be -- if they were going to be testifying, they would be

5  disclosed in July at the -- I'm sorry in June at the expert

6  disclosure deadline because they are hybrid witnesses.  They

7  are witnesses who are testifying based on their scientific or

8  technical knowledge.

9          THE COURT:  Have you deposed these witnesses?

10          MR. BATES:  We have not deposed those witnesses.

11  And none of these ten witnesses have been deposed because we

12  relied on that, that representation that these were not going

13  to be -- that hybrid witnesses would be disclosed, and then

14  continuing through discovery where we were told that these

15  folks don't want to be involved in the litigation.

16          So no depositions were conducted of them.  Had they

17  been disclosed, we would have sought, potentially, Rule 35

18  IMEs depending on their expertise.  So for instance, if they

19  disclosed an expert in gynecology, we would have potentially

20  had an expert -- a counter expert to that.  So because the

21  original disclosures were never made, we never took their

22  depositions, we never had the opportunity to retain any

23  counter experts.  And so, the failure of them to do that --

24  because they failed to disclose these witness, they should be

25  excluded unless they can show that it was substantially

B.R. v. F.C.S.B.

40

1    justified or harmless.  And they had the opportunity in the

2    briefing to explain why it was substantially justified.  We've

3    really gotten no clear explanation as to why.  And it is the

4    opposite of harmless, Your Honor, because here we are, a

5    couple weeks away from trial, and we have ten witnesses who

6    were never deposed and everybody in the case believed they

7    would not be a part of the case.

8              THE COURT:  All right.  I think I understand your

9    point.

10             MR. BATES:  Thank you, Your Honor.

11             MR. KEEFE:  Your Honor, Robert Keefe, on behalf of

12   the plaintiff.  Let me start by dividing these ten providers

13   into two groups.  The seven who were disclosed but just not as

14   expert witnesses and the three who were not disclosed during

15   the discovery period.  I'll start with the seven.

16             Your Honor, I think the School Board is conflating

17   what has to be disclosed under Rule 26(a)(2).  There are two

18   types of experts under that rule.  There's 26(a)(2)(B) experts

19   which are retained experts, who have to, under the rule, serve

20   full expert reports.  And then there are what are called

21   hybrid expert witnesses which are covered by 26(a)(2)(C),

22   which are witnesses who have fact testimony and who also may

23   have expert testimony.

24             Your Honor --

25             THE COURT:  The bottom line is whether or not we're

─────────────── B.R. v. F.C.S.B. ───────────────

41

1    assessing the first part of 26(a) or the second part of 26(a).

2    There's a responsibility to put the other side on notice that

3    these people are going to testify, again, about something or

4    the other.

5            MR. KEEFE:  Your Honor, these seven:  Saylor,

6    Trager, Ward, Trahan, Cigna, Jalazzo, and Rosato were

7    disclosed under Rule 26.  They simply were not disclosed as

8    experts.  There was never a representation that they would not

9    be witnesses -- fact witnesses in this case.  There was a

10   representation they would not be designated as expert

11   witnesses.

12           THE COURT:  If they are not experts and they don't

13   have firsthand knowledge, what are they going to testify

14   about?

15           MR. KEEFE:  Your Honor, they do have firsthand

16   knowledge.  They were treating providers of the plaintiff.

17   And I'll cite you to a case that actually the School Board

18   cited in their response, *Roop v. Desousa.*  That's from Judge

19   Novak in this district from 2023.  And I'll quote you from

20   page 484 of that decision.  It's 660 Federal Supplement 3d

21   447.

22           "Generally a treating physician need not be

23   designated as an expert and may testify as a lay witness to

24   personal observations stemming from his course of treatment of

25   the plaintiff."  And Judge Novak cited Spring -- for that

—B.R. v. F.C.S.B.—

42

1    proposition -- *Spring v. Waffle House,* which is out of the

2    District of South Carolina.  I have a copy of that opinion

3    because I think the judge in the *Waffle House* case got this

4    right.  He actually excluded the treating provider's testimony

5    to the extent they were expert opinions, but allowed them to

6    testify as fact witnesses.

7              THE COURT:  What kind of questions are you going to

8    ask of these potential witnesses?

9              MR. KEEFE:  I'll just use the language that Judge

10   Childs used in the *Waffle House* case, which is:  "The treating

11   physicians will be permitted to testify to their observations,

12   course of treatment, and diagnosis of the plaintiff at the

13   time they treated him."

14             And so, we would ask these treating providers who

15   have been disclosed as fact witnesses about how they -- what

16   they observed when they treated B.R., the course of B.R.'s

17   treatment under their care, what they diagnosed B.R. with as

18   part of their treatment of her, and that would be the scope of

19   their testimony.

20             THE COURT:  What about the other three?  Saylor,

21   Ward, and Trahan?

22             MR. KEEFE:  So, Your Honor, the other three, what

23   the School Board's motion labels as the "three undisclosed

24   providers" Brillhart, Jackson, and R.J.

25             THE COURT:  Okay.  Jackson, Brillhart, and R.J.

B.R. v. F.C.S.B.

43

1    Okay.

2              MR. KEEFE:  Correct, Your Honor.  So as the School

3    Board concedes in their papers as to Dr. Jackson, B.R. did not

4    start seeing Dr. Jackson until October 17, 2023, which is --

5    or sorry October 12, 2023, which was after the close of

6    discovery.  And Dr. Jackson was disclosed to the School Board

7    five days later.  And so, I'm not sure what -- you know, when

8    the School Board has an ongoing subpoena and records

9    collection that extends past the close of discovery, you start

10   seeing a new provider after the close of discovery and

11   disclose that provider within five days.  I'm not sure there's

12   a failure to disclose at all.

13             THE COURT:  Well, we have the rules and we have time

14   considerations for a reason.  And the reason why we have it is

15   to put the other side on notice as to, you know, what the

16   theory of the case is, what they have to defend and the like.

17             MR. KEEFE:  Well, Your Honor, if the School Board's

18   position, and it is a School Board's position is, that all

19   records, every time B.R. goes to see a doctor, even up to the

20   present, and there are records generated as part of her

21   treatment, they are part of the ongoing subpoena request to

22   these providers to produce to the School Board.  So they are

23   relevant to the B.R.'s ongoing damages.  And so, I think that

24   if you start seeing a provider between the close of discovery

25   and trial and that provider is within five days disclosed and

B.R. v. F.C.S.B.

44

1   the School Board has this provider's records, there's no

2   prejudice and it's relevant to the plaintiff's ongoing

3   damages.

4            THE COURT:  The Court does have some concerns about

5   the application of Rule 26(a) and the requirements and

6   necessities to meet those circumstances.  The Court is going

7   to take this under advisement.  I will say, at best, you can

8   hope to get something consistent with what Judge Novak did.

9   In other words, just providing some basic background

10  information.  But if these individuals who have not been

11  identified as 26(a) traditional experts, they are going to be

12  limited in their testimony.

13           MR. KEEFE:  Your Honor, if I may, I'd like to give

14  you the citation to the *Waffle House* case.  I think Judge

15  Childs's order in that case may be helpful.  It's from the

16  District of South Carolina, it's a 2021 unpublished decision.

17  2021, Westlaw 119303.  And the language that I think is most

18  helpful is on the last page of the opinion.  It might just be

19  -- sorry, *3 is the page.

20           THE COURT:  All right.  As I said, the Court is

21  going to take it under advisement.

22           MR. KEEFE:  Thank you, Your Honor.

23           THE COURT:  The next one is Docket 649 and 653,

24  F.C.S.B.'s omnibus motion in limine regarding equal protection

25  claim, criminal activities by nonparties, et cetera.

─────────────────── B.R. v. F.C.S.B. ───────────────────

45

1          MS. REWARI:  Your Honor, I think our position is

2   laid out in our briefs.

3          THE COURT:  State your name for the record, please,

4   ma'am.

5          MS. REWARI:  I'm sorry.  Sona Rewari.  I just assume

6   because I'm the only woman on this side that the court

7   reporter would have my name but I apologize for that.

8          THE COURT:  It's fine.  As I said, it just helps the

9   court reporter.

10          MS. REWARI:  Your Honor, as we stated in our papers,

11   the equal protection claim was dismissed and what we're

12   concerned about is that, replete in the plaintiff's exhibit

13   lists, are exhibits that appear to try to back door that

14   theory, which is a theory of a custom wide practice into this

15   case.  And I believe that misunderstanding of the Title IX

16   deliberate indifference case claim, how that differs from an

17   equal protection claim has already been exhibited this morning

18   because on a Title IX deliberate indifference claim, it's not

19   the knowledge, even actual knowledge of the system at large.

20   It's the actual knowledge and actions of the people who

21   responded to the plaintiffs.

22          THE COURT:  Why don't you think that, particularly

23   focusing on Exhibits 44, 57, and 101, as their relevancy to

24   the reasonableness of the Fairfax County School Board

25   response's to claims that are similar in nature?

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────
EASTERN DISTRICT OF VIRGINIA

46

1          MS. REWARI:  Because, Your Honor, it has to be

2    the -- under Title IX for a deliberate indifference claim, you

3    have to show the actual knowledge of the people who responded.

4    And in this case, the people who responded are the

5    administrators at Rachel Carson Middle School.  There's no --

6    there's no evidence obtained in discovery regarding that they

7    were -- I don't have the exhibit list in front of me.  I

8    assume you're talking about district-wide surveys.  There's no

9    evidence that these -- this principal or these assistant

10   principals, you know, were responsible for the surveys or

11   conducting the surveys, or applying them to their schools.

12   And the surveys themselves are not specific to this middle

13   school or any middle school.  They are not even specific to

14   what is happening at school.  The question in those surveys --

15          THE COURT:  Is the focus necessarily on what was

16   happening at that particular middle school or is the focus on

17   what was the Fairfax County School Board's response generally

18   to this kind of circumstance?

19          MS. REWARI:  Under Title IX on deliberate

20   indifference it is what is happening at that school.  It is

21   not what is -- and that's the difference between the equal

22   protection claim that's a custom, right, a custom, a

23   district-wide policy under deliberate -- for a Title IX

24   deliberate indifference claim, the question is very narrow and

25   it was made clear in the *Doe v. Fairfax County School Board*

B.R. v. F.C.S.B.

47

1    case.  It's made clear in the *Jennings v. University of North*

2    *Carolina* case.  The question is, what is the school -- what

3    is -- did the student experience harassment; did the school

4    have actual knowledge of that harassment; and did they act

5    with deliberate indifference to that harassment?  And

6    deliberate indifference, is that clearly unreasonable in light

7    of the known circumstances about that harassment?

8           And the Supreme Court made clear in *Davis* that it

9    cannot be based on constructive knowledge.  This argument

10   about what you know about the system, what you know about the

11   county, what you know about the climate is a constructive

12   knowledge argument.  And so, these individuals cannot be

13   charged with knowing what's happening in every school through

14   the county, what's happening in the United States District

15   Court with criminal complaints against, you know, sex

16   traffickers.  This is how far afield we're getting in this.

17   These individuals are in charge of running their school,

18   addressing the needs of the students in their school.  There

19   is no defendant in this case who has any kind of district-wide

20   responsibility.

21          And so, they have no authority.  These individuals

22   whose actions are being challenged have no authority over

23   students at any school other than their own.  They have no

24   authority over, you know, people who are being charged.

25          THE COURT:  Taking your argument to its extreme,

———B.R. v. F.C.S.B.———

48

1   it's almost suggesting that Fairfax County School Board can

2   never be responsible for anything that happens at any of the

3   schools.

4           MS. REWARI:  No.  Under Title IX they are

5   responsible.  The actions of an administrator or a person with

6   authority to take corrective action.  They have to address

7   actual knowledge of harassment and what's made clear in the

8   *Doe v. Fairfax County School Board* cases is actual knowledge

9   of allegations of harassment of the student.  It's not, you

10  know, you're held to a standard that you must root out all

11  sexual harassment in all schools.  You have to have knowledge

12  that this student is being harassed and then you have to

13  address that.  That's the difference between a Title IX

14  deliberate indifference claim and an equal protection claim.

15          THE COURT:  All right.  I think I understand your

16  point.  I'll hear from the opponent colleague.

17          MR. BRENNER:  Andrew Brenner, Your Honor.  Where do

18  I start?  There is a defendant that has to do with county-wide

19  practices, that's her client.  She made a lot of arguments

20  about why Mr. Kinney's clients may be more responsible for

21  what was going on on a county-wide level.  It is not

22  Mr. Kinney's motion, excuse me, it's Ms. Rewari's motion, on

23  behalf of Fairfax County.

24          And as Your Honor pointed out, under the theory

25  she's espousing -- I mean she actually even said there's no

B.R. v. F.C.S.B.

49

1  defendant in this case that has county-wide responsibility.

2  Yes, there is.  It's called Fairfax County School Board.

3  That's who the defendant who has county-wide responsibility is

4  in this case.

5          So I'm not even sure where to take that argument.

6  The idea that the county was not involved in this is also just

7  factually incorrect.  It did get to the county level, albeit

8  super late, but you will hear testimony that finally the

9  School Board defendants elevated to the county level to

10  Mr. Zuluaga, who I think he was an assistant superintendent,

11  but I may have the title wrong.  So all of this -- this is why

12  the way this motion was framed was you can't put in evidence

13  regarding equal protection because you dismissed it.  I said,

14  yes, we can't put in evidence solely related to equal

15  protection, but this evidence, as it becomes clear in, I

16  think, motion in limine No. 7.

17          And as Your Honor pointed out, it goes to what

18  Fairfax County's knowledge was and what Fairfax County's

19  deliberate indifference was to the complaint to the

20  plaintiffs.  So I just disagree 100 percent factually as to

21  the recitation of who are the responsible parties here.  Yes,

22  the School Board defendants, excuse me, school defendants were

23  responsible for what was going on in their school.  They will

24  all testify they were acting under the direction and policy of

25  the School Board and the School Board has obligations in the

—B.R. v. F.C.S.B.—

50

1  school level and at the county level.  So this evidence goes

2  to all of that and we just think it should be -- the motion

3  should be denied.

4       THE COURT:  I'm going to allow Plaintiff's

5  Exhibit 44, 57, and 101 as relevant to the reasonableness of

6  Fairfax County School Board's response.  The sex trafficking

7  stuff under 54, 58, 173, 220, and 342, how does that help at

8  all?

9       MR. BRENNER:  So there will be allegations in the

10  testimony in the case from our client who is going to say that

11  she was subjected to what she believes was gang-related sexual

12  assault on the school grounds.  And I believe, though I don't

13  know because I don't represent them, but if history is any

14  indicator, I think the School Board's position and the

15  school's position is going to be that's impossible, that type

16  of stuff never happens here, we don't know what you're talking

17  about.  And so, it -- depending on how that evidence comes in

18  and what their defense is, it will go to -- and we have an

19  expert, Detective Woolf, who will talk about it -- it's just a

20  fact in the case that sadly, tragically this was happening,

21  and it's something that gives the jury context.

22       Again, it would depend on how the School Board

23  chooses to defend against that testimony from our client.  So

24  that's why it's relevant.

25       THE COURT:  All right.  As the Court indicated, it's

—————————B. R. v. F. C. S. B.—————————

51

1  going to allow Plaintiff's Exhibit 44, 57, and 101 as relevant

2  to the reasonableness of Fairfax County School Board's

3  response.  But in the Court's view, Exhibits 54, 58, 173, 220,

4  and 342, referring to sex trafficking, are just too

5  attenuated.  And so, the Court is going to grant the motion

6  with regard to that.

7       All right.  Also talking about Fairfax County School

8  Board's omnibus motions in limine.  Let's talk first about

9  Mike and Mary Roe.

10      MS. REWARI:  Your Honor, as we said, these are 15

11  unnamed defendants who were never served.  They should be

12  dismissed from the case.  And we should -- the plaintiffs

13  should be precluded from referring to them as defendants.  We

14  understand that she's going to allege that she was assaulted

15  by unknown assailants in a closet at the school and we're

16  not seeking to prevent that testimony.  We just want a ruling

17  that she can't refer to them as the unknown defendants, which

18  is how she has referred to them in testimony in this case.

19      MR. BRENNER:  Andrew Brenner, Your Honor.  We agree,

20  as has been in our papers, we agree to that limitation.

21      THE COURT:  Very good.  Agreement on something.

22  We're heading in the right direction.  Okay, so, the Court

23  will grant that motion.

24      School Board policies.  Policies after the date of

25  March 1, 2013, which are alleged to be post the plaintiffs

—————————————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

1  withdrawal from the school.

2          MS. REWARI:  Yes, Your Honor.  I believe that their

3  papers had said that there was some confusion about the date

4  of her withdrawal.  There's no confusion.  Our records have --

5  in fact there is some exhibits on their list that her date of

6  withdrawal was March 1, 2013.  As we said that post March 1,

7  2013 policies are inadmissible, they are irrelevant, and they

8  are barred by Rule 407 as post-accident remedial measures.

9  They've argued that they should be able to do it if there's a

10 question of feasibility.  There hasn't been that argument.

11 There isn't a witness on the list who is going to be -- who

12 has policy authority for the school system.  So I don't

13 foresee that.  I understand that some of this was addressed in

14 the earlier motions in limine with one of the other

15 defendants.  So we accept your ruling and I would just say --

16 I don't see feasibility coming in as an issue.

17          THE COURT:  All right.

18          MR. BRENNER:  Your Honor, Andrew Brenner.  I think

19 you did address that in connection with the school.  The

20 defendants, they have the 2013 data.  I assume Your Honor's

21 ruling will be consistent with that.

22          THE COURT:  Yes, sir.  Very good.

23          The 2014 VRA and OCR letter.

24          MS. REWARI:  Thank you, Your Honor.  As we've

25 explained in the papers, this is barred by Rule 408.  It's a

B.R. v. F.C.S.B.

53

1   settlement involving --

2           THE COURT:  It sounds like it.  Let me hear what

3   they are going to say on the other side.

4           MS. ANDERSON:  I think we are going to get close to

5   agreement on this one as well, Your Honor.

6           For the VRA agreements, just that they open the door

7   for impeachment.  If they deny they need to have certain

8   policies -- those types of things, we just didn't want to

9   foreclose that.  We understand we would approach the bench and

10  discuss with Your Honor.

11          The only thing that we think is slightly -- stands

12  out as different is the OCR letter related to the plaintiff's

13  complaint which comes after the agreement so it's not part of

14  the discussions and settlement.  And it --

15          THE COURT:  What is the probative value of that?

16          MS. ANDERSON:  I think that, you know, she made that

17  complaint, that the school, you know, under -- under the case

18  law, we're allowed to bring in investigation results.

19          THE COURT:  Don't you agree that whatever some other

20  agency may or may not have been doing can serve as a

21  distraction to the litigation that we have before us?

22          MS. ANDERSON:  I think if we're all in agreement

23  that that is true for Detective Chambers and what he -- his

24  opinions and his assessments and his findings, you know, we

25  then may agree as well.  I think this may be an issue more of,

B.R. v. F.C.S.B.

54

1   you know, if it doesn't apply to FCPD that it should not apply

2   to DOE.

3          THE COURT:  It might well be the case.

4          MS. ANDERSON:  And then, Your Honor, the only thing

5   that I would point out that I think is an argument we see

6   throughout that I just want to address is that there's this

7   idea -- and it's brought up in these motions -- that the

8   violation of policies cannot support a finding of deliberate

9   indifference.  And while we agree that that's true that that

10  alone cannot, it is relevant, violation of policies just in

11  general.  So this is something we see as a theme throughout

12  and so I just wanted to touch base on that.

13         THE COURT:  Wouldn't you agree, though, that

14  typically when we have, what I call, an agency resolution of

15  the case that the fact-finder then says, Well, what happened

16  there?  How was it resolved?  Which is not relevant, not

17  probative, and completely inadmissible to what we need to do

18  in the context of this case.  And allowing this information to

19  sort of come in generally just opens scrutiny where there

20  should be none.

21         MS. ANDERSON:  Again, I think, we may agree with

22  you, Your Honor, if that also applies to FCPD and other

23  investigations that took place.  But to the extent those are

24  allowed in, we believe the DOE's investigation is relevant if

25  that's relevant.

B.R. v. F.C.S.B.

55

1          THE COURT:  Okay.  The Court will take it under

2    advisement.  But, as I said, the bottom line is that I am very

3    uncomfortable with any of this kind of information coming in

4    because it doesn't really help.

5          MS. REWARI:  Your Honor, can I just clarify one

6    thing?  I believe the letter -- there may be some confusion

7    about the letter.  But the letter came with the agreement.

8          THE COURT:  Yeah, well --

9          MS. REWARI:  So they are together and they both say

10   there hasn't been any findings.

11         THE COURT:  Why don't you do this, why don't you put

12   your heads together, which might be asking for the impossible,

13   but put your heads together and see if you can come up with

14   some sort of reasonable redaction of that letter.

15         MS. REWARI:  The letter goes with the agreement and

16   it says --

17         THE COURT:  The agreement is not coming in.  But you

18   won, so.

19         MS. REWARI:  All right.

20         THE COURT:  Don't overplay your hand.

21         MS. REWARI:  Okay.

22         THE COURT:  All right.  The --

23         MS. REWARI:  Are you speaking only about the 2014

24   letter because there's the 2020 letter?

25         THE COURT:  I think it's the same analysis.

---------------------- B.R. v. F.C.S.B. ----------------------

56

1          MS. ANDERSON:  Your Honor, we were identifying that

2    letter.  The other letter we would put in the category of the

3    VRA.

4          THE COURT:  So we're in agreement on that.

5          MS. REWARI:  I agree.

6          THE COURT:  Very good.  The Fairfax County youth

7    survey.

8          MS. REWARI:  Your Honor, I believe that you -- I

9    don't have exhibit numbers in front of me, but --

10          THE COURT:  That's 44, 427, 552, 553, 554, 555, and

11   731.

12          MS. REWARI:  Correct.  Most of the questions on this

13   survey had nothing to do with any of the issues in this case.

14   I mean these surveys are asking what are the students eating,

15   how are they spending their time.  It's not limited to what

16   are you doing in school.  It's a community -- it's a community

17   tool that is used by the county to monitor trends, to decide

18   how to allocate resources to come up with programs.  The

19   school system participates in these surveys and cooperates in

20   these surveys is because it's interested in developing these

21   programs to help students.  The questions are not specific to

22   schools.  The questions are not specific to what are you

23   reporting, but that is the implication and that's how they

24   want to use it that students are being harassed in school.

25   None of the questions on these surveys ask that.  Some of

─────────B.R. v. F.C.S.B.─────────

57

1   these surveys postdate the events in this case because they

2   come all the way up to 2020.  And so, they are using surveys

3   about, you know -- that were taken of students.  The surveys

4   are also not limited to middle school students.  They

5   are limited -- they are high school students.  And so, there's

6   a lot of questions that have nothing to do with this case.

7   The data does not support the conclusion that they are trying

8   to draw from this, and it would be very misleading to a jury

9   to suggest that, you know, these surveys show that Fairfax

10   County is not a good place to live or not a good place for

11   students to reside.

12          And I want to go back to just one clarification

13   point with respect to why a district-wide condition would not

14   have any relevance.  The elements of a Title IX claim, and

15   reading from the *Doe v. Fairfax County School Board* case is

16   with respect to:  "They have to show they were a student at an

17   educational institution receiving federal funds, they suffered

18   sexual harassment that was so severe or pervasive and

19   objectively offensive. . ."  And I don't think you need the

20   rest of that.

21          But the third element is the school.  The school,

22   through an official who has authority to address the alleged

23   harassment and to institute corrective measures, had actual

24   notice or knowledge of the alleged harassment.  And number

25   four, the school acted with deliberate indifference to the

B.R. v. F.C.S.B.

58

1   alleged harassment.  And the Fourth Circuit said in *Jennings,*

2   "The Title IX requires that a funding recipient must actually

3   be aware of the discrimination and fail to remedy it.  These

4   surveys don't show that.  They don't show that the school

5   system was aware of discrimination in its school.  The

6   questions don't even ask that question.

7           THE COURT:  Okay.  I think I understand your point.

8           MS. REWARI:  Thank you.

9           THE COURT:  Response.

10          MR. BRENNER:  Your Honor, this is the argument you

11  address in the equal protection claim.  In fact, these

12  exhibits are -- in the equal protection argument you heard

13  earlier there were two sets of exhibits.  There were the youth

14  surveys, which these are.  And then there were the, what I'll

15  call the sex trafficking exhibits.  You admitted the youth

16  survey exhibits or denied the motion, excuse me.  That's more

17  accurate.  And you -- I believe you granted -- you granted the

18  motion as to the sex trafficking.  So this is just, as we've

19  gone over it, number one and number seven are the same motion.

20  In number seven, they just listed more exhibits than they

21  listed in number one.  But it's these youth surveys for the

22  same reason we argued before.  And that counsel for FCSB made

23  the same argument they made before, Your Honor.  Admitted the

24  youth surveys there and there's no distinction between the two

25  motions as to that issue.

59

1          THE COURT:  The Court is going to deny that motion

2     in limine.

3          The next one is exclude evidence of Fairfax County

4     School Board's finances or budget.

5          MS. REWARI:  Your Honor, this is -- we believe this

6     is an impermissible suggestion that the wealth of the school

7     system affects its responsibilities under --

8          THE COURT:  Why don't you go ahead and stop right

9     there and I will question the other side.  How does this have

10    anything to do with what we need to resolve?

11         MR. BRENNER:  Andrew Brenner, Your Honor.  I would

12    say that the way that it could become relevant, one of the

13    issues in this case is that the -- according to the

14    plaintiff's evidence, the school, and vis-à-vis its relation

15    to the School Board did not -- the School Board had in place

16    certain structures at least on paper to deal with Title IX

17    issues.  Because, and when you hear the evidence, because of

18    how the school, the individual school defendants, how they --

19    how they implemented those policies they made it so it never

20    got there.  That was sort of --

21         THE COURT:  But what does budgeting and finance --

22         MR. BRENNER:  We do not intend to get into the

23    overall budget.  Just as we expect, as we put in our papers,

24    that they are not going to also make some argument to the jury

25    that, well -- because they will all be tax payers of -- well,

B.R. v. F.C.S.B.

60

 1   not all Fairfax County, but some will presumably, that this is

 2   going to affect you because you're in Fairfax.  So as long as

 3   all of that is out --

 4          THE COURT:  It's the violation of the golden rule

 5   and that's not going to happen.

 6          MR. BRENNER:  Right.  So with that caveat, honestly,

 7   I think that it's unlikely that evidence regarding their

 8   budgetary constraints would come in.  If we did believe it was

 9   likely, we would approach the Court outside the presence of

10   the jury.

11          THE COURT:  The Court is going to, at this time,

12   grant their request to exclude those.

13          The next one is motion in limine to bar any

14   disparagement of defense counsel.  That should be pretty easy.

15   We're not going to disparage anybody in this courtroom.

16          MR. BRENNER:  Absolutely agree, Your Honor.

17          THE COURT:  All right.  Next one is barring any cost

18   of the defense.

19          MS. REWARI:  I believe this is the same issue, Your

20   Honor.

21          THE COURT:  The Court will grant that.

22          MS. REWARI:  Thank you.

23          MR. BRENNER:  Just to be clear.  Andrew Brenner.

24   This motion had three parts.  So the first two parts were

25   disparagement of defense counsel, absolutely agree as we put

B.R. v. F.C.S.B.

61

1    in our papers.

2           The second part is the cost.  I think that refers to

3    the cost of defense, obviously, irrelevant.

4           THE COURT:  Yes.

5           MR. BRENNER:  The third thing is the way it's styled

6    is a little broader.  We will not criticize in any way or

7    disparage defense counsel for the way it conducted its defense

8    in this case; however, however, what Fairfax County --

9           THE COURT:  "However" is always a transition word.

10           MR. BRENNER:  Yeah, semicolon, however, comma.

11           It could be fair game anything that Fairfax County

12    -- I assume at all times, because they're such fine lawyers,

13    that everything the lawyers for Fairfax County did was at the

14    direction of their client.  I mean that's the assumption.

15    It's the assumption I think the Court should make.  You can

16    make that for our side too.

17           So to the extent -- I don't want to throw out the

18    baby with the bath water.  To the extent things that Fairfax

19    County has done vis-à-vis -- because remember, one of the

20    claims is a retaliation claim.  So things that Fairfax County

21    has done should not be looped into --

22           THE COURT:  And I appreciate the motion in limine,

23    but I don't think a motion in limine, with all due respect, is

24    the mechanism best used to sort of challenge strategic

25    approaches in the way the cases are presented.  With that

B.R. v. F.C.S.B.

62

1   being said, I'm going to deny it, but I'm hopeful that we all

2   understand what the rules are and what the expectations are

3   with regard to the presentation and the defense of the case.

4           MR. BRENNER:  Yes, Your Honor.

5           THE COURT:  All right.  I'm going to try to be

6   delicate here.

7           This next motion is an attempt to preclude -- to

8   prevent the preclusion of plaintiff or other lay witnesses

9   from trying to establish through their own testimony the truth

10  of any of the plaintiff's medical diagnoses.

11          MS. REWARI:  Your Honor, this is our motion.  And

12  our concern is that they're not medical experts who are going

13  to be testifying to certain conditions that have been claimed

14  in this case, and that the plaintiff not be able to put that

15  information or those diagnoses in through the testimony of her

16  family members or herself because --

17          THE COURT:  Well, plaintiffs in cases like this have

18  a little bit more latitude than lay witnesses.  Obviously, the

19  plaintiff can testify about her own circumstances, her own

20  observations, what she did in response to things that she was

21  told, and the like.  I do have some concern about other people

22  just coming in and giving their opinion, which is basically to

23  be decided by the fact-finders as to how the case should be

24  resolved.  I think there is a little bit of latitude if there

25  are witnesses who can testify.  To this extent, I'm being

———— B.R. v. F.C.S.B. ————

63

1    specific here, is that we were aware of her feelings about

2    certain situations and circumstances without providing any

3    diagnosis or expert testimony.

4            MS. REWARI:  That's all we want, Your Honor.  We

5    just don't want any medical diagnoses coming from the witness

6    box -- from a lay witness.

7            THE COURT:  Except from expert witnesses?

8            MS. REWARI:  Correct.  Correct.

9            MR. BRENNER:  Andrew Brenner, Your Honor.

10           I guess a couple of things.  So as far as diagnoses,

11   it would come in two ways.  One would be from the treaters who

12   made the diagnoses.

13           THE COURT:  And that's easy.

14           MR. BRENNER:  And this was Mr. Kivus (ph).  They're

15   basically going to walk through the records and say, I saw her

16   on this day, this is what I treated her for, this is the

17   diagnosis I made.  Not like -- with the benefit of hindsight I

18   would make this diagnosis.  That's for an expert.  That's the

19   second place a diagnosis comes in.

20           What I'm trying to get at here, and we try to put in

21   our papers is, you can't sanitize the effects -- so, for

22   example, if plaintiff's mother is testifying, okay, and the

23   question is, you know, Tell us how your daughter has changed.

24   You tell us from your observations -- how was your daughter

25   before; how is she now; what types of things did she like to

1    do.  Things like --

2          THE COURT:  And a witness can testify, this is what

3    she's going to say that she's more sullen, she's not as active

4    as she used to be.

5          MR. BRENNER:  Correct.

6          THE COURT:  But she's not going to be able to say

7    that because of what happened at Fairfax County Public School

8    system or not is the reason why she feels --

9          MR. BRENNER:  Correct.  And that's what I understand

10   Your Honor is ruling.  What I don't want to have happen,

11   because I don't want to blurt something out.  She may say, for

12   example if she were to say, my daughter, not because of what

13   happened at Fairfax County -- my daughter shuts down, you

14   know, we have dinners as a family and we're talking and all of

15   a sudden she shuts down because her PTSD kicks in, for

16   example.  She's not diagnosed here with PTSD.

17         THE COURT:  That's -- that's probably where you

18   cross the line.  She can't say that's when her PTSD kicks in.

19   That's probably where the line is crossed.  She's more sullen,

20   she's more quiet, she's not the person that she used to be.

21   But you're not going to be able to say because of the PTSD.

22   That's something that the expert, if you're presenting that

23   evidence, will be able to lay the foundation for.  And the

24   jury could or could not make the connection between the two.

25         MR. BRENNER:  Okay.  I'm glad I asked, because I

─────────────── B.R. v. F.C.S.B. ───────────────

65

1   would have gone on the wrong side of that line.  So I'm glad I

2   asked.  And for the plaintiff herself, she's obviously going

3   to talk about what she understands she suffered from.

4            THE COURT:  Okay.  That's tradition.

5            MR. BRENNER:  Thank you.

6            THE COURT:  Just so everyone is aware.  After we go

7   through all of these motions in limine, the Court is going to

8   provide you a written documentation of what the Court did so

9   that you're aware of the Court's specific rulings on specific

10  issues.

11           Individuals who are sitting in the courtroom right

12  now, we're working through a civil matter and we're working

13  hard, the lawyers are doing are very good job.

14           (Discussion off the record.)

15           THE COURT:  The next one is a more specific one.

16           Is allowing mention of plaintiff's mental -- excuse

17  me -- medical and mental health treatment records during

18  opening statements.

19           MS. REWARI:  Your Honor, I would just want to make

20  sure I understand where you've just drawn the line on the last

21  one.  Is the plaintiff allowed to say, I do this because I

22  have PTSD?

23           THE COURT:  Probably not.

24           MS. REWARI:  Okay.  Thank you.  That's what I wanted

25  to clarify, because there are some conditions for which, you

B.R. v. F.C.S.B.

66

1    know, we're many years down the line and we've heard names but

2    we haven't seen a doctor who's diagnosed it so I just want to

3    make sure --

4                THE COURT:  As I said, probably not, but, again,

5    trials are fluid.  And sometimes things happen that you don't

6    predict and so you have to deal with them at the time.

7                But generally, as I said, the plaintiff can testify

8    about her conditions and how she feels and all of that.  The

9    mother can testify with regard to her observations as to how

10   her daughter is doing, but they don't get to get into medical

11   diagnoses or explain why things are the way they are.

12               MS. REWARI:  Okay.  And that is, I believe, where

13   the cases that we've cited draw the line exactly where you're

14   seeing that.  And that's where we wanted the line drawn.

15               With respect to this one -- and this dovetails with

16   the other concern, right.  We don't want -- some of these

17   medical records may come in, some may not.  We are concerned

18   is that there's entire medical files that have been

19   designated.  There's things in there.  No doctor is going to

20   connect to some of these conditions to what happened in 2011

21   or '12 or allegedly happened and didn't happen.  And so, until

22   that record is admitted, we're just asking --

23               THE COURT:  Let's do this, and maybe you can back

24   door the discussion.

25               What medical records and mental health treatment

B.R. v. F.C.S.B.

67

1  records do you believe you're going to mention during opening

2  statement?

3          MR. BRENNER:  I don't know for sure because I

4  haven't finished, but the motion is drafted very broadly.

5  They don't want us referencing any medical conditions during

6  opening.  Of course I'm going to reference her medical

7  conditions during opening.  And it's interesting, Your Honor,

8  because there isn't going to be a dispute in the case that she

9  has been seen by multiple professionals, healthcare

10 professionals, and has been diagnosed with these things.

11 There's no dispute there.  They don't have a witness that says

12 otherwise.  It is not a case where the parties are going to

13 fight about what conditions she had.

14         THE COURT:  Mr. Brenner, I'm thinking what your

15 opponent colleague is suggesting that there's a possibility,

16 and, again, I don't know what you're going to do, and

17 apparently you don't know quite right now how you're going to

18 handle the opening statement.  What I think she's suggesting

19 is that there should not, in opening statement, be a litany of

20 medical records or mental health treatments that you're

21 showing to the jury and saying, ladies and gentlemen of the

22 jury, we're going to prove this, and this record is going to

23 prove this, and we're going to prove that, and this record is

24 going to prove that, and going through, you know, hours and

25 hours of medical treatment and mental health diagnoses that

─────────── B.R. v. F.C.S.B. ───────────

68

1    are part of what you believe your case in chief is, because,

2    as you know, that's not evidence.  It's just for the jury to

3    consider your predicate for the case.

4         MR. BRENNER:  Right.  So first of all, I'm a strong

5    believer that no one is interesting for more than an hour and

6    I know that I'm not.  So that's not going to happen.

7         THE COURT:  Well, I always like to say the Sermon on

8    the Mount was 20 minutes and unless you can do better than

9    that, you need to sit down.

10        MR. BRENNER:  So what I will do, Your Honor, if

11   we're going to use an isolated medical record, I'll show that

12   to them beforehand, and if they have an objection to it.  But

13   can I borrow one minute of the Court's time, because it's an

14   issue that I think we need to address.

15        THE COURT:  Sure.

16        MR. BRENNER:  What counsel just said, Judge, what

17   you have to understand what's going on here when she said,

18   Well, some of the medical records aren't coming in.  Here is

19   what happened in this case.  What happened in this case is

20   defendant, as is their right, requested to subpoena medical

21   records from third-party providers.  These are not experts.

22   These are the people that --

23        There was some litigation over that regarding

24   protective orders and what issues are confidential, but

25   ultimately what happened is Judge Fitzpatrick put a system in

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

B.R. v. F.C.S.B.

69

1  place where the plaintiff would provide HIPAA authorizations

2  to -- I think F.C.S.B. did all those subpoenas, on the defense

3  side.  They would then subpoena the records.  The records

4  would come back to them.  They would, I think, either copy

5  them or send us a link.  They provided the records.  They did

6  what they were supposed to do.  And when they sent the records

7  to the providers, it had a sheet for them to fill out -- a

8  records custodian certificate.

9          Okay.  So when we came to prepare for trial, we

10  noticed they had not -- again, I don't blame the defense for

11  this.  Some of the providers had not filled out the -- the

12  sign-off.

13          THE COURT:  Designation.

14          MR. BRENNER:  Exactly.  So we went and got those.

15  Much to the consternation of our colleagues.  They thought

16  that that was inappropriate for us to go to these third

17  parties and have them sign off.  But we have tried to, I think

18  over the last three or four weeks, tried to get an agreement

19  that no one is objecting to the authenticity of the records

20  that defendant subpoenaed and got from third parties and we

21  have certifications.  All of them are authentic.  If you have

22  other objections, that's fine.  Hearsay, relevance.  I get

23  that.  We have not been able to secure that agreement.

24          So when you're talking about how long the trial is

25  going to be, we're going to have to go through the whole

B.R. v. F.C.S.B.

70

1    process of 902.11.  I guess we're going to have to proffer to

2    the Court certificates.  I don't know what's going on, but I

3    wanted Your Honor to be aware of it that there is some dispute

4    as to the authenticity of records that the defendants

5    themselves collected.  I don't understand it.  I don't know

6    why it is.  They haven't articulated it to me.  But I just

7    wanted you to know that when she says, "Well, some of the

8    records won't come in."  As far as I'm concerned, every record

9    that is collected from the third party, we have subpoenaed

10   from them, if it's relevant, comes in.

11           It is authentic and, obviously, if it's not

12   relevant, then it is a different story.  If there's hearsay

13   within hearsay, we've also asked for those objections.  So I

14   just wanted you to be aware of that because I know you're

15   focused on the length of the trial and these are the types of

16   things that I think we should be able to work out, but I

17   wanted you to know that we have not been able to.

18           THE COURT:  Let me ask the question, generally, of

19   the other side.  Why is there any dispute with regard to the

20   underpinnings of admissible evidence?  In other words,

21   bringing people in to authenticate things, why is there a

22   problem with that?

23           MS. REWARI:  Your Honor, there isn't a problem with

24   that.  I think our issue with some of these records is that,

25   you know, if you have a 500-page or 200-page medical record,

B.R. v. F.C.S.B.

71

1    the jury doesn't just take the entire medical file back and

2    then try to interpret it.

3            THE COURT:  Well, I would assume Mr. Brenner and his

4    team are not going to suggest that's the way things should be

5    done.  I'm thinking that he's probably going to highlight

6    certain incidents of any report that is going to be offered

7    and suggest that dealing with, again, what Mr. Blanchard said,

8    the rule of completeness.  Here is the entire document, we're

9    using pages 5, 10, and 27, and 73, and with that same

10   document, you can offer 24, 28, 32, and 35 without necessarily

11   having the underpinnings of having someone come in and verify

12   the record and authenticate the record and all of that.  You

13   all can pick and choose whatever you want to out of the

14   document and you can impeach and cross-examine with regard to

15   anything in the document, but it's a 500-page document.  I

16   can't see any need for that to come in at all.

17           MS. REWARI:  Yes.  And that's why we're saying we

18   don't see the whole file coming in.  We said identify the

19   pages because some of these providers you get, you know, the

20   doctor's notes, but then you get other things.  They've just

21   produced the whole file.  And, yes, there's a custodian

22   declaration, but what is it being offered for?  Is the

23   dispute --

24           THE COURT:  Well, it seems to me that the simple

25   thing, and maybe I'm making things too simplistic.  But the

———————————— B.R. v. F.C.S.B. ————————————

72

1  simple thing is, if you have a 500-page document, you look at

2  Mr. Brenner and you say:  What pages are you going to offer?

3  And he says, I'm going to offer these pages.  And he says to

4  you, What pages are you going to offer?  I'm going to offer

5  these pages.  And you all agree that if there's anything in

6  the other remaining pages that's relevant or subject to

7  cross-examination, you can use them without having the jury

8  bored by dealing with the admissibility of a 500-page

9  document.  Why doesn't that make sense?

10        MS. REWARI:  That does make sense and that's what

11  we've asked them to do.

12        MR. BRENNER:  I think it makes perfect sense.  The

13  only issue I'm focused on, which we have not until, I think,

14  just now.  We haven't agreed that they are all authentic.  We

15  don't have to bring in a records custodian to testify live.

16  Now what pages, I agree with Your Honor, except if I had put

17  on my exhibit list parts of medical records, you would have

18  heard what we heard before, well, that violates the rule of

19  completeness.  So, yeah, I don't --

20        THE COURT:  As I said, Mr. Blanchard made a good

21  point early on about the necessity, adhering to the rule of

22  completeness and all the necessities to make something

23  admissible, and all of that.  But again, I think that good,

24  competent counsel, and you all are, can come to agreements on

25  simple things as opposed to overcomplicating the matter.

─────────────── B.R. v. F.C.S.B.────

73

1    We've been looking at this case probably for a year or more in

2    one way or another.  Even my wife knows about this case.  And

3    what I have come to the conclusion of is that this is a

4    reasonably simple case, and that is whether you believe

5    plaintiff and whether or not the number of defendants did what

6    they needed to do under the applicable law.  It seems to me

7    that's the simple part of the case.  I actually said that to

8    my wife, and without any legal training, she agreed.  But she

9    loves me and we've been married for 42 years, and so, it

10   doesn't really matter.  But I believe that the case can be

11   simplified significantly if we can get agreements on the

12   simple things.

13           MR. BRENNER:  Your Honor, I couldn't agree more.  I

14   couldn't agree more.  It sounds like you got my opening down

15   to a minute so I will take that under advisement.  It may be

16   the easiest way to do it.  But all I was trying to do is if we

17   can clear away the authentication issue, we can deal with the

18   issue which we've tried to do.  And counsel is correct, we've

19   had two disagreements.  One was authentication and one was

20   over sort of -- I'll say, calming down the records, which

21   we've done.  We also have a bunch of duplicates on our exhibit

22   lists.  We've got rid of those.  They know that.

23           So we will work on the identifying parts of the

24   record that we want to go in.  Of course if there's other

25   parts of the record, they can put them in too.  No objection

B.R. v. F.C.S.B.

74

1    to that.

2            THE COURT:  Okay.  I think we have a relative

3    agreement and the Court will explain what it's going to do

4    with regard to the facilitation of what we're doing on that.

5            There's a request to exclude witness, Josephine

6    Evola, who worked on the investigation of plaintiff's

7    complaint at OCR.  And Lisa Fagan, a special education

8    attorney who assisted plaintiff.

9            MR. BRENNER:  Your Honor, did you skip No. 12 on

10   purpose?

11           THE COURT:  No. 12?

12           MR. BRENNER:  Yeah, there's one before Evola and

13   Fagan.

14           THE COURT:  Oh, age of consent.  I'm sorry.  Okay,

15   yes, I'm sorry I did skip that.  Age of consent.

16           MS. REWARI:  Your Honor, as we've laid out in our

17   papers, we don't have an issue with arguing the ages of the

18   parties.  They are relevant.  As we've said under the Title IX

19   guidelines, you know, you consider welcomeness in terms of the

20   maturity of the students, right, and that welcomeness is an

21   issue under Title IX.  The Virginia Code on what is the age of

22   consent for Virginia criminal law does not preclude an

23   argument that conduct between these students was welcome or

24   not welcomed.  By that argument, you couldn't have, you know,

25   harassment in elementary school because they're all underage.

───────── B.R. v. F.C.S.B. ─────────

75

 1   And so, what we're asking is that the province of the Court,

 2   which is instruct the jury on the law be not taken from the

 3   Court.  They can make the argument that she's 12, but they

 4   shouldn't be allowed to argue that under Virginia law that

 5   means she legally cannot consent.

 6           THE COURT:  Okay.  Mr. Brenner.

 7           MR. BRENNER:  So, Andrew Brenner, Your Honor.

 8   You've addressed, at least preliminarily, in one of your prior

 9   orders.  Let's be clear.  The law in Virginia is not that a

10   12-year old cannot consent to harassment.  This is a

11   tremendous watering down of what's going on here.  The issue

12   is, under Virginia law, a 12-year old cannot consent to sexual

13   assault.  Whether it be sodomy or vaginal intercourse, or anal

14   intercourse for that matter.  So that's what we're talking

15   about.  And the defendant --

16           THE COURT:  Isn't it true that typically when we're

17   talking about the age of consent, and typically -- I'm not

18   saying this is always the case -- we're talking about it in

19   the context of a criminal case.  Is that fair?

20           MR. BRENNER:  I would say, yes, that is fair

21   typically, but it has now been specifically incorporated into

22   Title IX jurisprudence.  So, yes, typically, the Virginia law

23   itself goes to -- it's a criminal statute.  Is a direct way to

24   answer that.

25           Now, the courts --

———————— B.R. v. F.C.S.B. ————————

76

1      THE COURT:  Do we have the necessary elements to

2  apply that particular principle in the context of a civil

3  case?  In other words, age of consent, and maybe I'm being too

4  simplistic again here.  Typically talks about when you have a

5  minor and whether or not the minor can consent to have

6  relations with a person who is not a minor.  That's typically

7  where we see it.

8      MR. BRENNER:  Not under Virginia law.  It's not

9  limited to the -- I'll call it -- in the criminal context,

10  I'll call it the assailant or the alleged.  But I'm hesitant

11  to use criminal terms when we talk about the case.  But it is

12  not limited to sexual conduct between a minor and a non-minor.

13  So that's just not correct.  A 13-year old with a 12-year old,

14  which you have here, is she cannot consent to that.  It is a

15  legal matter.

16      But where Your Honor started, I think, is the right

17  place to start, which is:  It is a criminal statute so what

18  are we talking about.  And the answer is it's been

19  specifically incorporated, as Your Honor noted in your order

20  in the *Mary M* case.  It has been specifically incorporated

21  into the unwelcomeness element of a Title IX claim.  So that's

22  undisputed.

23      Now, the defendants' answer to that is, frankly,

24  they just made up a new rule.  They said, Well, sure that's

25  true.  It is relevant to Title IX.  But we think what they

B.R. v. F.C.S.B.

77

1   meant to say it's only Title IX when it's an adult on a

2   student.  That's just not the law.  That is not what the law

3   is.

4              In fact, there's cases that specifically rejected

5   that because it makes sense, Your Honor.  When you're talking

6   about welcomeness, unwelcomeness consent it's from the eye of

7   the consentee or lack of consentee, it's not from the eye of

8   the perpetrator.  That's the whole purpose of age of consent

9   law.  So we're only asking Your Honor to -- so we filed a

10  motion on this ourselves saying they couldn't argue she

11  consented.  They sort of doubled down and said not only can

12  we, you can't even mention that this issue exists, that the

13  law exists.

14             We're not trying to take it out of Your Honor's hand

15  at all.  We're asking Your Honor to instruct on what the law

16  is.  And the law is that a 12-year old girl cannot consent to

17  sex and that law also, in the jurisprudence of the federal

18  courts in this country, have adapted that to the welcomeness,

19  unwelcomeness element of Title IX claims.  So it's highly

20  relevant and they should be -- I don't want to -- our motions

21  are sister motions.  So I'm trying to -- our motion is they

22  can't say she consented.  Their motion is, Well, not only can

23  we do that, you can't even tell the jury this law exists.  And

24  we think their motion should be denied and ours should be

25  granted.

B.R. v. F.C.S.B.

78

1          THE COURT:  Okay.

2          MS. REWARI:  Your Honor, I just want to address a

3   couple of points that Mr. Brenner raised that had not been

4   raised originally with respect to their motion.  So in our

5   brief on -- in Docket 725, we've addressed the law on this.

6   And the *Mary M* case was decided by the Seventh Circuit before

7   it was decided whether student-on-student harassment was

8   actionable under Title IX.  So it doesn't apply to

9   student-on-student harassment.  It was the adult-to-student

10  context.  And as we've explained --

11         THE COURT:  That's the *Lawrence School Board* case

12  that you're talking about, *Mary M Lawrence School Board*?

13         MS. REWARI:  The *Mary M* case there's -- if you look

14  at footnote 7 --

15         THE COURT:  I got it.  131 F.3d 1220.  I got it.

16         MS. REWARI:  Correct.  Correct.  That was an open

17  question at the time the Seventh Circuit decided that case.

18  And that case involved an adult and a child.  And what we said

19  is when the Supreme Court decided *Davis* and said that

20  student-on-student harassment is actionable, they looked at

21  the Title IX guidelines and the Title IX guidelines said

22  welcomeness is an issue and it involves, you know, even when

23  the children are underage that it's not -- these -- the state

24  laws on consent don't dictate the protections of Title IX,

25  otherwise different states would have different protections

79

1   depending on, you know, students would have different rights

2   under Title IX depending on the laws of their state.

3          THE COURT:  The problem is, and again I'm not

4   responsible for this, but I'm going to acknowledge it.  It

5   seems there's a conflation between age of consent and

6   welcomeness, which, in the Court's view, are two separate

7   inquiries.  It becomes a little muddy when we try to conflate

8   the two, I think.

9          MS. REWARI:  I agree.  I agree.  And there is a real

10  issue in this case about welcomeness, right.  And it's not

11  even consent.  We're talking about conduct that she initiated.

12         And so, their argument is that -- even if she

13  initiates it, it's harassment because she can't consent.

14  That's really confusing for a jury.  The question is

15  welcomeness.  Did she welcome this conduct.

16         And under Title IX, under the guidelines, you know,

17  the guidelines explained, and the Supreme Court relied on this

18  in finding that student-on-student harassment was actionable.

19  They relied on those guidelines and they explained that you

20  have to consider the age.  And there isn't a categorical rule

21  that a minor cannot consent to sexual activities with another

22  minor.

23         THE COURT:  Okay.  I think I understand everybody's

24  point.  As far as this issue is concerned, the Court will

25  grant in part and deny in part the motion with regard to the

─────────────── B.R. v. F.C.S.B. ───────────────

80

1  deliberate indifference and retaliation claims under Title IX

2  against the Fairfax County School Board.

3       The Fairfax County School Board will be permitted to

4  discuss whether plaintiff had welcomed the contact with C.K.

5  and J.O., but will not be permitted to talk in terms of

6  consent.

7       While plaintiff points to authority that seems to

8  hold that a minor victim's initiation or invitation of conduct

9  has illegal consequences, those cases were all focused on an

10  adult, school, employees involvement with a minor child.

11       There is no authority that the Court can find

12  holding that where the sexual harassment allegations focus is

13  on incidents between two children of similar age.  The issue

14  of welcomeness is irrelevant.  The only two cases plaintiff

15  cites involving relationships between two minor children are

16  both distinguishable as cases involving students with severe

17  learning disabilities which takes us into another area.

18       The Court, in its opinion order, a disposition of

19  the motions in limine today will provide the specific language

20  that the Court has just used.

21       Now, we move to the, never disclosed witnesses.

22  Josephine Evola and Lisa Fagan.

23       MS. REWARI:  Your Honor, this is our motion.

24  Ms. Evola, as far as we can tell, was an attorney in the

25  Office of Civil Rights.  Both of these names were just

─────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────

───B.R. v. F.C.S.B.───

81

1    provided in documents.  And so, we would say that her

2    knowledge has not been disclosed and we can glean it from

3    looking at some documents of the thousands of pages that have

4    been produced, but we -- she was not disclosed as a potential

5    witness.

6            Ms. Fagan was the plaintiff's attorney.  They've

7    claimed privilege over her communications.  She was never

8    disclosed as a witness.  And I don't know that they are

9    serious about calling these individuals because we haven't

10   seen subpoenas to any of them, but to the extent they are, we

11   believe they should be precluded.

12           THE COURT:  Okay.  Welcome.  Sorry for your loss.

13           MS. ZOLL:  Your Honor, Brittany Zoll for plaintiff.

14   I would just add that these are individuals whom defendants

15   have been well aware of.  They've known of them in their role

16   in --

17           THE COURT:  The "well aware" standard has no

18   application.  It is not whether or not they've been disclosed

19   or not.

20           MS. ZOLL:  Understood.  They were not disclosed.

21   They were listed on plaintiff's trial witness list to her

22   question of:  Do we intend to call them.  I think the answer

23   is:  You know, at this point, we are not intending to call

24   them, but a wholesale exclusion of them when we don't know

25   what's going to happen at trial and how it might go will be

B.R. v. F.C.S.B.

82

1    unwarranted.

2              THE COURT:  Thank you.  The Court is going to grant

3    the motion to exclude these two individuals.

4              Next is a related motion about improperly disclosed

5    witnesses from Rachel Carson Middle School.  I think it's Abby

6    Harris, Maya Hossaim, Olivia Palchus, Jayde Survey, and

7    Rebecca Spurrier.

8              This might be simpler to let the other side respond

9    and then you can rebut.

10             MS. ZOLL:  Sure.  Again, Brittany Zoll for

11   plaintiff.

12             I would just point out that these individuals are

13   differently situated than the two you just excluded.  These

14   individuals were disclosed in plaintiff's disclosures.  The

15   only thing that was not disclosed was their contact

16   information, which she did not have.  She requested that

17   information from the school since they were school students.

18             THE COURT:  Can you give me some idea without any

19   violation of your attorney-client privileges, generally, what

20   these people are going to testify about.

21             MS. ZOLL:  Sure.  So, if I may, the witness whom, in

22   particular we have now subpoenaed and we have disclosed her

23   contact information that we obtained via public records to

24   defense, so they have that information now.  She will testify,

25   for example, to school statements that she wrote that are in

─────B. R.  v.  F. C. S. B.─────

83

1    the record that the school has had to what she saw at the

2    school at the time of the events.

3            THE COURT:  Is this generally or specific to this

4    case?

5            Is this information that she's going to disclose as

6    to what she saw at the school.  Is it general information or

7    is it information specific to this case?

8            MS. ZOLL:  Specific to this case.  She wrote, for

9    example, student statements that document incidents she

10   personally witnessed a car --

11           THE COURT:  Involving Ms. B.R.?

12           MS. ZOLL:  Yes.

13           THE COURT:  Okay.  All right.

14           MS. REWARI:  Your Honor, it's been 12 years since

15   the school system had involvement with these students.  Well,

16   some of them have graduated -- well, they've all graduated.

17   Some of them left the school right after and some of them

18   graduated, you know, in 2017.  And so, the idea that we should

19   know what they are going to -- that we should have been able

20   to find them is, I think, unreasonable.  We did try to find

21   some of these people.  We did provide notice, but we weren't

22   able to find them.  They've only disclosed their contact

23   information for one person, Jayde Survey, and we just got

24   that.

25           THE COURT:  Would you suggest that the other side,

—B.R. v. F.C.S.B.—

84

1  with all due respect, does not exercise due care in trying to

2  update the information with regard to these witnesses?

3         MS. REWARI:  No, because they've had these names --

4  they've had the names since 2012.  And, you know, discovery --

5  the initial disclosures are May 2012.  And if this information

6  could be found by a public records search, then they should

7  have done it sooner.  But to get it for the first time two

8  days ago or actually -- when we got the subpoena on Friday, so

9  there was an address on Friday.  That was the first time.  And

10 for the rest of these people, we still don't have any contact

11 information.

12        THE COURT:  Which two do you have the contact

13 information on?

14        MS. REWARI:  The only one is Jayde Survey because

15 she was served on Friday with a subpoena.  I'm sorry.  I don't

16 know when she was served.  The return was filed for us on

17 Friday.  And that's where we got the address.  And then they

18 formally gave it to us again yesterday.

19        THE COURT:  Okay.  I'll let you close your argument.

20        MS. ZOLL:  Your Honor, first, I don't know if you've

21 ever tried to search for information via public records, it's

22 not quite that easy.

23        But we are really only concerned here with J.S.,

24 Ms. Survey, whom we disclosed her information as soon as we

25 obtained it.

─────────────── B.R. v. F.C.S.B. ───────────────

85

1        THE COURT:  Okay.  The Court is going to allow you

2   to have the testimony of Ms. Survey, but none of the others.

3        The next one is the alleged retaliation against, I'm

4   assuming, Ms. B.R.'s brother.

5        MS. REWARI:  I believe this motion is largely agreed

6   to, but --

7        THE COURT:  Let's see.

8        MS. ZOLL:  Right.  Thank you.  Your Honor, I think

9   we are in agreement that plaintiff is not asking for damages

10  be awarded to her brother, right.  But to the extent that the

11  School Board took actions in retaliation against plaintiff

12  that happened to her family, to her brother, those are

13  relevant to proving retaliation against the plaintiff.

14       So for example --

15       THE COURT:  What is the nature of the retaliation

16  you believe you're going to be able to prove?

17       MS. ZOLL:  Right.  So, for example, plaintiff's

18  brother was forced to leave school early.  And you can imagine

19  a situation where, you know, in retaliation against plaintiff

20  and wanting to, you know, hypothetically get her out of the

21  school at this point.  She's still being home schooled.  You

22  can see a family saying, oh, let's wait until our son, who is

23  older, graduates.  And then --

24       THE COURT:  Help me understand how allowing the

25  removal of her brother from school early is retaliation?  Was

—B.R. v. F.C.S.B.—

86

1   there something specific --

2         MS. ZOLL:  Because it pushes the family out of the

3   School Board and out of the district.

4         THE COURT:  Okay.  All right.

5         MS. REWARI:  Your Honor, the only evidence that's

6   been produced in this case is that he graduated early from

7   high school.  That he did a nontraditional senior year and he

8   presumably had all the coursework ready to do it, because he

9   was a junior when this happened, and then in his senior year

10  he did a nontraditional year.

11        THE COURT:  What were the circumstances that were

12  such that the brother was removed from the Fairfax County

13  School Board traditionally?

14        MS. REWARI:  He wasn't removed.  He chose to take,

15  you know, to do internships rather than to take classes in the

16  building.  He wasn't removed.  But the teachers and the

17  administrators at his high school, who permitted him to take

18  that nontraditional senior year, are not witnesses in this

19  case.

20        And his educational experience was not -- they

21  didn't provide discovery of that.  They didn't identify the

22  people that they are going to say she did him unfairly.  He

23  was not even a student at the school that is described in the

24  complaint.  Nothing about him is in the complaint.  We didn't

25  take discovery about his educational experience, how that

B.R. v. F.C.S.B.

87

1    impacted his college admissions, his applications.

2            I mean, they produced his college application.  He

3    used the fact that he was taking a nontraditional year.  He

4    had done all of this coursework to get into college.  So the

5    idea that this is retaliation is far-fetched.  But the

6    discovery of that -- you know, it's not pled in the complaint.

7    Discovery of that has not been provided.  If they are going to

8    get into that, we want to be able to call his teachers and his

9    administrator to talk about --

10           THE COURT:  More witnesses.

11           MS. REWARI:  Right.  Exactly.  I mean it's a trial

12   within a trial as to his experience.  He can't get damages for

13   that and she doesn't have standing to complain about whatever

14   may have happened or not happened with her brother.

15           THE COURT:  I think I understand your point.

16           MS. ZOLL:  Your Honor, may I make one more point?

17           THE COURT:  Yes, ma'am.

18           MS. ZOLL:  I'd just like to add that separately this

19   evidence may be relevant, for example, if the other side -- if

20   defendants try to paint her brother as a bad actor or to

21   impeach him for bias.  I think it's important for the jury to

22   understand --

23           THE COURT:  Is this the only purpose that the

24   brother is going to be called to testify is to suggest a

25   retaliation, because if that's the case, they're not going to

B.R. v. F.C.S.B.

88

1  be able to call him for something else.  Either he is in or

2  he's out.

3          MS. ZOLL:  No, absolutely not.  The brother has, you

4  know, firsthand knowledge of how plaintiff acts on a

5  day-to-day basis.

6          THE COURT:  Just as a mother would testify.  I

7  think, obviously, that's admissible, but getting into

8  retaliation without more, again, it's just confusing to the

9  jury.  So the Court is going to grant that motion.

10         Again, this does not preclude the brother from being

11 able to testify with regard to his own observations as to his

12 sister and the like.  That's obviously legitimate, but

13 retaliation, I think, is a distraction to the fact-finder.

14         Another related one is alleged threats to fiance.

15 First, let me hear from counsel.

16         What is the nature of the threats that were brought

17 against the fiance, specifically and with particularity, if

18 you can?

19         MS. ZOLL:  My understanding of what happened is not

20 simply that his law firm -- he's an attorney -- saw that he

21 was specifically Tweeting on, I guess, Twitter about F.C.S.B.

22 and about this case, and about F.C.S.B.'s counsel.  And, you

23 know, of course this law firm is within their rights to

24 monitor their employees and tell him to stop.  But what

25 happened in this case was F.C.S.B.'s counsel, presumably, at

B.R. v. F.C.S.B.

89

1  the request of its client, specifically contacted plaintiff's

2  fiance's employer and told plaintiff's fiance's employer about

3  his conduct presumably in an attempt to intimidate him, get

4  him to stop.  And I think that this evidence is particularly

5  relevant on cross, potentially.  We don't intend to admit it

6  on direct, but it goes to potential biases if they want to say

7  he's up here, he's biased in favor of his fiance.  You know

8  why he might be -- appear to be biased.

9          THE COURT:  Well, I would expect that since he's a

10  fiance he would be biased.  That's the nature of being a

11  fiance.

12          MS. ZOLL:  Yeah, but I think the jury should

13  understand that there may be other potential animosity between

14  the fiance and F.C.S.B. based on the actions they took against

15  him.

16          THE COURT:  I appreciate your arguments, counsel.

17  Again, I believe that this particular testimony with which you

18  make reference to is too attenuated to do anything to help us

19  with regard to resolving the issues that we need to resolve

20  and so that motion will be granted.

21          Damages.  There's a suggestion that plaintiff failed

22  to update her Rule 26(a) and following disclosures after

23  May 22.

24          MS. REWARI:  Correct, Your Honor.  We have not

25  gotten disclosure since May 2022, as we've acknowledged in our

1    reply, that to the extent that she's relying on the

2    calculations in Mr. Young's report and Mr. Karras's report.

3    We do have those and this motion doesn't apply to that.

4            There's a separate motion as to Mr. Young.  And I

5    believe Your Honor has -- with respect to the -- this is a

6    joint motion.  With respect to the School Board, Mr. Young's

7    testimony is not -- those damages are not recoverable in light

8    of your ruling last week.  But the rest of this motion applies

9    to the treatment expenses which are the economic losses that

10   are recoverable under the -- that she is seeking under Title

11   IX against the school system.  And also the damages seeking

12   against all the other defendants.  This is a motion on behalf

13   of everybody and they've had plenty of time to update this.

14           And in fact, we flagged this issue when we filed our

15   motion for summary judgment in November, and they, in that

16   brief, said that doesn't mean we can't update it and they

17   never updated it.  And so, we're going into trial and we have

18   no idea what is the number -- if it's a different number than

19   the one that was given us and tied to receipts.

20           And so, we ask -- our motion is that shouldn't be

21   allowed to claim any more economic losses than what is in her

22   computation when she was required to provide under

23   Rule 26(a)(3).

24           THE COURT:  All right.

25           MR. BRENNER:  Your Honor, Andrew Brenner.  I was so

—B.R. v. F.C.S.B.—

91

1    excited I thought I was going to say we agreed, but we're very

2    close.

3           So as I understand Counsel's argument, what's in

4    Dr. -- Mr. Karras's report and Mr. Young's report is they have

5    other objections to it, but as far as disclosure, it's okay.

6    I think that is the bulk -- we're talking economic damages

7    now.  That's the bulk of it.  Here is the only little slipper

8    that needs to be added.  So I think I mentioned this before.

9    There was a dispute before Judge Fitzpatrick where the

10   plaintiff's position was that medical records collection

11   should end at the end of discovery.  And it was the

12   defendant's position, no, they should collect through trial.

13   The defendant prevailed on that.  So they've continued to

14   collect records and did what Judge Fitzpatrick ordered.  We

15   weren't happy with it, but they did what they were supposed to

16   do.

17          The only thing we were going to add, and we put in

18   our papers we would do it by next week, is the additional

19   medical expenses she has incurred since those reports.  So

20   that's it.  Obviously, they couldn't be in the reports because

21   they didn't exist at the time of the reports.  They are

22   ongoing and they continue to be ongoing --

23          THE COURT:  Do those medical expenses predate May of

24   2022?

25          MR. BRENNER:  No, no.  We're only adding the stuff

———————— B.R. v. F.C.S.B.————————

92

1    from post-reports.  So I think the reports were July of '23.

2    But don't hold that -- I'm not sure I have the exact month,

3    but, yes, it's essentially to update the disclosure.  We

4    couldn't disclose it back in May of 2022 because it didn't

5    exist.

6              So I think we're in agreement.  Karras and Young

7    are, to the extent Your Honor deals with them in other issues,

8    are the economic damages that will be sought, plus whatever

9    economic damages she has incurred post Karras and Young's

10   reports.  They have the records.  They are not coming from --

11   they are coming from the medical bills that they've collected

12   and copied us.

13             And so, there will be no secrets.  It's just you

14   can't cut us off, you can't keep collecting the records and

15   then say, but you've got to be stuck with the records that

16   existed as of July.  So that's the only place where we

17   disagree.

18             MS. REWARI:  Your Honor, I want to clarify.

19   Mr. Karras's report is not based on historical damages.  It's

20   future earned, future medical expenses.  So that calculation

21   is not about any --

22             THE COURT:  That's another issue.  That's another --

23             MS. REWARI:  Exactly.  And so, this is not updating

24   anything with respect to what was in those reports.  And we

25   had to subpoena these records because plaintiff didn't provide

B.R. v. F.C.S.B.

93

1    them.  Just because we subpoenaed them does not relieve her of

2    the burden.

3              THE COURT:  Let's stay on course.  We're having a

4    pretty good conversation and we don't need to, you know, start

5    playing the blame game.  What we need to do is focus on what

6    has and has not been done as the requirements of the

7    procedures to perfect this case for trial.  So let's keep our

8    eye on the ball.

9              MS. REWARI:  My point is that we -- plaintiff did

10   not need to wait for the subpoenas to be able to quantify her

11   damages.  She knew what she paid for these services and she's

12   had this information.  So the subpoenas are a red herring

13   because this is the plaintiff's burden.  These are her

14   receipts.

15             THE COURT:  The Court is going to take this under

16   advisement and take a look at the circumstances that have been

17   alleged and the argument that has been presented today.

18             The next one is the Holy Name Medical Center

19   regarding plaintiff's offering testimony to her medical

20   visits.  The Holy Name Medical Center from 2017 to 2019.

21   Regarding the alleged assaults in 2011 and 2012.

22             Let me hear from the other side before you speak.

23             MR. BRENNER:  This is a motion that I think all of

24   the defendants have joined or at least some.  I don't really

25   -- I don't understand why they've picked this one provider.

94

1    Just so Your Honor is clear, plaintiff has been under

2    continuous and constant inpatient and outpatient treatment

3    since March of 2012.  Okay.  So her records run the gamut --

4    and she continues to be in treatment.  So it's been 12 years

5    almost to the day, and she continues to be treated.  All of

6    the defendants have picked out one provider and they are

7    essentially arguing relevance.

8                THE COURT:  Again, I follow your point.  Why was

9    this particular medical provider cherry picked?  What was, I

10   guess, the problem with this one?

11               MS. REWARI:  Because this one is $100,000 of

12   emergency room care for illnesses that have no relationship.

13   They are not psychiatric illnesses.  And I want to be

14   respectful because this is her medical records and I

15   understand it's an open courtroom, but, as we've described,

16   these are viral illnesses, these are bacterial illnesses.  And

17   this is years later and there's no medical expert who is going

18   to say this virus in 2017 --

19               THE COURT:  What I'm going to do is I'm going to

20   take a look at the report and see if it's probative.  So I'll

21   take this under advisement also.

22               MS. REWARI:  Thank you.

23               THE COURT:  All right.  Thank you.

24               All right.  Ladies and gentlemen, we're sitting in

25   the courtroom, we're working hard.  We're doing okay, but

─────B.R. v. F.C.S.B.─────

95

1  we're not doing great.

2            Experts on credibility and veracity.  There's a

3  request of barring the expert witness from testifying or

4  planning regarding the credibility of any other witness's

5  testimony.

6            I will start out by saying this, you can, obviously,

7  have disagreements on experts and experts have different

8  perspectives, and just experts opine differently.  That's the

9  nature of the battle of the experts.  We're going to,

10  generally, have a rule on witnesses in this case.  If this

11  case does indeed go to trial, which is going to preclude from

12  any witnesses from listening to the testimony of anyone else

13  other than an expert who has been probably designated who

14  needs to listen to the testimony of another expert.

15            So I think this might be a little simpler than we're

16  thinking.  So the proponent of the motion, I'll hear from you

17  first.

18            MR. ELLIKER:  Thank you, Your Honor.  Kevin Elliker

19  for the School Board.  Actually, I apologize, the expert

20  motions, the Daubert motions are on behalf of all the

21  defendants.

22            THE COURT:  Yes, sir.

23            MR. ELLIKER:  I think that the reason -- well, I

24  know the reason we filed this motion is because several of the

25  experts, either in their depositions or the reports, made

―――― B.R. v. F.C.S.B. ――――

96

1  statements effectively opining on the credibility of the

2  plaintiff during the course of their interactions with her.

3  That is the opinion testimony we would like to have excluded.

4  I don't think that that should be controversial, but that was

5  the reason why we filed that motion is to get that order.

6          THE COURT:  And let me go to Mr. Brenner or whoever.

7  You're taking on this.  You don't have any problem with that?

8          MR. KEEFE:  Your Honor, we don't, but I would like

9  to reply that defendants' expert, Dr. DeRight's entire opinion

10  is that he can't make a determination about plaintiff's

11  cognitive injuries because she's malingering, which means

12  she's making it up.  So I don't understand how Dr. DeRight's

13  opinion would come in that crosses the line into credibility.

14          THE COURT:  Okay.

15          MR. ELLIKER:  Well, Your Honor, the Dr. DeRight

16  opinion, I think, was --

17          (Counsel confers.)

18          MR. ELLIKER:  I have what I think is the answer to

19  that, but I wasn't prepared for Dr. DeRight --

20          THE COURT:  All right.  You're being pushed aside.

21          MS. REWARI:  Sorry.  With respect to Dr. DeRight,

22  this was not a separate motion, but Dr. DeRight's opinion is

23  that she's malingering based on his evaluation of her and

24  his -- the credibility --

25          THE COURT:  Malingering is, from what I understand,

B.R. v. F.C.S.B.

97

1    typically viewed as a diagnosis.  Whether or not a person is

2    telling the truth or not is a credibility or a veracity

3    determination, which is completely different.

4           MS. REWARI:  Correct.  Thank you.  Yes, exactly.

5    And I'm sorry to pull him off of here, but he did not do Dr.

6    DeRight's report or his deposition and I want to make sure

7    you're clear on that.  Yes, it is a diagnosis.

8           THE COURT:  All right.

9           MR. BRENNER:  Since I did do Dr. DeRight's

10   deposition, I thought malingering is what you did too.

11          His definition of malingering is -- here is his

12   basic opinion.  His basic opinion is, I ran a bunch of tests

13   on her, just like the plaintiff's experts met with her.  They

14   are really going to one of plaintiff's experts that did an

15   extensive forensic examination.  So they are both doing an

16   examination of her, a forensic examination, not a physical

17   forensic.  And what Dr. DeRight does is he says -- because I

18   had the same question you did on malingering.  That's all I

19   deposed.  Is he said, "She's filled out these tests to

20   determine her cognitive deficit."  The scores of those tests

21   shows that she does have a neurocognitive deficit, but I have

22   decided that those tests are not valid because -- he uses the

23   word "malingering" but what he explains is, "Because I think

24   she's not being honest in her answers."  So he runs the test,

25   he gets the result that -- I'll just say he doesn't like,

B.R. v. F.C.S.B.

98

1  whatever you want to call it -- but he gets the result that

2  shows that she has the deficits that plaintiff is claiming and

3  he says you can't trust those results because she's not being

4  honest in her answers to the test.  So it really is the flip

5  side of the same coin.  It's not a medical --

6          THE COURT:  Isn't that the subject of good

7  cross-examination?  For instance, doctor, you've said all of

8  these things in your report which support our theory that

9  plaintiff has been damaged by what has occurred, and after

10  those reports you come up with a term "malingerer," and

11  without questioning the credibility of my client, can you

12  explain to the fact-finder what the term malingering means

13  from a medical standpoint?

14          And I believe that that answer probably is going to

15  be supportive of your theory that this is just a term that

16  she's used without her -- without him providing any context

17  for her credibility or veracity.  I think that crosses the

18  line because another witness doesn't get to come on the stand

19  and testify against the veracity of another witness.

20          MR. BRENNER:  Well, I agree with you.  But I asked

21  him that question.  He is absolutely going to say, "She is not

22  being truthful in her answers."  That's his testimony.

23          THE COURT:  Well, then I'm going to preclude that.

24          MR. BRENNER:  That's our point.  It's good for the

25  goose, it's good for the gander.

B.R. v. F.C.S.B.

99

1        THE COURT:  I will preclude that.  He doesn't get to

2   make that determination.  That's a determination that's left

3   for the fact-finder.

4        MR. BRENNER:  Thank you.

5        MS. REWARI:  Your Honor, there wasn't a motion on

6   Dr. DeRight, and I don't want to take your time to disagree

7   with this characterization, but this is a neuropsychologist.

8   They administer testing, they have validity scales, they have

9   symptoms validity scales and performance validity scales.  His

10  opinion is based on her scores on those scales and his

11  evaluation of her.  He's not opining on whether he believes

12  her or not, whether she's believable or not.  There's a

13  science to neuropsychology.  He's going to explain it.  There

14  wasn't a separate motion on this.  So we don't plan to have

15  him testify that she's not believable.

16       THE COURT:  Well, and he's not going to do that, and

17  if he does do that, you're going to have a problem.  So you

18  need to advise him of the scope of his testimony, that is to

19  stick to the records, the files, and the evaluations that he

20  conducted and nothing more.  He is not to pass any judgment on

21  the credibility of anybody in this case, including the

22  plaintiff.

23       MS. REWARI:  And we agree.  And we didn't offer him

24  for that.  And so, we don't -- there wasn't a motion on this.

25  We put his report before you so you can see for yourself.  We

─────────── B.R. v. F.C.S.B. ───────────

100

1   put his deposition before you so you can see for yourself.  I

2   disagree that that's what he's intending -- we don't intend to

3   offer him for that.

4            THE COURT:  All right.  I'm just letting you know.

5            I guess that deals with the one expert.  I guess

6   Dr. Ryan is a little bit different.

7            MR. ELLIKER:  Yes, Your Honor.  And to be clear to

8   the defense Daubert's motion.  Dr. Ryan is an expert who we

9   seek limitation of her testimony.  There are five other

10  experts that we seek to exclude.

11           The CliffNotes Version, Your Honor, is that Dr. Ryan

12  is a psychiatrist and so therefore is not qualified to opine

13  on nonpsychiatric diagnoses and prognoses.  If you look at her

14  report, she has a section where she says, these are my

15  conclusions and my diagnoses.  And she talks about disorders

16  that are in the DSM-V.  Those are in bounds as far as Rule 702

17  goes.  Her report then goes on to talk about physical

18  conditions that she admitted on her deposition were not within

19  her expertise.  She's not a cardiologist, she's not a

20  gynecologist.  She acknowledges that she can't opine on the

21  causation or the prognoses of those conditions.

22           THE COURT:  And, obviously, if she has herself and

23  her deposition stated that she cannot opine to those things, I

24  would suspect that plaintiff will not try to elicit testimony

25  in that regard.

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

B.R. v. F.C.S.B.

101

1          MR. ELLIKER:  I suspect that -- I would hope that

2     that's true, but I think that their response to our motion

3     suggests that they think that there's a different reason that

4     that testimony could come in.

5          THE COURT:  Okay.

6          MR. KEEFE:  Your Honor, Robert Keefe.

7          THE COURT:  Yes, sir.

8          MR. KEEFE:  So Dr. Ryan is a medical doctor who has

9     -- there's no dispute that she's qualified in treating

10    psychiatric conditions and diagnoses.  She is also, as an

11    expert in the field of psychiatry and in treating patients for

12    more than 20 years, has expertise from that experience and

13    scientific knowledge about the comorbidities associated with

14    psychiatric illnesses.

15         And in her report, she says looking -- she's not

16    diagnosing B.R. with nonpsychiatric things like endometriosis,

17    for example.  But based on her extensive experience and

18    qualifications, she can testify and she is qualified to

19    testify that patients with the psychiatric condition she has

20    diagnosed B.R. to have, such as PTSD, are linked to --

21    scientific literature has established an interrelationship

22    between these psychiatric conditions and these physical

23    comorbidities.

24         I point you to Judge Rogers's decisions in the 3M

25    MDL down in the Northern District of Florida.  There was

B.R. v. F.C.S.B.

102

1    motion in limine practice about -- that was about defective

2    ear plugs -- and so hearing loss and tinnitus.  And, of

3    course, this dealt with veterans so there's PTSD diagnoses as

4    well in their medical records.  Judge Rogers ruled that these

5    otologists, experts in ear and hearing loss, could opine,

6    based on their treatment of veterans with hearing loss and

7    tinnitus, and based on their familiarity with the scientific

8    literature, that there is an association, and I think the word

9    --

10           THE COURT:  I'm actually aware of those studies and

11   I believe that those studies were in depth because they

12   focused on veterans and the like.  But is there a similar

13   study that you can point to that's going to suggest that the

14   circumstances that your client was facing are supported in the

15   scientific literature for the other things that you want to

16   sort of bootstrap to your case?

17           MR. KEEFE:  Your Honor, I'm not the expert.

18   Dr. Ryan is.  And she does cite and she is able to cite to

19   those -- that literature.  I do not have a citation for you,

20   but I would rely on Dr. Ryan's expert report.

21           THE COURT:  I agree with you that Dr. Ryan can

22   testify to the psychiatric circumstances that your client is

23   facing, but to get into these other things which are outside

24   of her area of expertise, I think it stretches the envelope a

25   little too far, so I'm going to grant the motion.

103

1          And, obviously, if things come up during the course

2   of trial that maybe open the door, you have the prerogative to

3   revisit it with the Court.

4          MR. KEEFE:  If I may just consult?

5          THE COURT:  Yes.

6          (Counsel confers.)

7          MR. KEEFE:  Your Honor, if I may simply ask that if

8   we, outside the presence of the jury, maybe make a Daubert

9   proffer.

10          THE COURT:  Sure.  Absolutely.  Protect the record.

11  Absolutely.

12          All right.  The next one is to exclude the testimony

13  of Gary Young, plaintiff's vocational and lost earnings

14  capacity expert.  I believe the Court addressed some of this

15  earlier, didn't it?

16          MR. ELLIKER:  Yes, Your Honor.  And I think that

17  what you put in your -- or what you noted in your summary

18  judgment order last week goes to the speculative nature.  I

19  think it's titled a little bit differently.  But I think --

20  let me step back.  The same observations you made as to why

21  lost earning capacity is too attenuated to be damages in this

22  case, are the sort of -- foundationally based on the fact

23  that Gary Young's testimony is itself entirely speculative.

24          I think that the best I can put it is that he makes

25  a hypothesis that no one can test about whether the plaintiff

B.R. v. F.C.S.B.

104

1   is incapable of working because he doesn't perform any tests

2   to make that conclusion.

3            THE COURT:  And I agree substantially as to what

4   you're saying with regard to that, but to essentially allow

5   someone, who is a qualified vocational expert to testify that

6   this individual would have been a doctor or would have been a

7   lawyer, had it not been for these circumstances, is just too

8   speculative to allow that kind of testimony to be presented.

9            Again, the vocational expert can testify to the

10  things vocational experts tend to testify that she's -- and I

11  don't know this for sure, but I'm assuming she's going to

12  testify that she's competent, that she's hard working, that

13  she could pursue all kinds of things, but the idea of saying

14  that she's going to be a specific thing or a specific

15  profession, I think, stretches the envelope a little bit too

16  much.

17           MR. ELLIKER:  And, Your Honor, respectfully, our

18  motion goes farther than that.  To exclude Mr. Young because

19  even as to what her current state is, her current work

20  capacity, that he didn't conduct any kind of reliable

21  methodology at all as to that.

22           THE COURT:  But isn't that typically the subject of

23  cross-examination?

24           MR. ELLIKER:  Well, Your Honor, I think this is

25  where I have to sort of double back to the Fourth Circuit's

B.R. v. F.C.S.B.

105

1  decision in the *Overhead Door's* case from 2021, which is the

2  most recent sort of, you know, overview of the importance of

3  the Court's gatekeeping function.  In that case, Judge Gibney,

4  who I have great personal affinity for was --

5          THE COURT:  Because he ruled in your favor in that

6  case.

7          MR. ELLIKER:  No, I clerked for him.  And in that

8  case, though, Judge Gibney said to the litigants, "It sounds

9  to me like the disagreement you have here between the expert

10  witnesses is ripe for cross-examination."

11          When that went up to the Fourth Circuit, I think

12  Judge Agee is the author of that opinion, he said, "No,

13  there's a critical gatekeeping function that the district

14  court cannot allow unreliable expert testimony to be the grist

15  for cross-examination."  And so, in that case there's a lot of

16  -- I think there's a lot of very helpful language about what

17  you have to do.  You really have to do a hard look and really

18  forecast the wording changes into Rule 702.  At that time, it

19  was just a proposed amendment to 702.  But now that is the

20  rule.  And the commentary indicates that the rules committee

21  thought that maybe too many district courts were allowing this

22  cross-examination be the solution for the gatekeeping

23  function.

24          THE COURT:  With all due respect to Judge Agee,

25  isn't that blurring the distinction between the person being

106

1   qualified to be an expert witness and the ability of that

2   person to be cross-examined as an expert witness?

3           MR. ELLIKER:  Well, Your Honor, let me back up.  I

4   think there's threshold determinations.  One is, is the person

5   qualified as a witness on their own credentials and standards.

6   And we haven't challenged Mr. Young in terms of his

7   qualifications as an expert as far as that goes.  But then,

8   the question is:  What is the opinion that the expert is going

9   to be putting in front of the jury, and that's where you have

10  questions of relevance and reliability.  And in our case,

11  obviously, the reliability is a huge concern because, as far

12  as we can -- what we know from his report and his depositions,

13  how did you come to determine what the plaintiff's current

14  ability to work is.  And he interviewed her, and he looked at

15  some expert reports.  But he did not conduct any kind of

16  testing, he didn't look at what her current focus or attention

17  abilities were, didn't look at any kind of employment records,

18  or treatment providers to figure out how she had been able to

19  attend work or not.

20          Ultimately, it reached this conclusion that he

21  himself admitted was extremely rare in his own practice.  I

22  think he said, among all the cases that he's done, there's

23  fewer than five percent of his cases where he had said someone

24  is totally incapable of working.  There's no testing that's

25  been done for us to go back and try to recreate that

B.R. v. F.C.S.B.

107

1    hypothesis.  And I think that goes to the reliability of it.

2    And then the other --

3              THE COURT:  I think I understand your point.

4              MR. ELLIKER:  Thank you, Your Honor.

5              MR. KEEFE:  Just briefly because I think you and I

6    may disagree about the purpose of cross-examining witnesses.

7    I would just say that all of that sounds like a very effective

8    cross-examination of Mr. Young.  And so, with that I would --

9    I would also mention that there is no battle of the experts

10   here.  There is no rebuttal expert.  Mr. Young's expert

11   opinion stands unrebutted.  So I think this is something

12   appropriate for cross-examination, about the weight of his

13   opinions should be given, but I think passes the threshold of

14   Rule 702.

15             THE COURT:  All right.  The Court is going to grant

16   in part and deny in part the request.  The Court will allow

17   the testimony from Gary Young regarding plaintiff's capacity

18   to work.

19             Next is -- I apologize if I mispronounce the name --

20   exclude the testimony of Nancy Cantalupo, a Title IX expert.

21             MR. ELLIKER:  Yes, Your Honor.  Kevin Elliker again.

22   We've -- the defendant's position is that Ms. Cantalupo's

23   expert testimony on Title IX is improper, largely because it

24   reaches sort of -- the whole thing strikes us as being making

25   the ultimate legal conclusion about whether there was a

—————B.R. v. F.C.S.B.—————

108

1  violation of Title IX.  In fact, if the Court looks at her

2  report that she put forward, the headings are, according to

3  her opinion, I have two opinions, an opinion one and an

4  opinion two.

5          THE COURT:  I think that while she's not going to,

6  obviously, be able to testify to the ultimate fact in issue,

7  and that is whether there's a Title IX violation.  Obviously,

8  she's not going to be entitled to do that.  Wouldn't a

9  fact-finder be somewhat educated on what Title IX means by

10  having someone simply come in and say Title IX was enacted in

11  such and such year, it was enacted to deal with these specific

12  circumstances in our jurisprudence and these cases are brought

13  by plaintiffs who feel that they are aggrieved and that's it.

14          MR. ELLIKER:  Well, I'm not sure that that's

15  something that's the subject of expert testimony.

16          THE COURT:  Well, it may or may not be, but I think

17  if you were to ask most people what Title IX is, you know,

18  most laypersons, what Title IX is, they would say:  Doesn't it

19  have something to do with women and sports?  I think that

20  that's what most people would say.  And, obviously, Title IX's

21  reach is much more significant than that.

22          MR. ELLIKER:  Right.  And, Your Honor, I think it's

23  important for the jury to understand what Title IX is and

24  that's why it's commonplace for Courts to give a jury

25  instruction as to what Title IX is.  And in fact, in Title IX

1  cases, and I believe in the Jane Doe Fairfax County case,

2  there was a jury instruction that explicitly was, this is what

3  Title IX is.

4          THE COURT:  Was there a request in that case for

5  there to be an expert witness on Title IX, if you know?

6          MR. ELLIKER:  I'm looking at Ms. Rewari, who was

7  counsel for the School Board in that case.

8          THE COURT:  Who, if you do not give the right

9  answer, will push you out of the way.

10          MR. ELLIKER:  Yes.  Judge, and I'm hearing the

11  answer is "no."

12          On this, I would commend to the Court Judge Lydon's

13  opinion in the *Coastal Carolina University* case, which is a

14  2021 decision.  It talks, and it's specifically about the

15  propriety of a Title IX expert.  And really, I think that you

16  can conceive of this as the testimony for a Title IX expert.

17  They are sort of two categories.  Category 1 is what's not

18  okay, which is opining on the ultimate legal conclusion, but

19  it also includes providing testimony about specific Department

20  of Education regulations and guidance from the Office of Civil

21  Rights.  And the reason for that, as Judge Lydon says, is that

22  the school system can't be held liable for -- alleged

23  violations of rules, regulations, or guidance from OCR.

24          And so, introducing expert testimony about the

25  substance of that information presents to the jury a legal

110

1    framework that isn't the basis for liability.

2              What is permissible is an expert who can step

3    forward to provide testimony in their expert opinion about

4    what best practices are.  In other words, what the standard of

5    care.  And that's -- that is what Judge Lydon goes through.

6    She says you can't basically talk about anything except for

7    what would be the appropriate standard of care.  In the course

8    of making that testimony, the expert can say best practices

9    are informed by guidance from the Department of Education.

10   But Judge Lydon makes it very clear, that's as far as you can

11   go.  You can't then say here is what that guidance is.

12   Because again, it's introducing the illegal framework.  That's

13   not what the jury is supposed to consider.

14             In this case, Ms. Cantalupo's testimony is all in

15   Category 1 because nothing that she can say goes to what the

16   proper standard of care is here.  She admits that she

17   doesn't know what other schools were doing in 2000 and 2012 in

18   order to comply with Title IX.  She says that.  "I don't

19   know."  And so, because of that there's no relevant proper

20   testimony that she can offer as an expert as to Title IX.

21             THE COURT:  Okay.

22             MR. ELLIKER:  And the small caveat at the end of

23   that is, Your Honor, is that in the, what we hope unlikely

24   event that you allow her to testify, there's the issue of a

25   late disclosed supplemental report that came in well after the

─────B.R. v. F.C.S.B.─────

111

1  close of discovery.  I won't go on.  I think the dates speak

2  for themselves as to why we think that that testimony coming

3  from that report should be precluded if she's allowed to

4  testify.

5          THE COURT:  Thank you, sir.

6          MS. ANDERSON:  Thank you, Your Honor.  Alison

7  Anderson.  I'm going to just maintain the objection to the

8  fact that she can't testify to the fact that the school

9  violated Title IX and rest on their papers on that.  What I

10  would like to focus on, and I think you're focused on, is the

11  issue of whether or not she gets to talk about what is Title

12  IX, what is the purpose of Title IX, what are some minimum

13  standards that she knows because of her study in the area of

14  what are some very basic minimal standards and principles.

15          THE COURT:  And after listening to that testimony,

16  are you then going to answer or ask the ultimate question:

17  Have those standards been met in this case?

18          MS. ANDERSON:  I think Your Honor is going to

19  instruct me not to and I think if that's -- if that's the

20  ruling, that's the ruling.  I don't want to say that we agree

21  to it, but we could understand that ruling and we could do the

22  testimony.

23          THE COURT:  Why don't we do this, why don't you

24  provide the questions that you anticipate asking, the answers

25  that you anticipate being received, the Court will take a look

─B.R. v. F.C.S.B.─

112

1   at it and make the determinations as to what questions can and

2   cannot be answered in the context of this expert witness's

3   testimony.

4        MS. ANDERSON:  I totally appreciate that.  I think,

5   if I may suggest, we will likely have a PowerPoint that

6   outlines it and that may be the best way to show what we plan

7   to testify, have her testify to.  I just worry the questions

8   and answers -- you know how trial goes.

9        THE COURT:  Yeah.  And --

10       MS. ANDERSON:  But we could provide in advance --

11       THE COURT:  I trust you implicitly in what you

12  represent those responses to be.  Again, I think the best way

13  for the Court to look at it is to really know what the

14  specific questions are, what the specific answers are

15  anticipated to be, and then, you know, modifying, changing,

16  removing, adding questions that you can ask in the context of

17  this.  Because I believe that this expert can, and I think

18  it's important and helpful in the context of a timeline in a

19  case, which is not something that most people understand.  To

20  have a general understanding of what it's all about.

21       While I have no problem with the way Judge

22  Nachmanoff did it in using an instruction, I think that a

23  witness might well be helpful to a fact-finder because it's --

24  we're trying to help them understand as best they can with

25  regard to what's going on.  So send me the questions and the

——— B.R. v. F.C.S.B.———

113

1   anticipated answers, and we'll take a look at it.

2         MS. ANDERSON:  Sounds good.  And then I just want to

3   flag two other issues.  One is that because the motion to seek

4   to exclude her in her entirety, she's also an expert on sexual

5   harassment and gender-based violence.  And so, part of her

6   proposed testimony is about gender stereotypes that play into

7   when allegations of sexual harassment and --

8         THE COURT:  Tell me what you anticipate her saying,

9   because that's a little bit of another -- again another

10  tenuous area.  I'm just uncomfortable with people getting up

11  and opining, generally, about how they feel about social

12  science, which is what this is.

13        MS. ANDERSON:  So she is very well experienced in

14  this area, teaches on this area of the law, and what she's

15  going to go through is just stereotypes that have come into

16  play, for example, that women tend not to believe -- be

17  believed if there's an allegation of sexually promiscuous.

18  Things like that.  And I think the reason that's so important,

19  Your Honor, is that we have to prove under Title IX that this

20  was gender-based, this was sex-based.  And so that's why her

21  testimony about some of these -- and I can include that in the

22  questioning so you can see what it is.

23        But we think it's really important because that's

24  something that, even before I started doing these cases,

25  didn't fully understand some of these sort of stereotypes that

B.R. v. F.C.S.B.

114

1  play into how women and girls are seen when bringing these

2  allegations forward.

3           THE COURT:  I would like to take a look at those

4  questions.  Again, I'm very, shall we say, hesitant to get

5  into a whole lot of social science, because social science is

6  what it is.  It's thought as to how people socialize and

7  sociology of things.  We've all been to these courses on

8  implicit bias and we don't know what to make of that.  As an

9  African American I don't believe all white people are evil and

10  I don't believe that all white people are going to be evil to

11  other black people, but that's not what the implicit bias

12  standards actually state that white people are implicitly

13  biased against black people.  I just don't get that.  I can't

14  buy into it.  So I'm a little hesitant on any kind of social

15  science which seems to stereotype people in any way.

16          MS. ANDERSON:  And she does ground it in the law by

17  the way on just how the law used to treat these things.  I

18  will submit that.  The other thing I just want to flag too is

19  that while counsel focused on *Coastal Carolina* and I think

20  even that case permits the testimony we are going to provide

21  in questions and answers.  I would also direct to the -- I'm

22  going to mess up this last name, but the *Robackish* (ph) case

23  as well, which does talk about how the expert can ground some

24  of these minimum standards and guidance that is being issued,

25  because while violations -- and again, this goes to the point

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

115

1   that violations of guidance are not preclusive of the issue,

2   they don't determine the issue that there's a Title IX

3   violation in this case.  They are part of the known

4   circumstances when you're doing the deliberate indifference

5   analysis.  What guidance the schools had received at the time.

6              THE COURT:  Thank you, ma'am.

7              MS. ANDERSON:  Thank you, Your Honor.

8              THE COURT:  This next one is to exclude the

9   testimony of Rustioni and Woolf under Rule 403.

10             MR. ELLIKER:  Your Honor, I know you're going to

11  look at questions on that.  I just reemphasize on what

12  Ms. Rewari said earlier, which is the known circumstances

13  element of Title IX is the known circumstances about the

14  harassment on the student.  Not what did the administrators

15  know about the state of the law or regulations because then

16  you have a jury question about what law were officials aware

17  of.

18             THE COURT:  Thank you.

19             MS. ANDERSON:  I'm sorry.  I just have to note that

20  we absolutely disagree with that.  You'll see it in the jury

21  instruction, I'm sure, but we do -- just to note, we

22  absolutely disagree that the actual notice goes to --

23             THE COURT:  I understand.

24             MR. ELLIKER:  Your Honor, when I look at Ms.

25  Rustioni and Mr. Woolf, I think of your admonishment to keep

B.R. v. F.C.S.B.

116

1    the eye on the ball.  I think both of these -- we'll note that

2    both of these experts are put forward to opine on the efficacy

3    of the Fairfax County Police Department's March 2012

4    investigation.

5           Again, the question here is, what was it that the --

6    was the School Board deliberately indifferent, what were the

7    known circumstances to them, and testimony about whether the

8    questions that Detective Chambers asked were good questions,

9    which is what Ms. Rustioni would testify about, or whether the

10   police department's investigation was good enough, which is

11   what Mr. Woolf would testify about, doesn't go to what the

12   school or its officials who act on his behalf knew about the

13   circumstances of the case.  And in fact, what's relevant about

14   the Fairfax County Police Department's investigation is that

15   they reached a conclusion and told the school that they, you

16   know, had reached a conclusion about unfounded allegations and

17   determined not to proceed further.

18          The question that the jury will have to ask is:  Is

19   receiving that information from the police department, were

20   they deliberately indifferent for their action to what that

21   police determination was as communicated to the School Board.

22   None of the administrators or teachers or individuals in the

23   case, any decision makers from the School Board are in the

24   interrogation room, none of them are telling the police

25   department these are the questions you should ask.  None of

117

1    them, after the fact, are saying we know you closed the

2    investigation, but what kinds of questions did you ask?  Were

3    they good enough?  And so, that's why we think this is pretty

4    far afield.

5            The other issue is that there's an issue of

6    Rule 403, prejudice to the Fairfax County School Board, to

7    have experts come in and talk about what a bad job the Fairfax

8    County Police Department did.  Those are entirely different

9    entities.

10           And the last piece is that Mr. Woolf will have --

11   they will offer him as an expert to talk about sex

12   trafficking.  You've already excluded evidence that relates to

13   that so I'll just say that I think that that probably goes

14   along with that determination, but we would ask that these

15   experts be excluded entirely.

16           MS. ANDERSON:  Alison Anderson again.  I'll take

17   Ms. Rustioni first.

18           I think, again, a lot of this goes to whether or not

19   Detective Chambers is allowed to say that he found -- that his

20   results were unfounded, and his opinions about ████████ -- I

21   apologize, B.R., the plaintiff's interview with Detective

22   Chambers.

23           THE COURT:  I would direct that the first name

24   reference be stricken from the record.

25           MS. ANDERSON:  Thank you, Your Honor.  And I do very

─────────B. R. v. F.C.S.B.─────────
                                                                118

1    much apologize.

2           So if that is a part of this case, then it is

3    absolutely critical for Ms. Rustioni to testify about the --

4    the mistakes that Detective Chambers did, the way that he

5    asked the questions that elicited certain answers, and almost

6    more importantly the signals he sent to her in that interview.

7           THE COURT:  Wouldn't that, potentially, and again

8    I'm just thinking about the fact-finder, potentially, blur

9    what's going on here because, as everyone has pointed out, the

10   focus is on these particular defendants, not what some

11   separate entity may or may not have done.  And so, why is it

12   so significant then to talk in any great detail about the

13   significance of what the Fairfax County Police Department did

14   in their own investigation.

15          MS. ANDERSON:  For a few reasons.  Although, I think

16   that that balancing act changes if Detective Chambers's

17   opinings and ultimate conclusions are out of the case.  But in

18   that balancing, it's important because plaintiff has sent

19   signals in that interview, and Ms. Rustioni speaks to this,

20   that, you know, she's threatened that she's going to be

21   prosecuted.  There's just a lot of signals that are sent to

22   her.  Don't speak up, don't continue to say what happened to

23   you, and I can't guarantee what the defendants are going to

24   do, but I'm almost certain that in her cross-examination they

25   are going to say, well, at first you only said this amount of

─B.R. v. F.C.S.B.─

119

```
 1    the story, and then you said that amount.  And Ms. Rustioni

 2    explains why she received signals in that interview that

 3    she didn't want to then become forthcoming and tell the rest,

 4    and tell everything that had happened to her.

 5              The other thing I think is important is that we

 6    can't deny that if Fairfax County Police Department's

 7    assessment comes in that the jurors are going to be thinking

 8    -- they are going to be giving credibility to that assessment.

 9    So it is important for them to understand what we deem to be

10    some real problems with Detective Chambers's assessment.

11              I think that also address the fact that, you know,

12    they are saying, Well, Fairfax County -- the police department

13    is different than Fairfax School Board, but you can't have

14    your cake and eat it too.  You can't get in that Fairfax

15    County Police Department made certain determinations, but then

16    say well that's the police so you can't -- you can't come in.

17    It would be prejudicial for you to come in and talk about --

18              THE COURT:  My instinct tells me that neither of

19    those things should come out.  That's what my instinct tells

20    me because it, again, gets a little bit ancillary to what

21    needs to be decided in this case.  It doesn't matter what

22    happened when the civil rights division investigated the case

23    from the standpoint of litigating our case, it doesn't matter

24    what the police department determined in a different context

25    from a criminal context what was important.  It has really
```

B.R. v. F.C.S.B.

120

1   nothing to do with what we need to decide.  And, again, I

2   think all of these things are just ancillary to what we need

3   to decide in this case.

4          MS. ANDERSON:  And I agree that absolutely tips the

5   balances, especially for Rustioni.  It may depend how hard

6   they cross-examine and focus on her statements made in that

7   interview that we may want to reapproach the issue should

8   Detective Chambers's ultimate conclusions be out of the trial.

9          The other piece I will say for Woolf, though, so he

10  has two areas he testifies on.  One is Chambers.  We've

11  discussed that.  The other is that he testifies that in

12  Fairfax County it was known that there were these issues with

13  sex trafficking, with gang rapes, those types of things.

14         THE COURT:  And again, we're not even going to get

15  into that at all.

16         MS. ANDERSON:  Our concern, Your Honor, is that on

17  cross-examination there's going to be -- and there at least

18  has been in litigation, and maybe the defendants will agree

19  that they are not going to make the implications that she's

20  making those things up because they sound so wild.  And that's

21  why we think Woolf's expertise is important to show it's not

22  so wild.

23         THE COURT:  Is there going to be any direct

24  suggestion -- again, please listen to the way that I'm asking

25  this question -- direct suggestion that what B.R. was made to

B.R. v. F.C.S.B.

121

1  or is alleged to have suffered has any relationship whatsoever

2  to either sex trafficking or gang activity?

3        MS. ANDERSON:  I think what Woolf says is that her

4  experience in the closets is consistent with those types of

5  things.  That we are not going to have direct evidence to say

6  it was actual sex trafficking or that it was, you know, that

7  money was exchanging hands and those types of things.  But

8  what he does testify to is that what she's explaining is

9  occurring to her in those closets is consistent with that.

10 And I also think it's important to notice, when you're talking

11 about schools, and how much they are investigating or looking

12 into these issues that they are aware that these types of

13 things are happening in Fairfax County at the time.

14       THE COURT:  I appreciate that and I appreciate your

15 candor in response to my question.  The Court will take that

16 under advisement and take another look at it.

17       MR. BLANCHARD:  May I make one comment?

18       THE COURT:  Sure.

19       MR. BLANCHARD:  He specifically has testified in his

20 deposition that he conducted no investigation himself.  They

21 present him as the chief investigator at the time in Fairfax

22 County, the expert on trafficking and other things and his

23 familiarity with gangs, but he was instructed not to do any

24 investigation.  So what he's coming in to do is say she gave

25 me this story, and I'm saying, oh, that could be.  And I think

B.R. v. F.C.S.B.

122

1   if you read his report and you read his deposition transcript,

2   you'll see that's what it is.  It is pure bootstrapping with

3   Woolf.  He didn't look into the facts and circumstances.

4           THE COURT:  All right.  I appreciate what you're

5   saying.

6           MR. ELLIKER:  I'm sorry, Judge, there's another

7   expert.

8           THE COURT:  Yeah, what I'm going to do, that way

9   everyone can sort of plan a little ahead, what we're going to

10  do is take up Dr. Cisler, we're going to take a five-minute

11  break for comfort, we're going to come back in and we're going

12  to grind real hard until we get this done.

13          MR. ELLIKER:  Judge, Kevin Elliker again.  Dr.

14  Cisler is a psychologist who did not examine the plaintiff,

15  didn't review an MRI, didn't look at any of the kinds of

16  records that he admits he would look at in his study of the

17  human brain.  And so therefore, his opinion is not based on

18  the facts of this case.  The lone -- I think that the lone

19  potential relevance that the plaintiffs would forward here has

20  to do with this almost metaphysical question about PTSD in its

21  physical nature.  And ultimately, because there is still open

22  the possibility after the summary judgment decision last week

23  that damages for PTSD could be awarded in the event that

24  there's a physical injury brought by physical harm.  That's

25  the only purpose that we could see him as being presented as

B.R. v. F.C.S.B.

123

1    coming in.  But again, he -- I commend -- I commend his

2    deposition to you, which I believe was actually much shorter

3    than anticipated because the ultimate question he answered was

4    he conceded he was not sufficiently informed about plaintiff's

5    brain and her circumstances to opine on any of her personal

6    psychological characteristics or conditions.  And so,

7    ultimately, I think what he -- what he presents is sort of a

8    science report that's untethered to the facts in this case to

9    say I don't know what plaintiff has or doesn't have, I haven't

10   looked at the scans of her brain, but here is what I think

11   about the physical nature of PTSD.  And we think that that's

12   irrelevant.  And again, his opinion is not reliable because it

13   has no connections to the plaintiff's circumstances.

14          THE COURT:  Thank you.

15          MR. KEEFE:  Your Honor, I'll start with relevance

16   and then move to reliability.  I think clearly based on your

17   ruling on the *Cummings* issue whether or not plaintiff has

18   suffered physical injury and that her PTSD is a result of that

19   physical injury is very relevant to the issue of damages.  I

20   think I don't know -- if you have questions about that, I'm

21   happy to answer them.

22          THE COURT:  I don't.

23          MR. KEEFE:  On the reliability issue, let me first

24   just talk threshold issues.  There is no requirement under

25   *Daubert* that any medical expert perform any specific test on a

B.R. v. F.C.S.B.

124

1    party or that a medical expert perform any specific

2    examination or look at any specific image.  That's fodder for

3    cross-examination.  With Dr. Cisler, who is a Ph.D. in

4    psychiatry and specializing in neuroimagery, based on his own

5    research and his familiarity with the extensive peer-reviewed

6    case studies, and, as you quoted in your order on the motion

7    for partial summary judgment, meta-analyses, consolidating all

8    of these individual studies, ruling out the outliers, and

9    looking at what the metadata says, by definition, someone with

10   a PTSD diagnosis -- and he relies on Dr. Ryan's diagnosis of

11   PTSD, which is entirely appropriate for an expert to do -- by

12   definition has physical injury and damage to their brain.  You

13   don't have PTSD symptoms without these physical changes and

14   damages to your brain.  He concedes he can't say what

15   particular changes have happened, but by definition physical

16   injury and damage has occurred in B.R.'s brain based on her

17   PTSD diagnosis.

18          THE COURT:  All right.

19          MR. KEEFE:  He is familiar with the scientific

20   literature.  So I think -- it's not a metaphysical question,

21   this is well-founded in the scientific literature cited in

22   Dr. Cisler's report.

23          MR. ELLIKER:  Judge, with the briefest indulgence.

24          I think, again, this just sort of goes back to the

25   *Cummings* issue.  What Dr. Cisler also said, was asked:  "Can

B.R. v. F.C.S.B.

125

1    you think of any mental health condition where there's not a

2    physical change to the brain?  And he said, "No."  And he was

3    asked about conditions that you just ruled she can't get

4    damages for, and she said, "Yes, those would indicate physical

5    changes in the brain."

6             So I think that that gets to -- that's more of the

7    *Cummings* issue, but we're definitely going to come to a head

8    on that, I think, in terms of the jury instructions about what

9    kinds of damages are available.  But Dr. Cisler's testimony

10   calls that up, I think, early for us to come to a decision --

11   come to sort of a head on that about what it is -- what

12   relevance his testimony really has to this case.

13            THE COURT:  Well, from a general standpoint, and I,

14   again, appreciate the good arguments on this issue.  From a

15   general standpoint, I'm not going to prevent Dr. Cisler from

16   testifying generally.  I will say this, though, there are

17   limitations to what he can testify to.  So what you need to

18   do, as best you can, is present your questions in a way that's

19   going to keep him on task because if he gets off task, then

20   I'm going to stop his testimony.  So just be prepared.  I'm

21   not going to preclude him, generally, but he needs to make

22   sure he understands what he can and cannot testify to.  So

23   that's denied.

24            What we're going to do, ladies and gentlemen, is

25   take a -- because there's probably going to be a run on the

─B.R. v. F.C.S.B.─

126

1  ladies and men's room, let's take a seven-minute break and

2  come back in at 12:55.  Let's try, as best we can, to finish

3  up, and it's not that many left.  Maybe 15 out of 40-some.

4  Let's try to get it done by 1:30, because we are getting in

5  the way of a criminal matter that the marshals service is

6  handling.  So we do need to be sensitive to that also.

7          MR. BRENNER:  And, Judge, at the very end can we get

8  two minutes of your time just so we can better understand the

9  trial schedule which days are going to be off and Good Friday,

10 things like that so we can arrange our witnesses?

11         THE COURT:  Sure.  Absolutely.

12         MR. BRENNER:  Okay.

13         THE COURT:  And if you all are very good, I'll even

14 let you come back to chambers to do that.

15         All right.

16         (Recess.)

17         MS. ANDERSON:  Your Honor, if I can ask just one

18 clarifying question real quick.  Nancy Cantalupo, the

19 questions you said to submit to you, I assume, that's ex parte

20 to chambers?

21         THE COURT:  Chambers, and provide a copy to the

22 other side.

23         MS. ANDERSON:  Okay.

24         THE COURT:  And you can direct them specifically to

25 Ms. Barry.

B.R. v. F.C.S.B.

127

1          MS. ANDERSON:  Thank you so much.  I appreciate it.

2          THE COURT:  Who doesn't know me.  Heading into the

3    home stretch, we have a lot of B.R. omnibus motions in limine.

4    Suffice it to say that with regard to the very first one, the

5    consent.  I think we've already dealt with that one.  Is that

6    fair?

7          MR. BRENNER:  I think you dealt with that and you

8    said you would reduce it to a written order.

9          THE COURT:  Thank you.  The next one relates to an

10   Omnibus motion in limine regarding allegations of family

11   abuse.

12         MR. BRENNER:  Yes, Your Honor.  I'm not sure how

13   much I need to have to add to the papers.  There's been sort

14   of innuendo hints, confirmed in their response that they may

15   try to argue that B.R. was abused by, I guess, her parents or

16   maybe her brother.  I'm not even sure what they're going to

17   say.  It is not relevant to any issue.  Highly inflammatory to

18   the extent there's any relevance it would be outweighed by the

19   prejudice.  We just think it's, as Your Honor said a few

20   times, it's extraneous to the matters at hand and would be

21   highly prejudicial.  For the record, we deny it factually, but

22   that's not what's before Your Honor.

23         THE COURT:  Yes, sir.

24         MS. REWARI:  Your Honor, the evidence of this are

25   plaintiff's own statements during the time -- during the

B.R. v. F.C.S.B.

128

1    events in this case, and then following the events in this

2    case.  It's her own statement that she said that her parents

3    were beating her.  I understand from the brief they have an

4    explanation for it and they can make that to the jury, but

5    this evidence is relevant.  I think it goes to causation of

6    her claimed emotional distress, her claimed medical

7    conditions, her claimed psychiatric injuries.  Some of these

8    records we've identified them in our papers, some of these are

9    communications to her therapists about this.

10          And so, they've argued in their papers that this is

11   normal teenage angst, but one of these records is a police

12   visit to their home in the same months that this is happening

13   at school, January 2012.  Right.  The period that's covered

14   here is October 2011 to February 2012.  And the only police

15   involvement during that time period that she was in school is

16   a police visit to her house on a call of domestic assault.

17          So, you know, this is relevant.  It goes to

18   causation, it goes to damages.  As Your Honor knows, our

19   theory of this case is that the allegations that she has made

20   are untrue.  That these events didn't happen.  And some of

21   these statements are made to defendant, C.K., in the messages

22   that we say are from her.  I understand that that is something

23   that she's going to deny, but he said there in November 2011,

24   and he's on video with the -- in his police interview telling

25   the police about this in March of 2012.  And whether the

B.R. v. F.C.S.B.

129

1    police investigated, whether anybody thought it was credible,

2    is beside the point because the plaintiff was the one making

3    those claims.

4            THE COURT:  All right.  This one is a little bit

5    complicated, and what the Court is going to do is grant in

6    part and deny in part.  I'm going to bar any testimony by J.O.

7    regarding alleged family abuse B.R. may have suffered.  If

8    B.R. introduces J.O.'s social media post regarding B.R.'s

9    bullying, then the entire statement, including the alleged

10   family abuse, may well come in.

11           I'm going to allow C.K. to testify about what B.R.

12   allegedly told him regarding abuse by her family or that he

13   told that information to other persons.  I'm not going to

14   allow him to say that he told that to the police.  Again, that

15   gets into circumstances that we just don't need to have

16   discussed.  And so, when you talk to C.K. about the testimony

17   that this individual is going to give, there's -- I'm going to

18   direct you to specifically note that he's not to testify with

19   regard to any police activity.  Again, I'm going to try, to

20   the extent that I can, to keep all of that information out of

21   our case.  So make sure you instruct him on that.

22           MS. REWARI:  Your Honor, may I just clarify two

23   things.  One, I believe his police interview is on their

24   exhibit list, it is on our exhibit list.  So those are -- if

25   the police interview gets played, then it may come in in that

———B. R. v. F.C.S.B.———

130

1    way so I would just flag that.

2            THE COURT:  Well, I'm hoping that the police

3    interview does not come in because what I'm trying to do, as

4    best I can, is to keep the focus of this case on what it needs

5    to be focused upon.

6            MS. REWARI:  And the second point is that and we'll

7    get to this in the other motion.  But with respect to the

8    police investigation, the reason that it is part of this case

9    is because the police allegation was an off campus, so not a

10   school event assault, and then the school was told that the

11   police found it to be unfounded and that the family asked the

12   investigation be stopped.  It's in the school's letters.

13           THE COURT:  But again, I don't want investigations

14   that were conducted by ancillary authorities under different

15   standards of investigation -- as you know in a criminal case

16   you have to have probable cause and it is beyond a reasonable

17   doubt.  I don't want those evidentiary standards being

18   interjected into this case, because I think it would confuse

19   the jury.  The police may well have believed that these

20   allegations took place, but they may have also made the

21   determination that there's not probable cause to support

22   getting any kind of arrest warrants.  So again, I just don't

23   want the jury to be confused about differing standards of

24   proof with regard to differing investigations.

25           MS. REWARI:  And that would be fine, Your Honor, if

B.R. v. F.C.S.B.

131

1    they are not permitted to put on evidence.  The school was

2    aware that this allegation had been made to the police because

3    the allegation was not made to the school.  It was made to the

4    police.  And what they've alleged is that the school needed to

5    do something about it and it was deliberately indifferent for

6    them not to do something about it.  And the school's answer

7    is, it was a police matter and the police closed it.  So as

8    long as they don't say that, we're fine.  The police

9    investigation can stay out.  But if they are going to say, you

10   learned of this because we reported it to the police, and then

11   you had to do something about it, even though it was not a

12   school event, that's when the reasonableness of the school's

13   response requires evidence of what they -- why they didn't do

14   a separate investigation once the police said we've

15   investigated it, we've closed it.

16        THE COURT:  I think the Court has provided a

17   reasonable explanation as to the context of how this case

18   should be resolved and it seems to me that based upon what the

19   Court has said and other situations in this case that it's

20   best to just leave the police out of this altogether.  If the

21   government -- if the plaintiff wants to make some suggestion

22   that Fairfax didn't do anything, then you may well be able to

23   back door it, but let's be careful with the police

24   investigation.

25        MS. REWARI:  Again, we're happy to keep the police

─────────────── B.R. v. F.C.S.B. ───────────────

132

1   out of it.  It's -- we would only offer this evidence if it

2   was -- if it was alleged that the school knew about it because

3   it was reported to the police.

4           THE COURT:  Okay.  Mr. Blanchard, you're standing.

5           MR. BLANCHARD:  Yes, Your Honor.  My only concern

6   is -- my concern about the police --

7           THE COURT:  Can you step to the lectern.  There's no

8   mic back there.

9           MR. BLANCHARD:  I apologize, Judge.

10           THE COURT:  That's okay.

11           MR. BLANCHARD:  I would like to talk about the

12   police protocol process conclusions.  But if principal parties

13   and witnesses in this case made prior inconsistent statements

14   or had different versions of what happened or different

15   statements about what may have been the cause of their

16   injuries or their drama or trauma, just because they were made

17   to a police officer, that doesn't preclude them from coming in

18   under the Court's ruling, correct?

19           THE COURT:  What I would suggest, Mr. Blanchard, and

20   you know I respect you as a very good lawyer and an excellent

21   practitioner.  There are ways to ask the question without even

22   mentioning the police.  If a person were to, say, get on the

23   stand and say something that you believed to be inconsistent

24   with what they said to the police, you could direct them to

25   the time that they gave a statement to an entity.  And do you

B.R. v. F.C.S.B.

133

1    recall making that statement to the entity; do you recall what

2    date you made that statement to the entity, and isn't it in

3    fact true that to that entity you stated the following.

4              MR. BLANCHARD:  I agree.  In this case, we have some

5    video in some circumstances too and we have police officers

6    who were called randomly from the street, a 911 call, who

7    responded and were told very specific things about what had

8    happened and what the problem was within the plaintiff's

9    household, and those are different from what my client's

10   alleged to have done and caused her injury and harm.  And I'm

11   being --

12             THE COURT:  I'm not trying to hamstring you, but

13   what I don't want to have happen is the police investigation

14   to be the central theme of this case.

15             MR. BLANCHARD:  No, I don't either, Your Honor.  And

16   I'll stay away from the -- you know, I think there's a lot of

17   effort on one side to have experts come in or others come in

18   to say what somebody else has --

19             THE COURT:  And --

20             MR. BLANCHARD:  I'm not going to do that with the

21   police.

22             THE COURT:  And I can suggest to you that the more

23   we make mention of the police, the more we make them the focus

24   of this case.  We're invariably going to get a question from

25   the jury:  What happened in the police investigation?  Which

134

1   has nothing to do with what we need to resolve here.

2           MR. BLANCHARD:  Understood.  And I'll work the best

3   I can to work without it.  I just don't want to be barred from

4   providing admissions by parties just because they were made to

5   the police.

6           THE COURT:  All right, sir.

7           MR. BLANCHARD:  Thank you.

8           THE COURT:  The next one focuses on -- it focuses on

9   certain circumstances regarding the conduct of the plaintiff.

10  And you know what I'm talking about.

11          MR. BRENNER:  Yeah, I do, Your Honor.  Is there

12  anyone in the courtroom not associated with this case?

13          THE COURT:  Okay.  Very good.

14          (No response from the gallery.)

15          MR. BRENNER:  Just maybe for efficiency sake.  We

16  had this as our motion in limine No. 3.

17          THE COURT:  Yes.

18          MR. BRENNER:  And the defendant recently filed a

19  motion -- I think they styled it motion -- I call it a

20  Rule 412 motion.  I apologize.  I don't have the full title of

21  it.  But it's essentially to admit or admit evidence under

22  412.  Something to that effect.  They are the same -- largely

23  the same issue, and I'd just sort of talk about it together,

24  maybe save us some time.

25          Our motion goes to a very specific time, which is

B.R. v. F.C.S.B.

135

1    Rule 412 of the Federal Rules of Evidence.  Provide that you

2    can't put on evidence, unless certain tests are met, evidence

3    of an alleged sexual assault victim's promiscuity,

4    representation, things like that.  And then if the evidence

5    falls into that bucket then there's a balancing test and in

6    some ways you can still do it.  For example, if the plaintiff

7    puts that issue at play.  So if the plaintiff says, I never

8    did this.  And since this event happened, I've never been with

9    a boy or a man now.  She's now of age.  And then they can say,

10   No, of course, here is the evidence you have.

11            So there are exceptions to the rule.  So our motion

12   I thought was pretty narrowly tailored and theirs goes a

13   little farther.  But I think the general concept we're trying

14   to get established is stuff post-incident, post-March 2012

15   that go to the sexual activity, sexual reputation, sexual

16   conduct of the plaintiff are barred unless plaintiff opens the

17   door to that evidence somehow.  I don't think she will, but

18   just like I don't want to be foreclosed --

19            THE COURT:  And I agree substantially with what

20   you're saying, but the issue that we have in this case is that

21   there's an allegation that your client suffered all kinds of

22   related circumstances because of the trauma that she's claimed

23   to have suffered on this March date.

24            MR. BRENNER:  Correct.

25            THE COURT:  If there are other incidents,

B.R. v. F.C.S.B.

136

1   theoretically, and I don't know if they are or not, that could

2   have also contributed or been the main cause or the primary

3   source of what she's going through now, why wouldn't that, in

4   some respect, be admissible?

5        MR. BRENNER:  Right.  That is sort of the tension

6   and where the general rule runs into maybe the evidence of the

7   case.  And here is my answer to that:

8        If, for example, the defendant or the defendants in

9   this case elected to have a counterpart to Dr. Ryan, would be

10  the easiest way to say it, a psychiatrist expert that says I

11  reviewed everything in this case and I've determined that B.R.

12  does suffer from PTSD, but I think it's caused, at least in

13  part by X, Y, Z, then I think -- I can see a world where that

14  would come in.  I think you still run into the balancing test

15  because what you don't want to do -- the reason this rule

16  exists is because, as Your Honor knows, originally criminal

17  context, now in the civil context, you know, an often defense

18  in a sexual assault case.  Let's just say in a criminal

19  context to make it easier.

20       THE COURT:  Is that the person that's not --

21       MR. BRENNER:  She asked for it so there has been a

22  change in the law because of that.  But the law recognizes

23  exactly what Your Honor is saying, well, wait a second, yes,

24  that's bad, that shouldn't be in, but there are certain

25  circumstances you don't want to prejudice the defendant in the

B.R. v. F.C.S.B.

137

1    criminal case or a civil case because there's evidence.  So if

2    they had gone that route and said, we looked at this, an

3    expert looked at it and we think that something that happened

4    in 2018 is easily the cause or a major contributing cause.

5    Then I think it's a harder conversation, but that doesn't

6    exist in this case.  What they purport to do, what they

7    purport and say they want to do, or at least want to preserve

8    the right to do, is just throw this stuff out there to the

9    jury and let the jury speculate.  No expert is going to say

10   that a relationship she had in high school was what's the

11   cause of what she's claiming her damages in this case.  No one

12   is going to say that.  So there is no relevance to that

13   evidence because it's just sort of, you know, the proverbial

14   skunk in the jury box.

15           THE COURT:  The thing is, and I don't know what your

16   client is going to testify to, I can speculate, but I don't

17   know specifically.  But let's suppose, for the sake of

18   discussion -- and again, I don't know if this is this case or

19   not -- she says that after that traumatic experience that I

20   suffered at the hands of others, has precluded me from being

21   able to function actively in an intimate way.

22           MR. BRENNER:  Yeah, if she said that I think that

23   would clearly be a situation where -- I can't even -- I don't

24   even know how I could get the balancing test back in my favor,

25   but she's not going to testify to that.  Just so you know

B.R. v. F.C.S.B.

138

1   she's a 24-year-old woman now, she's engaged.  So there's no

2   -- that's not going to be her testimony.  But you're right

3   that would be a situation where I would be really hard to

4   stand here in front of you and say the balancing test still

5   goes the other way.  Although, I think you still would have to

6   do the balancing test.  That's not this case.  The reason I

7   say their motion is similar, they also bring in stuff that I

8   think is just subject to other motions, for example.  I'm not

9   going to belabor the point the whole Facebook, the chat

10  messages between C.K. and Facebook user.  You've addressed

11  that.  We'll deal with it if and when it comes in, if it comes

12  up.  That's not really what our motion was about.  Our motion

13  was post-incident stuff.  So on that stuff, I say let's see if

14  it even becomes an issue.  I don't know there will.  I don't

15  know what their plans are.  You pretty much laid out what

16  they'll need to do.  So I think on this -- I think the

17  post-stuff is out unless my client opens the door to it, and I

18  think that should be the focus of the Court's inquiry right

19  now.

20            THE COURT:  Thank you.

21            MS. REWARI:  Your Honor, the post-2012 stuff is not

22  about her.

23            THE COURT:  You would agree that her lack of or

24  involvement in intimacy and, quote, promiscuity has absolutely

25  nothing to do with this case?

B.R. v. F.C.S.B.

139

1          MS. REWARI:  Sure.  Absolutely we don't have any

2    evidence on that.  We're not offering any evidence on that.

3    In fact, that was an agreement that we made with the other

4    side that we weren't going to ask those questions, even in the

5    deposition, unless she was going to argue, as you identified.

6    If she was going to say, I can't have -- you know, I have not

7    been able to have those relationships, then we would get into

8    it, but we didn't need to get into it because they said they

9    were not going to do that.

10          What we have at issue here are three pieces of

11    evidence that are post-2012 or actually two pieces of evidence

12    that are post-2012.  One is late 2012.  But the two pieces of

13    evidence that are late -- post her attendance at FCPS are

14    evidence of sexual assaults by other people.  One of these

15    people is a person who dated her for two years, right.  And

16    then the other person is a very graphic and -- it's

17    three-and-a-half pages in the dairy to her therapist this

18    other assault.

19          And so, the allegation in this case is that she's

20    continued to suffer and we've heard today that she's been in

21    treatment all this time.  And so, this goes to causation.

22    It's not about her sexual behavior.  It goes to causation of

23    the psychiatric conditions and the physical conditions that

24    she's claiming if you consider PTSD a physical condition.

25          THE COURT:  What context would you be of a mind to

—B.R. v. F.C.S.B.—

140

1    present this evidence?

2        MS. REWARI:  Cross-examination of her expert.  I

3    mean her expert was told there were no other problems, this is

4    the only problem that she's had.  And we did ask one of her

5    experts about it and she didn't have -- you know, she said,

6    well, you know, the person is dissociating, I don't

7    necessarily believe that she was actually abused by this

8    boyfriend that she dated for two years.  So she has an

9    explanation and the jury can weigh that.

10        But our position with this expert is that she wasn't

11   even given any documents from the school system from 2011 and

12   '12, you know, what the statements were said.  She has a very

13   limited set of information and we should be entitled to

14   cross-examine that opinion.  We don't need our own expert to

15   say here is the causes of her conditions.  We have an expert

16   who is saying he found malingering.  We don't need a

17   psychiatric expert to be able to cross-examine their expert to

18   say, Could these other conditions.  You know, she agreed if

19   there was -- if there was other abuse that it could cause

20   psychiatric injuries.  And so, if there's evidence of other

21   abuse that's in plaintiff's own words, we should be able to

22   cross-examine the reliability of her opinions.

23        THE COURT:  All right.  What the Court is going to

24   do is deny, generally, the motion in limine.  I would suggest

25   to counsel for defendants that this does not open the door for

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────B.R. v. F.C.S.B.─────

141

1   this, you know, broad so-called thorough examination of the

2   plaintiff's intimacy.  It does not give you carte blanche to

3   do that in any way; and if you try to do it, I'm going to cut

4   you off.

5          All right.  There's a motion in limine to exclude

6   evidence of B.R.'s mother's prior criminal case.  And

7   something regarding her civil litigation.

8          Was her mother convicted of a crime involving lying,

9   cheating, or stealing?

10          MR. KEEFE:  Your Honor, it's actually not a criminal

11   case.  It says *United States v.* Ms. R, but it was actually a

12   student loan issue, so it's not criminal.

13          THE COURT:  Was it prosecuted in the context of a

14   fraud case?

15          MR. KEEFE:  No, Your Honor.  To my knowledge

16   there's -- it was a civil debt collection matter.

17          THE COURT:  Okay.  And based upon what you know --

18   and again, I think you're probably limited in what you know.

19   Does it have anything to do which would suggest that her

20   veracity or believability should be undermined because of that

21   criminal investigation?

22          MR. KEEFE:  No, Your Honor.

23          THE COURT:  Let me hear from the other side.

24          MS. REWARI:  Your Honor, we would -- this is their

25   motion.  What we said was we would want to use this

B.R. v. F.C.S.B.

142

1   information to impeach on the question of was she

2   sophisticated enough, did she have enough experience with

3   litigation, because one of the issues in this case is

4   spoliation.  We had a motion before Judge Fitzpatrick and --

5             THE COURT:  How did that go?

6             MS. REWARI:  He said we could argue it at trial.  He

7   wasn't going to give an instruction.  He found that there was

8   a duty.  He found that --

9             THE COURT:  But don't we sort of get off track again

10  if we start bringing in other things that typically are not

11  bases for impeachment?  You know, obviously, we can talk about

12  lying, cheating, stealing, felonies and misdemeanors involving

13  lying, cheating, or stealing that's typically what we do when

14  we want to cross-examine as far as their veracity or

15  truthfulness is concerned.  This could open up Pandora's box

16  for all kinds of things.  When you filled out your credit card

17  application, you said that you made $27,000 a year; isn't it

18  in fact true that you made 26,500?

19            MS. REWARI:  Your Honor, let me put this a little

20  bit in context.  The way that this came up and the reason they

21  filed this motion is that they said she was not thinking

22  litigation when she deleted all of plaintiff's

23  Facebook messages, you know, all the text messages are gone,

24  all the Facebook messages are gone.  All of her digital

25  footprint from the time period of this alleged harassment is

─────B.R. v. F.C.S.B.─────

143

1  gone and what we're saying is that that spoliation was done

2  with an intent to deprive.  The family had lawyers and they --

3  the mother destroyed this evidence and their comeback is, no,

4  all that she was thinking was, was she wanted to protect her

5  daughter.  And so that's the only way.  We don't intend to

6  prove -- put in the complaint from these lawsuits.  It's the

7  fact that she was in prior litigation.  We're not going to get

8  into the details of what those cases were, but that she is an

9  experienced litigant is the only way that we expected --

10          THE COURT:  "Experienced litigant," what does that

11  mean?

12          MS. REWARI:  Well, she had at least, I believe,

13  three lawsuits before this one, maybe four.  I don't know the

14  full count.  But she'd had other lawsuits.  And so, this idea

15  that she wasn't thinking litigation when they hired two law

16  firms and threatened a lawsuit against the school system, and

17  then deleted all of her Facebook, which, as Your Honor knows,

18  the issue in this -- one of the central issues in this case

19  is, is she a Facebook user, who sent those messages.  And

20  she's denying that it's her.  We're saying it's her.  And all

21  of that -- those accounts have been deleted, they were deleted

22  by her mom.  She 's admitted in discovery that they were

23  deleted in 2013 after these events, while they were in

24  administrative proceedings with the school system.

25          And so, this only goes to the point of was she

B.R. v. F.C.S.B.

144

1  thinking when she said, I'm going to go meet with lawyers, and

2  when she came and recorded conversations and brought lawyers

3  to meetings, was she thinking litigation.  We don't intend to

4  put in the pleadings from these cases, only to ask if she's

5  been a party to other cases, if she's had experience with

6  litigation.

7            THE COURT:  All that you're going to get from this

8  particular testimony -- you're not going to be able to get

9  anything related to any financial statements that she may have

10  filed or anything like that.  I will let you ask questions

11  regarding the issue of spoliation.  And they need to be

12  precise and they need to be discreet, and you need to move on

13  after you ask those questions.

14            MS. REWARI:  Okay.  Thank you.

15            THE COURT:  Something about, filed this prior

16  bankruptcy, as it relates to damages.

17            MR. KEEFE:  Your Honor, we actually -- that was not

18  part of our motion.

19            THE COURT:  Okay.  Very good.

20            The next one is allowing defendants to question B.R.

21  regarding her prior SAC complaints to impeach or refresh her

22  recollection.  I'll start out by saying, impeachment and

23  refreshing of recollection are two things that you can do

24  pretty much all the time, but the predicate for doing that has

25  to exist.

———B.R. v. F.C.S.B.———

145

1          MR. KEEFE:  Agreed, Your Honor.  I think the focus

2  of our argument is actually a 403 issue where the reason why

3  something -- allegations are different in an amended complaint

4  can be for legal strategy reasons, get into privilege issues.

5  And so, I'm not sure, even on cross, asking a plaintiff, well,

6  why did you add this allegation to a second amended complaint

7  with -- I don't know how the plaintiff could answer that

8  without violating privilege.  It seems to just be impossible

9  to answer, Oh, my lawyers did this in this lawsuit --

10          THE COURT:  I have a good question for your opponent

11  colleague.  Let me see what she does with it.

12          MS. REWARI:  Uhm.

13          THE COURT:  Well, let me ask the question before you

14  answer it.

15          Why are you trying to admit the first complaint?

16  It's the first time that I've ever seen a lawyer try to admit

17  a complaint.  Obviously, you can impeach someone with a

18  complaint because that is a verified statement of the person

19  who's providing the complaint, but why are you trying to admit

20  the complaint?

21          MS. REWARI:  We're not.  It's not on our exhibit

22  list.  This motion was only to preclude us from asking her

23  about it and presumably because of the fraud on the court

24  motion that they've raised this.  But it's not on our exhibit

25  list, but we are entitled to ask her, you know, that when this

B.R. v. F.C.S.B.

146

1  lawsuit was filed in 2019 -- I mean I'm not saying that's how

2  I would ask it, but there was an allegation at one point that

3  a certain event occurred this way and now the -- now she's

4  testifying it happened this way.

5        THE COURT:  And absolutely you can impeach in that

6  regard, but as I said, this idea of making the complaint an

7  exhibit, I don't understand that.

8        MS. REWARI:  We wouldn't want the jury to take that

9  back.  We don't want, you know, yeah, we don't want the whole

10  thing in, but there are certain factual representations about

11  who did what, when things happened, how they happened.

12        THE COURT:  Typically, from the experience that I've

13  had, is when someone wants to impeach based upon an allegation

14  in the complaint, is they -- good lawyers stand there with the

15  complaint and they ask a question and the witness provides an

16  answer that's inconsistent with the complaint, and then you

17  refer to the paragraph 26 of your complaint where you stated

18  such and such.  That's typically the way it happens.

19        MS. REWARI:  That's how we would anticipate.  We

20  would not be offering the complaint as evidence.  We don't

21  think the pleading should be going back with the jury.

22        MR. KEEFE:  Just a point of clarification, Judge.  I

23  don't think it's material, but none of the complaints have

24  been verified complaints.

25        THE COURT:  Okay.  I know what I'm going to do, but

B.R. v. F.C.S.B.

147

1   I'll take it under advisement so that I can come up with a

2   more cogent explanation as to why the Court is doing what it's

3   doing.

4            The next one is to preclude -- it relates to

5   Detective Gadell.

6            MS. ZOLL:  Your Honor --

7            THE COURT:  Let me ask you the first question.  Why

8   isn't this cumulative?

9            MS. ZOLL:  I believe it is cumulative to the extent

10  that they're using it to say the same things as Detective

11  Chambers.  It is my understanding from their motion is that

12  that's not how they are going to use it because Detective

13  Gadell has no knowledge whatsoever of what happened in 2012.

14  He wasn't there, he didn't come -- he had literally no role

15  until 2019.  His role in 2019 was incredibly limited.  It was

16  looking at her complaint in 2019, comparing it to the police

17  investigation in 2012 to see if there were any differences,

18  and from there he was to ask the plaintiff if she wanted to

19  pursue criminal -- further criminal investigation of the new

20  allegation.  She did not.  I don't think an investigation in

21  2019 has any relevance whatsoever.

22           THE COURT:  Let me ask you this because I believe I

23  understand what your opponent colleague is going to argue.

24  Why can't this in some way be deemed corroborative?

25           MS. ZOLL:  Corroborative of?

B.R. v. F.C.S.B.

148

1            THE COURT:  B.R.

2            MS. ZOLL:  I'm not sure I entirely follow you.  If

3    you wouldn't mind clarifying.

4            THE COURT:  Okay.  Theoretically B.R. is going to

5    give testimony regarding the circumstances of her position or

6    perspective as to how the case actually is.  I'm assuming

7    that's going to be the case.  And I'm assuming Detective

8    Gadell will, in some way, corroborate that or not corroborate

9    it.

10           MS. ZOLL:  He did no investigation other than to

11   compare what she alleged in her complaint in 2019 to the

12   investigation that was done in 2012 by Detective Chambers.  So

13   he did no additional investigation of or claims to decide

14   whether or not they were verified.  After he did this

15   comparison of what the gap is between the 2012 investigation

16   and the 2019 complaint, he asked her if she wanted to pursue a

17   substantive investigation and she declined.

18           THE COURT:  Okay.  I think I understand.

19           MS. REWARI:  Your Honor, Detective Gadell is only to

20   answer the allegations that were made in the complaint that --

21   and actually they were made in depositions and in pleadings in

22   this court that she is in danger.  That she's in current

23   danger.  And that her safety is at risk because this detective

24   will testify that the police have tried to get her to

25   cooperate in an investigation.

B.R. v. F.C.S.B.

149

1          THE COURT:  Again, here is the police getting

2   involved.

3          MS. REWARI:  Well, Your Honor, again, it's only if

4   she is permitted to testify that she has current fears for her

5   safety.  We should be able to answer that.  I don't think that

6   there's any basis.

7          THE COURT:  Oh, if she opens the door to that,

8   absolutely, but I think the concern, and it's the Court's

9   concern also, is that this particular detective doesn't get

10  carte blanche to just sort of testify with regard to anything

11  the detective wants to talk about, even credibility,

12  reliability, what the investigation showed, or whatever.

13  That's not what this is intended to do.

14         MS. REWARI:  No.  And his deposition was very short.

15  It is essentially -- his information is that the first time

16  that this allegation of a rape in a closet was made.  It was

17  reported by the school system after this lawsuit was filed

18  because it was in the complaint.  We reported it.  He tried to

19  investigate it.  The plaintiff was not -- didn't return his

20  phone calls.  Her attorney wasn't interested in having that

21  investigated.  And so, if she's permitted to testify that I'm,

22  you know, they filed papers, briefs in this court saying they

23  are afraid to come to Fairfax County.  That they only come to

24  this building because it has security.  All 11 of the

25  individual defendants were barred from attending her

B.R. v. F.C.S.B.

150

1    deposition because she claim she's afraid for her safety.  So

2    we're concerned that this evidence will be presented at trial.

3    If that's presented, then we should be allowed to put on

4    evidence that --

5              THE COURT:  Let me ask a question.  Do you intend to

6    put that evidence on that she's afraid to come to Fairfax

7    County and the like?

8              MS. ZOLL:  No.

9              THE COURT:  Okay.  All right.

10             MS. ZOLL:  Yeah, if I may, I would just push back a

11   little further.  I don't think her decision whether or not to

12   pursue a criminal investigation in 2019, you know, really even

13   reflects on her state of mind in terms of safety or anything

14   or the veracity of her claims.

15             THE COURT:  The Court doesn't believe it's relevant

16   at all, but --

17             MR. BRENNER:  I was just getting up for the next

18   one.

19             THE COURT:  Okay.  The Court believes that this

20   motion in limine should be granted.  It's just, again, not

21   necessary.  The next one deals with the conclusion of the

22   Fairfax County Police Department investigation.  Again, we're

23   going down this road.

24             MR. BRENNER:  I think you have covered this one,

25   Your Honor.  I think you have -- well, I don't want to put

B.R. v. F.C.S.B.

151

1    words -- I think you stated that this is not going to be

2    relevant, that's not going to come into evidence.  That's what

3    we were trying to keep out.

4         MS. REWARI:  Again, the way that this -- I could see

5    this coming in in addition to the fact that, you know, what

6    we've talked about.  As long as they're not going to say you

7    should have reported something that we reported only to the

8    police.  You should have investigated something and that there

9    was deliberate indifference because this report to the police

10   wasn't separately investigated by the school system.  They've

11   said it in an expert report, they've said it in their papers.

12   If they're not going to take that position, then I believe the

13   police part of it can be more limited.  As Mr. Blanchard

14   pointed out, there are statements that were given to the

15   police that are directly contrary to what has been said here,

16   but we can ask those questions without saying was it to a

17   police officer, you know, you made this statement, we can show

18   her the statement.

19        With respect to the other piece of this, the experts

20   were told, including the forensic expert -- psychiatric

21   expert, was told that there was a conspiracy between the

22   police department and the school.  And the detective, you

23   know, threatened her and part of her distress is because of

24   the way the detective behaved in his interview with her, and

25   that's been part of her psychological injuries.

B.R. v. F.C.S.B.

152

1          And so, there's a conspiracy and a collusion with

2    the police department that's alleged in the complaint, even

3    though the police department is not a defendant.

4          THE COURT:  The thing that's so troubling to the

5    Court about this case is there are so many ancillary issues

6    that everybody wants to get into, and the Court just does not

7    see the need to get into these ancillary issues and I don't

8    believe the fact-finder, when listening to this, is going to

9    be other than confused as to what it needs to resolve in the

10   context of this case.

11          Again, it's just -- what the Court is going to do,

12   is it's going to preclude the defendants from offering

13   evidence regarding the Fairfax County police officer's view of

14   the credibility of anybody, including the information in the

15   police department investigation.  I will allow the police

16   department investigation was closed, but other than that,

17   that's it.  And again, let's just be careful with this.

18          MS. REWARI:  Thank you.

19          THE COURT:  The next one relates to the defendant's

20   prior sexual experience.

21          MS. ANDERSON:  I think we can rest on our papers.

22   We, obviously sympathetic, but think it's irrelevant to the

23   objective standard of deliberate indifference.

24          MS. REWARI:  Your Honor, I'm going to touch on this,

25   but this is really an issue for Mr. Kinney because it was his

B.R. v. F.C.S.B.

153

1   client's testimony.  She didn't talk about her experience.  It

2   was more she -- she was answering the question as to why an

3   allegation of sexual assault would not be something she would

4   take lightly, would not be something that she would overlook.

5   And if she's not entitled to say, as a woman, as a person

6   who's been through something like this, I would not take that

7   sort of thing lightly if it was made to me.  That's keeping

8   important information from the jury.  She's not going to talk

9   about who did -- she has no intention -- again, Mr. Kinney can

10  address this.  I don't think anybody has any intention of

11  getting into painful personal details like that.

12          But if you look at the answer that prompted this

13  question, she didn't even say that.  I mean somebody who

14  wasn't in the room, you wouldn't even have known that that's

15  what she was talking about.  So that's not what, you know,

16  there was no detail about any of this.  And so, this motion to

17  say, Well, you can't talk about that.  I mean if people -- if

18  a lot of these defendants are women, they're women.  And so,

19  if they are not allowed to say, Yeah, if I saw a girl having,

20  you know, a boy touch her like that, I would put a stop to it.

21  Because our defense is none -- no touching was ever reported,

22  no touching of plaintiff was ever reported.  Sexual --

23          THE COURT:  How does this come down to whether or

24  not the person who allegedly observed something like this is a

25  woman or a man?  I would think that any young man with any

B.R. v. F.C.S.B.

154

1   virtue if he saw something going down that was not

2   appropriate, he would step in also.  So why does this come

3   down to a woman thing?

4        MS. REWARI:  All I'm saying is no defendant should

5   be limited from being able to say why, why this allegation

6   against them is unfounded.  These are -- these people are

7   professional educators who work with children every day.

8   They've been living under the cloud of this allegation for a

9   long time and they're looking forward to their day in court to

10  clear their names and they should be able to say why they

11  believe -- why this allegation against them is totally

12  unfounded, would -- that they would never have responded the

13  way that the plaintiff is describing them to have responded.

14       THE COURT:  All right.  The Court is going to deny

15  that motion in limine.

16       Here we go again.  The internal affairs report.  I'm

17  assuming internal affairs report of the government, but not

18  the police department, correct?

19       MS. ANDERSON:  This is of our expert, Mr. Woolf.

20  And just to make it really narrow, we are not objecting to

21  them asking questions about the internal affairs investigation

22  of Mr. Woolf, which gets to what they want to get to, which is

23  bias.  Although, I still sort of disagree with some of that,

24  but we're not objecting to the questions.  What we're

25  objecting to is them admitting it as evidence, because it's

155

1    pages and pages of rank hearsay that, you know, you don't

2    actually need the allegations and their specifics to be

3    admitted in evidence for what the purpose they are looking

4    for.

5           THE COURT:  Does that satisfy you, Counsel?  No.

6           MS. REWARI:  I think so.  It's a little bit

7    different than what was argued in the papers.  The Rule 608

8    doesn't apply to extrinsic evidence and so we hadn't heard

9    that it was hearsay.  I don't know if there are parts of it.

10   We may have to look at it and see if there are parts of it, if

11   he denies it.  We may need to impeach him if he says, no,

12   that's not what happened.  Because it is -- it does go to his

13   bias, it does go to his credibility.  We've cited the *Doorman*

14   *v. Annapolis OBGYN* --

15          THE COURT:  What's going to happen with regard to

16   that you can use it for impeachment purposes, but the IA

17   report does not come in.

18          MS. REWARI:  Okay.

19          THE COURT:  Okay.  The next one regards an exhibit,

20   trial Exhibit 95.  And it's a so-called post hoc summary

21   document created by one of the individual school defendants.

22          MR. KEEFE:  Yes, Your Honor, briefly.  What this

23   document is, in February of 2012 the principal of middle

24   school instructed an assistant principal, T.B., one of the

25   defendants in this case to draft up a summary of what the

B.R. v. F.C.S.B.

156

1    school had done in response to B.R.'s complaints since October

2    and November.  She went around and interviewed people in the

3    school, teachers mainly, and wrote down what they said to her.

4    And it is in a memo that was prepared to give to the

5    superintendant's office when they got involved in February of

6    2012.  So it is an after the fact summary written by T.B.

7    based on what people told her.

8             THE COURT:  Why isn't it rank hearsay?

9             MR. KEEFE:  Your Honor, It is rank hearsay.  My

10   understanding of what defendants argue is that they're not

11   going to offer it for the truth of the matter, they are going

12   to offer it for under either nonhearsay because it's not

13   offered for the truth or, if I'm reading it carefully and

14   parsing 8033's affect on the listener exception.  Your Honor,

15   there's simply no way to use this document other than for the

16   truth, which is that the school did these things in response

17   to B.R.'s complaints and to use it for a fact of -- a fact

18   remembered is a runaround the whole thing because you can't --

19   this is a School Board having its agents, who it acts through,

20   writing a document, having another agent read it, and then

21   offering it to prove what the School Board authored.

22            THE COURT:  Theoretically, and, again, just getting

23   into theories -- there's a lot of theories in this case.  But

24   theoretically, why couldn't that particular investigation,

25   let's call it that, suggest that the defendants were taking

B.R. v. F.C.S.B.

157

1    reasonable steps to address these circumstances which

2    plaintiff alleges?

3              MR. KEEFE:  Your Honor, the way to prove that from

4    the defendants' side is to ask them directly:  What did you

5    do?  What defendant, A.F.; defendant, T.B., what did you do?

6    What did you know?  What you cannot, under the rules of

7    evidence, prove that is, here is the summary we wrote out of

8    court based on interviews we did internally because it's

9    hearsay.

10             THE COURT:  All right.

11             MS. REWARI:  Your Honor, first of all, it's not post

12   hoc.  This was done when the complaint was being raised to

13   above the heads of the assistant principals.  It was raised to

14   the principal, it was raised to the assistant superintendent.

15   So this was information that was provided to their bosses to

16   show this is what we've done so the bosses can make the

17   determinations of what more needs to be done.

18             THE COURT:  So are you, in effect, willing to offer

19   the entire exhibit?

20             MS. REWARI:  Yes.

21             THE COURT:  Is that what you want to do?

22             MS. REWARI:  Yes, because that --

23             THE COURT:  Give me the hearsay exception.

24             MS. REWARI:  It is not offered for the truth of what

25   is said in there.  It's offered to show, and we have a number

─────────────── B. R. v. F. C. S. B. ───────────────

158

1    of cases --

2            THE COURT:  Give me a hearsay exception or exemption

3    which would allow this to come in.  Just saying that it's not

4    offered for the truth of the matter, doesn't cut it.  It's got

5    to be offered for something that is consistent with the rules

6    of evidence.

7            MS. REWARI:  Correct and it's being offered to show

8    why the school, why the assistant superintendent and why the

9    principal determined that no further action needed to be

10   taken.  This was done after B.R. stopped coming to school and

11   they had to make the determination, are we going to be doing

12   anything more at this point.  And we've cited a number of

13   cases at pages 26 and 27 of our brief that show that when a

14   decision of a corporate entity, as to why you responded this

15   way or that way, you know, it's challenged, they can show this

16   is the information that we had.

17           Now, if their complaint stopped at when she stopped

18   attending school, then I would agree with you because

19   that's -- then at that point, it is just information.  But

20   when they -- what they've alleged in this case is that there

21   was something more that should have been done by the assistant

22   superintendent, by the principal.  And so, what we're saying

23   is this is why their actions were not clearly unreasonable.

24   They were not clearly unreasonable.  They had this detailed

25   memo.  They had, step-by-step, of what was done, what

B.R. v. F.C.S.B.

159

1    information the school had had.  And the challenge in this

2    case that they've made is there should have been a further

3    investigation.  So the jury should be entitled to see what was

4    the investigation.  This would be akin to --

5              THE COURT:  Again, I'm instinctively having no

6    problem with the fact that an investigation was done because

7    that goes to part of your defense.  But to allow a hearsay

8    document in when there's no exception to the hearsay rule nor

9    exemption to the hearsay rule, and the best one that you can

10   come up with, and it was what the Court was talking about, is

11   the state of mind exception, but it does not apply to a

12   statement, a memory, or belief to prove the fact remembered.

13             And in the case *United States v. Smallwood* it says,

14   "This exception to the general hearsay rule provides that a

15   hearsay statement is admissible if it bears on the declarant's

16   existing state of mind as long as it's not a statement of

17   memory or belief to prove the fact remembered or believed."

18             MS. REWARI:  Right.  And that is not the exception

19   we're citing.  The *United States v. Davis* case from the Fourth

20   Circuit, where you're offering statements as an explanation of

21   a motive of the officer's actions that are being challenged.

22   When an employer, in the second case we cited,

23   that illustrates this example, *Arrington v. E.R. Williams*,

24   where an employer's decision making was under challenge, and

25   where evidence is offered for the purpose of explaining why

B.R. v. F.C.S.B.

160

1    they took the decision that they did, that memo -- so, you

2    know, say in a HR context, right, you are challenged:  Why did

3    you not take further action to address sexual harassment in

4    the workplace.  The employer can say here is the investigation

5    we did and they put in the investigation this is the

6    statements we got, this is the information that we had and

7    this is why we determined that it was not, you know, a hostile

8    work environment.  This is -- this is the exact similar

9    scenario of being able to say this is why the superintendent,

10   who was not in the school, believed that -- assistant

11   superintendant, believed there was no further action that

12   needed to be taken.

13          THE COURT:  Well, the bottom line is this, if the

14   statement or position is taken that no investigation was

15   conducted, that there was nothing done in response to the

16   plaintiff's allegations, then, you know, you can bring forth

17   the idea that an investigation was conducted, but the report

18   itself, the internal affairs investigation, does not come in.

19   The whole document does not come in.  You can, obviously,

20   suggest that something did happen.  You can put a witness on

21   the stand and you can ask was an investigation done.  Were you

22   satisfied with the results of the investigation?  Yes.  Yes.

23   But the investigation itself, I don't think, comes in under

24   any hearsay exception or exemption.

25          MS. REWARI:  Okay.

B.R. v. F.C.S.B.

161

1           THE COURT:  The next one deals with the so-called

2   three-year old fall theory.

3           MR. KEEFE:  Your Honor, this motion seeks to exclude

4   an argument or argument based on this one medical record from

5   when B.R. was three years old, reflecting that she tripped and

6   fell in a parking lot as a three-year-old and had facial

7   swelling.  Plaintiffs have no expert connecting this medical

8   record, any causation evidence, expert or otherwise.  Our

9   understanding of what they intend to do with this is just put

10  it in front of the jury and say, this may be the cause of

11  B.R.'s TBI.  And that is just simply --

12          THE COURT:  Wouldn't defendants be allowed to -- if

13  a witness gets on the stand and testifies that the resulting

14  activity regarding plaintiff is related to this specific

15  incident, couldn't they then ask, are there any other

16  circumstances which could have caused this, such as a fall

17  when a person was three years old they injured their head?

18          MR. KEEFE:  Absolutely, Your Honor, the defendants

19  may test the bases for any expert opinion on

20  cross-examination.  This is just simply you can't

21  affirmatively show the medical records to the jury and argue

22  without any basis that this was the cause or potential cause.

23          THE COURT:  Is the extent, Counsel, is the extent

24  that I've described your ability to use this particular fact

25  or circumstance is sufficient to address your concerns?  In

B.R. v. F.C.S.B.

162

1   other words, the witness -- the expert witness can be probed

2   as to whether or not there is other causation.  That's an easy

3   question.  And if you have a specific reference to other

4   potential causations, that can be referenced.  But the witness

5   will not be able to testify that based upon my expert opinion

6   this is the reason for plaintiff's circumstances.

7          MS. REWARI:  Correct.  I mean, we don't have -- we

8   don't have an expert whose -- that we're going to offer to say

9   this fall on her face caused a TBI because we don't agree that

10  there is a TBI.  What we're saying is if you have information

11  about head injuries, this is the only head injuries, so she

12  will be able to cross-examine her expert as to whether he had

13  this information and, you know, whether he has any record of

14  any other head injury other than this one.

15         THE COURT:  I don't think that this is something

16  that can be resolved in the context of a motion in limine.  It

17  depends on what the expert says and it depends on the nature

18  and scope of the cross-examination.  Again, if you have

19  someone who has been verified and selected and proven,

20  provided to the other side as to who can testify that this is

21  the causation, that's something else.  But from what I

22  understand, you don't have anybody who is able to say that.

23         MS. REWARI:  Yes.  All we want to do is

24  cross-examine the expert who they are going to offer to say

25  that she has -- that her cognitive issues are due to a TBI.

163

1          THE COURT:  All right.  Again, this is consistent

2   with what the Court believes.  We're going to allow

3   questioning on the basis of plaintiff's own expert opinions

4   and their accuracy regarding plaintiff's TBI.  You can inquire

5   on cross-examination, but that's the extent of it.  The other

6   one is a little sensitive.

7          MS. ANDERSON:  I think you've already basically

8   ruled on it so I think we can deal with it pretty high level.

9   The only argument is that without Dr. Jennings's testimony on

10  it counsel shouldn't be able to argue that themselves.

11         THE COURT:  I think I pretty much touched on it

12  already and this is a very sensitive subject and I really

13  don't need to hear anything else on it.  What I can do for

14  purposes of everyone here is to take it under advisement and

15  let you know what I'm going to do without further argument.

16         Thank you.

17         The next one which deals with DeRight and Tuwiner.

18  The request is to limit DeRight and Tuwiner to giving opinions

19  confined to the four corners of their expert reports.

20         MR. BRENNER:  Yes.  Andrew Brenner.  I think there's

21  an agreement from the defense on this one that they're not

22  going to elicit opinions outside of their reports.

23         THE COURT:  Very good.

24         MS. REWARI:  Yes.  We just wanted the rule to apply

25  to everybody that no one is going to go outside their report.

B.R. v. F.C.S.B.

164

1    That's all.

2              THE COURT:  Absolutely.  Facebook messages.

3              MR. BRENNER:  Yeah, I think this one -- again,

4    there's not an agreement on how it's going to play out at the

5    end, but there's not an agreement where we are now.  What the

6    defense said in their response was that they understand they

7    will not mention these or talk about them or publish them, or

8    reveal their contacts unless and until the Court admits them

9    into evidence.  So I think that's where we are right now.

10             THE COURT:  You agree?

11             MS. REWARI:  I just want to clarify, the plaintiff

12   has said that she had text messages with him and the content

13   of those text messages, so we should be permitted to talk in

14   opening that there were messages, just not to discuss the

15   contents of these specific messages.

16             THE COURT:  You agree, Mr. Brenner?

17             MR. BRENNER:  I don't even know what it means.  I'm

18   not sure what she's saying.  The motion goes to these

19   particular Facebook messages.  If she wants to talk about

20   phone text messages that may have existed or that I have,

21   that's not a part --

22             THE COURT:  If we want to sort of get out of the

23   scope of Facebook messages, maybe we need to have something

24   else, because I think you made reference to text messages,

25   which are different from Facebook messages.

B.R. v. F.C.S.B.

165

1          MS. REWARI:  I would just like the ruling to be

2    specific to the motion, that's all.  The motion was just on

3    the Facebook.

4          THE COURT:  We agree.

5          MR. BRENNER:  I think that's fair.

6          THE COURT:  There's a so-called fake Facebook

7    circumstance, and I think we can all agree that that shouldn't

8    happen.

9          MR. BRENNER:  I think we also are, again, agreement

10   as of today, but maybe not by the end of the day.  I think the

11   defendants' response to this was that they understand before

12   they -- these messages if and when -- until they are entered

13   into evidence, that there will be no reference.  I think that

14   was the position.  Same as the last one, Judge.

15         THE COURT:  Very good.  All right.  Home stretch.

16         Motion to establish number of peremptories.  I'll

17   tell you what the Court has done, and we've been working hard

18   on this case in the back and because there's so many different

19   defendants and the traditional way of establishing peremptory

20   challenges would not apply.  What we're going to do and what

21   we have done is we've come up with an algorithm to make it

22   fair as to people getting the amount of challenges that they

23   are going to get consistent with the traditional way of it and

24   we'll provide you that algorithm.

25         The last one is motion to overrule objections as to

—————B. R.  v.  F.C.S.B.—————

166

1    and address Rule 412.

2        MS. REWARI:  Your Honor, we filed this largely as a

3    precaution because they have made a number of Rule 412

4    objections to some of our exhibits, including the Facebook

5    messages, which for the majority of this evidence, we believe

6    it's intrinsic.  Rule 412 doesn't apply.  And the only

7    evidence to -- that I believe is not intrinsic are the medical

8    records that we just talked about.

9        THE COURT:  Why isn't all of this encompassed by all

10   the other determinations we've made on the motions in limine?

11       MS. REWARI:  I believe that they are.  I believe

12   that they are.  The only -- I think the only one we haven't

13   specifically talked about is -- are the Facebook messages that

14   are Exhibit 73, which are the Facebook chats between plaintiff

15   under the fake name, Jenny Taylor, and another student.  In

16   these messages, the plaintiff admits that she was the one who

17   sent these.  And they are relevant because the allegation in

18   this case is that she was being cyber bullied online.  The

19   only evidence of cyber bullying are messages by this Jenny

20   Taylor.  And these Jenny Taylor messages were reported to

21   school officials, they were also taken to the police, and I

22   understand you're going to be keeping the police out of it as

23   much as you can, but several student statements talk about

24   Jenny Taylor.  And this is the only evidence of cyber bullying

25   that has been produced in this case.

B.R. v. F.C.S.B.

167

1          So we think this is intrinsic.  We don't think

2   Rule 412 applies to this, because this is what's alleged in

3   the complaint, and it shows that plaintiff was behind these

4   messages.  And so, again, we filed this because there was a

5   412 objection raised in our, you know, in the objections that

6   were exchanged and we just wanted to make sure we were

7   complying with the rule as much as possible.  So we filed this

8   motion to identify everything that they had objected to on

9   Rule 412 grounds, to explain why we thought Rule 412 didn't

10  apply; and if it did apply, why we thought that that objection

11  should be overruled.

12          THE COURT:  Well, the bottom line, as far as the

13  Court is concerned, is this particular motion in limine is

14  untimely.  And I guess the safety net on this is that we've

15  addressed pretty much -- we've had almost 50 motions in

16  limine, and I think this is the most motions in limine I've

17  ever seen in any case, and I've been around for a long time.

18  So I think it's been addressed and this latest one is

19  untimely, so the Court is going to deny it based upon that

20  basis.

21          All right.  From my records, we're done.

22          MR. BRENNER:  Yeah, I just wanted to talk briefly

23  about scheduling, if we could.

24          THE COURT:  Let's do this.  We have some other

25  issues or other cases that we need to take up.  So what I

B.R. v. F.C.S.B.

168

1    would like to do is allow Ms. Tinsley to clear the courtroom.

2    Allow the United States marshal to bring in the defendant in

3    the criminal case.  I'll meet with counsel in chambers and

4    that way I'll have my calendar and we all can take a look

5    at --

6              MR. BRENNER:  Great.

7              THE COURT:  One of the other things -- and I'm glad

8    Ms. Barry reminded me of this -- I'm going to direct that the

9    parties, once again, contact Judge Fitzpatrick's chambers to

10   see if you can come up with some sort of resolution on this

11   case.  As I said, this case is one that's either going to go

12   one way extreme or the other.  So everyone needs to be aware

13   of that.

14             I'm very happy with the competency of the lawyers

15   that have been presented today because without the Court being

16   prepared and counsel being attentive to the Court's

17   requirements, we could have been here for a couple of days,

18   which is not the goal.  We're not in California, we're in

19   Virginia.  So I appreciate the counsel's hard work on this and

20   to allow us to get this case resolved.  But the bottom line is

21   speak with Judge Fitzpatrick.  He's a good man, he has a good

22   instinct and he thinks a lot like I do so he's probably a good

23   person to talk to about seeing what you can do on this case.

24             We'll go in the back and figure out how long we need

25   to present this case if it goes to trial, and also we can talk

B.R. v. F.C.S.B.

169

1    about the days that we're actually going to have court, and

2    what times we're going to start and the like.  So we'll meet

3    you back in chambers.

4                    **(Proceedings adjourned at 1:53 p.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motion

7    hearing in the case of the **B.R. versus F.C.S.B.,** Civil

8    Action No.: 1:19-cv-917, in said court on the 6th day of

9    March, 2024.

10          I further certify that the foregoing 170 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this March 21, 2024.

17

18

19

20

21   _____
                        Tonia M. Harris, RPR
22                      Official Court Reporter

23

24

25

                                                              170