**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| B.R., | ) |
| | ) |
| Plaintiff, | ) |
| | )   Civil No. 1:19-cv-00917-RDA-WEF |
| v. | ) |
| | ) |
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF B.R.'S MEMORANDUM IN SUPPORT OF HER
MOTION FOR NEW TRIAL**

This Court should grant a new trial under Fed. R. Civ. P. 59.  The errors detailed below, individually or in the alternative, cumulatively affected B.R.'s substantial rights and therefore require a new trial.

**LEGAL STANDARD**

Federal Rule of Civil Procedure Rule 59(a) states in pertinent part that "the court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  In the Fourth Circuit, the Court must set aside the verdict and grant a new trial if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (citations omitted).

When considering a grant of a new trial, the Court should exercise its "own independent judgment, after a weighing of all the evidence and any other pertinent factors, in determining

1

whether the verdict . . . would result in a miscarriage of justice." *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir. 1959). The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. *Id.*

Granting a new trial "is not a discretionary task, but a duty" and "so long as the jury verdict has been set aside, not from mere difference of opinion, but as against the clear weight of the evidence, the trial judge will be sustained." *Swentek v. USAIR, Inc.*, 830 F.2d 552, 559 (4th Cir. 1987).

## ARGUMENT

### I.    A New Trial is Required Because the Court Erred in Permitting the Jury to Consider Whether B.R. "Welcomed" Sexual Advances.

The Court erroneously admitted, over B.R.'s objection, extensive evidence regarding whether B.R. "welcomed" C.K.'s sexual advances. This evidence was primarily, but not exclusively, in the form of Facebook messages between C.K. and "Facebook User." Defendants made this evidence a feature of their case, even arguing in closing that they showed that B.R., then a 12-year-old child, made certain "choices" and she must be held accountable. Trial Tr. (Vol. 23) at 155:9–16. In short, Defendants expressly argued that B.R. had consented to the conduct at issue.

This issue was briefed by the parties in their respective pretrial motions *in limine*, ECF Nos. 649, 662. Specifically, B.R. argued that since it was undisputed that she was below the legal age of consent under Virginia law, it would be error to allow this evidence to be admitted. However, the Court rejected this argument and case law supporting same, *Mary M. v. N. Lawrence Comm. Sch. Corp.*, 131 F.3d 1220, 1226–27 (7th Cir. 1997), and created an exception at FCSB's urging for conduct between students as opposed to between an adult school employee and a minor child. Accordingly, the Court ruled that FCSB was permitted to discuss whether B.R. "welcomed"

the conduct at issue.  ECF No. 837 at 11–12.  Yet, at the same time, the Court precluded Plaintiff from including evidence or argument related to the age of consent in Virginia.  *Id.*

This evidence became the central focus of FCSB's defense.  As the Court will no doubt recall, FCSB presented this evidence in graphic detail and on display during the testimony of C.K.  Trial Tr. (Vol. 16 – A.M.) at 75:8–149:17; DX 1.  The Court's decision to allow inquiry and evidence regarding whether B.R. "welcomed" C.K.'s conduct requires a new trial.

Va. Code Ann. § 18.2-63C(i) states that "a child under the age of thirteen shall not be considered a consenting child."  Likewise, Va. Code Ann. § 18.2-61A(iii), which governs rape, defines statutory rape as sexual intercourse with a child under the age of thirteen.  While Virginia law includes an exception for minor victims above age thirteen who are close in age, there is no such exception for children under the age of thirteen.  Va. Code Ann. § 18.2-63A-C.  The Supreme Court of Virginia has also long allowed civil recovery for "consensual" sexual relations between a person under the age of consent with someone over the age of consent.  *Parsons v. Parker*, 160 Va. 810 (Va. 1933).

As Judge Posner concluded in *Doe v. Oberweis Dairy*, a Title VII case, the "age of consent" is "fixed by the state" and "represents a legislative judgment about the maturity of girls in matters of sex."  *Doe v. Oberweis Dairy*, 456 F.3d 704, 713 (7th Cir. 2006) (quoting *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 450 (7th Cir. 2000)).  Accordingly, "to avoid undermining valid state policy by reclassifying sex that the state deems nonconsensual as consensual," rather than deciding whether a minor plaintiff could "welcome" sexual advances, district courts "should defer to the judgment of average maturity in sexual matters that is reflected in the age of consent in the state."  *Id.*  While B.R. and C.K. were no doubt close in age, the Virginia state legislature has determined that children under the age of thirteen are not able to consent to sexual activity with anyone.

3

The Court's decision in this case undermined state law and permitted the jury to focus on whether B.R. and C.K.'s relationship was consensual, despite the fact that, at age twelve, B.R. was lawfully unable to consent to sexual advances made by a person of any age.  Having the Court engage in this type of age and maturity analysis is the exact type of "intractable inquir[y] into maturity" Judge Posner cautioned against in *Doe v. Oberweis Dairy*, and why he instructed that federal courts should apply the law of consent of the state.[1]

This Court erred by not following the law applied by the Seventh Circuit in *Mary M. v. N. Lawrence Comm. Sch. Corp.*, 131 F.3d 1220, 1226–27 (7th Cir. 1997), a Title IX case.  In *Mary M.*, the Seventh Circuit correctly found that it was reversible error for the district court to allow the question of "welcomeness" to be placed before the jury.  The Seventh Circuit stated clearly: "If elementary school children cannot be said to consent to sex in a criminal context, they similarly cannot be said to welcome it in a civil context. To find otherwise would be incongruous." *Id.* at 1227.  B.R. was twelve years old at the time of the incidents at issue, and, as a matter of law, she could not consent or welcome sexual advances by anyone, including C.K.  As in *Mary M.*, permitting inquiry into "welcomeness" in this case constituted a significant error of law that requires a new trial.

Federal court deference to state legislatures on the age of consent is also consistent with the Tenth Amendment.  Congress's authority to regulate is constrained to interstate commerce, which the Supreme Court has held does not include a "federal civil remedy for the victims of gender-motivated violence," or criminal penalties for "purely local crimes" like bringing a gun on school property. *United States v. Morrison*, 529 U.S. 598, 602 (2000); *see also Bond v. United*

---

[1] For completeness, the court in *Doe v. Oberweis* noted that this evidence could be relevant to the issue of damages, but that is not how FCSB used it here.

*States*, 572 U.S. 844, 860 (2014); *United States v. Lopez*, 514 U.S. 549 (1995).  It follows that Congress cannot regulate an inherently local, noneconomic act—sex—by supplanting state law. Of course, Title IX is a spending clause statute, and Congress may attach conditions on the receipt of federal funds.  *See, e.g.*, *S. Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).  But there is no explicit or even implicit condition in Title IX stating that federal funds for Virginia schools come at the cost of loosening the Commonwealth's age of consent law.  The Constitution requires that Virginia law controls over any "welcomeness" inquiry implied.

## II.    A New Trial is Required Because the Court Erred in its Severe Limiting of Plaintiff's Title IX Expert, Nancy Cantalupo's, Testimony.

Professor Nancy Cantalupo, Plaintiff's Title IX expert, provided a report that included her expert opinions that:

First, my review of the new evidence listed above and re-review of existing evidence significantly strengthened the opinion I offered to a reasonable degree of professional certainty in my Preliminary Report FCSB failed to follow baseline requirements of Title IX or to heed the advice that the U.S. Department of Education's Office for Civil Rights ("OCR") had provided to schools like FCSB prior to August 2011. In particular, as I discussed in my Preliminary Report and supplement here, FCSB's seemingly deliberate noncompliance with Title IX requirements put in place in 1975, including its failures to clearly and accessibly designate a Title IX Coordinator and to adopt and publish a Title IX grievance procedure, was clearly unreasonable in the 2011-12 school year, nearly four decades after those requirements became law.

…

First, FCSB's failure to structure its Title IX Coordinator designation in a manner that would be clear and accessible to students and their parents left the FCSB staff with no guidance for how to respect and protect the Title IX rights of students such as B.R. Without information about non-discriminatory ways to address the escalating harassment for which B.R. was seeking help, the FCSB staff acted according to gender-stereotypes by assuming that sexual harassment and gender-based violence victims lie about being victimized. Second, FCSB's—again, seemingly deliberate—failure to provide and to inform B.R. and her parents of a Title IX grievance procedure they could use to stop the SH-GBV B.R. was experiencing eliminated any ability on B.R.'s part to check the gender-stereotyping and bias in the RCMS staff's treatment of her and her reports. Third, FCSB's failure to provide a Title IX grievance procedure meant that B.R.'s reports of SH-GBV had no way of being communicated to the FCSB Title IX Coordinator …. Thus, in violating its most basic Title IX legal obligations, FCSB both created the conditions for its staff to gender stereotype B.R. and eliminated her and her parents' abilities to stop them….

Instead of being permitted to testify to these opinions, the Court required B.R. to proffer limited testimony based on the Court's pre-trial rulings, and the Court then provided edited versions of highly scripted questions and answers, and further limited Professor Cantalupo's testimony while on the witness stand. *See, e.g.*, Trial Tr. (Vol. 3- PM Session) at 64:8–65:4. These extensive limitations on Professor Cantalupo's testimony, B.R.'s Title IX expert, was highly detrimental and prejudicial to B.R.'s case.

Defendants did not offer any Title IX expert, affirmatively or to rebut Professor Cantalupo's expert opinions that FCSB and the ISDs had violated Title IX in their treatment of B.R.'s reports of sexual harassment, retaliation, and sexual assault. Instead, Defendants filed a motion to preclude Professor Cantalupo's testimony at trial. *See* ECF No. 659 at 21–23.

Defendants argued, and the Court concluded, that Professor Cantalupo's opinions in her report invaded the province of the jury. However, Professor Cantalupo's expert opinions did not invade the province of the jury as the ultimate question for the jury was whether FCSB is "liable under Title IX for its 'deliberate indifference to known acts of student-on-student sexual harassment in its programs or activities,'" where "that harassment '[was] so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit." *See Feminist Maj. Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)); *e.g., Doe ex rel. Watson v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 718 (W.D. Va. 2018) (concluding that expert's opinion that the school was "'deliberately indifferent' to the risk of harm to plaintiff and that the failure to provide adequate policy or training was a proximate cause of the sexual abuse" went "beyond the proper role of an expert witness"); *Roohbakhsh v. Bd. of Trs. of Neb. State Colls.*, 2019 WL 5653448, at *4–5 (D. Neb. Oct. 31, 2019) (finding that expert's opinions about whether

a school's "conduct amounted to deliberate indifference is a question for the jury to determine and must be excluded").

Courts have permitted experts to "testify as to whether [d]efendants complied with the applicable standard of care . . . which may be reflected in [government] regulations." *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at \*41, \*43 (N.D. Fla. Feb. 28, 2021) (explaining that "a qualified expert may 'testify about industry standards of care, which may be reflected in regulations and statutes, and he can testify about how a reasonable operator in the industry would comply with these statutes and regulations'" and finding an expert "qualifie[d] to testify as to whether Defendants complied with the applicable standard of care in the hearing protection device manufacturing industry, which may be reflected in EPA regulations"); *see also Scott v. Paychex Ins. Agency, Inc.*, 2023 WL 5275182, at \*5–6 (S.D. Fla. Aug. 16, 2023). Professor Cantalupo's references to applicable regulations to "better frame h[er] analysis of" Defendants' conduct does not transform her opinions into "impermissible legal conclusions." *See Scott*, 2023 WL 5275182, at \*5–6; *see, e.g., Bd. of Trs. of Neb. State Colls.*, 2020 WL 606426, at \*3, \*5 (D. Neb. Feb. 7, 2020) (denying summary judgment on the plaintiff's Title IX claim where the plaintiff submitted "expert testimony on the adequacy of the response and the effects of such a response on a victim").

Professor Cantalupo was also not permitted to testify regarding federal regulations and guidance in the Title IX context, which was error. This testimony would have been helpful to the jury under FRE 702 as interpreted by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Even under the court decision that is most aligned with Defendants' position, the expert was permitted to testify about OCR guidance "to note that these regimes inform standards and best practices for educational institutions." *Doe v. Coastal Carolina Univ.*, 2021 WL 1651057, at \*2 (D.S.C. Mar.

8, 2021); *see also Muccie v. Dailey*, 2022 WL 1746755, at *3 (D. Mont. May 21, 2022) (permitting a Title IX expert to opine that "OCR guidance informs best practices and standards" (alteration adopted)); *Roohbakhsh*, 2019 WL 5653448, at *6 (allowing Title IX expert to provide testimony that "generally discusses Title IX" and "[the OCR] standards that colleges and universities generally follow"); *McCoy v. Isidore Newman Sch.*, 2022 WL 4533773, at *6 (E.D. La. Sept. 28, 2022) (permitting expert to "explicat[e] industry compliance standards and practices under Title IX, and what is generally expected within the industry under those standards").

Because of the restrictions placed on Professor Cantalupo's testimony, the jury did not have any explanation as to what is actually required by Title IX and were deprived of expert analysis of how FCSB's actions comported with what federal regulation and OCR Guidance.  This was error, which was further compounded by the Court's jury instruction on deliberate indifference, discussed next.

## III.    The Court Improperly Instructed the Jury on the "Deliberate Indifference" Element of B.R.'s Title IX Claim.

The Court erroneously removed from its jury instruction on the Title IX deliberate indifference standard the explanation that "half-hearted investigations" do not suffice to shield a school from liability.  As a result, the Court's deliberate indifference instruction left the jury with only an abstract statement of the law that was misleading and prejudicial to B.R.

### A.  Relevant procedural history on the deliberate indifference instruction

The Court's initial proposed jury instruction on deliberate indifference was:

"Deliberate indifference" means that the school official's response or lack of response to the alleged harassment was clearly unreasonable in light of all the known circumstances.  Deliberate indifference is a high standard that requires more than a showing of mere negligence and therefore a school is not deliberately indifferent for failing to eliminate all student-on-student harassment or for failing to impose the disciplinary sanctions sought by the alleged victim.  On the other

hand, half-hearted investigations or remedial measures that leave student-on-student harassment unchecked do not suffice to shield a school from liability.

The Court cited as authority *Doe v. Farifax County School Board*, 1 F.4th 257 (4th Cir. 2021) and quoted the Fourth Circuit's statement that "half-hearted investigation or remedial action will not suffice to shield a school from liability." *See Doe*, 1 F.4th at 268. The Court's initial proposed instruction correctly stated the law and gave helpful guidance to the jury on how to apply the deliberate indifference standard in this case.

During the charge conference, however, FCSB requested that the Court make the following changes to the final sentence of its proposed instruction:

> On the other hand, ~~half-hearted investigations or~~ remedial measures that school officials know leave student-on-student harassment unchecked do not suffice to shield a school from liability.

*See* Trial Tr. (Vol. 23 - Apr. 23, 2024) at 14:4–16:6.

In response to FCSB's request, the Court stated that "half-hearted investigation" is "not the best terminology," is "not a term that you can objectively weigh," explained that the Fourth Circuit "may have cited the term" in *Doe v. Fairfax School Board* because it "was looking at the particular facts of that case." *Id.* at 14:10–16:7. The Court also stated that it was "a little bit uncomfortable with these references to 'half-hearted investigations,' because there's no definitive language in any of the cases it had reviewed. *Id.* at 18:1–8.

Based on the Court's statements, Plaintiff suggested that if the Court was inclined to make the changes requested by FCSB, it "should also take out the parts about defining what is 'not deliberate indifference'" and instruct the jury only that deliberate indifference is a response or lack of response that was "clearly unreasonable in light of known circumstances" and is a "high standard that requires more than a showing of mere negligence." *Id.* at 16:18–17:6.

The Court decided to strike the entire portion of the instruction regarding examples of what would and would not constitute deliberate indifference (although it left in Jury Instruction No. 28 which gave examples of what would not constitute deliberate indifference).  *Id.* at 17:7–22. Thus, the Court's final instruction to the jury on deliberate indifference was:

> "Deliberate indifference" means that the school official's response or lack of response to the alleged harassment was clearly unreasonable in light of all the known circumstances. Deliberate indifference is a high standard that requires more than a showing of mere negligence."

*Id.* at 67:10–14.

Plaintiff renewed her objection to the Court not giving the instruction she had proposed.

*Id.* at 48:12–22.

### B. The Court should order a new trial based on the improper jury instruction on deliberate indifference.

A new trial is appropriate based on jury instructions if the jury instruction was erroneous and "there is a reasonable probability that the erroneous instruction affected the jury's verdict." *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 535 (4th Cir. 2021) (quotation marks omitted).  Even though the Court recognized in its order denying FCSB's motion for judgment as a matter of law, "[a] reasonable jury could . . . determine that the efforts by the school to increase monitoring and shadowing were no more than half-hearted and ineffective remedies,"  ECF No. 970 at 6, the Court's deliberate indifference instruction left the jury with the misimpression that FCSB doing *something*—even a half-hearted investigation—in response to B.R.'s complaints of sexual harassment would satisfy FCSB's obligations under Title IX.  This is not the law.  *See Doe*, 1 F.4th at 271; *Feminist Maj. Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018) ("[T]he mere act of listening to students is not a remedy in and of itself."); *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) ("[H]alf-hearted investigation or remedial action will [not]

10

suffice to shield a school from liability."); *Vance v. Spencer Cnty. Pub. Sch. Dist,* 231 F.3d 253, 260 (6th Cir. 2000) (rejecting school district's argument that "as long as a school district does something in response to harassment, it has satisfied the standard"); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 (2d Cir. 2012) ("half-hearted" remedial measures could not shield school district from liability under analogous Title VI spending clause anti-discrimination statute).  As these cases demonstrate, the concept that half-hearted remedial measures are insufficient to shield a school from liability was *not* limited to the particular facts of *Doe*. As instructed, the jury could have concluded that FCSB's response to B.R.'s complaints of sexual harassment were no more than half-hearted and ineffective remedies, but still ruled in its favor because of the Court's erroneous instruction.

The Court's deliberate indifference instruction was an "incomplete, and therefore incorrect, statement of the law" under the Fourth Circuit's Title IX jurisprudence and warrants a new trial. *See Hunter v. County of Sacramento*, 652 F.3d 1225, 1235 (9th Cir. 2011) (granting a new trial based on district court's decision not to use the plaintiff's proposed instructions regarding a "practice or custom" for purposes of § 1983 liability because the district court's instruction "was an incomplete, and therefore incorrect, statement of the law" that also omitted a "legal principal" that could not "be readily deduced from simply reading the definition of practice or custom").

As explained above, *see supra.* Section II, this instructional error, in combination with the erroneous restrictions placed on Professor Cantalupo's expert testimony, left the jury with an incomplete, and therefore incorrect statement of the Fourth Circuit's jurisprudence on deliberate indifference in the Title IX context.  A new trial is required.

**IV.    A New Trial is Warranted Because the Court Erroneously Excluded Dr. Eileen Ryan's Expert Opinion that Defendants' Response to B.R.'s Complaints of Sexual Harassment was a Cause of B.R.'s PTSD.**

B.R. called Dr. Eileen Ryan, an expert forensic psychiatrist, to opine that Defendants' conduct was a cause of B.R.'s PTSD. Dr. Ryan's causation opinion was critical to B.R.'s claims. Indeed, it was ***required***. *See Roop v. Desousa*, 660 F. Supp. 3d 477, 504 (E.D. Va. 2023) (explaining that Virginia law "requires expert testimony on causation" for "complex medical conditions"); *Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 175–76 (4th Cir. 2020) (requiring, under North Carolina law, expert testimony to opine on the plaintiff's exacerbation of his PTSD following an elevator malfunction). But the Court—*sua sponte* in the middle of Dr. Ryan's direct examination—precluded Dr. Ryan from opining on the cause of B.R.'s PTSD. *See* Trial Tr. (Vol. 14 – AM Session) at 29:13 (The Court: "Move on from this. Move on."); *id.* at 49:22–50:6 (The Court: "She can say that she looked at things, but ***she can't say that the school caused this or the defendants caused that*** or [B.R.] was raped. ***She can't say that because she doesn't have firsthand knowledge***." (emphasis added)). The Court's exclusion of Dr. Ryan's causation opinion affected B.R.'s substantial rights and therefore requires a new trial. *See* Fed. R. Civ. P. 61; *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 377 (4th Cir. 2015) (affirming district court's order granting a new trial based on prejudice to government by exclusion of testimony that was "a relevant, and indeed essential, component of the government's evidence on [an] element" of its claim against the defendant).

Dr. Ryan intended to offer the opinion that B.R.'s PTSD was "a direct result not only of the traumatic sexual assaults she suffered at the age of 12 while a student at Rachel Carson Middle School, but also as a result of Rachel Carson Middle School's and the Fairfax County school system's neglect and disregard for her safety." *See* ECF No. 659-1 at 34. Dr. Ryan intended to explain how "the lack of any definitive action on the part of school officials whom BR perceived as authority figures who could protected her" caused B.R.'s PTSD. *See id.* at 73. Each of these

opinions were properly disclosed pretrial, and Defendants did not move to exclude either.  *See* ECF No. 659 at 13 (moving only to exclude only Dr. Ryan's opinions regarding "non-psychiatric conditions").

The Court's exclusion of Dr. Ryan's causation opinion during B.R.'s direct examination of her based on Dr. Ryan's lack of firsthand knowledge was erroneous.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, ***including those that are not based on firsthand knowledge or observation***." (emphasis added and citation omitted)).  The Court's ruling also precluded B.R. from presenting expert testimony that was necessary evidence supporting the causation element of her claims.  The prejudice was exacerbated because the court allowed Dr. Jonathan DeRight, a defense witness, to testify that the Plaintiff was malingering her PTSD.  A new trial is therefore warranted.  *Tuomey*, 792 F.3d at 377; *see also Kopf v. Skyrm*, 993 F.2d 374, 378–79 (4th Cir. 1993).

**V.     A New Trial is Warranted Because Defendants Were Allowed to Use the Allegations in B.R.'s Complaints[2] of On-Campus Rapes for Impermissible Purposes.**

In her Second Amended Complaint, B.R. had alleged that she had been raped at school by people she believed to be older non-students.  *E.g.*, ECF No. 155 ¶ 176.  Although B.R. strongly stands by those factual allegations, she elected not to pursue those allegations at trial due to the potential insufficiency of the evidence to show that school officials were on notice of those allegations while B.R. was a student at RCMS.[3]  In other words, whether or not these allegations

---

[2] None of B.R.'s Complaints were "verified complaints."

[3] These evidentiary concerns were exacerbated by the court's pre-trial rulings excluding evidence of sex trafficking occurring within FCPS, and the uncertainty about the scope of Detective Bill Woolf's testimony, who would have testified both in his role as the former head of the Fairfax County Police Department's Sex Trafficking Unit and as an expert in sex-trafficking. *See* ECF No. 837, pg. 5.  Both the exhibits and testimony would have shown that Plaintiff's abuse fit the profile of young girls being groomed for trafficking, which was a prevalent within FCPS at the time. The

were true was irrelevant to any of the claims or defenses in the case.  Indeed, the court repeatedly

told the parties that this was a "notice case" and encouraged them to stick to issues related to notice.

*See, e.g.*, Trial Tr. (Vol. 1-AM Session) at 9:1-4.

Of course, had B.R. affirmatively testified at trial that these on-campus rapes did not occur,

Defendants would have been free to impeach that testimony.  Indeed, that is how this Court

resolved Plaintiff's pretrial Motion in *Limine* regarding the use of prior complaints, holding that

they could be used for the limited purpose of "impeach[ing] plaintiff."  ECF No. 837 at 12–13.

But there was no basis to use these allegations to "impeach" B.R. because she never denied that

they occurred.  Instead, Defendants repeatedly used the allegations in the complaints for

impermissible purposes.

For certain witnesses, Defendants asked questions which were designed to disprove the on-

campus allegations on their merits.  For example, Mr. Fratalli, the principal at RCMS during the

events at issue, was repeatedly asked about how the janitor closets (the location of the alleged on-

campus rapes) were always locked because they contained "deadly chemicals."  *E.g.*, Trial Tr. (Vol.

3 – AM Session) at 71:22–72:1; 78:7–80:17.  Other witnesses were asked about precautions the

school had in place to prevent non-students from being on school property.  *E.g.*, Trial Tr. (Vol.

20) at 113:25–116:7.  Similarly, other witnesses testified about ingress and egress from school

property.  *E.g.*, Trial Tr. (Vol. 20) at 226:24–227:3. None of this testimony was relevant to any of

the claims B.R. pursued at trial.

Even more troubling was the defense questioning of witnesses about how it made them feel

to read these allegations in the complaints.  *E.g.*, Trial Tr. (Vol. 16 – AM Session) at 19:10–12 ("Q.

---

court previously called these reports "alarming." *B.R. v. F.C.S.B.*, Civil Action 1:19-cv-917
(RDA/WEF), 16 (E.D. Va. Mar. 10, 2023) ("The fact that sexual assault, sexual harassment, and
sex trafficking of students are issues in the county is indeed alarming…").

Ms. Carr, can you describe for the jury the impact that this case and the allegations that have been made against you have had on you personally and professionally?").[4]  These too are both irrelevant and unfairly prejudicial, and served no purpose other than to elicit sympathy from the jury to the defendants. *See Lewis v. City of Chicago Police Dept.*, 590 F. 3d 427, 440 (7th Cir. 2009) (inflammatory evidence designed to unfairly invoke sympathy for a party properly excluded under FRE 403).

Finally, on summation, despite none of the on-campus assaults being affirmatively entered into evidence by B.R, defendants spoke about the allegations "of strange adult males roaming the halls and raping the plaintiff" and insinuated that because B.R. did not testify to this at trial, she was being dishonest. Trial Tr. (Vol 23) at 164:8-10.[5]  This prejudice is compounded by the Court's motion *in limine* ruling limiting evidence about pervasive sex trafficking within FCPS in the time. *See* ECF No. 837.[6] A new trial is warranted.

---

[4] B.R. by comparison, was not allowed to answer the question about why she brought this case. Trial Tr. (Vol 10) at 74:8-12.

[5] This is also a mischaracterization of B.R.'s deposition testimony.  B.R. never said there were adult males who abused her at school. Instead, she said:

> Q: "Okay. And I believe you have previously said that the people in the closet,-- were they men?
> A.     To my recollection.
> Q. Okay. And so they were adult men in the closet?.... Is that right?
> A. They were older than me, you know, from the perspective as a 12-year-old, they felt older than me…. They felt bigger than me…"

B.R. Depo Vol. 2 at 408-409.

[6] Indeed, absent the court's pre-trial motion, the Plaintiff would have proffered a unanimous resolution passed by the Fairfax County School Board acknowledging that sex trafficking was a pervasive and misunderstood issue within the school system, with victims identified in "every high school" and "multiple" middle and elementary schools. *FCPS January 7, 2021, Board Minute Meetings,                       Item                       3.03,* https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BXL2CS019289/$file/01-07-21_PH_and_ERM_FINAL%5B1%5D.pdf.   Plaintiff would have further proffered evidence from

**VI.    A New Trial is Required Because the Court Erred in Allowing Defendants to use Extrinsic Evidence to Attack B.R.'s Credibility and Then Make Improper Propensity Arguments.**

The Court erred in allowing Defendants to use extrinsic evidence to attack B.R.'s credibility and then make improper and unfairly prejudicial propensity arguments.  Indeed, this became a key feature of Defendants' case.

Rule 608 prescribes how evidence designed to attack a party's (or witness's) character for truthfulness or untruthfulness can be used.  Rule 608 governs the use of such evidence.  While the rule allows a party to be *cross-examined* on issues related to character for truthfulness in certain circumstances, it expressly states that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b); *see United States v. Bynum*, 3 F.3d 769, 772 (4th Cir. 1993) ("A *cross-examiner* may inquire into specific incidents of conduct but does so at the peril of not being able to rebut the witness' denials.  The purpose of this rule is to prohibit things from getting too far afield—to prevent the proverbial trial within a trial." (emphasis added)); *United States v. Gearhart*, 2023 WL 3808112, at *3 (W.D. Va. June 5, 2023) ("Rule 608(b) prohibits the cross-examiner from introducing extrinsic evidence of the prior bad act, except for evidence of a qualifying conviction under Rule 609. . . . Simply put, Rule 608(b) gives the cross-examiner

---

federal authorities that described the grooming pattern of sex traffickers within Fairfax County and how their actions were strikingly similar to what the Plaintiff endured.  She would have also shown the jury a documentary produced by FCSB called "Tricked" that would have directly refuted the defense's contention that sex trafficking and violent gang abuse could not happen in upscale neighborhoods in Northern Virginia.  In fact, a central theme in FCSB's own documentary was that disbelief that this type of violence could happen in affluent Fairfax County was a major impediment to combating sex trafficking and related grooming.

leeway to ask the question, but she must live with the witness' answer—including one she firmly believes is an untruthful one."); *United States v. Mosby*, 2024 WL 96349, at *7 n.3 (D. Md. Jan. 9, 2024) ("During such cross-examination, the cross-examiner may ask the witness about specific instances of conduct, but he is stuck with the witness' answer."); *Norton v. Rosier*, 2019 WL 346709, at *2 (E.D.N.C. Jan. 28, 2019) ("To the extent defendant seeks to introduce the exhibits at issue to attack plaintiff's character for truthfulness, defendant is not allowed to do so pursuant to Rule 608(b)'s prohibition of extrinsic evidence.").

On top of Rule 608(b), a court must evaluate all evidence under the Rule 403 balancing test to ensure that a piece of evidence's probative value is not substantially outweighed by its risk of unfair prejudice.  *See United States v. Simpson,* 910 F. 2d 154, 158 (4th Cir. 1990) (error under FRE 403 to allow in evidence that the defendant "fit the profile" of a drug dealer"); *United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000) (error not to exclude prior bad act under FRE 403 even though it met requirements for exceptions under 404(b)).

Here, Defendants were permitted to use extrinsic evidence (*e.g.*, B.R.'s resumes) in their cross-examination on this issue.  Defendants were also permitted to use the testimony of a separate witness (corporate representative from PWC), and introduce numerous documents to attack Plaintiff's credibility. Rule 608(b) *does not* allow Defendants, in their case-in-chief, to call a completely different witness (by deposition) "to prove specific instances of [Plaintiff's] conduct in order to attack . . . [her] character for truthfulness." Fed. R. Evid. 608(b); *Bynum*, 3 F.3d at 772; *Gearhart*, 2023 WL 3808112, at *3; *Norton*, 2019 WL 346709, at *2.

The Court's erroneous admission of extrinsic evidence to attack B.R.'s credibility and make an improper and unfairly prejudicial propensity argument resulted in severe prejudice to B.R. Indeed, FCSB featured it in its closing argument.[7]   As FCSB argued to the jury:

> Now, you heard a discussion about PwC. Why did we talk about PwC? Why did we spend so much time looking at that? Because [B.R.] looked you in the eyes and said, 'I never sent that resume. I didn't make that.' That resume is filled with falsehoods, and she was so good at it, at 17 years old, she fooled a Big Four accounting firm into giving her an internship into having them think that she was a college junior or college senior. . . . .  This example shows you the pattern that has been followed.

Trial Tr. (Vol. 23) at 152:10–153:2.

As shown above, the defense wrapped up a five-week trial by arguing that because the Plaintiff misrepresented her credentials to get a college internship at the age of 17 (a fact disputed by the Plaintiff), she was a liar who had a "pattern" of untruthfulness, including fabricating being abused as a child at the age of 12.  This is the exact type of propensity argument and unfairly prejudicial argument that the rules of evidence—Rule 608(b) and Rule 403—are designed to protect against.  *See also* Rule 404(b); *United States v. McBride*, 676 F. 3d 385, 395 (4th Cir. 2012) (citing *Michelson v. United States*, 335 U.S. 469 (1948)).

A new trial is warranted.

## VII.   A New Trial is Required Because There was Insufficient Evidence to Support the Jury's Verdict.

Plaintiff is entitled to a new trial because the evidence was insufficient to support the jury's verdict.

---

[7] When evaluating whether an argument or error was used for an improper purpose, courts may consider how the evidence was used in summation.  *See Middleton v. McNeil*, 541 U.S. 433 (2004). While the defense argued at trial that they needed to admit the deposition and resume to show the Plaintiff's ability to work—the defense never used anything about PWC for those purposes in its summation. Rather, they used it to make a propensity argument about the Plaintiff's character for truthfulness, which was improper and unfairly prejudicial.

**A. The Court should grant a new trial because the evidence was insufficient to submit to the jury the issue of whether FCSB had actual notice of B.R.'s complaints of sexual harassment.**

A new trial is warranted because the clear weight of the evidence reflects that FCSB had actual notice of B.R.'s complaints of sexual harassment, yet the issue of notice was submitted to the jury for its consideration. *See Doe*, 1 F.4th at 258 (reversing denial of motion for new trial because no evidence in the record supported the jury's verdict that FCSB lacked actual notice).

As FCSB Assistant Superintendent Dr. Fabio Zuluaga wrote in his June 29, 2012 letter to Mrs. R., B.R. and Mrs. R. had brought "specific concerns . . . to the school's attention . . . related to alleged sexual harassment, inappropriate touching, name calling, and other bullying." DX 178 at FCSB-BR-008086. Dr. Zuluaga also wrote in his letter that "[i]n March 2012, we were notified by the police that [Mrs. R.] filed a police complaint stating [B.R.] had been sexually assaulted outside of school by an 8th grade student." *Id.* at FCSB-BR-008087. Dr. Zuluaga's June 29, 2012 letter is uncontroverted evidence that FCSB had "actual notice" of B.R.'s reports of sexual harassment and sexual assault.

In addition, B.R.'s November 21, 2011 written statement to the school, where she reported that she was "scared to come to school" because, among other things, (1) C.K. and D.N. "come to my locker every morning before first pd. . . . . very close to me . . . harass me, tease me, and give me seductive looks"; (2) C.K. "left me a very inappropriate voicemail with lots of sexual terms"; (3) C.K. said D.N. "wants to come up to me and call me volgur [sic] names like whore, bitch, and lesbian"; (4) "People I don't eve[n] know call me lesbian"; (5) J.O. "calls me bitch and makes offensive wall post on my facebook calling me bitch and a whore"; and (6) D.M. "told everyone [D.N.] said I gave him oral sex which is completely false and I sent naked pictures which again

19

isn't true [and] that I let anyone get in my shirt and pants which is offensive because I've never done so,"  Plaintiff's Ex. 77, also constituted "notice" as a matter of law.

So did B.R.'s January 27, 2012 email to Defendant A.F. and Director of Student Services Cheryl Weaver, where B.R. reported that she had "been severely bullied this year," including "sexual harassment, physical harassment, name-calling, etc. . . . on the grounds of Rachel Carson." PX 111 at FCSB-BR-001073.  And FCSB was notified by Detective Chambers in March 2012 that B.R. "had claimed that C.K. had raped her in November 2011."  Trial Tr. (Vol. 2 – P.M. Session) at 84:1-21, *see id.* at 100:19–101:25.  FCSB did not deny receiving any of this information.

As the Fourth Circuit held in *Doe*, "a school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge under Title IX—regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred."  1 F.4th at 263. "While school officials' *subjective* understanding that an allegation involves sexual harassment is not required," *see Doe*, 1 F.4th at 270 n.8, here, it is clear that school officials actually understood B.R.'s November 21, 2011 statement as alleging sexual harassment. Defendant A.F., RCMS's principal, confirmed that he would consider B.R.'s November 21, 2011 statement to be "a complaint of sexual harassment."  Trial Tr. (Vol. 2 – A.M. Session) at 94:3–9.  Defendant S.T., one of RCMS's assistant principals, also confirmed that B.R.'s November 21, 2011 statement "would be sexual harassment" if the allegations were verified.  Trial Tr. (Vol. 11 – P.M. Session) at 24:2–5.  A.F.'s and S.T.'s testimony "provid[es] further proof that a reasonable official would certainly have understood [B.R.] to be alleging sexual harassment."  *See Doe*, 1 F.4th at 270 n.8. "All of this evidence indicates that the School Board was both objectively and subjectively aware that there was an allegation" of sexual harassment.  *See id.*

Thus, the issue of notice on B.R.'s Title IX claim should not have been submitted to the jury, as B.R. argued in her Rule 50 Motion at the conclusion of the case.

**B.  The jury's finding on deliberate indifference was erroneous and a manifest injustice because FCSB indisputably knew about allegations that then 12-year-old B.R. reported rape, but did nothing.**

Despite FCSB indisputably learning that B.R. alleged she had been raped by an older student, it did not investigate these claims. Yet the jury still found in favor of FCSB because of the denial of the Plaintiff's rule 50 motion, and the other errors cited herein. This finding warrants a new trial, as it would result in a miscarriage of justice.

Rule 59 permits a new trial to be granted "if ... (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Minter v. Wells Fargo Bank*, NA, 762 F. 3d 339, 346 (4th Cir. 2014); *USEEOC v. Consol Energy, Inc*., 860 F. 3d 131 (4th Cir. 2017) (evaluating request for new trial for clear error of law); *Gilliam v. Allen*, 62 F. 4th 829 (4th Cir. 2023) (evaluating trial court's granting of Rule 59 motion for a resulting "manifest injustice").

Here, A.F. admitted he received notice of B.R.'s report of rape by C.K. from Detective Fred Chambers in March 2012. Yet aside from calling the school's general counsel and checking attendance records, he did nothing.[8] Trial Tr. (Vol. 3 PM) at 86:1-86:13.

Similarly, Assistant Superintendent Fabio Zuluaga indisputably knew that the Plaintiff's mother reported sexual abuse of her child to the Superintendent in writing. Trial Tr. (Vol. 11) at

---

[8] The checking of an attendance record and calling the division counsel is not reasonably calculated to remediate the sexual harassment and is thus deliberate indifference. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018) (explaining that "ma[king] no real effort to investigate or end the harassment" constitutes deliberate indifference).

64-65:3; PX 178 (letter from Dr. Zuluaga to Plaintiff's family from June 2012 acknowledging knowledge of a "sexual assault" but simply relying on the police investigation). Yet again, there is no evidence that the school system did any investigation into Plaintiff's allegations of rape by an older student.

A school acts with deliberate indifference when its "response to the alleged harassment or the lack of any such response is clearly unreasonable in light of the known circumstances." *Doe*, 1 F.4th at 271 (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)) (cleaned up).  Efforts "not reasonably calculated" to remedy the offending conduct are deliberately indifferent. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018).  Allegations of rape and sexual abuse are always severe enough to qualify as sexual harassment under Title IX.  *Doe v. Fairfax Cnty. Sch. Bd.*, 10 F.4th 406, 412 & n.3 (Wynn, J., concurring in denial of rehearing en banc) (explaining that "a single, severe instance of peer-on-peer harassment can lead to liability for the school where the school's response (or lack thereof) leaves the victim vulnerable to additional harassment).  Further, a school has an obligation, independent of the police, to investigate reports of rape and sexual abuse.  *Doe v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 35 F.4th 459, 467 (6th Cir. 2022) ("But [a school system] has Title IX obligations that are separate and apart from any criminal matter.").  The failure to investigate a report of rape made against a student with a previous track-record of sexual misconduct is deliberate indifference.  *See Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015).

Here, the jury's finding that the school district did not act with deliberate indifference is both a clear error and against the weight of evidence. *Minter*, 762 F.3d at 348.  A school district indisputably knew that a 12-year-old child made a report of sexual abuse, both from the police, and in writing, and did nothing.  This is a clear violation of a student's Title IX rights.  Schools

must investigate and take steps to remediate sexual harassment, including rape.  The jury's finding is a manifest injustice that requires a new trial.

## VIII.    B.R. is Entitled to a New Trial Under the Cumulative Error Doctrine.

B.R. submits that a number of incorrect rulings were made, ranging from allowing "overtly irrelevant, prejudicial, and unreliable evidence," *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1015 (4th Cir. 2020) (Agee, J., concurring in part and dissenting in part), to precluding some of her core evidence. These incorrect rulings were reversible error independently and, when taken in totality, they had the cumulative effect of "so fatally infect[ing] the trial that they violated the trial's fundamental fairness." *United States v. Ivey*, 60 F. 4th 99, 114 (4th Cir. 2023).

### A.    The Court allowed the admission of overtly irrelevant, unreliable, and prejudicial evidence.

The following is a non-exhaustive list of irrelevant, prejudicial, and unreliable evidence that was admitted, over the Plaintiff's objection, and denied her a fair trial.

#### 1.    Admitting the "Facebook User Messages" and then issuing unfairly prejudicial curative instructions.

The "Facebook User" messages, marked as DX 1, should not have been admitted.  First, as discussed above, they were irrelevant (or alternatively, minimally relevant and unfairly prejudicial) given that Plaintiff was under the age of consent at the time they were purportedly written.  *See supra* Section 1.

Second, the messages were not known to any school official until 2023, 12 years after they were purportedly created.  Thus, they needlessly confused the jury and unfairly prejudiced the plaintiff by offering school officials a post hoc rationalization to justify their actions/inactions.  *See Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 648 (1999) (school conduct is to be evaluated in light of the *known* circumstances).

Third, the messages were not properly authenticated under rule FRE 901(b), as there was no evidence sufficient to support a finding that the messages belonged to Plaintiff.  C.K. told the police in a recorded interview in 2012 that he rarely spoke with the Plaintiff via Facebook.  Trial Tr. (Vol. 16 PM) at 57:19-58:2. The messages also starkly contrast C.K.'s recollection. For instance, he denied ever asking Plaintiff for naked pictures of herself yet he asked Facebook User for such pictures dozens of times over a 2-3 week period.  Similarly, he adamantly claimed that there was only one sexual encounter between him and Plaintiff, while the messages detail multiple encounters. Trial Tr. (Vol 16PM) at 66:1 to 67:10.  Indeed, C.K. conceded the messages do not align with his memory.  *See* Trial Tr. (Vol 16 PM) at 65-71.

Curiously, much of the information the defense used in the closing to tie the messages to the Plaintiff were things the Plaintiff discussed in her 14-hour deposition, or otherwise disclosed in discovery.  For instance, the defense relies on the fact that "Facebook User" had the same locker as Plaintiff - 498. Trial Tr. (Vol. 24) at 136:13-20.  Yet the defense admits that discovery showed this to be Plaintiff's locker. This discovery occurred months before the messages surfaced.

As argued in court, all of this is insufficient to allow a jury to conclude that the messages were authentic and belonged to the Plaintiff.  Instead, it's reminiscent of *United States v. Vaynor*, 769 F. 3d 125, 130–35 (2nd Cir. 2014) where it was an error to admit purported social media information authenticated by individuals who had a motive to implicate the defendant.  *See also State v. Sublet*, 113 A.3d 695 (Md. 2015).

Similarly, the messages did not comply with the "best evidence" rules as codified at FRE 1001 through FRE 1004.  Authenticity of the messages has long been disputed.  *See* ECF No. 416 (B.R.'s September 2023 letter to the court, pro-se, denying she was "Facebook user").  Although the Facebook messages' original form is a JSON or HTML file, the defense has only produced

duplicate PDFs.   Trial Tr. (Vol 16 PM) 73:22–74:5.   Indeed, even the Court appeared to acknowledge that it had seen doctored social media evidence in PDF format.  Trial Tr. (Vol 16 PM) at 80:6–81:2.  This, too, required exclusion.

Finally, as previously briefed, the curative instructions offered by the Court at ECF No. 941 were unfairly prejudicial and infringed on the province of the jury.  While not the Court's intention, the Court offering an opinion on evidence whose authenticity was hotly disputed caused great, unfair prejudice to B.R.  *See United States v. Moffett*, 53 F.4th 679, 685 (1st Cir. 2022) (reversing conviction when trial judge improperly instructed on evidence that invaded province of jury and collecting cases).

> **2.  The Court erred by allowing irrelevant discussion of the 12-year-old victim's sexual history as a teenager, along with insinuations she "cried rape."**

The Court allowed the defense to cross-examine B.R. about a therapy note she sent her psychologist in confidence, and at his direction, when she was 15 to help her process and understand her post-traumatic reactions.  In the note, she discussed how a sexual advance by a male friend triggered a flashback to the abuse she experienced by C.K. when she was 12.  The defense then used this to insinuate that B.R. had a propensity for "crying rape."

This line of questioning was irrelevant and unfairly prejudicial, *see* FRE 401; 403, and was an impermissible character attack to try to show that B.R. had a propensity for making false allegations of rape.   Additionally, since FRE 412 is implicated by this evidence, the Court should have conducted an in-camera review of the evidence. The Court did not do so.

> **3.  The Court erred by allowing the defense to impeach B.R. with unverified court filings and then insinuated B.R. should not be trusted because she has had multiple sets of lawyers.**

In their closing arguments, the defense attacked B.R. by insinuating she could not be trustworthy because she had multiple lawyers and amended her complaint multiple times.  Trial Tr. (Vol 24) at 170-171.  That B.R. had multiple lawyers and that the pleadings were amended has no relevance to any of her claims or damages.  As discussed above, they were also not properly used for any type of impeachment.  *See supra* Section V.

The error in allowing this type of argument is further compounded by the fact that the defense filed a motion *in limine*, which the Court granted, to prohibit discussion of attorney conduct by B.R.  *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (unfair to have a witness take the stand but then arbitrarily exclude material portions of the testimony).  Just as B.R. was not allowed to criticize defense tactics, the defense should not have been allowed to make insinuations about B.R.'s litigation choices and pre-trial strategies.  *See Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co.*, 71 F.3d 335 (10th Cir. 1995) (discussing the policy considerations of not allowing litigation conduct to come before the jury).

### 4. The insinuation that the police closed B.R.'s case cast doubt on the veracity of her claims.

As the Court correctly recognized, third parties should not be allowed to opine on the credibility of witnesses. Trial Tr. (Vol 10 AM) at 5:19-7:8.  Additionally, schools have an obligation, independent of law enforcement, to investigate and remediate sexual harassment, which includes sexual abuse and rape. *Doe v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 35 F.4th 459, 467 (6th Cir. 2022).

Notwithstanding the above, in the defense's closing, they heavily insinuated that because the police closed their investigation into B.R.'s sexual abuse, her allegations were without merit.  Trial Tr. (Vol 23) at 153:20-154:4.  This was unfairly prejudicial and improper.

### 5.  Post Hoc Justifications

The standard for evaluating a school's actions under Title IX is whether the school's conduct was "clearly unreasonable in light of the known circumstances." *Doe v. Fairfax County School Board*, 1 F.4th 257, 271 (4th Cir. 2021) (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999)). In Title IX and gender discrimination cases, post hoc rationalizations and justifications for a government entity's actions/inactions created in response to litigation are impermissible. *Whitaker v. Kenosha Unified School District*, 858 F. 3d 1034, 1050 (7th Cir. 2017) citing *United States v. Virginia*, 518 US 515 (1996) (explaining that in the context of sex-based discrimination, post hoc rationalization is impermissible).

Despite the above, the defense spent a significant amount of time justifying their actions/inactions by things that none of the school employees knew at the time.  For instance, in the defense's closing, the School Board argued that Plaintiff could not have been abused in her neighborhood, because nobody saw the attacks.  Trial Tr. (Vol 24) 127:18-131:19.  Yet nobody from the school did any sort of investigation into Plaintiff's allegations of rape and abuse in the community.  *See* Trial Tr. (Vol. 3); Trial Tr. (Vol. 3 PM) at 86:1-86:13; PX 178.

The school system cannot simply decline to investigate, and then come up with post hoc excuses and justifications to attack the Plaintiff's credibility when they are sued.

### 6.  Improperly allowing the school's post-hoc investigatory memo

After Plaintiff's parents complained to the Superintendent about the administration's indifferent response to sexual harassment and bullying at Rachel Carson Middle School, the administration put together a 14-page document labeled "Chronology of Events."  DX 200.  The document, created in mid-February 2012, contained narratives, and recounting of various alleged incidences that occurred dating back to October 2011 through February 2012.  The document

purported to show various things the administration did in response to Plaintiff's and her parents' complaints.

At the motion *in limine* hearing, the Court called this document "rank hearsay."  Then, at trial, the Court reversed itself and allowed the document in under the "business record exception." This is despite the fact that all the administrators testified they never prepared a document like this before, and this was not a document prepared in the ordinary course.  Additionally, the document was prepared with the potential for litigation (or administrative investigations) "around the corner." *Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co*., 71 F.3d 335, 342 (10th Cir. 1995).

As a result of this document being improperly admitted, the defense referenced this document in their closing as evidence of the truth of the matter that the school "did a lot" and "bent over backwards." Trial Tr. (Vol. 24) 154:8-10.

**B.      The Court excluded Plaintiff's highly probative evidence.**

The following is a non-exhaustive list of evidence that was improperly excluded.  These errors are compounded when compared to the irrelevant and unreliable evidence the defense was permitted to admit.

**1.   Exclusion of note from the treating physician to school that B.R. had been raped**

As briefed during the middle of trial, Plaintiff's primary care physician in 2012, Dr. Kevin Weaver, testified that he wrote a letter to the school, which he then faxed, that explained that Plaintiff had been raped by an older student.  He produced this letter from his medical records 10 years later, and the Plaintiff sought to introduce it into evidence.

Plaintiff's mother also testified that she both faxed the letter and personally delivered it to the school's front office.  *See* ECF No. 954.  To corroborate this, Kurt Mills, an employee from the

school district, wrote the Plaintiff's mother back shortly after, and told her not to have the doctor

discuss "incidences under investigation" as that would "complicate" the approval. *Id.*

Despite the testimony of two third-party witnesses and a circumstantially corroborating

email from an employee at FCSB' headquarters, the court did not allow this letter into evidence.

### 2. Exclusion of Plaintiff's testimony that she had been adjudicated disabled by the Social Security Administration for PTSD

In 2019, the Social Security Administration adjudicated the Plaintiff as disabled because

of PTSD and other trauma-related issues.  Yet when the Plaintiff attempted to testify to this at trial,

the court prohibited this testimony. Trial Tr. (Vol 10AM) at 53:3-53:12.

Given that Defendants repeatedly suggested that Plaintiff's injuries were not real, this

evidence should have been admitted.

### 3. Arbitrary Redactions to the Plaintiff's Medical Records

At least 15 medical providers have independently diagnosed Plaintiff with PTSD related to

trauma.  Trial Tr. (Volume 14 AM) at 61:68.  Even though this trauma arises from the sexual abuse

she experienced at the age of 12, Plaintiff's medical records were redacted to omit any reference

to "rape" or being the "victim of crime."   This is despite the fact that Plaintiff made these

statements for the purpose of seeking medical treatment. FRE 803(4).

### 4. Limitation of perpetrators' disciplinary records

Prior and concurrent incidences of misconduct sexual misconduct is highly relevant to

notice in Title IX cases. *Hill v. Cundiff*, 797 F.3d 948, 959 (11th Cir. 2015); *Brown v. Arizona*, 82

F.4th 863, 882 (9th Cir. 2023) (en banc).   At the age of six, C.K. was sent for a neuropsychological

evaluation after telling girls on the school bus he had a gun and wanted to shoot them and forcibly

kissing them. In the exam, the neuropsychologist ominously warned that C.K. needed

"consequences for his action" and "progressive discipline."  These records then formed a crucial

part of the school's IEP.   Plaintiff should have been allowed to make the argument that the school, despite knowing that C.K. had these issues, took actions that emboldened increasingly violent behavior. This was crucial evidence to both the gross negligence and Title IX claims.   However, the court excluded this evidence at a sidebar. Trial Tr. (Vol. 11) at 60-61.

Additionally, the evidence showed that that J.O. had been disciplined by her school for threats to disseminate sexually inappropriate pictures of another student.   This is the exact thing that B.R. alleged that J.O. did to her.   Yet despite FRE 415 and FRE 404(b), the Court repeatedly gave limiting instructions on this point.   ECF No. 837.

## CONCLUSION

For the reasons stated above, the Court should grant the Plaintiff's motion for a new trial.

Dated: May 22, 2024

Respectfully submitted,

By: _____/s/ Robert G. Keefe_____

ANDREW S. BRENNER
(Pro Hac Vice)
BRITTANY ZOLL
(Pro Hac Vice)
SAMANTHA PEDERSEN
(Pro Hace Vice)
ROBERT G. KEEFE
(Pro Hac Vice)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, FL  33131
Telephone: (305) 539-8400
Facsimile:  (305) 539-1307
abrenner@bsfllp.com
bzoll@bsfllp.com
spedersen@bsfllp.com
rkeefe@bsfllp.com


ALISON L. ANDERSON
(Pro Hac Vice)
**BOIES SCHILLER FLEXNER LLP**
2029 Century Park East, Suite 1520
Los Angeles, CA  90067
Telephone: (213) 629-9040
Facsimile:  (213) 629-9022
alanderson@bsfllp.com


JONATHAN L. FAHEY
(VSB No. 44854)
**HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC**
2300 N Street NW, Ste 643
Washington, DC  20037
Telephone:  (202) 737-8808
jfahey@holtzmanvogel.com
*Counsel for Plaintiff B.R.*

31

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 22, 2024, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By: <u>/s/ *Robert G. Keefe*</u>

*Counsel for Plaintiff B.R.*