**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| B.R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 1:19-cv-00917-RDA-WEF |
| v. | ) | |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR NEW TRIAL**

**INTRODUCTION**

As the Court repeatedly told the parties, this was a notice case. It was about a school system and school bureaucrats who promised to take sexual harassment seriously as part of its agreement to accept federal funding. So, when 12-year-old B.R. notified school officials by begging for help after being harassed by the boy that FCSB previous disciplined for exposing his genitals to girls in class—what did (and didn't) the school officials do? This was what the trial should have been about.

Yet this is not what the jury heard. A series of erroneous evidentiary rulings allowed Defendants to turn the trial into a character assassination of the Plaintiff. Even though she was only 12, and therefore under the age of legal consent, the defense incessantly victim blamed her and argued that she "consented to" and "welcomed" her abuse.

In short, and as described below, the case devolved into a victim blaming bonanza. Compounding this problem were improper instructions to the jury and the improper exclusion of

1

certain evidence Plaintiff sought to admit that could have at least attempted to level the playing field a bit.

## ARGUMENT

As detailed below, a series of errors (independently and cumulatively) deprived Plaintiff of a fair trial, and the subsequent verdict resulted in a manifest injustice.

### The Jury Verdict Represented a Manifest Injustice

As described in the motion for a new trial, a school system that learns of an allegation of sexual harassment has an obligation under Title IX to respond. While school systems have some deference about *how* they respond, their response must be "reasonably calculated to end the harassment." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012)). Simply taking a report or listening to a complaint does not satisfy Title IX as a matter of law. *Id*.

Here, the Defendants' *own testimony* demonstrates that by March 2012, they knew of an allegation that B.R. had been raped at or near a school bus stop by an older student (C.K.) who had a history of sexual misconduct. They also indisputably knew that the Plaintiff had previously complained about C.K. Despite knowing that, nobody at FCSB investigated the rape even though Title IX requires it. *Doe v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 35 F.4th 459, 467 (6th Cir. 2022) ("But [a school system] has Title IX obligations that are separate and apart from any criminal matter."). Nobody from FCSB even interviewed C.K. after B.R.'s rape report, far worse than *Vance v. Spencer County Public School District*, where school officials who interviewed an assailant were still found deliberately indifferent. 231 F.3d 253, 262 (6th Cir. 2000).

*Doe v. Fairfax County School Board* is controlling here. *Doe* involved the sexual assault of a high school child on a school band trip. Like here, FCSB tried to justify inaction and dodge

liability by claiming it was unclear whether a sexual assault had actually occurred. The Fourth Circuit disagreed, reversed the District Court's ruling, and remanded for a new trial. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 277 (4th Cir. 2021). In the Fourth Circuit's words, "the record brim[med] with unrebutted evidence demonstrating that the School Board, through appropriate officials, received multiple reports that objectively provided notice of an allegation that Doe had been sexually assaulted by Smith." *Id.* at 269.

By accepting federal funding, school systems agree that they will take reasonable, appropriate steps to remedy sexual harassment, and know they face liability for actions that are clearly unreasonable. When they learn that a 12-year old child claims to have been raped by another student with a track record of sexual misconduct, they must conduct their own, independent investigation, apart from the police, and implement their own remedial measures.[1] They did not do so here, in violation of the statutory intent of Title IX, and the understanding schools have with federal authorities when they accept federal educational funds.

Alas, FCSB should have devoted the same energy it did in this litigation attacking the credibility of a childhood rape victim to investigating her claims at the time. Allowing this verdict to stand sends the wrong message and would result in a manifest injustice.

### The Court Erred in Permitting the Jury to Consider Whether B.R. "Welcomed" Sexual Advances

Fairfax County Public Schools is a public school system with a duty to keep children safe. Indeed, their own core "beliefs" state "[e]veryone thrives in a vibrant, healthful, safe, enriching,

---

[1] In their opposition, F.C.S.B. argues that offering to have the victim change schools was an appropriate remedial measure. This argument is frivolous and defeats the entire purpose of Title IX.

and respectful environment."[2]  Yet, here FCSB is arguing that a twelve-year-old—below the age of consent—can welcome sexual contact and that she had a "romantic" relationship.

Over Plaintiff's repeated objection, counsel for Defendants made the alleged Facebook messages between C.K. and B.R. and other evidence that twelve-year-old B.R. welcomed and consented to C.K.'s sexual advances *the* feature of their case.  This is despite the fact that under Virginia law B.R. could not consent to sexual activity.  Va. Code Ann. § 18.2-63C(i); Va. Code Ann. § 18.2-61A(iii).  This Court erred in allowing this evidence and argument at trial and a new trial is warranted because of it.  *Mary M. v. N. Lawrence Comm. Sch. Corp.*, 131 F.3d 1220, 1226–27 (7th Cir. 1997).[3]

In response, Defendants make three arguments, each of which mischaracterizes the history of this case.  First, Defendants make the incredulous argument that Plaintiff's pre-trial motion practice on this issue was limited only to barring counsel from arguing that Plaintiff consented to the conduct at issue, and did not seek to exclude evidence of welcomeness.  ECF No. 1007 at 13.  This argument ignores the holding in *Mary M.*, which Plaintiff chiefly relied upon in her motion *in limine* on this issue.  *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1227 (7th Cir. 1997).  In *Mary M.*, the 7th Circuit ruled that *welcomeness* is not a proper inquiry to present to the jury where a child victim was under the age of consent.  *Id.*  In doing so, the Court of Appeals explained,

> If welcomeness were properly an issue for the jury to consider in cases involving elementary students, the very children bringing the suits would be subject to intense scrutiny regarding their responses to their alleged abusers. Trial transcripts would be replete with insinuations that a child dressed or acted in such a manner as to ask for the very conduct she or he is seeking to redress. In this case, the record

---

[2] *See* FCPS website at https://www.fcps.edu/about-fcps/beliefs-mission-vision#:~:text=Fairfax%20County%20Public%20Schools%20inspires,responsible%20and%20innovative%20global%20citizens.

[3] The admission of the Facebook messages are discussed in a separate section, *infra*.

demonstrates as much; every witness called by the plaintiff was subject to questions regarding Diane's reaction to each and every one of Fields' advances.

*Id*.   As in *Mary M.*, Plaintiff's request to exclude inquiry into welcomeness was not limited to putting that element to the jury—it follows directly from *Mary M.* that it also included barring evidence from being used to show that Plaintiff "consented" to the conduct at issue.

Nor did Plaintiff waive this issue by not making certain objections throughout the trial. Rule 103 requires a specific objection following a motion *in limine* ruling "only where the specific ground would not be clear from the context." *Werner v. Upjohn Co.*, 628 F.2d 848, 853 (4th Cir. 1980). It was clear from Plaintiff's motion *in limine*, in line with *Mary M.*, that she sought to keep out both argument and evidence regarding consent and welcomeness. *See United States v. Wilson*, 118 F.3d 228 (4th Cir. 1997) ("[M]otions in limine will preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it.") (cleaned up).

Second, Defendants argue that Plaintiff's motion for a new trial on this issue does not argue anything new. In the Fourth Circuit, the Court must set aside the verdict and grant a new trial if the verdict "will result in a miscarriage of justice." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (citations omitted). Plaintiff's request for a new trial is based, at least in part, upon new events that occurred at trial. In its Order on Plaintiff's Motions *in limine*, the Court ruled that "FCSB will be permitted to discuss whether Plaintiff 'welcomed' the contact of CK and JO but will not be permitted to talk in terms of consent." ECF No. 837 at 11.

At trial, Defendants introduced highly prejudicial evidence, primarily through the admission of the Facebook messages, to show that Plaintiff consented to the conduct at issue. The introduction of this prejudicial evidence at trial warrants the Court's consideration of this issue based on what the Court observed at trial. *See e.g.*, *Rush v. Virginia Dept. of Transp.*, 208 F. Supp.

5

2d 624, 627–28 (W.D. Va. 2002) (reconsidering prior motion *in limine* ruling based on observation of evidence introduced at trial).   Regardless of whether Defendants used the word "consent," this evidence was clearly introduced to show just that.   This evidence infected the entire trial.

FCSB's argument that B.R. "opened the door" to welcomeness by her expert's testimony is frivolous.   The door-opening doctrine only applies to *inadmissible evidence*: "[W]hen a party offers inadmissible evidence before a jury, the court may in its discretion allow the opposing party to offer *otherwise inadmissible* evidence on the same matter to rebut any unfair prejudice created." *Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004); *Schaefer v. Fam. Med. Centers of S.C., LLC*, 2019 WL 2135675, at \*6 (D.S.C. May 16, 2019) (same).   The Court ruled in this case that "FCSB will be permitted to discuss whether [B.R.] 'welcomed' the contact of CK and JO[.]"   ECF No. 837 at 11.   So, welcomeness was admissible evidence in this trial against B.R.'s protests.

Finally, Defendants address Plaintiff's argument that the Court supplanted the legislature's determination on the age of consent only in a footnote.   Defendants request the Court ignore Judge Posner's sound reasoning in *Doe v. Oberweis Dairy*, 456 F.3d 704 (7th Cir. 2006) because that is a Title VII case.   State power to decide the age of consent does not change based on a particular cause of action.[4]   The Court should not substitute the legislature's judgment with its own.   In fact, Fourth Circuit precedent requires this Court to "look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc).   Even FCSB agrees.   ECF No. 650 at 14.

---

[4] The Supreme Court of Pennsylvania ordered a new trial, where, like here, the defense in a civil case argued an 11-year-old consented to sexual contact with a 15 year old. *C.C.H. v. Philadelphia Phillies, Inc.*, 596 Pa. 23, 45 (2008)

Moreover, as Judge Posner explained in *Doe v. Oberweis Dairy*, federal courts should defer to the judgments that state legislatures make on children's maturity in sexual matters:

> The age of consent fixed by a state represents a legislative judgment about the maturity of girls in matters of sex. To avoid undermining valid state policy by reclassifying sex that the state deems nonconsensual as consensual… and to avoid intractable inquiries into maturity that legislatures invariably pretermit by basing entitlements to public benefits (right to vote, right to drive, right to drink, right to own a gun, etc.) on specified ages rather than on a standard of "maturity," federal courts….should defer to the judgment of average maturity in sexual matters that is reflected in the age of consent in the state.

456 F.3d at 713 (citation omitted).

The determination of the age of consent has already been made by the Virginia State Legislature, which decided that children under the age of 13 cannot consent to any sexual activity. The Court's determination that Plaintiff could "welcome" sexual activity effectively supplanted this determination.[5]

## Facebook Messages

As discussed *supra*, one of the primary themes of the defense was "consent," and the Facebook messages between C.K. and "Facebook User" were the central piece of evidence Defendants offered in support of that defense.

FRE 901(b) allows evidence to be authenticated by a list of various means. Crucially, however, a reasonable jury must be able to conclude that the document is what the proponent claims it to be. FRE 104(b); *Huddleston v. United States*, 485 U.S. 681, 690 (1988). Here, the

---

[5] A recent case filed in the District of Maryland highlights the problems with an alternative approach. There, a parent sued on behalf of her six-year-old daughter who was sexually assaulted by older students, who were also under-age. *See Robinson v. Bd. of Educ. of Washington Cnty.*, No. 1:22-CV-01102-ELH, 2023 WL 6643373 (D. Md. Oct. 12, 2023). Under the approach suggested by FCSB, it's possible that schools could argue that a 6 year old "welcomed" sexual conduct. Such an approach is troubling, which is why courts should defer to the legislature.

defense fails to rebut, or provide any sort of explanation, for how or why the messages fail to comport with C.K.'s own testimony. The messages dramatically contradict that testimony regarding the method in which he contacted B.R. (not on Facebook), the frequency (not often), the number of sexual encounters (not more than one), and his lack of solicitation of naked pictures (he asked about 45 times) as explained in Plaintiff's opening brief. This leaves insufficient evidence to support the finding that the messages are authentic and between C.K. and the Plaintiff.

The Defendants also fail to properly convey the legal standard under FRE 1001-1005, collectively known as the best evidence rule. FRE 1003 explicitly states, "A duplicate is admissible to the same extent as the original *unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate*" (emphasis added).

In response, Defendants make no serious attempt to rebut this point, not even citing FRE 1003. Nor do they dispute that a PDF of a Facebook message is essentially a duplicate of the native JSON or HTML file. Instead, they seek refuge in a false equivalency, claiming that Plaintiff's current social media messages produced from her adult accounts were in native PDF files. But this equivalency holds no water, as there was no genuine question raised about the authenticity of Plaintiff's messages.[6]

Finally, the defense offers nothing to support the propriety of the "curative" jury instruction given regarding the messages. Perhaps recognizing that the instruction was unsupportable on the merits, the defense pivots to a procedural argument, claiming that Plaintiff's counsel agreed to the jury instructions. That is simply untrue -- Plaintiff filed a written brief opposing any such "curative" instruction. Only once the court had made a clear, definitive ruling on the matter, did Plaintiff offer a compromise. As stated repeatedly, a party does not waive an objection simply by

---

[6] No party attempted to introduce any messages from Plaintiff's undisputed adult accounts into evidence.

trying to handle or deal with occurrences that happen over their objections.  *In re CR Bard, Inc.*, 810 F.3d 913, n.2 (4th Cir. 2016).

### The Court Improperly Limited the Testimony of Nance Cantalupo

Plaintiff agrees with the Defendants that she argued repeatedly in pre-trial motions, at trial, and now in her post-trial motion, that Professor Cantalupo is one of the leading Title IX experts, and her full expert testimony should have been provided to the jury.  In this Title IX case, the jury had to evaluate whether FCSB and its administrators' responses were reasonable or "clearly unreasonable" after learning of reported sexual harassment and assault.  Professor Cantalupo should have been permitted to testify to specific actions that were available to FCSB administrators and opine on the adequacy of their responses to Plaintiff's reports.

Defendants rely on a scattershot of disjointed arguments.  First, Defendants refer to *Coastal Carolina* as the authority on the issue, a decision decided by a trial court in another state.  *Doe v. Coastal Carolina Univ.*, 2021 WL 1651057 (D.S.C. Mar. 8, 2021).  In addition to being non-binding, the case is also not directly on point as it involves an erroneous outcome Title IX case, and not a deliberate indifference case.  And yet, even in *Coastal Carolina*, the Title IX expert was permitted to testify to much more than Professor Cantalupo was allowed to do here.

Next, the defense takes the position that the jury had "no need" to know about federal regulations and guidance because a violation of federal guidance is not "per se" deliberate indifference in a Title IX claim.  While it is true that simply failing to follow federal guidelines is not per se deliberate indifference, the regulations and guidelines exist for a reason, and provide a framework for analyzing the reasonableness of a school official's actions.  And an expert witness is required to explain such federal regulations and guidance and how the defendants either met or failed to meet these federal regulations and guidance.  Indeed, the applicable federal standards,

even when not dispositive, are frequently allowed topics for experts. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *41, *43 (N.D. Fla. Feb. 28, 2021).

Finally, the defense attempts to mischaracterize Cantalupo's testimony as having been limited to just preclusion of "legal conclusions." In reality, the limitations of her testimony went far beyond that. Cantalupo was prohibited from testifying about anything other than Title IX at the highest level. Professor Cantalupo was prohibited from testifying about federal guidance and regulations, could not talk about specific actions available to school officials, and could not opine on various courses of actions taken by FCPS administrators.

As a result, the jury was deprived of important information needed for them to determine whether FCPS and its administrators' actions were reasonable or "clearly unreasonable," allowing FCPS to misleadingly argue that doing "something" shielded them from liability for Plaintiff's Title IX claim.

### The Court's Jury Instruction for "Deliberate Indifference" Was Erroneous and Prejudicial

An erroneous jury instruction requires a new trial if "there is a reasonable probability that the erroneous instruction affected the jury's verdict." *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 535 (4th Cir. 2021). As explained in the motion, an "incomplete" statement of the law is an incorrect statement of the law. *Hunter v. County of Sacramento*, 652 F.3d 1225, 1235 (9th Cir. 2011).

Defendants acknowledge that the Fourth Circuit has instructed that "half-hearted investigation or remedial action will not suffice to shield a school from liability," but argue that the Court's omission of this language from its jury instruction for deliberate indifference here was not erroneous because the language "identif[ies] extreme positions—not define[s] deliberate indifference," and that the Court's instruction did not leave the jury with the misimpression that

FCSB could escape liability under Title IX simply by conducting a half-hearted investigation. *See* Opp. at 18–19. But Defendants' arguments do the opposite; namely, they illustrate why the Court's omission of the "half-hearted" language was erroneous and affected the jury's verdict because the jury was not informed that simply monitoring and shadowing B.R. for a limited period of time was not sufficient to shield it from Title IX liability.

The Ninth Circuit's decision in *Hunter*, which B.R. cited but which Defendants fail to address, is instructive. In that case, the Ninth Circuit remanded for a new trial after finding that the district court erroneously failed to give the plaintiff's proposed instructions including statements of Ninth Circuit law on which the plaintiff's theory of the case depended. *Hunter*, 652 F.3d at 1235 (9th Cir. 2011). The Ninth Circuit explained that, although the district court's jury instruction was "certainly consistent" with the Ninth Circuit's caselaw, it was "far from a complete statement of our caselaw." *Id.* Because the plaintiff's proposed jury instructions included a "legal principle . . . [which] could not be readily deduced" from the instruction the district court gave, the Ninth Circuit concluded that the district court's instruction "in the context of this case . . . was an incomplete, and therefore incorrect, statement of the law." *Id.*

Here, the jury was instructed that FCSB's response to B.R.'s allegations of harassment would constitute "deliberate indifference" if it was "clearly unreasonable in light of the known circumstances." But, as in *Hunter*, the jury was not accurately instructed using statements of Circuit law on which B.R.'s theory of the case depended—that "half-hearted" measures would not shield FCSB from liability under Title IX. That legal principle could not be readily deduced from the instruction for deliberate indifference this Court gave. Accordingly, the "incomplete, and therefore incorrect" statement of the Fourth Circuit's Title IX jurisprudence warrants a new trial. *See Hunter*, 652 F.3d at 1235.

**The Defense Improperly Used the Issue of On Campus Rapes**

This Court correctly observed that this was a 'notice case' – who knew what, when, and what they did with this information.   Trial Tr. (Vol. 1 AM Session) at 9:1-4.   The Court repeatedly told the parties to streamline issues and avoid side shows.

After the Court's rulings on the motions in limine, Plaintiff made the choice not to focus on the on-campus rapes alleged in her Second Amended Complaint because those on-campus rapes were not essential to any element the Plaintiff had to prove, and because the evidence of actual, contemporaneous notice of them to school officials was not as robust as other notice evidence.[7] This decision was also made, in part, based on this court definite ruling at the motion *in limine* stage to preclude much of the systemic issues on sex trafficking, and urged the parties to stay focused on notice, the Plaintiff heeded that instruction, and prepared her case with that understanding.   ECF No. 837 at 5.

To be clear, Plaintiff has never retracted her claims that the on-campus rapes occurred, and its disingenuous for FCPS to shout 'hoax.'   In fact, on cross-examination of Plaintiff, FCSB elicited testimony concerning the on-campus rapes.[8]

---

[7] The defense mischaracterizes the Plaintiff's position that there was "no good evidence" on the notice of the campus assaults.   While there is no written documentation (e.g., emails from parents, letters from doctors) describing on campus gang assaults, Plaintiff adamantly stands by that she told school officials, in the language of a 12-year-old, that she was abused on campus by multiple, older people.   However, in light of the court's motion *in limine* rulings and the overwhelming evidence of notice on all other issues, the Plaintiff heeded the court's instruction to avoid "side shows."

[8] Trial Tr. (VOL 9 PM), 71: 4- 71:22 (MS. REWARI: Have you been raped by somebody other than C.K. and J.O.?
A. I have, in fact, yes.
Q . How many people other than C.K. and J.O.?
MR. BRENNER:  Same objection.
THE WITNESS:  I feel like this is –
MR. BRENNER:  Objection.
THE COURT:  How many people, other than those people named as defendants in this action, have you suggested have had inappropriate sexual actions with you?

FCSB has publicly acknowledged it has a sex trafficking problem—they unanimously passed a resolution on the topic multiple times, before taking it down from the web after Plaintiff began citing it in this lawsuit.   Just two years after the Plaintiff's abuse, FCSB published a documentary—Tricked—to discuss sex trafficking in FCPS schools.    And the star official in FCPS'c own documentary, Detective Bill Woolf, was prepared to testify here that Plaintiff's abuse fit the profile of trafficking victims prevalent within FCPS at the time.

Indeed, both investigative news reports and court documents showed that sex traffickers would infiltrate schools and abuse children.   Another parent filed an affidavit to how her daughter was similarly gang-raped on FCPS property in the same year as the Plaintiff, and how she alerted FCPS officials at the highest level, only to be met with the same indifference.   ECF No. 368-1.

Despite the limitations placed on the Plaintiff, the defense was able to mischaracterize the Plaintiff's allegations and deposition testimony on the on-campus gang assaults to make her look crazy and fantastical—when she is just one of at least 800 potential victims of sex trafficking and/or related grooming within FCPS.[9]

The handling of the on-campus gang assaults was fundamentally unfair.   As the Plaintiff with the burden of proof, she had the right to tell her narrative.  *See Old Chief v. United States,* 519 U.S. 172, 187 (1997).  When the court substantially limited this, it should have also prevented the

---

THE WITNESS:  I am not able to count that because then you want me to start talking about what happened in the closet, and I can't.
THE COURT:  That's her answer.
BY MS. REWARI:  Q. Before you left Virginia in 2013, had you been raped by people other than C.K. and J.O.?
MR. BRENNER:  Same objection.
THE COURT:  Sustained.  Sustained.  I think we're as far as we're going to be able to go on this.).

[9] In FCPS's Tricked Documentary, the documentary states that as many as 800 underage girls in Fairfax County Public Schools were trafficked or attempted to be trafficked by one ring alone. https://www.youtube.com/watch?v=tK3iZuyW-fQ&list=PLGU615q8gq9zF_JAppvRj9Onn7wB2L443&index=1 (4:56-5:20).

defense from making unfair insinuations and mischaracterizations of the on-campus assaults. It's not that the Plaintiff wants it "both ways" as the defense argues. Instead, the one-way presentation of the on-campus gang assaults, over the Plaintiff's repeated written and oral objections, denied her a fair trial.

### The Court Erroneously Excluded Dr. Ryan's Causation Testimony

While the defense denies that Dr. Ryan's testimony was limited, it also argues that such limitation was an error. Defendants do not justify how substantial limitations placed on her testimony comported with FRE 702/*Daubert*.

First, the defense's contention that Dr. Ryan's testimony was not limited is simply wrong. The defense does not even attempt to square the Court's repeated rulings, cited in the opening brief, which clearly showed a definitive ruling on the record. *See* FRE 103(b). The Court never changed those rulings. Dr. Ryan was erroneously precluded from offering her full causation opinion (or anything close to it) and, perhaps more importantly, explaining *why* and *how* FCSB's response to B.R.'s complaints of sexual harassment caused B.R.'s PTSD. The Court erroneously cut off Dr. Ryan's causation opinion after Dr. Ryan gave a one-sentence answer that simply stated her overall conclusion. Trial Tr. (Vol. 14 AM) at 29:5–12. Thus, Dr. Ryan—B.R.'s only medical causation expert—was precluded from explaining to the jury *how* she reached that ultimate conclusion regarding the cause of B.R.'s PTSD, leaving the jury totally unequipped to assess whether Dr. Ryan's causation opinion was "plausible, coherent, and internally consistent." *See United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021) (explaining that, once expert testimony is admitted, the factfinder "must determine the weight to give the opinion by considering whether it is plausible, coherent, and internally consistent"). Indeed, allowing Dr. Ryan to give her

conclusion, but not the bases for that conclusion, left her opinion and the entirety of her testimony open to the unfair attack of being wholly without substantive support.   This was error.

### The Court Erroneously Allowed Defendants to use Extrinsic Evidence to Attack B.R.'s Credibility

The Court denied Plaintiff's mid-trial motion to preclude the PwC testimony based, at least in part, on Defendants' representation that they intended to use such testimony to rebut B.R.'s inability to maintain employment and impeach B.R. on other grounds with respect to her employment experiences.  *See* Defs.' Opp. to PwC Mot., ECF No. 945 at 1 ("The PwC internship is not a collateral issue raised to smear the Plaintiff.");  Order Denying PwC Mot., ECF No. 948 at 2.  But Defendants' representation to the Court proved false.  Defendants used the extrinsic PwC testimony in exactly the manner that Rule 608 prohibits: to attack B.R.'s credibility.  As FCSB's counsel explained to the jury during closing arguments, "Why did we talk about PwC? . . . That resume is filled with *falsehoods*, and *she was so good at it*, at 17 years old, she *fooled* a Big Four accounting firm into giving her an internship into having them think she was a college junior or college senior. . . . . This example shows you the pattern that has been followed. . . . [Y]ou get the first *lie* accepted . . . ." Trial Tr. (Vol. 23) at 152:10–153:2 (emphasis added).

Defendants only response is to insist that B.R. has "selective[ly]" quoted from FCSB's closing argument.  ECF No. 1007 at 27.  Tellingly, however, Defendants do not cite any portion of the trial transcript where the PwC testimony was used to rebut B.R.'s testimony about her employment-related issues.  That is because the PwC testimony was used exclusively for the improper purpose of attacking B.R.'s credibility and making an improper propensity argument about her character.  Indeed, Defendants continue to use it for this purpose.  *See* ECF No. 1007 at 7 ("As a high school student, she had posed as a highly-accomplished senior at Columbia University to obtain a prestigious internship and a permanent job offer from a Big Four accounting

firm."). In a case that, as Defendants put it, was "a credibility contest," the erroneous admission of the PwC testimony for the purpose of attacking B.R.'s credibility and attacking her character on the basis of propensity for untruthfulness require a new trial. *Id.* at 8.

## The Court's Cumulative Errors Warrant a New Trial

As set forth below, the admission of improper evidence against Plaintiff, coupled with the exclusion of evidence in her favor, warrants a new trial.

### *Other Defense Evidence Improperly Admitted*

The defense contends that a therapy note about the Plaintiff's assault when she was 15 years old was not offered to show that she cried rape, but to show "inconsistencies." First, as a threshold, it appears that the defense (similar to the PWC resume issue) agrees that it would be improper to introduce evidence to show purported history of "crying rape." In any event, the defense offers no details to show how the alleged incident in question has anything to do with the Plaintiff's claims or allegations, aside from conclusory statements on impeachment. In other words, *how* these notes showed inconsistencies is inconspicuously missing from Defendants' brief. In any event, the defense does not contest that the ruling implicated FRE 412, and why a FRE 412 analysis was needed so the court could properly understand the FRE 412 (or FRE 404(b)) implications. Instead, this evidence was improperly admitted as offered to make an improper character attack based on propensity.

Regarding the police investigation, whether the police closed or opened the investigation has no relevance to a school district's obligation under Title IX. *Doe*, 35 F.4th at 467 (6th Cir. 2022). Instead, Defendants' arguments left the jury with the impression that the police investigation had been closed because the police did not believe B.R., and thus, FCSB used the

police's determination as, in effect, a silent witness on her credibility. This infringes on the duty of the jury. *See United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995).

On the issue of post-hoc rationalizations for FCSB's conduct, the undisputed record shows that the school district, in clear contravention of federal guidance, conducted no investigation (nor did it even alert the Title IX coordinator) when it learned of the claim that Plaintiff had been raped by an older student with a track record of sexual misconduct. But only "known circumstances" at the time are relevant to judge FCSB's conduct, and nobody at FCSB knew the post hoc rationalizations for that conduct that FCSB's counsel conjured over a decade later.[10] It is contrary to Title IX's remedial purposes for FCSB to fail to investigate an allegation of child rape, and then shout that the allegations are not credible when they themselves did nothing to evaluate the credibility. Such logic would once again create the perverse incentive that the court previously rejected in *Doe v. FCPS*. Given that much of was based on post hoc rationalizations, justice requires a new trial.

Nor was DX 200 admissible as a "classic business record" as FCSB now claims. The defense completely ignores the fact that the administrators who created the document testified they had never done anything like this before. There was nothing systemic about the memo, nor was there a "business" need to have the record be accurate. Instead, it was at best similar to a self-serving accident report statement made by a train engineer that the Supreme Court properly excluded in *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943). Similarly, the defense makes no attempt to square the 14 page post-hoc memo, created after the Plaintiff's parents went to the superintendent's office to complain, with the equally similar *Timberlake Construction Co. v. U.S.*

---

[10] Indeed, what the school officials unequivocally knew, was that at the very least, in November 2011, the Plaintiff was being called sexually charged and subject to sexual rumors—including by J.O., who also had a track record of sexual misconduct and bullying behavior.

*Fidelity & Guaranty Co*., 71 F.3d 335, 342 (10th Cir. 1995) where the court excluded a letter that was prepared with the potential for litigation (or administrative investigations) "around the corner".

The reason is simple: the court got it initially right when it called this document "rank hearsay." By nonetheless later allowing it in as a "business record," the court allowed the defendants to use the self-serving memo created months after key events to argue that they "bent over backwards" trying to help the Plaintiff. This was error and requires Plaintiff to have a new trial, with DX 200 excluded.

*Other Plaintiff Evidence Improperly Excluded*

Regarding Dr. Weaver's letter describing Plaintiff's sexual abuse, the defense fails to engage with the applicable legal standard. Whether or not the school had notice of sexual abuse (and what they did or not do) was the core of the trial, and thus highly relevant. Trial Tr. (Vol. 1 AM Session) at 9:1-4. A note, on letterhead, from Plaintiff's treating doctor to the school describing sexual abuse, was some of the Plaintiff's most important evidence.

Dr. Weaver testified he faxed the note to the school, corroborated by his own medical records maintained for over a decade as a third party to the litigation. Plaintiff's mother also testified she faxed and hand delivered the note. There was circumstantial evidence in the form of an email by school officials corroborating receipt. All of this is evidence sufficient to support the finding that the school received Dr. Weaver's note. The note should have been admitted, and Defendants' arguments against admission went to the weight of this critical evidence, not to its admissibility. *See Huddleston,* 485 U.S. at 690.

In any event, excluding this evidence was fundamentally unfair. One of the Plaintiff's key contentions is that school officials did everything they could to ignore her, and then retaliated when

she (and her parents) would not stop complaining about the sexual harassment and abuse. Here, the record shows FCPS told Plaintiff's mother not to talk about sexual abuse in her doctor's notes. Who told FCPS's office staffer to say that? A reasonable jury could have inferred that it was the Rachel Carson administration or someone else with authority in FCPS (i.e. the Superintendent or Dr. Zuluaga). To reward FCPS for this act by excluding this note is fundamentally unfair.

On the Social Security Administration piece, the defense argues that Plaintiff's PTSD is only relevant to damages. This is again wrong. The evidence showed the Plaintiff was a happy, healthy child when she entered Rachel Carson Middle School in 2011. She left with a diagnosis of PTSD, which has stayed with her into adulthood, rendering the Social Security Administration to declare her disabled. This makes it more likely than not (or, at a minimum, probative on the issue) that the Plaintiff was the victim of severe sexual abuse and harassment while at Rachel Carson Middle School (as opposed to reacting to a break-up with a "boyfriend," as the defense implicitly argued). *See Emami v. Bolden,* 241 F. Supp. 3d 673, 682 (E.D.V.A. 2017) (relevant evidence is usually admissible, and evidence is relevant for a purpose if it has "any tendency" to make a material fact more likely).

On the references to "rape" and "crime victim" in her medical records, Defendants offer no authority about why these should have been excluded. On the contrary, the Fourth Circuit has ordered new trials when medical information on child sexual abuse has been needlessly excluded. *Morgan v. Foretich*, 846 F.2d 941, 950 (4th Cir. 1988). In fact, *Morgan* is on point, holding it was a legal error to exclude information about a child's abuse found in the medical record. Here, like *Morgan*, Plaintiff was a child for much of her medical records and sought treatment for injuries related to her abuse. It was an error to arbitrarily exclude these references, and this requires a new

trial.  After all, FCSB argued that B.R.'s story about her abuse often changed, yet parts of medical records showing the consistency in her claims over time were redacted.

Regarding the portions of C.K.'s disciplinary records that were excluded, the defense again appears to concede the relevance.  Relying on procedural grounds, they claim this point was waived.  Not so.  *See* Trial Tr. (Vol. 11) at 60-61.  These records should have been admitted for the reasons described in the opening brief.

Finally, on the issue of J.O.'s records, the Court in its ruling on the motion *in limine* unfairly limited these.  Again, once the court has made a definitive ruling on the record, the issue is preserved.  Offering a compromise or otherwise trying to work under the situation created by the ruling does not waive the objection.  *In re CR Bard, Inc*., 810 F. 3d 913, n.2 (4th Cir. 2016).  On the merits, the defense does nothing to rebut the Plaintiff's points.

## CONCLUSION

Plaintiff is mindful that this was a long trial, involving the expense of scarce judicial resources.  Of course, a re-trial would involve the investment of additional resources.  Notwithstanding, all parties are entitled to a fair trial.  Unfortunately, the errors identified herein, independently and cumulatively, deprived plaintiff of that right.  Accordingly, she respectfully requests a new trial on all issues.

Dated: July 1, 2024

Respectfully submitted,

By: _____ /s/ *Robert G. Keefe* _____

ANDREW S. BRENNER
(Pro Hac Vice)
BRITTANY ZOLL
(Pro Hac Vice)
SAMANTHA PEDERSEN
(Pro Hac Vice)
ROBERT G. KEEFE
(Pro Hac Vice)
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, FL  33131
Telephone: (305) 539-8400
Facsimile:  (305) 539-1307
abrenner@bsfllp.com
bzoll@bsfllp.com
spedersen@bsfllp.com
rkeefe@bsfllp.com

ALISON L. ANDERSON
(Pro Hac Vice)
**BOIES SCHILLER FLEXNER LLP**
2029 Century Park East, Suite 1520
Los Angeles, CA  90067
Telephone: (213) 629-9040
Facsimile:  (213) 629-9022
alanderson@bsfllp.com

JONATHAN L. FAHEY
 (VSB No. 44854)
**HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK PLLC**
2300 N Street NW, Ste 643
 Washington, DC  20037
Telephone:  (202) 737-8808
jfahey@holtzmanvogel.com

*Counsel for Plaintiff B.R.*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2024, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By: /s/ *Robert G. Keefe*

*Counsel for Plaintiff B.R.*