1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                          :
                               :
              Plaintiff,       :   Civil Action
                               :   No. 19-917
          v.                   :
                               :
F.C.S.B.,                      :   March 18, 2024
              et al.,          :   9:03 a.m.
                               :
                               :
                               :   VOLUME I - AM SESSION
Defendants.                    :
                               :
..............................
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

2

APPEARANCES:  (Cont.)

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

3

For Defendant F.C.S.B.:        **Kevin Elliker, Esq.**
                               HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Avenue, NW
                               Washington, DC 20037
                               804-788-8200
                               Email: Kelliker@huntonak.com


Court Reporter:        MS. TONIA M. HARRIS, RPR
                       United States District Court
                       401 Courthouse Square
                       Tenth Floor
                       Alexandria, VA 22314

4

TABLE OF CONTENTS

MISCELLANY

Preliminary motions................................. 04
Voir dire........................................... 36
Opening statements by Mr. Brenner................... 109
Opening statements by Ms. Rewari.................... 119
Opening statements by Mr. Kinney.................... 131
Opening statements by Mr. Blanchard................. 138
Certificate of Court Reporter....................... 129

B.R. v. F.C.S.B.

5

THE COURTROOM CLERK:  Civil Action 2019-917, B.R. versus F.C.S.B., et al.  Counsel, please state your appearances for the record.

MR. BRENNER:  Good morning, Your Honor.  Andrew Brenner, Alison Anderson, and Jonathan Fahey here on behalf of the plaintiff in the well today, and our client is here.

THE COURT:  Good morning.

MS. REWARI:  Good morning, Your Honor.  Sona Rewari. Kevin Elliker and Ryan Bates.  Scott Burton for Fairfax School Board.

THE COURT:  Good morning.

MR. BLANCHARD:  Good morning, Your Honor.  Bruce Blanchard from Odin, Feldman & Pittleman here on behalf of defendant, J.O., who is present and seated in the courtroom.

THE COURT:  Good morning.

MR. KINNEY:  Good morning, Your Honor.  Michael Kinney on behalf of the nine individual school defendants.

THE COURT:  Good morning, sir.

MR. DAVIS:  Good morning, Your Honor.  James Davis on behalf of the defendant, C.K.

THE COURT:  Good morning, sir.

As we get started, I like to sort of get us all pointed in the same direction as best we can.  For purposes of the court reporter who is very vital to the manner in which we conduct our business, as you begin an examination of a witness

B.R. v. F.C.S.B.

6

or you make any statement to the jury and the like, simply state your name again so that she doesn't have to try to figure out who's speaking.  That would just help us to manage things a little bit better.

In addition, we have some people that are doing some of the, I guess, technical work publishing things and the like.  I would ask that you not publish anything or put anything up unless and until the Court has made a determination on the admissibility of it.  In other words, don't anticipate that you're going to be allowed to put something up until you hear the Court say that it is admitted or there's a stipulation that it's been admitted.

A couple of little housekeeping matters.  The Court was very disappointed.  It gets a call on Friday saying that the deadline for providing information to the Court so the Court could manage its docket was not available because a copy machine had broken down.  Now, I know there's a lot of lawyers in this case and a lot of lawyers that work for big firms, and I cannot believe that a copy machine is getting in the way of us being able to get our work done.

So I want an explanation for that as to why there wasn't a backup copy machine to get things to the Court in a timely fashion?

MR. BATES:  Good morning, Your Honor.  Ryan Bates on behalf of the School Board.

7

The vendor that we used to copy the exhibits had printed all of the exhibits, and there are some technical reason that I don't understand, but the exhibit stickers that are electronically placed on the documents did not -- did not come through.  So the binders were printed; however, the -- for some reason the electronic stickers that were on all of the documents did not come through.  So everything needed to be reprinted.  And we do apologize for that, Your Honor.

THE COURT:  There wasn't some sort of backup available to get this accomplished?

MR. BATES:  They literally had three -- there was -- it was not a broken copy machine.  There were three copiers running, and we were quite disappointed, Your Honor, as you are, and we do apologize for that.

THE COURT:  Well, again, I accept your apology, and I recognize that things happen, but it's a little difficult for the Court to believe that when it imposes a deadline and has an expectation for things to be filed that we're going to allow some technical issue to get in the way of the Court effectuating its purpose.

Lawyers sometimes make the mistake of thinking that they're the only ones working during the weekends and at nights and things like that, and we have people that are working hard to try to make this case facilitated as best it can be.  And the Court was very disappointed because it

B.R. v. F.C.S.B.

8

essentially allowed your side to circumvent the deadline, and that's not fair.

            MR. BATES:  We apologize.  It will not happen again.

            THE COURT:  All right.  Another thing the Court has tried as best it can to allow you all to manage this case. And suffice it to say that the Court may have been a little bit too liberal and allow you to manage this case because of all the different filings and the fights that are over everything that is associated with this case.  And suffice it to say that it is important to this Court that things that can be managed and facilitate between the cooperation of counsel need to be recognized here.  And -- just has not happened. There's a fight over everything in this case, and that's not the way good litigators litigate cases.

            So the Court is going to impose some specific deadlines.

            With regard to any opening statements today, you get ten minutes.  No more than ten minutes.  You can have less. When you have your closing arguments, it's going to be a similar time frame.

            For purposes of your opening statements, you do not need to go over what you believe every witness is going to testify about.  It's not the way it works.  Opening statement is an overview as to what you believe the case is going to be about.

B.R. v. F.C.S.B.

9

As the Court has indicated several times, essentially this case is a notice case, and we don't need to get to too many things to effectuate whether or not notice has been properly given in this case.

So I encourage Counsel to try to work through things.

In addition to that, the Court encouraged counsel to come up with stipulations, and I hope during the course of this trial that those stipulations are accomplished and that we can do things that are going to allow the jury to better hear this case and to better understand the things that are not in dispute.

We don't need a live witness on simple things. So try as best you can to come up with stipulations.

I have a couple of new motions that were filed in this case.

First, plaintiff, B.R., filed a motion regarding the scope of anticipated testimony of Detective Frederick Chambers. That's docket reference 868. That motion is denied.

If counsel wanted to request that Detective Chambers' testimony be submitted pretrial, then that request should have been made during the motions in limine hearing.

However, the Court will instruct that the same ruling that the Court made with respect to the Fairfax County

B.R. v. F.C.S.B.

10

Police Department report applies to Detective Chambers'
testimony.

Second, counsel for defendant, J.O., James Miller
seeks to withdrawal.  J.O. will still be represented by
Mr. Blanchard.  Is that what I understand?

MR. BLANCHARD:  That's correct, Your Honor.

THE COURT:  And the parties do not oppose that
motion.  First one that has not been opposed.  And that motion
will be granted.

MR. BLANCHARD:  Thank you.

THE COURT:  Third, plaintiff has filed a proffer of
detective -- excuse me, Dr. Eileen Ryan's testimony regarding
the association between PTSD and physical morbidities.  The
Court will issue an order on this, but to the extent that the
notice is a motion for reconsideration, it is denied.

Plaintiff seeks to introduce the opinion of Dr. Ryan
that there is an association between plaintiff's PTSD and
other nonpsychiatric conditions that plaintiff has had as been
diagnosed by others.  That's at docket 870.  Plaintiff does
not explain why this information would be useful or helpful to
the jurors or why permitting this testimony would not run the
risk of confusing jurors as to the difference between
"association" and "causation."

As this Court noted in its order on the motions in
limine, Courts have recognized that psychiatrists are not

B.R. v. F.C.S.B.

qualified to render opinions as to the causes of physical
conditions.

The Court's function under Rule 702 is to act as a
gatekeeper, and the Court also has a duty to keep out evidence
that is unduly prejudicial under Rule 403.  Hence, Dr. Ryan's
proposed testimony regarding a link or association between
plaintiff's PTSD and plaintiff's nonpsychiatric injuries run
afoul of both rules.  There is a risk of the jury confuses
association for causation as discussed in the Court's
March 8th order.

Dr. Ryan is a psychiatrist, who's not qualified to
testify as to the origin or cause of physical injuries.  As
courts recognize, "Doctors in their day-to-day practice
stumble upon confidential occurrences and random events and
often follow human nature, which is to confuse association and
causation.  The Court should not be too eager to make the
leaps of faith from similar associations."

And that is from the *Siharath* and *Sandoz Pharmacy*
case, 131 F. Supp. 2d. 1347, 1353.  It's a Georgia case.

Plaintiffs did not explain the relevance of this
association or the link it is meant to establish causation,
which Dr. Ryan is not qualified to do for these nonpsychiatric
injuries.  Thus, the association between PTSD and the physical
injuries is of limited relevance and risks misleading or
confusing the jury according to the motion and so far as it

B.R. v. F.C.S.B.

12

seeks reconsideration of the Court's prior ruling will be denied and the association testimony excluded pursuant to Federal Rules of Evidence 702 and 403.

Finally, B.R. seeks to voluntary dismiss C.K. as a defendant in this action, pursuant to a settlement agreement, and the nonsettling defendants object.

The Court has had an opportunity to take a look at the settlement agreement and does not see anything in there which could in any way suggest witness tampering and the like. And so, therefore, the parties are stuck where they are.

It's my understanding that the defendants have not subpoenaed that particular witness. And suffice it to say that was a mistake. I understand this is beyond the subpoena power of the Court, so you would have to approach it as you may.

Is there anything else you need to do?

MR. BRENNER: Just one -- well, two housekeeping matters. Based on the last ruling, Your Honor, is defendant, C.K., dismissed, is that --

THE COURT: I'll take -- I'll take it under advisement. In other words, he's not dismissed as of right now.

MR. BRENNER: Okay. And, you know, we can -- when we talked after the hearing on the 6th, we had planned to -- and ask Your Honor should we plan to have our first witness

B.R. v. F.C.S.B.

13

available Tuesday morning.  Is that still the plan?

       THE COURT:  Yes, sir.  I'm hoping that the way the Court is going to be able to conduct its business is that we'll get through the voir dire this morning.  Then, depending on where we are, we might take a break for lunch.  Just sort of depends where we are.  And then opening statements and maybe the first witness.  If we still have time for the first witness, say around two o'clock today, we might go ahead and jump into the first.

       MR. BRENNER:  Oh, so I should -- I should have my witness available this afternoon?

       THE COURT:  As I said, what the Court would prefer is for you to have maybe three witnesses in reserve every day, so we're not saying, well, we've run out of witnesses today.  I don't think that that's productive.

       MR. BRENNER:  Okay.

       THE COURT:  All right.

       MR. DAVIS:  Judge, James Davis on behalf of defendant, C.K.

       Judge, I have Mr. K███████ waiting downstairs.  I didn't have him in the courtroom waiting for you to make the ruling on the motion to dismiss.

       THE COURT:  J.K.

       MR. DAVIS:  C.K.  I'm sorry.  C.K.

       So, Judge, I'm wondering if I can either -- and he

B. R. v. F. C. S. B.

is available if you are going to order him to appear to

testify on behalf of the defendants. He's available to

maybe -- he's here. I can bring him up, have the Court

address him.

If we're to continue while you take this under

advisement, I'd ask for your permission -- ruling --

THE COURT: Well, he -- as far as I'm concerned, at

this point, there's a settlement agreement that effects his

circumstances. And the bottom line is, you can do with him

what you may. I'm not ordering him to do anything.

MR. DAVIS: Okay. Judge, I do have some concerns

because there is a condition precedent that has to take place

for the agreement to be effective so --

THE COURT: Generally tell me, and I'll figure out

what you're saying, generally tell me what that condition

precedent is.

MR. DAVIS: It relates to a motion to dismiss. It's

in the agreement. So --

THE COURT: Well, as I'm sure you understand,

there's different circumstances that may or may not affect

circumstances based upon when the Court issues the motion to

dismiss -- excuse me, motion to dismiss. And so I don't have

that order in front of me right now. I may enter it at a

later time.

MR. DAVIS: Yes, sir. Could he be ordered to appear

so that he can participate in the jury selection, so that he can come into the courtroom and participate in the --

THE COURT:  No.

MR. DAVIS:  Okay.  Thank you, sir.

THE COURT:  What I will tell you is that as I go through the voir dire, I will make reference to that individual because it's important for me to make sure that no one knows that individual.

And I'll let the parties know that for purposes of voir dire, the jury is going to be confused unless I give names as to whether or not they recognize someone.  So for purposes of voir dire, I will state those names.  But going forward, it is the Court's hope that we can stay within the parameters of the initials.

MR. DAVIS:  Yes, sir.

MR. ELLIKER:  Just -- just for brief purposes of the record.  With respect to the Rule 41 motion, not the in camera relief that we sought, it's our view, based on the way we understand it, and we haven't seen the agreement, that C.K. would be in position to appear voluntarily.

If that's not the case because of the prejudice that comes, as we said in the papers, we -- we believe that you have the authority to set conditions, as the language said, on terms the Court considers proper to ameliorate the prejudice to the defendants by the fact that this dismissal is happening

B.R. v. F.C.S.B.

16

so late.  And everyone understands --

THE COURT:  Well, everybody had the opportunity to have their particular witnesses or victims or whatever you want to refer them to as dismissed as C.K. was, and they didn't take advantage of those opportunities, as I am under the impression that C.K. has resolved his dispute with B.R. and is allowed to pursue any recourse he chooses through his counsel.

MR. ELLIKER:  I understand, Your Honor.  I would just say that because we don't know what -- what any of these conditions precedent are, our view is that the Court has the power as a condition of the -- we wouldn't object to his dismissal so long as there's an assurance that he can testify. As we said in the papers, everyone understands that because --

THE COURT:  Did you subpoena C.K.?

MR. ELLIKER:  Your Honor, he lives in North Carolina.

THE COURT:  Did you take advantage of the procedures allowing him to be subpoenaed for today?

MR. ELLIKER:  Well, Your Honor, I think our view is that --

THE COURT:  What you're basically telling me is you thought that he was going to be a party to this litigation, so there was no need to subpoena him, but again, you should have taken the opportunity to make sure that any witness that you

B.R. v. F.C.S.B.

17

thought might be relevant to your case is available to testify, and you did not.

　　　　MR. ELLIKER:  Your Honor, we asked Mr. Davis to accept a subpoena on his client's behalf.  And the response we got was that that was not authorized.

　　　　THE COURT:  To accept a subpoena?

　　　　MR. ELLIKER:  We asked Mr. Davis to accept a subpoena from the School Board to appear for testimony at trial on his client's behalf, and that was declined.

　　　　THE COURT:  So what do you want the Court to do?

　　　　MR. ELLIKER:  Well, Your Honor, I understand that you've made a decision on this.  If nothing else, we just think that under Rule 41A2, the Court can set conditions that it deems appropriate, and what I understand is that you may not think that that condition is appropriate, and we --

　　　　THE COURT:  The only case we were able to find regarding the issue that you're trying to raise is some Missouri case.  That's the only case that seems to have any application at all.

　　　　And the bottom line, and I'll cite -- and the bottom line is that in that Missouri case, there was evidence of tampering, and as I said, I reviewed the settlement agreement. There is nothing in that settlement agreement which in any way can be suggestive of tampering.

　　　　MR. ELLIKER:  Your Honor, I appreciate that very

B.R. v. F.C.S.B.

18

much, the *Cenergenics* case, and that had to do with the

particular -- the question of whether there was witness

tampering and whether a sanction would be necessary.

I'm talking about under Rule 41(a)(2), that the

Court has the authority to set conditions that it deems

appropriate in order to effectuate a voluntary dismissal after

the normal time period when a plaintiff can accomplish that

without leave of court.

There's all sorts of reasons that the Court could

set a condition that don't have anything to do with witness

tampering or the like.  It's really just a question of

prejudice.

And so, there's cases where Courts have looked and

considered the nature of the prejudice to the defendants and

had -- I mean, frankly, Your Honor, I think our view is that

the rule requires the Court to consider whether there is

prejudice to the defendants in order to determine whether

there are conditions that are necessary.  And so, I

understand --

THE COURT:  Isn't that accomplished essentially by

the Court taking an in-camera review of the settlement

agreement?

MR. ELLIKER:  I want to -- the in-camera review --

that was a separate request, the in-camera review, and I -- I

very much appreciate and we are assured by your review of it

B.R. v. F.C.S.B.

19

that there's nothing untoward in the settlement agreement, and
I'm happy that we can all put that behind us.

        Setting that aside, the question is when someone --
when a plaintiff moves to voluntarily dismiss a defendant at
this stage, the Court, under Rule 41(a)(2), is supposed to
ask, is there a condition that I need to set on this dismissal
in order to alleviate prejudice to any of the defendants.

        THE COURT:  And a condition that you want me to set
is requiring him to be available to testify?

        MR. ELLIKER:  Yes.

        THE COURT:  Okay.  What authority do you have for
that proposition?  The Fourth Circuit at best is split on it.

        MR. ELLIKER:  Your Honor, I admit we didn't cite any
Fourth Circuit precedent.  And so all we can do is point to
persuasive precedent from outside the Fourth Circuit.

        We cite a Fifth Circuit case that says that district
courts have the authority to impose conditions on Rule
41(a)(2) dismissal, including the requirement for certain
witnesses to be produced at trial.

        We cite that case that's at Bechuck versus Home
Depot.  It's a 2016 case.

        THE COURT:  Usually when we're talking about
prejudice, aren't we usually talking about prejudice to the
party that is being dismissed as opposed to prejudice to
someone else?

B.R. v. F.C.S.B.

20

MR. ELLIKER:  Your Honor, I think -- well, and in
that case, I've cited -- the School Board cites in its
response to a Ninth Circuit case that talks about Rule
41(a)(2) dismissal being inappropriate when dismissal of one
defendant may prejudice other remaining defendants.

I understand not only -- it's not the Fourth
Circuit, but it's the Ninth Circuit, and I appreciate that,
but I'm doing the best I can with the precedent I can put in
front of you that I think supports the position we have.

THE COURT:  I appreciate that, sir.

Plaintiff want to say anything?

MR. ELLIKER:  And the last point I'll make, again,
the Court has jurisdiction over C.K. right now because he's a
defendant in the case.  And so the Court has authority to
order him as -- and that was the other case that we cited.
Again, it's a federal court in New York case, so it's just
persuasive, but in that case, in order for a party to be
dismissed voluntarily, the Court ordered that that person,
before they be dismissed, provide certain information to the
parties so that they could effect a subpoena and get discovery
from them because it was not right on the precipice of trial.
It was earlier on.

THE COURT:  Again, that sort of presupposes that
there hasn't been an opportunity for discovery in this case.
We've been in this case for two years.

B.R. v. F.C.S.B.

21

MR. ELLIKER:  I understand, Your Honor, and there's
no secret why it is that C.K. is such an important witness,
and what it is that the parties all understand he would
testify to in this case regarding the Facebook messages and
the authentication of that.

Those messages came in the discovery period late,
and when that came out, as we said in the papers, in the
papers that C.K. filed, offered to have plaintiff's counsel --
he would sit for a deposition to authenticate those messages.
That was declined.

And we are just at a stage where that testimony
wasn't captured by deposition because it was offered and it
was declined.

And more important than that, Judge, he has told
everyone, including the Court, when we were here on March 6th
that he was going to be here.  He joined a witness list on
Wednesday that all the defendants filed saying he will
testify.

THE COURT:  I think we can all agree that his
position has substantially changed since then.

MR. ELLIKER:  There's no doubt, but I suppose what
I'm saying is in terms of considering the prejudice of the
remaining defendants is that there's that reliance interest.

It wasn't as though we were cavalierly, you know,
going about without thinking about checking our flank on that,

B.R. v. F.C.S.B.

22

so to speak.

So -- again, Your Honor, I don't have the elusion I can turn you around to see this our way, but just in terms of saying what the concern from our perspective is.

The Court has the power under Rule 41 to set a condition that would be appropriate to address the prejudice that's faced here.  That prejudice is not the result of some poor mistake or footfault on our part.

It was genuine good faith reliance on the fact that there were representations made to the Court that he would be here, that we filed a joint witness list that said he would be here, and that even not 24 hours before he was -- before the dismissal was sought, it was our understanding that he planned to be here.

THE COURT:  All right.  Well, suffice it to say that what you just said, I am a good listener and I am malleable, so there are times you can convince me to go another way from the perspective that I have, but the bottom line is at this point, I'm not going to order him to do anything.

We'll see how the case goes.  There may be circumstances which present which might cause the Court to change its mind, and you're a very good, smart lawyer and you understand why I'm not dismissing him at this time.  There is an advantage to you for that.

MR. ELLIKER:  I appreciate that, Your Honor.  Thank

─────B. R. v. F.C.S.B.─────

23

you.

        MR. BRENNER:  Your Honor, the only thing I want --

I'm not going to address that issue, as I understand Your

Honor's ruling.

        As far as when you -- we communicated with Your

Honor's chambers last week regarding the screens being turned,

and we appreciate Your Honor having --

        THE COURT:  We took them out.

        MR. BRENNER:  Yeah, we appreciate Your Honor doing

that for us.

        So we've had discussion among counsel -- we've dealt

with how we're dealing with documents.  You want me to give

the Court how that's going to work?  We've agreed --

        THE COURT:  Yeah, why don't you tell me.

        MR. BRENNER:  Yeah.  So for use of documents in

trial, with the exception of some documents that have always

been redacted because they've never been produced in

unredacted form, but for documents that can be unredacted is

the way -- I always struggle with unredacted and redacted, but

the ones that can be unredacted for use at trial, they will be

unredacted, although both sides -- so the jury will get

unredacted, on the screens it will get unredacted.  Your

Honor, of course, will have unredacted.  But both sides will

reserve the right before anything becomes publicly filed to

seek the Court's permission to seal as we did in the normal

———B. R. v. F.C.S.B.———

24

course.

THE COURT:  And what I would propose -- and
Ms. Armentrout is very good -- the deputy clerk -- is very
good at what she does -- and instead of waiting until the end
of trial to take care of all of those post day requirements or
occurrences, just get with Ms. Armentrout on every day to make
sure that we're doing what we think we want to do, and I have
no problem with the approach that you have.

MR. BRENNER:  Right.  And we understood Your Honor's
instruction at the end of every day to make sure what's in and
out.  I'm not -- it may take sometimes a little more to make
sure that we have the right redactions, and we'll take care of
that timely, not at the end of trial, but it may be hard to do
it at the very end of that day.

The second issue is, how will the parties be
referred to in Court because there you can't turn the screen
around, so I will tell you what we have proposed, or at least
discussed.

So for -- and I understand, Your Honor, it's not
customary, at least in my practice, and especially in federal
court to use first names.  We usually use mister and miss.
The problem is the main identifying information is the last
name, not the first name.

So we would propose for the plaintiff's family that
the plaintiff be referred to by her first name.  Her mother

B.R. v. F.C.S.B.

25

will be referred to by Mrs. R., and her brother, I think, will

probably Mr. R. is probably the only way to do it.  It's a

little awkward because --

        THE COURT:  It's a little awkward.  What I have

thought what would be a good idea, and again, I try to let the

parties manage their own cases to the extent that I can until

it becomes unmanageable for them, is it would have been a good

idea for us to simply have provided the jury a sheet of paper

with who Spiel is, who J.O. is, what F.C.B.S. is, so that,

when a person testifies, they can look down at the paper and

say, okay, this is what they're talking about.

        Why wasn't that a viable alternative.

        MR. BRENNER:  We saw two problems -- or at least I

shouldn't say "we."  Our side saw two problems with that.  I

can't speak for the defendants.

        One is it's just inevitably going to be get messed

up.  For example, if you're talking to a mother, it's going to

be very hard for her to constantly refer to her daughter by

her initials.  So I just think it's going to be -- not that

anyone's going to do anything to --

        THE COURT:  Well, the original reason why we went

with the initials is to protect your client.

        MR. BRENNER:  Correct.

        THE COURT:  And the other side wanted the same

consideration, and so I granted that.  So it's become

B.R. v. F.C.S.B.

26

cumbersome because of that but --

       MR. BRENNER:  No question.  I wasn't meaning to put that on the Court.  No question.

       THE COURT:  What we're seemingly now sort of saying, well, we wanted that, but now we really don't want that.

       MR. BRENNER:  Right.  So we -- we had talked to Judge Fitzpatrick about this.  It was one of the hearings in February.  And what Judge Fitzpatrick said, which I agree with and I think all sides agree with, is that, certain, I'll call them protective order provisions, were put in place to govern the discovery and because of trials are sort of a different a different -- a different thing, and it's -- and he said that both sides should be prepared to sort of adapt to that, so that's what we're trying to do.

       The other thing is when the documents are going to say names and then you're going back to initials and, for example, there are some that the initials are almost identical.  We just thought that it would be better to use our client's first name as far as the defendants.  I asked them what they wanted to do.  My understanding, individual school defendants want to use their -- their names.  I would, of course, refer to them as mister and miss and then their last name.  I'm totally fine with that.

       THE COURT:  I don't have any real problem with that.

       MR. BRENNER:  Okay.

B.R. v. F.C.S.B.

27

THE COURT:  Again, I think that because of the circumstances I don't have any problem with the circumstances, it's going to be naturally cumbersome anyway.

MR. BRENNER:  Yeah, no question.

THE COURT:  So we'll just work -- and I don't have any real problem with referring people by their first names. That doesn't --

MR. BRENNER:  And I understand that defendant, J.O., refers -- would prefer to be referred to as J.O.

MR. BLANCHARD:  May I approach?

What I was looking for was when I was asked that question, I'd been -- my understanding was that always has been was that plaintiff only wanted to be called by her initials.

When I saw a proposal that people and witnesses be called by their first name, I was a bit concerned that that personalizes maybe things a little bit more than the Court may want, so I wanted to wait and see what -- what Your Honor felt about that.

There's also concern for even more inconsistencies to who's this or that.  I do not intend to call any of the plaintiff's family members or other things by their first names.

THE COURT:  That's fine.

MR. BLANCHARD:  If the plaintiff is going to go by

B.R. v. F.C.S.B.

28

her first name, I -- I'm okay with my client doing the same
and going by the first name.  I'm just looking for the same --
same thing.

THE COURT:  Yeah, in order to be consistent.  In
order to be balanced.

MR. BLANCHARD:  I guess we'll just play it as it
goes.  If we do initials, I'm going to mess up.  I mean, it's
just the way it is.

THE COURT:  Well, what the Court is going to allow,
and I don't think but maybe one of you has had a case, I'm
going to allow the jurors to take notes.  And obviously the
notes are not evidence, but it seems to me that once they get
back to deliberate, they can sort out things by looking at
their own notes.  And one juror might say, oh, J.O. is this
person, and B.R. is the plaintiff.  That's that person.  They
can sort of pull it together.

I don't have any problem with you referring to your
client by her first name or her full name.  Again, we're at
the trial stage, and I think that those protective devices
that were put in place to protect the sanctity of the case
pretrial.  I think that that was the primary objective.

But we do have a responsibility to make sure that
the case is presented to the fact-finder in a way that they
can understand it.  And if it gets to the point where it gets
confusing, the Court will readdress the issue.

B.R. v. F.C.S.B.

29

Every now and then a juror will raise their hand about something or anything.  And if they say we're not able to follow, I'll send them out, we'll take a break, and we'll figure out a better way to do it.

MR. BLANCHARD:  And just for clarity then, if my client gets on the stand and she is addressed by her -- for example, if -- let me put it in my -- if the plaintiff gets on the stand, I -- my choice -- well, my preference, given the posture and everything else, would be not to call her by her first name.

THE COURT:  It would seem to me that the simple thing to do, and this is -- maybe I'm just old school, I would just call her "ma'am."

MR. BLANCHARD:  Well, that's what I was planning if it was limited to first names.  And I think it will.  I just wondered if I could -- I just don't know whose last name that I can say Ms. This or Mr. That.  Are we -- are we at the point -- is the Court's ruling that names are not going to happen?

THE COURT:  We can -- we can open it up a little bit.  But, again, we want to make sure that the protective devices we put in place to protect certain witnesses in this case still exist.

And, again, obviously we have experienced counsel here, and I'm sure, I'm confident that you all can figure out

B.R. v. F.C.S.B.

30

a way to do it.  But as I said, I'm old school.  If the
plaintiff is called by her lawyer and she testifies and he
refers to her by her first name, that's fine.  If you want to
refer to her as ma'am, that's fine.

   MR. BLANCHARD:  But not miss, last name.

   THE COURT:  Exactly.

   MR. BLANCHARD:  Okay.  That's the clarification.

   THE COURT:  One of the things that the Court is
going to do, and maybe this sort of bleeds into the voir dire,
is at the beginning of the voir dire process, I'm going to
acknowledge the lawyers and ask anybody if they know the
lawyers.  And I'm going to acknowledge the potential witnesses
in the case and ask if anyone knows them.

   And I'm going to be referring to them by their
proper names, so that we can make sure that people are -- can
connect by face and by name.

   And then after I do that, the protective order or
the theory or thrust of the protective order will remain in
place, and you all just do the best you can to make sure that
people know who we're talking about when we're going through
the process.

   MR. BLANCHARD:  Yes, sir.  Thank you, Your Honor.

   THE COURT:  And, again, the nonparties to the case
can be referred to by their names.  I don't think that the
protective order should in any way affect that.

B.R. v. F.C.S.B.

31

MR. BLANCHARD:  Okay.  So I can -- I can call the plaintiff's family members mister and miss and last name?

And I'm probably -- sorry.  I'm probably going to be using "ma'am" and "sir," but, if for some reason I'm addressing them for something else, I just want to make sure. I'm trying to --

THE COURT:  Maybe the simple way -- what is the plaintiff's mother's full name so I'll know?

MR. BRENNER:  Well, I don't -- it's -- her first name is B███ --

THE COURT:  Okay.

MR. BRENNER:  -- and her last name is R.  I'm trying to avoid the last names.

THE COURT:  And so, after you use her pseudonym, as opposed to an alphabet, Mr. Blanchard can refer to her in the same way that you do or use ma'am or sir, depending on gender.

MR. BRENNER:  Yeah, I will refer to her -- for example, in opening, if -- although it's ten minutes now, and I maybe won't refer to her at all, but if I do refer to her, I will either refer to her as my client's mother or B███.

THE COURT:  Yeah.

MR. BRENNER:  In the case she's been Mrs. R.

THE COURT:  Yeah, my client's mother, who I'm going to refer to affectionately as B███.

MR. BRENNER:  Okay.

B.R. v. F.C.S.B.

32

THE COURT:  That way --

MR. BRENNER:  Yeah.  We're just -- we're trying to avoid use of --

THE COURT:  Okay.

MR. BRENNER:  -- last names as the short way to do it.

And we don't -- look, if -- for example, if counsel is examining our client and instead of -- they don't want to use her first name, which I understand, if they want to say "ma'am," obviously that's fine.  If they -- if they because old habits are hard to break, if they want to use her initials --

THE COURT:  Invariably, during the course of this trial, somebody is going to mess up and refer to someone by name.  And that's not going to be by design.  It's going to be by mistake.  I think it happened the other day in the motions in limine, and there was an immediate apology because, you know, we usually don't work with alphabets, we work with proper names.  And so, if someone messes up, they'll correct it, and we'll move on.

MR. BRENNER:  Yeah, and I think Your Honor gave a direction -- a direction when that happened.  And by the way, I totally agree.  We did it.  It was by mistake.  If the defendants do it, it'll be by mistake.  I have no -- no worry about that.

B.R. v. F.C.S.B.

33

And I think you gave a direction at that time when that happened to any press in the room not to use full names.

THE COURT:  Exactly.

MR. BRENNER:  And we would ask that you do that again.

THE COURT:  Right.  And is -- just a little general statement to the members of the press.  Obviously, the Court respects freedom of the press.  The Court respects the ability for good reporting and to make sure that the public has an opportunity to know about the circumstances of this case, but I think with using discretion, and judgment, that you will live within the spirit and the letter of the Court's instruction with regard to the protective orders that have been put in place.

All right.  Anything else we need to do?

MR. BRENNER:  Nothing from the plaintiff, Your Honor.

MR. ELLIKER:  Your Honor, very briefly.

THE COURT:  Yes, sir.

MR. ELLIKER:  I just wanted to emphasize obviously we're going to be doing the voir dire process this morning. Parties submitted their proposed voir dire.  And I know that the Court will make sure -- I have no reason to think the Court won't make sure that there hasn't been pretrial, exposure to pretrial publicity, but in the last few days

B.R. v. F.C.S.B.

34

there's been a lot of pretrial publicity that's come to us
that we understand that --

THE COURT:  Yeah, I know that it's out there.
Someone said something to me at church yesterday so --

MR. ELLIKER:  Yeah, there was an article where -- I
don't need to get into the particulars of it, but
there's articles that -- I guess the point I want to make for
the record and for the Court is even headlines themselves can
be --

THE COURT:  Salacious.

MR. ELLIKER:  Salacious.

THE COURT:  Uh-huh.

MR. ELLIKER:  And enticing to try to click on.  And
in this time of social media -- and on top of that, social
media posts by people who write these articles may not --
people may not realize as they're scrolling through an article
that talks about factually --

THE COURT:  Well, what -- what would likely happen
if we get an indication from a person in the venire that
they've had some exposure, I'll probably shut down the
questioning at that point and do it at the bench.  So that way
we can avoid contaminating the entire venire.

That would -- that would be very helpful.  Because
as I'm sure you understand, we have some specific instances in
mind that we would like to make sure that we can address it if

B.R. v. F.C.S.B.

35

it arises.

THE COURT:  Yes, sir.

MR. ELLIKER:  Thank you.

THE COURT:  Very good.

Anything -- oh, Mr. Blanchard.

MR. BLANCHARD:  Your Honor, there is, I think, one outstanding -- and I don't know if you want to take this up now or after the jury is scheduled.

I think there were competing limiting instructions submitted for the Court to -- to look at.  We had come to agreement on some parts of it, but not on the full --

THE COURT:  We'll -- we'll have some time to work on those.

MR. BLANCHARD:  Okay.  I guess I'm asking, is the Court going to -- will a limiting instruction be offered at the beginning of the case?

THE COURT:  Likely.

MR. BLANCHARD:  Okay.  So that's the only reason I raise it now.  I just didn't know if you want to take it up now.

THE COURT:  Yeah, likely.  Again, we're going to see how things go.  You have those down there?  Okay.

I think you're going to be satisfied with what we did.

All right.  Are you ready to bring the jury in?

B.R. v. F.C.S.B.

36

All right. These individuals in the courtroom, as best we can tell, are these potential witnesses or other people? I see you have a whole lot of people back there.

(Discussion off the record.)

MR. BRENNER: Your Honor, on the plaintiff side, those are lawyers from our team, no witnesses.

THE COURT: All lawyers? You can have a bar meeting here soon.

And these individuals associated with the defendants' defense team, the people in the well?

MR. KINNEY: Those are my clients.

THE COURT: Okay. Very good.

MR. ELLIKER: Your Honor, your courtroom staff has been very accommodating with the seating arrangements, so we appreciate it.

THE COURT: They spent about two hours figuring it out, so we got it together.

All right, Ms. Tinsley.

(Jury present.)

THE COURT: You may be seated.

THE COURTROOM CLERK: Civil Action 2019-917, B.R. versus F.C.S.B., et al.

Counsel, please note your appearances for the record.

MR. BRENNER: Good morning. May it please the

B.R. v. F.C.S.B.

37

Court, Andrew Brenner, Alison Anderson, and Jonathan Fahey,

along -- for the plaintiff, who is here with us in court

today.

THE COURT:  Thank you, sir.

MS. REWARI:  Good morning, Your Honor.  Sona Rewari,

Kevin Elliker, Ryan Bates and Scott Burton here for the

Fairfax County School Board.

THE COURT:  Thank you.  Good morning.

MR. BLANCHARD:  Good morning, Your Honor.  Bruce

Blanchard here from the law firm of Odin Feldman & Pittleman

on behalf of defendant, J.O., who is seated in the courtroom

next to me.  Thank you.

MR. KINNEY:  Good morning, Your Honor.  Michael

Kinney on behalf of A█████ F████████, S█████ T████, M█████

F██████, T██████ B██████, B██████ H█████████, P███ H██████, J███████

F████████, M████ C████, and F█████ T████████.

THE COURT:  Good morning, sir.

MR. DAVIS:  Good morning, Your Honor.  James Davis

on behalf of the defendant, C.K., in this matter.

THE COURT:  Good morning.

THE COURTROOM CLERK:  Ladies and gentlemen of the

jury, as I call your name, please stand, answer present, and

be seated as the next name is called.

Juror No. 1, Henry Andrews, Jr.

THE JUROR:  Present.

B.R. v. F.C.S.B.

38

THE COURTROOM CLERK:  Juror No. 2, Jason Barrios.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 3, Katie Boyette.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 4, Michaela
Broyhill.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 5, Jeremy Burnside.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 6, Ellen Butler.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 7, Audrey Butler.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 8, Gina Ditommaso.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 9, Nicole Dunn.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 10, James Gehlsen.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 11, Samuel Glaser.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 12, Starr Granby.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 13, Daniel Grant.

THE JUROR:  Present.

─────────── B.R. v. F.C.S.B.───────────

39

       THE COURTROOM CLERK:  Juror No. 14, Preston Hayward.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 15 Kayla Heyward.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 16, Nicholas Hill.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 17, Sarah Hott.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 18, David
Houghtaling.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 19, Kevin Kerr.

       THE COURT:  Rule.

       THE COURTROOM CLERK:  Juror No. 20, Christopher
Kopchak.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 21, Suzanne Lyda.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 22, Steven McGinnis.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 23, Trinity Nevarr.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 24, Tuan Nguyen.

       THE JUROR:  Present.

       THE COURTROOM CLERK:  Juror No. 25, Scott Nycum.

———B.R. v. F.C.S.B.———

40

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 26,

A-d-e-g-b-o-y-e-g --

            THE JUROR:  Present.

            THE COURT:  Can you say your name for us?

            THE JUROR:  Adegboyeg.

            THE COURTROOM CLERK:  Thank you.

            THE COURT:  Thank you, sir.

            THE COURTROOM CLERK:  Juror No. 27, Deborah Outlaw.

Juror No. 27, Debra Outlaw.

            THE COURT:  Rule.

            THE COURTROOM CLERK:  Juror No. 28, Ronald Patrick,

II.

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 29, Vishwanath

Peddinti.

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 30, Jose Pereira.

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 31, Jeffrey Pidano.

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 32, Teresa Pittman.

            THE JUROR:  Present.

            THE COURTROOM CLERK:  Juror No. 33, Robert Ritenour.

            THE JUROR:  Present.

41

THE COURTROOM CLERK:  Juror No. 34, William Rorrer.
Juror No. 34, William Rorrer.

THE COURT:  Rule.

THE COURTROOM CLERK:  Juror No. 35, Carl Rosene.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 36, Habibullah
Sherdil.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 37, Kathy Slayton.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 38, Lukas Stanley.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 39, Michael Stevens.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 40, Jennifer Suliga.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 41, Keith Sykes.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 42, Jeffrey Tabish.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 43, Joseph Tatman.

THE JUROR:  Present.

THE COURTROOM CLERK:  Juror No. 44, David Treadwell,
Jr.

THE JUROR:  Present.

B.R. v. F.C.S.B.

THE COURTROOM CLERK:  Juror No. 45, Bimo Yusman.

THE JUROR:  Present.

THE COURTROOM CLERK:  Ladies and gentlemen of the jury, can you stand, raise your right hands and respond after the oath.

(Jury panel sworn.)

THE COURTROOM CLERK:  Please be seated.

THE COURT:  Good morning, ladies and gentlemen. It's okay to say good morning back.  That's what you do when someone says good morning.  I'd say happy St. Patrick's Day or something like that, but that's 364 days out.  So I'll try again.  Good morning.

THE PANEL:  Good morning.

THE COURT:  Thank you for your robust response.

Let me welcome you.  My name is Rossie Alston, Jr. I'll be the judge presiding in this case.  The case is titled B.R. versus F.C.S.B., et al.  "Et al" is a fancy way of saying "and others," and I'll tell you a little bit about that later.

First and importantly, I want to take this opportunity to thank you for your service as jurors.  Nothing you do as an American citizen is any more important than jury service.  Together with voting, it is one of the two cardinal duties each of us has as American citizens.  And it is important that you fulfill these duties.

I know that there is inconvenience associated with

B.R. v. F.C.S.B.

43

jury duty, and it's not easy, but it is vitally important to the role that you're playing here today.

You might have noticed that there were a few people whose names were called and who did not answer, and you might have heard me say "Rule," which basically means that that individual needs to come to court and explain why they didn't show up.

It is a rule to show cause why they should not be held in contempt of court. Interestingly enough, one of the persons who did not show is an attorney. And so he or she is going to have some really explaining to do when we get them back in court.

We're going to proceed as follows: Before the trial begins, there will be jury selection. After jury selection concludes today, the trial will begin with opening statements and you may hear from one witness. We have lawyers, as a fancy term, we call it voir dire, and it means seeking truth.

And so what we're going to do is ask you some questions. These questions are not intended to embarrass you or make you feel uncomfortable, but rather basically done so that we can seat the best people we can to sit in different causes.

In this regard, I'm going to give you a brief description of the case, and the deputy clerk will speak with you later about your responsibilities. If you have an

B.R. v. F.C.S.B.

44

affirmative answer, I'll ask you to just raise your hands or say yes. If you have a negative answer, you don't need to raise your hand, and basically what we're trying to do is identify people who may need to ask follow-up questions.

These questions will be easy to answer. It will be a simple give and take, and you may ask -- answer these questions from where you're seating.

When your name is called or when you give an answer to the question, if you could either give your name or your jury number, and if you don't know your number, don't worry about it. We'll figure it out. Just give us your name so we can basically follow up on the questions.

And so if I were to say something to the effect of, do you have a child, and that's not going to be one of the questions, and you say, "yes," and you raise your hand, and I ask you specific questions, I want to say something to the effect of, "Can you state your name?

Bob Jones.

Can you give us a number?

I don't know my number."

Ms. Armentrout is very good. She'll look the number up for you.

Now, once I finish asking a number of these general questions, I'll ask questions that are more specific to the case. In these instances, you may be asked to come forward

B.R. v. F.C.S.B.

45

one at a time so that you can give your answers in relative

privacy here at the bench.  And I do that to preserve your

privacy as to any information you may have to disclose, and

I'll tell you when that time comes about.

Because of the nature of this case, the parties are

permitted to proceed by pseudonyms.  You might have heard the

clerks call the case as B.R. versus F.C.S.B.  The reason why

we do that is because there are good reasons why we're doing

it, but we'll help you sort through that a little bit later.

I'll reiterate who the parties are so that you may

keep track of them and their roles in this case, and we'll

allow you to take notes so that you can not have to depend on

your independent recollection, but you can look at your notes

to refresh your memory about something that you perceive as

important.

But for purposes of this voir dire, the matter is

brought by plaintiff, B.R.  B.R. has alleged that defendants

F.C.S.B. violated her rights under Title IX of the Education

Amendments of 1972, also referred to as Title IX, by creating

a hostile educational environment and acting deliberately

indifferent to B.R.'s alleged complaint of sexual assault at

her middle school, and also by allegedly retaliating against

B.R. for making such report.

B.R. has also alleged that there is teachers and

administrators that violated her First Amendment rights and

were grossly negligent with respect to the care of B.R.

Finally, B.R. has alleged that fellow students assaulted and battered B.R.  Each of these defendants have denied all of the plaintiff's claims.

All right.  Ladies and gentlemen, as I've explained earlier, if you have an affirmative answer to any question that I ask, I ask that you raise your hand or respond.  If you have a negative answer, you don't need to raise your hand.  I know that many of you answered questions through a questionnaire that we sent out, and we greatly appreciate you taking time to answer those questions.  Because the answers to those questions are so very important, some of them may be repeated now.

Is English your first language?

All right.  If you can say "yes."

THE JURORS:  Yes.

THE COURT:  If English is not your first language, please stand.

All right.  Sir, can you state -- I'll start with you, sir.  Can you state your name or your number?

THE JUROR:  37 [sic], Habibullah Sherdil.

THE COURT:  Okay.  Going to give you the mic there. You can sing a song if you'd like.

Okay.  What's the name, sir?

THE JUROR:  Habibullah Sherdil.

B.R. v. F.C.S.B.

47

THE COURT:  Okay.

THE JUROR:  Number 37.

THE COURT:  Okay.  I asked the question is English your first language.  Do you have any problems reading, writing, or understanding the English language, sir?

THE JUROR:  I do not.

THE COURT:  Thank you, sir.

Next gentleman.

THE JUROR:  My name is to Tuan Nguyen.  Number 24.

THE COURT:  Thank you.

Do you have any problems reading, writing, or understanding the English language?

THE JUROR:  No, sir.

THE COURT:  Thank you, sir.

The gentleman behind you.

THE JUROR:  Jose Carlos Pereira.  The number is 634.  My first language is Portuguese.

THE COURT:  Okay.  Do you have any problems reading, writing, or understanding the English language?

THE JUROR:  None whatsoever.

THE COURT:  Thank you, sir.

Anyone else?

Does anyone here have a problem with your hearing or your eyesight that might make it difficult to hear or see the evidence presented in this case?

—————— B. R. v. F. C. S. B. ——————

48

All right.  If you could work your way around the
room again.  If you could give us your name and or number.

THE JUROR:  Joseph Tatman, 43.  I have mild hearing
loss.  It makes it hard -- like, I have to really struggle to
hear you, sir.

THE COURT:  Okay.  Let me point out for you, at this
point, I'm not on mic.  But if I move over here, I will be on
mic.  Does it make it easier for you to understand and hear?

THE JUROR:  Yes.

THE COURT:  Okay.  The lawyers, when they're
presenting their case, will actually be speaking through a mic
also.  So if we have that in place for you, would you have any
difficulty understanding the proceedings, sir?

THE JUROR:  No.

THE COURT:  Thank you, sir.

Next person.

THE JUROR:  I'm Juror No. 10.  I have slight hearing
loss.  I wear hearing aids.  I can hear fine as long as people
don't have a speech impediment.  And if it's -- this room is
well padded with acoustics, for acoustics.  So if it's like a
gymnasium where there's a lot of echoing and everything, I
have trouble making out sounds.

THE COURT:  Well, typically, sir, lawyers have no
difficulty speaking.  Some of them speak too much.  So I don't
think you're going to have any problems being able to hear.

B.R. v. F.C.S.B.

49

What we will do during the course of the trial, if you have any difficulty hearing or seeing things, I look over at the jury from time to time, if you can just simply raise your hand, and I'll probably figure out what the issue is, and I'll ask the lawyers at that time to speak up a little bit.

THE JUROR:  Thank you.

THE COURT:  Thank you.

Anyone else?

All right.  Ladies and gentlemen, what I'm going to do at this point is identify by name some of the -- at least not -- if not all of the witnesses in this case.  Again, we'll refer to them by pseudonym or less -- more familiar ways going forward.  But the bottom line is for purposes of identifying witnesses, I need you to hear these names specifically.

Anyone acquainted with an individual by the name of B███████ R████████?

Is anyone acquainted with anyone by the name of S██████ T██████?

Is anyone acquainted with anyone by the name of A███████ F████████?

Is anyone acquainted with an individual by the name of P████████ ██ H███████?

Is anyone acquainted with anyone by the name of T██████ B██████?

Case 1:19-cv-00917-RDA-LRV   Document 1042   Filed 08/26/24   Page 50 of 145
PageID# 20763

——B.R. v. F.C.S.B.——

50

Is anyone acquainted with anyone by the name of B███ H███████?

Is anyone acquainted with anyone by the name of M███████ P████████ F████████?

Is anyone acquainted by anybody by the name of M███ C████?

Is anyone acquainted with anybody by the name of F████████ T████████?

Is anyone acquainted by anyone by the name of J████ F████████?

Is anyone acquainted by anyone by the name of J████ O█████?

All right. As I have called these names, I'm going to ask the people who are present in the courtroom who are called by those names to please stand. Just simply stand.

Ladies and gentlemen of the jury, I'm going to ask you to take a look at these individuals who are now standing. Are any of you acquainted by sight with any of these individuals?

(No response.)

THE COURT: Very good. Thank you, ladies and gentlemen.

Now, I'm going to introduce more particularly some of the attorneys in this case, if not all of them.

Do you know or recognize any of the attorneys in

——Tonia M. Harris OCR-USDC/EDVA 703-646-1438——

EASTERN DISTRICT OF VIRGINIA

——— B. R. v. F.C.S.B.———

51

this case?  And I'm going to take them individually.

          And I'm going to ask counsel to please stand as I
say your name.

          Andrew Brenner.

          Thank you, sir.

          Alison Anderson.

          Samantha Peterson.

          Robert Keefe.

          Brittany Zoll.

          Vanessa Tussey.

          MR. BRENNER:  Ms. Tussey is not in the courtroom,
nor will --

          THE COURT:  Very good.

          Are any of you acquainted with the law firm of Boies
Schiller Flexner?

          Are any of you acquainted with Jonathan Fahey?

          Or the law firm of Holtzman Vogel Baran Torchinsky &
Josefiak?

          Next group of attorneys, Ms. Sona Rewari?

          Ryan Bates?

          Mr. Scott Burton?

          Kevin Elliker?

          The law firm of Hunton Andrews Kurth LLP?

          Bruce Blanchard?

          The law firm of Odin, Feldman & Pittleman?

B.R. v. F.C.S.B.

52

James Miller?

MR. BLANCHARD:  Your Honor, he's no longer.

THE COURT:  James Davis?  Law firm of James Davis

PC?

Michael Kinney?  Or the law firm of Michael Kinney,

PLC.

All right.  Did I get all of the attorneys?  All

right.

Counsel for the nine individual teachers and

administrators is Mr. Michael Kinney.

Counsel for J.O. is Mr. Bruce Blanchard and the law

firm of Odin, Feldman & Pittleman.

Have you or any of your family members, any friend

or anyone else you know ever had any dealings with their --

these attorneys or their law firms?

Very good.

Okay.  At this point, I'd like to ask counsel to

read the names of the witnesses, and then I'll -- we'll go

back and go by pseudonyms later.

Mr. Brenner.

MR. BRENNER:  Your Honor, in addition to the names

that you've just read, B██ R██████.  D██ R██████.  Andrew

McLaughlin.  Co█████████ Ki██.  J█████ S██████.  Olivia

Brasengreien (ph).  Dr. Keith Saylor.  Dr. Kevin Weaver.  Alex

Karras.  Bill Woolf.  Dr. Eileen Ryan.  Dr. Joshua Cisler.

Dr. Sidney Binks.  Marcella Rustioni.  Diane Burkhart.

Dr. Jonathan Trager.  Dr. Sarah Cigner -- Cigna, excuse me.

Your Honor, should I try and be reading for the full

list for both sides or just trying -- try to --

THE COURT:  Just --

MR. BRENNER:  Just our side, Your Honor?

THE COURT:  Yes.

MR. BRENNER:  Okay.

THE COURT:  And then if there was someone that was

missed, we can go back and readdress it.

MR. BRENNER:  Rose Rosato.

Your Honor, I think I've covered it.

THE COURT:  Okay.  We can go back and -- if we

missed anyone.

MR. BRENNER:  Thank you.

THE COURT:  Ms. Rewari.

MS. REWARI:  Thank you, Your Honor.

MR. BRENNER:  Oh, I have one more, if I may?

THE COURT:  That's fine.

MR. BRENNER:  May appear by deposition that --

THE COURT:  That's fine, yes, go ahead and read the

name into the record.

MR. BRENNER:  Yeah, Mr. S███ R█████.  Oh, I'm

sorry, Christi Trahan.  Dr. Rachel Ward.

I think that's it, Your Honor.

─B.R. v. F.C.S.B.─

THE COURT:  Thank you, sir.

Ms. Rewari.

MS. REWARI:  Thank you.

We have some duplicates, and I'll try not to repeat them.

THE COURT:  That's fine.

MS. REWARI:  I apologize if I do.

Amy Moir.  Dr. Mary Ann Panarelli.  Dr. Jonathan DeRight.  Dr. Seth Tuwiner.  Dr. Sara Jennings.  Major Fred Chambers.  Rich Genus.  C██████ K████████.

THE COURT:  Can you speak up a little bit?

MS. REWARI:  Sorry.  Should I go back a few?

THE COURT:  No, you're fine.

MS. REWARI:  All right.  Tracy Bromberg. Co████████ Ki██.  Sarah Thompson.  Tiffany Estrella.  Hannah Jordan.  Demetrios Kappatos.  Cheryl Weaver.  Fabio Zuluaga. Richard Boaz.

Thank you.

THE COURT:  Thank you.  Do any of you know any of the following people?

MR. BRENNER:  Can I -- I'm sorry.  Can I just add a few more?

THE COURT:  That's fine.

MR. BRENNER:  Sorry, my apologies.  Sherry Breathwaite.  Nancy Cantalupo, I'm not sure if I did.  And

————B. R. v. F.C.S.B.————

55

Dr. Eileen Ryan.

THE COURT:  Do any of you know any of those
individuals who have been previously mentioned?  Okay.  Which
one did you recognize, sir?  If you can stand, state your name
and number.

THE JUROR:  Twenty-eight, and I believe I know
Dr. Seth Tuwiner.

THE COURT:  Okay.  Without being particular, how do
you know this individual?

THE JUROR:  Neurologist --

THE COURT:  Socially or professionally?

THE JUROR:  Professionally.

THE COURT:  All right.  Thank you, sir.  Anyone
else?  One more hand up, Ms. Tinsley, in the front row.

THE JUROR:  Number 17, I believe she said, Sarah
Hott.  Seth Tuwiner as well.

THE COURT:  Professionally or personally?

THE JUROR:  I was a patient of his, so I'm not sure
what you consider -- I guess professionally.

THE COURT:  Thank you, ma'am.  And your name again?

THE JUROR:  Sarah Hott.

THE COURT:  Thank you.  Anyone else?

As we were going through all of those names, I'm
sure that there were at least thoughts in your mind or sharing
it with your other potential jurors that there's a whole lot

B.R. v. F.C.S.B.

56

of witnesses here, and how long is this case going to be.

Am I reading minds pretty well here?  Well, don't concern yourself with that.  The Court has a very good way of moving things along, and some of these witnesses, quite frankly, are going to be very, very brief.  So don't let the number of witnesses influence or concern you.  We will move them along.

The next question is likely to generate some responses, and I'm going to simply ask you to raise your hand if you have a response to this question.

Have you read or heard anything about this case before coming here today, including on social media, the internet, or the news?  If so, raise your hand.

All right, sir, if I could ask you to come up to the bench.  I'll invite one representative from each team.

(Juror No. 35 present.)

THE COURT:  All right, sir.  Can you state your full name and number, please.

THE JUROR:  Carl Rosene, Juror 35.

THE COURT:  Thirty-five.  And what did you hear about this case?

THE JUROR:  Just that my wife has been talking to me about it, and she was following it because my son's data was included in a data breach that we have information from this case, and so she and her friends started following the case.

——— B.R. v. F.C.S.B. ———

57

THE COURT:  Is there anything about your wife

following the case and you knowing it, I guess, secondhand is

the best way to describe it, which would in any way influence

your ability to sit impartial to the cause?

THE JUROR:  I don't know.  I mean, based on what

she's told me, it's hard to say.

THE COURT:  Okay.  You can have a seat, sir.

Lawyers can stay.  Lawyers can stay.

(Juror is dismissed.)

THE COURT:  His answer was too equivocal for me, so

I'm going to go ahead and excuse him.  As I said at the

beginning, what I'm going to do on this case is I'm not going

to let someone know that they are gone already.  I'll do it at

the very end.

MS. REWARI:  We neglected to bring up juror 6 here

today.  They were excused by your ruling on the motions on the

day, but I think she was inadvertently omitted from the order.

It was an agreed upon juror.  So --

THE COURT:  Yeah, we'll check that.  We'll cross

that.

MR. BLANCHARD:  Full disclosure, when I was coming

up on the elevator -- when I was coming up on the elevator,

one of the jurors -- and I'll check her number -- just asked

me if I was a juror and I said, no.  And I'm looking for it --

I asked if he was one of the clerks -- he said, no.  So that

─────B. R. v. F.C.S.B.─────

58

was all the conversation.

            THE COURT:  That's fine.  Very good.  Appreciate
that.

            THE COURTROOM CLERK:  I think we have another juror.

            THE COURT:  We've got another juror.

            (Juror No. 12 present.)

            THE COURT:  Come on up, ma'am.  State your name
and/or number.

            THE JUROR:  Starr Granby, No. 12.

            THE COURT:  Did you hear something about this case?

            THE JUROR:  I just heard that there was a case.  I
saw a headline, and I heard some people talking about a sexual
assault case in Fairfax, but I don't know details.

            THE COURT:  Was there anything about your exposure
to that headline or whatever would in any way interfere with
your ability to sit impartially on this case?

            THE JUROR:  No.

            THE COURT:  Thank you, ma'am.

            (Juror No. 12 excused.)

            THE COURT:  We've have an opportunity for follow-up
and you can do whatever you want.  I think she saw a headline,
which is not that big of a deal.

            (Open court.)

            THE COURT:  Anyone else?  We got through that a lot
more efficiently.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

59

All right.  Ladies and gentlemen of the venire, I'm going to ask you this question:  Do any of you know any of the other potential jurors?  In other words, do you know somebody else that is part of your group?

Yes, sir.

THE JUROR:  Starr, we went to high school together.

THE COURT:  Oh, okay.  I'm going to ask this in a very oblique or a vague manner:  Is there any problem with you and this young lady serving on a jury together?

THE JUROR:  Not at all.  I haven't seen her in 20 years.

THE COURT:  Did you actually know her or just knew of her?

THE JUROR:  We went to school with her, just passing by.

THE COURT:  What high school did you go to?

THE JUROR:  Hilton High School in Woodbridge, Virginia.

THE COURT:  Hilton Bulldogs, school colors blue and gold.

THE JUROR:  That's right.  State champs.

THE COURT:  Not recently, though.

(Discussion off the record.)

THE COURT:  Anyone else?  Very good.  Thank you.

All right.  Ladies and gentlemen, I'm going to

──────── B.R. v. F.C.S.B.────────

60

introduce to you the court family or my team.  I'm going to

ask them to stand.  Do any of you know Ms. Tonia Harris, the

court reporter here?  Do any of you know Ms. Trish Armentrout?

Any of you know Ms. Alexis August, my senior law clerk?  Do

any of you know Ms. Elizabeth Drill, who is deputy chief of

staff and senior law clerk?  Do any of you know Ms. Joanna

Barry, who is my chief of staff?

     Okay.  I saw a hand go up in the back.  Ma'am, did

you raise your hand?  Oh, okay.  I thought you -- just

brushing your hair?  That's fine.  Very good.

     And the star of our group is the individual, who

will be your liaison between the Court and your activity, is

the best court security officer in the Eastern District of

Virginia, Ms. Devone Tinsley.  Do any of you know her?

     You all will love her by the end of your service

because she's so very good at what she does.

     Very good.

     All right.  Ladies and gentlemen, this case is

expected to last 20 trial days, 20 trial days.  We'll work

Mondays through Fridays.  We will not work on Good Friday.

We'll start our day mostly at 10 o'clock in the morning, maybe

10:30 or so, and we'll typically end our day around 4 o'clock,

unless you all decide that you want to go a little longer.

     The reason why we end at 4 o'clock is because some

people have day care responsibilities and you need to pick up

B. R. v. F. C. S. B.

61

children and the like, and so we're very sensitive to that.

Now, I understand that we all have jobs, family commitments, personal commitments, and a variety of obligations we need to attend to. And I want you to please take a moment of reflection and understand that jury duty is critical to the administration of justice and that the few weeks you might serve in this trial pale in consideration to other circumstances that other individuals will serve in the country.

We send 19- and 20-year-old men and women to fight wars overseas, gone for long periods of time. Your responsibility in this case is going to be 20 days or less. Are there any extraordinary, extraordinary circumstances preventing you from serving on this jury?

All right. Let's go around the room. Hands up, please.

THE JUROR: Thirty-three. I have a father-in-law that was in a bad accident in February, and he's been in ICU in and out. He's in a recovery facility now in Asheboro, North Carolina.

THE COURT: Are you one of the primary caretakers of your father-in-law?

THE JUROR: My wife is power of attorney, and we have to move him when he gets out of the rehab on the 29th up here to an assisted living facility.

─────────────── B.R. v. F.C.S.B. ───────────────

62

THE COURT:  All right.  Thank you, sir.

Raise your hands high so Ms. Tinsley can see you.

THE JUROR:  Juror 35.  I have a funeral in Houston, and in addition, a long-planned family trip and a business trip all around that same week, from the 5th to the 12th.

THE COURT:  Your number was?

THE JUROR:  Thirty-five.

THE COURT:  Okay.  Next?

And, again, we're looking for extraordinary circumstances.  I realize that we have other things that are important in our lives, but it needs to be extraordinary.

Yes, ma'am.

THE JUROR:  I don't know if this is extraordinary. I'm 8.  I have international travel planned for April 25th.  I don't know how long --

THE COURT:  We will be finished before April 25th.

THE JUROR:  Okay.  I didn't know what 20 days was.

THE COURT:  We'll be finished by April 25th.

THE JUROR:  Juror 39.  Is it possible to speak to you in private?

THE COURT:  Yes, sir.  Come on up.

(Side bar.)

THE COURT:  Yes, sir.

(Juror No. 39 present.)

THE JUROR:  So I understand the service requirement.

B.R. v. F.C.S.B.

63

I retired from the Navy 34 years.  I'm the CEO of a nonprofit

organization called the Navy League of the United States.

And it just so happens every year from the 8th to

the 10th of April we have an exposition that we do at Sears.

It's the Gaylord National Convention.

What's significant about this is it generates

80 percent of all of our total annual revenue for the

organization.  And I'm the CEO of the organization, and I'm

responsible for putting the show on.

THE COURT:  Okay.  Thank you, sir.  Okay.  Thank

you.

The lawyers can stay here.  You can have a seat.

What was your number again?

THE JUROR:  Thirty-nine.

(Juror No. 39 excused.)

THE COURT:  We're doing pretty well in the venire.

Unless someone has an objection, I'm going to go ahead and

excuse 17, 35, and 39, unless someone has an objection.

Thirty-three, 35, and 39.  I don't know where I got 17 from.

We got another one.  Does anyone have any objection

to excusing 33, 35, and 39?

(All attorneys negatively respond.)

THE COURT:  State your name and number.

THE JUROR:  Lukas Stanley.  I don't know what my

juror number is.  I think it's 38ish.

—————B.R. v. F.C.S.B.—————

64

THE COURTROOM CLERK:  Thirty-eight.

THE COURT:  Thirty-eight.  Okay.

THE JUROR:  So I work in a SCIF, and I'm on high demand for contracts, and I have to be on site for those things every day, so...

THE COURT:  You work with the Department of Defense or something?

THE JUROR:  Yes.  I'm a DOD contractor.  I've got three projects that I run.

THE COURT:  Would you suggest to the Court that the nature of your work affects National Security?

THE JUROR:  Yes.

THE COURT:  In a significant way?

THE JUROR:  Yes.

THE COURT:  Thank you, sir.

THE JUROR:  And I also have a back thing that I can't sit for very long, so that's --

THE COURT:  How do you sit in a SCIF if you can't sit?

THE JUROR:  I stand up a lot.

THE COURT:  Okay.  Thank you, sir.

(Juror No. 38 excused.)

THE COURT:  All right.  Excused.

Does anyone have any problem with him being excused?  Very good.

B.R. v. F.C.S.B.

65

Anyone else?  Very good.  We're not doing bad.

I got 33, 35, 38, and 39.

All right.  Very good.

Is there one other individual that needs to address
the Court?

(Open court.)

THE COURT:  There's one other individual that needed
to address the Court?

THE JUROR:  Good morning, Your Honor.  Juror No.
10277536 -- sorry, 775376.  My name is Katie Boyette.  I am a
high school English teacher, and we are currently in the
middle of preparing for our state exams, known as the SOLs.
And I also teach AP -- an AP English course, and I have to
prepare my students for both exams that are very important,
and we are also in the middle of, of course, a teacher
shortage and a substitute shortage.

So if I am gone for a considerably long amount of
time, I do fear that my students will not have the proper
preparation, and if this isn't extraordinary, I do apologize,
but I did want to make that known.  Thank you.

THE COURT:  I appreciate that, ma'am.  You're No. 3,
correct?

THE JUROR:  Yes.  I thought I was No. 3.  I wasn't
sure.  Sorry.

THE COURT:  Thank you.  Anyone else?

B.R. v. F.C.S.B.

66

THE JUROR:  Is this the time to disclose a potential health concern, a personal health concern?  Or is it a different question?

THE COURT:  Come on up, sir.

(Side bar.)

(Juror No. 31 present.)

THE COURT:  Just a second.

THE JUROR:  Yeah.

THE COURT:  All right.  Can you state your name or number, sir?

THE JUROR:  Yeah, Geoffrey Pidano.  Number 31, I believe.

THE COURT:  Okay.

THE JUROR:  I just have like Crohn's disease.  It's like a gastrointestinal.

THE COURT:  Okay.

THE JUROR:  So they took out my colon, so sometimes --

THE COURT:  I understand.

THE JUROR:  -- I get like urges.  Like, I don't -- I'm not going to --

THE COURT:  I understand.

THE JUROR:  -- lose control.  But --

THE COURT:  I understand.

THE JUROR:  -- it could be a distraction.  Like --

B.R. v. F.C.S.B.

67

and I'm sure you guys have bathroom breaks.  But --

        THE COURT:  We do.

        THE JUROR:  -- I don't want to lose focus during, you know, some key testimony or something like that.

        THE COURT:  I appreciate you --

        THE JUROR:  Yeah.

        THE COURT:  -- sharing that information, personal.

        THE JUROR:  It's under good control, but it could potentially -- every day is a little bit different.

        THE COURT:  Okay.  Very good.

        THE JUROR:  I just want to let you know.

        THE COURT:  Thank you, sir.  We appreciate it.

        (Juror excused.)

        THE COURT:  Since we're doing pretty well, I'm of the mind to let the English teacher go.  Anyone have any problem with that?

        Very good.

        MS. ANDERSON:  It's No. 3?

        THE COURT:  Yeah, No. 3.

        Just to be protective, I'm going hold on to him just a little bit because he said he can control it.  We will take bathroom breaks.  I don't want to get to the point where I'm stuck.  So we'll retain him for right now.

        Okay.  Thank you.

        (Open court.)

B.R. v. F.C.S.B.

68

        THE COURT:  This is a very broad question.  And I'm
looking for not general responses, but rather specific
responses, so listen to the question very carefully.

        Have you had any experiences with judges, lawyers or
the courts that would effect your ability to hear this case
fairly and impartially?

        (No response.)

        THE COURT:  Very good.

        The next series of questions are more case specific.
They may take a little bit more reflection, but listen to them
or try to pose them as best you can.

        If you or a member of your immediate family attended
Fairfax County public schools, is there anything about that
experience that would render you unable to give a fair and
impartial verdict in this case?

        (No response.)

        THE COURT:  Very good.

        If you or any member of your immediate family have
worked for Fairfax County public schools, is there anything
about that experience that would render you unable to give a
fair and impartial verdict in this case?

        (No response.)

        THE COURT:  We'll give you an opportunity to
approach the bench, if you need to, on this next question.

        Have you or any member of your immediate family or

B.R. v. F.C.S.B.

69

close friends been the victim or have been accused of sexual

assault or sexual harassment?

　　　　　All right.  Got a few hands.  We got to bring those

people up to the bench.

　　　　　If you have a response to that question that you

need to discuss, just get in line, and we'll take you in turn.

　　　　　(Side bar.)

　　　　　(Juror No. 38 present.)

　　　　　THE COURT:  All right, sir.  Again, state your name

and number, please.

　　　　　THE JUROR:  Twenty-eight.  Ronald H. Patrick, II.

　　　　　THE COURT:  All right.  Can you tell us a little bit

about that.

　　　　　THE JUROR:  My wife was sexually abused as a child.

　　　　　THE COURT:  As a child.  Anything about her

experience or her discussions with you in any way render you

in a position to not fairly hear this case?

　　　　　THE JUROR:  No, sir.

　　　　　THE COURT:  All right.  Thank you, sir.

　　　　　THE JUROR:  Yup.

　　　　　(Juror excused.)

　　　　　(Juror No. 35 present.)

　　　　　THE JUROR:  Juror 35.

　　　　　THE COURT:  Yes, sir.

　　　　　THE JUROR:  A neighbor child was raped.  And, in

B.R. v. F.C.S.B.

70

fact, the assailant was convicted of rape.

THE COURT:  Is there anything about that experience that would render you unable to sit indifferent to this cause?

THE JUROR:  That particular incident, no.  She has a history, though, of probably being the victim of assault, but also making accusations that weren't believed, so that could be -- color.

THE COURT:  Okay.  Thank you, sir.

(Juror excused.)

THE COURT:  Counsel, he's already been excused so we don't have to worry about that one.

Next.

(Juror No. 6 present.)

THE COURT:  Good morning, ma'am.  State your name and number, please.

THE JUROR:  I'm Juror No. 6, Ellen Butler.

THE COURT:  Okay.  And what did you want to tell us, ma'am?

THE JUROR:  I disclosed this on my questionnaire, but I had an incident back in college.  I never reported it or anything, but I was simply sort of what you call a date rape situation.

THE COURT:  Was there anything about that experience that would interfere with your ability to sit indifferent to the cause?

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

71

THE JUROR:  I don't believe so, Your Honor.

THE COURT:  Thank you, ma'am.

(Juror excused.)

MS. REWARI:  I believe this was the juror by
agreement.

THE COURT:  What was the number?  Number 6.
Number 6 was excused earlier, I believe.  We'll check it.
We'll cross check it.

(Juror No. 14 present.)

THE COURT:  Good morning, sir.  State your name and
number, please.

THE JUROR:  Number 14.

THE COURT:  Okay.  What did you want to share with
us, sir?

THE JUROR:  My daughter graduated from South County.

THE COURT:  Okay.

THE JUROR:  Outside of school.  Suffered sexual
assault.

THE COURT:  Okay.  Was there anything about that
particular situation which would interfere with your ability
to sit indifferent to this cause?

THE JUROR:  No, sir.

THE COURT:  All right.  And your juror number again
was?

THE JUROR:  14.

B.R. v. F.C.S.B.

72

THE COURT: Okay. Thank you, sir.

THE JUROR: Yes, sir.

(Juror excused.)

(Juror No. 42 present.)

THE COURT: Good morning, sir. How are you? Can you state your name and juror number?

THE JUROR: I'm sorry. I have my juror number back at the seat.

THE COURT: Okay. What's your name? We'll look it up.

THE JUROR: Jeff Tabish. I have a younger brother who's serving a long sentence, having sex with a minor.

THE COURT: Okay. The gentleman said, for the record, in case anyone couldn't hear, he's got a brother who has been prosecuted and convicted for a sexual relationship with a minor.

And so, this information that we're taking here will not be disclosed as part of the public record. We really appreciate you coming forward and disclosing that information.

And what was your number again?

Jeff Tabish. And I have my --

THE COURTROOM CLERK: Forty-two.

THE COURT: Forty-two. Forty-two.

All right. Would that experience in any way interfere with your ability to sit indifferent to this case?

—B.R. v. F.C.S.B.—

73

In other words, could you hear this case fairly?

        THE JUROR:  Yes.

        THE COURT:  All right.  Thank you, sir.

        (Jury excused.)

        (Juror No. 26 present.)

        THE COURT:  Name and number, sir.

        THE JUROR:  Adegboyeg Ogunlewe, 26.

        THE COURT:  What would you like to share with us?

        THE JUROR:  In another jurisdiction, one of my
cousins was sexually assaulted, and she didn't get, what I
consider, a fair trial then.

        THE COURT:  Would that experience in any way
interfere with your ability to hear this case?

        THE JUROR:  That's not what I'm sure about.

        THE COURT:  Okay.  Would it be fair to say that
because of the way you believed your relative was treated in
this case that would cause you some consternation here in this
case?

        THE JUROR:  I think of myself as somebody that would
be fair, honest, but I can't say for sure if it would.

        THE COURT:  Appreciate that, sir.  Thank you.

        (Juror excused.)

        THE COURT:  We should probably should let him go.  I
know that he might be more sympathetic to one side than the
other, but I think it's safe to let him go.  So -- 42 it was?

B.R. v. F.C.S.B.

74

THE COURTROOM CLERK:  Twenty-six.

THE COURT:  Twenty-six.

(Juror No. 22 present.)

THE COURT:  All right.  Sir, your name and number.

THE JUROR:  Steve McGinnis.  22, I believe.

THE COURT:  Okay.  Go ahead, sir.

THE JUROR:  So a friend of mine in high school was
sexually assaulted.  And then my cousin was sexually assaulted
in college and dropped out after that.

THE COURT:  Would that experience or the experiences
of your friends and your relatives interfere with your ability
to sit indifferent to the cause?

THE JUROR:  I don't know if it would.

THE COURT:  Can you rephrase it?

THE JUROR:  No, it should not.

THE COURT:  Okay.  Very good, sir.  Thank you.

THE JUROR:  Thank you.

(Juror excused.)

THE COURT:  Come on up, ma'am.

(Juror No. 9 present.)

THE COURT:  Yes, ma'am.

THE JUROR:  So I was molested.

THE COURT:  Name and number.

THE JUROR:  Nicole Dunn.  I'm sorry.

THE COURT:  That's all right.

B.R. v. F.C.S.B.

75

THE JUROR:  I think it's 9.

THE COURTROOM CLERK:  Yes.

THE COURT:  Yes.  Okay.  9.  Okay.

THE JUROR:  I was molested by a family member when I was younger.

THE COURT:  Obviously, we regret that incident, but is there anything about that experience that would interfere with your ability to sit indifferent to this case?

THE JUROR:  No, sir.

THE COURT:  Okay.  Thank you.

(Juror excused.)

(Juror No. 6 present.)

THE COURT:  Good morning.  Your name and number, please.

THE JUROR:  I think it's 16 [sic], Kayla Heyward.

THE COURT:  Okay.  What would you like to share with us?

THE JUROR:  I've been a victim of sexual harassment growing up.

THE COURT:  Okay.  Was that in the workplace or in school or what context?

THE JUROR:  School.

THE COURT:  Okay.  Would there be anything about that experience that would interfere with your ability to hear objectively to this case?

B.R. v. F.C.S.B.

76

THE JUROR:  Probably biased.

THE COURT:  Okay.  What was your number?

THE JUROR:  Sixteen [sic].

THE COURT:  Thank you.

THE COURTROOM CLERK:  It's actually 15.

THE COURT:  Fifteen.

(Juror excused.)

(Discussion off the record.)

THE COURT:  Anybody have any objection to 15?  No objection to 15 being out.  Very good.

I think this gentleman here just wants to tell us something, so we'll hear what it is.  Is he one we've already gotten ridden of?

That's the Navy league guy.  Joanna, tell him we're fine.  Don't tell him he's out, but we don't need to bring him up.

Very good.  We worked our way through that.  The next questions are pretty benign, so I think we're in a pretty good position right now, but if something else comes up, we'll come back to that.  Thank you for your agreement and willing to come to a conciliation on these types of things.  I appreciate that.

MS. ANDERSON:  For the record, we struck 26?

THE COURTROOM CLERK:  Thirty-five, 33, 39, 38, 35, 26, 15.

B.R. v. F.C.S.B.

77

(Juror No. 20 present.)

THE COURT:  Name and number, please.

THE JUROR:  Chris Kopchak, Juror No. 20.  So I'm perfectly fine being able to serve on the trial as a juror. But I was under the understanding that, like, current active law enforcement were exempt.

THE COURT:  No.

THE JUROR:  Okay.  That's all.

THE COURT:  Good try.

THE JUROR:  Just wondering.

THE COURT:  Thank you.

(Juror excused.)

THE COURT:  I never heard one that.

MS. ANDERSON:  Some states they are in certain localities.

THE COURT:  Not in the Old Dominion.

Thank you.

(Open court.)

THE COURT:  We're back to everyone.  Some of the evidence in this case may include testimony regarding alleged sexual assault and sexual interactions between 12- and 13-year-old children.

Would you have any difficulty listening to this type of evidence and deciding this case fairly and impartially based on all of the evidence?  This question is not directed

B.R. v. F.C.S.B.

78

to other individuals who have already approached the bench and discussed some personal and private information.

Does anyone have a response to that?

Thank you.

Would the fact that the plaintiff is an individual, in other words, one person, and one of the defendants is a public entity impact your ability to decide this case fairly and impartially?  If so, raise your hand.

If plaintiff proves her case based on the law on which I will instruct you later and based on the evidence of the case, would any of you be unwilling to award her damages?

Conversely, if plaintiff does not prove her case based on the law on which I will instruct you later and based on the evidence in this case, would any of you be unwilling to find in favor of the defendants and awarding plaintiff nothing?

Very good.

Is there anyone who feels that if you were selected to sit as a juror in this case, you would be unwilling or unable to render a verdict based solely on the evidence presented at this trial and the law which I will instruct you on at the conclusion of the trial?  Would you be unwilling to follow the law as it is given to you if you disagree with it?

It is important that every juror here hear all the testimony and instructions of the case.  Would you be

B.R. v. F.C.S.B.

79

unwilling to raise your hand or speak up if you don't hear
something a witness or the Court says?

Another way of putting that, from time to time I
will look over at the jury to make sure that you're okay and
you're able to hear things.  I want to make sure that if you
want to communicate with the Court, you can raise your hand or
do this or something to let me know that you need the lawyers
to either speak up or if you need a bathroom break, a little
bit more frantic way would probably be more appropriate, but
would any of you be unwilling to follow that sort of protocol
in the court?

Very good.

Does anyone here have any other matters that you
feel you should call to the Court's attention that may have
some bearing on your qualifications as a juror, or you feel
may prevent you from rendering a fair and impartial verdict
based solely upon the evidence and my instruction?

And again, that question goes primarily to people
who have not had the opportunity to speak with the Court and
the lawyers at the bench.

All right, ladies and gentlemen, you can sit at
ease.  I'm going to bring the lawyers up.

(Side bar.)

THE COURT:  Number 6 should have been here,
according to us.

B.R. v. F.C.S.B.

80

MS. REWARI:  I think it's 9.

Number 9.

MS. ANDERSON:  I thought it was 6.

MS. REWARI:  Everything got -- they got renumbered.

THE COURT:  That's fine.  Are there any strikes for cause?

MS. ANDERSON:  That we didn't already do up here?

THE COURT:  That have not been addressed.

MS. ANDERSON:  Sorry, there was one that we just realized works for Fairfax County as their employer that we did want to raise.

THE COURT:  Just the fact that they're employed by the County doesn't necessarily make them incompetent, does it?

MS. REWARI:  County or the school system?

MS. ANDERSON:  It says on their disclosure they didn't -- they didn't include.

(Off-the-record discussion.)

THE COURT:  Any other strikes for cause?  Very good. We gave you the prescriptions as to how you can go through the striking process.  We do have enough people now in the venire where we can get through it without having to reformulate things.

We'll follow the protocol that we set out for the strike that the one defendant who is no longer present here today, we'll just let that one fade into the ether, so

B.R. v. F.C.S.B.

81

that's -- so one less strike for the defendant.

So -- okay.  Remember as you're going through the striking process, no back strikes, so make sure that you -- if you want to remove someone on your peremptory that you get rid of them on the round that they are up because once they are seated, you can't unseat them.

MS. ANDERSON:  I'm sorry, Your Honor.  No. 40, I don't think we spoke to her today, but she had said that she would possibly be not able to be impartial, the reason for her mom being a retired schoolteacher.  Can we just talk to her.

THE COURT:  Yeah, we can bring her up.

Who is No. 40, Trish?

THE COURTROOM CLERK:  Jennifer Suliga.

THE COURT:  Juror No. 40 please come up.

(Juror No. 40 present.)

THE COURT:  Good morning, ma'am, not meaning to single you out, but we have singled you out.

THE JUROR:  I feel singled out.

THE COURT:  On your jury questionnaire you had raised some concern about apparently your mother or relative being a schoolteacher and the like.

Was there anything about that situation or circumstance or past history of your mother that would interfere with your ability to sit as an impartial juror in this case?

B.R. v. F.C.S.B.

82

THE JUROR:  No.  I felt that it was necessary to say.  Just a fact.

THE COURT:  Sure, absolutely.  We want information. Thank you, ma'am.

(Juror No. 40 excused.)

MS. REWARI:  There were two members of the venire that had experience with our expert.  We would like to make sure there is not adverse experience.

THE COURT:  Did you write the numbers down?

MS. REWARI:  I did.

THE COURTROOM CLERK:  Seventeen and 28.

THE COURT:  Juror 17, please.  And on deck, Juror 28.

(Juror No. 17 present.)

THE COURT:  Good morning, ma'am.  Your Juror number and your name, please?

THE JUROR:  Sarah Hott and 17.

THE COURT:  You indicated earlier in response to a general question that you had some experience with one of the professionals in this case.  Which one was that?

THE JUROR:  Tuwiner.

THE COURT:  Okay.  Was there anything about that experience or your professional relationship with that individual which would impact your ability to hear this case impartially?

─────B. R. v. F. C. S. B.─────

83

THE JUROR:  No.  My husband and I really had negative opinions after seeing him.  It was not -- we sought healthcare elsewhere.

THE COURT:  If I were to instruct you that you're to consider that witness's testimony based solely on the evidence which you hear in court today and not necessarily equate any of your professional experience with this individual, would you be willing to do that?

THE JUROR:  Yes.

THE COURT:  Thank you.

(Juror No. 17 excused.)

THE COURT:  Joanna, what number are we?

THE COURTROOM CLERK:  Twenty-eight and number of strikes, seven.

(Juror No. 28 present.)

THE COURT:  Good morning again, sir.  If you could state your name and number.

THE JUROR:  Twenty-eight.  Ronald Patrick.

THE COURT:  Okay.  Sir, you indicated in response to one of my general questions that you had a relationship with one of the professionals in this case.  Which one was that?

Seth Tuwiner.

THE COURT:  Okay.  Was there anything about that professional relationship that you had with that particular individual which would interfere with your ability to hear

B.R. v. F.C.S.B.

84

this case impartially?

THE JUROR:  No, sir.

THE COURT:  Thank you, sir.

(Juror excused.)

THE COURT:  I think the first lady probably should be excused.  Again, we won't tell her, but she was trying, but she didn't get there.

Very good.  Any other strikes for cause?

MS. ANDERSON:  With the Court's indulgence, if we could just figure out if there is one that we think we agreed to that you agreed to that wasn't on the order somehow, but we --

THE COURT:  All right.  Put your heads together very quickly, very quickly, and then we'll come back.

MR. KINNEY:  The Court finally calibrated the algorithm.  We've lost one on the defense side?

THE COURT:  Which was more related to a particularized defendant.  What I will do is this.  If you all cannot come to an agreement on the three that you're supposed to do together, then I'll take another look at it.  Okay.

MR. KINNEY:  Thank you.

THE COURT:  You understand what I'm saying?  Did you follow me?

MS. ANDERSON:  No, not totally.

THE COURT:  They have what I call three combined

strikes.  If they have a point where they are not in agreement

as to how they are going to exercise their three, I may give

them one back.

        MS. ANDERSON:  Okay.

        THE COURT:  Okay.  All right.  Anybody else?  All

right.  Why don't you put your heads together really quick on

that one, and we'll come back and you can just let us know.

        (Counsel confers.)

        (Discussion off the record.)

        THE COURT:  Which one was it that you think you

agreed on?

        MS. ANDERSON:  Juror No. 6.

        THE COURT:  Do you agree?

        MS. REWARI:  Yes.

        THE COURT:  We're still fine.  Okay.  No. 6 will be

excused.  As I said, I'm not going to tell the people that

have been excused that they are excused before we actually get

the jury seated.

        MR. BLANCHARD:  I did appreciate the -- letting me

know.

        (Open court.)

        THE COURT:  Ms. Armentrout.

        THE COURTROOM CLERK:  Ladies and gentlemen of the

jury, as I call your name, please come forward and have a seat

in the jury box as directed by the security officer.

B.R. v. F.C.S.B.

86

Juror No. 41, Keith Sykes.

Juror No. 7, Audrey Butler.

Juror No. 10, James Gehlsen.

Juror No. 1, Henry Andrews, Jr.

Juror No. 32, Teresa Pittman.

Juror No. 2, Jason Barrios.

Juror No. 42, Jeffrey Tabish.

Juror No. 30, Jose Pereira.

THE COURT:  Ladies and gentlemen, this is part of the process that's a lot less formal.  As we try to select the individuals who are going to sit on this cause, and what I like to do is I like to sort of play what I call a little bit of games where we can recognize people who are special, and so we'll play a few of those games that I like to play.

(Discussion off the record.)

THE COURTROOM CLERK:  Would the following jurors please return to your seat in the courtroom.

Juror No. 10, James Gehlsen.

Juror No. 42, Jeffrey Tabish.

Juror No. 2, Jason Barrios.

Juror No. 7 , Audrey Butler.

Would the following jurors please come forward and have a seat in the jury box as directed by the court security officer?

Juror No. 28, Ronald Patrick, II.

B.R. v. F.C.S.B.

87

Juror No. 36, Habibullah Sherdil.

Juror No. 8, Gina Ditommaso.

Juror No. 9, Nicole Dunn.

(Counsel confers.)

(Discussion off the record.)

THE COURTROOM CLERK:  Would the following jurors
please return to your seats in the courtroom?

Juror No. 8, Gina Ditommaso.

THE JUROR:  Ditommaso.

THE COURTROOM CLERK:  Thank you.  I apologize.

Juror No. 28, Ralph Patrick, II.

Juror No. 9, Nicole Dunn.

Juror No. 40, Jennifer Suliga.

Juror No. 43, Joseph Tatman.

Juror No. 24, Tuan Nguyen.

(Counsel confers.)

(Discussion off the record.)

THE DEPUTY CLERK:  Would Juror No. 40, Jennifer
Suliga, please return to your seat in the courtroom?

Juror No. 5, Jeremy Burnside.

(Counsel confers.)

(Discussion off the record.)

THE COURTROOM CLERK:  Will Juror No. 5, Jeremy
Burnside, please return to the courtroom?

Juror No. 21, Suzanne Lyda, please have a seat in

─B. R. v. F. C. S. B.─

88

the jury box.

        (Counsel confers.)

        (Discussion off the record.)

        THE COURTROOM CLERK:  No. 21, Suzanne Lyda, please return to your seat in the courtroom.

        Juror No. 12, Starr Granby.

        (Counsel confers.)

        (Discussion off the record.)

        THE COURTROOM CLERK:  Ladies and gentlemen of the jury, will you please stand, raise your right hand and respond after the oath.

        (Jury sworn.)

        THE COURTROOM CLERK:  Please be seated.

        THE COURT:  Ladies and gentlemen of the venire, in other words, people that were selected to be here today to potentially serve as jurors, I want to thank you on behalf of the Eastern District of Virginia for your service in coming here today.  The fact that you were here today to participate in the process was -- was incredibly important to this process.  Just because you didn't get to serve on this particular jury doesn't mean that you won't be called on for further service.

        What I would encourage you not to do is to contact your fellow jurors and ask them about what's going on in the case because one of the instructions that they're going to

B.R. v. F.C.S.B.

89

receive is not to discuss the case or any aspect of the case
with anyone while the case is pending.  So while you might be
interested in what's going on, I would require and request
that you make sure that you do not contact these individuals
as to the process that we're going through.

As I indicated earlier, those few jurors who did not
show for jury are going to have consequences associated with
their failure to appear.  So your being here today was so
critical and so important to the administration of justice,
and I thank you for being here today.

Ms. Tinsley will escort you out.  And, once again,
thank you for being here.

(Jury venire excused.)

THE COURT:  You may have a seat.  Thank you, ladies
and gentlemen.

All right.  Ladies and gentlemen of the jury, what
we're going to do at this point is give you a bit of a break
for comfort and allow you to secure your personal items.

As I said, Ms. Tinsley will be the liaison between
you and the Court.  So anything you require, anything that you
need, just let Ms. Tinsley know.

She's also going to take your cell phone numbers so
that we can make sure that we can stay in contact with you,
and I'll let you know if anything is going on.

Tomorrow morning we will start at 10:30.  Usually,

———B. R. v. F.C.S.B.———

90

we will start at 10:00, but tomorrow morning we're starting at
10:30.  I have a doctor's appointment that I need to go to,
but we'll start at 10:30.

    We'll usually end our day sometime around 4:00 or
5:00, depending on how things are going.

    Today we're going to get through opening statements
and probably a witness or two.  We'll do as best we can to get
you out of here by 4 o'clock.

    We'll -- make sure that you contact your employers
to let them know the commitment that you've made and the
responsibility that you have.  If you run into any problems
with the employer, simply let me know, and I will take care of
it.  Okay?

    So let me go ahead and let you take your bathroom
break, and we'll come back in at, say, oh, 12:05, and we'll
take our lunch sometime around 1:00.

    Yes, sir?

    THE JUROR:  Are we allowed to take notes?

    THE COURT:  Yes, Ms. Tinsley is going to make
arrangements for that when she takes you to the back.

    (Jury excused.)

    THE COURT:  You may have a seat.

    I want to compliment counsel with regard to the
efficiency that we were able to conduct this process.  I told
you we would do it in two hours, and we did it in two hours

B. R. v. F. C. S. B.

91

and five minutes.  I apologize for the five minutes that I was
unable to account for.

But we're going to go ahead and let you take your
comfort break at this point.  As I said, I would hope that the
opening statements are no more than about ten minutes a piece.

We'll go in turn.  The defendants can decide what
order they want to go in as far as making their opening
statements.

But try to keep the Court, as best you can,
accounting for who's talking.  And make sure that when you
make your opening statements you identify yourself for the
record, but you can go in any order that you want.

As I said in the minute order that was issued, if we
get to some witnesses today, remember that you're speaking
with one voice.  Obviously, the defendants are not speaking
with one voice for every single witness, but you don't need to
cover ground that's already been covered.

If you're handling this direct examination of a
witness, you're the one that needs to make the objections.
Obviously, your counsel can consult with you and make
suggestions, but you speak with one voice as far as the
objections that you may want to watch.

It looks like you want to say something, sir?

MR. BRENNER:  Yeah, on the time issue, I'm not going
to lie to Your Honor, I was planning a lot longer than ten

B.R. v. F.C.S.B.

92

minutes, but you've given us ten minutes.  I just -- it seems

to me -- I don't know what that means as far as --

THE COURT:  I'm not going to ring a bell or

anything.

MR. BRENNER:  No, I'm more concerned with if the

plaintiff gets ten minutes and the defendants get 30 because

they each take ten minutes.

THE COURT:  Well, I'm hoping that the defendants

don't need to cover the same ground that their first speaker

covers.

And, again, I say ten minutes, but if you're 11, 12,

13, you know, I'm not going to ring a bell.  You may get a

look from me if you start repeating.  And I'm not suggesting

that you will.  But the bottom line is from the defendants'

standpoint, they don't need to restate what their cocounsel

have said.  So I'm hoping that they know how to manage their

time.  And if they don't, we'll deal with it.

MR. BRENNER:  And, Your Honor, one other request.

Because it's a long trial and so we're obviously going to

cover very little in opening, that's fine.  I would like to be

able to tell the jury that Your Honor has given us a time

amount so it doesn't look like I'm trying to just --

THE COURT:  Yeah, you can throw me under the bus.

That's fine.

MR. BRENNER:  Okay.  So I'll say that the Court has

B.R. v. F.C.S.B.

93

asked us to keep --

THE COURT:  And when I bring them back in, I
probably will say something to them that, you know, we have
good lawyers, and they have been instructed to present their
opening statements in an efficient way, and typically we're
looking at a finite amount of time, so please pay attention to
the lawyers as they speak.  I'll take care of that for you.

MR. BRENNER:  You don't want me to say anything on
it?

THE COURT:  You can say something too.

MR. BRENNER:  Okay.

THE COURT:  But I'll say it.

MR. BRENNER:  And then as far as -- so we're going
to open, all the sides will open, and then we're going to take
our lunch break?

THE COURT:  We can take a lunch break, and then
we'll try to work through a witness or two.

MR. BRENNER:  And just for Your Honor's
understanding, the first witness will take well into tomorrow.

THE COURT:  Sure.

MR. BRENNER:  Okay.  So it's going to be the
plaintiff's mother.

THE COURT:  What I would like you to do, if you can,
if you find a natural breaking point from your first witness,
somewhere around 3 o'clock, 3:30, or something like that, you

B.R. v. F.C.S.B.

94

can say, Your Honor, this might be a good time for us to adjourn for the day.  That's fine too.

            MR. BRENNER:  And then as soon as we sit down or Your Honor leaves the bench, I'm going to give them a copy of the things that I would like to show the jury, so if they have objections, maybe you could just deal with it for a minute before we start?

            THE COURT:  Sure.  And for housekeeping purposes, and, again, this is a little different than other judges in the Eastern District, I don't mind if you move about the well a little bit.

            MR. BRENNER:  Right.

            THE COURT:  I don't want you to get too close to the jury, but if you want to walk around, that's -- that's fine with me.  You don't have to stay behind the lectern.

            MR. BRENNER:  Right.  But my -- my understanding, if we're going to show stuff, we need to show it to each other first, and then give you a chance to rule if there's an objection?

            THE COURT:  Yes.

            MR. BRENNER:  Okay.  So I will do that as soon as you walk off the bench.

            THE COURT:  Okay.  Thank you.

            MR. BRENNER:  Okay.

            THE COURT:  We'll see you in about 10, 15 minutes.

B.R. v. F.C.S.B.

95

MR. BRENNER:  Your Honor.

THE COURT:  Yes?

MR. BRENNER:  I'm sorry.  I guess I need to know for opening purposes who my defendants are.

THE COURT:  Who your defendants are?

MR. BRENNER:  Well, you didn't enter the order of dismissal as to C.K., so the plaintiff needs to know who the -- I mean, we believe the case was dismissed as to him, but Your Honor decided --

THE COURT:  It seems to me that if you settled with someone that they're no longer in this case.

MR. BRENNER:  I'm sorry?  Okay.  I will -- I will govern myself accordingly.

MR. DAVIS:  Judge, I'm just looking for some guidance, does that mean I don't participate in opening and examinations?  I just don't want to --

THE COURT:  Are you adherent to your settlement agreement?

MR. DAVIS:  Pardon me?

THE COURT:  Are you adherent to the agreement?

MR. DAVIS:  Yes, sir.

THE COURT:  Okay.  Very good.

MR. BRENNER:  Thank you, Judge.

(Recess.)

(Court proceedings resumed at 12:10 p.m.)

B.R. v. F.C.S.B.

96

THE COURT:  Ms. Tinsley.

(Jury present.)

THE COURT:  You don't have to sit where you were sitting all the time.  Wherever you're comfortable, just have a seat.

(Discussion off the record.)

THE COURT:  Everyone can have a seat.  Thank you.

Good afternoon, ladies and gentlemen.

Members of the jury, now that we've completed voir dire, we will begin the trial of the case you heard about during jury selection.  Before the trial begins, I'm going to give you some instructions that will help you understand what will happen and how you should conduct yourself during the trial.

During the trial, you will hear me use a few terms that you may have not have heard before.  Let me briefly explain some of those common terms.

The party who sues is called the plaintiff.  The party being sued or the parties being sued is called the defendant or defendants.

In this action, the parties will be using pseudonyms for the plaintiff and for the individual defendants involved in this case from time to time.  In your consideration of the claims and evidence in this case, you should not assign any relevance to the use of pseudonyms or to the fact that the

B.R. v. F.C.S.B.

97

parties have agreed to use pseudonyms.  From time to time, you

may use -- hear the lawyers in the case actually refer to

parties or individual witnesses by familiar names, do not give

that any weight whatsoever.  Just a way of helping you

understand who's testifying and making a record as best they

can.

The parties have agreed that the plaintiff may be

referred to as B.R. by those initials.  There are multiple

defendants against whom plaintiff asserts varying claims.  The

Fairfax County School Board, which will usually be referred to

as the School Board, or F.C.P.S., as well as individuals will

be referred to by their initials.

The individual defendants can be broken down

generally into two groups:  School employees and former

students.  The individual employee defendants are S.T., A.F.,

P.A.H., T.B., B.H., M.P.F., M.C., F.T., and J.F.

The individual former student defendant is J.O.

In your consideration of the claims and evidence in

this case, you should not assign any relevance to the use of

pseudonyms.  And in addition to that, the parties may from

time to time refer to people more familiar.

For instance, a person may have the name Susie

Jones, and one of the lawyers may call her Susie.  And just so

to make sure that we all understand what's going on and it's

not meant to be any disrespect in any way.

B.R. v. F.C.S.B.

98

Plaintiffs claim that between October 2011 and February 2012, when she was in the 7th grade at Rachel Carson Middle School, she was subjected to sexual harassment by fellow students and unknown others that were so severe, pervasive, and objectively offensive that they effectively denied her access to an educational opportunity or benefit.

Specifically, she claims that J.O. and others sexually harassed and assaulted her at Rachel Carson Middle School and in the context of which the School Board could have exerted substantial control.

She claims that school officials who had the power to take corrective action to remedy the effects of the sexual harassment and sexual assaults were deliberately indifferent after learning of the alleged sexual harassment and sexual assaults and that their actions were clearly unreasonable in the light of the known circumstances.

She also claims that the School Board retaliated against her for engaging in protective activity under Title IX by reporting the sexual harassment and sexual assaults against her.

She seeks money damages against the School Board. The School Board denies all claims.

Plaintiff has sued the defendants under different legal claims and different theories.

First, plaintiff has asserted claims against

defendant, Fairfax County School Board, under a statute called Title IX.  Title IX provides that no person in the United States shall on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.

Second, plaintiff claims that three of the individual school employees, defendants, S.T., A.F., and P.A.H., while acting under control of state law, intentionally deprived plaintiff of her rights under the First Amendment of the United States Constitution by retaliating against her for reporting the sexual harassment and sexual assaults.

A.F. was the principal of Rachel Carson Middle School.

S.T. and P.A.H. were assistant principals at the school.

S.T., A.F., and P.A.H. deny those claims.

Third, plaintiff asserted claims that all of the nine school officials, defendants, A.F., B.H., F.T., J.F., M.C., M.P.E., P.A.H., S.T., and T.B. acted in a grossly negligent manner in responding to reports of sexual harassment and sexual assaults.

T.B. was an assistant principal at the school.  B.H. and J.F. were guidance counselors at the school.  F.T., J.F., M.C., and M.P.F. were all teachers at the school.

B.R. v. F.C.S.B.

100

B.R. seeks monetary damages, including punitive damages, against each of these defendants. Again, all of the school officials deny those claims.

Fourth, plaintiff has asserted claims against the individual former student defendant, J.O. that J.O. committed assault and battery against her, which refers to the actual or attempted touching of another person in an unlawful manner. She seeks monetary damages, including punitive damages against J.O. And, again, J.O. denies those claims.

By your verdict at the conclusion of the trial, you will decide disputed issues of fact. You and you alone will be the judges of the facts.

I will decide all questions of law that arise during the trial. Before you begin your deliberations at the close of the case, I will instruct you in a more detail manner on the law that you must follow and apply. I will give you copies of the written instructions that I will give you at the end of the case.

Because you will be asked to decide the facts of the case, you should give careful attention to the testimony and evidence presented. It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

Keep in mind that I will instruct you at the end of the trial about the rules that apply in determining the

B.R. v. F.C.S.B.

101

credibility or believability of any witness.

During the trial, you should keep an open mind.  You should not form or express any opinion about the case until you have heard all of the testimony and all of the evidence, lawyers' closing arguments, and my instructions to you on the law.

You must follow that law whether you agree with it or not.  The evidence from which you will find the facts will consist of testimony of witnesses, documents, and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered for -- by you.  I will list them for now:

Number one, statements, arguments, and questions by lawyers are not evidence.

Two, objections to evidence are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you're instructed that some items of evidence is relevant for a limited purpose only, you must follow that instruction.

B.R. v. F.C.S.B.

You should not infer or conclude from any of my rulings or comments that I have any opinions about the case favoring one side or the other.  I do not favor one side or the other.  Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered. Rule 3.

Rule 4, anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence:  Direct and circumstantial.  Direct evidence is the direct proof of a fact such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  You must consider both kinds of evidence.

Each party is entitled to have the case decided solely on the evidence that applies to the party.  Some of the evidence in this case is limited under the rules of evidence to one of the parties, and it cannot be considered against the others.

You should pay close attention to all of my instructions during the trial.  Including when I may remind you that certain testimony and documents will be admitted for a limited purpose and not -- cannot be considered against a particular defendant.

B.R. v. F.C.S.B.

103

During the course of the trial, it may be necessary for me to talk with the lawyers out of your hearing about questions of law or procedure.  Sometimes you may be excused from the courtroom during these discussions.  I will try to limit these interruptions as much as possible, but you should remember the importance of the matter you're here to determine and should be patient even though the case may at times seem to go slowly.

The lawyers are not allowed to speak with you during this case.  When you see the lawyers at a recess or passing in the hall and they may not speak to you, they are not being rude or unfriendly.  They're simply following the rules of law.

Oftentimes, lawyers will come to me during the course of a trial and say, "I saw Juror 5 in the -- in front of the building, and she spoke, and I felt uncomfortable about speaking."  The lawyers can say "hello."  The lawyers can provide you a salutation.  They can acknowledge that you said something to them, but they're not to discuss the case with you.  And these are good lawyers, and they will not do that.

So if the lawyers go the other way when they see you, they're not being rude.  They're just trying to follow the instructions of the Court.

Now, a few words about your conduct as jurors.  You as jurors must decide this case based solely on the evidence

B . R .   v .   F . C . S . B .

104

presented here within the four walls of this courtroom.  This means that during the trial you may not conduct any independent research about the case, the matters in the case, and the individuals or corporations involved in the case.  In other words, you should not consult dictionaries or reference materials, search the internet, or use any electronic tools to obtain information about this case or to help you decide the case.

Please do not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors.  After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone or -- anyone else until you've had a -- have returned a verdict and the case is at an end.

You may not communicate about the case with anyone, including your family or friends, in person by cell phone, through emails or social media or through any other means.

I expect you to inform me as soon as you become aware of another juror's violation of these instructions.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result, which would require the entire trial process to start over.

Do not form any opinion until the evidence is all

B.R. v. F.C.S.B.

in.  Keep an open mind until you start your deliberations at the end of the case.

If you want to take notes during the course of the trial, you may do so.  However, it is difficult to take detailed notes and to pay attention to what the witnesses are saying at the same time you may be taking notes.  If you do take notes, be sure that your note-taking does not interfere with your listening to and consideration of the evidence.

Also, if you do take notes, do not discuss it with anyone before you begin your deliberations.  Do not take your notes with you at the end of the day.  Be sure to leave them in the jury room.  Ms. Tinsley will collect them at the end of the day.

If you choose not to take notes, remember that it is your individual responsibility to listen carefully to the evidence.  You cannot give this responsibility to someone else who is taking notes.  We depend on the judgment of all jurors, and you must remember this as the case proceeds.

The trial will now begin in earnest.  First, the plaintiff's attorney will make an opening statement which simply is an outline to help you understand what the evidence is that he expects to come in.

Next, the defendants' attorney will make opening statements.

The Court has provided specific time parameters that

B.R. v. F.C.S.B.

106

I've encouraged the attorneys to follow.  And so, don't be thinking that just because the attorney gave a rather short opening statement that he or she is not attentive to the task. Rather, the Court has instructed the attorneys that they're simply to give an overview or outline of the case and to stay within the Court's time parameters as prudently as possible.

What is said in opening statements is not evidence, but is simply an outline or summary to help you understand what each party expects the evidence to show.  A party is not required to make an opening statement.

After the opening statements, plaintiff will present evidence in support of her claims, and the defendants' lawyer may cross-examine the witnesses.

At conclusion of the plaintiff's case, each defendant may introduce evidence and plaintiff's lawyers may cross-examine those witnesses.

The defendants are not required to introduce any evidence or to call any witnesses.  If any defendant introduces evidence, plaintiff may then present rebuttal evidence.  After the evidence is presented, the party lawyers will make closing arguments explaining what they believe the evidence has shown.  What the lawyers say in their closing arguments is not evidence.

Finally, I will instruct you on the law that you are to apply in reaching your verdict, and you will then retire to

─ B.R. v. F.C.S.B. ─

107

the jury room.

Another thing that I always like to say as we begin the process of this is that if your spouse is like my spouse, when you get home at the end of the day, he or she will say, "What did you do today?"

And your response was, "I was selected to participate in jury service."

At that point, the conversation should cease, and you can say to your spouse, "The Judge told me that this was going to happen, and he actually shared a story with me about a witness who didn't follow through on the instruction not to discuss a case or any aspect of the case with anyone."

And that particular juror, because of her indiscretions, ended up being fined $10,000 for their indiscretion. So this is serious business and serious work that we're doing.

So when you get home, it's okay to say that you're serving on jury duty to your spouse or loved one, but the conversation needs to end there. "And the judge reminded me of that $10,000 that that lady had to pay because she didn't follow the Court's instruction."

Usually that will end the conversation about what you're doing today. So I just ask you to keep that in mind.

I will also probably instruct you at the end of every day not to discuss the case or any aspect of the case

B.R. v. F.C.S.B.

108

with anyone, and that is simply a reminder to you as to what
your obligations are.

During the course of this trial, I'm expecting that
the lawyers are going to ask for what is called a rule on
witnesses with regard to certain witnesses.  And rule on
witnesses is simply a suggestion that the people who may be
testifying stay outside of the courtroom so they don't have
the benefit of hearing the testimony of anyone else.  People
that are parties to the litigation are entitled to stay in the
courtroom at all times.

But, again, there are certain things that we'll do
as far as administering the case.  I will present the case to
you as efficiently and carefully as we can, and I request that
you pay close attention to the evidence as its presented.

You will note that during the course of the trial I
will look at you from time to time to see if you have any
problems hearing or if there are any personal needs that need
to be addressed.  I know the gentleman in the back is blessed
with a service dog.  We've made arrangements that if the dog
needs to go out that one of the law clerks or interns will
take the dog out for you.

So we're thinking about everything that we need to
do to accommodate you.

Your service is critical to the administration of
justice, and I thank you for your attention to these matters.

─────B. R. v. F. C. S. B.─────

109

Mr. Brenner.

MR. BRENNER:  May it please the Court?

THE COURT:  Yes, sir.

MR. BRENNER:  Counsel.

MS. REWARI:  Your Honor, I'm sorry to interrupt. Could we go invoke the witnesses at this point?

THE COURT:  Yes.

Any person that is not a party to the action who expects to testify, please stand.

All right.  It doesn't look like anybody is here who fits into that category.

Counsel, I'm going to leave it up to you to monitor who's coming in and out of the courtroom and instruct people who are potential witnesses in the case not to come into the courtroom.

Ms. Tinsley, if you could as we go through the process, sort of pay attention as Ms. Drill and Ms. Barry and Ms. August, if we have some people walk into the courtroom, let's get somebody's attention so they do not --

But the rule on witnesses will indeed apply.

**OPENING STATEMENT**

MR. BRENNER:  May it please the Court again.

THE COURT:  Yes, sir.  Thank you.

MR. BRENNER:  Counsel.

Good afternoon.  My name is Andrew Brenner, and

B.R. v. F.C.S.B.

110

along with Alison Anderson, Jonathan Fahey, Samantha Pederson,

Brittany Zoll, and Robert Keefe who are with me, we

represent --

THE COURT:  Pick up -- pick up your voice.

MR. BRENNER:  We represent -- this is our client,

B███.  She's sitting here at counsel table with us.

Also with us today is Mr. Dan Brown who's going to

help us with the technology a bit to move things along a

little quicker.

Let me just -- the judge was not kidding when he

said he wants us to be efficient.  He's given us a very short

time -- time restraint, so let me just join by saying -- we

join in thanking you for your service.  No doubt this is a big

sacrifice in each of your lives.  Very rare that someone gets

a jury summons and starts celebrating that they're so happy to

come spend time at the courthouse, but we'll do everything I

can to move things along as quickly as possible.

What's this case about?  You'll be pleased to know

that a lot of what this case is about there really isn't any

disagreement on.  A lot of the facts of this case no one

disputes.

B███ is 24 years old today.  This case takes place

when she was 12 years old.

If you could bring up the slide.

On your screen should be a picture of B███ when

——B.R. v. F.C.S.B.——

111

she's 11 years old.  B███ started Rachel Carson Middle School

when she was 12 years old.

Why do I say a lots in -- not in dispute?  Before

the fall semester of Rachel Carson Middle School, everyone who

testifies, all the records you see will say that -- will show

you that B███ was a perfectly normal, well-adjusted,

physically healthy, mentally healthy 12-year-old girl.  No

dispute about any of that.

In fact, you'll hear from her pediatrician who sees

her right before the events that bring us here today start.

He's going to tell you there's nothing wrong.  It's all good.

What else is not in dispute?  Well, beginning

then -- actually beginning her next visit with the doctor,

which is in December, but beginning then through today, B████

is no longer good.

You can bring up the inpatient.

Since March 2012, B███ spent about three months in

inpatient residential treatments.  She spent over 125 days in

intensive outpatient treatments.  She's seen over 50

healthcare providers.  Currently, she sees doctors about three

to four times a week when things are good.

If you can go to the diagnosis slide, please.

These are just some of the things that are wrong

with B███.  B███ suffers from severe posttraumatic stress

disorder.  No one is going to tell you otherwise.  You're

B.R. v. F.C.S.B.

112

going to hear from the doctors and see their records that
their only job was to care and treat for B████.  They're not
paid expert witnesses in a courtroom.

    And we will also bring you a paid -- a paid witness
who will do a full diagnosis, but this is what her medical
records show.

    And, in fact, defendant may bring you two medical
witnesses.  They will also not dispute that B████ has severe
PTSD and other related diagnoses that are in her medical
records diagnosed by her treaters whose only job was to
provide her care and treatment.

    As I said, so what -- if that is all in agreement
what are we here about?  What are we talking about?

    And what we're here about is really two things:
what happened between October 11th and February of 2012.  And
let me just give you why those dates are -- the -- the -- when
I go through them a little bit, the harassment starts in
October 2012.  It escalates.  It's sexualized vulgarity.  It
escalates into physical groping, and it escalates into
multiple rapes.

    Now, at the outset, let me tell you throughout this
trial, we're going to use words that you don't normally use in
mixed company.  Probably should try not to use much at all.
But the words matter because the words are what B████ is
telling the school.

B.R. v. F.C.S.B.

113

She's also going to describe to you the assaults on her as they happened, and it's going to be uncomfortable.

So that's going to be one part of the case. What -- what did -- what happened to B████. And I'll go through the top line of that evidence.

But also at the second part of the case, and the judge touched on this, is -- is what did the school know and what did they do.

Now, it's natural, it's going to be natural, there's a lot of individual former and current schoolteachers, guidance counselors, assistant principals, and principal. And it's natural to want to believe that these folks who have chosen those career to serve the public and to serve our children, it's going to be natural -- let me change it -- it's going to be a little hard to believe that they would have been deliberately indifferent to this girl, but they were. And with that benefit that we give to our teachers, our principals, and guidance counselors comes the responsibility. They're the first line of defense for the children and the schools.

There's going to be no dispute, you've heard the judge talked about Title IX briefly. He'll give you instructions at the end of the case. You'll probably hear a lot about that during the trial. Maybe more than you care to. But let me try to boil it down.

B.R. v. F.C.S.B.

114

To its bear essence, schools have an obligation to provide a safe environment in which their students could learn.  And when they find out things that are preventing that from happening they have an obligation to do a thorough investigation to take immediate action.

And we believe the evidence will show in this case that just didn't happen here.  And you've now seen the results, which again I reiterate, are not in dispute.  No one is going to say, I don't believe, I don't believe any witness is going to come in here and say B███ is fine.

So what happened to B███?  Starting October 2011, and, again, this is a very top-line version of what you'll hear.  B███ has an incident outside the school with a student where the student makes sexual advances.  B███ a 7th grader; the boy is an 8th grader.  B███ will tell you, she thought the boy was -- it was her first date, this is B████ first date in her life.  She thought the boy was cute, had a crush on him.  She'll tell you that.

And after that, at the end of that date, which you'll hear in much more detail from B███.  The boy made advances to her.  He tried to put his hand down her shirt and he ultimately exposed himself.

And B███ stopped him, and he stopped.  He did stop.

As you would imagine a 12-year-old girl, she's really a month out of elementary school.  She had gone to

———— B. R. v. F. C. S. B. ————

115

Forrest Elementary.  She's just started at Rachel Carson.  She
was confused.  She didn't understand.  Is that what happens in
middle school.  And she just sort of hoped it would go away.

But when she gets to school on that Monday, she is
subjected to a cascading wall of being called a whore and a
slut.  Everyone is going around and saying she gave a blow job
to this boy.  She is being called a lesbian.

B█████ will tell you she reported this to the school.
She did what was she was supposed to.  She tried reporting it
to her guidance counselor who does not see her for a month.

B█████ -- the -- B█████ abuse at school goes
unremedied by the school, and it intensifies.  Boys start
touching her at her locker, start feeling under her skirt,
start feeling under her shirt and grabbing her backside.

And B█████ is reporting all of this to the school,
and they are doing almost nothing.

What the evidence will be, although B█████ guidance
counselor did not see her, another one did.  And B█████ is
consistently told she just needs to adjust better to middle
school.  It's just a boy/girl thing.  And please don't provoke
the boys to do any more than they are already doing.

This ultimately leads to B█████ being vulnerable,
being ostracized.  And ultimately -- and we'll get -- B█████
will tell this story in great detail.  She's ultimately
subjected to a series of sexual assaults by an 8th grade boy

———— Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ————
EASTERN DISTRICT OF VIRGINIA

———B.R. v. F.C.S.B.———

116

in her neighborhood.

All of this time she's telling the school, "Boys are hurting me, boys are getting inside of me."  And that's what the evidence is going to be.

And the school really does nothing until B████ mom, B███, who will be the first witness, comes to the school and starts demanding -- you'll see in the records the school doesn't believe B████ then, and they don't believe her now.

And that's why they didn't do what they needed to do to protect her.

Your Honor, if I could just put up one more slide before I finish, and I'll wrap up.

THE COURT:  You may.

MR. BRENNER:  I just want to give you one example -- you can bring up the student statement.

So there's going to be testimony from B████ and B████ and other students about what was going on.  And what the school knew.  And the school is going to deny a lot of it.

This statement is one that B████ was asked to fill out by the school.  This is at the time that mom has come demanding action.  And I just want to read it to you.

She said she's scared to come to school.  It's a 12-year-old girl.  She says boys, she names them, are coming to her locker before first period, giving her "hey B████ looks, laughing at her, harassing her, teasing her, and giving

B.R. v. F.C.S.B.

117

her seductive looks.  She says one of the boys left her an inappropriate voicemail, which you'll hear the mom reported directly to the school.  Inappropriate is probably a very minimizing way to put it.

She tells them specifically, the boy, David, that's the boy in the basement, the -- after the -- the first date was in the basement where she stops his advances.  He's saying she's a whore, a bitch, and a lesbian.

B██████ saying to the school, "I don't even know what that is.  I don't why they're calling me a lesbian."

She says they're making fun of her ethnicity. They're calling her a bitch and posting on their Facebook walls that she's a bitch and a whore.

She says David told people that she gave him oral sex, which she's telling the school never happened.  And she said David sent her naked pictures of herself.  And that the boys are coming and saying that anyone can get in her shirt and pants, which is offensive because she's never done so.

Remember, that was first date.  A boy trying to do something, her stopping it.

She tells him this is November 21st.  It all started about three weeks ago -- three weeks ago, which is, I guess, the last day of October.  And escalated to two weeks to the present.

Ladies and gentlemen, you're going to hear in great

B.R. v. F.C.S.B.

118

detail how the school failed B███.  You're going to hear that ultimately in February of 2012 her parents were forced to pull her out of school because she wasn't safe.

In addition to what you've already seen, she's getting death threats.  In fact, got death threats on the day that she is pulled from school.

She's on in-home learning for about a year, at which time the school makes things unreasonably and unnecessarily painful for her.  They accuse her of cheating.  They tell her mom she can't come to the school and pick up the assignments.  She can't do extracurricular's.  She can't do anything.  Ultimately, the family has had enough, and they move out of Fairfax County.

And that's the story that you're going to hear.  Those are the facts you're going to hear.

You're going to hear from B███ how she can't sleep.  She's engaged now to a boy named Andrew.  She can't sleep unless Andrew is awake.  So they have to sleep in shifts.

She's going to tell you that every day she lives in fear of the next trigger for her PTSD.

Andrew is going to tell you -- and you'll watch B███ in trial, you'll see -- you may see all the sides of B███.  It's just what the truth is.  Sometimes she's great.  And sometimes she's waking up in the middle of the night with terrors screaming in a curled up position on the bed.  And

B.R. v. F.C.S.B.

119

that's how trauma is.  The trauma B███ endured is going to

live with her for the rest of her life.

     With that, I thank you again.  As you can see, it's

going to be -- it's going to be a trial with a lot of -- a lot

of difficult facts to talk about.  And we will take them

seriously, and we will take your time seriously.  And thank

you so much again on behalf of B███ and the rest of our team.

Thank you.

     Thank you, Your Honor.

     THE COURT:  Thank you, Mr. Brenner.

     Just a moment.

**OPENING STATEMENT**

     MS. REWARI:  Ladies and gentlemen, good afternoon.

My name is Sona Rewari, and I represent the Fairfax County

School Board.

     Joining me are Ryan Bates, Kevin Elliker, Scott

Burton, Cindy Baroody, and Brady Walker, he's going to help us

with our exhibits.

     We also want to thank you for your service.  We

understand that we're asking for a huge time commitment,

taking you away from your busy lives, and we really appreciate

your time and your attention.

     THE COURT:  Adjust your volume just a little bit.

     MS. REWARI:  Thank you.

     Now, before we talk about what happened in this

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

120

case, let's make one thing clear, rape and sexual violence are horrific crimes.  These aren't school disciplinary matters, these aren't kids just being kids.  These are crimes, and they're serious crimes.

A school is not the police department.  And it does not pretend to be the police department.  There's at least one uniformed police officer in every middle and high school in Fairfax County.  If an allegation like that is made to a school, they must report it to the police immediately.

In this case, as the evidence will show, B.R. and her family never reported any rape to the school.

Now, as you've heard from Mr. Brenner, B.R. makes some very serious, even shocking allegations in this case.  And that would be normal after listening to that presentation to think this might really have happened.

We ask you to resist that temptation.  Under our judicial system, the plaintiff carries the burden to prove her case, so she presents her evidence first.  And it's important to keep an open mind and form no opinions until you've heard all the evidence.

As you've heard, B.R. is suing 11 defendants before you today.  She sued the School Board, and she has sued ten people personally, nine of them are former or current employees of the school system.  You will hear from each of them.

B.R. v. F.C.S.B.

121

You will also hear from her former friend who she has also sued.

The School Board operates Rachel Carson Middle School.

I want to show you a picture.  Rachel Carson is a public school for 7th and 8th graders.  It opened in 1988. You'll learn that Rachel Carson is more than just a school, it's a community.  Middle school students are at a critical stage in their social and emotional development.  You'll hear from these educators about what Rachel Carson does to guide its students through the exciting and challenging transition to their teenage years.  You will hear witnesses describe some of the things the school does to provide students with a safe, positive, and nurturing, learning environment.

School officials, as you will hear, kept careful watch and monitor what occurs in Rachel Carson.

You will hear about what the school does to educate students and to train staff about harassment and bullying and to promote a culture of kindness and respect.

Now, over 12 years ago B.R. attended in-person classes at Rachel Carson for about five months.  It is undisputed that she made some complainants during those five months.  You will learn about those complaints during this trial.

B.R.'s claims against the School Board are brought

B.R. v. F.C.S.B.

122

under a federal law called Title IX, and you may have heard of

Title IX. You're going to learn more about it during the

trial.

As you listen to the evidence in this case, we ask

that you consider three questions:

First, was B.R. sexually harassed at school?

Second, what did the school know?

Third, what did the school do about it?

That's it. The evidence will show that every time

B.R. raised a concern or a complaint with the school, the

school responded swiftly and appropriately.

We ask that you listen very carefully when hearing

all the evidence. The evidence will show that B.R.'s story

has changed dramatically over the years. The most important

change, as you will hear, are B.R.'s allegations about rapes

and sexual violence and sexual touching at school.

Now, let's walk through B.R.'s five months of

attending classes at Rachel Carson to preview the evidence you

will hear on what actually was reported to the school.

For the first quarter of the year there were no

complaints from B.R. or her mother. The evidence will show

that the Monday before Thanksgiving B.R. and her mother told

an assistant principal that three students, C.K., J.O., and a

boy named David, had been verbally harassing her at her locker

and elsewhere. And you've seen her detailed handwritten

B.R. v. F.C.S.B.

123

statement that Mr. Brenner just showed you.  The students were
not in B.R.'s classes.

You will learn that the school jumped into action
that day.  They pulled the students into the office, they
collected statements, they called their parents, they took
steps to keep the students separated from B.R. at school.  Her
counselor shadowed her during class transitions.  The teachers
stood outside their classrooms to monitor activity in the
locker pod.

You will learn that the second issue arose two weeks
later when B.R.'s mother spoke with the school's police
officer and a different administrator about her daughter's
rage and outbursts at home.  She reported that other students
were saying that C.K. wanted revenge.  The police officer
investigated immediately.

B.R. could not identify any of the kids she had
heard this from, and C.K. denied saying anything like it.

Meanwhile, the school stepped up its monitoring of
the situation.  Now with the two counselors keeping eyes on
B.R. between classes.

You will see that within days, B.R.'s mother emailed
the school to say the plan worked and to thank them.

She told the police officer that she was happy with
the way the school was handling things.

After that, things were quiet for weeks.  You'll see

B.R. v. F.C.S.B.

124

a thank you note from B.R. to her counselor telling her thank you so much for always helping me solve my problems.  This was a note right before winter break.

Then you will learn in late January 2012, B.R. made her third complaint, this time that a boy, not anyone mentioned before, had been spreading rumors that she was by bisexual.  The school investigated the same day.  The student admitted to making the comment.  He was disciplined for making the comment.  B.R. never complained about that boy again.

The evidence will show that five days later B.R. made her fourth complaint.  She said that unidentified students were stealing her schoolwork.  With help from her counselor and teachers, the work was found in the lost and found bin and in her binder.

You will learn that still B.R.'s mother decided to keep her home for two days telling the school this was evidence of vandalism and bullying.  Two assistant principals met with mom and came up with a plan for B.R. to hand in her assignments directly to the teachers and to allow her to leave class discreetly to see her counselor if she wanted extra help.

The school checked back in and expressed their desire that B.R. feel comfortable and supported at the school. And they wanted to know -- make sure the plan was working.

Now, you'll learn that the fifth and final complaint

B.R. v. F.C.S.B.

125

started with an incident in the cafeteria in the second week of February.  It involved B.R. and a male 7th grade student who said B.R. -- who B.R. said she didn't even know.  She and the boy exchanged inappropriate words in the cafeteria on a Wednesday.  They got back into it with each other on a Thursday.

When a teacher heard B.R.'s comments and told her to knock it off, she went down to the main office and made a complaint.  The school investigated that too.  They interviewed about ten different students to get to the bottom of that incident.

You will hear that later in the same day as the cafeteria incident, B.R. returned to the office and reported that two unidentified female students told her, "Everyone hates you," and, "Someone's going to kill you."

B.R. did not know them.  She couldn't identify them. When administrators called mom and told her about this and that they would be looking into it, mom told them that a boy had thrown a ball at B.R. in gym class the day before.  The evidence will show that there was no history between B.R. and this student.  But the school investigated the ball throw as well.

You will hear testimony that this day, February 9th, 2012, was the day that B.R.'s parents pulled her from in-person instruction.  They asked the school to provide

B.R. v. F.C.S.B.

126

homebound instruction and contacted the superintendent of the
school system.

You will hear testimony from the assistant
superintendent in charge of Rachel Carson who personally
reviewed the school's investigation, met with school
administrators and staff and met with B.R. and her family.

The evidence will show that her parents did not want
B.R. to return to Rachel Carson and that the assistant
superintendent offered to place her at two other excellent
middle schools.  Her parents turned those down.

The evidence will show that when B.R.'s parents said
that she had an emotional disability and wanted special
education services, the school approved that request.  It
offered a placement at a third school, but B.R.'s parents
turned that down too.

The evidence will show that her parents kept her on
homebound instruction with teachers coming to their home
several times a week for a year before pulling her out of the
school system altogether.

Ladies and gentlemen, what I have just summarized is
everything the school knew about the -- any alleged harassment
of B.R. at school when she was in 7th grade.  That's it.

And the evidence will show that each and every time
the school acted quickly and appropriately, to support and
care for her.

B.R. v. F.C.S.B.

127

Now, as you heard from Mr. Brenner, B.R. alleges in this case that she was subjected to rapes and sexual assaults, both in school and out of school. And I will say this again, B.R. and her family never reported any rape or sexual assault to the school.

You will hear that in March 2012, after she had stopped coming to school in person, B.R. and her mother went to the police to report an alleged rape by C.K. in her neighborhood, not in school.

The evidence will show that the police investigated that allegation as an non-school incident and that the school cooperated fully in that investigation.

You will hear from police officers who dealt with B.R. and her mother on multiple occasions during this time period.

B.R. also alleges in this case that she was gang raped in school. Apparently in a closet during the after-school period by a group of men.

MR. BRENNER: May we approach, Your Honor?

THE COURT: Sure. Uh-uh.

(Side bar.)

THE COURT: I'm giving you a little latitude, but this case in not about the police investigation, so you need to move on from that.

MS. REWARI: Sure.

B.R. v. F.C.S.B.

128

THE COURT:  Any police investigation has nothing to do with the disposition of this case.  So you don't need to highlight it.  You need to move on now.

MS. REWARI:  Okay.

MR. BRENNER:  So, Your Honor, if you noticed in our opening we mentioned nothing about the neighbor.  The reason is because the defendants moved in limine before the trial to keep out any evidence of gang activity, which is what the plaintiff alleges this was.  They said it is irrelevant to the case.  We oppose that, and you granted their motion, so we did not bring that up in our case.  And now --

THE COURT:  It's a little bit of a difference, and I think probably what happened is we -- from my perspective, the term "gang rape" does not necessarily associate with gang activity like MS-13 or Crips or whatever.  I think that that was a term of art.

And if -- you just need to be careful, and I would suggest to you that in the context of what you're talking about, we're not talking about things that are traditionally known as gang activity.  That's a term of art that I used in my opening statement.  Make sure we're consistent with the motion in limine.

MS. REWARI:  I mean, she has testified that she saw tattoos on their faces.

THE COURT:  We're not going to get into that.  Okay?

B.R. v. F.C.S.B.

129

I've allowed you to use the term "gang rape" as it's a term of
art, a terrible term of art.  But it is a term of art that I'm
going to allow you -- to associate that with what we call
traditional gang activity is not going to be allowed.

        MS. REWARI:  Okay.

        MR. BLANCHARD:  If I may for my client?

        THE COURT:  Uh-huh.

        MR. BLANCHARD:  Plaintiff's credibility, the
plaintiff's credibility is critical here.

        THE COURT:  Sure.

        MR. BLANCHARD:  She has changed and added -- and my
client was added late to this story.  To say that's somehow
limited in -- in who she talked to and what she told them
about what happened to her over this time period, I think
is --

        THE COURT:  You have absolute the prerogative to
make reference to what you believe is going to be inconsistent
testimony.  But, again, we're steering clear of this mention
of gang activity, which is what we're talking about.

        MR. BLANCHARD:  Understood.  But that was her term
and description of it, not ours.

        THE COURT:  Okay.  The Court's ruled.

        MR. BLANCHARD:  Yes, sir.

        (Open court.)

                  OPENING STATEMENTS

B.R. v. F.C.S.B.

130

(Cont'd)

MS. REWARI:  B.R. also alleges that she was raped in a closet during an after-school period by a group of men.  You will learn that this allegation was first made to the school with the filing of this lawsuit many years later.  You will see no evidence that this was ever reported to the school while she was a student.

You will hear how the school's design and location work to give type access to the -- type control of access to the building.  You'll hear from over a dozen school employees who will tell you nothing like this was ever reported to them.

They will also testify that during school and after school the exterior doors are locked, the closets are locked, students are monitored during after-school program.

You will also see other evidence that casts significant doubt on whether the allegations B.R. makes in this lawsuit today are how events played out in the 2011/2012 school year.

The evidence will show that someone named Jenny Taylor posted on Facebook, "B.R., go die."  Jenny Taylor sent messages to B.R.'s boyfriend.  You will hear the messages were so disturbing that B.R.'s mother took them to the police and blamed C.K.  And the evidence will show that Jenny Taylor was B.R.  She was cyberbullying herself.

And you've heard from Mr. Brenner that B.R. has had

———B.R. v. F.C.S.B.———

131

significant emotional difficulties, but the evidence will show
that she had emotional problems before she came to Rachel
Carson.  These educators understand that middle school is a
major developmental milestone.  The evidence will show that
they did their best to help B.R. and to support her individual
needs.  They didn't cause B.R.'s emotional problems, and they
aren't to blame for her emotional struggles.

In closing, we again ask that you keep an open mind
while B.R. presents her evidence.

When her evidence is done, the School Board and the
other defendants will present their evidence.  You will hear
from over a dozen school employees who worked at Rachel Carson
and supported B.R. during her 7th grade year.  You'll hear
from other administrators, her childhood physician, and police
officers.  You will also hear from our medical experts who
examined B.R., reviewed her treatment records and who will
share their opinions on her claimed injuries.

Mr. Brenner told you that her PTSD is undisputed.
It is disputed.  Our expert will explain why it's disputed and
how it's disputed.

I thank you again for service on this jury.  We
appreciate your time and attention, and I look forward to
presenting our case to you when it's our turn.

Thank you.

**OPENING STATEMENT**

B.R. v. F.C.S.B.

132

MR. KINNEY:  Members of the jury, I'm Michael
Kinney.  It's difficult to do this without -- without
repeating Ms. Rewari, but I take -- I take the Court's
direction to us very seriously.

Let me begin by introducing you to my clients.

Beginning here is assistant principal, T█████
B████; history teacher, M█████ F██████; assistant principal
S█████ T███; principal, A█████ F██████; school counselor,
B████ H██████, up there in the corner; assistant principal,
P███ H█████; and then on the inside aisle here, school
counsel --

THE COURT:  If you'd stand as Mr. Kinney
acknowledges you, that would be appropriate.

MR. KINNEY:  Thank you, Your Honor.

School counselor, J█████ F███████; math teacher,
M█████ C███; science teacher, F████ T█████.

These are my clients.

And you've heard -- you've heard something of each
of them, I think, in Ms. Rewari's opening.

I think what I can do is to provide some
biographical detail just to let you know who they are.  But I
owe you on behalf of all of them a plain statement.  B.R. and
her family never reported to any one of my clients that she
was raped or sexually assaulted.

My clients have been sued individually in this case;

B.R. v. F.C.S.B.

133

that is, separate from the School Board.  My clients are
accused of acting with gross negligence.  Gross negligence
means acting entirely without any care, without the slightest
care for B.R.'s safety.  It's a shocking lack of care.
Nothing in the evidence in this case will give you any reason
to be shocked about my clients.

Care for children motivated each of them to become
educators in the first place.  Their care for children
animated their work at school during the day.  And as
professional educators, they combined their individual
motivations to create a culture of caring at Rachel Carson
Middle School.  A culture that was as much a part of the daily
lessons as math and history and English and science.

Rachel Carson, the evidence will show, is not a
place without care.  My clients are a large -- large part of
the reason for that.

Again, Mr. F█████ was the principal.  His care for
students made him make priorities of student safety and
student well-being.

Each morning when the main door is opened to allow
the students to come in, he stationed himself just inside the
door, also with the director of student services.  And they --
they greeted the students as they came in.  But they were also
actively keeping watch, you know, do they see anything that
might get in the way of learning.  Is someone -- is someone

—B.R. v. F.C.S.B.—

134

anxious or frustrated or sick or angry or sad.

And he expected the same thing of the school -- of the teachers and the school counselors. Before class and between class changes, all of the teachers were required to be outside of the classrooms, watching over the locker pods as the -- as the students went to their lockers and made -- made their way to their -- to their next classes.

School counselors were stationed throughout the school. And in this way, I should say throughout the hallways in the school during -- during the class changes.

And in this way each pod of about 140 students always had four or five or six pairs of adult eyes on them. This was -- this was something Mr. F█████ required, and it's something that they all did, and they all enjoyed doing.

It was, in fact, in this way that -- that J█████ F█████ first encountered B.R. Early in the school year Ms. F█████ was moving through the hallway. She saw a group of girls, just apparently not doing anything. But something about the scene made Ms. F█████ think that she needed to offer some help.

And as she approached, one of the girls appeared to be upset, and that girl was B.R. She wasn't crying, but it seemed she needed some special attention.

So Ms. F█████ took her out of the hustle and bustle of the -- of the hallway, took her to her office,

─────────────── B.R. v. F.C.S.B. ───────────────

135

helped her to be comfortable, notified her teacher so that he
wouldn't mark her -- mark her tardy or absent.  And she
remained in Ms. F███████ office until she -- until she
felt ready to go back to class.  And so she went back to
class.

She told Ms. F███████ nothing of being harmed.
And weeks later, in fact, B.R.'s mother emailed
Ms. F███████, emailed Ms. F███████ to ask her to meet with
B.R. to give her some coping skills and strategies.

She said, perhaps -- she said that B.R. always
enjoyed talking to her.

Ms. F█████ had a similar experience with B.R.  On
one of the first days of the school year, Ms. F██████
encountered B.R. crying in the hallway.  And based on her
experience, she knows that some students first coming to
middle school are overwhelmed by the -- by the change from
elementary school.  You've got more classes, you got more
students.

And so M██████ shared with B.R. -- pardon me,
Ms. F██████ shared with B.R. her own feelings of anxiety about
the new school year.  So many more names to learn, so many
more personalities to learn.

And she walked with B.R. to a counselor's office,
left her in the care of a counselor.  And when B.R. felt
better, she went back to class.  And when she went back to

─────── B.R. v. F.C.S.B. ───────

136

class, Ms. F███ asked her do you feel better, and B.R.

answered her with a hug.

Ms. C███ was B.R.'s math teacher.  As the school

year progressed and math lessons became more difficult,

Ms. C██ supported B.R. by allowing her to turn in her

assignments a little later than the deadline.  Take tests

later that she had missed because she was absent.

B.R.'s mother had an open line of communication with

Ms. C██, emailing her, in fact, to request these

accommodations.  And Ms. C████ -- B.R.'s mother never told

Ms. C██ that her daughter was being harmed, never told her

daughter that her daughter -- never told Ms. C███ that her

daughter was being bullied.  And B.R. herself never told

Ms. C██ that anyone was harming her.

F████ T██████ was B.R.'s science teacher.  Because

Mr. T██████ classroom was the closest to the pod, often all

of the teachers would sort of congregate towards his open

door, and they were all there looking over the pod -- looking

over the locker pod.

Each day you'll hear -- you'll hear evidence that

each day, many times a day, students would have trouble with

their -- with their lockers.  These are new things for 7th

graders, and they would ask Mr. T██████ to help them open it.

This put Mr. T█████ right inside the pod that is

right among the lockers interacting with the children.  And he

B.R. v. F.C.S.B.

137

never witnessed anyone bother B.R.  And B.R. never told him that anyone was bothering her or harming her in anyway.

And I have to compress my -- compress my remarks because I shouldn't -- I shouldn't repeat Ms. Rewari.  But let me -- let me do provide some background for detail.

It was P█████ H██████ and S█████ T████ who jumped into action to support B.R. even before investigating her reports.  And even when their investigations didn't verify what she was telling them.

It was B███████ H█████████ and J██████ F████████████ who shadowed B.R. between classes.  Neither one of them ever saw anyone bother B.R.

It was P█████ H██████ who disciplined the boy who made an inappropriate comment about B.R.

It was T██████ B██████ who investigated the cafeteria incident of February 8th, February 9th in reviewing a score of students to find out what happened.  It was T██████ B██████ who disciplined the boy who she found had actually called B.R. a name.

THE COURT:  Watch your time.

MR. KINNEY:  She continued to --

THE COURT:  Watch your time, Counsel.

MR. KINNEY:  Thank you, Your Honor.  I'll close.

THE COURT:  Thank you.

MR. KINNEY:  Nothing in my clients' conduct will

B.R. v. F.C.S.B.

138

shock you.  The evidence in this case will show that none of

my clients ignored B.R.  All of my clients supported her in

school.  None of them wanted her to leave and all of them

would have welcomed her back.  Thank you.

THE COURT:  Thank you, Counsel.

Mr. Blanchard.

### OPENING STATEMENT

MR. BLANCHARD:  Good afternoon, ladies and

gentlemen.  My name is Bruce Blanchard, and I represent the

defendant, J.O.  And it's J████.

And, J████, if you could stand up from the -- is my

client who stands under 5 feet tall and who you heard very

little about in the plaintiff's opening statement.

I just ask you to make note of that because there

will be a story about that.  Or at least I expect there will,

and it's a story that has changed over the years.  It's a

story that alleges a sexual assault that she participated in

with someone else according to the plaintiff that I believe

the evidence will show you did not happen.

Counsel's talked about, you know, these dates of

when things happened in October and November and December and

January.  What I will tell you is from the day that the

plaintiff, B.R., stepped on the Rachel Carson Middle School

campus until the day she left, while there may have been some

squabbles and back forth, her best friend was my client,

B.R. v. F.C.S.B.

139

J█████.  And during that time, J██████ was never accused of a

sexual assault by the plaintiff.  Never.  She never told a

boyfriend, she never told anyone at the school, she never told

a police detective.  Never mentioned my client.

When you hear my client -- I'm sorry.  I keep

knocking your screen.

When my client got added to this claim, it was, in

the words of C████████ Ki█, who will testify in this case,

and who is the plaintiff's boyfriend for a period of time

roughly from -- they first met, I believe, in mid-December.

He was an 8th grader; she was in 7th.  So this is in the

height of the plaintiff's narrative about all of this sexual

assaults and abuse, she meets Constantine.  And he says they

start, quote, unquote, going out.  And these are 12 and

13-year-old kids.  They are dating through June.

B.R. leaves school or stops attending school

sometime in early February.  He will tell you that B.R.'s best

friend was J█████.  That they met by hugging each other, they

were -- called each other besties.  And that B.R. told her

boyfriend, "J██████ is my best friend."

He will also tell you what ended that relationship

was when B.R. told Mr. Ki█, "I don't think J█████ believes me

anymore.  She thinks I'm making the whole thing up."  And

that's his testimony that's been in this case, and I believe

you will hear that at trial.

B.R. v. F.C.S.B.

So in early February as she's leaving school or sometime after she's left school, she tells her boyfriend, "I'm not friends with J██████ anymore.  She believes I'm making things up."

J██████ then gets added to this story.  Now, again, there may be back and forth of name calling, but there is no support for the claim of a sexual assault.  And when you hear it, I ask you to listen closely, listen closely to the details, the facts, the mechanics of how it could occur, how a 23-year-old -- 24-year-old woman now, but 12-year-old child who stands less than 4'11, could be involved in what the plaintiff claims happened.

This story was condensed today.  It's going to be something you need to listen to.  So what I'm going to ask you to do, instead of recounting anything anybody else has said, and given the fact that basically nothing was said about my client in their opening, what I'm going to do is just ask you to do two things:  one, listen to everything.  Listen to every witness and read whatever documents or evidence that Judge Alston admits into evidence and pay attention to the realtime voices of the participants.  The words the plaintiff used in 2011 and 2012.  The records that were created time sensitive to the events in 2011 and 2012.  Because that is the best voice of history you're going to have.

My client got served with this lawsuit four and a

B.R. v. F.C.S.B.

141

half years ago as a sophomore at Virginia Commonwealth

University for the first time when she accused by the

plaintiff directly to her of supposedly being involved in

anything.  And for the last four and a half years she's lived

under the weight of those allegations that I submit to you

that the evidence will show are not true.

And she's here to tell you that.  And I think if you

listen to the evidence and use your common sense.  And I'm

telling you hold on to it, trust it, use your common sense.  I

have no doubt at the end of this trial you will know exactly

what's going on in this case, and you will know that my

client, the things the plaintiff says that occurred, did not

happen.  Thank you.

Thank you, Your Honor.

THE COURT:  Thank you, sir.

Anyone else?

All right.  Ladies and gentlemen, I'm going to go

ahead and let us take our lunch break right now.  We ran a

little longer than we usually are going to during the course

of the trial as far as lunch, so if you want to plan your day,

know that we're going to try to shoot for around 1 o'clock for

lunch each and every day.

Since this is your first day, what we're going to

do, and I'm going to make some other arrangements so we can

maybe extend a little bit today.  If you can come back at

B.R. v. F.C.S.B.

142

one -- be back in the jury room at 1 o'clock.  1 o'clock.
That gives you a good 40 minutes.  There are some decent
places -- excuse me, 2 o'clock.  I'm still on the other time.
2 o'clock.  If you can come back and be in the jury room no
later than 2 o'clock, that will help us to more easily
facilitate the matter.

Remember the instruction that I gave you at the very
beginning.  Do not discuss the case or any aspect of the case
with anyone.  I would avoid talking about your jury service at
all.  There are pretty good places around here where you can
grab a quick bite.  As I indicated earlier today, we're going
to make arrangements for you to have lunch brought in for the
next several days.  And Ms. Tinsley will give you a menu that
you can maybe take a look at sometime.

We're going shoot to -- as I said, we're going to
make some other arrangements.  We're going to shoot to try to
get to about 4 o'clock today.  Okay?  So we'll see you at
2 o'clock.

(Jury excused.)

THE COURT:  All right.  Thank you, ladies and
gentlemen.  You can be seated.

I appreciate all counsel doing as best it could to
adhere to the Court's direction with regard to the use of
time.  And I compliment counsel on that.  I think the opening
statements were all presented, and we're in a good place.

B.R. v. F.C.S.B.

143

I had a CLE that I did last Friday, and I talked about how jurors start as individuals, they become a collective, and then they become monolithic.  And already you can see people are actually establishing relationships by shaking hands as they go out and looking out for another.  I think we have a good strong jury, and they've been paying attention the whole time.

Let's try to get back in our places around 2 o'clock.  And we'll start as best we can.

I don't believe the canteen is open downstairs.  You don't want to go down there anyway.  So try to find some place that you can grab a quick bite back, and we'll see you back in here at 2 o'clock.

MR. KINNEY:  I have just one minor matter, Your Honor.

THE COURT:  Yes.

MR. KINNEY:  It appeared to me that the Court used as its instruction for the description of the case the plaintiff's proposed instruction.  It said that the plaintiff is seeking punitive damages from my clients.  I don't think there's a controversy about that.  The second amended complaint does not include a request for punitive damages.

THE COURT:  Well, when we do the final instruction, if there's some tweaking that we need to do, we can do that to accomplish your objective.

B.R. v. F.C.S.B.

144

         Very good.  Thank you, Counsel.  We'll see you at
2 o'clock.

         (Lunch Recess 1:23 p.m.)

         (A.M. Session concluded)

CERTIFICATE OF REPORTER

        I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Jury Trial - Volume 1, in the case of the **B.R. versus F.C.S.B.,** Civil Action No.: 1:19-cv-917, in said court on the 18th day of March, 2024.

        I further certify that the foregoing 145 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

        In witness whereof, I have hereto subscribed my name, this August 26, 2024.

_____
Tonia M. Harris, RPR
Official Court Reporter