1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **B.R.,** | : | |
| | : | |
| **Plaintiff,** | : | Civil Action |
| | : | No. 1:19-cv-917 |
| **v.** | : | |
| | : | |
| **F.C.S.B., et al.,** | : | March 19, 2024 |
| | : | 10:19 a.m. |
| | : | |
| | : | |
| **Defendants.** | : | VOLUME 2 - A.M. SESSION |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:                    **Jonathan Fahey, Esq.**
                                      HOLTZMAN VOGEL BARAN TORCHINSKY
                                      & JOSEFIAK, PLLC
                                      2300 N Street NW
                                      Suite 643a
                                      Washington, DC 20037
                                      202-536-1702
                                      Email: Jfahey@holtzmanvogel.com

                                      **Alison Anderson, Esq.**
                                      BOIES SCHILLER FLEXNER, LLP
                                      2029 Century Park East
                                      Suite 1520
                                      Los Angeles, CA 90067
                                      213-995-5720
                                      Email: Alanderson@bsfllp.com

2

APPEARANCES:  (Cont.)

For the Plaintiff:            **Brittany Zoll, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             610-804-1787
                             Email: Britzoll@gmail.com

                             **Andrew Brenner, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             305-539-8400
                             Email: Abrenner@bsfllp.com

                             **Robert Keefe, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             850-585-3414
                             Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:       **Ryan Bates, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1596
                             Email: Rbates@hunton.com

                             **Sona Rewari, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1974
                             Email: Srewari@huntonak.com

                             **Scott W. Burton, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Ave NW
                             Washington, DC 20037
                             202-955-1664
                             Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

3

For Defendant F.C.S.B.:      **Kevin Elliker, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             804-788-8200
                             Email: Kelliker@huntonak.com

For the Defendants:          **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,         THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,    KINNEY, PLC.
F.T., J.F.)                  1801 Robert Fulton Drive
                             Suite 120
                             Reston, VA 20191
                             Email:  Mk@kinneyesq.com

For the Defendant J.O.:      **Bruce Blanchard, Esq.**
                             ODIN, FELDMAN & PITTLEMAN, PC.
                             1775 Wiehle Avenue
                             Suite 400
                             Reston, VA 20190
                             Email:  Bruce.blanchard@ofplaw.com

Court Reporter:    MS. TONIA M. HARRIS, RPR
                   United States District Court
                   401 Courthouse Square
                   Tenth Floor
                   Alexandria, VA 22314

—B.R. v. F.C.S.B.—

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Plaintiff:

A███████  F██████  F███████████, ████████

        Direct examination by Mr. Brenner............. 14

EXHIBITS

On behalf of the Plaintiff:

                                                    Admitted

Number 14......................................... 19
Number 56......................................... 57
Number 59......................................... 115
Number 65......................................... 25
Number 77......................................... 76
Number 78......................................... 98
Number 103........................................ 68
Number 529........................................ 107
Number 640........................................ 74
Number 723........................................ 32

MISCELLANY

Preliminary matters................................ 05
Certificate of Court Reporter...................... 122

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

5

THE COURT:  Good morning.  What I'd like to do, if there's no objection, is to go through the ruling on the testimony of Professor Nancy Cantalupo.

I'll read the order.  I will have a copy of the order and the information for you.  "This matter comes before the Court on the plaintiff's proffer of Professor Nancy Cantalupo's testimony, which is attached to this order as Exhibit A.  After hearing argument on a motion in limine concerning Professor Cantalupo's testimony, the Court issued an order limiting the scope of Professor Cantalupo's testimony and directing plaintiff's counsel to submit a list of proposed questions and Professor Cantalupo's anticipated response as Docket No. 837.

Plaintiff complied with that order on March 18, 2024, after we entered the first day of trial.  The parties engaged in further argument regarding the scope of the anticipated testimony, particularly focused on whether Professor Cantalupo should be permitted to testify regarding federal regulation applicable to schools and guidance from the Office of Civil Rights Guidance.

In this regard, both parties cited *Doe versus Coastal Carolina*, 2021 WL 1651057.  It's a South Carolina case cited March 2021."

The Court agrees with the analysis of the Coastal Carolina court and will follow its holding that Professor

——————————— B.R. v. F.C.S.B.———————————

6

Cantalupo may not testify as to any specific regulation, rule or standard derived from the OCR guidance.

That particular language is taken from professor -- excuse me of the opinion at Page 2.

Dr. Cantalupo may testify more generally regarding standards and best practices as indicated in that opinion.  As previously discussed in the March 8, 2024, order, Professor Cantalupo may also testify regarding certain gender-based stereotypes.  For that proposition, we cite *Hnot versus Willis Group Holdings, Limited*, 2007 WL1599154, Page 2.  That's a Southern District of New York case permitting an expert to testify regarding, quote, the operation or gender stereotyping and the kinds of conditions in which such stereotyping may most commonly flourish.

To that end, the Court has attached an exhibit to this order, which is a revised statement of plaintiff's proposed testimony that comports with this Court's ruling.

Professor Cantalupo remains able to testify as to the background of Title IX, the operation of gender stereotyping, and certain standards surrounding the application of Title IX.  Questions regarding certain specific OCR guidance and Dear Colleague Letters are not permitted.

Moreover, to make the question here consistent with this Court's view of the relevance of certain issues, the Court has removed aspects of questions that refer to criminal

B.R. v. F.C.S.B.

7

law as well as certain statistical information.

The defendants may open the door to such testimony and cross-examination, however, if they attack the basis or Professor Cantalupo's opinions.

The Court took the time to actually read the transcript of the expert in the Coastal Carolina case, and it appears that the judge there tried, as best she could to -- I don't like this term, but it's the best term to use -- split the baby on allowing certain information to come in and certain information to be precluded.

I will note that in that particular transcript, it was interesting to note that the defense there made a mistake by actually opening the door to additional information that otherwise would not have been permitted by the Court's order, but by the questioning, in questioning the basis for the testimony of the expert therein allowed a little bit more broad information that would have -- that would have not come out had it not been for the cross-examination.

So, I commend to the defense the opportunity to look at that transcript and see the mistake that was made there, and I compliment plaintiff, particularly Ms. Anderson, for putting together the proposed questions and giving the Court a very good proffer as to what the testimony should be.

I would suggest, and I am sure you'll do this, that when you speak with the good doctor that she be aware of the

———————— B.R. v. F.C.S.B. ————————

8

scope of her testimony and not get into the trap of what some
people do, thinking that they can slip things in the back
door.  That's not going to happen, and if she tries to do
that, you run the risk of her testimony being excluded
altogether.

So good work on both parts.  My team did excellent
work.  While you all were enjoying dinner, we were working
last night.  So we all appreciate the work that was put in.

MR. BRENNER:  May I have a minute with Ms. Anderson?
I may make a small request of the Court.

THE COURT:  Sure.

(Counsel confers.)

MR. BRENNER:  Your Honor, could we just -- I know
the jury's not here, but could we go to sidebar?  It has to do
with the first witness.

(Sidebar.)

THE COURT:  Before we get started, off the record.

(Discussion off the record.)

MR. BRENNER:  So under the theory, I'd rather ask
for permission than forgiveness.

So I expect -- I expect -- well, I do expect that
Mr. F█████, who is the first witness, who is the principal,
so there was a little maybe confusion yesterday.  I mean, he's
going to testify essentially that as part of his testimony
that the School Board is setting the policies.  It is not like

B.R. v. F.C.S.B.

9

it's a separate thing.  He's implementing the policies.

        Part of what I expect he'll testify, at least he did in deposition, and I have no reason to expect otherwise, is that whenever a guidance came down, F.C.S.B. gave it to them as part of what they did.  Since you said that, I still planned on doing that.  I just wanted to make sure I wasn't running afoul.  I think it's different.  It's not an expert issue, but I just wanted to again --

        THE COURT:  I think you're fine as far as that's concerned.  If you cross the line, I'm sure we will hear an objection, but I think you're fine.

        Another little thing, I just want to make sure how we're going to handle this is from the jury standpoint.  Obviously, you're calling a defendant as part of your case in chief.  And it's my thinking, and I'll hear from the defendants on this, that for purposes of facilitating the testimony, because he is a defendant in the action, that you will be entitled to lead to some degree.

        MR. BRENNER:  Yeah.  I think that's Rule 611, I think.  Yeah.

        THE COURT:  And because I like to sort of balance your ability to lead when you're calling your own witness, I'm going to give them a little bit of latitude as far as setting predicates for the testimony so that we know what we're talking about.

B.R. v. F.C.S.B.

10

        MR. BRENNER:  Yeah.  I think under Rule 611, I think
I get to treat it like cross.

        THE COURT:  And I'll give you -- whoever is doing
the cross, I'll give you some latitude as far as making sure
that when this particular witness is testifying, you can get
him to focus on what you want him to testify about for
purposes of facilitating the trial.

        MR. BRENNER:  One other question on him.  I guess it
seems to me, and tell me if I'm wrong, that as far as the
order of examinations, that this is Mr. Kinney's client, and
he would go first?

        THE COURT:  Yes.

        MR. BRENNER:  Okay.

        THE COURT:  I was thinking about that this morning.
I was thinking that as we're going through the
cross-examination, and at this point, there seems to be a
general identity of interest between all of the defendants.
So I anticipate that there might not be a whole lot of cross
coming from any of the others.

        MR. BLANCHARD:  These witnesses I'm not sure there
would be any from me.

        MR. BATES:  Judge, we were actually preparing for
the School Board to question him first, because we have the
broader claims, and then Mr. Kinney.

        THE COURT:  That's fine.

B.R. v. F.C.S.B.

MS. REWARI:  We've coordinated, so it is not going to be redundant.

THE COURT:  That's fine, and just so I can make sure I keep track, again, when you come to the lectern, just identify yourself, and also for purposes of this examination, because it's a little unusual, state who you're representing. That way the transcript reads -- as I said, I read the transcript this morning, and there should have been a better job as far as accomplishing what the objective was, and people sort of got a little lost, so...

MR. BRENNER:  My client -- our client is not going to be here today.  She's got a --

THE COURT:  Situation.

MR. BRENNER:  She did not have a great night or a great day.  So I just wanted to let the Court -- to let you know.  It's not that she's --

THE COURT:  You don't have any problem with me saying that she's not here because of personal circumstances? Does anyone have any objection to that?  Because the question is going to be asked invariably.

MR. BRENNER:  Yeah, that sounds like she's just running errands, which she's definitely not.

MS. ANDERSON:  Just not do anything.

THE COURT:  So you want me to not even mention it? It's a civil case.

B.R. v. F.C.S.B.

12

MS. ANDERSON:  We just wanted to let you know.

THE COURT:  As I said, I just always get a little uneasy when I'm thinking as to what the jury may be thinking, as I am now.

MR. BRENNER:  Sure.  If it comes up and they raise it, then we will --

THE COURT:  You might get a hand, and I'll just deal with it then.

MR. BLANCHARD:  Just one point of clarification on keeping the record clear, if I'm in the back row behind the wires, and I haven't been -- when I stand up and say objection, I haven't been going to the podium --

THE COURT:  That's fine.

MR. BLANCHARD:  -- should I also identify myself each time I make an objection?

THE COURT:  Sure.  I just want this record to read as clean as possible.

MR. BLANCHARD:  Yes, sir.

MR. BRENNER:  It's going to be Mr. F████ first. I think he's going to be quite a while.

THE COURT:  Okay.  That's fine.

MS. BARRY:  Do you want to do the transcript redactions?

THE COURT:  Let's do that later.

(Open court.)

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

13

(Jury present.)

THE COURT:  Good morning, ladies and gentlemen.
Thank you for coming in on time.  It is important that we have
all of you here because we cannot start until all of you are
here, and so I hope that you enjoyed your evening.

I have to ask you this question, and in the course
of the trial, I'm going to ask this question several times.
Were you able to live up to the Court's instruction not to
discuss the case or any aspect of the case with anyone?  Have
any of you shared the story of $10,000?  Okay.  Very good.

Well, we've been working in here a little bit this
morning as efficiently as possible.  So I'm having a good
morning, and I look forward to a good day.

Next witness.

MR. BRENNER:  Sorry, Judge.  I think it's pronounced
A███████ F█████████.

THE COURT:  Okay.  Come on up, sir, be sworn.

(Witness seated.)

(A███████ F█████████, Plaintiff's witness, sworn.)

THE COURT:  Sir, please have a seat.  Listen to the
questions of counsel and answer them as best you can.  If you
hear an objection or if you hear the Court making a comment,
it probably is your best practice to slow down just a little
bit so we can address any issues.

THE WITNESS:  Okay.  Thank you.

B.R. v. F.C.S.B.

14

THE COURT:  Thank you, sir.

DIRECT EXAMINATION

BY MR. BRENNER:

Q.   Good morning, sir.

A.   Good morning.

Q.   Would you please state your full name?

A.   A████ F████ F███████, ██.

Q.   F███████?

A.   F███████.

Q.   F███████, okay.

       MR. BRENNER:  Your Honor, may I approach to give the

witness the documents?

       THE COURT:  You may.

BY MR. BRENNER:

Q.   Let me introduce myself.  My name is Andrew Brenner.  We

have not met before, have we?

A.   No, sir.

Q.   Okay.  And I represent the plaintiff in this action,

okay?

A.   Yes, sir.

Q.   Mr. F███████, you were the principal of Rachel Carson

Middle School during the, both the 2011 and '12 years, and

2012- '13 school years, right?

A.   Correct.

Q.   And my client was a student, in-person learning, for the

B.R. v. F.C.S.B.

15

fall semester of 2011 and for about a month of the -- you call

it winter semester, what do you call it?

A.   The second one.  The second semester.

Q.   The second semester.  It's a good name.

          And then she was an in-person learning but still --

so still technically at Rachel Carson, but in-person learning

for the next year until about March 2013, is that correct?

A.   Correct.

Q.   Now, you became the principal at Rachel Carson Middle

School in 2003, correct?

A.   Yes, sir.

Q.   And you remained there as principal until 2015?

A.   Yes.

Q.   Just to get a little bit of background about Rachel

Carson, schools got 7th grade and 8th grade only, is that

right?

A.   Correct.

Q.   And for the most part, though, not entirely the 7th

graders are primarily on the first floor?

A.   Yes for electives.

Q.   Maybe they do some electives on the 8th floor [sic]?

A.   Right.

Q.   Flipping that, the 8th grades are primarily on the second

floor, but then there's things on the first floor like

cafeteria, PE, like that?

Direct - A.F.

—————B.R. v. F.C.S.B.—————

16

A.    Right.

Q.    Okay.  Do the 8th graders have electives on the first
floor?

A.    Yes.

Q.    Okay.  So predominantly split by level but some overlap
through different times?

A.    Yes, there are some combinations, 7th and 8th.

Q.    The school also had about 1200 students per year?

A.    Somewhere in there, like 1250, somewhere at that point.

Q.    Generally split evenly between the grades?

A.    Generally.

Q.    Okay.  Now, I want to talk a little bit first before we
get into the specifics of the case.  I want to talk just a
little bit about --

          I should tell you this, I will periodically tell you
when I'm trying to switch to another topic.

A.    Okay.

Q.    Because it will help both of us.

A.    Sure.

Q.    But sometimes I will stay on and sometimes I'll just be
confusing.  So if you're ever confused or I talk too fast and
the court reporter hasn't slowed me down yet just let me know.
Okay?

A.    Okay.  Can I let you know something?

Q.    Sure.

B.R. v. F.C.S.B.

17

A.    I'm hard of hearing.

Q.    Okay.  Tell me when -- am I talking loud enough now?

A.    Yes.

Q.    I feel like I'm yelling at you.

A.    No.

Q.    That's good.  So if I start to trail off, just raise your hand or just say that I'm doing it.

A.    All right.

Q.    Okay.  At all times, while you were at the principal at Rachel Carson, and I'm focussing on the sexual harassment policies and regulations.  Those regulations and policies were set by the Fairfax County School Board, correct?

A.    Yes.

Q.    In other words, the School Board would set the policies, correct?

A.    Correct.

Q.    They would be -- you would be designated as to -- to make sure that those policies, regulations, procedures are taught to your fellow administrators, guidance counselors, and teachers, right?

A.    Yes.

Q.    Okay.  And then some of it actually gets taught to the students, right?  There's a, for lack of a better word, there's a PowerPoint or a slide presentation at some point that's given to students that advises them of different things

B.R. v. F.C.S.B.

18

and the policies and different rules in the school, right?

A.   Right, several.

Q.   Several?  So several different slides?

A.   Of information to the students in different ways.

Q.   Okay.  The School Board -- and then so you, through your

administrators, teachers, guidance counselors then implement

the School Board's policies?

A.   Correct.

Q.   The School Board had or had a -- and we're focussing back

now in 2011 to '13?

A.   Right.

Q.   If that changes, I'll tell you.

A.   Okay.

Q.   The School Board had a regulation that defined

harassment, correct?

A.   Yes.

Q.   Okay.  So if you could look in your exhibit binder there,

the numbers are on the right is where I'm going -- the numbers

I'm going to use to help you find it.

          Do you see Exhibit 14?

A.   Okay.

Q.   You're there?

A.   Yes.

Q.   Exhibit 14 is regulation 4952.1, is that right?

A.   Correct.

B.R. v. F.C.S.B.

19

Q.   Okay.  And that is a School Board policy?

A.   Right.  It's a regulation.

Q.   A regulation.  And it has a definition of harassment?

A.   Yes.  Complaints of discrimination or harassments based
on race, sex, color, religion, national origin, age, or
disability.

          MR. BRENNER:  Okay.  Your Honor, at this point, we'd
like to move for the admission of Exhibit 14.

          THE COURT:  Without objection.

(Plaintiff's Exhibit No. 14 was admitted into evidence.)

          MR. BATES:  No objection, Your Honor.

          MR. BRENNER:  May I publish, Your Honor?

          THE COURT:  Without objection.

BY MR. BRENNER:

Q.   This is from the School Board, correct?

A.   Correct.

Q.   You see the effective date of January of 2008?

A.   Yes.

Q.   These would be changed periodically over the years,
right?

A.   Correct.

Q.   I can show you the next one.  It is later than 2011.  But
does this look right for the time period?

A.   Yes.

Q.   Okay.  And then that's the definition of harassment that

B.R. v. F.C.S.B.

20

was promulgated -- well, that's a terrible word -- was put

forth by the School Board for the school, yourself, and your

staff, and your administrators to follow, correct?

A.   Right, based on federal and state laws.

Q.   Right.  For example, based on federal law being Title IX.

The jurors heard that expression.  We'll talk a little more

about it?

A.   Yeah, I know.

Q.   You know?

A.   Yes.

Q.   Okay.  So if you could go to the first line.  Just to

make clear, this policy applies to students, right; and

employees and applicants?  You need to go -- do I not have you

on the right page?  It's on that first page under where it

says, "persons"?

A.   Right.  Including students, employees, and --

Q.   And just so you know?

          MR. BRENNER:  May I approach, Your Honor?

          THE COURT:  You may.

BY MR. BRENNER:

Q.   So it may be easier for you -- whatever works best for

you.

A.   Okay.

Q.   This is a policy that applied to people, including

students, correct?

—B.R. v. F.C.S.B.—

21

A.    Correct.

Q.    And if we go down to "harassment."  (As read):  "It's
conduct that has the purpose or effect of unreasonably
interfering with an individual's work performance or
educational opportunity."

        You know that's also from federal law, correct?

A.    Right.

Q.    (As read):  "Or creating an intimidating, hostile, or
offensive, working, or educational environment for the
individual because of her race, sex, color, religion, national
origin, age, or disability."

        Again, straight from federal law, right?

A.    Yes.

Q.    And then it gives some examples.  (As read):  "Examples of
things that contribute to a hostile environment include vulgar
and/or abusive comments and jokes."

        You agree with that, right?

A.    It depends.

Q.    Okay.  So you disagree with the law there?

A.    Um, it depends on who or if both students are engaged in
name-calling.  That would be different.  It depends on how the
meaning of what they are saying to one another.

Q.    So we'll get to your -- we'll touch on it later to be
clear so the jury is clear.  The "it depends" language is
coming from Mr. F███████, not from the policy, correct?

Case 1:19-cv-00917-RDA-LRV   Document 1043   Filed 08/26/24   Page 22 of 137
PageID# 20880                           Direct - A.F.

─B. R.  v.  F. C. S. B.─

22

A.   It also depends if it's verified.

Q.   Okay.  I promise you we're going to get to that.  You can write a note.

        But just confirm for me that there's nothing in the policy that's promulgated by the School Board, based on federal law, that says either "it depends" or it needs to be verified, correct?

        MR. BATES:  Objection.  He's asking for a legal conclusion about federal law.

        THE COURT:  Sir, what is your interpretation of what your responsibility is regarding that particular provision?

        THE WITNESS:  Sir, our responsibility is to investigate fully any claims of sexual harassment, discrimination.  And if it's verified, then we have definitions within the school rights and responsibilities based on the law that we follow.

        THE COURT:  All right.  Next question.

BY MR. BRENNER:

Q.   If you go -- it continues on, it says, (As read): "Vulgar or abusive comments, jokes, comments, and stories related to the individual's race, sex, color, religion, national origin, age, or disability."

        Would you give the same answer that your -- the way you interpret the policy is -- again, it depends and needs to be verified?

B.R. v. F.C.S.B.

23

A.   It needs to be investigated and assessed on if it
violates the SR&R or if it needs to go further and report to
Office of Equity and Compliance.

Q.   That use of the policy, the way you've explained it to
the judge and to the jury, is that your -- is that the way
that Fairfax County School Board wanted you to implement this
regulation?

A.   The way the School Board want us to support this
regulation was written within the SR&R, School Rights and
Responsibilities.  And how we move forward with what is
expected of the students and how we investigate those claims.

Q.   First of all, you've used the word "SR&R" a couple of
times.  That's Student Rights and Responsibilities?

A.   Yes, sir, I'm sorry.

Q.   You're fine.  I've just learned from the judge that we
need to clarify these things.

     So my question is slightly different.  Because you
have added language that is admittedly not in the policy,
right, that language "it depends" and "verification" not in
the policy, we're looking at.  I just want to know if that's
something that Mr. F█████ came up with or is that something
the School Board taught Mr. F█████ is the School Board
policy?

     MR. BATES:  I would object to firm and misstating
his testimony.

B.R. v. F.C.S.B.

24

THE COURT:  Rephrase, Counsel.

MR. BRENNER:  Okay.

BY MR. BRENNER:

Q.   The "it depends if verified" language that you just told the judge and the jury about, is that something that is pursuant to School Board policy or is that something that you came up with to run your school?

A.   If -- the word "verify," is that what you're implying?

Q.   Well, on both, on both.

A.   Right.

Q.   You added two modifiers.  One is you said "it depends" and the examples you gave were the two students that are --

A.   Name-calling.

Q.   Name-calling, back and forth whatever it is.  And a verification component.  I'm just trying to understand is that a Mr. F████████ policy or is that a Fairfax County School Board policy?

A.   It's in the Students Rights and Responsibilities.

Q.   Then it's a Fairfax County School policy?  The Students Rights and Responsibilities, right?

A.   Right.

Q.   Okay.  And you'll show that to me when we get there.  Okay?

So the Students Rights and Responsibilities, it's the next, it's Exhibit 65.  Do you have that, sir?

─── B.R. v. F.C.S.B. ───

25

A.   Yes.

Q.   Is that -- is that the Students Rights and

Responsibilities document that was effective beginning

August 1, 2011 that you've just been referring to?

A.   Correct.

Q.   65.  That's correct, did you say?

A.   Correct.

        MR. BRENNER:  Your Honor, we would move for the

admission of Plaintiff's Exhibit 65.

        THE COURT:  Without objection.

        MR. BATES:  No objection, Your Honor.

(Plaintiff's Exhibit No. 65 was admitted into evidence.)

        THE COURT:  Thank you.  And you don't need to rise.

You can just stay seated.

        (Discussion off the record.)

        MR. BRENNER:  May we publish, Your Honor?

        THE COURT:  You may.

BY MR. BRENNER:

Q.   Okay.  So this is a document that you had brought up.

It's another component of the School Board's sexual harassment

policy, right?

A.   Correct.

Q.   Okay.  We had a regulation, we have the SR&R, and I think

there's going to be one more, right?  I'll get there.

        MR. BATES:  Object to the form.

─────────────── B.R. v. F.C.S.B. ───────────────

26

                    (Court reporter clarification.)

                    THE COURT:  Object to the form of the question.

Overruled.

BY MR. BRENNER:

Q.    There's -- we went over the -- we first went over the

regulation?

A.    Correct.

Q.    We're now in the SR&R?

A.    Yes, sir.

Q.    And there's going to be a third document which when

they're all together form the -- sort of the Fairfax County

School Board direction on sexual harassment.  That's going to

be a policy, right?

A.    Yes, sir.  I don't set policy.

Q.    I'm sorry?

A.    I don't set policy.

Q.    No, I didn't ask -- no --

A.    Okay.

Q.    You know what, we'll get there when we get there.

A.    Okay.

Q.    All right.  So this student rights and responsibilities

is what you're referring to is -- is -- had the component of

verification and -- in the "it depends" language.  You think

that's in there?

A.    Sir, bullying or harassment occurs after several

incidents.  Students play in the cafeteria or whatnot, call

each other a name, is that -- can you label that sexual

harassment?  If you cannot verify that, if it's a kind of he

said/she said, how are you going to --

   THE COURT:  You don't get to ask questions, sir.

You need to answer the questions.

   THE WITNESS:  Okay.

   THE COURT:  All right.

   THE WITNESS:  Sorry, sir.

BY MR. BRENNER:

Q.   Were you done?

A.   Yeah.

Q.   Okay.  By the way, if I cut you off, not on purpose.

Give me the hand, okay?

A.   Okay.

Q.   Okay.  Let's -- let me ask the question again because

you didn't -- I don't think you answered it.

A.   Okay.

Q.   So you had said -- in a prior answer you said in the

Students Rights and Responsibilities is where you'll find that

language about "it depends" and verification.  I'm just asking

you, is it there?

A.   I will have to look through.  Okay?

Q.   Okay.  Sure.

A.   Okay.  On Page 19.

─────────── B. R. v. F.C.S.B. ───────────

28

Q.   Okay.  Let's get there.

A.   Oh, I'm sorry.  C.

Q.   Okay.

A.   "Verbal or written use of vulgar, profane" --

          THE COURT:  Sir, sir, sir.

          THE WITNESS:  Oh, I'm sorry.

          THE COURT:  Wait for a question.  Wait for a
question.

          THE WITNESS:  Okay.

BY MR. BRENNER:

Q.   Okay.  So you are in Page 19, correct?

A.   Correct.

Q.   I think that's on the screen, too, if it's easier for
you.  And you are directing us to C?

A.   Correct.

Q.   As in Charlie?

A.   Uh-huh.

Q.   And you're saying that's where you're finding this
rule -- or not rule, this -- this guidance that it has -- it
depends and it's based upon verification?

A.   Correct.

Q.   So why don't you read it to the jury?

A.   Sure.  (As read): "Verbal or written use of vulgar,
profane, obscene, or patently offensive conduct or language
sometimes referred to curse words, profanity, or processing

—B.R. v. F.C.S.B.—

29

[sic] of displaying visual imagery that is obscene as defined

by the Code of Virginia or engaging in indecent or lewd

exposure of body parts."

Q.   Okay.  If you go back --

A.   And --

Q.   Oh, I'm sorry.

A.   Go --

Q.   I cut you off.

A.   No, that's fine.

Q.   Okay.  So just so the jury understands.  If we could go

back one page so we know what list we're reading from.

        Okay.  We're going to go back one page because we

started on the list.  It's on the bottom of Page 18, that list

that we were -- that you were reading from, C, is those things

on that list -- and they shall result -- right, that's

mandatory -- in disciplinary action at the discretion of the

principal, right?

        So that means that there will be disciplinary

action, but you get to decide what it is?

A.   Again, depending on the situation, we look into

everything, and we make a decision based on the occurrence.

Sometimes -- you know, it's just not a static consequence

depending on --

        MR. BRENNER:  Now that we've shown the jury, we'll

go to C of the next page, please, Mr. Brown.  Thank you.  Can

─────B.R. v. F.C.S.B.─────

30

you just blow up C?

BY MR. BRENNER:

Q.   So in this case it's a student, this applies to students,
right?

A.   Correct.

Q.   Okay.  So a student uses verbal or written use of vulgar,
profane, obscene, or patently offensive conduct or language,
sometimes referred to as curse words or profanity, those
things shall result in disciplinary action?

A.   Right.

Q.   Mandatory?

A.   Correct.

Q.   Okay.  Let's go --

     MR. BRENNER:  You can take that down, Mr. Brown.
Thank you.

BY MR. BRENNER:

Q.   Let's go to the other thing I was previewing, which is
the policy.  It's going to be Exhibit 723 in your notebook.

     MR. BRENNER:  Counsel, 723.

BY MR. BRENNER:

Q.   Did you find it?  It's second to the last.

A.   Okay.

     THE COURT:  Saying "uh-huh" and "huh-uh."
Mr. F██████, you've been paying attention to the process that
we use here, and one of the more important persons in the

─────────── B. R. v. F.C.S.B.───────────

courtroom is the court reporter, Ms. Harris.  And when you say

things like "uh-uh" and "huh-uh," those things don't really

translate very well for recording.  So if you could say "yes"

or "no" or "I don't understand," that will probably be better

for all of us.

        THE WITNESS:  Okay.

        THE COURT:  Thank you, sir.

BY MR. BRENNER:

Q.   Okay.  Sir, did you have an opportunity to review

Exhibit 723?

A.   I would like to take my time and read it.

Q.   Of course.

A.   Thank you.

        Correct.

Q.   You've read it now?

A.   Yes.

Q.   Okay.  That is a policy also promulgated -- or I'm sorry,

put forth by the School Board?

A.   Correct.

Q.   Okay.  Having to do with sexual harassment?

A.   Correct.

        MR. BRENNER:  Your Honor, at this point, we would

move for admission of Plaintiff's Trial Exhibit 723.

        THE COURT:  Without objection.

        MR. BRENNER:  May we publish?

Case 1:19-cv-00917-RDA-LRV    Document 1043    Filed 08/26/24    Page 32 of 137
PageID# 20890                    Direct - A.F.

B.R. v. F.C.S.B.

32

THE COURT:  You may.

(Plaintiff's Exhibit No. 723 was admitted into evidence.)

BY MR. BRENNER:

Q.   Okay.  So we kind of touched on this a little bit, but
you and I got back and forth.  There's sort of three legs to
this stool here.  There's the original regulation we looked
at, there's the SR&R, and this is the third leg of the stool?

A.   Right.  Correct.

Q.   And this is a School Board policy regarding prohibition
of sexual harassment, correct?

A.   Correct.

Q.   Okay.  If you go --

        MR. BRENNER:  Mr. Brown, if you can start in Roman
Numeral III and highlight the first -- the first full
sentence.

BY MR. BRENNER:

Q.   Okay.  Do you see that?

A.   Yes.

Q.   Okay.  So -- I'm pointing out, you've talked about this
before.  This, again, is -- is what the School Board is saying
to you and your fellow administrators, teachers, guidance
counselors is -- it's being given to you in accordance with --
in addition to another statute, the Civil Rights Act Title IX
of the Education Amendments of 1972, right?

A.   Correct.

B.R. v. F.C.S.B.

33

Q.   Okay.  That's the Title IX we've been referring to,
right?

A.   Correct.

Q.   Okay.

MR. BRENNER:  Next -- next sentence, you can
unhighlight that one, and go to the next one.  Please.

BY MR. BRENNER:

Q.   This -- this sentence -- and I apologize.  I know it's
awkward to have the screen to your side, so you tell me when
you're ready.

A.   I'm ready.

Q.   Okay.  The -- this is the School Board saying on behalf
of your school and every other school in Fairfax County, that
they're committed to maintaining, quote, An environment free
from sexual harassment of any kind?

A.   Correct.

Q.   And you -- you understood that that commitment is a
commitment that the School Board is making to the students of
the school, right?

A.   Correct.

Q.   And the parents?

A.   Correct.

Q.   Okay.

MR. BRENNER:  Let's unhighlight that, and go to the
next sentence, please.

─ B. R. v. F. C. S. B. ─

34

BY MR. BRENNER:

Q.   It says, "Therefore, unwelcomed sexual advances, requests
for sexual favors, and other verbal or physical contact of a
sexual nature amounting to or constituting harassment are
prohibited," right?

A.   Correct.

Q.   Okay.  And then it says it, "The School Board directs the
division superintendent or his or her designee to take
appropriate action when complaints are received."

      Are you the designated designee in that?

A.   I was.

Q.   Or were you?

A.   Yeah, I was.

Q.   Okay.  All right.  Thank you.

      MR. BRENNER:  You can take that down, Mr. Brown.
Thank you.

BY MR. BRENNER:

Q.   Those three things we just went through, the policy, the
regulation, and the SR&R, the administrators at RCMS were all
required to follow, correct?

A.   Correct.

Q.   And it was your job as the principal of the school to
ensure that they did so?

A.   Yes, sir.

Q.   And it was your job to ensure that the policies,

Direct - A.F.

—B.R. v. F.C.S.B.—

35

regulations, and the SR&R were implemented and enforced at
Rachel Carson?

A.    Yes, sir.

Q.    We're going to switch topics.

A.    Okay.

Q.    Okay.  Now, as principal of Rachel Carson Middle School,
you oversaw the school's administrative staff?

A.    Yes.

Q.    You, you -- you yourself as the principal were ultimately
responsibile for the well-being and safety of the students,
correct?

A.    Yes.

Q.    That was a -- that was a duty you -- you had, right?

A.    Right.

Q.    Okay.  The assistant principal -- so let's -- let's back
up a little bit.

        The way the school was structured, the
administration, you're the top guy, right?

A.    I'm the principal.

Q.    Okay.  Well, you report to anyone at the school?

A.    I did have superiors that overlooked my --

        THE COURT:  But you were the main person on site?

        THE WITNESS:  On site.

        THE COURT:  Is that fair?

        THE WITNESS:  Correct.

─ B. R. v. F.C.S.B. ─

36

BY MR. BRENNER:

Q.   Yeah, you reported to people in the superintendent's
office, right?

A.   Sure.

Q.   Okay.

A.   Yes.

Q.   At the school, you're the top guy?

A.   Correct.

Q.   Okay.  Then sort of we're thinking organizational chart,
there's a branch off for -- is it the director of student
services?

A.   Correct.

Q.   And that was Cheryl Weaver at the time?

A.   Yes.

Q.   Okay.  And then -- and Cheryl Weaver's direct report was
you?

A.   Yes.

Q.   Okay.  Am I right that the assistant principals are off a
different branch, they don't report to Cheryl, or do they?  Or
Ms. Weaver?  I apologize.

A.   No, they report to me.

Q.   Okay.  So a separate branch are the assistant principals,
right?

A.   Yes.

Q.   The assistant principals at the time -- again, our time

———B.R. v. F.C.S.B.———

period we're talking about, were Ms. B█████?

A.    Yes.

Q.    Was it Ms. T█████ at the time?

A.    Yes.

Q.    Okay.  Mr. H█████?

A.    Yes.

Q.    And did I miss one?  Did I miss one?

A.    No.

Q.    Okay.  And did they break out -- did they have like

separate titles, like 7th grade principal, 8th grade?  Was

that a separate title, or they were just all assistant

principals?

A.    They took care of certain aspects of the school building

with certain responsibilities.  Since the school was so large

with the number of children, they did have certain groups of

students that -- that was under them in their care.

Q.    Okay.  But, for example, did anyone have the title 7th

grade principal or assistant principal?

A.    I am not sure if -- since there was three of them and we

had two grades, I'm not sure if one person just took care of

all 7th or one person took care of all 8th.  Or one was split.

Maybe a team of 7th and a team of 8th.

Q.    So you reminded me of something that I forgot to ask you

before.

            Within the school, you guys -- the school had teams

─B. R. v. F.C.S.B.─

38

right, for students?

A.   Yes.

Q.   And how many teams were there in each grade?

A.   I believe eight.

Q.   Eight per grade?

A.   No, eight total.  So it's --

Q.   Four per grade?

A.   Right.  If -- if I remember correctly.

Q.   Yeah.

A.   It was --

Q.   I think it may be five, but we'll see.  I'm not -- I
won't hold you to it.

        But were those relatively -- if you were a 7th
grader, you were on a 7th grade team, is that fair?

A.   That's fair.

Q.   Okay.  Regardless if it was four or five?

A.   Right.

Q.   And what was the significance of the teams, meaning, did
they -- did you only go to classes with kids in your teams?

A.   A team would be placed in the building within a certain
pod area.  Those pod areas had lockers.

        And on that team, they would have a -- a science
teacher, an English teacher, a math teacher, and a history or
social studies teacher.  So the -- those teachers would have
approximately 140 students in common.

And what it did was that, you know, if you're in a
large school, you know, kids can get lost.  But when you have
a smaller group of students where every -- every child is
known, then it makes it more of a kind of a family setting,
and that teachers can really watch and discuss the students on
a -- on a daily basis.

Q.   So the subjects you just listed, are those sometimes
called the core classes?

A.   Correct.  The four core.

Q.   I'm sorry?

A.   The four core.

Q.   Four core?

A.   Uh-huh.

Q.   So if you were in 7th grade team -- I think my client was
in Explorers; do you remember that?

A.   I believe that was the name, but I'm not going to --

Q.   Not --

          THE COURT:  You remember the term "Explorers,"
though?

          THE WITNESS:  I do, sir.

          THE COURT:  Okay.

BY MR. BRENNER:

Q.   That was one of the teams?

A.   Right.

Q.   My recollection is they all had a letter, there was A

─B. R. v. F.C.S.B.─

40

through E.

        So if you were an explorer, you would take your core

classes with other Explorers?

A.    Correct.

Q.    You would also have -- I think you said this, you used

the word "pod," you would have your locker around other

Explorers, right?

A.    They would have the same lockers within that area.

        Could I change something, though?

Q.    Of course.

A.    We had different math courses for 7th graders.  So a 7th

grade student can go into a 7th grade math class.  They can

go -- they can choose to take 7th grade Honors math, and they

could possibly qualify for Algebra I Honors based on

assessments and the SOL scores the previous year.

Q.    Okay.  Would that -- would that create an occasion where,

for example, your example where a 7th grade -- I assume

Algebra I was an advanced math for 7th grade?

A.    Yes, sir.

Q.    Or honors.

        Would that create an occasion where the 7th grader

either would be on the 8th grade floor or in class with the

8th graders, or they would just be with other 7th grade honors

on that first floor?

A.    It depends on how many students qualified.  To the best

B.R. v. F.C.S.B.

41

of my memory, there were students -- or I'm sorry, teachers

that were qualified to teach Algebra I since they had

secondary endorsements.  So to the best of my memory, I

believe that they were with 7th graders.

Q.   Okay.  Thank you for -- for clarifying that.

     So let's go back.  We were talking about the -- sort

of the hierarchy of the school or the corporate structure or

board chart.

     The assistant principals were the ones responsible

for conducting investigations of student reports of sexual

harassment?

A.   Correct.

Q.   And they would -- their work on that, they would report

to you their results or recommendations, correct?

A.   Correct.

Q.   It was your responsibility as the principal of the school

to ensure that the assistant principals were trained on how to

investigate a report of sexual harassment?

A.   Correct.

Q.   Okay.  And they would get that training, though, from the

county?

A.   Correct.

Q.   When I say "the county," I mean Fairfax County School

Board, right?

A.   Yes.  And the various departments within the county.

B.R. v. F.C.S.B.

42

Q.   All right.  Rachel Carson is in Fairfax County?

A.   Yes, sir.

Q.   As far as you understand, Rachel Carson and all other

schools in Fairfax County were subject to the requirements of

Title IX?

A.   Correct.

Q.   Okay.  Teachers -- so now we've had assistant principals.

          Teachers were told to immediately report a student's

complaint of sexual harassment to either a guidance counselor

or an administrator?

A.   Yes.

Q.   Okay.  So the guidance counselors, were they in the --

what I was trying to call an org chart, were they below the

assistant principals?

A.   They were part of the department of student services.

Q.   Did they report to Ms. Weaver?

A.   Yes.

Q.   Okay.  So they're -- they're under the Ms. Weaver branch?

A.   Yes.

Q.   But for sexual harassment in particular, their -- their

obligation was to refer to the assistant principals?

A.   Correct.

Q.   Okay.  And then -- and so teachers go to guidance

counselor or administrator with sexual harassment complaints.

Counselors go right to the administrators, correct?

B.R. v. F.C.S.B.

43

A.   Correct.

Q.   Okay.  Now, administrators were told that they needed to start the investigation of a student's complaint of sexual harassment in a timely manner?

A.   Yes.

Q.   And that, again, is Fairfax County School Board policy?

A.   Yes.

Q.   You would agree that any investigation on sexual harassment must be done promptly, correct?

A.   Yes.

Q.   When a student reported sexual harassment, actually you also were supposed to be notified before the assistant principals began investigating the complaint, correct?

A.   Correct.

Q.   Okay.  Just -- you've been -- when is the first time you received a report of my client's complaints of sexual harassment?

A.   With -- I believe it was the first incident where there was name-calling down in the locker pod.  That was --

Q.   And when was -- I'm sorry.

A.   That was in November, I believe.

Q.   So it's your testimony that because the policy was that it immediately comes to you before it even goes to the assistant principals, that is the first time my client made any complaint to any of -- teacher, guidance counselor,

─────────── B. R.  v.  F.C.S.B. ───────────

44

administrator about name-calling or any other form of sexual

harassment?

        MR. BATES:  Objection, misstates his testimony.

        THE COURT:  Rephrase.

BY MR. BRENNER:

Q.   We'll go back.

        Your testimony was when a student reports sexual

harassment you are supposed to be notified before the

assistant principals began investigating the complaint.  That

was your testimony?

        THE COURT:  Yes or no, sir.

        THE WITNESS:  Sir, it was a long time ago.  So could

I just have a little time to think?

        THE COURT:  I understand that you have to take a

little time to make sure that you're giving what you believe

to be an accurate answer.

        THE WITNESS:  Yes.

        THE COURT:  Mr. Brenner, why don't you, if you can,

refresh his recollection.

        MR. BRENNER:  I'm going to do that, Your Honor.

        THE COURT:  All right.

        MR. BRENNER:  May I approach?

        THE COURT:  You may.

BY MR. BRENNER:

Q.   Just to tell you about court rules.  So I'm going to give

B. R. v. F. C. S. B.

45

you something to read.  You're not supposed to read it out

loud.  It's for you to read to refresh your recollection.

A.   Okay.  Thank you.

        THE COURT:  The way that I like to do it -- and

Mr. Brenner, you were consistent with that -- is he's going to

give a document to you.  I want you to look at that document.

After you read the document, the page or reference that he

provides to you, look up, and he may have -- may have to ask

you another question regarding your recollection of the

events.

        MR. BRENNER:  May I approach, Your Honor?

        MR. BATES:  Actually, before we do, I got the page

number, can we have it on the record for other counsel?

        MR. BRENNER:  Sure.  The page number that I'm going

to read -- that I'm going to tender to the witness, Your

Honor, is Page 246, Lines 16 through 22.

        THE COURT:  246, 16 through 22.

        You may approach.

        Again, sir, take a look at 16 through 22, and after

you read it, look up.

        (A pause in the proceedings.)

        THE COURT:  All right.  Does that refresh your

recollection, sir?

        THE WITNESS:  Yes, sir.

        THE COURT:  Okay.

─ B.R. v. F.C.S.B.─

BY MR. BRENNER:

Q.    So you were supposed to be notified of a complaint of
sexual harassment before the investigation began, correct?

A.    Right.

Q.    Okay.

A.    Correct.

        MR. BRENNER:  Your Honor, may I just leave that up
there with him just in case --

        THE COURT:  You may.

        MR. BRENNER:  -- if we need it again.

BY MR. BRENNER:

Q.    And your testimony is that the first time you were
notified of any report of sexual harassment by my client was
not until November, right?

A.    Sir, I can't really put a date to that.  I was just --
too far back for me to remember exactly when someone told me.

Q.    Do you think you were told before an investigation
started?

A.    If they were investigating a sexual harassment case, yes.

Q.    Okay.  So you don't remember it, the date, you don't
remember specifically being told, but you think you were
because that was the policy, is that fair?

A.    If they were investigating a sexual harassment case.

Q.    Yeah, you -- the policy would be you would be notified
before the investigation began?

B.R. v. F.C.S.B.

47

A.    Correct.

Q.    Okay.  Change topics, subjects.

       Title IX, which we've talked about a few times,

guarantee that no person in Fairfax County Public School shall

be subjected to sexual harassment, correct?

A.    Correct.

Q.    The United States Department of Education Office of Civil

Rights enforces Title IX, correct?

A.    Can you please repeat?

Q.    Yes, I can.

A.    Thank you.

Q.    Sorry.

A.    No.

Q.    Is it too low, or was I fast?

A.    No, I just --

Q.    Okay.

A.    -- didn't hear it.

Q.    The United States Department of Education Office of Civil

Rights enforces Title IX, correct?

A.    Correct.

Q.    You under -- and that's something referred to as the OCR?

A.    Right, Office of Civil Rights.

Q.    You understand that the OCR issues guidelines on what the

school is required to do to comply with Title IX, correct?

       MR. BATES:  Objection.  Calls for legal conclusion.

———B.R. v. F.C.S.B.———

48

          THE COURT:  I'll allow that.

BY MR. BRENNER:

Q.   Is that correct?

A.   Correct.

Q.   Generally speaking, it was your responsibility as

principal to implement and enforce any guidelines that came

out of the Office of Civil Rights?

A.   Correct.

Q.   In fact, anything from the OCR, which is the Office of

Civil Rights, would go directly from the county to you as

principal, correct?

          MR. BATES:  Same objection, Your Honor.

          THE COURT:  That's asked and answered, but I'll let

him answer it one more time.

          THE WITNESS:  Yes.

BY MR. BRENNER:

Q.   Now, do you recall in 2011 that the OCR had directed you

the Title IX --

          (Court reporter clarification.)

BY MR. BRENNER:

Q.   Let me -- let me direct you to a different exhibit.

We'll do it that way.

          If you could look at Exhibit 56.  Let me know when

you're there.

          MR. BATES:  Judge, can we have a side bar?

B.R. v. F.C.S.B.

THE COURT:  Purpose?

MR. BATES:  We're getting into issues that were a subject of a motion.

THE COURT:  The motion that was addressed this morning?

MR. BATES:  Yes.

THE COURT:  Okay.  Stay within the boundaries of the Court's instruction.  I think he's anticipating that you're going to ask a question, and he's trying to get ahead of it.  So I think everyone is aware of the Court's instruction and determinations regarding motions in limine and the like.  So let's make sure we stay in those parameters.

MR. BRENNER:  Your Honor, I think I need to -- I need to approach then because I don't -- I don't understand.

(Side bar.)

THE COURT:  What is the nature of your objection?

MR. BATES:  He's asking about the OCR "Dear Colleague" Letters that are not relevant to this and subject to the Cantalupo deposition -- the Court just ruled that this subject is essentially off limits because it's confusing because it's not the standard.

THE COURT:  Well, it's a bit -- it's a bit different from what we did with Dr. Cantalupo because with Dr. Cantalupo I was precluding her from giving an expert opinion as to whether or not these guidelines need to be followed and met

——— B.R. v. F.C.S.B. ———

50

and the like.

          This gentleman is simply being asked questions of
whether he was aware of the guidelines and did he follow them.
The answer could be yes or no, and the jury can give whatever
weight they want to with that.

          MR. BATES:  I would say 403, Your Honor.  The jury
is being asked -- they're confused -- they're going to be
instructed on a standard of the deliberate indifference.

          THE COURT:  Uh-huh.

          MR. BATES:  And they're being shown policy and
guidance documents that were not -- are not based on that
standard.

          We've got OCR standards, and we have the standards
that they're going to be instructed on later.  So they're
being led down a road to believe that a federal government
agency has some type of dictative powers as to what is a Title
IX violation in this case and under Supreme Court law.

          THE COURT:  And why wouldn't that be covered in an
instruction, whatever the guidelines and the policies that are
issued, they're issued.  There's no mandate, as I understand
it, that requires specificity or particularity with regard to
how they're followed.

          I think that this is a valid examination because
it's attempting to get from this particular principal what he
did to meet his notice and responsibility.  And I think the

B.R. v. F.C.S.B.

term used was "verification."  I wasn't really comfortable
with that term.  I would probably just prefer him to say that
his investigation showed X as opposed to "verification"
because I can't find verification anywhere in those
guidelines.

            But I'm going to give him a little latitude on that.

            Now, with regard to Dr. Cantalupo, it's probably
going to be a different standard, because of what the Court
did in the motion in limine.  But he can ask him questions
generally about this.  And in cross-examination, which you're
entitled to do because he's calling him as an adverse witness,
you can get into whether it was his thought or belief that he
had a responsibility to follow these, with specificity and
particularity.  I'm going to let him delve into it a little
bit, but, as I say, be careful and don't cross any lines.

            And I would suggest that you don't want to in any
way suggest that this was an absolute as far as this
particular witness is concerned.

            MR. BRENNER:  Right.  That's why I did -- I did lay
a foundation.  He said this is what the School Board was
giving him.  Okay.  I'm not going to go too far.

            MR. BATES:  I would just say if we go down this
road, can we please have a curative instruction because
they're literally being shown the OCR guidance documents that
have no relevance to this claim.

THE COURT:  You can propose a curative instruction
down the road, and we'll take a look at it.

MR. BATES:  All right.  Thank you.

(Open court.)

THE COURT:  Does anyone on the jury need a comfort
break, or are we good?

We're good.  Okay.

MR. BRENNER:  Your Honor, I would note for the
record --

BY MR. BRENNER:

Q.    Well, do you have Exhibit 56 in front of you?

A.    56, yes.

Q.    Okay.  And that's the example of what we were just
talking about, OCR guidance that the School Board would send
to you, correct?

A.    Sorry.  I don't remember this document.

Q.    I understand that.

You told us that every time the OCR issued guidance,
the School Board would send it to you.  This is an example of
OCR guidance -- you don't specifically remember this one?

A.    No, sir.

Q.    You have no reason to doubt it was sent to you because
they sent you all of them, correct?

A.    Can you be more specific, sir?

Q.    Sure.

B.R. v. F.C.S.B.

53

MR. BATES:  And, Judge, can we get some foundation
here, please?

THE COURT:  Let me look at the nature of the
questions.

MR. BRENNER:  I'm sorry?

THE COURT:  I'm looking at the nature of the
questions to see what foundation might have to be laid.

I think he's fine.  Go ahead with your examination.

BY MR. BRENNER:

Q.  You told us that the School Board would send you -- all
OCR guidance would go right from School Board to the
principal, and that was you, correct?

MR. KINNEY:  Objection, Your Honor.

MR. BRENNER:  Your Honor, may I refresh his
recollection?

THE COURT:  You may.

BY MR. BRENNER:

Q.  Mr. F███████, do you still have your deposition up there
with you?

A.  Yes, sir.

Q.  Okay.  Great.

If you would look at Page 172, Lines 14 through 20.
And, again, just read it to yourself, and then I'll ask the
question again per His Honor's instructions.

172, Line 14 through Line 20.

─B.R. v. F.C.S.B.─

54

A.   Okay.

Q.   Okay.  Now, does that refresh your recollection any correspondence or memorandum from the OCR would come directly to you as principal?

A.   If it was brought down by the School Board, that would come directly to me, sir.

Q.   If it was what?

A.   If the School Board sent that document or that memorandum, it would come to me.

Q.   Well, actually, sir, let's read now -- your testimony was not if the School Board did it, your testimony was they all did.  You said any correspondence or memorandum from the OCR, that's all of them, right?

A.   Sir, that was not my understanding at the time.

Q.   Okay.  So do you remember giving your deposition on August --

A.   Yes, sir.

Q.   Let's see what day it was.  August -- May 8, 2023?

A.   Correct.

Q.   And do you remember being asked the following question and giving the following answer --

        MR. BRENNER:  Your Honor, do you need to see the transcript?

        THE COURT:  No.

BY MR. BRENNER:

B.R. v. F.C.S.B.

55

Q.   You were asked -- by the way, you took the deposition, you were under oath, right?

A.   Yes.

Q.   To the extent your memory was clearer at one time, it would have been clearer a year ago than it is today, right?

A.   Yes.

Q.   Okay.  And you were asked the following question, and you gave the following answer?

        "QUESTION:  Any correspondence or memorandum from OCR, would they come directly to you as principal?"

BY MR. BRENNER:

Q.   And your answer was?   Your answer was "Correct."  And then there was -- and then you said, "Correct.  I'm sorry. Correct."

        Is that your answer?

        THE COURT:  Hold it.  Just -- hold it.  Just a second.

        MR. KINNEY:  This is improper impeachment.  It's a different question that's being asked.

        THE COURT:  Well, it's -- we're actually getting into some evidentiary nuances.  We were first doing present recollection refresh, and then I think he's reading from a transcript, which makes it past recollection recorded, which sets a different standard for the ability to inquire because it being under oath.

        MR. BRENNER:  Your Honor --

        THE COURT:  Go ahead.

        MR. BRENNER:  I'll just ask a new question.

        THE COURT:  Go ahead.  That'd be fine.

BY MR. BRENNER:

Q.   Let me ask you this question:  Any correspondence or

memorandum from OCR would come directly to you as principal?

A.   So I'm kind of getting confused.

        THE COURT:  Let's -- let's try not to make it too

complicated.

        Is it true or not that any correspondence or

memorandum from OCR would come directly to you as principal

when you were the principal at that particular middle school?

        THE WITNESS:  Correct.

        THE COURT:  Okay.

BY MR. BRENNER:

Q.   So now if we go back to Exhibit 65.  I'm sorry 56.  That

is an example of OCR guidance, correct?

A.   Correct.

Q.   Okay.

        MR. BRENNER:  Your Honor, we would like to move that

into evidence.  There's a cover sheet on the front, which we

would not move in.  That shouldn't be there.

        THE COURT:  Why don't you check with your colleague

there to make sure you all are working from the same sheet of

—B.R. v. F.C.S.B.—

57

music.  Show him what you're trying to admit.

     MR. BRENNER:  There's a slip sheet in front that we won't admit.

     THE COURT:  Show it to him.

     MR. BRENNER:  He has it.

     THE COURT:  All right.

     MR. BATES:  Judge, I would note the same objection from the sidebar.

     THE COURT:  Overruled.

     MR. BRENNER:  May we publish, Your Honor?

     THE COURT:  You may.

(Plaintiff's Exhibit No. 56 was admitted into evidence.)

BY MR. BRENNER:

Q.   So this is a letter from the Department of Education, Office of Civil Rights, correct?

A.   Correct.

Q.   If you could go to Page 3, please.

A.   Yes.

Q.   The guidance from 2001 tells -- it says that -- why don't we blow up starting with the first sentence, please.  Can you read that?

A.   Correct.

Q.   It says (As read):  "When a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it

B.R. v. F.C.S.B.

58

interferes with or limits a student's ability to participate
in or benefit from the school's program."  Right?

A.   Correct.

Q.   Is that consistent or inconsistent with your
understanding of Fairfax County's School Board policy?

A.   Consistent.

Q.   Okay.  So let's go to the Page 4.  Okay.  Let me focus on
that first sentence, I think.  I'll give you a chance to read
it.

        (A pause in the proceedings.)

        THE WITNESS:  Correct.

BY MR. BRENNER:

Q.   Okay.  It says (As read):  "If a school knows or
reasonably should know about student-on-student harassment
that creates a hostile environment, Title IX requires the
school to take immediate action to eliminate the harassment,
prevent its recurrence, and address its effects."

A.   Correct.

Q.   Is that consistent with or inconsistent with your
understanding of Fairfax County School Board's policy?

A.   Consistent.

Q.   Consistent.  Okay.  Let's go to the middle of that page.
That says (As read):  "Schools may have an obligation to
respond to student-on-student sexual harassment that initially
occurred off school grounds, outside a school's education

program or activity.  If a student files a complaint with

the" --

        By the way, do you agree with that first sentence?

Is that consistent with Fairfax County's school policy?

A.   Yes.  But I would like to highlight the two words "may

have."

Q.   You want to highlight two words in the --

A.   "Schools may have an obligation."

Q.   Okay.  So let me ask you then, as the principal at Rachel

Carson Middle School implementing the policies of the School

Board, did you believe that you had an obligation to do what

it says here or just may have an obligation?

A.   It depends on the situation, sir.

Q.   Okay.  The next sentence says (As read):  "If a student

files a complaint with the school, regardless of where the

conduct occurred, the school must process the complaint in

accordance with its established procedures."

        Do you see that?

A.   Correct.

Q.   That's a "must," not a "may," right?

A.   Correct.

Q.   And that is consistent or inconsistent with the Fairfax

County School Board policies?

A.   Consistent.

Q.   So the fact that something occurs off campus does not

mean that the school does not have an obligation to follow

its established procedures to process the complaint, correct?

          MR. BATES:  Same objection, Your Honor, we've been

raising, and I think Mr. Brenner is now close to or has

crossed the line we talked about at sidebar.

          THE COURT:  All right.  It's a continuing objection,

and I acknowledge that.  And, Mr. Brenner, stay within the

confines of the Court.

BY MR. BRENNER:

Q.   Okay.  Just to be clear, I'm trying to understand what

you understood as the principal was the Fairfax County School

Board policy, okay?

A.   Yes, sir.

Q.   And all I'm trying to do then is when they would send you

these things is understand that what they are sending you was

outside of the contours of the Fairfax County School Board

policy or it was consistent with.  Do you understand?

A.   Yes.

Q.   Okay.  So that's what I'm trying to get at.  So was it

consistent with Fairfax County's school policy that there was

a requirement to investigate complaints in the normal

established procedures, even if the conduct occurred off

school grounds?

A.   Correct.

Q.   Okay.  So it then goes on, there's about three lines down

───── B. R. v. F.C.S.B. ─────

61

which is, for example.  So here it's giving an example of what

they mean.  So let me read it for you and the jury.

        THE COURT:  Well, let's make it simple.

        Sir, do you see the highlighted provision there?

And I'll read it.  (As read):  "For example, if a student

alleges that he or she was sexually assaulted by another

student off school grounds, and that upon returning to school,

he or she was taunted and harassed by the students who are the

alleged perpetrator's friends, the school should take the

earlier sexual assault into account in determining whether

there's a sexually hostile environment."

        Are you aware of that policy?

        THE WITNESS:  Yes, sir.

        THE COURT:  All right.  Did you follow that?

        THE WITNESS:  Yes, sir.  I'm sorry.

BY MR. BRENNER:

Q.   I think Your Honor asked this -- well, let me ask, did

you follow that policy because it was consistent with the

Fairfax County School Board policy?

        MR. BATES:  Your Honor, I would like to object.

This is not a policy.  This is an OCR guidance.

        THE COURT:  Well, I think we're running the risk

here of being semantic that we're getting in trouble as far as

trying to focus on the main thrust of the case, and as I

indicated to the jury when I initially instructed them , that

this case is about notice essentially.

And I think what Mr. Brenner is trying to go over with the gentleman here is whether or not he followed -- whether you call it policy, procedure, or protocol, whatever you want to call it, whether he followed the suggestions that are made as part of these procedures that have been put in place.

And so I think this is relevant questioning, but I think if we continue to get into semantics, we're going to confuse everybody.

So, sir, did you follow this language in this particular provision?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. BRENNER:

Q.   And was that consistent with Fairfax County School Board policy?

A.   Yes.

Q.   And then it tells you the reason, the last sentence, it said (As read):  "The school should also take steps to protect the student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates."

Is that consistent with Fairfax County policy?

A.   Yes.

B.R. v. F.C.S.B.

63

Q.   Okay.  I'm going to do one more with you.  Go to the
middle of that page.

        The sentence starts with "because students."  It
says -- Mr. F██████, you want to read it first or should I
just read it?

A.   You can just read it.

Q.   Okay.  It says (As read):  "Because students often
experience the continuing effects of off-campus sexual
harassment in the educational setting, schools should consider
the effects of the off-campus conduct when evaluating whether
there is a hostile environment on campus."

A.   Correct.

Q.   Is that consistent with your understanding of Fairfax
County School Board policy?

A.   Correct.

Q.   Okay.  You can take that down.

        Going -- in our relevant time period, 2011 to 2013,
you agree that Title IX required a school to conduct a
comprehensive investigation of a report of sexual harassment?

        MR. BATES:  Objection, calls for a legal --

        THE COURT:  Sustained.

BY MR. BRENNER:

Q.   Well, did you understand that Fairfax County School
Board's policies required a school to conduct a comprehensive
investigation of a report of sexual harassment?

─────B.R. v. F.C.S.B.─────

64

A.    Yes.

Q.    Same question.  Did you understand that Fairfax County

School Board's policies required it to conduct a fair

investigation of any reports of sexual harassment?

A.    Yes.

Q.    And the same question, you agree that Fairfax County

School Board's policies required it to conduct an impartial

investigation of any sexual harassment?

A.    Yes.

Q.    Same question for sexual assaults.  Fairfax County School

Board's policy would have required a comprehensive

investigation of any report of sexual assault?

A.    Yes.

Q.    And a fair investigation of any report of sexual assault?

A.    Yes.

Q.    And an impartial investigation of any report of sexual

assault?

A.    Yes.

Q.    Would you agree that a school is responsible for

addressing harassment incidents that it knows about or

reasonably should know about?

A.    Yes.

Q.    You yourself are not fully familiar with what the term

"deliberate indifference" meant, are you?

          MR. BATES:  Objection, Your Honor.

B.R. v. F.C.S.B.

65

THE COURT:  Yeah, let's rephrase that, Mr. Brenner.

BY MR. BRENNER:

Q.   I'm not asking for the definition.  I just want to let --
whether you say it or not, I don't want --

THE COURT:  Let me try.  Do you know what the term
"deliberate indifference" in the context of Title IX means,
yes or no?

THE WITNESS:  Not fully, sir.

BY MR. BRENNER:

Q.   But you would agree that you would be -- not you.

You would agree that the school would be in
violation of Fairfax County school policies when peer
harassment is based on sex is sufficiently serious that it
creates a hostile environment and such harassment is
encouraged, tolerated, not adequately addressed, or ignored by
school employees?

A.   The question, sir?

Q.   Yeah.  Would you agree that Fairfax County School Board,
its policies would be violated if harassment based on sex is
sufficiently serious that it creates a hostile environment,
and such harassment is -- you understood the School Board's
policies to -- that the school was responsible to eliminate
the hostile environment created by the harassment?

A.   Correct.

Q.   Same question.  You agree that policies would be violated

B.R. v. F.C.S.B.

66

if there was abusive behavior on the basis of sex and it

created a hostile environment?

A.   Correct.

Q.   And the school would be obligated to respond to that,

correct?

A.   Correct.

Q.   And you would also agree it is the school's

obligations -- you understood the School Board's policies

to -- that it was -- the school was responsible to eliminate

the hostile environment created by the harassment?

A.   Right.

Q.   And you would agree pursuant to the Fairfax County School

Board policies, you had the obligation to address the effects

of the hostile environment created by the harassment?

A.   Correct.

Q.   And you would agree pursuant to the Fairfax County School

Board policies, you had needed to take steps to prevent the

hostile environment created by the harassment from

reoccurring?

A.   Correct.

Q.   Okay.  So let's -- you would agree that -- or you -- you

would agree that harassment can include verbal acts such as

name-calling?

        THE COURT:  In the context of Title IX, you would

agree that it was your responsibility is that name-calling

─── B.R. v. F.C.S.B. ───

67

would fall within the parameters of the things that you have
to investigate?

     THE WITNESS:  Correct, Your Honor.

BY MR. BRENNER:

Q.  Same question for graphic statements?

A.  Correct.

Q.  Same statement for -- can include written statements?

A.  Correct.

Q.  Harassment creates a hostile environment when the conduct
is sufficiently severe, pervasive, or persistent so as to
interfere or limit a student's ability to participate in or
benefit from the services, activities, or opportunities
offered by the school?

A.  Correct.

Q.  Okay.  Let's switch topics and talk about how Rachel
Carson applied the policies.  Okay?

     We're going to switch topics and talk about how
Rachel Carson applied these policies.

A.  Yes, sir.

Q.  While you were there.  Okay?

A.  Uh-huh.

Q.  If you could go in your book, please, and look at
Exhibit 103.

     (A pause in the proceedings.)

BY MR. BRENNER:

—B.R. v. F.C.S.B.—

68

Q.    Are you ready?

A.    Yes, sir.

Q.    Okay.  Do you recognize this document?

A.    Yes.

Q.    Okay.  Is this document the -- I assume it's PowerPoint,

a slide -- but a slide presentation that would be given to the

students at Rachel Carson?

A.    Yes.

Q.    If my memory is correct taught by guidance counselors or

assistant principals, do you know?

A.    This looks more -- the administrators, when they talk to

students at the beginning of the year or midyear.

Q.    And when you use "administrators," that's referring to

principal, assistant principal, and director of student

services?

A.    It would be the assistant principals.

Q.    The assistant principal?

A.    To their groups.

Q.    Okay.

A.    Correct.

        MR. BRENNER:  Your Honor, at this time, we would

like to move for admission of Exhibit 103.

        MR. BATES:  No objection.

        THE COURT:  Without objection.

(Plaintiff's Exhibit No. 103 was admitted into evidence.)

         MR. BRENNER:  Just put up the first page, please.

BY MR. BRENNER:

Q.   So this is the PowerPoint that would be taught by the

assistant principals to all of the students at the beginning

of the school year.  Is that what you said?

A.   At the beginning and midyear.

Q.   Okay.  So in the 2011/'12 school year, is it fair to say

that at least the goal would have been to teach this to the

students in the first -- first month of school?

A.   Correct.

Q.   And when does the school year start generally?

A.   Back then, I believe it was September, after Labor Day.

Q.   Right after Labor Day?  Okay.

A.   Yes.

Q.   Let's go to -- let's go to Page 2, I believe it is.  This

is what's called student rights, what the students are being

told, right?

A.   Correct.

Q.   And they're told that they have a right to a public

education, right?

A.   Yes, sir.

Q.   And now we went through this before, but that would

include a public education free from harassment, correct?

A.   Correct.

Q.   And it says they're entitled to a safe school

B.R. v. F.C.S.B.

70

environment, right?

A.   Correct.

Q.   And that you told the students that, right?

A.   Yes.

Q.   You expected them to believe you?

A.   Pardon me?

Q.   Did you expect the students to believe you when you told
them that they had a right to a safe environment?

A.   Yes, sir.

Q.   Okay.

        THE COURT:  Would it be fair to say that all the
bullet points and the student rights that have just been
listed here were things that you focused on as part of being
the lead administrator in your school?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Okay.

BY MR. BRENNER:

Q.   Let's go to page -- the next page.  It says that
bullying --

        MR. BRENNER:  Oh, no.  Next page.

        (A pause in the proceedings.)

BY MR. BRENNER:

Q.   The students were told that bullying is not tolerated at
Rachel Carson Middle School, right?

A.   Correct.

—B.R. v. F.C.S.B.—

71

Q.   In fact, I think -- I think some -- I'm sorry.  Were you looking at something?

A.   I thought I heard something.

        THE COURT:  There was a sneeze.

        MR. BRENNER:  I think someone coughed, yeah.

BY MR. BRENNER:

Q.   Actually, did Rachel Carson publicize to the parents of the school that they had a, quote, No tolerance policy for bullying, right?

A.   Correct.

Q.   You expected the parents to believe that, right?

A.   Yes, sir.

Q.   And rely on it?

A.   Yes.

Q.   Okay.  On the last bullet point there it said, "All bullying incidents will be reported to the School Resource Officer," right?

A.   Yes.

Q.   Okay.  Now, I want to just talk a little bit about something that came up -- if you can look in your book -- your book under 640.

        Is there not a 640 in your book?

        THE COURT:  This might be a good time for us to take a little bit of a break.

        Ladies and gentlemen, we're going to take our

morning break.  It's about 11:50 now.  If we can get you back
in at 12 o'clock, and we'll try to do as best we can as to
find a good breaking point around 1 o'clock.

        Ms. Armentrout should have provided you the menus
for your choices for lunch.  And what we usually try to do is
figure out when the lunch arrives, and then we work around
that.  Sometimes they come on time; sometimes they don't.  But
we'll work around that.

        Remember the Court's instruction not to discuss the
case or any aspect of the case with anyone.

        Thank you.  See you about 12 o'clock noon.

        (Jury excused.)

        THE COURT:  I think you may be seated.

        Mr. Brenner, do you think you might be finished,
your part of the examination, by around 1 o'clock?

        MR. BRENNER:  No, Your Honor.

        THE COURT:  No?  Give me a time that you think you
might be getting close to.

        MR. BRENNER:  Maybe getting -- total time?

        THE COURT:  Yes, so I can try to manage the jury's
time.

        MR. BRENNER:  I will tell you I'm on page -- I'm
exactly -- well, not exactly -- I've got to do my math --
about 30 percent through.

        THE COURT:  Okay.  All right.  We'll see everybody

────B.R. v. F.C.S.B.────

at noon.

(Recess.)

(Court proceedings resumed at 12:05 p.m.)

(Jury present.)

THE COURT:  You may be seated.

I need a moment with Ms. Tinsley.

(A pause in the proceedings.)

THE COURT:  I'm just going to inform counsel of
something that is very important.  We need to accommodate one
of the jurors with regard to a religious holiday, and so we
need to end at a specific time.  So just to be aware I'm not
cutting you off because I want to cut you off, I'm trying to
accommodate the holiday.

MR. BRENNER:  Is that today, Your Honor?

THE COURT:  Yes.

MR. BRENNER:  Okay.

THE COURT:  And probably every day until Friday, I
believe.

MR. BRENNER:  Okay.  I'm going to shoot for when you
give me a sign that lunch has arrived.

THE COURT:  Yes.

MR. BRENNER:  Okay.  May I proceed?

THE COURT:  You may.

BY MR. BRENNER:

Q.    Okay.  When we broke, I was directing you to Exhibit 640,

—B.R. v. F.C.S.B.—

74

not in your book, but I gave it to you, right?

A.    Yes.

Q.    Is that a picture of Rachel Carson Middle School?

A.    Yes, sir.

         MR. BRENNER:  May we put -- admit that into

evidence, Your Honor?

         MR. BATES:  No objection.

         THE COURT:  Without objection.

(Plaintiff's Exhibit No. 640 was admitted into evidence.)

         MR. BRENNER:  May we publish?

         THE COURT:  You may.

BY MR. BRENNER:

Q.    That's Rachel Carson Middle School, right?

A.    Yes.

Q.    So I just want to touch on a couple of things.  When --

you were here during the opening statements, right?

A.    Yes.

Q.    And I think it was Mr. Kinney talked about how you

would -- that safety was so important that you would stand --

stand in the front entrance?

A.    Right.  With the director of student services.

Q.    Okay.  Right.  So you and Ms. Weaver?

A.    Yes.

Q.    And the front entrance, is this --

         MR. BRENNER:  Is the witness able to draw, Your

─B. R. v. F. C. S. B.─

75

Honor?

THE WITNESS:  Am I able to draw?

THE COURT:  If you'd put your finger on it, it should work.

BY MR. BRENNER:

Q.  Can you -- can you draw where the front entrance is?

A.  Unfortunately, the tree is in the way.

Q.  You don't -- you don't like students climbing trees?

A.  I mean, sometimes I do.

THE COURT:  I think we can have a stipulation that the front entrance is somewhere behind the evergreen tree in the front of the school.

BY MR. BRENNER:

Q.  It's -- it's in -- the --

A.  Vicinity, yes.

Q.  Driveway behind the green tree or the tree?

A.  Yeah.

Q.  And then there's a front door there, right?

A.  Correct.

Q.  You may know this because you were a principal for a long time.  How many square feet is the building, do you know that?

A.  Not off the top of my head, no.

Q.  It's pretty big, right?

A.  It's very big.

Q.  Yeah.  And you and Ms. Weaver would stand and greet the

—B.R. v. F.C.S.B.—

76

students in the morning?

A.    Yes.

Q.    And they would just go by you and then go to wherever --
usually go to their lockers, right?

A.    Right.  We would say good morning as they walked in.

Q.    Okay.  Okay.  Change topics.

         Can you go to Exhibit 77 in your book?

A.    Okay.  I'm there.

Q.    Do you recognize that document?

A.    Yes.

Q.    Okay.  And that document is a written student statement
from my client dated November 21, 2011?

A.    Yes.

         MR. BRENNER:  Your Honor, at this time, we would
like to admit Plaintiff's Exhibit 77.

         THE COURT:  Without objection.

(Plaintiff's Exhibit No. 77 was admitted into evidence.)

         MR. BRENNER:  May we publish?

         THE COURT:  You may.

BY MR. BRENNER:

Q.    Okay.  Just to orient everyone, this is a -- without the
handwriting, this is a form that the school has, right?

A.    Yes.

Q.    And it's -- is it generally -- well, let me ask you this.
Is it -- is it -- is it filled out in with guidance

counselors, assistant principals, or both or something else?

A.   Normally with the assistant principals.

Q.   Okay.  And this is an opportunity for the student to
write out what -- whatever they need the administration's help
with, right?

A.   Yes, sir.

Q.   It is not limited, for example, to sexual harassment
stuff, right?  It could be anything?

A.   It could be anything that they are investigating.

Q.   Well, is it -- "investigating" is a little bit more of a
term than I thought.  Is it just for things that need
investigation?  What if a child, for example, was having
trouble with math class, would they do that or no?

A.   No.

Q.   Okay.  So it's a different form.  That's to see the
guidance counselor form?

A.   Yes, or to see the guidance counselor.

Q.   So these forms are meant to be used by the assistant
principals to essentially take witness statements or
complaints, right?

A.   Correct.

Q.   Okay.  And it would normally be filled out where?

A.   It depends.  If the student comes to the administration
office, it could be done there.  It could be done in the
alternative instructional arrangement room if they need to be

─────────────B.R. v. F.C.S.B.─────────────

78

separated so they don't talk with one another.  It could be --

we could divvy out some of those students into the counselor

office, again, to make sure there's no discussion between them

until we get the facts.

Q.   Okay.  Anything on this document tells you where it was

filled out?  Can you tell?

A.   No.

Q.   Okay.  Now, let's go to the first -- first of all, it's

her name on top, correct?

A.   Yes.

Q.   Let's go to the first line of the statement of facts.

Can you highlight the first line, please.

      So here is B███ coming to the school, and the first

thing she says in the statement is she's scared to come to

school, right?

A.   Correct.

Q.   And then she lists -- we'll ultimately count them, but

she lists a lot of reasons why she's scared to come to school,

right?  Yes?

      THE COURT:  Do you have any reason to believe that

the document says anything than what it says right here?

      THE WITNESS:  Your Honor, I --

      THE COURT:  Do you have any reason to believe that

the document says anything other than what it says right here?

      THE WITNESS:  No.

B.R. v. F.C.S.B.

79

THE COURT:  Very good.

BY MR. BRENNER:

Q.   Okay.  So what I want to do, let's walk through the document to find out -- by the way, this would be one of those things that -- before this document was filled out, because this is an investigation document, right?

A.   Yes.

Q.   You already should have been notified of the complaint, right?

A.   Yes.

Q.   Okay.  Were you?  Do you have any record of being notified of the complaint?

A.   I have no record.

Q.   Do you have any personal recollection of being notified of the complaint?

A.   I had a recollection of discussing this.

Q.   You have a recollection of discussing it after the mom came in, right, not before, right?

A.   I can't give you a timeline.

Q.   Okay.  Fair enough.  The first reason that B████ tells the school that she's scared is because C████████ K██████ and D████ N███ come to my locker every morning before first period.  They come very close to me.  They say, "hey, B████," and they laugh at me, harass me, tease me, and give me seductive looks.  Right?

─────B.R. v. F.C.S.B.─────

80

            MR. BATES:  Your Honor, just I'd request counsel not

to use the -- use pseudonyms for the name of C.K., Your Honor.

            THE COURT:  Well, the document says what it says,

and obviously we can work around it, and I think the jury at

this point has a pretty good idea as to an initial reference

to people, but the document says what it says, and the jury

can make whatever sense it wants to.

            I would just encourage all members of the press who

may be in attendance here today to make sure that you live up

to the responsibility of not reporting names and circumstances

in which they should not be reported.  All right.

BY MR. BRENNER:

Q.   Did I read that correctly?

            THE COURT:  Did he read it correctly, sir?

            THE WITNESS:  Yes.

BY MR. BRENNER:

Q.   Okay.  She then says, "C.K. left me a very inappropriate

voicemail with lots of sexual terms."

            Do you see that?

A.   Yes.

Q.   That's an additional reason she says she's scared to come

to school, right?

A.   Correct.

Q.   She says that, "C says that D.N. wants to come up to me

and call me vulgar names like whore, bitch, and lesbian."

B.R. v. F.C.S.B.

81

          Do you see that?

A.    Yes.

Q.    "People I don't even know call me lesbian," right?

A.    Correct.

Q.    "J.O. and C██████ make fun of me for being half Indian

and basically say offensive terms."

A.    Correct.

Q.    "J.O. calls me bitch and makes offensive wall posts on my

Facebook, calling me a bitch and a whore."  Right?

A.    Yes.

Q.    And then it says, "On DM bus, he told everyone D.N. said

I gave him oral sex, which is completely false."

          Do you see that?

A.    Yes.

Q.    "And I sent naked pictures, which again isn't true."

          Do you see that?

A.    Yes.

Q.    "Also that I let anyone get in my shirt and pants, which

is offensive because I've never done so."

          Do you see that?

A.    Yes.

Q.    And it says, "It all started three weeks ago, but really

escalated two weeks to the present."

A.    Yes, that's what it reads.

Q.    Let me just go to the next page so you can see it because

B.R. v. F.C.S.B.

there's a second page.  And then she identifies who the

bullies are, right, on the left?

A.    Correct.

Q.    The same people that were named in the document.  And

then it identifies, I guess, some other witnesses.  Is that

what that is?

        THE COURT:  I don't think he sees the term

"witnesses" on there.  Maybe make another reference.

BY MR. BRENNER:

Q.    Do you know what the reference to those names are, why

that would be on the form?  Let me ask it a different way.

        You know that one of the things the assistant

principals ask students to do is not only to identify what is

the alleged misbehavior, also to identify other students that

may have witnessed it, right?

A.    Correct.

Q.    So she's doing both.  She's identifying who she is

contending are the alleged wrongdoers, right?

A.    Correct.

Q.    And that's on the left side of the line, and on the right

she's identifying who she's saying in the school you should

talk to, right?

A.    That's what I assume.

Q.    Okay.  Let's go back to the first page.

        You agree that a student telling the school that she

is scared to come to the school should raise red flags, right?

A.   Correct.

Q.   It should be concerning to school officials that a

12-year-old girl is saying she's scared to come to school?

A.   Correct.

Q.   You don't want students scared to come to school, do you?

A.   No.

Q.   Okay.  The school needs to take this seriously, right?

A.   Absolutely.

        MR. BRENNER:  Okay.  If we could bring back up

Exhibit 65, Your Honor, that was previously admitted and

published?

        THE COURT:  You may.  65.

BY MR. BRENNER:

Q.   This was -- we went over this earlier -- this is the

SR&R; is that correct?

A.   Correct.

Q.   And that would outline whether things are or are not

covered by the rules of conduct and disciplinary procedures?

A.   Correct.

        MR. BRENNER:  One moment, Your Honor.

        (A pause in the proceedings.)

        MR. BRENNER:  Okay.  You can take that down, please.

BY MR. BRENNER:

Q.   Now, you would agree with me, pursuant to that SR&R that

was just up, it's more serious if a student commits multiple

offenses than a first offense often, right?

A.   Correct.

Q.   Okay.  They face more stringent disciplinary action,

correct?

A.   Correct.

Q.   It's, therefore, important for the school to keep track

of a student's disciplinary history?

A.   Yes.

Q.   In fact, the School Board kept student's disciplinary

records until after the student graduated high school, right?

A.   Correct.

          MR. BRENNER:  Mr. Keefe, could you pull up

subsection D.

A.   Sir?

BY MR. BRENNER:

Q.   I'm sorry, I'm pulling something back up on the screen.

A.   Oh, okay.

          THE COURT:  Based on the way the witness was sitting

there, I think he was wanting to maybe modify his answer.

BY MR. BRENNER:

Q.   Oh, I'm sorry.

A.   Yes.  It does escalate for similar behaviors, but if a

child threw a French fry in a cafeteria, it would not escalate

past something he did prior or she did prior.

B.R. v. F.C.S.B.

85

Q.   Right.  It's not just the numerical thing to say, well,

someone had three disciplinary procedures.  They could have

one prior that's really, really bad, and that would be

important, right?

A.   Yes, sir.

Q.   And they could have three, like you said, throwing French

fries and they probably shouldn't throw French fries, but not

the end of the world?

A.   Right.

Q.   Okay.  Fair enough.  Is that what you wanted to --

A.   Yes, sir.  I just want to be clear about that.

          MR. BRENNER:  Do you have that --

BY MR. BRENNER:

Q.   Changing topics.

          In 2011-2012, Fairfax County did not have a

dedicated Title IX office for sexual harassment, correct?

          THE COURT:  If you know.

          THE WITNESS:  I don't know, sir.

BY MR. BRENNER:

Q.   Okay.  Let me see if I can refresh your recollection.  Do

you still have your deposition up there with you, sir?

A.   Yes, sir.

Q.   So I'm going to go to pages -- same routine we did

before.

A.   Okay.

─── B. R. v. F. C. S. B.───

86

Q.   I'm going to go to Page 192.  And we're going to go from Line 14 to 193, Line 5.

A.   On 192?

Q.   I'm sorry, 192, Line 14 to 193 --

        THE COURT:  Apparently there's a page turn on Page 192 to 193, so read from the bottom of Page 192, Line 14, through the top of Page 193, Line 5.

        THE WITNESS:  Thank you.

        THE COURT:  Yes, sir.

        THE WITNESS:  Right.  It was --

        THE COURT:  First, does that refresh your recollection?

        THE WITNESS:  Yes.

        THE COURT:  Now, do you want to respond to the question that was previously asked?

        THE WITNESS:  Yes, it wasn't a dedicated alone Title IX office, but Title IX questions or areas of investigation came out of the Office of Equity and Compliance.

BY MR. BRENNER:

Q.   Right.  I think the words you used in your deposition was that it was sort of melded into the Office of Equity and Compliance?

A.   Yes, sir.

Q.   Okay.  And so, I want to talk a little bit about the Office of Equity and Compliance because that's what was around

B.R. v. F.C.S.B.

87

then, right?

A.    Yes.

Q.    That's a Fairfax County School Board office, right?

A.    I'm sorry.

Q.    That's okay.

      That office -- it's an office that's part of the
Fairfax County School Board?

A.    Correct.

Q.    Right.  It's the Fairfax County School Board Office of
Equity and Compliance?

A.    Yes, sir.

Q.    Okay.  So I'm just going to call it the Office of Equity
and Compliance.  You'll know what I'm talking about.

A.    Correct.

Q.    That office was responsible for training assistant
principals and how to investigate occurrences at the school,
is that correct?

A.    At least it was providing materials for instruction.

Q.    Okay.

A.    For assistant principals.  I don't know if they -- out of
their office they did that directly.

Q.    Okay.  The office also trained assistant principals on
when complaints needed to be reported to the county office
that oversaw Title IX compliance?

A.    Correct.

B.R. v. F.C.S.B.

88

Q.   Okay.  The school relied on the Office of Equity and

Compliance for training on Title IX compliance, correct?

A.   Correct.

Q.   And if -- if there was a situation where Rachel Carson

Middle School decided to report something to that office,

different things would happen as opposed to just doing it

in-house, correct?

A.   Can you give me a little bit more?

Q.   Sure.

         Once you -- let me just step back.

         You made the decision whether to keep the

investigation and decision in-house or to report it to the

Office of Equity and Compliance?

A.   Based on the investigation, yes.

Q.   It was -- that was your call?

A.   Yes, sir.

Q.   Okay.  And if you decided to send it to the Office of

Equity and Compliance, they could do a few different things,

right?

A.   Correct.

Q.   One of the things they could do is they could take the

case, meaning they could investigate, right?

A.   Correct.

Q.   And sometimes that can be helpful because it's -- it's a

little bit of -- you know, you told us earlier you want

—B.R. v. F.C.S.B.—

impartiality.  Sometimes there's relationships at the school,

that it'd be better off to have an outside party

investigating, right?

A.   Correct.

Q.   They never did that with -- with -- well, while my client

was in-person learning, never -- never referred her complaint

to the Office of Equity of compliance?

A.   No.

Q.   Correct, right?

A.   Correct.

Q.   Okay.  Another thing the office can do, they could assign

their own investigator outside the school, right?

A.   Correct.

Q.   They could -- they could analyze your investigation, your

school's investigation to make sure that you had dotted all

your i's and crossed all of your t's, right?

A.   Yes.

Q.   And they could actually give the school additional

directions how to proceed, right?

A.   Yes.

Q.   They were the experts in this area, isn't that true, sir?

A.   Yes.

Q.   Okay.  And, of course, if you didn't refer to them --

didn't refer a complaint to them, none of those things would

happen, right?  They don't know about it?

B.R. v. F.C.S.B.

90

A.    They -- that office did not know --

Q.    Yes.

A.    -- would not know, but certainly there are areas that we
have to cover from there to be in compliance with there.

Q.    You know from guidelines, policies, SR&R, you know what
you're supposed to do?

A.    Correct.

Q.    But if you don't bring it to their attention, which you
never did with my client, they can't take the case, they can't
investigate it, they can't assign an outside investigator,
they can't cross-check and check your investigations because
they don't know about it, right?

A.    Right.

Q.    Okay.  Okay.  So I told you we'd get back to
verification.

A.    Uh-huh.

Q.    We're back.  All right?

A.    All right.

Q.    Okay.  If a student reported sexual harassment to the
school, it was the policy of Fairfax County School Board that
the Office of Equity and Compliance was not notified until
that complaint was verified, correct?

A.    Correct.

Q.    Okay.  Now, you -- you showed us one little section of a
policy that the jury will determine whether it said anything

B.R. v. F.C.S.B.

91

about verification. Is there any other place where I can see
that policy in writing?

A.   A little bit more on that.

Q.   Sure.

        Is there any policy, regulation, SR&R that you can
point to, other than what you pointed to earlier, that says
that the first step has to be -- you have to verify it before
you report to the Office of Equity?

A.   Right. After talking to the witnesses and whatnot and
there was no witnesses that observed the situation and it was
a -- you know, someone said this, someone said that, and we
could not verify that, how are we going to move.

Q.   Well, so are you telling me if there's a situation where
Sally said Johnny did something and Johnny says he didn't,
that would fall in the unverified bucket if there was no one
else around?

A.   If -- again, there's a lot that goes into an
investigation. It's not just, you know, he said/she said. It
looks at the students as a whole, past incidents, how they're
going to move forward with the consequences, notifying
parents.

        THE COURT: Basically, sir, would it be fair to say
that in the context of the investigations you conduct you make
credibility determinations, who you believe as part of your
investigation?

B.R. v. F.C.S.B.

92

THE WITNESS:  Yes, sir --

THE COURT:  All right.

THE WITNESS:  -- Your Honor.

BY MR. BRENNER:

Q.   Is your answer complete?

A.   Complete.

Q.   Okay.  Now, regardless of your determination, the school
was supposed to notify the parents of the student if that
student complained about being sexually harassed, correct?

A.   Correct.

Q.   Okay.  And until Mrs. R. came to the school -- you know
she came to the school shortly -- right around the time of
that written statement we were just looking at, right?

A.   Correct.

Q.   Okay.  Prior to that time, the school never reached out
to her about her daughter's complaints, correct?

A.   Sir, you would have to ask the assistant principal that
did the investigation.

Q.   Which one do you want me to ask?

A.   Pardon me?

Q.   Which one do you want me to ask?  Which assistant
principal did the investigation?  Who should I ask?

A.   On what investigation?  There was a few.

Q.   Okay.  Let's go back.

Prior to Mrs. R. coming to the school in November of

Case 1:19-cv-00917-RDA-LRV   Document 1043   Filed 08/26/24   Page 93 of 137
PageID# 20951                                    Direct - A.F.

—B.R. v. F.C.S.B.—

93

2021 [sic], I asked you, did anyone ever reach out to her to tell her that her daughter had made complaints about sexual harassment.

MR. BATES:  Objection.  Lack of foundation, Your Honor.

THE COURT:  To your knowledge, did anyone reach out to Ms. R. or did Ms. R. reach out to you first, to your knowledge?

THE WITNESS:  I'm not sure if they reached out to her.

THE COURT:  Okay.

BY MR. BRENNER:

Q.   Okay.  You know that she came to school on her own volition and demanded to be -- for a meeting, right, in November, do you know that or not?

A.   Sir, could you repeat that?

Q.   Of course.

A.   I'm not --

Q.   Of course.  Of course.

     You know that the first contact between the school and Mrs. R. regarding the complaints that her daughter was making, that contact was initiated by Mrs. R., not the school?

MR. BATES:  Same objection, Your Honor.  There's a presumption of a complaint that there's been --

THE COURT:  Do you know, sir?

B.R. v. F.C.S.B.

94

THE WITNESS:  I don't know that, sir.

BY MR. BRENNER:

Q.   Well, let me -- let's pull back up Exhibit 77.

MR. BRENNER:  Can I publish Exhibit 77?

THE COURT:  You may.

BY MR. BRENNER:

Q.   It seems like -- is that -- would you consider that a complaint of sexual harassment?

A.   Yes.

Q.   Okay.  And do you know following -- following this complaint, was there a contact between Mrs. R. and the school?

A.   You would have to ask the assistant principal that did the investigation when the contact was made.

Q.   Okay.  Then -- then now -- who is that?

A.   Ms. T█████.

Q.   Okay.  So you don't know?

A.   I don't know exactly when the parent was notified.

Q.   Okay.  Well, do you know if the parent was notified as opposed to the parent coming to you?

A.   I don't want to guess.

Q.   Okay.  Also, the school was --

MR. BRENNER:  You can take that down, please.  Thank you.

BY MR. BRENNER:

Q.   The school was actually -- if -- if a complaint was

B.R. v. F.C.S.B.

determined by the school to be unverified, the school was

supposed to reach out to the parent and tell them they had a

right to go to the Office of Equity and Compliance, right?

       MR. BATES:  Objection.  Foundation, Your Honor.

       THE COURT:  Overruled.

BY MR. BRENNER:

Q.   What I said is correct, right?

A.   Sir, would you restate that one more time?

Q.   Of course.

       If -- if a student makes a complaint, similar to

Exhibit 77 --

A.   Uh-huh.

Q.   -- and the complaint is determined to be unverified, the

school was supposed to reach out to the parent and give them

the opportunity to take it to the next level, to go to the

Office of Equity and Compliance, right?

A.   Again, sir, you'll have to ask the assistant principal if

that was --

Q.   You as the principal of Rachel Carson don't know that?

A.   Sir, I wasn't -- I didn't do the investigation, and I do

not know when the parent was contacted or what was said.

       THE COURT:  The question was a little simpler than

that, sir.

       If a determination is made, not talking specifically

about this case, but generally, if a determination was made

that a complaint was unfounded, in other words, that the

school was not going to do anything more about it, do you know

if you had a responsibility to report that to the next level?

   THE WITNESS:  Yes.

BY MR. BRENNER:

Q.   Okay.  You do -- you do know that.

   And you know that never happened with Mrs. R.,

right?

A.   No, sir, I do not know that.

Q.   You don't know one way or the other?

A.   No, sir.

Q.   Okay.  And that would, again, be the assistant principal

would know that?

A.   Yes.

Q.   Okay.  So I want to talk about the concept of

verification.

   MR. BRENNER:  If we can bring back up, with Your

Honor's indulgence, Exhibit 77?

   THE COURT:  You can try.

BY MR. BRENNER:

Q.   Okay.  So I want to go through each of the students that

were alleged to be engaged in misconduct, okay?

   THE COURT:  Let's try to use initials here.

   MR. BRENNER:  Yes.  Thank you, Your Honor.

BY MR. BRENNER:

—————————————B.R. v. F.C.S.B.—————————————

97

Q.   So I want to start with what's on the screen here.  So I
want to use the initial -- can you highlight -- yes, thank
you.

        Okay.  So it says that:  "D.N. said I gave him oral
sex, which is completely false," right?

A.   Correct.

Q.   "And I sent naked pictures, which again isn't true"?

A.   Correct.

Q.   Both of those things for sure violate the school's sexual
harassment policy, right, if verified?

A.   If verified.

Q.   Absolutely, no question in your mind, right?

A.   No question.

Q.   Okay.  So let's -- so do you know if the school took a
statement from D.N. about this?

A.   Yes.

Q.   You do know that?

A.   Yes.

Q.   So let's -- it should be in your book as 78.  Is that a
student statement from D.N.?

A.   Correct.

        MR. BRENNER:  Your Honor, can we move Exhibit 78
into evidence?

        MR. BATES:  No objection.

        THE COURT:  Without objection.  You may publish.

B.R. v. F.C.S.B.

98

(Plaintiff's Exhibit No. 78 was admitted into evidence.)

BY MR. BRENNER:

Q.    In the first line, what he is called in to do is he's not
called in about him.  He says, "I was called in Ms. T███████
office."  She's an assistant principal, right?

A.    Correct.

Q.    "To explain what was happening between C and B█████" --

A.    Correct.

Q.    -- right?  He's asked about the voicemail.  You know that
was attributed to C.  He said, "I explained to her that I have
no idea who is leaving voicemails," right?

                MR. BATES:  Objection, foundation.

                THE COURT:  Overruled.  I would assume that this
gentleman would have qualified to some extent as the custodian
of records, so it's fine.

BY MR. BRENNER:

Q.    He -- D.N. is being accused by B█████ of spreading rumors,
saying that she gave him a blow job, right?

A.    Correct.

Q.    He doesn't say "yes" or "no" to that in this statement,
does he?

A.    No.

Q.    He's not asked, is he?

A.    Sir, I was not in the interview with that student, or
communication with the parent.  So I would just be making an

B.R. v. F.C.S.B.

assumption, and that's not what I want to do.

Q.    Okay.  You would -- it would be troubling to you if the

allegation was asked of him, and he wrote a statement that

didn't address it at all, right?  That would be troubling?

          THE COURT:  Rephrase that.

BY MR. BRENNER:

Q.    Meaning the allegation is -- or one of the allegations is

that "D.N. said I gave him oral sex, which is completely

false."  Right?

A.    Yes.

Q.    He doesn't address that in this statement, does he?

A.    No.

Q.    So one of two things happened.  He either wasn't asked

about it, right?

A.    Correct.

Q.    Or he was asked about it and he didn't answer?

A.    Or he told the assistant principal additional information

that's not in the statement.

Q.    Don't you want everything in the student statement?

That's the whole purpose of them.

A.    Student statements are just to provide information on

what the student is wanting to communicate on the incident.

Sometimes there's other --

Q.    Well, here --

A.    I'm sorry.

B.R. v. F.C.S.B.

100

Q.   I'm sorry, are you done?

A.   No.

Q.   Okay.  Go ahead.

A.   Sometimes there's discussions not only with the student,
but there is also discussions with the parent, and more
information comes out.

         Certainly the assistant principal would be taking
notes and getting all the information, trying to put -- you
know, get a full picture of what occurred.

         It's just not simple, okay, we have these sheets,
and then we're going to make a determination.  They do a lot
more than what you see.

Q.   So is it your testimony that the assistant principal --
who was it?  Was this Ms. --

A.   Ms. T███.

Q.   Ms. T███.  So you think that she took more notes than --
on this incident?

A.   Ms. T███ is very thorough, and I believe she did a deep
investigation into what occurred here.

         THE COURT:  Let's maybe cut to the chase a little
bit, sir, so we can get an idea as to how this process works
inside.

         Correct me if I'm wrong, and if I say anything
incorrect, please correct me.  In a situation like this,
students who may or may not be involved are called into an

administrator's office?

THE WITNESS:  Correct.

THE COURT:  And in this case they were called into Ms. T█████ office?

THE WITNESS:  Or it could have been a different location.

THE COURT:  Or a different location.  And when they come into the office, are they generally told what they are being brought into the office about?

THE WITNESS:  Yes.

THE COURT:  Okay.  And after they are told what they're generally being brought into the office about, does the administrator have a discussion with them or does the administrator simply ask them to write a statement?

THE WITNESS:  Initially they ask the student to write a statement so they are not biassed.

THE COURT:  And after the student writes the statement, what does the administrator then do?

THE WITNESS:  Then he or she would go and investigate all the students that were mentioned, while keeping the students apart so they don't talk and discuss.

THE COURT:  Do you have any reason to believe that that is not what happened here?

THE WITNESS:  No.

THE COURT:  Okay.

─ B.R. v. F.C.S.B. ─

BY MR. BRENNER:

Q.   Nowhere in D.N.'s written statement does he deny the allegation that he's been spreading rumors that my client gave him a blow job, correct?  Not in this statement?

A.   Not in the statement.

Q.   Okay.  But yet, is it your testimony -- well, is it your testimony that the School Board -- excuse me, the school determined that that happened?  Is that what your testimony is?

A.   Sir, I do not want to -- I want you to have the truth of how this investigation occurred, and what was told.  I would be the second person, you know, communicating that, and that's -- I don't think that would be appropriate in this situation.  I wasn't there.

Q.   Well, whatever happened, whatever -- we know what he wrote down, so someone else may testify to what he said. That's not you, right?  You don't know?

A.   Pardon me?

Q.   If he said something else that's not on the written statement, you don't personally know it, correct?

A.   Sir, I'd rather you get a first person.

Q.   Right.  You don't know?  You don't have a firsthand account?

A.   I wasn't there, and I want to make sure that you get the correct information.

─── B.R. v. F.C.S.B. ───

Q.   Whatever he said, no one goes back and asks my client whether -- what David said was true, correct?

A.   To my knowledge, correct.

Q.   So whatever David said was enough, and the school said this one is unverified, right?

          MR. BATES:  Objection, misstates testimony.

          THE COURT:  Rephrase, please.

BY MR. BRENNER:

Q.   Whatever -- you don't know what David said.  We only know what he wrote.  Someone else may know what he said.  No one goes back and checks it with my client.

          So on this issue, the school determined that it was unverified and did not -- did not make it a -- noted it as a sexual harassment complaint, correct?

          MR. BATES:  Objection.  There's a statement in there --

          THE COURT:  Sustained.

          Was there any cross-verification of what this particular D.N. said in his statement, to your knowledge?

          THE WITNESS:  I would feel more comfortable if it was -- this question was targeted toward --

          THE COURT:  And that's why I said to your knowledge.

          THE WITNESS:  My knowledge, I think it was their own investigation, and both parents were talked with.

BY MR. BRENNER:

B.R. v. F.C.S.B.

104

Q.    Is it your testimony that both parents were contacted?

A.    Correct.

Q.    Firsthand knowledge or not firsthand knowledge?

A.    Firsthand knowledge.

Q.    You contacted --

A.    No.  As far as being told they were contacted.

Q.    And that's from Ms. T████ again?

A.    Yes.

Q.    Now, we looked earlier at some documents that you told me
were consistent with the school's policies.  You agree that if
something happened off campus, you told us this, and it's
having affects on campus, that's a school issue, right?

A.    Correct.

Q.    And clearly in B██████ statement, she's reporting a sex
that happened to her in school as a result of the interaction
with David Neil, correct -- D.N., right?

A.    Correct.

Q.    Okay.  Let's talk about the -- by the way, the whole
Exhibit 77 -- Let me just put that back up.

        MR. BRENNER:  Can I put that back up, Your Honor?

        THE COURT:  You may.

        MR. BRENNER:  77, please.

        THE COURT:  It's up.

        MR. BRENNER:  Oh, I'm sorry.

BY MR. BRENNER:

Q.   Just so the jury knows, everything in there, every one of those complaints that I read through, your assistant principal and you ultimately signed off were determined to be unverified, correct?

A.   Right.  Through the investigation, it could not be substantiated.

Q.   Every one of those things in Exhibit 77, you signed off on the determination that they were unverified, correct?

          MR. BATES:  Objection, misstates the testimony.

          THE COURT:  And it's asked and answered.

          Sir, there are a lot of allegations in the Exhibit, No. 77.  And Mr. Brenner is trying to inquire as to whether all of those allegations were proven to be unsubstantiated. Is that your testimony?

          THE WITNESS:  Sir, it was a long time ago, and I just would feel more comfortable if that question was provided to the assistant principal.

          THE COURT:  That's the best you are going to do, Mr. Brenner.

          MR. BRENNER:  Okay.  Thank you, Your Honor.

BY MR. BRENNER:

Q.   Let's look at the -- about five lines down, starting with C.K.  "C.K. left me a very inappropriate voicemail with lots of sexual terms."  Do you see that?

A.   Correct.

B.R. v. F.C.S.B.

106

Q.   Okay.  In the statement we just looked at from D.N., he

said he didn't know anything about that, right?

A.   Correct.

Q.   Okay.  Now, there was a statement taken from C.K.

following this, right?  There was a statement taken from C.K.

following B████████ complaint, right?

A.   Right.

        MR. BRENNER:  So if we could pull that up -- don't

pull that up, let me give it to counsel.  It's Exhibit 529.

        THE COURT:  Take 77 down and pull up 529.  Is there

going to be an objection to 529?

        MR. BATES:  We're pulling it up right now, Your

Honor.  No objection.

        THE COURT:  You can pull up 529, and you may

publish.  Just a second.

        MR. BRENNER:  Take it down, please.

        MR. BLANCHARD:  The Court is aware that -- of the

issue with respect to what evidence was against one party.  I

don't want to keep interrupting.  If I could have --

        THE COURT:  Ladies and gentlemen, as I indicated to

you during the course of the litigation that the Court is

going to provide limiting instructions.  Limiting instructions

are basically a suggestion that not all evidence against one

person may be considered as evidence against another.  You

must evaluate the responsibility of each of these individual

─────B.R. v. F.C.S.B.─────

107

defendants individually.

        MR. BLANCHARD:  That will be fine.  Thank you.

        THE COURT:  You're fine.

        MR. BLANCHARD:  Yes, sir.

        Okay.  May I bring up --

        THE COURT:  You may, 529.

(Plaintiff's Exhibit No. 529 was admitted into evidence.)

        MR. BRENNER:  Yep.

BY MR. BRENNER:

Q.  Okay.  So this is the statement from C.K. as part of the investigation of B█████ complaint?

A.  Sir, I don't think I have that in my binder, but --

Q.  Okay.  Let me get that for you.

        Well, can you see it on the screen or --

A.  Yeah, I can see it on the screen.

Q.  Is that okay?

A.  Yes, sir.

Q.  Okay.  So that's C.K.'s statement, right?  Do you see that?

A.  Yes.

Q.  Okay.  So what I want to do first is I want to start where they start talking about voicemails.  So the sentence starts with "And then they would."

        Remember, in Exhibit 77 B████ -- one of B██████ complaints is that C.K. left her a vulgar voicemail, right?

B.R. v. F.C.S.B.

108

A.   Correct.

Q.   And we'll talk about -- you know, a little more about --
the mom told the school about that too, right?

A.   Correct.

Q.   Okay.  So let's -- let's focus on the voicemail.

    So there's first Ms. T█████, the investigator, right?
She's the investigator?

A.   Correct.

Q.   She's supposed to be investigating whether C.K. left the
voicemail as part -- as one of the things she's investigating,
right?

A.   Right.

Q.   He doesn't talk about that at all, does he?  He doesn't
say I did or did not leave a voicemail, right?

A.   Correct.

Q.   He says someone else leaves a voicemail, and he says he's
talking about D.N., I think, right?

        THE COURT:  You got to scroll up.

        MR. BRENNER:  Yeah, you can scroll.

        THE COURT:  And for your reference, D.N. is the
first proper name referred to in first sentence in the
paragraph.

        THE WITNESS:  Could you move it up -- just a little
bit, sir?

BY MR. BRENNER:

Direct - A.F.
B.R. v. F.C.S.B.
109

Q.   You mean to go down or --

A.   Down.  Yeah.

     Okay, sir.

Q.   All right.  So C.K., when -- the allegations against him

sending the voicemails, he says, actually, no, it's J.O. and

D.N., right?  That's who the "they" is referring to?

          MR. BLANCHARD:  Your Honor, object.  That's not the

testimony.

          THE COURT:  I agree.  Rephrase.

BY MR. BRENNER:

Q.   Let me -- let me read it.

          (As read):  "Then she called him at J█████ party" --

so talking about B████, right -- "at J's party using J's phone

and called D, and she called at least ten times, I think.  So

then he called her back and said, 'Leave me alone.  You're a

whore and a slut, I think."

          And then they -- they -- they would send messages on

the phone and call and leave voicemails saying stuff.

          THE WITNESS:  But, sir, you're leaving two words

out that is "I think."

          MR. BRENNER:  Oh.

          THE WITNESS:  And it's scattered throughout.

BY MR. BRENNER:

Q.   Okay.  So here -- here -- and we're going to go back up.

          So that -- and that's on the whore and slut.

B.R. v. F.C.S.B.

110

So B███ is saying to the school, "People are calling me a whore and slut," and C.K. is saying, "I think people are calling her a whore and a slut."

And you want to point out that that is not -- that is not confirming of B█████ story, that is -- that is -- that's not enough for the school?

A.   Again, there may be more information that was provided to Ms. T███ that is not in this statement, and she needs to be questioned about that.  I'm sure she has information on that.

Q.   Let's go -- let's just go through this first.  Because pretty much C.K. confirms almost everything in B█████ statement, doesn't he?

THE COURT:  The document -- the document speaks for itself.  The document speaks for itself.

MR. BLANCHARD:  I object.

THE COURT:  And -- and the term confirms everything as a rather broad term, Mr. Brenner.

BY MR. BRENNER:

Q.   "About a month ago, D came up to me in the hallway and said that B███ gave me a hand job and a blow job."

That confirms -- that is consistent with B█████ report except for they've added the word "hand job" to "blow job," right?

THE COURT:  Is that what it says , sir?

THE WITNESS:  I -- they keep switching around.

B.R. v. F.C.S.B.

THE COURT:  Is that what it says?  Is that what the first line says?

THE WITNESS:  Correct.

BY MR. BRENNER:

Q.   Okay.  Consistent with what B▆▆▆▆ said, right?

A.   Correct.

Q.   Okay.  The next line says, "And I who" -- not sure what that means -- "and he said no -- he said no, then they broke up and his friends started saying she was a whore."

Exactly what B▆▆▆ -- well, not the breakup part, but she said that people were saying she was a whore, right?

A.   Right.  Correct.

Q.   And -- and C.K.'s statement is supportive of what B▆▆▆ was saying, right?

THE COURT:  Is there some general consistency between what B said and what this particular statement says generally?

THE WITNESS:  Generally.

BY MR. BRENNER:

Q.   Okay.  And, yet, B▆▆▆▆ statements were determined to be unverified, correct?

A.   B▆▆▆▆ statement -- sir, again, I was not there, I do not have all the information in front of me to see how the investigation came out and the information that was collected by the assistant principal.  I think she would have some good

Case 1:19-cv-00917-RDA-LRV    Document 1043    Filed 08/26/24    Page 112 of 137
PageID# 20970                                    Direct - A.F.
B.R. v. F.C.S.B.

112
information on why it was not verified.

Q.    You made the call, though, right?  You just don't
remember why?

A.    I can't remember why.

Q.    But you made the call?

A.    I made the call.

Q.    Now, it's important when someone is making an allegation
of sexual harassment to see if the alleged wrongdoer has a
history of sexual misconduct, right?

A.    Pardon me, sir?

Q.    Yeah, it's important to look at whether a student accused
of sexual harassment has a history of similar sexual
misconduct?

        THE COURT:  Stated another way, sir, if you had a
student who had a history of sexual misconduct and one that
did not, they would be looked at differently?

        THE WITNESS:  Right.  Correct.

        THE COURT:  Okay.

BY MR. BRENNER:

Q.    Is that correct?

A.    Correct.

Q.    Okay.  Now, do you know, as you sit here today, whether
C.K. had a history of disciplinary misconduct with the school?

A.    He had some disciplinary actions taken against him and
consequences.

─B.R. v. F.C.S.B.─

113

Q.   I'm sorry?

A.   And consequences.

Q.   Right.  So he had things ranging from -- he had some
things like disruptive conduct, correct?

A.   Correct.

Q.   He was hiding other students' property, right?

A.   Correct.

Q.   Let's go to -- if you could go in your book to
Exhibit 59.

        THE COURT:  Mr. Brenner, just as a matter of -- how
long do you think this area of inquiry with regard to 59 is
going to take?

        MR. BRENNER:  Two minutes.

        THE COURT:  Okay.  We'll get through this, and then
we'll have our lunch.

BY MR. BRENNER:

Q.   Can you find -- do you have Exhibit 59 in your book?

A.   Yes, sir.

Q.   Okay.  That is a disciplinary -- well, that -- is that a
printout of a disciplinary record for C.K.?

A.   Yes, sir.

Q.   Okay.  And the disciplinary record is from 5-8-2011?

A.   Correct.  He was a 7th grader at that time.

Q.   So this is about six months prior, correct?

A.   Correct.

B.R. v. F.C.S.B.

114

Q.   And you agree with me, whether it's verified or not, the

allegations that were made by B███ were of sexual harassment

by C.K. among others, correct?

A.   B█████ claims.

Q.   Yes.

        MR. BRENNER:  So, Your Honor, I would like to move

into evidence Exhibit 59.

        THE COURT:  Without objection?

        MR. BATES:  Judge, we object.  And this gets into

the motion in limine order.  The Court ruled on the first

portion of this, but there are many disciplinary instances in

this document.

        THE COURT:  I would -- I would assume, Mr. Brenner,

that you're going to stay within the confines of the Court's

rulings and -- and not refer to things that the Court has said

is not properly before the Court?

        MR. BRENNER:  Yeah, yeah.  I think what Mr. --

counsel is saying is that this exhibit has other exhibits in

it.  And I'll make a subrecord of this particular thing.

        THE COURT:  Okay.  So let's do this, let's not

publish it at this point until you make those redactions.

        MR. BRENNER:  It's -- no, it's ready.  It's --

there's many sheets.  The one sheet doesn't need to be

redacted.

        THE COURT:  Okay.  I'm going to trust your

───────────B.R. v. F.C.S.B.───────────

115

representation.

MR. BATES:  And I just want to correct something for the record.  There are -- there are other pieces of paper in this document just to be clear.

THE COURT:  Yes.

MR. BATES:  Okay.  Thank you.

THE COURT:  All right.

Go ahead, Mr. Brenner.

MR. BRENNER:  Okay.  So we're just publishing the one page.

Okay.  Can you -- so --

THE COURT:  Ladies and gentlemen of the jury, oftentimes, in the context of what we lawyers do, we have to lay foundations, we have to make sure that things are complete, and sometimes we have to redact things that are not applicable or substantive or relevant to what we need to do.  So what you're seeing now is a portion of a document, and the Court has recognized that portion of the document comes through.  But don't concern yourself with what might be missing.

(Plaintiff's Exhibit No. 59 was admitted into evidence.)

MR. BRENNER:  So just highlight the top part before you get to the narrative.

THE COURT:  And please let's stay within initials here.

B.R. v. F.C.S.B.

116

           MR. BRENNER:  Yes.

BY MR. BRENNER:

Q.   So this is for C.K., a disciplinary record?

A.   Correct.

Q.   May 2011?

A.   Correct.

Q.   And can you -- can you read for the jury what C.K. --

this became a verified complaint, correct?

           THE COURT:  Why don't you do this so the witness

won't make a mistake as far as following --

           MR. BRENNER:  Okay.

           THE COURT:  So why don't you read the clarification,

I think is what it says, the section using the initials, and

then ask him a question in response to what you read.

           MR. BRENNER:  Yes.

BY MR. BRENNER:

Q.   This ended up being a verified complaint, right?

A.   Correct, sir.

Q.   It says, "C exposed his genitals to female students

during his seventh period science class.  He was counseled by

Ms. M██.  Parent was notified, and he was assigned one day of

ISS and AIA."

A.   It's alternative instructional arrangement.

Q.   "And one day out-of-school suspension.  SRO notified."

           So just first of all, so C, or C.K. was found by the

B.R. v. F.C.S.B.

school during his seventh grade year to have exposed his

genitals in a classroom to two female students, correct?

A.   Correct.

Q.   Okay.  Ms. M███ is actually Ms. T████, right?

A.   Yes, sir.

Q.   Ms. T████ did this investigation, is that what this

means?

A.   Yes.

Q.   And ISS and AIA, those are forms of suspension or

discipline?

A.   One was in-school alternative instruction arrangement

where he gets separated from the school community in the

alternative instructional assistant room with a school safety

officer.  And --

        THE COURT:  In addition to that, there was one day

of traditional school suspension?

        THE WITNESS:  And then there was an out-of-school.

BY MR. BRENNER:

Q.   And then the SRO is the School Resource Officer who was

notified?

A.   The Fairfax County police officer, yes, sir.

Q.   Do you know if -- well, presumably you would presume when

Ms. T████, who is here Ms. M███, received the complaint from

B███, she knew this history about C.K., right?

        MR. BATES:  Objection, foundation.

Direct - A.F.

B.R. v. F.C.S.B.

118

THE COURT:  Sustained.

BY MR. BRENNER:

Q.   Do you know whether Ms. T███ knew this information about C.K.?

A.   I would prefer you ask her that question.  That would be me assuming.

MR. BRENNER:  Last question, Your Honor.

BY MR. BRENNER:

Q.   As the principal of the school, would it be your expectation for your assistant principal to review the disciplinary records of the students that were alleged to have been engaged in sexual misconduct?

A.   Yes.

MR. BRENNER:  This is a good place to stop.

THE COURT:  Very good.  Thank you.

All right, ladies and gentlemen, I appreciate your attentiveness and appreciate you letting us try to find natural breaking points.

Your lunches arrived, so that's a positive.  We're going to let you enjoy your lunch and let you go until about 1:50, so you need to be back in your spots around 1:45 so that we can make sure that you all are here.

For those who need that special accommodation that I spoke about earlier, we have made arrangements for you to have a room for yourself so you can practice your faith.

─────── B. R. v. F. C. S. B. ───────

119

Remember the Court's instructions.  Do not discuss the case or any aspect of the case with anyone.  Don't even run the risk of saying, I like that lawyer or I don't like that lawyer, because that usually generates conversation.

So try to attend to the Court's instructions with all regard.  Thank you.  Enjoy your lunch.

(Jury excused.)

THE COURT:  You may have a seat.  We're going to go ahead and take our break until about 1:45.  I'm sure before I get ready to go, someone is going to have something they want me to do, so --

MS. ANDERSON:  A quick one, I think.  I know we're tired of arguments, but one question in regards to -- I saw that you struck all of the Title IX coordinator.  I understand, but just wondering if we can at least include, because I think she would say it is important that people are aware of who the Title IX coordinator is, or who the -- who at the school they should reach out to for these types of complaints if they have issues with sexual harassment.

THE COURT:  Is that a general approach, or is that something that Ms. Cantalupo said should happen?

MS. ANDERSON:  No, that's a general approach.  The people -- that it's standard practice that people -- I mean, and we just heard testimony about the fact that there should be --

────────────── B. R. v. F.C.S.B. ──────────────

120

THE COURT:  I'll give you a little latitude on it,
but I don't want to get into this big dissertation about what
a Title IX coordinator does or does not do.  I think that
that's inconsistent with what the *Coastal Carolina* case says.
I think the trial judge in that case took great pains to try
to strike the distinction between what is appropriate for a
fact-finder to hear, and what is not.

And as I said, I encourage everyone to take a look
at that transcript because mistakes were made, which opened
the door for other things, which I think generated some of the
analysis that followed in that case.

MS. ANDERSON:  I'll keep it to just the --

MR. BRENNER:  Can I just ask for scheduling, what
time -- what time are we breaking for -- so we're not breaking
for the day for the juror, we're breaking for a time during
the day?

THE COURT:  I think, based upon what information
I've been told, is that he wants to celebrate his faith around
1:30.

MR. BRENNER:  Okay.

THE COURT:  That's what I was told.

MR. BRENNER:  Oh, it shouldn't interrupt the --

THE COURT:  Exactly.

MR. BRENNER:  Okay.  And we'll go until 4-ish today?

THE COURT:  I'll talk to them and see if they'll

Direct - A.F.

─B.R. v. F.C.S.B.─

121

give us another hour.  When I heard you were 30 percent

through, I was thinking we need another hour.

          MR. BRENNER:  Okay.  I will try to work better

during the lunch break to try to tighten things up.

          THE COURT:  All right.  Thank you.  You may step

down, sir.

          All right.  Everyone enjoy your lunch.  We'll see

you back in here about 1:45.

              (Lunch Recess 1:08 p.m.).

              (Conclusion of A.M. Session.)

CERTIFICATE OF REPORTER

I, Tonia Harris, an Official Court Reporter for
the Eastern District of Virginia, do hereby certify that I
reported by machine shorthand, in my official capacity, the
proceedings had and testimony adduced upon the Jury Trial
in the case of the **B.R. versus F.C.S.B., et al.**, Civil
Action No.: 1:19-cv-917, in said court on the 19th day of
March, 2024.

I further certify that the foregoing 137 pages
constitute the official transcript of said proceedings, as
taken from my machine shorthand notes, my computer realtime
display, together with the backup tape recording of said
proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my
name, this August 26, 2024.


_____
Tonia M. Harris, RPR
Official Court Reporter

122

123

## $

**$10,000** [1] - 13:10

## '

**'12** [1] - 14:22
**'13** [2] - 14:23, 18:10
**'Leave** [1] - 109:14

## 0

**05** [1] - 4:14

## 1

**1** [3] - 25:4, 72:3, 72:15
**100** [3] - 2:3, 2:7, 2:11
**103** [3] - 67:23, 68:22, 68:25
**103...........................**
**.............** [1] - 4:11
**10:19** [1] - 1:6
**115** [1] - 4:9
**11:50** [1] - 72:1
**12** [2] - 72:2, 72:11
**12-year-old** [1] - 83:4
**120** [1] - 3:6
**1200** [1] - 16:8
**122** [1] - 4:14
**123** [1] - 122:10
**1250** [1] - 16:9
**12:05** [1] - 73:3
**14** [10] - 4:4, 18:20, 18:24, 19:8, 19:10, 53:22, 53:25, 86:2, 86:4, 86:6
**14...........................**
**.............** [1] - 4:8
**140** [1] - 38:25
**1520** [1] - 1:21
**16** [3] - 45:16, 45:17, 45:19
**1651057** [1] - 5:22
**172** [2] - 53:22, 53:25
**1775** [1] - 3:9
**18** [2] - 5:14, 29:13
**1801** [1] - 3:6
**19** [5] - 1:6, 4:8, 27:25, 28:11, 122:16
**192** [5] - 86:1, 86:3, 86:4, 86:6
**193** [4] - 86:2, 86:4, 86:6, 86:7
**1972** [1] - 32:24
**19th** [1] - 122:8
**1:08** [1] - 123:8
**1:19-cv-917** [2] - 1:4, 122:8

**1:30** [1] - 120:18
**1:45** [3] - 118:20, 119:8, 121:7
**1:50** [1] - 118:20

## 2

**2** [4] - 1:8, 6:4, 6:10, 69:15
**20** [2] - 53:22, 53:25
**2001** [1] - 57:19
**2003** [1] - 15:10
**20037** [5] - 1:17, 2:15, 2:19, 2:22, 3:2
**2007** [1] - 6:10
**2008** [1] - 19:17
**2011** [9] - 14:22, 15:1, 18:10, 19:22, 25:4, 48:17, 63:17, 76:12, 116:4
**2011-2012** [1] - 85:15
**2011'12** [1] - 69:7
**2012** [1] - 14:23
**2013** [2] - 15:7, 63:17
**2015** [1] - 15:12
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:19
**2021** [3] - 5:22, 5:23, 93:1
**2023** [1] - 54:18
**2024** [5] - 1:6, 5:15, 6:7, 122:9, 122:16
**2029** [1] - 1:20
**21** [1] - 76:12
**213-995-5720** [1] - 1:22
**22** [3] - 45:16, 45:17, 45:19
**2200** [4] - 2:15, 2:18, 2:22, 3:2
**22314** [1] - 3:13
**2300** [1] - 1:16
**246** [2] - 45:16, 45:17
**25** [1] - 4:9
**2800** [3] - 2:3, 2:7, 2:11
**2nd** [3] - 2:3, 2:7, 2:11

## 3

**3** [1] - 57:17
**30** [2] - 72:24, 120:25

**305-539-8400** [1] - 2:8
**32** [1] - 4:12
**33131** [3] - 2:4, 2:8, 2:12

## 4

**4** [1] - 58:7
**4-ish** [1] - 120:23
**400** [1] - 3:10
**401** [1] - 3:12
**403** [1] - 50:6
**4952.1** [1] - 18:24

## 5

**5** [2] - 86:2, 86:7
**5-8-2011** [1] - 113:21
**529** [5] - 106:9, 106:10, 106:11, 106:14, 107:6
**56** [5] - 48:23, 52:11, 52:12, 56:17, 57:12
**56...........................**
**.............** [1] - 4:8
**57** [1] - 4:9
**59** [5] - 113:8, 113:10, 113:16, 114:6, 115:20
**59...........................**
**.............** [1] - 4:9

## 6

**604** [1] - 74:9
**604...........................**
**.............** [1] - 4:11
**610-804-1787** [1] - 2:24
**611** [2] - 9:19, 10:1
**640** [3] - 71:21, 71:22, 73:25
**643a** [1] - 1:17
**65** [7] - 24:25, 25:6, 25:9, 25:12, 56:17, 83:11, 83:13
**65...........................**
**.............** [1] - 4:9
**68** [1] - 4:11

## 7

**723** [5] - 30:18, 30:19, 31:10, 31:23, 32:2
**723...........................**
**.............** [1] - 4:12
**74** [1] - 4:11
**76** [1] - 4:10
**77** [13] - 76:7, 76:15, 76:17, 94:3, 94:4, 95:11, 96:18,

104:19, 104:22, 105:7, 105:12, 106:10, 107:23
**77...........................**
**.............** [1] - 4:10
**78** [3] - 97:19, 97:22, 98:1
**78...........................**
**.............** [1] - 4:10
**7th** [20] - 15:15, 15:18, 16:7, 37:10, 37:17, 37:21, 37:22, 38:13, 38:14, 39:14, 40:11, 40:12, 40:13, 40:17, 40:18, 40:21, 40:23, 41:4, 113:22

## 8

**8** [2] - 6:7, 54:18
**804-788-8200** [1] - 3:3
**837** [1] - 5:13
**850-585-3414** [1] - 2:12
**8th** [10] - 15:15, 15:21, 15:23, 16:2, 16:7, 37:10, 37:21, 37:22, 40:22, 40:23

## 9

**90067** [1] - 1:21
**98** [1] - 4:10

## A

**A.F** [1] - 3:5
**a.m** [1] - 1:6
**A.M** [2] - 1:8, 121:9
**ability** [5] - 9:22, 55:24, 58:1, 67:11, 122:14
**able** [4] - 6:18, 13:8, 74:25, 75:2
**abrenner@bsfllp. com** [1] - 2:9
**absolute** [1] - 51:17
**absolutely** [2] - 83:9, 97:12
**abusive** [3] - 21:16, 22:20, 66:1
**accommodate** [2] - 73:9, 73:13
**accommodation** [1] - 118:22
**accomplishing** [1] - 11:9
**accordance** [2] - 32:22, 59:17
**account** [2] - 61:10,

102:23
**accurate** [1] - 44:16
**accused** [2] - 98:17, 112:10
**acknowledge** [1] - 60:7
**Act** [1] - 32:23
**Action** [2] - 1:4, 122:8
**action** [8] - 9:17, 14:18, 29:16, 29:19, 30:9, 34:9, 58:16, 84:4
**actions** [1] - 112:23
**activities** [1] - 67:12
**activity** [1] - 59:1
**acts** [1] - 66:22
**added** [3] - 23:18, 24:11, 110:21
**addition** [2] - 32:23, 117:14
**additional** [4] - 7:13, 80:21, 89:18, 99:17
**address** [5] - 13:24, 58:17, 66:13, 99:4, 99:11
**addressed** [2] - 49:4, 65:15
**addressing** [1] - 64:20
**adduced** [1] - 122:6
**adequately** [1] - 65:15
**administration** [2] - 35:18, 77:23
**administration's** [1] - 77:4
**administrative** [1] - 35:7
**administrator** [7] - 42:10, 42:24, 44:1, 70:14, 101:13, 101:14, 101:18
**administrator's** [1] - 101:1
**administrators** [9] - 17:19, 18:6, 20:3, 32:21, 34:19, 42:25, 43:2, 68:11, 68:13
**admission** [4] - 19:8, 25:9, 31:23, 68:22
**admit** [4] - 57:1, 57:3, 74:5, 76:15
**admitted** [10] - 19:10, 25:12, 32:2, 57:12, 68:25, 74:9, 76:17, 83:11, 98:1, 115:20
**Admitted** [1] - 4:7
**admittedly** [1] - 23:18
**advanced** [1] - 40:18
**advances** [1] - 34:2
**adverse** [1] - 51:11
**advises** [1] - 17:25

**affects** [1] - 104:12
**afoul** [1] - 9:7
**age** [3] - 19:5, 21:11, 22:22
**agency** [1] - 50:16
**ago** [5] - 44:12, 55:5, 81:22, 105:15, 110:18
**agree** [21] - 21:17, 43:8, 59:3, 63:18, 64:6, 64:19, 65:10, 65:11, 65:18, 65:25, 66:7, 66:12, 66:16, 66:21, 66:22, 66:25, 82:25, 83:25, 104:10, 109:8, 113:25
**agrees** [1] - 5:24
**ahead** [7] - 49:9, 53:8, 56:2, 56:4, 100:3, 115:7, 119:8
**AIA** [2] - 116:21, 117:8
**al** [2] - 1:6, 122:7
**alanderson@bsfllp. com** [1] - 1:22
**Alexandria** [1] - 3:13
**Algebra** [3] - 40:14, 40:18, 41:2
**Alison** [1] - 1:19
**allegation** [4] - 99:3, 99:7, 102:3, 112:6
**allegations** [5] - 99:7, 105:11, 105:13, 109:3, 114:1
**alleged** [6] - 61:9, 82:14, 82:18, 96:22, 112:7, 118:10
**alleges** [1] - 61:6
**allow** [1] - 48:1
**allowed** [1] - 7:16
**allowing** [1] - 7:9
**almost** [1] - 110:10
**alone** [2] - 86:16, 109:14
**ALSTON** [1] - 1:11
**alternative** [4] - 77:25, 116:22, 117:10, 117:12
**altogether** [1] - 8:5
**Amendments** [1] - 32:24
**amounting** [1] - 34:4
**analysis** [2] - 5:24, 120:10
**analyze** [1] - 89:14
**ANDERSON** [5] - 11:23, 12:1, 119:11, 119:21, 120:11
**Anderson** [3] - 1:19, 7:21, 8:9

**Andrew** [2] - 2:6, 14:15
**ANDREWS** [4] - 2:14, 2:18, 2:21, 3:1
**Angeles** [1] - 1:21
**answer** [15] - 13:21, 22:23, 27:6, 27:19, 44:16, 48:14, 50:4, 54:21, 55:8, 55:12, 55:15, 84:20, 92:5, 99:16
**answered** [3] - 27:17, 48:13, 105:10
**anticipate** [1] - 10:18
**anticipated** [2] - 5:12, 5:17
**anticipating** [1] - 49:8
**apart** [1] - 101:21
**apologize** [2] - 33:8, 36:20
**APPEARANCES** [3] - 1:13, 2:1, 2:25
**applicable** [2] - 5:19, 115:15
**applicants** [1] - 20:13
**application** [1] - 6:21
**applied** [3] - 20:24, 67:16, 67:18
**applies** [2] - 20:12, 30:3
**appreciate** [3] - 8:8, 118:15, 118:16
**approach** [8] - 14:11, 20:18, 44:22, 45:11, 45:18, 49:14, 119:19, 119:21
**appropriate** [3] - 34:9, 102:13, 120:5
**area** [4] - 38:21, 40:8, 89:21, 113:10
**areas** [3] - 38:21, 86:17, 90:3
**argument** [2] - 5:8, 5:16
**arguments** [1] - 119:12
**Armentrout** [1] - 72:4
**arrangement** [3] - 77:25, 116:22, 117:10
**arrangements** [1] - 118:23
**arrived** [2] - 73:20, 118:18
**arrives** [1] - 72:6
**aspect** [2] - 13:9, 72:10, 119:1
**aspects** [2] - 6:25, 37:13
**assault** [4] - 61:10,

64:12, 64:14, 64:17
**assaulted** [2] - 61:6, 62:21
**assaults** [1] - 64:10
**assessed** [1] - 23:1
**assessments** [1] - 40:15
**assign** [2] - 89:11, 90:10
**assigned** [1] - 116:20
**assistant** [40] - 35:15, 36:18, 36:22, 36:25, 37:11, 37:18, 41:9, 41:17, 42:7, 42:14, 42:21, 43:12, 43:24, 44:9, 68:10, 68:14, 68:16, 68:17, 69:4, 77:1, 77:2, 77:18, 82:12, 87:15, 87:20, 87:22, 92:17, 92:21, 94:12, 95:17, 96:12, 98:5, 99:17, 100:7, 100:13, 105:2, 105:17, 111:24, 117:12, 118:9
**associates** [1] - 62:23
**assume** [5] - 40:17, 68:5, 82:23, 98:13, 114:12
**assuming** [1] - 118:5
**assumption** [1] - 99:1
**attached** [2] - 5:7, 6:15
**attack** [1] - 7:3
**attempting** [1] - 50:24
**attend** [1] - 119:4
**attendance** [1] - 80:9
**attention** [2] - 30:24, 90:8
**attentiveness** [1] - 118:16
**attributed** [1] - 98:10
**A██████** [4] - 4:3, 13:16, 14:7, 25:4, 54:16, 54:18
**A██████** [1] - 13:19
**Ave** [1] - 2:22
**Avenue** [4] - 2:15, 2:18, 3:2, 3:9
**aware** [7] - 7:25, 49:10, 50:3, 61:12, 73:11, 106:17, 119:16
**awkward** [1] - 33:9

---

**B**

---

**B.H** [1] - 3:5
**B.R** [2] - 1:3, 122:7
**baby** [1] - 7:9

**background** [2] - 6:19, 15:14
**backup** [1] - 122:13
**bad** [1] - 85:3
**balance** [1] - 9:21
**B██** [1] - 37:1
**bar** [2] - 48:25, 49:15
**BARAN** [1] - 1:15
**BARRY** [1] - 12:22
**based** [15] - 6:8, 19:4, 20:4, 20:5, 22:5, 22:16, 28:20, 29:21, 40:14, 50:11, 65:13, 65:19, 84:19, 88:14, 120:16
**basis** [4] - 7:3, 7:15, 39:6, 66:1
**BATES** [40] - 10:22, 19:11, 22:8, 23:24, 25:11, 25:25, 44:3, 45:12, 47:25, 48:12, 48:25, 49:2, 49:6, 49:17, 50:6, 50:10, 51:22, 52:3, 53:1, 57:7, 60:3, 61:20, 63:20, 64:25, 68:23, 74:7, 80:1, 93:4, 93:23, 95:4, 97:24, 98:12, 103:6, 103:15, 105:9, 106:12, 114:8, 115:1, 115:5, 117:24
**Bates** [1] - 2:14
**became** [2] - 15:9, 116:7
**BEFORE** [1] - 1:11
**began** [4] - 43:13, 44:9, 46:3, 46:25
**beginning** [4] - 25:3, 68:12, 69:4, 69:6
**behalf** [4] - 4:2, 4:6, 33:12
**behavior** [1] - 66:1
**behaviors** [1] - 84:23
**behind** [3] - 12:10, 75:11, 75:16
**belief** [1] - 51:12
**B██████** [1] - 110:10
**below** [1] - 42:13
**benefit** [2] - 58:2, 67:12
**best** [11] - 6:6, 7:7, 7:8, 13:21, 13:23, 20:21, 40:25, 41:3, 72:2, 105:18, 122:14
**better** [5] - 11:8, 17:23, 31:4, 89:2, 121:2
**between** [8] - 10:17, 16:10, 78:3, 93:20,

94:11, 98:7, 111:15, 120:5
**biassed** [1] - 101:16
**big** [3] - 75:23, 75:24, 120:1
**binder** [2] - 18:17, 107:11
**bit** [21] - 7:16, 9:23, 13:11, 13:24, 15:14, 16:12, 16:14, 32:4, 35:16, 49:22, 51:15, 71:19, 71:24, 77:10, 86:24, 88:8, 88:25, 91:3, 100:21, 108:23
**bitch** [3] - 80:25, 81:8, 81:9
**BLANCHARD** [9] - 10:20, 12:9, 12:14, 12:18, 106:17, 107:2, 107:4, 109:6, 110:14
**Blanchard** [1] - 3:8
**blow** [6] - 30:1, 57:20, 98:18, 102:4, 110:19, 110:21
**Board** [51] - 8:25, 10:23, 17:12, 17:14, 18:5, 18:9, 18:14, 19:1, 19:15, 20:2, 22:5, 23:6, 23:8, 23:22, 24:6, 24:16, 26:12, 31:18, 32:9, 32:20, 33:12, 33:18, 34:7, 41:24, 43:6, 51:20, 52:14, 52:19, 53:10, 53:11, 54:5, 54:8, 54:11, 58:5, 59:11, 59:23, 60:12, 60:16, 61:19, 62:16, 63:14, 65:18, 66:13, 66:17, 84:10, 87:3, 87:7, 87:9, 90:20, 102:7
**board** [1] - 41:8
**Board's** [9] - 18:7, 25:20, 58:20, 63:24, 64:3, 64:7, 64:11, 65:21, 66:8
**body** [1] - 29:3
**BOIES** [4] - 1:20, 2:2, 2:6, 2:10
**book** [9] - 67:22, 71:20, 71:21, 71:22, 74:1, 76:7, 97:19, 113:7, 113:16
**bottom** [2] - 29:13, 86:6
**boundaries** [1] - 49:7
**branch** [4] - 36:10, 36:19, 36:22, 42:18

**break** [6] - 37:9, 52:6, 71:24, 72:1, 119:8, 121:3
**breaking** [5] - 72:3, 118:17, 120:13, 120:14
**breakup** [1] - 111:9
**BRENNER** [194] - 8:9, 8:13, 8:19, 9:19, 10:1, 10:8, 10:13, 11:11, 11:14, 11:21, 12:5, 12:19, 13:15, 14:3, 14:11, 14:14, 19:7, 19:12, 19:14, 20:18, 20:20, 22:18, 24:2, 24:3, 25:8, 25:16, 25:18, 26:4, 27:10, 28:10, 29:24, 30:2, 30:14, 30:16, 30:19, 30:20, 31:8, 31:22, 31:25, 32:3, 32:13, 32:16, 33:5, 33:7, 33:24, 34:1, 34:15, 34:17, 36:1, 39:22, 44:5, 44:20, 44:22, 44:24, 45:11, 45:14, 46:1, 46:7, 46:10, 46:11, 48:2, 48:16, 48:20, 49:13, 51:19, 52:8, 52:10, 53:5, 53:9, 53:14, 53:17, 54:22, 54:25, 55:11, 56:1, 56:3, 56:5, 56:16, 56:21, 57:2, 57:5, 57:10, 57:13, 58:12, 60:9, 61:16, 62:15, 63:22, 65:2, 65:9, 67:4, 67:25, 68:21, 69:1, 69:2, 70:17, 70:20, 70:22, 71:5, 71:6, 72:16, 72:19, 72:22, 73:14, 73:16, 73:19, 73:22, 73:24, 74:5, 74:10, 74:12, 74:25, 75:5, 75:13, 76:14, 76:18, 76:20, 79:2, 80:12, 80:16, 82:9, 83:10, 83:14, 83:21, 83:23, 83:24, 84:13, 84:16, 84:21, 85:12, 85:13, 85:19, 86:19, 92:4, 93:12, 94:2, 94:4, 94:6, 94:22, 94:24, 95:6, 96:5, 96:17, 96:20, 96:24, 96:25, 97:22, 98:2, 98:16, 99:6, 102:1, 103:8, 103:25, 104:20, 104:22, 104:24, 104:25,
105:20, 105:21, 106:8, 106:16, 107:7, 107:8, 108:18, 108:24, 109:9, 109:20, 109:22, 110:17, 111:3, 111:18, 112:18, 113:12, 113:15, 114:5, 114:16, 114:21, 115:8, 115:21, 115:25, 116:1, 116:10, 116:14, 116:15, 117:17, 118:1, 118:6, 118:7, 118:13, 120:12, 120:19, 120:21, 120:23, 121:2
**Brenner** [15] - 2:6, 14:15, 44:18, 45:5, 60:4, 60:7, 62:2, 65:1, 72:14, 105:12, 105:19, 110:16, 113:9, 114:12, 115:7
**Brenner............** [1] - 4:4
**bring** [4] - 83:10, 90:8, 96:17, 107:5
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**broad** [2] - 7:17, 110:16
**broader** [1] - 10:24
**broke** [2] - 73:25, 111:7
**brought** [4] - 25:19, 54:5, 101:9, 101:12
**brown** [4] - 29:25, 30:14, 32:13, 34:15
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:11
**bucket** [1] - 91:15
**building** [3] - 37:13, 38:20, 75:21
**bullet** [2] - 70:12, 71:15
**bullies** [1] - 82:2
**bullying** [5] - 26:25, 70:19, 70:23, 71:9, 71:16
**Burton** [1] - 2:21
**burtons@huntonak. com** [1] - 2:23
**bus** [1] - 81:11
**BY** [95] - 14:3, 14:14, 19:14, 20:20, 22:18, 24:3, 25:18, 26:4,
27:10, 28:10, 30:2, 30:16, 30:20, 31:8, 32:3, 32:16, 33:7, 34:1, 34:17, 36:1, 39:22, 44:5, 44:24, 46:1, 46:11, 48:2, 48:16, 48:20, 52:10, 53:9, 53:17, 54:25, 55:11, 56:5, 56:16, 57:13, 58:12, 60:9, 61:16, 62:15, 63:22, 65:2, 65:9, 67:4, 67:25, 68:21, 70:17, 70:22, 71:6, 73:24, 74:12, 75:5, 75:13, 76:20, 79:2, 80:12, 82:9, 83:14, 83:24, 84:16, 84:21, 85:15, 85:19, 86:19, 92:4, 93:12, 94:2, 94:6, 94:24, 95:6, 96:5, 96:20, 96:25, 98:2, 98:16, 99:6, 102:1, 103:8, 103:25, 104:20, 104:22, 104:24, 105:21, 107:8, 108:9, 109:22, 110:17, 111:3, 111:18, 112:18, 113:15, 116:1, 116:15, 117:17, 118:1, 118:7

**C**

**C.K** [20] - 80:2, 80:17, 105:23, 106:4, 106:5, 107:9, 107:24, 108:8, 109:3, 110:1, 110:10, 112:22, 113:19, 114:2, 116:2, 116:6, 116:24, 117:23, 118:3
**C.K.'s** [2] - 107:17, 111:12
**CA** [1] - 1:21
**cafeteria** [3] - 15:25, 27:1, 84:24
**campus** [7] - 59:25, 62:21, 63:8, 63:10, 63:11, 104:11, 104:12
**cannot** [2] - 13:4, 27:3
**Cantalupo** [11] - 5:3, 5:18, 6:1, 6:5, 6:8, 6:18, 49:19, 49:23, 51:7, 119:20
**Cantalupo's** [5] - 5:7, 5:9, 5:10, 5:12, 7:4

**capacity** [1] - 122:5
**care** [4] - 37:13, 37:16, 37:20, 37:21
**careful** [1] - 51:15
**Carolina** [5] - 5:22, 5:25, 7:6, 120:3
**Carson** [19] - 14:21, 15:6, 15:9, 15:15, 17:10, 35:2, 35:6, 42:1, 42:3, 59:10, 67:16, 67:18, 68:7, 70:24, 71:7, 74:3, 74:13, 88:4, 95:19
**case** [27] - 5:22, 6:11, 7:6, 9:14, 11:25, 13:9, 16:13, 30:3, 46:8, 46:19, 46:23, 50:17, 61:24, 62:1, 72:10, 88:22, 90:9, 95:25, 101:3, 119:1, 120:3, 120:4, 120:10, 122:7
**celebrate** [1] - 120:17
**Century** [1] - 1:20
**certain** [11] - 6:8, 6:20, 6:21, 6:24, 7:1, 7:9, 7:10, 37:13, 37:14, 37:15, 38:20
**certainly** [2] - 90:3, 100:7
**Certificate** [1] - 4:14
**CERTIFICATE** [1] - 122:1
**certify** [2] - 122:4, 122:10
**chance** [1] - 58:8
**change** [3] - 40:9, 47:2, 76:6
**changed** [1] - 19:19
**changes** [1] - 18:12
**changing** [1] - 85:14
**Charlie** [1] - 28:16
**chart** [3] - 36:9, 41:8, 42:13
**chase** [1] - 100:20
**check** [2] - 56:24, 90:11
**checks** [1] - 103:11
**Cheryl** [3] - 36:13, 36:15, 36:19
**chief** [1] - 9:15
**child** [3] - 39:3, 77:12, 84:24
**children** [1] - 37:15
**choices** [1] - 72:5
**choose** [1] - 40:13
**C▇▇▇▇** [1] - 81:5
**circumstances** [2] - 11:18, 80:10
**cite** [1] - 6:9

**cited** [2] - 5:21, 5:23
**Civil** [10] - 1:4, 5:20, 32:23, 47:7, 47:18, 47:22, 48:7, 48:10, 57:15, 122:7
**civil** [1] - 11:25
**claim** [1] - 51:25
**claims** [4] - 10:24, 22:13, 23:11, 114:3
**clarification** [4] - 12:9, 26:1, 48:19, 116:11
**clarify** [1] - 23:16
**clarifying** [1] - 41:5
**class** [4] - 40:12, 40:22, 77:13, 116:19
**classes** [3] - 38:19, 39:8, 40:3
**classroom** [1] - 117:1
**clean** [1] - 12:17
**clear** [7] - 12:10, 20:12, 21:24, 60:10, 85:11, 115:3
**clearer** [2] - 55:4, 55:5
**clearly** [1] - 104:14
**client** [13] - 10:10, 11:11, 14:25, 39:14, 43:24, 46:13, 76:12, 89:5, 90:9, 102:3, 103:1, 103:11
**client's** [1] - 43:16
**climbing** [1] - 75:8
**close** [3] - 60:4, 72:18, 79:23
**Coastal** [4] - 5:22, 5:24, 7:6, 120:3
**Code** [1] - 29:2
**Colleague** [2] - 6:22, 49:18
**colleague** [1] - 56:24
**collected** [1] - 111:23
**color** [3] - 19:5, 21:10, 22:21
**combinations** [1] - 16:7
**comfort** [1] - 52:5
**comfortable** [3] - 51:1, 103:20, 105:16
**coming** [4] - 10:19, 13:3, 21:25, 78:13, 92:25, 94:19
**commend** [1] - 7:19
**comment** [1] - 13:22
**comments** [3] - 21:16, 22:20
**commitment** [2] - 33:17, 33:18
**commits** [1] - 84:1
**committed** [1] - 33:14
**common** [1] - 38:25
**commonly** [1] - 6:14

**communicate** [1] - 99:22
**communicating** [1] - 102:12
**communication** [1] - 98:25
**community** [1] - 117:11
**complained** [1] - 92:9
**complaint** [29] - 42:9, 43:3, 43:13, 43:25, 44:9, 46:2, 59:1, 59:15, 59:16, 60:2, 79:8, 79:12, 79:15, 89:6, 89:24, 90:22, 93:24, 94:8, 94:11, 94:25, 95:10, 95:13, 96:1, 103:14, 106:6, 107:10, 116:7, 116:16, 117:22
**complaints** [13] - 19:4, 34:9, 42:24, 43:16, 60:21, 77:20, 87:23, 92:16, 93:2, 93:21, 105:2, 107:24, 119:18
**complete** [3] - 92:5, 92:6, 115:14
**completely** [3] - 81:12, 97:5, 99:8
**Compliance** [12] - 23:3, 86:18, 86:22, 86:25, 87:10, 87:13, 88:2, 88:13, 88:18, 90:21, 95:3, 95:16
**compliance** [4] - 87:24, 88:2, 89:7, 90:4
**complicated** [1] - 56:10
**complied** [1] - 5:14
**compliment** [1] - 7:21
**comply** [1] - 47:24
**component** [3] - 24:15, 25:20, 26:22
**comports** [1] - 6:17
**comprehensive** [3] - 63:19, 63:24, 64:11
**computer** [1] - 122:12
**concept** [1] - 96:15
**concern** [1] - 115:18
**concerned** [2] - 9:10, 51:18
**concerning** [2] - 5:9, 83:3
**conclusion** [2] - 22:9, 47:25
**Conclusion** [1] - 121:9
**conditions** [1] - 6:13

**conduct** [16] - 21:3, 28:24, 30:7, 57:24, 57:25, 59:16, 60:22, 63:10, 63:18, 63:24, 64:3, 64:7, 67:9, 83:19, 91:23, 113:3
**conducting** [1] - 41:10
**confers** [1] - 8:12
**confines** [2] - 60:8, 114:13
**confirm** [1] - 22:4
**confirming** [1] - 110:4
**confirms** [3] - 110:10, 110:15, 110:20
**confuse** [1] - 62:10
**confused** [3] - 16:21, 50:7, 56:8
**confusing** [2] - 16:21, 49:20
**confusion** [1] - 8:23
**consequence** [1] - 29:22
**consequences** [3] - 91:20, 112:24, 113:1
**consider** [2] - 63:9, 94:7
**considered** [1] - 106:24
**consistency** [1] - 111:14
**consistent** [19] - 6:23, 45:5, 58:4, 58:6, 58:19, 58:21, 58:22, 59:4, 59:22, 59:24, 60:17, 60:20, 61:18, 62:16, 62:24, 63:13, 104:10, 110:20, 111:4
**constitute** [1] - 122:11
**constituting** [1] - 34:4
**Cont** [2] - 2:1, 2:25
**contact** [5] - 34:3, 93:20, 93:22, 94:11, 94:13
**contacted** [4] - 95:21, 104:1, 104:5, 104:6
**contending** [1] - 82:18
**CONTENTS** [1] - 4:1
**context** [4] - 65:6, 66:24, 91:23, 115:12
**continue** [1] - 62:9
**continues** [1] - 22:19
**continuing** [1] - 60:6, 63:8
**contours** [1] - 60:16
**contribute** [1] - 21:15
**conversation** [1] - 119:3
**coordinated** [1] - 11:1
**coordinator** [3] -

119:13, 119:16, 120:2
**copy** [1] - 5:4
**core** [5] - 39:8, 39:9, 39:11, 39:12, 40:2
**corporate** [1] - 41:7
**Correct** [1] - 55:13
**correct** [206] - 14:24, 15:7, 15:8, 15:10, 15:17, 17:12, 17:15, 17:16, 18:8, 18:15, 18:25, 19:15, 19:16, 19:21, 20:3, 20:25, 21:1, 21:6, 21:25, 22:7, 25:5, 25:6, 25:7, 25:22, 26:7, 28:11, 28:12, 28:15, 28:21, 30:5, 30:12, 31:14, 31:19, 31:21, 32:8, 32:10, 32:11, 32:25, 33:3, 33:16, 33:20, 33:22, 34:6, 34:20, 34:21, 35:11, 35:25, 36:8, 36:12, 39:9, 40:4, 41:12, 41:14, 41:15, 41:19, 41:22, 42:6, 42:22, 42:25, 43:1, 43:9, 43:13, 43:14, 46:3, 46:6, 47:1, 47:5, 47:6, 47:8, 47:19, 47:20, 47:24, 48:3, 48:4, 48:8, 48:11, 52:15, 52:23, 53:12, 54:19, 55:12, 55:14, 56:14, 56:18, 56:19, 57:15, 57:16, 57:22, 58:3, 58:11, 58:18, 59:19, 59:21, 60:2, 60:24, 63:12, 63:15, 65:24, 66:3, 66:5, 66:6, 66:15, 66:20, 67:3, 67:6, 67:8, 67:14, 68:9, 68:20, 69:10, 69:18, 69:23, 69:24, 70:2, 70:25, 71:10, 75:19, 77:21, 78:9, 78:16, 80:23, 81:4, 81:7, 82:3, 82:16, 82:19, 83:2, 83:5, 83:16, 83:17, 83:20, 84:3, 84:5, 84:6, 84:12, 85:16, 87:8, 87:14, 87:17, 87:25, 88:2, 88:3, 88:7, 88:20, 88:23, 89:4, 89:9, 89:10, 89:13, 90:7, 90:22, 90:23, 92:9, 92:10, 92:14, 92:16, 95:7,

97:6, 97:8, 97:21, 98:6, 98:8, 98:19, 99:15, 100:23, 100:24, 101:2, 102:4, 102:20, 102:25, 103:2, 103:3, 103:14, 104:2, 104:13, 104:16, 104:17, 105:4, 105:8, 105:25, 106:3, 107:25, 108:3, 108:7, 108:14, 111:2, 111:5, 111:11, 111:20, 112:16, 112:19, 112:20, 113:3, 113:4, 113:6, 113:22, 113:23, 113:24, 114:2, 115:1, 116:3, 116:5, 116:7, 116:17, 117:1, 117:2
**correctly** [3] - 38:8, 80:13, 80:14
**correspondence** [5] - 54:3, 54:12, 55:9, 56:6, 56:11
**coughed** [1] - 71:5
**counsel** [9] - 5:11, 13:21, 24:1, 30:19, 45:13, 73:8, 80:1, 106:9, 114:17
**Counsel** [1] - 8:12
**counseled** [1] - 116:19
**counselor** [6] - 42:9, 42:24, 43:25, 77:16, 77:17, 78:2
**counselors** [7] - 17:19, 18:6, 32:22, 42:12, 42:25, 68:9, 77:1
**count** [1] - 78:17
**county** [5] - 41:21, 41:23, 41:25, 48:10, 87:23
**County** [33] - 17:12, 23:6, 24:16, 24:19, 26:11, 33:13, 41:23, 42:1, 42:4, 43:6, 47:4, 58:20, 59:23, 60:11, 60:16, 61:19, 62:16, 62:24, 63:14, 63:23, 64:2, 64:6, 64:10, 65:12, 65:18, 66:12, 66:16, 85:15, 87:3, 87:7, 87:9, 90:20, 117:20
**County's** [3] - 58:5,

59:4, 60:20
**couple** [2] - 23:12, 74:15
**course** [9] - 13:6, 31:12, 40:10, 89:23, 93:17, 93:19, 95:9, 106:21
**courses** [1] - 40:11
**court** [9] - 5:25, 12:25, 16:22, 26:1, 31:1, 44:25, 48:19, 52:4, 122:8
**COURT** [193] - 1:1, 1:12, 5:1, 8:11, 8:17, 9:9, 9:21, 10:3, 10:12, 10:14, 10:25, 11:3, 11:13, 11:17, 11:24, 12:2, 12:7, 12:13, 12:16, 12:21, 12:24, 13:2, 13:17, 13:20, 14:1, 14:13, 19:9, 19:13, 20:19, 22:10, 22:17, 24:1, 25:10, 25:13, 25:17, 26:2, 27:5, 27:8, 28:5, 28:7, 30:23, 31:7, 31:24, 32:1, 35:22, 35:24, 39:18, 39:21, 44:4, 44:11, 44:14, 44:18, 44:21, 44:23, 45:4, 45:17, 45:22, 45:25, 46:9, 48:1, 48:13, 49:1, 49:4, 49:7, 49:16, 49:22, 50:9, 50:18, 52:1, 52:5, 53:3, 53:6, 53:16, 54:24, 55:16, 55:20, 56:2, 56:4, 56:9, 56:15, 56:24, 57:4, 57:6, 57:9, 57:11, 60:6, 61:3, 61:14, 61:22, 62:14, 63:21, 65:1, 65:5, 66:24, 68:24, 70:11, 70:16, 71:4, 71:23, 72:13, 72:17, 72:20, 72:25, 73:5, 73:8, 73:15, 73:17, 73:21, 73:23, 74:8, 74:11, 75:3, 75:10, 76:16, 76:19, 78:20, 78:23, 79:1, 80:3, 80:14, 82:7, 83:13, 84:19, 85:17, 86:5, 86:9, 86:11, 86:14, 91:22, 92:2, 93:6, 93:11, 93:25, 94:5, 95:5, 95:22, 96:19, 96:23, 97:25, 98:13, 99:5, 100:20, 101:3,

101:7, 101:11,
101:17, 101:22,
101:25, 103:7,
103:17, 103:22,
104:21, 104:23,
105:10, 105:18,
106:10, 106:14,
106:20, 107:3,
107:6, 108:17,
108:19, 109:8,
110:12, 110:15,
110:23, 110:25,
111:14, 112:13,
112:17, 113:9,
113:13, 114:7,
114:12, 114:19,
114:24, 115:4,
115:6, 115:11,
115:23, 116:8,
116:11, 117:14,
117:25, 118:14,
119:7, 119:19,
119:25, 120:16,
120:20, 120:22,
120:24, 121:4
**Court** [26] - 3:11, 3:12,
4:14, 5:6, 5:9, 5:24,
6:15, 6:25, 7:5, 7:22,
8:10, 11:15, 13:22,
49:19, 50:17, 51:8,
60:8, 73:3, 106:17,
106:21, 114:9,
114:14, 114:15,
115:17, 122:3,
122:22
**Court's** [10] - 6:17,
6:24, 7:14, 13:8,
49:8, 49:10, 72:9,
114:13, 118:25,
119:4
**Courthouse** [1] - 3:12
**courtroom** [1] - 31:1
**cover** [1] - 56:22, 90:4
**covered** [2] - 50:18,
83:19
**create** [2] - 40:16,
40:21
**created** [5] - 65:23,
66:2, 66:10, 66:14,
66:18
**creates** [5] - 57:24,
58:15, 65:14, 65:20,
67:9
**creating** [1] - 21:8
**credibility** [1] - 91:24
**criminal** [1] - 6:25
**cross** [11] - 7:3, 7:18,
9:10, 10:2, 10:4,
10:16, 10:18, 51:10,
51:15, 90:11, 103:18

**cross-check** [1] -
90:11
**cross-examination** [4]
- 7:3, 7:18, 10:16,
51:10
**cross-verification** [1]
- 103:18
**crossed** [2] - 60:5,
89:16
**curative** [2] - 51:23,
52:1
**curse** [2] - 28:25, 30:8
**custodian** [1] - 98:14
**cut** [4] - 27:13, 29:8,
73:12, 100:20
**cutting** [1] - 73:12

# D

**D.N** [13] - 80:24,
81:11, 97:4, 97:15,
97:20, 98:17, 99:8,
103:19, 104:16,
106:1, 108:16,
108:19, 109:5
**D.N.'s** [1] - 102:2
**daily** [1] - 39:6
**date** [3] - 19:17, 46:15,
46:20
**dated** [1] - 76:12
**daughter** [2] - 93:2,
93:21
**daughter's** [1] - 92:16
**David** [3] - 103:2,
103:4, 103:9, 104:16
**DC** [5] - 1:17, 2:15,
2:19, 2:22, 3:2
**deal** [1] - 12:7
**Dear** [2] - 6:22, 49:17
**decide** [1] - 29:19
**decided** [2] - 88:5,
88:17
**decision** [3] - 29:21,
88:11, 88:12
**dedicated** [2] - 85:16,
86:16
**deep** [1] - 100:18
**defendant** [2] - 9:14,
9:17
**Defendant** [3] - 2:14,
3:1, 3:8
**defendants** [4] - 7:2,
9:16, 10:17, 107:1
**Defendants** [2] - 1:8,
3:4
**defense** [2] - 7:12,
7:19
**defined** [2] - 18:14,
29:1
**definitely** [1] - 11:22

**definition** [3] - 19:3,
19:25, 65:3
**definitions** [1] - 22:15
**degree** [1] - 9:18
**deliberate** [3] - 50:8,
64:24, 65:6
**delve** [1] - 51:14
**demanded** [1] - 93:14
**deny** [1] - 102:2
**department** [1] - 42:15
**Department** [3] - 47:7,
47:18, 57:14
**departments** [1] -
41:25
**deposition** [7] - 9:3,
49:19, 53:18, 54:15,
55:1, 85:21, 86:20
**derived** [1] - 6:2
**designated** [2] -
17:17, 34:10
**designee** [2] - 34:8,
34:10
**determination** [5] -
92:7, 95:24, 95:25,
100:11, 105:8
**determinations** [2] -
49:11, 91:24
**determine** [1] - 90:25
**determined** [6] - 95:1,
95:13, 102:8,
103:12, 105:3,
111:19
**determining** [1] -
61:10
**dictative** [1] - 50:16
**different** [21] - 9:7,
16:6, 17:25, 18:1,
18:3, 18:4, 21:21,
23:17, 36:19, 40:11,
48:21, 49:22, 51:8,
55:19, 55:24, 77:15,
82:11, 88:6, 88:18,
101:5, 101:7
**differently** [1] - 112:15
**dinner** [1] - 8:7
**direct** [2] - 36:15,
48:21
**Direct** [1] - 4:4
**DIRECT** [1] - 14:2
**directed** [1] - 48:17
**directing** [3] - 5:11,
28:14, 73:25
**direction** [1] - 26:12
**directions** [1] - 89:19
**directly** [7] - 48:10,
54:3, 54:6, 55:10,
56:7, 56:12, 87:21
**director** [3] - 36:10,
68:14, 74:21
**directs** [1] - 34:7

**disability** [3] - 19:6,
21:11, 22:22
**disagree** [1] - 21:19
**disciplinary** [16] -
29:16, 29:18, 30:9,
83:19, 84:4, 84:8,
84:10, 85:2, 112:22,
112:23, 113:18,
113:19, 113:21,
114:10, 116:2,
118:10
**discipline** [1] - 117:9
**discretion** [1] - 29:16
**discrimination** [2] -
19:4, 22:14
**discuss** [5] - 13:9,
39:5, 72:9, 101:21,
118:25
**discussed** [1] - 6:7
**discussing** [2] -
79:16, 79:17
**Discussion** [2] - 8:18,
25:15
**discussion** [2] - 78:3,
101:13
**discussions** [2] -
100:4, 100:5
**display** [1] - 122:13
**displaying** [1] - 29:1
**disruptive** [1] - 113:3
**dissertation** [1] -
120:1
**distinction** [1] - 120:5
**District** [3] - 3:12,
6:11, 122:4
**DISTRICT** [3] - 1:1,
1:1, 1:12
**division** [1] - 34:8
**divvy** [1] - 78:2
**DM** [1] - 81:11
**Docket** [1] - 5:13
**doctor** [1] - 7:25
**document** [28] - 25:3,
25:19, 26:10, 45:6,
45:7, 52:16, 54:8,
68:3, 68:5, 76:9,
76:11, 78:5, 78:21,
78:24, 79:4, 79:5,
79:6, 80:3, 80:6,
82:4, 110:12,
110:13, 114:11,
115:3, 115:16,
115:17
**documents** [4] -
14:12, 50:11, 51:24,
104:9
**Doe** [1] - 5:21
**done** [6] - 27:11, 43:9,
77:24, 81:19, 100:1
**door** [5] - 7:2, 7:13,

8:3, 75:18, 120:9
**dotted** [1] - 89:15
**doubt** [1] - 52:22
**down** [22] - 9:4, 13:23,
16:22, 21:2, 30:14,
34:15, 43:19, 50:15,
51:22, 52:2, 54:5,
60:25, 63:16, 83:23,
94:22, 102:16,
105:22, 106:10,
106:16, 108:25,
109:1, 121:5
**Dr** [4] - 6:5, 49:23,
51:7
**draw** [3] - 74:25, 75:2,
75:6
**Drive** [1] - 3:6
**driveway** [1] - 75:16
**during** [7] - 14:22,
74:16, 106:21,
116:19, 116:25,
120:14, 121:3
**duty** [1] - 35:13

# E

**easier** [2] - 20:21,
28:13
**East** [1] - 1:20
**EASTERN** [1] - 1:1
**Eastern** [1] - 122:4
**education** [3] - 58:25,
69:20, 69:23
**Education** [4] - 32:24,
47:7, 47:18, 57:14
**educational** [3] - 21:5,
21:9, 63:9
**effect** [1] - 21:3
**effective** [2] - 19:17,
25:3
**effects** [4] - 58:17,
63:8, 63:10, 66:13
**efficiently** [1] - 13:12
**eight** [3] - 38:4, 38:5,
38:6
**either** [4] - 22:6,
40:22, 42:9, 99:13
**electives** [3] - 15:20,
15:21, 16:2
**eliminate** [3] - 58:16,
65:22, 66:9
**Elliker** [1] - 3:1
**Email** [11] - 1:18, 1:22,
2:5, 2:9, 2:13, 2:16,
2:20, 2:23, 3:3, 3:7,
3:11
**employees** [3] - 20:13,
20:16, 65:16
**encourage** [2] - 80:8,
120:7

encouraged [1] - 65:15
end [3] - 6:15, 73:11, 85:8
ended [1] - 116:16
endorsements [1] - 41:3
enforce [1] - 48:6
enforced [1] - 35:1
enforces [2] - 47:8, 47:19
engaged [4] - 5:16, 21:20, 96:22, 118:11
engaging [1] - 29:2
English [1] - 38:23
enjoy [3] - 118:19, 119:5, 121:6
enjoyed [1] - 13:5
enjoying [1] - 8:7
ensure [3] - 34:23, 34:25, 41:17
entered [1] - 5:15
entirely [1] - 15:18
entitled [3] - 9:18, 51:11, 69:25
entrance [4] - 74:20, 74:24, 75:6, 75:11
environment [17] - 21:9, 21:15, 33:14, 57:25, 58:15, 61:11, 63:11, 65:14, 65:20, 65:23, 66:2, 66:10, 66:14, 66:18, 67:9, 70:1, 70:8
Equity [14] - 23:3, 86:18, 86:21, 86:25, 87:10, 87:12, 88:1, 88:13, 88:18, 89:7, 90:21, 91:8, 95:3, 95:16
errands [1] - 11:22
escalate [2] - 84:23, 84:24
escalated [1] - 81:23
Esq [11] - 1:15, 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1, 3:4, 3:8
essentially [4] - 8:24, 49:20, 62:1, 77:19
established [3] - 59:17, 60:2, 60:22
et [2] - 1:6, 122:7
evaluate [1] - 106:25
evaluating [1] - 63:10
evening [1] - 13:5
evenly [1] - 16:10
events [1] - 45:10
evergreen [1] - 75:11
evidence [16] - 19:10,

25:12, 32:2, 56:22, 57:12, 68:25, 74:6, 74:9, 76:17, 97:23, 98:1, 106:18, 106:23, 106:24, 114:6, 115:20
evidentiary [1] - 55:21
exactly [6] - 46:16, 72:23, 94:17, 111:9, 120:22
examination [9] - 4:4, 7:3, 7:18, 10:16, 11:5, 50:23, 51:10, 53:8, 72:15
EXAMINATION [1] - 14:2
examinations [1] - 10:10
example [12] - 20:5, 37:17, 40:17, 52:13, 52:19, 56:18, 61:1, 61:5, 77:7, 77:12
examples [3] - 21:14, 24:12
excellent [1] - 8:6
except [1] - 110:21
excluded [1] - 8:4
excuse [2] - 6:4, 102:7
excused [2] - 72:12, 119:6
exhibit [4] - 6:15, 18:17, 48:21, 114:17
Exhibit [40] - 5:8, 18:20, 18:24, 19:8, 19:10, 24:25, 25:9, 25:12, 30:18, 31:10, 31:23, 32:2, 48:23, 52:11, 56:17, 57:12, 67:23, 68:22, 68:25, 73:25, 74:9, 76:7, 76:15, 76:17, 83:11, 94:3, 94:4, 95:11, 96:18, 97:22, 98:1, 104:19, 105:7, 105:11, 106:9, 107:23, 113:8, 113:16, 114:6, 115:20
exhibits [1] - 114:17
EXHIBITS [1] - 4:5
expect [6] - 8:21, 9:2, 9:3, 70:7
expectation [1] - 118:9
expected [3] - 23:11, 70:5, 71:11
experience [1] - 63:8
expert [5] - 6:11, 7:6, 7:16, 9:8, 49:24
experts [1] - 89:21

explain [1] - 98:7
explained [2] - 23:4, 98:10
explorer [1] - 40:2
explorers [4] - 39:15, 39:18, 40:3, 40:7
exposed [2] - 116:18, 116:25
exposure [1] - 29:3
expression [1] - 20:6
extent [2] - 55:4, 98:14

## F

F.C.S.B [5] - 1:6, 2:14, 3:1, 9:4, 122:7
F.T [1] - 3:6
face [1] - 84:4
Facebook [1] - 81:9
facilitating [2] - 9:16, 10:7
fact [6] - 48:9, 59:25, 71:1, 84:10, 119:23, 120:6
fact-finder [1] - 120:6
facts [2] - 78:4, 78:11
Fahey [1] - 1:15
fair [11] - 35:24, 38:14, 38:15, 46:22, 64:3, 64:14, 69:7, 70:11, 79:20, 85:10, 91:22
Fairfax [36] - 17:12, 23:6, 24:16, 24:19, 26:11, 33:13, 41:23, 42:1, 42:4, 43:6, 47:4, 58:5, 58:20, 59:4, 59:22, 60:11, 60:16, 60:20, 61:19, 62:16, 62:24, 63:13, 63:23, 64:2, 64:6, 64:10, 65:12, 65:18, 66:12, 66:16, 85:15, 87:3, 87:7, 87:9, 90:20, 117:20
faith [2] - 118:24, 120:17
fall [3] - 15:1, 67:1, 91:15
false [3] - 81:12, 97:5, 99:9
familiar [1] - 64:23
family [1] - 39:4
far [12] - 9:9, 9:23, 10:4, 10:9, 11:9, 42:3, 46:16, 51:17, 51:21, 61:23, 104:6, 116:9
fast [2] - 16:21, 47:14
favors [1] - 34:3

federal [8] - 5:19, 20:4, 20:5, 21:6, 21:12, 22:6, 22:9, 50:15
feet [1] - 75:21
FELDMAN [1] - 3:9
fellow [2] - 17:19, 32:21
female [2] - 116:18, 117:1
few [4] - 47:3, 88:18, 92:23
figure [1] - 72:6
files [2] - 59:1, 59:15
filled [4] - 76:25, 77:22, 78:6, 79:5
finder [1] - 120:6
fine [13] - 9:9, 9:11, 10:25, 11:3, 12:13, 12:21, 23:15, 29:9, 53:8, 56:4, 98:15, 107:2, 107:3
finger [1] - 75:3
finished [2] - 72:14
firm [1] - 23:24
first [52] - 5:15, 8:15, 8:22, 10:11, 10:23, 12:19, 15:19, 15:24, 16:2, 16:12, 20:11, 20:14, 23:12, 26:5, 32:14, 40:24, 43:15, 43:18, 43:24, 46:12, 55:21, 57:20, 58:8, 59:3, 63:4, 69:1, 69:9, 78:8, 78:11, 78:12, 78:13, 79:20, 79:22, 82:24, 84:2, 86:11, 91:7, 93:7, 93:20, 98:3, 102:21, 107:20, 108:5, 108:20, 110:9, 111:1, 114:9, 116:24
firsthand [4] - 102:22, 104:3, 104:4
five [3] - 38:11, 38:16, 105:22
FL [3] - 2:4, 2:8, 2:12
flags [1] - 83:1
FLEXNER [4] - 1:20, 2:2, 2:6, 2:10
flipping [1] - 15:23
Floor [1] - 3:13
floor [7] - 15:19, 15:21, 15:24, 16:3, 40:22, 40:24
flourish [1] - 6:14
focus [4] - 10:6, 58:7, 61:24, 108:4
focused [2] - 5:17, 70:13

focussing [2] - 17:10, 18:9
follow [10] - 5:25, 20:3, 22:16, 34:20, 50:3, 51:13, 60:1, 61:14, 61:18, 62:11
followed [5] - 49:25, 50:22, 62:3, 62:5, 120:10
following [9] - 54:20, 54:21, 55:7, 55:8, 94:10, 106:5, 106:6, 116:9
FOR [1] - 1:1
foregoing [1] - 122:10
forgiveness [1] - 8:20
forgot [1] - 37:23
form [8] - 25:25, 26:2, 26:11, 44:1, 76:22, 77:15, 77:16, 82:11
forms [2] - 77:18, 117:8
forth [4] - 20:2, 24:14, 31:18, 32:5
forward [3] - 13:13, 23:10, 91:20
foundation [7] - 51:20, 53:1, 53:7, 93:4, 95:4, 98:12, 117:24
foundations [1] - 115:13
four [8] - 38:7, 38:16, 39:9, 39:11, 39:12
F███ [2] - 4:3, 14:7
F█ [1] - 13:19
F████ [16] - 4:3, 8:22, 12:19, 13:16, 14:7, 14:8, 14:9, 14:10, 14:21, 21:25, 23:21, 23:22, 24:16, 30:24, 53:18, 63:4
free [2] - 33:14, 69:23
French [3] - 84:24, 85:6, 85:7
Friday [1] - 73:17
friends [2] - 61:9, 111:8
fries [2] - 85:7
front [10] - 52:11, 56:22, 57:2, 74:20, 74:24, 75:6, 75:11, 75:12, 75:18, 111:22
fry [1] - 84:24
full [3] - 14:6, 32:14, 100:9
fully [3] - 22:13, 64:23, 65:8
Fulton [1] - 3:6
fun [1] - 81:5

**G**

**gender** [3] - 6:8, 6:12, 6:19
**gender-based** [1] - 6:8
**general** [4] - 10:17, 111:14, 119:19, 119:21
**generally** [12] - 6:5, 16:10, 16:11, 48:5, 51:10, 69:11, 76:24, 95:25, 101:8, 101:12, 111:16, 111:17
**generated** [1] - 120:9
**generates** [1] - 119:3
**genitals** [2] - 116:18, 117:1
**gentleman** [3] - 50:2, 62:3, 98:14
**gentlemen** [5] - 13:2, 71:25, 106:20, 115:11, 118:15
**girl** [1] - 83:4
**given** [3] - 17:25, 32:22, 68:6
**goal** [1] - 69:8
**government** [1] - 50:15
**grade** [18] - 15:15, 37:10, 37:18, 38:3, 38:5, 38:7, 38:14, 39:14, 40:12, 40:13, 40:17, 40:18, 40:22, 40:23, 116:25
**grader** [3] - 38:14, 40:21, 113:22
**graders** [5] - 15:19, 16:2, 40:11, 40:23, 41:4
**grades** [3] - 15:23, 16:10, 37:20
**graduated** [1] - 84:11
**graphic** [1] - 67:5
**great** [4] - 11:14, 11:15, 53:21, 120:4
**green** [1] - 75:16
**greet** [1] - 75:25
**grounds** [3] - 58:25, 60:23, 61:7
**group** [1] - 39:3
**Group** [1] - 6:10
**groups** [2] - 37:15, 68:18
**guarantee** [1] - 47:4
**guess** [3] - 10:8, 82:5, 94:20
**guidance** [25] - 5:19, 6:2, 6:22, 9:4, 17:19,

18:6, 28:19, 32:21, 42:9, 42:12, 42:23, 43:25, 50:11, 51:24, 52:14, 52:18, 52:20, 53:11, 56:18, 57:19, 61:21, 68:9, 76:25, 77:16, 77:17
**Guidance** [1] - 5:20
**guidelines** [7] - 47:23, 48:6, 49:25, 50:3, 50:19, 51:5, 90:5
**guy** [2] - 35:18, 36:7
**guys** [1] - 37:25

**H**

**half** [1] - 81:5
**hallway** [1] - 110:18
**hand** [5] - 12:7, 17:7, 27:14, 110:19, 110:21
**handle** [1] - 9:13
**handwriting** [1] - 76:22
**harass** [1] - 79:24
**harassed** [2] - 61:8, 92:9
**harasses** [1] - 57:23
**harassing** [1] - 57:24
**harassment** [62] - 17:10, 18:15, 19:3, 19:25, 21:2, 22:13, 25:20, 26:12, 26:25, 27:3, 31:20, 32:10, 33:15, 34:4, 41:11, 41:18, 42:9, 42:20, 42:24, 43:4, 43:9, 43:11, 43:17, 44:2, 44:8, 46:3, 46:13, 46:19, 46:23, 47:5, 58:14, 58:16, 58:24, 62:22, 63:9, 63:19, 63:25, 64:4, 64:8, 64:20, 65:13, 65:14, 65:19, 65:21, 65:23, 66:10, 66:14, 66:18, 66:22, 67:9, 69:23, 77:7, 85:16, 90:19, 93:3, 94:8, 97:10, 103:14, 112:7, 112:11, 114:1, 119:18
**harassments** [1] - 19:4
**hard** [1] - 17:1
**HARRIS** [1] - 3:11
**Harris** [3] - 31:1, 122:3, 122:21
**head** [1] - 75:22
**hear** [6] - 9:10, 9:15,

13:22, 47:17, 120:6
**heard** [4] - 20:6, 71:3, 119:23, 120:25
**hearing** [2] - 5:8, 17:1
**help** [3] - 16:18, 18:19, 77:4
**helpful** [1] - 88:24
**hereby** [1] - 122:4
**hereto** [1] - 122:15
**hiding** [1] - 113:5
**hierarchy** [1] - 41:7
**high** [1] - 84:11
**highlight** [6] - 32:14, 59:5, 59:7, 78:12, 97:2, 115:21
**highlighted** [1] - 61:4
**history** [7] - 38:23, 84:8, 112:8, 112:11, 112:14, 112:22, 117:23
**Hnot** [1] - 6:9
**hold** [3] - 38:12, 55:16
**holding** [1] - 5:25
**Holdings** [1] - 6:10
**holiday** [2] - 73:10, 73:13
**HOLTZMAN** [1] - 1:15
**Honor** [54] - 8:13, 14:11, 19:7, 19:11, 19:12, 20:18, 25:8, 25:11, 25:16, 31:22, 44:20, 45:11, 45:16, 46:7, 48:12, 49:13, 50:6, 52:8, 53:13, 53:14, 54:22, 56:1, 56:21, 57:10, 60:3, 61:17, 61:20, 62:13, 64:25, 67:3, 68:21, 70:15, 72:16, 73:14, 74:6, 75:1, 76:14, 78:22, 80:1, 80:2, 83:11, 83:21, 92:3, 93:5, 93:23, 95:4, 96:24, 97:22, 104:20, 105:20, 106:13, 109:6, 114:5, 118:6
**Honor's** [2] - 53:24, 96:18
**HONORABLE** [1] - 1:11
**honors** [4] - 40:13, 40:14, 40:20, 40:23
**hope** [1] - 13:5
**hostile** [14] - 21:8, 21:15, 57:24, 58:15, 61:11, 63:11, 65:14, 65:20, 65:23, 66:2, 66:10, 66:14, 66:18, 67:9

hour [2] - 120:25, 121:1
**house** [2] - 88:7, 88:12
**H██████** [1] - 37:5
**HUNTON** [4] - 2:14, 2:18, 2:21, 3:1

**I**

**i's** [1] - 89:16
**idea** [3] - 80:5, 98:11, 100:21
**identifies** [2] - 82:1, 82:5
**identify** [4] - 11:5, 12:14, 82:13, 82:14
**identifying** [2] - 82:17, 82:21
**identity** [1] - 10:17
**ignored** [1] - 65:15
**Ill** [3] - 4:3, 14:7, 32:14
**imagery** [1] - 29:1
**immediate** [1] - 58:16
**immediately** [2] - 42:8, 43:23
**impartial** [2] - 64:7, 64:16
**impartiality** [1] - 89:1
**impeachment** [1] - 55:18
**implement** [3] - 18:6, 23:6, 48:6
**implemented** [1] - 35:1
**implementing** [2] - 9:1, 59:10
**implying** [1] - 24:8
**important** [9] - 13:3, 30:25, 73:9, 74:19, 84:7, 85:4, 112:6, 112:10, 119:15
**improper** [1] - 55:18
**in-house** [2] - 88:7, 88:12
**in-person** [4] - 14:25, 15:5, 15:6, 89:6
**in-school** [1] - 117:10
**inappropriate** [2] - 80:17, 105:23
**incident** [3] - 43:18, 99:22, 100:17
**incidents** [4] - 27:1, 64:20, 71:16, 91:19
**include** [5] - 21:15, 66:22, 67:7, 69:23, 119:14
**including** [2] - 20:16, 20:24
**inconsistent** [4] -

58:4, 58:19, 59:22, 120:3
**incorrect** [1] - 100:24
**indecent** [1] - 29:2
**Indian** [1] - 81:5
**indicated** [3] - 6:6, 61:25, 106:20
**indifference** [3] - 50:8, 64:24, 65:6
**individual** [2] - 21:10, 106:25
**individual's** [2] - 21:4, 22:21
**individually** [1] - 107:1
**indulgence** [1] - 96:18
**inform** [1] - 73:8
**information** [19] - 5:5, 7:1, 7:9, 7:10, 7:13, 7:17, 18:4, 99:17, 99:21, 100:6, 100:8, 102:25, 110:6, 110:8, 111:22, 111:23, 111:25, 118:2, 120:16
**initial** [2] - 80:5, 97:2
**initials** [3] - 96:23, 115:23, 116:12
**initiated** [1] - 93:22
**inquire** [2] - 55:24, 105:12
**inquiry** [1] - 113:10
**inside** [1] - 100:22
**instances** [1] - 114:10
**instructed** [3] - 50:8, 50:14, 61:25
**instruction** [9] - 13:8, 49:8, 49:10, 50:19, 51:23, 52:1, 72:9, 87:18, 117:10
**instructional** [3] - 77:25, 116:22, 117:12
**instructions** [5] - 53:24, 106:22, 118:25, 119:4
**interaction** [1] - 104:15
**interest** [1] - 10:17
**interesting** [1] - 7:12
**interfere** [1] - 67:11
**interferes** [1] - 58:1
**interfering** [1] - 21:4
**interpret** [1] - 22:24
**interpretation** [1] - 22:10
**interrupt** [1] - 120:21
**interrupting** [1] - 106:19
**interview** [1] - 98:24

**intimidating** [1] - 21:8
**introduce** [1] - 14:15
**invariably** [1] - 11:20
**investigate** [9] -
22:13, 23:11, 41:18,
60:21, 67:2, 87:16,
88:22, 90:10, 101:20
**investigated** [1] - 23:1
**investigating** [9] -
43:13, 44:9, 46:19,
46:23, 77:9, 77:10,
89:3, 108:8, 108:9
**investigation** [34] -
43:3, 43:8, 46:3,
46:17, 46:25, 51:3,
63:19, 63:25, 64:4,
64:8, 64:12, 64:14,
64:16, 77:12, 79:6,
86:17, 88:12, 88:14,
89:14, 89:15, 91:18,
91:25, 92:18, 92:22,
92:23, 94:13, 95:20,
100:19, 102:11,
103:24, 105:5,
107:10, 111:23,
117:5
**investigations** [3] -
41:10, 90:11, 91:23
**investigator** [4] -
89:12, 90:10, 108:5,
108:6
**involved** [1] - 100:25
**ISS** [2] - 116:21, 117:8
**issue** [4] - 9:8, 103:12,
104:12, 106:18
**issued** [4] - 5:9, 50:20,
52:18
**issues** [5] - 6:24,
13:24, 47:23, 49:2,
119:18
**it'd** [1] - 89:2
**itself** [2] - 110:13
**IX** [24] - 6:19, 6:21,
20:5, 32:23, 33:1,
42:5, 47:3, 47:8,
47:19, 47:24, 48:18,
50:17, 58:15, 63:18,
65:6, 66:24, 85:16,
86:17, 87:24, 88:2,
119:13, 119:16,
120:2

**J**

**J's** [2] - 109:12
**J.F** [1] - 3:6
**J.O** [4] - 3:8, 81:5,
81:8, 109:4
**January** [1] - 19:17
jfahey@

holtzmanvogel.
**com** [1] - 1:18
**job** [9] - 11:9, 34:22,
34:25, 98:18, 102:4,
110:19, 110:21,
110:22
**Johnny** [2] - 91:14
**jokes** [2] - 21:16,
22:20
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**JR** [1] - 1:11
**Judge** [5] - 10:22,
13:15, 53:1, 57:7,
114:8
**JUDGE** [1] - 1:12
**judge** [6] - 7:7, 23:5,
23:15, 24:5, 48:25,
120:4
**juror** [1] - 120:14
**jurors** [2] - 20:6, 73:10
**Jury** [5] - 13:1, 72:12,
73:4, 119:6, 122:6
**jury** [19] - 9:13, 12:3,
21:24, 23:5, 24:5,
28:22, 29:10, 29:24,
50:4, 50:6, 52:5,
61:2, 61:25, 80:4,
80:6, 90:25, 105:1,
115:11, 116:6
**JURY** [1] - 1:11
**jury's** [2] - 8:14, 72:20

**K**

**Keefe** [2] - 2:10, 84:13
**keep** [6] - 11:4, 84:7,
88:11, 106:19,
110:24, 120:11
**keeping** [2] - 12:10,
101:21
kelliker@huntonak.
**com** [1] - 3:3
**kept** [1] - 84:10
**Kevin** [1] - 3:1
**kids** [2] - 38:19, 39:2
**kind** [5] - 27:3, 32:4,
33:15, 39:4, 56:8
**kinds** [1] - 6:13
**Kinney** [3] - 3:4,
10:24, 74:18
**KINNEY** [3] - 3:5,
53:13, 55:18
**Kinney's** [1] - 10:10
**knowledge** [9] - 93:6,
93:8, 103:3, 103:19,
103:22, 103:23,
104:3, 104:4
**known** [1] - 39:4
**knows** [1] - 58:13,

64:20, 105:1
**KURTH** [4] - 2:14,
2:18, 2:21, 3:1

**L**

**label** [1] - 27:2
**Labor** [2] - 69:12,
69:13
**lack** [2] - 17:23, 93:4
**ladies** [3] - 13:2,
71:25, 106:20,
115:11, 118:15
**laid** [1] - 53:7
**language** [10] - 6:3,
21:24, 23:18, 23:19,
24:4, 26:23, 27:21,
28:24, 30:7, 62:11
**large** [2] - 37:14, 39:2
**last** [5] - 8:8, 30:21,
62:19, 71:15, 118:6
**latitude** [4] - 9:23,
10:4, 51:6, 119:25
**laugh** [1] - 79:24
**law** [9] - 7:1, 20:5,
21:6, 21:12, 21:19,
22:6, 22:9, 22:16,
50:17
**LAW** [1] - 3:5
**laws** [1] - 20:4
**lawyer** [2] - 119:2,
119:3
**lawyers** [1] - 115:12
**lay** [2] - 51:19, 115:13
**lead** [3] - 9:18, 9:22,
70:14
**learned** [1] - 23:15
**learning** [4] - 14:25,
15:5, 15:6, 89:6
**least** [5] - 9:2, 69:8,
87:18, 109:13,
119:14
**leave** [3] - 46:7,
108:13, 109:17
**leaves** [1] - 108:15
**leaving** [2] - 98:11,
109:18
**lectern** [1] - 11:4
**led** [1] - 50:15
**left** [6] - 80:17, 82:2,
82:20, 105:23,
107:24, 108:8
**leg** [1] - 32:7
**legal** [2] - 22:8, 47:25,
63:20
**legs** [1] - 32:5
**lesbian** [2] - 80:25,
81:3
**letter** [2] - 39:25,
57:14

**Letters** [2] - 6:22,
49:18
**letting** [1] - 118:16
**level** [3] - 16:5, 95:15,
96:3
**lewd** [1] - 29:2
**limine** [4] - 5:8, 49:11,
51:9, 114:9
**limit** [1] - 67:11
**limited** [1] - 77:7
**Limited** [1] - 6:10
**limiting** [3] - 5:10,
106:22
**limits** [2] - 49:20, 58:1
**line** [9] - 9:10, 20:11,
60:5, 78:11, 78:12,
82:20, 98:3, 111:1,
111:6
**Line** [7] - 53:25, 86:2,
86:4, 86:6, 86:7
**Lines** [2] - 45:16,
53:22
**lines** [5] - 51:15,
60:25, 105:22
**list** [5] - 5:11, 29:11,
29:13, 29:15
**listed** [2] - 39:7, 70:13
**listen** [1] - 13:20
**lists** [2] - 78:17, 78:18
**literally** [1] - 51:24
**litigation** [1] - 106:21
**live** [2] - 13:8, 80:9
**LLP** [8] - 1:20, 2:2,
2:6, 2:10, 2:14, 2:18,
2:21, 3:1
**location** [2] - 101:6,
101:7
**locker** [2] - 40:6,
43:19, 79:22
**lockers** [3] - 38:21,
40:8, 76:4
**look** [19] - 7:19, 13:13,
18:17, 19:23, 27:23,
29:20, 45:6, 45:8,
45:19, 45:20, 48:23,
52:2, 53:3, 53:22,
67:22, 71:20,
105:22, 112:10,
120:7
**looked** [4] - 32:6,
104:9, 106:1, 112:15
**looking** [4] - 23:20,
53:6, 71:2, 92:13
**looks** [3] - 68:11,
79:25, 91:19
**Los** [1] - 1:21
**lost** [2] - 11:10, 39:2
**loud** [2] - 17:2, 45:2
**low** [1] - 47:14
**lunch** [8] - 72:5, 72:6,

73:20, 113:14,
118:19, 119:5,
121:3, 121:6
**Lunch** [1] - 121:8
**lunches** [1] - 118:18

**M**

**M.C** [1] - 3:5
**M.P.F** [1] - 3:5
**machine** [2] - 122:5,
122:12
M███ [3] - 116:20,
117:3, 117:22
**main** [2] - 35:22, 61:24
**maintaining** [1] -
33:14
**manage** [1] - 72:20
**mandate** [1] - 50:20
**mandatory** [2] - 29:16,
30:11
**manner** [1] - 43:4
**March** [7] - 1:6, 5:14,
5:23, 6:7, 15:7,
122:9, 122:16
**materials** [1] - 87:18
**math** [7] - 38:23,
40:11, 40:12, 40:13,
40:18, 72:23, 77:13
**matter** [2] - 5:5, 113:9
**matters**.....................
............ [1] - 4:14
**mean** [7] - 8:23, 41:23,
60:1, 61:2, 75:9,
108:25, 119:22
**meaning** [4] - 21:22,
38:18, 88:22, 99:7
**means** [4] - 29:18,
65:6, 111:7, 117:6
**meant** [2] - 64:24,
77:18
**meet** [1] - 50:25
**meeting** [1] - 93:14
**melded** [1] - 86:21
**members** [1] - 80:8
**memorandum** [6] -
54:3, 54:9, 54:12,
55:9, 56:7, 56:12
**memory** [4] - 41:1,
41:3, 55:4, 68:9
**mention** [1] - 11:24
**mentioned** [1] -
101:20
**menus** [1] - 72:4
**messages** [1] - 109:16
**met** [2] - 14:16, 49:25
**Miami** [3] - 2:4, 2:8,
2:12
**Michael** [1] - 3:4
**MICHAEL** [1] - 3:5

**middle** [3] - 56:13, 58:22, 63:2
**Middle** [8] - 14:22, 15:9, 35:6, 59:10, 70:24, 74:3, 74:13, 88:5
**midyear** [2] - 68:12, 69:6
**might** [7] - 10:18, 12:7, 53:7, 71:23, 72:14, 72:18, 115:18
**mind** [1] - 97:12
**minute** [1] - 8:9
**minutes** [1] - 113:12
**misbehavior** [1] - 82:14
**MISCELLANY** [1] - 4:13
**misconduct** [6] - 96:22, 112:8, 112:12, 112:14, 112:22, 118:11
**miss** [2] - 37:7
**missing** [1] - 115:19
**misstates** [3] - 44:3, 103:6, 105:9
**misstating** [1] - 23:24
**mistake** [3] - 7:12, 7:20, 116:9
**mistakes** [1] - 120:8
**mk@kinneyesq.com** [1] - 3:7
**modifiers** [1] - 24:11
**modify** [1] - 84:20
**mom** [2] - 79:17, 108:2
**moment** [2] - 73:6, 83:21
**month** [3] - 15:1, 69:9, 110:18
**months** [1] - 113:23
**moreover** [1] - 6:23
**morning** [13] - 5:1, 10:14, 11:8, 13:2, 13:12, 13:13, 14:4, 14:5, 49:5, 72:1, 76:1, 76:5, 79:22
**most** [2] - 6:14, 15:18
**motion** [5] - 5:8, 49:3, 49:4, 51:9, 114:9
**motions** [1] - 49:11
**move** [12] - 19:8, 23:10, 25:8, 31:23, 56:21, 56:23, 68:22, 91:12, 91:20, 97:22, 108:22, 114:5
**MR** [245] - 8:9, 8:13, 8:19, 9:19, 10:1, 10:8, 10:13, 10:20, 10:22, 11:11, 11:14,

11:21, 12:5, 12:9, 12:14, 12:18, 12:19, 13:15, 14:3, 14:11, 14:14, 19:7, 19:11, 19:12, 19:14, 20:18, 20:20, 22:8, 22:18, 23:24, 24:2, 24:3, 25:8, 25:11, 25:16, 25:18, 25:25, 26:4, 27:10, 28:10, 29:24, 30:2, 30:14, 30:16, 30:19, 30:20, 31:8, 31:22, 31:25, 32:3, 32:13, 32:16, 33:5, 33:7, 33:24, 34:1, 34:15, 34:17, 36:1, 39:22, 44:3, 44:5, 44:20, 44:22, 44:24, 45:11, 45:12, 45:14, 46:1, 46:7, 46:10, 46:11, 47:25, 48:2, 48:12, 48:16, 48:20, 48:25, 49:2, 49:6, 49:13, 49:17, 50:6, 50:10, 51:19, 51:22, 52:3, 52:8, 52:10, 53:1, 53:5, 53:9, 53:13, 53:14, 53:17, 54:22, 54:25, 55:11, 55:18, 56:1, 56:3, 56:5, 56:16, 56:21, 57:2, 57:5, 57:7, 57:10, 57:13, 58:12, 60:3, 60:9, 61:16, 61:20, 62:15, 63:20, 63:22, 64:25, 65:2, 65:9, 67:4, 67:25, 68:21, 68:23, 69:1, 69:2, 70:17, 70:20, 70:22, 71:5, 71:6, 72:16, 72:19, 72:22, 73:14, 73:16, 73:19, 73:22, 73:24, 74:5, 74:7, 74:10, 74:12, 74:25, 75:5, 75:13, 76:14, 76:18, 76:20, 79:2, 80:1, 80:12, 80:16, 82:9, 83:10, 83:14, 83:21, 83:23, 83:24, 84:13, 84:16, 84:21, 85:12, 85:13, 85:19, 86:19, 92:4, 93:4, 93:12, 93:23, 94:2, 94:4, 94:6, 94:22, 94:24, 95:4, 95:6, 96:5, 96:17, 96:20, 96:24, 96:25, 97:22, 97:24, 98:2, 98:12, 98:16, 99:6, 102:1, 103:6, 103:8, 103:15, 103:25,

104:20, 104:22, 104:24, 104:25, 105:9, 105:20, 105:21, 106:8, 106:12, 106:16, 106:17, 107:2, 107:4, 107:7, 107:8, 108:18, 108:24, 109:6, 109:9, 109:20, 109:22, 110:14, 110:17, 111:3, 111:18, 112:18, 113:12, 113:15, 114:5, 114:8, 114:16, 114:21, 115:1, 115:5, 115:8, 115:21, 115:25, 116:1, 116:10, 116:14, 116:15, 117:17, 117:24, 118:1, 118:6, 118:7, 118:13, 120:12, 120:19, 120:21, 120:23, 121:2
**MS** [7] - 11:1, 11:23, 12:1, 12:22, 119:11, 119:21, 120:11
**multiple** [1] - 84:1
**music** [1] - 57:1
**must** [4] - 43:9, 59:16, 59:20, 106:25

**N**

**naked** [2] - 81:15, 97:7
**name** [16] - 14:6, 14:15, 15:4, 21:21, 24:13, 24:14, 27:2, 39:16, 43:19, 44:1, 66:23, 66:25, 78:9, 80:2, 108:20, 122:16
**name-calling** [7] - 21:21, 24:13, 24:14, 43:19, 44:1, 66:23, 66:25
**named** [1] - 82:4
**names** [2] - 80:10, 80:25, 82:10
**Nancy** [2] - 5:3, 5:6
**narrative** [1] - 115:22
**national** [3] - 19:5, 21:10, 22:22
**natural** [1] - 118:17
**nature** [4] - 34:4, 49:16, 53:3, 53:6
**need** [21] - 20:13, 23:16, 25:13, 27:6, 46:10, 49:13, 49:14, 49:25, 52:5, 54:22,

73:6, 73:9, 73:11, 77:4, 77:11, 77:25, 114:22, 115:15, 118:20, 118:22, 121:1
**needed** [3] - 43:2, 66:17, 87:23
**needs** [6] - 22:6, 22:24, 23:1, 23:2, 83:8, 110:7
**Neil** [1] - 104:16
**never** [7] - 81:19, 89:5, 89:6, 90:9, 92:15, 96:7
**new** [1] - 56:3
**New** [1] - 6:11
**next** [17] - 13:14, 15:7, 19:22, 22:17, 24:25, 29:25, 33:5, 33:6, 33:25, 59:14, 70:18, 70:20, 81:25, 95:15, 96:3, 111:6
**night** [2] - 8:8, 11:14
**none** [1] - 89:24
**noon** [2] - 72:11, 73:1
**normal** [1] - 60:21
**normally** [4] - 77:2, 77:22
**note** [5] - 7:11, 7:12, 22:3, 52:8, 57:7
**notebook** [1] - 30:18
**noted** [1] - 103:13
**notes** [3] - 100:8, 100:16, 122:12
**nothing** [1] - 22:4
**notice** [2] - 50:25, 62:1
**notified** [14] - 43:12, 44:8, 46:2, 46:13, 46:24, 79:8, 79:12, 79:14, 90:21, 94:17, 94:18, 116:20, 116:23, 117:19
**notify** [1] - 92:8
**notifying** [1] - 91:20
**November** [5] - 43:21, 46:14, 76:12, 92:25, 93:15
**nowhere** [1] - 102:2
**nuances** [1] - 55:21
**Number** [6] - 4:8, 4:9, 4:9, 4:10, 4:10, 4:11, 4:11, 4:12
**number** [3] - 37:15, 45:13, 45:14
**numbers** [2] - 18:18
**Numeral** [1] - 32:14
**numerical** [1] - 85:1
**NW** [5] - 1:16, 2:15, 2:18, 2:22, 3:2

**O**

**o'clock** [4] - 72:2, 72:3, 72:11, 72:15
**oath** [2] - 55:2, 55:25
**object** [7] - 23:24, 25:25, 26:2, 61:20, 109:6, 110:14, 114:8
**objection** [41] - 5:2, 9:11, 11:19, 12:12, 12:15, 13:22, 19:9, 19:11, 19:13, 22:8, 25:10, 25:11, 31:24, 44:3, 47:25, 48:12, 49:16, 53:13, 57:7, 60:3, 60:6, 63:20, 64:25, 68:23, 68:24, 74:7, 74:8, 76:16, 93:4, 93:23, 95:4, 97:24, 97:25, 98:12, 103:6, 103:15, 105:9, 106:11, 106:13, 114:7, 117:24
**objective** [1] - 11:9
**obligated** [1] - 66:4
**obligation** [7] - 42:21, 58:23, 59:8, 59:11, 59:12, 60:1, 66:13
**obligations** [1] - 66:8
**obscene** [3] - 28:24, 29:1, 30:7
**observed** [1] - 91:10
**obviously** [2] - 9:14, 80:4
**occasion** [2] - 40:16, 40:21
**occurred** [6] - 58:25, 59:16, 60:22, 100:9, 100:19, 102:11
**occurrence** [1] - 29:21
**occurrences** [1] - 87:16
**occurs** [2] - 26:25, 59:25
**OCR** [20] - 6:2, 6:22, 47:21, 47:23, 48:9, 48:17, 49:17, 50:13, 51:24, 52:14, 52:18, 52:20, 53:11, 54:3, 54:12, 55:10, 56:7, 56:12, 56:18, 61:21
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 122:1
**off-campus** [2] - 63:8, 63:10
**offense** [1] - 84:2
**offenses** [1] - 84:2
**offensive** [6] - 21:9,

28:24, 30:7, 81:6, 81:8, 81:19

**offered** [1] - 67:13

**office** [21] - 36:3, 77:24, 78:3, 85:16, 86:17, 87:3, 87:6, 87:15, 87:21, 87:22, 87:23, 88:5, 89:11, 90:1, 98:5, 101:1, 101:4, 101:8, 101:9, 101:12

**Office** [21] - 5:20, 23:3, 47:7, 47:18, 47:22, 48:7, 48:9, 57:15, 86:18, 86:21, 86:25, 87:9, 87:12, 88:1, 88:13, 88:17, 89:7, 90:21, 91:8, 95:3, 95:16

**OFFICE** [1] - 3:5

**officer** [2] - 117:13, 117:20

**Officer** [2] - 71:17, 117:18

**Official** [2] - 122:3, 122:22

**official** [2] - 122:5, 122:11

**officials** [1] - 83:3

**often** [2] - 63:7, 84:2

**oftentimes** [1] - 115:12

**once** [1] - 88:10

**one** [55] - 10:8, 12:9, 15:3, 19:22, 21:22, 24:11, 25:24, 29:11, 29:12, 30:25, 33:6, 37:7, 37:20, 37:21, 39:23, 48:14, 52:20, 55:4, 63:1, 73:9, 78:1, 79:4, 82:12, 83:21, 85:3, 88:21, 90:24, 91:15, 92:19, 92:21, 95:8, 96:10, 99:7, 99:13, 103:1, 103:5, 103:10, 105:1, 105:7, 106:18, 106:23, 107:23, 108:9, 112:14, 114:22, 115:9, 116:20, 116:23, 117:10, 117:14, 119:11, 119:12

**ones** [1] - 41:9

**open** [1] - 7:2

**Open** [2] - 12:25, 52:4

**opened** [1] - 120:8

**opening** [2] - 7:13, 74:16

**operation** [2] - 6:12, 6:19

**opinion** [3] - 6:4, 6:6, 49:24

**opinions** [1] - 7:4

**opportunities** [1] - 67:12

**opportunity** [5] - 7:19, 21:5, 31:9, 77:3, 95:15

**opposed** [3] - 51:3, 88:6, 94:19

**oral** [3] - 81:12, 97:4, 99:8

**order** [10] - 5:4, 5:5, 5:7, 5:10, 5:14, 6:7, 6:16, 7:14, 10:10, 114:9

**org** [1] - 42:13

**organizational** [1] - 36:9

**orient** [1] - 76:21

**origin** [3] - 19:5, 21:11, 22:22

**original** [1] - 32:6

**otherwise** [2] - 7:14, 9:3

**out-of-school** [2] - 116:23, 117:16

**outline** [1] - 83:18

**outside** [5] - 58:25, 60:16, 89:2, 89:12, 90:10

**overlap** [1] - 16:5

**overlooked** [1] - 35:21

**overruled** [4] - 26:3, 57:9, 95:5, 98:13

**oversaw** [2] - 35:7, 87:24

**own** [4] - 9:22, 89:12, 93:13, 103:23

**P**

**P.A.H** [1] - 3:5

**p.m** [1] - 73:3

**p.m.)** [1] - 121:8

**Page** [14] - 6:4, 6:10, 27:25, 28:11, 29:13, 45:16, 53:22, 57:17, 58:7, 69:15, 86:1, 86:5, 86:6, 86:7

**page** [20] - 20:14, 29:11, 29:12, 29:25, 45:7, 45:12, 45:14, 58:22, 63:2, 69:1, 70:18, 70:20, 72:22, 81:25, 82:1, 82:24, 86:5, 115:9

**pages** [2] - 85:23,

122:10

**pains** [1] - 120:4

**pants** [1] - 81:18

**paper** [1] - 115:2

**paragraph** [1] - 108:21

**parameters** [2] - 49:12, 67:1

**pardon** [4] - 70:6, 92:20, 102:18, 112:9

**parent** [9] - 94:17, 94:18, 94:19, 95:2, 95:14, 95:21, 98:25, 100:5, 116:20

**parents** [7] - 33:21, 71:7, 71:11, 91:21, 92:8, 103:24, 104:1

**Park** [1] - 1:20

**part** [15] - 8:24, 9:2, 9:5, 9:14, 15:18, 42:15, 62:6, 70:13, 72:15, 87:6, 91:24, 107:9, 108:9, 111:9, 115:21

**participate** [2] - 58:1, 67:11

**particular** [12] - 6:3, 7:11, 10:5, 22:11, 42:20, 50:24, 51:18, 56:13, 62:12, 103:19, 111:15, 114:18

**particularity** [2] - 50:21, 51:14

**particularly** [2] - 5:17, 7:21

**parties** [2] - 5:15, 5:21

**parts** [2] - 8:6, 29:3

**party** [4] - 89:2, 106:18, 109:11, 109:12

**past** [3] - 55:23, 84:25, 91:19

**patently** [2] - 28:24, 30:7

**pause** [6] - 45:21, 58:10, 67:24, 70:21, 73:7, 83:22

**paying** [1] - 30:24

**PC** [1] - 3:9

**PE** [1] - 15:25

**peer** [1] - 65:12

**Pennsylvania** [4] - 2:15, 2:18, 2:22, 3:2

**People** [1] - 109:25

**people** [12] - 8:2, 11:9, 20:24, 36:2, 80:6, 81:3, 82:4, 110:2, 111:10, 119:15, 119:22

**per** [4] - 16:8, 38:5,

38:7, 53:24

**percent** [2] - 72:24, 120:25

**performance** [1] - 21:4

**period** [5] - 19:23, 37:1, 63:17, 79:23, 116:19

**periodically** [2] - 16:15, 19:19

**permission** [1] - 8:20

**permitted** [3] - 5:18, 6:22, 7:14

**permitting** [1] - 6:11

**perpetrator** [1] - 62:22

**perpetrator's** [1] - 61:9

**persistent** [1] - 67:10

**person** [11] - 14:25, 15:5, 15:6, 35:22, 37:20, 37:21, 47:4, 89:6, 102:12, 102:21, 106:24

**personal** [2] - 11:18, 79:14

**personally** [1] - 102:20

**persons** [2] - 20:15, 30:25

**pervasive** [1] - 67:10

**phone** [2] - 109:12, 109:17

**physical** [1] - 34:3

**picture** [2] - 74:3, 100:9

**pictures** [2] - 81:15, 97:7

**pieces** [1] - 115:2

**PITTLEMAN** [1] - 3:9

**place** [3] - 62:7, 91:1, 118:13

**placed** [1] - 38:20

**Plaintiff** [5] - 1:4, 1:15, 2:2, 4:2, 4:6

**plaintiff** [3] - 5:14, 7:21, 14:18

**Plaintiff's** [12] - 13:19, 19:10, 25:12, 31:23, 32:2, 57:12, 68:25, 74:9, 76:15, 76:17, 98:1, 115:20

**plaintiff's** [4] - 5:6, 5:11, 6:16, 25:9

**planned** [1] - 9:6

**play** [1] - 27:1

**PLC** [1] - 3:5

**PLLC** [1] - 1:16

**pod** [4] - 38:21, 40:6, 43:19

**podium** [1] - 12:12

**point** [12] - 10:16, 12:9, 16:9, 17:24, 19:7, 31:22, 71:15, 72:3, 80:5, 91:6, 110:3, 114:20

**pointed** [1] - 91:6

**pointing** [1] - 32:19

**points** [2] - 70:12, 118:17

**police** [1] - 117:20

**policies** [26] - 8:25, 9:1, 17:11, 17:14, 17:18, 18:1, 18:7, 34:25, 50:19, 59:10, 59:23, 63:24, 64:3, 64:7, 65:12, 65:19, 65:22, 65:25, 66:8, 66:13, 66:17, 67:16, 67:18, 90:5, 104:10

**policy** [48] - 19:1, 20:12, 20:24, 21:25, 22:5, 22:24, 23:4, 23:18, 23:20, 23:23, 24:6, 24:16, 24:17, 24:19, 25:21, 26:13, 26:14, 26:16, 30:18, 31:17, 32:9, 34:18, 43:6, 43:22, 46:22, 46:24, 50:10, 58:5, 58:20, 59:4, 60:12, 60:17, 60:20, 61:12, 61:18, 61:19, 61:21, 62:4, 62:17, 62:24, 63:14, 64:11, 71:8, 90:20, 90:25, 91:2, 91:5, 97:10

**portion** [3] - 114:10, 115:16, 115:17

**positive** [1] - 118:18

**possible** [2] - 12:17, 13:12

**possibly** [1] - 40:14

**posts** [1] - 81:8

**PowerPoint** [2] - 68:5, 69:3

**powerpoint** [1] - 17:24

**powers** [1] - 50:16

**practice** [3] - 13:23, 118:24, 119:22

**practices** [1] - 6:6

**precluded** [1] - 7:10

**precluding** [1] - 49:24

**predicates** [1] - 9:24

**predominantly** [1] - 16:5

**prefer** [2] - 51:2, 118:4

**Preliminary** [1] - 4:14

**preparing** [1] - 10:22

**present** [2] - 13:1, 55:21, 73:4, 81:23

**presentation** [2] - 17:24, 68:6
**press** [1] - 80:8
**presumably** [1] - 117:21
**presume** [1] - 117:21
**presumption** [1] - 93:24
**pretty** [3] - 75:23, 80:5, 110:10
**prevent** [2] - 58:17, 66:17
**previewing** [1] - 30:17
**previous** [1] - 40:15
**previously** [3] - 6:7, 83:11, 86:15
**primarily** [2] - 15:19, 15:23
**principal** [45] - 8:22, 14:21, 15:9, 15:12, 17:9, 29:17, 34:22, 35:6, 35:9, 35:15, 35:19, 37:10, 37:18, 41:16, 48:6, 48:11, 50:24, 53:12, 54:4, 55:10, 56:7, 56:12, 56:13, 59:9, 60:11, 68:14, 68:17, 75:20, 92:17, 92:22, 94:12, 95:17, 95:19, 96:12, 98:5, 99:17, 100:7, 100:13, 105:2, 105:17, 111:24, 118:8, 118:9
**principals** [22] - 36:18, 36:22, 36:25, 37:12, 41:9, 41:17, 42:7, 42:14, 42:21, 43:13, 43:24, 44:9, 68:10, 68:16, 69:4, 77:1, 77:2, 77:19, 82:13, 87:16, 87:20, 87:22
**printout** [1] - 113:19
**problem** [1] - 11:17
**procedure** [1] - 62:4
**procedures** [7] - 17:18, 59:17, 60:2, 60:22, 62:6, 83:19, 85:2
**proceed** [2] - 73:22, 89:19
**proceedings** [10] - 45:21, 58:10, 67:24, 70:21, 73:3, 73:7, 83:22, 122:6, 122:11, 122:14
**PROCEEDINGS** [1] - 1:11
**process** [4] - 30:24, 59:16, 60:2, 100:21

**processing** [1] - 28:25
**profane** [3] - 28:4, 28:24, 30:7
**profanity** [2] - 28:25, 30:8
**Professor** [10] - 5:3, 5:6, 5:9, 5:10, 5:12, 5:18, 5:25, 6:7, 6:18, 7:4
**professor** [1] - 6:3
**proffer** [2] - 5:6, 7:23
**program** [2] - 58:2, 59:1
**prohibited** [1] - 34:5
**prohibition** [1] - 32:9
**promise** [1] - 22:2
**promptly** [1] - 43:9
**promulgated** [3] - 20:1, 22:5, 31:17
**pronounced** [1] - 13:15
**proper** [1] - 108:20
**properly** [1] - 114:15
**property** [1] - 113:5
**propose** [1] - 52:1
**proposed** [3] - 5:11, 6:17, 7:22
**proposition** [1] - 6:9
**protect** [1] - 62:20
**protocol** [1] - 62:4
**proven** [1] - 105:13
**provide** [2] - 99:21, 106:22
**provided** [3] - 72:4, 105:16, 110:6
**provides** [1] - 45:8
**providing** [1] - 87:18
**provision** [3] - 22:11, 61:4, 62:12
**pseudonyms** [1] - 80:2
**public** [2] - 69:19, 69:23
**Public** [1] - 47:4
**publicize** [1] - 71:7
**publish** [10] - 19:12, 25:16, 31:25, 57:10, 74:10, 76:18, 94:4, 97:25, 106:15, 114:20
**published** [1] - 83:12
**publishing** [1] - 115:8
**pull** [6] - 84:13, 94:3, 106:8, 106:9, 106:10, 106:14
**pulling** [2] - 84:17, 106:12
**purpose** [4] - 21:3, 27:13, 49:1, 99:20
**purposes** [3] - 9:16,

10:7, 11:5
**pursuant** [4] - 24:6, 66:12, 66:16, 83:25
**put** [11] - 8:8, 20:1, 31:18, 46:15, 62:6, 69:1, 74:5, 75:3, 100:8, 104:19, 104:20
**putting** [1] - 7:22

**Q**

**qualified** [3] - 40:25, 41:2, 98:14
**qualify** [1] - 40:14
**QUESTION** [1] - 55:9
**questioned** [1] - 110:8
**questioning** [3] - 7:15, 62:8
**questions** [12] - 5:12, 6:21, 6:25, 7:22, 13:21, 27:5, 27:6, 50:2, 51:9, 53:4, 53:7, 86:17
**quick** [1] - 119:11
**quite** [1] - 12:20
**quote** [3] - 6:12, 33:14, 71:8

**R**

**race** [3] - 19:5, 21:10, 22:21
**Rachel** [19] - 14:21, 15:6, 15:9, 15:14, 17:10, 35:2, 35:6, 42:1, 42:3, 59:9, 67:15, 67:18, 68:7, 70:24, 71:7, 74:3, 74:13, 88:4, 95:19
**raise** [3] - 12:5, 17:6, 83:1
**raising** [1] - 60:4
**ranging** [1] - 113:2
**rather** [3] - 8:19, 102:21, 110:16
**rbates@hunton.com** [1] - 2:16
**RCMS** [1] - 34:19
**reach** [6] - 93:1, 93:6, 93:7, 95:2, 95:14, 119:17
**reached** [2] - 92:15, 93:9
**read** [43] - 5:4, 7:5, 11:7, 12:16, 21:2, 21:8, 21:14, 22:19, 28:22, 28:23, 31:11, 31:15, 45:1, 45:2, 45:7, 45:15, 45:20,

53:23, 54:10, 57:21, 57:23, 58:8, 58:13, 58:23, 59:14, 61:2, 61:5, 62:20, 63:4, 63:5, 63:6, 63:7, 80:13, 80:14, 86:6, 105:2, 109:10, 109:11, 116:6, 116:11, 116:13
**reading** [3] - 29:11, 29:14, 55:22
**reads** [2] - 11:7, 81:24
**ready** [5] - 33:10, 33:11, 68:1, 114:21, 119:9
**really** [7] - 31:2, 39:5, 46:15, 51:1, 81:22, 85:3
**realtime** [1] - 122:12
**reason** [8] - 9:3, 52:22, 62:19, 78:20, 78:23, 79:20, 80:21, 101:22
**reasonably** [2] - 58:14, 64:21
**reasons** [1] - 78:18
**received** [3] - 34:9, 43:16, 117:22
**Recess** [2] - 73:2, 121:8
**recognize** [2] - 68:3, 76:9
**recognized** [1] - 115:17
**recollection** [14] - 39:25, 44:19, 45:2, 45:9, 45:23, 53:15, 54:2, 55:22, 55:23, 79:14, 79:16, 79:17, 85:20, 86:12
**recommendations** [1] - 41:14
**record** [13] - 8:17, 8:18, 12:10, 12:16, 25:15, 45:13, 52:9, 79:11, 79:13, 113:19, 113:21, 115:2, 116:2
**recorded** [1] - 55:23
**recording** [2] - 31:3, 122:13
**records** [3] - 84:11, 98:15, 118:10
**recurrence** [1] - 58:17
**red** [1] - 83:1
**redact** [1] - 115:14
**redacted** [1] - 114:23
**redactions** [2] - 12:23, 114:20
**redundant** [1] - 11:2

**refer** [5] - 6:25, 42:21, 89:23, 89:24, 114:14
**reference** [5] - 45:7, 80:5, 82:8, 82:10, 108:19
**referred** [5] - 28:25, 30:8, 47:21, 89:6, 108:20
**referring** [5] - 25:4, 26:22, 33:1, 68:13, 109:5
**refresh** [8] - 44:19, 45:2, 45:22, 53:14, 54:2, 55:22, 85:20, 86:11
**regard** [6] - 5:21, 50:21, 51:7, 73:10, 113:10, 119:5
**regarding** [11] - 5:16, 5:18, 6:5, 6:8, 6:12, 6:21, 22:11, 32:9, 45:9, 49:11, 93:21
**regardless** [3] - 38:16, 59:15, 92:7
**regards** [1] - 119:12
**regulation** [13] - 5:19, 6:1, 18:14, 18:24, 19:2, 19:3, 23:7, 23:9, 25:23, 26:6, 32:6, 34:19, 91:5
**regulations** [4] - 17:11, 17:18, 35:1
**related** [1] - 22:21
**relationships** [1] - 89:1
**relatively** [1] - 38:13
**relevance** [2] - 6:24, 51:25
**relevant** [4] - 49:18, 62:8, 63:17, 115:15
**relied** [1] - 88:1
**religion** [3] - 19:5, 21:10, 22:21
**religious** [1] - 73:10
**rely** [1] - 71:13
**remained** [1] - 15:12
**remains** [1] - 6:18
**remember** [15] - 38:8, 39:15, 39:18, 46:16, 46:20, 46:21, 52:16, 52:20, 54:15, 54:20, 72:9, 107:23, 112:2, 112:3, 118:25
**reminded** [1] - 37:23
**removed** [1] - 6:25
**reoccurring** [1] - 66:19
**repeat** [2] - 47:9, 93:16
**rephrase** [6] - 24:1,

44:4, 65:1, 99:5,
103:7, 109:8
**report** [21] - 23:2,
35:20, 36:15, 36:19,
36:21, 41:13, 41:18,
42:8, 42:16, 43:16,
46:13, 63:19, 63:25,
64:12, 64:14, 64:16,
88:5, 88:12, 91:8,
96:3, 110:21
**reported** [7] - 36:2,
43:11, 71:16, 80:11,
87:23, 90:19, 122:5
**Reporter** [3] - 3:11,
122:3, 122:22
**reporter** [4] - 16:22,
26:1, 31:1, 48:19
**REPORTER** [1] -
122:1
**Reporter....................
...** [1] - 4:14
**reporting** [2] - 80:10,
104:14
**reports** [3] - 41:10,
44:7, 64:4
**represent** [1] - 14:18
**representation** [1] -
114:25
**representing** [1] -
11:6
**request** [2] - 8:10,
80:1
**requests** [1] - 34:2
**required** [7] - 34:20,
47:24, 63:18, 63:24,
64:3, 64:7, 64:11
**requirement** [1] -
60:21
**requirements** [1] -
42:4
**requires** [2] - 50:21,
58:15
**Resource** [2] - 71:16,
117:18
**respect** [1] - 106:18
**respond** [3] - 58:24,
66:4, 86:14
**response** [2] - 5:12,
116:13
**responsibile** [1] -
35:10
**responsibilities** [3] -
22:15, 26:21, 37:14
**Responsibilities** [7] -
23:10, 23:13, 24:18,
24:20, 24:24, 25:3,
27:20
**responsibility** [10] -
22:11, 22:12, 41:16,
48:5, 50:25, 51:13,

66:25, 80:10, 96:3,
106:25
**responsible** [5] - 41:9,
64:19, 65:22, 66:9,
87:15
**restate** [1] - 95:8
**Reston** [2] - 3:7, 3:10
**result** [3] - 29:15,
30:9, 104:15
**results** [1] - 41:14
**resumed** [1] - 73:3
**retaliation** [1] - 62:22
**returning** [1] - 61:7
**review** [2] - 31:9,
118:9
**revised** [1] - 6:16
**Rewari** [1] - 2:17
**REWARI** [1] - 11:1
**Rights** [15] - 5:20,
23:9, 23:13, 24:18,
24:20, 24:24, 25:2,
27:20, 32:23, 47:8,
47:19, 47:22, 48:7,
48:10, 57:15
**rights** [4] - 22:15,
26:21, 69:16, 70:12
**rise** [1] - 25:13
**risk** [3] - 8:4, 61:22,
119:2
**rkeefe@bsfllp.com**
[1] - 2:13
**road** [3] - 50:15,
51:23, 52:2
**Robert** [2] - 2:10, 3:6
**Roman** [1] - 32:13
**room** [3] - 77:25,
117:12, 118:24
**ROSSIE** [1] - 1:11
**routine** [1] - 85:23
**row** [1] - 12:10
**RPR** [2] - 3:11, 122:21
**rule** [3] - 6:1, 28:19
**Rule** [2] - 9:19, 10:1
**ruled** [2] - 49:19,
114:9
**rules** [3] - 18:1, 44:25,
83:19
**ruling** [2] - 5:2, 6:17
**rulings** [1] - 114:14
**rumors** [2] - 98:17,
102:3
**run** [3] - 8:4, 24:7,
119:2
**running** [3] - 9:7,
11:22, 61:22
**Ryan** [1] - 2:14

## S

**S.T** [1] - 3:5

**safe** [2] - 69:25, 70:8
**safety** [3] - 35:10,
74:19, 117:12
**said/she** [2] - 27:4,
91:18
**Sally** [1] - 91:14
**saw** [1] - 119:12
**scared** [7] - 78:14,
78:18, 79:21, 80:21,
83:1, 83:4, 83:6
**scattered** [1] - 109:21
**scheduling** [1] -
120:12
**SCHILLER** [4] - 1:20,
2:2, 2:6, 2:10
**school** [108] - 14:23,
16:8, 18:1, 20:2,
22:15, 24:7, 33:13,
33:19, 34:22, 35:17,
35:20, 36:7, 37:13,
37:14, 37:25, 39:2,
41:7, 41:16, 47:24,
56:13, 58:13, 58:16,
58:25, 59:4, 59:15,
59:16, 60:1, 60:20,
60:23, 61:7, 61:9,
62:20, 63:18, 63:24,
64:19, 65:11, 65:12,
65:16, 65:22, 66:4,
66:9, 67:13, 69:5,
69:7, 69:9, 69:11,
69:25, 70:14, 71:8,
75:12, 76:22, 78:13,
78:15, 78:18, 79:21,
80:22, 82:21, 82:25,
83:1, 83:3, 83:4,
83:6, 83:8, 84:7,
84:11, 87:16, 88:1,
89:1, 89:12, 89:18,
90:20, 92:7, 92:11,
92:12, 92:15, 92:25,
93:13, 93:20, 93:22,
94:11, 94:21, 94:25,
95:1, 95:14, 96:2,
97:14, 102:7, 103:4,
103:12, 104:12,
104:15, 108:2,
109:25, 110:5,
112:22, 116:23,
116:25, 117:10,
117:11, 117:12,
117:15, 117:16,
118:8, 119:17
**School** [73] - 8:25,
10:23, 14:22, 15:10,
17:12, 17:14, 18:5,
18:7, 18:9, 18:14,
19:1, 19:15, 20:2,
22:5, 23:6, 23:8,
23:9, 23:22, 24:6,

24:16, 24:19, 25:20,
26:12, 31:18, 32:9,
32:20, 33:12, 33:18,
34:7, 35:6, 41:23,
43:6, 47:4, 51:20,
52:14, 52:19, 53:10,
53:11, 54:5, 54:8,
54:11, 58:5, 58:20,
59:10, 59:23, 60:11,
60:16, 61:19, 62:16,
63:14, 63:23, 64:3,
64:7, 64:10, 65:18,
65:21, 66:8, 66:12,
66:16, 70:24, 71:16,
74:3, 74:13, 84:10,
87:3, 87:7, 87:9,
88:5, 90:20, 102:7,
117:18
**school's** [7] - 35:7,
58:2, 58:25, 66:7,
89:15, 97:9, 104:10
**schools** [6] - 5:19,
15:15, 42:4, 58:23,
59:8, 63:9
**science** [2] - 38:22,
116:19
**scope** [3] - 5:10, 5:16,
8:1
**scores** [1] - 40:15
**Scott** [1] - 2:21
**screen** [6] - 28:13,
33:9, 84:17, 97:1,
107:13, 107:14
**scroll** [2] - 108:17,
108:18
**SE** [3] - 2:3, 2:7, 2:11
**seat** [2] - 13:20, 119:7
**seated** [4] - 13:18,
25:14, 72:13, 73:5
**second** [9] - 15:3,
15:4, 15:23, 30:21,
55:17, 82:1, 102:12,
106:15
**secondary** [1] - 41:3
**section** [2] - 90:24,
116:12
**seductive** [1] - 79:25
**see** [31] - 7:20, 18:20,
19:17, 32:17, 38:11,
53:7, 54:18, 54:22,
59:18, 61:4, 72:11,
72:25, 77:15, 77:17,
80:19, 81:1, 81:13,
81:16, 81:20, 81:25,
85:20, 91:1, 100:12,
105:24, 107:13,
107:14, 107:17,
111:22, 112:7,
120:24, 121:6
**seeing** [1] - 115:16

**sees** [1] - 82:7
**semantic** [1] - 61:23
**semantics** [1] - 62:9
**semester** [4] - 15:1,
15:2, 15:3, 15:4
**send** [6] - 52:14,
52:19, 53:10, 60:14,
88:17, 109:16
**sending** [2] - 60:15,
109:4
**sense** [1] - 80:7
**sent** [5] - 52:22, 52:23,
54:8, 81:15, 97:7
**sentence** [12] - 32:15,
33:5, 33:8, 33:25,
57:20, 58:8, 59:3,
59:14, 62:19, 63:3,
107:21, 108:20
**separate** [4] - 9:1,
36:22, 37:10, 37:11
**separated** [2] - 78:1,
117:11
**September** [1] - 69:12
**serious** [4] - 57:25,
65:13, 65:20, 84:1
**seriously** [1] - 83:8
**services** [5] - 36:11,
42:15, 67:12, 68:15,
74:21
**SESSION** [1] - 1:8
**Session** [1] - 121:9
**set** [4] - 17:12, 17:14,
26:14, 26:16
**sets** [1] - 55:24
**setting** [4] - 8:25,
9:23, 39:4, 63:9
**seventh** [2] - 116:19,
116:25
**several** [5] - 13:7,
18:2, 18:3, 26:25
**severe** [1] - 67:10
**sex** [10] - 19:5, 21:10,
22:21, 65:13, 65:19,
66:1, 81:12, 97:5,
99:8, 104:14
**sexual** [56] - 17:10,
22:13, 25:20, 26:12,
27:2, 31:20, 32:10,
33:15, 34:2, 34:3,
34:4, 41:10, 41:18,
42:9, 42:20, 42:24,
43:3, 43:8, 43:11,
43:16, 44:1, 44:7,
46:3, 46:13, 46:19,
46:23, 47:5, 58:24,
61:10, 62:21, 63:8,
63:19, 63:25, 64:4,
64:8, 64:10, 64:12,
64:14, 64:16, 77:7,
80:18, 85:16, 90:19,

93:2, 94:8, 97:9, 103:14, 105:24, 112:7, 112:8, 112:11, 112:14, 114:1, 118:11, 119:18
**sexually** [4] - 57:23, 61:6, 61:11, 92:9
**shall** [3] - 29:15, 30:9, 47:4
**shared** [1] - 13:10
**sheet** [4] - 56:22, 56:25, 57:2, 114:22
**sheets** [2] - 100:10, 114:22
**shirt** [1] - 81:18
**shoot** [1] - 73:19
**shorthand** - 122:5, 122:12
**shortly** [1] - 92:12
**show** [4] - 19:22, 24:22, 57:1, 57:4
**showed** [2] - 51:3, 90:24
**shown** [3] - 29:24, 50:10, 51:24
**sic** [3] - 15:21, 29:1, 93:1
**side** [3] - 33:9, 48:25, 82:20
**Side** [1] - 49:15
**sidebar** [3] - 8:14, 57:8, 60:5
**Sidebar** [1] - 8:16
**sign** [1] - 73:20
**signed** [2] - 105:3, 105:7
**significance** [1] - 38:18
**similar** [3] - 84:23, 95:10, 112:11
**simple** [2] - 61:3, 100:10
**simpler** [1] - 95:22
**simply** [2] - 50:2, 101:14
**sit** [1] - 112:21
**site** [2] - 35:22, 35:23
**sitting** [1] - 84:19
**situation** [8] - 11:13, 29:20, 59:13, 88:4, 91:10, 91:13, 100:24, 102:14
**six** [1] - 113:23
**slide** [3] - 17:24, 68:6
**slides** [1] - 18:3
**slightly** [1] - 23:17
**slip** [2] - 8:2, 57:2
**slow** [1] - 13:23
**slowed** [1] - 16:22

**slut** [4] - 109:15, 109:24, 110:1, 110:2
**small** [1] - 8:10
**smaller** [1] - 39:3
**sneeze** [1] - 71:4
**so..** [1] - 11:10
**social** [1] - 38:24
**SOL** [1] - 40:15
**someone** [10] - 46:16, 71:5, 85:2, 91:11, 102:16, 103:10, 108:15, 112:6, 119:9
**sometimes** [14] - 16:20, 28:25, 29:22, 30:8, 39:7, 72:7, 75:9, 88:24, 89:1, 99:23, 100:4, 115:14
**somewhere** [3] - 16:9, 75:11
**Sona** [1] - 2:17
**sorry** [26] - 13:15, 23:14, 26:15, 27:9, 28:2, 28:6, 29:6, 31:17, 39:10, 41:1, 43:20, 47:12, 52:16, 53:5, 55:13, 56:17, 61:15, 71:1, 84:17, 84:22, 86:4, 87:4, 99:25, 100:1, 104:24, 112:25
**sort** [7] - 9:21, 11:10, 26:11, 32:5, 36:9, 41:6, 86:21
**sounds** [1] - 11:21
**South** [1] - 5:22
**Southern** [1] - 6:11
**speaking** [1] - 48:5
**speaks** [2] - 110:12, 110:13
**special** [1] - 118:22
**specific** [4] - 6:1, 6:21, 52:24, 73:11
**specifically** [3] - 46:21, 52:20, 95:24
**specificity** [2] - 50:21, 51:13
**specifics** [1] - 16:13
**split** [4] - 7:8, 16:5, 16:10, 37:21
**spots** [1] - 118:20
**spreading** [2] - 98:17, 102:3
**square** [1] - 75:21
**Square** [1] - 3:12
**SR&R** [12] - 23:2, 23:9, 23:12, 25:23, 26:8, 32:7, 34:19, 35:1, 83:16, 83:25, 90:5, 91:5
**srewari@huntonak.**

**com** [1] - 2:20
**SRO** [2] - 116:23, 117:18
**staff** [2] - 20:3, 35:7
**stand** [4] - 12:11, 74:19, 74:20, 75:25
**standard** [7] - 6:2, 49:21, 50:8, 50:12, 51:8, 55:24, 119:22
**standards** [4] - 6:6, 6:20, 50:13
**standpoint** [1] - 9:13
**start** [8] - 13:4, 17:6, 32:13, 43:3, 69:11, 97:1, 107:20, 107:21
**started** [5] - 8:17, 29:13, 46:18, 81:22, 111:8
**starting** [2] - 57:20, 105:22
**starts** [2] - 63:3, 107:22
**state** [3] - 11:6, 14:6, 20:4
**statement** [33] - 6:16, 67:7, 76:11, 78:11, 78:14, 92:13, 97:15, 97:20, 98:20, 99:3, 99:11, 99:18, 99:19, 101:14, 101:16, 101:18, 102:2, 102:4, 102:5, 102:20, 103:15, 103:19, 104:14, 106:1, 106:4, 106:5, 107:9, 107:17, 110:7, 110:11, 111:12, 111:15, 111:21
**statements** [6] - 67:5, 67:7, 74:16, 77:19, 99:21, 111:19
**STATES** [2] - 1:1, 1:12
**States** [3] - 3:12, 47:7, 47:18
**static** [1] - 29:22
**statistical** [1] - 7:1
**statute** [1] - 32:23
**stay** [7] - 16:20, 25:14, 49:7, 49:12, 60:7, 114:13, 115:23
**step** [3] - 88:10, 91:7, 121:4
**steps** [2] - 62:20, 66:17
**stereotypes** [1] - 6:9
**stereotyping** [3] - 6:12, 6:13, 6:20
**still** [5] - 9:5, 15:5, 15:6, 53:18, 85:21

**stipulation** [1] - 75:10
**stool** [2] - 32:6, 32:7
**stop** [1] - 118:13
**stories** [1] - 22:20
**story** [2] - 13:10, 110:4
**straight** [1] - 21:12
**Street** [4] - 1:16, 2:3, 2:7, 2:11
**strike** [1] - 120:5
**stringent** [1] - 84:4
**struck** [1] - 119:13
**structure** [1] - 41:7
**structured** [1] - 35:17
**Student** [1] - 23:13
**student** [45] - 14:25, 26:21, 30:3, 30:6, 36:10, 40:12, 41:10, 42:15, 43:11, 44:7, 57:23, 57:24, 58:14, 58:24, 59:1, 59:14, 61:5, 61:7, 62:21, 68:14, 69:16, 70:12, 74:21, 76:11, 77:3, 77:23, 82:25, 84:1, 84:11, 90:19, 92:8, 92:9, 95:10, 97:20, 98:24, 99:19, 99:21, 99:22, 100:4, 101:15, 101:17, 112:10, 112:14
**student's** [6] - 42:8, 43:3, 58:1, 67:11, 84:8, 84:10
**student-on-student** [2] - 58:14, 58:24
**Students** [5] - 24:18, 24:19, 24:24, 25:2, 27:20
**students** [46] - 16:8, 17:23, 17:25, 18:4, 20:12, 20:16, 20:25, 21:20, 23:11, 24:12, 27:1, 30:3, 33:18, 35:10, 37:16, 38:1, 38:25, 39:3, 39:5, 40:25, 41:1, 61:8, 63:3, 63:7, 68:7, 68:12, 69:4, 69:9, 69:16, 70:3, 70:7, 70:23, 75:8, 76:1, 78:2, 82:13, 82:14, 83:6, 91:19, 96:21, 100:25, 101:20, 101:21, 116:18, 117:1, 118:10
**students'** [1] - 113:5
**studies** [1] - 30:9
**stuff** [2] - 77:8, 109:17
**subject** [4] - 42:4,

49:3, 49:18, 49:20
**subjected** [1] - 47:5
**subjects** [2] - 39:7, 47:2
**submit** [1] - 5:11
**subrecord** [1] - 114:18
**subscribed** [1] - 122:15
**subsection** [1] - 84:14
**substantiated** [1] - 105:6
**substantive** [1] - 115:15
**sufficiently** [4] - 57:25, 65:13, 65:20, 67:10
**suggest** [3] - 7:24, 51:16, 51:17
**suggestion** [1] - 106:23
**suggestions** [1] - 62:5
**Suite** [7] - 1:17, 1:21, 2:3, 2:7, 2:11, 3:6, 3:10
**superintendent** [1] - 34:8
**superintendent's** [1] - 36:2
**superiors** [1] - 35:21
**support** [1] - 23:8
**supportive** [1] - 111:12
**supposed** [9] - 43:12, 44:8, 45:1, 46:2, 90:6, 92:8, 95:2, 95:14, 108:8
**Supreme** [1] - 50:17
**surrounding** [1] - 6:20
**suspension** [3] - 116:23, 117:8, 117:15
**sustained** [3] - 63:21, 103:17, 117:25
**switch** [4] - 16:16, 35:4, 67:15, 67:17
**switching** [1] - 110:24
**sworn** [2] - 13:17, 13:19

---

**T**

**t's** [1] - 89:16
**T.B** [1] - 3:5
**TABLE** [1] - 4:1
**tape** [1] - 122:13
**targeted** [1] - 103:21
**taught** [5] - 17:18, 17:22, 23:22, 68:9, 69:3
**taunted** [1] - 61:8

**teach** [2] - 41:2, 69:8
**teacher** [5] - 38:23, 38:24, 43:25
**teachers** [9] - 17:20, 18:6, 32:21, 38:24, 39:5, 41:1, 42:7, 42:8, 42:23
**team** [7] - 8:6, 37:22, 38:14, 38:20, 38:22, 39:14
**teams** [5] - 37:25, 38:3, 38:18, 38:19, 39:23
**tease** [1] - 79:24
**technically** [1] - 15:6
**ten** [1] - 109:13
**tender** [1] - 45:15
**Tenth** [1] - 3:13
**term** [11] - 7:8, 39:18, 51:1, 51:2, 64:23, 65:5, 77:11, 82:7, 110:15, 110:16
**terms** [3] - 80:18, 81:6, 105:24
**terrible** [1] - 20:1
**T▇▇** [12] - 37:3, 94:15, 100:15, 100:16, 100:18, 104:7, 108:5, 110:7, 117:3, 117:5, 117:22, 118:2
**T▇▇** [2] - 98:4, 101:4
**testify** [10] - 5:18, 6:1, 6:5, 6:8, 6:12, 6:18, 8:24, 9:2, 10:6, 102:16
**testifying** [1] - 10:5
**testimony** [33] - 5:3, 5:7, 5:9, 5:10, 5:17, 6:17, 7:2, 7:16, 7:23, 8:1, 8:4, 8:24, 9:17, 9:24, 23:25, 43:22, 44:3, 44:7, 44:10, 46:12, 54:10, 54:11, 100:13, 102:6, 102:7, 102:8, 103:6, 104:1, 105:9, 105:14, 109:7, 119:23, 122:6
**that'd** [1] - 56:4
**THE** [247] - 1:1, 1:11, 3:5, 5:1, 8:11, 8:17, 9:9, 9:21, 10:3, 10:12, 10:14, 10:25, 11:3, 11:13, 11:17, 11:24, 12:2, 12:7, 12:13, 12:16, 12:21, 12:24, 13:2, 13:17, 13:20, 13:25, 14:1,

14:13, 19:9, 19:13, 20:19, 22:10, 22:12, 22:17, 24:1, 25:10, 25:13, 25:17, 26:2, 27:5, 27:7, 27:8, 27:9, 28:5, 28:6, 28:7, 28:9, 30:23, 31:6, 31:7, 31:24, 32:1, 35:22, 35:23, 35:24, 35:25, 39:18, 39:20, 39:21, 44:4, 44:11, 44:12, 44:14, 44:17, 44:18, 44:21, 44:23, 45:4, 45:17, 45:22, 45:24, 45:25, 46:9, 48:1, 48:13, 48:15, 49:1, 49:4, 49:7, 49:16, 49:22, 50:9, 50:18, 52:1, 52:5, 53:3, 53:6, 53:16, 54:24, 55:16, 55:20, 56:2, 56:4, 56:9, 56:14, 56:15, 56:24, 57:4, 57:6, 57:9, 57:11, 58:11, 60:6, 61:3, 61:13, 61:14, 61:15, 61:22, 62:13, 62:14, 63:21, 65:1, 65:5, 65:8, 66:24, 67:3, 68:24, 70:11, 70:15, 70:16, 71:4, 71:23, 72:13, 72:17, 72:20, 72:25, 73:5, 73:8, 73:15, 73:17, 73:21, 73:23, 74:8, 74:11, 75:2, 75:3, 75:10, 76:16, 76:19, 78:20, 78:22, 78:23, 78:25, 79:1, 80:3, 80:14, 80:15, 82:7, 83:13, 84:19, 85:17, 85:18, 86:5, 86:8, 86:9, 86:10, 86:11, 86:13, 86:14, 86:16, 91:22, 92:1, 92:2, 92:3, 93:6, 93:9, 93:11, 93:25, 94:1, 94:5, 95:5, 95:22, 96:4, 96:19, 96:23, 97:25, 98:13, 99:5, 100:20, 101:2, 101:3, 101:5, 101:7, 101:10, 101:11, 101:15, 101:17, 101:19, 101:22, 101:24, 101:25, 103:7, 103:17, 103:20, 103:22, 103:23, 104:21, 104:23, 105:10, 105:15, 105:18,

106:10, 106:14, 106:20, 107:3, 107:6, 108:17, 108:19, 108:22, 109:8, 109:18, 109:21, 110:12, 110:15, 110:23, 110:24, 110:25, 111:2, 111:14, 111:17, 112:13, 112:16, 112:17, 113:9, 113:13, 114:7, 114:12, 114:19, 114:24, 115:4, 115:6, 115:11, 115:23, 116:8, 116:11, 117:14, 117:16, 117:25, 118:14, 119:7, 119:19, 119:25, 120:16, 120:20, 120:22, 120:24, 121:4
**theory** [1] - 8:19
**Therefore** [1] - 34:2
**therefore** [1] - 84:7
**therein** [1] - 7:16
**they've** [1] - 110:21
**thinking** [8] - 8:2, 9:15, 10:14, 10:15, 12:3, 36:9, 121:1
**third** [2] - 26:10, 32:7
**thorough** [1] - 100:18
**three** [7] - 32:5, 34:18, 37:19, 60:25, 81:22, 85:2, 85:6
**threw** [1] - 84:24
**throughout** [1] - 109:21
**throw** [1] - 85:7
**throwing** [1] - 85:6
**thrust** [1] - 61:24
**tighten** [1] - 121:3
**timeline** [1] - 79:19
**timely** [1] - 43:4
**Tinsley** [1] - 73:6
**tired** [1] - 119:12
**title** [2] - 37:11, 37:17
**Title** [24] - 6:19, 6:21, 20:5, 32:23, 33:1, 42:5, 47:3, 47:8, 47:19, 47:24, 48:18, 50:16, 58:15, 63:18, 65:6, 66:24, 85:16, 86:16, 86:17, 87:24, 88:2, 119:13, 119:16, 120:2
**titles** [1] - 37:10
**today** [6] - 11:12, 55:5, 73:14, 80:9, 112:21,

120:23
**together** [3] - 7:22, 26:11, 122:13
**tolerance** [1] - 71:8
**tolerated** [2] - 65:15, 70:23
**TONIA** [1] - 3:11
**Tonia** [2] - 122:3, 122:21
**took** [8] - 7:5, 37:13, 37:20, 37:21, 55:1, 97:14, 100:16, 120:4
**top** [6] - 35:18, 36:7, 75:22, 78:9, 86:7, 115:21
**topic** [1] - 16:16
**topics** [6] - 35:4, 47:2, 67:15, 67:17, 76:6, 85:14
**TORCHINSKY** [1] - 1:15
**total** [2] - 38:6, 72:19
**touch** [2] - 21:23, 74:15
**touched** [1] - 32:4
**toward** [1] - 103:21
**track** [2] - 11:4, 84:7
**traditional** [1] - 117:15
**trail** [1] - 17:6
**trained** [2] - 41:17, 87:22
**training** [3] - 41:20, 87:15, 88:2
**transcript** [10] - 7:6, 7:11, 7:20, 11:7, 11:8, 12:22, 54:23, 55:23, 120:8, 122:11
**TRANSCRIPT** [1] - 1:11
**translate** [1] - 31:3
**trap** [1] - 8:1
**treat** [1] - 10:2
**tree** [4] - 75:7, 75:11, 75:16
**trees** [1] - 75:8
**trial** [4] - 5:15, 10:7, 13:7, 120:4
**Trial** [2] - 31:23, 122:6
**TRIAL** [2] - 1:11, 4:1
**tried** [1] - 7:7
**tries** [1] - 8:3
**trouble** [2] - 61:23, 77:13
**troubling** [2] - 99:2, 99:4
**true** [5] - 56:11, 81:15, 89:21, 97:7, 103:2
**trust** [1] - 114:24
**truth** [1] - 102:10
**try** [12] - 56:9, 65:5,

72:2, 72:5, 72:20, 96:19, 96:23, 118:16, 119:4, 120:4, 121:2, 121:3
**trying** [13] - 16:16, 24:15, 42:13, 49:9, 57:1, 60:10, 60:14, 60:19, 61:24, 62:2, 73:12, 100:8, 105:12
**turn** [1] - 86:5
**two** [10] - 24:11, 24:12, 37:20, 59:5, 59:7, 81:23, 99:13, 109:18, 113:12, 117:1
**type** [1] - 50:16
**types** [1] - 119:17

## U

**ultimately** [3] - 35:9, 78:17, 105:3
**under** [10] - 8:19, 10:1, 20:14, 37:16, 42:18, 47:21, 50:17, 55:2, 55:25, 71:21
**understood** [4] - 33:17, 60:11, 65:21, 66:8
**uneasy** [1] - 12:3
**unfortunately** [1] - 75:7
**unfounded** [1] - 96:1
**unhighlight** [2] - 33:6, 33:24
**United** [2] - 47:7, 47:18
**united** [1] - 3:12
**UNITED** [2] - 1:1, 1:12
**unreasonably** [1] - 21:3
**unsubstantiated** [1] - 105:13
**unusual** [1] - 11:6
**unverified** [8] - 91:15, 95:1, 95:13, 103:5, 103:13, 105:4, 105:8, 111:20
**unwelcomed** [1] - 34:2
**up** [41] - 12:5, 12:11, 13:8, 13:17, 23:21, 24:7, 25:19, 30:1, 35:16, 45:8, 45:20, 46:7, 53:18, 57:20, 69:1, 71:20, 80:9, 80:24, 83:10, 84:1, 84:13, 84:17, 85:21, 94:3, 96:17, 104:19, 104:20, 104:23,

106:8, 106:9,
106:10, 106:12,
106:14, 107:5,
108:17, 108:22,
109:23, 110:18,
111:8, 116:16, 121:3
**uses** [1] - 30:6

## V

**VA** [3] - 3:7, 3:10, 3:13
**valid** [1] - 50:23
**various** [1] - 41:25
**verbal** [5] - 28:4,
28:23, 30:6, 34:3,
66:22
**verification** [12] -
23:19, 24:15, 26:23,
27:21, 28:20, 51:1,
51:3, 51:4, 90:15,
91:1, 96:16, 103:18
**verified** [12] - 22:1,
22:7, 22:14, 22:25,
24:4, 90:22, 97:10,
97:11, 111:25,
113:25, 116:7,
116:16
**verify** [4] - 24:8, 27:3,
91:7, 91:12
**versus** [3] - 5:21, 6:9,
122:7
**vicinity** [1] - 75:15
**view** [1] - 6:24
**violate** [1] - 97:9
**violated** [2] - 65:19,
65:25
**violates** [1] - 23:2
**violation** [2] - 50:17,
65:12
**Virginia** [2] - 29:2,
122:4
**VIRGINIA** [1] - 1:1
**visual** [1] - 29:1
**VOGEL** [1] - 1:15
**voicemail** [8] - 80:18,
98:9, 105:23,
107:24, 108:4,
108:9, 108:13,
108:15
**voicemails** [4] - 98:11,
107:21, 109:4,
109:17
**volition** [1] - 93:14
**VOLUME** [1] - 1:8
**vulgar** [7] - 21:15,
22:20, 28:4, 28:23,
30:6, 80:25, 107:24

## W

**wait** [2] - 28:7
**walk** [1] - 79:3
**walked** [1] - 76:5
**wall** [1] - 81:8
**wants** [3] - 80:7,
80:24, 120:17
**Washington** [5] -
1:17, 2:15, 2:19,
2:22, 3:2
**watch** [1] - 39:5
**ways** [1] - 18:4
**Weaver** [1] - 36:13
**weaver** [5] - 36:20,
42:16, 42:18, 74:22,
75:25
**Weaver's** [1] - 36:15
**weeks** [2] - 81:22,
81:23
**weight** [1] - 50:5
**well-being** [1] - 35:10
**whatnot** [2] - 27:1,
91:9
**whereof** [1] - 122:15
**whole** [4] - 10:18,
91:19, 99:20, 104:18
**whore** [8] - 80:25,
81:9, 109:15,
109:24, 110:1,
110:2, 111:8, 111:10
**Wiehle** [1] - 3:9
**Willis** [1] - 6:9
**winter** [1] - 15:2
**wires** [1] - 12:11
**witness** [16] - 8:15,
8:22, 9:22, 10:5,
13:14, 13:18, 13:19,
14:12, 45:15, 51:11,
51:18, 74:25, 77:19,
84:19, 116:8, 122:15
**WITNESS** [53] - 13:25,
22:12, 27:7, 27:9,
28:6, 28:9, 31:6,
35:23, 35:25, 39:20,
44:12, 44:17, 45:24,
48:15, 56:14, 58:11,
61:13, 61:15, 62:13,
65:8, 67:3, 70:15,
75:2, 78:22, 78:25,
80:15, 85:18, 86:8,
86:10, 86:13, 86:16,
92:1, 92:3, 93:9,
94:1, 96:4, 101:2,
101:5, 101:10,
101:15, 101:19,
101:24, 103:20,
103:23, 105:15,
108:22, 109:18,
109:21, 110:24,

111:2, 111:17,
112:16, 117:16
**witnessed** [1] - 82:15
**WITNESSES** [1] - 4:1
**witnesses** [5] - 10:20,
82:5, 82:8, 91:9,
91:10
**WL** [1] - 5:22
**WL1599154** [1] - 6:10
**wondering** [1] -
119:14
**word** [6] - 17:23, 20:1,
23:12, 24:8, 40:6,
110:21
**words** [8] - 17:14,
28:25, 30:8, 59:5,
59:7, 86:20, 96:1,
109:18
**works** [2] - 20:21,
100:21
**world** [1] - 85:8
**write** [4] - 22:3, 77:4,
101:14, 101:16
**writes** [1] - 101:17
**writing** [1] - 91:2
**written** [9] - 23:9,
28:4, 28:23, 30:6,
67:7, 76:11, 92:13,
102:2, 102:19
**wrongdoer** [1] - 112:7
**wrongdoers** [1] -
82:18
**wrote** [3] - 99:3,
102:16, 103:10

## Y

**year** [9] - 15:7, 16:8,
40:15, 55:5, 68:12,
69:5, 69:7, 69:11,
116:25
**years** [3] - 14:22,
14:23, 19:19
**yelling** [1] - 17:4
**yesterday** [1] - 8:23
**York** [1] - 6:11
**yourself** [7] - 11:5,
20:2, 35:9, 53:23,
64:23, 115:18,
118:24

## Z

**Zoll** [1] - 2:2