1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                            :
                                 :
               Plaintiff,        :   Civil Action
                                 :   No. 1:19-cv-917
          v.                     :
                                 :
F.C.S.B., et al.,                :   March 21, 2024,
                                 :   9:51 a.m.
                                 :
                                 :
          Defendants.            :   VOLUME 4 - A.M. SESSION
                                 :
.............................    :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

2

APPEARANCES:  (Cont.)

For the Plaintiff:            **Brittany Zoll, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             610-804-1787
                             Email: Britzoll@gmail.com

                             **Andrew Brenner, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             305-539-8400
                             Email: Abrenner@bsfllp.com

                             **Robert Keefe, Esq.**
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             850-585-3414
                             Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:       **Ryan Bates, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1596
                             Email: Rbates@hunton.com

                             **Sona Rewari, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1974
                             Email: Srewari@huntonak.com

                             **Scott W. Burton, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Ave NW
                             Washington, DC 20037
                             202-955-1664
                             Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

3

For Defendant F.C.S.B.:        **Kevin Elliker, Esq.**
                               HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Avenue, NW
                               Washington, DC 20037
                               804-788-8200
                               Email: Kelliker@huntonak.com


For the Defendants:            **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,           THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,      KINNEY, PLC.
F.T., J.F.)                    1801 Robert Fulton Drive
                               Suite 120
                               Reston, VA 20191
                               Email:  Mk@kinneyesq.com


For the Defendant J.O.:        **Bruce Blanchard, Esq.**
                               ODIN, FELDMAN & PITTLEMAN, PC.
                               1775 Wiehle Avenue
                               Suite 400
                               Reston, VA 20190
                               Email:  Bruce.blanchard@ofplaw.com

Court Reporter:     MS. TONIA M. HARRIS, RPR
                    United States District Court
                    401 Courthouse Square
                    Tenth Floor
                    Alexandria, VA 22314

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Plaintiff:

C███████ K██

Cross-examination by Mr. Bates............. 26
Cross-examination by Mr. Kinney............ 95
Cross-examination by Mr. Blanchard........ 96
Redirect examination by Mr. Keefe.......... 98
Recross-examination by Mr. Bates........... 111

J████ F█████████

Direct examination by Mr. Brenner.......... 116

EXHIBITS

On behalf of the Plaintiff:

Admitted

Number 305......................................... 120
Number 84 (pages 3606 and 3607...................... 160

On behalf of the Defendants:

Admitted

Number 206......................................... 41
Number 73.......................................... 58
Number 18.......................................... 60
Number 72.......................................... 74
Number 74.......................................... 81

MISCELLANY

Preliminary matters.................................. 05
Certificate of Court Reporter....................... 102

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

5

THE COURT:  Good morning.

(Good morning responses from the lawyers.)

THE COURT:  A few housekeeping matters and I've been informed that the parties want to take up a couple of things.

One of the jurors was asking for basically his permission slip to be away from work.  One of the clerks in the clerk's office, when he gave him his, basically, excuse slip, made a mistake of handing him the order of trial along with his excuse slip.  Fortunately, the juror didn't look at it, just simply threw it in his car.  The clerk realized that he had made a mistake and immediately asked for it back.  From everything that we've been able to determine, the individual did not look at the order at all.  He did, like most of us when we get something, just put it in the car.

So, we have no reason to believe that he actually read anything.  If you all want me to conduct an interview of him, I will.  But the Court is very well comfortable with us just proceeding the way we are.

MR. BRENNER:  If we can just have a clarification of what is meant by "the order of trial"?

THE COURT:  It's the document that's usually circulated, the trial will begin at 9:00 a.m., the trial will begin with jury section, technology in the court, motions for summary judgment must be filed by a certain date.

MR. BRENNER:  Oh, that one.

────────── B.R. v. F.C.S.B. ──────────

6

            THE COURT:  Yes, sir.

            MR. BRENNER:  The October hearing.

            THE COURT:  Yes, sir.

            MR. BRENNER:  I'll just take a quick look over it.
My instinct is we don't have to do anything this second for
sure, but I just want to take a quick look at the order.

            THE COURT:  Go ahead.

            MR. BRENNER:  Okay.  But I'm sure it's fine.

            MR. BATES:  No issues from the School Board's
perspective.

            THE COURT:  Very good.

            Is that the position of all defense counsel?

            MR. KINNEY:  Yes, Your Honor.

            THE COURT:  Very good.  I can hand it down so you
can see it so you don't have to dig for it.  But again, the
information that we were provided is that he never looked at
it.

            MR. BRENNER:  Okay.

            (A pause in the proceedings.)

            MR. BRENNER:  No objection from the plaintiffs.

            THE COURT:  Appreciate that.  The next thing, the
Court was informed and the way that I come in I didn't see
them, but there were individuals outside who have an interest
in this case, not an interest as far as being parties to the
matter, but rather an interest in the -- I guess the best way

B. R. v. F. C. S. B.

7

of putting it, the outcome of the case.  We will take all

reasonable steps to ensure that the people who are exercising

their constitutional rights don't interfere with what we have

to do in this courtroom.  We'll take all reasonable steps and

I will depend on Ms. Tinsley and the rest of the marshal

service and court security officers to make sure that there

are no inappropriate contacts.

       Anything else we need to do?

       MR. BRENNER:  Yes.  Good morning, Your Honor.

Andrew Brenner on behalf of the plaintiff.

       So, I think each side needs to report to you a juror

contact.  So, I'll do the plaintiff's contact and the School

Board counsel will do their contact.

       And I'll tell you what I think needs to be done

but -- so when I was leaving court in the evening yesterday

after the conclusion of the court day, when I came out of the

front entryway of the court, so in that -- outside the

courthouse but in that sort of where the patio is there, where

the sidewalk is, the first thing I saw was the juror who sits

closest to you in the front row, I believe.

       THE COURT:  The smoker.

       MR. BRENNER:  Is he a smoker?

       THE COURT:  The one that smokes meat.

       MR. BRENNER:  Oh, the second one.  I'm sorry.  The

second one.  I think it's the one that's celebrating the

religious holidays.

THE COURT:  Okay.

MR. BRENNER:  Him and the witness who had just left for the day, who is Co.K.  So they were standing there and so I walked out.  That's first thing I saw.  And so I approached them and I said, You guys really -- because of court rules, you guys really can't be talking about anything and certainly not about the case because -- and they both said, immediately, Oh, we weren't talking about the case.

I said, you probably -- you guys shouldn't be talking at all.  And so Co.K. left with me across the street to the hotel where his stuff was.  So that was my -- I just wanted Your Honor to know, both there was the potential contact between them, which I think is nothing, but obviously I wasn't part of it, and also because I actually had words with the juror.

And my request is that, which I think at least part of it the School Board joins in, is we would like the jurors reinstructed that they shouldn't be talking to anyone.  I don't remember -- I should have looked at it up, but I don't remember in your original instruction if it just said "Counsel," but maybe remind them it's counsel, parties.

THE COURT:  I'll take care of it.

MR. BRENNER:  And if I could ask one more, with the Court's indulgence, if you could remind the jurors that we as

B.R. v. F.C.S.B.

9

lawyers, whether it's the defense side or plaintiff's side, if we see it we're duty-bound to report it to you.  I don't want to feel like the juror feels like we're telling on him, so if you could remind them that that's our obligation.

THE COURT:  Okay.

MR. BRENNER:  We have a couple of other matters, but I think it probably makes sense to have the School Board raise their content.

MS. REWARI:  Good morning, Your Honor.  Sona Rewari for the School Board.  I understand that one of the jurors yesterday saw Mr. F█████ in the building and made a comment to him about, Are you -- do you think you're done yet or you're finished yet, regarding his testimony.

And Mr. F█████ politely changed the subject so he would not discuss that and disengaged the conversation, but I do agree that it would be worth reminding the jurors that -- we're not trying to be rude and they may see us in the hallways and we are required not to speak to them other than polite, you know --

THE COURT:  The niceties of the day, hello, good morning.  I think those things are appropriate, obviously.  All right.  Very good.

MS. REWARI:  And we would ask that the jury also be instructed not to watch any -- I mean, look at any social media in addition to what has --

B.R. v. F.C.S.B.

10

THE COURT:  That was already given in the preliminary instruction, but if you want me to reiterate it, I can.

MS. REWARI:  Yes.  We've seen that the -- there are news stories regarding the proceedings that are happening in this court and they are being shared on social media and believe that some of the witnesses that are testifying in this case follow that social media or run that social media.

So I would ask that, again, that instruction both be given to the jury, but also we need to clarify with the witnesses they cannot -- the rule on witnesses would -- I would ask that both sides be told that their witnesses cannot also be reading summaries of this case on social media before they testify.

THE COURT:  That's going to be a little bit difficult for the Court to do unless I have every witness here.

MS. REWARI:  I understand.  We can tell our witnesses but I would ask --

THE COURT:  That's going to be the instruction of the Court, is that your -- it's a requirement to instruct all witnesses that are appearing on your case, whether called as adverse or not, to instruct them to stay away from social media.  That will be the obligation of counsel.  I don't think that I can control that.

B.R. v. F.C.S.B.

11

MS. REWARI:  I understand.  I understand.

THE COURT:  All right.

MS. REWARI:  We can only do our best, thank you.

MR. FAHEY:  Good morning, Your Honor.  Jonathan
Fahey.  I just have a brief matter.  I just also want to get a
chance to talk.  Mr. Blanchard has.

We have a witness, Mr. Karras, who we are going to
request the Court -- I've already spoken with counsel.  We
have an agreement on this.  We would like to be able to put
him first thing Monday morning.  He's an expert witness.  He
has a family trip.  He's coming in from Philadelphia but has a
family trip leaving Tuesday to go to Hilton Head with his
family, his grandchildren, a preplanned trip.  So our request
would be if he could just go, even if there is a witness
already on the stand, could he -- could we just put him on,
get him on and get him off in the morning?

THE COURT:  How long do you think this witness is
going to take to present?

MR. FAHEY:  I think about 45 minutes from our end.
I won't speak for them, but I can't imagine this being a
really long witness, even from their end of it.  So I would
think, you know, hour-and-a-half at the most.  And if we could
do that and accommodate him, we would appreciate that.

MR. ELLIKER:  Your Honor, as Mr. Fahey indicated,
the School Board doesn't have an objection to that.

B.R. v. F.C.S.B.

12

THE COURT:  Very good.  As we sit here and labor through this trial, we will make sure that Mr. Karras can get to Hilton Head.

MR. FAHEY:  Thank you, Your Honor.

THE COURT:  All right.  Anything else?

MR. KEEFE:  Yes, Your Honor.  Two issues I wanted to raise before the jury came in about what I anticipate will come up during Mr. Ki█'s cross-examination today.

The first I think is more straightforward.  I anticipate that Mr. Ki█ will be asked if B█████ has accused him of groping her.  And before that question was asked, I wanted to let you know that Mr. Ki█'s testimony will be that the only person in the world who has ever told that to him is a math tutor.  So there's a double hearsay issue there.

Assuming what the math tutor said was true, it would be B████ to math tutor, math tutor to Mr. Ki█, so there's no hearsay exception for the math tutor to Mr. Ki█ part of that communication.

THE COURT:  Well, something that I heard yesterday, and it's a term that I was not aware of, I think the gentleman made reference to the term of "cupping," I think is the term that he used --

MR. KEEFE:  Scooping.

THE COURT:  Scooping.  That he made reference to a term of "scooping."  And in some context, I believe that the

B.R. v. F.C.S.B.

13

defendants would be entitled to ask him was he involved in
that.

MR. KEEFE:  Well, certainly.  I just think the
question, even if I object, did -- would leave the implication
that there's evidence that would be admissible that B████
accused him of --

(Counsel confers.)

MR. KEEFE:  Your Honor, what I'm trying to get at is
not an accusation that Mr. Ki█ was involved in sexual
misconduct generally at the school.  It's specifically that
B████ accused him, Mr. Ki█, of groping her.

THE COURT:  Okay.  And your position, and please
correct me if I misstate it, is that you believe that the
information that Mr. Ki█ was told regarding this incident did
not come directly from B████, but came through another source
that B████ said that he said it?

MR. KEEFE:  That's absolutely right.

THE COURT:  Okay.  All right.  We'll see how the
question is asked, and then we'll revisit it.  If you could,
before you bring him, instruct Mr. Ki█ that this may be an
issue of controversy, so if a question is asked, to wait for
the judge to make a determination as to whether or not the
question and the answer is appropriate.

MR. KEEFE:  Yes, Your Honor.  The second issue is
that I anticipate the defense will show Mr. Ki█ two exhibits

B.R. v. F.C.S.B.

14

that I have an objection to.  That's Exhibit 72 and 74.  These

were subject to plaintiff's motion in limine 15.  They are two

of the fake Facebook accounts.  And that motion in limine, at

least the briefing on it, was at Docket No. 663, ECF Stamp 25.

And the Court took it under advisement at least as to -- the

Court ruled about opening arguments, but then took it -- my

understanding is under advisement as to other issues, and

that's at Docket No. 837, ECF Stamp 14.  I anticipate that --

      THE COURT:  What was the first number?

      MR. KEEFE:  The briefing on the motion --

      THE COURT:  The docket number.

      MR. KEEFE:  663.  And that's at the ECF page 25.

      THE COURT:  Okay.

      MR. KEEFE:  So Exhibit 72 are Facebook messages

Mr. Ki█ received from what the parties, I think, have called

the high school freshmen Facebook account.  And Exhibit 74 are

Facebook messages Mr. Ki█ received from a Facebook account

under the name Adrianna Capsulo.

      The issue, Your Honor, is Mr. Ki█ isn't able --

there's no way Mr. Kit can say that these are B████.  He can't

lay that foundation.  He doesn't know that.  His testimony is

just he supposes, he suspects they're her based on just the

way the person was typing, and until there's a sufficient

foundation that they are B████, there is absolutely no

relevance to these Facebook accounts that could have come from

B.R. v. F.C.S.B.

15

any third party.

I'd just cite to the Court some cases on this issue. The first is *United States v. Vayner*, 2014 Second Circuit Case 769 Federal Reporter 3d. 125. And there the Second Circuit found it was reversible error to admit printed social media pages because the government presented insufficient evidence that the page is what the government claimed it to be, which was the defendant's Facebook page.

And I'll quote from page 133 of that opinion: "There must be some basis beyond a witness's testimony on which a reasonable juror could conclude that the page in question was not just any internet page, but, in fact, the defendant's profile."

I think the profile there was on the Russian equivalent of Facebook. I contrast that with the Fourth Circuit's opinion in *United States v. Hassan*. That's a 2014 case at 742 Federal 3d. 104. And I'd point the Court to page 133 of that opinion. And the Fourth Circuit there found it wasn't an abuse of discretion to admit Facebook pages where the government showed that it tracked the Facebook pages and accounts to the defendant's email addresses using internet or IP protocol addresses.

THE COURT: In other words, it was a question of whether or not an appropriate foundation had been laid to actually get to the point of the admissibility of those?

B.R. v. F.C.S.B.

16

MR. KEEFE: Correct. And without that foundation
that they actually belonged to this person, there's no
relevance.

THE COURT: What did the Fourth Circuit ultimately
say?

MR. KEEFE: Well, in that case, because there was
the appropriate foundation, there was no abuse of discretion
in admitting them.

THE COURT: Okay.

MR. KEEFE: Two more cases. I won't go through
them, but they are similar to the *Hassan* case out of the Sixth
Circuit and the Third Circuit. The first is *United States v.
Farad*, 895 Fed 3d. 859. It's a 2018 case, and I'd refer the
Court to pages 868 and 878. And then also *United States v.
Brown*, 834 Fed 3d. 803. That's a 2016 case, similar issue.

(Counsel confers.)

MR. KEEFE: I would like to clarify that the Jenni
Taylor Facebook accounts, as we noted as we conceded in our
motion in limine briefing and also with Mr. Ki█ yesterday, he
laid the foundation that he knows now that that is -- B███
was behind the Jenni Taylor, so I just want to be clear, I'm
limiting my discussion here today to the Adrianna Capsulo and
the high school freshman Facebook accounts.

THE COURT: Before Mr. Bates has an opportunity to
respond, my recollection of the testimony of the young man

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

17

yesterday was he made reference to a lot of things that he had

seen on Facebook and a lot of what he called cyberbullying is

I think the term that he used.

        And as I recall from the opening statement that was

made by defense, there was a suggestion that B.R. was

"bullying herself through use of cyberspace."

        Would, in your opinion, or view, that information go

to ultimately the credibility of the entire incident if the

government and the people who are working from that side are

able to prove or suggest that Ms. B.R. was part of her own

bullying?

        MR. KEEFE:  If I may consult.

        THE COURT:  Yes.

        (Counsel confers.)

        MR. KEEFE:  Well, first, Your Honor, my

understanding is that these are direct messages and not what

was posted for public viewing on social media.

        THE COURT:  That might make it a little bit

different.  Yes, sir.  Okay.

        Mr. Bates.

        MR. BATES:  Judge, you hit the nail on the head, the

comments.  These messages are highly relevant.  And let me

back up and explain why.  So -- and by the way, this is the

second bite at the apple at this issue.  A motion in limine

was filed and Your Honor ruled that these messages could not

B.R. v. F.C.S.B.

18

be brought up in opening statements, but you're going to take

it under advisement and, I believe, see how the evidence comes

in.  So this has already been ruled on.

Be that as it may, let me back up and provide some

context.  Mr. Ki█ received a subpoena in this case for

documents.  And the subpoena requested all communications that

he received from B.R.  In conjunction with that, he produced

three sets of chats, one with a Jenni Taylor that the parties

have stipulated to, and I would ask Your Honor to read the

stipulation to the jury today to streamline things that B.R.

was Jenni Taylor.

THE COURT:  And while we're talking about that, can

you hand out that stipulation?

MR. BATES:  We just worked it out this morning, Your

Honor.  So if -- so I apologize for that.  So the parties

agree and B.R. will testify that she was Jenni Taylor.

These -- and as we will see today in these Jenni

Taylor messages, B.R., a/k/a Jenni Taylor, was graphically

cyberbullying herself to the point that it calls Mr. Ki█ to go

to mom and mom goes to the police.  So that's settled.

These are two additional examples of essentially the

same thing under two other accounts.  Mr. Ki█ will testify

that he believes this was B.R.  These -- it's not a question

of authenticity.  Mr. Ki█ pulled these messages from his

Facebook account.  They are real.

THE COURT:  Why do you believe that he believes that they are B.R.?

MR. BATES:  Because he's testified in his deposition as to that.

THE COURT:  Okay.  So he stated under oath that he believes that these are B.R.?

MR. BATES:  Yes.

THE COURT:  And was there any additional -- I'm sorry to cut you off.  I'm just trying to get a feel for your argument.  Was there any additional circumstances which he was able to cite to that led him to believe that these were B.R.?

MR. BATES:  You -- that's exactly where I was going, Your Honor.  Yes.  It was the manner in which -- it was the type -- so he dated her for five months, and they were friends for another five months.  They texted often.  She had a particular texting style.

For example, she spelled the word "really" without, I believe, like an A in the middle.  Or at the end, when she wanted to put emphasis on something, she would put the last letter five times.  So if she said, I love you, she would put "love" L-O-V-E-E-E-E.

So he noticed all of these discrepancies, and he will testify to that today.  And he also noticed that -- that when B.R.'s normal Facebook account would log off, these other accounts would log on at the same time.  And so he put all

B.R. v. F.C.S.B.

20

these pieces together and will testify as to why he believes
that it was B.R.

Now, we have very competent counsel over here that
can cross-examine him on that and can raise that issue, but
it's not an issue of authenticity. These messages are real.
They are sitting in his account today. It is not a question
of relevance because this is more relevance of B.R.
cyberbullying himself [sic].

So, Your Honor, we ask that you deny this request
and let's have the evidence come in.

THE COURT: Lots of notes are being passed your way.
I'll let you read the lots of notes that are being passed your
way.

MR. BATES: Counsel -- my co-counsel brought up an
important point as well. In one of these two chats that
apparently the plaintiff disputes is her, you will actually
see a reference -- he references her and says, "I know this is
you." So in realtime, he knew this was her.

THE COURT: Just a moment.

(Discussion off the record.)

THE COURT: All right. Oh, Mr. Blanchard.

MR. BLANCHARD: Bruce Blanchard for Defendant, J.O.
Your Honor, just very quickly, I would note that while the
plaintiff has stipulated to this, this witness will also tell
the Court that she never told him that she was --

B.R. v. F.C.S.B.

21

THE COURT:  Give me proper names and not pronouns.

MR. BLANCHARD:  Mr. Ki█ will say that B███, B.R.,
never told him that she was Jenni Taylor.  That only came out
because of this case.  So it wasn't like she was openly
telling people or told him, I was Jenni Taylor.  She was
cat-fishing him.

Structurally and contextually, the other two fake
accounts are the same, the message structure.  I'm an
outsider, you don't know me or I'm not telling you who I am,
and then, I know your girlfriend or I know your ex-girlfriend.
Not only are the -- the grammatical and typing --

THE COURT:  Syntax, style.

MR. BLANCHARD:  Thank you, the same, but just
structurally and contextually they are very similar.

THE COURT:  All right.  Well, I think the best
way -- did you want to close your argument?

MR. KEEFE:  If I may, Your Honor.

THE COURT:  You may.

MR. KEEFE:  I would like to contrast what -- in the
cases I cited to you is found to be -- sufficiently lay the
foundation to make the Facebook profile relevant to the issues
in the case.

In one case, the *Brown* case, the defendant admitted
that the Facebook account belonged to him, so the messages on
it were relevant.  In the *Farad* case, the Facebook account was

B.R. v. F.C.S.B.

22

registered to the defendant's email address and the photos at issue showed the defendant's distinctive tattoos.

And, Your Honor, let me just -- I'll read for you the relevant part of Mr. Ki█'s deposition testimony, if I may. I think it goes to this.

You know, this is not expert testimony about syntax. And I'll read what Mr. Ki█ described it.  It says, "I mean" -- and this is at page 73 starting at line 20.  "I mean, down to -- and again, I'm -- this is just my amateur opinion.  I'm not, like, whatever you call it, like, a forensic type, whatever, you know what I'm saying?  But like the way she would spell stuff -- sorry, like the way she would spell your, so she used like 'UR' stuff a lot I remember."

So I just don't think that's sufficiently -- from a lay witness, it lays the sufficient foundation to make those messages relevant yet.

THE COURT:  Well, I think this issue comes down as to how the case plays out.  We'll listen to what Mr. C.K. [sic] says and we'll work from there.  In the meantime, I'm going to look at the cases that you cite.  I just had my chief of staff run the cases off.  So, we'll take a look at the cases and so that I have a better understanding as to how those jurors resolved the issue.

MR. BATES:  Your Honor, if the Court is going to be looking at cases, we would direct the Court to our filing at

B.R. v. F.C.S.B.

23

599 that has to do with the authentication of messages like

this.  That briefing had to do with C.K.'s messages, but the

cases in that brief, Specifically at page 10 of the ECF

number, discusses the low bar of authentication.  I think the

Court will find those helpful.

(Discussion off the record.)

THE COURT:  All right.  Is there anything else we

need to do?  All right.  We can bring the jury in.

(Jury present.)

(Witness seated.)

THE COURT:  You may be seated.  Good morning, ladies

and gentlemen.

(Good morning responses.)

THE COURT:  Trust that you all were able to live up

to the Court's instruction not discuss the case or any aspect

of the case with anyone.  In that regard, I want to follow up

on a couple of things.

And this is a relatively small courthouse and we

live in a relatively small community in the Alexandria area,

and I don't want to in any way discourage people from being

kind and nice and extending the appropriate niceties of the

day.

But two things, lawyers are real, real uncomfortable

when they have contact with jurors.  They try to avoid it to

the extent they can.  I always say that there's absolutely

nothing wrong with saying good morning or good afternoon or having a good day.  There's nothing wrong with that.  There's nothing wrong with a nod just acknowledging that a person that you know has passed you by.  There's nothing wrong that.  The lawyers feel very uncomfortable when they have to basically have a conversation with you, whether it's about the case or not.

So I would encourage you to consider the fact that these -- all these lawyers, as far as I know, are all very good people.  They are very nice people.  They are not going to -- and I can say this -- do anything that is going to violate any ethics with regard to their professional responsibility in dealing with jurors.

And so, again, I don't have any problem with you saying good morning, good evening, good night.  I'm sure you'd like to say good night because you're leaving, but -- obviously there's nothing wrong with that, but the lawyers are very, very uncomfortable when they have this contact.

In addition to that, we have several people in this case who are going to testify.  It's probably a good idea not to have even indirect contact with them, even if you are talking about how bad the Commanders football team is.  You probably don't even want to talk about that.  So, if there are any witnesses, again, it's all right to nod your head, acknowledge that they exist and they may speak to you and say

B. R. v. F. C. S. B.

25

good morning or whatever, but as far as any conversations, whether they are related to the case or not, is probably not a good idea.  So, try to avoid that to the extent that you can.

You might recall also that at the beginning of the trial I gave you an instruction to avoid all kinds of media, social media, print media, and the like.  And so I want to reiterate that to you, that you probably want to stay away from that.  Even the most slightest thing could lead you down the path that you don't want to go to.  So to the extent you can, I would encourage you to stay away from social media and all contacts during the course of the trial.

Obviously, you can check your work emails and things like that, but try to avoid the social media and also the print media, because sometimes there are things that are printed that you might not even know you're reading.  Then you've gotten something that you might need to bring to the attention of the Court.  So, again, just stay away from the newspapers.  That's probably a good idea to some, extending the social media to include newspapers and the like.  So, just stay away from all of those.

We're getting through the trial pretty well.  We're going at a decent pace.  And we're going to work with you to allow you to get this case in a timely manner and allow you to fulfill your responsibilities.

But there are things that I'm going to have to go

B.R. v. F.C.S.B.

over with you from time to time which are probably the

fluidity of the case so just, as best you can, follow the

Court's instructions.  All right.

       Very good.  Are we fine?  Everyone agree?

       MR. BATES:  Good, Your Honor.

       MR. BRENNER:  Yes, Your Honor.

       THE COURT:  All right.

       (Witness seated and remain under oath.)

           CROSS-EXAMINATION

BY MR. BATES:

Q.   Good morning, Mr. Ki█.

A.   Good morning.

Q.   My name is Ryan Bates.  I represent --

       THE COURT:  You're still under oath, sir.

       MR. BATES:  Thank you.

BY MR. BATES:

Q.   My name is Ryan Bates.  I represent Fairfax County School

Board.

       Mr. Ki█, you knew B.R. from December 2011 to

October 2012; is that right?

A.   That's correct.

Q.   Okay.  And you were very close with her during that

period, right?

A.   Yes, I was.

Q.   And during that period you were boyfriend and girlfriend

B.R. v. F.C.S.B.

27

with her and also close friends with her; is that right?

A.   That's correct.

Q.   So I'm going to start my questions with some of the
topics that Mr. Keefe raised with you yesterday.

So when questioned by Mr. Keefe you were asked a lot
of questions about rumors, right?

A.   Yes.

Q.   Okay.  And I'm going to ask you right now about what you
personally saw, not about any rumors or not about any hearsay.

Did you personally see B.R. being sexually assaulted
at any point while she was at Rachel Carson Middle School?

A.   I did not see her sexually assaulted.

Q.   Did you see B.R. being touched in any unwanted way while
she was at Rachel Carson Middle School?

A.   No.

Q.   Did you see B.R. being sexually harassed in any way while
she was at Rachel Carson Middle School?

A.   Yes.

Q.   Okay.  You gave a deposition in this case, right,
Mr. Ki█?

A.   Yes.

Q.   And there was a court reporter there?

A.   Yes, there was.

Q.   And I was there?

A.   Yes.

B.R. v. F.C.S.B.

28

Q.   And B.R.'s lawyers were there?

A.   That's correct.

Q.   And that deposition was in the summer of last year?

A.   Just about, yes.

Q.   Okay.  And your deposition was closer in time to the
events that we're talking about today?

A.   By nine months but, again, that's still 11 years prior.

Q.   Okay.  I asked you questions at the deposition?

A.   Yes, you did.

Q.   And the other counsel in this case asked you questions?

A.   Absolutely.

Q.   And you gave answers?

A.   Yes.

Q.   And the court reporter took down what you said, right?

A.   Yes.

Q.   Okay.  And you took an oath at that deposition, right?

A.   I did.

Q.   And you swore to tell the truth?

A.   I did.

Q.   And you did tell the truth?

A.   Yes.

          THE COURT:  It's getting a little bit cumbersome.
Ms. Tinsley, if you could present that to the witness.

          Sir, he's going to ask you to take a look at a
certain page of that deposition.  After you read that

─────────B.R. v. F.C.S.B.─────────

deposition, at the portion of the deposition, look back up to

let us know that you're ready to answer any follow-up

questions.

          THE WITNESS:  Yes, sir.

BY MR. BATES:

Q.    So, Mr. Ki█, I've handed you your deposition.  Have you

seen this before?

A.    I have.

Q.    And if you can turn to page 48 of that deposition.  I'm

going to give you a moment to get there.  If you can let me

know when you're there.

A.    I'm on 48.

Q.    And if you could look at the very last line on 48.  It

starts at 21.

A.    21.

          THE COURT:  Read it to yourself.

          THE WITNESS:  I'm good.

          THE COURT:  Yes, sir.

BY MR. BATES:

Q.    And I'm going to ask you that question one more time.

          Did you witness B.R. being sexually harassed in any

way while she was at Rachel Carson Middle School?

A.    So I understand I can correct my deposition.

          THE COURT:  You can answer the question yes or no.

BY MR. BATES:

B.R. v. F.C.S.B.

30

Q.    Answer the question, please.

A.    Yes, I did.

Q.    Okay.  So in your deposition in which you were under

oath, the question was asked to you:

        "QUESTION:  Did you witness B.R. being sexually

harassed in any way while she was at Rachel Carson?"

        And the answer you gave was "No"; is that correct?

A.    That's correct.

Q.    Let me be a little bit more broad with my questions.

Those questions focused on Rachel Carson, but you interacted

with B.R. outside of Rachel Carson, right?

A.    That's correct.

Q.    Okay.  So at any time have you ever witnessed B.R. being

sexually assaulted?

A.    I've never seen her sexually assaulted.

Q.    At any time have you witnessed B.R. being touched in any

unwanted manner?

A.    No.

Q.    At any time have you witnessed B.R. being sexually

harassed?

A.    Yes.

Q.    Okay.  If you can take a look at your deposition again.

A.    Okay.

Q.    And if you can direct your attention to page 50 at

line 19.  Are you there, sir?

Redirect - Co.K.

─── B.R. v. F.C.S.B. ───

31

A.    Line 19.  Yes.

Q.    Okay.  It says:

        "QUESTION:  And at any time have you witnessed B.R.

being sexually harassed?

        "ANSWER:  No."

        Did I read that correctly?

A.    You read it correctly.

Q.    Thank you.

        So let's talk about what B.R. may or may not have

told you, okay?  She never told you that she was sexually

harassed at school, correct?

A.    That's not true.

Q.    I'm sorry.  Let me rephrase my question.

        B.R. never told you that she had been sexually

assaulted at school?

A.    No, she never told me she'd been sexually assaulted at

school.

Q.    Thank you for the clarification.

        She never told you that she had been raped at

school?

A.    No, not at school.

Q.    And she never told you that anything happened to her in a

closet at school, right?

A.    No.

Q.    And she never told you that she had been sexually touched

by her locker in school, had she?

A.   I don't think so.  I don't remember that.

Q.   And she never told you that a boy in her history class

had put his hands down her pants, did she?

A.   I don't remember that.

Q.   And she never told you that Defendant C.K. had burned her

with a lighter, did she?

        MR. KEEFE:  Objection, Your Honor.  May I approach?

        MR. BATES:  Your Honor, this is in the complaint.

        (Side bar.)

        MR. KEEFE:  My objection is the use of the

defendant, C.K., he is not in this case.

        MR. BATES:  I apologize that -- he's been a

defendant for five years -- and with the similarities --

        THE COURT:  Just clean it up.

        MR. BATES:  Okay.

        THE COURT:  Just clean it up.

        MR. BATES:  You're right.  I apologize.

        MR. KEEFE:  Just using the allegations in the

complaint to with -- with this witness I think --

        MR. BLANCHARD:  I'm sorry.  I can't hear.

        THE COURT:  He's making reference to the statement

that the allegations in the complaint actually highlighted

some things, and so what I'm going to do is I'm going to let

you have the opportunity to see if you can clean it up a

B.R. v. F.C.S.B.

33

little bit by referring to C.K. appropriately as far as the
status of this case is concerned.

        MR. BATES:  Okay.

        THE COURT:  And then on redirect -- I'm coming to
the place on redirect, I'm going to give you a lot of latitude
as far as trying to clean up what you think is appropriate.

        MR. KEEFE:  Thank you, Your Honor.

        MR. BLANCHARD:  Just so I'm aware, Your Honor, that
has implications for my client, so I would kind of like to
know what the cleanup is.

        THE COURT:  Well, I will say this, and I -- because
I have this case on my mind all the time.  I don't recall
anything that this witness has said representing J.O. at all
to this point.

        MR. BLANCHARD:  I know, but I know it's in the
complaint about my client.

        THE COURT:  You think it's coming?

        MR. BLANCHARD:  It might.

        THE COURT:  All right.  We'll see what happens as
far as that is concerned.

        (Open court.)

BY MR. BATES:

Q.   Mr. Ki█, B.R. never told you that C.K. had burned her
with a lighter, correct?

A.   I don't recall that.

B.R. v. F.C.S.B.

34

Q.   And you don't recall seeing any burn marks on her body during that ten-month period that you knew her?

A.   I couldn't say for sure.

Q.   And if you can take your deposition again and go to page 124.

A.   124.

Q.   And I'll direct you to line 3.  It says:

        "QUESTION:" --

            MR. KEEFE:  Your Honor, improper impeachment.

            MR. BATES:  Can you --

            THE COURT:  Why don't you let him take a look at that particular provision.

BY MR. BATES:

Q.   If you can read to yourself line 3 through 5, and then I will ask you the question again.  Again, 124, line 3 through 5.

A.   I see it.

Q.   Did you see any burn marks on B.R.'s body?

A.   Again, I responded here, "I don't think so," but I wouldn't know for sure.

Q.   Okay.  B.R. never told you that C.K. had cut her with a knife, correct?

A.   That's correct.

Q.   At the time that you knew her, did you notice any cut marks on B.R.'s body?

B.R. v. F.C.S.B.

35

A.    I did.

Q.    And where were those cut marks?

A.    To my recollection, they were generally on the arms
and -- definitively I will say the arm.

Q.    Okay.  Can you show the jury where on the arms, just on
your arms as an example?

A.    The inner forearm.  (Demonstrated.)

Q.    Okay.  Did she tell you how she got those cut marks?

A.    Yes.

Q.    And what did she tell you?

A.    She said they were self-inflicted.

Q.    So in other words, she was cutting herself?

A.    That's correct.

Q.    Mr. Ki█, you went to Rachel Carson Middle School for two
years; is that right?

A.    That's right.

Q.    And you would consider it to be a safe school?

A.    Generally, yes.

Q.    And there weren't any fights at the school that you can
remember, correct?

A.    I'm sure there were, but it wasn't an epidemic like in
some other schools.

Q.    Well, let me be a little bit more pointed with my
question.

A.    Okay.

B.R. v. F.C.S.B.

36

Q.    Do you remember any fights at Rachel Carson Middle

School, sitting here today?

A.    No.

Q.    Okay.  Thank you.

You never encountered any random groups of adult

males roaming the halls at Rachel Carson, did you?

A.    I did not.

Q.    I would like to switch to a slightly different topic

here.

You testified yesterday about being called into the

office by several different assistant principals -- well,

actually let me back up for a moment.

You recall that you gave a statement to the school

on February 15th?

A.    That's correct.

Q.    Okay.  And you testified yesterday that after giving that

statement, you had been called into the office by several of

the assistant principals; is that correct?

A.    That's correct.

Q.    And one of those principals was Ms. B██████?

A.    Yes.

Q.    And the others were Ms. T████ and Mr. H██████?

A.    Yes.

Q.    Okay.  Did -- in this meeting with Ms. B█████, when she

called you in, did she tell you that she didn't believe what

B.R. v. F.C.S.B.

37

you had written down?

A.    Which meeting?

Q.    Any of the meetings.

A.    No.

Q.    Okay.  Did she tell you to change your statement?

A.    She didn't tell me to change my statement.

Q.    Okay.  And let's switch to Mr. H████.  In any of the

meetings with Mr. H████, did he tell you that he did not

believe what you wrote in that statement?

A.    I don't recall that.

Q.    And did he, Mr. H████, tell you to change your

statement?

A.    No.

Q.    And let's turn to Ms. T████.  In that meeting with

Ms. T████, did Ms. T████ ever tell you that she didn't believe

what you had told the school?

A.    She didn't tell me she didn't believe me.

Q.    So that would be a "no"?

A.    Sure, yes.

Q.    Okay.  And did Ms. T████ tell you to change your

statement?

A.    No.

Q.    If I can have Grady pull up Plaintiff's Exhibit 149,

which was admitted yesterday.

         This is your statement, and you will have it on the

Case 1:19-cv-00917-RDA-LRV    Document 1045    Filed 08/26/24    Page 38 of 186
PageID# 21148
Redirect - Co.K.

──── B.R. v. F.C.S.B. ────

38

screen, and it will also be probably in one of the books in front of you.

THE COURT:  Ladies and gentlemen of the jury, you've heard a few times over the course of the litigation counsel refer to Grady.  Grady is their technology assistant who is actually working the board in the back.  Okay.

MR. BATES:  Thank you, Judge.

THE COURT:  Yes, sir.

MR. BATES:  That was one of the many things referenced earlier, but there's been a lot of conversation.

BY MR. BATES:

Q.  So do you have that statement in front of you, either on the book or on the screen?

A.  I have both.

Q.  All right.  Great.  And this is the statement that you were asked about yesterday, right?

A.  Yes.

Q.  And this -- you wrote this statement on February 15, 2012?

A.  That's correct.

Q.  And this is about an incident that had happened the previous week; is that right?

A.  Yes.

Q.  Okay.  And you know that because the first four words are "on Wednesday last week," right?

─B.R. v. F.C.S.B.─

39

A.   Yes.

Q.   And you were out of school in the days prior to writing this statement; is that correct?

A.   I know I was out of school for a few days during this time period, but I couldn't say if it was before or after this statement.

Q.   Okay.  And at the time you wrote this statement, B.R. -- who was your girlfriend at the time, right?

A.   Yes.

Q.   So at the time you wrote this statement, B.R. was already pulled from in-person classes at Rachel Carson, correct?

A.   I'm not sure about that.

Q.   Okay.  And so, despite this incident happening the week prior, the school was still investigating the incident; is that true?

A.   Yes.

Q.   And the school came to you, asking you to write this statement, correct?

A.   Yes.

Q.   Okay.  And when writing this statement, you attempted to be accurate, correct?

A.   Yes.

Q.   You attempted to be complete?

A.   Yes.

Q.   And so, I'm going to give you a moment to read this

statement to yourself one more time before I ask this next

question.  And just let me know when you're ready.

A.   I'm ready.

Q.   So isn't it true that in this statement the only thing

that you told the school was the comment that Ben Flowers had

made about you -- about B.R. to you in the cafeteria?

A.   In this written statement?  Yes.

Q.   You didn't add any other things that you may have seen or

heard or anything else in this statement, correct?

A.   You're talking about the verbal or written?

Q.   In your written statement.

A.   In the written, no.

Q.   And you didn't add any of the other details that you've

testified about to this written statement, correct?

A.   Correct.

Q.   So in your statement, isn't it true that you talk about

Ben Flowers coming up to you and saying bad things about B.R.?

A.   Yes.

        MR. BATES:  Okay.  If we can pull up Defendants'

Exhibit 206.  And, Judge, this has been stipulated by the

parties to be admitted, but if we can get verbal confirmation

from plaintiff's counsel on that.

        MR. KEEFE:  Just admit it into evidence?

        MR. BATES:  We would move to admit and publish.

        THE COURT:  Plaintiff concurs.  You may.

Redirect - Co.K.

B.R. v. F.C.S.B.

41

(Defendants' Exhibit No. 206, was admitted into evidence.)

BY MR. BATES:

Q.    And, Mr. Ki█, this will either be in the pocket of your white binder or you can look at it on the screen, and I will give you a moment to read this statement and let me know when you are done.

        Grady, if I could actually move to the second page of this document, it's a typed version of this.  It's a typed version.  It might be a little easier to read because of the handwriting and the shading.

A.    I read it.

Q.    In this statement, Ben Flowers said that B.R. started that interaction; isn't that right?

A.    In the statement, yes.

Q.    Ben Flowers said that B.R. told his brother to "suck his dick"; is that correct?

A.    In the statement, yes.

Q.    And that's B.R. saying that to Ben -- I'm sorry, and that's B.R. saying that to Ben, correct?

        MR. KEEFE:  Objection, misstates the document.

        THE COURT:  Rephrase the question, Counsel.

BY MR. BATES:

Q.    In the third line of this statement it says, "She said to tell him to suck his dick"; is that correct?

A.    In the statement, yes.

─── B.R. v. F.C.S.B. ───

Q.   And then according to Ben, he says that at that point, you came over; is that correct?

A.   Yes.

Q.   And then -- so according to Ben, you came over -- after this initial conversation between B.R. and Ben, you came over afterwards?

A.   That's correct.

Q.   And then he claims that in this second interaction between you and Ben, that you called him a "douche bag bitch"; is that correct?

A.   In the statement, yes.

Q.   And if you take a look at the third line -- the third row, I should say, up in the statement, Ben also claims that B.R. in this initial interaction called him an asshole, correct?  I'm sorry, an a-hole?

A.   I'm sorry, could you repeat the question.

Q.   Yeah.  In the third line of this statement Ben also claims that in this interaction between the two of them before you came over, that B.R. had called Ben an a-hole?

A.   That's what he claims, yes.

Q.   You testified yesterday that the school administration -- something along the lines of the school administration didn't do enough about bullying; is that correct?

A.   Yes.

Q.   And isn't it true that the discipline of one student, an

─────B.R. v. F.C.S.B.─────

43

8th grade student for example, isn't necessarily shared with
other students?

       MR. KEEFE:  Objection, foundation.

       THE COURT:  I think you need to lay a foundation for
that.

BY MR. BATES:

Q.    Do you have an understanding from your two years at
Rachel Carson, whether the discipline -- whether it was the
school policy to share disciplinary decisions involving one
student with other students?

A.    I couldn't answer any questions on F.C.S.B. policy.

Q.    Okay.  I'm not asking you to answer questions on policy.
I'm asking you, in your two years of being a student, was it a
practice, were you ever told about the discipline of another
student?

A.    No.

Q.    Okay.  So in other words, a 13-year-old Constantine may
not have known whether other students like Ben Flowers were
actually disciplined for this incident that we just talked
about?

A.    Well, it depends who is telling me.

       THE COURT:  Would it be fair to say that generally
if a student at the school is disciplined, other students
generally would not know about it?  Unless there was a
suspension and the child wasn't there.

THE WITNESS:  I mean, sir, the student himself could

have told everyone.  I mean -- there's nothing stopping the

student.

BY MR. BATES:

Q.   Okay.  That's fair.  That's fair.

So, other than the student telling them, I'm talking

about from the administration to the student body --

A.   Yeah.

Q.   -- that's not normal?

A.   That's not normal.

Q.   Okay.  So Ben Flowers could have been disciplined for

this and you didn't know about it?

A.   It's possible.

Q.   Okay.  Switching to our next topic, did you testify

yesterday that you heard a student call B.R. a lesbian?

A.   Yes.

Q.   And was that student -- did that student that say that

have any affiliation with band?

A.   I don't recall.

Q.   Okay.  Isn't it true that you're not sure whether you

reported that comment to school administration?

A.   Yes.

Q.   So you can't -- sitting here today, you cannot testify

and tell this jury that you told school administration about

that lesbian comment; is that correct?

—B.R. v. F.C.S.B.—

45

A.    For that comment, that's correct.

Q.    We heard about something called scooping yesterday; is
that true?

A.    Yes.

Q.    And by the way, Mr. Ki█, I know you may anticipate my
testimony, but the court reporter would appreciate it if you
just let me finish my question and then she'll be able to take
it down; is that okay?

        THE COURT:  For the record, Mr. Bates is not
testifying; he's asking questions.  So, it's an examination.

        You said testimony "your testimony."  I think you
meant your examination.

        MR. BATES:  Yes, thank you, Your Honor.

        THE COURT:  All right.

BY MR. BATES:

Q.    You testified yesterday about scooping, didn't you?

A.    I did.

Q.    And you said that's when a boy grabs a girl's breast; is
that correct?

A.    Sort of.  It's when a boy does, like, the sweeping motion
under their breast with their hand.

Q.    Okay.

A.    It could be grabbing, it could not be, but definitely
that's the motion.

Q.    Okay.

───────B.R. v. F.C.S.B.───────

46

A.    Because he thought it was funny.

Q.    And isn't it true that you only recall seeing scooping

happening one time?

A.    I think in my -- my deposition I said at least once.

Q.    Okay.  So can you think of more than one time, can you

testify here today that you saw scooping happen more than one

time?

A.    Not today, nope.

Q.    Okay.  And that one time you saw that, that occurred on

the school bus; is that correct?

A.    That's correct.

Q.    Okay.  And are any of the people sitting in this --

around these tables, were they on that school bus when that

happened?

A.    No.

Q.    Okay.  And you did not report this scooping incident to

the school administration, did you?

A.    No.

Q.    And you never saw B.R. get scooped, did you?

A.    No.

Q.    So, Mr. Ki█, we talked about your deposition being taken

in the summer; is that correct?

A.    Yes.

Q.    Have you spoken with B.R. since your deposition?

A.    No.

B.R. v. F.C.S.B.

47

Q.   Okay.  Why do you say it like that?

A.   I purposely avoided it.

Q.   Okay.  Have you talked to any member of B.R.'s family
since your deposition?

A.   No.

Q.   Okay.  Have you spoken with any of B.R.'s lawyers or
investigators since your deposition?

A.   Yes.

Q.   Okay.  And when is the last time you spoke with one of
B.R.'s lawyers?

       Or actually, let me back up.  Did you speak to
B.R.'s lawyers about your testimony today?

A.   About my testimony today?  No.

Q.   Okay.  When was the last time you spoke with B.R.'s
lawyers?

A.   Before yesterday's testimony.

Q.   Okay.  And that conversation yesterday was about the
testimony that you started yesterday; is that right?

A.   Yes.

Q.   Okay.  All right.  I'm going to go back in time a little
bit and ask some general questions.

       You were not zoned to go to Rachel Carson Middle
School, were you?

A.   That's correct.

Q.   And based on your address, you were actually supposed to

B.R. v. F.C.S.B.

48

go to Langston Hughes Middle School, right?

A.    Yes.

Q.    And so you made a special request to go to Rachel Carson?

A.    That's right.

Q.    And Principal F▮▮▮▮▮, he approved that request?

A.    I believe so, yes.

Q.    Just to make sure we're clear on the timelines, you met
B.R. in December 2011; is that right?

A.    That's right.

Q.    And you became friends at that time?

A.    Yes.

Q.    And then you started dating her the next month, in
January 2012; is that right?

A.    Yes.

Q.    Okay.  So you were friends for about a month before you
started dating?

A.    Right.  That's right.

Q.    And then, so you start dating in January and then you
break up in June of that same year; is that right?

A.    That's right.

Q.    Okay.  So dated for about five months?

A.    Yes.

Q.    Okay.  And then from June --

A.    That would be six, five or six.  That's fine, though.

Q.    Okay.  Thank you.

Case 1:19-cv-00917-RDA-LRV    Document 1045    Filed 08/26/24    Page 49 of 186
PageID# 21159
Redirect - Co.K.

B.R. v. F.C.S.B.

49

And from June until October of that year, you stayed friends with her; is that right?

A.    That's right.

Q.    Okay.  So in total you knew her -- that's a lot of math -- maybe about 10 or 11 months?

A.    That's correct.

Q.    And during that time period you spent time together in school; is that right?

A.    Just in January, February, yes.

Q.    That's right.  Well, December --

A.    Oh, yes.

Q.    -- January, February --

A.    Including December, yes.

Q.    You went to see her at her locker at times; is that right?

A.    Yes.

Q.    And you never saw anyone sexually harass or improperly touch B.R. at her locker; is that right?

A.    Not at her locker, no.  Not at her locker, no.

Q.    Okay.

A.    Actually, wait.  Correction.  The kid who called her a lesbian, right, as a derogatory thing, but that is a form of sexual harassment.

Q.    Okay.  So let me rephrase my question.

A.    Yes.

B.R. v. F.C.S.B.

50

Q.   So are you saying that the lesbian comment that we just talked about, that was the comment, and you heard that in the locker bay?

A.   That's right.

Q.   Okay.  And that's the comment that wasn't reported to administration?

A.   That's correct.

Q.   Okay.  And so let me be more specific and I appreciate the clarification.

     The times that you went to B.R.'s locker, did you actually see her ever getting sexually or physically assaulted?

A.   No.

Q.   And you spent time together outside of school; is that right?

A.   That's right.

Q.   And where would you spend time with her?

A.   Usually at her house.

Q.   Okay.  And sometimes she went to your house, too, right?

A.   Every now and then, yes.

Q.   Okay.  But mostly it was at her house?

A.   I would say 90 percent at her house.

Q.   And sometimes to get from school to her house, her mother picked you up; is that right?

A.   Yes.

B.R. v. F.C.S.B.

51

Q.   Okay.  Did her father or brother also pick you guys up
and bring you from school to their house?

A.   Her father, yes.  I couldn't say anything about the
brother.

Q.   Okay.  So mom and dad both at times picked you guys up
and took you from school to her home?

A.   I think that would be inaccurate, because -- hold on.
Actually, yes, that's correct.

Q.   Okay.

A.   While she was still at school.

Q.   Yes, understood.

        And when you were dating during this five-month
period, you went to her house probably about one to two times
a week; is that right?

A.   That's correct.

Q.   And you would stay at her house for maybe up to two
hours?

A.   Could have even been up to three or four.

Q.   Okay.  And sometimes you would stay for dinner, right?

A.   Yes.

Q.   And you would even take walks around her neighborhood?

A.   Short ones, yes.

Q.   Okay.  And she lives in a pretty -- she lived at the time
in a pretty nice neighborhood?

A.   Yes.

B.R. v. F.C.S.B.

52

Q.   You didn't encounter any issues on your walks?

A.   No.

Q.   Nobody trying to assault or harass you guys in any way?

A.   No.

Q.   Okay.  And you would actually go on excursions with her at this time, right?

A.   Yes.

Q.   And, for example, you went to an Easter event in Washington, D.C.?

A.   That's correct.

Q.   And so you spent a good amount of time with B.R.'s family, right?

A.   Yes.

Q.   And you would describe B.R.'s mother as very protective?

A.   Yes.

Q.   And she had an aggressive nature?

A.   Sometimes, yes.

Q.   And you would describe her as a helicopter parent?

A.   Yes.

Q.   And you have used that word to describe her yourself?

A.   I believe so, yes.

Q.   And she would hover over the two of you; is that right?

A.   Yes.

Q.   And she would always be asking B.R. what the two of you were doing?

A.    Yes.

Q.    And, in fact, you thought that that seemed a little bit

obsessive; is that right?

A.    At the time, yes.

Q.    And B.R. had a phone at that time that you dated; is that

right?

A.    Yes.

Q.    And this was a smartphone?

A.    Yes.

Q.    And a smartphone is one that has internet access, right?

A.    That's correct.

Q.    So she had access to Facebook on that phone?

A.    Yes.

Q.    And did she have access to this application called

Facebook Messenger?

A.    Yes.

Q.    Are you struggling because it may not have been a

separate app at that moment?

A.    Yes.

Q.    But you know that she communicated during -- using the

Facebook application; is that right?

A.    That's correct.

Q.    And there's a direct message function in the Facebook --

associated with Facebook that allows a person to send a

message directly to another person?

─────B.R. v. F.C.S.B.─────

54

A.    Yes.

Q.    And that's essentially like a text message?

A.    Yes.

Q.    Okay.  And just to be clear, B.R. used that?

A.    Yes.

Q.    And she used it with you?

A.    Yes.

Q.    And she used it with other students as well?

A.    Yes.

Q.    Okay.  And when you dated her, B.R. used vulgar language, didn't she?

A.    Yes.

Q.    And would she do that in front of her parents?

A.    I don't think so.  I don't recall.

Q.    And she would use sexually vulgar language, wouldn't she?

A.    Sometimes, yes.

Q.    Okay.  We talked about cyberbullying yesterday.  And isn't it true that -- I'm sorry, I don't think we got a verbal response there.  We talked about cyberbullying yesterday?

A.    We did.

Q.    And by "we," I mean you and Mr. Keefe; is that correct?

A.    That's correct.

Q.    Isn't it true that you believe that B.R. has engineered her own cyberbullying?

A.    Not all of it, but some of it.

─────B.R. v. F.C.S.B.─────

55

Q.   Okay.  You've used those words, right, yourself,

"engineered her own cyberbullying"?

A.   I don't recall.  If it's in the deposition, please point

it out.

Q.   Okay.  Can you take a look at page 107, and I'll just

direct you to a line -- at 107 at line 14, if you can just

take a look at that, and I will re-ask my question.

A.   Okay.  I see it.

Q.   You've used that word yourself, "engineering," that B.R.

has engineered her own cyberbullying; is that right?

A.   Yes.

Q.   So in other words, she has basically bullied herself

under fake Facebook accounts; is that right?

A.   That's right.

Q.   And these were several Facebook accounts; is that right?

A.   That's right.

Q.   You testified very briefly yesterday about Jenni Taylor;

do you remember that?

A.   I do.

Q.   I believe it was only about three questions; do you

recall that?

A.   I do recall that.

Q.   And you testified that you believe that B.R. was Jenni

Taylor; is that correct?

A.   That's correct.

Redirect - Co.K.

———B.R. v. F.C.S.B.———

56

Q.   And can you describe for the jury why you believed --
well, let me back up for a moment.

         At the time that you were speaking with Jenni
Taylor, did you know that it was B.R.?

A.   At the time, no.

Q.   And you figured that out at a later time?

A.   That's correct.

Q.   And we'll get into that in a moment.  But what made you
believe at some point late -- after the conversation that B.R.
was Jenni Taylor?

A.   Two main things.  One, the way they text was identical.
So if you look at the spellings, certain abbreviations, so
"thanks," THX.  With three M's, for example.  "Really" with
only the Y and the vowel.  I'm giving examples here.

         So if you were to put B.R.'s text side by side with
Jenni Taylor's, it looks like the same person to me.

         Second, when one was online, the other was not.  One
account would hop offline, the other would come online and
start messaging me.

Q.   So I know what you're talking about with No. 2 because
I've used Facebook for a while, but there may be some jury
members who don't understand how you can tell when one person
hops off and one person hops on.  So can you explain that for
the jury?

A.   So in Facebook Messenger, when you're online, there's

───── B.R. v. F.C.S.B. ─────

usually a green dot, and at the time there was as well, saying that you are online.  When you came offline, it would go -- the dot would turn white, kind of like Microsoft Teams, if you're familiar with that.

So when one account would come offline, the dot would switch from green to white, and I noticed that, and the other account goes online white to green.

Q.  Thank you, sir.  So you believed that B.R. was cyberbullying herself through that Jenni Taylor account?

A.  Through this account, yes.

Q.  Okay.  And you weren't shown any of those messages yesterday in your testimony -- during your questioning?

A.  No.

Q.  And you received a document, a subpoena in this case, right?

A.  Yes.

Q.  And that subpoena requested communications between you and B.R.; is that correct?

A.  Yes.

Q.  And you produced those Jenni Taylor messages in response to that subpoena, correct?

A.  Correct.

MR. BATES:  If we can pull up Exhibit 73, please.

Yes.  Thank you.

Your Honor, the parties have stipulated to the

—— B.R. v. F.C.S.B. ——
58

admission of Exhibit 73, and I'll let counsel confirm that

stipulation for the record.

　　　　　MR. KEEFE:  Yes, Your Honor.

　　　　　THE COURT:  Thank you.

　　　　　MR. BATES:  And we'd like to move to admit and

publish Exhibit 73.

　　　　　THE COURT:  You may.

(Defendants' Exhibit No. 73, was admitted into evidence.)

BY MR. BATES:

Q.　Mr. Ki█, this is in your booklet, the white booklet at

DX-73.  So you can feel free to use -- it might actually be

better to use the booklet since this is a multipage document,

but it's up to you, sir.

A.　Okay.

Q.　So if you want to flip through this, we don't have to

read it right now, but if you can just flip through this and

answer this question when you're ready, what is this document?

A.　This is another set of messages I produced in response to

the subpoena.

Q.　Okay.  And where were these messages stored?

A.　Facebook Messenger on my account.

Q.　And how did you -- when you received the subpoena, how

did you -- walk us through how you went about locating these

messages and putting them in this current format and sending

them to the lawyers.

B.R. v. F.C.S.B.

59

A.   Very simple.  First I use a search function to -- I typed

in B▮▮▮▮, B▮▮▮ R., full last name.  When I didn't find

anything with that -- because sometimes the search function

doesn't want to pull up very, very old messages, so I just

start scrolling back and back through the history, until I got

to the very bottom oldest messages, and that's where I found

these.

Q.   So to your knowledge, are these messages still in your

Facebook account?

A.   I believe so, yes.

Q.   And it says "Facebook user" at the top.  Do you

understand why?

A.   My understanding is that that account was deleted.

Q.   And what makes you believe that?

A.   When you delete an account, the messages will still

remain.  My understanding is that Facebook holds on to them in

their servers, but there's no name tied to the account because

there's no more profile.

          MR. BATES:  At this time, I would ask -- represent

to the Court that the parties have agreed to stipulate to the

admission of the Defendants' Exhibit 18, and I would ask

counsel to confirm that stipulation.

          MR. KEEFE:  That's correct, Your Honor.

          MR. BATES:  And I would move for these to be

admitted and published.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

60

THE COURT:  You may publish.

(Defendants' Exhibit No. 18, was admitted into evidence.)

BY MR. BATES:

Q.   I want to take a look at this quickly before we move back
to the other document, Mr. Ki█.  This is also in -- it's DX-18
in your book there.  And we can -- you can flip through this,
but let's start -- let's start at the first page because --
what is this document?

A.   So this document -- this is the email I sent to the R.
family with the Jenni Taylor messages attached.

Q.   So you emailed this document yourself?

A.   I did.

Q.   And you sent this to B.R.'s mother?

A.   I think that's her email.  I cannot confirm.

Q.   And you sent this on March 1, 2012; is that correct?

A.   March 1, 2012, that is correct.

Q.   So at the time that you sent this, you and B.R. were
dating; is that correct?

A.   Yes.

Q.   And B.R. was out of school at that moment?

A.   Yes.

Q.   And what is the name of the individual as shown in this
document that you are having this conversation with?

A.   Jenni Taylor.

MR. BATES:  And if I can ask Grady now, let's do a

B.R. v. F.C.S.B.

61

side by side.  Let's put up on the screen Defendants'

Exhibit 18 and 73.

       (A pause in the proceedings.)

       THE COURT:  I don't claim to be expert, but I am

going to volunteer.  I think if you take your cursor and move

it off the middle of the screen, it will open up the middle of

the screen to allow the other one to be posted.

BY MR. BATES:

Q.  Or you can do this, Mr. Ki█.  How about on the screen,

maybe in the meantime we can see if we can get this worked

out, but take a look at -- 73 can be on your screen, but take

a look at 18 in your book and that way you will have them side

by side, and you can answer this question.  What's the

difference between these two documents?

       Or let me rephrase my question, ask a little bit

more pointed question.  Is this the same conversation that

we're looking at?

A.  Um, no.

Q.  Hold on one moment.

       THE COURT:  Take that exhibit down.  There we are.

Now I think you can probably get 18 on the second portion of

the page.

       In other words, sir, what he's asking you to do is

take a look at what is 73 that's in front of you and 18 that's

in the binder and see if they are the same thing.

─ B.R. v. F.C.S.B. ─

62

THE WITNESS:  Yes, sir, I understand.  These are the same.

BY MR. BATES:

Q.   Just one --

         THE COURT:  We've got two of 73 up there.

BY MR. BATES:

Q.   So we're looking at the same conversation; is that right?

A.   That's right.

Q.   Okay.  And I would ask you to flip to the last couple pages.  I think for purposes of the screen, we can just flip to the last page of each document.  And let me know if one conversation continues and another conversation -- if one conversation continues a little bit longer than the other conversation.

A.   Okay.  You said go to the last page?

Q.   Yeah.

A.   I'm just trying to find --

Q.   It might be best to just use your book maybe to go to the last page in 18 and then the last page in 73.

A.   I'm at the end of 73.  I'm sorry.  Yes.

Q.   Let me ask it this way; this might be a little bit easier.  You emailed the Jenni Taylor conversation on March 1st; is that correct?

A.   That's right.

Q.   Can you find out if DX-73 goes past March 1st?

─ B.R. v. F.C.S.B. ─

63

A.    It does.

Q.    Okay.  And so, you would agree that 73 is a longer

version of the same conversation?

A.    Yes.

Q.    Okay.  And so, let's take a look at 73.  And you just

believe 73 is -- even though it says "Facebook user," this is

a conversation between you and Jenni Taylor --

A.    That's right.

Q.    -- correct?

        Who was actually B.R., right?

A.    Yes.

Q.    Okay.  And the messages on the left --

        MR. BATES:  You can take down 18 and let's just put

73 on the -- the first page of 73 on the board.

BY MR. BATES:

Q.    Okay.  So here is my question.  On the left, who is

saying the items on the left, is that B███ or is that you?

A.    That will be B███.

Q.    And on the right is who?

A.    Me.

Q.    Okay.  And so, and the date of this conversation starts

on February 27, 2012; is that correct?

A.    That's correct.

Q.    And you can see that on the top of the -- the top there?

A.    Yes, I can.

Redirect - Co.K.

———B.R. v. F.C.S.B.———

64

Q.   Okay.  And so, this was during the time that you were

dating B.R., correct?

A.   Yes.

Q.   And it's about a month or two into the relationship?

A.   That's right.

Q.   And Jenni sent you that first message -- I'm just going

to say B█████ -- B.R., okay?

     And B.R. sent you that first message; is that right?

A.   Yes.

Q.   Okay.  And this message was -- from this account was out

of nowhere; isn't that right?

A.   Yes.

Q.   You had never had any other communication with this Jenni

Taylor account; is that right?

A.   That's right.

Q.   And she initially says, "Hey, sexy.  So, um, do you hate

B████?"

     Do you see that?

A.   Yes.

Q.   And you say, "Excuse Me," question mark; is that right?

A.   Yep.

Q.   And she says, "Ha, ha, read my status."

     Do you see that?

A.   I do.

Q.   And after that you say and --

─────────B.R. v. F.C.S.B.─────────

65

            THE COURT:  Document speaks for itself.

            MR. BATES:  And -- thank you, Judge.

BY MR. BATES:

Q.   When you said -- when you responded after she says, "Ha,

ha, read my status," you were angry; is that right?

A.   Yes.

Q.   And why -- what did this mean when it says, "Ha, ha, read

my status"?

A.   So Facebook status is the public posts that you can make.

I believe I went to the main part of Facebook, saw this user

post a long status and if I remember correctly, it was all

targeted at B████, just saying the usual mean stuff.

Q.   But --

A.   And then I came back and responded with these.

Q.   Okay.  So in other words, Jenni Taylor was bullying B████

on her main Facebook page; is that correct?

A.   No.  That would have been this account posting a status

for itself.

Q.   Right.  And that -- that status, as it's called in

Facebook, is --

A.   Right.

Q.   -- is publicly available; is that right?

A.   That's correct.

Q.   So she contacts you, says, "Look at my status," you go

look at the status, and it's her bullying herself in a -- just

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438───────

EASTERN DISTRICT OF VIRGINIA

─── B.R. v. F.C.S.B. ───

66

in a different form?

A.    Yes.

Q.    Okay.  And on page 3 -- in this section, you're trying to find out who -- in the initial page of this conversation you're trying to find out who Jenni Taylor is, right?

A.    On page 3?

Q.    Yeah.  So actually let me be more pointed with my question.

        On the bottom of page 3 Jenni Taylor says, "I may be J.O."

        Do you see that?

A.    I do.

Q.    And she says "Or C.K."

        Do you see that?

A.    Yes.

Q.    And then she says, "You will never know," right?

A.    Yes.

Q.    So she was hiding who she actually is, isn't that correct?

A.    That's correct.

Q.    And if you continue -- let's go to page 8.  And I'm sorry, the lettering is very difficult on that page.  It might be better to look at this on the screen because the Bates numbering is very small.

A.    I have both in front of me.

─B.R. v. F.C.S.B.─

67

Q.    Okay.  And the second line down it says, "I may be Kate."

        Do you see that?

A.    I do.

Q.    Who is Kate?

A.    That would be Kat or Kate Collela.  She went by both.

Q.    Is she your friend?

A.    Yes.

Q.    Okay.  And who's Alex?

A.    That would be --

Q.    You don't have to say his name.  Just, is Alex a friend

of yours?

A.    Yes.

Q.    And is Kaitlyn a friend of yours?

A.    Yes.

Q.    So at this point she's essentially saying, I may be this

friend, I may be this friend, I may be this friend; is that

true?

A.    That's true.

Q.    And how did that make you feel, that your friends were

being brought into this conversation?

A.    Made me upset.

Q.    And so, isn't it true that you thought during the course

of this conversation -- this is not the first time you've seen

this conversation; is this correct?

A.    That's correct.

───────B.R. v. F.C.S.B.───────

68

Q.    You saw it last year at your deposition?

A.    Yes.

Q.    Okay.  And in this conversation, you -- it's clear -- and
the jury can read this line for line later.  But it's clear
that you -- you think that this is actually C.K. who is behind
these messages, at least initially?

A.    Initially at this time, yes.

Q.    And so, at page 11 --

          MR. BATES:  If we can, Grady, go to page 11.

BY MR. BATES:

Q.    And can you read that top line for us?

A.    You want me to read that top line?

Q.    Yes.

A.    You want me to read that top line?

Q.    Yes.

A.    "So fuck off Kornefag."

Q.    Okay.  And you said that because you thought that he was
behind this?

A.    Yes.

Q.    And that's a combination of C.K.'s last name and a slur;
is that right?

A.    That's right.

Q.    And read the next couple of lines for us, please?

A.    "Everybody is going to know you're a rapist.  Oh, wait,
everybody already does on know," asterisk.

B.R. v. F.C.S.B.

69

Q.   Okay.  You thought C.K. was a rapist because B.R. had
told you that; is that right?

A.   That's right.

Q.   You had no other independent information to lead you to
believe that C.K. is a rapist?

A.   That's correct.

Q.   It was going around that school that C.K. had raped her;
isn't that true?

A.   Yes.

Q.   And that was started by B.R., right?

A.   That rumor?  I couldn't say for sure.

Q.   Okay.  Would it make much sense for C.K. to start a rumor
that he committed a serious crime?

A.   Not to me, no.

Q.   And, in fact, you were very angry at the author of these
messages; isn't that right?

A.   Yes.

Q.   Because -- and we'll read them in a moment, but there
were a lot of derogatory things in here said about your
girlfriend, right?

A.   That's right.

Q.   Okay.  And if you can turn to page 14.  And read for the
jury the three lines that you had said to -- through this
account.

A.   I apologize in advance.

B.R. v. F.C.S.B.

70

          "You bastard.  You can go rot in hell.  You

half-black motherfucker."

Q.   Okay.

A.   Sorry about that.

Q.   At the bottom of this page -- but now -- and now -- well,

actually let's do this.  Let's go back to the beginning of

this document.

          And now that we've gone through your trying to

figure out who this is, let's look at the actual messages that

this -- that B███ is telling you during this time.

          So let's take a look at the second page.  At the

bottom.

A.   Okay.

Q.   And isn't it true the second line from the bottom it

says, "She gives BJ's to everyone"?

A.   That's correct.

Q.   Okay.  And above that it says, "Your girlfriend stupid

ho."

          Do you see that?

A.   Yes.

Q.   And on the next page, she tells you she's a slut, right?

A.   Yes.

Q.   Okay.  And she tells you, "I hope she commits suicide";

is that right?

A.   That's right.

─────B.R. v. F.C.S.B.─────

71

Q.   And on the next page at the bottom under 1 and 2, it

says, "B███ is ugly.  God damn ho."

          Do you see that?

A.   Yes.

Q.   Let's skip forward to page 9.

          If you look at the top of that, that says, "She's a

ho.  That's B█████ job.  She's our bitch.  I enjoy hurting

her."

          Do you see that?

A.   Yes.

Q.   And below that, it says, "She's so fun to hurt"; is that

right?

A.   Yes.

Q.   And below that it says, "She's so fun to torture her."

          Do you see that?

A.   Yes.

Q.   "We love raping that bitch"?

A.   Yes.

Q.   I'll let you just cycle through these -- the rest of

these pages if you need to.  But -- and you can answer my

question whenever you're ready.

          These type of comments from B███ to you, her

boyfriend, continue for many more pages; is that right?

A.   That's right.

Q.   And they actually get more graphic?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

72

A.    I would say so, yes.

Q.    And in fact this was the most disturbing conversation you've ever had in your life; is that correct?

A.    Oh, 100 percent.

Q.    And in addition to sending you messages from the Jenni Taylor account to your Facebook account, isn't it true that B████, through the Jenni Taylor account also sent messages to B█████ personal Facebook account?

A.    That's correct.

Q.    And you know that because you've seen them?

A.    Yes.

Q.    So in other words, B████ sent messages under Jenni Taylor through her personal account and showed them to you; is that right?

A.    Yes.

Q.    As more evidence of bullying?

A.    Yes.

Q.    And those messages were similar in nature to the ones that we're reading here today?

A.    Yes.

Q.    We can put this down.

        We can go to Exhibit 18 again.  And, again, Mr. Ki█, this is the email conversation of the Jenni Taylor that you sent to the R. family; is that correct?

A.    That's correct.

B.R. v. F.C.S.B.

73

Q.   And this was sent on March 1, 2012?

A.   March 1, 2012.

Q.   Okay.  You sent these messages to the family at least in part because you knew they were going to sue the school system; isn't that right?

A.   Yes.

Q.   So in 2012, you knew that B.R. and/or her family were going to sue the school system?

A.   That's correct.

Q.   And, in fact, you were directly told by B.R. and her mother that they were getting ready to sue the school system?

A.   Yes.

Q.   And so, to be a supportive boyfriend and because these were so disturbing, you sent these to the family, correct?

A.   Correct.

Q.   Let's take a look at Exhibit 72.  Mr. Ki█ --

         MR. BATES:  I'm sorry, do not publish this to the jury yet.  I apologize for that.

BY MR. BATES:

Q.   Mr. Ki█, can you pull up 72 in your book, please?

A.   I have it.

Q.   We talked earlier that you received a subpoena in this case, right?

A.   Yes.

Q.   And it asked for communications between you and B.R.; is

─ B.R. v. F.C.S.B. ─

74

that right?

A.    Yes.

Q.    And you produced this communication that we're looking at

in response to that subpoena, correct?

A.    That's correct.

Q.    And you followed the same steps that you testified

earlier for the Jenni Taylor conversation to locate this

document; is that right?

A.    That's right.

Q.    And is it your belief based on your earlier testimony

about texting style, word spelling, logging in and out at the

same time, that you believe that this was B.R. behind this

Facebook account as well?

        THE COURT:  Hold on before you answer.  The Court is

aware of the arguments that have been made previously with

regard to these circumstances, and the Court believes that a

reasonable analysis of *U.S. v. Vayner* and *U.S. v. Barnes* would

allow this testimony to be provided to the jury.

        MR. BATES:  Thank you, Your Honor.  At this point, I

would like to move to admit and publish Exhibit 72.

        THE COURT:  Over objection, you may.

(Defendants' Exhibit No. 72, was admitted into evidence.)

Q.    And, Mr. Ki█, this document also says "Facebook user" at

the top; is that correct?

A.    That's correct.

—B.R. v. F.C.S.B.—

75

Q.   And does your previous testimony about why you believe it

says "Facebook user" apply to this conversation as well?

A.   Absolutely.

Q.   Because the account was deleted?

A.   Yes.

Q.   And what is the start date of these messages?

A.   January 22nd, 2012.

Q.   Okay.  And they end on what date?  If you can flip

through to the end.  Grady, go to the last page, please.

A.   January 23rd, 2012.

Q.   So this was just a two-day conversation?

A.   Yes.

Q.   And this conversation actually took place about a month

or so before the Jenni Taylor conversation; is that right?

A.   That's correct.

Q.   And is this what you believe to be the first conversation

that B.R. initiated with you via a fake Facebook account?

A.   Yes.

Q.   So I know we're going a little bit backwards,

chronologically speaking, but you had actually just started

dating B.R. right around this time; is that right?

A.   That's right.

Q.   And take a look at -- let's go -- are you at the first

page?  What does the -- at the top it says, "Hi, you're really

cute.  I'm a freshman at SLHS."

Redirect - Co.K.

B.R. v. F.C.S.B.

76

        Do you see that?

A.    Yes.

Q.    What's your understanding as to what SLHS is?

A.    South Lakes High School.

Q.    Is that a high school in the Fairfax County school

system?

A.    Correct.

Q.    And do some students from Rachel Carson go to South Lakes

High School?

A.    Yes.

Q.    And you went to South Lakes High School?

A.    Correct.

Q.    And at the time that you received this, you were an 8th

grader; is that right?

A.    That's right.

Q.    So you believed, or at least this person was representing

to you that this was a ninth grader at the high school?

A.    Yes.

Q.    Okay.  And you immediately say, "Hi, I'm in a

relationship."

        Do you see that?

A.    Yes.

Q.    And you said that essentially because it appeared that

this person was hitting on you; is that right?

A.    Yes.

───── B.R. v. F.C.S.B. ─────

77

Q.   And the relationship that you are referring to is
actually the relationship with B.R.?

A.   Correct.

Q.   And after you say that, "Hi, I'm in a relationship," and
what's XD mean?

A.   That's like a laughing kind of thing, kind of similar to
this -- the colon and parenthesis to make a smiley face, like
that.

Q.   Thank you.  I actually did not know the answer to that
question.

          It says, "I'm an eighth grader at Carson.  Nice to
meet you."  And the immediate response to that is what from
this account user?

A.   "And your GF pretty and all, but you deserve better...she
looks like a slut.  She's ugly," with five Y's.

Q.   So you just initiate this conversation and right out the
bat this person is calling your girlfriend ugly and a slut?

A.   Yes.

Q.   And what did you think about this when you received this?

A.   I thought, who are you, why are you saying these things,
why are you messaging me.

Q.   And you thought this was more evidence of the
cyberbullying of B.R., right?

A.   Yes.

Q.   And at the time that you had this conversation, you

B.R. v. F.C.S.B.

78

didn't think this was B.R., right?

A.   Correct.

Q.   You came to think that later?

A.   Correct.

Q.   We'll talk about that in a moment.  But let's just
continue looking at these messages on the second page.  And is
it the same format as before?  You are on the right in the
blue, and the South Lakes High School freshman is on the left
in the black?

A.   Correct.

Q.   And so, this person says to you, "Why would you date that
bitch?  If she died, I'd be happy."

         Do you see that?

A.   Yes.

Q.   And down towards the middle it says, "She's ugly.  That
bitch should kill herself."

         Do you see that?

A.   Yes.

Q.   And it proceeds to say at the bottom, "She is stupid and
ugly."

         Do you see that?

A.   Yes.

Q.   And on the next page, in the middle, she says, "You
should dump her.  She's a tramp."

         Do you see that?

───── B.R. v. F.C.S.B. ─────

79

A.    Yes.

Q.    And by the way, there was two P's.  Is that what you were

talking about earlier about B███ would sometimes use

repetitive letters at the bottom of -- I'm sorry, at the end

of a word?

A.    That's correct.

Q.    And actually on that note, let's flip back to the first

page, where it says "She's ugly."

          Do you see that?

A.    Yes.

Q.    And there's five Y's at the end of that.  Is that another

example of what you believe to be B███ texting style?

A.    Yes.

Q.    And let's take a look at -- yeah, you're at the right

page.

          Towards the bottom it says -- it's on the -- it's on

the screen.  I apologize, I don't know.  I can't see the Bates

numbering.  But it says, "I love sex," and do you see the

repetitive E's in that?

A.    Yes, I do.

Q.    Is that another example of B███ texting style?

A.    Yes.

Q.    And on this page, in the middle, this person is saying to

you, "I have not" -- I'm sorry, "It's not.  I have only had

lesbo sex 2, oral 8."

———— B.R. v. F.C.S.B.————

80

        Do you see that?

A.   Yes.

Q.   And then it says, "Yeah, I am, hehe, I love sex"; is that
right?

A.   That's right.

Q.   And in this conversation you're essentially trying to
defend B.R.; isn't that right?

A.   That's right.

Q.   And let's actually just -- one more question on this
document.  If we can go back to the first page, you mentioned
in your testimony earlier about the spelling of the word
"really," and about how B.R. spelled "really" a particular
way.  Is that top line, is that an example of the strange way
that B.R. would spell "really"?

A.   Yes.

Q.   And for the record, that's "rlly."

A.   Yes.

Q.   By late 2012 -- I'm sorry, by late February 2012, you had
only been dating B.R. for about two months; is that right?

A.   Late February?  Not even two.

Q.   Yeah.  And by that time you had already received messages
from two separate Facebook accounts making derogatory comments
about B.R., right?

A.   Yes.

Q.   And so you, as a 13-year-old boy, thought that B.R. was

─────B.R. v. F.C.S.B.─────

81

being cyberbullied; is that right?

A.   Absolutely.

Q.   But now you believe that B.R. was behind both of those
accounts, right?

A.   Yes.

Q.   Okay.  Now, I want to flip your forward in time, to the
extent you can do that, and -- yeah, you can take those down,
in your memory.  And after you ended the relationship with
B.R. and stopped talking to her, were you contacted by --
through another -- a third Facebook account that you believed
to be her?

A.   Yes.

        MR. BATES:  Given the Court's ruling, I would ask
counsel if they stipulate to the admission of Exhibit 74.

        MR. KEEFE:  Same objection, Your Honor.

        THE COURT:  The objection is overruled.  You may --
it is admitted and you may publish.

(Defendants' Exhibit No. 74, was admitted into evidence.)

        THE COURT:  For the record, the objection is
overruled based upon the Court's prior determination with
regard to the application of the case of *U.S. v. Barnes* and
*U.S. v. Vayner*.

BY MR. BATES:

Q.   Mr. Kit, this is a conversation that you produced in
response to the subpoena that was issued -- document

Redirect - Co.K.

──── B.R. v. F.C.S.B. ────

82

subpoenaed that was issued to you in this case?

A.    Yes.

Q.    And you did that in response to a request for
communications with B.R.; is that correct?

A.    Yes.

Q.    And you produced this document because you believed this
was B.R.; is that right?

A.    Yes.

Q.    Okay.  And is it true that you believe this was B.R.
because of all the things that you've -- we've talked about
with the other two communications; is that right?

A.    Yes.

Q.    Like, for example, just while it's top of mind on that
first page where it says, "hi," there's three I's.

          Do you see that?

A.    Yes.

Q.    And that's that same repetitive at the end that you were
talking about, right?

A.    Yes.

Q.    And at the time that you received this set of messages,
B.R. was not a student at Rachel Carson Middle School; is that
right?

A.    That's correct.

Q.    And you're in high school at the time of this; is that
right?

B.R. v. F.C.S.B.

83

A.   Yes.

Q.   Okay.  So let's just, you know, the timeline can be a little bit confusing for the jury.

So this was about six months after you broke up with B.R. that you had received this communication?

A.   Yes.

Q.   Okay.  And if you can flip to the second page.  The name of the -- the user name of this individual it says, "Adrianna Capsulo."

Do you see that on the top?

A.   Yes.

Q.   And why, to your understanding, is there a name here as opposed to the other ones we looked at just had "Facebook user"?

A.   My understanding is that this account still exists.

Q.   Okay.  And did you ever look up Adrianna Capsulo in the school yearbook?

A.   I did.

Q.   Okay.  And did you find her there?

A.   I did not.

Q.   Did you find any evidence that Adrianna Capsulo was actually a real person?

A.   I did not.

Q.   And on the second page of this document, is Adrianna telling you that the two of you were in the same pod at

B.R. v. F.C.S.B.

84

Carson; is that right?

A.   Yes.

Q.   And by "pod" she means sort of the group of students that are clustered together at Rachel Carson?

A.   A locker pod, yes.

Q.   Yes.  And then she says that she moved out the middle of that year; is that right?

A.   Yes.

Q.   Okay.  And on page 3 of this conversation, Adrianna tells you that she has a girlfriend; is that right?

A.   Yes.

Q.   And that she loves this girlfriend and that this girlfriend is so amazing; is that right?

A.   Yes.

Q.   And on the next page and towards the middle, she tells you that, "I love my life as a bisexual motherfucker."

        Do you see that?

A.   Yes.

Q.   And then you tell her, "That's no problem at all.  I have several bi, gay, and lesbian friends myself"; is that right?

A.   Yes.

Q.   And then on the next page at the top it says -- at the next page at the top it says -- she asked you, "Well, maybe, UK" -- does "UK" mean you know?

A.   Yes.

─────────── B.R. v. F.C.S.B. ───────────

85

Q.    Okay.  So it says, "Well, maybe you know my girlfriend."

         Do you see that?

A.    I do.

Q.    And you ask, "Well, who is your girlfriend"; is that
right?

A.    Yes.

Q.    And she says, "Well, I am afraid you tell people."

         Do you see that?

A.    I do.

         THE COURT:  Sir, to make the testimony a little bit
easier because of the generation of your -- the person asking
you questions and other persons in the room, as we go through
these emails, if you could tell us what the common parlance or
common wording of these abbreviations mean, it would help
things go a little easier.

         THE WITNESS:  Yes, Your Honor.

         THE COURT:  Thank you, sir.

         THE WITNESS:  Would you like me to start --

         THE COURT:  Let's go ahead.

         THE WITNESS:  -- with "PPL"?

         THE COURT:  Yes, sir.

         THE WITNESS:  That's people.

         THE COURT:  Okay.

         MR. BATES:  And if you can skip to the next page,
Grady, on the screen.

Case 1:19-cv-00917-RDA-LRV   Document 1045   Filed 08/26/24   Page 86 of 186
PageID# 21196                    Redirect - Co.K.

──────── B.R. v. F.C.S.B. ────────

86

BY MR. BATES:

Q.   The person at the top -- I'm sorry.  Adrianna tells you,

"But I think you hated her."

          Do you see that?

A.   Yes, I do.

Q.   And you said, "Wait.  Is he half Indian" -- I'm sorry.

"Is she half Italian and half Indian"?

A.   Yes.

Q.   And why did you say that?

A.   Because I was starting to suspect that this was either

B███  messaging me or the other possibility that could have,

in this story, been her girlfriend -- what Adrianna is

claiming.

Q.   Okay.  And B.R. is half Italian and half Indian; is that

correct?

A.   To my knowledge, yes.

Q.   And towards the end of the -- that page, you ask -- you

say, "Is her name B.R.?"  And I'm not going to read the name.

          Do you see that?

A.   I do.

Q.   Okay.  Because you had suspected at that point that this

was her; is that right?

A.   Yes.

Q.   And I'm sorry, right under that it says, "I don't know

you hate her"; is that correct?

Case 1:19-cv-00917-RDA-LRV    Document 1045    Filed 08/26/24    Page 87 of 186
PageID# 21197
Redirect - Co.K.
B.R. v. F.C.S.B.

87

A.   Yes, I understood it as, I don't know, do you hate her?

Q.   Okay.  And then, Adrianna tells you on the next page,

"She thinks you do.  Well, she says you do and she's not sure.

I don't know.  She got really mad I talked to you because she

said that you don't like her anymore and that I shouldn't get

involved because she doesn't want to bother you."

          Do you see that?

A.   Yes, I do.

Q.   By the way, when you broke up with B.R., that was your

decision, right?

A.   It was.

Q.   Okay.  And after the breakup, did she want to get back

with you?

A.   At some point, yes.

Q.   And at the bottom of this page and -- it says, "She's

really amazing.  She's really outgoing."

          Do you see that?

A.   I do.

Q.   And is Adrianna talking about B.R. basically?

A.   Yes.

Q.   And then at the top of the next page, can you just read

for us what you said there?

A.   That bubble right there.  Yeah.

          "Well, the thing is, and you can't tell her this,

after going out with her for six months and everything

revolving around her depression, her still thinking there was

a chance of getting back together" -- oh, sorry.

"Well, the thing is, and you can't tell her this,

after going out with her for six months and everything

revolving around her depression, and her still thinking there

was a chance of getting back together, and all of the dramatic

shit she created and all the fucking Facebook statuses, it

just got on my nerves and I finally said I was done."

Q.   And can you read that next bubble?

A.   "No one could stand her anymore anyway."

Q.   Okay.  And Adrianna then tells you, "Well, she has

changed.  Like it's amazing.  Like seriously, I knew her

before and she is absolutely -- is incredible."

Do you see that?

A.   Yes.

Q.   And then she says, "She has a record deal."

A.   Yes.

Q.   And on the next page she says, "She's halfway through her

first album."

Do you see that?

A.   I do.

Q.   "I think you should talk to her before she moves.  She's

really chill now.  I am a freshmen myself."

Do you see that?

A.   I see that.

─────B.R. v. F.C.S.B.─────

89

Q.   And you told her, "I'd rather not talk to her at all."

A.   Yes.

Q.   And then at that point she calls you a fucking prick

or --

          THE COURT:  Speaks for itself.

BY MR. BATES:

Q.   And if you -- if we can skip a couple of pages through --

we're not going to read most of this.  If we can -- I'll go

through one more.

          Actually go back one, please.  And with -- it says

at the top, "She's already having an amazing life."

          Do you see that?

          Can you go back to the one that says the B word,

"She's already having an amazing life," at the top.  It's the

last page.  Sorry about that.

          Do you see that?  It says, "She's having an amazing

life."

A.   Yes, I see it.

Q.   "She's a model right now"?

A.   Yes.

Q.   "Her personality has blossomed"?

A.   Yes.

Q.   And then --

          THE COURT:  Speaks for itself.

          MR. BATES:  Yeah, we can move on from that.  We're

Redirect - Co.K.

B.R. v. F.C.S.B.

90

done with that.  Thank you.

BY MR. BATES:

Q.   And as you test- --

          (Counsel confers.)

BY MR. BATES:

Q.   Just that last -- one more question on that last page.

It says -- you tell her, is that right, "I can't find a record

of you in either of my Carson yearbooks."

          Do you see that?

A.   Yes, I do.

Q.   So that references what you talked about earlier, about

that you searched the yearbooks?

A.   Yes.

Q.   And then you say, "B" -- and I'm not going to read the

word -- the name -- "B, you were always such a great actor.

Good day."

          Do you see that?

A.   Yes, I do.

Q.   So, at the end of this conversation, you had already --

you had quickly believed that that was B.R.?

A.   That's correct.

Q.   Okay.

          THE COURT:  How much longer do you think you're

going to take?  I would like to give the jury a break if they

need one.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

91

            MR. BATES:  Your Honor, not much at all.

            THE COURT:  Okay.  Can we go another 15 minutes?

            Go ahead.

            MR. BATES:  Thank you.

BY MR. BATES:

Q.    You ended the relationship with B.R., as we said, in
June 2012?

A.    That's correct.

Q.    And you ended it because you believed B.R. was behind
these two accounts; is that right?

A.    That factored into my decision-making.

Q.    And isn't it true you did not want to continue a
relationship with someone who did this?

A.    Yes.

Q.    Okay.  Because you did not know what was true with her
anymore?

A.    Yes.

Q.    Okay.  And at that point you were 99 percent sure that
she was the one that wrote those messages and then engineered
her own cyberbullying?

A.    I don't think she engineered the whole cyberbullying she
is experienced, but for those messages and any pages tied to
those accounts, I believe it was her, yes.

Q.    Okay.  And even though that you ended the relationship,
you remained friends with her for several months; isn't that

Redirect - Co.K.

—B.R. v. F.C.S.B.—

92

true?

A.   That's right.

Q.   And that's because she asked you to come over to her house at times?

A.   Yes.  She still wanted to maintain a friendship.  I obliged.

Q.   So, you hung out with her at least another ten times or so?

A.   Yes.

Q.   Okay.  But then you stopped being friends with her in the fall of 2012, right?

A.   That's correct.

Q.   And you stopped being friends with her because she had accused you of grabbing her breast, right?

           MR. KEEFE:  Objection, Your Honor.

           THE COURT:  Overruled.  You can answer.

           THE WITNESS:  No.

BY MR. BATES:

Q.   Let me repeat that question.  I think you may have misunderstood.

           You stopped being friends with B.R. because she had accused you of grabbing her breast, right?

A.   No.  I stopped being friends with her before that.

Q.   Okay.  Well, you had stopped -- okay.  But at some point she had accused you of grabbing her breast; is that right?

B.R. v. F.C.S.B.

93

A.   She did not personally accuse me.  I heard it from the tutor that we shared, the math tutor.

Q.   Did you grab her breast?

A.   No.

Q.   So you believed that she had falsely accused you of grabbing her breast; is that right?

A.   I believe that, yes.

          MR. BATES:  Nothing further, Your Honor.

          THE COURT:  Ladies and gentlemen, just a moment. We're going to give -- let's see what happens when I ask this question.

          Mr. Kinney, do you have any questions?

          MR. KINNEY:  I do, Your Honor.

          THE COURT:  All right.  Then that will pre-empt everything that I was -- or actually it would suggest that I'm going to do what I was going to do.

          All right.  Ladies and gentlemen of the jury, what we're going to do is take our morning break.  I know it's almost afternoon, but we're going to take our morning break. We're going to go until about 11:50, 11:50, so that gives you about 10 minutes.

          Remember the Court's instructions, do not discuss the case or any aspect of the case -- actually 11:55 -- do not discuss the case or any aspect of the case with anyone now that the case is pending.  Thank you.

B.R. v. F.C.S.B.

94

We'll see you in about 10 minutes.  11:55.

(Jury excused.)

THE COURT:  Mr. Kinney, how long do you anticipate your examination to go?

MR. KINNEY:  Your Honor, I think no more than ten minutes.

THE COURT:  Okay.  Mr. Blanchard?

MR. BLANCHARD:  Three questions, maybe five, but I think they will be yes, yes, yes.

THE COURT:  And counsel for plaintiff, how long do you expect your redirect to take?

MR. KEEFE:  I anticipate about 30 minutes, Your Honor.

THE COURT:  Okay.  We can work within those confines.  Thank you.

All right, sir.  You can step down.  Obviously, take advantage of your personal needs.  We're going to be back at about 11:55.

MR. BATES:  Your Honor, I would just like to apologize to the Court for the foul language.  I thought it was important for the jury to see that, so my apologies.

THE COURT:  Okay.  I think from the standpoint of the jury, a reasonable individual might believe that they heard the foul language, didn't attribute it to you, and that it was part of the record in the matter, but I think the

B.R. v. F.C.S.B.

95

Court's suggestion that the document speaks for itself after

we've had the benefit of actually hearing the language would

suffice for putting things in context that you may want to put

them in.

MR. BATES:  Understood.  Thank you, Your Honor.

(Recess.)

(Court proceedings resumed at 12:07 p.m.)

THE COURT:  If we can get the witness to come on

back in.  Is he here?

(Discussion off the record.)

THE COURT:  Ms. Tinsley.

You may be seated, thank you.

(Jury present.)

THE COURT:  Sir, you're still under oath.

MR. KINNEY:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. KINNEY:

Q.    Mr. Kit, I'm Michael Kinney.  I represent Ms. T████,

Mr. H████ and Ms. B████.

Do you recall meeting me at your deposition back in

June of last year?

A.    Absolutely.

Q.    Mr. Ki█, I hope I can say I was impressed by your apology

before you had to address some of the language in here.

B.R. v. F.C.S.B.

96

A.   Yeah, it's wild stuff.

Q.   I take it you regret that language?

A.   100 percent.

Q.   Some of that language do you believe could be considered
bullying?

A.   You know, at the time, I wouldn't have thought that
because it was kind of a response to someone I thought was
bullying a friend.  I'd have to think about it more now.

Q.   Let me ask it this way:  There was one word that you
combined C.K.'s last name with a slur?

A.   Yes.

Q.   The slur that you used, might that be similar in kind to
what Ben -- what you thought Ben Flowers had called B.R.?

A.   Yeah, absolutely.

Q.   You don't use that language now as an adult, do you?

A.   No.

Q.   You wouldn't -- you wouldn't want to be judged as an
adult for language that you used at the age of 13, would you?

A.   I personally wouldn't, but people's perceptions are what
they are.

Q.   Mr. Ki█, thank you.

         THE COURT:  Mr. Blanchard.

         MR. BLANCHARD:  Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. BLANCHARD:

B.R. v. F.C.S.B.

97

Q.   Good afternoon.

A.   Good afternoon.

Q.   I'm Bruce Blanchard.  I represent J.O., and like those
before me, we met last June, correct?

A.   Correct.

Q.   Can you tell the jury what the relationship was between
B.R. and J.O. during the time that you knew them?

A.   When I first met B.R. and J.O., they were friends.  They
were close friends.  I assumed they were actually best
friends.  At some point, that friendship ended, I want to say
around January or February of 2012.

Q.   So when you say you assumed they were best friends, why
did you -- did B.R. tell you that?

A.   Yes.

Q.   And how did you see them greet each other?  How did you
see them interact with each other in the hallways?

A.   It was always with hey, with smiles, hugs.

Q.   Call each other besties?

A.   Absolutely.

Q.   And you said that sometime the friendship ended?

A.   Yes.

Q.   Do you recall whether that was about the time that B.R.
stopped going to classes at Rachel Carson?

A.   It was around that time frame.

Q.   Okay.  And did B.R. tell you why the friendship had

B.R. v. F.C.S.B.

98

ended?

A.    Yes.

Q.    What did she tell you?

A.    She told me that J.O. had no longer believed her story

about C.K.

Q.    And did she also tell you that she suspected that she had

made it up?

A.    Yes.

Q.    At no time while you were dating B.R., did B.R. ever tell

you that J.O. had ever physically or sexually assaulted her?

A.    To my recollection, no.

Q.    Think that's something you would remember?

A.    Yes.

        MR. BLANCHARD:  Thank you.  I have no other

questions.

        THE COURT:  Redirect?

        MR. KEEFE:  Yes, Your Honor.

                REDIRECT EXAMINATION

BY MR. KEEFE:

Q.    I'll try to go slower at the start today.

A.    Yes, sir.

Q.    Mr. Ki█, when the School Board's counsel asked you about

your deposition testimony that you had not witnessed sexual

harassment, can you explain that deposition testimony?

        THE COURT:  You need to speak up just a little bit,

Counsel.

BY MR. KEEFE:

Q.    Did you hear my question?

A.    I did.

        MR. KEEFE:  Did you hear my question, ma'am?  I'll

repeat the question.

BY MR. KEEFE:

Q.    When the School Board -- when the counsel for the School

Board asked you about your deposition testimony that you had

not witnessed B███ be sexually harassed, can you explain that

deposition testimony?

A.    Yes.  In my mind, just during the deposition, I think I

was thinking of physically touching in the school, when they

asked me, did you ever witness B███ being sexually harassed.

        In my mind, touching, but since then, I reviewed the

definition, both in like Websters, but also what the Army

Sexual Harassment and Assault Response Program teaches, and

name-calling, verbal threats, these are -- these can be

included in sexual harassment, so that's the correction I want

to make.

Q.    So did anything that counsel for the School Board asked

you today cause you to change your testimony from yesterday

about the sexual harassment you witnessed B███ suffer at

Rachel Carson?

A.    Could you rephrase the question?

─────B.R. v. F.C.S.B.─────

Q.    Yes.  Did anything that the counsel for the School Board

asked you today about witnessing sexual harassment of B███ at

Rachel Carson cause you to change -- cause you to rethink what

you testified yesterday?

A.    I don't think so.

Q.    Okay.  You mentioned that you did not -- that B███ never

told you that C.K. raped her at school; is that right?

A.    Yes.

Q.    Did B███ tell you that C.K. raped her off campus?

A.    Yes.

Q.    Did you tell the school that?

A.    Yes.

Q.    How many times did you tell the school that?

A.    I'm going by the statements, so definitively, four.

Q.    Now, let's talk a little bit about the questions that the

lawyer -- or the counsel for the School Board asked you about

those meetings you had with the assistant principals.

A.    Okay.

Q.    The first question he asked you was if Ms. B███ told

you to change your statement, and you said she didn't; is that

right?

A.    That's right.

Q.    Did you -- even though Ms. B███ may not have explicitly

told you to change your statement during that first meeting,

what was your understanding of what Ms. B███ wanted you to

─────B.R. v. F.C.S.B.─────

101

do?

A.   I felt like she was implying that I should change my

statement.

        MR. KINNEY:  Your Honor, the witness can't

speculate.

        THE COURT:  Well, he's already answered the

question, and so the objection is untimely.  So it's

overruled.

BY MR. KEEFE:

Q.   I'll skip over the second meeting you had with Mr. H█████

and Ms. T████ and go to the third meeting with Ms. B█████.

A.   Okay.

Q.   Do you know which meeting I'm talking about?

A.   Yes, the one with the check marks.

Q.   That's right.  During that meeting, did Ms. B█████ say to

you, change your statement?

A.   No.

Q.   But did you understand what Ms. B█████ wanted you to do?

A.   Yes.

Q.   And what was that?

        THE COURT:  Sustained.  Okay.  You might be able

to -- you might be able to get at it, Counsel, but you're not

going to be able to get at it this way.  You can't ask him

what she was thinking.

        MR. KEEFE:  What was your understanding of what

B.R. v. F.C.S.B.

102

Ms. B███ wanted you to do?

        MR. BATES:  Objection.  This has been --

        THE COURT:  Sustained.  Ask it another way, Counsel.

BY MR. KEEFE:

Q.    Did you feel -- did you feel --

        THE COURT:  Looking at it from your own personal
perspective, what did you believe the expectation was to be?

        THE WITNESS:  I believe the expectation was to
reevaluate and possibly change my statement, sir.

        THE COURT:  Okay.

BY MR. KEEFE:

Q.    During your second and fourth meetings with Mr. H███
and Ms. T███, based on your perspective, what was your
understanding of what was happening in those meetings?

A.    My understanding was that they wanted me to re-evaluate
my previous statements.

Q.    During your meetings with Ms. B███, did you have an
understanding of how you were supposed to re-evaluate your
statements?

A.    Yes, both verbally but especially in the written
statements.

Q.    And how was that?

A.    To water them down, not make them seem as bad -- not
make what was happening to B███ seemed as bad.

Q.    And during those meetings it was more than just -- you

B.R. v. F.C.S.B.

103

reported to the school more than just written statements,

right?

A.   Yes.

Q.   Okay.  And so, when the School Board's counsel showed you

your written statement from February 15th, do you recall that

statement?

A.   Yes, I do.

Q.   And it was focused on the Ben Flowers incident --

A.   Yes.

Q.   -- right?

A.   Yes.

Q.   During that first meeting with Ms. B█████ where you wrote

that statement, what else did you tell Ms. B█████?

A.   I believe -- excuse me.  To my recollection, I told her

about the bullying that B████ was experiencing, the rumors,

and the harassment.

Q.   Did you tell Ms. B█████ that there was a rumor that C.K.

had raped B████ off campus?

A.   Yes.

Q.   Did you tell Ms. B█████ that there was a rumor being

spread that B████ had given David N. a blow job?

A.   Yes.

Q.   Did you tell Ms. B█████ that there were death threats

being made against B████?

A.   Yes.

B.R. v. F.C.S.B.

104

Q.   Did you tell Ms. B███ that students were calling B███

a slut?

A.   Yes.

Q.   Did you tell Ms. B███ that students were calling B███

a whore?

A.   Yes.

Q.   And did you tell Ms. B███ that people were calling

B███ "bitch"?

A.   Yes.

Q.   Did you tell each of the school -- the three vice

princi- -- assistant principals in those meetings all of those

things you just told me?

A.   Yes.

Q.   What did you mean when you answered counsel for the

School Board's question that school officials didn't do enough

to prevent sexual harassment?

A.   Was that directly asked?

        THE COURT:  Rephrase the question.

BY MR. KEEFE:

Q.   Correct me if I'm wrong --

A.   Okay.

Q.   -- but I believe you testified that -- you thought school

officials didn't do enough to prevent sexual harassment?

A.   Correct.

Q.   What did you mean by that?

B.R. v. F.C.S.B.

105

A.   So I think it's one --

  MR. BATES:  Objection, this is outside of the scope,
Your Honor.

  THE COURT:  Counsel, I'm giving you a little bit of
latitude but "as I recall" and "correct me if I'm wrong,"
these were things that you reviewed with the witness on your
original examination.  And I don't believe Mr. Bates delved
into that area, so --

  MR. KEEFE:  I understand, Your Honor.

  THE COURT:  You could move on.

BY MR. KEEFE:

Q.   Counsel for the School Board asked you about the term
"scooping"; do you remember that?

A.   Yes.

Q.   And you said you remember one specific instance where you
firsthand witnessed scooping; is that right?

A.   Yes.

Q.   Was scooping -- was it common knowledge at the school
that people were scooping female students?

A.   Absolutely.

Q.   In fact, it was so common it had its own term?

A.   Yes.

Q.   And let me clarify one other thing.  You testified that
you had spoken with the plaintiff's lawyers before your
testimony yesterday; is that right?

─B.R. v. F.C.S.B.─

106

A.   Yes.

Q.   Did you also speak with the School Board's lawyers before your testimony yesterday?

     Before yesterday, had you spoken with the School Board's lawyers?

A.   Yes.

Q.   Had you spoken with J.O.'s lawyer?

A.   Not since the deposition.

Q.   Mr. Ki█, you testified in response to the School Board's counsel's question about whether you had witnessed other students touching B█████ at her locker; is that right?

A.   Yes.

Q.   Would you have to be with B████ at her locker to see that?  Would you have to be at B██████ locker to see other students touching her at her locker?

A.   Yes.

Q.   You were her boyfriend at the time; is that right?

A.   Yes.

Q.   You were an 8th grader at a school where 8th graders were the oldest students on campus; is that right?

A.   Yes.

Q.   Do you think it's likely that other students would touch your girlfriend in front of you at the school?

          MR. BATES:  Objection.

          THE COURT:  Sustained.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────── B. R. v. F. C. S. B. ───────

107

BY MR. KEEFE:

Q.    When the School Board's counsel asked you about the
cyberbullying and, in particular, the Facebook messages he
showed you, you answered that that was some but not all of the
cyberbullying.

        Can you explain what you meant by that?

A.    So include the direct messages I saw from David N. as
well as just in general, people would post things on B█████
wall, her Facebook wall.  People would direct message her
saying, You're a liar, and the other insults.

        So, those accounts that I submitted as part of the
subpoena, that's not the only cyberbullying that happened to
B████.

        MR. KEEFE:  Mr. Brown, if you could please pull up
Defendants' Exhibit 73.

BY MR. KEEFE:

Q.    Mr. Ki█, although this says "Facebook user" at the top,
this is the Jenni Taylor Facebook messages.

A.    Okay.

Q.    Do you see the date at the top of that first page?

A.    I do.

Q.    What is that date?

A.    February 27, 2012.

Q.    Do you know when B████ left in-person learning at Rachel
Carson?

A.   I couldn't tell you the date, no.

Q.   Okay.  Do you have an understanding of whether she had

left Rachel Carson before February 27, 2012?

A.   Yes.

Q.   Okay.  So if B███ sent this message to you on

February 27, 2012, it couldn't have been the cyberbullying

that you talked about that happened when she was in school; is

that right?

A.   Yeah, that would be correct.

Q.   So when you went to the assistant principals' offices and

you told them that B███ was being cyberbullied, you weren't

talking about these messages, were you?

A.   It's possible I could have because, again, according to

my other written statement, I had four meetings into March.

So, I think it's entirely possible I brought this up.

Q.   I appreciate that.  Let me clarify.  Your first meeting

on February 15th --

A.   No.

Q.   -- could this have been the cyberbullying you were

telling Ms. B█████ about at that meeting?

A.   No.

Q.   You also testified that you printed out the Jenni Taylor

messages and gave them to the R. family because they -- you --

they had told you that they were going to sue the School

Board; is that right?

B.R. v. F.C.S.B.

109

A.    That's correct.

Q.    Are you aware -- do you have any understanding of whether in 2014 the R. family filed a complaint with the Department of Education Office of Civil Rights?

A.    I do.

Q.    Are you aware that this lawsuit was not filed until 2019, seven years later?

A.    Yes.

Q.    Do you have any understanding one way or the other which proceeding they were talking about when they said "sue"?

A.    No.

Q.    In one of the messages in these Facebook accounts, you had said that, "B████, you are a great actor"; is that right?

A.    Yes.

Q.    Was B████ acting when you saw her being called a slut?

A.    No.

Q.    Was B████ acting when you saw her called a bitch?

        MR. BATES:  Objection, Your Honor, this is leading. And --

        THE COURT:  I'll give you a little latitude but -- and we've already sort of heard the pejorative terms that were used, and I don't think it's really necessary to revisit them.

        MR. KEEFE:  Yes, Your Honor.

BY MR. KEEFE:

Q.    On all the occasions that you witnessed B████ being

sexually harassed, was she acting?

A.    No.

          MR. KEEFE:  One moment, Your Honor.

BY MR. KEEFE:

Q.    I think the last thing that was covered when the School

Board's lawyer questioned you was about what you had heard

someone say about B█████ accusing you of groping her; do you

remember that?

A.    Yes.

Q.    Who was that person who told you that?

A.    That was our mutual math tutor.

Q.    Had the school assigned that math tutor to you?

A.    To me, no.

Q.    How did you come to have that math tutor?

A.    Through the R. family.  I can elaborate.

Q.    Do you know who the math tutor worked for?

A.    I believe she worked for FCPS.

Q.    Okay.  Is the math tutor the only person in the world

who's ever told you that B█████ said you had groped her?

A.    Yes.

Q.    Does the only person in the world who told you that B█████

[sic] had groped her worked for the School Board?

A.    I don't know if they still do.

Q.    At the time they told you that?

A.    To my knowledge, yes.

─────────────── B.R. v. F.C.S.B. ───────────────

111

MR. KEEFE:  No further questions, Your Honor.

MR. BATES:  Your Honor, may I have a really brief recross on a new topic that was covered.

THE COURT:  Well, the thing is is we're not going to get into this idea of direct, cross, redirect, recross, re-re-redirect.  We're not going to go down that road.

Now, if you want to tell me that this witness can be released if you're able to inquire into one area, we might have a different answer.  But then I'm going to give plaintiff an opportunity to also delve into that area.

MR. BATES:  That's fine, Your Honor, and yes --

THE COURT:  This is an exception to the rule.  I don't want everybody else to think that they can start doing this.

MR. BATES:  I understand.  We're agreeable to the witness being released after this, at least from the School Board's perspective.

THE COURT:  All right.

MR. BATES:  And I will be very brief.

RECROSS EXAMINATION

BY MR. BATES:

Q.    Mr. Ki█, was it your testimony that you told Ms. B█████ on February 15th, the date of your statement, that there were rumors that B█████ -- I'm sorry -- that B.R. had been raped off campus?

B.R. v. F.C.S.B.

112

MR. KEEFE:  Objection, Your Honor, this is not new.

THE COURT:  How is this new?  How is this new information?  I think we've already heard about this.

MR. BATES:  I'd be happy to say in open court if you don't want a sidebar, but this was a new --

THE COURT:  Give me a theoretical basis.

MR. BATES:  Theoretically speaking, he -- well, he said something -- in redirect he testified to something that was not testified to in direct.  In other words --

THE COURT:  I'll give you a little latitude, but again, ground that's been fertilized, we don't need to fertilize it again.

BY MR. BATES:

Q.   Is it your testimony, Mr. Ki█, that on February 15th, you told Ms. B█████ about this rumor that C.K. had allegedly raped B.R. off campus?

A.   My testimony is that I verbally did, but not in this written statement.

Q.   Okay.  In this written statement that you're looking at, Plaintiff's Exhibit 149, you didn't say that anywhere in your statement?

A.   Yes.

Q.   You didn't feel that that was important enough to put down in writing?

THE COURT:  This is where we are actually going into

B.R. v. F.C.S.B.

113

recross of things that we've already heard about.  So I'm

going to limit the examination unless you can come up with

something new.

MR. BATES:  One final question, Your Honor.

BY MR. BATES:

Q.  Did you tell -- on February 15th, had you told B.R.'s mom

about this rumor as to what had happened with C.K. off campus?

A.  I don't recall.  Like -- can you rephrase your question

or restate it?

Q.  On February 15th --

A.  Okay.

Q.  -- you said you told Ms. B███████ about the rumor.  At that

point had you told --

MR. KEEFE:  Objection, Your Honor.  This is not new.

This is an entirely new --

THE COURT:  I'm going to let him finish his

question.  I'm going to ask the witness to pause before

answering the question so I can discern whether it is new

examination or not.

So go ahead and ask the question.  Sir, if you could

just pause before you answer so I can have an opportunity to

rule.

BY MR. BATES:

Q.  You've just testified that you told Ms. B███████ about this

rumor on February 15th.  My question is, by that time on

B.R. v. F.C.S.B.

114

February 15th, did you tell B.R.'s mom about this rumor?

THE COURT:  You can answer the question.

MR. KEEFE:  Objection, asked and answered.

THE COURT:  Overruled.  I guess an easy way of
stating the question again, sir, and again, it wasn't
difficult, but I think what they are trying to discern is
whether or not at the time that you were providing this
information to the school personnel, did you also tell B.R.'s
mother about this.

THE WITNESS:  I thought they already knew about this
at this time.

THE COURT:  So you didn't say anything directly to
them about this?

THE WITNESS:  I don't recall.

THE COURT:  Okay.

MR. BATES:  Nothing further, Your Honor.  We
appreciate it.

THE COURT:  I'll give you an opportunity for -- I
guess we would call it sur redirect.

MR. KEEFE:  No, Your Honor.  Thank you.

THE COURT:  All right.  Very good.

Is this witness free to go?

MR. KEEFE:  He is.

MR. BATES:  Yes, from the School Board.

MR. BLANCHARD:  Yes, sir.

B.R. v. F.C.S.B.

115

MR. KINNEY:  Yes.

THE COURT:  Sir, you're free to go.  I would specifically request of you, and I'm going to be a little bit more precise than I am with most -- please do not discuss the case or my aspect of the case with anyone.  If you could, stay away from social media as it involves this particular matter or anything that might be directly or indirectly related to it.

It would be my request of you to stay away from all social media until you get an indication that the case has been resolved one way or the other.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you, sir.

(Witness excused.)

THE COURT:  Next witness?

MR. BRENNER:  The plaintiff will call J█████ F███████.

THE COURT:  Just a moment.

MR. BRENNER:  One moment to collect documents.

THE COURT:  Yes.

(A pause in the proceedings.)

THE COURT:  Okay, Trish.

(J█████ F████████, Plaintiff's witness, sworn.)

THE COURT:  Ma'am, please have a seat.  Listen to the questions of counsel, answer them as best you can.  And as

B.R. v. F.C.S.B.

116

I said to other witnesses who will appear, if you hear an objection, take a moment to pause so the Court can rule on the objection.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  If you could speak into the mic, the closer you get, the better we can hear you.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Yes, ma'am.

MR. BRENNER:  Your Honor, may I approach?

THE COURT:  You may.

MR. BRENNER:  May it please the Court?

THE COURT:  Yes, sir.  Thank you.

DIRECT EXAMINATION

BY MR. BRENNER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   My name is Andrew Brenner.  I represent the plaintiff in this case.  Okay?

A.   Yes.

Q.   I don't think you and I have had a chance to meet yet.

Could you please just start by helping me pronounce your last name?

A.   It's F███████.

Q.   F███████, okay.

A.   Yes.

Direct - J.F.

────B.R. v. F.C.S.B.────

117

Q.   You're currently an employee of the Fairfax County Public

Schools?

A.   Correct.

Q.   Your current position is you're a school counselor?

A.   That's correct.

Q.   Are you still at the Franklin Middle School?

A.   I am.

Q.   You've been there for -- I think -- are you in the last

part of your fourth year?

A.   Correct.

Q.   You -- prior to that, you worked at Rachel Carson,

correct?

A.   Correct.

Q.   Same job, guidance counselor?

A.   Correct.

Q.   You began at Rachel Carson in 2007?

A.   That's correct.

Q.   So you were there, is it 2007 to 2020?

A.   That's correct.

Q.   Does that usually go, I guess, to the end of the 2020

school year and start at the other one, 2020/'21 school year?

A.   Yes.

Q.   If I trail away from the microphone and you don't hear

me, let me know.  Okay?

A.   I will.

Direct - J.F.

B.R. v. F.C.S.B.

118

Q.   And when you started at Rachel Carson in 2007, that was
your first employment with Fairfax County?

A.   Yes.

Q.   I believe you were in the youth ministry before that?

A.   I was.

Q.   Is that the immediate preceding job?

A.   Yes.

        THE COURT:  Can you pick up your voice just a bit?

        MR. BRENNER:  Sure.

BY MR. BRENNER:

Q.   Okay.  Let's talk about some basics about what you do and
what you believe students are entitled to, okay?

A.   Sounds good.

Q.   You agree with me that it's important for students to
have a safe learning environment?

A.   I do.

Q.   In fact, the reason it's important is that's the whole
purpose of students coming to school is to learn?

A.   Correct.

Q.   And you agree with me that students have a constitutional
right to a safe environment for education?

A.   Yes.

Q.   And you would agree that would include an environment
where the child is not subject to sexual harassment?

A.   Correct.

━B. R. v. F.C.S.B.━

119

Q.   I want to get your understanding as a guidance counselor

at -- for Fairfax County, some of your understandings of what

harassment is, okay?

A.   Sounds good.

Q.   Or sexual harassment, to be more specific?

A.   Okay.

Q.   You agree that sexual harassment is unwanted, unwelcomed

behavior of one student or more towards another student or

more of a sexual nature?

A.   Yes.

Q.   And a single instance by one perpetrator would be

considered sexual harassment?

A.   Correct.

Q.   Now, if we could -- Plaintiff's Exhibit 305.  Do you have

that in your binder?  I believe it's been admitted into

evidence.

         Do you recognize Plaintiff's Exhibit 305?

A.   Yes.

Q.   This is an example of the PowerPoint presentation that

was given to students at Rachel Carson Middle School?

A.   Correct.

Q.   On bullying and sexual harassment?

A.   Yes.

         MR. BRENNER:  Your Honor, could we move to admit

Exhibit 305?

━Tonia M. Harris OCR-USDC/EDVA 703-646-1438━

───B.R. v. F.C.S.B.───

120

THE COURT:  Without objection.

MS. REWARI:  No objection.

THE COURT:  Without objection.

(Plaintiff's Exhibit No. 305 was admitted into evidence.)

MR. BRENNER:  Publish, please?

THE COURT:  You may publish.

BY MR. BRENNER:

Q.  The jury has heard about some of this, I believe, in

Principal F███████ testimony, but just to reorient everyone,

the school at the beginning of the school year would give a

presentation to students on, among other things, bullying and

sexual harassment; is that fair?

A.  Yes.

Q.  And that was done by the guidance counselors?

A.  Yes.

Q.  You've done that?

A.  Yes.

Q.  And on the first page, it has the definition of sexual

harassment.  Do you see that?

A.  I do.

Q.  Unwelcomed sexual advances is sexual harassment?

A.  Correct.

Q.  Request for sexual favors is sexual harassment?

A.  Yes.

Q.  And other verbal or physical conduct of a sexual nature

Direct - J.F.

B.R. v. F.C.S.B.

121

is sexual harassment, correct?

A.    Yes.

Q.    You understood verbal conduct of sexual nature to include

any name-calling of a sexual nature, correct?

A.    Correct.

Q.    And that would be sexual harassment?

A.    In my definition, yes.

Q.    Sure.  If someone is acting -- I'm sorry, if someone in a

school setting says that someone performed a sex act on

someone, that too would be considered sexual harassment?

A.    Yes.

        MR. BRENNER:  So if we could take that down and

bring up Plaintiff's 77, which I'm quite certain is in

evidence.

        Do you have 77 in there?

        THE COURT:  It is in.

        MR. BRENNER:  May I have permission to publish, Your

Honor?

        THE COURT:  You may.

BY MR. BRENNER:

Q.    By the way, have you seen this before?

A.    No.

Q.    You've never seen this before?

A.    No.

Q.    So this was -- you probably saw it -- never before or

B.R. v. F.C.S.B.

122

never before when you were in the courtroom?  I mean, have you

seen it in the courtroom?

A.    I see it right now.

Q.    Okay.  All right.  Let's just look at a couple of things

and just have me -- and have you confirm for me one way or the

another whether these things would be considered sexual

harassment, okay?

A.    Okay.

Q.    So let's go to the second -- the first -- the second and

third sentence starting at "C█████████?

        So it says, "C.K. and D.N. came to my locker every

morning before first period.  They came very close to me.

They said, quote, Hey, B███.  Then they laughed at me,

harassed me, teased me, and give me seductive looks."

        You would consider that sexual harassment, right?

        MS. REWARI:  Objection, Your Honor.  Can we just

clarify this is not a legal conclusion, it's not calling for

legal conclusion?  He's not calling for legal conclusion; he's

asking for her understanding.

        THE COURT:  Ma'am, let me ask the question a

different way.

        Is this the type of thing that you believe should be

investigated?

        THE WITNESS:  I think it should be looked into.

        THE COURT:  Okay.

─── B. R. v. F. C. S. B.───

123

BY MR. BRENNER:

Q.    And again, to address the point counsel is making.  I'm

focusing on -- first of all the county.  And we'll get to this

a little bit -- but the county, Fairfax County School Board

or -- do you call it Fairfax County public schools or Fairfax

County School Board?  Who do you consider your employer?

A.    Fairfax --

Q.    Right.  It's kind of mixed up, right?  We use it --

A.    So, Fairfax County --

Q.    -- interchangeably.

A.    Yeah.  I --

Q.    Okay.

A.    Yes.

            THE COURT:  Let her answer.

            THE WITNESS:  Interchangeable, actually.

BY MR. BRENNER:

Q.    Okay.  Which one do you want me to use so we're using

the --

A.    Fairfax County School Board.

Q.    Okay.  So you got training from the Fairfax County School

Board on lots of issues because it's part of your job, right?

A.    Correct.

Q.    And one of the issues you got training for is to get an

understanding from the Fairfax County School Board what is

considered sexual harassment and bullying?

─B.R. v. F.C.S.B.─

A.   Correct.

Q.   And you took that understanding and employed that in your role as a guidance counselor to do your job at the school, right?

A.   Correct.

Q.   Okay.  So with that understanding, so I'm using based on the training you got from the School Board, which informed your understanding of what sexual harassment is.  That's what I'm asking about, okay?

A.   Okay.

Q.   Okay.  So, those things we just looked at, would that be considered sexual harassment?

A.   There would need to be more context to those, so it would need to be looked into to find out what those things meant.

Q.   Okay.  What about the next line that says, "C.K. left me a very inappropriate voicemail with lots of sexual terms"?

         Would that be considered sexual harassment?

A.   Again, there's no specifics there.  So I would -- if I were an assistant principal, I would want to know what -- specifically what those terms were and what the voicemail said.

Q.   Okay.  Let's go to the next line.  "C." -- and you know we're just using initials?

A.   Yes.

Q.   Okay.  "C. says D.N. wants to come up to me and call me

───B.R. v. F.C.S.B.───

125

vulgar names like whore, bitch, and lesbian."

        Would that -- is that enough detail that you would

consider that sexual harassment?

A.   It's hearsay.  It says C███████ says -- "C. says D.N.

wants to come up."

        So again, it would need to be investigated.  But the

words that are listed there, yeah, they are vulgar.

Q.   I agree, they are vulgar.  Are they -- according to your

guidance or teaching from the School Board, do they fall

within the School Board's definition of "sexual harassment"?

A.   Harassment.  For me, yes.

Q.   Okay.  Thank you.

        Now, if you go down to -- we'll skip to the next

line and we'll go to the next one that refers to J.O., so

there's two in a row that refer to J.O.  I'm going to go to

the one that says, "J.O. calls me..."

        "J.O. calls me bitch and makes offensive wall posts

on my Facebook calling me bitch and a whore."

        Same question.  Based on your training from the

Fairfax County School Board to do your job as a guidance

counselor, do you believe that constitutes sexual harassment?

A.   The word "whore."

Q.   Okay.  "Whore" does but not -- the B word does not?

A.   Let's -- I can't say yes or no to that one.

Q.   Fair enough.

─ B.R. v. F.C.S.B. ─

126

The next one says, "On DM bus, he told everyone D.N.
said I gave him oral sex which is completely false and I sent
naked pictures which again isn't true."

Is that, again, based on your training from Fairfax
County School Board, in order to do your job as a guidance
counselor at Rachel Carson Middle School, does that constitute
sexual harassment?

A.   If it's true in the investigation, it would.

Q.   Okay.  I think it's the last one.  "Also that I let
anyone get in my shirt and pants which is offensive because
I've never done so."

Would that be -- again, as you said, if true, would
that be -- would that be considered sexual harassment by --
pursuant to your understanding of the Fairfax County School
Board's definition of that?

A.   If the investigation proved it to be true, yes.

Q.   Okay.

MR. BRENNER:  We can take that down, please.

BY MR. BRENNER:

Q.   So let me just reorient a little bit.  You were at the
school, Rachel Carson, for 13 years?

A.   Correct.

Q.   On an average year, is it fair to say about 1200
students, 12- to 1300 students?

A.   That's fair.

─────────────── B.R. v. F.C.S.B. ───────────────

127

Q.    During that time period?

A.    Yes.

Q.    Okay.  During that time period, it was always 7th and 8th
graders?

A.    Yes.

Q.    Obvious question but I just ask it for the record, boys'
and girls' -- boys' and girls' school, right?

A.    Correct.

Q.    So, if there's -- I'm going to make you do some math.  I
get --

A.    Okay.

Q.    If there's 1200 kids in the school and it's for 13 years.
About 14- to 15,000 kids ran through that school while you
were there; is that right?

A.    That's correct.

Q.    Good math.

        All right.  Now, using the definition of "sexual
harassment" that you gave us today and your understanding
based on your training from Fairfax County, with the exception
of any allegations regarding to my clients -- we'll put that
aside, okay -- while you were at Rachel Carson, it's your
testimony that you don't recall learning of even a single
instance of sexual harassment of --

        (Court Reporter clarification.)

        MR. BRENNER:  I'll try it again.  I did poorly.

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

B.R. v. F.C.S.B.

128

BY MR. BRENNER:

Q.   Using the definition of "sexual harassment" that you gave
us, and putting aside any allegations regarding my client,
it's -- for the entire 13 years while you were at Rachel
Carson, you do not remember learning of a single instance of
any sexual harassment involving any student?

A.   No, I recall --

        MR. BRENNER:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. BRENNER:

Q.   I've handed you a transcript of your deposition -- well,
is that a transcript of your deposition taken a little less
than -- well, about eight months ago?

A.   Yes.

Q.   You were under oath for that deposition?

A.   Correct.

Q.   If you go to page 202, lines 15 to 22, I'm going to read
them into the record and ask you if I've read them correctly.

        MS. REWARI:  Your Honor --

        THE COURT:  This is -- I think what you need to do
is lay a predicate for the question and then hear what the
response to the question is and then offer the deposition
testimony if it's inconsistent.  Let's take it through that
way.

BY MR. BRENNER:

B.R. v. F.C.S.B.

129

Q.   Let me ask you the question again.

        During the entire -- with the exception of any

allegations regarding my client, while you were counselor at

Rachel Carson Middle School, do you recall learning of any

instances of sexual harassment involving a student?

        THE COURT:  What is your testimony today.

        MR. BRENNER:  Correct.

        THE WITNESS:  I do remember one that I recorded in

my deposition that was sexual harassment in nature.

BY MR. BRENNER:

Q.   Okay.  So first let me read what you told us at your

deposition.

A.   Yes.

Q.   You were asked at your deposition:

        "QUESTION:  You told us about the one where you were

at RCMS and then another incidents then at your recent school.

What about with regard to sexual harassment?"

        But let me give you more context.

        So we -- prior to the questions regarding bullying

in the deposition.

        Do you see that?

        So that's that preface.  We're now moving to sexual

harassment in the deposition.

        And then you were asked:

        "QUESTION:  What about with regard to sexual

B.R. v. F.C.S.B.

130

harassment?  With the exception of any allegations

regarding -- with regard to B.R., while you were a counselor

at RCMS, do you recall learning of any instances of sexual

harassment involving a student?"

And your answer was:

"ANSWER:  I don't remember."

THE WITNESS:  Yeah.  That was my answer.

BY MR. BRENNER:

Q.   Okay.  And now you recall there was maybe one other one?

A.   The one that I am recalling in my mind right now is the

one that I reported in the deposition about the student that I

was involved in supporting the efforts.  And so, to me that

was sexual in nature, but I didn't --

Q.   Okay.  So perhaps you either -- at most, you remember

one; is that --

A.   I remember one.

Q.   Okay.  Fair enough.

And that's over that 13-year period?

A.   That's what I remember.

Q.   Sure.  Okay.  So now I want to talk to you specifically

about your interactions with my client, okay?

A.   Okay.

Q.   You can put that -- you can leave that up there but put

it aside.

A.   Okay.  Thank you.

─B.R. v. F.C.S.B.─

131

Q.   Yes.

     It's your testimony that you recall meeting with
B█████ only one time?

A.   One time that I could fast recall.

Q.   Well, have you -- have you -- well, I'm not sure what
that means.

     You now recall meeting with her on more than one
occasion?

A.   After looking at documents that have been presented to
me, I believe that there were two occasions.

Q.   Okay.  So let's just reset.

     At the time your deposition was taken -- I
appreciate that you've seen documents that refresh your
recollection.

     At the time your deposition, you recalled a single
instance of meeting with her, correct?

A.   That's correct.

Q.   And then since your deposition, as you're -- without
telling me anything your lawyer has said to you, when you said
you were provided documents, was that by your lawyer?

A.   It was.

Q.   Okay.  And after you reviewed those documents, you now
recall a second instance?

A.   I can't recall it directly.

Q.   Sure.

B.R. v. F.C.S.B.

132

A.   If you ask me about what was said, I can't produce that.

I don't remember that.  But based on the document, it was

obvious that I had a second meeting with her.

Q.   So let's focus at least on the first one because I think

you have at least a little more recollection.

A.   That's correct.

Q.   Is that fair?

A.   Yes, it is.

Q.   Okay.  And then I'll ask you some general questions about

the second one, understanding that you don't have much of a

recall about -- much more about it, but I'll ask you a few

questions, okay?

A.   Okay.  Yes.

Q.   Fair enough?

A.   Fair.

Q.   Okay.  The one that we talked about -- well, not we.  I

wasn't there.

        But the one in your deposition that you talked

about, even after seeing the documents, do you think that was

the first meeting?

A.   Yes, it was.

Q.   So that's -- we're talking about the first time.

        So that meeting came about because you were -- there

was an incident in the locker bay between classes, correct?

A.   Correct.

─B.R. v. F.C.S.B.─

133

Q.   And what happened is you were walking -- it says through

the locker pods.  Does that mean along the hallway?

A.   I was.

Q.   Right.  So there's the --

          MR. BRENNER:  You know what, can we bring up the --

I think it's -- it's part of Defense Exhibit 193.  Your Honor,

I'm sorry, I'm asking the wrong person.  Your Honor, may we

publish -- it's already in evidence.  It's part of Defense

Exhibit 193.

          THE COURT:  You may.

          MR. BRENNER:  My apologies, Your Honor.

          THE COURT:  That's okay.

BY MR. BRENNER:

Q.   Okay.  I think you were in court -- well, I'm not sure if

you can see the screens, but you know what this is, right?

A.   I do.

Q.   And this is -- is this Locker Pod A, is that what it is?

A.   I believe so.

Q.   You're a guidance counselor -- so there was testimony

from Mr. F█████ about the teachers would be along the wall

there.  That's not where you would normally be.  Your office

is not there?

A.   No, it is not.

Q.   Your office is at the administration office?

A.   That's correct.

B.R. v. F.C.S.B.

134

Q.   Which is -- it's the other way.  There you go.  You can't

see it from here, but this day you happened to be walking

through the pods, as you said?

A.   If you're looking at the locker pods, I was coming this

way down the hall.

Q.   Okay.  And in you're in the hallway, so you're in the

yellow area?

A.   No.  I was nowhere in this --

        THE COURT:  Using that letter 3 -- excuse me, No. 3

on the particular document there at the screen, if you look at

the screen, you can see a 3?

        THE WITNESS:  Oh, yes.

        THE COURT:  Where were you coming from in relation

to that 3?

        THE WITNESS:  Your Honor, I was walking from that

distance, and my face was walking towards the 3 coming from a

totally different area --

        THE COURT:  Okay.

        THE WITNESS:  -- of the building.

BY MR. BRENNER:

Q.   Are you walking towards the 3?

A.   Yes.  I mean, the 3 is at a distance.  I didn't get that

close to the 3, but I was way down the hallway on the other --

I was in the B pod.  I think I was coming from the B pod all

the way down.

─B.R. v. F.C.S.B.─

135

Q.    Different locker pod?

A.    Correct.

          MR. BRENNER:  Is the drawing mechanism available for

the witness?

          THE COURT:  She just needs to draw on it.

BY MR. BRENNER:

Q.    Oh, you just need to draw it apparently.

          So why don't you show us where you were coming from,

if you could, or why don't you show us --

A.    I cannot.

Q.    Well, why don't you show us where you first

encountered -- what you did encounter -- let me --

          THE COURT:  Okay.  Let's try to do it this way.  I

think from the angle of this particular picture there's not

enough depth to suggest where she was coming from.

          So, ma'am, if you could use your finger and just

sort of point the direction that you were going, using that 3

as a reference.

          THE WITNESS:  So I was coming like this way.  Does

that make sense?

BY MR. BRENNER:

Q.    Yes, perfect.  Okay.  Now, what happened was, is you saw

three or four students in a semicircle along the side of one

of the locker bays?

A.    That's right.

─ B.R. v. F.C.S.B. ─

Q.    Can you point to where that would be?

A.    It was over on this wall.

Q.    Oh, not even on the side of the locker bay, it's across
the hall?

A.    It's -- there's a wall here.  Okay.  So if I can explain
to the Court and the jury.

            THE COURT:  Go ahead.

            THE WITNESS:  This hallway here is as long as -- or
as wide as this hallway here.  So imagine the extension of
this floor on this -- this way going all the way -- excuse me,
going over here.  Then there was a wall here, okay.

            THE COURT:  Can we all agree that the width of that
particular area that she's speaking about is about 7 to 8 feet
wide?  Can we all agree on that?

            MR. BRENNER:  I -- it seems -- that's -- it's a good
enough estimate for anything I'm trying to do.

            THE COURT:  Ma'am, in the picture that we're looking
at, the depth that's pointing toward the No. 3 only gives you
about maybe one-third of the depth to the wall; is that
correct?

            THE WITNESS:  That's correct.

BY MR. BRENNER:

Q.    So you found the kid --

A.    So --

Q.    I'm sorry, you were talking.  Go ahead.

A.   Sorry.  So that's correct, Your Honor, the width of the hallway.  And so this wall here, okay, goes all the way down. There's a music classroom here, there's another classroom right here, and along this wall here is what were a row of lockers, and that's where I encountered your client.

Q.   Thank you.  So you actually found her -- the semicircle of kids around her was actually next to a different locker bay than her locker bay?

A.   No.  It was where these lockers are here, it was maybe 8 feet away on the wall here.

Q.   Oh, I thought you said there were other lockers over there that you found her by, that are off the screen here.

A.   Correct.  So --

Q.   Let me see if I can direct you a bit.  I'm not trying to be rude.  I'm trying to help us move along.

        When you found the semicircle of students, they were surrounding someone, right?

A.   They were surrounding someone.

Q.   Right.  And were they -- was the semicircle surrounding someone, was it against a locker?

A.   It was against the locker.

Q.   Was it against any of these lockers or a different group of lockers?

A.   It was against the lockers where I drew.

Q.   And the lockers were you drew, are those also A?

─────B.R. v. F.C.S.B.─────

138

A.    That is correct.

Q.    Okay.  Got it.  That was my confusion.

A.    I'm sorry.

Q.    That was my confusion.  It was more than these three rows

in locker -- in Pod A?

A.    That's correct.

Q.    Got it.  Okay.  Good.

          By the way, do you know in this picture where B.R.'s

locker was?

A.    I did not.

Q.    You did not or do not?

A.    Correct, both to both questions.

Q.    Okay.  Thank you.  So you found -- and your testimony is

the three to four kids you found were girls, right?

A.    That's correct.

Q.    And they were surrounded, and it was enough that -- it

was unusual enough that you approached, right?

A.    Yes.

Q.    And you approached the kids and asked if they were okay,

right?

A.    Correct.

Q.    And they sort of looked at another girl who was standing

with her hand in her forehead, right?

A.    That's correct.

Q.    Forehead in her hand?

B.R. v. F.C.S.B.

139

A.    Like this.

Q.    Seemed to be in some sort of distress?

A.    That's correct.

Q.    And you -- excuse me, you decided that -- and by the way,
you didn't know -- the girl that was the one in distress, at
the time, you didn't know who that girl was?

A.    Correct.

Q.    You decided -- I'm going say it was -- it turns out it
was B███, right?

A.    Correct.

Q.    So I'm going to say it was B███, but at this point, you
don't know it was B███?

A.    Okay.

Q.    You decided that B███ needed to move to a quiet, safe
place, correct?

A.    I didn't know what she needed.  I just asked how I could
assist and let her make the decision.

Q.    Is it your testimony that she said, take me to a quiet,
safe place?  That's what you did, right?

A.    I took her there.  I don't believe that -- I mean, we can
look at my deposition.  I don't remember what I said, but the
ultimate event was that she agreed that we were going to move
to a safe space.  A quiet space.

Q.    Okay.  And this was -- this incident took place in
October of 2011?

B.R. v. F.C.S.B.

140

A.   Somewhere around that timeline, yeah.

Q.   Now, I'm trying to just walk you through, and I'm trying
to track what's in your deposition, but you should answer what
you know today.

A.   Okay.

Q.   Okay.  I'm not trying to trick you, but I'm just giving
you advanced notice that's what I'm doing, okay?

A.   Got it.

Q.   All right.  You took her to the main office where the
counselors sit?

A.   Correct.

Q.   And on that walk, you asked B███ her name because you
didn't know her name?

A.   That's correct.

Q.   She told you?

A.   Correct.

Q.   You asked her -- well, you asked her who her assigned
guidance counselor was?

A.   I did.

Q.   Right.  So this is -- we talked about this with
Mr. F████ a bit, but the students were all divided -- each
student had an assigned or dedicated guidance counselor?

A.   That's correct.

Q.   And in that particular school year 2011/2012, you had
your own group of assigned students, right?

B.R. v. F.C.S.B.

141

A.    I did.

Q.    How many did you usually have?

A.    In a given year, it's 250 to 280 students.

Q.    How many guidance counselors were there?

A.    Five.

Q.    Okay.  So five relatively equally divided among the

student body?

A.    That's correct.

Q.    And did you -- I'm just curious, did you have 7th

graders, 8th graders, or some mix?

A.    It was split.  I had one 7th grade team and one 8th grade

team.

Q.    Was that typical?

A.    It was.

Q.    And B████ was in 7th grade you later learned, right?

A.    Correct.

Q.    It just so happens she was not on your assigned team?

A.    Correct.

Q.    You asked her who her assigned counselor was, correct?

A.    Yes.

Q.    And she told you it was Ms. H██████, right?

A.    Correct.

Q.    We'll go through this -- you don't remember much about

this meeting.  So, for example, you don't remember -- you

assumed you did, but you don't remember if you asked her what

was wrong?

A.   Correct.

Q.   And you assumed she told you what was wrong, but you don't remember what she told you?

A.   That is correct.

Q.   When she told you Ms. H███████ was her guidance counselor, your first instinct was to try to find Ms. H███████?

A.   Correct.

Q.   You guys worked, I assume, collegially, but you did have assignments and that would be the more appropriate person for her to see because that was her counselor?

A.   Correct.

Q.   You went to look for Ms. H██████ for about a little under a minute, I think you said 30 to 45 seconds?

A.   That is correct.

Q.   No one is holding you to the amount of seconds, but you wanted to look for her for a short amount of time?

A.   Correct.

Q.   You weren't able to find her; she wasn't in her office?

A.   Correct.

Q.   And so then you came back and you attended to -- you met -- you met with B█████?

A.   That's correct.

Q.   And your recollection is that meeting was about -- I

─────────B. R. v. F. C. S. B.─────────

143

think the word you used is not -- maybe not more than

45 minutes.

A.    That's correct.

Q.    Right.  It's a lengthy meeting but it's, you know,

somewhere in the just under hour but more than a half an hour?

A.    Correct.

Q.    Now, in opening statements -- Mr. Kenney is representing

you here today, right?

A.    Correct.

Q.    And he told the jury that -- that B███ told you nothing

about being harmed, but the truth is you don't remember

anything she told you?

A.    I don't remember specifically what she told me.

Q.    Okay.  Well, you can look in your deposition.

A.    Yup.

Q.    You can look at page 62.  And you can look at lines 15 to

18.  I'm just going to ask you to read that and then I'm just

going to ask you a question again, okay?

A.    Okay.  (Complied.)

Q.    You actually don't remember what was said, anything that

was said in that meeting?

A.    I do not.

Q.    Okay.  Fair enough.  Thank you.

        Now, in that meeting, just the two of you.

A.    It was.

B.R. v. F.C.S.B.

144

Q.   Okay.  So there's three ways we can learn about what
happened in that meeting.  One would be B██████ recollection,
whatever she recalls, right?

A.   Correct.

Q.   We've got your recollection which you don't recall.

     The third way could be if there were notes taken in
the meeting; that would be another way we could document what
happened at the meeting, right?

A.   That's correct.

Q.   Now, we talked about already that you -- well, you -- you
went to training periodically through the County to learn all
sorts of things to implement their policies; is that fair?

A.   Fair.

Q.   Okay.  And sometimes it was specific to guidance
counselors?

A.   Correct.

Q.   And one of the jobs of guidance counselors at RCMS, or
Rachel Carson in this time period and perhaps now, is they are
ones that have interactions with students, right?

A.   Yes.

Q.   So if a -- for example, if a student comes to a teacher
and says, I'm having a problem with some of the boys in the
class, the teacher would be -- would refer them to their
guidance counselor?

A.   Correct.

─B.R. v. F.C.S.B.─

145

Q.   The students could also go right to the guidance
counselor's office and fill out -- isn't it like a slip, like
request to see or something like that?

A.   Correct.

Q.   It was, like, a preprinted form and they would write
their name, who their guidance counselor was, and just really
briefly say what they wanted to see the counselor about,
right?

A.   Correct.

Q.   It's a little different than the student statements we've
looked; those are with the assistant principals?

A.   That's correct.

Q.   Okay.  So in your training at the County you --

         MS. REWARI:  Can I object?  The County is a
separate --

         MR. BRENNER:  I'll make it clear.

         MS. REWARI:  -- entity.  So if we can just say the
School Board --

         MR. BRENNER:  I'll make it clear.

         THE COURT:  We're aware.

BY MR. BRENNER:

Q.   I knew I would get in trouble on the name.  So when I'm
referring to "the County," I mean the County School Board, but
I'll try to make it clear each time, okay?

A.   Okay.

—B.R. v. F.C.S.B.—

146

Q.   The training I was talking about was by the County School

Board, not just the County, correct?

A.   Okay.

Q.   You agree with me?

A.   Yes.

Q.   Okay.  And at one of those meetings, prior to 2011, the

lawyer for the School Board -- you call them the division

counsel, I think -- but the lawyer for the School Board talked

to you about a particular subject; do you remember that?

A.   Personally?

Q.   Yeah.  Not you.  I'm sorry, no.  Bad question.

        Talk to the group, not to you personally.  Let me

make it clear.

        The lawyer came in to talk to you about the issue of

what to document and what not to document when it came to

student complaints; do you remember that?

A.   I remember -- I remember that being part of a, like,

session, breakout session, yes.

Q.   A breakout -- so it was a breakout session with the

lawyer, with the School Board lawyer --

A.   I remember that.

Q.   -- and he was there -- was it he or she?

A.   She.

Q.   She was there to teach you, among other things, but she

was -- particularly this time she was teaching you about what

to document and not document when a student comes to you and

has a complaint about something that's happening to him or

her, correct?

A.    Yes.

Q.    And her advice to you was, and -- well, she said the

purpose of it, they wanted to make sure you knew how the

School Board wanted it done from "its angle"; do you remember

that?

A.    I don't remember that.

Q.    So let me help you out because it's -- let me help you

with your deposition.

         If you can go to page 70.  And I'm focusing on lines

10 through 14 for now.  Let's go 10 to 16.

A.    I'm sorry, sir, did you say 10 to 17?

Q.    No, 10 to 16.  Well, it should go to -- yeah, 10 to 16.

Are you on the right page, page 70?

A.    I am.  I am.

Q.    Okay.  16 ends an answer, right?

A.    It does.

Q.    Okay.  I was just making sure you and I were on the same

page and line.

A.    Yes.

Q.    So did you get a chance to read that?

A.    I did.

Q.    So let me just ask you the questions again.

────────────────── B.R. v. F.C.S.B. ──────────────────

148

A.   Okay.

Q.   There was a class from the School Board's lawyers that
was teaching you about the documentation regarding student
complaints, right?

A.   Correct.

Q.   And this one particular they were talking about --

A.   Can I --

Q.   I'm sorry.  Yeah.

A.   I'm sorry, I just wanted to -- I'm sorry I interjected.

Q.   Do you want to say something, or do you want me to ask
the next question?

A.   Continue.  I'm sorry.

Q.   Okay.  That's okay.

        The breakout session which you referred to earlier
was so the school counselors would learn about -- from the
School Board's lawyers about documenting and not documenting
things from the angle what the School Board wanted.

A.   I'd like to clarify that.

Q.   First let me -- well --

        MS. REWARI:  Your Honor, may I object.  This is
mischaracterizing what was in the deposition.  There was an
objection on privilege, and that is -- her testimony was not a
disclosure of legal advice.

        THE COURT:  Rephrase.

        MR. BRENNER:  I propose to just read the deposition

testimony for impeachment purposes.

THE COURT:  Let me see what you want to read.  What lines are you referring to?

MR. BRENNER:  To give you context, you should probably start -- you should probably start at page 68, line 24, and go through page 70 -- at least for now through page 70, line 16, but then we'll have some additional questions.

(A pause in the proceedings.)

THE COURT:  You can go from 68 -- for impeachment purposes -- and, again, the information at 68, line 24 doesn't really relate specifically to the question that you want to ask.  I think the substance of what you want to ask actually starts on page 70 or thereabouts.  69, 70; is that fair?

MR. BRENNER:  Probably.  I was just trying to give Your Honor context for it.

THE COURT:  Yes.

MR. BRENNER:  I think it starts 69, line 24.

THE COURT:  Okay.  I'm going to let you ask -- on page 69, line 24, I'll let you impeach her on that.  And I don't want any reference to 70 pages -- 70, pages 4 through -- lines 4 through 6.

MR. BRENNER:  I'm sorry, 4 through 6 did you say?

THE COURT:  Yeah, that really has nothing to do with what we --

MR. BRENNER:  Yeah.  You want me to skip over that?

THE COURT:  Yes.  And --

MR. BRENNER:  Yes.

THE COURT:  Then you can ask her about 7 through 16.

MR. BRENNER:  Okay.  Let me just write it down so I
don't mess it up.

BY MR. BRENNER:

Q.    Okay.  You ready?

A.    I'm ready.

Q.    So I'm just going to read to you -- I'm going to read to
you and the jury the testimony, at least this part that we've
been talking about so far.

        "QUESTION:  So this class with division counsel, who
was present in it?

        "ANSWER:  Counselors and I don't recall the name of
the lady.

        "QUESTION:  Did this" --

        Is 7 okay, Your Honor?  You said 4 to 6 out.  Do you
want 7 -- is line 7 okay?  I think 7 -- you're right, I think
7 is okay.  If it's okay with Your Honor.  I think you had it
right.

        THE COURT:  Yes.

BY MR. BRENNER:

Q.    Okay.

        "QUESTION:  Did this pertain to any particular event

─────────── B. R. v. F. C. S. B. ───────────

151

that you were going to that class for?

     "ANSWER:  No.

     "QUESTION:  So it was just a general class provided to the school counselors?

     "ANSWER:  It was.  It was a breakout session for school counselors to know about documentation from our angle.

     "QUESTION:  Okay.

     "ANSWER:  And how to document or not document."

A.    That's right.

Q.    (BY MR. BRENNER)  Right.  So the school -- the School Board's counsel was teaching the counselors what to document and not document from the angle of the School Board?

A.    No, from our angle, from the angle of a school counselor.

Q.    Okay.

A.    To know about documentation from the angle of the school counselor.

Q.    Okay.

A.    Because we had this -- oh, can I explain?  We had this class because they -- every year the School Board sends out like a survey to counselors asking them what kind of breakout sessions that would be beneficial for all school counselors. And through that survey, they come up with the -- the next year's in-service to start the school year.

     And one of the breakout sessions was, legally, what are some of the things that we need to be considering as

─B.R. v. F.C.S.B.─

152

school counselors moving forward.  And so there were various

topics in that breakout session, and one of the topics was on

how to document based on the school counselor's angle.

Q.   For a Fairfax County School Board school counselor?

A.   For a Fairfax County School Board school counselor.

Q.   Yeah, that's a lot of schools.

A.   That's a lot of schools.

Q.   Yeah, got it.  I thought you said your answer -- you said

that they were responding to what you needed to do or should

do legally?  Is that the word you used?

A.   So what I recall is that the survey that was sent out,

there were various topics.  And you could even -- you could

even put in topics that you were interested in for the

following school year.  And one of the topics was, what are --

what are some things we as counselors need to consider in

regards to calling Child Protective Services or in reporting

self-harm or suicidal idea- --

        THE COURT:  Fair to say in that particular

counseling session, a variety of issues were covered, not just

simply issues related to Title IX?

        THE WITNESS:  That's correct.

BY MR. BRENNER:

Q.   Right.  What I was trying to clarify is one of the issues

was how to -- and we talked about this -- is to document what

students were telling you when they were making complaints?

─── B. R. v. F.C.S.B. ───

153

A.    Yes.

Q.    The general message of the lawyer -- of the School
Board's lawyer was "less is more"?

A.    Correct.

Q.    And what you took that to mean, at least how you
implemented that is from that point forward, you never took
notes of any of these meetings with students?

A.    Unless it was something that was like in a Tier 3, which
is significant, like an abuse or something like this.

Q.    And as far as -- it was abuse of what?

A.    Abuse or something like this.

Q.    Something like this?

A.    Abuse.  It could have been --

        THE COURT:  When you're referring to the term
"something like this," were you particularly talking about
sexual harassment or was that sort of a term of transition
that you use when describing things that were otherwise talked
about, but not included in abuse?

        THE WITNESS:  I'm sorry, Your Honor?

        THE COURT:  What did you mean by "something like
this"?

        THE WITNESS:  I just meant -- so I meant Tier 3.
This is my brain, is these are the high-level cases of
students that have significant issues in the school that
could -- where we resource out.  So we resource out to

B.R. v. F.C.S.B.

154

therapists.  It might be hospitalization.  It could have -- it could be abuse cases.  It could be rape, as we are talking today, those types of things.

          THE COURT:  Tier 3 could be identified as something that's particularly serious?

          THE WITNESS:  Yes, sir.

          THE COURT:  Okay.

BY MR. BRENNER:

Q.   So let's see if we can clarify what -- how you implemented this advice or guidance from the School Board's lawyer.

          If you look at page 72 of your deposition.  Actually it starts at the bottom of page 71.  And read through to page 72, line 21.

A.   Okay.

Q.   So, now let me ask you some questions.

A.   Okay.

Q.   In the context of meeting with students --

A.   Okay.

Q.   -- what the lawyer told you is one "less is more," correct?

A.   Correct.

Q.   And from that point forward, you did not take notes of your meetings with students?

A.   Not extensive notes.

─────B.R. v. F.C.S.B.─────

155

Q.   In your deposition you said don't take notes, correct,

from that point forward?

A.   Correct.

Q.   Okay.  That was from the advice of -- from the advice of

the School Board's counselor?

A.   That was their suggestion.

Q.   Now, you're not aware of any benefit to the student for

you -- by you not taking notes at these meetings?

A.   Could you repeat that?

Q.   Sure.  You're not aware of any benefit to the student of

not taking notes -- I will ask you the question exactly.

         There's no benefit of not taking notes when you're

speaking with a student in distress?

A.   So let me explain, if I can, to the Court.

Q.   If you can first answer my question, and then you can

explain if you feel you need to.

A.   Sure.

Q.   But it's a yes or no question.

         Are you aware of any benefit from not taking notes

when you're speaking with a student in distress?

A.   There is -- in my opinion, there is no benefit because

it's handled immediately afterward.

Q.   Okay.

         THE COURT:  Where are you in your examination,

Mr. Brenner?

B.R. v. F.C.S.B.

156

MR. BRENNER:  I'm sorry, Your Honor.  I didn't hear you.

THE COURT:  Where are you in your examination?

MR. BRENNER:  I'm on my last section, which will probably take -- it won't be five minutes, but it won't be 25.

THE COURT:  Can we go to 1:30?  All right.  1:30 let's target.

MR. BRENNER:  We're at 1:20 now?

THE COURT:  We're at 1:17 and 35 seconds.

MR. BRENNER:  Okay.  I'll shoot for the 1:30 target.

BY MR. BRENNER:

Q.    Well, let me back up one thing, because you told us earlier that you remember a second meeting, though not much about it, with B██████?

A.    That's correct.

Q.    Do you have any idea of what the time frame of that one was?

A.    December, maybe.  Beginning of December.

Q.    And you don't remember any specifics about it?

A.    Just in the email that jogged my memory that I must have met with her.

Q.    I bet I'm going to show you that email.

A.    Sounds good.

Q.    Okay.  Now, the next thing that you remembered happening, at least when we talked to you earlier in the year or late

B.R. v. F.C.S.B.

157

last year is that you were asked by Assistant Principal

Mr. H██████ -- that's his name, P███ H█████?

A.    It is.

Q.    Okay.  You were asked to shadow B.R.?

A.    That's correct.

Q.    And what shadowing means is that -- in this case, you,

you would watch a student for -- in this case, it was two

times during the day in the -- it's like five minutes between

periods, right, four or five?

A.    I think it might have been four.  It might have been

three.

Q.    I think it's four.  It's really short.  You would watch

them as they went from one class to the other or one class to

the locker and you would do that twice a day -- two periods in

the day, right?

A.    What I remember, two periods in the day.

Q.    And what you understood -- what Mr. H█████ wanted you to

do was he wanted to make sure that no one was approaching

B█████ during those two class interchanges?

A.    That's correct.

Q.    Now, you asked Mr. H█████, who are you looking for, who

are the kids that I'm looking to make sure not approach,

right?

A.    Correct.

Q.    And he didn't tell you that, right?

B.R. v. F.C.S.B.

158

A.   He said, we're not sure.

Q.   Okay.  Mr. H█████ told you he didn't -- he didn't know who B████ was saying was bothering her at the lockers?  Is that what he told you?  He didn't know the names of the kids?

A.   To my recollection, I was just told to monitor her.  I asked, who am I looking for, and I was just told, make sure that you -- you make sure she's safe and nobody is approaching and if somebody approaches, take note, and then let me know who that person is.

Q.   And you assumed the reason you were given this assignment was because people had been bothering B████?

A.   I assumed that.

Q.   Now, there's a time -- you just brought this up.  There was a time when you had communications with B████ mother, right?

A.   Correct.

Q.   I'm going to call her Mrs. R., okay?

A.   Okay.

Q.   I'm going to bring -- if you could look at your -- in your binder there, and if you look at Exhibit 84.  You got to go -- let me see if I can direct you to that specific page using those numbers on the bottom.  So if you could go to -- do you see on the bottom there's like those small numbers on in the bottom right corner?

A.   I do.

———————— B.R. v. F.C.S.B.————————

159

Q.   Okay.  So you see where it says a number ending in 3606?

It's sort of towards -- more towards the back of the document.

A.   Got it.

Q.   It should be flagged in there for you.

A.   It is.

Q.   Okay.  And we're going to look at 3606 and 3607.

          MR. BRENNER:  Your Honor --

          THE WITNESS:  Okay.

BY MR. BRENNER:

Q.   This is an email exchange between yourself and Mrs. R.,

and it looks like Mr. Genus is copied on a couple of them,

Ms. Weaver is copied on almost all of them, I believe, and

then Ms. H█████ is copied on one of them; is that right?

A.   That's correct.

Q.   And all of those people -- well, Mr. Genus is the School

Resource Officer.  The other people are all -- were all Rachel

Carson Middle School employees at the time, right?

A.   Correct.

          MR. BRENNER:  Your Honor, we would like to move

admission at this point just those two pages that I've

identified from this exhibit.

          THE COURT:  Without objection?

          MS. REWARI:  Just to clarify, 3606 and 3607?

          MR. BRENNER:  Yes, Counsel.

          THE COURT:  Without objection.

B.R. v. F.C.S.B.

160

(Plaintiff's Exhibit No. 84, pages 3606 and 3607, was admitted into evidence.)

          MR. BRENNER:  May I publish, Your Honor?

          THE COURT:  You may.

BY MR. BRENNER:

Q.   Okay.  So let's start with -- so all I did here is I took the very bottom of 3606, which is the address there, and then the email that follows so you could see.

          So this is another one of those email trails where it's -- it goes from oldest to newest, right?  So we're starting from what I believe is the first one in this particular trail.

A.   That's correct.

Q.   So Mrs. R. writes you -- this is December 7, 2011, right?

A.   Yes.

Q.   And the reason you said this email jogged your memory is it's pretty clear, at least from Mrs. R.'s perspective, that her daughter has met with you on more than one occasion, right?

A.   Can you repeat that one more time?

Q.   Yeah.  You said it jogged your memory.  You had seen a document that indicated you must have met more than one time.  Is this that document?

A.   This is that document.

Q.   Right.  And so that jogged your memory.  It wouldn't make

———B.R. v. F.C.S.B.———

161

much sense if the only time I met was once based on what's

written here, correct?

A.   Correct.

Q.   She says to you that she's not sure if you've had a

chance to talk to Ms. Weaver, who was the director of student

services?

A.   Correct.

Q.   But she tells you that her daughter has been experiencing

extreme bullying and sexual harassment, right?

A.   That's what it says.

Q.   And as a consequence of sharing her experience with

school administrators -- so those would be the assistant

principals?

A.   Correct.

Q.   She's now concerned about her safety at school and she

says because of ongoing threatening remarks, correct?

A.   Correct.

Q.   Now she says, "She's always enjoyed speaking with you..."

        That's probably what jogged your memory that it must

have been more than one time?

A.   No.  The email itself reminded me, not that part.

Q.   Okay.  "She's always enjoyed speaking with you so

Ms. Weaver suggested she meet with you to get some strategies

and skills for coping with the situation."

A.   That's -- yes.

─B.R. v. F.C.S.B.─

162

Q.   She tells you that "B███ is not in school that day, her

anxiety is high, and she asks that I..."  -- "she" meaning

Ms. Weaver -- "asks that I request that you meet with her this

morning," right?

         MS. REWARI:  Objection.  I think you misread that

line.

         MR. BRENNER:  Oh, I'm sorry.  Counselor is right.

BY MR. BRENNER:

Q.   It says, "Although B████ is in school today, her

anxiety level is high and she asked" -- B████ asked -- "that I

write to you requesting that you meet with her this morning."

         THE WITNESS:  That's what it reads, yes.

BY MR. BRENNER:

Q.   At this point -- were you aware that B███ had been

having difficulty getting Ms. H██████, her assigned guidance

counselor, to meet with her?  Do you have any knowledge of

that?

A.   I did not.

Q.   Okay.  And then she said she realizes your day is booked

solid, but it would mean very much to her if you could take

the time, right?

A.   It does say that.

Q.   Okay.  So now let's go to the next email.

A.   Okay.

Q.   It says -- this is you writing back the next day, right?

B.R. v. F.C.S.B.

163

It looks like the next morning.

A.    That is correct.

Q.    It says, "Hello, Mrs. R., thank you for your voice message and email today.  Ms. Weaver filled me in about the situation and I was able to speak with B██████ yesterday."

So, in response to Ms. R.'s email you actually did meet with B██████ on the 7th?

A.    I did.

Q.    Okay.  So, is that probably the second meeting?

A.    That was the second meeting.

Q.    You say, "I will be monitoring her between change of classes of first and third periods today and tomorrow."

That's the shadowing we just talked about?

A.    That's correct.

Q.    "I've given her some strategies to use if she ever feels threatened, uncomfortable, or afraid."

And then you write, "I will continue to be a support to her and you throughout the year."

A.    That's correct.

Q.    And then you ask if there's any other way you can help, right?

A.    That's correct.

Q.    Now, Ms. R. writes back -- so you shadowed B████ on December 8th, correct?

A.    Correct.

B.R. v. F.C.S.B.

164

Q.    Okay.  And that was the first day you shadowed her?

A.    That's right.

Q.    Okay.  And Mrs. R. writes you back the next day, this
time adding Ms. H████ and adding Mr. Genus in, the School
Resource Officer.

      She says, "Good morning to you and Ms. H████.
Hope all is well with you."  She says, "As an update, B████
said yesterday was a great day at school."

      That was the day you shadowed her, right?

A.    Correct.

Q.    And Ms. R. reports to you, "She attributes this to the
guidance and hallway shadowing you provided -- or provided by
you," right?

A.    Correct.

Q.    And Ms. R. thanks you for doing that, right?

A.    Yes.

Q.    And she says she would "...appreciate if you could
continue to monitor the situation in the hallways during class
changes just through the early part of next week to ensure the
situation has truly simmered down," right?

A.    Correct.

Q.    And then she says she will stay in touch and update you
as necessary, right?

A.    Correct.

Q.    So that's December 9th.  On December 9th you shadow B████

B.R. v. F.C.S.B.

165

for the second day?

A.    I believe so.

Q.    You actually never shadow her again, correct?

A.    I don't believe so.

Q.    Right.  And the reason you didn't shadow her again is

because the school administrators directed you to stop?

A.    I was asked to -- yeah, I was asked to stop.

Q.    By the school administrators, correct?

A.    That is correct.

Q.    And then this line where you told Mrs. R. you would

continue to support B███ and her mom throughout the year, you

actually never provided any support to B███ again after

December 9th; isn't that correct?

A.    After that, no, I did not.

Q.    Okay.

         MR. BRENNER:  May I consult with my colleague, Your

Honor?

         THE COURT:  You may.

         (Counsel confers.)

         MR. BRENNER:  Thank you, Ms. F██████.

         THE WITNESS:  Thank you so much.

         THE COURT:  All right.  You can step down because

we're going to take our lunch break.

         Ladies and gentlemen, this is our lunch break.  I

compliment counsel for reaching the goal of 1:30 on the money,

B.R. v. F.C.S.B.

166

pretty much.  Let's go until 2:15.

         And again, please do not discuss the case or aspect

of the case with anyone.  If you by chance decide to leave the

courthouse, I would suggest to you that don't have any contact

with any people who may be outside to avoid the risk that we

may have run into earlier, so just try as much you can to

avoid anybody.

         Anyone wants to ask any questions, just keep

walking.  If there's a problem, make sure Ms. Tinsley knows.

         (Jury excused.)

         THE COURT:  All right.  We'll see everybody back at

2:15.

         MR. BATES:  Thank you, Judge.

         (Lunch Recess 1:31 p.m.)

         (A.M. Session concluded.)

CERTIFICATE OF REPORTER

        I, Tonia Harris, an Official Court Reporter for

the Eastern District of Virginia, do hereby certify that I

reported by machine shorthand, in my official capacity, the

proceedings had and testimony adduced upon the Jury Trial

in the case of the **B.R. versus F.C.S.B., et al.**, Civil

Action No.: 1:19-cv-917, in said court on the 21st day of

March, 2024.

        I further certify that the foregoing 186 pages

constitute the official transcript of said proceedings, as

taken from my machine shorthand notes, my computer realtime

display, together with the backup tape recording of said

proceedings to the best of my ability.

        In witness whereof, I have hereto subscribed my

name, this August 26, 2024.

_____
Tonia M. Harris, RPR
Official Court Reporter

167

**'**

**'UR'** [1] - 22:13

**0**

**05** [1] - 4:19

**1**

**1** [5] - 60:15, 60:16, 71:1, 73:1, 73:2
**10** [9] - 23:3, 49:5, 93:21, 94:1, 147:13, 147:14, 147:15
**100** [5] - 2:3, 2:7, 2:11, 72:4, 96:3
**102** [1] - 4:19
**104** [1] - 15:17
**107** [2] - 55:5, 55:6
**11** [4] - 28:7, 49:5, 68:8, 68:9
**111** [1] - 4:6
**116** [1] - 4:8
**11:50** [1] - 93:20
**11:55** [3] - 93:23, 94:1, 94:18
**12** [1] - 126:24
**120** [2] - 3:7, 4:12
**1200** [2] - 126:23, 127:12
**124** [3] - 34:5, 34:6, 34:15
**125** [1] - 15:4
**12:07** [1] - 95:7
**13** [4] - 96:18, 126:21, 127:12, 128:4
**13-year** [1] - 130:18
**13-year-old** [2] - 43:17, 80:25
**1300** [1] - 126:24
**133** [2] - 15:9, 15:18
**14** [5] - 14:8, 55:6, 69:22, 127:13, 147:13
**149** [2] - 37:23, 112:20
**15** [5] - 14:2, 38:18, 91:2, 128:17, 143:16
**15,000** [1] - 127:13
**1520** [1] - 1:21
**15th** [9] - 36:14, 103:5, 108:17, 111:23, 112:14, 113:6, 113:10, 113:25, 114:1
**16** [6] - 147:13, 147:15, 147:18, 149:7, 150:4
**160** [1] - 4:12
**167** [1] - 167:10

**17** [1] - 147:14
**1775** [1] - 3:10
**18** [10] - 59:21, 60:2, 61:2, 61:12, 61:21, 61:24, 62:19, 63:13, 72:22, 143:17
**18.............................
............** [1] - 4:16
**1801** [1] - 3:6
**19** [2] - 30:25, 31:1
**193** [2] - 133:6, 133:9
**1:17** [1] - 156:9
**1:19-cv-917** [2] - 1:4, 167:8
**1:20** [1] - 156:8
**1:30** [4] - 156:6, 156:10, 165:24
**1:31** [1] - 166:13
**1st** [2] - 62:23, 62:25

**2**

**2** [3] - 56:20, 71:1, 79:25
**20** [1] - 22:8
**20037** [3] - 1:17, 2:15, 2:19, 2:22, 3:2
**2007** [3] - 117:16, 117:18, 118:1
**2011** [5] - 26:19, 48:8, 139:25, 146:6, 160:13
**2011/2012** [1] - 140:24
**2012** [19] - 26:20, 38:19, 48:13, 60:15, 60:16, 63:22, 73:1, 73:2, 73:7, 75:7, 75:10, 80:18, 91:7, 92:11, 97:11, 107:23, 108:3, 108:6
**2014** [3] - 15:3, 15:16, 109:3
**2016** [1] - 16:15
**2018** [1] - 16:13
**2019** [1] - 109:6
**20190** [1] - 3:11
**20191** [1] - 3:7
**202** [1] - 128:17
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:19
**2020** [2] - 117:18, 117:20
**2020/'21** [1] - 117:21
**2024** [3] - 1:6, 167:9,

167:16
**2029** [1] - 1:20
**206** [2] - 40:20, 41:1
**206.............................
............** [1] - 4:15
**21** [5] - 1:6, 29:14, 29:15, 154:14, 167:16
**213-995-5720** [1] - 1:22
**21st** [1] - 167:8
**22** [1] - 128:17
**2200** [4] - 2:15, 2:18, 2:22, 3:2
**22314** [1] - 3:14
**22nd** [1] - 75:7
**2300** [1] - 1:16
**23rd** [1] - 75:10
**24** [4] - 149:6, 149:11, 149:18, 149:20
**25** [3] - 14:4, 14:12, 156:5
**250** [1] - 141:3
**26** [1] - 4:4
**27** [4] - 63:22, 107:23, 108:3, 108:6
**280** [1] - 141:3
**2800** [3] - 2:3, 2:7, 2:11
**2:15** [2] - 165:25, 166:11
**2nd** [3] - 2:3, 2:7, 2:11

**3**

**3** [20] - 34:7, 34:14, 34:15, 66:3, 66:6, 66:9, 84:9, 134:9, 134:11, 134:14, 134:16, 134:21, 134:22, 134:23, 135:17, 136:18, 153:8, 153:22, 154:4
**30** [2] - 94:12, 142:15
**305** [4] - 119:14, 119:17, 119:25, 120:4
**305-539-8400** [1] - 2:8
**305.............................
............** [1] - 4:12
**33131** [3] - 2:4, 2:8, 2:12
**35** [1] - 156:9
**3606** [4] - 159:1, 159:6, 159:23, 160:6
**3607** [2] - 159:6, 159:23
**3d** [4] - 15:4, 15:17, 16:13, 16:15

**4**

**4** [5] - 1:8, 149:21, 149:22, 149:23, 150:18
**400** [1] - 3:10
**401** [1] - 3:13
**41** [1] - 4:15
**45** [3] - 11:19, 142:15, 143:2
**48** [3] - 29:9, 29:12, 29:13

**5**

**5** [2] - 34:14, 34:16
**50** [1] - 30:24
**58** [1] - 4:15
**599** [1] - 23:1

**6**

**6** [3] - 149:22, 149:23, 150:18
**60** [1] - 4:16
**610-804-1787** [1] - 2:4
**62** [1] - 143:16
**643a** [1] - 1:17
**663** [2] - 14:4, 14:12
**68** [3] - 149:5, 149:10, 149:11
**69** [3] - 149:14, 149:18, 149:20

**7**

**7** [8] - 136:13, 150:4, 150:18, 150:19, 150:20, 160:13
**70** [8] - 147:12, 147:16, 149:6, 149:7, 149:14, 149:21
**71** [1] - 154:13
**72** [8] - 14:1, 14:14, 73:16, 73:20, 74:20, 74:22, 154:12, 154:14
**72.............................
............** [1] - 4:16
**73** [17] - 22:8, 57:23, 58:1, 58:6, 58:8, 61:2, 61:11, 61:24, 62:5, 62:19, 62:20, 63:2, 63:5, 63:6, 63:14, 107:15
**73.............................
............** [1] - 4:15
**74** [5] - 4:16, 14:1, 14:16, 81:14, 81:18

**74.............................
............** [1] - 4:17
**742** [1] - 15:17
**769** [1] - 15:4
**77** [2] - 121:13, 121:15
**7th** [5] - 127:3, 141:9, 141:11, 141:15, 163:6

**8**

**8** [4] - 66:21, 79:25, 136:13, 137:9
**803** [1] - 16:15
**804-788-8200** [1] - 3:3
**81** [1] - 4:17
**834** [1] - 16:15
**837** [1] - 14:8
**84** [2] - 158:20, 160:1
**84.............................
............** [1] - 4:12
**850-585-3414** [1] - 2:12
**859** [1] - 16:13
**868** [1] - 16:14
**878** [1] - 16:14
**895** [1] - 16:13
**8th** [8] - 43:1, 76:13, 106:19, 127:3, 141:10, 141:11, 163:23

**9**

**9** [1] - 71:5
**90** [1] - 50:22
**90067** [1] - 1:21
**95** [1] - 4:5
**96** [1] - 4:5
**98** [1] - 4:6
**99** [1] - 91:18
**9:00** [1] - 5:22
**9:51** [1] - 11:9
**9th** [3] - 164:24, 165:12

**A**

**a-hole** [2] - 42:15, 42:19
**A.F** [1] - 3:5
**a.m** [2] - 1:6, 5:22
**A.M** [2] - 1:8, 166:14
**a/k/a** [1] - 18:18
**abbreviations** [2] - 56:12, 85:14
**ability** [1] - 167:14
**able** [13] - 5:12, 11:9, 14:19, 17:10, 19:11, 23:14, 45:7, 101:21,

101:22, 101:23,
111:8, 142:20, 163:4
**abrenner@bsfllp.
com** [1] - 2:9
**absolutely** [11] -
13:17, 14:24, 23:25,
28:11, 75:3, 81:2,
88:13, 95:23, 96:14,
97:19, 105:20
**abuse** [8] - 15:19,
16:7, 153:9, 153:10,
153:11, 153:13,
153:18, 154:2
**access** [3] - 53:10,
53:12, 53:14
**accommodate** [1] -
11:23
**according** [4] - 42:1,
42:4, 108:13, 125:8
**account** [32] - 14:16,
14:17, 18:25, 19:24,
20:6, 21:24, 21:25,
56:18, 57:5, 57:7,
57:9, 57:10, 58:21,
59:9, 59:13, 59:15,
59:17, 64:10, 64:14,
65:17, 69:24, 72:6,
72:7, 72:8, 72:13,
74:13, 75:4, 75:17,
77:13, 81:10, 83:15
**accounts** [16] - 14:3,
14:25, 15:21, 16:18,
16:23, 18:22, 19:25,
21:8, 55:13, 55:15,
80:22, 81:4, 91:10,
91:23, 107:11,
109:12
**accurate** [1] - 39:21
**accusation** [1] - 13:9
**accuse** [1] - 93:1
**accused** [7] - 12:10,
13:6, 13:11, 92:14,
92:22, 92:25, 93:5
**accusing** [1] - 110:7
**acknowledge** [1] -
24:25
**acknowledging** [1] -
24:3
**act** [1] - 121:9
**acting** [4] - 109:15,
109:17, 110:1, 121:8
**Action** [2] - 1:4, 167:8
**actor** [2] - 90:15,
109:13
**actual** [1] - 70:9
**add** [2] - 40:8, 40:13
**adding** [1] - 164:3
**addition** [3] - 9:25,
24:19, 72:5
**additional** [4] - 18:21,

19:8, 19:10, 149:7
**address** [5] - 22:1,
47:25, 95:25, 123:2,
160:6
**addresses** [2] - 15:21,
15:22
**adduced** [1] - 167:6
**administration** [8] -
42:21, 42:22, 44:7,
44:21, 44:24, 46:17,
50:6, 133:24
**administrators** [3] -
161:11, 165:5, 165:7
**admissibility** [1] -
15:25
**admissible** [1] - 13:5
**admission** [4] - 58:1,
59:21, 81:14, 159:20
**admit** [7] - 15:5,
15:19, 40:23, 40:24,
58:8, 59:25, 60:2,
74:22, 81:17, 81:18,
119:15, 120:4, 160:1
**admitting** [1] - 16:8
**Adrianna** [12] - 14:18,
16:22, 83:8, 83:16,
83:21, 83:24, 84:9,
86:2, 86:12, 87:2,
87:19, 88:11
**adult** [3] - 36:5, 96:15,
96:18
**advance** [1] - 69:25
**advanced** [1] - 140:7
**advances** [1] - 120:21
**advantage** [1] - 94:17
**adverse** [1] - 10:23
**advice** [5] - 147:5,
148:23, 154:10,
155:4
**advisement** [3] - 14:5,
14:7, 18:2
**affiliation** [1] - 44:18
**afraid** [2] - 85:7,
163:15
**afternoon** [6] - 24:1,
93:19, 97:1, 97:2,
116:15, 116:16
**afterwards** [1] - 42:6
**age** [1] - 96:18
**aggressive** [1] - 52:16
**ago** [1] - 128:13
**agree** [12] - 9:16,
18:16, 26:4, 63:2,
118:14, 118:20,
118:23, 119:7,

125:8, 136:12,
136:14, 146:4
**agreeable** [1] - 111:15
**agreed** [2] - 59:20,
139:22
**agreement** [1] - 11:9
**ahead** [6] - 6:7, 85:19,
91:3, 113:20, 136:7,
136:25
**al** [2] - 1:6, 167:7
**alanderson@bsfllp.
com** [1] - 1:22
**album** [1] - 88:19
**Alex** [2] - 67:8, 67:10
**Alexandria** [2] - 3:14,
23:19
**Alison** [1] - 1:19
**allegations** [6] -
32:19, 32:23,
127:20, 128:3,
129:3, 130:1
**allegedly** [1] - 112:15
**allow** [4] - 25:23, 61:7,
74:18
**allows** [1] - 53:24
**almost** [2] - 93:19,
159:12
**ALSTON** [1] - 1:11
**amateur** [1] - 22:9
**amazing** [6] - 84:13,
87:16, 88:12, 89:11,
89:14, 89:16
**amount** [3] - 52:11,
142:17, 142:18
**analysis** [1] - 74:17
**Anderson** [1] - 1:19
**Andrew** [3] - 2:6, 7:10,
116:17
**ANDREWS** [4] - 2:14,
2:18, 2:21, 3:1
**Angeles** [1] - 1:21
**angle** [9] - 135:14,
147:7, 148:17,
151:6, 151:12,
151:13, 151:15,
152:3
**angry** [2] - 65:5, 69:15
**answer** [24] - 13:23,
29:2, 29:24, 30:1,
30:7, 43:11, 43:12,
58:17, 61:13, 71:20,
74:14, 77:9, 92:16,
111:9, 113:21,
114:2, 115:25,
123:14, 130:5,
130:7, 140:3,
147:18, 152:8,
155:15
**ANSWER** [6] - 31:5,
130:6, 150:15,

151:2, 151:5, 151:8
**answered** [4] - 101:6,
104:14, 107:4, 114:3
**answering** [1] -
113:18
**answers** [1] - 28:12
**anticipate** [7] - 12:7,
12:10, 13:25, 14:8,
45:5, 94:3, 94:12
**anxiety** [2] - 162:1,
162:9
**anyway** [1] - 88:10
**apologies** [2] - 94:21,
133:11
**apologize** [7] - 18:15,
32:13, 32:18, 69:25,
73:18, 79:17, 94:20
**apology** [1] - 95:24
**app** [1] - 53:18
**appear** [1] - 116:1
**APPEARANCES** [3] -
1:13, 2:1, 2:25
**appeared** [1] - 76:23
**appearing** [1] - 10:22
**apple** [1] - 17:24
**application** [3] -
53:14, 53:21, 81:21
**apply** [1] - 75:2
**appreciate** [8] - 6:21,
11:23, 45:6, 50:8,
108:16, 114:17,
131:13, 164:16
**approach** [4] - 37:22,
32:8, 116:9, 128:8, 157:22
**approached** [3] - 8:5,
138:17, 138:19
**approaches** [1] -
158:8
**approaching** [2] -
157:18, 158:7
**appropriate** [7] - 9:21,
13:23, 15:24, 16:7,
23:21, 33:6, 142:11
**appropriately** [1] -
33:1
**approved** [1] - 48:5
**area** [7] - 23:19, 105:8,
111:8, 111:10,
134:7, 134:17,
136:13
**argument** [2] - 19:10,
21:16
**arguments** [2] - 14:6,
74:15
**arm** [1] - 35:4
**arms** [3] - 35:3, 35:5,
35:6
**Army** [1] - 99:16
**aside** [3] - 127:21,
128:3, 130:24

**aspect** [5] - 23:15,
93:23, 93:24, 115:5,
166:1
**Assault** [1] - 99:17
**assault** [1] - 52:3
**assaulted** [8] - 27:10,
27:12, 30:14, 30:15,
31:15, 31:16, 50:12,
98:10
**asshole** [1] - 42:14
**assigned** [7] - 110:12,
140:17, 140:22,
140:25, 141:17,
141:19, 162:14
**assignment** [1] -
158:10
**assignments** [1] -
142:11
**assist** [1] - 139:17
**Assistant** [1] - 157:1
**assistant** [9] - 36:11,
36:18, 38:5, 100:17,
104:11, 108:10,
124:19, 145:11,
161:11
**associated** [1] - 53:24
**assume** [1] - 142:10
**assumed** [6] - 97:9,
97:12, 141:25,
142:3, 158:10,
158:12
**assuming** [1] - 12:15
**asterisk** [1] - 68:25
**attached** [1] - 60:10
**attempted** [2] - 39:20,
39:23
**attended** [1] - 142:22
**attention** [2] - 25:17,
30:24
**attribute** [1] - 94:24
**attributes** [1] - 164:10
**authentication** [2] -
23:1, 23:4
**authenticity** [2] -
18:24, 20:5
**author** [1] - 69:15
**available** [2] - 65:22,
135:3
**Ave** [1] - 2:22
**Avenue** [3] - 2:15,
2:18, 3:2, 3:10
**average** [1] - 126:23
**avoid** [6] - 23:24, 25:3,
25:5, 25:13, 166:4,
166:6
**avoided** [1] - 47:2
**aware** [10] - 12:20,
33:8, 74:15, 109:2,
109:6, 145:20,
155:7, 155:10,

155:19, 162:13

# B

**B.H** [1] - 3:6
**B.R** [107] - 1:3, 17:5, 17:10, 18:7, 18:10, 18:16, 18:18, 18:23, 19:2, 19:6, 19:11, 20:2, 20:7, 21:2, 26:19, 27:10, 27:13, 27:16, 29:21, 30:5, 30:11, 30:13, 30:16, 30:19, 31:3, 31:9, 31:14, 33:23, 34:21, 39:7, 39:10, 40:6, 40:17, 41:12, 41:15, 41:18, 41:19, 42:5, 42:14, 42:19, 44:15, 46:19, 46:24, 48:8, 49:18, 52:24, 53:5, 54:4, 54:10, 54:23, 55:9, 55:23, 56:4, 56:9, 57:8, 57:18, 60:17, 60:20, 63:10, 64:2, 64:7, 64:8, 69:1, 69:10, 73:7, 73:10, 73:25, 74:12, 75:17, 75:21, 77:2, 77:23, 78:1, 80:7, 80:12, 80:14, 80:19, 80:23, 80:25, 81:3, 81:9, 82:4, 82:7, 82:9, 82:21, 83:5, 86:14, 86:18, 87:9, 87:19, 90:20, 91:6, 91:9, 92:21, 96:13, 97:7, 97:8, 97:13, 97:22, 97:25, 98:9, 111:24, 112:16, 130:2, 157:4, 167:7
**B.R.'s** [18] - 19:24, 28:1, 34:18, 34:25, 47:3, 47:6, 47:10, 47:12, 47:14, 50:10, 52:11, 52:14, 56:15, 60:13, 113:6, 114:1, 114:8, 138:8
**backup** [1] - 167:13
**backwards** [1] - 75:19
**bad** [5] - 24:22, 40:17, 102:23, 102:24, 146:11
**bag** [1] - 42:9
**B██████** [24] - 36:20, 36:24, 95:20, 100:19, 100:23, 100:25, 101:11, 101:15, 101:18, 102:1, 102:17, 103:12, 103:13,

103:17, 103:20, 103:23, 104:1, 104:4, 104:7, 108:20, 111:22, 112:15, 113:12, 113:24
**band** [1] - 44:18
**bar** [2] - 23:4, 32:10
**BARAN** [1] - 1:15
**Barnes** [2] - 74:17, 81:21
**based** [12] - 14:22, 47:25, 74:10, 81:20, 102:13, 124:6, 125:19, 126:4, 127:19, 132:2, 152:3, 160:25
**basics** [1] - 118:11
**basis** [2] - 15:10, 112:6
**bastard** [1] - 70:1
**bat** [1] - 77:17
**Bates** [9] - 2:14, 16:24, 17:20, 26:13, 26:17, 45:9, 66:23, 79:17, 105:7
**BATES** [86] - 6:9, 17:21, 18:14, 19:3, 19:7, 19:12, 20:14, 22:24, 26:5, 26:10, 26:15, 26:16, 29:5, 29:19, 29:25, 32:9, 32:13, 32:16, 32:18, 33:3, 33:22, 34:10, 34:13, 38:7, 38:9, 38:11, 40:19, 40:24, 41:2, 41:22, 43:6, 44:4, 45:13, 45:15, 57:23, 58:5, 58:9, 59:19, 59:24, 60:3, 60:25, 61:8, 62:3, 62:6, 63:13, 63:15, 65:2, 65:3, 68:9, 68:10, 73:17, 73:19, 74:19, 81:13, 81:23, 85:24, 86:1, 89:6, 89:25, 90:2, 90:5, 91:1, 91:4, 91:5, 92:18, 93:8, 94:19, 95:5, 102:2, 105:2, 106:24, 109:18, 111:2, 111:11, 111:15, 111:19, 111:21, 112:4, 112:7, 112:13, 113:4, 113:5, 113:23, 114:16, 114:24, 166:12
**Bates...........** [1] - 4:6
**Bates.............** [1] - 4:4

**bay** [5] - 50:3, 132:24, 136:3, 137:7, 137:8
**bays** [1] - 135:24
**became** [4] - 48:10
**BEFORE** [1] - 1:11
**began** [1] - 117:16
**begin** [2] - 5:22, 5:23
**beginning** [4] - 25:4, 70:6, 120:10, 156:18
**behalf** [4] - 4:2, 4:10, 4:13, 7:10
**behavior** [1] - 119:8
**behind** [6] - 16:21, 68:5, 68:18, 74:12, 81:3, 91:9
**belief** [1] - 74:10
**believes** [5] - 18:23, 19:1, 19:6, 20:1, 74:16
**belonged** [2] - 16:2, 21:24
**below** [2] - 71:11, 71:14
**Ben** [18] - 40:5, 40:17, 41:12, 41:15, 41:18, 41:19, 42:1, 42:4, 42:5, 42:9, 42:13, 42:17, 42:19, 43:18, 44:11, 96:13, 103:8
**beneficial** [1] - 151:21
**benefit** [6] - 95:2, 155:7, 155:10, 155:12, 155:19, 155:21
**best** [9] - 6:25, 11:3, 21:15, 26:2, 62:18, 97:9, 97:12, 115:25, 167:14
**besties** [1] - 97:18
**bet** [1] - 156:22
**better** [4] - 22:22, 58:12, 66:23, 116:6
**better...she** [1] - 77:14
**between** [13] - 8:14, 42:5, 42:9, 42:18, 57:17, 61:14, 63:7, 73:25, 97:6, 132:24, 157:8, 159:10, 163:10
**beyond** [1] - 15:10
**bi** [1] - 84:20
**binder** [4] - 41:4, 61:25, 119:15, 158:20
**bisexual** [1] - 84:16
**bit** [23] - 10:15, 17:18, 28:22, 30:9, 33:1, 35:23, 47:21, 53:2, 61:15, 62:13, 62:21, 75:19, 83:3, 85:10,

98:25, 100:15, 105:4, 115:3, 118:8, 123:4, 126:20, 137:14, 140:21
**bitch** [10] - 42:9, 71:7, 71:17, 78:12, 78:16, 104:8, 109:17, 125:1, 125:17, 125:18
**bite** [1] - 17:24
**BJ's** [1] - 70:15
**black** [2] - 70:2, 78:9
**BLANCHARD** [12] - 20:22, 21:2, 21:13, 32:21, 33:8, 33:15, 33:18, 94:8, 96:23, 96:25, 98:14, 114:25
**Blanchard** [7] - 3:9, 11:6, 20:21, 20:22, 94:7, 96:22, 97:3
**Blanchard........** [1] - 4:5
**blossomed** [1] - 89:21
**blow** [1] - 103:21
**blue** [1] - 78:8
**board** [2] - 38:6, 63:14
**Board** [36] - 7:13, 8:18, 9:7, 9:10, 11:25, 26:18, 99:8, 99:9, 99:21, 100:1, 100:16, 105:12, 108:25, 110:22, 114:24, 123:4, 123:6, 123:19, 123:21, 123:24, 124:7, 125:9, 125:20, 126:5, 145:18, 145:23, 146:2, 146:7, 146:8, 146:20, 147:7, 148:17, 151:12, 151:19, 152:4, 152:5
**Board's** [18] - 6:9, 98:22, 103:4, 104:15, 106:2, 106:5, 106:9, 107:2, 110:6, 111:17, 125:10, 126:15, 148:2, 148:16, 151:11, 153:3, 154:10, 155:5
**body** [5] - 34:1, 34:18, 34:25, 44:7, 141:7
**BOIES** [4] - 1:20, 2:2, 2:6, 2:10
**book** [5] - 38:13, 60:6, 61:12, 62:18, 73:20
**booked** [1] - 162:18
**booklet** [2] - 58:10, 58:12

**books** [1] - 38:1
**bother** [1] - 87:6
**bothering** [2] - 158:3, 158:11
**bottom** [15] - 59:6, 66:9, 70:5, 70:12, 70:14, 71:1, 78:19, 79:4, 79:16, 87:15, 154:13, 158:22, 158:23, 158:24, 160:6
**bound** [1] - 9:2
**boy** [4] - 32:3, 45:18, 45:20, 80:25
**boyfriend** [4] - 26:25, 71:23, 73:13, 106:17
**boys** [1] - 144:22
**boys'** [2] - 127:6, 127:7
**brain** [1] - 153:23
**break** [6] - 48:19, 90:24, 93:18, 93:19, 165:22, 165:23
**breakout** [8] - 146:18, 146:19, 148:14, 151:5, 151:20, 151:24, 152:2
**breakup** [1] - 87:12
**breast** [7] - 45:18, 45:21, 92:14, 92:22, 92:25, 93:3, 93:6
**Brenner** [4] - 2:6, 7:10, 116:17, 155:25
**BRENNER** [80] - 5:19, 5:25, 6:2, 6:4, 6:8, 6:18, 6:20, 7:9, 7:22, 7:24, 8:3, 8:24, 9:6, 26:6, 115:16, 115:19, 116:9, 116:11, 116:14, 116:19, 118:10, 119:24, 120:5, 120:7, 121:12, 121:17, 121:20, 123:1, 123:16, 126:18, 126:19, 127:25, 128:1, 128:8, 128:10, 128:25, 129:7, 129:10, 130:8, 133:5, 133:11, 133:13, 134:20, 135:3, 135:6, 135:21, 136:15, 136:22, 145:16, 145:19, 145:21, 148:25, 149:4, 149:15, 149:18, 149:23, 150:1, 150:3, 150:5, 150:7,

170

150:23, 151:10, 152:22, 154:8, 156:1, 156:4, 156:8, 156:10, 156:11, 159:7, 159:9, 159:19, 159:24, 160:2, 160:4, 162:6, 162:7, 162:12, 165:15, 165:19

**Brenner.........** [1] - 4:8
**brief** [4] - 11:5, 23:3, 111:2, 111:19
**briefing** [4] - 14:4, 14:10, 16:19, 23:2
**briefly** [2] - 55:17, 145:7
**bring** [7] - 13:20, 23:8, 25:16, 51:2, 121:13, 133:5, 158:19
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**broad** [1] - 30:9
**broke** [2] - 83:4, 87:9
**brother** [3] - 41:15, 51:1, 51:4
**brought** [5] - 18:1, 20:14, 67:20, 108:15, 158:13
**Brown** [2] - 21:23, 107:14
**brown** [1] - 16:15
**Bruce** [3] - 3:9, 20:22, 97:3
**bruce.blanchard@ofplaw.com** [1] - 3:11
**bubble** [1] - 87:23, 88:9
**building** [2] - 9:11, 134:19
**bullied** [1] - 55:12
**bullying** [14] - 17:6, 17:11, 42:23, 65:15, 65:25, 72:16, 96:5, 96:8, 103:15, 119:22, 120:11, 123:25, 129:19, 161:8
**burn** [2] - 34:1, 34:18
**burned** [2] - 32:6, 33:23
**Burton** [1] - 2:21
**burtons@huntonak.com** [1] - 2:23
**bus** [3] - 46:10, 46:13, 126:1
**BY** [75] - 26:10, 26:16, 29:5, 29:19, 29:25, 33:22, 34:13, 38:11,

41:2, 41:22, 43:6, 44:4, 45:15, 58:9, 60:3, 61:8, 62:3, 62:6, 63:15, 65:3, 68:10, 73:19, 81:23, 86:1, 89:6, 90:2, 90:5, 91:5, 92:18, 95:18, 96:25, 98:19, 99:2, 99:7, 101:9, 102:4, 102:11, 104:19, 105:11, 107:1, 107:16, 109:24, 110:4, 111:21, 112:13, 113:5, 113:23, 116:14, 118:10, 120:7, 121:20, 123:1, 123:16, 126:19, 128:1, 128:10, 128:25, 129:10, 130:8, 133:13, 134:20, 135:6, 135:21, 136:22, 145:21, 150:7, 150:23, 151:10, 152:22, 154:8, 156:11, 159:9, 160:4, 162:7, 162:12

## C

**C.K** [20] - 22:18, 32:6, 32:12, 33:1, 33:23, 34:21, 66:13, 68:5, 69:1, 69:5, 69:7, 69:12, 98:5, 100:7, 100:9, 103:17, 112:15, 113:7, 122:11, 124:15
**C.K.'s** [3] - 23:2, 68:20, 96:10
**CA** [1] - 1:21
**cafeteria** [1] - 40:6
**campus** [6] - 100:9, 103:18, 106:20, 111:25, 112:16, 113:7
**cannot** [5] - 10:11, 10:12, 44:23, 60:14, 135:10
**capacity** [1] - 167:5
**Capsulo** [5] - 14:18, 16:22, 83:9, 83:16, 83:21
**car** [2] - 5:10, 5:14
**care** [1] - 8:23
**Carson** [36] - 27:11, 27:14, 27:17, 29:22, 30:6, 30:10, 30:11,

35:14, 36:1, 36:6, 39:11, 43:8, 47:22, 48:3, 76:8, 77:11, 82:21, 84:1, 84:4, 90:8, 97:23, 99:24, 100:3, 107:25, 108:3, 117:11, 117:16, 118:1, 119:20, 126:6, 126:21, 127:21, 128:5, 129:4, 144:18, 159:17
**case** [49] - 6:24, 7:1, 8:8, 8:9, 10:8, 10:13, 10:22, 15:17, 16:6, 16:11, 16:13, 16:15, 18:5, 21:4, 21:22, 21:23, 21:25, 22:18, 23:15, 23:16, 24:6, 24:20, 25:2, 25:23, 26:2, 27:19, 28:10, 32:12, 33:2, 33:12, 57:14, 73:23, 81:21, 82:1, 93:23, 93:24, 93:25, 115:5, 115:10, 116:18, 157:6, 157:7, 166:1, 166:2, 167:7
**Case** [1] - 15:3
**cases** [10] - 15:2, 16:10, 21:20, 22:20, 22:21, 22:22, 22:25, 23:3, 153:23, 154:2
**cat** [1] - 21:6
**cat-fishing** [1] - 21:6
**celebrating** [1] - 7:25
**Century** [1] - 1:20
**certain** [4] - 5:24, 28:25, 56:12, 121:13
**certainly** [2] - 8:7, 13:3
**CERTIFICATE** [1] - 167:1
**Certificate** [1] - 4:19
**certify** [2] - 167:4, 167:10
**chance** [7] - 11:6, 88:2, 88:6, 116:20, 147:23, 161:4, 166:2
**change** [12] - 37:5, 37:6, 37:11, 37:20, 99:22, 100:3, 100:20, 100:24, 101:2, 101:16, 102:9, 163:10
**changed** [2] - 9:14, 88:12
**changes** [1] - 164:18
**chats** [2] - 18:8, 20:15
**check** [2] - 25:12,

101:14
**chief** [1] - 22:20
**Child** [1] - 152:16
**child** [2] - 43:25, 118:24
**chill** [1] - 88:23
**chronologically** [1] - 75:20
**Circuit** [6] - 15:3, 15:4, 15:18, 16:4, 16:12
**Circuit's** [1] - 15:16
**circulated** [1] - 5:22
**circumstances** [2] - 19:10, 74:16
**cite** [3] - 15:2, 9:11, 22:20
**cited** [1] - 21:20
**Civil** [3] - 1:4, 109:4, 167:7
**claim** [1] - 61:4
**claimed** [1] - 15:7
**claiming** [1] - 86:13
**claims** [4] - 42:8, 42:13, 42:18, 42:20
**clarification** [4] - 5:19, 31:18, 50:9, 127:24
**clarify** [9] - 10:10, 16:17, 105:23, 108:16, 122:17, 148:18, 152:23, 154:9, 159:23
**class** [11] - 32:3, 144:23, 148:2, 150:13, 151:1, 151:3, 151:19, 157:13, 157:19, 164:17
**classes** [4] - 39:11, 97:23, 134:24, 163:11
**classroom** [2] - 137:3
**clean** [4] - 32:15, 32:17, 32:25, 33:6
**cleanup** [1] - 33:10
**clear** [10] - 16:21, 48:7, 54:4, 68:3, 68:4, 145:16, 145:19, 145:24, 146:13, 160:16
**clerk** [1] - 5:10
**clerk's** [1] - 5:7
**clerks** [1] - 5:6
**client** [5] - 33:9, 33:16, 128:3, 129:3, 130:21, 137:5
**clients** [1] - 127:20
**close** [6] - 21:16, 26:22, 27:1, 97:9, 122:12, 134:23
**closer** [2] - 28:5,

116:6
**closest** [1] - 7:20
**closet** [1] - 31:23
**clustered** [1] - 84:4
**co** [2] - 20:14
**co-counsel** [1] - 20:14
**Co.K** [2] - 8:4, 8:11
**colleague** [1] - 165:15
**collect** [1] - 115:19
**collegially** [1] - 142:10
**Collela** [1] - 67:5
**colon** [1] - 77:7
**combination** [1] - 68:20
**combined** [1] - 96:10
**comfortable** [1] - 5:17
**coming** [12] - 11:11, 33:4, 33:17, 40:17, 118:18, 134:4, 134:13, 134:16, 134:24, 135:8, 135:15, 135:19
**Commanders** [1] - 24:22
**comment** [8] - 9:11, 40:5, 44:21, 44:25, 45:1, 50:1, 50:2, 50:5
**comments** [3] - 17:22, 71:22, 80:22
**commits** [1] - 70:23
**committed** [1] - 69:13
**common** [4] - 85:13, 85:14, 105:18, 105:21
**communicated** [1] - 53:20
**communication** [4] - 12:18, 64:13, 74:3, 83:5
**communications** [6] - 18:6, 57:17, 73:25, 82:4, 82:11, 158:14
**community** [1] - 23:19
**competent** [1] - 20:3
**complaint** [6] - 32:9, 32:20, 32:23, 33:16, 109:3, 147:2
**complaints** [3] - 146:16, 148:4, 152:25
**complete** [1] - 39:23
**completely** [1] - 126:2
**complied** [1] - 143:19
**compliment** [1] - 165:24
**computer** [1] - 167:12
**conceded** [1] - 16:18
**concerned** [3] - 33:2, 33:20, 161:14

**conclude** [1] - 15:11
**concluded** [1] - 166:14
**conclusion** [4] - 7:16, 122:17, 122:18
**concurs** [1] - 40:25
**conduct** [3] - 5:16, 120:25, 121:3
**confers** [5] - 13:7, 16:16, 17:14, 90:4, 165:18
**confines** [1] - 94:15
**confirm** [4] - 58:1, 59:22, 60:14, 122:5
**confirmation** [1] - 40:21
**confusing** [1] - 83:3
**confusion** [2] - 138:2, 138:4
**conjunction** [1] - 18:7
**consequence** [1] - 161:10
**consider** [6] - 24:8, 35:17, 122:15, 123:6, 125:3, 152:15
**considered** [8] - 96:4, 119:12, 121:10, 122:6, 123:25, 124:12, 124:17, 126:13
**considering** [1] - 151:25
**Constantine** [1] - 43:17
**constitute** [2] - 126:6, 167:11
**constitutes** [1] - 125:21
**constitutional** [2] - 7:3, 118:20
**consult** [2] - 17:12, 165:15
**Cont** [2] - 2:1, 2:25
**contact** [8] - 7:12, 7:13, 8:14, 23:24, 24:18, 24:21, 166:3
**contacted** [1] - 81:9
**contacts** [3] - 7:7, 25:11, 65:24
**content** [1] - 9:8
**CONTENTS** [1] - 4:1
**context** [8] - 12:25, 18:5, 95:3, 124:13, 129:18, 149:4, 149:16, 154:18
**contextually** [2] - 21:7, 21:14
**continue** [8] - 66:21, 71:23, 78:6, 91:12, 148:12, 163:16,

164:17, 165:10
**continues** [2] - 62:12, 62:13
**contrast** [2] - 15:15, 21:19
**control** [1] - 10:25
**controversy** [1] - 13:21
**conversation** [36] - 9:15, 24:6, 38:10, 42:5, 47:17, 56:9, 60:23, 61:16, 62:7, 62:12, 62:13, 62:14, 62:22, 63:3, 63:7, 63:21, 66:4, 67:20, 67:23, 67:24, 68:3, 72:2, 72:23, 74:7, 75:2, 75:11, 75:13, 75:14, 75:16, 77:16, 77:25, 80:6, 81:24, 84:9, 90:19
**conversations** [1] - 25:1
**copied** [3] - 159:11, 159:12, 159:13
**coping** [1] - 161:23
**corner** [1] - 158:24
**correct** [215] - 13:13, 16:1, 26:21, 27:2, 28:2, 29:23, 30:7, 30:8, 30:12, 31:11, 33:24, 34:22, 34:23, 35:13, 35:20, 36:15, 36:18, 36:19, 38:20, 39:3, 39:11, 39:18, 39:21, 40:9, 40:14, 40:15, 41:16, 41:19, 41:24, 42:2, 42:7, 42:10, 42:15, 42:23, 44:25, 45:1, 45:19, 46:10, 46:11, 46:22, 47:24, 49:6, 50:7, 51:8, 51:15, 52:10, 53:11, 53:22, 54:21, 54:22, 55:24, 55:25, 56:7, 57:18, 57:21, 57:22, 59:23, 60:15, 60:16, 60:18, 62:23, 63:9, 63:22, 63:23, 64:2, 65:16, 65:23, 66:19, 66:20, 67:24, 67:25, 69:6, 70:16, 72:3, 72:9, 72:24, 72:25, 73:9, 73:14, 73:15, 74:4, 74:5, 74:24, 74:25, 75:15, 76:7, 76:12, 77:3, 78:2, 78:4, 78:10, 79:6, 82:4, 82:23, 86:15, 86:25, 90:21,

91:8, 92:12, 97:4, 97:5, 104:20, 104:24, 105:5, 108:9, 109:1, 117:3, 117:5, 117:10, 117:12, 117:13, 117:15, 117:17, 117:19, 118:19, 118:25, 119:13, 119:21, 120:22, 121:1, 121:4, 121:5, 123:22, 124:1, 124:5, 126:22, 127:8, 127:15, 128:16, 129:7, 131:16, 131:17, 132:6, 132:24, 132:25, 133:25, 135:2, 136:20, 136:21, 137:1, 137:13, 138:1, 138:6, 138:12, 138:15, 138:21, 138:24, 139:3, 139:7, 139:10, 139:15, 140:11, 140:14, 140:16, 140:23, 141:8, 141:16, 141:18, 141:19, 141:22, 142:2, 142:5, 142:9, 142:13, 142:16, 142:19, 142:21, 142:24, 143:3, 143:6, 143:9, 144:4, 144:9, 144:16, 144:25, 145:4, 145:9, 145:12, 146:2, 147:3, 148:5, 152:21, 153:4, 154:21, 154:22, 155:1, 155:3, 156:15, 157:5, 157:20, 157:24, 158:16, 159:14, 159:18, 160:12, 161:1, 161:2, 161:6, 161:13, 161:15, 161:16, 163:1, 163:13, 163:18, 163:21, 163:23, 163:24, 164:9, 164:13, 164:20, 164:23, 165:2, 165:7, 165:8, 165:12
**correction** [2] - 49:21, 99:19
**correctly** [4] - 31:6, 31:7, 65:11, 128:18
**counsel** [32] - 6:12, 7:13, 8:22, 10:24,

11:8, 20:3, 20:14, 28:10, 38:4, 40:22, 58:1, 59:22, 81:14, 94:10, 98:22, 99:8, 99:21, 100:1, 100:16, 103:4, 104:14, 105:4, 105:12, 107:2, 115:25, 123:2, 146:8, 150:13, 151:11, 165:24
**Counsel** [10] - 13:7, 16:16, 17:14, 41:21, 90:4, 99:1, 101:22, 102:3, 159:24, 165:18
**counsel's** [1] - 106:10
**counseling** [1] - 152:19
**counselor** [24] - 117:4, 117:14, 119:1, 124:3, 125:21, 126:6, 129:3, 130:2, 133:19, 140:18, 140:22, 141:19, 142:7, 142:12, 144:24, 145:6, 145:7, 151:13, 151:16, 152:4, 152:5, 155:5, 162:6, 162:15
**counselor's** [2] - 145:2, 152:3
**counselors** [14] - 120:14, 140:10, 141:4, 144:15, 144:17, 148:15, 150:15, 151:4, 151:6, 151:11, 151:20, 151:21, 152:1, 152:15
**County** [25] - 26:17, 76:5, 117:1, 118:2, 119:2, 123:4, 123:5, 123:6, 123:9, 123:19, 123:20, 123:24, 125:20, 126:5, 126:14, 127:19, 144:11, 145:13, 145:14, 145:23, 146:1, 146:2, 152:4, 152:5
**county** [2] - 123:3, 123:4
**couple** [8] - 5:4, 9:6, 23:17, 62:9, 68:23, 89:7, 122:4, 159:11
**course** [3] - 25:11, 38:4, 67:22

**Court** [30] - 3:12, 3:12, 4:19, 5:17, 6:22, 10:16, 10:21, 11:8, 14:5, 14:6, 15:2, 15:17, 16:14, 20:25, 22:24, 22:25, 23:5, 25:17, 59:20, 74:14, 74:16, 94:20, 95:7, 116:2, 116:11, 127:24, 136:6, 155:14, 167:3, 167:22
**COURT** [191] - 1:1, 1:12, 5:1, 5:3, 5:21, 6:1, 6:3, 6:7, 6:11, 6:14, 6:21, 7:21, 7:23, 8:2, 8:23, 9:5, 9:20, 10:1, 10:15, 10:20, 11:2, 11:17, 12:1, 12:5, 12:19, 12:24, 13:12, 13:18, 14:9, 14:11, 14:13, 15:23, 16:4, 16:9, 16:24, 17:13, 17:18, 18:12, 19:1, 19:5, 19:8, 20:11, 20:19, 20:21, 21:1, 21:12, 21:15, 21:18, 22:17, 23:7, 23:11, 23:14, 26:7, 26:14, 28:22, 29:16, 29:18, 29:24, 32:15, 32:17, 32:22, 33:4, 33:11, 33:17, 33:19, 34:11, 38:3, 38:8, 40:25, 41:21, 43:4, 43:22, 45:9, 45:14, 58:4, 58:7, 60:1, 61:4, 61:20, 62:5, 65:1, 74:14, 74:21, 81:16, 81:19, 85:10, 85:17, 85:19, 85:21, 85:23, 89:5, 89:24, 90:23, 91:2, 92:16, 93:9, 93:14, 94:3, 94:7, 94:10, 94:14, 94:22, 95:8, 95:11, 95:14, 95:16, 96:22, 98:16, 98:25, 101:6, 101:21, 102:3, 102:6, 102:10, 104:18, 105:4, 105:10, 106:25, 109:20, 111:4, 111:12, 111:18, 112:2, 112:6, 112:10, 112:25, 113:16, 114:2, 114:4, 114:12, 114:15, 114:18, 114:21, 115:2, 115:13,

115:15, 115:18, 115:20, 115:22, 115:24, 116:5, 116:8, 116:10, 116:12, 118:8, 120:1, 120:3, 120:6, 121:16, 121:19, 122:20, 122:25, 123:14, 128:9, 128:20, 129:6, 133:10, 133:12, 134:9, 134:13, 134:18, 135:5, 135:13, 136:7, 136:12, 136:17, 145:20, 148:24, 149:2, 149:10, 149:17, 149:19, 149:24, 150:2, 150:4, 150:22, 152:18, 153:14, 153:20, 154:4, 154:7, 155:24, 156:3, 156:6, 156:9, 159:22, 159:25, 160:3, 165:17, 165:21, 166:10

**court** [14] - 5:23, 7:6, 7:15, 7:16, 7:17, 8:6, 10:6, 27:22, 28:14, 33:21, 45:6, 112:4, 133:14, 167:8

**Court's** [6] - 8:25, 23:15, 26:3, 81:13, 81:20, 95:1

**court's** [1] - 93:22

**courthouse** [3] - 7:18, 23:18, 166:3

**Courthouse** [1] - 3:13

**courtroom** [3] - 7:4, 122:1, 122:2

**covered** [2] - 110:5, 111:3, 152:19

**created** [1] - 88:7

**credibility** [1] - 17:8

**crime** [1] - 69:13

**CROSS** [3] - 26:9, 95:17, 96:24

**cross** [3] - 12:8, 20:4, 111:5

**Cross** [3] - 4:4, 4:5, 4:5

**CROSS-EXAMINATION** [3] - 26:9, 95:17, 96:24

**cross-examination** [1] - 12:8

**Cross-examination** [3] - 4:4, 4:5, 4:5

**cross-examine** [1] -

20:4

**cumbersome** [1] - 28:22

**cupping** [1] - 12:21

**curious** [1] - 141:9

**current** [2] - 58:24, 117:4

**cursor** [1] - 61:5

**cut** [5] - 19:9, 34:21, 34:24, 35:2, 35:8

**cute** [1] - 75:25

**cutting** [1] - 35:12

**cyberbullied** [2] - 81:1, 108:11

**cyberbullying** [17] - 17:2, 18:19, 20:8, 54:17, 54:19, 54:24, 55:2, 55:10, 57:9, 77:23, 91:20, 91:21, 107:3, 107:5, 107:12, 108:6, 108:19

**cyberspace** [1] - 17:6

**cycle** [1] - 71:19

## D

**D.C** [1] - 52:9

**D.N** [4] - 122:11, 124:25, 125:4, 126:1

**dad** [1] - 51:5

**damn** [1] - 71:2

**date** [9] - 5:24, 63:21, 75:6, 75:8, 78:11, 107:20, 107:22, 108:1, 111:23

**dated** [4] - 19:14, 48:21, 53:5, 54:10

**dating** [9] - 48:12, 48:16, 48:18, 51:12, 60:18, 64:2, 75:21, 80:19, 98:9

**daughter** [2] - 160:17, 161:7

**David** [2] - 103:21, 107:7

**days** [2] - 39:2, 39:4

**DC** [5] - 1:17, 2:15, 2:19, 2:22, 3:2

**deal** [1] - 88:16

**dealing** [1] - 24:13

**death** [1] - 103:23

**December** [11] - 26:19, 48:8, 49:10, 49:13, 156:18, 160:13, 163:23, 164:24, 165:12

**decent** [1] - 25:22

**decide** [1] - 166:2

**decided** [3] - 139:4,

139:8, 139:14

**decision** [3] - 87:10, 91:11, 139:17

**decision-making** [1] - 91:11

**decisions** [1] - 43:9

**dedicated** [1] - 140:22

**defend** [1] - 80:7

**Defendant** [5] - 2:14, 3:1, 3:9, 20:22, 32:6

**defendant** [3] - 21:23, 32:12, 32:14

**Defendant's** [6] - 40:19, 41:1, 58:8, 59:21, 60:2, 61:1, 74:22, 81:18, 107:15

**defendant's** [5] - 15:8, 15:13, 15:21, 22:1, 22:2

**Defendants** [3] - 1:8, 3:5, 4:13

**defendants** [1] - 13:1

**Defense** [2] - 133:6, 133:8

**defense** [4] - 6:12, 9:1, 13:25, 17:5

**definitely** [1] - 45:23

**definition** [7] - 99:16, 120:18, 121:7, 125:10, 126:15, 127:17, 128:2

**definitively** [2] - 35:4, 100:14

**delete** [1] - 59:15

**deleted** [2] - 59:13, 75:4

**delve** [1] - 110:10

**delved** [1] - 105:7

**demonstrated** [1] - 35:7

**deny** [1] - 20:9

**Department** [1] - 109:3

**deposition** [52] - 19:3, 22:4, 27:19, 28:3, 28:5, 28:8, 28:16, 28:25, 29:1, 29:6, 29:9, 29:23, 30:3, 30:22, 34:4, 46:4, 46:21, 46:24, 47:4, 47:7, 55:3, 68:1, 95:21, 98:23, 98:24, 99:9, 99:11, 99:12, 106:8, 128:11, 128:12, 128:15, 128:22, 129:9, 129:12, 129:14, 129:20, 129:23, 130:11, 131:12, 131:15, 131:18,

132:18, 139:21, 140:3, 143:14, 147:11, 148:21, 148:25, 154:12, 155:1

**depression** [2] - 88:1, 88:5

**depth** [3] - 135:15, 136:18, 136:19

**derogatory** [3] - 49:22, 69:19, 80:22

**describe** [4] - 52:14, 52:18, 52:20, 56:1

**described** [1] - 22:7

**describing** [1] - 153:17

**deserve** [1] - 77:14

**despite** [1] - 39:13

**detail** [1] - 125:2

**details** [1] - 40:13

**determination** [2] - 13:22, 81:20

**determine** [1] - 5:12

**dick** [2] - 41:16, 41:24

**died** [1] - 78:12

**difference** [1] - 61:14

**different** [11] - 17:19, 36:8, 36:11, 66:1, 111:9, 122:21, 134:17, 135:1, 137:7, 137:22, 145:10

**difficult** [3] - 10:16, 66:22, 114:6

**difficulty** [1] - 162:14

**dig** [1] - 6:15

**dinner** [1] - 51:19

**DIRECT** [1] - 116:13

**direct** [13] - 4:8, 17:16, 22:25, 30:24, 34:7, 53:23, 55:6, 107:7, 107:9, 111:5, 112:9, 137:14, 158:21

**directed** [1] - 165:5

**direction** [1] - 135:17

**directly** [7] - 13:15, 53:25, 73:10, 104:17, 114:12, 115:7, 131:24

**director** [1] - 161:4

**discern** [2] - 113:18, 114:6

**disciplinary** [1] - 43:9

**discipline** [3] - 42:25, 43:8, 43:14

**disciplined** [3] - 43:19, 43:23, 44:11

**disclosure** [1] - 148:23

**discourage** [1] - 23:20

**discrepancies** [1] - 19:22

**discretion** [2] - 15:19, 16:7

**discuss** [6] - 9:15, 23:15, 93:22, 93:24, 115:4, 166:1

**discusses** [1] - 23:4

**Discussion** [3] - 20:20, 23:6, 95:10

**discussion** [1] - 16:22

**disengaged** [1] - 9:15

**display** [1] - 167:13

**disputes** [1] - 20:16

**distance** [2] - 134:16, 134:22

**distinctive** [1] - 22:2

**distress** [2] - 139:2, 139:5, 155:13, 155:20

**District** [2] - 3:12, 167:4

**DISTRICT** [3] - 1:1, 1:1, 1:12

**disturbing** [2] - 72:2, 73:14

**divided** [2] - 140:21, 141:6

**division** [2] - 146:7, 150:13

**DM** [1] - 126:1

**Docket** [2] - 14:4, 14:8

**docket** [1] - 14:11

**document** [38] - 5:21, 41:8, 41:20, 57:14, 58:12, 58:17, 60:5, 60:8, 60:9, 60:11, 60:23, 62:11, 65:1, 70:7, 74:8, 74:23, 80:10, 81:25, 82:6, 83:24, 95:1, 132:2, 134:10, 144:7, 146:15, 147:1, 151:8, 151:11, 151:12, 152:3, 152:24, 159:2, 160:21, 160:22, 160:23

**documentation** [3] - 148:3, 151:6, 151:15

**documenting** [2] - 148:16

**documents** [8] - 18:6, 61:14, 115:19, 131:9, 131:13, 131:20, 131:22, 132:19

**done** [9] - 7:14, 9:12, 41:6, 88:8, 90:1, 120:14, 120:16,

126:11, 147:7
**dot** [3] - 57:1, 57:3, 57:5
**double** [1] - 12:14
**douche** [1] - 42:9
**down** [28] - 6:14, 22:8, 22:17, 25:8, 28:14, 32:4, 37:1, 45:8, 61:20, 63:13, 67:1, 72:21, 78:15, 81:7, 94:16, 102:23, 111:6, 112:24, 121:12, 125:13, 126:18, 134:5, 134:23, 134:25, 137:2, 150:5, 164:19, 165:21
**dramatic** [1] - 88:6
**draw** [2] - 135:5, 135:7
**drawing** [1] - 135:3
**drew** [2] - 137:24, 137:25
**Drive** [1] - 3:6
**dump** [1] - 78:24
**during** [27] - 12:8, 25:11, 26:22, 26:25, 34:2, 39:4, 49:7, 51:12, 53:20, 57:12, 64:1, 67:22, 70:10, 97:7, 99:12, 100:24, 101:15, 102:12, 102:17, 102:25, 103:12, 127:1, 127:3, 129:2, 157:8, 157:19, 164:17
**duty** [1] - 9:2
**duty-bound** [1] - 9:2
**DX-18** [1] - 60:5
**DX-73** [2] - 58:11, 62:25

## E

**E's** [1] - 79:19
**early** [1] - 164:18
**easier** [4] - 41:9, 62:22, 85:11, 85:15
**East** [1] - 1:20
**Easter** [1] - 52:8
**EASTERN** [1] - 1:1
**Eastern** [1] - 167:4
**easy** [1] - 114:4
**ECF** [4] - 14:4, 14:8, 14:12, 23:3
**Education** [1] - 109:4
**education** [1] - 118:21
**efforts** [1] - 130:12
**eight** [1] - 128:13
**eighth** [1] - 77:11
**either** [5] - 38:12,

41:3, 86:10, 90:8, 130:14
**elaborate** [1] - 110:15
**ELLIKER** [1] - 11:24
**Elliker** [1] - 3:1
**email** [15] - 15:21, 22:1, 60:9, 60:14, 72:23, 156:20, 156:22, 159:10, 160:7, 160:8, 160:15, 161:20, 162:22, 163:3, 163:5
**Email** [11] - 1:18, 1:22, 2:5, 2:9, 2:13, 2:16, 2:20, 2:23, 3:3, 3:8, 3:11
**emailed** [2] - 60:11, 62:22
**emails** [2] - 25:12, 85:13
**emphasis** [1] - 19:19
**employed** [1] - 124:2
**employee** [1] - 117:1
**employees** [1] - 159:17
**employer** [1] - 123:6
**employment** [1] - 118:2
**empt** [1] - 93:14
**encounter** [2] - 52:1, 135:12
**encountered** [3] - 36:5, 135:12, 137:5
**encourage** [2] - 24:8, 25:10
**end** [12] - 11:19, 11:21, 19:18, 62:20, 75:8, 75:9, 79:4, 79:11, 82:17, 86:17, 90:19, 117:20
**ended** [7] - 81:8, 91:6, 91:9, 91:24, 97:10, 97:20, 98:1
**ending** [1] - 159:1
**ends** [1] - 147:18
**engineered** [5] - 54:23, 55:2, 55:10, 91:19, 91:21
**engineering** [1] - 55:9
**enjoy** [1] - 71:7
**enjoyed** [2] - 161:17, 161:21
**ensure** [2] - 7:2, 164:18
**entire** [3] - 17:8, 128:4, 129:2
**entirely** [2] - 108:15, 113:15
**entitled** [2] - 13:1, 118:12

entity [1] - 145:17
**entryway** [1] - 7:17
**environment** [3] - 118:15, 118:21, 118:23
**epidemic** [1] - 35:21
**equally** [1] - 141:6
**equivalent** [1] - 15:15
**error** [1] - 15:5
**especially** [1] - 102:20
**Esq** [1] - 1:15, 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1, 3:5, 3:9
**essentially** [5] - 18:21, 54:2, 67:15, 76:23, 80:6
**estimate** [1] - 136:16
**et** [2] - 1:6, 167:7
**ethics** [1] - 24:12
**evaluate** [2] - 102:15, 102:18
**evening** [2] - 7:15, 24:15
**event** [3] - 52:8, 139:22, 150:25
**events** [1] - 28:6
**evidence** [18] - 13:5, 15:6, 18:2, 20:10, 40:23, 41:1, 58:8, 60:2, 72:16, 74:22, 77:22, 81:18, 83:21, 119:16, 120:4, 121:14, 133:8, 160:1
**ex** [1] - 21:10
**ex-girlfriend** [1] - 21:10
**exactly** [2] - 19:12, 155:11
**examination** [15] - 4:4, 4:5, 4:5, 4:6, 4:6, 4:8, 12:8, 45:10, 45:12, 94:4, 105:7, 113:2, 113:19, 155:24, 156:3
**EXAMINATION** [6] - 26:9, 95:17, 96:24, 98:18, 111:20, 116:13
**examine** [1] - 20:4
**example** [12] - 19:17, 35:6, 43:1, 52:8, 56:13, 79:12, 79:21, 80:13, 82:13, 119:19, 141:24, 144:21
**examples** [2] - 18:21, 56:14
**exception** [5] - 12:17, 111:12, 127:19,

129:2, 130:1
**exchange** [1] - 159:10
**excursions** [1] - 52:5
**Excuse** [1] - 64:20
**excuse** [6] - 5:7, 5:9, 103:14, 134:9, 136:10, 139:4
**excused** [2] - 94:2, 115:14, 166:9
**exercising** [1] - 7:2
**exhibit** [2] - 61:20, 159:21
**Exhibit** [29] - 14:1, 14:14, 14:16, 37:23, 40:20, 41:1, 57:23, 58:1, 58:6, 58:8, 59:21, 60:2, 61:2, 72:22, 73:16, 74:20, 74:22, 81:14, 81:18, 107:15, 112:20, 119:14, 119:17, 119:25, 120:4, 133:6, 133:9, 158:20, 160:1
**EXHIBITS** [1] - 4:9
**exhibits** [1] - 13:25
**exist** [1] - 24:25
**exists** [1] - 43:15
**expect** [1] - 94:11
**expectation** [2] - 102:7, 102:8
**experience** [1] - 161:10
**experienced** [1] - 91:22
**experiencing** [2] - 103:15, 161:7
**expert** [3] - 11:10, 22:6, 61:4
**explain** [9] - 17:23, 56:23, 98:24, 99:10, 107:6, 136:5, 151:18, 155:14, 155:16
**explicitly** [1] - 100:23
**extending** [2] - 23:21, 25:18
**extension** [1] - 136:9
**extensive** [1] - 154:25
**extent** [4] - 23:25, 25:3, 25:9, 81:7
**extreme** [1] - 161:8

## F

**F.C.S.B** [5] - 1:6, 2:14, 3:1, 43:11, 167:7
**F.T** [1] - 3:6
**face** [2] - 77:7, 134:16
**Facebook** [52] - 14:3,

14:14, 14:16, 14:17, 14:25, 15:8, 15:15, 15:19, 15:20, 16:18, 16:23, 17:2, 18:25, 19:24, 21:21, 21:24, 21:25, 53:12, 53:15, 53:21, 53:23, 53:24, 55:13, 55:15, 56:21, 56:25, 58:21, 59:9, 59:11, 59:16, 63:6, 65:9, 65:10, 65:16, 65:20, 72:6, 72:8, 74:13, 74:23, 75:2, 75:17, 80:22, 81:10, 83:13, 88:7, 107:3, 107:9, 107:17, 107:18, 109:12, 125:18
**fact** [8] - 15:12, 24:8, 53:2, 69:15, 72:2, 73:10, 105:21, 118:17
**factored** [1] - 91:11
**Fahey** [3] - 1:15, 11:5, 11:24
**FAHEY** [3] - 11:4, 11:19, 12:4
**fair** [18] - 43:22, 44:5, 120:12, 125:25, 126:23, 126:25, 130:17, 132:7, 132:14, 132:15, 143:23, 144:12, 144:13, 149:14, 152:18
**Fairfax** [19] - 26:17, 76:5, 117:1, 118:2, 119:2, 123:4, 123:5, 123:7, 123:9, 123:19, 123:20, 123:24, 125:20, 126:4, 126:14, 127:19, 152:4, 152:5
**fake** [4] - 14:3, 21:7, 55:13, 75:17
**fall** [2] - 92:11, 125:9
**false** [1] - 126:2
**falsely** [1] - 93:5
**familiar** [1] - 57:4
**family** [13] - 11:11, 11:12, 11:13, 47:3, 52:12, 60:10, 72:24, 73:3, 73:7, 73:14, 108:23, 109:3, 110:15
**far** [8] - 6:24, 24:9, 25:1, 33:1, 33:6, 33:20, 150:12, 153:10
**Farad** [1] - 21:25

**farad** [1] - 16:13
**fast** [1] - 131:4
**father** [2] - 51:1, 51:3
**favors** [1] - 120:23
**FCPS** [1] - 110:17
**February** [19] - 36:14,
38:18, 49:9, 49:12,
63:22, 80:18, 80:20,
97:11, 103:5,
107:23, 108:3,
108:6, 108:17,
111:23, 112:14,
113:6, 113:10,
113:25, 114:1
**Fed** [2] - 16:13, 16:15
**Federal** [2] - 15:4,
15:17
**feet** [2] - 136:13,
137:10
**FELDMAN** [1] - 3:9
**felt** [1] - 101:2
**female** [1] - 105:19
**fertilize** [1] - 112:12
**fertilized** [1] - 112:11
**few** [4] - 5:3, 38:4,
39:4, 132:11
**fights** [2] - 35:19, 36:1
**figure** [1] - 70:9
**figured** [1] - 56:6
**filed** [4] - 5:24, 17:25,
109:3, 109:6
**filing** [1] - 22:25
**fill** [1] - 145:2
**filled** [1] - 163:3
**final** [1] - 113:4
**finally** [1] - 88:8
**fine** [4] - 6:8, 26:4,
48:24, 111:11
**finger** [1] - 135:16
**finish** [2] - 45:7,
113:16
**finished** [1] - 9:13
**first** [43] - 7:19, 8:5,
11:10, 12:9, 14:9,
15:3, 16:12, 17:15,
38:24, 59:1, 60:7,
63:14, 64:6, 64:8,
67:23, 75:16, 75:23,
79:7, 80:10, 82:14,
88:19, 97:8, 100:19,
100:24, 103:12,
107:20, 108:16,
118:2, 120:18,
122:9, 122:12,
123:3, 129:11,
132:4, 132:20,
132:22, 135:11,
142:7, 148:19,
155:15, 160:10,
163:11, 163:25

**firsthand** [1] - 105:16
**fishing** [1] - 21:6
**five** [15] - 19:14,
19:15, 19:20, 32:14,
48:21, 48:24, 51:12,
77:15, 79:11, 94:8,
141:5, 141:6, 156:5,
157:8, 157:9
**five-month** [1] - 51:12
**FL** [3] - 2:4, 2:8, 2:12
**flagged** [1] - 159:4
**FLEXNER** [4] - 1:20,
2:2, 2:6, 2:10
**flip** [9] - 58:15, 58:16,
60:6, 62:9, 62:10,
75:8, 79:7, 81:6,
83:7
**floor** [1] - 136:10
**Floor** [1] - 3:13
**Flowers** [8] - 40:5,
40:17, 41:12, 41:15,
43:18, 44:11, 96:13,
103:8
**fluidity** [1] - 26:2
**focus** [1] - 132:4
**focused** [2] - 30:10,
103:8
**focusing** [2] - 123:3,
147:12
**follow** [4] - 10:8,
23:16, 26:2, 29:2
**follow-up** [1] - 29:2
**followed** [1] - 74:6
**following** [1] - 152:14
**follows** [1] - 160:7
**football** [1] - 24:22
**FOR** [1] - 1:1
**forearm** [1] - 35:7
**foregoing** [1] - 167:10
**forehead** [2] - 138:23,
138:25
**forensic** [1] - 22:10
**form** [3] - 49:22, 66:1,
145:5
**format** [2] - 58:24,
78:7
**fortunately** [1] - 5:9
**forward** [6] - 71:5,
81:6, 152:1, 153:6,
154:23, 155:2
**foul** [2] - 94:20, 94:24
**foundation** [10] -
14:21, 14:24, 15:24,
16:1, 16:7, 16:20,
21:21, 22:15, 43:3,
43:4
**four** [9] - 38:24, 51:18,
100:14, 108:14,
135:23, 138:14,
157:9, 157:10,

157:12
**Fourth** [3] - 15:15,
15:18, 16:4
**fourth** [2] - 102:12,
117:9
**frame** [2] - 97:24,
156:16
**Franklin** [1] - 117:6
**F▮▮▮▮** [5] - 9:11,
9:14, 48:5, 133:20,
140:21
**F▮▮▮▮** [1] - 120:9
**F▮▮▮▮** [5] -
115:17, 115:23,
116:23, 116:24,
165:19
**free** [3] - 58:11,
114:22, 115:2
**freshman** [3] - 16:23,
75:25, 78:8
**freshmen** [2] - 14:16,
88:23
**friend** [7] - 67:6,
67:10, 67:13, 67:16,
96:8
**friends** [16] - 19:14,
27:1, 48:10, 48:15,
49:2, 67:19, 84:20,
91:25, 92:10, 92:13,
92:21, 92:23, 97:8,
97:9, 97:10, 97:12
**friendship** [4] - 92:5,
97:10, 97:20, 97:25
**front** [8] - 7:17, 7:20,
38:2, 38:12, 54:13,
61:24, 66:25, 106:23
**fuck** [1] - 68:16
**fucking** [2] - 88:7,
89:3
**fulfill** [1] - 25:24
**full** [1] - 59:2
**Fulton** [1] - 3:6
**fun** [2] - 71:11, 71:14
**function** [3] - 53:23,
59:1, 59:3
**funny** [1] - 46:1

**G**

**gay** [1] - 84:20
**general** [5] - 47:21,
107:8, 132:9, 151:3,
153:2
**generally** [5] - 13:10,
35:3, 35:18, 43:22,
43:24
**generation** [1] - 85:11
**gentleman** [1] - 12:20
**gentlemen** [5] - 23:12,
38:3, 93:9, 93:17,

165:23
**Genus** [3] - 159:11,
159:15, 164:3
**GF** [1] - 77:14
**girl** [3] - 138:22,
139:5, 139:6
**girl's** [1] - 45:18
**girlfriend** [14] - 21:10,
26:25, 39:8, 69:20,
70:17, 77:17, 84:10,
84:12, 84:13, 85:1,
85:4, 86:12, 106:23
**girls** [1] - 138:14
**girls'** [2] - 127:7
**given** [8] - 10:1, 10:10,
81:13, 103:21,
119:20, 141:3,
158:10, 163:14
**goal** [1] - 165:24
**god** [1] - 71:2
**government** [4] - 15:6,
15:7, 15:20, 17:9
**grab** [1] - 93:3
**grabbing** [5] - 45:23,
92:14, 92:22, 92:25,
93:6
**grabs** [1] - 45:18
**grade** [4] - 43:1,
141:11, 141:15
**grader** [4] - 76:14,
76:17, 77:11, 106:19
**graders** [4] - 106:19,
127:4, 141:10
**Grady** [8] - 37:23,
38:5, 41:7, 60:25,
68:9, 75:9, 85:25
**grammatical** [1] -
21:11
**grandchildren** [1] -
11:13
**graphic** [1] - 71:25
**graphically** [1] - 18:18
**great** [4] - 38:15,
90:15, 109:13, 164:7
**green** [3] - 57:1, 57:6,
57:7
**greet** [1] - 97:15
**groped** [2] - 110:19,
110:22
**groping** [3] - 12:11,
13:11, 110:7
**ground** [1] - 112:11
**group** [4] - 84:3,
137:22, 140:25,
146:12
**groups** [1] - 36:5
**guess** [4] - 6:25,
114:4, 114:19,
117:20
**guidance** [20] -

117:14, 119:1,
120:14, 124:3,
125:9, 125:20,
126:5, 133:19,
140:18, 140:22,
141:4, 142:6,
144:14, 144:17,
144:24, 145:1,
145:6, 154:10,
162:14, 164:11
**guys** [7] - 8:6, 8:7,
8:10, 51:1, 51:5,
52:3, 142:10

**H**

**half** [8] - 11:22, 70:2,
86:6, 86:7, 86:14,
143:5
**half-black** [1] - 70:2
**halfway** [1] - 88:18
**hall** [2] - 134:5, 136:4
**halls** [1] - 36:6
**hallway** [7] - 133:2,
134:6, 134:23,
136:8, 136:9, 137:2,
164:11
**hallways** [3] - 9:18,
97:16, 164:17
**hand** [5] - 6:14, 18:13,
45:21, 138:23,
138:25
**handed** [2] - 29:6,
128:11
**handing** [1] - 5:8
**handled** [1] - 155:22
**hands** [1] - 32:4
**handwriting** [1] -
41:10
**happy** [2] - 78:12,
112:4
**harass** [2] - 49:17,
52:3
**harassed** [10] - 27:16,
29:21, 30:6, 30:20,
31:4, 31:11, 99:10,
99:14, 110:1, 122:14
**Harassment** [1] -
99:17
**harassment** [45] -
49:23, 98:24, 99:19,
99:23, 100:2,
103:16, 104:16,
104:23, 118:24,
119:3, 119:5, 119:7,
119:12, 119:22,
120:12, 120:19,
120:21, 120:23,
121:1, 121:6,
121:10, 122:7,

122:15, 123:25, 124:8, 124:12, 124:17, 125:3, 125:10, 125:11, 125:21, 126:7, 126:13, 127:18, 127:23, 128:2, 128:6, 129:5, 129:9, 129:17, 129:23, 130:1, 130:4, 153:16, 161:8
**harm** [1] - 152:17
**harmed** [1] - 143:11
**Harris** [2] - 167:3, 167:21
**HARRIS** [1] - 3:12
**Hassan** [2] - 15:16, 16:11
**hate** [3] - 64:16, 86:25, 87:1
**hated** [1] - 86:3
**Head** [2] - 11:12, 12:3
**head** [2] - 17:21, 24:24
**hear** [8] - 32:21, 99:3, 99:5, 116:1, 116:6, 117:23, 128:21, 156:1
**heard** [13] - 12:19, 38:4, 40:9, 44:15, 45:2, 50:2, 93:1, 94:24, 109:21, 110:6, 112:3, 113:1, 120:8
**hearing** [2] - 6:2, 95:2
**hearsay** [4] - 12:14, 12:17, 27:9, 125:4
**hehe** [1] - 80:3
**helicopter** [1] - 52:18
**hell** [1] - 70:1
**hello** [2] - 9:20, 163:2
**help** [5] - 85:14, 137:15, 147:10, 163:19
**helpful** [1] - 23:5
**helping** [1] - 116:21
**hereby** [1] - 167:4
**hereto** [1] - 167:15
**herself** [7] - 17:6, 18:19, 35:12, 55:12, 57:9, 65:25, 78:16
**hi** [1] - 82:14
**Hi** [3] - 75:24, 76:19, 77:4
**hiding** [1] - 66:18
**high** [8] - 14:16, 16:23, 76:5, 76:17, 82:24, 153:23, 162:1, 162:9
**High** [4] - 76:4, 76:9, 76:11, 78:8

**high-level** [1] - 153:23
**highlighted** [1] - 32:23
**highly** [1] - 17:22
**Hilton** [2] - 11:12, 12:3
**himself** [2] - 20:8, 44:1
**history** [2] - 32:3, 59:5
**hit** [1] - 17:21
**hitting** [1] - 76:24
**ho** [3] - 70:18, 71:2, 71:7
**hold** [3] - 51:7, 61:19, 74:14
**holding** [1] - 142:17
**holds** [1] - 59:16
**hole** [2] - 42:15, 42:19
**holidays** [1] - 8:1
**HOLTZMAN** [1] - 1:15
**home** [1] - 51:6
**Honor** [82] - 6:13, 7:9, 8:13, 9:9, 11:4, 11:24, 12:4, 12:6, 13:8, 13:24, 14:19, 17:15, 17:25, 18:9, 18:15, 19:13, 20:9, 20:23, 21:17, 22:3, 22:24, 26:5, 26:6, 32:8, 32:9, 33:7, 33:8, 34:9, 45:13, 57:25, 58:3, 59:23, 74:19, 81:15, 85:16, 91:1, 92:15, 93:8, 93:13, 94:5, 94:13, 94:19, 95:5, 95:15, 96:23, 98:17, 101:4, 105:3, 105:9, 109:18, 109:23, 110:3, 111:1, 111:2, 111:11, 112:1, 113:4, 113:14, 114:16, 114:20, 116:4, 116:9, 119:24, 121:18, 122:16, 128:8, 128:19, 133:6, 133:7, 133:11, 134:15, 137:1, 148:20, 149:16, 150:18, 150:20, 153:19, 156:1, 159:7, 159:19, 160:2, 165:16
**HONORABLE** [1] - 1:11
**hop** [1] - 56:18
**hope** [3] - 70:23, 95:24, 164:6
**hops** [1] - 56:23
**hospitalization** [1] - 154:1

**hotel** [1] - 8:12
**hour** [3] - 11:22, 143:5
**hour-and-a-half** [1] - 11:22
**hours** [1] - 51:17
**house** [9] - 50:18, 50:19, 50:21, 50:22, 50:23, 51:2, 51:13, 51:16, 92:4
**housekeeping** [1] - 5:3
**hover** [1] - 52:22
**H▮▮▮** [3] - 95:20, 157:2
**H▮▮▮** [9] - 36:22, 37:7, 37:8, 37:11, 101:10, 102:12, 157:17, 157:21, 158:2
**Hughes** [1] - 48:1
**hugs** [1] - 97:17
**H▮▮▮** [4] - 142:14, 162:14, 164:3, 164:5
**H▮▮▮** [4] - 141:21, 142:6, 142:8, 159:13
**hung** [1] - 92:7
**HUNTON** [4] - 2:14, 2:18, 2:21, 3:1
**hurt** [1] - 71:11
**hurting** [1] - 71:7

---

**I**

---

**I's** [1] - 82:14
**I..** [1] - 162:1
**idea** [6] - 24:20, 25:3, 25:18, 111:5, 152:17, 156:16
**identical** [1] - 56:11
**identified** [2] - 154:4, 159:21
**imagine** [2] - 11:20, 136:9
**immediate** [2] - 77:12, 118:6
**immediately** [4] - 5:11, 8:8, 76:19, 155:22
**impeach** [1] - 149:20
**impeachment** [3] - 34:9, 149:1, 149:10
**implement** [1] - 144:12
**implemented** [2] - 153:6, 154:10
**implication** [1] - 13:4
**implications** [1] - 33:9
**implying** [1] - 101:2

**important** [5] - 20:15, 94:21, 112:23, 118:14, 118:17
**impressed** [1] - 95:24
**improper** [1] - 34:9
**improperly** [1] - 49:17
**in-person** [2] - 39:11, 107:24
**in-service** [1] - 151:23
**inaccurate** [1] - 51:7
**inappropriate** [2] - 7:7, 124:16
**incident** [10] - 13:14, 17:8, 38:21, 39:13, 39:14, 43:19, 46:16, 103:8, 132:24, 139:24
**incidents** [1] - 129:16
**include** [4] - 25:19, 107:7, 118:23, 121:3
**included** [2] - 99:19, 153:18
**including** [1] - 49:13
**inconsistent** [1] - 128:23
**incredible** [1] - 88:13
**independent** [1] - 69:4
**Indian** [3] - 86:6, 86:7, 86:14
**indicated** [2] - 11:24, 160:21
**indication** [1] - 115:10
**indirect** [1] - 24:21
**indirectly** [1] - 115:7
**individual** [4] - 5:12, 60:22, 83:8, 94:23
**individuals** [1] - 6:23
**indulgence** [1] - 8:25
**inflicted** [1] - 35:11
**information** [7] - 6:16, 13:14, 17:7, 69:4, 112:3, 114:8, 149:11
**informed** [3] - 5:4, 6:22, 124:7
**initial** [3] - 42:5, 42:14, 66:4
**initials** [1] - 124:23
**initiate** [1] - 77:16
**initiated** [1] - 75:17
**inner** [1] - 35:7
**inquire** [1] - 111:8
**instance** [6] - 105:15, 119:11, 127:23, 128:5, 131:16, 131:23
**instances** [2] - 129:5, 130:3
**instinct** [2] - 6:5, 142:7
**instruct** [3] - 10:21,

10:23, 13:20
**instructed** [1] - 9:24
**instruction** [6] - 8:21, 10:2, 10:9, 10:20, 23:15, 25:5
**instructions** [2] - 26:3, 93:22
**insufficient** [1] - 15:6
**insults** [1] - 107:10
**interact** [1] - 97:16
**interacted** [1] - 30:10
**interaction** [4] - 41:13, 42:8, 42:14, 42:18
**interactions** [2] - 130:21, 144:19
**interchangeable** [1] - 123:15
**interchangeably** [1] - 123:10
**interchanges** [1] - 157:19
**interest** [3] - 6:23, 6:24, 6:25
**interested** [1] - 152:13
**interfere** [1] - 7:3
**interjected** [1] - 148:9
**internet** [3] - 15:12, 15:21, 53:10
**interview** [1] - 5:16
**investigated** [2] - 122:23, 125:6
**investigating** [1] - 39:14
**investigation** [2] - 126:8, 126:16
**investigators** [1] - 47:7
**involved** [4] - 13:1, 13:9, 87:6, 130:12
**involves** [1] - 115:6
**involving** [4] - 43:9, 128:6, 129:5, 130:4
**IP** [1] - 15:22
**issue** [13] - 12:14, 13:21, 13:24, 14:19, 15:2, 16:15, 17:24, 20:4, 20:5, 22:2, 22:17, 22:23, 146:14
**issued** [2] - 81:25, 82:1
**issues** [11] - 6:9, 12:6, 14:7, 21:21, 52:1, 123:21, 123:23, 152:19, 152:20, 152:23, 153:24
**Italian** [2] - 86:7, 86:14
**items** [1] - 63:17
**itself** [6] - 65:1, 65:18, 89:5, 89:24, 95:1, 161:20

**IX** [1] - 152:20

## J

**J.F** [1] - 3:6
**J.O** [13] - 3:9, 20:22, 33:13, 66:10, 97:3, 97:7, 97:8, 98:4, 98:10, 125:14, 125:15, 125:16, 125:17
**J.O.'s** [1] - 106:7
**January** [7] - 48:13, 48:18, 49:9, 49:12, 75:7, 75:10, 97:11
**Jenni** [33] - 16:17, 16:21, 18:8, 18:11, 18:16, 18:17, 18:18, 21:3, 21:5, 55:17, 55:23, 56:3, 56:10, 56:16, 57:9, 57:20, 60:10, 60:24, 62:22, 63:7, 64:6, 64:13, 65:15, 66:5, 66:9, 72:5, 72:7, 72:12, 72:23, 74:7, 75:14, 107:18, 108:22
**jfahey@ holtzmanvogel. com** [1] - 1:18
**J████** [2] - 115:16, 115:23
**job** [8] - 71:7, 103:21, 117:14, 118:6, 123:21, 124:3, 125:20, 126:5
**jobs** [1] - 144:17
**jogged** [5] - 156:20, 160:15, 160:20, 160:24, 161:18
**joins** [1] - 8:18
**Jonathan** [2] - 1:15, 11:4
**JOSEFIAK** [1] - 1:16
**JR** [1] - 1:11
**Judge** [5] - 17:21, 38:7, 40:20, 65:2, 166:12
**JUDGE** [1] - 1:12
**judge** [1] - 13:22
**judged** [1] - 96:17
**judgment** [1] - 5:24
**June** [6] - 48:19, 48:23, 49:1, 91:7, 95:22, 97:4
**juror** [6] - 5:9, 7:11, 7:19, 8:16, 9:3, 15:11
**jurors** [8] - 5:5, 8:18, 8:25, 9:10, 9:16,

22:23, 23:24, 24:13
**Jury** [5] - 23:9, 94:2, 95:13, 166:9, 167:6
**jury** [26] - 5:23, 9:23, 10:10, 12:7, 18:10, 23:8, 35:5, 38:3, 44:24, 56:1, 56:21, 56:24, 68:4, 69:23, 73:18, 74:18, 83:3, 90:24, 93:17, 94:21, 94:23, 97:6, 120:8, 136:6, 143:10, 150:11
**JURY** [1] - 1:11

## K

**Kaitlyn** [1] - 67:13
**Karras** [2] - 11:7, 12:2
**Kat** [1] - 67:5
**Kate** [3] - 67:1, 67:4, 67:5
**KEEFE** [55] - 12:6, 12:23, 13:3, 13:8, 13:17, 13:24, 14:10, 14:12, 14:14, 16:1, 16:6, 16:10, 16:17, 17:12, 17:15, 21:17, 21:19, 32:8, 32:11, 32:19, 33:7, 34:9, 40:23, 41:20, 43:3, 58:3, 59:23, 81:15, 92:15, 94:12, 98:17, 98:19, 99:2, 99:5, 99:7, 101:9, 101:25, 102:4, 102:11, 104:19, 105:9, 105:11, 107:1, 107:14, 107:16, 109:23, 109:24, 110:3, 110:4, 111:1, 112:1, 113:14, 114:20, 114:23
**Keefe** [4] - 2:10, 27:4, 27:5, 54:21
**Keefe........** [1] - 4:6
**keep** [1] - 166:7
**kelliker@huntonak. com** [1] - 3:3
**Kenney** [1] - 143:7
**Kevin** [1] - 3:1
**kid** [2] - 49:21, 136:23
**kids** [7] - 127:12, 127:13, 137:7, 138:14, 138:19, 157:22, 158:4
**kill** [1] - 78:16
**kind** [9] - 23:21, 33:9, 57:3, 77:6, 96:7,

96:12, 123:8, 151:20
**kinds** [1] - 25:5
**Kinney** [4] - 3:5, 93:12, 94:3, 95:19
**KINNEY** [8] - 3:6, 6:13, 93:13, 94:5, 95:15, 95:18, 101:4, 115:1
**Kinney...........** [1] - 4:5
**Ki██** [44] - 12:10, 12:16, 12:17, 13:9, 13:11, 13:14, 13:20, 13:25, 14:15, 14:17, 14:19, 14:20, 16:19, 18:5, 18:19, 18:22, 18:24, 21:2, 22:7, 26:11, 26:19, 27:20, 29:6, 33:23, 35:14, 41:3, 45:5, 46:21, 58:10, 60:5, 61:9, 72:22, 73:16, 73:20, 74:23, 81:24, 95:19, 95:24, 96:21, 98:22, 106:9, 107:17, 111:22, 112:14
**knife** [1] - 34:22
**knowledge** [5] - 59:8, 86:16, 105:18, 110:25, 162:15
**known** [1] - 43:18
**knows** [2] - 16:20, 166:8
**Kornefag** [1] - 68:16
**KURTH** [4] - 2:14, 2:18, 2:21, 3:1

## L

**L-O-V-E-E-E-E** [1] - 19:21
**labor** [1] - 12:1
**ladies** [5] - 23:11, 38:3, 93:9, 93:17, 165:23
**lady** [1] - 150:16
**laid** [2] - 15:24, 16:20
**Lakes** [4] - 76:4, 76:8, 76:11, 78:8
**Langston** [1] - 48:1
**language** [10] - 54:10, 54:15, 94:20, 94:24, 95:2, 95:25, 96:2, 96:4, 96:15, 96:18
**last** [27] - 19:19, 28:3, 29:13, 38:25, 47:9, 47:14, 59:2, 62:9, 62:11, 62:15, 62:19, 68:1, 68:20, 75:9,

89:15, 90:6, 95:22, 96:10, 97:4, 110:5, 116:22, 117:8, 126:9, 156:4, 157:1
**late** [5] - 56:9, 80:18, 80:20, 156:25
**latitude** [4] - 33:5, 105:5, 109:20, 112:10
**laughed** [1] - 122:13
**laughing** [1] - 77:6
**LAW** [1] - 3:5
**lawsuit** [1] - 109:6
**lawyer** [14] - 100:16, 106:7, 110:6, 131:19, 131:20, 146:7, 146:8, 146:14, 146:20, 153:2, 153:3, 154:11, 154:20
**lawyers** [17] - 5:2, 9:1, 23:23, 24:5, 24:9, 24:17, 28:1, 47:6, 47:10, 47:12, 47:15, 58:25, 105:24, 106:2, 106:5, 148:2, 148:16
**lay** [5] - 14:21, 21:20, 22:15, 43:4, 128:21
**lays** [1] - 22:15
**lead** [2] - 25:8, 69:4
**leading** [1] - 109:18
**learn** [4] - 18:18, 144:1, 144:11, 148:15
**learned** [1] - 141:15
**learning** [6] - 107:24, 118:15, 127:22, 128:5, 129:4, 130:3
**least** [16] - 8:17, 14:4, 14:5, 46:4, 68:6, 73:3, 76:16, 92:7, 111:16, 132:4, 132:5, 149:6, 150:11, 153:5, 156:25, 160:16
**leave** [3] - 13:4, 130:23, 166:2
**leaving** [3] - 7:15, 11:12, 24:16
**led** [1] - 19:11
**left** [9] - 8:3, 8:11, 63:12, 63:16, 63:17, 78:8, 107:24, 108:3, 124:15
**legal** [4] - 122:17, 122:18, 148:23
**legally** [2] - 151:24, 152:10
**lengthy** [1] - 143:4

**lesbian** [6] - 44:15, 44:25, 49:22, 50:1, 84:20, 125:1
**lesbo** [1] - 79:25
**less** [3] - 128:12, 153:3, 154:20
**letter** [2] - 19:20, 134:9
**lettering** [1] - 66:22
**letters** [1] - 79:4
**level** [2] - 153:23, 162:9
**liar** [1] - 107:10
**life** [5] - 72:3, 84:16, 89:11, 89:14, 89:17
**lighter** [2] - 32:7, 33:24
**likely** [1] - 106:22
**limine** [4] - 14:2, 14:3, 16:19, 17:24
**limit** [1] - 113:2
**limiting** [1] - 16:22
**line** [33] - 22:8, 29:13, 30:25, 31:1, 34:7, 34:14, 34:15, 41:23, 42:12, 42:17, 55:6, 67:1, 68:4, 68:11, 68:12, 68:14, 70:14, 80:13, 124:15, 124:22, 125:14, 147:21, 149:6, 149:7, 149:11, 149:18, 149:20, 150:19, 154:14, 162:5, 165:9
**lines** [8] - 42:22, 68:23, 69:23, 128:17, 143:16, 147:12, 149:3, 149:22
**listed** [1] - 125:7
**listen** [2] - 22:18, 115:24
**litigation** [1] - 38:4
**live** [2] - 23:14, 23:19
**lived** [1] - 51:23
**lives** [1] - 51:23
**LLP** [8] - 1:20, 2:2, 2:6, 2:10, 2:14, 2:18, 2:21, 3:1
**locate** [1] - 74:7
**locating** [1] - 58:23
**Locker** [1] - 133:17
**locker** [26] - 32:1, 49:14, 49:18, 49:19, 50:3, 50:10, 84:5, 106:11, 106:13, 106:14, 106:15, 122:11, 132:24, 133:2, 134:4, 135:1,

135:24, 136:3,
137:7, 137:8,
137:20, 137:21,
138:5, 138:9, 157:14
**lockers** [8] - 137:5,
137:9, 137:11,
137:22, 137:23,
137:24, 137:25,
158:3
**log** [2] - 19:24, 19:25
**logging** [1] - 74:11
**Look** [1] - 65:24
**look** [43] - 5:9, 5:13,
6:4, 6:6, 9:24, 22:20,
22:21, 28:24, 29:1,
29:13, 30:22, 34:11,
41:4, 42:12, 55:5,
55:7, 56:12, 60:4,
61:11, 61:12, 61:24,
63:5, 65:25, 66:23,
70:9, 70:11, 71:6,
73:16, 75:23, 79:14,
83:16, 122:4,
134:10, 139:21,
142:14, 142:18,
143:14, 143:16,
154:12, 158:19,
158:20, 159:6
**looked** [8] - 6:16,
8:20, 83:13, 122:24,
124:11, 124:14,
138:22, 145:11
**looking** [13] - 22:25,
61:17, 62:7, 74:3,
78:6, 102:6, 112:19,
131:9, 134:4,
136:17, 157:21,
157:22, 158:6
**looks** [5] - 56:16,
77:15, 122:14,
159:11, 162:25
**Los** [1] - 1:21
**love** [6] - 19:20, 19:21,
71:17, 79:18, 80:3,
84:16
**loves** [1] - 84:12
**low** [1] - 23:4
**lunch** [2] - 165:22,
165:23
**Lunch** [1] - 166:13

## M

**M's** [1] - 56:13
**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [6] - 99:5,
115:24, 116:8,
122:20, 135:16,
136:17

**machine** [2] - 167:5,
167:12
**mad** [1] - 87:4
**main** [4] - 56:11,
65:10, 65:16, 140:9
**maintain** [1] - 92:5
**males** [1] - 36:6
**man** [1] - 16:25
**manner** [3] - 19:13,
25:23, 30:17
**March** [10] - 1:6,
60:15, 60:16, 62:23,
62:25, 73:1, 73:2,
108:14, 167:9,
167:16
**mark** [1] - 64:20
**marks** [6] - 34:1,
34:18, 34:25, 35:2,
35:8, 101:14
**marshal** [1] - 7:5
**math** [14] - 12:13,
12:15, 12:16, 12:17,
49:5, 93:2, 110:11,
110:12, 110:14,
110:16, 110:18,
127:9, 127:16
**matter** [4] - 6:25, 11:5,
94:25, 115:6
**matters** [2] - 5:3, 9:6
**matters......................
............** [1] - 4:19
**me..** [1] - 125:16
**mean** [21] - 9:24, 22:7,
22:8, 44:1, 44:2,
54:21, 65:7, 65:12,
77:5, 84:24, 85:14,
104:14, 104:25,
122:1, 133:2,
134:22, 139:20,
145:23, 153:5,
153:20, 162:19
**meaning** [1] - 162:1
**means** [3] - 84:3,
131:6, 157:6
**meant** [6] - 5:20,
45:12, 107:6,
124:14, 153:22
**meantime** [2] - 22:19,
61:10
**meat** [1] - 7:23
**mechanism** [1] -
135:3
**media** [17] - 9:25,
10:6, 10:8, 10:13,
10:24, 15:5, 17:17,
25:5, 25:6, 25:10,
25:13, 25:14, 25:19,
115:6, 115:10
**meet** [7] - 77:12,
116:20, 161:22,

162:2, 162:10,
162:15, 163:6
**meeting** [30] - 36:24,
37:2, 37:14, 95:21,
100:24, 101:10,
101:11, 101:13,
101:15, 103:12,
108:16, 108:20,
131:2, 131:7,
131:16, 132:3,
132:20, 132:23,
141:24, 142:25,
143:4, 143:21,
143:24, 144:2,
144:7, 144:8,
154:18, 156:13,
163:8, 163:9
**meetings** [13] - 37:3,
37:8, 100:17,
102:12, 102:14,
102:17, 102:25,
104:11, 108:14,
146:6, 153:7,
154:24, 155:8
**member** [1] - 47:3
**members** [1] - 56:22
**memory** [6] - 81:8,
156:20, 160:15,
160:20, 160:24,
161:18
**mentioned** [2] - 80:10,
100:6
**mess** [1] - 150:6
**message** [11] - 21:8,
53:23, 53:25, 54:2,
64:6, 64:8, 64:10,
107:9, 108:5, 153:2,
163:3
**messages** [43] -
14:14, 14:17, 17:16,
17:22, 17:25, 18:18,
18:24, 20:5, 21:24,
22:16, 23:1, 23:2,
57:11, 57:20, 58:18,
58:20, 58:24, 59:4,
59:6, 59:8, 59:15,
60:10, 63:12, 68:6,
69:16, 70:9, 72:5,
72:7, 72:12, 72:18,
73:3, 75:6, 78:6,
80:21, 82:20, 91:19,
91:22, 107:3, 107:7,
107:18, 108:12,
108:23, 109:12
**messaging** [3] -
56:19, 77:21, 86:11
**Messenger** [3] -
53:15, 56:25, 58:21
**met** [9] - 48:7, 97:4,
97:8, 142:23,

156:21, 160:17,
160:21, 160:25
**Miami** [3] - 2:4, 2:8,
2:12
**mic** [1] - 116:5
**Michael** [2] - 3:5,
95:19
**MICHAEL** [1] - 3:5
**microphone** [1] -
117:23
**Microsoft** [1] - 57:3
**Middle** [14] - 27:11,
27:14, 27:17, 29:22,
35:14, 36:1, 47:22,
48:1, 82:21, 117:6,
119:20, 126:6,
129:4, 159:17
**middle** [8] - 19:18,
61:6, 78:15, 78:23,
79:23, 84:6, 84:15
**might** [19] - 17:18,
25:4, 25:15, 25:16,
33:18, 41:9, 58:11,
62:18, 62:21, 66:22,
94:23, 96:12,
101:21, 101:22,
111:8, 115:7, 154:1,
157:10
**mind** [5] - 33:12,
82:13, 99:12, 99:15,
130:10
**ministry** [1] - 118:4
**minute** [1] - 142:15
**minutes** [9] - 11:19,
91:2, 93:21, 94:1,
94:6, 94:12, 143:2,
156:5, 157:8
**MISCELLANY** [1] -
4:18
**mischaracterizing** [1]
- 148:21
**misconduct** [1] -
13:10
**misread** [1] - 162:4
**misstate** [1] - 13:13
**misstates** [1] - 41:20
**mistake** [2] - 5:8, 5:11
**misunderstood** [1] -
92:20
**mix** [1] - 141:10
**mixed** [1] - 123:8
**mk@kinneyesq.com**
[1] - 3:8
**model** [1] - 89:19
**mom** [6] - 18:20, 51:5,
113:6, 114:1, 165:10
**moment** [17] - 20:19,
29:10, 36:12, 39:25,
41:5, 53:18, 56:2,
56:8, 60:20, 61:19,

69:18, 78:5, 93:9,
110:3, 115:18,
115:19, 116:2
**Monday** [1] - 11:10
**money** [1] - 165:24
**monitor** [2] - 158:5,
164:17
**monitoring** [1] -
163:10
**month** [6] - 34:2,
48:12, 48:15, 51:12,
64:4, 75:13
**months** [11] - 19:14,
19:15, 28:7, 48:21,
49:5, 80:19, 83:4,
87:25, 88:4, 91:25,
128:13
**morning** [23] - 5:1,
5:2, 7:9, 9:9, 9:21,
11:4, 11:10, 11:16,
18:14, 23:11, 23:13,
24:1, 24:15, 25:1,
26:11, 26:12, 93:18,
93:19, 122:12,
162:3, 162:10,
162:25, 164:5
**most** [7] - 5:13, 11:22,
25:8, 72:2, 89:8,
115:4, 130:14
**mostly** [1] - 50:21
**mother** [6] - 50:23,
52:14, 60:13, 73:11,
114:9, 158:14
**motherfucker** [2] -
70:2, 84:16
**motion** [7] - 14:2,
14:3, 14:10, 16:19,
17:24, 45:20, 45:24
**motions** [1] - 5:23
**move** [14] - 40:24,
41:7, 58:5, 59:24,
60:4, 61:5, 74:20,
89:25, 105:10,
119:24, 137:15,
139:14, 139:22,
159:19
**moved** [1] - 84:6
**moves** [1] - 88:22
**moving** [2] - 129:22,
152:1
**MR** [244] - 5:19, 5:25,
6:2, 6:4, 6:8, 6:9,
6:13, 6:18, 6:20, 7:9,
7:22, 7:24, 8:3, 8:24,
9:6, 11:4, 11:19,
11:24, 12:4, 12:6,
12:23, 13:3, 13:8,
13:17, 13:24, 14:10,
14:12, 14:14, 16:1,
16:6, 16:10, 16:17,

17:12, 17:15, 17:21,
18:14, 19:3, 19:7,
19:12, 20:14, 20:22,
21:2, 21:13, 21:17,
21:19, 22:24, 26:5,
26:6, 26:10, 26:15,
26:16, 29:5, 29:19,
29:25, 32:8, 32:9,
32:11, 32:13, 32:16,
32:18, 32:19, 32:21,
33:3, 33:7, 33:8,
33:15, 33:18, 33:22,
34:9, 34:10, 34:13,
38:7, 38:9, 38:11,
40:19, 40:23, 40:24,
41:2, 41:20, 41:22,
43:3, 43:6, 44:4,
45:13, 45:15, 57:23,
58:3, 58:5, 58:9,
59:19, 59:23, 59:24,
60:3, 60:25, 61:8,
62:3, 62:6, 63:13,
63:15, 65:2, 65:3,
68:9, 68:10, 73:17,
73:19, 74:19, 81:13,
81:15, 81:23, 85:24,
86:1, 89:6, 89:25,
90:2, 90:5, 91:1,
91:4, 91:5, 92:15,
92:18, 93:8, 93:13,
94:5, 94:8, 94:12,
94:19, 95:5, 95:15,
95:18, 96:23, 96:25,
98:14, 98:17, 98:19,
99:2, 99:5, 99:7,
101:4, 101:9,
101:25, 102:2,
102:4, 102:11,
104:19, 105:2,
105:9, 105:11,
106:24, 107:1,
107:14, 107:16,
109:18, 109:23,
109:24, 110:3,
110:4, 111:1, 111:2,
111:11, 111:15,
111:19, 111:21,
112:1, 112:4, 112:7,
112:13, 113:4,
113:5, 113:14,
113:23, 114:3,
114:16, 114:20,
114:23, 114:24,
114:25, 115:1,
115:16, 115:19,
116:9, 116:11,
116:14, 118:9,
118:10, 119:24,
120:5, 120:7,
121:12, 121:17,
121:20, 123:1,

123:16, 126:18,
126:19, 127:25,
128:1, 128:8,
128:10, 128:25,
129:7, 129:10,
130:8, 133:5,
133:11, 133:13,
134:20, 135:3,
135:6, 135:21,
136:15, 136:22,
145:16, 145:19,
145:21, 148:25,
149:4, 149:15,
149:18, 149:23,
150:1, 150:3, 150:5,
150:7, 150:23,
151:10, 152:22,
154:8, 156:1, 156:4,
156:8, 156:10,
156:11, 159:7,
159:9, 159:19,
159:24, 160:2,
160:4, 162:6, 162:7,
162:12, 165:15,
165:19, 166:12
**MS** [14] - 9:9, 9:23,
10:4, 10:18, 11:1,
11:3, 120:2, 122:16,
128:19, 145:14,
145:17, 148:20,
159:23, 162:4
**multipage** [1] - 58:12
**music** [1] - 137:3
**must** [5] - 5:24, 15:10,
156:20, 160:21,
161:18
**mutual** [1] - 110:11

# N

**nail** [1] - 17:21
**naked** [1] - 126:3
**name** [26] - 14:18,
26:13, 26:17, 59:2,
59:17, 60:22, 67:10,
68:20, 83:7, 83:8,
83:12, 86:18, 90:15,
96:10, 99:18,
116:17, 116:22,
121:4, 140:12,
140:13, 145:6,
145:22, 150:15,
157:2, 167:16
**name-calling** [2] -
99:18, 121:4
**names** [3] - 21:1,
125:1, 158:4
**nature** [8] - 52:16,
72:18, 119:9,
120:25, 121:3,

121:4, 129:9, 130:13
**necessarily** [1] - 43:1
**necessary** [2] -
109:22, 164:22
**need** [17] - 7:8, 10:10,
23:8, 25:16, 43:4,
71:20, 90:25, 98:25,
112:11, 124:13,
124:14, 125:6,
128:20, 135:7,
151:25, 152:15,
155:16
**needed** [3] - 139:14,
139:16, 152:9
**needs** [4] - 7:11, 7:14,
94:17, 135:5
**neighborhood** [2] -
51:21, 51:24
**nerves** [1] - 88:8
**never** [27] - 6:16,
20:25, 21:3, 30:15,
31:10, 31:14, 31:16,
31:19, 31:22, 31:25,
32:3, 32:6, 33:23,
34:21, 36:5, 46:19,
49:17, 64:13, 66:16,
100:6, 121:23,
121:25, 122:1,
126:11, 153:6,
165:2, 165:11
**new** [9] - 111:3, 112:1,
112:2, 112:5, 113:3,
113:14, 113:15,
113:18
**newest** [1] - 160:9
**news** [1] - 10:5
**newspapers** [2] -
25:18, 25:19
**next** [31] - 6:21, 40:1,
44:14, 48:12, 68:23,
70:21, 71:1, 78:23,
84:15, 84:22, 84:23,
85:24, 87:2, 87:21,
88:9, 88:18, 115:15,
124:15, 124:22,
125:13, 125:14,
126:1, 137:7,
148:11, 151:22,
156:24, 162:22,
162:24, 162:25,
164:2, 164:18
**nice** [4] - 23:21, 24:10,
51:24, 77:11
**niceties** [2] - 9:20,
23:21
**night** [2] - 24:15,
24:16
**nine** [1] - 28:7
**ninth** [1] - 76:17
**nobody** [2] - 52:3,

158:7
**normal** [3] - 19:24,
44:9, 44:10
**normally** [1] - 133:21
**note** [3] - 20:23, 79:7,
158:8
**noted** [1] - 16:18
**notes** [12] - 20:11,
20:12, 144:6, 153:7,
154:23, 154:25,
155:1, 155:8,
155:11, 155:12,
155:19, 167:12
**nothing** [11] - 8:14,
24:1, 24:2, 24:3,
24:4, 24:17, 44:2,
93:8, 114:16,
143:10, 149:24
**notice** [2] - 34:24,
140:7
**noticed** [3] - 19:22,
19:23, 57:6
**nowhere** [2] - 64:11,
134:8
**Number** [7] - 4:12,
4:12, 4:15, 4:15,
4:16, 4:16, 4:17
**number** [4] - 14:9,
14:11, 23:4, 159:1
**numbering** [2] -
66:24, 79:18
**numbers** [2] - 158:22,
158:23
**NW** [5] - 1:16, 2:15,
2:18, 2:22, 3:2

# O

**oath** [7] - 19:5, 26:8,
26:14, 28:16, 30:4,
95:14, 128:15
**object** [3] - 13:4,
145:14, 148:20
**objection** [30] - 6:20,
11:25, 14:1, 32:8,
32:11, 41:20, 43:3,
74:21, 81:15, 81:16,
81:19, 92:15, 101:7,
102:2, 105:2,
106:24, 109:18,
112:1, 113:14,
114:3, 116:2, 116:3,
120:1, 120:2, 120:3,
122:16, 148:22,
159:22, 159:25,
162:4
**obligation** [2] - 9:4,
10:24
**obliged** [1] - 92:6
**obsessive** [1] - 53:3

**obvious** [2] - 127:6,
132:3
**obviously** [5] - 8:14,
9:21, 24:17, 25:12,
94:16
**occasion** [2] - 131:8,
160:17
**occasions** [2] -
109:25, 131:10
**occurred** [1] - 46:9
**October** [4] - 6:2,
26:20, 49:1, 139:25
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5,
4:1, 167:1
**offensive** [2] - 125:17,
126:10
**offer** [1] - 128:22
**Office** [1] - 109:4
**office** [9] - 5:7, 36:11,
36:17, 133:21,
133:24, 140:9,
142:20, 145:2
**OFFICE** [1] - 3:5
**Officer** [2] - 159:16,
164:4
**officers** [1] - 7:6
**offices** [1] - 108:10
**Official** [2] - 167:3,
167:22
**official** [2] - 167:5,
167:11
**officials** [2] - 104:15,
104:23
**offline** [3] - 56:18,
57:2, 57:5
**often** [1] - 19:15
**old** [1] - 59:4
**oldest** [3] - 59:6,
106:20, 160:9
**once** [2] - 46:4, 160:25
**one** [110] - 5:5, 5:6,
5:25, 7:23, 7:24,
7:25, 8:24, 9:10,
18:8, 20:15, 21:23,
29:20, 36:20, 38:1,
38:9, 40:1, 42:25,
43:9, 46:3, 46:5,
46:6, 46:9, 47:9,
51:13, 53:10, 56:11,
56:17, 56:22, 56:23,
57:5, 61:7, 61:19,
62:4, 62:11, 62:12,
80:9, 88:10, 89:9,
89:10, 89:13, 90:6,
90:25, 91:19, 96:9,
101:14, 105:1,
105:15, 105:23,
109:9, 109:12,
110:3, 111:8, 113:4,

115:11, 115:19, 117:21, 119:8, 119:11, 122:5, 123:17, 123:23, 125:14, 125:16, 125:24, 126:1, 126:9, 129:8, 129:15, 130:9, 130:10, 130:11, 130:15, 130:16, 131:3, 131:4, 131:7, 132:4, 132:10, 132:16, 132:18, 135:23, 136:19, 139:5, 141:11, 142:17, 144:2, 144:17, 146:6, 148:6, 151:24, 152:2, 152:14, 152:23, 154:20, 156:12, 156:16, 157:13, 157:18, 159:13, 160:8, 160:10, 160:17, 160:19, 160:21, 161:19

**one-third** [1] - 136:19
**ones** [4] - 51:22, 72:18, 83:13, 144:19
**ongoing** [1] - 161:15
**online** [-] - 56:17, 56:18, 56:25, 57:2, 57:7
**Open** [1] - 33:21
**open** [2] - 61:6, 112:6
**opening** [4] - 14:6, 17:4, 18:1, 143:7
**openly** [1] - 21:4
**opinion** [6] - 15:9, 15:16, 15:18, 17:7, 22:9, 155:21
**opportunity** [5] - 16:24, 32:25, 111:10, 113:21, 114:18
**opposed** [1] - 83:13
**oral** [2] - 79:25, 126:2
**order** [5] - 5:8, 5:13, 5:20, 6:6, 126:5
**original** [2] - 8:21, 105:7
**otherwise** [1] - 153:17
**outcome** [1] - 7:1
**outgoing** [1] - 87:16
**outside** [6] - 6:23, 7:17, 30:11, 50:14, 105:2, 166:4
**outsider** [1] - 21:9
**overruled** [5] - 81:16, 81:20, 92:16, 101:8,

114:4
**own** [8] - 17:10, 54:24, 55:2, 55:10, 91:20, 102:6, 105:21, 140:25

---

**P**

**P's** [1] - 79:2
**P.A.H** [1] - 3:5
**p.m** [2] - 95:7, 166:13
**pace** [1] - 25:22
**page** [77] - 14:12, 15:7, 15:8, 15:9, 15:11, 15:12, 15:18, 22:8, 23:3, 28:25, 29:9, 30:24, 34:5, 41:7, 55:5, 60:7, 61:22, 62:11, 62:15, 62:19, 63:14, 65:16, 66:3, 66:4, 66:6, 66:9, 66:21, 66:22, 68:8, 68:9, 69:22, 70:5, 70:11, 70:21, 71:1, 71:5, 75:9, 75:24, 78:6, 78:23, 79:8, 79:15, 79:23, 80:10, 82:14, 83:7, 83:24, 84:9, 84:15, 84:22, 84:23, 85:24, 86:17, 87:2, 87:15, 87:21, 88:18, 89:15, 90:6, 107:20, 120:18, 128:17, 143:16, 147:12, 147:16, 147:21, 149:5, 149:6, 149:7, 149:14, 149:20, 154:12, 154:13, 154:14, 158:21
**pages** [13] - 15:6, 15:19, 15:20, 16:14, 62:10, 71:20, 71:23, 89:7, 91:22, 149:21, 159:20, 167:10
**pants** [2] - 32:4, 126:10
**parent** [1] - 52:18
**parenthesis** [1] - 77:7
**parents** [1] - 54:13
**Park** [1] - 1:20
**parlance** [1] - 85:13
**part** [17] - 8:15, 8:17, 12:17, 17:10, 22:4, 65:10, 73:4, 94:25, 107:11, 117:9, 123:21, 133:6, 133:8, 146:17, 150:11, 161:20, 164:18

**particular** [14] - 19:16, 34:12, 80:12, 107:3, 115:6, 134:10, 135:14, 136:13, 140:24, 146:9, 148:6, 150:25, 152:18, 160:11
**particularly** [3] - 146:25, 153:15, 154:5
**parties** [9] - 5:4, 6:24, 8:22, 14:15, 18:8, 18:15, 40:21, 57:25, 59:20
**party** [1] - 15:1
**passed** [3] - 20:11, 20:12, 24:4
**past** [1] - 62:25
**path** [1] - 25:9
**patio** [1] - 7:18
**pause** [7] - 6:19, 61:3, 113:17, 113:21, 115:21, 116:2, 149:9
**PC** [1] - 3:9
**pejorative** [1] - 109:21
**pending** [1] - 93:25
**Pennsylvania** [4] - 2:15, 2:18, 2:22, 3:2
**people** [18] - 7:2, 17:9, 21:5, 23:20, 24:10, 24:19, 46:12, 85:7, 85:22, 104:7, 105:19, 107:8, 107:9, 158:11, 159:15, 159:16, 166:4
**people's** [1] - 96:19
**percent** [4] - 50:22, 72:4, 91:18, 96:3
**perceptions** [1] - 96:19
**perfect** [1] - 135:22
**performed** [1] - 121:9
**perhaps** [2] - 130:14, 144:18
**period** [11] - 26:23, 26:25, 34:2, 39:5, 49:7, 51:13, 122:12, 127:1, 127:3, 130:18, 144:18
**periodically** [1] - 144:11
**periods** [4] - 157:9, 157:14, 157:16, 163:11
**permission** [2] - 5:6, 121:17
**perpetrator** [1] - 119:11
**person** [25] - 12:13,

14:23, 16:2, 24:3, 39:11, 53:24, 53:25, 56:16, 56:22, 56:23, 76:16, 76:24, 77:17, 78:11, 79:23, 83:22, 85:11, 86:2, 107:24, 110:10, 110:18, 110:21, 133:7, 142:11, 158:9
**personal** [4] - 72:8, 72:13, 94:17, 102:6
**personality** [1] - 89:21
**personally** [6] - 27:9, 27:10, 93:1, 96:19, 146:10, 146:12
**personnel** [1] - 114:8
**persons** [1] - 85:12
**perspective** [5] - 6:10, 102:7, 102:13, 111:17, 160:16
**pertain** [1] - 150:25
**P▆▆** [1] - 157:2
**Philadelphia** [1] - 11:11
**phone** [2] - 53:5, 53:12
**photos** [1] - 22:1
**physical** [1] - 120:25
**physically** [3] - 50:11, 98:10, 99:13
**pick** [2] - 51:1, 118:8
**picked** [2] - 50:24, 51:5
**picture** [3] - 135:14, 136:17, 138:8
**pictures** [1] - 126:3
**pieces** [1] - 20:1
**PITTLEMAN** [1] - 3:9
**place** [6] - 33:5, 75:13, 139:15, 139:19, 139:24
**Plaintiff** [5] - 1:4, 1:15, 2:2, 4:2, 4:10
**plaintiff** [8] - 7:10, 20:16, 20:24, 40:25, 94:10, 111:9, 115:16, 116:17
**Plaintiff's** [8] - 37:23, 112:20, 115:23, 119:14, 119:17, 120:4, 121:13, 160:1
**plaintiff's** [5] - 7:12, 9:1, 14:2, 40:22, 105:24
**plaintiffs** [1] - 6:20
**plays** [1] - 22:18
**PLC** [1] - 3:6
**PLLC** [1] - 1:16
**pocket** [1] - 41:3
**Pod** [2] - 133:17,

138:5
**pod** [6] - 83:25, 84:3, 84:5, 134:24, 135:1
**pods** [3] - 133:2, 134:3, 134:4
**point** [27] - 15:17, 15:25, 18:19, 20:15, 27:11, 33:14, 42:1, 55:3, 56:9, 67:15, 74:19, 86:21, 87:14, 89:3, 91:18, 92:24, 97:10, 113:13, 123:2, 135:17, 136:1, 139:11, 153:6, 154:23, 155:2, 159:20, 162:13
**pointed** [3] - 35:23, 61:16, 66:7
**pointing** [1] - 136:18
**police** [1] - 18:20
**policies** [1] - 144:12
**policy** [3] - 43:9, 43:11, 43:12
**polite** [1] - 9:19
**politely** [1] - 9:25
**poorly** [1] - 127:25
**portion** [2] - 29:1, 61:21
**position** [3] - 6:12, 13:12, 117:4
**possibility** [1] - 86:11
**possible** [3] - 44:13, 108:13, 108:15
**possibly** [1] - 102:9
**post** [2] - 65:11, 107:8
**posted** [2] - 17:17, 61:7
**posting** [1] - 65:17
**posts** [2] - 65:9, 125:17
**potential** [1] - 8:13
**PowerPoint** [1] - 119:19
**PPL** [1] - 85:20
**practice** [1] - 43:14
**pre** [1] - 93:14
**pre-empt** [1] - 93:14
**preceding** [1] - 118:6
**precise** [1] - 115:4
**predicate** [1] - 128:21
**preface** [1] - 129:22
**Preliminary** [1] - 4:19
**preliminary** [1] - 10:2
**preplanned** [1] - 11:13
**preprinted** [1] - 145:5
**present** [5] - 11:18, 23:9, 28:23, 95:13, 150:14
**presentation** [2] -

180

119:19, 120:11
**presented** [2] - 15:6, 131:9
**pretty** [6] - 25:21, 51:23, 51:24, 77:14, 160:16, 165:25
**prevent** [2] - 104:16, 104:23
**previous** [3] - 38:22, 75:1, 102:16
**previously** [1] - 74:15
**prick** [1] - 89:3
**princi** [1] - 104:17
**Principal** [3] - 48:5, 120:9, 157:1
**principal** [1] - 124:19
**principals** [7] - 36:11, 36:18, 36:20, 100:17, 104:11, 145:11, 161:12
**principals'** [1] - 108:10
**print** [2] - 25:6, 25:14
**printed** [3] - 15:5, 25:15, 108:22
**privilege** [1] - 148:22
**problem** [4] - 24:14, 84:19, 144:22, 166:8
**proceed** [1] - 95:15
**proceeding** [2] - 5:18, 109:10
**PROCEEDINGS** [1] - 1:11
**proceedings** [9] - 6:19, 10:5, 61:3, 95:7, 115:21, 149:9, 167:6, 167:11, 167:14
**proceeds** [1] - 78:19
**produce** [1] - 132:1
**produced** [6] - 18:7, 57:20, 58:18, 74:3, 81:24, 82:6
**professional** [1] - 24:12
**profile** [4] - 15:13, 15:14, 21:21, 59:18
**Program** [1] - 99:17
**pronounce** [1] - 116:21
**pronouns** [1] - 21:1
**proper** [1] - 21:1
**propose** [1] - 148:25
**protective** [1] - 52:14
**Protective** [1] - 152:16
**protocol** [1] - 15:22
**prove** [1] - 17:10
**proved** [1] - 126:16
**provide** [1] - 18:4
**provided** [7] - 6:16,

74:18, 131:20, 151:3, 164:11, 165:11
**providing** [1] - 114:7
**provision** [1] - 34:12
**public** [3] - 17:17, 65:9, 123:5
**Public** [1] - 117:1
**publicly** [1] - 65:22
**publish** [11] - 40:24, 58:6, 60:1, 73:17, 74:20, 81:17, 120:5, 120:6, 121:17, 133:8, 160:2
**published** [1] - 59:25
**pull** [6] - 37:23, 40:19, 57:23, 59:4, 73:20, 107:14
**pulled** [2] - 18:24, 39:11
**purpose** [2] - 118:18, 147:6
**purposely** [1] - 47:2
**purposes** [3] - 62:10, 149:1, 149:11
**pursuant** [1] - 126:14
**put** [18] - 5:14, 11:9, 11:15, 19:19, 19:20, 19:25, 32:4, 56:15, 61:1, 63:13, 72:21, 95:3, 112:23, 127:20, 130:23, 152:13
**putting** [4] - 7:1, 58:24, 95:3, 128:3

### Q

**QUESTION** [10] - 30:5, 31:3, 34:8, 129:15, 129:25, 150:13, 150:17, 150:25, 151:3, 151:7
**questioned** [2] - 27:5, 110:6
**questioning** [1] - 57:12
**questions** [27] - 27:3, 27:6, 28:8, 28:10, 29:3, 30:9, 30:10, 43:11, 43:12, 45:10, 47:21, 55:20, 85:12, 93:12, 94:8, 98:15, 100:15, 111:1, 115:25, 129:19, 132:9, 132:12, 138:12, 147:25, 149:8, 154:16, 166:7
**quick** [2] - 6:4, 6:6
**quickly** [3] - 20:23,

60:4, 90:20
**quiet** [3] - 139:14, 139:18, 139:23
**quite** [1] - 121:13
**quote** [2] - 15:9, 122:13

### R

**R.'s** [2] - 160:16, 163:5
**Rachel** [3] - 27:11, 27:14, 27:17, 29:22, 30:6, 30:10, 30:11, 35:14, 36:1, 36:6, 39:11, 43:8, 47:22, 48:3, 76:8, 82:21, 84:4, 97:23, 99:24, 100:3, 107:24, 108:3, 117:11, 117:16, 118:1, 119:20, 126:6, 126:21, 127:21, 128:4, 129:4, 144:18, 159:16
**raise** [3] - 9:7, 12:7, 20:4
**raised** [1] - 27:4
**ran** [1] - 127:13
**random** [1] - 36:5
**rape** [1] - 154:2
**raped** [7] - 31:19, 69:7, 100:7, 100:9, 103:18, 111:24, 112:15
**raping** [1] - 71:17
**rapist** [3] - 68:24, 69:1, 69:5
**rather** [2] - 6:25, 89:1
**rbates@hunton.com** [1] - 2:16
**RCMS** [3] - 129:16, 130:3, 144:17
**re** [5] - 55:7, 102:15, 102:18, 111:6
**re-ask** [1] - 55:7
**re-evaluate** [2] - 102:15, 102:18
**re-re-redirect** [1] - 111:6
**reaching** [1] - 165:24
**read** [40] - 5:16, 18:9, 20:12, 22:3, 22:7, 28:25, 29:16, 31:6, 31:7, 34:14, 39:25, 41:5, 41:9, 41:11, 58:16, 64:22, 65:5, 65:7, 68:4, 68:11, 68:12, 68:14, 68:23, 69:18, 69:22, 86:18, 87:21, 88:9, 89:8,

90:14, 128:17, 128:18, 129:11, 143:17, 147:23, 148:25, 149:2, 150:10, 154:13
**reading** [3] - 10:13, 25:15, 72:19
**reads** [1] - 162:11
**ready** [8] - 29:2, 40:2, 40:3, 58:17, 71:21, 73:11, 150:8, 150:9
**real** [5] - 18:25, 20:5, 23:23, 83:22
**realized** [1] - 5:10
**realizes** [1] - 162:18
**really** [19] - 8:6, 8:7, 11:21, 19:17, 56:13, 75:24, 80:12, 80:14, 87:4, 87:16, 88:23, 109:22, 111:2, 145:6, 149:12, 149:24, 157:12
**realtime** [2] - 20:18, 167:12
**reason** [5] - 5:15, 118:17, 158:10, 160:15, 165:4
**reasonable** [5] - 7:2, 7:4, 15:11, 74:17, 94:23
**recalled** [1] - 131:15
**recalling** [1] - 130:10
**received** [12] - 14:15, 14:17, 18:5, 18:7, 57:14, 58:22, 73:22, 76:13, 77:19, 80:21, 82:20, 83:5
**recent** [1] - 129:16
**Recess** [2] - 95:6, 166:13
**recognize** [1] - 119:17
**recollection** [10] - 16:25, 35:3, 98:11, 103:14, 131:14, 132:5, 142:25, 144:2, 144:5, 158:5
**record** [12] - 20:20, 23:6, 45:9, 58:2, 80:16, 81:19, 88:16, 90:7, 94:25, 95:10, 127:6, 128:18
**recorded** [1] - 129:8
**recording** [1] - 167:13
**recross** [3] - 111:3, 111:5, 113:1
**Recross** [1] - 4:6
**RECROSS** [1] - 111:20
**Recross-examination** [1] - 4:6

**redirect** [8] - 33:4, 33:5, 94:11, 98:16, 111:5, 111:6, 112:8, 114:19
**Redirect** [1] - 4:6
**REDIRECT** [1] - 98:18
**reevaluate** [1] - 102:9
**refer** [4] - 16:13, 38:5, 125:15, 144:23
**reference** [7] - 12:21, 12:24, 17:1, 20:17, 32:22, 135:18, 149:21
**referenced** [1] - 38:10
**references** [2] - 20:17, 90:11
**referred** [1] - 148:14
**referring** [5] - 33:1, 77:1, 145:23, 149:3, 153:14
**refers** [1] - 125:14
**refresh** [1] - 131:13
**regard** [7] - 23:16, 24:12, 74:16, 81:21, 129:17, 129:25, 130:2
**regarding** [9] - 9:13, 10:5, 13:14, 127:20, 128:3, 129:3, 129:19, 130:2, 148:3
**regards** [1] - 152:16
**registered** [1] - 22:1
**regret** [1] - 96:2
**reinstructed** [1] - 8:19
**reiterate** [2] - 10:2, 25:7
**relate** [1] - 149:12
**related** [3] - 25:2, 115:7, 152:20
**relation** [1] - 134:13
**relationship** [10] - 64:4, 76:20, 77:1, 77:2, 77:4, 81:8, 91:6, 91:13, 91:24, 97:6
**relatively** [3] - 23:18, 23:19, 141:6
**released** [2] - 111:8, 111:16
**relevance** [4] - 14:25, 16:3, 20:7
**relevant** [5] - 17:22, 21:21, 21:25, 22:4, 22:16
**religious** [1] - 8:1
**remain** [2] - 26:8, 59:16
**remained** [1] - 91:25
**remarks** [1] - 161:15
**remember** [39] - 8:20,

8:21, 22:13, 32:2,
32:5, 35:20, 36:1,
55:18, 65:11, 93:22,
98:12, 105:13,
105:15, 110:8,
128:5, 129:8, 130:6,
130:14, 130:16,
130:19, 132:2,
139:21, 141:23,
141:24, 141:25,
142:4, 143:11,
143:13, 143:20,
146:9, 146:16,
146:17, 146:21,
147:7, 147:9,
156:13, 156:19,
157:16
**remembered** [1] -
156:24
**remind** [3] - 8:22,
8:25, 9:4
**reminded** [1] - 161:20
**reminding** [1] - 9:16
**reorient** [2] - 120:9,
126:20
**repeat** [5] - 42:16,
92:19, 99:6, 155:9,
160:19
**repetitive** [3] - 79:4,
79:19, 82:17
**rephrase** [8] - 31:13,
41:21, 49:24, 61:15,
99:25, 104:18,
113:8, 148:24
**report** [3] - 7:11, 9:2,
46:16
**reported** [5] - 44:21,
50:5, 103:1, 130:11,
167:5
**reporter** [3] - 27:22,
28:14, 45:6
**Reporter** [5] - 3:12,
15:4, 127:24, 167:3,
167:22
**REPORTER** [1] -
167:1
**Reporter..................
...** [1] - 4:19
**reporting** [1] - 152:16
**reports** [1] - 164:10
**represent** [6] - 26:13,
26:17, 59:19, 95:19,
97:3, 116:17
**representing** [3] -
33:13, 76:16, 143:7
**request** [12] - 8:17,
11:8, 11:13, 20:9,
48:3, 48:5, 82:3,
115:3, 115:9,
120:23, 145:3, 162:2

**requested** [2] - 18:6,
57:17
**requesting** [1] -
162:10
**required** [1] - 9:18
**requirement** [1] -
10:21
**reset** [1] - 131:11
**resolved** [2] - 22:23,
115:11
**resource** [2] - 153:25
**Resource** [2] - 159:16,
164:4
**respond** [1] - 16:25
**responded** [3] - 34:19,
65:4, 65:14
**responding** [1] -
152:9
**response** [11] - 54:19,
57:20, 58:18, 74:4,
77:12, 81:25, 82:3,
96:7, 106:9, 128:22,
163:5
**Response** [1] - 99:17
**responses** [2] - 5:2,
23:13
**responsibilities** [1] -
25:24
**responsibility** [1] -
24:13
**rest** [2] - 7:5, 71:19
**restate** [1] - 113:9
**Reston** [2] - 3:7, 3:11
**resumed** [1] - 95:7
**rethink** [1] - 100:3
**reversible** [1] - 15:5
**reviewed** [3] - 99:15,
105:6, 131:22
**revisit** [2] - 13:19,
109:22
**revolving** [2] - 88:1,
88:5
**REWARI** [14] - 9:9,
9:23, 10:4, 10:18,
11:1, 11:3, 120:2,
122:16, 128:19,
145:14, 145:17,
148:20, 159:23,
162:4
**Rewari** [2] - 2:17, 9:9
**rights** [1] - 7:3
**Rights** [1] - 109:4
**risk** [1] - 166:4
**rkeefe@bsfllp.com**
[1] - 2:13
**rlly** [1] - 80:16
**road** [1] - 111:6
**roaming** [1] - 36:6
**Robert** [2] - 2:10, 3:6
**role** [1] - 124:3

**room** [1] - 85:12
**ROSSIE** [1] - 1:11
**rot** [1] - 70:1
**row** [4] - 7:20, 42:13,
125:15, 137:4
**rows** [1] - 138:4
**RPR** [2] - 3:12, 167:21
**rude** [2] - 9:17, 137:15
**rule** [4] - 10:11,
111:12, 113:22,
116:2
**ruled** [3] - 14:6, 17:25,
18:3
**rules** [1] - 8:6
**ruling** [1] - 81:13
**rumor** [9] - 69:11,
69:12, 103:17,
103:20, 112:15,
113:7, 113:12,
113:25, 114:1
**rumors** [4] - 27:6,
27:9, 103:15, 111:24
**run** [3] - 10:8, 22:21,
166:5
**Russian** [1] - 15:14
**Ryan** [3] - 2:14, 26:13,
26:17

## S

**S.T** [1] - 3:5
**safe** [7] - 35:17,
118:15, 118:21,
139:14, 139:19,
139:23, 158:7
**safety** [1] - 161:14
**saw** [15] - 7:19, 8:5,
9:11, 27:9, 46:6,
46:9, 46:19, 49:17,
65:10, 68:1, 107:7,
109:15, 109:17,
121:25, 135:22
**SCHILLER** [4] - 1:20,
2:2, 2:6, 2:10
**School** [74] - 6:9,
7:12, 8:18, 9:7, 9:10,
11:25, 26:17, 27:11,
27:14, 27:17, 29:22,
35:14, 36:2, 47:23,
48:1, 76:4, 76:9,
76:11, 78:8, 82:21,
98:22, 99:8, 99:21,
100:1, 100:16,
103:4, 104:15,
105:12, 106:2,
106:4, 106:9, 107:2,
108:24, 110:5,
110:22, 111:16,
114:24, 117:6,
119:20, 123:4,

123:6, 123:19,
123:20, 123:24,
124:7, 125:9,
125:10, 125:20,
126:5, 126:6,
126:14, 129:4,
145:18, 145:23,
146:1, 146:7, 146:8,
146:20, 147:7,
148:2, 148:16,
148:17, 151:10,
151:12, 151:19,
152:4, 152:5, 153:2,
154:10, 155:5,
159:15, 159:17,
164:3
**school** [93] - 13:10,
14:16, 16:23, 31:11,
31:15, 31:17, 31:20,
31:21, 31:23, 32:1,
35:17, 35:19, 36:13,
37:16, 39:2, 39:4,
39:14, 39:17, 40:5,
42:21, 42:22, 43:9,
43:23, 44:21, 44:24,
46:10, 46:13, 46:17,
49:8, 50:14, 50:23,
51:2, 51:6, 51:10,
60:20, 69:7, 73:4,
73:8, 73:11, 76:5,
76:17, 82:24, 83:17,
99:13, 100:7,
100:11, 100:13,
103:1, 104:10,
104:15, 104:22,
105:18, 106:19,
106:23, 108:7,
110:12, 114:8,
117:4, 117:21,
118:18, 120:10,
121:9, 124:3,
126:21, 127:7,
127:12, 127:13,
129:16, 140:24,
148:15, 151:4,
151:6, 151:10,
151:13, 151:15,
151:21, 151:23,
152:1, 152:3, 152:4,
152:5, 152:14,
153:24, 161:11,
161:14, 161:25,
162:8, 164:7, 165:5,
165:7
**schools** [4] - 35:22,
123:5, 152:6, 152:7
**Schools** [1] - 117:2
**scooped** [1] - 46:19
**scooping** [12] - 12:23,
12:24, 12:25, 45:2,

45:16, 46:2, 46:6,
46:16, 105:13,
105:16, 105:18,
105:19
**scope** [1] - 105:2
**Scott** [1] - 2:21
**screen** [15] - 38:1,
38:13, 41:4, 61:1,
61:6, 61:7, 61:9,
61:11, 62:10, 66:23,
79:17, 85:25,
134:10, 134:11,
137:12
**screens** [1] - 133:15
**scrolling** [1] - 59:5
**SE** [3] - 2:3, 2:7, 2:11
**search** [2] - 59:1, 59:3
**searched** [1] - 90:12
**seat** [1] - 115:24
**seated** [4] - 23:10,
23:11, 26:8, 95:12
**second** [26] - 6:5,
7:24, 7:25, 13:24,
17:24, 41:7, 42:8,
56:17, 61:21, 67:1,
70:11, 70:14, 78:6,
83:7, 83:24, 101:10,
102:12, 122:9,
131:23, 132:3,
132:10, 156:13,
163:8, 163:9, 164:25
**Second** [2] - 15:3,
15:4
**seconds** [3] - 142:15,
142:17, 156:9
**section** [3] - 5:23,
66:3, 156:4
**security** [1] - 7:6
**seductive** [1] - 122:14
**see** [84] - 6:15, 6:22,
9:2, 9:17, 13:18,
18:2, 18:17, 20:17,
27:10, 27:12, 27:13,
27:16, 32:25, 33:19,
34:17, 34:18, 49:14,
50:11, 55:8, 61:10,
61:25, 63:24, 64:18,
64:23, 66:11, 66:14,
67:2, 70:19, 71:3,
71:9, 71:15, 76:1,
76:21, 78:13, 78:17,
78:21, 78:25, 79:9,
79:17, 79:18, 80:1,
82:15, 83:10, 84:17,
85:2, 85:8, 86:4,
86:19, 87:7, 87:17,
88:14, 88:20, 88:24,
88:25, 89:12, 89:16,
89:18, 90:9, 90:17,
93:10, 94:1, 94:21,

97:15, 97:16, 106:13, 106:14, 107:20, 120:19, 122:3, 129:21, 133:15, 134:2, 134:11, 137:14, 142:12, 145:3, 145:7, 149:2, 154:9, 158:21, 158:23, 159:1, 160:7, 166:10
**seeing** [3] - 34:1, 46:2, 132:19
**seem** [1] - 102:23
**self** [2] - 35:11, 152:17
**self-harm** [1] - 152:17
**self-inflicted** [1] - 35:11
**semicircle** [4] - 135:23, 137:6, 137:16, 137:19
**send** [1] - 53:24
**sending** [2] - 58:24, 72:5
**sends** [1] - 151:19
**sense** [4] - 9:7, 69:12, 135:20, 160:25
**sent** [15] - 60:9, 60:13, 60:15, 60:17, 64:6, 64:8, 72:7, 72:12, 72:24, 73:1, 73:3, 73:14, 108:5, 126:2, 152:11
**sentence** [1] - 122:10
**separate** [3] - 53:18, 80:22, 145:15
**serious** [2] - 69:13, 154:5
**seriously** [1] - 88:12
**servers** [1] - 59:17
**service** [2] - 7:6, 151:23
**services** [1] - 161:5
**Services** [1] - 152:16
**Session** [1] - 166:14
**SESSION** [1] - 1:8
**session** [7] - 146:18, 146:19, 148:14, 151:5, 152:2, 152:19
**sessions** [2] - 151:21, 151:24
**set** [2] - 58:18, 82:20
**sets** [1] - 18:8
**setting** [1] - 121:9
**settled** [1] - 18:20
**seven** [1] - 109:7
**several** [6] - 24:19, 36:11, 36:17, 55:15, 84:20, 91:25
**sex** [5] - 79:18, 79:25, 80:3, 121:9, 126:2

**Sexual** [1] - 99:17
**sexual** [51] - 13:9, 49:23, 98:23, 99:19, 99:23, 100:2, 104:16, 104:23, 118:24, 119:5, 119:7, 119:9, 119:12, 119:22, 120:12, 120:18, 120:21, 120:23, 120:25, 121:1, 121:3, 121:4, 121:6, 121:10, 122:6, 122:15, 123:25, 124:8, 124:12, 124:16, 124:17, 125:3, 125:10, 125:21, 126:7, 126:13, 127:17, 127:23, 128:2, 128:6, 129:5, 129:9, 129:17, 129:22, 129:25, 130:3, 130:13, 153:16, 161:8
**sexually** [20] - 27:10, 27:12, 27:16, 29:21, 30:5, 30:14, 30:15, 30:19, 31:4, 31:10, 31:14, 31:16, 31:25, 49:17, 50:11, 54:15, 98:10, 99:10, 99:14, 110:1
**sexy** [1] - 64:16
**shading** [1] - 41:10
**shadow** [4] - 157:4, 164:24, 165:2, 165:4
**shadowed** [3] - 163:22, 163:25, 164:8
**shadowing** [3] - 157:6, 163:12, 164:11
**share** [1] - 43:9
**shared** [3] - 10:6, 43:1, 93:2
**sharing** [1] - 161:10
**shirt** [1] - 126:10
**shit** [1] - 88:7
**shoot** [1] - 156:10
**short** [3] - 51:22, 142:18, 157:12
**shorthand** [2] - 167:5, 167:12
**show** [6] - 13:25, 35:5, 135:8, 135:9, 135:11, 156:22
**showed** [5] - 15:20, 22:2, 72:13, 103:4, 107:4

**shown** [2] - 57:11, 60:22
**sic** [2] - 22:19, 110:22
**sic]** [1] - 20:8
**side** [12] - 7:11, 9:1, 17:9, 56:15, 61:1, 61:12, 61:13, 135:23, 136:3
**Side** [1] - 32:10
**sidebar** [1] - 112:5
**sides** [1] - 10:12
**sidewalk** [1] - 7:19
**significant** [2] - 153:9, 153:24
**similar** [6] - 16:11, 16:15, 21:14, 72:18, 77:6, 96:12
**similarities** [1] - 32:14
**simmered** [1] - 164:19
**simple** [1] - 59:1
**simply** [2] - 5:10, 152:20
**single** [4] - 119:11, 127:22, 128:5, 131:15
**sit** [2] - 12:1, 140:10
**sits** [1] - 7:19
**sitting** [4] - 20:6, 36:2, 44:23, 46:12
**situation** [4] - 161:23, 163:4, 164:17, 164:19
**six** [5] - 48:24, 83:4, 87:25, 88:4
**Sixth** [1] - 16:11
**skills** [1] - 161:23
**skip** [6] - 71:5, 85:24, 89:7, 101:10, 125:13, 150:1
**SLHS** [2] - 75:25, 76:3
**slightest** [1] - 25:8
**slightly** [1] - 36:8
**slip** [4] - 5:6, 5:8, 5:9, 145:2
**slower** [1] - 98:20
**slur** [3] - 68:20, 96:10, 96:12
**slut** [5] - 70:21, 77:15, 77:17, 104:2, 109:15
**small** [4] - 23:18, 23:19, 66:24, 158:23
**smartphone** [2] - 53:8, 53:10
**smiles** [1] - 97:17
**smiley** [1] - 77:7
**smoker** [2] - 7:21, 7:22
**smokes** [1] - 7:23
**social** [14] - 9:24, 10:6, 10:8, 10:13,

10:23, 15:5, 17:17, 25:6, 25:10, 25:13, 25:19, 115:6, 115:10
**solid** [1] - 162:19
**someone** [10] - 91:13, 96:7, 110:7, 121:8, 121:9, 121:10, 137:17, 137:18, 137:20
**sometime** [1] - 97:20
**sometimes** [9] - 25:14, 50:19, 50:23, 51:19, 52:17, 54:16, 59:3, 79:3, 144:14
**somewhere** [2] - 140:1, 143:5
**Sona** [2] - 2:17, 9:9
**sorry** [37] - 7:24, 19:9, 22:12, 31:13, 32:21, 41:18, 42:15, 42:16, 54:18, 62:20, 66:22, 70:4, 73:17, 79:4, 79:24, 80:18, 86:2, 86:6, 86:24, 88:2, 89:15, 111:24, 121:8, 133:7, 136:25, 137:1, 138:3, 146:11, 147:14, 148:8, 148:9, 148:12, 149:23, 153:19, 156:1, 162:6
**sort** [9] - 7:18, 45:20, 84:3, 109:21, 135:17, 138:22, 139:2, 153:16, 159:2
**sorts** [1] - 144:12
**sounds** [3] - 118:13, 119:4, 156:23
**source** [1] - 13:15
**South** [4] - 76:4, 76:8, 76:11, 78:8
**space** [2] - 139:23
**speaking** [6] - 56:3, 75:20, 112:7, 136:13, 155:13, 155:20, 161:17, 161:21
**speaks** [4] - 65:1, 89:5, 89:24, 95:1
**special** [1] - 48:3
**specific** [5] - 50:8, 105:15, 119:5, 144:14, 158:21
**specifically** [7] - 13:10, 23:3, 115:3, 124:20, 130:20, 143:13, 149:12
**specifics** [2] - 124:18, 156:19

**speculate** [1] - 101:5
**spell** [3] - 22:12, 80:14
**spelled** [1] - 19:17, 80:12
**spelling** [2] - 74:11, 80:11
**spellings** [1] - 56:12
**spend** [1] - 50:17
**spent** [3] - 49:7, 50:14, 52:11
**split** [1] - 141:11
**spoken** [6] - 11:8, 46:24, 47:6, 105:24, 106:4, 106:7
**spread** [1] - 103:21
**Square** [1] - 3:13
**srewari@huntonak.com** [1] - 2:20
**staff** [1] - 22:21
**Stamp** [2] - 14:4, 14:8
**stand** [2] - 11:15, 88:10
**standing** [2] - 8:4, 138:22
**standpoint** [1] - 94:22
**start** [17] - 27:3, 48:18, 56:19, 59:5, 60:7, 69:12, 75:6, 85:18, 98:20, 111:13, 116:21, 117:21, 149:5, 151:23, 160:5
**started** [7] - 41:12, 47:18, 48:12, 48:16, 69:10, 75:20, 118:1
**starting** [4] - 22:8, 86:10, 122:10, 160:10
**starts** [5] - 29:14, 63:21, 149:14, 149:18, 154:13
**statement** [48] - 17:4, 32:22, 36:13, 36:17, 37:5, 37:6, 37:9, 37:12, 37:21, 37:25, 38:12, 38:15, 38:18, 39:3, 39:6, 39:7, 39:10, 39:18, 39:20, 40:1, 40:4, 40:7, 40:9, 40:11, 40:14, 40:16, 41:5, 41:12, 41:14, 41:17, 41:23, 41:25, 42:11, 42:13, 42:17, 100:20, 100:24, 101:3, 101:16, 102:9, 103:5, 103:6, 103:13, 108:14, 111:23, 112:18, 112:19, 112:21
**statements** [8] - 18:1,

183

100:14, 102:16, 102:19, 102:21, 103:1, 143:7, 145:10
**States** [5] - 3:12, 15:3, 15:16, 16:12, 16:14
**STATES** [2] - 1:1, 1:12
**stating** [1] - 114:5
**status** [10] - 33:2, 64:22, 65:5, 65:8, 65:9, 65:11, 65:17, 65:19, 65:24, 65:25
**statuses** [1] - 88:7
**stay** [10] - 10:23, 25:7, 25:10, 25:17, 25:20, 51:16, 51:19, 115:5, 115:9, 164:21
**stayed** [1] - 49:1
**step** [2] - 94:16, 165:21
**steps** [3] - 7:2, 7:4, 74:6
**still** [13] - 26:14, 28:7, 39:14, 51:10, 59:8, 59:15, 83:15, 88:1, 88:5, 92:5, 95:14, 110:23, 117:6
**stipulate** [2] - 59:20, 81:14
**stipulated** [4] - 18:9, 20:24, 40:20, 57:25
**stipulation** [4] - 18:10, 18:13, 58:2, 59:22
**stop** [2] - 165:5, 165:6
**stopped** [7] - 81:9, 92:10, 92:13, 92:21, 92:23, 92:24, 97:23
**stopping** [1] - 44:2
**stored** [1] - 58:20
**stories** [1] - 10:5
**story** [2] - 86:12, 98:4
**straightforward** [1] - 12:9
**strange** [1] - 80:13
**strategies** [2] - 161:22, 163:14
**streamline** [1] - 18:10
**street** [1] - 8:11
**Street** [4] - 1:16, 2:3, 2:7, 2:11
**structurally** [2] - 21:7, 21:14
**structure** [1] - 21:8
**struggling** [1] - 53:17
**student** [33] - 42:25, 43:1, 43:10, 43:13, 43:15, 43:23, 44:1, 44:3, 44:6, 44:7, 44:15, 44:17, 82:21, 119:8, 128:6, 129:5, 130:4, 130:11,

140:22, 141:7, 144:21, 145:10, 146:16, 147:1, 148:3, 155:7, 155:10, 155:13, 155:20, 157:7, 161:4
**students** [34] - 43:2, 43:10, 43:18, 43:23, 54:8, 76:8, 84:3, 104:1, 104:4, 105:19, 106:11, 106:15, 106:20, 106:22, 118:12, 118:14, 118:18, 118:20, 119:20, 120:11, 126:24, 135:23, 137:16, 140:21, 140:25, 141:3, 144:19, 145:1, 152:25, 153:7, 153:24, 154:18, 154:24
**stuff** [5] - 8:12, 22:12, 22:13, 65:12, 96:1
**stupid** [2] - 70:17, 78:19
**style** [5] - 19:16, 21:12, 74:11, 79:12, 79:21
**subject** [4] - 9:14, 14:2, 118:24, 146:9
**submitted** [1] - 107:11
**subpoena** [11] - 18:5, 18:6, 57:14, 57:17, 57:21, 58:19, 58:22, 73:22, 74:4, 81:25, 107:12
**subpoenaed** [1] - 82:1
**subscribed** [1] - 167:15
**substance** [1] - 149:13
**suck** [2] - 41:15, 41:24
**sue** [5] - 73:4, 73:8, 73:11, 108:24, 109:10
**suffer** [1] - 99:23
**suffice** [1] - 95:3
**sufficient** [2] - 14:23, 22:15
**sufficiently** [2] - 21:20, 22:14
**suggest** [4] - 17:10, 93:15, 135:15, 166:3
**suggested** [1] - 161:22
**suggestion** [3] - 17:5, 95:1, 155:6
**suicidal** [1] - 152:17
**suicide** [1] - 70:23

**Suite** [7] - 1:17, 1:21, 2:3, 2:7, 2:11, 3:7, 3:10
**summaries** [1] - 10:13
**summary** [1] - 5:24
**summer** [2] - 28:3, 46:22
**support** [3] - 163:16, 165:10, 165:11
**supporting** [1] - 130:12
**supportive** [1] - 73:13
**supposed** [2] - 47:25, 102:18
**supposes** [1] - 14:22
**sur** [1] - 114:19
**surrounded** [1] - 138:16
**surrounding** [3] - 137:17, 137:18, 137:19
**survey** [3] - 151:20, 151:22, 152:1
**suspect** [1] - 86:10
**suspected** [2] - 86:21, 98:6
**suspects** [1] - 14:22
**suspension** [1] - 43:25
**sustained** [3] - 101:21, 102:3, 106:25
**sweeping** [1] - 45:20
**switch** [3] - 36:8, 37:7, 57:6
**switching** [1] - 44:14
**swore** [1] - 28:18
**sworn** [1] - 115:23
**syntax** [2] - 21:12, 22:6
**system** [4] - 73:5, 73:8, 73:11, 76:6

**T**

**T.B** [1] - 3:6
**TABLE** [1] - 4:1
**tables** [1] - 46:13
**tape** [1] - 167:13
**target** [2] - 156:7, 156:10
**targeted** [1] - 65:12
**tattoos** [1] - 22:2
**Taylor** [31] - 16:18, 16:21, 18:8, 18:11, 18:16, 18:18, 21:3, 21:5, 55:17, 55:24, 56:4, 56:10, 57:9, 57:20, 60:10, 60:24, 62:22, 63:7, 64:14,

65:15, 66:5, 66:9, 72:6, 72:7, 72:12, 72:23, 74:7, 75:14, 107:18, 108:22
**Taylor's** [1] - 56:16
**teach** [1] - 146:24
**teacher** [2] - 144:21, 144:23
**teachers** [1] - 133:20
**teaches** [1] - 99:17
**teaching** [4] - 125:9, 146:25, 148:3, 151:11
**team** [4] - 24:22, 141:11, 141:12, 141:17
**Teams** [1] - 57:3
**teased** [1] - 122:14
**technology** [2] - 5:23, 38:5
**ten** [3] - 34:2, 92:7, 94:5
**ten-month** [1] - 34:2
**Tenth** [1] - 3:13
**term** [9] - 12:20, 12:21, 12:25, 17:3, 105:12, 105:21, 153:14, 153:16
**terms** [3] - 109:21, 124:16, 124:20
**T▮▮▮▮** [8] - 36:22, 37:14, 37:15, 37:20, 95:19, 101:11, 102:13
**test** [1] - 90:3
**testified** [17] - 19:3, 36:10, 36:16, 40:14, 42:21, 45:16, 55:17, 55:23, 74:6, 100:4, 104:22, 105:23, 106:9, 108:22, 112:8, 112:9, 113:24
**testify** [9] - 10:14, 18:16, 18:22, 19:23, 20:1, 24:20, 44:14, 44:23, 46:6
**testifying** [2] - 10:7, 45:10
**testimony** [42] - 9:13, 12:12, 14:21, 15:10, 16:25, 22:4, 22:6, 45:6, 45:11, 47:12, 47:13, 47:16, 47:18, 57:12, 74:10, 74:18, 75:1, 80:11, 85:10, 98:23, 98:24, 99:9, 99:11, 99:22, 105:25, 106:3, 111:22, 112:14, 112:17, 120:9,

127:22, 128:23, 129:6, 131:2, 133:19, 138:13, 139:18, 148:22, 149:1, 150:11, 167:6
**text** [3] - 54:2, 56:11, 56:15
**texted** [1] - 19:15
**texting** [4] - 19:16, 74:11, 79:12, 79:21
**THE** [224] - 1:1, 1:11, 3:5, 5:1, 5:3, 5:21, 6:1, 6:3, 6:7, 6:11, 6:14, 6:21, 7:21, 7:23, 8:2, 8:23, 9:5, 9:20, 10:1, 10:15, 10:20, 11:2, 11:17, 12:1, 12:5, 12:19, 12:24, 13:12, 13:18, 14:9, 14:11, 14:13, 15:23, 16:4, 16:9, 16:24, 17:13, 17:18, 18:12, 19:1, 19:5, 19:8, 20:11, 20:19, 20:21, 21:1, 21:12, 21:15, 21:18, 22:17, 23:7, 23:11, 23:14, 26:7, 26:14, 28:22, 29:4, 29:16, 29:17, 29:18, 29:24, 32:15, 32:17, 32:22, 33:4, 33:11, 33:17, 33:19, 34:11, 38:3, 38:8, 40:25, 41:21, 43:4, 43:22, 44:1, 45:9, 45:14, 58:4, 58:7, 60:1, 61:4, 61:20, 62:1, 62:5, 65:1, 74:14, 74:21, 81:16, 81:19, 85:10, 85:16, 85:17, 85:18, 85:19, 85:20, 85:21, 85:22, 85:23, 89:5, 89:24, 90:23, 91:2, 92:16, 92:17, 93:9, 93:14, 94:3, 94:7, 94:10, 94:14, 94:22, 95:8, 95:11, 95:14, 95:16, 96:22, 98:16, 98:25, 101:6, 101:21, 102:3, 102:6, 102:8, 102:10, 104:18, 105:4, 105:10, 106:25, 109:20, 111:4, 111:12, 111:18, 112:2, 112:6, 112:10, 112:25, 113:16, 114:2, 114:4, 114:10, 114:12, 114:14, 114:15,

114:18, 114:21,
115:2, 115:12,
115:13, 115:15,
115:18, 115:20,
115:22, 115:24,
116:4, 116:5, 116:7,
116:8, 116:10,
116:12, 118:8,
120:1, 120:3, 120:6,
121:16, 121:19,
122:20, 122:24,
122:25, 123:14,
123:15, 128:9,
128:20, 129:6,
129:8, 130:7,
133:10, 133:12,
134:9, 134:12,
134:13, 134:15,
134:18, 134:19,
135:5, 135:13,
135:19, 136:7,
136:8, 136:12,
136:17, 136:21,
145:20, 148:24,
149:2, 149:10,
149:17, 149:19,
149:24, 150:2,
150:4, 150:22,
152:18, 152:21,
153:14, 153:19,
153:20, 153:22,
154:4, 154:6, 154:7,
155:24, 156:3,
156:6, 156:9, 159:8,
159:22, 159:25,
160:3, 162:11,
165:17, 165:20,
165:21, 166:10
**theoretical** [1] - 112:6
**theoretically** [1] -
112:7
**therapists** [1] - 154:1
**thereabouts** [1] -
149:14
**thinking** [4] - 88:1,
88:5, 99:13, 101:24
**thinks** [1] - 87:3
**third** [11] - 15:1, 41:23,
42:12, 42:17, 81:10,
101:11, 122:10,
136:19, 144:6,
163:11
**Third** [1] - 16:12
**threatened** [1] -
163:15
**threatening** [1] -
161:15
**threats** [2] - 99:18,
103:23
**three** [13] - 18:8,

51:18, 55:20, 56:13,
69:23, 82:14, 94:8,
104:10, 135:23,
138:4, 138:14,
144:1, 157:11
**threw** [1] - 5:10
**throughout** [2] -
163:17, 165:10
**THX** [1] - 56:13
**tied** [2] - 59:17, 91:22
**Tier** [3] - 153:8,
153:22, 154:4
**timeline** [2] - 83:2,
140:1
**timelines** [1] - 48:7
**timely** [1] - 25:23
**Tinsley** [4] - 7:5,
28:23, 95:11, 166:8
**Title** [1] - 152:20
**today** [25] - 12:8,
16:22, 18:10, 18:17,
19:23, 20:6, 28:6,
36:2, 44:23, 46:6,
46:8, 47:12, 47:13,
72:19, 98:20, 99:22,
100:2, 127:18,
129:6, 140:4, 143:8,
154:3, 162:8, 163:3,
163:11
**together** [7] - 20:1,
49:7, 50:14, 84:4,
88:2, 88:6, 167:13
**tomorrow** [1] - 163:11
**TONIA** [1] - 3:12
**Tonia** [2] - 167:3,
167:21
**took** [13] - 14:5, 14:6,
28:14, 28:16, 51:6,
75:13, 124:2,
139:20, 139:24,
140:9, 153:5, 153:6,
160:5
**top** [20] - 59:11, 63:24,
68:11, 68:12, 68:14,
71:6, 74:24, 75:24,
80:13, 82:13, 83:10,
84:22, 84:23, 86:2,
87:21, 89:11, 89:14,
107:17, 107:20
**topic** [3] - 36:8, 44:14,
111:3
**topics** [6] - 27:4,
152:2, 152:12,
152:13, 152:14
**TORCHINSKY** [1] -
1:15
**torture** [1] - 71:14
**total** [1] - 49:4
**totally** [1] - 134:17
**touch** [3] - 49:18,

106:22, 164:21
**touched** [3] - 27:13,
30:16, 31:25
**touching** [4] - 99:13,
99:15, 106:11,
106:15
**toward** [1] - 136:18
**towards** [9] - 78:15,
79:16, 84:15, 86:17,
119:8, 134:16,
134:21, 159:2
**track** [1] - 140:3
**tracked** [1] - 15:20
**trail** [2] - 117:23,
160:11
**trails** [1] - 160:8
**training** [9] - 123:20,
123:23, 124:7,
125:19, 126:4,
127:19, 144:11,
145:13, 146:1
**tramp** [1] - 78:24
**TRANSCRIPT** [1] -
1:11
**transcript** [3] - 128:11,
128:12, 167:11
**transition** [1] - 153:16
**Trial** [1] - 167:6
**TRIAL** [2] - 1:11, 4:1
**trial** [8] - 5:8, 5:20,
5:22, 12:2, 25:5,
25:11, 25:21
**trick** [1] - 140:6
**trip** [3] - 11:11, 11:12,
11:13
**Trish** [1] - 115:22
**trouble** [1] - 145:22
**true** [25] - 12:15,
31:12, 39:15, 40:4,
40:16, 42:25, 44:20,
45:3, 46:2, 54:18,
54:23, 67:17, 67:18,
67:22, 69:8, 70:14,
72:6, 82:9, 91:12,
91:15, 92:1, 126:3,
126:8, 126:12,
126:16
**truly** [1] - 164:19
**trust** [1] - 23:14
**truth** [3] - 28:18,
28:20, 143:11
**try** [9] - 23:24, 25:3,
25:13, 98:20,
127:25, 135:13,
142:7, 145:24, 166:5
**trying** [19] - 9:17, 13:8,
19:9, 33:6, 52:3,
62:17, 66:3, 66:5,
70:8, 80:6, 114:6,
136:16, 137:14,

137:15, 140:2,
140:6, 149:15,
152:23
**Tuesday** [1] - 11:12
**turn** [4] - 29:9, 37:14,
57:3, 69:22
**turns** [1] - 139:8
**tutor** [12] - 12:14,
12:15, 12:16, 12:17,
93:2, 110:11,
110:12, 110:14,
110:16, 110:18
**twice** [1] - 157:14
**two** [37] - 12:6, 13:25,
14:2, 16:10, 18:21,
18:22, 20:15, 21:7,
23:23, 35:14, 42:18,
43:7, 43:13, 51:13,
51:16, 52:22, 52:24,
56:11, 61:14, 62:5,
64:4, 75:11, 79:2,
80:19, 80:20, 80:22,
82:11, 83:25, 91:10,
125:15, 131:10,
143:24, 157:7,
157:14, 157:16,
157:19, 159:20
**two-day** [1] - 75:11
**type** [4] - 19:14, 22:10,
71:22, 122:22
**typed** [3] - 41:8, 59:1
**types** [1] - 154:3
**typical** [1] - 141:13
**typing** [2] - 14:23,
21:11

**U**

**U.S** [4] - 74:17, 81:21,
81:22
**ugly** [6] - 71:2, 77:15,
77:17, 78:15, 78:20,
79:8
**UK** [2] - 84:24
**ultimate** [1] - 139:22
**ultimately** [2] - 16:4,
17:8
**uncomfortable** [4] -
23:23, 24:5, 24:18,
163:15
**under** [18] - 14:5, 14:7,
14:18, 18:2, 18:22,
19:5, 26:8, 26:14,
30:3, 45:21, 55:13,
71:1, 72:12, 86:24,
95:14, 128:15,
142:15, 143:5
**understandings** [1] -
119:2
**understood** [5] -

51:11, 87:1, 95:5,
121:3, 157:17
**united** [1] - 3:12
**United** [4] - 15:3,
15:16, 16:12, 16:14
**UNITED** [2] - 1:1, 1:12
**unless** [4] - 10:16,
43:24, 113:2, 153:8
**untimely** [1] - 101:7
**unusual** [1] - 138:17
**unwanted** [3] - 27:13,
30:17, 119:7
**unwelcomed** [2] -
119:7, 120:21
**up** [54] - 5:4, 8:20,
12:8, 17:23, 18:1,
18:4, 20:14, 23:14,
23:16, 29:1, 29:2,
32:15, 32:17, 32:25,
33:6, 36:12, 37:23,
40:17, 40:19, 42:13,
47:11, 48:19, 50:24,
51:1, 51:5, 51:16,
51:18, 56:2, 57:23,
58:13, 59:4, 61:1,
61:6, 62:5, 73:20,
83:4, 83:16, 87:9,
98:7, 98:25, 107:14,
108:15, 113:2,
118:8, 121:13,
123:8, 124:25,
125:5, 130:23,
133:5, 150:6,
151:22, 156:12,
158:13
**update** [2] - 164:6,
164:21
**upset** [1] - 67:21
**user** [9] - 59:11, 63:6,
65:10, 74:23, 75:2,
77:13, 83:8, 83:14,
107:17
**usual** [1] - 65:12

**V**

**VA** [3] - 3:7, 3:11, 3:14
**variety** [1] - 152:19
**various** [2] - 152:1,
152:12
**Vayner** [3] - 15:3,
74:17, 81:22
**verbal** [6] - 40:10,
40:21, 54:18, 99:18,
120:25, 121:3
**verbally** [2] - 102:20,
112:17
**version** [3] - 41:8,
41:9, 63:3
**versus** [1] - 167:7

**via** [1] - 75:17
**vice** [1] - 104:10
**view** [1] - 17:7
**viewing** [1] - 17:17
**violate** [1] - 24:12
**VIRGINIA** [1] - 1:1
**Virginia** [1] - 167:4
**VOGEL** [1] - 1:15
**voice** [2] - 118:8, 163:2
**voicemail** [2] - 124:16, 124:20
**VOLUME** [1] - 1:8
**volunteer** [1] - 61:5
**vowel** [1] - 56:14
**vulgar** [5] - 54:10, 54:15, 125:1, 125:7, 125:8

## W

**wait** [4] - 13:21, 49:21, 68:24, 86:6
**walk** [3] - 58:23, 140:2, 140:12
**walked** [1] - 8:5
**walking** [6] - 133:1, 134:2, 134:15, 134:16, 134:21, 166:8
**walks** [2] - 51:21, 52:1
**wall** [11] - 107:9, 125:17, 133:20, 136:2, 136:5, 136:11, 136:19, 137:2, 137:4, 137:10
**wants** [3] - 124:25, 125:5, 166:7
**Washington** [6] - 1:17, 2:15, 2:19, 2:22, 3:2, 52:9
**watch** [3] - 9:24, 157:7, 157:12
**water** [1] - 102:23
**ways** [1] - 144:1
**weaver** [5] - 159:12, 161:4, 161:22, 162:2, 163:3
**Websters** [1] - 99:16
**Wednesday** [1] - 38:25
**week** [5] - 38:22, 38:25, 39:13, 51:14, 164:18
**whereof** [1] - 167:15
**white** [5] - 41:4, 57:3, 57:6, 57:7, 58:10
**whole** [2] - 91:21, 118:17
**whore** [5] - 104:5,

125:1, 125:18, 125:22, 125:23
**wide** [2] - 136:9, 136:14
**width** [2] - 136:12, 137:1
**Wiehle** [1] - 3:10
**wild** [1] - 96:1
**WITNESS** [32] - 29:4, 29:17, 44:1, 62:1, 85:16, 85:18, 85:20, 85:22, 92:17, 102:8, 114:10, 114:14, 115:12, 116:4, 116:7, 122:24, 123:15, 129:8, 130:7, 134:12, 134:15, 134:19, 135:19, 136:8, 136:21, 152:21, 153:19, 153:22, 154:6, 159:8, 162:11, 165:20
**Witness** [3] - 23:10, 26:8, 115:14
**witness** [26] - 8:3, 10:16, 11:7, 11:10, 11:14, 11:17, 11:21, 20:24, 22:15, 28:23, 29:21, 30:5, 32:20, 33:13, 95:8, 99:14, 101:4, 105:6, 111:7, 111:16, 113:17, 114:22, 115:15, 115:23, 135:4, 167:15
**witness's** [1] - 15:10
**witnessed** [10] - 30:13, 30:16, 30:19, 31:3, 98:23, 99:10, 99:23, 105:16, 106:10, 109:25
**witnesses** [8] - 10:7, 10:11, 10:12, 10:19, 10:22, 24:24, 116:1
**WITNESSES** [1] - 4:1
**witnessing** [1] - 100:2
**word** [13] - 19:17, 52:20, 55:9, 74:11, 79:5, 80:11, 89:13, 90:15, 96:9, 125:22, 125:23, 143:1, 152:10
**wording** [1] - 85:14
**words** [12] - 8:15, 15:23, 35:12, 38:24, 43:17, 55:1, 55:12, 61:23, 65:15, 72:12, 112:9, 125:7
**world** [3] - 12:13,

110:18, 110:21
**worth** [1] - 9:16
**write** [5] - 39:17, 145:5, 150:5, 162:10, 163:16
**writes** [3] - 160:13, 163:22, 164:2
**writing** [4] - 39:2, 39:20, 112:24, 162:24
**written** [13] - 37:1, 40:7, 40:10, 40:11, 40:12, 40:14, 102:20, 103:1, 103:5, 108:14, 112:18, 112:19, 161:1
**wrote** [6] - 37:9, 38:18, 39:7, 39:10, 91:19, 103:12

## X

**XD** [1] - 77:5

## Y

**Y's** [2] - 77:15, 79:11
**year** [20] - 28:3, 48:19, 49:1, 68:1, 84:7, 95:22, 117:9, 117:21, 120:10, 126:23, 140:24, 141:3, 151:19, 151:23, 152:14, 156:25, 157:1, 163:17, 165:10
**year's** [1] - 151:23
**yearbook** [1] - 83:17
**yearbooks** [2] - 90:8, 90:12
**years** [9] - 28:7, 32:14, 35:15, 43:7, 43:13, 109:7, 126:21, 127:12, 128:4
**yellow** [1] - 134:7
**yesterday** [27] - 7:15, 9:11, 12:19, 16:19, 17:1, 27:4, 36:10, 36:16, 37:24, 38:16, 42:21, 44:15, 45:2, 45:16, 47:17, 47:18, 54:17, 54:19, 55:17, 57:12, 99:22, 100:4, 105:25, 106:3, 106:4, 163:4, 164:7
**yesterday's** [1] - 47:16
**you..** [1] - 161:17
**young** [1] - 16:25
**yourself** [8] - 29:16,

34:14, 40:1, 52:20, 55:1, 55:9, 60:11, 159:10
**youth** [1] - 118:4
**yup** [1] - 143:15

## Z

**Zoll** [1] - 2:2
**zoned** [1] - 47:22

186