1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                           :
                                :
              Plaintiff,        :   Civil Action
                                :   No. 1:19-cv-917
         v.                     :
                                :
F.C.S.B., et al.,               :   March 25, 2024,
                                :   9:00 a.m.
                                :
         Defendants.            :
                                :   VOLUME 6 - A.M. SESSION
.............................   :
                                :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:        **Jonathan Fahey, Esq.**
                          HOLTZMAN VOGEL BARAN TORCHINSKY
                          & JOSEFIAK, PLLC
                          2300 N Street NW
                          Suite 643a
                          Washington, DC 20037
                          202-536-1702
                          Email: Jfahey@holtzmanvogel.com

                          **Alison Anderson, Esq.**
                          BOIES SCHILLER FLEXNER, LLP
                          2029-Century Park East
                          Suite 1520
                          Los Angeles, CA 90067
                          213-995-5720
                          Email: Alanderson@bsfllp.com

APPEARANCES:  (Cont.)

2

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

For Defendant F.C.S.B.:     **Kevin Elliker, Esq.**

3

HUNTON ANDREWS KURTH, LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
804-788-8200
Email: Kelliker@huntonak.com


For the Defendants:          **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,         THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,    KINNEY, PLC.
F.T., J.F.)                  1801 Robert Fulton Drive
                             Suite 120
                             Reston, VA 20191
                             Email:  Mk@kinneyesq.com


For the Defendant J.O.:      **Bruce Blanchard, Esq.**
                             ODIN, FELDMAN & PITTLEMAN, PC.
                             1775 Wiehle Avenue
                             Suite 400
                             Reston, VA 20190
                             Email:  Bruce.blanchard@ofplaw.com


Official Court Reporter:     MS. TONIA M. HARRIS, RPR
                             United States District Court
                             401 Courthouse Square
                             Tenth Floor
                             Alexandria, VA 22314

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Plaintiff:

Alex Karras

         Direct examination by Mr. Fahey................. 12
         Cross-examination by Mr. Elliker............... 38
         Redirect examination by Mr. Fahey.............. 59

B.R.

         Direct examination by Mr. Brenner.............. 61

EXHIBITS

On behalf of the Plaintiff:

                                                    Admitted

Number 805......................................... 26
Number 71.......................................... 63

MISCELLANY

Preliminary matters................................. 05
Certificate of Court Reporter....................... 186

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

—— B.R. v. F.C.S.B. ——

5

THE COURT:  Good morning.

(Good morning responses.)

THE COURT:  I hope everyone had an enjoyable holiday weekend.  I know I did.  And we look forward to working through this week.

I have managed to rearrange my schedule so I will not have to leave at three o'clock today, so we'll drive on through three o'clock today.  I will try to find a good time sometime around four, four or five o'clock, whatever, to try to go ahead and take our break for the day.

MR. BRENNER:  Yeah.  I was just going to ask on that.

What's the best time to try to find our morning break too?

THE COURT:  Today?

MR. BRENNER:  Yes, because I'll be doing the examination.

THE COURT:  Well, you control it to a degree.

How long do you think your first witness will take?

MR. BRENNER:  Oh, our first witness --

MR. FAHEY:  Direct, probably half hour.

THE COURT:  Okay.  How long do you anticipate on cross?

And my rule of thumb, typically, when I teach my trial practice class, is that if the direct is 30 minutes, I

B.R. v. F.C.S.B.

6

cannot see a cross being more than 15.

MR. ELLIKER:  I cannot see my cross being more than

15 minutes, Judge.

THE COURT:  Very good.  You could have fit well in

my trial practice class.

And then we have -- I believe someone suggested B.R.

is going to testify after that.

MR. BRENNER:  Yes.  She will resume her redirect.

THE COURT:  Okay.  I've had an opportunity to take a

look at some of the circumstances regarding her deposition.

And suffice it to say that I hope that you all are going to be

in a position to streamline the examination and not have it

take the, I believe, 16 hours that the deposition took.

Am I correct on that?

MR. BRENNER:  I think the deposition was two full

days.  I don't know the exact amount of hours, but yes.

THE COURT:  Okay.  You are in charge of that

deposition, Ms. Rewari?

MS. REWARI:  Yes, Your Honor.  I believe that we

have a lot of ground to cover with Ms. --

THE COURT:  It's all right to cover a lot of ground,

but I can't see why there would be the need.  At least from

what I was able to understand, the deposition ran from

something like nine o'clock in the morning until seven o'clock

at night and it wasn't concluded.

B.R. v. F.C.S.B.

7

And observation of that deposition is there was a lot of information obviously you are entitled to get into, but not a lot of information that was relevant to what we need to decide here.  So I'm hoping that you'll be able to not lose the jury by taking so much time asking questions that have nothing to do with what we need to resolve.

MS. REWARI:  We will do our best to stay on top of things.

THE COURT:  All right.  Are we ready to bring the jury in?

MS. ANDERSON:  Your Honor, we have one more issue to address.  I think it's easy because we're in agreement.

THE COURT:  Promises.

MS. ANDERSON:  That's true.

There was a confusion over one of the statements for Ms. J.S. under redactions that it was -- there was a thought it was her, but it actually is a different student with initials J.S.  So we have agreed upon something, an instruction, that if you're willing to give to the jury --

THE COURT:  What does it say?

MS. ANDERSON:  And I can read that out loud.

THE COURT:  Okay.

MS. ANDERSON:  So you heard from a witness on Friday, Ms. Jayde S.  She was shown four statements and asked questions about them.  Because of confusion over redactions,

—— B.R. v. F.C.S.B.——

8

one of these statements, which pertained to an incident in the cafeteria, was not written by Jayde S but was, instead, written by a different Rachel Carson student with the same initials, J.S.  That statement is Plaintiff's Exhibit 129.

THE COURT:  Okay.  Can you hand that up so I can read it word for word?

MS. ANDERSON:  Yes.

THE COURT:  I'm sure there's no objection.

MR. BATES:  We've agreed to that, Your Honor.

THE COURT:  Very good.

MS. ANDERSON:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. BRENNER:  So what -- the morning break, what did we get?

THE COURT:  We're probably talking about, depending on how you go, 11:00, morning break somewhere around 11:00.

MR. BRENNER:  With Your Honor's permission, when I get to a natural breaking point in that general vicinity, I'll just ask Your Honor, Is this a good time for the morning break?

THE COURT:  Yes.

MR. BATES:  Your Honor, the only issue we had remaining was the motion for production of those Facebook messages that we filed on Saturday night.  I didn't know if Your Honor wanted --

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

9

THE COURT:  I took a look at everything that's going on, and we actually have a bit of a logistical problem because it appears that the order that was issued by Judge Fitzpatrick during the discovery process didn't necessarily coincide with the timing that one would expect that information to be turned over.

Suffice it to say that I believe that plaintiff should have better faith -- not saying they didn't exercise good faith -- better faith disclosed.  But I don't think these circumstances were injurious enough for the Court to impose a restriction on the testimony.

MR. BLANCHARD:  Your Honor, I don't think we were asking for a restriction.  We just wanted to see what the communications were because a witness -- Ms. -- for the record, Bruce Blanchard.

Your Honor, the witness testified on Friday as to what the -- my recollection on the record before me, but what communication she had with the plaintiff.  We would -- we need to confirm whether that's accurate or not.

And these Facebook --

THE COURT:  What you can do, at some point B.R. is going to testify.  And that particularized issue might be better left to the examination of B.R. so the Court can have better ability to sort out sequence of events.

MR. BLANCHARD:  And determine at that point whether

B.R. v. F.C.S.B.

10

they should be turned over?

THE COURT:  Yes.

MR. BLANCHARD:  Thank you.

THE COURT:  All right.  You are going to let Mr. Fahey have something to do here?

MR. FAHEY:  This is my moment, Your Honor.

THE COURT:  All right.  Well, don't relish in it too much, so --

(Jury present.)

THE COURT:  You can have a seat.  Good morning, ladies and gentlemen.

(Good morning responses.)

THE COURT:  Sir, you're looking very dapper this morning.  I tell you, you are looking sharp.

I hope you all had a good weekend as we begin the second week of this trial.  A couple of little things that I want to share with you.

First, I need to give you an instruction that's basically a clarification or a stipulation of things because, as you know, during the course of the trial we've been using initials.  And sometimes the initials overlap, and so we just need to make a bit of a clarification on that.

And also wanted to share with you that I have a little surprise for you for your mid-afternoon break that you might enjoy.  A little anticipation there, but very good.

B.R. v. F.C.S.B.

11

I'll share, and I'm even going to let the lawyers know, I've made enough for you all to have some too.  So, all right.

Ladies and gentlemen, first I need to ask you, were all of you able to live up to the Court's instruction not to discuss the case or any aspect of the case with anyone?

Very good.  And thank you for that.

This is a stipulation -- again, a stipulation is an agreement by the parties that an event is, indeed, true, and you're able to give whatever weight you want to it.  But this is the stipulation that I'm going to read into the record.

You heard from a witness on Friday, Ms. Jayde S. You might recall her; she was the pregnant lady.  She was shown four statements and asked questions about them.  Because of confusion or redactions -- and redactions are things we take out of documents because you should not be concerned with those -- one of these statements which pertain to an incident in the cafeteria was not written by Jayde S., the young lady who testified.

It was instead written by a Rachel Carson student with the same initials, J.S.  That statement is Plaintiff's Exhibit 129.  So stated another way, Jayde S. and J.S. are two different people who were students at Rachel Carson Middle School.

All right.  Very good.

Are we ready to take the next witness?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────────────────── B.R. v. F.C.S.B. ───────────────────

12

        MR. FAHEY:  Yes, Your Honor.  Jonathan Fahey for the

plaintiff.  Good morning, good morning.  The plaintiff calls

Alex Karras.

        THE COURT:  You know, there is a football player by

the name of Alex Karras.

        MR. FAHEY:  We can ask that on -- it's a distant

relative, is my understanding.

        THE COURT:  He played for the Detroit Lions.

        (Discussion off the record.)

        (ALEX KARRAS, Government's witness, sworn.)

        (Witness seated.)

        THE COURT:  Please have a seat, sir.  Listen to the

questions of counsel.  Answer them as best you can.  If you

hear the Court intercede in something, take a moment before

you provide your answer.

        MR. FAHEY:  May I proceed?

        THE COURT:  Yes, sir.

        MR. FAHEY:  Thank you.

                        DIRECT EXAMINATION

BY MR. FAHEY:

Q.    Please state your name.

A.    My name is Alex Karras.

Q.    Mr. Karras, what do you do for a living?

A.    I'm a certified life care planner.

Q.    And for the members of the jury who may not know what

B.R. v. F.C.S.B.

13

that is, what is a certified life care planner?

A.    A life care planner is a -- professionals that list out,

price out medical care that's recommended for individuals that

typically require life-long treatment.

Q.    And before I get into all of your background, were you

engaged to prepare a life care plan in this case?

A.    Yes, I was.

Q.    Ask you a little bit about your background before we get

into substance here.

        What's your educational background?

A.    I have a bachelor's in occupational therapy.

        I also have a national certification in case

management.

        I also have a national certification of

rehabilitation counseling.

        I also have a national certification in Medicare

Set-Aside Allocation.

        I also hold a certification in ergonomics from the

University of Michigan.

Q.    Okay.  And let me go through some of your certifications

and how they may relate to this case.

        So the national certification, you have -- do you

have a national certification of rehabilitation case

management?

A.    Correct.

B.R. v. F.C.S.B.

14

Q.    What did that involve to get that certification?

A.    A case management certification involves studying in the field for about a year under another -- already existing certified rehabilitation counselor.  At the end of my time, my area of discipline was in -- under a number of physical disabilities.

After which, you need to submit basically like a thesis in terms of what you did for the last year, your experience, your work experience.  That gets reviewed by a board.  Then you get permission to take the national certification, which I did, pass a certification, and became certified as a case manager.

Q.    Are you also -- do also have a national certification in rehabilitative counseling?

A.    Correct.

Q.    And what is -- again, what is that?  Just a brief summary of what that entails to get that certification.

A.    It's essentially identical.  You're in the field again. You're working it and studying under an existing certified rehabilitation counselor.  After about a year, again, you submit essentially a thesis to the board.

They review it.  If they feel that your clinical experience meets their requisite criteria, you get the authorization to sit for the national certification, which I did, and pass that certification exam.

Cross - A. Farras

B.R. v. F.C.S.B.

15

Q.    Do you also have a certification in national life care
planning?

A.    Yes, I do.

Q.    And, again, what is that?

      And is that more -- is that directly related to what
you did here?

A.    That's very involved.  It requires about 140 hours of
clinical study.  You're studying various disabilities,
injuries, diagnoses like spinal cord injury, brain injury
management, things like --

      (Reporter clarification.)

      THE WITNESS:  Diagnoses such as traumatic brain
injuries, spinal cord injuries, amputations, et cetera.
You're taking different modules, testing modules, courses, in
various kinds of injuries, chronic, severe, catastrophic
injuries.

      After succeeding and passing all of those individual
examinations, you then sit for national certification
examination, which I did.  You need to submit a life care plan
to the review board of which I used to be a member.  If they
feel that your -- your results, your exam and as well your
submitted life care plan is sufficient, you get certified,
which I did, and became certified some years back.

BY MR. FAHEY:

Q.    Is that life care plan you submitted, is that like a

B.R. v. F.C.S.B.

16

hypothetical or fictitious one, or is it based on a real case?

A.   Well, it's based -- that was based on a real case, yes.

Q.   If you could talk about your experience in the field with respect to life care planning, specifically?

A.   My experience for over the years since the early '80s has been with people with chronic, typically severe and catastrophic injuries.  Many of the people that I've worked with over the years, unfortunately, had severe traumatic brain injuries with spinal cord injuries.  People that can't walk, people with amputations, either singular, one extremity, or sometimes, unfortunately, some people with no extremities.

        So I worked clinically and in the field of rehabilitation with people historically with catastrophic injuries.

Q.   When you say "work with them," in what ways with respect to this field are you working with them?

A.   Well, I did three things.  I case-manage those type of people, individuals with those disorder -- those disorders.  And the case management process is bringing people through the medical process to ensure that they get the kind of care they need continued upon their diagnosis, limitations, and functional deficits.

        As an example, if you happen to be someone and you're missing a leg, my job as a case manager would be to make sure you get to a prosthetist, a physiatrist, get the

—B.R. v. F.C.S.B.—

17

prosthetics that you need, the replacements sockets, silicone

liners that you need, given the fact that now you've lost a

limb and you're relying on a prosthetic artificial device to

walk.  I bring people through that process to get the medical

care that they need.

Q.   And, again, you said -- you -- were you about to say

something?

A.   Well, as a case manger.

Q.   You've been doing this, I think you said since the '80s,

about 40 years?

A.   Yes.

Q.   So how old were you?  Were you eight years old when you

started?

A.   Exactly, I was.

Q.   Okay.  Have you ever done any, like, speaking on -- on

the topic of life care management?  And if you have, if you

could just give a brief summary, not going over all the

speaking?

A.   Yeah, I've given lectures or participated in lectures on

chronic, severe, catastrophic injuries, either as a life care

planner, case manager, or rehabilitation counselor over the

years.  Typically, those are invites of organizations that are

getting people to gather to talk about an injury.  The process

of healthcare delivery within the system for someone with a

catastrophic injury.

─────────B.R. v. F.C.S.B.─────────

                                                                    18

          THE COURT:  Mr. Fahey, when are you going to offer

this gentleman as an expert in --

          MR. FAHEY:  Life care management planning.

          THE COURT:  Any objection?

          MR. ELLIKER:  No, Your Honor, not from the School

Board.

          THE COURT:  Any objection from anyone else?

          MR. FAHEY:  I'll just ask one -- one more question

on the qualifications because I think it goes to the weight of

his testimony, but I'll be able to cut it short at this point.

          THE COURT:  That's fine.  So recognized as an expert

in that so --

BY MR. FAHEY:

Q.   Have you ever testified as an expert in court?

A.   Yes, sir.

Q.   What courts, as a general --

A.   Well, both state and federal courts.

Q.   Approximately how many times?

A.   I don't keep track, but it's been a lot over the years.

Q.   Okay.

A.   A lot.  Hundreds.

Q.   What fields have you been qualified as an exert in?

A.   Life care planning.

Q.   Have you ever been rejected as an expert?

A.   Never.

─B.R. v. F.C.S.B.─

19

Q.   When you testify as an expert, are you typically paid as

an expert?

A.   Yes, sir.

Q.   How much -- what is your current rate for testifying or

for -- for doing the analysis and testifying?

A.   My hourly rate is $325 an hour.  My testimony rate, I

believe, is $3,200 an hour -- a day, rather.

Q.   Were you retained and paid as an expert in this case?

A.   Yes, I was.

Q.   Let me get a little bit more into life care planning as

to what it is and what you generally do, and then we'll get

into the specifics of this case, if that's okay.

         And before we get into that, I think you brought

some materials with you to the stand?

A.   Yes.

Q.   If you could just -- for the record, just say what they

are.

A.   This is the life care plan report that I developed and

submitted back on June 12, 2023.

Q.   I would just ask, Mr. Karras, if you do need to refer to

that, if you -- if you could just -- if we could ask the judge

before you do.  But I just want to -- I noticed you had

materials with you, so anything other than that that you

brought with you?

A.   No, sir.

Cross - A. Farras

B.R. v. F.C.S.B.

20

Q.   Okay.  If you could give the jury just a little bit more color on basically what is life care planning and when does it come into play with respect to injuries?

A.   Well, life care planners get called in cases, again, where people need lifelong care.  And people like yourself, the court system needs an estimate on what the cost is required and recommended by medical experts.

So life care planners like myself speak with those clinical experts, physicians, et cetera, review records.  And based upon the recommendations of treatment made by physician -- physician experts in particular, I price out -- very simply, price out the care that's recommended by those people.

Q.   So basically you just submit sort of an estimate of what cost will be prospectively?

A.   Yes, sir.

Q.   What are types of things -- types of cases where you get involved in?

A.   I get involved in cases where people have severe psychological disorders, neurocognitive disorders due to various reasons, typically traumatic brain injury.  I've done reports on people that can't walk, spinal cord injury -- injuries, people that are blind, people that have no extremities, people that have severe orthopedic maybe neurologic disorders, whether they have severe chronic pain.

B.R. v. F.C.S.B.

Those are typically -- it's probably more, but those are
typically the kind of conditions that require lifelong
treatment, hence a projection of what the lifelong treatment
would be.

Q.    And what's the term "catastrophic injury" with respect to
what you do?

A.    Well, catastrophic injury -- or injuries are people that
have essentially lifelong -- lifelong injuries, and -- but the
residual effect, which is very important to life care
planners, is the residual of an injury or trauma.  I can't
walk, I can't speak, I can't see.  I have severe
neurocognitive deficit, I can't think properly.  I have severe
emotional deficits, can't leave my home.

        There are people that have very disturbing long-term
problems that -- that, fortunately, more people don't have,
but people have them, and they can't function in the community
for physical reasons or for emotional-thinking reasons.

Q.    So could it be both -- just summarizing, both physical or
mental or both?

A.    It could be physical, it could be mental only, it could
be a combination.

Q.    Could you give sort of a just background on how you go
about making your calculations for sort of -- for the general
case, and then we'll take it into here?

A.    Well, my calculations typically are -- again, I'm getting

B.R. v. F.C.S.B.

22

recommendations from treatment by physicians or medical
experts or could be recommendations for surgeries,
recommendations for medications, it could be recommendations
for diagnostics.  Whatever the treatment recommendations are,
we've had them ourselves, I'm sure.  We go to our GP, our GP
says you need to take certain medication for cholesterol or
diabetes.  That's essentially a plan, a treatment plan.

      What I do with those recommendations is I price out
the recommendations made by an expert or a physician like it
did in this case.

Q.  How do you get the numbers?  Like, how do you get -- what
the costs are based upon these recommendations?

A.  Well, based upon the frequency and duration, duration is
obviously over someone's life expectancy.  Based upon the
frequency, like in this case made by Drs. Ryan and Binks, I
sourced the cost for that care using the physicians' fee
reference as well as the medical fees.  I drilled down that
cost relative to where people live because medical care
varies -- the cost of medical care, I should say, varies
depending upon where you live.

      So when a physician makes a recommendation for so
many evaluations a year, I'm pricing out a physician
evaluating somebody at that frequency made on an annual basis
and over lifetime.

Q.  And you were talking about getting information from the

─────B. R. v. F.C.S.B.─────

23

physicians.

         How do you get the information in terms of what form
it comes to you in?  Or forms?

A.   Well, typically, the forms come from really two -- really
two main reasons -- main methods, I should say.  It's from the
medical records that are submitted.  And you'll see that it'll
confirm a diagnoses and problems that people have.

         And as well, physician experts, like in this case
Dr. Ryan and Dr. Binks, the recommendations that they make in
the reports.  So I'm looking at general medical records,
expert records.  And in this case as well, I conferenced with
both Drs. Binks and Ryan to confirm what their recommendations
were that became the basis for the treatment and the plan.

Q.   So "conferenced" meaning -- is that standard that you
would also have conversations in addition to the reports?

A.   It's standard for me.  Not everyone does it, but I do it.

Q.   Let's draw your attention to this case, if you're ready,
and we're going to -- as we go through, probably put some
items on the screen so you'll be able to look to your left or,
alternatively, it would also be part of your report.

         What specifically did you do -- again, did you do a
life care plan for the person that is known as B.R. in this
case?

A.   Yes, I did.

Q.   In doing this life care plan, what specifically did you

B.R. v. F.C.S.B.

24

review to come up with your plan?

A.    I reviewed medical records, and I reviewed the reports

from Drs. Ryan and Drs. Bink -- and Dr. Binks.

Q.    Did you -- you mentioned conferencing.

A.    Yes.

Q.    Did you conference with them?

A.    Correct.  After -- after a review of the records, I

conferenced with both Dr. Binks and Ryan collectively.  And

then, obviously, priced out the care that was recommended by

both practitioners.

Q.    And if I could ask you, without getting into like

specifics, but -- what -- you're talking about Dr. Ryan --

we'll hear from Dr. Ryan later.

        But who is Dr. Ryan in terms of as specialties and

what you -- what did you specifically review?

A.    Dr. Ryan is a clinical psychiatrist.  She was called in

to evaluate B.R.

        Dr. -- Dr. Binks is a clinical neuropsychologist.

He submitted or he tested B.R. in terms of neurocognition, how

well the brain works.

        So I conferenced with both those practitioners in

preparation for submitting this report.

Q.    And you've already mentioned it, and I think the jury

may -- may understand, but what's the point of having a

conferencing of them in addition to just reading a medical

B.R. v. F.C.S.B.

25

report?

A.   Well, for me -- for me, just to make sure that what
people are recommending, is I'm interpreting the
recommendations accurately.  Sometimes there is -- might be a
question about something, although in this case Dr. Ryan was
very explicit.  I just want to make sure that I'm accurately
representing what the experts are recommending for care, which
is why I conference with them.

Q.   And did you ultimately prepare a summary call sheet in
this case?

A.   Yes, I did.

          MR. FAHEY:  If I could approach the witness and show
him what's been marked as -- it's Plaintiff's Exhibit 805.
Your Honor, may I approach?

          THE COURT:  You may.

          MR. FAHEY:  Thank you.

BY MR. FAHEY:

Q.   And I don't want to publish this now, but if you could
just tell the jury just generally what that is and then we'll
sort of go through it.

A.   This is the summary call sheet that lists out by category
recommended care by Drs. Binks and Ryan, and as well as cost
for that care over her lifetime, an estimated 57 years, and as
well a total for that cost over the remainder of her life.

          MR. FAHEY:  Offer Plaintiff's Exhibit 805 into

B.R. v. F.C.S.B.

26

evidence.

            THE COURT:  Without objection?

            MR. ELLIKER:  No objection.

            THE COURT:  Without objection.  You may publish.

            MR. FAHEY:  We don't want to publish it now.  Thank

you.

            THE COURT:  All right.

(Plaintiff's Exhibit No. 805 was admitted into evidence.)

BY MR. FAHEY:

Q.   If we -- you mentioned life expectancy.

A.   Yes, sir.

Q.   Can you explain how that plays into this and also -- it's

a compound question, but how you calculate it?

A.   Well, we use -- life care planners use -- the Center for

Disease Control has an estimate on how long -- our length of

our lives, all of us.  We may not like what they estimate, but

they have an estimate on how long each of us will live.

            So we use that estimation by the CDC, the Center for

Disease Control, to determine the life expectancy of an

individual.  In B.R.'s case, her life expectancy, according to

the Center for Disease Control, is 57 years.  So we use 57

years as a calculation for the annualized cost over her

lifetime.

Q.   Okay.  And I'm going to go through your -- the exhibit

that was just entered, but you also had some more detailed

B.R. v. F.C.S.B.

explanations under each -- each section.

        So if I could ask you -- and if we can pull up the
first section -- and I don't think there's any objection to
this.  There's a section called "Future Medical Care Routine."

        Do you see that?

        It may be on the right, or if it's easier -- or on
your left --

A.   Yes.

Q.   -- or if it's easier to refer to your report, whichever
works.

        Do you have that in front of you?

A.   Yes, sir.

Q.   If you could just sort of walk through it.  And if it's
on the screen -- I don't know if we could make it a little bit
bigger for the jury.  If not, if you could just explain.

        Just going left to right starts "items/service."

        What is that?

A.   Well, as I mentioned earlier, I take the recommendations
made by experts.  In this case, it was Drs. Ryan and Binks.
Dr. Ryan, she's a psychiatrist.  She recommended that B.R.
should be seen on a monthly basis indefinitely throughout her
life by psychiatry.

        So on the left-hand side you'll see the item.  The
item is always what the doctors recommend.  In this case it
was -- all of it was Dr. Ryan and Dr. Binks.  So it begins at

Cross - A. Farras

B.R. v. F.C.S.B.

28

the age of 24, 2023.  It continues for the next 57 years on a
monthly basis, as recommended by Dr. Ryan.

       I source the costing for that, which does vary,
between a physician's fee reference, medical fees, and
Dr. Ward's fee.  She was a treating psychiatrist in this case.
And what I do is, to be fair, and as reasonably and
conservative as possible, I take the average of the cost,
because there's always some disparity.

       I take the average of the cost to be fair, and I use
that average cost on an annual basis, as recommended by
Dr. Ryan.  And over the next -- over the next 57 years, on an
annual basis, it comes out to the cost that we saw before on
the cost summary sheet.

Q.   Which is how much?

A.   For the rest of her life, it's $207,252 for the
psychiatric cost for the rest of her life.

Q.   And for clarification, when you say you take the average,
there's the number that's a per-year average, 2,400, and
beneath that there's a number of 4,872.

       Is that the average of those two?

A.   Yes, sir.

Q.   If we can go to the next slide.  And it's the next -- it
should be the next thing in your report as well.  It will be
to your left, but, also, if it's easier, look in front of you.

       There's something called "projected therapeutic

modalities."

Do you see that?

A.   Yes, sir.

Q.   Just, first, what does that mean?

And then we can go through the chart.

A.   The modalities are things like therapies, individual therapy, psychiatric therapy.  It could be speech therapy, as an example.

In this case, Dr. Ryan had recommended that B.R. required a combination of cognitive behavioral therapy and individual therapy.  They are similar but yet dissimilar.

Cognitive therapy uses a different basis to use cognition and vision -- visual thoughts, if you will.  As well as individual therapy, talk therapy.  Although, you're obviously speaking in both.

But since she made a recommendation for both, what I did was I sourced the costing for both therapies that she recommended.  And, again, my methodology is consistent.

I -- there's always a disparity in the cost, so I take the average of the cost for that therapy.  It's annualized, as recommended by Dr. Ryan for annual therapy, and I take that number and multiply times her life expectancy, which is 57 years.

Q.   Did you do the same thing as with the others?

And just so the jury can see it, there's the numbers

———B.R. v. F.C.S.B.———

30

on the per year.  There's the $14,112, $15,648.

      Did you also take the average of those?

A.   Correct.  And you can see the costing there.  It's kind

of similar.  Some costing is dissimilar, but the costing here

was very close to each other.  But, again, the methodology is

the same.  I think the average of the costing I obtained, to

be as fair and conservative as possible, use that average and

project it over lifetime.

Q.   And back to your Exhibit 805, or our Exhibit 805 from

your report, what's the total amount over B.R.'s lifetime for

the projected therapeutic modalities?

A.   That cost is $848,160 over the next 57 years.

Q.   Okay.  And let's go to the next section of your chart.

And -- it's in your report.

      Next section of this is called "Diagnostic Testing."

      Do you see that?

A.   Yes, I do.

Q.   If we can put that on.

      And what is diagnostic testing?

A.   Diagnostic testing is typically things that physicians

recommend, such as blood work.  It could be MRI scans, CT

scans, x-rays, depending upon the injury.

      In this case, B.R. is taking a few medications.

She'll need at least annual blood studies to make sure that

the medications over time aren't causing an ill effect or a

─── B.R. v. F.C.S.B. ───

31

negative effect, in particular, to her liver.  So you take

those studies once a year, gets interpreted by a PCP or GP or

psychiatry to see if everything is okay with the prescribed

medications.

Q.   You -- on the cost section you have the per-year cost, if

you could see that.

A.   Correct.

Q.   What is the per-year cost?  What is the range?

A.   The range is -- for the one study done, is -- $92 is at

the low end.  The other next low end I found was $118.  So,

again, I take the average of those two costs and project that

average on an annual basis for the next 57 years.

Q.   Going back to Plaintiff's Exhibit 805, what's the total

of that?

A.   That total is $5,985 over the next 57 years.

Q.   And there's a section -- on your -- the next section,

it's called "Medications."

A.   Correct.

Q.   And I think everyone probably knows what medications are,

but I have a specific question about them.

        If you -- what's the difference between -- or what's

a generic medication?

A.   A generic medication typically is an off-label.  It's a

brand name that's out of patent, and they come up with a

generic brand, generic medication, that replicates or closely

—B. R. v. F.C.S.B.—

32

replicates the brand name type of medication.

So there's a generic medication.  There is a brand

name.  Generic medications are typically less expensive than a

brand-name medication.

Q.   And I'm just going to go through -- if we can just go

through each medication on here.

And these medication recommendations, where do they

come from?

A.   Well, these are in the records, and as well Dr. Ryan

confirmed the necessity of these medications.

Q.   If we can go through the -- on this section, the first

recommendation.

What drug is that for?

A.   This is for anxiety.

Q.   And what's the name of the drug?

A.   This is Alprazolam, and it's for -- it's an antianxiety

medication.

Q.   And what is --

A.   And this is the generic for Xanax.

Q.   And this would be a generic?

A.   Correct.  This is a generic for Xanax.

Q.   And is that -- did -- do you choose whether to recommend

the generic, or do you base that on what the doctor says?

A.   That's based upon the records and what physicians

recommend, because there are some people that respond better

B.R. v. F.C.S.B.

33

to brand-name medications, and they'll just stick with those.

So it really -- it's their decision, not mine.

Q.   And the price or cost per year on that, if you could

refer to your --

A.   The annual cost for the generic of Xanax, Alprazolam,

is -- varies between $90.96 and $104.88.  Again, I take the

average of that medication, use that average of that

medication over a lifetime.

Q.   And the -- just going down your chart, what's the next

medication recommended?

A.   The next one is Bupropion, which is the generic for

Wellbutrin.  Again, I sourced the costing for that.  On an

annual basis, that came out to $123.12 versus $132.00.  Again,

I take the average and use that average over the next

57 years.

Q.   And just so it's clear -- I think it's implicit -- but is

this also based upon Dr. Ryan's recommendation?

A.   Correct.

Q.   What's the next drug on your chart?

A.   The next drug is Clonazepam, which is a generic for

Klonopin.  That's, again, an antianxiety medication.  On an

annual basis, again, that varied between $92.16 and $116.40.

Again, I took the average of that medication over the

remainder of her life.

        The next one is Vyvanse, which is a brand name,

─ B.R. v. F.C.S.B. ─

34

which she's currently taking.  The generic -- and I better

spell this because if I pronounce it, you may not come out

with it.  It's L-I-S-D-E-X-A-M-F-E-T-A-M-I-N-E,

Lisdexamfetamine.  And that's the generic for that medication.

And that medication as a brand name -- the brand cost is

between $4,340.88 and as well $4,352.16.  Again, I use the

average over her lifetime.

Q.   And you said this was a brand name versus a generic?

A.   Yes, sir.

Q.   Can you explain why brand name versus a generic?

A.   Well, that's what she was current -- that's what she was

taking at the time the report was written.  That was the

medication preferred or recommended by Dr. Ryan.  So I left it

in as that medication to use over the course of her lifetime.

Q.   Going back to your Plaintiff's Exhibit 805, what is the

total amount based on your calculations of the medications

recommended by Dr. Ryan in this case?

A.   The medication cost over her lifetime is $266,547.96.

Q.   The next section you have is called "Facility Care."

        Do you see that?

A.   Yes, sir.

Q.   What is facility care -- I think most people understand

it, but if you can -- in terms of the way you analyze it, what

qualifies?

A.   Well, the recommendations from Dr. Ryan were that B.R.

B.R. v. F.C.S.B.

35

required a variation of hospitalization-,

institutionalized-type care.  She has a -- and she was

hospitalized in the past for both psychiatric condition, her

PTSD that was -- posttraumatic stress disorder -- diagnosed by

Dr. Ryan as well as an eating disorder.  So Dr. Ryan

recommended inpatient care and outpatient intensive care for

both conditions.

So the first is for the posttraumatic stress

disorder, the emotional aspect of her injuries, and her

residual problems is a -- is a 30-day inpatient

hospitalization twice over the next 57 years.  And that cost

annually, as you could see, range from $1,657.89 and

$1,676.84.  Again, same methodology.  Took the average of that

cost, and it's averaged over her lifetime.

As well she has an eating disorder.  Dr. Ryan

recommended at least one inpatient stay, a 30-day stay at a

facility that specializes in eating disorder treatment.  That

cost for that treatment amounted to an average of $881.58 over

her lifetime.

Again, Dr. Ryan had recommended often when -- when

patients are in an inpatient program in a transition of going

back in the community, rather than going straight into the

community where people can fail on their success, you go into

transition programming.

She recommended insensitive outpatient programming.

B.R. v. F.C.S.B.

36

And there were -- she recommended three to four hours daily,

and that amounted to 21 sessions over a lifetime.  And you can

see that average is -- ranges between $92.11 and $147.37.

Again, I took the average of that over her lifetime.

Q.    And your last section, "Residential Treatment"?

A.    The last -- the last one is a -- is a -- like a

psychiatric residential -- you're in a facility.  This is a

residential program for eating disorder.  And it was

recommended to -- 30 to 60 days over life expectancy.  I use

an average of 60 days over life expectancy.

         I took the average of the costing, you can see

below.  And that amounted -- or the average amounted to $1,000

per year.  Estimated over 57 years.

Q.    The next one is -- what is this, transcranial magnetic

stimulation?

A.    Correct.  This is --

Q.    What is that?

A.    This was, again, recommended by -- by Dr. Ryan.  This is

a head harness that people wear.  And the theory is, through

magnetic impulses to the brain, you can soften the -- the

deleterious or the negative effects of emotions.  And that

treatment was recommended five times weekly for an estimated

four to six weeks, which was only 25 sessions over 57 years.

And that cost range between, as you can, see $98.68 and

$131.58 over -- estimated over a lifetime.

─B. R. v. F.C.S.B.─

37

Q.   And is that the last one in the section of facility care?

A.   Yes.

Q.   Okay.  If we can --

A.   Well, that's acute medical intervention.

Q.   Yeah, acute medical intervention.

         Okay.  What was the total number, going back to Exhibit 805 of facility care?

A.   I'm sorry.  I forgot that.  $209,115 for the facility care over the next 57 years.  And I just mentioned the medical intervention, the transcranial magnetic stem programming. That amounts to $6,562.50 over her lifetime.

Q.   Okay.  The final part on your -- on your chart is potential medical surgical care?

A.   Yes.

Q.   And what was the amount that you figured for that?

A.   Well, that came at -- that's -- there's no -- there's no cost for that.

         The reason is, in speaking with Dr. Ryan, it was -- I guess she wasn't certain that that was a necessary absolute treatment.  So to be fair, I put it in there so you could see what the cost would be, but it's not part of the overall cost for B.R. over her lifetime.

Q.   So you have that as a zero?

A.   Yes, sir.

Q.   Okay.  I'd like to put Plaintiff's Exhibit 805 on the

screen.  And this is what you've been discussing overall.

        Do you have that in front of you?

A.    Yes, I do.

Q.    And is this -- what just -- again, just what does 805

say?  Or what -- what is it?

A.    This is the cost over the next 57 years for all of the

treatment that we just went through, recommended by Dr. Ryan.

This amounts to $1,543,622.46 of treatment, overall treatment,

collective treatment over the next 57 years.

Q.    And just -- just for clarification, was all of this,

these calculations, based on information provided by Dr. Ryan

in this case?

A.    Yeah, unequivocally -- each item in this plan, every one,

was recommended by Dr. Ryan.

Q.    Are your opinions, or your analysis, are they based on a

reasonable degree of certainty in your field?

A.    Yes, sir.

        MR. FAHEY:  No further questions.  Thank you, Your

Honor.

        THE COURT:  Cross.

                    CROSS-EXAMINATION

BY MR. ELLIKER:

Q.    Good morning, Mr. Karras.  How are you?

A.    Good morning, sir.  How are you?

Q.    Oh, I'm good.

─B.R. v. F.C.S.B.─

My name is Kevin Elliker, and I'm here on behalf of Fairfax County School Board.

I'll start where Mr. Fahey ended.  Your opinion is that the plaintiff will need $1.5 million for her future psychiatric care; is that right?

A.   Correct.  It's recommended by Dr. Ryan, correct.

Q.   And that's the care that's going to be required over the next 57 years?

A.   Correct.

Q.   Until she's 81 years old?

A.   Correct.

Q.   Now, you're aware that the conduct in question in this case took place between 2011 and 2012, right?

A.   Correct.

Q.   So that's about 12 years ago?

A.   Correct.

Q.   So tell the jury how much the plaintiff has spent on psychiatric care over the last 12 years?

A.   I don't know that number.

Q.   Okay.  Wouldn't that be important to know to project out future cost?

A.   Not necessarily.

Q.   You don't think it's important to know what she spent on care in the past for these conditions in order to determine what she should spend in the future?

—B.R. v. F.C.S.B.—

40

A.   No.

Q.   Okay.  And I have a few questions about what you do generally as a life care planner.

In every case, do you analyze all the available medical records?

A.   The records that come in, yes.

Q.   All the available medical records?

A.   Well, it depends on all the available medical records, but the records reviewed in this case pertain -- pertain to the psychiatric care provided by Dr. Ward who is a treating psychiatrist.  But, again, the report was -- heavily relied on the very extensive syntax analysis that Dr. Ryan did and her recommendations for care.

Q.   Okay.  In every case, do you analyze educational records?

A.   Not in every case.

Q.   Okay.  Do you analyze employment records in every case?

A.   No, not a vocational expert.

Q.   And in every case, do you interview the client?

A.   Not every case.

Q.   In every case, do you interview the client's family?

A.   Not every case.

Q.   In every case, do you interview the client's treating physicians?

A.   No.

Q.   Okay.  In fact, those things I just went through, you

Redirect - A. Farras

—— B.R. v. F.C.S.B. ——

41

didn't do those in this case, did you?

A.   That is correct.

Q.   You didn't review any medical records that predated 2018;
isn't that right?

A.   Correct.

Q.   And that means that there's a six-year gap in medical
records between the events in this case and the records that
you reviewed for making your plan?

A.   For the most part, that's correct.

Q.   And you didn't review any of her educational or
employment records?

A.   Correct.

Q.   And you didn't interview the plaintiff herself or anyone
in her family, did you?

A.   No.

Q.   And you didn't speak with any of her treating physicians?

A.   No.

Q.   And I want to clarify something.  You understand the
difference between a clinical physician and a forensic
physician?

A.   Correct.

Q.   You correct me if I'm wrong, but clinical generally
refers to someone who's treating the patient, right?

A.   Correct.

Q.   Now, you've mentioned Dr. Ryan and Dr. Binks.

─────────B. R. v. F. C. S. B.─────────
42

          Neither one of those are treating physicians for the
plaintiff, right?

A.    That is correct.

Q.    You also mentioned Dr. Ward as a treating physician.

          Do you know when Dr. Ward started treating the
plaintiff?

A.    I think somewhere around 2020 or somewhere around there.

Q.    Do you know the --

A.    It's probably in my report.

Q.    Okay.  Do you know the last time that the plaintiff saw
Dr. Ward?

A.    After a couple years of treatment, if I'm not mistaken.

Q.    Now, you're familiar with your own website, right?

A.    Correct.

Q.    Now, don't you advertise on your website that those
things we just discussed you do in every matter?

A.    I do what in every matter?

Q.    Well, we can go back through them.

          Analyze all available medical records, analyze
educational records, analyze employment records, interview the
client, interview the client's family, interview the client's
treating physicians.  Those things, don't you say on your
website that you do those in every matter?

A.    It depends on the case.

Q.    Would it help you to look at your website to confirm

—B.R. v. F.C.S.B.—

that?

A.   No.  But it depends on the case.

Q.   All right.  So if -- if it is true that you say on your
website that you do that in every matter, then the statement
on your website is not true?

A.   Well, that would be inaccurate because it depends on the
case.

Q.   Your website doesn't -- well, if your website says in
every matter you do those things --

        MR. FAHEY:  Your Honor, objection.  Asked and
answered.

        THE COURT:  Sustained.

BY MR. ELLIKER:

Q.   You prepare between 150 and 200 of these reports every
year; isn't that right?

A.   That's an estimate, yes, sir.

Q.   Okay.  And how many of those reports do you do the steps
that you advertise on your website?

A.   I don't know the correlation between one or the other.
They come into the office.  Whether they come because of the
website, what I've done in the past, I can't make that
differentiation.

Q.   I want to ask about some of the assumptions that you
made, putting into your report.

        You're aware that the -- well, back up.

Redirect - A. Farras

─B. R. v. F. C. S. B.─

44

The conditions that you were told about by Drs. Ryan and Dr. Binks included sadistic torture and multiple rapes, correct?

A.    Correct.

Q.    That you were told that the plaintiff was tortured with lighters, right?

A.    Correct.

Q.    And you were told that her abusers cut her on her thighs?

A.    Correct.

Q.    You were told that the plaintiff estimated that while she was in 7th grade she was raped over 50 times by one person?

A.    Correct.

Q.    And you were also told that the plaintiff estimated that she was raped by groups of men another 20 times, right?

A.    Correct.

Q.    And you also were told that the plaintiff sustained head injuries when her head was banged against a wall during rapes committed by groups of men, right?

A.    That is correct.

Q.    And you were told by Dr. Ryan that she has a traumatic brain injury?

A.    That is correct.

Q.    And that she has PTSD, or posttraumatic stress disorder?

A.    Correct, sir.

Q.    And major depressive disorder?

—B.R. v. F.C.S.B.—

45

A.    Yes.

Q.    And an eating disorder?

A.    Correct.

Q.    And those four condition, the TBI, PTSD, major depressive

disorder, eating disorder, those are the four conditions that

you're pricing out treatment for, right?

A.    Correct.

Q.    Okay.  And if Dr. Binks said it, you took it as true?

A.    Correct.

Q.    And same thing with Dr. Ryan?

A.    Yes, sir.

Q.    You also assumed that those four conditions that they

told you about are all attributable to the events that are at

issue in this case?

A.    That is correct.

Q.    And you also assumed that none of those conditions were

preexisting before the plaintiff -- before the allegations

that are at issue in this case?

A.    That is correct.

Q.    Now, you went over those treatment plans, and it's fair

to say that all the treatments that are identified in your

plan are for psychiatric conditions?

A.    Psychiatric and physical.  An eating disorder will be

physical, but it stems from a psychiatric condition.

Q.    Okay.

MR. ELLIKER:  Your Honor, if I can -- may I approach?

THE COURT:  Yes.

BY MR. ELLIKER:

Q.   Mr. Karras, if you could -- please don't read it out loud, but if you could review page 121, line 16.  Let me stop.

You were deposed in this case, correct?

A.   Yes, sir.

Q.   And at that deposition you were asked questions?

A.   Correct.

Q.   And there was a court reporter there?

A.   Correct.

Q.   And you swore to tell the truth?

A.   Correct.

Q.   And did you tell the truth?

A.   Yes.

Q.   Okay.  Now, please take a look, without reading it, at page 121, lines 16 through 21.

And let me know when you've read it.

A.   Got it.

Q.   Now, is it fair to say that all the treatments that are listed in the summary cost and are in your plan are treatments for psychiatric conditions?

A.   Psychiatric conditions of which she also has other disorders.  The eating disorder stems from a psychiatric

—— B.R. v. F.C.S.B. ——

47

condition.  Typically, people either don't eat at all or some

people that overeat have an eating disorder.  They don't do it

because they wake up some day and say, I think I'm going to

not eat for the next whatever.

It stems from a psychiatric condition, usually

depression, anxiety.

Q.   Sure.  Okay.  Thank you for that clarification.

A.   You're welcome.

Q.   Is it possible to look at your treatment plan and isolate

which of the costs are specific to PTSD versus depression?

MR. FAHEY:  Your Honor, he's asking to speculate.

Is it possible?  You know, certainly everything is possible.

It's reasonable --

THE COURT:  Why don't you -- okay.  Just no speaking

objections.  So just -- the objection is lack of foundation.

So --

MR. FAHEY:  Thank you, Your Honor.

THE COURT: -- that's sustained.

BY MR. ELLIKER:

Q.   Well, in your report on the -- the slides we just looked

through, on those charts it identifies which conditions the

treatment recommendations pertain to, correct?

A.   Correct.

Q.   And that portion of your report doesn't slice out this is

for PTSD versus this is for depression, right?

B.R. v. F.C.S.B.

48

A.   Correct.  But if you look at the primary disability, you will see PTSD, posttraumatic stress disorder.  And that was as noted by Dr. Ryan, with dissociative behaviors, as well, major depression, as well, TBI and anorexia.

So those are the conditions -- if you look at -- it says, "Primary disability."  You'll see all of those definitions there on the top right.  So the basis for the plan is a nexus of these problems.

Now, what came first?  That's a question for Dr. Ryan.  What's more involved and more severe or taking over on a daily basis, one that's more problematic?

I really can't answer that.  That's a Dr. Ryan condition.  But the plan is developed of a nexus, a conglomerate of these number of diagnoses.

Q.   Right.  And that conglomerate, that's a very specific -- you said "conglomerate."

A.   That's a terrible word, by the way, but I didn't know what else to say.  It's a terrible word.

Q.   We'll say a very specific grouping of conditions.

A.   Correct.

Q.   And those conditions are identified by others?

A.   Correct.

Q.   And it requires the very specific life care plan that you've put together for that group of conditions?

A.   Correct.  But I think your question, though, is

misleading.  You know, you're trying to really -- you're

trying to use a scalpel, if you will, and very narrowly define

things.

You know, when you have neurocognitive disorders,

you also have personality defects and you have emotional

disorders.  So there's overlay of these conditions.  Again,

I'm going to give you this, not necessarily as a layman, but

Dr. Ryan can better explain this.  But there's an overlap of

these conditions or these symptoms.

Q.   But you're not a medical doctor, right?

A.   Precisely.

Q.   Right.

A.   That's why Dr. Ryan would be a better person to answer

these questions.

Q.   Right.  So if it were determined that the plaintiff does

not have posttraumatic stress disorder but she does --

MR. FAHEY:  Your Honor, object to foundation.  It's

also beyond his expertise, hypothetical --

THE COURT:  Let me hear the question before I rule

on it.

Don't answer the question, sir, until I hear the

question.

BY MR. ELLIKER:

Q.   If it were determined that the plaintiff does not have

PTSD but she does have mayor depression, your life care plan

Redirect - A. Farras

─ B. R. v. F.C.S.B. ─

50

doesn't address what would be necessary for her future care,

does it?

        THE COURT:  The objection is overruled.

        You can answer.

BY MR. ELLIKER:

Q.   What was your answer?

A.   Again, I think you're splitting a hair, because having

major depression -- again, this is really a question for

Dr. Ryan -- having major depression can lead to these other

kind of behaviors as well.

        There are people who are majorly depressed that

don't leave their home, that don't eat, that try to take their

lives, aside from having posttraumatic stress disorder with

the conditions that Dr. Ryan had listed.

Q.   Well, sir, I'm asking a particular question about what

your report says.  So I'll say it again.

        If it were determined that the plaintiff does not

have PTSD but she does have major depression, your life care

plan doesn't address what would be necessary for her future

care, does it?

A.   Well, I think it does.

Q.   Okay.  Take a look --

A.   As an example, you're not going to therapy, individual

therapy if you don't have depression or anxiety.  She's taking

medications.  Why?  Because she is anxious and depressed.

───────B. R. v. F. C. S. B.───────

51

So, again, you're kind of like -- it's a bit
misleading, that question.  I'm not trying to be difficult,
but it actually doesn't make sense to me.

Q.   Okay.

(Counsel confers.)

BY MR. ELLIKER:

Q.   You still have your deposition there?

A.   Yes.

Q.   Could you please take a look at page 98, lines 1 through
5?

Let me know when you've read that.

A.   Hold on a second.  98?  Yes, sir.

Yes.

Q.   Okay.  Let's assume that the plaintiff does not have
PTSD, but she does have major depression.

Does your life care plan account for the treatment
that she would need in that circumstance?

A.   Well, again, I think -- I see the answer here.  I don't
think I understood that question as thoroughly as you're
asking it now.

But, again, there was treatment in this plan for
these multiple conditions, and there's an overlay in the
symptoms and the results of the condition.  That's what's been
addressed and recommended by Dr. Ryan.  It's, quite frankly,
the best answer I can give you.

─ B. R. v. F. C. S. B. ─

52

Q.   Okay.

        MR. ELLIKER:  I'd like to read, Your Honor.

BY MR. ELLIKER:

Q.   "QUESTION:  Let's assume she does not have PTSD but she

does have major depression.  Do you have a separate condition

in your life care plan for treatment only for major depression

but not PTSD?

        "ANSWER:  No."

        That's what you said in your deposition?

A.   Correct.  And what I'm saying to you now is you're not

going into a facility for anxiety, depression, as recommended.

You're not getting medication as prescribed if you don't have

depression.

        So I'm saying to you -- and I apologize, I didn't

understand the question then, and you're asking it very

differently now, in my opinion.

        You're not getting that treatment if you

don't have -- you're not taking antidepressant medication if

you're not depressed.

Q.   Now, you've priced out the psychiatric assessments for

the plaintiff in your life care plan, right?

A.   Yes, sir.

Q.   And that's 12 times a year every year for the next

57 years?

A.   Correct.

B.R. v. F.C.S.B.

53

Q.    And you mentioned Dr. Ward as a treating physician.

You didn't talk to Dr. Ward, did you?

A.    No, she was no longer treating her at the time.

Q.    Okay.  And you also priced out twice weekly visits to a

therapist, right?

A.    Correct.

Q.    And you estimated that about 96 times per year?

A.    Well, I didn't do it -- well, I did it for 40 weeks, not

52 weeks.

Q.    Sure.

A.    Right.  So 96 times a year for the next 57 years.

Q.    Okay.  And you don't account for the possibility that the

plaintiff could improve with therapy, do you?

A.    No, that's not what was recommended.  That could happen.

Q.    Okay.  And did you look at the plaintiff's records to see

if she has ever been to a therapist 96 times in one year?

A.    I know she was treating with -- with a licensed counselor

at -- actually, I think it was a more frequent basis at that

point.

Q.    Okay.  So -- but do you know whether that was 96 times a

year?

A.    Well, let's look at something for a second so I can

answer that.

She was treating with Cristina Trahan for diagnose

of chronic --

─── B.R. v. F.C.S.B. ───

54

Q.   Well, hold on a second, sir.

          THE COURT:  So don't read aloud.  If you need

something to refresh your recollection, just read it to

yourself.

          THE WITNESS:  She was treating twice weekly with a

licensed psychologist.

BY MR. ELLIKER:

Q.   Okay.

A.   Obviously, that would be more than, you know, 96 sessions

a year.

Q.   And you also priced out the four different medications

you mentioned.

A.   Yes, sir.

Q.   The most expensive one of those was Vyvanse.

A.   Yes, sir.

Q.   And you attribute that as treatment for eating disorder;

isn't that right?

A.   Correct.

Q.   Okay.  Now, who told you that that's what that medication

is for for the plaintiff?

A.   Likely Dr. Ryan.

Q.   Now, you're aware that Vyvanse is also used to treat

ADHD?

A.   Correct, and depression and eating disorder.

Q.   Right.  And with respect to Vyvanse's use for eating

—— B.R. v. F.C.S.B. ——

55

disorders, you're aware that Vyvanse is an appetite

suppressant, right?

A.    I'm not sure of that.

Q.    Okay.  Are you aware of the type of eating disorder that

the plaintiff has been diagnosed with?

A.    Well, bulimia.

Q.    You're sure about that?

A.    I think -- I'm sorry, anorexia.  I'm sorry.

Q.    Now, with someone with anorexia -- well, we can ask an

expert.

        The blood work that you mentioned, once a month,

every month, for the rest of her life, right?

A.    Hold on a second.  I think there's a mistake.  I just

want to make sure we're talking the same thing.

        Blood work is not once a month.  It's once a year.

Q.    I'm sorry.

        Is that different from blood work that might be done

at an annual physical?

A.    It could be.

Q.    Could you clarify?

A.    It depends what you're testing for.  And, again, you're

asking me questions -- as you mentioned, I'm not a doctor.

You asked me questions that Dr. Ryan would be better apt at

answering.  And, again, these are the recommendations that you

made, and I'm giving you the reasoning for it, but I would

confirm that with Dr. Ryan.

Q.   Okay.  Fair enough.

         So we can cut to the chase, then.  You're not making
any assertion that the plaintiff, in fact, has the conditions
that you've been asked to consider the price of treatment for,
correct?

A.   Correct.

Q.   And you're not making any assertion as to the certainty
that the plaintiff is going to need any of this treatment,
right?

A.   This is -- that's not my opinion; it's Dr. Ryan's
opinion.

Q.   Right.  And -- and Dr. Ryan is a paid expert, right?

A.   I believe so.

Q.   Okay.  And Dr. Binks is a paid expert, right?

A.   I believe so.

Q.   And you're relying entirely on their opinions for the
pricing that you've done?

A.   Yes, sir.

Q.   So if Dr. Ryan's or Dr. Binks' conclusions are wrong,
then your report is wrong too, right?

A.   Hypothetically, it could be the case.

Q.   Okay.  Now, last topic.

         You mentioned that your hourly rate is $325 an hour?

A.   Correct.

—————B.R. v. F.C.S.B.—————

57

Q.   And you're being paid $3200 per day for testimony?

A.   I believe that's the case.

Q.   Okay.  Do you know how much you've been paid so far in
this case?

A.   I do not.

Q.   Well, it's more than $14,000, right?

A.   It probably is.  I don't know.

Q.   Okay.  You -- why don't you refresh your recollection by
looking at page 58 of your deposition, lines 14 through 20.

A.   I'm sorry.  What page?

Q.   58.

A.   Okay.  Thank you.

        58.  Okay, I'm there.

Q.   Line 14 through 20.

A.   I -- I'm sorry.  Hold on.  Okay.

        Yes, sir.

Q.   Okay.  So by the time of your deposition, had you been
paid more than $14,000?

A.   Well, according to here, it's $14,500.

Q.   Okay.  And that was by the time you were deposed?

A.   Correct.

Q.   And today it's another $3200?

A.   Correct.

Q.   So we're getting close to $20,000?

A.   Correct.

Q.   All right.  And you didn't conduct any investigation into what the plaintiff claimed happened to her?

A.   No.

Q.   And you have no evidence that any of the defendants in this case are responsible for the plaintiff's injuries, do you?

        MR. FAHEY:  Objection, Your Honor.

        THE COURT:  Sustained.

        Outside the scope of his expertise.

BY MR. ELLIKER:

Q.   What you did was you took the list of conditions given to you by the two other experts and put a dollar figure next to it, right?

A.   I think I said that a couple of times, yes.

Q.   Okay.  And you've been paid about $20,000 for that?

A.   About that number, I guess, so far.

Q.   Okay.

A.   Thank you.

        MR. ELLIKER:  Thank you, Your Honor.

        THE COURT:  Mr. Kinney?

        MR. KINNEY:  I have nothing to add, Your Honor.

        THE COURT:  Mr. Blanchard?

        MR. BLANCHARD:  No, sir.

        THE COURT:  Redirect.

        MR. FAHEY:  Thank you, Your Honor.

B.R. v. F.C.S.B.

59

REDIREDT EXAMINATION

BY MR. FAHEY:

Q.   Defendant's counsel asked you about whether or not you
interviewed the plaintiff in this case?

A.   Correct.

Q.   And your answer was "no"?

A.   Correct.  It's "no."

Q.   And why was that?

A.   Well, this is -- this is a very difficult topic.  I don't
feel it's in my purview, my expertise, my professionalism to
interview a young woman or young anyone regarding this kind of
situation in the past.  I'd be afraid -- quite frankly, I'd be
afraid that I can unearth some bad reactions, and I don't want
to be in that position.  I don't think it's fair to the person
to do that, so I've elected to not interview B.R.

Q.   He asked you about past medical expenses.

          Is your job to review past medical expenses?

A.   Not always.  It depends on the case.

Q.   Did you think it was necessary in this case?

A.   Well, yeah, like I said before, I mean, like I -- I
reviewed Dr. Ward's records very -- you know, very accurately.
Dr. -- Dr. Ryan did a very extensive review.  I think she
interviewed B.R. like over 15 hours and interviewed family
members.  And she did a very extensive record review.  I
relied on the information that Dr. Ryan had reviewed and her

B.R. v. F.C.S.B.

60

opinion.

Q.   He -- defendant's counsel asked if B.R. could get better

from these conditions; is that right?

A.   Correct.

Q.   Or that question.

Could she also get worse?

A.   Unfortunately, yes.

Q.   All of your opinions that you testified to, again,

they're within the area of this life care planning, not

medical, right?

A.   Correct.

Q.   Were they, all of your opinions with respect to that, to

a reasonable degree of certainty within your field?

A.   Yes, sir.

MR. FAHEY:  Okay.  No further questions, Your Honor.

THE COURT:  Thank you.

Is this witness subject to recall?

MR. FAHEY:  Not from us, Your Honor.  We -- we --  I

think he has somewhere to go, as we discussed before, so

hopefully not from them.

MR. ELLIKER:  No, Your Honor.

MR. BLANCHARD:  No, Your Honor.

MR. KINNEY:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.  You're free

to go.  During the pendency --

B.R. v. F.C.S.B.

61

THE WITNESS:  Thank you.

THE COURT:  -- of the case, please do not discuss the case or any aspect of the case with anyone.

(Witness excused.)

THE COURT:  Next witness.

MR. BRENNER:  We would call B.R. to the stand.

(Plaintiff's witness, B.R., was previously sworn and reseated.)

MR. BRENNER:  May it please the Court.

THE COURT:  Just a second.

(An off the record discussion.)

DIRECT EXAMINATION (CONTINUED)

BY MR. BRENNER:

Q.   Good morning again.  Can you just reintroduce yourself to the jury?

A.   Good morning.  My name is B█████.

Q.   Okay.  Where we left off, I guess it was last Thursday. We had -- I got up and to the point where you were about to start Rachel Carson Middle School, okay?

A.   Yes.

Q.   So I'm going to start from there.

MR. BRENNER:  May I publish Plaintiff's Exhibit 804, which I believe is in evidence?

THE COURT:  Yes, it's in.  You may publish.

BY MR. BRENNER:

─B.R. v. F.C.S.B.─

62

Q.   Who is that?

A.   That's me.

Q.   Can you see the screen there?

A.   Yes.  Yes, sorry.

Q.   That's you?

A.   That's me, yes.

Q.   Okay.  Is -- when you started middle school at Rachel
Carson, how old were you?

A.   I was 12 years old.

Q.   Okay.  Can you estimate about when that picture was from?

A.   I think I was around 11 years old.

Q.   Okay.  All right.  Okay.  So let's talk about you at that
age, starting Rachel Carson Middle School.

         MR. BRENNER:  You can take that down, please.

BY MR. BRENNER:

Q.   If you look in your -- the binder I just gave you.

A.   Uh-huh.

Q.   Exhibit 71.

         MR. BRENNER:  Your Honor, I'm going to move the
screen away from her, if that's okay.

         THE WITNESS:  71, you say?

BY MR. BRENNER:

Q.   Yes.

A.   Okay.

Q.   Do you recognize that document?

A.    I do.

Q.    Okay.  Without -- without reading it, just briefly,

just is it -- what is it?

A.    It is an email that I sent my guidance counselor,

Ms. H███████.

Q.    Okay.  And what date was that?

A.    That was August 17, 2011.

Q.    And that's right about when you're about to start middle

school?

A.    Yes, right before.

        MR. BRENNER:  Okay.  Your Honor, at this time we

would like to move Plaintiff's Exhibit 71 into evidence.

        THE COURT:  Any objection?

        MS. REWARI:  No objection.

        THE COURT:  Without objection.

(Plaintiff's Exhibit No. 71 was admitted into evidence.)

        MR. BRENNER:  Permission to publish?

        THE COURT:  You may.

BY MR. BRENNER:

Q.    Okay.  You have it in front of you.  It's -- who is

bah███████@fcps.edu?

A.    That's B██████ H██████.

Q.    And the email says -- it says, "It was so great seeing

you this morning."

        Do you see that?

B.R. v. F.C.S.B.

64

A.    Yes.

Q.    Okay.  Do -- what was the occasion that you saw

Ms. H█████ that morning?

A.    If I recall correctly, there was an orientation that I

went with my mom to the school, and Ms. H█████ was there.

Q.    At -- at Rachel Carson?

A.    Yes.

Q.    And is this in the days leading up to the beginning of

the school year?

A.    Yes.

Q.    Okay.  The next line says, "I'm so excited to attend

RCMS."

        Is that Rachel Carson Middle School?

A.    Yes.

Q.    "And can't wait for the school year to start."

        Do you see that?

A.    Yes.

Q.    You told us on Thursday that you were -- you were a

kid -- and we were talking about Forest at the time.  You were

a kid who -- who liked school, right?

A.    That's correct.

Q.    Were you, in fact, excited to start Rachel Carson?

A.    I was very excited.

Q.    Remind the jury, you had some interaction with Rachel

Carson before you started there, right?

A.   I did.

Q.   And what -- how was that?

A.   It was positive.  My older brother, Dash, went to Rachel
Carson.

Q.   Okay.  And then you -- you ask her that you had -- you
had -- you said you had one question, right?

A.   Yes.

Q.   And you said, "I have not heard the status about my
placement in chorus."

         What were you talking about there?

A.   I recall that I -- something about scheduling.  I didn't
know if I was going to be in chorus and when that might be in
my schedule, and that was really important to me.

Q.   Was chorus an elective or an extracurricular?

A.   It was an elective.

Q.   Did you get in chorus?

A.   I did.

Q.   And you told the jury how you used to like to sing,
right?

A.   Yes.

Q.   Okay.  Does this --

         MR. BRENNER:  You can take that down, please.

BY MR. BRENNER:

Q.   Does that email accurately sort of reflect what your
general feeling was about starting at Rachel Carson?

Case 1:19-cv-00917-RDA-LRV    Document 1047    Filed 08/26/24    Page 66 of 207
PageID# 21485                    Direct - B.R.

B.R. v. F.C.S.B.

66

A.    It did.  I was extremely excited to start at Rachel
Carson.

Q.    Okay.  Now, the -- you mentioned that there was an -- you
recall there being an orientation that day.

A.    Yes.

Q.    The jury has heard from several witnesses now about
orientations or presentations regarding sexual harassment and
bullying.

        Was that day such an orientation?

A.    There is none of that on that orientation.  That
orientation that I was referring to in this email was more
just like kind of a welcome to the school.  I believe that
there was like a tour that was done and my mom was there,
so --

Q.    Okay.  Now, you've seen -- or the jury has seen a
PowerPoint presentation that did talk about sexual harassment
and bullying.

        Were you in the courtroom for some of those times?

A.    I was.

Q.    Okay.  First of all, do you recall -- do you have a
specific recollection of receiving that orientation?

A.    I don't have a vivid recollection of it.  I vaguely
recall maybe, like, spending five minutes or something like
seeing a PowerPoint or something like that in the context of
in, like, a lecture hall, but that's the extent I remember it.

B.R. v. F.C.S.B.

67

Q.   When you say "lecture hall," is that -- is that a

classroom or something bigger than that?

A.   There was something -- I believe it was called like the

Little Theatre or something like that, which basically wasn't

like a classroom but -- I don't even know how to explain it,

but it wasn't a classroom.

Q.   Okay.  So was there -- when you -- I know it's not a

vivid recollection, but your general recollection about this

PowerPoint, was it done with a bigger group of students than,

for example, a classroom size?

A.   That's correct.

Q.   Do you know if it was the whole 7th grade or whole 8th

grade?

        Well, you were in 7th grade, right?

A.   Yes.

Q.   Do you know if it was your whole grade or something

smaller than that, if you remember?

A.   If I remember correctly, I believe it was smaller than,

like, my entire 7th grade class.

Q.   Okay.  Was it with the team that the jury has heard

about?

A.   I think that might be possible.

Q.   Okay.  And do you remember who gave that presentation,

whether it was a teacher or a guidance counselor or an

administrator?

─── B.R. v. F.C.S.B. ───

68

A.    I don't have a recollection.  I feel like maybe it was the guidance counselors, but I'm not 100 percent certain on that one.

Q.    And do you recall being given a test that you had to get -- do you recall being -- let me rephrase it.

      Do you recall taking a test -- you, individually, taking a test following that presentation?

A.    I don't have a recollection of that.

Q.    Okay.  Now, in -- putting aside that you don't have a vivid recollection of -- of the -- what was in that PowerPoint, do you remember Rachel Carson, either whether it be guidance counselors, teachers, administrators, telling the students that Rachel Carson had a zero tolerance for bullying?

A.    I don't recall that.

Q.    Okay.  Do you remember either the teachers, the guidance counselors, or the administrators telling the students if they had a problem -- for example, a problem with bullying.

      Let's just start with that -- what was the process to go through to get that problem addressed?

      Do you remember learning that?

A.    I recall at some point knowing that there was some, I guess, basic grievance process or what to do, I guess, if you had some sort of issue.

Q.    And whether -- and I'll include bullying and sexual harassment or unwanted touching, anything like that.

B.R. v. F.C.S.B.

69

            What was your understanding of what the school

taught the students they were supposed to do if they were

experiencing that?

A.    My understanding was that you could tell your teachers

about it, who then could, I guess, refer you to the guidance

office, like give you a pass to go to the guidance office.

            You could then speak to your guidance counselors.

They were really the direct point of contact if there was any

issue.

Q.    And your guidance counselor was who?

A.    B█████ H███████.

Q.    Okay.  And that's an assignment made by the school?

A.    That's correct.

Q.    Could you go directly to the -- was there an office where

the guidance counselors sat?

A.    Yes.

Q.    Okay.  Was it near -- the jury has seen this already,

but, just for the record, was it in the same sort of wing of

the school where the principal sat?

A.    Yes.

Q.    Okay.  Was there an ability that you could go fill out a

slip yourself, like before school or at some point that you

could directly try to see your -- give a slip that would go to

your guidance counselor?

A.    Yes.

B.R. v. F.C.S.B.

70

Q.   Okay.  So a teacher could give you a pass to go to the
guidance counselors, one way?

A.   That's correct.

Q.   Or you could try to fill out one of those slips?

A.   Yes.

Q.   And what was your understanding of -- if you filled out a
slip, in your case for Ms. H█████, what was supposed to
happen next?

A.   That your guidance counselor was either supposed to come
get you from class or maybe they might write to your teacher
and say, like, Hey, I'm pulling so and so out of class.

         That was my two understandings of it.

Q.   So either the guidance counselor could come directly to
class and take you out.

         Is that one?

A.   Uh-huh.

Q.   You have to say "yes" or "no."

A.   Sorry.  Yes.  Sorry.

Q.   That's okay.

         Or they could essentially ask the teacher to send
you down?

A.   Yes.

Q.   Okay.  And what was your understanding, based on what the
school told you, about the -- you called the grievance
process, but the -- how do you get things addressed?

What was your understanding of how quickly after you requested to see a counselor you were supposed to see the counselor?

A.   I was pretty sure that it was an immediate response or relatively soon after you filled that out.

Q.   Within a day?

A.   I think that would be a reasonable idea.

Q.   But either way, once you start the process, either by asking the teacher or filling out the slip, you're sort of waiting for the next step from the guidance counselor?

A.   That's correct.

Q.   Okay.  So we're now going to go through -- well, your first month -- you remember school started before or after Labor Day?

A.   I think it started after Labor Day.

Q.   So you -- let's just say you started the first week of September.

A.   Okay.

Q.   So for the first week of September -- excuse me -- for the month of September, did you have any real problems at school?

A.   I think there definitely was, like, change in the sense of it was a bigger school.  I was acclimating to going from elementary school to middle school.

But I was excited to be going to middle school.  I

─────────B.R. v. F.C.S.B.─────────

72

was excited for the classes.  I don't really remember anything
that notable except just kind of, like, getting acclimated to
the new environment.

Q.   Okay.  Did there come a point -- and we'll go through it
in more detail.

        But did there come a point when that changed?

A.   Yes.

Q.   Okay.  Now, we're going to go through what changed and
relative to the chronological order, okay?

A.   Okay.

Q.   What -- what you're going to testify about, what those
next four or five months at Rachel Carson, have you -- have
you told that -- told what happened to you to various medical
providers over the years?

A.   I have.

Q.   And when I say "medical providers," I'm including not
just medical doctors but therapists, counselors, things like
that.

A.   Yes.

Q.   Okay.  Did you also share these experiences or your
recounting of those experiences with the lawyers on this side
of the room?

A.   Yes.

Q.   Okay.  You were deposed?

A.   I was deposed twice.

─────────────B.R. v. F.C.S.B.─────────────
73

Q.   Okay.  And did you share the experiences you're going to

share today with various school officials?

          Or -- we'll go through and you'll tell us what you

shared with school officials at the time.  Is that okay?

A.   That's correct.

Q.   Okay.  Have you always tried to be truthful about these

events?

A.   I have.

Q.   Okay.  Do you always -- you continue to do that today?

A.   Absolutely.

Q.   Is your -- each time you tell this, what happened to you,

whether it be to the lawyers, to the healthcare providers, to

anyone, is it always exactly the same?

          MS. REWARI:  Objection, Your Honor.  Leading.

          THE COURT:  Overruled.

          THE WITNESS:  I'm sorry, could you repeat that?

BY MR. BRENNER:

Q.   Sure.

          Each time over the years, whether it be that you've

told it to the lawyers, the school officials, to healthcare

providers, every time you tell it, is it always exactly the

same?

A.   I always do my best, but this is like extremely traumatic

for me, so sometimes certain details are more vivid to me than

others, but I always do my best.

─ B.R. v. F.C.S.B. ─

74

Q.    Okay.  And will you try to do that here today?

A.    Absolutely.

Q.    Okay.  All right.  So, generally, without pinpointing a
specific day, unless you're able to, what was sort of the
beginning of the change at Rachel Carson Middle School for
you?

A.    The beginning of the change was when I went to a pumpkin
patch with a boy named D███ N███.

Q.    So let's take it slowly.

A.    Okay.

Q.    David Neil, 7th grader or 8th grader?

A.    He was an 8th grader.

Q.    Did you know --

          THE COURT:  Counsel, let's -- to the extent that
we're protecting all the young people.

          MR. BRENNER:  I apologize.

          THE COURT:  Now that you know the name, let's go
with the alphabet or initial.

          MR. BRENNER:  I apologize, Your Honor.

          THE COURT:  Yes, sir.

BY MR. BRENNER:

Q.    And can you try to do the same?

A.    Yes, I'm sorry if I slip up.

Q.    That's okay.  That's okay.

          I'm going to call him David.  Okay?

B.R. v. F.C.S.B.

75

A.    Okay.

Q.    Was David a 7th grader or 8th grader?

A.    David was an 8th grader.

Q.    And did you know David from before this time period, the
beginning of school at Rachel Carson?

A.    Not the beginning of -- I didn't know him before Rachel
Carson.

Q.    Okay.  How did you -- did you meet him at Rachel Carson?

A.    Yes.  I did meet him at Rachel Carson.

Q.    Okay.  And how did you meet him?

A.    I recall meeting David at through like some other groups
that I used to hang out with or some other friends that I used
to hang out with.  Yeah.

Q.    Now, you said -- you mentioned the pumpkin patch.

        Does that help you at least narrow in about what
time of year we're talking about?

A.    That's correct.

Q.    This is -- was it a pre-Halloween pumpkin patch setup?

A.    Yes.

Q.    Okay.  And you said -- you -- well, tell the jury, what
was the connection between David and the pumpkin patch?  I
mean, how did those two come together?

A.    So David had asked me if I wanted to go to a pumpkin
patch with his family, and I had told him that I needed to
talk to my mom.

────── B.R. v. F.C.S.B. ──────

76

Q.   Okay.  At this point, was -- when he asked you, was David
your boyfriend?

A.   I wouldn't call him my boyfriend.  I would say I had a
crush on him, for sure.

Q.   Okay.  Had you ever gone on any sort of date with him
before?

A.   No.

Q.   Had you ever spent time alone with him before?

A.   No.

Q.   Okay.  You said you -- did you see him periodically in
school before then?

A.   I would say periodically, yeah.

Q.   And then sometimes I think you mentioned that you could
be in group settings with other friends where he was there?

A.   That's correct.

Q.   Okay.  So he asked you to the pumpkin patch, and you --
you say you need to clear it with your mom?

A.   Yes.

Q.   And your mom testified a little bit about this, but
what's your understanding of what happened next vis-à-vis your
mom and your trip to the pumpkin patch?

A.   So I told my mom that I wanted to go to the pumpkin
patch.  I asked her if it was okay.  And my mom said that she
needed to talk to David's mom.  And -- and so -- yeah, my mom
went to talk to David's mom.

B.R. v. F.C.S.B.

77

Q.   Okay.  Was that -- was this typical or atypical type of
thing for your mom to do if you were to go to somewhere with
someone?

A.   I think it was extremely typical.  Any time I did
something, my mom just wanted to make sure that I was with,
you know, a safe adult and that she knew that I -- where I was
going to be.

Q.   Okay.  And did you understand -- do you understand
whether your mom actually talked to David's mom before going
to the pumpkin patch?

A.   She did.

Q.   Okay.  So what was -- when -- did you go to the pumpkin
patch on a weekday or a weekend?

A.   If I recall correctly, it was a weekend.

Q.   Tell -- tell the jury what you recall the intended plan
was for your trip to the pumpkin patch?

A.   So my mom told me that when she spoke to David's mom, the
plan was -- and then this was my understanding -- that David
and his mom -- also with his mom was his younger sister, and I
believe it was maybe his stepfather, were going to pick me up
from my house, and then we were going to go to a pumpkin
patch.  And then after we went to the pumpkin patch,
David's -- they were going to -- they were just going to drop
me off at -- back at my house.

Q.   Okay.  So as part of that plan, were you supposed to at

any point end up at David's house?

A.   No.

Q.   Okay.  You said you had a -- had a little bit of -- you said you had a crush on David.

          Were you excited about the trip to the pumpkin patch?

A.   I was very excited.

Q.   Okay.  So let's -- let's talk about how the plan played out a little bit, okay?

A.   Okay.

Q.   Did, in fact, you get picked up by David, his mom, you think maybe his stepfather, and David and his little sister at your home?

A.   Yes.

Q.   Did you guys go to the pumpkin patch?

A.   We did.

Q.   And was it as fun you thought it was going to be?

A.   It was not fun.

Q.   Okay.  Tell the jury what happened.

A.   His little sister was very upset.  She was crying the entire time and wanted to go home.  I think she was maybe like, I don't know, six or seven years younger than -- than me, and so she was really not having it that day and wanted to go home.

Q.   Okay.  And what happened next?

A.    Then basically we had to leave the pumpkin patch early.

Q.    Okay.

A.    And --

Q.    And --

A.    I'm sorry.  Go ahead.

Q.    Did -- when you left the pumpkin patch early, did you go straight back to your house, what the plan was?

A.    No.

Q.    Okay.  What happened?

A.    David's mom said that she wanted to put, I guess, the sister down for a nap or feed her.  I don't really recall what exactly it was that she said she wanted to do, but she wanted to drop the younger sister off at home and that while she was there she also like wanted -- needed to do a load of laundry, and then she would drop me back off, like the plan, after she did those two things.

Q.    Okay.  Did you -- at this point, did you care or were you upset, were you scared, or you were fine to go back to his house?

A.    I was fine with it.

Q.    And when you got back to his house, where did -- where did -- tell me where the various people went, the mom, the little sister, if you know, the stepfather, and where you and David went?

A.    I'm not really sure where like his stepfather went.  I

—B.R. v. F.C.S.B.—

80

think he was upstairs.  David's mom told David and me to wait

downstairs in the basement.  The laundry room was in the

basement.  But, also, she was upstairs part of the time, I

believe, feeding his sister or something like that.

Q.   Did you say "feeding"?

A.   Yes, I'm sorry.

Q.   Okay.  Did you hear the sister continue to not be --

having a great time?

A.   She was not having a great time still.

Q.   Okay.  You go down to the basement.  Finished basement?

A.   Yes.

Q.   Okay.  And you -- do you go down there alone with David?

A.   Yes.  At that time I did, yes.

Q.   Okay.  And you said that -- was the mom down there at

some point?  You mentioned a laundry room.  I was just

wondering.

A.   Yeah, she was there at some points during it.  She wasn't

there the entire time, but she was there for a certain amount

of time.  She said that we wouldn't be there in the basement

long and that she was going to drive me home shortly.

Q.   Okay.  And where -- where did you and David go in the

basement?

A.   There were couches on the -- in the basement.  There was

like a TV area, so we just were sitting there, I believe, on

the couches.

B.R. v. F.C.S.B.

81

Q.   Okay.  Do you recall whether you were watching TV?

A.   I don't recall.

Q.   Okay.  And it's points -- I think you said some points
the mom had come down, and some points you were alone?

A.   That's correct.

Q.   Okay.  While you were alone in the basement with David,
did anything happen between the two of you?

A.   Yes.

Q.   Okay.  Can you -- in your words, tell -- tell the jury
what happened.

A.   So at first David and I were just talking.  We were
talking about things related to school.  And then David had
then come closer to me.  I was sitting on the couch, and he
tried to touch my breast.

Q.   Okay.  So let me -- let me stop you there.

         You two were sitting next to each other on the
couch?

A.   Yes.

Q.   And at some point, he sort of slides up closer?

A.   Correct.

Q.   Okay.  When you said he -- he tried to touch your -- your
breast, did he try to -- and I have to ask the details.  And
did he try to do it above your shirt, below your shirt, if you
remember?

A.   I don't have a vivid recollection at this moment, but I

————B.R. v. F.C.S.B.————

knew that like he was trying to touch my breast.

Q.   Okay.  And did you -- first of all, did you -- did you

say anything to him?

A.   Yes.  I -- like I pushed him away when he tried touching

my breast.

Q.   Okay.  Did you also say something or just -- just push

him away, if you remember?

A.   I recall just like pushing him away.

Q.   Okay.  And when you pushed his hand away, did he -- well,

is -- I don't want to put words in your mouth, did you push

his hand away?  Is that what you're saying?

A.   Yes.  I pushed his hand away.

Q.   Okay.  And when you pushed his hand away, did he, you

know, fight you or attack you, or did he move his hand away?

A.   He moved his hand away.

Q.   Okay.  What -- what happened next?

A.   He then exposed himself to me.

Q.   Okay.  Can you explain what you mean by that?

A.   He -- I'm sorry.  I don't mean to be graphic, but he

exposed his penis to me.

Q.   Okay.  While you -- is he -- is he sitting next to you on

the couch while he does this, or has he moved and standing in

front of you?  What -- where --

A.   He -- he's sitting on the couch still.

Q.   Okay.  And what did you do?

Case 1:19-cv-00917-RDA-LRV   Document 1047   Filed 08/26/24   Page 83 of 207
PageID# 21502
Direct - B.R.

B.R. v. F.C.S.B.

83

A.   I just -- I asked him to stop.

Q.   Okay.  And did he -- what did he do?

A.   He tried to touch my breast one more time, and then
I really was like, I don't want to do this, stop.

        And he -- he stopped.

Q.   Okay.  And did he -- did he put his pants back on or
unexpose him?

A.   Yeah, he unexposed himself.

Q.   Okay.  What happens next?

A.   It was really awkward between David and me.  We weren't
really saying much.  It just -- there was a lot of
awkwardness, and then shortly after, his mom said that she was
ready to drive me home.

Q.   Okay.  And did she, in fact, drive you home?

A.   She did.

Q.   When you got home, do you remember if your mom was home?

A.   She was home.

Q.   Do you remember -- did she ask you about how your time at
the pumpkin patch was?

A.   I recall she asked that, yes.

Q.   Okay.  And what did you tell her?

A.   I told her it was all right.

Q.   Okay.  Did you tell her about what had happened in the
basement?

A.   Well, she had asked me why I came home in a different car

B.R. v. F.C.S.B.

84

because it was a different car than the car that I came in.
Like, the car, I should say, that they picked me up in.  And I
don't recall telling her about like what had happened, though,
in the basement.

Q.   So -- so you do you recall your mom asking you why you
came back in a different car?

A.   Yes.

Q.   And I think what you're saying, but, again, correct me if
I'm wrong, you -- you told -- you explained that you had --
David -- you had to go back to his house, and I guess his mom
had switched cars?

A.   Yes.  I did tell her that like we had to go home, to his
house because his sister was upset, and then his mom drove me
home.

Q.   Okay.  How -- how were -- after this experience in the
basement, how -- what was -- what was going through your head?

A.   I felt very weird.  I didn't know what to think.  I
didn't know what was going on.  That had never happened to me.
I had a lot of just mixed feelings, but yeah.

Q.   So let me -- so as of this point, can you tell the jury
if -- if you had -- you had sexual experiences before that
point?

A.   I had not.

Q.   Okay.  Had you ever, you know, kissed a boy in a -- I
guess romantic way other than, you know, just peck -- give a

─── B.R. v. F.C.S.B. ───

85

peck to say hello.

   Had you ever kissed a boy?

A. No.

Q. Okay.  Okay.  Did you return to Rachel Carson Middle

School after that weekend?

A. I did.

Q. This is still in October?

A. Yes.

Q. Okay.  Now, up until that point, had you -- before this

weekend, had you been subjected to any vulgar or sexual

name-calling?

A. No.

Q. Had you been subjected to any sexual harassment?

A. No.

Q. Were you aware of rumors spreading about you -- again,

prior to this -- this week, were you aware of any rumors being

spread about you about your sexuality?

A. I don't recall that, no.

Q. Were you aware of rumors being spread about you about --

I guess your promiscuity?

A. You're saying, like, before the --

Q. Before this, yeah.  We're talking before the pumpkin

patch.

A. I did not hear any rumors about my promiscuity.

Q. Or your willingness to engage in any various sex acts

B.R. v. F.C.S.B.

86

with any boys that wanted to?

A.    I did not hear that.

Q.    Okay.  Did that change when you got back to school on
that Monday?

A.    Yes.

Q.    Okay.  So tell the jury again in your words -- well, let
me back up one step.

        The change you're about to describe, did it start
happening essentially the beginning part of that next week?

A.    Yes.

Q.    Okay.  Can you tell the jury -- first of all, as far as
name-calling, were people to you -- not hearing -- were people
actually, to you, calling you names?

A.    Yes.

Q.    Do you remember what names they were calling you?

A.    They were calling me a slut, a whore, a bitch.

Q.    Were these -- let's do it two different ways.

        First of all, were some of the kids that were doing
this, were they kids that you didn't even know?

A.    Yes.

Q.    So explain -- are you okay?

A.    Yeah, I'm good.  I'm sorry.

Q.    It's okay.  And if you need at any point to take a break,
just ask His Honor, and he'll find a place and decide when we
can break, okay?

87

A.    Okay.

Q.    Dealing with the kids you don't know first.  How would that happen?

      Meaning how, where, how often were they calling you these things?

A.    Very often.  In the hallways, in classes.  I mean, I had only been like a student there for like a month, so there were a lot of students I didn't even know yet.  And they were just calling me these names and, yeah.

Q.    Again, we're on the name-calling.

      Were people that you knew also doing the same thing?

A.    Yes.

Q.    Were some of these people, people that you considered your friends?

A.    Yes.

Q.    Again, first, trying to use either first names or initials, can you remember the kids that you knew that were doing this to you?

A.    Well, it really started with David.

Q.    Okay.  So David -- David is the pumpkin patch --

A.    Yeah.

Q.    And he was calling you those names that you just said?

A.    Yes.

Q.    Did you -- when David did that, did you talk -- did you confront him?  Did you ask him why he was doing it?

B.R. v. F.C.S.B.

A.   I did.

Q.   Okay.  Can you explain to the jury what -- how that went?

A.   When I tried to ask David why he was saying these things about me, he wouldn't talk to me and he was laughing and thought it was funny.

Q.   He was laughing at you?

A.   Yeah.  And he was laughing with his friends and he thought it was funny, and it wasn't funny.

Q.   Okay.  Do you remember any of your other -- any other kids that you knew and considered your friends -- again, using first names or initials, whichever you feel -- that were doing that at this point?

A.   Could you just clarify that -- the time point again?  I'm sorry.

Q.   Sure.  Yes.  No, you have nothing to be sorry for.

        I'm talking about in -- in the immediate days following the -- the weekend at the pumpkin patch.  So when you come back to school, whether it's Monday or Tuesday.

        Other than David, can you identify any other kids that you knew or thought were your friends that were also calling you the names that you just told the jury?

A.   So I heard that there were people that were calling me those names but then also people that were like telling me about it and --

Q.   Okay.  So let's -- let's go to that.  So in addition to

─── B. R.  v.  F. C. S. B. ───

89

people directly calling you these things, did your friends or

other people report to you that this was sort of going around

the school that B███ is a slut, B███ is a whore?  Was

that -- were you being told that these things were being said

all around the school?

A.    Yes.

Q.    Do you remember anyone who told you that?

A.    Yes.

Q.    Okay.  Who is that?

A.    My friend, Olivia.

Q.    Okay.  Olivia herself, was she -- was she participating

in this?  Meaning, was she calling you these names?

A.    No, she was telling me about it.  And, also, there were

certain things that were being said about me that I didn't

even know what they meant.

Q.    Okay.  So let's talk about that.

A.    Okay.

Q.    In addition to the name-calling we went through -- and

the jury has seen some of this already, and we'll go through

your -- we'll go through a little bit more detail later.

            Were people also spreading rumors about sex acts

that you apparently -- that you supposedly did?

A.    Yes.

Q.    Were those rumors -- to make sure I understand at this

point, were the rumors, one, that you had done certain sex

B.R. v. F.C.S.B.

90

acts with David?

A.    Yes.

          MS. REWARI:  Objection.  Leading, Your Honor.

          THE COURT:  I'm going to let you lead a little bit

to provide a predicate for the answers, but let her testify,

and don't lead her if you can.

BY MR. BRENNER:

Q.    Tell the jury what the rumors were about the sex acts.

A.    That I had given David a blow job.

Q.    Okay.

A.    And that I done other sexual acts with David.

Q.    Okay.  And you started to say -- did you talk -- what

about that -- did you talk to Olivia about?

A.    I didn't know what a blow job meant.

Q.    Okay.  Other than David, were any of your other -- people

that you thought were your friends participating in this

name-calling and rumor spreading?

A.    Yes.

Q.    How many of them do you remember?

A.    I very vividly remember that J████ was doing that as

well.

Q.    Okay.  And is J████ sometimes referred to J.O., and she's

in this courtroom today?

A.    That's correct.

Q.    Okay.  And was she -- so I guess we sort of broke it down

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────
EASTERN DISTRICT OF VIRGINIA

─────B.R. v. F.C.S.B.─────

91

to the name-calling and the rumors about sexual acts.

        Was she doing one, both -- one or the other or both?

        MR. BLANCHARD:  Your Honor, can I have a

clarification of whether this is something the witness heard

or whether this was something --

        MR. BRENNER:  Sure.

        THE COURT:  There has been a bit of a transition, so

let's, if we can, focus on what she heard was being said and

what was actually told to her.

        MR. BRENNER:  I'll do both, Your Honor.

        THE COURT:  Okay.

        MR. BRENNER:  Thank you.

BY MR. BRENNER:

Q.   First directly.  Again, in this time period.  This is

just the first couple of days after the pumpkin patch.

        Did J███ directly call you names like slut and

whore?

A.   She was more taking part of, like, taunting me about it.

Making it sound like it was a joke, like it was funny, but it

felt like it was teasing and bullying rather than just being

jovial about it.

Q.   Okay.  And then as far as the rumors you were hearing

about what people were saying, were you hearing rumors that

J███ was saying -- calling you these names?

A.   I was also hearing that too, yes.

Case 1:19-cv-00917-RDA-LRV    Document 1047    Filed 08/26/24    Page 92 of 207
PageID# 21511                              Direct - B.R.

────────B. R. v. F.C.S.B.────────

92

Q.   Okay.  Now, on the -- on the --

          MR. BLANCHARD:  Strike -- I mean, that's hearsay.

          THE COURT:  Well, I think the testimony, as it's
been given by the witness, is two-part.  She heard things were
being said and that she heard that other people were saying
things.

          The second category of things, I believe, is more
attenuated than the first.  So let's focus on what she heard
directly, if we could.

          MR. BRENNER:  Well, just to be clear -- thank you,
Your Honor.

BY MR. BRENNER:

Q.   When we're talking about rumors spreading, your -- are
you -- you, yourself, with your own ears, are you hearing
these rumors?

A.   Yes.

Q.   Okay.  Do you attempt to -- first of all, why don't you
tell the jury in your words what this -- the first couple of
days of this, what this experience was like for you?

A.   It was immensely upsetting.  I didn't understand why
these rumors were being spread about me.  It was very
frustrating.  I felt immensely overwhelmed.  It was just
really upsetting.

Q.   Did you follow the school's -- what the school had taught
you about what to do if you were having those feelings and

B.R. v. F.C.S.B.

93

experiencing what you were experiencing?

A.   Yes.

Q.   Okay.  So tell the jury what you tried to do -- first of
all, when did you -- did there come a time in this first
couple of days that you tried to see someone in the school
administration?

A.   I tried -- I mean, I don't -- I don't know if you would
qualify it as administration, but I tried to talk to my
guidance counselors.

Q.   Okay.  So your guidance counselor -- at that point you
had one guidance counselor, right?

A.   That is correct.

Q.   Okay.  Did you try to see Ms. H█████?

A.   I did.

Q.   Okay.  Tell the jury how you tried -- and is this within
the first day or two of when this started?

A.   That is correct.

Q.   Okay.  And tell the jury what you did to try to see
Ms. H█████?

A.   So I had tried to put like a -- they had the request to
see your guidance counselor forms.  And I had -- there's
like -- you write your name on it.  There's the reason to see
your guidance counselor, like what's the reason you want to
see them.

         I had filled out a form requesting to see

B.R. v. F.C.S.B.

94

Ms. H█████ --

Q.    Okay.  So that's what -- I'm sorry.

A.    -- and I explained -- I'm sorry -- and I just explained
the reason on there.

Q.    Okay.  So in the -- where is that form?  Where do you get
that form?

A.    Usually it was, I believe, in the guidance office.

Q.    And you would write your name, you said?

A.    Yes.

Q.    You would identify who your counselor was?

A.    Yes.

Q.    And the reason you said -- was that -- the jury has seen
these student statements.

        Is this form something different than that?

A.    It is different than a student statement.

Q.    Is it -- at least as you understand, what you're supposed
to put is much shorter and just the reason you want to see the
counselor?

A.    I feel like there usually was, like, maybe, like, a
sentence worth -- like you could write maybe, like, a sentence
of, like, how much space there was.  There wasn't a lot of
room to really write much.

Q.    Okay.  Is it a preprinted form?

A.    Yes.

Q.    With lines for you to write on?

B.R. v. F.C.S.B.

95

A.   I don't really recall if it had, like, lines like the
student statement, but --

Q.   Okay.  And then you filled out a form for Ms. H████?

A.   I did.  Multiple.

Q.   Okay.  Start with one, this one.

     What were you supposed to do with the form?  Is
there a place to put it?

A.   Yeah.  I don't have a vivid recollection, but there was
somewhere in, like, the guidance office to, like, put the slip
in or something to that effect.

Q.   Okay.  And after you did that, did you return to class?

A.   I did.

Q.   Okay.  And, again, we went through this before, was your
expectation at the time that Ms. H████ would either come
get you or send someone to have the teacher send you?

A.   Yes.

Q.   Okay.  Did -- did -- at any point during that week, did
Ms. H████ come get you?

A.   No.

Q.   At any point during that week, did Ms. H████ ask for
your teachers to send you to her?

A.   No.

Q.   Now, we'll get to this in more detail later, but this is
in mid -- mid-ish October, mid to late October, is that your
recollection?

B.R. v. F.C.S.B.

96

A.    I believe it was mid-October.

Q.    Okay.  And you mentioned this already.  You -- you've --
you tried to see Ms. H███████ on multiple occasions?

A.    That's correct.

Q.    When is the first time regarding this issue that
Ms. H███████ actually met with you?

A.    So I also had -- I don't know if this is -- really goes
directly to your question, but I did see her in the hallway.

Q.    Okay.  Put that aside.  As opposed to running into her,
was there a time where you actually met and were able to
discuss with Ms. H███████ what was happening with you -- to
you in any -- in any sort of detail?

A.    Not until November 21st.

Q.    Okay.  And that -- that -- did that meeting occur because
Ms. H███████ asked to see you?

A.    No.  It was because my mom came into the school.

Q.    Okay.  So we'll go -- we'll get back to the November
meeting.

        So for the next 35 or so days, we don't have the
exact day, is it your testimony that you tried to see
Ms. H███████ on several occasions?

A.    Yes.

Q.    Did you fill out more than one form?

A.    Yes.

Q.    Did you meet --

B.R. v. F.C.S.B.

MS. REWARI:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.

BY MR. BRENNER:

Q.   Did you -- did you -- you started to mention -- were there times you actually saw her, bumped into her and reiterated -- well, did you bump into her at times?

A.   I did.

Q.   And what -- did you tell her -- what did you tell her? This is, again, before November 21st.

A.   I recall that there were two instances where I ran into her in the hallways.

Q.   And what -- those are between the mid-October period and November 21st?

A.   Yes.

Q.   Okay.  And what did you say to Ms. H██████?

A.   The first time it was in the first week that I was reporting that there was -- that David was spreading these rumors about me, as were some of my other peers.  And I told her I really needed to speak with her because it was really important.

Q.   And what did she say?

A.   She told me that she was really busy but that she would get to me.  It seemed like she knew that I was trying to reach her, like with the slips, but --

Q.   Okay.  And there was a second time that you -- did you

—B.R. v. F.C.S.B.—

98

run into her a second time?

A.    Yes.

Q.    Okay.  Again, this is before November 21st?

A.    Yes.

Q.    And tell the jury what happened in that encounter.

A.    I told her that it was, again, very important.  And this
time -- I don't really want to skip ahead, but that it was an
emergency and that I really wanted to see her.

Q.    What did she say?

A.    She said -- like, again, she apologized and said she was
sorry that she hasn't had a chance to see me but that she was
going to get to me.

Q.    Okay.  Other than -- now we're going back to that first
couple of days after the pumpkin patch.

          Other than filling out the slip for Ms. H█████,
did you try any other ways to see a guidance counselor?

A.    Yes, I did.

Q.    Tell the jury what you did.

A.    So I asked for several of my teachers for a pass to go to
the guidance office.

Q.    Can I stop you there?

A.    Yes.

Q.    Do you remember the teachers you asked?

A.    Yes.  I asked my science teacher.

Q.    What's -- what's that teacher's name?

───── B.R. v. F.C.S.B. ─────

99

A.    Mr. T█████.

Q.    Mr. T█████?

A.    Yes, I'm sorry.

Q.    Okay.  And what about -- tell the jury what you asked

Mr. T█████.

A.    I said that I needed to see Ms. H██████ because it was

really important, that there were these things that were being

talked about and spread, and I felt really uncomfortable.

Q.    Okay.  You said there were three teachers -- were there

three teachers you talked with?

A.    Yes.

Q.    Okay.  Who was the second one?

A.    The second one was M█████ C████, my math teacher.

Q.    Okay.  And -- and what period did you have Ms. C████?

A.    I believe she was my first period math teacher.  She also

was my homeroom teacher as well.

Q.    Okay.  And did you -- tell the jury what you told Ms.

C████ at this point.

A.    I had just told Ms. C████ as well that I needed a pass to

go see the guidance counselor, Ms. H██████, because -- just

again, similar to Mr. T█████, that there had been things that

were being said about me that were making me feel really

uncomfortable, that were inappropriate, and I just really

needed to see a guidance counselor.  And she did give me a

pass to go.

B.R. v. F.C.S.B.

100

Q.   Ms. C█████ did?

A.   Yes.

Q.   Mr. T███████ did not?

A.   He gave me a pass too.

Q.   Okay.  So they both gave you passes?

A.   That's correct.

Q.   Okay.  And then the third teacher was who?

A.   It was Ms. F███████.

Q.   And Ms. F███████ was what teacher for you?

A.   She was my history teacher.

Q.   Okay.  And conversation with Ms. F███████, was it -- tell
the jury what that was.

A.   It was, again, very similar that these -- there were
things that were being said about me that were really making
me feel uncomfortable.  I felt just really upset by what was
going on.  And I did tell her that I had been trying to reach
my guidance counselor for like a few days, and I was not
successful.

Q.   Okay.  Did Ms. F██████ also give you a pass to go see the
counselor?

A.   I believe she did; however, she told me to go see
Ms. F███████████.

Q.   Okay.  So the jury -- the jury has met Ms. F██████████.
She -- she testified.  Remind -- remind us what her job was at
the school.

B.R. v. F.C.S.B.

101

A.    Ms. F███████ was another guidance counselor at the
school.

Q.    Okay.  Not your assigned one, right?

A.    She was not my assigned guidance counselor.

Q.    So did you ultimately see Ms. F████████ that first week
after the pumpkin patch?

A.    I did.

Q.    Okay.  Ms. F███████ testified already that there was
a -- there was a time where she found you -- I think she
described, as your -- your forehead was in your hand around
lockers, and she took you to her office.

        Were you in the courtroom when she testified to
that?

A.    I don't -- I don't know if I was in the courtroom when
she said that.

Q.    That -- that incident happened, is that -- is that a
correct statement, like what she said that there was a time
where she found you by your lockers and took her to your
office -- took you to her office?

A.    Yes, there was a time that that did happen.

Q.    Was that the first time you met Ms. F████████?

A.    That was not the first time.

Q.    So the -- what you're -- I'm going to ask you to describe
now your meeting with Ms. F███████.

        This took place before the incident that she

B.R. v. F.C.S.B.

102

discussed at the lockers?

A.    That's correct.

Q.    Okay.  So tell -- tell -- tell the jury where you met
Ms. F█████████, I mean, where you talked to her.

A.    I talked to her in her office.

Q.    Okay.  Did you tell her what was going on with the
name-calling and the rumors spreading about your promiscuity?

A.    I did.

Q.    Did you tell her in --

        MS. REWARI:  Objection, Your Honor.  Leading.

        THE COURT:  Sounds like it's going to be.

BY MR. BRENNER:

Q.    What did you tell her?

A.    I told Ms. F████████ that David and other boys and
people at school were going around saying that I had done
these inappropriate things and that I felt extremely
uncomfortable.  I felt that it was really inappropriate.  I
told her that I didn't even know what some of these things
meant.  And I was very upset by what was being said.  Yeah.

Q.    Now, the jury has seen an email that Ms. F████████
wrote later in December where she talked about counseling you
on strategies.

        Did -- did she provide you advice in this first
meeting in October on what you should do about what was
happening to you?

Case 1:19-cv-00917-RDA-LRV   Document 1047   Filed 08/26/24   Page 103 of 207
PageID# 21522
Direct - B.R.

————B.R. v. F.C.S.B.————

103

A.   I mean, I don't really know if it was a strategy, but she

told me that I should not engage in it.  That -- by not

engaging in it, I should specify, by not feed into the rumors.

Q.   What -- what does that mean?

A.   I guess like not instigate it any further.  Not -- like,

I guess really don't -- don't play into it.  Don't, you know,

talk about these rumors back.  Don't rebut it.  Kind of, I

guess, keep my head down.  Don't say anything, you know, it'll

get better.

        I -- she also told me that, you know, sometimes this

did happen, does happen.  When kids go to middle school,

they're not always nice.  But, you know, I'm just adapting to

middle school.

Q.   Was -- again, I'm not trying to -- I'm trying to

understand, not -- not put words in your mouth.

        Was -- the strategy she was giving you, was she

telling you things that you needed to do or needed to change?

A.   Yeah, basically.

Q.   Okay.  Ms. F▇▇▇▇▇ also testified in her meetings

with you she doesn't remember anything that was said.

        What is -- do you --

        MS. REWARI:  Objection.  Calls (indiscernible), Your

Honor, in the commentary about another witness' testimony.

        THE COURT:  Rephrase that, Counsel.

BY MR. BRENNER:

Direct - B.R.

B.R. v. F.C.S.B.

104

Q.    Do you have -- how many times during -- let's -- let's

set the time period to remind the jury.

You're in Rachel Carson from the beginning of school

in September?

A.    Uh-huh.

Q.    Okay.  Yes?

A.    Yes, I'm sorry.

Q.    And your last day of in-person learning is what?

A.    I believe it's February 9th, 2012.

Q.    Okay.  So five -- about five months, September to

February.

During that five-month period, how many times would

you estimate that you met with Ms. F█████████?

A.    I would say maybe -- I'm approximating, about five or six

times.

Q.    And do you have, whether it's -- by a particular meeting,

do you have -- do you have specific recollections of what you

told her in those meetings and what she told you?

A.    Yes.

Q.    Okay.

MR. BRENNER:  Your Honor, this would be a perfect

place to stop, if it's --

THE COURT:  All right.  Ladies and gentlemen, we're

going to go ahead and take our morning break.  As has always

been indicated to you, please do not discuss the case or any

─────────────── B.R. v. F.C.S.B. ───────────────

105

aspect of the case with anyone.  We're going go take a pretty

good break because we're going to try to drive until

1 o'clock.  So we're going to go ahead and take a little

longer break.  So we'll see you back in at 11:15.  11:15.

(Jury excused.)

THE COURT:  All right.  Young lady, you may step

down.

All right.  We'll see everyone back in at 11:15.

(Recess.)

(Court proceedings resumed at 11:18 a.m.)

MS. REWARI:  Before we bring the jury in, I hate to

interrupt the flow, but we have some concern that there's been

a lot of leading.  I understand we're setting background, but

now that we're into the meat of the allegations here, I just

would --

THE COURT:  I'll tell you this, Ms. Rewari, and I'm

going to let you into the inner sanctum of the chambers.  One

of my interns had a question about leading.  And my response

was that, you know, leading is defined as a question that

suggests a response, and I sort of suggested two ways that you

can lead.

And her response was basically, Where is the line?

And I said, Well, I typically let lawyers lead to

set circumstances up.  But once you get into the substance of

the examination, then I sort of rein lawyers in.

And so the concern that you have is one that's been addressed, and I took advantage of having a teaching moment. And so I understand where you are coming from.  And Mr. Brenner is a very good and competent lawyer, and he knows the line.  And if he crosses it, I will let him know.

MS. REWARI:  Thank you, Your Honor.

THE COURT:  Yes.

MR. BRENNER:  Thank you, Your Honor.

THE COURT:  You know the line?

MR. BRENNER:  The funny -- the short answer is yes, but the funny thing is that I know I need to do better.  I'm trying not to do it.  I'm not -- I'm trying not to lead because I think it's more effective anyway.

But, yes, I know the line.  I'm trying not to cross it.  When I cross it, I think it enures to our detriment, not to our benefit.

THE COURT:  And the allowance I'm giving you is an allowance I'm going to give to the other side.  So, again --

MR. BRENNER:  Of course.

THE COURT:  -- it's just the way of trying to take care of matters as efficiently as we can.

MR. BRENNER:  Yes.  I understand, Your Honor.  I understand the guidance, and I'm doing my best and I will continue to try to do my best.

THE COURT:  Okay.

B.R. v. F.C.S.B.

107

(Jury present.)

THE COURT:  You may be seated.  Ladies and
gentlemen, the examination of B.R. commences.

MR. BRENNER:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. BRENNER:

Q.   Okay.  We left off I think after your meeting with
Ms. F▮▮▮▮▮▮▮, the first meeting, okay?

A.   Okay.

Q.   After that meeting, in the school setting, where it was
going around the school, did the -- how, if at all, did the
name-calling and rumors about promiscuity -- how, if at all,
did they change things?  Did they get better, get worse, or
stay the same?

A.   They got worse.

Q.   Okay.  You mentioned previously your friend, J▮▮▮▮.

A.   Yes.

Q.   Okay.  Remind the jury, because it was several days ago,
when did you meet J▮▮▮?

A.   I met J▮▮▮ in the 6th grade at Floris Elementary School.

Q.   Okay.  Between when -- and just the reminder so we can
lay the predicate.

Were you guys close friends at Floris?

A.   We were close friends, yes.

Q.   Okay.  Now, again, leading up to this time period where

B.R. v. F.C.S.B.

we're at right now, had your -- how would you describe your

friendship with J█████?

A.    Well, leading up to this time period, J████ and I were

close friends.  I -- we just -- we had a close friendship.  I

really did love J████ a lot.

Q.    Okay.  Had there been any change in your friendship sort

of starting the summer and through your early part of your

time at Rachel Carson?

A.    Yes, there had been a change.

Q.    Okay.  Can you tell the jury about that?

A.    I wanted to distance myself from J████ going into the 7th

grade.  There had been some events that transpired and also

some concerns that I had about my friendship with J█████ that

sort of wanted me to pull away from her in the 7th grade.  And

I had voiced this to my mom.

        THE COURT:  Okay.  Let's not get into what those

specific things are.  She's stated her concern.

BY MR. BRENNER:

Q.    Okay.  Without getting into the specifics, did you do

anything -- not the reason why it changed, but did you do

anything in the first month or so at Rachel Carson to start

distancing yourself from J█████?

A.    I had just said that I wasn't available to hang out on

some weekends more.  It was a little bit hard.  My plan did

not go as I wanted to because we had gym class together.  So

B.R. v. F.C.S.B.

109

that was a little bit -- something I hadn't planned

accordingly for leading up to the 7th grade and going into

middle school.  That made it harder for me to distance myself

from her, but yeah.

Q.   Okay.

        MR. BRENNER:  So if we could bring up -- Your Honor,

permission to publish already in evidence Exhibit 604?

        THE COURT:  Yes, you may.

BY MR. BRENNER:

Q.   Okay.  So I know the screen is hard for you to -- we're

going to keep it up for a little bit so you can explain to the

jury basically, and then I'll take it away from you, okay?

A.   All right.  That sounds good.

Q.   All right.  And I think you can -- if you use your finger

you can draw on it, okay?

A.   Okay.

Q.   Okay.  So what -- just, first of all, what is this a

picture of?

A.   This is a picture of my neighborhood that I lived in when

I was 12.

Q.   Okay.  Can you circle on that picture your home?

A.   Sure.

        And do I just draw on it or...

Q.   I think so.

        THE COURT:  Put your finger on it, it should work.

───────B.R. v. F.C.S.B.───────

110

BY MR. BRENNER:

Q.   It should work.  Is it working?

No.

Oh, there you go.

Okay.  So that's -- that -- you're circling your
home?

A.   Yeah.  That might have not been the best circle, but yes.

Q.   Okay.  Now, we're going to -- just show the jury so we
don't have to keep coming back to this.

Show the jury where the bus stop was for Rachel
Carson Middle School.

A.   (Complies.)

Q.   Okay.  We're going to talk in a second about a park or an
area.

A.   Uh-huh.

Q.   Can you just show the jury where that is?

A.   Yes.

Q.   Okay.  And between that and your home, is there -- or was
there -- back in 2011, was there any sort of fencing?

A.   I'm sorry, could you repeat that question?

Q.   Between the park area, which you just drew on, and your
home, which appear to be catty-corner, was there some sort of
fencing or trees in between?

A.   Yes.

Q.   Okay.  And -- okay.

B.R. v. F.C.S.B.

111

MR. BRENNER:  We can take that down, please.

Your Honor, may I approach?

THE COURT:  You may.

THE WITNESS:  Okay.

BY MR. BRENNER:

Q.  Did there come a time where you had an encounter with two
other students in that park?

A.  Yes.

Q.  Okay.  And as far as time frame, is -- we left off at the
week after the -- the pumpkin patch.

Relative to that, when does this happen, if you can
pinpoint it?

A.  It happens around the -- so it happens around that
Friday.

Q.  The Friday after the weekend of the pumpkin patch?

A.  Approximately, yes.

Q.  Okay.  So tell the jury, first of all, that day, how did
you get home from school?

A.  That day I went home from school by taking the school bus
at my regular time.

Q.  So the jury has heard some testimony that there's two --
there's a -- there's some buses that come at the regular time
and some that -- there's a late bus sometimes.

You were on which that day?

A.  I was on the regular school bus.

B.R. v. F.C.S.B.

112

Q.   And tell the jury what you -- what you recall from the
time you got off the school bus.

         What's the next thing you did?

A.   I went home.

Q.   Okay.  And then what did you do next?

A.   I had a snack, my mom was home, we talked a little bit.
And then I had to -- sometimes I had the neighbor that lived
diagonally across the street, the mom was a widow and
sometimes I would -- my mom and I would help the mom with
various different tasks or things she might have needed.

         And so on this particular day, I believe she was
getting her car serviced or needed something and she wasn't
sure if she was going to be home on time.  And so she had
asked me to pick up this little girl from the bus -- her bus
stop.  It was a different bus stop that the elementary school
stopped at.  And if she hadn't been home from wherever she
was supposed to be, the mom, then I should bring the little
girl back to my house, if that makes sense.

Q.   And the little girl was who?

A.   Her name was Faith.

Q.   And how is she related to the neighbor?

A.   She's her daughter.

Q.   Okay.  So did -- after you went home, what did you do
next?

A.   I then went to go pick up Faith from the bus stop.

B.R. v. F.C.S.B.

113

Q.   Okay.  And what did you do after you picked up Faith at the bus stop?

A.   I then went and dropped Faith back at her house.

Q.   And was her mom there?

A.   Her mom literally was just pulling into the driveway, and I said "Hi" to her mom and then dropped Faith off at her house.

Q.   How old is Faith?

A.   I want to say maybe about seven, six or seven.

Q.   And what happened next?

A.   I realized that I had left something at the -- like near Faith's bus stop in that park area.

Q.   So let me just stop you for one second.

        The bus stop that I had you draw on the map, that's -- that was the bus stop for what?

A.   The bus stop was for, like, Rachel Carson.  For my -- it was my bus stop.

Q.   Okay.  And the elementary school bus stop was where?

A.   The elementary school bus stop was a little bit closer to my house.

Q.   Okay.  In the neighborhood?

A.   Yes.

Q.   Okay.  So you -- tell the jury what happened.

        You said you forgot something.

        Where were you going?

─B.R. v. F.C.S.B.─

114

A.   I forgot something at like -- so near the elementary

school bus stop there was a park with benches.  And when I was

waiting for Faith, I left something there.  I don't recall if

it was a hoodie or headphones or something, but I left

something there, and I wanted to go get it once I dropped

Faith off.

Q.   Okay.  Were you with anyone at this point?

A.   I was not.  I dropped Faith off.  I was not with anyone.

Q.   Okay.  Do you have a general recollection what time the

Rachel Carson regular bus dropped off?

A.   That would be approximately maybe like 3ish.  I'm not

100 percent sure on that one.

Q.   And then the elementary school bus, when did that drop

off?

A.   I felt like it was closer to maybe, like, I don't know,

3:45, 4ish, something like that.

Q.   Okay.  So you've -- after you find whatever you left

there, what happens next?

A.   I see my friend J████, and I see that she's with

C████████.

Q.   Okay.  So in that aerial photo that we looked at, when

you see them, where are you walking?

A.   So I'm walking back from, like, where my house is

basically.  So I'm --

Q.   Walking back from your house or to your house?

B.R. v. F.C.S.B.

115

A.    I'm walking back from my house back to the park --

Q.    Okay.

A.    -- to get this -- to get the item that I --

Q.    Oh, I understand.

       And you said you see who?

A.    I see J███ and C███████.

Q.    Okay.  And C███████ is someone -- did you know C████████
before this time?

A.    I knew C███████, yes.

Q.    Okay.  And what was your understanding -- did you have an
understanding of any relationship between C███████ and J███?

A.    I was aware that C███████ was J███ boyfriend.

Q.    Okay.  So when you see them, are -- where are they?

A.    They are coming from like the -- towards the -- I guess
the beginning of the neighborhood, coming like towards where
I'm located.

Q.    Okay.  And when you -- did there come a time where you
come -- you meet at the same place?  I mean, you're physically
next to them?

A.    Yes.

Q.    Okay.  Where is that?

A.    That's at the park area that I drew on the map.

Q.    Okay.  In that -- I know you call it a park, but is there
like playgrounds and courts or anything?

A.    No.  There's benches there.  There's like a trash can

there.  It's -- I would really just say there was mainly

benches there.

Q.   Okay.  Tell me the -- or tell -- not me -- tell the jury

the next thing you remember happening when you see J████ and

C████████ at the park.

A.   I remember just like talking to J████.  I mean, you know,

she was my friend.  I was just talking to her.  I don't recall

really saying much to C████████, but I recall talking to

J████.  And she had asked me if I wanted to hang out with her

and C████████.  I told her that I couldn't because I knew that

like my mom had dinner like coming.  Like, I heard her when I

was getting ready to pick up Faith, that she had spoken to my

dad about like picking up food --

Q.   Okay.

A.   -- that evening, so I knew that dinner was coming.  So I

told her I couldn't stay because my mom was expecting me to be

home.  And, you know, we just talked for a few more minutes.

I think we may have even taken a few selfies.

Q.   Okay.

A.   And then I told her I had to go.

Q.   What happened next?

A.   As I was walking home, I felt myself being pushed.

Q.   Okay.  Again, in your words, describe to the jury how you

were being pushed.

A.   I was walking towards my house, and then I felt a push

B.R. v. F.C.S.B.

117

from behind.

Q.    Did you at the time know who had pushed you?

A.    I knew that it was J▮▮▮ that had pushed me.

Q.    Okay.  And what happened next?

A.    I was on the floor, like I was on the ground.  There were
some bushes at the time, like in -- in this park vicinity.
Again, it's not a park, but I'll just refer to it as a park.

Q.    Okay.

A.    I felt there was some sharp -- like, felt things against
my arm.  I was very confused at this point.  J▮▮▮ and
C▮▮▮ were both laughing.  I didn't understand what was
funny about the situation.

Q.    At this point, when they're laughing, are you standing,
sitting, laying, what were you?

A.    At this point I'm laying down.

Q.    On your side, your tummy, or your back?

A.    I'm on my back.

Q.    Okay.  Where is J▮▮▮?

A.    J▮▮▮ is on top of me, like straddling me.

Q.    Is she -- well, you said -- when you said they were
laughing -- are they laughing at this point?

A.    Yes.

Q.    Okay.  J▮▮▮, you said she's straddling.  Explain what
that means.  Where -- where is she sitting vis-à-vis your -- I
guess your chest is up, right?  You're on your back?

B.R. v. F.C.S.B.

A.    I'm on my -- I'm on my back, yes.

Q.    Where is -- where is she straddling your body?

A.    My -- kind of on my like -- I don't know, pelvic area.
She's facing towards me, so I can see her face.

Q.    Okay.  C_____, where is he?

A.    He's to the side of me.

Q.    Is he standing, sitting, laying?  What's he doing?

A.    I don't really recall.  I feel like he was just like
kneeling or standing.

            MR. BLANCHARD:  Objection to what she feels likes.

            THE COURT:  Please listen to the question as best
you can, ma'am.

            THE WITNESS:  I'm sorry.  I think he was --

BY MR. BRENNER:

Q.    You can answer.

A.    I'm sorry.  If you -- can you --

Q.    Yeah, you think he was -- tell the jury where -- where
you think C_____ is at this point where -- when J____ is
straddling your midsection?

A.    He's to the side of me.

Q.    Okay.  And -- and you don't recall whether he's laying,
sitting, or standing at the time?

            THE COURT:  Objection sustained.

BY MR. BRENNER:

Q.    Do you recall whether he's laying, sitting, or standing

─────B.R. v. F.C.S.B.─────

119

at the time?

A.   Well, I think --

        MR. BRENNER:  I'm sorry?

        THE COURT:  I sustained the objection and you -- you

corrected the question.  She can answer.

        MR. BRENNER:  Okay.

        THE WITNESS:  Can you repeat the question?  I'm

sorry.

BY MR. BRENNER:

Q.   Do you recall when -- if J████ is -- you're on your back

and J████ is straddling you.  I'm just -- at this point, I

mean, the very beginning of this, do you recall at that point

whether C████████ is standing?

        You said he's to the side of you.  I'm just trying

to understand if you know at the beginning of what's going on

if he's laying down, standing up, or sitting down on your

side?

A.   At this point, he's sitting down and trying to like hold

my arms down.

Q.   Okay.  Is he -- if you're laying and J████ is here, is

C████████ on -- towards your head side or towards your feet

side?

A.   Towards my head.

Q.   And at this point, are they still laughing?

A.   Yes.

B.R. v. F.C.S.B.

120

Q.   Are -- what is the first thing when you're on the ground

that you remember either of them saying to you?

A.   I just recall laughing.  And, honestly, like it just felt

like kind of a blur.  I just recall like the actions that

really were being done to me and that there was laughing.  And

I said, like, stop.  I didn't find it funny.  I made it very

clear that I did not find it funny.

Q.   Okay.  What is -- other than the -- so you've been pushed

to the ground, you're being straddled.  And you said -- you

said C███████ was holding your hands or arms down?

A.   At this time, yes.

Q.   Okay.  What's -- what's the next thing you remember

either of them -- you said actions being taken.  What's the

next thing you remember either of them doing?  And specify who

is doing what.

A.   I remember that C███████ gives his phone to J████.

Q.   Okay.

A.   And she lifts up my shirt, and they take a picture of my

breasts.

Q.   Do you recall which of them lifted your shirt?

A.   I believe it was J████.

Q.   Were you wearing -- if you recall, were you wearing any

sort of bra at the time?

A.   I was wearing a sports bra.

Q.   And did you recall one way or the other whether your

B.R. v. F.C.S.B.

121

sports bra was lifted up also?

A.   At that time, it was lifted up to take the picture.

Q.   So --

          THE COURT:  Watch your form.

BY MR. BRENNER:

Q.   Okay.  And who -- you -- who took the picture?

A.   J███.

Q.   Okay.  And what do you remember happened next?

A.   I then remember that the phone was like put to the side
and that C██████ began to expose himself to me.

Q.   Did either of them say anything to you about the picture
at that time?

A.   That they were going to post it on Facebook.

Q.   Okay.  You said -- you said the next thing that happened
is C██████ started to expose himself.

          Can you explain that?

A.   I recall that he was wearing sweat pants, and he took his
penis out of his sweat pants and was exposing himself to me.

Q.   Where -- where is he when -- when he's doing that?

A.   He was on the side of me.

Q.   Where is -- where is J████?

A.   J███ is still on top of me.

Q.   Is -- is anything -- your arms, are they being held or
not being held anymore?

A.   At this point, J███ is restraining by sitting like on

B.R. v. F.C.S.B.

top of me.

Q.   Okay.  What's the next thing you recall happening after
C▮▮▮▮▮▮▮ exposed himself?

A.   I recall that he forced me to give him oral sex.

Q.   Is he -- where is he when he's doing that?

A.   He's to the side of me.

Q.   Okay.  And where is J▮▮▮?

A.   She's still on top of me.

Q.   What do you recall happening next?

A.   I recall that C▮▮▮▮▮ still was making me give him oral
sex.  And by this point, I didn't even know what to make of
the situation.  I then felt J▮▮▮ go inside of my pants.

Q.   Okay.  When you -- you said -- explain to the jury what
you mean when you said you felt J▮▮▮ go inside your pants.

A.   I felt her hand shift to going inside of my pants.

Q.   Did her hand go --

        THE COURT:  Watch your form.

BY MR. BRENNER:

Q.   Well, where -- I have to ask, where exactly did her hand
go?

A.   J▮▮▮ put her hand inside of my vagina.

Q.   Okay.  Where --

A.   May I clarify that?

Q.   Sure.

        THE COURT:  You need to -- you need to listen to the

B.R. v. F.C.S.B.

123

questions of Counsel, and answer as best you can.

BY MR. BRENNER:

Q.   Well, did you need to clarify what -- that answer?

A.   I didn't -- I didn't know if that was like clear as to

what I was saying when she put her fingers inside of me.

Q.   Inside of you where?

A.   Inside of my vagina.

Q.   Okay.  And where is she when he's doing that?

A.   She is now off to the side of me.

Q.   No longer straddling you?

A.   That's correct.

Q.   And is -- are you still being forced to perform oral sex

on C██████ at this time?

A.   I don't recall it being at the same time, no.

Q.   And what are -- are they -- are either of them saying

anything to you?

A.   I just really recall like a lot of like laughing, that

they were laughing at me.  They thought it was funny.  They

were talking to each other, and they thought it was funny.

And it wasn't.

Q.   What do -- what do you recall?

A.   I recall wanting it to stop.  I recall being very

confused because this was someone that who was my close

friend.

Q.   J████?

───────────B.R. v. F.C.S.B.───────────

124

A.   Yes.  She was my close friend.

Q.   What happened next?

A.   Eventually, like the sexual stuff, it stopped.  And they told me that they were going to post the picture of my breasts on Facebook, and they did.

Q.   Did you ever see -- did you ever see that picture?

A.   I did.

          And I -- I don't know --

          THE COURT:  If you can wait for a question.

          THE WITNESS:  Sorry.

BY MR. BRENNER:

Q.   Well, tell me, after you saw the picture, what -- what transpired?

A.   I said that if you don't delete the picture that I'm going to tell my mom.

Q.   Okay.

A.   And they did delete the picture.

Q.   You said when the -- all the sexual stuff stopped, on this -- on this particular occasion, have you now told the jury about the sexual acts that were done?

A.   Yes.

Q.   Okay.  Did -- how did -- how did this -- how did -- how did it all end?  Meaning, how did you -- what happened next?

A.   I recall that C█████████ also -- I had house keys, and my house keys fell out of my pocket while I was being assaulted.

And he put them down his pants, and he said that if I wanted

to get my house keys back that I had to reach for them in his

pants.

And I told him that if he didn't give me my house

keys back that I was going to tell my mom.  And I was very

upset at this point.  And, eventually, he did give me my keys

back.

Q.  Did -- did they -- who left the park first?  Did you

leave first, or did they leave first?

A.  I don't recall vividly, but I think I left first.

Q.  And where did you go?

A.  I went home.

Q.  Okay.  Tell us what happened when you got home.

A.  I immediately went upstairs to take a shower.

Q.  Was that -- well, strike that.

Was that your normal routine when you would come

home?

A.  No, that was not my normal routine.  Usually I interacted

with whoever might have been home, whether it be my parents or

my brother.

Can I add something that I forgot about -- to

mention also about the park assault?

Q.  Yes.

A.  When I was being assaulted, I saw my dad's car drive by

as well.

—B.R. v. F.C.S.B.—

126

Q.   Okay.  Drove by -- well, tell the jury, where was your
dad's car driving by?

A.   My dad was driving -- well, my dad and my brother were in
the car.  I saw my brother more distinctly.  He had a bag of
food in his hands, and they were driving down like -- it's
like the main street towards my house, and I saw them.

Q.   Okay.  Did they stop?

A.   No.

Q.   Okay.  You were telling the jury when you got home you
immediately went upstairs and took a shower.

A.   I did.

Q.   Okay.  And what happened next?

A.   I didn't really want to be around anyone.  There was a
staircase that -- at the front of our house that went up to --
it went upstairs.  There were two staircases.  I never really
used the staircase closer to the door to just go upstairs and
take a shower as soon as I got home.  So I took a shower and I
spent quite a bit of time in the shower and then eventually I
went down for dinner.

Q.   And I think you -- well, what day of the week was this,
best you recall?

A.   I believe it was on a Friday.

Q.   Okay.  Did you return to Rachel Carson on Monday?

A.   I believe so, yes.

Q.   Okay.  The -- the name-calling, the vulgar name-calling

B.R. v. F.C.S.B.

127

and the rumors about your promiscuity, were those -- did those

continue when you got back to school on Monday?

A.   They got worse.

Q.   Okay.  So tell the jury how that changed between the

prior week and now after what you just described happened to

you.

A.   Well, now C██████ was taking part of it in the sense of

he was saying, Well, I did the same thing with B███, and she

did these things with me as well.

        So he was just --

        MR. BLANCHARD:  Again, can we just get clarification

whether this is something she's heard as opposed to something

she --

        THE COURT:  If you can focus -- focus her a bit

because we do seem to have transition between what she heard

herself and what other people may have told her.  So let's try

to focus on the two separate inquiries.

        MR. BRENNER:  Okay.  Sure.

BY MR. BRENNER:

Q.   B███, I'm asking you about, at this point, what you

heard people were saying about you.

A.   I just want to be very clear that what I heard is that

C██████ was saying that I had done sexual acts with him.

        MR. BLANCHARD:  Your Honor, this is --

        MR. BRENNER:  May we approach?

Direct - B.R.

B.R. v. F.C.S.B.

128

THE COURT:  Sure.

(Sidebar.)

THE COURT:  I think the problem that we're having is the transition because what she heard is one thing.  That's direct firsthand knowledge.

What she heard somebody say that somebody else heard is hearsay.

So what exception do you have to the hearsay rule for the things that she did not hear directly but she heard someone say this?

MR. BRENNER:  Everything she's testified, she heard directly.  None of it is hearsay.  None of it is offered for the truth of the matter --

THE COURT:  Well, if she heard it directly -- let me finish.  If she actually heard it directly, that's one thing.  And I agree with you, that is -- there's no hearsay problem there.

But what she is saying is not consistent with the statement that you're making because she's saying that, I heard that they were saying these things about me, as opposed to, as I heard myself.

MR. BRENNER:  What I'm saying is none of it is hearsay.

THE COURT:  Okay.

MR. BRENNER:  None of it is being offered for the

B.R. v. F.C.S.B.

129

truth of the matter asserted.

THE COURT:  What purpose is it offered for?

MR. BRENNER:  It's being offered for the affect it's had on her and what's going on in school.  The school is being charged of notices.  She is not -- it's the things she's hearing she says are not true.  None of it is being offered for the truth of the matter asserted.

THE COURT:  You're offering it for the truth of the matter and just this environment she's experienced, so it is offering it for the truth of the matter.

MR. BRENNER:  That's what she's hearing.  She's hearing the environment part she is hearing.  This is what people are saying.  And that is what she is hearing.  That is firsthand testimony of what people are saying.  The matters asserted are not for the truth.

THE COURT:  But aren't you going to -- if I allow this, aren't you going to allow -- argue to the jury that all of these things were being said as part of creating this hostile environment that she was forced to exist in when she didn't have any firsthand knowledge that these things were said?

MR. BRENNER:  No, but that's what I'm saying.  The part that Your Honor -- and I agree with where you're trying to draw the line, but the part about the, this is what's being said, that's what she is saying, I am actually hearing.

THE COURT:  Okay.  I got no problem with that.

MR. BRENNER:  Yeah.  So she's hearing -- the fact that she's hearing what other people were saying, that second part, is not hearsay.  It is not for the truth of the matter.

THE COURT:  What is the purpose of it?

MR. BRENNER:  Which part?

THE COURT:  The second part.  That -- we all agree that what she heard she can testify to.

I'm just giving an example.  This is not part of the record.  But if she heard herself, that is, C.K. said she was a tramp, she heard that herself, not hearsay, good to go.

But if she heard someone, someone told her that C.K. said she was a tramp, that's different.

MR. BRENNER:  It's going to be the same thing.  That is what the rumor is.  She's going to say, I heard rumors around the school.  I heard that C.K. was saying I was a tramp.

She has to be able to say it.

How else can you get that in?  She's hearing it.

THE COURT:  But let me ask you this:  Do you believe she's going to be able to testify that C.K. told her directly -- maybe that's the way to put it -- the tramp is the example?

MR. BRENNER:  That's the second thing.  We will get to it indirectly, which I did last time.  I went through the

B.R. v. F.C.S.B.

131

whole process.  What did you hear directly from people, and
what did you hear about the rumors?

And the whole point of hostile environment of the
school, as you already heard from Co.K, and you already heard
from J███ S██████ it is absolutely rampant through the school
what she is testifying to, everyone is hearing.  And the jury
gets to know that she heard it too.

THE COURT:  I think the testimony from Co.K. and the
other individual were talking about things that they
specifically heard or specifically said.

MR. BRENNER:  I'm asking her, What did you hear?  So
she'll say -- she will say something like, I heard that
C█████ was saying I'm a slut.  I heard C██████ saying I
gave him oral sex.

She has to be able to say that.  It's not offered
for any truth of the matter asserted.

THE COURT:  Let me ask the question:  What is it
offered for?

MR. BRENNER:  It's offered to show that this is the
environment that she was subjected to and the -- ultimately,
we'll get to the school knowing.

THE COURT:  Let me ask you this by way of a
hypothetical.

What if -- hypothetically, what if the things that
she's said that she heard other people say about her were not

───────B.R. v. F.C.S.B.───────

132

true?

How is that to be appropriately interjected into the case?

In other words, if someone said that she had gone to the moon and back, and she heard someone say that she had gone to the moon and back -- and that's obviously not true -- why does that get to be part of the record that we are trying to create in this case?

MR. BRENNER:  The whole point is, none of this is true.  The point is they are spreading rumors --

THE COURT:  I think they are going to take a position contrary to that.

MR. BRENNER:  Well, no, I don't -- they will.  Fair enough.  Fair enough.  From her perspective.

THE COURT:  Right.

MR. BRENNER:  She's not saying -- I'm -- she's not -- well, we're obviously not going to argue, Oh, she really did give --

THE COURT:  Yeah.

MR. BRENNER:  None of this is true.  It's all the effect on her and the environment of the school.

Now, they can cross her and say, Well, actually, it wasn't a rumor.  You actually did these things.

If they can lay that foundation, do that, that's fine.  But this is -- the reason I want -- this is not really

─────────────── B.R. v. F.C.S.B. ───────────────

133

a hearsay issue.

      THE COURT:  Well, let me ask you --

      MR. BRENNER:  Every time she tries to say what she heard, Mr. Blanchard stands up and interrupts her answer and says, Well, she's saying what she heard from other people.

      Yes, it's what she heard.

      THE COURT:  He's being a zealous advocate, which he's entitled to do.

      MR. BRENNER:  That's okay.  I agree.

      THE COURT:  This is what you can do.  You can ask her directly what she heard that were things that were directed to her that she had firsthand knowledge of, and you can ask her was she aware that there were things going on and being said in the school without getting into what they are saying and what was the effect on her.

      MR. BRENNER:  Just want to be clear.  If I say to her, preface it as:  she said -- I'm making this up.

      THE COURT:  Right, right.

      MR. BRENNER:  Hypothetically, she said my friend Olivia told me that C██████ said, You gave him oral sex.

      That's what she heard and the effect on the listener.  I want to make sure that's okay.  I preface my question with any of the stuff she heard.  I'm only asking what she heard.

      THE COURT:  But I think based upon -- obviously,

—— B.R. v. F.C.S.B.——

134

she's not a lawyer, and she doesn't understand the nuances.

MR. BRENNER:  It's our job.  Right.

THE COURT:  But I think the effort that you're trying to accomplish by asking her what she heard directly is sort of in a bad way getting leaked into other things that she cannot testify to.  I think that's the problem.

MR. BRENNER:  I'm going to preface my question to her on things that she heard directly.

THE COURT:  Okay.  All right.

MR. BRENNER:  And then, as I understood Your Honor, she can -- I can also ask her:  Were you aware of these type of rumors being spread around the school?  Without getting into what they were.

THE COURT:  Yes.  Fine, but that's it.

MR. BRENNER:  I think the examination -- but I understand.  So I'm going to -- and -- yeah, I'm sorry.

MS. REWARI:  And just -- since we're here, I think that the example that Your Honor gave, I heard from my friend Olivia that C.K. said this, to my ears it's different than, I heard kids saying so and so.

THE COURT:  Yeah, yeah.

MS. REWARI:  When you -- and so as long as that testimony is tied to an individual with a name, to me, that's a different character than saying it generally.  When you say, Generally, I heard these things, that's when the bleeding

Case 1:19-cv-00917-RDA-LRV   Document 1047   Filed 08/26/24   Page 135 of 207
PageID# 21554
Direct - B.R.

—————————— B.R. v. F.C.S.B. ——————————

135

starts from one to another.

        THE COURT:  All right.  I think we're all on the

same page.

        MR. BLANCHARD:  Thank you, Your Honor.

        THE COURT:  Thank you.

        (Open court.)

        MR. BRENNER:  So, Your Honor, may I just lead for a

little bit to reset?

        THE COURT:  You can reset the stage, yes.

BY MR. BRENNER:

Q.   When the -- right before -- right before the lawyers went

up there, we were talking about the day or days when you

returned to school after what happened at the park, okay.

        Do you remember that?

A.   Yeah.

Q.   Okay.  So -- and you had -- you had testified that the --

the name-calling and the rumors of promiscuity had -- had

gotten worse since the previous week?

A.   Yes.

Q.   Okay.  So that's where we were.

A.   Okay.

Q.   So, first, I want to focus -- I want to focus my

questions on what you yourself heard.

A.   Okay.

Q.   Okay.  So -- and I'm going to start with what people said

B.R. v. F.C.S.B.

136

to you, okay?

        So were people in this -- this week we're talking

about now, were people coming to you -- coming up to you and

name-calling?

A.    Yes.

Q.    Okay.  Tell me what they were saying to you.

A.    They were saying --

Q.    Tell the jury, excuse me.

A.    They were saying that I was a slut, that I was a whore,

that I gave out blow jobs, that I gave out hand jobs.  They

said that I was a bitch.  They called me a lesbian.

Q.    Okay.  And these were things that were all said directly

to you?

A.    Yes.

Q.    Like we did when we talked about the prior week, were

there -- were these -- were these things being said to you by

kids that you didn't know?

A.    Yes.

Q.    Okay.  Were there any kids that you did know that were

saying these things to you?

A.    Yes.

Q.    Who was that?  Again, first -- first names or initial, if

you can?

A.    David, C███████, J████.

Q.    Okay.  In addition to the name-calling, were anyone -- I

───────────B.R. v. F.C.S.B.───────────

137

guess you touched on this a little bit, but were anyone -- was there anyone else coming up and saying that you had performed sexual acts on anyone?

A.    Yes, there were a few other people.

Q.    And did they name -- again, what was said to you, directly to you, did they name the person or persons that you supposedly engaged in these acts with?

A.    Yes, they told me --

        MS. REWARI:  Objection, Your Honor.

        THE COURT:  Okay.  Well, is this something she heard directly, Counsel?

        THE WITNESS:  Yes.

BY MR. BRENNER:

Q.    This is to you directly.

A.    Yes.

Q.    Did people to you directly say, you know, you -- B████, you engaged in sex acts A, B, or C with -- with particular people?

A.    Yes.

        THE COURT:  She can answer that.

        MR. BRENNER:  Okay.

        MS. REWARI:  Your Honor, I would just clarify that I believe we haven't heard the names of these few other people.

        THE COURT:  Well, let's see if she can provide names or initials.

─B.R. v. F.C.S.B.─

138

BY MR. BRENNER:

Q.    Do you know the -- do you know the names or initials of
these other people who came up to you and said these things?

A.    Yes.

Q.    Who -- again, names or initial, if you could?

A.    Patrick.

Q.    Okay.

A.    I recall there was this boy named Danny.

Q.    Danny?

A.    Yes.

Q.    Okay.  Anyone else?

A.    Those are the ones that stick out at the top of my head
right now.

Q.    And when -- again, we're focusing on things that you
yourself heard.

A.    Yes.

Q.    All right.  When Patrick or Danny or these -- any other
kids came to you and said -- talked about sex acts that you
engaged in, did they name the people that you -- did they say
to you, I heard you engaged in a sex act with, and name names?

A.    Yes.

Q.    And what names did they name?

A.    They named to me directly C█████████ and David
specifically.

Q.    Okay.  Now, were you aware -- without getting into any of

Case 1:19-cv-00917-RDA-LRV   Document 1047   Filed 08/26/24   Page 139 of 207
PageID# 21558                           Direct - B.R.

B.R. v. F.C.S.B.

139

the details, were you aware also that there were rumors going around the school about things like your sexuality and your promiscuity?

           THE COURT:  Yes or no.

           THE WITNESS:  Yes.

BY MR. BRENNER:

Q.   Okay.  And how -- tell the jury what you were going through at that time.

           What was -- how were you feeling?

A.   I felt terrible.  I felt humiliated.  I felt embarrassed.  I loved coming to school, and now I just didn't want to.  I wanted to disappear.

Q.   Okay.

           MR. BRENNER:  Your Honor, may I publish, already in evidence, it's a -- it's a part of Exhibit 193.  It's a locker photo.

           THE COURT:  We couldn't hear you.

           MR. BRENNER:  Yeah, permission to publish.  It's part of Exhibit 193.  It's a photo of some lockers the jury has seen.

           THE COURT:  Yes.

BY MR. BRENNER:

Q.   The jury has heard a lot about lockers, but I want to -- I want to just ask you some questions.  You don't -- may I? Let's do it real quick, okay?

─────B.R. v. F.C.S.B.─────

140

A.    Okay.

Q.    Do you see that?

A.    Yes.

Q.    Okay.  Can you just point out for the jury where your

locker was?

A.    Sure.  (Indicating) in that vicinity.

Q.    Okay.

A.    More or less.

        THE COURT:  Just for point of reference.  I see --

and correct me if I'm wrong, ma'am, I've never been to the

school.

        Are there three rows of lockers or four?

        THE WITNESS:  I believe that there were three

lockers, but mine was in the last row facing the wall.  If

that makes sense.

        THE COURT:  So the lockers are two-sided?

        THE WITNESS:  Yes.

        THE COURT:  Okay.

        MR. BRENNER:  Okay.

BY MR. BRENNER:

Q.    So when you say "facing the wall," if you were standing

looking at your locker, would you be -- would your face be

facing the wall or your back be facing the wall?

A.    My back would be facing the wall.

Q.    The wall with the yellow strip on the top there or

─────B.R. v. F.C.S.B.─────
141

whatever that is?

A.    That's correct.

Q.    Okay.

        MR. BRENNER:  We can take that down.

        May I approach?

        THE COURT:  Standing order.

        THE WITNESS:  Only if the screen is off when it's
here.

        MR. BRENNER:  The screen is off?

        THE WITNESS:  As long as the screen is off, I
don't -- yeah.

        MR. BRENNER:  Okay.

BY MR. BRENNER:

Q.    Okay.  During -- well, let me ask you this:  How -- when
the -- when the things are being said to you directly and the
rumors you're hearing -- well, let's just say it directly
about the alleged sex acts with David and C█████████, are they
in school at this time?  I mean, are they still students
there?

A.    Yes.

Q.    Do you -- do you have to see them during the day?

A.    I do have to see them during the day.

Q.    Okay.  And how did that -- how did that make you feel?

A.    It felt terrible because they were coming to my locker.

Q.    Okay.  So let's talk about the lockers.  The jury has

B.R. v. F.C.S.B.

142

heard some about the lockers.

          Tell the jury what was happening at your lockers --
at your locker.

A.   David and C█████, and at times other boys too, would
come to my locker and come around me, and they would touch me
inside of my blouse or on the outside of my blouse, but a lot
of times on the inside of my blouse, on the back side, like on
my butt area or like in my pants region, and they were
touching me.

Q.   Now, you said they would -- they would come around you.
What do you mean by that?  The teachers or the -- anyone in --
any of the adults in school, where were they when the kids
were at their lockers?

A.   They were usually, to my recollection, at the doors of
their respective classroom.

          MR. BRENNER:  Okay.  If we -- if we could bring that
back up, Your Honor?  May we publish?

          THE COURT:  You may.

BY MR. BRENNER:

Q.   Can you draw where the teachers would be?

A.   Yes.

Q.   Okay.

A.   So if like -- those are not exact, but that's kind of the
vicinity that they would be in if those were classrooms.

Q.   Okay.

─── B.R. v. F.C.S.B.───

143

A.   They would be near their classrooms or congregating in

that area.

Q.   Were the teachers or anyone else, any of the adults in

the school, walking in between the rows of lockers to make

sure nothing was going on?

A.   I don't recall that being the case.

Q.   Okay.

          MR. BRENNER:  You can take that down, please.

BY MR. BRENNER:

Q.   Did you report to anyone at the school what was going on

at your locker?

A.   I did.

Q.   Okay.  Before we get into that, was this a one-time

event, or did this happen more than once?

A.   This was a repeated unwanted thing that happened to me.

Q.   And who -- and is -- and when it -- is it -- am I right

that it first started this week we're at?

A.   Yes, that's correct.

Q.   Tell me, or tell the jury, who did you try to report this

to?

A.   I tried -- do you just want me to like list?

Q.   Sure.

A.   I tried to at different points tell Ms. H███████, my

guidance counselor.

Q.   Okay.

─B.R. v. F.C.S.B.─

144

A.    Ms. F███████, the other guidance counselor.  And then

my three core teachers.

Q.    Who -- who -- well, how many core teachers did you have?

A.    I had four.

Q.    Okay.  And did you report it to all four?

A.    I recall -- like, I recall telling three of the four of

them.

Q.    And who were they?

A.    It was Ms. C███, Ms. F██████, and Mr. T██████.

Q.    And who -- who -- and they're all in the courtroom today?

A.    They are.

Q.    Are they in the courtroom today?

A.    Yes, they're in the courtroom.

Q.    Okay.  And there was a fourth core teacher?

A.    There was.

Q.    And what was her name?

A.    Her name was Ms. Estrella.

Q.    And she's not in the courtroom?

A.    She is not in the courtroom.

Q.    Okay.  Now, Ms. F██████ testified about finding you

at your locker with your hand in your forehead.

        Is this during that -- did that happen during this

week?

A.    That is correct.

Q.    And that would be what number meeting with

B.R. v. F.C.S.B.

145

Ms. F██████████?

A.    That would be my second meeting with her.

Q.    Okay.  And so, can you tell the jury what you recall of that meeting with Ms. F██████████?

A.    I recall that I was being touched at my locker by three boys, David, C███████, and Patrick.  They were touching my breasts, they were touching my butt.  And Ms. F██████████ came and she asked me to come with her to her office.

Q.    Okay.  So is it -- it's your recollection that it was three boys surrounding you and not three girls?

A.    That is correct.

Q.    Okay.  And she asked you to come to her office, you said?

A.    That's correct.

Q.    Tell the jury what happened next.

A.    When I went to Ms. F██████████ office, I told her that things had not gotten better because she had told me the week before that things would die down.  They would get better.

        They weren't getting better.  They were getting worse.  I told her that these boys were coming to my locker.  They were bothering me.  They were touching me.  They were saying that I did all of these sexual things.  They were saying that I gave blow jobs, that I was a slut, that I was a whore.

        And that I didn't want to be touched by my locker, and I felt really upset by this.

B.R. v. F.C.S.B.

146

Q.    Okay.  Can you just -- I think we got our microphone --

A.    I'm sorry, am I too close?

Q.    Yes.  Scoot back a little bit.

A.    Is that better?  Sorry.

        Okay.  Can you hear me from here?  Okay.

        THE COURT:  Just from that position, just say, "Test
1, 2, 3."

        THE WITNESS:  Test 1, 2, 3.  Can you hear me okay?

        THE COURT:  That's good.

        THE WITNESS:  Okay.  Sorry.

        MR. BRENNER:  Good, Your Honor?

        THE COURT:  Yes.

BY MR. BRENNER:

Q.    Now, you said at the -- the prior meeting with
Ms. F███████ she had given you advice of things you should
change to maybe hope it would blow over.

        Did her advice to you change during this meeting?

A.    I just felt very -- yeah, like it didn't really change.
It was, again, to the effect of I hadn't given it enough time
to die down.

Q.    The "it" being what?  What had you not given enough
time --

A.    The rumors, the name-calling, the -- now it was touching
on top of it.  And, like, I just hadn't given it enough time,
like I was still adapting to middle school.

B.R. v. F.C.S.B.

147

       And I didn't agree with that assessment.  I felt very dismissed.

Q.    During this week does Ms. H█████ see you?

A.    No, but I tried to see her.

Q.    Okay.  Is this -- is this during this week one of the hallway encounters you talked about?

A.    That is correct.

Q.    Okay.  And where did you see Ms. H█████?

A.    I recall seeing her when I was about to go upstairs to my second period class, which was a Spanish class that I had on the second floor of the school.  And that is where I had this interaction with her.

Q.    What you described earlier?

A.    Yes, correct.

Q.    Okay.  Okay.  In the assault that you described in the park, you said both C█████ and J████ were there, correct?

A.    Correct.

Q.    Was there a time that you were sexually assaulted again in your neighborhood?

A.    Yes.  There was a time I was repeatedly sexually assaulted.

Q.    Okay.  So let's bring up the aerial one more time.

       MR. BRENNER:  Permission to publish, Your Honor?

       THE COURT:  You may.

BY MR. BRENNER:

B.R. v. F.C.S.B.

148

Q.   To be clear on these -- on the -- what we're about to go
through, was J█████ present for any of these additional
assaults?

A.   She was not.

Q.   Okay.  Who was present?

A.   C████████.

Q.   Can you -- can you -- either by a circle or an X or
whatever you want to do, can you show the jury where these
additional assaults took place?

A.   Yes.

Q.   Okay.

A.   It's not working.  Do I need to press something?

          THE COURT:  Why don't we take it down, and then put
it back up and see if it repopulates?

          Try now.

          MR. BRENNER:  Do you have that pointer?  Let me see
if this works.

          (A pause in the proceedings.)

          THE COURT:  Mr. Brown [sic], just a question, it
seems like this particular one -- and I don't know why -- has
an area in red that's circled, and I don't recall it being
circled last time.

          MR. BRENNER:  I think that has been the one -- I
think it is the same one.

          THE COURT:  Okay.  And I'm thinking that might be

B.R. v. F.C.S.B.

149

the reason why it's not populating is because there's already

something on it, but she can use the pointer.

            MR. BRENNER:  Oh.  Is that -- I'm sorry, Judge.

            THE COURT:  She can use the pointer.

            MR. BRENNER:  Is the pointer working?

            THE COURT:  We'll see in a minute.

            THE WITNESS:  I don't think so.

            MR. BRENNER:  Okay.

            THE WITNESS:  Move back.

            (Brief off-the-record discussion.)

BY MR. BRENNER:

Q.   Okay.  So can you show where the assaults took place?

A.   Like right here.

Q.   Okay.  So that's -- where is that in relation to the bus

stop?

A.   It's right behind the bus stop.

Q.   Is there -- it's hard to see in that picture, but is

there a fence in between the road where the bus stop is and

where the assaults took place?

A.   Yes.

Q.   Okay.  And then can you show the jury, is there another

place in your neighborhood where the assaults took place?

A.   Yes.

Q.   Can you show that -- where that is?

A.   (Pointing.)

─B.R. v. F.C.S.B.─

Q.   Are you pointing to those trees there?

A.   Correct.

Q.   Okay.  Okay.  Any -- other than the park, which you went

through before, any other place in your neighborhood where the

sexual assaults by just C█████ occurred?

A.   Those are the two places that it happened.

Q.   Okay.  As you sit here today in 2024, can you pinpoint

the exact amount of times C█████ sexually assaulted you?

A.   Well, I can't give an exact amount of times that it

happened, but it just shouldn't have ever happened.

Q.   Okay.  Can you pinpoint -- I guess it's 13 years later or

nearly 12 1/2 years later -- the exact dates that any assaults

occurred?

A.   I can give like a date range.

Q.   Just a range, okay.

          When do the assaults by C█████ alone, the sexual

assaults, start?

A.   They start in October.

Q.   Okay.  And when did they end?

A.   They start -- they end in February of 2012.

Q.   How do you know that date?

A.   It stopped when I was pulled out of school by my mom.

Q.   Okay.  Do you know if the -- do you recall if the

assaults took place on weekdays, weekends, or both?

A.   I recall them taking place on weekdays.

B.R. v. F.C.S.B.

151

Q.   Do you recall if those weekdays were always a school day
or no?

A.   Generally, I recall them usually, if not always, being
school days.

Q.   Are you able to tell this jury exactly what happened on
each assault by time?

         Meaning, can you say Assault No. 2 this happened,
Assault 5 this happened?

A.   I can't, because when you're repeatedly raped and
sexually assaulted, it's very hard to, like, have a
recollection of what someone did to you on Time 3 versus
Time 5.  It blurs together.

Q.   Okay.  So I want to talk about it, then, more in sort of
subjects or categories and see if you can do the best you can
to explain to the jury what happened to you.

A.   Okay.

Q.   My first question is:  During these assaults by
C█████, were there threats made to you?

A.   Yes.  There were many threats made to me and my family.

Q.   Okay.  So tell the jury what threats were made to you?

A.   Threats that if I told anyone -- or I shouldn't say
"anyone," but my parents specifically -- what he was doing to
me, that he would kill my family and kill me.  And that
included my brother also.

Q.   Okay.  And were those threats something that -- let me

B.R. v. F.C.S.B.

152

ask you this: When was the first time that threat -- those
types of threats were made?

A.    When he sexual assaulted me for the first time by
himself.

Q.    Did there come -- was there ever a time in the period of
time between October and February 9th where those threats
stopped?

A.    They never stopped.  They were ongoing, continuous
threats that, frankly, feel like they got more violent.

Q.    Okay.  Now, we're going to talk about the actual sexual
violence, but I want to talk about first, was there also other
physical things that C███████ did to you that weren't in and
of themselves sex acts during these assaults?

A.    Could you clarify?

Q.    Sure.

        So putting aside -- and we're going get to this in a
moment.  Putting aside the sex acts that you were -- that were
done to you or you were forced to do, did he also -- were
there other physical -- physical violence done to you?

A.    Yes, there was.

Q.    Okay.  Can you tell the jury, as best you can, what those
things were?

A.    He would use knives and cut me.

Q.    Okay.

A.    He would burn me with lighters.

B.R. v. F.C.S.B.

153

Q.   Okay.

A.   He would use, like, clothespins.

Q.   Clothespins?

A.   Yeah.

Q.   Can you explain that to the jury, what you mean by that?

A.   I guess the best way you could describe it is like -- I don't know if you're hanging your laundry on, I don't know, a clothesline and --

Q.   And where would he use clothespins?

A.   On my body, but specifically on my breasts, on my vagina.

Q.   Any other acts of physical violence that took place during these assaults?

        We're going to get to the sexual violence in a moment.

A.   He hit me.  He kicked me.  He hit my head, repeatedly striked my head at times.  I mean, he obviously restrained me by just holding me down.

Q.   Okay.  Okay.  Let's now talk about the -- the sexual violence.

        Are you okay?

A.   Yeah.

Q.   Tell the jury what sexual violence C████████ did to you.

A.   C████████ would force me to give him oral sex.  He would use his fingers and go inside of my vagina.  He would vaginally penetrate me, and he would anally penetrate me.

─────────B. R. v. F.C.S.B.─────────

154

Q.   And penetrate you with his fingers or with something else
or both?

          THE COURT:  Watch your form.

BY MR. BRENNER:

Q.   How would he vaginally penetrate you?

A.   With his penis and fingers.

Q.   And how would he anally penetrate you?

A.   With his penis.

Q.   Did all of those things, the sexual violence --

          THE WITNESS:  Sorry.

          MR. BRENNER:  Do you need to take a break?

          THE WITNESS:  I'm okay.

          THE COURT:  Ladies and gentlemen, we're going to go
to about 1:00.  Why don't we, in our spaces right now, just
stand up and take a stretch break?

               (A short break was taken.)

          THE COURT:  Okay.

BY MR. BRENNER:

Q.   B███, we're going to change subjects.

A.   Okay.

Q.   As we go from late October into November, let me just try
to give -- as a predicate, give you a marker.

          Did there come a time -- and you mentioned earlier
where your mom came to school in November?

A.   Yes.

Case 1:19-cv-00917-RDA-LRV   Document 1047   Filed 08/26/24   Page 155 of 207
PageID# 21574
Direct - B.R.

155

─────B.R. v. F.C.S.B.─────

Q.   Okay.  And you remember that date?

A.   November 21st.

Q.   So I'm now going to focus on the time period between when
the assaults -- the assaults by just C██████ have started
and continue up until that date, okay?

A.   Okay.

Q.   Okay.  The things we've been talking about before, the
vulgarity, the -- the rumors of promiscuity, the name-calling,
did those things continue in that time period?

A.   Yes.

Q.   Did you -- did they get better, worse, or stay relatively
the same?

A.   It got worse.

Q.   Okay.  How did -- how did those things get worse?

A.   Now things were said directly to me, like I was having
sex with C██████, that any boy could do these things with me
and I would do them -- like sexual things with them.  The
touching was also still going on.  Things like I was a slut, I
was a whore continued.

          THE COURT:  Next question.

BY MR. BRENNER:

Q.   Were these -- the things that were being said directly to
you, were they being said by boys and girls?

A.   Yes.

Q.   Okay.  Were they being said to you, again, by people you

know, people you don't know, or both?

A.    Both.

Q.    Did you continue to make efforts to reach out to the
school for help?

A.    Yes.

Q.    Okay.  So tell me or tell the jury what the next meeting
you recall with anyone from the school?

A.    I recall I kept reaching out for help, that I kept asking
to go -- from my teachers to go to the guidance office and try
to see my guidance counselors.  My guidance counselor, I
should say Ms. H██████.  I still -- I was not successful at
meeting with anyone.  And, yeah, I hadn't had a meeting with
anyone.

Q.    Did there -- did there come a time in this time period
where you had any additional meetings with Ms. F████████?

A.    Those were the two times before.

Q.    Okay.  Did you -- you told us earlier that Ms. C███ was
your homeroom teacher?

A.    Yes, and my math teacher.

Q.    Okay.  Explain to the jury what -- what the homeroom
teacher, what was -- what was that role, what -- how did that
fit into your daily schedule?

A.    Basically, when you got to school in the morning, it was
like you would go to your homeroom class, and you would hear
morning announcements and just sort of like, I guess, kind of

B.R. v. F.C.S.B.

like your home base.

Q.    Okay.  Is that where attendance was taken?

A.    To my recollection, yes.

Q.    Okay.  Can you tell the jury during this time period how you were getting to school?

A.    I was taking the bus to school mainly.

Q.    Okay.  Did there come a time where you started being late to class?

A.    Late or near late to class at times, yes.

Q.    And tell the jury about that.  Why were you being -- if you were coming on the school bus, why would you -- why were you being late to class?

A.    Because David and C█████████ would be by my locker in the morning, and they were touching me and taunting me and saying all of these sexual slurs and things to me.  And they were touching me.  And I couldn't open my locker.  And my hands would be shaking, and I couldn't open my locker because I was so upset by this.

Q.    The lockers at Rachel Carson, were they keys or a combination?

A.    They were combinations.

Q.    And if -- if a student -- was there -- was there a person from the faculty that was assigned to help kids with their lockers if they had problems?

A.    Yes, there was.

B.R. v. F.C.S.B.

158

Q.   And who was that?

A.   Mr. T█████, my science teacher, had the master key for

my pod.

Q.   When you say "pod," what -- what does that mean?

A.   Like, I meant the Explorers team, like my area where my

locker was situated.

Q.   Did you -- did there come a time where you asked

Mr. T█████ for help with your locker?

A.   On many occasions, yes.

Q.   Okay.  And what was -- did he help you open your locker

when you asked?

A.   He did, but he seemed very irritated with me.

Q.   Okay.  What -- what about Ms. C████, how did she react to

you being late to class?

A.   Again, like irritated.  Like I was a bad student.

Q.   You mentioned there were three teachers here.

         I want to talk a little bit about Ms. F███████.

A.   Yes.

Q.   Okay.  Did you ever report to Ms. F██████ the types of

things that were happening to you?

         THE COURT:  Just a moment, ma'am.

         MS. REWARI:  It's fine.  Sorry.  I was anticipating

a leading question.  Thank you.

         THE COURT:  You may answer.

         The question was:  Did you ever report to

B.R. v. F.C.S.B.

159

Ms. F████ the type of things that were happening to you?

                    THE WITNESS:  Yes.

BY MR. BRENNER:

Q.   Tell the jury what -- what -- the best of your

recollection, what you told Ms. F████?

A.   I was struggling, so my second period class was my

Spanish class, and that was on the second floor.  And I recall

having her class after that.  So I would have to come from the

second floor back down to the first floor where her class was.

And during that time that I would be coming down from the

second floor, I would see C████ usually, and he would

touch me or he would be taunting me or he would be threatening

me.  And I was really struggling to -- either get to class

just barely on time or it was just really struggling to get to

class, and I had told her like this is why I was struggling to

get to class.

Q.   Well, just -- what exactly did you tell her?  Or to the

best of your recollection?

A.   I told her that I couldn't get to class because that boys

were saying these really sexual things that were making me

really uncomfortable.  They were touching me.  They were

threatening me.  And I felt really unsafe, and it was hard to

get to class.

Q.   And what do you recall Ms. F████ doing?

A.   I recall on some occasions she gave me a pass to go to

——B.R. v. F.C.S.B.——

160

the guidance counselor.  But, again, it was B███ try to make

it to class on time.

Q.    During this time period, did you actually -- did you ever

just go to the guidance counselor's office just to see if you

could walk in?

A.    I did.

Q.    Tell the jury about that.

A.    I left slips, too, while I was there, just to try to walk

in and ask to see my guidance counselor, and I still was not

successful.

        Just to clarify, are you still talking about before?

Q.    Before November 21st.

A.    Yes.

Q.    Okay.  Because you actually do see Ms. H███████ with --

when your mom comes in?

A.    That's correct.

Q.    Okay.  Let's talk -- the jury has heard about the concept

of cyberbullying.

A.    Yes.

Q.    So, first of all, what -- what was there -- by your own

observation and by your own experience, was there

cyberbullying -- was -- was there cyberbullying going on at

Rachel Carson Middle School in the fall of 2011, in the spring

of 2012?

A.    A lot of it, yes.

─B.R. v. F.C.S.B.─

161

Q.   Okay.  Before we get into particular instances, can you just describe to the jury what different types of cyberbullying people were doing?

A.   There were multiple forms of cyberbullying.  There were -- you could -- if you had a Facebook page, someone might post something on your Facebook wall, just like your profile, basically.  And someone could comment or write something on your wall that's nasty or maybe leave a nasty comment on your page.

Q.   And did you have a Facebook page at the time?

A.   I did.

Q.   Okay.  Does that mean you also have a Facebook wall?

A.   Yes.

Q.   Okay.  What other types of cyberbullying were going on?

A.   There were actual, like, hate pages.

Q.   Explain to the jury what a hate page is.

A.   A hate page is literally just a page dedicated to spreading hate about a topic or a person.

Q.   Okay.  Were there any other kinds of cyberbullying going on in -- in the -- we'll focus on the fall since we're on the timeline.

A.   Yes.

Q.   2011.

     What other types?

A.   There would be accounts that were created to send direct

———B.R. v. F.C.S.B.———

162

messages to people that were sexual in nature.  Usually about

rumors or things that I was doing or supposedly doing, calling

me really derogatory names.

Q.   Okay.  Before --

A.   And --

Q.   Before we get into about you.  I'm just talking

generally.  The cyberbullying, were you the only subject of

cyberbullying at Rachel Carson?

A.   No.  There was a lot of other cyberbullying.

Q.   Okay.

A.   I don't -- so there was another form of cyberbullying.

Q.   And what is that?

A.   Like impersonating people was also something that --

Q.   And tell the jury how that -- again, not as to you

particular, just how -- at Rachel Carson, how would kids do

that?

A.   They would pretend certain accounts belonged to a certain

student, and they would say stuff that was just really hurtful

or hateful, and it would just -- they would -- the account

would pretend to be that certain person.

Q.   Okay.  Can you -- now, as to you in particular -- again,

we're in the fall of 2011.

A.   Yes.

Q.   October, November.

         Were you subjected to cyberbullying at Rachel

Direct - B.R.

─B.R. v. F.C.S.B.─

163

Carson?

A.    I was.

Q.    Can you tell the jury what that -- how -- what form that
took?

A.    It took the form of a lot of the things that I just
talked about.  Things on my Facebook wall, people would write
stuff to the effect of I was a slut, I was a whore.  Sometimes
it was in a way that it was meant to be hurtful or bullying,
or it would be stuff along the lines of, I hate how all of the
8th graders call you a whore or something like that.

        I would receive direct messages that would tell me
to go kill myself.  That everyone hated me.

        There were also hate pages that were started that
were telling me to drink bleach and to kill myself and that no
one liked me and that I was a slut.  There were also accounts
that impersonated me as well.

Q.    Did -- did you and your mom report this to the school?

A.    Yes.

Q.    Okay.  Is that -- now that -- that would get us into the
November, '21/'22 area?

A.    That's correct.

Q.    Okay.  Before that -- before that, did you ever tell any
of the school officials, whether it be teachers, guidance
counselors, assistant principals, prior to November 21st, that
you were being subjected to cyberbullying?

B.R. v. F.C.S.B.

164

A.   I did mention it, yes.

Q.   Okay.  Who do you think you told that to?

A.   I mentioned it to -- well, I mentioned it in my slips to
the guidance counselor.

Q.   For your reason for visit?

A.   Yes.  For my reason for visit.

Q.   That would be to Ms. H██████?

A.   Correct.

Q.   Anything else?

A.   I also mentioned it in my meeting with Ms. F████████ as
well.  And I did tell my core room teachers -- or my core
teachers that as well too.

Q.   Okay.  Now, the jury heard and saw messages from an
account under the name of Jenni Taylor.

A.   Yes.

Q.   You know what that is, right?

A.   Of course.

Q.   Okay.  And we're going to talk about that later and allow
you to give your explanation for that.

A.   Of course.

Q.   The cyberbullying that you just went through, that is
not -- is it the Jenni Taylor stuff?

A.   No, it was -- it was completely different.

Q.   Okay.  I want to talk to you a little bit about -- and
we'll get back to that later, I promise.  I want to talk to

you a little bit about, I guess, your -- your technology at

the time, what you had -- what you used, okay?

A.    Okay.

Q.    First of all, did the school have computers for the kids

to use at the school?

A.    Yes.

Q.    Were those -- if you recall, were those laptops or

desktops?

A.    I think they were laptops.

Q.    And how would that work?  How -- would they -- how did

you get them?  Did they bring them around on a cart or what

happened?

A.    I believe so.  I'm not 100 percent sure.

Q.    Did the school allow the kids to take their own -- the

laptops home?

A.    No.

Q.    Okay.  So you had access -- well, I won't lead.

        Did you have access to use those computers for

certain times in school?

A.    Yes.

Q.    Okay.  Let's go to your -- now to your home and to you.

        Your recollection, did you have a cell phone at the

time?

A.    I did.

Q.    Was it what we now call a smartphone or was it not?

─────── B.R. v. F.C.S.B. ───────

166

A.   It was not a smartphone.

Q.   Okay.  Were you able, on that cell phone, to send -- I
never know if they're called texts or SMS.

     Were you able to send text messages?

A.   I was able to send text messages, yes.

Q.   Okay.  To other phones?

A.   Yes.

Q.   Okay.  And did you do that?

A.   I did at times, yes.

Q.   Okay.  Your brother, did he have -- what -- what was his
phone situation?

A.   He did not have a smartphone either.  It was like a flip
phone.

Q.   And your mom?

A.   She had a flip phone.

Q.   And what about -- did anyone in your house have a -- what
we now call a smartphone?

A.   My dad did.

Q.   Okay.  Why -- do you know why your dad had one and you
guys didn't?

A.   Yes.  So my dad was running a small business, and I
recall that he needed a smartphone to be able to, I guess,
process credit cards that he was using from his business, if
that makes sense.

Q.   Were you done?  I'm sorry.

─B.R. v. F.C.S.B.─

167

A.   Yeah, I'm sorry.  That's it.

Q.   Okay.  Just tell the jury what your dad's business was,
the business he was running.

A.   My dad ran a small beauty distribution business.  So he
would, like, take wholesale hair products and sell them to
other hair salons.

Q.   Okay.  Computers in the house.

     Did you guys have -- did the family have a computer
or more than one computer?

A.   We had a computer.

Q.   Was that a desktop or a laptop?

A.   It was a desktop.

Q.   Can you tell the jury where that computer sat in the
house?

A.   The desktop was in a study off the side of our kitchen on
the first floor.

Q.   And you mentioned the house was -- had a second level.

     Was -- were the bedrooms all on a particular level?

A.   The bedrooms were all on the second floor.

Q.   And the first floor had one on it?

A.   The first floor had a powder room.  It had a formal
living room.  It had like a family room, an eat-in kitchen, a
kitchen.  Then there was the study, and then there was a
laundry room, and then to the garage, access to the garage.

Q.   And the computer was in the study?

─────────── B.R. v. F.C.S.B. ───────────

168

A.    That's correct.

Q.    Did you guys have, whether it be -- was it -- did you
guys -- on the computer was there access to the internet?

A.    Yes.

Q.    Did you use that computer sometimes to access the
internet?

A.    At times, yes.

Q.    Did you use that computer sometimes to access social
media?

A.    At times.

Q.    Would that include Facebook?

A.    Yeah, at times.

Q.    Was the -- were there any -- were you allowed -- the
kids, you and your brother, were you allowed to take your cell
phones upstairs at night when you went to bed?

A.    No, we weren't allowed to.

Q.    So how did -- explain to the jury what the -- I'll call
it a rule, but if it wasn't a rule, tell me how that worked in
your house.

A.    It was basically that -- I don't think it was even just
really for my brother and me, but everyone in the family --
and my mom was very specific about this -- but to leave our
phones in this area in the kitchen, that we had like a -- I
don't know how to describe it, like a docking station.  So all
of our phones would sit there, and my phone, my brother's

───B. R. v. F. C. S. B.───

169

phone.

Q.   And so you would -- just tell the jury about when you

would sort of park the phones for the night.

A.   Before I went upstairs for bed.

Q.   Okay.  And then were you able -- what about the school?

        What was the school's, if they had one, policy on

kids and cell phones?

A.   I recall that you couldn't have a cell phone around.  I

always kept my phone in my locker.

Q.   Okay.  So you sort of skipped a step for me.

A.   Oh, I'm sorry.

Q.   Were you allowed to bring cell phones to school, to

Rachel Carson in this time period?

A.   I think you were allowed to, but I think they had to just

be stored and put away.

Q.   In your locker?

A.   In your -- I don't know if it had to be in your locker or

in your backpack, but it had to be away.

Q.   And did you bring your cell phone to school at Rachel

Carson?

A.   I did, yes.

Q.   Did you -- where did you put it?

A.   I kept it in my locker.

Q.   Okay.  Were there times when you were allowed to use your

dad's smartphone?

─────B.R. v. F.C.S.B.─────

170

A.   I didn't use my dad's smartphone until much later in,

like, the year.  Like I would say December 2011 onward.

Q.   Okay.  So I want to ask you some questions specifically

about texting --

A.   Okay.

Q.   -- and Facebook messaging.

A.   Got it.

Q.   Let's start with texting.

        Did you -- this time period again we're talking --

let's just focus on the rest of 2011 at this point.

A.   Okay.

Q.   Okay.  Did you text with your friends?

A.   I'm sure I did.

Q.   Did you Facebook message with your friends?

A.   I'm sure I did at times.

Q.   Okay.  How would you do that?  Where would you do that

from?

A.   From the computer in the study.

Q.   Okay.  Now, with regard to C.K. in particular --

A.   Okay.

Q.   -- C███████, as you've been referring to him, were there

ever times when you texted -- again, phone texting -- with

C███████?

A.   Yes, there were times.

Q.   First of all, I'm going to get into how that occurred and

B.R. v. F.C.S.B.

171

why that occurred.

        But how frequently did that occur?

A.   It occurred on like, I don't know, a few times a week,

maybe.  It depended.

Q.   And would it be 1 text, 2 texts, 10 texts, 20 texts?

A.   It depended on what he wanted.

Q.   Okay.  Did -- was there a time -- well, tell the jury

how -- on what -- how it came to be that you would send text

messages to C█████████?

A.   Several ways.  C█████████ would tell me when he was raping

me that if I didn't respond to his text messages that he would

hurt my family or hurt me worse.  I was worried that he would

cut me worse with knives and that he would harm my family.  He

kept threatening that if I didn't respond to his text

messages, that he would kill my parents and my brother.

        Also, there are times when he was raping me or

during the rapes, I should say, he would take my phone and he

would text himself from my phone.

Q.   What types of texts did he tell you that you had to send

him?

A.   It really ranged.  There were some that said, like, I

love you.  There would be some that said, like, I want to see

you.  There would be others that were a little bit more sexual

in nature.  And he very clearly, like, instructed me what he

wanted me to respond to him, like --

B.R. v. F.C.S.B.

172

Q.   Did he tell you why he wanted you to text you those things?

A.   He told me that if I ever told anyone what happened to me, he would just say I was his girlfriend and then no one would believe me.

Q.   And then as far as when he would text -- I thought you said this -- correct me if I'm wrong -- that sometimes while the assaults were occurring he would take your phone and text himself?

A.   That's correct.

Q.   Were those messages or those text messages of the same -- the same characters you just described what he would tell you that you had to text him?

A.   Yes, that is correct.

Q.   Did you guys -- did he ever call you on your phone?

A.   At times, yes.

Q.   Okay.  Did you ever call him?

A.   I believe a few times I did, yes.

Q.   Okay.  And why would you call him if he was assaulting you?

A.   The same thing applied in the sense of he said if he called me that I had to call him back; otherwise, he was going to harm my family or me worse.

Q.   Okay.  Did you -- do you recall ever exchanging Facebook messages with C█████████?

B.R. v. F.C.S.B.

173

A.   I don't.

Q.   Okay.

        MR. BRENNER:  You want to go -- you want me to try

to cover one more topic, Your Honor?

        THE COURT:  Yes, sir.

        MR. BRENNER:  Okay.

BY MR. BRENNER:

Q.   Okay.  The jury has heard about an incident involving a

voicemail left on your phone.

A.   Yes.

Q.   Do you recall a time where you learned that your mom had

heard a voicemail on your phone?

A.   I do.

Q.   Okay.  Tell the jury, without -- first of all, you,

yourself -- let's just clear this away -- you, yourself, did

you ever hear the contents of that voicemail with your own

ears?

A.   I never heard it, but my mom told me that she was --

Q.   Okay.  Don't -- I'm just going to try to take it in small

pieces.

A.   All right.

Q.   You, yourself, did you ever hear the contents?

A.   I didn't hear the contents.

Q.   Without telling the jury what your mom told you was on --

did your mom tell you what was on it?

B.R. v. F.C.S.B.

174

A.   My mom did not tell me --

          THE COURT:  "Yes" or "no."

          THE WITNESS:  Oh, I'm sorry.

BY MR. BRENNER:

Q.   Yes.  So my question is bad.  Let me try it again.

          In addition to never hearing it, did your mom --
without saying what it said or didn't say, did your mom ever
say -- tell you the words that were on the voicemail?

          Just "yes" or "no."

A.   No.

Q.   Again, yes or no, did your mom ever tell you sort of
what kind -- what kind of content was on the voicemail?

A.   Yes.

Q.   Okay.  And what was your understanding of what was the
content on the voicemail?  Without -- because you don't know
the words, but just generally describe the nature of the
voicemail.

A.   That --

          MS. REWARI:  Objection.  Hearsay.

          THE COURT:  Sustained.  Sustained.

BY MR. BRENNER:

Q.   Did you have an understanding -- well, let me step back.

          How -- how did it come to be that you're your mom
would hear a voicemail on your phone but you wouldn't?

A.   My phone was left downstairs where it was supposed to at

——B.R. v. F.C.S.B.——

175

night.

Q.   Okay.

A.   My mom, I guess, heard the voicemail.

Q.   Okay.  Are you aware of whether your mother ever reported

to the school about this voicemail?

A.   Yes, I was there when she reported it.

Q.   Okay.  And was -- when did that happen?

A.   That happened on November 21st.

Q.   Can you tell the jury -- well, did you -- did your mom --

did the -- did your mom show you what number -- I mean what

telephone number the voicemail came from?

A.   I'm not a hundred percent sure of that.

Q.   Okay.  Do you know what number the voicemail came from?

          MS. REWARI:  Objection, Your Honor.  There's --

          THE COURT:  How is she going to do that?

          MR. BRENNER:  Let me ask a foundational question.

          THE COURT:  Ask --

BY MR. BRENNER:

Q.   Did you see on your phone the number that the voicemail

came from?

A.   Yes.

Q.   Okay.  And whose number was that?

A.   It was C███████████.

Q.   Okay.  Did your mom ask you about -- ask you about what

was going on, if anything, with C███████████?

B.R. v. F.C.S.B.

176

A.    Yes.  I told my mom that C██████ was -- C██████ -- I

told her about C██████ and David, that C██████ and David

were coming to my locker and that they were touching me

underneath my blouse, all over my body, basically.

        I told her that C██████ had taken $50 from me, and

he had threatened me over it.

        I told my mom that I was really scared of C██████.

        And I also had told my mom about some of those --

like the rumors and the name-calling that was going on.

        I also told her about the cyberbullying that had

been going on.

        I also told her that J████ had also been harassing

me as well.

Q.    Did you tell your mom at this time about the -- the

sexual assaults from C██████?

A.    I had not told her about the rapes, no.

Q.    Okay.  What happens next after your mom gets the

voicemail?

A.    After my mom gets the voicemail, she tells me that she's

extremely concerned and worried about me and that we needed to

go to the school.

Q.    Okay.  And the date of this is what?

A.    It's like right before November 21st.  So around that

time frame.

Q.    Okay.  And do you go to the school with your mom -- well,

tell the jury, what happens on November 21st?

A.   On November 21st, I told my mom that I didn't want to go to school first thing in the morning, because I was worried that C████████ would see me going to the front office with my mom.  And I was really afraid that he would hurt my parents if he saw me going to the front office with my mom, so I asked my mom if we could go to the school once like the school day had started so that people were in their classes.  And so my mom, my dad, me, we went to the school.

Q.   Okay.  So you, your mom, your dad?

A.   Uh-huh.

Q.   And you go after school has already started?

A.   Yes.

Q.   Okay.  And where do you guys go when you get to school?

A.   We go to like the front office area.  And -- yeah, we go to the front office area.

     MR. BRENNER:  Could we bring up -- I think it's Defense 61 is the -- yeah, can -- Your Honor, may I publish Defense 61?  It's already in evidence.

     THE COURT:  You may.

     Young lady, if you could just draw a line at the bottom to see if that part is work -- yeah, just draw a line at the bottom.

     THE WITNESS:  It's not working.

     THE COURT:  We need the pointer again.

────B.R. v. F.C.S.B.────

178

BY MR. BRENNER:

Q.   Yeah.  I just want you to sort of use the pointer, and I'm just going to ask you where some things are.

         Show the jury, if you will, the entrance that you guys, you and your family, walked into.

A.   I always struggle to understand this map, but -- yeah, it never makes sense to me, but -- if I understand correctly, this is the front, like, entrance to the school.

Q.   Okay.  And then what's -- where -- where do you guys go when you come in?

A.   And then this is the front office area, if I'm understanding this map correctly, yes.

Q.   And who sits there?

A.   There was someone at the front desk that sat there.  And then I believe these are some of the administrators' offices. And --

Q.   When you say "administrators," what -- what do you mean?

A.   I believe that Mr. F███████ office was somewhere in this vicinity, and then I -- and then some of the guidance counselors' offices were there.

Q.   Okay.  So it's you, your mom, and your dad.

         Did you have -- do you know if you guys had an appointment?

A.   No, we did not.  Can I -- can I --

Q.   Yeah, yeah, we can take that down.

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

————— B.R. v. F.C.S.B. —————

179

A.   We didn't have an appointment.  My mom just came into

school.  And when I was with her, she went to the front desk

and said that she wanted to speak to Mr. F██████ right away.

Q.   And who did she say that to?

A.   She said that to someone at the front desk.

Q.   Okay.  And what -- what was she told?

A.   She was told that Mr. F██████ was busy.

Q.   Okay.  What happens next?

A.   Then we see Ms. H███████, my guidance counselor.

Q.   Okay.  And I think you testified to this before, but did

your -- did your mom, either because of the tennis or because

of Dash, did she know Ms. H███████?

A.   She did, yes.

Q.   Did Ms. H███████ know your mom?

A.   She did, yes.

Q.   And did you -- where did you see Ms. H███████?  I mean,

where did you first encounter her?

A.   Right in, like, the front office area, kind of again near

like where the front desk was, kind of near the door to the

front office.

Q.   And what, if anything, do you recall Ms. H███████ saying

when she sees you and your mom and your dad?

A.   She says to my mom, I didn't realize things had gotten so

bad.  I know that B████ has been trying to see me for the last

few weeks, and I've not been able to see her yet.

B.R. v. F.C.S.B.

180

Q.    Do you go into -- what happens next?

A.    Then my mom tells her about some of the things that have

been happening, the sexual harassment, the voicemail.  She

tells her what, I guess, the contents are because she said, I

don't want to say it in front of B████.  And she whispered it

into Ms. H████████ ear.

Q.    Okay.  So when -- let's just make sure that the record is

clear.

        Who is in the -- this meeting at this point?

A.    So we're still in the front office area.  We're not in

like a meeting yet.

Q.    And who is -- who is talking -- who are the people that

are part of that conversation?

A.    It's me, my dad, Ms. H████████, and my mom.

Q.    And your mom mentions the voicemail?

A.    My mom mentions the voicemail and just the other

harassment, sexual harassment, bullying, nonconsensual

touching that's going on.

Q.    Is your mom reporting this at this point, or are you

reporting it at this point?

A.    My mom is the one that's talking because I had -- I had

told my mom, and I had told her I was scared.

Q.    Okay.  And you said she -- because I cut you off.

        Why did she whisper to Ms. H████████?

A.    She didn't want me to hear what was the contents of the

B.R. v. F.C.S.B.

181

voicemail, but she was really upset.

Q.    Who is upset?

A.    My mom was like really, really disturbed by whatever the

voicemail said.

Q.    Okay.  What happens next?

A.    Ms. H██████ says that it's really serious and that we

need to see Officer Genus, who was the school resource officer

or like the school police officer.

Q.    Had you met Officer Genus before?

A.    I had met him in like the context of like I had seen him

around.  I knew who he was, but I never had like such a direct

interaction like this with him.

Q.    Did Officer Genus -- did someone contact Officer Genus?

A.    I recall that we just, like, went into -- he was either

in the front office -- I don't know if he had an office there.

I don't recall that as vividly, or I don't recall if he went

into Ms. H██████ office, but we still were in the front

office area, and he then, like, came as well.

Q.    And what happened when Officer -- so when Officer Genus

gets there, he's the -- it's him and Ms. H██████ and then the

three people of your family?

A.    Yeah.  And then we go to someone's office.  I don't know

if it's Ms. H██████ or Officer Genus' office.  Someone's

office, again, in the front where all the offices are.

Q.    Yeah.  And what happens there?

─B.R. v. F.C.S.B.─

182

A.   And then, my mom tells Officer Genus what has transpired,

especially with the voicemail.  My mom takes -- has my phone

in her hand and is trying to play a voicemail or show him --

I'm standing like outside in like the doorway area, so I see

that she has my phone in her hand, and she's trying to play

it.  And she's unable to play it.

Q.   Okay.

A.   And then --

Q.   I'm sorry.

A.   No.  And then my mom just called -- said she was -- she

said she blocked the number because she was very disturbed by

what she heard.  And then she was in Officer Genus' office or

Ms. H███████ office, whoever's office, on the phone with

Sprint, who is my phone carrier, I guess.

Q.   Again, based on what you heard, did your mom tell --

well, when Officer Genus is there, is Ms. H██████ also still

in the room or --

A.   Yes.

Q.   Okay.  From what -- based only on what you heard, did you

hear whether your mom told Officer Genus and Ms. H██████ who

the -- who the phone number, the message came from?

A.   I heard that directly that it was from C████████, yes.

Q.   That she told him that?

A.   That is correct.

Q.   Okay.  You say your mom spent two hours doing what --

B.R. v. F.C.S.B.

183

what was going on?

A.    I don't know the exact amount, like, of time, but she

spent a significant amount of time trying to be on the phone

with Sprint, my phone carrier or her phone carrier, I should

say, trying to retrieve the voicemail that she had -- because

she had blocked the number, I guess, and was unable to play

the voicemail.

Q.    Okay.  As far as you know, from what you saw and what you

heard, was your mom ever able to retrieve that voicemail?

A.    To my knowledge, no.

Q.    Okay.  Did there come a time where anyone else joined the

meeting, anyone else from the school?

A.    Yes.  At this time, Mr. H██████, who was, I believe, my

assigned assistant principal for the 7th grade.

Q.    Okay.

A.    He came into the office as well at this point.

Q.    And why did he -- do you know why he came in?

A.    I presume because I was his assigned student, and also

what my mom and I was reporting was pretty serious.

Q.    Okay.  Did anyone else, again, from the school -- the

school join that meeting?

A.    Later on, S███ T████, who was principal -- or the

assistant principal for the 8th grade, came in as well.

Q.    Okay.  Do you have an understanding -- well, when in the

meeting did -- did Ms. T████ join you?

B.R. v. F.C.S.B.

184

A.   Ms. T█████ joined -- I don't recall when exactly, but as

soon as I started -- my mom and I started talking about David

and C█████████ and that the fact that they were in the 8th

grade.

Q.   Okay.  So as soon as -- as soon as you brought up two 8th

graders by name, Ms. T████ came to the meeting?

A.   Yes.

          THE COURT:  Is this a good break?

          MR. BRENNER:  Yes.

          THE COURT:  All right.  Ladies and gentlemen, we're

going to go ahead and take our lunch break.  It's

approximately 1:07 now.  So let's go to 1:50.  That will allow

you to go ahead and take a little time to stretch your legs

and enjoy your meal.

          Remember the Court's instructions, do not discuss

the case or any aspect of the case with anyone while the case

is pending.

          We'll see you in a bit.

          (Jury excused.)

          THE COURT:  All right.  Everyone can be reseated.

          Young lady, you can step down.

          (Witness excused.)

          THE COURT:  Mr. Brenner, I'm just trying to manage

time as best I can.

          How much longer do you anticipate -- best guess?

Direct - B.R.

B.R. v. F.C.S.B.

185

And I know you're trying to do your job.

    MR. BRENNER:  My hope was to finish today.

    THE COURT:  Okay.

    MR. BRENNER:  That was my hope.

    THE COURT:  That's fine.  Just trying to manage the jury's time and actually work with them as far as their willingness to come back.

    I was told this morning that the reason why traffic was so good this morning, and it was actually pretty easy, is because all the kids were out on Spring Break.  And so we might be able to talk them into coming back at nine o'clock tomorrow, particularly for the woman from Stafford.  So we might try to start at nine o'clock tomorrow again.

    MR. BRENNER:  Yeah.  I would say that would be great, Judge, only because -- again, no fault to anyone -- but we're -- things are taking a long time, and we are all trying, but every hour we can steal is probably good.

    THE COURT:  All right.  Very good.  All right. We'll see everyone back in at the designated time.

    (Lunch Recess 1:12 p.m.).

CERTIFICATE OF REPORTER

      I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Jury Trial in the case of the **B.R. versus F.C.S.B., et al.**, Civil Action No.: 1:20-cv-1442, in said court on the 25th day of March, 2024.

      I further certify that the foregoing 207 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

      In witness whereof, I have hereto subscribed my name, this August 26, 2024.

Tonia M. Harris, RPR
Official Court Reporter

186

## $

**$1,000** [1] - 36:12
**$1,543,622.46** [1] - 38:8
**$1,657.89** [1] - 35:12
**$1,676.84** [1] - 35:13
**$104.88** [1] - 33:6
**$116.40** [1] - 33:22
**$118** [1] - 31:10
**$123.12** [1] - 33:13
**$131.58** [1] - 36:25
**$132.00** [1] - 33:13
**$14,000** [2] - 57:6, 57:18
**$14,112** [1] - 30:1
**$14,500** [1] - 57:19
**$147.37** [1] - 36:3
**$15,648** [1] - 30:1
**$20,000** [2] - 57:24, 58:15
**$207,252** [1] - 28:15
**$209,115** [1] - 37:8
**$266,547.96** [1] - 34:18
**$3,200** [1] - 19:7
**$3200** [2] - 57:1, 57:12
**$325** [2] - 19:6, 56:24
**$4,340.88** [1] - 34:6
**$4,352.16** [1] - 34:6
**$5,985** [1] - 31:15
**$50** [1] - 176:5
**$6,562.50** [1] - 37:11
**$848,160** [1] - 30:12
**$881.58** [1] - 35:18
**$90.96** [1] - 33:6
**$92** [1] - 31:9
**$92.11** [1] - 36:3
**$92.16** [1] - 33:22
**$98.68** [1] - 36:24

## '

**'21/'22** [1] - 163:20
**'80s** [2] - 16:5, 17:9

## 0

**05** [1] - 4:13

## 1

**1** [5] - 51:9, 105:3, 146:7, 146:8, 171:5
**1.5** [1] - 39:4
**1/2** [1] - 150:12
**10** [1] - 171:5
**100** [6] - 2:2, 2:6, 2:10, 68:2, 114:12, 165:13
**11** [1] - 62:11

**11:00** [2] - 8:16
**11:15** [3] - 105:4, 105:8
**11:18** [1] - 105:10
**12** [8] - 4:4, 19:19, 39:15, 39:18, 52:23, 62:9, 109:20, 150:12
**120** [1] - 3:6
**121** [2] - 46:6, 46:18
**129** [2] - 8:4, 11:21
**13** [1] - 150:11
**14** [2] - 57:9, 57:14
**140** [1] - 15:7
**15** [3] - 6:1, 6:3, 59:23
**150** [1] - 43:14
**1520** [1] - 1:20
**16** [3] - 6:13, 46:6, 46:18
**17** [1] - 63:7
**1775** [1] - 3:9
**1801** [1] - 3:6
**186** [2] - 4:14, 186:10
**193** [2] - 139:15, 139:19
**1:00** [1] - 154:14
**1:07** [1] - 184:12
**1:12** [1] - 185:20
**1:19-cv-917** [1] - 1:4
**1:20-cv-1442** [1] - 186:8
**1:50** [1] - 184:12

## 2

**2** [4] - 146:7, 146:8, 151:7, 171:5
**2,400** [1] - 28:18
**20** [4] - 44:14, 57:9, 57:14, 171:5
**200** [1] - 43:14
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2011** [8] - 39:13, 63:7, 110:19, 160:23, 161:23, 162:22, 170:2, 170:10
**2012** [4] - 39:13, 104:9, 150:20, 160:24
**2018** [1] - 41:3
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19

**2020** [1] - 42:7
**2023** [2] - 19:19, 28:1
**2024** [4] - 1:6, 150:7, 186:9, 186:16
**2029-Century** [1] - 1:19
**21** [2] - 36:2, 46:18
**213-995-5720** [1] - 1:21
**21st** [7] - 96:13, 97:9, 97:13, 98:3, 155:2, 160:12, 163:24, 175:8, 176:23, 177:1, 177:2
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**2300** [1] - 1:15
**24** [1] - 28:1
**25** [3] - 1:6, 36:23, 186:16
**25th** [1] - 186:8
**26** [1] - 4:11
**2800** [3] - 2:3, 2:7, 2:11
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**3** [3] - 146:7, 146:8, 151:11
**30** [2] - 5:25, 36:9
**30-day** [2] - 35:10, 35:16
**305-539-8400** [1] - 2:8
**33131** [3] - 2:3, 2:7, 2:11
**35** [1] - 96:19
**38** [1] - 4:5
**3:45** [1] - 114:16
**3ish** [1] - 114:11

## 4

**4,872** [1] - 28:19
**40** [2] - 17:10, 53:8
**400** [1] - 3:10
**401** [1] - 3:13
**4ish** [1] - 114:16

## 5

**5** [3] - 51:10, 151:8, 151:12
**50** [1] - 44:11
**52** [1] - 53:9
**57** [19] - 25:23, 26:21, 28:1, 28:11, 29:23, 30:12, 31:12, 31:15, 33:15, 35:11, 36:13,

**36:23, 37:9, 38:6, 38:9, 39:8, 52:24, 53:11
**58** [3] - 57:9, 57:11, 57:13
**59** [1] - 4:5

## 6

**6** [1] - 1:8
**60** [2] - 36:9, 36:10
**604** [1] - 109:7
**61** [3] - 4:7, 177:18, 177:19
**610-804-1787** [1] - 2:4
**63** [1] - 4:11
**643a** [1] - 1:16
**6th** [1] - 107:20

## 7

**71** [4] - 62:18, 62:21, 63:12, 63:16
**71................................ ............** [1] - 4:11
**7th** [10] - 44:11, 67:12, 67:14, 67:19, 74:11, 75:2, 108:11, 108:14, 109:2, 183:14

## 8

**804** [1] - 61:22
**804-788-8200** [1] - 3:2
**805** [10] - 25:13, 25:25, 26:8, 30:9, 31:13, 34:15, 37:7, 37:25, 38:4
**805................................ ............** [1] - 4:11
**81** [1] - 39:10
**850-585-3414** [1] - 2:12
**8th** [9] - 67:12, 74:11, 74:12, 75:2, 75:3, 163:10, 183:23, 184:3, 184:5

## 9

**90067** [1] - 1:20
**96** [5] - 53:7, 53:11, 53:16, 53:20, 54:9
**98** [2] - 51:9, 51:12
**9:00** [1] - 1:6
**9th** [2] - 104:9, 152:6

## A

**A.F** [1] - 3:5
**a.m** [2] - 1:6, 105:10
**A.M** [1] - 1:8
**ability** [3] - 9:24, 69:21, 186:14
**able** [20] - 6:23, 7:4, 11:4, 11:9, 18:10, 23:19, 74:4, 96:10, 130:18, 130:21, 131:15, 151:5, 166:2, 166:4, 166:5, 166:22, 169:5, 179:25, 183:9, 185:11
**abrenner@bsfllp. com** [1] - 2:8
**absolute** [1] - 37:19
**absolutely** [3] - 73:10, 74:2, 131:5
**abusers** [1] - 44:8
**access** [6] - 165:17, 165:18, 167:24, 168:3, 168:5, 168:8
**acclimated** [1] - 72:2
**acclimating** [1] - 71:23
**accomplish** [1] - 134:4
**according** [2] - 26:20, 57:19
**accordingly** [1] - 109:2
**account** [4] - 51:16, 53:12, 162:19, 164:14
**accounts** [3] - 161:25, 162:17, 163:15
**accurate** [1] - 9:19
**accurately** [4] - 25:4, 25:6, 59:21, 65:24
**act** [1] - 138:20
**Action** [2] - 1:4, 186:8
**actions** [2] - 120:4, 120:13
**acts** [16] - 85:25, 89:21, 90:1, 90:8, 90:11, 91:1, 124:20, 127:23, 137:3, 137:7, 137:17, 138:18, 141:17, 152:13, 152:17, 153:11
**actual** [2] - 152:10, 161:15
**acute** [2] - 37:4, 37:5
**adapting** [2] - 103:12, 146:25
**add** [2] - 58:21, 125:21

**addition** [6] - 23:15, 24:25, 88:25, 89:18, 136:25, 174:6
**additional** [3] - 148:2, 148:9, 156:15
**address** [3] - 7:12, 50:1, 50:19
**addressed** [4] - 51:24, 68:19, 70:25, 106:2
**adduced** [1] - 186:6
**ADHD** [1] - 54:23
**administration** [2] - 93:6, 93:8
**administrator** [1] - 67:25
**administrators** [3] - 68:12, 68:16, 178:17
**administrators'** [1] - 178:15
**admitted** [2] - 26:8, 63:16
**Admitted** [1] - 4:10
**adult** [1] - 77:6
**adults** [2] - 142:12, 143:3
**advantage** [1] - 106:2
**advertise** [2] - 42:15, 43:18
**advice** [3] - 102:23, 146:15, 146:17
**advocate** [1] - 133:7
**aerial** [2] - 114:21, 147:22
**affect** [1] - 129:3
**afraid** [3] - 59:12, 59:13, 177:5
**afternoon** [1] - 10:24
**age** [2] - 28:1, 62:13
**ago** [2] - 39:15, 107:18
**agree** [5] - 128:16, 129:23, 130:7, 133:9, 147:1
**agreed** [2] - 7:18, 8:9
**agreement** [2] - 7:12, 11:8
**ahead** [7] - 5:10, 79:5, 98:7, 104:24, 105:3, 184:11, 184:13
**al** [2] - 1:6, 186:7
**alanderson@bsfllp. com** [1] - 1:21
**ALEX** [1] - 12:10
**Alex** [4] - 4:3, 12:3, 12:5, 12:22
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**allegations** [2] - 45:17, 105:14
**alleged** [1] - 141:17
**Allocation** [1] - 13:17

**allow** [5] - 129:16, 129:17, 164:18, 165:14, 184:12
**allowance** [2] - 106:17, 106:18
**allowed** [6] - 168:13, 168:14, 168:16, 169:12, 169:14, 169:24
**alone** [5] - 76:8, 80:12, 81:4, 81:6, 150:16
**aloud** [1] - 54:2
**alphabet** [1] - 74:18
**alprazolam** [2] - 32:16, 33:5
**ALSTON** [1] - 1:11
**alternatively** [1] - 23:20
**amount** [9] - 6:16, 30:10, 34:16, 37:15, 80:18, 150:8, 150:9, 183:2, 183:3
**amounted** [4] - 35:18, 36:2, 36:12
**amounts** [2] - 37:11, 38:8
**amputations** [2] - 15:13, 16:10
**anally** [2] - 153:25, 154:7
**analysis** [3] - 19:5, 38:15, 40:12
**analyze** [7] - 34:23, 40:4, 40:14, 40:16, 42:19, 42:20
**ANDERSON** [6] - 7:11, 7:14, 7:21, 7:23, 8:7, 8:11
**Anderson** [1] - 1:18
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**announcements** [1] - 156:25
**annual** [10] - 22:23, 28:10, 28:12, 29:21, 30:24, 31:12, 33:5, 33:13, 33:22, 55:18
**annualized** [2] - 26:22, 29:21
**annually** [1] - 35:12
**anorexia** [3] - 48:4, 55:8, 55:9
**answer** [19] - 12:13, 12:15, 48:12, 49:13, 49:21, 50:4, 50:6, 51:18, 51:25, 53:23, 59:6, 106:10, 118:15, 119:5,

123:1, 123:3, 133:4, 137:20, 158:24
**ANSWER** [1] - 52:8
**answered** [1] - 43:11
**answering** [1] - 55:24
**answers** [1] - 90:5
**antianxiety** [2] - 32:16, 33:21
**anticipate** [2] - 5:22, 184:25
**anticipating** [1] - 158:22
**anticipation** [1] - 10:25
**antidepressant** [1] - 52:18
**anxiety** [4] - 32:14, 47:6, 50:24, 52:11
**anxious** [1] - 50:25
**anyway** [1] - 106:13
**apologize** [5] - 52:14, 74:16, 74:19
**apologized** [1] - 110:22
**appear** [1] - 110:22
**APPEARANCES** [3] - 1:13, 1:25, 2:24
**appetite** [1] - 55:1
**applied** [1] - 172:21
**appointment** [2] - 178:23, 179:1
**approach** [6] - 25:12, 25:14, 46:2, 111:2, 127:25, 141:5
**appropriately** [1] - 132:2
**approximating** [1] - 104:14
**apt** [1] - 55:23
**area** [21] - 14:5, 60:9, 80:24, 110:14, 110:21, 113:12, 115:22, 118:3, 142:8, 143:2, 148:21, 158:5, 163:20, 168:23, 177:15, 177:16, 178:11, 179:18, 180:10, 181:18, 182:4
**argue** [2] - 129:17, 132:17
**arm** [1] - 117:10
**arms** [3] - 119:19, 120:10, 121:23
**artificial** [1] - 17:3
**Aside** [1] - 13:17
**aside** [5] - 50:13, 68:9, 96:9, 152:16, 152:17
**aspect** [1] - 11:5, 35:9, 61:3, 105:1, 184:16

**Assault** [2] - 151:7, 151:8
**assault** [3] - 125:22, 147:15, 151:6
**assaulted** [7] - 124:25, 125:24, 147:18, 147:21, 150:8, 151:10, 152:3
**assaulting** [1] - 172:19
**assaults** [17] - 148:3, 148:9, 149:12, 149:19, 149:22, 150:5, 150:12, 150:16, 150:17, 150:24, 151:17, 152:13, 153:12, 155:4, 172:8, 176:15
**asserted** [4] - 129:1, 129:7, 129:15, 131:16
**assertion** [2] - 56:4, 56:8
**assessment** [1] - 147:1
**assessments** [1] - 52:20
**assigned** [5] - 101:3, 101:4, 157:23, 183:14, 183:18
**assignment** [1] - 69:12
**assistant** [3] - 163:24, 183:14, 183:23
**assume** [2] - 51:14, 52:4
**assumed** [2] - 45:12, 45:16
**assumptions** [1] - 43:23
**attack** [1] - 82:14
**attempt** [1] - 92:17
**attend** [1] - 64:11
**attendance** [1] - 157:2
**attention** [1] - 23:17
**attenuated** [1] - 92:8
**attributable** [1] - 45:13
**attribute** [1] - 54:16
**atypical** [1] - 77:1
**August** [1] - 63:7
**authorization** [1] - 14:24
**available** [5] - 40:4, 40:7, 40:8, 42:19, 108:23
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**average** [25] - 28:7,

28:9, 28:10, 28:17, 28:18, 28:20, 29:20, 30:2, 30:6, 30:7, 31:11, 31:12, 33:7, 33:14, 33:23, 34:7, 35:13, 35:18, 36:3, 36:4, 36:10, 36:11, 36:12
**averaged** [1] - 35:14
**aware** [14] - 39:12, 43:25, 54:22, 55:1, 55:4, 85:15, 85:16, 85:19, 115:12, 133:13, 134:11, 138:25, 139:1, 175:4
**awkward** [1] - 83:10
**awkwardness** [1] - 83:12

## B

**B.H** [1] - 3:5
**B.R** [20] - 1:3, 4:6, 6:6, 9:21, 9:23, 23:22, 24:17, 24:19, 27:20, 29:9, 30:23, 34:25, 37:22, 59:15, 59:23, 60:2, 61:6, 61:7, 107:3, 186:7
**B.R.'s** [2] - 26:20, 30:10
**bachelor's** [1] - 13:11
**background** [5] - 13:5, 13:8, 13:10, 21:22, 105:13
**backpack** [1] - 169:18
**backup** [1] - 186:13
**bad** [5] - 59:13, 134:5, 158:15, 174:5, 179:24
**bag** [1] - 126:4
**bah██████@fcps. edu** [1] - 63:21
**banged** [1] - 44:17
**BARAN** [1] - 1:14
**barely** [1] - 159:14
**base** [2] - 32:23, 157:1
**based** [16] - 16:1, 16:2, 20:10, 22:12, 22:13, 22:14, 32:24, 33:17, 34:16, 38:11, 38:15, 70:23, 133:25, 182:15, 182:19
**basement** [11] - 80:2, 80:3, 80:10, 80:19, 80:22, 80:23, 81:6, 83:24, 84:4, 84:16
**basic** [1] - 68:22
**basis** [13] - 22:23,

23:13, 27:21, 28:2,
28:10, 28:12, 29:12,
31:12, 33:13, 33:22,
48:7, 48:11, 53:18
**Bates** [1] - 2:13
**BATES** [2] - 8:9, 8:22
**beauty** [1] - 167:4
**became** [3] - 14:11,
15:23, 23:13
**bed** [2] - 168:15, 169:4
**bedrooms** [2] -
167:18, 167:19
**BEFORE** [1] - 1:11
**began** [1] - 121:10
**begin** [1] - 10:15
**beginning** [10] - 64:8,
74:5, 74:7, 75:5,
75:6, 86:9, 104:3,
115:15, 119:12,
119:15
**begins** [1] - 27:25
**behalf** [3] - 4:2, 4:9,
39:1
**behavioral** [1] - 29:10
**behaviors** [2] - 48:3,
50:10
**behind** [2] - 117:1,
149:16
**b**[redacted] [1] - 154:19
**B**[redacted] [9] - 61:16, 89:3,
127:8, 127:20,
137:16, 160:1,
179:24, 180:5
**belonged** [1] - 162:17
**below** [2] - 36:12,
81:23
**benches** [3] - 114:2,
115:25, 116:2
**beneath** [1] - 28:19
**benefit** [1] - 106:16
**best** [20] - 5:13, 7:7,
12:13, 51:25, 73:23,
73:25, 106:23,
106:24, 110:7,
118:11, 123:1,
126:21, 151:14,
152:21, 153:6,
159:4, 159:18,
184:24, 184:25,
186:14
**better** [18] - 9:8, 9:9,
9:23, 9:24, 32:25,
34:1, 49:8, 49:13,
55:23, 60:2, 103:9,
106:11, 107:13,
145:16, 145:17,
145:18, 146:4,
155:11
**between** [27] - 28:4,
31:21, 33:6, 33:22,

34:6, 36:3, 36:24,
39:13, 41:7, 41:19,
43:14, 43:19, 75:21,
81:7, 83:10, 97:12,
107:21, 110:18,
110:21, 110:23,
115:11, 127:4,
127:15, 143:4,
149:18, 152:6, 155:3
**beyond** [1] - 49:18
**bigger** [4] - 27:15,
67:2, 67:9, 71:23
**binder** [1] - 62:16
**Bink** [1] - 24:3
**Binks** [11] - 22:15,
23:12, 24:3, 24:8,
24:18, 25:22, 27:19,
27:25, 41:25, 44:2,
45:8
**binks** [2] - 23:9, 56:15
**Binks'** [1] - 56:20
**bit** [28] - 9:2, 10:22,
20:18, 19:10, 20:1,
27:14, 51:1, 76:19,
78:3, 78:9, 89:20,
90:4, 91:7, 108:24,
109:1, 109:11,
112:6, 113:19,
126:18, 127:14,
135:8, 137:1, 146:3,
158:17, 164:24,
165:1, 171:23,
184:18
**bitch** [2] - 86:16,
136:11
**Blanchard** [4] - 3:8,
9:15, 58:22, 133:4
**BLANCHARD** [11] -
9:12, 9:25, 10:3,
58:23, 60:22, 91:3,
92:2, 118:10,
127:11, 127:24,
135:4
**bleach** [1] - 163:14
**bleeding** [1] - 134:25
**blind** [1] - 20:23
**blocked** [2] - 182:11,
183:6
**blood** [5] - 30:21,
30:24, 55:11, 55:15,
55:17
**blouse** [4] - 142:6,
142:7, 176:4
**blow** [5] - 90:9, 90:14,
136:10, 145:22,
146:16
**blur** [1] - 120:4
**blurs** [1] - 151:12
**board** [3] - 14:10,
14:21, 15:20

**Board** [2] - 18:6, 39:2
**body** [3] - 118:2,
153:10, 176:4
**BOIES** [4] - 1:19, 2:2,
2:6, 2:10
**bothering** [1] - 145:20
**bottom** [2] - 177:22,
177:23
**boy** [5] - 74:8, 84:24,
85:2, 138:8, 155:16
**boyfriend** [3] - 76:2,
76:3, 115:12
**boys** [8] - 86:1,
102:14, 142:4,
145:6, 145:10,
145:19, 155:23,
159:19
**bra** [3] - 120:23,
120:24, 121:1
**brain** [7] - 15:9, 15:12,
16:8, 20:21, 24:20,
36:20, 44:21
**brand** [11] - 31:24,
31:25, 32:1, 32:2,
32:4, 33:1, 33:25,
34:5, 34:8, 34:10
**brand-name** [2] -
32:4, 33:1
**Break** [1] - 185:10
**break** [16] - 5:10, 5:14,
8:13, 8:16, 8:20,
10:24, 86:23, 86:25,
104:24, 105:2,
105:4, 154:11,
154:15, 154:16,
184:8, 184:11
**breaking** [1] - 8:18
**breast** [5] - 81:14,
81:22, 82:1, 82:5,
83:3
**breasts** [4] - 120:19,
124:4, 145:7, 153:10
**B**[redacted] [2] - 63:22,
69:11
**Brenner** [3] - 2:5,
106:4, 184:23
**BRENNER** [131] -
5:11, 5:16, 5:20, 6:8,
6:15, 8:13, 8:17,
61:6, 61:9, 61:13,
61:22, 61:25, 62:14,
62:15, 62:19, 62:22,
63:11, 63:17, 63:19,
65:22, 65:23, 73:17,
74:16, 74:19, 74:21,
90:7, 91:6, 91:10,
91:12, 91:13, 92:10,
92:12, 97:3, 102:12,
103:25, 104:21,
106:8, 106:10,

106:19, 106:22,
107:4, 107:6,
108:18, 109:6,
109:9, 110:1, 111:1,
111:5, 118:14,
118:24, 119:3,
119:6, 119:9, 121:5,
122:18, 123:2,
124:11, 127:18,
127:19, 127:25,
128:11, 128:22,
128:25, 129:3,
129:11, 129:22,
130:2, 130:6,
130:14, 130:24,
131:11, 131:19,
132:9, 132:13,
132:16, 132:20,
133:3, 133:9,
133:16, 133:19,
134:2, 134:7,
134:10, 134:15,
135:7, 135:10,
137:13, 137:21,
138:1, 139:6,
139:14, 139:18,
139:22, 140:19,
140:20, 141:4,
141:9, 141:12,
141:13, 142:16,
142:19, 143:8,
143:9, 146:11,
146:13, 147:23,
147:25, 148:16,
148:23, 149:3,
149:5, 149:8,
149:11, 154:4,
154:11, 154:18,
155:21, 159:3,
173:3, 173:6, 173:7,
174:4, 174:21,
175:16, 175:18,
177:17, 178:1,
184:9, 185:2, 185:4,
185:14
**Brenner**.............. [1] -
4:7
**Brief** [1] - 149:10
**brief** [2] - 14:16, 17:17
**briefly** [1] - 63:2
**bring** [11] - 7:9, 17:4,
105:11, 109:6,
112:17, 142:16,
147:22, 165:11,
169:12, 169:19,
177:17
**bringing** [1] - 16:19
**Brittany** [1] - 2:1
**britzoll@gmail.com**
[1] - 2:4

**broke** [1] - 90:25
**brother** [9] - 65:3,
125:20, 126:3,
126:4, 151:24,
166:10, 168:14,
168:21, 171:15
**brother's** [1] - 168:25
**brought** [3] - 19:13,
19:24, 184:5
**brown** [1] - 148:19
**Bruce** [2] - 3:8, 9:15
**bruce.blanchard@**
**ofplaw.com** [1] -
3:11
**bulimia** [1] - 55:6
**bullying** [6] - 66:8,
66:17, 68:13, 68:17,
68:24, 91:20, 163:8,
180:17
**bump** [1] - 97:6
**bumped** [1] - 97:5
**bupropion** [1] - 33:11
**burn** [1] - 152:25
**Burton** [1] - 2:20
**burtons@huntonak.**
**com** [1] - 2:23
**bus** [25] - 110:10,
111:19, 111:23,
111:25, 112:2,
112:14, 112:15,
112:25, 113:2,
113:12, 113:14,
113:15, 113:16,
113:17, 113:18,
113:19, 114:2,
114:10, 114:13,
149:14, 149:16,
149:18, 157:6,
157:11
**buses** [1] - 111:22
**bushes** [1] - 117:6
**business** [5] - 166:21,
166:23, 167:2,
167:3, 167:4
**busy** [2] - 97:22, 179:7
**butt** [2] - 142:8, 145:7
**BY** [64] - 12:20, 15:24,
18:13, 25:17, 26:9,
38:22, 43:13, 46:4,
47:19, 49:23, 50:5,
51:6, 52:3, 54:7,
58:10, 59:2, 61:13,
61:25, 62:15, 62:22,
63:19, 65:23, 73:17,
74:21, 90:7, 91:13,
92:12, 97:3, 102:12,
103:25, 107:6,
108:18, 109:9,
110:1, 111:5,
118:14, 118:24,

119:9, 121:5,
122:18, 123:2,
124:11, 127:19,
135:10, 137:13,
138:1, 139:6,
139:22, 140:20,
141:13, 142:19,
143:9, 146:13,
147:25, 149:11,
154:4, 154:18,
155:21, 159:3,
173:7, 174:4,
174:21, 175:18,
178:1

# C

**C.K** [6] - 130:10,
130:12, 130:16,
130:21, 134:19,
170:19
**CA** [1] - 1:20
**cafeteria** [2] - 8:2,
11:17
**calculate** [1] - 26:13
**calculation** [1] - 26:22
**calculations** [4] -
21:23, 21:25, 34:16,
38:11
**cannot** [3] - 6:1, 6:2,
134:6
**capacity** [1] - 186:5
**car** [9] - 83:25, 84:1,
84:2, 84:6, 112:12,
125:24, 126:2, 126:4
**cards** [1] - 166:23
**care** [60] - 12:24, 13:1,
13:2, 13:3, 13:6,
15:1, 15:19, 15:22,
15:25, 16:4, 16:20,
17:5, 17:16, 17:20,
18:3, 18:23, 19:10,
19:18, 20:2, 20:4,
20:5, 20:8, 20:12,
21:9, 22:16, 22:18,
22:19, 23:22, 23:25,
24:9, 25:7, 25:22,
25:23, 26:14, 34:22,
35:2, 35:6, 37:1,
37:7, 37:9, 37:13,
39:5, 39:7, 39:18,
39:24, 40:3, 40:10,
40:13, 48:23, 49:25,
50:1, 50:18, 50:20,
51:16, 52:6, 52:21,
60:9, 79:17, 106:21
**Care** [2] - 27:4, 34:19
**C▮▮▮** [8] - 99:13, 99:14,
99:18, 99:19, 100:1,
144:9, 156:17,

158:13
**carrier** [3] - 182:14,
183:4
**cars** [1] - 84:11
**Carson** [36] - 8:3,
11:19, 11:22, 61:19,
62:8, 62:13, 64:6,
64:13, 64:22, 64:25,
65:4, 65:25, 66:2,
68:11, 68:13, 72:12,
74:5, 75:5, 75:7,
75:8, 75:9, 85:4,
104:3, 108:8,
108:21, 110:11,
113:16, 114:10,
126:23, 157:19,
160:23, 162:8,
162:15, 163:1,
169:13, 169:20
**cart** [1] - 165:11
**case** [73] - 11:5, 13:6,
13:12, 13:21, 13:23,
14:2, 14:12, 16:1,
16:2, 16:17, 16:19,
16:24, 17:8, 17:21,
19:8, 19:12, 21:24,
22:10, 22:15, 23:8,
23:11, 23:17, 23:23,
25:5, 25:10, 26:20,
27:19, 27:24, 28:5,
29:9, 30:23, 34:17,
38:12, 39:13, 40:4,
40:9, 40:14, 40:15,
40:16, 40:18, 40:19,
40:20, 40:21, 40:22,
41:1, 41:7, 42:24,
43:2, 43:7, 45:14,
45:18, 46:7, 56:22,
57:2, 57:4, 58:5,
59:4, 59:18, 59:19,
61:2, 61:3, 70:7,
104:25, 105:1,
132:3, 132:8, 143:6,
184:16, 186:7
**case-manage** [1] -
16:17
**cases** [1] - 20:4,
20:17, 20:19
**catastrophic** [7] -
15:15, 16:7, 16:13,
17:20, 17:25, 21:5,
21:7
**categories** [1] -
151:14
**category** [2] - 25:21,
92:7
**catty** [1] - 110:22
**catty-corner** [1] -
110:22
**causing** [1] - 30:25

**CDC** [1] - 26:18
**cell** [7] - 165:22,
166:2, 168:14,
169:7, 169:8,
169:12, 169:19
**Center** [3] - 26:14,
26:18, 26:21
**certain** [11] - 22:6,
37:19, 68:2, 73:24,
80:18, 89:14, 89:25,
162:17, 162:20,
165:19
**certainly** [1] - 47:12
**certainty** [3] - 38:16,
56:8, 60:13
**CERTIFICATE** [1] -
186:1
**Certificate** [1] - 4:14
**certification** [16] -
13:12, 13:14, 13:16,
13:18, 13:22, 13:23,
14:1, 14:2, 14:11,
14:13, 14:17, 14:24,
14:25, 15:1, 15:18
**certifications** [1] -
13:20
**certified** [7] - 12:24,
13:1, 14:4, 14:12,
14:19, 15:22, 15:23
**certify** [2] - 186:4,
186:10
**cetera** [2] - 15:13, 20:9
**chambers** [1] - 105:17
**chance** [1] - 98:11
**change** [13] - 71:22,
74:5, 74:7, 86:3,
86:8, 103:17,
107:13, 108:6,
108:9, 146:16,
146:17, 146:18,
154:19
**changed** [4] - 72:6,
72:8, 108:20, 127:4
**character** [1] - 134:24
**characters** [1] -
172:12
**charge** [1] - 6:17
**charged** [1] - 129:5
**chart** [5] - 29:5, 30:13,
33:9, 33:19, 37:12
**charts** [1] - 47:21
**chase** [1] - 56:3
**chest** [1] - 117:25
**cholesterol** [1] - 22:6
**choose** [1] - 32:22
**Chorus** [4] - 65:9,
65:12, 65:14, 65:16
**C▮▮▮▮** [62] -
114:20, 115:6,
115:7, 115:9,

115:11, 115:12,
116:5, 116:8,
116:10, 117:11,
118:5, 118:18,
119:13, 119:21,
120:10, 120:16,
121:10, 121:15,
122:3, 122:10,
123:13, 124:24,
127:7, 127:23,
131:13, 133:20,
136:24, 138:23,
141:17, 142:4,
145:6, 147:16,
148:6, 150:5, 150:8,
150:16, 151:18,
152:12, 153:22,
153:23, 155:4,
155:16, 157:13,
159:11, 170:21,
170:23, 171:9,
171:10, 172:25,
175:25, 176:1,
176:2, 176:5, 176:7,
176:15, 177:4,
182:22, 184:3
**C▮▮▮▮** [1] -
175:23
**chronic** [5] - 15:15,
16:6, 17:20, 20:25,
53:25
**chronological** [1] -
72:9
**circle** [3] - 109:21,
110:7, 148:7
**circled** [2] - 148:21,
148:22
**circling** [1] - 110:5
**circumstance** [1] -
51:17
**circumstances** [3] -
6:10, 9:10, 105:24
**Civil** [2] - 1:4, 186:7
**claimed** [1] - 58:2
**clarification** [8] -
10:19, 10:22, 15:11,
28:17, 38:10, 47:7,
91:4, 127:11
**clarify** [8] - 41:18,
55:20, 88:13,
122:23, 123:3,
137:22, 152:14,
160:11
**class** [25] - 5:25, 6:5,
67:19, 70:10, 70:11,
70:14, 95:11,
108:25, 147:10,
156:24, 157:8,
157:9, 157:12,
158:14, 159:6,

159:7, 159:8, 159:9,
159:13, 159:15,
159:16, 159:19,
159:23, 160:2
**classes** [3] - 72:1,
87:6, 177:8
**classroom** [5] - 67:2,
67:5, 67:6, 67:10,
142:15
**classrooms** [2] -
142:24, 143:1
**clear** [10] - 33:16,
76:17, 92:10, 120:7,
123:4, 127:22,
133:16, 148:1,
173:15, 180:8
**clearly** [1] - 171:24
**client** [2] - 40:18,
42:21
**client's** [4] - 40:20,
40:22, 42:21
**clinical** [7] - 14:22,
15:8, 20:9, 24:16,
24:18, 41:19, 41:22
**clinically** [1] - 16:12
**clonazepam** [1] -
33:20
**close** [9] - 30:5, 57:24,
107:23, 107:24,
108:4, 123:23,
124:1, 146:2
**closely** [1] - 31:25
**closer** [5] - 81:13,
81:19, 113:19,
114:15, 126:16
**clothesline** [1] - 153:8
**clothespins** [3] -
153:2, 153:3, 153:9
**Co.K** [2] - 131:4, 131:8
**cognition** [1] - 29:13
**cognitive** [2] - 29:10,
29:12
**coincide** [1] - 9:4
**collective** [1] - 38:9
**collectively** [1] - 24:8
**color** [1] - 20:2
**combination** [3] -
21:21, 29:10, 157:20
**combinations** [1] -
157:21
**coming** [16] - 106:3,
110:9, 115:14,
115:15, 116:11,
116:15, 136:3,
137:2, 139:11,
141:24, 145:19,
157:11, 159:10,
176:3, 185:11
**commences** [1] -
107:3

**comment** [2] - 161:7, 161:8
**commentary** [1] - 103:23
**committed** [1] - 44:18
**communication** [1] - 9:18
**communications** [1] - 9:14
**community** [3] - 21:16, 35:22, 35:23
**competent** [1] - 106:4
**completely** [1] - 164:23
**Complies** [1] - 110:12
**compound** [1] - 26:13
**computer** [10] - 167:8, 167:9, 167:10, 167:13, 167:25, 168:3, 168:5, 168:8, 170:18, 186:12
**computers** [3] - 165:4, 165:18, 167:7
**concept** [1] - 160:17
**concern** [3] - 105:12, 106:1, 108:17
**concerned** [2] - 11:15, 176:20
**concerns** [1] - 108:13
**concluded** [1] - 6:25
**conclusions** [1] - 56:20
**condition** [8] - 35:3, 45:4, 45:24, 47:1, 47:5, 48:13, 51:23, 52:5
**conditions** [22] - 21:2, 35:7, 39:24, 44:1, 45:5, 45:12, 45:16, 45:22, 46:23, 46:24, 47:21, 48:5, 48:19, 48:21, 48:24, 49:6, 49:9, 50:14, 51:22, 56:4, 58:11, 60:3
**conduct** [2] - 39:12, 58:1
**conference** [2] - 24:6, 25:8
**conferenced** [4] - 23:11, 23:14, 24:8, 24:21
**conferencing** [2] - 24:4, 24:25
**confers** [1] - 51:5
**confirm** [5] - 9:19, 23:7, 23:12, 42:25, 56:1
**confirmed** [1] - 32:10
**confront** [1] - 87:25
**confused** [2] - 117:10,

123:23
**confusion** [3] - 7:15, 7:25, 11:14
**conglomerate** [3] - 48:14, 48:15, 48:16
**congregating** [1] - 143:1
**connection** [1] - 75:21
**conservative** [2] - 28:7, 30:7
**consider** [1] - 56:5
**considered** [2] - 87:13, 88:10
**consistent** [2] - 29:18, 128:18
**constitute** [1] - 186:11
**Cont** [2] - 1:25, 2:24
**contact** [2] - 69:8, 181:13
**content** [2] - 174:12, 174:15
**CONTENTS** [1] - 4:1
**contents** [5] - 173:16, 173:22, 173:23, 180:4, 180:25
**context** [2] - 66:24, 181:10
**continue** [7] - 73:9, 80:7, 106:24, 127:2, 155:5, 155:9, 156:3
**continued** [2] - 16:21, 155:19
**CONTINUED** [1] - 61:12
**continues** [1] - 28:1
**continuous** [1] - 152:8
**contrary** [1] - 132:12
**control** [1] - 5:18
**Control** [3] - 26:15, 26:19, 26:21
**conversation** [2] - 100:11, 180:13
**conversations** [1] - 23:15
**cord** [4] - 15:9, 15:13, 16:9, 20:22
**core** [5] - 144:2, 144:3, 144:14, 164:11
**corner** [1] - 110:22
**correct** [102] - 6:14, 13:25, 14:15, 24:7, 30:3, 31:7, 31:18, 32:21, 33:18, 36:16, 39:6, 39:9, 39:11, 39:14, 39:16, 41:2, 41:5, 41:9, 41:12, 41:21, 41:22, 41:24, 42:3, 42:14, 44:3, 44:4, 44:7, 44:9,

44:12, 44:15, 44:19, 44:22, 44:24, 45:3, 45:7, 45:9, 45:15, 45:19, 46:7, 46:10, 46:12, 46:14, 47:22, 47:23, 48:1, 48:20, 48:22, 48:25, 52:10, 52:25, 53:6, 54:18, 54:24, 56:6, 56:7, 56:25, 57:21, 57:23, 57:25, 59:5, 59:7, 60:4, 60:11, 64:21, 67:11, 69:13, 70:3, 71:11, 73:5, 75:17, 76:15, 81:5, 81:20, 84:8, 90:24, 93:12, 93:17, 96:4, 100:6, 101:17, 102:2, 123:11, 140:10, 141:2, 143:18, 144:24, 145:11, 145:13, 147:7, 147:14, 147:16, 147:17, 150:2, 160:16, 163:21, 164:8, 168:1, 172:7, 172:10, 172:14, 182:24
**corrected** [1] - 119:5
**correctly** [5] - 64:4, 67:18, 77:14, 178:7, 178:12
**correlation** [1] - 43:19
**cost** [34] - 20:6, 20:15, 22:16, 22:18, 22:19, 25:22, 25:24, 26:22, 28:7, 28:9, 28:10, 28:12, 28:13, 28:16, 29:19, 29:20, 30:12, 31:5, 31:8, 33:3, 33:5, 34:5, 34:18, 35:11, 35:14, 35:18, 36:24, 37:17, 37:21, 38:6, 39:21, 46:22
**costing** [8] - 28:3, 29:17, 30:3, 30:4, 30:6, 33:12, 36:11
**costs** [3] - 22:12, 31:11, 47:10
**couch** [4] - 81:13, 81:17, 82:22, 82:24
**couches** [2] - 80:23, 80:25
**Counsel** [4] - 51:5, 103:24, 123:1, 137:11
**counsel** [4] - 12:13, 59:3, 60:2, 74:14
**counseling** [3] - 13:15, 14:14, 102:21

**counselor** [33] - 14:4, 14:20, 17:21, 53:17, 63:4, 67:24, 69:10, 69:24, 70:9, 70:13, 71:2, 71:3, 71:10, 93:10, 93:11, 93:21, 93:23, 94:10, 94:18, 98:16, 99:20, 99:24, 100:17, 100:20, 101:1, 101:4, 143:24, 144:1, 156:10, 160:1, 160:9, 164:4, 179:9
**counselor's** [1] - 160:4
**counselors** [10] - 68:2, 68:12, 68:16, 69:7, 69:15, 70:2, 72:17, 93:9, 156:10, 163:24
**counselors'** [1] - 178:20
**County** [1] - 39:2
**couple** [7] - 10:16, 42:12, 58:14, 91:15, 92:18, 93:5, 98:14
**course** [5] - 10:20, 34:14, 106:19, 164:17, 164:20
**courses** [1] - 15:14
**COURT** [163] - 1:1, 1:12, 5:1, 5:3, 5:15, 5:18, 5:22, 6:4, 6:9, 6:17, 6:21, 7:9, 7:13, 7:20, 7:22, 8:5, 8:8, 8:10, 8:12, 8:15, 8:21, 9:1, 9:21, 10:2, 10:4, 10:7, 10:10, 10:13, 12:4, 12:8, 12:12, 12:17, 18:1, 18:4, 18:7, 18:11, 18:15, 26:2, 26:4, 26:7, 38:20, 43:12, 46:3, 47:14, 47:18, 49:19, 50:3, 54:2, 58:8, 58:20, 58:22, 58:24, 60:16, 60:24, 61:2, 61:5, 61:10, 61:24, 63:13, 63:15, 63:18, 73:15, 74:14, 74:17, 74:20, 90:4, 91:7, 91:11, 92:3, 97:2, 102:11, 103:24, 104:23, 105:6, 105:16, 106:7, 106:9, 106:17, 106:20, 106:25, 107:2, 107:5, 108:16, 109:8, 109:25,

111:3, 118:11, 118:23, 119:4, 121:4, 122:17, 122:25, 124:9, 127:14, 128:1, 128:3, 128:14, 128:24, 129:2, 129:8, 129:16, 130:1, 130:5, 130:7, 130:20, 131:8, 131:17, 131:22, 132:11, 132:15, 132:19, 133:2, 133:7, 133:10, 133:18, 133:25, 134:3, 134:9, 134:14, 134:21, 135:2, 135:5, 135:9, 137:10, 137:20, 137:24, 139:4, 139:17, 139:21, 140:9, 140:16, 140:18, 141:6, 142:18, 146:6, 146:9, 146:12, 147:24, 148:13, 148:19, 148:25, 149:4, 149:6, 154:3, 154:13, 154:17, 155:20, 158:21, 158:24, 173:5, 174:2, 174:20, 175:15, 175:17, 177:20, 177:25, 184:8, 184:10, 184:20, 184:23, 185:3, 185:5, 185:18
**Court** [10] - 3:12, 3:12, 4:14, 9:10, 9:23, 12:14, 61:9, 105:10, 186:3, 186:22
**court** [5] - 18:14, 20:6, 46:11, 135:6, 186:8
**Court's** [2] - 11:4, 184:15
**Courthouse** [1] - 3:13
**courtroom** [9] - 66:18, 90:23, 101:12, 101:14, 144:10, 144:12, 144:13, 144:18, 144:19
**courts** [3] - 18:16, 18:17, 115:24
**cover** [3] - 6:20, 6:21, 173:4
**create** [1] - 132:8
**created** [1] - 161:25
**creating** [1] - 129:18
**credit** [1] - 166:23
**Cristina** [1] - 53:24

criteria [1] - 14:23
Cross [1] - 4:5
CROSS [1] - 38:21
cross [7] - 5:23, 6:1,
6:2, 38:20, 106:14,
106:15, 132:22
Cross-examination
[1] - 4:5
CROSS-
EXAMINATION [1] -
38:21
crosses [1] - 106:5
crush [2] - 76:4, 78:4
crying [1] - 78:20
CT [1] - 30:21
current [2] - 19:4,
34:11
cut [6] - 18:10, 44:8,
56:3, 152:23,
171:13, 180:23
cyberbullying [15] -
160:18, 160:22,
161:3, 161:4,
161:14, 161:19,
162:7, 162:8, 162:9,
162:11, 162:25,
163:25, 164:21,
176:10

**D**

dad [12] - 116:13,
126:3, 166:18,
166:19, 166:21,
167:4, 177:9,
177:10, 178:21,
179:22, 180:14
dad's [5] - 125:24,
126:2, 167:2,
169:25, 170:1
daily [3] - 36:1, 48:11,
156:22
Danny [3] - 138:8,
138:9, 138:17
dapper [1] - 10:13
Dash [2] - 65:3,
179:12
date [7] - 63:6, 76:5,
150:14, 150:21,
155:1, 155:5, 176:22
dates [1] - 150:12
daughter [1] - 112:22
David [43] - 74:11,
74:25, 75:2, 75:3,
75:4, 75:11, 75:21,
75:23, 76:1, 77:18,
78:4, 78:11, 78:12,
79:24, 80:1, 80:12,
80:21, 81:6, 81:11,
81:12, 83:10, 84:10,

87:19, 87:20, 87:24,
88:3, 88:19, 90:1,
90:9, 90:11, 90:15,
97:17, 102:14,
136:24, 138:23,
141:17, 142:4,
145:6, 157:13,
176:2, 184:2
David's [8] - 76:24,
76:25, 77:9, 77:17,
77:23, 78:1, 79:10,
80:1
days [14] - 6:16, 36:9,
36:10, 64:8, 88:16,
91:15, 92:19, 93:5,
96:19, 98:14,
100:17, 107:18,
135:12, 151:4
DC [5] - 1:16, 2:15,
2:18, 2:22, 3:2
dealing [1] - 87:2
December [2] -
102:21, 170:2
decide [2] - 7:4, 86:24
decision [1] - 33:2
dedicated [1] - 161:17
defects [1] - 49:5
Defendant [3] - 2:13,
2:25, 3:8
defendant's [2] - 59:3,
60:2
Defendants [2] - 1:7,
3:4
defendants [1] - 58:4
Defense [2] - 177:18,
177:19
deficit [1] - 21:12
deficits [2] - 16:22,
21:13
define [1] - 49:2
defined [1] - 105:19
definitely [1] - 71:22
definitions [1] - 48:7
degree [3] - 5:18,
38:16, 60:13
delete [2] - 124:14,
124:17
deleterious [1] - 36:21
delivery [1] - 17:24
depended [2] - 171:4,
171:6
deposed [4] - 46:7,
57:20, 72:24, 72:25
deposition [11] - 6:10,
6:13, 6:15, 6:18,
6:23, 7:1, 46:9, 51:7,
52:9, 57:9, 57:17
depressed [3] - 50:11,
50:25, 52:19
depression [15] -

47:6, 47:10, 47:25,
48:4, 49:25, 50:8,
50:9, 50:18, 50:24,
51:15, 52:5, 52:6,
52:11, 52:13, 54:24
depressive [2] -
44:25, 45:4
derogatory [1] - 162:3
describe [8] - 86:8,
101:23, 108:1,
116:23, 153:6,
161:2, 168:24,
174:16
described [5] -
101:10, 127:5,
147:13, 147:15,
172:12
designated [1] -
185:19
desk [4] - 178:14,
179:2, 179:5, 179:19
desktop [3] - 167:11,
167:12, 167:15
desktops [1] - 165:8
detail [4] - 72:5, 89:20,
95:23, 96:12
detailed [1] - 26:25
details [3] - 73:24,
81:22, 139:1
determine [3] - 9:25,
26:19, 39:24
determined [3] -
49:15, 49:24, 50:17
detriment [1] - 106:15
Detroit [1] - 12:8
developed [2] - 19:18,
48:13
device [1] - 17:3
diabetes [1] - 22:7
diagnose [1] - 53:24
diagnosed [2] - 35:4,
55:5
diagnoses [4] - 15:9,
15:12, 23:7, 48:14
diagnosis [1] - 16:21
Diagnostic [1] - 30:15
diagnostic [2] - 30:19,
30:20
diagnostics [1] - 22:4
diagonally [1] - 112:8
die [2] - 145:17,
146:20
difference [2] - 31:21,
41:19
different [21] - 7:17,
8:3, 11:22, 15:14,
29:12, 54:11, 55:17,
83:25, 84:1, 84:6,
86:17, 94:14, 94:15,
110:21, 112:15,

130:13, 134:19,
134:24, 143:23,
161:2, 164:23
differentiation [1] -
43:22
differently [1] - 52:16
difficult [2] - 51:2,
59:9
dinner [3] - 116:11,
116:15, 126:19
direct [7] - 5:21, 5:25,
69:8, 128:5, 161:25,
163:11, 181:11
DIRECT [2] - 12:19,
61:12
Direct [2] - 4:4, 4:7
directed [1] - 133:12
directly [29] - 15:5,
69:14, 69:23, 70:13,
89:1, 91:14, 91:16,
92:9, 96:8, 128:9,
128:12, 128:14,
128:15, 130:22,
131:1, 133:11,
134:4, 134:8,
136:12, 137:6,
137:11, 137:14,
137:16, 138:23,
141:15, 141:16,
155:15, 155:22,
182:22
disabilities [2] - 14:6,
15:8
disability [2] - 48:1,
48:6
disappear [1] - 139:12
discipline [1] - 14:5
disclosed [1] - 9:9
discovery [1] - 9:4
discuss [5] - 11:5,
61:2, 96:11, 104:25,
184:15
discussed [3] - 42:16,
60:19, 102:1
discussing [1] - 38:1
discussion [2] -
61:11, 149:10
Discussion [1] - 12:9
Disease [3] - 26:15,
26:19, 26:21
dismissed [1] - 147:2
disorder [21] - 16:18,
35:4, 35:5, 35:9,
35:15, 35:17, 36:8,
44:23, 44:25, 45:2,
45:5, 45:23, 46:25,
47:2, 48:2, 49:16,
50:13, 54:16, 54:24,
55:4
disorders [8] - 16:18,

20:20, 20:25, 46:25,
49:4, 49:6, 55:1
disparity [2] - 28:8,
29:19
display [1] - 186:13
dissimilar [2] - 29:11,
30:4
dissociative [1] - 48:3
distance [2] - 108:11,
109:3
distancing [1] -
108:22
distant [1] - 12:6
distinctly [1] - 126:4
distribution [1] -
167:4
DISTRICT [3] - 1:1,
1:1, 1:12
District [2] - 3:12,
186:4
disturbed [2] - 181:3,
182:11
disturbing [1] - 21:14
docking [1] - 168:24
doctor [3] - 32:23,
49:10, 55:22
doctors [2] - 27:24,
72:17
document [1] - 62:25
documents [1] - 11:15
dollar [1] - 58:12
done [17] - 17:15,
20:21, 31:9, 43:21,
55:17, 56:18, 66:13,
67:9, 89:25, 90:11,
102:15, 120:5,
124:20, 127:23,
152:18, 152:19,
166:25
door [2] - 126:16,
179:19
doors [1] - 142:14
doorway [1] - 182:4
down [33] - 22:17,
33:9, 62:14, 65:22,
70:21, 79:11, 80:10,
80:12, 80:14, 81:4,
90:25, 103:8, 105:7,
111:1, 117:15,
119:16, 119:18,
119:19, 120:10,
125:1, 126:5,
126:19, 141:4,
143:8, 145:17,
146:20, 148:13,
153:17, 159:9,
159:10, 178:25,
184:21
downstairs [2] - 80:2,
174:25

**Dr** [67] - 23:9, 24:3, 24:8, 24:12, 24:13, 24:14, 24:16, 24:18, 25:5, 27:20, 27:25, 28:2, 28:5, 28:11, 29:9, 29:21, 32:9, 33:17, 34:13, 34:17, 34:25, 35:5, 35:15, 35:20, 36:18, 37:18, 38:7, 38:11, 38:14, 39:6, 40:10, 40:12, 41:25, 42:4, 42:5, 42:11, 44:2, 44:20, 45:8, 45:10, 48:3, 48:10, 48:12, 49:8, 49:13, 50:9, 50:14, 51:24, 53:1, 53:2, 54:21, 55:23, 56:1, 56:11, 56:13, 56:15, 56:20, 59:21, 59:22, 59:25

**draw** [8] - 23:17, 109:15, 109:23, 113:14, 129:24, 142:20, 177:21, 177:22

**drew** [2] - 110:21, 115:22

**drilled** [1] - 22:17

**drink** [1] - 163:14

**drive** [6] - 5:7, 80:20, 83:13, 83:14, 105:2, 125:24

**Drive** [1] - 3:6

**driveway** [1] - 113:5

**driving** [3] - 126:2, 126:3, 126:5

**drop** [4] - 77:23, 79:13, 79:15, 114:13

**dropped** [5] - 113:3, 113:6, 114:5, 114:8, 114:10

**drove** [2] - 84:13, 126:1

**Drs** [7] - 22:15, 23:12, 24:3, 25:22, 27:19, 44:1

**drug** [4] - 32:13, 32:15, 33:19, 33:20

**due** [1] - 20:20

**duration** [2] - 22:13

**during** [24] - 9:4, 10:20, 44:17, 60:25, 80:17, 95:17, 95:20, 104:1, 104:12, 141:14, 141:21, 141:22, 144:22, 146:17, 147:3, 147:5, 151:17, 152:13, 153:12, 157:4, 159:10, 160:3, 171:17

---

# E

**ear** [1] - 180:6

**early** [4] - 16:5, 79:1, 79:6, 108:7

**ears** [3] - 92:14, 134:19, 173:17

**easier** [3] - 27:6, 27:9, 28:24

**East** [1] - 1:19

**EASTERN** [1] - 1:1

**Eastern** [1] - 186:4

**easy** [2] - 7:12, 185:9

**eat** [4] - 47:1, 47:4, 50:12, 167:22

**eat-in** [1] - 167:22

**eating** [13] - 35:5, 35:15, 35:17, 36:8, 45:2, 45:5, 45:23, 46:25, 47:2, 54:16, 54:24, 54:25, 55:4

**educational** [4] - 13:10, 40:14, 41:10, 42:20

**effect** [9] - 21:9, 30:25, 31:1, 95:10, 132:21, 133:15, 133:21, 146:19, 163:7

**effective** [1] - 106:13

**effects** [1] - 36:21

**efficiently** [1] - 106:21

**effort** [1] - 134:3

**efforts** [1] - 156:3

**eight** [1] - 17:12

**either** [21] - 16:10, 17:20, 47:1, 68:11, 68:15, 70:9, 70:13, 71:8, 87:16, 95:14, 120:2, 120:13, 120:14, 121:11, 123:15, 148:7, 159:13, 166:12, 179:11, 181:14

**elected** [1] - 59:15

**elective** [2] - 65:14, 65:15

**elementary** [6] - 71:24, 112:15, 113:18, 113:19, 114:1, 114:13

**Elementary** [1] - 107:20

**Elliker** [2] - 2:25, 39:1

**ELLIKER** [17] - 6:2, 18:5, 26:3, 38:22, 43:13, 46:1, 46:4,

---

47:19, 49:23, 50:5, 51:6, 52:2, 52:3, 54:7, 58:10, 58:19, 60:21

**Elliker**............... [1] - 4:5

**email** [5] - 63:4, 63:23, 65:24, 66:11, 102:20

**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11

**embarrassed** [1] - 139:10

**emergency** [1] - 98:8

**emotional** [4] - 21:13, 21:17, 35:9, 49:5

**emotional-thinking** [1] - 21:17

**emotions** [1] - 36:21

**employment** [3] - 40:16, 41:11, 42:20

**encounter** [3] - 98:5, 111:6, 179:17

**encounters** [1] - 147:6

**end** [7] - 14:4, 31:10, 78:1, 124:23, 150:19, 150:20

**ended** [1] - 39:3

**engage** [2] - 85:25, 103:2

**engaged** [5] - 13:6, 137:7, 137:17, 138:19, 138:20

**engaging** [1] - 103:3

**enjoy** [1] - 10:25, 184:14

**enjoyable** [1] - 5:3

**ensure** [1] - 16:20

**entails** [1] - 14:17

**entered** [1] - 26:25

**entire** [3] - 67:19, 78:21, 80:18

**entirely** [1] - 56:17

**entitled** [2] - 7:2, 133:8

**entrance** [2] - 178:4, 178:8

**enures** [1] - 106:15

**environment** [7] - 72:3, 129:9, 129:12, 129:19, 131:3, 131:20, 132:21

**ergonomics** [1] - 13:18

**especially** [1] - 182:2

**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8

---

**essentially** [6] - 14:18, 14:21, 21:8, 22:7, 70:20, 86:9

**estimate** [8] - 20:6, 20:14, 26:15, 26:16, 26:17, 43:16, 62:10, 104:13

**estimated** [7] - 25:23, 36:13, 36:22, 36:25, 44:10, 44:13, 53:7

**estimation** [1] - 26:18

**Estrella** [1] - 144:17

**et** [4] - 1:6, 15:13, 20:9, 186:7

**evaluate** [1] - 24:17

**evaluating** [1] - 22:23

**evaluations** [1] - 22:22

**evening** [1] - 116:15

**event** [2] - 11:8, 143:14

**events** [5] - 9:24, 41:7, 45:13, 73:7, 108:12

**eventually** [4] - 124:3, 125:6, 126:18

**evidence** [9] - 26:1, 26:8, 58:4, 61:23, 63:12, 63:16, 109:7, 139:15, 177:19

**exact** [7] - 6:16, 96:20, 142:23, 150:8, 150:9, 150:12, 183:2

**exactly** [8] - 17:14, 73:13, 73:21, 79:12, 122:19, 151:5, 159:17, 184:1

**exam** [2] - 14:25, 15:21

**EXAMINATION** [4] - 12:19, 38:21, 59:1, 61:12

**examination** [11] - 4:4, 4:5, 4:5, 4:7, 5:17, 6:12, 9:23, 15:19, 105:25, 107:3, 134:15

**examinations** [1] - 15:18

**example** [8] - 16:23, 29:8, 50:23, 67:10, 68:17, 130:9, 130:23, 134:18

**except** [1] - 72:2

**exception** [1] - 128:8

**exchanging** [1] - 172:24

**excited** [8] - 64:11, 64:22, 64:23, 66:1, 71:25, 72:1, 78:5, 78:7

---

**excuse** [2] - 71:19, 136:8

**excused** [4] - 61:4, 105:5, 184:19, 184:22

**exercise** [1] - 9:8

**exert** [1] - 18:22

**Exhibit** [18] - 8:4, 11:21, 25:13, 25:25, 26:8, 30:9, 31:13, 34:15, 37:7, 37:25, 61:22, 62:18, 63:12, 63:16, 109:7, 139:15, 139:19

**exhibit** [1] - 26:24

**EXHIBITS** [1] - 4:8

**exist** [1] - 129:19

**existing** [2] - 14:3, 14:19

**expect** [1] - 9:5

**expectancy** [7] - 22:14, 26:10, 26:19, 26:20, 29:22, 36:9, 36:10

**expectation** [1] - 95:14

**expecting** [1] - 116:16

**expenses** [2] - 59:16, 59:17

**expensive** [2] - 32:3, 54:14

**experience** [8] - 14:9, 14:23, 16:3, 16:5, 84:15, 92:19, 160:21

**experienced** [1] - 129:9

**experiences** [4] - 72:20, 72:21, 73:1, 84:21

**experiencing** [3] - 69:3, 93:1

**expert** [13] - 18:2, 18:11, 18:14, 18:24, 19:1, 19:2, 19:8, 22:9, 23:11, 40:17, 55:10, 56:13, 56:15

**expertise** [3] - 49:18, 58:9, 59:10

**experts** [8] - 20:7, 20:9, 20:11, 22:2, 23:8, 25:7, 27:19, 58:12

**explain** [17] - 26:12, 27:15, 34:10, 49:8, 67:5, 82:18, 86:21, 88:2, 109:11, 117:23, 121:16, 122:13, 151:15, 153:5, 156:20, 161:16, 168:17

**explained** [3] - 84:9, 94:3
**explanation** [1] - 164:19
**explanations** [1] - 27:1
**explicit** [1] - 25:6
**Explorers** [1] - 158:5
**expose** [2] - 121:10, 121:15
**exposed** [3] - 82:17, 82:20, 122:3
**exposing** [1] - 121:18
**extensive** [3] - 40:12, 59:22, 59:24
**extent** [2] - 66:25, 74:14
**extracurricular** [1] - 65:14
**extremely** [5] - 66:1, 73:23, 77:4, 102:16, 176:20
**extremities** [2] - 16:11, 20:24
**extremity** [1] - 16:10

**F**

**F.C.S.B** [4] - 1:6, 2:13, 2:25, 186:7
**F.T** [1] - 3:6
**face** [2] - 118:4, 140:22
**Facebook** [13] - 8:23, 9:20, 121:13, 124:5, 161:5, 161:6, 161:10, 161:12, 163:6, 168:11, 170:6, 170:14, 172:24
**Facility** [1] - 34:19
**facility** [7] - 34:22, 35:17, 36:7, 37:1, 37:7, 37:8, 52:11
**facing** [6] - 118:4, 140:14, 140:21, 140:23, 140:24
**fact** [8] - 17:2, 40:25, 56:4, 64:22, 78:11, 83:14, 130:2, 184:3
**faculty** [1] - 157:23
**FAHEY** [27] - 5:21, 10:6, 12:1, 12:6, 12:16, 12:18, 12:20, 15:24, 18:3, 18:8, 18:13, 25:12, 25:16, 25:17, 25:25, 26:5, 26:9, 38:18, 43:10, 47:11, 47:17, 49:17, 58:7, 58:25, 59:2,

60:15, 60:18
**Fahey** [5] - 1:14, 10:5, 12:1, 18:1, 18:1, 39:3
**Fahey.............** [1] - 4:5
**Fahey.................** [1] - 4:4
**fail** [1] - 35:23
**fair** [10] - 28:6, 28:9, 30:7, 37:20, 45:20, 46:21, 56:2, 59:14, 132:13, 132:14
**Fairfax** [1] - 39:2
**Faith** [10] - 112:20, 112:25, 113:1, 113:3, 113:6, 113:8, 114:3, 114:6, 114:8, 116:12
**faith** [3] - 9:8, 9:9
**Faith's** [1] - 113:12
**fall** [3] - 160:23, 161:20, 162:22
**familiar** [1] - 42:13
**family** [15] - 40:20, 41:14, 42:21, 59:23, 75:24, 151:19, 151:23, 167:8, 167:22, 168:21, 171:12, 171:13, 172:23, 178:5, 181:21
**far** [8] - 57:3, 58:16, 86:11, 91:22, 111:9, 172:6, 183:8, 185:6
**F▮▮▮▮▮▮** [10] - 100:8, 100:9, 100:11, 100:19, 144:9, 158:17, 158:19, 159:1, 159:5, 159:24
**fault** [1] - 185:15
**February** [4] - 104:9, 104:11, 150:20, 152:6
**federal** [1] - 18:17
**fee** [3] - 22:16, 28:4, 28:5
**feed** [2] - 79:11, 103:3
**feeding** [2] - 80:4, 80:5
**feelings** [1] - 84:19, 92:25
**fees** [2] - 22:17, 28:4
**feet** [1] - 119:21
**FELDMAN** [1] - 3:9
**fell** [1] - 124:25
**felt** [24] - 84:17, 91:20, 92:22, 99:8, 100:15, 102:16, 102:17, 114:15, 116:22, 116:25, 117:9,

120:3, 122:12, 122:14, 122:15, 139:10, 141:24, 145:25, 146:18, 147:1, 159:22
**fence** [1] - 149:18
**fencing** [2] - 110:19, 110:23
**few** [10] - 30:23, 40:2, 100:17, 116:17, 116:18, 137:4, 137:23, 171:3, 172:18, 179:25
**fictitious** [1] - 16:1
**field** [7] - 14:3, 14:18, 16:3, 16:12, 16:16, 38:16, 60:13
**fields** [1] - 18:22
**fight** [1] - 82:14
**figure** [1] - 58:12
**figured** [1] - 37:15
**filed** [1] - 8:24
**fill** [3] - 69:21, 70:4, 96:23
**filled** [4] - 70:6, 71:5, 93:25, 95:3
**filling** [2] - 71:9, 98:15
**final** [1] - 37:12
**fine** [7] - 18:11, 79:18, 79:20, 132:25, 134:14, 158:22, 185:5
**finger** [2] - 109:14, 109:25
**fingers** [4] - 123:5, 153:24, 154:1, 154:6
**finish** [2] - 128:15, 185:2
**finished** [1] - 80:10
**first** [65] - 5:19, 5:20, 10:18, 11:3, 27:3, 29:4, 32:11, 35:8, 48:9, 66:20, 71:13, 71:16, 71:19, 81:11, 82:2, 86:11, 86:18, 87:2, 87:16, 88:11, 91:14, 91:15, 92:8, 92:17, 92:18, 93:3, 93:4, 93:16, 96:5, 97:16, 98:13, 99:15, 101:5, 101:21, 101:22, 102:23, 107:8, 108:21, 109:17, 111:17, 120:1, 125:8, 125:9, 125:10, 135:22, 136:22, 143:17, 151:17, 152:1, 152:3, 152:11, 159:9, 160:20,

165:4, 167:16, 167:20, 167:21, 170:25, 173:14, 177:3, 179:17
**firsthand** [4] - 128:5, 129:14, 129:20, 133:12
**fit** [2] - 6:4, 156:22
**Fitzpatrick** [1] - 9:3
**five** [8] - 5:9, 36:22, 66:23, 72:12, 104:10, 104:12, 104:14
**five-month** [1] - 104:12
**FL** [3] - 2:3, 2:7, 2:11
**FLEXNER** [4] - 1:19, 2:2, 2:6, 2:10
**flip** [2] - 166:12, 166:15
**floor** [10] - 117:5, 147:11, 159:7, 159:9, 159:11, 167:16, 167:19, 167:20, 167:21
**Floor** [1] - 3:13
**Floris** [2] - 107:20, 107:23
**flow** [1] - 105:12
**focus** [10] - 91:8, 92:8, 127:14, 127:17, 135:22, 155:3, 161:20, 170:10
**focusing** [1] - 138:14
**follow** [1] - 92:24
**following** [2] - 68:7, 88:17
**food** [2] - 116:13, 126:5
**football** [1] - 12:4
**FOR** [1] - 1:1
**force** [1] - 153:23
**forced** [4] - 122:4, 123:12, 129:19, 152:18
**foregoing** [1] - 186:10
**forehead** [2] - 101:10, 144:21
**forensic** [1] - 41:19
**Forest** [1] - 64:19
**forgot** [4] - 37:8, 113:24, 114:1, 125:21
**form** [15] - 23:2, 93:25, 94:5, 94:6, 94:14, 94:23, 95:3, 95:6, 96:23, 121:4, 122:17, 154:3, 162:11, 163:3, 163:5
**formal** [1] - 167:21

**forms** [4] - 23:3, 23:4, 93:21, 161:4
**fortunately** [1] - 21:15
**forward** [1] - 5:4
**foundation** [3] - 47:15, 49:17, 132:24
**foundational** [1] - 175:16
**four** [15] - 5:9, 7:24, 11:13, 36:1, 36:23, 45:4, 45:5, 45:12, 54:11, 72:12, 140:12, 144:4, 144:5, 144:6
**fourth** [1] - 144:14
**frame** [2] - 111:9, 176:24
**frankly** [3] - 51:24, 59:12, 152:9
**F▮▮▮▮▮** [2] - 179:3, 179:7
**F▮▮▮▮▮▮▮** [1] - 178:18
**F▮▮▮▮▮▮** [21] - 100:22, 100:23, 101:1, 101:5, 101:8, 101:21, 101:24, 102:4, 102:14, 102:20, 103:19, 104:13, 107:8, 144:1, 144:20, 145:1, 145:4, 145:7, 146:15, 156:15, 164:10
**F▮▮▮▮▮▮▮** [1] - 145:15
**free** [1] - 60:24
**frequency** [3] - 22:13, 22:15, 22:23
**frequent** [1] - 53:18
**frequently** [1] - 171:2
**Friday** [6] - 7:24, 9:16, 11:11, 111:14, 111:15, 126:22
**friend** [8] - 89:10, 107:16, 114:19, 116:7, 123:24, 124:1, 133:19, 134:18
**friends** [13] - 75:12, 76:14, 87:14, 88:7, 88:10, 88:20, 89:1, 90:16, 107:23, 107:24, 108:4, 170:12, 170:14
**friendship** [4] - 108:2, 108:4, 108:6, 108:13
**front** [23] - 27:11, 28:24, 38:2, 63:20, 82:23, 126:14, 177:4, 177:6,

177:15, 177:16,
178:8, 178:11,
178:14, 179:2,
179:5, 179:18,
179:19, 179:20,
180:5, 180:10,
181:15, 181:17,
181:24
**frustrating** [1] - 92:22
**full** [1] - 6:15
**Fulton** [1] - 3:6
**fun** [2] - 78:17, 78:18
**function** [1] - 21:16
**functional** [1] - 16:22
**funny** [11] - 88:5, 88:8,
91:19, 106:10,
106:11, 117:12,
120:6, 120:7,
123:18, 123:19
**future** [5] - 39:4,
39:21, 39:25, 50:1,
50:19
**Future** [1] - 27:4

## G

**gap** [1] - 41:6
**garage** [2] - 167:24
**gather** [1] - 17:23
**general** [7] - 8:18,
18:16, 21:23, 23:10,
65:25, 67:8, 114:9
**Generally** [1] - 134:25
**generally** [9] - 19:11,
25:19, 40:3, 41:22,
74:3, 134:24, 151:3,
162:7, 174:16
**generic** [17] - 31:22,
31:23, 31:25, 32:2,
32:3, 32:19, 32:20,
32:21, 32:23, 33:5,
33:11, 33:20, 34:1,
34:4, 34:8, 34:10
**gentleman** [1] - 18:2
**gentlemen** [6] - 10:11,
11:3, 104:23, 107:3,
154:13, 184:10
**Genus** [8] - 181:7,
181:9, 181:13,
181:19, 182:1,
182:16, 182:20
**Genus'** [2] - 181:23,
182:12
**girl** [3] - 112:14,
112:18, 112:19
**girlfriend** [1] - 172:4
**girls** [2] - 145:10,
155:23
**given** [10] - 17:2,
17:19, 58:11, 68:4,

90:9, 92:4, 146:15,
146:19, 146:21,
146:24
**Government's** [1] -
12:10
**GP** [3] - 22:5, 31:2
**grade** [13] - 44:11,
67:12, 67:13, 67:14,
67:16, 67:19,
107:20, 108:12,
108:14, 109:2,
183:14, 183:23,
184:4
**grader** [6] - 74:11,
74:12, 75:2, 75:3
**graders** [2] - 163:10,
184:6
**graphic** [1] - 82:19
**great** [4] - 63:23, 80:8,
80:9, 185:15
**grievance** [2] - 68:22,
70:24
**ground** [5] - 6:20,
6:21, 117:5, 120:1,
120:9
**group** [3] - 48:24,
67:9, 76:14
**grouping** [1] - 48:19
**groups** [3] - 44:14,
44:18, 75:11
**guess** [27] - 37:19,
58:16, 61:17, 68:22,
69:5, 79:10, 84:10,
84:25, 85:20, 90:25,
103:5, 103:6, 103:8,
115:14, 117:25,
137:1, 150:11,
153:6, 156:25,
165:1, 166:22,
175:3, 180:4,
182:14, 183:6,
184:25
**guidance** [42] - 63:4,
67:24, 68:2, 68:12,
68:15, 69:5, 69:6,
69:7, 69:10, 69:15,
69:24, 70:2, 70:9,
70:13, 71:10, 93:9,
93:10, 93:11, 93:21,
93:23, 94:7, 95:9,
98:16, 98:20, 99:20,
99:24, 100:17,
101:1, 101:4,
106:23, 143:24,
144:1, 156:9,
156:10, 160:1,
160:4, 160:9,
163:23, 164:4,
178:19, 179:9
**guys** [11] - 78:15,

107:23, 166:20,
167:8, 168:2, 168:3,
172:15, 177:14,
178:5, 178:9, 178:22
**gym** [1] - 108:25

## H

**hair** [3] - 50:7, 167:5,
167:6
**half** [1] - 5:21
**hall** [2] - 66:25, 67:1
**Halloween** [1] - 75:18
**hallway** [2] - 96:8,
147:6
**hallways** [2] - 87:6,
97:11
**hand** [17] - 8:5, 27:23,
82:9, 82:11, 82:12,
82:13, 82:14, 82:15,
101:10, 122:15,
122:16, 122:19,
122:21, 136:10,
144:21, 182:3, 182:5
**hands** [3] - 120:10,
126:5, 157:16
**hang** [4] - 75:12,
75:13, 108:23, 116:9
**hanging** [1] - 153:7
**harassing** [1] - 176:12
**harassment** [7] - 66:7,
66:16, 68:25, 85:13,
180:3, 180:17
**hard** [5] - 108:24,
109:10, 149:17,
151:10, 159:22
**harder** [1] - 109:3
**harm** [2] - 171:13,
172:23
**harness** [1] - 36:19
**Harris** [2] - 186:3,
186:21
**HARRIS** [1] - 3:12
**hate** [7] - 105:11,
161:15, 161:16,
161:17, 161:18,
163:9, 163:13
**hated** [1] - 163:12
**hateful** [1] - 162:19
**head** [10] - 36:19,
44:16, 44:17, 84:16,
103:8, 119:21,
119:23, 138:12,
153:15, 153:16
**headphones** [1] -
114:4
**healthcare** [3] - 17:24,
73:12, 73:20
**hear** [21] - 12:14,
24:13, 49:19, 49:21,

80:7, 85:24, 86:2,
128:9, 131:1, 131:2,
131:11, 139:17,
146:5, 146:8,
156:24, 173:16,
173:22, 173:23,
174:24, 180:25,
182:20
**heard** [70] - 7:23,
11:11, 65:8, 66:6,
67:20, 88:22, 91:4,
91:8, 92:4, 92:5,
92:8, 111:21,
116:11, 127:12,
127:15, 127:21,
127:22, 128:4,
128:6, 128:9,
128:11, 128:14,
128:15, 128:20,
128:21, 130:8,
130:10, 130:11,
130:12, 130:15,
130:16, 131:4,
131:7, 131:10,
131:12, 131:13,
131:25, 132:5,
133:4, 133:5, 133:6,
133:11, 133:21,
133:23, 133:24,
134:4, 134:8,
134:18, 134:20,
134:25, 135:23,
137:10, 137:23,
138:15, 138:20,
139:23, 142:1,
160:17, 164:13,
173:8, 173:12,
173:18, 175:3,
182:12, 182:15,
182:19, 182:22,
183:9
**hearing** [17] - 86:12,
91:22, 91:23, 91:25,
92:14, 129:6,
129:11, 129:12,
129:13, 129:25,
130:2, 130:3,
130:19, 131:6,
141:16, 174:6
**hearsay** [10] - 92:2,
128:7, 128:8,
128:12, 128:16,
128:23, 130:4,
130:11, 133:1,
174:19
**heavily** [1] - 40:11
**held** [2] - 121:23,
121:24
**hello** [1] - 85:1
**help** [8] - 42:25, 75:15,

112:9, 156:4, 156:8,
157:23, 158:8,
158:10
**hence** [1] - 21:3
**hereby** [1] - 186:4
**hereto** [1] - 186:15
**herself** [5] - 41:13,
89:11, 127:16,
130:10, 130:11
**Hi** [1] - 113:6
**himself** [9] - 82:17,
83:8, 121:10,
121:15, 121:18,
122:3, 152:4,
171:18, 172:9
**historically** [1] - 16:13
**history** [1] - 100:10
**hit** [2] - 153:15
**hold** [6] - 13:18,
51:12, 54:1, 55:13,
57:15, 119:18
**holding** [2] - 120:10,
153:17
**holiday** [1] - 5:3
**HOLTZMAN** [1] - 1:14
**home** [37] - 21:13,
50:12, 78:13, 78:21,
78:24, 79:13, 80:20,
83:13, 83:14, 83:16,
83:17, 83:25, 84:12,
84:14, 109:21,
110:6, 110:18,
110:22, 111:18,
111:19, 112:4,
112:6, 112:13,
112:16, 112:23,
116:17, 116:22,
125:12, 125:13,
125:17, 125:19,
126:9, 126:17,
157:1, 165:15,
165:21
**homeroom** [4] -
99:16, 156:18,
156:20, 156:24
**honestly** [1] - 120:3
**Honor** [63] - 6:19,
7:11, 8:9, 8:11, 8:19,
8:22, 8:25, 9:12,
9:16, 10:6, 12:1,
18:5, 25:14, 38:19,
43:10, 46:1, 47:11,
47:17, 49:17, 52:2,
58:7, 58:19, 58:21,
58:25, 60:15, 60:18,
60:21, 60:22, 60:23,
62:19, 63:11, 73:14,
74:19, 86:24, 90:3,
91:3, 91:10, 92:11,
97:1, 102:10,

195

103:23, 104:21,
106:6, 106:8,
106:22, 107:4,
109:6, 111:2,
127:24, 129:23,
134:10, 134:18,
135:4, 135:7, 137:9,
137:22, 139:14,
142:17, 146:11,
147:23, 173:4,
175:14, 177:18
Honor's [1] - 8:17
HONORABLE [1] -
1:11
hoodie [1] - 114:4
hope [6] - 5:3, 6:11,
10:15, 146:16,
185:2, 185:4
hopefully [1] - 60:20
hoping [1] - 7:4
hospitalization [2] -
35:1, 35:11
hospitalized [1] - 35:3
hostile [2] - 129:19,
131:3
hour [5] - 5:21, 19:6,
19:7, 56:24, 185:17
hourly [2] - 19:6,
56:24
hours [6] - 6:13, 6:16,
15:7, 36:1, 59:23,
182:25
house [28] - 77:21,
77:24, 78:1, 79:7,
79:19, 79:21, 84:10,
84:13, 112:18,
113:3, 113:7,
113:20, 114:23,
114:25, 115:1,
116:25, 124:24,
124:25, 125:2,
125:4, 126:6,
126:14, 166:16,
167:7, 167:14,
167:17, 168:19
h███████ [1] - 183:13
humiliated [1] -
139:10
H█████ [40] - 63:5,
63:22, 64:3, 64:5,
69:11, 70:7, 93:13,
93:19, 94:1, 95:3,
95:14, 95:18, 95:20,
96:3, 96:6, 96:11,
96:15, 96:21, 97:15,
98:15, 99:6, 99:20,
143:23, 147:3,
147:8, 156:11,
160:14, 164:7,
179:9, 179:12,

179:14, 179:16,
179:21, 180:14,
180:24, 181:6,
181:20, 181:23,
182:16, 182:20
H█████ [1] -
180:6, 181:17,
182:13
hundred [1] - 175:12
hundreds [1] - 18:21
HUNTON [4] - 2:14,
2:17, 2:21, 3:1
hurt [1] - 171:12,
177:5
hurtful [2] - 162:18,
163:8
hypothetical [3] -
16:1, 49:18, 131:23
hypothetically [1] -
56:22, 131:24,
133:19

I

idea [1] - 71:7
identical [1] - 14:18
identified [2] - 45:21,
48:21
identifies [1] - 47:21
identify [2] - 88:19,
94:10
ill [1] - 30:25
immediate [2] - 71:4,
88:16
immediately [2] -
125:14, 126:10
immensely [2] - 92:20,
92:22
impersonated [1] -
163:16
impersonating [1] -
162:13
implicit [1] - 33:16
important [7] - 21:9,
39:20, 39:23, 65:13,
97:20, 98:6, 99:7
impose [1] - 9:10
improve [1] - 53:13
impulses [1] - 36:20
in-person [1] - 104:8
inaccurate [1] - 43:6
inappropriate [3] -
99:23, 102:16,
102:17
incident [5] - 8:1,
11:16, 101:16,
101:25, 173:8
include [2] - 68:24,
168:11
included [2] - 44:2,

151:24
including [1] - 72:16
indeed [1] - 11:8
indefinitely [1] - 27:21
indicated [1] - 104:25
indicating [1] - 140:6
indirectly [1] - 130:25
indiscernible [1] -
103:22
individual [8] - 15:17,
26:20, 29:6, 29:11,
29:14, 50:23, 131:9,
134:23
individually [1] - 68:6
individuals [2] - 13:3,
16:18
information [7] - 7:2,
7:3, 9:5, 22:25, 23:2,
38:11, 59:25
initial [3] - 74:18,
136:22, 138:5
initials [9] - 7:18, 8:4,
10:21, 11:20, 87:17,
88:11, 137:25, 138:2
injuries [17] - 15:9,
15:13, 15:15, 15:16,
16:7, 16:9, 16:14,
17:20, 20:3, 20:23,
21:7, 21:8, 35:9,
44:17, 58:5
injurious [1] - 9:10
injury [11] - 15:9,
17:23, 17:25, 20:21,
20:22, 21:5, 21:7,
21:10, 30:22, 44:21
inner [1] - 105:17
inpatient [4] - 35:6,
35:10, 35:16, 35:21
inquiries [1] - 127:17
insensitive [1] - 35:25
inside [10] - 122:12,
122:14, 122:15,
122:21, 123:5,
123:6, 123:7, 142:6,
142:7, 153:24
instances [2] - 97:10,
161:1
instead [2] - 8:2,
11:19
instigate [1] - 103:5
institutionalized [1] -
35:2
institutionalized-
type [1] - 35:2
instructed [1] - 171:24
instruction [3] - 7:19,
10:18, 11:4
instructions [1] -
184:15
intended [1] - 77:15

intensive [1] - 35:6
interacted [1] - 125:18
interaction [3] - 64:24,
147:12, 181:12
intercede [1] - 12:14
interjected [1] - 132:2
internet [2] - 168:3,
168:6
interns [1] - 105:18
interpreted [1] - 31:2
interpreting [1] - 25:3
interrupt [1] - 105:12
interrupts [1] - 133:4
intervention [3] -
37:4, 37:5, 37:10
interview [9] - 40:18,
40:20, 40:22, 41:13,
42:20, 42:21, 59:11,
59:15
interviewed [3] - 59:4,
59:23
investigation [1] -
58:1
invites [1] - 17:22
involve [1] - 14:1
involved [4] - 15:7,
20:18, 20:19, 48:10
involves [1] - 14:2
involving [1] - 173:8
irritated [2] - 158:12,
158:15
ish [1] - 95:24
isolate [1] - 47:9
issue [9] - 7:11, 8:22,
9:22, 45:14, 45:18,
68:23, 69:9, 96:5,
133:1
issued [1] - 9:3
it'll [2] - 23:6, 103:8
item [4] - 27:23, 27:24,
38:13, 115:3
items [1] - 23:19
items/service [1] -
27:16

J

J.F [1] - 3:6
J.O [2] - 3:8, 90:22
J.S [5] - 7:16, 7:18,
8:4, 11:20, 11:21
Jayde [5] - 7:24, 8:2,
11:11, 11:17, 11:21
J█████ [43] - 90:20,
90:22, 91:16, 91:24,
107:16, 107:19,
107:20, 108:2,
108:3, 108:5,
108:11, 108:13,
108:22, 114:19,

115:6, 115:11,
116:4, 116:6, 116:9,
117:3, 117:10,
117:18, 117:19,
117:23, 118:18,
119:10, 119:11,
119:20, 120:16,
120:21, 121:7,
121:21, 121:22,
121:25, 122:7,
122:12, 122:14,
122:21, 123:25,
136:24, 147:16,
148:2, 176:12
J█████ [1] - 115:12
Jenni [2] - 164:14,
164:22
jfahey@
holtzmanvogel.
com [1] - 1:17
job [7] - 16:24, 59:17,
90:9, 90:14, 100:24,
134:2, 185:1
jobs [3] - 136:10,
145:22
join [2] - 183:21,
183:25
joined [2] - 183:11,
184:1
joke [1] - 91:19
Jonathan [2] - 1:14,
12:1
JOSEFIAK [1] - 1:15
jovial [1] - 91:21
JR [1] - 1:11
judge [1] - 19:21
Judge [4] - 6:3, 9:3,
149:3, 185:15
JUDGE [1] - 1:12
June [1] - 19:19
JURY [1] - 1:11
jury [105] - 7:5, 7:10,
7:19, 12:25, 20:1,
24:23, 25:19, 27:15,
29:25, 39:17, 61:15,
64:24, 65:18, 66:6,
66:15, 67:20, 69:17,
75:20, 77:15, 78:19,
81:9, 84:20, 86:6,
86:11, 88:2, 88:21,
89:19, 90:8, 92:18,
93:3, 93:15, 93:18,
94:12, 98:5, 98:18,
99:4, 99:17, 100:12,
100:23, 102:3,
102:20, 104:2,
105:11, 107:18,
108:10, 109:12,
110:8, 110:10,
110:16, 111:17,

111:21, 112:1, 113:23, 116:3, 116:23, 118:17, 122:13, 124:20, 126:1, 126:9, 127:4, 129:17, 131:6, 136:8, 139:7, 139:19, 139:23, 140:4, 141:25, 142:2, 143:19, 145:3, 145:14, 148:8, 149:21, 151:5, 151:15, 151:20, 152:21, 153:5, 153:22, 156:6, 156:20, 157:4, 157:10, 159:4, 160:7, 160:17, 161:2, 161:16, 162:14, 163:3, 164:13, 167:2, 167:13, 168:17, 169:2, 171:7, 173:8, 173:14, 173:24, 175:9, 177:1, 178:4

**Jury** [5] - 10:9, 105:5, 107:1, 184:19, 186:6

**jury's** [1] - 185:6

## K

**Karras** [8] - 4:3, 12:3, 12:5, 12:22, 12:23, 19:20, 38:23, 46:5

**KARRAS** [1] - 12:10

**Keefe** [1] - 2:9

**keep** [4] - 18:19, 103:8, 109:11, 110:9

**kelliker@huntonak. com** [1] - 3:3

**kept** [5] - 156:8, 169:9, 169:23, 171:14

**Kevin** [2] - 2:25, 39:1

**key** [1] - 158:2

**keys** [6] - 124:24, 124:25, 125:2, 125:5, 125:6, 157:19

**kicked** [1] - 153:15

**kid** [2] - 64:19, 64:20

**kids** [19] - 86:18, 86:19, 87:2, 87:17, 88:10, 88:19, 103:11, 134:20, 136:17, 136:19, 138:18, 142:12, 157:23, 162:15, 165:4, 165:14, 168:14, 169:7, 185:10

**kill** [5] - 151:23, 163:12, 163:14, 171:15

**kind** [17] - 16:20, 21:2, 30:3, 50:10, 51:1, 59:11, 66:12, 72:2, 103:7, 118:3, 120:4, 142:23, 156:25, 174:12, 179:18, 179:19

**kinds** [2] - 15:15, 161:19

**Kinney** [2] - 3:4, 58:20

**KINNEY** [3] - 3:5, 58:21, 60:23

**kissed** [2] - 84:24, 85:2

**kitchen** [4] - 167:15, 167:22, 167:23, 168:23

**Klonopin** [1] - 33:21

**kneeling** [1] - 118:9

**knives** [2] - 152:23, 171:13

**knowing** [2] - 68:21, 131:21

**knowledge** [4] - 128:5, 129:20, 133:12, 183:10

**known** [1] - 23:22

**knows** [2] - 31:19, 106:4

**KURTH** [4] - 2:14, 2:17, 2:21, 3:1

## L

**label** [1] - 31:23

**Labor** [2] - 71:14, 71:15

**lack** [1] - 47:15

**ladies** [6] - 10:11, 11:3, 104:23, 107:2, 154:13, 184:10

**lady** [5] - 11:12, 11:17, 105:6, 177:21, 184:21

**laptop** [1] - 167:11

**laptops** [3] - 165:7, 165:9, 165:15

**last** [14] - 14:8, 36:5, 36:6, 37:1, 39:18, 42:10, 56:23, 61:17, 104:8, 130:25, 140:14, 148:22, 179:24

**late** [8] - 95:24, 111:23, 154:21, 157:7, 157:9, 157:12, 158:14

**laughing** [12] - 88:4, 88:6, 88:7, 117:11, 117:13, 117:21, 119:24, 120:3, 120:5, 123:17, 123:18

**laundry** [5] - 79:14, 80:2, 80:15, 153:7, 167:24

**LAW** [1] - 3:5

**lawyer** [2] - 106:4, 134:1

**lawyers** [7] - 11:1, 72:21, 73:12, 73:20, 105:23, 105:25, 135:11

**lay** [2] - 107:22, 132:24

**laying** [7] - 117:14, 117:15, 118:7, 118:21, 118:25, 119:16, 119:20

**layman** [1] - 49:7

**lead** [8] - 50:9, 90:4, 90:6, 105:21, 105:23, 106:12, 135:7, 165:17

**leading** [12] - 64:8, 73:14, 90:3, 97:1, 102:10, 105:13, 105:18, 105:19, 107:25, 108:3, 109:2, 158:23

**leaked** [1] - 134:5

**learned** [1] - 173:11

**learning** [2] - 68:20, 104:8

**least** [5] - 6:22, 30:24, 35:16, 75:15, 94:16

**leave** [8] - 5:7, 21:13, 50:12, 79:1, 125:9, 161:8, 168:22

**lecture** [2] - 66:25, 67:1

**lectures** [2] - 17:19

**left** [20] - 9:23, 23:19, 27:7, 27:16, 27:23, 28:24, 34:13, 61:17, 79:6, 107:7, 111:9, 113:11, 114:3, 114:4, 114:17, 125:8, 125:10, 160:8, 173:9, 174:25

**left-hand** [1] - 27:23

**leg** [1] - 16:24

**legs** [1] - 184:13

**length** [1] - 26:15

**lesbian** [1] - 136:11

**less** [2] - 32:3, 140:8

**level** [2] - 167:17,

167:18

**licensed** [2] - 53:17, 54:6

**life** [44] - 12:24, 13:1, 13:2, 13:4, 13:6, 15:1, 15:19, 15:22, 15:25, 16:4, 17:16, 17:20, 18:3, 18:23, 19:10, 19:18, 20:2, 20:4, 20:8, 21:9, 22:14, 23:22, 23:25, 25:24, 26:10, 26:14, 26:19, 26:20, 27:22, 28:15, 28:16, 29:22, 33:24, 36:9, 36:10, 40:3, 48:23, 49:25, 50:18, 51:16, 52:6, 52:21, 55:12, 60:9

**life-long** [1] - 13:4

**lifelong** [5] - 20:5, 21:2, 21:3, 21:8

**lifetime** [16] - 22:24, 25:23, 26:23, 30:8, 30:10, 33:8, 34:7, 34:14, 34:18, 35:14, 35:19, 36:2, 36:4, 36:25, 37:11, 37:22

**lifted** [3] - 120:20, 121:1, 121:2

**lifts** [1] - 120:18

**lighters** [2] - 44:6, 152:25

**likely** [1] - 54:21

**limb** [1] - 17:3

**limitations** [1] - 16:21

**line** [10] - 46:6, 57:14, 64:11, 105:22, 106:5, 106:9, 106:14, 129:24, 177:21, 177:22

**liners** [1] - 17:2

**lines** [6] - 46:18, 51:9, 57:9, 94:25, 95:1, 163:9

**Lions** [1] - 12:8

**LISDEXAMFETAMIN E** [1] - 34:3

**lisdexamfetamine** [1] - 34:4

**list** [3] - 13:2, 58:11, 143:21

**listed** [2] - 46:22, 50:14

**listen** [3] - 12:12, 118:11, 122:25

**listener** [1] - 133:22

**lists** [1] - 25:21

**literally** [2] - 113:5, 161:17

**live** [4] - 11:4, 22:18,

22:20, 26:17

**lived** [2] - 109:19, 112:7

**liver** [1] - 31:1

**lives** [2] - 26:16, 50:13

**living** [2] - 12:23, 167:22

**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1

**load** [1] - 79:14

**located** [1] - 115:16

**locker** [22] - 139:15, 140:5, 140:22, 141:24, 142:3, 142:5, 143:11, 144:21, 145:5, 145:19, 145:24, 157:13, 157:16, 157:17, 158:6, 158:8, 158:10, 169:9, 169:16, 169:17, 169:23, 176:3

**lockers** [15] - 101:11, 101:18, 102:1, 139:19, 139:23, 140:12, 140:14, 140:16, 141:25, 142:1, 142:2, 142:13, 143:4, 157:19, 157:24

**logistical** [1] - 9:2

**long-term** [1] - 21:14

**look** [15] - 5:4, 6:10, 9:1, 23:19, 28:24, 42:25, 46:17, 47:9, 48:1, 48:5, 50:22, 51:9, 53:15, 53:22, 62:16

**looked** [2] - 47:20, 114:21

**looking** [5] - 10:13, 10:14, 23:10, 57:9, 140:22

**Los** [1] - 1:20

**lose** [1] - 7:4

**lost** [1] - 17:2

**loud** [2] - 7:21, 46:6

**love** [2] - 108:5, 171:22

**loved** [1] - 139:11

**low** [2] - 31:10

**lunch** [1] - 184:11

**Lunch** [1] - 185:20

## M

**M.C** [1] - 3:5

**M.P.F** [1] - 3:5

**ma'am** [3] - 118:12, 140:10, 158:21
**machine** [2] - 186:5, 186:12
**magnetic** [3] - 36:14, 36:20, 37:10
**main** [3] - 23:5, 126:6
**major** [9] - 44:25, 45:4, 48:3, 50:8, 50:9, 50:18, 51:15, 52:5, 52:6
**majorly** [1] - 50:11
**manage** [3] - 16:17, 184:23, 185:5
**managed** [1] - 5:6
**management** [7] - 13:13, 13:24, 14:2, 15:10, 16:19, 17:16, 18:3
**manager** [3] - 14:12, 16:24, 17:21
**manger** [1] - 17:8
**map** [4] - 113:14, 115:22, 178:6, 178:12
**March** [3] - 1:6, 186:9, 186:16
**marked** [1] - 25:13
**marker** [1] - 154:22
**master** [1] - 158:2
**materials** [2] - 19:14, 19:23
**math** [3] - 99:13, 99:15, 156:19
**matter** [12] - 42:16, 42:17, 42:23, 43:4, 43:9, 128:13, 129:1, 129:7, 129:9, 129:10, 130:4, 131:16
**matters** [2] - 106:21, 129:14
**matters......................
............** [1] - 4:13
**mayor** [1] - 49:25
**meal** [1] - 184:14
**mean** [24] - 29:4, 59:20, 75:22, 82:18, 82:19, 87:6, 92:2, 93:7, 102:4, 103:1, 103:4, 115:18, 116:6, 119:12, 122:14, 141:18, 142:11, 153:5, 153:16, 158:4, 161:12, 175:10, 178:17, 179:16
**meaning** [5] - 23:14, 87:4, 89:12, 124:23, 151:7

**means** [2] - 41:6, 117:24
**meant** [5] - 89:15, 90:14, 102:19, 158:5, 163:8
**meat** [1] - 105:14
**media** [1] - 168:9
**Medical** [1] - 27:4
**medical** [30] - 13:3, 16:20, 17:4, 20:7, 22:1, 22:17, 22:18, 22:19, 23:6, 23:10, 24:2, 24:25, 28:4, 37:4, 37:5, 37:9, 37:13, 40:5, 40:7, 40:8, 41:3, 41:6, 42:19, 49:10, 59:16, 59:17, 60:10, 72:13, 72:16, 72:17
**Medicare** [1] - 13:16
**medication** [23] - 22:6, 31:22, 31:23, 31:25, 32:1, 32:2, 32:4, 32:6, 32:7, 32:17, 33:7, 33:8, 33:10, 33:21, 33:23, 34:4, 34:5, 34:13, 34:14, 34:18, 52:12, 52:18, 54:19
**Medications** [1] - 31:17
**medications** [11] - 22:3, 30:23, 30:25, 31:4, 31:19, 32:3, 32:10, 33:1, 34:16, 50:25, 54:11
**meet** [6] - 75:8, 75:9, 75:10, 96:25, 107:19, 115:18
**meeting** [24] - 75:11, 96:14, 96:18, 101:24, 102:24, 104:16, 107:7, 107:8, 107:10, 144:25, 145:2, 145:4, 146:14, 146:17, 156:6, 156:12, 164:10, 180:9, 180:11, 183:12, 183:21, 183:25, 184:6
**meetings** [3] - 103:19, 104:18, 156:15
**meets** [1] - 14:23
**M**████████ [1] - 99:13
**member** [1] - 15:20
**members** [2] - 12:25, 59:24
**men** [2] - 44:14, 44:18
**mental** [2] - 21:19,

21:20
**mention** [3] - 97:4, 125:22, 164:1
**mentioned** [24] - 24:4, 24:23, 26:10, 27:18, 37:9, 41:25, 42:4, 53:1, 54:12, 55:11, 55:22, 56:24, 66:3, 75:14, 76:13, 80:15, 96:2, 107:16, 154:23, 158:16, 164:3, 164:10, 167:17
**mentions** [2] - 180:15, 180:16
**message** [2] - 170:14, 182:21
**messages** [12] - 8:24, 162:1, 163:11, 164:13, 166:4, 166:5, 171:9, 171:11, 171:15, 172:11, 172:25
**messaging** [1] - 170:6
**met** [9] - 96:6, 96:10, 100:23, 101:21, 102:3, 104:13, 107:20, 181:9, 181:10
**methodology** [3] - 29:18, 30:5, 35:13
**methods** [1] - 23:5
**Miami** [3] - 2:3, 2:7, 2:11
**Michael** [1] - 3:4
**MICHAEL** [1] - 3:5
**Michigan** [1] - 13:19
**microphone** [1] - 146:1
**mid** [6] - 10:24, 95:24, 96:1, 97:12
**mid-afternoon** [1] - 10:24
**mid-ish** [1] - 95:24
**mid-October** [2] - 96:1, 97:12
**middle** [8] - 62:7, 63:8, 71:24, 71:25, 103:11, 103:13, 109:3, 146:25
**Middle** [8] - 11:22, 61:19, 62:13, 64:13, 74:5, 85:4, 110:11, 160:23
**midsection** [1] - 118:19
**might** [15] - 9:22, 10:25, 11:12, 25:4, 55:17, 65:12, 67:22, 70:10, 110:7,

112:10, 125:19, 148:25, 161:5, 185:11, 185:13
**million** [1] - 39:4
**mine** [2] - 33:2, 140:14
**minute** [1] - 149:6
**minutes** [4] - 5:25, 6:3, 66:23, 116:17
**MISCELLANY** [1] - 4:12
**misleading** [2] - 49:1, 51:2
**missing** [1] - 16:24
**mistake** [1] - 55:13
**mistaken** [1] - 42:12
**mixed** [1] - 84:19
**mk@kinneyesq.com** [1] - 3:7
**modalities** [3] - 29:1, 29:6, 30:11
**modules** [2] - 15:14
**mom** [99] - 64:5, 66:13, 75:25, 76:17, 76:19, 76:21, 76:22, 76:23, 76:24, 76:25, 77:2, 77:5, 77:9, 77:17, 77:19, 78:11, 79:10, 79:22, 80:1, 80:14, 81:4, 83:12, 83:16, 84:5, 84:10, 84:13, 96:16, 108:15, 112:6, 112:8, 112:9, 112:17, 113:4, 113:5, 113:6, 116:11, 116:16, 124:15, 125:5, 150:22, 154:24, 160:15, 163:17, 166:14, 168:22, 173:11, 173:18, 173:24, 173:25, 174:1, 174:6, 174:7, 174:11, 174:23, 175:3, 175:9, 175:10, 175:24, 176:1, 176:7, 176:8, 176:14, 176:17, 176:19, 176:25, 177:2, 177:5, 177:6, 177:7, 177:8, 177:10, 178:21, 179:1, 179:11, 179:14, 179:22, 179:23, 180:2, 180:14, 180:15, 180:16, 180:19, 180:21, 180:22, 181:3, 182:1, 182:2, 182:10, 182:15,

182:20, 182:25, 183:9, 183:19, 184:2
**moment** [7] - 10:6, 12:14, 81:25, 106:2, 152:17, 153:14, 158:21
**Monday** [4] - 86:4, 88:18, 126:23, 127:2
**month** [8] - 55:11, 55:12, 55:15, 71:13, 71:20, 87:7, 104:12, 108:21
**monthly** [2] - 27:21, 28:2
**months** [2] - 72:12, 104:10
**moon** [2] - 132:5, 132:6
**morning** [25] - 5:1, 5:2, 5:13, 6:24, 8:13, 8:16, 8:19, 10:10, 10:12, 10:14, 12:2, 38:23, 38:24, 61:14, 61:16, 63:24, 64:3, 104:24, 156:23, 156:25, 157:14, 177:3, 185:8, 185:9
**most** [3] - 34:22, 41:9, 54:14
**mother** [1] - 175:4
**motion** [1] - 8:23
**mouth** [2] - 82:10, 103:15
**move** [4] - 62:19, 63:12, 82:14, 149:9
**moved** [2] - 82:15, 82:22
**MR** [190] - 5:11, 5:16, 5:20, 5:21, 6:2, 6:8, 6:15, 8:9, 8:13, 8:17, 8:22, 9:12, 9:25, 10:3, 10:6, 12:1, 12:6, 12:16, 12:18, 12:20, 15:24, 18:3, 18:5, 18:8, 18:13, 25:12, 25:16, 25:17, 25:25, 26:3, 26:5, 26:9, 38:18, 38:22, 43:10, 43:13, 46:1, 46:4, 47:11, 47:17, 47:19, 49:17, 49:23, 50:5, 51:6, 52:2, 52:3, 54:7, 58:7, 58:10, 58:19, 58:21, 58:23, 58:25, 59:2, 60:15, 60:18, 60:21, 60:22, 60:23, 61:6, 61:9, 61:13, 61:22, 61:25, 62:14, 62:15, 62:19, 62:22, 63:11,

198

63:17, 63:19, 65:22,
65:23, 73:17, 74:16,
74:19, 74:21, 90:7,
91:3, 91:6, 91:10,
91:12, 91:13, 92:2,
92:10, 92:12, 97:3,
102:12, 103:25,
104:21, 106:8,
106:10, 106:19,
106:22, 107:4,
107:6, 108:18,
109:6, 109:9, 110:1,
111:1, 111:5,
118:10, 118:14,
118:24, 119:3,
119:6, 119:9, 121:5,
122:18, 123:2,
124:11, 127:11,
127:18, 127:19,
127:24, 127:25,
128:11, 128:22,
128:25, 129:3,
129:11, 129:22,
130:2, 130:6,
130:14, 130:24,
131:11, 131:19,
132:9, 132:13,
132:16, 132:20,
133:3, 133:9,
133:16, 133:19,
134:2, 134:7,
134:10, 134:15,
135:4, 135:7,
135:10, 137:13,
137:21, 138:1,
139:6, 139:14,
139:18, 139:22,
140:19, 140:20,
141:4, 141:9,
141:12, 141:13,
142:16, 142:19,
143:8, 143:9,
146:11, 146:13,
147:23, 147:25,
148:16, 148:23,
149:3, 149:5, 149:8,
149:11, 154:4,
154:11, 154:18,
155:21, 159:3,
173:3, 173:6, 173:7,
174:4, 174:21,
175:16, 175:18,
177:17, 178:1,
184:9, 185:2, 185:4,
185:14
**MRI** [1] - 30:21
**MS** [23] - 6:19, 7:7,
7:11, 7:14, 7:21,
7:23, 8:7, 8:11,
63:14, 73:14, 90:3,
97:1, 102:10,

103:22, 105:11,
106:6, 134:17,
134:22, 137:9,
137:22, 158:22,
174:19, 175:14
**multiple** [5] - 44:2,
51:22, 95:4, 96:3,
161:4
**multiply** [1] - 29:22

## N

**name** [47] - 12:5,
12:21, 12:22, 31:24,
32:1, 32:3, 32:4,
32:5, 33:1, 33:25,
34:5, 34:8, 34:10,
39:1, 61:16, 74:17,
85:11, 86:12, 87:10,
89:18, 90:17, 91:1,
93:22, 94:8, 98:25,
102:7, 107:12,
112:20, 126:25,
134:23, 135:17,
136:4, 136:25,
137:5, 137:6,
138:19, 138:20,
138:22, 144:16,
144:17, 146:23,
155:8, 164:14,
176:9, 184:6, 186:16
**name-calling** [16] -
85:11, 86:12, 87:10,
89:18, 90:17, 91:1,
102:7, 107:12,
126:25, 135:17,
136:4, 136:25,
146:23, 155:8, 176:9
**named** [3] - 74:8,
138:8, 138:23
**names** [19] - 86:13,
86:15, 87:9, 87:16,
87:22, 88:11, 88:21,
88:23, 89:12, 91:16,
91:24, 136:22,
137:23, 137:24,
138:2, 138:5,
138:20, 138:22,
162:3
**nap** [1] - 79:11
**narrow** [1] - 75:15
**narrowly** [1] - 49:2
**nasty** [2] - 161:8
**national** [10] - 13:12,
13:14, 13:16, 13:22,
13:23, 14:10, 14:13,
14:24, 15:1, 15:18
**natural** [1] - 8:18
**nature** [3] - 162:1,
171:24, 174:16

**near** [7] - 69:17,
113:11, 114:1,
143:1, 157:9,
179:18, 179:19
**nearly** [1] - 150:12
**necessarily** [3] - 9:4,
39:22, 49:7
**necessary** [4] - 37:19,
50:1, 50:19, 59:19
**necessity** [1] - 32:10
**need** [31] - 6:22, 7:3,
7:6, 9:18, 10:18,
10:22, 11:3, 14:7,
15:19, 16:21, 17:1,
17:2, 17:5, 19:20,
20:5, 22:6, 30:24,
39:4, 51:17, 54:2,
56:9, 76:17, 86:23,
106:11, 122:25,
123:3, 148:12,
154:11, 177:25,
181:7
**needed** [13] - 75:24,
76:24, 79:14, 97:19,
99:6, 99:19, 99:24,
103:17, 112:10,
112:12, 166:22,
176:20
**needs** [1] - 20:6
**negative** [2] - 31:1,
36:21
**neighbor** [2] - 112:7,
112:21
**neighborhood** [6] -
109:19, 113:21,
115:15, 147:19,
149:22, 150:4
**Neil** [1] - 74:11
**neurocognition** [1] -
24:19
**neurocognitive** [3] -
20:20, 21:12, 49:4
**neurologic** [1] - 20:25
**neuropsychologist**
[1] - 24:18
**never** [10] - 18:25,
84:18, 126:15,
140:10, 152:8,
166:3, 173:18,
174:6, 178:7, 181:11
**new** [1] - 72:3
**next** [69] - 11:25, 28:1,
28:11, 28:22, 28:23,
30:12, 30:13, 30:15,
31:10, 31:12, 31:15,
31:16, 33:9, 33:11,
33:14, 33:19, 33:20,
33:25, 34:19, 35:11,
36:14, 37:9, 38:6,
38:9, 39:8, 47:4,

52:23, 53:11, 58:12,
61:5, 64:11, 70:8,
71:10, 72:12, 76:20,
78:25, 81:16, 82:16,
82:21, 83:9, 86:9,
96:19, 112:3, 112:5,
112:24, 113:10,
114:18, 115:19,
116:4, 116:21,
117:4, 120:12,
120:14, 121:8,
121:14, 122:2,
122:9, 124:2,
124:23, 126:12,
145:14, 155:20,
156:6, 176:17,
179:8, 180:1, 181:5
**nexus** [2] - 48:8, 48:13
**nice** [1] - 103:12
**night** [5] - 6:25, 8:24,
168:15, 169:3, 175:1
**nine** [3] - 6:24, 185:11,
185:13
**nonconsensual** [1] -
180:17
**none** [9] - 45:16,
66:10, 128:12,
128:22, 128:25,
129:6, 132:9, 132:20
**normal** [2] - 125:16,
125:18
**notable** [1] - 72:2
**noted** [1] - 48:3
**notes** [1] - 186:12
**nothing** [4] - 7:6,
58:21, 88:15, 143:5
**noticed** [1] - 19:22
**notices** [1] - 129:5
**November** [16] -
96:13, 96:17, 97:9,
97:13, 98:3, 154:21,
154:24, 155:2,
160:12, 162:24,
163:20, 163:24,
175:8, 176:23,
177:1, 177:2
**nuances** [1] - 134:1
**number** [17] - 14:5,
28:18, 28:19, 29:22,
37:6, 39:19, 48:14,
58:16, 144:25,
175:10, 175:11,
175:13, 175:19,
175:22, 182:11,
182:21, 183:6
**Number** [2] - 4:11,
4:11
**numbers** [2] - 22:11,
29:25
**NW** [5] - 1:15, 2:14,

2:18, 2:21, 3:1

## O

**o'clock** [8] - 5:7, 5:8,
5:9, 6:24, 105:3,
185:11, 185:13
**object** [1] - 49:17
**objection** [25] - 8:8,
18:4, 18:7, 26:2,
26:3, 26:4, 27:3,
43:10, 47:15, 50:3,
58:7, 63:13, 63:14,
63:15, 73:14, 90:3,
97:1, 102:10,
103:22, 118:10,
118:23, 119:4,
137:9, 174:19,
175:14
**objections** [1] - 47:15
**observation** [2] - 7:1,
160:21
**obtained** [1] - 30:6
**obviously** [9] - 7:2,
22:14, 24:9, 29:15,
54:9, 132:6, 132:17,
133:25, 153:16
**occasion** [2] - 64:2,
124:19
**occasions** [4] - 96:3,
96:21, 158:9, 159:25
**occupational** [1] -
13:11
**occur** [2] - 96:14,
171:2
**occurred** [5] - 150:5,
150:13, 170:25,
171:1, 171:3
**occurring** [1] - 172:8
**October** [10] - 85:7,
95:24, 96:1, 97:12,
102:24, 150:18,
152:6, 154:21,
162:24
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5,
4:1, 186:1
**off-label** [1] - 31:23
**off-the-record** [1] -
149:10
**offer** [2] - 18:1, 25:25
**offered** [8] - 128:12,
128:25, 129:2,
129:3, 129:6,
131:15, 131:18,
131:19
**offering** [2] - 129:8,
129:10
**OFFICE** [1] - 3:5
**office** [36] - 43:20,

69:6, 69:14, 94:7,
95:9, 98:20, 101:11,
101:19, 102:5,
145:8, 145:12,
145:15, 156:9,
160:4, 177:4, 177:6,
177:15, 177:16,
178:11, 178:18,
179:18, 179:20,
180:10, 181:15,
181:17, 181:18,
181:22, 181:23,
181:24, 182:12,
182:13, 183:16
**Officer** [11] - 181:7,
181:9, 181:13,
181:19, 181:23,
182:1, 182:12,
182:16, 182:20
**officer** [2] - 181:7,
181:8
**offices** [3] - 178:15,
178:20, 181:24
**official** [2] - 186:5,
186:11
**Official** [3] - 3:12,
186:3, 186:22
**officials** [4] - 73:2,
73:4, 73:20, 163:23
**often** [3] - 35:20, 87:4,
87:6
**old** [7] - 17:12, 39:10,
62:8, 62:9, 62:11,
113:8
**older** [1] - 65:3
**Olivia** [4] - 89:10,
90:13, 133:20,
134:19
**olivia** [1] - 89:11
**once** [9] - 31:2, 55:11,
55:15, 71:8, 105:24,
114:5, 143:14, 177:7
**one** [62] - 7:11, 7:15,
8:1, 9:5, 11:16, 16:1,
16:10, 18:8, 31:9,
33:11, 33:25, 35:16,
36:6, 36:14, 37:1,
38:13, 42:1, 43:19,
44:11, 48:11, 53:16,
54:14, 65:6, 68:3,
70:2, 70:4, 70:15,
83:3, 86:7, 89:25,
91:2, 93:11, 95:5,
96:23, 99:12, 99:13,
101:3, 105:17,
106:1, 113:13,
114:12, 120:25,
128:4, 128:15,
135:1, 143:13,
147:5, 147:22,

148:20, 148:23,
148:24, 163:15,
166:19, 167:9,
167:20, 169:6,
172:4, 173:4, 180:21
**one-time** [1] - 143:13
**ones** [1] - 138:12
**ongoing** [1] - 152:8
**onward** [1] - 170:2
**open** [3] - 157:16,
157:17, 158:10
**Open** [1] - 135:6
**opinion** [5] - 39:3,
52:16, 56:11, 56:12,
60:1
**opinions** [4] - 38:15,
56:17, 60:8, 60:12
**opportunity** [1] - 6:9
**opposed** [3] - 96:9,
127:12, 128:20
**or..** [1] - 109:23
**oral** [6] - 122:4,
122:10, 123:12,
131:14, 133:20,
153:23
**order** [4] - 9:3, 39:24,
72:9, 141:6
**organizations** [1] -
17:22
**orientation** [6] - 64:4,
66:4, 66:9, 66:10,
66:11, 66:21
**orientations** [1] - 66:7
**orthopedic** [1] - 20:24
**otherwise** [1] - 172:22
**ourselves** [1] - 22:5
**outpatient** [2] - 35:6,
35:25
**outside** [3] - 58:9,
142:6, 182:4
**overall** [3] - 37:21,
38:1, 38:8
**overeat** [1] - 47:2
**overlap** [2] - 10:21,
49:8
**overlay** [2] - 49:6,
51:22
**overruled** [3] - 50:3,
73:15, 97:2
**overwhelmed** [1] -
92:22
**own** [6] - 42:13, 92:14,
160:20, 160:21,
165:14, 173:16

**P**

**P.A.H** [1] - 3:5
**p.m.)** [1] - 185:20
**page** [12] - 46:6,

46:18, 51:9, 57:9,
57:10, 135:3, 161:5,
161:9, 161:10,
161:16, 161:17
**pages** [3] - 161:15,
163:13, 186:10
**paid** [8] - 19:1, 19:8,
56:13, 56:15, 57:1,
57:3, 57:18, 58:15
**pain** [1] - 20:25
**pants** [9] - 83:6,
121:17, 121:18,
122:12, 122:14,
122:15, 125:1,
125:3, 142:8
**parents** [4] - 125:19,
151:22, 171:15,
177:5
**park** [18] - 110:13,
110:21, 111:7,
113:12, 114:2,
115:1, 115:22,
115:23, 116:5,
117:6, 117:7, 125:8,
125:22, 135:13,
147:16, 150:3, 169:3
**Park** [1] - 1:19
**part** [24] - 23:20,
37:12, 37:21, 41:9,
77:25, 80:3, 86:9,
91:18, 92:4, 108:7,
127:7, 129:12,
129:18, 129:23,
129:24, 130:4,
130:6, 130:7, 130:9,
132:7, 139:15,
139:19, 177:22,
180:13
**participated** [1] -
17:19
**participating** [2] -
89:11, 90:16
**particular** [13] - 20:11,
31:1, 50:15, 104:16,
112:11, 124:19,
137:17, 148:20,
161:1, 162:15,
162:21, 167:18,
170:19
**particularized** [1] -
9:22
**particularly** [1] -
185:12
**parties** [1] - 11:8
**pass** [10] - 14:11,
14:25, 69:6, 70:1,
98:19, 99:19, 99:25,
100:4, 100:19,
159:25
**passes** [1] - 100:5

**passing** [1] - 15:17
**past** [6] - 35:3, 39:24,
43:21, 59:12, 59:16,
59:17
**patch** [26] - 74:8,
75:14, 75:18, 75:21,
75:24, 76:16, 76:21,
76:23, 77:10, 77:13,
77:16, 77:22, 78:6,
78:15, 79:1, 79:6,
83:19, 85:23, 87:20,
88:17, 91:15, 98:14,
101:6, 111:10,
111:15
**patent** [1] - 31:24
**patient** [1] - 41:23
**patients** [1] - 35:21
**Patrick** [3] - 138:6,
138:17, 145:6
**pause** [1] - 148:18
**PC** [1] - 3:9
**PCP** [1] - 31:2
**peck** [2] - 84:25, 85:1
**peers** [1] - 97:18
**pelvic** [1] - 118:3
**pendency** [1] - 60:25
**pending** [1] - 184:17
**penetrate** [5] - 153:25,
154:1, 154:5, 154:7
**penis** [4] - 82:20,
121:18, 154:6, 154:8
**Pennsylvania** [4] -
2:14, 2:18, 2:21, 3:1
**people** [75] - 11:22,
16:6, 16:7, 16:9,
16:10, 16:11, 16:13,
16:18, 16:19, 17:4,
17:23, 20:5, 20:13,
20:19, 20:22, 20:23,
20:24, 21:7, 21:14,
21:15, 21:16, 22:18,
23:7, 25:3, 32:25,
34:22, 35:23, 36:19,
47:1, 47:2, 50:11,
74:15, 79:22, 86:12,
87:11, 87:13, 88:22,
88:23, 89:1, 89:2,
89:21, 90:15, 91:23,
92:5, 102:15,
127:16, 127:21,
129:13, 129:14,
130:3, 131:1,
131:25, 133:5,
135:25, 136:2,
136:3, 137:4,
137:16, 137:18,
137:23, 138:3,
138:19, 155:25,
156:1, 161:3, 162:1,
162:13, 163:6,

177:8, 180:12,
181:21
**per** [8] - 28:18, 30:1,
31:5, 31:8, 33:3,
36:13, 53:7, 57:1
**per-year** [3] - 28:18,
31:5, 31:8
**percent** [4] - 68:2,
114:12, 165:13,
175:12
**perfect** [1] - 104:21
**perform** [1] - 123:12
**performed** [1] - 137:2
**period** [19] - 75:4,
91:14, 97:12, 99:14,
99:15, 104:2,
104:12, 107:25,
108:3, 147:10,
152:5, 155:3, 155:9,
156:14, 157:4,
159:6, 160:3,
169:13, 170:9
**periodically** [2] -
76:10, 76:12
**permission** [6] - 8:17,
14:10, 63:17, 109:7,
139:18, 147:23
**person** [9] - 23:22,
44:11, 49:13, 59:14,
104:8, 137:6,
157:22, 161:18,
162:20
**personality** [1] - 49:5
**persons** [1] - 137:6
**perspective** [1] -
132:14
**pertain** [4] - 11:16,
40:9, 47:22
**pertained** [1] - 8:1
**phone** [30] - 120:16,
121:9, 165:22,
166:2, 166:11,
166:13, 166:15,
168:25, 169:1,
169:8, 169:9,
169:19, 170:22,
171:17, 171:18,
172:8, 172:15,
173:9, 173:12,
174:24, 174:25,
175:19, 182:2,
182:5, 182:13,
182:14, 182:21,
183:3, 183:4
**phones** [7] - 166:6,
168:15, 168:23,
168:25, 169:3,
169:7, 169:12
**photo** [3] - 114:21,
139:16, 139:19

**physiatrist** [1] - 16:25
**physical** [11] - 14:5,
21:17, 21:18, 21:20,
45:23, 45:24, 55:18,
152:12, 152:19,
153:11
**physically** [1] - 115:18
**physician** [10] - 20:11,
22:9, 22:21, 22:22,
23:8, 41:19, 41:20,
42:4, 53:1
**physician's** [1] - 28:4
**physicians** [9] - 20:9,
22:1, 23:1, 30:20,
32:24, 40:23, 41:16,
42:1, 42:22
**physicians'** [1] - 22:16
**pick** [4] - 77:20,
112:14, 112:25,
116:12
**picked** [3] - 78:11,
84:2, 113:1
**picking** [1] - 116:13
**picture** [14] - 62:10,
109:18, 109:19,
109:21, 120:18,
121:2, 121:6,
121:11, 124:4,
124:6, 124:12,
124:14, 124:17,
149:17
**pieces** [1] - 173:20
**pinpoint** [3] - 111:12,
150:7, 150:11
**pinpointing** [1] - 74:3
**PITTLEMAN** [1] - 3:9
**place** [15] - 39:13,
86:24, 95:7, 101:25,
104:22, 115:18,
148:9, 149:12,
149:19, 149:22,
150:4, 150:24,
150:25, 153:11
**placement** [1] - 65:9
**places** [1] - 150:6
**Plaintiff** [5] - 1:4, 1:14,
2:1, 4:2, 4:9
**plaintiff** [27] - 9:7,
9:18, 12:2, 39:4,
39:17, 41:13, 42:2,
42:6, 42:10, 44:5,
44:10, 44:13, 44:16,
45:17, 49:15, 49:24,
50:17, 51:14, 52:21,
53:13, 54:20, 55:5,
56:4, 56:9, 58:2,
59:4
**plaintiff's** [2] - 53:15,
58:5
**Plaintiff's** [12] - 8:4,

11:20, 25:13, 25:25,
26:8, 31:13, 34:15,
37:25, 61:7, 61:22,
63:12, 63:16
**plan** [32] - 13:6, 15:19,
15:22, 15:25, 19:18,
22:7, 23:13, 23:22,
23:25, 24:1, 38:13,
41:8, 45:22, 46:22,
47:9, 48:7, 48:13,
48:23, 49:25, 50:19,
51:16, 51:21, 52:6,
52:21, 77:15, 77:18,
77:25, 78:8, 79:7,
79:15, 108:24
**planned** [1] - 109:1
**planner** [5] - 12:24,
13:1, 13:2, 17:21,
40:3
**planners** [4] - 20:4,
20:8, 21:10, 26:14
**planning** [7] - 15:2,
16:4, 18:3, 18:23,
19:10, 20:2, 60:9
**plans** [1] - 45:20
**play** [6] - 20:3, 103:6,
182:3, 182:5, 182:6,
183:6
**played** [2] - 12:8, 78:8
**player** [1] - 12:4
**playgrounds** [1] -
115:24
**plays** [1] - 26:12
**PLC** [1] - 3:5
**PLLC** [1] - 1:15
**pocket** [1] - 124:25
**pod** [2] - 158:3, 158:4
**point** [52] - 8:19, 9:21,
9:25, 18:10, 24:24,
53:19, 61:18, 68:21,
69:8, 69:22, 72:4,
72:6, 76:1, 78:1,
79:17, 80:15, 81:19,
84:20, 84:22, 85:9,
86:23, 88:12, 88:13,
89:25, 93:10, 95:17,
95:20, 99:18, 114:7,
117:10, 117:13,
117:15, 117:21,
118:18, 119:11,
119:12, 119:18,
119:24, 121:25,
122:11, 125:6,
127:20, 131:3,
132:9, 132:10,
140:4, 140:9,
170:10, 180:9,
180:19, 180:20,
183:16
**pointer** [6] - 148:16,

149:2, 149:4, 149:5,
177:25, 178:2
**pointing** [2] - 149:25,
150:1
**points** [5] - 80:17,
81:3, 81:4, 143:23
**police** [1] - 181:8
**policy** [1] - 169:6
**populating** [1] - 149:1
**portion** [1] - 47:24
**position** [4] - 6:12,
59:14, 132:12, 146:6
**positive** [1] - 65:3
**possibility** [1] - 53:12
**possible** [6] - 28:7,
30:7, 47:9, 47:12,
67:22
**post** [3] - 121:13,
124:4, 161:6
**posttraumatic** [6] -
35:4, 35:8, 44:23,
48:2, 49:16, 50:13
**potential** [1] - 37:13
**powder** [1] - 167:21
**PowerPoint** [4] -
66:16, 66:24, 67:9,
68:11
**practice** [2] - 5:25, 6:5
**practitioners** [2] -
24:10, 24:21
**pre** [1] - 75:18
**pre-Halloween** [1] -
75:18
**precisely** [1] - 49:11
**predated** [1] - 41:3
**predicate** [3] - 90:5,
107:22, 154:22
**preexisting** [1] - 45:17
**preface** [3] - 133:17,
133:22, 134:7
**preferred** [1] - 34:13
**pregnant** [1] - 11:12
**Preliminary** [1] - 4:13
**preparation** [1] -
24:22
**prepare** [3] - 13:6,
25:9, 43:14
**preprinted** [1] - 94:23
**prescribed** [2] - 31:3,
52:12
**present** [4] - 10:9,
107:1, 148:2, 148:5
**presentation** [3] -
66:16, 67:23, 68:7
**presentations** [1] -
66:7
**press** [1] - 148:12
**presume** [1] - 183:18
**pretend** [2] - 162:17,
162:20

**pretty** [4] - 71:4,
105:1, 183:19, 185:9
**previous** [1] - 135:18
**previously** [2] - 61:7,
107:16
**price** [6] - 13:3, 20:11,
20:12, 22:8, 33:3,
56:5
**priced** [4] - 24:9,
52:20, 53:4, 54:11
**pricing** [3] - 22:22,
45:6, 56:18
**Primary** [1] - 48:6
**primary** [1] - 48:1
**principal** [4] - 69:19,
183:14, 183:22,
183:23
**principals** [1] - 163:24
**problem** [8] - 9:2,
68:17, 68:19, 128:3,
128:16, 130:1, 134:6
**problematic** [1] -
48:11
**problems** [6] - 21:15,
23:7, 35:10, 48:8,
71:20, 157:24
**proceed** [2] - 12:16,
107:4
**proceedings** [5] -
105:10, 148:18,
186:6, 186:11,
186:14
**PROCEEDINGS** [1] -
1:11
**process** [11] - 9:4,
16:19, 16:20, 17:4,
17:23, 68:18, 68:22,
70:25, 71:8, 131:1,
166:23
**production** [1] - 8:23
**products** [1] - 167:5
**professionalism** [1] -
59:10
**professionals** [1] -
13:2
**profile** [1] - 161:6
**program** [2] - 35:21,
36:8
**programming** [3] -
35:24, 35:25, 37:10
**project** [3] - 30:8,
31:11, 39:20
**projected** [2] - 28:25,
30:11
**projection** [1] - 21:3
**promiscuity** [8] -
85:20, 85:24, 102:7,
107:12, 127:1,
135:17, 139:3, 155:8
**promise** [1] - 164:25

**promises** [1] - 7:13
**pronounce** [1] - 34:2
**properly** [1] - 21:12
**prospectively** [1] -
20:15
**prosthetic** [1] - 17:3
**prosthetics** [1] - 17:1
**prosthetist** [1] - 16:25
**protecting** [1] - 74:15
**provide** [4] - 12:15,
90:5, 102:23, 137:24
**provided** [2] - 38:11,
40:10
**providers** [4] - 72:14,
72:16, 73:12, 73:21
**psychiatric** [15] -
28:16, 29:7, 35:3,
36:7, 39:5, 39:18,
40:10, 45:22, 45:23,
45:24, 46:23, 46:24,
46:25, 47:5, 52:20
**psychiatrist** [4] -
24:16, 27:20, 28:5,
40:11
**psychiatry** [2] - 27:22,
31:3
**psychological** [1] -
20:20
**psychologist** [1] -
54:6
**PTSD** [11] - 35:4,
44:23, 45:4, 47:10,
47:25, 48:2, 49:25,
50:18, 51:15, 52:4,
52:7
**publish** [12] - 25:18,
26:4, 26:5, 61:22,
61:24, 63:17, 109:7,
139:14, 139:18,
142:17, 147:23,
177:18
**pull** [2] - 27:2, 108:14
**pulled** [1] - 150:22
**pulling** [2] - 70:11,
113:5
**pumpkin** [26] - 74:7,
75:14, 75:18, 75:21,
75:23, 76:16, 76:21,
76:22, 77:10, 77:12,
77:16, 77:21, 77:22,
78:5, 78:15, 79:1,
79:6, 83:19, 85:22,
87:20, 88:17, 91:15,
98:14, 101:6,
111:10, 111:15
**purpose** [1] - 129:2,
130:5
**purview** [1] - 59:10
**push** [3] - 82:6, 82:10,
116:25

**pushed** [9] - 82:4, 82:9, 82:12, 82:13, 116:22, 116:24, 117:2, 117:3, 120:8
**pushing** [1] - 82:8
**put** [24] - 23:18, 30:18, 37:20, 37:25, 48:24, 58:12, 79:10, 82:10, 83:6, 93:20, 94:17, 95:7, 95:9, 96:9, 103:15, 109:25, 121:9, 122:21, 123:5, 125:1, 130:22, 148:13, 169:15, 169:22
**putting** [4] - 43:24, 68:9, 152:16, 152:17

**Q**

**qualifications** [1] - 18:9
**qualified** [1] - 18:22
**qualifies** [1] - 34:24
**qualify** [1] - 93:8
**QUESTION** [1] - 52:4
**questions** [15] - 7:5, 7:25, 11:13, 12:13, 38:18, 40:2, 46:9, 49:14, 55:22, 55:23, 60:15, 123:1, 135:23, 139:24, 170:3
**quick** [1] - 139:25
**quickly** [1] - 71:1
**quite** [3] - 51:24, 59:12, 126:18

**R**

**Rachel** [36] - 8:3, 11:19, 11:22, 61:19, 62:7, 62:13, 64:6, 64:13, 64:22, 64:24, 65:3, 65:25, 66:1, 68:11, 68:13, 72:12, 74:5, 75:5, 75:6, 75:8, 75:9, 85:4, 104:3, 108:8, 108:21, 110:10, 113:16, 114:10, 126:23, 157:19, 160:23, 162:8, 162:15, 162:25, 169:13, 169:19
**rampant** [1] - 131:5
**ran** [3] - 6:23, 97:10, 167:4
**range** [6] - 31:8, 31:9, 35:12, 36:24,

150:14, 150:15
**ranged** [1] - 171:21
**ranges** [1] - 36:3
**raped** [3] - 44:11, 44:14, 151:9
**rapes** [4] - 44:2, 44:17, 171:17, 176:16
**raping** [2] - 171:10, 171:16
**rate** [4] - 19:4, 19:6, 56:24
**rather** [3] - 19:7, 35:22, 91:20
**rays** [1] - 30:22
**rbates@hunton.com** [1] - 2:16
**RCMS** [1] - 64:12
**reach** [4] - 97:23, 100:16, 125:2, 156:3
**reaching** [1] - 156:8
**react** [1] - 158:13
**reactions** [1] - 59:13
**read** [9] - 7:21, 8:6, 11:10, 46:5, 46:19, 51:11, 52:2, 54:2, 54:3
**reading** [3] - 24:25, 46:17, 63:2
**ready** [5] - 7:9, 11:25, 23:17, 83:13, 116:12
**real** [4] - 16:1, 16:2, 71:20, 139:25
**realize** [1] - 179:23
**realized** [1] - 113:11
**really** [61] - 23:4, 33:2, 48:12, 49:1, 50:8, 65:13, 69:8, 72:1, 78:23, 79:11, 79:25, 83:4, 83:10, 83:11, 87:19, 92:23, 94:22, 95:1, 96:7, 97:19, 97:22, 98:7, 98:8, 99:7, 99:8, 99:22, 99:23, 100:14, 100:15, 102:17, 103:1, 103:6, 108:5, 116:1, 116:8, 118:8, 120:5, 123:17, 126:13, 126:15, 132:18, 132:25, 145:25, 146:18, 159:13, 159:14, 159:20, 159:21, 159:22, 162:3, 162:18, 168:21, 171:21, 176:7, 177:5, 181:1, 181:3, 181:6
**realtime** [1] - 186:12

**rearrange** [1] - 5:6
**reason** [12] - 37:18, 93:22, 93:23, 94:4, 94:12, 94:17, 108:20, 132:25, 149:1, 164:5, 164:6, 185:8
**reasonable** [4] - 38:16, 47:13, 60:13, 71:7
**reasonably** [1] - 28:6
**reasoning** [1] - 55:25
**reasons** [4] - 20:21, 21:17, 23:5
**rebut** [1] - 103:7
**receive** [1] - 163:11
**receiving** [1] - 66:21
**Recess** [2] - 105:9, 185:20
**recognize** [1] - 62:25
**recognized** [1] - 18:11
**recollection** [21] - 9:17, 54:3, 57:8, 66:21, 66:22, 67:8, 68:1, 68:8, 68:10, 81:25, 95:8, 95:25, 114:9, 142:14, 145:9, 151:11, 157:3, 159:5, 159:18, 165:22
**recollections** [1] - 104:17
**recommend** [4] - 27:24, 30:21, 32:22, 32:25
**recommendation** [4] - 22:21, 29:16, 32:12, 33:17
**recommendations** [18] - 20:10, 22:1, 22:2, 22:3, 22:4, 22:8, 22:9, 22:12, 23:9, 23:12, 25:4, 27:18, 32:7, 34:25, 40:13, 47:22, 55:24
**recommended** [28] - 13:3, 20:7, 20:12, 24:9, 25:22, 27:20, 28:2, 28:10, 29:9, 29:18, 29:21, 33:10, 34:13, 34:17, 35:6, 35:16, 35:20, 35:25, 36:1, 36:9, 36:18, 36:22, 38:7, 38:14, 39:6, 51:24, 52:11, 53:14
**recommending** [2] - 25:3, 25:7
**record** [12] - 9:15, 9:17, 11:10, 12:9,

19:16, 59:24, 61:11, 69:18, 130:10, 132:7, 149:10, 180:7
**recording** [1] - 186:13
**records** [24] - 20:9, 23:6, 23:10, 23:11, 24:2, 24:7, 32:9, 32:24, 40:5, 40:6, 40:7, 40:8, 40:9, 40:14, 40:16, 41:3, 41:7, 41:11, 42:19, 42:20, 53:15, 59:21
**recounting** [1] - 72:21
**red** [1] - 148:21
**redactions** [4] - 7:16, 7:25, 11:14
**REDIRECT** [1] - 59:1
**redirect** [2] - 6:8, 58:24
**Redirect** [1] - 4:5
**refer** [5] - 19:20, 27:9, 33:4, 69:5, 117:7
**reference** [3] - 22:17, 28:4, 140:9
**referred** [1] - 90:22
**referring** [2] - 66:11, 170:21
**refers** [1] - 41:23
**reflect** [1] - 65:24
**refresh** [2] - 54:3, 57:8
**regard** [1] - 170:19
**regarding** [4] - 6:10, 59:11, 66:7, 96:5
**region** [1] - 142:8
**regular** [4] - 111:20, 111:22, 111:25, 114:10
**rehabilitation** [6] - 13:15, 13:23, 14:4, 14:20, 16:13, 17:21
**rehabilitative** [1] - 14:14
**rein** [1] - 105:25
**reintroduce** [1] - 61:14
**reiterated** [1] - 97:6
**rejected** [1] - 18:24
**relate** [1] - 13:21
**related** [3] - 15:5, 81:12, 112:21
**relation** [1] - 149:14
**relationship** [1] - 115:11
**relative** [4] - 12:7, 22:18, 72:9, 111:11
**relatively** [2] - 71:5, 155:11
**relevant** [1] - 7:3
**relied** [2] - 40:11, 59:25

**relish** [1] - 10:7
**relying** [2] - 17:3, 56:17
**reminder** [2] - 25:24, 33:24
**remaining** [1] - 8:23
**remember** [32] - 66:25, 67:17, 67:18, 67:23, 68:11, 68:15, 68:20, 71:13, 72:1, 81:24, 82:7, 83:16, 83:18, 86:15, 87:17, 88:9, 89:7, 90:19, 90:20, 98:23, 103:20, 116:4, 116:6, 120:2, 120:12, 120:14, 120:16, 121:8, 121:9, 135:14, 155:1, 184:15
**remind** [5] - 64:24, 100:24, 104:2, 107:18
**reminder** [1] - 107:21
**repeat** [3] - 73:16, 110:20, 119:7
**repeated** [1] - 143:15
**repeatedly** [3] - 147:20, 151:9, 153:15
**rephrase** [2] - 68:5, 103:24
**replacements** [1] - 17:1
**replicates** [2] - 31:25, 32:1
**repopulates** [1] - 148:14
**report** [23] - 19:18, 23:20, 24:22, 25:1, 27:9, 28:23, 30:10, 30:14, 34:12, 40:11, 42:9, 43:24, 47:20, 47:24, 50:16, 56:21, 89:2, 143:10, 143:19, 144:5, 158:19, 158:25, 163:17
**reported** [3] - 175:4, 175:6, 186:5
**Reporter** [4] - 3:12, 15:11, 186:3, 186:22
**REPORTER** [1] - 186:1
**reporter** [1] - 46:11
**Reporter.................... ...** [1] - 4:14
**reporting** [4] - 97:17, 180:19, 180:20, 183:19

**reports** [6] - 20:22,
23:10, 23:15, 24:2,
43:14, 43:17
**representing** [1] -
25:7
**request** [1] - 93:20
**requested** [1] - 71:2
**requesting** [1] - 93:25
**require** [2] - 13:4, 21:2
**required** [4] - 20:7,
29:10, 35:1, 39:7
**requires** [2] - 15:7,
48:23
**requisite** [1] - 14:23
**reseated** [2] - 61:8,
184:20
**reset** [2] - 135:8, 135:9
**Residential** [1] - 36:5
**residential** [2] - 36:7,
36:8
**residual** [3] - 21:9,
21:10, 35:10
**resolve** [1] - 7:6
**resource** [1] - 181:7
**respect** [6] - 16:4,
16:15, 20:3, 21:5,
54:25, 60:12
**respective** [1] -
142:15
**respond** [4] - 32:25,
171:11, 171:14,
171:25
**response** [4] - 71:4,
105:18, 105:20,
105:22
**responses** [2] - 5:2,
10:12
**responsible** [1] - 58:5
**rest** [4] - 28:15, 28:16,
55:12, 170:10
**Reston** [2] - 3:7, 3:10
**restrained** [1] - 153:16
**restraining** [1] -
121:25
**restriction** [2] - 9:11,
9:13
**results** [2] - 15:21,
51:23
**resume** [1] - 6:8
**resumed** [1] - 105:10
**retained** [1] - 19:8
**retrieve** [2] - 183:5,
183:9
**return** [1] - 85:4,
95:11, 126:23
**returned** [1] - 135:13
**review** [12] - 14:22,
15:20, 20:9, 24:1,
24:7, 24:15, 41:3,
41:10, 46:6, 59:17,

59:22, 59:24
**reviewed** [7] - 14:9,
24:2, 40:9, 41:8,
59:21, 59:25
**REWARI** [17] - 6:19,
7:7, 63:14, 73:14,
90:3, 97:1, 102:10,
103:22, 105:11,
106:6, 134:17,
134:22, 137:9,
137:22, 158:22,
174:19, 175:14
**Rewari** [3] - 2:17,
6:18, 105:16
**rkeefe@bsfllp.com**
[1] - 2:12
**road** [1] - 149:18
**Robert** [2] - 2:9, 3:6
**role** [1] - 156:21
**romantic** [1] - 84:25
**room** [10] - 72:22,
80:2, 80:15, 94:22,
164:11, 167:21,
167:22, 167:24,
182:17
**ROSSIE** [1] - 1:11
**Routine** [1] - 27:4
**routine** [2] - 125:16,
125:18
**row** [1] - 140:14
**rows** [2] - 140:12,
143:4
**RPR** [2] - 3:12, 186:21
**rule** [5] - 5:24, 49:19,
128:8, 168:18
**rumor** [3] - 90:17,
130:15, 132:23
**rumors** [31] - 85:15,
85:16, 85:19, 85:24,
89:21, 89:24, 89:25,
90:8, 91:1, 91:22,
91:23, 92:13, 92:15,
92:21, 97:18, 102:7,
103:3, 103:7,
107:12, 127:1,
130:15, 131:2,
132:10, 134:12,
135:17, 139:1,
141:16, 146:23,
155:8, 162:2, 176:9
**run** [1] - 98:1
**running** [3] - 96:9,
166:21, 167:3
**Ryan** [51] - 2:13,
22:15, 23:9, 23:12,
24:3, 24:8, 24:12,
24:13, 24:14, 24:16,
25:5, 25:22, 27:19,
27:20, 27:25, 28:2,
28:11, 29:9, 29:21,

32:9, 34:13, 34:17,
34:25, 35:5, 35:15,
35:20, 36:18, 37:18,
38:7, 38:11, 38:14,
39:6, 40:12, 41:25,
44:1, 44:20, 45:10,
48:3, 48:10, 48:12,
49:8, 49:13, 50:9,
51:24, 54:21, 55:23,
56:1, 56:13, 59:22,
59:25
**ryan** [1] - 50:14
**Ryan's** [2] - 33:17,
56:11, 56:20

## S

**S.T** [1] - 3:5
**sadistic** [1] - 44:2
**safe** [1] - 77:6
**salons** [1] - 167:6
**sanctum** [1] - 105:17
**sat** [4] - 69:15, 69:19,
167:13, 178:14
**Saturday** [1] - 8:24
**saw** [11] - 28:12,
42:10, 64:2, 97:5,
124:12, 125:24,
126:4, 126:6,
164:13, 177:6, 183:8
**scalpel** [1] - 49:2
**scans** [2] - 30:21,
30:22
**scared** [3] - 79:18,
176:7, 180:22
**schedule** [3] - 5:6,
65:13, 156:22
**scheduling** [1] - 65:11
**SCHILLER** [4] - 1:19,
2:2, 2:6, 2:10
**school** [105] - 62:7,
63:9, 64:5, 64:9,
64:15, 64:20, 66:12,
69:1, 69:12, 69:19,
69:22, 70:24, 71:13,
71:21, 71:23, 71:24,
71:25, 73:2, 73:4,
73:20, 75:5, 76:11,
81:12, 86:3, 88:18,
89:3, 89:5, 92:24,
93:5, 96:16, 100:25,
101:2, 102:15,
103:11, 103:13,
104:3, 107:10,
107:11, 109:3,
111:18, 111:19,
111:25, 112:2,
112:15, 113:18,
113:19, 114:2,
114:13, 127:2,

129:4, 130:16,
131:4, 131:5,
131:21, 132:21,
133:14, 134:12,
135:13, 139:2,
139:11, 140:11,
141:18, 142:12,
143:4, 143:10,
146:25, 147:11,
150:22, 151:1,
151:4, 154:24,
156:4, 156:7,
156:23, 157:5,
157:6, 157:11,
163:17, 163:23,
165:4, 165:5,
165:14, 165:19,
169:5, 169:12,
169:19, 175:5,
176:21, 176:25,
177:3, 177:7, 177:9,
177:12, 177:14,
178:8, 179:2, 181:7,
181:8, 183:12,
183:20, 183:21
**School** [11] - 11:23,
18:5, 39:2, 61:19,
62:13, 64:13, 74:5,
85:5, 107:20,
110:11, 160:23
**school's** [2] - 92:24,
169:6
**science** [2] - 98:24,
158:2
**scoot** [1] - 146:3
**scope** [1] - 58:9
**Scott** [1] - 2:20
**screen** [9] - 23:19,
27:14, 38:1, 62:3,
62:20, 109:10,
141:7, 141:9, 141:10
**SE** [3] - 2:2, 2:6, 2:10
**seat** [2] - 10:10, 12:12
**seated** [2] - 12:11,
107:2
**second** [25] - 10:16,
51:12, 53:22, 54:1,
55:13, 61:10, 92:7,
97:25, 98:1, 99:12,
99:13, 110:13,
113:13, 130:3,
130:7, 130:24,
145:2, 147:10,
147:11, 159:6,
159:7, 159:9,
159:11, 167:17,
167:19
**section** [12] - 27:1,
27:3, 27:4, 30:13,
30:15, 31:5, 31:16,

32:11, 34:19, 36:5,
37:1
**see** [94] - 6:1, 6:2,
6:22, 9:13, 21:11,
23:6, 27:5, 27:23,
29:2, 29:25, 30:3,
30:16, 31:3, 31:6,
34:20, 35:12, 36:3,
36:11, 36:24, 37:20,
48:2, 48:6, 51:18,
53:15, 62:3, 63:25,
64:16, 69:23, 71:2,
76:10, 93:5, 93:13,
93:18, 93:21, 93:22,
93:24, 93:25, 94:17,
96:3, 96:8, 96:15,
96:20, 98:8, 98:11,
98:16, 99:6, 99:20,
99:24, 100:19,
100:21, 101:5,
105:4, 105:8,
114:19, 114:22,
115:5, 115:6,
115:13, 116:4,
118:4, 124:6,
137:24, 140:2,
140:9, 141:21,
141:22, 147:3,
147:4, 147:8,
148:14, 148:16,
149:6, 149:17,
151:14, 156:10,
159:11, 160:4,
160:9, 160:14,
171:22, 175:19,
177:4, 177:22,
179:9, 179:16,
179:24, 179:25,
181:7, 182:4,
184:18, 185:19
**seeing** [3] - 63:23,
66:24, 147:9
**seem** [1] - 127:15
**sees** [1] - 179:22
**selfies** [1] - 116:18
**sell** [1] - 167:5
**send** [10] - 70:20,
95:15, 95:21,
161:25, 166:2,
166:4, 166:5, 171:8,
171:19
**sense** [8] - 51:3,
71:22, 112:18,
127:7, 140:15,
166:24, 172:21,
178:7
**sent** [1] - 63:4
**sentence** [1] - 94:20
**separate** [2] - 52:5,
127:17

**September** [5] - 71:17, 71:19, 71:20, 104:4, 104:10
**sequence** [1] - 9:24
**serious** [2] - 181:6, 183:19
**serviced** [1] - 112:12
**SESSION** [1] - 1:8
**sessions** [3] - 36:2, 36:23, 54:9
**set** [2] - 104:2, 105:24
**Set** [1] - 13:17
**Set-Aside** [1] - 13:17
**setting** [2] - 105:13, 107:10
**settings** [1] - 76:14
**setup** [1] - 75:18
**seven** [4] - 6:24, 78:22, 113:9
**several** [5] - 66:6, 96:21, 98:19, 107:18, 171:10
**severe** [10] - 15:15, 16:6, 16:8, 17:20, 20:19, 20:24, 20:25, 21:11, 21:12, 48:10
**sex** [17] - 85:25, 89:21, 89:25, 90:8, 122:4, 122:11, 123:12, 131:14, 133:20, 137:17, 138:18, 138:20, 141:17, 152:13, 152:17, 153:23, 155:16
**sexual** [30] - 66:7, 66:16, 68:24, 84:21, 85:10, 85:13, 90:11, 91:1, 124:3, 124:18, 124:20, 127:23, 137:3, 145:21, 150:5, 150:16, 152:3, 152:10, 153:13, 153:18, 153:22, 154:9, 155:17, 157:15, 159:20, 162:1, 171:23, 176:15, 180:3, 180:17
**sexuality** [2] - 85:17, 139:2
**sexually** [4] - 147:18, 147:20, 150:8, 151:10
**shaking** [1] - 157:17
**share** [6] - 10:17, 10:23, 11:1, 72:20, 73:1, 73:2
**shared** [1] - 73:4
**sharp** [2] - 10:14, 117:9

**sheet** [3] - 25:9, 25:21, 28:13
**shift** [1] - 122:15
**shirt** [4] - 81:23, 120:18, 120:20
**short** [3] - 18:10, 106:10, 154:16
**shorter** [1] - 94:17
**shorthand** [2] - 186:5, 186:12
**shortly** [2] - 80:20, 83:12
**show** [2] - 25:12, 110:8, 110:10, 110:16, 131:19, 148:8, 149:12, 149:21, 149:24, 175:10, 178:4, 182:3
**shower** [5] - 125:14, 126:10, 126:17, 126:18
**shown** [2] - 7:24, 11:13
**sic** [1] - 148:19
**side** [16] - 27:23, 72:21, 106:18, 117:16, 118:6, 118:20, 119:14, 119:17, 119:21, 119:22, 121:9, 121:20, 122:6, 123:9, 142:7, 167:15
**Sidebar** [1] - 128:2
**sided** [1] - 140:16
**significant** [1] - 183:3
**silicone** [1] - 17:1
**similar** [4] - 29:11, 30:4, 99:21, 100:13
**simply** [1] - 20:12
**sing** [1] - 65:18
**singular** [1] - 16:10
**sister** [9] - 77:19, 78:12, 78:20, 79:11, 79:13, 79:23, 80:4, 80:7, 84:13
**sit** [4] - 14:24, 15:18, 150:7, 168:25
**sits** [1] - 178:13
**sitting** [13] - 80:24, 81:13, 81:16, 82:21, 82:24, 117:14, 117:24, 118:7, 118:22, 118:25, 119:16, 119:18, 121:25
**situated** [1] - 158:6
**situation** [4] - 59:12, 117:12, 122:12, 166:11
**six** [5] - 36:23, 41:6,

78:22, 104:14, 113:9
**six-year** [1] - 41:6
**size** [1] - 67:10
**skip** [1] - 98:7
**skipped** [1] - 169:10
**slice** [1] - 47:24
**slide** [1] - 28:22
**slides** [2] - 47:20, 81:19
**slip** [1] - 69:22, 69:23, 70:7, 71:9, 74:23, 95:9, 98:15
**slips** [4] - 70:4, 97:24, 160:8, 164:3
**slowly** [1] - 74:9
**slurs** [1] - 157:15
**slut** [9] - 86:16, 89:3, 91:16, 131:13, 136:9, 145:22, 155:18, 163:7, 163:15
**small** [3] - 166:21, 167:4, 173:19
**smaller** [2] - 67:17, 67:18
**smartphone** [7] - 165:25, 166:1, 166:12, 166:17, 166:22, 169:25, 170:1
**SMS** [1] - 166:3
**snack** [1] - 112:6
**social** [2] - 168:8
**sockets** [1] - 17:1
**soften** [1] - 36:20
**someone** [21] - 6:6, 16:23, 17:24, 41:23, 55:9, 77:3, 93:5, 95:15, 115:7, 123:23, 128:10, 130:12, 132:4, 132:5, 151:11, 161:5, 161:7, 178:14, 179:5, 181:13
**sometime** [1] - 5:9
**sometimes** [14] - 10:21, 16:11, 25:4, 73:24, 76:13, 90:22, 103:10, 111:23, 112:7, 112:9, 163:7, 168:5, 168:8, 172:7
**somewhere** [7] - 8:16, 42:7, 60:19, 77:2, 95:9, 178:18
**Sona** [1] - 2:17
**soon** [5] - 71:5, 126:17, 184:2, 184:5
**sorry** [40] - 37:8, 55:8, 55:16, 57:10, 57:15,

62:4, 70:18, 73:16, 74:23, 79:5, 80:6, 82:19, 86:22, 88:14, 88:15, 94:2, 94:3, 98:11, 99:3, 104:7, 110:20, 118:13, 118:16, 119:3, 119:8, 124:10, 134:16, 146:2, 146:4, 146:10, 149:3, 154:10, 158:22, 166:25, 167:1, 169:11, 174:3, 182:9
**sort** [30] - 9:24, 20:14, 21:22, 21:23, 25:20, 27:13, 65:24, 68:23, 69:18, 71:9, 74:4, 76:5, 81:19, 89:2, 90:25, 96:12, 105:20, 105:25, 108:6, 108:14, 110:19, 110:22, 120:23, 134:5, 151:13, 156:25, 169:3, 169:10, 174:11, 178:2
**sound** [1] - 91:19
**sounds** [2] - 102:11, 109:13
**source** [1] - 28:3
**sourced** [3] - 22:16, 29:17, 33:12
**space** [1] - 94:21
**spaces** [1] - 154:14
**Spanish** [2] - 147:10, 159:7
**speaking** [5] - 17:15, 17:18, 29:15, 37:18, 47:14
**specializes** [1] - 35:17
**specialties** [1] - 24:14
**specific** [10] - 31:20, 47:10, 48:15, 48:19, 48:23, 66:21, 74:4, 104:17, 108:17, 168:22
**specifically** [10] - 16:4, 23:21, 23:25, 24:15, 131:10, 138:24, 151:22, 153:10, 170:3
**specifics** [3] - 19:12, 24:12, 108:19
**specify** [2] - 103:3, 120:14
**speculate** [1] - 47:11
**speech** [1] - 29:7
**spell** [1] - 34:2
**spend** [1] - 39:25

**spending** [1] - 66:23
**spent** [6] - 39:17, 39:23, 76:8, 126:18, 182:25, 183:3
**spinal** [4] - 15:9, 15:13, 16:9, 20:22
**splitting** [1] - 50:7
**spoken** [1] - 116:12
**sports** [2] - 120:24, 121:1
**spread** [5] - 85:17, 85:19, 92:21, 99:8, 134:12
**spreading** [8] - 85:15, 89:21, 90:17, 92:13, 97:17, 102:7, 132:10, 161:18
**Spring** [1] - 185:10
**spring** [1] - 160:23
**Sprint** [2] - 182:14, 183:4
**Square** [1] - 3:13
**srewari@huntonak. com** [1] - 2:19
**Stafford** [1] - 185:12
**stage** [1] - 135:9
**staircase** [2] - 126:14, 126:16
**staircases** [1] - 126:15
**stand** [3] - 19:14, 61:6, 154:15
**standard** [2] - 23:14, 23:16
**standing** [11] - 82:22, 117:13, 118:7, 118:9, 118:22, 118:25, 119:13, 119:16, 140:21, 141:6, 182:4
**stands** [1] - 133:4
**start** [18] - 39:3, 61:19, 61:21, 63:8, 64:15, 64:22, 66:1, 68:18, 71:8, 86:8, 95:5, 108:21, 135:25, 150:17, 150:18, 150:20, 170:8, 185:13
**started** [20] - 17:13, 42:5, 62:7, 64:25, 71:13, 71:15, 71:16, 87:19, 90:12, 93:16, 97:4, 121:15, 143:17, 155:4, 157:7, 163:13, 177:8, 177:12, 184:2
**starting** [3] - 62:13, 65:25, 108:7
**starts** [2] - 27:16, 135:1

**state** [2] - 12:21, 18:17
**statement** [7] - 8:4, 11:20, 43:4, 94:15, 95:2, 101:17, 128:19
**statements** [6] - 7:15, 7:24, 8:1, 11:13, 11:16, 94:13
**States** [1] - 3:12
**STATES** [2] - 1:1, 1:12
**station** [1] - 168:24
**status** [1] - 65:8
**stay** [6] - 7:7, 35:16, 107:14, 116:16, 155:11
**steal** [1] - 185:17
**stem** [1] - 37:10
**stems** [3] - 45:24, 46:25, 47:5
**step** [6] - 71:10, 86:7, 105:6, 169:10, 174:22, 184:21
**stepfather** [4] - 77:20, 78:12, 79:23, 79:25
**steps** [1] - 43:17
**stick** [2] - 33:1, 138:12
**still** [18] - 51:7, 80:9, 82:24, 85:7, 119:24, 121:22, 122:8, 122:10, 123:12, 141:18, 146:25, 155:18, 156:11, 160:9, 160:11, 180:10, 181:17, 182:16
**stimulation** [1] - 36:15
**stipulation** [2] - 10:19, 11:7, 11:10
**stop** [26] - 46:6, 81:15, 83:1, 83:4, 98:21, 104:22, 110:10, 112:15, 112:25, 113:2, 113:12, 113:13, 113:14, 113:15, 113:16, 113:17, 113:18, 113:19, 114:2, 120:6, 123:22, 126:7, 149:15, 149:16, 149:18
**stopped** [7] - 83:5, 112:16, 124:3, 124:18, 150:22, 152:7, 152:8
**stored** [1] - 169:15
**straddled** [1] - 120:9
**straddling** [6] - 117:19, 117:23, 118:2, 118:19, 119:11, 123:10
**straight** [1] - 35:22,

79:7
**strategies** [1] - 102:22
**strategy** [2] - 103:1, 103:16
**streamline** [1] - 6:12
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**street** [2] - 112:8, 126:6
**stress** [6] - 35:4, 35:8, 44:23, 48:2, 49:16, 50:13
**stretch** [2] - 154:15, 184:13
**strike** [2] - 92:2, 125:15
**striked** [1] - 153:16
**strip** [1] - 140:25
**struggle** [1] - 178:6
**struggling** [4] - 159:6, 159:13, 159:14, 159:15
**student** [11] - 7:17, 8:3, 11:19, 87:7, 94:13, 94:15, 95:2, 157:22, 158:15, 162:18, 183:18
**students** [8] - 11:22, 67:9, 68:13, 68:16, 69:2, 87:8, 111:7, 141:18
**studies** [2] - 30:24, 31:2
**study** [6] - 15:8, 31:9, 167:15, 167:23, 167:25, 170:18
**studying** [3] - 14:2, 15:18, 16:8
**stuff** [7] - 124:3, 124:18, 133:23, 162:18, 163:7, 163:9, 164:22
**subject** [2] - 60:17, 162:7
**subjected** [5] - 85:10, 85:13, 131:20, 162:25, 163:25
**subjects** [2] - 151:14, 154:19
**submit** [4] - 14:7, 14:21, 15:19, 20:14
**submitted** [5] - 15:22, 15:25, 19:19, 23:6, 24:19
**submitting** [1] - 24:22
**subscribed** [1] - 186:15
**substance** [2] - 13:9, 105:24
**succeeding** [1] -

15:17
**success** [1] - 35:23
**successful** [3] - 100:18, 156:11, 160:10
**suffice** [2] - 6:11, 9:7
**sufficient** [1] - 15:22
**suggested** [2] - 6:6, 105:20
**suggests** [1] - 105:20
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:6, 3:10
**summarizing** [1] - 21:18
**summary** [6] - 14:16, 17:17, 25:9, 25:21, 28:13, 46:22
**summer** [1] - 108:7
**supposed** [9] - 69:2, 70:7, 70:9, 71:2, 77:25, 94:16, 95:6, 112:17, 174:25
**supposedly** [3] - 89:22, 137:7, 162:2
**suppressant** [1] - 55:2
**surgeries** [1] - 22:2
**surgical** [1] - 37:13
**surprise** [1] - 10:24
**surrounding** [1] - 145:10
**sustained** [8] - 43:12, 44:16, 47:18, 58:8, 118:23, 119:4, 174:20
**sweat** [2] - 121:17, 121:18
**switched** [1] - 84:11
**swore** [1] - 46:13
**sworn** [2] - 12:10, 61:7
**symptoms** [2] - 49:9, 51:23
**syntax** [1] - 40:12
**system** [2] - 17:24, 20:6

## T

**T.B** [1] - 3:5
**TABLE** [1] - 4:1
**tape** [1] - 186:13
**T█████** [1] - 158:2
**T██████** [7] - 99:1, 99:2, 99:5, 99:21, 100:3, 144:9, 158:8
**tasks** [1] - 112:10
**taught** [2] - 69:2, 92:24

**taunting** [3] - 91:18, 157:14, 159:12
**Taylor** [2] - 164:14, 164:22
**TBI** [2] - 45:4, 48:4
**teach** [1] - 5:24
**teacher** [18] - 67:24, 70:1, 70:10, 70:20, 71:9, 95:15, 98:24, 99:13, 99:15, 99:16, 100:7, 100:9, 100:10, 144:14, 156:18, 156:19, 156:21, 158:2
**teacher's** [1] - 98:25
**teachers** [18] - 68:12, 68:15, 69:4, 95:21, 98:19, 98:23, 99:9, 99:10, 142:11, 142:20, 143:3, 144:2, 144:3, 156:9, 158:16, 163:23, 164:11, 164:12
**teaching** [1] - 106:2
**team** [2] - 67:20, 158:5
**teasing** [1] - 91:20
**technology** [1] - 165:1
**telephone** [1] - 175:11
**tennis** [1] - 179:11
**Tenth** [1] - 3:13
**term** [2] - 21:5, 21:14
**terms** [5] - 14:8, 23:2, 24:14, 24:19, 34:23
**terrible** [4] - 48:17, 48:18, 139:10, 141:24
**T█████** [4] - 183:22, 183:25, 184:1, 184:6
**test** [4] - 68:4, 68:6, 68:7, 146:8
**Test** [1] - 146:6
**tested** [1] - 24:19
**testified** [13] - 9:16, 11:18, 18:14, 60:8, 76:19, 100:24, 101:8, 101:12, 103:19, 128:11, 135:16, 144:20, 179:10
**testify** [8] - 6:7, 9:22, 19:1, 72:11, 90:5, 130:8, 130:21, 134:6
**testifying** [3] - 19:4, 19:5, 131:6
**testimony** [12] - 9:11, 18:10, 19:6, 57:1, 92:3, 96:20, 103:23, 111:21, 129:14, 131:8, 134:23, 186:6
**Testing** [1] - 30:15

**testing** [4] - 15:14, 30:19, 30:20, 55:21
**text** [13] - 166:4, 166:5, 170:12, 171:5, 171:8, 171:11, 171:14, 171:18, 172:1, 172:6, 172:8, 172:11, 172:13
**texted** [1] - 170:22
**texting** [3] - 170:4, 170:8, 170:22
**texts** [5] - 166:3, 171:5, 171:19
**THE** [188] - 1:1, 1:11, 3:5, 5:1, 5:3, 5:15, 5:18, 5:22, 6:4, 6:9, 6:17, 6:21, 7:9, 7:13, 7:20, 7:22, 8:5, 8:8, 8:10, 8:12, 8:15, 8:21, 9:1, 9:21, 10:2, 10:4, 10:7, 10:10, 10:13, 12:4, 12:8, 12:12, 12:17, 15:12, 18:1, 18:4, 18:7, 18:11, 25:15, 26:2, 26:4, 26:7, 38:20, 43:12, 46:3, 47:14, 47:18, 49:19, 50:3, 54:2, 54:5, 58:8, 58:20, 58:22, 58:24, 60:16, 60:24, 61:1, 61:2, 61:5, 61:10, 61:24, 62:21, 63:13, 63:15, 63:18, 73:15, 73:16, 74:14, 74:17, 74:20, 90:4, 91:7, 91:11, 92:3, 97:2, 102:11, 103:24, 104:23, 105:6, 105:16, 106:7, 106:9, 106:17, 106:20, 106:25, 107:2, 107:5, 108:16, 109:8, 109:25, 111:3, 111:4, 118:11, 118:13, 118:23, 119:4, 119:7, 121:4, 122:17, 122:25, 124:9, 124:10, 127:14, 128:1, 128:3, 128:14, 128:24, 129:2, 129:8, 129:16, 130:1, 130:5, 130:7, 130:20, 131:8, 131:17, 131:22, 132:11, 132:15, 132:19, 133:2,

133:7, 133:10, 133:18, 133:25, 134:3, 134:9, 134:14, 134:21, 135:2, 135:5, 135:9, 137:10, 137:12, 137:20, 137:24, 139:4, 139:5, 139:17, 139:21, 140:9, 140:13, 140:16, 140:17, 140:18, 141:6, 141:7, 141:10, 142:18, 146:6, 146:8, 146:9, 146:10, 146:12, 147:24, 148:13, 148:19, 148:25, 149:4, 149:6, 149:7, 149:9, 154:3, 154:10, 154:12, 154:13, 154:17, 155:20, 158:21, 158:24, 159:2, 173:5, 174:2, 174:3, 174:20, 175:15, 175:17, 177:20, 177:24, 177:25, 184:8, 184:10, 184:20, 184:23, 185:3, 185:5, 185:18
**Theatre** [1] - 67:4
**themselves** [1] - 152:13
**theory** [1] - 36:19
**therapeutic** [2] - 28:25, 30:11
**therapies** [2] - 29:6, 29:17
**therapist** [2] - 53:5, 53:16
**therapists** [1] - 72:17
**therapy** [14] - 13:11, 29:7, 29:10, 29:11, 29:12, 29:14, 29:20, 29:21, 50:23, 50:24, 53:13
**thesis** [2] - 14:8, 14:21
**thighs** [1] - 44:8
**thinking** [2] - 21:17, 148:25
**third** [1] - 100:7
**thoroughly** [1] - 51:19
**thoughts** [1] - 29:13
**threat** [1] - 152:1
**threatened** [1] - 176:6
**threatening** [3] - 159:12, 159:22, 171:14
**threats** [8] - 151:18,

151:19, 151:20, 151:21, 151:25, 152:2, 152:6, 152:9
**three** [15] - 5:7, 5:8, 16:17, 36:1, 99:9, 99:10, 140:12, 140:13, 144:2, 144:6, 145:5, 145:10, 158:16, 181:21
**throughout** [1] - 27:21
**thumb** [1] - 5:24
**Thursday** [2] - 61:17, 64:18
**tied** [1] - 134:23
**timeline** [1] - 161:21
**timing** [1] - 9:5
**today** [12] - 5:7, 5:8, 5:15, 57:22, 73:2, 73:9, 74:1, 90:23, 144:10, 144:12, 150:7, 185:2
**together** [5] - 48:24, 75:22, 108:25, 151:12, 186:13
**tolerance** [1] - 68:13
**tomorrow** [2] - 185:12, 185:13
**TONIA** [1] - 3:12
**Tonia** [2] - 186:3, 186:21
**took** [26] - 6:13, 9:1, 33:23, 35:13, 36:4, 36:11, 39:13, 45:8, 58:11, 101:11, 101:18, 101:19, 101:25, 106:2, 121:6, 121:17, 126:10, 126:17, 148:9, 149:12, 149:19, 149:22, 150:24, 153:11, 163:4, 163:5
**top** [9] - 7:7, 48:7, 117:19, 121:22, 122:1, 122:8, 138:12, 140:25, 141:24
**topic** [5] - 17:16, 56:23, 59:9, 161:18, 173:4
**TORCHINSKY** [1] - 1:14
**torture** [1] - 44:2
**tortured** [1] - 44:5
**total** [6] - 25:24, 30:10, 31:13, 31:15, 34:16, 37:6
**touch** [6] - 81:14, 81:21, 82:1, 83:3,

142:5, 159:12
**touched** [3] - 137:1, 145:5, 145:24
**touching** [13] - 68:25, 82:4, 142:9, 145:6, 145:7, 145:20, 146:23, 155:18, 157:14, 157:16, 159:21, 176:3, 180:18
**tour** [1] - 66:13
**towards** [8] - 115:14, 115:15, 116:25, 118:4, 119:21, 119:23, 126:6
**track** [1] - 18:19
**traffic** [1] - 185:8
**Trahan** [1] - 90:23
**tramp** [4] - 130:11, 130:13, 130:17, 130:22
**transcranial** [2] - 36:14, 37:10
**transcript** [1] - 186:11
**TRANSCRIPT** [1] - 1:11
**transition** [5] - 35:21, 35:24, 91:7, 127:15, 128:4
**transpired** [3] - 108:12, 124:13, 182:1
**trash** [1] - 115:25
**trauma** [1] - 21:10
**traumatic** [5] - 15:12, 16:8, 20:21, 44:20, 73:23
**treat** [1] - 54:22
**treating** [14] - 28:5, 40:10, 40:22, 41:16, 41:23, 42:1, 42:4, 42:5, 42:22, 53:1, 53:3, 53:17, 53:24, 54:5
**treatment** [28] - 13:4, 20:10, 21:3, 22:1, 22:4, 22:7, 23:13, 35:17, 35:18, 36:22, 37:20, 38:7, 38:8, 38:9, 42:12, 45:6, 45:20, 47:9, 47:22, 51:16, 51:21, 52:6, 52:17, 54:16, 56:5, 56:9
**Treatment** [1] - 36:5
**treatments** [3] - 45:21, 46:21, 46:22
**trees** [2] - 110:23, 150:1
**trial** [4] - 5:25, 6:5,

10:16, 10:20
**TRIAL** [2] - 1:11, 4:1
**Trial** [1] - 186:6
**tried** [17] - 73:6, 81:14, 81:21, 82:4, 83:3, 88:3, 93:3, 93:5, 93:7, 93:8, 93:15, 93:20, 96:3, 96:20, 143:21, 143:23, 147:4
**tries** [1] - 133:3
**trip** [3] - 76:21, 77:16, 78:5
**true** [10] - 7:14, 11:8, 43:3, 43:5, 45:8, 129:6, 132:1, 132:6, 132:10, 132:20
**truth** [10] - 46:13, 46:15, 128:13, 129:1, 129:7, 129:8, 129:10, 129:15, 130:4, 131:16
**truthful** [1] - 73:6
**try** [26] - 5:8, 5:9, 5:13, 50:12, 69:23, 70:4, 74:1, 74:22, 81:22, 81:23, 93:13, 93:18, 98:16, 105:2, 106:24, 127:16, 143:19, 148:15, 154:21, 156:9, 160:1, 160:8, 173:3, 173:19, 174:5, 185:13
**trying** [27] - 49:1, 49:2, 51:2, 82:1, 87:16, 97:23, 100:16, 103:14, 106:12, 106:14, 106:20, 119:14, 119:18, 129:23, 132:7, 134:4, 179:24, 182:3, 182:5, 183:3, 183:5, 184:23, 185:1, 185:5, 185:16
**Tuesday** [1] - 88:18
**tummy** [1] - 117:16
**turned** [2] - 9:5, 10:1
**TV** [2] - 80:24, 81:1
**twice** [4] - 35:11, 53:4, 54:5, 72:25
**two** [26] - 6:15, 11:21, 23:4, 23:5, 28:20, 31:11, 58:12, 70:12, 75:22, 79:16, 81:7, 81:16, 86:17, 92:4, 93:16, 97:10, 105:20, 111:6, 111:21, 126:15, 127:17, 140:16,

150:6, 156:16, 182:25, 184:5
**two-part** [1] - 92:4
**two-sided** [1] - 140:16
**type** [7] - 16:17, 32:1, 35:2, 55:4, 77:1, 134:11, 159:1
**types** [8] - 20:17, 152:2, 158:19, 161:2, 161:14, 161:24, 171:19
**typical** [2] - 77:1, 77:4
**typically** [15] - 5:24, 13:4, 16:6, 17:22, 19:1, 20:21, 21:1, 21:2, 21:25, 23:4, 30:20, 31:23, 32:3, 47:1, 105:23

## U

**ultimately** [3] - 25:9, 101:5, 131:20
**unable** [2] - 182:6, 183:6
**uncomfortable** [5] - 99:8, 99:23, 100:15, 102:17, 159:21
**under** [6] - 7:16, 14:3, 14:5, 14:19, 27:1, 164:14
**underneath** [1] - 176:4
**understandings** [1] - 70:12
**understood** [2] - 51:19, 134:10
**unearth** [1] - 59:13
**unequivocally** [1] - 38:13
**unexpose** [1] - 83:7
**unexposed** [1] - 83:8
**unfortunately** [3] - 16:8, 16:11, 60:7
**united** [1] - 3:12
**UNITED** [2] - 1:1, 1:12
**University** [1] - 13:19
**unless** [1] - 74:4
**unsafe** [1] - 159:22
**unwanted** [2] - 68:25, 143:15
**up** [47] - 8:5, 11:4, 24:1, 27:2, 31:24, 43:25, 47:3, 61:18, 64:8, 74:23, 77:20, 78:1, 78:11, 81:19, 84:2, 85:9, 86:7, 105:24, 107:25, 108:3, 109:2, 109:6, 109:11, 112:14,

112:25, 113:1, 116:12, 116:13, 117:25, 119:16, 120:18, 121:1, 121:2, 126:14, 133:4, 133:17, 135:12, 136:3, 137:2, 138:3, 142:17, 147:22, 148:14, 154:15, 155:5, 177:17, 184:5

**upset** [10] - 78:20, 79:18, 84:13, 100:15, 102:19, 125:6, 145:25, 157:18, 181:1, 181:2

**upsetting** [2] - 92:20, 92:23

**upstairs** [9] - 80:1, 80:3, 125:14, 126:10, 126:15, 126:16, 147:9, 168:15, 169:4

**uses** [1] - 29:12

**V**

**VA** [3] - 3:7, 3:10, 3:14
**vagina** [4] - 122:21, 123:7, 153:10, 153:24
**vaginally** [2] - 153:25, 154:5
**vaguely** [1] - 66:22
**variation** [1] - 35:1
**varied** [1] - 33:22
**varies** [3] - 22:19, 33:6
**various** [8] - 15:8, 15:15, 20:21, 72:13, 73:2, 79:22, 85:25, 112:10
**vary** [1] - 28:3
**versus** [7] - 33:13, 34:8, 34:10, 47:10, 47:25, 151:11, 186:7
**vicinity** [5] - 8:18, 117:6, 140:6, 142:24, 178:19
**violence** [7] - 152:11, 152:19, 153:11, 153:13, 153:19, 153:22, 154:9
**violent** [1] - 152:9
**Virginia** [1] - 186:4
**VIRGINIA** [1] - 1:1
**vis-à-vis** [2] - 76:20, 117:24
**vision** [1] - 29:13
**visit** [2] - 164:5, 164:6
**visits** [1] - 53:4

**visual** [1] - 29:13
**vivid** [6] - 66:22, 67:8, 68:10, 73:24, 81:25, 95:8
**vividly** [3] - 90:20, 125:10, 181:16
**vocational** [1] - 40:17
**VOGEL** [1] - 1:14
**voiced** [1] - 108:15
**voicemail** [25] - 173:9, 173:12, 173:16, 174:8, 174:12, 174:15, 174:17, 174:24, 175:3, 175:5, 175:11, 175:13, 175:19, 176:18, 176:19, 180:3, 180:15, 180:16, 181:1, 181:4, 182:2, 182:3, 183:5, 183:7, 183:9
**VOLUME** [1] - 1:8
**vulgar** [1] - 85:10, 126:25
**vulgarity** [1] - 155:8
**Vyvanse** [4] - 33:25, 54:14, 54:22, 55:1
**Vyvanse's** [1] - 54:25

**W**

**wait** [3] - 64:15, 80:1, 124:9
**waiting** [2] - 71:10, 114:3
**wake** [1] - 47:3
**walk** [7] - 16:9, 17:4, 20:22, 21:11, 27:13, 160:5, 160:8
**walked** [1] - 178:5
**walking** [7] - 114:22, 114:23, 114:25, 115:1, 116:22, 116:25, 143:4
**wall** [11] - 44:17, 140:14, 140:21, 140:23, 140:24, 140:25, 161:6, 161:8, 161:12, 163:6
**ward** [6] - 40:10, 42:4, 42:5, 42:11, 53:1, 53:2
**ward's** [2] - 28:5, 59:21
**Washington** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**watch** [3] - 121:4, 122:17, 154:3
**watching** [1] - 81:1

**ways** [5] - 16:15, 86:17, 98:16, 105:20, 171:10
**wear** [1] - 36:19
**wearing** [4] - 120:22, 120:24, 121:17
**website** [10] - 42:13, 42:15, 42:23, 42:25, 43:4, 43:5, 43:8, 43:18, 43:21
**week** [22] - 5:5, 10:16, 71:16, 71:19, 85:16, 86:9, 95:17, 95:20, 97:16, 101:5, 111:10, 126:20, 127:5, 135:18, 136:2, 136:15, 143:17, 144:23, 145:16, 147:3, 147:5, 171:3
**weekday** [1] - 77:13
**weekdays** [3] - 150:24, 150:25, 151:1
**weekend** [8] - 5:4, 10:15, 77:13, 77:14, 85:5, 85:10, 88:17, 111:15
**weekends** [2] - 108:24, 150:24
**weekly** [3] - 36:22, 53:4, 54:5
**weeks** [4] - 36:23, 53:8, 53:9, 179:25
**weight** [2] - 11:9, 18:9
**weird** [1] - 84:17
**welcome** [2] - 47:8, 66:12
**Wellbutrin** [1] - 33:12
**whereof** [1] - 186:15
**whichever** [2] - 27:9, 88:11
**whisper** [1] - 180:24
**whispered** [1] - 180:5
**whoever's** [1] - 182:13
**whole** [6] - 67:12, 67:16, 131:1, 131:3, 132:9
**wholesale** [1] - 167:5
**whore** [8] - 86:16, 89:3, 91:17, 136:9, 145:23, 155:19, 163:7, 163:10
**widow** [1] - 112:8
**Wiehle** [1] - 3:9
**willing** [1] - 7:19
**willingness** [2] - 85:25, 185:7
**wing** [1] - 69:18
**WITNESS** [24] - 15:12,

54:5, 61:1, 62:21, 73:16, 111:4, 118:13, 119:7, 124:10, 137:12, 139:5, 140:13, 140:17, 141:7, 141:10, 146:8, 146:10, 149:7, 149:9, 154:10, 154:12, 159:2, 174:3, 177:24
**witness** [15] - 5:19, 5:20, 7:23, 9:14, 9:16, 11:11, 11:25, 12:10, 25:12, 60:17, 61:5, 61:7, 91:4, 92:4, 186:15
**Witness** [2] - 12:11, 61:4, 184:22
**witness'** [1] - 103:23
**WITNESSES** [1] - 4:1
**witnesses** [1] - 66:6
**woman** [2] - 59:11, 185:12
**wondering** [1] - 80:16
**word** [4] - 8:6, 48:17, 48:18
**words** [9] - 81:9, 82:10, 86:6, 92:18, 103:15, 116:23, 132:4, 174:8, 174:16
**works** [3] - 24:20, 27:10, 148:17
**worried** [3] - 171:12, 176:20, 177:3
**worse** [12] - 60:6, 107:13, 107:15, 127:3, 135:18, 145:19, 155:11, 155:13, 155:14, 171:12, 171:13, 172:23
**worth** [1] - 94:20
**write** [8] - 70:10, 93:22, 94:8, 94:20, 94:22, 94:25, 161:7, 163:6
**written** [5] - 8:2, 8:3, 11:17, 11:19, 34:12
**wrote** [1] - 102:21

**X**

**x-rays** [1] - 30:22
**Xanax** [3] - 32:19, 32:21, 33:5

**Y**

**year** [25] - 14:3, 14:8,

14:20, 22:22, 28:18, 30:1, 31:2, 31:5, 31:8, 33:3, 36:13, 41:6, 43:15, 52:23, 53:7, 53:11, 53:16, 53:21, 54:10, 55:15, 64:9, 64:15, 75:16, 170:2
**years** [37] - 15:23, 16:5, 16:8, 17:10, 17:12, 17:22, 18:19, 25:23, 26:21, 26:22, 28:1, 28:11, 29:23, 30:12, 31:12, 31:15, 33:15, 35:11, 36:13, 36:23, 37:9, 38:6, 38:9, 39:8, 39:10, 39:15, 39:18, 42:12, 52:24, 53:11, 62:9, 62:11, 72:14, 73:19, 78:22, 150:11, 150:12
**yellow** [1] - 140:25
**young** [7] - 11:17, 59:11, 74:15, 105:6, 177:21, 184:21
**younger** [3] - 77:19, 78:22, 79:13
**yourself** [11] - 20:5, 54:4, 61:14, 69:22, 92:14, 108:22, 135:23, 138:15, 173:15, 173:22

**Z**

**zealous** [1] - 133:7
**zero** [2] - 37:23, 68:13
**Zoll** [1] - 2:1