1

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2

 3    B.R.,                             :
                                        :
 4                   Plaintiff,         :   Civil Action
                                        :   No. 1:19-cv-917
 5              v.                       :
                                        :
 6    F.C.S.B., et al.,                 :   March 26, 2024,
                                        :   9:01 a.m.
 7                                       :
                 Defendants.            :
 8                                       :   VOLUME 7- A.M. SESSION
      ............................. :
 9                                       :

10

11            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
12               UNITED STATES DISTRICT COURT JUDGE

13    APPEARANCES:

14    For the Plaintiff:          Jonathan Fahey, Esq.
                                  HOLTZMAN VOGEL BARAN TORCHINSKY
15                                & JOSEFIAK, PLLC
                                  2300 N Street NW
16                                Suite 643a
                                  Washington, DC 20037
17                                202-536-1702
                                  Email: Jfahey@holtzmanvogel.com
18
                                  Alison Anderson, Esq.
19                                BOIES SCHILLER FLEXNER, LLP
                                  2029 Century Park East
20                                Suite 1520
                                  Los Angeles, CA 90067
21                                213-995-5720
                                  Email: Alanderson@bsfllp.com
22

23

24

25
      APPEARANCES:  (Cont.)
```

2

```
 1
 2   For the Plaintiff:        Brittany Zoll, Esq.
                               BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
 3                             Suite 2800
                               Miami, FL 33131
 4                             610-804-1787
                               Email: Britzoll@gmail.com
 5
                               Andrew Brenner, Esq.
 6                             BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
 7                             Suite 2800
                               Miami, FL 33131
 8                             305-539-8400
                               Email: Abrenner@bsfllp.com
 9
                               Robert Keefe, Esq.
10                             BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
11                             Suite 2800
                               Miami, FL 33131
12                             850-585-3414
                               Email: Rkeefe@bsfllp.com
13
     For Defendant F.C.S.B.:   Ryan Bates, Esq.
14                             HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Avenue, NW
15                             Washington, DC 20037
                               202-955-1596
16                             Email: Rbates@hunton.com

17                             Sona Rewari, Esq.
                               HUNTON ANDREWS KURTH, LLP
18                             2200 Pennsylvania Avenue, NW
                               Washington, DC 20037
19                             202-955-1974
                               Email: Srewari@huntonak.com
20
                               Scott W. Burton, Esq.
21                             HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Ave NW
22                             Washington, DC 20037
                               202-955-1664
23                             Email: Burtons@huntonak.com

24
     APPEARANCES:  (Cont.)
25
```

EASTERN DISTRICT OF VIRGINIA

3

```
 1  For Defendant F.C.S.B.:      Kevin Elliker, Esq.
                                 HUNTON ANDREWS KURTH, LLP
 2                               2200 Pennsylvania Avenue, NW
                                 Washington, DC 20037
 3                               804-788-8200
                                 Email: Kelliker@huntonak.com
 4

 5  For the Defendants:          Michael E. Kinney, Esq.
    (S.T., A.F., P.A.H.,         THE LAW OFFICE OF MICHAEL E.
 6  T.B., B.H., M.P.F., M.C.,    KINNEY, PLC.
    F.T., J.F.)                  1801 Robert Fulton Drive
 7                               Suite 120
                                 Reston, VA 20191
 8                               Email:  Mk@kinneyesq.com

 9  For the Defendant J.O.:      Bruce Blanchard, Esq.
                                 ODIN, FELDMAN & PITTLEMAN, PC.
10                               1775 Wiehle Avenue
                                 Suite 400
11                               Reston, VA 20190
                                 Email:  Bruce.blanchard@ofplaw.com
12
    Official Court Reporter:     MS. TONIA M. HARRIS, RPR
13                               United States District Court
                                 401 Courthouse Square
14                               Tenth Floor
                                 Alexandria, VA 22314
15

16

17

18

19

20

21

22

23

24

25
```

```
                                                                    4
 1                       TABLE OF CONTENTS
                          TRIAL WITNESSES
 2
    On behalf of the Plaintiff:
 3
    B.R.
 4
            Direct examination by Mr. Brenner............... 07
 5          Cross-examination by MS. Rewari................. 45

 6                          EXHIBITS

 7  On behalf of the Defendants:
                                                        Admitted
 8
    Number 44........................................... 155
 9  Number 56........................................... 94
    Number 58........................................... 96
10  Number 59........................................... 97
    Number 60........................................... 98
11  Number 62........................................... 86
    Plaintiff's Number 80............................... 70
12  Number 84........................................... 163
    Number 279.......................................... 157
13
                          MISCELLANY
14
    Preliminary matters................................. 05
15  Certificate of Court Reporter....................... 181

16  After review of the record and upon agreement of counsel and
    deputy clerk, all final exhibits can be found on CME at Docket
17  #975.

18

19

20

21

22

23

24

25
                              Tonia M. Harris OCR-USDC/EDVA 703-646-1438
                        EASTERN DISTRICT OF VIRGINIA
```

—————B.R. v. F.C.S.B.—————

5

```
 1              THE COURT:  Good morning.

 2              (Good morning responses.)

 3              THE COURT:  Is there anything we need to do before

 4    we bring the jury in?

 5              MR. BRENNER:  Nothing from the plaintiff, Your

 6    Honor.

 7              MR. BLANCHARD:  No, Your Honor.

 8              MR. KINNEY:  No, Your Honor.

 9              MR. BRENNER:  Should I have the witness take the

10    stand?

11              THE COURT:  Yes, that's fine.

12              (Jury present.)

13              THE COURT:  You may be seated.  Good morning, ladies

14    and gentlemen.

15              (Good morning responses.)

16              THE COURT:  I hope that you all had a good night and

17    a good evening.  We're moving along as well as we can.

18              I kind of wanted to give you a heads-up on something

19    that we're going to do to sort of help us all manage our time.

20    As you all might imagine, I have other things that I have to

21    do on other dockets.  This is not my only case, even though

22    the lawyers think it is.  But this is not my only case, and I

23    have a criminal docket that I need to work through on

24    Wednesdays.  Usually Wednesday is my criminal docket matter

25    where I have a few sentencings and a few things that I need to
```

B.R. v. F.C.S.B.

6

```
 1   do.
 2            So instead of having everyone come in and start a
 3   little bit and then stop and then restart again, I just
 4   figured we'd let everyone come in at 12 noon tomorrow.  I
 5   should be through with my docket by then.
 6            I was also thinking as I was sort of cogitating on
 7   this last night is it would also give me an opportunity to
 8   make contact with your work and let them know that you're
 9   moving along and that you'll be back in as soon as
10   practicable.  But it gives you a morning to work with, and
11   sometimes that can be to your advantage.  So we want to work
12   with you on that.
13            I have to ask you this.  I ask it every day:  Have
14   all of you lived up to the Court's instruction not to discuss
15   the case or any aspect of the case with anyone?  Very good.
16   And you stayed away from social media and newsprint to the
17   extent you can.
18            I will tell you this.  There was a tragedy that
19   occurred last night at the Francis Scott Key bridge.  Some
20   tanker hit it and the whole bridge fell into the water and
21   it's just a horrible scene, particularly for me because I've
22   got gephyrophobia.  I don't like bridges.  I have someone in
23   line with me.
24   I can deal with tunnels.  My law clerks and I had a discussion
25   this morning as to whether we prefer tunnels or bridges, and
```

Direct - B.R.

─B.R. v. F.C.S.B.─

7

1    the vote was bridges over tunnels.  I was voting for tunnels,

2    but I'm more comfortable in a tunnel.

3              (Discussion off the record.)

4              THE COURT:  Thank you.  Mr. Brenner.

5              MR. BRENNER:  May I proceed, Your Honor?

6              THE COURT:  You may.

7              MR. BRENNER:

8                   DIRECT EXAMINATION - Continued

9    BY MR. BRENNER:

10   Q.   Okay.  B███, just a few more things and then counsel for

11   the various defendants will have an opportunity to ask you

12   questions as well, okay?

13   A.   Sounds good.

14   Q.   Okay.  First I want to start with -- so the jury is

15   observing you in the courtroom and on the witness stand.  Do

16   you have good days and bad days?

17   A.   I do.

18   Q.   Give the jury an example of -- well, give an example of

19   both.  How are you on your good days and how are you on your

20   bad days?

21   A.   So I'll start with my good days.  On my good days I can

22   function.  I can get out of bed.  I can interact with my

23   family.  I can interact with my partner.  I can leave my

24   house.  I can at times maybe even work, but it really depends

25   on what a good day looks like.  There's a spectrum of what a

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─

8

1    good day looks like.  Sometimes I'm happy.  Sometimes I can go

2    places, but it really varies.

3    Q.   And before you get to the bad days, do you have any sort

4    of -- I don't know, advanced warning?  Like do you know when

5    you wake up, is it going to be good day or a bad day?

6    A.   Again, it really depends.  There may be some indicators

7    for me that it could be a better day, but it really depends on

8    a matter of factors, whether that be how I sleep, if I sleep,

9    if I have nightmares, if I have flashbacks, how hypervigilant

10   I am.

11   Q.   What's hypervigilant?

12   A.   So hypervigilance for me looks like I just am extremely

13   aware of all of my surroundings.  I pick up on movement,

14   sounds, just extremely sensitive to everything in my

15   surroundings, and it is extremely overbearing.  It is not

16   something I can just ignore, and it really heightens my

17   anxiety and stress and -- yeah.

18   Q.   Tell the jury what your bad days are like.

19   A.   My bad days, I don't get up out of bed.  I struggle to

20   get out of bed.  I'm upset.  I sometimes struggle with

21   something called association, which means I just don't feel

22   present in my body.

23   Q.   Explain that a little better.

24   A.   So disassociation means for me when I feel so overwhelmed

25   with memories of my trauma that I just can't -- it feels like

Direct - B.R.

──────B.R. v. F.C.S.B.──────

9

1   I can't exist in my body, so I feel numb.  I feel like I can't

2   feel my arms, my legs.  I just don't feel like I can exist in

3   my body or in my life.

4           There are times where I'm just very upset.  I'm

5   crying.  I can't have interactions with my family or my

6   partner.

7   Q.   Who's your -- you mentioned your partner a couple of

8   times.  We'll talk about it a little later, but who's your

9   partner?

10  A.   My partner name is Andrew.

11  Q.   Okay.  You can go on.

12  A.   And so I guess sometimes I just -- can you ask the

13  question again?  I'm sorry.

14  Q.   Sure.  Well, I'll get you a more targeted question.  Even

15  during this trial, will you likely have good days and bad

16  days?

17  A.   Already so far I've had some decent days and I've had

18  some bad days.  There are some days I, like, just can't even

19  get out of bed.  The idea of coming here feels so overwhelming

20  to me that I just feel like I can't.  I just literally

21  physically can't.

22  Q.   Okay.  Let's transition.  I want to spend a little bit of

23  time this morning talking about your medical treatment

24  since -- we'll call it since spring of 2012, okay?

25  A.   Okay.

Direct - B.R.

─B.R. v. F.C.S.B.─

10

1   Q.   Just to reorient you, you testified yesterday that you

2   got your first diagnosis of PTSD, I think you thought it was

3   either March or April of 2012?

4   A.   Not 100 percent sure on like the month, like something

5   around that time frame, yes.

6   Q.   Okay.  What do you recall was the first either facility

7   or doctor you were seeing around this time?

8   A.   I recall that I was seeing my -- well, I had a

9   pediatrician that I was seeing.

10  Q.   And then after your -- and what's his name?

11  A.   His name is Dr. Kevin Weaver.

12  Q.   And then -- and Dr. Weaver you had been seeing -- had you

13  been seeing Dr. Weaver prior to going to Rachel Carson?

14  A.   I believe that I've been seeing Dr. Weaver since I was

15  about, I think, 7 -- 6 or 7 years old.

16  Q.   And what's the next facility or doctor you went to in

17  2012 other than Dr. Weaver?

18  A.   I recall that I ended up in the emergency room at

19  Children's National Hospital because I was experiencing a

20  mental health crisis.

21  Q.   And what do you recall from that experience?

22  A.   I recall that I was just extremely distraught.  My

23  parents were -- and I were -- well, I had expressed concerns

24  to my mom that I didn't want to live anymore, that I wanted to

25  take my own life, and my parents brought me to the hospital.

─B.R. v. F.C.S.B.─

11

1  Q.   And from -- were you admitted to a facility or to the

2  hospital from the emergency room?

3  A.   I recall that the doctor said that they thought it was

4  better that I stay --

5           MS. REWARI:  Objection, Your Honor.

6           THE COURT:  Focus her.

7           MR. BRENNER:  I'll rephrase, Your Honor.  I'll

8  re-ask.

9  BY MR. BRENNER:

10 Q.   Without saying what the doctors said or didn't say,

11 just -- you can tell the jury what do you recall was the next

12 step after the emergency room?

13 A.   I didn't want to stay in an inpatient unit because I was

14 afraid to be away from my parents, and so the best next step

15 was a partial hospitalization program which means you're in an

16 inpatient -- an intensive therapy program all day.  You just

17 sleep at home.

18 Q.   Do you recall a facility or a place called the Gil

19 Center?

20 A.   Yes, I did go to the Gil Center, yes.

21 Q.   That was the next place?

22 A.   That was the next therapist I saw for a while, yes.

23 Q.   Okay.  What was the name of the therapist you saw at Gil

24 Center?

25 A.   Her name was Nicole Jalazo.

──── B.R. v. F.C.S.B. ────

12

1    Q.   Just approximately how long did you see Dr. Jalazo?

2    A.   I saw her for about -- I want to say a month, but I was

3    not allowed to keep seeing her.

4    Q.   Okay.  Do you know why you were not allowed to keep

5    seeing her?

6    A.   Yes.

7              MS. REWARI:  Objection, Your Honor.  Hearsay.

8              THE COURT:  See if you can ask it another way which

9    will not generate her making reference to things which

10   probably are hearsay in nature.

11             MR. BRENNER:  I think we should probably approach.

12   I don't want to run afoul of the Court's direction.

13             THE COURT:  Let me take a look at the question

14   again.

15             (A pause in the proceedings.)

16             THE COURT:  Did you have an opportunity to meet with

17   this doctor?

18             THE WITNESS:  I met with this therapist -- she was a

19   social worker -- for about four weeks, I believe.

20             THE COURT:  Was it something that the therapist had

21   to take care of professionally or something relating to you

22   that caused you to stop seeing this particular therapist.

23             THE WITNESS:  It was something relating to me.

24             THE COURT:  Okay.  I think that's about as far as we

25   can go unless you have a way to sort of get to the point

─B.R. v. F.C.S.B.─

13

 1  you're trying to make.

 2  BY MR. BRENNER:

 3  Q.   Well, what was your understanding of what related to you,

 4  why you couldn't see --

 5          THE COURT:  What was going on in your life then that

 6  caused you not to be able to continue to see your therapist?

 7          THE WITNESS:  Because I was a student at Fairfax

 8  County Public Schools.

 9          THE COURT:  Okay.

10  BY MR. BRENNER:

11  Q.   What about you being a student at Fairfax County Schools

12  prevented you to see -- I guess, is it Ms. Jalazo, not --

13  A.   Yes.

14  Q.   I apologize.  What is it about you being a student at

15  Fairfax County Public Schools that prevented you from

16  continuing to see Dr. Jalazo?

17  A.   My --

18          MS. REWARI:  Objection, Your Honor.

19          THE COURT:  Basis?  Hearsay, fact or foundation?

20          MS. REWARI:  I believe that what he's eliciting is

21  double hearsay.

22          THE COURT:  All right.  Come on up, see if we can

23  work through this.

24          (Side bar.)

25          THE COURT:  What do you anticipate her testimony to

────────── B.R. v. F.C.S.B. ──────────

14

1   be?

2          MR. BRENNER:  The truth is I actually had forgotten

3   this part so I wasn't actually trying to -- my associate

4   reminded me that or my colleague just reminded me that -- what

5   I think she'll testify to is that the school prevented her --

6   the school told Ms. Jalazo she couldn't see her anymore.

7          MS. PEDERSEN:  That she needed to see an M.D.

8          MR. BRENNER:  The school wouldn't allow her to

9   continue treatment with her because she was a social worker.

10  So our position wouldn't be hearsay --

11         MS. PEDERSEN:  I believe the evidence is that --

12         MR. BRENNER:  -- because it's a statement.

13         MS. REWARI:  I believe the evidence is that the

14  school said in order to have sign off on a homebound

15  instruction she needed an M.D. or a psychiatrist to give that.

16  This has nothing to do with Ms. Jalazo.  She also needed a

17  psychiatrist.  So that is --

18         THE COURT:  It sounds like we agree on the factual

19  predicate that we maybe trying to get at.

20         MR. BRENNER:  Yes.  And I think it's fine that, I

21  think, on cross if they want to say, Well, they weren't saying

22  you couldn't see her, they are just saying something in

23  addition.  I think that's fair cross.

24         MS. REWARI:  I believe this information does not

25  come to her directly.  It came from her mother and somebody

Direct - B.R.

────────────B.R. v. F.C.S.B.────────────

15

1   else at the school.  There's several chains and she doesn't

2   have firsthand knowledge of what the school say or didn't say.

3   It is being relayed to her by her mother.

4           THE COURT:  Okay.  So we already have in the record

5   that the fact that there was a need to change providers had

6   something to do with something with the Fairfax County Schools

7   said to her.  Do we all degree on that?

8           MR. BRENNER:  Well --

9           THE COURT:  I'm trying go through the process.

10           MR. BRENNER:  Yes.  So I think what she said you

11   asked, in terms of your question, you said was about you

12   personally or something else, and she said her, and then what

13   about her, and she said the fact that I was a student at

14   Fairfax County.  We got that far.  I don't -- I don't think

15   anyone know what that means.

16           THE COURT:  That's why I brought you all up here

17   because I didn't know either.

18           Okay.  What I'm going to allow you to ask, and

19   obviously you can do this on cross-examination.  You need to

20   clean it up.

21           Was your -- Was the determination to no longer to

22   meet with Ms. Jalazo related to something that Fairfax County

23   Schools requested?

24           MR. BRENNER:  Leave it at that?

25           THE COURT:  Leave it at that.

─────B.R. v. F.C.S.B.─────

16

1        MR. BRENNER:  And ask her -- can I just ask her to

2    answer this "yes" or "no"?

3        THE COURT:  Yes.  Okay.

4        MR. BRENNER:  Okay.

5        (Open court.)

6    BY MR. BRENNER:

7    Q.   I'm going ask you a yes or no question.

8    A.   Okay.

9    Q.   And just -- hold on a second.

10   A.   Okay.

11       MR. BRENNER:  I'm sorry.  May I proceed?

12       THE COURT:  Yes, you may.

13       MR. BRENNER:  Okay.  Sorry.

14   BY MR. BRENNER:

15   Q.   And for this one just answer yes or no, okay?

16   A.   Got it.

17   Q.   Was the reason that you stopped seeing Ms. Jalazo after a

18   month, you said, as a result of something that the Fairfax

19   County School Board requested?

20   A.   Yes.

21   Q.   Okay.  What was your next treatment, either by name of

22   doctor or facility, after you stopped treating with

23   Ms. Jalazo?

24   A.   I believe it was the Kellar Center.

25   Q.   Okay.  Is that the Inova Kellar Center?

─────────────── B.R. v. F.C.S.B. ───────────────

17

```
 1   A.    That's correct, yes.

 2   Q.    And was that inpatient, outpatient, periodic?  Just

 3   explain to the jury what your treatment was at the Inova

 4   Kellar Center?

 5   A.    It was a partial hospitalization program so what that

 6   means is you're in intensive therapy for, I think it was from

 7   like 9:00 to 3:00 p.m. or something like that.

 8   Q.    Okay.  Seven days a week, five days a week?

 9   A.    It was five days a week.

10   Q.    Oh, by the way, I forgot to ask you this.  Before we walk

11   through -- I forgot to ask you, before we walk through, just

12   currently -- there was some discussion yesterday with another

13   witness.  Currently how often do you see medical or healthcare

14   providers?

15   A.    Currently, I would say about three to four times a week.

16   Q.    Okay.  And how many of those are therapists or other

17   mental health care providers?

18   A.    I would say around two, sometimes three.  Or therapist,

19   mental health, sometimes it's two.

20   Q.    Per week?

21   A.    Yes.

22   Q.    And is that a number that you see on the good days or the

23   bad days or bad weeks or good weeks?

24   A.    I would say on like the goodish weeks.

25   Q.    And what about when you're having bad times, do you see
```

Direct - B.R.
B.R. v. F.C.S.B.

18

1  them more or less?

2  A.   I do see them more, yes.

3  Q.   Okay.  So let's go back to Inova.  How long were you

4  doing the -- the -- the weekday, you know, all day 9:00 to

5  3:00, whatever, that time at Inova?

6  A.   I believe that I started in April of 2012.  Not

7  100 percent sure, but I think it was -- I was in the partial

8  hospitalization program for like three or four weeks and not

9  100 percent sure how long exactly.

10  Q.   Do you have an understanding of what you were being

11  treated for?

12  A.   Yes, I did.

13  Q.   What was that?

14  A.   Post-traumatic stress disorder.

15          MS. REWARI:  Objection, Your Honor.

16          THE COURT:  It is what she thought she was being

17  treated for.  Overruled.

18  BY MR. BRENNER:

19  Q.   After the three weeks or so of the full-day treatment,

20  did you do any further treatment at Inova?

21  A.   Yes, I did.  I stepped down to an intensive outpatient

22  program.

23  Q.   And what was the difference in frequency between the

24  previous every day for 9:00 to 3:00 or so to the intensive

25  outpatient?

Direct - B.R.
─────B.R. v. F.C.S.B.─────
19

1    A.    So it's a cut-down.  I believe it's three days a week for

2    about three or four hours in the afternoon or evening time.

3    Q.    And same things you are being treated for?

4    A.    Yes.

5    Q.    How many weeks or months did you think you did that?

6    A.    I think I did that for several months.  I'm not exactly

7    sure how long, but it was, I believe, several months.

8    Q.    Okay.  Assume that takes us somewhere into the summerish

9    of 2012.  Does that sound right?

10   A.    That sounds about right, yes.

11   Q.    Did you continue treating at Inova?

12   A.    I was discharged and I saw an individual therapist.

13   Q.    Okay.  Who was that?

14   A.    I believe at the time it was Dr. Julie Galton.

15   Q.    Can you spell that?

16   A.    G-A-L-T-O-N.

17   Q.    G-A-L-T-O-N?

18   A.    Yes.

19   Q.    Okay.  And how often were you seeing Doctor -- is it --

20   is it Doctor?

21   A.    Yes.  Yes.

22   Q.    How often were you seeing Dr. Galton?

23   A.    I was seeing her.  I'm not 100 percent sure.  I think

24   maybe twice a week.

25   Q.    Okay.

B.R. v. F.C.S.B.

20

1    A.    Sometimes more, sometimes less.

2    Q.    Who's Dr. Yadin, Y-A-D-I-N?

3    A.    So that fast forwards a little bit of time, but she was a

4    provider psychologist that I saw at the University of

5    Pennsylvania center for anxiety.

6    Q.    And when was that about?

7    A.    I believe that was sometime in either -- I think in 2012

8    at some point.

9    Q.    Were you in either partial hospitalization or intensive

10   outpatient or regularly seeing a therapist for the balance

11   of -- all of 2012?

12   A.    For 2012, I did another, I guess you could say, stint at

13   the partial hospitalization at the Kellar Center.

14   Q.    And the partial hospitalization, just so the terms --

15   we're on the same page, that's the Monday through Friday,

16   every day?

17   A.    That's correct, yes.

18   Q.    So you did it first for in the March, April time frame

19   and then you went back and went back into the partial

20   hospitalization program?

21   A.    I believe I did in, I think, August or September.

22   Q.    Okay.  How long was that one?

23   A.    I think -- I think maybe, I don't know, a few weeks.

24   Q.    During this time, did you start seeing a new -- well, you

25   told the jury yesterday it's about this time that you -- or

─B. R. v. F.C.S.B.─

21

1   getting to the point where you move out of this area, correct?

2   A.   It's getting to that point but not yet.

3   Q.   Okay.  So what else happens in -- in 2012?  Who else do

4   you see before you leave this area?  "This area" meaning the

5   Virginia metro/D.C. area.

6   A.   I believe I start seeing a psychologist named Dr. Keith

7   Saylor.

8   Q.   Okay.  Tell me what you saw Dr. Saylor for.

9   A.   I saw Dr. Saylor for my posttraumatic stress disorder and

10  also my major depression disorder.

11  Q.   What's Dr. Saylor's title?  What's his --

12  A.   He's a psychologist.

13  Q.   Okay.  And how often would you see Dr. Saylor?

14  A.   I saw Dr. Saylor maybe two or three times a week.

15  Q.   And for how long did you see Dr. Saylor?

16  A.   I believe I saw him until I think 2014.

17  Q.   And you started sometime in 2012?

18  A.   If my recollection serves, yes, I think so.

19  Q.   By the way, the therapy sessions, are they always

20  in-person or are they sometimes remote or tele?

21  A.   They sometimes are remote, especially once I moved from

22  this area.

23  Q.   What area was Dr. Saylor in?

24  A.   Dr. Saylor was in the Fairfax area.

25  Q.   And you continued seeing him after you left the Fairfax

—B.R. v. F.C.S.B.—

22

1    County area?

2    A.    That's correct.  Sometimes I would make visits, though.

3    I was living in New York at the time, and I would visit -- I

4    would drive four or five hours to see him here.

5    Q.    Okay.  And did you also sometimes see him remotely?

6    A.    I did, yes.

7    Q.    Now, over the course of the last 12 years, have you

8    undergone different types of therapy?

9    A.    Could you rephrase that?

10   Q.    Sure.  So what type of therapy, as you understood it,

11   were you doing with Dr. Saylor?

12   A.    I was doing some like cognitive behavioral therapy,

13   trauma processing, honestly just learning how to function

14   again.

15   Q.    What is -- what are those things?  What is the first one,

16   the cognitive, what does that mean?

17   A.    Basically any -- in my understanding of what it means is

18   just any negative thoughts or beliefs that you hold about

19   yourself or something, and you work through it and process it

20   with your therapist.

21   Q.    Is that -- you mentioned trauma processing.  What does

22   that mean?

23   A.    So some of the traumatic events that I experienced at

24   Rachel Carson Middle School or also the rapes that I

25   experienced, we started to address some of them, but I really

—B.R. v. F.C.S.B.—

23

1    struggled to do it.

2    Q.   Why did you -- explain to the jury how you struggled to

3    do it or --

4    A.   I felt a little bit resentful.  A little bit might be an

5    understatement about being in therapy.  I was kind of annoyed

6    at my parents because I kind of felt like I -- why did I have

7    to be the one in therapy, why am I the one that's being

8    punished again.

9            I didn't see that it was trying to help me at the

10   time.  I thought it was more of like a punishment at the time.

11   Q.   Okay.  Who is Dr. Trager?

12   A.   So when I moved to the New York area, he became my

13   primary care physician.

14   Q.   Okay.  At that point, do you stop seeing Dr. Weaver?

15   A.   I do.

16   Q.   Okay.  Can you explain to the jury the process of trying

17   to -- with Dr. Saylor -- excuse me, Dr. Saylor or the other

18   therapist the processes you would go through to try to tell

19   them what happened?

20   A.   It was very difficult because I felt like I lost my voice

21   when I was 12 years old, so I felt like no one wanted to hear

22   me.  So I really struggled to be in therapy to articulate some

23   of the things that I had endured specifically.

24           I felt a lot of shame about being raped.  I felt

25   like it was my fault.  I felt like no one believed me, and I

─────────── B.R. v. F.C.S.B. ───────────

24

1    just had a really difficult time just trying to process things

2    that I went through, and I just -- I struggled with that, and

3    also it was really hard for me to wrap my head around the fact

4    that my life was now completely different.  It was a new life

5    that I didn't know.

6              I went from not even knowing what posttraumatic

7    stress disorder was to dealing with it in a very severe and

8    visceral way every single day of my life.

9    Q.   Who is Dr. -- or not, excuse me -- who is Rose Rosato?

10   A.   Rose became my therapist, I think, in 2014 or 2015.

11   Q.   Was there an overlap between Ms. Rosato and Dr. Saylor,

12   or was one right after the other?

13   A.   I believe there may have been a short overlap.  I'm not

14   100 percent sure about that.

15   Q.   And Ms. Rosato, where does she practice out of, or where

16   was she practicing out of at the time?

17   A.   Rose is out of New Jersey.

18   Q.   Okay.  And you said you think about 2014 or '15 you

19   started with her?

20   A.   Yes.

21   Q.   Okay.  And what types of therapy did you do with

22   Ms. Rosato?

23   A.   I did a lot of, again, just basic, like, talk therapy.  I

24   did some trauma processing with her.  She tried to do some, I

25   guess, helping with some coping mechanisms, some, like, how to

─── B.R. v. F.C.S.B. ───

25

1    deal with some of my triggers, some of the anxieties that I

2    had.

3              There were a lot of things that would just come up

4    that would become very triggering or remind me of what I went

5    through and would be hard to work through, and so Rose would

6    help me work through some of those things.

7    Q.   Did there come a time where you were hospitalized again?

8    A.   Yes.

9    Q.   Okay.  Is that -- where was that at?

10   A.   So that was at Robert Wood Johnson.

11   Q.   Where is Robert Wood Johnson?

12   A.   It is in New Jersey.

13   Q.   And what's the, if you recall, the approximate year or

14   month, if you can remember, that you were hospitalized at

15   Robert Wood Johnson?

16   A.   I believe it was 2016.

17   Q.   Was this one -- unlike when you were 12, was this one

18   where you actually slept at the hospital?

19   A.   That's correct.  I was hospitalized all day, all night,

20   seven days a week.

21   Q.   And how long were you hospitalized at Robert Wood

22   Johnson?

23   A.   I was hospitalized for about a month.

24   Q.   And what do you recall was -- what was -- what were

25   you -- what's your -- what do you recall of what you were

Direct - B.R.

B.R. v. F.C.S.B.

26

1   being treated for at RWJ?

2   A.   So it primarily was an eating disorder hospital.  So it

3   was dealing -- I was there primarily for my eating disorder,

4   however, also my PTSD too.

5   Q.   Did you discuss with your therapist the -- the -- your

6   eating disorders?

7   A.   Yes, I did.

8   Q.   Did you discuss processing -- you said processing the

9   trauma.  Did you discuss how those eating orders did or did

10  not relate to your trauma?

11  A.   Yes.  We talked about how --

12          MS. REWARI:  Objection, Your Honor, hearsay.

13          THE COURT:  Ask the question again.

14          Ma'am, don't -- in response to the questions, don't

15  talk about what someone else said to you.  You can talk about

16  your own personal experience.  You can talk about how you

17  felt, but don't in your answer provide any information about

18  why you believe this or the predicate for what you did.

19          MR. BRENNER:  Your Honor, if I may, can I try to lay

20  a different predicate to --

21          THE COURT:  Sure.

22  BY MR. BRENNER:

23  Q.   The conversations you had with your therapist at this

24  time, were those conversations done in the course of you

25  trying to seek medical treatment and care?

—————B.R. v. F.C.S.B.—————

27

1   A.   Yes.

2   Q.   Can you tell us what was your understanding and what you

3   guys -- what you understood and what you discussed about your

4   relationship between your eating disorders and your trauma?

5              MS. REWARI:  Objection.

6              THE COURT:  Sustained.

7              MS. REWARI:  Thank you.

8              THE COURT:  What did you do in response to what your

9   therapist suggested that you do to address your concerns about

10  your eating disorder?

11             THE WITNESS:  My -- I'm sorry, could you repeat that

12  one more time?

13             THE COURT:  What did you do in response to what your

14  therapist suggested that you should do to address the concerns

15  that you were having regarding your eating disorder?

16             THE WITNESS:  What I did was really tried to open up

17  about my trauma that happened to me when I was 12 years old

18  because that was why I wanted to shrink myself.

19  BY MR. BRENNER:

20  Q.   What do you mean by shrink yourself?

21  A.   I hated my body.  I wanted to disappear.  I frankly

22  wanted to die because I was so humiliated.  I felt embarrassed

23  to exist in the skin that I lived in.  I -- that I just wanted

24  to shrink myself.

25  Q.   Without showing any photographs, can you explain to the

B.R. v. F.C.S.B.

28

1   jury what you looked like during this time?

2   A.   I looked a lot smaller than what I am now.  I had more

3   protruded bones.  I was constantly cold.  By that, I mean I

4   was shivering, I was shaking.  I had some of the -- I don't

5   really remember what exactly it's called, but some of the hair

6   growth that you have, like white hair growth on my arms.

7          I -- you could see more bones in my face and in my

8   collarbone region.  My ribs were protruding.  I wanted to

9   shrink myself.

10  Q.   You mentioned in a prior answer the word "trigger."

11  What's a trigger?

12  A.   A trigger is when something reminds me of what happened

13  to me when I was 12 years old.

14         THE COURT:  What we're going to do with that answer

15  is going to be what is her understanding as to what a trigger

16  is.

17  BY MR. BRENNER:

18  Q.   Is that your understanding of what a trigger is?

19  A.   That is my understanding, yes.

20  Q.   Now, after the Robert Wood Johnson inpatient stay, was

21  there a time that you did a different kind of hospitalization

22  at Robert Wood Johnson?

23  A.   Yes.  So I stepped down from an inpatient stay, which was

24  when I was there 24/7, and then I stepped down to a partial

25  hospitalization, so, again, like a day program there.

29

1   Q.   More like the weekdays for -- sort of like a full

2   workday?

3   A.   Yes.

4   Q.   Okay.  And was that immediately -- you stepped down from

5   the inpatient to the partial hospitalization?

6   A.   Yes.  So I began sleeping again at my parents' house, and

7   my dad actually would drive me two hours each way to go to the

8   program.

9   Q.   How long were you in the partial hospitalization program

10  at Robert Wood Johnson?

11  A.   I believe I was in there maybe for, I think, four months,

12  if I'm not mistaken.  I'm not 100 percent sure, but something

13  like that.

14  Q.   By my count, we're in the spring and summer of 2016.

15  Does that sound about right?

16  A.   I believe so, yes.

17  Q.   Okay.  During this time, you continued treating with

18  Ms. Rosato?

19  A.   I believe so, yes.

20  Q.   What is -- what is Holy Name Hospital?

21  A.   Holy Name Hospital was a local hospital to where I lived

22  at the time.

23           MS. REWARI:  Objection, Your Honor.  I believe this

24  was -- this topic was a motion in limine that we had.

25           THE COURT:  Which one?  Give me the reference

──────B.R. v. F.C.S.B.──────

30

1    number.

2              (Counsel confers.)

3              MS. REWARI:  It's No. 18 on ECF-653.  It was taken

4    under advisement.

5              THE COURT:  Just a moment.

6              (A pause in the proceedings.)

7              THE COURT:  Mr. Brenner, are you anticipating

8    calling anyone from that particular facility?

9              MR. BRENNER:  From the facility.

10             THE COURT:  Holy Name Medical Center.

11             MR. BRENNER:  I don't believe so.  If I could

12   approach, Your Honor.

13             THE COURT:  Sure.

14             (Side bar.)

15             THE COURT:  To make sure I'm talking about the same

16   thing, the motion in limine that we're supposedly dealing with

17   was me taking under advisement the issues regarding the Holy

18   Name Medical Center regarding plaintiffs offering testimony

19   attempting to attribute her 2017 and 2019 medical visits to

20   Holy Name Medical Center back in 2011/2012 for alleged

21   assault.

22             Is that the right one.

23             MR. BRENNER:  I think other defendants joined it.

24   There was more than one, but on that same issue.

25             THE COURT:  Okay.

1           MR. BRENNER:  So, Your Honor, as you saw in your

2    order, I didn't understand the motion then.  I still don't

3    understand it, to be frank.  You took it under advisement that

4    it may be renewed at trial.  All I'm doing is -- I don't

5    understand the basis for it.  All I'm doing is laying the

6    predicate and the foundation.  This is all in the course of

7    treatment in 2012 to 2024.  They picked out Holy Name for

8    reasons that are known to them and not to me, but it's all

9    part of her treatment that she was receiving --

10          THE COURT:  So is the testimony that you're going to

11   try to elicit simply related to a sequence of treatment and

12   not her providing --

13          MR. BRENNER:  It's the same thing as with all the

14   other -- the same exact series of questions.

15          MS. REWARI:  Your Honor, she's testified yesterday

16   that she thought she had a seizure.  The records show that she

17   had a UTI.  That was the ultimate diagnosis.  That it was a

18   recurrent UTI, which are bacterial illnesses.  It has nothing

19   to do with this.  There's not going to be any witness that's

20   going to say that her UTI was caused by --

21          THE COURT:  Obviously, she's not going to able to

22   make that leap.

23          MS. REWARI:  I'm sorry.  It's misleading to a jury

24   to talk about this.

25          THE COURT:  What would prevent you form

───── B.R. v. F.C.S.B. ─────

1   cross-examination after he, through these witnesses, elicits

2   testimony regarding her attending Holy Name Medical Center, by

3   simply asking her, Isn't it, in fact, true you went there for

4   a UTI?

5          MS. REWARI:  Well, if she's going to argue with me

6   on the diagnosis, again, my concern is that she -- they can

7   talk about it, but they shouldn't say that it was related to

8   this.

9          THE COURT:  Well, no, that's not what I think they

10  are trying to do.  Again, what's going to prevent you from

11  asking the question:  Ma'am, isn't it in fact true that you

12  went in for a UTI?  Do you know what a UTI is?  That's a

13  bacterial infection, isn't it?

14         MS. REWARI:  Okay.

15         THE COURT:  All right.

16         (Open court.)

17  BY MR. BRENNER:

18  Q.   What is Holy Name Hospital?

19  A.   Holy Name Hospital was an emergency room -- or a

20  hospital, I should say, nearby my house at the time.

21  Q.   Did there come a time where you went to Holy Name

22  Hospital?

23  A.   Many times, yes.

24  Q.   What was the -- was there a time where you were admitted

25  there?

─B.R. v. F.C.S.B.─

33

1   A.   Yes.

2   Q.   And when was that?

3   A.   I believe that was in the summer of 2017.  I'm not

4   100 percent sure about that.

5   Q.   Do you recall how long that admission was?

6   A.   I think it was a few days.

7   Q.   Okay.  And do you recall what you were being treated for

8   at Holy Name Hospital?

9   A.   Yes.

10   Q.   And what was that?

11   A.   I had had an incident where I passed out and it was

12   unclear whether I had a seizure or whatever.  I had been

13   having weird symptoms for a long time.

14            THE COURT:  Next question.

15            THE WITNESS:  I'm sorry.

16   BY MR. BRENNER:

17   Q.   Whether at Holy Name or anywhere else, have you ever --

18   do you currently -- have you had and do you currently have

19   pelvic pain?

20   A.   I have severe pelvic pain, yes.

21   Q.   And how long have you had that for?

22   A.   I have had it for a long time.  I would say since 2013.

23   Q.   What about endometriosis?

24   A.   Yes, I do have that as well.

25   Q.   And how long have you had endometriosis for?

———B.R. v. F.C.S.B.———

34

1   A.    I believe I was diagnosed with it --

2            MS. REWARI:  Objection, Your Honor.

3            THE COURT:  Sustained.  And let me say something to

4   all people who are attending today's hearing who are a part of

5   the gallery, the information that is being elicited this

6   morning is private and personal in nature, and I would hope

7   that you all would be sensitive to the fact that this

8   information is not one that's typically shared with the

9   public.  I'll just simply leave it at that.

10  BY MR. BRENNER:

11  Q.    Without saying -- without using the word "someone"

12  diag- -- what's your understanding of how long you've had

13  endometriosis for?

14  A.    For a few years now.

15  Q.    Okay.  The jury heard yesterday from another witness that

16  talked about TBI, or traumatic brain injury?

17  A.    Yes.

18  Q.    Is it your understanding you have suffered traumatic

19  brain injury?

20  A.    Yes.

21  Q.    Okay.  Who is -- who is Dr. Ward?

22  A.    Dr. Ward is a psychiatrist.

23  Q.    Okay.  MD?

24  A.    Yes.

25  Q.    And was there -- did there come a time when you started

─B.R. v. F.C.S.B.─

35

1    seeing Dr. Ward?

2    A.   Yes, there was.

3    Q.   When was that?

4    A.   I believe it was around 2020, if I'm not mistaken.

5    Q.   Are you still seeing Dr. Ward?

6    A.   I'm not currently seeing Dr. Ward, no.

7    Q.   When you started seeing Dr. Ward, how often would you see

8    her?

9    A.   I was seeing Dr. Ward about three times a week.

10   Q.   Was she your -- maybe I'm using the wrong term, but was

11   she your primary therapist at the time?

12   A.   So, Dr. Ward is a psychiatrist, but she also is a

13   therapist, too, so I was seeing her in the capacity of both as

14   my psychiatrist and my therapist.

15   Q.   And what is your -- explain to the jury what type of

16   therapy or what the therapy process was with Dr. Ward.

17   A.   We did talk therapy, we did trauma processing, we did

18   some talking about like coping skills, coping mechanisms,

19   talked about some trauma mechanisms I have, relationships,

20   variety of other things.

21   Q.   How long did you see her for?

22   A.   I saw her until around 2023.

23   Q.   Just going to go through some other doctors just so --

24   A.   Yes.

25   Q.   -- the jury can just know who they are and what you saw

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─

36

1    them for, okay?

2    A.    Got it.

3    Q.    Dr. Sara Gluck?

4    A.    She was psychologist I saw.

5    Q.    All right.  Approximate time frame?

6    A.    Around 2019, I think.

7    Q.    Anything -- was it the same type of therapy and trauma

8    processing that you'd been going through prior to then?

9    A.    Yes, it was very similar to that.

10   Q.    Who is Dr. Sharon Herzfeld?

11   A.    She was a neurologist that I was seeing.

12   Q.    What did you see Dr. Herzfeld for?

13   A.    I saw --

14   Q.    Just in your understanding.

15   A.    My understanding was I was seeing her for a traumatic

16   brain injury.

17   Q.    Who is Dr. Sylvia Mohen -- I'm going to try to pronounce

18   this -- Mohen?

19   A.    She was a neurologist that I briefly saw, as well, for my

20   traumatic brain injury or also I -- my understanding was

21   postconcussion syndrome as well.

22   Q.    Okay.  What's TMJ?

23   A.    I honestly wouldn't even know what exactly it stands for,

24   but basically there's severe tension in my jaw and it is

25   absolutely debilitating pain.

Direct - B.R.

─B.R. v. F.C.S.B.─

37

1    Q.    Is that something you have experienced in the past?

2    A.    I've been experiencing it since I've gone through all of

3    this.

4    Q.    And do you still experience it?

5    A.    Yes, it is so painful.

6    Q.    Who is Dr. Charity Hill?

7    A.    She was a physician that I saw for my chronic pelvic

8    pain.

9    Q.    And who is Dr. Rebecca Aronson?

10   A.    She is another provider that I saw for my chronic pelvic

11   pain.

12            MS. REWARI:  Objection, Your Honor.  Medical

13   diagnoses.  I think she can talk about --

14            MR. BRENNER:  I'll rephrase, Your Honor.

15            THE COURT:  Rephrase, please.

16   BY MR. BRENNER:

17   Q.    Based on your understanding, what were you seeing

18   Dr. Aronson for?

19   A.    Sorry.  My understanding was for my chronic pelvic pain.

20   That's what I was going to her for, complaining about.

21            THE COURT:  Ladies and gentlemen of the jury, just

22   so that we're clear, this particular witness cannot provide

23   any medical diagnosis, cannot state what was the cause of any

24   particular thing.  She can only state as to what she was

25   understanding her treatment to address.  That way we can avoid

─────────B.R. v. F.C.S.B.─────────

38

1  some of the objections in the interchange that we're having as

2  far as what she can and cannot testify to.

3          So essentially what this witness is testifying to is

4  her understanding of her treatment plan.

5          MR. BRENNER:  Thank you, Your Honor.

6  BY MR. BRENNER:

7  Q.   Did we do Dr. Sarah Cigna?

8  A.   I don't believe we have, no.

9  Q.   Who is Dr. Sarah Cigna?

10 A.   She is an OB-GYN that I had been seeing.  I went to her

11 because of some pelvic pain that I was dealing with.

12 Q.   Who is --

13 A.   And can I add to that?  I'm sorry.

14         And also -- I don't know if I can say this, but my

15 understanding was I --

16         THE COURT:  Before you say that --

17         THE WITNESS:  Sorry.

18         THE COURT:  -- you kind of flagged something for me.

19 So I think she --

20         MR. BRENNER:  It was subtle, Judge.

21         THE COURT:  It was very subtle.  Why don't you

22 approach here, Mr. Brenner, and see what she wants to

23 volunteer and then you can assess it.

24         MR. BRENNER:  May I?

25         THE COURT:  You may.

─────────────────── B.R. v. F.C.S.B. ───────────────────

39

1          (Counsel confers.)

2          MR. BRENNER:  Let me just ask the question.

3   BY MR. BRENNER:

4   Q.   Were you about to tell the jury an additional thing based

5   on your understanding you were seeing Dr. Cigna for?

6   A.   Yes.

7   Q.   And what was that?

8   A.   Endometriosis.

9   Q.   Okay.  I think we're on to Kristie Trahan.  Who is that?

10  A.   Kristie Trahan is my current therapist that I see.

11  Q.   I think -- hope the jury will hear from Kristie Trahan,

12  so we'll let her explain what she does with you, okay?

13  A.   That sounds good.

14  Q.   What is The Dorm?

15  A.   It was an intensive outpatient program that I went to

16  during the summer of 2023.

17  Q.   So less than a year ago?

18  A.   Yes.

19  Q.   And how long were you at The Dorm?

20  A.   I would say maybe sixish, seven weeks.  I'm not

21  100 percent sure.

22  Q.   And what was your understanding of why -- what you were

23  being treated for at The Dorm?

24  A.   My understanding was due to my posttraumatic stress

25  disorder.

                                                                        Direct - B.R.

                          ─B.R. v. F.C.S.B.─
                                                                        40

1   Q.   Now, we talked -- we skipped over one but just remind the

2   jury, in the middle of all of this was also your -- was your

3   two stays at Sabino out in Arizona?

4   A.   Yes, I went to residential treatment as well.

5   Q.   Okay.  And what was your understanding of what you were

6   being treated for there?

7   A.   My understanding of what I was being treated for was my

8   posttraumatic stress disorder and issues relating to that I

9   was having.

10  Q.   The Dorm, is it -- inpatient or outpatient?

11  A.   It was an intensive outpatient program.

12  Q.   Same thing, five days a week?

13  A.   I don't recall -- I don't know if it was five days a

14  week, but it was multiple -- I think it was at least three or

15  four times a week.

16  Q.   And when you would go, is it a relatively all day --

17  A.   Yes.

18  Q.   Where is The Dorm?

19  A.   It's in D.C.

20  Q.   Okay.  Okay.  So we're almost done.  We're going to move

21  on to just one more topic, okay?

22  A.   Okay.

23  Q.   We talked a little bit about, you referred to someone as

24  your partner.  You said his name was Andrew.  Are you engaged

25  to be married to Andrew?

                                      ─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
                          EASTERN DISTRICT OF VIRGINIA

Direct - B.R.

———B.R. v. F.C.S.B.———

41

1   A.   I am engaged to Andrew.  He's wonderful.

2   Q.   So let's before -- I want to just talk really briefly

3   about a prior relationship.  Who is -- who is Ari -- I'll call

4   him Ari B.?

5   A.   Ari, he is my ex.  We started dating when I was in

6   college.

7   Q.   And how long did you date Ari for?

8   A.   A few years.

9   Q.   And when did you meet Andrew?

10  A.   I met Andrew in 2021.

11  Q.   And how did you meet Andrew?

12  A.   Andrew and I have a modern-day romance of meeting on a

13  dating app.

14  Q.   Okay.  Just really briefly describe for the jury your

15  relationship with Andrew?

16  A.   I love Andrew.  He's wonderful.  He's incredibly

17  supportive of me.  We have a wonderful relationship.  He is

18  how I survive.  I don't know how I would do it without him,

19  but my condition does make our relationship hard at times.

20          I do worry that one day he'll get sick of my

21  condition or get sick of me, and that is constantly a stress

22  that I have, but yeah.

23  Q.   Okay.  And hopefully the jury will get a chance to hear

24  from him, so we'll ask him.

25          Let's talk about you and your future a little bit.

B.R. v. F.C.S.B.

42

1  Have you thought about your future in the sense of wanting to

2  have kids and a family?

3  A.    Yes, I have.

4  Q.    And just tell the jury what that thought process has been

5  for you.

6  A.    I would love to get married, and I would love to have

7  children, but I have a lot of fears surrounding it.

8  Q.    What are those fears?

9  A.    I have fears that I won't be able to have children.  I

10  have fears of bringing children into this world with what I've

11  gone through.  Every little thing that you can imagine, I

12  don't know what to do with them about going to school.  That

13  scares me.

14  Q.    As far as how you feel, meaning pain and -- just tell the

15  jury currently what is a day in the life like for B████.

16  A.    I have severe physical pain.  It is debilitating.

17  Oftentimes I'm in tears.  It's hard to move.  I often need to

18  lay down.  I feel exhausted moving.  There's a lot of tension

19  that I hold in my neck and my body.  My pelvic pain, it just

20  hurts a lot.  Honestly, there are sometimes I don't even want

21  to live because of the pain that I have in my body.

22          MR. BRENNER:  May I have a moment, Your Honor?

23          THE COURT:  Yes.

24          (Counsel confers.)

25  BY MR. BRENNER:

─B.R. v. F.C.S.B.─

43

 1   Q.   So one last question.  You had -- I think you testified

 2   previously that other than those -- some of those internships

 3   and the brief job you had at Sidley Austin (ph), you don't

 4   currently hold a job, right?

 5   A.   No, I don't.

 6   Q.   And from your perception, why are you -- from your

 7   perception, is it because you're unwilling to work or because

 8   you're unable to work?

 9   A.   I'm not unwilling.  I want to, but I'm unable.

10   Q.   And why are you unable to work?

11   A.   Because -- I'm capable of getting a job, the problem is

12   keeping it.  There are some triggers that will happen that I

13   then can't work.  Like it can be the littlest thing that

14   occurs, and then I'm afraid to go to work.  I can't go to

15   work.  I panic.  I'm afraid I will have a panic attack.  I'm

16   afraid to socialize at times.  At times I don't want to talk.

17   It just becomes overwhelming to me to work, but I want to more

18   than anything.  I want to function.

19   Q.   And as far as the time spent, you told us how often you

20   go to doctors.

21         How many hours a week do you go either sitting in

22   doctors' offices or going back and forth or sitting on virtual

23   doctors' appointments?

24   A.   It really depends on the time or the week.  I can say

25   before the trial started, for example, the week before I went

B.R. v. F.C.S.B.

44

1   for about maybe 15 hours.

2           MR. BRENNER:  Thank you, B████.  The attorneys for

3   the School Board, I think, will question you next.

4           THE WITNESS:  Thank you.

5           THE COURT:  Thank you.  All right.  Let's go ahead

6   and take a ten-minute break and come back in at five after

7   10:00.  You can step down.

8           (Recess.)

9           (Court proceedings resumed at 10:12 a.m.)

10          THE COURT:  Ready to bring the jury in.

11          MR. BRENNER:  Your Honor, at times, if I can move

12  back a little bit so I can see the witness?

13          THE COURT:  Sure.  If you want to switch places with

14  some of the people in the back, that's fine, you can do that.

15          The only variable in this is that you're still

16  responsible for the objections.

17          MR. BRENNER:  Yes.  I will try to get the microphone

18  closer to me.

19          (Discussion off the record.)

20          MS. REWARI:  Your Honor, when the jury comes in

21  before I start, I just want to make sure that everyone can

22  hear me, if that's okay.

23          THE COURT:  I'll give you a thumbs up.  I'll look at

24  the jury and I'll do this, and I'll give you a thumbs up.

25          MS. REWARI:  Thank you.

────B.R. v. F.C.S.B.────

45

1          THE COURT:  All right, Ms. Tinsley.

2          (Jury present.)

3          THE COURT:  You may be seated.  Thank you.

4          All right, ladies and gentlemen, we're going to

5    begin the cross-examination of B.R.  As you are aware, each

6    one of the attorneys representing different people who are the

7    defendants in this action will have the opportunity to

8    cross-examine her.

9          If you have any hard time hearing the lawyers or

10   hearing the answers to the questions, just simply give me the

11   sign and I'll get them to bump it up a bit.

12          Ms. Rewari.

13          MS. REWARI:  Thank you.

14                    CROSS-EXAMINATION

15   BY MS. REWARI:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   My name is Sona Rewari, and I represent the Fairfax

19   County School Board.  We've met before?

20   A.   Several times, yes.

21   Q.   Okay.  And I understand that Mr. Brenner has been

22   addressing you by your first name.  I know you by your

23   initials, and so I'm going to use your initials this morning

24   if that's okay with you.

25   A.   That's fine.

─────────B.R. v. F.C.S.B.─────────

46

1   Q.   Okay.  And, you know, if I trip up and use your name, I'm

2   not intentionally trying to --

3   A.   No worries.  Whatever works.

4   Q.   Okay.  Thank you.  You know, I just don't want to be

5   rude.

6   A.   I appreciate that.  Thank you.

7   Q.   Ms. R., your attorney talked to you about some mental

8   conditions that you have, right?

9   A.   Yes, ma'am.

10  Q.   Okay.  Your mental conditions don't cause your mind to

11  create false memory, though, right?

12  A.   They do not cause me to create false memories at all.

13  Q.   And you've never had the experience of recalling

14  something and then later learning that it did not happen?

15  A.   I'm sorry, could you please restate that question?

16  Q.   Sure.  You've never had the experience of recalling

17  something, and then later learning that it did not happen?

18  A.   No.

19  Q.   And when you were in 7th grade, you did not have any

20  problems with your memory, right?

21  A.   I did not have any problems, no.

22  Q.   The allegations that you've made in this action were all

23  things that you recalled in 2012, right?

24  A.   Yes, ma'am.

25  Q.   Okay.  And you have not repressed any memories of these

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Direct - B.R.

B.R. v. F.C.S.B.

47

 1   events, have you?

 2   A.   I have not repressed memories.

 3   Q.   In fact, you've told us that your memories of these

 4   events are so vivid that you wish you had memory loss, right?

 5   A.   I wish I had memory loss.

 6   Q.   I'd like to first start by talking about the statement

 7   that you wrote for the school on November 21, 2011, okay?  And

 8   you have a binder up there.  We're going to show the exhibits

 9   that are admitted on the screen, but I know you prefer the

10   binder, so --

11   A.   Thank you.  I appreciate that.

12   Q.   And there is a white binder for the plaintiff's exhibits,

13   and there's a black binder for the exhibits that are

14   defendants' exhibits.

15   A.   I only have this one.  Is this the right one?

16   Q.   There's two.  So there's a white one there, okay, and so

17   some of them are plaintiff's exhibits and some of them are

18   defendants' -- I'll tell you which binder, okay?

19   A.   Okay.

20   Q.   So in the white binder, if you can take a look at

21   Exhibit 77.

22        MS. REWARI:  And, Your Honor, I believe this is

23   admitted into evidence.  If I may publish it.

24        THE COURT:  You may.

25   BY MS. REWARI:

B.R. v. F.C.S.B.

48

1   Q.   And this is the statement that you wrote in the alcove

2   outside Ms. T███████ office?

3   A.   That's correct.

4   Q.   Okay.  And you don't recall that anyone was with you when

5   you wrote this statement?

6   A.   No one was with me.

7   Q.   And so, all the words here are yours, right?

8   A.   Yes, ma'am.

9   Q.   And in the fifth line there you say, "They give me

10  seductive looks."  That was your phrase?

11  A.   Yes, ma'am.

12  Q.   Okay.  The chart on the second page of this document,

13  that's also something you drew?

14  A.   Yes.

15  Q.   Okay.  And the names that you put there were all names

16  that you chose to write down?

17  A.   Yes.

18  Q.   Now, in this statement, you did not describe being

19  touched by anyone, right?

20  A.   I would need to go back and look at it.

21  Q.   Sure.

22  A.   No, I didn't say that they are touching me.  I say they

23  come very close to me.

24  Q.   Okay.  Now, when you were talking about this statement

25  with your lawyer yesterday, you said that your mom did the

─────B.R. v. F.C.S.B.─────

49

1   talking in this meeting?

2   A.    If I recall correctly, what I said, I said both of us

3   did, both of us reported it.

4   Q.    And then you said that you orally described in this

5   meeting that you were being touched up and down?

6   A.    I said that I was being touched by my locker underneath

7   my blouse and in my pants.

8   Q.    And you've said that you actually said -- you claim that

9   you said in this meeting that your genitalia were being

10  touched, right?

11  A.    I said that I pointed to where I was being touched, and I

12  said I was being touched underneath my blouse and underneath

13  my pants, so, yes.

14  Q.    You actually said that you stated in this meeting that

15  your genitalia were being touched, right?

16  A.    I don't recall if I actually said that, but I gestured to

17  where I was being touched, and also my mom spoke about this

18  too.

19          MS. REWARI:  Okay.  May I approach the witness, Your

20  Honor?

21          THE COURT:  You may.

22          MS. REWARI:  Thank you.

23          THE WITNESS:  Thank you.

24          MS. REWARI:  Sure.

25  BY MS. REWARI:

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Direct - B.R.
——B.R. v. F.C.S.B.——

50

1  Q.   Now, you gave a deposition in this case, right?

2  A.   Yes, twice, for 14 hours.

3  Q.   And you were represented by lawyers at that deposition?

4  A.   I was, ma'am.

5  Q.   And there was a court reporter there?

6  A.   Yes, ma'am.

7  Q.   And there was a videographer there too, right?

8  A.   That's correct.

9  Q.   And I was there?

10  A.   You were there, yes.

11  Q.   And I asked you some questions?

12  A.   I do remember that, yes.

13  Q.   And you gave me some answers, right?

14  A.   I gave a lot of answers I recall that day, yes.

15  Q.   And the court reporter took down what you said?

16  A.   Yes.

17  Q.   And the videographer recorded what you said, right?

18  A.   That's correct.

19  Q.   And you took an oath at that deposition?

20  A.   I did, ma'am, yes.

21  Q.   And you swore to tell the truth?

22  A.   Yes.

23  Q.   And you did tell the truth?

24  A.   I did tell the truth, to the best of my ability, yes.

25  Q.   And after the deposition was over, did you have a chance

─────── B.R. v. F.C.S.B. ───────

51

1   to read the transcript?

2   A.   I did when I got it from my lawyers.

3   Q.   And so you had a chance to make sure it was accurate?

4   A.   I did, yes.

5   Q.   Okay.  Would you please take a look at the transcript

6   that I just handed you on page 14, and please take a look at

7   line 15.

8               MR. BRENNER:  Which volume is it?

9               MS. REWARI:  Volume II.

10              MR. BRENNER:  And say the page again, please.

11              MS. REWARI:  Page 14.

12              THE WITNESS:  Is it just the 14, this one?  Yeah?

13  BY MS. REWARI:

14  Q.   Yeah.  There's numbers in the corners.

15  A.   Okay.

16  Q.   It's four to a page.  All right.  So you see --

17  A.   Okay.

18  Q.   -- at the top there's a number in the corner of each?

19  A.   Yeah.

20  Q.   So if you go to page 14.  And please take a look at

21  line 15.

22  A.   Yes, ma'am.

23  Q.   Okay.  And I'm going to have Mr. Brady play the clip.

24              MR. BRENNER:  Your Honor, the rules -- I don't --

25  can I inquire what counsel is intending to read from?  It's

─B.R. v. F.C.S.B.─

52

1   the rule of completeness, I believe.  I don't know what she's

2   intending, but there are two questions that give context to

3   it.

4           MS. REWARI:  You were asked, "What touching did you

5   describe in this meeting?"  Right?

6           THE WITNESS:  That's correct.

7   BY MS. REWARI:

8   Q.   And you described -- you answered that -- what you

9   described in this meeting included telling the school that

10  your genitalia were being touched?

11  A.   That's correct.  If you are being touched on your breasts

12  and if you're being touched on your butt and you're touched in

13  your front area, that is being touched in your genitalia.  But

14  I'm also a 24-year-old woman now, so I'm explaining it in a

15  24-year-old woman's voice.

16  Q.   Okay.  And so you didn't use the word "genitalia" when

17  you were --

18  A.   No, I don't think I used the word "genitalia" when I was

19  12 years old.  I don't recall that being the case.

20  Q.   All right.  Your mom was also in this meeting with the

21  school, right?

22  A.   That's correct.

23  Q.   And was your dad also in the meeting?

24  A.   I believe my dad was there, yes.

25  Q.   And they were present when you told the school verbally

B.R. v. F.C.S.B.

53

1  in the meeting what you say you said?

2  A.   Yes, they were.

3  Q.   Okay.  And even before this meeting you had told your mom

4  what was happening to you at school, right?

5  A.   Could you please clarify that question?

6  Q.   Even before you came to the school on November 21st,

7  2011, with your mother and your father, you had told your

8  mother what was happening to you at school?

9  A.   I had told my mom about -- well, she was the one that

10  came to me about the voicemail and I had told her about the

11  threats that I had been getting, that I had to give C██████

12  $50 because he was threatening me.

13       I had told my mom that I had been being touched by

14  my locker.  I had told my mom about the sexual slurs that were

15  occurring.  So in that context, yes, I did tell my mom.

16  Q.   Well, you told the jury yesterday that your mother knew

17  before she came in for this meeting that you were being

18  touched all over your body, right?

19  A.   Yes, and that's what she did report, yes, that's correct.

20  Q.   All right.  And you also said that your mother knew that

21  C.K. had stolen $50 from you at knifepoint, right?

22  A.   I don't recall if I said knifepoint to my mom, but I said

23  that C██████ was threatening me.

24  Q.   Okay.  And when did you tell your mother about the knife?

25  A.   I'm not sure when I told my mom about the knife exactly.

────B.R. v. F.C.S.B.────

54

1   I don't know when I told her at that point, but I was scared

2   of C███████.

3   Q.   So according to your testimony, what you described to

4   your mom before the meeting were multiple sexual assaults,

5   right?

6   A.   Yes, ma'am.

7   Q.   Okay.  And being robbed maybe at knifepoint?

8           MR. BRENNER:  Objection, asked and answered.

9           THE COURT:  Rephrase.

10  BY MS. REWARI:

11  Q.   Before the meeting, you had told your mom that you had

12  been robbed of $50 by threat, right?

13  A.   Yes.

14  Q.   Okay.  And you told your mom that you were being sexually

15  assaulted, right?

16  A.   I told my mom that I was being non-consensually touched

17  at my locker, yes.

18  Q.   Well, all over your body, right?

19  A.   That's correct, ma'am, yes.

20  Q.   And you would agree that being touched all over your body

21  without consent, having your genitalia touched, is a sexual

22  assault, right?

23  A.   Yes, that's what we were reporting to the school.  That's

24  correct, yes, ma'am.

25  Q.   All right.  Now, you were not at school when C.K. asked

─────────── B.R. v. F.C.S.B. ───────────
55

1   you for $50, right?

2   A.   That's correct.

3   Q.   You were in your neighborhood?

4   A.   I was at my bus stop, yes.

5   Q.   Okay.  And then when you gave him the $50, that was on a

6   different day, right?

7   A.   When he forced me to give him $50, that was -- if I

8   understand your question, it was on a different day.  I think

9   I understand your question, I'm not sure, but --

10  Q.   Well, so he asked you on one day for $50, right?

11  A.   Yes.  When he raped me, yes.

12  Q.   Okay.  And then you brought the $50 on a different day,

13  correct?

14  A.   That's correct, yes, ma'am.

15  Q.   You didn't have the $50 on you when you gave it to him?

16  A.   That's correct, yes.

17  Q.   And both the demand for the $50 and the delivery of the

18  $50 occurred in your neighborhood, right?

19  A.   Yes.

20  Q.   And your bus stop is less than a half mile from your

21  house?

22  A.   I don't know how far, but a few blocks from my house.

23  Q.   About a five-minute walk?

24  A.   More or less.

25  Q.   And this robbery of the $50 occurred in early November,

B.R. v. F.C.S.B.

56

1    right?

2    A.   I believe so.  I'm not 100 percent on the time frame, but

3    some time around then.

4    Q.   Okay.  And the meeting with the school is November 21st?

5    A.   That's correct.

6    Q.   Okay.  And so, your mom does not report to the police

7    that you've been robbed in your neighborhood, right?

8              MR. BRENNER:  Objection, Your Honor.  May we

9    approach?

10             THE COURT:  Overruled.

11             THE WITNESS:  I mean, the SRO was there.  He's a

12   school police officer, so my mom is telling the school.  The

13   school police officer is there.  I mean, I don't know if

14   that -- how that counts or what, but yeah.

15   BY MS. REWARI:

16   Q.   Okay.  But she came to the school to report whatever it

17   was that you had -- that you and she were discussing, right?

18   A.   That's correct, ma'am, yes.

19   Q.   And one of the first people that she met in the school

20   was a uniformed police officer?

21   A.   Yes, ma'am.

22   Q.   He doesn't work for the school system, right?

23   A.   I don't know if -- I don't know how that works, but he's

24   an SRO is my understanding.

25   Q.   He wears a full police uniform, right?

Direct - B.R.
B.R. v. F.C.S.B.

57

1    A.    I think so, yes.

2    Q.    Carries a gun?

3    A.    That's correct, ma'am.

4    Q.    Okay.  And that's Officer Genus, right?

5    A.    Yes, ma'am.

6    Q.    Okay.  And he's brought into the meeting?

7    A.    At some point, yes, he is brought into the meeting.

8    Q.    By Ms. H███████, right?

9    A.    Yes, that's correct.

10   Q.    Okay.  And it was her decision based on what -- what your

11   mom was reporting, that this was something that needed Officer

12   Genus's involvement, right?

13   A.    I think so.

14   Q.    Okay.  And so he's brought into the meeting and the

15   discussion is about the voicemail, right?

16   A.    At that time I recall that my mom was trying to retrieve

17   the voicemail she had showed them.  She had told both of them

18   by whispering into his and her ear about what was said on the

19   voicemail.

20   Q.    Okay.  The police department has provided responses to a

21   subpoena in this case, right?

22   A.    I guess so.

23              MR. BRENNER:  Objection, Your Honor.

24              THE COURT:  Careful here, Ms. Rewari.

25   BY MS. REWARI:

─────B.R. v. F.C.S.B.─────

58

1  Q.   Okay.  Well, your mom, to your knowledge, did not make a

2  police report about C.K. stealing $50 from you, right?

3  A.   So, you know, I don't know how this works, but my mom

4  reported it to people at the school.  C███████ was a student

5  at the school.  I don't know how that works.  I'm not sure how

6  to answer that question.

7  Q.   Okay.  And your mom did not make a police report about

8  anyone touching your genitalia, right?

9  A.   She reported it to the school.  I don't know -- I don't

10 know how that works.

11 Q.   Now, Officer Genus did not come with you when you went

12 upstairs to Ms. T██████ office, right?

13 A.   That's correct.

14 Q.   And Ms. T████ was brought into the building -- excuse

15 me -- brought into the meeting by someone other than your

16 mother, right?

17 A.   I believe so.

18 Q.   Okay.  And Mr. H█████ joined the meeting because of a

19 request by someone other than your mother, right?

20 A.   I believe so.  That's a question better for my mom, but I

21 believe so.

22 Q.   And those are two administrators, correct?

23 A.   That's correct, ma'am.

24 Q.   Two of the three assistant principals at the school?

25 A.   Yeah.

Direct - B.R.

B.R. v. F.C.S.B.

59

1   Q.   Okay.  And, now, you were not in the room when your mom

2   was talking to them?

3   A.   I was kind of in the doorframe of the office, if that

4   makes sense.

5   Q.   And so, you had a chance to write in your statement what

6   was going on, correct?

7   A.   So now I'm a little bit confused because I feel like

8   you're jumping ahead.  I thought we were talking about Officer

9   Genus being there with Ms. H███████.  And I wrote the

10  statement later on, so I'm a little bit confused about the

11  question.

12  Q.   Yeah.  I don't want you to be confused.

13  A.   Sorry.

14  Q.   Yeah, no, that's fine.  It's fine.  I just want to be

15  clear.

16           So the meeting with Officer Genus and

17  Ms. H██████ -- was Mr. H█████ on the first floor?

18  A.   I believe that Mr. H█████ was on the first floor, yes.

19  Q.   And this is in the office, when you walk into the school,

20  door one, right?  Office is on the right?

21  A.   I believe so.

22  Q.   Okay.  And that's where the guidance counselors' offices

23  are, right?

24  A.   Yes.

25  Q.   Okay.  And that's where the principals' office is?

─────B.R. v. F.C.S.B.─────

60

1   A.    Yes.

2   Q.    Okay.  But not all the assistant principals had their

3   offices there?

4   A.    That's correct, yes.

5   Q.    Only one assistant principal?

6   A.    I don't recall.  I'm not 100 percent sure about that.

7   Q.    All right.  And so, Ms. T█████ does not have her office

8   there?

9   A.    That's correct.

10  Q.    Okay.  And so, first you meet with Ms. H███████ and then

11  she brings in Officer Genus, into the meeting, right?

12  A.    Correct.

13  Q.    At some point Mr. H██████ joined the meeting?

14  A.    That's correct, yes.

15  Q.    And then, at some point Ms. T█████ joined the meeting?

16  A.    That's correct.

17  Q.    Okay.  And then I believe, with Mr. Brenner, you said the

18  group went upstairs to Ms. T██████ office?

19  A.    Yes.

20  Q.    Minus the officer.  Officer Genus did not go upstairs,

21  right?

22  A.    That's correct, yes.

23  Q.    And so, when you get upstairs, that's when you write your

24  statement?

25  A.    So I sat in the meeting with my mom, my dad, Mr. H██████,

─B.R. v. F.C.S.B.─

61

1    Ms. T████, Ms. H██████ first, and then later on in the course

2    of that meeting I sat in the alcove area to write the

3    statement.

4    Q.   Okay.  I appreciate that clarification.  Thank you.

5            So then when you sat in the alcove and wrote the

6    statement, nobody was telling you what you needed to write or

7    not write in that, right?

8    A.   That's correct.

9    Q.   Okay.  And if we could look at Exhibit 77 again, there's

10   nothing in there about $50, is --

11   A.   If that's the statement, I'm sorry, I have not -- can

12   I --

13   Q.   Yes.  I'm sorry.  It's on the screen.  It's the one you

14   were just looking at, Exhibit --

15            THE COURT:  She's going to look at the hard copy.

16            THE WITNESS:  Put this down?

17            MS. REWARI:  Sure, yes, that's fine.

18            THE WITNESS:  Sorry, I just have a few notebooks.

19   Sorry.  Okay.

20   BY MS. REWARI:

21   Q.   In the white binder, go to Exhibit 77.

22   A.   Okay.

23   Q.   There's nothing about $50 in this statement either,

24   right?

25   A.   Yeah, you're right, there's nothing about $50, but that

—B.R. v. F.C.S.B.—

 1  was verbally said.

 2  Q.   And there's nothing about him threatening you in there

 3  either, right, C.K. threatening you?

 4  A.   That's not what I wrote in the statement, but I did,

 5  again, say that.

 6  Q.   Okay.  Now, this was the Monday before Thanksgiving,

 7  correct?

 8  A.   I believe so, yes.

 9  Q.   Okay.  And your mom sent an email to the school right

10  after this meeting, correct?

11  A.   I'm not sure what email my mom sent.  I don't know.

12  Q.   Would you please turn to Exhibit 79 in that white binder

13  that you're in.

14           MS. REWARI:  Your Honor, this has also been admitted

15  into evidence?

16           THE COURT:  Yes, ma'am.

17           THE WITNESS:  I don't see -- in the white binder?

18  BY MS. REWARI:

19  Q.   Yes.

20           MR. BRENNER:  It's not in mine either.  She might

21  not have it because I don't have it.

22           (Counsel confers.)

23           THE COURT:  Why don't you do this.  If you've got

24  the exhibit, have another copy of it, just hand it to her and

25  she can make reference to that directly.

B.R. v. F.C.S.B.

63

1          MS. REWARI:  I can give her my copy.

2          THE COURT:  Ms. Tinsley.

3          THE WITNESS:  Thank you.

4   BY MS. REWARI:

5   Q.   So this is an email from your mother dated November 21st,

6   2011, right?

7   A.   That's what it says, yes.

8   Q.   And it's 2:47 p.m.?

9   A.   Okay.

10  Q.   And school dismissal is around 2:50, right?

11  A.   I don't recall exactly, but that sounds right.

12  Q.   Okay.  And she's writing to Ms. T████, Ms. H██████, and

13  Mr. H█████.  Do you see that?

14  A.   I do, yes.

15  Q.   And the subject line of this email is "Thank you," right?

16  A.   That sounds right, yeah.

17  Q.   And she sent this email the same afternoon before the end

18  of the school day, right?

19  A.   It appears to say that, yes.

20  Q.   And she did not describe any touching in this statement?

21          MR. BRENNER:  Your Honor --

22  BY MS. REWARI:

23  Q.   Excuse me, in this email, right?

24          MR. BRENNER:  -- just a lack of foundation.

25          THE COURT:  It is in evidence and it's subject to

─────B.R. v. F.C.S.B.─────
64

1    reasonable cross.  Overruled.

2    BY MS. REWARI:

3    Q.    Please go ahead and take a moment to read it if you need

4    to.

5    A.    I mean, I can't speak on behalf of my mom, but my mom and

6    I described this in the meeting to them.  I think sexual

7    harassment encompasses that, but --

8    Q.    Your mom has two degrees from Columbia University, right?

9    A.    She's a very smart woman, yes, ma'am.

10   Q.    She has a master's degree in communications with an

11   emphasis in journalism, right?

12   A.    That's correct, ma'am, yes.

13   Q.    And she had worked as the corporate communications for a

14   number of companies before 2011?

15   A.    I guess so, yes, it's my understanding.

16   Q.    Okay.  And you went to classes for the rest of the day on

17   November 21st, 2011, right?

18   A.    I believe so, yes.

19   Q.    And you don't recall anything that happened at school

20   that day after that meeting that was problematic for you,

21   right?

22   A.    There was things that was problematic that happened on

23   that day.

24   Q.    Okay.  So last summer when I took your deposition, you

25   didn't recall anything that happened at school that day that

Direct - B.R.

B.R. v. F.C.S.B.

65

1   was problematic for you, correct?

2   A.   I'm not sure.  I would have to reread what I said.

3   Q.   Why don't you take a look at -- go back to that

4   deposition transcript.  And please take a look at page 36.

5              MR. BRENNER:  Which volume?

6              MS. REWARI:  We're still on Volume 2.

7              MR. BRENNER:  36?

8              MS. REWARI:  Yes, page 36, line 18.

9              THE WITNESS:  Okay.  I'm actually not sure if this

10  is the right -- it says 36 in the corner of it, but is the

11  page number on top?

12             MS. REWARI:  May I show her?

13             THE WITNESS:  Sorry.

14             MS. REWARI:  No problem.

15             THE WITNESS:  Got it.  Thank you.

16  BY MS. REWARI:

17  Q.   So if you would please take a look at page/line 36/18,

18  and if you could read to 38/7.

19  A.   I'm sorry, could -- sorry, could you repeat that?  I'm

20  sorry, this is a little bit hard for me to read.  Where did

21  you want me to start?

22  Q.   Well, I'm directing you to start at page 36, line 18 --

23  A.   Okay.

24  Q.   -- just for context.  And --

25             THE COURT:  It's a deposition.  You can read it into

─────────── B.R. v. F.C.S.B. ───────────
66

1   the record and just ask her a question.

2           MS. REWARI:  Okay.  Thank you.

3   BY MS. REWARI:

4   Q.   "QUESTION:  Do you recall if anything else happened at

5   school that day that was problematic for you?

6           "ANSWER:  I don't recall."

7           MR. BRENNER:  Your Honor, there's -- in the rule of

8   completeness, it actually starts where Ms. Rewari said she was

9   going to start, which is line 36.

10          MS. REWARI:  I'm happy to --

11          MR. BRENNER:  Page 36, line 18.

12          THE COURT:  Start from there.

13          MS. REWARI:  I'm happy to read the whole thing.  We

14  can play the clip.

15          THE COURT:  Just read it.

16          MS. REWARI:  Just read it?  All right.

17          THE COURT:  Yes.

18  BY MS. REWARI:

19  Q.   "QUESTION:  Okay.  So did anything else happen on

20  November 21st, 2011, regarding the report you made?

21          "ANSWER:  I mean, can you clarify that question a

22  little bit more?

23          "QUESTION:  So who did you give the statement to?

24          "ANSWER:  I don't really recall giving a statement.  I

25  was told like -- told just to write the statement and leave it

─────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────
EASTERN DISTRICT OF VIRGINIA

1    in the alcove.

2         "QUESTION:  Okay.

3         "ANSWER:  But no one reviewed it with me.

4         "QUESTION:  Okay.  And so then what happened?  Once

5    you were finished writing the statement, what happened?

6         "ANSWER:  I recall going back in the meeting with my

7    mom and dad and Ms. S.T. and Mr. H█████ and Ms. H█████.

8         "QUESTION:  And then did you go to classes that day?

9         "ANSWER:  To the best of my recollection, I think I

10   did, but -- I think I did.  I think I had something at school

11   that day that I needed to do or something, but I'm not

12   100 percent sure.  I think I did.

13        "QUESTION:  Do you recall how you got home that day?

14        "ANSWER:  I don't recall that.

15        "QUESTION:  Okay.  Do you recall if anything else

16   happened at school that day that was problematic for you?

17        "ANSWER:  I don't recall."

18        MR. BRENNER:  The answer continues.

19        THE COURT:  You can do that on redirect.

20        MR. BRENNER:  It's not another question.  It's in

21   the middle of an answer.

22        THE COURT:  Read the whole answer.

23        MR. BRENNER:  It's 10 through 13.

24        MS. REWARI:  I -- there's one line.

25        (Counsel confers.)

1    BY MS. REWARI:

2    Q.   All right.  There's an objection, and then the witness

3    says "I'm sorry" to her attorney.

4         "ANSWER:  I don't -- I don't recall at this second.

5    That being said, if something comes to me, I'm happy to tell

6    you.  It's just a lot for me to think of at once."

7         All right.  After you got home from school that day,

8    your mom sent a second email to the school, right?

9    A.   I don't know what my mom sent.  I'm not my mom.

10   Q.   Okay.  If you could -- in the white binder, if you could

11   take a look at Exhibit 80 in the white binder.

12   A.   You said 80?

13   Q.   Yes.

14   A.   Okay.

15        MS. REWARI:  And, Your Honor, I believe this is in

16   evidence as well?

17        THE COURT:  Yes, ma'am.

18        MS. REWARI:  Okay.  If we can publish it.  And,

19   Grady, if you can focus in on the bottom email.

20        THE COURT:  It is not in.  Take it down.

21        MS. REWARI:  Take it down, please.

22        THE COURT:  What exhibit number is it?

23        MS. REWARI:  It is Plaintiff's 80.

24        THE COURT:  It doesn't show as in evidence.

25        MS. REWARI:  It might have been one of the

B.R. v. F.C.S.B.

69

1   stipulated exhibits.

2          MR. BRENNER:  Your Honor, for the record, we don't

3   object to this exhibit.  We -- I think she needs -- I think

4   foundation needs to be laid to see whether this witness has

5   ever seen this evidence.  I don't think it's in evidence yet.

6          THE COURT:  If you can, go ahead and lay a

7   foundation.

8          MS. REWARI:  Your Honor, this is an exhibit that

9   that's been proposed for their stipulation, to which we've

10  agreed.  So we have been allowing witnesses to talk about

11  stipulated exhibits on which they weren't --

12         THE COURT:  We're getting into too many things that

13  were discussions as part of a bench conference.  There's a --

14  shall we say a disagreement as to the significance of things

15  that have been stipulated and their potential admissibility.

16         So I think you all need to at some point come to an

17  agreement as to what the stipulations mean.  So for purposes

18  of what we need to do right now, just go ahead, if you can,

19  and lay a foundation, and then we can readdress this later,

20  but, you know, I will simply say for the benefit of all

21  counsel that what's good for one side is good for another.  So

22  let's do the best we can.

23  BY MS. REWARI:

24  Q.  Your mom emailed to the school on your behalf when you

25  were in 7th grade, right?

—B.R. v. F.C.S.B.—

70

1   A.   Yes, ma'am, my mom did that.

2   Q.   Okay.  And now that you're the plaintiff in this lawsuit,

3   you've looked at the emails she sent on your behalf, right?

4   A.   I have not looked at all of them, no.

5   Q.   Okay.  But you have reviewed evidence in this case,

6   right?

7   A.   I've reviewed some evidence in this case.

8   Q.   All right.  Have you seen -- you haven't read the email

9   that's Exhibit 80?

10  A.   It's possible.  I just don't have a vivid recollection of

11  it.

12  Q.   All right.

13          MR. BRENNER:  Again, Your Honor, we're not objecting

14  to the admission of the exhibit.

15          THE COURT:  Very good.

16          MS. REWARI:  May I publish it?

17          THE COURT:  You may.

18          MS. REWARI:  Thank you.

19  (Defendants' moved Plaintiff's Exhibit No. 80, was admitted

20  into evidence.)

21  BY MS. REWARI:

22  Q.   Please let me know when you're finished reading it.  I

23  don't want to interrupt you.

24  A.   Thank you.  (Reviewing document.)  Okay.

25  Q.   And so this is a second email from your mother to the

─B.R. v. F.C.S.B.─

71

1    school dated November 21st, 2011, right?

2    A.   Yes.

3    Q.   And the time on this is 4:19 p.m., correct?

4    A.   Yes.

5    Q.   And this is about an hour-and-a-half after the email that

6    we just looked at in Exhibit 79, right?

7    A.   That appears to be the case, yes.

8    Q.   Okay.  And again, she's sending this email to Ms. T██████,

9    Ms. H█████████, and Mr. H████████ the same people who were on the

10   first email that we looked at, right?

11   A.   I believe so.

12   Q.   Okay.  And the subject of this is, "Update on B.R.'s day

13   at school," right?

14   A.   That's what it says, yes.

15   Q.   Okay.  And she writes, "Please be advised I picked up

16   B.R. around 2:20."

17   A.   Okay.

18   Q.   Okay.  "And much to our dismay, as she had feared and

19   expressed, B.R. was left to deal with J.O. on her own at PE

20   during 8th period.  Her locker was not switched and she was

21   forced into a hostile and uncomfortable situation once again.

22   Thankfully, another student sat next to B.R. and served as a

23   buffer."

24   A.   Okay.

25   Q.   All right.  And J.O. is one of the students, one of the

─────B.R. v. F.C.S.B.─────

72

1   three students that you described as a bully in Exhibit 77, in

2   your statement?

3   A.   That's how I described in my statement, yes.

4   Q.   Okay.  And you didn't have any classes with J.O. that

5   year, correct?

6   A.   I don't believe that's true.  I believe I had a class

7   with her.

8   Q.   You and J.O. had the same PE period, right?

9   A.   That's correct, ma'am, yes.

10  Q.   And but you had Mr. Kappatos and she had a different

11  teacher for PE, right?

12  A.   Yeah, that sounds right.

13  Q.   Okay.  And so, you were not in the same PE class; you

14  were just in the locker room at the same time for change-out

15  and change-in, right?

16  A.   Yes, but a lot of the PE classes were very integrated.

17  For example, if, you know, we were on outside running or if,

18  you know, we were certain activities, the classes are very

19  integrated.

20  Q.   So other than being in the PE locker room at the same

21  time with J.O., you didn't have any classes in the building

22  with her, right?

23  A.   So I'm not -- I'm a little bit confused about that.

24  Could you restate that.

25  Q.   Sure.  She was in different pod from you, correct?

B.R. v. F.C.S.B.

73

1   A.   Yes, that's correct.

2   Q.   You were Explorers and she was in a different pod?

3   A.   That's correct, ma'am.

4   Q.   And your electives in the first half of the year were

5   chorus?

6   A.   Yes.

7   Q.   And she was not in chorus, right?

8   A.   That's correct.

9   Q.   Women's chorus actually you were in, right?

10  A.   Yeah, that sounds right.

11  Q.   An all-girl class, correct?

12  A.   If I recall correctly, that sounds right.  I don't think

13  I had any issues in that class.

14  Q.   And your other elective was Intro to Spanish, correct?

15  A.   Yes.

16  Q.   And she was not in that elective either, right?

17  A.   That's correct, yes.

18  Q.   And we just talked about PE.  She was not -- she did not

19  have Mr. Kappatos for PE, right?

20  A.   That's correct.

21  Q.   Okay.  So the only time that you and she were in the same

22  area, scheduled to be in the same area would be during PE

23  locker time, right?

24  A.   It was not just during PE locker time.  It could be

25  during the whole PE period.

─────── B.R. v. F.C.S.B. ───────

74

1   Q.   Okay.  All right.  But that was the only class, right?

2   A.   That's correct, ma'am, yes.

3   Q.   And you did not have any classes with C.K.?

4   A.   That's correct.

5   Q.   And you did not have any classes with D.N.?

6   A.   That's correct.

7   Q.   And they were 8th graders, so their class other than

8   perhaps electives were all upstairs, right?

9   A.   That's correct.  Or they should be upstairs.

10  Q.   And the 7th graders sat in a different part of the

11  cafeteria for lunch than the 8th graders, right?

12  A.   I don't recall that detail as vividly, but if that's what

13  you say --

14  Q.   All right.  If we can go back to Exhibit -- the email

15  that we're looking at in Exhibit 80.

16        So the first paragraph was a discussion about your

17  PE locker.  In the second paragraph she writes -- your mom

18  writes, "B.R. tells me today was worse than any other day with

19  at least 15 unknown people," and she has quotation marks

20  around this, "approaching her during lunch and LS, and asking

21  if she gave oral sex to C.K. and D.N."

22        Do you see that?

23  A.   Yes, I see that.

24  Q.   Okay.  And "LS" is learning seminar?

25  A.   That's correct.

─────────────── B. R. v. F.C.S.B. ───────────────

75

1    Q.   And then she writes, "Classmates, too, asked if J.O. and

2    C.K.'s rumors about her supposed sex acts were true.  It seems

3    this is now more than just a trio of ill-advised students

4    engaged in bullying.  We are extremely worried about the

5    impact of all of this on B.R. and also her physical safety."

6         Correct?

7    A.   That's what it says, yes.

8    Q.   So, according to the email that your mom sent the school,

9    "Today," meaning November 21, 2011, "was worse than any other

10   day," by your report, right?

11   A.   I honestly don't recall that -- that vividly, but it's

12   possible.

13   Q.   Okay.  And so, supposedly she knew that you were being

14   touched on your genitalia at school and had been robbed by a

15   student, right?

16   A.   Yes.

17   Q.   Okay.  And there's nothing in here about C.K. or D.N. at

18   all?

19   A.   In this email?

20   Q.   There's nothing in this email about C.K. or D.N. touching

21   you, correct?

22   A.   In this paragraph it appears that she's talking about

23   rumors, so I don't see that here.

24   Q.   Well, this email is five paragraphs and there's nothing

25   in any of those five paragraphs about you being touched at

Direct - B.R.

─B.R. v. F.C.S.B.─

76

1    school?

2    A.    This is my mom's writing.  That's what it says in here.

3    Q.    In the first paragraph she talks about your locker being

4    switched, right?

5    A.    Yes.

6    Q.    And that's your PE locker?

7    A.    That's correct, ma'am.

8    Q.    And the PE locker is in the girl's locker room, right?

9    A.    Yes, ma'am.

10   Q.    You also had a regular locker by your pod?

11   A.    Yes.

12   Q.    Okay.  And the PE locker is not coed, correct?

13   A.    That's correct.

14   Q.    But your regular locker is coed, right?

15   A.    Yes.

16   Q.    And that's where you claim -- you said you were being

17   touched?

18   A.    That's where I said I was being touched, yes.

19   Q.    And in this email she's asking about getting your PE

20   locker switched, correct?

21   A.    It appears to be the case, yes.

22   Q.    Okay.  And your mother never asked for your regular

23   locker to be switched, correct?

24   A.    I don't have a vivid recollection of that.

25   Q.    Okay.  Do you have any recollection of your mom asking

B.R. v. F.C.S.B.

77

1  for your regular locker to be switched?

2  A.   I'm honestly not sure.

3  Q.   The -- your PE locker was asked to be switched so it

4  could be more visible to the female PE teacher, right?

5  A.   Yes.

6  Q.   Okay.  And there was some discussion with Mr. Brenner

7  about the visibility of your regular locker?

8  A.   You mean like my regular like --

9  Q.   Yes.

10  A.   -- for school -- pod, yes.

11  Q.   Sure, yes.  In the pod, right?

12  A.   Uh-huh.

13  Q.   And you were shown some photographs -- and I want to

14  see -- the angle of the photograph you were shown was if

15  you're looking at the locker, locker pod from the front.  I

16  want to see if we can show you a different angle.

17        So, would you please in the black binder -- well,

18  first of all, let's look at Defendants' Exhibit 61.

19        MS. REWARI:  Your Honor, this is the schematic of

20  the school that's in evidence.

21        THE COURT:  Yes, ma'am.  You may publish.

22        MS. REWARI:  And I think it's going to be easier for

23  the witness to see on the screen because it's a small picture.

24  So, if I may show her this.

25        THE COURT:  No.  Ms. Tinsley gets to move the

─────────B.R. v. F.C.S.B.─────────

78

1    monitor.

2         MS. REWARI:  Thank you.

3         MS. TINSLEY:  I think the monitor --

4         THE COURT:  Ms. Tinsley, need to move the monitor.

5         THE WITNESS:  Yeah, thank you.

6         THE COURT:  Do you have that pointer again?

7         MR. BROWN:  It won't work.  Software.

8         THE COURT:  Oh, okay.

9         MS. REWARI:  Okay.  Grady is just going to try to

10   blow it up so we can see it more closely.

11        THE COURT:  Ma'am, if you could draw a line to see

12   if the -- underneath, to see if it's working.

13        Yeah, it's working.

14        THE WITNESS:  It's working.  Thank you.

15        THE COURT:  Very good.

16        MS. TINSLEY:  Thank you.

17        THE COURT:  Having a good day.

18   BY MS. REWARI:

19   Q.   Okay.  And so, just so we're understanding, your locker

20   was in the area that's on this map under LR, and it says 116A,

21   right?  That's where your locker was?

22   A.   I think so.  As you may recall from my deposition, I

23   really struggled to understand this map.  But if that's where

24   you're telling me it was, I trust you.

25   Q.   Yeah, let me see if I can help orient you.  Do you see

B.R. v. F.C.S.B.

79

1   just to the -- if you come in from the main doors, you see the

2   office on the right?

3   A.    Yes.

4   Q.    Then there's a long area.

5         And then you see it says "SCI" up at the top.

6   A.    Okay.

7   Q.    And that room is 115A.

8   A.    Got it.

9   Q.    All right.  And that was Mr. T█████ classroom, right?

10  A.    That's correct.

11  Q.    Okay.  And then below the "SCI," it says "LR."  That's a

12  locker area?

13  A.    Uh-huh, yes.

14  Q.    Okay.  And that's where your locker was?

15  A.    If -- I think so.  If that's where you are telling me,

16  then, yes.

17  Q.    Okay.  And just above the "LR" is an "O"?

18  A.    Okay.

19  Q.    And you see there's a door marked there.

20  A.    I think so, yes.

21  Q.    And it says 113A?

22  A.    Yes, I see that.

23  Q.    And that was Ms. B█████ office, correct?

24  A.    I believe so.  I'm not 100 percent sure.

25  Q.    And Ms. B█████ was an assistant principal at the school

─────────B.R. v. F.C.S.B.─────────

80

1    at the time, right?

2    A.   She was, yes.

3    Q.   And then just to the left of that it says, "CR 112A"?

4    A.   Okay.

5    Q.   And that was one of your teachers, core teachers, right?

6    In that classroom?

7    A.   Yes.

8    Q.   Which teacher was that?

9    A.   I believe that was Ms. F███████ classroom, my history

10   teacher.

11   Q.   Okay.  That was your history teacher.  And then next to

12   her classroom, whose classroom is that?

13   A.   I believe that's Ms. C████ classroom.

14   Q.   Ms. C███ over here?

15   A.   Yes.

16   Q.   Right -- your math teacher?

17   A.   That's correct.

18   Q.   And then next to --

19         THE COURT:  Let the record reflect she's referring

20   to CR 11A.

21         MS. REWARI:  Thank you, Your Honor.

22   BY MS. REWARI:

23   Q.   And then next to Ms. C████ classroom there's a classroom

24   marked 110A?

25   A.   Yes, ma'am.

─B.R. v. F.C.S.B.─

81

1   Q.   And was that your English teacher's classroom?

2   A.   I believe it was, yes.

3   Q.   And that's Ms. Estrella?

4   A.   That's correct, ma'am.

5   Q.   Okay.  And your -- one of your electives that year, I

6   think we just talked about, was women's chorus, right?

7   A.   Yes.

8   Q.   And that was in the choral room that's shown right below

9   locker room area?

10  A.   That's what it says.

11  Q.   Okay.  And that's 137A?

12  A.   Okay.

13  Q.   And so, I believe with Mr. Brenner you said you saw the

14  teachers standing outside their doors during classroom

15  transitions, right?

16  A.   Yes, ma'am.

17  Q.   Okay.  And so, the photograph that we spent a lot of time

18  looking at is the view when you're coming down that long

19  hallway that goes here (pointing), right?

20  A.   I'm sorry, can you repeat that.

21  Q.   The photograph that you were shown yesterday shows you

22  the -- the advantage point coming from that direction into the

23  locker pod, right?

24  A.   I'm not really sure what the photograph angle was at this

25  time.

─────B.R. v. F.C.S.B.─────

82

1    Q.   Okay.  Your teacher's vantage point wasn't looking

2    straight at the lockers.  It was looking from the side, right?

3    A.   I'm not sure.  I guess so.  I don't know.

4    Q.   All right.  Why don't you, please, in the black binder

5    turn to Defendants' Exhibit 192.

6             MS. REWARI:  And, Your Honor, this is -- I don't

7    believe this is in evidence yet.

8             THE COURT:  Any objection?

9             MR. BRENNER:  Is it --

10            THE COURT:  It is in.

11            MR. BRENNER:  I have no objection.

12            THE COURT:  It is in.

13            MS. REWARI:  Oh, it is in?  Oh, okay.  Well, there

14   we go.  We can just put it on the screen.  I think the

15   photographs will be easier for you on the screen, but it's up

16   to you, however you would like to do it.

17            Grady, if you could go to page 8.

18            MR. BRENNER:  What's the stamp on the bottom?

19   BY MS. REWARI:

20   Q.   This is a view of the locker pod from the side, right?

21   A.   It appears to be that, yes.

22   Q.   And then I believe with Mr. Brenner you said that you

23   were in the last row of lockers?

24   A.   Yes.  My back facing towards that tape stuff.

25            THE COURT:  There are three locker bays there.  One

Direct - B.R.

─────B.R. v. F.C.S.B.─────

83

1    of them appear -- three of them appear to be two-sided.  One

2    of them appears to be one-sided.  Which part of the locker bay

3    were you in?

4              THE WITNESS:  It was -- I mean, can I just show you?

5              THE COURT:  Yes.

6              MS. REWARI:  Please.

7              THE WITNESS:  Like in this vicinity (pointing).

8    BY MS. REWARI:

9    Q.    Okay.  So you were facing out towards the hallway?

10   A.    That's correct, yes.

11   Q.    And then in the back there you can see a door at the very

12   back of the photograph.  Do you see that?

13   A.    Are you -- yes, I can see that.

14   Q.    Okay.  And that's the door to the choral room, right?

15   A.    I believe so.

16   Q.    And that's where Ms. Moir, your chorus teacher, would

17   stand?

18   A.    I don't recall seeing Ms. Moir standing out there.

19   Q.    Okay.  But that's the door to where you went for chorus?

20   A.    Yes.

21   Q.    If you could go to page 21 of this exhibit, Grady.

22              And the lockers are pretty -- the locker bays are

23   pretty well spaced apart, right?

24   A.    I mean, when there's a lot of students, I don't -- I

25   don't really know how to answer that question, I guess, on

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─
84

1   this picture.

2              THE COURT:  Based upon your best estimate, how far

3   apart are the locker bays, your best estimate?

4              THE WITNESS:  Can you clarify that?

5              THE COURT:  In between the locker bays, about how

6   many feet, if you can tell us, exist?

7              THE WITNESS:  I'm honestly not sure how many feet

8   or -- I don't know how to estimate that.

9              THE COURT:  That's fine.

10  BY MS. REWARI:

11  Q.   These are pretty short lockers.  I mean, they are shorter

12  than me, right?

13  A.   I think I was a little shorter than you, honestly.

14             THE COURT:  (Laughter.)

15  BY MS. REWARI:

16  Q.   They're less than five feet, right?

17  A.   I think might have been shorter than you when I was 12,

18  Ms. Rewari, sorry.  I don't know how to answer that.  It felt

19  high enough.

20  Q.   Okay.  If we go back to -- you can take that down.

21             If we can go back to Exhibit 80 in the white binder.

22  This is your mom's email.  Just go back to that.

23  A.   In the white binder you said?

24  Q.   Yes.

25  A.   I'm sorry, you said 80?

Direct - B.R.

─B.R. v. F.C.S.B.─

85

1  Q.   Yes, 80, the email we were just looking at.

2  A.   Okay.

3  Q.   Let's take a look at the third paragraph there.  She

4  wrote, "We will be keeping B.R. home until after Thanksgiving

5  with the hope this entire matter is addressed in a

6  constructive positive learning environment as restored with

7  the school's intervention.  If things have not simmered down

8  by then, we will need to consider more serious action.  To

9  that end, please let us know what steps the school is taking."

10       And that's what happened, you didn't go to school

11  for the rest of that week, correct?

12  A.   Yes.

13  Q.   And you did go the next day to -- to a meeting with your

14  parents and Ms. T█████, right?

15  A.   I was asked to join the meeting, yes.

16  Q.   Okay.  But you didn't attend classes, correct?

17  A.   I believe so.

18  Q.   So I want to talk a little bit about --

19       THE WITNESS:  Can we take this down?  It's really --

20  I'm sorry.

21  BY MS. REWARI:

22  Q.   Sure, sure.  No problem.

23  A.   Sorry.  Thank you.

24  Q.   No problem.

25       So I want to talk about the three students who you

B.R. v. F.C.S.B.

86

1    described as bullies in the November 21st statement.  I

2    believe with Mr. Brenner you said you've been friends since

3    6th grade with J.O., right?

4    A.   Yes, ma'am.

5    Q.   And I think you said you were trying to distance yourself

6    from her?

7    A.   I was trying, but I don't know if I was very successful

8    at it.

9    Q.   But in October you still described her as your best

10   friend, right?

11   A.   I think that might be fair, yeah.

12   Q.   And you were also friends with C.K.?

13   A.   Again, I don't really know if that's a fair assessment.

14   Q.   Okay.  Would you please take a look at Defendants'

15   Exhibit 62 in the black binder.  And this is not in evidence.

16           THE COURT:  Any objection, Mr. Brenner?

17           MR. BRENNER:  One moment, Your Honor.

18           THE COURT:  Yes, sir.

19           MR. BRENNER:  No objection.

20           THE COURT:  Without objection.

21   (Defendants' Exhibit No. 62, was admitted into evidence.)

22           MS. REWARI:  If I may publish, Your Honor?

23           THE COURT:  You may.

24           (Exhibit 62 published.)

25           MR. BRENNER:  May I inquire of counsel for one

Direct - B.R.

─── B.R. v. F.C.S.B. ───

87

1   second, Your Honor?

2          THE COURT:  You may.

3          (Counsel confers.)

4   BY MS. REWARI:

5   Q.   You saw this document in your deposition last night,

6   right?

7   A.   I did see it in my deposition, yes.

8   Q.   And so you recall that this is a Facebook post?

9   A.   Yes.  I do recall that this was a Facebook post, that's

10  correct.

11  Q.   And so, just for anybody who doesn't use Facebook, at

12  this time in 2011, if you had a Facebook account, you had a

13  wall, correct?

14  A.   That's correct.

15  Q.   And people could post things on your wall?

16  A.   That's correct.

17  Q.   And they could decide who can see it and who can't see

18  it?

19  A.   I guess so.

20  Q.   So there is settings on Facebook.  You can pick public,

21  meaning anybody can see it, right?

22  A.   I guess so.

23  Q.   Well, do you recall that?

24  A.   I think so.  I mean, you're asking me in 2011.  I think

25  so.  I'm not 100 percent what I knew at that time, but that

─────────B.R. v. F.C.S.B.─────────

88

1    sounds about right.

2    Q.    You've had Facebook accounts on and off since 6th grade,

3    right?

4    A.    Sounds about right.

5    Q.    You still have Facebook accounts now?

6    A.    I have a Facebook account currently.

7    Q.    Okay.  And so when you post something on someone's

8    Facebook wall, you, as a poster, can decide if you want it to

9    be visible to the public or to certain friends, you can -- you

10   decide the level of visibility of that, right?

11   A.    I guess so, yeah.  That makes sense.

12   Q.    Okay.  And there's also ways to message each other on

13   Facebook that are private messages, right?

14   A.    Yes.

15   Q.    And that's what I think Mr. Co████████ K. talked about

16   as chats or DM's?

17   A.    That sounds right.

18   Q.    DM means direct message, right?

19   A.    Yes, it does mean that.

20   Q.    Okay.  And so, and in Facebook, you can pick people to be

21   your friends?

22   A.    Yes.

23   Q.    And so you get a friend request, and you decide as the

24   Facebook account holder, am I going to accept this request or

25   am I going to not accept this request, right?

Direct - B.R.

———B.R. v. F.C.S.B.———

89

1    A.   I guess so, yes.

2    Q.   And also on Facebook you have the ability to block

3    people?

4    A.   I guess so.

5    Q.   And you have the ability to defriend people?

6    A.   I think that's fair to say.

7    Q.   All right.  And so, in Exhibit 82 --

8    A.   Are we at 82 or --

9    Q.   I'm sorry, 62, thank you.  In Exhibit 62, this is a post

10   on the page of someone with the initials T.P.

11            Do you see that at the top?

12   A.   Yes, I do.

13   Q.   And then C.K. has posted something to T.P. in the first

14   post there.  And he's defending you and J.O. to this person,

15   right?

16   A.   That appears to be the case.

17   Q.   And you liked that post?

18   A.   I think that's what it shows.

19   Q.   And when we say "like that post," meaning on Facebook you

20   get a choice of pressing "like" to show your support or

21   endorsement of what someone else has said, right?

22   A.   I mean, yes.  I guess.

23   Q.   Right.  And so, his post has two likes, and one of them

24   is you?

25   A.   That's what it appears to say on here.

Direct - B.R.

——————— B.R. v. F.C.S.B. ———————

90

1   Q.   And then below that is a long series of, it looks like

2   o's by David N.?

3   A.   That's what it says here.

4   Q.   And that's the same David N. that's in your statement on

5   November 21st, right?

6   A.   That's what -- I mean, it says that here, yes.

7   Q.   And then on this page -- and by the way, the print date

8   on this is hard to read, but it's -- the top of it at the

9   bottom of the page is October 18th, 2011?

10  A.   Okay.

11  Q.   And if you go to the third page of this document, there's

12  also a note -- a handwritten note there that says 10/18/2011.

13       Do you see that?

14  A.   That's what it says, yes.

15  Q.   If we can go back to the first page.

16  A.   Okay.

17  Q.   And so this if this was printed out on October 18th,

18  2011, it shows how recently some of these comments are, right?

19  A.   I don't know if that's when it is from, if that's what

20  the date says and that's what you say, that makes sense.

21  Q.   Right.  If some of these say 18 hours ago -- in fact,

22  most of these say 18 hours ago, right?

23  A.   That's what it says, yes.

24  Q.   And so, on this first page you wrote three comments to

25  C.K. on just the first page, right?

B.R. v. F.C.S.B.

91

1   A.   That's what it says, yes.

2   Q.   And you're actually addressing him by name, so your

3   comments are directed to him, right?

4   A.   That's what it says on here, yes.

5   Q.   And then, on the second page you've got three more

6   comments to him, right?

7   A.   That appears to be the case.

8   Q.   And in the last comment you referred to J.O. as your best

9   friend, right?

10  A.   Yes.  I -- I love J████.

11  Q.   Okay.  And I'm not going to go over the language that's

12  used in here, but would you agree that there's some vulgar

13  terms?

14  A.   Absolutely, 100 percent agree with that assessment.

15  Q.   And some of those vulgar terms were used by you, right?

16  A.   That's correct.  I'm not proud of it, but, yes.

17  Q.   Okay.  Is not the way you talked at your home in front of

18  your parents?

19  A.   Yeah, you're right.  It's not how I always talked at home

20  in front of my parents.  You're right about that.

21  Q.   And at the top of this second page, you made a reference

22  to fried chicken?

23  A.   Yeah.

24  Q.   That was a joke about race, wasn't it?

25  A.   Yes, that was a joke.  I was not proud of that.  And I

1    actually, like I told you in my deposition, I apologized to

2    the girl who then told me she was also a victim of C███████.

3    Q.   Okay.  You laughed in this post at comments that made

4    racial jokes, didn't you?

5    A.   I did, ma'am, but I did apologize for them because it's

6    not right.  I'm not going to sit here today and say that was

7    right.  I was wrong.

8    Q.   Now, you said yesterday that you had racial comments

9    directed to you online?

10   A.   That's correct, ma'am.

11   Q.   You didn't produce any Facebook or social media posts

12   about -- with messages about your race, did you?

13   A.   I'm not sure what I did, but I can tell you that I did

14   see them and I did report them.

15   Q.   And you didn't save any of them to produce to the School

16   Board in this case, right?

17   A.   I did the best that I could.  I was 12 years old.

18   Q.   Okay.  And Mr. Brenner didn't show you any emails

19   discussing with the school any racial comments, right?

20   A.   I don't know if Mr. Brenner did, I don't believe he did.

21   Q.   Okay.  You haven't alleged any kind of racial

22   discrimination in this lawsuit, right?

23           MR. BRENNER:  Objection.  Asks for a legal

24   conclusion.

25           THE COURT:  Overruled.  She can answer if she knows.

B.R. v. F.C.S.B.

93

1          THE WITNESS:  I don't really -- can you rephrase

2   that question.  I'm not sure I understand what you're saying.

3          THE COURT:  You've made several allegations in the

4   course of your complaint.  The complaint is what you filed

5   when you want to sue someone.

6          Was there anything in there about race that you're

7   aware of?

8          THE WITNESS:  I'm not sure in the complaint, but

9   there were racial comments about the fact that I am of Indian

10  origin, yes.

11  BY MS. REWARI:

12  Q.   You don't have a claim in this case that you were

13  discriminated against on the basis of your race, right?

14         THE COURT:  Do you have a copy of the complaint?

15         MS. REWARI:  I do.

16         THE COURT:  Why don't you give it to her, let her

17  see if it refreshes her recollection.

18         And what Ms. Rewari is going to do is give you a

19  copy of the complaint that was filed in your case.  You can

20  take a look at it, just read it through, take your time as

21  much as you need, and then Ms. Rewari may have some more

22  questions for you.

23         THE WITNESS:  Thank you.

24         MR. BRENNER:  Your Honor, if it saves time, I can

25  stipulate that there's no claim for racial discrimination.

Direct - B.R.

─B.R. v. F.C.S.B.─

94

1        THE COURT:  All right.  There's a stipulation.

2        MS. REWARI:  Okay.

3        THE COURT:  Ladies and gentlemen, I've instructed

4   you before, a stipulation is an agreement by the lawyers that

5   is what the evidence would have been is what has been stated

6   or suggested.

7        MS. REWARI:  Okay.

8   BY MS. REWARI:

9   Q.   In the fall of 2011 and prior to November 21, 2011, you

10  had hung out with all three of these students, D.N., C.K., and

11  J.O., outside of school, right?

12  A.   I had hung out in group settings before.  So, yeah,

13  that's probably -- that's definitely true at some point.

14  Q.   Okay.  Now, if you would please take a look at Exhibit 56

15  in that black binder.

16  A.   Okay.

17  Q.   And could you please identify what that is?

18  A.   It's a picture of me and D███ N███.

19        MS. REWARI:  Your Honor, move to admit this.

20        THE COURT:  Without objection?

21        MR. BRENNER:  No objection.

22  (Defendants' Exhibit No. 56, was admitted into evidence.)

23  BY MS. REWARI:

24  Q.   And this is a photo of you and David N., right?

25  A.   That's correct.

Direct - B.R.

B.R. v. F.C.S.B.

95

1   Q.   And if we look below that, it's got C.K.'s name on it and

2   a date.

3            Do you see that?

4   A.   I do see that.  It says October 21, 2011.

5   Q.   So that means that this picture was posted on Facebook in

6   October 21, 2011, right?

7   A.   That's what it says, yes.

8   Q.   Well, you produced this picture, right?  It's your number

9   down at the bottom?

10  A.   If I produced it, then, yes.

11  Q.   Okay.  And you took it off his -- C.K.'s Facebook page,

12  right?

13  A.   That would make sense.

14  Q.   Okay.  And so, this photograph, then, was taken on or

15  before October 21, 2011, right?

16  A.   That sounds about right.

17  Q.   And in this photograph there's two other people in the

18  front?

19  A.   Yes, ma'am.

20  Q.   A blue shirt and a yellow shirt?

21  A.   Yes.

22  Q.   And was that C.K. and J.O.?

23  A.   It's possible that it was them.  I'm not 100 percent

24  sure.  I don't have a vivid recollection.  I'm not saying it's

25  not them; I just don't remember.

B.R. v. F.C.S.B.

96

1  Q.   Okay.  And this is not in your neighborhood, right?

2  A.   This does not appear to be in my neighborhood.

3  Q.   Okay.  All right.  If you could please take a look at

4  Exhibit 58 in the book.

5  A.   Okay.

6  Q.   And can you identify this photograph?

7  A.   Yes, I can.  Do you want me to say more?

8  Q.   Yeah, who is in the picture?

9  A.   J█████ and me.

10 Q.   Okay.

11      MS. REWARI:  Your Honor, we move to admit

12 Defendants' Exhibit 58 and publish.

13      THE COURT:  Without objection?

14      MR. BRENNER:  No objection.

15      THE COURT:  You may publish.

16 (Defendants' Exhibit No. 58, was admitted into evidence.)

17 BY MS. REWARI:

18 Q.   And you're on -- you're the one on the top and she's the

19 one on the bottom in this photograph; is that right?

20 A.   That's correct, yes.

21 Q.   Okay.  And this one is also posted October 21, 2011,

22 right?

23 A.   That's what it says, but I recall taking this photo

24 and -- yeah, I'll leave it at that.

25 Q.   And so, do you know when it was taken?

─────────────B.R. v. F.C.S.B.─────────────

97

1   A.   I don't know the exact date, but I can tell you that this

2   was a different date than the one you just showed me before.

3   Q.   Okay.  And so, it's possible that J.O. was in the other

4   photograph, but she's definitely in this one, right?

5   A.   Yes, that's correct.

6   Q.   Okay.  Great.  If you'd please take a look at Defendants'

7   Exhibit 59.  It's the next one in the binder.

8              THE COURT:  Any objection to this, Mr. Brenner?

9              MR. BRENNER:  No objection, Your Honor.

10             THE COURT:  No objection.  You may publish.

11  (Defendants' Exhibit No. 59, was admitted into evidence.)

12  BY MS. REWARI:

13  Q.   All right.  And this is another photograph of you and

14  J.O., right?

15  A.   Yes, this is.  I remember it, actually.

16  Q.   Excuse me?

17  A.   I remember this.

18  Q.   Okay.  And that's you on the right and her on the left,

19  correct?

20  A.   That appears to be the case.

21  Q.   And it's your hand around her neck there, right?

22  A.   I think -- yes, that's what it looks like.

23  Q.   Okay.

24  A.   I don't know if it's around her neck.  It looks like it's

25  on her chin, but sure.

1   Q.   Okay.  But you have your arm around her face --

2   A.   Yeah.

3   Q.   -- right?

4        And you're both sticking out your tongues?

5   A.   Yeah, being 12 years old.

6   Q.   Right, being 12?

7   A.   Yeah.

8   Q.   All right.  Okay.  And again, this one, same postdate,

9   October 21, 2011?

10  A.   So I -- I have a little bit of a different recollection.

11  Q.   I'm sorry.  My question is just, that's the postdate,

12  right?

13  A.   That's the postdate; however, these two photos that you

14  just showed me -- not the first one -- happened on the same

15  day.  The first one you showed me happened on a different day.

16  I just want to make sure that I clarify that.

17  Q.   Sure.  Thank you.

18       All right.  So, please take a look at Defendants'

19  Exhibit 60.

20            THE COURT:  Any objection, Mr. Brenner?

21            MR. BRENNER:  No objection.

22            THE COURT:  Without objection.  You may publish.

23  (Defendants' Exhibit No. 60, was admitted into evidence.)

24            MS. REWARI:  I'm sorry.  Could we go back to 59 for

25  a second there.

Direct - B.R.
───────B.R. v. F.C.S.B.───────
99

1  BY MS. REWARI:

2  Q.   Do you see that -- I'm not sure if it's coming through on

3  the screen, but does J.O. appear to have marker drawn -- like

4  a smily face or something drawn on her head?

5  A.   I don't -- it shows something, but I don't know what it

6  is.

7  Q.   All right.  But you can see some pink, right, on her

8  forehead?  Looks like some kind of drawing?

9  A.   I mean, looks like there's something there.  I'm not sure

10  what it is.

11  Q.   All right.

12         MS. REWARI:  Now, we can go to Defendants'

13  Exhibit 60.

14  BY MS. REWARI:

15  Q.   And this is a picture of C.K. and J.O., right?

16  A.   That's, yes, the two people that raped me, yes.

17  Q.   Okay.  And they both have marker on their faces?

18  A.   That appears to be the case.

19  Q.   Okay.  Were you with them this day that the picture was

20  taken, with both of them, J.O. and C.K.?

21  A.   I believe that this happened in my neighborhood the day

22  of the park assault.

23  Q.   And so, what you're saying is that this photograph and

24  the ones that we saw in 58 and 59 were taken the same day they

25  raped you?

Direct - B.R.

──B.R. v. F.C.S.B.──

100

1   A.   Yes, ma'am.  As you may recall from my testimony

2   yesterday, I did say I talked to J███.  I even said I took

3   some selfies with her before.

4   Q.   Okay.  All right.  Now, you went to a pumpkin patch with

5   David N. --

6            MS. REWARI:  You can take that down, please.

7   BY MS. REWARI:

8   Q.   You went to a pumpkin patch with David N., right?

9   A.   Yes, ma'am, that's correct.

10  Q.   And you went to a haunted house at Bradley Farms in

11  October?

12  A.   Sorry.  Sorry about that.

13  Q.   No problem.  You went to a haunted house at Bradley Farms

14  in October with J.O. and some other kids, right?

15  A.   That sounds about right.  I don't have a vivid

16  recollection of that, but that sounds about right.

17  Q.   And so, haunted house before Halloween, right?

18  A.   Yeah, makes sense.

19  Q.   Okay.  And pumpkin patch before Halloween, right?

20  A.   That makes sense.

21  Q.   And then you went to J.O.'s birthday party on

22  November 4th?

23  A.   That's correct, I did, yes.

24  Q.   Okay.  And so, you went to this birthday party after you

25  say she and C.K. raped you?

1   A.   Yes, I did.

2   Q.   And she invited you to this party?

3   A.   Yeah, she had invited me a few weeks previously.

4   Q.   And your mom brought you to the party?

5   A.   Yes.

6   Q.   Okay.  It was at her grandmother's house?

7   A.   It was at her grandmother's house, correct.

8   Q.   Did your mom go inside?

9   A.   I believe my mom did.  I remember that my mom spoke to

10  her grandmother, and my mom came back and had some concerns.

11  Q.   Okay.  Did your mom wait in the driveway during this

12  party?

13  A.   I have a vague recollection of that or something to that

14  effect, but I feel like you'd have to ask my mom that.  I'm

15  not 100 percent sure.

16  Q.   If we can go to -- in the white binder, if you can take a

17  look at Plaintiff's Exhibit 78.

18  A.   You said 78?

19  Q.   Yes.

20           THE COURT:  78 has been admitted, so --

21           MS. REWARI:  It's been admitted, so we're going to

22  put it on the screen.

23           THE COURT:  She doesn't have the exhibit.

24           MS. REWARI:  You don't have it?  Oh, I'm sorry.

25           THE WITNESS:  Thank you.

B.R. v. F.C.S.B.

102

1          MS. REWARI:  Sure.

2    BY MS. REWARI:

3    Q.   Okay.  Now, this is the statement from David N. that we

4    looked at a couple of days ago, right?

5    A.   I'm sorry, you said that we looked at a few days ago?

6    Q.   We looked at this exhibit from David N.

7    A.   Okay.

8    Q.   Okay.  And the jury has seen it.  And so I want to go to

9    the second page of this handwritten version.

10   A.   Okay.

11   Q.   All right.  And there at the top it says -- well,

12   actually, start at the page before it says, "I don't know why

13   J.O. is involved in this either."

14          And then on the second page, "I didn't think that

15   she did anything wrong or did anything to encourage this than

16   make B.R. jealous.  I did call B.R. for C.K. on my phone after

17   me and B.R. broke, as they were going out during this time."

18          Do you see that?

19   A.   That's what it says in his statement.

20   Q.   Okay.  And you and David N. were going out at some point,

21   right?

22   A.   I had a crush on David.  I don't know if I would call it

23   going out, but I had a crush on him.

24   Q.   You considered him your boyfriend?

25   A.   I mean, I don't know if we, like, had a talk about that,

─────B.R. v. F.C.S.B.─────

103

 1  but I guess if you want to characterize it as that, that's

 2  fine.

 3  Q.   And you also went out with C.K.?

 4  A.   That's not true, ma'am.

 5  Q.   Okay.  You called him your boyfriend?

 6  A.   I don't recall calling him my boyfriend.

 7  Q.   You called him your boyfriend to friends like J.O.,

 8  didn't you?

 9  A.   No.

10  Q.   Okay.  Now, you said on direct examination yesterday that

11  you and C.K. sometimes called each other on the phone, right?

12  A.   Yes, that he forced me to call him, yes, ma'am, he did

13  force me.

14  Q.   And you had also sent him text messages on your phone?

15  A.   Yes, when he forced me to.

16  Q.   And happened several times a week?

17  A.   Yes, ma'am.

18  Q.   And he'd make you send him messages, you said, that --

19  that said things like "I love you"?

20  A.   Yes.  He would force me to say that, yes, ma'am.

21  Q.   And you also sent him messages that said things like "I

22  want to see you"?

23  A.   Yes, ma'am.

24  Q.   Okay.  And you also sent him messages that were sexual in

25  nature, right?

1   A.   That's correct, yes.

2   Q.   And he was -- you say he was making you do this.  He was

3   making you do this before you went to the school on

4   November 21, right?

5   A.   Yes, ma'am.

6   Q.   Okay.  And your mom blocked C.K.'s phone number from your

7   phone when she heard the voicemail, didn't she?

8   A.   To my understanding, she did.

9   Q.   And she blocked his phone number on November 14th, didn't

10  she?

11  A.   I don't know when my mom did that.

12  Q.   Okay.  In the white binder, if you would please turn to

13  Plaintiff's Exhibit 171.

14  A.   Do I put this aside for a moment?

15  Q.   Sure.

16  A.   I'm sorry, you said 170 --

17  Q.   171 in the white binder.

18  A.   Okay.

19       MS. REWARI:  And, Your Honor, I believe this is

20  another -- it's not admitted, but I believe it's a stipulated

21  exhibit.

22       THE COURT:  Any objection?

23       MR. BRENNER:  Your Honor, may we approach for one

24  second?

25       THE COURT:  Not preferred, but okay.

B. R. v. F.C.S.B.

105

1          (Side bar.)

2          MR. BRENNER:  Your Honor, I just wanted to make sure

3   I understood the full back and forth.  There's lots of

4   proposals going back and forth.

5          And so, if it's -- this particular exhibit is an

6   exhibit that we would agree is going into evidence, but I just

7   -- she keeps saying "stipulation" back and forth, and I wanted

8   to make sure that we were on the same page.  So there's

9   certain exhibits that either we've proposed or they proposed.

10  I agree that counsel representatives says that we proposed

11  something they've said they agreed upon something, and I

12  accept her representation that she says we stipulated to it.

13  It's just hard to go back and forth.

14          THE COURT:  Well, that's one of the things that the

15  court has some concerns about.  Typically, and again this is

16  not necessarily typical, but if something is stipulated to, it

17  doesn't require the necessary foundational requirements that

18  we typically see in cases.  And so, usually, but it's not

19  every time, but usually it is admissible.  It seems that you

20  all have a sort of juxtapose as to significance of something

21  that's been stipulated to and -- we've heard from both sides

22  -- that we stipulated to it, but we don't think it's

23  admissible.  I've heard that from both sides.  So if you all

24  are saying that going forward, and this is the Court's

25  preference, that if something is stipulated to that it shall

Direct - B.R.

B.R. v. F.C.S.B.

106

1    be admissible, except for under the unusual circumstances, I

2    think it will help us facilitate moving things along.

3              MR. BRENNER:  That's why I wanted to do a side bar.

4    I, in my mind, stipulations were -- it's my understanding a

5    stipulation does make it admissible.  So if we stipulate,

6    that's what we're trying to do, exhibits admitted.

7              I think where the confusion has come up is, I think

8    if it's admitted, you can -- you still have to ask the

9    witness, for example, when you put it up there, you can say to

10   the witness:  Have you ever seen this before?  Do you know

11   anything about this.

12             THE COURT:  Sure.

13             MR. BRENNER:  And so, that's all I was trying to do

14   with the earlier exhibit.  If she had seen her mom's email,

15   great; if she had not, great.  So I wasn't trying to say lay a

16   foundation to admit it, I was just saying lay a foundation for

17   questioning the witness about it.

18             THE COURT:  And I think from an efficiency

19   standpoint for counsel who has that situation -- again, it can

20   be sort of transposed, it can be you and her going the other

21   way.  If you had simply asked the question or you would ask

22   the question, if it's your witness, Have you seen this

23   document before, it would help sort of move things along, but

24   what I want to try to avoid, to the extent that we can, is the

25   little fire fights over the question of stipulation and

Direct - B.R.
─ B.R. v. F.C.S.B. ─

107

1   admissibility.  As I said, typically when you stipulate to

2   something that you think is deemed admissible -- except for

3   under unusual circumstances -- for instance you stipulated to

4   something involving A, D knows nothing about this situation at

5   all and you try to get it admitted through D.  I can see where

6   that can be a problem, but in most circumstances I think we

7   should always think that when something is stipulated to, you

8   all have agreed that it's been stipulated to, may become

9   admissible so we don't have to go through this drill every

10  time.

11          MR. BRENNER:  That is my understanding as well and

12  the question --

13          THE COURT:  Okay.

14          MS. REWARI:  That's why I'm using a lot of these are

15  on our list as well, but I use the plaintiff's version because

16  --

17          THE COURT:  What I'm going to do going forward to

18  make things simpler, because the Court's security officer has

19  a lot of responsibilities and it's unusual to facilitate the

20  use of evidence.  What I'm going to do is ask my chief of

21  staff to stand by the witness, because she has some problems

22  looking at the screen, and help her find the exhibit so it

23  makes things a little more efficient.

24          You're okay with that Joanna?

25          THE LAW CLERK:  Yes.

—B.R. v. F.C.S.B.—

1          THE COURT:  Okay.

2          MS. REWARI:  Thank you.

3          MR. BLANCHARD:  Can we take a break soon?

4          THE COURT:  Is everyone for that?  Can we stipulate

5     that we can take a break?

6          We'll go ahead and take our morning break and I'll

7     tell the jury we'll bring them back in at 11:40 p.m.

8          (Open court.)

9          THE COURT:  We're going to take our morning break.

10    We'll see you back in here at 11:40.

11         (Recess.)

12         (Court proceedings resumed at 11:44 a.m.)

13         THE COURT:  We had a bench conference to take care

14    of some administrative matters.  And it was agreed that my

15    chief of staff, Ms. Joanna Berry, who's obviously part of my

16    court staff, will assist the witness in finding things that

17    are a part of the depositions and exhibits.

18         Did we all agree on that?

19         MR. BRENNER:  The plaintiff does, Your Honor.

20         MS. REWARI:  Yes.

21         THE COURT:  Very good.

22         (Jury present.)

23         THE COURT:  All right.  You may be seated.  Ladies

24    and gentlemen of the jury, what we have done to try to

25    facilitate things a little bit because we're working sometimes

1    from hard copy exhibits and sometimes working from the screen,

2    to assist witnesses in being able to find things that the

3    lawyers are trying to make reference to, my chief of staff is

4    going to assist the witness in finding things that might

5    otherwise be difficult to find.

6    BY MS. REWARI:

7    Q.    Okay.  Now, Ms. R., before the break, we were talking

8    about the messages that you sent to C.K. on your phone, right?

9    A.    Just to clarify, you mean text messages, right?

10   Q.    Yes.  Thank you.  Text messages, you recall sending him

11   text messages?

12   A.    Yes, ma'am.

13   Q.    And hundreds of text messages, would you say?

14   A.    I don't know how many.

15   Q.    Would you say it's more than 100?

16   A.    I'm not sure how to estimate that, but several times a

17   week.

18   Q.    Sometimes several times a day?

19   A.    Maybe.  It's possible.

20   Q.    Okay.  And for how long?

21   A.    I'm not exactly sure.

22   Q.    Was it months?

23   A.    I think so.  I'm not 100 percent sure.

24   Q.    Okay.  And you said that he would make you text him

25   things like "I love you"?

Case 1:19-cv-00917-RDA-LRV    Document 1048    Filed 08/26/24    Page 110 of 203
PageID# 21736
Direct - B.R.

——B.R. v. F.C.S.B.——

110

1   A.   Yes, ma'am.

2   Q.   How did he make you send texts like that?

3   A.   I'm sorry, could you repeat that one more time?

4   Q.   Sure.  Can you just explain how he made you send him

5   texts that said "I love you"?

6   A.   C██████ would rape me.  He would force me to give him

7   oral sex.  He would sodomize me.  He would vaginally penetrate

8   me.  And while he was doing that, he would threaten me, and he

9   also would cut me with knives, and said if I didn't respond to

10  him, that he would hurt me.  So that's how he forced me to

11  send him text messages.

12  Q.   And he -- how did he force you to say certain things in

13  the messages?

14  A.   Because he would tell me what to say, or he would tell me

15  what -- along the lines he wanted me to say.

16  Q.   You were living at home, right, this entire time --

17  A.   Yes, ma'am.

18  Q.   -- in 7th grade?

19  A.   Yes, ma'am.

20  Q.   And you had a pretty structured schedule, we heard,

21  right?

22  A.   I would say before October 2011, yes.

23  Q.   Okay.  And once your mom found out there were problems at

24  school, your schedule didn't become less structured, right?

25  A.   I didn't participate in as many extracurricular

────B.R. v. F.C.S.B.────

111

1  activities.

2  Q.    You had more oversight at home.  Once your mom knew there

3  were some concerns, she was paying more attention to what was

4  happening to you at home, right?

5  A.    I don't know.  I guess so.  I'm not sure how to answer

6  that question.

7  Q.    And all of these incidents with C.K. happened in your

8  neighborhood, right?

9  A.    All of the rapes with C.K. happened in my neighborhood,

10  yes.

11  Q.    And Mr. Brenner had you point out in the neighborhood map

12  where these incidents occurred, right?

13  A.    Yes, where the rapes occurred.

14  Q.    And there are two locations that you pointed to?

15  A.    Yes.

16  Q.    One was bus stop at the intersection of Ox Road and

17  Middleton Farms Road, right?

18  A.    Yes.  West Ox Road.

19  Q.    Thank you.  West Ox Road and Middleton Farms.

20          And one was a wooded area in your community?

21  A.    That's correct, yes.

22  Q.    And so, when you were meeting with C.K., you were going

23  home after, right?

24  A.    Yes.  When C███████ was raping me, yes.

25  Q.    Okay.  And you had a cell phone?

─────B.R. v. F.C.S.B.─────

1   A.    I did, yes.

2   Q.    And if you weren't home at a particular time, your mom

3   would call, right?

4   A.    Yes, correct.

5   Q.    And so your mom knew when the bus dropped you home?

6   A.    That's correct.

7   Q.    And at some point your parents started picking you up

8   from school, right?

9   A.    That's much later in the year, after nothing had been

10  done to protect me for months, that's correct, yes.

11  Q.    Okay.  After Thanksgiving they started picking you up

12  from school, right?

13  A.    Occasionally.

14  Q.    And when you took the bus, they knew what time the bus

15  was going to drop you home, right?

16  A.    Yes.

17  Q.    And it's a five-minute walk from your -- from the bus

18  stop to your house?

19  A.    More or less.

20  Q.    And -- your parents also had cell phones, right?

21  A.    Yes.

22  Q.    And your parents didn't work outside the home during this

23  time, correct?

24  A.    My -- like I was saying, my dad had a small beauty

25  distribution business.  So, sometimes he was home; sometimes

B.R. v. F.C.S.B.

113

1    he wasn't.  But, yeah.

2    Q.    Generally when you got home from school there was a

3    parent there, correct?

4    A.    That's fair to say.

5    Q.    And so, when you were seeing C.K. and these rapes that

6    you've told us about were occurring, they were occurring after

7    school, before dinner, right?

8    A.    Yeah, it was terrible.

9    Q.    Okay.  And after you met with him, you went home each

10   time, right?

11   A.    Yes, after he raped me, every time I went home.

12   Q.    And in some of these text messages that said, "I love

13   you," "I want to see you," and said some sexual things, they

14   were sent from your home, right?

15   A.    That would be fair to say, I think.

16   Q.    And late at night sometimes, right?

17   A.    I don't know when in the day they were sent.

18   Q.    Were sometimes in the evening?

19   A.    I guess in the evening, but I don't have a recollection

20   of when exactly.

21   Q.    And he wasn't with you when you were texting him, right?

22   A.    That's correct.

23   Q.    Okay.  And sometimes you'd send them early in the

24   morning, right?

25   A.    I don't recall that being the case.

─────B.R. v. F.C.S.B.─────

114

1    Q.   I think you said yesterday that you kept your phone in

2    your locker at school?

3    A.   Yes.

4    Q.   Okay.  So when you were using your phone, you were either

5    at home -- right?

6    A.   I don't know if I understand your question.

7    Q.   When you were using your phone you weren't at school,

8    correct?

9    A.   That's fair to say.

10   Q.   Okay.  So when you're texting him you're texting him from

11   a location that is not school, correct?

12   A.   That would be fair, yes.

13   Q.   Okay.  And you weren't permitted to spend hours outside

14   of the house unaccounted for, were you?

15   A.   That's correct.

16   Q.   And so, when you're texting him, these messages about "I

17   love you," "I want to see you," sexual things, generally, that

18   was from your home, right?

19   A.   No.

20   Q.   Okay.  Where were you?

21   A.   Sometimes when C███████ was raping me, he would take my

22   phone and he would send text messages to himself.  That would

23   say of the contents "I love you," and stuff like that, so that

24   was not inside of my house.

25   Q.   Okay.  But then sometimes you sent those messages with

B.R. v. F.C.S.B.

115

1    those contents from your house?

2    A.    That's correct, ma'am.

3    Q.    Okay.  Your phone didn't have a password block on it,

4    right?

5    A.    I don't recall.  I'm not sure.  I don't recall that being

6    the case, but I'm not sure.

7    Q.    And you had to give your phone to your mom every night,

8    leave it downstairs, right?

9    A.    I just left it downstairs every night.

10   Q.    Okay.  I think you said that it was a rule applied even

11   to your dad, everybody had to leave their phone before

12   bedtime, right?

13   A.    Yes.

14   Q.    Okay.  So when you were with C.K. and he takes your

15   phone, he would take your phone and text himself, "I love

16   you"?

17   A.    Yes.

18   Q.    Okay.  Any other text that he sent to himself?

19   A.    A variety of other text messages.

20   Q.    Okay.  What kinds of text did he send to himself?

21   A.    Sexual ones.

22   Q.    Okay.  But you also sent sexual ones to him from your

23   house?

24   A.    That is correct, yes.

25   Q.    All right.  So what kinds of things did you send him?

B.R. v. F.C.S.B.

116

1    A.   Could you clarify?  I'm not sure I understand your

2    question.

3    Q.   I just want to make sure we have an understanding of when

4    you say, I had to send him some more sexual things, what kinds

5    of sexual things -- did you send pictures?

6    A.   I don't recall sending pictures.

7    Q.   Okay.  Is it possible you sent pictures?

8    A.   I don't recall that being the case.  I -- never mind.

9    It's fine.

10   Q.   Okay.  So these were all verbal then, right?

11   A.   When you say -- I'm sorry.  When you "verbal," can you

12   clarify that?

13          THE COURT:  I think that's -- let's get the focus.

14   She's asking what did you say in the text messages as a

15   reference to sexual things.  Do you recall specifically what

16   sexual references you made?

17          THE WITNESS:  I'm sure that they were about certain

18   just sexual things, acts.  I don't really have a vivid

19   recollection of what was said, but I don't --

20   BY MS. REWARI:

21   Q.   Did you tell him about sexual acts you wanted to perform

22   on him?

23   A.   I don't recall.

24   Q.   Did you tell him about liking the sexual acts he

25   performed on you?

─────B.R. v. F.C.S.B.─────

117

1    A.    I don't recall that being the case.

2    Q.    Okay.  So when you said "sexual things," can you just

3    explain what you mean by that?

4    A.    I don't honestly remember exactly what I texted him

5    because it was extremely traumatic.  But it was stuff about, I

6    think, just my breasts, stuff about like his genitalia, but I

7    don't recall anything more specific than that.

8    Q.    Did you call him your boyfriend in any of those messages?

9    A.    I don't recall.

10    Q.    Is it possible you called him your boyfriend in those

11    messages?

12    A.    I mean, maybe.  I don't know.

13    Q.    Did he call you his girlfriend in those messages?

14    A.    I don't recall getting that, but I recall the reason he

15    was telling me to text him was because he would -- if I were

16    to ever tell anyone what he was doing to me by violently

17    raping me, he would tell people that I was his girlfriend.

18    Q.    He was 13, right?

19    A.    Yes, but he was a rapist.

20    Q.    Okay.  And the way he got -- he didn't live in your

21    community, correct?

22    A.    It's my understanding he didn't.

23    Q.    Okay.  And he would skateboard over to Middleton Farms,

24    right?

25    A.    I guess so.

B.R. v. F.C.S.B.

118

1   Q.   Well, did you see him ever use any other form of

2   transportation other than walking and skateboarding?

3   A.   I think those are the two ways.  That would make sense.

4   Q.   And he lived with his grandparents?

5   A.   I found that out later on, but yes, it appears that way.

6   Q.   And sometimes he got grounded and couldn't come out,

7   right?

8   A.   I can't speak to what C███████'s schedule or life was.

9   Q.   Okay.  Now, we were talking about Exhibit 171.  Is

10  that --

11              MR. BRENNER:  Is that on the white notebook?

12              MS. REWARI:  That's the one we were just talking

13  about.

14              MR. BRENNER:  The white notebook?

15              MS. REWARI:  Right.  White notebook.

16              THE WITNESS:  Okay.

17  BY MS. REWARI:

18  Q.   And I think I asked you earlier if you recall that your

19  mom blocked C.K.'s phone number from your phone on November

20  14th.  Do you recall that?

21  A.   You did -- I recall you asking me that question, yes.

22  Q.   And if you take a look at Exhibit 171.  And just to

23  yourself, take a look at where it says November 14th and just

24  read that to yourself.

25  A.   I didn't write this --

—————————————— B.R. v. F.C.S.B. ——————————————

119

1   Q.   Okay.

2   A.   -- by the way.  I'm not -- I'm not even really quite sure

3   what exactly I'm looking at.

4   Q.   I just want you to read the paragraph that says "November

5   14th."

6   A.   Okay.

7   Q.   And my question is, does it refresh your recollection

8   that your mom blocked C.K.'s phone number from your phone on

9   November 14th?

10  A.   Like I said, I don't know.  I mean, if that's what it

11  says here, then okay, that makes sense.  But I -- I don't know

12  the exact date.

13  Q.   Do you recall that there was a time that you couldn't

14  call him anymore?

15  A.   I'm not sure.  I'm sure that was the case if the number

16  was blocked, but I don't have a vivid recollection of this.

17  Q.   And if a phone number is blocked, the person can't call

18  you, right?

19  A.   I believe that's the case, yes.

20  Q.   And if a phone number is blocked, the person can't text

21  you, right?

22  A.   I believe that would make sense.

23  Q.   Okay.  And Facebook doesn't run on phone lines, it runs

24  on the internet, right?

25  A.   That's correct.

Direct - B.R.

─B.R. v. F.C.S.B.─

120

1    Q.    And so, if you can't use a phone to contact a person, you

2    can contact them still through Facebook, right?

3    A.    If you have access to it.

4    Q.    Okay.  But you can -- on some phones, if you have a

5    smartphone, you can go on Facebook on your phone, right?

6    A.    If you were to have maybe a smartphone, but I didn't.

7    Q.    Okay.  Did you have a smartphone when you were dating

8    Co███████?

9    A.    No, I did not.

10   Q.    Okay.  You haven't produced any text messages with C.K.

11   in this lawsuit, right?

12   A.    I'm not sure.  I don't think so.

13   Q.    Did you keep any of those text messages with C.K.?

14   A.    I don't know what happened to my phone.  When I was 12

15   years old, I was badly traumatized.  I'm not sure what

16   happened to my phone.

17   Q.    Well, your mom took your phone, right?

18   A.    She did, yes.

19   Q.    Okay.  And now you have your brother's phone number?

20   A.    I currently have my brother's phone number, that's

21   correct.

22   Q.    And your phone number and his phone number were swapped

23   in 2013, right?

24   A.    I don't know the date, but that the sounds about right.

25   Q.    A year after you stopped coming to in-person school?

Direct - B.R.

───── B.R. v. F.C.S.B. ─────

121

1   A.    Uh-huh.

2   Q.    Okay.  And so, the phone you had you gave to your mom,

3   correct?

4   A.    Yes.

5   Q.    And then she gave you your brother's phone?

6   A.    I don't really recall exactly how that transpired, but

7   that sounds about right.

8   Q.    And in 2011, your family didn't have unlimited calling

9   plan; you had to pay for every call, correct?

10  A.    I don't know what my parents had.

11  Q.    And they didn't have unlimited text messaging, either.

12  You had to pay for every text, right?

13  A.    I'm not sure.

14  Q.    Okay.

15            THE COURT:  Had you ever been told that you had to

16  limit the amount of texting and calling that you had done?

17            THE WITNESS:  I don't have a vivid recollection of

18  that.

19  BY MS. REWARI:

20  Q.    You were asked in this case for your text messages with

21  C.K., correct?

22  A.    Yes.

23  Q.    And you didn't produce any?

24  A.    That's fair to say.

25  Q.    And you were asked in this case for your Facebook

—————B.R. v. F.C.S.B.—————

1   messages with C.K., and you didn't produce any, right?

2   A.   I didn't have any Facebook messages with C.K.

3   Q.   And you didn't produce the Facebook posts that we just

4   looked at in Defendants' Exhibit 62 about your best friend,

5   right?

6   A.   I'm not sure -- which one was that again?

7   Q.   The comments in October -- you didn't produce those,

8   right?

9   A.   I'm not exactly sure, but I do know that I produced some

10   things, so I'm not sure.

11   Q.   All right.  Now, you're aware that C.K. produced some

12   Facebook messages to us, right?

13   A.   I believe so.

14   Q.   And you've seen those messages?

15   A.   Um, are you referring -- I'm not -- which one?

16   Q.   You've seen that he's produced over 250 pages of messages

17   with a Facebook user, right?

18   A.   Oh, yes.  I know now what you're talking about.

19   Q.   And you've seen those messages, right?

20   A.   Yes.  I saw them when they were produced to me on the

21   last day of discovery, that's correct.

22   Q.   And you had a chance to look at them.  It's been several

23   months, right?

24   A.   I did have a chance to look at them, that's correct.

25   Q.   And if you could just take a look at Defendants'

───B.R. v. F.C.S.B.───

123

1    Exhibit 1 in the black binder.

2             And in these messages, C.K. -- well, first of all,

3    these are with -- between C.K. and Facebook user, right?

4    A.   That's what it says.

5    Q.   And so, do you understand that Facebook user means it's a

6    deleted account?

7    A.   I guess so.  It just says Facebook user on here, but that

8    makes sense.  I don't know.

9    Q.   Okay.  And in these messages, C.K. addresses Facebook

10   user as B███████, right?

11   A.   I mean, I would have to look through it again.

12   Q.   Why don't you take a look at page 252.  There's numbers

13   down in the corner, K, and then there's a number.

14   A.   Okay.

15   Q.   All right.  Twice on this page he addresses Facebook user

16   as B█████, right?

17   A.   That's what it says here.

18   Q.   And then, Facebook user on page 229 and 230 answers when

19   he calls her B█████?

20   A.   That's what it says in the messages.

21   Q.   And Facebook user on page 171 refers to herself as B█████?

22   A.   Where is it?

23   Q.   It's the third message down on page 171.

24   A.   I do see that, yeah.

25   Q.   Okay.  And then Facebook user again refers to herself as

—— B.R. v. F.C.S.B. ——

124

1   B████ on page 165.

2   A.   Okay.

3   Q.   Do you agree with that?

4   A.   I mean, that's what it says on these messages.

5   Q.   Okay.  And then on page 111, C.K. says to Facebook user,

6   calls her by the name B████ and she responds, right?

7   A.   It says the name B████.

8   Q.   Right.  He calls her by the name of B████ and she

9   answers, right?

10  A.   I would have to check.

11  Q.   On 111.

12  A.   I mean, if that's what you say.

13  Q.   Please take a look.  Read the entry that's at the bottom

14  of page 111 and the response.

15  A.   Are you talking about like five messages down?  Is that

16  what you're referencing?  I'm not sure I'm understanding this.

17  Q.   Sure.  So these messages, the way they print is they go

18  bottom up, so you have to read them from the bottom up.  You

19  do the timestamps there.  Looking at the one that says,

20  "November 13, 2011, 12:00 p.m. 45 seconds."

21           THE COURT:  Basically, ma'am, they read in reverse

22  sequence.  The last one on the top of the page is the last one

23  received.

24           THE LAW CLERK:  Can you say the time again?

25           MS. REWARI:  Yes.  It's noon, noon and 4500ths of a

─────────── B.R. v. F.C.S.B. ───────────

125

1    second, or 45 seconds.

2              THE WITNESS:  I see that.

3    BY MS. REWARI:

4    Q.   Okay.  And so, C.K. addresses Facebook user as B████, and

5    she responds, right?

6    A.   I mean, that's what it says here.

7    Q.   I mean, there were no other girls named B████ at Rachel

8    Carson Middle School that whole year, right?

9    A.   I don't know that.

10   Q.   Okay.  You've been produced a yearbook, Defendants'

11   Exhibit 279.  You've seen the yearbook in this case, right?

12   A.   I haven't seen it.

13   Q.   It's in your binder, Exhibit 279, in the black binder.

14             You don't recall any girls named B████ at Rachel

15   Carson other than you that year, do you?

16   A.   I don't know.  I was there for a month before all of this

17   started happening.

18   Q.   Okay.  In these messages, if you take a look at page 200.

19             Are you okay?

20   A.   No, but let's proceed.

21   Q.   On page 200, the second message on the top at 8:50 p.m.,

22   C.K. discusses going to Middleton.

23   A.   Yeah, where he would rape me.

24   Q.   Okay.  And your neighborhood was called Middleton Farms?

25   A.   That's correct.

Direct - B.R.

─B.R. v. F.C.S.B.─

126

1  Q.   And your street where your bus stop was, was Middleton

2  Farms Road, right?

3  A.   I mean, my bus stop was off of West Ox Road.  I don't

4  know if that's what you mean.

5  Q.   Yeah.  It was at the intersection of Middleton Farms Road

6  and West Ox Road, right?

7  A.   Yes.

8  Q.   And your neighborhood was called Middleton for short,

9  right?

10  A.   Middleton Farms.

11  Q.   Yeah, okay.  And on page 253 as an example, there's a

12  reference to a David.

13         Do you see that?

14  A.   What was your question?

15  Q.   My question is, there's a reference in the middle of

16  page 253 to a David by Facebook user.

17         Do you see that?

18  A.   Yeah.

19  Q.   And C.K. was friends with David, right?

20  A.   Yes.

21  Q.   Okay.  And David is the same name of the boy you went to

22  the pumpkin patch with, right?

23  A.   Yes, who sexually harassed me, yes.

24  Q.   And he's the one that you -- there was a David that we

25  saw in your statement to the school, right?

—————B.R. v. F.C.S.B.—————
                                                                        127

1   A.   When he was sexually harassing me, yes.

2   Q.   And on page 250 -- again, we have to read these

3   backwards.  So 250 to 249 there's a discussion about Facebook

4   user and David breaking up.

5            Do you see that?

6   A.   I don't know.  Is it about David?  It doesn't say his

7   name on this page.

8   Q.   Okay.  Well, maybe you can start -- start looking at it

9   from page 253 and just read up.

10  A.   You want me to read from 253 to 250; is that right?

11  Q.   249, just read up.

12           THE COURT:  Do you want her to read it aloud or to

13  herself?

14           MS. REWARI:  To herself.

15           THE WITNESS:  (Reviewing document.)  I'm done

16  reading.

17  BY MS. REWARI:

18  Q.   Okay.  In these messages, Facebook user discusses a

19  breakup with David that happened on November 4, 2011, right?

20  A.   I don't see the name David mentioned in here.

21  Q.   Okay.  Well, it discusses a breakup with someone on

22  November 4th, correct?

23  A.   I mean, that's what the messages say, but that doesn't

24  make sense.

25  Q.   Okay.  J██████ birthday party was November 4th, right?

B.R. v. F.C.S.B.

128

1    A.   Yes.

2    Q.   And there's references on page 249 about having --

3    Facebook user having been with a J███ the day before, right?

4    A.   Is that on 249?

5    Q.   Yes, on 249.

6    A.   I mean, it just says J███'s name.

7    Q.   Yeah, but the Facebook references that she or he was with

8    J███ the day before, right?

9    A.   I don't mean to be difficult, but I don't know if it's in

10   the right spot.  I don't see anything about yesterday.

11            THE COURT:  You may approach.

12   BY MS. REWARI:

13   Q.   Okay.  So there's a reference on page 249 about having

14   been with J███ the day before, right?

15   A.   It just says the word "yesterday."

16   Q.   And it also refers to someone who kept calling him

17   yesterday?

18   A.   That's what the word says.  I don't know what this means,

19   but --

20   Q.   All right.  But you were friends with a J███ during this

21   time in November 2011, right?

22   A.   I went to her birthday party.

23   Q.   And you were her friend still in October of 2011, right?

24   A.   Before she raped me, yes.

25   Q.   Okay.  There's also references through these messages --

B.R. v. F.C.S.B.

129

1   you can take a look at page 245, as an example, to an Arianna,

2   Facebook user's friend Arianna?

3   A.   Okay.

4   Q.   And there's seven or eight references in these messages

5   to this friend Arianna, right?

6   A.   Yes.  Well, I mean, I only know about the one that you

7   just showed me.

8   Q.   You can take a look at page 243 and then on 228 and 223.

9            (A pause in the proceedings.)

10           MR. BRENNER:  Your Honor, may I approach?

11           THE COURT:  Yes.

12           (Side bar.)

13           MR. BRENNER:  They are welcome to -- they have every

14   right to do a full cross-examination.  I'm just telling you

15   from my observation she's going to shut down right now and I

16   didn't want to say that out loud.  Just knowing her --

17           THE COURT:  Obviously, I respect what you're saying

18   from your perspective as to where your client is.  The thing

19   that the Court needs to be concerned with, as far as the

20   administration of justice, is that we can't have a case where

21   she answers all of your questions and then decides to shut

22   down when the defense is asking questions.  That isn't fair

23   and that's not just.

24           MR. BRENNER:  I understand.

25           THE COURT:  So what I would suggest that maybe some

B.R. v. F.C.S.B.

130

1    of the people who have a better relationship -- I know you've

2    been working with her in the past -- but make her understand

3    that she needs to answer the questions and she needs to answer

4    them as best she can, and that if she does not answer them,

5    then the whole trial may come to a stop.  She needs to

6    understand that.  She can't have it both ways.  She can't just

7    say her side of the story and not deal with the circumstances

8    that may be counter to her story.

9           MS. PEDERSEN:  100 percent.

10          THE COURT:  She needs to understand that.

11          MS. PEDERSEN:  Can I have two minutes with her?

12          THE COURT:  We'll let you take her out.

13          MR. BRENNER:  Just to be clear, I was not suggesting

14   that her testimony should end.

15          THE COURT:  The point I wanted to make for the

16   record is that there needs to be an understanding on -- I'm

17   not saying it's you or Ms. Pedersen or anybody, the

18   professionals here, but the young lady needs to understand

19   that she can't shut down.  She needs to answer the questions

20   even if they are tough questions.  We shad something similar

21   to that happen the other day where I got the impression from

22   information that was made available generally that the witness

23   didn't understand that she was going to have to be

24   cross-examined and that's why she went into distress.  There

25   was some statement to me that she didn't know the other side

1   was going to get to ask her questions.

2            MR. BRENNER:  Not her.

3            THE COURT:  Oh, no, no.  The other lady that was

4   pregnant.  I'm sure we all remember her.

5            MR. BRENNER:  I can assure you that my client has

6   been made fully aware that she was going to be cross-examined,

7   and she does know that she needs to answer the questions to

8   the best of her ability.  I was just trying to, without making

9   any sort of -- to show in front of the jury that she needs a

10  small break.

11           THE COURT:  And the way that you handled that that

12  was very professional and appropriate.  I'm going to rely on

13  you, Ms. Pedersen, to make her understand that she can't just

14  have a break down and decide that she doesn't want to answer

15  the questions from the other side, because the only remedy

16  that would be available to the Court in those circumstances is

17  discount all of her testimony.

18           MS. PEDERSEN:  Yes, Your Honor.

19           MR. BRENNER:  And just one last point.  And I don't

20  mean Your Honor is suggesting this, but the end result is the

21  same, but it's not that she's choosing to break down.

22           THE COURT:  Sure.

23           MR. BRENNER:  It's just -- I just thought, as an

24  officer of the court, having been with her a lot, that's why I

25  moved the seat so I can see her, so I just wanted you to know

B.R. v. F.C.S.B.

132

1    what was going on.

2              THE COURT:  Sure.

3              (Open court.)

4              THE COURT:  All right.  Ladies and gentlemen, we're

5    going to take a break.

6              (Jury excused.)

7              THE COURT:  We're in recess.

8              (Recess.)

9              (In chambers conference held without the jury.)

10             THE COURT:  Let the record reflect that we're back

11   in chambers.

12             MR. BRENNER:  Thank you, Judge.  I wanted to have a

13   conference.  I thought it would be easier than a sidebar.

14   It's all going to be on the record.  I'm trying to get us

15   through this.  I understand what Your Honor said and I don't

16   disagree with a word of it.  Obviously the defendants have a

17   right to a full cross-examination within the rules of

18   evidence, and it would be -- I agree with that.  I don't have

19   one word to say against that.

20             So here is what I see what's happening.  So we have

21   a -- literally it's probably -- we have about 2500 messages

22   because --

23             THE COURT:  From who to who?

24             MR. BRENNER:  I'm sorry?

25             THE COURT:  From who to whom?

B.R. v. F.C.S.B.

133

1          MR. BRENNER:  So it's -- on the document itself,

2     which is all we have right now, we have C███████ K█████ and

3     Facebook user.

4          THE COURT:  Okay.

5          MR. BRENNER:  I understand that Mr. K█████ has

6     been subpoenaed by the defense and is going to testify.  I

7     don't know what he's -- just to give Your Honor just a tiny

8     bit of background.

9          The messages themselves were produced, I think, on

10    the very last day of discovery.

11         THE COURT:  B.R. said that on the stand.

12         MR. BRENNER:  Second to the last day.  So it's after

13    B.R. has been deposed and after Mr. K████ has been deposed.

14    Neither party was re-deposed after those.  So when I say -- I

15    don't really know what Mr. K████ is going to say is the

16    short answer for that.

17         But let's assume for a second he is going to attempt

18    to authenticate the messages.  He can do that.  Your Honor

19    will determine whether he's made a proper authentication.  She

20    is going to say, I believe --

21         THE COURT:  B.R. is going to say?

22         MR. BRENNER:  Yes.  Thank you, Judge.

23         B.R. is going to say that she does not believe these

24    messages are real, she has no recollection of them, and all

25    the stuff you've seen already.  So it seems to me that there's

Direct - B.R.

───B.R. v. F.C.S.B.───

134

1    only so much you can ask a witness who is saying they're not

2    her.  She's saying, "They are not me."

3            And what Ms. Rewari is doing is going through line

4    by line of these thousands of messages, but you have a witness

5    who has already said -- I don't know if she's going to ask it

6    -- but if she was asked in trial -- I'm not sure if she was

7    asked that specific question -- will say that she doesn't

8    recognize these messages, she doesn't think they are real, and

9    she has no recollection of them.

10            So it's not a document in evidence.  You just can't

11   keep reading from a document that's not in evidence.  We're

12   far beyond any foundation.  My recommendation is she ask the

13   witness are these -- Do you recognize these messages?  Are

14   they yours?  I think she already said I don't recognize them.

15   But either way, other than seeing them in the litigation, she

16   can give her answer.

17            And then, when Mr. K█████ comes up, he can testify

18   and say -- and as you pointed out several times -- once a

19   document is in evidence it speaks for itself.  The jury will

20   determine whether to believe Mr. K█████ or my client as to

21   whether they are between them.

22            THE COURT:  Let me stop you there, and I'm following

23   your argument, but I think the problem is is that she's not

24   stated to the extent that you suggested.  She's basically

25   saying, "I don't recall."  And from the perspective of where I

———B.R. v. F.C.S.B.———

135

1    sit "I don't recall" is a safety net to avoid having to deal

2    with things.  I'll tell you that's the perception I have.

3            MR. BRENNER:  In general and in --

4            THE COURT:  Yeah, it's an avoidance thing as opposed

5    to, what can best be described as, a candid response to the

6    question.  You know that's the safety net.

7            I will tell you that -- even during the time that

8    we've had an opportunity to sit down, I've actually started

9    researches to what I can do in a situation, such as this,

10   where a party to an action just simply refuses to cooperate

11   with a cross-examination.  And I don't believe for a moment

12   that she's refusing to cooperate because she's trying to be

13   intentional.  I think she's refusing to cooperate because

14   she's having some struggles with the way that the questions is

15   being asked and the responses she may have to give.

16   And so, as I read the case law, there are a couple of remedies

17   available to me in this instance.  One, I can hold her in

18   contempt.  I'm not going to do that.  Or I can strike all of

19   her testimony which undermines your case significantly because

20   she's the victim in the case.  And that's not something I want

21   to do willy-nilly because it is critical that she have her day

22   in court.  But the bottom line is, because of our adversarial

23   system, they are entitled to inquire.  And if she shuts down,

24   I might have to do what I got to do.

25           MR. BRENNER:  No, I understand that, Judge.  I

Direct - B.R.
─────B.R. v. F.C.S.B.─────

136

1    actually -- when we took our break, there wasn't even a

2    question pending.  I just noticed as I told you --

3              THE COURT:  Yes, she was deteriorating.

4              MR. BRENNER:  Yeah.  So I don't think she hasn't

5    answered a question yet.  That's not my perception of what's

6    going on.  What I'm just saying is there has to be -- it

7    doesn't have to be -- from our perspective, I think there

8    should be a limitation on how much you can read from a

9    document that neither -- that Mr. K███████ hasn't

10   authenticated and she's saying it is not hers.  So right now

11   we're just reading from a document that's not in evidence.

12             THE COURT:  Well, I think -- the theory of the

13   questioning -- and again, Ms. Rewari can better explain it

14   than I can.  But the theory of the question, as I'm getting

15   it, is that okay, there's been all kinds of suggestions and

16   information about Facebook posting and texting and all of

17   that, and she has, through your examination, presented as a,

18   you know, naive 12-year-old who is not involved in all the

19   bullying that apparently was alleged to be prevalent in the

20   school.  And she's sort of saying, I'm not involved, I'm the

21   good kid, I'm the one that's being taken advantage of.  I

22   think that the theory of these emails and the text messages

23   that Ms. Rewari is suggesting is that she's not as naive and

24   uninvolved as one might think she is.  That's for the jury to

25   decide.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Direct - B.R.

B.R. v. F.C.S.B.

137

1          MR. BRENNER:  Sure.

2          THE COURT:  And that they are at least entitled to

3  -- not to undermine her character, but question her

4  credibility as to the type of damage that she's presenting.

5          MR. BRENNER:  Right.  So, for example, there was one

6  of the exhibits.

7          THE COURT:  Did I mess up, Ms. Rewari?

8          MS. REWARI:  No.  And we've said that we've intended

9  to authenticate these messages through her as well as through

10  him.  And, you know, as with any communications with an email,

11  you don't need both parties to authenticate an email.  These

12  messages -- I don't believe there's any good faith basis for

13  her to say she thinks they are fake.  They have --

14          THE COURT:  That's what she's suggested.  She says,

15  "I don't recall these.  I don't know where they come from."

16          MS. REWARI:  Exactly.  And what we've been told is

17  that she recalls messages with him for a period of months and

18  the evidence is the mom blocked his phone.  The only other way

19  for them to communicate was by Facebook.  So I'm trying to

20  show that these are messages that she's told the jury about

21  that he would make her send.

22          MR. BRENNER:  I'm sorry.

23          THE COURT:  Let me ask you this, and, again, it is a

24  civil case and so you're required to at least let the Court

25  know the things that are going on.

B.R. v. F.C.S.B.

138

1          Is anyone intending on calling C.K.?

2          MR. BLANCHARD:  Yes.

3          MS. REWARI:  Yes.

4          THE COURT:  What do you believe C.K. is going to

5   say?

6          MR. BLANCHARD:  So he's going to authenticate and

7   say that that was their communication back and forth.  I'm

8   sure of that.

9          MS. REWARI:  And he is also going to say that they

10  dated.  I mean J███ is going to say they dated as well.

11         MR. BLANCHARD:  Yeah, my client --

12         THE COURT:  Did J.O. date him or did B.R. date him?

13         MR. BLANCHARD:  J.O. and C.K. went out, like, in the

14  month of October.  That's why in the picture when you see the

15  plaintiff walking with that other kid, David ███, and

16  David ███ --

17         MS. REWARI:  David N.

18         MR. BLANCHARD:  There's a lawyer --

19         THE COURT:  Okay.  Don't put him in this.  Let's

20  strike that from the record.

21         MR. BLANCHARD:  I knew you guys would know.

22         That D.N. and C.K. skateboarded.  They were friends.

23  J███ was dating C.K., she breaks up with C.K. right at the

24  beginning of November.  And in the text messages you will see

25  that from what happens next with B.R., who pursues C.K. and

B.R. v. F.C.S.B.

139

1    establishes a relationship --

2              THE COURT:  From a general standpoint, and again

3    this may help me resolve what I have to resolve, is C.K. going

4    to acknowledge an intimate relationship with B.R.?

5              MR. BLANCHARD:  My understanding, and maybe you can

6    speak to that better is, yes, not -- nobody is going to say my

7    client was involved in --

8              THE COURT:  No.  The question is -- and again, I'm

9    trying to figure out all kinds of things that is going on.

10   You believe that C.K. is going to acknowledge an intimate

11   relationship with B.R.?

12             MR. BLANCHARD:  Discuss an incident with B.R.

13             THE COURT:  And will suggest probably that that

14   relationship was consensual.  I'm assuming that's where he's

15   coming from.

16             MR. BLANCHARD:  Yes.  And I think the messages and

17   the Facebook and everything else are going to fully support

18   that.

19             MS. REWARI:  Right.  From our defense, and I think

20   we've talked about this, the messages are critically important

21   because they show that all of this conduct was welcomed and,

22   you know, so far the evidence is the first complaint -- we're

23   saying the first complaint to the school is November 21st

24   these messages show that they dated until November 20th.  They

25   broke up.  November 21st they come to the school --

———————B.R. v. F.C.S.B.———————

                                                                         140

1           THE COURT:  They being?

2           MS. REWARI:  I'm sorry, yes.  B.R. and C.K. date

3   from November 5th through November 20th.  He breaks up with

4   her on November 20th.  The morning of November 21st is the

5   first complaint to the school.  And then the school takes

6   action and then there is no interaction between C.K. and B.R.

7   that's reported by her or her mother.  So it's really

8   important for us to be able to show the report the school got.

9   The school's investigation was that she had dated both of

10  these boys.  She didn't put that in her statement.  The school

11  found that out from D.N.'s statement and from talking to

12  students.

13          THE COURT:  Let me suggest something to you and then

14  I'll get back to you Mr. Brenner.

15          MR. BRENNER:  Sure.

16          THE COURT:  Let me suggest something to you.

17  Because of the -- what's the best word -- I don't to want say

18  tenor because that's suggestive that she's doing something

19  wrong -- but the exchange of the examination, I think that's

20  sort of getting lost in the wash, because you're asking the

21  question, she deteriorates, we look for it, breaks down.  So

22  we sort of lost the energy associated with it.

23          So I am suggesting, and again you all will do what

24  you think you need to do as advocates, is that maybe the best

25  way is to ask her to take a look at the entire situation, all

B.R. v. F.C.S.B.

141

1    these emails, the 2500 emails, ask her a general question:

2    What do you recollect about this?  She's likely going to say,

3    I have no recollection.  Okay.  And then sort of leave it

4    alone and let it be filled in, to the extent it can be,

5    through C.K.

6              MS. REWARI:  Well, Your Honor, I intend to try to

7    move these in through her because I believe we can establish

8    -- and the reason I'm going through all of this -- is

9    circumstantial evidence to show that there are numerous

10   indicia in these messages that this is her, and regardless of

11   whether she remembers them or not, the jury can receive them

12   now as messages between her and C.K.

13             THE COURT:  Let me ask you this, Ms. Rewari, and I

14   appreciate your comment.  What is the difference between them

15   receiving them -- okay, I think I know the answer.  The

16   difference between receiving them now or receiving them at a

17   later date.  You essentially want to publish all of them.

18             MS. REWARI:  Correct.  And there's a very different

19   narrative of events in these messages in terms of how they're

20   meeting, when they're meeting, what they're doing.  And so,

21   she's testified yesterday that she was being, you know,

22   touched at school, for example.  And in these messages --

23             THE COURT:  Well, why don't we do it this way -- and

24   Mr. Brenner I'll hear from you after I make this suggestion.

25             MR. BRENNER:  Thank you.

B.R. v. F.C.S.B.

142

1    THE COURT:  Why don't we do this, assuming for the

2   sake of discussion, that she's going to deny or not recall,

3   which has been consistent.  You simply reading those things

4   that were a part of that exchange, asking her if she has any

5   recollection of that.  She'll say "no," and then ask them to

6   be admitted into evidence, I'll take it under advisement until

7   an additional amount of foundation is provided by C.K.

8    MS. REWARI:  Okay.  I do have a few more questions

9   on circumstantial evidence because I believe we heard

10  yesterday that I think the suggestion is going to be that

11  someone was impersonating, you know, impersonation.  There are

12  certain things in these messages that show no one can be

13  impersonating her.

14   THE COURT:  Yeah.  A certain indicia of reliability.

15   MS. REWARI:  Right.

16   THE COURT:  I get that.

17   MS. REWARI:  And I didn't mean to make her go

18  through every page.  She said, "You showed me one page."  So I

19  was just saying well there is other pages.  I don't intend to

20  do that with her.  I was just sort of going through my list of

21  the circumstantial evidence I believe is in the messages.

22   THE COURT:  You know this record very well.  Why

23  don't you go through the text messages -- I think email

24  messages.  Pick out your best ones, ask her about those, and

25  then move on, and then ask that they be admitted into

B.R. v. F.C.S.B.

143

1   evidence.  I'll take it under advisement, and then we'll see

2   what C.K. says.

3           MS. REWARI:  Okay.  And may I then ask her without

4   you know -- may I refresh her recollection without -- I

5   haven't published anything to the jury yet, and I haven't -- I

6   haven't read anything --

7           THE COURT:  Some of my law students have snuck into

8   the courtroom and we have gone over past recollection record

9   and present recollection refresh.  And so, I want them to see

10  a classic example the way it's done.  As I say, you can

11  refresh someone's recollection with an apple.  Does this

12  refresh your recollection?  Yes, it does.  I recall this now

13  or past recollection record -- or you can read it into the

14  record because it's under oath.  I'm glad that the lawyers --

15  new lawyers are getting to see how it's done.

16          Let's do it the way I suggest, because I think it

17  will help facilitate things, and we'll avoid the possibility

18  of her deteriorating to the extent that I have to do something

19  that I prefer not to do.

20          MS. REWARI:  Okay.  So if I'm understanding

21  correctly, I can still ask her a few more questions for

22  circumstantial evidence?

23          THE COURT:  Yup.

24          MS. REWARI:  I mean, I'm not going to make her read

25  it unless she wants to read -- we're going to get more

B.R. v. F.C.S.B.

144

1    specific.  Right now it's just reading the names.

2          THE COURT:  Just read those things.  As my good

3    friend and colleague, Judge Hilton, would say, pick your best

4    ten and use those and then and then you can follow-up saying,

5    There are a lot of other exchanges in this, would you agree?

6    Yes, there are.

7          And then we can see what C.K. says.

8          MR. FAHEY:  So he would say, Pick your best three.

9          (Laughter.)

10          MR. BRENNER:  So I guess my question is, so I'm just

11    not sure where Ms. Rewari is going with this.  So if it's, for

12    example, if there's something in -- like she already did, if

13    they wanted to establish that some of the messages say the

14    name B███ in it, we don't need the witness to do that, right?

15    The document says what it does.  For your purposes --

16          THE COURT:  Yeah, it says what it says.

17          MR. BRENNER:  So I don't know if there is stuff that

18    they -- and maybe there is -- that they need her to -- maybe

19    there's something they need her to confirm that you couldn't

20    see just from you and I, and she can see.  I don't know -- I

21    don't think we need to do, Does it say B███?  You can see

22    that.

23          THE COURT:  We've already gone down that road and I

24    think the jury is in depth enough to figure out that B███

25    being a somewhat unusual name that there is some connection or

Direct - B.R.

B.R. v. F.C.S.B.

145

1    significance of what we don't know to this case.

2              MR. BRENNER:  And the other thing I was going to say

3    -- if it's not the time or the forum to do it, but I would say

4    that Counsel's understanding of what C.K. is going to testify

5    to is not as clean as -- unless he's going to testify

6    consistent with his deposition -- inconsistent with his

7    deposition.

8              THE COURT:  We'll see.

9              MR. BRENNER:  Right.  Well, that's what I'm saying.

10   And that's why it's suggested that's the better time to do it.

11   I don't know what he's going to say.  I only know what he said

12   in deposition.

13             THE COURT:  Inquiring minds want to know.

14             MR. BLANCHARD:  And my representation is based on

15   what Mr. David [sic] put in his affidavit in one of the

16   motions.

17             THE COURT:  Mr. Davis.

18             MR. BRENNER:  There's no affidavit from Mr. Davis.

19             MR. BLANCHARD:  I'm sorry his brief.  Where he --

20   the affidavit was missing is the problem.  One of the

21   problems.  On the foundation issue.  That he -- that he put in

22   his brief that his client will testify to the -- how he found

23   the -- and authenticate.

24             MR. BRENNER:  Yes, I agree with that.  It was the

25   other stuff about the sexual encounter and -- Mr. K██████

Direct - B.R.
─────B.R. v. F.C.S.B.─────
146

1   will, I think Your Honor will find, has some interesting

2   testimony about Facebook messages.  I'll leave it at that.

3            THE COURT:  We'll see.  But again --

4            MR. BLANCHARD:  The one that he's contesting now.

5            THE COURT:  Right now let's focus on what we're

6   focusing -- try to do right now.

7            What I'm interested in is the best way, and I think

8   Ms. Rewari is in agreement with this, and I think I hear that

9   you're in agreement, is to go ahead and move through this as

10  efficiently as we can so we don't get ourselves in a box that

11  we can't get out of, because if this young lady is suffering,

12  from the extent of challenges that has been suggested, and

13  whether it's related to this case or something else, it is

14  clear to me that this lady has challenges.

15           MR. BRENNER:  Sure.

16           THE COURT:  That we don't want to have a situation

17  where her challenges overwhelm her and put us in a spot that I

18  don't think any of us want to be in.

19           MR. BRENNER:  So can I just talk to her to tell her

20  what's going to happen.

21           THE COURT:  I asked Ms. Pedersen to do that.

22           MR. BRENNER:  Well, I'm just filling in the --

23           THE COURT:  Specifically what Ms. Rewari --

24           MR. BRENNER:  Yeah.

25           THE COURT:  I don't have a problem with that.

─────────── B.R. v. F.C.S.B. ───────────

1    MR. BRENNER:  I'm just trying, as you said, I'm

2  trying to get to the next -- over the next hump.

3    THE COURT:  I don't have a problem with that at all.

4  And I think your point will be well made, Ms. Rewari.

5    I'll even give a simple instruction to the jury and

6  I'll come up with something that's appropriate so they know

7  that we've tried to facilitate the presentation.

8    MR. BRENNER:  Sure.

9    MS. REWARI:  It's your courtroom so -- but in terms

10  of if she needs a break, you know, I'm trying to give her a

11  minute and --

12    THE COURT:  I watch her all the time -- and I will

13  tell you, and others may disagree, I think that you've been

14  very patient with her and your manner has been appropriate and

15  it's been respectful.  I don't have any problem with that at

16  all, and even though apparently the Press doesn't like you

17  very much, so.

18    MR. BATES:  Just for the record, I am not --

19    THE COURT:  Mr. Bates.

20    MR. BATES:  Or my scooter.

21    THE COURT:  Off the record.

22    (Off the record discussion.)

23    MR. BLANCHARD:  Just for the record, the credibility

24  issues from for my client are -- the defense is tied to the

25  credibility of the plaintiff's testimony.

B.R. v. F.C.S.B.

148

1            THE COURT:  Right.

2            MR. BLANCHARD:  So I would note that I won't oppose

3    the solution the Court's posing, but when I get to cross,

4    there may be things that I need to go into.

5            THE COURT:  And again, as I said on, I think,

6    yesterday, I said I thought Ms. Rewari would basically cover,

7    in a very broad stroke, most of the things that are going to

8    be --

9            MR. BLANCHARD:  I was hoping that.

10           THE COURT:  And that you would get the opportunity

11   to cross-examine specifically on those items that relate to

12   J.O.

13           MR. BLANCHARD:  And then some of that may -- I don't

14   want to recover ground, but if we're cutting off questions

15   about what she did or didn't write, and when she gives these

16   answers of "I don't recall," it's problematic as to what she's

17   testified to in terms of what you can go into.

18           THE COURT:  From the defense standpoint, were you

19   planning on calling C.K. before or after J.O.?

20           MR. BLANCHARD:  I don't think --

21           MS. REWARI:  Yeah, I don't think we've figured that

22   out.  Again, we think that --

23           THE COURT:  From an efficiency standpoint, again

24   there's trial strategy, but from an efficiency standpoint, I

25   think C.K. before J.O. would probably be the best course.

Direct - B.R.

—B.R. v. F.C.S.B.—

149

1          MS. REWARI:  Right.  And it just sort of depends on

2    his -- because he is out of state and we have subpoenaed him.

3    And I don't want to retread ground, but, you know, it's

4    different from a defendant's perspective if you get the

5    admission, if you get the credibility question from the

6    plaintiff's testimony versus having a defendant who is going

7    to -- or not a defendant, but a witness who is going to

8    dispute the plaintiff's account.

9          And so again, I'm going to -- I will try to be as

10   focused as possible.  We're getting narrowed down to, you

11   know, single instances in these messages.  And what I intend

12   to do -- just so Mr. Brenner knows -- I intend to move them

13   in, and I know --

14         THE COURT:  I'll take them under advisement.

15         MS. REWARI:  And then I'm going to ask her about the

16   narrative that's in these messages without the jury reading

17   them.  At some point, hopefully, they'll get to read them, but

18   the narrative that is told from these messages.

19         THE COURT:  And again, if you could get it as

20   focused as you possibly can with, you know, 10, 12, or less

21   questions that would be fine.

22         MS. REWARI:  Okay.

23         THE COURT:  We're all on the same page.

24         MS. REWARI:  I'm told there's some looks of

25   confusion on the jury, so I'm trying to do it baby steps.

B.R. v. F.C.S.B.

150

1          MR. BRENNER:  So just so I understand.  I got the

2   part where you -- but then the follow-up, I guess, putting

3   aside the document that you're going to ask her things like,

4   Did you tell C.K. blah.

5          THE COURT:  Well, actually simpler than that.  In

6   these exchanges can you look at line -- page 47, line 12 where

7   it says blah, blah, blah.  Did you say this?  No, I don't

8   recall.  Looking at line --

9          MR. BRENNER:  Well, then we're back to reading -- I

10  thought we were going to avoid that.  I thought she was going

11  to use this foundationally to lay the predicate which C.K.

12  would fill in the gaps.  Presumably that he's going to say

13  what counsel thinks -- I don't have any reason to doubt that.

14  I'm not suggesting otherwise.

15          And then they are going to move it in.  I can say

16  objection for the record.  You can say, Take it under

17  advisement.  At that point, I thought Ms. Rewari was going to

18  start asking her questions that later -- so she says, for

19  example, Did you ever tell C.K. X, Y, Z?  And she says, I

20  don't recall doing that.  Or, No, I never did that.

21          If the document comes in later, they'll be able to

22  say and argue she told you she didn't say this and here it is.

23  So as opposed to -- I didn't think you could just read from

24  the document.

25          MS. REWARI:  And I think I'm somewhere in the

Direct - B.R.

─────B.R. v. F.C.S.B.─────

151

1   middle.  I was going to do it that way.  What I was going to

2   do is, if she says, "No," I would say look at pages blah, blah

3   to blah, blah, and, you know, these lines.  Does that refresh

4   -- and you know without reading it.

5          THE COURT:  And the way present recollection refresh

6   is -- it's a twofold thing, as you know.  A person looks at

7   it, you ask him to refresh his recollection, and they say, No,

8   it does not, and then you're stuck.

9          MS. REWARI:  Right.

10          THE COURT:  If they say it does refresh his

11   recollection, then you get to ask the question again.  Provide

12   an answer.

13          So as I say, pick your best ten or so and work

14   through the process and we'll see how it plays out, and we'll

15   go from there.  All right.

16          MR. BRENNER:  I just want to put on the record

17   because you had said you don't know if others disagree.  I'm

18   not accusing Ms. Rewari of doing anything unprofessionally or

19   untoward.

20          THE COURT:  No.  Zealous advocacy.

21          All right.  Thank you.

22          (In chambers conference concluded.)

23          (Court proceedings resumed at 12:58 p.m.)

24          THE COURT:  Before we bring the jury in, let the

25   record reflect that all counsel and the Court had an

—B.R. v. F.C.S.B.—

152

1   opportunity to discuss means and manners of more efficiently

2   handling this examination.  It was a good colloquy between all

3   the lawyers and the Court.  And we look forward to this matter

4   being presented in an efficient and professional manner.

5              (Jury present.)

6              THE COURT:  Ladies and gentlemen of the jury,

7   oftentimes when you are out longer than you expect, you wonder

8   what may be going on in court.

9              A lot of times this judge and the lawyers will work

10  together to come up with more efficient ways of presenting

11  evidence to you.  And so we've been taking advantage of that

12  time.

13             You've heard reference to some email exchanges or

14  Facebook exchanges -- a better way of putting it -- that may

15  or may not have existed between individuals involved in this

16  case.

17             The Court has been made aware that there may be

18  2500 pages of these exchanges that --

19             MR. BRENNER:  No, not 2500.  About -- that would be

20  the amount of messages.  The pages would be about 250, 275.

21             THE COURT:  Okay.  2500 messages over 250 pages that

22  may or may not have been exchanged between individuals in this

23  case.

24             What we're going to do is this.  Counsel for the

25  defendant, School Board, is going to highlight certain

———B.R. v. F.C.S.B.———

153

1    circumstances in those exchanges and work through those.

2          There may be a chance where we get to allow you to

3    see the entire exchange of emails, depending on certain other

4    evidence that's offered in the case.  So pay attention as best

5    you can, and we'll try to get our lunch around 1:30.

6          MS. REWARI:  Thank you, Your Honor.

7          THE COURT:  Yes, ma'am.

8    BY MS. REWARI:

9    Q.   Ms. R., before the break we were talking about references

10   in these messages to an Arianna, right?

11   A.   Yeah.

12   Q.   And there's also messages in -- references in these

13   message to an Olivia, right?

14   A.   I mean, if you have examples and you want to go through

15   it, sure.  But I don't -- you're just now telling me things.

16   Q.   Okay.  Well, I'm happy to cite you an example.

17   A.   Yes, please.

18   Q.   You can take a look at page --

19   A.   And what exhibit is this?

20   Q.   Exhibit 1 in the black binder.

21   A.   Okay.

22   Q.   Okay.  Page 26.

23   A.   Okay.  What's your question?

24   Q.   There's references -- for example, on page 26, the last

25   message, there's a reference to an Arianna, an Olivia, and a

1  Patrick, right?

2  A.    Correct, but I have no idea what this is in context to.

3  You're just showing me a random message.

4  Q.    Okay.  You were friends with an Arianna, correct?

5  A.    That's correct.

6  Q.    And you had two good friends named Olivia, right?

7  A.    That's correct.

8  Q.    And you talked yesterday about a boy named Patrick?

9  A.    There's a boy named Patrick involved in sexually

10  harassing me, yes.

11  Q.    Okay.  On page 166, Facebook user gives C.K. her locker

12  number?  And that's Locker No. 498?

13  A.    I need to take a look at this message.

14  Q.    Sure.

15  A.    You said 168; is that correct?

16  Q.    166.  If you take a look at the message that has a time

17  stamp of 10:23 p.m. on November 9, 2011.

18  A.    I don't recall what my locker number was.

19  Q.    Okay.  Would you please take a look at Defendants'

20  Exhibit 44 in that black binder.

21  A.    Okay.

22  Q.    Okay.  And this is your student record, right?

23  A.    It appears to be my student record; however, there is

24  some handwriting in there.

25  Q.    Okay.

B.R. v. F.C.S.B.

155

1          MS. REWARI:  Your Honor, I move to admit this

2   document.  I believe there is no objection to this.

3          MR. BRENNER:  No objection.

4          THE COURT:  Without objection, and you may publish.

5   (Defendants' Exhibit No. 44, was admitted into evidence.)

6          MS. REWARI:  Grady, if you could move in at the top.

7   And actually, if you go down to the bottom.  And can we just

8   take a look at the Bates number.

9   BY MS. REWARI:

10  Q.   This is -- this Bates number indicates this is a document

11  produced by your family, right?

12  A.   If I understand Bates numbers correctly, then that would

13  make sense.

14  Q.   Okay.  And then if you go back up to the top, that's your

15  name at the top, right?

16  A.   Yes, this is my name.

17  Q.   Okay.  And your student ID?

18  A.   It says my student ID.

19  Q.   And your birthday is correct there?

20  A.   Yes.

21  Q.   Okay.  And then it says, "Grade 7?"

22  A.   Yes.

23  Q.   And then someone's handwritten under "Locker Number" 498,

24  right?

25  A.   It's handwritten and it says "498," yeah.

───────── B.R. v. F.C.S.B. ─────────

1   Q.   Okay.  And there's a combination next to it?

2   A.   It appears to say that, yes.

3   Q.   And again, this locker number matches the locker number

4   that's on page 166 of Exhibit 1 as a locker number that

5   Facebook user gives C.K. and her locker number, right?

6   A.   I mean, it's possible that Facebook user did, but B█████

7   didn't give C███████ these.

8   Q.   Okay.  And in -- on that page she also tells him that her

9   locker is under the Explorers banner.

10           Do you see that?

11  A.   I do see that.

12  Q.   Okay.  And you were in the Explorers pod during the fall

13  of 2011, right?

14  A.   It says -- hold on one second.  I don't think that the

15  message says it exactly like you just said.

16  Q.   Okay.  She directs him that, "The locker's location is

17  where the Explorers banner thingy is on the wall.  My locker

18  is there," right?

19           THE COURT:  Is that what it says?

20           THE WITNESS:  That's now what it says.

21  BY MS. REWARI:

22  Q.   Okay.  And your locker was near the Explorers banner in

23  pod A, right?

24  A.   It's near it but I read the message differently.

25  Q.   Okay.  Would you take a look at Defendants' Exhibit 279,

─────────────────────B.R. v. F.C.S.B.─────────────────────
                                                                    157

 1   which is the yearbook?  It's in that black binder.

 2            MS. REWARI:  Your Honor, this is not in evidence yet

 3   I believe.

 4            THE COURT:  Any objection?

 5            MR. BRENNER:  No objection.

 6            THE COURT:  Without objection.  You may publish.

 7   (Defendants' Exhibit No. 279, was admitted into evidence.)

 8   BY MS. REWARI:

 9   Q.   Okay.  And Mister -- well, you're welcome to look at it

10   in the book.

11   A.   What am I looking for?

12            MS. REWARI:  Grady, could you take us to page 85.

13   Could you zoom in on that picture on the bottom right there?

14            It might be easier if you want to look at it on the

15   screen.  It's a little bit harder in the printout.

16            Can you zoom that a little bit more?

17            THE WITNESS:  Okay.

18   BY MS. REWARI:

19   Q.   And that's you at your locker under the Explorers banner,

20   correct?

21   A.   If you say that's me.  I don't really know.  I mean,

22   maybe.  I don't know.

23   Q.   Okay.  That's where your locker was, though, right?  Near

24   the Explorers banner?

25   A.   In the vicinity, but -- yeah, in that vicinity.

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

—B.R. v. F.C.S.B.—

158

1   Q.   Okay.

2   A.   I'm not sure exactly that's where my locker was, but in

3   that vicinity.

4   Q.   And that's the back wall in pod A that we were looking at

5   where -- where your locker was, you were looking towards the

6   science classroom?

7   A.   I'm sorry.  Can you please repeat that question again?

8   Q.   Sure.  It might be easier if we go back to Exhibit 192,

9   which were the pictures of the locker pod.  I think we looked

10  at page 8.

11         MS. REWARI:  And, Your Honor, I believe this is --

12  we talked about this earlier this morning.

13         THE COURT:  Yes.

14  BY MS. REWARI:

15  Q.   And so, I think you drew on this picture before.  Your

16  locker was on -- in the last row, on the left side looking out

17  into the building with the wall on your back, right?

18  A.   Yeah, that sounds about right.

19  Q.   Okay.  And that wall is where, during your 7th grade year

20  there was a banner that said "Explorers," right?

21  A.   I mean, if that's what you say it said.  I don't have a

22  vivid recollection of that, but if that's what you say was

23  there.

24  Q.   Well, do you recall that there was a banner there on the

25  wall?

Direct - B.R.

─────B.R. v. F.C.S.B.─────

159

1  A.   I don't recall there being a specific banner, but I

2  recall there was some tape there, so that -- that would make

3  sense.

4  Q.   Right.  And it said "Explorers" on it, right?

5  A.   That would make sense.  I could see that.

6         MS. REWARI:  All right.  You can take that down,

7  thank you.

8  BY MS. REWARI:

9  Q.   If you look at -- go back to Exhibit 1, these are the

10 Facebook messages.  And if you would turn to page 33.  And in

11 the message that is November 15th, 2011, at 10:17 p.m.

12        Do you see that?  It's the third message on this

13 page.

14 A.   I see that.

15 Q.   And Facebook user discusses her mom's birthday.

16        Do you see that?

17 A.   I do.

18 Q.   And your mom's birthday is around November 15th, right?

19 A.   My mom's birthday is on November 16th.

20 Q.   Okay.

21 A.   Not November 15th.

22 Q.   Okay.  And she discusses celebrating her mom's birthday

23 on November 15th, right?

24 A.   That's correct, but that's, again, not how the message is

25 written here exactly.

Direct - B.R.

─B.R. v. F.C.S.B.─

160

1    Q.   Okay.  On page 150 of these messages, Facebook user

2    refers to a boy named David "spreading rumors that weren't

3    true, like I gave him a BJ," right?

4    A.   Where are you now?  I'm sorry.

5    Q.   On page 150.  You're reading up from the bottom, and so

6    I'm directing you to the two messages up at the top.  And the

7    first one in time is November 11, 2011, at 3:58 p.m., and the

8    second one is at 3:59 p.m.

9    A.   I see David's name.

10   Q.   And I'm directing your attention to the message that

11   says, "David spreaded rumors that weren't true, like I gave

12   him a BJ."

13   A.   I see that there, but again, I have no idea what we're

14   looking at.

15   Q.   You allege in this case that a boy named David spread

16   rumors that weren't true, like that you gave him a BJ, right?

17   A.   That's correct, but you're having me look at bunch of

18   messages that I've never seen until you produced it to me the

19   day before discovery and which is just --

20              THE COURT:  Ma'am, ma'am.  Just try to answer the

21   questions as best you can.

22              THE WITNESS:  I can't answer this because I don't

23   know what these messages are even about.

24   BY MS. REWARI:

25   Q.   I'm asking for your allegation in this case.  You

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

──────B.R. v. F.C.S.B.──────

1  reported to the school and you're alleging in this case that a

2  boy named David spread rumors that weren't true about you, and

3  one of those rumors was that you gave him a BJ, right?

4  A.    That he was going around saying I gave people and him

5  oral sex.  That is what he said.  But that wasn't a secret.

6  Everyone knew that.

7  Q.    Okay.  All right.  On page -- starting at page 174 --

8  again, we're moving backwards -- there's discussion of -- of

9  needing money to pay David for a lost longboard.

10            (Court Reporter clarification.)

11  A.    Okay.

12  BY MS. REWARI:

13  Q.    And a longboard is a skateboard, right?

14  A.    I mean, I assume so.

15  Q.    Okay.  And you gave C.K. money to pay for a longboard

16  that belonged to David, right?

17  A.    To be clear, I did not give it to him.  He forced me.

18  Q.    Okay.  But the $50 that you gave him was to pay David

19  because C.K. lost David's longboard, right?

20  A.    So I didn't find out that fact until much later on, like

21  I mentioned to you in my deposition.  What I told you was that

22  C████████ told me I needed to give him $50.  It was not until

23  later on that I found out at school that C████████ was in

24  trouble for stealing David's longboard.

25  Q.    Okay.  All right.  On page 59 of these messages.  I'm

─────B.R. v. F.C.S.B.─────

162

1   looking at the messages at the bottom of the page that start,

2   "November 14, 2011."  Okay?  And there's a discussion there

3   between Facebook user and C.K. about her mother going through

4   her cell phone records and seeing that Facebook user and C.K.

5   had talked a long time.

6           Do you see that?

7   A.   I see that but I have no recollection of a conversation

8   that I ever had like that with my mother.

9   Q.   Okay.  Your mom gave the school phone logs in November

10  2011, right?

11  A.   That's my understanding, yes.

12  Q.   Okay.  And those are the only phone logs that have been

13  produced by anybody in this case, right?

14  A.   I can't speak on behalf you subpoenaed my mother.  I can

15  only speak on behalf of what you gave me a subpoena for.

16  Q.   Okay.  And so, you didn't produce any phone records other

17  than what was already in the school's file from November 2011,

18  correct?

19  A.   Yeah, and I was 12 years old.

20  Q.   All right.  Well, please look at Defendants' Exhibit 84.

21           MR. BRENNER:  I'm sorry.  What was the number?

22           MS. REWARI:  In the black binder.  84.

23           MR. BRENNER:  8-4?

24           MS. REWARI:  Right.

25  BY MS. REWARI:

B.R. v. F.C.S.B.

163

1  Q.   Okay.  And do you recognize these as a call log from your

2  cell phone -- for your cell phone number from November 2011?

3  A.   I don't think I'm on the right page.  Hold on.  I see

4  Stacy's phone log.  Where is it?

5  Q.   On the front page it says "Dash Inc. Call Log."

6           Do you see that?

7  A.   Yes.  Now I see it.

8           MS. REWARI:  All right.  Your Honor, if there's no

9  objection I would move this into evidence.

10           THE COURT:  Without objection?

11           MR. BRENNER:  No objection, Your Honor.

12           THE COURT:  You may publish it if you choose.

13  (Defendants' Exhibit No. 84, was admitted into evidence.)

14  BY MS. REWARI:

15  Q.   And so your phone was registered to Dash Inc. in November

16  2011, right?

17  A.   I don't know how I'm supposed to know that.

18  Q.   That's your parent's business, Dash Inc.?

19  A.   Yeah, but I don't know how my parents' phone lines and --

20  I guess so, if that's what you're telling me, but I don't

21  know.

22  Q.   All right.  Now, this log has a print date down at the

23  bottom of November 21, 2011, right?

24  A.   That's what it says.

25  Q.   And, in fact, the email from your mom --

Direct - B.R.

B.R. v. F.C.S.B.

164

1          (The jury has a question.)

2          THE JUROR:  Our video doesn't -- it blinked out.

3          THE COURT:  Just a moment.

4          (A pause in the proceedings.)

5          THE COURT:  If I could, we'll get someone to come up

6   to take a look at it.  If I can get you to slide down and take

7   a look at the boards closer to you.  You have to sit a little

8   closer.  This is the way you would have to sit if we had a

9   whole bunch of people in the jury, so consider yourself

10  fortunate.  Thank you, ladies and gentlemen.  All right.

11         (Discussion off the record.)

12  BY MS. REWARI:

13  Q.   Okay.  The email from your mom to the school on the

14  afternoon of November 21st, 2011, at 2:47 p.m. that was

15  Plaintiff's Exhibit 79 referenced, and I think we looked at

16  this paragraph earlier, that -- that she had been working with

17  Sprint to unblock C.K.'s number from your cell phone.

18         You may have that if you would like to take a look

19  at it.  It's still up there Plaintiff's Exhibit 79.  Could you

20  go to that one for a moment, please?

21  A.   Thank you.  Okay.  What about this one, I'm sorry?

22  Q.   Please take a look at the second paragraph there.

23  A.   Okay.

24  Q.   And then she said there, "I've been working with Sprint

25  for the past two hours to unblock C.K.'s phone number from

—B.R. v. F.C.S.B.—

165

1    B.R.'s cell phone, so the sexually explicit message left from

2    his number could be shared with you.  Unfortunately, Sprint's

3    technical department has advised me that everything related to

4    that number, voicemail and call history, has been discarded on

5    the phone, as is policy when a block is requested.  The only

6    retrievable detail is the call log from our account."

7            Right?  That's what she wrote?

8    A.   That's what my mother wrote.

9    Q.   Okay.  And so if you go back to what we were just looking

10   at, Defendants' Exhibit 84, and this is the call log, and it

11   has a print date of November 21st, 2011.

12           Do you see that?

13   A.   I do see that.

14   Q.   Okay.  And it looks, again, that the numbers -- you have

15   to read from the bottom up, and some of these are faded, but

16   the very top, the last date is November 21, 2011.

17           Do you see that?

18   A.   Yes.

19   Q.   And there's a bunch of calls to voicemail that morning.

20           Do you see that?

21   A.   I do see that.

22   Q.   And they start at 8:19 a.m., correct?

23   A.   That's what it says on here.

24   Q.   And it's about the time you came with your mom to the

25   school and tried to play the voicemail, right?

Direct - B.R.

B.R. v. F.C.S.B.

166

1   A.   Again, to be clear, my mom was the one trying to play the

2   voicemail.  I wasn't the one playing the voicemail.

3   Q.   Okay.  And I think you said she spent, like, two hours

4   trying to get the voicemail?

5   A.   Again, that was a rough estimate.  I'm not 100 percent

6   sure about how long it was, but --

7   Q.   And there's a series of calls here to voicemail, 8:19 to

8   9:33.

9        Do you see that?

10  A.   That's what it says there.

11  Q.   But this log only goes back as far as November 14th,

12  2011, on the next page, right?

13  A.   I mean, that's what it says.

14  Q.   Okay.  And the number -- the numbers that are called on

15  November 14th -- and you can see -- let me step back a

16  second -- an incoming call is denoted on this log as incoming,

17  and then an outgoing call is denoted with an address -- I

18  mean, a location, right?

19  A.   I can't tell.  It's faded.

20  Q.   Okay.  Well, do you see some in the -- where it says,

21  "Destination," under that sometimes it says, "Incoming"?

22  A.   I see there's one that says "incoming" on there.

23  Q.   And then sometimes it says -- it has a location?

24  A.   I do see that , yes.

25  Q.   And when it says, "West Palm Beach, Florida," that's for

B.R. v. F.C.S.B.

167

1  all the voicemail -- well, all the voicemails are calls to

2  West Palm Beach, Florida, because that's where your phone

3  number was based from, right?

4  A.   I guess so.

5  Q.   You had a 561 extension?

6  A.   Yes.

7  Q.   And you still do, right?

8  A.   Yes, I do still have a 561 number.

9  Q.   Yeah, okay.  And so, when we're looking on the second

10 page, and then calls start on November 14th on this log.

11 There's time stamps for every call.

12          Do you see that?

13 A.   I do see some.

14 Q.   Okay.  And there's some calls before 8:00 a.m., three

15 calls actually, right?

16 A.   I can't see the date on that, but if that says -- if

17 you're telling me that says 11/14, then I believe you, but I

18 just can't tell on my copy.

19 Q.   There's three -- you can see the time stamps, though,

20 right?  7:34 a.m. -- it might be easier on the screen.

21 7:34 a.m., 7:35 a.m.?

22 A.   I can kind of see it a little bit, yeah.

23 Q.   Okay.  And then there's a gap until 2:57 p.m., correct?

24 A.   It seems that way.

25 Q.   Okay.  And school at Rachel Carson this year dismissed

Direct - B.R.

—————————B.R. v. F.C.S.B.—————————

168

1   around 2:50 p.m., right?

2   A.   I don't recall the exact time, but if that's what time

3   you tell me, then that makes sense.

4   Q.   Well, it was around 3:00 p.m., right?

5   A.   If that's what you say, then that makes sense.

6   Q.   And the number that's called at 2:57 p.m., that's C.K.'s

7   number, right?

8   A.   I'm not 100 percent sure at this time, but that would

9   maybe make sense.

10  Q.   Why don't you take a look in the white binder under

11  Plaintiff's Exhibit 171.  And if you just direct your

12  attention to the paragraph that says November 14th, and

13  there's a phone number listed there, right?

14  A.   Yes, I see that.

15          MS. REWARI:  I think this is in, Your Honor.  Oh,

16  no, it's not?  Oh, thank you.

17  BY MS. REWARI:

18  Q.   Okay.  There's a phone number listed there, and it says

19  C████████'s number?

20  A.   That's what it says on here.

21  Q.   And that's the same number that's on this log that we

22  were just looking at as being called at 2:57 p.m., and again

23  at 2:59 p.m., right?

24  A.   That makes sense.

25  Q.   Okay.

─────────B.R. v. F.C.S.B.─────────

169

1  A.   I don't know.

2  Q.   Well, does it match?  You have both of those in front of

3  you.  Does it match?

4  A.   I feel like I'm kind of not understanding what exactly

5  you're asking me.  I'm sorry, I'm just -- you're giving me

6  times, and maybe if you can repeat that, I don't really

7  understand.

8  Q.   Sure.  Okay.  So in the Exhibit 171, there's a phone

9  number --

10  A.   In the chronology that my mom wrote?

11  Q.   Right.  And your mom gives a phone number for C.K.?

12  A.   Okay.

13  Q.   And this is a chronology she gives to the school at some

14  point, right?

15  A.   Yes, because they didn't investigate, yes.

16  Q.   And so there's a phone number listed there for C.K.?

17  A.   Yes, that's what it says.

18  Q.   Okay.  And that is the same phone number that is being

19  called on this call log on November 14th at 2:57 p.m. and at

20  2:59 p.m., right?

21  A.   You need to pull back up the call log.

22        THE COURT:  Let me ask it another way, ma'am.  The

23  reference that your mother apparently made in her email

24  regarding someone else's telephone number, I believe it was

25  C.K., ending in 795, does it appear, based from what you can

─────────

—B.R. v. F.C.S.B.—

170

1   see on the exhibit in front of you, match the last three

2   numbers of that number at 2:59 p.m., 2:57, and --

3          THE WITNESS:  Are you asking me to do it on the --

4   the voicemail log?

5          THE COURT:  All right.  Let's see if we can focus a

6   little bit.

7          Your mother gave a statement with regard to a number

8   that she had claimed had some bad information, bad statements

9   on it, right?

10          THE WITNESS:  Yeah.

11          THE COURT:  And that number had as its last four

12   digits 1795?

13          THE WITNESS:  I guess so.

14          THE COURT:  Okay.  Does the 1795 in the number that

15   your mother referenced coincide with the number on this

16   particular document that's on the screen, 1795?

17          THE WITNESS:  Yeah.  That makes sense.

18          THE COURT:  Okay.

19   BY MS. REWARI:

20   Q.   Okay.  And if we can go to the first page of this log.

21   We're still on Defendants' Exhibit 84.  Again, it might be

22   easier, because this copy is faded, to just look at it on the

23   screen.

24   A.   It's really hard to look at my screen to my left.  I'm

25   not trying to be difficult.  It's just really hard.  It makes

─── B.R. v. F.C.S.B. ───

1   me feel really sick.

2   Q.   Okay.  Well, you're welcome to look at it in the book.  I

3   just want to make sure you're able to see what you need to

4   see.

5          THE COURT:  Do you see it in the book, ma'am?

6          THE WITNESS:  What are you asking me again?  I'm

7   sorry.

8   BY MS. REWARI:

9   Q.   I'm directing your attention to the bottom of the first

10  page of Defendants' 84.

11  A.   Okay.

12  Q.   And then there's five more calls to the same number with

13  the same extension, 1795 there.

14          Do you see that?

15          THE COURT:  Actually there's six.

16          MS. REWARI:  Six, thank you.

17          THE WITNESS:  I see that, yeah.

18  BY MS. REWARI:

19  Q.   Okay.  Well, there's five outgoing calls to that number,

20  and then one incoming call from that number, right?

21  A.   I'm going off of what you're telling me.

22  Q.   Well, please, take your time.  You can take a look.

23  Count them.

24  A.   It's like it's hard to see on this copy.  I'm trying not

25  to be difficult, but it's hard for me to look at the screen,

─────B.R. v. F.C.S.B.─────

172

1    so if you tell me it's five or six, then I trust you.

2    Q.   Okay.  All right.  Well, so all of these calls are -- on

3    this page are before 3:30 p.m.  There's time stamps there.

4    A.   Okay.

5    Q.   And then there's an incoming call from that 1795

6    extension -- last four digits, at 3:21 p.m., right?

7    A.   Okay.

8    Q.   And then there's a call incoming at 4:15 p.m., and that's

9    an incoming call from your home phone, right?

10               MR. BRENNER:  Which call are you --

11               MS. REWARI:  At 4:15 p.m., there's a number --

12               MR. BRENNER:  You mean 4:25?  Is that what you're

13   referring to?

14               MS. REWARI:  Oh, I'm sorry.

15               MR. BRENNER:  I'm just trying to see where you're

16   referring to.

17               MS. REWARI:  Thank you, thank you, 4:25.

18   BY MS. REWARI:

19   Q.   4:25 p.m., and the last four digits are 3838.

20   A.   If you say -- I don't recall what my home number was, but

21   that sounds right, if that's what you're telling me.

22               THE COURT:  Mr. Brenner, to help move things along,

23   can you agree that the number 3838, based upon your

24   information and belief, is the number associated with her

25   family, based on your information and belief?

─── B.R. v. F.C.S.B.───

173

1          MR. BRENNER:  I honestly don't know, Your Honor.

2    BY MS. REWARI:

3    Q.   If you can take a look at Defendants' Exhibit 44.  That

4    was the student's record we were just looking at, there's a

5    phone number listed there under "home phone."

6    A.   I don't mean to be difficult, by the way.  I just don't

7    know.

8    Q.   It's fine.

9          MR. BRENNER:  It appears from Exhibit 44 that it's

10   the same number, Your Honor.

11         THE COURT:  Okay.  And can you also agree that the

12   number 1795 coincides with the numbers on that particular

13   exhibit?

14         MR. BRENNER:  When we were trying to match the

15   two --

16         THE COURT:  Yeah.

17         MR. BRENNER:  Yeah, the 1795 appears to be on both

18   exhibits.

19         THE COURT:  Very good.  Thank you.

20   BY MS. REWARI:

21   Q.   And I think you said earlier on Defendants' Exhibit 84

22   that behind this log is a log that says Stacy and K., right?

23   A.   Yeah.

24   Q.   And that's C.K.'s mother?

25   A.   Yeah.

B.R. v. F.C.S.B.

174

1   Q.   And so this is her log -- phone log, right?

2   A.   It appears to be.

3   Q.   And you see that there's some entries on this log that

4   are highlighted, or they're grayed out?

5   A.   It appears to say that or look that way.

6   Q.   And would you agree that the ones that are grayed out are

7   calls from a 561 number?

8   A.   I mean, I don't know if they are all coming from a --

9   like -- can you clarify that?

10  Q.   Sure.  So the ones that appear in gray, with lines

11  through them on this log, are calls from a 561 number.

12  A.   You're saying they are -- all are coming from a 561?

13          THE COURT:  Let's try it this way, ma'am.

14          A little bit down the page on 11/14 at 3:20 p.m.

15  let's focus on that one.

16  Do you see that one?

17          THE WITNESS:  I'm sorry, that was on --

18          THE COURT:  Do you see that one?

19          THE WITNESS:  You said 11/20 --

20          THE COURT:  11/14.

21          THE WITNESS:  11/14.  Oh, yes, I see that.

22          THE COURT:  Okay.  Do those numbers ending in 6212

23  appear, for the next five numbers, to be the same number?

24          THE WITNESS:  Yes, they appear to be the same

25  number.

─────B.R. v. F.C.S.B.─────

175

1        THE COURT:  If we drop down to 11/13, they're sort

2   of out of order because they're reverse sequence.  Are the

3   ones ending in 6212 on those dates 11/13, the, I guess, fourth

4   and fifth one down, do you see those?

5        THE WITNESS:  I see that one, yes.

6        THE COURT:  Okay.  And then there's another one on

7   11/12 -- again, and we're reverse sequence -- ending in 6212.

8        THE WITNESS:  That would make sense, yes.

9        THE COURT:  Okay.  You recognize that those all are

10  coming from -- apparently, based on the information, they are

11  from West Palm Beach, Florida, or a phone associated with West

12  Palm Beach, Florida.

13        THE WITNESS:  I do see that but I just am not sure

14  if your question is if they are all coming from me or -- I

15  don't know what you're -- are you say -- like I'm --

16        THE COURT:  I'm just trying to verify the numbers.

17        THE WITNESS:  Oh, yeah.  I'm sorry.  I didn't --

18  misunderstood the question, yeah.

19        THE COURT:  You're fine.

20  BY MS. REWARI:

21  Q.   And that was your phone number?

22  A.   Yes, that's correct.

23  Q.   And the longest call on C.K.'s log on November 14th is a

24  nine-minute call with your phone number, right?

25  A.   I mean, that's what the log says.

1  Q.   Okay.

2  A.   It doesn't change the fact that he raped me.

3  Q.   Okay.  And the longest call on your log -- the first page

4  of Defendants' Exhibit 84, the longest call on your log on

5  November 14th is also this nine-minute call with C.K.'s

6  number, right?

7  A.   If that's what you say, yes.

8  Q.   All right.  So let's go back to -- Defendants' Exhibit 1,

9  the Facebook messages.  And again, take you back to page 59.

10  And Facebook user tells C.K. that her mother went through her

11  phone log and saw that she and C.K. had talked a long time,

12  right?

13  A.   Again, I have to check the message on this.  You said 59?

14  Q.   Yes.

15          THE COURT:  Ms. Rewari, when you finish this

16  particular area of inquiry, we can go ahead and take our lunch

17  break.  I'll let you finish up here.

18          MS. REWARI:  Thank you.

19          THE WITNESS:  I'm sorry.  Can you ask your question

20  again.

21  BY MS. REWARI:

22  Q.   On page 59, Facebook user, on November 14 -- the night of

23  November 14, 2011, Facebook user tells C.K. that her mother

24  went through her cellphone records and saw that she and C.K.

25  had talked a long time.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

1    A.    That's what it says, but again, I don't recognize any of

2    these messages and I think it's very coincidental these were

3    produced after two of my depositions where we spent 14 hours

4    together.

5    Q.    Okay.  And she also tells him that "Someone left me a

6    horrible message," on page 58, right?

7    A.    Again, that's what it says, but I don't know anything

8    about these messages.

9    Q.    Okay.  Your mom reported to the school that someone left

10   you a horrible voicemail on November 14, 2011, right?

11   A.    My mom reported that there was a sexually threatening

12   voicemail, yes.

13   Q.    Okay.  And if we went back to Exhibit 84 and we would

14   look, we would see that someone called voicemail from your

15   phone before 8 p.m. that night, right?

16   A.    I mean, if that's what you say, then sure.

17   Q.    And in these messages, Facebook user tells C.K. it was a

18   voicemail that was the horrible message.

19           This the top of page 58, right?

20           THE COURT:  There was a -- wrong exhibit was up,

21   which was -- it confused people.

22           MS. REWARI:  Thank you.  Sorry.

23           THE WITNESS:  I'm sorry, what was that?

24   BY MS. REWARI:

25   Q.    On page 58, Facebook user tells C.K. the horrible message

─────B. R. v. F.C.S.B.─────

178

 1    was a voicemail?

 2    A.   Again, that's what it says, but I don't know what these

 3    messages are.  And I will keep saying that.

 4    Q.   Okay.  And on page 57, Facebook user tells C.K., "It

 5    sounded like David or his friend."

 6    A.   You said 57?

 7    Q.   Yes.

 8    A.   Well, I didn't listen to the voicemail.  How would I know

 9    that?

10    Q.   I'm asking you what the messages say, ma'am.  The

11    messages say that the horrible voicemail that Facebook user

12    received was from David or his friend, correct?

13    A.   That is what it says, but that makes no sense.

14    Q.   Okay.  And Facebook user tells C.K. on this page that her

15    mother wanted to report it to the school but she, Facebook

16    user, did not want to, right?

17    A.   I don't know -- what page are you on now?

18    Q.   Same page, page 57.  Message at 8:38 p.m.

19    A.   I don't see that on -- on 57 or 58, I'm sorry?  I don't

20    see --

21    Q.   On page 57, third message from the top, 8:38 p.m. and

22    11 seconds.

23    A.   I got it.  Sorry.

24    Q.   Okay.  And so Facebook user tells C.K. that her mom wants

25    to report it to the school but she said no and started crying

Direct - B.R.

─B.R. v. F.C.S.B.─

179

1    and ran.

2    A.    Well, clearly that's not true because I wrote a statement

3    on November 21st saying I was scared to come to school.

4    Q.    Okay.  And on page 51 Facebook user tells C.K. about what

5    her brother and her father was saying about this voicemail,

6    right?

7    A.    What was your question?  I'm sorry.

8    Q.    Facebook user tells C.K. what her father and her brother

9    wanted to do about the voicemail, right?

10   A.    I don't recall having a conversation with my father or

11   brother to the contents of what are in this message, so I

12   don't know how that would make any sense.

13   Q.    I'm asking in these messages --

14   A.    I mean, yes, the messages say what you want them to say,

15   but I don't recognize the messages.  These messages are not

16   mine, I've been adamant about that, and it's very suspicious

17   that these were produced to me --

18              THE COURT:  Ma'am, ma'am --

19              THE WITNESS:  -- on the last day of discovery.

20              THE COURT:  -- ma'am.  As best you can, listen to

21   the questions --

22              THE WITNESS:  Sorry.

23              THE COURT:  -- of counsel, and to the extent that

24   you can -- I know you're passionate about your situation, but

25   don't try to editorialize.  Simply answer the questions.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Direct - B.R.

B.R. v. F.C.S.B.

180

1           THE WITNESS:  What was your question?

2           THE COURT:  It's a good time to break.  It's a good

3   time to break.

4           All right.  Ladies and gentlemen, 2:30.  All right.

5   Please don't discuss the case or any aspect of the case with

6   anyone.

7           (Jury excused.)

8           THE COURT:  You can step down, young lady.

9           All right.  We're going to take our break until

10  2:30.  Give me one representative from each one of the

11  parties, in the library.

12          (Lunch Recess 1:44 p.m.)

13          (A.M. Session concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 26th day of

9    March, 2024.

10          I further certify that the foregoing 203 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this August 26, 2024.

17

18

19

20

21   _____
                              Tonia M. Harris, RPR
22                            Official Court Reporter

23

24

25

                                                          181

## $

**$50** [18] - 53:12, 53:21, 54:12, 55:1, 55:5, 55:7, 55:10, 55:12, 55:15, 55:17, 55:18, 55:25, 58:2, 61:10, 61:23, 61:25, 161:17, 161:21

## '

**'15** [1] - 24:18

## 0

**05** [1] - 4:14
**07** [1] - 4:4

## 1

**1** [5] - 122:25, 153:19, 156:3, 159:8, 176:7
**10** [2] - 67:23, 149:19
**10/18/2011** [1] - 90:11
**100** [24] - 2:2, 2:6, 2:10, 10:4, 18:7, 18:9, 19:23, 24:14, 29:12, 33:4, 39:21, 56:2, 60:6, 67:12, 79:23, 87:24, 91:13, 95:22, 101:14, 109:14, 109:22, 130:8, 166:4, 168:7
**10:00** [1] - 44:7
**10:03** [1] - 1:6
**10:12** [1] - 44:9
**10:17** [1] - 159:10
**10:23** [1] - 154:16
**11** [2] - 160:6, 178:21
**11/12** [1] - 175:6
**11/13** [2] - 174:25, 175:2
**11/14** [4] - 167:16, 174:13, 174:19, 174:20
**11/20** [1] - 174:18
**110A** [1] - 80:23
**111** [3] - 124:4, 124:10, 124:13
**112A** [1] - 80:2
**113A** [1] - 79:20
**115A** [1] - 79:6
**116A** [1] - 78:19
**11:40** [2] - 108:6, 108:9
**11:44** [1] - 108:11
**11A** [1] - 80:19
**12** [15] - 6:4, 22:7, 23:21, 25:17, 27:17,

28:13, 52:19, 84:16, 92:16, 98:4, 98:5, 120:13, 149:19, 150:5, 162:18
**12-year-old** [1] - 136:17
**120** [1] - 3:6
**12:00** [1] - 124:19
**12:58** [1] - 151:22
**13** [3] - 67:23, 117:17, 124:19
**137A** [1] - 81:10
**14** [10] - 50:2, 51:6, 51:11, 51:12, 51:20, 162:1, 176:21, 176:22, 177:2, 177:9
**14th** [12] - 104:8, 118:19, 118:22, 119:4, 119:8, 166:10, 166:14, 167:9, 168:11, 169:18, 175:22, 176:4
**15** [4] - 44:1, 51:7, 51:21, 74:18
**150** [2] - 159:25, 160:4
**1520** [1] - 1:20
**155** [1] - 4:8
**157** [1] - 4:12
**15th** [4] - 159:10, 159:17, 159:20, 159:22
**163** [1] - 4:12
**165** [1] - 123:25
**166** [3] - 154:10, 154:15, 156:3
**168** [1] - 154:14
**16th** [1] - 159:18
**170** [1] - 104:15
**171** [8] - 104:12, 104:16, 118:8, 118:21, 123:20, 123:22, 168:10, 169:7
**174** [1] - 161:6
**1775** [1] - 3:9
**1795** [7] - 170:11, 170:13, 170:15, 171:12, 172:4, 173:11, 173:16
**18** [6] - 30:3, 65:8, 65:22, 66:11, 90:20, 90:21
**1801** [1] - 3:6
**181** [2] - 4:15, 181:10
**18th** [2] - 90:8, 90:16
**192** [2] - 82:4, 158:7
**1:19-cv-917** [2] - 1:4, 181:8
**1:30** [1] - 153:4

**1:44** [1] - 180:11

## 2

**2** [1] - 65:6
**200** [2] - 125:17, 125:20
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2011** [41] - 47:7, 53:7, 63:6, 64:14, 64:17, 66:20, 70:25, 75:8, 87:11, 87:23, 90:8, 90:17, 94:8, 95:3, 95:5, 95:14, 96:20, 98:8, 110:21, 121:7, 124:19, 127:18, 128:20, 128:22, 154:16, 156:12, 159:10, 160:6, 162:1, 162:9, 162:16, 163:1, 163:15, 163:22, 164:13, 165:10, 165:15, 166:11, 176:22, 177:9
**2011/2012** [1] - 30:20
**2012** [12] - 9:24, 10:3, 10:17, 18:6, 19:9, 20:7, 20:11, 20:12, 21:3, 21:17, 31:7, 46:23
**2013** [2] - 33:22, 120:22
**2014** [3] - 21:16, 24:10, 24:18
**2015** [1] - 24:10
**2016** [2] - 25:16, 29:14
**2017** [2] - 30:19, 33:3
**2019** [2] - 30:19, 36:6
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2020** [1] - 35:4
**2021** [1] - 41:10
**2023** [2] - 35:22, 39:16
**2024** [4] - 1:6, 31:7, 181:9, 181:16
**2029** [1] - 1:19
**20th** [3] - 139:23, 140:2, 140:3
**21** [11] - 75:8, 83:20, 94:8, 95:3, 95:5,

95:14, 96:20, 98:8, 104:3, 163:22, 165:15
**213-995-5720** [1] - 1:21
**21st** [15] - 47:7, 53:6, 56:4, 63:5, 64:17, 66:20, 70:25, 85:25, 90:4, 139:22, 139:24, 140:3, 164:13, 165:10, 179:2
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**223** [1] - 129:7
**22314** [1] - 3:14
**228** [1] - 129:7
**229** [1] - 123:17
**230** [1] - 123:17
**2300** [1] - 1:15
**24-year-old** [2] - 52:14, 52:15
**24/7** [1] - 28:24
**243** [1] - 129:7
**245** [1] - 128:25
**249** [6] - 127:2, 127:10, 128:1, 128:3, 128:4, 128:12
**250** [6] - 122:15, 127:1, 127:2, 127:9, 152:19, 152:20
**2500** [5] - 132:20, 140:25, 152:17, 152:18, 152:20
**252** [1] - 123:11
**253** [4] - 126:10, 126:15, 127:8, 127:9
**26** [4] - 1:6, 153:21, 153:23, 181:16
**26th** [1] - 181:8
**275** [1] - 152:19
**279** [4] - 125:10, 125:12, 156:24, 157:6
**279**........................
............. [1] - 4:12
**2800** [3] - 2:3, 2:7, 2:11
**2:20** [1] - 71:15
**2:30** [2] - 180:3, 180:9
**2:47** [2] - 63:8, 164:13
**2:50** [2] - 63:10, 167:25
**2:57** [5] - 167:22, 168:5, 168:21, 169:18, 170:1
**2:59** [3] - 168:22, 169:19, 170:1
**2nd** [2] - 2:2, 2:6, 2:10

95:14, 96:20, 98:8, 104:3, 163:22, 165:15
**213-995-5720** [1] - 1:21

## 3

**305-539-8400** [1] - 2:8
**33** [1] - 159:9
**33131** [2] - 2:3, 2:7, 2:11
**36** [7] - 65:4, 65:7, 65:8, 65:10, 65:22, 66:9, 66:11
**36/18** [1] - 65:17
**38/7** [1] - 65:18
**3838** [2] - 172:18, 172:22
**3:00** [4] - 17:7, 18:5, 18:24, 168:3
**3:20** [1] - 174:13
**3:21** [1] - 172:5
**3:30** [1] - 172:2
**3:58** [1] - 160:6
**3:59** [1] - 160:7

## 4

**4** [1] - 127:18
**400** [1] - 3:10
**401** [1] - 3:13
**44** [4] - 154:19, 155:4, 173:2, 173:8
**44**..............................
............ [1] - 4:8
**45** [3] - 4:5, 124:19, 124:25
**4500ths** [1] - 124:24
**47** [1] - 150:5
**498** [3] - 154:11, 155:22, 155:24
**4:15** [2] - 172:7, 172:10
**4:19** [1] - 71:2
**4:25** [3] - 172:11, 172:16, 172:18
**4th** [3] - 100:21, 127:21, 127:24

## 5

**51** [1] - 179:3
**56** [2] - 94:13, 94:21
**56**..............................
............ [1] - 4:9
**561** [5] - 167:4, 167:7, 174:6, 174:10, 174:11
**57** [5] - 178:3, 178:5, 178:17, 178:18, 178:20
**58** [8] - 96:3, 96:11, 96:15, 99:23, 177:5, 177:18, 177:24, 178:18

**58**...........................
.............. [1] - 4:9
**59** [8] - 97:6, 97:10, 98:23, 99:23, 161:24, 176:8, 176:12, 176:21
**59**...........................
.............. [1] - 4:10
**5th** [1] - 140:2

**6**

**6** [1] - 10:15
**60** [3] - 98:18, 98:22, 99:12
**60**...........................
.............. [1] - 4:10
**61** [1] - 77:17
**610-804-1787** [1] - 2:4
**62** [6] - 86:14, 86:20, 86:23, 89:8, 122:3
**62**...........................
.............. [1] - 4:11
**6212** [3] - 174:21, 175:2, 175:6
**643a** [1] - 1:16
**6th** [2] - 86:2, 88:1

**7**

**7** [4] - 1:8, 10:15, 155:20
**70** [1] - 4:11
**77** [4] - 47:21, 61:9, 61:21, 71:25
**78** [3] - 101:16, 101:17, 101:19
**79** [4] - 62:12, 71:5, 164:14, 164:18
**795** [1] - 169:24
**7:34** [2] - 167:19, 167:20
**7:35** [1] - 167:20
**7th** [5] - 46:19, 69:25, 74:9, 110:17, 158:18

**8**

**8** [3] - 82:16, 158:9, 177:14
**8-4** [1] - 162:22
**80** [9] - 68:11, 68:12, 68:23, 70:9, 70:19, 74:14, 84:20, 84:24, 84:25
**80**...........................
.............. [1] - 4:11
**804-788-8200** [1] - 3:2
**82** [2] - 89:6, 89:7
**84** [9] - 162:19,

162:21, 163:12, 165:9, 170:20, 171:9, 173:20, 176:3, 177:12
**84**...........................
.............. [1] - 4:12
**85** [1] - 157:11
**850-585-3414** [1] - 2:12
**86** [1] - 4:11
**8:00** [1] - 167:13
**8:19** [2] - 165:21, 166:6
**8:38** [2] - 178:17, 178:20
**8:50** [1] - 125:20
**8th** [3] - 71:19, 74:6, 74:10

**9**

**9** [1] - 154:16
**90067** [1] - 1:20
**94** [1] - 4:9
**96** [1] - 4:9
**97** [1] - 4:10
**98** [1] - 4:10
**9:00** [3] - 17:7, 18:4, 18:24
**9:33** [1] - 166:7

**A**

**A.F** [1] - 3:5
**a.m** [8] - 1:6, 44:9, 108:11, 165:21, 167:13, 167:19, 167:20
**A.M** [2] - 1:8, 180:12
**ability** [5] - 50:24, 89:1, 89:4, 131:7, 181:14
**able** [7] - 13:6, 31:21, 42:9, 109:1, 140:7, 150:20, 171:2
**abrenner@bsfllp. com** [1] - 2:8
**absolutely** [2] - 36:25, 91:13
**accept** [3] - 88:23, 88:24, 105:11
**access** [1] - 120:2
**according** [2] - 54:3, 75:7
**account** [6] - 87:11, 88:5, 88:23, 123:5, 149:7, 165:5
**accounts** [2] - 88:1, 88:4
**accurate** [1] - 51:3

**accusing** [1] - 151:17
**acknowledge** [2] - 139:3, 139:9
**action** [5] - 45:7, 46:22, 85:7, 135:9, 150:5
**Action** [2] - 1:4, 181:8
**activities** [2] - 72:17, 110:25
**acts** [4] - 75:1, 116:17, 116:20, 116:23
**adamant** [1] - 179:15
**add** [1] - 38:13
**addition** [1] - 14:23
**additional** [2] - 39:4, 142:6
**address** [5] - 22:25, 27:9, 27:14, 37:25, 166:16
**addressed** [1] - 85:4
**addresses** [3] - 123:8, 123:14, 125:3
**addressing** [2] - 45:22, 91:1
**adduced** [1] - 181:6
**administration** [1] - 129:19
**administrative** [1] - 108:13
**administrators** [1] - 58:22
**admissibility** [2] - 69:15, 106:25
**admissible** [6] - 105:18, 105:22, 105:25, 106:4, 107:1, 107:8
**admission** [3] - 33:5, 70:14, 149:4
**admit** [4] - 94:18, 96:10, 106:15, 154:25
**Admitted** [1] - 4:7
**admitted** [22] - 11:1, 32:24, 47:9, 47:23, 62:14, 70:19, 86:20, 94:21, 96:15, 97:10, 98:22, 101:19, 101:20, 104:19, 106:5, 106:7, 107:4, 142:5, 142:24, 154:4, 157:6, 163:12
**advanced** [1] - 8:4
**advantage** [4] - 6:11, 81:21, 136:20, 152:10
**adversarial** [1] - 135:21
**advised** [3] - 71:14, 75:2, 165:2

**advisement** [7] - 30:4, 30:17, 31:3, 142:5, 142:25, 149:13, 150:16
**advocacy** [1] - 151:19
**advocates** [1] - 140:23
**affidavit** [3] - 145:14, 145:17, 145:19
**afoul** [1] - 12:12
**afraid** [4] - 11:14, 43:14, 43:15, 43:16
**afternoon** [3] - 19:2, 63:17, 164:13
**ago** [5] - 39:17, 90:20, 90:21, 102:3, 102:4
**agree** [14] - 14:18, 54:20, 91:11, 91:13, 105:5, 105:9, 108:17, 124:2, 132:17, 144:4, 145:23, 172:22, 173:10, 174:5
**agreed** [4] - 69:10, 105:10, 107:7, 108:13
**agreement** [4] - 69:17, 94:3, 146:7, 146:8
**ahead** [8] - 44:5, 59:8, 64:3, 69:6, 69:18, 108:5, 146:8, 176:15
**al** [2] - 1:6, 181:7
**alanderson@bsfllp. com** [1] - 1:21
**alcove** [4] - 48:1, 61:2, 61:5, 67:1
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**all-girl** [1] - 73:10
**allegation** [1] - 160:24
**allegations** [2] - 46:22, 93:2
**allege** [1] - 160:14
**alleged** [3] - 30:20, 92:20, 136:18
**alleging** [1] - 160:25
**allow** [3] - 14:8, 15:18, 153:1
**allowed** [2] - 12:3, 12:4
**allowing** [1] - 69:10
**almost** [1] - 40:20
**alone** [1] - 141:3
**aloud** [1] - 127:11
**ALSTON** [1] - 1:11
**amount** [3] - 121:15, 142:6, 152:19
**Anderson** [1] - 1:18
**Andrew** [21] - 2:5, 9:10, 40:24, 40:25, 41:1, 41:9, 41:10,

41:11, 41:12, 41:15, 41:16
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**angle** [3] - 77:13, 77:15, 81:23
**annoyed** [1] - 23:5
**ANSWER** [9] - 66:6, 66:21, 66:24, 67:3, 67:6, 67:9, 67:14, 67:17, 68:4
**answer** [26] - 16:2, 16:15, 26:17, 28:10, 28:14, 58:6, 67:18, 67:21, 67:22, 83:24, 84:17, 92:24, 111:4, 130:2, 130:3, 130:18, 131:6, 131:13, 133:15, 134:15, 141:14, 151:11, 160:19, 160:21, 179:24
**answered** [3] - 52:8, 54:8, 136:4
**answers** [7] - 45:10, 50:13, 50:14, 123:17, 124:8, 129:20, 148:15
**anticipate** [1] - 13:25
**anticipating** [1] - 30:7
**anxieties** [1] - 25:1
**anxiety** [2] - 8:17, 20:5
**apart** [2] - 83:22, 84:2
**apologize** [2] - 13:14, 92:4
**apologized** [1] - 91:25
**app** [1] - 41:13
**appear** [8] - 82:25, 96:1, 99:2, 169:24, 174:9, 174:22, 174:23
**APPEARANCES** [3] - 1:13, 1:25, 2:24
**apple** [1] - 143:10
**applied** [1] - 115:9
**appointments** [1] - 43:23
**appreciate** [4] - 46:6, 47:11, 61:4, 141:13
**approach** [8] - 12:11, 30:12, 38:22, 49:19, 56:9, 104:22, 128:10, 129:9
**approaching** [1] - 74:19
**appropriate** [3] - 131:11, 147:5, 147:13
**approximate** [2] -

25:13, 36:5
**April** [3] - 10:3, 18:6, 20:18
**area** [19] - 21:1, 21:4, 21:5, 21:22, 21:23, 21:24, 22:1, 23:12, 52:13, 61:2, 73:21, 78:19, 79:3, 79:11, 81:8, 111:19, 176:15
**argue** [2] - 32:5, 150:21
**argument** [1] - 134:22
**Ari** [3] - 41:3, 41:4, 41:7
**ari** [1] - 41:5
**Arianna** [6] - 128:25, 129:1, 129:4, 153:9, 153:24, 154:3
**Arizona** [1] - 40:3
**arm** [1] - 97:25
**arms** [2] - 9:2, 28:6
**Aronson** [2] - 37:9, 37:18
**articulate** [1] - 23:22
**aside** [2] - 104:13, 150:2
**aspect** [2] - 6:15, 180:4
**assault** [3] - 30:21, 54:22, 99:21
**assaulted** [1] - 54:15
**assaults** [1] - 54:4
**assess** [1] - 38:23
**assessment** [2] - 86:12, 91:13
**assist** [3] - 108:15, 109:1, 109:3
**assistant** [4] - 58:24, 60:2, 60:5, 79:24
**associate** [1] - 14:3
**associated** [3] - 140:21, 172:23, 175:10
**association** [1] - 8:21
**assume** [3] - 19:8, 133:16, 161:13
**assuming** [2] - 139:13, 141:25
**assure** [1] - 131:4
**attack** [1] - 43:15
**attempt** [1] - 133:16
**attempting** [1] - 30:19
**attend** [1] - 85:15
**attending** [2] - 32:2, 34:4
**attention** [5] - 111:2, 153:3, 160:9, 168:11, 171:8
**attorney** [2] - 46:7, 68:3

**attorneys** [2] - 44:2, 45:6
**attribute** [1] - 30:19
**August** [1] - 20:21
**Austin** [1] - 43:3
**authenticate** [1] - 133:17, 137:8, 137:10, 138:5, 145:22
**authenticated** [1] - 136:9
**authentication** [1] - 133:18
**available** [3] - 130:21, 131:15, 135:16
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**avoid** [5] - 37:25, 106:23, 134:25, 143:16, 150:9
**avoidance** [1] - 135:3
**aware** [6] - 8:13, 45:5, 93:6, 122:10, 131:5, 152:16

# B

**B.H** [1] - 3:5
**B.R** [24] - 1:3, 4:3, 45:5, 71:15, 71:18, 71:21, 74:17, 75:4, 85:3, 102:15, 102:16, 133:10, 133:12, 133:20, 133:22, 138:11, 138:24, 139:3, 139:10, 139:11, 140:1, 140:5, 181:7
**B.R.'s** [2] - 71:11, 164:25
**baby** [1] - 149:24
**background** [1] - 133:7
**backup** [1] - 181:13
**backwards** [2] - 127:2, 161:7
**bacterial** [2] - 31:18, 32:13
**bad** [13] - 7:16, 7:20, 8:3, 8:5, 8:18, 8:19, 9:15, 9:18, 17:23, 17:25, 170:7
**badly** [1] - 120:14
**balance** [1] - 20:10
**B**▮▮▮ [1] - 79:24
**B**▮▮▮▮ [1] - 79:22
**banner** [8] - 156:8, 156:16, 156:21, 157:18, 157:23,

158:19, 158:23, 158:25
**bar** [5] - 13:24, 30:14, 104:25, 106:2, 129:11
**BARAN** [1] - 1:14
**based** [10] - 37:17, 39:4, 57:10, 84:1, 145:13, 167:2, 169:24, 172:22, 172:24, 175:9
**basic** [1] - 24:23
**basis** [4] - 13:19, 31:5, 93:12, 137:11
**BATES** [2] - 147:17, 147:19
**Bates** [5] - 2:13, 147:18, 155:7, 155:9, 155:11
**bay** [1] - 83:1
**bays** [4] - 82:24, 83:21, 84:2, 84:4
**Beach** [4] - 166:24, 167:1, 175:10, 175:11
**beauty** [1] - 112:23
**became** [2] - 23:12, 24:10
**become** [3] - 25:4, 107:7, 110:23
**becomes** [1] - 43:17
**bed** [4] - 7:22, 8:19, 8:20, 9:19
**bedtime** [1] - 115:11
**BEFORE** [1] - 1:11
**began** [1] - 29:6
**begin** [1] - 45:5
**beginning** [1] - 138:23
**behalf** [7] - 4:2, 4:7, 64:5, 69:24, 70:3, 162:13, 162:14
**behavioral** [1] - 22:12
**behind** [1] - 173:21
**belief** [2] - 172:23, 172:24
**beliefs** [1] - 22:18
**B**▮▮▮ [1] - 7:10
**belonged** [1] - 161:15
**below** [4] - 79:10, 81:7, 89:25, 94:25
**bench** [2] - 69:13, 108:12
**benefit** [1] - 69:20
**Berry** [1] - 108:14
**best** [25] - 11:14, 50:24, 67:9, 69:22, 84:1, 84:2, 86:8, 91:7, 92:16, 122:3, 130:3, 131:7, 135:4, 140:16, 140:23,

142:23, 144:2, 144:7, 146:6, 148:24, 151:12, 153:3, 160:20, 179:19, 181:14
**better** [9] - 8:7, 8:23, 11:4, 58:20, 129:25, 136:12, 139:5, 145:9, 152:13
**between** [14] - 18:23, 24:11, 27:4, 84:4, 123:2, 134:20, 140:5, 141:11, 141:13, 141:15, 152:1, 152:14, 152:21, 162:2
**beyond** [1] - 134:11
**binder** [29] - 47:8, 47:10, 47:12, 47:13, 47:18, 47:20, 61:21, 62:12, 62:17, 68:10, 68:11, 77:16, 82:3, 84:20, 84:22, 86:14, 94:14, 97:6, 101:15, 104:11, 104:16, 122:25, 125:12, 153:19, 154:19, 156:25, 162:21, 168:9
**birthday** [9] - 100:20, 100:23, 127:24, 128:21, 155:18, 159:14, 159:17, 159:18, 159:21
**bit** [23] - 6:3, 9:22, 20:3, 23:4, 40:23, 41:25, 44:12, 45:11, 59:7, 59:10, 65:20, 66:22, 72:22, 85:17, 98:9, 108:24, 133:7, 157:14, 157:15, 167:21, 170:5, 174:13
**BJ** [4] - 160:2, 160:11, 160:15, 161:2
**black** [11] - 47:13, 77:16, 82:3, 86:14, 94:14, 122:25, 125:12, 153:19, 154:19, 156:25, 162:21
**blah** [8] - 150:3, 150:6, 151:1, 151:2
**Blanchard** [1] - 3:8
**BLANCHARD** [19] - 5:7, 108:2, 138:1, 138:5, 138:10, 138:12, 138:17, 138:20, 139:4, 139:11, 139:15,

145:13, 145:18, 146:3, 147:22, 148:1, 148:8, 148:12, 148:19
**blinked** [1] - 164:1
**block** [3] - 89:1, 115:2, 165:4
**blocked** [8] - 104:5, 104:8, 118:18, 119:7, 119:15, 119:16, 119:19, 137:17
**blocks** [1] - 55:22
**blouse** [2] - 49:7, 49:12
**blow** [1] - 78:9
**blue** [1] - 95:19
**Board** [5] - 16:19, 44:3, 45:19, 92:15, 152:24
**boards** [1] - 164:6
**body** [9] - 8:22, 9:1, 9:3, 27:21, 42:19, 42:21, 53:18, 54:18, 54:20
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**bones** [2] - 28:3, 28:7
**book** [4] - 96:3, 157:9, 171:1, 171:4
**bottom** [16] - 68:19, 82:17, 90:8, 95:8, 96:18, 124:12, 124:17, 135:21, 155:6, 157:12, 160:4, 161:25, 163:22, 165:14, 171:8
**box** [1] - 146:9
**boy** [6] - 126:20, 154:7, 154:8, 160:1, 160:14, 161:1
**boyfriend** [6] - 102:23, 103:4, 103:5, 103:6, 117:7, 117:9
**boys** [1] - 140:9
**Bradley** [2] - 100:9, 100:12
**Brady** [1] - 51:23
**brain** [4] - 34:16, 34:19, 36:16, 36:20
**break** [17] - 44:6, 108:2, 108:4, 108:5, 108:8, 109:6, 131:9, 131:13, 131:20, 132:4, 135:25, 147:9, 153:8, 176:16, 180:1, 180:2, 180:8
**breaking** [1] - 127:3

**breaks** [3] - 138:22, 140:2, 140:20
**breakup** [2] - 127:18, 127:20
**breasts** [2] - 52:11, 117:5
**BRENNER** [137] - 5:5, 5:9, 7:5, 7:7, 7:9, 11:7, 11:9, 12:11, 13:2, 13:10, 14:2, 14:8, 14:12, 14:20, 15:8, 15:10, 15:24, 16:1, 16:4, 16:6, 16:11, 16:13, 16:14, 18:18, 26:19, 26:22, 27:19, 28:17, 30:9, 30:11, 30:23, 31:1, 31:13, 32:17, 33:16, 34:10, 37:14, 37:16, 38:5, 38:6, 38:20, 38:24, 39:2, 39:3, 42:22, 42:25, 44:2, 44:11, 44:17, 51:8, 51:10, 51:24, 54:8, 56:8, 57:23, 62:20, 63:21, 63:24, 65:5, 65:7, 66:7, 66:11, 67:18, 67:20, 67:23, 69:2, 70:13, 82:8, 82:10, 82:17, 86:16, 86:18, 86:24, 92:22, 93:23, 94:20, 96:13, 97:8, 98:20, 104:22, 105:1, 106:2, 106:12, 107:10, 108:18, 118:10, 118:13, 129:9, 129:12, 129:23, 130:12, 131:1, 131:4, 131:18, 131:22, 132:11, 132:23, 132:25, 133:4, 133:11, 133:21, 135:2, 135:24, 136:3, 136:25, 137:4, 137:21, 140:14, 141:24, 144:9, 144:16, 145:1, 145:8, 145:17, 145:23, 146:14, 146:18, 146:21, 146:23, 146:25, 147:7, 149:25, 150:8, 151:15, 152:18, 155:2, 157:4, 162:20, 162:22, 163:10, 172:9, 172:11, 172:14, 172:25, 173:8, 173:13,

173:16
**Brenner** [19] - 2:5, 7:4, 30:7, 45:21, 60:17, 77:5, 81:12, 82:21, 86:1, 86:15, 92:17, 92:19, 97:7, 98:19, 111:10, 140:13, 141:23, 149:11, 172:21
**brenner** [1] - 38:22
**Brenner..............** [1] - 4:4
**bridge** [2] - 6:19, 6:20
**bridges** [3] - 6:22, 6:25, 7:1
**brief** [3] - 43:3, 145:18, 145:21
**briefly** [3] - 36:19, 41:2, 41:14
**bring** [4] - 5:4, 44:10, 108:6, 151:23
**bringing** [1] - 42:10
**brings** [1] - 60:1
**Brittany** [1] - 2:1
**britzoll@gmail.com** [1] - 2:4
**broad** [1] - 148:6
**broke** [2] - 102:16, 139:24
**brother** [3] - 179:4, 179:7, 179:10
**brother's** [3] - 120:18, 120:19, 121:4
**brought** [9] - 10:25, 15:16, 55:12, 57:6, 57:7, 57:14, 58:14, 58:15, 101:3
**BROWN** [1] - 78:6
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:11
**buffer** [1] - 71:22
**building** [3] - 58:14, 72:20, 158:16
**bullies** [1] - 85:25
**bully** [1] - 71:25
**bullying** [2] - 75:3, 136:18
**bump** [1] - 45:11
**bunch** [3] - 160:16, 164:8, 165:18
**Burton** [1] - 2:20
**burtons@huntonak. com** [1] - 2:23
**bus** [9] - 55:4, 55:20, 111:15, 112:4, 112:13, 112:16, 125:25, 126:2
**business** [2] - 112:24,

163:17
**butt** [1] - 52:12
**BY** [82] - 7:9, 11:9, 13:2, 13:10, 16:6, 16:14, 18:18, 26:22, 27:19, 28:17, 32:17, 33:16, 34:10, 37:16, 38:6, 39:3, 42:25, 45:15, 47:25, 49:25, 51:13, 52:7, 54:10, 56:15, 57:25, 61:20, 62:18, 63:4, 63:22, 64:2, 65:16, 66:3, 66:18, 68:1, 69:23, 70:20, 78:17, 80:21, 82:18, 83:7, 84:9, 84:14, 85:20, 87:3, 93:10, 94:7, 94:22, 96:16, 97:11, 98:25, 99:13, 100:6, 102:1, 109:5, 116:19, 118:16, 121:18, 125:2, 127:16, 128:11, 153:7, 155:8, 156:20, 157:7, 157:17, 158:13, 159:7, 160:23, 161:11, 162:24, 163:13, 164:11, 168:16, 170:18, 171:7, 171:17, 172:17, 173:1, 173:19, 175:19, 176:20, 177:23

# C

**C.K** [80] - 53:21, 54:25, 58:2, 62:3, 74:2, 74:20, 75:16, 75:19, 86:11, 89:12, 90:24, 94:9, 95:21, 99:14, 99:19, 100:24, 102:15, 103:2, 103:10, 109:7, 111:6, 111:8, 111:21, 113:4, 115:13, 120:9, 120:12, 121:20, 121:25, 122:1, 122:10, 123:1, 123:2, 123:8, 124:4, 125:3, 125:21, 126:18, 137:25, 138:3, 138:12, 138:21, 138:22, 138:24, 139:2, 139:9, 140:1, 140:5, 141:4, 141:11, 142:6, 143:1, 144:6,

145:3, 148:18, 148:24, 150:3, 150:10, 150:18, 154:10, 156:4, 161:14, 161:18, 162:2, 162:3, 169:10, 169:15, 169:24, 176:9, 176:10, 176:22, 176:23, 177:16, 177:24, 178:3, 178:13, 178:23, 179:3, 179:7
**C.K.'s** [12] - 75:1, 94:25, 95:10, 104:5, 118:18, 119:7, 164:16, 164:24, 168:5, 173:23, 175:22, 176:4
**CA** [1] - 1:20
**cafeteria** [1] - 74:10
**candid** [1] - 135:4
**cannot** [3] - 37:22, 37:23, 38:2
**capable** [1] - 43:11
**capacity** [2] - 35:13, 181:5
**care** [5] - 12:21, 17:17, 23:13, 26:25, 108:12
**careful** [1] - 57:24
**C██** [1] - 80:13
**C██** [2] - 80:12, 80:22
**carries** [1] - 57:2
**Carson** [5] - 10:13, 22:24, 125:7, 125:14, 167:24
**case** [44] - 5:21, 5:22, 6:15, 50:1, 52:19, 57:21, 70:5, 70:7, 71:6, 76:20, 89:15, 91:6, 92:15, 93:11, 93:18, 97:19, 99:17, 113:24, 115:5, 116:7, 116:25, 119:14, 119:18, 121:19, 121:24, 125:10, 129:19, 135:15, 135:18, 135:19, 137:23, 144:25, 146:12, 152:15, 152:22, 153:3, 160:14, 160:24, 160:25, 162:12, 180:4, 181:7
**cases** [1] - 105:17
**caused** [3] - 12:22, 13:6, 31:20
**celebrating** [1] - 159:21

**cell** [7] - 111:24, 112:19, 162:3, 163:1, 164:16, 164:25
**cellphone** [1] - 176:23
**center** [1] - 20:5
**Center** [11] - 11:19, 11:20, 11:24, 16:24, 16:25, 17:4, 20:13, 30:10, 30:18, 30:20, 32:2
**Century** [1] - 1:19
**certain** [9] - 72:17, 88:8, 105:8, 110:11, 116:16, 142:11, 142:13, 152:24, 153:2
**CERTIFICATE** [1] - 181:1
**Certificate** [1] - 4:15
**certify** [2] - 181:4, 181:10
**chains** [1] - 15:1
**challenges** [3] - 146:11, 146:13, 146:16
**chambers** [3] - 132:8, 132:10, 151:21
**chance** [7] - 41:23, 50:25, 51:3, 59:5, 122:21, 122:23, 153:1
**change** [4] - 51:5, 72:13, 72:14, 176:1
**change-in** [1] - 72:14
**change-out** [1] - 72:13
**character** [1] - 137:2
**characterize** [1] - 102:25
**Charity** [1] - 37:6
**chart** [1] - 48:12
**chats** [1] - 88:15
**check** [2] - 124:9, 176:12
**chicken** [1] - 91:21
**chief** [3] - 107:19, 108:14, 109:2
**children** [3] - 42:7, 42:9, 42:10
**Children's** [1] - 10:19
**chin** [1] - 97:24
**choice** [1] - 89:19
**choose** [1] - 163:11
**choosing** [1] - 131:20
**choral** [2] - 81:7, 83:13
**chorus** [6] - 73:4, 73:6, 73:8, 81:5, 83:15, 83:18
**chose** [1] - 48:16

185

C████12] - 53:11,
53:23, 54:2, 58:4,
92:1, 110:5, 111:23,
114:20, 133:1,
156:6, 161:21,
161:22
C████2] - 118:7,
168:18
chronic [3] - 37:7,
37:10, 37:19
chronology [2] -
169:9, 169:12
Cigna [3] - 38:7, 38:9,
39:5
circumstances [6] -
105:25, 107:2,
107:5, 130:6,
131:15, 152:25
circumstantial [4] -
141:8, 142:8,
142:20, 143:21
cite [1] - 153:15
civil [1] - 137:23
Civil [2] - 1:4, 181:7
claim [4] - 49:8, 76:15,
93:11, 93:24
claimed [1] - 170:7
clarification [2] - 61:4,
161:9
clarify [8] - 53:5,
66:21, 84:3, 98:15,
109:8, 115:25,
116:11, 174:8
class [6] - 72:5, 72:12,
73:10, 73:12, 73:25,
74:6
classes [9] - 64:16,
67:8, 72:3, 72:15,
72:17, 72:20, 74:2,
74:4, 85:15
classic [1] - 143:9
classmates [1] - 74:25
classroom [11] - 79:8,
80:5, 80:8, 80:11,
80:12, 80:22, 80:25,
81:13, 158:5
clean [2] - 15:20,
145:4
clear [6] - 37:22,
59:15, 130:12,
146:13, 161:16,
165:25
clearly [1] - 179:1
CLERK [2] - 107:24,
124:23
clerks [1] - 6:24
client [7] - 129:17,
131:4, 134:19,
138:10, 139:6,
145:21, 147:23

clip [2] - 51:23, 66:14
close [1] - 48:23
closely [1] - 78:9
closer [3] - 44:18,
164:6, 164:7
coed [2] - 76:11, 76:13
cogitating [1] - 6:6
cognitive [2] - 22:12,
22:16
coincide [1] - 170:14
coincidental [1] -
177:1
coincides [1] - 173:11
cold [1] - 28:3
collarbone [1] - 28:8
colleague [2] - 14:4,
144:2
college [1] - 41:6
colloquy [1] - 152:1
Columbia [1] - 64:8
combination [1] -
155:25
comfortable [1] - 7:2
coming [10] - 9:19,
81:17, 81:21, 99:1,
120:24, 139:14,
174:7, 174:11,
175:9, 175:13
comment [2] - 91:7,
141:13
comments [9] - 90:17,
90:23, 91:2, 91:5,
92:2, 92:7, 92:18,
93:8, 122:6
communicate [1] -
137:18
communication [1] -
138:6
communications [3] -
64:10, 64:13, 137:9
community [2] -
111:19, 117:20
companies [1] - 64:14
complaining [1] -
37:20
complaint [8] - 93:3,
93:7, 93:13, 93:18,
139:21, 139:22,
140:4
completely [1] - 24:4
completeness [2] -
52:1, 66:8
computer [1] - 181:12
concern [1] - 32:6
concerned [1] -
129:18
concerns [6] - 10:23,
27:9, 27:14, 101:9,
105:14, 111:2
concluded [2] -

151:21, 180:12
conclusion [1] - 92:23
condition [2] - 41:19,
41:21
conditions [2] - 46:8,
46:10
conduct [1] - 139:20
conference [5] -
69:13, 108:12,
132:8, 132:12,
151:21
confers [6] - 30:2,
39:1, 42:24, 62:22,
67:25, 87:2
confirm [1] - 144:18
confused [5] - 59:7,
59:10, 59:12, 72:22,
177:20
confusion [2] - 106:6,
149:24
connection [1] -
144:24
consensual [1] -
139:13
consensually [1] -
54:16
consent [1] - 54:21
consider [2] - 85:7,
164:8
considered [1] -
102:23
consistent [2] - 142:2,
145:5
Co████2] -
88:14, 120:7
constantly [2] - 28:3,
41:21
constitute [1] - 181:11
constructive [1] - 85:5
Cont [2] - 1:25, 2:24
contact [2] - 6:8,
119:25, 120:1
contempt [1] - 135:17
contents [3] - 114:22,
114:25, 179:10
CONTENTS [1] - 4:1
contesting [1] - 146:3
context [4] - 52:2,
53:15, 65:24, 154:1
continue [3] - 13:6,
14:9, 19:11
continued [2] - 21:25,
29:17
Continued [1] - 7:8
continues [1] - 67:18
continuing [1] - 13:16
conversation [2] -
162:6, 179:9
conversations [1] -
26:23, 26:24

cooperate [3] - 135:9,
135:11, 135:12
coping [3] - 24:25,
35:18
copy [9] - 61:15,
62:24, 63:1, 93:13,
93:18, 108:25,
167:17, 170:21,
171:23
core [1] - 80:4
corner [3] - 51:18,
65:10, 123:12
corners [1] - 51:14
corporate [1] - 64:13
correct [118] - 17:1,
20:17, 21:1, 22:2,
25:19, 48:3, 50:8,
50:18, 52:6, 52:11,
52:22, 53:19, 54:19,
54:24, 55:2, 55:13,
55:14, 55:16, 56:5,
56:18, 57:3, 57:9,
58:13, 58:22, 58:23,
59:6, 60:4, 60:9,
60:12, 60:14, 60:16,
60:22, 61:8, 62:7,
62:10, 64:12, 65:1,
71:2, 72:4, 72:8,
72:24, 72:25, 73:2,
73:7, 73:10, 73:13,
73:16, 73:19, 74:1,
74:3, 74:5, 74:8,
74:24, 75:5, 75:20,
76:6, 76:11, 76:12,
76:19, 76:22, 79:9,
79:22, 80:16, 81:3,
83:9, 85:10, 85:15,
87:9, 87:12, 87:13,
87:15, 91:15, 92:9,
94:24, 96:19, 97:4,
97:18, 100:8,
100:22, 101:6,
103:25, 111:20,
112:3, 112:5, 112:9,
112:22, 113:2,
113:21, 114:7,
114:10, 114:14,
115:1, 115:23,
117:20, 119:24,
120:20, 121:2,
121:8, 121:20,
122:20, 122:23,
125:24, 127:21,
141:17, 154:1,
154:3, 154:4, 154:6,
154:14, 155:18,
157:19, 159:23,
160:16, 162:17,
165:21, 167:22,
175:21, 178:11

correctly [4] - 49:2,
73:11, 143:20,
155:11
Counsel [6] - 30:2,
39:1, 42:24, 62:22,
67:25, 87:2
counsel [10] - 7:10,
51:25, 69:21, 86:24,
105:9, 106:18,
150:12, 151:24,
152:23, 179:22
Counsel's [1] - 145:3
counselors' [1] -
59:22
count [2] - 29:14,
171:22
counter [1] - 130:7
counts [1] - 56:14
County [3] - 13:8,
13:11, 13:15, 15:6,
15:14, 15:22, 16:19,
22:1, 45:19
couple [3] - 9:7,
102:3, 135:15
course [6] - 22:7,
26:24, 31:6, 61:1,
93:3, 148:24
Court [15] - 3:12, 3:12,
4:15, 44:9, 108:11,
129:18, 131:15,
137:23, 151:22,
151:24, 152:2,
152:16, 161:9,
181:3, 181:22
court [12] - 16:5,
32:16, 50:5, 50:15,
105:14, 108:7,
108:15, 131:23,
132:2, 135:21,
152:7, 181:8
COURT [253] - 1:1,
1:12, 5:1, 5:3, 5:11,
5:13, 5:16, 7:4, 7:6,
11:6, 12:8, 12:13,
12:16, 12:20, 12:24,
13:5, 13:9, 13:19,
13:22, 13:25, 14:18,
15:4, 15:9, 15:16,
15:25, 16:3, 16:12,
18:16, 26:13, 26:21,
27:6, 27:8, 27:13,
28:14, 29:25, 30:5,
30:7, 30:10, 30:13,
30:15, 30:25, 31:10,
31:21, 31:25, 32:9,
32:15, 33:14, 34:3,
37:15, 37:21, 38:16,
38:18, 38:21, 38:25,
42:23, 44:5, 44:10,
44:13, 44:23, 45:1,

45:3, 47:24, 49:21,
54:9, 56:10, 57:24,
61:15, 62:16, 62:23,
63:2, 63:25, 65:25,
66:12, 66:15, 66:17,
67:19, 67:22, 68:17,
68:20, 68:22, 68:24,
69:6, 69:12, 70:15,
70:17, 77:20, 77:24,
78:3, 78:5, 78:7,
78:10, 78:14, 78:16,
80:18, 82:7, 82:9,
82:11, 82:24, 83:4,
84:1, 84:4, 84:8,
84:13, 86:15, 86:17,
86:19, 86:22, 87:1,
92:24, 93:2, 93:13,
93:15, 93:25, 94:2,
94:19, 96:12, 96:14,
97:7, 97:9, 98:19,
98:21, 101:19,
101:22, 104:21,
104:24, 105:13,
106:11, 106:17,
107:12, 107:16,
107:25, 108:3,
108:8, 108:12,
108:20, 108:22,
116:12, 121:14,
124:20, 127:11,
128:10, 129:10,
129:16, 129:24,
130:9, 130:11,
130:14, 131:2,
131:10, 131:21,
132:1, 132:3, 132:6,
132:9, 132:22,
132:24, 133:3,
133:10, 133:20,
134:21, 135:3,
136:2, 136:11,
137:1, 137:6,
137:13, 137:22,
138:3, 138:11,
138:18, 139:1,
139:7, 139:12,
139:25, 140:12,
140:15, 141:12,
141:22, 141:25,
142:13, 142:15,
142:21, 143:6,
143:22, 144:1,
144:15, 144:22,
145:7, 145:12,
145:16, 146:2,
146:4, 146:15,
146:20, 146:22,
146:24, 147:2,
147:11, 147:18,
147:20, 147:25,
148:4, 148:9,

148:17, 148:22,
149:13, 149:18,
149:22, 150:4,
151:4, 151:9,
151:19, 151:23,
152:5, 152:20,
153:6, 155:3,
156:18, 157:3,
157:5, 158:12,
160:19, 163:9,
163:11, 164:2,
164:4, 169:21,
170:4, 170:10,
170:13, 170:17,
171:4, 171:14,
172:21, 173:10,
173:15, 173:18,
174:12, 174:17,
174:19, 174:21,
174:25, 175:5,
175:8, 175:15,
175:18, 176:14,
177:19, 179:17,
179:19, 179:22,
180:1, 180:7
**Court's** [5] - 6:14,
12:12, 105:23,
107:17, 148:2
**Courthouse** [1] - 3:13
**courtroom** [3] - 7:15,
143:7, 147:8
**cover** [1] - 148:5
**CR** [2] - 80:2, 80:19
**create** [2] - 46:11,
46:12
**credibility** [4] - 137:3,
147:22, 147:24,
149:4
**criminal** [2] - 5:23,
5:24
**crisis** [1] - 10:20
**critical** [1] - 135:20
**critically** [1] - 139:19
**cross** [14] - 14:21,
14:23, 15:19, 32:1,
45:5, 45:8, 64:1,
129:13, 130:23,
131:5, 132:16,
135:10, 148:2,
148:10
**CROSS** [1] - 45:14
**Cross** [1] - 4:5
**cross-examination** [6]
- 15:19, 32:1, 45:5,
129:13, 132:16,
135:10
**CROSS-
EXAMINATION** [1] -
45:14
**Cross-examination**

[1] - 4:5
**cross-examine** [2] -
45:8, 148:10
**cross-examined** [2] -
130:23, 131:5
**crush** [2] - 102:21,
102:22
**crying** [2] - 9:5,
178:24
**current** [1] - 39:10
**cut** [2] - 19:1, 110:8
**cut-down** [1] - 19:1
**cutting** [1] - 148:13

**D**

**D.C** [1] - 40:19
**D.N** [6] - 74:4, 74:20,
75:16, 75:19, 94:9,
138:21
**D.N.'s** [1] - 140:10
**dad** [7] - 29:7, 52:23,
52:24, 60:25, 67:7,
112:23, 115:10
**damage** [1] - 137:3
**Dash** [3] - 163:4,
163:14, 163:17
**date** [16] - 41:7, 90:6,
90:19, 95:1, 96:25,
97:1, 119:11,
120:23, 138:11,
140:1, 141:16,
163:21, 165:10,
165:15, 167:15
**dated** [6] - 63:5,
70:25, 138:9,
139:23, 140:8
**dates** [1] - 175:2
**dating** [4] - 41:5,
41:13, 120:6, 138:22
**David** [3] - 90:1, 90:3,
94:23, 100:4, 100:7,
102:2, 102:5,
102:19, 102:21,
126:11, 126:15,
126:18, 126:20,
126:23, 127:3,
127:5, 127:18,
127:19, 138:14,
138:15, 138:16,
145:14, 160:1,
160:10, 160:14,
161:1, 161:8,
161:15, 161:17,
178:4, 178:11
**David's** [3] - 160:8,
161:18, 161:23
**Davis** [2] - 145:16,
145:17
**days** [26] - 7:16, 7:19,

7:20, 7:21, 8:3, 8:18,
8:19, 9:15, 9:16,
9:17, 9:18, 17:8,
17:9, 17:22, 17:23,
19:1, 25:20, 33:6,
40:12, 40:13, 102:3,
102:4
**DC** [5] - 1:16, 2:15,
2:18, 2:22, 3:2
**deal** [5] - 6:24, 25:1,
71:18, 130:6, 134:25
**dealing** [4] - 24:7,
26:3, 30:16, 38:11
**debilitating** [2] -
36:25, 42:16
**decent** [1] - 9:17
**decide** [6] - 87:16,
88:7, 88:9, 88:22,
131:13, 136:24
**decides** [1] - 129:20
**decision** [1] - 57:10
**deemed** [1] - 107:1
**Defendant** [3] - 2:13,
2:25, 3:8
**defendant** [3] - 149:5,
149:6, 152:24
**Defendant's** [20] -
77:17, 82:4, 86:13,
96:11, 97:5, 98:17,
99:11, 122:3,
122:24, 125:9,
154:18, 156:24,
162:19, 165:9,
170:20, 171:9,
173:2, 173:20,
176:3, 176:7
**defendant's** [1] -
149:3
**Defendants** [3] - 1:7,
3:4, 4:7
**defendants** [4] - 7:11,
30:23, 45:7, 132:15
**Defendants'** [9] -
70:19, 86:20, 94:21,
96:15, 97:10, 98:22,
155:4, 157:6, 163:12
**defendants'** [2] -
47:14, 47:18
**defending** [1] - 89:13
**defense** [5] - 129:21,
133:5, 139:18,
147:23, 148:17
**definitely** [2] - 94:12,
97:3
**defriend** [1] - 89:4
**degree** [2] - 15:7,
64:10
**degrees** [1] - 64:8
**deleted** [1] - 123:5
**delivery** [1] - 55:17

**demand** [1] - 55:17
**denoted** [2] - 166:15,
166:16
**deny** [1] - 142:1
**department** [2] -
57:20, 165:2
**deposed** [3] - 133:12,
133:13
**deposition** [15] - 50:1,
50:3, 50:19, 50:25,
64:24, 65:4, 65:25,
78:21, 87:4, 87:6,
91:25, 145:5, 145:6,
145:11, 161:20
**depositions** [2] -
108:16, 177:2
**depression** [1] - 21:10
**depth** [1] - 144:23
**describe** [4] - 41:14,
48:18, 52:5, 63:20
**described** [10] - 49:4,
52:8, 52:9, 54:3,
64:6, 71:25, 72:2,
85:25, 86:8, 135:4
**Destination** [1] -
166:20
**detail** [2] - 74:11,
165:5
**deteriorates** [1] -
140:20
**deteriorating** [2] -
136:2, 143:17
**determination** [1] -
15:21
**determine** [2] -
133:18, 134:19
**diag** [1] - 34:12
**diagnosed** [1] - 34:1
**diagnoses** [1] - 37:13
**diagnosis** [4] - 10:2,
31:17, 32:6, 37:23
**die** [1] - 27:22
**difference** [3] - 18:23,
141:13, 141:15
**different** [18] - 22:8,
24:4, 26:20, 28:21,
45:6, 55:6, 55:8,
55:12, 72:9, 72:24,
73:1, 74:9, 77:15,
97:1, 98:9, 98:14,
141:17, 149:3
**differently** [1] - 156:23
**difficult** [7] - 23:20,
24:1, 109:4, 128:8,
170:24, 171:24,
173:5
**digits** [3] - 170:11,
172:5, 172:18
**dinner** [1] - 113:6
**Direct** [1] - 4:4

**direct** [3] - 88:17, 103:9, 168:10
**DIRECT** [1] - 7:8
**directed** [2] - 91:2, 92:8
**directing** [4] - 65:22, 160:5, 160:9, 171:8
**direction** [2] - 12:12, 81:21
**directly** [2] - 14:25, 62:25
**directs** [1] - 156:15
**disagree** [3] - 132:15, 147:12, 151:16
**disagreement** [1] - 69:14
**disappear** [1] - 27:21
**disassociation** [1] - 8:24
**discarded** [1] - 165:3
**discharged** [1] - 19:12
**discount** [1] - 131:16
**discovery** [4] - 122:20, 133:9, 160:18, 179:18
**discriminated** [1] - 93:12
**discrimination** [2] - 92:21, 93:24
**discuss** [7] - 6:14, 26:5, 26:8, 26:9, 139:11, 151:25, 180:4
**discussed** [1] - 27:3
**discusses** [5] - 125:21, 127:17, 127:20, 159:14, 159:21
**discussing** [2] - 56:17, 92:18
**discussion** [10] - 6:24, 17:12, 57:15, 74:15, 77:5, 127:2, 142:1, 147:21, 161:7, 162:1
**Discussion** [3] - 7:3, 44:19, 164:10
**discussions** [1] - 69:13
**dismay** [1] - 71:17
**dismissal** [1] - 63:10
**dismissed** [1] - 167:24
**disorder** [10] - 18:14, 21:9, 21:10, 24:7, 26:2, 26:3, 27:10, 27:15, 39:25, 40:8
**disorders** [2] - 26:6, 27:4
**display** [1] - 181:13
**dispute** [1] - 149:7

**distance** [1] - 86:4
**distraught** [1] - 10:22
**distress** [1] - 130:23
**distribution** [1] - 112:24
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [2] - 3:12, 181:4
**DM** [1] - 88:17
**DM's** [1] - 88:15
**docket** [3] - 5:23, 5:24, 6:5
**dockets** [1] - 5:21
**Doctor** [2] - 19:19, 19:20
**doctor** [5] - 10:7, 10:16, 11:3, 12:17, 16:22
**doctors** [3] - 11:10, 35:23, 43:20
**doctors'** [2] - 43:22, 43:23
**document** [19] - 48:12, 70:23, 87:4, 90:10, 106:22, 127:14, 132:25, 134:9, 134:10, 134:18, 136:8, 136:10, 144:14, 150:2, 150:20, 150:23, 155:1, 155:9, 170:15
**done** [8] - 26:24, 40:20, 108:23, 112:9, 121:15, 127:14, 143:9, 143:14
**door** [5] - 59:20, 79:18, 83:10, 83:13, 83:18
**doorframe** [1] - 59:3
**doors** [2] - 78:25, 81:13
**Dorm** [5] - 39:14, 39:19, 39:23, 40:10, 40:18
**double** [1] - 13:21
**doubt** [1] - 150:12
**down** [40] - 18:21, 19:1, 28:23, 28:24, 29:4, 42:18, 44:7, 48:16, 49:5, 50:15, 61:16, 68:20, 68:21, 81:17, 84:19, 85:6, 85:18, 95:8, 100:5, 123:12, 123:22, 124:14, 129:14, 129:21, 130:18, 131:13, 131:20,

135:7, 135:22, 140:20, 144:22, 149:9, 155:6, 159:5, 163:21, 164:5, 174:13, 174:25, 175:3, 180:7
**downstairs** [2] - 115:7, 115:8
**Dr** [45] - 10:11, 10:12, 10:13, 10:14, 10:17, 12:1, 13:16, 19:14, 19:22, 20:2, 21:6, 21:8, 21:9, 21:11, 21:13, 21:14, 21:15, 21:23, 21:24, 22:11, 23:11, 23:14, 23:17, 24:9, 24:11, 34:21, 34:22, 35:1, 35:5, 35:6, 35:7, 35:9, 35:12, 35:16, 36:3, 36:10, 36:12, 36:17, 37:6, 37:9, 37:18, 38:7, 38:9, 39:5
**draw** [1] - 78:10
**drawing** [1] - 99:7
**drawn** [2] - 99:2, 99:3
**drew** [2] - 48:13, 158:14
**drill** [1] - 107:8
**drive** [2] - 22:4, 29:7
**Drive** [1] - 3:6
**driveway** [1] - 101:10
**drop** [2] - 112:14, 174:25
**dropped** [1] - 112:4
**due** [1] - 39:24
**during** [18] - 9:15, 20:24, 28:1, 29:17, 39:16, 71:19, 73:21, 73:23, 73:24, 74:19, 81:13, 101:10, 102:16, 112:21, 128:19, 135:6, 156:11, 158:18

---

## E

**ear** [1] - 57:18
**early** [2] - 55:25, 113:22
**easier** [7] - 77:21, 82:14, 132:12, 157:13, 158:7, 167:19, 170:21
**East** [1] - 1:19
**Eastern** [1] - 181:4
**EASTERN** [1] - 1:1
**eating** [7] - 26:2, 26:3, 26:6, 26:9, 27:4, 27:10, 27:15

**ECF-653** [1] - 30:3
**editorialize** [1] - 179:24
**effect** [1] - 101:13
**efficiency** [3] - 106:17, 148:22, 148:23
**efficient** [3] - 107:22, 152:3, 152:9
**efficiently** [2] - 146:9, 151:25
**eight** [1] - 129:3
**either** [16] - 10:3, 10:6, 15:17, 16:21, 20:7, 20:9, 43:21, 61:23, 62:3, 62:20, 73:15, 102:12, 105:8, 114:3, 121:10, 134:14
**elective** [2] - 73:13, 73:15
**electives** [3] - 73:3, 74:7, 81:4
**elicit** [1] - 31:11
**elicited** [1] - 34:5
**eliciting** [1] - 13:20
**elicits** [1] - 32:1
**Elliker** [1] - 2:25
**email** [29] - 62:9, 62:11, 63:5, 63:15, 63:17, 63:23, 68:8, 68:19, 70:8, 70:24, 71:4, 71:7, 71:9, 74:13, 75:7, 75:18, 75:19, 75:23, 76:18, 84:21, 84:25, 106:13, 137:9, 137:10, 142:22, 152:12, 163:24, 164:12, 169:22
**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11
**emailed** [1] - 69:24
**emails** [6] - 70:3, 92:17, 136:21, 140:25, 153:2
**embarrassed** [1] - 27:22
**emergency** [4] - 10:18, 11:2, 11:12, 32:19
**emphasis** [1] - 64:11
**encompasses** [1] - 64:7
**encounter** [1] - 145:24
**encourage** [1] - 102:14
**end** [4] - 63:17, 85:8, 130:13, 131:19

**ended** [1] - 10:18
**ending** [4] - 169:24, 174:21, 175:2, 175:6
**endometriosis** [4] - 33:23, 33:25, 34:13, 39:8
**endorsement** [1] - 89:20
**endured** [1] - 23:23
**energy** [1] - 140:21
**engaged** [4] - 40:24, 41:1, 75:3
**English** [1] - 80:25
**entire** [4] - 85:4, 110:15, 140:24, 153:2
**entitled** [2] - 135:22, 137:1
**entries** [1] - 174:2
**entry** [1] - 124:12
**environment** [1] - 85:5
**especially** [1] - 21:21
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8
**essentially** [2] - 38:3, 141:16
**establish** [2] - 141:6, 144:12
**establishes** [1] - 138:25
**estimate** [5] - 84:1, 84:2, 84:7, 109:15, 166:4
**Estrella** [1] - 81:2
**et** [2] - 1:6, 181:7
**evening** [4] - 5:17, 19:2, 113:17, 113:18
**events** [4] - 22:23, 47:1, 47:4, 141:18
**evidence** [43] - 14:11, 14:13, 47:23, 62:15, 63:25, 68:16, 68:24, 69:5, 70:5, 70:7, 70:19, 77:19, 82:6, 86:14, 86:20, 94:4, 94:21, 96:15, 97:10, 98:22, 105:5, 107:19, 132:17, 134:9, 134:10, 134:18, 136:10, 137:17, 139:21, 141:8, 142:5, 142:8, 142:20, 142:25, 143:21, 152:10, 153:3, 155:4, 157:1, 157:6, 163:8, 163:12
**ex** [1] - 41:5
**exact** [4] - 31:14,

96:25, 119:11, 168:1
**exactly** [17] - 18:9,
19:6, 28:5, 36:23,
53:25, 63:11,
109:20, 113:19,
117:3, 119:2, 121:5,
122:8, 137:15,
156:14, 158:1,
159:24, 169:3
**EXAMINATION** [2] -
7:8, 45:14
**examination** [12] - 4:4,
4:5, 15:19, 32:1,
45:5, 103:9, 129:13,
132:16, 135:10,
136:16, 140:18,
152:1
**examine** [2] - 45:8,
148:10
**examined** [2] -
130:23, 131:5
**example** [14] - 7:18,
43:25, 72:16, 106:8,
126:10, 128:25,
137:4, 141:21,
143:9, 144:11,
150:18, 153:15,
153:23
**examples** [1] - 153:13
**except** [2] - 105:25,
107:1
**exchange** [3] -
140:18, 142:3, 153:2
**exchanged** [1] -
152:21
**exchanges** [6] -
144:4, 150:5,
152:12, 152:13,
152:17, 152:25
**excuse** [5] - 23:17,
24:9, 58:14, 63:23,
97:15
**excused** [2] - 132:5,
180:6
**exhausted** [1] - 42:18
**exhibit** [17] - 62:24,
68:22, 69:3, 69:8,
70:14, 83:20,
101:22, 102:5,
104:20, 105:4,
105:5, 106:13,
107:21, 153:18,
169:25, 173:12,
177:19
**Exhibit** [60] - 47:21,
61:9, 61:14, 61:21,
62:12, 68:11, 70:9,
70:19, 71:5, 71:25,
74:13, 74:14, 77:17,
82:4, 84:20, 86:14,

86:20, 86:23, 89:6,
89:8, 94:13, 94:21,
96:3, 96:11, 96:15,
97:6, 97:10, 98:18,
98:22, 99:12,
101:16, 104:12,
118:8, 118:21,
122:3, 122:25,
125:10, 125:12,
153:19, 154:19,
155:4, 156:3,
156:24, 157:6,
158:7, 159:8,
162:19, 163:12,
164:14, 164:18,
165:9, 168:10,
169:7, 170:20,
173:2, 173:8,
173:20, 176:3,
176:7, 177:12
**EXHIBITS** [1] - 4:6
**exhibits** [13] - 47:9,
47:12, 47:13, 47:14,
47:17, 69:1, 69:11,
105:8, 106:5,
108:16, 108:25,
137:5, 173:17
**exist** [4] - 9:1, 9:2,
27:23, 84:5
**existed** [1] - 152:14
**expect** [1] - 152:6
**experience** [5] -
10:21, 26:16, 37:4,
46:13, 46:16
**experienced** [3] -
22:23, 22:25, 37:1
**experiencing** [2] -
10:19, 37:2
**explain** [10] - 8:23,
17:3, 23:2, 23:16,
27:25, 35:15, 39:12,
110:3, 117:2, 136:12
**explaining** [1] - 52:14
**explicit** [1] - 164:25
**Explorers** [9] - 73:1,
156:8, 156:11,
156:16, 156:21,
157:18, 157:23,
158:19, 159:3
**expressed** [2] - 10:23,
71:18
**extension** [3] - 167:4,
171:12, 172:5
**extent** [7] - 6:17,
106:23, 134:23,
141:3, 143:17,
146:11, 179:22
**extracurricular** [1] -
110:24
**extremely** [6] - 8:12,

8:14, 8:15, 10:22,
75:3, 117:4

---

# F

**F.C.S.B** [4] - 1:6, 2:13,
2:25, 181:7
**F.T** [1] - 3:6
**face** [3] - 28:7, 97:25,
99:3
**Facebook** [68] - 87:7,
87:8, 87:10, 87:11,
87:19, 88:1, 88:4,
88:5, 88:7, 88:12,
88:19, 88:23, 89:1,
89:18, 92:10, 95:4,
95:10, 119:22,
120:1, 120:4,
121:24, 122:1,
122:2, 122:11,
122:16, 123:2,
123:4, 123:6, 123:8,
123:14, 123:17,
123:20, 123:24,
124:4, 125:3,
126:15, 127:2,
127:17, 128:2,
128:6, 129:1, 133:2,
136:15, 137:18,
139:16, 146:1,
152:13, 154:10,
156:4, 156:5, 159:9,
159:14, 159:25,
162:2, 162:3, 176:8,
176:9, 176:21,
176:22, 177:16,
177:24, 178:3,
178:10, 178:13,
178:14, 178:23,
179:3, 179:7
**faces** [1] - 99:16
**facilitate** [5] - 106:1,
107:18, 108:24,
143:16, 147:6
**facility** [7] - 10:6,
10:16, 11:1, 11:18,
16:22, 30:8, 30:9
**facing** [2] - 82:23,
83:8
**fact** [13] - 13:19, 15:5,
15:13, 24:3, 32:3,
32:11, 34:7, 47:3,
90:20, 93:8, 161:19,
163:24, 176:1
**factors** [1] - 8:8
**factual** [1] - 14:18
**faded** [3] - 165:14,
166:18, 170:21
**Fahey** [1] - 1:14
**FAHEY** [1] - 144:7

**fair** [10] - 14:23, 86:10,
86:12, 89:5, 113:3,
113:14, 114:8,
114:11, 121:23,
129:21
**Fairfax** [10] - 13:7,
13:11, 13:15, 15:6,
15:14, 15:22, 16:18,
21:24, 21:25, 45:18
**faith** [1] - 137:11
**fake** [1] - 137:12
**fall** [2] - 94:8, 156:11
**false** [2] - 46:11, 46:12
**family** [6] - 7:23, 9:5,
42:2, 121:7, 155:10,
172:24
**far** [12] - 9:17, 12:24,
15:14, 38:2, 42:14,
43:19, 55:22, 84:1,
129:18, 134:11,
139:21, 166:10
**Farms** [9] - 100:9,
100:12, 111:16,
111:18, 117:22,
125:23, 126:1,
126:4, 126:9
**F█████** [1] - 80:8
**fast** [1] - 20:3
**father** [4] - 53:7,
179:4, 179:7, 179:9
**fault** [1] - 23:25
**feared** [1] - 71:17
**fears** [4] - 42:7, 42:8,
42:9, 42:10
**feet** [3] - 84:5, 84:6,
84:15
**FELDMAN** [1] - 3:9
**fell** [1] - 6:20
**felt** [10] - 23:4, 23:6,
23:20, 23:21, 23:24,
23:25, 26:17, 27:22,
84:17
**female** [1] - 77:3
**few** [13] - 5:25, 7:10,
20:23, 33:6, 34:14,
41:8, 55:22, 61:18,
101:2, 102:4, 142:7,
143:20
**fifth** [2] - 48:9, 175:3
**fights** [1] - 106:24
**figure** [2] - 139:8,
144:23
**figured** [2] - 6:4,
148:20
**file** [1] - 162:16
**filed** [2] - 93:3, 93:18
**fill** [1] - 150:11
**filled** [1] - 141:3
**filling** [1] - 146:21
**fine** [13] - 5:11, 14:20,

44:14, 45:25, 59:14,
61:17, 84:8, 103:1,
116:8, 149:20,
173:7, 175:18
**finish** [2] - 176:14,
176:16
**finished** [2] - 67:5,
70:21
**fire** [1] - 106:24
**first** [31] - 7:14, 10:2,
10:6, 20:18, 22:15,
45:22, 47:6, 56:19,
59:17, 59:18, 60:10,
61:1, 71:9, 73:3,
74:15, 76:2, 77:17,
89:12, 90:14, 90:23,
90:24, 98:13, 98:14,
123:1, 139:21,
139:22, 140:4,
160:6, 170:19,
171:8, 176:2
**firsthand** [1] - 15:2
**five** [16] - 17:8, 17:9,
22:4, 40:12, 40:13,
44:6, 55:23, 75:23,
75:24, 84:15,
112:16, 124:14,
171:11, 171:18,
171:25, 174:22
**five-minute** [2] -
55:23, 112:16
**FL** [3] - 2:3, 2:7, 2:11
**flagged** [1] - 38:18
**flashbacks** [1] - 8:9
**FLEXNER** [4] - 1:19,
2:2, 2:6, 2:10
**Floor** [1] - 3:13
**floor** [2] - 59:17, 59:18
**Florida** [4] - 166:24,
167:1, 175:10,
175:11
**focus** [6] - 11:6,
68:19, 116:12,
146:4, 170:4, 174:14
**focused** [2] - 149:9,
149:19
**focusing** [1] - 146:5
**follow** [2] - 144:3,
150:1
**follow-up** [2] - 144:3,
150:1
**following** [1] - 134:21
**FOR** [1] - 1:1
**force** [4] - 103:12,
103:19, 110:5,
110:11
**forced** [6] - 55:7,
71:20, 103:11,
103:14, 110:9,
161:16

**foregoing** [1] - 181:10
**forehead** [1] - 99:7
**forgot** [2] - 17:10, 17:11
**forgotten** [1] - 14:2
**form** [2] - 31:25, 117:25
**forth** [6] - 43:22, 105:2, 105:3, 105:6, 105:12, 138:6
**fortunate** [1] - 164:9
**forum** [1] - 145:2
**forward** [3] - 105:23, 107:16, 152:2
**forwards** [1] - 20:3
**foundation** [11] - 13:19, 31:6, 63:24, 69:4, 69:7, 69:19, 106:15, 134:11, 142:6, 145:20
**foundational** [1] - 105:16
**foundationally** [1] - 150:10
**four** [11] - 12:19, 17:15, 18:8, 19:2, 22:4, 29:11, 40:15, 51:16, 170:10, 172:5, 172:18
**fourth** [1] - 175:2
**frame** [4] - 10:5, 20:18, 36:5, 56:2
**Francis** [1] - 61:9
**frank** [1] - 31:3
**frankly** [1] - 27:21
**frequency** [1] - 18:23
**Friday** [1] - 20:15
**fried** [1] - 91:21
**friend** [10] - 86:9, 88:22, 91:8, 122:3, 128:22, 129:1, 129:4, 144:2, 178:4, 178:11
**friends** [10] - 86:1, 86:11, 88:8, 88:20, 103:6, 126:18, 128:19, 138:21, 154:3, 154:5
**front** [9] - 52:13, 77:14, 91:16, 91:19, 95:17, 131:8, 163:4, 169:1, 169:25
**full** [6] - 18:19, 29:1, 56:25, 105:2, 129:13, 132:16
**full-day** [1] - 18:19
**fully** [2] - 131:5, 139:16
**Fulton** [1] - 3:6
**function** [3] - 7:22,

22:13, 43:18
**future** [2] - 41:25, 42:1

# G

**G-A-L-T-O-N** [1] - 19:16
**gallery** [1] - 34:5
**Galton** [2] - 19:14, 19:22
**GALTON** [1] - 19:17
**gap** [1] - 167:22
**gaps** [1] - 150:11
**general** [3] - 135:2, 139:1, 140:25
**generally** [3] - 113:1, 114:16, 130:21
**generate** [1] - 12:9
**genitalia** [10] - 49:9, 49:15, 52:10, 52:13, 52:16, 52:18, 54:21, 58:8, 75:13, 117:5
**gentlemen** [9] - 5:14, 37:21, 45:4, 94:2, 108:23, 132:3, 152:5, 164:9, 180:3
**Genus** [6] - 57:4, 58:11, 59:9, 59:16, 60:11, 60:20
**Genus's** [1] - 57:12
**gephyrophobia** [1] - 6:22
**gestured** [1] - 49:16
**Gil** [3] - 11:18, 11:20, 11:23
**girl** [2] - 73:10, 92:1
**girl's** [1] - 76:7
**girlfriend** [2] - 117:12, 117:16
**girls** [2] - 125:6, 125:13
**glad** [1] - 143:13
**Gluck** [1] - 36:3
**goodish** [1] - 17:24
**Grade** [1] - 155:20
**grade** [6] - 46:19, 69:25, 86:2, 88:1, 110:17, 158:18
**graders** [3] - 74:6, 74:9, 74:10
**Grady** [6] - 68:19, 78:8, 82:16, 83:20, 155:5, 157:11
**grandmother** [1] - 101:9
**grandmother's** [2] - 101:5, 101:6
**grandparents** [1] - 118:3
**gray** [1] - 174:9

**grayed** [2] - 174:3, 174:5
**great** [3] - 97:5, 106:14
**ground** [2] - 148:13, 149:2
**grounded** [1] - 118:5
**group** [2] - 60:18, 94:11
**growth** [1] - 28:6
**guess** [25] - 9:12, 13:12, 20:12, 24:25, 57:22, 64:15, 82:2, 83:24, 87:18, 87:21, 88:10, 88:25, 89:3, 89:21, 102:25, 111:4, 113:18, 117:24, 123:6, 144:9, 150:1, 163:19, 167:3, 170:12, 175:2
**guidance** [1] - 59:22
**gun** [1] - 57:2
**guys** [2] - 27:3, 138:20
**GYN** [1] - 38:10

# H

**hair** [2] - 28:5, 28:6
**half** [3] - 55:20, 71:4, 73:3
**Halloween** [2] - 100:16, 100:18
**hallway** [2] - 81:18, 83:8
**hand** [2] - 62:24, 97:20
**handed** [1] - 51:6
**handled** [1] - 131:10
**handling** [1] - 152:1
**handwriting** [1] - 154:23
**handwritten** [4] - 90:11, 102:8, 155:22, 155:24
**happy** [5] - 8:1, 66:10, 66:13, 68:5, 153:15
**harassed** [1] - 126:22
**harassing** [2] - 126:25, 154:9
**harassment** [1] - 64:7
**hard** [14] - 24:3, 25:5, 41:19, 42:17, 45:9, 61:15, 65:20, 90:7, 105:12, 108:25, 170:23, 170:24, 171:23, 171:24
**harder** [1] - 157:14
**HARRIS** [1] - 3:12
**Harris** [2] - 181:3,

181:21
**hated** [1] - 27:21
**haunted** [3] - 100:9, 100:12, 100:16
**head** [2] - 24:3, 99:3
**heads** [1] - 5:18
**heads-up** [1] - 5:18
**health** [3] - 10:20, 17:17, 17:19
**healthcare** [1] - 17:13
**hear** [6] - 23:21, 39:11, 41:23, 44:22, 141:23, 146:7
**heard** [7] - 34:15, 104:6, 105:20, 105:22, 110:19, 142:8, 152:12
**hearing** [3] - 34:4, 45:9, 45:10
**hearsay** [6] - 12:7, 12:10, 13:19, 13:21, 14:10, 26:12
**heightens** [1] - 8:16
**held** [1] - 132:8
**help** [10] - 5:19, 23:9, 25:6, 78:24, 106:1, 106:22, 107:21, 139:2, 143:16, 172:21
**helping** [1] - 24:25
**hereby** [1] - 181:4
**hereto** [1] - 181:15
**herself** [4] - 123:20, 123:24, 127:12, 127:13
**Herzfeld** [2] - 36:10, 36:12
**high** [1] - 84:18
**highlight** [1] - 152:24
**highlighted** [1] - 174:3
**Hill** [1] - 37:6
**Hilton** [1] - 144:2
**himself** [4] - 114:21, 115:14, 115:17, 115:19
**history** [3] - 80:8, 80:10, 165:3
**hit** [1] - 6:20
**hold** [7] - 16:9, 22:18, 42:19, 43:4, 135:16, 156:13, 163:2
**holder** [1] - 88:23
**HOLTZMAN** [1] - 1:14
**Holy** [12] - 29:20, 29:21, 30:10, 30:17, 30:20, 31:7, 32:2, 32:18, 32:19, 32:21, 33:8, 33:17
**home** [24] - 11:17, 67:13, 68:7, 85:3,

91:16, 91:18, 110:15, 111:1, 111:3, 111:22, 112:1, 112:4, 112:14, 112:21, 112:24, 113:1, 113:8, 113:10, 113:13, 114:4, 114:17, 172:8, 172:19, 173:4
**homebound** [1] - 14:14
**honestly** [9] - 22:13, 36:23, 42:20, 75:10, 77:1, 84:6, 84:12, 117:3, 172:25
**Honor** [65] - 5:6, 5:7, 5:8, 7:5, 11:5, 11:7, 12:7, 13:18, 18:15, 26:12, 26:19, 29:23, 30:12, 31:1, 31:15, 34:2, 37:12, 37:14, 38:5, 42:22, 44:11, 44:20, 47:22, 49:20, 51:24, 56:8, 57:23, 62:14, 63:21, 66:7, 68:15, 69:2, 69:8, 70:13, 77:18, 80:20, 82:5, 86:16, 86:21, 86:25, 93:23, 94:18, 96:10, 97:8, 104:18, 104:22, 105:1, 108:18, 129:9, 131:17, 131:19, 132:14, 133:6, 133:17, 141:5, 145:25, 153:5, 154:25, 157:1, 158:10, 163:7, 163:10, 168:14, 172:25, 173:9
**HONORABLE** [1] - 1:11
**hope** [4] - 5:16, 34:6, 39:11, 85:4
**hopefully** [2] - 41:23, 149:16
**hoping** [1] - 148:8
**horrible** [6] - 6:21, 177:5, 177:9, 177:17, 177:24, 178:10
**Hospital** [7] - 10:19, 29:20, 29:21, 32:18, 32:19, 32:22, 33:8
**hospital** [6] - 10:25, 11:2, 25:18, 26:2, 29:21, 32:20
**hospitalization** [11] - 11:15, 17:5, 18:8,

20:9, 20:13, 20:14, 20:20, 28:21, 28:25, 29:5, 29:9
**hospitalized** [5] - 25:7, 25:14, 25:19, 25:21, 25:23
**hostile** [1] - 71:20
**hour** [1] - 71:4
**hour-and-a-half** [1] - 71:4
**hours** [12] - 19:2, 22:4, 29:7, 43:21, 44:1, 50:2, 90:20, 90:21, 114:12, 164:24, 166:2, 177:2
**house** [15] - 7:24, 29:6, 32:20, 55:21, 55:22, 100:9, 100:12, 100:16, 101:5, 101:6, 112:17, 114:13, 114:23, 114:25, 115:22
**H█████** [1] - 71:8
**H█████** [7] - 58:18, 59:17, 59:18, 60:13, 60:25, 63:13, 67:7
**humiliated** [1] - 27:22
**hump** [1] - 147:1
**H██████** [8] - 57:8, 59:9, 59:17, 60:10, 61:1, 63:12, 67:7, 71:8
**hundreds** [1] - 109:12
**hung** [2] - 94:9, 94:11
**HUNTON** [4] - 2:14, 2:17, 2:21, 3:1
**hurt** [1] - 110:9
**hurts** [1] - 42:20
**hypervigilance** [1] - 8:12
**hypervigilant** [2] - 8:9, 8:11

**I**

**ID** [2] - 155:16, 155:17
**idea** [3] - 9:19, 154:1, 160:12
**identify** [2] - 94:16, 96:5
**ignore** [1] - 8:16
**ll** [1] - 51:9
**ill** [1] - 75:2
**ill-advised** [1] - 75:2
**illnesses** [1] - 31:18
**imagine** [2] - 5:20, 42:11
**immediately** [1] - 29:4
**impact** [1] - 75:4

**impersonating** [2] - 142:10, 142:12
**impersonation** [1] - 142:10
**important** [2] - 139:19, 140:7
**impression** [1] - 130:20
**in-person** [2] - 21:20, 120:24
**Inc** [3] - 163:4, 163:14, 163:17
**incident** [1] - 33:11, 139:11
**incidents** [2] - 111:6, 111:11
**included** [1] - 52:9
**incoming** [7] - 166:15, 166:21, 171:19, 172:4, 172:7, 172:8
**Incoming** [1] - 166:20
**inconsistent** [1] - 145:5
**incredibly** [1] - 41:16
**Indian** [1] - 93:8
**indicates** [1] - 155:9
**indicators** [1] - 8:6
**indicia** [2] - 141:9, 142:13
**individual** [1] - 19:12
**individuals** [2] - 152:14, 152:21
**infection** [1] - 32:13
**information** [1] - 14:24, 26:17, 34:5, 34:8, 130:21, 136:15, 170:7, 172:23, 172:24, 175:9
**initials** [3] - 45:23, 89:9
**injury** [4] - 34:16, 34:19, 36:16, 36:20
**Inova** [6] - 16:25, 17:3, 18:3, 18:5, 18:20, 19:11
**inpatient** [7] - 11:13, 11:16, 17:2, 28:20, 28:23, 29:5, 40:10
**inquire** [3] - 51:25, 86:24, 135:22
**inquiring** [1] - 145:12
**inquiry** [1] - 176:15
**inside** [2] - 101:7, 114:23
**instance** [2] - 107:2, 135:16
**instances** [1] - 149:10
**instead** [1] - 6:2
**instructed** [1] - 94:2

**instruction** [3] - 6:14, 14:15, 147:4
**integrated** [2] - 72:15, 72:18
**intend** [4] - 141:5, 142:18, 149:10, 149:11
**intended** [1] - 137:7
**intending** [3] - 51:25, 52:2, 137:25
**intensive** [7] - 11:16, 17:6, 18:21, 18:24, 20:9, 39:15, 40:11
**intentional** [1] - 135:12
**intentionally** [1] - 46:2
**interact** [2] - 7:22, 7:23
**interaction** [1] - 140:5
**interactions** [1] - 9:5
**interchange** [1] - 38:1
**interested** [1] - 146:6
**interesting** [1] - 145:25
**internet** [1] - 119:23
**internships** [1] - 43:2
**interrupt** [1] - 70:22
**intersection** [2] - 111:15, 126:4
**intervention** [1] - 85:6
**intimate** [2] - 139:3, 139:9
**intro** [1] - 73:13
**investigate** [1] - 169:14
**investigation** [1] - 140:8
**invited** [2] - 101:1, 101:2
**involved** [6] - 102:12, 136:17, 136:19, 139:6, 152:14, 154:8
**involvement** [1] - 57:12
**involving** [1] - 107:3
**issue** [2] - 30:24, 145:20
**issues** [4] - 30:17, 40:8, 73:12, 147:23
**items** [1] - 148:10
**itself** [2] - 132:25, 134:18

**J**

**J.F** [1] - 3:6
**J.O** [25] - 3:8, 71:18, 71:24, 72:3, 72:7, 72:20, 74:25, 86:2, 89:13, 91:7, 94:10,

95:21, 97:2, 97:13, 99:2, 99:14, 99:19, 100:13, 102:12, 103:6, 138:11, 138:12, 148:11, 148:18, 148:24
**J.O.'s** [1] - 100:20
**Jalazo** [1] - 11:25, 12:1, 13:12, 13:16, 14:6, 14:16, 15:22, 16:17, 16:23
**jaw** [1] - 36:24
**jealous** [1] - 102:15
**J██████** [9] - 91:9, 96:8, 100:1, 128:2, 128:7, 128:13, 128:19, 138:9, 138:22
**J██████** [2] - 127:24, 128:5
**Jersey** [2] - 24:17, 128:5
**jfahey@ holtzmanvogel. com** [1] - 1:17
**Joanna** [2] - 107:23, 108:14
**job** [3] - 43:3, 43:4, 43:11
**Johnson** [7] - 25:10, 25:11, 25:15, 25:22, 28:20, 28:22, 29:10
**join** [1] - 85:14
**joined** [4] - 30:23, 58:18, 60:13, 60:15
**joke** [1] - 91:23, 91:24
**jokes** [1] - 92:3
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**journalism** [1] - 64:11
**JR** [1] - 1:11
**Judge** [3] - 38:20, 132:11, 133:21, 135:24, 144:2
**JUDGE** [1] - 1:12
**judge** [1] - 152:8
**Julie** [1] - 19:14
**jumping** [1] - 59:8
**JUROR** [1] - 164:1
**jury** [44] - 5:4, 7:14, 7:18, 8:18, 11:11, 17:3, 20:25, 23:2, 23:16, 28:1, 31:23, 34:15, 35:15, 35:25, 37:21, 39:4, 39:11, 40:2, 41:14, 41:23, 42:4, 42:15, 44:10, 44:20, 44:24, 53:16, 102:7, 108:6, 108:23, 131:8, 132:8, 134:18,

136:23, 137:19, 141:10, 143:4, 144:23, 147:4, 149:15, 149:24, 151:23, 152:5, 163:25, 164:8
**JURY** [1] - 1:11
**Jury** [7] - 5:12, 45:2, 108:21, 132:5, 152:4, 180:6, 181:6
**justice** [1] - 129:19
**juxtapose** [1] - 105:19

**K**

**Kappatos** [2] - 72:9, 73:18
**Keefe** [1] - 2:9
**keep** [5] - 12:3, 12:4, 120:12, 134:10, 178:2
**keeping** [1] - 43:12, 85:3
**keeps** [1] - 105:6
**Keith** [1] - 21:6
**Kellar** [4] - 16:24, 16:25, 17:4, 20:13
**kelliker@huntonak. com** [1] - 3:3
**kept** [2] - 113:25, 128:15
**Kevin** [2] - 2:25, 10:11
**Key** [1] - 6:19
**kid** [2] - 136:20, 138:14
**kids** [2] - 42:2, 100:13
**kind** [10] - 5:18, 23:5, 23:6, 28:21, 38:18, 59:3, 92:20, 99:7, 167:21, 169:3
**kinds** [5] - 115:19, 115:24, 116:3, 136:14, 139:8
**Kinney** [1] - 3:4
**KINNEY** [2] - 3:5, 5:8
**knife** [2] - 53:24, 53:25
**knifepoint** [3] - 53:21, 53:22, 54:7
**knives** [1] - 110:8
**knowing** [2] - 24:6, 129:15
**knowledge** [2] - 15:2, 58:1
**known** [1] - 31:8
**knows** [3] - 92:24, 107:3, 149:11
**K██████** [8] - 133:1, 133:4, 133:12, 133:14, 134:16, 134:19, 136:8,

145:24
**Kristie** [3] - 39:9, 39:10, 39:11
**KURTH** [4] - 2:14, 2:17, 2:21, 3:1

## L

**lack** [1] - 63:24
**ladies** [9] - 5:13, 37:21, 45:4, 94:2, 108:22, 132:3, 152:5, 164:9, 180:3
**lady** [5] - 130:17, 131:2, 146:10, 146:13, 180:7
**laid** [1] - 69:4
**language** [1] - 91:10
**last** [22] - 6:7, 6:19, 22:7, 43:1, 64:24, 82:22, 87:4, 91:7, 122:20, 124:21, 131:18, 133:9, 133:11, 153:23, 158:15, 165:15, 169:25, 170:10, 172:5, 172:18, 179:18
**late** [1] - 113:15
**laughed** [1] - 92:2
**laughter** [2] - 84:13, 144:8
**law** [3] - 6:24, 135:15, 143:6
**LAW** [3] - 3:5, 107:24, 124:23
**lawsuit** [3] - 70:2, 92:21, 120:10
**lawyer** [2] - 48:25, 138:17
**lawyers** [10] - 5:22, 45:9, 50:3, 51:2, 94:3, 109:2, 143:13, 143:14, 152:2, 152:8
**lay** [7] - 26:19, 42:18, 69:6, 69:19, 106:14, 106:15, 150:10
**laying** [1] - 31:5
**leap** [1] - 31:22
**learning** [5] - 22:13, 46:14, 46:17, 74:23, 85:5
**least** [4] - 40:14, 74:18, 137:1, 137:23
**leave** [11] - 7:23, 15:24, 15:25, 21:4, 34:9, 66:25, 96:23, 115:7, 115:10, 141:2, 146:1
**left** [10] - 21:25, 71:18,

80:2, 97:17, 115:8, 158:15, 164:25, 170:23, 177:4, 177:8
**legal** [1] - 92:22
**legs** [1] - 9:2
**less** [9] - 18:1, 20:1, 39:17, 55:20, 55:24, 84:15, 110:23, 112:18, 149:19
**level** [1] - 88:9
**library** [1] - 180:10
**life** [8] - 9:3, 10:25, 13:5, 24:4, 24:8, 42:15, 118:7
**likely** [2] - 9:15, 141:1
**limine** [2] - 29:24, 30:16
**limit** [1] - 121:15
**limitation** [1] - 136:7
**line** [17] - 6:23, 48:9, 51:7, 51:21, 63:15, 65:8, 65:22, 66:9, 66:11, 67:24, 78:10, 134:2, 134:3, 135:21, 150:5, 150:7
**lines** [5] - 110:14, 119:22, 151:2, 163:18, 174:9
**list** [2] - 107:14, 142:19
**listed** [4] - 168:12, 168:17, 169:15, 173:4
**listen** [2] - 178:7, 179:19
**literally** [2] - 9:20, 132:20
**litigation** [1] - 134:14
**littlest** [1] - 43:13
**live** [3] - 10:24, 42:21, 117:19
**lived** [4] - 6:14, 27:23, 29:21, 118:3
**living** [2] - 22:3, 110:15
**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1
**local** [1] - 29:21
**location** [4] - 114:10, 156:15, 166:17, 166:22
**locations** [1] - 111:13
**Locker** [2] - 154:11, 155:22
**locker** [51] - 49:6, 53:14, 54:17, 71:19, 72:13, 72:19, 73:22, 73:23, 74:16, 76:2, 76:5, 76:7, 76:9,

76:11, 76:13, 76:19, 76:22, 76:25, 77:2, 77:6, 77:14, 78:18, 78:20, 79:11, 79:13, 81:8, 81:22, 82:19, 82:24, 83:1, 83:21, 84:2, 84:4, 114:1, 154:10, 154:17, 156:2, 156:3, 156:4, 156:8, 156:16, 156:21, 157:18, 157:22, 158:1, 158:4, 158:8, 158:15
**locker's** [1] - 156:15
**lockers** [4] - 82:1, 82:22, 83:21, 84:10
**Log** [1] - 163:4
**log** [24] - 162:25, 163:3, 163:21, 165:5, 165:9, 166:10, 166:15, 167:9, 168:20, 169:18, 169:20, 170:3, 170:19, 173:21, 173:25, 174:2, 174:10, 175:22, 175:24, 176:2, 176:3, 176:10
**logs** [2] - 162:8, 162:11
**longboard** [5] - 161:8, 161:12, 161:14, 161:18, 161:23
**longest** [3] - 175:22, 176:2, 176:3
**look** [63] - 12:13, 44:23, 47:20, 48:20, 51:5, 51:6, 51:20, 61:9, 61:15, 65:3, 65:4, 65:17, 68:11, 77:17, 85:2, 86:13, 93:19, 94:13, 94:25, 96:2, 97:5, 98:17, 101:16, 118:21, 118:22, 122:21, 122:23, 122:24, 123:10, 123:11, 124:12, 125:17, 128:25, 129:7, 140:20, 140:24, 150:5, 151:1, 152:2, 153:17, 154:12, 154:15, 154:18, 155:7, 156:24, 157:8, 157:13, 159:8, 160:16, 162:19, 164:5, 164:6, 164:17, 164:21, 168:9, 170:21, 170:23,

171:1, 171:21, 171:24, 173:2, 174:4, 177:13
**looked** [12] - 28:1, 28:2, 70:3, 70:4, 71:5, 71:9, 102:3, 102:4, 102:5, 122:3, 158:8, 164:14
**looking** [22] - 61:14, 74:14, 77:14, 81:17, 81:25, 82:1, 84:25, 107:21, 119:2, 124:18, 127:7, 150:7, 157:10, 158:3, 158:4, 158:15, 160:13, 161:25, 165:8, 167:8, 168:21, 173:3
**looks** [12] - 7:25, 8:1, 8:12, 48:10, 89:25, 97:21, 97:23, 99:7, 99:8, 149:23, 151:5, 165:13
**Los** [1] - 1:20
**loss** [2] - 47:4, 47:5
**lost** [5] - 23:20, 140:19, 140:21, 161:8, 161:18
**loud** [1] - 129:15
**love** [11] - 41:16, 42:6, 91:9, 103:18, 109:24, 110:4, 113:11, 114:16, 114:22, 115:14
**LR** [3] - 78:19, 79:10, 79:16
**LS** [2] - 74:19, 74:23
**Lunch** [1] - 180:11
**lunch** [4] - 74:10, 74:19, 153:4, 176:15

## M

**M.C** [1] - 3:5
**M.D** [2] - 14:7, 14:15
**M.P.F** [1] - 3:5
**Ma'am** [1] - 32:11
**ma'am** [61] - 26:14, 46:9, 46:24, 48:8, 48:11, 50:4, 50:6, 50:20, 51:22, 54:6, 54:19, 54:24, 55:14, 56:18, 56:21, 57:3, 57:5, 58:23, 62:16, 64:9, 64:12, 68:17, 70:1, 72:8, 73:2, 74:1, 76:6, 76:8, 77:20, 78:10, 80:24, 81:3, 81:15, 86:3, 92:4, 92:9, 95:18,

99:25, 100:8, 103:3, 103:11, 103:16, 103:19, 103:22, 104:4, 109:11, 109:25, 110:16, 110:18, 115:1, 124:20, 153:6, 160:19, 169:21, 171:4, 174:12, 178:9, 179:17, 179:19
**machine** [2] - 181:5, 181:12
**main** [1] - 78:25
**major** [1] - 21:10
**manage** [1] - 5:19
**manner** [2] - 147:13, 152:3
**manners** [1] - 151:25
**map** [3] - 78:19, 78:22, 111:10
**March** [5] - 1:6, 10:3, 20:18, 181:9, 181:16
**marked** [2] - 79:18, 80:23
**marker** [2] - 99:2, 99:16
**marks** [1] - 74:18
**married** [2] - 40:25, 42:6
**master's** [1] - 64:10
**match** [4] - 169:1, 169:2, 169:25, 173:13
**matches** [1] - 156:2
**math** [1] - 80:15
**matter** [4] - 5:24, 8:8, 85:4, 152:2
**matters** [1] - 108:13
**matters...................
............** [1] - 4:14
**MD** [1] - 34:23
**mean** [51] - 22:16, 22:22, 27:20, 28:3, 56:11, 56:13, 64:5, 66:21, 69:17, 77:7, 83:3, 83:23, 84:10, 87:23, 88:18, 89:21, 90:5, 99:8, 102:24, 109:8, 117:2, 117:11, 119:9, 123:10, 124:3, 124:11, 125:5, 125:6, 126:2, 126:3, 127:22, 128:5, 128:8, 129:5, 131:19, 138:9, 142:16, 143:23, 153:13, 156:5, 157:20, 158:20,

161:13, 166:12,
166:17, 172:11,
173:5, 174:7,
175:24, 177:15,
179:13
**meaning** [5] - 21:4,
42:14, 75:8, 87:20,
89:18
**means** [11] - 8:21,
8:24, 11:15, 15:15,
17:6, 22:17, 88:17,
95:4, 123:4, 128:17,
151:25
**mechanisms** [3] -
24:25, 35:18, 35:19
**media** [2] - 6:16, 92:10
**medical** [6] - 9:23,
17:13, 26:25, 30:19,
37:12, 37:23
**Medical** [4] - 30:10,
30:18, 30:20, 32:2
**meet** [5] - 12:16,
15:22, 41:9, 41:11,
60:10
**meeting** [35] - 41:12,
49:1, 49:5, 49:9,
49:14, 52:5, 52:9,
52:20, 52:23, 53:1,
53:3, 53:17, 54:4,
54:11, 56:4, 57:6,
57:7, 57:14, 58:15,
58:18, 59:16, 60:11,
60:13, 60:15, 60:25,
61:2, 62:10, 64:6,
64:20, 67:6, 85:12,
85:14, 111:21,
141:19
**memories** [5] - 8:25,
46:12, 46:25, 47:2,
47:3
**memory** [4] - 46:11,
46:20, 47:4, 47:5
**mental** [5] - 10:20,
17:17, 17:19, 46:7,
46:10
**mentioned** [5] - 9:7,
22:21, 28:10,
127:19, 161:20
**mess** [1] - 137:6
**message** [23] - 88:11,
88:17, 123:22,
125:20, 153:12,
153:24, 154:2,
154:12, 154:15,
156:14, 156:23,
159:10, 159:11,
159:23, 160:9,
164:25, 176:12,
177:5, 177:17,
177:24, 178:17,

178:20, 179:10
**messages** [93] -
88:12, 92:11,
103:13, 103:17,
103:20, 103:23,
109:7, 109:8, 109:9,
109:10, 109:12,
110:10, 110:12,
113:11, 114:15,
114:21, 114:24,
115:18, 116:13,
117:7, 117:10,
117:12, 120:9,
120:12, 121:19,
121:25, 122:1,
122:11, 122:13,
122:15, 122:18,
123:1, 123:8,
123:19, 124:3,
124:14, 124:16,
125:17, 127:17,
127:22, 128:24,
129:3, 132:20,
133:8, 133:17,
133:23, 134:3,
134:7, 134:12,
136:21, 137:8,
137:11, 137:16,
137:19, 138:23,
139:15, 139:19,
139:23, 141:9,
141:11, 141:18,
141:21, 142:11,
142:20, 142:22,
142:23, 144:12,
146:1, 149:10,
149:15, 149:17,
152:19, 152:20,
153:9, 153:11,
159:9, 159:25,
160:5, 160:17,
160:22, 161:24,
161:25, 176:8,
177:1, 177:7,
177:16, 178:2,
178:9, 178:10,
179:12, 179:13,
179:14
**messaging** [1] -
121:10
**met** [5] - 12:18, 41:10,
45:19, 56:19, 113:8
**metro/D.C** [1] - 21:5
**Miami** [3] - 2:3, 2:7,
2:11
**Michael** [1] - 3:4
**MICHAEL** [1] - 3:5
**microphone** [1] -
44:17
**Middle** [2] - 22:24,

125:7
**middle** [4] - 40:2,
67:21, 126:14,
150:25
**Middleton** [9] -
111:16, 111:18,
117:22, 125:21,
125:23, 125:25,
126:4, 126:7, 126:9
**might** [13] - 5:20, 23:4,
62:20, 68:25, 84:16,
86:10, 109:3,
135:23, 136:23,
157:13, 158:7,
167:19, 170:20
**mile** [1] - 55:20
**mind** [3] - 46:10,
106:3, 116:7
**minds** [1] - 145:12
**mine** [2] - 62:20,
179:15
**minus** [1] - 60:20
**minute** [6] - 44:6,
55:23, 112:16,
147:10, 175:23,
176:4
**minutes** [1] - 130:10
**MISCELLANY** [1] -
4:13
**misleading** [1] - 31:23
**missing** [1] - 145:19
**mistaken** [2] - 29:12,
35:4
**Mister** [1] - 157:8
**misunderstood** [1] -
175:17
**mk@kinneyesq.com**
[1] - 3:7
**modern** [1] - 41:12
**modern-day** [1] -
41:12
**Mohen** [2] - 36:17,
36:18
**Moir** [2] - 83:15, 83:17
**mom** [68] - 10:24,
48:25, 49:17, 52:20,
53:3, 53:9, 53:13,
53:14, 53:15, 53:22,
53:25, 54:4, 54:11,
54:14, 54:16, 56:6,
56:12, 57:11, 57:16,
58:1, 58:3, 58:7,
58:20, 59:1, 60:25,
62:9, 62:11, 64:5,
64:8, 67:7, 68:8,
68:9, 69:24, 70:1,
74:16, 75:7, 76:24,
101:3, 101:7, 101:8,
101:9, 101:10,
101:13, 104:5,

104:10, 110:22,
111:1, 112:1, 112:4,
115:6, 118:18,
119:7, 120:16,
121:1, 137:17,
162:8, 163:24,
164:12, 165:23,
165:25, 169:9,
169:10, 177:8,
177:10, 178:23
**mom's** [7] - 76:1,
84:21, 106:13,
159:14, 159:17,
159:18, 159:21
**moment** [8] - 30:5,
42:22, 64:3, 86:16,
104:13, 135:10,
164:2, 164:19
**Monday** [2] - 20:15,
62:6
**money** [2] - 161:8,
161:14
**monitor** [3] - 77:25,
78:2, 78:3
**month** [7] - 10:4, 12:2,
16:18, 25:14, 25:23,
125:15, 138:13
**months** [8] - 19:5,
19:6, 19:7, 29:11,
109:21, 112:9,
122:22, 137:16
**morning** [17] - 5:1,
5:2, 5:13, 5:15, 6:10,
6:25, 9:23, 34:6,
45:16, 45:17, 45:23,
108:5, 108:8,
113:23, 140:3,
158:11, 165:18
**most** [3] - 90:21,
107:5, 148:6
**mother** [24] - 14:25,
15:3, 53:7, 53:8,
53:16, 53:20, 53:24,
58:16, 58:19, 63:5,
70:24, 76:21, 140:6,
162:2, 162:7,
162:13, 165:7,
169:22, 170:6,
170:14, 173:23,
176:9, 176:22,
178:14
**motion** [3] - 29:24,
30:16, 31:2
**motions** [1] - 145:15
**move** [18] - 21:1,
40:20, 42:17, 44:11,
77:24, 78:3, 94:18,
96:10, 106:22,
141:6, 142:24,
146:8, 149:11,

150:14, 154:25,
155:5, 163:8, 172:21
**moved** [3] - 21:21,
23:12, 131:24
**movement** [1] - 8:13
**moving** [5] - 5:17, 6:9,
42:18, 106:1, 161:7
**MR** [161] - 5:5, 5:7,
5:8, 5:9, 7:5, 7:7,
7:9, 11:7, 11:9,
12:11, 13:2, 13:10,
14:2, 14:8, 14:12,
14:20, 15:8, 15:10,
15:24, 16:1, 16:4,
16:6, 16:11, 16:13,
16:14, 18:18, 26:19,
26:22, 27:19, 28:17,
30:9, 30:11, 30:23,
31:1, 31:13, 32:17,
33:16, 34:10, 37:14,
37:16, 38:5, 38:6,
38:20, 38:24, 39:2,
39:3, 42:22, 42:25,
44:2, 44:11, 44:17,
51:8, 51:10, 51:24,
54:8, 56:8, 57:23,
62:20, 63:21, 63:24,
65:5, 65:7, 66:7,
66:11, 67:18, 67:20,
67:23, 69:2, 70:13,
78:6, 82:8, 82:10,
82:17, 86:16, 86:18,
86:24, 92:22, 93:23,
94:20, 96:13, 97:8,
98:20, 104:22,
105:1, 106:2,
106:12, 107:10,
108:2, 108:18,
118:10, 118:13,
129:9, 129:12,
129:23, 130:12,
131:1, 131:4,
131:18, 131:22,
132:11, 132:23,
132:25, 133:4,
133:11, 133:21,
135:2, 135:24,
136:3, 136:25,
137:4, 137:21,
138:1, 138:5,
138:10, 138:12,
138:17, 138:20,
139:4, 139:11,
139:15, 140:14,
141:24, 144:7,
144:9, 144:16,
145:1, 145:8,
145:13, 145:17,
145:18, 145:23,
146:3, 146:14,
146:18, 146:21,

193

146:23, 146:25,
147:7, 147:17,
147:19, 147:22,
148:1, 148:8,
148:12, 148:19,
149:25, 150:8,
151:15, 152:18,
155:2, 157:4,
162:20, 162:22,
163:10, 172:9,
172:11, 172:14,
172:25, 173:8,
173:13, 173:16
**MS** [189] - 4:5, 11:5,
12:7, 13:18, 13:20,
14:7, 14:11, 14:13,
14:24, 18:15, 26:12,
27:5, 27:7, 29:23,
30:3, 31:15, 31:23,
32:5, 32:14, 34:2,
37:12, 44:20, 44:25,
45:13, 45:15, 47:22,
47:25, 49:19, 49:22,
49:24, 49:25, 51:9,
51:11, 51:13, 52:4,
52:7, 54:10, 56:15,
57:25, 61:17, 61:20,
62:14, 62:18, 63:1,
63:4, 63:22, 64:2,
65:6, 65:8, 65:12,
65:14, 65:16, 66:2,
66:3, 66:10, 66:13,
66:16, 66:18, 67:24,
68:1, 68:15, 68:18,
68:21, 68:23, 68:25,
69:8, 69:23, 70:16,
70:18, 70:20, 77:18,
77:21, 78:1, 78:2,
78:8, 78:15, 78:17,
80:20, 80:21, 82:5,
82:12, 82:18, 83:5,
83:7, 84:9, 84:14,
85:20, 86:21, 87:3,
93:10, 93:14, 94:1,
94:6, 94:7, 94:18,
94:22, 96:10, 96:16,
97:11, 98:23, 98:25,
99:11, 99:13, 100:5,
100:6, 101:20,
101:23, 101:25,
102:1, 104:18,
107:13, 108:1,
108:19, 109:5,
116:19, 118:11,
118:14, 118:16,
121:18, 124:24,
125:2, 127:13,
127:16, 128:11,
130:8, 130:10,
131:17, 137:7,
137:15, 138:2,

138:8, 138:16,
139:18, 140:1,
141:5, 141:17,
142:7, 142:14,
142:16, 143:2,
143:19, 143:23,
147:8, 148:20,
148:25, 149:14,
149:21, 149:23,
150:24, 151:8,
153:5, 153:7,
154:25, 155:5,
155:8, 156:20,
157:1, 157:7,
157:11, 157:17,
158:10, 158:13,
159:5, 159:7,
160:23, 161:11,
162:21, 162:23,
162:24, 163:7,
163:13, 164:11,
168:14, 168:16,
170:18, 171:7,
171:15, 171:17,
172:10, 172:13,
172:16, 172:17,
173:1, 173:19,
175:19, 176:17,
176:20, 177:21,
177:23
**multiple** [2] - 40:14,
54:4

## N

**naive** [2] - 136:17,
136:22
**Name** [12] - 29:20,
29:21, 30:10, 30:18,
30:20, 31:7, 32:2,
32:18, 32:19, 32:21,
33:8, 33:17
**name** [25] - 9:10,
10:10, 10:11, 11:23,
11:25, 16:21, 40:24,
45:18, 45:22, 46:1,
91:1, 94:25, 124:5,
124:6, 124:7,
126:20, 127:6,
127:19, 128:5,
144:13, 144:24,
155:14, 155:15,
160:8, 181:16
**named** [9] - 21:6,
125:6, 125:13,
154:5, 154:7, 154:8,
160:1, 160:14, 161:1
**names** [3] - 48:15,
143:25
**narrative** [3] - 141:18,
149:15, 149:17

**narrowed** [1] - 149:9
**National** [1] - 10:19
**nature** [3] - 12:10,
34:6, 103:24
**near** [3] - 156:21,
156:23, 157:22
**nearby** [1] - 32:20
**necessarily** [1] -
105:15
**necessary** [1] - 105:16
**neck** [3] - 42:19,
97:20, 97:23
**need** [23] - 5:3, 5:23,
5:25, 15:5, 15:19,
42:17, 48:20, 64:3,
69:16, 69:18, 78:3,
85:7, 93:20, 137:10,
140:23, 144:13,
144:17, 144:18,
144:20, 148:3,
154:12, 169:20,
171:2
**needed** [7] - 14:7,
14:15, 14:16, 57:11,
61:6, 67:11, 161:21
**needing** [1] - 161:8
**needs** [13] - 69:3,
69:4, 129:18, 130:2,
130:4, 130:9,
130:15, 130:17,
130:18, 131:6,
131:8, 147:9
**negative** [1] - 22:18
**neighborhood** [11] -
55:3, 55:18, 56:7,
95:25, 96:1, 99:20,
111:7, 111:8,
111:10, 125:23,
126:7
**net** [2] - 134:25, 135:5
**neurologist** [2] -
36:11, 36:19
**never** [6] - 46:13,
46:16, 76:21, 116:7,
150:19, 160:17
**new** [5] - 20:24, 24:4,
143:14
**New** [4] - 22:3, 23:12,
24:17, 25:12
**newsprint** [1] - 6:16
**next** [20] - 10:16,
11:11, 11:14, 11:21,
11:22, 16:21, 33:14,
44:3, 71:21, 80:10,
80:17, 80:22, 85:12,
97:6, 138:24, 147:1,
155:25, 166:11,
174:22
**Nicole** [1] - 11:25
**night** [10] - 5:16, 6:7,

6:19, 25:19, 87:4,
113:15, 115:6,
115:8, 176:21,
177:14
**nightmares** [1] - 8:9
**nilly** [1] - 135:20
**nine** [2] - 175:23,
176:4
**nine-minute** [2] -
175:23, 176:4
**nobody** [2] - 61:6,
139:5
**non** [1] - 54:16
**non-consensually** [1]
- 54:16
**noon** [3] - 6:4, 124:24
**note** [3] - 90:11, 148:1
**notebook** [3] - 118:10,
118:13, 118:14
**notebooks** [1] - 61:18
**notes** [1] - 181:12
**nothing** [12] - 5:5,
14:16, 31:18, 61:10,
61:23, 61:25, 62:2,
75:16, 75:19, 75:23,
107:3, 112:8
**noticed** [1] - 136:1
**November** [59] - 47:7,
53:6, 53:25, 56:4,
63:5, 64:17, 66:20,
70:25, 75:8, 85:25,
90:4, 94:8, 100:21,
104:3, 104:8,
118:18, 118:22,
119:3, 119:8,
124:19, 127:18,
127:21, 127:24,
128:20, 138:23,
139:22, 139:23,
139:24, 140:2,
140:3, 154:16,
159:10, 159:17,
159:18, 159:20,
159:22, 160:6,
162:1, 162:8,
162:16, 163:1,
163:14, 163:22,
164:13, 165:10,
165:15, 166:10,
166:14, 167:9,
168:11, 169:18,
175:22, 176:4,
176:21, 176:22,
177:9, 179:2
**numb** [1] - 9:1
**number** [69] - 17:22,
30:1, 51:18, 64:14,
65:11, 68:22, 95:7,
104:5, 104:8,
118:18, 119:7,

119:14, 119:16,
119:19, 120:18,
120:19, 120:21,
123:12, 154:11,
154:17, 155:7,
155:9, 156:2, 156:3,
156:4, 162:20,
163:1, 164:16,
164:24, 165:1,
165:3, 166:13,
167:2, 167:7, 168:5,
168:6, 168:12,
168:20, 169:8,
169:10, 169:15,
169:17, 169:23,
170:1, 170:6,
170:10, 170:13,
170:14, 171:11,
171:18, 171:19,
172:10, 172:19,
172:22, 172:23,
173:4, 173:9,
173:11, 174:6,
174:10, 174:22,
174:24, 175:20,
175:23, 176:5
**Number** [10] - 4:8, 4:9,
4:9, 4:10, 4:10, 4:11,
4:11, 4:12, 4:12,
155:22
**numbers** [10] - 51:14,
123:11, 155:11,
165:13, 166:13,
170:1, 173:11,
174:21, 174:22,
175:15
**numerous** [1] - 141:8
**NW** [5] - 1:15, 2:14,
2:18, 2:21, 3:1

## O

**o's** [1] - 90:1
**oath** [2] - 50:19,
143:13
**OB** [1] - 38:10
**OB-GYN** [1] - 38:10
**object** [1] - 69:3
**objecting** [1] - 70:13
**objection** [40] - 11:5,
12:7, 13:18, 18:15,
26:12, 27:5, 29:23,
34:2, 37:12, 54:8,
56:8, 57:23, 68:2,
82:7, 82:10, 86:15,
86:18, 86:19, 92:22,
94:19, 94:20, 96:12,
96:13, 97:7, 97:8,
97:9, 98:19, 98:20,

98:21, 104:21,
150:15, 155:1,
155:2, 155:3, 157:3,
157:4, 157:5, 163:8,
163:9, 163:10
**objections** [2] - 38:1,
44:16
**observation** [1] -
129:14
**observing** [1] - 7:15
**obviously** [4] - 15:19,
31:21, 108:14,
132:15
**Obviously** [1] - 129:16
**occasionally** [1] -
112:12
**occurred** [5] - 6:19,
55:18, 55:25,
111:11, 111:12
**occurring** [3] - 53:15,
113:5
**occurs** [1] - 43:14
**October** [14] - 86:8,
90:8, 90:16, 95:3,
95:5, 95:14, 96:20,
98:8, 100:10,
100:13, 110:21,
122:6, 128:22,
138:13
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5,
4:1, 181:1
**offered** [1] - 153:3
**offering** [1] - 30:18
**office** [10] - 48:2,
58:12, 59:3, 59:19,
59:20, 59:25, 60:7,
60:18, 79:1, 79:22
**OFFICE** [1] - 3:5
**officer** [6] - 56:12,
56:13, 56:20, 60:20,
107:17, 131:23
**Officer** [7] - 57:4,
57:11, 58:11, 59:8,
59:16, 60:11, 60:20
**offices** [3] - 43:22,
59:22, 60:3
**official** [2] - 181:5,
181:11
**Official** [3] - 3:12,
181:3, 181:22
**often** [7] - 17:13,
19:19, 19:22, 21:13,
35:7, 42:17, 43:19
**oftentimes** [2] - 42:17,
152:6
**old** [9] - 10:15, 23:21,
27:17, 28:13, 52:19,
92:16, 98:4, 120:14,
162:18

**Olivia** [3] - 153:12,
153:24, 154:5
**once** [7] - 21:21, 67:4,
68:6, 71:20, 110:22,
111:1, 134:17
**one** [96] - 16:15,
20:22, 22:15, 23:7,
23:21, 23:25, 24:12,
25:17, 27:12, 29:25,
30:22, 30:24, 34:8,
40:1, 40:21, 41:20,
43:1, 45:6, 47:15,
47:16, 48:6, 51:12,
53:9, 55:10, 56:19,
59:20, 60:5, 61:13,
67:3, 67:24, 68:25,
69:21, 71:24, 80:4,
81:4, 82:24, 82:25,
83:1, 86:16, 86:24,
89:22, 96:17, 96:18,
96:20, 97:1, 97:3,
97:6, 98:7, 98:13,
98:14, 104:22,
105:13, 110:2,
111:15, 111:19,
118:11, 122:5,
122:14, 124:18,
124:21, 126:23,
129:5, 131:18,
132:18, 135:16,
136:20, 136:23,
137:4, 142:11,
142:17, 145:14,
145:19, 146:3,
156:13, 160:6,
160:7, 161:2,
164:19, 164:20,
165:25, 166:1,
166:21, 171:19,
174:14, 174:15,
174:17, 175:3,
175:4, 175:5, 180:9
**one-sided** [1] - 83:1
**ones** [1] - 99:23,
115:20, 115:21,
142:23, 174:5,
174:9, 175:2
**online** [1] - 92:8
**open** [3] - 27:16,
108:7, 132:2
**Open** [2] - 16:5, 32:16
**opportunity** [7] - 6:7,
7:11, 12:16, 45:7,
135:7, 148:9, 151:25
**oppose** [1] - 148:1
**opposed** [2] - 135:3,
150:22
**oral** [3] - 74:20, 110:6,
161:4
**orally** [1] - 49:4

**order** [3] - 14:14, 31:2,
175:1
**orders** [1] - 26:9
**orient** [1] - 78:24
**origin** [1] - 93:9
**otherwise** [2] - 109:4,
150:13
**ourselves** [1] - 146:9
**outgoing** [2] - 166:16,
171:18
**outpatient** [7] - 17:2,
18:21, 18:25, 20:10,
39:15, 40:10, 40:11
**outside** [6] - 48:2,
72:16, 81:13, 94:10,
112:21, 114:12
**overbearing** [1] - 8:15
**overlap** [2] - 24:11,
24:13
**overruled** [4] - 18:17,
56:10, 64:1, 92:24
**oversight** [1] - 111:1
**overwhelm** [1] -
146:16
**overwhelmed** [1] -
8:24
**overwhelming** [2] -
9:19, 43:17
**own** [3] - 10:25, 26:16,
71:18
**Ox** [5] - 111:15,
111:17, 111:18,
126:2, 126:5

## P

**P.A.H** [1] - 3:5
**p.m** [31] - 17:7, 63:8,
71:2, 108:6, 124:19,
125:20, 151:22,
154:16, 159:10,
160:6, 160:7,
164:13, 167:22,
167:25, 168:3,
168:5, 168:21,
168:22, 169:18,
169:19, 170:1,
172:2, 172:5, 172:7,
172:10, 172:18,
174:13, 177:14,
178:17, 178:20,
180:11
**page** [89] - 20:15,
48:12, 51:6, 51:10,
51:11, 51:16, 51:20,
65:4, 65:8, 65:11,
65:22, 66:11, 82:16,
83:20, 89:9, 90:6,
90:8, 90:10, 90:14,
90:23, 90:24, 91:4,

91:20, 95:10, 102:8,
102:11, 102:13,
105:7, 123:11,
123:14, 123:17,
123:20, 123:22,
123:25, 124:4,
124:13, 124:21,
125:17, 125:20,
126:10, 126:15,
127:1, 127:6, 127:8,
128:1, 128:12,
128:25, 129:7,
142:17, 149:22,
150:5, 153:17,
153:21, 153:23,
154:10, 156:3,
156:7, 157:11,
158:9, 159:9,
159:12, 159:25,
160:4, 161:6,
161:24, 161:25,
163:2, 163:4,
166:11, 167:9,
170:19, 171:9,
172:2, 174:13,
176:2, 176:8,
176:21, 177:5,
177:18, 177:24,
178:3, 178:13,
178:16, 178:17,
178:20, 179:3
**page/line** [1] - 65:17
**pages** [7] - 122:15,
142:18, 151:1,
152:17, 152:19,
152:20, 181:10
**pain** [11] - 33:19,
33:20, 36:25, 37:8,
37:11, 37:19, 38:11,
42:14, 42:16, 42:19,
42:21
**painful** [1] - 37:5
**Palm** [4] - 146:24,
167:1, 175:10,
175:11
**panic** [2] - 43:15
**pants** [2] - 49:7, 49:13
**paragraph** [9] - 74:15,
74:16, 75:21, 76:2,
85:2, 119:3, 164:15,
164:21, 168:11
**paragraphs** [2] -
75:23, 75:24
**parent** [1] - 113:2
**parent's** [1] - 163:17
**parents** [1] - 10:23,
10:25, 11:14, 23:6,
85:13, 91:17, 91:19,
112:6, 112:19,
112:21, 121:9

**parents'** [2] - 29:6,
163:18
**park** [1] - 99:21
**Park** [1] - 1:19
**part** [10] - 14:3, 31:9,
34:4, 69:13, 74:9,
83:1, 108:14,
108:16, 142:3, 150:1
**partial** [10] - 11:15,
17:5, 18:7, 20:9,
20:13, 20:14, 20:19,
28:24, 29:5, 29:9
**participate** [1] -
110:24
**particular** [9] - 12:22,
30:8, 37:22, 37:24,
105:4, 112:1,
170:15, 173:11,
176:15
**particularly** [1] - 6:21
**parties** [2] - 137:10,
180:10
**partner** [6] - 7:23, 9:6,
9:7, 9:9, 9:10, 40:24
**party** [9] - 100:20,
100:23, 101:1,
101:3, 101:11,
127:24, 128:21,
133:13, 135:9
**passed** [1] - 33:11
**passionate** [1] -
179:23
**password** [1] - 115:2
**past** [5] - 37:1, 130:1,
143:7, 143:12,
164:24
**patch** [4] - 100:3,
100:7, 100:18,
126:21
**patient** [1] - 147:13
**Patrick** [3] - 153:25,
154:7, 154:8
**pause** [4] - 12:15,
30:6, 129:8, 164:3
**pay** [6] - 121:8,
121:11, 153:3,
161:8, 161:14,
161:17
**paying** [1] - 111:2
**PC** [1] - 3:9
**PE** [18] - 71:18, 72:7,
72:10, 72:12, 72:15,
72:19, 73:17, 73:18,
73:21, 73:23, 73:24,
74:16, 76:5, 76:7,
76:11, 76:18, 77:2,
77:3
**Pedersen** [3] - 130:16,
131:12, 146:20
**PEDERSEN** [5] - 14:7,

195

14:11, 130:8,
130:10, 131:17
**pediatrician** [1] - 10:9
**pelvic** [7] - 33:19,
33:20, 37:7, 37:10,
37:19, 38:11, 42:19
**pending** [1] - 136:1
**penetrate** [1] - 110:6
**Pennsylvania** [5] -
2:14, 2:18, 2:21, 3:1,
20:5
**people** [18] - 34:4,
44:14, 45:6, 56:19,
58:4, 71:8, 74:18,
87:14, 88:19, 89:2,
89:4, 95:16, 99:15,
117:16, 129:25,
161:3, 164:8, 177:20
**per** [1] - 17:20
**percent** [20] - 10:4,
18:7, 18:9, 19:23,
24:14, 29:12, 33:4,
39:21, 56:2, 60:6,
67:12, 79:23, 87:24,
91:13, 95:22,
101:14, 109:22,
130:8, 166:4, 168:7
**perception** [4] - 43:6,
43:7, 135:1, 136:4
**perform** [1] - 116:20
**performed** [1] -
116:24
**perhaps** [1] - 74:7
**period** [4] - 71:19,
72:7, 73:24, 137:16
**periodic** [1] - 17:2
**permitted** [1] - 114:12
**person** [7] - 21:20,
89:13, 119:16,
119:19, 119:25,
120:24, 151:5
**personal** [2] - 26:16,
34:6
**personally** [1] - 15:12
**perspective** [4] -
129:17, 134:24,
136:6, 149:3
**ph** [1] - 43:3
**phone** [65] - 102:15,
103:10, 103:13,
104:5, 104:6, 104:8,
109:7, 111:24,
113:25, 114:3,
114:6, 114:21,
115:2, 115:6,
115:10, 115:14,
118:18, 119:7,
119:16, 119:19,
119:22, 119:25,
120:4, 120:13,

120:15, 120:16,
120:18, 120:19,
120:21, 121:1,
121:4, 137:17,
162:3, 162:8,
162:11, 162:15,
163:1, 163:3,
163:14, 163:18,
164:16, 164:24,
164:25, 165:4,
167:1, 168:12,
168:17, 169:7,
169:10, 169:15,
169:17, 172:8,
173:4, 173:25,
175:10, 175:20,
175:23, 176:10,
177:14
**phones** [2] - 112:19,
120:3
**photo** [2] - 94:23,
96:22
**photograph** [12] -
77:13, 81:16, 81:20,
81:23, 83:11, 95:13,
95:16, 96:5, 96:18,
97:3, 97:12, 99:22
**photographs** [3] -
27:25, 77:12, 82:14
**photos** [1] - 98:12
**phrase** [1] - 48:10
**physical** [2] - 42:16,
75:4
**physically** [1] - 9:21
**physician** [2] - 23:13,
37:7
**pick** [7] - 8:13, 87:19,
88:19, 142:23,
144:2, 144:7, 151:12
**picked** [2] - 31:7,
71:14
**picking** [2] - 112:6,
112:10
**picture** [11] - 77:22,
83:25, 94:17, 95:4,
95:7, 96:7, 99:14,
99:18, 138:13,
157:12, 158:14
**pictures** [4] - 116:4,
116:5, 116:6, 158:8
**pink** [1] - 99:6
**PITTLEMAN** [1] - 3:9
**place** [2] - 11:18,
11:21
**places** [2] - 8:2, 44:13
**Plaintiff** [4] - 1:4, 1:14,
2:1, 4:2
**plaintiff** [4] - 5:5, 70:2,
108:18, 138:14
**Plaintiff's** [6] - 68:23,

101:16, 104:12,
164:14, 164:18,
168:10
**plaintiff's** [6] - 47:12,
47:17, 107:14,
147:24, 149:5, 149:7
**plaintiffs** [1] - 30:18
**plan** [2] - 38:4, 121:8
**planning** [1] - 148:18
**play** [4] - 51:23, 66:14,
165:24, 165:25
**playing** [1] - 166:1
**plays** [1] - 151:13
**PLC** [1] - 3:5
**PLLC** [1] - 1:15
**pod** [12] - 72:24, 73:1,
76:9, 77:9, 77:10,
77:14, 81:22, 82:19,
156:11, 156:22,
158:3, 158:8
**point** [22] - 12:25,
20:8, 21:1, 21:2,
23:14, 54:1, 57:7,
60:13, 60:15, 69:16,
81:21, 81:25, 94:12,
102:19, 111:10,
112:6, 130:14,
131:18, 147:3,
149:16, 150:16,
169:13
**pointed** [3] - 49:11,
111:13, 134:17
**pointer** [1] - 78:5
**pointing** [1] - 81:18
**pointing)** [1] - 83:6
**police** [8] - 56:6,
56:12, 56:13, 56:20,
56:25, 57:20, 58:2,
58:7
**policy** [1] - 165:4
**posing** [1] - 148:2
**position** [1] - 14:10
**positive** [1] - 85:5
**possibility** [1] -
143:16
**possible** [9] - 70:10,
75:11, 95:22, 97:2,
109:18, 116:6,
117:9, 149:9, 156:5
**possibly** [1] - 149:19
**post** [11] - 18:14, 87:7,
87:8, 87:14, 88:6,
89:8, 89:13, 89:16,
89:18, 89:22, 92:2
**post-traumatic** [1] -
18:14
**postconcussion** [1] -
36:21
**postdate** [3] - 98:7,
98:10, 98:12

**posted** [3] - 89:12,
95:4, 96:20
**poster** [1] - 88:7
**posting** [1] - 136:15
**posts** [2] - 92:10,
122:2
**posttraumatic** [4] -
21:9, 24:6, 39:24,
40:8
**potential** [1] - 69:15
**practicable** [1] - 6:10
**practice** [1] - 24:15
**practicing** [1] - 24:16
**predicate** [5] - 14:19,
26:18, 26:20, 31:6,
150:10
**prefer** [3] - 6:25,
47:10, 143:18
**preference** [1] -
105:24
**preferred** [1] - 104:24
**pregnant** [1] - 131:3
**Preliminary** [1] - 4:14
**present** [8] - 5:12,
8:22, 45:2, 52:25,
108:21, 143:8,
151:4, 152:4
**presentation** [1] -
147:6
**presented** [2] -
136:16, 152:3
**presenting** [2] - 137:3,
152:9
**press** [1] - 147:15
**pressing** [1] - 89:19
**presumably** [1] -
150:11
**pretty** [4] - 83:21,
83:22, 84:10, 110:19
**prevalent** [1] - 136:18
**prevent** [2] - 31:25,
32:10
**prevented** [3] - 13:12,
13:15, 14:5
**previous** [1] - 18:24
**previously** [2] - 43:2,
101:2
**primarily** [2] - 26:2,
26:3
**primary** [2] - 23:13,
35:11
**principal** [2] - 60:5,
79:24
**principals** [2] - 58:24,
60:2
**principals'** [1] - 59:25
**print** [4] - 90:6,
124:16, 163:21,
165:10
**printed** [1] - 90:16

**printout** [1] - 157:14
**private** [2] - 34:6,
88:12
**problem** [11] - 43:11,
65:14, 85:21, 85:23,
100:12, 107:5,
134:22, 145:19,
146:24, 147:2,
147:14
**problematic** [6] -
64:20, 64:22, 65:1,
66:5, 67:16, 148:15
**problems** [5] - 46:20,
46:21, 107:20,
110:22, 145:20
**proceed** [3] - 7:5,
16:11, 125:19
**proceedings** [10] -
12:15, 30:6, 44:9,
108:11, 129:8,
151:22, 164:3,
181:6, 181:11,
181:14
**PROCEEDINGS** [1] -
1:11
**process** [7] - 15:9,
22:19, 23:16, 24:1,
35:16, 42:4, 151:13
**processes** [1] - 23:18
**processing** [7] -
22:13, 22:21, 24:24,
26:8, 35:17, 36:8
**produce** [7] - 92:10,
92:14, 121:22,
121:25, 122:2,
122:6, 162:15
**produced** [14] - 95:7,
95:9, 120:9, 122:8,
122:10, 122:15,
122:19, 125:9,
133:8, 155:10,
160:17, 162:12,
177:2, 179:16
**professional** [2] -
131:11, 152:3
**professionally** [1] -
12:21
**professionals** [1] -
130:17
**program** [11] - 11:15,
11:16, 17:5, 18:8,
18:22, 20:20, 28:25,
29:8, 29:9, 39:15,
40:11
**pronounce** [1] - 36:17
**proper** [1] - 133:18
**proposals** [1] - 105:3
**proposed** [4] - 69:9,
105:8, 105:9
**protect** [1] - 112:9

**protruded** [1] - 28:3
**protruding** [1] - 28:8
**proud** [2] - 91:15, 91:24
**provide** [2] - 26:17, 37:22
**Provide** [1] - 151:10
**provided** [2] - 57:20, 142:6
**provider** [2] - 20:4, 37:10
**providers** [3] - 15:5, 17:14, 17:17
**providing** [1] - 31:12
**psychiatrist** [5] - 14:15, 14:17, 34:22, 35:12, 35:14
**psychologist** [4] - 20:4, 21:6, 21:12, 36:4
**PTSD** [2] - 10:2, 26:4
**Public** [2] - 13:8, 13:15
**public** [3] - 34:9, 87:19, 88:8
**publish** [13] - 47:23, 68:18, 70:16, 77:20, 86:21, 96:11, 96:14, 97:9, 98:21, 141:16, 155:3, 157:5, 163:11
**published** [2] - 86:23, 143:4
**pull** [1] - 169:20
**pumpkin** [4] - 100:3, 100:7, 100:18, 126:21
**punished** [1] - 23:8
**punishment** [1] - 23:10
**purposes** [2] - 69:17, 144:14
**pursues** [1] - 138:24
**put** [12] - 48:15, 61:16, 82:13, 101:21, 104:13, 106:8, 138:18, 140:9, 145:14, 145:20, 146:16, 151:15
**putting** [2] - 150:1, 152:13

**Q**

**QUESTION** [8] - 66:4, 66:19, 66:23, 67:2, 67:4, 67:8, 67:13, 67:15
**questioning** [2] - 106:16, 136:12
**questions** [24] - 7:12,

26:14, 31:14, 45:10, 50:11, 52:2, 93:21, 129:20, 129:21, 130:2, 130:18, 130:19, 130:25, 131:6, 131:14, 135:13, 142:7, 143:20, 148:13, 149:20, 150:17, 160:20, 179:20, 179:24
**quite** [1] - 119:1
**quotation** [1] - 74:18

**R**

**race** [4] - 91:23, 92:11, 93:5, 93:12
**Rachel** [5] - 10:13, 22:24, 125:6, 125:13, 167:24
**racial** [6] - 92:3, 92:7, 92:18, 92:20, 93:8, 93:24
**ran** [1] - 178:25
**random** [1] - 154:2
**rape** [2] - 110:5, 125:22
**raped** [8] - 23:24, 55:11, 99:15, 99:24, 100:24, 113:10, 128:23, 176:1
**rapes** [4] - 22:24, 111:8, 111:12, 113:4
**raping** [3] - 111:23, 114:20, 117:16
**rapist** [1] - 117:18
**rbates@hunton.com** [1] - 2:16
**re** [2] - 11:8, 133:13
**re-ask** [1] - 11:8
**re-deposed** [1] - 133:13
**read** [34] - 51:1, 51:25, 64:3, 65:18, 65:20, 65:25, 66:13, 66:15, 66:16, 67:22, 70:8, 90:7, 93:19, 118:23, 119:3, 124:12, 124:17, 124:20, 127:1, 127:8, 127:9, 127:10, 127:11, 135:15, 136:7, 143:5, 143:12, 143:23, 143:24, 144:1, 149:16, 150:22, 156:23, 165:14
**readdress** [1] - 69:19
**reading** [10] - 70:21,

127:15, 134:10, 136:10, 142:2, 143:25, 149:15, 150:8, 151:3, 160:4
**ready** [1] - 44:10
**real** [2] - 133:23, 134:7
**really** [31] - 7:24, 8:2, 8:6, 8:7, 8:16, 22:25, 23:22, 24:1, 24:3, 27:16, 28:5, 41:2, 41:14, 43:24, 66:24, 78:22, 81:23, 83:24, 85:18, 86:12, 92:25, 116:17, 119:1, 121:5, 133:14, 140:6, 157:20, 169:5, 170:23, 170:24, 170:25
**realtime** [1] - 181:12
**reason** [4] - 16:17, 117:13, 141:7, 150:12
**reasonable** [1] - 64:1
**reasons** [1] - 31:8
**Rebecca** [1] - 37:9
**recalled** [1] - 46:23
**recalling** [2] - 46:13, 46:16
**receive** [1] - 141:10
**received** [2] - 124:22, 178:11
**receiving** [4] - 31:9, 141:14, 141:15
**recently** [1] - 90:17
**Recess** [4] - 44:8, 108:10, 132:7, 180:11
**recess** [1] - 132:6
**recognize** [7] - 134:7, 134:12, 134:13, 162:25, 175:8, 176:25, 179:14
**recollect** [1] - 141:1
**recollection** [30] - 21:18, 67:9, 70:10, 76:23, 76:24, 93:16, 95:23, 98:9, 100:15, 101:12, 113:18, 116:18, 119:6, 119:15, 121:16, 133:23, 134:8, 141:2, 142:4, 143:3, 143:7, 143:8, 143:10, 143:11, 143:12, 151:4, 151:6, 151:10, 158:21, 162:6
**recommendation** [1] - 134:11
**record** [25] - 7:3, 15:4,

44:19, 66:1, 69:2, 80:18, 130:15, 132:9, 132:13, 138:19, 142:21, 143:7, 143:12, 143:13, 147:17, 147:20, 147:21, 147:22, 150:15, 151:15, 151:24, 154:21, 154:22, 164:10, 173:3
**recorded** [1] - 50:17
**recording** [1] - 181:13
**records** [4] - 31:16, 162:3, 162:15, 176:23
**recover** [1] - 148:13
**recurrent** [1] - 31:18
**redirect** [1] - 67:19
**reference** [12] - 12:9, 29:25, 62:25, 91:20, 109:2, 116:14, 126:11, 126:14, 128:12, 152:12, 153:24, 169:22
**referenced** [2] - 164:14, 170:14
**references** [8] - 116:15, 128:1, 128:6, 128:24, 129:3, 153:8, 153:11, 153:23
**referencing** [1] - 124:15
**referred** [2] - 40:23, 91:7
**referring** [4] - 80:18, 122:14, 172:12, 172:15
**refers** [4] - 123:20, 123:24, 128:15, 160:1
**reflect** [3] - 80:18, 132:9, 151:24
**refresh** [9] - 119:6, 143:3, 143:8, 143:10, 143:11, 151:2, 151:4, 151:6, 151:9
**refreshes** [1] - 93:16
**refuses** [1] - 135:9
**refusing** [2] - 135:11, 135:12
**regard** [1] - 170:6
**regarding** [6] - 27:15, 30:17, 30:18, 32:2, 66:20, 169:23
**regardless** [1] - 141:9
**region** [1] - 28:8
**registered** [1] - 163:14

**regular** [6] - 76:9, 76:13, 76:21, 76:25, 77:6, 77:7
**regularly** [1] - 20:10
**relate** [2] - 26:10, 148:10
**related** [6] - 13:3, 15:22, 31:11, 32:7, 146:12, 165:2
**relating** [3] - 12:21, 12:23, 40:8
**relationship** [10] - 27:4, 41:3, 41:15, 41:17, 41:19, 129:25, 138:25, 139:3, 139:10, 139:13
**relationships** [1] - 35:19
**relatively** [1] - 40:16
**relayed** [1] - 15:3
**reliability** [1] - 142:13
**rely** [1] - 131:11
**remedies** [1] - 135:15
**remedy** [1] - 131:14
**remember** [9] - 25:14, 28:5, 50:12, 95:24, 97:14, 97:16, 101:8, 117:3, 131:3
**remembers** [1] - 141:10
**remind** [2] - 25:4, 40:1
**reminded** [1] - 14:4
**reminds** [1] - 28:12
**remote** [2] - 21:20, 21:21
**remotely** [1] - 22:5
**renewed** [1] - 31:4
**reorient** [1] - 10:1
**repeat** [6] - 27:11, 65:19, 81:19, 110:2, 158:6, 169:5
**rephrase** [6] - 11:7, 22:9, 37:14, 37:15, 54:9, 92:25
**report** [11] - 53:19, 56:6, 56:16, 58:2, 58:7, 66:20, 75:9, 92:13, 140:7, 178:14, 178:24
**reported** [8] - 49:3, 58:4, 58:9, 140:6, 160:25, 177:8, 177:10, 181:5
**REPORTER** [1] - 181:1
**reporter** [2] - 50:5, 50:15
**Reporter** [4] - 3:12, 161:9, 181:3, 181:22

197

Reporter...................
... [1] - 4:15
reporting [2] - 54:23,
57:11
represent [1] - 45:18
representation [2] -
105:11, 145:13
representative [1] -
180:9
representatives [1] -
105:9
represented [1] - 50:3
representing [1] -
45:6
repressed [2] - 46:25,
47:2
request [4] - 58:19,
88:22, 88:23, 88:24
requested [3] - 15:23,
16:19, 165:4
require [1] - 105:16
required [1] - 137:23
requirements [1] -
105:16
reread [1] - 65:2
researches [1] - 135:8
resentful [1] - 23:4
residential [1] - 40:4
resolve [2] - 139:2
respect [1] - 129:16
respectful [1] - 147:14
respond [1] - 110:8
responds [2] - 124:5,
125:4
response [5] - 26:14,
27:8, 27:13, 124:13,
135:4
responses [4] - 5:2,
5:15, 57:20, 135:14
responsibilities [1] -
107:18
responsible [1] -
44:16
rest [2] - 64:16, 85:10
restart [1] - 6:3
restate [2] - 46:15,
72:23
Reston [2] - 3:7, 3:10
restored [1] - 85:5
result [2] - 16:18,
131:19
resumed [3] - 44:9,
108:11, 151:22
retread [1] - 149:2
retrievable [1] - 165:5
retrieve [1] - 57:16
reverse [3] - 124:20,
175:1, 175:6
reviewed [3] - 67:3,
70:5, 70:7

Reviewing [2] - 70:23,
127:14
Rewari [21] - 2:17,
45:12, 45:18, 57:24,
66:8, 84:17, 93:17,
93:20, 134:2,
136:12, 136:22,
137:6, 141:12,
144:10, 146:7,
146:22, 147:3,
148:5, 150:16,
151:17, 176:14
REWARI [181] - 11:5,
12:7, 13:18, 13:20,
14:13, 14:24, 18:15,
26:12, 27:5, 27:7,
29:23, 30:3, 31:15,
31:23, 32:5, 32:14,
34:2, 37:12, 44:20,
44:25, 45:13, 45:15,
47:22, 47:25, 49:19,
49:22, 49:24, 49:25,
51:9, 51:11, 51:13,
52:4, 52:7, 54:10,
56:15, 57:25, 61:17,
61:20, 62:14, 62:18,
63:1, 63:4, 63:22,
64:2, 65:6, 65:8,
65:12, 65:14, 65:16,
66:2, 66:3, 66:10,
66:13, 66:16, 66:18,
67:24, 68:1, 68:15,
68:18, 68:21, 68:23,
68:25, 69:8, 69:23,
70:16, 70:18, 70:20,
77:18, 77:21, 78:1,
78:8, 78:17, 80:20,
80:21, 82:5, 82:12,
82:18, 83:5, 83:7,
84:9, 84:14, 85:20,
86:21, 87:3, 93:10,
93:14, 94:1, 94:6,
94:7, 94:18, 94:22,
96:10, 96:16, 97:11,
98:23, 98:25, 99:11,
99:13, 100:5, 100:6,
101:20, 101:23,
101:25, 102:1,
104:18, 107:13,
108:1, 108:19,
109:5, 116:19,
118:11, 118:14,
118:16, 121:18,
124:24, 125:2,
127:13, 127:16,
128:11, 137:7,
137:15, 138:2,
138:8, 138:16,
139:18, 140:1,
141:5, 141:17,
142:7, 142:14,

142:16, 143:2,
143:19, 143:23,
147:8, 148:20,
148:25, 149:14,
149:21, 149:23,
150:24, 151:8,
153:5, 153:7,
154:25, 155:5,
155:8, 156:20,
157:1, 157:7,
157:11, 157:17,
158:10, 158:13,
159:5, 159:7,
160:23, 161:11,
162:21, 162:23,
162:24, 163:7,
163:13, 164:11,
168:14, 168:16,
170:18, 171:7,
171:15, 171:17,
172:10, 172:13,
172:16, 172:17,
173:1, 173:19,
175:19, 176:17,
176:20, 177:21,
177:23
Rewari................ [1] -
4:5
ribs [1] - 28:8
rkeefe@bsfllp.com
[1] - 2:12
road [1] - 144:22
Road [8] - 111:15,
111:16, 111:17,
111:18, 126:1,
126:2, 126:4, 126:5
robbed [4] - 54:7,
54:12, 56:7, 75:13
robbery [1] - 55:25
Robert [9] - 2:9, 3:6,
25:10, 25:11, 25:15,
25:21, 28:20, 28:22,
29:10
romance [1] - 41:12
room [12] - 10:18,
11:2, 11:12, 32:19,
59:1, 72:13, 72:19,
76:7, 79:6, 81:7,
81:8, 83:13
Rosato [5] - 24:9,
24:11, 24:15, 24:22,
29:18
Rose [4] - 24:9, 24:10,
24:17, 25:5
ROSSIE [1] - 1:11
rough [1] - 166:4
row [2] - 82:22, 158:15
RPR [3] - 3:12, 181:21
rude [1] - 46:5
rule [3] - 52:1, 66:7,

115:9
rules [2] - 51:24,
132:16
rumors [7] - 75:1,
75:22, 160:1,
160:10, 160:15,
161:1, 161:2
run [2] - 12:12, 119:22
running [1] - 72:16
runs [1] - 119:22
RWJ [1] - 26:1
Ryan [1] - 2:13

## S

S.T [2] - 3:5, 67:7
Sabino [1] - 40:3
safety [3] - 75:4,
134:25, 135:5
sake [1] - 142:1
Sara [1] - 36:3
Sarah [2] - 38:7, 38:9
sat [5] - 60:25, 61:2,
61:5, 71:21, 74:9
save [1] - 92:14
saves [1] - 93:23
saw [24] - 11:22,
11:23, 12:2, 19:12,
20:4, 21:8, 21:9,
21:14, 21:16, 31:1,
35:22, 35:25, 36:4,
36:13, 36:19, 37:7,
37:10, 81:12, 87:4,
99:23, 122:19,
126:24, 176:10,
176:23
Saylor [12] - 21:7,
21:8, 21:9, 21:13,
21:14, 21:15, 21:23,
21:24, 22:11, 23:17,
24:11
Saylor's [1] - 21:11
scared [2] - 54:1,
179:2
scares [1] - 42:13
scene [1] - 6:21
schedule [3] - 110:19,
110:23, 118:7
scheduled [1] - 73:21
schematic [1] - 77:18
SCHILLER [4] - 1:19,
2:2, 2:6, 2:10
school [81] - 14:5,
14:6, 14:8, 14:14,
15:1, 15:2, 42:12,
47:7, 52:9, 52:21,
52:25, 53:4, 53:6,
53:8, 54:23, 54:25,
56:4, 56:12, 56:13,
56:16, 56:19, 56:22,

58:4, 58:5, 58:9,
58:24, 59:19, 62:9,
63:10, 63:18, 64:19,
64:25, 66:5, 67:10,
67:16, 68:7, 68:8,
69:24, 70:25, 71:12,
75:7, 75:13, 75:25,
77:9, 77:19, 79:24,
85:8, 85:9, 92:18,
94:10, 104:2,
110:23, 112:7,
112:11, 113:1,
113:6, 114:1, 114:6,
114:10, 120:24,
126:24, 136:19,
139:22, 139:24,
140:4, 140:7, 140:9,
141:21, 160:25,
161:22, 162:8,
164:12, 165:24,
167:24, 169:12,
177:8, 178:14,
178:24, 179:2
School [7] - 16:19,
22:24, 44:3, 45:19,
92:14, 125:7, 152:24
school's [3] - 85:6,
140:8, 162:16
Schools [5] - 13:8,
13:11, 13:15, 15:6,
15:23
SCI [2] - 79:4, 79:10
science [1] - 158:5
scooter [1] - 147:19
Scott [2] - 2:20, 6:19
screen [15] - 47:9,
61:13, 77:22, 82:13,
82:14, 99:2, 101:21,
107:21, 108:25,
157:14, 167:19,
170:15, 170:22,
170:23, 171:24
SE [3] - 2:2, 2:6, 2:10
seat [1] - 131:24
seated [5] - 5:13, 45:3,
108:22
second [22] - 16:9,
48:12, 68:4, 68:8,
70:24, 74:16, 86:25,
91:4, 91:20, 98:24,
102:8, 102:13,
104:23, 124:25,
125:20, 133:11,
133:16, 156:13,
160:7, 164:21,
166:15, 167:8
seconds [3] - 124:19,
124:25, 178:21
secret [1] - 161:4
security [1] - 107:17

**seductive** [1] - 48:10
**see** [139] - 12:1, 12:8, 13:4, 13:6, 13:12, 13:16, 13:22, 14:6, 14:7, 14:22, 17:13, 17:22, 17:25, 18:2, 21:4, 21:13, 21:15, 22:4, 22:5, 23:9, 28:7, 35:7, 35:21, 36:12, 38:22, 39:10, 44:12, 51:16, 62:17, 63:13, 69:4, 74:21, 74:22, 75:22, 77:13, 77:15, 77:22, 78:9, 78:10, 78:11, 78:24, 78:25, 79:4, 79:18, 79:21, 83:10, 83:11, 83:12, 87:6, 87:16, 87:20, 89:10, 90:12, 92:13, 93:16, 95:2, 95:3, 99:1, 99:6, 102:17, 103:21, 105:17, 107:4, 108:9, 113:12, 114:16, 117:25, 123:23, 125:1, 126:12, 126:16, 127:4, 127:19, 128:9, 131:24, 132:19, 138:13, 138:23, 142:25, 143:8, 143:14, 144:6, 144:19, 144:20, 145:7, 146:2, 151:13, 153:2, 156:9, 156:10, 159:4, 159:11, 159:13, 159:15, 160:8, 160:12, 162:5, 162:6, 163:2, 163:5, 163:6, 165:11, 165:12, 165:16, 165:19, 165:20, 166:8, 166:14, 166:19, 166:21, 166:23, 167:11, 167:12, 167:15, 167:18, 167:21, 168:13, 169:25, 170:4, 171:2, 171:3, 171:4, 171:13, 171:16, 171:23, 172:14, 174:2, 174:15, 174:17, 174:20, 175:3, 175:4, 175:12, 177:13, 178:18, 178:19
**seeing** [33] - 10:7, 10:8, 10:9, 10:12,

10:13, 10:14, 12:3, 12:5, 12:22, 16:17, 19:19, 19:22, 19:23, 20:10, 20:24, 21:6, 21:25, 23:14, 35:1, 35:5, 35:6, 35:7, 35:9, 35:13, 36:11, 36:15, 37:17, 38:10, 39:5, 83:17, 113:4, 134:14, 162:3
**seek** [1] - 26:25
**seizure** [2] - 31:16, 33:12
**selfies** [1] - 100:2
**seminar** [1] - 74:23
**send** [11] - 103:17, 110:1, 110:3, 110:10, 113:22, 114:21, 115:19, 115:24, 116:3, 116:4, 137:20
**sending** [2] - 71:7, 109:9, 116:5
**sense** [23] - 42:1, 59:4, 88:10, 90:19, 95:12, 100:17, 100:19, 118:2, 119:10, 119:21, 123:7, 127:23, 155:12, 159:2, 159:4, 168:2, 168:4, 168:8, 168:23, 170:16, 175:7, 178:12, 179:11
**sensitive** [2] - 8:14, 34:7
**sent** [17] - 62:9, 62:11, 63:17, 68:8, 68:9, 70:3, 75:7, 103:13, 103:20, 103:23, 109:7, 113:13, 113:16, 114:24, 115:17, 115:21, 116:6
**sentencings** [1] - 5:25
**September** [1] - 20:21
**sequence** [4] - 31:11, 124:21, 175:1, 175:6
**series** [3] - 31:14, 89:25, 166:6
**serious** [1] - 85:7
**served** [1] - 71:21
**serves** [1] - 21:18
**SESSION** [1] - 1:8
**Session** [1] - 180:12
**sessions** [1] - 21:19
**settings** [2] - 87:19, 94:11
**seven** [4] - 17:8, 25:20, 39:20, 129:3

**several** [10] - 15:1, 19:6, 19:7, 45:20, 93:2, 103:15, 109:15, 109:17, 122:21, 134:17
**severe** [4] - 24:7, 33:20, 36:24, 42:16
**sex** [4] - 74:20, 75:1, 110:6, 161:4
**sexual** [18] - 53:14, 54:4, 54:21, 64:6, 103:23, 113:12, 114:16, 115:20, 115:21, 116:3, 116:4, 116:14, 116:15, 116:17, 116:20, 116:23, 117:1, 145:24
**sexually** [6] - 54:14, 126:22, 126:25, 154:8, 164:25, 177:10
**shad** [1] - 130:19
**shaking** [1] - 28:4
**shall** [2] - 69:14, 105:24
**shame** [1] - 23:24
**shared** [2] - 34:8, 165:1
**Sharon** [1] - 36:10
**shirt** [2] - 95:19
**shivering** [1] - 28:4
**short** [4] - 24:13, 84:10, 126:7, 133:15
**shorter** [3] - 84:10, 84:12, 84:16
**shorthand** [2] - 181:5, 181:12
**show** [16] - 31:16, 47:8, 65:12, 68:24, 77:15, 77:23, 83:3, 89:19, 92:17, 131:8, 137:19, 139:20, 139:23, 140:7, 141:8, 142:11
**showed** [6] - 57:17, 97:1, 98:13, 98:14, 129:6, 142:17
**showing** [2] - 27:25, 154:2
**shown** [4] - 77:12, 77:13, 81:7, 81:20
**shows** [4] - 81:20, 89:17, 90:17, 99:4
**shrink** [4] - 27:18, 27:20, 27:24, 28:9
**shut** [3] - 129:14, 129:20, 130:18
**shuts** [1] - 135:22
**sic** [1] - 145:14

**sick** [3] - 41:20, 41:21, 170:25
**Side** [3] - 30:14, 104:25, 129:11
**side** [9] - 13:24, 69:21, 82:1, 82:19, 106:2, 130:6, 130:24, 131:14, 158:15
**sidebar** [1] - 132:12
**sided** [2] - 82:25, 83:1
**sides** [2] - 105:20, 105:22
**Sidley** [1] - 43:3
**sign** [2] - 14:14, 45:11
**significance** [3] - 69:14, 105:19, 144:25
**significantly** [1] - 135:18
**similar** [2] - 36:9, 130:19
**simmered** [1] - 85:6
**simple** [1] - 144:7
**simpler** [2] - 107:17, 150:4
**simply** [9] - 31:11, 32:3, 34:9, 45:10, 69:20, 106:20, 135:9, 142:2, 179:24
**single** [2] - 24:8, 149:10
**sit** [5] - 92:5, 134:25, 135:7, 164:6, 164:7
**sitting** [2] - 43:21, 43:22
**situation** [7] - 71:20, 106:18, 107:3, 135:8, 140:24, 146:15, 179:23
**six** [3] - 171:14, 171:15, 171:25
**sixish** [1] - 39:20
**skateboard** [2] - 117:22, 161:12
**skateboarded** [1] - 138:21
**skateboarding** [1] - 118:1
**skills** [1] - 35:18
**skin** [1] - 27:23
**skipped** [1] - 40:1
**sleep** [3] - 8:8, 11:17
**sleeping** [1] - 29:6
**slept** [1] - 25:18
**slide** [1] - 164:5
**slurs** [1] - 53:14
**small** [3] - 77:22, 112:23, 131:9
**smaller** [1] - 28:2
**smart** [1] - 64:9

**smartphone** [3] - 120:4, 120:5, 120:6
**smily** [1] - 99:3
**snuck** [1] - 143:6
**social** [4] - 6:16, 12:19, 14:9, 92:10
**socialize** [1] - 43:16
**sodomize** [1] - 110:6
**software** [1] - 78:6
**solution** [1] - 148:2
**Someone** [1] - 177:4
**someone** [16] - 6:22, 26:15, 34:11, 40:23, 58:15, 58:19, 89:9, 89:20, 93:4, 127:20, 128:15, 142:10, 164:4, 169:23, 177:8, 177:13
**sometime** [3] - 20:7, 21:17, 56:3
**sometimes** [28] - 6:11, 8:1, 8:20, 9:12, 17:18, 17:19, 20:1, 21:20, 21:21, 22:2, 22:5, 42:20, 103:10, 108:24, 108:25, 109:17, 112:24, 113:15, 113:17, 113:22, 114:20, 114:24, 118:5, 166:20, 166:22
**somewhat** [1] - 144:24
**somewhere** [2] - 19:8, 150:24
**Sona** [2] - 2:17, 45:18
**soon** [2] - 6:9, 108:2
**sorry** [55] - 9:13, 16:11, 16:13, 27:11, 31:23, 33:15, 37:19, 38:13, 38:17, 46:15, 59:13, 61:11, 61:13, 61:18, 61:19, 65:13, 65:19, 65:20, 68:3, 81:19, 84:17, 84:24, 85:19, 85:22, 89:8, 98:10, 98:23, 100:11, 101:23, 102:4, 104:15, 110:2, 116:10, 132:23, 137:21, 140:1, 145:18, 158:6, 160:3, 162:20, 164:20, 169:4, 171:6, 172:13, 174:16, 175:16, 176:18, 177:21, 177:22, 178:18, 178:22, 179:6, 179:21

**sort** [16] - 5:19, 6:6, 8:3, 12:25, 29:1, 105:19, 106:19, 106:22, 131:8, 136:19, 140:19, 140:21, 141:2, 142:19, 148:25, 174:25
**sound** [2] - 19:9, 29:15
**sounded** [1] - 178:4
**sounds** [20] - 7:13, 8:14, 14:18, 19:10, 39:13, 63:11, 63:16, 72:11, 73:9, 73:11, 87:25, 88:3, 88:16, 95:15, 100:14, 100:15, 120:23, 121:6, 158:17, 172:20
**spaced** [1] - 83:22
**Spanish** [1] - 73:13
**speaks** [1] - 134:18
**specific** [4] - 117:6, 134:6, 143:25, 158:25
**specifically** [4] - 23:23, 116:14, 146:22, 148:10
**spectrum** [1] - 7:25
**spell** [1] - 19:15
**spend** [2] - 9:22, 114:12
**spent** [4] - 43:19, 81:16, 166:2, 177:2
**spot** [2] - 128:9, 146:16
**spread** [2] - 160:14, 161:1
**spreaded** [1] - 160:10
**spreading** [1] - 160:1
**spring** [2] - 9:24, 29:14
**Sprint** [2] - 164:16, 164:23
**Sprint's** [1] - 165:1
**Square** [1] - 3:13
**srewari@huntonak. com** [1] - 2:19
**SRO** [2] - 56:11, 56:24
**Stacy** [1] - 173:21
**Stacy's** [1] - 163:3
**staff** [4] - 107:20, 108:14, 108:15, 109:2
**stamp** [2] - 82:17, 154:16
**stamps** [3] - 167:10, 167:18, 172:2
**stand** [5] - 5:10, 7:15,

83:16, 107:20, 133:10
**standing** [2] - 81:13, 83:17
**standpoint** [5] - 106:18, 139:1, 148:17, 148:22, 148:23
**stands** [1] - 36:23
**start** [18] - 6:2, 7:14, 7:21, 20:24, 21:6, 44:21, 47:6, 65:21, 65:22, 66:9, 66:12, 102:11, 127:7, 150:17, 161:25, 165:21, 167:9
**started** [13] - 18:6, 21:17, 22:25, 24:19, 34:25, 35:7, 41:5, 43:25, 112:6, 112:10, 125:16, 135:7, 178:24
**starting** [1] - 161:6
**starts** [1] - 66:8
**state** [3] - 37:23, 37:24, 149:1
**statement** [31] - 14:12, 47:6, 48:1, 48:5, 48:18, 48:24, 59:5, 59:10, 60:24, 61:3, 61:6, 61:11, 61:23, 62:4, 63:20, 66:23, 66:24, 66:25, 67:5, 72:1, 72:2, 85:25, 90:3, 102:2, 102:18, 126:24, 130:24, 140:9, 140:10, 170:6, 179:1
**statements** [1] - 170:7
**STATES** [2] - 1:1, 1:12
**States** [1] - 3:12
**stay** [4] - 11:4, 11:13, 28:20, 28:23
**stayed** [1] - 6:16
**stays** [1] - 40:3
**stealing** [2] - 58:2, 161:23
**step** [5] - 11:12, 11:14, 44:7, 166:14, 180:7
**stepped** [4] - 18:21, 28:23, 28:24, 29:4
**steps** [2] - 85:8, 149:24
**sticking** [1] - 98:3
**still** [15] - 31:2, 35:5, 37:4, 44:15, 65:6, 86:8, 88:4, 106:7, 120:1, 128:22, 143:20, 164:18, 167:6, 167:7, 170:20

**stint** [1] - 20:12
**stipulate** [4] - 93:24, 106:4, 106:25, 108:3
**stipulated** [12] - 69:1, 69:11, 69:15, 104:19, 105:11, 105:15, 105:20, 105:21, 105:24, 107:2, 107:6, 107:7
**stipulation** [6] - 69:9, 93:25, 94:3, 105:6, 106:4, 106:24
**stipulations** [2] - 69:17, 106:3
**stolen** [1] - 53:21
**stop** [11] - 6:3, 12:22, 23:14, 55:4, 55:20, 111:15, 112:17, 125:25, 126:2, 130:4, 134:21
**stopped** [3] - 16:17, 16:22, 120:24
**story** [2] - 130:6, 130:7
**straight** [1] - 82:1
**strategy** [1] - 148:23
**street** [1] - 125:25
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**stress** [7] - 8:17, 18:14, 21:9, 24:7, 39:24, 40:8, 41:21
**strike** [2] - 135:17, 138:19
**stroke** [1] - 148:6
**structured** [2] - 110:19, 110:23
**struggle** [2] - 8:19, 8:20
**struggled** [5] - 23:1, 23:2, 23:22, 24:2, 78:22
**struggles** [1] - 155:13
**stuck** [1] - 151:7
**student** [11] - 13:7, 13:11, 13:14, 15:13, 58:4, 71:21, 75:14, 154:21, 154:22, 155:16, 155:17
**student's** [1] - 173:3
**students** [8] - 71:24, 71:25, 75:2, 83:23, 85:24, 94:9, 140:11, 143:6
**stuff** [7] - 82:23, 114:22, 117:4, 117:5, 133:24, 144:16, 145:24
**subject** [3] - 63:15, 63:25, 71:11

**subpoena** [2] - 57:21, 162:14
**subpoenaed** [3] - 133:5, 149:1, 162:13
**subscribed** [1] - 181:15
**subtle** [2] - 38:20, 38:21
**successful** [1] - 86:6
**sue** [1] - 93:4
**suffered** [1] - 34:18
**suffering** [1] - 146:10
**suggest** [5] - 129:24, 139:12, 140:12, 140:15, 143:15
**suggested** [7] - 27:9, 27:14, 94:5, 134:23, 137:13, 145:9, 146:11
**suggesting** [5] - 130:12, 131:19, 136:22, 140:22, 150:13
**suggestion** [2] - 141:23, 142:9
**suggestions** [1] - 136:14
**suggestive** [1] - 140:17
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:6, 3:10
**summer** [4] - 29:14, 33:3, 39:16, 64:24
**summerish** [1] - 19:8
**support** [2] - 89:19, 139:16
**supportive** [1] - 41:17
**supposed** [2] - 75:1, 163:16
**supposedly** [2] - 30:16, 75:12
**surrounding** [1] - 42:7
**surroundings** [2] - 8:13, 8:15
**survive** [1] - 41:18
**suspicious** [1] - 179:15
**sustained** [2] - 27:6, 34:3
**swapped** [1] - 120:21
**switch** [1] - 44:13
**switched** [6] - 71:19, 76:3, 76:19, 76:22, 76:25, 77:2
**swore** [1] - 50:21
**Sylvia** [1] - 36:17
**symptoms** [1] - 33:13
**syndrome** [1] - 36:21
**system** [2] - 56:22,

135:22

## T

**T.B** [1] - 3:5
**T.P** [2] - 89:9, 89:12
**TABLE** [1] - 4:1
**talks** [1] - 76:2
**tanker** [1] - 6:20
**tape** [3] - 82:23, 159:1, 181:13
**targeted** [1] - 9:14
**T██████** [1] - 79:8
**TBI** [1] - 34:16
**teacher** [7] - 72:10, 77:3, 80:7, 80:9, 80:10, 80:15, 83:15
**teacher's** [2] - 80:25, 81:25
**teachers** [3] - 80:4, 81:13
**tears** [1] - 42:17
**technical** [1] - 165:2
**tele** [1] - 21:20
**telephone** [1] - 169:23
**ten** [4] - 44:6, 144:3, 151:12
**ten-minute** [1] - 44:6
**tenor** [1] - 140:17
**tension** [2] - 36:24, 42:18
**Tenth** [1] - 3:13
**term** [1] - 35:10
**terms** [7] - 15:11, 20:14, 91:12, 91:14, 141:18, 147:8, 148:16
**terrible** [1] - 113:7
**T██████** [7] - 58:14, 60:7, 60:15, 61:1, 63:12, 71:7, 85:13
**T██████** [3] - 48:2, 58:12, 60:18
**testified** [5] - 10:1, 31:15, 43:1, 141:20, 148:16
**testify** [7] - 14:5, 38:2, 133:5, 134:16, 145:3, 145:4, 145:21
**testifying** [1] - 38:3
**testimony** [13] - 13:25, 30:18, 31:10, 32:2, 54:3, 99:25, 130:13, 131:16, 135:18, 146:1, 147:24, 149:5, 181:6
**text** [24] - 103:13, 109:8, 109:9, 109:10, 109:12, 109:23, 110:10,

113:11, 114:21, 115:14, 115:17, 115:18, 115:19, 116:13, 117:14, 119:19, 120:9, 120:12, 121:10, 121:11, 121:19, 136:21, 138:23, 142:22

**texted** [1] - 117:3

**texting** [6] - 113:20, 114:9, 114:15, 121:15, 136:15

**texts** [2] - 110:1, 110:4

**thankfully** [1] - 71:21

**Thanksgiving** [3] - 62:6, 85:3, 112:10

**THE** [314] - 1:1, 1:11, 3:5, 5:1, 5:3, 5:11, 5:13, 5:16, 7:4, 7:6, 11:6, 12:8, 12:13, 12:16, 12:18, 12:20, 12:23, 12:24, 13:5, 13:7, 13:9, 13:19, 13:22, 13:25, 14:18, 15:4, 15:9, 15:16, 15:25, 16:3, 16:12, 18:16, 26:13, 26:21, 27:6, 27:8, 27:11, 27:13, 27:16, 28:14, 29:25, 30:5, 30:7, 30:10, 30:13, 30:15, 30:25, 31:10, 31:21, 31:25, 32:9, 32:15, 33:14, 33:15, 34:3, 37:15, 37:21, 38:16, 38:17, 38:18, 38:21, 38:25, 42:23, 44:4, 44:5, 44:10, 44:13, 44:23, 45:1, 45:3, 47:24, 49:21, 49:23, 51:12, 52:6, 54:9, 56:10, 56:11, 57:24, 61:15, 61:16, 61:18, 62:16, 62:17, 62:23, 63:2, 63:3, 63:25, 65:9, 65:13, 65:15, 65:25, 66:12, 66:15, 66:17, 67:19, 67:22, 68:17, 68:20, 68:22, 68:24, 69:6, 69:12, 70:15, 70:17, 77:20, 77:24, 78:3, 78:4, 78:5, 78:7, 78:10, 78:13, 78:14, 78:16, 80:18, 82:7, 82:9, 82:11, 82:24, 83:3, 83:4, 83:6, 84:1, 84:3, 84:4, 84:6, 84:8, 84:13, 85:18,

86:15, 86:17, 86:19, 86:22, 87:1, 92:24, 92:25, 93:2, 93:7, 93:13, 93:15, 93:22, 93:25, 94:2, 94:19, 96:12, 96:14, 97:7, 97:9, 98:19, 98:21, 101:19, 101:22, 101:24, 104:21, 104:24, 105:13, 106:11, 106:17, 107:12, 107:16, 107:24, 107:25, 108:3, 108:8, 108:12, 108:20, 108:22, 116:12, 116:16, 118:15, 121:14, 121:16, 124:20, 124:23, 125:1, 127:11, 127:14, 128:10, 129:10, 129:16, 129:24, 130:9, 130:11, 130:14, 131:2, 131:10, 131:21, 132:1, 132:3, 132:6, 132:9, 132:22, 132:24, 133:3, 133:10, 133:20, 134:21, 135:3, 136:2, 136:11, 137:1, 137:6, 137:13, 137:22, 138:3, 138:11, 138:18, 139:1, 139:7, 139:12, 139:25, 140:12, 140:15, 141:12, 141:22, 141:25, 142:13, 142:15, 142:21, 143:6, 143:22, 144:1, 144:15, 144:22, 145:7, 145:12, 145:16, 146:2, 146:4, 146:15, 146:20, 146:22, 146:24, 147:2, 147:11, 147:18, 147:20, 147:25, 148:4, 148:9, 148:17, 148:22, 149:13, 149:18, 149:22, 150:4, 151:4, 151:9, 151:19, 151:23, 152:5, 152:20, 153:6, 155:3, 156:18, 156:19, 157:3, 157:5, 157:16, 158:12,

160:19, 160:21, 163:9, 163:11, 164:1, 164:2, 164:4, 169:21, 170:2, 170:4, 170:9, 170:10, 170:12, 170:13, 170:16, 170:17, 171:4, 171:5, 171:14, 171:16, 172:21, 173:10, 173:15, 173:18, 174:12, 174:16, 174:17, 174:18, 174:19, 174:20, 174:21, 174:23, 174:25, 175:4, 175:5, 175:7, 175:8, 175:12, 175:15, 175:16, 175:18, 176:14, 176:18, 177:19, 177:22, 179:17, 179:18, 179:19, 179:21, 179:22, 179:25, 180:1, 180:7

**themselves** [1] - 133:8

**theory** [3] - 136:11, 136:13, 136:21

**therapist** [20] - 11:22, 11:23, 12:18, 12:20, 12:22, 13:6, 17:18, 19:12, 20:10, 22:20, 23:18, 24:10, 26:5, 26:23, 27:9, 27:14, 35:11, 35:13, 35:14, 39:10

**therapists** [1] - 17:16

**therapy** [15] - 11:16, 17:6, 21:19, 22:8, 22:10, 22:12, 23:5, 23:7, 23:22, 24:21, 24:23, 35:16, 35:17, 36:7

**they've** [1] - 105:10

**thingy** [1] - 156:16

**thinking** [1] - 6:6

**thinks** [2] - 137:12, 150:12

**third** [5] - 85:2, 90:10, 123:22, 159:11, 178:20

**thoughts** [1] - 22:18

**thousands** [1] - 134:3

**threat** [1] - 54:12

**threaten** [1] - 110:7

**threatening** [5] - 53:12, 53:23, 62:2, 62:3, 177:10

**threats** [1] - 53:11

**three** [21] - 17:15,

17:18, 18:8, 18:19, 19:1, 19:2, 21:14, 35:9, 40:14, 58:24, 71:25, 82:24, 82:25, 85:24, 90:23, 91:4, 94:9, 144:7, 167:13, 167:18, 169:25

**thumbs** [2] - 44:23, 44:24

**tied** [1] - 147:23

**timestamps** [1] - 124:18

**TINSLEY** [2] - 78:2, 78:15

**Tinsley** [4] - 45:1, 63:2, 77:24, 78:3

**tiny** [1] - 133:6

**title** [1] - 21:11

**TMJ** [1] - 36:22

**today** [2] - 74:17, 92:5

**Today** [1] - 75:8

**today's** [1] - 34:4

**together** [3] - 152:9, 177:3, 181:13

**tomorrow** [1] - 6:4

**tongues** [1] - 98:3

**TONIA** [1] - 3:12

**Tonia** [2] - 181:3, 181:21

**took** [9] - 31:3, 50:15, 50:19, 64:24, 95:10, 100:1, 112:13, 120:16, 135:25

**top** [17] - 51:18, 65:11, 79:4, 89:10, 90:7, 91:20, 96:17, 102:10, 124:21, 125:20, 155:5, 155:13, 155:14, 160:5, 165:15, 177:18, 178:20

**topic** [2] - 29:24, 40:21

**TORCHINSKY** [1] - 1:14

**touched** [23] - 48:19, 49:5, 49:6, 49:10, 49:11, 49:12, 49:15, 49:17, 52:10, 52:11, 52:12, 52:13, 53:13, 53:18, 54:16, 54:20, 54:21, 75:13, 75:24, 76:16, 76:17, 141:21

**touching** [5] - 48:22, 52:4, 58:8, 63:20, 75:19

**tough** [1] - 130:19

**towards** [3] - 82:23, 83:8, 158:4

**tragedy** [1] - 6:18

**Trager** [1] - 23:11

**Trahan** [3] - 39:9, 39:10, 39:11

**transcript** [4] - 51:1, 51:5, 65:4, 181:11

**TRANSCRIPT** [1] - 1:11

**transition** [1] - 9:22

**transitions** [1] - 81:14

**transpired** [1] - 121:5

**transportation** [1] - 118:1

**transposed** [1] - 106:19

**trauma** [11] - 8:25, 22:13, 22:21, 24:24, 26:9, 26:10, 27:4, 27:17, 35:17, 35:19, 36:7

**traumatic** [7] - 18:14, 22:23, 34:16, 34:18, 36:15, 36:20, 117:4

**traumatized** [1] - 120:14

**treated** [8] - 18:11, 18:17, 19:3, 26:1, 33:7, 39:23, 40:6, 40:7

**treating** [3] - 16:22, 19:11, 29:17

**treatment** [13] - 9:23, 14:9, 16:21, 17:3, 18:19, 18:20, 26:25, 31:7, 31:9, 31:11, 37:25, 38:4, 40:4

**Trial** [1] - 181:6

**TRIAL** [2] - 1:11, 4:1

**trial** [6] - 9:15, 31:4, 43:25, 130:4, 134:5, 148:23

**tried** [4] - 24:24, 27:16, 147:6, 165:24

**trigger** [5] - 28:10, 28:11, 28:12, 28:15, 28:18

**triggering** [1] - 25:4

**triggers** [2] - 25:1, 43:12

**trio** [1] - 75:2

**trip** [1] - 46:1

**trouble** [1] - 161:23

**true** [11] - 32:3, 32:11, 72:5, 75:1, 94:12, 103:3, 160:2, 160:10, 160:15, 161:1, 179:11

**trust** [2] - 78:23, 171:25

**truth** [4] - 14:2, 50:21, 50:23, 50:24

**try** [16] - 23:18, 26:19, 31:11, 36:17, 44:17, 78:8, 106:23, 107:4, 108:23, 141:5, 146:5, 149:8, 153:4, 160:19, 174:12, 179:24

**trying** [33] - 13:1, 14:3, 14:19, 15:9, 23:9, 23:16, 24:1, 26:25, 32:10, 46:2, 57:16, 86:4, 86:6, 106:5, 106:12, 106:14, 109:2, 131:7, 132:13, 135:11, 137:18, 139:8, 146:25, 147:1, 147:9, 149:24, 165:25, 166:3, 170:24, 171:23, 172:14, 173:13, 175:15

**tunnel** [1] - 7:2

**tunnels** [4] - 6:24, 6:25, 7:1

**turn** [4] - 62:12, 82:4, 104:11, 159:9

**twice** [3] - 19:24, 50:2, 123:14

**two** [24] - 17:18, 17:19, 21:14, 29:7, 40:3, 47:16, 52:2, 58:22, 58:24, 64:8, 82:25, 89:22, 95:16, 98:12, 99:15, 111:13, 118:2, 130:10, 154:5, 160:5, 164:24, 166:2, 173:14, 177:2

**two-sided** [1] - 82:25

**twofold** [1] - 151:5

**type** [4] - 22:10, 35:15, 36:7, 137:3

**types** [2] - 22:8, 24:21

**typical** [1] - 105:15

**typically** [4] - 34:8, 105:14, 105:17, 106:25

## U

**ultimate** [1] - 31:17

**unable** [3] - 43:8, 43:9, 43:10

**unaccounted** [1] - 114:13

**unblock** [2] - 164:16, 164:24

**unclear** [1] - 33:12

**uncomfortable** [1] -

71:20

**under** [17] - 30:4, 30:17, 31:3, 78:19, 105:25, 107:2, 142:5, 142:25, 143:13, 149:13, 150:15, 155:22, 156:8, 157:18, 166:20, 168:9, 173:4

**undergone** [1] - 22:8

**undermine** [1] - 137:2

**undermines** [1] - 135:18

**underneath** [4] - 49:6, 49:12, 78:11

**understatement** [1] - 23:5

**understood** [3] - 22:10, 27:3, 105:2

**unfortunately** [1] - 165:1

**uniform** [1] - 56:25

**uniformed** [1] - 56:20

**uninvolved** [1] - 136:23

**unit** [1] - 11:13

**UNITED** [2] - 1:1, 1:12

**united** [1] - 3:12

**University** [2] - 20:4, 64:8

**unknown** [1] - 74:18

**unless** [3] - 12:25, 143:24, 145:4

**unlike** [1] - 25:17

**unlimited** [2] - 121:7, 121:10

**unprofessionally** [1] - 151:17

**untoward** [1] - 151:18

**unusual** [4] - 105:25, 107:2, 107:18, 144:24

**unwilling** [2] - 43:7, 43:9

**up** [48] - 5:18, 6:14, 8:5, 8:13, 8:19, 10:18, 13:22, 15:16, 15:20, 25:3, 27:16, 44:23, 44:24, 45:11, 46:1, 47:8, 49:5, 71:14, 78:9, 79:4, 82:14, 106:6, 106:8, 112:6, 112:10, 124:17, 127:3, 127:8, 127:10, 134:16, 137:6, 138:22, 139:24, 140:2, 144:3, 147:5, 150:1, 152:9, 155:13, 160:4,

160:5, 164:4, 164:18, 165:14, 169:20, 176:16, 177:19

**update** [1] - 71:11

**upset** [2] - 8:20, 9:4

**upstairs** [6] - 58:12, 60:18, 60:20, 60:23, 74:7, 74:8

**user** [35] - 122:16, 123:2, 123:4, 123:6, 123:9, 123:14, 123:17, 123:20, 123:24, 124:4, 125:3, 126:15, 127:3, 127:17, 128:2, 133:2, 154:10, 156:4, 156:5, 159:14, 159:25, 162:2, 162:3, 176:9, 176:21, 176:22, 177:16, 177:24, 178:3, 178:10, 178:13, 178:15, 178:23, 179:3, 179:7

**user's** [1] - 129:1

**UTI** [6] - 31:17, 31:18, 31:20, 32:4, 32:12

## V

**VA** [3] - 3:7, 3:10, 3:14

**vaginally** [1] - 110:6

**vague** [1] - 101:12

**vantage** [1] - 81:25

**variable** [1] - 44:15

**varies** [1] - 8:2

**variety** [2] - 35:20, 115:18

**various** [1] - 7:11

**verbal** [2] - 116:9, 116:10

**verbally** [2] - 52:25, 62:1

**verify** [1] - 175:15

**version** [2] - 102:8, 107:14

**versus** [2] - 149:5, 181:7

**vicinity** [4] - 83:6, 157:24, 158:2

**victim** [2] - 92:1, 135:19

**video** [1] - 164:1

**videographer** [2] - 50:7, 50:17

**view** [2] - 81:17, 82:19

**violently** [1] - 117:15

**Virginia** [2] - 21:5,

181:4

**VIRGINIA** [1] - 1:1

**virtual** [1] - 43:22

**visceral** [1] - 24:8

**visibility** [2] - 77:6, 88:9

**visible** [2] - 77:3, 88:8

**visit** [1] - 22:3

**visits** [2] - 22:2, 30:19

**vivid** [9] - 47:4, 70:10, 76:23, 95:23, 100:14, 116:17, 119:15, 121:16, 158:21

**vividly** [2] - 74:11, 75:10

**VOGEL** [1] - 1:14

**voice** [2] - 23:20, 52:15

**voicemail** [23] - 53:10, 57:15, 57:17, 57:19, 104:6, 165:3, 165:18, 165:24, 166:1, 166:3, 166:6, 166:25, 170:3, 177:9, 177:11, 177:13, 177:17, 177:25, 178:7, 178:10, 179:4, 179:8

**voicemails** [1] - 166:25

**VOLUME** [1] - 1:8

**volume** [2] - 51:8, 65:5

**Volume** [2] - 51:9, 65:6

**volunteer** [1] - 38:23

**vote** [1] - 7:1

**voting** [1] - 7:1

**vulgar** [2] - 91:11, 91:14

## W

**wait** [1] - 101:10

**wake** [1] - 8:5

**walk** [5] - 17:10, 17:11, 55:23, 59:19, 112:16

**walking** [1] - 118:1, 138:14

**wall** [8] - 87:12, 87:14, 88:7, 156:16, 158:3, 158:16, 158:18, 158:24

**wants** [3] - 38:22, 143:24, 178:23

**ward** [9] - 34:21, 34:22, 35:1, 35:5, 35:6, 35:7, 35:9,

35:12, 35:16

**warning** [1] - 8:4

**wash** [1] - 140:19

**Washington** [5] - 1:16, 2:15, 2:18, 2:22, 3:2

**watch** [1] - 147:11

**water** [1] - 6:20

**ways** [4] - 88:11, 118:2, 130:5, 152:9

**wears** [1] - 56:25

**Weaver** [1] - 10:11

**weaver** [5] - 10:12, 10:13, 10:14, 10:17, 23:14

**Wednesday** [1] - 5:24

**Wednesdays** [1] - 5:24

**week** [19] - 17:8, 17:9, 17:15, 17:20, 19:1, 19:24, 21:14, 25:20, 35:9, 40:12, 40:14, 40:15, 43:21, 43:24, 43:25, 85:10, 103:15, 109:16

**weekday** [1] - 18:4

**weekdays** [1] - 29:1

**weeks** [10] - 12:19, 17:23, 17:24, 18:8, 18:19, 19:5, 20:23, 39:20, 101:2

**weird** [1] - 33:13

**welcome** [3] - 129:12, 157:8, 171:1

**welcomed** [1] - 139:20

**West** [7] - 111:17, 126:2, 126:5, 166:24, 167:1, 175:10

**west** [1] - 111:18

**whereof** [1] - 181:15

**whispering** [1] - 57:18

**white** [18] - 28:6, 47:12, 47:16, 47:20, 61:21, 62:12, 62:17, 68:10, 68:11, 84:20, 84:22, 101:15, 104:11, 104:16, 118:10, 118:13, 118:14, 168:9

**whole** [7] - 6:20, 66:13, 67:22, 73:24, 125:7, 130:4, 164:8

**Wiehle** [1] - 3:9

**willy** [1] - 135:20

**willy-nilly** [1] - 135:20

**wish** [2] - 47:4, 47:5

**witness** [26] - 5:9, 7:15, 17:13, 31:19, 34:15, 37:22, 38:3,

44:12, 49:19, 68:2,
69:4, 77:22, 106:8,
106:9, 106:16,
106:21, 107:20,
108:15, 109:3,
130:21, 133:25,
134:3, 134:12,
144:13, 149:6,
181:15
**WITNESS** [57] - 12:18,
12:23, 13:7, 27:11,
27:16, 33:15, 38:17,
44:4, 49:23, 51:12,
52:6, 56:11, 61:16,
61:18, 62:17, 63:3,
65:9, 65:13, 65:15,
78:4, 78:13, 83:3,
83:6, 84:3, 84:6,
85:18, 92:25, 93:7,
93:22, 101:24,
116:16, 118:15,
121:16, 125:1,
127:14, 156:19,
157:16, 160:21,
170:2, 170:9,
170:12, 170:16,
171:5, 171:16,
174:16, 174:18,
174:20, 174:23,
175:4, 175:7,
175:12, 175:16,
176:18, 177:22,
179:18, 179:21,
179:25
**witnesses** [3] - 32:1,
69:10, 109:1
**WITNESSES** [1] - 4:1
**woman** [2] - 52:14,
64:9
**woman's** [1] - 52:15
**women's** [2] - 73:8,
81:5
**wonder** [1] - 152:6
**wonderful** [3] - 41:1,
41:16, 41:17
**Wood** [7] - 25:10,
25:11, 25:15, 25:21,
28:20, 28:22, 29:10
**wooded** [1] - 111:19
**word** [9] - 28:10,
34:11, 52:16, 52:18,
128:14, 128:17,
132:15, 132:18,
140:16
**words** [1] - 48:7
**workday** [1] - 29:2
**worker** [2] - 12:19,
14:9
**works** [5] - 46:3,
56:23, 58:3, 58:5,

58:10
**world** [1] - 42:10
**worried** [1] - 75:3
**worries** [1] - 46:3
**worry** [1] - 41:20
**worse** [2] - 74:17, 75:8
**wrap** [1] - 24:3
**write** [9] - 48:16, 59:5,
60:23, 61:2, 61:6,
61:7, 66:25, 118:24,
148:14
**writes** [4] - 71:14,
74:16, 74:17, 74:25
**writing** [3] - 63:12,
67:5, 76:1
**written** [1] - 159:24
**wrote** [12] - 47:7, 48:1,
48:5, 59:9, 61:5,
62:4, 85:3, 90:23,
165:6, 165:7, 169:9,
179:1

## Y

**yadin** [1] - 20:2
**YADIN** [1] - 20:2
**year** [11] - 25:13,
39:17, 72:4, 73:3,
81:4, 112:8, 120:24,
125:7, 125:14,
158:18, 167:24
**yearbook** [3] - 125:9,
125:10, 156:25
**years** [12] - 10:15,
22:7, 23:21, 27:17,
28:13, 34:14, 41:8,
52:19, 92:16, 98:4,
120:14, 162:18
**yellow** [1] - 95:19
**yesterday** [19] - 10:1,
17:12, 20:25, 31:15,
34:15, 48:25, 53:16,
81:20, 92:7, 100:1,
103:9, 113:25,
128:9, 128:14,
128:16, 141:20,
142:9, 148:5, 154:7
**York** [2] - 22:3, 23:12
**young** [3] - 130:17,
146:10, 180:7
**yourself** [6] - 22:19,
27:20, 86:4, 118:22,
118:23, 164:8
**yup** [1] - 143:22

## Z

**zealous** [1] - 151:19
**Zoll** [1] - 2:1
**zoom** [2] - 157:12,

157:15