1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                           :
                                :
                Plaintiff,      :   Civil Action
                                :   No. 1:19-cv-917
           v.                   :
                                :
F.C.S.B., et al.,               :   March 28, 2024,
                                :   10:04 a.m.
                                :
                Defendants.     :
                                :   VOLUME 9 - A.M. SESSION
............................. :
                                :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029-Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES:  (Cont.)

2

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

3

APPEARANCES:   (Cont.)

For Defendant F.C.S.B.:        **Kevin Elliker, Esq.**
                              HUNTON ANDREWS KURTH, LLP
                              2200 Pennsylvania Avenue, NW
                              Washington, DC 20037
                              804-788-8200
                              Email: Kelliker@huntonak.com


For the Defendants:           **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,          THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,     KINNEY, PLC.
F.T., J.F.)                   1801 Robert Fulton Drive
                              Suite 120
                              Reston, VA 20191
                              Email:  Mk@kinneyesq.com


For the Defendant J.O.:       **Bruce Blanchard, Esq.**
                              ODIN, FELDMAN & PITTLEMAN, PC.
                              1775 Wiehle Avenue
                              Suite 400
                              Reston, VA 20190
                              Email:  Bruce.blanchard@ofplaw.com


Official Court Reporter:      MS. TONIA M. HARRIS, RPR
                              United States District Court
                              401 Courthouse Square
                              Tenth Floor
                              Alexandria, VA 22314

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Plaintiff:

Kristie Trahan

        Direct examination by Ms. Pedersen............... 18
        Cross-examination by Mr. Bates.................. 52
        Redirect examination by Ms. Pedersen............ 60

Dr. Kevin Weaver

        Direct examination by Ms. Pedersen............... 63
        Cross-examination by Ms. Rewari................. 108

EXHIBITS

On behalf of the Plaintiff:

                                                    Admitted

Number 161......................................... 89
Number 449B........................................ 24
Number 457(Pages 51, 52)........................... 85
Number 457(Pages 59, 60)........................... 79
Number 457(Bates 80).............................. 69
Number 457(Bates 73).............................. 72
Defendants' Number 87.............................. 75
Defendants' Number 165............................. 91

On behalf of the Defendants:

                                                    Admitted

Number 108......................................... 111
Number 109......................................... 115
Number 110......................................... 120
Number 111......................................... 124
Number 112......................................... 126

MISCELLANY

Preliminary matters................................ 05
Court's ruling..................................... 13
Certificate of Court Reporter...................... 139

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

5

THE COURT:  Good morning.

(Good morning responses.)

THE COURT:  Is there anything we need to do before we bring the jury in?

MR. BRENNER:  Yes, Your Honor.

MR. BATES:  Yes, Your Honor.  If I may.  There's a witness -- it's come to our attention that there is a -- the first witness this morning is Kristie Trahan, who is plaintiff's social worker, slash, current therapist.  And we had filed a Rule 37 motion prior to, at the motions in limine deadline in March, and the Court had issued an order on that at ECF-837.

And I thought the Court's order was abundantly clear in which Ms. Trahan is one of the seven treating providers who was not disclosed under the expert disclosure requirements that's required.  And the Court found she was required to be disclosed but was not disclosed and, therefore, she's one of the seven who, if called in plaintiff's case, she can testify as to her -- this is a quote:  "The observations of plaintiff's condition and treatment of plaintiff, and not to any causes, diagnosis, prognosis, or future medical care."

So that's abundantly clear to us, Your Honor.  It came to our attention yesterday that plaintiff desires Ms. Trahan to talk about her diagnosis of plaintiff, which to us seems to be a motion for reconsideration.

B.R. v. F.C.S.B.

6

THE COURT:  Give me that particular one.

MR. BATES:  I can hand this order up to the Court.

THE COURT:  That's fine.

MR. BATES:  So to us, Your Honor, this appears to be a motion for reconsideration the night before a witness is called.  So our position is that the order is abundantly clear, and there is no reason to depart from that.

THE COURT:  Mr. Brenner.

MR. BRENNER:  Your Honor, if you recall, we raised this -- it is not a motion for reconsideration.  We raised this the first day of trial because -- let me give you the context to remind you.

We, before opening statements, were going to put up a slide, a demonstrative slide that listed the various diagnoses she's had.  And they said, Look at this order.  Look what it means.  It means that -- let me step even -- one step.

We'll talk about treaters, talking about what treaters did.  Okay.  This is not a treater talking about causation in the past, not talking about expert opinions.  So if you look at Your Honor's order -- so I raised it, and I said it can't be that a -- here, I'll tell you what our --

May I hand something to the Court, Your Honor?

THE COURT:  Yes.

MR. BRENNER:  Your Honor, this is -- we're entering the medical phase of the case, so this will come up a couple

B.R. v. F.C.S.B.

7

of times.

If you go to the last tab -- and I said there's a -- and I'll explain to you what happened in your order.  But I said your order says, "No treatments to diagnosis," but obviously treaters can testify as to their own diagnosis, and you said, "That's the way it usually works."  And then you said, "Again, there's an issue" and -- it was getting mixed with an authenticity issue.

But, Your Honor, if you look at your order, you're citing to two cases.  You said you wanted to follow what Judge Novak did in the *Roop* case.  So if you look at what Judge Novak did, Judge Novak said -- again, this is all the things we -- what an expert can do, and what a treater can do. Judge Novak said, "Generally, a treating physician need not be designated as an expert.  He may testify as a lay witness to personal observations stemming from his course of treatment of plaintiff," and cites the *Waffle House* case, which you also cite to in your order.  Lest there be any doubt how Judge Novak interpreted that, if you look on page 8 of the --

THE COURT:  Before you get to that, and refresh my recollection, in that case was there an alleged discovery violation?

MR. BRENNER:  Yeah, basically the same thing.  The expert -- the treating physician was not disclosed as an expert.  So that's what the *Roop* case is dealing with.

B.R. v. F.C.S.B.

8

And then if you want to know what Judge Novak did, if you look at page 8 of that opinion. "Dr. Guerette," who is the -- they are the doctor in question, "testified about his treatment of plaintiff which began in 2011. He diagnosed her with interstitial cystitis." And later says, "Dr. Guerette conceded when he examined the plaintiff in 2011. He diagnosed her with something different" -- my name -- my pronunciation is not good -- but "cystocele." So he testified as to diagnosis.

Here is where the confusion happened, Judge. If you look at the *Waffle House* case and if you look at the last page of the case, so here's the distinction. "The Court will not permit Dr. Lohr and Dr. Hassan" -- those -- in those cases, those were the doctors that were treaters but not experts -- "to provide any expert opinions, including expert opinions on C.S.'s diagnosis, prognosis, and future medical needs."

That's the line in your opinion -- that's the line in your order. And then explains what that means. It's impossible for a treater to testify about not giving diagnosis, that's their treatment.

So the next line says, "The Court will" therefore -- well, I added "therefore" -- "The Court will restrict Dr. Lohr and Dr. Hassan to providing testimony about their individual observations and treatments of C.S. In other words, the treating physicians will be permitted to testify as to their

B.R. v. F.C.S.B.

9

observations, course of treatment, and diagnosis of C.S. at the time they treated him."

And when I raised this to you, I said of course the treater is going to testify to what he or she diagnosed the plaintiff with.  They've taken this first line, which is to limit the expert opinion.

So, for example, Dr. Ryan is an expert.  Dr. Ryan can come in and not have the issue here and testify, Based on my review of the records, interview of B.R., this is what I think the cause of it was.  These are my diagnoses.

These treaters are going to stand up and say, Here are any notes.  We're going to walk through their notes.  Here is what I did, here is what I saw, here is what I observed, here is what I diagnosed her with.  Not going to say, And I'm saying it's because of what the School Board did, none of that.  They're not experts.  They are treating physicians.

In fact, the defense position has gone so far to say you have to redact the medical records, the actual medical records that would go in evidence -- there's no evidentiary objection to them -- to take out the ex- -- not the experts' -- the treaters' diagnosis of the plaintiff.

So I raised this with you at the beginning because, I said, This is going to be a problem.  And I said, Treaters can always testify about what they did and their diagnoses.  And you said, "That's usually the case because that's the only

B.R. v. F.C.S.B.

10

way a treater can testify."

So again, I think your order is clear.  I think if you read where you're citing to in the next line, which explains the line that's in your order, if you look at what happened in what Judge Novak did, which Your Honor said you were following, you see that that treater was allowed to testify about his -- I think it is a "his"; yeah, his, Nathan -- his diagnosis, but none of these doctors are going to testify, the treaters, about what other doctors did.  They are just going to say, I saw -- I saw B.R. on this date, this is what we did, this is what I diagnosed.  Boom.  Next one.

THE COURT:  Let Mr. Bates close his argument, and then the Court will rule.

What is it that you're trying to preclude?

MR. BATES:  I'm trying to adhere with Your Honor's --

THE COURT:  Reading the order from your perspective, what are you trying to preclude?

MR. BATES:  I'm trying to preclude testimony as to diagnoses, causation, and everything else you listed there.

THE COURT:  Causation is the easy one.

MR. BATES:  Right.

THE COURT:  She's not going to be able to testify, the doctor -- I'm assuming it's a woman -- is not going to be able to testify as to what the cause of her analysis is.

B.R. v. F.C.S.B.

11

MR. BATES:  Right.

THE COURT:  She -- do you want to preclude her from saying that she met with plaintiff, provided medical care to plaintiff?

MR. BATES:  No.

THE COURT:  Okay.  And that she came to certain conclusions with regard to the medical care that she provided plaintiff?

MR. BATES:  To the extent that's a -- I think the core issue of dispute here is diagnosis.  And if Mr. Brenner is unclear about that, I think the order speaks to itself and what was said in that sidebar does not modify the Court's order after three rounds of briefing on this issue.

But to answer your question, diagnosis, okay, that is -- that falls on the expert side.  They have an expert witness who is going to talk about her diagnosis.  Based on these records, Ms. Trahan came to a diagnosis conclusion.  But they have an expert witness who is going to talk about that who is properly disclosed and we'll hear from next week.

What they're trying to do is backdoor in these diagnoses from individuals who they never properly disclosed, and it's already been determined by you that they were not property disclosed, so their testimony is very limited as to their observations.

And so I think that's clear and with regard to

B.R. v. F.C.S.B.

12

redaction of the documents, as I told counsel last night, we do not object to Ms. Trahan's complete file coming in so long as there are redactions of the diagnoses.  They want to show the jury -- even if they are precluded from having her testify as to her diagnosis, they want to publish to the jury documents that say "diagnoses" at the top.  And that's fair. That's not consistent with the Court's order, which is to preclude her from testifying as to diagnoses because that's on the expert side.

THE COURT:  Okay.  This is what we're going to do. The Court is going to take a look at the *Waffle House* case again, take a look at what Judge -- I think it was Novak did in that case and try as best it can to have its order and direction consistent with what Judge Novak did.  So we'll take a look at it.

All right.  Are we ready to bring the jury in?

MR. BRENNER:  It is our first witness.

THE COURT:  Oh, I thought this was a witness you were calling on Tuesday.

MR. BRENNER:  No, no, there's two treaters today.

MR. BATES:  Ms. Trahan is being called right now, Your Honor, and this is part of our issue.  This is not an 11th hour issue.  We're past the 11th hour.

THE COURT:  She's the first witness up today?

MR. BATES:  She's the first witness today.

B.R. v. F.C.S.B.

13

THE COURT:  All right.  The Court is going to take a break and read the *Waffle House* case.

(Recess.)

(Court proceedings resumed at 10:23 a.m.)

THE COURT:  The Court had an opportunity to not only review the several cases that are very important in considering this issue and the order of the Court regarding how this is to be treated.  I'm going to state for the record that we have found that there is a discovery violation in this case, and having found that plaintiff was required to list the seven improperly disclosed treating physicians and providers pursuant to 26(a)(2)(C), the Court must now determine whether to exclude their testimony entirely pursuant to the *Southern States* factors.

The Court finds that given plaintiff's prior counsel's comments in a hearing before Judge Fitzpatrick, there is a surprise to defendants that these treating physicians will be testifying in a hybrid expert witness status as opposed to a traditional expert witness status.  The Court found that permitting defendants to cure that surprise now by deposing the treating physicians would significantly disrupt the trial to begin in just two weeks, which we are now present in.

Under the *Ingram* standard, Courts have held that a treating physician's testimony about a patient's diagnosis,

B.R. v. F.C.S.B.

14

prognosis, and future medical care is based upon scientific, technical, or other specialized knowledge that's requiring expert designation pursuant to 26(a)(2)(A) of the Federal Rules of Civil Procedure, and Courts generally permit treating physicians to testify as fact witnesses but exclude their testimony to the extent it consists of expert opinion.  That's in the *Springs* case.

Accordingly, when plaintiff failed to disclose the treating physicians as experts or the hybrid experts, the Court permitted them to provide testimony about their observations and course of treatment at the time they treated the patient, but not express any opinions that they formulated based upon scientific, technical, or specialized knowledge after they treated plaintiff.

So essentially, this witness will be able to testify that she treated plaintiff, she observed certain things, but will not be providing any expert opinion as to any diagnosis or prognosis.  That is the Court's ruling.  I note your exception.

MS. PEDERSEN:  Can I just ask for clarification? Does that mean that the witness is not permitted to say "PTSD" on the stand?

THE COURT:  That's a diagnosis.

MS. PEDERSEN:  But the course of her treatment is for the PTSD, so she -- if she's not allowed to say PTSD -- I

B.R. v. F.C.S.B.

15

just want to make sure I can advise the witness before she
gets on the stand.

THE COURT:  All right.  She can testify that she
evaluated plaintiff because of her conditions.

MS. PEDERSEN:  Conditions.

THE COURT:  But not any specific reference to PTSD.

Now, obviously, if they open the door during
cross-examinations and ask questions, like, What conditions
were you talking about?  Then you can maybe rehabilitate on
that on redirect.

MS. PEDERSEN:  And can I make one more
clarification?

THE COURT:  Yes.

MS. PEDERSEN:  Some of the -- I'm going to use
Ms. Trahan's records with her while she's on the stand, and I
know opposing counsel has an objection to the top portion of
each record, says, "Diagnosis PTSD."

Would it be --

THE COURT:  You can redact that, and I don't think
we'll have a problem with the rule of completeness.

MS. PEDERSEN:  So -- yes, I don't know if we can
redact on the fly, but what I can have Mr. Brown do is before
we publish to the jury, I can have him zoom in on the note
part of the record that doesn't show "Diagnosis PTSD."

THE COURT:  We're really depending on Mr. Brown to

B.R. v. F.C.S.B.

16

come through on this, so --

        MS. PEDERSEN:  I have faith in him.  I do.

        THE COURT:  The situation is this, if -- and
Mr. Brown has been doing an excellent job, as Mr. Grady has.
I want to make sure I'm balanced here.  But if it is put up
and the jury sees it, it may cause that entire testimony to be
subject to being stricken.

        MS. PEDERSEN:  Would it be permissible if instead,
after I advise the witness that she's not permitted to say
"PTSD," once I show her the record, she just reads the part
out loud instead of publishing --

        THE COURT:  Reads -- reads what part?

        MS. PEDERSEN:  There's parts of her record that I
want to ask her questions.  She has progress notes.

        THE COURT:  Yeah, that's fine.

        MS. PEDERSEN:  If I just have her read that.

        THE COURT:  Yeah, and I'm going to give you a moment
to advise the witness so that she understands the scope of the
Court's ruling.

        MS. PEDERSEN:  Thank you, Your Honor.

        THE COURT:  Yes, ma'am.  Why don't you go ahead and
do that now.  We'll wait for the jury.

        (A pause in the proceedings.)

        (Jury present.)

        THE COURT:  You may be seated.  Thank you.

B.R. v. F.C.S.B.

17

Good morning, ladies and gentlemen.

(Good morning responses.)

THE COURT:  We started a little later than anticipated because we were trying to take care of some matters.

Let me ask the question:  Were you all able to live up to the Court's instruction not to discuss the case or any aspect of the case with anyone?  And to the extent you could, you've avoided social media and print media?

Very good.

What we're going to do is, because we're going to try to accommodate certain witnesses, we're going to take people out of order.  The lawyers have agreed to do this.  We have some people that are from out of town, and we want to make sure that they have the opportunity to leave because their ability to testify is predicated on it happening today as best we can.

So what we're going to do is take these witnesses out of turn, and then we will return to plaintiff testifying, and then we'll see where we are after that.  But we have a full day, and we appreciate your attention to these matters.

Next witness.

MS. PEDERSEN:  Your Honor, may I approach to give her --

THE COURT:  You may.

B.R. v. F.C.S.B.

18

(KRISTIE TRAHAN, Plaintiff's Witness, sworn)

(Witness seated.)

THE COURT:  Please have a seat, ma'am.  If you could

speak to the mic -- into the mic, it will all help us to hear

your testimony.  Answer the questions of counsel as best you

can.  If you hear an interruption or the Court says something,

it might be a good opportunity to pause on anything that you

want to say.

THE WITNESS:  Thank you.

MS. PEDERSEN:  May I proceed?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. PEDERSEN:

Q.    Good morning, Ms. Trahan.

A.    Good morning.

Q.    How are you today?

A.    I am well.  How are you?

Q.    My name is Samantha Pedersen, and I represent B███ in

this case.

      Would you mind introducing yourself to the jury,

please?

A.    Yes, I'm Kristie Trahan.  I am B██████ clinical licensed

therapist.

Q.    And have you ever testified in a courtroom before?

A.    I have, yes.

Q.   And what was -- what was that for?

A.   I testified in child removal cases in the State of
Michigan when there was childhood sexual abuse or abuse.

Q.   So let's start by telling the jury quickly about your --
your background.

          What's your current job title?

A.   I am a licensed -- clinical licensed master social
worker.

Q.   Okay.  And what's the name of the practice where you
currently conduct your therapy?

A.   Healing Minds.

Q.   Did you start that practice?

A.   Yes, I did.  In 2015.

Q.   And do you do anything alongside your current practice at
Healing Minds?

A.   Yes.  After I graduated from grad school, I was trained
in eye movement desensitization and reprocessing a year after
I graduated.  And then in subsequent years, I became an EMDR
certified therapist and an EMDR consultant.

          I currently facilitate trainings for other
therapists to learn EMDR.  And I provide consultation for
individuals and groups across the country, including the State
of Michigan's mental health problem, the State of South
Carolina's mental health program.  And during those
consultations, I help clinicians that have difficult complex

B.R. v. F.C.S.B.

20

trauma cases that they need assistance in.

Q.   Okay.  And you -- you said "EMDR" a couple of times.

         Can you just briefly give us a quick insight as to
what EMDR is?

A.   Yeah, absolutely.  So I'll explain EMDR the way I explain
EMDR to my clients.

         Let's say I was to walk into this courtroom today
and I tripped on my way approaching the stand, then I would
experience embarrassment.  My face would turn red, I would
start sweating, I would have butterflies in my stomach.  So
that is how my limbic system, the emotion center part of my
brain, responds to embarrassment.

         So during that time, neurons are firing, stimulating
that limbic system part of the brain, and my body responds
through my nervous system to that embarrassing moment.

         Following that experience --

         THE COURT:  Let's go ahead and move on.

BY MS. PEDERSEN:

Q.   We'll move on.

         Can you tell us when you first started seeing B█████
as a patient?

A.   January 2022.

Q.   And do you recall the circumstances as to how she became
your patient?

A.   Yes.  I had a local therapist that contacted me that

B.R. v. F.C.S.B.

21

B██████ had contacted regarding trauma work.  And that

therapist was concerned --

            MR. BATES:  Objection to the extent it's hearsay,

Your Honor.

            THE COURT:  It provides a background as to how she

came to be in contact with B.R., so I'll allow some testimony

on that.

BY MS. PEDERSEN:

Q.    You can proceed.

A.    Okay.  So that therapist wanted to find somebody that was

extensively trained in trauma experiences and dissociation,

and asked if I was comfortable taking B██████ complex case.

And, subsequently, B████ contacted me the following week and

we began services.

Q.    And did you begin the services in person or virtually?

A.    Virtually.

Q.    And how do you currently conduct your therapy sessions

with B████?

A.    Continued virtually.

Q.    About how long are your sessions with her?

A.    Initially, we met twice a week for an hour and a half

each.  Each session.  And due to time constraints, we

currently see each other once a week for one hour.

Q.    You currently see her?

A.    Uh-huh.

B.R. v. F.C.S.B.

Q.   Can you just tell the jury a little bit about your first few sessions with B████?

A.   Yeah, so initially with B████, there was a lot of getting to know her and beginning the EMDR process, evaluating for safety.  B████ has consistently had suicidal ideation.  So ensuring that there was safety for her to move forward in doing the trauma work that we needed to do.  Evaluating for dissociation, ensuring that B████ had the skills that she needed to proceed in doing such an intensive trauma treatment.

Q.   And did you start EMDR treatment with her initially?

A.   Yes.

Q.   Okay.  And are you currently doing EMDR treatment with her?

A.   Not active trauma treatment, no.  She does resourcing. We call it EMDR resourcing, and it's essentially skill work to help her body stay grounded, to keep her in the moment.  It was really difficult for B████ to tolerate.  When we're doing EMDR, we look for somebody to be in the window of tolerance, means they're not feeling too much or they're not feeling too little, and with court and B████ extensive trauma history, it's difficult for her to stay in this window of tolerance.

Q.   Okay.

A.   She either experiences too much or becomes numb.

Q.   So is most of your current therapy of her, kind of your traditional talk therapy?

B.R. v. F.C.S.B.

23

A.    Yes.  We do a lot of internal family systems work with
bilateral stimulation, which is part of the EMDR, to ground
B███████ body often and to make sure that she's able to stay in
the present, since that's something that's very challenging
for her.

Q.    Okay.  So I want to turn and talk a little bit about some
of B███████ conditions and your treatment --

A.    Okay.

Q.    -- of those conditions.

A.    Okay.

Q.    You have a binder in front of you.  There's a couple of
documents.  If you look at Tab 1 -- actually, nope, we're
going to skip Tab 1.

          We're going to start at Tab 6.

A.    Okay.

Q.    Do you recognize this document as a medical record that
you've maintained in the course and care of your treatment of
B███████?

A.    Yes.

Q.    Okay.  And it says B███████ name on it?

A.    It does.

Q.    Okay.  And if you flip to the next page, do you see your
signature on that record?

A.    I do.

          MS. PEDERSEN:  Plaintiffs would like to move in

B.R. v. F.C.S.B.

24

Plaintiff's Exhibit 449.  This is the set of records we
discussed.  It will be subject to counsels' discussion with
redactions and certain extractions that --

          MR. BATES:  Judge, our position is that the -- her
complete -- we don't have an issue with her complete file
coming in as long as it has the appropriate redactions per the
Court's order and other issues.  So for that reason, I think
the parties can work out the appropriate redactions later, but
nothing should be published to the jury considering the
redactions aren't in place right now.

          MS. PEDERSEN:  I'm in agreement that we can work
together before things get to the jury.

          THE COURT:  That's fine.

          MS. PEDERSEN:  For proper redactions.

          THE COURT:  And I'm assuming if we approach it this
way, that we're not going to require the professional here to
come back and lay another foundation for it and all of that.

          MR. BATES:  Not at all, Your Honor.

          THE COURT:  Okay.  Very good.

(Plaintiff's Exhibit No. 449B, was admitted into evidence.)

BY MS. PEDERSEN:

Q.  All right.  Can you look at where your note there says
"progress note"?

          THE COURT:  You need to answer "yes" or "no," ma'am.

          THE WITNESS:  Oh, sorry.  Yes.

B.R. v. F.C.S.B.

25

BY MS. PEDERSEN:

Q.    All right.  Can you -- can you read that to the jury,
please?

A.    Absolutely.

        "Client and therapist discuss recent stressors.
Client reported increase in anxiety and dissociation within
the past few days.  Client shared experience of panic attack
this week and skills she was able to utilize to get through
it.  Client shared experiencing of depersonalization.
Therapist evaluated for triggers, flashbacks, and nightmares.
Therapist noted daily functioning is severely impacted.
Client is clear -- clearly able to present well.  However,
trauma triggers are impacting daily functioning.  Client
reported the desire to share her trauma story on this day.
Discussed possible increasing triggers due to sharing her
story.  Client was able to share her traumatic history.
Therapist utilized grounding techniques throughout session.
Following client sharing her story, therapist facilitated
parts work to assist in grounding.  Therapist facilitated
resourcing to enhance EMDR safeguards."

Q.    Thank you.  Okay.  So we'll unpack that a little bit.

A.    Okay.

Q.    Can you explain to the jury what it means when you say
B███ experiences a trigger?

A.    Yes.  So everyone has triggers.  We can have triggers

that are stored in a positive adaptive state, such as smelling

something that reminds you of grandmother's cooking, or you

can have triggers that are stored in the maladaptive part of

the brain, which is what B█████ experiences.

        She has both external and internal triggers.  So for

B████, it often looks like feeling unsafe when the rest of us

that haven't experienced trauma feel safe in that environment.

For B████, that often looks like feeling unable to go certain

places or do certain things.  It's -- also a very big trigger

for B████ is having concern that she is unbelieved in many

circumstances.

Q.    Okay.  And in your course of treatment with her, about

how often is she experiencing these triggers?

A.    Daily.

Q.    Your record also talks about some anxiety and panic

attacks.

A.    Uh-huh.

Q.    From your experience in treating B████, how does her

anxiety present itself?

A.    B████ has a lot of anxiety symptoms that look different

depending on the day, depending on the trigger.  So it could

look like a complete panic attack when she feels completely

out of control, and nobody can approach her, and nobody can

touch her, and she has heart palpitations, it's difficulty to

breathe.

B.R. v. F.C.S.B.

There's other times where B███ may feel just an underlying anxiety all the time where she just feels this pervasive sense of, I'm unsafe.

Q.   And is that similar to what happens when B███ experiences a panic attack?

A.   A panic attack is much more intense for B███.  A panic attack looks like, I can't breathe.  She wants to crawl out of her own skin, she feels very uncomfortable, her heart is pounding.  Sometimes that may look like she isn't certain if she is going to die in that moment.

Q.   The record you just read also mentioned dissociation.

Could you just explain to the jury what dissociation for B███ looks like?

A.   Yes, absolutely.  So for B███, dissociation looks like leaving her body.  So oftentimes when I begin therapy, this is a big piece of understanding the client, so B███ and I had to do a lot of work around dissociation.  So everyone has some level of dissociation.  Maybe we're daydreaming.  Maybe we just drive to the grocery store, and we don't remember all the turns we took and it's very quickly that we arrive there.  And we think, Oh, how did I get here so quickly?

And then there's the other end of the spectrum --

Q.   Let's just -- can you just tell us what it looks like for B███?

A.   Yes.  So, B███ is here on the spectrum.  She experiences

B.R. v. F.C.S.B.

28

dissociation often.  For B███ sometimes that looks like, It

feels like my life is a dream.  It feels like I'm disconnected

from my body.  It feels like I'm walking through, but I'm not

actually experiencing my own thoughts, my own emotions, my own

experience.

          THE COURT:  And I appreciate Counsel focusing you,

ma'am.  If you could, only relate your testimony as it relates

to B.R.

          THE WITNESS:  Yes, Your Honor.

BY MS. PEDERSEN:

Q.    Have you in your sessions with B███ ever seen her

dissociate?

A.    Yes.

Q.    And what does that look like in session?

A.    Sometimes that looks like B███ completely shutting down

and being nonresponsive.

Q.    When you say "shutting down," physically what does that

look like?

A.    It looks like she's a 12-year-old girl.  It looks like

her body becomes -- so for B███, often dissociation looks

like going back and reverting and regressing to that childlike

state where she was traumatized.  So sometimes it looks like

her head is down.  Sometimes it looks like she's sobbing.

Sometimes it almost looks like she has this glassed overlook.

And since working with her for two years, I can now recognize

that in her eyes, and we do lots of things in that moment to

ground B████.  But it's just that disconnected from self

feeling.

Q.   And your note also mentions depersonalization.

          Is that the same thing as --

A.   It's part of dissociation, yes.

Q.   How is it different?

A.   It's that -- it's like a subtitle of dissociation, right.

Depersonalization is disconnected from self, emotions, body

sensation.  It's not being able to feel any emotion in your

body.

Q.   Let's look at another one of your records.

A.   Okay.

Q.   Let's go to Tab 12 in your binder.

A.   Okay.

Q.   Do you recognize this document as one of your records

maintained in your care and --

A.   Yes.

Q.   -- treatment of B████?

          Okay.  Could you tell us the date of this record?

A.   It is January 25, 2022.

Q.   Can you read your progress note from this session?

A.   Yes.

Q.   To the jury, please.

A.   "Client and therapist discussed recent stressors.  Client

shared increase in anxiety and stressors.  Client reported

since beginning therapy she feels more sensitive.  Therapist

normalized experience and discussed impact of beginning

working on trauma memories.  Client shared difficulty making

decisions.  Discussed various aspects of functioning that have

been impacted.  Client shared desire to live a normal

functioning life but sadness she is unable to.  Client shared

fears related to not being able to have a career or function

as a healthy mom later in life due to triggers and symptoms.

Client shared recent trigger with significant other.

Therapist explained what happens during triggering situations

and healthy way to share with significant other and assert

what she needs in those moments.

        "Client shared aspects of eating disorders as a

means to cope with abuse.  She had significant insight into

her words her abusers used to blame her womanly body for

reasons of abuse."

Q.   You can stop there.

A.   Okay.

Q.   Thank you.

        MR. BLANCHARD:  Your Honor, in the interest of

completeness, I'd ask that she be allowed to complete the

reading of the note.

        THE COURT:  You can go over that with her on cross.

BY MS. PEDERSEN:

———B.R. v. F.C.S.B.———

31

Q.   This progress note mentions B████ eating disorder?

A.   Yes.

Q.   Can you tell me what -- how B████ eating disorder

presents itself to you in your treatment and care?

A.   Yes.  B████ eating disorder is directly related to her

trauma experiences.

          MR. BLANCHARD:  Objection.

          THE COURT:  Sustained.

          MR. BATES:  Thank you.

          THE COURT:  Let's keep her focused.

          MR. BLANCHARD:  We ask that the answer be struck,

Your Honor.

          THE COURT:  It will be.

          Let's stay within the confines of the Court's order.

BY MS. PEDERSEN:

Q.   Let's look at a different record.

A.   Okay.

Q.   Can you go to page 34 of your binder, please?

A.   Yes.

Q.   And what's the date of this record?

A.   It is March 8th.

Q.   And you recognize this record as one you maintained in

your care and treatment of B███?

A.   Yes.

Q.   Okay.  Can you just read the first three or four

———— B.R. v. F.C.S.B. ————

32

sentences?

A.   Yes.  "Client and therapist discussed recent stressors.
Client shared increasing stressors related to travel with her
significant other this weekend.  She shared feeling stressed
about the location of travel, discussed difficulty approaching
social situations.  Client shared support she has in place if
she's feeling too triggered."

Q.   You can stop there.  Thank you.

     So as part of your treatment of B████, do you guys
talk about difficulties she has with things like travel plans?

A.   Yes.  So I remember this session well.  This was the
first time that B███ was traveling through Virginia with her
significant other, and she was traveling with a group of his
friends.  So B███ had significant anxiety about even coming
into the state of Virginia due to it being the place that she
was abused, and she had a lot of fear.  So B███ could
recognize that she wasn't going to be with her abusers but --

     THE COURT:  Let me interrupt just a minute.  If you
could get her to stay away from things we talked about, that
would be appreciated.  So if you need a moment to speak with
the witness, you need to take advantage of it now.

     MS. PEDERSEN:  Sure.

     (A pause in the proceedings.)

     MS. PEDERSEN:  May I proceed?

     THE COURT:  You may.

BY MS. PEDERSEN:

Q.   Can you tell me a little bit about B███ difficulty with approaching social situations that you guys have spoke about in your treatment and care?

A.   Yes.  It's difficult to approach new friendships, friendships with her significant other's friends.

        MR. BATES:  Objection, Your Honor.  This is outside of observations.

        MS. PEDERSEN:  Your Honor, this is things that B███ directly told her in her treatment and care.  It's talk therapy.

        THE COURT:  I'll give you a little latitude on that.  Go ahead.

        THE WITNESS:  So at times when B███ has shared with me that she's going to meet new individuals, that she's going to be interacting with others, she describes high levels of anxiety.  Due to, I don't have the same conversations that other people have.  When I said I moved schools multiple times, people ask, Were you an army brat for --

        THE COURT:  Next question.

        Members of the jury, I'm going to give you an instruction at this point because things may seem to get a little bit confusing.  This particular person can testify with regard to her observations of B.R., but she cannot opine with regard to the issue that you need -- or issues that you need

to decide in this case.  So take her testimony in the context

that it's given, that she's a person working with B.R. and

nothing else.

          MS. PEDERSEN:  Thank you.

BY MS. PEDERSEN:

Q.   If you look at that same record that we were looking at.

Can you read to the jury starting at -- it's kind of in the

middle of the paragraph.

A.   Okay.

Q.   And it starts with, "Discussed relationships and how her

history" --

          Do you see that?

A.   Yes.

Q.   Can you just read, starting there, two or three

sentences?

A.   Yes.  "Discussed relationships and how her history of

trauma impacts all relationships.  Discussed significant other

relationship and challenges with her loved ones who are

attorneys desiring to help her.  Discussed how to set limits.

Client shared difficulty recognizing why others would desire

to be her friend.  Client reported invites to spend time with

acquaintances but having intense fear.  Client reported

difficulty trusting.  Client shared not being able to be hurt

again if she stays isolated."

Q.   You can stop there.

B.R. v. F.C.S.B.

35

Can you tell me a little bit about B██████
difficulty initiating new friendships based on your treatment
with her?

A.   Yes.  It's difficult for her to initiate new friendships.

MR. BATES:  Objection.

THE COURT:  Sustained.

BY MS. PEDERSEN:

Q.   Can you tell me a little bit about your treatment of
B████ and how you help her navigate new relationships?

A.   Yes.  When B████ is in a place where she can get to know
someone and she is able to stay grounded in her body and move
forward in the process of getting to know someone, she has a
lot of anxiety.  So working on the skills that she needs
because she knows this is a healthy decision for her to go
make a new friend, to stay in her body, to recognize her
anxiety, and utilize thoughts to help her move forward and
into a friendship.

Q.   And what are some of the tools that you've given B████ in
the course of your treatment to help deal with these feelings?

A.   So we use things like opposite action when you know you
can check the facts.  We talk about checking the facts.
When -- if you know that fear means you are in danger or
someone you love is in danger but you know that your body is
not truly in danger, then we want to use opposite action and
approach anyways.

B.R. v. F.C.S.B.

36

Q.   Okay.  Has B█████ discussed with you during the course of

her treatment her relationship with her current fiance?

A.   Yes.

Q.   And was she already in this relationship when you guys

first started seeing each other?

A.   I believe so.

Q.   Okay.  And as part of your care and treatment of B█████,

have you helped her navigate being in an intimate

relationship?

A.   Yes.

Q.   Okay.  And what -- what kind of difficulties during the

course and care of your treatment is B█████ experiencing or

expressing to you that she is experiencing in navigating this

relationship with her fiance?

A.   B█████ expressed various ways that --

          MR. BATES:  Objection, Your Honor.

          Can I consult with counsel for one moment?

          THE COURT:  Yes.

          (Counsel confers.)

          THE COURT:  You guys come to a resolution of

whatever it was you were trying to resolve?

          MR. BLANCHARD:  I think we need to approach, Your

Honor.

          MS. PEDERSEN:  Yes.

          THE COURT:  Okay.

─── B. R. v. F.C.S.B. ───

37

(Sidebar.)

MR. BATES:  Judge, the issue is that plaintiff has stipulated to she's not going to claim that what has happened to her has affected her relationship, so this line of questioning seems to be getting into that.

MR. BRENNER:  I --

THE COURT:  What we're going to do, again, because I like to speak with one voice.  I think Ms. Pedersen's responsibility to this witness will not be overbreadth of the case.  Can we all agree on that?

MR. BRENNER:  Yes.

MS. PEDERSEN:  Yes.

MR. BRENNER:  Just to tell you why I was going to talk.  What happened when we were having our little discussions before we came up is, Ms. Rewari asked me if I had recalled stipulating at the March 6th hearing, Ms. Pedersen wasn't there.  And I thought they -- I don't recall what she's saying, and she -- they were going to try to find the transcript, but apparently they are not able to.  I can tell you what I recall on the issue.  I'd be happy to look at the transcript.

THE COURT:  What do you recall?

MS. REWARI:  So there was a Rule 412 motion by them and the discussion at the hearing was --

THE COURT:  I'm sorry if I'm in your space.  I'm

B.R. v. F.C.S.B.

38

real sensitive to those kinds of things.

        MS. REWARI:  There was a heated discussion at that hearing about whether we can get into other sexual assaults. And Your Honor asked me, Well, you know are you going to be getting into her consensual relationships?  And I said, No, there has been a stipulation even before her deposition that there was not going to be any discovery regarding her consensual sexual relationships.  And Mr. Brenner said, Yes, she's a young woman, she has a fiance, and we're not arguing difficulty having intimate relationships.

        THE COURT:  You think this witness may be sort of going into the suggestion that because of the circumstances involved that she may now be experiencing difficulties with regard to her relationship with her fiance?

        MS. REWARI:  Correct.  That's where I heard her going and we didn't depose --

        THE COURT:  Where are you going with that?  I'm sorry.

        MR. BRENNER:  The stipulations that -- as Ms. Rewari is -- I'm giving you my recollection.

        THE COURT:  Okay.

        MR. BRENNER:  My recollection is what happened was there was a discussion -- so we filed a -- we filed a motion in limine that had some 412 arguments.  They filed a separate 412 motion.  I honestly don't know which context this has come

up.  My recollection, though, there was a discussion about was

she able to have intimate relationships, and I said, Of course

she's able to.  They know this.  She's had relationships.  I

do not remember and if the transcript says otherwise

stipulating that we wouldn't talk about the difficulties she

had.  That's the part that we're --

THE COURT:  Well, the concern is -- and, again, I

don't know what the transcript says.  I have some recollection

generally that I typically preclude that kind of evidence,

because it has nothing to do with what we need to decide in

this case or the cases related, but I would suggest that if

the door is opened to some extent suggesting that she is able

to have intimate relationships or the door is opened to

suggest that she's unable to function, then I think

cross-examination may well get into that, and I would prefer

it not to.

MR. BRENNER:  Right.  So the testimony, just so you

know, the testimony is -- her fiance will testify.  It goes to

her damages.  She doesn't -- it would go to damages not to

liability issues.  Her fiance's name is Andrew, and he would

say, I think, that they are engaged, that they are intimate

with each other, but there is problems with intimacy as a

result of these issues.  That's what the testimony will --

THE COURT:  Well --

MR. BRENNER:  But here is what I -- I'm just

Case 1:19-cv-00917-RDA-LRV    Document 1049    Filed 08/26/24    Page 40 of 157
PageID# 21869                    Direct - K. Trahan
B.R. v. F.C.S.B.

40

confused what the argument -- are they saying the evidence of
what B.R.'s life is like now is off limits.  I don't think --

        THE COURT:  I don't think that that's where they are
going.  I think what is being suggested is that this
particular witness is going to -- I don't want to use the word
"opine" because that's not a very precise word -- but it is
going to suggest that the incidents that B.R. alleges have
undermined his ability to have a good relationship with her.
And, quite frankly, I'd rather that come through the fiance as
opposed to this witness here.

        MR. BLANCHARD:  Your Honor, to be clear from our
perspective, but it was always made clear to us that has --
she does not have a problem with a normal -- there were no
questions with respect to her sex life.  There's not a problem
there --

        THE COURT:  The nature of the relationship doesn't
necessarily involve intimacy.  It can be whether or not she's
able to get along, how he observes her --

        MR. BLANCHARD:  I understand that, but I thought
they were going to get into intimacy.  And that's what I
thought I just heard Mr. Brenner say.

        (Simultaneously speaking.)

        MR. BATES:  Which we've had no discovery over -- to
be clear, we have not asked this question in any deposition
because of this stipulation.

MS. PEDERSEN:  So I think it's relevant as to what is happening to her in the present day.  And a huge part of her treatment with this therapist is managing her relationship with her significant other.  The trauma that she has suffered has impacted her ability to have a normal relationship with her fiance.  That's --

MS. REWARI:  So here is the transcript.

THE COURT:  The Court is going to rule as to the following:  Stay away from the topic of -- unless -- Mr. Brenner is lead counsel on this case -- wants to open the door for further discussions about this issue, which I would allow cross-examination if he opens the door.  I'd rather this witness stay away from that area.  And if the fiance is able to testify with regard to the nature of his relationship with her fiance, we're fine.  But through this witness, particularly with the restrictions that this witness has with regards to opining about situations, I think its better coming from the boyfriend or the fiance.

MR. BRENNER:  I just want to make sure before we let this witness go back and forth on the record regarding what we we're going to do with the redactions.  I don't think the parties agree on this, but we'll deal with it later.  But it is our position, and I understand Your Honor's ruling that she can't testify to diagnosis.

THE COURT:  Correct.

MR. BRENNER:  Understood your positions --
understood your ruling on the position.  I get positions, you
get rulings.  I figured that part out.

But we are going to move for record that they never
sought -- the motion was about this witness can't testify to
X, Y, or Z because she was improperly disclosed.  We will be
moving those records in with the diagnosis and we've --

THE COURT:  For purposes of the record --

(Simultaneously speaking.)

MR. BRENNER:  Yeah, okay.

THE COURT:  -- claim.  That's fine.

MR. BRENNER:  No, no, no.  The purpose is to go to
the jury too.  There's no objection.

THE COURT:  Well, if the opinions cannot come in
because of the discovery violation, how do the records come
in?

MR. BRENNER:  Because there is no evidentiary
objection, there's no valid evidentiary objections.

THE COURT:  I think that was addressed in the motion
in limine.  That was the evidentiary --

MR. BRENNER:  No, the objection was the testimony --
so you're going to get lots of records of doctors that don't
testify at all.  It can't be bootstrapped where you have the
person testify to those records -- those records get redacted,
but there are other records that go unredacted.

I would like to brief the issue for Your Honor.
I just wouldn't want to -- I don't want to have the argument
now.  I just wanted you to understand that for the purpose of
today we're staying away from it.  But it's our position it
will go in, and we will explain why, and if you want us to
file a bench brief, we're happy to.

THE COURT:  Instinctively what I'm thinking is that
if there is a discovery violation in this case, which the
Court has decided, there are certain things that certain other
experts may be able to do because there is no discovery
violation and certain things that other witnesses, because
there is a discovery violation, cannot do, and so if there are
records that suggest an opinion from those experts who have
not been entitled to provide an opinion, a diagnosis, et
cetera, how do the records come in?

MR. BRENNER:  Well, because -- I understand your
instinct, but I rather put it in a briefing, but I will say
that we believe they come in.  But we also believe they will
come in through the other experts.  I just don't want you to
have the understanding that we were agreeing that they can
never put the records in.  It's a different issue as to what
she can testify.  I understand your instinct, and we'll -- I
just wanted the record --

THE COURT:  Okay.  Something you said was
entertaining.  That you are agreeing on anything.  You all

haven't agreed on anything much during the course of the case.

     MR. BRENNER:  No, no.  I think we have.  There are a list of 100 exhibits or so that have been --

     THE COURT:  I'm looking forward to seeing and hearing about them.

     MR. BRENNER:  Hopes springs internal.

     THE COURT:  Okay.  All right.

     MR. BATES:  Last comment.  I thought we agreed with regard to this witness that we're going to be redacting the diagnosis.  So I'm not sure why we wouldn't be doing that for every witness given this Court's ruling, but that's not the issue right now.  So I think --

     THE COURT:  The thing is not all of the discovery violations relate to all of the witnesses.  There was a discovery violation with specific witnesses involved.

     MR. BATES:  Right.  Treating.  Right.  For purposes of my position is, the diagnosis is in all of the treating -- the seven, that Your Honor ruled on, the diagnosis for all of those are out.  They can't testify about it and they can't get it in through the backdoor with records.

     THE COURT:  Where there are discovery violations.

     MR. BATES:  Correct.

     MR. BRENNER:  Just -- we'll brief it.  Every time counsel says -- note the discovery violation was not a failure to disclose the witness, not a failure to produce records.

That's not what happened.  What the discovery violation, Your
Honor, found was that they were not disclosed as either
experts or hyper experts.  So no disclosure issues.  The
record comes --

        THE COURT:  They knew about the witness.

        MR. BRENNER:  And the records.

        THE COURT:  And they knew about the records
theoretically, but, again, I think the cases make a very, very
big distinction between lay expert witnesses treating
physicians and traditional expert witnesses who are going to
opine with regard to diagnoses, et cetera.  Even if it's a
very big distinction as to the breadth of what these
particular witnesses can and cannot testify to.

        MR. BRENNER:  Just -- you made a comment they may or
may not known about the record.  Just so you know, the way the
records collection happened in this case, for the most part,
is they collected the records and sent them to us.  It is not
a may known about the records.  The records are not a
disclosure issue.

        MS. REWARI:  I just want to clarify one thing.  We
did object to all the records.  There are evidentiary
objections.  We filed those objections.

        THE COURT:  We'll deal with that later.

        MR. BRENNER:  I'm not saying --

        THE COURT:  We'll deal with that later.  Thank you.

B.R. v. F.C.S.B.

46

(Open court.)

THE COURT:  Thank you for your patience.  You may
start.

MS. PEDERSEN:  Thank you.

BY MS. PEDERSEN:

Q.   Let's look at one last record.

This is going to be at 22 in your binder.

A.   Okay.

Q.   Do you recognize this record as one maintained in your
care and treatment of B████?

A.   I do.

MR. BLANCHARD:  Can I ask what date -- what date it
is?

MS. PEDERSEN:  I was just about to ask her.

MR. BLANCHARD:  Thank you.

BY MS. PEDERSEN:

Q.   What is the date of this record?

A.   February 10, 2022.

Q.   I'm just going to give you a minute to read over this
record.  You don't need to read it out loud.

A.   Okay.

Q.   We were just talking a little bit about B████ and your
observation of B████ and her -- how her personal relationships
have been impacted.

Can you just tell us a little bit about your

─────────── B.R. v. F.C.S.B. ───────────

47

observations during the course of your treatment about how

B█████ conditions have impacted her relationships with her

family?

A.    Yes.  B████ has a lot of shame, and she has a lot of

self-doubt, and so in her -- during her interactions with her

family, that often comes up.  And so when she is expressing a

need to her family, she often doesn't want to express that

need because she has so much shame that they've had to do so

much for her in difficult moments.

Q.    Was B████ ever working, like had a job during the time

that you have been seeing her?

A.    Yes.

Q.    Do you remember what the job was?

A.    She worked at an attorney's office.

Q.    And as part of your treatment, did you observe any

difficulties that B████ experienced while working at this job?

A.    Yes.

         MR. BLANCHARD:  Your Honor, I object.  Foundation.

         MS. PEDERSEN:  I'm asking about her observations

during treatment.

         MR. BLANCHARD:  She's asked observations about work

and this would --

         THE COURT:  Did you ever observe B.R. at work?

         THE WITNESS:  Not in her place of work.  Following

her place of work.

B.R. v. F.C.S.B.

THE COURT:  Objection sustained.

BY MS. PEDERSEN:

Q.   Did you ever talk with B█████ about certain coping

strategies to implement during her time at this job?

A.   Yes.

Q.   And can you tell us a little bit about some of the coping

strategies you helped her with while she was working?

A.   Yes.  We talked about a lot of grounding things to make

sure that she felt in her body, and we talked about when

anxiety comes up what things she can do, how she can care for

herself.  We talked about decreasing work as she was able to

tolerate it.  We talked about what to do when she experienced

a headache or if she experienced sensitivities to things or

she was experiencing triggers, how she can get back in her

body and stay focused on work versus the trigger that was

coming up.

Q.   Did B█████ ever share with you during the course of your

treatment any concerns that she had about maintaining a

career?

A.   Yes.  Significantly.  So throughout my time with B█████,

she's consistently said --

MR. BATES:  Objection, Your Honor, to the extent

she's just relaying what B.R. told her.

MS. PEDERSEN:  They do talk therapy, Your Honor.

It's hard to not ask her about what B█████ says to her in

─────B.R. v. F.C.S.B.─────

49

therapy.

THE COURT:  In the context of your therapy with

B.R., do you talk with her specifically with regard to things

that may be going on in her life?

THE WITNESS:  Yes, Your Honor.

THE COURT:  In response to those things, what do you

observe?  In her response to those things, what do you

observe?

THE WITNESS:  Can you ask that again?

THE COURT:  In response to those things that you

talk about with her regarding those subjects, what do you

observe about her personality, demeanor?

THE WITNESS:  Okay.  So she has -- she has

difficulty being able to stay in her body without experiencing

high levels of anxiety without -- she has difficulty staying

focused and completing tasks in those moments because of her

levels of anxiety.

BY MS. PEDERSEN:

Q.   Is there anything else you want to share about your

overall observation of B█████ and the difficulties she's

expressed to you during the course and care of your treatment?

A.   So I think the piece, a little bit more regarding work,

is that it's really difficult because B█████ has all of this

shame about I really want to be able to work.

MR. BLANCHARD:  Objection.

THE WITNESS:  I want to be able --

THE COURT:  Take a moment.  I know that you're

trying as best you can to walk the line but -- and the

therapist is trying to do best she can to answer the

questions --

THE WITNESS:  Sorry.

THE COURT:  -- but she's a therapist, not a lawyer,

so we need to kind of make sure that --

MS. PEDERSEN:  I'm -- yes.

THE COURT:  -- you know what the expectations are.

MS. PEDERSEN:  I'm just doing my best to elicit her

observations.

THE COURT:  That's what we're all trying to do.

MS. PEDERSEN:  Can I try and ask it again?

THE COURT:  Try again.

BY MS. PEDERSEN:

Q.   Okay.  Generally, as a general matter, can you just share

your general observations of B█████ over the last few years

during the course of your therapy treatment?

THE COURT:  Without focusing on any diagnoses or

opinions.

THE WITNESS:  Or what?

THE COURT:  Or opinions.

THE WITNESS:  Okay.  Okay.  I have observed B████ in

many circumstances have difficulty staying in her body, have

─ B.R. v. F.C.S.B. ─

51

difficulty approaching new places, new things, have difficulty

approaching work, have difficulty with expressing significant

shame about her ability to engage in any normal life

circumstances that she desires to move towards.  She has

significant difficulty with her relationships with those that

love her because she struggles when she feels very triggered

and she wants to push away people.

THE COURT:  Next question.

BY MS. PEDERSEN:

Q.    Did you ever refer B███ to hospitalization programs?

A.    Yes.

Q.    Do you recall the circumstances of that referral?

A.    Yes.  I was traveling.  B███ -- it was in the middle of

depositions or following depositions.  I can't recall.  And I

had had contact with B███.  We had done our typical skill

work, make sure she was grounded in her body, make sure that

she was eating, sleeping, taking care of herself.  B███

expressed a lot of suicide ideation.  Historically, when B███

expresses suicidal ideation, we're able to get to a point

where she can express some hope, she can share with me that

she does feel safe.

MR. BATES:  Objection, Your Honor.  This is hearsay.

This is plaintiff's witness.

THE COURT:  Next question.

BY MS. PEDERSEN:

─────────── B.R. v. F.C.S.B. ───────────

52

Q.   When you referred her to the hospitalization program, did

you feel that she needed additional support than what you

could offer in that moment?

        THE COURT:  Yes or no.

        THE WITNESS:  Yes.

BY MS. PEDERSEN:

Q.   Okay.  And based on your observations of B█████, did she

have all bad days, all good days, good days and bad days?

A.   She has good moments and most difficult days.  But she

does have good moments.

        MS. PEDERSEN:  Can you just give me one second?

        (Counsel confers.)

        MS. PEDERSEN:  That's all the questions I have for

you today.  Thank you so much.

        THE WITNESS:  Thank you.

        THE COURT:  Who is taking the lead on the cross?

        MR. BATES:  I am, Your Honor.

        THE COURT:  All right.  Go ahead.

        MR. BATES:  Can I ask my colleague to hand this to

Ms. Trahan?

        THE COURT:  Ms. Barry will.

        THE WITNESS:  Thank you.

                    CROSS-EXAMINATION

BY MR. BATES:

Q.   Good morning, Ms. Trahan.

—B.R. v. F.C.S.B.—

53

A.    Good morning.

Q.    My name is Ryan Bates.  I represent Fairfax County School
Board.

        You started treating B.R. in 2022; is that right?

A.    Yes.

Q.    Okay.  And during that time period until today, are you
her primary therapist?

A.    I am, yes.

Q.    And you know that the events alleged in this case are
alleged to have happened over ten years ago, right?

A.    Yes.

Q.    And this was ten or more years before you ever started
treating her; is that right?

A.    Yes.

Q.    And so, just to be clear, you didn't treat B.R. at all
from 2011 through 2022?

A.    Correct.

Q.    You mentioned in your testimony that B.R. -- and by the
way, I'm going to refer to her as "B.R." because that's what
she's known as in this case.

        Do you understand that?

A.    Yes, sir.

Q.    Okay.  And you mentioned in your testimony that B.R. had
shared her -- I think you called it a trauma story; is that
right?

─── B.R. v. F.C.S.B. ───

A.    Yes.

Q.    And did she ever tell you that she had been sexually

abused by anybody who is not associated with this case

whatsoever?

        MS. PEDERSEN:  Objection.  Beyond the scope of what

I asked the witness.

        THE COURT:  Let me look at it again.

        And I sustain that objection.

BY MR. BATES:

Q.    Plaintiff's case has been pending the entire time that

you've been seeing her; is that right?

A.    I believe so.  I don't --

        THE COURT:  Give her a point of reference.

        THE WITNESS:  Yeah, thank you.

BY MR. BATES:

Q.    When you started seeing plaintiff, you said that was

2022?

A.    Yes.

Q.    And her lawsuit was pending at that time, are you aware

of that?

A.    I actually don't recall.

Q.    Let me do this.  I'll refer you to -- I have put in front

of you a complete copy of your medical records.

A.    Okay.

Q.    And I'm going to refer you to a specific page, and you

─────B.R. v. F.C.S.B.─────

55

can read that and which I hope will refresh your

recollection --

A.   Okay.

Q.   -- and then I'll re-ask the question, if that's make

sense.  Give me one moment.

         If you can take a look at page 57, and there are

tiny numbers on the bottom right.  It says HM/00057.

A.   Okay.

Q.   Does that refresh your recollection as to whether you

started treating B.R. while this case was pending?

A.   So this form is the standard intake questionnaire.

Q.   Ma'am, just to be clear, I don't -- there's -- I'm going

to try to be very precise with my questions, given some of the

Court's rulings.  So let me just ask that question.  Does

this refresh --

         THE COURT:  Tell her what date the lawsuit was

filed.

BY MR. BATES:

Q.   Ma'am, okay, the lawsuit was filed in July 2019.

A.   Okay.

Q.   Okay.

         So given -- given that, at the time that this

lawsuit was -- was filed -- I'm sorry, at the time you started

treating B.R., this lawsuit had already been filed; is that

correct?

B.R. v. F.C.S.B.

56

A.   Yes.

Q.   Okay.  And so, isn't it true that you have only treated her while she's been a plaintiff in this case?  Right?

A.   Yes.

Q.   Okay.  And if you can take a look at that questionnaire that you've got right in front of you, and if you need to refresh your recollection, but that intake questionnaire is something that you have all clients fill out right when you start treating them; is that right?

A.   Prior to treatment, yes.

Q.   Prior to treatment.  Thank you.

     And in that questionnaire, she had told you that she had been subjected to rapes; is that correct?

A.   Yes.

Q.   And that was in conjunction with her schooling at Fairfax County Public Schools?

A.   Yes.

Q.   And she told you, before you started treating with her, that she had been raped on a daily basis?

     MS. PEDERSEN:  Objection, your Honor.

BY MR. BATES:

Q.   Isn't that true?

     MS. PEDERSEN:  This is -- I did my best to stay away from the events.

     THE COURT:  You can't have it both way, Mr. Bates.

─────── B.R. v. F.C.S.B. ───────

57

            Sustained.

            MR. BATES:  Okay.  Your Honor, to be clear, I'm

asking her about her observations of treatment --

            THE COURT:  The objection was sustained.

            MR. BATES:  Okay.  Thank you.

BY MR. BATES:

Q.   And plaintiff -- in -- in some of those notes you took a

look at, plaintiff talks a lot about this -- this case and her

therapy, doesn't -- doesn't she?

A.   Yes.

Q.   Okay.

            MS. PEDERSEN:  Objection.  Beyond the scope.  We

never discussed her discussions with attorneys.

            THE COURT:  Overruled.  Overruled.

            You can answer, ma'am.

BY MR. BATES:

Q.   In conjunction with your treatment of B.R., she talks

about this case a lot, doesn't she?

A.   Yes.

Q.   And you mentioned -- in fact, she -- she gets extra

sessions during stressful times; is that right?

A.   Yes.  Because she's very triggered.

Q.   Okay.  And you gave her extra sessions before the start

of this trial; is that right?

A.   I don't -- I think one, yes.

B.R. v. F.C.S.B.

58

Q.   Okay.

A.   I'm sorry.  I don't recall.

Q.   You didn't see her for 15 hours the week before trial?

A.   Fifteen hours the week before trial?

Q.   Fifteen hours?

A.   No, sir.

Q.   Okay.

A.   I believe I saw her for one or two hours the week before the trial.

Q.   Okay.  Thank you.

In conjunction with your treatment of B.R., she mentioned to you about chats that had been produced in this case; is that correct?

MS. PEDERSEN:  Objection, Your Honor.

MR. BATES:  Your Honor, we're -- we're -- if -- if they're able to get in certain aspects what she said on day one and day three, we're -- my position is we're able to get into discussions that she said on day five and day seven.  And I promise Your Honor I'm going to be brief with this.  I will be no more than three minutes.

MS. PEDERSEN:  Your Honor, two things.  One, again, I was very purposeful in not discussing with the witness the events or facts of this case.

THE COURT:  I think Mr. Bates's position is that there were certain things that this witness relied on as part

───── B.R. v. F.C.S.B. ─────

59

of her therapeutic session with B.R., and you highlighted a
couple of things that she did in the course of that
therapeutic session.

          Mr. Bates is suggesting that some of the other
things are contemporaneous with those discussions that she had
with B.R.  So I'm going to give him a little latitude.  If he
drifts, go ahead and make another objection, the Court will
take another look at it.

BY MR. BATES:

Q.  Ma'am, isn't it true that last year, in fact, last
summer, B.R. told you about chats that had been produced in
this case.

          Do you remember that?

A.  Yes.

Q.  Okay.

A.  Initially in therapy, she discussed text messages as
well.

Q.  Okay.  And she told you that she felt validated when
those chats were found; is that right?

A.  Yes, sir.

Q.  Okay.  And she told you that those chats were between her
and her alleged abuser; is that right?

A.  No.  So the --

          MS. PEDERSEN:  Objection.

          THE COURT:  Outside the scope --

─────────────── B.R. v. F.C.S.B. ───────────────

60

MS. PEDERSEN:  Yeah.

THE COURT:  -- of direct.

Sustained.

MR. BATES:  Can I have one moment, Your Honor?

THE COURT:  You may.

(Counsel confers.)

MR. BATES:  Thank you, Judge.  I have no further questions.

Thank you, Ms. Trahan.  Appreciate it.

THE COURT:  Mr. Kinney.

MR. KINNEY:  No questions, Your Honor.

THE COURT:  Thank you.

MR. BLANCHARD:  No questions, Your Honor.

THE COURT:  Thank you.

Redirect.

MS. PEDERSEN:  May I proceed?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MS. PEDERSEN:

Q.   Mr. Bates here mentioned that you had only started seeing
B███ a couple of years ago.

Was B███ being seen by other therapists prior to
seeing you?

A.   Yes, she was.

Q.   Were you her only therapist?

─── B.R. v. F.C.S.B. ───

61

A.    No.

Q.    Were you her only treater?

A.    No.

Q.    Okay.

        MS. PEDERSEN:  Thank you.  That's all.

        THE COURT:  Thank you.

        Is this witness subject to recall?

        MR. BATES:  Not from us, Your Honor.

        THE COURT:  Is she subject to recall?

        MS. PEDERSEN:  Excuse me, sorry.

        THE COURT:  Is this witness subject to recall?

        MS. PEDERSEN:  Well, only for foundation issues, but
we have no further questions.

        THE COURT:  Well, the concern is, is that if I
release her, she's going to go back to her state.

        Where are you from?

        THE WITNESS:  Maryland.

        THE COURT:  Going to go back to Maryland.

        MS. PEDERSEN:  I think -- I think that's okay, to
release her.

        THE COURT:  Okay.  All right.  Ma'am, you're free to
go.  During the pendency of this case, please do not discuss
this case or any aspect of the case with anyone.

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Thank you, ma'am.

B.R. v. F.C.S.B.

62

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Next witness.

MS. PEDERSEN:  Can we have a sidebar for one moment?

THE COURT:  Sure.

(Sidebar.)

MS. PEDERSON:  Dr. Weaver is still going through security, so we might need to --

THE COURT:  Tinsley.

(Discussion off the record.)

MS. PEDERSEN:  Oh, he just walked in.

THE COURT:  Okay.  Never mind.  I thought we were going to have to send a note downstairs to tell them to let this person in the courthouse, but apparently he's in.

Very good.

(Open court.)

(DR. KEVIN MICHAEL WEAVER, Plaintiff's Witness, Sworn)

THE COURT:  All right.  Sir, please listen to the questions of counsel and answer best you can.  If you hear an objection or you hear the Court speaking, it'd probably a good time to pause.  Speak as close as you can to the mic without getting too close.

THE WITNESS:  Okay.

THE COURT:  Thank you, sir.

MS. PEDERSEN:  The plaintiff calls Dr. Weaver.

B.R. v. F.C.S.B.

63

DIRECT EXAMINATION

BY MS. PEDERSEN:

Q.    Good morning, Dr. Weaver.

A.    Good morning.

Q.    Would you please introduce yourself to the jury?

A.    I'm Kevin Michael Weaver.

Q.    And have you ever testified in a courtroom before?

A.    I have.

Q.    So I want to start just by giving the jury a quick

background on you.

A.    Sure.

Q.    So are you a medical doctor?

A.    I am.

Q.    And are you currently practicing?

A.    No.  I retired July of 2022.

Q.    And was B█████ a patient of yours when you were practicing

in Herndon, Virginia?

A.    She was.

Q.    Okay.  And what was the name of that practice?

A.    Herndon Family Medicine.

Q.    And about how long were you practicing at Herndon Family

Medicine?

A.    I opened the office in August of 1986 and worked there

the whole time until I retired in July of 2022.

Q.    About how big was the staff at Herndon Family Medicine?

─────B.R. v. F.C.S.B.─────

64

A.    When I started, it was myself, two other physicians.

When I retired, it was 12 doctors and 4 nurse practitioners.

Q.    Do you recall when you started seeing B███ as a patient?

A.    I believe it was December of 2006.

Q.    Sorry to interrupt.

        Do you have your document binder in front of you or

no?

A.    Yes, I do.

Q.    The one that we provided you?

A.    No.

Q.    Okay.  Let me get that.

        MS. PEDERSEN:  One moment, Your Honor.

        (A pause in the proceedings.)

BY MS. PEDERSEN:

Q.    Sorry about that.

A.    Okay.

Q.    So I just asked you, do you recall when you started

seeing B███ as a patient?

A.    Let me turn to the correct page.  Which section is it

under?

Q.    Well, you -- you can answer off of your memory.  I'll

direct you to --

A.    December of 2006, I'm pretty sure is correct.

Q.    Okay.  So if B███ was born in 1999, about how old was

she when you started seeing her?

B.R. v. F.C.S.B.

65

A.   That would make her seven years old.

Q.   And since this was a family practice, did you see any other members of B▮▮▮▮ family?

A.   I did.  I saw her older brother, and perhaps maybe a couple of times her mother.

Q.   Okay.  Did you ever meet her father?

A.   Yes, I did.

Q.   And do you recall just generally what was your impression of what B▮▮▮▮ family was like?

A.   I thought they -- they impressed me as a very tight-knit loving family.  Good relationships between the parents and between the children and the parents.

Q.   So in -- in some of the earlier years when B▮▮▮ was seven, eight, nine, what were some of the typical reasons B▮▮▮ would come for a visit to see you?

A.   She'd come in for her -- for physical exams.  She would come in for sometimes infections, like throat infections.  Maybe bronchitis.  Those types of things.  Or if she had a rash or hurt herself.

        THE COURT:  If I can interrupt, Doctor.  What was the nature of your practice and the nature of your particular specialty, if anything?

        THE WITNESS:  I am board certified in family practice, so was seeing from newborns until death.

        THE COURT:  Back in the day, we would call that a

─────B.R. v. F.C.S.B.─────

66

general practitioner to some extent.

        THE WITNESS:  In the old days that's what they were

called.  The only difference now is there's a three-year

residency preceding going into practice.

        THE COURT:  I appreciate that, sir.

        THE WITNESS:  Sure.

BY MS. PEDERSEN:

Q.   Do you recall about how often you would see B█████ for

doctor visits?

A.   Two, three times a year, approximately.

Q.   Would you characterize the amount of doctor visits from

B████ as standard or similar to your average patient?

A.   Yeah, I would say within the normal realm.

Q.   Can you tell us a little bit about your impression of

B████ when you first met her as your patient?

A.   Quiet, reserved, very serious, especially as a student,

as I got to know her after the first few visits.  She really

take pride and was very concerned that she did well in school.

Q.   And when B█████ first became your patient, do you recall

her having any significant health problems?

A.   That I had known about at that time?

Q.   When you were treating her as her physician from, you

know, 2006 for the first couple of years, do you recall any

significant health problems?

A.   No.  Nothing that I would classify as chronic, no.

─────────── B.R. v. F.C.S.B. ───────────

67

Q.   Do you recall her ever having any sort of significant

behavioral issues?

A.    No.

Q.   Do you recall her ever having any sort of significant

mental health issue?

A.   Not during that time, no.

Q.   All right.  I'd like to show you a record.

A.   Yes.

Q.   It's in your binder.  It's the plaintiff's exhibit tab

marked 457.

A.   On the bottom.

Q.   And it's the tab marked 80.

A.   80.  Thank you.  Okay.

Q.   Do you recognize this as one of your records you

maintained in the course and care of your treatment of B████?

A.   Yes, I do.

Q.   And if you flip to the next page, you see an electronic

signature.  Is that your signature?

A.   It is.

        MS. PEDERSEN:  Plaintiffs move to admit Plaintiff's

Exhibit 457.

        THE COURT:  Any objection?

        MS. REWARI:  My understanding is that this exhibit

is more than just the two pages we've talked about, so we have

an objection to the rest of the pages but not these two pages.

B.R. v. F.C.S.B.

68

THE COURT:  You're just trying to get in the two

pages or the entire document?

MS. PEDERSEN:  We should probably sidebar on this.

THE COURT:  Let me ask you, just trying to get in

the two pages or the entire document?

MS. PEDERSEN:  I'm trying to get his entire set --

well, a certain set of records.  I'm going to go -- I'm not

going to go through all of them with him.

THE COURT:  It's an authenticity problem,

Ms. Rewari?

MS. REWARI:  No, Your Honor.  There's a question

about there's been redactions made, and we have an objection

to the redactions and this witness's -- the testimony that

they are going to offer.

THE COURT:  The Court will withhold determination on

the admission of this -- admissibility of documents.  You can

have him testify from it if it refreshes his recollection, and

we will address whether it comes in later.  I don't want to

take up the jury's time by having another bench conference.

MS. PEDERSEN:  Your Honor, may I publish the ones

that have no redaction issues?

MS. REWARI:  Yes, that's fine.

THE COURT:  Okay.  Yes.

MS. PEDERSEN:  Thank you, Your Honor.

BY MS. PEDERSEN:

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

69

Q.   So are you at Tab 80 there?

A.   Yes.

        MS. PEDERSEN:  Mr. Brown, can we publish

Plaintiff's -- oh, I'm sorry.

        Your Honor, may we publish Plaintiff's Exhibit 457

at Bates 80?

        THE COURT:  Without objection.

(Plaintiff's Exhibit No. 457, Bates 80, was admitted into

evidence.)

        THE COURT:  Good catch, Mr. Brenner.

        MR. BROWN:  May we publish, Your Honor?

        THE COURT:  You may.

        MS. PEDERSEN:  Can you go to the next page,

Mr. Brown?  And can you go to the bottom there?

BY MS. PEDERSEN:

Q.   Dr. Weaver, can you tell us what the date of this record

is?

A.   November 11, 2009.

Q.   So about how old is B████ here?

A.   That would make her ten years old.

        MS. PEDERSEN:  Can you go back to the first page,

please?

BY MS. PEDERSEN:

Q.   And at the very top there it says "Reason for Visit."

        Do you see that?

———— B.R. v. F.C.S.B.————

70

A.    Yes, I do.

Q.    Can you read that to the jury?

A.    "Patient presents for routine physical.  Health is
generally good.  There are no particular complaints with the
exception of those listed in the HPI or review of systems."

Q.    So this was a visit for a routine physical?

A.    Yes.

Q.    And what -- what's typically done on a routine physical?

A.    Historically-wise, we ask questions in regards to how
they are doing overall.  That would cover family, school,
social, interactions, emotions, diet, exercise, those types of
things.

Q.    Do you do a physical exam?

A.    Yes, yes.

Q.    And what kind of things do you do in that physical exam?

A.    Examine the head, eyes, ears, nose, and throat.  Neck,
thyroid, heart and lungs.  Abdominal exam, including
evaluation of the organs, liver and spleen, feeling for any
masses.  A quick skin examination.  Just a general look at
musculoskeletal for any deformities of arms, legs, and
oftentimes a quick look at their spine, just screening we make
for like a scoliosis.

Q.    And for --

A.    Which is an abnormal curvature.

Q.    Thank you.

B.R. v. F.C.S.B.

71

            And for these routine physicals, is -- would it have

been typical for B█████ to be alone in the room with you, or is

there usually a parent?

A.    At this age I'd have a parent with them.

Q.    Around what age would a parent stop coming into the room

with the patient?

A.    Generally, probably for me it was usually about 13.

Certainly, if I knew or I was getting impressions from the

parents or from the child that they were starting to do --

getting into things like maybe tobacco or alcohol, that type

of thing, then I would usually excuse the parent after I had

initially had them in the room to have some private

discussions about various issues.

Q.    And at this time, B██████ mother would have been in the

room?

A.    Yes.

Q.    Thank you.

            So if you look back at the record, you have some

notes about B█████ under "HPI."

            Do you see that there?

A.    Yes, I do.

Q.    What does "HPI" stand for?

A.    History of present illness.

Q.    And could you just read what you wrote here to the jury?

A.    Yes.  "B██████ is a ten-year-old girl who presents for

B.R. v. F.C.S.B.

72

routine physical.  She has no current concerns.  She is living

at home with parents and sibling.  She communicates well and

respects parents.  Gets along well with the sibling.  Sleeping

eight or more hours a night.  School:  Performing well, A's,

slash, B's.  Socially has best friends.  Emotionally happy and

well-adjusted.  Dietary:  Eating, adequate amounts of fruits

and vegetables.  No soda or fast food intake typically, and

enjoying fruit juices."  Exercise wise:  Enjoying tennis three

times a week.

Q.    Thank you.

        Is this description consistent with your memory of

B█████ at ten years old?

A.    This many years later, I'll go by what it says, yes.

Q.    I'd like to look at another record in this set.  This is

at page 73.

        THE COURT:  Any objection anticipated?

        MS. REWARI:  These two pages are fine, Your Honor.

        THE COURT:  All right.  Without objection.

        MS. PEDERSEN:  May we publish?

        THE COURT:  You may.

(Plaintiff's Exhibit No. 457, Bates 73, was admitted into

evidence.)

BY MS. PEDERSEN:

Q.    Let's turn to the next page.  And if you see at the

bottom there, Dr. Weaver, can you tell the jury the date of

─────────────── B.R. v. F.C.S.B. ───────────────

73

this record?

A.    November 15, 2010.

Q.    So B███ is about 11 at this time?

A.    Correct.

Q.    Let's go back to the first page.

        If you look a little at the top it says, "Reason for
Visit."

        Can you read what you wrote under "Reason for
Visit"?  You can just read the first sentence.  It's fine?

A.    Sure.  "Presents for routine physical exam."

Q.    So is this a similar visit as the one she -- that we
looked at when she was ten years old?

A.    It is.

Q.    And you don't have to read this again to the jury, but
can you just give us your recollection of your findings from
this visit?

A.    She's doing very well, doing extremely well in school,
seems to be happy, well-adjusted.  Has good social contacts.
Exercising regularly.  Physical exam was all within a normal
range.

Q.    And how she presented at this visit, was that consistent
with your memory of B███ around the age of 11?

A.    Yes.

Q.    As part of the physicals or other visits that B███ or
other patients come to, do you typically assess or look out

B.R. v. F.C.S.B.

74

for any signs of physical abuse within the home or the family?

A.    Sure.  I would watch interactions between the parents and

the child if the parents were with them, which at this age

they usually were.

        I also would observe her for signs like unusual

bruising, like not on the shins where a lot of kids are going

to fall down and bruise their shin or knee, but in unusual

places.  Or burns, especially certain kind of patterns of

burns like immersion burns where you are going to see a whole

area burned because of them being immersed.  So yeah, we take

a quick look for that.

Q.    In your course of treatment and care of B█████, did you

ever have any indications that she might have suffered abuse

from within the family?

A.    I never saw any signs of that, and certainly observing

interactions between her and her mother and occasion when her

father was in, I saw no signs that they have evidence of that

or how she interacted with them that would suggest that.

Q.    Do you recall a visit from B█████ mother in November of

2011?

A.    I do.

Q.    Can you open your binder to Defendants' Exhibit 87.

A.    Where does it say "87"?

Q.    It's behind the number tabs.

        THE COURT:  Joanna, if you could help him.  Joanna.

B.R. v. F.C.S.B.

75

THE WITNESS:  Thank you.  Yes.

BY MS. PEDERSEN:

Q.   Okay.  Do you recognize this document as one of your
medical records from your care and treatment of B█████?

A.   I do.

Q.   Is that B██████ name at the top?

A.   It is.

Q.   Is that your handwriting and signature?

A.   It is.

        MS. PEDERSEN:  I'd like to move into evidence
Defendants' Exhibit 87.

        MS. REWARI:  No objection, Your Honor.

        THE COURT:  Without objection.  You may publish.

(Plaintiff offered Defendants' Exhibit No. 87, and was
admitted into evidence.)

BY MS. PEDERSEN:

Q.   So this one looks a little different than the records we
just saw.

        You handwrote it; is that right?

A.   I did.

Q.   Okay.  Why did you handwrite this record?

A.   The only reason that I would handwrite it when we had our
computerized system is the computer system was down or the
Wi-Fi would be down, would be the only reason.

Q.   So it's likely the Wi-Fi was down this day?

─────── B.R. v. F.C.S.B. ───────

76

A.   Yes.

Q.   Let's look at the top paragraph here since it's sometimes a little difficult to read doctor's script.

Can you read that paragraph to the jury?

THE COURT:  She's trying to be kind, Doctor.

THE WITNESS:  You saw me snicker.

THE COURT:  Yeah.  Probably the best way is because we typically are best at reading our own handwriting.  If you could go ahead and read that.

THE WITNESS:  I certainly will.

"Mother is here today to discuss concerns regarding B███.  She's having adolescent independence, resistant behavior.  Mother unhappy with some of her friends.  Wrong crowd.  She has expressed -- B███ has expressed feeling down, sad, admits to students who are bullying her, spreading false gossip of B███ being loose, promiscuous.  These have been placed on Facebook.  B███ embarrassed, ashamed, and angry."

BY MS. PEDERSEN:

Q.   Can you remind us what the date of this record is?

A.   November 28, 2011.

Q.   And can you just tell us a little bit about what you remember about this visit?

A.   I just remember that Ms. R███ was upset and was concerned about B███ and wanted to try to get some help to try to prevent it from happening.

B.R. v. F.C.S.B.

77

Q.    Was that typical in your practice for concerned parents to come to you for guidance?

A.    Oh, yes.

Q.    So under that first paragraph you have an "O."  What does that "O" stand for?

A.    Objective.  It's the physical exam part.

Q.    And then you wrote "PT not present"?  Is "PT" --

A.    Patient.

Q.    -- patient?

       Okay.  And then you have an "A."  What does that "A" stand for?

A.    Assessment.

Q.    Okay.

A.    What the diagnosis is.

Q.    So next to where you write "I think adolescent behavior, bullying," you wrote something else.

       Can you read that to the jury?

A.    "Adjustment reaction."

Q.    And what did you mean by "adjustment reaction"?

A.    Adjustment reaction is an excessive reaction to some type of a stressor.  And it's usually beyond what a normal reaction be -- would be to that event.

Q.    And did you just spend this visit talking to B██████ mom about different stressors that B████ was experiencing?

A.    Yes.

─B.R. v. F.C.S.B.─

78

Q.   So after --

          MS. PEDERSEN:  You can take that down.  Thank you.

BY MS. PEDERSEN:

Q.   After this visit, do you recall the next time you saw

B███?

A.   It was about a week later.

Q.   Does December 6, 2011, sound correct?

A.   Yes, it does.

Q.   Okay.  Let's look at your record from that visit.  That's

going to be in your binder tabbed at 60.

A.   60.  Thank you.  One page?

          MS. PEDERSEN:  One moment.

BY MS. PEDERSEN:

Q.   Can you actually look at the page right before 60.

It's -- you got to flip through the tab first.

          The number at the bottom should be ending in 059.

Herndon 059.

A.   I have it.

Q.   Do you see that?  Okay.

A.   I do.

Q.   And do you recognize this as one of your medical records

from your care and treatment of B███?

A.   Yes, I do.

Q.   And can you tell us the date of this record?

A.   This is December the 6th, 2011.

─────────────── B.R. v. F.C.S.B. ───────────────

79

Q.   Okay.

         MS. PEDERSEN:  Plaintiffs move -- if -- if they

don't have an objection, may we publish?

         THE COURT:  Any objection?

         MS. REWARI:  No objection to publishing these two

pages, Your Honor.

         THE COURT:  It's admitted.  You may publish.

(Plaintiff's Exhibit No. 457, pages 059 and 060, was admitted

into evidence.)

         MS. PEDERSEN:  Can you go to the next page,

Mr. Brown?

BY MS. PEDERSEN:

Q.   Do you see where it says "physical exam" there?

A.   Yes.

Q.   Can you read to the jury what you wrote?

A.   "Unhappy appearing.  White female adolescent.  Mood is

down, sad.  Her affect is appropriate.  She has mild

psychomotor retardation present.  No active suicidal

ideations, psychotic ideations, and her memory is intact.  No

acute distress.  No edema present."

Q.   And the date of this record is what, again?

A.   December the 6th, 2011.

Q.   Okay.  And does this align with your recollection of

B████ during this visit?

A.   Yes.

─────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438───────────

EASTERN DISTRICT OF VIRGINIA

────────────── B. R. v. F. C. S. B. ──────────────

80

Q.    Have --

A.    It does.

Q.    Have you ever seen B███ present like this before in one

of your appointments?

A.    Not up until this date.

Q.    And what does mild psychomotor retardation mean?

A.    Psychomotor retardation means mentally and physically

things are slowed down.  People, when they start feeling down,

sad, depressed, both mentally in terms of how quickly they are

talking, moving, and their expressions are just all slow.

Q.    And that's what you were --

A.    That's what I was referring to there.

Q.    -- referring to B███?

       Okay.

       MS. PEDERSEN:  Can we go back to the page before?

BY MS. PEDERSON:

Q.    And looking at the top there, can you read to the jury

what the reason for the visit was?

A.    Feeling sad.

Q.    And then under HPI, which I think earlier you said is

history of present illness?

A.    Correct.

Q.    Okay.  Can you read the first couple of sentences of this

to the jury?

A.    Sure.

B. R. v. F.C.S.B.

81

"12-year-old adolescent female with mom is here to consult regarding bullying at school and feeling sad. B▆▆▆ relates she's been feeling down, sad, and intermittently angry through much of this year" -- which would -- should have been the school year -- "but it has been amplified over the past month. Over the month she has been bullied by multiple students at her school in the direction of one boy. She admits to being upset, having intermittent episodes of extreme anger, feeling down. Motivation level is very low. Reduced enjoyment of some of her normal activities."

Q.   You can stop there.

A.   I don't see it documented.

Q.   Prior to this visit, had B▆▆▆ ever had any episodes of extreme anger?

A.   Not that I was aware of.

Q.   That you witnessed?

A.   Not that I was aware of.

Q.   Let's continue reading.

A.   (As read):  "Her motivational levels are very low. Reducing enjoyment of some of her normal activities. Still enjoys spending time with her brother and parents, has good relationship with both. She denies any use of tobacco, alcohol, or drugs. She's not sexually active. The principal or vice principal at the school are aware of the problem, or trying to make some arrangements to evaluate and protect her.

B.R. v. F.C.S.B.

They have spoken to the one boy involved, but are currently trying to survey the others.  She relates being afraid to go to school, gets her more angry and depressed."

Q.   Had B████, prior to this, ever expressed to you that she was afraid to go to school?

A.   Not prior to this visit that I remember or that I think when I reviewed the record I don't see it documented.

Q.   Let's go to the second page again.

        And if you look under where it says "plan," can you read the first sentence there to the jury?

A.   Counseling for 45 minutes.  This was greater than 50 percent of the office visit.

Q.   Okay.  What -- what did you counsel B████ about for 45 minutes?

A.   We're, first of all, investigating what was going on, how was it involved, what's going on with school, getting more information about what -- you know, the principal, vice principal, all of that.  And then counseling in regards to what she could do to help try to deal with the anger, what she could do in terms of the bullying type thing, what -- what would be appropriate, what would not be.

Q.   Okay.  And then the next line you write "safety contract made."

        What is a safety contract?

A.   Safety contract is when I have -- when people are getting

B.R. v. F.C.S.B.

83

really depressed, and there potentially might be some suicidal

ideation thoughts of it.  I usually tend to make a safety

contract with my patients that they would contact me rather

than acting on those thoughts so -- so we could help her and

get the care she or anyone else would need rather than them

acting on those suicide thoughts.

Q.   And you verbally entered that contract with B████?

A.   Yes, I did.

Q.   Okay.  The next line says -- and I might butcher the

pronunciation.  The next line says, "Start Setraline" --

A.   Correct.

Q.   -- "as rapid side effects reviewed."

        What is Setraline?

A.   Setraline is an antidepressant.

Q.   Why did you prescribe B████ an antidepressant?

A.   Because based on all of her symptoms that she was

presenting and the intensity of the symptoms, I was fairly

confident that this was depression.  And this had been going

on for over six weeks, which is sort of the -- one of the

criteria for duration for depression.

Q.   And this -- this record again was December 6, 2011?

A.   It is.

Q.   Okay.  And prior to this, had she ever presented with a

need for antidepressants?

A.   Not to me, she had not.

Q.   Can you look right above "plan" and then above "orders"
where it says "assessment"?

A.   Yes.

Q.   Can you read to the jury what you wrote here?

A.   "Depression."  And then the second was, "Adjustment
disorder with anxiety."

Q.   And had you made a diagnosis of depression at this time
for B____?

A.   Yes.  Initially, I was thinking adjustment disorder,
which is a -- as I said, sort of an overreaction to some type
of a stressor or event that a person sustains.  And it
presents usually with very similar symptoms as depression, but
usually a lot less intense.

     I was -- she had this episode where the bullying --
or more than one episode of the bullying, and initially I was
thinking that this was adjustment disorder, but with the
intensity, I was sort of leaning more towards depression,
which is why I started her on the antidepressant.

Q.   Okay.  Now, about a month later, do you recall a visit
from B____ on January 16, 2012?

A.   Yes.

Q.   This is going to be in your binder at Tab 51.

A.   Thank you.

     MS. PEDERSEN:  If counsel doesn't have an objection,
may I publish, Your Honor?

B.R. v. F.C.S.B.

85

MS. REWARI:  No objection.

THE COURT:  No objection.  You may publish.

(Plaintiff's Exhibit No. 457, Pages 051 and 052, was admitted into evidence.)

MS. PEDERSEN:  Thank you.

BY MS. PEDERSEN:

Q.   So looking at the first page at the top right under HPI.

Can you read to the jury what you wrote here?

A.   "B▮▮▮▮ returns for evaluation of -- for fatigue and depression.  Please see prior note.  Patient feels she's doing much better on the Sertraline, 25 milligrams at bedtime.  Back to 75 percent of normal.  States she is not getting angry, down, or upset like she used to.  Feels she is 75 to 80 percent of her normal self.  Had one outburst with her mother one week prior to this visit.  School is going well.  No one is really bothering her at school.  She is currently involved with school theatre, which opens this coming week.  Enjoying herself."

Q.   And is this consistent with your memory of B▮▮▮ at that visit?

A.   It is.

Q.   Do you recall whether B▮▮▮ continued to get better after this visit?

A.   Her course over the next year was one of up and down, quite fluctuating.  She would have good weeks and then -- or

B.R. v. F.C.S.B.

86

several good weeks and then followed by a week where she got

very emotional, very angry.

Q.   Let's look at another page here.  Let's go to Tab 49 in

your binder.

          (Counsel confers.)

BY MS. PEDERSEN:

Q.   I'm going to give you a minute to just read over the

record.

          (A pause in the proceedings.)

          THE WITNESS:  I'm familiar with it.

BY MS. PEDERSEN:

Q.   Great.  If you look at the first few sentences of the

record.

          Can you read the first two sentences to the jury?

A.   Sure.  "B███████ mother presents today regarding B███████

mood.  Patient refused to go to school on January 26th and

27th.  Told mother students at school were bullying her

again."

Q.   That's good.  Thank you.

          Had B██████ ever refused to go to school before in

your -- sorry.

          Did B██████ ever express to you or did you ever know

during your treatment of B██████ that she refused to go to

school?

A.   Not prior to this date.  I have documented and certainly

don't recall that.

Q.    And then if you look at the sentences kind of towards the end of the HPI --

A.    Yes.

Q.    -- starting at, "She refuses to take the Sertraline."

        Can you read to those few sentences to the jury?

A.    "She refuses to take the Sertraline, states it makes her feel weird.  Parents have not seen any evidence of drugs or drug use.  Academically, her grades have fallen from A's to C's in the last three weeks."

Q.    And based on your care and treatment of B█████, was this a behavior change for her?

A.    Very much so.  Very uncharacteristic.

Q.    How so?

A.    As I said, she typically was much more quiet, reserved, bright, well-spoken.

Q.    Let's -- you can flip to the next page in your binder. Just looking at the "Assessment" section.

        Do you see that there?

A.    I do.

Q.    Can you read that assessment to the jury?

A.    Sure.  "Depression, acute exacerbation with significant anger.  Needs psychiatry consultation to explore underlying issues and to adjustment disorder with anxiety."

Q.    And what did you mean by "acute exacerbation with

B.R. v. F.C.S.B.

88

significant anger.  Needs psychiatry consultation"?

A.   Well, the fact that Mother shared with me one particular

night where B█████ became extremely emotional and,

quote/unquote, just lost it.

Q.   Okay.  And then the next section under "Plan," I'll give

you a second to read that.  Or actually, can you just read the

first sentence to the jury?

A.   Sure.  "Counseling with Mother for 40 minutes.  This was

greater than 50 percent of the office visit."

Q.   And do you recall what you counseled B██████ mother about

for that time at this visit?

A.   We talked about B█████.  We talked about what could we do

to help try to handle some of this anger issues.  Also

counseling with Mother and how Mother can interact with her,

you know, so as not being presented as confrontational to

B█████.

Q.   Did you ultimately refer B█████ to a psychiatrist or

psychologist?

A.   Yes.

Q.   We are going to switch gears a little bit.  I'm not going

to ask you to get into the details, but do you recall a time

where you learned what happened -- do you recall a time where

B█████ or her mother expressed to you what was going on during

2011 and 2012 while she was at Rachel Carson?

A.   Yes.

B.R. v. F.C.S.B.

89

Q.   Okay.  Do you recall B███ or her mother asking you to

assist them in something called "homebound instruction"?

A.   I do.

Q.   Let's look at another record.  This one is in your

binder.  Plaintiff's Exhibit -- it's in the back tabs.  161.

        Do you see that?

A.   I do.

Q.   Can you flip to the next page, the second page?

A.   Uh-huh.

Q.   Do you recognize this document as one of the records that

you've maintained in your course of treatment with B███?

A.   Yes.

Q.   And is that B███ name at the top?

A.   It is.

Q.   Is this your script pad?

A.   It is.

Q.   And is that your signature at the bottom?

A.   Yes.

        MS. PEDERSEN:  Plaintiffs move to admit Plaintiff's

Exhibit 161.

        MS. REWARI:  No objection.

        THE COURT:  Without objection.

(Plaintiff's Exhibit No. 161, was admitted into evidence.)

        MS. PEDERSEN:  May we publish?

        THE COURT:  You may.

───B. R. v. F. C. S. B.───

BY MS. PEDERSEN:

Q.    Can you tell us the date of this note?

A.    It is February 17, 2012.

Q.    And can you read to the jury what you wrote in this note?

A.    "Patient is under psychiatric care for bullying with secondary depression.  She has been sexually harassed and received death threats.  I have recommended removal from school, suggest allowing home instruction for her for the near future.  She is emotionally unstable and school is not a safe, secure environment."

Q.    And do you recall sending this to the school?

A.    Yes.

Q.    Did you fax this note?

A.    Yes, it would be faxed.

Q.    Following this note, did anyone from the school ever follow up with you via fax, via email?

A.    Received some follow-up faxes in regards to homebound instruction --

Q.    Yes.

A.    -- request, yes.

Q.    Let's look at another record.  This is going to be in your binder in the back tab, so Defendants' Exhibit 165.

          THE COURT:  Any objection?

          MS. REWARI:  No, Your Honor.

          THE COURT:  No objection.  It's admitted.

─────────── B.R. v. F.C.S.B. ───────────

91

(Plaintiff offered Defendants' Exhibit No. 165, and was

admitted into evidence.)

          THE COURT:  You may publish.

          MS. PEDERSEN:  Thank you.

BY MS. PEDERSEN:

Q.   Do you recognize this document as a medical request for

homebound instruction?

A.   I do.

Q.   And was this form faxed to you at Herndon Family

Medicine?

A.   Yes, it was.

Q.   Okay.  And that -- that top portion there where it says

B███████ name, is that your handwriting?

A.   No, I'm pretty sure that was filled -- this was filled

out by the school before it was faxed to me.

Q.   So this came to you as a blank form except for the top

part that was filled out?

A.   Correct.

Q.   So if you scroll down a little bit.  That handwriting

there, is that your handwriting?

A.   Yes, it is.

Q.   And the name at the top, "Cheryl Weaver," was that who

instructed you to fill this form out?

A.   That was who sent it to me, so I'll say yes.

Q.   Can you -- let's look at the first question -- well, I

guess it's the second question here, starting at, "If yes,

what is the medical condition?"

          Can you read that question and answer to the jury,

please?

A.    "If yes, what is the medical condition preventing the

student from participating in classroom instruction?"

          My answer was, "Depression with anxiety."

Q.    And can you read the second question and answer?

A.    "How does this medical condition affect the patient's

ability to participate in classroom instruction?"

          My response, "Patient has been repeatedly bullied by

schoolmates, causing severe anxiety and depression."

Q.    And can you read the next question and answer for the

jury?

A.    "What amount and kind of activity is suggested for the

student while on homebound instruction?"

          "She may exercise without restriction," was my

response.

Q.    Let's flip to the second page.

          Can you read the bottom portion question and answer?

A.    "This is in response to specific steps planned to return

the student to classroom instruction."

          It says, "Possible change in school.  Efforts by

school administration to date has had little effect on

reducing or eliminating the bullying."

─────B.R. v. F.C.S.B.─────

93

Q.   And the date there, you sent this on what date?

A.   February the 23rd, 2012.

Q.   And at this time, did you form an impression based on
your treatment of B███ whether B███ was safer at home or
another school than she was at Rachel Carson?

A.   Yes, which is why I wrote it as such.

Q.   We're going to go to the tab in your binder in the
beginning, Tab No. 44.

        MS. PEDERSEN:  You can take that down, Mr. Brown.

        THE COURT:  Any objection To 44?

        MS. REWARI:  Yes, there is, Your Honor.

        THE COURT:  What is the objection?

        (Counsel confers.)

        MS. REWARI:  Your Honor, may we approach?

        THE COURT:  Yes.

        (Sidebar.)

        THE COURT:  Let me see the exhibit before --

        MS. PEDERSEN:  Sure.  The top of the record starts
there and it ends on the second page.

        THE COURT:  Okay.

        MS. PEDERSEN:  Thank you.

        THE COURT:  Okay.  Your objection?

        MS. REWARI:  My objection is that this witness,
based on this exhibit -- the next record, he wrote a letter
about the police investigation and crime that was reported to

B.R. v. F.C.S.B.

94

him during this visit.  So if they are going to get into this

visit, then we should be permitted to --

       THE COURT:  My next page doesn't have that.

       MS. PEDERSEN:  She's talking about an unrelated page

that I'm not introducing with him at this moment.

       MS. REWARI:  This was a letter that he issued based

on this visit.

       MS. PEDERSEN:  I will likely be introducing that

document later in our examination, but with redactions as to

the references to the police department and the language

saying who perpetrated this crime.  In accordance with Your

Honor's ruling.

       MS. REWARI:  So the record that she's looking at

contains the recommendation.  I imagine she's going to ask him

right now about --

       THE COURT:  What page?  What page?

       MS. PEDERSEN:  I do not plan on asking him.

       MS. REWARI:  The record you are about to show him is

saying that he's recommending transferring to a new school.

And, again, it's because the recommendation is made because

it's reported to him that she's the victim of a crime that's

been investigated by the police.

       THE COURT:  And your objection is that, in your

view, this opens the door to too much involvement of the

police?

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

95

MS. PEDERSEN:  That is my position, Your Honor.  I think she has the opposite position.

MS. REWARI:  Yes.  My position is getting into this with this witness with regard to what he recommended to the school and why it opens the door with respect to what they've reported to him as to what was going on with the police.

MS. PEDERSEN:  Your Honor, I have no intention about asking him anything related to the police.  I'm just going to ask him about the records here related to homebound, which they are going to discuss, too.  I've properly redacted any references to the police, and I do not intend to ask the witness anything related to the police.

MS. REWARI:  Again, our concern is, you can't sanitize the facts that was presented to this witness.  If you're going to ask him the recommendation he made, then we are entitled to ask him what the basis of that recommendation was.  So the reason he's -- if they want to present to the jury that she was safe to return to school and it's because she's been told that there's an ongoing police investigation.

THE COURT:  Correct me if I'm wrong, Ms. Rewari, you probably know a whole lot more about this than I do.  But if a medical provider is put on notice that a child has been sexually assaulted, doesn't he have a duty to report?

MS. REWARI:  Yes, yes.

THE COURT:  Okay.  And, so, isn't he just adhering

to his duty to report?

       MS. REWARI:  This is not a duty.  This is not a report.

       THE COURT:  I'm saying that he's adhering to his duty to report.  In other words, he's telling the police.

       MS. REWARI:  No, he's not.  Not it -- this is a letter to the school.

       MS. PEDERSEN:  Your Honor, if he was asked this question which -- I think Ms. Rewari is assuming answers from Dr. Weaver.  I don't know if it's Dr. Weaver's testimony that he's only trying to get her on homebound because of a police investigation.  I think he's trying to get her on homebound because he's now seen her multiple times and she's severely depressed, anxious, and suffering extreme bullying at school.

       THE COURT:  Did you depose this doctor?

       MS. REWARI:  We did.

       THE COURT:  And when you deposed this doctor, did you get into this subject -- I'm not saying that that's necessarily going to dictate what I do here, but did you ask him questions --

       MS. REWARI:  Yes.

       THE COURT:  -- about this?

       And what were his responses?

       MS. REWARI:  Well, he wrote -- he wrote this letter, and he wrote another letter that's later in the same set

because he was being reported -- the mother was reporting to

him about the police.  And the record we just looked at, for

example, what he just talked about, that the mother reported

an extreme episode of anger, that's the incident with the

police that they are home the night before.

THE COURT:  Yeah.

MS. REWARI:  Right.  And now --

MS. PEDERSEN:  Your Honor, I'm --

MS. REWARI:  It's reported in the record that the

police came to the home, and he based that recommendation on

what we just talked about, what is based on her report --

THE COURT:  I think we're switching gears -- we're

switching gears.  Now we're talking about the admissibility of

what happened based upon the police report that he's made

aware of, so that's switching gears.

MS. REWARI:  Right.

THE COURT:  What I'm going to let you do -- this is

not going to come in because there's a lot of hearsay in here.

I have some real concern about that.

But you can ask him based upon his interaction with

B.R. on that date, did he make any recommendations to the

school.

MS. PEDERSEN:  On this date, I think I've already --

that's fine.  Okay.

THE COURT:  Yeah, the document doesn't come in.  You

can ask him based upon his interaction with B.R. on that date,

did he make any recommendations to the school based upon his

professional responsibility.  But the document doesn't come

in.

          MS. PEDERSEN:  Yeah.  I'm --

          MS. REWARI:  You're looking at the record, the

March 6th visit, right?

          MS. PEDERSEN:  Oh, that's --

          THE COURT:  Yeah.  What do you want me to look at?

          MS. PEDERSEN:  The document that I'm trying to do

with the witness is on Herndon 44.  It's not --

          THE COURT:  44?

          MS. PEDERSEN:  I purposely did not use that document

that you have there.  This is not the letter.

          MS. REWARI:  Our concern is, Your Honor, that you

can't present a false picture to the jury as to what was

really happening with what was being reported to him.  You

can't say, well, were they telling you about the problems in

school and not telling you --

          THE COURT:  This is -- this is what you can do with

this document.  I'm working from Herndon 44.  Okay?

          MS. PEDERSEN:  Okay.

          THE COURT:  You can ask him, obviously, about if her

presenting with -- it looks like diffused pruritus on her

scalp.

MS. PEDERSEN:  Yeah.

THE COURT:  You can ask him about that.

You can ask him what caused that, she's scratching her scalp.  You can ask him that.

You can ask him:  Based upon that particular visit, did you make any recommendations to the school?  Assuming he's going to say "yes."  And then you can move on.

MR. BLANCHARD:  Your Honor, I'm confused.  The doctor hasn't witnessed any of what he's talking about.  He's saying that the plaintiff and the mother are telling him. Part of the story they're telling him is bullying at the school, but the police -- she had this incident and that they are talking about the police part of the story.  Part of the story that she's telling is she also had this blowup and the police came.  And the impression is that's part of the story, in terms of why he's taking action upon.

What they seem to be saying is we don't -- we're not going to let them know the whole story.  We're not going to tell him what --

THE COURT:  Well, I think the concern that you have is better addressed during the time that you do your cross-examination.  And if she objects, then I'll rule.

But obviously, the foundation for this altercation between B.R. and her mother has been played, in the Court's view, and so you do have some latitude to get into it.

But, again, we're not going to cross into the thing
that we discussed yesterday about her being put in the police
car and she was arrested or handcuffed, not getting into all
of that.

Basically, what I'm allowing you to do is simply
this:  He can answer questions regarding what the doctor did
in response to the things that he was told without getting
into specificity of what he was actually told.

And then on cross-examination, you can ask whatever
questions you think are appropriate, and the Court will rule
at that time.

MR. BLANCHARD:  Thank you, Your Honor.

MS. PEDERSEN:  Before we move on, I think you said I
can talk about the scalp.

Can I talk about the other, the hip pain?

THE COURT:  Yes.

(Open court.)

THE COURT:  Ladies and gentlemen, I apologize for
that distraction, what they call, white noise.  It's a device
that's been developed over the last several years to keep
jurors and others who should not be hearing things from
hearing things.  You might recall during the voir dire, I
actually asked you a bunch of questions and entertained you so
you wouldn't be dealing with whatever they were dealing with.

So, again, those things are necessary for the

complete and appropriate presentation of things that you're

allowed to hear and not hear.

          MS. PEDERSEN:  May I proceed?

          THE COURT:  Yes.

          MS. PEDERSEN:  Thanks.

BY MS. PEDERSEN:

Q.   Are you currently looking at Tab 44 in your binder?

A.   Yes, I am.

Q.   Okay.  We're not going to put this one on the screen, but

can you just tell us the date on this record?

A.   Sure.  It is dated March 6, 2012.

Q.   Okay.  And if you flip back to the first page there.

A.   Uh-huh.

Q.   Can you tell the jury what the reason for the visit was?

A.   It's listed as evaluation of left hip pain.

Q.   Okay.  And if you look under "HPI," it looks like she

also presented with something else?

A.   She did.  She presented with diffused pruritus of her

scalp.  Pruritus is itching.  The hip pain.  And also for

follow-up in regards to having some blood tests done.

Q.   And can you read the date of when she started complaining

about hip pain?

A.   Yes.  Her hip pain started since -- she states since

the -- November of 2011.

Q.   Okay.  Do you recall doing a physical examination of her

B.R. v. F.C.S.B.

102

hip during this visit?

A.   Yes, I did.

Q.   And what do you recall about her complaints during that
examination?

A.   Upon examination of her hip, she had a normal appearance
of it.  When I say "normal appearance," no local swelling,
bruising, that type of thing.  She did have tenderness with
palpation of the left hip diffusely over her muscles on the
side laterally and in the front anteriorly.  Her range of
motion of the hip was normal.  However, she did have some pain
when I was putting her hip through ranges of motion, flexion,
extension, rotation, and in all directions that she had some
pain with that range of motion.

Q.   Thank you -- oh, sorry.  I didn't mean to cut you off.

A.   Well, I was just going to say that she did not have --
she did not have any pain, though, when she was walking.

Q.   Okay.  And after this visit, did you refer her to
physical therapy for that hip pain?

A.   That was part of my plan if she was not improving very
quickly.  I'm not sure if she ever actually needed to have
that done.

Q.   Thank you.

        We're going to look at another record.  This one is
in your binder as Plaintiff's Exhibit 183.

        Sorry, 183-A.  Do you see that there?

─────B. R. v. F.C.S.B.─────

103

A.    Yes.

Q.    Okay.  And do you recognize this as one of your medical

records in the course and care of treatment of B████?

A.    Yes, the letter.

Q.    And is it electronically signed by you at the end of the

letter?

A.    It is.

        MS. PEDERSEN:  Okay.  Plaintiffs move to admit

Plaintiff's Exhibit 183-A.

        MS. REWARI:  We object, Your Honor.  This is the

letter that we just discussed at sidebar.

        THE COURT:  The same letter that we discussed -- is

it precisely the same letter that we discussed?

        MS. REWARI:  Well, we've discussed a March 7th

letter that she said she was not offering at that time but --

which I --

        THE COURT:  Stay -- stay focused.

        All right.  The objection is sustained.

BY MS. PEDERSEN:

Q.    Do you recall writing another letter to the school?

A.    After this one?

Q.    No.  Do you recall writing this letter?

A.    Yes.

Q.    Excuse me.  Can you read starting at "To whom it may

concern"?

─────────── B.R. v. F.C.S.B. ───────────

A.   "To whom it may concern" --

    THE COURT:  Hold it --

BY MS. PEDERSEN:

Q.   You can read it to yourself.

A.   Oh, I'm sorry.

    THE COURT:  Read it to yourself.  Read it to
yourself.

    MS. PEDERSEN:  I should have made that clear.
Apologies.

    THE WITNESS:  Yes.

BY MS. PEDERSEN:

Q.   And what do you remember about this letter?

    THE COURT:  Without getting into the specifics or
the particularly of this letter, you can tell us about the
timing, who you sent it to, or the purpose of sending it.

    THE WITNESS:  The letter was sent to the social
worker and also to be passed on to the administration at her
school.  The purpose of it was to advise them of an incident.

    THE COURT:  Circumstances that you've been made
aware of?

    THE WITNESS:  Of an incident that I've been made
aware of.

    THE COURT:  Okay.  Next question.

BY MS. PEDERSEN:

Q.   And did you send this letter to B█████ school?

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

A.    I did.

Q.    Did -- did anyone from the school have some follow-up,

after this letter, with you?

A.    I did not receive any, no.

Q.    Do you recall writing another letter a couple of days

later?

A.    Maybe a little over -- about a week or a little over a

week later.

Q.    Does March sound -- does March 16th sound correct?

A.    That sounds about right, yes.

Q.    You can flip your binder to Plaintiff's Exhibit 457 at

Tab 40.

A.    I'm sorry.  Where am I flipping to?

        THE COURT:  Tab 40.

BY MS. PEDERSEN:

Q.    Tab 40.  There in the front --

A.    In the front.  Thank you.

Q.    Yeah.

A.    Okay.

Q.    Do you recognize this letter?

A.    I do.

Q.    Did you write this letter?

A.    Yes, I did.

Q.    And is that your electronic signature at the end there?

A.    It is.

──────B.R. v. F.C.S.B.──────

106

MS. PEDERSEN:  Plaintiffs move to admit Plaintiff's

Exhibit 457 at 40.

MS. REWARI:  Your Honor, we object to this letter,

given that it's --

THE COURT:  Same objection?

MS. REWARI:  Right.

THE COURT:  All right.  Follow the format that the

Court used in asking the doctor questions.

BY MS. PEDERSEN:

Q.   And do you want a minute to just read it over?

A.   I'm sorry?

Q.   I'm going to give you a minute to just read over the

letter.  You can read it in your head.

A.   Yes.

Q.   And the date of this letter is what?

A.   March the 16th of 2012.

Q.   Does this letter relay the circumstances you were made

aware of to the school?

A.   It does.

Q.   Do you have any memory of why you sent a second letter

ten days later?

A.   I believe that I had a request from someone at the school

system that they wanted to have another letter specifically

about the homebound instruction.

Q.   And did you send this letter here to the school?

─B.R. v. F.C.S.B.─

107

A.   Yes.

Q.   And after this letter was sent, did anyone from the

school ever follow up with you via fax about this letter?

A.   Not that I received.

Q.   Did anyone from the school ever follow up with you via

email about this letter?

A.   No.

Q.   And did anyone at the school ever follow up with you via

a phone call about this letter?

A.   No.

          MS. PEDERSEN:  One moment, Your Honor.

          THE COURT:  Okay.

          (Counsel confers.)

          MS. PEDERSEN:  I'd like to, on the record, just move

this letter into evidence.  It is notice to the school.

          THE COURT:  Objection overruled.

          Excuse me.  Objection sustained.  I'm sorry.

Objection sustained.

          It does not come in.

          MS. PEDERSEN:  That's all the questions I have, Your

Honor.

          THE COURT:  I always follow the direction of my

team.  Let's come back in at 12:40.

          Are their lunches coming?  Lunches are here.

          All right.  We're probably going to come back about

───── B.R. v. F.C.S.B. ─────

108

12:40 and try to go to 1:15 or so to take our lunch break.

          Okay.

          (Jury excused.)

          THE COURT:  I'm sorry, Doctor.  You can step down,

sir.  You can step down.

          How much time do you anticipate on your -- how much

time do you anticipate on your cross, Ms. Rewari?  The direct

was 50 minutes.

          MS. REWARI:  We have subpoenaed Dr. Weaver as well.

He is on our witness list.  And so, I will need to go outside

the scope of direct in order to ensure that he only has to

testify once.  I believe that he is traveling out of the

country on April 5th, so --

          THE COURT:  I have to ask the question again:  How

much time do you think you need for the doctor?

          Ms. REWARI:  I think I need an hour.

          THE COURT:  All right.  We'll see you back in at

12:40.

          (Recess.)

          THE COURT:  Are we ready to bring the jury in?

          MS. PEDERSEN:  Yes.

          (Jury present.)

          THE COURT:  You may be seated.

          All right.  Ladies and gentlemen, we're going to

commence the further examination of the doctor.

B.R. v. F.C.S.B.

109

CROSS-EXAMINATION

BY MS. REWARI:

Q.   Good afternoon, Dr. Weaver.

A.   Good afternoon.

Q.   I'm Sona Rewari.  I represent the Fairfax County School
Board.  We met last summer.  I took your deposition.

       So in the four months between October 9, 2011, and
February 9, 2012, B.R. was seen in your office five times,
right?

A.   Yes.

Q.   And Ms. Pedersen showed you the handwritten note that we
looked at, you record --

A.   From November?

Q.   Yes.  But B.R. was actually seen by your office a month
before that, in October, right?

A.   She was, as I recall.

Q.   Okay.  And then she was seen again on December 6th, which
is a note that we looked at, but she was also seen on
December 13th, correct?

A.   Yes.

Q.   And then she was also seen on January 6th?

A.   Yes.

Q.   And then she was also seen on January 16th, right?

A.   Yes.

Q.   And we looked at that note.  And during the same time

—B.R. v. F.C.S.B.—

110

period, her mom came in twice to meet with you about her

daughter without B.R., right?

A.   Correct.  November and February.

Q.   Okay.  And so between January 16th and the letters that

you were asked about in March of 2012, you had not seen B.R.

until March 6th, right?

A.   After the 17th of January?

Q.   Yes.

A.   Correct.

Q.   And so the letters that we looked at -- we'll look at

them again, but in February, those are all based on what Mom

told you on the February 1 meeting and what you had observed

about B.R. in the prior --

A.   In the prior -- in the prior months.

Q.   Right.

A.   It was a combination of those two.

Q.   Right.

A.   Yes.

Q.   Thank you.

      So when she came in on October 12, 2011, you did a

physical exam on B.R., right?

A.   Sure.  If you want me to answer your question, I'll look

at it.

Q.   If you -- I have a white binder up there for you.

A.   Yes.

─────────────── B.R. v. F.C.S.B. ───────────────

Q.   If you can take a look at Defendants' Exhibit 108.

A.   Thank you.  I'm there.

Q.   Okay.  And can you please identify what this document is?

A.   This is a office visit for what looks like an upper respiratory infection.

Q.   This is dated October 12, 2011?

A.   It is.

Q.   So mid-October?

A.   Correct.

Q.   Okay.

        MS. REWARI:  Your Honor, we move to admit Defendants' Exhibit 108.

        MS. PEDERSEN:  No objection.

        THE COURT:  Without objection.

        MS. REWARI:  And if we may publish?

        THE COURT:  You may.

(Defendants' Exhibit No. 108, was admitted into evidence.)

BY MS. REWARI:

Q.   And so on this date she was seen in your office by you, right?

A.   Yes.

Q.   Okay.  And could you please tell the jury what the reason for the visit was?

A.   "Seven-day history of nasal congestion, cough, sore throat, fever, headache, and sneezing."

─────────────────────────────────────────────

───── B.R. v. F.C.S.B.─────

112

Q.   And so on this date did you do a physical exam?

A.   Yes, I did.

Q.   Did you find any abnormalities in this physical exam?

A.   The only thing that was abnormal is that she had

rhinorrhea, which is clear drainage -- I'm sorry, drainage

from the nose; that the nasal turbinates, which is a tissue

inside the nose, were enlarged but not tender over the

sinuses.  The rest of the examination was fairly normal.

Q.   Okay.  And --

        MS. REWARI:  You can take that down.

BY MS. REWARI:

Q.   So the next visit after this was just by her mother on

November 28, 2011, right?

A.   Yes.

Q.   Okay.  And that's Defendants' Exhibit 87, which I believe

was admitted during your direct.  We looked at it.

        THE COURT:  You may publish, if you want.

        MS. REWARI:  Thank you.

BY MS. REWARI:

Q.   And this is the handwritten record that you talked about.

        During this meeting, you spoke to her mother for 30

to 35 minutes, right?

A.   Yes.

Q.   And it was greater than 50 percent of the office visit?

A.   Yes.

B.R. v. F.C.S.B.

113

Q.   And so when you put under "Objective, patient not present," that indicated you had not had a chance to observe B.R. yourself, right?

A.   That day, correct.

Q.   Right.  And so everything here under "Subjective" is her mother's report?

A.   That's right.

Q.   And November 28, 2011, was the week after Thanksgiving that year?

A.   I'm sorry, the what?

Q.   That's the week after Thanksgiving that year?

A.   If you say so.  I don't know when Thanksgiving hit that year.

Q.   Okay.  And you wrote down bullying as one of your assessments in that record, if we go down below the "Subjective"?  You wrote down "bullying," right?

     And you didn't write down "sexual harassment"?

A.   I did not.

Q.   In the later record you do talk about sexual harassment, but at this point you just wrote down "bullying," right?

A.   Correct.

Q.   Okay.  Because no sexual harassment was reported to you during this visit?

A.   Correct.

Q.   Okay.  And you didn't write down any physical assaults of

─ B.R. v. F.C.S.B. ─

B.R.?

A.    I did not.

Q.    Because no physical assaults were reported to you, right?

A.    That's right.

Q.    You didn't write down any sexual assaults of B.R. in this record, right?

A.    Yes, that's correct.

Q.    And no sexual assaults were reported to you?

A.    Not at this time.

Q.    Okay.  An adjustment reaction could be an adjustment to a life change, right?

A.    To any kind of significant life stressor.

Q.    For an adolescent, could it be an adjustment to a bad breakup?

A.    Sure.

Q.    And then you referred her -- you recommended to the mother that B.R. go for counseling, right?

A.    I did.

Q.    And you told her mom to bring her back in a week?

A.    Yes.

Q.    Okay.  All right.  And then she did come back about a week later on December 6th with her daughter, right?

A.    Yes.

Q.    Okay.  And so if you could please take a look at Exhibit 109.  In your book.

─────── B.R. v. F.C.S.B. ───────

115

A.   Yes.

Q.   And this is -- I think this is just another printout of

the same records you looked at with Ms. Pedersen?

A.   It appears so.

     MS. REWARI:  Your Honor, we move to admit

Defendants' Exhibit 109.

     MS. PEDERSEN:  No objection.

     THE COURT:  Without objection.

     MS. REWARI:  May we publish?

     THE COURT:  You may.

     MS. REWARI:  Thank you.

(Defendants' Exhibit No. 109, was admitted into evidence.)

BY MS. REWARI:

Q.   All right.  And during this visit on December 6, 2011 --

I'm looking at under "plan" on -- I think it's the last page,

page 9329.  The last digits.

     MS. REWARI:  If you could -- Grady, if you could

zoom in under "plan."

BY MS. REWARI:

Q.   You spent 45 minutes with B.R. and her mother during this

visit, right?

A.   Yes.

Q.   And Mom was in the room the whole time?

A.   Yes.

Q.   Was she in the room for all of your visits with B.R.

B.R. v. F.C.S.B.

116

during this time period?

A.   I would say probably for most of them, yes.

Q.   Okay.  And once B.R. turned 13, did that change?

A.   Yes.

Q.   Okay.  And so, what was reported to you at this

December 6th visit was -- included that she was having -- she,

B.R., was having episodes of extreme anger?

A.   Yes.

Q.   And then you were told that she's been bullied by

multiple students at her school at the direction of one boy?

A.   That's what was reported.

Q.   Okay.  And was "bullied" your word or their words?

A.   I think it was theirs.

Q.   Okay.  And then they told you that the school was trying

to make arrangements to evaluate and protect B.R.?

A.   Correct.

Q.   And, again, that's their report?

A.   Their report.

Q.   And their report to you was that the school had spoken to

the one boy involved, right?

A.   Yes.

Q.   Okay.  And that they were trying to survey the others?

A.   Correct.

Q.   And you noted in this record that she is not sexually

active.  Do you see that?

─────B.R. v. F.C.S.B.─────

A.   Yes.

Q.   Your question was broad enough to cover both

nonconsensual and sexual activity, right?

A.   It certainly was phrased that way.

Q.   Okay.  And did you have any concern about B.R.'s ability

to understand what your questions about sexual activity meant?

A.   I thought she was bright enough to understand what I was

saying.

Q.   Okay.  Did you have any questions about her verbal

abilities?

A.   No.

Q.   Okay.  And during this visit, neither B.R. nor her mother

reported to you that she was being physically assaulted at

school, correct?

A.   That's right.

Q.   And during this visit, neither B.R. nor her mother

reported to you that she had been sexually assaulted, correct?

A.   Correct.

Q.   And, again, during this visit, neither B.R. nor her

mother reported that she was being sexually harassed at

school, correct?

A.   Correct.

Q.   And, again, in this visit you recommended that she -- and

I should clarify the pronoun here.  You recommended that B.R.

get in touch with a psychologist for counseling, right?

A.   Yes, I did.

Q.   And this was the same recommendation you'd made a week earlier?

A.   Yes.

Q.   All right.  And then you saw B.R. again about a week later on December 13, 2011, correct?

A.   Where would that be?

Q.   Oh, I'm sorry.  Actually, can we go back to Defendants' Exhibit 87?  This is the handwritten note.

A.   Sure.

Q.   And could you just explain what adolescent behavior is referring to?

A.   When I think about adolescent behavior, I think of moodiness, defiance, and showing some degree of disrespect for adults, especially authority figures.

Q.   And in this note, her mom reported to you that she was unhappy with some of her daughter's friends?

A.   Mother was unhappy with her -- with B███ friends.

Q.   And her mother reported to you that she thought her daughter was hanging out with the wrong crowd?

A.   That's correct.

Q.   Okay.  And her mother reported to you that things about her daughter were being placed on Facebook?

A.   Yes.

Q.   Did she show you any Facebook posts?

B.R. v. F.C.S.B.

119

A.   No, I don't think she had a computer with her.

Q.   Okay.  And then where -- under "Subjective," you've

written, "She is having adolescent independence, resistant

behavior."

       Were those her words, or was that your

characterization of what Mom was describing to you?

A.   I think that was my -- I put those terms in based on what

Mother was telling me.

Q.   Do you recall -- and I know we're talking years later

now -- if she gave you any examples?

A.   Not that I can recall right now.

Q.   Okay.  Fair enough.  Just -- just checking.

A.   Yeah.

Q.   All right.  So now let's talk about that visit on

December 13, 2011.  Okay?

A.   Okay.

Q.   If you could go to Tab 110 in your book?

A.   Okay.  Uh-huh.

Q.   And is this a record of your care and treatment of B.R.

on December 13, 2011?

A.   It is.

       MS. REWARI:  Okay.  Your Honor, we move to admit

Defendants' Exhibit 110.

       MS. PEDERSEN:  No objection.

       THE COURT:  Without objection.

B.R. v. F.C.S.B.

120

(Defendants' Exhibit No. 110 was admitted into evidence.)

BY MS. REWARI:

Q.   All right.  And if we go to under "reason for visit."

         MS. REWARI:  Grady, if you could zoom on that?

BY MS. REWARI:

Q.   What was the reason for her visit on December 13th?

A.   It was for general -- routine physical exam.

Q.   Okay.  And so this is like the physical exams that we looked at in the other exhibits for 2009 and 2010, right?

A.   That's correct.

Q.   And you did all the same things that you did in all of those exams in the prior years?

A.   Sure.  Update the information, but yes.

Q.   Right.  Would you have paid particular attention to her emotional state given what you had learned the previous week?

A.   I think I covered it pretty well the previous week, that I didn't spend that much time on it this --

Q.   Okay.

A.   -- this visit.

Q.   And you had started her on an antidepressant the prior week?

A.   I had.

Q.   Okay.  So in this -- in this visit, you had an opportunity to check her physical appearance too?

A.   Yes.

B.R. v. F.C.S.B.

121

Q.    And check for any medical complaints?

A.    Yes.

Q.    And so I think you had said before that during your physical exam you checked for signs of abuse?

A.    Yes.

Q.    In all the time that you treated B.R., did you ever see physical signs of abuse on her?

A.    Not that I recall.

Q.    Okay.  And as part of your obligations as a doctor, if you suspect a child is being physically abused, regardless of who's doing it, do you have an obligation to report that?

A.    Yes, we do.

Q.    Okay.  And had you ever had occasion to make that kind of report for B.R.?

A.    Yes.

Q.    And you're talking about the letter after March 6th?

A.    Correct.

Q.    Okay.  So but before March 6th, did you ever make that kind of a report?

A.    No.

Q.    Okay.  And during this visit on December 6th, did you find her in any apparent distress?

A.    No, she was not.

Q.    Okay.

A.    She appeared well-groomed, appropriate affect in terms of

——B. R.  v.  F. C. S. B.——

122

emotions.

Q.   And so, did you look at her head during this visit?

A.   Yes, I did.

Q.   And can you just explain what you do when you examine the head?

A.   Examine the head.  We'll look at the general scalp.  Like if a person has been abused or hit or anything, local swelling, bruising, that type of thing.  And then we examine the eyes, the ears, the nose, the throat.  And for any kind of swelling, enlarged lymph nodes in the neck, if a person has had a recent infection or an injury, oftentimes the lymph nodes will swell in reaction to that.  That's just part of the exam too.

Q.   And you found no abnormalities there?

A.   That's correct.  None documented.

Q.   Okay.  And do -- did you look at her arms and legs as well?

A.   I did a -- did a quick skin exam, yes.

Q.   Okay.  And so you didn't find any burn marks or cuts?

A.   I did not.

Q.   Okay.

A.   None -- none documented.

Q.   No knife wounds?

A.   None documented.

Q.   Okay.  And then you did a neurologic exam during this

─B. R. v. F.C.S.B.─

123

visit?

A.   Yes.  Now, that's not extremely detailed.  That's a quick

thing.

        Look -- as a person is talking to you and moving,

you can get an idea about eye movement, different directions,

facial expressions, looks for how the muscles in the face and

the nerves are working.  Looking at how they're talking gives

you a quick idea about how their tongue functions.  All these

are evaluated.  Cranial nerves.  Plus, looking at arms and leg

movement, that type of thing.  Coordination as their moving

their arms and legs gives us so -- it was quick observation

over that as opposed to getting a reflex hammer out and doing

that type of thing.

Q.   Sure.  And then you also pierced her ears during this

visit -- maybe not you personally, but your office did?

A.   Yes.

Q.   Okay.  And that was something she had to request?

A.   Yes.

Q.   And you also, again, asked about sexual activity in this

visit, right?

A.   Yes.  I'm pretty sure that was under the history.

Q.   Okay.  And, again, your questions would have covered both

consensual and nonconsensual sexual activity?

A.   I think it would have been an open-ended question.

Q.   Okay.  And then the next time after December 13, 2011,

─────────────── B.R. v. F.C.S.B. ───────────────

124

that you saw B.R. was -- or was seen in your office was

January 6, 2012?

A.   I think that's correct.

Q.   Okay.

A.   For the pharyngitis; is that right?

          THE COURT:  He's asking for a point of reference.

BY MS. REWARI:

Q.   Let me see if I can direct you to Defendant -- the --

A.   January 6, 2012.

Q.   Yeah.  And that's Defendants' Exhibit -- excuse me.

Defendants' Exhibit 111.

          MS. REWARI:  Your Honor, we move to admit

Defendants' Exhibit 111.

          MS. PEDERSEN:  No objection, Your Honor.

          THE COURT:  Without objection.  You may publish.

          MS. REWARI:  Thank you.

(Defendants' Exhibit No. 111, was admitted into evidence.)

BY MS. REWARI:

Q.   And what was reason for B.R.'s visit on January 6, 2012?

A.   It was a sore throat.

Q.   Okay.  And she was accompanied by her mother?

A.   I don't know.  I did not see her.

Q.   Oh, you did not see her.  Okay.

          According to the -- what was the practice of your

office for creating these kinds of records if you're not the

B.R. v. F.C.S.B.

125

ones seeing the patient?

A.   The same.  Regardless of who's seeing the patient.

Q.   Okay.  And -- and according to your office's records, was she accompanied by her mother during this visit?

        I'm looking under "HPI."

A.   I don't see it specifically documented.

        THE COURT:  You can approach the doctor.

BY MS. REWARI:

Q.   You can -- you may look at the screen.  It might be easier to look at it on the screen.

A.   Oh, accompanied by the mother.  I'm sorry.  I'm going through the rest of the note.  I missed it right at the beginning.  Sorry.

Q.   No problem.  No problem.

A.   Yes, accompanied by mother.

Q.   Okay.  And this was a viral illness, right?

A.   Yes, it was.  Throat infection.

Q.   And the report for this viral illness was that it -- she had had this problem for three days?

A.   Had symptoms for three days.

Q.   Right.  And -- and it was reported to your office that she had spent New Year's in Times Square?

A.   That's what was documented, yes.

Q.   So if she missed school three days around this time period, would that be consistent with this report?

A.    I guess.  I didn't see her, so I don't know much of the
facts.

Q.    Okay.  But she -- you did see her -- you were the one
that saw her on January 16, 2012?

A.    Yes.

Q.    Okay.  If you could take a look at Defendants'
Exhibit 112 --

A.    Sure.

Q.    -- in your book.

A.    Yes.

Q.    And is this just another form of the printout that
Ms. Pedersen showed you about January 16th?

A.    It appears so.

Q.    Okay.

        MS. REWARI:  Your Honor, we move to admit
Defendants' Exhibit 112.

        THE COURT:  Without objection.  You may publish.
(Defendants' Exhibit No. 112, was admitted into evidence.)

BY MS. REWARI:

Q.    And if we could start with the top.

A.    "HPI"?

Q.    Under "HPI," yes, thank you.

        And HPI is the patient's report?

A.    It's sort of like anything -- information that you
obtained just from talking to the patient.

B.R. v. F.C.S.B.

127

THE COURT:  What does the term "HPI" stand for?

THE WITNESS:  History of present illness.

BY MS. REWARI:

Q.   And is that similar to the "S" that we saw in the

handwritten note?

A.   It is.

Q.   So that's the subjective report?

A.   Correct.

Q.   And then if -- when you have "plan" in these records, is

that the -- it's your -- it's your assessment as to what

should happen?

A.   Well, the assessment is the "A."

Q.   Okay.

A.   Or diagnosis, either one.  Assessment, diagnosis are

both -- are the same.  And the "P" does stand for plan, which

is what kind of treatment, what type of test you want to do,

those type of things.

Q.   Okay.  And so when she returned for evaluation on

January 16th, this was a follow-up to the Sertraline that you

started her on on December 6th, right?

A.   That was the purpose.

Q.   And that's your typical practice, to follow up with a

patient who is starting a new antidepressant to see how

they're doing on it, right?

A.   That's right.

─────B.R. v. F.C.S.B.─────

128

Q.   And so is it fair to say that most of this visit was
checking in on her emotional state?

A.   Yes.

Q.   And so in this record or at least on this visit she and
her mother reported to you that she was back to 75 percent
normal?

A.   That's right.

Q.   And that's something you would have asked in terms of how
things are going?

A.   Yes.

Q.   And -- so -- and she reported to you, or maybe her
mother, both, reported to you that she's not getting angry,
down, and upset like she used to; is that right?

A.   That's correct.  That's what Mother and she reported.

Q.   But the next line where you wrote, "Feels she is about 75
to 80 percent of her normal self," was that a self-report by
B.R.?

A.   Yes.

Q.   And so her portion was a little bit higher than the one
before, 75 to 80?

A.   Slightly.

Q.   Okay.  And then, "Had one outburst with her mother one
week ago."

          And, again, her mother is in the room when you're
having this discussion?

─────B.R. v. F.C.S.B.─────

A.   Yes.

Q.   And so this is consistent with between the two of them,
that there had been one outburst about a week ago?

A.   Yeah, it was -- didn't appear to be any kind of
disagreement in regards to that statement.

Q.   Okay.  And then the next line, "School is going well, no
one is really bothering her at school," again, that was a
report made by B.R. and her mother?

A.   I think primarily B.R.

Q.   Okay.  And then, the last line, "She's currently involved
with high school theatre which opens this week, enjoying
herself."  Right?  That was --

A.   Yeah.  Report from her.

Q.   Okay.  And from what you saw in terms of how she was
presenting to you versus what she was reporting to you, those
two things were consistent, right?

A.   They were.  Which is under the physical exam in regards
to -- would you like to go there now?

Q.   Yeah, sure.

A.   I mean, under "Physical Exam" it talks about that she's
appearing -- "Well appearing, well -- white female adolescent.
Mood is happy, positive.  Affect is appropriate.  Insight and
judgment are good.  No suicidal or psychotic ideations."

     So yes, everything was looking like it had improved.

Q.   Okay.  And so, you, from your observation, found that she

──────B.R. v. F.C.S.B.──────

130

seemed happy, positive, upbeat, right?

A.    Yes.

Q.    Okay.  And the plan that formulated -- that you

formulated on January 16th was that she would continue therapy

with her psychologist?

A.    Yes.

Q.    All right.  So it was your understanding on January 16th

that she was seeing a psychologist?

A.    I thought she was.

Q.    Okay.  Did you later learn that she wasn't seeing a

psychologist during this time?

A.    Never, never heard anything.

Q.    Okay.  And during this visit you were not told that she

had been sexually assaulted, correct?

A.    No.

Q.    And during this visit you were not told that she was

being sexually harassed, correct?

A.    No.

Q.    Okay.  And then the plan, on this visit, was that she

would return to the office for re-evaluation in five weeks,

right?

A.    Correct.

Q.    So that would have been near the end of February?

A.    Yeah, mid-February.

Q.    Okay.  And that's, again, a normal follow-up for patients

B.R. v. F.C.S.B.

131

with -- for whom you prescribed Sertraline?

A.   Correct.

Q.   So were you surprised, then, when her mother came to see
you on February 1, 2012?

A.   Yes.

Q.   And Ms. Pedersen asked you about that visit.  I'm just
going to have you look at that document in your book,
Defendants' Exhibit 113.  Just read it to yourself.

A.   Okay.

Q.   And, again, this is -- this is a visit just by Mom, not
with her -- with B.R., right?

A.   That's correct.

Q.   And you spent 40 minutes talking to her mother that day,
right?

A.   Yes, that's what's documented.

Q.   Okay.  And she told you that her daughter insisted on
returning to school that day, right?

A.   The day that I -- that the letter came in, yes.

Q.   Right.  So she didn't want to come to see you; she wanted
to go to school?

A.   Yes.  That's what's documented.

Q.   Okay.  And you said that -- well, what did the mom share
with you had happened between her and her daughter?  That day.
Why was she there to see you?

A.   Because the daughter and the mother had a very emotional

─ B.R. v. F.C.S.B. ─

132

interaction between the two of them the night prior.

Q.   It was a physical interaction, right?

A.   Yes.  Verbal and physical.

Q.   Okay.  Over a cell phone?

A.   Yes.

Q.   And in this interaction, the mother sustained some

injuries, right?

A.   Yes.

Q.   By her report?

A.   Yes.

Q.   And was this interaction that was -- as it was reported

to you, very inconsistent with what you had seen from her

daughter just -- on January 16th?

A.   Yes.  As I said, that visit on the 16th, I was quite

happy with how she looked.  She looked like she was responding

very nicely.  The only thing that sort of, in the back of my

mind kept -- as we continue on with this, is that she would

seem to do real well, and then all of a sudden something

happened.

Q.   And -- sorry.  Just give me one moment, please.

A.   Sure.

Q.   And so did you explore with her mother what may be going

on that would have caused this kind of verbal and physical

altercation?

A.   I think, you know, usually when I -- in this type of

─────B.R. v. F.C.S.B.─────

situation, I tend to ask open-ended questions as opposed to

saying, Is there somebody in the house?  Is there -- is she

getting abused?  Is she doing this?  I just try to ask an

open-ended question like, What's going on?  Is there something

with the family?  Is there something at school?

       I just ask an open-ended question and then wait for

them to tell me whatever information that they have.

Q.  And in the plan that you developed that day, you --

the -- the plan that you wrote in your records for that day

included "A psychiatry consultation as soon as possible

urged."

       Right?

A.  Yes.

Q.  And this is consistent with what you had recommended in

November?

A.  I'm not sure if I asked for psychiatry.  I think I asked

for just therapist for counseling.  Psychiatry is little

different.

Q.  Thank you.  Yes.

       It was a little more urgent now, right?

A.  Yes.  And I'm also -- by asking for a psychiatrist, I'm

asking for somebody to do a deeper evaluation and also review

medicine, too, which is what psychiatrists do that

psychologists and other therapists do not do.

Q.  And your second recommendation that day, or plan, was

———B. R.  v.  F. C. S. B.———

134

therapy with a psychologist in addition to the psychiatrist,
right?

A.    Correct.  Most psychiatrists do not do therapy.

Q.    Okay.  And then the other part of the plan was safety
issues that you addressed with her mom, right?

A.    Correct.

Q.    And there was no plan discussed, at least as documented
in your record, with respect to school, right?

A.    Nothing on this visit.

Q.    Okay.  And so the issue that Mom reported to you on
February 1, 2012, was not -- she was not attributing it to
school, right?

A.    She was not.

Q.    Okay.

A.    She just was relaying what happened the night prior.

Q.    Okay.

A.    Which bothered her.

Q.    Sure.  And she said to you in this visit that her
daughter's grades had fallen from A's to C's in the last three
weeks, right?

A.    Yes.

Q.    Now, three weeks before February 1 would have been prior
to the January 16th visit, right?

        And I'm asking you to do a little math here.

A.    I'm sorry.  Three weeks, yeah, would have been prior to

—B. R. v. F. C. S. B.—

135

the January 16, yes.

Q.   Right.  So when you saw her on January 16th, there wasn't
a concern about her grades at that visit, right?

A.   Not that we're -- not that was communicated.

Q.   Okay.  And they ever showed you her report cards from
school, right?

A.   No.

Q.   You said that you discussed with Mom, anger issues?

A.   I'm sorry -- we're -- are we into the history or --

Q.   No.  Sorry.  I think with Ms. Pedersen when she asked you
about this visit, you --

A.   Oh, you're just trying to ask -- yes, yes.  It was about
emotional outbursts and anger.

Q.   Did you see -- from what mom was reporting to you, you
were seeing that there was some concern about anger issues and
emotional outbursts, right?

A.   Yes.

Q.   And the episode the night before, at least the way it was
described to you, involved some aggression too, right?

A.   Yes.  There was some physicalness in addition to the
verbal, emotional part.

Q.   Okay.  You were then asked about Plaintiff's Exhibit --
if you'll give me a moment.  I think this is also in --
actually, one second.

          (A pause in the proceedings.)

THE COURT:  Are you -- are you switching to another topic?

MS. REWARI:  Yes.

THE COURT:  Okay.  Let's go ahead and take our break, then.

Ladies and gentlemen, it's 1:20 now.  Let's shoot for two o'clock.  Two o'clock.

(Jury excused.)

THE COURT:  You may be seated.

Ms. Rewari, how long -- how much longer do you anticipate on your examination?

MS. REWARI:  I believe I have about 30 minutes.

THE COURT:  Okay.  Mr. Kinney, how long do you think you'll need, sir?

MR. KINNEY:  Your Honor, I don't anticipate any questions.

THE COURT:  Very good.

Mr. Blanchard?

MR. BLANCHARD:  If I do, probably one to three questions.

THE COURT:  Okay.  And with the scope of the cross-examination and because it's now turned into a little bit of a direct examination because of the availability of the witness, how long do you anticipate, ma'am?

MS. PEDERSEN:  So far, only maybe three questions,

─B.R. v. F.C.S.B.─

137

but I can't anticipate what she's going to ask.

THE COURT:  Sure.  I understand.

Who do you all anticipate would be your next

witness?  Is B.R. retaking the stand?

Okay.  I believe Ms. Rewari yesterday said she

needed about another hour with her.  And I believe Mr. Brenner

said he'd probably -- would probably need less time on the

redirect examination, as I recall.

MR. BRENNER:  I'm sorry, Judge?

THE COURT:  I believe yesterday you said you would

need less than the one hour at this time on the redirect?

MR. BRENNER:  I thought at that point, it was

probably a little less than an hour.

THE COURT:  Okay.  So what we'll try to do today is

this:  We'll get through the testimony of the doctor.  We'll

get through the testimony of B.R. and see where we are at that

point.  I think we're probably going to be near the end of the

day after her, so let's see where we are.

Do you have another witness available?

MR. BRENNER:  We do.  But I think in the -- when you

were just going through the time, I think we also have another

hour between Mr. Kinney and Mr. Blanchard for cross.  At least

as of yesterday.

MR. BLANCHARD:  Probably shorter than that but --

THE COURT:  Best thing that we can do -- I

─────B.R. v. F.C.S.B.─────

138

appreciate it, Mr. Blanchard.

      The best thing that we can do is have that witness

in reserve just in case we run a little shorter.

      MR. BRENNER:  Yeah, we've planned for that.

      THE COURT:  Okay.  Very good.  Very good.

      All right.

      MR. BRENNER:  At least I try to plan for that.

      THE COURT:  Okay.  We're having a good day.  We'll

see everyone back in at 1:55 for a two o'clock start.

      (Lunch Recess 1:23 p.m.)

      (A.M. Session concluded.)

CERTIFICATE OF REPORTER

       I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Jury Trial in the case of the **B.R. versus F.C.S.B., et al.**, Civil Action No.: 1:19-cv-917, in said court on the 29th day of March, 2024.

       I further certify that the foregoing 157 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

       In witness whereof, I have hereto subscribed my name, this August 26, 2024.

Tonia M. Harris, RPR
Official Court Reporter

139

## 0

**05** [1] - 4:21
**051** [1] - 85:3
**052** [1] - 85:3
**059** [3] - 78:16, 78:17, 79:8
**060** [1] - 79:8

## 1

**1** [6] - 23:12, 23:13, 110:12, 131:4, 134:11, 134:22
**10** [1] - 46:18
**100** [4] - 2:2, 2:6, 2:10, 44:3
**108** [4] - 4:8, 111:1, 111:12, 111:17
**108**..........................
............. [1] - 4:17
**109** [3] - 114:25, 115:6, 115:12
**109**..........................
............. [1] - 4:18
**10:04** [1] - 1:6
**10:23** [1] - 13:4
**11** [3] - 69:18, 73:3, 73:22
**110** [3] - 119:17, 119:23, 120:1
**110**..........................
............. [1] - 4:18
**111** [4] - 4:17, 124:11, 124:13, 124:17
**111**..........................
............. [1] - 4:19
**112** [3] - 126:7, 126:16, 126:18
**113** [1] - 131:8
**115** [1] - 4:18
**11th** [2] - 12:23
**12** [4] - 29:14, 64:2, 110:20, 111:6
**12-year-old** [2] - 28:19, 81:1
**120** [2] - 3:8, 4:18
**124** [1] - 4:19
**12:40** [3] - 107:23, 108:1, 108:18
**13** [7] - 4:21, 71:7, 116:3, 118:6, 119:15, 119:20, 123:25
**139** [2] - 4:22, 139:10
**13th** [2] - 109:19, 120:6
**15** [2] - 58:3, 73:2
**1520** [1] - 1:20
**16** [3] - 84:20, 126:4,

135:1
**161** [3] - 89:5, 89:20, 89:23
**161**..........................
............. [1] - 4:11
**165** [2] - 90:22, 91:1
**165**..........................
. [1] - 4:15
**16th** [12] - 105:9, 106:16, 109:23, 110:4, 126:12, 127:19, 130:4, 130:7, 132:13, 132:14, 134:23, 135:2
**17** [1] - 90:3
**1775** [1] - 3:11
**17th** [1] - 110:7
**18** [1] - 4:4
**1801** [1] - 3:7
**183** [1] - 102:24
**183-A** [2] - 102:25, 103:9
**1986** [1] - 63:23
**1999** [1] - 64:24
**1:15** [1] - 108:1
**1:19-cv-917** [2] - 1:4, 139:8
**1:20** [1] - 136:6
**1:23** [1] - 138:10
**1:55** [1] - 138:9

## 2

**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:3
**2006** [3] - 64:4, 64:23, 66:23
**2009** [2] - 69:18, 120:9
**2010** [2] - 73:2, 120:9
**2011** [21] - 8:4, 8:6, 53:16, 74:20, 76:20, 78:7, 78:25, 79:22, 83:21, 88:24, 101:24, 109:7, 110:20, 111:6, 112:13, 113:8, 115:14, 118:6, 119:15, 119:20, 123:25
**2012** [14] - 84:20, 88:24, 90:3, 93:2, 101:11, 106:16, 109:8, 110:5, 124:2, 124:9, 124:19, 126:4, 131:4, 134:11
**2015** [1] - 19:13
**2019** [1] - 55:19
**20190** [1] - 3:12
**20191** [1] - 3:8

**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2022** [8] - 20:22, 29:21, 46:18, 53:4, 53:16, 54:17, 63:15, 63:24
**2024** [3] - 1:6, 139:9, 139:16
**2029-Century** [1] - 1:19
**213-995-5720** [1] - 1:21
**22** [1] - 46:7
**2200** [4] - 2:14, 2:18, 2:21, 3:3
**22314** [1] - 3:15
**2300** [1] - 1:15
**23rd** [1] - 93:2
**24** [1] - 4:12
**25** [2] - 29:21, 85:11
**26(a)(2)(A** [1] - 14:3
**26(a)(2)(C** [1] - 13:12
**26th** [1] - 86:16
**27th** [1] - 86:17
**28** [4] - 1:6, 76:20, 112:13, 113:8
**2800** [3] - 2:3, 2:7, 2:11
**29** [1] - 139:16
**29th** [1] - 139:8
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**30** [2] - 112:21, 136:12
**305-539-8400** [1] - 2:8
**33131** [3] - 2:3, 2:7, 2:11
**34** [1] - 31:18
**35** [1] - 112:22
**37** [1] - 5:10

## 4

**4** [1] - 64:2
**40** [6] - 88:8, 105:12, 105:14, 105:16, 106:2, 131:13
**400** [1] - 3:11
**401** [1] - 3:14
**412** [3] - 37:23, 38:24, 38:25
**44** [6] - 93:8, 93:10, 98:11, 98:12, 98:21,

101:7
**449** [2] - 24:1, 24:20
**449**..........................
............. [1] - 4:12
**45** [3] - 82:11, 82:14, 115:20
**457** [9] - 67:10, 67:21, 69:5, 69:8, 72:21, 79:8, 85:3, 105:11, 106:2
**457(Bates** [2] - 4:13, 4:14
**457(Pages** [2] - 4:12, 4:13
**49** [1] - 86:3

## 5

**50** [4] - 82:12, 88:9, 108:8, 112:24
**51** [2] - 4:12, 84:22
**52** [1] - 4:5
**52)**..........................
. [1] - 4:12
**57** [1] - 55:6
**59** [1] - 4:13
**5th** [1] - 108:13

## 6

**6** [8] - 23:14, 78:7, 83:21, 101:11, 115:14, 124:2, 124:9, 124:19
**60** [4] - 4:5, 78:10, 78:11, 78:14
**60)**..........................
. [1] - 4:13
**610-804-1787** [1] - 2:4
**63** [1] - 4:7
**643a** [1] - 1:16
**69** [1] - 4:13
**6th** [12] - 37:16, 78:25, 79:22, 98:7, 109:17, 109:21, 110:6, 114:22, 116:6, 121:16, 121:18, 121:21, 127:20

## 7

**72** [1] - 4:14
**73** [2] - 72:15, 72:21
**73)**..........................
... [1] - 4:14
**75** [6] - 4:14, 85:12, 85:13, 128:5, 128:15, 128:20
**79** [1] - 4:13
**7th** [1] - 103:14

## 8

**8** [2] - 7:19, 8:2
**80** [8] - 67:12, 67:13, 69:1, 69:6, 69:8, 85:14, 128:16, 128:20
**80)**..........................
... [1] - 4:13
**804-788-8200** [1] - 3:4
**85** [1] - 4:12
**850-585-3414** [1] - 2:12
**87** [6] - 74:22, 74:23, 75:11, 75:14, 112:15, 118:9
**87**..........................
[1] - 4:14
**89** [1] - 4:11
**8th** [1] - 31:21

## 9

**9** [3] - 1:8, 109:7, 109:8
**90067** [1] - 1:20
**91** [1] - 4:15
**9329** [1] - 115:16

## A

**A's** [3] - 72:4, 87:9, 134:19
**A.F** [1] - 3:6
**a.m** [2] - 1:6, 13:4
**A.M** [2] - 1:8, 138:11
**abdominal** [1] - 70:17
**abilities** [1] - 117:10
**ability** [7] - 17:16, 40:8, 41:5, 51:3, 92:10, 117:5, 139:14
**able** [26] - 10:23, 10:25, 14:15, 17:6, 23:3, 25:8, 25:12, 25:16, 29:10, 30:8, 34:23, 35:11, 37:19, 39:2, 39:3, 39:12, 40:18, 41:13, 43:10, 48:11, 49:14, 49:24, 50:1, 51:19, 58:16, 58:17
**abnormal** [2] - 70:24, 112:4
**abnormalities** [2] - 112:3, 122:14
**abrenner@bsfllp. com** [1] - 2:8
**absolutely** [3] - 20:5, 25:4, 27:14
**abundantly** [3] - 5:13,

5:22, 6:6
**abuse** [8] - 19:3,
30:15, 30:17, 74:1,
74:13, 121:4, 121:7
**abused** [5] - 32:16,
54:3, 121:10, 122:7,
133:3
**abuser** [1] - 59:22
**abusers** [2] - 30:16,
32:17
**academically** [1] -
87:9
**accommodate** [1] -
17:12
**accompanied** [4] -
124:21, 125:4,
125:11, 125:15
**accordance** [1] -
94:11
**according** [2] -
124:24, 125:3
**accordingly** [1] - 14:8
**acquaintances** [1] -
34:22
**acting** [2] - 83:4, 83:6
**Action** [2] - 1:4, 139:8
**action** [3] - 35:20,
35:24, 99:16
**active** [4] - 22:14,
79:18, 81:23, 116:25
**activities** [2] - 81:10,
81:20
**activity** [5] - 92:15,
117:3, 117:6,
123:19, 123:23
**actual** [1] - 9:18
**acute** [3] - 79:20,
87:22, 87:25
**adaptive** [1] - 26:1
**added** [1] - 8:22
**addition** [2] - 134:1,
135:20
**additional** [1] - 52:2
**address** [1] - 68:18
**addressed** [3] - 42:19,
99:21, 134:5
**adduced** [1] - 139:6
**adequate** [1] - 72:6
**adhere** [1] - 10:15
**adhering** [2] - 95:25,
96:4
**adjusted** [2] - 72:6,
73:18
**Adjustment** [1] - 84:5
**adjustment** [9] -
77:18, 77:19, 77:20,
84:9, 84:16, 87:24,
114:10, 114:13
**administration** [2] -
92:24, 104:17

**admissibility** [2] -
68:16, 97:13
**admission** [1] - 68:16
**admit** [9] - 67:20,
89:19, 103:8, 106:1,
111:11, 115:5,
119:22, 124:12,
126:15
**admits** [2] - 76:15,
81:8
**admitted** [16] - 24:20,
69:8, 72:21, 75:15,
79:7, 79:8, 85:3,
89:23, 90:25, 91:2,
111:17, 112:16,
115:12, 120:1,
124:17, 126:18
**Admitted** [2] - 4:10,
4:16
**adolescent** [9] -
76:12, 77:15, 79:16,
81:1, 114:13,
118:11, 118:13,
119:3, 129:21
**adults** [1] - 118:15
**advantage** [1] - 32:21
**advise** [4] - 15:1, 16:9,
16:18, 104:18
**affect** [4] - 79:17,
92:9, 121:25, 129:22
**affected** [1] - 37:4
**afraid** [2] - 82:2, 82:5
**afternoon** [2] - 109:3,
109:4
**age** [4] - 71:4, 71:5,
73:22, 74:3
**aggression** [1] -
135:19
**ago** [4] - 53:10, 60:21,
128:23, 129:3
**agree** [2] - 37:10,
41:22
**agreed** [3] - 17:13,
44:1, 44:8
**agreeing** [2] - 43:20,
43:25
**agreement** [1] - 24:11
**ahead** [7] - 16:21,
20:17, 33:13, 52:18,
59:7, 76:9, 136:4
**al** [2] - 1:6, 139:7
**alanderson@bsfllp.**
**com** [1] - 1:21
**alcohol** [2] - 71:10,
81:23
**Alexandria** [1] - 3:15
**align** [1] - 79:23
**Alison** [1] - 7:18
**alleged** [4] - 7:21,
53:9, 53:10, 59:22

**alleges** [1] - 40:7
**allow** [2] - 21:6, 41:12
**allowed** [4] - 10:6,
14:25, 30:22, 101:2
**allowing** [2] - 90:8,
100:5
**almost** [1] - 28:24
**alone** [1] - 71:2
**alongside** [1] - 19:14
**ALSTON** [1] - 1:11
**altercation** [2] - 99:23,
132:24
**amount** [2] - 66:11,
92:15
**amounts** [1] - 72:6
**amplified** [1] - 81:5
**analysis** [1] - 10:25
**Anderson** [1] - 1:18
**Andrew** [2] - 2:5,
39:20
**ANDREWS** [4] - 2:14,
2:17, 2:21, 3:2
**Angeles** [1] - 1:20
**anger** [11] - 81:9,
81:14, 82:19, 87:23,
88:1, 88:13, 97:4,
116:7, 135:8,
135:13, 135:15
**angry** [6] - 76:17,
81:3, 82:3, 85:12,
86:2, 128:12
**answer** [15] - 11:14,
18:5, 24:24, 31:11,
50:4, 57:15, 62:19,
64:21, 92:3, 92:7,
92:8, 92:13, 92:20,
100:6, 110:22
**answers** [1] - 96:9
**anteriorly** [1] - 102:9
**anticipate** [7] - 108:6,
108:7, 136:11,
136:15, 136:24,
137:1, 137:3
**anticipated** [2] - 17:4,
72:16
**antidepressant** [5] -
83:14, 83:15, 84:18,
120:20, 127:23
**antidepressants** [1] -
83:24
**anxiety** [17] - 25:6,
26:15, 26:19, 26:20,
27:2, 30:1, 32:14,
33:17, 35:13, 35:16,
48:10, 49:15, 49:17,
84:6, 87:24, 92:7,
92:12
**anxious** [1] - 96:14
**anyways** [1] - 35:25
**apologies** [1] - 104:9

**apologize** [1] - 100:18
**apparent** [1] - 121:22
**appear** [1] - 129:4
**appearance** [3] -
102:5, 102:6, 120:24
**APPEARANCES** [3] -
1:13, 1:25, 3:1
**appeared** [1] - 121:25
**appearing** [3] - 79:16,
129:21
**appointments** [1] -
80:4
**appreciate** [5] - 17:21,
28:6, 60:9, 66:5,
138:1
**appreciated** [1] -
32:20
**approach** [8] - 17:23,
24:15, 26:23, 33:5,
35:25, 36:22, 93:14,
125:7
**approaching** [5] -
20:8, 32:5, 33:3,
51:1, 51:2
**appropriate** [8] - 24:6,
24:8, 79:17, 82:21,
100:10, 101:1,
121:25, 129:22
**April** [1] - 108:13
**area** [2] - 41:13, 74:10
**arguing** [1] - 38:9
**argument** [3] - 10:12,
40:1, 43:2
**arguments** [1] - 38:24
**arms** [4] - 70:20,
122:16, 123:9,
123:11
**army** [1] - 33:19
**arrangements** [2] -
81:25, 116:15
**arrested** [1] - 100:3
**arrive** [1] - 27:20
**ashamed** [1] - 76:17
**aspect** [2] - 17:8,
61:23
**aspects** [3] - 30:5,
30:14, 58:16
**assaulted** [4] - 95:23,
117:13, 117:17,
130:14
**assaults** [5] - 38:3,
113:25, 114:3,
114:5, 114:8
**assert** [1] - 30:12
**assess** [1] - 73:25
**assessment** [6] -
77:12, 84:2, 87:21,
127:10, 127:12,
127:14
**Assessment** [1] -

87:18
**assessments** [1] -
113:15
**assist** [2] - 25:19, 89:2
**assistance** [1] - 20:1
**associated** [1] - 54:3
**assuming** [4] - 10:24,
24:15, 96:9, 99:6
**attack** [5] - 25:7,
26:22, 27:5, 27:6,
27:7
**attacks** [1] - 26:16
**attention** [4] - 5:7,
5:23, 17:21, 120:14
**attorney's** [1] - 47:14
**attorneys** [2] - 34:19,
57:13
**attributing** [1] -
134:11
**August** [1] - 63:23
**authenticity** [2] - 7:8,
68:9
**authority** [1] - 118:15
**availability** [1] -
136:23
**available** [1] - 137:19
**Ave** [1] - 2:21
**Avenue** [4] - 2:14,
2:18, 3:3, 3:11
**average** [1] - 66:12
**avoided** [1] - 17:9
**aware** [8] - 54:19,
81:15, 81:17, 81:24,
97:15, 104:20,
104:22, 106:18

## B

**B's** [1] - 72:5
**B.H** [1] - 3:7
**B.R** [57] - 1:3, 9:9,
10:10, 21:6, 28:8,
33:24, 34:2, 40:7,
47:23, 48:23, 49:3,
53:4, 53:15, 53:18,
53:19, 53:23, 55:10,
55:24, 57:17, 58:11,
59:1, 59:6, 59:11,
97:21, 98:1, 99:24,
109:8, 109:14,
110:2, 110:5,
110:13, 110:21,
113:3, 114:1, 114:5,
114:17, 115:20,
115:25, 116:3,
116:7, 116:15,
117:12, 117:16,
117:19, 117:24,
118:5, 119:19,
121:6, 121:14,

124:1, 128:17, 129:8, 129:9, 131:11, 137:4, 137:16, 139:7
**B.R.'s** [3] - 40:2, 117:5, 124:19
**backdoor** [2] - 11:20, 44:20
**background** [3] - 19:5, 21:5, 63:10
**backup** [1] - 139:13
**bad** [3] - 52:8, 114:13
**balanced** [1] - 16:5
**BARAN** [1] - 1:14
**Barry** [1] - 52:21
**Based** [1] - 9:8
**based** [19] - 11:16, 14:1, 14:13, 35:2, 52:7, 83:16, 87:11, 93:3, 93:24, 94:6, 97:10, 97:11, 97:14, 97:20, 98:1, 98:2, 99:5, 110:11, 119:7
**basis** [2] - 56:19, 95:16
**BATES** [41] - 5:6, 6:2, 6:4, 10:15, 10:19, 10:22, 11:1, 11:5, 11:9, 12:21, 12:25, 21:3, 24:4, 24:18, 31:9, 33:7, 35:5, 36:16, 37:2, 40:23, 44:8, 44:16, 44:22, 48:22, 51:22, 52:17, 52:19, 52:24, 54:9, 54:15, 55:18, 56:21, 57:2, 57:5, 57:6, 57:16, 58:15, 59:9, 60:4, 60:7, 61:8
**Bates** [9] - 2:13, 10:12, 53:2, 56:25, 59:4, 60:20, 69:6, 69:8, 72:21
**Bates's** [1] - 58:24
**Bates..................** [1] - 4:5
**became** [4] - 19:18, 20:23, 66:19, 88:3
**becomes** [2] - 22:23, 28:20
**bedtime** [1] - 85:11
**BEFORE** [1] - 1:11
**began** [2] - 8:4, 21:14
**begin** [3] - 13:22, 21:15, 27:15
**beginning** [6] - 9:22, 22:4, 30:2, 30:3, 93:8, 125:13
**behalf** [3] - 4:2, 4:10, 4:16

**behavior** [6] - 76:13, 77:15, 87:12, 118:11, 118:13, 119:4
**behavioral** [1] - 67:2
**behind** [1] - 74:24
**B▮▮▮▮** [5] - 26:20, 29:19, 51:18, 80:13, 83:15
**B▮▮▮▮** [6] - 18:22, 22:20, 23:3, 23:7, 23:20, 118:18
**below** [1] - 113:15
**bench** [2] - 43:6, 68:19
**best** [14] - 12:13, 17:17, 18:5, 50:3, 50:4, 50:11, 56:23, 62:19, 72:5, 76:7, 76:8, 137:25, 138:2, 139:14
**better** [4] - 41:17, 85:11, 85:22, 99:21
**between** [13] - 45:9, 59:21, 65:11, 65:12, 74:2, 74:16, 99:24, 109:7, 110:4, 129:2, 131:23, 132:1, 137:22
**beyond** [3] - 54:5, 57:12, 77:21
**big** [5] - 26:9, 27:16, 45:9, 45:12, 63:25
**bilateral** [1] - 23:2
**binder** [18] - 23:11, 29:14, 31:18, 46:7, 64:6, 67:9, 74:22, 78:10, 84:22, 86:4, 87:17, 89:5, 90:22, 93:7, 101:7, 102:24, 105:11, 110:24
**bit** [17] - 22:1, 23:6, 25:21, 33:2, 33:23, 35:1, 35:8, 46:22, 46:25, 48:6, 49:22, 66:14, 76:21, 88:20, 91:19, 128:19, 136:23
**blame** [1] - 30:16
**Blanchard** [4] - 3:10, 136:18, 137:22, 138:1
**BLANCHARD** [16] - 30:21, 31:7, 31:11, 36:22, 40:11, 40:19, 46:12, 46:15, 47:18, 47:21, 49:25, 60:13, 99:8, 100:12, 136:19, 137:24
**blank** [1] - 91:16

**blood** [1] - 101:20
**blowup** [1] - 99:14
**board** [1] - 65:23
**Board** [3] - 9:15, 53:3, 109:6
**body** [17] - 20:14, 22:16, 23:3, 27:15, 28:3, 28:20, 29:9, 29:11, 30:16, 35:11, 35:15, 35:23, 48:9, 48:15, 49:14, 50:25, 51:16
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**book** [4] - 114:25, 119:17, 126:9, 131:7
**boom** [1] - 10:11
**bootstrapped** [1] - 42:23
**born** [1] - 64:24
**bothered** [1] - 134:17
**bothering** [2] - 85:16, 129:7
**bottom** [7] - 55:7, 67:11, 69:14, 72:25, 78:16, 89:17, 92:20
**boy** [4] - 81:7, 82:1, 116:10, 116:20
**boyfriend** [1] - 41:18
**brain** [3] - 20:12, 20:14, 26:4
**brat** [1] - 33:19
**breadth** [1] - 45:12
**break** [3] - 13:2, 108:1, 136:5
**breakup** [1] - 114:14
**breathe** [2] - 26:25, 27:7
**Brenner** [8] - 2:5, 6:8, 11:10, 38:8, 40:21, 41:10, 69:10, 137:6
**BRENNER** [31] - 5:5, 6:9, 6:24, 7:23, 12:17, 12:20, 37:6, 37:11, 37:13, 38:19, 38:22, 39:17, 39:25, 41:19, 42:1, 42:10, 42:12, 42:17, 42:21, 43:16, 44:2, 44:6, 44:23, 45:6, 45:14, 45:24, 137:9, 137:12, 137:20, 138:4, 138:7
**brief** [4] - 43:1, 43:6, 44:23, 58:19
**briefing** [2] - 11:13, 43:17
**briefly** [1] - 20:3
**bright** [2] - 87:16, 117:7

**bring** [4] - 5:4, 12:16, 108:20, 114:19
**Brittany** [2] - 2:1
**britzoll@gmail.com** [1] - 2:4
**broad** [1] - 117:2
**bronchitis** [1] - 65:18
**brother** [2] - 65:4, 81:21
**Brown** [1] - 15:22
**BROWN** [1] - 69:11
**brown** [6] - 15:25, 16:4, 69:3, 69:14, 79:11, 93:9
**Bruce** [1] - 3:10
**bruce.blanchard@ ofplaw.com** [1] - 3:12
**bruise** [1] - 74:7
**bruising** [3] - 74:6, 102:7, 122:8
**bullied** [4] - 81:6, 92:11, 116:9, 116:12
**bullying** [14] - 76:15, 77:16, 81:2, 82:20, 84:14, 84:15, 86:17, 90:5, 92:25, 96:14, 99:11, 113:14, 113:16, 113:20
**bunch** [1] - 100:23
**burn** [1] - 122:19
**burned** [1] - 74:10
**burns** [3] - 74:8, 74:9
**Burton** [1] - 2:20
**burtons@huntonak. com** [1] - 2:23
**butcher** [1] - 83:9
**butterflies** [1] - 20:10
**BY** [67] - 18:13, 20:18, 21:8, 24:21, 25:1, 28:10, 30:25, 31:15, 33:1, 34:5, 35:7, 46:5, 46:16, 48:2, 49:18, 50:16, 51:9, 51:25, 52:6, 52:24, 54:9, 54:15, 55:18, 56:21, 57:6, 57:16, 59:9, 60:19, 63:2, 64:14, 66:7, 68:25, 69:15, 69:23, 72:23, 75:2, 75:16, 76:18, 78:3, 78:13, 79:12, 80:16, 85:6, 86:6, 86:11, 90:1, 91:5, 101:6, 103:19, 104:3, 104:11, 104:24, 105:15, 106:9, 109:2, 111:18, 112:11, 112:19, 115:13,
**cases** [7] - 7:10, 8:13, 13:6, 19:2, 20:1, 39:11, 45:8
**catch** [1] - 69:10
**causation** [3] - 6:19, 10:20, 10:21
**caused** [2] - 99:3, 132:23
**causes** [1] - 5:21
**causing** [1] - 92:12
**cell** [1] - 132:4
**center** [1] - 20:11
**certain** [15] - 11:6, 14:16, 17:12, 24:3, 26:8, 26:9, 27:9, 43:9, 43:11, 48:3,

115:19, 120:2, 120:5, 124:7, 124:18, 125:8, 126:19, 127:3

**C**

**C's** [2] - 87:10, 134:19
**C.S** [2] - 8:24, 9:1
**C.S.'s** [1] - 8:16
**CA** [1] - 1:20
**cannot** [4] - 33:24, 42:14, 43:12, 45:13
**capacity** [1] - 139:5
**car** [1] - 100:3
**cards** [1] - 135:5
**care** [26] - 5:21, 11:3, 11:7, 14:1, 17:4, 23:17, 29:17, 31:4, 31:23, 33:4, 33:10, 36:7, 36:12, 46:10, 48:10, 49:21, 51:17, 67:15, 74:12, 75:4, 78:22, 83:5, 87:11, 90:5, 103:3, 119:19
**career** [2] - 30:8, 48:19
**Carolina's** [1] - 19:24
**Carson** [2] - 88:24, 93:5
**case** [41] - 5:18, 6:25, 7:11, 7:17, 7:21, 7:25, 8:11, 8:12, 9:25, 12:11, 12:13, 13:3, 13:10, 14:7, 17:7, 17:8, 18:19, 21:12, 34:1, 37:10, 39:11, 41:10, 43:8, 44:1, 45:16, 53:9, 53:20, 54:3, 54:10, 55:10, 56:3, 57:8, 57:18, 58:13, 58:23, 59:12, 61:22, 61:23, 138:3, 139:7

58:16, 58:25, 68:7, 74:8
**certainly** [5] - 71:8, 74:15, 76:10, 86:25, 117:4
**CERTIFICATE** [1] - 139:1
**Certificate** [1] - 4:22
**certified** [2] - 19:19, 65:23
**certify** [2] - 139:4, 139:10
**cetera** [2] - 43:15, 45:11
**challenges** [1] - 34:18
**challenging** [1] - 23:4
**chance** [1] - 113:2
**change** [4] - 87:12, 92:23, 114:11, 116:3
**characterization** [1] - 119:6
**characterize** [1] - 66:11
**chats** [4] - 58:12, 59:11, 59:19, 59:21
**check** [3] - 35:21, 120:24, 121:1
**checked** [1] - 121:4
**checking** [3] - 35:21, 119:12, 128:2
**Cheryl** [1] - 91:22
**child** [5] - 19:2, 71:9, 74:3, 95:22, 121:10
**childhood** [1] - 19:3
**childlike** [1] - 28:21
**children** [1] - 65:12
**chronic** [1] - 66:25
**circumstances** [8] - 20:23, 26:11, 38:12, 50:25, 51:4, 51:12, 104:19, 106:17
**cite** [1] - 7:18
**cites** [1] - 7:17
**citing** [2] - 7:10, 10:3
**Civil** [3] - 1:4, 14:4, 139:7
**claim** [2] - 37:3, 42:11
**clarification** [2] - 14:20, 15:12
**clarify** [2] - 45:20, 117:24
**classify** [1] - 66:25
**classroom** [3] - 92:6, 92:10, 92:22
**clear** [14] - 5:13, 5:22, 6:7, 10:2, 11:25, 25:12, 40:11, 40:12, 40:24, 53:15, 55:12, 57:2, 104:8, 112:5
**clearly** [1] - 25:12

**client** [24] - 25:5, 25:6, 25:7, 25:9, 25:12, 25:13, 25:16, 25:18, 27:16, 29:25, 30:1, 30:4, 30:6, 30:7, 30:10, 30:14, 32:2, 32:3, 32:6, 34:20, 34:21, 34:22, 34:23
**clients** [2] - 20:6, 56:8
**clinical** [2] - 18:22, 19:7
**clinicians** [1] - 19:25
**close** [3] - 10:12, 62:21, 62:22
**colleague** [1] - 52:19
**collected** [1] - 45:17
**collection** [1] - 45:16
**combination** [1] - 110:16
**comfortable** [1] - 21:12
**coming** [8] - 12:2, 24:6, 32:14, 41:17, 48:16, 71:5, 85:17, 107:24
**commence** [1] - 108:25
**comment** [2] - 44:8, 45:14
**comments** [1] - 13:16
**communicated** [1] - 135:4
**communicates** [1] - 72:2
**complaining** [1] - 101:21
**complaints** [3] - 70:4, 102:3, 121:1
**complete** [7] - 12:2, 24:5, 26:22, 30:22, 54:23, 101:1
**completely** [2] - 26:22, 28:15
**completeness** [2] - 15:20, 30:22
**completing** [1] - 49:16
**complex** [2] - 19:25, 21:12
**computer** [3] - 75:23, 119:1, 139:12
**computerized** [1] - 75:23
**conceded** [1] - 8:6
**concern** [12] - 26:10, 39:7, 61:14, 95:13, 97:19, 98:15, 99:20, 103:25, 104:1, 117:5, 135:3, 135:15
**concerned** [4] - 21:2, 66:18, 76:24, 77:1

**concerns** [3] - 48:18, 72:1, 76:11
**concluded** [1] - 138:11
**conclusion** [1] - 11:17
**conclusions** [1] - 11:7
**condition** [4] - 5:20, 92:2, 92:5, 92:9
**conditions** [6] - 15:4, 15:5, 15:8, 23:7, 23:9, 47:2
**conduct** [2] - 19:10, 21:17
**conference** [1] - 68:19
**confers** [6] - 36:19, 52:12, 60:6, 86:5, 93:13, 107:13
**confident** [1] - 83:18
**confines** [1] - 31:14
**confrontational** [1] - 88:15
**confused** [2] - 40:1, 99:8
**confusing** [1] - 33:23
**confusion** [1] - 8:10
**congestion** [1] - 111:24
**conjunction** [3] - 56:15, 57:17, 58:11
**consensual** [3] - 38:5, 38:8, 123:23
**considering** [2] - 13:7, 24:9
**consistent** [9] - 12:7, 12:14, 72:11, 73:21, 85:19, 125:25, 129:2, 129:16, 133:14
**consistently** [2] - 22:5, 48:21
**consists** [1] - 14:6
**constitute** [1] - 139:11
**constraints** [1] - 21:22
**consult** [2] - 36:17, 81:2
**consultant** [1] - 19:19
**consultation** [4] - 19:21, 87:23, 88:1, 133:10
**consultations** [1] - 19:25
**Cont** [2] - 1:25, 3:1
**contact** [3] - 21:6, 51:15, 83:3
**contacted** [3] - 20:25, 21:1, 21:13
**contacts** [1] - 73:18
**contains** [1] - 94:14
**contemporaneous** [1] - 59:5

**CONTENTS** [1] - 4:1
**context** [4] - 6:12, 34:1, 38:25, 49:2
**continue** [3] - 81:18, 130:4, 132:17
**continued** [2] - 21:19, 85:22
**contract** [5] - 82:22, 82:24, 82:25, 83:3, 83:7
**control** [1] - 26:23
**conversations** [1] - 33:17
**cooking** [1] - 26:2
**coordination** [1] - 123:10
**cope** [1] - 30:15
**coping** [2] - 48:3, 48:6
**copy** [1] - 54:23
**core** [1] - 11:10
**correct** [46] - 38:15, 41:25, 44:22, 53:17, 55:25, 56:13, 58:13, 64:19, 64:23, 73:4, 78:7, 80:22, 83:11, 91:18, 95:20, 105:9, 109:19, 110:3, 110:9, 111:9, 113:4, 113:21, 113:24, 114:7, 116:16, 116:23, 117:14, 117:17, 117:18, 117:21, 117:22, 118:6, 118:21, 120:10, 121:17, 122:15, 124:3, 127:8, 128:14, 130:14, 130:17, 130:22, 131:2, 131:12, 134:3, 134:6
**cough** [1] - 111:24
**Counsel** [21] - 28:6, 36:19, 52:12, 60:6, 86:5, 93:13, 107:13
**counsel** [9] - 12:1, 15:16, 18:5, 36:17, 41:10, 44:24, 62:19, 82:13, 84:24
**counsel's** [1] - 13:16
**counseled** [1] - 88:10
**counseling** [7] - 82:11, 82:18, 88:8, 88:14, 114:17, 117:25, 133:17
**counsels'** [1] - 24:2
**country** [2] - 19:22, 108:13
**County** [3] - 53:2, 56:16, 109:5
**couple** [9] - 6:25,

20:2, 23:11, 59:2, 60:21, 65:5, 66:23, 80:23, 105:5
**course** [22] - 7:16, 9:1, 9:3, 14:11, 14:24, 23:17, 26:12, 35:19, 36:1, 36:12, 39:2, 44:1, 47:1, 48:17, 49:21, 50:19, 59:2, 67:15, 74:12, 85:24, 89:11, 103:3
**Court** [29] - 3:13, 3:14, 4:22, 5:11, 5:16, 6:2, 6:22, 8:12, 8:21, 8:22, 10:13, 12:11, 13:1, 13:4, 13:5, 13:7, 13:12, 13:15, 13:20, 14:10, 18:6, 43:9, 59:7, 62:20, 68:15, 100:10, 106:8, 139:3, 139:22
**court** [6] - 22:20, 41:8, 46:1, 62:16, 100:17, 139:8
**COURT** [223] - 1:1, 1:12, 5:1, 5:3, 6:1, 6:3, 6:8, 6:23, 7:20, 10:12, 10:17, 10:21, 10:23, 11:2, 11:6, 12:10, 12:18, 12:24, 13:1, 13:5, 14:23, 15:3, 15:6, 15:13, 15:19, 15:25, 16:3, 16:12, 16:15, 16:17, 16:21, 16:25, 17:3, 17:25, 18:3, 18:11, 20:17, 21:5, 24:13, 24:15, 24:19, 24:24, 28:6, 30:24, 31:8, 31:10, 31:13, 32:18, 32:25, 33:12, 33:20, 35:6, 36:18, 36:20, 36:25, 37:7, 37:22, 37:25, 38:11, 38:17, 38:21, 39:7, 39:24, 40:3, 40:16, 41:8, 41:25, 42:8, 42:11, 42:14, 42:19, 43:7, 43:24, 44:4, 44:7, 44:13, 44:21, 45:5, 45:7, 45:23, 45:25, 46:2, 47:23, 48:1, 49:2, 49:6, 49:10, 50:2, 50:7, 50:10, 50:13, 50:15, 50:20, 50:23, 51:8, 51:24, 52:4, 52:16, 52:18, 52:21, 54:7, 54:13, 55:16, 56:25, 57:4, 57:14, 58:24, 59:25, 60:2, 60:5, 60:10,

143

60:12, 60:14, 60:17, 61:6, 61:9, 61:11, 61:14, 61:18, 61:21, 61:25, 62:3, 62:5, 62:9, 62:12, 62:18, 62:24, 65:20, 65:25, 66:5, 67:22, 68:1, 68:4, 68:9, 68:15, 68:23, 69:7, 69:10, 69:12, 72:16, 72:18, 72:20, 74:25, 75:13, 76:5, 76:7, 79:4, 79:7, 85:2, 89:22, 89:25, 90:23, 90:25, 91:3, 93:10, 93:12, 93:15, 93:17, 93:20, 93:22, 94:3, 94:16, 94:23, 95:20, 95:25, 96:4, 96:15, 96:17, 96:22, 97:6, 97:12, 97:17, 97:25, 98:9, 98:12, 98:20, 98:23, 99:2, 99:20, 100:16, 100:18, 101:4, 103:12, 103:17, 104:2, 104:6, 104:13, 104:19, 104:23, 105:14, 106:5, 106:7, 107:12, 107:16, 107:22, 108:4, 108:14, 108:17, 108:20, 108:23, 111:14, 111:16, 112:17, 115:8, 115:10, 119:25, 124:6, 124:15, 125:7, 126:17, 127:1, 136:1, 136:4, 136:9, 136:13, 136:17, 136:21, 137:2, 137:10, 137:14, 137:25, 138:5, 138:8
**Court's** [12] - 4:21, 5:13, 11:12, 12:7, 14:18, 16:19, 17:7, 24:7, 31:14, 44:11, 55:14, 99:24
**courthouse** [1] - 62:14
**Courthouse** [1] - 3:14
**courtroom** [3] - 18:24, 20:7, 63:7
**Courts** [2] - 13:24, 14:4
**cover** [2] - 70:10, 117:2
**covered** [2] - 120:16, 123:22

**cranial** [1] - 123:9
**crawl** [1] - 27:7
**creating** [1] - 124:25
**crime** [3] - 93:25, 94:11, 94:21
**criteria** [1] - 83:20
**CROSS** [2] - 52:23, 109:1
**cross** [11] - 15:8, 30:24, 39:15, 41:12, 52:16, 99:22, 100:1, 100:9, 108:7, 136:22, 137:22
**Cross** [2] - 4:5, 4:8
**CROSS-EXAMINATION** [2] - 52:23, 109:1
**Cross-examination** [2] - 4:5, 4:8
**cross-examination** [5] - 39:15, 41:12, 99:22, 100:9, 136:22
**cross-examinations** [1] - 15:8
**crowd** [2] - 76:14, 118:20
**cure** [1] - 13:20
**current** [6] - 5:9, 19:6, 19:14, 22:24, 36:2, 72:1
**curvature** [1] - 70:24
**cut** [1] - 102:14
**cuts** [1] - 122:19
**cystitis** [1] - 8:5
**cystocele** [1] - 8:8

**D**

**daily** [4] - 25:11, 25:13, 26:14, 56:19
**damages** [2] - 39:19
**danger** [3] - 35:22, 35:23, 35:24
**date** [26] - 10:10, 29:20, 31:20, 46:12, 46:17, 55:16, 69:16, 72:25, 76:19, 78:24, 79:21, 80:5, 86:25, 90:2, 92:24, 93:1, 97:21, 97:23, 98:1, 101:10, 101:21, 106:15, 111:19, 112:1
**dated** [2] - 101:11, 111:6
**daughter** [8] - 110:2, 114:22, 118:20, 118:23, 131:16, 131:23, 131:25, 132:13

**daughter's** [2] - 118:17, 134:19
**daydreaming** [1] - 27:18
**days** [12] - 25:7, 52:8, 52:9, 66:2, 105:5, 106:21, 125:19, 125:20, 125:24
**DC** [5] - 1:16, 2:15, 2:18, 2:22, 3:3
**deadline** [1] - 5:11
**deal** [5] - 35:19, 41:22, 45:23, 45:25, 82:19
**dealing** [3] - 7:25, 100:24
**death** [2] - 65:24, 90:7
**December** [18] - 64:4, 64:23, 78:7, 78:25, 79:22, 83:21, 109:17, 109:19, 114:22, 115:14, 116:6, 118:6, 119:15, 119:20, 120:6, 121:21, 123:25, 127:20
**decide** [2] - 34:1, 39:10
**decided** [1] - 43:9
**decision** [1] - 35:14
**decisions** [1] - 30:5
**decreasing** [1] - 48:11
**deeper** [1] - 133:22
**Defendant** [4] - 2:13, 3:2, 3:10, 124:8
**Defendants** [3] - 1:7, 3:6, 4:16
**defendants** [2] - 13:17, 13:20
**defendants'** [1] - 111:17
**Defendants'** [23] - 4:14, 4:15, 74:22, 75:11, 75:14, 90:22, 91:1, 111:1, 111:12, 112:15, 115:6, 115:12, 118:8, 119:23, 120:1, 124:10, 124:11, 124:13, 124:17, 126:6, 126:16, 126:18, 131:8
**defense** [1] - 9:17
**defiance** [1] - 118:14
**deformities** [1] - 70:20
**degree** [1] - 118:14
**demeanor** [1] - 49:12
**demonstrative** [1] - 6:14
**denies** [1] - 81:22
**depart** [1] - 6:7

**department** [1] - 94:10
**depersonalization** [3] - 25:9, 29:4, 29:9
**depose** [2] - 38:16, 96:15
**deposed** [1] - 96:17
**deposing** [1] - 13:21
**deposition** [3] - 38:6, 40:24, 109:6
**depositions** [2] - 51:14
**depressed** [4] - 80:9, 82:3, 83:1, 96:14
**depression** [11] - 83:18, 83:20, 84:5, 84:7, 84:12, 84:17, 85:10, 87:22, 90:6, 92:7, 92:12
**described** [1] - 135:19
**describes** [1] - 33:16
**describing** [1] - 119:6
**description** [1] - 72:11
**desensitization** [1] - 19:17
**designated** [1] - 7:15
**designation** [1] - 14:3
**desire** [3] - 25:14, 30:6, 34:20
**desires** [2] - 5:23, 51:4
**desiring** [1] - 34:19
**detailed** [1] - 123:2
**details** [1] - 88:21
**determination** [1] - 68:15
**determine** [1] - 13:12
**determined** [1] - 11:22
**developed** [2] - 100:20, 133:8
**device** [1] - 100:19
**diagnosed** [5] - 8:4, 8:6, 9:4, 9:14, 10:11
**diagnoses** [10] - 6:15, 9:10, 9:24, 10:20, 11:21, 12:3, 12:6, 12:8, 45:11, 50:20
**Diagnosis** [2] - 15:17, 15:24
**diagnosis** [28] - 5:21, 5:24, 7:4, 7:5, 8:9, 8:16, 8:20, 9:1, 9:21, 10:8, 11:10, 11:14, 11:16, 11:17, 12:5, 13:25, 14:17, 14:23, 41:24, 42:7, 43:14, 44:10, 44:17, 44:18, 77:14, 84:7, 127:14
**dictate** [1] - 96:19
**die** [1] - 27:10
**diet** [1] - 70:11

**dietary** [1] - 72:6
**difference** [1] - 66:3
**different** [9] - 8:7, 26:20, 29:7, 31:16, 43:21, 75:17, 77:24, 123:5, 133:18
**difficult** [9] - 19:25, 22:17, 22:21, 33:5, 35:4, 47:9, 49:23, 52:9, 76:3
**difficulties** [6] - 32:10, 36:11, 38:13, 39:5, 47:16, 49:20
**difficulty** [15] - 26:24, 30:4, 32:5, 33:2, 34:20, 34:23, 35:2, 38:10, 49:14, 49:15, 50:25, 51:1, 51:2, 51:5
**diffused** [2] - 98:24, 101:18
**diffusely** [1] - 102:8
**digits** [1] - 115:16
**dire** [1] - 100:22
**direct** [7] - 60:2, 64:22, 108:7, 108:11, 112:16, 124:8, 136:23
**DIRECT** [2] - 18:12, 63:1
**Direct** [2] - 4:4, 4:7
**direction** [4] - 12:14, 81:7, 107:22, 116:10
**directions** [2] - 102:12, 123:5
**directly** [2] - 31:5, 33:10
**disagreement** [1] - 129:5
**disclose** [2] - 14:8, 44:25
**disclosed** [10] - 5:15, 5:17, 7:24, 11:19, 11:21, 11:23, 13:11, 42:6, 45:2
**disclosure** [3] - 5:15, 45:3, 45:19
**disconnected** [3] - 28:2, 29:2, 29:9
**discovery** [13] - 7:21, 13:9, 38:7, 40:23, 42:15, 43:8, 43:10, 43:12, 44:13, 44:15, 44:21, 44:24, 45:1
**discuss** [5] - 17:7, 25:5, 61:22, 76:11, 95:10
**discussed** [21] - 24:2, 25:15, 29:25, 30:3, 30:5, 32:2, 32:5,

34:10, 34:16, 34:17,
34:19, 36:1, 57:13,
59:16, 100:2,
103:11, 103:12,
103:13, 103:14,
134:7, 135:8
**discussing** [1] - 58:22
**discussion** [6] - 24:2,
37:24, 38:2, 38:23,
39:1, 128:25
**Discussion** [1] - 62:10
**discussions** [6] -
37:15, 41:11, 57:13,
58:18, 59:5, 71:13
**disorder** [7] - 31:1,
31:3, 31:5, 84:6,
84:9, 84:16, 87:24
**disorders** [1] - 30:14
**display** [1] - 139:13
**dispute** [1] - 11:10
**disrespect** [1] -
118:14
**disrupt** [1] - 13:22
**dissociate** [1] - 28:12
**dissociation** [12] -
21:11, 22:8, 25:6,
27:11, 27:12, 27:14,
27:17, 27:18, 28:1,
28:20, 29:6, 29:8
**distinction** [3] - 8:12,
45:9, 45:12
**distraction** [1] -
100:19
**distress** [2] - 79:20,
121:22
**DISTRICT** [3] - 1:1,
1:1, 1:12
**District** [2] - 3:14,
139:4
**Doctor** [3] - 65:20,
76:5, 108:4
**doctor** [15] - 8:3,
10:24, 63:12, 66:9,
66:11, 96:15, 96:17,
99:9, 100:6, 106:8,
108:15, 108:25,
121:9, 125:7, 137:15
**doctor's** [1] - 76:3
**doctors** [5] - 8:14,
10:8, 10:9, 42:22,
64:2
**document** [16] -
23:16, 29:16, 64:6,
68:2, 68:5, 75:3,
89:10, 91:6, 94:9,
97:25, 98:3, 98:10,
98:13, 98:21, 111:3,
131:7
**documented** [11] -
81:12, 82:7, 86:25,

122:15, 122:22,
122:24, 125:6,
125:23, 131:15,
131:21, 134:7
**documents** [4] - 12:1,
12:6, 23:12, 68:16
**done** [4] - 51:15, 70:8,
101:20, 102:21
**door** [7] - 15:7, 39:12,
39:13, 41:11, 41:12,
94:24, 95:5
**doubt** [2] - 7:18, 47:5
**down** [29] - 28:15,
28:17, 28:23, 74:7,
75:23, 75:24, 75:25,
76:14, 78:2, 79:17,
80:8, 81:3, 81:9,
85:13, 85:24, 91:19,
93:9, 108:4, 108:5,
112:10, 113:14,
113:15, 113:16,
113:17, 113:20,
113:25, 114:5,
128:13
**downstairs** [1] - 62:13
**Dr** [18] - 4:6, 8:2, 8:5,
8:13, 8:22, 8:23, 9:7,
62:7, 62:25, 63:3,
69:16, 72:25, 96:10,
108:9, 109:3
**DR** [1] - 62:17
**drainage** [2] - 112:5
**dream** [1] - 28:2
**drifts** [1] - 59:7
**Drive** [1] - 3:7
**drive** [1] - 27:19
**drug** [1] - 87:9
**drugs** [2] - 81:23, 87:8
**due** [5] - 21:22, 25:15,
30:9, 32:15, 33:17
**duration** [1] - 83:20
**during** [46] - 15:7,
19:24, 20:13, 30:11,
36:1, 36:11, 44:1,
47:1, 47:5, 47:10,
47:20, 48:4, 48:17,
49:21, 50:19, 53:6,
57:21, 61:22, 67:6,
79:24, 86:23, 88:23,
94:1, 99:21, 100:22,
102:1, 102:3,
109:25, 112:16,
112:21, 113:23,
115:14, 115:20,
116:1, 117:12,
117:16, 117:19,
121:3, 121:21,
122:2, 122:25,
123:14, 125:4,
130:11, 130:13,

130:16
**duty** [4] - 95:23, 96:1,
96:2, 96:5

# E

**ears** [3] - 70:16, 122:9,
123:14
**easier** [1] - 125:10
**East** [1] - 1:19
**Eastern** [1] - 139:4
**EASTERN** [1] - 1:1
**easy** [1] - 10:21
**eating** [6] - 30:14,
31:1, 31:3, 31:5,
51:17, 72:6
**ECF-837** [1] - 5:12
**edema** [1] - 79:20
**effect** [1] - 92:24
**effects** [1] - 83:12
**efforts** [1] - 92:23
**eight** [2] - 65:14, 72:4
**either** [3] - 22:23,
45:2, 127:14
**electronic** [2] - 67:17,
105:24
**electronically** [1] -
103:5
**elicit** [1] - 50:11
**eliminating** [1] - 92:25
**Elliker** [1] - 3:2
**email** [2] - 90:16,
107:6
**Email** [11] - 1:17, 1:21,
2:4, 2:8, 2:12, 2:16,
2:19, 2:23, 3:4, 3:9,
3:12
**embarrassed** [1] -
76:17
**embarrassing** [1] -
20:15
**embarrassment** [1] -
20:12
**EMDR** [14] - 19:18,
19:19, 19:21, 20:2,
20:4, 20:5, 20:6,
22:4, 22:10, 22:12,
22:15, 22:18, 23:2,
25:20
**emotion** [2] - 20:11,
29:10
**emotional** [8] - 86:2,
88:3, 120:15, 128:2,
131:25, 135:13,
135:16, 135:21
**emotionally** [2] - 72:5,
90:9
**emotions** [4] - 28:4,
29:9, 70:11, 122:1
**end** [6] - 27:22, 87:3,

103:5, 105:24,
130:23, 137:17
**ended** [4] - 123:24,
133:1, 133:4, 133:6
**ending** [1] - 78:16
**ends** [1] - 93:19
**engage** [1] - 51:3
**engaged** [1] - 39:21
**enhance** [1] - 25:20
**enjoying** [3] - 72:8,
85:18, 129:11
**Enjoying** [1] - 72:8
**enjoyment** [2] - 81:10,
81:20
**enjoys** [1] - 81:21
**enlarged** [2] - 112:7,
122:10
**ensure** [1] - 108:11
**ensuring** [2] - 22:6,
22:8
**entered** [1] - 83:7
**entering** [1] - 6:24
**entertained** [1] -
100:23
**entertaining** [1] -
43:25
**entire** [5] - 16:6,
54:10, 68:2, 68:5,
68:6
**entirely** [1] - 13:13
**entitled** [2] - 43:14,
95:16
**environment** [2] -
26:7, 90:10
**episode** [4] - 84:14,
84:15, 97:4, 135:18
**episodes** [3] - 81:8,
81:13, 116:7
**especially** [2] - 66:16,
74:8, 118:15
**Esq** [11] - 1:14, 1:18,
2:1, 2:5, 2:9, 2:13,
2:17, 2:20, 3:2, 3:6,
3:10
**essentially** [2] - 14:15,
22:15
**et** [4] - 1:6, 43:14,
45:11, 139:7
**evaluate** [2] - 81:25,
116:15
**evaluated** [3] - 15:4,
25:10, 123:9
**evaluating** [2] - 22:4,
22:7
**evaluation** [6] - 70:18,
85:9, 101:15,
127:18, 130:20,
133:22
**event** [2] - 77:22,
84:11

**events** [3] - 53:9,
56:24, 58:23
**evidence** [20] - 9:19,
24:20, 39:9, 40:1,
69:9, 72:22, 74:17,
75:10, 75:15, 79:9,
85:4, 87:8, 89:23,
91:2, 107:15,
111:17, 115:12,
120:1, 124:17,
126:18
**evidentiary** [5] - 9:19,
42:17, 42:18, 42:20,
45:21
**ex** [1] - 9:20
**exacerbation** [2] -
87:22, 87:25
**Exam** [1] - 129:20
**exam** [16] - 70:13,
70:15, 70:17, 73:10,
73:19, 77:6, 79:13,
110:21, 112:1,
112:3, 120:7, 121:4,
122:13, 122:18,
122:25, 129:17
**examination** [20] - 4:4,
4:5, 4:5, 4:7, 4:8,
39:15, 41:12, 70:19,
94:9, 99:22, 100:9,
101:25, 102:4,
102:5, 108:25,
112:8, 136:11,
136:22, 136:23,
137:8
**EXAMINATION** [5] -
18:12, 52:23, 60:18,
63:1, 109:1
**examinations** [1] -
15:8
**examine** [4] - 70:16,
122:4, 122:6, 122:8
**examined** [1] - 8:6
**example** [2] - 9:7, 97:3
**examples** [1] - 119:10
**exams** [3] - 65:16,
120:8, 120:12
**excellent** [1] - 16:4
**except** [1] - 91:16
**exception** [2] - 14:19,
70:5
**excessive** [1] - 77:20
**exclude** [2] - 13:13,
14:5
**excuse** [5] - 61:10,
71:11, 103:24,
107:17, 124:10
**excused** [3] - 62:2,
108:3, 136:8
**exercise** [3] - 70:11,
72:8, 92:17

exercising [1] - 73:19
Exhibit [39] - 24:1,
24:20, 67:21, 69:5,
69:8, 72:21, 74:22,
75:11, 75:14, 79:8,
85:3, 89:5, 89:20,
89:23, 90:22, 91:1,
102:24, 103:9,
105:11, 106:2,
111:1, 111:12,
111:17, 112:15,
114:25, 115:6,
115:12, 118:9,
119:23, 120:1,
124:10, 124:11,
124:13, 124:17,
126:7, 126:16,
126:18, 131:8,
135:22
exhibit [4] - 67:9,
67:23, 93:17, 93:24
EXHIBITS [1] - 4:9
exhibits [2] - 44:3,
120:9
expectations [1] -
50:10
experience [6] - 20:9,
20:16, 25:7, 26:18,
28:5, 30:3
experienced [4] -
26:7, 47:16, 48:12,
48:13
experiences [7] -
21:11, 22:23, 25:24,
26:4, 27:5, 27:25,
31:6
experiencing [9] -
25:9, 26:13, 28:4,
36:12, 36:13, 38:13,
48:14, 49:14, 77:24
expert [21] - 5:15,
6:19, 7:13, 7:15,
7:24, 7:25, 8:15, 9:6,
9:7, 11:15, 11:18,
12:9, 13:18, 13:19,
14:3, 14:6, 14:17,
45:9, 45:10
experts [9] - 8:14,
9:16, 14:9, 43:10,
43:13, 43:19, 45:3
experts' [1] - 9:21
explain [8] - 7:3, 20:5,
25:23, 27:12, 43:5,
118:11, 122:4
explained [1] - 30:11
explains [2] - 8:18,
10:4
explore [2] - 87:23,
132:22
express [1] - 14:12,

47:7, 51:20, 86:22
expressed [7] - 36:15,
49:21, 51:18, 76:14,
82:4, 88:23
expresses [1] - 51:19
expressing [3] -
36:13, 47:6, 51:2
expressions [2] -
80:10, 123:6
extension [1] - 102:12
extensive [1] - 22:20
extensively [1] - 21:11
extent [7] - 11:9, 14:6,
17:8, 21:3, 39:12,
48:22, 66:1
external [1] - 26:5
extra [2] - 57:20, 57:23
extractions [1] - 24:3
extreme [5] - 81:8,
81:14, 96:14, 97:4,
116:7
extremely [3] - 73:17,
88:3, 123:2
eye [2] - 19:17, 123:5
eyes [3] - 29:1, 70:16,
122:9

F

F.C.S.B [4] - 1:6, 2:13,
3:2, 139:7
F.T [1] - 3:7
face [2] - 20:9, 123:6
Facebook [3] - 76:17,
118:23, 118:25
facial [1] - 123:6
facilitate [1] - 19:20
facilitated [2] - 25:18,
25:19
fact [5] - 9:17, 14:5,
57:20, 59:10, 88:2
factors [1] - 13:14
facts [5] - 35:21,
58:23, 95:14, 126:2
Fahey [1] - 1:14
failed [1] - 14:8
failure [2] - 44:24,
44:25
fair [3] - 12:6, 119:12,
128:1
Fairfax [3] - 53:2,
56:15, 109:5
fairly [2] - 83:17, 112:8
faith [1] - 16:2
fall [1] - 74:7
fallen [2] - 87:9,
134:14
falls [1] - 11:15
false [2] - 76:15, 98:16
familiar [1] - 86:10

family [13] - 23:1,
47:3, 47:6, 47:7,
65:2, 65:3, 65:9,
65:11, 65:23, 70:10,
74:1, 74:14, 133:5
Family [4] - 63:20,
63:21, 63:25, 91:9
far [2] - 9:17, 136:25
fast [1] - 72:7
father [2] - 65:6, 74:17
fatigue [1] - 85:9
fax [1] - 90:13, 90:16,
107:3
faxed [3] - 90:14, 91:9,
91:15
faxes [1] - 90:17
fear [3] - 32:16, 34:22,
35:22
fears [1] - 30:8
February [12] - 46:18,
90:3, 93:2, 109:8,
110:3, 110:11,
110:12, 130:23,
130:24, 131:4,
134:11, 134:22
Federal [1] - 14:3
feelings [1] - 35:19
FELDMAN [1] - 3:10
felt [2] - 48:9, 59:18
female [3] - 79:16,
81:1, 129:21
fever [1] - 111:25
few [6] - 22:2, 25:7,
50:18, 66:17, 86:12,
87:6
Fi [2] - 75:24, 75:25
fiance [10] - 36:2,
36:14, 38:9, 38:14,
39:18, 40:9, 41:6,
41:13, 41:15, 41:18
fiance's [1] - 39:20
fifteen [2] - 58:4, 58:5
figured [1] - 42:3
figures [1] - 118:15
file [3] - 12:2, 24:5,
43:6
filed [9] - 5:10, 38:23,
38:24, 45:22, 55:17,
55:19, 55:23, 55:24
fill [2] - 56:8, 91:23
filled [3] - 91:14, 91:17
findings [1] - 73:15
fine [9] - 6:3, 16:15,
24:13, 41:15, 42:11,
68:22, 72:17, 73:9,
97:24
firing [1] - 20:13
first [29] - 5:8, 6:11,
9:5, 12:17, 12:24,
12:25, 20:20, 22:1,

31:25, 32:12, 36:5,
66:15, 66:17, 66:19,
66:23, 69:21, 73:5,
73:9, 77:4, 78:15,
80:23, 82:10, 82:15,
85:7, 86:12, 86:14,
88:7, 91:25, 101:12
Fitzpatrick [1] - 13:16
five [3] - 58:18, 109:8,
130:20
FL [3] - 2:3, 2:7, 2:11
flashbacks [1] - 25:10
flexion [1] - 102:11
FLEXNER [4] - 1:19,
2:2, 2:6, 2:10
flip [8] - 23:22, 67:17,
78:15, 87:17, 89:8,
92:19, 101:12,
105:11
flipping [1] - 105:13
Floor [1] - 3:15
fluctuating [1] - 85:25
fly [1] - 15:22
focused [4] - 31:10,
48:15, 49:16, 103:17
focusing [2] - 28:6,
50:20
follow [13] - 7:10,
90:16, 90:17,
101:20, 105:2,
106:7, 107:3, 107:5,
107:8, 107:22,
127:19, 127:22,
130:25
follow-up [5] - 90:17,
101:20, 105:2,
127:19, 130:25
followed [1] - 86:1
following [4] - 10:6,
20:16, 21:13, 25:18,
41:9, 47:24, 51:14,
90:15
food [1] - 72:7
FOR [1] - 1:1
foregoing [1] - 139:10
form [6] - 55:11, 91:9,
91:16, 91:23, 93:3,
126:11
format [1] - 106:7
formulated [3] -
14:12, 130:3, 130:4
forth [1] - 41:20
forward [4] - 22:6,
35:12, 35:16, 44:4
foundation [4] -
24:17, 47:18, 61:12,
99:23
four [2] - 31:25, 109:7
frankly [1] - 40:9
free [1] - 61:21

friend [2] - 34:21,
35:15
friends [4] - 32:14,
33:6, 72:5, 76:13,
118:17, 118:18
friendship [1] - 35:17
friendships [4] - 33:5,
33:6, 35:2, 35:4
front [7] - 23:11,
54:22, 56:6, 64:6,
102:9, 105:16,
105:17
fruit [1] - 72:8
fruits [1] - 72:6
full [1] - 17:21
Fulton [1] - 3:7
function [2] - 30:8,
39:14
functioning [4] -
25:11, 25:13, 30:5,
30:7
functions [1] - 123:8
future [4] - 5:21, 8:16,
14:1, 90:9

G

gears [4] - 88:20,
97:12, 97:13, 97:15
general [6] - 50:17,
50:18, 66:1, 70:19,
120:7, 122:6
Generally [1] - 7:14
generally [6] - 14:4,
39:9, 50:17, 65:8,
70:4, 71:7
gentlemen [4] - 17:1,
100:18, 108:24,
136:6
girl [2] - 28:19, 71:25
given [9] - 13:15, 34:2,
35:18, 44:11, 55:13,
55:22, 106:4, 120:15
glassed [1] - 28:24
gossip [1] - 76:16
grad [1] - 19:16
grades [3] - 87:9,
134:19, 135:3
graduated [2] - 19:16,
19:18
Grady [3] - 16:4,
115:17, 120:4
grandmother's [1] -
26:2
great [1] - 86:12
greater [3] - 82:11,
88:9, 112:24
grocery [1] - 27:19
groomed [1] - 121:25
ground [2] - 23:2, 29:2

grounded [3] - 22:16, 35:11, 51:16
grounding [3] - 25:17, 25:19, 48:8
group [1] - 32:13
groups [1] - 19:22
Guerette [2] - 8:2, 8:5
guess [2] - 92:1, 126:1
guidance [1] - 77:2
guys [4] - 32:9, 33:3, 36:4, 36:20

## H

half [1] - 21:21
hammer [1] - 123:12
hand [3] - 6:2, 6:22, 52:19
handcuffed [1] - 100:3
handle [1] - 88:13
handwrite [2] - 75:21, 75:22
handwriting [5] - 75:8, 76:8, 91:13, 91:19, 91:20
handwritten [4] - 109:11, 112:20, 118:9, 127:5
handwrote [1] - 75:19
hanging [1] - 118:20
happy [7] - 37:20, 43:6, 72:5, 73:18, 129:22, 130:1, 132:15
harassed [3] - 90:6, 117:20, 130:17
harassment [3] - 113:17, 113:19, 113:22
hard [1] - 48:25
Harris [2] - 139:3, 139:21
HARRIS [1] - 3:13
Hassan [2] - 8:13, 8:23
head [6] - 28:23, 70:16, 106:13, 122:2, 122:5, 122:6
headache [2] - 48:13, 111:25
Healing [2] - 19:11, 19:15
health [6] - 19:23, 19:24, 66:20, 66:24, 67:5, 70:3
healthy [3] - 30:9, 30:12, 35:14
hear [7] - 11:19, 18:4, 18:6, 62:19, 62:20, 101:2

heard [3] - 38:15, 40:21, 130:12
hearing [7] - 13:16, 37:16, 37:24, 38:3, 44:5, 100:21, 100:22
hearsay [2] - 21:3, 51:22, 97:18
heart [3] - 26:24, 27:8, 70:17
heated [1] - 38:2
held [1] - 13:24
help [12] - 18:4, 19:25, 22:16, 34:19, 35:9, 35:16, 35:19, 74:25, 76:24, 82:19, 83:4, 88:13
helped [2] - 36:8, 48:7
hereby [1] - 139:4
hereto [1] - 139:15
Herndon [8] - 63:17, 63:20, 63:21, 63:25, 78:17, 91:9, 98:11, 98:21
herself [5] - 48:11, 51:17, 65:19, 85:18, 129:12
high [3] - 33:16, 49:15, 129:11
higher [1] - 128:19
highlighted [1] - 59:1
hip [11] - 100:15, 101:15, 101:19, 101:22, 101:23, 102:1, 102:5, 102:8, 102:10, 102:11, 102:18
historically [2] - 51:18, 70:9
historically-wise [1] - 70:9
history [10] - 22:20, 25:16, 34:11, 34:16, 71:23, 80:21, 111:24, 123:21, 127:2, 135:9
hit [2] - 113:12, 122:7
HM/00057 [1] - 55:7
hold [1] - 104:2
HOLTZMAN [1] - 1:14
home [6] - 72:2, 74:1, 90:8, 93:4, 97:5, 97:10
homebound [2] - 89:2, 90:17, 91:7, 92:16, 95:9, 96:11, 96:12, 106:24
honestly [1] - 38:25
Honor [74] - 5:5, 5:6, 5:22, 6:4, 6:9, 6:22, 6:24, 7:9, 10:5,

12:22, 16:20, 17:23, 21:4, 24:18, 28:9, 30:21, 31:12, 33:7, 33:9, 36:16, 36:23, 38:4, 40:11, 43:1, 44:18, 45:2, 47:18, 48:22, 48:24, 49:5, 51:22, 52:17, 56:20, 57:2, 58:14, 58:15, 58:19, 58:21, 60:4, 60:11, 60:13, 61:8, 61:24, 64:12, 68:11, 68:20, 68:24, 69:5, 69:11, 72:17, 75:12, 79:6, 84:25, 90:24, 93:11, 93:14, 95:1, 95:7, 96:8, 97:8, 98:15, 99:8, 100:12, 103:10, 106:3, 107:11, 107:21, 111:11, 115:5, 119:22, 124:12, 124:14, 126:15, 136:15
Honor's [4] - 6:20, 10:16, 41:23, 94:12
HONORABLE [1] - 1:11
hope [2] - 51:20, 55:1
hopes [1] - 44:6
hospitalization [2] - 51:10, 52:1
hour [9] - 12:23, 21:21, 21:23, 108:16, 137:6, 137:11, 137:13, 137:22
hours [5] - 58:3, 58:4, 58:5, 58:8, 72:4
house [1] - 133:2
House [4] - 7:17, 8:11, 12:11, 13:2
HPI [12] - 70:5, 71:19, 71:22, 80:20, 85:7, 87:3, 101:16, 125:5, 126:21, 126:22, 126:23, 127:1
huge [1] - 41:2
HUNTON [4] - 2:14, 2:17, 2:21, 3:2
hurt [2] - 34:23, 65:19
hybrid [2] - 13:18, 14:9
hyper [1] - 45:3

## I

idea [2] - 123:5, 123:8
ideation [4] - 22:5, 51:18, 51:19, 83:2

ideations [3] - 79:19, 129:23
identify [1] - 111:3
illness [5] - 71:23, 80:21, 125:16, 125:18, 127:2
imagine [1] - 94:14
immersed [1] - 74:10
immersion [1] - 74:9
impact [1] - 30:3
impacted [5] - 25:11, 30:6, 41:5, 46:24, 47:2
impacting [1] - 25:13
impacts [1] - 34:17
implement [1] - 48:4
important [1] - 13:6
impossible [1] - 8:19
impressed [1] - 65:10
impression [4] - 65:8, 66:14, 93:3, 99:15
impressions [1] - 71:8
improperly [2] - 13:11, 42:6
improved [1] - 129:24
improving [1] - 102:19
incident [4] - 97:4, 99:12, 104:18, 104:21
incidents [1] - 40:7
included [2] - 116:6, 133:10
including [3] - 8:15, 19:22, 70:17
inconsistent [1] - 132:12
increase [2] - 25:6, 30:1
increasing [2] - 25:15, 32:3
independence [2] - 76:12, 119:3
indicated [1] - 113:2
indications [1] - 74:13
individual [1] - 8:23
individuals [3] - 11:21, 19:22, 33:15
infection [3] - 111:5, 122:11, 125:17
infections [2] - 65:17
information [4] - 82:17, 120:13, 126:24, 133:7
Ingram [1] - 13:24
initiate [1] - 35:4
initiating [1] - 35:2
injuries [1] - 132:7
injury [1] - 122:11
inside [1] - 112:7

insight [3] - 20:3, 30:15, 129:22
insisted [1] - 131:16
instead [2] - 16:8, 16:11
instinct [2] - 43:17, 43:22
instinctively [1] - 43:7
instructed [1] - 91:23
instruction [11] - 17:7, 33:22, 89:2, 90:8, 90:18, 91:7, 92:6, 92:10, 92:16, 92:22, 106:24
intact [1] - 79:19
intake [3] - 55:11, 56:7, 72:7
intend [1] - 95:11
intense [3] - 27:6, 34:22, 84:13
intensity [2] - 83:17, 84:17
intensive [2] - 22:9
interact [1] - 88:14
interacted [1] - 74:18
interacting [1] - 33:16
interaction [6] - 97:20, 98:1, 132:1, 132:2, 132:6, 132:11
interactions [4] - 47:5, 70:11, 74:2, 74:16
interest [1] - 30:21
intermittent [1] - 81:8
intermittently [1] - 81:3
internal [3] - 23:1, 26:5, 44:6
interpreted [1] - 7:19
interrupt [3] - 32:18, 64:5, 65:20
interruption [1] - 18:6
interstitial [1] - 8:13
interview [1] - 9:9
intimacy [3] - 39:22, 40:17, 40:20
intimate [5] - 36:8, 38:10, 39:2, 39:13, 39:21
introduce [1] - 63:5
introducing [3] - 18:20, 94:5, 94:8
investigated [1] - 94:22
investigating [1] - 82:15
investigation [3] - 93:25, 95:19, 96:12
invites [1] - 34:21
involve [1] - 40:17

**involved** [8] - 38:13,
44:15, 82:1, 82:16,
85:17, 116:20,
129:10, 135:19
**involvement** [1] -
94:24
**isolated** [1] - 34:24
**issue** [19] - 7:7, 7:8,
9:8, 11:10, 11:13,
12:22, 12:23, 13:7,
24:5, 33:25, 37:2,
37:20, 41:11, 43:1,
43:21, 44:12, 45:19,
67:5, 134:10
**issued** [2] - 5:11, 94:6
**issues** [14] - 24:7,
33:25, 39:20, 39:23,
45:3, 61:12, 67:2,
68:21, 71:13, 87:24,
88:13, 134:5, 135:8,
135:15
**it'd** [1] - 62:20
**itching** [1] - 101:19
**itself** [3] - 11:11,
26:19, 31:4

**J**

**J.F** [1] - 3:7
**J.O** [1] - 3:10
**January** [20] - 20:22,
29:21, 84:20, 86:16,
109:21, 109:23,
110:4, 110:7, 124:2,
124:9, 124:19,
126:4, 126:12,
127:19, 130:4,
130:7, 132:13,
134:23, 135:1, 135:2
**jfahey@**
  **holtzmanvogel.**
  **com** [1] - 1:17
**Joanna** [2] - 74:25
**job** [6] - 16:4, 19:6,
47:10, 47:13, 47:16,
48:4
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**JR** [1] - 1:11
**Judge** [12] - 7:10,
7:11, 7:18, 8:1, 8:10,
10:5, 12:12, 12:14,
13:16, 37:2, 60:7,
137:9
**JUDGE** [1] - 1:12
**judge** [3] - 7:12, 7:14,
24:4
**judgment** [1] - 129:23
**juices** [1] - 72:8
**July** [3] - 55:19, 63:15,

63:24
**jurors** [1] - 100:21
**Jury** [5] - 16:24, 108:3,
108:22, 136:8, 139:6
**JURY** [1] - 1:11
**jury** [45] - 5:4, 12:4,
12:5, 12:16, 15:23,
16:6, 16:22, 18:20,
19:4, 22:1, 24:9,
24:12, 25:2, 25:23,
27:12, 29:24, 33:21,
34:7, 42:13, 63:5,
63:9, 70:2, 71:24,
72:25, 73:14, 76:4,
77:17, 79:15, 80:17,
80:24, 82:10, 84:4,
85:8, 86:14, 87:6,
87:21, 88:7, 90:4,
92:3, 92:14, 95:18,
98:16, 101:14,
108:20, 111:22
**jury's** [1] - 68:19

**K**

**Keefe** [1] - 2:9
**keep** [3] - 22:16,
31:10, 100:20
**kelliker@huntonak.**
  **com** [1] - 3:4
**kept** [1] - 132:17
**Kevin** [3] - 3:2, 4:6,
63:6
**KEVIN** [1] - 62:17
**kids** [1] - 74:6
**kind** [17] - 22:24, 34:7,
36:11, 39:9, 50:8,
70:15, 74:8, 76:5,
87:2, 92:15, 114:12,
121:13, 121:19,
122:9, 127:16,
129:4, 132:23
**kinds** [2] - 38:1,
124:25
**Kinney** [3] - 3:6,
60:10, 136:13
**kinney** [1] - 137:22
**KINNEY** [3] - 3:7,
60:11, 136:15
**knee** [1] - 74:7
**knife** [1] - 122:23
**knit** [1] - 65:10
**knowledge** [2] - 14:2,
14:13
**known** [4] - 45:15,
45:18, 53:20, 66:21
**knows** [1] - 35:14
**KRISTIE** [1] - 18:1
**Kristie** [3] - 4:3, 5:8,
18:22

**KURTH** [4] - 2:14,
2:17, 2:21, 3:2

**L**

**ladies** [4] - 17:1,
100:18, 108:24,
136:6
**language** [1] - 94:10
**last** [15] - 7:2, 8:11,
12:1, 44:8, 46:6,
50:18, 59:10, 87:10,
100:20, 109:6,
115:15, 115:16,
129:10, 134:19
**laterally** [1] - 102:9
**latitude** [3] - 33:12,
59:6, 99:25
**LAW** [1] - 3:6
**lawsuit** [5] - 54:19,
55:16, 55:19, 55:23,
55:24
**lawyer** [1] - 50:7
**lawyers** [1] - 17:13
**lay** [3] - 7:15, 24:17,
45:9
**lead** [2] - 41:10, 52:16
**leaning** [1] - 84:17
**learn** [2] - 19:21,
130:10
**learned** [2] - 88:22,
120:15
**least** [5] - 128:4,
134:7, 135:18,
137:22, 138:7
**leave** [1] - 17:15
**leaving** [1] - 27:15
**left** [2] - 101:15, 102:8
**leg** [1] - 123:9
**legs** [3] - 70:20,
122:16, 123:11
**less** [4] - 84:13, 137:7,
137:11, 137:13
**lest** [1] - 7:18
**letter** [36] - 93:24,
94:6, 96:7, 96:24,
96:25, 98:14, 103:4,
103:6, 103:11,
103:12, 103:13,
103:15, 103:20,
103:22, 104:12,
104:14, 104:16,
104:25, 105:3,
105:5, 105:20,
105:22, 106:3,
106:13, 106:15,
106:17, 106:20,
106:23, 106:25,
107:2, 107:3, 107:6,
107:9, 107:15,

121:16, 131:18
**letters** [2] - 110:4,
110:10
**level** [2] - 27:18, 81:9
**levels** [4] - 33:16,
49:15, 49:17, 81:19
**liability** [1] - 39:20
**licensed** [2] - 18:22,
19:7
**life** [9] - 28:2, 30:7,
30:9, 40:2, 40:14,
49:4, 51:3, 114:11,
114:12
**likely** [2] - 75:25, 94:8
**limbic** [2] - 20:11,
20:14
**limine** [3] - 5:10,
38:24, 42:20
**limit** [1] - 9:6
**limited** [1] - 11:23
**limits** [2] - 34:19, 40:2
**line** [14] - 8:17, 8:21,
9:5, 10:3, 10:4, 37:4,
50:3, 82:22, 83:9,
83:10, 128:15,
129:6, 129:10
**list** [3] - 13:10, 44:3,
108:10
**listed** [4] - 6:14, 10:20,
70:5, 101:15
**listen** [1] - 62:18
**live** [2] - 17:6, 30:6
**liver** [1] - 70:18
**living** [1] - 72:1
**LLP** [8] - 1:19, 2:2,
2:6, 2:10, 2:14, 2:17,
2:21, 3:2
**local** [3] - 20:25,
102:6, 122:7
**location** [1] - 32:5
**Lohr** [2] - 8:13, 8:22
**Look** [1] - 6:15
**look** [63] - 6:15, 6:20,
7:9, 7:11, 7:19, 8:2,
8:11, 10:4, 12:11,
12:12, 12:15, 22:18,
23:12, 24:22, 26:20,
26:22, 27:9, 28:14,
28:18, 29:12, 31:16,
34:6, 37:20, 46:6,
54:7, 55:6, 56:5,
57:8, 59:8, 70:19,
70:21, 71:18, 72:14,
73:6, 73:25, 74:11,
76:2, 78:9, 78:14,
82:9, 84:1, 86:3,
86:12, 87:2, 89:4,
90:21, 91:25, 98:9,
101:16, 102:23,
110:10, 110:22,

111:1, 114:24,
122:2, 122:6,
122:16, 123:4,
125:9, 125:10,
126:6, 131:7
**looked** [11] - 73:12,
97:2, 109:12,
109:18, 109:25,
110:10, 112:16,
115:3, 120:9, 132:15
**looking** [13] - 34:6,
44:4, 80:17, 85:7,
87:18, 94:13, 98:6,
101:7, 115:15,
123:7, 123:9, 125:5,
129:24
**looks** [19] - 26:6, 26:8,
27:7, 27:13, 27:14,
27:23, 28:1, 28:15,
28:19, 28:20, 28:22,
28:23, 28:24, 75:17,
98:24, 101:16,
111:4, 123:6
**loose** [1] - 76:16
**Los** [1] - 1:20
**lost** [1] - 88:4
**loud** [2] - 16:11, 46:20
**love** [2] - 35:23, 51:6
**loved** [1] - 34:18
**loving** [1] - 65:11
**low** [2] - 81:9, 81:19
**lunch** [1] - 108:1
**Lunch** [1] - 138:10
**lunches** [2] - 107:24
**lungs** [1] - 70:17
**lymph** [2] - 122:10,
122:11

**M**

**M.C** [1] - 3:7
**M.P.F** [1] - 3:7
**ma'am** [11] - 16:21,
18:3, 24:24, 28:7,
55:12, 55:19, 57:15,
59:10, 61:21, 61:25,
136:24
**machine** [2] - 139:5,
139:12
**maintained** [6] -
23:17, 29:17, 31:22,
46:9, 67:15, 89:11
**maintaining** [1] -
48:18
**maladaptive** [1] - 26:3
**managing** [1] - 41:3
**March** [16] - 1:6, 5:11,
31:21, 37:16, 98:7,
101:11, 103:14,
105:9, 106:16,

110:5, 110:6,
121:16, 121:18,
139:9, 139:16
**marked** [2] - 67:10,
67:12
**marks** [1] - 122:19
**Maryland** [2] - 61:17,
61:18
**masses** [1] - 70:19
**master** [1] - 19:7
**math** [1] - 134:24
**matter** [1] - 50:17
**matters** [2] - 17:5,
17:21
**matters.....................
...........** [1] - 4:21
**mean** [6] - 14:21,
77:19, 80:6, 87:25,
102:14, 129:20
**means** [8] - 6:16, 8:18,
22:19, 25:23, 30:15,
35:22, 80:7
**meant** [1] - 117:6
**media** [2] - 17:9
**medical** [20] - 5:21,
6:25, 8:16, 9:18,
11:3, 11:7, 14:1,
23:16, 54:23, 63:12,
75:4, 78:21, 91:6,
92:2, 92:5, 92:9,
95:22, 103:2, 121:1
**medicine** [1] - 133:23
**Medicine** [4] - 63:20,
63:22, 63:25, 91:10
**meet** [3] - 33:15, 65:6,
110:1
**meeting** [2] - 110:12,
112:21
**members** [2] - 33:21,
65:3
**memories** [1] - 30:4
**memory** [6] - 64:21,
72:11, 73:22, 79:19,
85:19, 106:20
**mental** [3] - 19:23,
19:24, 67:5
**mentally** [2] - 80:7,
80:9
**mentioned** [6] - 27:11,
53:18, 53:23, 57:20,
58:12, 60:20
**mentions** [2] - 29:4,
31:1
**messages** [1] - 59:16
**met** [4] - 11:3, 21:21,
66:15, 109:6
**Miami** [3] - 2:3, 2:7,
2:11
**mic** [3] - 18:4, 62:21
**Michael** [2] - 3:6, 63:6

**MICHAEL** [2] - 3:6,
62:17
**Michigan** [1] - 19:3
**Michigan's** [1] - 19:23
**mid** [2] - 111:8, 130:24
**mid-February** [1] -
130:24
**mid-October** [1] -
111:8
**middle** [2] - 34:8,
51:13
**might** [7] - 18:7, 62:8,
74:13, 83:1, 83:9,
100:22, 125:9
**mild** [2] - 79:17, 80:6
**milligrams** [1] - 85:11
**mind** [3] - 18:20,
62:12, 132:17
**Minds** [2] - 19:11,
19:15
**minute** [5] - 32:18,
46:19, 86:7, 106:10,
106:12
**minutes** [9] - 58:20,
82:11, 82:14, 88:8,
108:8, 112:22,
115:20, 131:13,
136:12
**MISCELLANY** [1] -
4:20
**missed** [2] - 125:12,
125:24
**mixed** [1] - 7:7
**mk@kinneyesq.com**
[1] - 3:9
**modify** [1] - 11:12
**mom** [9] - 30:9, 77:23,
81:1, 110:1, 114:19,
118:16, 131:22,
134:5, 135:14
**Mom** [6] - 110:11,
115:23, 119:6,
131:10, 134:10,
135:8
**moment** [18] - 16:17,
20:15, 22:16, 27:10,
29:1, 32:20, 36:17,
50:2, 52:3, 55:5,
60:4, 62:4, 64:12,
78:12, 94:5, 107:11,
132:20, 135:23
**moments** [5] - 30:13,
47:9, 49:16, 52:9,
52:10
**month** [4] - 81:6,
84:19, 109:14
**months** [2] - 109:7,
110:14
**mood** [3] - 79:16,
86:16, 129:22

**moodiness** [1] -
118:14
**morning** [11] - 5:1,
5:2, 5:8, 17:1, 17:2,
18:14, 18:15, 52:25,
53:1, 63:3, 63:4
**most** [6] - 22:24,
45:16, 52:9, 116:2,
128:1, 134:3
**Mother** [6] - 88:2,
88:8, 88:14, 119:8,
128:14
**mother** [40] - 65:5,
71:14, 74:16, 74:19,
76:11, 76:13, 85:15,
86:15, 86:17, 88:10,
88:23, 89:1, 97:1,
97:3, 99:10, 99:24,
112:12, 112:21,
114:17, 115:20,
117:12, 117:16,
117:20, 118:18,
118:19, 118:22,
124:21, 125:4,
125:11, 125:15,
128:5, 128:12,
128:22, 128:24,
129:8, 131:3,
131:13, 131:25,
132:6, 132:22
**mother's** [1] - 113:6
**motion** [12] - 5:10,
5:25, 6:5, 6:10,
37:23, 38:23, 38:25,
42:5, 42:19, 102:10,
102:11, 102:13
**motions** [1] - 5:10
**motivation** [1] - 81:9
**motivational** [1] -
81:19
**move** [22] - 20:17,
20:19, 22:6, 23:25,
35:11, 35:16, 42:4,
51:4, 67:20, 75:10,
79:2, 89:19, 99:7,
100:13, 103:8,
106:1, 107:14,
111:11, 115:5,
119:22, 124:12,
126:15
**moved** [1] - 33:18
**movement** [3] - 19:17,
123:5, 123:10
**moving** [4] - 42:7,
80:10, 123:4, 123:10
**MR** [91] - 5:5, 5:6, 6:2,
6:4, 6:9, 6:24, 7:23,
10:15, 10:19, 10:22,
11:1, 11:5, 11:9,
12:17, 12:20, 12:21,

12:25, 21:3, 24:4,
24:18, 30:21, 31:7,
31:9, 31:11, 33:7,
35:5, 36:16, 36:22,
37:2, 37:6, 37:11,
37:13, 38:19, 38:22,
39:17, 39:25, 40:11,
40:19, 40:23, 41:19,
42:1, 42:10, 42:12,
42:17, 42:21, 43:16,
44:2, 44:6, 44:8,
44:16, 44:22, 44:23,
45:6, 45:14, 45:24,
46:12, 46:15, 47:18,
47:21, 48:22, 49:25,
51:22, 52:17, 52:19,
52:24, 54:9, 54:15,
55:18, 56:21, 57:2,
57:5, 57:6, 57:16,
58:15, 59:9, 60:4,
60:7, 60:11, 60:13,
61:8, 69:11, 99:8,
100:12, 136:15,
136:19, 137:9,
137:12, 137:20,
137:24, 138:4, 138:7
**MS** [214] - 14:20,
14:24, 15:5, 15:11,
15:14, 15:21, 16:2,
16:8, 16:13, 16:16,
16:20, 17:23, 18:10,
18:13, 20:18, 21:8,
23:25, 24:11, 24:14,
24:21, 25:1, 28:10,
30:25, 31:15, 32:22,
32:24, 33:1, 33:9,
34:4, 34:5, 35:7,
36:24, 37:12, 37:23,
38:2, 38:15, 41:1,
41:7, 45:20, 46:4,
46:5, 46:14, 46:16,
47:19, 48:2, 48:24,
49:18, 50:9, 50:11,
50:14, 50:16, 51:9,
51:25, 52:6, 52:11,
52:13, 54:5, 56:20,
56:23, 57:12, 58:14,
58:21, 59:24, 60:1,
60:16, 60:19, 61:5,
61:10, 61:12, 61:19,
62:4, 62:7, 62:11,
62:25, 63:2, 64:12,
64:14, 66:7, 67:20,
67:23, 68:3, 68:6,
68:11, 68:20, 68:22,
68:24, 68:25, 69:3,
69:13, 69:15, 69:21,
69:23, 72:17, 72:19,
72:23, 75:2, 75:10,
75:12, 75:16, 76:18,
78:2, 78:3, 78:12,

78:13, 79:2, 79:5,
79:10, 79:12, 80:15,
80:16, 84:24, 85:1,
85:5, 85:6, 86:6,
86:11, 89:19, 89:21,
89:24, 90:1, 90:24,
91:4, 91:5, 93:9,
93:11, 93:14, 93:18,
93:21, 93:23, 94:4,
94:6, 94:8, 94:13,
94:17, 94:18, 95:1,
95:3, 95:7, 95:13,
95:24, 96:2, 96:6,
96:8, 96:16, 96:21,
96:24, 97:7, 97:8,
97:9, 97:16, 97:23,
98:5, 98:6, 98:8,
98:10, 98:13, 98:15,
98:22, 99:1, 100:13,
101:3, 101:5, 101:6,
103:8, 103:10,
103:14, 103:19,
104:3, 104:8,
104:11, 104:24,
105:15, 106:1,
106:3, 106:6, 106:9,
107:11, 107:14,
107:20, 108:9,
108:21, 109:2,
111:11, 111:13,
111:15, 111:18,
112:10, 112:11,
112:18, 112:19,
115:5, 115:7, 115:9,
115:11, 115:13,
115:17, 115:19,
119:22, 119:24,
120:2, 120:4, 120:5,
124:7, 124:12,
124:14, 124:16,
124:18, 125:8,
126:15, 126:19,
127:3, 136:3,
136:12, 136:25
**multiple** [4] - 33:18,
81:6, 96:13, 116:10
**muscles** [2] - 102:8,
123:6
**musculoskeletal** [1] -
70:20
**must** [1] - 13:12

## N

**name** [12] - 8:7, 18:18,
19:9, 23:20, 39:20,
53:2, 63:19, 75:6,
89:13, 91:13, 91:22,
139:16
**nasal** [2] - 111:24,
112:6

**Nathan** [1] - 10:8
**nature** [4] - 40:16, 41:14, 65:21
**navigate** [2] - 35:9, 36:8
**navigating** [1] - 36:13
**near** [3] - 90:8, 130:23, 137:17
**necessarily** [2] - 40:17, 96:19
**necessary** [1] - 100:25
**neck** [2] - 70:16, 122:10
**need** [24] - 5:3, 7:14, 20:1, 24:24, 32:20, 32:21, 33:25, 36:22, 39:10, 46:20, 47:7, 47:8, 50:8, 56:6, 62:8, 83:5, 83:24, 108:10, 108:15, 108:16, 136:14, 137:7, 137:11
**needed** [4] - 70:16, 22:9, 52:2, 102:20, 137:6
**needs** [5] - 8:16, 30:13, 35:13, 87:23, 88:1
**nerves** [2] - 123:7, 123:9
**nervous** [1] - 20:15
**neurologic** [1] - 122:25
**neurons** [1] - 20:13
**never** [8] - 11:21, 42:4, 43:21, 57:13, 62:12, 74:15, 130:12
**new** [10] - 33:5, 33:15, 35:2, 35:4, 35:9, 35:15, 51:1, 94:19, 127:23
**New** [1] - 125:22
**newborns** [1] - 65:24
**next** [32] - 8:21, 10:3, 10:11, 11:19, 17:22, 23:22, 33:20, 51:8, 51:24, 62:3, 67:17, 69:13, 72:24, 77:15, 78:4, 79:10, 82:22, 83:9, 83:10, 85:24, 87:17, 88:5, 89:8, 92:13, 93:24, 94:3, 104:23, 112:12, 123:25, 128:15, 129:6, 137:3
**nicely** [1] - 132:16
**night** [8] - 6:5, 12:1, 72:4, 88:3, 97:5, 132:1, 134:15, 135:18

**nightmares** [1] - 25:10
**nine** [1] - 65:14
**nobody** [2] - 26:23
**nodes** [2] - 122:10, 122:12
**noise** [1] - 100:19
**nonconsensual** [2] - 117:3, 123:23
**none** [6] - 9:15, 10:8, 122:15, 122:22, 122:24
**nonresponsive** [1] - 28:16
**normal** [18] - 30:6, 40:13, 41:5, 51:3, 66:13, 73:19, 77:21, 81:10, 81:20, 85:12, 85:14, 102:5, 102:6, 102:10, 112:8, 128:6, 128:16, 130:25
**normalized** [1] - 30:3
**nose** [4] - 70:16, 112:6, 112:7, 112:9
**note** [22] - 14:18, 15:23, 24:22, 24:23, 29:4, 29:22, 30:23, 31:1, 44:24, 62:13, 85:10, 90:2, 90:4, 90:13, 90:15, 109:11, 109:18, 109:25, 118:9, 118:16, 125:12, 127:5
**noted** [2] - 25:11, 116:24
**notes** [6] - 9:12, 16:14, 57:7, 71:19, 139:12
**nothing** [5] - 24:9, 34:3, 39:10, 66:25, 134:9
**notice** [2] - 95:22, 107:15
**Novak** [5] - 7:11, 7:12, 7:14, 7:19, 8:1, 10:5, 12:12, 12:14
**November** [10] - 69:18, 73:2, 74:19, 76:20, 101:24, 109:13, 110:3, 112:13, 113:8, 133:15
**numb** [1] - 22:23
**Number** [12] - 4:11, 4:12, 4:12, 4:13, 4:13, 4:14, 4:14, 4:15, 4:17, 4:18, 4:18, 4:19
**number** [2] - 74:24,

78:16
**numbers** [1] - 55:7
**nurse** [1] - 64:2
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:3

**O**

**o'clock** [3] - 136:7, 138:9
**object** [5] - 12:2, 45:21, 47:18, 103:10, 106:3
**objection** [60] - 9:20, 15:16, 21:3, 31:7, 33:7, 35:5, 36:16, 42:13, 42:18, 42:21, 48:1, 48:22, 49:25, 51:22, 54:5, 54:8, 56:20, 57:4, 57:12, 58:14, 59:7, 59:24, 62:20, 67:22, 67:25, 68:12, 69:7, 72:16, 72:18, 75:12, 75:13, 79:3, 79:4, 79:5, 84:24, 85:1, 85:2, 89:21, 89:22, 90:23, 90:25, 93:10, 93:12, 93:22, 93:23, 94:23, 103:18, 106:5, 107:16, 107:17, 107:18, 111:13, 111:14, 115:7, 115:8, 119:24, 119:25, 124:14, 124:15, 126:17
**objections** [3] - 42:18, 45:22
**objective** [1] - 77:6
**Objective** [1] - 113:1
**objects** [1] - 99:22
**obligation** [1] - 121:11
**obligations** [1] - 121:9
**observation** [4] - 46:23, 49:20, 123:11, 129:25
**observations** [15] - 5:19, 7:16, 8:24, 9:1, 11:24, 14:11, 33:8, 33:24, 47:1, 47:19, 47:21, 50:12, 50:18, 52:7, 57:3
**observe** [7] - 47:15, 47:23, 49:7, 49:8, 49:12, 74:5, 113:2
**observed** [4] - 9:13, 14:16, 50:24, 110:12
**observes** [1] - 40:18
**observing** [1] - 74:15
**obtained** [1] - 126:25

**obviously** [4] - 7:5, 15:7, 98:23, 99:23
**occasion** [2] - 74:16, 121:13
**October** [5] - 109:7, 109:15, 110:20, 111:6, 111:8
**ODIN** [1] - 3:10
**OF** [5] - 1:1, 1:11, 3:6, 4:1, 139:1
**offer** [2] - 52:3, 68:14
**offered** [2] - 75:14, 91:1
**offering** [1] - 103:15
**office** [14] - 47:14, 63:23, 82:12, 88:9, 109:8, 109:14, 111:4, 111:19, 112:24, 123:15, 124:1, 124:25, 125:21, 130:20
**OFFICE** [1] - 3:6
**office's** [1] - 125:3
**official** [2] - 139:5, 139:11
**Official** [3] - 3:13, 139:3, 139:22
**often** [9] - 23:3, 26:6, 26:8, 26:13, 28:1, 28:20, 47:6, 47:7, 66:8
**oftentimes** [3] - 27:15, 70:21, 122:11
**old** [8] - 64:24, 65:1, 66:2, 69:19, 69:20, 71:25, 72:12, 73:12
**older** [1] - 65:4
**once** [4] - 16:10, 21:23, 108:12, 116:3
**one** [64] - 5:14, 5:17, 6:1, 6:16, 10:11, 10:21, 15:11, 21:23, 29:12, 29:16, 31:22, 36:17, 37:8, 45:20, 46:6, 46:9, 52:11, 55:5, 57:25, 58:8, 58:17, 58:21, 60:4, 62:4, 64:9, 64:12, 67:14, 73:11, 75:3, 75:17, 78:11, 78:12, 78:21, 80:3, 81:7, 82:1, 83:19, 84:15, 85:14, 85:15, 85:16, 85:24, 88:2, 89:4, 89:10, 101:9, 102:23, 103:2, 103:21, 107:11, 113:14, 116:10, 116:20, 126:3, 127:14, 128:19,

128:22, 129:3, 129:7, 132:20, 135:24, 136:19, 137:11
**ones** [3] - 34:18, 68:20, 125:1
**ongoing** [1] - 95:19
**open** [7] - 15:7, 41:10, 74:22, 123:24, 133:1, 133:4, 133:6
**Open** [3] - 46:1, 62:16, 100:17
**open-ended** [4] - 123:24, 133:1, 133:4, 133:6
**opened** [3] - 39:12, 39:13, 63:23
**opening** [1] - 6:13
**opens** [5] - 41:12, 85:17, 94:24, 95:5, 129:11
**opine** [3] - 33:24, 40:6, 45:11
**opining** [1] - 41:17
**opinion** [7] - 8:2, 8:17, 9:6, 14:6, 14:17, 43:13, 43:14
**opinions** [7] - 6:19, 8:15, 14:12, 42:14, 50:21, 50:23
**opportunity** [4] - 13:5, 17:15, 18:7, 120:24
**opposed** [4] - 13:19, 40:10, 123:12, 133:1
**opposing** [1] - 15:16
**opposite** [3] - 35:20, 35:24, 95:2
**order** [23] - 5:11, 5:13, 6:2, 6:6, 6:15, 6:20, 7:3, 7:4, 7:9, 7:18, 8:18, 10:2, 10:4, 10:17, 11:11, 11:13, 12:7, 12:13, 13:7, 17:13, 24:7, 31:14, 108:11
**orders** [1] - 84:1
**organs** [1] - 70:18
**otherwise** [1] - 39:4
**outburst** [3] - 85:14, 128:22, 129:3
**outbursts** [2] - 135:13, 135:16
**outside** [3] - 33:7, 59:25, 108:10
**overall** [2] - 49:20, 70:10
**overbreadth** [1] - 37:9
**overlook** [1] - 28:24
**overreaction** [1] - 84:10

**overruled** [3] - 57:14,
107:16
**own** [6] - 7:5, 27:8,
28:4, 76:8

# P

**P.A.H** [1] - 3:6
**p.m** [1] - 138:10
**pad** [1] - 89:15
**page** [33] - 7:19, 8:2,
8:11, 23:22, 31:18,
54:25, 55:6, 64:19,
67:17, 69:13, 69:21,
72:15, 72:24, 73:5,
78:11, 78:14, 79:10,
80:15, 82:8, 85:7,
86:3, 87:17, 89:8,
92:19, 93:19, 94:3,
94:4, 94:16, 101:12,
115:15, 115:16
**pages** [9] - 67:24,
67:25, 68:2, 68:5,
72:17, 79:6, 79:8,
139:10
**Pages** [1] - 85:3
**paid** [1] - 120:14
**pain** [9] - 100:15,
101:15, 101:19,
101:22, 101:23,
102:10, 102:13,
102:16, 102:18
**palpation** [1] - 102:8
**palpitations** [1] -
26:24
**panic** [6] - 25:7, 26:15,
26:22, 27:5, 27:6
**paragraph** [4] - 34:8,
76:2, 76:4, 77:4
**parent** [4] - 71:3, 71:4,
71:5, 71:11
**parents** [10] - 65:11,
65:12, 71:9, 72:2,
72:3, 74:2, 74:3,
77:1, 81:21, 87:8
**Park** [1] - 1:19
**part** [29] - 12:22,
15:24, 16:10, 16:12,
20:11, 20:14, 23:2,
26:3, 29:6, 32:9,
36:7, 39:6, 41:2,
42:3, 45:16, 47:15,
58:25, 73:24, 77:6,
91:17, 99:11, 99:13,
99:15, 102:19,
121:9, 122:12,
134:4, 135:21
**participate** [1] - 92:10
**participating** [1] -
92:6

**particular** [9] - 6:1,
33:23, 40:5, 45:13,
65:21, 70:4, 88:2,
99:5, 120:14
**particularly** [2] -
41:16, 104:14
**parties** [2] - 24:8,
41:22
**parts** [2] - 16:13,
25:19
**passed** [1] - 104:17
**past** [4] - 6:19, 12:23,
25:7, 81:5
**patience** [1] - 46:2
**patient** [22] - 14:12,
20:21, 20:24, 63:16,
64:3, 64:18, 66:12,
66:15, 66:19, 70:3,
71:6, 77:8, 77:9,
85:10, 86:16, 90:5,
92:11, 113:1, 125:1,
125:2, 126:25,
127:23
**patient's** [3] - 13:25,
92:9, 126:23
**patients** [3] - 73:25,
83:3, 130:25
**patterns** [1] - 74:8
**pause** [7] - 16:23,
18:7, 32:23, 62:21,
64:13, 86:9, 135:25
**PC** [1] - 3:10
**Pedersen** [7] - 18:18,
37:16, 109:11,
115:3, 126:12,
131:6, 135:10
**PEDERSEN** [146] -
14:20, 14:24, 15:5,
15:11, 15:14, 15:21,
16:2, 16:8, 16:13,
16:16, 16:20, 17:23,
18:10, 18:13, 20:18,
21:8, 23:25, 24:11,
24:14, 24:21, 25:1,
28:10, 30:25, 31:15,
32:22, 32:24, 33:1,
33:9, 34:4, 34:5,
35:7, 36:24, 37:12,
41:1, 46:4, 46:5,
46:14, 46:16, 47:19,
48:2, 48:24, 49:18,
50:9, 50:11, 50:14,
50:16, 51:9, 51:25,
52:6, 52:11, 52:13,
54:5, 56:20, 56:23,
57:12, 58:14, 58:21,
59:24, 60:1, 60:16,
61:5, 61:5, 61:10,
61:12, 61:19, 62:4,
62:11, 62:25, 63:2,

64:12, 64:14, 66:7,
67:20, 68:3, 68:6,
68:20, 68:24, 68:25,
69:3, 69:13, 69:15,
69:21, 69:23, 72:19,
72:23, 75:2, 75:10,
75:16, 76:18, 78:2,
78:3, 78:12, 78:13,
79:2, 79:10, 79:12,
80:15, 84:24, 85:5,
85:6, 86:6, 86:11,
89:19, 89:24, 90:1,
91:4, 91:5, 93:9,
93:18, 93:21, 94:4,
94:8, 94:17, 95:1,
95:7, 96:8, 97:8,
97:23, 98:5, 98:8,
98:10, 98:13, 98:22,
99:1, 100:13, 101:3,
101:5, 101:6, 103:8,
103:19, 104:3,
104:8, 104:11,
104:24, 105:15,
106:1, 106:9,
107:11, 107:14,
107:20, 108:21,
111:13, 115:7,
119:24, 124:14,
136:25
**Pedersen's** [1] - 37:8
**Pedersen............** [1] -
4:5
**Pedersen..............** [2]
- 4:4, 4:7
**PEDERSON** [2] - 62:7,
80:16
**pendency** [1] - 61:22
**pending** [3] - 54:10,
54:19, 55:10
**Pennsylvania** [4] -
2:14, 2:18, 2:21, 3:3
**people** [7] - 17:13,
17:14, 33:18, 33:19,
51:7, 80:8, 82:25
**per** [1] - 24:6
**percent** [7] - 82:12,
85:12, 85:14, 88:9,
112:24, 128:5,
128:16
**performing** [1] - 72:4
**perhaps** [1] - 65:4
**period** [4] - 53:6,
110:1, 116:1, 125:25
**permissible** [1] - 16:8
**permit** [2] - 8:13, 14:4
**permitted** [5] - 8:25,
14:10, 14:21, 16:9,
94:2
**permitting** [1] - 13:20
**perpetrated** [1] -

94:11
**person** [9] - 21:15,
33:23, 34:2, 42:24,
62:14, 84:11, 122:7,
122:10, 123:4
**personal** [2] - 7:16,
46:23
**personality** [1] - 49:12
**personally** [1] -
123:15
**perspective** [2] -
10:17, 40:12
**pervasive** [1] - 27:3
**pharyngitis** [1] - 124:5
**phase** [1] - 6:25
**phone** [2] - 107:9,
132:4
**phrased** [1] - 117:4
**Physical** [1] - 129:20
**physical** [28] - 65:16,
70:3, 70:6, 70:8,
70:13, 70:15, 72:1,
73:10, 73:19, 74:1,
77:6, 79:13, 101:25,
102:18, 110:21,
112:1, 112:3,
113:25, 114:3,
120:7, 120:8,
120:24, 121:4,
121:7, 129:17,
132:2, 132:3, 132:23
**physically** [4] - 28:17,
80:7, 117:13, 121:10
**physicalness** [1] -
135:20
**physicals** [2] - 71:1,
73:24
**physician** [3] - 7:14,
7:24, 66:22
**physician's** [1] - 13:25
**physicians** [9] - 8:25,
9:16, 13:11, 13:18,
13:21, 14:5, 14:9,
45:10, 64:1
**picture** [1] - 98:16
**piece** [2] - 27:16,
49:22
**pierced** [1] - 123:14
**PITTLEMAN** [1] - 3:10
**place** [6] - 24:10, 32:6,
32:15, 35:10, 47:24,
47:25
**placed** [2] - 76:17,
118:23
**places** [3] - 26:9, 51:1,
74:8
**plaintiff** [24] - 5:20,
5:23, 5:24, 7:17, 8:4,
8:6, 9:5, 9:21, 11:3,
11:4, 11:8, 13:10,

14:8, 14:14, 14:16,
15:4, 17:19, 37:2,
54:16, 56:3, 57:7,
57:8, 62:25, 99:10
**Plaintiff** [7] - 1:4, 1:14,
2:1, 4:2, 4:10, 75:14,
91:1
**Plaintiff's** [18] - 18:1,
24:1, 24:20, 62:17,
67:20, 69:4, 69:5,
69:8, 72:21, 79:8,
85:3, 89:19, 89:23,
102:24, 103:9,
105:11, 106:1,
135:22
**plaintiff's** [8] - 5:9,
5:18, 5:20, 13:15,
51:23, 54:10, 67:9,
89:5
**plaintiffs** [6] - 23:25,
67:20, 79:2, 89:19,
103:8, 106:1
**Plan** [1] - 88:5
**plan** [16] - 82:9, 84:1,
94:17, 102:19,
115:15, 115:18,
127:9, 127:15,
130:3, 130:19,
133:8, 133:9,
133:25, 134:4,
134:7, 138:7
**planned** [2] - 92:21,
138:4
**plans** [1] - 32:10
**played** [1] - 99:24
**PLC** [1] - 3:7
**PLLC** [1] - 1:15
**plus** [1] - 123:9
**point** [7] - 33:22,
51:19, 54:13,
113:20, 124:6,
137:12, 137:17
**police** [19] - 93:25,
94:10, 94:22, 94:25,
95:6, 95:8, 95:11,
95:12, 95:19, 96:5,
96:11, 97:2, 97:5,
97:10, 97:14, 99:12,
99:13, 99:15, 100:2
**portion** [4] - 15:16,
91:12, 92:20, 128:19
**position** [12] - 6:6,
9:17, 24:4, 41:23,
42:2, 43:4, 44:17,
58:17, 58:24, 95:1,
95:2, 95:3
**positions** [2] - 42:1,
42:2
**positive** [3] - 26:1,
129:22, 130:1

**possible** [3] - 25:15, 92:23, 133:10
**posts** [1] - 118:25
**potentially** [1] - 83:1
**pounding** [1] - 27:9
**practice** [11] - 19:9, 19:12, 19:14, 63:19, 65:2, 65:21, 65:24, 66:4, 77:1, 124:24, 127:22
**practicing** [3] - 63:14, 63:16, 63:21
**practitioner** [1] - 66:1
**practitioners** [1] - 64:2
**preceding** [1] - 66:4
**precise** [2] - 40:6, 55:13
**precisely** [1] - 103:13
**preclude** [6] - 10:14, 10:18, 10:19, 11:2, 12:8, 39:9
**precluded** [1] - 12:4
**predicated** [1] - 17:16
**prefer** [1] - 39:15
**Preliminary** [1] - 4:21
**prescribe** [1] - 83:15
**prescribed** [1] - 131:1
**present** [17] - 13:23, 16:24, 23:4, 25:12, 26:19, 41:2, 71:23, 77:7, 79:18, 79:20, 80:3, 80:21, 95:17, 98:16, 108:22, 113:2, 127:2
**presentation** [1] - 101:1
**presented** [6] - 73:21, 83:23, 88:15, 95:14, 101:17, 101:18
**presenting** [3] - 83:17, 98:24, 129:15
**presents** [6] - 31:4, 70:3, 71:25, 73:10, 84:12, 86:15
**pretty** [4] - 64:23, 91:14, 120:16, 123:21
**prevent** [1] - 76:25
**preventing** [1] - 92:5
**previous** [2] - 120:15, 120:16
**pride** [1] - 66:18
**primarily** [1] - 129:9
**primary** [1] - 53:7
**principal** [4] - 81:23, 81:24, 82:17, 82:18
**print** [1] - 17:9
**printout** [2] - 115:2, 126:11

**private** [1] - 71:12
**problem** [10] - 9:23, 15:20, 19:23, 40:13, 40:14, 68:9, 81:24, 125:14, 125:19
**problems** [4] - 39:22, 66:20, 66:24, 98:18
**Procedure** [1] - 14:4
**proceed** [6] - 18:10, 21:9, 22:9, 32:24, 60:16, 101:3
**proceedings** [9] - 13:4, 16:23, 32:23, 64:13, 86:9, 135:25, 139:6, 139:11, 139:14
**PROCEEDINGS** [1] - 1:11
**process** [2] - 22:4, 35:12
**produce** [1] - 44:25
**produced** [2] - 58:12, 59:11
**professional** [2] - 24:16, 98:3
**prognosis** [4] - 5:21, 8:16, 14:1, 14:18
**program** [2] - 19:24, 52:1
**programs** [1] - 51:10
**progress** [4] - 16:14, 24:23, 29:22, 31:1
**promiscuous** [1] - 76:16
**promise** [1] - 58:19
**pronoun** [1] - 117:24
**pronunciation** [2] - 8:7, 83:10
**proper** [1] - 24:14
**properly** [3] - 11:19, 11:21, 95:10
**property** [1] - 11:23
**protect** [2] - 81:25, 116:15
**provide** [4] - 8:15, 14:10, 19:21, 43:14
**provided** [3] - 11:3, 11:7, 64:9
**provider** [1] - 95:22
**providers** [2] - 5:14, 13:11
**provides** [1] - 21:5
**providing** [2] - 8:23, 14:17
**pruritus** [3] - 98:24, 101:18, 101:19
**psychiatric** [1] - 90:5
**psychiatrist** [3] - 88:17, 133:21, 134:1
**psychiatrists** [2] -

133:23, 134:3
**psychiatry** [5] - 87:23, 88:1, 133:10, 133:16, 133:17
**psychologist** [6] - 88:18, 117:25, 130:5, 130:8, 130:11, 134:1
**psychologists** [1] - 133:24
**psychomotor** [3] - 79:18, 80:6, 80:7
**psychotic** [2] - 79:19, 129:23
**PT** [2] - 77:7
**PTSD** [7] - 14:21, 14:25, 15:6, 15:17, 15:24, 16:10
**Public** [1] - 56:16
**publish** [19] - 12:5, 15:23, 68:20, 69:3, 69:5, 69:11, 72:19, 75:13, 79:3, 79:7, 84:25, 85:2, 89:24, 91:3, 111:15, 112:17, 115:9, 124:15, 126:17
**published** [1] - 24:9
**publishing** [2] - 16:11, 79:5
**purpose** [5] - 42:12, 43:3, 104:15, 104:18, 127:21
**purposeful** [1] - 58:22
**purposely** [1] - 98:13
**purposes** [2] - 42:8, 44:16
**pursuant** [3] - 13:12, 13:13, 14:3
**push** [1] - 51:7
**put** [10] - 6:13, 16:5, 43:17, 43:21, 54:22, 95:22, 100:2, 101:9, 113:1, 119:7
**putting** [1] - 102:11

**Q**

**questioning** [1] - 37:5
**questionnaire** [4] - 55:11, 56:5, 56:7, 56:12
**questions** [26] - 15:8, 16:14, 18:5, 40:14, 50:5, 52:13, 55:13, 60:8, 60:11, 60:13, 61:13, 62:19, 70:9, 96:20, 100:6, 100:10, 100:23, 106:8, 107:20,

117:6, 117:9, 123:22, 133:1, 136:16, 136:20, 136:25
**quick** [9] - 20:3, 63:9, 70:19, 70:21, 74:11, 122:18, 123:2, 123:8, 123:11
**quickly** [5] - 19:4, 27:20, 27:21, 80:9, 102:20
**quiet** [2] - 66:16, 87:15
**quite** [3] - 40:9, 85:25, 132:14
**quote** [1] - 5:19
**quote/unquote** [1] - 88:4

**R**

**Rachel** [2] - 88:24, 93:5
**raised** [5] - 6:9, 6:10, 6:20, 9:3, 9:22
**range** [2] - 73:20, 102:9, 102:13
**ranges** [1] - 102:11
**raped** [1] - 56:19
**rapes** [1] - 56:13
**rapid** [1] - 83:12
**rash** [1] - 65:19
**rather** [5] - 40:9, 41:12, 43:17, 83:3, 83:5
**rbates@hunton.com**
p - 2:16
**re** [2] - 55:4, 130:20
**re-ask** [1] - 55:4
**re-evaluation** [1] - 130:20
**reaction** [4] - 77:18, 77:19, 77:20, 77:21, 114:10, 122:12
**read** [48] - 10:3, 13:2, 16:16, 25:2, 27:11, 29:22, 31:25, 34:7, 34:14, 46:19, 46:20, 55:1, 70:2, 71:24, 73:8, 73:9, 73:14, 76:3, 76:4, 76:9, 77:17, 79:15, 80:17, 80:23, 81:19, 82:10, 84:4, 85:8, 86:7, 86:14, 87:6, 87:21, 88:6, 90:4, 92:3, 92:8, 92:13, 92:20, 101:21, 103:24, 104:4, 104:6, 106:10, 106:12,

106:13, 131:8
**reading** [4] - 10:17, 30:23, 76:8, 81:18
**reads** [3] - 16:10, 16:12
**ready** [2] - 12:16, 108:20
**real** [3] - 38:1, 97:19, 132:18
**really** [9] - 15:25, 22:17, 49:23, 49:24, 66:17, 83:1, 85:16, 98:17, 129:7
**realm** [1] - 66:13
**realtime** [1] - 139:12
**reason** [12] - 6:7, 24:7, 73:6, 75:22, 75:24, 80:18, 95:17, 101:14, 111:22, 120:3, 120:6, 124:19
**Reason** [2] - 69:24, 73:8
**reasons** [2] - 30:17, 65:14
**recalled** [1] - 37:16
**receive** [1] - 105:4
**received** [3] - 90:7, 90:17, 107:4
**recent** [5] - 25:5, 29:25, 30:10, 32:2, 122:11
**Recess** [3] - 13:3, 108:19, 138:10
**recognize** [14] - 23:16, 28:25, 29:16, 31:22, 32:17, 35:15, 46:9, 67:14, 75:3, 78:21, 89:10, 91:6, 103:2, 105:20
**recognizing** [1] - 34:20
**recollection** [11] - 7:21, 38:20, 38:22, 39:1, 39:8, 55:2, 55:9, 56:7, 68:17, 73:15, 79:23
**recommendation** [7] - 94:14, 94:20, 95:15, 95:16, 97:10, 118:2, 133:25
**recommendations** [3] - 97:21, 98:2, 99:6
**recommended** [6] - 90:7, 95:4, 114:16, 117:23, 117:24, 133:14
**recommending** [1] - 94:19
**reconsideration** [3] - 5:25, 6:5, 6:10

**record** [60] - 13:8, 15:17, 15:24, 16:10, 16:13, 23:16, 23:23, 26:15, 27:11, 29:20, 31:16, 31:20, 31:22, 34:6, 41:20, 42:4, 42:8, 43:23, 45:4, 45:15, 46:6, 46:9, 46:17, 46:20, 62:10, 67:7, 69:16, 71:18, 72:14, 73:1, 75:21, 76:19, 78:9, 78:24, 79:21, 82:7, 83:21, 86:8, 86:13, 89:4, 90:21, 93:18, 93:24, 94:13, 94:18, 97:2, 97:9, 98:6, 101:10, 102:23, 107:14, 109:12, 112:20, 113:15, 113:19, 114:6, 116:24, 119:19, 128:4, 134:8
**recording** [1] - 139:13
**records** [40] - 9:9, 9:18, 9:19, 11:17, 15:15, 24:1, 29:12, 29:16, 42:7, 42:15, 42:22, 42:24, 42:25, 43:13, 43:15, 43:21, 44:20, 44:25, 45:6, 45:7, 45:16, 45:17, 45:18, 45:21, 54:23, 67:14, 68:7, 75:4, 75:17, 78:21, 89:10, 95:9, 103:3, 115:3, 124:25, 125:3, 127:9, 133:9
**red** [1] - 20:9
**redact** [3] - 9:18, 15:19, 15:22
**redacted** [2] - 42:24, 95:10
**redacting** [1] - 44:9
**redaction** [2] - 12:1, 68:21
**redactions** [10] - 12:3, 24:3, 24:6, 24:8, 24:10, 24:14, 41:21, 68:12, 68:13, 94:9
**REDIRECT** [1] - 60:18
**Redirect** [1] - 4:5
**redirect** [4] - 15:10, 60:15, 137:8, 137:11
**reduced** [1] - 81:9
**reducing** [2] - 81:20, 92:25
**refer** [6] - 51:10, 53:19, 54:22, 54:25, 88:17, 102:17
**reference** [3] - 15:6,

54:13, 124:6
**references** [2] - 94:10, 95:11
**referral** [1] - 51:12
**referred** [2] - 52:1, 114:16
**referring** [3] - 80:12, 80:13, 118:12
**reflex** [1] - 123:12
**refresh** [5] - 7:20, 55:1, 55:9, 55:15, 56:7
**refreshes** [1] - 68:17
**refused** [3] - 86:16, 86:20, 86:23
**refuses** [2] - 87:5, 87:7
**regard** [10] - 11:7, 11:25, 33:24, 33:25, 38:14, 41:14, 44:9, 45:11, 49:3, 95:4
**regarding** [10] - 13:7, 21:1, 38:7, 41:20, 49:11, 49:22, 76:11, 81:2, 86:15, 100:6
**regardless** [2] - 121:10, 125:2
**regards** [4] - 41:17, 70:9, 82:18, 90:17, 101:20, 129:5, 129:17
**regressing** [1] - 28:21
**regularly** [1] - 73:19
**rehabilitate** [1] - 15:9
**relate** [2] - 28:7, 44:14
**related** [7] - 30:8, 31:5, 32:3, 39:11, 95:8, 95:9, 95:12
**relates** [3] - 28:7, 81:3, 82:2
**relationship** [13] - 34:18, 36:2, 36:4, 36:9, 36:14, 37:4, 38:14, 40:8, 40:16, 41:3, 41:5, 41:14, 81:22
**relationships** [14] - 34:10, 34:16, 34:17, 35:9, 38:5, 38:8, 38:10, 39:2, 39:3, 39:13, 46:23, 47:2, 51:5, 65:11
**relay** [1] - 106:17
**relaying** [2] - 48:23, 134:15
**release** [2] - 61:15, 61:20
**relevant** [1] - 41:1
**relied** [1] - 58:25
**remember** [9] - 27:19,

32:11, 39:4, 47:13, 59:13, 76:22, 76:23, 82:6, 104:12
**remind** [2] - 6:12, 76:19
**reminds** [1] - 26:2
**removal** [2] - 19:2, 90:7
**repeatedly** [1] - 92:11
**report** [22] - 95:23, 96:1, 96:3, 96:5, 97:11, 97:14, 113:6, 116:17, 116:18, 116:19, 121:11, 121:14, 121:19, 125:18, 125:25, 126:23, 127:7, 128:16, 129:8, 129:13, 132:9, 135:5
**reported** [31] - 25:6, 25:14, 30:1, 34:21, 34:22, 93:25, 94:21, 95:6, 97:1, 97:3, 97:9, 98:17, 113:22, 114:3, 114:8, 116:5, 116:11, 117:13, 117:17, 117:20, 118:16, 118:19, 118:22, 125:21, 128:5, 128:11, 128:12, 128:14, 132:11, 134:10, 139:5
**Reporter** [3] - 3:13, 139:3, 139:22
**REPORTER** [1] - 139:1
**Reporter..................... ** [1] - 4:22
**reporting** [3] - 97:1, 129:15, 135:14
**represent** [3] - 18:18, 53:2, 109:5
**reprocessing** [1] - 19:17
**request** [4] - 90:20, 91:6, 106:22, 123:17
**require** [1] - 24:16
**required** [3] - 5:16, 13:10
**requirements** [1] - 5:15
**requiring** [1] - 14:2
**reserve** [1] - 138:3
**reserved** [2] - 66:16, 87:15
**residency** [1] - 66:4
**resistant** [2] - 76:12, 119:3
**resolution** [1] - 36:20

**resolve** [1] - 36:21
**resourcing** [3] - 22:14, 22:15, 25:20
**respect** [3] - 40:14, 95:5, 134:8
**respects** [1] - 72:3
**respiratory** [1] - 111:5
**responding** [1] - 132:15
**responds** [2] - 20:12, 20:14
**response** [7] - 49:6, 49:7, 49:10, 92:11, 92:18, 92:21, 100:7
**responses** [3] - 5:2, 17:2, 96:23
**responsibility** [2] - 37:9, 98:3
**rest** [4] - 26:6, 67:25, 112:8, 125:12
**Reston** [2] - 3:8, 3:12
**restrict** [1] - 8:22
**restriction** [1] - 92:17
**restrictions** [1] - 41:16
**result** [1] - 39:23
**resumed** [1] - 13:4
**retaking** [1] - 137:4
**retardation** [3] - 79:18, 80:6, 80:7
**retired** [3] - 63:15, 63:24, 64:2
**return** [4] - 17:19, 92:21, 95:18, 130:20
**returned** [1] - 127:18
**returning** [1] - 131:17
**returns** [1] - 85:9
**reverting** [1] - 28:21
**review** [4] - 9:9, 13:6, 70:5, 133:22
**reviewed** [2] - 82:7, 83:12
**REWARI** [67] - 37:23, 38:2, 38:15, 41:7, 45:20, 67:23, 68:11, 68:22, 72:17, 75:12, 79:5, 85:1, 89:21, 90:24, 93:11, 93:14, 93:23, 94:6, 94:13, 94:18, 95:3, 95:13, 95:24, 96:2, 96:6, 96:16, 96:21, 96:24, 97:7, 97:9, 97:16, 98:6, 98:15, 103:10, 103:14, 106:3, 106:6, 108:9, 108:16, 109:2, 111:11, 111:15, 111:18, 112:10, 112:11, 112:18, 112:19, 115:5,

115:9, 115:11, 115:13, 115:17, 115:19, 119:22, 120:2, 120:4, 120:5, 124:7, 124:12, 124:16, 124:18, 125:8, 126:15, 126:19, 127:3, 136:3, 136:12
**Rewari** [10] - 2:17, 37:15, 38:19, 68:10, 95:20, 96:9, 108:7, 109:5, 136:10, 137:5
**Rewari.................** [1] - 4:8
**rhinorrhea** [1] - 112:5
**rkeefe@bsfllp.com** [1] - 2:12
**Robert** [2] - 2:9, 3:7
**room** [7] - 71:2, 71:5, 71:12, 71:15, 115:23, 115:25, 128:24
**Roop** [2] - 7:11, 7:25
**ROSSIE** [1] - 1:11
**rotation** [1] - 102:12
**rounds** [1] - 11:13
**routine** [7] - 70:3, 70:6, 70:8, 71:1, 72:1, 73:10, 120:7
**RPR** [2] - 3:13, 139:21
**Rule** [2] - 5:10, 37:23
**rule** [5] - 10:13, 15:20, 41:8, 99:22, 100:10
**ruled** [1] - 44:18
**Rules** [1] - 14:4
**ruling** [6] - 14:18, 16:19, 41:23, 42:2, 44:11, 94:12
**ruling..................... .............** [1] - 4:21
**rulings** [2] - 42:3, 55:14
**run** [1] - 138:3
**Ryan** [4] - 2:13, 9:7, 53:2

**S**

**S.T** [1] - 3:6
**sad** [6] - 76:15, 79:17, 80:9, 80:19, 81:2, 81:3
**sadness** [1] - 30:7
**safe** [4] - 26:7, 51:21, 90:9, 95:18
**safeguards** [1] - 25:20
**safer** [1] - 93:4
**safety** [7] - 22:5, 22:6, 82:22, 82:24, 82:25,

153

83:2, 134:4
**Samantha** [1] - 18:18
**sanitize** [1] - 95:14
**saw** [16] - 9:13, 10:10,
58:8, 65:4, 74:15,
74:17, 75:18, 76:6,
78:4, 118:5, 124:1,
126:4, 127:4,
129:14, 135:2
**scalp** [5] - 98:25, 99:4,
100:14, 101:19,
122:6
**SCHILLER** [4] - 1:19,
2:2, 2:6, 2:10
**school** [63] - 19:16,
66:18, 70:10, 72:4,
73:17, 81:2, 81:5,
81:7, 81:24, 82:3,
82:5, 82:16, 85:15,
85:16, 85:17, 86:16,
86:17, 86:20, 86:24,
90:8, 90:9, 90:11,
90:15, 91:15, 92:23,
92:24, 93:5, 94:19,
95:5, 95:18, 96:7,
96:14, 97:22, 98:2,
98:19, 99:6, 99:12,
103:20, 104:18,
104:25, 105:2,
106:18, 106:22,
106:25, 107:3,
107:5, 107:8,
107:15, 116:10,
116:14, 116:19,
117:14, 117:21,
125:24, 129:6,
129:7, 129:11,
131:17, 131:20,
133:5, 134:8,
134:12, 135:6
**School** [3] - 9:15,
53:2, 109:5
**schooling** [1] - 56:15
**schoolmates** [1] -
92:12
**schools** [1] - 33:18
**Schools** [1] - 56:16
**scientific** [2] - 14:1,
14:13
**scoliosis** [1] - 70:22
**scope** [6] - 16:18,
54:5, 57:12, 59:25,
108:11, 136:21
**Scott** [1] - 2:20
**scratching** [1] - 99:3
**screen** [3] - 101:9,
125:9, 125:10
**screening** [1] - 70:21
**script** [2] - 76:3, 89:15
**scroll** [1] - 91:19

**SE** [3] - 2:2, 2:6, 2:10
**seat** [1] - 18:3
**seated** [4] - 16:25,
18:2, 108:23, 136:9
**second** [12] - 52:11,
82:8, 84:5, 88:6,
89:8, 92:1, 92:8,
92:19, 93:19,
106:20, 133:25,
135:24
**secondary** [1] - 90:6
**section** [3] - 64:19,
87:18, 88:5
**secure** [1] - 90:10
**security** [1] - 62:8
**see** [41] - 10:6, 17:20,
21:23, 21:24, 23:22,
34:12, 58:3, 65:2,
65:15, 66:8, 67:17,
69:25, 71:20, 72:24,
74:9, 78:19, 79:13,
81:12, 82:7, 85:10,
87:19, 89:6, 93:17,
102:25, 108:17,
116:25, 121:6,
124:8, 124:22,
124:23, 125:6,
126:1, 126:3,
127:23, 131:3,
131:19, 131:24,
135:14, 137:16,
137:18, 138:9
**seeing** [17] - 20:20,
36:5, 44:4, 47:11,
54:11, 54:16, 60:20,
60:23, 64:3, 64:18,
64:25, 65:24, 125:1,
125:2, 130:8,
130:10, 135:15
**seem** [3] - 33:22,
99:17, 132:18
**sees** [1] - 16:6
**self** [6] - 29:2, 29:9,
47:5, 85:14, 128:16
**self-doubt** [1] - 47:5
**self-report** [1] -
128:16
**send** [3] - 62:13,
104:25, 106:25
**sending** [2] - 90:11,
104:15
**sensation** [1] - 29:10
**sense** [2] - 27:3, 55:5
**sensitive** [2] - 30:2,
38:1
**sensitivities** [1] -
48:13
**sent** [7] - 45:17, 91:24,
93:1, 104:15,
104:16, 106:20,

107:2
**sentence** [3] - 73:9,
82:10, 88:7
**sentences** [7] - 32:1,
34:15, 80:23, 86:12,
86:14, 87:2, 87:6
**separate** [1] - 38:24
**serious** [1] - 66:16
**Sertraline** [5] - 85:11,
87:5, 87:7, 127:19,
131:1
**services** [2] - 21:14,
21:15
**Session** [1] - 138:11
**SESSION** [1] - 1:8
**session** [21] - 21:22,
25:17, 28:14, 29:22,
32:11, 59:1, 59:3
**sessions** [6] - 21:17,
21:20, 22:2, 28:11,
57:21, 57:23
**set** [6] - 24:1, 34:19,
68:6, 68:7, 72:14,
96:25
**Setraline** [3] - 83:10,
83:13, 83:14
**seven** [8] - 5:14, 5:18,
13:11, 44:18, 58:18,
65:1, 65:14, 111:24
**seven-day** [1] - 111:24
**several** [3] - 13:6,
86:1, 100:20
**severe** [1] - 92:12
**severely** [2] - 25:11,
96:13
**sex** [1] - 40:14
**sexual** [12] - 19:3,
38:3, 38:8, 113:17,
113:19, 113:22,
114:5, 114:8, 117:3,
117:6, 123:19,
123:23
**sexually** [9] - 54:2,
81:23, 90:6, 95:23,
116:24, 117:17,
117:20, 130:14,
130:17
**shame** [4] - 47:4, 47:8,
49:24, 51:3
**share** [8] - 25:14,
25:16, 30:12, 48:17,
49:19, 50:17, 51:20,
131:22
**shared** [16] - 25:7,
25:9, 30:1, 30:4,
30:6, 30:7, 30:10,
30:14, 32:3, 32:4,
32:6, 33:14, 34:20,
34:23, 53:24, 88:2
**sharing** [2] - 25:15,

25:18
**shin** [1] - 74:7
**shins** [1] - 74:6
**shoot** [1] - 136:6
**shorter** [2] - 137:24,
138:3
**shorthand** [2] - 139:5,
139:12
**show** [6] - 12:3, 15:24,
16:10, 67:7, 94:18,
118:25
**showed** [3] - 109:11,
126:12, 135:5
**showing** [1] - 118:14
**shutting** [2] - 28:15,
28:17
**sibling** [2] - 72:2, 72:3
**side** [6] - 11:15, 12:9,
83:12, 102:9
**Sidebar** [3] - 37:1,
62:6, 93:16
**sidebar** [4] - 11:12,
62:4, 68:3, 103:11
**signature** [6] - 23:23,
67:18, 75:8, 89:17,
105:24
**signed** [1] - 103:5
**significant** [18] -
30:10, 30:12, 30:15,
32:4, 32:13, 32:14,
33:6, 34:17, 41:4,
51:2, 51:5, 66:20,
66:24, 67:1, 67:4,
87:22, 88:1, 114:12
**significantly** [2] -
13:21, 48:20
**signs** [6] - 74:1, 74:5,
74:15, 74:17, 121:4,
121:7
**similar** [5] - 27:4,
66:12, 73:11, 84:12,
127:4
**simply** [1] - 100:5
**simultaneously** [2] -
40:22, 42:9
**sinuses** [1] - 112:8
**situation** [2] - 16:3,
133:1
**situations** [4] - 30:11,
32:6, 33:3, 41:17
**six** [1] - 83:19
**skill** [2] - 22:15, 51:15
**skills** [2] - 22:8, 25:8,
35:13
**skin** [3] - 27:8, 70:19,
122:18
**skip** [1] - 23:13
**slash** [2] - 5:9, 72:5
**sleeping** [2] - 51:17,
72:3

**slide** [2] - 6:14
**slightly** [1] - 128:21
**slow** [1] - 80:10
**slowed** [1] - 80:8
**smelling** [1] - 26:1
**sneezing** [1] - 111:25
**snicker** [1] - 76:6
**sobbing** [1] - 28:23
**social** [8] - 5:9, 17:9,
19:7, 32:6, 33:3,
70:11, 73:18, 104:16
**socially** [1] - 72:5
**soda** [1] - 72:7
**someone** [4] - 35:11,
35:12, 35:23, 106:22
**sometimes** [8] - 27:9,
28:1, 28:15, 28:22,
28:23, 28:24, 65:17,
76:2
**Sona** [2] - 2:17, 109:5
**soon** [1] - 133:10
**sore** [2] - 111:24,
124:20
**sorry** [28] - 24:25,
37:25, 38:18, 50:6,
55:23, 58:2, 61:10,
64:5, 64:15, 69:4,
86:21, 102:14,
102:25, 104:5,
105:13, 106:11,
107:17, 108:4,
112:5, 113:10,
118:8, 125:11,
125:13, 132:20,
134:25, 135:9,
135:10, 137:9
**sort** [8] - 38:11, 67:1,
67:4, 83:19, 84:10,
84:17, 126:24,
132:16
**sought** [1] - 42:5
**sound** [3] - 78:7,
105:9
**sounds** [1] - 105:10
**South** [1] - 19:23
**Southern** [1] - 13:13
**space** [1] - 37:25
**speaking** [3] - 40:22,
42:9, 62:20
**speaks** [1] - 11:11
**specialized** [2] - 14:2,
14:13
**specialty** [1] - 65:22
**specific** [4] - 15:6,
44:15, 54:25, 92:21
**specifically** [3] - 49:3,
106:23, 125:6
**specificity** [1] - 100:8
**specifics** [1] - 104:13
**spectrum** [2] - 27:22,

27:25
**spend** [3] - 34:21, 77:23, 120:17
**spending** [1] - 81:21
**spent** [3] - 115:20, 125:22, 131:13
**spine** [1] - 70:21
**spleen** [1] - 70:18
**spoken** [3] - 82:1, 87:16, 116:19
**spreading** [1] - 76:15
**springs** [1] - 44:6
**Springs** [1] - 14:7
**Square** [2] - 3:14, 125:22
**srewari@huntonak. com** [1] - 2:19
**staff** [1] - 63:25
**stand** [11] - 9:11, 14:22, 15:2, 15:15, 20:8, 71:22, 77:5, 77:11, 127:1, 127:15, 137:4
**standard** [3] - 13:24, 55:11, 66:12
**Start** [1] - 83:10
**start** [12] - 19:4, 19:12, 20:10, 22:10, 23:14, 46:3, 56:9, 57:23, 63:9, 80:8, 126:20, 138:9
**started** [19] - 17:3, 20:20, 36:5, 53:4, 53:12, 54:16, 55:10, 55:23, 56:18, 60:20, 64:1, 64:3, 64:17, 64:25, 84:18, 101:21, 101:23, 120:20, 127:20
**starting** [7] - 34:7, 34:14, 71:9, 87:5, 92:1, 103:24, 127:23
**starts** [2] - 34:10, 93:18
**State** [2] - 19:22, 19:23
**state** [8] - 13:8, 19:2, 26:1, 28:22, 32:15, 61:15, 120:15, 128:2
**statement** [1] - 129:5
**statements** [1] - 6:13
**States** [2] - 3:14, 13:14
**STATES** [2] - 1:1, 1:12
**states** [3] - 85:12, 87:7, 101:23
**status** [2] - 13:19
**stay** [14] - 22:16, 22:21, 23:3, 31:14, 32:19, 35:11, 35:15,

41:9, 41:13, 48:15, 49:14, 56:23, 103:17
**staying** [3] - 43:4, 49:15, 50:25
**stays** [1] - 34:24
**stemming** [1] - 7:16
**step** [4] - 6:16, 108:4, 108:5
**steps** [1] - 92:21
**still** [2] - 62:7, 81:20
**stimulating** [1] - 20:13
**stimulation** [1] - 23:2
**stipulated** [1] - 37:3
**stipulating** [2] - 37:16, 39:5
**stipulation** [2] - 38:6, 40:25
**stipulations** [1] - 38:19
**stomach** [1] - 20:10
**stop** [5] - 30:18, 32:8, 34:25, 71:5, 81:11
**store** [1] - 27:19
**stored** [2] - 26:1, 26:3
**story** [9] - 25:14, 25:16, 25:18, 53:24, 99:11, 99:13, 99:14, 99:15, 99:18
**strategies** [2] - 48:4, 48:7
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**stressed** [1] - 32:4
**stressful** [1] - 57:21
**stressor** [3] - 77:21, 84:11, 114:12
**stressors** [6] - 25:5, 29:25, 30:1, 32:2, 32:3, 77:24
**stricken** [1] - 16:7
**struck** [1] - 31:11
**struggles** [1] - 51:6
**student** [4] - 66:16, 92:6, 92:16, 92:22
**students** [4] - 76:15, 81:7, 86:17, 116:10
**subject** [6] - 16:7, 24:2, 61:7, 61:9, 61:11, 96:18
**subjected** [1] - 56:13
**Subjective** [3] - 113:5, 113:16, 119:2
**subjective** [1] - 127:7
**subjects** [1] - 49:11
**subpoenaed** [1] - 108:9
**subscribed** [1] - 139:15
**subsequent** [1] - 19:18

**subsequently** [1] - 21:13
**subtitle** [1] - 29:8
**sudden** [1] - 132:18
**suffered** [2] - 41:4, 74:13
**suffering** [1] - 96:14
**suggest** [6] - 39:11, 39:14, 40:7, 43:13, 74:18, 90:8
**suggested** [2] - 40:4, 92:15
**suggesting** [2] - 39:12, 59:4
**suggestion** [1] - 38:12
**suicidal** [5] - 22:5, 51:19, 79:18, 83:1, 129:23
**suicide** [2] - 51:18, 83:6
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:8, 3:11
**summer** [2] - 59:11, 109:6
**support** [2] - 32:6, 52:2
**surprise** [2] - 13:17, 13:20
**surprised** [1] - 131:3
**survey** [2] - 82:2, 116:22
**suspect** [1] - 121:10
**sustain** [1] - 54:8
**sustained** [10] - 31:8, 35:6, 48:1, 57:1, 57:4, 60:3, 103:18, 107:17, 107:18, 132:6
**sustains** [1] - 84:11
**sweating** [1] - 20:10
**swell** [1] - 122:12
**swelling** [3] - 102:6, 122:8, 122:10
**switch** [1] - 88:20
**switching** [4] - 97:12, 97:13, 97:15, 136:1
**Sworn** [1] - 62:17
**sworn** [1] - 18:1
**symptoms** [6] - 26:20, 30:9, 83:16, 83:17, 84:12, 125:20
**system** [6] - 20:11, 20:14, 20:15, 75:23, 106:23
**systems** [2] - 23:1, 70:5

## T

**T.B** [1] - 3:7
**tab** [6] - 7:2, 67:9, 67:12, 78:15, 90:22, 93:7
**Tab** [13] - 23:12, 23:13, 23:14, 29:14, 69:1, 84:22, 86:3, 93:8, 101:7, 105:12, 105:14, 105:16, 119:17
**tabbed** [1] - 78:10
**TABLE** [1] - 4:1
**tabs** [2] - 74:24, 89:5
**talks** [4] - 26:15, 57:8, 57:17, 129:20
**tape** [1] - 139:13
**tasks** [1] - 49:16
**team** [1] - 107:23
**technical** [2] - 14:2, 14:13
**techniques** [1] - 25:17
**ten** [7] - 53:10, 53:12, 69:20, 71:25, 72:12, 73:12, 106:21
**ten-year-old** [1] - 71:25
**tend** [2] - 83:2, 133:1
**tender** [1] - 112:7
**tenderness** [1] - 102:7
**tennis** [1] - 72:8
**Tenth** [1] - 3:15
**term** [1] - 127:1
**terms** [7] - 80:9, 82:20, 99:16, 119:7, 121:25, 128:8, 129:14
**test** [1] - 127:16
**testified** [5] - 8:3, 8:8, 18:24, 19:2, 63:7
**testify** [30] - 5:18, 7:5, 7:15, 8:19, 8:25, 9:4, 9:8, 9:24, 10:1, 10:7, 10:9, 10:23, 10:25, 12:4, 14:5, 14:15, 15:3, 17:16, 33:23, 39:18, 41:14, 41:24, 42:5, 42:23, 42:24, 43:22, 44:19, 45:13, 68:17, 108:12
**testifying** [3] - 12:8, 13:18, 17:19
**testimony** [3] - 8:23, 10:19, 11:23, 13:13, 13:25, 14:6, 14:10, 16:6, 18:5, 21:6, 28:7, 34:1, 39:17, 39:18, 39:23, 42:21, 53:18, 53:23, 68:13,

96:10, 137:15, 137:16, 139:6
**tests** [1] - 101:20
**text** [1] - 59:16
**Thanksgiving** [3] - 113:8, 113:11, 113:12
**THE** [255] - 1:1, 1:11, 3:6, 5:1, 5:3, 6:1, 6:3, 6:8, 6:23, 7:20, 10:12, 10:17, 10:21, 10:23, 11:2, 11:6, 12:10, 12:18, 12:24, 13:1, 13:5, 14:23, 15:3, 15:6, 15:13, 15:19, 15:25, 16:3, 16:12, 16:15, 16:17, 16:21, 16:25, 17:3, 17:25, 18:3, 18:9, 18:11, 20:17, 21:5, 24:13, 24:15, 24:19, 24:24, 24:25, 28:6, 28:9, 30:24, 31:8, 31:10, 31:13, 32:18, 32:25, 33:12, 33:14, 33:20, 35:6, 36:18, 36:20, 36:25, 37:7, 37:22, 37:25, 38:11, 38:17, 38:21, 39:7, 39:24, 40:3, 40:16, 41:8, 41:25, 42:8, 42:11, 42:14, 42:19, 43:7, 43:24, 44:4, 44:7, 44:13, 44:21, 45:5, 45:7, 45:23, 45:25, 46:2, 47:23, 47:24, 48:1, 49:2, 49:5, 49:6, 49:9, 49:10, 49:13, 50:1, 50:2, 50:6, 50:7, 50:10, 50:13, 50:15, 50:20, 50:22, 50:23, 50:24, 51:8, 51:24, 52:4, 52:5, 52:15, 52:16, 52:18, 52:21, 52:22, 54:7, 54:13, 54:14, 55:16, 56:25, 57:4, 57:14, 58:24, 59:25, 60:2, 60:5, 60:10, 60:12, 60:14, 60:17, 61:6, 61:9, 61:11, 61:14, 61:17, 61:18, 61:21, 61:24, 61:25, 62:1, 62:3, 62:5, 62:9, 62:12, 62:18, 62:23, 62:24, 65:20, 65:23, 65:25, 66:2, 66:5, 66:6, 67:22, 68:1, 68:4, 68:9, 68:15, 68:23, 69:7, 69:10, 69:12,

155

72:16, 72:18, 72:20, 74:25, 75:1, 75:13, 76:5, 76:6, 76:7, 76:10, 79:4, 79:7, 85:2, 86:10, 89:22, 89:25, 90:23, 90:25, 91:3, 93:10, 93:12, 93:15, 93:17, 93:20, 93:22, 94:3, 94:16, 94:23, 95:20, 95:25, 96:4, 96:15, 96:17, 96:22, 97:6, 97:12, 97:17, 97:25, 98:9, 98:12, 98:20, 98:23, 99:2, 99:20, 100:16, 100:18, 101:4, 103:12, 103:17, 104:2, 104:6, 104:10, 104:13, 104:16, 104:19, 104:21, 104:23, 105:14, 106:5, 106:7, 107:12, 107:16, 107:22, 108:4, 108:14, 108:17, 108:20, 108:23, 111:14, 111:16, 112:17, 115:8, 115:10, 119:25, 124:6, 124:15, 125:7, 126:17, 127:1, 127:2, 136:1, 136:4, 136:9, 136:13, 136:17, 136:21, 137:2, 137:10, 137:14, 137:25, 138:5, 138:8
**theatre** [2] - 85:17, 129:11
**theirs** [1] - 116:13
**theoretically** [1] - 45:8
**therapeutic** [2] - 59:1, 59:3
**therapist** [22] - 5:9, 18:23, 19:19, 20:25, 21:2, 21:10, 25:5, 25:10, 25:11, 25:17, 25:18, 25:19, 29:25, 30:2, 30:11, 32:2, 41:3, 50:4, 50:7, 53:7, 60:25, 133:17
**therapists** [3] - 19:21, 60:22, 133:24
**therapy** [17] - 19:10, 21:17, 22:24, 22:25, 27:15, 30:2, 33:11, 48:24, 49:1, 49:2, 50:19, 57:9, 59:16, 102:18, 130:4,

134:1, 134:3
**therefore** [3] - 5:17, 8:21, 8:22
**they've** [3] - 9:5, 47:8, 95:5
**thinking** [3] - 43:7, 84:9, 84:16
**thoughts** [5] - 28:4, 35:16, 83:2, 83:4, 83:6
**threats** [1] - 90:7
**three** [17] - 11:13, 31:25, 34:14, 58:17, 58:20, 66:3, 66:10, 72:8, 87:10, 125:19, 125:20, 125:24, 134:19, 134:22, 134:25, 136:19, 136:25
**three-year** [1] - 66:3
**throat** [2] - 65:17, 70:16, 111:25, 122:9, 124:20, 125:17
**throughout** [2] - 25:17, 48:20
**thyroid** [1] - 70:17
**tight** [1] - 65:10
**tight-knit** [1] - 65:10
**timing** [1] - 104:15
**Tinsley** [1] - 62:9
**tiny** [1] - 55:7
**tissue** [1] - 112:6
**title** [1] - 19:6
**tobacco** [2] - 71:10, 81:22
**today** [12] - 12:20, 12:24, 12:25, 17:16, 18:16, 20:7, 43:4, 52:14, 53:6, 76:11, 86:15, 137:14
**together** [2] - 24:12, 139:13
**tolerance** [2] - 22:18, 22:21
**tolerate** [2] - 22:17, 48:12
**tongue** [1] - 123:8
**TONIA** [1] - 3:13
**Tonia** [2] - 139:3, 139:21
**took** [3] - 27:20, 57:7, 109:6
**tools** [1] - 35:18
**top** [14] - 12:6, 15:16, 69:24, 73:6, 75:6, 76:2, 80:17, 85:7, 89:13, 91:12, 91:16, 91:22, 93:18, 126:20
**topic** [2] - 41:9, 136:2

**TORCHINSKY** [1] - 1:14
**touch** [2] - 26:24, 117:25
**towards** [3] - 51:4, 84:17, 87:2
**town** [1] - 17:14
**traditional** [3] - 13:19, 22:25, 45:10
**TRAHAN** [1] - 18:1
**Trahan** [11] - 4:3, 5:8, 5:14, 5:24, 11:17, 12:21, 18:14, 18:22, 52:20, 52:25, 60:9
**Trahan's** [2] - 12:2, 15:15
**trained** [2] - 19:16, 21:11
**trainings** [1] - 19:20
**TRANSCRIPT** [1] - 1:11
**transcript** [6] - 37:19, 37:21, 39:4, 39:8, 41:7, 139:11
**transferring** [1] - 94:19
**trauma** [15] - 20:1, 21:1, 21:11, 22:7, 22:9, 22:14, 22:20, 25:13, 25:14, 26:7, 30:4, 31:6, 34:17, 41:4, 53:24
**traumatic** [1] - 25:16
**traumatized** [1] - 28:22
**travel** [3] - 32:3, 32:5, 32:10
**traveling** [4] - 32:12, 32:13, 51:13, 108:12
**treat** [1] - 53:15
**treated** [7] - 9:2, 13:8, 14:11, 14:14, 14:16, 56:2, 121:6
**treater** [6] - 6:18, 7:13, 8:19, 9:4, 10:1, 10:6, 61:2
**Treaters** [1] - 9:23
**treaters** [7] - 6:17, 6:18, 7:5, 8:14, 9:11, 10:9, 12:20
**treaters'** [1] - 9:21
**treating** [22] - 5:14, 7:14, 7:24, 8:25, 9:16, 13:11, 13:17, 13:21, 13:25, 14:4, 14:9, 26:18, 44:16, 44:17, 45:9, 53:4, 53:13, 55:10, 55:24, 56:9, 56:18, 66:22
**treatment** [50] - 5:20,

7:16, 8:4, 8:20, 9:1, 14:11, 14:24, 22:9, 22:10, 22:12, 22:14, 23:7, 23:17, 26:12, 29:19, 31:4, 31:23, 32:9, 33:4, 33:10, 35:2, 35:8, 35:19, 36:2, 36:7, 36:12, 41:3, 46:10, 47:1, 47:15, 47:20, 48:18, 49:21, 50:19, 56:10, 56:11, 57:3, 57:17, 58:11, 67:15, 74:12, 75:4, 78:22, 86:23, 87:11, 89:11, 93:4, 103:3, 119:19, 127:16
**treatments** [2] - 7:4, 8:24
**trial** [6] - 6:11, 13:22, 57:24, 58:3, 58:4, 58:9
**Trial** [1] - 139:6
**TRIAL** [2] - 1:11, 4:1
**trigger** [5] - 25:24, 26:9, 26:21, 30:10, 48:15
**triggered** [3] - 32:7, 51:6, 57:22
**triggering** [1] - 30:11
**triggers** [10] - 25:10, 25:13, 25:15, 25:25, 26:3, 26:5, 26:13, 30:9, 48:14
**tripped** [1] - 20:8
**true** [3] - 56:2, 56:22, 59:10
**truly** [1] - 35:24
**trusting** [1] - 34:23
**try** [14] - 12:13, 17:12, 37:18, 50:14, 50:15, 55:13, 76:24, 76:25, 82:19, 88:13, 108:1, 133:3, 137:14, 138:7
**trying** [22] - 10:14, 10:15, 10:18, 10:19, 11:20, 17:4, 36:21, 50:3, 50:4, 50:13, 68:1, 68:4, 68:6, 76:5, 81:25, 82:2, 96:11, 96:12, 98:10, 116:14, 116:22, 135:12
**Tuesday** [1] - 12:19
**turbinates** [1] - 112:6
**turn** [5] - 17:19, 20:9, 23:6, 64:19, 72:24
**turned** [2] - 116:3, 136:22
**turns** [1] - 27:20

**twice** [2] - 21:21, 110:1
**two** [23] - 7:10, 12:20, 13:22, 28:25, 34:14, 58:8, 58:21, 64:1, 66:10, 67:24, 67:25, 68:1, 68:5, 72:17, 79:5, 86:14, 110:16, 129:2, 129:16, 132:1, 136:7, 138:9
**type** [11] - 71:10, 77:20, 82:20, 84:10, 102:7, 122:8, 123:10, 123:13, 127:16, 127:17, 132:25
**types** [2] - 65:18, 70:11
**typical** [5] - 51:15, 65:14, 71:2, 77:1, 127:22
**typically** [6] - 39:9, 70:8, 72:7, 73:25, 76:8, 87:15

## U

**ultimately** [1] - 88:17
**unable** [3] - 26:8, 30:7, 39:14
**unbelieved** [1] - 26:10
**uncharacteristic** [1] - 87:13
**unclear** [1] - 11:11
**uncomfortable** [1] - 27:8
**under** [23] - 5:15, 13:24, 64:20, 71:19, 73:8, 77:4, 80:20, 82:9, 85:7, 88:5, 90:5, 101:16, 113:1, 113:5, 115:15, 115:18, 119:2, 120:3, 123:21, 125:5, 126:22, 129:17, 129:20
**underlying** [2] - 27:2, 87:23
**undermined** [1] - 40:8
**understood** [2] - 42:1, 42:2
**unhappy** [4] - 76:13, 79:16, 118:17, 118:18
**united** [1] - 3:14
**UNITED** [2] - 1:1, 1:12
**unless** [1] - 41:9
**unpack** [1] - 25:21
**unredacted** [1] - 42:25
**unrelated** [1] - 94:4

**unsafe** [2] - 26:6, 27:3
**unstable** [1] - 90:9
**unusual** [2] - 74:5, 74:7
**up** [26] - 6:2, 6:13, 6:25, 9:11, 12:24, 16:5, 17:7, 37:15, 39:1, 47:6, 48:10, 48:16, 68:19, 80:5, 85:24, 90:16, 90:17, 101:20, 105:2, 107:3, 107:5, 107:8, 110:24, 127:19, 127:22, 130:25
**upbeat** [1] - 130:1
**update** [1] - 120:13
**upper** [1] - 111:4
**upset** [4] - 76:23, 81:8, 85:13, 128:13
**urged** [1] - 133:11
**urgent** [1] - 133:20
**utilize** [2] - 25:8, 35:16
**utilized** [1] - 25:17

**V**

**VA** [3] - 3:8, 3:12, 3:15
**valid** [1] - 42:18
**validated** [1] - 59:18
**various** [4] - 6:14, 30:5, 36:15, 71:13
**vegetables** [1] - 72:7
**verbal** [4] - 117:9, 132:3, 132:23, 135:21
**verbally** [1] - 83:7
**versus** [3] - 48:15, 129:15, 139:7
**via** [5] - 90:16, 107:3, 107:5, 107:8
**vice** [2] - 81:24, 82:17
**victim** [1] - 94:21
**view** [2] - 94:24, 99:25
**violation** [9] - 7:22, 13:9, 42:15, 43:8, 43:11, 43:12, 44:15, 44:24, 45:1
**violations** [2] - 44:14, 44:21
**viral** [2] - 125:16, 125:18
**VIRGINIA** [1] - 1:1
**Virginia** [4] - 32:12, 32:15, 63:17, 139:4
**virtually** [3] - 21:15, 21:16, 21:19
**Visit** [3] - 69:24, 73:7, 73:9
**visit** [66] - 65:15, 70:6, 73:11, 73:16, 73:21,

74:19, 76:22, 77:23, 78:4, 78:9, 79:24, 80:18, 81:13, 82:6, 82:12, 84:19, 85:15, 85:20, 85:23, 88:9, 88:11, 94:1, 94:2, 94:7, 98:7, 99:5, 101:14, 102:1, 102:17, 111:4, 111:23, 112:12, 112:24, 113:23, 115:14, 115:21, 116:6, 117:12, 117:16, 117:19, 117:23, 119:14, 120:3, 120:6, 120:19, 120:23, 121:21, 122:2, 123:1, 123:15, 123:20, 124:19, 125:4, 128:1, 128:4, 130:13, 130:16, 130:19, 131:6, 131:10, 132:14, 134:9, 134:18, 134:23, 135:3, 135:11
**visits** [5] - 66:9, 66:11, 66:17, 73:24, 115:25
**VOGEL** [1] - 1:14
**voice** [1] - 37:8
**voir** [1] - 100:22
**VOLUME** [1] - 1:8

**W**

**Waffle** [4] - 7:17, 8:11, 12:11, 13:2
**wait** [2] - 16:22, 133:6
**walk** [3] - 9:12, 20:7, 50:3
**walked** [1] - 62:11
**walking** [2] - 28:3, 102:16
**wants** [3] - 27:7, 41:10, 51:7
**Washington** [5] - 1:16, 2:15, 2:18, 2:22, 3:3
**watch** [1] - 74:2
**ways** [1] - 36:15
**Weaver** [10] - 4:6, 62:7, 62:25, 63:3, 63:6, 69:16, 72:25, 91:22, 108:9, 109:3
**weaver** [1] - 96:10
**WEAVER** [1] - 62:17
**Weaver's** [1] - 96:10
**week** [27] - 11:19, 21:13, 21:21, 21:23,

25:8, 58:3, 58:4, 58:8, 72:9, 78:6, 85:15, 85:17, 86:1, 105:7, 105:8, 113:8, 113:11, 114:19, 114:22, 118:2, 118:5, 120:15, 120:16, 120:21, 128:23, 129:3, 129:11
**weekend** [1] - 32:4
**weeks** [9] - 13:22, 83:19, 85:25, 86:1, 87:10, 130:20, 134:20, 134:22, 134:25
**weird** [1] - 87:8
**well-adjusted** [2] - 72:6, 73:18
**well-groomed** [1] - 121:25
**well-spoken** [1] - 87:16
**whatsoever** [1] - 54:4
**whereof** [1] - 139:15
**white** [4] - 79:16, 100:19, 110:24, 129:21
**whole** [5] - 63:24, 74:9, 95:21, 99:18, 115:23
**Wi** [2] - 75:24, 75:25
**Wi-Fi** [2] - 75:24, 75:25
**Wiehle** [1] - 3:11
**window** [2] - 22:18, 22:21
**wise** [2] - 70:9, 72:8
**withhold** [1] - 68:15
**Witness** [4] - 18:1, 18:2, 62:2, 62:17
**witness** [50] - 5:7, 5:8, 6:5, 7:15, 11:16, 11:18, 12:17, 12:18, 12:24, 12:25, 13:18, 13:19, 14:15, 14:21, 15:1, 16:9, 16:18, 17:22, 32:21, 37:9, 38:11, 40:5, 40:10, 41:13, 41:15, 41:16, 41:20, 42:5, 44:9, 44:11, 44:25, 45:5, 51:23, 54:6, 58:22, 58:25, 61:7, 61:11, 62:3, 93:23, 95:4, 95:12, 95:14, 98:11, 108:10, 136:24, 137:4, 137:19, 138:2, 139:15
**WITNESS** [31] - 18:9,

24:25, 28:9, 33:14, 47:24, 49:5, 49:9, 49:13, 50:1, 50:6, 50:22, 50:24, 52:5, 52:15, 52:22, 54:14, 61:17, 61:24, 62:1, 62:23, 65:23, 66:2, 66:6, 75:1, 76:6, 76:10, 86:10, 104:10, 104:16, 104:21, 127:2
**witness's** [1] - 68:13
**witnessed** [2] - 81:16, 99:9
**WITNESSES** [1] - 4:1
**witnesses** [9] - 14:5, 17:12, 17:18, 43:11, 44:14, 44:15, 45:9, 45:10, 45:13
**woman** [2] - 10:24, 38:9
**womanly** [1] - 30:16
**word** [3] - 40:5, 40:6, 116:12
**words** [5] - 8:24, 30:16, 96:5, 116:12, 119:5
**worker** [2] - 5:9, 19:8, 104:17
**works** [1] - 7:6
**wounds** [1] - 122:23
**write** [6] - 77:15, 82:22, 105:22, 113:17, 113:25, 114:5
**writing** [3] - 103:20, 103:22, 105:5
**written** [1] - 119:3
**wrote** [18] - 71:24, 73:8, 77:7, 77:16, 79:15, 84:4, 85:8, 90:4, 93:6, 93:24, 96:24, 96:25, 113:14, 113:16, 113:20, 128:15, 133:9

**Y**

**year** [11] - 19:17, 59:10, 66:3, 66:10, 71:25, 81:4, 81:5, 85:24, 113:9, 113:11, 113:13
**Year's** [1] - 125:22
**years** [16] - 19:18, 28:25, 50:18, 53:10, 53:12, 60:21, 65:1, 65:13, 66:23, 69:20, 72:12, 72:13, 73:12,

100:20, 119:9, 120:12
**yesterday** [5] - 5:23, 100:2, 137:5, 137:10, 137:23
**young** [1] - 38:9
**yourself** [7] - 18:20, 63:5, 104:4, 104:6, 104:7, 113:3, 131:8

**Z**

**Zoll** [1] - 2:1
**zoom** [3] - 15:23, 115:18, 120:4