1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2

 3   B.R.,                        :
                                  :
 4                  Plaintiff,    :   Civil Action
                                  :   No. 1:19-cv-917
 5             v.                 :
                                  :
 6   F.C.S.B., et al.,            :   April 1, 2024,
                                  :   9:08 a.m.
 7                                :
                 Defendants.      :
 8                                :   VOLUME 10 - A.M. SESSION
     ........................... :
 9                                :

10

11        TRANSCRIPT OF JURY TRIAL PROCEEDINGS
        BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
12           UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Plaintiff:        Jonathan Fahey, Esq.
                               HOLTZMAN VOGEL BARAN TORCHINSKY
15                             & JOSEFIAK, PLLC
                               2300 N Street NW
16                             Suite 643a
                               Washington, DC 20037
17                             202-536-1702
                               Email: Jfahey@holtzmanvogel.com
18
                               Alison Anderson, Esq.
19                             BOIES SCHILLER FLEXNER, LLP
                               2029-Century Park East
20                             Suite 1520
                               Los Angeles, CA 90067
21                             213-995-5720
                               Email: Alanderson@bsfllp.com
22

23

24

25
     APPEARANCES:  (Cont.)
```

2

| | |
|---|---|
| For the Plaintiff: | **Brittany Zoll, Esq.**<br>BOIES SCHILLER FLEXNER, LLP<br>100 SE 2nd Street<br>Suite 2800<br>Miami, FL 33131<br>610-804-1787<br>Email: Britzoll@gmail.com |
| | **Andrew Brenner, Esq.**<br>BOIES SCHILLER FLEXNER, LLP<br>100 SE 2nd Street<br>Suite 2800<br>Miami, FL 33131<br>305-539-8400<br>Email: Abrenner@bsfllp.com |
| | **Robert Keefe, Esq.**<br>BOIES SCHILLER FLEXNER, LLP<br>100 SE 2nd Street<br>Suite 2800<br>Miami, FL 33131<br>850-585-3414<br>Email: Rkeefe@bsfllp.com |
| For Defendant F.C.S.B.: | **Ryan Bates, Esq.**<br>HUNTON ANDREWS KURTH, LLP<br>2200 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>202-955-1596<br>Email: Rbates@hunton.com |
| | **Sona Rewari, Esq.**<br>HUNTON ANDREWS KURTH, LLP<br>2200 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>202-955-1974<br>Email: Srewari@huntonak.com |
| | **Scott W. Burton, Esq.**<br>HUNTON ANDREWS KURTH, LLP<br>2200 Pennsylvania Ave NW<br>Washington, DC 20037<br>202-955-1664<br>Email: Burtons@huntonak.com |

APPEARANCES:  (Cont.)

3

| | |
|---|---|
| 1 | For Defendant F.C.S.B.: |
| 2 | |
| 3 | |
| 4 | |

For Defendant F.C.S.B.:        **Kevin Elliker, Esq.**
                               HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Avenue, NW
                               Washington, DC 20037
                               804-788-8200
                               Email: Kelliker@huntonak.com

For the Defendants:            **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,           THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,      KINNEY, PLC.
F.T., J.F.)                    1801 Robert Fulton Drive
                               Suite 120
                               Reston, VA 20191
                               Email:  Mk@kinneyesq.com

For the Defendant J.O.:        **Bruce Blanchard, Esq.**
                               ODIN, FELDMAN & PITTLEMAN, PC.
                               1775 Wiehle Avenue
                               Suite 400
                               Reston, VA 20190
                               Email:  Bruce.blanchard@ofplaw.com

Official Court Reporter:       MS. TONIA M. HARRIS, RPR
                               United States District Court
                               401 Courthouse Square
                               Tenth Floor
                               Alexandria, VA 22314

4

1          TABLE OF CONTENTS
           TRIAL WITNESSES
2

On behalf of the Plaintiff:
3

B.R.
4          Cross-examination by Mr. Kinney................ 13
           Redirect examination by Mr. Brenner........... 29
5

On behalf of the Defendants:
6

Fabio Zuluaga
7

           Direct examination by Ms. Rewari............... 81
8

                       EXHIBITS
9

On behalf of the Plaintiff:
10                                                      Admitted

11  Number 581........................................ 57
    Number 807........................................ 33
12  Defendants' Number 131............................ 47

13  On behalf of the Defendants:
                                                        Admitted
14
    Number 38......................................... 123
15  Number 157........................................ 93
    Number 160........................................ 96
16  Number 178........................................ 130
    Number 200........................................ 146
17  Number 365........................................ 015
    Plaintiff's Number 133............................ 89
18  Plaintiff's Number 160............................ 108
    Plaintiff's Number 294............................ 154
19
                       MISCELLANY
20
    Preliminary matters............................... 05
21  Certificate of Court Reporter.................... 161

22  After review of the record and upon agreement of counsel and
    deputy clerk, all final exhibits can be found on CME at Docket
23  #975.

24

25

                              Tonia M. Harris OCR-USDC/EDVA 703-646-1438

                    EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

5

1          THE COURTROOM CLERK:  Good morning.

2          (Good morning responses.)

3          THE COURT:  Apparently about 9:30 last night the

4    defendants filed another request regarding certain evidence

5    that the Court has already dealt with.  The Court has had an

6    opportunity to read the briefs.  I don't need to hear anything

7    from the plaintiffs.

8          This matter comes before the Court on Defendants'

9    F.C.S.B.'s bench brief on relevance of Fairfax County Police

10   Department's March 2012 investigative findings.  The Court

11   construes this bench brief as a motion for reconsideration.

12   Although this Court has permitted F.C.S.B. to elicit testimony

13   that the March 2012 investigation of plaintiff's alleged rape

14   was closed, F.C.S.B. continues to assert that it is important

15   for the jury to know that the Fairfax County Police Department

16   determined that the allegations were unfounded and that

17   Ms. R., plaintiff's mother, asked the police to stop

18   investigating.

19         To begin with, this Court has not held that F.C.S.B.

20   cannot elicit testimony that Ms. R. asked FCPD to stop

21   investigating plaintiff's allegations.  The defendants may do

22   so.  This Court has excluded evidence that the F.C.S.B.

23   concluded that the plaintiff's allegations were unfounded or

24   that the FCPD made credibility determinations regarding

25   plaintiff and C.K.

Cross - B.R.

─── B.R. v. F.C.S.B.───

6

1    To that end, circuit court of appeals, including the

2  Fourth Circuit, have routinely held that similar reports

3  suffered from all risk of undue prejudice because they contain

4  credibility determinations and tend to undermine the exclusive

5  province of the jury.  I cite for that, *United States v.*

6  *McDonald* and the *United States v. Dorsey*.  The evaluation of a

7  witness's credibility is a determination usually within the

8  jurors exclusive purview, *United States v. Hayes*.  It is

9  impermissible for a prosecutor to elicit one witness's opinion

10  that another witness has told the truth.  F.C.S.B. did not

11  address the authorities cited by Court in its order nor has

12  F.C.S.B. cited other authority from the Fourth Circuit

13  addressing this issue.

14    Plaintiff's questioning on the issue of the police

15  investigation was the subject of multiple sidebars with the

16  Court and has not opened the door to a discussion of the

17  police investigation to the extent F.C.S.B. desired nor does

18  plaintiff's questioning on this issue permit F.C.S.B. to

19  invade the province of the jury.  The Court is not going to

20  permit F.C.S.B. to invade the jury's province.  Moreover, many

21  of the facts discussed in F.C.S.B.'s brief are facts that can

22  be argued to the jury and do not undermine the Court's

23  conclusion about what the focus of taking evidence should be.

24    Accordingly, it is ordered that F.C.S.B.'s bench

25  brief construes a motion for reconsideration is denied.

─────B.R. v. F.C.S.B.─────

7

1 Ordered this day.

2           I will say to representatives of the defendants,

3 you've asked me to do this about ten times.  I've made clear

4 what the Court's position is on this, so continuing to file

5 motions for reconsideration is not to your advantage.  And

6 when you do file motions for reconsideration, make sure that

7 you're accurate in what you're saying to the Court as to the

8 Court's disposition of matters.

9           Is there anything we need to do before we bring the

10 jury in?

11           MR. BRENNER:  Not from the plaintiff, Your Honor.

12           MS. REWARI:  Your Honor, we would like some

13 clarification regarding the -- where on the closet

14 allegations.  We went back through --

15           THE COURT:  I'm not following you.

16           MS. REWARI:  So we went back through the transcripts

17 over the weekend and we just would like some clarification in

18 terms of the Court's ruling as to what we may or we may not do

19 with regard to the plaintiff's allegations that she was raped

20 in a closet at Rachel Carson.  Those allegations are in the

21 operative complaint and so we had been allowed -- Your Honor

22 has allowed us to ask some of our witnesses about it.  But

23 we -- in the pretrial motions, the plaintiff said that this

24 was still part of their case.  They have -- they have in the

25 motion in limine they said it was still part of their case.

Cross - B.R.

B.R. v. F.C.S.B.

8

1  The Court's motion in limine order did not exclude those

2  claims only the references to the criminal filings that are

3  attached to the second amended complaint regarding gangs.

4          And so, the plaintiff has objected several times and

5  we've tried to ask her about it, and I understood Your Honor's

6  ruling as we can't say "gangs," but we can say "men in the

7  closet." But we just want some clarity because I was not

8  permitted to -- because of the objections -- to ask the

9  plaintiff about her allegations.

10          THE COURT:  Is this -- again, I'm just trying to

11  focus on what you're talking about.

12          Is this the question in which you sort of made the

13  reference, generally, to someone being gang raped?

14          MS. REWARI:  Well, no.  My question is:  Was the

15  reason that we were not permitted to ask the plaintiff about

16  her allegations in the second amended complaint and the prior

17  complaints about the closet because it was outside the scope

18  of direct or was there some other reason.  Plaintiff objected

19  and we have been -- you know.

20          THE COURT:  What was the basis of the plaintiff's

21  rejection?  I read the records, obviously, but tell me what

22  the basis of plaintiff's objection?

23          MS. REWARI:  I believe their objection was, Well, we

24  didn't raise it with her on direct.  We didn't put it in our

25  opening.  And I just want to clarify that we can still go into

─────────B. R.  v.  F. C. S. B.─────────

9

1   it in our case because it is still part of the case.

2          THE COURT:  I don't think I've done anything to

3   preclude you from doing that.

4          MS. REWARI:  Okay.  And that's -- we can call her

5   back in our case to ask her about those allegations because we

6   have not had a chance to do that, but I just wanted to clarify

7   that that that was your ruling.

8          MR. BRENNER:  Your Honor, I don't want to waste the

9   Court's time with it now, because it's not going to be an

10  issue, I think, with plaintiff on the stand.  This is an issue

11  that has been discussed at least five times through the trial.

12         THE COURT:  Whenever someone loses, they file a

13  motion for reconsideration, which apparently is the way that

14  we are going to do things in this case, which is very

15  disappointing to the Court.

16         Again, I appreciate that people can make strong

17  arguments on their behalf and believe what their

18  interpretation of the law is, but asking the Court to

19  reconsider things five, six, seven times is not productive.

20         MR. BRENNER:  Right.  So all I would say is I don't

21  agree with Ms. Rewari's interpretation of how this issue has

22  been handled so far.  We don't need to deal with it today.  I

23  would like to get my client on and off the stand today so we

24  can deal with that.  I just wanted to note for the record that

25  it's gone beyond -- the issue is not limited to what was the

B.R. v. F.C.S.B.

10

1    scope of direct.  It was not the only objection.  It's

2    happened with other witnesses.  You've ruled on this, but

3    they, obviously, has done a scouring of the transcript.  I

4    would have liked to know that this was going to be brought up

5    this morning so I could have done the same.  We will --

6            THE COURT:  Well, I thought I would preclude your

7    argument by basically ending up on your side of the issue.

8            MR. BRENNER:  No.  On the closet issue, not the

9    other issue.  If they are going to raise this, which they have

10   now, we will go back and be able to apprise Your Honor of what

11   happened.  I don't think it is an issue for --

12           THE COURT:  Well, it's my understanding that -- I

13   guess the best way to describe it, the initial examination of

14   B.R. is going to end today.  There may be some other

15   examination down the road if defendant chooses to call B.R.

16           MR. BRENNER:  That's what I'm saying or they try to

17   do it through -- this issue through the witness so we can

18   address it, after we've had a chance to do what apparently

19   they've done over the weekend, and that way both sides can

20   apprise the Court of what's happened, but for now --

21           THE COURT:  I'll take it under advisement,

22   Mr. Brenner.

23           MR. BRENNER:  Okay.  Thank you.

24           THE COURT:  Anything else we need to do before we

25   bring the jury in?

─────────────────── B.R. v. F.C.S.B. ───────────────────

                                                                    11

1            MR. BRENNER:  Nothing for the plaintiff, Your Honor.

2            THE COURT:  All right.

3            MS. ANDERSON:  Your Honor, should she take the

4    stand?

5            THE COURT:  Yes.

6            (Witness was previously sworn and has reseated.)

7            (Jury present.)

8            THE COURT:  You may have a seat.  Good morning,

9    ladies and gentlemen.

10           (Good morning responses.)

11           THE COURT:  I trust you all had a very enjoyable

12   holiday weekend and got to spend some time with family, which

13   is so very important.  Sorry that it's raining today.  I saw

14   one of you coming in this morning as you were trying to get to

15   the courthouse, and I felt sorry for you because it was

16   raining and I'm in the car and she's trying to get inside.  So

17   I'm glad that you didn't get too wet.

18           What I would like to do at this time, ladies and

19   gentlemen, is sort of go over the schedule for this week and

20   maybe a part of next week.  Because I think it's important for

21   you to be able to plan your time.  I've taken a look at the

22   Court's calendar, certain travels that needed to be built into

23   this.  And so, if you want to write down on your little

24   notepad what I am envisioning for this week and maybe the

25   next.

B.R. v. F.C.S.B.

12

1          Today we'll go from 9:00 until about 3:00.  Tomorrow

2    we'll go from 10:00 to 4:00 or thereabout.  Wednesday is a

3    very, very tough day.  We're going to go from 11:00 to 2:00.

4    I apologize that it's going to be a restricted day, but I've

5    got other things that are a part of my obligations as a judge

6    that I have to attend to.

7          Thursday 10:00 to 4:00 or thereabout.  Friday,

8    because I have travel, we're going to go 9:00 to 1:00.  I have

9    to go to Danville, Virginia.  Not Puerto Rico or Hawaii,

10   Danville, Virginia.  Next week we're looking at Monday, 9:00

11   to 3:00.  Tuesday, 10:00 to 4:00.  Wednesday, 9:00 to 4:00.

12   Thursday, 10:00 to 4:00; and if we're there Friday, 10:00 to

13   4:00.  Obviously, we will adjust based upon your own personal

14   and collective responsibilities to adjust.  We may go a little

15   longer some days, we may shorten things up some days just so

16   we have natural breaks.  I kind of wanted to give you some

17   idea because there are a few days in there where if you have

18   your own professional obligations, you might be able to work

19   some of those in during those days, but that's the best way

20   that we can manage the case at this time.

21          All right.  I have to ask a question:  Were all of

22   you able to live up to the Court's instruction not to discuss

23   the case or any aspect of the case with anyone and I take it

24   you were able to stay away from social media and news media to

25   the extent that it involves these cases.

─────────── B.R. v. F.C.S.B. ───────────

13

1          Very good, ladies and gentlemen.

2          All right.  We have Ms. B.R. on the stand for the

3     recommencement of her testimony.

4                          CROSS-EXAMINATION

5     BY MR. KINNEY:

6     Q.   Good morning, ma'am.

7     A.   Good morning.

8               MR. KINNEY:  May I proceed, Your Honor?

9               THE COURT:  You may.

10              THE WITNESS:  Good morning, sir.

11    BY MR. KINNEY:

12    Q.   Michael Kinney, I represent A████ F███████, S████ T████,

13    T████ B████, P████ H█████, B████ H██████, J████

14    F███████, M███ C███, M█████ F████, and F████ T██████.

15              Do you understand that?

16    A.   I do.

17    Q.   I'd like to ask you about some photos that you saw last

18    week, Defense Exhibit 364.

19              MR. KINNEY:  Your Honor, I believe these are already

20    in evidence.

21              THE COURT:  Yes, sir.

22    BY MR. KINNEY:

23    Q.   Would you take a look at the fourth photo in that group.

24    It has a label at the bottom, FT007.

25              Do you see that?

1    A.    You said "seven," is that what you said, sir?

2    Q.    It's labeled seven, yes?

3    A.    Yes, I see that.

4    Q.    I think you testified that's a photo of you and friend

5    O.B.?

6    A.    That's correct.

7    Q.    Do you know when this photo was taken?

8    A.    I do not.

9    Q.    O.B. looks to be wearing a furry sweater or hoodie --

10           THE COURT:  Was --

11           THE COURTROOM CLERK:  Was the Exhibit 360?

12           MR. KINNEY:  Pardon me?

13           THE COURTROOM CLERK:  Was the exhibit 360?

14           MR. KINNEY:  364.

15           THE COURTROOM CLERK:  364.  Thank you.

16           THE COURT:  All right.  Thank you, sir.

17   BY MR. KINNEY:

18   Q.    Does O.B. appear to be wearing a furry hoodie?

19   A.    It appears that way, yes.

20   Q.    Could this photo have been taken in the fall?

21   A.    It could have been.

22   Q.    You just don't know?

23   A.    I don't have a recollection of this.

24   Q.    Okay.  I'd like to ask you about some other photos that I

25   don't believe were in the book?

─B.R. v. F.C.S.B.─

15

1   A.   Okay.  Should I put this aside?

2   Q.   You may.

3   A.   Thank you.

4        MR. BRENNER:  Your Honor, we will have no objection

5   to these photos.

6        THE COURT:  Without objection.  You may publish.

7        MR. KINNEY:  May I publish?  Thank you.  365 that

8   we're publishing.

9        MR. BRENNER:  Your Honor, Mr. Kinney, can you just

10  identify for the record which part -- is this part of 365 or

11  is it all of 365.

12       MR. KINNEY:  All of 365.

13       MR. BRENNER:  It is?  Okay.  These four pictures are

14  the whole exhibit?

15       MR. KINNEY:  I'm going to ask about all the photos

16  in the exhibit.

17       MR. BRENNER:  Just for record keeping, I'm just

18  trying figure out what's going into evidence.

19       I don't object to these four photos, Your Honor.  I

20  don't know what else is in that exhibit.

21       THE COURT:  All right.  We'll see how it pans out.

22  Do you recognize that picture, ma'am?

23       THE WITNESS:  I guess so, yes.

24  (Defendants' Exhibit No. 365 was admitted into evidence.)

25  BY MR. KINNEY:

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

Cross - B.R.

────B.R. v. F.C.S.B.────

16

1   Q.   Do you recognize yourself in the photo?

2   A.   I do, yes.

3   Q.   Are you wearing black pants and a gray sweater?

4   A.   That's correct, yes.

5   Q.   Do you remember when these photos were taken?

6   A.   If I'm not mistaken, I believe some time in either

7   September or October.  I don't have a vivid recollection of

8   it.

9   Q.   It appears to be at a park, am I correct in that?

10  A.   It appears to look like that, yes.

11  Q.   And that would make it a field trip I suppose?

12  A.   That sounds about right, yes.

13  Q.   Do you remember taking a field trip to a park?

14  A.   I do.

15  Q.   Let me ask you to look at the last photo in that group.

16  Do you remember taking this photo?

17  A.   Vaguely I do.

18  Q.   What do you remember about it?

19  A.   I just remember taking the photo.  I don't recall what

20  context it was.  I feel like maybe a guidance counselor

21  appreciation week or something, but I don't have a distinct

22  recollection of why we were taking this photo.

23           THE COURT:  Is this all part of 365?

24           MR. KINNEY:  Yes, Your Honor.

25           THE COURT:  For purposes of making the record clean.

Cross - B.R.

—B.R. v. F.C.S.B.—

17

1   Refer to it 365 A, B, and C if you're going to use subparts of

2   365.

3          MR. KINNEY:  Okay.

4          THE COURT:  Do you mind if we call this one A or B.

5          MR. KINNEY:  Pardon me?

6          THE COURT:  Do you mind if we call this one B of

7   365?

8          MR. KINNEY:  Well, it's the fourth in 365 so it

9   would be D.

10         THE COURT:  Well, I don't know what order you are

11  offering them, but, okay, whatever you want to call it, but I

12  just want the record to be clean.

13         MR. KINNEY:  Okay.  We're looking at the fourth

14  photo in exhibit --

15         THE WITNESS:  This one, right?

16         MR. KINNEY:  Yes, 365.

17  BY MR. KINNEY:

18  Q.   It has a label at the bottom FT012?

19  A.   Yes.  Thank you.

20  Q.   The class has spelled out "Thank you, Mrs. H███████"?

21  A.   That's what it says, yes.

22  Q.   Not everyone is holding a letter, are they?

23  A.   That's correct.

24  Q.   Are you holding a letter?

25  A.   I am.

─B.R. v. F.C.S.B.─

18

1   Q.   What letter are you holding?

2   A.   I believe it's the P.

3   Q.   How did it come to be that you were holding a letter and

4   not others?

5   A.   I think I was asked to hold it.

6   Q.   Okay.  Do you know what you were doing right before this

7   photo was taken?

8   A.   I don't.

9   Q.   Let me ask you about your January 27, 2012, email to

10  Cheryl Weaver and Principal F███████.

11          Do you remember talking to Mr. Brenner about that

12  last week?

13  A.   I do.

14  Q.   Am I correct that this letter was your first direct

15  contact with Principal F███████?

16  A.   It was my first direct contact with Mr. F███████, yes.

17  Q.   January 27th was a school day, wasn't it?

18  A.   I don't know, but that sounds about right.

19  Q.   You sent it, as I think I recall, a little after noon on

20  January 27th; is that right?

21  A.   I'm not sure what time it was at.

22  Q.   Do you remember how long it took you to write it?

23  A.   Quite a while.

24  Q.   You put some thought into it?

25  A.   A lot of thought, yes.

Cross - B.R.

B.R. v. F.C.S.B.

19

```
 1   Q.   Did anyone help you write it?
 2   A.   No.
 3   Q.   I noticed it was from your family email address, but you
 4   wrote it?
 5   A.   That's correct.
 6   Q.   I hope you let me say it was an articulate letter?
 7   A.   I appreciate that.  Thank you, Mr. Kinney.
 8   Q.   Do you agree?
 9   A.   I would agree, yes.
10   Q.   You were a 7th grader in a school of 1,300 children and
11   you were writing the principal.  That seems to me -- if you
12   would allow me to say brave?
13   A.   It was a step that I had to take, yes.
14   Q.   Did you feel brave in writing it?
15   A.   I just wanted help.  I don't really know if I felt brave
16   at the time.  Today I feel brave writing that as a
17   12-year-old, but I just wanted someone to help me when I was
18   12.
19   Q.   You made a policy recommendation or you made a proposal
20   in the letter, didn't you?
21   A.   That was one part of my letter, yes.
22   Q.   You recommended more frequent assemblies on the subject
23   of bullying?
24   A.   Yes.  And other behaviors at school.
25   Q.   Ms. R., I would like to talk to you now about
```

B.R. v. F.C.S.B.

20

1   November 21.

2   A.    Okay.

3   Q.    You met with Ms. T▇ first with your parents?

4   A.    Yes, I did.

5   Q.    At some point your mother went home to get a phone log?

6   A.    I don't recall exactly what my mom did, but that sounds

7   about right.

8   Q.    You stayed at school that day, though, didn't you?

9   A.    I did, yes.

10  Q.    And you spoke with Ms. T▇ without your parents?

11  A.    I don't recall speaking to Ms. T▇ alone that day, no.

12  Q.    Did you speak with Ms. T▇ with anyone?

13  A.    So I'm a little bit confused by the question.  I met with

14  Ms. T▇, Mr. H▇, and Ms. H▇ when I was first there

15  with my parents and I didn't meet with anyone separate on that

16  first day, November 21st.  I met with Ms. T▇ alone another

17  day.

18  Q.    On the 22nd?

19  A.    No.

20  Q.    What other day?

21  A.    It was some time in December.

22  Q.    Well, what did you tell Ms. T▇ in December?

23  A.    In December I tried to tell Ms. T▇ more about what I

24  was experiencing with C▇ that he was touching me up and

25  down my body, that I was scared of him, that I felt

1   threatened, that he was going inside of me and I actually

2   wrote a statement that day as well.

3   Q.   You didn't tell Ms. T████ that you had given C.K. $50?

4   A.   That was much earlier.  My mom and I reported that on

5   November 21st.

6   Q.   Well, that wasn't in your student statement on the 21st,

7   was it?

8   A.   Yeah, you're right.  It was not in my statement, but it

9   was verbally said.

10  Q.   Did Ms. T████ ask if your mother knew about the $50

11  before that day?

12  A.   Yes, because my mom was the one that reported it.

13  Q.   Ms. T████ told you that she was going to get the money

14  back, didn't she?

15  A.   Yes, she said that she was going to go and stop by and

16  see C████████'s mother.

17  Q.   She didn't tell you that she would call C████████'s

18  mother and get it back?

19  A.   She said that she was going to stop by and see

20  C████████'s mom and then on November 22nd she said that she

21  had stopped by.  I didn't know who this was at the time but

22  Stacy's house, who is C████████'s mother.  That's how show got

23  the $50 back.

24  Q.   Did you tell Mrs. T████ that you had dated David N.?

25  A.   I had told her about the pumpkin patch incident in terms

B.R. v. F.C.S.B.

22

1  of that I had gone to the pumpkin patch and how things had

2  transpired, but I don't know if I specifically said that we

3  dated.  I think it was very obvious that I had a crush on him.

4  Q.   When did you tell Ms. T████ that you had gone to the

5  pumpkin patch?

6  A.   I had told her that day that I came in and reported it

7  with my mom on November 21st.

8  Q.   Did you tell Ms. T████ on November 21st that D████ N████

9  had exposed himself to you?

10 A.   I don't think I told her that he exposed himself on that

11 day, no.

12 Q.   You hadn't told your mother that he had exposed himself

13 before then, did you?

14 A.   That's correct, because I wasn't complaining about D████

15 N████ conduct in the basement.

16 Q.   Did Ms. T████ ask you about going out with C.K.?

17 A.   I don't recall her specifically asking.  I recall though

18 more dismissing my complaints though as a boy/girl thing.  So

19 it really wasn't asked in that context of, like, dating or

20 anything like that.

21 Q.   You didn't tell Ms. T████ that you had some kind of

22 physical contact with David N. in the basement?

23 A.   I did not tell her that there was any physical conduct in

24 the basement because I wasn't reporting that.

25 Q.   Did Ms. T████ tell you that you needed to have a

B.R. v. F.C.S.B.

23

1  conversation with your parents about being in the basement

2  with David?

3  A.   So I don't -- I'm a little bit confused about that

4  because my parents were there with me that day and my mom was

5  the one that told her about the pumpkin patch.

6  Q.   Is your testimony then that Ms. T███ did not tell you to

7  have a conversation with your parents about being in the

8  basement with David?

9  A.   Well, that was the first time I ever met with Ms. T███

10 so I'm not sure how that's possible.

11 Q.   So the answer is "no"?

12 A.   To the extent I understand your question, no.  But I'm

13 not sure I do.

14 Q.   Ms. R., let me ask you about another topic.  You

15 testified last week in response to questions from Ms. Rewari

16 and Mr. Blanchard that your lawyers did not ask you to review

17 the complaints filed in this case?

18 A.   Yes, they never asked for me -- they never gave me a

19 chance, I should say.

20 Q.   And that applies to the initial complaint they never gave

21 you a chance to review the initial complaint?

22 A.   Yes, I had asked to review it, but I was told it was not

23 necessary.

24 Q.   And there was an amended complaint, the first amended

25 complaint, were you asked to review that?

─────B. R. v. F.C.S.B.─────

24

1    A.   I had asked to review it, and I was not given a chance to

2    review it.

3    Q.   And there was a second amended complaint, were you asked

4    to review that?

5            MR. BRENNER:  Just an objection that these exact

6    questions were asked and answered.

7            THE COURT:  Overruled.

8            THE WITNESS:  I'm sorry.  Can you repeat the

9    question?

10   BY MR. KINNEY:

11   Q.   There's a second amended complaint?

12   A.   Yes.

13   Q.   Were you asked to review that?

14   A.   I was not asked to review that, no, but, again, I had

15   asked as well to review that.

16   Q.   You were not given a chance to review that?

17   A.   I was not given a chance or I was not even -- and I was

18   not even given a copy.  I had asked to see it.

19   Q.   Ms. R., back in September you wrote several letters

20   directly to the Court, do you remember?

21   A.   Unfortunately I do, yes.

22   Q.   On September 7th you wrote a letter of three-and-a-half

23   single spaced pages, right?

24   A.   That is correct.

25   Q.   On September 11th I believe you wrote two letters, do you

B.R. v. F.C.S.B.

25

1  recall that?

2  A.   So I don't recall like which letter I wrote on what day

3  but, yes, I do recall writing letters to the Court.

4  Q.   One of them was ten single spaced pages, correct?

5  A.   If that's exactly what it is, I trust you Mr. Kinney.

6  Q.   Would you trust me that the second letter is eight single

7  spaced pages?

8  A.   If that's what you say, I don't believe you have a reason

9  to lie to me about that.

10  Q.   September 12th you wrote a letter of ten single spaced

11  pages?

12  A.   That sounds right.  I don't know.  I don't have the

13  letters in front of me.

14  Q.   On September 13th you wrote a letter of over 11 single

15  spaced pages?

16  A.   That sounds about right.

17  Q.   And in every one of those letters you told the Court that

18  you wrote them yourself without a lawyer?

19  A.   I did.  There were pretty extraordinary circumstances

20  surrounding why I wrote those letters.

21  Q.   And in fact, you did write those letters yourself without

22  a lawyer?

23  A.   I did, yes.

24  Q.   In the second September 11th letter you asked permission

25  to amend your complaint a third time, didn't you?

———— B. R. v. F.C.S.B. ————

26

1   A.   I did, yes.

2   Q.   Your lawyers had already, in fact, filed a third amended

3   complaint before then, didn't they?

4   A.   I --

5           MR. BRENNER:  Objection, relevance, Your Honor.

6           THE COURT:  Where are we going with this?

7           MR. KINNEY:  Pardon me?

8           THE COURT:  Where are we going with this.

9           MR. KINNEY:  I just want the facts, Your Honor, that

10  she was aware of a third amended complaint.  She's testified

11  as to others and this is the --

12          THE COURT:  I think she said that she's aware of

13  them, and I think her testimony is that she may have looked at

14  them, but according to her testimony the attorneys didn't

15  allow her to review that.

16          MR. KINNEY:  And I would like to ask the same

17  question about the third amended complaint.

18          THE COURT:  All right.  Overruled.

19  BY MR. KINNEY:

20  Q.   Did you review the third amended complaint?

21  A.   So I did not review it.  My understanding, though, of

22  what had happened though is there was some issue where the

23  defense had asked my lawyer to take it down and then I never

24  had a chance to review it either.

25  Q.   You never had a chance to review it before it was filed?

─B.R. v. F.C.S.B.─

27

1  A.   No.

2  Q.   Did you ask to review it before it was filed?

3  A.   I did, yes.

4  Q.   And your lawyers didn't permit you to review it?

5  A.   That's correct.  That's why they are no longer my

6  lawyers.

7  Q.   And then the -- your lawyers withdrew the third amended

8  complaint?

9  A.   I terminated my lawyers.

10  Q.   So let me make sure I understand you.  You didn't read

11  the initial complaint -- well, the first amended complaint, or

12  the second amended complaint, or the third amended complaint;

13  is that right?

14  A.   That was not by choice.

15  Q.   And you -- I take it you didn't approve the filing of

16  those complaints?

17  A.   It would have been nice if my counsel had allowed me to

18  see it, but I was not given that opportunity.

19  Q.   Ms. R., who gave your lawyers the approval to file the

20  complaints in this case on your behalf?

21          MR. BRENNER:  Objection, relevance, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I mean I was the one that brought this

24  case.

25  BY MR. KINNEY:

─────────B.R. v. F.C.S.B.─────────

28

1    Q.   But you just testified that you didn't see, review, or

2    approve any of the pleadings or any of the complaints that

3    were filed in this case?

4    A.   Like I just said, there is a reason why they are not my

5    lawyers anymore.

6    Q.   Is it your testimony that your lawyers filed those

7    complaints without any approval?

8    A.   So I told my lawyers about what happened to me, right and

9    then they drafted legal pleadings, but I was never given an

10   opportunity to review those, and that is my testimony.

11   Q.   But is it your testimony that your lawyers filed the --

12   complaints in this case without your approval?

13   A.   Yes, and I wish I had a chance to review them.  I wanted

14   to review them, but, again, that's why I don't have the same

15   counsel that I did at the time.

16   Q.   Is it your testimony that no one other than your lawyers

17   approved the complaints?

18   A.   I'm sorry.  Can you clarify that question?

19   Q.   Yes.  Did anyone other than your lawyers approve the

20   complaint on your behalf?

21   A.   I'm not even sure what that means, what does that mean?

22          THE COURT:  Ma'am, you said you didn't have an

23   opportunity to review the complaints that were filed in this

24   action.  Was anyone else reviewing them for you, I guess is --

25          THE WITNESS:  No.  No one else reviewed them for me.

1   BY MR. KINNEY:

2   Q.   Is it your testimony that every set of lawyers you had

3   wouldn't allow you to review the complaints?

4   A.   That is correct, yes, actually.

5           MR. KINNEY:  Thank you, Ms. R.

6           THE WITNESS:  Thank you, Mr. Kinney.

7           THE COURT:  Thank you.

8           MR. BRENNER:  Thank you, Judge.  Can I take a second

9   to set up a little bit?

10          THE COURT:  Yes, sir.

11                    REDIRECT EXAMINATION

12  BY MR. BRENNER:

13  Q.   Good morning, B███.

14  A.   Good morning, Mr. Brenner.

15  Q.   It's day number six in that seat?

16  A.   Yes, I think so.

17  Q.   One thing I failed to do initially when we spoke is to

18  explain to the jury why is the screen is off to the side for

19  you and not for other witnesses.

20          Can you just briefly explain to the jury what the

21  issue is with the screen as it relates to you?

22  A.   Yeah.  So with my condition when I turn my head to the

23  left I get extremely nauseous and dizzy and it really

24  aggravates my light sensitivity to look to the left, and

25  that's why I don't look at the screen.

Redirect - B.R.

─────────B. R. v. F.C.S.B.─────────

30

1   Q.   Okay.  We'll try not to use the screen at all, but if we

2   have to it would be short.

3            Okay.  I want to pick up where Mr. Blanchard left

4   off with you on Thursday afternoon.

5            Do you recall him asking you a series of questions

6   about your father's car?

7   A.   Yes, I do.

8   Q.   And whether your father's car had tinted windows?

9   A.   I do recall that, yes.

10  Q.   Okay.  And do you remember what you told him as the kind

11  of car your father had?

12  A.   I told him that my dad had a Toyota Camry, Corolla,

13  something like that.

14  Q.   Do you remember what you told Mr. Blanchard about whether

15  you recall your father's car having tinted windows?

16  A.   I recall saying that my dad did not have tinted windows.

17  Q.   Okay.  In your binder you have what we'll mark as

18  Exhibit 807.  If not, I can hand you a copy.

19  A.   I have it.

20  Q.   Exhibit 807, how many pages is it?

21  A.   It is -- I believe it's three pages.

22  Q.   And how many pictures are on those pages?

23  A.   Three.

24  Q.   Does the last page have two pictures?

25  A.   Yes.  The last page has two pictures.  My bad.

Redirect - B.R.

B.R. v. F.C.S.B.

31

```
 1   Q.   Four total?

 2   A.   Four total, yes.

 3              MR. BRENNER:  Your Honor, at this time we'd move in

 4   Plaintiff's Exhibit 807.

 5              MS. REWARI:  Your Honor, this is a document that was

 6   not produced to us.  We'd object.

 7              MR. BRENNER.  May we approach.

 8              (Side bar.)

 9              THE COURT:  Okay.

10              MS. REWARI:  This document was not produced in

11   discovery.  It's not been authenticated and I don't --

12              MR. BRENNER:  It wouldn't have been in discovery.

13   It only came up because Mr. Blanchard represented to the --

14   Mr. Blanchard showed this picture to the jury.

15              THE COURT:  I recall.

16              MR. BRENNER:  And he showed the side of a car with

17   tinted windows.  And said, it looks like a Camry, doesn't it?

18   Well, it turns out if he had showed the right picture, it is

19   actually a Hyundai.

20              And these are pictures showing the family Camry.  It

21   would be no reason for them to produce them.

22              THE COURT:  When were these pictures taken?

23              MR. BRENNER:  She will testify -- I have others.  I

24   think -- I think 2008 or -9.  She will say they had it in '11.

25              THE COURT:  When was the picture taken?
```

——B.R. v. F.C.S.B.——

32

1          MR. BRENNER:  I'll ask her.  I believe it is before

2    2011.

3          THE COURT:  Okay.

4          MS. REWARI:  I'd be surprised if it was before 2011

5    because that's her brother in the car and he was born in 1995,

6    so that would be when he was 16, but we don't object to this

7    photograph.  This is a blowup what Mr. Blanchard showed her.

8    But these photographs is of a Camry.

9          THE COURT:  Were those pictures produced by you in

10   discovery?

11         MS. REWARI:  Yes.  I mean -- I think this is a

12   blowup of the photograph that he showed from that exhibit.

13         THE COURT:  Okay.  This is what we're going to do.

14   You can ask her questions about it, but it doesn't come in.

15         MR. BRENNER:  This -- the pictures of the Camry, but

16   I can do this one?

17         THE COURT:  Yes.  You can make reference to it.

18         MR. BLANCHARD:  Just for the record, I asked her,

19   "What kind of car?"  I believe she said a Toyota.  And then I

20   said, "Was it a Sedan?"  I think she said it was a four door.

21   This was the only picture I was aware of.  And if that was in

22   there, I didn't -- if that's not a Toyota, it's not a Toyota.

23   But I never represented I asked her is that's your dad's car.

24   She said, "no."  So I just wanted for the record --

25         THE COURT:  The jury can give whatever weight and

B.R. v. F.C.S.B.

33

1    credibility it wants to.  You can ask her about the picture.

2                MR. BRENNER:  I can ask her about the two and --

3                THE COURT:  Yes.  But these apparently, suggested by

4    Ms. Rewari, do not come in because they were not provided in

5    discovery.  So you can ask her questions about it, but they

6    don't come in.

7                MR. BRENNER:  I understand Your Honor's ruling.

8    Okay.

9                MS. REWARI:  Your Honor, I would just also point out

10   the sticker on this photograph of this vehicle is not for

11   sale, so we haven't had a chance to figure out --

12               THE COURT:  As I said, they are not going to see it.

13               Very good.

14               (Open court.)

15   BY MR. BRENNER:

16   Q.   If you look at the three-page exhibit I just gave you.

17   The first two pages -- well first of all, do these -- the

18   two -- the first two pages do those confirm your recollection

19   that your family car was a Toyota at the time or your father's

20   car?

21   A.   Yes, it does.

22               MR. BRENNER:  Now, if we could bring up and move

23   into evidence the last page of 807, Your Honor?

24               THE COURT:  You may.  That's without objection.

25   (Plaintiff's Exhibit No. 807 was admitted into evidence.)

Redirect - B.R.

───────B.R. v. F.C.S.B.───────

34

1   BY MR. BRENNER:

2   Q.   Do you see that?

3   A.   Yes, I see that.

4   Q.   Okay.  Go back to the one before.

5        So do you recall being shown this one during your

6   cross-examination by Mr. Blanchard?

7   A.   That is correct.  This is what Mr. Blanchard showed me.

8   Q.   He showed you the tinted windows?

9   A.   Yes.

10  Q.   Okay.  But you can't tell from the side there what kind

11  of car it is, can you?

12  A.   No.  And I'm not really car savvy.

13  Q.   Let's go to the next picture.  It's the same picture,

14  just a different view.

15       MR. BRENNER:  Can you blow up to the front of the

16  car there?  A little more.

17       (IT tech complied.)

18       MR. BRENNER:  Is that the best you can do, Mr.

19  Brown?

20  BY MR. BRENNER:

21  Q.   Is that a Toyota symbol or a Hyundai symbol?

22  A.   That looks like to be a Hyundai symbol.

23  Q.   Okay.  Is that your dad's car?

24  A.   That is not my dad's car.

25  Q.   You can take that down, Mr. Brown.

1          You understand who -- do you understand who

2     Mr. Blanchard represents in this case.

3     A.    Yes, he represents J███.

4     Q.    So let's talk a little bit more about J████?

5     A.    Can I put this down?

6     Q.    You can put this down, yes, ma'am.

7          There was some question of you over the course of

8     the cross-examination about your relationship with J████?

9     A.    Yes.

10    Q.    You met J███ when?

11    A.    I met J███ when I was in the 6th grade at Floris

12    Elementary school.

13    Q.    How would you describe your relationship in 6th grade?

14    A.    I'm sorry.  Can you repeat that?

15              MR. BRENNER:  Your Honor, may we approach for one

16    second?  I have to raise an issue.

17              THE COURT:  Okay.  And if you have something else

18    that you think you're going to want to talk to me about.

19              MR. BRENNER:  I don't.  It's a quick one.  I

20    promise.

21              THE COURT:  All right.

22              (Side bar.)

23              MR. BRENNER:  I don't want to do this in front of

24    the jury.  I just really ask, especially when she's on the

25    stand, if counsel can refrain from whispering.  It's super

B.R. v. F.C.S.B.

36

1  distracting.  She keeps looking over there.  I know they are

2  not trying to distract her, but --

3       THE COURT:  They are entitled.  We have to keep the

4  courtroom balanced.  Your people have been walking around

5  handing sticky notes and doing things during the time that

6  we're doing examinations of people and they are communicating

7  as best they can.  I don't find it distracting.  I've got a

8  sort of global view of everything that's going on.  So if they

9  want to pass notes, that's fine.  If your people want to pass

10  notes, that's fine, but what's good for one side, is good for

11  the other.

12       MR. BRENNER:  I wasn't -- passing notes I'm totally

13  fine with.  It's the audible that's far above whispering.  If

14  Your Honor has seen it and Your Honor thinks it's okay, then I

15  just wanted to raise it and --

16       THE COURT:  Okay.

17       MR. BLANCHARD:  Your Honor, before we leave.  The

18  questions that was just asked seemed to be already asked and

19  answered.  What her relationship was.  She testified to that

20  in direct.  I don't mind cross examining on what I asked

21  about.  What I didn't question her about is something

22  different or new.

23       THE COURT:  Well, he's not entitled to only examine

24  her on questions that you asked, but questions that everybody

25  on this side of the room asked.

────────B.R. v. F.C.S.B.────────

37

1        MR. BLANCHARD:  I understand.  (Inaudible) by my

2   questions about her relationship with J███.  And all I'm

3   saying that's already been testified to.  I don't want to

4   waste the time on objections.  If they are going back to

5   something specific, that's fine, but if it's just repeating of

6   the testimony --

7        THE COURT:  All right.  If it gets to that point,

8   I'll acknowledge it.

9        MR. BLANCHARD:  Thank you.

10        (Open court.)

11   BY MR. BRENNER:

12   Q.  I will just ask you briefly to remind the jury.

13        You and J███ were friends in 6th grade?

14   A.  Yes, we were friends in 6th grade.

15   Q.  Okay.  And did that relationship between you and J███

16   start to change over the summer and into 7th grade?

17   A.  It had a drastic change into the 7th grade.  There were

18   some circumstances that I saw personally with J███ that

19   really concerned --

20        THE COURT:  Keep her focused.  Keep her focused.

21   That's --

22        MR. BRENNER:  Well, okay.  I'm focused on the time

23   period before the.

24        THE COURT:  Well, the question was:  Did that

25   relationship between you and J███ start to change over the

—————B.R. v. F.C.S.B.—————

38

1    summer and into 7th grade.

2            It seems to me the answer is either "yes" or "no"

3    not a discussion as to what may have led to this.

4            THE WITNESS:  Yes, it did.

5    BY MR. BRENNER:

6    Q.   Why did it -- this is again before the incident in the

7    park with J█████ and C████████.  So I'm focusing in the summer

8    and into 7th grade before that point?

9    A.   Okay.

10   Q.   Can you tell the jury why your relationship began to

11   change?

12   A.   So my friend Olivia had observed that there was fake

13   Facebook pages and also hate pages that were created by, in my

14   observation, by J█████ and I got really --

15           THE COURT:  Sustained.  This is hearsay on hearsay,

16   so that part of the testimony is stricken from the record.

17           MR. BLANCHARD:  I further object.  This --

18           THE COURT:  You won the objection, Mr. Blanchard.

19           MR. BLANCHARD:  Understood.  Thank you, Your Honor.

20   BY MR. BRENNER:

21   Q.   You were asked questions, I believe, by Ms. Rewari

22   regarding your PE locker and a crate.

23           Do you remember that?

24   A.   I do, yes.

25   Q.   Let's just put a little more detail on that.  Did there

—————B. R. v. F.C.S.B.—————

39

1    come a time -- and I think Ms. Rewari asked you this -- where

2    you asked for your PE locker to be changed?

3    A.    Yes.

4    Q.    And why did you -- who did you ask first?

5    A.    So it was first asked in the context of when my parents

6    and I met with the school during, like, the November 21st

7    meeting.

8    Q.    Okay.

9    A.    And it was supposed to be changed immediately.  However,

10   the immediate solution was just moving my clothes out of a

11   locker into literally a crate in the office of the gym locker

12   room, so, basically my stuff was just left out unlocked, but I

13   had to change in the same place.

14   Q.    Why did you ask for your locker to be changed in that

15   meeting?

16   A.    I didn't want to be near J█████.

17   Q.    Okay.  Was your PE locker near J█████'s PE locker?

18   A.    Yes, the original one.

19   Q.    Okay.  And then so the first change the school did was

20   put -- take you out of your locker and put your stuff in the

21   PE office; is that right?

22   A.    That's correct, yes.

23   Q.    But where -- did you change in the office?

24   A.    No, I did not change in the office.  I changed -- sorry.

25   I changed, essentially, in the same place where my locker was

Redirect - B.R.

──────B.R. v. F.C.S.B.──────

40

1  because I was literally right in front of the PE office.

2  Q.   Okay.  And then eventually did your PE locker get

3  changed?

4  A.   It did eventually get changed, yes.

5  Q.   And did it get moved away from J███'s locker?

6  A.   It did.

7  Q.   Okay.  Where did it get moved to, yours?

8  A.   So my new locker got moved into a corner of the locker

9  room away from the office in the locker room, so it was in a

10  corner that was isolated and dark.

11  Q.   You were asked some questions on direct examination

12  about -- do you remember being shown a call log.  It was a

13  list of calls under the -- I think the Dash Inc. cell phone

14  number?

15  A.   Yes, I do.

16  Q.   And you were asked about -- if after the incident in the

17  park with -- with J.O. and C.K. whether you still

18  occassionally called J███.

19          Do you remember that?

20  A.   I do recall that.

21  Q.   Okay.  You also were asked by Ms. Rewari if J███ had had

22  a birthday party shortly around that time, I think it was

23  shortly after the incident in the park; is that right?

24  A.   Yes, it was in early November.

25  Q.   And you told Ms. Rewari you went to the birthday party,

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─

41

1    right?

2    A.    I did, yes.

3    Q.    And that you occasionally still called J████ after that

4    incident in the park; is that right?

5    A.    That's correct, yes.

6    Q.    Can you explain to the jury why -- from your words and

7    your memory of what was going through your head back then, why

8    did you do that?  I mean why did you continue to sometimes

9    call J████, even see her in school, and go to her birthday

10   party?

11   A.    So what I recall is that I was scared of J████.  I was

12   scared that she was going to keep bullying me, harass me, and

13   I felt like nothing was being done about it at school, so I

14   wanted to try to keep the peace.  I thought maybe if I

15   befriended her or maybe if I, you know, was a better friend,

16   then it would stop some of the bullying, stop some of the

17   harassment.

18         And also, during the park assault those, like,

19   pictures of my breast were taken and I was afraid that, you

20   know, they were hanging over my head.  I didn't know if they

21   were going to be posted or something, and I was just trying to

22   keep the peace and I had already committed to her birthday

23   party prior to the park assault and I was afraid that if I

24   didn't go she would be upset with me.

25   Q.    Okay.  You told the jury under a questioning -- both from

B.R. v. F.C.S.B.

42

1  myself and from Ms. Rewari -- you talked about some different

2  forms of cyberbullying.

3           Do you remember that?

4  A.   I do, yes.

5  Q.   And Ms. Rewari spent some time with you going through the

6  Jenni Taylor messages between Jenni Taylor, who was you,

7  right?

8  A.   Yes, unfortunately, yeah.

9  Q.   And Mr. Ki█?

10 A.   Yes.

11 Q.   But you told Ms. Rewari that when you had referred to

12 cyberbullying there was a lot of more cyberbullying going on

13 and you referencing like hate pages.

14          Do you remember that?

15 A.   That is correct, yes.

16          MR. BRENNER:  Can I check if 64 is in evidence, Your

17 Honor.  Defense Exhibit 64.

18          THE COURTROOM CLERK:  Defense?

19          MR. BRENNER:  Defense 64.

20          THE COURTROOM CLERK:  Yes.

21          MR. BRENNER:  May I publish, Your Honor?

22          THE COURT:  Yes.

23          MR. BRENNER:  Mr. Brown, can you just make it, the

24 left part or -- not there, the middle section a little bigger,

25 the text.

—B.R. v. F.C.S.B.—

43

1   BY MR. BRENNER:

2   Q.    Do you recall discussing this with Ms. Rewari?

3   A.    I do.

4   Q.    And this is from -- this is a message from O.B. to you?

5   A.    Yes.

6   Q.    Okay.  And do you see there -- is she reporting to you

7   that there's -- there's -- in addition to the Jenni Taylor

8   messages there's also separate -- or at least a separate hate

9   page going on about you?

10  A.    Yes.  That's the case, yes.

11  Q.    Okay.  Is that consistent with your recollection of what

12  was going on at the time that -- putting aside your private

13  messages with Mr. Ki█ that there were hate pages set up

14  directed at you?

15  A.    Yes, that had gone on since October --

16          MS. REWARI:  Objection, Your Honor.  Misstates the

17  testimony.  I think he just said that in plural --

18          MR. BRENNER:  I actually clarified, but I'll do it

19  again.  I'll do it again.

20  BY MR. BRENNER:

21  Q.    Is this consistent with your recollection that aside from

22  the Jenni Taylor messages with Mr. Ki█, there was at least a

23  hate page going around directed at you around the school at

24  this time?

25  A.    Yes, there were multiple hate pages.

Redirect - B.R.

———B.R. v. F.C.S.B.———

44

1   Q.   Okay.

2          MR. BRENNER:  Okay.  You can take that down,

3   Mr. Brown.

4   BY MR. BRENNER:

5   Q.   Okay.  Towards the end of the day on Thursday --

6          MR. BRENNER:  You can close that.

7   BY MR. BRENNER:

8   Q.   Towards the end of the day on Thursday, Ms. Rewari spent

9   some time with you having you go through a handwritten note

10  that you had written to one of your therapists; do you recall

11  that?

12  A.   I do.

13  Q.   Okay.  And it referenced a boy named James?

14  A.   Yes.

15  Q.   Okay.  So you know what I'm talking about?

16  A.   I do.

17  Q.   Okay.  Let's -- and Ms. Rewari asked you if you had -- is

18  this another instance of you accusing another boy of sexual

19  assaulting you.  Do you remember those questions?

20  A.   I do recall those questions, yes.

21  Q.   Let's -- let's be clear.  Have you ever, ever, either in

22  a lawsuit or any public way other than in notes to your

23  therapist, have you ever accused this boy, James, of sexually

24  assaulting you?

25  A.   I have never accused him, no.

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———
EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

45

1    Q.   Okay.  Have you ever outside -- so explain -- explain to

2    the -- well, other than the fact that the through the

3    discovery process, and the Court process, those -- that your

4    therapist notes were produced in the case --

5    A.   Uh-huh.

6    Q.   -- have you done anything, meaning verbally written, any

7    way publicized anything about your encounter with James?

8    A.   I have not, no.  It was something that I was working

9    through confidentially with my therapist.  Because I was

10   trying to relearn how to live my entire life.  That meant

11   relearning trust.  That meant relearning boundaries.  That

12   meant --

13            THE COURT:  Hold on.

14            THE WITNESS:  I'm sorry.  Go ahead.

15   BY MR. BRENNER:

16   Q.   Can you describe for the jury what the -- the process is

17   like for -- that you were going through with your -- by the

18   way, who was -- do you remember who the therapist you wrote

19   this to was?

20   A.   It was Dr. Keith Saylor.

21   Q.   And knowing that it's Dr. Saylor, can you estimate for

22   the jury about how old you were?

23   A.   I think I was probably around 14, maybe 15 years old.

24   Q.   And was this -- this document something that Dr. Saylor

25   asked you to write?

B.R. v. F.C.S.B.

46

1   A.   It was, yes.

2   Q.   Okay.  And throughout your therapy, throughout the last

3   12 years, are there -- are there other instances where you're

4   writing and trying to express yourself through writings

5   through your therapist?

6   A.   Yes.  My therapist had asked me to do it in the context

7   of I was struggling to open up, and they utilized it as a

8   therapeutic exercise to try to help me work through my trauma.

9   Q.   Okay.  Now, there were some questions about that saying

10  that you had compared in -- in that -- in that note about --

11  in the note that you wrote about James to your therapist that

12  you had somehow compared it to what had happened with

13  C█████████.

14          Do you remember those questions?

15  A.   I do recall those questions, yes.

16  Q.   Was there a time where you -- where a therapist asked you

17  to write about what happened with C██████████?

18  A.   Yes.  There were times.

19  Q.   Okay.  And did that happen shortly after the incident

20  themselves occurred?

21  A.   Yes.

22  Q.   Okay.  And do you remember -- to the best of your

23  recollection, do you remember the facility that that occurred

24  at?

25  A.   I recall it being, I think, at the Kellar Center.

Redirect - B.R.

─────B.R. v. F.C.S.B.─────

47

1  Q.   And remind the jury when you went to the Kellar Center?

2  A.   I went twice during the year of, I think, 2012.

3  Q.   Okay.  Which is the -- the year you were pulled out of

4  school?

5  A.   That's correct, yes.

6  Q.   Okay.  Do you have in your binder Defense Exhibit 131?

7  It's in your black binder.

8  A.   Yes, I have it.

9  Q.   First of all, how many pages is that document?

10 A.   This document is two pages.

11 Q.   Okay.  Is that your handwriting on both pages?

12 A.   That is my handwriting, yes.

13 Q.   Is that something you wrote in or about 2012?

14 A.   Yes.

15 Q.   And is this something you wrote for -- as part of your

16 therapy process?

17 A.   I did, yes.

18 Q.   Okay.

19      MR. BRENNER:  Your Honor, at this time, we'd like to

20 introduce Defense Exhibit 131.

21      MS. REWARI:  No objection.

22      THE COURT:  Without objection.

23 (Plaintiff's offered Defendants' Exhibit No. 131 and was

24 admitted into evidence.)

25 BY MR. BRENNER:

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Redirect - B.R.

————B.R. v. F.C.S.B.————

48

1   Q.   Okay.  Is that the first page?

2   A.   Yes.

3   Q.   Okay.  And this is in 2012?

4   A.   Yes.

5   Q.   Okay.  "Dear C████████, I keep having flashbacks of what

6   you did to me.  I feel like I need to throw up.  I can't stop

7   looking at the scars on my wrist.  Why?  You have not only" --

8   I think it says "scared" -- but scared -- is that supposed to

9   be "scarred" or "scared"?

10  A.   It's supposed to be scarred.

11  Q.   Okay.  "Scarred me physically, but emotionally I wish you

12  could walk in my shoes."

13          Is that something that you wrote at the time?

14  A.   Yes.

15  Q.   Is that so you -- just so it's clear, is that a

16  letter you sent -- did you send this letter to C████████?

17  A.   I didn't.  It was for my therapist.

18  Q.   Okay.  The next page, please.

19          Again, your handwriting.  Do you think it's at or

20  about the same time you wrote the first page?

21  A.   Yes.

22  Q.   Okay.  It says, "Distorted my sexual abuse.  C████████.

23  It started on October 21st.  You and J████ pushed B████ into a

24  bush."

25          By the way, you're writing in the third person here?

1    A.   Yes.

2    Q.   Is that something that you did throughout your therapy?

3    Is that typical, atypical?

4    A.   That was typical.  Sometimes when I felt too emotionally

5    difficult, that was just something that I did.

6    Q.   Okay.  "You took her shirt" -- referring to yourself,

7    you're the "her"?

8    A.   Yes.

9    Q.   And pulled it up.

10   A.   Yes.

11   Q.   "You took pictures on your phone.  There was more to this

12   date the first time it happened, but B████ can't bear this

13   pain.  You started threatening her.  She remembers how you

14   slit her wrist.  Still has these -- those scars.  She

15   remembers how you gave her unwanted oral sex.  You forced her

16   to give you oral sex, too.  She remembers how you penetrated

17   her, and she begged you to stop, but you didn't.  She

18   remembers when you put your fingers in her private parts.  Why

19   didn't you stop?  She remembers you" -- you wrote "grouping"

20   is that --

21   A.   I meant to say "groping."

22   Q.   Okay.  You -- you -- "She remembers you groping her at

23   her locker.  B████ told you and David to stop."

24        Do you know who the David is referencing -- is that

25   D.N.?  I don't want to say the name.

——B.R. v. F.C.S.B.——

50

1   A.   Yes.

2   Q.   Okay.  "To stop, but you didn't.  You told everyone at

3   school that 'B███ is a whore.'  You said, 'B███ gives

4   free'" -- you underlined "free" -- "'oral sex.'  Everyone

5   called her a slut.  B███ didn't even know what these things

6   mean."

7   A.   Yes.

8          MR. BRENNER:  You can take that down.

9   BY MR. BRENNER:

10  Q.   You wrote that in the -- in the fall -- excuse me, the

11  spring or summer of 2012?

12  A.   Yes.

13  Q.   Okay.  Now, there was a lot of questions about whether

14  you reported -- that you -- that you told people in various

15  instances that you were raped one time or you were raped

16  multiple times.  Do you recall those questions from

17  Ms. Rewari?

18  A.   I do.

19  Q.   So just so the jury is clear, is it your testimony that

20  you were raped one time by C███████ or you were raped

21  multiple times by C███████?

22  A.   I was raped multiple times by C███████.

23  Q.   Okay.  We talked about this a little on direct, but I

24  just want to clear it up.  Are you able to -- to identify with

25  any precision the -- the number of times that C███████ raped

——Tonia M. Harris OCR-USDC/EDVA 703-646-1438——

EASTERN DISTRICT OF VIRGINIA

—B.R. v. F.C.S.B.—

51

1  you?

2  A.    I can't give you a specific number.

3  Q.    Okay.  Can you give the jury though -- well, can you --

4  can you identify for the jury what things happened to you on

5  each specific rape?

6  A.    No.  Because after a while it just starts to blur

7  together as the overall things of what he did to me.

8  Q.    Okay.  Can you explain to the jury, then, the overall

9  things that C▮▮▮▮▮ did to you during his multiple rapes of

10  you?

11  A.    He forced me to give him oral sex.  He gave me oral sex.

12  He vaginally penetrated me.  He anally penetrated me.  He used

13  his fingers, he used his penis.  And, also, he was physically

14  violent with me as well.

15  Q.    And what do you mean by that?

16  A.    He used weapons to scare me.  He cut me with knives.  He

17  used lighters.  He used things like clothespins.  He hit me.

18  He hit my head.  He threatened that if I told my parents that

19  he would kill them.

20  Q.    Now, if you recall, I asked you a few minutes ago that

21  you recall a phone log?

22  A.    Yes.

23  Q.    And there were a series of calls on that log for one

24  minute to C▮▮▮▮▮?

25  A.    Yes.

B.R. v. F.C.S.B.

52

1  Q.   Can you -- can you tell the jury what -- what those

2  one-minute -- to the best you recall, what those one-minute

3  calls were?

4  A.   So to the best of my ability, the one-minute calls was

5  that I was doing what C███████ told me to do, and I returned

6  a call or I called him simply because I was being threatened

7  and afraid.

8  Q.   There was some questions about your -- your -- the

9  conditions you suffered; do you recall that?

10  A.   Yes, I do recall that.

11  Q.   And some questions about some -- for example, there's

12  questions about having a urinary tract infection at the time?

13  A.   Yes, I recall that.

14  Q.   Okay.  Again, based on your perception and your

15  understanding, have you been treated for PTSD?

16  A.   I have been, to my understanding, yes.

17  Q.   And when did that start?

18  A.   That started in 2012.

19  Q.   And is it finished?

20  A.   No, unfortunately.

21  Q.   How many doctors, in your estimate, would you say that

22  you -- doctors and other healthcare providers have you seen

23  for what you understood is treatment for your PTSD?

24  A.   Many, more than a handful.

25  Q.   Okay.  And those have been -- is it -- has there been any

B.R. v. F.C.S.B.

53

1  period during those 12 years since 2012 that you have not been

2  under care for what you understand is PTSD.

3  A.    No.  I've always been under care since 2012 for my PTSD,

4  that I understand.

5  Q.    Okay.  Have you -- at any point, have you applied for

6  disability as a result of that?

7  A.    Yes.

8          MS. REWARI:  Objection, Your Honor.  This is beyond

9  the scope of cross.

10          THE COURT:  It seems to be.

11          MR. BRENNER:  I'm sorry?

12          THE COURT:  It seems to be.

13          MR. BRENNER:  Okay.

14  BY MR. BRENNER:

15  Q.    You were asked some questions about UTIs and -- by the

16  way, have you and do you experience UTIs occasionally?

17  A.    I have experienced UTIs.  I have not experienced them in

18  a few years.  It has to do a lot with my eating and drinking,

19  in my understanding.

20  Q.    Okay.

21  A.    So, yeah.

22  Q.    But you -- but you have had UTIs; is that fair?

23  A.    I have had them, yes.

24  Q.    And have you been given antibiotics for those?

25  A.    Yes.

—B.R. v. F.C.S.B.—

54

1   Q.   You can answer.

2   A.   Yes, sorry about that.

3   Q.   Now, you also described pelvic pain?

4   A.   Yes.

5   Q.   Okay.  Is -- is the pelvic -- do you suffer from pelvic

6   pain?

7   A.   Yes.  Debilitating pelvic pain.

8   Q.   Okay.  Is the pelvic pain that you suffer from caused by

9   your UTIs?

10        MS. REWARI:  Objection, Your Honor.

11        THE COURT:  You can't provide an opinion as to the

12   connection between the two.

13   BY MR. BRENNER:

14   Q.   Do you have pelvic pain at times where you don't have

15   UTIs?

16   A.   Yes.  It's often the case most of the time where I don't

17   have a UTI but experience severe pelvic pain.

18   Q.   You said you haven't had UTIs recently; is that right?

19   A.   That's correct.

20   Q.   Do you still even now suffer from pelvic pain?

21   A.   Yes.  To this day, even this morning.

22   Q.   I was going to say, about how often does that occur?

23   A.   Multiple times a week.  Excruciatingly.

24   Q.   Okay.  I want to -- I want to switch topics.

25        You were shown -- and I believe admitted into

B.R. v. F.C.S.B.

55

1  evidence, but you were shown a handwritten statement that you

2  gave to Officer Boaz, do you remember being shown that?

3  A.    Yes.

4  Q.    Okay.  And Ms. Rewari asked you about that statement and

5  asked you what was in there and what was not, do you recall

6  that testimony?

7  A.    I do recall.

8  Q.    Okay.  Now, do you recall telling Ms. Rewari that in

9  addition to the statement that you had conversations with

10 Officer Boaz?

11 A.    I did have conversations, yes.

12 Q.    Okay.  And were those at or about the same time you gave

13 the written statement?

14 A.    Yes.  It was actually before I gave my written statement

15 where I had the conversations.

16 Q.    Okay.  Now, that happened -- I think Ms. Rewari said the

17 date, but I think it happened on the first Friday in March?

18 A.    I think that's what she said.  I'm not -- I'm not a

19 hundred percent sure.  I think so.

20 Q.    Is that -- is that consistent with your recollection of

21 when you had the conversations and wrote the statement?

22 A.    That sounds about right, yes.

23 Q.    Okay.  Can you tell the jury after -- there were -- there

24 were questions about whether in the written statement that you

25 had written that you were raped.  Do you remember those

B.R. v. F.C.S.B.

56

1  questions?

2  A.   Yes, I do.

3  Q.   Okay.  Now, after your conversation with -- with Officer

4  Boaz, what's -- what's -- that's on a Friday?

5  A.   Yes.

6  Q.   First of all, did you ever see Officer Boaz again after

7  that Friday?

8  A.   No.

9  Q.   Okay.  Tell the jury -- just without getting into any

10  conversations, tell the jury what the next thing that is --

11  where -- where is your next step after that Friday?

12  A.   The next step after that Friday was I was sent to a place

13  called Child Help to receive a rape kit.

14  Q.   Okay.  Is that -- and has that sometimes been referred to

15  as a SANE exam?

16  A.   Yes.

17  Q.   Okay.  So whenever you said to Officer Boaz on Friday,

18  the next thing happens is you are sent for a rape kit on

19  Monday?

20  A.   That's correct.

21  Q.   Okay.  Now, if you could go in your book --

22          MR. BRENNER:  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. BRENNER:

25  Q.   Now, do you recall on Thursday, I believe it was

——B.R. v. F.C.S.B.——

57

1   Thursday, Ms. Rewari had you review the SANE exam?

2   A.   Yes, she had me review it.

3   Q.   And she questioned you about that, right?

4   A.   That is correct.

5   Q.   And it was part of her questioning about whether there

6   was -- that you had reported one rape or multiple rapes; do

7   you recall that?

8   A.   I do recall that, yes.

9   Q.   She pointed you to specific sections of that report?

10  A.   Yes.

11        MR. BRENNER:  Okay.  Your Honor, at this point, we

12  would like to move into evidence Plaintiff's Exhibit 581.

13        MS. REWARI:  Your Honor, we still object.  I asked

14  her about what she reported, but this is a medical record

15  that --

16  (Plaintiff's Exhibit No. 581 was admitted into evidence.)

17        THE COURT:  Overruled.  You opened the door.

18        MR. BRENNER:  Okay.  Your Honor, can we turn some of

19  the screens.  I think we'll -- you know what, I think we'll --

20  I think we'll be okay.  I'll just try to do it.

21        The -- may I approach?

22        THE COURT:  You may.

23        Ladies and gentlemen who are in the gallery, simply

24  make a request, some of the information that you are likely to

25  see is personal in nature.  And I would hope that you would

B.R. v. F.C.S.B.

58

1   protect the privacy of the individuals involved if you decide

2   to do any reporting on SANE.

3   BY MR. BRENNER:

4   Q.   If you -- if you could go to what's on the bottom of the

5   document.  It's -- Bates range is 1-4, ends in 1-4?

6   A.   Yes.

7   Q.   Okay.  And that's what Ms. Rewari went over with you?

8   A.   Yes.

9   Q.   Okay.  And is that in there, does it include what the

10  nurse reported you told her?

11  A.   Yes, that's what it says here.

12  Q.   Okay.  In there, did you report that you had been --

13          MR. BRENNER:  Your Honor, we -- we would like to

14  publish this page to the jury.

15          THE COURT:  You may.

16          (Exhibit published.)

17  BY MR. BRENNER:

18  Q.   It says the second line says, "The child states" --

19  that's talking about you?

20  A.   Yes.

21  Q.   "That a 13-year old boy from her school touched her

22  breast and penetrated her anus with his penis"?

23  A.   Yes, that's what it say.

24  Q.   Is that something you -- you recall -- do you recall

25  telling the SANE nurse that or --

─────B.R. v. F.C.S.B.─────

59

1  A.   I have recollection, yes.

2           MR. BRENNER:  Okay.  You can take that down.

3           If you could go to -- let me just make sure I have

4  the right page, Your Honor.

5           May I publish?

6           THE COURT:  You may.

7  BY MR. BRENNER:

8  Q.   Do you see where it says "conclusions"?

9  A.   Yes.

10          MR. BRENNER:  Now scroll --

11 BY MR. BRENNER:

12 Q.   It says, "The conclusions regarding nongenital findings

13 are abnormal, and the nature of the abnormalities are

14 consistent with the history given."

15          Do you see that?

16 A.   Yes.

17 Q.   Okay.  Now, let's go to the genital findings.

18          MR. BRENNER:  Scroll down, please.

19          THE WITNESS:  Okay.

20 BY MR. BRENNER:

21 Q.   "The genital findings were abnormal and the nature of the

22 abnormalities are consistent with the history given."

23          Is that what it says?

24 A.   Yes.

25          MR. BRENNER:  Okay.  You can take that down, please.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

B.R. v. F.C.S.B.

60

```
 1   BY MR. BRENNER:

 2   Q.   Okay.  Let's -- Mr. Kinney asked you some questions.  He

 3   identified for you at the beginning the --

 4   A.   Can I put this away?

 5   Q.   Yes, I'm sorry.

 6   A.   Okay.

 7   Q.   He identified for you the various defendants here that he

 8   represents?

 9   A.   Yes.

10   Q.   Some of the -- do you recognize some of those as your

11   teachers?

12   A.   I do.

13   Q.   How many of them were teachers?

14   A.   Three of them.

15   Q.   Okay.  And were they elective teachers, core teachers,

16   what were they?

17   A.   They were all core teachers.

18   Q.   Okay.  How many other teachers did you have during your

19   first and second -- well, the second -- between September and

20   February 2011 and 2012?

21   A.   I had at least, I believe, four others.

22   Q.   Okay.  Now, Mr. Kinney went -- went through with you and

23   talked about what you saw and didn't saw and complaints of

24   what your prior lawyers showed you and didn't show you.

25            Were you involved in deciding which of your teachers
```

B.R. v. F.C.S.B.

61

1   would be part of this lawsuit?

2   A.   Yes, I was.

3   Q.   Okay.  And these are the three you chose?

4   A.   Yes.

5   Q.   And we talked on direct why you -- why you chose them.

6   Let's just talk about who the other teachers were.

7   A.   Were.

8   Q.   Who is Tiffany Estrella?

9   A.   She was my English teacher.

10  Q.   Okay.  And Tiffany Estrella was not named by you as a

11  defendant in the lawsuit?

12  A.   That's correct.

13  Q.   And why is that?

14  A.   Ms. Estrella --

15  Q.   Is -- let me preface, why is that, from your perspective?

16  A.   From my perspective, I had told Ms. Estrella on the last

17  day that I was in school that I was receiving death threats

18  and there had been an incident of where I received death

19  threats from multiple students.  And that --

20          THE COURT:  Mr. Brenner, keep her focused.  I don't

21  know where she's starting to go because I don't want to get

22  into what Ms. Estrella may or may not have said.

23          MR. BRENNER:  Okay.

24          THE COURT:  I think we're heading down that path.

25          MR. BRENNER:  Okay.

B.R. v. F.C.S.B.

62

BY MR. BRENNER:

Q.   Amy -- Amy Moir -- how do you pronounce Amy Moir or

M-O-I-R?

A.   Oh, Amy Moir, I think it was.

Q.   Okay.

A.   Is what I thought.

Q.   Who was she?

A.   She was my chorus teacher.

Q.   Okay.  Did you make a decision that -- was it your

decision that she, unlike the other teachers who you described

why you brought the suit, she did not fit that same --

A.   She didn't know.

Q.   Another teacher is Ms. Jordan, who was that?

A.   She was my Spanish teacher.

Q.   Same -- same answer, you -- you elected -- you did not

think that she failed to protect you?  It's a terrible

question.

        Did you -- did you find her conduct different than

the conduct of the three teachers here?

A.   I did find it different, yes.

Q.   And same answer for Mr. Bickford?

A.   Correct.

Q.   Who is Mr. Bickford?

A.   Mr. Bickford was my drama teacher.

Q.   Okay.

B.R. v. F.C.S.B.

63

1   A.   And he didn't do anything, so --

2   Q.   Okay.  Let's go through a few topics quickly.

3           There was -- there was testimony and records shown

4   from Dr. Kevin Weaver.  You know him, right?

5   A.   Yes, my pediatrician.

6   Q.   And there were times in Dr. Weaver's records in November,

7   December, January, I think, where he noted in his records that

8   you were not sexually active?

9   A.   Yes.

10  Q.   Okay.  First of all, do you remember whether it's those

11  appointments or other appointments that Dr. Weaver, as part of

12  his physical or other treatment of you, would ask whether you

13  were sexually active?

14          MS. REWARI:  Objection, Your Honor.  I don't think I

15  covered this with the -- with the plaintiff.

16          THE COURT:  I think it might have been not

17  necessarily covered by you, but I think it was covered by the

18  general defense examination.

19          MS. REWARI:  Okay.

20          THE COURT:  So I'll allow it.

21          THE WITNESS:  Can you repeat that?  I'm sorry.

22  BY MR. BRENNER:

23  Q.   Sure.

24          Do you recall in some appointments that Dr. Weaver

25  in this time period would ask as part of his normal history

─────B.R. v. F.C.S.B.─────

64

1   and physical if you were sexually active?

2   A.   Yes, I recall that.

3   Q.   And at this point when he asked these questions, were you

4   already being raped by C███████?

5   A.   Yes.

6   Q.   And did you tell Dr. Weaver at this point -- at those

7   points that you were not sexually active?

8   A.   That's correct.

9   Q.   And at that point, had you told even your mom about the

10  rapes from C███████?

11  A.   No, I had not told my mom.

12  Q.   Okay.  Ms. Rewari spent -- spent some time with you,

13  again I think Thursday, regarding your time, your internship

14  at PwC?

15  A.   That's correct, yes.

16  Q.   And that's PricewaterhouseCoopers?

17  A.   Yes.

18  Q.   Okay.  First of all, how long did you work at

19  PricewaterhouseCoopers?

20  A.   Maybe three months.

21  Q.   And do you recall when that was, the year that was?

22  A.   I believe it was 2017.

23  Q.   Was it a summer internship or a during the year

24  internship?

25  A.   It was a summer internship.  I think it was from like May

B.R. v. F.C.S.B.

65

1    to August.

2    Q.    And where were you in your schooling -- I mean, were you

3    still in high school or were you in college?  Where were you?

4    A.    I was -- I had finished my first year of college.

5    Q.    Say -- I'm sorry.  Say that one more time.

6    A.    I had finished my first year of college.

7    Q.    At what school?

8    A.    John Jay.

9    Q.    Okay.  The process -- how did you -- how did you come to,

10   for lack of a better word, connect with PwC?

11   A.    My academic advisement at John Jay College had

12   recommended me for it.

13   Q.    Okay.  And did you -- did you, in fact, submit an

14   application to PwC for -- for your summer internship?

15   A.    I did not.

16   Q.    Okay.  How did you -- how did you get an application if

17   you -- excuse me.  How did you get an internship if you didn't

18   submit an application?

19   A.    I worked with my academic advisor, and I had given her my

20   resume.  And then I was told to have an interview with them.

21   I was given an interview after that.

22   Q.    Okay.  Either in your -- in your -- was your interview --

23   what was your interview, was it in person, was it remote, what

24   was it?

25   A.    There were, I believe, two rounds of interviews.  One was

Case 1:19-cv-00917-RDA-LRV    Document 1050    Filed 08/26/24    Page 66 of 181
PageID# 22052
Redirect - B.R.
B.R. v. F.C.S.B.

66

1    in person, and one was over like -- like, it was remote.

2    Q.    Remote by phone or by video?

3    A.    By phone.

4    Q.    Okay.  So one's in person; one's by just telephone?

5    A.    That's correct, yes.

6    Q.    Did -- during your -- your -- either your interview

7    process or in documents you had to submit to PwC, did -- did

8    you tell them how old you were?

9    A.    I did, yes.

10   Q.    Did you give them any -- any documents, like driver's

11   license, passport -- whatever tax forms that identified

12   your -- your name and your age?

13   A.    Yes, when I started I had to give my like I-9 forms, and

14   I recall giving my passport to HR and --

15            THE COURT:  What is an I-9 form?

16            THE WITNESS:  Oh, like I guess -- like just making

17   sure you're like a citizen or like legally can hold a job or

18   something.

19   BY MR. BRENNER:

20   Q.    Okay.  Ms. Rewari showed you a resume that -- that you --

21   I think you told her it was not a resume you put together,

22   right?

23   A.    That's correct, yes.

24   Q.    Did any time did you tell PwC through a resume or

25   otherwise that you had been serving in the United States

B.R. v. F.C.S.B.

67

1   military since you were 14 years old?

2   A.   I had not, and I would never.

3   Q.   Okay.  Did you -- did you tell PwC, either through a

4   resume that you created or through any other interview, that

5   you graduated high school at age 13 or 14?

6   A.   I had not.

7           MS. REWARI:  Objection, Your Honor, leading.

8           THE COURT:  Watch your form.

9   BY MR. BRENNER:

10  Q.   Well did you -- what -- did you -- did you lie about

11  your -- did you -- did you tell PwC that you had graduated

12  high school in a year that you would have been 13 or 14 years

13  old?

14  A.   No.

15  Q.   Did you tell PwC that you were a president of a club at

16  Columbia?

17  A.   No.

18  Q.   Were you even a student at Columbia at that time?

19  A.   No.

20  Q.   If the -- if the internship happened in the summer of

21  2017, I think you said --

22  A.   Uh-huh.

23  Q.   -- when did you become a student at Columbia?

24  A.   I became a student at Columbia, I believe January of

25  2018.

B.R. v. F.C.S.B.

68

1   Q.   Okay.  So one full semester later?

2   A.   That's correct, yes.

3   Q.   Okay.  Did you tell anyone at PwC, either in writing or

4   verbally, that you expected to graduate college at the age of

5   17?

6   A.   No, I did not.

7            MR. BRENNER:  May I approach?

8            THE COURT:  You may.

9            MR. BRENNER:  Your Honor, I better clear up

10   something with you before I move on.  At sidebar.

11            (Side bar.)

12            MR. BRENNER:  So this record was used on

13   cross-examination by Ms. Rewari.  This is a record from

14   Principal Pachter.  Mr. Pachter, P-A-C-H-T-E-R.

15            So this record was used my Ms. Rewari, and she went

16   to the part where it said "decided to retain counsel."  And

17   she -- she made a comment -- I think -- I have a quote in my

18   notes.  My quote says -- Ms. Rewari says, "At this time you're

19   represented by three sets of lawyers and you're getting ready

20   to sue?"  And I'm going to -- just to make clear Your Honor

21   knows where I'm going.  I am going to ask her to explain what

22   that -- what that was, because it was not this suit.  It was a

23   rep by lawyers to get an IEP plan for the school.

24            THE COURT:  All right.  Let me see if I can make it

25   even simpler, that way I can make the determination.

Case 1:19-cv-00917-RDA-LRV   Document 1050   Filed 08/26/24   Page 69 of 181
PageID# 22055
Redirect - B.R.
B.R. v. F.C.S.B.

69

1        MR. BRENNER:  Sure.

2        THE COURT:  There were questions asked on

3    cross-examination, I believe most of the ones that are

4    focusing on the ones that were asked by Mr. Kinney

5    specifically.  Going into the various complaints that were

6    filed and whether she had an opportunity to review them,

7    whether she signed off on them.  I'm paraphrasing.

8        MR. BRENNER:  Yes.

9        THE COURT:  Basically suggesting to the fact-finder

10   that an allegation was made in the lawsuit, and she doesn't

11   even really know what was in her own lawsuit.  I think that's

12   the general principal or general crux of Ms. Rewari's

13   argument.

14       MR. BRENNER:  You would have to ask Mr. Kinney.

15       THE COURT:  Is that fair, Mr. Kinney?  Is that fair,

16   Mr. Kinney?

17       And so what -- what are you trying to do now?

18       MR. BRENNER:  So this record -- this is from 2012.

19       THE COURT:  Uh-huh.

20       MR. BRENNER:  And what Ms. Rewari was -- got --

21   crossed the plaintiff on -- and was insinuating, in 2012 they

22   were setting up this lawsuit against Fairfax County School

23   Board, which is not correct.

24       What happened was shortly after this time or at this

25   time they engaged lawyers, including from the National Women's

———B.R. v. F.C.S.B.———

70

1  Law Center, to help them with the IEP process with the school,

2  an Individualized Education Plan.

3          And then they also filed a complaint with the United

4  States Department of Education.

5          THE COURT:  We don't need to go down that road

6  either.

7          MR. BRENNER:  We don't, except for they have left

8  the impression with the jury that this family has -- I'm sure

9  they're going to do this with mom, but has orchestrated this

10  thing since 2012.  And the fact of the matter is it's just not

11  true.  She filed this lawsuit --

12          THE COURT:  And what does that say that's going to,

13  in your opinion, help you?

14          MR. BRENNER:  This is what she did on cross.  It's

15  what she did on cross.  She went to this and pointed to this

16  school system that has been too slow to respond and the family

17  has decided to retain counsel.

18          THE COURT:  Uh-huh.

19          MR. BRENNER:  Ms. Rewari then amplified and said at

20  this time you had three sets of lawyers repping you.  And the

21  implication is that this was all about some money suit, and

22  that's not what happened.

23          As far as the OCR, Your Honor, you actually

24  allowed -- in the pretrial hearing, you did not keep out the

25  OCR recitation.

B.R. v. F.C.S.B.

71

1          THE COURT:  No.

2          MR. BRENNER:  What you said was you're keeping out

3    the -- what's called the voluntarily resolution agreement.  No

4    problem with that.

5          But you said as far as what's called -- the findings

6    letter.  But don't hold me to it.  You said the parties could

7    agree on redactions.  I'm not trying to move that in.  I'm

8    trying to get her to tell the jury that this was not -- 2012,

9    they were not -- she was not -- she was not complicating a

10   lawsuit what we're here today and she didn't file that lawsuit

11   since 2019.

12         THE COURT:  Let's do it -- let's just keep it

13   simple.  Let's keep it simple.  You can ask on examination by

14   defense counsel, you were asked about your perspective

15   regarding filing a lawsuit in this action.  At the time that

16   you were meeting with this provider.

17         MR. BRENNER:  Give the date.

18         THE COURT:  You know, were you meeting this

19   provider, was it your intention to file a lawsuit.  Yes or no.

20         And then you can say, well, in the letter or in this

21   statement here it suggests that you were indeed considering

22   that.

23         MR. BRENNER:  Okay.

24         THE COURT:  What would be --

25         MR. BRENNER:  Retained lawyers.

1          THE COURT:  What would be your response to that.

2          And let her explain it the way as best she can, and

3    it's up to the jury to decide whatever weight they want to

4    give it.

5          MR. BRENNER:  I'm just -- I'm fine with that.  I

6    think it's -- I think it's probably a better practice to lead

7    a little bit so she doesn't say something she's not supposed

8    to say.  I don't want her to blurt out that -- I can go talk

9    to her.  I don't want her to blurt out, We filed something

10   with EEOC earlier.

11         I don't want her --

12         THE COURT:  Yeah, we don't want her to do that.

13         MR. BRENNER:  So I'd rather -- I'd rather lead a

14   little bit.

15         THE COURT:  I just -- I prefer that you follow the

16   format that I've suggested.

17         Ms. Pedersen, you seem to have some relationship

18   with B.R., why don't you make sure -- because I don't want

19   Mr. Brenner to go up there because it looks like he's

20   providing information as to what she should say on the stand.

21   You should go up there and say, Hey, the Court has entered

22   certain orders precluding you from testifying about certain

23   things, including the Department of Education resolution.  You

24   cannot talk about that.  You cannot mention that.  You simply

25   need to focus as best you can on Mr. Brenner's questions and

B.R. v. F.C.S.B.

73

1   answer those questions and pause before you answer the

2   question to make sure that the Court doesn't have a problem

3   with the question and potential answer.

4           MR. BRENNER:  Would you mind giving me the guidance

5   again so I can follow-up?

6           THE COURT:  You can ask her essentially on

7   examination by defense counsel, you were asked about your

8   notion of potentially filing a lawsuit in this action, and it

9   relates to a date of appointment that references this

10  particular date.  And there is something in that particular

11  document that suggests that you were considering a lawsuit.

12  Can you explain why that is in there, and did you say anything

13  suggesting that you were going to file a lawsuit.

14          That's pretty much it.

15          MR. BRENNER:  And then I'm going to ask her when did

16  you file this lawsuit.

17          THE COURT:  Yeah, that's --

18          MR. BRENNER:  And can I ask her why did she file

19  this lawsuit?

20          THE COURT:  I think we all know why, but -- if you

21  need to ask it again, obviously she believes her rights were

22  violated under Title IX and the school, after receiving

23  notice, didn't take appropriate steps to address her concerns

24  that's creating a hostile environment for her to be entitled

25  to recovery.

─────────B.R. v. F.C.S.B.─────────

74

1           MR. BRENNER:  She will say that.

2           She will also say, which is consistent with what

3    she's been saying for 12 years, including in her letter to

4    Mr. F█████, that she doesn't want this to happen again.

5           THE COURT:  Well --

6           MR. BRENNER:  That's the truth.  That's what she

7    will say.

8           THE COURT:  Again, that's the type of thing that we

9    try to avoid.  You know, we always hear about, you know, I'm

10   filing a lawsuit for myself, and all those others are going to

11   be disfranchised because of what happened to me.  I don't

12   think we need to go down that path.

13          MR. BRENNER:  I'm not going to ask her why.

14          THE COURT:  Yeah.

15          MR. BRENNER:  I'm just going to get her to say when

16   she filed this lawsuit.

17          THE COURT:  That's fine.

18          MS. REWARI:  Your Honor, may I address a number of

19   things?  First of all --

20          THE COURT:  I'm going to get in your space.  I hope

21   you don't mind.

22          MS. REWARI:  No, it's fine.

23          I just want to -- I want to clarify a couple of

24   things.  So, one, on my cross-examination, she did say when I

25   asked her the question that she intended to bring an

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

—————B.R. v. F.C.S.B.—————

75

1   administrative action and not a lawsuit.  So she already said

2   that.

3          And Mr. Brenner said that she was represented by the

4   National Women's Law Center for IEP.  That's not a

5   representative for the IEP.

6          THE COURT:  That -- that shouldn't come in anyway.

7          MS. REWARI:  Exactly.

8          And so, Lisa Fagan was the --

9          THE REPORTER:  Excuse me, Lisa Fagan?

10          THE COURT:  Lisa Fagan, F-A-G-A-N.

11          MS. REWARI:  Right.  And this was in the pretrial

12   motions in limine.

13          So Ms. Fagan was her special education attorney.

14   The National Women's Law Center was not involved in the

15   special education piece of it.

16          And we do have -- they've already heard from Mr. Ki

17   that he was told the family was planning to file a lawsuit.

18   Again, he's welcomed to --

19          THE COURT:  That's up for the jury to decide

20   whatever weight they want to give.

21          The one thing that I want to make clear -- and I've

22   said it before.  I want to keep all these cause organizations

23   out of it.  These cause organizations have nothing to do with

24   what we need to resolve.  And, unfortunately, the cause

25   organizations have gotten involved in what we're doing here,

B.R. v. F.C.S.B.

76

1   and that's unfortunate, but I want to stay away from it.

2           MR. BRENNER:  I'll make it real simple.  I'm going

3   to do less than you told me to.

4           THE COURT:  Okay.

5           MR. BRENNER:  So Ms. Rewari should have this record.

6           THE COURT:  Uh-huh.

7           MR. BRENNER:  From our March 12, 2012.

8           THE COURT:  Right.

9           MR. BRENNER:  It references that --

10          The parents decided to retain counsel.

11          THE COURT:  Right.

12          MS. REWARI:  It also says, "filed suit," so that's

13  the part that I asked about.

14          THE COURT:  He's getting to that.  He's getting to

15  that.

16          MR. BRENNER:  Okay.  Defense filed suit.

17          THE COURT:  Uh-huh.

18          MR. BRENNER:  Can you just tell the jury first who

19  filed lawsuit, she's going to say I did.

20          THE COURT:  Uh-huh.

21          MR. BRENNER:  When did you file.

22          THE COURT:  That's fine.

23          MR. BRENNER:  And I'm just -- I'm afraid that it's

24  going --

25          THE COURT:  Let me ask you this:  Was the complaint

B.R. v. F.C.S.B.

77

1    that was filed in this action verified, was it a verified

2    complaint?

3                MR. BRENNER:  No.

4                THE COURT:  Okay.

5                MR. BRENNER:  I don't think any of them were.

6                THE COURT:  Okay.  All right.  Thank you.  Good

7    enough.

8                MR. BRENNER:  I had looked.  I'll just keep it

9    cleaner that way.

10                THE COURT:  Ms. Pederson, speak with your client.

11                (Open court.)

12                THE COURT:  Ladies and gentlemen of the jury,

13    sometimes after bench conferences there's a discussion based

14    on the Court's ruling as to what can and cannot be said and

15    what can and cannot be presented to you.  And, oftentimes, we

16    take advantage of counsel to make sure that the witness knows

17    the extent to which they can testify on a particular subject.

18                You might have seen Ms. Pederson or some of the

19    other lawyers interacting with B.R. during the course of the

20    recesses, and it was simply to make sure that the witness

21    stayed within the scope of the course of direction as to what

22    can be testified to.

23                MR. BRENNER:  May I proceed, Your Honor?

24                THE COURT:  You may.

25    BY MR. BRENNER:

Redirect - B.R.

B.R. v. F.C.S.B.

78

```
 1   Q.   Do you have in front of you the -- that page 16 record?
 2              MR. BRENNER:  And for the record, Your Honor, I'm
 3   referring to Plaintiff's Exhibit 451, page -- page ending in
 4   1-6.
 5              THE WITNESS:  Yes, sir.
 6   BY MR. BRENNER:
 7   Q.   Do you recall Ms. Rewari asking you questions about this
 8   document?
 9   A.   Yes.
10   Q.   Okay.  And if you look at the second page, who is the
11   healthcare provider?
12              THE COURT:  You can lead her on that.
13   BY MR. BRENNER:
14   Q.   Is it Alan Pachter?
15   A.   Yes, it is.
16   Q.   And just remind the jury, when did you see Mr. Pachter?
17   A.   I think I started seeing him in February of 2012.
18   Q.   And how long did you see him for, as best you can recall?
19   A.   I think three or four weeks, maybe.
20   Q.   Okay.  Have you seen him since?
21   A.   No.
22   Q.   Okay.  Do you recall in this document Ms. Rewari -- first
23   of all, the date of the document is March 5th, 2012?
24   A.   Yes.
25   Q.   So this is in -- towards the middle of that two-week
```

Redirect - B.R.

─────B. R. v. F.C.S.B.─────

79

1    period you saw him?

2    A.    Yes.

3    Q.    Okay.  Or towards the end.

4         Ms. Rewari directed your attention to a part of that

5    document towards the end of the first paragraph where it said

6    the family had decided to retain counsel and file suit; do you

7    see that?

8         Towards the bottom of the first paragraph.

9         THE COURT:  You can approach.

10        THE WITNESS:  Oh, yes.  I'm sorry, I see that.  Yes.

11   BY MR. BRENNER:

12   Q.    You see that?

13   A.    Yes.

14   Q.    Okay.  And that -- this is a 2012 record, right?

15   A.    That's correct.

16   Q.    Can you tell the jury when this -- this lawsuit that

17   we're here today was filed?

18   A.    2019.

19        MR. BRENNER:  Your Honor, may I confer with my

20   colleagues?

21        THE COURT:  You may.

22        (Counsel confers.)

23        MR. BRENNER:  Thank you.  I have no further

24   questions.

25        THE WITNESS:  Thank you.

B.R. v. F.C.S.B.

80

1          THE COURT:  Thank you.  You step down.

2          (Witness excused.)

3          THE COURT:  I'm going to go ahead and give the jury

4   their morning break at this point between now and the next

5   witness.

6          Who is your next witness?

7          MR. BRENNER:  I think it's defense calling a witness

8   out of turn, Your Honor.

9          THE COURT:  Okay.

10          MS. REWARI:  Yes.

11          MR. BRENNER:  Who is that?

12          MS. REWARI:  Dr. Zuluaga.

13          THE COURT:  Okay.  What we're going to do, is we're

14   going to take him out of turn.  If you can go ahead and

15   retrieve him.  We'll come back in at -- we'll say 10:45.

16   Excuse me, 10:50.  10:50.  Twelve minutes.  All right.

17          (Jury excused.)

18          THE COURT:  All right.  Ladies and gentlemen, be

19   seated.

20          We'll come back in at about 10:50.

21          (Recess.)

22          (Court proceedings resumed at 11:01 a.m.)

23          (Jury present.)

24          THE COURT:  Have a seat.  Thank you.

25          Next witness.

B.R. v. F.C.S.B.

81

1          Ladies and gentlemen, we're taking another witness

2    out of turn.  You may recall the Court at one point advising

3    we're trying to accommodate conflicting schedules of a whole

4    lot of other people.  Both the plaintiff and witnesses are

5    going to be called out of turn.  This is a witness who is

6    going to be called by the defense out of turn.  And so

7    plaintiff will be able to cross-examine that particular

8    witness.

9          Next witness.

10         MS. REWARI:  Your Honor, we will call Fabio Zuluaga.

11         THE COURT:  Come on up, sir.

12   (FABIO ZULUAGA, Defendant's witness, sworn.)

13         (Witness seated.)

14         THE COURT:  Please have a seat, sir.  Listen to the

15   questions of counsel as best you can.  If you hear the Court

16   interrupt, you might want to pause before giving your answer,

17   but listen to the questions and answers as best you can.

18   We'll try to figure out what your voice quality is, so you may

19   need to get closer to the mic or back away from the mic, so if

20   you could just do a test.

21         THE WITNESS:  Testing, testing.

22         THE COURT:  Back up just a little bit.

23         Very good.

24         Ms. Rewari.

25         MS. REWARI:  Thank you.

B.R. v. F.C.S.B.

82

DIRECT EXAMINATION

1

2  BY MS. REWARI:

3  Q.   Good morning, Dr. Zuluaga.

4  A.   I'm Fabio Zuluaga, former assistant superintendent with

5  Fairfax County School District.

6  Q.   Sir, where are you currently employed?

7  A.   I'm retired from Fairfax County after 14 years in the

8  system, and now I am an educational consultant, so I travel

9  across the country.

10 Q.   Sir, when did you retire from the FCPS?

11 A.   June 30, 2023.

12 Q.   And just so we are all on the same page, when I say FCPS,

13 is that, in your mind, the same as the Fairfax County School

14 Board?

15 A.   It is.

16 Q.   Okay.  And how many years did you work for the school

17 system before you retired?

18 A.   For Fairfax County, I did work 14 years.

19 Q.   14?

20 A.   14, 1-4.

21 Q.   And what was the position of your retirement?

22 A.   I was assistant superintendent for a region called Region

23 2.

24 Q.   And how long were you the assistant superintendent for

25 Region 2?

B.R. v. F.C.S.B.

83

1   A.   Nine years.

2   Q.   How many schools did you have on your oversight?

3   A.   In Region 2 I had 40 schools.

4   Q.   40?

5   A.   40.

6   Q.   Okay.  And what was your position during the 2011 to 2012

7   school year?

8   A.   I was Cluster 8 assistant superintendent.  A cluster was

9   a combination of 25 schools, so I did supervise a portfolio of

10  25 schools.

11  Q.   Okay.  And so was the school system organized in clusters

12  at one point?

13  A.   Correct.

14  Q.   At some point was it reorganized into regions?

15  A.   Correct.  We had eight clusters, and then a new

16  superintendent came and was looking for efficiencies, so those

17  eight clusters were combined into five regions, and I had the

18  privilege of supporting Region 2 schools.

19  Q.   And when did you start in the position of Cluster 8,

20  assistant superintendent?

21  A.   July 1st, 2009.

22  Q.   Is your doctorate in education?

23  A.   Correct.

24  Q.   And when did you receive that?

25  A.   I graduated from Nova Southeastern University, I believe,

─────B.R. v. F.C.S.B.─────

84

1   in 1993, '93, yeah.

2   Q.   Okay.  Do you also have a school superintendent

3   certification?

4   A.   I do.

5   Q.   And when did you receive that?

6   A.   I did it at the University of Kentucky in Lexington, I

7   believe in -- I want to say I did it before I came to Fairfax,

8   so it has to be in 2003, -4, but I don't remember the dates

9   very well.

10  Q.   Okay.  That's fine.  That's fine.  And what is your -- do

11  you have a masters degree as well?

12  A.   I do.  I do have a masters degree in curriculum and

13  instruction, and a doctoral degree in educational leadership,

14  supervising the schools.

15  Q.   Okay.  So your doctorate is in education leadership, and

16  your masters degree is in -- I'm sorry, can you say that

17  again?

18  A.   Curriculum and instruction.

19  Q.   Curriculum and instruction?

20  A.   Correct.

21  Q.   And when you were cluster assistant superintendent, was

22  that your first job at the Fairfax County Public Schools?

23  A.   In Fairfax, yes, but not in the United States.

24  Q.   Who did you report to as cluster assistant

25  superintendent?

─────B.R. v. F.C.S.B.─────

1  A.   To the deputy superintendent.  That is just right below

2  the superintendent.  Deputy superintendent, Dr. Rich

3  Moniuszko.

4  Q.   Okay.  And then the deputy superintendent, do you know

5  who he or she reported to?

6  A.   Superintendent.

7  Q.   The superintendent, okay.  Could you please give the jury

8  an overview of your job duties as cluster superintendent?

9  A.   As cluster assistant superintendent, I was really in

10 charge of all of my 25 schools.  My main goal was to make sure

11 the schools -- it was supporting the superintendent in the

12 hiring of principals, evaluation of principals, visiting the

13 schools constantly, making sure the teachers were teaching,

14 the schools were safe, clean, organized.

15         So that was the main goal, the main job of cluster

16 assistant superintendent, which I did it in Cluster 8 for five

17 years.

18 Q.   Okay.  How many middle schools were in that 25 schools

19 that you had in Cluster 8?

20 A.   Three.

21 Q.   Which three middle schools did you have?

22 A.   I supervised Carson Middle School, I supervised Langston

23 Hughes in Reston, and Stone Middle School in the Chantilly,

24 Westfield area.

25 Q.   Okay.  And were you the direct report for the principals

─B.R. v. F.C.S.B.─

86

1    of the schools that you supervised?

2    A.    I did have a cluster director who she helped me with the

3    management of the cluster at that time.  But the principals,

4    they reported to me.

5    Q.    And did you evaluate the performance of the principals?

6    A.    Correct, with support from my cluster director.

7    Q.    Were you also the next step to appeal for parents who

8    disagreed with the decisions of school principals?

9    A.    Correct.

10   Q.    Can you give the jury an idea of proportion of the time

11   that you spent visiting the schools under your supervision

12   when you were a cluster superintendent?

13   A.    I visited the schools both in Cluster 8 and in Region 2 a

14   lot.  I probably would say -- probably 65 percent of my time

15   was visiting the schools.

16   Q.    In the 2011/2012 school year, how familiar were you with

17   Rachel Carson Middle School?

18   A.    Very, very familiar.  I visited the school a lot.

19   Q.    Okay.  Had you ever visited classrooms during the school

20   day?

21   A.    Oh, yeah, many, multiple classrooms.

22   Q.    Had you visited the school during the start of the day?

23   A.    At the beginning of the day, and at the end of the day,

24   too.

25   Q.    Okay.  And had you seen the school during class

Direct - Zuluaga

B.R. v. F.C.S.B.

87

1    transitions?

2    A.    Multiple times.

3    Q.    Okay.  Had you observed teachers and administrators

4    working in the school?

5    A.    Yes, I did.

6    Q.    Had you observed students receiving instruction in the

7    school?

8    A.    I did.

9    Q.    Okay.  And what was your general impression of the school

10   in the 2011/2012 school year?

11   A.    Carson Middle School was a large school, large middle

12   school of close to probably 1,300 students.  It was a very

13   well-organized school, very clean, safe, welcoming.

14          I clearly remember -- I did visits announced visits,

15   my formal visits, and also unannounced visits.  If I was

16   driving through the area, I usually stopped to get coffee, and

17   then I said -- I thought, well, I'm close to this particular

18   school, I'm going to visit this school just to see what's

19   going on.  And so I did visit the school constantly throughout

20   different times of the day.

21          Did I answer your question?

22   Q.    Yes.  And had you met with the administration of the

23   school before the events we're going to be talking about

24   today?

25   A.    Meet with them before?

─B. R. v. F.C.S.B.─

88

1    Q.    Right.  Before the 2011/2012 school year, had you had

2    meetings with the principal of the school?

3    A.    Oh, yeah, multiple visits, yeah.  Multiple meetings,

4    yeah.

5    Q.    And so you were familiar with the administration?

6    A.    Very familiar.  As part of my duty, there is a

7    document -- an important document that is called the SIP, the

8    school improvement plan.  That's the plan that all the schools

9    have to write for the superintendent and for my office every

10   year, and the school improvement plan has goals and objectives

11   around the number of the students that have to be successful

12   in reading, math, also kind of a welcoming environment the

13   school needs to have.  So all of those documents I do review.

14   As part of my job description, I review that document, and of

15   course, I discuss the document with the school principal and

16   their administrators.

17   Q.    Okay.  Now, I'm going to take you back to February 2012,

18   and I would ask you to please take a look in the binder that's

19   in front of you.  And there's some tabs for documents in

20   there, and there are some tabs that has a DX number in front

21   of them.

22           Do you see that?

23   A.    I do.

24   Q.    And then there are some tabs that have a PX in front of

25   them.

─────────B.R. v. F.C.S.B.─────────

89

1          Do you see that?

2    A.    I do.

3    Q.    So if you could please just take a look in your binder at

4    what is Plaintiff's PX-133.

5    A.    I have it.

6    Q.    And can you please identify what we're looking at in

7    Exhibit 133?

8    A.    This is an email from the executive assistant from the

9    former superintendent, Dr. Jack Dale, and she has asked me to

10   respond.

11          MS. REWARI:  Before we get into the email, Your

12   Honor, we move to admit Plaintiff's Exhibit 133.

13          MR. BRENNER:  No objection, Your Honor.

14          THE COURT:  Without objection.

15   (Defendants' offered Plaintiff's Exhibit No. 133, and was

16   admitted into evidence.)

17          MS. REWARI:  May we publish it?

18          THE COURT:  You may.

19          MS. REWARI:  May I ask if the monitor can be

20   returned to its original --

21          (Discussion off the record.)

22   BY MS. REWARI:

23   Q.    Dr. Zuluaga, Grady is going to zoom us in on certain

24   parts of it.  You're welcome to look at the document in your

25   binder, but it might be easier to look at it on the screen,

─────────────B.R. v. F.C.S.B.─────────────

90

 1   however you prefer, okay?

 2   A.    Okay.

 3   Q.    All right.  So could you please explain who was Dr. Jack

 4   Dale?

 5   A.    Dr. Jack Dale was the superintendent at that time, and

 6   Sue Kirkbride, his executive assistant.

 7   Q.    Okay.  And was it part of your job duties to address

 8   concerns from parents in your cluster?

 9   A.    Correct.

10   Q.    And if you, please, go down in this document to the email

11   that's at the bottom of this page, February 10, 2012.

12         Do you see that?

13   A.    I do.

14   Q.    Okay.  And is that an email from the plaintiff B.R.'s

15   mother to Dr. Dale?

16   A.    Yes.

17   Q.    Okay.  And I'm not going to have you read the whole

18   email.  Have you had a chance to read it coming in today?

19   A.    This particular email?

20   Q.    Yes.

21   A.    Yes.

22   Q.    And this email goes to the next page.  Do you see that?

23   A.    Yes.

24   Q.    And she's included in this email.  Below that she's

25   forwarding an email that was sent to A█████ F███████ also on

B.R. v. F.C.S.B.

91

1   February 10th.  Do you see that?

2   A.   On Friday, February 10th.

3   Q.   Correct.

4   A.   Yes, I do.

5   Q.   And the subject of this email is "Bullying at RCMS needs

6   to be stopped"?

7   A.   Correct.

8   Q.   And it's marked -- it's marked high importance; do you

9   see that?

10  A.   Yes, I do.

11  Q.   Okay.  And then below that email -- and that one goes on

12  for a few pages, if we go to the one below that email.  And

13  this is on page 6 of the document and it's FCPSBR004747?

14  A.   Yes.  0047 -- yes, correct.

15  Q.   And there's another email there, Friday, January 27,

16  2012.

17          THE COURT:  If you look to the screen, it might be

18  easier, Doctor.  The screen beside you, if you look at that,

19  it might be easier.

20          THE WITNESS:  Okay.  Yes, I do.  Yeah.

21  BY MS. REWARI:

22  Q.   And that is an email that's two pages, and the -- and the

23  closing to that email, that's signed by the plaintiff B.R.,

24  right?

25  A.   Yes.  Yes, I do.  I see it.

B.R. v. F.C.S.B.

92

1  Q.   And so, all of this -- if we go back to the first page,

2  it's forwarded to you on Monday, February 13, 2012, at

3  8:51 a.m.?

4  A.   Yes.

5  Q.   And what was your understanding of what you were being

6  asked to do?

7  A.   To immediately develop an understanding of the issue,

8  right.  And to contact the department to set up an appointment

9  with the parents to -- to look for clarification of the issue

10 and seek further understanding of their perspective on what

11 happened.

12 Q.   Okay.  And what was your reaction to receiving a

13 complaint like this regarding Rachel Carson?

14 A.   I immediately remember asking my director that we really

15 had to address this right away.  My schedule needed to change,

16 and I just wanted to really address this issue right away.

17 Q.   Had you received a complaint like this about Rachel

18 Carson before?

19 A.   No.

20 Q.   I'm sorry?

21 A.   No.

22 Q.   No?

23 A.   I haven't.

24 Q.   All right.  And then you said -- I think you mentioned

25 your cluster director, is he or she on this email that we're

B.R. v. F.C.S.B.

93

1   looking at, at the very top?

2   A.   Yes, it is Dr. Jane Dreyfuss.

3   Q.   All right.  Well, would you please turn in your book to

4   Defendants' Exhibit 157.

5           And can you please identify this document?

6   A.   Yes.

7           MR. BRENNER:  I'm sorry.  Ms. Rewari, what was the

8   number?

9           MS. REWARI:  Defendants' Exhib9it 157.

10  BY MS. REWARI:

11  Q.   Is this an email exchange with Jane Dreyfuss, you, T█████

12  B█████, and A█████ F█████████?

13  A.   Correct.

14  Q.   Okay.

15          MS. REWARI:  Your Honor, we move to admit

16  Defendants' Exhibit 157.

17          THE COURT:  Without objection?

18          MR. BRENNER:  No objection.

19          THE COURT:  Without objection.  You may publish.

20  (Defendants' Exhibit No. 157 was admitted into evidence.)

21  BY MS. REWARI:

22  Q.   Okay.  All right.  If we could start with the email at

23  the bottom.  The one for -- or is it Dr. Dreyfuss?

24  A.   Dr. Dreyfuss.

25  Q.   Okay.  From Dr. Dreyfuss to A█████ F█████████ and T█████

———B.R. v. F.C.S.B.———
94

1   B█████.  And you're copied on this?

2   A.   Yes.

3   Q.   All right.  And the subject is "meeting with parent"?

4   A.   Correct.

5   Q.   And so, what -- what is your understanding of what

6   Dr. Dreyfuss was going to be doing?

7   A.   To immediately discuss the issue with the parents, find

8   additional information, and just look for further

9   clarification about the events stated -- the parents described

10  on the email.

11  Q.   Okay.  And did you ask Dr. Dreyfuss to then meet with the

12  parents?

13  A.   Yes, I did.

14  Q.   And was it your understanding that that meeting was set

15  up the same day -- set up on Monday, February 13th, to occur

16  the next morning at 8:30?

17  A.   Correct, right away.

18  Q.   And then in the email above that, it's an email from

19  Ms. B█████ to you, Dr. Dreyfuss, and Mr. F████████.

20           Do you see that?

21  A.   I see, I do.

22  Q.   Okay.  And she writes "We're in the process of writing up

23  all the actions we have taken.  It is a complex process

24  because so many people had been pulled in to support this

25  student"?

—B.R. v. F.C.S.B.—

95

1  A.   Correct.

2  Q.   Did you ask the school to write up all the actions that

3  they had taken thus far?

4  A.   I did.

5  Q.   And why did you do that?

6  A.   I always do it.  All the incidents that I have in

7  different schools, I like to hear first from the parents.  And

8  that's why I wanted the meeting to happen the next day, right.

9  But I also wanted to see here the perspective from the school,

10 so I do direct all my administrators to write a detailed

11 report.  We usually call it a chronology of events or

12 something like that.

13 Q.   Okay.  All right.  If you would please take a look at

14 Defendants' 160 in your book.

15 A.   Okay.

16 Q.   And there's a series of emails there.  Are these emails

17 between you and B.R.'s mother?

18 A.   Yes, they are.

19 Q.   Okay.

20      MS. REWARI:  Your Honor, we move to admit

21 Defendants' Exhibit 160.

22      MR. BRENNER:  No objection.

23      THE COURT:  Without objection.

24      MS. REWARI:  Okay.  May we publish?

25      THE COURT:  You may.

B.R. v. F.C.S.B.

96

1          MS. REWARI:  Thank you.

2    (Defendants' Exhibit No. 160 was admitted into evidence.)

3    BY MS. REWARI:

4    Q.   Let's start with the bottom and move up as emails --

5    printed emails tend to do.  If you could go to the second

6    page.

7    A.   Okay.

8    Q.   All right.  And on this initial email you're copied,

9    right?

10   A.   Correct.

11   Q.   Okay.  And Mrs. R. wrote, "Dr. Dreyfuss, thank you for

12   your call earlier this evening.  Unfortunately, my husband and

13   I will need to reschedule our meeting with you.  After much

14   discussion and thought today, we realized that we need to seek

15   counsel of an attorney to ensure we understand our rights to

16   in terms of securing a safe learning environment for our

17   daughter.

18          "Also, as we have the highest regards for

19   Dr. Zuluaga, we would like to schedule a time when he's able

20   to attend as well.  Please let us know what his availability

21   is for later this week?"

22          Did you know the R. family?

23   A.   No, I didn't.

24   Q.   All right.  But had you been in the -- I guess, is

25   Westfield High School in your cluster?

B.R. v. F.C.S.B.

97

1   A.    Correct.  In that particular cluster, yes.

2   Q.    And was Floris Elementary School in your cluster?

3   A.    Yes.

4   Q.    Okay.  And so, had you also visited Floris Elementary as

5   a cluster superintendent?

6   A.    Yes, I did.  A lot.

7   Q.    And did you visit Westfield High School?

8   A.    Yes.

9   Q.    Okay.  All right.  And the next email on the same page,

10  you respond to Ms. R. the same night, right, 9 -- she writes

11  you at 9:01, and you write her back at 9:16 p.m.?

12          If you look at the bottom of the first page of the

13  exhibit, it says 21:16 as a time stamp?

14  A.    Yeah.

15  Q.    Okay.  And so did you then offer to also meet with them?

16  A.    Correct.

17  Q.    Okay.  And --

18  A.    Yes.

19  Q.    And you offered to meet with her -- or with the family

20  that same Thursday?

21  A.    Yeah.  I did.

22  Q.    Okay.  All right.  If we go to the -- back to the first

23  page.

24  A.    All right.

25  Q.    If you look at these emails, and we don't need to go

B.R. v. F.C.S.B.

98

1   through each one.

2          Was the meeting then arranged at their convenience

3   for Thursday at 4 o'clock?

4   A.   Yes.  I think she wanted a later time, and I did

5   reorganize my schedule to make it happen, yeah.

6   Q.   Okay.  All right.  If you please take a look at

7   defendants' Exhibit 200 in your book.

8          And just -- okay.  Could you please identify what is

9   at Defendants' Exhibit 200?

10  A.   This is a fax that I received from Carson Middle School.

11  Responding to my request about the incidents, the chronology

12  of the incidents detailing what happened.

13  Q.   And what's the date of this fax?

14  A.   February 15th.

15  Q.   And so, is this something that you had requested in

16  advance of the meeting with the family?

17  A.   I did request it, the chronology.  I didn't request it in

18  advance.

19  Q.   Okay.

20  A.   But I did request the chronology that was something that

21  I always did as an assistant superintendent of a regional

22  cluster.

23  Q.   Okay.

24          MS. REWARI:  Your Honor, we move to admit

25  Defendants' Exhibit 200.

B.R. v. F.C.S.B.

99

1          MR. BRENNER:  Objection, Your Honor.  This is the

2    issue we addressed pretrial.

3          THE COURT:  Let me see the exhibit.

4          Which particular docket number was it resolved

5    under, in your view, Counsel?

6          MR. BRENNER:  I'm sorry, Your Honor?

7          THE COURT:  Which particular docket entry was it a

8    result of?

9          MR. BRENNER:  Oh, it's in docket entry 837.  On

10   page 13.  Page 1-3, yes.

11         MS. REWARI:  Your Honor, I believe that this --

12         THE COURT:  Just a moment.

13         MS. REWARI:  Your ruling on this --

14         THE COURT:  Just a moment.

15         MS. REWARI:  Oh, sorry.

16         (A pause in the proceedings.)

17         THE COURT:  Okay.  The Court's ruling is going to be

18   as follows:  You can ask him questions, obviously, about the

19   steps that he believed that he took and that the members of

20   his team took to supposedly address B.R.'s problems or issues.

21         The document, because as you can see is full of

22   hearsay, cannot be offered for the truth of the matter, but

23   you can ask questions about what steps were taken during the

24   course of the investigation based upon the notes and the

25   observations that were placed in the document itself.

B.R. v. F.C.S.B.

100

1        MS. REWARI:  And just for the purpose of the record,

2   we're offering it not for the truth of the matter but to show

3   that this is the information that Dr. Zuluaga had in assessing

4   what further action needed to be taken.

5        THE COURT:  And the Court's determination is that

6   the hearsay issues related to this document overwhelm the

7   basis for you going -- for pursuing the hearsay exception.

8        MS. REWARI:  May I ask him about the length of the

9   document --

10        THE COURT:  Yes.

11        MS. REWARI:  -- and what was covered?  Okay.

12        THE COURT:  Yes.

13   BY MS. REWARI:

14   Q.   All right.  Dr. Zuluaga, in this fax, did you receive a

15   chronology from the school?

16   A.   I did.

17   Q.   How many pages was the chronology?

18   A.   How many pages do we have here in this document?

19   Q.   In the memo from the school.

20        MS. REWARI:  May I ask him the title of the memo?

21        THE COURT:  Yes.

22   BY MS. REWARI:

23   Q.   Okay.  What was the name of the memo that you received?

24   A.   Chronology of Events or --

25   Q.   If you look at -- on Exhibit 200, if you go to after the

—B.R. v. F.C.S.B.—

101

 1  fax cover pages.

 2  A.   Okay.

 3  Q.   There's a memo that starts there; do you see that?

 4  A.   Yes.  Yeah.

 5  Q.   Was it called B.R. Incidents?

 6  A.   Correct.

 7  Q.   And how many pages was this memo?  You see there's

 8  numbers down at the bottom right-hand corner?

 9  A.   14 -- 14 pages.

10  Q.   14 pages?

11  A.   A document of detailed narrative of 14 pages, yeah.

12  Q.   Okay.  And was it 14 single-spaced pages?

13  A.   Yes.

14  Q.   And was this a document that then the school prepared for

15  you to give you the history of what had happened in terms of

16  what actions they had taken?

17  A.   Correct.

18  Q.   And did this document also include for you the history of

19  what had been reported to the school?

20  A.   Correct.

21  Q.   Okay.  And how many issues were listed in this memo?  Do

22  you see how there's Issue No. 1?  Do you see that listing?

23  A.   I think there were four issues, yeah.

24  Q.   And then how current was the memo in terms of -- what was

25  the last date discussed in the memo in terms of actions taken

─B.R. v. F.C.S.B.─

102

1   by the school?

2   A.   Let's see, February 9th -- no, February --

3   Q.   If you go to the last page -- excuse me, if you go to

4   page 14 of this memo.  How current is it?

5   A.   February 15, 2012.

6   Q.   Okay.  And then what is the start date -- if you go back

7   to the first page, what is the start date for what they were

8   telling you in terms of --

9   A.   November 21st, 2011.

10  Q.   November 21st, 2011?

11  A.   Yes.

12  Q.   All right.  And did the packet that the school sent you

13  also include copies of emails?

14  A.   Correct.

15  Q.   And did it include both emails from the school and emails

16  to the school?

17  A.   Correct.

18  Q.   Now, did you have the meeting with the family on

19  Thursday, February 16th, as we saw in the other email?

20  A.   I did.

21  Q.   What do you recall about that meeting?

22  A.   The mother was very anxious about the whole situation,

23  was not pleased in the manner in which the school had handled

24  all the issues and the incidents that were reported by B███.

25  Was extremely dissatisfied with Carson Middle School and asked

─B.R. v. F.C.S.B.─

103

1  me -- I remember she asked me to look for the possibility of

2  B████ returning to two different middle schools that she

3  thought was much better than Carson.  She asked for two middle

4  schools that were in different -- in a different region, in a

5  different area.  One was Cooper Middle School, and the other

6  one was Longfellow.

7          My portfolio of schools was called Cluster 8

8  schools, and those two schools were in Cluster 1.  And even

9  though I wanted B████ -- I really wanted B████ to come back to

10  us, and I was determined to provide additional steps, whatever

11  it takes to help the kid, she -- mom was determined that she

12  really wanted her daughter to attend a different middle

13  school, which I immediately said, I will do it.  We'll --

14  whatever is best for her, even though I believe we can help

15  her at Carson, I immediately -- she was looking for those two

16  schools.  I said, just give me a little bit of time, I will

17  have to obtain permission from the cluster assistant

18  superintendent because I really wanted her to come back to the

19  system.

20  Q.  Was this meeting at your office?

21  A.  Yes.

22  Q.  And do you recall who from the plaintiff's family was at

23  that meeting?

24  A.  I recall my cluster director, Dr. Dreyfuss, the mother

25  was present, the student, and also the father.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

104

1    Q.   Okay.  So when you say "student," the plaintiff B.R. was

2    present?

3    A.   Yes.

4    Q.   Do you recall how long the meeting was?

5    A.   I don't recall it, but definitely at least an hour, an

6    hour-and-a-half.

7    Q.   Did her mother tell you at any time in this meeting that

8    her daughter had been raped at school?

9    A.   No.  Oh, no, never.

10   Q.   Did she tell you that her daughter was being

11   inappropriately touched in her blouse or in her pants at her

12   school?

13   A.   No, absolutely not.

14   Q.   What was your understanding of what the concern was in

15   terms of what was happening at school?

16   A.   My understanding at that point was that B███ was being

17   called vulgar names, inappropriate names, that she was being

18   bullied, and that that behavior was not stopped by other

19   students, and that the school was doing absolutely nothing to

20   stop that.

21   Q.   And that's what mom was telling you?

22   A.   Yes.

23   Q.   And you said you wanted to -- your preference would have

24   been to have the plaintiff return to Carson.

25             Can you explain why?

B.R. v. F.C.S.B.

105

1   A.   Yeah, because we really -- I thought the school was

2   well-equipped to help the student.  We wanted to get to the

3   bottom of the issue with her, and also to provide the right

4   support for the student, either to Carson or to another middle

5   school.  I knew that we had the schools that could help her be

6   successful, not just at the middle school level, but also at

7   the high school level.

8   Q.   Okay.  And why did you believe the school -- that Carson

9   could provide the support that you thought were appropriate?

10  A.   Because through my multiple visits to the school, many,

11  many visits to Carson Middle School, I witnessed the care in

12  which the teachers treated the students before school, after

13  school.

14          This was a school that when the kids came in the

15  morning, I think the arrival at that point, if I recall this

16  properly, was 7:30 a.m., when the kids were coming out of the

17  buses and the car riders, all the administrators were there

18  welcoming the kids.  And many of the administrators were able

19  to recognize kids by names.

20          At the end of the day, the administrators were

21  out -- out of the school saying good bye to the kids.

22  Multiple classes that I observed was very high -- Carson was a

23  very, very high-achieving school in Fairfax, always.

24          And so I was able to observe, even attend when the

25  parents came for conferences or events in the evenings, it was

─B.R. v. F.C.S.B.─

106

1  always a very organized, welcoming school.

2           THE COURT:  Ms. Rewari, Mr. Brenner, I'm going to

3  reconsider the previous determination that I made with regards

4  to some parts of this.  I am going to allow the fax cover page

5  from Mr. Zuluaga to Ms. B███ dated February 15, 2012, and

6  the other fax pages that are attended to that.  I am going to

7  allow those to come in, but not the incident report itself.

8           MS. REWARI:  Okay.  So the first four pages of

9  Defendants' Exhibit 200?

10          THE COURT:  If we're counting back and -- front and

11 back, that will be four pages, yes.

12          MS. REWARI:  Okay.  And, Your Honor, may I just

13 flash those up for the jury then, those four pages?

14          THE COURT:  Yes.  And I'm talking about the fax

15 cover pages.

16          MS. REWARI:  Right, okay.

17 BY MS. REWARI:

18 Q.   So is this the first page of the fax that you received

19 from Ms. B███ on the screen?

20 A.   Excuse me?

21 Q.   I'm sorry.  On the screen, is the first page of the fax

22 from Ms. B███ before you met with the parents?

23 A.   Correct.

24 Q.   Okay.  And then she's marked this "urgent"?

25 A.   Yes.

Direct - Zuluaga

—————B.R. v. F.C.S.B.—————

107

1   Q.   Okay.

2   A.   Yes.

3   Q.   And then she wrote on there, "First of two parts"?

4   A.   Correct.

5   Q.   So this one has 11 pages, including cover, and then if

6   you flip to the second page, and Grady will go to the next

7   screen.  This is another fax that's ten pages.  Do you see

8   that?

9   A.   Yes, I do.  I do.

10  Q.   Okay.  And then the third page is --

11         (Counsel confers.)

12  BY MS. REWARI:

13  Q.   We're on the third page.  This one has a different fax

14  time on it of 14:02 up at the top, and this one is also 11

15  pages, right, marked "urgent"?

16  A.   Correct.

17  Q.   And then the next one, the fourth page, this is another

18  fax, third of three parts.  Do you see that?

19  A.   I do.

20  Q.   And this one is also marked "urgent," 11 pages?

21  A.   Yes.

22  Q.   Okay.  Did you have any doubts as to the seriousness with

23  which the school was taking this matter?

24  A.   No.  I appreciated -- I remember creating this document

25  in its entirety.

─────B.R. v. F.C.S.B.─────

108

1          THE COURT:  Next question.  Next question.

2   BY MS. REWARI:

3   Q.   Okay.  If you would -- in your book, please turn to

4   Plaintiff's Exhibit -- this is with a P -- 160.

5          MR. BRENNER:  We have no objection to that, Your

6   Honor.

7          THE COURT:  Without objection.

8   (Defendant's offered Plaintiff's Exhibit No. 160, was admitted

9   into evidence.)

10         MS. REWARI:  160.

11  BY MS. REWARI:

12  Q.   Okay.  Dr. Zuluaga, if I could just focus your attention

13  to the email at the bottom of this chain.

14  A.   Okay.

15  Q.   And the subject line of this is "Yesterday's meeting,"

16  right?  And that's your name there, your email address there

17  at the top?

18  A.   Correct.

19  Q.   And is the "cc" Dr. Dreyfuss?

20  A.   Yes.

21  Q.   And this is sent Friday, February 17, 2012?

22  A.   Correct.

23  Q.   And is this an email from the plaintiff's mother to you

24  on the morning of February 17th?

25  A.   It is.

B.R. v. F.C.S.B.

109

1  Q.   Okay.  And then she references in the first paragraph the

2  meeting with the family yesterday afternoon, correct?

3  A.   Correct.

4  Q.   Okay.

5  A.   Yes.

6  Q.   And she stated, "We appreciate the generous amount of

7  time and open environment you provided" --

8  A.   Yes.

9  Q.   -- correct?  And did you -- did you find it to be a

10  cordial meeting?

11  A.   It was.

12  Q.   Okay.  And in the next sentence she says, "After speaking

13  with you and Dr. Dreyfuss, we are once again hopeful B.R. will

14  be able to get an education in a safe and positive learning

15  environment within FCPS."

16         And in this next paragraph she says, "As discussed,

17  we will have B.R.'s physician fax a note for her absence this

18  past week and the need for homebound instruction some time

19  today."

20         Was there a discussion about homebound instruction

21  in that meeting that you had on February 16th?

22  A.   No.

23  Q.   Can you explain what homebound instruction is?

24  A.   Yeah.  Homebound instruction is -- is a rather

25  restrictive approach where the kid is educated at home, and we

─B. R. v. F.C.S.B.─

110

1    do send teachers to their homes to help the students with

2    their academics and whatever other needs that that particular

3    student might have.

4            I was surprised to see that the request was for a

5    homebound instruction, but I thought maybe allowing that

6    approach to help the student for a short amount of time will

7    help us keep supporting her and see if we could bring her back

8    into the system.

9    Q.   So just so we're clear, was homebound instruction

10   something that you recommended or that the family asked for?

11   A.   The family asked for.

12   Q.   Did they tell you at any point why they wanted homebound

13   instruction?

14   A.   No.  She provided the doctor's note that said that she

15   needed this kind of support.

16   Q.   Okay.  And when a student is homebound, do the -- does

17   the school system then send instructors to the home to provide

18   learning?

19   A.   Correct.

20   Q.   And under what circumstances -- apart from this case,

21   under what circumstances typically would the school system be

22   providing homebound instruction to a student?

23   A.   We usually provide homebound to students that cannot

24   really for a variety of physical reasons or emotional reasons,

25   but mainly physical reasons, cannot come to school, and they

B.R. v. F.C.S.B.

111

1  need the teachers to go to their home, the students cannot

2  come to us.  So this is not a choice that we offer too

3  lightly, but in this case, we had a doctor's note that said

4  that she needed that support.

5  Q.   Can you just explain for the jury why is this something

6  that you don't typically offer lightly?

7  A.   Well, in situations like this, we really wanted to

8  give -- when a student is going through this situation, like

9  this one, you really want to make sure that you provide the

10  right support at the school level, that the counselors, the

11  social workers, the school psychologists, the students do have

12  teachers that -- they can have access to.

13          And in this particular case, I thought that we are

14  going to provide homebound for a while to see if things settle

15  down a little bit.  But then when we bring the student back,

16  we need to provide all kinds of support to make sure that --

17  that she does not well academically but also emotionally at

18  the school level.

19  Q.   Okay.  And so is part of being in school -- being in

20  school with other students part of the educational experience

21  that -- that you consider important?

22  A.   I do.

23  Q.   And why is that?

24  A.   It's an opportunity for the students to socialize, to get

25  to know the teachers to get to know other students.  For us to

─────────B. R.  v.  F.C.S.B.─────────

112

1  also monitor if they're making progress or not.  And it is

2  very important for us to make sure the kids are with us and

3  provide -- and we provide the right support academically and

4  emotionally to them.  And that's very difficult to provide in

5  a homebound situation.  So we -- we prefer to do it at the

6  school level.

7              THE COURT:  Doctor, if I could get you to back off

8  the mic just a little bit so we don't --

9              THE WITNESS:  Sure.

10             THE COURT:  -- get the feedback.

11             THE WITNESS:  Okay.  Thanks.

12             THE COURT:  Thank you.

13             MS. REWARI:  You can just slide the mic a little bit

14 further towards the -- away from you.  There you go.

15             THE WITNESS:  Okay.

16 BY MS. REWARI:

17 Q.  Okay.  All right.  And now, in the next paragraph in this

18 email, mom references Cooper and Longfellow.  And you've

19 talked a little bit about that.  Did you have an understanding

20 as to why they were particularly interested in Cooper and

21 Longfellow?

22 A.  Based on my conversation with the mother, she always

23 wanted -- she thought that these schools were better than

24 Carson.  Had better academics.  And she spoke very highly

25 about these two schools.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

B.R. v. F.C.S.B.

113

1   Q.   Okay.  And you had said earlier that Carson was a

2   high-achieving school.

3   A.   Yes, indeed.

4   Q.   What do you mean by "high-achieving"?

5   A.   Students were performing extremely well in reading, math,

6   science, and the state assessments.  The school was very

7   organized.  It was well-run.  And the teachers really care a

8   lot about the students, so I thought Carson was a high,

9   high-performing school.

10  Q.   And were Cooper and Longfellow also, in your

11  understanding, high-performing schools?

12  A.   They were.

13  Q.   Where were they located relative to Herndon?

14  A.   Longfellow is in the McLean area.  And Cooper, I don't

15  know Cooper.

16  Q.   Okay.

17  A.   I don't remember.

18  Q.   Okay.  Were they close to Herndon or -- well, let me

19  try the -- try it this way.

20         Are all the schools in Cluster 8 near each other

21  relatively?

22  A.   Say that again, please.

23  Q.   Is Cluster 8 close together -- is it a geographic region

24  as well as a grouping of schools?

25  A.   Not necessarily, but the schools in that particular

———B.R. v. F.C.S.B.———

114

1  pyramid are close together.

2  Q.   Okay.  And what high schools does Cooper -- do you know

3  what high school Cooper feeds to?

4  A.   No, but I know that Longfellow feeds into McLean High.

5  Q.   McLean High School.  Okay.

6        All right.  So after February 17, 2012, did you

7  have -- do you have an understanding as to whether the family

8  did send a note from the physician asking for homebound

9  instruction?

10  A.   Correct.

11  Q.   And were you involved in getting that approved?

12  A.   I was.

13  Q.   Okay.  Did you have it expedited?

14  A.   Yes.

15  Q.   And did you continue to follow-up while she was -- with

16  the family while the student was on homebound?

17  A.   I did.

18  Q.   Okay.

19  A.   I did.

20  Q.   Did you look into placement for her at Cooper and

21  Longfellow?

22  A.   Absolutely, right away.  And those two options were

23  available to me.

24  Q.   And what did you do to make those options available?

25  A.   I had to obtain permission, approval from the Cluster 1

Case 1:19-cv-00917-RDA-LRV    Document 1050    Filed 08/26/24    Page 115 of 181
PageID# 22101                                                    Direct - Zuluaga
B.R. v. F.C.S.B.

115

1    assistant superintendent.  And then also from the office of

2    pupil personnel, which is the office that places the students

3    in different schools.

4    Q.    Okay.  And did you then get approvals for those options?

5    A.    I did.

6    Q.    Did you present those options to the family?

7    A.    Yes.

8    Q.    And what was the response you received?

9    A.    I believe the mother wanted to extend homebound approach.

10   Q.    Okay.

11   A.    Because we approve homebound just for a month.

12   Q.    Okay.

13   A.    She wanted to extend that.

14   Q.    Did they ever take you up on the offer or -- I guess it

15   wasn't an offer.

16          Did they ever decide they wanted their daughter at

17   Cooper Middle School?

18   A.    No.

19   Q.    Did they ever decide they wanted to put their daughter at

20   Longfellow Middle School?

21   A.    No.

22   Q.    Okay.  All right.  Did you also then investigate the

23   concerns the family had raised about Rachel Carson?

24   A.    Oh, yes, of course.

25   Q.    Could you please tell the jury what you did to

B.R. v. F.C.S.B.

116

1    investigate that?

2    A.   Well, once my cluster director and I, we read the

3    chronology of events, I met immediately, set up a meeting with

4    all the administrators at Carson Middle.  I met with them

5    individually and then as a group collective.

6              I asked them to walk me through all the steps they

7    took to support the student.  I asked them exactly who was

8    involved in that process.

9              And I also asked if they did follow the school --

10   the student rights and responsibilities that we have in place

11   for issues such as that one.  Highly investigated that.

12             And they were able to share with me --

13             MR. BRENNER:  Objection.

14             THE WITNESS:  -- all the steps they took in terms

15   of --

16             THE COURT:  Just a second.

17             MR. BRENNER:  I don't object to the witness saying

18   what he did.  I do object to the hearsay the witness is saying

19   what the administrators told him.

20             THE COURT:  Sir, in answering the questions, focus

21   on what you know firsthand, not what someone else told you,

22   and what you did in response to what you were told without

23   telling us what you were actually told.

24             THE WITNESS:  Yeah.  What I did was to review the

25   school level, all the records that were available to me at

B.R. v. F.C.S.B.

117

1   that time.  Have conversations with each one of the

2   administrators, the principal, and some of the school

3   counselors, including the director of student services.

4   BY MS. REWARI:

5   Q.   Okay.  So how many administrators were at the school at

6   this time?

7   A.   I believe three assistant principals.  One director of

8   the student services, which is the person that directs all the

9   counselors, the principal, yeah.

10  Q.   And so, the principal being A██████ F████████?

11  A.   Correct.

12  Q.   The assistant principals being Ms. B██████, Ms. T██████, and

13  Mr. H██████?

14  A.   Correct.

15  Q.   And the director of student services being Cheryl Weaver?

16  A.   Yes, correct, yes.

17  Q.   And did you go to the school for the meeting?

18  A.   I did.

19  Q.   Okay.  And did you discuss -- or did you have any ideas

20  of anything more the school needed to be doing?

21  A.   We discussed each one of the steps.  We -- first the

22  issues that the family presented to me and how the school

23  investigated those issues.

24        I asked the school to share with me the hard

25  evidence, which students that you talked to, what exactly what

B.R. v. F.C.S.B.

118

1  the other students said about the incidents, what are the --

2  show me the written statements from the students, which they

3  did.

4         And, also, I was very concerned about what was the

5  school doing to make sure that those three or four students

6  that were involved in the issue that they did not interact at

7  all among themselves until we really figure out what was --

8  exactly what was going on.

9         So they showed me all the steps that they had in

10 place to make sure the students, none of the students

11 interacted.

12 Q.   Okay.  If you take a look in your book at Defendants'

13 Exhibit 38.

14 A.   Page what?  Excuse me.

15 Q.   DX-38.  It should be the first tab.

16 A.   DX.  Okay.

17 Q.   And can you identify what this document is?

18 A.   It's called the response to R███ chronology of events.

19 Q.   Okay.  And was this -- well, let me back up.

20        Did the family give you a chronology that the mother

21 had written up?

22 A.   Yeah.

23 Q.   Okay.  And if you flip in your book to Plaintiff's

24 Exhibit 171, this is at PX.

25 A.   PX.  Yes.

─────B.R. v. F.C.S.B.─────

119

1   Q.   Okay.

2           MS. REWARI:  Your Honor, I believe this was admitted

3   previously.

4           THE COURT:  Yes.

5           MS. REWARI:  Okay.

6           MR. BRENNER:  171 was.

7           MS. REWARI:  17 -- yes.

8           MR. BRENNER:  171?

9           MS. REWARI:  Yes.  Plaintiff's Exhibit 171.

10          May I publish this?

11          THE COURT:  You may.

12          (Exhibit published.)

13  BY MS. REWARI:

14  Q.   Okay.  And, Dr. Zuluaga, so is this the chronology that

15  was presented to you by the plaintiff's mother?

16  A.   Yes.

17  Q.   Okay.  And this -- this document is -- it's two-sided in

18  your book, but it's four pages?

19  A.   Correct.

20  Q.   Okay.  And the -- on the second page under "Monday,

21  November 21st"; do you see that?

22  A.   Yes.

23  Q.   Okay.  And this one says, "B.R., her father and I go to

24  school," correct?

25  A.   Correct.

┌─────────────────────────────────────────────────────────────
B.R. v. F.C.S.B.
                                                                120

1    Q.   And then the next paragraph says, "B.R. writes her first

2    statement," right?

3    A.   Yes.

4    Q.   Okay.  And is that the same date that the chronology from

5    the school that you looked at in the Exhibit 200, is that

6    where -- that chronology started Monday, November 21st?

7    A.   Correct, yeah.

8    Q.   Okay.  And then if you go to the last page of this

9    document, week of February 6th?

10   A.   Right.

11   Q.   Down at the bottom, "Escalation, see letter to F██████

12   with subsequent details"?

13   A.   Correct.  I do see that.

14   Q.   And is that week of February 6th where essentially -- let

15   me -- let me try this again.

16        Did the memo you received from the school cover the

17   week of February 6th?

18   A.   I don't remember.

19   Q.   You can take a look at -- to refresh your recollection,

20   the memo that's at tab in your book, at Defendants'

21   Exhibit 200.

22   A.   Okay.

23   Q.   And just look at it for your -- read it to yourself in

24   terms of looking at the dates that are covered in there.

25   A.   Yeah.

─────── B.R. v. F.C.S.B. ───────

121

1  Q.  This is the 14 page --

2  A.  Document.

3  Q.  Take a look at the 14 -- maybe it would be faster if you

4  go towards the end of it.

5  A.  Okay.  Yes.

6  Q.  And so the memo and chronology you got from the school

7  covered the week of February 6th, right?

8  A.  Yes, it does.

9  Q.  And it continued until February 15th?

10  A.  It continued until February 15th, yeah.

11  Q.  Okay.  And so, now, if we go back in your book to

12  Defendants' Exhibit 38.  Again, we're not showing -- is this a

13  response to that document -- chronology from the mom?

14  A.  It is.

15  Q.  Okay.  And is this something that you asked the school to

16  prepare to respond to the mom's chronology?

17  A.  Correct.  Correct, I did.

18      MS. REWARI:  Your Honor, we move to admit

19  Defendants' Exhibit 38.

20      MR. BRENNER:  Same objection as to Exhibit 200, Your

21  Honor.

22      THE COURT:  Let me see the entire exhibit.

23      MS. REWARI:  Ms. Barry has it.  And, Your Honor,

24  just so I make sure that that's coming through clearly, this

25  was prepared by the school in response to the chronology

Direct - Zuluaga

B.R. v. F.C.S.B.

122

1   that's in Exhibit 171 that's been admitted.  That was the

2   mom's version of chronology, and this is the school's response

3   to that.

4               THE COURT:  You might be able to get it in, but you

5   need to give me a hearsay exemption or exception.

6               MS. REWARI:  This is not for the truth of the

7   matter, but in terms of -- Dr. Zuluaga is responding to the

8   concerns that the family has raised.  He is investigating.

9               This is information that is in his state of mind in

10  terms of the information he has from the family versus the

11  information he has from the school.

12              THE COURT:  State of mind exception is not going to

13  get you there.  Do you have another exemption or exception?

14  You might want to speak with your colleagues.

15              MS. REWARI:  Well, again, it's not being offered for

16  the truth of the matter asserted.  It's going to show in terms

17  of the information the school had.

18              THE COURT:  If that's your argument, then it doesn't

19  come in.

20              MS. REWARI:  Well, I guess what I will say is that

21  it's a record of the school's operations.

22              THE COURT:  Is it a record exception?

23              MS. REWARI:  Business records, thank you.

24              THE COURT:  Then overruled.  It's in.

25              MS. REWARI:  Thank you.  May I publish?

————————B.R. v. F.C.S.B.————————

123

1          THE COURT:  You may.

2          MS. REWARI:  Okay.  Thank you.

3  (Defendants' Exhibit No. 38, was admitted into evidence.)

4  BY MS. REWARI:

5  Q.   All right.  So in this memo, does the school then

6  respond, paragraph by paragraph, to what is in the chronology

7  from mom?

8  A.   Yes, they do.

9  Q.   Okay.  And then did you meet with the school to go over

10  the information that they presented to you?

11  A.   Correct, I did.

12  Q.   If you go to the second page of this document.

13  A.   Okay.

14  Q.   At the top it says, "The plan that was developed did not

15  include B.R. staying home.  The school has always been

16  committed to having B.R. attend school and to putting a plan

17  in place to ensure her safety"?

18  A.   Correct.

19  Q.   Did you talk to the school about that, about this idea

20  that B.R. would stay home?

21  A.   I -- on November 21st -- let me think.

22  Q.   It may be helpful if you just take a look at Plaintiff's

23  Exhibit 171, which is -- I think this was in response to

24  that -- mom's chronology.  If you want to take a look and see

25  what she has written there, and look at what the school has

─ B.R. v. F.C.S.B. ─

124

1   written.

2   A.   On what date?  Excuse me.

3   Q.   Sorry.  Look at Monday, November 21st and then Tuesday,

4   November 22nd.

5   A.   All right.  Okay.  Yeah.  We never thought that this

6   student was going to stay at home because we didn't propose

7   that.  We really wanted B████ to come back to us, not to stay

8   at home.  And it was not our idea to offer a homebound

9   approach to B████.

10  Q.   Did you ever talk to -- after receiving this response in

11  Defendants' Exhibit 38, did you talk to B.R.'s mother about

12  being able to re-interview B.R. to get some more information?

13  A.   Yes.

14  Q.   And what was the response?

15  A.   She wanted -- it was through a phone call, I believe, and

16  she wanted B███ to just get a homebound, and then I believe

17  in that process she was also asking to see if we could

18  evaluate B███ a little further to see if she might qualify

19  for specialized education, what we call in another location an

20  IEP, but, yeah, I remember that.

21  Q.   Was she willing to make her daughter available to be

22  interviewed about the things in the chronology?

23  A.   No.

24  Q.   And did you ask for that?

25  A.   I don't remember, because it was a phone call after I met

─────────────B.R. v. F.C.S.B.─────────────

125

1   with them, but I don't remember that we --

2   Q.   Okay.  Did you -- did you also talk to the school, to

3   Rachel Carson to see what additional steps the school could

4   implement to facilitate her return to school?

5   A.   Yes.  There were -- several adults were shadowing all the

6   kids, including the principal, the director of the student

7   services.  By shadowing during transitions, I mean adults

8   being strategically placed in the halls, classrooms, all of

9   that was in place, making sure that if she needed to go to the

10  first floor, the second floor, or that there was always an

11  adult paying attention, shadowing her and also paying

12  attention from the behavior from the other students.

13          I was also considering the possibility of hiring an

14  additional instructional assistant.  An instructional

15  assistant is just a teacher aide that supports the teachers,

16  so I was thinking about hiring a temporary instructional

17  assistant to support B█████ because I really wanted her to come

18  back to Carson, so I thought we --

19          THE COURT:  You can take the exhibit down.

20          MS. REWARI:  Okay.

21  BY MS. REWARI:

22  Q.   I'm sorry.  Please.

23  A.   So I -- we have done that in the past when a student

24  needs additional support.  So we thought, okay, we can do

25  that, and I was willing to approve that additional adult to

Direct - Zuluaga

B.R. v. F.C.S.B.

126

1    shadow B█████ to help ensure that she -- that the other

2    students were not really making inappropriate comments, which

3    was -- we really didn't want it to happen.

4    Q.   Okay.  Did you get any pushback or resistance from the

5    school in terms of any of the ideas that you had?

6    A.    No.  On the contrary, they were always asking me for what

7    additional things should we do to --

8            MR. BRENNER:  Objection, Your Honor, this is

9    hearsay, what the school is saying to him.

10           THE COURT:  Sustained.  You can say what you did in

11   response to what the investigation showed, but not what

12   someone was telling you.

13   BY MS. REWARI:

14   Q.   In your experience in addressing concerns of students, in

15   your purview, would it be appropriate to contact other -- you

16   know, the student's elementary school or prior teacher to get

17   more information about the student?

18   A.   Oh, yeah, absolutely.

19   Q.   Why?

20   A.   Because you want to know why the situation is evolving.

21   You want to find all the information available to you that you

22   can get to make sure that the decisions you make to support

23   the student is the best decision based on the information you

24   have.

25   Q.   So if a student is in middle school at Rachel Carson,

————B. R. v. F.C.S.B.————

127

1  would it be appropriate to contact the administration at her

2  elementary school to find out what her experience was like

3  there?

4  A.   Yes, it is appropriate.

5  Q.   Okay.  And would it be appropriate to then investigate

6  what kinds of structures were in place for that student in

7  elementary school?

8  A.   Yes, absolutely.

9  Q.   And why is that?

10  A.   You want to know if the students -- what was their -- how

11  the students were behaving at the elementary level, what

12  issues they had at the elementary level, and how those issues

13  may have carried over the middle school experience, yeah.

14  Q.   All right.  If you take a look at -- please take a look

15  at Plaintiff's Exhibit 267 in your book.

16  A.   Yeah.

17  Q.   Did it come to your attention sometime in June 2012 that

18  the family made another complaint to Dr. Dale?

19  A.   June 2012, yes.

20  Q.   Okay.  What was your understanding of that complaint?

21  A.   That we didn't -- we -- that she did not receive any

22  response from my office.

23  Q.   And then did you then address that complaint from

24  June 2012?

25  A.   Oh, absolutely, yeah.

B.R. v. F.C.S.B.

128

1   Q.   And how did you address that complaint?

2   A.   I remember writing a very detailed response letter from

3   my office, which I wrote regarding the issues that she was

4   raising here.

5   Q.   All right.  If you look in your book at Defendants'

6   Exhibit 178.

7   A.   Yes, I do.

8   Q.   Okay.  And you'll see two tabs.  One says "redacted" and

9   one says Exhibit 178.  Could you look at the one that says

10  Defendants' 178 with the "redacted" behind it?

11  A.   Yeah, okay.

12  Q.   And can you identify what that document there is?

13  A.   This is a memo that I wrote in June 29, 2012, to respond

14  to Mrs. R███████ on the concerns that she sent to

15  Superintendent Jack Dale.  The superintendent directed me to

16  respond to her.

17  Q.   Okay.  And I'm sorry, you said memo.  Is this a letter?

18  A.   This is a letter, yes.

19  Q.   And it is a letter to the plaintiff's mother?

20  A.   Correct.

21          MS. REWARI:  Your Honor, we move to admit

22  Defendants' 178 with the -- as redacted.

23          MR. BRENNER:  We just need to approach for a minute.

24          THE COURT:  That's fine.  Come on up.

25          (Side bar.)

Direct - Zuluaga

────────── B.R. v. F.C.S.B. ──────────

129

1          MR. BRENNER:  For the record, we're on Defense

2   Exhibit 178, which is the letter he's talking about.  I

3   just -- we had proposed yesterday evening to defense that this

4   whole paragraph be redacted.

5          THE COURT:  It would be the third full paragraph on

6   page 2 --

7          MR. BRENNER:  2.

8          THE COURT:  -- of the document?  Okay.

9          MR. BRENNER:  Correct.  Right.  So we -- when we got

10  this this morning since defense, obviously, is taking a

11  different position on what things need to be redacted.  We

12  think the whole paragraph should be redacted they think less.

13  Your Honor's guidance on what should be redacted.

14         THE COURT:  Is this what you --

15         MR. BRENNER:  We suggest the whole paragraph.  They

16  suggest, I guess --

17         MS. REWARI:  We just redacted.

18         THE COURT:  Okay.  Let me read it.

19         MR. BRENNER:  Just that one paragraph.

20         (A pause in the proceedings.)

21         THE COURT:  Just for my edification, what has been

22  redacted?

23         MS. REWARI:  We have it here.

24         THE COURT:  This is the same paragraph?

25         MS. REWARI:  Yes.

──────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ────────
EASTERN DISTRICT OF VIRGINIA

—B.R. v. F.C.S.B.—

130

1              (A pause in the proceedings.)

2              THE COURT:  Over your objection, I think the

3    redaction is fair so I am going to allow it.

4              MR. BRENNER:  You will allow the current version?

5              THE COURT:  Yes, the redacted version.

6              MR. BRENNER:  Can I ask you a question?  Are you

7    trying to admit the June 10th letter?  The one he's responding

8    to because it's got an redaction issue too.

9              MS. REWARI:  No, I am not.  It hasn't been redacted

10   yet.

11             MR. BRENNER:  Okay.

12             MR. BLANCHARD:  I'm just going to step out for a

13   minute.  You don't need to stop.

14             THE COURT:  Okay.

15             (Open court.)

16             THE COURT:  All right.  Ms. Rewari, you may

17   continue.

18             MS. REWARI:  Okay.  So we move to admit Defendants'

19   Exhibit 178.

20             THE COURT:  Over objection, as redacted.

21             MS. REWARI:  Now, with the redaction, may we

22   publish?

23             THE COURT:  You may.

24   (Defendants' Exhibit No. 178 was admitted into evidence.)

25   BY MS. REWARI:

—B. R. v. F.C.S.B.—

131

1  Q.   Dr. Zuluaga, if you could just walk us through this

2  letter.  And I don't need you to read the document to the

3  jury.  They'll have a chance to read it for themselves later.

4       But can you sort of tell us what you're discussing

5  in the first paragraph of this, just in your own words?

6  A.   Yes, I do respond to the way how the school investigated

7  the alleged sexual harassment and bullying towards the

8  student.

9       I also tell the mom that there was a chronology of

10 events document that well detail that she had access through a

11 FERPA request, so mom received all of that.

12 Q.   If I may just pause you there.  When you say she had

13 access to the document, that's the document that we saw the

14 fax cover pages for?

15 A.   Correct.

16 Q.   And so, that memo was also then shared with the family in

17 March?

18 A.   Yes.  Because the mother, Ms. R▆▆▆▆, asked, through a

19 FERPA request, for all the documents, and we provided all

20 those documents to her.

21 Q.   Okay.  All right.  Please continue.

22 A.   I explained that as soon as she brought this issue to my

23 attention, I immediately met with her, then met with the

24 school officials.  Clearly explained how everything was

25 investigated, the School Resource Officer, how he was involved

─────────── B.R. v. F.C.S.B. ───────────

132

1   in the investigation.  That's the first paragraph.

2   Q.   Okay.  And then in the second paragraph, what is a

3   concern that you addressed in the next paragraph?

4   A.   Yeah, mom, Mrs. R███████, said that we forced her daughter

5   to attend homebound instruction, which I was surprised with

6   that statement because there was not -- homebound instruction

7   is probably perhaps the last -- the last approach that I will

8   take to support the student that needs this kind of help.

9   Q.   Okay.  And then I think you --

10  A.   I also -- I also explained we put adults to shadow her

11  daughter, counselors that she had access, full access, a

12  hundred percent access to the director of student services or

13  her own counselor, which she developed a relationship with the

14  counselor, a positive relationship that she had access if

15  anything happened, if she hears anything, making inappropriate

16  comments, to just go directly to the office and just tell us

17  who did it or -- and help her recognize which student was

18  making those inappropriate comments.

19         MS. REWARI:  And I'm sorry, Grady, if you could go

20  to page 2 because this paragraph continues onto the next page.

21  BY MS. REWARI:

22  Q.   All right.  And -- and please continue, what else were

23  you addressing in this paragraph?

24  A.   That we -- I was able to, through my discussions with the

25  SRO, the School Resource Officer, that he was stationed either

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Direct - Zuluaga

─────B.R. v. F.C.S.B.─────

133

1    close to B███ classrooms or to her lockers where she had

2    her locker just to make sure that the other students were

3    being respectful to her.

4            Let me see what else.  That we -- the counseling

5    department provided a list of therapeutic services for

6    services because mom was looking for that, and the counseling

7    department was able to provide a list of them that mom could

8    have access to.

9    Q.   Does the school provide the therapist, is that -- does

10   the school system provide therapists?

11   A.   No, we provide -- we provide counseling.  And we have a

12   variety of professionals that can help such as a school

13   counselor, the school psychologist, or the social worker.  But

14   in terms of this kind of therapy that she was asking -- that

15   we still provided those outside -- outside resources that she

16   could take advantage of.

17   Q.   So you mean when you say "we provide the outside

18   resources," you mean you give the names?

19   A.   Right.

20   Q.   Contact information?

21   A.   Correct.

22   Q.   And then it's up to the family to connect with the

23   therapist to make the appointment?

24   A.   Correct.

25   Q.   Okay.  All right.  And then what was the concern you were

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

134

1    addressing in the third paragraph of this letter?

2    A.   Yeah, that -- that she -- I responded that she definitely

3    was not going to bring her daughter back to Carson.

4    Q.   Let me just clarify that.  You responded in this

5    paragraph to the -- were you telling her that it was -- that

6    it was your recollection that -- that Mrs. R. had said she was

7    not going to bring her daughter back to Carson?  Even on

8    February 16th, she told you that?

9    A.   Correct.

10   Q.   Okay.  And so was it your understanding that even at the

11   February 16th meeting, she had already decided that her

12   daughter was not going to return to the school?

13   A.   Yes.  Even though I remember, I said, Ma'am, I do visit

14   my schools a lot, so I'm -- I trust that the school officials

15   and the administrators put the right instructions in place,

16   but I am willing to go myself as assistant superintendent, I

17   will go myself and visit the school unannounced to see if in

18   reality the structures are in place, to see if we have the

19   School Resource Officer where it needs to be, if the teachers

20   are outside of the classrooms providing supervision.  I will

21   go and do it myself.

22        I remember saying that.

23   Q.   And did she take you up on that?

24   A.   No.

25   Q.   Okay.  All right.  Let's go to the next paragraph.  This

─B.R. v. F.C.S.B.─

135

1   is the second full paragraph on this page.

2          And what was the concern you were addressing in this

3   paragraph?

4   A.   It was the phone call, the follow-up phone call that I

5   had with her where I reassured her that we will do -- we'll

6   put any instruction in place, whatever it takes to make sure

7   her daughter was safe.  Whether it's at Carson or a different

8   middle school.

9   Q.   Okay.

10  A.   And reiterated my desire to -- that also told her that

11  her request for Longfellow or Cooper were approved.

12  Q.   Okay.  And you had told her before this June letter that

13  you had gotten approval?

14  A.   Correct.

15  Q.   Right?  Okay.

16          And I'm sorry, what cluster were those in?

17  Cluster -- was it --

18  A.   Cluster 1.

19  Q.   Cluster 1.  Okay.

20          All right.  And in the next paragraph were you

21  addressing a concern that the school had not responded to a

22  police complaint?

23  A.   Correct.

24  Q.   Okay.  And was the crime that was reported to the police

25  ever reported to the school, to your knowledge?  By -- by the

─B.R. v. F.C.S.B.─

136

1    family?

2              THE COURT:  Yes or no?

3              THE WITNESS:  I don't remember.

4              THE COURT:  Okay.

5    BY MS. REWARI:

6    Q.   All right.  And was it your understanding that the

7    information that the police provided to the school regarding

8    whatever was alleged to them -- sorry.  Let me start that

9    again.  Trying to mind the Court's ruling.

10             At the time that you wrote this letter, in June 29,

11   2012, did you have an understanding that the police

12   investigation was closed?

13   A.   Yes.

14   Q.   Okay.  And did you have an understanding that the

15   information provided to the police -- to the school by the

16   police provided the school no basis for disciplining the

17   student?

18   A.   That was my understanding, yes.

19   Q.   Did you have an understanding that the information

20   provided by the police gave the school no basis for removing

21   the student from school?

22   A.   Correct.

23   Q.   And when I say "the student," we're talking about the

24   student accused by B.R., right?

25   A.   Correct.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

─────B. R. v. F.C.S.B.─────

137

1   Q.   Okay.  And was it your understanding that the police

2   had -- excuse me -- was it your understanding that the school

3   had cooperated with the police in the -- in its investigation?

4   A.   Yes.

5   Q.   Okay.  All right.  Let's go to the next page.

6   A.   Okay.

7   Q.   And if we go to the top of page 3 --

8            THE COURT:  Just a second, Ms. Rewari.

9            (A pause in the proceedings.)

10           THE COURT:  Okay.

11  BY MS. REWARI:

12  Q.   All right.  If we go to the top of page 3.

13  A.   Okay.

14  Q.   And what is a concern you are addressing in this

15  paragraph?

16  A.   That was the request that mother had about evaluating her

17  daughter further evaluation to see if she qualify for an

18  emotional disability and that might require additional

19  services.

20  Q.   And we've heard a little bit about special education

21  services.  If a child is found eligible for that -- for

22  special education services, does that result in an

23  Individualized Education Plan?

24  A.   Yes, that's what we call an IEP.

25  Q.   IEP.  Okay.

─────B.R. v. F.C.S.B.─────

138

1              And so was it the family's idea that she should be

2   evaluated for emotional disability?

3   A.    Yes.

4   Q.    Okay.  And so then did the school system then convene the

5   team that would need to evaluate her for that?

6   A.    Yes.

7   Q.    And this was a request that came through the family's

8   lawyer; is that right?

9   A.    Correct.

10  Q.    Okay.  And then you wrote at the end of this paragraph,

11  "The assessment process will be accelerated so that all

12  assessments can be completed in a decision about eligibility

13  made in order to have services if warranted in place at the

14  beginning of the new school year"?

15  A.    Correct.

16  Q.    Okay.  And so to your understanding, did the assessment

17  process get accelerated to accommodate this timing?

18  A.    Yes.  We -- we wanted to make sure we had a plan in place

19  because I really thought that the student was going to return

20  to us -- to the system.

21  Q.    All right.  And did you expect the student to return to

22  in-school instruction?

23  A.    Yes.

24  Q.    Okay.  All right.  In the next paragraph that starts

25  "Finally," what were you addressing in this paragraph?

—B.R. v. F.C.S.B.—

139

1  A.   I'm addressing mother's complaint, Ms. R█████, that not

2  all the files -- that she didn't have access to all the files.

3  And I do -- I addressed all the files that were given to her

4  based on her FERPA request.

5  Q.   And when we say "FERPA" we're talking about the Family

6  Educational Rights and Privacy Act?

7  A.   Correct.

8  Q.   And -- and under that, is it your understanding that

9  under that law a family or student can ask for their school

10  records?

11  A.   Yes.

12  Q.   And so, was it your understanding that copies of B.R.'s

13  records were provided to the family in March of 2012?

14  A.   Yes, that's my understanding.

15  Q.   All right.  And then if you go down below this, there's a

16  list of bullet -- bulleted points in to specific points raised

17  in your email?

18  A.   Correct.

19  Q.   So now was it your understanding that all of her

20  daughter's written statements were provided to the family in

21  March?

22  A.   Correct.

23  Q.   And in the next one, you said, "Typed and redacted

24  copies."

25          Why are only typed and redacted copies of students'

—— B. R. v. F.C.S.B. ——

140

1  statements provided and not original handwritten?

2  A.   Because you -- in situations like this one, you got to

3  make sure that you provide the facts and that you protect

4  identity of all the involved parties.

5  Q.   So someone's handwriting might give away the name of the

6  student?

7  A.   Correct, yes.

8  Q.   And so you're -- this is the privacy of the students who

9  wrote the statements as well?

10 A.   Correct.

11 Q.   Okay.  All right.  And then the next bullet --

12 A.   And the practice is that this kind of reports are given

13 to the parents, but that it's an office, a central office in

14 Fairfax that also provides guidance to the school in terms of

15 all these documents, so it's just not the school, but there is

16 guidance.

17 Q.   Okay.  And is it a pretty big undertaking to collect

18 everything?

19 A.   Huge.  Yeah.

20 Q.   All right.  And the next bullet point, it says, "All

21 staff records that were produced, including counselor notes

22 other than personal notes."

23        And is that next part quoting from an FCPS

24 regulation?

25 A.   I believe so.

B.R. v. F.C.S.B.

141

1  Q.   Okay.  The next bullet talks about a complete attendance

2  report, right?

3  A.   Correct.

4  Q.   Okay.  And then the next bullet talks about the SRO did

5  not produce any school records.  Can you explain what you are

6  telling her in this bullet?

7  A.   That we didn't have any records from -- from the police

8  officer or from the police department.

9  Q.   The SRO's records belong to the police departments?

10  A.   Correct.

11  Q.   Okay.  And so, the School Resource Officer is a Fairfax

12  County police officer, but not an employee of the school

13  system; is that right?

14  A.   Correct.

15  Q.   Okay.  All right.  And in the next bullet, can you just

16  explain what you were telling her in this bullet?

17  A.   Yeah, that basically we didn't produce any additional

18  report unless there was a recommendation for expulsion, but we

19  didn't have a recommendation for expulsion.

20  Q.   For any student involved in this?

21  A.   Correct.

22  Q.   Okay.  And then you said two documents summarizing the

23  school investigations?

24  A.   Right.

25  Q.   These are the -- "Various reports of bullying were

Direct - Zuluaga

B.R. v. F.C.S.B.

142

1  prepared for me by school staff."  And we've looked at one of

2  them, and it's Defendants' Exhibit 38.

3        Was the second one the one that's Defendants'

4  Exhibit 200, the fax?

5  A.  Yes.

6  Q.  Okay.  And were those also -- was that memo also provided

7  to the family in March?

8  A.  I believe so.

9  Q.  Or at least a version of that memo?

10 A.  Correct.

11 Q.  Okay.  And then, if we go to the last page, the top

12 paragraph.

13 A.  Uh-huh.

14 Q.  All right.  What were you telling her here?

15 A.  That if there is additional reports since February 16th,

16 that we -- the school will have those records available for

17 her if there were additional reports.  And that's --

18 Q.  Okay.  And so then was there a second round of FERPA

19 documents provided to the family, sometime after June 29th?

20 A.  Yes, yes.

21 Q.  Okay.  All right.  And then in the next paragraph, you

22 wrote, "While I recognize that you disagree about the adequacy

23 of what the school has done, I want to assure you that both

24 the school and I remain very concerned about B.R.'s well-being

25 and are most willing to talk about additional steps that can

─B.R. v. F.C.S.B.─

143

1    be taken to support her.  We want to -- we want not only to

2    ensure B.R.'s safety but to also to address our mutual

3    concerns about her emotional well-being and comfort."

4            And so did you invite her, then, to meet with you?

5    When I say "her," I mean Mrs. R.?

6    A.   I don't remember, but I always reiterated to her that we

7    were ready to support her daughter in any setting that she

8    needed support with and that we were willing to even add

9    additional steps if she was not satisfied with the steps the

10   school took during the incidents.

11           MS. REWARI:  Your Honor, I would like to renew my

12   offer of Defendants' Exhibit 200 as a business record that has

13   been -- we've heard from the testimony now that it was a

14   record that was provided as part of the FERPA request.

15           MR. BRENNER:  Your Honor, it's not -- the business

16   record doesn't overcome the hearsay within the document.

17           THE COURT:  Well, the admissibility of that

18   particular document, I think you're going to need to lay more

19   of a foundation.

20           MS. REWARI:  Okay.

21           THE COURT:  Of the entire document.

22   BY MS. REWARI:

23   Q.   Okay.  If you go back to Defendants' Exhibit 200.  And

24   directing your attention to the 14-page memo that's behind the

25   fax pages.

─B. R. v. F.C.S.B.─

144

1          What is your practice with respect to asking for

2    these types of memos?  I think you just said -- that you

3    always ask.  So what is your practice?

4    A.   I do.  I always ask for a well-detailed chronology of

5    events of what happened.

6          This is not a document that is prepared just for

7    one -- by one person, but it's a multidisciplinary group of

8    professionals.

9          And, also, the evidence of those instructors.  So if

10   somebody says, hey, we -- this is what we did, this date.  I

11   want to see some kind of an artifact that proves or shows that

12   in reality the SRO went there or the student had green light

13   to go to the office or the teachers were shadowing or the

14   director of student services were providing constant support

15   to the student.

16         So I wanted to see that -- those artifacts.

17   Q.   And so was this memo then created at your request?

18   A.   Yes.

19   Q.   And was it created in -- close in time to the time that

20   you requested this?

21   A.   Yes.

22   Q.   Okay.  And then did you rely on this document in order to

23   determine how you were going to deal with the family?

24              THE COURT:  Yes or no.  Yes or no.

25              THE WITNESS:  Not entirely, because I also wanted to

─────B. R. v. F. C. S. B.─────

145

1  talk to the administrators, not just the written report.  I

2  wanted to meet with them in person.

3  BY MS. REWARI:

4  Q.  All right.  Let me -- let me see if I can ask a better

5  question.

6          Did you use this document in guiding your actions

7  with respect to the concerns the family brought to you?

8  A.  Yes.

9          MS. REWARI:  Your Honor, I move to admit this a

10  business record.

11          THE COURT:  You're not quite there.

12          MS. REWARI:  Not quite there?  All right.  I'll keep

13  going.  I'll keep trying.

14  BY MS. REWARI:

15  Q.  Was this memo then kept -- in the regular course of the

16  school systems operations?

17          THE COURT:  You're there, it's in.

18          MS. REWARI:  Okay.

19          THE COURT:  All right.

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.

22          MS. REWARI:  Okay.

23          THE COURT:  It's in.

24          MS. REWARI:  All right.  Thank you.

25          MR. BRENNER:  Just over objection.

B.R. v. F.C.S.B.

146

1              THE COURT:  Over objection, yes, sir.

2              MS. REWARI:  All right.

3              THE COURT:  Ladies and gentlemen, this particular

4    document is being offered for a limited purpose in the

5    particular case.  The information in the document is not to be

6    considered true or otherwise false or whatever.  It's only

7    information that you can consider based upon the supposition

8    that the School Board took appropriate steps to deal with

9    their responsibilities under Title IX and for nothing else.

10   This is part of a business record that was kept in the regular

11   course of business by the School Board for the purpose of

12   investigating their -- the complaint that B.R.'s mother and

13   B.R. had filed against the school.

14   (Defendants' Exhibit No. 200 was admitted into evidence.)

15             MS. REWARI:  Okay.  And, Your Honor, if I may -- I

16   have not asked him about the emails behind that, but I believe

17   these emails have come in -- some of them have come in -- some

18   of them are stipulation, so we'd just ask if this ruling

19   applies to everything that's behind -- and I want to give

20   Mr. Brenner a chance --

21             THE COURT:  There's -- there's a general objection

22   to the document that I've overruled.  Mr. Brenner has noted

23   for the record his exception to the Court's determination,

24   so --

25             MS. REWARI:  Okay.  All right.  Thank you.

B.R. v. F.C.S.B.

147

1          THE COURT:  Uh-huh.

2          MS. REWARI:  All right.

3          MR. BRENNER:  I think -- Your Honor, I think what

4   counsel is referring to is in addition to the document,

5   there's just a collection of emails behind it that are not --

6          MS. REWARI:  These were part of the facts.  So it

7   was a memo, and then the emails are a part of the facts.  And

8   I believe some of these emails were already in.  I haven't

9   gone through all of them, but this is what was provided to him

10  in the fax.

11         MR. BRENNER:  For example, Your Honor, you have the

12  document --

13         THE COURT:  There are more emails that are part of

14  this business record that have been -- that have not been

15  admitted?

16         MS. REWARI:  Correct.  Correct.  And so that's why I

17  just wanted to clarify, for me to publish it, whether we --

18  there was any objection or issue with respect to the -- to the

19  emails, because we have not --

20         THE COURT:  The best thing that can be used to

21  describe the emails, Mr. Brenner -- and, again, correct me if

22  I'm wrong, Ms. Rewari -- is that these are supplemental to the

23  document that has been admitted.  Do you have any objection to

24  the supplemental documents?  And to give you a point of

25  reference, email dated November 22, 2011, at 7:27, one at

─B.R. v. F.C.S.B.─

148

1   8:49, one at on November 21st at 2:47, and then they follow in

2   sequence?

3           MR. BRENNER:  Yes, so, for example, Your Honor, Bate

4   that ends in 10023, there is a handwritten note there.  I

5   don't think counsel's even tried to lay the business record

6   exception for the emails.  The fact that they're included in a

7   fax does not make them a business record.  I think the better

8   course -- if there's a particular email counsel wants to

9   introduce, we can talk about, but right now I'm looking at

10  just a hodgepodge of emails.

11          MS. REWARI:  Right.  And I can lay a -- a foundation

12  for why he received the emails as well.  Some of these emails

13  are from plaintiff's mother.  Some of them are --

14          THE COURT:  To the emails -- and, again, I haven't

15  compared the two, but do the emails in any way coincide with

16  the information that has been allowed through that previous

17  exhibit, or is it something different?

18          MS. REWARI:  I believe they're -- these emails --

19  the emails end on February 10th, and the memo goes to

20  February 15th.  So the events that are in the emails are also

21  discussed.  The emails -- I guess are corroboration or

22  evidence of what is being discussed in the memos.

23          THE COURT:  Okay.  As I indicated earlier, the Court

24  reconsidered determination with regard to the fax documents.

25  The Court allowed those in.  The Court allowed the document

─────────────── B.R. v. F.C.S.B. ───────────────

149

 1   entitled B██████ R██████ Incidents to come in as a business

 2   record exception to the hearsay rule.

 3            I don't think that the email exchange that are a

 4   part of that submission actually gets you anywhere near the

 5   business records exception to the hearsay rule, so I'm going

 6   to allow you to have the facts.  I'm going to allow you to

 7   have the investigation, but the emails don't come in.

 8            MS. REWARI:  Okay.  That's fine.  So may I show the

 9   memo on the screen?

10            THE COURT:  Uh-huh.

11            MS. REWARI:  Okay.  Thank you.

12            (Exhibit published.)

13   BY MS. REWARI:

14   Q.   If we can go to FCPSBR10001.

15            Okay.  So now, this is the memo that you also

16   referenced in your June 29 letter to mom where you indicated

17   that she'd gotten a copy?

18   A.   Correct.

19   Q.   Okay.  And so, it came to you in this fax on February 15,

20   2012; is that right?

21   A.   Correct.

22   Q.   Okay.  All right.  So the first issue -- and I -- it's a

23   long document, I'm not going to take the jury's time to read

24   it all of it with you.  But the discussion of the -- issue

25   No. 1 goes from page 1 to page 6, right?

1   A.   Yes.  Yes.

2   Q.   Okay.  And then this is -- this issue No. 1 is a

3   discussion about B.R. being harassed at her locker?

4   A.   Correct.

5   Q.   Okay.  All right.  So if we go to -- if we can just flip

6   to -- from page 1, we'll go to page 6 and then issue No. 2.

7   A.   Yes.

8   Q.   All right.  So if we go to issue No. 2 on page 6.

9           MS. REWARI:  Can you take us to page 6?

10          All right.  Actually, if you just look at the last

11  paragraph before issue No. 2, can you -- can you zoom out and

12  go to the last paragraph under issue No. 1?

13  BY MS. REWARI:

14  Q.   All right.  Now, it says, "On December 9, Mrs. R. sent an

15  email to both Mrs. H██████ and Ms. F████████ saying that

16  things were going much better and thanking everyone.  Officer

17  Genus, Cheryl Weaver, Mr. H█████, Mrs. T█████ for their support

18  in the halls and elsewhere."

19          Do you see that?

20  A.   Yes.

21  Q.   And then below that is issue No. 2.  Do you see that?

22  A.   Yes.

23  Q.   And this is -- this next issue picks up on January 20th,

24  right?

25  A.   Yes.

─────B.R. v. F.C.S.B.─────

                                                                151

1   Q.   Okay.  And the initials here, B.G., don't appear on any

2   of the prior pages, right?  This is not a student whose

3   initials are on any of the pages 1 through 6?

4   A.   Correct.

5   Q.   Correct?

6   A.   No difference.

7   Q.   And then this -- this issue has a one-paragraph

8   discussion?

9   A.   Correct, yes.

10  Q.   All right.  And then below that, on page 6 is -- I'm

11  sorry, in issue -- in this paragraph issue, No. 2, it says,

12  "The student received a consequence."

13          Do you see that?

14  A.   Correct, yes.

15  Q.   "And Mr. H███ checked back in with B.R. to make sure

16  there were no further problems."

17  A.   Yes.

18  Q.   And then, "He and Mrs. H███ checked with B.R.

19  regularly to make sure the issue did not reappear"?

20  A.   Yes.

21  Q.   Okay.  And the initials B.G. don't show up anywhere else

22  in this memo after this, right?

23  A.   They don't.

24  Q.   You're welcome to flip through.

25  A.   Yes.

─────B.R. v. F.C.S.B.─────

152

1    Q.   Okay.  All right.  So then issue No. 3, January 25, below

2    that.  And the first line there is, "On January 25th, B.R.

3    went to Mrs. H█████ and told her that people were taking her

4    work from her core classes"?

5    A.   Yes.

6    Q.   Okay.  And then this discussion -- the discussion of this

7    issue goes from page 6 to page -- top of page 9, right?

8    A.   Yes.

9    Q.   And I -- there's no names redacted in this; do you see

10   that?

11   A.   Yes.

12   Q.   Okay.  Was it your understanding that no students were

13   ever identified who were allegedly taking B.R.'s work?

14   A.   Yes, that was my understanding.

15   Q.   Okay.  All right.  Let's go to issue No. 4 that's at the

16   top of page 9.  And this starts on Thursday, February 9th?

17   A.   Yes.

18   Q.   All right.  And it says 2011, but is that a typo, it

19   should be 2012?

20   A.   Correct.

21   Q.   Okay.  And that was B.R.'s last day of in-school

22   instruction, right?

23   A.   Yes.

24   Q.   Okay.  And the first paragraph talks about an incident in

25   the cafeteria, right?

B.R. v. F.C.S.B.

153

1   A.   Yes.

2   Q.   Okay.  All right.  And then this -- the discussion of

3   this issue goes from page 9 to page 10, and then page 11?

4   A.   Yes.

5   Q.   Okay.  And page 12.  And then page 13?

6   A.   Okay.

7   Q.   And page 14?

8   A.   Okay.

9   Q.   All right.  And there's a lot of names redacted in there,

10  right?

11  A.   Uh-huh.

12  Q.   There's a lot of initials that appear through here?

13  A.   Yes.

14  Q.   And so was it your understanding that the school had

15  talked to a lot of students with regard to this incident?

16  A.   Correct.

17       MR. BRENNER:  Objection.  Leading.

18       THE COURT:  Sustained.  That's leading.

19  BY MS. REWARI:

20  Q.   All right.  And then the last paragraph on page 14 says,

21  "On Wednesday, February 15th," and then it -- below that, "As

22  of February 15th"?

23  A.   Yes.

24  Q.   Okay.  So did you have an understanding as to whether the

25  school was still investigating this matter at the time that

B.R. v. F.C.S.B.

154

1    you received this memo?

2    A.    Yes.

3    Q.    All right.  You can put that aside.

4              If you please take a look -- let's go back to your

5    letter on June 29th.

6              After that letter, did you receive an email from mom

7    asking for a meeting?

8              If it helps, please take a look -- I know we're

9    talking about 12 years ago.  Please take a look at Plaintiff's

10   Exhibit 294 in your book.

11   A.    294.

12   Q.    PX-294.

13   A.    Yeah.

14   Q.    And are these emails between you and Mrs. R. on July 16,

15   2012?

16   A.    Correct.

17             MS. REWARI:  Okay.  Your Honor, we move to admit

18   Plaintiff's Exhibit 294.

19             MR. BRENNER:  No objection.

20             THE COURT:  Without objection.

21   (Defendants' offered Plaintiff's Exhibit 294 and was admitted

22   into evidence.)

23             THE COURT:  How much longer with this witness?  I'm

24   trying to gauge for lunch.

25             MS. REWARI:  I think maybe ten minutes.

—B.R. v. F.C.S.B.—

155

1          THE COURT:  Very good.

2   BY MS. REWARI:

3   Q.   Okay.  So if we look at the first email, it's marked high

4   importance.  It's dated Monday July 16th, right?

5   A.   Yes.

6   Q.   Okay.  And so, was it your understanding she was

7   responding on July 16th to your letter that was dated

8   June 29th?

9   A.   Correct.

10  Q.   Okay.  And then you responded to her the same day?

11  A.   Yes, I did.  I did.

12  Q.   Okay.  Was it -- what was your understanding of why she

13  was contacting you?

14  A.   Let me see.  Well, she -- I believe the mother,

15  Mrs. R███████, believed that we wanted to help her daughter,

16  but there were several structures that we -- the homebound,

17  the IEP, the possibility for her to come back to Cooper and

18  Longfellow, so I thought that all of this was going to be,

19  hey, this is -- this is where we are, this is -- we have

20  additional information, the IEP usually -- this -- this letter

21  is dated July 16th.  And IEP provides additional information,

22  so I always believe that Mrs. R███████ was going to allow us to

23  help her daughter in a different setting.

24  Q.   Okay.  So were -- at this point, were you still thinking

25  that she was going to permit her daughter to return to

B.R. v. F.C.S.B.

156

1    in-person instruction?

2    A.    If not with Carson -- to Carson, maybe to Longfellow or

3    Cooper because she knew that those two schools were approved.

4    Q.    Okay.  All right.  And then did -- take a look at

5    Plaintiff's Exhibit 304 in your binder.  PX.

6    A.    Yes.

7    Q.    Did you then arrange a meeting with the family in August

8    of 2012?

9    A.    Correct, yes.

10   Q.    Okay.  And if you look at the second page of this

11   email --

12   A.    Yes.

13   Q.    -- or second page of this document, it starts, "On

14   Friday, August 3rd"?

15   A.    Yes.

16   Q.    Okay.  And this meeting was set up for August 13, 2012;

17   is that right?

18   A.    Yes.

19   Q.    Did Ms. -- Mrs. R. then advise you that she was going to

20   be bringing attorneys from two different organizations to

21   attend the meeting?

22   A.    Correct.

23   Q.    Okay.  So did you go to the meeting with her on

24   August 13, 2012?

25   A.    I believe so, but I -- let's see.  This -- yes, I

—B.R. v. F.C.S.B.—

157

1  responded to her saying, "Yes, not a problem, see you Monday

2  morning."

3  Q.   Okay.

4  A.   Yeah.

5  Q.   And then do you recall -- do you recall what the IEP that

6  the school system did -- did it find any emotional disability

7  like the family requested?

8  A.   Yes, the IEP, yes, they found an emotional disability.

9  And -- and so our mind immediately began -- we began thinking,

10 okay, we started to think how are we going to support this

11 student with an IEP.  Mom did not want to bring her daughter

12 to Carson Middle School, but we thought that Longfellow and

13 Cooper Middle School also have some very strong specialized

14 programs that we were able to provide that support there as

15 well.

16 Q.   Did the school system also offer special placement at a

17 school with -- for students with emotional disabilities?

18 A.   Yes, it's a small school where -- the assistant offer --

19 a smaller school because we have smaller teacher-student

20 ratio.  So a teacher probably will not have more than five,

21 seven kids.

22       And, also, we had at that particular school more

23 social workers, counselors, and school psychologist that could

24 help with a recently discovered emotional disability.

25 Q.   And did the family accept that offer for her to attend

─B.R. v. F.C.S.B.─

158

1    that school?

2    A.    No, the family accepted everything in the IEP.  They did

3    agree with all the structures.  They thought that, okay, we

4    have good support for -- for B███.  But the family requested

5    a location at a -- in a private school.

6    Q.    In a private school?

7    A.    Yeah.

8    Q.    Okay.  And did the school system then pay for the private

9    school?

10   A.    No, I don't believe so.

11   Q.    Okay.  And so, where did -- to your knowledge, where did

12   B.R. attend 8th grade?

13   A.    I believe through homebound.

14   Q.    Homebound?

15   A.    Yeah.

16   Q.    Okay.

17          MS. REWARI:  No further questions, Your Honor.

18          THE COURT:  All right.  Ladies and gentlemen, we're

19   going to go ahead and take our lunch break.  I'll get you back

20   in -- I'll give you a little longer break today, get you back

21   in at 2 o'clock.  2 o'clock.

22          Please do not discuss the case or any aspect of the

23   case with anyone.  Enjoy your meal.

24          (Jury excused.)

25          THE COURT:  You can step down, Doctor.

B.R. v. F.C.S.B.

159

1          Thank you.  Y'all may be seated.

2          MS. REWARI:  May I tell him that he's subject to

3    cross?

4          THE COURT:  Yeah.

5          Sir, just because we're breaking for lunch doesn't

6    mean that you're off of the witness stand.  Okay?  Very good.

7          Mr. -- who is doing the cross?  Mr. Brenner?

8          MR. BRENNER:  I am.

9          THE COURT:  How long do you anticipate?

10         MR. BRENNER:  I had thought before we started about

11   45 minutes, so I will look at my notes over the break.

12         THE COURT:  Okay.  And that might be the --

13         MR. BRENNER:  A little longer, but I hope not.

14         THE COURT:  Okay.  And that might be the point that

15   we take our break for the day.

16         MR. BRENNER:  Can I just inquire if any of the other

17   defense counsel will be questioning the witness?

18         MR. KINNEY:  I have no questions.

19         MR. BLANCHARD:  No questions.

20         THE COURT:  From what I was made to understand --

21   and if they change their minds, they're not necessarily wedded

22   to this -- that they identify people that are going to handle

23   the witness for the entire defense team in many instances.  I

24   think when you are dealing with a cross-examination from the

25   defense, I think they all want to take their opportunity, but

─────B.R. v. F.C.S.B.─────

160

1    I think --

2           MR. BRENNER:  No, I understand.

3           THE COURT:  Yeah.

4           MR. BRENNER:  -- just knowing if I was going right

5    away after lunch.

6           THE COURT:  Yes, sir.

7           MR. BRENNER:  Okay.

8           THE COURT:  I think that's the goal.

9           MR. BRENNER:  Okay.

10          THE COURT:  All right.  Everyone enjoy your meal.

11          (Lunch Recess 12:56 p.m.)

12          (A.M. Session concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 1st day of

9    April, 2024.

10           I further certify that the foregoing 181 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 26, 2024.

17

18

19

20

21   _____
                                        Tonia M. Harris, RPR
22                                      Official Court Reporter

23

24

25

                                                              161

## $

**$50** [3] - 21:2, 21:9, 21:22

## '

**'11** [1] - 31:23
**'93** [1] - 83:25
**'B▮** [2] - 50:2
**'oral** [1] - 50:3

## 0

**0047** [1] - 91:13
**05** [1] - 4:19

## 1

**1** [13] - 1:6, 101:21, 103:7, 114:25, 135:18, 135:19, 149:25, 150:2, 150:6, 150:12, 151:3, 161:16
**1,300** [2] - 19:9, 87:11
**1-3** [1] - 99:9
**1-4** [3] - 58:4, 82:19
**1-6** [1] - 78:3
**10** [3] - 1:8, 90:10, 153:3
**100** [3] - 2:2, 2:6, 2:10
**10023** [1] - 148:4
**108** [1] - 4:16
**10:00** [5] - 12:2, 12:7, 12:11, 12:12
**10:45** [1] - 80:14
**10:50** [3] - 80:15, 80:19
**10th** [4] - 90:25, 91:1, 130:7, 148:19
**11** [5] - 25:13, 107:4, 107:13, 107:19, 153:3
**11:00** [1] - 12:3
**11:01** [1] - 80:21
**11th** [2] - 24:24, 25:23
**12** [7] - 19:17, 46:2, 52:25, 74:2, 76:6, 153:5, 154:9
**12-year-old** [1] - 19:16
**120** [1] - 3:7
**123** [1] - 4:13
**12:56** [1] - 160:11
**12th** [1] - 25:9
**13** [8] - 4:4, 67:4, 67:11, 92:1, 99:9, 153:5, 156:16, 156:24
**13-year** [1] - 58:20

**130** [1] - 4:15
**131** [3] - 47:5, 47:19, 47:22
**131**..........................
. [1] - 4:11
**133** [3] - 89:6, 89:11, 89:14
**133**..........................
. [1] - 4:16
**13th** [2] - 25:13, 94:14
**14** [18] - 45:22, 66:25, 67:4, 67:11, 82:6, 82:17, 82:18, 82:19, 101:8, 101:9, 101:10, 101:11, 102:3, 121:1, 121:3, 153:7, 153:20
**14-page** [1] - 143:24
**146** [1] - 4:15
**14:02** [1] - 107:13
**15** [4] - 45:22, 102:4, 106:4, 149:19
**1520** [1] - 1:20
**154** [1] - 4:17
**157** [4] - 93:3, 93:8, 93:15, 93:19
**157**..........................
............ [1] - 4:14
**15th** [6] - 98:13, 121:9, 121:10, 148:20, 153:21, 153:22
**16** [3] - 32:5, 77:25, 154:14
**160** [6] - 95:13, 95:20, 96:1, 108:3, 108:7, 108:9
**160**..........................
. [1] - 4:16
**160**..........................
............ [1] - 4:14
**161** [2] - 4:19, 161:10
**16th** [8] - 102:18, 109:21, 134:8, 134:11, 142:15, 155:4, 155:7, 155:21
**17** [4] - 68:4, 108:21, 114:6, 119:7
**171** [6] - 118:24, 119:6, 119:8, 119:9, 122:1, 123:23
**1775** [1] - 3:10
**178** [7] - 128:6, 128:9, 128:10, 128:22, 129:2, 130:19, 130:24
**178**..........................
............ [1] - 4:15
**17th** [1] - 108:24
**1801** [1] - 3:6
**1993** [1] - 83:25

**1995** [1] - 32:4
**1:00** [1] - 12:8
**1:19-cv-917** [2] - 1:4, 161:8
**1st** [2] - 83:20, 161:8

## 2

**2** [15] - 82:22, 82:24, 83:2, 83:17, 86:12, 129:6, 129:7, 132:20, 150:6, 150:8, 150:11, 150:21, 151:11, 158:21
**200** [12] - 98:6, 98:8, 98:24, 100:24, 106:8, 120:5, 120:21, 121:20, 142:4, 143:12, 143:23, 146:14
**200**..........................
............ [1] - 4:15
**2003** [1] - 84:7
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2008** [1] - 31:23
**2009** [1] - 83:20
**2011** [8] - 32:1, 32:3, 60:19, 83:5, 102:8, 102:9, 147:25, 152:18
**2011/2012** [3] - 86:15, 87:9, 87:25
**2012** [40] - 5:10, 5:13, 18:8, 47:1, 47:12, 48:2, 50:10, 52:17, 52:25, 53:2, 69:19, 69:17, 69:20, 70:9, 71:7, 76:6, 78:16, 78:22, 79:13, 83:5, 88:16, 90:10, 91:15, 92:1, 102:4, 106:4, 108:21, 114:6, 127:17, 127:19, 127:24, 128:13, 136:11, 139:13, 149:20, 152:19, 154:15, 156:8, 156:16, 156:24
**2017** [2] - 64:21, 67:20
**2018** [1] - 67:24
**2019** [2] - 71:10, 79:17
**20190** [1] - 3:11
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] -

2:22
**202-955-1974** [1] - 2:19
**2023** [1] - 82:10
**2024** [3] - 1:6, 161:9, 161:16
**2029-Century** [1] - 1:19
**20th** [1] - 150:23
**21** [1] - 19:25
**213-995-5720** [1] - 1:21
**21:16** [1] - 97:12
**21st** [14] - 20:15, 21:4, 21:5, 22:6, 22:7, 39:5, 48:22, 102:8, 102:9, 119:21, 120:6, 123:21, 124:3, 148:1
**22** [1] - 147:25
**2200** [4] - 2:14, 2:18, 2:21, 3:2
**22314** [1] - 3:14
**22nd** [3] - 20:17, 21:19, 124:4
**2300** [1] - 1:15
**25** [5] - 83:8, 83:9, 85:9, 85:17, 152:1
**25th** [1] - 152:2
**267** [1] - 127:15
**27** [2] - 18:9, 91:14
**27th** [2] - 18:16, 18:19
**2800** [3] - 2:3, 2:7, 2:11
**29** [4] - 4:4, 128:13, 136:10, 149:16
**294** [4] - 154:10, 154:11, 154:18, 154:21
**294**..........................
. [1] - 4:17
**29th** [3] - 142:19, 154:5, 155:8
**2:00** [1] - 12:3
**2:47** [1] - 148:1
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**3** [3] - 137:7, 137:12, 152:1
**30** [1] - 82:10
**304** [1] - 156:5
**305-539-8400** [1] - 2:8
**33** [1] - 4:10
**33131** [3] - 2:3, 2:7, 2:11
**360** [2] - 14:11, 14:13
**364** [3] - 13:18, 14:14, 14:15

**365** [10] - 15:7, 15:10, 15:11, 15:12, 16:22, 16:25, 17:1, 17:6, 17:7, 17:15
**38** [6] - 118:13, 121:12, 121:19, 123:3, 124:11, 142:2
**38**..........................
............ [1] - 4:13
**3:00** [2] - 12:1, 12:11
**3rd** [2] - 156:14

## 4

**4** [3] - 84:7, 98:2, 152:15
**40** [3] - 83:2, 83:3, 83:4
**400** [1] - 3:10
**401** [1] - 3:13
**45** [1] - 159:11
**451** [1] - 78:2
**47** [1] - 4:11
**4:00** [6] - 12:2, 12:7, 12:11, 12:12, 12:13

## 5

**57** [1] - 4:10
**581** [2] - 57:11, 57:15
**581**..........................
............ [1] - 4:10
**5th** [1] - 78:22

## 6

**6** [8] - 91:12, 149:25, 150:6, 150:8, 150:9, 151:3, 151:10, 152:7
**610-804-1787** [1] - 2:4
**64** [3] - 42:15, 42:16, 42:18
**643a** [1] - 1:16
**65** [1] - 86:13
**6th** [8] - 35:10, 35:12, 37:12, 37:13, 120:9, 120:14, 120:17, 121:7

## 7

**7:27** [1] - 147:25
**7:30** [1] - 105:15
**7th** [6] - 19:9, 24:21, 37:15, 37:16, 37:25, 38:7

## 8

**8** [8] - 83:7, 83:18,

85:15, 85:18, 86:12, 103:6, 113:20, 113:23
**804-788-8200** [1] - 3:3
**807** [5] - 30:17, 30:19, 31:3, 33:22, 33:24
**807............................ .............** [1] - 4:10
**81** [1] - 4:6
**837** [1] - 99:8
**850-585-3414** [1] - 2:12
**89** [1] - 4:16
**8:30** [1] - 94:15
**8:49** [1] - 148:1
**8:51** [1] - 92:2
**8th** [1] - 158:12

**9**

**9** [6] - 31:23, 97:9, 150:14, 152:7, 152:16, 153:3
**90067** [1] - 1:20
**93** [1] - 4:14
**96** [1] - 4:14
**9:00** [4] - 12:1, 12:8, 12:10, 12:11
**9:01** [1] - 97:10
**9:08** [1] - 1:6
**9:16** [1] - 97:10
**9:30** [1] - 5:3
**9th** [1] - 102:1, 152:16

**A**

**A.F** [1] - 3:5
**a.m** [4] - 1:6, 80:21, 92:2, 105:15
**A.M** [2] - 1:8, 160:12
**ability** [2] - 52:3, 161:14
**able** [17] - 10:10, 11:21, 12:18, 12:22, 12:24, 50:23, 81:6, 96:18, 105:17, 105:23, 109:14, 116:12, 122:4, 124:12, 132:24, 133:7, 157:14
**abnormal** [2] - 59:12, 59:20
**abnormalities** [2] - 59:12, 59:21
**abrenner@bsfllp. com** [1] - 2:8
**absence** [1] - 109:17
**absolutely** [6] - 104:12, 104:18, 114:22, 126:18,

127:8, 127:25
**abuse** [1] - 48:21
**academic** [2] - 65:10, 65:18
**academically** [2] - 111:17, 112:3
**academics** [2] - 110:2, 112:24
**accelerated** [2] - 138:11, 138:17
**accept** [1] - 157:25
**accepted** [1] - 158:2
**access** [9] - 111:12, 131:10, 131:13, 132:11, 132:12, 132:14, 133:8, 139:2
**accommodate** [2] - 81:2, 138:17
**according** [1] - 26:13
**accordingly** [1] - 6:24
**accurate** [1] - 7:7
**accused** [3] - 44:22, 44:24, 136:24
**accusing** [1] - 44:17
**achieving** [3] - 105:22, 113:2, 113:4
**acknowledge** [1] - 37:7
**Act** [1] - 139:6
**Action** [2] - 1:4, 161:8
**action** [6] - 28:23, 71:14, 73:7, 74:25, 76:25, 100:3
**actions** [5] - 94:22, 95:1, 101:15, 101:24, 145:6
**active** [4] - 63:7, 63:12, 63:25, 64:6
**add** [1] - 143:8
**addition** [3] - 43:6, 55:8, 147:4
**additional** [15] - 94:7, 103:9, 125:3, 125:14, 125:24, 125:25, 126:7, 137:18, 141:17, 142:15, 142:17, 142:25, 143:9, 155:20, 155:21
**address** [13] - 6:11, 10:18, 19:2, 73:22, 74:17, 90:6, 92:14, 92:15, 99:19, 108:15, 127:23, 128:1, 143:2
**addressed** [3] - 99:1, 132:3, 139:3
**addressing** [9] - 6:13, 126:14, 132:23, 134:1, 135:2,

135:21, 137:14, 138:25, 139:1
**adduced** [1] - 161:6
**adequacy** [1] - 142:22
**adjust** [2] - 12:13, 12:14
**administration** [3] - 87:21, 88:4, 127:1
**administrative** [1] - 74:25
**administrators** [12] - 87:2, 88:15, 95:9, 105:16, 105:17, 105:19, 116:4, 116:19, 117:2, 117:5, 134:15, 145:1
**admissibility** [1] - 143:17
**admit** [10] - 89:11, 93:14, 95:19, 98:23, 121:18, 128:21, 130:7, 130:18, 145:9, 154:17
**admitted** [16] - 33:24, 47:23, 54:24, 57:15, 89:15, 93:19, 96:1, 108:7, 119:2, 122:1, 123:3, 130:24, 146:14, 147:15, 147:23, 154:21
**Admitted** [2] - 4:9, 4:12
**adult** [2] - 125:11, 125:25
**adults** [3] - 125:5, 125:7, 132:10
**advance** [2] - 98:15, 98:17
**advantage** [3] - 7:5, 77:15, 133:16
**advise** [1] - 156:19
**advisement** [2] - 10:21, 65:10
**advising** [1] - 81:1
**advisor** [1] - 65:18
**afraid** [4] - 41:18, 41:22, 52:6, 76:22
**afternoon** [2] - 30:3, 109:2
**age** [3] - 66:11, 67:4, 68:3
**aggravates** [1] - 29:23
**ago** [2] - 51:19, 154:9
**agree** [5] - 9:21, 19:7, 19:8, 71:6, 158:3
**agreement** [1] - 71:2
**ahead** [4] - 45:13, 80:2, 80:13, 158:19
**aide** [1] - 125:15
**al** [2] - 1:6, 161:7

**Alan** [1] - 78:13
**alanderson@bsfllp. com** [1] - 1:21
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**allegation** [1] - 69:9
**allegations** [9] - 5:16, 5:21, 5:23, 7:14, 7:19, 7:20, 8:9, 8:16, 9:5
**alleged** [3] - 5:13, 131:7, 136:8
**allegedly** [1] - 152:13
**allow** [9] - 19:11, 26:14, 29:2, 63:19, 106:3, 106:6, 130:3, 130:4, 149:6, 155:22
**allowed** [7] - 7:21, 7:22, 27:16, 70:23, 148:16, 148:25
**allowing** [1] - 110:5
**alone** [2] - 20:10, 20:15
**ALSTON** [1] - 1:11
**amend** [1] - 25:24
**amended** [14] - 8:3, 8:16, 23:23, 24:2, 24:10, 26:1, 26:9, 26:16, 26:19, 27:6, 27:10, 27:11
**amount** [2] - 109:6, 110:6
**amplified** [1] - 70:18
**Amy** [4] - 62:1, 62:3
**anally** [1] - 51:11
**ANDERSON** [1] - 11:3
**Anderson** [1] - 1:18
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**announced** [1] - 87:13
**answer** [9] - 23:10, 38:1, 53:25, 62:14, 62:20, 72:25, 73:2, 81:15, 87:20
**answered** [2] - 24:5, 36:18
**answering** [1] - 116:20
**answers** [1] - 81:16
**antibiotics** [1] - 53:23
**anticipate** [1] - 159:9
**anus** [1] - 58:21
**anxious** [1] - 102:21
**anyway** [1] - 75:5
**apart** [1] - 110:20
**apologize** [1] - 12:4
**appeal** [1] - 86:6
**appeals** [1] - 6:1

**appear** [3] - 14:18, 151:1, 153:12
**APPEARANCES** [3] - 1:13, 1:25, 2:24
**application** [3] - 65:13, 65:15, 65:17
**applied** [1] - 53:4
**applies** [2] - 23:19, 146:19
**appointment** [3] - 73:8, 92:7, 133:23
**appointments** [3] - 63:10, 63:23
**appreciate** [3] - 9:16, 19:6, 109:6
**appreciated** [1] - 107:23
**appreciation** [1] - 16:20
**apprise** [2] - 10:10, 10:20
**approach** [12] - 31:6, 35:14, 56:21, 57:20, 68:6, 79:8, 109:25, 110:6, 115:9, 124:9, 128:23, 132:7
**appropriate** [7] - 73:22, 105:8, 126:15, 127:1, 127:4, 127:5, 146:8
**approval** [7] - 27:18, 28:6, 28:11, 114:25, 135:13
**approvals** [1] - 115:4
**approve** [5] - 27:14, 28:1, 28:18, 115:11, 125:25
**approved** [4] - 28:16, 114:11, 135:11, 156:3
**April** [3] - 1:6, 161:9, 161:16
**area** [4] - 85:23, 87:15, 103:4, 113:14
**argued** [1] - 6:22
**argument** [3] - 10:7, 69:12, 122:18
**arguments** [1] - 9:17
**arrange** [1] - 156:7
**arranged** [1] - 98:1
**arrival** [1] - 105:14
**articulate** [1] - 19:5
**artifact** [1] - 144:11
**artifacts** [1] - 144:16
**aside** [4] - 15:1, 43:11, 43:20, 154:3
**aspect** [2] - 12:23, 158:22
**assault** [2] - 41:17, 41:22

assaulting [2] - 44:18, 44:23
assemblies [1] - 19:21
assert [1] - 5:14
asserted [1] - 122:16
assessing [1] - 100:2
assessment [2] - 138:11, 138:16
assessments [2] - 113:6, 138:12
assistant [21] - 82:3, 82:21, 82:23, 83:7, 83:19, 84:20, 84:23, 85:8, 85:15, 89:7, 90:5, 98:20, 103:16, 115:1, 117:7, 117:12, 125:14, 125:15, 125:17, 134:16, 157:18
assure [1] - 142:23
attached [1] - 8:3
attend [9] - 12:6, 96:19, 103:11, 105:23, 123:16, 132:5, 156:21, 157:25, 158:12
attendance [1] - 141:1
attended [1] - 106:5
attention [7] - 79:3, 108:11, 125:11, 125:12, 127:17, 131:23, 143:24
attorney [2] - 75:12, 96:14
attorneys [2] - 26:13, 156:20
atypical [1] - 49:2
audible [1] - 36:12
A█████ [10] - 13:12, 64:25, 90:24, 93:11, 93:24, 117:10, 156:7, 156:14, 156:16, 156:24
authenticated [1] - 31:10
authorities [1] - 6:11
authority [1] - 6:12
availability [1] - 96:19
available [6] - 114:23, 114:24, 116:25, 124:21, 126:21, 142:16
Ave [1] - 2:21
Avenue [4] - 2:14, 2:18, 3:2, 3:10
avoid [1] - 74:8
aware [3] - 26:9, 26:11, 32:20

**B**

B.G [2] - 151:1, 151:21
B.H [1] - 3:6
B.R [25] - 1:3, 4:3, 10:14, 10:15, 13:2, 72:17, 77:18, 91:22, 101:4, 103:25, 109:13, 119:23, 120:1, 123:15, 123:16, 123:20, 124:12, 136:24, 146:13, 150:3, 151:15, 151:18, 152:2, 158:12, 161:7
B.R.'s [11] - 90:13, 95:16, 99:19, 109:17, 124:11, 139:12, 142:24, 143:2, 146:12, 152:13, 152:21
backup [1] - 161:13
bad [1] - 30:24
balanced [1] - 36:3
B█████ [8] - 13:13, 93:11, 93:25, 94:18, 106:4, 106:18, 106:21, 117:12
bar [4] - 31:7, 35:21, 68:10, 128:25
BARAN [1] - 1:14
Barry [1] - 121:23
based [8] - 12:13, 52:13, 77:12, 99:23, 112:22, 126:23, 139:4, 146:7
basement [5] - 22:14, 22:21, 22:23, 22:25, 23:7
basis [5] - 8:20, 8:22, 100:6, 136:16, 136:20
Bate [1] - 148:3
Bates [2] - 2:13, 58:4
bear [1] - 49:11
became [1] - 67:23
become [1] - 67:22
BEFORE [1] - 1:11
befriended [1] - 41:14
began [3] - 38:9, 157:9
begged [1] - 49:16
begin [1] - 5:19
beginning [3] - 60:2, 86:22, 138:14
behalf [6] - 4:2, 4:8, 4:12, 9:17, 27:19, 28:19
behaving [1] - 127:11
behavior [2] - 104:17, 125:12
behaviors [1] - 19:23
behind [7] - 128:10, 143:24, 146:16, 146:19, 147:5
believes [1] - 73:20
B█████ [4] - 48:22, 49:11, 49:22, 50:4
belong [1] - 141:9
below [9] - 84:25, 90:23, 91:10, 91:11, 139:15, 150:21, 151:10, 152:1, 153:21
bench [4] - 5:9, 5:11, 6:24, 77:12
beside [1] - 91:17
best [16] - 10:13, 12:19, 34:17, 36:6, 46:21, 52:1, 52:3, 72:1, 72:24, 78:17, 81:14, 81:16, 103:13, 126:23, 147:20, 161:14
better [10] - 41:14, 65:9, 68:8, 72:5, 103:2, 112:23, 112:24, 145:4, 148:7, 150:16
between [8] - 37:14, 37:24, 42:5, 54:11, 60:18, 80:3, 95:16, 154:14
beyond [2] - 9:25, 53:7
Bickford [3] - 62:20, 62:22, 62:23
big [1] - 140:17
bigger [1] - 42:23
binder [7] - 30:16, 47:5, 47:6, 88:17, 89:2, 89:24, 156:5
birthday [4] - 40:21, 40:24, 41:8, 41:21
bit [13] - 20:12, 23:2, 29:8, 35:3, 72:6, 72:13, 81:21, 103:15, 111:15, 112:8, 112:13, 112:19, 137:20
black [2] - 16:2, 47:6
BLANCHARD [8] - 32:17, 36:16, 36:25, 37:8, 38:16, 38:18, 130:12, 159:19
Blanchard [11] - 3:9, 23:15, 30:2, 30:13, 31:12, 31:13, 32:6, 34:5, 34:6, 35:1, 38:17
blouse [1] - 104:10
blow [1] - 34:14
blowup [2] - 32:6, 32:11
blur [1] - 51:5
blurt [2] - 72:7, 72:8
Board [4] - 69:22, 82:13, 146:8, 146:11
Boaz [5] - 55:1, 55:9, 56:3, 56:5, 56:16
body [1] - 20:24
BOIES [4] - 1:19, 2:2, 2:6, 2:10
book [14] - 14:25, 56:20, 93:2, 95:13, 98:6, 108:2, 118:12, 118:23, 119:18, 120:20, 121:11, 127:15, 128:5, 154:10
born [1] - 32:4
bottom [12] - 13:24, 17:17, 58:3, 79:7, 90:10, 93:22, 96:3, 97:11, 101:7, 105:2, 108:12, 120:11
boundaries [1] - 45:10
boy [4] - 44:12, 44:17, 44:22, 58:20
boy/girl [1] - 22:17
brave [4] - 19:11, 19:13, 19:14, 19:15
break [5] - 80:3, 158:19, 158:20, 159:11, 159:15
breaking [1] - 159:5
breaks [1] - 12:16
breast [2] - 41:18, 58:21
B█████ [1] - 13:13
Brenner [12] - 2:5, 10:22, 18:10, 29:13, 61:19, 72:18, 75:2, 106:1, 146:20, 146:22, 147:21, 159:7
BRENNER [164] - 7:11, 9:8, 9:20, 10:8, 10:16, 10:23, 11:1, 15:4, 15:9, 15:13, 15:17, 24:4, 26:4, 27:20, 29:7, 29:11, 31:2, 31:6, 31:11, 31:15, 31:19, 31:22, 31:25, 32:14, 33:1, 33:6, 33:14, 33:21, 33:25, 34:14, 34:17, 34:19, 35:14, 35:18, 35:22, 36:11, 37:10, 37:21, 38:4, 38:19, 42:15, 42:18, 42:20, 42:22, 42:25, 43:17, 43:19, 44:1, 44:3, 44:5, 44:6, 45:14, 47:18, 47:24, 50:7, 50:8, 53:10, 53:12, 53:13, 54:12, 56:21, 56:23, 57:10, 57:17, 58:2, 58:12, 58:16, 59:1, 59:6, 59:9, 59:10, 59:17, 59:19, 59:24, 59:25, 61:22, 61:24, 61:25, 63:21, 66:18, 67:8, 68:6, 68:8, 68:11, 68:25, 69:7, 69:13, 69:17, 69:19, 70:6, 70:13, 70:18, 71:1, 71:16, 71:22, 71:24, 72:4, 72:12, 73:3, 73:14, 73:17, 73:25, 74:5, 74:12, 74:14, 76:1, 76:4, 76:6, 76:8, 76:15, 76:17, 76:20, 76:22, 77:2, 77:4, 77:7, 77:22, 77:24, 78:1, 78:5, 78:12, 79:10, 79:18, 79:22, 80:6, 80:10, 89:12, 93:6, 93:17, 95:21, 98:25, 99:5, 99:8, 108:4, 116:13, 116:17, 119:6, 119:8, 121:20, 126:8, 128:23, 129:1, 129:7, 129:9, 129:15, 129:19, 130:4, 130:6, 130:11, 143:15, 145:25, 147:3, 147:11, 148:3, 153:17, 154:19, 159:8, 159:10, 159:13, 159:16, 160:2, 160:4, 160:7, 160:9
Brenner's [1] - 72:24
Brenner........... [1] - 4:4
brief [4] - 5:9, 5:11, 6:21, 6:25
briefly [2] - 29:19, 37:11
briefs [1] - 5:6
bring [9] - 7:9, 10:25, 33:21, 74:24, 110:7, 111:15, 134:3, 134:7, 157:11
bringing [1] - 156:20
Brittany [1] - 2:1

**britzoll@gmail.com**
[1] - 2:4
**brother** [1] - 32:4
**brought** [5] - 10:4,
27:22, 62:10,
131:22, 145:7
**brown** [4] - 34:18,
34:24, 42:22, 44:2
**Bruce** [1] - 3:9
**bruce.blanchard@**
**ofplaw.com** [1] -
3:11
**built** [1] - 11:22
**bullet** [8] - 139:16,
140:11, 140:20,
141:1, 141:4, 141:6,
141:15, 141:16
**bulleted** [1] - 139:16
**bullied** [1] - 104:17
**Bullying** [1] - 91:4
**bullying** [5] - 19:22,
41:11, 41:15, 131:7,
141:25
**Burton** [1] - 2:20
**burtons@huntonak.**
**com** [1] - 2:23
**buses** [1] - 105:16
**bush** [1] - 48:23
**business** [11] -
122:23, 143:12,
143:15, 145:10,
146:10, 146:11,
147:14, 148:5,
148:7, 149:1, 149:5
**BY** [70] - 13:5, 13:11,
13:22, 14:17, 15:24,
17:16, 24:9, 26:18,
27:24, 28:25, 29:11,
33:14, 33:25, 34:19,
37:10, 38:4, 38:19,
42:25, 43:19, 44:3,
44:6, 45:14, 47:24,
50:8, 53:13, 54:12,
56:23, 58:2, 58:16,
59:6, 59:10, 59:19,
59:25, 61:25, 63:21,
66:18, 67:8, 77:24,
78:5, 78:12, 79:10,
82:1, 89:21, 91:20,
93:9, 93:20, 96:2,
100:12, 100:21,
106:16, 107:11,
108:1, 108:10,
112:16, 117:4,
119:13, 123:4,
125:21, 126:13,
130:25, 132:21,
136:5, 137:11,
143:22, 145:3,
145:14, 149:13,

150:13, 153:19,
155:2
**bye** [1] - 105:20

# C

**C.K** [4] - 5:25, 21:2,
22:15, 40:16
**CA** [1] - 1:20
**cafeteria** [1] - 152:25
**calendar** [1] - 11:22
**Camry** [5] - 30:11,
31:16, 31:20, 32:7,
32:14
**cannot** [9] - 5:20,
72:23, 77:13, 77:14,
99:21, 110:23,
110:25, 111:1
**capacity** [1] - 161:5
**car** [17] - 11:16, 30:5,
30:7, 30:10, 30:14,
31:15, 32:4, 32:18,
32:22, 33:18, 33:19,
34:10, 34:11, 34:15,
34:22, 34:23, 105:16
**care** [4] - 53:1, 53:2,
105:10, 113:7
**C**■ - 13:14
**carried** [1] - 127:13
**Carson** [29] - 7:20,
85:21, 86:16, 87:10,
92:12, 92:17, 98:9,
102:24, 103:2,
103:14, 104:23,
105:3, 105:7,
105:10, 105:21,
112:24, 113:1,
113:8, 115:23,
116:4, 125:3,
125:18, 126:25,
134:3, 134:7, 135:7,
156:2, 157:12
**case** [25] - 7:24, 7:25,
9:1, 9:5, 9:14, 12:20,
12:23, 23:16, 27:19,
27:23, 28:2, 28:11,
35:1, 43:9, 45:3,
54:15, 110:20,
111:3, 111:13,
146:5, 158:22,
158:23, 161:7
**cases** [1] - 12:25
**caused** [1] - 54:7
**cell** [1] - 40:12
**Center** [5] - 46:24,
46:25, 69:25, 75:3,
75:13
**central** [1] - 140:13
**certain** [5] - 5:4,
11:22, 72:21, 89:22

**CERTIFICATE** [1] -
161:1
**Certificate** [1] - 4:19
**certification** [1] - 84:2
**certify** [2] - 161:4,
161:10
**chain** [1] - 108:12
**chance** [14] - 9:6,
10:18, 23:18, 23:20,
23:25, 24:15, 24:16,
26:23, 26:24, 28:12,
33:10, 90:17, 131:3,
146:20
**change** [10] - 37:15,
37:16, 37:24, 38:10,
39:12, 39:18, 39:22,
39:23, 92:14, 159:21
**changed** [7] - 39:1,
39:8, 39:13, 39:23,
39:24, 40:2, 40:3
**Chantilly** [1] - 85:22
**charge** [1] - 85:9
**check** [1] - 42:15
**checked** [2] - 151:15,
151:18
**Cheryl** [3] - 18:9,
117:15, 150:17
**Child** [1] - 56:12
**child** [2] - 58:17,
137:21
**children** [1] - 19:9
**choice** [2] - 27:13,
111:2
**chooses** [1] - 10:15
**chorus** [1] - 62:7
**chose** [2] - 61:2, 61:4
**C**■■■■■■ [15] - 20:23,
38:6, 46:12, 46:16,
48:4, 48:15, 50:19,
50:20, 50:21, 50:24,
51:8, 51:23, 52:4,
64:3, 64:9
**c**■■■■■■ [1] - 48:21
**C**■■■■■■ [4] - 21:15,
21:16, 21:19, 21:21
**chronology** [23] -
95:10, 98:10, 98:16,
98:19, 100:14,
100:16, 100:23,
116:3, 118:18,
118:20, 119:14,
120:4, 120:6, 121:6,
121:13, 121:16,
121:25, 122:2,
123:6, 123:24,
124:22, 131:9, 144:4
**circuit** [1] - 6:1
**Circuit** [2] - 6:2, 6:12
**circumstances** [4] -
25:18, 37:17,

110:20, 110:21
**cite** [1] - 6:5
**cited** [2] - 6:11, 6:12
**citizen** [1] - 66:16
**Civil** [2] - 1:4, 161:7
**claims** [1] - 8:2
**clarification** [4] - 7:13,
7:17, 92:8, 94:8
**clarified** [1] - 43:17
**clarify** [6] - 8:25, 9:6,
28:17, 74:22, 134:4,
147:17
**clarity** [1] - 8:7
**class** [2] - 17:19,
86:24
**classes** [2] - 105:21,
152:4
**classrooms** [5] -
86:18, 86:20, 125:8,
133:1, 134:20
**clean** [4] - 16:24,
17:11, 85:13, 87:12
**cleaner** [1] - 77:8
**clear** [9] - 7:3, 44:20,
48:14, 50:18, 50:23,
68:8, 68:19, 75:20,
110:9
**clearly** [3] - 87:13,
121:24, 131:24
**CLERK** [6] - 5:1,
14:11, 14:13, 14:15,
42:17, 42:19
**client** [2] - 9:23, 77:9
**close** [8] - 44:5, 87:11,
87:16, 113:18,
113:23, 114:1,
133:1, 144:19
**closed** [2] - 5:14,
136:12
**closer** [1] - 81:18
**closet** [5] - 7:13, 7:20,
8:7, 8:17, 10:8
**closing** [1] - 91:22
**clothes** [1] - 39:9
**clothespins** [1] -
51:16
**club** [1] - 67:14
**cluster** [24] - 83:7,
84:20, 84:23, 85:7,
85:8, 85:14, 86:1,
86:2, 86:5, 86:11,
90:7, 92:24, 96:24,
96:25, 97:1, 97:4,
98:21, 103:16,
103:23, 116:2,
135:16, 135:17,
135:18, 135:19
**Cluster** [10] - 83:7,
83:18, 85:15, 85:18,
86:12, 103:6, 103:7,

113:20, 113:23,
114:25
**clusters** [3] - 83:10,
83:14, 83:16
**coffee** [1] - 87:15
**coincide** [1] - 148:15
**colleagues** [2] -
79:19, 122:14
**collect** [1] - 140:17
**collection** [1] - 147:5
**collective** [2] - 12:14,
116:5
**college** [4] - 65:2,
65:3, 65:5, 68:3
**College** [1] - 65:10
**Columbia** [6] - 67:15,
67:17, 67:22, 67:23
**combination** [1] - 83:8
**combined** [1] - 83:16
**comfort** [1] - 143:3
**coming** [4] - 11:14,
90:17, 105:15,
121:24
**comment** [1] - 68:16
**comments** [3] - 126:2,
132:16, 132:18
**committed** [2] - 41:21,
123:16
**communicating** [1] -
36:5
**compared** [3] - 46:9,
46:11, 148:15
**complaining** [1] -
22:13
**complaint** [32] - 7:21,
8:3, 8:16, 23:19,
23:20, 23:23, 23:24,
24:2, 24:10, 25:24,
26:2, 26:9, 26:16,
26:19, 27:7, 27:10,
27:11, 28:19, 70:2,
76:24, 77:1, 92:12,
92:16, 127:18,
127:20, 127:23,
128:1, 135:22,
139:1, 146:12
**complaints** [13] - 8:17,
22:17, 23:16, 27:15,
27:19, 28:1, 28:6,
28:11, 28:16, 28:22,
29:2, 60:22, 69:4
**complete** [1] - 141:1
**completed** [1] -
138:12
**complex** [1] - 94:22
**complicating** [1] -
71:8
**complied** [1] - 34:16
**computer** [1] - 161:12
**concern** [6] - 104:13,

132:3, 133:25, 135:2, 135:21, 137:14

**concerned** [3] - 37:18, 118:4, 142:24

**concerns** [8] - 73:22, 90:7, 115:23, 122:8, 126:14, 128:14, 143:3, 145:7

**concluded** [2] - 5:23, 160:12

**conclusion** [1] - 6:23

**conclusions** [2] - 59:7, 59:11

**condition** [1] - 29:21

**conditions** [1] - 52:8

**conduct** [4] - 22:14, 22:22, 62:17, 62:18

**confer** [1] - 79:18

**conferences** [2] - 77:12, 105:24

**confers** [2] - 79:21, 107:10

**confidentially** [1] - 45:8

**confirm** [1] - 33:17

**conflicting** [1] - 81:2

**confused** [2] - 20:12, 23:2

**connect** [2] - 65:9, 133:22

**connection** [1] - 54:11

**consequence** [1] - 151:12

**consider** [2] - 111:21, 146:7

**considered** [1] - 146:6

**considering** [3] - 71:20, 73:10, 125:13

**consistent** [6] - 43:10, 43:20, 55:19, 59:13, 59:21, 74:1

**constant** [1] - 144:14

**constantly** [2] - 85:12, 87:18

**constitute** [1] - 161:11

**construes** [2] - 5:11, 6:25

**consultant** [1] - 82:7

**Cont** [2] - 1:25, 2:24

**contact** [7] - 18:14, 18:15, 22:21, 92:7, 126:15, 127:1, 133:20

**contacting** [1] - 155:13

**contain** [1] - 6:3

**CONTENTS** [1] - 4:1

**context** [4] - 16:19, 22:18, 39:4, 46:5

**continue** [5] - 41:7, 114:15, 130:17, 131:21, 132:22

**continued** [2] - 121:9, 121:10

**continues** [2] - 5:14, 132:20

**continuing** [1] - 7:4

**contrary** [1] - 126:6

**convene** [1] - 138:4

**convenience** [1] - 98:1

**conversation** [4] - 22:25, 23:6, 56:2, 112:22

**conversations** [6] - 55:8, 55:10, 55:14, 55:20, 56:9, 117:1

**Cooper** [14] - 103:4, 112:18, 112:20, 113:10, 113:14, 113:15, 114:2, 114:3, 114:20, 115:17, 135:11, 155:17, 156:3, 157:13

**cooperated** [1] - 137:3

**copied** [2] - 93:25, 96:7

**copies** [4] - 102:12, 139:12, 139:24, 139:25

**copy** [3] - 24:17, 30:17, 149:17

**cordial** [1] - 109:10

**core** [3] - 60:14, 60:16, 152:4

**corner** [3] - 40:7, 40:9, 101:7

**Corolla** [1] - 30:11

**correct** [110] - 14:6, 16:3, 16:8, 17:22, 18:13, 19:4, 22:13, 24:23, 25:3, 27:4, 29:3, 34:6, 39:21, 41:4, 42:14, 47:4, 54:18, 56:19, 57:3, 61:11, 62:21, 64:7, 64:14, 66:4, 66:22, 68:1, 69:22, 79:14, 83:12, 83:14, 83:22, 84:19, 86:5, 86:8, 90:8, 91:2, 91:6, 91:13, 93:12, 94:3, 94:16, 94:25, 96:9, 96:25, 97:15, 101:5, 101:16, 101:19, 102:13, 102:16, 106:22, 107:3, 107:15, 108:17,

108:22, 109:2, 109:3, 109:9, 110:19, 114:10, 117:11, 117:14, 117:16, 119:19, 119:24, 119:25, 120:7, 120:13, 121:17, 123:11, 123:18, 128:20, 129:9, 131:15, 133:21, 133:24, 134:9, 135:14, 135:23, 136:22, 136:25, 138:9, 138:15, 139:7, 139:18, 139:22, 140:7, 140:10, 141:3, 141:10, 141:14, 141:21, 142:10, 147:16, 147:21, 149:18, 149:21, 150:4, 151:4, 151:5, 151:9, 151:14, 152:20, 153:16, 154:16, 155:9, 156:9, 156:22

**corroboration** [1] - 148:21

**Counsel** [3] - 79:21, 99:4, 107:10

**counsel** [15] - 27:16, 28:14, 35:24, 68:15, 70:16, 71:13, 73:6, 76:9, 77:15, 79:5, 81:14, 96:14, 147:4, 148:8, 159:17

**counsel's** [1] - 148:5

**counseling** [3] - 133:4, 133:6, 133:11

**counselor** [5] - 16:19, 132:13, 132:14, 133:13, 140:21

**counselors** [5] - 111:10, 117:3, 117:9, 132:11, 157:23

**counting** [1] - 106:9

**country** [1] - 82:8

**County** [9] - 5:9, 5:15, 69:21, 82:4, 82:6, 82:12, 82:17, 84:21, 141:12

**couple** [1] - 74:22

**course** [9] - 35:6, 77:18, 77:20, 88:14, 99:23, 115:24, 145:15, 146:11, 148:8

**COURT** [215] - 1:1, 1:12, 5:3, 7:15, 8:10,

8:20, 9:2, 9:12, 10:6, 10:12, 10:21, 10:24, 11:2, 11:5, 11:8, 11:11, 13:9, 13:21, 14:10, 14:16, 15:6, 15:21, 16:22, 16:24, 17:3, 17:5, 17:9, 24:6, 26:5, 26:7, 26:11, 26:17, 27:21, 28:21, 29:6, 29:9, 31:8, 31:14, 31:21, 31:24, 32:2, 32:8, 32:12, 32:16, 32:24, 33:2, 33:11, 33:23, 35:16, 35:20, 36:2, 36:15, 36:22, 37:6, 37:19, 37:23, 38:14, 38:17, 42:21, 45:12, 47:21, 53:9, 53:11, 54:10, 56:22, 57:16, 57:21, 58:14, 59:5, 61:19, 61:23, 63:15, 63:19, 66:14, 67:7, 68:7, 68:23, 69:1, 69:8, 69:14, 69:18, 70:4, 70:11, 70:17, 70:25, 71:11, 71:17, 71:23, 71:25, 72:11, 72:14, 73:5, 73:16, 73:19, 74:4, 74:7, 74:13, 74:16, 74:19, 75:5, 75:9, 75:18, 76:3, 76:5, 76:7, 76:10, 76:13, 76:16, 76:19, 76:21, 76:24, 77:3, 77:5, 77:9, 77:11, 77:23, 78:11, 79:8, 79:20, 79:25, 80:2, 80:8, 80:12, 80:17, 80:23, 81:10, 81:13, 81:21, 89:13, 89:17, 91:16, 93:16, 93:18, 95:22, 95:24, 99:2, 99:6, 99:11, 99:13, 99:16, 100:4, 100:9, 100:11, 100:20, 106:1, 106:9, 106:13, 107:25, 108:6, 108:19, 112:7, 112:10, 112:12, 116:16, 116:20, 119:4, 119:11, 121:22, 122:4, 122:12, 122:18, 122:22, 122:24, 123:1, 125:19, 126:10, 128:24, 129:5, 129:8, 129:14, 129:18, 129:21, 129:24,

130:2, 130:5, 130:14, 130:16, 130:20, 130:23, 136:2, 136:4, 137:8, 137:10, 143:17, 143:21, 144:24, 145:11, 145:17, 145:19, 145:21, 145:23, 146:1, 146:3, 146:21, 147:1, 147:13, 147:20, 148:14, 148:23, 149:10, 153:18, 154:20, 154:23, 155:1, 158:18, 158:25, 159:4, 159:9, 159:12, 159:14, 159:20, 160:3, 160:6, 160:8, 160:10

**court** [7] - 5:22, 6:1, 33:13, 37:9, 77:10, 130:15, 161:8

**Court** [30] - 3:12, 3:13, 4:19, 5:5, 5:8, 5:10, 5:12, 5:19, 6:11, 6:16, 6:19, 7:7, 9:15, 9:18, 10:20, 24:19, 25:2, 25:16, 45:2, 72:20, 73:1, 80:21, 81:1, 81:14, 148:23, 148:25, 161:3, 161:22

**Court's** [13] - 6:22, 7:4, 7:8, 7:18, 8:1, 9:9, 11:22, 12:22, 77:13, 99:16, 100:4, 136:9, 146:23

**courthouse** [1] - 11:15

**Courthouse** [1] - 3:13

**COURTROOM** [6] - 5:1, 14:11, 14:13, 14:15, 42:17, 42:19

**courtroom** [1] - 36:3

**cover** [6] - 100:25, 106:3, 106:14, 107:4, 120:16, 131:14

**covered** [6] - 63:14, 63:16, 100:10, 120:24, 121:7

**crate** [2] - 38:21, 39:10

**created** [4] - 38:12, 67:3, 144:17, 144:19

**creating** [2] - 73:23, 107:23

**credibility** [4] - 5:24, 6:4, 6:7, 32:25

**crime** [1] - 135:24

criminal [1] - 8:2
Cross [1] - 4:4
cross [13] - 34:5, 35:7,
  36:19, 53:8, 68:12,
  69:2, 70:13, 70:14,
  74:23, 81:6, 159:3,
  159:7, 159:24
CROSS [1] - 13:4
Cross-examination
  [1] - 4:4
cross-examination [6]
  - 34:5, 35:7, 68:12,
  69:2, 74:23, 159:24
CROSS-
  EXAMINATION [1] -
  13:4
cross-examine [1] -
  81:6
crossed [1] - 69:20
crush [1] - 22:2
crux [1] - 69:11
current [3] - 101:23,
  102:3, 130:4
curriculum [3] -
  84:11, 84:17, 84:18
cut [1] - 51:15
cyberbullying [3] -
  42:1, 42:11

**D**

D.N [1] - 49:24
dad [2] - 30:11, 30:15
dad's [3] - 32:22,
  34:22, 34:23
Dale [6] - 89:8, 90:3,
  90:4, 90:14, 127:18,
  128:15
Danville [2] - 12:9,
  12:10
dark [1] - 40:9
Dash [1] - 40:12
date [13] - 49:11,
  55:16, 71:16, 73:8,
  73:9, 78:22, 98:12,
  101:24, 102:5,
  102:6, 120:4, 124:2,
  144:10
dated [7] - 21:23,
  22:2, 106:4, 147:25,
  155:4, 155:7, 155:21
dates [2] - 84:7,
  120:24
dating [1] - 22:18
daughter [19] - 96:16,
  103:11, 104:7,
  104:9, 115:16,
  115:19, 124:21,
  132:4, 132:11,
  134:3, 134:7,

134:12, 135:7,
  137:17, 143:7,
  155:15, 155:23,
  155:25, 157:11
daughter's [1] -
  139:20
David [6] - 21:23,
  22:21, 23:1, 23:7,
  49:22, 49:23
days [4] - 12:15,
  12:17, 12:19
DC [5] - 1:16, 2:15,
  2:18, 2:22, 3:2
deal [4] - 9:22, 9:24,
  144:23, 146:8
dealing [1] - 159:24
dealt [1] - 5:5
dear [1] - 48:4
death [2] - 61:16,
  61:17
debilitating [1] - 54:6
December [5] - 20:20,
  20:21, 20:22, 63:6,
  150:14
decide [5] - 57:25,
  72:2, 75:18, 115:16,
  115:19
decided [5] - 68:15,
  70:16, 76:9, 79:5,
  134:11
deciding [1] - 60:24
decision [4] - 62:8,
  62:9, 126:23, 138:12
decisions [2] - 86:7,
  126:22
defendant [2] - 10:15,
  61:10
Defendant [2] - 2:13,
  3:1, 3:9
Defendant's [2] -
  81:11, 108:7
defendants [4] - 5:4,
  5:21, 7:2, 60:6
Defendants [3] - 1:7,
  3:5, 4:12
defendants' [1] - 98:6
Defendants' [31] -
  4:11, 5:8, 47:22,
  89:14, 93:3, 93:8,
  93:15, 93:19, 95:13,
  95:20, 96:1, 98:8,
  98:24, 106:8,
  118:12, 120:20,
  121:12, 121:19,
  123:3, 124:11,
  128:5, 128:10,
  128:22, 130:18,
  130:24, 142:2,
  142:3, 143:12,
  143:23, 146:14,

154:21
Defense [5] - 13:18,
  42:16, 47:5, 47:19,
  129:1
defense [14] - 26:22,
  42:17, 42:18, 63:17,
  71:13, 73:6, 76:15,
  80:6, 81:5, 129:3,
  129:10, 159:17,
  159:23, 159:25
definitely [2] - 104:4,
  134:2
degree [4] - 84:10,
  84:11, 84:12, 84:15
denied [1] - 6:25
Department [3] - 5:15,
  70:3, 72:22
department [4] - 92:7,
  133:5, 133:7, 141:8
Department's [1] -
  5:10
departments [1] -
  141:9
deputy [3] - 84:25,
  85:1, 85:3
describe [4] - 10:13,
  35:12, 45:15, 147:21
described [3] - 54:2,
  62:9, 94:8
description [1] - 88:13
desire [1] - 135:10
desired [1] - 6:17
detail [2] - 38:24,
  131:10
detailed [4] - 95:9,
  101:10, 128:2, 144:4
detailing [1] - 98:11
details [1] - 120:12
determination [6] -
  6:7, 68:24, 100:4,
  106:2, 146:23,
  148:24
determinations [2] -
  5:24, 6:4
determine [1] - 144:23
determined [5] - 5:16,
  103:9, 103:10
develop [1] - 92:6
developed [2] -
  123:14, 132:13
difference [1] - 151:6
different [19] - 34:13,
  36:21, 41:25, 62:17,
  62:19, 87:19, 95:6,
  103:1, 103:3, 103:4,
  103:11, 107:12,
  115:3, 129:11,
  135:7, 148:17,
  155:23, 156:20
difficult [2] - 49:4,

112:4
direct [11] - 8:18, 8:24,
  10:1, 18:13, 18:15,
  36:19, 40:10, 50:22,
  61:4, 85:24, 95:9
DIRECT [1] - 81:25
Direct [1] - 4:6
directed [4] - 43:13,
  43:22, 79:3, 128:15
directing [1] - 143:24
direction [1] - 77:20
directly [2] - 24:19,
  132:16
director [12] - 86:1,
  86:5, 92:13, 92:24,
  103:23, 116:2,
  117:3, 117:7,
  117:15, 125:6,
  132:12, 144:14
directs [1] - 117:8
disabilities [1] -
  157:17
disability [6] - 53:5,
  137:18, 138:2,
  157:6, 157:8, 157:24
disagree [1] - 142:22
disagreed [1] - 86:7
disappointing [1] -
  9:15
disciplining [1] -
  136:16
discovered [1] -
  157:24
discovery [5] - 31:10,
  31:11, 32:9, 33:4,
  45:2
discuss [5] - 12:22,
  88:14, 94:6, 117:19,
  158:22
discussed [7] - 6:21,
  9:11, 101:24,
  109:16, 117:21,
  148:21, 148:22
discussing [2] - 43:1,
  131:4
Discussion [1] - 89:20
discussion [11] - 6:16,
  38:2, 77:12, 96:13,
  109:20, 149:24,
  150:3, 151:8, 152:6,
  153:2
discussions [1] -
  132:24
disfranchised [1] -
  74:10
dismissing [1] - 22:17
display [1] - 161:13
disposition [1] - 7:8
dissatisfied [1] -
  102:24

distinct [1] - 16:20
Distorted [1] - 48:21
distract [1] - 36:1
distracting [2] - 35:25,
  36:6
District [3] - 3:13,
  82:4, 161:4
DISTRICT [3] - 1:1,
  1:1, 1:12
dizzy [1] - 29:22
docket [3] - 99:3,
  99:6, 99:8
doctor [1] - 112:7
Doctor [2] - 91:17,
  158:25
doctor's [2] - 110:14,
  111:3
doctoral [1] - 84:12
doctorate [2] - 83:21,
  84:14
doctors [2] - 52:20,
  52:21
document [55] - 31:4,
  31:9, 45:23, 47:8,
  47:9, 58:4, 73:10,
  78:7, 78:21, 78:22,
  79:4, 88:6, 88:13,
  88:14, 89:23, 90:9,
  91:12, 93:4, 99:20,
  99:24, 100:5, 100:8,
  100:17, 101:10,
  101:13, 101:17,
  107:23, 118:17,
  119:17, 120:9,
  121:2, 121:13,
  123:12, 128:12,
  129:8, 131:2,
  131:10, 131:13,
  143:16, 143:18,
  143:21, 144:6,
  144:22, 145:6,
  146:4, 146:5,
  146:22, 147:4,
  147:12, 147:23,
  148:25, 149:23,
  156:13
documents [11] -
  66:6, 66:9, 88:12,
  88:18, 131:19,
  131:20, 140:15,
  141:22, 142:19,
  147:24, 148:24
done [8] - 9:2, 10:3,
  10:5, 10:19, 41:12,
  45:5, 125:23, 142:23
door [3] - 6:16, 32:19,
  57:16
Dorsey [1] - 6:6
doubts [1] - 107:21
down [23] - 10:15,

11:23, 20:24, 26:22, 34:24, 35:4, 35:5, 44:1, 50:7, 59:1, 59:17, 59:24, 61:23, 70:4, 74:11, 79:25, 90:9, 101:7, 111:15, 120:11, 125:19, 139:15, 158:25
**Dr** [35] - 45:19, 45:20, 45:23, 63:3, 63:5, 63:10, 63:23, 64:5, 80:11, 82:2, 85:1, 89:8, 89:22, 90:2, 90:4, 90:14, 93:1, 93:22, 93:23, 93:24, 94:5, 94:10, 94:18, 96:10, 96:18, 100:2, 100:13, 103:23, 108:11, 108:19, 109:13, 119:14, 122:7, 127:18, 131:1
**drafted** [1] - 28:8
**drama** [1] - 62:23
**drastic** [1] - 37:16
**Dreyfuss** [12] - 93:1, 93:10, 93:22, 93:23, 93:24, 94:5, 94:10, 94:18, 96:10, 103:23, 108:19, 109:13
**drinking** [1] - 53:17
**Drive** [1] - 3:6
**driver's** [1] - 66:9
**driving** [1] - 87:15
**during** [19] - 12:19, 34:4, 36:4, 39:5, 41:17, 47:1, 51:8, 52:25, 60:17, 64:22, 66:5, 77:18, 83:5, 86:18, 86:21, 86:24, 99:22, 125:7, 143:10
**duties** [2] - 85:7, 90:6
**duty** [1] - 88:5
**DX** [2] - 88:19, 118:16
**DX-38** [1] - 118:15

---

## E

**early** [1] - 40:23
**easier** [3] - 89:24, 91:17, 91:18
**East** [1] - 1:19
**EASTERN** [1] - 1:1
**Eastern** [1] - 161:4
**eating** [1] - 53:17
**edification** [1] - 129:21
**educated** [1] - 109:25
**education** [8] - 75:12, 75:14, 83:21, 84:14,
109:14, 124:19, 137:20, 137:22
**Education** [4] - 70:1, 70:3, 72:22, 137:23
**Educational** [1] - 139:6
**educational** [3] - 82:7, 84:12, 111:20
**EEOC** [1] - 72:9
**efficiencies** [1] - 83:15
**eight** [3] - 25:5, 83:14, 83:16
**either** [11] - 16:5, 26:23, 38:1, 44:20, 65:21, 66:5, 67:2, 68:2, 70:5, 105:3, 132:25
**elected** [1] - 62:14
**elective** [1] - 60:14
**Elementary** [3] - 35:11, 97:1, 97:3
**elementary** [5] - 126:16, 127:2, 127:7, 127:11, 127:12
**elicit** [3] - 5:12, 5:20, 6:9
**eligibility** [1] - 138:12
**eligible** [1] - 137:21
**Elliker** [1] - 3:1
**elsewhere** [1] - 150:18
**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:8, 3:11
**email** [38] - 18:8, 19:2, 89:7, 89:10, 90:9, 90:13, 90:17, 90:18, 90:21, 90:23, 90:24, 91:4, 91:10, 91:11, 91:14, 91:21, 91:22, 92:24, 93:10, 93:21, 94:9, 94:17, 96:7, 97:8, 102:18, 108:12, 108:15, 108:23, 112:18, 139:17, 147:25, 148:8, 149:3, 150:15, 154:6, 155:3, 156:11
**emails** [28] - 95:15, 96:3, 96:4, 97:24, 102:12, 102:14, 146:16, 146:17, 147:5, 147:7, 147:8, 147:13, 147:19, 147:21, 148:6, 148:10, 148:12, 148:14, 148:15,
148:18, 148:19, 148:20, 148:21, 149:7, 154:14
**emotional** [8] - 110:24, 137:18, 138:2, 143:3, 157:6, 157:8, 157:17, 157:24
**emotionally** [4] - 48:10, 49:3, 111:17, 112:4
**employed** [1] - 82:5
**employee** [1] - 141:12
**encounter** [1] - 45:6
**end** [11] - 6:1, 10:14, 44:4, 44:7, 79:2, 79:4, 86:22, 105:19, 121:4, 138:10, 148:19
**ending** [2] - 10:7, 78:2
**ends** [2] - 58:4, 148:4
**engaged** [1] - 69:24
**English** [1] - 61:8
**enjoy** [2] - 158:23, 160:10
**enjoyable** [1] - 11:11
**ensure** [4] - 96:14, 123:17, 126:1, 143:2
**entered** [1] - 72:20
**entire** [4] - 45:9, 121:22, 143:21, 159:23
**entirely** [1] - 144:25
**entirety** [1] - 107:24
**entitled** [4] - 36:2, 36:22, 73:23, 149:1
**entry** [2] - 99:6, 99:8
**environment** [5] - 73:23, 88:11, 96:15, 109:7, 109:15
**envisioning** [1] - 11:24
**equipped** [1] - 105:1
**Escalation** [1] - 120:11
**especially** [1] - 35:23
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 3:1, 3:5, 3:9
**essentially** [3] - 39:24, 73:5, 120:14
**estimate** [2] - 45:20, 52:20
**Estrella** [5] - 61:7, 61:9, 61:13, 61:15, 61:21
**et** [2] - 1:6, 161:7
**evaluate** [3] - 86:4, 124:18, 138:5
**evaluated** [1] - 138:2
**evaluating** [1] - 137:16
**evaluation** [3] - 6:6, 85:11, 137:17
**evening** [2] - 96:11, 129:3
**evenings** [1] - 105:24
**Events** [1] - 100:23
**events** [9] - 87:22, 94:8, 95:10, 105:24, 116:3, 118:18, 131:10, 144:5, 148:20
**eventually** [2] - 40:1, 40:3
**evidence** [23] - 5:4, 5:22, 6:23, 13:20, 15:18, 33:22, 33:24, 42:15, 47:23, 54:25, 57:11, 57:15, 89:15, 93:19, 96:1, 108:8, 117:25, 123:3, 130:24, 144:9, 146:14, 148:22, 154:22
**evolving** [1] - 126:20
**exact** [1] - 24:4
**exactly** [6] - 20:5, 25:4, 75:6, 116:7, 117:25, 118:8
**exam** [2] - 56:14, 56:25
**EXAMINATION** [3] - 13:4, 29:10, 81:25
**examination** [15] - 4:4, 4:4, 4:6, 10:13, 10:15, 34:5, 35:7, 40:10, 63:17, 68:12, 69:2, 71:12, 73:6, 74:23, 159:24
**examinations** [1] - 36:5
**examine** [2] - 36:22, 81:6
**examining** [1] - 36:19
**example** [3] - 52:10, 147:11, 148:3
**except** [1] - 70:6
**exception** [9] - 100:6, 122:5, 122:12, 122:13, 122:22, 146:23, 148:6, 149:2, 149:5
**exchange** [2] - 93:10, 149:3
**exclude** [1] - 8:1
**excluded** [1] - 5:22
**exclusive** [2] - 6:4, 6:8
**excruciatingly** [1] -
54:22
**excuse** [9] - 50:9, 65:16, 75:8, 80:15, 102:2, 106:19, 118:14, 124:2, 137:2
**excused** [3] - 80:1, 80:16, 158:24
**executive** [2] - 89:7, 90:5
**exemption** [2] - 122:5, 122:13
**exercise** [1] - 46:7
**Exhib9it** [1] - 93:8
**Exhibit** [57] - 13:18, 14:11, 30:17, 30:19, 31:3, 33:24, 42:16, 47:5, 47:19, 47:22, 57:11, 57:15, 58:15, 78:2, 89:6, 89:11, 89:14, 93:3, 93:15, 93:19, 95:20, 96:1, 98:6, 98:8, 98:24, 100:24, 106:8, 108:3, 108:7, 118:13, 118:24, 119:9, 119:12, 120:5, 120:21, 121:12, 121:20, 122:1, 123:3, 123:23, 124:11, 127:15, 128:6, 128:9, 129:2, 130:19, 130:24, 142:2, 142:4, 143:12, 143:23, 146:14, 149:12, 154:10, 154:18, 154:21, 156:5
**exhibit** [13] - 14:13, 15:14, 15:16, 15:20, 17:13, 32:11, 33:15, 97:12, 99:2, 121:19, 121:22, 125:19, 148:17
**EXHIBITS** [1] - 4:7
**expect** [1] - 138:21
**expected** [1] - 68:3
**expedited** [1] - 114:13
**experience** [6] - 53:15, 54:16, 111:20, 126:14, 127:2, 127:13
**experienced** [2] - 53:16
**experiencing** [1] - 20:23
**explain** [15] - 29:17, 29:19, 41:5, 44:25, 51:7, 68:20, 72:1, 73:11, 90:2, 104:24,

109:23, 111:5,
141:5, 141:16
**explained** [3] -
131:22, 131:24,
132:10
**exposed** [3] - 22:8,
22:9, 22:11
**express** [1] - 46:3
**expulsion** [2] -
141:18, 141:19
**extend** [2] - 115:9,
115:13
**extent** [4] - 6:17,
12:25, 23:11, 77:16
**extraordinary** [1] -
25:18
**extremely** [3] - 29:22,
102:24, 113:5

---

**F**

**F-A-G-A-N** [1] - 75:9
**F.C.S.B** [13] - 1:6,
2:13, 3:1, 5:12, 5:14,
5:19, 5:22, 6:10,
6:12, 6:17, 6:18,
6:20, 161:7
**F.C.S.B.'s** [3] - 5:9,
6:21, 6:24
**F.T** [1] - 3:6
**FABIO** [1] - 81:11
**Fabio** [3] - 4:5, 81:9,
82:3
**Facebook** [1] - 38:12
**facilitate** [1] - 125:4
**facility** [1] - 46:22
**fact** [7] - 25:20, 26:1,
45:1, 65:12, 69:8,
70:9, 148:6
**fact-finder** [1] - 69:8
**facts** [7] - 6:21, 26:8,
140:3, 147:6, 147:7,
149:6
**Fagan** [4] - 75:7, 75:8,
75:9, 75:12
**Fahey** [1] - 1:14
**failed** [2] - 29:16,
62:15
**fair** [4] - 53:21, 69:14,
130:3
**Fairfax** [13] - 5:9, 5:15,
69:21, 82:4, 82:6,
82:12, 82:17, 84:6,
84:21, 84:22,
105:22, 140:14,
141:11
**fake** [1] - 38:11
**fall** [2] - 14:20, 50:9
**false** [1] - 146:6
**familiar** [1] - 86:15,

86:17, 88:4, 88:5
**family** [40] - 11:12,
19:2, 31:20, 33:18,
70:7, 70:15, 75:16,
79:5, 96:21, 97:18,
98:15, 102:17,
103:21, 109:2,
110:10, 110:11,
114:7, 114:16,
115:6, 115:23,
117:22, 118:20,
122:8, 122:10,
127:18, 131:16,
133:22, 136:1,
139:9, 139:13,
139:20, 142:7,
142:19, 144:23,
145:7, 156:7, 157:7,
157:25, 158:2, 158:4
**Family** [1] - 139:5
**family's** [2] - 138:1,
138:7
**far** [5] - 9:22, 36:12,
70:22, 71:4, 95:2
**F██████** [1] - 13:14
**faster** [1] - 121:3
**father** [3] - 30:10,
103:24, 119:23
**father's** [4] - 30:5,
30:7, 30:14, 33:18
**fax** [20] - 98:9, 98:12,
100:13, 100:25,
106:3, 106:5,
106:13, 106:17,
106:20, 107:6,
107:12, 107:17,
109:17, 131:14,
142:4, 143:25,
147:10, 148:7,
148:24, 149:19
**FCPD** [2] - 5:20, 5:24
**FCPS** [4] - 82:9,
82:11, 109:15,
140:23
**FCPSBR004747** [1] -
91:12
**FCPSBR10001** [1] -
149:14
**February** [33] - 60:19,
78:16, 88:16, 90:10,
90:25, 91:1, 92:1,
94:14, 98:13, 102:1,
102:4, 102:18,
106:4, 108:21,
108:24, 109:21,
114:6, 120:9,
120:14, 120:17,
121:7, 121:9,
121:10, 134:8,
134:11, 142:15,

148:19, 148:20,
149:19, 152:16,
153:21, 153:22
**feedback** [1] - 112:10
**feeds** [2] - 114:3,
114:4
**FELDMAN** [1] - 3:9
**felt** [5] - 11:15, 19:14,
20:24, 41:12, 49:3
**FERPA** [6] - 131:11,
131:19, 139:4,
139:5, 142:18,
143:14
**few** [5] - 12:17, 51:19,
53:17, 63:1, 91:11
**field** [2] - 16:10, 16:12
**figure** [4] - 15:18,
33:10, 81:17, 118:7
**file** [12] - 7:4, 7:6,
9:12, 27:18, 71:9,
71:18, 73:12, 73:15,
73:17, 75:16, 76:20,
79:5
**filed** [20] - 5:4, 23:16,
26:1, 26:24, 27:1,
28:2, 28:5, 28:10,
28:22, 69:5, 70:2,
70:10, 72:8, 74:5,
76:11, 76:15, 76:18,
76:25, 79:16, 146:13
**files** [3] - 139:2, 139:3
**filing** [4] - 27:14,
71:14, 73:7, 74:9
**filings** [1] - 8:2
**Finally** [1] - 138:25
**finder** [1] - 69:8
**findings** [5] - 5:10,
59:11, 59:16, 59:20,
71:4
**fine** [12] - 36:8, 36:9,
36:12, 37:4, 72:4,
74:16, 74:21, 76:21,
84:9, 128:24, 149:8
**fingers** [2] - 49:17,
51:12
**finished** [3] - 52:18,
65:3, 65:5
**first** [50] - 18:13,
18:15, 20:2, 20:13,
20:15, 23:8, 23:23,
27:10, 33:16, 33:17,
39:3, 39:4, 39:18,
47:8, 47:25, 48:19,
49:11, 55:16, 56:5,
60:18, 63:9, 64:17,
65:3, 65:5, 74:18,
76:17, 78:21, 79:4,
79:7, 84:21, 91:25,
95:6, 97:11, 97:21,
102:6, 106:7,

106:17, 106:20,
109:1, 117:21,
118:15, 120:1,
125:10, 131:5,
132:1, 149:22,
152:2, 152:24, 155:3
**First** [1] - 107:2
**firsthand** [1] - 116:21
**fit** [1] - 62:10
**five** [5] - 9:11, 9:19,
83:16, 85:15, 157:20
**FL** [3] - 2:3, 2:7, 2:11
**flash** [1] - 106:12
**flashbacks** [1] - 48:4
**FLEXNER** [4] - 1:19,
2:2, 2:6, 2:10
**flip** [4] - 107:5, 118:23,
150:5, 151:24
**Floor** [1] - 3:14
**floor** [2] - 125:10
**Floris** [3] - 35:10,
97:1, 97:3
**focus** [5] - 6:23, 8:11,
72:24, 108:11,
116:20
**focused** [4] - 37:19,
37:21, 61:19
**focusing** [2] - 38:6,
69:3
**follow** [6] - 72:14,
73:4, 114:15, 116:9,
135:4, 148:1
**follow-up** [3] - 73:4,
114:15, 135:4
**following** [1] - 7:15
**follows** [1] - 99:17
**FOR** [1] - 1:1
**forced** [3] - 49:14,
51:10, 132:4
**foregoing** [1] - 161:10
**form** [2] - 66:14, 67:7
**formal** [1] - 87:14
**format** [1] - 72:15
**former** [2] - 82:3, 89:8
**forms** [3] - 42:1,
66:10, 66:12
**forwarded** [1] - 92:1
**forwarding** [1] - 90:24
**foundation** [2] -
143:19, 148:11
**four** [15] - 15:13,
15:19, 30:25, 31:1,
32:19, 60:20, 78:18,
101:22, 106:7,
106:10, 106:12,
118:5, 119:18
**Fourth** [2] - 6:2, 6:12
**fourth** [4] - 13:23,
17:7, 17:12, 107:16
**F██████** [1] - 13:14

**F██████** [1] - 13:12,
18:9, 18:14, 18:15,
74:3, 90:24, 93:11,
93:24, 94:18,
117:10, 120:11
**F██████** [1] - 13:14
**F██████** [1] -
150:15
**free** [1] - 50:3
**free'** [1] - 50:3
**frequent** [1] - 19:21
**Friday** [5] - 12:7,
12:12, 55:16, 56:3,
56:6, 56:10, 56:11,
56:16, 91:1, 91:14,
108:21, 156:14
**friend** [3] - 14:4,
38:11, 41:14
**friends** [2] - 37:12,
37:13
**front** [9] - 25:12,
34:14, 35:22, 39:25,
77:25, 88:18, 88:19,
88:23, 106:9
**FT007** [1] - 13:24
**FT012** [1] - 17:17
**full** [5] - 67:25, 99:20,
129:5, 132:11, 135:1
**Fulton** [1] - 3:6
**furry** [2] - 14:9, 14:18

---

**G**

**gallery** [1] - 57:22
**gang** [1] - 8:13
**gangs** [2] - 8:3, 8:6
**gauge** [1] - 154:24
**general** [5] - 63:17,
69:11, 87:8, 146:21
**generally** [1] - 8:13
**generous** [1] - 109:6
**genital** [2] - 59:16,
59:20
**gentlemen** [9] - 11:9,
11:19, 13:1, 57:22,
77:11, 80:17, 80:25,
146:3, 158:18
**Genus** [1] - 150:17
**geographic** [1] -
113:23
**given** [14] - 21:2,
23:25, 24:15, 24:16,
24:17, 27:17, 28:8,
53:23, 59:13, 59:21,
65:18, 65:20, 139:3,
140:12
**glad** [1] - 11:17
**global** [1] - 36:7
**goal** [3] - 85:9, 85:14,
160:8

**goals** [1] - 88:9
**grade** [9] - 35:10, 35:12, 37:12, 37:13, 37:15, 37:16, 37:25, 38:7, 158:12
**grader** [1] - 19:9
**graduate** [1] - 68:3
**graduated** [3] - 67:4, 67:10, 83:24
**Grady** [3] - 89:22, 107:5, 132:19
**gray** [1] - 16:2
**green** [1] - 144:12
**groping** [2] - 49:20, 49:21
**group** [4] - 13:23, 16:14, 116:5, 144:7
**grouping** [2] - 49:18, 113:24
**guess** [9] - 10:13, 15:23, 28:23, 66:15, 96:23, 115:14, 122:20, 129:16, 148:21
**guidance** [5] - 16:19, 73:3, 129:13, 140:14, 140:16
**guiding** [1] - 145:6
**gym** [1] - 39:10

**H**

**half** [2] - 24:21, 104:5
**halls** [2] - 125:8, 150:18
**hand** [2] - 30:17, 101:7
**handful** [1] - 52:23
**handing** [1] - 36:4
**handle** [1] - 159:22
**handled** [2] - 9:22, 102:22
**handwriting** [4] - 47:10, 47:11, 48:18, 140:5
**handwritten** [4] - 44:8, 54:25, 140:1, 148:4
**hanging** [1] - 41:19
**harass** [1] - 41:11
**harassed** [1] - 150:3
**harassment** [2] - 41:16, 131:7
**hard** [1] - 117:24
**HARRIS** [1] - 3:12
**Harris** [2] - 161:3, 161:21
**hate** [6] - 38:12, 42:12, 43:7, 43:12, 43:22, 43:24
**Hawaii** [1] - 12:9

**Hayes** [1] - 6:8
**head** [4] - 29:21, 41:6, 41:19, 51:17
**heading** [1] - 61:23
**healthcare** [2] - 52:21, 78:10
**hear** [4] - 5:6, 74:8, 81:14, 95:6
**heard** [3] - 75:15, 137:20, 143:13
**hearing** [1] - 70:23
**hears** [1] - 132:15
**hearsay** [11] - 38:14, 99:21, 100:5, 100:6, 116:18, 122:5, 126:9, 143:16, 149:2, 149:5
**held** [2] - 5:19, 6:2
**help** [20] - 18:25, 19:14, 19:16, 46:7, 69:25, 70:12, 103:10, 103:13, 105:1, 105:4, 110:1, 110:6, 110:7, 126:1, 132:8, 132:17, 133:12, 155:15, 155:23, 157:24
**Help** [1] - 56:12
**helped** [1] - 86:1
**helpful** [1] - 123:22
**helps** [1] - 154:8
**hereby** [1] - 161:4
**hereto** [1] - 161:15
**Herndon** [2] - 113:13, 113:18
**high** [15] - 65:2, 67:4, 67:11, 91:7, 105:6, 105:21, 105:22, 113:2, 113:4, 113:8, 113:9, 113:11, 114:2, 114:3, 155:3
**High** [4] - 96:24, 97:6, 114:4, 114:5
**high-achieving** [3] - 105:22, 113:2, 113:4
**high-performing** [2] - 113:9, 113:11
**highest** [1] - 96:17
**highly** [2] - 112:24, 116:11
**himself** [3] - 22:8, 22:9, 22:11
**hiring** [3] - 85:11, 125:13, 125:16
**history** [5] - 59:13, 59:21, 63:24, 101:14, 101:17
**hit** [2] - 51:16, 51:17
**hodgepodge** [1] - 148:10

**hold** [4] - 18:4, 45:12, 66:16, 71:5
**holding** [4] - 17:21, 17:23, 17:25, 18:2
**holiday** [1] - 11:12
**HOLTZMAN** [1] - 1:14
**home** [8] - 20:4, 109:25, 110:17, 111:1, 123:15, 123:20, 124:6, 124:8
**homebound** [2] - 109:18, 109:20, 109:23, 109:24, 110:5, 110:9, 110:12, 110:16, 110:22, 110:23, 111:14, 112:5, 114:8, 114:16, 115:9, 115:11, 124:8, 124:16, 132:5, 132:6, 155:16, 158:13, 158:14
**homes** [1] - 110:1
**Honor** [73] - 7:11, 7:12, 7:21, 9:8, 10:10, 11:1, 11:3, 13:8, 13:19, 15:4, 15:9, 15:19, 16:23, 26:4, 26:8, 27:20, 31:2, 31:4, 33:8, 33:22, 35:14, 36:13, 36:16, 38:18, 42:16, 42:20, 43:15, 47:18, 53:7, 54:9, 56:21, 57:10, 57:12, 57:17, 58:12, 59:3, 63:13, 67:6, 68:8, 68:19, 70:22, 74:17, 77:22, 78:1, 79:18, 80:7, 81:9, 89:11, 89:12, 93:14, 95:19, 98:23, 98:25, 99:5, 99:10, 106:11, 108:5, 119:2, 121:18, 121:21, 121:23, 126:8, 128:21, 143:11, 143:15, 145:9, 146:15, 147:3, 147:11, 148:3, 154:17, 158:17
**Honor's** [3] - 8:5, 33:6, 129:13
**HONORABLE** [1] - 1:11
**hoodie** [2] - 14:9, 14:18
**hope** [4] - 19:5, 57:24, 74:19, 159:13

**hopeful** [1] - 109:13
**hostile** [1] - 73:23
**hour** [2] - 104:4, 104:5
**hour-and-a-half** [1] - 104:5
**house** [1] - 21:21
**HR** [1] - 66:13
**H███** [5] - 13:13, 20:13, 117:13, 150:17, 151:15
**huge** [1] - 132:19
**Hughes** [1] - 85:22
**H███** [6] - 13:13, 17:19, 20:13, 150:15, 151:18, 152:3
**hundred** [2] - 55:18, 132:12
**HUNTON** [4] - 2:14, 2:17, 2:21, 3:1
**husband** [1] - 96:11
**Hyundai** [3] - 31:18, 34:20, 34:21

**I**

**I-9** [2] - 66:12, 66:14
**idea** [5] - 12:17, 86:9, 123:19, 124:8, 138:1
**ideas** [2] - 117:19, 126:5
**identified** [4] - 60:2, 60:6, 66:10, 152:13
**identify** [9] - 15:10, 50:23, 51:3, 89:5, 93:4, 98:7, 118:17, 128:12, 159:22
**identity** [1] - 140:4
**IEP** [14] - 68:22, 69:25, 75:3, 75:4, 124:20, 137:24, 137:25, 155:17, 155:20, 155:21, 157:5, 157:8, 157:11, 158:2
**immediate** [1] - 39:9
**immediately** [9] - 39:8, 92:6, 92:13, 94:6, 103:12, 103:14, 116:3, 131:23, 157:9
**impermissible** [1] - 6:9
**implement** [1] - 125:4
**implication** [1] - 70:20
**importance** [2] - 91:7, 155:4
**important** [6] - 5:14, 11:13, 11:20, 88:6, 111:21, 112:2
**impression** [2] - 70:7,

87:8
**improvement** [2] - 88:7, 88:9
**in-person** [1] - 156:1
**in-school** [2] - 138:22, 152:21
**inappropriate** [4] - 104:16, 126:2, 132:15, 132:18
**inappropriately** [1] - 104:10
**inaudible** [1] - 36:25
**Inc** [1] - 40:12
**incident** [10] - 21:24, 38:5, 40:15, 40:22, 41:3, 46:18, 61:17, 106:6, 152:24, 153:15
**Incidents** [2] - 101:4, 149:1
**incidents** [6] - 95:5, 98:10, 98:11, 102:23, 118:1, 143:10
**include** [5] - 58:8, 101:17, 102:12, 102:14, 123:15
**included** [2] - 90:23, 148:6
**including** [8] - 6:1, 69:24, 72:22, 74:2, 107:4, 117:3, 125:6, 140:21
**indeed** [2] - 71:20, 113:3
**indicated** [2] - 148:23, 149:16
**Individualized** [2] - 70:1, 137:23
**individually** [1] - 116:5
**individuals** [1] - 57:25
**infection** [1] - 52:11
**information** [22] - 57:23, 72:19, 94:7, 100:2, 122:9, 122:10, 122:11, 122:17, 123:10, 124:12, 126:17, 126:21, 126:23, 133:20, 136:7, 136:15, 136:19, 146:5, 146:7, 148:16, 155:20, 155:21
**initial** [5] - 10:13, 23:19, 23:20, 27:10, 96:7
**initials** [4] - 151:1, 151:3, 151:21,

153:12
**inquire** [1] - 159:16
**inside** [2] - 11:16,
20:25
**insinuating** [1] - 69:20
**instance** [1] - 44:17
**instances** [3] - 46:2,
50:14, 159:23
**instruction** [20] -
12:22, 84:12, 84:17,
84:18, 87:5, 109:18,
109:20, 109:23,
109:24, 110:5,
110:9, 110:13,
110:22, 114:9,
132:5, 132:6, 135:6,
138:22, 152:22,
156:1
**instructional** [3] -
125:14, 125:16
**instructions** [1] -
134:15
**instructors** [2] -
110:17, 144:9
**intended** [1] - 74:24
**intention** [1] - 71:18
**interact** [1] - 118:6
**interacted** [1] - 118:11
**interacting** [1] - 77:18
**interested** [1] - 112:20
**internship** [7] - 64:12,
64:22, 64:23, 64:24,
65:13, 65:16, 67:19
**interpretation** [2] -
9:18, 9:21
**interrupt** [1] - 81:15
**interview** [7] - 65:19,
65:20, 65:21, 65:22,
66:5, 67:3, 124:12
**interviewed** [1] -
124:22
**interviews** [1] - 65:24
**introduce** [2] - 47:19,
148:9
**invade** [2] - 6:19, 6:20
**investigate** [3] -
115:22, 116:1, 127:5
**investigated** [4] -
116:11, 117:23,
131:6, 131:25
**investigating** [5] -
5:18, 5:21, 122:8,
146:12, 153:25
**investigation** [9] -
5:13, 6:15, 6:17,
99:23, 126:11,
132:1, 136:12,
137:3, 149:7
**investigations** [1] -
141:23

**investigative** [1] -
5:10
**invite** [1] - 143:4
**involved** [10] - 57:25,
60:24, 75:13, 75:24,
114:11, 116:8,
118:6, 131:25,
140:4, 141:20
**involves** [1] - 12:25
**isolated** [1] - 40:9
**Issue** [1] - 101:21
**issue** [42] - 6:13, 6:14,
6:18, 9:10, 9:21,
9:25, 10:7, 10:8,
10:9, 10:11, 10:17,
26:21, 29:20, 35:15,
92:6, 92:8, 92:15,
94:6, 99:1, 105:2,
118:6, 130:8,
131:22, 147:18,
149:22, 149:24,
150:2, 150:6, 150:8,
150:11, 150:12,
150:21, 150:23,
151:7, 151:11,
151:19, 152:1,
152:7, 152:15, 153:3
**issues** [11] - 99:19,
100:5, 101:20,
101:22, 102:23,
116:11, 117:22,
117:23, 127:12,
128:3
**IT** [1] - 34:16
**itself** [2] - 99:24, 106:6
**IX** [2] - 73:21, 146:9

**J**

**J.F** [1] - 3:6
**J.O** [2] - 3:9, 40:16
**Jack** [4] - 89:8, 90:2,
90:4, 128:15
**James** [4] - 44:12,
44:22, 45:6, 46:10
**Jane** [2] - 93:1, 93:10
**January** [9] - 18:8,
18:16, 18:19, 63:6,
67:23, 91:14,
150:23, 152:1, 152:2
**Jay** [2] - 65:7, 65:10
**J████████** [19] - 35:2,
35:3, 35:7, 35:9,
35:10, 37:1, 37:12,
37:14, 37:17, 37:24,
38:6, 38:13, 39:15,
40:17, 40:20, 41:2,
41:8, 41:10, 48:22
**J████████** [2] - 39:16,
40:4

**Jenni** [4] - 42:5, 43:6,
43:21
**jfahey@**
**holtzmanvogel.**
**com** [1] - 1:17
**J████████** [1] - 13:13
**job** [6] - 66:16, 84:21,
85:7, 85:14, 88:13,
90:6
**John** [2] - 65:7, 65:10
**Jonathan** [1] - 11:24
**Jordan** [1] - 62:12
**JOSEFIAK** [1] - 1:15
**JR** [1] - 1:11
**judge** [1] - 12:5
**Judge** [1] - 29:7
**JUDGE** [1] - 1:12
**July** [5] - 83:20,
154:14, 155:4,
155:7, 155:21
**June** [12] - 82:10,
127:17, 127:19,
127:24, 128:13,
130:7, 135:12,
136:10, 142:19,
149:16, 154:5, 155:8
**jurors** [1] - 6:8
**Jury** [5] - 11:7, 80:16,
80:22, 158:24, 161:6
**JURY** [1] - 1:11
**jury** [42] - 5:15, 6:5,
6:19, 6:22, 7:10,
10:25, 29:17, 29:19,
31:13, 32:24, 35:23,
37:11, 38:9, 41:5,
41:24, 45:15, 45:21,
46:25, 50:18, 51:2,
51:3, 51:7, 51:25,
55:22, 56:8, 56:9,
58:13, 70:7, 71:7,
72:2, 75:18, 76:17,
77:11, 78:15, 79:15,
80:2, 85:6, 86:9,
106:12, 111:5,
115:25, 131:3
**jury's** [2] - 6:20,
149:23

**K**

**Keefe** [1] - 2:9
**keep** [16] - 36:2,
37:19, 41:11, 41:13,
41:21, 48:4, 61:19,
70:23, 71:11, 71:12,
75:21, 77:7, 110:7,
145:12, 145:13
**keeping** [2] - 15:17,
71:1
**keeps** [1] - 35:25

**Keith** [1] - 45:19
**Kellar** [2] - 46:24,
46:25
**kelliker@huntonak.**
**com** [1] - 3:3
**Kentucky** [1] - 84:5
**kept** [2] - 145:15,
146:10
**Kevin** [2] - 3:1, 63:3
**kid** [2] - 103:10,
109:25
**kids** [8] - 105:13,
105:15, 105:17,
105:18, 105:20,
112:2, 125:6, 157:21
**kill** [1] - 51:18
**kind** [12] - 12:16,
22:20, 30:9, 32:18,
34:9, 88:11, 110:15,
132:8, 133:14,
140:12, 144:11
**kinds** [2] - 111:16,
127:6
**Kinney** [3] - 3:5,
13:12, 15:9, 19:6,
25:4, 29:5, 60:1,
60:21, 69:3, 69:13,
69:14, 69:15
**KINNEY** [29] - 3:6,
13:5, 13:8, 13:11,
13:19, 13:22, 14:12,
14:14, 14:17, 15:7,
15:12, 15:15, 15:24,
16:23, 17:2, 17:4,
17:7, 17:12, 17:15,
17:16, 24:9, 26:6,
26:8, 26:15, 26:18,
27:24, 28:25, 29:4,
159:18
**Kinney............** [1] -
4:4
**Kirkbride** [1] - 90:5
**kit** [2] - 56:12, 56:17
**Ki██** [4] - 42:8, 43:12,
43:21, 75:15
**knives** [1] - 51:15
**knowing** [2] - 45:20,
160:4
**knowledge** [2] -
135:25, 158:11
**knows** [2] - 68:20,
77:15
**KURTH** [4] - 2:14,
2:17, 2:21, 3:1

**L**

**label** [2] - 13:24, 17:17
**labeled** [1] - 14:2
**lack** [1] - 65:9

**ladies** [9] - 11:9,
11:18, 13:1, 57:22,
77:11, 80:17, 80:25,
146:3, 158:18
**Langston** [1] - 85:21
**large** [2] - 87:10
**last** [20] - 5:3, 13:17,
16:14, 18:11, 23:14,
30:23, 30:24, 33:22,
46:1, 61:15, 101:24,
102:2, 120:8, 132:7,
142:11, 150:10,
150:12, 152:21,
153:20
**LAW** [1] - 3:5
**law** [2] - 9:18, 139:9
**Law** [3] - 69:25, 75:3,
75:13
**lawsuit** [22] - 44:21,
60:25, 61:10, 69:9,
69:10, 69:21, 70:10,
71:9, 71:14, 71:18,
73:7, 73:10, 73:12,
73:15, 73:18, 74:9,
74:15, 74:25, 75:16,
76:18, 79:15
**lawyer** [4] - 25:17,
25:21, 26:22, 138:8
**lawyers** [21] - 23:15,
26:1, 27:3, 27:5,
27:6, 27:8, 27:18,
28:4, 28:5, 28:7,
28:10, 28:15, 28:18,
29:1, 60:23, 68:18,
68:22, 69:24, 70:19,
71:24, 77:18
**lay** [3] - 143:18, 148:5,
148:11
**lead** [2] - 72:5, 72:12,
78:11
**leadership** [2] - 84:12,
84:14
**leading** [3] - 67:6,
153:17, 153:18
**learning** [3] - 96:15,
109:14, 110:18
**least** [6] - 9:11, 43:7,
43:21, 60:20, 104:4,
142:9
**leave** [1] - 36:16
**led** [1] - 38:2
**left** [6] - 29:22, 29:23,
30:2, 39:11, 42:23,
70:6
**legal** [1] - 28:8
**legally** [1] - 66:16
**length** [1] - 100:7
**less** [2] - 76:2, 129:12
**letter** [35] - 17:21,
17:23, 17:25, 18:2,

18:13, 19:5, 19:19, 19:20, 24:21, 25:1, 25:5, 25:9, 25:13, 25:23, 48:15, 71:5, 71:19, 74:2, 120:11, 128:2, 128:17, 128:18, 128:19, 129:2, 130:7, 131:2, 134:1, 135:12, 136:10, 149:16, 154:5, 154:6, 155:7, 155:20

**letters** [7] - 24:18, 24:24, 25:2, 25:12, 25:16, 25:19, 25:20

**level** [8] - 105:5, 105:6, 111:10, 111:18, 112:6, 116:25, 127:11, 127:12

**Lexington** [1] - 84:5

**license** [1] - 66:10

**lie** [2] - 25:8, 67:9

**life** [1] - 45:9

**light** [2] - 29:23, 144:12

**lighters** [1] - 51:16

**lightly** [2] - 111:3, 111:6

**likely** [1] - 57:23

**limine** [3] - 7:25, 8:1, 75:11

**limited** [2] - 9:25, 146:4

**line** [3] - 58:17, 108:14, 152:2

**Lisa** [2] - 75:7, 75:8

**lisa** [1] - 75:9

**list** [4] - 40:12, 133:5, 133:7, 139:16

**listed** [1] - 101:20

**listen** [2] - 81:13, 81:16

**listing** [1] - 101:21

**literally** [2] - 39:10, 39:25

**live** [2] - 12:22, 45:9

**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1

**located** [1] - 113:13

**location** [2] - 124:19, 158:5

**locker** [17] - 38:21, 39:1, 39:10, 39:13, 39:16, 39:19, 39:24, 40:1, 40:4, 40:7, 40:8, 49:22, 133:2, 150:3

**lockers** [1] - 133:1

**log** [4] - 20:4, 40:11, 51:20, 51:22

**Longfellow** [12] - 103:5, 112:18, 112:21, 113:10, 113:14, 114:4, 114:21, 115:20, 135:11, 155:18, 156:2, 157:12

**look** [43] - 11:21, 13:23, 16:9, 16:14, 19:23, 29:24, 33:15, 78:9, 88:17, 89:2, 89:23, 89:24, 91:16, 91:17, 92:8, 94:7, 95:12, 97:11, 97:24, 98:5, 100:24, 102:25, 114:20, 118:12, 120:19, 120:23, 121:3, 123:22, 123:24, 123:25, 124:3, 127:14, 128:5, 128:9, 150:10, 154:4, 154:8, 154:9, 155:3, 156:4, 156:10, 159:11

**looked** [4] - 26:12, 77:7, 120:5, 142:1

**looking** [11] - 12:10, 17:12, 35:25, 48:6, 83:15, 89:5, 92:25, 103:14, 120:24, 133:6, 148:9

**looks** [4] - 14:9, 31:16, 34:21, 72:18

**Los** [1] - 1:20

**loses** [1] - 9:12

**lunch** [4] - 154:24, 158:19, 159:5, 160:5

**Lunch** [1] - 160:11

## M

**M.C** [1] - 3:6

**M.P.F** [1] - 3:6

**Ma'am** [1] - 134:13

**ma'am** [4] - 13:6, 15:22, 28:21, 35:5

**machine** [2] - 161:5, 161:12

**main** [3] - 85:9, 85:14

**manage** [1] - 12:20

**management** [1] - 86:2

**manner** [1] - 102:22

**March** [9] - 5:10, 5:13, 55:16, 76:6, 78:22, 131:17, 139:13, 139:21, 142:7

**mark** [1] - 30:16

**marked** [6] - 91:7, 106:23, 107:14, 107:19, 155:3

**masters** [3] - 84:10, 84:11, 84:15

**math** [2] - 88:11, 113:5

**matter** [8] - 5:8, 70:9, 99:21, 100:1, 107:22, 122:7, 122:16, 153:25

**matters** [1] - 7:8

**matters.....................
........... [1] - 4:19

**McDonald** [1] - 6:6

**McLean** [3] - 113:14, 114:4, 114:5

**meal** [2] - 158:23, 160:10

**mean** [13] - 27:22, 28:20, 32:10, 41:7, 50:5, 51:14, 65:1, 113:4, 125:7, 133:17, 133:18, 143:5, 159:6

**meaning** [1] - 45:5

**means** [1] - 28:20

**meant** [4] - 45:9, 45:10, 45:11, 49:20

**media** [2] - 12:24

**medical** [1] - 57:13

**meet** [8] - 20:14, 87:24, 94:10, 97:14, 97:18, 123:9, 143:4, 145:2

**meeting** [28] - 39:6, 39:14, 71:15, 71:17, 94:2, 94:13, 95:7, 96:12, 98:1, 98:15, 102:17, 102:20, 103:19, 103:22, 104:3, 104:6, 108:14, 109:2, 109:10, 109:21, 116:3, 117:17, 134:11, 154:7, 156:7, 156:16, 156:21, 156:23

**meetings** [2] - 88:1, 88:2

**M▓▓▓▓** [1] - 13:14

**members** [1] - 99:18

**memo** [27] - 100:18, 100:19, 100:22, 101:2, 101:6, 101:20, 101:23, 101:24, 102:3, 120:16, 120:20, 121:6, 123:5,

128:13, 128:17, 131:16, 142:6, 142:9, 143:24, 144:17, 145:15, 147:7, 148:19, 149:9, 149:15, 151:22, 154:1

**memory** [1] - 41:6

**memos** [2] - 144:2, 148:22

**men** [1] - 8:6

**mention** [1] - 72:23

**mentioned** [1] - 72:23

**message** [1] - 43:3

**messages** [4] - 42:5, 43:7, 43:12, 43:21

**met** [14] - 20:2, 20:12, 20:15, 23:8, 35:9, 35:10, 39:5, 87:21, 106:21, 116:3, 116:4, 124:25, 131:23

**mi** [1] - 149:1

**Miami** [3] - 2:3, 2:7, 2:11

**mic** [4] - 81:18, 112:8, 112:13

**Michael** [2] - 3:5, 13:12

**MICHAEL** [1] - 3:5

**Middle** [13] - 85:21, 85:22, 86:16, 87:10, 98:9, 102:24, 103:4, 105:10, 115:17, 115:20, 116:4, 157:12, 157:13

**middle** [13] - 42:23, 78:24, 85:17, 85:20, 87:10, 103:1, 103:2, 103:11, 105:3, 105:5, 126:25, 127:13, 135:8

**might** [15] - 12:18, 63:15, 77:17, 81:15, 89:24, 91:16, 91:18, 110:3, 122:4, 122:14, 124:18, 137:18, 140:5, 159:12, 159:14

**military** [1] - 66:25

**mind** [10] - 17:3, 17:5, 36:19, 73:3, 74:20, 82:12, 122:9, 122:12, 136:9, 157:9

**minds** [1] - 159:21

**minute** [6] - 51:23, 52:1, 52:3, 128:23, 130:13

**minutes** [4] - 51:19, 80:15, 154:25,

159:11

**MISCELLANY** [1] - 4:18

**misstates** [1] - 43:15

**mistaken** [1] - 16:5

**mk@kinneyesq.com** [1] - 3:8

**Moir** [3] - 62:1, 62:3

**MOIR** [1] - 62:2

**mom** [22] - 20:5, 21:3, 21:11, 21:19, 22:6, 23:3, 64:8, 64:10, 70:8, 103:10, 104:20, 112:18, 121:13, 123:7, 131:9, 131:11, 132:4, 133:6, 133:7, 149:16, 154:6, 157:11

**mom's** [1] - 121:16, 122:2, 123:24

**moment** [2] - 99:11, 99:13

**Monday** [9] - 12:10, 56:18, 92:1, 94:14, 119:20, 120:6, 124:3, 155:4, 157:1

**money** [2] - 21:12, 70:20

**M▓▓▓▓** [1] - 13:14

**monitor** [2] - 89:18, 112:1

**Moniuszko** [1] - 85:2

**month** [1] - 115:11

**months** [1] - 64:19

**moreover** [1] - 6:20

**morning** [19] - 5:1, 5:2, 10:5, 11:8, 11:10, 11:14, 13:6, 13:7, 13:10, 29:12, 29:13, 54:20, 80:3, 82:2, 94:15, 105:14, 108:24, 129:10, 157:2

**most** [3] - 54:15, 69:2, 142:25

**mother** [24] - 5:17, 20:4, 21:9, 21:15, 21:17, 21:21, 22:11, 90:14, 95:16, 102:21, 103:23, 104:6, 108:23, 112:22, 115:9, 118:20, 119:15, 124:11, 128:19, 131:18, 137:16, 146:12, 148:13, 155:14

**mother's** [1] - 139:1

**motion** [5] - 5:11,

6:25, 7:25, 8:1, 9:13
**motions** [4] - 7:5, 7:6, 7:23, 75:11
**move** [15] - 31:2, 33:21, 57:11, 68:9, 71:6, 89:11, 93:14, 95:19, 96:3, 98:23, 121:18, 128:21, 130:18, 145:9, 154:17
**moved** [3] - 40:4, 40:6, 40:7
**moving** [1] - 39:9
**MR** [199] - 7:11, 9:8, 9:20, 10:8, 10:16, 10:23, 11:1, 13:5, 13:8, 13:11, 13:19, 13:22, 14:12, 14:14, 14:17, 15:4, 15:7, 15:9, 15:12, 15:13, 15:15, 15:17, 15:24, 16:23, 17:2, 17:4, 17:7, 17:12, 17:15, 17:16, 24:4, 24:9, 26:4, 26:6, 26:8, 26:15, 26:18, 27:20, 27:24, 28:25, 29:4, 29:7, 29:11, 31:2, 31:6, 31:11, 31:15, 31:19, 31:22, 31:25, 32:14, 32:17, 33:1, 33:6, 33:14, 33:21, 33:25, 34:14, 34:17, 34:19, 35:14, 35:18, 35:22, 36:11, 36:16, 36:25, 37:8, 37:10, 37:21, 38:4, 38:16, 38:18, 38:19, 42:15, 42:18, 42:20, 42:22, 42:25, 43:17, 43:19, 44:1, 44:3, 44:5, 44:6, 45:14, 47:18, 47:24, 50:7, 50:8, 53:10, 53:12, 53:13, 54:12, 56:21, 56:23, 57:10, 57:17, 58:2, 58:12, 58:16, 59:1, 59:6, 59:9, 59:10, 59:17, 59:19, 59:24, 59:25, 61:22, 61:24, 61:25, 63:21, 66:18, 67:8, 68:6, 68:8, 68:11, 68:25, 69:7, 69:13, 69:17, 69:19, 70:6, 70:13, 70:18, 71:1, 71:16, 71:22, 71:24, 72:4, 72:12, 73:3, 73:14, 73:17, 73:25, 74:5, 74:12, 74:14, 76:1, 76:4,

76:6, 76:8, 76:15, 76:17, 76:20, 76:22, 77:2, 77:4, 77:7, 77:22, 77:24, 78:1, 78:5, 78:12, 79:10, 79:18, 79:22, 80:6, 80:10, 89:12, 93:6, 93:17, 95:21, 98:25, 99:5, 99:8, 108:4, 116:13, 116:17, 119:6, 119:8, 121:20, 126:8, 128:23, 129:1, 129:7, 129:9, 129:15, 129:19, 130:4, 130:6, 130:12, 143:15, 145:25, 147:3, 147:11, 148:3, 153:17, 154:19, 159:8, 159:10, 159:13, 159:16, 159:18, 159:19, 160:2, 160:4, 160:7, 160:9
**MS** [121] - 7:12, 7:16, 8:14, 8:23, 9:4, 11:3, 31:4, 31:9, 32:3, 32:10, 33:8, 43:15, 47:20, 53:7, 54:9, 57:12, 63:13, 63:18, 67:6, 74:17, 74:21, 75:6, 75:10, 76:11, 80:9, 80:11, 81:9, 81:24, 82:1, 89:10, 89:16, 89:18, 89:21, 91:20, 93:8, 93:9, 93:14, 93:20, 95:19, 95:23, 95:25, 96:2, 98:23, 99:10, 99:12, 99:14, 99:25, 100:7, 100:10, 100:12, 100:19, 100:21, 106:7, 106:11, 106:15, 106:16, 107:11, 108:1, 108:9, 108:10, 112:13, 112:16, 117:4, 119:2, 119:5, 119:7, 119:9, 119:13, 121:18, 121:23, 122:6, 122:15, 122:20, 122:23, 122:25, 123:2, 123:4, 125:20, 125:21, 126:13, 128:21, 129:17, 129:23, 129:25, 130:9, 130:18, 130:21, 130:25, 132:19,

132:21, 136:5, 137:11, 143:11, 143:20, 143:22, 145:3, 145:9, 145:12, 145:14, 145:18, 145:22, 145:24, 146:2, 146:15, 146:25, 147:2, 147:6, 147:16, 148:11, 148:18, 149:8, 149:11, 149:13, 150:9, 150:13, 153:19, 154:17, 154:25, 155:2, 158:17, 159:2
**multidisciplinary** [1] - 144:7
**multiple** [15] - 6:15, 43:24, 50:15, 50:20, 50:21, 51:8, 54:22, 57:5, 61:18, 86:20, 87:1, 88:2, 105:9, 105:21
**mutual** [1] - 143:2

## N

**name** [6] - 49:24, 66:11, 100:22, 108:15, 140:5, 161:16
**named** [2] - 44:12, 61:9
**names** [6] - 104:16, 105:18, 133:18, 152:9, 153:9
**narrative** [1] - 101:10
**National** [3] - 69:24, 75:3, 75:13
**natural** [1] - 12:16
**nature** [3] - 57:24, 59:12, 59:20
**nauseous** [1] - 29:22
**near** [4] - 39:15, 39:16, 113:20, 149:4
**necessarily** [3] - 63:16, 113:25, 159:21
**necessary** [1] - 23:22
**need** [24] - 5:6, 7:9, 9:22, 10:24, 48:5, 70:4, 72:24, 73:20, 74:11, 75:23, 81:18, 96:12, 96:13, 97:24, 109:18, 111:1, 111:16, 122:5, 128:23, 129:11, 130:13, 131:2, 138:5, 143:18

**needed** [9] - 11:22, 22:24, 92:14, 100:3, 110:15, 111:4, 117:20, 125:9, 143:8
**needs** [6] - 88:12, 91:4, 110:2, 125:24, 132:8, 134:19
**never** [11] - 23:17, 23:19, 26:22, 26:24, 28:8, 32:22, 44:24, 67:1, 104:8, 124:5
**new** [4] - 36:21, 40:7, 83:14, 138:14
**news** [1] - 12:24
**next** [41] - 11:20, 11:25, 12:10, 34:12, 48:17, 56:9, 56:10, 56:11, 56:17, 80:3, 80:5, 80:24, 81:8, 86:6, 90:21, 94:15, 95:7, 97:8, 107:5, 107:16, 107:25, 109:12, 109:16, 112:17, 120:1, 132:3, 132:20, 134:25, 135:20, 137:5, 138:24, 139:23, 140:11, 140:20, 140:23, 141:1, 141:4, 141:15, 142:21, 150:23
**nice** [1] - 27:16
**night** [2] - 5:3, 97:9
**nine** [1] - 82:25
**none** [1] - 118:10
**nongenital** [1] - 59:11
**noon** [1] - 18:18
**normal** [1] - 63:24
**note** [9] - 9:24, 44:8, 46:9, 46:10, 109:17, 110:14, 111:3, 114:8, 148:4
**noted** [2] - 63:6, 146:22
**notepad** [1] - 11:24
**notes** [12] - 36:4, 36:8, 36:9, 36:11, 44:21, 45:3, 68:17, 99:23, 140:21, 140:22, 159:11, 161:12
**nothing** [5] - 11:1, 41:12, 75:22, 104:18, 146:9
**notice** [1] - 73:22
**noticed** [1] - 19:2
**notion** [1] - 73:7
**Nova** [1] - 83:24
**November** [18] - 19:25, 20:15, 21:4,

21:19, 22:6, 22:7, 39:5, 40:23, 63:5, 102:8, 102:9, 119:21, 120:6, 123:21, 124:3, 124:4, 147:25, 148:1
**number** [9] - 29:14, 40:13, 50:24, 51:1, 74:17, 88:10, 88:19, 93:7, 99:3
**Number** [11] - 4:10, 4:10, 4:11, 4:13, 4:14, 4:14, 4:15, 4:15, 4:16, 4:16, 4:17
**numbers** [1] - 101:7
**nurse** [2] - 58:9, 58:24
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:2

## O

**o'clock** [3] - 98:2, 158:21
**O.B** [4] - 14:5, 14:9, 14:18, 43:3
**object** [7] - 15:19, 31:5, 32:5, 38:16, 57:12, 116:17, 116:18
**objected** [2] - 8:4, 8:18
**objection** [40] - 8:22, 8:23, 10:1, 15:4, 15:6, 24:4, 26:4, 27:20, 33:23, 38:17, 43:15, 47:20, 47:21, 53:7, 54:9, 63:13, 67:6, 89:12, 89:13, 93:16, 93:17, 93:18, 95:21, 95:22, 98:25, 108:4, 108:6, 116:13, 121:20, 126:8, 130:2, 130:20, 145:25, 146:1, 146:21, 147:18, 147:23, 153:17, 154:19, 154:20
**objections** [2] - 8:8, 37:3
**objectives** [1] - 88:9
**obligations** [2] - 12:5, 12:18
**observation** [1] - 38:13
**observations** [1] - 99:24
**observe** [1] - 105:23
**observed** [4] - 38:11,

87:2, 87:5, 105:21
**obtain** [2] - 103:16, 114:25
**obvious** [1] - 22:2
**obviously** [6] - 8:21, 10:3, 12:13, 73:20, 99:17, 129:10
**occasionally** [2] - 41:2, 53:15
**occasionally** [1] - 40:17
**occur** [2] - 54:21, 94:14
**occurred** [2] - 46:19, 46:22
**OCR** [2] - 70:22, 70:24
**October** [3] - 16:6, 43:14, 48:22
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 161:1
**offer** [10] - 97:14, 111:2, 111:6, 115:14, 115:15, 124:8, 143:12, 157:16, 157:18, 157:25
**offered** [8] - 47:22, 89:14, 97:18, 99:21, 108:7, 122:15, 146:4, 154:21
**offering** [2] - 17:10, 100:1
**office** [16] - 39:10, 39:20, 39:22, 39:23, 39:25, 40:8, 88:8, 103:19, 115:1, 115:2, 127:22, 128:3, 132:16, 140:13, 144:13
**OFFICE** [1] - 3:5
**Officer** [9] - 55:1, 55:9, 56:2, 56:5, 56:16, 131:25, 132:25, 134:19, 141:11
**officer** [3] - 141:8, 141:12, 150:16
**official** [2] - 161:5, 161:11
**Official** [3] - 3:12, 161:3, 161:22
**officials** [2] - 131:24, 134:14
**often** [2] - 54:15, 54:21
**oftentimes** [1] - 77:14
**old** [6] - 45:21, 45:22, 58:20, 66:7, 66:25, 67:12

**Olivia** [1] - 38:11
**once** [2] - 109:13, 116:2
**one** [69] - 6:9, 11:14, 17:3, 17:5, 17:14, 19:20, 21:11, 23:4, 25:3, 25:16, 27:22, 28:15, 28:24, 29:16, 32:15, 34:3, 34:4, 35:14, 35:18, 36:9, 39:17, 44:9, 50:14, 50:19, 51:22, 52:1, 52:3, 57:5, 65:4, 65:24, 65:25, 67:25, 74:23, 75:20, 81:1, 83:11, 91:10, 91:11, 93:22, 97:25, 103:4, 103:5, 107:4, 107:12, 107:13, 107:16, 107:19, 111:9, 116:11, 117:1, 117:7, 117:21, 119:23, 128:8, 128:9, 129:19, 130:7, 139:23, 140:2, 142:1, 142:3, 144:7, 147:25, 148:1, 151:7
**one's** [2] - 66:3
**one-minute** [3] - 52:1, 52:3
**one-paragraph** [1] - 151:7
**ones** [2] - 69:2, 69:3
**open** [2] - 46:6, 109:7
**Open** [4] - 33:13, 37:9, 77:10, 130:15
**opened** [2] - 6:16, 57:16
**opening** [1] - 8:25
**operations** [2] - 122:21, 145:16
**operative** [1] - 7:21
**opinion** [3] - 6:9, 54:10, 70:12
**opportunity** [7] - 5:6, 27:17, 28:9, 28:22, 69:5, 111:24, 159:25
**options** [4] - 114:22, 114:24, 115:4, 115:6
**oral** [4] - 49:14, 49:15, 51:10
**orchestrated** [1] - 70:8
**order** [5] - 6:11, 8:1, 17:9, 138:13, 144:22
**ordered** [2] - 6:24, 7:1
**orders** [1] - 72:21
**organizations** [4] - 75:21, 75:22, 75:24,

156:20
**organized** [5] - 83:10, 85:13, 87:12, 105:25, 113:7
**original** [3] - 39:17, 89:19, 140:1
**otherwise** [2] - 66:24, 146:6
**outside** [6] - 8:17, 44:25, 133:15, 133:17, 134:20
**overall** [2] - 51:6, 51:7
**overcome** [1] - 143:16
**overruled** [6] - 24:6, 26:17, 27:21, 57:16, 122:24, 146:22
**oversight** [1] - 83:1
**overview** [1] - 85:7
**overwhelm** [1] - 100:5
**own** [5] - 12:13, 12:18, 69:10, 131:5, 132:13

**P**

**P-A-C-H-T-E-R** [1] - 68:13
**P.A.H** [1] - 3:5
**p.m** [2] - 97:10, 160:11
**Pachter** [4] - 68:13, 78:13, 78:15
**packet** [1] - 102:11
**page** [69] - 30:23, 30:24, 33:15, 33:22, 43:8, 43:22, 47:25, 48:17, 48:19, 58:13, 59:3, 77:25, 78:2, 78:9, 82:11, 90:10, 90:21, 91:12, 91:25, 96:5, 97:8, 97:11, 97:22, 99:9, 102:2, 102:3, 102:6, 106:3, 106:17, 106:20, 107:5, 107:9, 107:12, 107:16, 118:14, 119:20, 120:8, 121:1, 123:12, 129:6, 132:20, 135:1, 137:5, 137:7, 137:12, 142:11, 149:25, 150:6, 150:8, 150:9, 151:10, 152:7, 152:16, 153:3, 153:5, 153:7, 153:20, 156:10, 156:13
**pages** [43] - 24:22, 25:3, 25:6, 25:10, 25:14, 30:19, 30:20,

30:21, 33:16, 33:17, 38:12, 42:12, 43:12, 43:24, 47:8, 47:9, 47:10, 91:11, 91:21, 100:16, 100:17, 100:25, 101:6, 101:8, 101:9, 101:10, 101:11, 106:5, 106:7, 106:10, 106:12, 106:14, 107:4, 107:6, 107:14, 107:19, 119:18, 131:14, 143:25, 151:2, 151:3, 161:10
**pain** [8] - 49:12, 54:2, 54:5, 54:6, 54:7, 54:13, 54:16, 54:19
**pans** [1] - 15:21
**pants** [2] - 16:2, 104:10
**paragraph** [38] - 79:4, 79:7, 109:1, 109:16, 112:17, 120:1, 123:6, 129:4, 129:5, 129:12, 129:15, 129:19, 129:24, 131:5, 132:1, 132:2, 132:3, 132:20, 132:23, 134:1, 134:5, 134:25, 135:1, 135:3, 135:20, 137:15, 138:10, 138:24, 138:25, 142:12, 142:21, 150:11, 150:12, 151:7, 151:11, 152:24, 153:20
**paraphrasing** [1] - 69:6
**pardon** [3] - 14:12, 17:4, 26:6
**parent** [1] - 94:2
**parents** [19] - 20:2, 20:9, 20:14, 22:25, 23:3, 23:6, 39:4, 51:17, 76:9, 86:6, 90:7, 92:8, 94:6, 94:8, 94:11, 95:6, 105:24, 106:21, 140:13
**Park** [1] - 1:19
**park** [8] - 16:8, 16:12, 38:6, 40:16, 40:22, 41:3, 41:17, 41:22
**part** [31] - 7:24, 7:25, 9:1, 11:20, 12:5, 15:10, 16:22, 19:20, 38:15, 42:23, 47:14,

57:4, 60:25, 63:10, 63:24, 68:15, 76:12, 79:3, 88:5, 88:13, 90:6, 111:19, 111:20, 140:23, 143:14, 146:10, 147:6, 147:7, 147:13, 149:4
**particular** [17] - 73:9, 77:16, 81:6, 87:16, 90:18, 96:25, 99:3, 99:6, 110:2, 111:13, 113:25, 143:18, 146:3, 146:5, 148:8, 157:22
**particularly** [1] - 112:20
**parties** [2] - 71:5, 140:4
**parts** [5] - 49:17, 89:23, 106:3, 107:2, 107:17
**party** [4] - 40:21, 40:24, 41:9, 41:22
**pass** [2] - 36:8
**passing** [1] - 36:11
**passport** [2] - 66:10, 66:13
**past** [2] - 109:18, 125:23
**patch** [4] - 21:24, 21:25, 22:4, 23:4
**path** [2] - 61:23, 74:11
**pause** [7] - 72:25, 81:15, 99:15, 129:20, 130:1, 131:12, 137:9
**pay** [1] - 158:8
**paying** [2] - 125:11
**PC** [1] - 3:9
**PE** [7] - 38:21, 39:1, 39:16, 39:20, 39:25, 40:1
**peace** [2] - 41:13, 41:21
**Pedersen** [1] - 72:16
**Pederson** [2] - 77:9, 77:17
**pediatrician** [1] - 63:4
**pelvic** [8] - 54:2, 54:4, 54:6, 54:7, 54:13, 54:16, 54:19
**penetrated** [4] - 49:15, 51:11, 58:21
**penis** [2] - 51:12, 58:21
**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:2
**people** [9] - 9:16, 36:3, 36:5, 36:8,

50:13, 81:3, 94:23, 152:3, 159:22
**percent** [3] - 55:18, 86:13, 132:12
**perception** [1] - 52:13
**performance** [1] - 86:4
**performing** [3] - 113:5, 113:9, 113:11
**perhaps** [1] - 132:7
**period** [4] - 37:22, 52:25, 63:24, 78:25
**permission** [3] - 25:23, 103:16, 114:25
**permit** [4] - 6:18, 6:20, 27:3, 155:25
**permitted** [3] - 5:12, 8:8, 8:15
**person** [8] - 48:24, 65:22, 65:25, 66:3, 117:8, 144:7, 145:2, 156:1
**personal** [3] - 12:13, 57:24, 140:22
**personally** [1] - 37:17
**personnel** [1] - 115:2
**perspective** [5] - 61:14, 61:15, 71:13, 92:9, 95:8
**P████** [1] - 13:13
**phone** [10] - 20:4, 40:12, 49:10, 51:20, 66:1, 66:2, 124:15, 124:25, 135:4
**photo** [11] - 13:23, 14:4, 14:7, 14:20, 15:25, 16:14, 16:15, 16:18, 16:21, 17:13, 18:6
**photograph** [3] - 32:6, 32:11, 33:9
**photographs** [1] - 32:7
**photos** [6] - 13:17, 14:24, 15:5, 15:15, 15:19, 16:4
**physical** [6] - 22:21, 22:22, 63:11, 63:25, 110:24, 110:25
**physically** [2] - 48:10, 51:12
**physician** [2] - 109:17, 114:8
**pick** [1] - 30:2
**picks** [1] - 150:23
**picture** [8] - 15:22, 31:13, 31:17, 31:24, 32:20, 32:25, 34:12
**pictures** [10] - 15:13,

30:21, 30:23, 30:24, 31:19, 31:21, 32:8, 32:14, 41:18, 49:10
**piece** [1] - 75:14
**PITTLEMAN** [1] - 3:9
**place** [13] - 39:12, 39:24, 56:11, 116:10, 118:10, 123:17, 125:9, 127:6, 134:15, 134:18, 135:6, 138:13, 138:18
**placed** [2] - 99:24, 125:8
**placement** [2] - 114:20, 157:16
**places** [1] - 115:2
**plaintiff** [17] - 5:25, 7:11, 7:23, 8:4, 8:9, 8:15, 8:18, 9:10, 11:1, 63:14, 69:20, 81:3, 81:6, 90:13, 91:22, 103:25, 104:23
**Plaintiff** [5] - 1:4, 1:14, 2:1, 4:2, 4:8
**Plaintiff's** [22] - 4:16, 4:16, 4:17, 31:3, 33:24, 47:22, 57:11, 57:15, 78:2, 89:3, 89:11, 89:14, 108:3, 108:7, 118:23, 119:9, 123:22, 127:15, 154:9, 154:18, 154:21, 156:5
**plaintiff's** [14] - 5:13, 5:17, 5:21, 5:23, 6:14, 6:18, 7:19, 8:20, 8:22, 103:21, 108:23, 119:15, 128:19, 148:13
**plaintiffs** [1] - 5:7
**plan** [8] - 11:21, 68:22, 88:7, 88:9, 123:14, 123:16, 138:18
**Plan** [2] - 70:1, 137:23
**planning** [1] - 75:16
**PLC** [1] - 3:6
**pleadings** [2] - 28:1, 28:8
**pleased** [1] - 102:22
**PLLC** [1] - 1:15
**plural** [1] - 43:16
**point** [20] - 20:4, 33:8, 37:6, 38:7, 53:4, 57:10, 64:2, 64:5, 64:8, 80:3, 81:1, 83:11, 83:13, 104:15, 105:14,

110:12, 140:20, 147:24, 155:24, 159:14
**pointed** [2] - 57:8, 70:14
**points** [3] - 64:6, 139:16
**Police** [2] - 5:9, 5:15
**police** [16] - 5:17, 6:14, 6:17, 135:22, 135:24, 136:7, 136:11, 136:15, 136:16, 136:20, 137:1, 137:3, 141:7, 141:8, 141:9, 141:12
**policy** [1] - 19:18
**portfolio** [2] - 83:8, 103:6
**position** [5] - 7:4, 82:20, 83:5, 83:18, 129:11
**positive** [2] - 109:14, 132:14
**possibility** [3] - 102:25, 125:13, 155:17
**possible** [1] - 23:9
**posted** [1] - 41:20
**potential** [1] - 73:2
**potentially** [1] - 73:7
**practice** [4] - 72:5, 140:12, 144:1, 144:3
**precision** [1] - 50:24
**preclude** [2] - 9:3, 10:6
**precluding** [1] - 72:21
**preface** [1] - 61:14
**prefer** [3] - 72:14, 89:25, 112:5
**preference** [1] - 104:22
**prejudice** [1] - 6:3
**Preliminary** [1] - 4:19
**prepare** [1] - 121:16
**prepared** [4] - 101:13, 121:25, 142:1, 144:6
**present** [5] - 11:7, 80:22, 103:24, 104:1, 115:6
**presented** [4] - 77:14, 117:22, 119:15, 123:10
**president** [1] - 67:14
**pretrial** [4] - 7:23, 70:23, 75:10, 99:1
**pretty** [3] - 25:18, 73:13, 140:17
**previous** [2] - 106:2, 148:16
**previously** [2] - 11:6,

119:3
**PricewaterhouseCoopers** [2] - 64:15, 64:18
**Principal** [3] - 18:9, 18:14, 68:13
**principal** [8] - 19:10, 69:11, 88:1, 88:14, 117:2, 117:9, 117:10, 125:6
**principals** [8] - 85:11, 85:24, 86:2, 86:4, 86:7, 117:7, 117:12
**printed** [1] - 96:4
**Privacy** [1] - 139:6
**privacy** [2] - 57:25, 140:8
**private** [5] - 43:11, 49:17, 158:5, 158:6, 158:8
**privilege** [1] - 83:17
**problem** [3] - 71:3, 73:1, 157:1
**problems** [2] - 99:19, 151:16
**proceed** [2] - 13:8, 77:22
**proceedings** [8] - 80:21, 99:15, 129:20, 130:1, 137:9, 161:6, 161:11, 161:14
**PROCEEDINGS** [1] - 1:11
**process** [13] - 45:2, 45:15, 47:15, 65:8, 66:6, 69:25, 94:21, 94:22, 116:8, 124:17, 138:11, 138:17
**produce** [3] - 31:20, 141:5, 141:17
**produced** [5] - 31:5, 31:9, 32:8, 45:3, 140:21
**productive** [1] - 9:19
**professional** [1] - 12:18
**professionals** [2] - 133:12, 144:8
**programs** [1] - 157:14
**progress** [1] - 112:1
**promise** [1] - 35:19
**pronounce** [1] - 62:1
**properly** [1] - 105:15
**proportion** [1] - 86:9
**proposal** [1] - 19:18
**propose** [1] - 124:6
**proposed** [1] - 129:3
**prosecutor** [1] - 6:9

**protect** [3] - 57:25, 62:15, 140:3
**proves** [1] - 144:11
**provide** [20] - 54:10, 103:9, 105:2, 105:8, 110:17, 110:23, 111:9, 111:14, 111:16, 112:3, 112:4, 133:7, 133:9, 133:10, 133:11, 133:17, 140:3, 157:14
**provided** [17] - 33:3, 109:7, 110:14, 131:19, 133:5, 133:15, 136:7, 136:15, 136:16, 136:20, 139:13, 139:20, 140:1, 142:6, 142:19, 143:14, 147:9
**provider** [3] - 71:15, 71:18, 78:10
**providers** [1] - 52:21
**provides** [2] - 140:14, 155:21
**providing** [4] - 72:19, 110:22, 134:20, 144:14
**province** [3] - 6:5, 6:19, 6:20
**psychologist** [2] - 133:13, 157:23
**psychologists** [1] - 111:11
**PTSD** [4] - 52:14, 52:22, 53:1, 53:2
**public** [1] - 44:21
**Public** [1] - 84:21
**publicized** [1] - 45:6
**publish** [12] - 15:6, 15:7, 42:20, 58:13, 59:4, 89:16, 93:18, 95:23, 119:10, 122:25, 130:22, 147:17
**published** [3] - 58:15, 119:12, 149:12
**publishing** [1] - 15:8
**Puerto** [1] - 12:9
**pulled** [3] - 47:2, 49:8, 94:23
**pumpkin** [4] - 21:24, 21:25, 22:4, 23:4
**pupil** [1] - 115:2
**purpose** [3] - 99:25, 146:4, 146:11
**purposes** [1] - 16:24
**pursuing** [1] - 100:6
**purview** [2] - 6:8,

126:15
**pushback** [1] - 126:4
**pushed** [1] - 48:22
**put** [16] - 8:24, 15:1,
18:23, 35:4, 35:5,
38:24, 39:19, 49:17,
60:3, 66:20, 115:19,
132:10, 134:15,
135:6, 154:3
**putting** [2] - 43:11,
123:16
**PwC** [9] - 64:13, 65:9,
65:13, 66:6, 66:23,
67:2, 67:10, 67:14,
68:2
**PX** [4] - 88:23, 118:24,
118:25, 156:5
**PX-133** [1] - 89:3
**PX-294** [1] - 154:12
**pyramid** [1] - 114:1

**Q**

**qualify** [2] - 124:18,
137:17
**quality** [1] - 81:17
**questioned** [1] - 57:2
**questioning** [5] - 6:14,
6:18, 41:24, 57:4,
159:17
**questions** [39] - 23:14,
24:5, 30:4, 32:13,
33:4, 36:17, 36:23,
37:1, 38:20, 40:10,
44:18, 44:19, 46:8,
46:13, 46:14, 50:12,
50:15, 52:7, 52:10,
52:11, 53:14, 55:23,
55:25, 60:1, 64:2,
69:1, 72:24, 72:25,
78:6, 79:23, 81:14,
81:16, 99:17, 99:22,
116:20, 158:17,
159:18, 159:19
**quick** [1] - 35:18
**quickly** [1] - 63:1
**quite** [3] - 18:22,
145:11, 145:12
**quote** [2] - 68:16,
68:17
**quoting** [1] - 140:23

**R**

**Rachel** [7] - 7:20,
86:16, 92:12, 92:16,
115:23, 125:3,
126:25
**R████** [8] - 118:18,
128:14, 131:18,

132:4, 139:1, 149:1,
155:15, 155:22
**raining** [2] - 11:13,
11:16
**raise** [4] - 8:24, 10:9,
35:15, 36:14
**raised** [3] - 115:23,
122:8, 139:16
**raising** [1] - 128:4
**range** [1] - 58:4
**rape** [5] - 5:13, 51:4,
56:12, 56:17, 57:5
**raped** [11] - 7:19, 8:13,
50:14, 50:19, 50:21,
50:24, 55:24, 64:3,
104:7
**rapes** [3] - 51:8, 57:5,
64:9
**rather** [3] - 72:12,
109:24
**ratio** [1] - 157:20
**rbates@hunton.com**
[1] - 2:16
**RCMS** [1] - 91:4
**re** [1] - 124:12
**re-interview** [1] -
124:12
**reaction** [1] - 92:11
**read** [11] - 5:6, 8:21,
27:9, 90:16, 90:17,
116:2, 120:23,
129:18, 131:2,
131:3, 149:23
**reading** [2] - 88:11,
113:5
**ready** [2] - 68:18,
143:7
**real** [1] - 76:1
**reality** [2] - 134:18,
144:12
**realized** [1] - 96:13
**really** [25] - 19:14,
22:18, 29:22, 34:11,
35:23, 37:18, 38:13,
69:10, 85:8, 92:13,
92:15, 103:8,
103:11, 103:17,
104:25, 110:24,
111:7, 111:9, 113:7,
118:7, 124:7,
125:17, 126:2,
126:3, 138:19
**realtime** [1] - 161:12
**reappear** [1] - 151:19
**reason** [5] - 8:15,
8:18, 25:7, 28:3,
31:20
**reasons** [2] - 110:24,
110:25
**reassured** [1] - 135:5

**receive** [6] - 56:12,
83:23, 84:4, 100:13,
127:21, 154:6
**received** [11] - 61:17,
92:16, 98:9, 100:22,
106:17, 115:8,
120:16, 131:11,
148:12, 151:12,
154:1
**receiving** [5] - 61:16,
73:21, 87:5, 92:11,
124:10
**recently** [2] - 54:17,
157:24
**Recess** [2] - 80:20,
160:11
**recesses** [1] - 77:19
**recitation** [1] - 70:24
**recognize** [6] - 15:22,
15:25, 60:9, 105:18,
132:17, 142:22
**recollection** [11] -
14:23, 16:6, 16:21,
33:17, 43:10, 43:20,
46:22, 55:19, 58:25,
120:19, 134:6
**recommencement** [1]
- 13:3
**recommendation** [3] -
19:18, 141:18,
141:19
**recommended** [3] -
19:21, 65:11, 110:10
**reconsider** [2] - 9:19,
106:2
**reconsideration** [5] -
5:11, 6:25, 7:5, 7:6,
9:13
**reconsidered** [1] -
148:24
**record** [32] - 9:24,
15:10, 15:17, 16:24,
17:11, 32:17, 32:23,
38:15, 57:13, 68:11,
68:12, 68:14, 69:17,
76:4, 77:25, 78:1,
79:13, 89:20, 99:25,
122:21, 122:22,
129:1, 143:12,
143:14, 143:16,
145:10, 146:10,
146:23, 147:14,
148:5, 148:7, 149:2
**recording** [1] - 161:13
**records** [14] - 8:21,
63:2, 63:5, 63:6,
116:25, 122:23,
139:10, 139:13,
140:21, 141:5,
141:7, 141:9,

142:16, 149:5
**recovery** [1] - 73:24
**redacted** [16] - 128:8,
128:10, 128:22,
129:4, 129:11,
129:12, 129:13,
129:17, 129:22,
130:5, 130:9,
130:20, 139:23,
139:25, 152:9, 153:9
**redaction** [3] - 130:3,
130:8, 130:21
**redactions** [1] - 71:6
**Redirect** [1] - 4:4
**REDIRECT** [1] - 29:10
**refer** [1] - 16:25
**reference** [3] - 8:13,
32:16, 147:25
**referenced** [2] - 44:12,
149:16
**references** [5] - 8:2,
73:8, 76:8, 109:1,
112:18
**referencing** [2] -
42:12, 49:23
**referred** [2] - 42:10,
56:13
**referring** [3] - 49:5,
78:2, 147:4
**refrain** [1] - 35:24
**refresh** [1] - 120:19
**regard** [3] - 7:19,
148:24, 153:15
**regarding** [11] - 5:4,
5:24, 7:13, 8:3,
38:21, 59:11, 64:12,
71:14, 92:12, 128:3,
136:7
**regards** [2] - 96:17,
106:2
**region** [3] - 82:21,
103:3, 113:23
**Region** [5] - 82:21,
82:24, 83:2, 83:17,
86:12
**regional** [1] - 98:20
**regions** [2] - 83:13,
83:16
**regular** [2] - 145:15,
146:10
**regularly** [1] - 151:19
**regulation** [1] - 140:24
**reiterated** [2] - 135:10,
143:6
**rejection** [1] - 8:21
**related** [1] - 100:5
**relates** [2] - 29:20,
73:8
**relationship** [10] -
35:7, 35:12, 36:18,

37:1, 37:14, 37:24,
38:9, 72:16, 132:13,
132:14
**relative** [1] - 113:13
**relatively** [1] - 113:21
**relearn** [1] - 45:9
**relearning** [2] - 45:10
**relevance** [3] - 5:9,
26:4, 27:20
**rely** [1] - 144:22
**remain** [1] - 142:24
**remember** [38] - 16:4,
16:12, 16:15, 16:17,
16:18, 18:10, 18:21,
24:19, 30:9, 30:13,
38:22, 40:11, 40:18,
42:2, 42:13, 44:18,
45:17, 46:13, 46:21,
46:22, 55:1, 55:24,
63:9, 84:7, 87:13,
92:13, 102:25,
107:23, 113:17,
120:18, 124:20,
124:25, 125:1,
128:2, 134:13,
134:22, 136:3, 143:6
**remembers** [6] -
49:12, 49:14, 49:15,
49:17, 49:18, 49:21
**remind** [3] - 37:11,
46:25, 78:15
**remote** [3] - 65:22,
65:25, 66:1
**removing** [1] - 136:20
**renew** [1] - 143:11
**reorganize** [1] - 98:4
**reorganized** [1] -
83:13
**rep** [1] - 68:22
**repeat** [3] - 24:7,
35:13, 63:20
**repeating** [1] - 37:4
**report** [9] - 57:8,
58:11, 84:23, 85:24,
95:10, 106:6, 141:2,
141:18, 145:1
**reported** [14] - 21:3,
21:11, 22:5, 50:13,
57:5, 57:13, 58:9,
85:4, 86:3, 101:18,
102:23, 135:24,
135:25, 161:5
**Reporter** [3] - 3:12,
161:3, 161:22
**REPORTER** [2] - 75:8,
161:1
**Reporter...................
...** [1] - 4:19
**reporting** [3] - 22:23,
43:5, 58:1

176

**reports** [5] - 6:2, 140:12, 141:25, 142:15, 142:17
**repping** [1] - 70:19
**represent** [1] - 13:12
**representative** [1] - 75:4
**representatives** [1] - 7:2
**represented** [4] - 31:12, 32:22, 68:18, 75:2
**represents** [3] - 35:1, 35:2, 60:7
**request** [15] - 5:4, 57:23, 98:10, 98:16, 98:19, 110:4, 131:11, 131:19, 135:11, 137:16, 138:7, 139:4, 143:14, 144:17
**requested** [4] - 98:14, 144:20, 157:7, 158:4
**require** [1] - 137:18
**reschedule** [1] - 96:12
**reseated** [1] - 11:6
**resistance** [1] - 126:4
**resolution** [2] - 71:2, 72:22
**resolve** [1] - 75:23
**resolved** [1] - 99:3
**Resource** [4] - 131:25, 132:25, 134:19, 141:11
**resources** [2] - 133:15, 133:18
**respect** [3] - 144:1, 145:7, 147:18
**respectful** [1] - 133:3
**respond** [8] - 70:15, 89:9, 97:9, 121:16, 123:6, 128:13, 128:16, 131:6
**responded** [5] - 134:2, 134:4, 135:21, 155:10, 157:1
**responding** [4] - 98:10, 122:7, 130:7, 155:7
**response** [14] - 23:14, 71:25, 115:8, 116:22, 118:18, 121:13, 121:25, 122:2, 123:23, 124:10, 124:14, 126:11, 127:22, 128:2
**responses** [2] - 5:2, 11:10
**responsibilities** [3] -

12:14, 116:10, 146:9
**Reston** [3] - 3:7, 3:11, 85:22
**restricted** [1] - 12:4
**restrictive** [1] - 109:25
**result** [3] - 53:5, 99:7, 137:22
**resume** [5] - 65:19, 66:19, 66:20, 66:23, 67:3
**resumed** [1] - 80:21
**retain** [4] - 68:15, 70:16, 76:9, 79:5
**retained** [1] - 71:24
**retire** [1] - 82:9
**retired** [2] - 82:6, 82:16
**retirement** [1] - 82:20
**retrieve** [1] - 80:14
**return** [6] - 104:23, 125:4, 134:12, 138:19, 138:21, 155:25
**returned** [2] - 52:4, 89:19
**returning** [1] - 103:1
**review** [30] - 23:15, 23:20, 23:21, 23:24, 23:25, 24:1, 24:3, 24:12, 24:13, 24:14, 24:15, 26:14, 26:19, 26:20, 26:23, 26:24, 27:1, 27:3, 27:25, 28:9, 28:12, 28:13, 28:22, 29:2, 56:25, 57:1, 69:5, 88:12, 88:13, 116:24
**reviewed** [1] - 28:24
**reviewing** [1] - 28:23
**Rewari** [35] - 2:17, 23:14, 33:3, 38:20, 38:25, 40:20, 40:24, 41:25, 42:4, 42:10, 43:1, 44:7, 44:16, 50:16, 55:3, 55:7, 55:15, 56:25, 58:6, 64:11, 66:19, 68:12, 68:14, 68:17, 69:19, 70:18, 76:4, 78:6, 78:21, 79:3, 81:23, 93:6, 106:1, 130:16, 137:8
**REWARI** [120] - 7:12, 7:16, 8:14, 8:23, 9:4, 31:4, 31:9, 32:3, 32:10, 33:8, 43:15, 47:20, 53:7, 54:9, 57:12, 63:13, 63:18, 67:6, 74:17, 74:21, 75:6, 75:10, 76:11,

80:9, 80:11, 81:9, 81:24, 82:1, 89:10, 89:16, 89:18, 89:21, 91:20, 93:8, 93:9, 93:14, 93:20, 95:19, 95:23, 95:25, 96:2, 98:23, 99:10, 99:12, 99:14, 99:25, 100:7, 100:10, 100:12, 100:19, 100:21, 106:7, 106:11, 106:15, 106:16, 107:11, 108:1, 108:9, 108:10, 112:13, 112:16, 117:4, 119:2, 119:5, 119:7, 119:9, 119:13, 121:18, 121:23, 122:6, 122:15, 122:20, 122:23, 122:25, 123:2, 123:4, 125:20, 125:21, 126:13, 128:21, 129:17, 129:23, 129:25, 130:9, 130:18, 130:21, 130:25, 132:19, 132:21, 136:5, 137:11, 143:11, 143:20, 143:22, 145:3, 145:9, 145:12, 145:14, 145:18, 145:22, 145:24, 146:2, 146:15, 146:25, 147:2, 147:6, 147:16, 148:11, 148:18, 149:8, 149:11, 149:13, 150:9, 150:13, 153:19, 154:17, 154:25, 155:2, 158:17, 159:2
**rewari** [1] - 147:22
**Rewari's** [2] - 9:21, 69:11
**Rewari.............** [1] - 4:6
**Rich** [1] - 85:1
**Rico** [1] - 12:9
**riders** [1] - 105:16
**right-hand** [1] - 101:7
**Rights** [1] - 139:6
**rights** [3] - 73:20, 96:14, 116:10
**risk** [1] - 6:3
**rkeefe@bsfllp.com** [1] - 2:12
**road** [2] - 10:15, 70:4

**Robert** [2] - 2:9, 3:6
**room** [4] - 36:24, 39:11, 40:8
**ROSSIE** [1] - 1:11
**round** [1] - 142:18
**rounds** [1] - 65:24
**routinely** [1] - 6:2
**RPR** [2] - 3:12, 161:21
**rule** [2] - 149:2, 149:5
**ruled** [1] - 10:2
**ruling** [9] - 7:18, 8:6, 9:7, 33:6, 77:13, 99:12, 99:16, 136:9, 146:18
**run** [1] - 113:7
**Ryan** [1] - 2:13

# S

**S.T** [1] - 3:5
**safe** [5] - 85:13, 87:12, 96:15, 109:14, 135:7
**safety** [2] - 123:17, 143:2
**sale** [1] - 33:10
**SANE** [4] - 56:14, 56:25, 58:1, 58:24
**satisfied** [1] - 143:9
**savvy** [1] - 34:11
**saw** [8] - 11:13, 13:17, 37:17, 60:22, 78:25, 102:18, 131:13
**Saylor** [3] - 45:19, 45:20, 45:23
**scare** [1] - 51:15
**scared** [6] - 20:24, 41:10, 41:11, 48:7, 48:8
**scarred** [2] - 48:8, 48:9
**Scarred** [1] - 48:10
**scars** [2] - 48:6, 49:13
**schedule** [4] - 11:19, 92:14, 96:18, 98:4
**schedules** [1] - 81:2
**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10
**School** [25] - 69:21, 82:4, 82:12, 85:21, 85:22, 86:16, 87:10, 96:24, 97:1, 97:6, 98:9, 102:24, 103:4, 105:10, 114:5, 115:17, 115:20, 131:25, 132:25, 134:19, 141:11, 146:8, 146:11, 157:12, 157:13
**school** [173] - 18:16, 19:9, 19:23, 20:7,

35:11, 39:5, 39:18, 41:8, 41:12, 43:22, 47:3, 50:2, 58:20, 61:16, 65:2, 65:6, 67:4, 67:11, 68:22, 69:25, 70:15, 73:21, 82:15, 83:6, 83:10, 84:1, 86:7, 86:15, 86:17, 86:18, 86:21, 86:24, 87:3, 87:6, 87:8, 87:9, 87:10, 87:11, 87:12, 87:17, 87:18, 87:22, 87:25, 88:1, 88:7, 88:9, 88:12, 88:14, 95:1, 95:8, 100:14, 100:18, 101:13, 101:18, 101:25, 102:11, 102:14, 102:15, 102:22, 103:12, 104:7, 104:11, 104:14, 104:18, 104:25, 105:4, 105:5, 105:6, 105:7, 105:9, 105:11, 105:12, 105:13, 105:20, 105:22, 105:25, 107:22, 110:17, 110:21, 110:25, 111:10, 111:11, 111:18, 111:19, 111:20, 112:6, 113:2, 113:6, 113:9, 114:3, 116:9, 116:25, 117:2, 117:5, 117:17, 117:20, 117:22, 117:24, 118:5, 119:24, 120:5, 120:16, 121:6, 121:15, 121:25, 122:11, 122:17, 123:5, 123:9, 123:15, 123:16, 123:19, 123:25, 125:2, 125:3, 125:4, 126:5, 126:9, 126:16, 126:25, 127:2, 127:7, 127:13, 131:6, 131:24, 133:9, 133:10, 133:12, 133:13, 134:12, 134:14, 134:17, 135:8, 135:21, 135:25, 136:7, 136:15, 136:16, 136:20, 136:21, 137:2, 138:4, 138:14, 138:22,

177

139:9, 140:14,
140:15, 141:5,
141:12, 141:23,
142:1, 142:16,
142:23, 142:24,
143:10, 145:16,
146:13, 152:21,
153:14, 153:25,
157:6, 157:16,
157:17, 157:18,
157:19, 157:22,
157:23, 158:1,
158:5, 158:6, 158:8,
158:9
**school's** [2] - 122:2,
122:21
**schooling** [1] - 65:1
**Schools** [1] - 84:21
**schools** [36] - 83:1,
83:2, 83:8, 83:9,
83:17, 84:13, 89:9,
85:10, 85:12, 85:13,
85:17, 85:20, 85:25,
86:10, 86:12, 86:14,
88:7, 95:6, 103:1,
103:3, 103:6, 103:7,
103:15, 105:4,
112:23, 112:25,
113:11, 113:20,
113:24, 113:25,
114:2, 115:3,
134:14, 156:3
**science** [1] - 113:6
**scope** [4] - 8:17, 10:1,
53:8, 77:20
**Scott** [1] - 2:20
**scouring** [1] - 10:3
**screen** [11] - 29:17,
29:20, 29:24, 29:25,
89:24, 91:16, 91:17,
106:18, 106:20,
107:6, 149:9
**screens** [1] - 57:18
**scroll** [2] - 59:9, 59:17
**SE** [3] - 2:2, 2:6, 2:10
**seat** [4] - 11:8, 29:14,
80:23, 81:13
**seated** [3] - 80:18,
81:12, 159:1
**second** [26] - 8:3,
8:16, 24:2, 24:10,
25:5, 25:23, 27:11,
29:7, 35:15, 58:17,
60:18, 78:9, 96:4,
107:5, 116:16,
119:20, 123:12,
125:10, 132:2,
135:1, 137:8, 142:3,
142:18, 156:10,
156:13

**section** [1] - 42:23
**sections** [1] - 57:8
**securing** [1] - 96:15
**Sedan** [1] - 32:19
**see** [69] - 13:25, 14:3,
15:21, 21:15, 21:18,
24:17, 27:17, 27:25,
33:11, 34:1, 34:2,
41:8, 43:5, 56:5,
57:24, 59:7, 59:14,
68:23, 78:15, 78:17,
79:6, 79:9, 79:11,
87:17, 88:21, 88:25,
90:11, 90:21, 90:25,
91:8, 91:24, 94:19,
94:20, 95:8, 99:2,
99:20, 101:2, 101:6,
101:21, 102:1,
107:6, 107:17,
110:4, 110:7,
111:14, 119:21,
120:11, 120:13,
121:22, 123:24,
124:17, 124:18,
125:3, 128:8, 133:4,
134:17, 134:18,
137:17, 144:11,
144:16, 145:4,
150:19, 150:21,
151:13, 152:9,
155:14, 156:25,
157:1
**seeing** [1] - 78:16
**seek** [2] - 92:9, 96:13
**seem** [1] - 72:16
**semester** [1] - 67:25
**send** [4] - 48:15,
110:1, 110:17, 114:8
**sensitivity** [1] - 29:23
**sent** [9] - 18:18, 48:15,
56:11, 56:17, 90:24,
102:11, 108:21,
128:14, 150:14
**sentence** [1] - 109:12
**separate** [3] - 20:14,
43:7
**September** [8] - 16:6,
24:18, 24:21, 24:24,
25:9, 25:13, 25:23,
60:18
**sequence** [1] - 148:2
**series** [1] - 30:4,
51:22, 95:15
**seriousness** [1] -
107:21
**services** [12] - 117:3,
117:8, 117:15,
125:7, 132:12,
133:5, 133:6,
137:19, 137:21,

137:22, 138:13,
144:14
**serving** [1] - 66:24
**SESSION** [1] - 1:8
**Session** [1] - 160:12
**set** [8] - 29:1, 29:8,
43:12, 92:7, 94:13,
94:14, 116:3, 156:16
**sets** [2] - 68:18, 70:19
**setting** [3] - 69:21,
143:7, 155:23
**settle** [1] - 111:14
**seven** [4] - 9:19, 14:1,
14:2, 157:21
**several** [4] - 8:4,
24:18, 125:5, 155:16
**severe** [1] - 54:16
**sex** [5] - 49:14, 49:15,
50:3, 51:10
**sexual** [3] - 44:17,
48:21, 131:7
**sexually** [5] - 44:22,
63:7, 63:12, 63:25,
64:6
**shadow** [2] - 126:1,
132:10
**shadowing** [4] -
125:5, 125:7,
125:11, 144:13
**share** [2] - 116:12,
117:24
**shared** [1] - 131:16
**shirt** [1] - 49:5
**shoes** [1] - 48:11
**short** [2] - 30:1, 110:6
**shorten** [1] - 12:15
**shorthand** [2] - 161:5,
161:12
**shortly** [4] - 40:21,
40:22, 46:18, 69:23
**show** [7] - 21:21,
60:23, 100:1, 118:2,
122:16, 149:8,
151:21
**showed** [11] - 31:13,
31:15, 31:17, 32:6,
32:11, 34:6, 34:7,
60:23, 66:19, 118:9,
126:11
**showing** [2] - 31:19,
121:12
**shown** [6] - 34:4,
40:11, 54:24, 54:25,
55:1, 63:2
**shows** [1] - 144:11
**side** [6] - 10:7, 29:17,
31:15, 34:9, 36:9,
36:24
**Side** [4] - 31:7, 35:21,
68:10, 128:25

**sidebar** [1] - 68:9
**sidebars** [1] - 6:15
**sided** [1] - 119:17
**sides** [1] - 10:19
**signed** [2] - 69:6,
91:22
**similar** [1] - 6:2
**simple** [3] - 71:12,
76:1
**simpler** [1] - 68:24
**simply** [4] - 52:5,
57:22, 72:23, 77:19
**single** [6] - 24:22,
25:3, 25:5, 25:9,
25:13, 101:11
**single-spaced** [1] -
101:11
**SIP** [1] - 88:6
**situation** [4] - 102:21,
111:8, 112:5, 126:20
**situations** [2] - 111:7,
140:2
**six** [2] - 9:19, 29:14
**slide** [1] - 112:13
**slit** [1] - 49:13
**slow** [1] - 70:15
**slut** [1] - 50:4
**small** [1] - 157:18
**smaller** [2] - 157:19
**social** [4] - 12:24,
111:11, 133:13,
157:23
**socialize** [1] - 111:24
**solution** [1] - 39:9
**someone** [5] - 8:13,
9:12, 19:16, 116:21,
126:12
**sometime** [2] -
127:17, 142:19
**sometimes** [4] - 41:7,
49:3, 56:13, 77:12
**Sona** [1] - 2:17
**soon** [1] - 131:22
**sorry** [26] - 11:13,
11:15, 24:7, 28:17,
35:13, 39:23, 45:13,
53:10, 54:1, 60:4,
63:20, 65:4, 79:9,
84:15, 92:19, 93:6,
99:5, 99:14, 106:20,
124:3, 125:22,
128:17, 132:19,
135:16, 136:8,
151:11
**sort** [4] - 8:12, 11:19,
36:7, 131:4
**sounds** [6] - 16:11,
18:17, 20:5, 25:11,
25:15, 55:21
**Southeastern** [1] -

83:24
**space** [1] - 74:19
**spaced** [6] - 24:22,
25:3, 25:6, 25:9,
25:14, 101:11
**Spanish** [1] - 62:13
**speaking** [2] - 20:10,
109:12
**special** [5] - 75:12,
75:14, 137:20,
137:22, 157:16
**specialized** [2] -
124:19, 157:13
**specific** [5] - 37:4,
51:1, 51:4, 57:8,
139:16
**specifically** [3] - 22:1,
22:16, 69:4
**spelled** [1] - 17:19
**spend** [1] - 11:12
**spent** [5] - 42:4, 44:7,
64:11, 86:10
**spring** [1] - 50:10
**Square** [1] - 3:13
**srewari@huntonak.**
**com** [1] - 2:19
**SRO** [3] - 132:25,
141:4, 144:12
**SRO's** [1] - 141:9
**Stacy's** [1] - 21:21
**staff** [2] - 140:21,
142:1
**stamp** [1] - 97:12
**stand** [7] - 9:10, 9:23,
11:4, 13:2, 35:24,
72:19, 159:6
**start** [10] - 37:15,
37:24, 52:16, 83:18,
86:21, 93:21, 96:3,
102:5, 102:6, 136:8
**started** [8] - 48:22,
49:12, 52:17, 66:12,
78:16, 120:6,
157:10, 159:10
**starting** [1] - 61:20
**starts** [5] - 51:5,
101:2, 138:24,
152:16, 156:13
**state** [3] - 113:6,
122:9, 122:12
**statement** [13] - 21:1,
21:5, 21:7, 54:25,
55:3, 55:8, 55:12,
55:13, 55:20, 55:23,
71:20, 120:2, 132:6
**statements** [4] -
118:2, 139:20,
140:1, 140:9
**STATES** [2] - 1:1, 1:12
**States** [7] - 3:13, 6:5,

6:6, 6:8, 66:24, 70:3, 84:22
**states** [1] - 58:17
**stationed** [1] - 132:25
**stay** [5] - 12:24, 75:25, 123:20, 124:6, 124:7
**stayed** [2] - 20:7, 77:20
**staying** [1] - 123:15
**step** [7] - 19:12, 56:10, 56:11, 79:25, 86:6, 130:12, 158:25
**steps** [13] - 73:22, 99:18, 99:22, 103:9, 116:6, 116:14, 117:21, 118:9, 125:3, 142:25, 143:9, 146:8
**sticker** [1] - 33:9
**sticky** [1] - 36:4
**still** [13] - 7:24, 7:25, 8:25, 9:1, 40:16, 41:2, 49:13, 54:19, 57:12, 65:2, 133:15, 153:25, 155:24
**stipulation** [1] - 146:18
**Stone** [1] - 85:22
**stop** [13] - 5:17, 5:20, 21:14, 21:18, 41:15, 48:5, 49:16, 49:18, 49:22, 50:1, 104:19, 130:13
**stopped** [4] - 21:20, 87:15, 91:5, 104:17
**strategically** [1] - 125:8
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**stricken** [1] - 38:15
**strong** [2] - 9:16, 157:13
**structures** [4] - 127:6, 134:18, 155:16, 158:3
**struggling** [1] - 46:6
**student** [48] - 21:5, 67:17, 67:22, 67:23, 94:24, 103:24, 103:25, 105:1, 105:3, 110:3, 110:6, 110:16, 110:22, 111:8, 111:15, 114:16, 116:7, 116:10, 117:3, 117:8, 117:15, 124:6, 125:6, 125:23, 126:17, 126:23, 126:25, 127:6, 131:8, 132:8,

132:12, 132:17, 136:17, 136:21, 136:23, 136:24, 138:19, 138:21, 139:9, 140:6, 141:20, 144:12, 144:14, 144:15, 151:2, 151:12, 157:11, 157:19
**student's** [1] - 126:16
**students** [32] - 61:18, 87:5, 87:11, 88:10, 104:18, 105:11, 110:1, 110:23, 111:1, 111:11, 111:20, 111:24, 111:25, 113:5, 113:8, 115:2, 117:25, 118:1, 118:2, 118:5, 118:10, 125:12, 126:2, 126:14, 127:10, 127:11, 133:2, 140:8, 152:12, 153:15, 157:17
**students'** [1] - 139:25
**stuff** [2] - 39:11, 39:19
**subject** [7] - 6:15, 19:21, 77:16, 91:4, 94:2, 108:14, 159:2
**submission** [1] - 149:4
**submit** [3] - 65:12, 65:17, 66:6
**subparts** [1] - 16:25
**subscribed** [1] - 161:15
**subsequent** [1] - 120:12
**successful** [2] - 88:10, 105:5
**sue** [1] - 68:19
**Sue** [1] - 90:5
**suffer** [3] - 54:4, 54:7, 54:19
**suffered** [2] - 6:3, 52:8
**suggest** [2] - 129:15, 129:16
**suggested** [2] - 33:2, 72:15
**suggesting** [2] - 69:8, 73:12
**suggests** [2] - 71:20, 73:10
**suit** [6] - 62:10, 68:21, 70:20, 76:11, 76:15, 79:5
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:7,

3:10
**summarizing** [1] - 141:22
**summer** [8] - 37:15, 37:25, 38:6, 50:10, 64:22, 64:24, 65:13, 67:19
**super** [1] - 35:24
**Superintendent** [1] - 128:15
**superintendent** [29] - 82:3, 82:21, 82:23, 83:7, 83:15, 83:19, 84:1, 84:20, 84:24, 84:25, 85:1, 85:3, 85:5, 85:6, 85:7, 85:8, 85:10, 85:15, 86:11, 88:8, 89:8, 90:4, 97:4, 98:20, 103:17, 115:1, 128:15, 134:16
**supervise** [1] - 83:8
**supervised** [3] - 85:21, 85:25
**supervising** [1] - 84:13
**supervision** [2] - 86:10, 134:20
**supplemental** [2] - 147:22, 147:24
**support** [22] - 86:5, 94:23, 105:3, 105:8, 110:15, 111:4, 111:10, 111:16, 112:3, 116:7, 125:17, 125:24, 126:22, 132:8, 143:1, 143:7, 143:8, 144:14, 150:17, 157:10, 157:14, 158:4
**supporting** [3] - 83:17, 85:10, 110:7
**supports** [1] - 125:15
**suppose** [1] - 16:10
**supposed** [4] - 39:8, 48:7, 48:9, 72:6
**supposedly** [1] - 99:19
**supposition** [1] - 146:7
**surprised** [3] - 32:3, 110:4, 132:5
**surrounding** [1] - 25:19
**sustained** [3] - 38:14, 126:10, 153:18
**sweater** [1] - 14:9, 16:2
**switch** [1] - 54:23

**sworn** [2] - 11:6, 81:11
**Sybil** [1] - 13:12
**symbol** [3] - 34:20, 34:21
**system** [15] - 70:15, 82:7, 82:16, 83:10, 103:18, 110:8, 110:17, 110:21, 133:10, 138:4, 138:20, 141:13, 157:6, 157:16, 158:8
**systems** [1] - 145:16

## T

**T.B** [1] - 3:6
**tab** [2] - 118:15, 120:20
**TABLE** [1] - 4:1
**tabs** [4] - 88:18, 88:19, 88:23, 128:8
**talks** [3] - 141:1, 141:4, 152:24
**T▮▮▮** [3] - 13:13, 93:10, 93:24
**tape** [1] - 161:13
**T▮▮▮** [1] - 13:14
**tax** [1] - 66:10
**Taylor** [4] - 42:5, 43:6, 43:21
**teacher** [9] - 61:8, 62:7, 62:12, 62:13, 62:23, 125:15, 126:16, 157:19, 157:20
**teacher-student** [1] - 157:19
**teachers** [21] - 60:10, 60:12, 60:14, 60:16, 60:17, 60:24, 61:5, 62:9, 62:18, 85:12, 87:2, 105:11, 110:1, 111:1, 111:12, 111:25, 113:7, 125:15, 134:19, 144:13
**teaching** [1] - 85:12
**team** [3] - 99:19, 138:5, 159:23
**tech** [1] - 34:16
**telephone** [1] - 66:3
**temporary** [1] - 125:16
**ten** [5] - 7:3, 25:3, 25:9, 107:6, 154:25
**tend** [2] - 6:4, 96:4
**Tenth** [1] - 3:14
**terminated** [1] - 27:8
**terms** [16] - 7:18, 21:24, 96:15,

101:14, 101:23, 101:24, 102:7, 104:14, 116:14, 120:24, 122:7, 122:10, 122:16, 126:5, 133:14, 140:14
**terrible** [1] - 62:15
**T▮▮▮** [22] - 13:12, 20:2, 20:9, 20:10, 20:11, 20:13, 20:15, 20:21, 20:22, 21:2, 21:9, 21:12, 21:23, 22:3, 22:7, 22:15, 22:20, 22:24, 23:5, 23:8, 117:12, 150:17
**test** [1] - 81:19
**testified** [7] - 14:4, 23:14, 26:9, 27:25, 36:18, 37:2, 77:21
**testify** [2] - 31:22, 77:16
**testifying** [1] - 72:21
**testimony** [19] - 5:12, 5:20, 13:3, 23:5, 26:12, 26:13, 28:5, 28:9, 28:10, 28:15, 29:1, 37:5, 38:15, 43:16, 50:18, 55:5, 63:2, 143:13, 161:6
**testing** [2] - 81:20
**text** [1] - 42:24
**thanking** [1] - 150:16
**THE** [248] - 1:1, 1:11, 3:5, 5:1, 5:3, 7:15, 8:10, 8:20, 9:2, 9:12, 10:6, 10:12, 10:21, 10:24, 11:2, 11:5, 11:8, 11:11, 13:9, 13:10, 13:21, 14:10, 14:11, 14:13, 14:15, 14:16, 15:6, 15:21, 15:23, 16:22, 16:24, 17:3, 17:5, 17:9, 17:14, 24:6, 24:7, 26:5, 26:7, 26:11, 26:17, 27:21, 27:22, 28:21, 28:24, 29:5, 29:6, 29:9, 31:8, 31:14, 31:21, 31:24, 32:2, 32:8, 32:12, 32:16, 32:24, 33:2, 33:11, 33:23, 35:16, 35:20, 36:2, 36:15, 36:22, 37:6, 37:19, 37:23, 38:3, 38:14, 38:17, 42:17, 42:19, 42:21, 45:12, 45:13, 47:21, 53:9, 53:11, 54:10, 56:22, 57:16,

57:21, 58:14, 59:5, 59:18, 61:19, 61:23, 63:15, 63:19, 63:20, 66:14, 66:15, 67:7, 68:7, 68:23, 69:1, 69:8, 69:14, 69:18, 70:4, 70:11, 70:17, 70:25, 71:11, 71:17, 71:23, 71:25, 72:11, 72:14, 73:5, 73:16, 73:19, 74:4, 74:7, 74:13, 74:16, 74:19, 75:5, 75:8, 75:9, 75:18, 76:3, 76:5, 76:7, 76:10, 76:13, 76:16, 76:19, 76:21, 76:24, 77:3, 77:5, 77:9, 77:11, 77:23, 78:4, 78:11, 79:8, 79:9, 79:20, 79:24, 79:25, 80:2, 80:8, 80:12, 80:17, 80:23, 81:10, 81:13, 81:20, 81:21, 89:13, 89:17, 91:16, 91:19, 93:16, 93:18, 95:22, 95:24, 99:2, 99:6, 99:11, 99:13, 99:16, 100:4, 100:9, 100:11, 100:20, 106:1, 106:9, 106:13, 107:25, 108:6, 108:19, 112:7, 112:9, 112:10, 112:11, 112:12, 112:15, 116:14, 116:16, 116:20, 116:24, 119:4, 119:11, 121:22, 122:4, 122:12, 122:18, 122:22, 122:24, 123:1, 125:19, 126:10, 128:24, 129:5, 129:8, 129:14, 129:18, 129:21, 129:24, 130:2, 130:5, 130:14, 130:16, 130:20, 130:23, 136:2, 136:3, 136:4, 137:8, 137:10, 143:17, 143:21, 144:24, 144:25, 145:11, 145:17, 145:19, 145:20, 145:21, 145:23, 146:1, 146:3, 146:21, 147:1, 147:13, 147:20, 148:14, 148:23, 149:10,

153:18, 154:20, 154:23, 155:1, 158:18, 158:25, 159:4, 159:9, 159:12, 159:14, 159:20, 160:3, 160:6, 160:8, 160:10
**themselves** [3] - 46:19, 118:7, 131:3
**therapeutic** [2] - 46:7, 133:5
**therapist** [11] - 44:22, 45:3, 45:8, 45:17, 46:4, 46:5, 46:10, 46:15, 48:16, 133:9, 133:23
**therapists** [2] - 44:9, 133:10
**therapy** [4] - 46:1, 47:15, 49:1, 133:14
**thereabout** [2] - 12:2, 12:7
**they've** [2] - 10:19, 75:15
**thinking** [3] - 125:16, 155:24, 157:9
**thinks** [1] - 36:13
**third** [13] - 25:24, 26:1, 26:9, 26:16, 26:19, 27:6, 27:11, 48:24, 107:9, 107:12, 107:17, 129:5, 134:1
**threatened** [3] - 20:25, 51:17, 52:5
**threatening** [1] - 49:12
**threats** [2] - 61:16, 61:18
**three** [16] - 24:21, 30:20, 30:22, 33:15, 60:13, 61:2, 62:18, 64:19, 68:18, 70:19, 78:18, 85:19, 85:20, 107:17, 117:7, 118:5
**three-and-a-half** [1] - 24:21
**three-page** [1] - 33:15
**throughout** [4] - 46:1, 49:1, 87:18
**throw** [1] - 48:5
**Thursday** [12] - 12:7, 12:12, 30:3, 44:4, 44:7, 56:24, 56:25, 64:12, 97:19, 98:2, 102:18, 152:16
**Tiffany** [2] - 61:7, 61:9
**timing** [1] - 138:17
**tinted** [5] - 30:7, 30:14, 30:15, 31:16, 34:7

**Title** [2] - 73:21, 146:9
**title** [1] - 100:19
**today** [13] - 9:22, 9:23, 10:14, 11:13, 12:1, 19:15, 71:9, 79:16, 87:23, 90:17, 96:13, 109:19, 158:20
**together** [5] - 51:6, 66:20, 113:23, 114:1, 161:13
**tomorrow** [1] - 12:1
**Tonia** [2] - 161:3, 161:21
**TONIA** [1] - 3:12
**took** [9] - 18:21, 49:5, 49:10, 99:18, 99:19, 116:7, 116:14, 143:10, 146:8
**top** [9] - 92:25, 107:13, 108:16, 123:14, 137:7, 137:12, 142:11, 152:7, 152:16
**topic** [1] - 23:13
**topics** [2] - 54:23, 63:1
**TORCHINSKY** [1] - 1:14
**total** [2] - 30:25, 31:1
**totally** [1] - 36:11
**touched** [2] - 58:20, 104:10
**touching** [1] - 20:23
**tough** [1] - 12:3
**towards** [9] - 44:4, 44:7, 78:24, 79:2, 79:4, 79:7, 112:14, 121:4, 131:7
**Toyota** [6] - 30:11, 32:18, 32:21, 33:18, 34:20
**tract** [1] - 52:11
**TRANSCRIPT** [1] - 1:11
**transcript** [2] - 10:3, 161:11
**transcripts** [1] - 7:16
**transitions** [2] - 86:25, 125:7
**transpired** [1] - 22:1
**trauma** [1] - 46:7
**travel** [2] - 12:8, 82:7
**travels** [1] - 11:22
**treated** [2] - 52:14, 105:11
**treatment** [2] - 52:22, 63:11
**trial** [1] - 9:11
**TRIAL** [2] - 1:11, 4:1
**Trial** [1] - 161:6

**tried** [3] - 8:5, 20:22, 148:5
**trip** [2] - 16:10, 16:12
**true** [2] - 70:10, 146:6
**trust** [5] - 11:11, 25:4, 25:5, 45:10, 134:14
**truth** [6] - 6:10, 74:5, 99:21, 100:1, 122:6, 122:16
**try** [10] - 10:16, 29:25, 41:13, 46:7, 57:19, 74:8, 81:17, 113:19, 120:15
**trying** [16] - 8:10, 11:14, 11:16, 15:18, 36:1, 41:20, 45:9, 46:3, 69:16, 71:6, 71:7, 81:2, 130:7, 136:9, 145:13, 154:24
**Tuesday** [2] - 12:11, 124:3
**turn** [9] - 29:21, 57:17, 80:7, 80:13, 81:1, 81:4, 81:5, 93:2, 108:2
**turns** [1] - 31:17
**twelve** [1] - 80:15
**twice** [1] - 47:1
**two** [25] - 24:24, 30:23, 30:24, 33:1, 33:16, 33:17, 47:9, 54:11, 65:24, 78:24, 91:21, 103:1, 103:2, 103:7, 103:14, 107:2, 112:25, 114:22, 119:17, 128:8, 141:22, 148:15, 156:3, 156:20
**two-sided** [1] - 119:17
**two-week** [1] - 78:24
**type** [1] - 74:7
**Typed** [1] - 139:23
**typed** [1] - 139:25
**types** [1] - 144:2
**typical** [2] - 49:2, 49:3
**typically** [2] - 110:21, 111:6
**typo** [1] - 152:18

**U**

**unannounced** [2] - 87:14, 134:17
**under** [15] - 10:21, 40:12, 41:24, 53:1, 53:2, 73:21, 86:10, 99:4, 110:20, 110:21, 119:20,

139:8, 139:9, 146:9, 150:12
**underlined** [1] - 50:3
**undermine** [2] - 6:4, 6:22
**understood** [2] - 8:5, 38:18, 52:22
**undertaking** [1] - 140:17
**undue** [1] - 6:3
**unfortunate** [1] - 75:25
**unfortunately** [5] - 24:20, 42:7, 52:19, 75:23, 96:11
**unfounded** [2] - 5:16, 5:23
**united** [1] - 3:13
**UNITED** [2] - 1:1, 1:12
**United** [6] - 6:5, 6:6, 6:8, 66:24, 70:2, 84:22
**University** [2] - 83:24, 84:5
**unless** [1] - 141:18
**unlike** [1] - 62:9
**unlocked** [1] - 39:11
**unwanted** [1] - 49:14
**up** [44] - 10:4, 10:7, 12:15, 12:22, 20:23, 29:8, 30:2, 31:12, 33:21, 34:14, 43:12, 46:6, 48:5, 49:8, 50:23, 68:8, 69:21, 72:2, 72:18, 72:20, 73:4, 75:18, 81:10, 81:21, 92:7, 94:14, 94:21, 95:1, 96:3, 106:12, 107:13, 114:15, 115:14, 116:3, 118:19, 118:21, 128:24, 133:22, 134:23, 135:4, 150:23, 151:21, 156:16
**upset** [1] - 41:23
**urgent** [3] - 106:23, 107:14, 107:19
**urinary** [2] - 52:11
**UTI** [1] - 54:16
**utilized** [1] - 46:6
**UTIs** [7] - 53:14, 53:15, 53:16, 53:21, 54:8, 54:14, 54:17

**V**

**VA** [3] - 3:7, 3:11, 3:14
**vaginally** [1] - 51:11
**vaguely** [1] - 16:16

variety [2] - 110:24, 133:12
Various [1] - 141:25
various [3] - 50:13, 60:6, 69:4
vehicle [1] - 33:9
verbally [3] - 21:8, 45:5, 68:3
verified [2] - 76:25
version [4] - 122:2, 130:4, 130:5, 142:9
versus [2] - 122:10, 161:7
video [1] - 66:1
view [3] - 34:13, 36:7, 99:4
violated [1] - 73:21
violent [1] - 51:13
Virginia [3] - 12:9, 12:10, 161:4
VIRGINIA [1] - 1:1
visit [5] - 87:17, 87:18, 97:6, 134:13, 134:17
visited [5] - 86:12, 86:17, 86:18, 86:21, 97:3
visiting [3] - 85:11, 86:10, 86:14
visits [7] - 87:13, 87:14, 88:2, 105:9, 105:10
vivid [1] - 16:6
VOGEL [1] - 1:14
voice [1] - 81:17
VOLUME [1] - 1:8
voluntarily [1] - 71:2
vulgar [1] - 104:16

**W**

walk [3] - 48:11, 116:6, 131:1
walking [1] - 36:3
wants [2] - 32:25, 148:8
warranted [1] - 138:13
Washington [5] - 1:16, 2:15, 2:18, 2:22, 3:2
waste [2] - 9:8, 37:3
watch [1] - 67:7
weapons [1] - 51:15
wearing [3] - 14:9, 14:18, 16:2
Weaver [7] - 18:9, 63:3, 63:10, 63:23, 64:5, 117:15, 150:17
Weaver's [1] - 63:5
wedded [1] - 159:21
Wednesday [3] - 12:2,

12:11, 153:21
week [16] - 11:19, 11:20, 11:24, 12:10, 13:18, 16:20, 18:11, 23:14, 54:22, 78:24, 96:20, 109:18, 120:9, 120:14, 120:17, 121:7
weekend [3] - 7:17, 10:19, 11:12
weeks [1] - 78:18
weight [3] - 32:24, 72:2, 75:19
welcome [2] - 89:23, 151:24
welcomed [1] - 75:17
welcoming [4] - 87:12, 88:11, 105:17, 105:25
well-being [2] - 142:24, 143:3
well-detailed [1] - 144:4
well-equipped [1] - 105:1
well-organized [1] - 87:12
well-run [1] - 113:7
Westfield [3] - 85:23, 96:24, 97:6
wet [1] - 11:17
whereof [1] - 161:15
whispering [2] - 35:24, 36:12
whole [7] - 15:14, 81:2, 90:16, 102:21, 129:4, 129:12, 129:15
whore [1] - 50:2
Wiehle [1] - 3:10
willing [5] - 124:21, 125:25, 134:16, 142:25, 143:8
windows [5] - 30:7, 30:14, 30:15, 31:16, 34:7
wish [2] - 28:12, 48:10
withdrew [1] - 27:6
WITNESS [25] - 13:10, 15:23, 17:14, 24:7, 27:22, 28:24, 29:5, 38:3, 45:13, 59:18, 63:20, 66:15, 78:4, 79:9, 79:24, 81:20, 91:19, 112:9, 112:11, 112:15, 116:14, 116:24, 136:3, 144:25, 145:20
witness [21] - 6:10,

10:17, 11:6, 77:15, 77:19, 80:4, 80:5, 80:6, 80:24, 80:25, 81:4, 81:7, 81:8, 81:11, 116:17, 116:18, 154:23, 159:6, 159:17, 159:23, 161:15
Witness [2] - 80:1, 81:12
witness's [2] - 6:7, 6:9
witnessed [1] - 105:10
WITNESSES [1] - 4:1
witnesses [4] - 7:22, 10:2, 29:18, 81:3
Women's [3] - 69:24, 75:3, 75:13
won [1] - 38:17
word [1] - 65:9
words [2] - 41:5, 131:5
worker [1] - 133:13
workers [2] - 111:11, 157:23
wrist [2] - 48:6, 49:13
write [10] - 11:23, 18:21, 18:25, 25:20, 45:24, 46:16, 88:8, 95:1, 95:9, 97:10
writes [3] - 94:21, 97:9, 120:1
writing [9] - 19:10, 19:13, 19:15, 25:2, 46:3, 48:24, 68:2, 94:21, 128:2
writings [1] - 46:3
written [12] - 44:9, 45:5, 55:12, 55:13, 55:23, 55:24, 118:2, 118:21, 123:25, 124:1, 139:20, 145:1
wrote [27] - 19:3, 21:1, 24:18, 24:21, 24:24, 25:1, 25:9, 25:13, 25:17, 25:19, 45:17, 46:10, 47:12, 47:14, 48:12, 48:19, 49:18, 50:9, 55:20, 96:10, 107:2, 128:3, 128:13, 136:10, 138:10, 140:9, 142:22

**Y**

y'all [1] - 159:1
year [13] - 47:1, 47:2, 64:20, 64:22, 65:3, 65:5, 67:11, 83:6, 86:15, 87:9, 87:25,

88:9, 138:14
years [13] - 45:22, 46:2, 52:25, 53:17, 66:25, 67:11, 74:2, 82:6, 82:15, 82:17, 82:25, 85:16, 154:9
yesterday [2] - 109:2, 129:3
Yesterday's [1] - 108:14
yourself [6] - 15:25, 25:17, 25:20, 46:3, 49:5, 120:23

**Z**

Zoll [1] - 2:1
zoom [2] - 89:22, 150:11
Zuluaga [14] - 4:5, 80:11, 81:9, 82:2, 82:3, 89:22, 96:18, 100:2, 100:13, 106:4, 108:11, 119:14, 122:7, 131:1
ZULUAGA [1] - 81:11