1

1          UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2

3    B.R.,                          :
                                    :
4              Plaintiff,           :   Civil Action
                                    :   No. 1:19-cv-917
5          v.                       :
                                    :
6    F.C.S.B., et al.,              :   April 2, 2024,
                                    :   10:31 a.m.
7                                   :
             Defendants.            :
8                                   :   VOLUME 11 - A.M. SESSION
     .............................  :
9                                   :

10

11        **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
        **BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
12          **UNITED STATES DISTRICT COURT JUDGE**

13   APPEARANCES:

14   For the Plaintiff:          **Jonathan Fahey, Esq.**
                                 HOLTZMAN VOGEL BARAN TORCHINSKY
15                               & JOSEFIAK, PLLC
                                 2300 N Street NW
16                               Suite 643a
                                 Washington, DC 20037
17                               202-536-1702
                                 Email: Jfahey@holtzmanvogel.com
18
                                 **Alison Anderson, Esq.**
19                               BOIES SCHILLER FLEXNER, LLP
                                 2029-Century Park East
20                               Suite 1520
                                 Los Angeles, CA 90067
21                               213-995-5720
                                 Email: Alanderson@bsfllp.com
22

23

24

25

2

```
 1  APPEARANCES:  (Cont.)
                                Brittany Zoll, Esq.
 2  For the Plaintiff:          BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 3                              Suite 2800
                                Miami, FL 33131
 4                              610-804-1787
                                Email: Britzoll@gmail.com
 5
                                Andrew Brenner, Esq.
 6                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 7                              Suite 2800
                                Miami, FL 33131
 8                              305-539-8400
                                Email: Abrenner@bsfllp.com
 9
                                Robert Keefe, Esq.
10                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
11                              Suite 2800
                                Miami, FL 33131
12                              850-585-3414
                                Email: Rkeefe@bsfllp.com
13
    For Defendant F.C.S.B.:     Ryan Bates, Esq.
14                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Avenue, NW
15                              Washington, DC 20037
                                202-955-1596
16                              Email: Rbates@hunton.com

17                              Sona Rewari, Esq.
                                HUNTON ANDREWS KURTH, LLP
18                              2200 Pennsylvania Avenue, NW
                                Washington, DC 20037
19                              202-955-1974
                                Email: Srewari@huntonak.com
20
                                Scott W. Burton, Esq.
21                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Ave NW
22                              Washington, DC 20037
                                202-955-1664
23                              Email: Burtons@huntonak.com

24

25
```

3

APPEARANCES:  (Cont.)


For Defendant F.C.S.B.:        **Kevin Elliker, Esq.**
                              HUNTON ANDREWS KURTH, LLP
                              2200 Pennsylvania Avenue, NW
                              Washington, DC 20037
                              804-788-8200
                              Email: Kelliker@huntonak.com


For the Defendants:           **Michael E. Kinney, Esq.**
(S.T., A.F., P.A.H.,          THE LAW OFFICE OF MICHAEL E.
T.B., B.H., M.P.F., M.C.,     KINNEY, PLC.
F.T., J.F.)                   1801 Robert Fulton Drive
                              Suite 120
                              Reston, VA 20191
                              Email:  Mk@kinneyesq.com

For the Defendant J.O.:       **Bruce Blanchard, Esq.**
                              ODIN, FELDMAN & PITTLEMAN, PC.
                              1775 Wiehle Avenue
                              Suite 400
                              Reston, VA 20190
                              Email:  Bruce.blanchard@ofplaw.com

Official Court Reporter:      MS. TONIA M. HARRIS, RPR
                              United States District Court
                              401 Courthouse Square
                              Tenth Floor
                              Alexandria, VA 22314

4

1                           TABLE OF CONTENTS
                            TRIAL WITNESSES
2

On behalf of the Defendants:
3

Fabio Zuluago
4

        Cross-examination by Mr. Brenner................. 21
5        Cross-examination by Mr. Kinney.................. 84
        Redirect examination by Ms. Rewari.............. 86
6

                              EXHIBITS
7

On behalf of the Plaintiff:
8                                                    Admitted

9    Defendants' Number 169............................. 71/73

10   On behalf of the Defendants:
                                                     Admitted
11

Number 156......................................... 88
12

                              MISCELLANY
13

Preliminary matters................................ 05
14   Certificate of Court Reporter...................... 126

15   After review of the record and upon agreement of counsel and
     deputy clerk, all final exhibits can be found on CME at Docket
16   #975.

17

18

19

20

21

22

23

24

25

EASTERN DISTRICT OF VIRGINIA

5

1          THE COURT:  Good morning.

2          (Good morning responses.)

3          THE COURT:  We're back on the record in the case of

4    B.R. versus Fairfax County School Board and others.  I

5    apologize that judge was late this morning.  There was a

6    terrible accident on 495, had all five lanes blocked at one

7    point, you couldn't move.  And so it's unfortunate.  It looked

8    like it was a pretty bad accident.  There was a box truck and

9    a tractor-trailer.  The box truck was demolished.  The

10   tractor-trailer was a hundred yards behind the box truck, and

11   state police were doing a good job.  They had funneled

12   everybody over to the right.  The only reason I got here is

13   because I guessed right as to which way I should go.  You

14   know, when you see an accident, you try to guess which way you

15   should go.  And I guessed right, so I was able to get here a

16   little earlier than the jurors.

17          I was told that all the jurors are now present, and

18   so -- and so that we're ready to go.

19          A couple of little things that we need to take care

20   of.  Mr. Blanchard's associate has become a member of the

21   Eastern District of Virginia this morning, and Mr. Blanchard

22   wants permission to allow her to sit at counsel table.  She

23   was not identified to the jurors before we started.  I'll do

24   something quickly with that.  I don't think there's going to

25   be a problem.  I understand there's no objection by the

———————————— B. R. v. F. C. S. B. ————————————

6

1    plaintiff.

2            MR. BRENNER:  That's correct, Your Honor.

3            THE COURT:  All right.

4            MR. BLANCHARD:  My colleague, Angela London, she

5    actually was here once before in the -- in the courtroom to

6    talk to me about something.  She does not recognize any of the

7    jurors.  But as I say, Your Honor, if that -- if it turns out

8    to be an issue, I don't want it to --

9            THE COURT:  Yeah.  As I said, what we'll do is we'll

10   recognize her, have her stand up.  I'll ask the jurors if they

11   know her.  They'll say they don't, and we'll be fine.

12           MR. BLANCHARD:  Thank you.

13           THE COURT:  Very good.

14           Another thing, as I got a note from one of the

15   jurors, I'm going to read into the record (As read):  "Dear

16   Judge Alston, can we please start at 10:00 on Wednesday,

17   April 17.  I'm a school principal, and we have our staff

18   picture that morning at 8:20.  This is my last year at the

19   school, and I would like to be present for the picture.  The

20   picture was scheduled with the company in July of 2023, so

21   this -- it is not able to be rescheduled.  Thank you for your

22   consideration.  Juror No. 12."

23           I'm hopeful that we will be close to the end by

24   April 17, but if we are not, I'm of a mind to accommodate her

25   on that request.  That's a special time.  You can't get it

B.R. v. F.C.S.B.

7

1    back.  So we'll work with her if we have to.

2           Does anyone have any problem with that approach?

3           MR. BRENNER:  No objection from the plaintiff.

4           MR. ELLIKER:  No, Your Honor.

5           THE COURT:  Very good.

6           I understand that there are a couple of other things

7    that we maybe can do later with regard to stipulated medical

8    records and another issue that doesn't necessarily fall within

9    that.  We have breaks that we have scheduled during the course

10   of litigation where we can take up those issues.

11          Are we ready to bring the jury in?

12          MS. ANDERSON:  Your Honor, we just had one issue on

13   Rustioni.  We can wait until right before her, but she will be

14   the next witness.

15          THE COURT:  Okay.  Let's go ahead and take that up

16   now, then.

17          MS. ANDERSON:  Okay.  I just wanted to be

18   transparent and share with the Court that we are going to --

19   while her report discusses both forensic interviewing and the

20   disclosure process for childhood victims of sexual abuse and

21   then does opinions about Chambers's interview, we are going to

22   not go into the Chambers's interview and just talk about the

23   disclosure process, as, obviously, there was a lot of cross

24   related to that.

25          THE COURT:  All right.

—————B.R. v. F.C.S.B.—————

8

1              MS. ANDERSON:  Thank you, Your Honor.

2              MR. ELLIKER:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. ELLIKER:  Kevin Elliker.  I agree, in general

5     terms, with what Ms. Anderson said about what's in

6     Ms. Rustioni's report, but I disagree that there are distinct

7     opinions that Ms. Rustioni offered as an expert in the case.

8     The sole purpose that she was retained for and is offered for

9     in the case was to comment on Detective Chambers's interview

10    of the plaintiff.

11             The expert report is only five pages long.  There's

12    one -- there's one short section that is about -- that gives

13    background on forensic child interviewing.  But even if you

14    look at that, it's clear it's talking about the importance

15    of that -- of that in the context of someone who's conducting

16    the interview.  The interviewer in the -- I'm sorry, let me

17    back up.

18             Ms. Anderson said "the disclosure process."  The --

19    it discusses the disclosure process in the context of what an

20    interviewer needs to understand and be thinking about as

21    they're doing the interview.  And I think unless there be any

22    doubt in her deposition, Ms. Rustioni was asked a question:

23    "For purposes of your expert report in this case, what were

24    you asked to provide an expert opinion on?"

25             Her answer was:  "My thoughts about the interview

B.R. v. F.C.S.B.

9

1  and how the interview was conducted."

2          The next question was:  "So are your opinions that

3  you're offering in this case limited to your opinions

4  regarding whether Detective Chambers's conducted a proper

5  forensic interview of the alleged child sex abuse victim?"

6          Answer:  "Yes."

7          The expert herself said that's what her opinion is

8  limited to.

9          Now -- and the Court, obviously, ordered in pretrial

10  motions at ECF-837:  Experts are confined to the opinions that

11  are contained within the four corners of the report.

12          We don't take issue with Ms. Rustioni taking the

13  stand and talking about her critique, I guess for lack of a

14  better term, of Detective Chambers's interview.  And this is

15  not -- this is not us trying to do a backdoor, trying to, you

16  know, open the door that is clearly not opened from the

17  Court's ruling about credibility determinations and the

18  factual determination of the police.

19          What -- as -- as the Court knows, during the

20  plaintiff's cross-examination, we used statements that she

21  made in her police interview as prior inconsistent statements.

22          And we also, during our case, would like to play the

23  interview for the jury so that they can actually see the

24  demeanor and the statements and all of those things that were

25  said when --

B.R. v. F.C.S.B.

10

1          THE COURT:  And -- and you're talking about doing

2     that in your case in chief?

3          MR. ELLIKER:  Yes.  And we think it would be,

4     frankly, fair to the plaintiff, because they have an expert

5     who's specifically opining on what they think is important to

6     understand about that interview, we think it's, frankly, fair

7     for them to have that expert to offer the opinion from the

8     report, which is her critique of whether Detective Chambers

9     conducted a proper forensic interview of the child.

10         The suggestion that we will excise out just this one

11    little portion that's sort of generically about the disclosure

12    process is not fair to what this expert actually was brought

13    into the case about, what she wrote her report about, and what

14    she was deposed about.

15         THE COURT:  Well, let me ask you this, and maybe I'm

16    just being a little bit too pragmatic here, but wouldn't it

17    be, I guess, more understandable for the fact-finder if we

18    have the expert opine as to the issues that she can opine to,

19    make her evaluation as to, you know, how the process worked

20    and all of that, and then actually play the interview at that

21    point?

22         MR. ELLIKER:  We -- we have no issue with that, Your

23    Honor.  And if -- the only -- we think that there's a

24    completeness issue, right, that the whole video needs to be

25    played to understand the whole context of it, and it's a

B.R. v. F.C.S.B.

11

1     90-minute video.

2              THE COURT:  Ms. Anderson.

3              MS. ANDERSON:  So as -- I appreciate Mr. Elliker

4     looking out for our interest, but I -- your order, as he read

5     correctly, said "within the four corners of the report."  And

6     in her report, there is a section that is literally titled

7     "Disclosure Process for Victims of Childhood Sexual Assault,"

8     and we think that it's much like Nancy, we're going to not get

9     into her actual fact-finding -- looking at the facts of the

10    case and comparing and that type of thing.  She's just going

11    to teach about the disclosure process.  And we think we have

12    the right and ability to do that, given the Court's rulings

13    that we're trying not to make the police the center stage of

14    this issue, but we do think that the disclosure process is an

15    important thing for jurors to understand.

16             THE COURT:  Well, the risk that we run, and you've

17    heard me say it before, is that I don't want this case to turn

18    into whether or not we should assess the credibility

19    determinations of the police and what they did and then invade

20    the province of the jury and what they need to decide in this

21    case.

22             And I do have some grave concerns that if we have

23    someone get on the stand and basically opine that the police

24    didn't do things right and the basis for their determination,

25    it's not supported by sociology, for lack of a better way of

B.R. v. F.C.S.B.

12

1  putting it, then, you know, we -- we open Pandora's box to all

2  kinds of things potentially being able to be brought in, such

3  as the credibility determinations of the police.  So --

4          MS. ANDERSON:  Well, and that's exactly what we're

5  trying not to do, Your Honor, is follow -- follow your

6  guidance and --

7          THE COURT:  But my point is -- but my point is is

8  that you really can't have it both ways.  You can't have

9  someone come in and essentially criticize the process and then

10 not have -- have the other side the opportunity to actually

11 say this is why we did what we did.

12         MS. ANDERSON:  So she's not going to criticize the

13 process at all.  In fact, we're not even going to talk about

14 the process.  What we're going to talk about is is the

15 disclosure process for sexual -- victims of sexual assault

16 that are children.  And what that includes, and just to give

17 you a high-level preview, is -- is that it doesn't always come

18 out all at once.  It's often delayed.  Sometimes portions come

19 out, and other portions come out later that this is sort of

20 typical or common in --

21         THE COURT:  I'm aware -- I'm aware of that.

22         MS. ANDERSON:  Yeah, so we're -- yeah, so we're

23 not -- we're not even going near the interview at all, is our

24 plan.

25         THE COURT:  Okay.  Well, all I can say at this point

—B.R. v. F.C.S.B.—

13

1   is I'll listen very closely to the questions that are asked,

2   and if you cross the line, then you have to bear the

3   consequences.  You know I respect you as a counselor and

4   respect the way that you handle your business, so I'm -- I'm

5   going to leave you to your best judgment.

6           MS. ANDERSON:  Okay.  And then I'm just going to --

7   just for the record, I think we object to playing of the

8   interview in general, and that's why we're staying completely

9   away from the interview and we're just talking about how

10  victims of childhood abuse, which was relevant to the six

11  hours of cross-exam that was all about what she said to whom

12  and when, her counselors, her this, her that, and so I think

13  it's important for the jury to hear that -- that --

14          THE COURT:  Well, I don't like to invite myself to

15  have additional work.  Why don't you give me the tape, and

16  I'll listen to it.

17          MR. ELLIKER:  Your Honor, we do have a transcript.

18  If you'd like to review the transcript --

19          THE COURT:  Yeah, that would be fine.

20          MR. ELLIKER:  -- that may be easier.

21          And if I could just make two more points for the

22  record.

23          THE COURT:  Sure.

24          MR. ELLIKER:  The first is under Rule 705, under --

25  under Rule 705, the opponent of an expert witness is entitled

B.R. v. F.C.S.B.

14

1    to cross-examine that expert on --

2            THE COURT:  Absolutely.

3            MR. ELLIKER:  -- the factual basis of the opinions.

4    And in her expert report, she says the only two things she

5    reviewed are the second amended complaint and the interview

6    video.

7            THE COURT:  All right.

8            MR. ELLIKER:  And then -- I forgot my second point,

9    Judge.

10           THE COURT:  Well, I'm sure you'll --

11           MR. ELLIKER:  I'll spend some time --

12           THE COURT:  I'm sure you'll remember it.  But --

13           MR. ELLIKER:  Maybe I was just going to suggest that

14   reviewing the transcript might reveal that -- I remember it.

15   Sorry, Judge.

16           She is not offered as an expert in the disclosure

17   process generally in terms of offering an opinion as to why

18   the plaintiff waited until March --

19           THE COURT:  She can -- she can testify about the

20   science, but she can't focus specifically or with

21   particularity on B.R.

22           MR. ELLIKER:  Well, and her -- her opinion is about

23   why it is that a forensic interviewer needs to understand that

24   in the interview room, there may not be a full disclosure at

25   that moment, not about whether there should have been a

B.R. v. F.C.S.B.

15

1    disclosure up until that point.

2            THE COURT:  And then I think you can probably cover

3    a lot of that on cross-examination.  So let's see how it plays

4    out --

5            MR. ELLIKER:  Okay.

6            THE COURT:  -- and then we'll go from there.

7            MS. ANDERSON:  Your Honor, just so that I'm clear,

8    if I don't get into interviewing or the interview at all, you

9    know, it would be our position that getting into the interview

10   with her would be beyond the scope.  I mean, she's our expert.

11   We get to call her for what we want.

12           THE COURT:  I agree, but as we've seen in this case,

13   people like to volunteer a whole lot of information that is

14   not the subject of what we have decided as the professionals

15   in this case.  People like to sort of backdoor things because

16   they think it is going to be helpful to their case or the

17   other.  So, we have to listen to what she says.  If she gets

18   off the track, so to speak -- and I'm not suggesting that she

19   does --

20           MS. ANDERSON:  On direct.

21           THE COURT:  -- on direct.  If she gets off the

22   track, then the Court has several options available to it.

23           MS. ANDERSON:  Understood.  Thank you, Your Honor.

24           THE COURT:  All right.  Very good.

25           MR. ELLIKER:  And we would just let the record

B.R. v. F.C.S.B.

16

1   reflect our objection as to restricting the scope of our

2   cross-examination under Rule 705.

3            THE COURT:  Well, I haven't done that, but --

4            MR. ELLIKER:  Well, I just don't want to -- I can't

5   object to questions she doesn't ask, I suppose.

6            THE COURT:  I understand, but I can't rule on things

7   that haven't been resolved.

8            MR. ELLIKER:  Understood.  I'm sure you're haven't,

9   Your Honor.

10           MR. BRENNER:  And, Judge, I sent an email -- I hope

11  that was okay -- to Ms. Barry last night.

12           THE COURT:  Yes.  Hold up.  And I'm sure all counsel

13  know this, but at the end of the day, my chief of staff,

14  Ms. Barry, will ask counselors, you know, what is their plan

15  for the witnesses for the day so that we can prepare.  And as

16  far as I've been able to discern the communication between

17  counsel for the plaintiff and Ms. Barry, I have been -- notice

18  to the other side -- you were aware that they were having

19  these conversations.  And, again, I think that that just goes

20  to our ability to administer the case, and I would encourage

21  that to continue to happen.

22           MR. BRENNER:  Yeah, and I just -- the second issue I

23  had, you had taken it under advisement at the end of the

24  day --

25           THE COURT:  And I hear that you've abandoned that.

B.R. v. F.C.S.B.

17

1          MR. BRENNER:  Yeah, so I was trying to save everyone

2     work for the night instead of coming this morning and saying

3     that I --

4          THE COURT:  We were working on other things.

5          MR. BRENNER:  Okay.  All right.  Well, I just want

6     to make sure -- honestly, Judge, I just want to make sure that

7     type of communication is appropriate.  Obviously have to

8     copy --

9          THE COURT:  That is fine.  As I said, we -- my team

10    and I were working on other issues that didn't come up.  So,

11    thank goodness.

12         MR. BRENNER:  Okay.

13         THE COURT:  All right.  Thank you, Ms. Tinsley.

14         (Jury present.)

15         THE COURT:  You may be seated.  Good morning, ladies

16    and gentlemen.

17         (Good morning responses.)

18         THE COURT:  I see that some of you were caught up in

19    that same accident on 495 that I was caught up in.  I will

20    tell you that as I drove by the accident, finally, I looked

21    over there to make sure that none of you were involved because

22    I was going to pick you up and bring you over here.  But we're

23    thankful for that.

24         We're starting a little late, but we were able to

25    take advantage of the time just a bit to resolve some of the

─────────B.R. v. F.C.S.B.─────────

18

1    issues that we need to resolve in the case.

2            Also, I had a note from one of you regarding a date

3    in the future.  That will be accommodated.  Hopefully, we

4    won't be there at that point, but it will be accommodated.

5            (Witness seated.)

6            THE COURT:  I've gotten another note from the jury.

7            (A pause in the proceedings.)

8            THE COURT:  Okay.  Tinsley, let's take the jury out.

9    Let's take them back out.  Take them back out.

10           (Jury excused.)

11           THE COURT:  You may be seated.

12           I got another note from the jury.  I thought it was

13   best that we discuss it without the jury.  It says, "Dear

14   Judge Rossie D. Alston, I would like to request time off to

15   celebrate EID with my family on April 10th, next Wednesday.

16   As this is an important religious holiday for me, I would be

17   deeply grateful if you could accommodate.  I have a

18   15-month-old son where we had intended to open gifts and go to

19   either the zoo and/or the park to celebrate together.  The

20   celebration is observed by a month of fasting, which I'm sure

21   you're already familiar with.  Thank you for your

22   understanding and consideration.  God bless, Juror 36."

23           I will say this:  I am of a mind to allow an

24   individual who wants to celebrate their religious holiday to

25   have that opportunity.  From the way I read this -- and I'm

19

1  not sure specifically what this holiday is -- but it seems

2  like it's on par with either Easter or Christmas for that

3  particular faith.  And we always accommodate those holidays to

4  the extent we can.

5          My instinct is to say, Okay, we'll take a break that

6  day and not have court on April 10th.  But, again, I would

7  encourage you all that looks like we'll lose another day.

8  That day was scheduled to go from 9:00 to 4:00.  I think

9  there's a way to maybe pick up a few of those hours during the

10  course of the week, but I'm inclined to grant that request.

11          Does anyone have any objection?

12          MR. BRENNER:  Your Honor, we have no objection.  I

13  just -- does the juror -- couldn't tell by the note.  Does the

14  juror need the whole day off or half a day off or --

15          THE COURT:  Yes, looks like he needs the whole day

16  off.

17          MR. BRENNER:  Whatever the juror needs to observe

18  his or her religious holiday, we have no objection.

19          MS. REWARI:  Your Honor, we have an expert who we

20  have booked for only that day, so we will try today to contact

21  him and see if we can get a different date.  I agree, we

22  should do everything to try to accommodate this juror.

23          THE COURT:  If you could, with that particular

24  witness, if you could say that the judge would really

25  appreciate and highly encourages the, sort of, adjustment of

B.R. v. F.C.S.B.

20

1    his time.

2            MS. REWARI:  We will make that contact during lunch

3    today.

4            THE COURT:  Mr. Kinney, you stood up, sir?

5            MR. KINNEY:  Just to say I have no objection.

6            THE COURT:  Mr. Blanchard?

7            MR. BLANCHARD:  No objection.

8            THE COURT:  All right.

9            MR. BLANCHARD:  Other than (indiscernible).

10           THE COURT:  Yeah.  What I will say to the jury

11   generally -- I won't speak to this juror directly or

12   specifically; he will hear what I say to the jurors -- is that

13   I'm aware of the note, and we're taking all efforts we can to

14   accommodate the request, and it looks like we will likely be

15   able to, okay.

16           All right.  Anything else we need to do before we

17   bring the jury back in again?  All right.  Very good.

18           (Jury present.)

19           THE COURT:  Thank you.  You may be seated.  The

20   Court has been provided another note from one of the jurors

21   essentially asking for an accommodation of a religious holiday

22   to be celebrated with family.  The Court has discussed the

23   request with all counsel.  No counsel objects to that

24   accommodation.  I will say to you all that we may need to make

25   a bit of an adjustment because of a conflict that involves a

—————————B.R. v. F.C.S.B.—————————

21

1   potential witness that was going to be called on that day.

2   So, we think we are going to be able to pull it off, but we're

3   not absolutely sure.  I'd say we are probably 95 percent

4   there, okay, but we do need to do some things on our end to

5   accommodate the request.

6            Finally, as you all have known, we've gotten to know

7   each other pretty well.  Mr. Blanchard, who is back there, has

8   a young associate that's working with him, Angela London, who

9   was not introduced to you all early on because she was

10  involved in other professional obligations and the like, we

11  just wanted to make sure that none of you were acquainted with

12  this young lady.

13           Ms. London, if you could do a little wave.  There

14  you go.  There you go.  Any of you acquainted with that young

15  lady?

16           Very good.  From time to time, she may actually sit

17  at counsel table, too, while Mr. Blanchard takes care of other

18  professional obligations.

19           Very good.  I think we're ready to go now.

20           MR. BLANCHARD:  Thank you, Your Honor.

21           MR. BRENNER:  May I proceed, Your Honor?

22           THE COURT:  You may.

23                      CROSS-EXAMINATION

24  BY MR. BRENNER:

25  Q.   Good morning, Dr. Zuluaga.

─B.R. v. F.C.S.B.─

22

1    A.    Good morning.

2    Q.    How are you today?

3    A.    Doing good, thanks.

4    Q.    So, I want to pick up -- where we left off yesterday, we

5    were talking about the various student statements that were

6    taken and maybe weren't taken in November of 2021; do you

7    remember talking about that?

8    A.    Yes, I do.

9    Q.    Okay.  And I asked you some questions about your

10   recollection of those statements without showing them to you,

11   and you gave me that recollection; do you remember?

12   A.    Yes.

13   Q.    Including asking you for your recollection of which

14   statements were, in fact, taken, and you gave me your best

15   recollection?

16   A.    My best recollection, correct.

17   Q.    Since last night have you had an opportunity to go back

18   and look at those statements?

19   A.    No.

20   Q.    Okay.  So, in fairness to you I want to show you now the

21   statements that we are talking about.  So, first of all, if

22   I --

23             MR. BRENNER:  Your Honor, may I republish

24   Plaintiff's Exhibit 77 briefly?

25             THE COURT:  You may.

B.R. v. F.C.S.B.

23

1              (Exhibit published.)

2    BY MR. BRENNER:

3    Q.   Okay.  Recall this is -- and we showed this one

4    yesterday.  This is plaintiff's, B████, statement.  Remember

5    that one?

6    A.   Yes.

7    Q.   Okay.  So --

8              (A pause in the proceedings.)

9    BY MR. BRENNER:

10   Q.   All right.  So, yes, sir.

11   A.   Could you tell me what's the exhibit number here in --

12   Q.   Yes, Doctor.  It's Plaintiff's Exhibit 77.

13   A.   77.

14   Q.   Can you just tell me when you get there?

15   A.   Yes, I am there.

16   Q.   Okay.  And I was reminded that I misspoke more than once.

17   This is from November 2011, not November 2021, okay?

18   A.   Correct.

19   Q.   With me?

20   A.   Yes.

21   Q.   And that's consistent with your recollection of the date,

22   right?

23   A.   It is, yes.

24   Q.   Okay.  So I'm not going to go through it in detail, but

25   recall -- I just want to refresh your recollection this is a

─B.R. v. F.C.S.B.─

24

1   statement where the plaintiff is reporting among other things

2   that she's being called names such as "slut" and "whore," and

3   there's rumors going around about her that she performed oral

4   sex on someone and was otherwise promiscuous or easy.

5           Do you see that?

6   A.   Yes.  I do see that.

7   Q.   Okay.  And I asked you what you thought -- you recalled

8   yesterday that --

9           MR. BRENNER:  You can take that down, Mr. Brown.

10  Thank you.

11  BY MR. BRENNER:

12  Q.   You recalled yesterday that you had reviewed, sometime in

13  the last few weeks, a statement from J.O. about this incident;

14  do you remember that?

15  A.   Yes, I do.

16  Q.   And your recollection is J.O.'s statement said that she

17  and B███ had called each other names; do you remember that?

18  A.   I do.

19  Q.   Okay.  So now let's bring up J.O.'s statement.

20          MR. BRENNER:  Oh, I'm sorry, Judge.  Exhibit 81, I

21  believe, is already in evidence.  Plaintiff's Exhibit 81.

22          THE WITNESS:  Okay.  Yes.

23          MR. BRENNER:  May I publish?

24          THE COURT:  You may.

25  BY MR. BRENNER:

Cross - Zuluaga

B.R. v. F.C.S.B.

25

1   Q.   Okay.  That's J.O.'s statement, isn't it?

2   A.   Yes, it is.

3   Q.   Okay.  Doesn't say anything about calling names, does it?

4   A.   It doesn't.

5   Q.   Okay.  It doesn't say anything, really, other than she

6   doesn't deny the rumors are going around; she just says she

7   explained it, right?

8   A.   Correct.

9   Q.   Okay.  So that is now -- does that refresh your

10  recollection of what J.O.'s statement was at this time,

11  written statement?

12  A.   It really doesn't.  This -- I remember seeing these

13  statements at that -- student's statements, but it doesn't --

14  Q.   Do you think you saw a different written statement from

15  J.O.?

16  A.   No.

17  Q.   Okay.  So this is the one you were trying to recall

18  yesterday?

19  A.   Yes.

20  Q.   Okay.

21          MR. BRENNER:  If we could, Your Honor, I believe

22  Plaintiff's Exhibit 78 is in evidence.

23          THE COURT:  Yes.  You may publish.

24          MR. BRENNER:  May I publish?

25          THE COURT:  You may.

─────B.R. v. F.C.S.B.─────

26

1              (Exhibit published.)

2    BY MR. BRENNER:

3    Q.    Okay.  So this one is two pages.

4    A.    Okay.

5    Q.    I put them side by side, and that's -- that's the D███

6    N███ statement.

7    A.    All right.

8    Q.    And you told me yesterday, I think, that you said that he

9    denied it but said that he and B███ had some sexual --

10   inappropriate sexual contact together; do you remember that?

11   A.    I do.

12   Q.    Okay.  So what -- what actually the David Neil statement

13   says is -- when it comes to the rumors he doesn't say they

14   don't -- aren't happening, he says --

15              MR. BRENNER:  If you could highlight about halfway

16   down where it says, "I also don't know."

17              Keep going, please.

18   BY MR. BRENNER:

19   Q.    He says, "I also don't know where the rumors are coming

20   from that are insulting her."

21              So he's -- he's confirming the rumors, he just

22   doesn't know where they're coming from; is that fair?

23   A.    Correct.  Yes, that's fair.

24   Q.    So -- and that's what B███ said, she said these rumors

25   are going around.  So we have one witness so far that

B.R. v. F.C.S.B.

27

1    acknowledges the rumors but said she explained them, and then

2    we have a second witness, again, who acknowledges the rumors

3    but just says he doesn't know where they're coming from,

4    correct?

5    A.   Correct.

6    Q.   Okay.  So, so far we have two corroborations of B████

7    statement.

8         Let's go -- the third statement was from C.K.,

9    right?

10   A.   What's the exhibit number, please?

11        MR. BRENNER:  You -- I'm sorry, you can take that

12   down, Mr. Brown.

13        My apologies, Doctor.

14   BY MR. BRENNER:

15   Q.   The third statement was from C.K.; do you remember that?

16   A.   Yes.

17   Q.   And I'm going to get you to it in your book.  I promise.

18   A.   Yes.

19   Q.   I promise.

20        And your recollection yesterday was that he denied

21   everything, right?

22   A.   May I see the statement?

23   Q.   Well, first I --

24   A.   I just want to make sure --

25   Q.   Again, I promise I'm going to bring it up for you in a

1   second.

2   A.   Correct.

3   Q.   I'm just --

4          MS. REWARI:  Objection, Your Honor.

5          THE WITNESS:  It's just I don't want to get confused

6   with the C.K., with all the initials.  I want --

7          THE COURT:  Doctor, let me -- let me resolve the

8   objections.  As I stated to you earlier, if you hear the Court

9   speaking, it's probably a good time to talk (sic) because

10  sometimes the lawyers will want to have a dialogue with the

11  Court --

12         THE WITNESS:  Okay.

13         THE COURT:  -- and it gets confusing if you're

14  talking during that dialogue.

15         THE WITNESS:  Okay.

16         THE COURT:  All right.

17         THE WITNESS:  Thanks.

18         THE COURT:  Your objection -- I think -- I think the

19  objection, I believe, is that you're asking him to testify

20  about something he doesn't know what you're talking about.

21         MR. BRENNER:  Yeah, I'm going to -- I'm going to

22  rephrase my question --

23         THE COURT:  Okay.

24         MR. BRENNER:  -- with Your Honor's indulgence.

25         THE COURT:  All right, sir.

B.R. v. F.C.S.B.

29

BY MR. BRENNER:

Q.   All I was asking you is do you remember testifying

yesterday that your recollection of C.K.'s statement is that

he basically denied everything?

A.   I remember that.

Q.   Okay.  So now -- now as I told you I would, I will show

you the statement.

A.   Okay.

Q.   So it's in your book at 529.

          MR. BRENNER:  Your Honor, I think that's in

evidence, I believe.  Plaintiff's 529.

          THE COURTROOM CLERK:  Defendants'?

          MR. BRENNER:  Plaintiff's.

          THE WITNESS:  Okay.

          MR. BRENNER:  Plaintiff.

          THE WITNESS:  Okay.

          THE COURTROOM CLERK:  Yes.

          MR. BRENNER:  May I publish?

          THE COURT:  You may.

BY MR. BRENNER:

Q.   Okay.  So is this the statement that you recall seeing in

the last few weeks?

A.   It is.

Q.   Okay.  So let's -- let's look at -- let's look at his

statement.

┌─ B.R. v. F.C.S.B. ─┐

30

1          MR. BRENNER:  Let's highlight the first sentence

2    first.

3    BY MR. BRENNER:

4    Q.   Okay.  He says, "About a month ago that" -- so this is in

5    October, right?

6    A.   Right.

7    Q.   Okay.  "David" -- and that's the David we've just been

8    talking about, right?

9    A.   Correct.

10   Q.   "Came up to me in the hallways and said that B███ gave

11   me a hand job and a blow job, and I eww, and he said, no."

12          So that's exactly what B███ reported what was going

13   on, right?

14   A.   Correct.

15   Q.   Okay.  And that's -- C.K. is confirming that.

16          Let's go -- then it says, "Then they broke up, and

17   him is friends started saying she was a whore."

18          Do you see that?

19   A.   From this particular student?

20   Q.   Yeah.

21   A.   Okay.  What sentence?  What --

22   Q.   Just the next one.  I just -- I just -- I finished at --

23   A.   Okay.  I do.  I do see it.  Yeah.

24   Q.   Do you see that?

25          So that's exactly what B███ said happened, right?

B.R. v. F.C.S.B.

31

1          MS. REWARI:  Objection, Your Honor, this is

2   misstating the evidence.

3          MR. BRENNER:  Well, let's -- let's --

4          THE COURT:  The question is a little bit vague.

5   This is what the statement says, correct?

6          THE WITNESS:  Correct.

7          THE COURT:  All right.

8   BY MR. BRENNER:

9   Q.   And that statement is consistent with what B███ reported

10  in her statement?

11  A.   I believe so.

12  Q.   Okay.  And then it says -- I'm going to go down to --

13  well, I'll just read it so -- so we're not cutting any out.

14          "She was a whore.  That is what I think.  Then she

15  called him at J████ party using J████ phone and called

16  David, and she called him at least ten times, I think.  So

17  then he called her back and said, 'Leave me alone.  You're a

18  whore and a slut.'"

19          Do you see that?

20  A.   I see that.

21  Q.   Exactly what B███ was saying was -- was being said about

22  her in school, right?

23          MS. REWARI:  Objection, Your Honor.  This is not

24  what B.R.'s statement said, so I object to his

25  characterization.

B.R. v. F.C.S.B.

32

1          MR. BRENNER:  Well, I'm asking -- I'm sorry.

2          MS. REWARI:  You can read the document, but --

3          THE COURT:  Okay.  Just generally stating, sir, is

4    this information consistent with information that you were

5    getting from B.R.?

6          THE WITNESS:  It is.

7          THE COURT:  Okay.

8    BY MR. BRENNER:

9    Q.   Okay.  And then it goes on to say -- at the very end it

10   says, "I think J████ called her saying she was a slut."

11         Do you see that?

12   A.   I do see that.

13   Q.   Also, is that also consistent with what you understood in

14   Plaintiff's 77 B████ was reporting to the school?

15   A.   Just give me a minute, please.

16   Q.   Sure.

17   A.   Yes.

18   Q.   Okay.  So if we could --

19         MR. BRENNER:  Your Honor, I believe Plaintiff's 723

20   is in evidence?

21         THE COURT:  723, yes.

22         MR. BRENNER:  May I publish?

23         THE COURT:  You may.

24         MR. BRENNER:  723.

25   BY MR. BRENNER:

─────── B. R. v. F.C.S.B. ───────

33

1  Q.   Okay.  So this is a Fairfax County School Board policy on

2  sexual harassment, right?

3  A.   Could you give me the exhibit number, please?

4  Q.   Oh, I'm sorry.  I'm sorry.  723.  I forgot you don't have

5  the screen.

6          Are you there, Doctor?

7  A.   I am.

8  Q.   Okay.  This is a Fairfax County School Board policy on

9  sexual harassment?

10 A.   It is.

11 Q.   Okay.  And I want you to go to Roman Numeral III, please.

12 A.   I am.

13 Q.   I'm going to -- I'm going to go to the sentence that

14 starts with "therefore."

15 A.   Okay.

16 Q.   Are you with me?

17 A.   Yes.

18 Q.   Okay.  It says, "Therefore, unwelcomed sexual advances,

19 request for sexual favors, and other verbal or physical

20 conduct of a sexual nature amounting to or consulting

21 harassment are prohibited."

22          Do you see that?

23 A.   I do.

24 Q.   Fair statement of the Fairfax County School Board policy?

25 A.   Yes.

B.R. v. F.C.S.B.

34

1   Q.   What B█████ is reporting in her statement and is being, as

2   you said, consistent with what the other students are saying

3   would be a violation of this policy?

4   A.   I believe so.

5   Q.   You believe so?

6   A.   It is.

7   Q.   Okay.

8            MR. BRENNER:  You can take that down, please.

9   BY MR. BRENNER:

10  Q.   Are you aware that, according to Mr. F███████, who was

11  the principal at Rachel Carson -- do you remember, right?

12  A.   Yes, I do.  Of course.

13  Q.   That -- that there was not a single report or incident --

14  well, let me back up.

15           You -- did -- you understood that Mr. F███████ was

16  the final call to decide whether to report anything to your

17  office regarding sexual harassment at Rachel Carson?

18           Is that consistent with your understanding?

19  A.   Could you restate the question, please, for me?

20  Q.   I can.

21           When Mr. F██████ was the principal at Rachel

22  Carson --

23  A.   Okay.

24  Q.   -- and when you were in your role -- did you -- is it

25  assistant superintendent?

─────────B. R. v. F.C.S.B.─────────

35

 1 | A.   Yeah, I was the assistant superintendent.

 2 | Q.   And there -- at that time, I'm going to focus on the 2007

 3 | to 2013 period, okay?

 4 | A.   Okay.

 5 | Q.   At that time, the -- Fairfax County had an office that

 6 | was dedicated or was responsible for Title IX compliance

 7 | issues, right?

 8 | A.   Correct.

 9 | Q.   Do you remember the name of that office at that time?

10 | A.   I don't -- Title IX office or --

11 | Q.   Okay.

12 | A.   No.

13 | Q.   And -- and that office was there for various reasons, one

14 | of which was to receive reports of violations of the School

15 | Board's sexual harassment policy?

16 | A.   Correct.

17 | Q.   And if necessary, take corrective action, for example?

18 | A.   Right.

19 | Q.   Okay.  And were you -- was it -- is it consistent with

20 | your understanding that at that time, in that time period when

21 | Mr. F█████ was the principal, it was his responsibility --

22 | he had the final call on whether to report anything regarding

23 | sexual harassment to the Title IX office?

24 | A.   I don't remember precisely that that was the directive,

25 | that the principal had the final authority to report --

─B. R. v. F.C.S.B.─

36

```
 1   Q.   Okay.

 2   A.   -- to that central office.

 3   Q.   You do understand that the only way -- and we talked

 4   about it here -- the only way it comes to your office's

 5   attention is either the school brings it to your attention or

 6   a parent brings it to your attention?

 7   A.   Correct.

 8   Q.   Okay.  In this instance with B███, the way it came to

 9   the School Board's attention is the parent brought it to your

10   attention?

11   A.   Correct.

12   Q.   Are you aware that from 2007 to 2013 that -- well, would

13   it surprise you if Mr. F██████ testified that between 2007

14   and 2013 at Rachel -- he did not report a single verified case

15   of sexual harassment to the Title IX office?

16        MS. REWARI:  Objection, Your Honor.  Having one

17   witness comment on another witness's testimony is

18   inappropriate unless there's a citation where he testified to

19   that.  Counsel is testifying.

20        MR. BRENNER:  All right.

21        THE COURT:  Why don't we rephrase the question.

22        Doctor, you have previously testified that you are

23   unaware of any other incidents at Carson Middle School; is

24   that correct?

25        THE WITNESS:  Correct.
```

1          THE COURT:  Would it surprise you if Mr. F█████

2    also said that?

3          THE WITNESS:  That we didn't have any -- the time I

4    just -- I --

5          THE COURT:  It's not a tricky question.  Let me

6    try -- try another way.

7          THE WITNESS:  Okay.  Yeah, I appreciate that.

8          THE COURT:  You testified earlier --

9          THE WITNESS:  Correct.

10          THE COURT:  -- that you were unaware of any

11    incidents involving Rachel Carson Middle School with regard to

12    the subjects that we're discussing here generally.

13          THE WITNESS:  Yes.

14          THE COURT:  And it has been suggested that

15    Mr. F█████ testified consistently with that.  Do you have

16    any reason to believe that he was in error in his

17    recollection?

18          THE WITNESS:  I don't -- I will have to see if he --

19    I don't.

20          THE COURT:  All right.

21          MR. BRENNER:  Okay.  Thank you, Judge.

22    BY MR. BRENNER:

23    Q.  As you sit here today, you're not aware of a single

24    reported case of sexual harassment out of Rachel Carson

25    between 2007 and 2013; is that fair?

─────────────────────── B.R. v. F.C.S.B. ───────────────────────
                                                                    38

1    A.   Between 2009 when I took the job in 2013, yes, I am not

2    aware.

3    Q.   Now, you know that sexual harassment was a significant

4    problem in the Fairfax Public School systems at this time,

5    don't you?

6    A.   I was aware that sexual harassment, that our students

7    were involved in those behaviors, and -- yeah.

8    Q.   And Rachel Carson was -- was pitching a perfect score, a

9    perfect game.  They -- they had zero, but you knew that it was

10   going around the county, right?

11        MS. REWARI:  Objection, Your Honor, argumentative.

12        THE COURT:  That's a characterization.

13   BY MR. BRENNER:

14   Q.   Well, let's -- let's look at what -- let's look at the

15   statistics that the School Board kept.

16   A.   Okay.

17   Q.   And see how they match up against what Rachel Carson was

18   saying was going on there, okay?

19   A.   Okay.

20        MR. BRENNER:  Your Honor --

21   BY MR. BRENNER:

22   Q.   If you could look at 552 in your book?

23   A.   Yeah, one second, please.

24        THE COURT:  552 is not in.

25        MR. BRENNER:  Right.  I'm going to try to lay the

B.R. v. F.C.S.B.

39

1    foundation.

2         THE WITNESS:  552, I do have the document.

3    BY MR. BRENNER:

4    Q.  You do have the document.

5         That -- that's a Fairfax County Youth Survey from --

6    from -- from October 2010?

7    A.  Correct.

8    Q.  If you go to the -- I guess it's the third page of the

9    document -- Doctor, at times I'm going to ask you to look at

10   the -- those little numbers on the bottom.

11   A.  Okay.

12   Q.  Okay.  So I'm looking at the one that ends in 382.

13   A.  I am.

14   Q.  This is a study that was sponsored -- cosponsored by the

15   Fairfax County School Board?

16   A.  Okay.

17   Q.  All right.

18        MR. BRENNER:  At this time, we'd like to move in

19   Exhibit 552 into evidence.

20        MS. REWARI:  Your Honor, this is not the School

21   Board's document.  It's not been authenticated by either --

22   it's a community survey created by a number of organizations.

23   As you can see from this --

24        THE COURT:  Yeah, let me see it.

25        MS. REWARI:  It has plaintiff's Bates number on it.

─── B. R. v. F.C.S.B. ───

40

1          THE COURT:  You want to ask him questions about

2    this?

3          MR. BRENNER:  Yeah, very -- just individual pages,

4    but I'm just laying the foundation that it's Fairfax County

5    School Board -- survey of Fairfax County School Board

6    students for --

7          THE COURT:  I think you -- I think you might need to

8    ask some more foundational questions.

9          MR. BRENNER:  Okay.

10   BY MR. BRENNER:

11   Q.   Sir, this is -- this is a -- if you could go to the page

12   that ends in 396.  Do you see that?

13   A.   One second, please.

14         MR. BRENNER:  May I help him, Your Honor?

15         THE WITNESS:  Yeah, your number or the -- the

16   document number?

17         THE COURT:  Yes.

18         (A pause in the proceedings.)

19         THE WITNESS:  Okay.

20         MR. BRENNER:  Thanks.

21   BY MR. BRENNER:

22   Q.   Doctor, this is a study that's commissioned by the

23   Fairfax County School Board and the Fairfax County board of

24   supervisors to obtain information from students regarding

25   what's going on in the schools; is that correct?

1              MS. REWARI:  Objection, Your Honor.  This is

2    misstating what the document says as to who prepared it, who

3    commissioned it.  There's other organizations that are on

4    this.

5              THE COURT:  All right.  Let's -- let's try it

6    another way.

7              Sir, you've had an opportunity to generally look at

8    Plaintiff's Exhibit Number 552.  You've had --

9              THE WITNESS:  Yes, correct.

10             THE COURT:  Were you aware of that 2009 youth

11   survey?

12             THE WITNESS:  I was.

13             THE COURT:  Okay.  Why don't you ask him questions

14   specifically with regard to the issues they were confronted

15   with here.  I don't want to go through this entire youth

16   survey.

17             MR. BRENNER:  I promise you, Judge, I'm not.  I

18   just -- I need to admit it into evidence to start -- I'm just

19   going to show two pages from the youth survey.

20             THE COURT:  The extractions from the survey may come

21   in, but you need to ask him some questions about it first.

22             MR. BRENNER:  Okay.

23   BY MR. BRENNER:

24   Q.   Okay.  It's a -- can you confirm for the -- for the Court

25   that is -- this particular one is a study of about 20 -- just

─B.R. v. F.C.S.B.─

42

1  over 29,000 students?  It's on that same page you were on.

2  Did you lose that page?

3  A.   Yeah, that's -- if that's what it says here in the

4  document, sir, that's what it is.

5  Q.   "And the purpose of the study is to get a comprehensive,

6  anonymous, and voluntary survey that examines behaviors,

7  experiences, and other factors that influence the health and

8  well-being of the county's youth."

9        Do you see that?

10 A.   Yes, I do.

11 Q.   Okay.  And among the things they studied was the

12 prevalence of bullying in schools, correct?

13 A.   Correct.

14 Q.   And the prevalence of sexual harassment in schools,

15 correct?

16 A.   I see that.

17       MS. REWARI:  Again, objection, Your Honor.  If you

18 can direct him to a question because I don't believe these

19 questions that he's talking about are --

20       THE COURT:  Well, right now he's laying a

21 foundation.

22       MS. REWARI:  Right.

23       THE COURT:  Yeah.

24       MS. REWARI:  But he's -- he's testifying that there

25 are questions specific to the school, so if he could direct us

───── B.R. v. F.C.S.B. ─────

43

1   and the witness to the page he's talking about.  He's asking

2   this witness if it was specific to schools.  I don't believe

3   it's specific to schools.  Bullying in the schools or

4   harassment --

5           THE COURT:  I'm going to overrule the objection.  I

6   think the witness is following along.

7           You can continue, Mr. Brenner.

8           MR. BRENNER:  Your Honor, I would like to admit and

9   publish just a couple of pages.

10          THE COURT:  Which ones?

11          MR. BRENNER:  The first one we'll go to in this

12  study is -- it's at 397.

13          And the second page will be 626.

14          THE COURT:  All right.  I'll let you ask him

15  questions about those particular provisions, but the youth

16  survey, as it's existing as a document, has not been subjected

17  to studies of whether or not it's scientifically correct,

18  whether or not there was a cross section of individuals who

19  are participating in the survey.

20          And the things that need to be, I guess, suggested

21  for the authenticity of the document having been done, I will

22  let you ask him questions about specific things regarding the

23  survey, but the survey itself doesn't come in.

24          MR. BRENNER:  Understood.

25  BY MR. BRENNER:

─B.R. v. F.C.S.B.─

44

1   Q.   Doctor, if you could go to the page that's on the bottom

2   right, 397?

3   A.   Okay.

4   Q.   Okay.  And I'm reading -- I'm directing your attention to

5   the section entitled Bullying, Cyberbullying, and Aggression.

6   A.   Okay.

7   Q.   Okay.  And can you confirm for me that the -- by the way,

8   this is in a section called Executive Summary, correct?  Page

9   before?

10  A.   Yes.

11  Q.   Okay.  And can you confirm for me the study found that

12  more than half of all students reported being bullied or

13  teased, and 9 percent reported that this happened at least

14  20 times in the past year?

15          MR. BRENNER:  May I approach, Your Honor?

16          THE COURT:  Is that what it says, sir?

17          THE WITNESS:  Yes.

18  BY MR. BRENNER:

19  Q.   Yes?

20  A.   Yes.

21  Q.   Okay.

22  A.   This is what it says here.

23  Q.   And if you go to the page that ends in 626, so that's

24  going to be more towards the end of the document.

25  A.   Okay.

B.R. v. F.C.S.B.

45

1              THE COURT:  You can approach.

2    BY MR. BRENNER:

3    Q.  If you look at page 626, did the study specifically look

4    at how many times it was reported that people were sexually

5    harassed?

6              MS. REWARI:  Objection, Your Honor.  I don't see

7    that question here.  It's being -- how many times the word

8    "reported" is not in any question I see.

9              MR. BRENNER:  Let's go -- let's -- let me -- let me

10   go back.

11             THE COURT:  Why don't we do this.  Mr. Brenner, when

12   you're asking the doctor questions about the survey, state the

13   question that is in the survey and have him answer that as

14   opposed to --

15             MR. BRENNER:  Yeah.

16             THE COURT:  I think Ms. Rewari is suggesting that

17   you're not being consistent with the question that's asked in

18   the survey.

19             MR. BRENNER:  I just want to clear up one thing from

20   before Ms. Rewari raised.

21   BY MR. BRENNER:

22   Q.  Can you go back to 396?  There was a question whether

23   this was talking about just youth or students.

24             Do you remember that objection being raised?

25   A.  Yes.

─────B.R. v. F.C.S.B.─────

46

1  Q.   Okay.  Can you read to the jury when it talks about how

2  many people were surveyed and who they were, the paragraph

3  that starts with, "The 2009 youth survey," which is on

4  page 396.

5           MR. BRENNER:  May I approach?

6           THE WITNESS:  Yes.  Do you want me to read this?

7  BY MR. BRENNER:

8  Q.   Yes, please.

9  A.   Read it aloud?

10          THE COURT:  Yes, you can read it.

11          THE WITNESS:  Okay.  "The 2009 youth survey was

12  conducted in the fall of 2009 and resulted in valid responses

13  from 29,223 students in 8th, 10th, and 12th grade and 10,927

14  students in 6th grade."

15  BY MR. BRENNER:

16  Q.   Okay.  So this report -- the 6th grade report is a

17  separate one.  This is a Fairfax County, students in the 8th,

18  10th, and 12th grades, correct?

19  A.   Correct.

20  Q.   "Sponsored by" -- we can go back and look at it again.

21  "Sponsored by or co-sponsored by the Fairfax County School

22  Board, your former employer."

23  A.   Yes.

24  Q.   Okay.

25  A.   I believe so, yeah.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────B.R. v. F.C.S.B.─────

47

1   Q.   So now let's go to page -- back to 626.

2   A.   Uh-huh.

3   Q.   Are you there?

4   A.   Yes.

5   Q.   We were looking at the one I pointed to when I was up

6   there, the bottom left-hand corner.

7   A.   B11.

8   Q.   B11.  The question was -- first of all, this question

9   went to -- was answered by 30,734 8th, 10th, and 12th graders,

10  right?

11  A.   Correct.

12  Q.   Students in the Fairfax County school system, correct?

13  A.   Yes.

14  Q.   Okay.  "How many times in the past year has anyone done

15  any of the following to you:  Sexually harassed you," okay?

16  A.   Yes.

17  Q.   So this is students being asked in a confidential

18  setting, not with assistant principals over their shoulders,

19  they were given an opportunity to confidentially tell the

20  School Board, this is what's going on in schools.  That's a

21  fair characterization, right?

22          MS. REWARI:  Objection, Your Honor.  The question

23  doesn't ask about school.  He has not shown this witness any

24  question so far that says, We're asking about the school

25  environment.

B.R. v. F.C.S.B.

48

1      This is the community survey about their lives.

2      MR. BRENNER:  I think that's -- she can raise that

3  in cross-examination -- or redirect.

4      THE COURT:  I think we need to be careful, though,

5  with characterizations, so let's -- as I said, the best way to

6  handle this witness is to ask him specifically what the

7  question was, who it was directed to, who the surveyors were

8  who the survey was directed to, et cetera.

9  BY MR. BRENNER:

10  Q.   Let's go back to the executive summary again.

11  A.   Okay.

12  Q.   I'm on the second paragraph of the summary.

13  A.   Okay.

14  Q.   I'm going to read it and have you confirm that this is

15  what it says.

16      "Information from this survey allows the county to

17  monitor trends in substance abuse, health, mental health, and

18  delinquency in order to support county efforts to plan,

19  evaluate, and improve community and school programs designed

20  to prevent health problems and promote healthy behaviors,"

21  right?

22  A.   Right.

23  Q.   The purpose of this is to address the issues in schools,

24  or one of the purposes, correct?

25  A.   Yes.

Cross - Zuluaga

———————B.R. v. F.C.S.B.———————

49

1   Q.   Okay.  So let's now go back to specifically the question

2   of sexual harassment.  I'll read it and you tell me if I miss

3   a word, okay?  Question --

4   A.   Okay.

5   Q.   -- B11, are you there?

6   A.   I am.

7   Q.   "How many times in the past year has anyone done any of

8   the following," and then it says, in caps, "to you," right?

9   A.   Yes.

10  Q.   And then it has a colon, and it says, "Sexually harassed

11  you."

12           Did I read that correctly?

13  A.   You did.

14  Q.   Exactly?

15  A.   Yes.

16  Q.   And then it says that there were 39,770 responses?

17  A.   Yes.

18  Q.   Well, that's not fair.  There were 39,770 people, but 309

19  did not respond to that one?

20  A.   Correct.

21  Q.   Okay.  So it's about 39,400 or so.  39,461 responded,

22  right?

23  A.   Right.

24  Q.   Correct?

25  A.   Correct.

———————Tonia M. Harris OCR-USDC/EDVA 703-646-1438———————

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

50

1  Q.   Just over 22 percent of them reported they have been

2  sexually harassed, correct?

3  A.   27 percent?

4  Q.   Just over 22 percent.

5  A.   Yes.

6  Q.   Okay.  And for example, 901 students said it had

7  happened -- 901 survey participants said that it had happened

8  to them over 40 times, right?

9  A.   Right.

10 Q.   Another 800 -- well, let's see -- 1600 plus said three to

11 five times, right?

12       Do you see that?

13 A.   Yes, I do.

14 Q.   798 said six to nine times?

15       MS. REWARI:  Objection, Your Honor.  Object on

16 relevance grounds.  These questions are not specific to

17 school, so asking what -- questions about what students might

18 be experiencing in the county, in the community, which is what

19 he just established, is not relevant for this witness.

20       THE COURT:  All right.  Goes to weight.

21 BY MR. BRENNER:

22 Q.   Am I reading those correctly?

23 A.   You are.

24 Q.   Okay.  A total of about 8700 or so reported sexual

25 harassment, correct?

B.R. v. F.C.S.B.

51

1    A.    Correct.

2    Q.    Okay.  If you could go to Exhibit 57 in your binder.

3    A.    557?

4    Q.    57, yes.

5          THE COURT:  57 or 557?

6          MR. BRENNER:  I'm sorry.  57, just two numbers.

7          THE WITNESS:  Yes.

8    BY MR. BRENNER:

9    Q.    Do you recognize that document?

10   A.    I do.

11   Q.    Okay.  Okay.  And this is a document that the Fairfax

12   County School Board reports to the Virginia Department of

13   Education various discipline events that they have in their

14   schools, correct?

15   A.    Correct.

16   Q.    This is specific --

17         MS. REWARI:  Objection.

18         THE COURT:  Basis?

19         MS. REWARI:  That's not what this document is, what

20   he just said.  It's not a -- it's not -- it's a -- at least

21   what I'm looking at, it's other school divisions.  Fairfax is

22   listed on here.

23         MR. BRENNER:  May we approach just a second, Your

24   Honor?

25         THE COURT:  No, I think the best thing to do is if

─B.R. v. F.C.S.B.─

52

1  we are going to refer to an exhibit, let's just go ahead and

2  refer to it specifically.  If you're going to make an

3  objection, please state a grounds for the objection as opposed

4  to arguing as to what it says.  No more speaking objections.

5  BY MR. BRENNER:

6  Q.   You just told the jury this is the Fairfax County School

7  Board would report to the Virginia Department of Education

8  various discipline events over the course of each year,

9  correct?

10  A.   One second.  Yeah, what I see is the map of Virginia, and

11  I see all the regions in Virginia.

12  BY MR. BRENNER:

13  Q.   Well, that's what you see on page 1.  Why don't you

14  look at -- why don't you look -- let me --

15        MR. BRENNER:  May I approach, Your Honor?

16        THE COURT:  You may.

17        THE WITNESS:  Okay.  Yeah, I do.

18  BY MR. BRENNER:

19  Q.   Okay.  You see that, the various counties --

20  A.   Correct.

21  Q.   -- reporting various discipline that was -- you can

22  confirm this is not discipline in the county generally; this

23  is discipline in the schools, correct?

24  A.   Yes, it says, "Report on discipline, crime, and

25  violence," yeah.

B.R. v. F.C.S.B.

53

1   Q.   In the schools?

2   A.   In the schools?  I don't know.

3   Q.   You don't know?

4   A.   Well, it says, "Arlington County," "Clarke County."

5   Q.   Okay.  Why don't you look at the headers on the top.

6   A.   It says, "Fairfax County, Fairfax City," even though

7   Fairfax --

8   Q.   Here are the things that are reported.

9   A.   Okay.

10  Q.   Other school violations is one, do you see that?

11  A.   Okay.

12  Q.   School threats, do you see that?

13  A.   Yes, I do.

14  Q.   Sexual harassment, do you see that?

15  A.   I do.

16  Q.   These are reports by the School Board to the State of

17  discipline actions taken in schools; isn't that correct, sir?

18  A.   Yes, based on this, what I'm seeing, yes.

19  Q.   Thank you.

20        MR. BRENNER:  Now, Your Honor --

21  BY MR. BRENNER:

22  Q.   Well, I'll just direct you.  Now, we just went through

23  the previous document that showed that, if my math was right,

24  there were 6,000 students that were reporting multiple

25  instances of sexual harassment; do you remember that?

B.R. v. F.C.S.B.

54

1    A.    I do.

2    Q.    Okay.  If you go to this document -- can you tell the

3    jury, if you go to the -- one, two, three -- fourth line down,

4    that relates to Fairfax County, correct?

5    A.    Yes.

6    Q.    Can you tell the jury how many instances of sexual

7    harassment were actually reported out by the school to the

8    Virginia Department of Education?

9            MS. REWARI:  Objection, misstates the exhibit.

10           THE COURT:  Overruled.

11           THE WITNESS:  Sexual harassment, based on this

12   document that I'm looking at, Fairfax County and Fairfax City,

13   69.  Is that --

14   BY MR. BRENNER:

15   Q.    Yeah 69, right?

16   A.    Right.

17   Q.    Okay.  If you could go in your book to 553.  This is --

18   is this the same type of document we just looked at for the

19   next year?

20   A.    Yes.

21   Q.    Not the report to the State, but the school study, the

22   youth survey?

23   A.    The youth survey, yes.

24   Q.    Right?

25   A.    Right.

─────────────────────── B.R. v. F.C.S.B.───────────────────────

                                                                    55

1   Q.   And it's for the year --

2            MS. REWARI:  Objection, Your Honor, mischaracterizes

3   the document as a school study.

4            THE COURT:  Overruled.

5   BY MR. BRENNER:

6   Q.   Well, let's -- the title of it is, "School Year 2010-11,

7   Fairfax County Youth Survey," right?

8   A.   Right.

9   Q.   It goes down a little lower.  It says -- can you tell the

10  jury who published this document?  Can you tell the jury --

11  read that first page -- who was the publisher of this

12  document?

13  A.   It says it's a publication of Fairfax County, Virginia,

14  and Fairfax County Public Schools.

15  Q.   Fairfax County Public Schools publishes this document,

16  correct?

17  A.   Yes.

18  Q.   Okay.  If you could go to the little Bates stamp on the

19  bottom to 11682?

20  A.   11682.  One second, please.

21  Q.   Should start at 11681.

22           MR. BRENNER:  May I approach, Your Honor?

23           THE COURT:  Yes.

24           THE WITNESS:  Okay.  I got it.

25           MR. BRENNER:  Start of 1681, please.  Okay.

———B.R. v. F.C.S.B.———

56

 1  BY MR. BRENNER:

 2  Q.   Page 11681 is the executive summary, correct?

 3  A.   Yes.

 4  Q.   And then -- it then goes to the bottom of that page.  It

 5  says, "Key Findings," correct?

 6  A.   Correct.

 7  Q.   Okay.  Go to the next page, please.

 8  A.   Yes.

 9  Q.   There's a section on "Bullying and Aggression," right?

10  A.   Yes.

11  Q.   It says, on the second bullet point, "More than half of

12  Fairfax County students" --

13           By the way, so is this talking about the students?

14  A.   Yes.

15  Q.   Okay.  "More than half of Fairfax County students

16  reported being bullied, taunted, ridiculed or teased by

17  someone in the past year and over one in ten were bullied 20

18  or more times," right?

19  A.   Correct.

20  Q.   Okay.  If you could go to page -- if you go to the -- two

21  more -- the next bullet point down.  It says, (As read):

22  "Overall, 8.8 percent of Fairfax County students reported

23  cyberbullying of student who attends their school in the past

24  year," right?

25  A.   Yes.

─B. R. v. F.C.S.B.─

57

1    Q.   So that's students in a confidential setting, in an

2    anonymous setting reporting what they had done to others,

3    correct?

4    A.   Correct.

5    Q.   And then when it talks about the victims of that, that's

6    the next bullet point, right?

7    A.   Yes.

8    Q.   "Approximately one in seven Fairfax County students, 14.1

9    percent, were cyberbullied in the past year with 12.5 percent

10   having been cyberbullied by someone who attends their school."

11   So that's a fellow student, correct?

12   A.   Yeah, that's what I'm reading, too.

13   Q.   You agree with me that it's within the job of the Fairfax

14   County School Board to try to protect its students from

15   cyberbullying by other students; do you agree with that?

16   A.   I do.

17   Q.   Okay.  And then it says one-third of the students

18   reported knowing someone who have been really hurt by

19   cyberbullying, right?

20   A.   Right.

21   Q.   But according to the reports from Rachel Carson, none of

22   it's going on there, right?  No reports are coming from Rachel

23   Carson, right?

24        MS. REWARI:  Objection, argumentative.

25        THE COURT:  Sustained.

─B.R. v. F.C.S.B.─

58

1   BY MR. BRENNER:

2   Q.   Are reports coming from Rachel Carson about cyberbullying

3   that you are aware of?

4   A.   No, I don't --

5   Q.   No reports -- at Rachel Carson, no reports about sexual

6   harassment, correct?

7   A.   Well, Counsel, I don't want to give you --

8   Q.   To your knowledge?

9   A.   -- information that is inaccurate.

10  Q.   To your knowledge?  To your knowledge?

11  A.   To my knowledge, no.

12  Q.   Okay.  Let's just do one more.  If you go to 554.  Are

13  you there, sir?

14  A.   I am.

15  Q.   Okay.  So this is for the 2011/2012 school year, which is

16  what -- the school year that B███ was an in-person student,

17  correct?

18  A.   Correct.

19  Q.   It's a Fairfax County Youth Survey, another one, right?

20  A.   Correct.

21  Q.   Published by whom?

22  A.   By Fairfax County, Virginia, and the Fairfax County

23  Public Schools.

24  Q.   Okay.  So published by the county and the school jointly?

25  A.   Yes.

Cross - Zuluaga

—B.R. v. F.C.S.B.—

59

1    Q.   Okay.  If you could go to page 537.  Do you see that?

2    A.   Okay.  One second.  One second.

3               (A pause in the proceedings.)

4               THE WITNESS:  I'm almost there.

5               Yes.

6    BY MR. BRENNER:

7    Q.   Are you there?  I'm sorry, it's such a cumbersome --

8    A.   It's a huge document.

9    Q.   -- for you there.

10   A.   Yes.  I am.  537.

11   Q.   Okay.  Again, this is similar to what we looked at

12   before.  This is a specific question regarding the prevalence

13   and frequency of being sexually harassed in the past year.

14               Do you see that?

15   A.   I do.

16   Q.   Specific for Fairfax County in 2011, correct?

17   A.   Yes.

18   Q.   All right.  Just over 18 percent of the students in a

19   confidential anonymous setting report that they are being

20   sexually harassed; is that true?

21   A.   Are you referring to 8th graders?

22   Q.   We can do 8th graders, so we'll do 8th graders.

23   17.7 percent of 8th graders -- because the survey was 8th,

24   10th, and 12th, right?

25   A.   Correct.

—B.R. v. F.C.S.B.—

60

1  Q.   So as 8th in particular, 17.7 percent report being

2  sexually harassed?

3  A.   Yes, that's what this report says.

4  Q.   Okay.  And the total survey -- the total amount of

5  students in this survey -- if we go back -- you know what, I

6  don't have that number.  Okay.

7       Okay.  So as you told me before, that this was a

8  problem in the Fairfax County school system, right?  Sexual

9  harassment, bullying, cyberbullying?

10  A.   Every time one kid, even if it's just one or two

11  students, it is a problem.

12  Q.   Okay.  You can close that up, please.  Move on to a new

13  topic.

14       So you talked about on direct examination that you

15  met with the family on February 16th; do you remember that?

16  A.   I do.

17  Q.   And the next -- you don't meet with them again in March,

18  correct?

19  A.   I don't meet again in March, no.

20  Q.   Or April?

21  A.   Correct.

22  Q.   Or May?

23  A.   Right.

24  Q.   Now, in June -- if you could go to your book, you get

25  a -- in June you're made aware that the family has reached

─────B.R. v. F.C.S.B.─────

61

```
 1  back out to Mr. Dale.  All right.  It's in the 261.

 2  A.   Yes, I do remember, and is this in what --

 3  Q.   It should be in your book, in 216.

 4  A.   The white one?  This one?

 5  Q.   In June of 2012, the family reaches back out to Mr. Dale,

 6  right?

 7  A.   Yes.

 8  Q.   So they had started with Mr. Dale back in February -- or

 9  Dr. Dale, excuse me, and referred the matter to you?

10  A.   Correct.

11  Q.   Right?

12           And then you met with the family one time on the

13  16th, right?

14  A.   Correct.

15  Q.   And then they are writing back in -- in June saying

16  that -- back to Dr. Dale, although they copy you?

17  A.   Right.

18  Q.   And they are saying, We met with Dr. Zuluaga back in

19  February and we haven't heard back from him, right?

20  A.   Yeah.  In my response to Ms. R██████, I told her that --

21  I recall making a phone call to her --

22  Q.   Okay.

23  A.   -- where we discuss Cooper and Longfellow.  And also I

24  may not have followed up with her directly, but the system was

25  in touch with her, right?  Her main goal was for her to -- at
```

Cross - Zuluaga

B.R. v. F.C.S.B.

62

1   that point because when this issue came to my attention, the

2   student was not -- the family decided not to send her back to

3   the school.

4   Q.   Okay.

5   A.   Right?

6   Q.   We're going to get to that in a minute --

7   A.   Let me --

8   Q.   Go ahead.

9   A.   -- let me finish.  And our main goal was to make sure

10  that she was receiving the support she needed through the

11  homebound that was requested by the mom.

12  Q.   Okay.  Were you done?

13  A.   Yes.

14  Q.   Okay.  Thank you.

15       I just want you -- there was a question asked of you

16  in direct examination whether the school ever heard from

17  either B████ family or people associated with the family

18  that B███ had been raped; do you remember that question?

19  A.   I do remember that question.

20  Q.   I think you said you don't recall; is that right?

21  A.   I do recall that --

22  Q.   From B███ -- either from B███ or people associated with

23  her family.  That's my question.

24       MS. REWARI:  He didn't finish his answer.

25       THE COURT:  All right.  To the extent that we can --

────B.R. v. F.C.S.B.────

63

1          THE WITNESS:  What I'd really -- yes.

2          THE COURT:  -- sir.  Remember what I said.

3          THE WITNESS:  Yes.

4          THE COURT:  When the Court is speaking, it's

5    probably best not to say anything.

6          THE WITNESS:  Okay.

7          THE COURT:  I don't want to have to tell you again.

8          THE WITNESS:  Okay.

9          THE COURT:  For everybody involved here, let's try

10   to stay focused on the questions that are being asked, let's

11   get people have an opportunity to answer the question, and

12   let's proceed in a more efficient manner.  This is not very

13   efficient, so let's do better.

14   BY MR. BRENNER:

15   Q.   I'll direct your attention to the second page of the

16   exhibit that you have in front of you.

17   A.   Which one is that?  Which --

18   Q.   Oh, I'm sorry.

19   A.   -- exhibit?

20   Q.   2-6-1, the one you just had opened.

21   A.   Okay.  One second, please.

22   Q.   It's in the black binder.

23   A.   It's in the black --

24   Q.   It should be open.

25   A.   261, okay.

B.R. v. F.C.S.B.

64

1   Q.   Are you there?

2   A.   Yes.

3   Q.   Okay.  I'm directing your attention to the second page,

4   which is part of the letter we were just talking about to

5   Dr. Dale, okay?

6   A.   Yes.

7   Q.   And if you could, to yourself, read the paragraph that

8   starts off -- the very first full paragraph on the second page

9   that starts with "In early."

10  A.   Yes.

11  Q.   Just read that to yourself, please.  I'm just going to

12  ask you a quick question.

13       Okay?

14  A.   Okay.

15  Q.   Does that refresh your recollection that the School Board

16  had been notified from B█████ doctor that -- of her sexual

17  assault; does that refresh your recollection?

18  A.   This memo was written in June -- in June 22, 2012.

19  Q.   Yes.

20  A.   Right.  What I recall is that Mrs. R█████ made a police

21  report, right?

22  Q.   I'm not asking you -- I'm just asking you, does it

23  refresh your recollection that the School Board had been

24  notified by B█████ doctor that she had been sexually

25  assaulted?  The answer is "yes" or "no."

─────── B.R. v. F.C.S.B. ───────

65

1   A.   I would love to see the doctor's note --

2   Q.   Okay.

3   A.   -- again, if you don't mind.

4   Q.   Let's -- let's go -- we have two more topics, okay?

5        We talked a little bit about homebound, remember?

6   A.   Correct, yes.

7   Q.   You don't need the document right now.  Just so you don't

8   get distracted.

9        The -- you recall the homebound for B█████ -- do

10  you recall the homebound for B████ started in February of

11  2012.

12  A.   I do.

13  Q.   Okay.  You --

14  A.   February and March.

15  Q.   February and March.

16        In fact, you told the jury that you expedited it; do

17  you remember that?

18  A.   I remember speaking to the coordinator of that office,

19  saying, Hey, we need -- this is important.  Mom has asked for

20  this special support.  We need to move really fast.

21  Q.   And that was Mr. Mills?

22  A.   Mr. Mills.

23  Q.   Kurt Mills?

24  A.   Yes.

25  Q.   Okay.  And then you said the initial one was for a month;

─B. R. v. F.C.S.B.─

66

1   do you remember that?

2   A.   I believe so, yes.

3   Q.   You believe so?

4   A.   Yeah.

5   Q.   Okay.  And then you -- you said that -- that you guys

6   wanted to take her off homebound but Mom insisted that she

7   stay on homebound; do you remember that?

8   A.   I do believe so, yes.

9   Q.   In fact, you said homebound is the last resort, and

10  you -- you, obviously, would follow Mom's wishes, but you did

11  not want B███ to stay on homebound, remember that?

12  A.   I do remember saying that yesterday, yes, sir.

13  Q.   Okay.  So the -- the first month ends either in --

14  sometime in March or early April because you're not sure when

15  it started, right?

16  A.   Correct.

17  Q.   Dr. Zuluaga, do you have any idea when you were

18  suggesting that B███ go on homebound where she was in March

19  and April?  Do you know where she was?

20  A.   I know she was not involved with us.  I know -- I -- I

21  don't know the details during that particular time.

22  Q.   You didn't know she was hospitalized?

23  A.   I don't recall that part.

24  Q.   You didn't know that she was going for intensive

25  outpatient therapy Monday through Friday the full day?

─B.R. v. F.C.S.B.─

67

1   A.   Not that -- I knew she was taking some support -- some

2   therapy support, but I didn't know that she was going with

3   that intensity Monday through Friday.  As she described that,

4   I don't recall that.

5   Q.   Surely that would be -- that would be a reason why Mom

6   did not want her to come off homebound, that would be

7   reasonable, right?

8   A.   Yeah.

9   Q.   Right.  And you wouldn't want to be critical of a mother

10  for -- for extending homebound if her daughter's in

11  hospitalization, right?

12  A.   Correct.

13  Q.   Okay.  You -- so did you mean to be critical of -- of

14  Mrs. R. when you testified?

15  A.   No.

16  Q.   Okay.

17  A.   Of course not.

18  Q.   While -- okay.  Last one.

19          You -- or one quick point.  You -- you talked about

20  shadowing; do you remember that?

21  A.   Yes.

22  Q.   And the school -- the administrators told you that's one

23  of the -- you kept calling them strictures they put in place;

24  do you remember that?

25  A.   Yes, sir.

─B.R. v. F.C.S.B.─

68

1   Q.   And one of the strictures they told you they put in place

2   was shadowing, right?

3   A.   Yes.

4   Q.   Did they tell you that the first person assigned to do

5   the shadowing did it for -- did they tell you how long she did

6   it for?

7   A.   The agreement -- when they shared that information with

8   me was that it was very consistent.

9   Q.   Okay.  So if she said it was two days and then she was

10  directed by the administrators to stop, that would be -- you

11  wouldn't describe that as consistent, would you?

12  A.   No.

13  Q.   Okay.  And you don't have any knowledge of how long the

14  shadowing took place, correct?

15  A.   No.

16  Q.   Okay.  Let's go -- one last thing, you talked about IEP.

17  An IEP; do you recall that?

18  A.   I do.

19  Q.   Okay.  You made a suggestion that -- that during this

20  period in the spring of 2012 that the family had not made

21  B███ available to be interviewed or talked to by you, is

22  that -- did you say that?

23  A.   B███ was not available to us -- we couldn't -- based on

24  the report that I got from the school administrators, they

25  were not able to finish because B███ was not able to

B.R. v. F.C.S.B.

69

1  provide a -- she provided a number of students that --

2  specific numbers, 15, 11, of kids that were harassing and

3  bullying her, but we were not able to pinpoint exactly who was

4  doing that.  She was not able to -- she was not able to --

5  during my conversations with the administrators, we --

6  Q.   I don't want to get you into conversations with the

7  administrators.  I'm just asking you, did you testify in --

8  that in the spring -- this is after she's out of in-person,

9  okay?  So you understand the time frame?

10 A.   Correct.  Yes.

11 Q.   After that time, is it -- is it your testimony that the

12 family did not make B███ available to -- to talk to the

13 school?  That's -- that's my question.

14 A.   The main goal at that point was for B███ to stay home

15 and receive services through homebound.  I think that -- my

16 understanding, that was the priority from the mom.

17 Q.   Okay.

18 A.   Okay.  That was exactly what they wanted to focus on.

19 Q.   Okay.  You know that the family was seeking -- and how do

20 you -- how do you -- what's the words for the IEP, what's the

21 actual words?

22 A.   An individualized educational plan, IEP.

23 Q.   You understood the parent -- the family was seeking that

24 for their daughter, right?

25 A.   Correct.

─B.R. v. F.C.S.B.─

70

1   Q.   Okay.  And the school put together what's called an IEP

2   team, right?

3   A.   Yes, yes.

4   Q.   Okay.  Part of that IEP team is various psychologists,

5   social workers, et cetera, to -- to give an evaluation, right?

6   A.   Yes, with the academics.

7   Q.   Okay.  And the family -- B██████ was made available for

8   that, correct?

9   A.   Yes.

10  Q.   Okay.  If you can --

11           MR. BRENNER:  Do you have a hard copy for that?

12  It's in there.

13  BY MR. BRENNER:

14  Q.   If you could look at DX-169.

15           MR. BRENNER:  May I approach, Your Honor?

16           THE COURT:  Defendants' Exhibit 169 is not in.

17           MR. BRENNER:  Yeah, I will lay a foundation.

18           THE COURT:  Okay.

19  BY MR. BRENNER:

20  Q.   This is -- do you have Defendants' Exhibit 169 in front

21  of you?

22  A.   Yes.

23  Q.   It's a Fairfax County Public Schools document?

24  A.   Yes.

25  Q.   Okay.  It's -- it's testing that's done as part of the

─B.R. v. F.C.S.B.─

71

1    IEP?

2    A.    Correct.

3         MR. BRENNER:  Your Honor, at this point, we'd like

4    to move in Defendants' Exhibit 169.

5         MS. REWARI:  No objection.

6         THE COURT:  Without objection.

7    (Plaintiff offered Defendants' Exhibit No. 169, and was

8    admitted into evidence.)

9    BY MR. BRENNER:

10   Q.    Okay.  So when you were talking about the IEP on --

11   yesterday, you kept describing that it was found that B█████

12   had an emotional problem, is that -- is that how you described

13   it?

14   A.    That was my understanding.

15   Q.    Right.

16   A.    That she did qualify for support in this particular area.

17   Q.    You know that the quote, unquote emotional problem is

18   B████  had PTSD, right?

19   A.    I didn't know that.

20   Q.    You did not know that.  Okay.

21        Well, let's look at the -- so if you could go to --

22   there's three sets of testing here.  If you can go to page --

23   page 15, which ends in 6168.

24   A.    Yeah.

25   Q.    Do you see that?

B.R. v. F.C.S.B.

72

```
 1  A.    I do.

 2  Q.    Okay.  And that's -- that shows that she was seen by a

 3  school psychologist?

 4  A.    Yes, I see that.

 5  Q.    If you go to page 6158.

 6  A.    Could you repeat the question before again?  This shows

 7  that one -- that she was seen by --

 8  Q.    By a school psychologist.

 9  A.    How do I know that she was seen by a school psychologist

10  here, sir?

11  Q.    That page --

12  A.    Other than she's --

13  Q.    -- on that page.

14  A.    Is the signature -- is her signature --

15  Q.    You don't see her signature?

16  A.    I do.

17  Q.    Okay.  What's -- what's "her," who are we talking about?

18  A.    Dr. Jill Roper.

19  Q.    What's her title?

20  A.    School psychologist.

21  Q.    Okay.  And if you go to the very beginning of the

22  document --

23  A.    Right.

24  Q.    Your document might -- might be in a little different

25  order.
```

─────B.R. v. F.C.S.B.─────

73

1          THE COURT:  You can approach.

2  BY MR. BRENNER:

3  Q.   If you look at that page, does it say that Jill Roper did

4  a evaluation of B█████ on July 11, 2012?

5  A.   Yes.

6          THE COURT:  And if Counsel would make -- the court

7  reporter asked me to have counsel always make an exhibit

8  reference so that the --

9          MR. BRENNER:  I'm sorry.  We're in Exhibit 169.

10         Your Honor, can I -- we move to admit 169 -- can we

11  publish?  I --

12         THE COURT:  First, we need to see if it's

13  admissible.

14         Any objection?

15         MS. REWARI:  I believe that we already --

16         MR. BRENNER:  Yeah, I think -- I think there was no

17  objection.

18         THE COURT:  Okay.  You may publish.

19  (Plaintiff offered Defendants' Exhibit No. 169, and was

20  admitted into evidence.)

21         MR. BRENNER:  All right.  Let's just do it -- easier

22  this way.  So 169, if you could bring that up.  Defendants'

23  Exhibit 169.

24  BY MR. BRENNER:

25  Q.   Okay.  So this is -- this is a report done by the school

B.R. v. F.C.S.B.

74

1  psychologist based on her evaluation of B█████ that took place

2  on July 11, 2012, correct?

3  A.   Yes.   This is a report of an evaluation that -- that she

4  conducted.

5  Q.   Okay.   And so now --

6  A.   The school psychologist.

7  Q.   Now have I resolved your concern that she was seen by a

8  school psychologist?

9  A.   No.   Because this is a report that she was evaluated.

10 That's completely different --

11 Q.   I understand.

12 A.   -- from providing services.

13 Q.   That's fair.   She -- I -- you're right.   She was

14 evaluated by a school psychologist?

15 A.   Correct.

16 Q.   Not treated, for example?

17 A.   Correct.

18 Q.   That's a fair point.   Thank you.

19        It says reason for the referral, the referral comes

20 from the school, right?

21 A.   Yes.

22 Q.   It says, "According to the local screening committee" --

23 well, actually, let's go down to the methods of assessment --

24 A.   Okay.

25 Q.   -- first.

—B.R. v. F.C.S.B.—

75

1    So the doctor -- Jill Roper, she did -- she had

2    B███████ records to review, and you'll see she had her medical

3    records.  We'll go through that in a minute.  Do you see that?

4    A.    Yes.

5    Q.    She did a student interview and a parent interview,

6    right?

7    THE COURT:  It says what it says.

8    THE WITNESS:  Yes.

9    BY MR. BRENNER:

10    Q.    Right.  So this is in -- July 12th, let's see what --

11    what Ms. Roper finds.  We'll go through some of these.

12    "According to the local screening committee" -- do

13    you see that under the reason for referral?

14    What is the local screening committee?

15    A.    Local screening committee is a group of professionals who

16    screen the student to see if that person will qualify for

17    disability.

18    Q.    For the School Board, correct?

19    A.    Right.  Excuse me?

20    Q.    For the School Board, they do that for the School Board?

21    A.    They do it for the school.

22    Q.    The school.  Okay.

23    It says, "According to the local screening

24    committee, B████ was medically unable to attend the second

25    half of her 7th grade year at R. Carson Middle School."

B.R. v. F.C.S.B.

76

1   A.   What page are you reading from?

2   Q.   The same one we're on, the first page?

3   A.   Okay.

4   Q.   Do you see that?

5   A.   First page?

6        THE COURT:  Look under the section Reason for

7   Referral.  I think that's where Mr. Brenner is reading from.

8        THE WITNESS:  Okay.  I -- I don't see that part.

9   BY MR. BRENNER:

10  Q.   It says, "She has been" -- she, B███ -- "has been

11  receiving hospital-based individual and group counseling for

12  posttraumatic stress disorder and depression since

13  February 2012."

14       Do you see that?

15  A.   Yes.

16  Q.   So according to Ms. Roper, based on her review of the

17  records and her interview, she's reporting what she's -- what

18  the history for B███ is, correct?

19  A.   Yes.

20  Q.   If you go down it says, "B███ struggles to regulate her

21  emotions 'exhibits flight or -- flight or flight' behaviors

22  and is constantly in a heightened state of vigilance."

23       Do you see that?

24  A.   Yeah, I think based on my knowledge of these documents,

25  what probably the writer meant was "flight or fight

B.R. v. F.C.S.B.

77

1    behaviors."

2    Q.    Oh, yes.  I agree.

3    A.    That's what we do -- that's how we call it in that

4    occasion.

5    Q.    Yeah, fight or flight.  Okay.

6          If you go to the second page, another thing

7    Dr. Roper does is try to get -- gets a baseline to figure out

8    what B███ was like before her time at the middle school.

9          Do you see that in "Background Information"?

10   A.    I do.

11   Q.    It says, in bold italics, "As an elementary school

12   student, B███ met, quote, grade level expectations in both

13   language arts and math, 'as defined in the program of

14   studies.'

15   A.    Right.

16   Q.    "She has also demonstrated good work habits throughout

17   her elementary school years?"

18         And then it says, "For example, B███ consistently

19   accepted responsibility, followed through on assignments,

20   listened to and followed instructions, organized materials and

21   played cooperativity."

22         So that's Dr. Roper's setting forth B███ history

23   at Floris Elementary School, right?

24   A.    Yes.

25   Q.    If you go -- she's also seen by a -- B███ is also seen

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─
                                                                    78

1   as part of the IEP team by a social worker, correct?

2   A.   Yes.

3   Q.   And that's the first one in your binder.

4            THE COURT:  What exhibit are we working from?  I'm

5   sorry.

6            MR. BRENNER:  Still on 169, Your Honor.

7            THE COURT:  Are you on a different page?

8            THE WITNESS:  169.

9   BY MR. BRENNER:

10  Q.   Do you see on page -- Exhibit 169 she's also evaluated by

11  a --

12           THE COURT:  Just a moment.  Let's take the one

13  that's up down because I don't think --

14           MR. BRENNER:  Yes.  Yes.

15           THE COURT:  -- this has anything to do with --

16           MR. BRENNER:  Thank you, Josh.

17           THE COURT:  -- what you are talking about now.

18           MR. BRENNER:  Thank you.

19  BY MR. BRENNER:

20  Q.   You see she's also evaluated by a social worker?  Do you

21  see that?

22  A.   Yes, I do.

23  Q.   Interview is actually the day before the other interview?

24  A.   Correct.

25  Q.   Okay.  If you go back a few pages, or you can take my

B.R. v. F.C.S.B.

79

1  word, it's by a Laura Preston, who is a school social worker.

2  Do you know who that is?

3  A.    No.

4  Q.    Okay.  So then she also gives a reason for the referral,

5  right, first page?

6  A.    Yes.

7          MR. BRENNER:  May I publish that, Your Honor?

8          THE COURT:  Any objection?

9          MR. BRENNER:  This is -- I'm sorry.  This is the

10  same document, same exhibit.

11          THE COURT:  Without objection.  You may publish.

12          (Exhibit published.)

13  BY MR. BRENNER:

14  Q.    Okay.  It says, "B███ will be entering 8th grade in the

15  fall.  She received homebound support since February 23,

16  2012" --

17          Does that clarify the date that homebound started?

18  A.    Yeah, yeah, it does.  Thanks.

19  Q.    -- "due to the emotional impact of bullying, which

20  occurred in the 7th grade," right?

21  A.    Yes.

22  Q.    This is the assessment of the school social worker,

23  correct?

24  A.    Correct.

25  Q.    "Academically she did well, but due to the emotional

Cross - Zuluaga

─B. R. v. F. C. S. B.─

80

1   concerns, refused to leave the home," correct?

2   A.   Yes.

3   Q.   "She has been diagnosed with posttraumatic stress

4   disorder" --

5   A.   Yes.

6   Q.   -- "and a vitamin D deficiency (thought to be related to

7   not being outside)."  Right?

8   A.   Right.

9   Q.   Now if you go to the next page.  See under "Developmental

10  History"?

11  A.   Yes.

12  Q.   So, similar to what Dr. Roper did, Ms. Preston has also

13  given sort of a baseline of what B█████ was like before the

14  harassment and bullying, right?

15  A.   Right.

16  Q.   She says, "Prior to November 2011, there were no concerns

17  with eating patterns."  Right?

18  A.   Yeah, that's what I'm reading, sir.

19  Q.   "From November to February, she suffered a loss of

20  appetite and a great weight loss.  This was thought to be

21  related to stress."

22  A.   Okay.

23  Q.   Right?

24  A.   Yes.

25  Q.   The social worker also reviewed the medical information.

—————————————————————— B.R. v. F.C.S.B. ——————————————————————

                                                                    81

1    She said, "B████ typically enjoys good physical health."

2    Right?

3    A.   Yes.

4    Q.   This is what we were talking about in March 9th.  This is

5    B████ -- parents took B████ to Children's National Hospital at

6    WDC to be evaluated.  "It was determined that she was

7    appropriate to be admitted, but due to the separation anxiety

8    B████ was experiencing, the hospitalization would be

9    detrimental to her.  Mrs. R. contacted the Inova Kellar

10   Center."  Right?

11   A.   Yes.

12   Q.   So, this is in the period where Mrs. R. is saying, We are

13   not ready to come off homebound.  Our daughter is

14   hospitalized, right?

15   A.   Right.

16   Q.   Yes?

17   A.   Yes, I believe so.

18   Q.   Okay.  If you go to the next page.  Without going through

19   any details, it's fair to say that she's hospitalized in and

20   out either in hospitalizations or inpatient -- either in

21   inpatient or intensive outpatient for the next -- basically up

22   and to the date of this interview.  It says "through

23   mid-June"; do you see that?

24   A.   I do.

25   Q.   Okay.  It says, "She received a diagnosis of" --

─────────────── B．R． v． F．C．S．B． ───────────────

82

1           MR. BRENNER:  Scroll down a little bit, please,

2   Mr. Brown.

3   BY MR. BATES:

4   Q.   "She received a diagnosis of PTSD and major depressive

5   disorder"?

6   A.   Yes.

7   Q.   Right?

8   A.   Yes.

9   Q.   And it also talks about how she did in elementary school?

10  A.   Correct.

11  Q.   No problems in elementary school, right?

12  A.   Correct, yes.

13  Q.   It says -- it then talks about the instance that brings

14  us here today --

15          MR. BRENNER:  Scroll down a little bit.

16  BY MR. BRENNER:

17  Q.   -- at Carson Middle School.

18          MR. BRENNER:  Scroll down, please, the other way.

19  BY MR. BRENNER:

20  Q.   It says -- if you look at that, it talks about the

21  incidents we're here and then it says, "The school counselor

22  reported that prior to this time, B█████ had been happy and

23  outgoing."  Right?

24  A.   I see that.

25          MR. BRENNER:  Okay.  If you go to the next page,

─────B.R. v. F.C.S.B.─────

83

1  please, and scroll down to "Brief Behavioral Profile."  Just

2  the first paragraph, please.  No.  "Brief Behavioral Profile."

3  Thank you, Mr. Brown.

4  BY MR. BRENNER:

5  Q.   Again, trying to get a baseline, "B███ has always

6  participated in extra curricular activities, Ranging from

7  chorus, drama, and sports."  Right?

8  A.   Yes.

9  Q.   Okay.  "She lost interest in playing the piano in

10 November.  B███ currently teaches a Sunday school class to

11 younger children."  Right?

12 A.   Yes.

13          MR. BRENNER:  May I confer with my colleagues for a

14 moment?

15          THE COURT:  Yes.

16          (Counsel confers.)

17          MR. BRENNER:  Dr. Zuluaga, thank you for your time.

18          I have no further questions, Your Honor.

19          THE COURT:  Let's go in order.  Mr. Blanchard, I'm

20 going to let you go ahead, if you want to ask questions, to

21 ask them.

22          MR. BLANCHARD:  I'm sorry?

23          THE COURT:  If you want to examine the doctor, this

24 is your opportunity.  I'm trying to get back in the order that

25 I thought was appropriate.

B.R. v. F.C.S.B.

84

1          Do you have any questions for the doctor?

2          MR. BLANCHARD:  I don't have any questions for the

3    doctor.

4          THE COURT:  Mr. Kinney, do you have any questions

5    for the doctor?

6          MR. KINNEY:  Just a couple.

7          THE COURT:  All right.

8                    CROSS-EXAMINATION

9    BY MR. KINNEY:

10   Q.   Good afternoon, Dr. Zuluaga.

11   A.   Good afternoon.

12   Q.   I'm Michael Kinney.  I represent the administrators,

13   counselors, and teachers?

14   A.   Okay, thanks.

15   Q.   Mr. Brenner asked you questions related to B.R.'s

16   inpatient care in the March and April time period?

17   A.   Yes.

18   Q.   Would you have expected her school performance or the

19   performance on her schoolwork to improve or not during that

20   time period?

21   A.   During the time that she was in homebound?

22   Q.   No.  Mr. Brenner said that she was receiving inpatient

23   care in the hospital?

24   A.   Correct.

25   Q.   Would you have expected her -- the performance on her

──────── B. R. v. F.C.S.B. ────────

85

1   schoolwork to have improved or not during that time period?

2   A.   Probably to decline.

3   Q.   You spoke with Mr. Brenner about the local screening

4   committee and the IEP report?

5   A.   Yes, sir.

6   Q.   What are the sources of the information in that report?

7   A.   As I said before, this is a group of professionals.

8   Most -- many of them are -- is a combination of school-based

9   professionals and also central office professionals who come

10  together, assess the students in a variety of areas, and then

11  determine a report to help the student improve.

12  Q.   Is part of the evidence in that report provided by

13  parents?

14  A.   Yes.

15          MR. KINNEY:  Thank you, Doctor.  That's all I've

16  got.

17          THE WITNESS:  Okay.

18          THE COURT:  Ms. Rewari, how long do you think you're

19  going to need?

20          MS. REWARI:  I think it's probably 30 to 45 minutes.

21          THE COURT:  All right.  We're going to take a short

22  break, ladies and gentlemen, for comfort.  And we'll come back

23  in at 12:15.  12:15.

24          (Jury excused.)

25          THE COURT:  Doctor, you can also step down and --

─B.R. v. F.C.S.B.─

86

1          All right.  You may be seated.

2          Ms. Rewari, I'm going hold you to that 30 to

3    45 minutes.

4          All right.  We're in recess.

5          (Recess.)

6          (Court proceedings resumed at 12:18 p.m.)

7          (Jury present.)

8          THE COURT:  Thank you.  You may be seated.

9          Ladies and gentlemen of the jury, Ms. Rewari has

10   indicated her examination is going to take somewhere between

11   30 and 45 minutes.

12                    REDIRECT EXAMINATION

13   BY MS. REWARI:

14   Q.   Good afternoon, Dr. Zuluaga.

15   A.   Good afternoon.

16   Q.   Yesterday Mr. Brenner asked you some questions about the

17   timing of the fax that you got from Ms. B███████.

18   A.   Okay.

19   Q.   Do you remember that?

20   A.   I do.

21   Q.   Okay.  And the fax that we talked about yesterday was on

22   February 15th, right?

23   A.   Correct.

24   Q.   And this is the fax that is Defendants' Exhibit 200 in

25   your book.

B.R. v. F.C.S.B.

87

1   A.   Yes.

2   Q.   Okay.  And Mr. Brenner suggested from the questions that

3   he asked you that the school was trying to get you its memo

4   before you met with the family; do you recall that?

5   A.   I do.

6   Q.   Okay.  Now, would you please look at the emails that are

7   attached to Defendants' Exhibit 200, and go to the email that

8   has the number FCSB-BR-1024?

9   A.   This is the black folder, right?

10  Q.   It should be in the white -- the skinny white binder,

11  right there.  If you go to tab DX-200.

12  A.   Right.

13  Q.   And if you look behind that tab.

14  A.   Right.

15  Q.   And there's some emails behind the memo, right?

16  A.   Yes.

17  Q.   Okay.  And if you could just turn to -- it's the --

18  they're numbered.  Do you see down on the bottom right?

19  A.   Yes.

20  Q.   If you go to the number that says FCSB-BR-1000 -- or

21  1024?

22  A.   Okay.

23  Q.   Do you see that?

24  A.   I do.

25  Q.   Okay.  And that's an email dated Monday, February 13,

B.R. v. F.C.S.B.

88

1  2012, 7:22 a.m., from Mrs. R. to Ms. B███████, right?

2  A.   Correct.

3  Q.   Okay.  And I'm going hand you Defendants' Exhibit 156 and

4  ask you to identify whether this is the same email?

5  A.   Yes, it is.

6         MS. REWARI:  Okay.  Your Honor, we move to admit

7  Defendants' Exhibit 156.

8         MR. BRENNER:  No objection.

9         THE COURT:  Without objection.  You may publish.

10 (Defendants' Exhibit No. 156 was admitted into evidence.)

11        MS. REWARI:  May we publish?

12        THE COURT:  Yes.

13        MS. REWARI:  Thank you.

14 BY MS. REWARI:

15 Q.   Okay.  So this email was sent by Mrs. R. to Ms. B████ at

16 7:22, Monday morning, February 13th, correct?

17 A.   Yes.

18 Q.   And it's copying Dr. Dale and Mr. F███████, right?

19 A.   Yes.

20 Q.   And so, Ms. B█████ and Mr. F███████ are the

21 administrators at Rachel Carson, correct?

22 A.   Correct.

23 Q.   And then Mrs. R. writes to Ms. B█████, "I received your

24 voice message late Friday."  And that would be Friday,

25 February 10th, which is the email below this one.

─────B. R. v. F.C.S.B.─────

89

1          Do you see that?

2    A.    Yes.

3    Q.    Okay.  And then Mrs. R. says to Mrs. -- Ms. B_____, "The

4    entire situation, which now is going on three-and-a-half

5    months, has been mismanaged, and there has been blatant

6    disregard for the welfare of my child.  This should have been

7    treated like an administrative issue with the principal's

8    leadership directing everyone to create a safe learning

9    environment two months ago.  Now, I've sent my concerns to the

10   school district.  There is no reason to continue go -- to go

11   in circles about what you are doing at the school."

12          Do you see that?

13   A.    I do.

14   Q.    Okay.  And then -- so your email that we looked at

15   yesterday, Plaintiff's Exhibit 133, which is also in that

16   little skinny book that your -- that you have in front of you.

17   A.    Okay.

18   Q.    That's PX-133.

19   A.    Yes.

20   Q.    Where Ms. Kirkbride asks you to respond on behalf of

21   Dr. Dale?

22   A.    Correct.

23   Q.    And that's --

24          MS. REWARI:  Your Honor, if we may publish?  Was

25   admitted yesterday, Plaintiff's Exhibit 133.

─B.R. v. F.C.S.B.─

90

1          THE COURT:  You may.

2   BY MS. REWARI:

3   Q.   So at the top, this email from Ms. Kirkbride to you at

4   8:51 is -- a.m., is about an hour-and-a-half after the school

5   already has been notified by Mrs. R. that she has gone to

6   Dr. Dale, right?

7   A.   Yes.

8   Q.   Right.  Her -- her email in Defendants' Exhibit 156

9   copied Dr. Dale and copied the school administration?

10  A.   Yes.

11  Q.   Okay.  Now, we looked at Defendants' Exhibit 157

12  yesterday.  That's also in your binder.

13          MS. REWARI:  And, Your Honor, I think this was

14  admitted yesterday.

15          (A pause in the proceedings.)

16          THE COURT:  Yes.

17          MS. REWARI:  Yes.  If we could publish?

18          THE COURT:  You may.

19          MS. REWARI:  Thank you.

20  BY MS. REWARI:

21  Q.   And this is -- the bottom of this exhibit is an email

22  from Dr. Dreyfuss to Ms. B████ and Mr. F███████ that evening

23  at 5:32 p.m.  Do you see that?

24  A.   I do.

25  Q.   Okay.  And Ms. -- Dr. Dreyfuss informed the school that

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

─── B. R. v. F.C.S.B. ───

91

1 she would be meeting with the parents the next morning at

2 8:30, right?

3 A.   Right.

4 Q.   And was that consistent with your practice to meet with

5 the family first?

6 A.   Yes.

7 Q.   Okay.  And then Dr. Dreyfuss asked in this email, "Once

8 we have had that meeting" -- I'm looking at the last line --

9 last two sentences.  "Once we have had that meeting, I would

10 like to review the information you have and talk about next

11 steps," right?

12 A.   Correct.

13 Q.   And then Ms. B█████ writes back, "We're in the process of

14 writing up all the actions we have taken.  It is a complex

15 process because so many people have been pulled in to support

16 this student," right?

17 A.   Yes.

18 Q.   Okay.  And so, this meeting that was scheduled for the

19 next morning was rescheduled, right?

20 A.   Yes.

21 Q.   Okay.  And it was rescheduled at the request of the

22 family?

23 A.   Correct.

24 Q.   And we saw that rescheduling in Defendants' Exhibit 160

25 in your binder.

B.R. v. F.C.S.B.

92

1          MS. REWARI:  Your Honor, I think --

2          THE WITNESS:  Yes.

3          MS. REWARI:  -- this was admitted yesterday.

4          If we may publish?

5          THE COURT:  You may.

6    BY MS. REWARI:

7    Q.   And these are emails back and forth between you and

8    Mrs. R. and Dr. Dreyfuss, right?

9    A.   Correct.

10   Q.   And Mary Mathes that's not somebody at the school,

11   correct?

12   A.   No.

13   Q.   Okay.  And so, the school wasn't copied on any of these

14   emails rescheduling this meeting, correct?

15   A.   Correct.

16   Q.   And then you received the fax from Ms. B█████ on the

17   afternoon of February 15th?

18   A.   Yes.

19   Q.   Would you have reviewed the materials from the school

20   before you met with the parents on February 16th?

21   A.   No, I -- I like to hear from the parents first.

22   Q.   Okay.  All right.  Let's -- let's switch to another

23   topic.

24          Mr. Brenner asked you yesterday about a phrase that

25   was used in your letter that was Defendants' Exhibit 178, the

─────── B.R. v. F.C.S.B.───────

93

1    one with the redaction.  If you could look at the

2    one that's -- it's in the skinny binder.  It says

3    Defendants' -- DX-178, and it has "redacted" behind it?

4    A.   Yes.

5    Q.   Okay?

6    A.   Okay.

7         MS. REWARI:  And, Your Honor, I believe this was

8    admitted with the redaction yesterday.  If we may publish?

9         THE COURT:  It was.  You may publish.

10         MS. REWARI:  Okay.

11         (Exhibit published.)

12   BY MS. REWARI:

13   Q.   All right.  If you look at the first page of this

14   document.

15   A.   Okay.

16   Q.   And he asked you -- I think -- he showed you the first

17   paragraph, and it says the words "inappropriate touching."  Do

18   you see that in the first paragraph?

19   A.   Correct.

20   Q.   Okay.  Now, if you -- if you go back to Plaintiff's

21   Exhibit 133, which we just had up, that's -- this is the email

22   that was forwarded to you from Dr. Dale's office asking you to

23   respond?

24   A.   Correct.

25   Q.   Okay.  If you could just go back to that one.

─B.R. v. F.C.S.B.─

94

1   A.   Okay.

2   Q.   And please turn to -- let's go to the email from the

3   family.

4   A.   Okay.

5   Q.   Friday, February 10, 2012, 12:04 p.m.?

6   A.   Correct.

7            MS. REWARI:  Okay.  So, Grady, if we could show that

8   one on the screen, on page 2.

9   BY MS. REWARI:

10  Q.   Okay.  And then this email goes on for -- let's see,

11  several more pages.  Go to page 5 at the bottom where it says

12  FCSB-BR-004746.  Do you see that?

13  A.   Yes, 746.

14  Q.   And then let's -- let's look at the paragraph that says

15  "In summary."

16  A.   Okay.

17           MS. REWARI:  Give Grady a moment to get there.

18  BY MS. REWARI:

19  Q.   Okay.  And this is in mom's email.  "In summary, over a

20  period of three months, B.R. has been the victim of ongoing

21  taunting, name-calling" -- with parentheses -- "with

22  obscenities no adult would be able to tolerate, physical

23  assault, intentionally shoved, poked, and now having a ball

24  thrown at her, bullying, and has been threatened with her life

25  on school property."

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

95

1           Do you see that?

2   A.   I do.

3   Q.   All right.  And she doesn't describe any sexual touching

4   in this summary paragraph, right?

5   A.   Correct.

6   Q.   She doesn't describe any hands being put in her

7   daughter's blouse, right?

8   A.   Right.

9   Q.   No hands in her daughter's pants?

10  A.   Correct.

11  Q.   No hands on here buttocks or her breasts?

12  A.   Correct.

13  Q.   No hands on her sexual organs?

14  A.   Correct.

15  Q.   Okay.  Let's take a look at Plaintiff's Exhibit 171,

16  which is the chronology that we talked about yesterday.

17  A.   One second.

18           MS. REWARI:  Your Honor, I believe this was admitted

19  yesterday.

20           THE COURT:  It was.  You may publish.

21           MS. REWARI:  Okay.

22           THE WITNESS:  171?

23           MS. REWARI:  171.  Plaintiff's, PX-171.

24           If I may publish?

25           THE COURT:  You may.

1          MS. REWARI:  Okay.  All right.  And, Grady, if we

2  could put that on the screen?  There we go.

3          (Exhibit published.)

4  BY MS. REWARI:

5  Q.   So this chronology runs from mid-October to the week of

6  November 14th on the first page, right?

7  A.   Yes.

8  Q.   Okay.  And then if you flip the page, we go to the second

9  page, and we look at -- let's take a look at Monday,

10 November 21st.

11 A.   Yes.

12 Q.   And this is a discussion that -- these are the

13 statements -- this is the area that Mr. Brenner focused you

14 on.

15          So if we go back to the page before and we look at

16 week of November 14th.

17 A.   Okay.

18 Q.   All right.  Where it says, "D.N. and C.K. start coming to

19 B.R.'s locker in morning."

20          Do you see that?

21 A.   November 14th?

22 Q.   Where it says, "Week of November 14th," that section.

23 A.   Yeah.  Under "Chronology of Events," right?

24 Q.   Yes.  If you look at the --

25 A.   DX 171.

B.R. v. F.C.S.B.

97

Q.    -- page --

A.    Yes.

Q.    And it's on your screen.  Might be a little bit easier?

A.    Okay.  Okay.

Q.    Okay.  So it says, "D.N. and C.K. start coming to B.R.'s
locker in the morning.  Block her.  Call her whore, lesbian,
ugly."  And then it has, "Witnesses.  Friends with boys but
tried to defend B.R.  J.O. and C.K. start to make racist
comments.  You're Indian.  Eww.  Disgusting.  Curry smell.
Indian.  C.K."

A.    Right.

Q.    "C.K. is waiting for B.R. at Middleton Farms bus stop
late bus and demands $50 from B.R. or else he threatens to
spread sexual rumors about B.R. and says he's going to hurt
your family, especially your brother, Dash.  B.R. gives it to
him, afraid of the threats and scared to tell anyone."

        And then, "On another bus D.M. tells J.H., M., and
A. about naked pics of B.R. and her sexual acts.  Did you hear
B.R. gives free oral sex and she did it to C.K. and D.N.?
Girls tell this to B.R. at school."

        Nothing about inappropriate sexual touching there,
right?

A.    Correct.

Q.    And if we flip the page, now go to the next page, weekend
of November 19th, this is Mom's chronology, the first entry.

─────────────B.R. v. F.C.S.B.─────────────

98

1   "B.R. explodes with rage and finally tells about bullying.

2   Says she is afraid.  B.R. tells me she can't go to school ever

3   again and she's crying.  She says, 'I'm really scared.'"

4           And then the next entry is Monday, November 21st,

5   "B.R. her father, and I go to school," right?

6   A.   Right.

7   Q.   Okay.  So no report in this chronology of any kind of

8   inappropriate sexual touching, right?

9   A.   Right.

10  Q.   You were asked a lot of questions about the statements,

11  about B.R.'s statement from November and D.N.'s statement and

12  C.K.'s statement.  First, let me start with, was B.R.'s family

13  complaining about any of these students in an email that you

14  got that was Plaintiff's Exhibit 133?

15  A.   One second.  This is an important question.  133.  Could

16  you rephrase the question, please?

17  Q.   Sure.

18          The email that you got in February --

19  A.   Correct.

20  Q.   -- right, from Dr. Dale's office that asked you to look

21  into this --

22  A.   Right.

23  Q.   And we looked at that email that has the "In Summary"

24  section, right --

25  A.   Right.

─────────── B. R. v. F.C.S.B. ───────────

99

1   Q.   -- several pages long.

2        Are any of these students mentioned in that email?

3   A.   No.

4   Q.   Okay.  Was there any allegation made in that email that

5   what the school had done to curb the conduct of these three

6   students whose statements were shown to you, was there any

7   allegation that what the school had done had not been

8   effective?

9   A.   No, is this the email that was written by the family on

10  Friday, February 10th at 12:04?

11  Q.   Correct.

12  A.   Correct.  No.

13  Q.   All right.  If we take a look at Defendants' Exhibit 200.

14  And the first part of -- this is the fax, right, from the

15  school?

16  A.   Yes.

17       MS. REWARI:  Okay.  And if -- Your Honor, you

18  admitted the memo, so if I could show the memo?

19       THE COURT:  Yes.

20       (Exhibit published.)

21       MS. REWARI:  Defendants' Exhibit 200, show the first

22  page of the memo.

23  BY MS. REWARI:

24  Q.   And this memo starts with Issue No. 1.  Do you see that?

25  A.   I do.

─────B.R. v. F.C.S.B.─────

100

1   Q.   Okay.  And it says, "Mrs. R. and B.R. came in to speak

2   with Mrs. H█████ about B.R. being harassed at her locker."

3   A.   Yes.

4   Q.   Okay.  And then there's a description there of what B.R.

5   reported according to this chronology, right?

6   A.   Yes.

7   Q.   Okay.  And then, this -- there's a discussion there, a

8   pretty long paragraph, of -- from the school about this

9   incident, right?

10  A.   Yes.

11  Q.   And let's turn the page to the second page of this

12  discussion or this memo, right?  And this goes on -- there's

13  several more paragraphs there, right?

14  A.   Yes.

15  Q.   And for example, there's a discussion in the third

16  paragraph, third full paragraph here, about a pumpkin patch;

17  do you see that?

18  A.   I do.

19  Q.   And there's nothing about a pumpkin patch in any of the

20  statements that we saw, right?

21  A.   Yes.

22  Q.   Okay.  There's also discussion in this paragraph about

23  $50 and a long board; do you see that?

24  A.   I do.

25  Q.   And the amount, $50, is not discussed in any of the

B.R. v. F.C.S.B.

101

1  students' statements that Mr. Brenner showed you, right?

2  A.   Right.

3  Q.   And there's discussion of money, but there is no

4  discussion of the 50 -- that it was $50, right?

5  A.   Correct.

6  Q.   Okay.  There's also discussion in the paragraph above

7  about a party at J.O.'s house; do you see that?

8  A.   In which paragraph?

9  Q.   If you look at the second full paragraph.

10 A.   I do.  Okay.  Yes, I do see it.

11 Q.   Right.  And the statement that we looked at didn't talk

12 about a party; it talked about being at J.O.'s house, right?

13 A.   Correct.

14 Q.   And then if you look at the -- the paragraph that starts

15 at the bottom of the page --

16 A.   All right.

17 Q.   -- where it says, "Mrs. T█████ met with J.O."

18 A.   Okay.

19 Q.   "J.O. said that J.O. and C███████ had been dating and

20 they broke up."

21 A.   Correct.

22 Q.   And then it goes on, right?

23 A.   Yes.

24 Q.   Okay.  None of that was in J.O.'s statement, correct?

25 A.   Correct.

B.R. v. F.C.S.B.

102

1  Q.   And so, in your experience, is it possible for

2  administrators to get more information from students than what

3  they -- the students choose to write down in their statements?

4  A.   Absolutely.

5  Q.   Are students required to write statements?

6  A.   It's best practice to write, but it also depends on how

7  comfortable the students are at writing the statements.

8  And -- but students respond to questions the administrators

9  ask and administrators need to write it down.

10 Q.   And so, is it common for administrators to find out a lot

11 more than what might be in a student's statement?

12 A.   Absolutely.

13 Q.   Okay.  All right.  Let's go -- keep looking at this.  The

14 discussion of this -- of this particular issue then goes on to

15 page 3.  Do you see there's several more paragraphs there?

16 A.   Correct.

17 Q.   And the first full paragraph says, "Mrs. T███ talked by

18 phone to the parents of the students she'd interviewed."

19         Do you see that?

20 A.   Yes, I do.

21 Q.   Do parents write statements for the school?

22 A.   Sometimes they do.  Sometimes they don't.

23 Q.   Okay.  Are they required to write statements?

24 A.   They are not.

25 Q.   Okay.  And can administrators talk to parents to get

 1  additional information about a situation?

 2  A.   Absolutely.

 3  Q.   Okay.  And is that common, if you're trying to figure out

 4  what is happening with a student to talk with the parents of

 5  the students involved?

 6  A.   Absolutely.

 7  Q.   Okay.  And then -- all right.  So this -- and again, I'm

 8  not going make you read every paragraph here, but this page

 9  continues for several more paragraphs about this November 21st

10  report, right?

11  A.   Correct.

12  Q.   Okay.  All right.  So please turn the page to page 4.

13  A.   All right.

14  Q.   Okay.  And, again, we're still on the November 21st issue

15  in this memo, right?

16  A.   Yes.

17  Q.   Okay.  And then go to page 5.

18  A.   Okay.

19  Q.   And, again, still, this goes on past November 21st.  Do

20  you see that?  There's a paragraph that says -- on

21  December 1 --

22  A.   I do.

23  Q.   -- and there's one on December 5 and on December 6,

24  right?  And then the next page, page 6, three more paragraphs

25  about this Issue No. 1; do you see that?

B.R. v. F.C.S.B.

104

1   A.   I do.

2   Q.   And so, it's -- over five and a half pages of this

3   single-spaced memo are just about this Issue No. 1, right?

4   A.   Correct.

5   Q.   And would you agree that there is a lot more information

6   in these five and a half pages than what was in those three

7   statements that were shown to you?

8   A.   Oh, absolutely.

9   Q.   Now, switch gears again.  Mr. Brenner asked you about an

10  allegation made to the SRO regarding a slap; do you recall

11  that?

12  A.   I do.

13  Q.   We just looked at that summary paragraph in Plaintiff's

14  Exhibit 133 that was Mom's email on February 10th --

15  A.   Yes.

16  Q.   -- correct.

17       You're welcome to go back to that.

18  A.   Yes.  One second.  The original memo that the mother --

19  Q.   Yeah, email from Mom.

20  A.   -- sent to superintendent -- to the principal.

21  Q.   Correct.

22       MS. REWARI:  Could you put that one --

23  BY MS. REWARI:

24  Q.   And if you could go to the page that's 4746.

25  A.   Okay.

B.R. v. F.C.S.B.

105

1   Q.   Page 5 of the email.

2   A.   Yes.

3   Q.   And let's get back to the "In Summary" paragraph.

4   A.   Okay.

5   Q.   Look at that again.

6        MS. REWARI:  And if -- Grady, if you could --

7   BY MS. REWARI:

8   Q.   And then when she describes physical assault, she's got,

9   "Intentionally shoved, poked, and now having a ball thrown at

10  her."

11       Do you see that?

12  A.   I do.

13  Q.   Nothing about a slap in there, correct?

14  A.   Correct.

15  Q.   Is it possible for a parent or a student to make a report

16  directly to the SRO and not to a school administrator?

17  A.   It could be.

18  Q.   And do you know whether B.R. or her parents ever made

19  reports directly to the SRO?

20  A.   Say that again.

21  Q.   So let me try --

22  A.   Ask the question again.

23  Q.   Right.

24  A.   Do I know?

25  Q.   Is the SRO an employee of the school system?

B.R. v. F.C.S.B.

106

1   A.   It's not an employee of the school system.

2   Q.   Right.  Are the SRO's records police records?

3   A.   Yes.

4   Q.   Okay.  Does the school system keep the police records?

5   A.   No, we don't.

6   Q.   Okay.  And so is it possible for a person to make a

7   police report to the SRO but the school not get a copy of it?

8   A.   Correct.

9   Q.   Okay.  All right.  Let's talk just for a couple of

10  minutes about that youth survey that you were asked about.

11  A.   Yes.

12  Q.   Now, is there a difference between the Fairfax County

13  Board of Supervisors and Fairfax County Public Schools?

14  A.   Yeah, one administers the county, and the other entity,

15  the Fairfax County Public Schools, administers the schools.

16  So they are two completely different boards, two completely

17  different entities, but they work together a lot.

18  Q.   Okay.  And so does the county provide community resources

19  that are outside of the school?

20  A.   Yes, they do.

21  Q.   Like after-school programs?

22  A.   Correct.

23  Q.   Like recreation centers?

24  A.   Yes.

25  Q.   Like parks?

B.R. v. F.C.S.B.

107

1   A.   Yes.

2   Q.   Fire?

3   A.   Correct.

4   Q.   Police department?

5   A.   Yeah.

6   Q.   And so, is part of the Fairfax County youth survey

7   determining what kind of issues might be in the community in

8   general?

9         MR. BRENNER:  Objection, leading, Your Honor.

10        THE COURT:  Rephrase.

11  BY MS. REWARI:

12  Q.   Is the Fairfax County youth survey limited to asking

13  questions about what is happening in school versus what is

14  happening elsewhere?

15  A.   I don't know the answer to that question.  What I know is

16  that whatever activity we have, whether it is an academic

17  activity during the school day or an after-school program that

18  is driven by another entity, the school is a school, right?

19  And the communities and the kids know our schools as a school

20  regardless of which program is managed by which entity.

21        Am I making sense?

22  Q.   Right.  And -- and -- but -- and sometimes students go to

23  programs that are not run by the county or by the school

24  system, right?

25  A.   Correct.  Correct.

─────B. R. v. F.C.S.B.─────

108

1   Q.   They might be involved in youth sports that are

2   provided --

3   A.   By the schools, yeah.   Summer programs.

4   Q.   They might go to a shopping mall, for example?

5            THE COURT:   Watch your form of the questions.

6            MS. REWARI:   Sorry.

7            THE WITNESS:   Yes.

8   BY MS. REWARI:

9   Q.   Okay.   And so, let me -- just -- let's take a look at

10  some of the questions that Mr. Brenner asked you about in the

11  Fairfax County youth survey.

12           Can you go to -- go to his binder, Exhibit 552.

13  A.   Okay.

14  Q.   And I think he asked you about the page that is

15  BR-WOR-11396?

16  A.   Yes.

17  Q.   Okay.   Just -- let's start with the paragraph above that,

18  the one that he asked you about.

19  A.   Okay.

20  Q.   And this document states that this report includes data

21  collected from the 2009 Fairfax County youth survey, a

22  comprehensive, anonymous, involuntarily survey that examines

23  behaviors, experiences, and other factors that influence the

24  health and well-being of the county's youth, right?

25  A.   Correct.

———B. R. v. F.C.S.B.———

109

1   Q.   And the paragraph ends, "These data provide insight into

2   the prevalence and frequency of substance abuse, violence, and

3   delinquency, health and health risk behaviors, and positive

4   behaviors such as community engagement and personal

5   integrity," right?

6   A.   Right.

7   Q.   And this is a pretty large document; would you agree?

8   A.   I do.

9   Q.   And there are -- let's see, if you go to the last page

10  of -- of the document, which is the questions, right?

11  A.   Yes.

12  Q.   And Mr. Brenner asked you about some of the questions,

13  but there's about -- on each page of the survey, start with

14  page 11623, please.  11623.

15  A.   1162?

16  Q.   3.

17  A.   3.  Okay.

18  Q.   And this is Appendix B, healthy behaviors -- univariate

19  tables weighted.  Do you see that?

20  A.   Yeah, I do.

21  Q.   And the questions here asks, for example:  What language

22  do you use most often at home?

23        This is question Number I7.  Do you see that on the

24  first page, down on the right?

25  A.   I7, yes, the last question of this page.

———B. R. v. F.C.S.B.———

110

1   Q.   And then it asks on the next page, for example:  How many

2   times have you driven a car or other vehicle when you had been

3   drinking alcohol?

4   A.   Correct.

5   Q.   So is that a question about conduct at school?

6   A.   No.

7   Q.   Okay.  The one over to the right of that:  How many

8   occasions, if any, have you had any beer, wine, or hard liquor

9   during the last 30 days?

10         Is that a question about conduct at school?

11   A.   No.

12   Q.   All right.  The next page, if you flip the page, go to

13   11626.

14   A.   Okay.

15   Q.   And there's a question -- if you look at question B1A:

16   How many times in the past year have you bullied, taunted,

17   ridiculed, or teased someone?

18         Do you see that?

19   A.   I do now.

20   Q.   Okay.  And, again, is that a question asking about what

21   you're doing at school?

22   A.   No.

23         One second -- let me see -- let me read the question

24   again.

25   Q.   Sure.  Please.

─B.R. v. F.C.S.B.─

111

1   A.   It's B8?

2   Q.   B1A on page 11625.

3   A.   11625.  B8 [sic].

4        Okay.  I see it now.

5   Q.   Okay.  And so the first question I just asked you about,

6   "How many times in the past year have bullied, taunted,

7   ridiculed, or teased someone?"

8        And that -- is that question limited to what you're

9   doing at school?

10  A.   No.

11  Q.   All right.  If you go down on that page, look at question

12  B3.  That question is:  How many times in the past year have

13  you been suspended from school?

14  A.   Correct.

15  Q.   Right.  So that's a question limited to -- to school,

16  right?

17  A.   Yes.

18  Q.   Okay.  Now, go to the next page, B9A:  How many times in

19  the past year has anyone done -- has anyone done any of the

20  following to you:  Bullied, taunted, ridiculed, or teased you?

21        Do you see that?

22  A.   I do.

23  Q.   All right.  And that -- is that a question limited to

24  what's happening to you at school?

25  A.   No.

B.R. v. F.C.S.B.

1    Q.   And then there's a question B13:  Have you ever been

2    physically forced to have sexual intercourse when you did not

3    want to?

4            Do you see that?

5    A.   I do.

6    Q.   And, again, is that a question limited to school?

7    A.   No.

8    Q.   I'm sorry?  I didn't --

9    A.   No, no.  No.

10   Q.   Okay.  And then this is the same page where -- the

11   question that Mr. Brenner asked you about:  How many times in

12   the past year has anyone done any of the following to you,

13   sexually harassed you?

14           Do you see that?

15   A.   I don't.

16   Q.   It's question B11.

17   A.   B11.

18   Q.   On the same page.

19   A.   I do.

20   Q.   Is that a question that was limited to what was happening

21   at school?

22   A.   No.

23   Q.   And the questions like this go from page -- where we

24   started, 11623, right, and there's multiple questions in every

25   page, right?

1  A.   Correct.

2  Q.   And then they go to 11663, correct?

3  A.   To 1162 [sic]?

4  Q.   They start on 11623, and they go all the way to 11663,

5  right?

6  A.   Right.

7  Q.   And there's at least four and sometimes up to eight or

8  nine questions on each page, right?

9  A.   Correct.

10  Q.   And so would you agree that's a pretty comprehensive

11  survey that asks about a lot of behavior?

12  A.   It is.

13  Q.   Okay.  And -- and the questions that Mr. Brenner asked

14  you about were not asking about what were you experiencing at

15  school, correct?

16          MR. BRENNER:  Objection, leading, Your Honor.

17          THE COURT:  Rephrase.

18  BY MS. REWARI:

19  Q.   Were the questions that he was asking you directing your

20  attention to asking what students were experiencing at school?

21  A.   Yes.

22  Q.   Which question was the one that --

23  A.   The question of harassment and bullying specifically to

24  the -- to the school.

25  Q.   Is there a question there that you see -- do you see a

─────B.R. v. F.C.S.B.─────

114

1  question on there that's asking about what happens at school?

2  A.   Specifically to --

3           MR. BRENNER:  Objection, asked and answered.

4           THE WITNESS:  -- the -- to what -- to one school,

5  no.  I don't see that.

6  BY MS. REWARI:

7  Q.   Okay.

8  A.   I see it as a system.

9           THE COURT:  Just a second, sir.

10          MR. BRENNER:  Objection, the witness answered the

11  question.  The counsel is now leading him to give a different

12  answer.

13          MS. REWARI:  I think he --

14          THE COURT:  She can try to -- overruled.  She can

15  try to rehabilitate the answer.

16  BY MS. REWARI:

17  Q.   Right.  Do you recall which question he asked you about?

18  A.   This is the one (indiscernible) -- I -- I recall the

19  questions.  I will have to go all over --

20  Q.   So I want to just ask you, not what his question was, but

21  what is the question in the survey.  So the question in the

22  survey that he directed your attention to was a question

23  that's B11, right?

24  A.   B11, one second.

25  Q.   And this is page 11626.

─── B.R. v. F.C.S.B. ───

115

1  A.   B11.  "How many times in the past has anyone done any of

2  the following to you, sexually harassed you?"

3  Q.   And those are the percentages where he said more than

4  22 percent of the -- of these students said yes, right?

5  A.   Correct.

6  Q.   And -- and the question was not asked how many times in

7  the past year has anyone done --

8          THE COURT:  Counsel, rephrase the question.  Was the

9  question asked.

10          MS. REWARI:  Thank you.

11 BY MS. REWARI:

12 Q.   Was the question here asked:  "How many times in the past

13 year has anyone done any of the following to you at school?"

14 A.   No.

15 Q.   Okay.

16          (A pause in the proceedings.)

17          MS. REWARI:  Your Honor, one moment for the Court's

18 indulgence.

19          THE COURT:  Yes, ma'am.

20 BY MS. REWARI:

21 Q.   Okay.  Mr. Brenner also asked you about the 2010/2011

22 survey which is Exhibit 553.

23 A.   Okay.

24 Q.   And he asked you about page 11682.

25 A.   11682.  One second, please.

─────── B. R. v. F.C.S.B. ───────

116

1           Yeah, correct.

2    Q.    Okay.  And he -- he directed your attention to the -- to

3    the section about bullying and aggression, right?

4    A.    Right.

5    Q.    And now, the first bullet that he read to you was,

6    "Almost half of the Fairfax County students, 49.4 percent,

7    reported bullying, taunting, ridiculing, or teasing someone in

8    the past year.  And 8.3 percent did so 20 or more times."

9    A.    I see that, correct.

10   Q.    And does that bullet talk about where the students were

11   saying they were experiencing bullying, taunting, ridiculing,

12   or teasing someone?

13   A.    No.

14   Q.    And does that bullet tell you whether the students were

15   asked, Did you report any bullying, taunting, ridiculing, or

16   teasing to a school administrator or school employee?

17   A.    No.

18   Q.    And then same question for the next bullet is, "More than

19   half of Fairfax County students reported being bullied,

20   taunted, ridiculed, or teased by someone in the past year.

21   Over one in ten were bullied 20 or more times."

22           Does that bullet talk about whether students

23   reported bullied, taunted, ridiculed, or teased by someone at

24   school?

25   A.    No.

─────B. R. v. F. C. S. B.─────

117

1   Q.   He also asked you about the bullet that said -- the two

2   bullets about cyberbullying, a student who attends their

3   school, right?

4   A.   Right.

5   Q.   And does anything in that bullet talk about whether the

6   student reported cyberbullying?

7   A.   No.

8   Q.   Is there any bullet in this section that talks about what

9   students were experiencing at school?

10  A.   No.

11  Q.   Is there anything in this section that talks about what

12  students were claiming to have reported to school?

13  A.   No.

14  Q.   Then he asked you about Plaintiff's Exhibit 554, which is

15  a 2011 and '12 youth survey.

16  A.   Okay.

17  Q.   And I think he took you to Table 107, which is page 10537

18  in this --

19  A.   One second.  10537, correct.

20  Q.   Right.  And then he asked you about that table, right?

21  A.   Yes.

22  Q.   Okay.  And this is a table that shows, "Prevalence in

23  frequency of being sexually harassed in the past year," right?

24  A.   Correct.

25  Q.   And does this table represent the prevalence and

B.R. v. F.C.S.B.

118

1    frequency of being sexually harassed at school in the past

2    year?

3    A.    No.

4    Q.    Okay.  If you turn to page 10569.

5    A.    Okay.

6    Q.    And what is -- what is -- well -- this table is called

7    "Frequency of Eating Green Salad in the Past Week," right?

8    A.    Correct.

9    Q.    And the table before that is "Frequency of Eating Fruits

10   in the Past Week," right?

11   A.    Correct.

12   Q.    Okay.  So would you agree that this survey is asking

13   about behaviors that might extend outside of school?

14   A.    Absolutely.

15   Q.    Is that something the schools would still care about?

16   A.    Yes.

17              THE COURT:  You're at the 45-minute mark.

18              MS. REWARI:  Am I at the 45-minute mark?  Okay.

19   BY MS. REWARI:

20   Q.    Let me just ask a couple of questions just about the IEP

21   documents that Mr. Brenner showed you.

22   A.    Okay.

23   Q.    As part of the information, if you could go to

24   Defendants' Exhibit 169.

25   A.    One second.  One sec.  It's the same folder?

———B.R. v. F.C.S.B.———

119

1   Q.   I think we can pull it up on the screen.

2   A.   Okay.

3   Q.   Okay?  I'm not sure if you have it.  Let's just put it on

4   the screen.

5   A.   169.

6   Q.   169.

7   A.   Okay.

8          MS. REWARI:  Let me ask you, Judge, if I can publish

9   it -- I believe it was Defendants' Exhibit 169.

10         Your Honor, may we publish that?

11         THE COURT:  You may.

12         (Exhibit published.)

13  BY MS. REWARI:

14  Q.   You were asked about a number of questions on this

15  sociocultural assessment; do you see that?

16  A.   Yes.

17  Q.   And what are the sources of information that are listed

18  there?  Well --

19  A.   "Review of records," "Local screening committee

20  meetings," "Interview with parents."

21  Q.   Okay.  And so, with respect to "review of records," do

22  you know what records were shared with the school by the

23  family?

24  A.   I don't.  For this particular IEP, I don't.

25  Q.   And do you know whether the family ever gave

B.R. v. F.C.S.B.

120

1   authorization for the school to get the plaintiff's medical

2   records?

3   A.   I don't.

4   Q.   Okay.  So "Interview with parent," is it possible that

5   the medical information that was reviewed by Mr. Brenner in

6   this was given orally by one of B.R.'s parents?

7            MR. BRENNER:  Objection, calls for speculation.  He

8   says he doesn't know what they got --

9            THE COURT:  Sustained.  Rephrase if you can.

10  BY MS. REWARI:

11  Q.   Okay.  Do you know what information in this document came

12  from the parent?

13  A.   I don't, because it varies from IEP to IEP.  Sometimes

14  it's just a list of questions.  Sometimes it's an inventory of

15  questions that are prepared.  Sometimes it's a informal

16  conversation with the parent.

17  Q.   Okay.  And so, for example, one of the things that

18  Mr. Brenner showed you was a discussion in this document --

19  let's go to page -- under "Developmental History," for

20  example, on page 2.

21  A.   Okay.  Correct.

22  Q.   All right.  And under the first -- the first paragraph

23  after that where it says, "Prior to November 2011," it says,

24  "She suffered a loss of appetite and a great weight loss."

25            Do you see that?

B.R. v. F.C.S.B.

121

1    A.    On second page?

2    Q.    It's easier on the --

3    A.    6160?

4    Q.    -- screen.

5    A.    Page, right, right.

6          I do see that.

7    Q.    Right.  Do you know whether the school was provided any

8    records showing that she suffered a great weight loss?

9    A.    I don't.

10   Q.    Is it possible this information came from Mom?

11         MR. BRENNER:  Objection, calls for speculation.

12         THE COURT:  Sustained.

13   BY MS. REWARI:

14   Q.    Okay.  All right.  With respect to the paragraph above

15   about "Pregnancy with B.R." under "Developmental History"?

16   A.    Okay.

17   Q.    Do you know whether the school was provided Mom's

18   prenatal records?

19   A.    I don't know that part.

20   Q.    Okay.  And then under "Medical Information" -- below

21   that, the next section is "Medical Information."

22   A.    Okay.

23   Q.    All right.  In the first paragraph, "November 2011."

24   A.    Okay.

25   Q.    It says, "Parents had family doctor, Dr. Kevin Weaver,

───────B.R. v. F.C.S.B.───────

122

1    talk to B.R. due to behavior changes.  He thought she had

2    signs of PTSD and met with B.R. about every three weeks."

3            Do you see that?

4    A.   I do.

5    Q.   Is it possible that that information came from Mom?

6            MR. BRENNER:  Objection.  Calls for speculation.

7            MS. REWARI:  I'm asking if it's possible.

8            THE COURT:  Anything is possible, so --

9            THE WITNESS:  It is --

10           THE COURT:  -- objection is sustained.

11           THE WITNESS:  It's possible.

12   BY MS. REWARI:

13   Q.   Okay.  The next paragraph says that "Dr. Weaver

14   recommended that B.R. remain on homebound instruction."

15   A.   I see that.

16   Q.   Do you know the source of that information?

17   A.   No.

18   Q.   Okay.

19           THE COURT:  You're at 50 minutes.

20           MS. REWARI:  All right.  Okay.

21   BY MS. REWARI:

22   Q.   Do you know the sources of any of the information that

23   Mr. Brenner showed you in this document?

24   A.   I don't.

25   Q.   Thank you.

───Tonia M. Harris OCR-USDC/EDVA 703-646-1438───

EASTERN DISTRICT OF VIRGINIA

—B.R. v. F.C.S.B.—

123

1          MS. REWARI:  No further questions.

2          THE COURT:  Thank you, Doctor.  You may step down.

3          (Witness excused.)

4          THE COURT:  Who do you anticipate your next witness

5   being?

6          MS. ANDERSON:  Your Honor, we'll be calling

7   Ms. S██████ T██████.

8          THE COURT:  And how long do you think that that

9   examination is going to take?

10         MS. ANDERSON:  It depends on the answers, but I

11  would estimate about an hour and 30 minutes.  On direct.  For

12  us.

13         THE COURT:  That's all you get to do is direct and a

14  redirect.

15         MS. ANDERSON:  I thought just maybe --

16         THE COURT:  I know.  I'm sure you'd like to do the

17  cross, too, Ms. Anderson.

18         MS. ANDERSON:  Sure.  If you'll let me.

19         THE COURT:  All right.  Let's go ahead and take our

20  break.  I want you to talk to the doctor and see if you can

21  pare her testimony down to an hour.  We need to better manage

22  our time, and we're not doing a very good job.  Not you

23  particularly, but all of us are not managing our time very

24  well.  And so what I'm going to start doing as a matter of

25  course is asking counsel how long their witnesses are going to

─ B. R. v. F. C. S. B. ─

124

 1  take.  I'm going to hold them to it, because we have not done

 2  a very good job meeting our estimations.

 3          So, try to pare it down to an hour.  From your side

 4  over here, obviously you're going to get the opportunity to

 5  cross-examine, but I can't imagine a cross-examination being

 6  more than the direct examination, so let's be careful with

 7  that.

 8          Yes, ma'am.

 9          MS. REWARI:  Your Honor, I just want to clarify.  I

10  think the witness they are talking about is Defendant,

11  Ms. T█████.  They've changed the order.  They are not calling

12  Ms. Rustioni right now.

13          MS. ANDERSON:  And I did inform Mister --

14          THE COURT:  You're calling her as part of your case

15  in chief?

16          MS. ANDERSON:  We are, yes.

17          THE COURT:  Okay.  All right.  Again, let's try to

18  do better.  I'm seeing emails about this case extending into

19  late April, and that's not going to happen.  We are -- we are

20  of a mind to see all the things that you're exchanging, and if

21  you're advising other people that you don't think you're going

22  to get out of this trial until late April, you need to

23  reassess your evaluations because that's not going to happen.

24          All right.  Ladies and gentlemen, we're going to go

25  until about 1:45 for our lunch.  Remember, don't discuss the

─B.R. v. F.C.S.B.─

125

1    case or any aspect of the case with anyone.

2              (Jury excused.)

3              THE COURT:  All right.  1:45.

4              (Lunch Recess 1:07 p.m.)

5              (A.M. Session concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 2nd day of

9    April, 2024.

10           I further certify that the foregoing 141 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 26, 2024.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                            126

**$**

**$50** [4] - 97:12, 100:22, 100:24, 101:3

**'**

**'12** [1] - 117:14
**'as** [1] - 77:13
**'exhibits** [1] - 76:21
**'Leave** [1] - 31:17

**0**

**05** [1] - 4:13

**1**

**1** [5] - 52:13, 99:23, 103:20, 103:24, 104:2
**10** [1] - 94:4
**10,927** [1] - 46:13
**100** [3] - 2:2, 2:6, 2:10
**1024** [1] - 87:20
**10537** [2] - 117:16, 117:18
**10569** [1] - 118:3
**107** [1] - 117:16
**10:00** [1] - 6:16
**10:31** [1] - 1:6
**10th** [9] - 18:15, 19:6, 46:13, 46:18, 47:9, 59:24, 88:24, 99:9, 104:13
**11** [4] - 1:8, 69:2, 73:4, 74:2
**1162** [2] - 109:14, 113:2
**11623** [4] - 109:13, 112:23, 113:3
**11625** [2] - 111:1, 111:2
**11626** [2] - 110:12, 114:24
**11663** [2] - 113:1, 113:3
**11681** [2] - 55:21, 56:2
**11682** [4] - 55:19, 55:20, 115:23, 115:24
**12** [1] - 6:22
**12.5** [1] - 57:9
**120** [1] - 3:6
**126** [2] - 4:14, 126:10
**12:04** [2] - 94:4, 99:9
**12:15** [2] - 85:22
**12:18** [1] - 86:5
**12th** [5] - 46:13, 46:18,

47:9, 59:24, 75:10
**13** [1] - 87:24
**133** [6] - 89:14, 89:24, 93:20, 98:13, 98:14, 104:13
**13th** [1] - 88:15
**14.1** [1] - 57:8
**14th** [4] - 96:5, 96:15, 96:20, 96:21
**15** [2] - 69:2, 71:23
**15-month-old** [1] - 18:18
**1520** [1] - 1:20
**156** [4] - 88:2, 88:6, 88:9, 90:7
**156..........................
................** [1] - 4:11
**157** [1] - 90:10
**15th** [2] - 86:21, 92:16
**160** [1] - 91:23
**1600** [1] - 50:10
**1681** [1] - 55:25
**169** [16] - 70:16, 70:20, 71:4, 71:7, 73:9, 73:10, 73:19, 73:22, 73:23, 78:6, 78:8, 78:10, 118:23, 119:4, 119:5, 119:8
**169..........................
.** [1] - 4:9
**16th** [3] - 60:15, 61:13, 92:19
**17** [2] - 6:17, 6:24
**17.7** [2] - 59:23, 60:1
**171** [4] - 95:14, 95:21, 95:22, 96:24
**1775** [1] - 3:9
**178** [1] - 92:24
**18** [1] - 59:18
**1801** [1] - 3:6
**19th** [1] - 97:24
**1:07** [1] - 125:3
**1:19-cv-917** [2] - 1:4, 126:8
**1:45** [2] - 124:24, 125:2

**2**

**2** [4] - 1:6, 94:7, 120:19, 126:16
**2-6-1** [1] - 63:20
**20** [5] - 41:25, 44:14, 56:17, 116:7, 116:20
**200** [4] - 86:23, 87:6, 99:12, 99:20
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2007** [4] - 35:2, 36:12, 36:13, 37:25

**2009** [6] - 38:1, 41:10, 46:3, 46:11, 46:12, 108:20
**2010** [1] - 39:6
**2010-11** [1] - 55:6
**2010/2011** [1] - 115:20
**2011** [6] - 23:17, 59:16, 80:16, 117:14, 120:22, 121:22
**2011/2012** [1] - 58:15
**2012** [10] - 61:5, 64:18, 65:11, 68:20, 73:4, 74:2, 76:13, 79:16, 87:25, 94:4
**2013** [5] - 35:3, 36:12, 36:14, 37:25, 38:1
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2021** [2] - 22:6, 23:17
**2023** [1] - 6:20
**2024** [3] - 1:6, 126:9, 126:16
**2029-Century** [1] - 1:19
**21** [1] - 4:4
**213-995-5720** [1] - 1:21
**216** [1] - 61:3
**21st** [5] - 96:9, 98:3, 103:8, 103:13, 103:18
**22** [4] - 50:1, 50:4, 64:18, 115:3
**2200** [2] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**23** [1] - 79:15
**2300** [1] - 1:15
**261** [2] - 61:1, 63:25
**27** [1] - 50:3
**2800** [3] - 2:3, 2:7, 2:11
**29,000** [1] - 42:1
**29,223** [1] - 46:13
**2nd** [4] - 2:2, 2:6, 2:10, 126:8

**3**

**3** [3] - 102:14, 109:15, 109:16

**30** [5] - 85:19, 86:1, 86:10, 110:8, 123:10
**30,734** [1] - 47:9
**305-539-8400** [1] - 2:8
**309** [1] - 49:18
**33131** [3] - 2:3, 2:7, 2:11
**36** [1] - 18:22
**382** [1] - 39:12
**39,400** [1] - 49:21
**39,461** [1] - 49:21
**39,770** [2] - 49:16, 49:18
**396** [3] - 40:12, 45:22, 46:4
**397** [2] - 43:12, 44:2

**4**

**4** [1] - 103:11
**40** [1] - 50:8
**400** [1] - 3:10
**401** [1] - 3:13
**45** [3] - 85:19, 86:2, 86:10
**45-minute** [2] - 118:16, 118:17
**4746** [1] - 104:23
**49.4** [1] - 116:5
**495** [2] - 5:6, 17:19
**4:00** [1] - 19:8

**5**

**5** [4] - 94:10, 103:16, 103:22, 104:25
**50** [2] - 101:3, 122:18
**529** [2] - 29:9, 29:11
**537** [2] - 59:1, 59:10
**552** [6] - 38:22, 38:24, 39:2, 39:19, 41:8, 108:11
**553** [2] - 54:17, 115:21
**554** [2] - 58:12, 117:13
**557** [2] - 51:3, 51:5
**57** [4] - 51:2, 51:4, 51:5, 51:6
**5:32** [1] - 90:22

**6**

**6** [2] - 103:22, 103:23
**6,000** [1] - 53:24
**610-804-1787** [1] - 2:4
**6158** [1] - 72:5
**6160** [1] - 121:2
**6168** [1] - 71:23
**626** [4] - 43:13, 44:23, 45:3, 47:1
**643a** [1] - 1:16

**69** [2] - 54:13, 54:15
**6th** [2] - 46:14, 46:16

**7**

**705** [3] - 13:24, 13:25, 16:2
**71/73** [1] - 4:9
**723** [4] - 32:19, 32:21, 32:24, 33:4
**746** [1] - 94:12
**77** [4] - 22:24, 23:12, 23:13, 32:14
**78** [1] - 25:22
**798** [1] - 50:14
**7:22** [2] - 87:25, 88:15
**7th** [2] - 75:25, 79:20

**8**

**8.3** [1] - 116:7
**8.8** [1] - 56:22
**800** [1] - 50:10
**804-788-8200** [1] - 3:2
**81** [2] - 24:20, 24:21
**84** [1] - 4:5
**850-585-3414** [1] - 2:12
**86** [1] - 4:5
**8700** [1] - 50:24
**88** [1] - 4:11
**8:20** [1] - 6:18
**8:30** [1] - 91:1
**8:51** [1] - 90:3
**8th** [10] - 46:13, 46:17, 47:9, 59:21, 59:22, 59:23, 60:1, 79:14

**9**

**9** [1] - 44:13
**90-minute** [1] - 11:1
**90067** [1] - 1:20
**901** [2] - 50:6, 50:7
**95** [1] - 21:3
**9:00** [1] - 19:8
**9th** [1] - 81:4

**A**

**A.F** [1] - 3:5
**a.m** [3] - 1:6, 87:25, 90:3
**A.M** [1] - 1:8, 125:4
**abandoned** [1] - 16:25
**ability** [3] - 11:12, 16:20, 126:14
**able** [13] - 5:15, 6:21, 12:2, 16:16, 17:24, 20:15, 21:2, 68:25,

127

69:3, 69:4, 94:21
**abrenner@bsfllp.com** [1] - 2:8
**absolutely** [8] - 14:2, 21:3, 102:3, 102:11, 103:1, 103:5, 104:7, 118:13
**abuse** [5] - 7:20, 9:5, 13:10, 48:17, 109:1
**academic** [1] - 107:15
**academically** [1] - 79:25
**academics** [1] - 70:6
**accepted** [1] - 77:19
**accident** [5] - 5:6, 5:8, 5:14, 17:19, 17:20
**accommodate** [6] - 6:24, 18:17, 19:3, 19:22, 20:14, 21:5
**accommodated** [2] - 18:3, 18:4
**accommodation** [2] - 20:21, 20:24
**According** [2] - 74:22, 75:23
**according** [5] - 34:10, 57:21, 75:12, 76:16, 100:4
**acknowledges** [2] - 27:1, 27:2
**acquainted** [2] - 21:11, 21:14
**Action** [2] - 1:4, 126:8
**action** [1] - 35:17
**actions** [2] - 53:17, 91:13
**activities** [1] - 83:5
**activity** [2] - 107:15, 107:16
**acts** [1] - 97:17
**actual** [2] - 11:9, 69:21
**additional** [2] - 13:15, 102:25
**address** [1] - 48:23
**adduced** [1] - 126:6
**adjustment** [2] - 19:25, 20:25
**administer** [1] - 16:20
**administers** [2] - 106:13, 106:14
**administration** [1] - 90:8
**administrative** [1] - 89:6
**administrator** [2] - 105:15, 116:15
**administrators** [12] - 67:22, 68:10, 68:24, 69:5, 69:7, 84:11, 88:20, 102:1, 102:7,

102:8, 102:9, 102:24
**admissible** [1] - 73:13
**admit** [4] - 41:18, 43:8, 73:10, 88:5
**Admitted** [2] - 4:8, 4:10
**admitted** [10] - 71:8, 73:20, 81:7, 88:9, 89:24, 90:13, 92:2, 93:7, 95:17, 99:17
**adult** [1] - 94:21
**advances** [1] - 33:18
**advantage** [1] - 17:25
**advisement** [1] - 16:23
**advising** [1] - 124:20
**afraid** [2] - 97:15, 98:1
**after-school** [2] - 106:20, 107:16
**afternoon** [5] - 84:9, 84:10, 86:13, 86:14, 92:16
**Aggression** [2] - 44:5, 56:9
**aggression** [1] - 116:2
**ago** [2] - 30:4, 89:8
**agree** [10] - 8:4, 15:12, 19:21, 57:13, 57:15, 57:2, 104:4, 109:6, 113:9, 118:11
**agreement** [1] - 68:7
**ahead** [5] - 7:15, 52:1, 62:8, 83:19, 123:18
**al** [2] - 1:6, 126:7
**alanderson@bsfllp.com** [1] - 1:21
**alcohol** [1] - 110:2
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**allegation** [3] - 99:3, 99:6, 104:9
**alleged** [1] - 9:5
**allow** [2] - 5:22, 18:23
**allows** [1] - 48:16
**almost** [2] - 59:4, 116:5
**alone** [1] - 31:17
**aloud** [1] - 46:9
**ALSTON** [1] - 1:11
**Alston** [2] - 6:16, 18:14
**amended** [1] - 14:5
**amount** [2] - 60:4, 100:24
**amounting** [1] - 33:20
**ANDERSON** [17] - 7:12, 7:17, 8:1, 11:3, 12:4, 12:12, 12:22, 13:6, 15:7, 15:20, 15:23, 123:5, 123:9,

123:14, 123:17, 124:12, 124:15
**Anderson** [1] - 1:18, 8:5, 8:18, 11:2, 123:16
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angela** [2] - 6:4, 21:8
**Angeles** [1] - 1:20
**anonymous** [4] - 42:6, 57:2, 59:19, 108:21
**answer** [9] - 8:25, 9:6, 45:13, 62:24, 63:11, 64:25, 107:14, 114:11, 114:14
**answered** [4] - 47:9, 114:2, 114:9
**answers** [1] - 123:9
**anticipate** [1] - 123:3
**anxiety** [1] - 81:7
**apologies** [1] - 27:13
**apologize** [1] - 5:5
**APPEARANCES** [3] - 1:13, 1:25, 2:24
**appendix** [1] - 109:17
**appetite** [1] - 80:20, 120:23
**appreciate** [3] - 11:3, 19:25, 37:7
**approach** [9] - 7:2, 44:15, 45:1, 46:5, 51:23, 52:15, 55:22, 70:15, 73:1
**appropriate** [3] - 17:7, 81:7, 83:24
**April** [13] - 1:6, 6:17, 6:24, 18:15, 19:6, 60:20, 66:14, 66:19, 84:15, 124:18, 124:21, 126:9, 126:16
**area** [2] - 71:16, 96:12
**areas** [1] - 85:9
**arguing** [1] - 52:4
**argumentative** [2] - 38:11, 57:24
**Arlington** [1] - 53:4
**arts** [1] - 77:13
**aspect** [1] - 124:25
**assault** [4] - 12:15, 64:17, 94:22, 105:7
**Assault** [1] - 11:7
**assaulted** [1] - 64:25
**assess** [2] - 11:18, 85:9
**assessment** [3] - 74:23, 79:22, 119:14
**assigned** [1] - 68:4
**assignments** [1] -

77:19
**assistant** [3] - 34:25, 35:1, 47:18
**associate** [2] - 5:20, 21:8
**associated** [2] - 62:17, 62:22
**attached** [1] - 87:6
**attend** [1] - 75:24
**attends** [3] - 56:23, 57:10, 117:1
**attention** [12] - 36:5, 36:6, 36:9, 36:10, 44:4, 62:1, 63:15, 64:3, 113:19, 114:21, 116:1
**authenticated** [1] - 39:21
**authenticity** [1] - 43:21
**authority** [1] - 35:25
**authorization** [1] - 119:25
**available** [5] - 15:22, 68:21, 68:23, 69:12, 70:7
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**aware** [12] - 12:21, 16:18, 20:13, 34:10, 36:12, 37:23, 38:2, 38:6, 41:10, 58:3, 60:25

## B

**B.H** [1] - 3:5
**B.R** [25] - 1:3, 5:4, 14:21, 32:5, 94:19, 97:7, 97:11, 97:12, 97:13, 97:14, 97:17, 97:18, 97:19, 97:25, 98:1, 98:4, 99:25, 100:1, 100:3, 105:17, 121:14, 121:25, 122:1, 122:13, 126:7
**B.R.'s** [7] - 31:24, 84:14, 96:18, 97:4, 98:10, 98:11, 120:5
**b11** [1] - 112:16
**B11** [7] - 47:7, 47:8, 49:5, 112:15, 114:22, 114:23, 114:25
**B13** [1] - 111:25
**B1A** [1] - 110:14
**b1A** [1] - 111:1
**B3** [1] - 111:11

**B8** [2] - 110:25, 111:2
**B9A** [1] - 111:17
**backdoor** [2] - 9:15, 15:15
**Background** [1] - 77:9
**background** [1] - 8:13
**backup** [1] - 126:13
**bad** [1] - 5:8
**ball** [2] - 94:22, 105:8
**B████** [9] - 86:16, 87:25, 88:14, 88:19, 88:22, 89:2, 90:21, 91:12, 92:15
**BARAN** [1] - 1:14
**Barry** [3] - 16:11, 16:14, 16:17
**based** [8] - 53:18, 54:11, 68:23, 74:1, 76:11, 76:16, 76:24, 85:7
**baseline** [3] - 77:7, 80:13, 83:4
**basis** [1] - 11:24, 14:3, 51:18
**Bates** [3] - 2:13, 39:25, 55:18
**bear** [1] - 13:2
**become** [1] - 5:20
**beer** [1] - 110:7
**BEFORE** [1] - 1:11
**beginning** [1] - 72:21
**behalf** [4] - 4:2, 4:7, 4:10, 89:19
**behavior** [1] - 113:10, 121:25
**Behavioral** [2] - 82:25, 83:1
**behaviors** [10] - 38:7, 42:6, 48:20, 76:21, 77:1, 108:22, 109:2, 109:3, 109:17, 118:12
**behind** [4] - 5:10, 87:12, 87:14, 93:2
**below** [2] - 88:24, 121:19
**best** [9] - 13:5, 18:13, 22:14, 22:16, 48:5, 51:25, 63:5, 102:5, 126:14
**better** [5] - 9:14, 11:25, 63:13, 123:20, 124:17
**between** [7] - 16:16, 36:13, 37:25, 38:1, 86:9, 92:6, 106:11
**beyond** [1] - 15:10
**binder** [8] - 51:2, 63:22, 78:3, 87:9, 90:11, 91:24, 93:1,

108:11
**bit** [8] - 10:16, 17:25, 20:25, 31:4, 65:5, 82:1, 82:14, 97:2
**black** [3] - 63:22, 63:23, 87:8
**BLANCHARD** [7] - 6:4, 6:12, 20:7, 20:9, 21:20, 83:21, 84:1
**Blanchard** [6] - 3:8, 5:21, 20:6, 21:7, 21:17, 83:18
**Blanchard's** [1] - 5:20
**blatant** [1] - 89:4
**bless** [1] - 18:22
**block** [1] - 97:5
**blocked** [1] - 5:6
**blouse** [1] - 95:6
**blow** [1] - 30:11
**board** [2] - 40:23, 100:22
**Board** [21] - 5:4, 33:1, 33:8, 33:24, 38:15, 39:15, 40:5, 40:23, 46:22, 47:20, 51:12, 52:7, 53:16, 57:14, 64:15, 64:23, 75:18, 75:20, 106:12
**Board's** - 35:15, 36:9, 39:21
**boards** [1] - 106:15
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**bold** [1] - 77:11
**book** [8] - 27:17, 29:9, 38:22, 54:17, 60:24, 61:3, 86:24, 89:15
**booked** [1] - 19:20
**bottom** [9] - 39:10, 44:1, 47:6, 55:19, 56:4, 87:17, 90:20, 94:10, 101:14
**box** [4] - 5:8, 5:9, 5:10, 12:1
**boys** [1] - 97:6
**BR-WOR-11396** [1] - 108:14
**break** [3] - 19:5, 85:21, 123:19
**breaks** [1] - 7:9
**breasts** [1] - 95:10
**BRENNER** [138] - 6:2, 7:3, 16:10, 16:22, 17:1, 17:5, 17:12, 19:12, 19:17, 21:21, 21:24, 22:23, 23:2, 23:9, 24:9, 24:11, 24:20, 24:23, 24:25, 25:21, 25:24, 26:2, 26:15, 26:18, 27:11,

27:14, 28:21, 28:24, 29:1, 29:10, 29:13, 29:15, 29:18, 29:20, 30:1, 30:3, 31:3, 31:8, 32:1, 32:8, 32:19, 32:22, 32:24, 32:25, 34:8, 34:9, 36:20, 37:21, 37:22, 38:13, 38:20, 38:21, 38:25, 39:3, 39:18, 40:3, 40:9, 40:10, 40:14, 40:20, 40:21, 41:17, 41:22, 41:23, 43:8, 43:11, 43:24, 43:25, 44:15, 44:18, 45:2, 45:9, 45:15, 45:19, 45:21, 46:5, 46:7, 46:15, 48:2, 48:9, 50:21, 51:6, 51:8, 51:23, 52:5, 52:12, 52:15, 52:18, 53:20, 53:21, 54:14, 55:5, 55:22, 55:25, 56:1, 58:1, 59:6, 63:14, 70:11, 70:13, 70:15, 70:17, 70:19, 71:3, 71:9, 73:2, 73:9, 73:16, 73:21, 73:24, 75:9, 76:9, 78:6, 78:9, 78:14, 78:16, 78:18, 78:19, 79:7, 79:9, 79:13, 82:1, 82:14, 82:15, 82:17, 82:18, 82:24, 83:3, 83:12, 83:16, 88:7, 107:8, 113:15, 114:2, 114:9, 120:6, 121:10, 122:5
**Brenner** [22] - 2:5, 43:7, 45:11, 76:7, 84:14, 84:21, 85:2, 86:15, 87:1, 92:23, 96:12, 100:25, 104:8, 108:9, 109:11, 112:10, 113:12, 115:20, 118:20, 120:4, 120:17, 122:22
**Brenner................** [1] - 4:4
**Brief** [2] - 82:25, 83:1
**briefly** [1] - 22:24
**bring** [6] - 7:11, 17:22, 20:17, 24:19, 27:25, 73:22
**brings** [3] - 36:5, 36:6, 82:12
**Brittany** [1] - 2:1
**britzoll@gmail.com** [1] - 2:4

**broke** [2] - 30:16, 101:19
**brother** [1] - 97:14
**brought** [3] - 10:12, 12:2, 36:9
**Brown** [1] - 82:2
**brown** [3] - 24:9, 27:12, 83:2
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:11
**bullet** [11] - 56:11, 56:21, 57:6, 116:4, 116:9, 116:13, 116:17, 116:21, 116:25, 117:4, 117:7
**bullets** [1] - 117:1
**bullied** [9] - 44:12, 56:16, 56:17, 110:15, 111:5, 111:19, 116:18, 116:20, 116:22
**bullying** [13] - 42:12, 43:3, 60:9, 69:3, 79:19, 80:14, 94:23, 97:25, 113:22, 116:2, 116:6, 116:10, 116:14
**Bullying** [2] - 44:5, 56:9
**Burton** [1] - 2:20
**burtons@huntonak. com** [1] - 2:23
**bus** [3] - 97:11, 97:12, 97:16
**business** [1] - 13:4
**buttocks** [1] - 95:10
**BY** [80] - 21:24, 23:2, 23:9, 24:11, 24:25, 26:2, 26:18, 27:14, 29:1, 29:20, 30:3, 31:8, 32:8, 32:25, 34:9, 37:22, 38:13, 38:21, 39:3, 40:10, 40:21, 41:23, 43:25, 44:18, 45:2, 45:21, 46:7, 46:15, 48:9, 50:21, 51:8, 52:5, 52:12, 52:18, 53:21, 54:14, 55:5, 56:1, 58:1, 59:6, 63:14, 70:13, 70:19, 71:9, 73:2, 73:24, 75:9, 76:9, 78:19, 82:15, 82:18, 83:3, 84:8, 86:12, 88:13, 90:1, 90:19, 92:5, 93:11, 94:8, 94:17, 96:3, 99:22,

104:22, 105:6, 107:10, 108:7, 113:17, 114:5, 114:15, 115:10, 115:19, 118:18, 119:12, 120:9, 121:12, 122:11, 122:20

---

# C

**C.K** [10] - 27:8, 27:15, 28:6, 30:15, 96:17, 97:4, 97:7, 97:9, 97:11, 97:18
**C.K.'s** [2] - 29:3, 98:11
**CA** [1] - 1:20
**capacity** [1] - 126:5
**caps** [1] - 49:8
**car** [1] - 110:1
**care** [5] - 5:19, 21:17, 84:15, 84:22, 118:14
**careful** [2] - 48:4, 124:5
**Carson** [15] - 34:11, 34:17, 34:22, 36:23, 37:11, 37:24, 38:8, 38:17, 57:21, 57:23, 58:2, 58:5, 75:25, 82:16, 88:20
**case** [23] - 5:3, 8:7, 8:9, 8:23, 9:3, 9:22, 10:2, 10:13, 11:10, 11:17, 11:21, 15:12, 15:15, 15:16, 16:20, 18:1, 36:14, 37:24, 124:13, 124:17, 124:25, 126:7
**caught** [2] - 17:18, 17:19
**celebrate** [3] - 18:15, 18:19, 18:24
**celebrated** [1] - 20:22
**celebration** [1] - 18:20
**center** [1] - 11:13
**Center** [1] - 81:10
**centers** [1] - 106:22
**central** [2] - 36:2, 85:8
**CERTIFICATE** [1] - 126:1
**Certificate** [1] - 4:14
**certify** [2] - 126:4, 126:10
**cetera** [2] - 48:8, 70:5
**Chambers** [1] - 10:8
**Chambers's** [5] - 7:21, 7:22, 8:9, 9:4, 9:14
**changed** [1] - 124:10
**changes** [1] - 121:25
**characterization** [3] -

31:25, 38:12, 47:21
**characterizations** [1] - 48:5
**chief** [3] - 10:2, 16:13, 124:14
**child** [4] - 8:13, 9:5, 10:9, 89:5
**Childhood** [1] - 11:7
**childhood** [2] - 7:20, 13:10
**children** [2] - 12:16, 83:10
**Children's** [1] - 81:5
**choose** [1] - 102:2
**chorus** [1] - 83:6
**C██████** [1] - 101:18
**Christmas** [1] - 19:2
**chronology** [5] - 95:15, 96:4, 97:24, 98:6, 100:4
**Chronology** [1] - 96:22
**circles** [1] - 89:10
**citation** [1] - 36:18
**City** [2] - 53:6, 54:12
**Civil** [2] - 1:4, 126:7
**claiming** [1] - 117:11
**clarify** [2] - 79:17, 124:8
**Clarke** [1] - 53:4
**class** [1] - 83:9
**clear** [3] - 8:14, 15:7, 45:19
**clearly** [1] - 9:16
**CLERK** [2] - 29:12, 29:17
**close** [2] - 6:23, 60:12
**closely** [1] - 13:1
**co** [1] - 46:21
**co-sponsored** [1] - 46:21
**colleague** [1] - 6:4
**colleagues** [1] - 83:12
**collected** [1] - 108:20
**colon** [1] - 49:10
**combination** [1] - 85:7
**comfort** [1] - 85:21
**comfortable** [1] - 102:6
**coming** [8] - 17:2, 26:19, 26:22, 27:3, 57:22, 58:2, 96:17, 97:4
**comment** [2] - 8:9, 36:17
**comments** [1] - 97:8
**commissioned** [2] - 40:22, 41:3
**committee** [7] - 74:22, 75:12, 75:14, 75:15,

75:24, 85:3, 119:18
**common** [3] - 12:20, 102:9, 103:2
**communication** [2] - 16:16, 17:7
**communities** [1] - 107:18
**community** [7] - 39:22, 48:1, 48:19, 50:18, 106:17, 107:6, 109:3
**company** [1] - 6:20
**comparing** [1] - 11:10
**complaining** [1] - 98:12
**complaint** [1] - 14:5
**completely** [4] - 13:8, 74:10, 106:15
**completeness** [1] - 10:24
**complex** [1] - 91:13
**compliance** [1] - 35:6
**comprehensive** [3] - 42:5, 108:21, 113:9
**computer** [1] - 126:12
**concern** [1] - 74:7
**concerns** [4] - 11:22, 80:1, 80:16, 89:8
**concluded** [1] - 125:4
**conduct** [4] - 33:20, 99:4, 110:4, 110:9
**conducted** [5] - 9:1, 9:4, 10:9, 46:12, 74:4
**conducting** [1] - 8:15
**confer** [1] - 83:12
**confers** [1] - 83:15
**confidential** [3] - 47:17, 57:1, 59:19
**confidentially** [1] - 47:19
**confined** [1] - 9:10
**confirm** [5] - 41:24, 44:7, 44:11, 48:14, 52:22
**confirming** [2] - 26:21, 30:15
**conflict** [1] - 20:25
**confronted** [1] - 41:14
**confused** [1] - 28:5
**confusing** [1] - 28:13
**consequences** [1] - 13:3
**consideration** [2] - 6:22, 18:22
**consistent** [11] - 23:21, 31:9, 32:4, 32:13, 34:2, 34:18, 35:19, 45:17, 68:8, 68:11, 91:3

**consistently** [2] - 37:15, 77:18
**constantly** [1] - 76:22
**constitute** [1] - 126:11
**consulting** [1] - 33:20
**Cont** [2] - 1:25, 2:24
**contact** [3] - 19:20, 20:2, 26:10
**contacted** [1] - 81:9
**contained** [1] - 9:11
**CONTENTS** [1] - 4:1
**context** [3] - 8:15, 8:19, 10:25
**continue** [3] - 16:21, 43:7, 89:9
**continues** [1] - 103:8
**conversation** [1] - 120:15
**conversations** [3] - 16:19, 69:5, 69:6
**Cooper** [1] - 61:23
**cooperativity** [1] - 77:21
**coordinator** [1] - 65:18
**copied** [3] - 90:8, 92:12
**copy** [4] - 17:8, 61:16, 70:11, 106:6
**copying** [1] - 88:17
**corner** [1] - 47:6
**corners** [2] - 9:11, 11:5
**correct** [139] - 6:2, 22:16, 23:18, 25:8, 26:23, 27:4, 27:5, 28:2, 30:9, 30:14, 31:5, 31:6, 35:8, 35:16, 36:7, 36:11, 36:24, 36:25, 37:9, 39:7, 40:25, 41:9, 42:12, 42:13, 42:15, 43:17, 44:8, 46:18, 46:19, 47:11, 47:12, 48:24, 49:20, 49:24, 49:25, 50:2, 50:25, 51:1, 51:14, 51:15, 52:9, 52:20, 52:23, 53:17, 54:4, 55:16, 56:2, 56:5, 56:6, 56:19, 57:3, 57:4, 57:11, 58:6, 58:17, 58:18, 58:20, 59:16, 59:25, 60:18, 60:21, 61:10, 61:14, 65:6, 66:16, 67:12, 68:14, 69:10, 69:25, 70:8, 71:6, 74:2, 74:15, 74:17, 75:18, 76:18, 78:1, 78:24, 79:23,

79:24, 80:1, 82:9, 82:11, 84:23, 86:22, 88:1, 88:15, 88:20, 88:21, 89:21, 91:11, 91:22, 92:8, 92:10, 92:13, 92:14, 93:18, 93:23, 94:5, 95:4, 95:9, 95:11, 95:13, 97:22, 98:18, 99:10, 99:11, 101:4, 101:12, 101:20, 101:23, 101:24, 102:15, 103:10, 104:3, 104:15, 104:20, 105:12, 105:13, 106:7, 106:21, 107:2, 107:24, 108:24, 110:3, 111:13, 112:25, 113:1, 113:8, 113:14, 115:4, 115:25, 116:8, 117:18, 117:23, 118:7, 118:10, 120:20
**corrective** [1] - 35:17
**correctly** [3] - 11:5, 49:12, 50:22
**corroborations** [1] - 27:6
**cosponsored** [1] - 39:14
**Counsel** [3] - 58:7, 73:6, 83:15
**counsel** [11] - 5:22, 16:12, 16:17, 20:23, 21:17, 36:19, 73:7, 114:10, 115:7, 123:24
**counseling** [1] - 76:11
**counselor** [2] - 13:3, 82:20
**counselors** [3] - 13:12, 16:14, 84:12
**counties** [1] - 52:19
**County** [45] - 5:4, 33:1, 33:8, 33:24, 35:5, 39:5, 39:15, 40:4, 40:5, 40:23, 46:17, 46:21, 47:12, 51:12, 52:6, 53:4, 53:6, 54:4, 54:12, 55:7, 55:13, 55:14, 55:15, 56:12, 56:15, 56:22, 57:8, 57:14, 58:19, 58:22, 59:16, 60:8, 70:23, 106:11, 106:12, 106:14, 107:5, 107:11, 108:10, 108:20,

116:5, 116:18
**county** [9] - 38:10, 48:16, 48:18, 50:18, 52:22, 58:24, 106:13, 106:17, 107:22
**county's** [2] - 42:8, 108:23
**couple** [6] - 5:19, 7:6, 43:9, 84:5, 106:8, 118:19
**course** [6] - 7:9, 19:10, 34:12, 52:8, 67:17, 123:24
**court** [3] - 19:6, 73:6, 126:8
**Court** [16] - 3:12, 3:12, 4:14, 7:18, 9:9, 9:19, 15:22, 20:20, 20:22, 28:8, 28:11, 41:24, 63:4, 86:5, 126:3, 126:22
**COURT** [168] - 1:1, 1:12, 5:1, 5:3, 6:3, 6:9, 6:13, 7:5, 7:15, 7:25, 8:3, 10:1, 10:15, 11:2, 11:16, 12:7, 12:21, 12:25, 13:14, 13:19, 13:23, 14:2, 14:7, 14:10, 14:12, 14:19, 15:2, 15:6, 15:12, 15:21, 15:24, 16:3, 16:6, 16:12, 16:25, 17:4, 17:9, 17:13, 17:15, 17:18, 18:6, 18:8, 18:11, 19:15, 19:23, 20:4, 20:6, 20:8, 20:10, 20:19, 21:22, 22:25, 24:24, 25:23, 25:25, 28:7, 28:13, 28:16, 28:18, 28:23, 28:25, 29:19, 31:4, 31:7, 32:3, 32:7, 32:21, 32:23, 36:21, 37:1, 37:5, 37:8, 37:10, 37:14, 37:20, 38:12, 38:24, 39:24, 40:1, 40:7, 40:17, 41:5, 41:10, 41:13, 41:20, 42:20, 42:23, 43:5, 43:10, 43:14, 44:16, 45:1, 45:11, 45:16, 46:10, 48:4, 50:20, 51:5, 51:18, 51:25, 52:16, 54:10, 55:4, 55:23, 57:25, 62:25, 63:2, 63:4, 63:7, 63:9, 70:16, 70:18, 71:6, 73:1,

73:6, 73:12, 73:18, 75:7, 76:6, 78:4, 78:7, 78:12, 78:15, 78:17, 79:8, 79:11, 83:14, 83:18, 83:22, 84:3, 84:6, 85:17, 85:20, 85:24, 86:7, 88:8, 88:11, 89:25, 90:15, 90:17, 92:4, 93:8, 95:19, 95:24, 99:18, 107:9, 108:4, 113:16, 114:8, 114:13, 115:7, 115:18, 118:16, 119:10, 120:8, 121:11, 122:7, 122:9, 122:18, 123:1, 123:3, 123:7, 123:12, 123:15, 124:13, 124:16, 125:2
**Court's** [3] - 9:17, 11:12, 115:16
**Courthouse** [1] - 3:13
**COURTROOM** [2] - 29:12, 29:17
**courtroom** [1] - 6:5
**cover** [1] - 15:2
**create** [1] - 89:7
**created** [1] - 39:22
**credibility** [3] - 9:17, 11:18, 12:3
**crime** [1] - 52:24
**critical** [2] - 67:9, 67:13
**criticize** [2] - 12:9, 12:12
**critique** [2] - 9:13, 10:8
**cross** [12] - 7:23, 9:20, 13:2, 13:11, 14:1, 15:3, 16:2, 43:18, 48:3, 123:16, 124:4
**CROSS** [2] - 21:23, 84:7
**Cross** [2] - 4:4, 4:5
**cross-exam** [1] - 13:11
**cross-examination** [5] - 9:20, 15:3, 16:2, 48:3, 124:4
**CROSS-EXAMINATION** [2] - 21:23, 84:7
**Cross-examination** [2] - 4:4, 4:5
**cross-examine** [2] - 14:1, 124:4
**crying** [1] - 98:2
**cumbersome** [1] -

59:7
**curb** [1] - 99:4
**curricular** [1] - 83:5
**curry** [1] - 97:8
**cutting** [1] - 31:13
**cyberbullied** [2] -
57:9, 57:10
**Cyberbullying** [1] -
44:5
**cyberbullying** [7] -
56:23, 57:15, 57:19,
58:2, 60:9, 117:1,
117:5

## D

**D.M** [1] - 97:16
**D.N** [3] - 96:17, 97:4,
97:18
**D.N.'s** [1] - 98:10
**Dale** [10] - 61:1, 61:5,
61:8, 61:9, 61:16,
64:5, 88:17, 89:20,
90:5, 90:8
**Dale's** [2] - 93:21,
98:19
**Dash** [1] - 97:14
**data** [2] - 108:19,
108:25
**date** [5] - 18:2, 19:21,
23:21, 79:17, 81:22
**dated** [1] - 87:24
**dating** [1] - 101:18
**daughter** [2] - 69:24,
81:13
**daughter's** [3] - 67:10,
95:6, 95:8
**David** [4] - 26:12,
30:7, 31:16
**days** [2] - 68:9, 110:8
**DC** [5] - 1:16, 2:15,
2:18, 2:22, 3:2
**dear** [1] - 6:15
**Dear** [1] - 18:13
**December** [3] -
103:20, 103:22
**decide** [2] - 11:20,
34:16
**decided** [2] - 15:14,
62:2
**decline** [1] - 85:1
**dedicated** [1] - 35:6
**deeply** [1] - 18:17
**defend** [1] - 97:7
**Defendant** [4] - 2:13,
2:25, 3:8, 124:9
**Defendants** [4] - 1:7,
3:4, 4:2, 4:10
**Defendants'** [22] - 4:9,
29:12, 70:16, 70:20,

71:4, 71:7, 73:19,
73:22, 86:23, 87:6,
88:2, 88:6, 88:9,
90:7, 90:10, 91:23,
92:24, 93:2, 99:12,
99:20, 118:23, 119:8
**deficiency** [1] - 80:6
**defined** [1] - 77:13
**delayed** [1] - 12:18
**delinquency** [2] -
48:18, 109:2
**demands** [1] - 97:12
**demeanor** [1] - 9:24
**demolished** [1] - 5:9
**demonstrated** [1] -
77:16
**denied** [3] - 26:9,
27:20, 29:4
**deny** [1] - 25:6
**Department** [3] -
51:12, 52:7, 54:8
**department** [1] - 107:3
**deposed** [1] - 10:14
**deposition** [1] - 8:22
**depression** [1] - 76:12
**depressive** [1] - 82:3
**describe** [3] - 68:11,
95:2, 95:5
**described** [2] - 67:3,
71:12
**describes** [1] - 105:7
**describing** [1] - 71:11
**description** [1] - 100:3
**designed** [1] - 48:19
**detail** [1] - 23:24
**details** [2] - 66:21,
81:19
**Detective** [4] - 8:9,
9:4, 9:14, 10:8
**determination** [2] -
9:18, 11:24
**determinations** [3] -
9:17, 11:19, 12:3
**determine** [1] - 85:10
**determined** [1] - 81:6
**determining** [1] -
107:6
**detrimental** [1] - 81:9
**Developmental** [3] -
80:9, 120:18, 121:14
**diagnosed** [1] - 80:3
**diagnosis** [2] - 81:25,
82:3
**dialogue** [2] - 28:10,
28:14
**difference** [1] - 106:11
**different** [8] - 19:21,
25:14, 72:24, 74:10,
78:7, 106:15,
106:16, 114:10

**direct** [11] - 15:20,
15:21, 42:18, 42:25,
53:22, 60:14, 62:16,
63:15, 123:10,
123:12, 124:5
**directed** [5] - 48:7,
48:8, 68:10, 114:21,
116:1
**directing** [4] - 44:4,
64:3, 89:7, 113:18
**directive** [1] - 35:24
**directly** [4] - 20:11,
61:24, 105:15,
105:18
**disability** [1] - 75:17
**disagree** [1] - 8:6
**discern** [1] - 16:16
**discipline** [7] - 51:13,
52:8, 52:21, 52:22,
52:23, 52:24, 53:17
**Disclosure** [1] - 11:7
**disclosure** [11] - 7:20,
7:23, 8:18, 8:19,
10:11, 11:11, 11:14,
12:15, 14:16, 14:24,
15:1
**discuss** [3] - 18:13,
61:23, 124:24
**discussed** [2] - 20:22,
100:24
**discusses** [2] - 7:19,
8:19
**discussing** [1] - 37:12
**discussion** [10] -
96:11, 100:6,
100:11, 100:14,
100:21, 101:2,
101:3, 101:5,
102:13, 120:17
**disgusting** [1] - 97:8
**disorder** [3] - 76:12,
80:4, 82:4
**display** [1] - 126:13
**disregard** [1] - 89:5
**distinct** [1] - 8:6
**distracted** [1] - 65:8
**DISTRICT** [3] - 1:1,
1:1, 1:12
**District** [3] - 3:12,
5:21, 126:4
**district** [1] - 89:9
**divisions** [1] - 51:21
**Doctor** [3] - 23:12,
27:13, 33:6, 39:9,
85:14
**doctor** [16] - 28:7,
36:22, 40:22, 44:1,
45:12, 64:16, 64:24,
75:1, 83:22, 83:25,
84:2, 84:4, 85:24,

121:24, 123:1,
123:19
**doctor's** [1] - 65:1
**document** [35] - 32:2,
39:2, 39:4, 39:9,
39:21, 40:16, 41:2,
42:4, 43:16, 43:21,
44:24, 51:9, 51:11,
51:19, 53:23, 54:2,
54:12, 54:18, 55:3,
55:10, 55:12, 55:15,
59:8, 65:7, 70:23,
72:22, 72:24, 79:10,
93:13, 108:19,
109:6, 109:9,
120:10, 120:17,
122:22
**documents** [2] -
76:24, 118:20
**done** [17] - 16:3,
43:21, 47:14, 49:7,
57:2, 62:12, 70:25,
73:25, 99:4, 99:6,
111:18, 112:11,
114:25, 115:6,
115:12, 123:25
**door** [1] - 9:16
**doubt** [1] - 8:22
**down** [24] - 24:9,
26:16, 27:12, 31:12,
34:8, 54:3, 55:9,
56:21, 74:23, 76:20,
78:13, 82:1, 82:14,
82:17, 82:25, 85:24,
87:17, 102:2, 102:8,
109:23, 111:10,
123:1, 123:20, 124:2
**Dr** [25] - 21:25, 61:9,
61:16, 61:18, 64:5,
66:17, 72:18, 77:7,
77:22, 80:12, 83:16,
84:9, 86:13, 88:17,
89:20, 90:5, 90:8,
90:21, 90:24, 91:6,
92:7, 93:21, 98:19,
121:24, 122:12
**drama** [1] - 83:6
**Dreyfuss** [4] - 90:21,
90:24, 91:6, 92:7
**drinking** [1] - 110:2
**Drive** [1] - 3:6
**driven** [2] - 107:17,
110:1
**drove** [1] - 17:20
**due** [4] - 79:19, 79:25,
81:7, 121:25
**during** [14] - 7:9, 9:19,
9:22, 19:9, 20:2,
28:14, 66:21, 68:19,
69:5, 84:18, 84:20,

84:25, 107:16, 110:8
**DX** [1] - 96:24
**DX-169** [1] - 70:14
**DX-178** [1] - 93:2
**DX-200** [1] - 87:10

## E

**early** [3] - 21:9, 64:9,
66:14
**easier** [4] - 13:20,
73:21, 97:2, 121:1
**East** [1] - 1:19
**Easter** [1] - 19:2
**EASTERN** [1] - 1:1
**Eastern** [2] - 5:21,
126:4
**easy** [1] - 24:4
**eating** [1] - 80:17
**Eating** [2] - 118:6,
118:8
**ECF-837** [1] - 9:10
**Education** [3] - 51:13,
52:7, 54:8
**educational** [1] -
69:22
**effective** [1] - 99:7
**efficient** [2] - 63:12,
63:13
**efforts** [2] - 20:13,
48:18
**EID** [1] - 18:15
**eight** [1] - 113:6
**either** [9] - 18:19,
19:2, 36:5, 39:21,
62:17, 62:22, 66:13,
81:20
**elementary** [4] -
77:11, 77:17, 82:8,
82:10
**Elementary** [1] - 77:23
**ELLIKER** [17] - 7:4,
8:2, 8:4, 10:3, 10:22,
13:17, 13:20, 13:24,
14:3, 14:8, 14:11,
14:13, 14:22, 15:5,
15:25, 16:4, 16:8
**Elliker** [3] - 2:25, 8:4,
11:3
**elsewhere** [1] - 107:13
**email** [24] - 16:10,
87:6, 87:24, 88:3,
88:14, 88:24, 89:13,
90:2, 90:7, 90:20,
91:6, 93:20, 94:1,
94:9, 94:18, 98:12,
98:17, 98:22, 99:1,
99:3, 99:8, 104:13,
104:18, 104:25
**Email** [11] - 1:17, 1:21,

131

2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11
**emails** [5] - 87:5, 87:14, 92:6, 92:13, 124:17
**emotional** [4] - 71:12, 71:17, 79:19, 79:25
**emotions** [1] - 76:21
**employee** [3] - 105:24, 105:25, 116:15
**employer** [1] - 46:22
**encourage** [2] - 16:20, 19:7
**encourages** [1] - 19:25
**end** [6] - 6:23, 16:13, 16:23, 21:4, 32:9, 44:24
**ends** [6] - 39:12, 40:12, 44:23, 66:13, 71:23, 108:25
**engagement** [1] - 109:3
**enjoys** [1] - 81:1
**entering** [1] - 79:14
**entire** [2] - 41:15, 89:3
**entities** [1] - 106:16
**entitled** [2] - 13:25, 44:5
**entity** [3] - 106:13, 107:17, 107:19
**entry** [2] - 97:24, 98:3
**environment** [2] - 47:25, 89:8
**error** [1] - 37:16
**especially** [1] - 97:14
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8
**essentially** [2] - 12:9, 20:21
**established** [1] - 50:19
**estimate** [1] - 123:10
**estimations** [1] - 124:1
**et** [4] - 1:6, 48:8, 70:5, 126:7
**evaluate** [1] - 48:19
**evaluated** [5] - 74:9, 74:14, 78:10, 78:20, 81:6
**evaluation** [5] - 10:19, 70:5, 73:4, 74:1, 74:3
**evaluations** [1] - 124:22
**evening** [1] - 90:21

**events** [2] - 51:13, 52:8
**Events** [1] - 96:22
**evidence** [11] - 24:21, 25:22, 29:11, 31:2, 32:20, 39:19, 41:18, 71:8, 73:20, 85:11, 88:9
**eww** [2] - 30:11, 97:8
**exactly** [7] - 12:4, 30:12, 30:25, 31:21, 49:14, 69:3, 69:18
**exam** [1] - 13:11
**examination** [13] - 4:4, 4:5, 4:5, 9:20, 15:3, 16:2, 48:3, 60:14, 62:16, 86:9, 123:8, 124:4, 124:5
**EXAMINATION** [3] - 21:23, 84:7, 86:11
**examine** [1] - 14:1, 83:22, 124:4
**examines** [2] - 42:6, 108:21
**example** [10] - 35:17, 50:6, 74:16, 77:18, 100:14, 108:3, 109:20, 109:25, 120:16, 120:19
**exchanging** [1] - 124:19
**excise** [1] - 10:10
**excuse** [2] - 61:9, 75:19
**excused** [4] - 18:10, 85:23, 123:2, 125:1
**executive** [2] - 48:10, 56:2
**Executive** [1] - 44:8
**Exhibit** [41] - 22:24, 23:1, 23:12, 24:20, 24:21, 25:22, 26:1, 39:19, 41:8, 51:2, 70:16, 70:20, 71:4, 71:7, 73:9, 73:19, 73:23, 78:10, 86:23, 87:6, 88:2, 88:6, 88:9, 89:14, 89:24, 90:7, 90:10, 91:23, 92:24, 93:20, 95:14, 98:13, 99:12, 99:19, 99:20, 104:13, 108:11, 115:21, 117:13, 118:23, 119:8
**exhibit** [15] - 23:11, 27:10, 33:3, 52:1, 54:9, 63:16, 63:19, 73:7, 78:4, 79:10, 79:12, 90:20, 93:10,

96:2, 119:11
**EXHIBITS** [1] - 4:6
**existing** [1] - 43:16
**expectations** [1] - 77:12
**expected** [2] - 84:17, 84:24
**expedited** [1] - 65:16
**experience** [1] - 101:25
**experiences** [2] - 42:7, 108:22
**experiencing** [6] - 50:18, 81:8, 113:13, 113:19, 116:10, 117:8
**expert** [15] - 8:7, 8:11, 8:23, 8:24, 9:7, 10:4, 10:7, 10:12, 10:18, 13:25, 14:1, 14:4, 14:16, 15:10, 19:19
**experts** [1] - 9:10
**explained** [2] - 25:7, 27:1
**explodes** [1] - 97:25
**extend** [1] - 118:12
**extending** [2] - 67:10, 124:17
**extent** [2] - 19:4, 62:25
**extra** [1] - 83:5
**extractions** [1] - 41:20

**F**

**F.C.S.B** [4] - 1:6, 2:13, 2:25, 126:7
**F.T** [1] - 3:6
**Fabio** [1] - 4:3
**fact** [6] - 10:17, 11:9, 12:13, 22:14, 65:16, 66:9
**fact-finder** [1] - 10:17
**fact-finding** [1] - 11:9
**factors** [2] - 42:7, 108:22
**facts** [1] - 11:9
**factual** [2] - 9:18, 14:3
**Fahey** [1] - 1:14
**fair** [12] - 10:4, 10:6, 10:12, 26:22, 26:23, 33:24, 37:25, 47:21, 49:18, 74:13, 74:18, 81:19
**Fairfax** [48] - 5:4, 33:1, 33:8, 33:24, 35:5, 38:4, 39:5, 39:15, 40:4, 40:5, 40:23, 46:17, 46:21, 47:12, 51:11, 51:21, 52:6,

53:6, 53:7, 54:4, 54:12, 55:7, 55:13, 55:14, 55:15, 56:12, 56:15, 56:22, 57:8, 57:13, 58:19, 58:22, 59:16, 60:8, 70:23, 106:11, 106:12, 106:14, 107:5, 107:11, 108:10, 108:20, 116:5, 116:18
**fairness** [1] - 22:20
**faith** [1] - 19:3
**fall** [3] - 7:8, 46:12, 79:15
**familiar** [1] - 18:21
**family** [25] - 18:15, 20:22, 60:15, 60:25, 61:5, 61:12, 62:2, 62:17, 62:23, 68:20, 69:12, 69:19, 69:23, 70:7, 87:3, 91:4, 91:21, 94:2, 97:14, 98:11, 99:8, 119:22, 119:24, 121:24
**far** [4] - 16:16, 26:25, 27:6, 47:24
**Farms** [1] - 97:11
**fast** [1] - 65:20
**fasting** [1] - 18:20
**father** [1] - 98:4
**favors** [1] - 33:19
**fax** [5] - 86:16, 86:20, 86:23, 92:15, 99:13
**FCSB-BR-004746** [1] - 94:11
**FCSB-BR-1000** [1] - 87:19
**FCSB-BR-1024** [1] - 87:7
**February** [19] - 60:15, 61:8, 61:19, 65:10, 65:14, 65:15, 76:13, 79:15, 80:19, 86:21, 87:24, 88:15, 88:24, 92:16, 92:19, 94:4, 98:17, 99:9, 104:13
**FELDMAN** [1] - 3:9
**fellow** [1] - 57:11
**few** [4] - 19:9, 24:13, 29:22, 78:25
**fight** [2] - 76:25, 77:5
**figure** [2] - 77:7, 103:2
**final** [3] - 34:16, 35:22, 35:25
**finally** [3] - 17:20, 21:6, 97:25
**finder** [1] - 10:17
**Findings** [1] - 56:5
**fine** [3] - 6:11, 13:19,

17:9
**finish** [3] - 62:9, 62:24, 68:25
**finished** [1] - 30:22
**fire** [1] - 107:1
**first** [36] - 13:24, 22:21, 27:23, 30:1, 30:2, 41:21, 43:11, 47:8, 55:11, 64:8, 66:13, 68:4, 73:12, 74:25, 76:2, 76:5, 78:3, 79:5, 83:1, 91:4, 92:20, 93:12, 93:15, 93:17, 96:5, 97:24, 98:11, 99:13, 99:20, 102:16, 109:23, 111:4, 116:4, 120:21, 121:22
**five** [5] - 5:6, 8:11, 50:11, 104:1, 104:5
**FL** [3] - 2:3, 2:7, 2:11
**FLEXNER** [4] - 1:19, 2:2, 2:6, 2:10
**flight** [4] - 76:21, 76:25, 77:5
**flight'** [1] - 76:21
**flip** [3] - 96:7, 97:23, 110:11
**Floor** [1] - 3:13
**Floris** [1] - 77:23
**focus** [3] - 14:20, 35:2, 69:18
**focused** [2] - 63:10, 96:12
**folder** [2] - 87:8, 118:24
**follow** [3] - 12:5, 66:10
**followed** [3] - 61:24, 77:19, 77:20
**following** [7] - 43:6, 47:15, 49:8, 111:19, 112:11, 115:1, 115:12
**FOR** [1] - 1:1
**forced** [1] - 112:1
**foregoing** [1] - 126:10
**forensic** [5] - 7:19, 8:13, 9:5, 10:9, 14:23
**forgot** [2] - 14:8, 33:4
**form** [1] - 108:4
**former** [1] - 46:22
**forth** [2] - 77:22, 92:6
**forwarded** [1] - 93:21
**foundation** [4] - 39:1, 40:4, 42:21, 70:17
**foundational** [1] - 40:8
**four** [3] - 9:11, 11:5,

113:6
**fourth** [1] - 54:3
**frame** [1] - 69:9
**frankly** [2] - 10:4, 10:6
**F████** [10] - 34:10,
  34:15, 34:21, 35:21,
  36:13, 37:1, 37:15,
  88:17, 88:19, 90:21
**free** [1] - 97:18
**frequency** [4] - 59:13,
  109:1, 117:22,
  117:25
**Frequency** [2] - 118:6,
  118:8
**Friday** [6] - 66:25,
  67:3, 88:23, 94:4,
  99:9
**friends** [2] - 30:17,
  97:6
**front** [3] - 63:16,
  70:20, 89:15
**Fruits** [1] - 118:8
**full** [6] - 14:24, 64:8,
  66:25, 100:15,
  101:8, 102:16
**Fulton** [1] - 3:6
**funneled** [1] - 5:11
**future** [1] - 18:3

## G

**game** [1] - 38:9
**gears** [1] - 104:8
**general** [3] - 8:4, 13:8,
  107:7
**generally** [6] - 14:17,
  20:11, 32:3, 37:12,
  41:7, 52:22
**generically** [1] - 10:11
**gentlemen** [4] - 17:16,
  85:21, 86:8, 124:23
**gifts** [1] - 18:18
**girls** [1] - 97:19
**given** [4] - 11:12,
  47:19, 80:13, 120:5
**goal** [3] - 61:25, 62:9,
  69:14
**God** [1] - 18:22
**goodness** [1] - 17:11
**grade** [7] - 46:13,
  46:14, 46:16, 75:25,
  77:12, 79:14, 79:20
**graders** [5] - 47:9,
  59:21, 59:22, 59:23
**grades** [1] - 46:18
**Grady** [4] - 94:6,
  94:16, 95:25, 105:5
**grant** [1] - 19:10
**grateful** [1] - 18:17
**grave** [1] - 11:22

great [3] - 80:20,
  120:23, 121:7
**Green** [1] - 118:6
**grounds** [2] - 50:16,
  52:3
**group** [3] - 75:15,
  76:11, 85:6
**guess** [5] - 5:14, 9:13,
  10:17, 39:8, 43:20
**guessed** [2] - 5:13,
  5:15
**guidance** [1] - 12:6
**guys** [1] - 66:5

## H

**habits** [1] - 77:16
**half** [11] - 19:14,
  44:12, 56:11, 56:15,
  75:25, 89:3, 90:3,
  104:1, 104:5, 116:5,
  116:18
**halfway** [1] - 26:15
**hallways** [1] - 30:10
**hand** [3] - 30:11, 47:6,
  88:2
**handle** [2] - 13:4, 48:6
**hands** [4] - 95:5, 95:8,
  95:10, 95:12
**happy** [1] - 82:21
**harassed** [12] - 45:5,
  47:15, 49:10, 50:2,
  59:13, 59:20, 60:2,
  100:1, 112:12,
  115:1, 117:22,
  117:25
**harassing** [1] - 69:2
**harassment** [22] -
  33:2, 33:9, 33:21,
  34:17, 35:15, 35:23,
  36:15, 37:24, 38:3,
  38:6, 42:14, 43:4,
  49:2, 50:25, 53:14,
  53:25, 54:7, 54:11,
  58:6, 60:9, 80:14,
  113:22
**hard** [2] - 70:11, 110:7
**Harris** [2] - 126:3,
  126:21
**HARRIS** [1] - 3:12
**headers** [1] - 53:5
**health** [8] - 42:7,
  48:17, 48:20, 81:1,
  108:23, 109:2
**healthy** [2] - 48:20,
  109:17
**hear** [6] - 13:13,
  16:25, 20:12, 28:8,
  92:20, 97:17
**heard** [3] - 11:17,

61:19, 62:16
**heightened** [1] - 76:22
**help** [2] - 40:14, 85:10
**helpful** [1] - 15:16
**hereby** [1] - 126:4
**hereto** [1] - 126:15
**herself** [1] - 9:7
**high** [1] - 12:17
**high-level** [1] - 12:17
**highlight** [2] - 26:15,
  30:1
**highly** [1] - 19:25
**history** [2] - 76:18,
  77:22
**History** [3] - 80:10,
  120:18, 121:14
**hold** [3] - 16:12, 86:1,
  123:25
**holiday** [5] - 18:16,
  18:24, 19:1, 19:18,
  20:21
**holidays** [1] - 19:3
**HOLTZMAN** [1] - 1:14
**home** [3] - 69:14,
  80:1, 109:21
**homebound** [17] -
  62:11, 65:5, 65:9,
  65:10, 66:6, 66:7,
  66:9, 66:11, 66:18,
  67:6, 67:10, 69:15,
  79:15, 79:17, 81:13,
  84:20, 122:13
**honestly** [1] - 17:6
**Honor** [59] - 6:2, 6:7,
  7:4, 7:12, 8:1, 8:2,
  10:23, 12:5, 13:17,
  15:7, 15:23, 16:9,
  19:12, 19:19, 21:20,
  21:21, 22:23, 25:21,
  28:4, 29:10, 31:1,
  31:23, 32:19, 36:16,
  38:11, 38:20, 39:20,
  40:14, 41:1, 42:17,
  43:8, 44:15, 45:6,
  47:22, 50:15, 51:24,
  52:15, 53:20, 55:2,
  55:22, 70:15, 71:3,
  73:10, 78:6, 79:7,
  83:17, 88:5, 89:23,
  90:12, 91:25, 93:6,
  95:17, 99:16, 107:8,
  113:15, 115:16,
  119:9, 123:5, 124:8
**Honor's** [1] - 28:24
**HONORABLE** [1] -
  1:11
**hope** [1] - 16:10
**hopeful** [1] - 6:23
**hopefully** [1] - 18:3
**Hospital** [1] - 81:5

**hospital** [2] - 76:11,
  84:22
**hospital-based** [1] -
  76:11
**hospitalization** [2] -
  67:11, 81:8
**hospitalizations** [1] -
  81:20
**hospitalized** [3] -
  66:22, 81:14, 81:19
**hour** [4] - 90:3,
  123:10, 123:20,
  124:2
**hour-and-a-half** [1] -
  90:3
**hours** [2] - 13:11, 19:9
**house** [2] - 101:6,
  101:11
**huge** [1] - 59:8
**H████** [1] - 100:1
**hundred** [1] - 5:10
**HUNTON** [4] - 2:14,
  2:17, 2:21, 3:1
**hurt** [2] - 57:18, 97:13

## I

**I7** [2] - 109:22, 109:24
**idea** [1] - 66:17
**identified** [1] - 5:23
**identify** [1] - 88:3
**IEP** [14] - 68:16, 68:17,
  69:20, 69:22, 70:1,
  70:4, 71:1, 71:10,
  78:1, 85:3, 118:19,
  119:23, 120:12
**III** [1] - 33:11
**imagine** [1] - 124:4
**impact** [1] - 79:19
**importance** [1] - 8:14
**important** [6] - 10:5,
  11:15, 13:13, 18:16,
  65:19, 98:14
**improve** [3] - 48:19,
  84:18, 85:10
**improved** [1] - 84:25
**in-person** [2] - 58:16,
  69:8
**inaccurate** [1] - 58:9
**inappropriate** [5] -
  26:10, 36:18, 93:16,
  97:20, 98:7
**incident** [3] - 24:13,
  34:13, 100:8
**incidents** [3] - 36:23,
  37:11, 82:20
**inclined** [1] - 19:10
**includes** [2] - 12:16,
  108:19
**including** [1] - 22:13

**inconsistent** [1] - 9:21
**Indian** [2] - 97:8, 97:9
**indicated** [1] - 86:9
**indiscernible** [1] -
  114:17
**indiscernible)** [1] -
  20:9
**individual** [3] - 18:24,
  40:3, 76:11
**individualized** [1] -
  69:22
**individuals** [1] - 43:18
**indulgence** [2] -
  28:24, 115:17
**influence** [2] - 42:7,
  108:22
**inform** [1] - 124:12
**informal** [1] - 120:14
**Information** [3] - 77:9,
  121:19, 121:20
**information** [21] -
  15:13, 32:4, 40:24,
  48:16, 58:9, 68:7,
  80:25, 85:5, 91:9,
  102:1, 102:25,
  104:4, 118:22,
  119:16, 120:4,
  120:10, 121:9,
  122:4, 122:15,
  122:21
**informed** [1] - 90:24
**initial** [1] - 65:25
**initials** [1] - 28:6
**Inova** [1] - 81:9
**inpatient** [4] - 81:20,
  81:21, 84:15, 84:21
**insight** [1] - 108:25
**insisted** [1] - 66:6
**instance** [2] - 36:8,
  82:12
**instances** [2] - 53:25,
  54:6
**instead** [1] - 17:2
**instinct** [1] - 19:5
**instruction** [1] -
  122:13
**instructions** [1] -
  77:20
**insulting** [1] - 26:20
**integrity** [1] - 109:4
**intended** [1] - 18:18
**intensity** [1] - 67:3
**intensive** [2] - 66:24,
  81:21
**intentionally** [2] -
  94:22, 105:8
**intercourse** [1] - 112:1
**interest** [2] - 11:4,
  83:8
**interview** [27] - 7:21,

133

7:22, 8:9, 8:16, 8:21,
8:25, 9:1, 9:5, 9:14,
9:21, 9:23, 10:6,
10:9, 10:20, 12:23,
13:8, 13:9, 14:5,
14:24, 15:8, 15:9,
75:5, 76:17, 78:23,
81:22
**Interview** [2] - 119:19,
120:3
**interviewed** [2] -
68:21, 102:17
**interviewer** [3] - 8:16,
8:20, 14:23
**interviewing** [3] -
7:19, 8:13, 15:8
**introduced** [1] - 21:9
**invade** [1] - 11:19
**inventory** [1] - 120:13
**invite** [1] - 13:14
**involuntarily** [1] -
108:21
**involved** [7] - 17:21,
21:10, 38:7, 63:9,
66:20, 103:4, 107:25
**involves** [1] - 20:25
**involving** [1] - 37:11
**Issue** [3] - 99:23,
103:24, 104:2
**issue** [12] - 6:8, 7:8,
7:12, 9:12, 10:22,
10:24, 11:14, 16:22,
62:1, 89:6, 102:13,
103:13
**issues** [8] - 7:10,
10:18, 17:10, 18:1,
35:7, 41:14, 48:23,
107:6
**italics** [1] - 77:11
**itself** [1] - 43:23
**IX** [4] - 35:6, 35:10,
35:23, 36:15

## J

**J.F** [1] - 3:6
**J.H** [1] - 97:16
**J.O** [7] - 3:8, 24:13,
25:15, 97:7, 101:16,
101:18
**J.O.'s** [7] - 24:16,
24:19, 25:1, 25:10,
101:6, 101:11,
101:23
**J**⬛ [1] - 32:10
**J**⬛ [2] - 31:15
**jfahey@**
**holtzmanvogel.**
**com** [1] - 1:17
**Jill** [3] - 72:18, 73:3,

75:1
**job** [7] - 5:11, 30:11,
38:1, 57:13, 123:21,
124:1
**jointly** [1] - 58:24
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**Josh** [1] - 78:16
**JR** [1] - 1:11
**Judge** [10] - 6:16,
14:9, 14:15, 16:10,
17:6, 18:14, 24:20,
37:21, 41:17, 119:7
**judge** [2] - 5:5, 19:24
**JUDGE** [1] - 1:12
**judgment** [1] - 13:5
**July** [4] - 6:20, 73:4,
74:2, 75:10
**June** [7] - 60:24,
60:25, 61:5, 61:15,
64:18, 81:23
**juror** [5] - 19:13,
19:14, 19:17, 19:22,
20:11
**Juror** [2] - 6:22, 18:22
**jurors** [9] - 5:16, 5:17,
5:23, 6:7, 6:10, 6:15,
11:15, 20:12, 20:20
**JURY** [1] - 1:11
**jury** [18] - 7:11, 9:23,
11:20, 13:13, 18:6,
18:8, 18:12, 18:13,
20:10, 20:17, 46:1,
52:6, 54:3, 54:6,
55:10, 65:16, 86:8
**Jury** [7] - 17:14, 18:10,
20:18, 85:23, 86:6,
125:1, 126:6

## K

**Keefe** [1] - 2:9
**keep** [3] - 26:17,
102:12, 106:3
**Kellar** [1] - 81:9
**kelliker@huntonak.**
**com** [1] - 3:3
**kept** [3] - 38:15, 67:23,
71:11
**Kevin** [3] - 2:25, 8:4,
121:24
**Key** [1] - 56:5
**kid** [1] - 60:10
**kids** [2] - 69:2, 107:18
**kind** [2] - 98:6, 107:6
**kinds** [1] - 12:2
**Kinney** [4] - 3:4, 20:4,
84:3, 84:11
**KINNEY** [5] - 3:5,
20:5, 84:5, 84:8,

85:14
**Kinney**.................. [1] -
4:5
**Kirkbride** [2] - 89:19,
90:2
**knowing** [1] - 57:18
**knowledge** [6] - 58:8,
58:10, 58:11, 68:13,
76:24
**known** [1] - 21:6
**knows** [1] - 9:19
**Kurt** [1] - 65:23
**KURTH** [4] - 2:14,
2:17, 2:21, 3:1

## L

**lack** [2] - 9:13, 11:25
**ladies** [4] - 17:15,
85:21, 86:8, 124:23
**lady** [2] - 21:12, 21:15
**lanes** [1] - 5:6
**language** [2] - 77:13,
109:20
**large** [1] - 109:6
**last** [13] - 16:8, 16:11,
22:17, 24:13, 29:22,
66:9, 67:18, 68:16,
91:7, 91:8, 109:8,
109:24, 110:8
**late** [6] - 5:5, 17:24,
88:23, 97:12,
124:18, 124:21
**Laura** [1] - 79:1
**LAW** [1] - 3:5
**lawyers** [1] - 28:10
**lay** [2] - 38:25, 70:17
**laying** [2] - 40:4, 42:20
**leadership** [1] - 89:7
**leading** [3] - 107:8,
113:15, 114:10
**learning** [1] - 89:7
**least** [4] - 31:16,
44:13, 51:20, 113:6
**leave** [2] - 13:5, 80:1
**left** [2] - 22:4, 47:6
**left-hand** [1] - 47:6
**lesbian** [1] - 97:5
**letter** [2] - 64:4, 92:24
**level** [2] - 12:17, 77:12
**life** [1] - 94:23
**likely** [1] - 20:14
**limited** [8] - 9:3, 9:8,
107:11, 111:7,
111:14, 111:22,
112:5, 112:9
**line** [3] - 13:2, 54:3,
91:7
**liquor** [1] - 110:7
**list** [1] - 120:13

**listed** [2] - 51:22,
119:16
**listen** [3] - 13:1, 13:16,
15:17
**listened** [1] - 77:20
**literally** [1] - 11:6
**litigation** [1] - 7:10
**lives** [1] - 48:1
**LLP** [8] - 1:19, 2:2,
2:6, 2:10, 2:14, 2:17,
2:21, 3:1
**Local** [1] - 119:18
**local** [6] - 74:22,
75:12, 75:14, 75:15,
75:23, 85:2
**locker** [2] - 96:18,
97:5, 100:1
**London** [3] - 6:4, 21:8,
21:13
**Longfellow** [1] - 61:23
**look** [38] - 8:14, 22:18,
29:24, 38:14, 38:22,
39:9, 41:7, 45:3,
46:20, 52:14, 53:5,
70:14, 71:21, 73:3,
76:6, 82:19, 87:5,
87:12, 92:25, 93:12,
94:13, 95:14, 96:8,
96:14, 96:23, 98:19,
99:12, 101:8,
101:13, 105:4,
108:8, 110:14,
111:10
**looked** [9] - 5:7,
17:20, 54:18, 59:11,
89:13, 90:10, 98:22,
101:10, 104:12
**looking** [6] - 11:4,
11:9, 39:12, 47:5,
51:21, 54:12, 91:7,
102:12
**looks** [3] - 19:7, 19:15,
20:14
**Los** [1] - 1:20
**lose** [2] - 19:7, 42:2
**loss** [5] - 80:19, 80:20,
120:23, 121:7
**lost** [1] - 83:8
**love** [1] - 65:1
**lower** [1] - 55:9
**Lunch** [1] - 125:3
**lunch** [2] - 20:2,
124:24

## M

**M.C** [1] - 3:5
**M.P.F** [1] - 3:5
**ma'am** [2] - 115:18,
124:7

**machine** [2] - 126:5,
126:12
**main** [3] - 61:25, 62:9,
69:14
**major** [1] - 82:3
**mall** [1] - 108:3
**manage** [1] - 123:20
**managed** [1] - 107:19
**managing** [1] - 123:22
**manner** [1] - 63:12
**map** [1] - 52:10
**March** [9] - 14:18,
60:17, 60:19, 65:14,
65:15, 66:14, 66:18,
81:4, 84:15
**mark** [2] - 118:16,
118:17
**Mary** [1] - 92:9
**match** [1] - 38:17
**materials** [2] - 77:20,
92:18
**math** [1] - 53:23,
77:13
**Mathes** [1] - 92:9
**matter** [2] - 61:9,
123:23
**matters**....................
.......... [1] - 4:13
**mean** [2] - 15:10,
67:13
**meant** [1] - 76:25
**medical** [5] - 7:7, 75:2,
80:25, 119:25, 120:4
**Medical** [2] - 121:19,
121:20
**medically** [1] - 75:24
**meet** [3] - 60:17,
60:19, 91:3
**meeting** [6] - 90:25,
91:7, 91:8, 91:17,
92:13, 124:1
**meetings** [1] - 119:19
**member** [1] - 5:20
**memo** [11] - 64:18,
87:2, 87:14, 99:17,
99:21, 99:23,
100:11, 103:14,
104:2, 104:17
**mental** [1] - 48:17
**mentioned** [1] - 99:1
**message** [1] - 88:23
**met** [8] - 60:15, 61:12,
61:18, 77:12, 87:3,
92:19, 101:16, 122:1
**methods** [1] - 74:23
**Miami** [3] - 2:3, 2:7,
2:11
**Michael** [2] - 3:4,
84:11
**MICHAEL** [1] - 3:5

134

**mid** [2] - 81:23, 96:4
**mid-June** [1] - 81:23
**mid-October** [1] - 96:4
**middle** [1] - 77:8
**Middle** [4] - 36:23, 37:11, 75:25, 82:16
**Middleton** [1] - 97:11
**might** [11] - 14:14, 40:7, 50:17, 72:24, 97:2, 102:10, 107:6, 107:25, 108:3, 118:12
**mills** [2] - 65:21, 65:22
**Mills** [1] - 65:23
**mind** [4] - 6:24, 18:23, 65:3, 124:19
**minute** [3] - 32:15, 62:6, 75:3
**minutes** [6] - 85:19, 86:2, 86:10, 106:9, 122:18, 123:10
**MISCELLANY** [1] - 4:12
**mischaracterizes** [1] - 55:2
**mismanaged** [1] - 89:4
**miss** [1] - 49:2
**misspoke** [1] - 23:16
**misstates** [1] - 54:9
**misstating** [2] - 31:2, 41:2
**Mister** [1] - 124:12
**mk@kinneyesq.com** [1] - 3:7
**Mom** [1] - 121:9
**mom** [7] - 62:11, 65:19, 66:6, 67:5, 69:16, 104:18, 122:4
**mom's** [4] - 66:10, 94:18, 97:24, 104:13
**Mom's** [1] - 121:16
**moment** [5] - 14:25, 78:12, 83:13, 94:16, 115:16
**Monday** [6] - 66:25, 67:3, 87:24, 88:15, 96:8, 98:3
**money** [1] - 101:2
**monitor** [1] - 48:17
**month** [4] - 18:20, 30:4, 65:25, 66:13
**months** [2] - 89:4, 89:8, 94:19
**morning** [17] - 5:1, 5:2, 5:5, 5:21, 6:18, 8:2, 8:3, 17:2, 17:15, 17:17, 21:25, 22:1, 88:15, 90:25, 91:18, 96:18, 97:5

**most** [2] - 85:7, 109:21
**mother** [2] - 67:9, 104:17
**motions** [1] - 9:10
**move** [7] - 5:7, 39:18, 60:12, 65:20, 71:4, 73:10, 88:5
**MR** [166] - 6:2, 6:4, 6:12, 7:3, 7:4, 8:2, 8:4, 10:3, 10:22, 13:17, 13:20, 13:24, 14:3, 14:8, 14:11, 14:13, 14:22, 15:5, 15:25, 16:4, 16:8, 16:10, 16:22, 17:1, 17:5, 17:12, 19:12, 19:17, 20:5, 20:7, 20:9, 21:20, 21:21, 21:24, 22:23, 23:2, 23:9, 24:9, 24:11, 24:20, 24:23, 24:25, 25:21, 25:24, 26:2, 26:15, 26:18, 27:11, 27:14, 28:21, 28:24, 29:1, 29:10, 29:13, 29:15, 29:18, 29:20, 30:1, 30:3, 31:3, 31:8, 32:1, 32:8, 32:19, 32:22, 32:24, 32:25, 34:8, 34:9, 36:20, 37:21, 37:22, 38:13, 38:20, 38:21, 38:25, 39:3, 39:18, 40:3, 40:9, 40:10, 40:14, 40:20, 40:21, 41:17, 41:22, 41:23, 43:8, 43:11, 43:24, 43:25, 44:15, 44:18, 45:2, 45:9, 45:15, 45:19, 45:21, 46:5, 46:7, 46:15, 48:2, 48:9, 50:21, 51:6, 51:8, 51:23, 52:5, 52:12, 52:15, 52:18, 53:20, 53:21, 54:14, 55:5, 55:22, 55:25, 56:1, 58:1, 59:6, 63:14, 70:11, 70:13, 70:15, 70:17, 70:19, 71:3, 71:9, 73:2, 73:9, 73:16, 73:21, 73:24, 75:9, 76:9, 78:6, 78:9, 78:14, 78:16, 78:18, 78:19, 79:7, 79:9, 79:13, 82:1, 82:14, 82:15, 82:17, 82:18, 82:24, 83:3, 83:12, 83:16, 83:21, 84:1, 84:5,

84:8, 85:14, 88:7, 107:8, 113:15, 114:2, 114:9, 120:6, 121:10, 122:5
**MS** [99] - 7:12, 7:17, 8:1, 11:3, 12:4, 12:12, 12:22, 13:6, 15:7, 15:20, 15:23, 19:19, 20:2, 28:4, 31:1, 31:23, 32:2, 36:16, 38:11, 39:20, 39:25, 41:1, 42:17, 42:22, 42:24, 45:6, 47:22, 50:15, 51:17, 51:19, 54:9, 55:2, 57:24, 62:24, 71:5, 73:15, 85:19, 86:12, 88:5, 88:10, 88:12, 88:13, 89:23, 90:1, 90:12, 90:16, 90:18, 90:19, 91:25, 92:2, 92:5, 93:6, 93:9, 93:11, 94:6, 94:8, 94:16, 94:17, 95:17, 95:20, 95:22, 95:25, 96:3, 99:16, 99:20, 99:22, 104:21, 104:22, 105:5, 105:6, 107:10, 108:5, 108:7, 113:17, 114:5, 114:12, 114:15, 115:9, 115:10, 115:16, 115:19, 118:17, 118:18, 119:7, 119:12, 120:9, 121:12, 122:6, 122:11, 122:19, 122:20, 122:25, 123:5, 123:9, 123:14, 123:17, 124:8, 124:12, 124:15
**multiple** [2] - 53:24, 112:23

**N**

**naked** [1] - 97:17
**name** [3] - 35:9, 94:20, 126:16
**name-calling** [1] - 94:20
**names** [3] - 24:2, 24:17, 25:3
**Nancy** [1] - 11:8
**National** [1] - 81:5
**nature** [1] - 33:20
**near** [1] - 12:23
**necessarily** [1] - 7:8

**necessary** [1] - 35:17
**need** [20] - 5:19, 11:20, 18:1, 19:14, 20:16, 20:24, 21:4, 40:7, 41:18, 41:21, 43:20, 48:4, 65:7, 65:19, 65:20, 73:12, 85:18, 102:8, 123:20, 124:21
**needed** [1] - 62:10
**needs** [5] - 8:20, 10:24, 14:23, 19:15, 19:17
**Neil** [1] - 26:12
**new** [1] - 60:12
**next** [26] - 7:14, 9:2, 18:15, 30:22, 54:19, 56:7, 56:21, 57:6, 60:17, 80:9, 81:18, 81:21, 82:24, 90:25, 91:9, 91:18, 97:23, 98:3, 103:23, 109:25, 110:11, 111:17, 116:17, 121:20, 122:12, 123:3
**night** [3] - 16:11, 17:2, 22:17
**nine** [2] - 50:14, 113:7
**none** [4] - 17:21, 21:11, 57:21, 101:23
**note** [8] - 6:14, 18:2, 18:6, 18:12, 19:13, 20:13, 20:20, 65:1
**notes** [1] - 126:12
**nothing** [3] - 97:20, 100:18, 105:12
**notice** [1] - 16:17
**notified** [3] - 64:16, 64:24, 90:4
**November** [19] - 22:6, 23:17, 80:16, 80:19, 83:9, 96:5, 96:9, 96:15, 96:20, 96:21, 97:24, 98:3, 98:10, 103:8, 103:13, 103:18, 120:22, 121:22
**Number** [4] - 4:9, 4:11, 41:8, 109:22
**number** [12] - 23:11, 27:10, 33:3, 39:22, 39:25, 40:15, 40:16, 60:6, 69:1, 87:7, 87:19, 119:13
**numbered** [1] - 87:17
**numbers** [3] - 39:10, 51:6, 69:2
**Numeral** [1] - 33:11
**NW** [5] - 1:15, 2:14,

2:18, 2:21, 3:1

**O**

**object** [4] - 13:7, 16:5, 31:24, 50:15
**objection** [44] - 5:25, 7:3, 16:1, 19:11, 19:12, 19:18, 20:5, 20:7, 28:4, 28:18, 28:19, 31:1, 31:23, 36:16, 38:11, 41:1, 42:17, 43:5, 45:6, 45:24, 47:22, 50:15, 51:17, 52:3, 54:9, 55:2, 57:24, 71:5, 71:6, 73:14, 73:17, 79:8, 79:11, 88:7, 88:8, 107:8, 113:15, 114:2, 114:9, 120:6, 121:10, 122:5, 122:9
**objections** [2] - 28:8, 52:4
**objects** [1] - 20:23
**obligations** [2] - 21:10, 21:18
**obscenities** [1] - 94:21
**observe** [1] - 19:17
**observed** [1] - 18:20
**obtain** [1] - 40:24
**obviously** [5] - 7:23, 9:9, 17:7, 66:10, 124:3
**occasion** [1] - 77:4
**occasions** [1] - 110:7
**occurred** [1] - 79:20
**October** [3] - 30:5, 39:6, 96:4
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 126:1
**offer** [1] - 10:7
**offered** [5] - 8:7, 8:8, 14:16, 71:7, 73:19
**offering** [2] - 9:3, 14:17
**office** [12] - 34:17, 35:5, 35:9, 35:10, 35:13, 35:23, 36:2, 36:15, 65:18, 85:8, 93:21, 98:19
**OFFICE** [1] - 3:5
**office's** [1] - 36:4
**official** [2] - 126:5, 126:11
**Official** [3] - 3:12, 126:3, 126:22
**often** [2] - 12:18, 109:21

**once** [4] - 6:5, 12:18, 23:16, 91:8
**Once** [1] - 91:6
**one** [81] - 5:6, 6:14, 7:12, 8:12, 10:10, 18:2, 20:20, 23:3, 23:5, 25:17, 26:3, 26:25, 30:22, 35:13, 36:16, 38:23, 39:12, 40:13, 41:25, 43:11, 45:19, 46:17, 47:5, 48:24, 49:19, 52:10, 53:10, 54:3, 55:20, 56:17, 57:8, 57:17, 58:12, 58:19, 59:2, 60:10, 61:4, 61:12, 63:17, 63:20, 63:21, 65:25, 67:18, 67:19, 67:22, 68:1, 68:16, 72:7, 76:2, 78:3, 78:12, 88:24, 92:25, 93:1, 93:24, 94:7, 95:16, 98:14, 103:22, 104:17, 104:21, 106:13, 108:17, 110:6, 110:22, 113:21, 114:3, 114:17, 114:23, 115:16, 115:24, 116:20, 117:18, 118:24, 120:5, 120:16
**one-third** [1] - 57:17
**ones** [1] - 43:10
**ongoing** [1] - 94:19
**open** [4] - 9:16, 12:1, 18:18, 63:24
**opened** [2] - 9:16, 63:20
**opine** [3] - 10:18, 11:23
**opining** [1] - 10:5
**opinion** [5] - 8:24, 9:7, 10:7, 14:17, 14:22
**opinions** [6] - 7:21, 8:7, 9:2, 9:3, 9:10, 14:3
**opponent** [1] - 13:25
**opportunity** [8] - 12:10, 18:25, 22:17, 41:7, 47:19, 63:11, 83:23, 124:3
**opposed** [2] - 45:14, 52:3
**options** [1] - 15:22
**oral** [2] - 24:3, 97:18
**orally** [1] - 120:5
**order** [6] - 11:4, 48:18, 72:25, 83:18, 83:23, 124:10

**ordered** [1] - 9:9
**organizations** [2] - 39:22, 41:3
**organized** [1] - 77:20
**organs** [1] - 95:12
**original** [1] - 104:17
**otherwise** [1] - 24:4
**outgoing** [1] - 82:22
**outpatient** [2] - 66:25, 81:21
**outside** [2] - 106:18, 118:12
**outside)** [1] - 80:7
**Overall** [1] - 56:22
**overrule** [1] - 43:5
**overruled** [3] - 54:10, 55:4, 114:13

## P

**P.A.H** [1] - 3:5
**p.m** [4] - 86:5, 90:22, 94:4, 125:3
**page** [86] - 39:8, 40:11, 42:1, 42:2, 43:1, 43:13, 44:1, 44:8, 44:23, 45:3, 46:4, 47:1, 52:13, 55:11, 56:2, 56:4, 56:7, 56:20, 59:1, 63:15, 64:3, 64:8, 71:22, 71:23, 72:5, 72:11, 72:13, 73:3, 76:1, 76:2, 76:5, 77:6, 78:7, 78:10, 79:5, 80:9, 81:18, 82:24, 93:12, 94:7, 94:10, 96:5, 96:7, 96:8, 96:14, 96:25, 97:23, 99:21, 100:10, 101:14, 102:14, 103:7, 103:11, 103:16, 103:23, 104:23, 104:25, 108:13, 109:8, 109:12, 109:13, 109:23, 109:24, 109:25, 110:11, 111:1, 111:10, 111:17, 112:9, 112:17, 112:22, 112:24, 113:7, 114:24, 115:23, 117:16, 118:3, 120:18, 120:19, 120:25, 121:4
**pages** [11] - 8:11, 26:3, 40:3, 41:19, 43:9, 78:25, 94:10,

98:25, 104:1, 104:5, 126:10
**Pandora's** [1] - 12:1
**pants** [1] - 95:8
**par** [1] - 19:2
**paragraph** [28] - 46:2, 48:12, 64:7, 64:8, 83:1, 93:16, 93:17, 94:13, 95:3, 100:7, 100:15, 100:21, 101:5, 101:7, 101:8, 101:13, 102:16, 103:7, 103:19, 104:12, 105:2, 108:16, 108:25, 120:21, 121:13, 121:22, 122:12
**paragraphs** [4] - 100:12, 102:14, 103:8, 103:23
**pare** [2] - 123:20, 124:2
**parent** [4] - 36:6, 36:9, 69:23, 75:5, 105:14, 120:3, 120:11, 120:15
**parentheses** [1] - 94:20
**Parents** [1] - 121:24
**parents** [12] - 81:5, 85:12, 90:25, 92:19, 92:20, 102:17, 102:20, 102:24, 103:3, 105:17, 119:19, 120:5
**Park** [1] - 1:19
**park** [1] - 18:19
**parks** [1] - 106:24
**part** [12] - 64:4, 66:23, 70:4, 70:25, 76:8, 78:1, 85:11, 99:13, 107:5, 118:22, 121:18, 124:13
**participants** [1] - 50:7
**participated** [1] - 83:5
**participating** [1] - 43:19
**particular** [10] - 19:3, 19:23, 30:19, 41:25, 43:15, 60:1, 66:21, 71:16, 102:13, 119:23
**particularity** [1] - 14:21
**particularly** [1] - 123:22
**party** [3] - 31:15, 101:6, 101:11
**past** [20] - 44:14, 47:14, 49:7, 56:17,

56:23, 57:9, 59:13, 103:18, 110:15, 111:5, 111:11, 111:18, 112:11, 114:25, 115:6, 115:11, 116:7, 116:19, 117:22, 117:25
**Past** [2] - 118:6, 118:9
**patch** [2] - 100:15, 100:18
**patterns** [1] - 80:17
**pause** [6] - 18:7, 23:8, 40:18, 59:3, 90:14, 115:15
**PC** [1] - 3:9
**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:1
**people** [10] - 15:13, 15:15, 45:4, 46:2, 49:18, 62:17, 62:22, 63:11, 91:14, 124:20
**percent** [14] - 21:3, 44:13, 50:1, 50:3, 50:4, 56:22, 57:9, 59:18, 59:23, 60:1, 115:3, 116:5, 116:7
**percentages** [1] - 115:2
**perfect** [2] - 38:8, 38:9
**performance** [3] - 84:17, 84:18, 84:24
**performed** [1] - 24:3
**period** [8] - 35:3, 35:20, 68:20, 81:12, 84:15, 84:19, 84:25, 94:19
**permission** [1] - 5:22
**person** [5] - 58:16, 68:4, 69:8, 75:16, 106:5
**personal** [1] - 109:3
**phone** [3] - 31:15, 61:21, 102:17
**phrase** [1] - 92:23
**physical** [4] - 33:19, 81:1, 94:21, 105:7
**physically** [1] - 112:1
**piano** [1] - 83:8
**pick** [3] - 17:22, 19:9, 22:4
**pics** [1] - 97:17
**picture** [3] - 6:18, 6:19, 6:20
**pinpoint** [1] - 69:3
**pitching** [1] - 38:8
**PITTLEMAN** [1] - 3:9
**place** [4] - 67:23, 68:1, 68:14, 74:1
**Plaintiff** [6] - 1:4, 1:14,

2:1, 4:7, 71:7, 73:19
**plaintiff** [8] - 6:1, 7:3, 8:10, 10:4, 14:18, 16:17, 24:1, 29:15
**plaintiff's** [8] - 9:20, 23:4, 24:21, 29:11, 29:13, 39:25, 95:22, 119:25
**Plaintiff's** [13] - 22:24, 23:12, 25:22, 32:14, 32:19, 41:8, 89:14, 89:24, 93:19, 95:14, 98:13, 104:12, 117:13
**plan** [4] - 12:24, 16:14, 48:18, 69:22
**play** [2] - 9:22, 10:20
**played** [2] - 10:25, 77:21
**playing** [2] - 13:7, 83:8
**plays** [1] - 15:3
**PLC** [1] - 3:5
**PLLC** [1] - 1:15
**plus** [1] - 50:10
**point** [16] - 5:7, 10:21, 12:7, 12:25, 14:8, 15:1, 18:4, 56:11, 56:21, 57:6, 62:1, 67:19, 69:14, 71:3, 74:18
**pointed** [1] - 47:5
**points** [1] - 13:21
**poked** [2] - 94:22, 105:8
**police** [12] - 5:11, 9:18, 9:21, 11:13, 11:19, 11:23, 12:3, 64:20, 106:1, 106:3, 106:6, 107:3
**policy** [5] - 33:1, 33:8, 33:24, 34:3, 35:15
**portion** [1] - 10:11
**portions** [2] - 12:18, 12:19
**position** [1] - 15:9
**positive** [1] - 109:2
**possible** [9] - 101:25, 105:14, 106:5, 120:3, 121:9, 122:4, 122:6, 122:7, 122:10
**posttraumatic** [2] - 76:12, 80:3
**potential** [1] - 21:1
**potentially** [1] - 12:2
**practice** [2] - 91:3, 102:5
**pragmatic** [1] - 10:16
**precisely** [1] - 35:24
**Pregnancy** [1] -

136

121:14
**Preliminary** [1] - 4:13
**prenatal** [1] - 121:17
**prepare** [1] - 16:15
**prepared** [2] - 41:2,
120:14
**present** [5] - 5:17,
6:19, 17:14, 20:18,
86:6
**Preston** [2] - 79:1,
80:12
**pretrial** [1] - 9:9
**pretty** [5] - 5:8, 21:7,
100:7, 109:6, 113:9
**prevalence** [6] -
42:12, 42:14, 59:12,
109:1, 117:21,
117:24
**prevent** [1] - 48:20
**preview** [1] - 12:17
**previous** [1] - 53:23
**previously** [1] - 36:22
**principal** [6] - 6:17,
34:11, 34:21, 35:21,
35:25, 104:19
**principal's** [1] - 89:6
**principals** [1] - 47:18
**priority** [1] - 69:16
**problem** [7] - 5:25,
7:2, 38:4, 60:8,
60:11, 71:12, 71:17
**problems** [2] - 48:20,
82:10
**proceed** [2] - 21:21,
63:12
**PROCEEDINGS** [1] -
1:11
**proceedings** [10] -
18:7, 23:8, 40:18,
59:3, 86:5, 90:14,
115:15, 126:6,
126:11, 126:14
**Process** [1] - 11:7
**process** [15] - 7:20,
7:23, 8:18, 8:19,
10:12, 10:19, 11:11,
11:14, 12:9, 12:13,
12:14, 12:15, 14:17,
91:12, 91:14
**professional** [2] -
21:10, 21:18
**professionals** [5] -
15:14, 75:15, 85:6,
85:8
**Profile** [2] - 82:25,
83:1
**program** [3] - 77:13,
107:16, 107:19
**programs** [4] - 48:19,
106:20, 107:22,

108:2
**prohibited** [1] - 33:21
**promiscuous** [1] -
24:4
**promise** [4] - 27:17,
27:19, 27:25, 41:17
**promote** [1] - 48:20
**proper** [2] - 9:4, 10:9
**property** [1] - 94:24
**protect** [1] - 57:14
**provide** [4] - 8:24,
69:1, 106:17, 108:25
**provided** [6] - 20:20,
69:1, 85:11, 108:1,
121:6, 121:16
**providing** [1] - 74:12
**province** [1] - 11:20
**provisions** [1] - 43:15
**psychologist** [8] -
72:3, 72:8, 72:9,
72:20, 74:1, 74:6,
74:8, 74:14
**psychologists** [1] -
70:4
**PTSD** [3] - 71:18, 82:3,
122:1
**Public** [7] - 38:4,
55:14, 55:15, 58:23,
70:23, 106:12,
106:14
**publication** [1] - 55:13
**publish** [21] - 24:23,
25:23, 25:24, 29:18,
32:22, 43:9, 73:11,
73:18, 79:7, 79:11,
88:8, 88:10, 89:23,
90:16, 92:3, 93:7,
93:8, 95:19, 95:23,
119:7, 119:9
**published** [10] - 23:1,
26:1, 55:10, 58:21,
58:24, 79:12, 93:10,
96:2, 99:19, 119:11
**publisher** [1] - 55:11
**publishes** [1] - 55:15
**pull** [2] - 21:2, 118:25
**pulled** [1] - 91:14
**pumpkin** [2] - 100:15,
100:18
**purpose** [3] - 8:8,
42:5, 48:23
**purposes** [2] - 8:23,
48:24
**put** [8] - 26:5, 67:23,
68:1, 70:1, 95:5,
96:1, 104:21, 119:2
**putting** [1] - 12:1
**PX-133** [1] - 89:17
**PX-171** [1] - 95:22

**Q**

**qualify** [2] - 71:16,
75:16
**questions** [42] - 13:1,
16:5, 22:9, 40:1,
40:8, 41:13, 41:21,
42:19, 42:25, 43:15,
43:22, 45:12, 50:16,
50:17, 63:10, 83:17,
83:19, 83:25, 84:1,
84:3, 84:14, 86:15,
87:1, 98:9, 102:7,
107:12, 108:4,
108:9, 109:9,
109:11, 109:20,
112:22, 112:23,
113:7, 113:12,
113:18, 114:18,
118:19, 119:13,
120:13, 120:14,
122:25
**quick** [2] - 64:12,
67:19
**quickly** [1] - 5:24
**quote** [2] - 71:17,
77:12

**R**

**Rachel** [13] - 34:11,
34:17, 34:21, 36:14,
37:11, 37:24, 38:8,
38:17, 57:21, 57:22,
58:2, 58:5, 88:20
**racist** [1] - 97:7
**R**■■■ [2] - 61:20,
64:20
**rage** [1] - 97:25
**raise** [1] - 48:2
**raised** [2] - 45:20,
45:24
**ranging** [1] - 83:5
**raped** [1] - 62:18
**rbates@hunton.com**
- 2:16
**reached** [1] - 60:25
**reaches** [1] - 61:5
**read** [20] - 6:15, 11:4,
18:25, 31:13, 32:2,
46:1, 46:6, 46:9,
46:10, 48:14, 49:2,
49:12, 55:11, 56:21,
64:7, 64:11, 103:7,
110:22, 116:4
**reading** [6] - 44:4,
50:22, 57:12, 76:1,
76:7, 80:18
**ready** [4] - 5:18, 7:11,
21:19, 81:13

**really** [8] - 12:8, 19:24,
25:5, 25:12, 57:18,
63:1, 65:20, 98:2
**realtime** [1] - 126:12
**Reason** [1] - 76:6
**reason** [7] - 5:12,
37:16, 67:5, 74:19,
75:13, 79:4, 89:9
**reasonable** [1] - 67:7
**reasons** [1] - 35:13
**reassess** [1] - 124:22
**recalled** [2] - 24:7,
24:12
**receive** [2] - 35:14,
69:15
**received** [5] - 79:15,
81:25, 82:3, 88:22,
92:15
**receiving** [3] - 62:10,
76:11, 84:21
**recess** [2] - 86:3, 86:4
**Recess** [1] - 125:3
**recognize** [3] - 6:6,
6:10, 51:9
**recollection** [15] -
22:10, 22:11, 22:13,
22:15, 22:16, 23:21,
23:25, 24:16, 25:10,
27:20, 29:3, 37:17,
64:15, 64:17, 64:23
**recommended** [1] -
122:13
**record** [5] - 5:3, 6:15,
13:7, 13:22, 15:25
**recording** [1] - 126:13
**records** [13] - 7:8,
75:2, 75:3, 76:17,
106:1, 106:3,
119:18, 119:20,
119:21, 120:1,
121:7, 121:17
**recreation** [1] - 106:22
**redacted** [1] - 93:2
**redaction** [2] - 92:25,
93:7
**redirect** [2] - 48:3,
123:13
**Redirect** [1] - 4:5
**REDIRECT** [1] - 86:11
**refer** [2] - 52:1, 52:2
**reference** [1] - 73:8
**referral** [4] - 74:19,
75:13, 79:4
**Referral** [1] - 76:7
**referred** [1] - 61:9
**referring** [1] - 59:21
**reflect** [1] - 16:1
**refresh** [5] - 23:25,
25:9, 64:15, 64:17,
64:23

**refused** [1] - 80:1
**regard** [3] - 7:7, 37:11,
41:14
**regarding** [8] - 9:4,
18:2, 34:17, 35:22,
40:24, 43:22, 59:12,
104:9
**regardless** [1] -
107:19
**regions** [1] - 52:11
**regulate** [1] - 76:20
**rehabilitate** [1] -
114:14
**related** [4] - 7:24,
80:6, 80:21, 84:14
**relates** [1] - 54:4
**relevance** [1] - 50:16
**relevant** [2] - 13:10,
50:19
**religious** [4] - 18:16,
18:24, 19:18, 20:21
**remain** [1] - 122:13
**remember** [33] -
14:12, 14:14, 22:7,
22:11, 23:4, 24:14,
24:17, 25:12, 26:10,
27:15, 29:2, 29:5,
34:11, 35:9, 35:24,
45:24, 53:25, 60:15,
61:2, 62:18, 62:19,
63:2, 65:5, 65:17,
65:18, 66:1, 66:7,
66:11, 66:12, 67:20,
67:24, 86:18, 124:24
**reminded** [1] - 23:16
**repeat** [1] - 72:6
**rephrase** [7] - 28:22,
36:21, 98:15, 107:9,
113:16, 115:7, 120:8
**report** [37] - 7:19, 8:6,
8:11, 8:23, 9:11,
10:8, 10:13, 11:5,
11:6, 14:4, 34:13,
34:16, 35:22, 35:25,
36:14, 46:16, 52:7,
54:21, 59:19, 60:1,
60:3, 64:21, 68:24,
73:25, 74:3, 74:9,
85:3, 85:5, 85:10,
85:11, 98:6, 103:9,
105:14, 106:6,
108:19, 116:14
**Report** [1] - 52:24
**reported** [22] - 30:12,
31:9, 37:24, 44:12,
44:13, 45:4, 45:8,
50:1, 50:24, 53:8,
54:7, 56:16, 56:22,
57:18, 82:21, 100:4,
116:6, 116:18,

116:22, 117:5, 117:11, 126:5

**REPORTER** [1] - 126:1

**reporter** [1] - 73:7

**Reporter** [3] - 3:12, 126:3, 126:22

**Reporter...................
...** [1] - 4:14

**reporting** [7] - 24:1, 32:14, 34:1, 52:21, 53:24, 57:2, 76:17

**reports** [9] - 35:14, 51:12, 53:16, 57:21, 57:22, 58:2, 58:5, 105:18

**represent** [2] - 84:11, 117:24

**republish** [1] - 22:23

**request** [8] - 6:25, 18:14, 19:10, 20:14, 20:23, 21:5, 33:19, 91:20

**requested** [1] - 62:11

**required** [2] - 102:4, 102:22

**rescheduled** [3] - 6:21, 91:18, 91:20

**rescheduling** [2] - 91:23, 92:13

**resolve** [3] - 17:25, 18:1, 28:7

**resolved** [2] - 16:7, 74:7

**resort** [1] - 66:9

**resources** [1] - 106:17

**respect** [4] - 13:3, 13:4, 119:20, 121:13

**respond** [4] - 49:19, 89:19, 93:22, 102:7

**responded** [1] - 49:21

**response** [1] - 61:20

**responses** [4] - 5:2, 17:17, 46:12, 49:16

**responsibility** [2] - 35:21, 77:19

**responsible** [1] - 35:6

**restate** [1] - 34:19

**Reston** [2] - 3:7, 3:10

**restricting** [1] - 16:1

**resulted** [1] - 46:12

**resumed** [1] - 86:5

**retained** [1] - 8:8

**reveal** [1] - 14:14

**review** [6] - 13:18, 75:2, 76:16, 91:9, 119:18, 119:20

**reviewed** [5] - 14:5, 24:12, 80:25, 92:18, 120:4

**reviewing** [1] - 14:14

**Rewari** [6] - 2:17, 45:16, 45:20, 85:17, 86:1, 86:8

**REWARI** [82] - 19:19, 20:2, 28:4, 31:1, 31:23, 32:2, 36:16, 38:11, 39:20, 39:25, 41:1, 42:17, 42:22, 42:24, 45:6, 47:22, 50:15, 51:17, 51:19, 54:9, 55:2, 57:24, 62:24, 71:5, 73:15, 85:19, 86:12, 88:5, 88:10, 88:12, 88:13, 89:23, 90:1, 90:12, 90:16, 90:18, 90:19, 91:25, 92:2, 92:5, 93:6, 93:9, 93:11, 94:6, 94:8, 94:16, 94:17, 95:17, 95:20, 95:22, 95:25, 96:3, 99:16, 99:20, 99:22, 104:21, 104:22, 105:5, 105:6, 107:10, 108:5, 108:7, 113:17, 114:5, 114:12, 114:15, 115:9, 115:10, 115:16, 115:19, 118:17, 118:18, 119:7, 119:12, 120:9, 121:12, 122:6, 122:11, 122:19, 122:20, 122:25, 124:8

**Rewari.............** [1] - 4:5

**ridiculed** [6] - 56:16, 110:16, 111:6, 111:19, 116:19, 116:22

**ridiculing** [3] - 116:6, 116:10, 116:14

**risk** [2] - 11:16, 109:2

**rkeefe@bsfllp.com** [1] - 2:12

**Robert** [2] - 2:9, 3:6

**role** [1] - 34:24

**Roman** [1] - 33:11

**room** [1] - 14:24

**Roper** [3] - 72:18, 73:3, 75:1

**roper** [4] - 75:11, 76:16, 77:7, 80:12

**Roper's** [1] - 77:22

**Rossie** [1] - 18:14

**ROSSIE** [1] - 1:11

**RPR** [2] - 3:12, 126:21

**Rule** [3] - 13:24, 13:25, 16:2

**rule** [1] - 16:6

**ruling** [1] - 9:17

**rulings** [1] - 11:12

**rumors** [9] - 24:3, 25:6, 26:13, 26:19, 26:21, 26:24, 27:1, 27:2, 97:13

**run** [2] - 11:16, 107:22

**runs** [1] - 96:4

**Rustioni** [5] - 7:13, 8:7, 8:22, 9:12, 124:11

**Rustioni's** [1] - 8:6

**Ryan** [1] - 2:13

**S**

**S.T** [1] - 3:5

**safe** [1] - 89:7

**Salad** [1] - 118:6

**save** [1] - 17:1

**saw** [3] - 25:14, 91:23, 100:19

**scared** [2] - 97:15, 98:2

**scheduled** [4] - 6:20, 7:9, 19:8, 91:17

**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10

**school** [110] - 6:17, 6:19, 31:22, 32:14, 36:5, 42:25, 47:12, 47:23, 47:24, 48:19, 50:17, 51:21, 53:10, 53:12, 54:7, 54:21, 55:3, 56:23, 57:10, 58:15, 58:16, 58:24, 60:8, 62:3, 62:16, 67:22, 68:24, 69:13, 70:1, 72:3, 72:8, 72:9, 72:20, 73:25, 74:6, 74:8, 74:14, 74:20, 75:21, 75:22, 77:8, 77:11, 77:17, 79:1, 79:22, 82:8, 82:10, 82:20, 83:9, 84:17, 85:7, 87:2, 89:9, 89:10, 90:3, 90:8, 90:24, 92:9, 92:12, 92:18, 94:24, 97:19, 98:1, 98:4, 99:4, 99:6, 99:14, 100:7, 102:20, 105:15, 105:24, 105:25, 106:3, 106:6, 106:18, 106:20, 107:12, 107:16, 107:17,

107:18, 107:22, 110:4, 110:9, 110:20, 111:8, 111:12, 111:14, 111:23, 112:5, 112:20, 113:14, 113:19, 113:23, 113:25, 114:3, 115:12, 116:15, 116:23, 117:2, 117:8, 117:11, 117:25, 118:12, 119:21, 119:25, 121:6, 121:16

**School** [30] - 5:4, 33:1, 33:8, 33:24, 35:14, 36:9, 36:23, 37:11, 38:4, 38:15, 39:15, 39:20, 40:5, 40:23, 46:21, 47:20, 51:12, 52:6, 53:16, 55:6, 57:14, 64:15, 64:23, 75:18, 75:20, 75:25, 77:23, 82:16

**school-based** [1] - 85:7

**Schools** [6] - 55:14, 55:15, 58:23, 70:23, 106:12, 106:14

**schools** [17] - 40:25, 42:12, 42:14, 43:2, 43:3, 47:20, 48:23, 51:14, 52:23, 53:1, 53:2, 53:17, 106:14, 107:18, 108:2, 118:14

**schoolwork** [2] - 84:18, 84:25

**science** [1] - 14:20

**scientifically** [1] - 43:17

**scope** [2] - 15:10, 16:1

**score** [1] - 38:8

**Scott** [1] - 2:20

**screen** [8] - 33:5, 75:16, 94:7, 96:1, 97:2, 118:25, 119:3, 121:3

**screening** [7] - 74:22, 75:12, 75:14, 75:15, 75:23, 85:2, 119:18

**scroll** [4] - 82:1, 82:14, 82:17, 82:25

**SE** [3] - 2:2, 2:6, 2:10

**seated** [6] - 17:15, 18:5, 18:11, 20:19, 85:25, 86:7

**sec** [1] - 118:24

**second** [34] - 14:5, 14:8, 16:22, 27:2,

28:1, 38:23, 40:13, 43:13, 48:12, 51:23, 52:10, 55:20, 56:11, 59:2, 63:15, 63:21, 64:3, 64:8, 75:24, 77:6, 95:16, 96:7, 98:14, 100:10, 101:8, 104:17, 110:22, 114:8, 114:23, 115:24, 117:18, 118:24, 120:25

**section** [13] - 8:12, 11:6, 43:18, 44:5, 44:8, 56:9, 76:6, 96:21, 98:23, 116:2, 117:7, 117:10, 121:20

**see** [98] - 5:14, 9:23, 15:3, 17:18, 19:21, 24:5, 24:6, 27:22, 30:18, 30:23, 30:24, 31:19, 31:20, 32:11, 32:12, 33:22, 37:18, 38:17, 39:23, 39:24, 40:12, 42:9, 42:16, 45:6, 45:8, 50:10, 50:12, 52:10, 52:11, 52:13, 52:19, 53:10, 53:12, 53:14, 59:1, 59:14, 65:1, 71:25, 72:4, 72:15, 73:12, 75:2, 75:3, 75:10, 75:13, 75:16, 76:4, 76:8, 76:14, 76:23, 77:9, 78:10, 78:20, 78:21, 80:9, 81:23, 82:23, 87:17, 87:22, 88:25, 89:11, 90:22, 93:17, 94:9, 94:11, 94:25, 96:19, 99:23, 100:16, 100:22, 101:6, 101:9, 102:14, 102:18, 103:19, 103:24, 105:10, 109:8, 109:18, 109:22, 110:17, 110:22, 111:3, 111:20, 112:3, 112:13, 113:24, 114:4, 114:7, 116:8, 119:14, 120:24, 121:5, 122:2, 122:14, 123:19, 124:19

**seeing** [4] - 25:12, 29:21, 53:18, 124:17

**seeking** [2] - 69:19, 69:23

138

**send** [1] - 62:2
**sense** [1] - 107:20
**sent** [4] - 16:10, 88:14, 89:8, 104:19
**sentence** [3] - 30:1, 30:21, 33:13
**sentences** [1] - 91:8
**separate** [1] - 46:17
**separation** [1] - 81:7
**services** [2] - 69:15, 74:12
**SESSION** [1] - 1:8
**Session** [1] - 125:4
**sets** [1] - 71:22
**setting** [5] - 47:18, 57:1, 57:2, 59:19, 77:22
**seven** [1] - 57:8
**several** [6] - 15:22, 94:10, 98:25, 100:12, 102:14, 103:8
**sex** [3] - 9:5, 24:4, 97:18
**sexual** [34] - 7:20, 12:15, 26:9, 26:10, 33:2, 33:9, 33:18, 33:19, 33:20, 34:17, 35:15, 35:23, 36:15, 37:24, 38:3, 38:6, 42:14, 49:2, 50:24, 53:14, 53:25, 54:6, 54:11, 58:5, 60:8, 64:16, 95:2, 95:12, 97:13, 97:17, 97:20, 98:7, 112:1
**Sexual** [1] - 11:7
**Sexually** [1] - 49:10
**sexually** [11] - 45:4, 47:15, 50:2, 59:13, 59:20, 60:2, 64:24, 112:12, 115:1, 117:22, 117:25
**shadowing** [4] - 67:20, 68:2, 68:5, 68:14
**share** [1] - 7:18
**shared** [2] - 68:7, 119:21
**shopping** [1] - 108:3
**short** [2] - 8:12, 85:20
**shorthand** [2] - 126:5, 126:12
**shoulders** [1] - 47:18
**shoved** [2] - 94:22, 105:8
**show** [6] - 22:20, 29:6, 41:19, 94:6, 99:17, 99:20
**showed** [7] - 23:3,

53:23, 93:15, 100:25, 118:20, 120:17, 122:22
**showing** [2] - 22:10, 121:7
**shown** [3] - 47:23, 99:5, 104:6
**shows** [3] - 72:2, 72:6, 117:21
**sic** [2] - 28:9, 113:2
**sic]** [1] - 111:2
**side** [5] - 12:10, 16:18, 26:5, 124:2
**signature** [3] - 72:14, 72:15
**significant** [1] - 38:3
**signs** [1] - 122:1
**similar** [2] - 59:11, 80:12
**single** [4] - 34:13, 36:14, 37:23, 104:2
**single-spaced** [1] - 104:2
**sit** [3] - 5:22, 21:16, 37:23
**situation** [2] - 89:3, 102:25
**six** [2] - 13:10, 50:14
**skinny** [3] - 87:9, 89:15, 93:1
**slap** [2] - 104:9, 105:12
**slut** [3] - 24:2, 31:18, 32:10
**smell** [1] - 97:8
**social** [6] - 70:5, 78:1, 78:20, 79:1, 79:22, 80:25
**sociocultural** [1] - 119:14
**sociology** [1] - 11:25
**sole** [1] - 8:8
**someone** [3] - 8:15, 11:23, 12:9, 24:4, 56:17, 57:10, 57:18, 110:16, 111:6, 116:6, 116:11, 116:19, 116:22
**sometime** [2] - 24:12, 66:14
**sometimes** [9] - 12:18, 28:10, 102:21, 107:21, 113:6, 120:12, 120:13, 120:14
**somewhere** [1] - 86:9
**son** [1] - 18:18
**Sona** [1] - 2:17
**sorry** [16] - 8:16, 14:15, 24:20, 27:11,

32:1, 33:4, 51:6, 59:7, 63:18, 73:9, 78:5, 79:9, 83:21, 108:5, 112:7
**sort** [5] - 10:11, 12:19, 15:15, 19:25, 80:13
**source** [1] - 122:15
**sources** [3] - 85:5, 119:16, 122:21
**spaced** [1] - 104:2
**speaking** [4] - 28:9, 52:4, 63:4, 65:18
**special** [2] - 6:25, 65:20
**specific** [9] - 42:25, 43:2, 43:3, 43:22, 50:16, 51:16, 59:12, 59:16, 69:2
**specifically** [11] - 10:5, 14:20, 19:1, 20:12, 41:14, 45:3, 48:6, 49:1, 52:2, 113:22, 114:1
**speculation** [3] - 120:6, 121:10, 122:5
**spend** [1] - 14:11
**sponsored** [4] - 39:14, 46:20, 46:21
**sports** [2] - 83:6, 107:25
**spread** [1] - 97:13
**spring** [2] - 68:20, 69:8
**Square** [1] - 3:13
**srewari@huntonak. com** [1] - 2:19
**SRO** [5] - 104:9, 105:15, 105:18, 105:24, 106:6
**SRO's** [1] - 106:1
**staff** [2] - 6:17, 16:13
**stage** [1] - 11:13
**stamp** [1] - 55:18
**stand** [3] - 6:10, 9:13, 11:23
**Start** [1] - 55:25
**start** [11] - 6:16, 41:18, 55:21, 96:17, 97:4, 97:7, 98:11, 108:16, 109:12, 113:3, 123:23
**started** [7] - 5:23, 30:17, 61:8, 65:10, 66:15, 79:17, 112:23
**starting** [1] - 17:24
**starts** [6] - 33:14, 46:3, 64:8, 64:9, 99:23, 101:13
**State** [2] - 53:16, 54:21

**state** [4] - 5:11, 45:12, 52:3, 76:22
**statement** [31] - 23:4, 24:1, 24:13, 24:16, 24:19, 25:1, 25:10, 25:11, 25:14, 26:6, 26:12, 27:7, 27:8, 27:15, 27:22, 29:3, 29:7, 29:21, 29:25, 31:5, 31:9, 31:10, 31:24, 33:24, 34:1, 98:10, 98:11, 101:10, 101:23, 102:10
**statements** [21] - 9:20, 9:21, 9:24, 22:5, 22:10, 22:14, 22:18, 22:21, 25:13, 96:12, 98:9, 99:5, 100:19, 100:25, 102:2, 102:4, 102:6, 102:20, 102:22, 104:6
**states** [1] - 108:19
**STATES** [2] - 1:1, 1:12
**States** [1] - 3:12
**stating** [1] - 32:3
**statistics** [1] - 38:15
**stay** [4] - 63:10, 66:7, 66:11, 69:14
**staying** [1] - 13:8
**step** [2] - 85:24, 123:1
**steps** [1] - 91:10
**still** [4] - 78:6, 103:13, 103:18, 118:14
**stipulated** [1] - 7:7
**stood** [1] - 20:4
**stop** [2] - 68:10, 99:11
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**stress** [3] - 76:12, 80:3, 80:21
**strictures** [2] - 67:23, 68:1
**struggles** [1] - 76:20
**student** [15] - 22:5, 30:19, 56:23, 57:11, 58:16, 62:2, 75:5, 75:16, 77:12, 85:10, 91:15, 103:3, 105:14, 117:1, 117:5
**student's** [2] - 25:13, 102:10
**students** [49] - 34:2, 38:6, 40:6, 40:24, 42:1, 44:12, 45:23, 46:13, 46:14, 46:17, 47:12, 47:17, 50:6, 50:17, 53:24, 56:12, 56:13, 56:15, 56:22,

57:1, 57:8, 57:14, 57:15, 57:17, 59:18, 60:5, 60:11, 69:1, 85:9, 98:12, 99:1, 99:5, 102:1, 102:2, 102:4, 102:6, 102:7, 102:17, 103:4, 107:21, 113:19, 115:3, 116:5, 116:9, 116:13, 116:18, 116:21, 117:8, 117:11
**students'** [1] - 100:25
**studied** [1] - 42:11
**studies** [2] - 43:17, 77:14
**study** [9] - 39:14, 40:22, 41:25, 42:5, 43:12, 44:11, 45:3, 54:21, 55:3
**subject** [1] - 15:14
**subjected** [1] - 43:16
**subjects** [1] - 37:12
**subscribed** [1] - 126:15
**substance** [2] - 48:17, 109:1
**suffered** [3] - 80:19, 120:23, 121:7
**suggest** [1] - 14:13
**suggested** [3] - 37:14, 43:20, 87:1
**suggesting** [3] - 15:18, 45:16, 66:18
**suggestion** [2] - 10:10, 68:19
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:6, 3:10
**Summary** [3] - 44:8, 98:22, 105:2
**summary** [7] - 48:10, 48:12, 56:2, 94:14, 94:18, 95:3, 104:12
**summer** [1] - 108:2
**Sunday** [1] - 83:9
**superintendent** [3] - 34:25, 35:1, 104:19
**supervisors** [1] - 40:24
**Supervisors** [1] - 106:12
**support** [8] - 48:18, 62:10, 65:20, 67:1, 67:2, 71:16, 79:15, 91:14
**supported** [1] - 11:25
**suppose** [1] - 16:5
**surely** [1] - 67:5
**surprise** [2] - 36:13,

37:1
**survey** [39] - 39:5, 39:22, 40:5, 41:11, 41:16, 41:19, 41:20, 42:6, 43:16, 43:19, 43:23, 45:12, 45:13, 45:18, 46:3, 46:11, 48:1, 48:8, 48:16, 50:7, 54:22, 54:23, 59:23, 60:4, 60:5, 106:9, 107:5, 107:11, 108:10, 108:20, 108:21, 109:12, 113:10, 114:20, 114:21, 115:21, 117:14, 118:11
**Survey** [2] - 55:7, 58:19
**surveyed** [1] - 46:2
**surveyors** [1] - 48:7
**suspended** [1] - 111:12
**sustained** [4] - 57:25, 120:8, 121:11, 122:9
**switch** [2] - 92:21, 104:8
**S▮▮▮▮** [1] - 123:6
**system** [8] - 47:12, 60:8, 61:24, 105:24, 105:25, 106:3, 107:23, 114:7
**systems** [1] - 38:4

## T

**T.B** [1] - 3:5
**tab** [2] - 87:10, 87:12
**TABLE** [1] - 4:1
**table** [7] - 5:22, 21:17, 117:19, 117:21, 117:24, 118:5, 118:8
**Table** [1] - 117:16
**tables** [1] - 109:18
**talks** [7] - 46:1, 57:5, 82:8, 82:12, 82:19, 117:7, 117:10
**tape** [2] - 13:15, 126:13
**taunted** [6] - 56:16, 110:15, 111:5, 111:19, 116:19, 116:22
**taunting** [4] - 94:20, 116:6, 116:10, 116:14
**teach** [1] - 11:11
**teachers** [1] - 84:12
**teaches** [1] - 83:9
**team** [4] - 17:9, 70:2,

70:4, 78:1
**teased** [7] - 44:13, 56:16, 110:16, 111:6, 111:19, 116:19, 116:22
**teasing** [3] - 116:6, 116:11, 116:15
**ten** [3] - 31:16, 56:17, 116:20
**Tenth** [1] - 3:13
**term** [1] - 9:14
**terms** [2] - 8:5, 14:17
**terrible** [1] - 5:6
**T▮▮▮▮** [4] - 101:16, 102:16, 123:6, 124:10
**testified** [6] - 36:13, 36:18, 36:22, 37:8, 37:15, 67:14
**testify** [3] - 14:19, 28:19, 69:7
**testifying** [3] - 29:2, 36:19, 42:24
**testimony** [4] - 36:17, 69:11, 123:20, 126:6
**testing** [2] - 70:25, 71:22
**thankful** [1] - 17:23
**THE** [213] - 1:1, 1:11, 3:5, 5:1, 5:3, 6:3, 6:9, 6:13, 7:5, 7:15, 7:25, 8:3, 10:1, 10:15, 11:2, 11:16, 12:7, 12:21, 12:25, 13:14, 13:19, 13:23, 14:2, 14:7, 14:10, 14:12, 14:19, 15:2, 15:6, 15:12, 15:21, 15:24, 16:3, 16:6, 16:12, 16:25, 17:4, 17:9, 17:13, 17:15, 17:18, 18:6, 18:8, 18:11, 19:15, 19:23, 20:4, 20:6, 20:8, 20:10, 20:19, 21:22, 22:25, 24:22, 24:24, 25:23, 25:25, 28:5, 28:7, 28:12, 28:13, 28:15, 28:16, 28:17, 28:18, 28:23, 28:25, 29:12, 29:14, 29:16, 29:17, 29:19, 31:4, 31:6, 31:7, 32:3, 32:6, 32:7, 32:21, 32:23, 36:21, 36:25, 37:1, 37:3, 37:5, 37:7, 37:8, 37:9, 37:10, 37:13, 37:14, 37:18, 37:20, 38:12, 38:24, 39:2, 39:24,

40:1, 40:7, 40:15, 40:17, 40:19, 41:5, 41:9, 41:10, 41:12, 41:13, 41:20, 42:20, 42:23, 43:5, 43:10, 43:14, 44:16, 44:17, 45:1, 45:11, 45:16, 46:6, 46:10, 46:11, 48:4, 50:20, 51:5, 51:7, 51:18, 51:25, 52:16, 52:17, 54:10, 54:11, 55:4, 55:23, 55:24, 57:25, 59:4, 62:25, 63:1, 63:2, 63:3, 63:4, 63:6, 63:7, 63:8, 63:9, 70:16, 70:18, 71:6, 73:1, 73:6, 73:12, 73:18, 75:7, 75:8, 76:6, 76:8, 78:4, 78:7, 78:8, 78:12, 78:15, 78:17, 79:8, 79:11, 83:14, 83:18, 83:22, 84:3, 84:6, 85:16, 85:17, 85:20, 85:24, 86:7, 88:8, 88:11, 89:25, 90:15, 90:17, 92:1, 92:4, 93:8, 95:19, 95:21, 95:24, 99:18, 107:9, 108:4, 108:6, 113:16, 114:3, 114:8, 114:13, 115:7, 115:18, 118:16, 119:10, 120:8, 121:11, 122:7, 122:8, 122:9, 122:10, 122:18, 123:1, 123:3, 123:7, 123:12, 123:15, 123:18, 124:13, 124:16, 125:2
**therapy** [2] - 66:25, 67:2
**therefore** [1] - 33:14
**Therefore** [1] - 33:18
**they've** [1] - 124:10
**thinking** [1] - 8:20
**third** [6] - 27:8, 27:15, 39:8, 57:17, 100:14, 100:15
**thoughts** [1] - 8:25
**threatened** [1] - 94:23
**threatens** [1] - 97:12
**threats** [2] - 53:12, 97:15
**three** [9] - 50:10, 54:3, 71:22, 89:3, 94:19, 99:4, 103:23, 104:5, 122:1

**three-and-a-half** [1] - 89:3
**throughout** [1] - 77:16
**thrown** [2] - 94:23, 105:8
**timing** [1] - 86:16
**Tinsley** [2] - 17:13, 18:8
**Title** [4] - 35:6, 35:10, 35:23, 36:15
**title** [2] - 55:6, 72:19
**titled** [1] - 11:6
**today** [5] - 19:20, 20:3, 22:2, 37:23, 82:13
**together** [6] - 18:19, 26:10, 70:1, 85:9, 106:16, 126:13
**tolerate** [1] - 94:21
**Tonia** [2] - 126:3, 126:21
**TONIA** [1] - 3:12
**took** [5] - 38:1, 68:14, 74:1, 81:5, 117:16
**top** [2] - 53:5, 90:2
**topic** [2] - 60:13, 92:22
**topics** [1] - 65:4
**TORCHINSKY** [1] - 1:14
**total** [3] - 50:24, 60:4
**touch** [1] - 61:25
**touching** [4] - 93:16, 95:2, 97:20, 98:7
**towards** [1] - 44:24
**track** [2] - 15:18, 15:22
**tractor** [2] - 5:9, 5:10
**tractor-trailer** [2] - 5:9, 5:10
**trailer** [2] - 5:9, 5:10
**transcript** [4] - 13:17, 13:18, 14:14, 126:11
**TRANSCRIPT** [1] - 1:11
**transparent** [1] - 7:18
**treated** [2] - 74:16, 89:6
**trends** [1] - 48:17
**TRIAL** [2] - 1:11, 4:1
**trial** [1] - 124:21
**Trial** [1] - 126:6
**tricky** [1] - 37:5
**tried** [1] - 97:7
**truck** [3] - 5:8, 5:9, 5:10
**true** [1] - 59:20
**try** [15] - 5:14, 19:20, 19:22, 37:6, 38:25, 41:5, 57:14, 63:9, 77:7, 105:20, 114:13, 114:14,

124:2, 124:16
**trying** [10] - 9:15, 11:13, 12:5, 17:1, 25:17, 83:4, 83:23, 87:2, 103:2
**turn** [6] - 11:17, 87:16, 94:1, 100:10, 103:11, 118:3
**turns** [1] - 6:7
**two** [16] - 13:21, 14:4, 26:3, 27:6, 41:19, 51:6, 54:3, 56:20, 60:10, 65:4, 68:9, 89:8, 91:8, 106:15, 116:25
**type** [3] - 11:10, 17:7, 54:18
**typical** [1] - 12:20
**typically** [1] - 81:1

## U

**ugly** [1] - 97:6
**unable** [1] - 75:24
**unaware** [2] - 36:23, 37:10
**under** [13] - 13:24, 13:25, 16:2, 16:23, 75:13, 76:6, 80:9, 96:22, 120:18, 120:21, 121:14, 121:19
**understandable** [1] - 10:17
**understood** [6] - 15:23, 16:8, 32:13, 34:15, 43:24, 69:23
**unfortunate** [1] - 5:7
**united** [1] - 3:12
**UNITED** [2] - 1:1, 1:12
**univariate** [1] - 109:17
**unless** [2] - 8:21, 36:18
**unquote** [1] - 71:17
**unwelcomed** [1] - 33:18
**up** [31] - 6:10, 7:10, 7:15, 8:17, 15:1, 16:12, 17:10, 17:18, 17:19, 17:22, 19:9, 20:4, 22:4, 24:19, 27:25, 30:10, 30:16, 34:14, 38:17, 45:19, 47:5, 60:12, 61:24, 73:22, 78:13, 81:21, 91:13, 93:20, 101:19, 113:6, 118:25

## V

**VA** [3] - 3:7, 3:10, 3:14
**vague** [1] - 31:4
**valid** [1] - 46:12
**varies** [1] - 120:12
**variety** [1] - 85:9
**various** [7] - 22:5,
35:13, 51:13, 52:8,
52:19, 52:21, 70:4
**vehicle** [1] - 110:1
**verbal** [1] - 33:19
**verified** [1] - 36:14
**versus** [3] - 5:4,
107:12, 126:7
**victim** [2] - 9:5, 94:19
**victims** [4] - 7:20,
12:15, 13:10, 57:5
**Victims** [1] - 11:7
**video** [3] - 10:24, 11:1,
14:6
**vigilance** [1] - 76:22
**violation** [1] - 34:3
**violations** [2] - 35:14,
53:10
**violence** [2] - 52:25,
109:1
**VIRGINIA** [1] - 1:1
**Virginia** [9] - 5:21,
51:12, 52:7, 52:10,
52:11, 54:8, 55:13,
58:22, 126:4
**vitamin** [1] - 80:6
**VOGEL** [1] - 1:14
**voice** [1] - 88:23
**VOLUME** [1] - 1:8
**voluntary** [1] - 42:6
**volunteer** [1] - 15:13

## W

**wait** [1] - 7:13
**waited** [1] - 14:18
**waiting** [1] - 97:11
**wants** [2] - 5:22, 18:24
**Washington** [5] -
1:16, 2:15, 2:18,
2:22, 3:2
**watch** [1] - 108:4
**wave** [1] - 21:13
**ways** [1] - 12:8
**WDC** [1] - 81:6
**Weaver** [2] - 121:24,
122:12
**Wednesday** [2] - 6:16,
18:15
**week** [4] - 19:10, 96:4,
96:15, 96:21
**Week** [2] - 118:6,
118:9

**weekend** [1] - 97:23
**weeks** [3] - 24:13,
29:22, 122:1
**weight** [4] - 50:20,
80:20, 120:23, 121:7
**weighted** [1] - 109:18
**welcome** [1] - 104:16
**welfare** [1] - 89:5
**well-being** [2] - 42:8,
108:23
**whereof** [1] - 126:15
**white** [3] - 61:4, 87:9
**whole** [5] - 10:24,
10:25, 15:13, 19:14,
19:15
**whore** [5] - 24:2,
30:17, 31:14, 31:18,
97:5
**Wiehle** [1] - 3:9
**wine** [1] - 110:7
**wishes** [1] - 66:10
**Witness** [2] - 18:5,
123:2
**WITNESS** [42] - 24:22,
28:5, 28:12, 28:15,
28:17, 29:14, 29:16,
31:6, 32:6, 36:25,
37:3, 37:7, 37:9,
37:13, 37:18, 39:2,
40:15, 40:19, 41:9,
41:12, 44:17, 46:6,
46:11, 51:7, 52:17,
54:11, 55:24, 59:4,
63:1, 63:3, 63:6,
63:8, 75:8, 76:8,
78:8, 85:16, 92:1,
95:21, 108:6, 114:3,
122:8, 122:10
**witness** [17] - 7:14,
13:25, 19:24, 21:1,
26:25, 27:2, 36:17,
43:1, 43:2, 43:6,
47:23, 48:6, 50:19,
114:9, 123:3, 124:9,
126:15
**witness's** [1] - 36:17
**WITNESSES** [1] - 4:1
**witnesses** [3] - 16:15,
97:6, 123:24
**word** [3] - 45:7, 49:3,
79:1
**words** [3] - 69:20,
69:21, 93:16
**worker** [5] - 78:1,
78:20, 79:1, 79:22,
80:25
**workers** [1] - 70:5
**write** [6] - 102:2,
102:4, 102:5, 102:8,
102:20, 102:22

**writer** [1] - 76:25
**writes** [2] - 88:22,
91:12
**writing** [3] - 61:15,
91:13, 102:6
**written** [4] - 25:11,
25:14, 64:18, 99:8
**wrote** [1] - 10:13

## Y

**yards** [1] - 5:10
**Year** [1] - 55:6
**year** [25] - 6:18, 44:14,
47:14, 49:7, 52:8,
54:19, 55:1, 56:17,
56:24, 57:9, 58:15,
58:16, 59:13, 75:25,
110:15, 111:5,
111:11, 111:18,
112:11, 115:6,
115:12, 116:7,
116:19, 117:22,
118:1
**years** [1] - 77:17
**yesterday** [21] - 22:4,
23:4, 24:8, 24:12,
25:18, 26:8, 27:20,
29:3, 66:12, 71:11,
86:15, 86:20, 89:14,
89:24, 90:11, 90:13,
92:2, 92:23, 93:7,
95:15, 95:18
**young** [3] - 21:8,
21:12, 21:14
**younger** [1] - 83:10
**yourself** [2] - 64:7,
64:11
**youth** [19] - 39:5,
41:10, 41:15, 41:19,
42:8, 43:15, 45:23,
46:3, 46:11, 54:22,
54:23, 106:9, 107:5,
107:11, 107:25,
108:10, 108:20,
108:23, 117:14
**Youth** [2] - 55:7, 58:19

## Z

**zero** [1] - 38:9
**Zoll** [1] - 2:1
**zoo** [1] - 18:19
**Zuluaga** [6] - 21:25,
61:18, 66:17, 83:16,
84:9, 86:13
**Zuluago** [1] - 4:3