1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                           :
                                :
              Plaintiff,        :   Civil Action
                                :   No. 1:19-cv-917
         v.                     :
                                :
F.C.S.B., et al.,               :   April 3, 2024,
                                :   11:13 a.m.
                                :
              Defendants.       :
                                :   VOLUME 12 - A.M. SESSION
..............................  :
                                :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029-Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES:  (Cont.)

2

```
 1
    For the Plaintiff:          Brittany Zoll, Esq.
 2                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 3                              Suite 2800
                                Miami, FL 33131
 4                              610-804-1787
                                Email: Britzoll@gmail.com
 5
                                Andrew Brenner, Esq.
 6                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 7                              Suite 2800
                                Miami, FL 33131
 8                              305-539-8400
                                Email: Abrenner@bsfllp.com
 9
                                Robert Keefe, Esq.
10                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
11                              Suite 2800
                                Miami, FL 33131
12                              850-585-3414
                                Email: Rkeefe@bsfllp.com
13
    For Defendant F.C.S.B.:     Ryan Bates, Esq.
14                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Avenue, NW
15                              Washington, DC 20037
                                202-955-1596
16                              Email: Rbates@hunton.com

17                              Sona Rewari, Esq.
                                HUNTON ANDREWS KURTH, LLP
18                              2200 Pennsylvania Avenue, NW
                                Washington, DC 20037
19                              202-955-1974
                                Email: Srewari@huntonak.com
20
                                Scott W. Burton, Esq.
21                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Ave NW
22                              Washington, DC 20037
                                202-955-1664
23                              Email: Burtons@huntonak.com

24

25
    APPEARANCES:  (Cont.)       Kevin Elliker, Esq.
```

3

```
 1                                HUNTON ANDREWS KURTH, LLP
    For Defendant F.C.S.B.:      2200 Pennsylvania Avenue, NW
 2                                Washington, DC 20037
                                  804-788-8200
 3                                Email: Kelliker@huntonak.com

 4
                                  Michael E. Kinney, Esq.
 5                                THE LAW OFFICE OF MICHAEL E.
    For the Defendants:           KINNEY, PLC.
 6  (S.T., A.F., P.A.H.,          1801 Robert Fulton Drive
    T.B., B.H., M.P.F., M.C.,     Suite 120
 7  F.T., J.F.)                   Reston, VA 20191
                                  Email:  Mk@kinneyesq.com
 8
                                  Bruce Blanchard, Esq.
 9                                ODIN, FELDMAN & PITTLEMAN, PC.
    For the Defendant J.O.:       1775 Wiehle Avenue
10                                Suite 400
                                  Reston, VA 20190
11                                Email:  Bruce.blanchard@ofplaw.com

12
    Official Court Reporter:     MS. TONIA M. HARRIS, RPR
13                                United States District Court
                                  401 Courthouse Square
14                                Tenth Floor
                                  Alexandria, VA 22314
15

16

17

18

19

20

21

22

23

24

25
```

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Plaintiff:

S████ T████

          Redirect examination by Ms. Anderson............ 12
          Recross-examination by Mr. Bates................ 30

Dr. Joshua Cisler

          Direct examination by Mr. Keefe................. 32
          Cross-examination by Mr. Elliker............... 67
          Redirect examination by Mr. Keefe.............. 105

                    MISCELLANY

Preliminary matters................................. 05
Certificate of Court Reporter....................... 109

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

5

1          THE COURT:  Are we ready to bring the jury in?

2          MS. ANDERSON:  From our side, yes, Your Honor.

3          MR. BLANCHARD:  Your Honor, if I may, just briefly.

4          THE COURT:  Yes.  Back on the record.

5          MR. BLANCHARD:  Your Honor, for the record, Bruce

6   Blanchard for Defendant, J.O.  The defendants filed an

7   opposition this morning to the plaintiff's motion to submit

8   medical exhibits.  I just wanted to join in and to let the

9   Court know my client is joining in that motion.  I did not --

10  I was on the road here when it was filed so I wasn't able to

11  join in.

12          THE COURT:  Very good.

13          MR. BLANCHARD:  Thank you, Your Honor.

14          THE COURT:  With regard to this witness, and correct

15  me if I'm wrong, I'm assuming that we don't have to deal with

16  the medical records issue for this particular witness?

17          MS. ANDERSON:  Correct, Your Honor.

18          THE COURT:  Okay.

19          MS. REWARI:  Your Honor, before the jury comes in,

20  we do have a matter that we would like to raise with you in

21  chambers or on a sidebar.  It relates to the issue that we

22  discussed the other day.

23          (Side bar.)

24          MS. REWARI:  So I just advised Ms. Anderson this

25  morning that a couple of matters have come to our attention.

———————————B. R. v. F. C. S. B.———————————

6

1    One is that there was an article in the Fairfax Times, I

2    believe yesterday, the same publication that Your Honor

3    discussed with us a couple of days ago.  The reporter states

4    in the article that she's obtained a transcript of the

5    hearing -- excuse me, of the trial from the day the plaintiff

6    testified on Monday and purports to be discussing the contents

7    of the SANE report in terms of the testimony that was given in

8    court regarding the SANE exam where you cautioned the audience

9    that --

10            THE COURT:  These are private matters that should

11    not be generally discussed and please be sensitive to the

12    concerns that would arise.

13            MS. REWARI:  But the article -- I haven't reviewed

14    it in detail --

15            THE COURT:  I've seen the article.

16            MS. REWARI:  Yeah, it says that the reporters

17    obtained a transcript of the trial.  And it purports to be

18    quoting from it.  I haven't checked it against what is in the

19    transcript itself, but --

20            THE COURT:  Let me ask a quick question and then I

21    will let --

22            (Discussion off the record.)

23            MS. REWARI:  Well, I thought the transcript would be

24    subject to redactions.  So my understanding was that only the

25    parties were getting the transcripts, but maybe I was under

─B.R. v. F.C.S.B.─

7

1    the misimpression as to who the transcripts were limited to.

2            The other issue that I had raised with Ms. Anderson

3    is that a couple of the individual defendants have reported to

4    us that they are being photographed by the plaintiff's brother

5    as they're entering the courthouse in the mornings and they

6    are feeling very intimidated because he is standing on the

7    sidewalk taking pictures of them and there are photographs

8    that are in the -- I don't know if there's photographs of

9    them, but people who told me about it in particular, but there

10   are photographs being printed in these papers.  And I

11   understand it is a public space, but plaintiff's brother is a

12   witness in the case.  He's also a member of the Virginia state

13   bar, and so --

14           THE COURT:  Let me put it like this -- and,

15   Mr. Brenner, I've appreciated your attempt to manage your side

16   of the case as best you can, and I appreciate you saying that

17   you have not had any contact with the press and that you

18   actually tried to avoid them, and I appreciate your approach,

19   as far as that is concerned.

20           I don't know how much you communicate with other

21   people associated with the case, but understand, and I'm

22   telling you this because I know you will appreciate this, but

23   under Rule 1 the Court has a whole lot of options that are

24   available to it and if this gentleman is indeed -- I don't

25   know if he's doing it or not -- indeed doing things which can

———— B.R. v. F.C.S.B. ————

8

 1    be interpreted as harassment that I will exclude his

 2    testimony, that I will not let him participate in this case at

 3    all, and I will keep him out of the courtroom.

 4            MR. BRENNER:  First of all, I understand.  This is

 5    the first time I am hearing about this, so I will address it.

 6    And I appreciate it being raised --

 7            THE COURT:  Sure.

 8            MR. BRENNER:  -- as Ms. Rewari says it's a public

 9    space.  I agree it's inappropriate and shouldn't be done.

10            THE COURT:  And --

11            MR. BRENNER:  So I get it.

12            THE COURT:  I get that it's a public space, but when

13    you have someone who is obviously on the other side of the

14    case --

15            MR. BRENNER:  I get it.

16            THE COURT:  -- taking pictures and when you add on

17    to that that the Press reporting, at least from this one

18    publication, cannot be best described as balanced.  It sort of

19    adds to the circumstances.

20            MR. BRENNER:  We've had those discussions already

21    and I think -- I understand what you are saying.  I was a

22    little alarmed when Ms. Rewari raised this with Ms. Anderson

23    because the impression at least that I -- it was just a

24    30-second conversation so just a part of it somehow that the

25    transcript had come from our side and I'm glad -- glad to hear

B.R. v. F.C.S.B.

9

1  that it didn't.  That it came direct -- that's okay.  I am a

2  little -- I think we need to clarify with the court reporter I

3  thought what the arrangement was at the beginning of the trial

4  was that we were going to use, for example, full names and

5  things like this, but both sides would have an opportunity to

6  issue redactions to the transcript before it became public,

7  and apparently it now went to a reporter without any such --

8          THE COURT:  Well, what I'm going to do is I'm going

9  to direct the court reporters not to release transcripts to

10 anyone except the lawyers involved in the case.  And the

11 purpose for that is because there's an agreement that certain

12 redactions are going to take place in those transcripts, and

13 so if we give the transcripts unredacted to a person who is

14 not a party to the litigation that can cause us some concern.

15 So I'm going to direct you not to provide it, and if anyone

16 gives you a hard time just say that's what the judge told me.

17         MR. BRENNER:  It obviously was our mistake in not

18 making this more clear to you.  It is not your fault.  You did

19 what you were supposed to do, but I just wanted to make sure

20 it doesn't happen again.

21         THE COURT:  Again, make sure that this individual --

22 and, again, I'm not making any determinations of what he did

23 or did not do.  He needs to understand that actions which

24 undermine the ability for me to treat this cause appropriately

25 and fairly over the appropriate process could result in some

—B. R. v. F.C.S.B.—

10

1    serious sanctions against him both personally and

2    professionally.

3            MR. BRENNER:  Understood, Your Honor.  I will

4    communicate that to him directly myself.

5            THE COURT:  Very good.

6            MS. REWARI:  The only other thing, in terms of our

7    assumption that -- and I -- I appreciate that it wasn't -- the

8    transcript did not come from the team, but I also brought to

9    Ms. Anderson's attention on Monday afternoon a member of the

10   defense team -- or I mean the plaintiff's team, was seen by us

11   having an extended conversation with a reporter outside the

12   courthouse, that's why.

13           MR. BRENNER:  To be clear that was our tech person

14   who evidently struck up a -- (indiscernible) reporter say, a

15   very industrious reporter, put it mildly.

16           THE COURT:  Tell Mr. Brown to stay away.

17           MR. BRENNER:  I did.  We actually saw it from the

18   window of the hotel.  We are staying across the street and we

19   said whoa.  We started calling him.  He knows he should not

20   speak with her about anything including the weather.

21           THE COURT:  If he talks about the weather, there's

22   going to be a very interesting account as to what happened.

23           MR. BRENNER:  Yeah, whose fault the weather was.

24           THE COURT:  And the dreary circumstances at the

25   courthouse was exemplified by the technical expert who said

B.R. v. F.C.S.B.

11

1   blah, blah, blah.  So we just don't need that.

2          MR. BRENNER:  No.  That message has already been

3   delivered.

4          THE COURT:  Tell Mr. Brown I'm not upset with him.

5   He's just being a nice person and sometimes being nice can be

6   unrewarded.

7          MR. BRENNER:  I agree with all of that.

8          THE COURT:  All right.  Very good.  Thank you.  The

9   transcripts cannot be made available and if she says, Why,

10  then you can say, because of the judge's direction and the

11  parties agreement.

12          (Open court.)

13          (Jury present.)

14          THE COURT:  You may be seated.

15          Good morning, ladies and gentlemen.

16          (Good morning responses.)

17          THE COURT:  At least there were no accidents on the

18  road this morning as we tried to make our way in, but it was a

19  very dreary day.  I keep looking forward to the weather

20  reports when I'm going to see sun that I think will excite us

21  all.  But I'm glad that you've taken the extreme efforts to be

22  here to meet your obligations.

23          I need to ask you this question:  Were all of you

24  able to live up to the Court's instructions not to discuss the

25  case or aspect of the case with anyone and to the extent you

 1    could you've stayed away from social media?  Very good.

 2            This is one of our shorter days.  We believe we are

 3    going to be able to get through the rest of Ms. T███████

 4    testimony and maybe one other person.  So we're probably going

 5    to try to drive through to our 2 o'clock stop time.  Your

 6    lunches had to be reordered because Panera apparently changed

 7    the menus so we had to have you reorder.  So we'll accommodate

 8    that, but we probably won't take our traditional lunch break

 9    today.  We'll get you your lunches and get you on your way,

10    but we will take a break at some point during the day.

11            All right, Ms. Anderson.

12            MS. ANDERSON:  Thank you, Your Honor.

13            THE COURT:  Ms. T█████, you are still under oath,

14    ma'am.

15            THE WITNESS:  Thank you.

16    (The witness, S█████ T█████, remained under oath and was

17    reseated.)

18                    REDIRECT EXAMINATION

19    BY MS. ANDERSON:

20    Q.   Good morning, Ms. T█████.

21    A.   Good morning.

22    Q.   I'm going to today try to ask very specific questions so

23    that we can, hopefully, get through this quickly.  So if you

24    can do your best to answer those, I would really appreciate

25    it.

B.R. v. F.C.S.B.

13

1          So yesterday when you were testifying with Mr.

2    Bates, you testified about a whole lot of conversations that

3    you remembered having back in November 2011; is that right?

4    A.   I shared what I knew, yes.

5    Q.   Okay.  And you now remember multiple conversations for

6    which you have no notes and there's no documents, no student

7    statements, correct?

8    A.   I remember I do not remember taking notes; no, I don't.

9    Q.   Okay.  And you were here in the courtroom when

10   Dr. Zuluaga testified about how in February 2012, just four

11   months after your November 21st investigation, that he

12   received a detailed description of everything that had

13   occurred with B███ at Rachel Carson, correct?

14   A.   Correct.

15   Q.   And that that document was created and input came from

16   you and the other Rachel Carson administrators, correct?

17   A.   Correct.

18   Q.   And you put together -- and this was put together

19   immediately after B███ was pulled from school, right?

20   A.   It was in February, I believe, yes.

21   Q.   Okay.  And it was right after she identifies the issues

22   and raises it with the superintendent's office, correct?

23   A.   I know we were asked to put it together.  I don't know if

24   she had already raised the issues with him but probably so,

25   yes.

B.R. v. F.C.S.B.

14

1    Q.   And you knew you were asked to put it together for the

2    superintendent's office, correct?

3    A.   I don't know if I recall knowing that we were putting it

4    together for the superintendent's office, but I knew we were

5    putting the document together to document what we had done.

6    Q.   Okay.  And you knew it was important that it happened

7    quickly because you all met together in the same room while

8    putting this together, correct?

9    A.   Well, we definitely met in the same room.  I don't know

10   if we were trying to do it with any level of speed, but --

11   Q.   Okay.  Now, in that memorandum to Dr. Zuluaga, it was

12   14 pages single-spaced, right?

13   A.   You'd have to show it to me.  I don't know exactly how

14   many pages.

15   Q.   Okay.  I will show you in a moment.

16   A.   Okay.

17   Q.   In that memorandum you wanted to capture your response to

18   what B█████ had told you, right?

19   A.   Correct.

20   Q.   And you wanted it to be thorough and show all of your

21   investigatory steps, correct?

22   A.   Correct.

23   Q.   And that memo was broken down into four separate issues

24   dealing with B████; is that right?

25   A.   I don't know how many issues -- you would have to show it

—B.R. v. F.C.S.B.—

15

1   to me.

2   Q.   Okay.

3   A.   Show it to me, I'm happy to speak about it.

4   Q.   And I will show that to you, but you were only, according

5   to your testimony, you were only involved with B████ on that

6   November 21 to 22 investigation, right?

7   A.   Correct.

8   Q.   And that would be the first issue in the memo?

9   A.   Correct.

10  Q.   And this was your opportunity to tell your boss's boss

11  everything that you did in your investigation, right?

12  A.   We were summarizing what we did in your investigation,

13  yes.

14  Q.   To show your thoroughness, correct?

15  A.   To show that we -- what we did, yes.

16  Q.   Okay.

17          MS. ANDERSON:  If we can pull up -- it's, Your

18  Honor, if we may publish, it's already admitted, Defense

19  Exhibit 200?

20          THE COURT:  You may.

21          (Exhibit published.)

22  BY MS. ANDERSON:

23  Q.   Thank you.  And Ms. T████, I'm going to hand you a paper

24  copy.

25          MS. ANDERSON:  May I approach, Your Honor?

─────────────── B.R. v. F.C.S.B. ───────────────

16

```
 1              THE COURT:  You may.

 2   BY MS. ANDERSON:

 3   Q.   You remember testifying yesterday about three witnesses

 4   that B███ had identified on her statement?

 5   A.   On the back of the statement?

 6   Q.   Correct.

 7   A.   Yes.

 8   Q.   Okay.

 9              MS. ANDERSON:  And if we can also publish, Your

10   Honor, Plaintiff's Exhibit 77, page 2?

11              THE COURT:  You may.

12              MS. ANDERSON:  Thank you.

13              (Exhibit published.)

14   BY MS. ANDERSON:

15   Q.   And now on this statement she identifies the three

16   witnesses:  A.J., M.J., and J.H., correct?

17   A.   Correct.

18   Q.   And you told the jury yesterday that you remembered

19   specifically speaking to these students and -- that B███ had

20   identified as witnesses, correct?

21   A.   I do remember speaking to them, yes.

22   Q.   Okay.  And please look through Defendants' Exhibit 200,

23   which is that joint memo that you and your colleagues put

24   together in 2012.  And let the jury know if there is any

25   mention of you having spoken to these three students.
```

Redirect - S.T.

─B.R. v. F.C.S.B.─

17

1   A.   I don't see their names mentioned here, no.

2   Q.   And your testimony was that they had said they all

3   refuted B████'s story, correct?

4   A.   That's correct, they did.

5   Q.   And yet there is no mention of that in this thorough memo

6   that you put together for your boss's boss, correct?

7   A.   It is not mentioned in there, no.

8   Q.   Okay.  So yesterday -- and we can take that down.  Thank

9   you, Mr. Brown.

10           Yesterday you went even further and you had

11  testified that you had spoken to numerous kids and did spot

12  checks in their locker pod -- in her locker pod, correct?

13  A.   We all did, yes.

14  Q.   And please look in that memo and let me know if you see

15  any reference to you having spoken to numerous kids in her

16  locker pod or doing spot checks?

17  A.   I just read through this.  I don't recall seeing it in

18  here, but we did do that.

19  Q.   Okay.  And yet your testimony yesterday was that all of

20  these students, they testified or they told you that they

21  refuted B████'s story and you don't mention a single one of

22  them in this memo, correct?

23  A.   This memo was of the steps that we took and we did talk

24  to students in the locker pod, but didn't make it into this

25  memo, but we did do that.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

Redirect - S.T.

———B.R. v. F.C.S.B.———

18

1   Q.   And you didn't think it was important to include

2   statements by specific witnesses that B███ had identified

3   that you say said did nothing was happening?

4   A.   I didn't get a statement from the students in the locker

5   pod.  I didn't keep them from class and bring them up and have

6   them write a sentence saying, "I didn't see anything."  I did

7   not do that.

8   Q.   You include in that memo, though, things that you didn't

9   have students write in statements?

10  A.   I understand that, but what I'm saying to you is I did

11  not, and just like I told you yesterday, I did not get

12  statements from the students that I spoke to in the locker

13  pod.

14  Q.   Okay.

15  A.   And I'm not required to get statements from the students

16  I spoke to.  That's not something I'm required to do either.

17  Q.   Okay.  And in that memo you do talk about your

18  conversation with D.M., correct?

19  A.   The incident about the bus?

20  Q.   Yup.

21  A.   D.M., yes.  He didn't write a statement, but that was his

22  choice.

23  Q.   And no statement, but you still recorded that

24  conversation in that memo, correct?

25  A.   Correct, because it was mentioned to me in her statement,

B.R. v. F.C.S.B.

19

1   in B████'s statement.

2   Q.   Just like those three witnesses:  A.J., M.J., and J.H.?

3   A.   She didn't make complaints about A.J., M.J., and J.H.

4   Q.   Okay.  So did you only speak to -- is your testimony that

5   you only spoke to the people she made complaints about?

6   A.   No, when I'm investigating the students that she made

7   complaints about I have to talk to those students, and then

8   you talk to all of the witnesses as well.

9   Q.   Okay.  But you didn't include the witnesses or any of the

10  numerous kids or the spot checks in that memo, correct?

11  A.   I don't see them in this memo, no.

12  Q.   You also testified with Mr. Bates about having had a

13  conversation with B████ about things happening in D.N.'s

14  basement that you -- that you characterized as welcomed; do

15  you remember that testimony?

16  A.   I remember talking about it, yes.

17  Q.   Okay.  And that you had said that B████ wanted you to

18  join her in speaking with her mom?

19  A.   She wanted me to be present, yes.

20  Q.   And so your testimony is is that a girl you've -- you had

21  not met before November 21st, correct?

22  A.   I had not, no.

23  Q.   12-year-old girl, correct?

24  A.   She was 12.

25  Q.   Okay.  And she's afraid of -- her mother finding out

─B.R. v. F.C.S.B.─

20

1  about sexual activity with her and a boy is your testimony?

2  A.   She didn't seem afraid to me, but she said, "I'm going to

3  tell her, but I want to tell her with you present."  And I

4  couldn't understand why she wanted me to be present.  I

5  thought it was a private matter, something she should talk to

6  her mother about in private.

7  Q.   Is it your testimony that she just voluntarily wants to

8  speak to an assistant principal at her new school about

9  something that was welcomed; that's your testimony?

10 A.   When I was talking to her about her statement that's when

11 she told me and I believe she told me because she knew I was

12 going to go talk to D.N. and he was going to tell me, which he

13 did.  So I think that's why it came out.  I didn't ask her to

14 tell me about anything because I didn't know she had done

15 anything in the basement at the time.

16 Q.   And I think you testified yesterday that you're sort of

17 known as the disciplinarian at the school, correct?

18 A.   I am strict, yes.

19 Q.   And that you tell her to stop talking about it and yet

20 she just continues to tell you about this welcomed interaction

21 between her and a supposed boyfriend?

22 A.   My response to her was, Wait a minute you probably -- if

23 you're about to tell me about something about the basement,

24 you might want to talk to your mom about that first.  I didn't

25 know what she was going to tell me.  And that's when she came

─────B.R. v. F.C.S.B.─────

21

1   out of her mouth and said, "It was no big deal, Ms. T███.  We

2   just went up and down on each other in the basement while his

3   mom did the laundry."

4   Q.   And, again, this conversation, according to your

5   testimony, is just between you and B███; is that right?

6   A.   Correct.

7   Q.   And that's not anywhere in this memo either, is it?

8   A.   Well, because that -- we weren't going to put her

9   personal business of what she did on her weekend in her

10  basement, in our memo.

11  Q.   Okay.  But it includes what D.N. said about the basement?

12  A.   It does, yeah.  He wrote it on the statement.

13  Q.   Now, you also testified yesterday with Mr. Bates about

14  how after the meeting with B███ and B███'s mom and B███'s

15  dad and after B███ writes a statement you have a conversation

16  with her, do you remember testifying about that?

17  A.   After I met with them initially downstairs and we all

18  went upstairs about the voicemail, yes.  When her mom left.

19  Q.   And you're alone with B███, there's no one else in this

20  conversation, mom is gone, Ms. H████ is gone, Genus is

21  gone.  You might have said P███ H████ was coming in and out

22  of the room?

23  A.   Prior to the mom leaving, yes.

24  Q.   Oh, okay.  So the conversation is just you and B███ when

25  she talks to you about the statement?

Redirect - S.T.

─ B.R. v. F.C.S.B. ─

22

1  A.    Correct.

2  Q.    That's correct.  And you testified that she changes what

3  she says in her statement from seductive looks to looks at me

4  funny, correct?

5  A.    That's what she said when I asked her to describe what

6  seductive looks meant to her.  She said, "They look at me

7  funny."

8  Q.    And you also said that she couldn't confirm -- that you

9  couldn't confirm from B███ any specific names -- that she

10  didn't provide any specific names she was being called like

11  whore, slut, bitch, none of those, correct?

12  A.    I asked who had she heard them personally herself.

13  Q.    And you testified that when you asked her if D.N. did

14  come up to her and call her vulgar names, she just didn't

15  answer you at all.  You testified to that yesterday?

16  A.    She did not confirm he had.  She said, He wants to come

17  up.  And I said, What do you mean by "wants to come up" that

18  doesn't make sense?  Did he come up or did he not come up?

19  And she did not answer me.

20  Q.    Okay.  And B███ is the one who makes the complaint,

21  correct?

22  A.    That's exactly correct, yes.

23  Q.    And this memo that you sent -- that you and your

24  colleagues sent to Dr. Zuluaga that's all about what's

25  happening with B███ at Rachel Carson Middle School, right?

Redirect - S.T.

B.R. v. F.C.S.B.

23

1  A.   This is a summary of what we did.  It wasn't a perfect

2  summary.  Did we maybe leave some things out as we were

3  preparing this, of course, that's possible, we're human, we're

4  not perfect individuals.

5  Q.   Okay.  And you didn't include that she walks back her

6  statement with you in a private conversation, correct?  In

7  that memo?

8  A.   I'm sorry.  Say that one again.

9  Q.   You didn't include in that memo that in a conversation

10 just between you and B███ she walks back her statements that

11 are written, all the things that she says in her statements,

12 correct?

13 A.   What do you mean "walks back her statement"?

14 Q.   She changes it from "seductive looks" to "looks at me

15 funny."

16 A.   Oh, I let her statements stand, yeah, I let it stand as

17 it was, absolutely.

18 Q.   And you didn't include in this memo any of that

19 conversation that you had with her, correct?

20 A.   I did not tell them about her -- I told them about her

21 admitting that she was in the basement with him, they knew

22 that.  I talked about that.

23 Q.   Okay.  But you don't talk about that in this memo?

24 A.   It's -- I don't believe it's in this memo, no.

25 Q.   And this memo, just to recap again, was in 2012 just a

B.R. v. F.C.S.B.

24

1    few months after what happened, right?

2    A.   It was, yes.

3    Q.   And in that memo, in that memo it's not 12 years later

4    when facing a lawsuit, correct?

5    A.   No, it's not, no.

6    Q.   And you have conversations that seemed pretty important

7    to your investigation and speaking to witnesses, that are not

8    in that memo, correct?

9    A.   Correct.  And ma'am, I can't go back and create

10   statements that aren't there.  That wouldn't be right, would

11   it?

12   Q.   And those conversations they don't -- there's no

13   statements, no notes, no other documents that support those

14   conversations that you had?

15   A.   From those three witnesses?

16   Q.   From those three witnesses.

17   A.   I did not get statements from those three witnesses, no.

18   Q.   Now, yesterday you were asked by Mr. Bates does the fact

19   that a child engages in horseplay on a bus in 7th grade, in

20   your experience, make it more likely that he will engage in

21   some type of sexual harassment in 8th grade, and you answered

22   "no"; do you remember that?

23   A.   I do.  I don't believe that that's true.

24   Q.   Does the fact that a student exposed his genitals to

25   multiple female students during his science class make it more

B.R. v. F.C.S.B.

25

1   likely that he will engage in some type of sexual harassment

2   just six months later?

3   A.   I'm not an expert in whether if a student shows his

4   genitals in class at the age of 12 or 13 then he's going to,

5   you know, have some type sexual harassment later.  I can't

6   make that judgment.  I'm not an expert in that area.

7   Q.   And to be clear that was -- that was labeled as a sexual

8   offense, correct?

9   A.   That's what it was labeled as, correct.

10  Q.   I also want to be clear, because I wasn't after your

11  testimony, but you did determine that C████████ had exposed

12  his genitals, correct?

13  A.   I believed the young lady when she told me, yes, I did.

14  Q.   And to be clear -- you believed that he actually did

15  that?

16  A.   I did believe he did it.  He said that he didn't, but I

17  did believe that he did that, yes.

18  Q.   Okay.  And that that incident, you and the other

19  assistant principals all agreed, was not classified as sexual

20  harassment?

21  A.   We did.

22  Q.   And you knew that if C.K., after that incident and having

23  been suspended, engaged in sexual harassment, he was likely

24  facing significant discipline if he engaged in sexual

25  harassment after that, correct?

─────────B.R. v. F.C.S.B.─────────

26

1    A.    It would depend on what he did.  But whether it's

2    significant or serious or not.

3    Q.    I want to talk about your testimony about the voicemail.

4    A.    Okay.

5    Q.    So it was your testimony that B███'s mom could not

6    remember what was on that voicemail, correct?

7    A.    She could not.  I heard what was on that voicemail when

8    she sat on the stand for the first time and said what was on

9    that voicemail.

10   Q.    Okay.  So just so I have -- we have this correct, B███'s

11   mom, she's so upset, so worried that she comes into school

12   Monday morning, correct?

13   A.    She comes in -- I don't know what date it was on, but --

14   21st.

15   Q.    And she didn't have an appointment that day to speak to

16   anybody, correct?

17   A.    Not that I'm aware of, no.

18   Q.    The first time that she comes to school to speak about

19   problems that are occurring with her daughter, B███, correct?

20   A.    I can't speak to that, because I didn't know B███ prior

21   to the 21st.

22   Q.    Fair enough.  And then she works for hours to retrieve

23   that voicemail and she does some of that in front of you,

24   correct?

25   A.    She does some in front of me and some in Ms. H██████'s

─────────── B.R. v. F.C.S.B. ───────────

27

1  office, yes.

2  Q.  And she even tries to do more of that when she goes home,

3  correct?

4  A.  She said she was going to go home to call Sprint.

5  Q.  And so, she's this motivated and this moved to come

6  barging into the school, but it is your testimony that she

7  doesn't remember a single word of what was on that voicemail?

8  A.  It is absolutely my testimony.  She would not tell me.  I

9  asked her several times.  Ms. H█████ asked her several times

10 to tell -- just tell us what was on the voicemail because just

11 because she couldn't retrieve it, didn't mean we couldn't look

12 into it if we knew what the voicemail said, and she could not

13 tell us what was on the voicemail.

14 Q.  Okay.  And so if she knew what was on the voicemail and

15 was able to tell it to you, you believed you would have had to

16 look into that?

17 A.  Well, we looked into the voicemail anyway, that's why I

18 ended up with C█████ -- K's phone records from his mom.

19 Q.  Just a last other topic, Ms. T███.

20      So you also testified about the $50, do you remember

21 testifying about that?

22 A.  I do, yes.

23 Q.  And your testimony was that it was a loan between

24 students, correct?

25 A.  She initially told me she gave it to him and then she

1    said she loaned it to him.  So I still said to her, it's too

2    much to loan a student.  And I asked her why she did that.

3    Q.   Okay.  And your testimony was that some random student,

4    you don't remember who, correct?

5    A.   I don't remember who walked in my office, no.

6    Q.   And he comes or she, he or she, comes to your office on

7    November 21st, correct?

8    A.   It's during transition, yes.

9    Q.   It just happens to be the same day that B███ and her mom

10   come to school and talk to you about what's going on with her,

11   correct?

12   A.   That's correct.

13   Q.   The same day that they are reporting this voicemail from

14   C.K., correct?

15   A.   Correct.

16   Q.   And they -- and that this student on this day just

17   happens to come in and tell you about a loan between two

18   students?

19   A.   He walked in the office and he said, Ms. T███, did you

20   know B███ gave C██████ K. $50?  And I asked him, For what?

21   And he said, A board.  And he did -- I mean -- and there's

22   Facebook messages out there that eventually confirm that.

23   Q.   And so, the loan that happens, that's off campus,

24   correct?

25   A.   I don't know whether she gave him the $50 from what --

1    you see, I've seen the Facebook messages so I think she gave

2    it to him in school.

3    Q.    And so, a loan happens between two students and that's

4    your understanding and yet right away you jump into action,

5    you get involved, and you call C.K.'s mom that day, correct?

6    A.    And she brought me the $50 that day, but I talked to

7    B██████ first.

8    Q.    You have her bring in the $50 that day, correct?

9    A.    And the phone logs.

10   Q.    And you call her mom -- you call B██████'s mom that day as

11   well?

12   A.    Correct.

13   Q.    About the $50 specifically?

14   A.    I tell her about that too, yes.

15   Q.    Okay.  And you have -- and you ask her if she wants to

16   come back that day to get that $50, correct?

17   A.    Correct.

18   Q.    And then when you're asked in August 14th, the day after

19   another meeting with the superintendent to write a statement,

20   that statement is all about the $50, correct?

21   A.    I was asked about specifically the $50.  And I believe

22   that was Dr. Zuluaga's office, but they wanted -- they had a

23   chronological of what we had done based on her statement.  He

24   wanted more specifics about the $50 and that's what I wrote.

25   I wrote about the $50 how she gave it to him.

B.R. v. F.C.S.B.

30

1  Q.   And you wrote that nine months later, correct?

2  A.   I did, yes.

3        MS. ANDERSON:  Let me just -- one moment.

4        THE COURT:  Yes, ma'am.

5        MS. ANDERSON:  No further questions.  Thank you.

6        THE COURT:  Thank you, ma'am.  You may step down.

7        MR. BATES:  Judge, since she's not subject to recall

8  or we don't plan to recall, can I have one minute of recross?

9        THE COURT:  All right, but let's not let this become

10  a trend.

11                  RECROSS EXAMINATION

12        MR. BATES:  Okay.  If we could have DX-83,

13  permission to publish this.  This was previously admitted.

14  Permission to publish?

15        THE COURT:  You may.

16        (Exhibit published.)

17  BY MR. BATES:

18  Q.   Ms. T███, Grady is going to put up the email that we

19  talked about yesterday that plaintiff's mother sent to you on

20  November 21st; do you see that?

21  A.   I do.

22  Q.   Take a look at this email and let us know if you see what

23  plaintiffs -- if plaintiff's mother described what was in that

24  voicemail in that email.

25  A.   She does not.

B.R. v. F.C.S.B.

31

1   Q.   Okay.

2          MR. BATES:  Your Honor, permission to publish

3   DX-200?

4          MS. ANDERSON:  Your Honor, I think, for completeness

5   he should read what it does say about cell phone.

6          THE COURT:  You're making reference to this exhibit

7   or the one that he's offering now?

8          MS. ANDERSON:  This exhibit that's up currently.

9          THE COURT:  Okay.  Overruled.  You can put up the

10  next exhibit.

11         MR. BATES:  Can we publish Defendants' Exhibit 200,

12  which was just referenced -- it's already admitted as well.

13         THE COURT:  You may.

14         (Exhibit published.)

15  BY MR. BATES:

16  Q.   Ms. T████, if you can take a look at the paragraph under

17  "issue No. 1."  Grady, if we can go to the first page of the

18  memo.  If you can highlight the paragraph under "issue," go

19  back first page of the memo.  If you can highlight the -- zoom

20  in on the first paragraph "under issue No. 1."

21         And Ms. T████, can you read the second to last

22  sentence in that paragraph?  Starts with "Ms. R. said . . ."

23  A.   "Ms. R. said she had heard the voicemail message but she

24  couldn't remember what it said."

25  Q.   Okay.  Is that consistent with your recollection?

B.R. v. F.C.S.B.

32

1   A.   Yes.

2   Q.   Okay.

3        MR. BATES:  No further questions, Your Honor.  Thank

4   you.

5        THE COURT:  Thank you, ma'am.  You may step down.

6        Next witness.

7        MR. KEEFE:  The plaintiff calls Joshua Cisler.

8        THE COURT:  Come up to the witness stand, sir.

9        (JOSHUA CISLER, Plaintiff's witness, sworn.)

10       (Witness seated.)

11       THE COURT:  Please have a seat, sir.  Listen to the

12  questions of counsel as best you can, answer them as best you

13  can.  If you hear the Court interrupt or if there's an

14  objection, please pause before answering the question and

15  don't answer the question until the Court rules on the

16  objection.

17       If you could get closer to the mic so we can sort of

18  address how loud your voice might be, it would be helpful.

19       THE WITNESS:  Is this okay?

20       THE COURT:  That's perfect.  Thank you, sir.

21                   DIRECT EXAMINATION

22  BY MR. KEEFE:

23  Q.   Good morning, sir.  Are you set with the IT?

24  A.   Yes.

25  Q.   Okay.  Could you please introduce yourself to the jury?

B.R. v. F.C.S.B.

33

1  A.    My name is Josh Cisler.

2  Q.    And Dr. Cisler, are you a licensed psychologist?

3  A.    Yes.

4  Q.    Do you also hold a Ph.D.?

5  A.    A Ph.D. in clinical psychology.

6  Q.    As a Ph.D. in clinical psychology, do you conduct

7  research in the field?

8  A.    I do.

9  Q.    What is the focus of your research?

10 A.    The focus of my research broadly is understanding how

11 early life trauma, in particular, physical and sexual assault,

12 alters brain function that then increases risk for the

13 developmental mental health disorders, in particular, PTSD.

14 Q.    Have we asked you to come here today to talk to the jury

15 about your expertise and the neurobiological basis of PTSD?

16 A.    Yes.

17 Q.    And have you, with my assistance, put together a

18 PowerPoint presentation to help the jury to better understand

19 your expert opinions in this case?

20 A.    Yes.

21        MR. KEEFE:  Your Honor, with your permission I would

22 like to bring up the PowerPoint on the screens in the

23 courtroom.

24        THE COURT:  You may.

25 BY MR. KEEFE:

─────B.R. v. F.C.S.B.─────

34

1  Q.   Dr. Cisler, the first question here is whether PTSD is

2  caused by physical injuries in the brain resulting from trauma

3  exposure; is that right?

4  A.   Yes.

5  Q.   And the second question is whether the symptoms of PTSD

6  are produced by those physical injuries to the brain; is that

7  right?

8  A.   Yes.

9  Q.   Have you reached an opinion on these questions?

10 A.   I have.

11 Q.   Before turning to your opinions, let's talk about what

12 you are not here to testify about.

13      First, are you offering any opinion about a

14 diagnosis of B███'s psychological condition?

15 A.   No.

16 Q.   And are you here -- and are the opinions you offered

17 focused only on PTSD?

18 A.   Yes.

19 Q.   So first -- if you could bring that back up.

20      On the first question, whether PTSD is a manifest of

21 trauma induced changes to the brain, what is your opinion?

22 A.   Yes, it is.

23 Q.   And on the second question, whether PTSD symptoms are

24 produced by those physical injuries to the brain caused by

25 trauma exposure, what is your opinion?

B.R. v. F.C.S.B.

35

1   A.   Yes, they are.

2   Q.   And are all of those -- are those opinions based on a

3   reasonable degree of professional, medical, and scientific

4   certainty?

5   A.   Yes.

6   Q.   Before we get into the specifics and bases for your

7   opinions, let's talk a bit about your qualifications.

8           Where did you go to college?

9   A.   At St. Louis University.

10  Q.   And what was your major?

11  A.   Psychology.

12  Q.   What did you do after graduating from St. Louis

13  University?

14  A.   I got a masters in clinical psychology from Minnesota

15  State University.

16  Q.   How long was that masters program?

17  A.   It's a two-year program.

18  Q.   And after obtaining your masters degree, what did you do

19  next?

20  A.   I got a doctorate in clinical psychology from the

21  University of Arkansas.

22  Q.   How long was the doctoral program?

23  A.   It was four years of coursework and supervised research

24  and clinical work and one year of a clinical internship at the

25  Medical University of South Carolina, so five years in total.

──── B.R. v. F.C.S.B. ────

36

1   Q.   During that clinical internship at the Medical University

2   of South Carolina what type of training did you receive?

3   A.   The reason that I chose to go to the Medical University

4   of South Carolina is because they had what's called a

5   traumatic stress track where I received specialized training

6   and research and treatment related to trauma and PTSD.

7           THE COURT:  Doctor, if you could get a little closer

8   to the mic, please.  Thank you.

9   BY MR. KEEFE:

10  Q.   During your time at the Medical University of South

11  Carolina, did you publish any research studies?

12  A.   I did.

13  Q.   What were they about generally?

14  A.   The research that I was publishing and working on at that

15  time was investigating how early life trauma, again, in

16  particular, physical and sexual assault, increased risk for

17  the development of mental health disorders, in particular,

18  PTSD depression and substance abuse disorders in adolescents.

19  Q.   After you obtained your Ph.D., what did you do next?

20  A.   I did a postdoctoral fellowship at the Brain Imaging

21  Research Center at the University of Arkansas for medical

22  sciences.

23  Q.   How long was that postdoctoral fellowship?

24  A.   It's two years.

25  Q.   And what training did you receive during your

1    postdoctoral fellowship at the Brain Imaging Research Center?

2    A.    I received specialized training in functional

3    neuroimaging and methodology.  So I learned how to use

4    functional neuroimaging, in particular, magnetic resonance

5    imaging or MRI, to understand brain function.  In particular

6    how to study, measure statistically quantified brain function

7    so we can investigate how differences in brain function might

8    contribute to the development of mental health disorders.

9    Q.    Did you conduct and publish research during that

10   postdoctoral fellowship?

11   A.    I did.

12   Q.    And just generally speaking, what was the focus of that

13   research?

14   A.    The main study that I was working on was investigating

15   brain circuitry differences between adolescent girls who have

16   and have not experienced physical and sexual assault.

17   Q.    After completing your postdoctoral fellowship, what did

18   you do next?

19   A.    I was on the faculty at the -- in psychiatry department

20   at the University of Arkansas for medical sciences working in

21   the Brain Imaging Research Center.

22   Q.    So by my count that's about nine years of formal training

23   and education in psychology and brain neurocircuitry just

24   after graduating college; does that sound about right?

25   A.    Yes.

B.R. v. F.C.S.B.

38

1  Q.   Next slide, please.

2       As a member of the faculty at the Brain Imaging

3  Research Center, what did you -- what were your roles?

4  A.   My primary job was conducting a program of research

5  focused on linking early life trauma, again, in particular

6  physical and sexual assault to neurocircuitry differences that

7  is help us understand the development of mental health

8  disorders.

9  Q.   How long were you a member of the faculty at the Brain

10 Imaging Research Center?

11 A.   Four years.

12 Q.   What did you do after leaving the Brain Imaging Research

13 Center?

14 A.   I took a job as an assistant professor in the Department

15 of Psychiatry at the University of Wisconsin-Madison.

16 Q.   And what types of things did you do in that role at the

17 University of Wisconsin?

18 A.   My primary role was leading a program of research,

19 investigating neurocircuitry differences associated with early

20 life trauma, again, focusing on physical and sexual assault.

21 Q.   Did you receive tenure while at the University of

22 Wisconsin?

23 A.   I did.

24 Q.   And just for the jury's benefit, how does a professor

25 receive tenure?

Direct - J. Cisler

B.R. v. F.C.S.B.

39

1   A.    A tenure is a competitive process that you have to apply

2   for and among other things, such as service to the university,

3   the primary determinant of receiving tenure is a selected

4   committee at the university has to review your academic and

5   scholarly work and determine that this individual has achieved

6   a national level of prominence in his or her field.

7   Q.    And how long did you work at the University of Wisconsin?

8   A.    I was there 2016 to 2021.

9   Q.    Where did you go next?

10  A.    I took a job as an associate professor at the University

11  of Texas at Austin in the Department of Psychiatry where my

12  role also as the associate director for the Institute of Early

13  Life Adversity Research.

14  Q.    Is that where you currently work?

15  A.    Yes.

16  Q.    And would you tell the jury, at a high level, about what

17  you do at the University of Texas?

18  A.    So, again, my primary role is leading a program of

19  research focused on understanding neurocircuitry differences

20  among individuals who experienced physical and sexual assault

21  that help us understand why those individuals are more likely

22  to develop PTSD and other mental health disorders, and my role

23  as the associate director for the Institute of Early Life

24  Adversity Research is to launch and lead a larger program of

25  research that's more broadly characterizing neurobiological

B.R. v. F.C.S.B.

40

1  mechanisms, neurobiological differences amongst individuals

2  who experienced early life trauma.

3  Q.   We touched on the research you've conducted, but let's

4  talk about the research you're currently conducting.

5        Can you tell the jury, at a high level, just

6  generally what type of research you're currently conducting?

7  A.   Yeah, right now I have four large extramurally funded

8  projects.  These are funded through the National Institute of

9  Mental Health.  And at a very high level, what we're trying to

10 understand is the neurocircuitry differences amongst

11 individuals with PTSD that give rise to particular types of

12 symptoms that we see in PTSD, and what we really want to do is

13 to leverage that knowledge so we can take what we learn about

14 the brain to develop and test new interventions that are more

15 effective for individuals who have PTSD.

16 Q.   I think you mentioned that your studies -- you've

17 received funding from the National Institutes of Health, what

18 is the significance, if any, of receiving that type of

19 funding?

20 A.   The National Institutes of Health is the largest funding

21 body for health-related research in America.  They provide the

22 most funding and it's considered a mark of prestige and

23 academia to get funding from the National Institutes of

24 Health.

25 Q.   Mr. Brown, next slide, please.

─────B.R. v. F.C.S.B.─────

41

1    Just briefly, have you received any honors or awards

2    for your work in the field?

3    A.    Yes.

4    Q.    And can you give the jury some examples of those awards?

5    A.    Yes.  Just two examples:  One is being elected into the

6    college, the American College of Neuropsychopharmacology.  So

7    the American College of Neuropsychopharmacology is one of the

8    most prestigious organizations that the members include the

9    leading researchers conducting the most cutting edge research

10   and treatment related to mental health disorders.  You have to

11   get elected into this college and the selection committee is,

12   again, comprised of leaders in the field related to mental

13   health.  And they look at your scholarly research output and

14   make a determination if you should be elected to the college

15   or not.

16         And the second is the Brain and Behavior Research

17   Foundation receiving a young investigator award.  The Brain

18   and Behavior Research Foundation is the second largest funding

19   agency for mental health-related research.  And this is a

20   competitive award that is again based on a determination of

21   the applicant's scholarly output.

22   Q.    All right.  So we've covered your academic work in

23   research, and you mentioned before that you're a licensed

24   psychologist.

25         Do you conduct clinical work in addition to your

B.R. v. F.C.S.B.

42

1    academic and research projects?

2    A.    I do.

3    Q.    What is clinical work?

4    A.    So doing clinical work means that I conduct outpatient

5    therapy.  So doing psychological therapy mostly with

6    individuals who have PTSD or anxiety disorders.

7    Q.    When did you start your clinical practice?

8    A.    I started clinical training in graduate school where I

9    was providing therapy under supervision of a licensed

10   psychologist.  And through my postdoctoral fellowship I became

11   a licensed psychologist and began practicing independently.

12   Q.    Have you maintained a clinical practice since your

13   postdoctoral fellowship?

14   A.    I have.

15   Q.    And has your clinical practice focused on treating any

16   injury in particular?

17   A.    It focused mostly on PTSD, yes.

18   Q.    Can you give a general estimate of how many patients you

19   have diagnosed with PTSD over the course of your career?

20   A.    Somewhere in the hundreds.

21   Q.    And does the research you conduct inform your clinical

22   practice?

23   A.    It does.

24   Q.    How so?

25   A.    So when a clinician is selecting a diagnostic tool or

B.R. v. F.C.S.B.

43

1   selecting a treatment to administer, we are not doing that at

2   random.  We are not just picking a tool or a treatment that we

3   think will work.  Rather, what we're doing is we are picking a

4   clinical procedure that is based on evidence, that is based on

5   some scientific research basis that tells us either that

6   diagnostic assessment or that treatment is most likely to work

7   for this individual.  The larger idea being that everything we

8   do as clinicians is informed by science.

9           THE COURT:  Is there any objection to the doctor

10  being qualified as an expert in clinical psychology?

11          MR. ELLIKER:  No, Your Honor.

12          MR. KEEFE:  That was my next request, Your Honor,

13  was to offer Dr. Cisler as an expert in the field of

14  psychology and also the neurobiology of posttraumatic stress

15  disorder.

16          THE COURT:  Without objection.

17          MR. ELLIKER:  Without objection.

18          MR. KEEFE:  With that we'll move to your actual

19  opinions in this case.  Mr. Brown, if you could bring up the

20  next slide.

21  BY MR. KEEFE:

22  Q.  So this is the first question we had talked about.  About

23  whether posttraumatic stress disorder, PTSD, is caused by

24  physical changes in the brain resulting from trauma exposure.

25          So let me ask you, based on your more than a decade

B.R. v. F.C.S.B.

44

1  of academic training, clinical experience, and research in the

2  field, have you formed an opinion about whether PTSD is caused

3  by physical damages in the brain resulting from trauma

4  exposure?

5  A.    Yes.

6  Q.    What is your opinion?

7  A.    Yes, it is.

8  Q.    And can you explain, at a high level, the bases for your

9  opinion?

10  A.    So at a very high level, the current scientific

11  understanding of PTSD is that it results from very specific

12  changes in two brain systems.  So we have one brain system

13  that is largely responsible for producing emotional responding

14  like fear or anxiety, that brain system is increased.  It's

15  function is increased.  It becomes hyperactive.

16          We have a second brain system that's responsible for

17  regulating or controlling that emotional output.  That brain

18  system gets weakened.  So one way to think about this is an

19  analogy with a river and a dam.  So the purpose of a dam is to

20  block the flow of a river and the likelihood of that dam being

21  successful is going to be largely dependent upon two things:

22  How strong is that river flowing, and how thick or how strong

23  is that dam.  So you can imagine if we make the river stronger

24  at the same time that we are making that dam thinner, we're

25  creating a perfect storm where that dam is going to fail and

B.R. v. F.C.S.B.

45

1    that river is going to burst through.  Right?

2            So that's very similar with what happens in PTSD.

3    That brain system that controls emotions is getting stronger,

4    that fear and anxiety is getting stronger.  At the same time,

5    the brain system that allows us to regulate or control those

6    emotions is getting weaker.  Again, creating that perfect

7    storm where the individual is going to be experiencing an

8    excessive anxiety and fear.

9    Q.  So you mentioned symptoms like anxiety and fear.  Are

10   those emotional symptoms?

11   A.   Yes.

12   Q.   Are the symptoms of PTSD physical?

13   A.   The symptoms of PTSD that we observe are not physical,

14   they are emotional or behavioral.

15   Q.   Do those emotional symptoms of PTSD have a physical

16   origin?

17   A.   Yes.  And that's the basis of my opinion is that what we

18   see in PTSD are emotional and behavioral changes, but the

19   current scientific understanding of PTSD is that those

20   emotional and physical changes are -- or emotional behavioral

21   changes are caused by underlying changes in neurobehavioral or

22   neurophysiological function.

23   Q.   Now, Mr. Brown, if you can bring up the next slide.

24           That brings us to the second question that we asked

25   you to answer in this case about whether the observable

B.R. v. F.C.S.B.

46

1   clinical symptoms, i.e., the emotional symptoms, are produced

2   by physical damage to the brain.  So let me ask you:  Based on

3   your more than a decade of academic training, clinical

4   experience, and research in the field, have you formed an

5   opinion about whether the symptoms of PTSD are produced by

6   physical damage to the brain?

7   A.   Yes, they are.

8   Q.   Okay.  Mr. Brown, if you could bring up the next slide.

9        I think I'll leave it to you to explain to the jury

10  what this means, but if you could, please.

11  A.   Sure.  So this figure is a depiction of a framework that

12  was developed by the National Institute of Mental Health.  So,

13  again, the National Institute of Mental Health is the largest

14  funding agency for mental health research in America.  It's a

15  taxpayer funded agency so our -- the taxes that we pay go to

16  fund this federal agency that puts out an agenda for the types

17  of mental health research that it deems to be important and

18  impactful.  So that's important context for understanding what

19  is the National Institute of Mental Health.

20       And the National Institute of Mental Health created

21  this formulation for thinking about mental health disorders,

22  right, this wasn't developed by me, it wasn't developed by

23  some other person at a university, this was developed by our

24  country's largest funding body for mental health research.

25  And what is important to look at in this formulation is at the

─B. R. v. F. C. S. B.─

47

1    bottom what we observe in a mental health disorder, these

2    observable clinical symptoms, are the product of underlying

3    physical changes.  So this is, again, the framework that was

4    produced by the National Institute of Mental Health.  When we

5    observe someone with a mental health disorder, we make a

6    diagnosis based on clinical symptoms.  This is something we

7    can see in the individual so we might see them show signs of

8    anxiety.  We might see them show signs of sadness.  We might

9    see them avoid certain situations.  That's what we can

10   observe.  But the framework for our scientific understanding

11   of these symptoms is that they're produced by underlying

12   changes in the body, by physical changes.

13   Q.   Is PTSD similar to other medical conditions that the jury

14   may be aware of?

15   A.   A reasonable analogy is to think about a stroke.  So when

16   someone has a stroke, you can very clearly observe changes in

17   their behavior.  They may lose function in an arm, you may see

18   that their face droops, you observe a behavioral change, but

19   we attribute that behavioral change that we see to an

20   underlying neurological cause even if we don't see that

21   underlying neurological cause.

22   Q.   At a high level, what kind of changes, physical changes,

23   in the brain occur in a person with a PTSD diagnosis?

24   A.   Again, at a very high level, we have these two brain

25   systems.  One system that's controlling or producing emotional

B.R. v. F.C.S.B.

48

1    responding and the other system that allows us to control or

2    regulate that emotional responding and these are getting

3    altered in a very specific way.  Such that that brain system

4    that produces emotions, such as fear and anxiety gets

5    stronger, and that brain system that allows us to control

6    those emotions is getting weaker.

7    Q.    Have peer-reviewed scientific studies shown that PTSD is

8    caused by physical changes in the brain resulting from trauma

9    exposure?

10   A.    Yes.

11   Q.    First, what does it mean for a study to be peer-reviewed?

12   A.    Peer review means that if someone conducts a study and

13   writes up the results and wants to send it to a journal, the

14   journal does not just accept it.  Rather what happens the

15   journal sends that manuscript to experts in the field that we

16   call "peers" and those peers review that manuscript

17   critically.  They make comments about whether the research was

18   sound, was the design sound, were the statistics done

19   correctly, are the conclusions reasonable given the data

20   that's presented.

21          So those peers in the field will review the paper

22   and then make a determination to the editor.  If that

23   manuscript should be accepted or if it should be revised based

24   on some weaknesses or if it should be rejected outright.

25   Q.    And have these peer-reviewed studies included both animal

B.R. v. F.C.S.B.

1   and human studies?

2   A.   Yes.

3   Q.   So we'll start with the animal studies.  Let me first ask

4   you, why are animal studies useful for researchers who may be

5   focused on treating humans with PTSD?

6   A.   Animal studies are very important, especially in the

7   context of PTSD and trauma because what animal studies allow

8   us to do is they allow us to randomly assign a certain group

9   of animals to receive our laboratory versions of traumas and

10  stressors, and we can't do that in people.  So when we're

11  doing human studies, we're recruiting groups of people that

12  already exist.  Right?  So we're finding individuals who have

13  PTSD.  They already have PTSD.  We're identifying them.

14  We're -- we're identifying a control group, people who haven't

15  experienced trauma don't have PTSD.  And that group already

16  exists.  And we're trying to identify them and compare them.

17  The problem is that we may not be able to control for all

18  other differences that might exist between those two groups.

19  So we want them to differ in that diagnosis.  We want one

20  group to have PTSD and the other group not to.  It's very

21  different -- very difficult to make sure those two groups

22  aren't different in any other way, because we can't randomly

23  assign who gets a trauma and who gets PTSD.  And this is where

24  the animal studies come in.  What animal studies allow us to

25  do is, for example, we can take 20 mice, we can randomly pick

B.R. v. F.C.S.B.

50

1  ten and have them go through our laboratory version of a

2  trauma or a stressor and the other ten don't.  And what that

3  allows us to do is to know that the ten -- those 20 mice

4  started out equally.  So if we see differences after the

5  laboratory stressor we know that the differences are only

6  because of the stressor or the trauma that was induced.  So

7  when we see brain differences, we can very clearly isolate the

8  cause of those brain differences to the traumatic event that

9  was given to them in the lab.

10 Q.  So the slide is already up, but let's take a look at an

11 illustration of what these peer-reviewed animal studies have

12 shown.  And, again, I'll leave it to you to explain to the

13 jury what this means?

14 A.  This is not the result of any one study, rather this is a

15 graphical depiction that summarizes this body of research and

16 there is two systems here.  And this is the systems that I've

17 already described.  So we have one system, the prefrontal

18 cortex and hippocampus here.  And this system is responsible

19 for allowing us to regulate our emotions, to control our

20 emotions so that we can continue to do the things that we want

21 to do.

22         So you can imagine that if you had an argument with

23 a partner and then have to go to work, you may be stressed but

24 your prefrontal cortex allows you to continue to focus on

25 work.  Right?  So that's what a prefrontal cortex is doing and

B.R. v. F.C.S.B.

51

1    animals who have been stressed, you can see here what this is

2    is a depiction of dendritic branching.  So we have neurons.

3    And the degree of branching is a measure of the neuronal

4    strength.  So animals who have been stressed, the neuronal

5    strength in the prefrontal cortex and hippocampus gets weaker

6    compared to controlled animals.  So that system that allows us

7    to control our emotions is getting weaker.

8            And over here on the right, the system, the amygdala

9    orbitofrontal cortex, which is what I described, these are a

10   part of the brain circuitry that allow us to identify threats

11   in our environment, that produce emotional responding.

12           Animals who have experienced stress show -- if I can

13   get this working -- greater dendritic branching in the

14   amygdala orbitofrontal cortex compared to controlled animals.

15   So this is what I was mentioning before in that river and dam

16   analogy.  The river here being the amygdala orbitofrontal

17   context is getting bigger, it's getting stronger, and the dam

18   or the prefrontal cortex and hippocampus is getting weaker or

19   thinner.

20   Q.   And do scientists have an understanding of how exposure

21   to trauma results in these physical changes to the brain?

22   A.   Yes.

23   Q.   What is that understanding?

24   A.   Yes.  And this is an oversimplification, but at a very

25   high level, what's happening is when we undergo a normal

—B.R. v. F.C.S.B.—

52

1   stressor, so you can imagine having a fight with a partner,

2   getting in an argument with a boss, having a tough day at

3   work.  These are normal stressors.  They release the stress

4   hormone that we've all probably heard of called cortisol.

5   Cortisol is a stress hormone is a type of glucocorticoid.  And

6   what happens in a traumatic stressor, in particular, repeated

7   or prolonged stressors is that the extent of that

8   glucocorticoid release or cortisol, the extent and the

9   duration of release of that stress hormone is prolonged.

10          So when that stress hormone is released, it goes

11  throughout the brain and it starts binding to these different

12  receptors in the brain, and the extent of that exposure in the

13  brain and the duration of that exposure is heightened when

14  someone has experienced trauma, in particular, prolonged

15  trauma.  And that prolonged exposure in the brain to these

16  glucocorticoids alters that morphology or the makeup, the

17  physical structure of the brain.  And it is that prolonged

18  glucocorticoid or cortisol released in the brain that results

19  in that image that I just showed where the amygdala is

20  stronger and the prefrontal cortex is weaker.

21  Q.   Do human brains have analogous structures to the animal

22  brains that were the subject of these peer-reviewed studies?

23  A.   Yes.  The keyword being "analogous."  The human brain is

24  much more complex than the animal brain, but the function is

25  analogous.

1   Q.   So let's move on to the peer-reviewed human studies.

2   What have the peer-reviewed human studies shown about whether

3   PTSD is caused by physical changes in the structure and

4   function of the brain?

5   A.   If the large body of human studies on PTSD corroborates

6   or support what the animal studies have shown.  So those two

7   bodies overlap very well.

8   Q.   So let's talk about one study.  And, again, it's up on

9   the screen in front of you.

10        First, if you can just, at a high level, describe

11   this study and explain to the jury what this chart represents.

12   A.   This is a study that I was involved in.  This is a study

13   of about 120 adolescent girls organized into three groups.  So

14   the NTC here is a no trauma control.  So these are girls who

15   didn't have histories of trauma and didn't currently have

16   PTSD.

17        The TEC here refers to trauma exposed controls.  So

18   these were adolescent girls who experienced physical or sexual

19   assault, didn't have PTSD.  And then the PTSD group are the

20   adolescent girls who experienced physical and sexual assault

21   and had PTSD.  And what this bar graph is comparing is the

22   grey matter volume in the left amygdala.  So if you recall,

23   the left amygdala from that previous slide, the left amygdala

24   is part of that circuitry that allows us to identify threats

25   in the environment and is responsible for producing that fear

B.R. v. F.C.S.B.

54

1    and anxiety.

2            And the grey matter volume amongst the individuals

3    with PTSD here you can see the smaller compared to the control

4    group.

5    Q.   In other words, the adolescent girls, in what's here

6    labeled as the PTSD group, were diagnosed with PTSD before

7    this study?

8    A.   Correct.

9    Q.   What would they have been diagnosed with PTSD based on?

10   A.   They would have been diagnosed based on their observable

11   clinical symptoms, so emotional symptoms, behavioral symptoms.

12   Q.   Okay.  And this study looked at the actual brain changes

13   that occurred?

14   A.   Correct.

15   Q.   So in other words, the symptoms that these girls in the

16   PTSD group were exhibiting were produced by, at least in part,

17   these physical changes in the brain?

18            MR. ELLIKER:  Objection, leading.

19            THE COURT:  Rephrase.

20   BY MR. KEEFE:

21   Q.   Could you explain what this graph --

22            THE COURT:  So in other words.

23            MR. KEEFE:  I understand.

24            THE COURT:  Preface.

25            MR. KEEFE:  I understand.

B.R. v. F.C.S.B.

55

1  BY MR. KEEFE:

2  Q.   Is this particular study just one example of many other

3  studies that have demonstrated similar results?

4  A.   Yes.  This is one study in a much larger field of

5  research that largely supports these underlying brain changes.

6  Q.   And in forming your opinion in this case that PTSD is

7  caused by physical changes in the brain resulting from trauma

8  exposure, did you rely on any single study standing alone?

9  A.   No.

10  Q.   And why wouldn't you rely on any single study informing

11  your opinion?

12  A.   Any one study is not going to be conclusive in and of

13  itself.  Right?  So with any one study you have a limited

14  sample size.  So you might only be able to recruit 50 people

15  or 100 people and maybe that 50 or 100 people aren't

16  generalizable to everyone.  Right?  So that's a problem.  And

17  as I mentioned earlier, matching the groups in every other

18  factor, other than that PTSD diagnosis is difficult, it can

19  never be fully sure that you did it.

20          So no one really ever wants to over interpret the

21  results of one study.  Rather, what we like to do is we like

22  to quantitatively summarize many studies.  So this is what's

23  called a meta-analysis where we take the results across a

24  large body of studies.  It could be five studies, it could be

25  ten studies, it could be 20 studies, combine all of the

─B.R. v. F.C.S.B.─

56

1   results and therefore we can combine all of those samples

2   instead of having a sample size of 50 or 100, now we have a

3   sample size of a thousand or more.  And that gives us a lot

4   more confidence when we pool results across all of those

5   studies to interpret those results and to be more confident

6   that the results of those studies are true.

7   Q.   So let's take a look at the results of one of those

8   meta-analyses.

9           Mr. Brown, if you can bring up the next slide.

10          And, again, I'll leave it to you to explain to the

11  jury what this graph demonstrates.

12  A.   Yes.  So this is one example of a meta-analysis in this

13  field of research.

14          What we're looking at here in these bars is a

15  measure of effect size or how big is the difference between

16  the control group and the PTSD group.  Okay.  So we have this

17  middle line, anything that's tipping left means that that

18  brain volume is smaller in PTSD.  Anything that's tipping

19  right, means that that brain region is bigger in PTSD.

20          We have two colored bars.  And these are referring

21  to either adults with PTSD compared to controls, or

22  adolescents or youth with PTSD compared to controls.  Right?

23          So this line, for example, would be the difference

24  between adults with and without PTSD in the volume of the left

25  amygdala.  This would be the difference in the volume of the

─B.R. v. F.C.S.B.─

57

1    left amygdala between youth with and without PTSD.

2              So we can look down the line down here and we can

3    see that just in these selected brain regions, you can see

4    they are all tipping left.  And, in particular, the

5    hippocampus would be significantly smaller amongst both adults

6    and adolescents with PTSD compared to adults and adolescents

7    who don't have PTSD.

8    Q.   Is there any significance that adults and pediatric

9    patients with PTSD demonstrate similar changes in brain

10   structure?

11   A.   Yes.  One of the implications of that is -- you know,

12   one of the ideas with PTSD and the underlying neurobiology is

13   that these are stable and persistent changes.  They are not

14   transient.  They don't just happen for a day and go away.  So

15   when we see brain changes in adolescents and adults that

16   correspond well, one of the implications of that is that the

17   underlying neurobiology is persistent across time.

18   Q.   One more look at a meta-analytic summary.

19              Mr. Brown, if you could bring up the next page.

20              Again, I'll leave it to you to explain just briefly

21   what this chart demonstrates.

22   A.   Yes.  So similar to the previous chart each of these bars

23   represents the difference in the size of that structure

24   between individuals with and without PTSD.  So anything that's

25   pointing left of that center line means that that region is

B.R. v. F.C.S.B.

58

1  smaller in individuals with PTSD, and anything right of that

2  line means that it's larger in individuals with PTSD.  And we

3  have two colors here.  We have orange and we have green.  And

4  what those refer to are differences that are either so big

5  that it is what we call "statistically significant."  So these

6  differences are so large they're unlikely to be due to chance.

7  And then we have those green bars where the differences are

8  not large enough for us to conclude that it's statistically

9  different.  So what we want to do here is just focus on the

10  orange bars.  And just to highlight -- if I can get this up.

11  Q.    There's no problem if it doesn't work.

12  A.    Okay.  If you just focus on the bottom right, those four

13  orange bars in the bottom right with the hippocampus and the

14  amygdala there -- if we just focus on the hippocampus, would

15  be fine -- that we're showing significantly smaller

16  hippocampus volumes in individuals who have PTSD compared to

17  those without PTSD.

18  Q.    Was the hippocampus the river or the dam in your analogy?

19  A.    In this analogy, the hippocampus is the dam, but one

20  important difference to note is that this is grey matter

21  volumes which is not the same thing as neuronal branching and

22  doesn't necessarily correspond in the same way with function.

23  Q.    Have scientists also conducted peer-reviewed studies to

24  determine whether adults who experience sexual assault prior

25  to the age of 18 demonstrate similar physical changes in their

B.R. v. F.C.S.B.

59

1    brain?

2    A.   Yes.

3    Q.   What have those peer-reviewed studies of adults with

4    early life trauma shown?

5    A.   Yes, so this is some of the research that I've conducted

6    where we've had adolescents with and without exposure to

7    physical or sexual assault.  And these are adolescents between

8    the ages of 11 and 17, and they would have experienced this

9    physical or sexual assault maybe in the last year, maybe in

10   the last few years.  So we're measuring their brain relatively

11   close to the time when they experienced the trauma.

12          And then, we have a group of adults and these adult

13   women that either have experienced physical assault prior to

14   the age of 18 or these are controlled adult women who have not

15   experienced trauma.  So what we can kind of think about is

16   that adult group of women who we are measuring their brain,

17   maybe a decade or longer after they've experienced the trauma,

18   because they experienced their trauma prior to the age of 18.

19   We can think about that group as their adolescent group fast

20   forward in time.

21          So we can measure brain changes close, relatively

22   close, to the time of the trauma.  And then what we want to

23   know is what happens later in time.  Do those changes go away?

24   Do those changes become different?  So that's what this group

25   of adult women who have experienced trauma prior to the age of

B.R. v. F.C.S.B.

60

1   16 allows us to do.  What we found in this study was that

2   brain changes that we observe close to the time of the trauma

3   are still there in those adult women who experienced that

4   trauma ten or more years prior.  So, again, suggesting that

5   these brain changes are stable and persistent over time.

6   Q.   What does that say about whether the injuries to the

7   brain that drive the symptoms of PTSD their likelihood to heal

8   over someone's lifetime?

9   A.   Yeah.  Our understanding of PTSD and the underlying

10  neurobiology that produces those PTSD symptoms is that in the

11  absence of treatment they don't go away, they are persistent

12  and stable over time.

13  Q.   So Dr. Cisler, I would like to now move about how your

14  opinions about the neurobiological consequences of PTSD apply

15  to B████.

16          In forming your opinions in this case, did you

17  review Dr. Eileen Ryan's forensic psychiatric evaluation of

18  B████?

19  A.   I did.

20  Q.   Based on your review of Dr. Ryan's forensic psychiatric

21  evaluation of B████, did Dr. Ryan diagnose B████ with PTSD?

22  A.   Yes.

23  Q.   And based on your review of Dr. Ryan's forensic

24  psychiatric evaluation of B████, did Dr. Ryan determine the

25  cause of B████'s PTSD?

B.R. v. F.C.S.B.

61

A.   Yes.

Q.   What was -- what did Dr. Ryan determine was the cause of

B████'s PTSD?

A.   It's a combination of two --

          MR. ELLIKER:  Objection, Your Honor.  They are

reading from the report of an expert who hasn't testified yet.

          THE COURT:  Don't read from the report.  Ask him

what was his evaluation based upon what he read in the report

without reading the report into the record at this time.

          MR. KEEFE:  I'll give it a shot, Your Honor.

BY MR. KEEFE:

Q.   Was your opinion based on -- in forming your opinions,

was one thing you looked at Dr. Eileen Ryan's expert report?

A.   Yes.

Q.   And in forming your opinions, how did Dr. Ryan's expert

opinion inform your opinion about the cause of B████'s PTSD?

          THE COURT:  Without telling us Dr. Ryan's opinion,

tell us how her perspective formed your scientific opinion.

          THE WITNESS:  So my scientific opinion in this case

was based upon Dr. Ryan's written review of medical records

and her evaluation of B████ that resulted in a determination

of a traumatic event that met our diagnostic criteria for what

is a trauma, and that the symptoms that she was experiencing

meet our diagnostic criteria symptoms for PTSD.

          THE COURT:  He's fine.

─B.R. v. F.C.S.B.─

62

1   BY MR. KEEFE:

2   Q.   So relying on Dr. Ryan's opinion about B███'s diagnosis

3   and the event or events Dr. Ryan identified as the cause of

4   that diagnosis, have you formed an --

5             MR. ELLIKER:  Your Honor.

6             THE COURT:  Rephrase that, Counsel.

7             MR. ELLIKER:  I object to the opinions offered here

8   about PTSD generally.  The first slide said not about anything

9   with respect to the plaintiff specifically.

10            MR. KEEFE:  Your Honor, I'm happy to show you

11  Dr. Cisler's expert report.

12            THE COURT:  Well, I think the very first question or

13  first area of questioning that you had for the doctor

14  specifically said that he's not making an evaluation on your

15  client and now he is.

16            MR. KEEFE:  Your Honor, his expert report fully

17  discloses an opinion specific to B███ in this case.

18            THE COURT:  Well, then isn't that inconsistent with

19  what you said he was being offered for.

20            MR. KEEFE:  No, Your Honor.

21            THE COURT:  Come on up.  Come up.

22            (Side bar.)

23            MR. KEEFE:  Your Honor, I'll start -- this is

24  Dr. Cisler's expert report.  This is a summary of opinions.

25            THE COURT:  You've got a pretty good organization.

─── B.R. v. F.C.S.B. ───

63

1   What were the first general questions that you asked him about

2   with regard to whether it relates to B.R.?

3           MR. KEEFE:  Whether PTSD --

4           THE COURT:  No, no, no.  What were your first

5   questions regarding whether or not his opinion was related

6   specifically to B.R.?  That was one of your first questions.

7           MR. KEEFE:  He's not offering a psychological

8   diagnosis.  He didn't diagnose B████ with a psychological

9   disorder.  That was my question and his response.

10          MR. ELLIKER:  Your Honor, in Dr. Cisler's deposition

11  I understand one of the three opinions from his expert report

12  offers an opinion as to this specific plaintiff, and what his

13  first two opinions about PTSD generally mean for her

14  specifically.  In his deposition, he was specifically asked.

15          "QUESTION: Do you consider yourself sufficiently

16          informed to be able to render an opinion as to her

17          psychological characteristics?

18          "ANSWER:  I do not.  I have not evaluated her

19          myself."

20          The follow-up question --

21          THE COURT:  Stop there.

22          MR. KEEFE:  That's exactly my point.  He is not

23  diagnosing her with a psychological condition.  He is saying

24  that based on all of his opinions already given, because he's

25  relying on another expert's diagnosis of PTSD, she has

B.R. v. F.C.S.B.

64

1  suffered physical injuries to her brain.

2          THE COURT:  Okay.  I believe that the other doctor,

3  Dr. Ryan, may well -- I don't know what she's going to say --

4  or is it a female?

5          MR. KEEFE:  Miss.

6          THE COURT:  I don't know what Dr. Ryan is going to

7  testify to, but I think that that testimony is best elicited,

8  if it can be at all, from that particular expert as opposed to

9  this one who is only, from what I gather, providing us some

10 general background on the subject of the PTSD so the jury can

11 understand the concept of PTSD.

12         MR. KEEFE:  What I would ask to be able to have him

13 opine to is that anyone with PTSD diagnosis, by definition,

14 has suffered physical injury to their brain?

15         MR. ELLIKER:  I think that that's fair.

16         THE COURT:  Okay.  Just ask that question.  All

17 right.

18         (Open court.)

19         MR. KEEFE:  May I proceed, Your Honor?

20         THE COURT:  You may.

21 BY MR. KEEFE:

22 Q.  Dr. Cisler, have you formed an opinion about whether an

23 individual who's been diagnosed with PTSD, by definition, has

24 suffered physical damages to their brain?

25 A.  Yes.

1  Q.   What is your opinion?

2  A.   By definition, based on our current scientific

3  understanding of PTSD, PTSD symptoms that are used to diagnose

4  are observable clinical symptoms, those are observable

5  emotions, those are observable behaviors.  Our understanding

6  is that those behaviors and emotions are produced by

7  underlying changes in brain function.

8  Q.   And if an individual has been diagnosed with PTSD, is it

9  necessary -- is it necessary to examine an MRI of that

10  individual's brain to determine whether or not they have

11  suffered physical injuries to their brain?

12  A.   Based on current scientific understanding of PTSD that I

13  have described, no.

14  Q.   And why not?

15  A.   A recurrent understanding of PTSD is that the only -- the

16  only way PTSD, any persistent emotional behavioral symptoms

17  associated with PTSD, can be there is due to these underlying

18  neurobiological -- persistent underlying neurobiological

19  changes.

20        MR. KEEFE:  Mr. Brown, the last slide if you would,

21  please.

22  BY MR. KEEFE:

23  Q.   All right.  So let's end where we started.  So first,

24  based on everything you've testified today, is it your

25  opinion, to a reasonable degree of medical certainty, that

─B.R. v. F.C.S.B.─

66

1   PTSD is caused by physical damages in the brain resulting from

2   trauma exposure?

3   A.   Yes.

4   Q.   Does a patient who suffers from PTSD, by definition, have

5   physical injury in the form of physical changes to the

6   structural and functional properties of her brain?

7   A.   Yes.

8   Q.   Is it your opinion to a reasonable degree of medical

9   certainty that PTSD symptoms are produced by those physical

10  injuries to the brain caused by trauma exposure?

11  A.   Yes.

12  Q.   Are all of the opinions that you've expressed today held

13  to a reasonable degree of medical probability?

14  A.   Yes.

15  Q.   And a reasonable degree of certainty in your field of

16  expertise?

17  A.   Yes.

18         MR. KEEFE:  Your Honor, I pass the witness.  Thank

19  you, Dr. Cisler.

20         THE COURT:  Thank you.  Ladies and gentlemen, we're

21  going to go ahead and take our break.  It's going to be a

22  short break.  Actually, it's going to be a little longer

23  because I want you to be able to get something to eat since

24  we're going to go past the lunch hour today.  So why don't we

25  come back in at 12:50, 12:50, and that will give you about

─────B.R. v. F.C.S.B.─────

67

1    20 minutes.

2                (Jury excused.)

3                (Recess.)

4                (Court proceedings resumed at 12:59 p.m.)

5                THE COURT:  How long do you anticipate on your

6    cross?

7                MR. ELLIKER:  20 minutes, but I'm going to aim for

8    15.

9                THE COURT:  Okay.  Mr. Kinney or Mr. Blanchard do

10   you all anticipate any examination?

11               MR. KINNEY:  No.

12               MR. BLANCHARD:  No.

13               THE COURT:  Very good.

14               (Jury present.)

15               THE COURT:  You may be seated.  Thank you.

16   Cross-examination.

17                          CROSS-EXAMINATION

18   BY MR. ELLIKER:

19   Q.   Good afternoon, Dr. Cisler.  My name is Kevin Elliker.  I

20   represent the Fairfax County School Board.  We just took a

21   short break.

22               Did you have any conversations during the break we

23   took?

24   A.   Yes.

25   Q.   Who did you have that conversation with?

Cross - J. Cisler

——B.R. v. F.C.S.B.——

68

1  A.   There was a court -- someone with a newspaper and we just

2  chitchatted a little bit.

3  Q.   And what was the newspaper; do you remember?

4  A.   I don't know.

5  Q.   Is the person who you spoke with seated in the courtroom?

6  A.   I don't see her, maybe.  Probably -- oh, yup, she is.

7  Q.   Right here in the front row.  How long was --

8            THE COURT:  Stop, stop.  Ladies and gentlemen in the

9  gallery, and I appreciate this being brought to my attention

10  and I appreciate your honesty in this, sir.

11           This case is going to be decided in this courtroom.

12  We do not need the Press or any outside agencies discussing

13  the witnesses' testimony or giving any opinions about the

14  case, or in any way interfering with the Court's ability to

15  administer justice.  So I am going to say to anyone who is a

16  part of the Press, please do not interfere with this trial.

17           Do you understand, ma'am?  I'm talking to you.

18           (No response.)

19           Do you understand, ma'am?  I'm talking to you.

20           UNIDENTIFIED SPEAKER:  I wasn't interfering and --

21           THE COURT:  Don't talk to any of the witnesses.

22           UNIDENTIFIED SPEAKER:  Okay.  I was not interfering.

23           THE COURT:  Don't argue with me, ma'am.

24           UNIDENTIFIED SPEAKER:  I am just stating the answer.

25           MR. ELLIKER:  I'll move on, Your Honor.

B.R. v. F.C.S.B.

69

1          THE COURT:  Come up.

2          (Side bar.)

3          THE COURT:  Mr. Brenner, I know that you don't

4   control the Press so this isn't directed at you.  But she's

5   doing everything she can to contaminate this trial.  Talking

6   to witnesses between their testimony, that can't happen.

7          MR. BRENNER:  First, I agree.  Second, I just

8   learned about it for the first time when Mr. Elliker asked

9   that question, because we, obviously, we talked to

10  (indiscernible) during the break so I wasn't with them.

11         THE COURT:  Oh, yeah.  As I said, I want the record

12  to be clear, Mr. Elliker and his team of lawyers have nothing

13  to do with this, but this is getting dangerous.

14         MR. BRENNER:  So, Judge, earlier I had offered if

15  you thought it would be helpful for me to talk to her, and it

16  was a decision, I think, collectively that would not be

17  helpful so I have not talked to her.  I will remake that offer

18  to try to express to her that it's -- it's unhelpful to anyone

19  and it's inappropriate.  I have not talked to her, but if Your

20  Honor think it is helpful, I'm happy to do it.

21         MR. ELLIKER:  I make no insinuation, I just make an

22  observation.  That the article written from this publication

23  was reported the weekend before trial and quoted Ms. Anderson

24  --

25         MS. ANDERSON:  It also quoted the School Board.  And

B.R. v. F.C.S.B.

70

1    I didn't even talk about this case.

2              THE COURT:  Did you talk to the reporter at all?

3              MS. ANDERSON:  I talked to the reporter -- yes, she

4    called me before trial.

5              THE COURT:  Before trial.

6              MS. ANDERSON:  Before trial.

7              THE COURT:  That's fine.

8              MS. ANDERSON:  After that I have not spoken with

9    this --

10             MR. ELLIKER:  Again --

11             MS. ANDERSON:  -- quote from the School Board.

12             MR. KEEFE:  Ms. Anderson, I -- Your Honor, I

13   understand and I -- I genuinely don't make any insinuations.

14   It's a fair point, a spokesperson from the School Board gave a

15   comment.  I was just reflecting in terms of the communications

16   who the channels of the communication have been with the

17   reporter.

18             THE COURT:  Well, let's move on.  Again, I want the

19   record to be clean.  I don't believe the point Mr. Elliker is

20   making are any accusations against you professionally or

21   personally.  That's not what I think I am hearing.  But, you

22   can see from the way that this woman actually dealt with me,

23   she's going to do her own thing and she's going to run the

24   risk of contaminating this entire proceeding.  I don't know

25   whether your suggestion is the most viable --

B.R. v. F.C.S.B.

71

1          MR. BRENNER:  I don't either.

2          THE COURT:  Let's do this, I want everybody to

3    advise their clients and their witnesses that they are not to

4    have any contact, basically, I'm enforcing the rule that no

5    one is to have any contact, direct or indirect with the Press,

6    and that includes the professionals, the witnesses, support

7    staff, anybody they are directed not to have any more contact

8    with the Press.  If she does it again or gets in the way

9    again, then I'll do what I need to do and that might be to

10   hold her in contempt because that's just inappropriate for her

11   to go talk to a witness between a witness's testimony.  That's

12   just wrong.

13          And, again, I'm not saying that a witness did

14   anything wrong.  He probably doesn't understand that if a

15   person from the Press comes up and says they want to talk,

16   he's a nice guy and talks to them, but this can't happen

17   anymore.

18          So I don't know who has any influence with this

19   woman, but she needs to get herself under control.

20          MS. ANDERSON:  I do not, for the record, have any

21   influence.  I have not spoken with her since this started.

22          THE COURT:  Unfortunately, there are a lot of people

23   that don't have any influence on a lot of people that are

24   interfering with the administration of justice in this trial.

25   So I am just going to take this time to let everybody see that

─B.R. v. F.C.S.B.─

72

1    we're all okay and that we're having a cooling-off period and

2    that we are good.  So I'm not going to hold any real

3    conversations about the case.  I'm just going to act like

4    we're talking.  So I'll give everybody a chance because

5    perceptions are everything.  And the jury knows clearly that I

6    am not very happy with this woman.

7                MR. BRENNER:  Yeah.

8                MS. ANDERSON:  Your Honor.

9                THE COURT:  Yes, ma'am.

10               MS. ANDERSON:  If you could just give some sort of

11   instruction or a statement that like we haven't done anything

12   wrong.

13               THE COURT:  Sure.

14               MS. ANDERSON:  I think it might have left that

15   impression.  So if it's just neutral.  I'm not saying --

16               THE COURT:  I think I can come up with something.

17               MR. BRENNER:  Especially the witness.  My guess is

18   she chitchatted with the witness.  I guess she didn't talk

19   about anything in the case.

20               MR. BATES:  Well, I overheard her talking to him

21   about his research.

22               MR. BRENNER:  So asking questions about his

23   research.

24               THE COURT:  Which are questions Mr. Elliker wants to

25   ask him about, I'm sure.

B.R. v. F.C.S.B.

73

1          MR. ELLIKER:  And, for the record, I'm sensitive to

2    First Amendment protections for members of the Press, such as

3    they are.

4          THE COURT:  Absolutely.

5          MR. KEEFE:  And so, there's sensitivity about trying

6    to inquire too much into what someone who is holding

7    themselves as a reporter and asking a witness about.

8    Obviously, if she's discussing his research, that's what he's

9    here to testify about.

10          THE COURT:  Yup, that's the problem.  Okay.  All

11    right.  Thank you.

12          (Open court.)

13          THE COURT:  Ladies and gentlemen of the jury, I am

14    going to give you a general instruction, and this is an

15    instruction that I believe all the lawyers have agreed to.

16    The issues that need to be decided in this case need to be

17    decided in this courtroom by you with the help of the lawyers

18    that are involved in the case.

19          As I've indicated earlier, I believe that both sides

20    have very good lawyers who are working very hard for their

21    perspective of the case.  This Court, though, however, has a

22    responsibility to make sure that the ends of justice are

23    accomplished for all people involved.  I appreciate and

24    recognize the right of the freedom of the Press.  It's part of

25    our constitution.  I appreciate that.  But the bottom line is

─B.R. v. F.C.S.B.─

74

1   that the Court shares great concern about things being done

2   during the midst of a trial that could, in some way, impact

3   what you all need to do.

4          So, again, none of the lawyers are involved, none of

5   the lawyers made a mistake, none of the lawyers are involved

6   in what may be considered an inappropriate contact with a

7   witness.  But the bottom line is this case is going to be

8   decided by you in this courtroom from the people that we hear

9   on this witness stand.

10         Thank you.  Mr. Elliker.

11         MR. KEEFE:  May I proceed?

12         THE COURT: Yes, sir.

13  BY MR. ELLIKER:

14  Q.   I'll start again.  Dr. Cisler, I'm Kevin Elliker.  I just

15  have a few questions for you.

16         First, you are not a medical doctor, right?

17  A.   Correct.

18  Q.   And you're not a neurologist?

19  A.   Correct.

20  Q.   Which would be someone who diagnoses and treats brain

21  disorders, right?

22  A.   That is what a neurologist generally would do, yes.

23  Q.   As a clinical psychologist you study the human mind and

24  human behavior; is that fair?

25  A.   I have testified that what I do for my job is study brain

Cross - J. Cisler

─ B.R. v. F.C.S.B.─

75

1  circuitry processes associated with trauma and PTSD.

2  Q.   That's fair.  And blame me as a lawyer oversimplifying

3  your expert opinion.

4            When you were preparing your opinion, you didn't do

5  any evaluation of the plaintiff in this case, right?

6  A.   That's correct.

7  Q.   And you didn't meet with her, did you?

8  A.   That's correct.

9  Q.   And, in fact, I think as Mr. Keefe discussed, to the

10  extent you received information about this case, you got that

11  from the report of Dr. Eileen Ryan, right?

12  A.   That's correct.

13  Q.   And you recall that Dr. Ryan's report itself included

14  information from another specialist, Dr. Sid Binks; do you

15  remember that?

16  A.   I don't.

17  Q.   And you didn't do anything to verify whether the

18  information you had received from Dr. Ryan was accurate,

19  right?

20  A.   Yes, I didn't -- yeah, I should say that my -- the basis

21  of my opinion, with respect to PTSD, is based on Dr. Ryan's

22  report, and the information provided in it.  I didn't see

23  anything that, I guess, would give me pause to the validity of

24  it.  But you're accurate that I didn't, like, double check the

25  things that she put in there.

──────────────── B.R. v. F.C.S.B. ────────────────

76

1  Q.   I'll put it a different way.  You assumed everything

2  Dr. Ryan had in her report was accurate, correct?

3  A.   Yes.

4  Q.   Now, you recall in your deposition you were deposed in

5  this case, correct?

6  A.   Yes.

7  Q.   And you were asked about the American Psychological

8  Association's Ethical Principles of Psychologist and the Code

9  of Conduct?

10  A.   Correct.

11  Q.   And so, you remember discussing that there's -- these are

12  the guidelines that govern your work as a psychologist,

13  correct?

14  A.   Correct.

15  Q.   And so, you're aware that that code of conduct says

16  psychologists should provide opinions about the psychological

17  characteristics of individuals only after they've conducted an

18  examination of that person in order to be supporting the

19  conclusions they would reach?

20  A.   That's the first clause that you're reading from, but

21  there's another one.

22  Q.   Okay.  But you're not rendering any kind of opinion about

23  the plaintiff's psychological characteristics?

24  A.   I am not rendering an opinion about her psychological

25  characteristics.

─B. R. v. F. C. S. B.─

77

```
 1   Q.   And no diagnosis of her mental condition, right?

 2   A.   That's not what I'm testifying about.

 3   Q.   And you're not giving any opinion as to events that may

 4   or may not have happened in this case with respect to the

 5   plaintiff's allegations?

 6   A.   That's correct.

 7   Q.   And you don't have any opinion that the plaintiff has, in

 8   fact, suffered any injuries one way or another?

 9   A.   I guess I'm not entirely --

10   Q.   Let me --

11   A.   -- sure how to answer that.

12   Q.   Let me rephrase.  You don't have any opinion based on

13   your personal knowledge that she suffered any injuries?

14   A.   I have not observed myself that there have been any

15   injuries, but, I guess, where I am -- what my testimony is

16   about is about what is our scientific understanding of PTSD.

17   So if we understand PTSD as having a neurobiological origin,

18   and then you tell me someone has PTSD, based on that

19   understanding, I will conclude that if we say X, Y, and Z

20   brain circuitry is involved in producing that symptom, I'm

21   going to infer that X, Y, and Z brain system is going to be

22   involved here.

23        In the same way that if you tell me that your uncle

24   has a stroke, I'm going to assume there is a neurological

25   origin even though I don't see it myself.
```

Cross - J. Cisler

————B.R. v. F.C.S.B.————

78

1    Q.   Right.

2    A.   That's correct.

3    Q.   All right.  So let's talk about those opinions then.

4         You talked about how PTSD is caused by physical

5    changes in the brain that result from trauma exposure, right?

6    A.   Yes.

7    Q.   And those physical changes are changes to the structural

8    and functional properties of the brain?

9    A.   Correct.

10   Q.   And then you also said that by definition those physical

11   changes are a physical injury; is that right?

12   A.   They are physical changes, yes.

13   Q.   But you said by definition they are physical injuries,

14   right?

15   A.   Okay.  I guess, I'm not sure of the distinction that

16   you're making.

17        THE COURT:  Doctor, what do you mean, from a

18   scientific standpoint, is the definition of physical changes?

19        THE WITNESS:  What is the definition of a physical

20   change?

21        THE COURT:  Yes.

22        THE WITNESS:  So, you know, some of the research

23   that I've talked about would be the size of a structure

24   increases or decreases.  The synaptic dendritic branching

25   increases or decreases, that's what I'm referring to.

Cross - J. Cisler

───────B.R. v. F.C.S.B.───────

79

1          THE COURT:  And what would be your scientific

2    definition of a physical injury?

3          THE WITNESS:  Yeah, I -- I don't know if I have a

4    lot of expertise in the definition of what an injury is.  I

5    think I can define that in our case if the brain is changing

6    to produce a disease after, versus before a traumatic event,

7    again, this is in the context of PTSD, can that reasonably be

8    considered an injury.  I think so.  And I don't want to get

9    over my skis in saying what is the scientific basis of an

10   injury, per se.  But I do feel confident in the context of

11   PTSD in saying that our understanding of the symptoms of PTSD

12   is they are produced by underlying physical changes that our

13   understanding is caused by these traumatic events.  So if a

14   traumatic event, as I explained, releases this cascade of

15   neurochemical changes, this results in persistent

16   morphological changes to the brain and that is what's

17   producing PTSD symptoms.

18   BY MR. ELLIKER:

19   Q.   Okay.  So I'm reading from the slide, and I can show you

20   if you'd like to review it.

21   A.   Sure.

22   Q.   One of the slides that Mr. Keefe went over with you asked

23   the question:  Is PTSD caused by physical injuries to the

24   brain resulting from trauma exposure?

25          And the answer was, "Yes."

—B.R. v. F.C.S.B.—

80

1   A.   Okay.

2   Q.   And then the slide says:  A patient who suffers from

3   PTSD, by definition, has incurred physical injury to their

4   brain; does that sound right?

5   A.   I see -- yeah, you're making a subtle distinction with

6   the words that I'm -- I apologize if I have been inconsistent

7   about.  I'm not as familiar with the terminology.

8   Q.   With the terminology in the slides that you prepared with

9   Mr. Keefe?

10  A.   As you made a subtle distinction before about cause

11  versus injury that --

12  Q.   Well, I think I asked -- you said that the physical

13  changes in the brain --

14  A.   Yes.

15  Q.   -- are by definition a physical injury?

16  A.   Yes.

17  Q.   And I think, if I understood your answer to the judge,

18  was that you don't have the expertise to define what a

19  physical injury is; is that what you said?

20  A.   Yes.

21  Q.   Okay.  And physical injury is not a phrase that you use

22  in your field, is it?

23  A.   A physical injury is not a typical phrase that I would

24  use, that's correct.

25  Q.   Okay.  The explanations that I think you gave with

─B. R. v. F.C.S.B.─

81

1    respect to physical changes in the brain, those apply to

2    basically every mental health disorder, right?

3    A.   Again, I don't want to get.

4             MR. KEEFE:  Objection, Your Honor, beyond the scope

5    of direct examination.

6             THE COURT:  It seems to be.  Sustained.

7             MR. ELLIKER:  Your Honor, this goes to the

8    foundation of the experts.

9             THE COURT:  I think it is the way you asked the

10   question.  Rephrase it.

11   BY MR. ELLIKER:

12   Q.   Okay.  It's your opinion, Doctor, that the mental health

13   disorders in general are the product of physical changes in

14   the brain, correct?

15            MR. KEEFE:  Same objection.

16            THE COURT:  That's overruled.  You can answer,

17   Doctor.

18            THE WITNESS:  As a gross oversimplification, yes,

19   but I would maybe make two illustrative examples.

20   BY MR. ELLIKER:

21   Q.   Well, let me ask it this way:  Is PTSD the only mental

22   health disorder whose clinical symptoms are produced through

23   alterations in the function and structure of the brain?

24   A.   Again, my expertise is PTSD, at a general level, our

25   understanding of mental health disorders, is that they're

─B.R. v. F.C.S.B.─

82

1    produced by underlying neurobiological changes.  And I qualify

2    that in the context of PTSD to just kind of help differentiate

3    PTSD from other mental health disorders.  So we can -- another

4    mental health disorder, for example, is what might be called

5    an adjustment disorder.

6              An adjustment disorder is a diagnosable mental

7    health disorder.  But it's more or less characterized by

8    transient changes.  Right?  So the person may be going through

9    a stressful time and have anxiety, but that's kind of expected

10   to resolve.  And one of the defining characteristics of PTSD

11   is that it is persistent and stable over time and that is true

12   probably of most but not all mental disorders.

13   Q.   One of the disorders that you said in your clinical

14   practice that you treat is anxiety disorder, right?

15   A.   Correct.

16   Q.   Okay.  So anxiety disorder, are the -- are the clinical

17   symptoms associated with anxiety disorder produced through

18   alterations in the function and structure -- let me start

19   over.

20             Are the clinical symptoms of anxiety disorder the

21   product of alterations in the function and structure of the

22   brain?

23   A.   An anxiety disorder?

24   Q.   Yes.

25   A.   Yes.

B.R. v. F.C.S.B.

83

1   Q.   And what about major depression?

2   A.   Yes.

3   Q.   What about eating disorder?

4   A.   I don't really study eating disorders.

5   Q.   So you don't know if an eating disorder is something that

6   the clinical symptoms are the product of changes in the brain?

7   A.   I wouldn't feel comfortable speaking on that topic.

8   Q.   Do you recall being asked that question at your

9   deposition?

10  A.   I don't.

11  Q.   Okay.

12         MR. ELLIKER:  Your Honor, may I approach the

13  witness?

14         THE COURT:  Is it a deposition?

15         MR. ELLIKER:  Yes.

16  BY MR. ELLIKER:

17  Q.   This is from -- and I think in order to get the full

18  context, page 53, line 1.  The question is:

19         "QUESTION: Is PTSD the only mental health disorder

20  whose clinical symptoms are produced through alterations in

21  functional and structure of the brain in your opinion?

22         "ANSWER: No.

23         "QUESTION:  What are the others?

24         "ANSWER: Our understanding of most mental health

25  disorders is that they are produced by changes in the brain.

B.R. v. F.C.S.B.

84

1          "QUESTION:  So is anxiety disorder one of those

2    disorders that is produced by changes in the brain in your

3    opinion?

4          "ANSWER: Yes.

5          "QUESTION:  Okay.  Is major depression one of those

6    disorders that is produced by changes in the brain?

7          "ANSWER: Yes.

8          "QUESTION:  Okay.  What about eating disorder?

9          "ANSWER:  Yes."

10          Do you remember giving that testimony?

11   A.   Vaguely, yes.

12   Q.   Does that -- well -- in fact, can you think of a single

13   mental health disorder that would not be produced by changes

14   in the brain?

15   A.   Are you asking that now or are you reading that from --

16   Q.   I'm asking you that now.

17   A.   Well, again, just to come back to the differentiation

18   between PTSD and adjustment disorder.  So adjustment disorder

19   is a diagnosable mental health disorder.  As someone has an

20   adjustment disorder, they may have symptoms of anxiety or

21   depression.  And our understanding of anxiety and depression,

22   again, would be produced by some underlying neurobiology,

23   certainly, but the difference between an adjustment disorder

24   and PTSD is an adjustment disorder is more or less defined by

25   being transient.  Whereas, PTSD would be defined by being

B.R. v. F.C.S.B.

85

1    persistent and stable over time.

2                So I feel comfortable in saying that in general most

3    mental health disorders have some type of a neurological

4    basis, but I don't feel comfortable talking about all of them

5    as a unitary process.

6    Q.   Okay.  Well, let's then stick with what we've talked

7    about then.  If we -- you call PTSD -- let me step back.

8                You say that PTSD is caused by physical changes

9    which are by definition a physical injury, isn't that also

10   true for depression?

11   A.   If you allow me a little bit of space to explain.

12   Q.   Well, let me put it this way, we're talking about the

13   clinical symptoms of PTSD.

14   A.   Yes.

15   Q.   Caused by physical changes, that's your opinion?

16   A.   Yes.

17   Q.   And then your opinion is that those physical changes are

18   by definition a physical injury?

19   A.   Yes.

20   Q.   Okay.  And I think you just agreed that anxiety disorder

21   and major depression and an eating disorder, those clinical

22   symptoms are also the product of physical changes in the

23   brain, right?

24   A.   Well, I -- I said most mental health disorders --

25   Q.   I asked about those three.

B.R. v. F.C.S.B.

86

1  A.   -- with some qualifications.

2  Q.   I asked about those three.

3  A.   Okay.

4  Q.   Anxiety disorder, major depression, and eating disorder.

5  And I think your testimony was --

6  A.   Is there an underlying brain basis for those?  Yes.  But

7  if I can just differentiate PTSD and depression.

8  Q.   Well, I want to make sure that -- I'll give you a chance

9  here, but I want to make sure that I get a clear answer to the

10 question.

11 A.   Yes.

12 Q.   Those three disorders have clinical symptoms that are a

13 result of physical changes in the brain, right?

14 A.   There is an underlying neurobiology.

15 Q.   Okay.  The same kind of underlying -- not the same exact,

16 but in the same way that there's an underlying neurobiological

17 change for PTSD.

18 A.   And this is where the differentiation becomes important.

19        So what's unique about PTSD is that it has a defined

20 origin.  Right?  And so in PTSD you have to have a traumatic

21 event.  You don't have to have that for depression or an

22 anxiety disorder, or even a eating disorder.  So it is true

23 that -- let's say major depression has a neurobiological

24 basis, in the same way that PTSD has a neurobiological basis,

25 but what's different between them -- and, you know, this is

Cross - J. Cisler

B.R. v. F.C.S.B.

87

1  why I study PTSD -- is that the traumatic event is the origin

2  of the PTSD symptoms where we can't really link depression to

3  a defining cause in the same way.

4  Q.   Well, then let's talk about the studies then.  In your

5  studies of PTSD, were you comparing one person's brain from

6  before a traumatic event to after or were you comparing people

7  with PTSD against people without PTSD?

8  A.   Do you mean in my personal research studies or in the

9  field in general?

10 Q.   In your personal research studies?

11 A.   Yeah, you're referring to like a longitudinal study where

12 you might find someone before and after trauma and I have not

13 done those studies.

14 Q.   Okay.  But in the research that you were discussing, it

15 was comparing people with PTSD against people without PTSD,

16 correct?

17 A.   In the report that I provided, you know, I go over the

18 entire body of research.  What I've discussed today is kind of

19 a summary and some individual snapshots of that entire body.

20 The entire body of research does include longitudinal studies

21 that have looked at people's brains before and after trauma.

22 Q.   I understand that, but the jury is listening to you right

23 now in the courtroom today.

24         So in terms of what you have told the jury, it's

25 comparing people with PTSD against people without PTSD, right?

Cross - J. Cisler

B.R. v. F.C.S.B.

88

1   A.   Well, I would love to provide more information if that's

2   the case.

3   Q.   I understand.  I'm asking about what you testified to.

4   A.   Okay.

5   Q.   You were comparing people with PTSD against people

6   without PTSD in the studies that were being discussed and

7   shown on the screen, right?

8   A.   In these specific studies that I mentioned earlier, those

9   were what are called case-controlled studies, correct.

10  Q.   Now, everybody who has PTSD, they don't all have the same

11  brains, right?

12  A.   They do not.

13  Q.   And the differences that you have seen have varied among

14  people with PTSD, right?

15  A.   There is definitely individual variation amongst

16  individuals with PTSD.

17  Q.   Right.  And the same is true for people without PTSD,

18  right?

19  A.   That is true.

20  Q.   In fact, there is no way to -- there is no constant way

21  in which you can take people with PTSD and people without PTSD

22  and say that there's always going to be this kind of

23  difference between those two groups of people, right?

24  A.   In terms of brain function?

25  Q.   Yes.

B.R. v. F.C.S.B.

89

1   A.   I would, you know -- an interesting thing about our

2   mental health disorders is that in order to diagnose a mental

3   health disorder you -- the criteria is you need a certain

4   number of symptoms, not a certain one symptom.

5          So, like, if we just take the case of depression,

6   there is nine symptoms of depression.  In order to be

7   diagnosed with depression, you need five of them.  So there's

8   lots of combination of five that can result in that diagnosis.

9          Similar with PTSD, there is four different symptom

10  clusters, but you can have different combinations of symptoms

11  that meet criteria for those clusters.  So just in terms of

12  the symptoms, someone with PTSD -- two people with PTSD can

13  have very different symptoms.  So, again, based on the

14  understanding that the neurobiology is producing these

15  symptoms, if it is the case that people with PTSD can meet

16  criteria for PTSD but have different symptom presentations, we

17  would expect that there's going to be some underlying

18  variation neurobiology that produces those different symptoms.

19  Q.   Let me try to get at it from this direction, Dr. Cisler.

20  The studies you published you use magnetic resonance imaging,

21  right?

22  A.   Yes.

23  Q.   MRI?

24  A.   That's correct.

25  Q.   It's an image of a human brain?

─────B. R. v. F. C. S. B.─────

90

1    A.    Yes.

2    Q.    You can't look at an MRI and tell whether that person has

3    PTSD, can you?

4    A.    Well, I wouldn't if I was diagnosing someone, but there

5    are studies that have attempted to use some machine learning

6    approaches that have documented abilities for sensitivity and

7    specificity in diagnosing PTSD, but it is certainly not

8    standard to diagnose PTSD that way.

9    Q.    Well, let me put it this way.  You're a clinical

10   psychologist, right?

11   A.    Yes.

12   Q.    You see patients with PTSD?

13   A.    Correct.

14   Q.    You have a patient that comes in and presents with you at

15   the clinic and they are saying, I think I might have PTSD or

16   you suspect that there is PTSD, you don't send them out for a

17   brain scan before you diagnose them?

18   A.    I do not, no.

19   Q.    Because using the MRI doesn't tell you yes or no does

20   this person have PTSD, does it?

21   A.    Well, that's a separate question.  Is an MRI the best

22   diagnostic tool?  The answer to that is "no."  The best

23   diagnostic tools that we have are structured clinical

24   interviews.  But that's a different question from asking me:

25   Does a MRI contain information that would carry a diagnosis?

─────── B.R. v. F.C.S.B. ───────

91

1    Q.    Okay.

2    A.    Or be consistent with a diagnosis.  And I think it would.

3    And that's, you know, the basis of my research is that we do

4    MRI's with people with PTSD and we characterize those

5    differences.

6    Q.    While you were talking about criteria for PTSD and what

7    you would use to diagnose, right?  You wouldn't use an MRI?

8    A.    I would not.

9    Q.    You would use the criteria from the DSM-V, right?

10   A.    I would.

11   Q.    That's the Diagnostic and Statistical Manual of Mental

12   Disorders, correct?

13   A.    That's correct.

14   Q.    And there's -- you talked about how in depression there's

15   maybe nine and you have to have a certain number of them?

16   A.    That's correct.

17   Q.    Same thing is true for PTSD?

18   A.    That's correct.

19   Q.    In general terms, right?

20   A.    Yes.

21   Q.    Sort of checklist of symptoms and you go through and you

22   look and see if they have one of these four and then these

23   four, that's how you can reach a diagnosis of PTSD?

24   A.    That's correct.

25   Q.    Okay.  And one of those criteria is exposure to a form of

─────B.R. v. F.C.S.B.─────

92

1  trauma, right?

2  A.   Yes.

3  Q.   That trauma doesn't have to be a physical trauma, does

4  it?

5  A.   It does not.

6  Q.   In fact, you might have a -- just for instance, a soldier

7  who is in a war zone --

8  A.   Yes.

9  Q.   -- might witness some kind of traumatic event --

10  A.   Absolutely.

11  Q.   -- and that person could develop PTSD?

12  A.   That's possible, yes.

13  Q.   Or if I got a phone call that a loved one had been badly

14  injured and I didn't even witness it, but I found out about

15  it, I could develop PTSD from that?

16  A.   That's possible, yes.

17  Q.   And so, the physical changes that might manifest in my

18  brain, those aren't the result of some physical trauma, are

19  they?

20  A.   Yes.  So this is what I was trying to describe.  We have

21  an external stressor and, you know, the external stressor

22  could be -- to use your example -- you could be in war and you

23  could witness your fellow soldiers getting shot.  You don't --

24  you didn't get shot yourself, you could witness that.  And our

25  understanding is that that is a type of stressor.  So a

B.R. v. F.C.S.B.

1  stressor could be directly physically experience yourself or

2  something stressful could be witnessing it happening to

3  someone else.  The underlying neurobiology in both of those

4  cases as a stressor would be that cascade of a glucocorticoid

5  responses that I described earlier.

6          So, yes, it certainly could happen in something that

7  doesn't physically happen to you, but the underlying stress

8  response would be similar.

9  Q.   Okay.  So let me try to make sure I understand.  That

10 external stressor doesn't have to be itself a physical injury,

11 right?

12 A.   It does not, correct.

13 Q.   So in your opinion, though, the soldier who witnesses

14 something or the family member who gets a phone call, who has

15 PTSD, they have suffered a physical injury because of your

16 opinion, right?

17         MR. KEEFE:  Objection, Your Honor.  This is not the

18 opinions he offered in this case.

19         THE COURT:  Overruled.  He can explain.

20         THE WITNESS:  Sorry.  Can you repeat the question?

21 BY MR. ELLIKER:

22 Q.   Sure.  And maybe I can simplify it a little bit.

23         Let's take the soldier.  In your opinion, the

24 soldier who is not physically injured in the war zone has

25 nevertheless suffered a physical injury because he has PTSD?

B.R. v. F.C.S.B.

94

1   A.   If the soldier develops PTSD as a result of seeing the

2   fellow soldiers shot, the current scientific understanding

3   would be that the only thing that could produce those stable

4   changes and emotions and behavior that meet the criteria for

5   PTSD would be underlying neurobiological changes.

6               THE COURT:  You're at 25 minutes.

7               MR. ELLIKER:  I apologize, Your Honor.

8   BY MR. ELLIKER:

9   Q.   Those underlying neurobiological changes that's the

10  physical injury you testified with Mr. Keefe, right?

11  A.   It would be the same neurobiology, that's correct.

12  Q.   And when you're looking at MRI of someone with PTSD,

13  compared to somebody without, you may see some differences but

14  you couldn't tell whether those differences were from someone

15  with PTSD who suffered a physical trauma versus an emotional

16  trauma, can you?

17  A.   That's -- that's a good -- that's a good point.

18  Q.   Is the answer, yes?

19  A.   Can I give a qualified answer?

20              THE COURT:  You can answer it anyway you want to,

21  Doctor.

22              THE WITNESS:  So this is coming back to why in my

23  report I went over the animal studies that probably seemed

24  irrelevant and, you know, maybe seemed like I was being overly

25  technical.  In what I described earlier, the relevance of the

B.R. v. F.C.S.B.

95

1    animal studies is that it allows us to address some of the

2    difficulties that we have interpreting the human studies.

3    Right?  So being able to take an animal and randomly assign

4    that animal to either receive the laboratory version of the

5    trauma or not is very important, because it allows us to know

6    that before the trauma all these animals started out equal and

7    if we see differences afterwards, we can very clearly

8    associate it with a traumatic event.

9          So that's a very foundational piece of information

10   that's relevant for us to carry forward in this conversation

11   about if we're looking at a single brain scan of someone who

12   has PTSD.  So let's say we see that difference in that

13   individual who has PTSD and now we want to say:  Where did

14   that come from?  Right?  So was it there before the trauma or

15   is it unique to after the trauma, because I only have the scan

16   after the trauma.  And it is absolutely the case that in that

17   one isolated incident I don't know.  Right?

18         But this is why it was very important to have

19   discussed the animal studies because the fact that we see the

20   same differences in the animal studies where we know where

21   that difference came from in the human studies where it's

22   murky and we could argue maybe it preexisted, maybe it was due

23   to something else.  The fact that we see those line up so

24   well, gives us much better confidence in interpreting the

25   results for our brain studies.

B. R. v. F. C. S. B.

96

1  BY MR. ELLIKER:

2  Q.   So let me ask the question, then.  If you're comparing

3  MRI's between folks with PTSD and folks without PTSD, you

4  can't by looking at people who have been diagnosed with PTSD

5  tell whether that is something that came from a physical

6  trauma or an emotional trauma?

7  A.   In that one single MRI it would be very hard to tell if a

8  difference was -- and the person experienced both physical or

9  emotional, it would be very difficult to isolate was one

10 difference due to physical or was one difference due to

11 emotional, yes.

12 Q.   And it's fair to say that not everyone who has a

13 traumatic experience develops PTSD, right?

14 A.   That is true, correct.

15 Q.   And not everyone who experiences a trauma will experience

16 a structural change to their brain?

17 A.   I don't know about that.

18 Q.   Okay.  Now, Mr. Keefe asked you at the start of your

19 testimony if you reached your opinions in this case with a

20 reasonable degree of certainty; do you remember that?

21 A.   Yes.

22 Q.   Okay.  That's not the word that you use in your expert

23 report, is it?

24 A.   I don't know, but I think you're about to tell me.

25 Q.   Okay.  Fair enough.  In your expert report, you use the

B.R. v. F.C.S.B.

97

1    word "a fair" -- "a reasonable degree of probability"; do you

2    remember that?

3              MR. KEEFE:  Objection, Your Honor.  Misstates the

4    report.  I ask that you read the entire --

5              THE COURT:  Read from the report.

6              You may approach.

7              MR. ELLIKER:  Thank you, Your Honor.  Sorry.

8              THE WITNESS:  The summary of opinions paragraph?

9              THE COURT:  Look at what he's pointed out to you,

10   read it to yourself.

11             MR. ELLIKER:  And for the record, it's the paragraph

12   that's above the page on your expert report that says, "Roman

13   Numeral III, summary of opinions."

14             THE WITNESS:  Above that?

15             MR. ELLIKER:  And just let me know when you've read

16   that.

17             THE WITNESS:  Okay.

18   BY MR. ELLIKER:

19   Q.   Does that refresh your recollection that you expressed

20   your opinions with a reasonable professional medical -- within

21   a reasonable professional, medical, and scientific

22   probability?

23   A.   Yes.

24   Q.   There's a difference between "certainty" and

25   "probability," right?

—B.R. v. F.C.S.B.—

98

1  A.   Yes.

2  Q.   And in your field, you don't talk about things that

3  you've studied as reaching an absolute certain conclusion, do

4  you?

5  A.   That's correct.

6  Q.   You talk about things in probabilities?

7  A.   You do.

8  Q.   But at the start of your testimony you said -- well, I'll

9  move on.

10        THE COURT:  How much longer are you going to take?

11        MR. ELLIKER:  With the Court's indulgence, 10

12  minutes.

13        THE COURT:  All right.

14  BY MR. ELLIKER:

15  Q.   Now, as a clinical psychologist, are you familiar with

16  the concept of malingering?

17  A.   Yes.

18        MR. KEEFE:  Objection, Your Honor.  Beyond the scope

19  of his opinions in this case.

20        MR. ELLIKER:  I'll move on.

21        THE COURT:  All right.

22  BY MR. ELLIKER:

23  Q.   You were told in this case that the plaintiff was

24  diagnosed with PTSD, correct?

25  A.   That's correct.

Cross - J. Cisler

─B. R. v. F. C. S. B.─

99

1   Q.   But you are also aware of other diagnoses that she's

2   been --

3            MR. KEEFE:  Objection, beyond the scope of his

4   opinions in this case.

5            MR. ELLIKER:  It's the underlying --

6            THE COURT:  You can ask a foundational question.  Go

7   ahead.

8   BY MR. ELLIKER:

9   Q.   You are also aware that Dr. Ryan identified additional

10  conditions in this plaintiff, right?

11  A.   Yes.

12  Q.   Including major depressive disorder?

13  A.   Yes.

14  Q.   And eating disorder?

15  A.   Yes.

16  Q.   And if you looked at someone's MRI who has that

17  constellation of a diagnoses:  PTSD, major depressive order,

18  and eating disorder, could you identify what changes in their

19  brain were associated with which of those disorders?

20            MR. KEEFE:  Same objection as before.

21            THE COURT:  Overruled.

22            THE WITNESS:  Sorry, ask that again.

23  BY MR. ELLIKER:

24  Q.   Sure.  Earlier we talked about how those disorders, the

25  clinical symptoms, are the result of neurobiological changes,

B.R. v. F.C.S.B.

100

1  right?

2  A.   Yes.

3  Q.   Those neurobiological changes could be observed in an

4  MRI, right?

5  A.   Yes.

6  Q.   If you had someone with that combination of conditions

7  --

8  A.   Yes.

9  Q.   -- you couldn't parse out which changes were attributable

10  to which disorder, could you?

11  A.   Well, they are not entirely overlapping neurocircuitry,

12  but they will involve overlapping processes.  So, yeah, I'm

13  pausing in giving you a direct answer because it's slightly

14  more complicated than saying that having comorbid conditions

15  means that you can't attribute brain changes to anything.  I

16  mean the reality of our mental health disorders is that they

17  tend to be comorbid.  Right?  So finding someone who only has

18  PTSD is very rare.  You're more likely to find people who have

19  comorbid conditions.  So what that means, in terms of the

20  research, is that when we study research or when we study

21  people who have PTSD and compare them with people without

22  PTSD, that we do -- those people with PTSD had, for the most

23  part, comorbid conditions.  So that's one important piece of

24  knowledge.

25           And the second important piece of knowledge is that

B.R. v. F.C.S.B.

101

1   in these case-control studies it is not the case that people

2   with PTSD are only compared to healthy controls.  There also

3   have been meta-analyses where people with PTSD have been

4   compared to people with depression.  And in those cases, you

5   actually do find that the hippocampal differences tend to be

6   larger in people with PTSD.

7           So this is a longwinded way of saying that -- I

8   don't know if I would agree that because someone has comorbid

9   conditions that you couldn't necessarily isolate any

10  observable differences to PTSD.  Some of them actually may be

11  clearly due to PTSD but some might not, so it's complicated.

12  Q.   It sounds complicated.

13          Let's talk about in a clinical setting.

14  A.   Sure.

15  Q.   You are treating a patient.  But as a part of that

16  clinical you're taking information and maybe applying it to

17  your research.

18  A.   Okay.

19  Q.   You have one patient that has PTSD, major depression,

20  anxiety disorder?

21  A.   Yes.

22  Q.   You have another patient who has anxiety disorder and an

23  eating disorder, all of those things except for PTSD.  If you

24  put those two MRI's next to each other, you wouldn't be able

25  to tell who had which disorders, could you?

B.R. v. F.C.S.B.

102

1          Just by looking at the MRI's.

2   A.    Uhm.

3   Q.    Not probabilistically just by looking at those two MRI's?

4   A.    By looking -- well, I actually think that -- like I

5   mentioned earlier that there is some machine algorithms who

6   can, let's say, you know, quantify brain-wide differences in

7   grey matter and have been trained to make a prediction about

8   PTSD versus non-PTSD and that's been -- if the control that

9   you just described is in that sample size, because it's

10  trained the classifier, it would still -- and the classifier

11  worked -- it would still be able to make a prediction about

12  PTSD.  And that classifier would be applied two single data

13  sets.  So you would be able to get a prediction.

14          So to answer your question, I certainly think it's

15  possible and that's kind of where the cutting edge research is

16  right now.  But, to your point, I would also say that I, as a

17  clinician, wouldn't use an MRI in that case to diagnose PTSD

18  or to diagnose the depression.  I still think for diagnostic

19  reasons what's going to be most accurate is getting the

20  symptom histories.

21          THE COURT:  Two more minutes.

22  BY MR. ELLIKER:

23  Q.    And the machine learning and all that stuff you talked

24  about, you wouldn't use that because that's all theoretical

25  based on probabilities, right?

─────B.R. v. F.C.S.B.─────

103

 1  A.   It is not theoretical.

 2  Q.   But it's based on probability, it is not certainty?

 3  A.   Well, the reality of everything that we do clinically is

 4  not based on certainty, it's also based on probability.  So if

 5  we use any diagnostic tool.

 6          So, for example, the COVID test that we are all very

 7  familiar with, those COVID test were based on probabilities,

 8  it wasn't a certainty either.

 9          So, yes, it's true that there's not certainty, but,

10  you know, we live in a world of probability.

11  Q.   Okay.  Let me wrap up here.  You didn't receive any MRI

12  from the plaintiff, did you?

13  A.   I did not.

14  Q.   Okay.  And you don't know if she's received an MRI, do

15  you?

16  A.   I do not know.

17  Q.   So without an MRI you couldn't say what the plaintiff's

18  brain looks like, could you?

19  A.   I could not, no.

20  Q.   You understand that she was 12 years old during the

21  events in this case?

22  A.   That sounds familiar.

23  Q.   She's about 24 years old now?

24  A.   Okay.

25  Q.   And so, she would have experienced physical changes in

B.R. v. F.C.S.B.

104

1  her brain from 12 to 24 no matter what, right?

2  A.    Do you mean just as a function of normative development?

3  Q.    Yes.

4  A.    Yes.

5  Q.    And if we accept your theory the eating disorder has

6  caused physical changes in her brain, right?

7  A.    Well, I -- again, I don't want to speak too much about

8  eating disorders.

9  Q.    Okay.  Whether or not the plaintiff had PTSD her brain

10  would look different today compared to what it looked like

11  12 years ago?

12  A.    Absolutely.

13  Q.    Okay.  And even if you had an MRI from 2011 and you

14  compared it to 2024, based on the information you received in

15  this case, you can't tell what effect any one mental health

16  condition would have had on her brain, could you?

17  A.    If I had an MRI of her brain in 2011 and I had an MRI of

18  her brain now, it would be very difficult to link any

19  differences between those to anything.  Given all the

20  environmental experiences, given normative adolescent

21  trajectories developing into adulthood that's absolutely

22  correct.

23        MR. ELLIKER:  Thank you, Doctor.  Thank you for the

24  indulgence, Your Honor.

25        THE COURT:  Redirect.

B.R. v. F.C.S.B.

105

1          MR. KEEFE:  Briefly.

2          THE COURT:  Yes, sir.

3                    REDIRECT EXAMINATION

4    BY MR. KEEFE:

5    Q.   One thing I would like to just give you a chance to clear

6    up is this distinction, to the extent there is any, between a

7    change in their injuries.  So let me pose a hypothetical.

8    A.   Sure.

9    Q.   First, PTSD, you testified I think on cross, is a change

10   in the brain in response to a traumatic event?

11   A.   Correct.

12   Q.   If I walk across the street and a car hits my leg and it

13   breaks --

14   A.   Yes.

15   Q.   -- is that a change in an event to a traumatic event?

16   A.   Yes.

17   Q.   Sorry.  Let me rephrase that.  A change in response to a

18   traumatic event?

19   A.   Yes.

20   Q.   Is it also, in common parlance, an injury?

21   A.   In common parlance an injury, yes, but that is not what

22   my expertise is in, defining what an injury is.

23          MR. KEEFE:  That's all I have.  Thank you.

24          THE COURT:  Thank you.  Is the witness subject to

25   recall?

B.R. v. F.C.S.B.

106

1          MR. ELLIKER:  No, Your Honor

2          MR. KEEFE:  No, Your Honor.

3          THE COURT:  All right.  Safe travels.  You're

4    excused.  Please do not discuss the case or any aspect of the

5    case with anyone while the case is pending.

6          (Witness excused.)

7          THE COURT:  I think we're at a stopping point for

8    the day.  Because I believe the next witness is Ms. R. and

9    that is going to take some time.

10          Ladies and gentlemen of the jury, I'm going to

11    excuse you for the day.  As you recall, tomorrow we're going

12    to start at 10 o'clock, 10 o'clock.  So if we get you back in

13    about 9:45 so that we can start as close to 10:00 as possible.

14    I don't have another docket that I need to attend to so we

15    should probably be able to start right at 10:00.

16          Please remember, do not discuss the case or any

17    aspect of the case with anyone --

18          Did you have a question?

19          THE JUROR: She has a question.

20          (A pause in the proceedings.)

21          THE COURT:  Apparently I do have something else on

22    my docket tomorrow that I think was recently placed on, but

23    it's an arraignment.  Typically we can do those in about five

24    minutes.  But please stay away from social media and stay away

25    from the print media to the extent you can.  If anyone

─B. R. v. F.C.S.B.─

107

1    approaches you about the case in any way, please report it to

2    the Court.

3              All right.  Thank you, ladies and gentlemen.

4              (Jury excused.)

5              THE COURT:  You may be seated.

6              Ms. Anderson, are you doing Ms. R.'s examination?

7              MS. ANDERSON:  I am, Your Honor.

8              THE COURT:  How long do you think?

9              MS. ANDERSON:  I think it's about five hours.

10             THE COURT:  All right.  The examination of Ms. R. is

11   going to take five hours from the plaintiff's side.  The

12   defendants about three hours?

13             MS. REWARI:  Your Honor, I believe she's already

14   testified for an hour or two before, so I would imagine I

15   would need at least five hours myself.

16             THE COURT:  Five hours, for direct examination it

17   took five hours?

18             MS. REWARI:  She's also on our list so I'm hoping

19   that we can just have her once.

20             THE COURT:  All right.  We're going to finish her

21   examination tomorrow one way or the other.  So you all need to

22   put your heads together to figure out how we can do this.

23   She's already testified once and I appreciate that only one

24   side had a real opportunity to examine, but, you know, there

25   has to be a natural end to every examination.

─────B. R. v. F.C.S.B.─────

108

1              So put your heads together and see if you can come

2     up with a way to fit it in during the entirety of the 10:00 to

3     4:00 tomorrow with a lunch break in the middle.

4              MS. ANDERSON:  Yes, Your Honor.

5              THE COURT:  Very good.

6

7              **(Proceedings adjourned at 1:48 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4   the Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Jury Trial

7   in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8   Action No.: 1:19-cv-917, in said court on the 3rd day of

9   April, 2024.

10         I further certify that the foregoing 125 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16  name, this August 26, 2024.

17

18

19

20

21  _____
    Tonia M. Harris, RPR
22  Official Court Reporter

23

24

25

## $

**$50** [11] - 27:20, 28:20, 28:25, 29:6, 29:8, 29:13, 29:16, 29:20, 29:21, 29:24, 29:25

## 0

**05** [1] - 4:10

## 1

**1** [4] - 7:23, 31:17, 31:20, 83:18
**10** [3] - 98:11, 106:12
**100** [6] - 2:2, 2:6, 2:10, 55:15, 56:2
**105** [1] - 4:8
**109** [2] - 4:10, 109:10
**10:00** [3] - 106:13, 106:15, 108:2
**11** [1] - 59:8
**11:13** [1] - 1:6
**12** [8] - 1:8, 4:4, 19:24, 24:3, 25:4, 103:20, 104:1, 104:11
**12-year-old** [1] - 19:23
**120** [2] - 3:6, 53:13
**12:50** [2] - 66:25
**12:59** [1] - 67:4
**13** [1] - 25:4
**14** [1] - 14:12
**14th** [1] - 29:18
**15** [1] - 67:8
**1520** [1] - 1:20
**16** [1] - 60:1
**17** [1] - 59:8
**1775** [1] - 3:9
**18** [1] - 58:25, 59:14, 59:18
**1801** [1] - 3:6
**1:19-cv-917** [2] - 1:4, 109:8
**1:48** [1] - 108:7

## 2

**2** [2] - 12:5, 16:10
**20** [5] - 49:25, 50:3, 55:25, 67:1, 67:7
**200** [3] - 15:19, 16:22, 31:11
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2011** [3] - 13:3, 104:13, 104:17
**2012** [3] - 13:10, 16:24, 23:25
**2016** [1] - 39:8

**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2021** [1] - 39:8
**2024** [4] - 1:6, 104:14, 109:9, 109:16
**2029-Century** [1] - 1:19
**21** [1] - 15:6
**213-995-5720** [1] - 1:21
**21st** [6] - 13:11, 19:21, 26:14, 26:21, 28:7, 30:20
**22** [1] - 15:6
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**2300** [1] - 1:15
**24** [2] - 103:23, 104:1
**25** [1] - 94:6
**2800** [3] - 2:3, 2:7, 2:11
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**3** [1] - 1:6
**30** [1] - 4:5
**30-second** [1] - 8:24
**305-539-8400** [1] - 2:8
**32** [1] - 4:7
**33131** [3] - 2:3, 2:7, 2:11
**3rd** [1] - 109:8

## 4

**400** [1] - 3:10
**401** [1] - 3:13
**4:00** [1] - 108:3

## 5

**5** [1] - 109:16
**50** [3] - 55:14, 55:15, 56:2
**53** [1] - 83:18

## 6

**610-804-1787** [1] - 2:4
**643a** [1] - 1:16

**67** [1] - 4:7

## 7

**77** [1] - 16:10
**7th** [1] - 24:19

## 8

**804-788-8200** [1] - 3:2
**850-585-3414** [1] - 2:12
**8th** [1] - 24:21

## 9

**90067** [1] - 1:20
**9:45** [1] - 106:13

## A

**A.F** [1] - 3:6
**A.J** [3] - 16:16, 19:2, 19:3
**a.m** [1] - 1:6
**A.M** [1] - 1:8
**abilities** [1] - 90:6
**ability** [3] - 9:24, 68:14, 109:14
**able** [14] - 5:10, 11:24, 12:3, 27:15, 49:17, 55:14, 63:16, 64:12, 66:23, 95:3, 101:24, 102:11, 102:13, 106:15
**abrenner@bsfllp.**
**com** [1] - 2:8
**absence** [1] - 60:11
**absolute** [1] - 98:3
**absolutely** [7] - 23:17, 27:8, 73:4, 92:10, 95:16, 104:12, 104:21
**abuse** [1] - 36:18
**academia** [1] - 40:23
**academic** [5] - 39:4, 41:22, 42:1, 44:1, 46:3
**accept** [2] - 48:14, 104:5
**accepted** [1] - 48:23
**accidents** [1] - 11:17
**accommodate** [1] - 12:7
**accomplished** [1] - 73:23
**according** [2] - 15:4, 21:4
**account** [1] - 10:22
**accurate** [4] - 75:18,

75:24, 76:2, 102:19
**accusations** [1] - 70:20
**achieved** [1] - 39:5
**act** [1] - 72:3
**Action** [2] - 1:4, 109:8
**action** [1] - 29:4
**actions** [1] - 9:23
**activity** [1] - 20:1
**actual** [2] - 43:18, 54:12
**add** [1] - 8:16
**addition** [1] - 41:25
**additional** [1] - 99:9
**address** [3] - 8:5, 32:18, 95:1
**adds** [1] - 8:19
**adduced** [1] - 109:6
**adjourned** [1] - 108:7
**adjustment** [7] - 82:5, 82:6, 84:18, 84:20, 84:23, 84:24
**administer** [2] - 43:1, 68:15
**administration** [1] - 71:24
**administrators** [1] - 13:16
**admitted** [3] - 15:18, 30:13, 31:12
**admitting** [1] - 23:21
**adolescent** [7] - 37:15, 53:13, 53:18, 53:20, 54:5, 59:19, 104:20
**adolescents** [7] - 36:18, 56:22, 57:6, 57:15, 59:6, 59:7
**adult** [5] - 59:12, 59:14, 59:16, 59:25, 60:3
**adulthood** [1] - 104:21
**adults** [9] - 56:21, 56:24, 57:5, 57:6, 57:8, 57:15, 58:24, 59:3, 59:12
**Adversity** [2] - 39:13, 39:24
**advise** [1] - 71:3
**advised** [1] - 5:24
**afraid** [2] - 19:25, 20:2
**afternoon** [1] - 10:9, 67:19
**afterwards** [1] - 95:7
**age** [5] - 25:4, 58:25, 59:14, 59:18, 60:3
**agencies** [1] - 68:12
**agency** [4] - 41:19, 46:14, 46:15, 46:16
**agenda** [1] - 46:16

**ages** [1] - 59:8
**ago** [2] - 6:3, 104:11
**agree** [4] - 8:9, 11:7, 69:7, 101:8
**agreed** [3] - 25:19, 73:15, 85:20
**agreement** [2] - 9:11, 11:11
**ahead** [2] - 66:21, 99:7
**aim** [1] - 67:7
**al** [2] - 1:6, 109:7
**alanderson@bsfllp.**
**com** [1] - 1:21
**alarmed** [1] - 8:22
**Alexandria** [1] - 3:14
**algorithms** [1] - 102:5
**Alison** [1] - 1:18
**allegations** [1] - 77:5
**allow** [5] - 49:7, 49:8, 49:24, 51:10, 85:11
**allowing** [1] - 50:19
**allows** [10] - 45:5, 48:1, 48:5, 50:3, 50:24, 51:6, 53:24, 60:1, 95:1, 95:5
**alone** [2] - 21:19, 55:8
**ALSTON** [1] - 1:11
**alterations** [4] - 81:23, 82:18, 82:21, 83:20
**altered** [1] - 48:3
**alters** [2] - 33:12, 52:16
**Amendment** [1] - 73:2
**America** [2] - 40:21, 46:14
**American** [3] - 41:6, 41:7, 76:7
**amygdala** [10] - 51:8, 51:14, 51:16, 52:19, 53:22, 53:23, 56:25, 57:1, 58:14
**analogous** [3] - 52:21, 52:23, 52:25
**analogy** [5] - 44:19, 47:15, 51:16, 58:18, 58:19
**analyses** [2] - 56:8, 101:3
**analysis** [2] - 55:23, 56:12
**analytic** [1] - 57:18
**ANDERSON** [27] - 5:2, 5:17, 12:12, 12:19, 15:17, 15:22, 15:25, 16:2, 16:9, 16:12, 16:14, 30:3, 30:5, 31:4, 31:8, 69:25, 70:3, 70:6, 70:8, 70:11, 71:20, 72:8, 72:10, 72:14, 107:7,

107:9, 108:4
**Anderson** [8] - 1:18, 5:24, 7:2, 8:22, 12:11, 69:23, 70:12, 107:6
**Anderson's** [1] - 10:9
**Anderson...........** [1] - 4:4
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**animal** [17] - 48:25, 49:3, 49:4, 49:6, 49:7, 49:24, 50:11, 52:21, 52:24, 53:6, 94:23, 95:1, 95:3, 95:4, 95:19, 95:20
**animals** [7] - 49:9, 51:1, 51:4, 51:6, 51:12, 51:14, 95:6
**ANSWER** [6] - 63:18, 83:22, 83:24, 84:4, 84:7, 84:9
**answer** [18] - 12:24, 22:15, 22:19, 32:12, 32:15, 45:25, 68:24, 77:11, 79:25, 80:17, 81:16, 86:9, 90:22, 94:18, 94:19, 94:20, 100:13, 102:14
**answered** [1] - 24:21
**answering** [1] - 32:14
**anticipate** [2] - 67:5, 67:10
**anxiety** [22] - 42:6, 44:14, 45:4, 45:8, 45:9, 47:8, 48:4, 54:1, 82:9, 82:14, 82:16, 82:17, 82:20, 82:23, 84:1, 84:20, 84:21, 85:20, 86:4, 86:22, 101:20, 101:22
**anyway** [2] - 27:17, 94:20
**apologize** [2] - 80:6, 94:7
**APPEARANCES** [3] - 1:13, 1:25, 2:25
**applicant's** [1] - 41:21
**applied** [1] - 102:12
**apply** [3] - 39:1, 60:14, 81:1
**applying** [1] - 101:16
**appointment** [1] - 26:15
**appreciate** [1] - 7:16, 7:18, 7:22, 8:6, 10:7, 12:24, 68:9, 68:10,

73:23, 73:25, 107:23
**appreciated** [1] - 7:15
**approach** [4] - 7:18, 15:25, 83:12, 97:6
**approaches** [2] - 90:6, 107:1
**appropriate** [1] - 9:25
**appropriately** [1] - 9:24
**April** [3] - 1:6, 109:9, 109:16
**area** [2] - 25:6, 62:13
**argue** [2] - 68:23, 95:22
**argument** [2] - 50:22, 52:2
**arise** [1] - 6:12
**Arkansas** [3] - 35:21, 36:21, 37:20
**arm** [1] - 47:17
**arraignment** [1] - 106:23
**arrangement** [1] - 9:3
**article** [5] - 6:1, 6:4, 6:13, 6:15, 69:22
**aspect** [3] - 11:25, 106:4, 106:17
**assault** [12] - 33:11, 36:16, 37:16, 38:6, 38:20, 39:20, 53:19, 53:20, 58:24, 59:7, 59:9, 59:13
**assessment** [1] - 43:6
**assign** [3] - 49:8, 49:23, 95:3
**assistance** [1] - 33:17
**assistant** [3] - 20:8, 25:19, 38:14
**associate** [4] - 39:10, 39:12, 39:23, 95:8
**associated** [6] - 7:21, 38:19, 65:17, 75:1, 82:17, 99:19
**Association's** [1] - 76:8
**assume** [1] - 77:24
**assumed** [1] - 76:1
**assuming** [1] - 5:15
**assumption** [1] - 10:7
**attempt** [1] - 7:15
**attempted** [1] - 90:5
**attend** [1] - 106:14
**attention** [3] - 5:25, 10:9, 68:9
**attributable** [1] - 100:9
**attribute** [2] - 47:19, 100:15
**audience** [1] - 6:8
**August** [1] - 29:18

Austin [1] - 39:11
**available** [2] - 7:24, 11:9
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**avoid** [2] - 7:18, 47:9
**award** [2] - 41:17, 41:20
**awards** [2] - 41:1, 41:4
**aware** [5] - 26:17, 47:14, 76:15, 99:1, 99:9

## B

**B.H** [1] - 3:6
**B.R** [4] - 1:3, 63:2, 63:6, 109:7
**background** [1] - 64:10
**backup** [1] - 109:13
**badly** [1] - 92:13
**balanced** [1] - 8:18
**bar** [5] - 5:23, 7:13, 53:21, 62:22, 69:2
**BARAN** [1] - 1:14
**barging** [1] - 27:6
**bars** [6] - 56:14, 56:20, 57:22, 58:7, 58:10, 58:13
**based** [30] - 29:23, 35:2, 41:20, 43:4, 43:25, 46:2, 47:6, 48:23, 54:9, 54:10, 60:20, 60:23, 61:8, 61:12, 61:20, 63:24, 65:2, 65:12, 65:24, 75:21, 77:12, 77:18, 89:13, 102:25, 103:2, 103:4, 103:7, 104:14
**basement** [7] - 19:14, 20:15, 20:23, 21:2, 21:10, 21:11, 23:21
**bases** [2] - 35:6, 44:8
**basis** [10] - 33:15, 43:5, 45:17, 75:20, 79:9, 85:4, 86:6, 86:24, 91:3
**BATES** [8] - 30:7, 30:12, 30:17, 31:2, 31:11, 31:15, 32:3, 72:20
**Bates** [5] - 2:13, 13:2, 19:12, 21:13, 24:18
**Bates...............** [1] - 4:5
**became** [2] - 9:6, 42:10

**become** [2] - 30:9, 59:24
**becomes** [2] - 44:15, 86:18
**BEFORE** [1] - 1:11
**began** [1] - 42:11
**beginning** [1] - 9:3
**behalf** [1] - 4:2
**behavior** [3] - 47:17, 74:24, 94:4
**Behavior** [2] - 41:16, 41:18
**behavioral** [7] - 45:14, 45:18, 45:20, 47:18, 47:19, 54:11, 65:16
**behaviors** [2] - 65:5, 65:6
**benefit** [1] - 38:24
**best** [9] - 7:16, 8:18, 12:24, 32:12, 64:7, 90:21, 90:22, 109:14
**better** [2] - 33:18, 95:24
**between** [23] - 20:21, 21:5, 23:10, 27:23, 28:17, 29:3, 37:15, 49:18, 56:15, 56:24, 57:1, 57:24, 59:7, 69:6, 71:11, 84:18, 84:23, 86:25, 88:23, 96:3, 97:24, 104:19, 105:6
**beyond** [3] - 81:4, 98:18, 99:3
**big** [3] - 21:1, 56:15, 58:4
**bigger** [2] - 51:17, 56:19
**binding** [1] - 52:11
**Binks** [1] - 75:14
**bit** [4] - 35:7, 68:2, 85:11, 93:22
**bitch** [1] - 22:11
**blah** [3] - 11:1
**blame** [1] - 75:2
**BLANCHARD** [4] - 5:3, 5:5, 5:13, 67:12
**Blanchard** [3] - 3:8, 5:6, 67:9
**block** [1] - 44:20
**board** [1] - 28:21
**Board** [4] - 67:20, 69:25, 70:11, 70:14
**bodies** [1] - 53:7
**body** [9] - 40:21, 46:24, 47:12, 50:15, 53:5, 55:24, 87:18, 87:19, 87:20
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10

**boss** [3] - 15:10, 17:6, 52:2
**boss's** [2] - 15:10, 17:6
**bottom** [5] - 47:1, 58:12, 58:13, 73:25, 74:7
**boy** [1] - 20:1
**boyfriend** [1] - 20:21
**brain** [108] - 33:12, 34:2, 34:6, 34:21, 34:24, 37:5, 37:6, 37:7, 37:15, 37:23, 40:14, 43:24, 44:3, 44:12, 44:14, 44:16, 44:17, 45:3, 45:5, 46:2, 46:6, 47:23, 47:24, 48:3, 48:5, 48:8, 50:7, 50:8, 51:10, 51:21, 52:11, 52:12, 52:13, 52:15, 52:17, 52:18, 52:23, 52:24, 53:4, 54:12, 54:17, 55:5, 55:7, 56:18, 56:19, 57:3, 57:9, 57:15, 59:1, 59:10, 59:16, 59:21, 60:2, 60:5, 60:7, 64:1, 64:14, 64:24, 65:7, 65:10, 65:11, 66:1, 66:6, 66:10, 74:20, 74:25, 77:20, 77:21, 78:5, 78:8, 79:5, 79:16, 79:24, 80:4, 80:13, 81:1, 81:14, 81:23, 82:22, 83:6, 83:21, 83:25, 84:2, 84:6, 84:14, 85:23, 86:6, 86:13, 87:5, 88:24, 89:25, 90:17, 92:18, 95:11, 95:25, 96:16, 99:19, 100:15, 102:6, 103:18, 104:1, 104:6, 104:9, 104:16, 104:17, 104:18, 105:10
**Brain** [8] - 36:20, 37:1, 37:21, 38:2, 38:9, 38:12, 41:16, 41:17
**brain-wide** [1] - 102:6
**brains** [4] - 52:21, 52:22, 87:21, 88:11
**branching** [5] - 51:2, 51:3, 51:13, 58:21, 78:24
**break** [8] - 12:8, 12:10, 66:21, 66:22, 67:21, 67:22, 69:10, 108:3

breaks [1] - 105:13
BRENNER [18] - 8:4,
  8:8, 8:11, 8:15, 8:20,
  9:17, 10:3, 10:13,
  10:17, 10:23, 11:2,
  11:7, 69:7, 69:14,
  71:1, 72:7, 72:17,
  72:22
Brenner [3] - 2:5,
  7:15, 69:3
briefly [4] - 5:3, 41:1,
  57:20, 105:1
bring [10] - 5:1, 18:5,
  29:8, 33:22, 34:19,
  43:19, 45:23, 46:8,
  56:9, 57:19
brings [1] - 45:24
Brittany [1] - 2:1
britzoll@gmail.com
  [1] - 2:4
broadly [2] - 33:10,
  39:25
broken [1] - 14:23
brother [2] - 7:4, 7:11
brought [3] - 10:8,
  29:6, 68:9
Brown [2] - 40:25,
  43:19
brown [8] - 10:16,
  11:4, 17:9, 45:23,
  46:8, 56:9, 57:19,
  65:20
Bruce [2] - 3:8, 5:5
bruce.blanchard@
  ofplaw.com [1] -
  3:11
burst [1] - 45:1
Burton [1] - 2:20
burtons@huntonak.
  com [1] - 2:23
bus [2] - 18:19, 24:19
business [1] - 21:9
BY [32] - 12:19, 15:22,
  16:2, 16:14, 30:17,
  31:15, 32:22, 33:25,
  36:9, 43:21, 54:20,
  55:1, 61:11, 62:1,
  64:21, 65:22, 67:18,
  74:13, 79:18, 81:11,
  81:20, 83:16, 93:21,
  94:8, 96:1, 97:18,
  98:14, 98:22, 99:8,
  99:23, 102:22, 105:4

                C

C.K [2] - 25:22, 28:14
C.K.'s [1] - 29:5
CA [1] - 1:20
campus [1] - 28:23

cannot [2] - 8:18, 11:9
capacity [1] - 109:5
capture [1] - 14:17
car [1] - 105:12
career [1] - 42:19
Carolina [4] - 35:25,
  36:2, 36:4, 36:11
carry [2] - 90:25,
  95:10
Carson [3] - 13:13,
  13:16, 22:25
cascade [2] - 79:14,
  93:4
case [51] - 7:12, 7:16,
  7:21, 8:2, 8:14, 9:10,
  11:25, 33:19, 43:19,
  45:25, 55:6, 60:16,
  61:19, 62:17, 68:11,
  68:14, 70:1, 72:3,
  72:19, 73:16, 73:18,
  73:21, 74:7, 75:5,
  75:10, 76:5, 77:4,
  79:5, 88:2, 88:9,
  89:5, 89:15, 93:18,
  95:16, 96:19, 98:19,
  98:23, 99:4, 101:1,
  102:17, 103:21,
  104:15, 106:4,
  106:5, 106:16,
  106:17, 107:1, 109:7
case-control [1] -
  101:1
case-controlled [1] -
  88:9
cases [2] - 93:4, 101:4
caused [16] - 34:2,
  34:24, 43:23, 44:2,
  45:21, 48:8, 53:3,
  55:7, 66:1, 66:10,
  78:4, 79:13, 79:23,
  85:8, 85:15, 104:6
cautioned [1] - 6:8
cell [1] - 31:5
center [1] - 57:25
Center [6] - 36:21,
  37:1, 37:21, 38:3,
  38:10, 38:13
certain [7] - 9:11,
  47:9, 49:8, 89:3,
  89:4, 91:15, 98:3
certainly [4] - 84:23,
  90:7, 93:6, 102:14
certainty [10] - 35:4,
  65:25, 66:9, 66:15,
  96:20, 97:24, 103:2,
  103:4, 103:8, 103:9
CERTIFICATE [1] -
  109:1
Certificate [1] - 4:10
certify [2] - 109:4,

109:10
chambers [1] - 5:21
chance [4] - 58:6,
  72:4, 86:8, 105:5
change [9] - 47:18,
  47:19, 78:20, 86:17,
  96:16, 105:7, 105:9,
  105:15, 105:17
changed [1] - 12:6
changes [69] - 22:2,
  23:14, 34:21, 43:24,
  44:12, 45:18, 45:20,
  45:21, 47:3, 47:12,
  47:16, 47:22, 48:8,
  51:21, 53:3, 54:12,
  54:17, 55:5, 55:7,
  57:9, 57:13, 57:15,
  58:25, 59:21, 59:23,
  59:24, 60:2, 60:5,
  65:7, 65:19, 66:5,
  78:5, 78:7, 78:11,
  78:12, 78:18, 79:12,
  79:15, 79:16, 80:13,
  81:1, 81:13, 82:1,
  82:8, 83:6, 83:25,
  84:2, 84:6, 84:13,
  85:8, 85:15, 85:17,
  85:22, 86:13, 92:17,
  94:4, 94:5, 94:9,
  99:18, 99:25, 100:3,
  100:9, 100:15,
  103:25, 104:6
changing [1] - 79:5
channels [1] - 70:16
characteristics [5] -
  63:17, 76:17, 76:23,
  76:25, 82:10
characterize [1] - 91:4
characterized [2] -
  19:14, 82:7
characterizing [1] -
  39:25
chart [3] - 53:11,
  57:21, 57:22
check [1] - 75:24
checked [1] - 6:18
checklist [1] - 91:21
checks [3] - 17:12,
  17:16, 19:10
child [1] - 24:19
chitchatted [2] - 68:2,
  72:18
choice [1] - 18:22
chose [1] - 36:3
chronological [1] -
  29:23
circuitry [5] - 37:15,
  51:10, 53:24, 75:1,
  77:20
circumstances [2] -

8:19, 10:24
Cisler [12] - 4:6, 32:7,
  33:1, 33:2, 34:1,
  43:13, 60:13, 64:22,
  66:19, 67:19, 74:14,
  89:19
CISLER [1] - 32:9
Cisler's [3] - 62:11,
  62:24, 63:10
Civil [2] - 1:4, 109:7
clarify [1] - 9:2
class [3] - 18:5, 24:25,
  25:4
classified [1] - 25:19
classifier [3] - 102:10,
  102:12
clause [1] - 76:20
clean [1] - 70:19
clear [8] - 9:18, 10:13,
  25:7, 25:10, 25:14,
  69:12, 86:9, 105:5
clearly [5] - 47:16,
  50:7, 72:5, 95:7,
  101:11
client [2] - 5:9, 62:15
clients [1] - 71:3
clinic [1] - 90:15
clinical [40] - 33:5,
  33:6, 35:14, 35:20,
  35:24, 36:1, 41:25,
  42:3, 42:4, 42:7,
  42:8, 42:12, 42:15,
  42:21, 43:4, 43:10,
  44:1, 46:1, 46:3,
  47:2, 47:6, 54:11,
  65:4, 74:23, 81:22,
  82:13, 82:16, 82:20,
  83:6, 83:20, 85:13,
  85:21, 86:12, 90:9,
  90:23, 98:15, 99:25,
  101:13, 101:16
clinically [1] - 103:3
clinician [2] - 42:25,
  102:17
clinicians [1] - 43:8
close [5] - 59:11,
  59:21, 59:22, 60:2,
  106:13
closer [2] - 32:17,
  36:7
clusters [2] - 89:10,
  89:11
Code [1] - 76:8
code [1] - 76:15
colleagues [2] -
  16:23, 22:24
collectively [1] - 69:16
College [1] - 41:7
college [6] - 35:8,
  37:24, 41:6, 41:11,

41:14
colored [1] - 56:20
colors [1] - 58:3
combination [3] -
  61:4, 89:8, 100:6
combinations [1] -
  89:10
combine [2] - 55:25,
  56:1
comfortable [3] -
  83:7, 85:2, 85:4
coming [1] - 21:21,
  94:22
comment [1] - 70:15
comments [1] - 48:17
committee [2] - 39:4,
  41:11
common [2] - 105:20,
  105:21
communicate [2] -
  7:20, 10:4
communication [1] -
  70:16
communications [1] -
  70:15
comorbid [5] - 100:14,
  100:17, 100:19,
  100:23, 101:8
compare [2] - 49:16,
  100:21
compared [12] - 51:6,
  51:14, 54:3, 56:21,
  56:22, 57:6, 58:16,
  94:13, 101:2, 101:4,
  104:10, 104:14
comparing [7] - 53:21,
  87:5, 87:6, 87:15,
  87:25, 88:5, 96:2
competitive [2] - 39:1,
  41:20
complaint [1] - 22:20
complaints [3] - 19:3,
  19:5, 19:7
completeness [1] -
  31:4
completing [1] - 37:17
complex [1] - 52:24
complicated [3] -
  100:14, 101:11,
  101:12
comprised [1] - 41:12
computer [1] - 109:12
concept [2] - 64:11,
  98:16
concern [2] - 9:14,
  74:1
concerned [1] - 7:19
concerns [1] - 6:12
conclude [2] - 58:8,
  77:19

conclusion [1] - 98:3
conclusions [2] -
  48:19, 76:19
conclusive [1] - 55:12
condition [4] - 34:14,
  63:23, 77:1, 104:16
conditions [7] - 47:13,
  99:10, 100:6,
  100:14, 100:19,
  100:23, 101:9
Conduct [1] - 76:9
conduct [6] - 33:6,
  37:9, 41:25, 42:4,
  42:21, 76:15
conducted [4] - 40:3,
  58:23, 59:5, 76:17
conducting [4] - 38:4,
  40:4, 40:6, 41:9
conducts [1] - 48:12
confidence [2] - 56:4,
  95:24
confident [2] - 56:5,
  79:10
confirm [4] - 22:8,
  22:9, 22:16, 28:22
consequences [1] -
  60:14
consider [1] - 63:15
considered [3] -
  40:22, 74:6, 79:8
consistent [2] - 31:25,
  91:2
constant [1] - 88:20
constellation [1] -
  99:17
constitute [1] - 109:11
constitution [1] -
  73:25
Cont [2] - 1:25, 2:25
contact [5] - 7:17,
  71:4, 71:5, 71:7,
  74:6
contain [1] - 90:25
contaminate [1] - 69:5
contaminating [1] -
  70:24
contempt [1] - 71:10
contents [1] - 6:6
CONTENTS [1] - 4:1
context [7] - 46:18,
  49:7, 51:17, 79:7,
  79:10, 82:2, 83:18
continue [2] - 50:20,
  50:24
continues [1] - 20:20
contribute [1] - 37:8
control [14] - 45:5,
  48:1, 48:5, 49:14,
  49:17, 50:19, 51:7,
  53:14, 54:3, 56:16,

69:4, 71:19, 101:1,
  102:8
controlled [4] - 51:6,
  51:14, 59:14, 88:9
controlling [2] -
  44:17, 47:25
controls [5] - 45:3,
  53:17, 56:21, 56:22,
  101:2
conversation [14] -
  8:24, 10:11, 18:18,
  18:24, 19:13, 21:4,
  21:15, 21:20, 21:24,
  23:6, 23:9, 23:19,
  67:25, 95:10
conversations [7] -
  13:2, 13:5, 24:6,
  24:12, 24:14, 67:22,
  72:3
cooling [1] - 72:1
cooling-off [1] - 72:1
copy [1] - 15:24
correct [106] - 5:14,
  5:17, 13:7, 13:13,
  13:14, 13:16, 13:17,
  13:22, 14:2, 14:8,
  14:19, 14:21, 14:22,
  15:7, 15:9, 15:14,
  16:6, 16:16, 16:17,
  16:20, 17:3, 17:4,
  17:6, 17:12, 17:22,
  18:18, 18:24, 18:25,
  19:10, 19:21, 19:23,
  20:17, 21:6, 22:1,
  22:2, 22:4, 22:11,
  22:21, 22:22, 23:6,
  23:12, 23:19, 24:4,
  24:8, 24:9, 25:8,
  25:9, 25:12, 25:25,
  26:6, 26:10, 26:12,
  26:16, 26:19, 26:24,
  27:3, 27:24, 28:4,
  28:7, 28:11, 28:12,
  28:14, 28:15, 28:24,
  29:5, 29:8, 29:12,
  29:16, 29:17, 29:20,
  30:1, 54:8, 54:14,
  74:17, 74:19, 75:6,
  75:8, 75:12, 76:2,
  76:5, 76:10, 76:13,
  76:14, 77:6, 78:2,
  78:9, 80:24, 81:14,
  82:15, 87:16, 88:9,
  89:24, 90:13, 91:12,
  91:13, 91:16, 91:18,
  91:24, 93:12, 94:11,
  96:14, 98:5, 98:24,
  98:25, 104:22,
  105:11
correctly [1] - 48:19

correspond [2] -
  57:16, 58:22
corroborates [1] -
  53:5
cortex [8] - 50:18,
  50:24, 50:25, 51:5,
  51:9, 51:14, 51:18,
  52:20
cortisol [4] - 52:4,
  52:5, 52:8, 52:18
Counsel [1] - 62:6
counsel [1] - 32:12
count [1] - 37:22
country's [1] - 46:24
County [1] - 67:20
couple [3] - 5:25, 6:3,
  7:3
course [2] - 23:3,
  42:19
coursework [1] -
  35:23
Court [13] - 3:12, 3:13,
  4:10, 5:9, 7:23,
  32:13, 32:15, 67:4,
  73:21, 74:1, 107:2,
  109:3, 109:22
court [8] - 6:8, 9:2,
  9:9, 11:12, 64:18,
  68:1, 73:12, 109:8
COURT [116] - 1:1,
  1:12, 5:1, 5:4, 5:12,
  5:14, 5:18, 6:10,
  6:15, 6:20, 7:14, 8:7,
  8:10, 8:12, 8:16, 9:8,
  9:21, 10:5, 10:16,
  10:21, 10:24, 11:4,
  11:8, 11:14, 11:17,
  12:13, 15:20, 16:1,
  16:11, 30:4, 30:6,
  30:9, 30:15, 31:6,
  31:9, 31:13, 32:5,
  32:8, 32:11, 32:20,
  33:24, 36:7, 43:9,
  43:16, 54:19, 54:22,
  54:24, 61:7, 61:17,
  61:25, 62:6, 62:12,
  62:18, 62:21, 62:25,
  63:4, 63:21, 64:2,
  64:6, 64:16, 64:20,
  66:20, 67:5, 67:9,
  67:13, 67:15, 68:8,
  68:21, 68:23, 69:1,
  69:3, 69:11, 70:2,
  70:5, 70:7, 70:18,
  71:2, 71:22, 72:9,
  72:13, 72:16, 72:24,
  73:4, 73:10, 73:13,
  74:12, 78:17, 78:21,
  79:1, 81:6, 81:9,
  81:16, 83:14, 93:19,

94:6, 94:20, 97:5,
  97:9, 98:10, 98:13,
  98:21, 99:6, 99:21,
  102:21, 104:25,
  105:2, 105:24,
  106:3, 106:7,
  106:21, 107:5,
  107:8, 107:10,
  107:16, 107:20,
  108:5
Court's [3] - 11:24,
  68:14, 98:11
courthouse [3] - 7:5,
  10:12, 10:25
Courthouse [1] - 3:13
courtroom [8] - 8:3,
  13:9, 33:23, 68:5,
  68:11, 73:17, 74:8,
  87:23
covered [1] - 41:22
COVID [2] - 103:6,
  103:7
create [1] - 24:9
created [2] - 13:15,
  46:20
creating [2] - 44:25,
  45:6
criteria [9] - 61:22,
  61:24, 89:3, 89:11,
  89:16, 91:6, 91:9,
  91:25, 94:4
critically [1] - 48:17
CROSS [1] - 67:17
cross [4] - 4:7, 67:6,
  67:16, 105:9
CROSS-
  EXAMINATION [1] -
  67:17
cross-examination [2]
  - 4:7, 67:16
current [5] - 44:10,
  45:19, 65:2, 65:12,
  94:2
cutting [2] - 41:9,
  102:15

# D

D.M [1] - 18:18
d.M [1] - 18:21
D.N [3] - 20:12, 21:11,
  22:13
D.N.'s [1] - 19:13
dad [1] - 21:15
dam [10] - 44:19,
  44:20, 44:23, 44:24,
  44:25, 51:15, 51:17,
  58:18, 58:19
damage [2] - 46:2,
  46:6

damages [3] - 44:3,
  64:24, 66:1
dangerous [1] - 69:13
data [2] - 48:19,
  102:12
date [1] - 26:13
daughter [1] - 26:19
days [2] - 6:3, 12:2
DC [5] - 1:16, 2:15,
  2:18, 2:22, 3:2
deal [2] - 5:15, 21:1
dealing [1] - 14:24
dealt [1] - 70:22
decade [3] - 43:25,
  46:3, 59:17
decided [4] - 68:11,
  73:16, 73:17, 74:8
decision [1] - 69:16
decreases [2] - 78:24,
  78:25
deems [1] - 46:17
Defendant [4] - 2:13,
  3:1, 3:9, 5:6
defendants [3] - 5:6,
  7:3, 107:12
Defendants [2] - 1:7,
  3:5
Defendants' [2] -
  16:22, 31:11
defense [1] - 10:10
Defense [1] - 15:18
define [2] - 79:5,
  80:18
defined [3] - 84:24,
  84:25, 86:19
defining [3] - 82:10,
  87:3, 105:22
definitely [2] - 14:9,
  88:15
definition [14] - 64:13,
  64:23, 65:2, 66:4,
  78:10, 78:13, 78:18,
  78:19, 79:2, 79:4,
  80:3, 80:15, 85:9,
  85:18
degree [3] - 35:3,
  35:18, 51:3, 65:25,
  66:8, 66:13, 66:15,
  96:20, 97:1
delivered [1] - 11:3
demonstrate [2] -
  57:9, 58:25
demonstrated [1] -
  55:3
demonstrates [2] -
  56:11, 57:21
dendritic [3] - 51:2,
  51:13, 78:24
department [1] - 37:19
Department [2] -

38:14, 39:11
**dependent** [1] - 44:21
**depiction** [3] - 46:11, 50:15, 51:2
**deposed** [1] - 76:4
**deposition** [5] - 63:10, 63:14, 76:4, 83:9, 83:14
**depression** [19] - 36:18, 83:1, 84:5, 84:21, 85:10, 85:21, 86:4, 86:7, 86:21, 86:23, 87:2, 89:5, 89:6, 89:7, 91:14, 101:4, 101:19, 102:18
**depressive** [2] - 99:12, 99:17
**describe** [3] - 22:5, 53:10, 92:20
**described** [8] - 8:18, 30:23, 50:17, 51:9, 65:13, 93:5, 94:25, 102:9
**description** [1] - 13:12
**design** [1] - 48:18
**detail** [1] - 6:14
**detailed** [1] - 13:12
**determinant** [1] - 39:3
**determination** [4] - 41:14, 41:20, 48:22, 61:21
**determinations** [1] - 9:22
**determine** [6] - 25:11, 39:5, 58:24, 60:24, 61:2, 65:10
**develop** [4] - 39:22, 40:14, 92:11, 92:15
**developed** [4] - 46:12, 46:22, 46:23
**developing** [1] - 104:21
**development** [4] - 36:17, 37:8, 38:7, 104:2
**developmental** [1] - 33:13
**develops** [2] - 94:1, 96:13
**diagnosable** [2] - 82:6, 84:19
**diagnose** [9] - 60:21, 63:8, 65:3, 89:2, 90:8, 90:17, 91:7, 102:17, 102:18
**diagnosed** [9] - 42:19, 54:6, 54:9, 54:10, 64:23, 65:8, 89:7, 96:4, 98:24

**diagnoses** [3] - 74:20, 99:1, 99:17
**diagnosing** [3] - 63:23, 90:4, 90:7
**diagnosis** [15] - 34:14, 47:6, 47:23, 49:19, 55:18, 62:2, 62:4, 63:8, 63:25, 64:13, 77:1, 89:8, 90:25, 91:2, 91:23
**Diagnostic** [1] - 91:11
**diagnostic** [8] - 42:25, 43:6, 61:22, 61:24, 90:22, 90:23, 102:18, 103:5
**differ** [1] - 49:19
**difference** [13] - 56:15, 56:23, 56:25, 57:23, 58:20, 84:23, 88:23, 95:12, 95:21, 96:8, 96:10, 97:24
**differences** [25] - 37:7, 37:15, 38:6, 38:19, 39:19, 40:1, 40:10, 49:18, 50:4, 50:5, 50:7, 50:8, 58:4, 58:6, 58:7, 88:13, 91:5, 94:13, 94:14, 95:7, 95:20, 101:5, 101:10, 102:6, 104:19
**different** [14] - 49:21, 49:22, 52:11, 58:9, 59:24, 76:1, 86:25, 89:9, 89:10, 89:13, 89:16, 89:18, 90:24, 104:10
**differentiate** [2] - 82:2, 86:7
**differentiation** [2] - 84:17, 86:18
**difficult** [4] - 49:21, 55:18, 96:9, 104:18
**difficulties** [1] - 95:2
**DIRECT** [1] - 32:21
**Direct** [1] - 4:7
**direct** [7] - 9:1, 9:9, 9:15, 71:5, 81:5, 100:13, 107:16
**directed** [2] - 69:4, 71:7
**direction** [2] - 11:10, 89:19
**directly** [1] - 10:4, 93:1
**director** [2] - 39:12, 39:23
**disciplinarian** [1] - 20:17
**discipline** [1] - 25:24

**discloses** [1] - 62:17
**discuss** [3] - 11:24, 106:4, 106:16
**discussed** [7] - 5:22, 6:3, 6:11, 75:9, 87:18, 88:6, 95:19
**discussing** [5] - 6:6, 68:12, 73:8, 76:11, 87:14
**Discussion** [1] - 6:22
**discussions** [1] - 8:20
**disease** [1] - 79:6
**disorder** [43] - 43:15, 43:23, 47:1, 47:5, 63:9, 81:2, 81:22, 82:4, 82:5, 82:6, 82:7, 82:14, 82:16, 82:17, 82:20, 82:23, 83:3, 83:5, 83:19, 84:1, 84:8, 84:13, 84:18, 84:19, 84:20, 84:23, 84:24, 85:20, 85:21, 86:4, 86:22, 89:3, 99:12, 99:14, 99:18, 100:10, 101:20, 101:22, 101:23, 104:5
**Disorders** [1] - 91:12
**disorders** [28] - 33:13, 36:17, 36:18, 37:8, 38:8, 39:22, 41:10, 42:6, 46:21, 74:21, 81:13, 81:25, 82:3, 82:12, 82:13, 83:4, 83:25, 84:2, 84:6, 85:3, 85:24, 86:12, 89:2, 99:19, 99:24, 100:16, 101:25, 104:8
**display** [1] - 109:13
**distinction** [4] - 78:15, 80:5, 80:10, 105:6
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [2] - 3:13, 109:4
**docket** [2] - 106:14, 106:22
**doctor** [10] - 36:7, 43:9, 62:13, 64:2, 74:16, 78:17, 81:12, 81:17, 94:21, 104:23
**doctoral** [1] - 35:22
**doctorate** [1] - 35:20
**document** [3] - 13:15, 14:5
**documented** [1] - 90:6
**documents** [2] - 13:6, 24:13
**done** [8] - 8:9, 14:5,

20:14, 29:23, 48:18, 72:11, 74:1, 87:13
**double** [1] - 75:24
**down** [7] - 14:23, 17:8, 21:2, 30:6, 32:5, 57:2
**downstairs** [1] - 21:17
**Dr** [38] - 4:6, 13:10, 14:11, 22:24, 29:22, 33:2, 34:1, 43:13, 60:13, 60:17, 60:20, 60:21, 60:23, 60:24, 61:2, 61:13, 61:15, 61:17, 61:20, 62:2, 62:3, 62:11, 62:24, 63:10, 64:3, 64:6, 64:22, 66:19, 67:19, 74:14, 75:11, 75:13, 75:14, 75:18, 75:21, 76:2, 89:19, 99:9
**dreary** [2] - 10:24, 11:19
**Drive** [1] - 3:6
**drive** [2] - 12:5, 60:7
**droops** [1] - 47:18
**DSM** [1] - 91:9
**DSM-V** [1] - 91:9
**due** [6] - 58:6, 65:17, 95:22, 96:10, 101:11
**duration** [2] - 52:9, 52:13
**during** [12] - 12:10, 24:25, 28:8, 36:1, 36:10, 36:25, 37:9, 67:22, 69:10, 74:2, 103:20, 108:2
**DX-200** [1] - 31:3
**DX-83** [1] - 30:12

# E

**Early** [2] - 39:12, 39:23
**early** [6] - 33:11, 36:15, 38:5, 38:19, 40:2, 59:4
**East** [1] - 1:19
**Eastern** [1] - 109:4
**EASTERN** [1] - 1:1
**eat** [1] - 66:23
**eating** [12] - 83:3, 83:4, 83:5, 84:8, 85:21, 86:4, 86:22, 99:14, 99:18, 101:23, 104:5, 104:8
**edge** [2] - 41:9, 102:15
**editor** [1] - 48:22
**education** [1] - 37:23
**effect** [2] - 56:15, 104:15

**effective** [1] - 40:15
**efforts** [1] - 11:21
**Eileen** [3] - 60:17, 61:13, 75:11
**either** [9] - 18:16, 21:7, 43:5, 56:21, 58:4, 59:13, 71:1, 95:4, 103:8
**elected** [2] - 41:5, 41:11, 41:14
**elicited** [1] - 64:7
**ELLIKER** [40] - 43:11, 43:17, 54:18, 61:5, 62:5, 62:7, 63:10, 64:15, 67:7, 67:18, 68:25, 69:21, 70:10, 73:1, 74:13, 79:18, 81:7, 81:11, 81:20, 83:12, 83:15, 83:16, 93:21, 94:7, 94:8, 96:1, 97:7, 97:11, 97:15, 97:18, 98:11, 98:14, 98:20, 98:22, 99:5, 99:8, 99:23, 102:22, 104:23, 106:1
**Elliker** [8] - 2:25, 67:19, 69:8, 69:12, 70:19, 72:24, 74:10, 74:14
**Elliker...............** [1] - 4:7
**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11
**email** [3] - 30:18, 30:22, 30:24
**emotional** [18] - 44:13, 44:17, 45:10, 45:14, 45:15, 45:18, 45:20, 46:1, 47:25, 48:2, 51:11, 54:11, 65:16, 94:15, 96:6, 96:9, 96:11
**emotions** [10] - 45:3, 45:6, 48:4, 48:6, 50:19, 50:20, 51:7, 65:5, 65:6, 94:4
**end** [2] - 65:23, 107:25
**ended** [1] - 27:18
**ends** [1] - 73:22
**enforcing** [1] - 71:4
**engage** [2] - 24:20, 25:1
**engaged** [2] - 25:23, 25:24
**engages** [1] - 24:19
**entering** [1] - 7:5
**entire** [5] - 70:24,

87:18, 87:19, 87:20, 97:4
**entirely** [2] - 77:9, 100:11
**entirety** [1] - 108:2
**environment** [2] - 51:11, 53:25
**environmental** [1] - 104:20
**equal** [1] - 95:6
**equally** [1] - 50:4
**especially** [2] - 49:6, 72:17
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8
**estimate** [1] - 42:18
**et** [2] - 1:6, 109:7
**Ethical** [1] - 76:8
**evaluated** [1] - 63:18
**evaluation** [7] - 60:17, 60:21, 60:24, 61:8, 61:21, 62:14, 75:5
**event** [14] - 50:8, 61:22, 62:3, 79:6, 79:14, 86:21, 87:1, 87:6, 92:9, 95:8, 105:10, 105:15, 105:18
**events** [4] - 62:3, 77:3, 79:13, 103:21
**eventually** [1] - 28:22
**evidence** [1] - 43:4
**evidently** [1] - 10:14
**exact** [1] - 86:15
**exactly** [3] - 14:13, 22:22, 63:22
**exam** [1] - 6:8
**EXAMINATION** [5] - 12:18, 30:11, 32:21, 67:17, 105:3
**examination** [14] - 4:4, 4:5, 4:7, 4:7, 4:8, 67:10, 67:16, 76:18, 81:5, 107:6, 107:10, 107:16, 107:21, 107:25
**examine** [2] - 65:9, 107:24
**example** [8] - 9:4, 49:25, 55:2, 56:12, 56:23, 82:4, 92:22, 103:6
**examples** [3] - 41:4, 41:5, 81:19
**except** [2] - 9:10, 101:23
**excessive** [1] - 45:8
**excite** [1] - 11:20

**exclude** [1] - 8:1
**excuse** [2] - 6:5, 106:11
**excused** [4] - 67:2, 106:4, 106:6, 107:4
**exemplified** [1] - 10:25
**Exhibit** [8] - 15:19, 15:21, 16:10, 16:13, 16:22, 30:16, 31:11, 31:14
**exhibit** [3] - 31:6, 31:8, 31:10
**exhibiting** [1] - 54:16
**exhibits** [1] - 5:8
**exist** [2] - 4:9, 42:19
**exists** [1] - 49:16
**expect** [1] - 89:17
**expected** [1] - 82:9
**experience** [7] - 24:20, 44:1, 46:4, 58:24, 93:1, 96:13, 96:15
**experienced** [18] - 37:16, 39:20, 40:2, 49:15, 51:12, 52:14, 53:18, 53:20, 59:8, 59:11, 59:13, 59:15, 59:17, 59:18, 59:25, 60:3, 96:8, 103:25
**experiences** [2] - 96:15, 104:20
**experiencing** [2] - 45:7, 61:23
**expert** [18] - 10:25, 25:3, 25:6, 33:19, 43:10, 43:13, 61:6, 61:13, 61:15, 62:11, 62:16, 62:24, 63:11, 64:8, 75:3, 96:22, 96:25, 97:12
**expert's** [1] - 63:25
**expertise** [6] - 33:15, 66:16, 79:4, 80:18, 81:24, 105:22
**experts** [2] - 48:15, 81:8
**explain** [9] - 44:8, 46:9, 50:12, 53:11, 54:21, 56:10, 57:20, 85:11, 93:19
**explained** [1] - 79:14
**explanations** [1] - 80:25
**exposed** [2] - 24:24, 25:11, 53:17
**exposure** [16] - 34:3, 34:25, 43:24, 44:4, 48:9, 51:20, 52:12, 52:13, 52:15, 55:8,

59:6, 66:2, 66:10, 78:5, 79:24, 91:25
**express** [1] - 69:18
**expressed** [2] - 66:12, 97:19
**extended** [1] - 10:11
**extent** [7] - 11:25, 52:7, 52:8, 52:12, 75:10, 105:6, 106:25
**external** [3] - 92:21, 93:10
**extramurally** [1] - 40:7
**extreme** [1] - 11:21

## F

**F.C.S.B** [4] - 1:6, 2:13, 3:1, 109:7
**F.T** [1] - 3:7
**face** [1] - 47:18
**Facebook** [2] - 28:22, 29:1
**facing** [2] - 24:4, 25:24
**fact** [9] - 24:18, 24:24, 75:9, 77:8, 84:12, 88:20, 92:6, 95:19, 95:23
**factor** [1] - 55:18
**faculty** [3] - 37:19, 38:2, 38:9
**Fahey** [1] - 1:14
**fail** [1] - 44:25
**fair** [8] - 26:22, 64:15, 70:14, 74:24, 75:2, 96:12, 96:25, 97:1
**Fairfax** [2] - 6:1, 67:20
**fairly** [1] - 9:25
**familiar** [4] - 80:7, 98:15, 103:7, 103:22
**family** [1] - 93:14
**far** [1] - 7:19
**fast** [1] - 59:19
**fault** [2] - 9:18, 10:23
**fear** [6] - 44:14, 45:4, 45:8, 45:9, 48:4, 53:25
**February** [2] - 13:10, 13:20
**federal** [1] - 46:16
**FELDMAN** [1] - 3:9
**fellow** [2] - 92:23, 94:2
**fellowship** [7] - 36:20, 36:23, 37:1, 37:10, 37:17, 42:10, 42:13
**female** [2] - 24:25, 64:4
**few** [3] - 24:1, 59:10, 74:15
**field** [15] - 33:7, 39:6,

41:2, 41:12, 43:13, 44:2, 46:4, 48:15, 48:21, 55:4, 56:13, 66:15, 80:22, 87:9, 98:2
**fight** [1] - 52:1
**figure** [2] - 46:11, 107:22
**filed** [2] - 5:6, 5:10
**fine** [3] - 58:15, 61:25, 70:7
**finish** [1] - 107:20
**first** [31] - 8:4, 8:5, 15:8, 20:24, 26:8, 26:18, 29:7, 31:17, 31:19, 31:20, 34:1, 34:13, 34:19, 34:20, 43:22, 48:11, 49:3, 53:10, 62:8, 62:12, 62:13, 63:1, 63:4, 63:6, 63:13, 65:23, 69:7, 69:8, 74:16, 76:20, 105:9
**First** [1] - 73:2
**fit** [1] - 108:2
**five** [10] - 35:25, 55:24, 89:7, 89:8, 106:23, 107:9, 107:11, 107:15, 107:16, 107:17
**FL** [3] - 2:3, 2:7, 2:11
**FLEXNER** [4] - 1:19, 2:2, 2:6, 2:10
**Floor** [1] - 3:14
**flow** [1] - 44:20
**flowing** [1] - 44:22
**focus** [7] - 33:9, 33:10, 37:12, 50:24, 58:9, 58:12, 58:14
**focused** [6] - 34:17, 38:5, 39:19, 42:15, 42:17, 49:5
**focusing** [1] - 38:20
**folks** [2] - 96:3
**follow** [1] - 63:20
**follow-up** [1] - 63:20
**FOR** [1] - 1:1
**foregoing** [1] - 109:10
**forensic** [3] - 60:17, 60:20, 60:23
**form** [2] - 66:5, 91:25
**formal** [1] - 37:22
**formed** [5] - 44:2, 46:4, 61:18, 62:4, 64:22
**forming** [4] - 55:6, 60:16, 61:12, 61:15
**formulation** [2] - 46:21, 46:25
**forward** [3] - 11:19,

59:20, 95:10
**Foundation** [2] - 41:17, 41:18
**foundation** [1] - 81:8
**foundational** [2] - 95:9, 99:6
**four** [9] - 13:10, 14:23, 35:23, 38:11, 40:7, 58:12, 89:9, 91:22, 91:23
**framework** [3] - 46:11, 47:3, 47:10
**freedom** [1] - 73:24
**front** [4] - 26:23, 26:25, 53:9, 68:7
**full** [2] - 9:4, 83:17
**fully** [2] - 55:19, 62:16
**Fulton** [1] - 3:6
**function** [1] - 33:12, 37:5, 37:6, 37:7, 44:15, 45:22, 47:17, 52:24, 53:4, 58:22, 65:7, 81:23, 82:18, 82:21, 88:24, 104:2
**functional** [5] - 37:2, 37:4, 66:6, 78:8, 83:21
**fund** [1] - 46:16
**funded** [3] - 40:7, 40:8, 46:15
**funding** [8] - 40:17, 40:19, 40:20, 40:22, 40:23, 41:18, 46:14, 46:24
**funny** [3] - 22:4, 22:7, 23:15

## G

**gallery** [1] - 68:9
**gather** [1] - 64:9
**general** [9] - 42:18, 63:1, 64:10, 73:14, 81:13, 81:24, 85:2, 87:9, 91:19
**generalizable** [1] - 55:16
**generally** [7] - 6:11, 36:13, 37:12, 40:6, 62:8, 63:13, 74:22
**genitals** [3] - 24:24, 25:4, 25:12
**gentleman** [1] - 7:24
**gentlemen** [6] - 11:15, 66:20, 68:8, 73:13, 106:10, 107:3
**genuinely** [1] - 70:13
**Genus** [1] - 21:20
**girl** [2] - 19:20, 19:23
**girls** [7] - 37:15,

53:13, 53:14, 53:18, 53:20, 54:5, 54:15
**given** [6] - 6:7, 48:19, 50:9, 63:24, 104:19, 104:20
**glad** [3] - 8:25, 11:21
**glucocorticoid** [4] - 52:5, 52:8, 52:18, 93:4
**glucocorticoids** [1] - 52:16
**govern** [1] - 76:13
**grade** [2] - 24:19, 24:21
**graduate** [1] - 42:8
**graduating** [2] - 35:12, 37:24
**Grady** [2] - 30:18, 31:17
**graph** [3] - 53:21, 54:21, 56:11
**graphical** [1] - 50:15
**great** [1] - 74:1
**greater** [1] - 51:13
**green** [2] - 58:3, 58:7
**grey** [4] - 53:22, 54:2, 58:20, 102:7
**gross** [1] - 81:18
**group** [16] - 49:8, 49:14, 49:15, 49:20, 53:19, 54:4, 54:6, 54:16, 56:16, 59:12, 59:16, 59:19, 59:24
**groups** [6] - 49:11, 49:18, 49:21, 53:13, 55:17, 88:23
**guess** [6] - 72:17, 72:18, 75:23, 77:9, 77:15, 78:15
**guidelines** [1] - 76:12
**guy** [1] - 71:16

# H

**hand** [1] - 15:23
**happy** [4] - 15:3, 62:10, 69:20, 72:6
**harassment** [7] - 8:1, 24:21, 25:1, 25:5, 25:20, 25:23, 25:25
**hard** [3] - 9:16, 73:20, 96:7
**Harris** [2] - 109:3, 109:21
**HARRIS** [1] - 3:12
**heads** [2] - 107:22, 108:1
**heal** [1] - 60:7
**health** [32] - 33:13, 36:17, 37:8, 38:7,

39:22, 40:21, 41:10, 41:13, 41:19, 46:14, 46:17, 46:21, 46:24, 47:1, 47:5, 81:2, 81:12, 81:22, 81:25, 82:3, 82:4, 82:7, 83:19, 83:24, 84:13, 84:19, 85:3, 85:24, 89:2, 89:3, 100:16, 104:15
**Health** [9] - 40:9, 40:17, 40:20, 40:24, 46:12, 46:13, 46:19, 46:20, 47:4
**health-related** [2] - 40:21, 41:19
**healthy** [1] - 101:2
**hear** [3] - 8:25, 32:13, 74:8
**heard** [4] - 22:12, 26:7, 31:23, 52:4
**hearing** [3] - 6:5, 8:5, 70:21
**heightened** [1] - 52:13
**held** [1] - 66:12
**help** [5] - 33:18, 38:7, 39:21, 73:17, 82:2
**helpful** [4] - 32:18, 69:15, 69:17, 69:20
**hereby** [1] - 109:4
**hereto** [1] - 109:15
**herself** [2] - 22:12, 71:19
**high** [9] - 39:16, 40:5, 40:9, 44:8, 44:10, 47:22, 47:24, 51:25, 53:10
**highlight** [3] - 31:18, 31:19, 58:10
**hippocampal** [1] - 101:5
**hippocampus** [9] - 50:18, 51:5, 51:18, 57:5, 58:13, 58:14, 58:16, 58:18, 58:19
**histories** [2] - 53:15, 102:20
**hits** [1] - 105:12
**hold** [3] - 33:4, 71:10, 72:2
**holding** [1] - 73:6
**HOLTZMAN** [1] - 1:14
**home** [2] - 27:2, 27:4
**honesty** [1] - 68:10
**Honor** [46] - 5:2, 5:3, 5:5, 5:13, 5:17, 5:19, 6:2, 10:3, 12:12, 15:18, 15:25, 16:10, 31:2, 31:4, 32:3, 33:21, 43:11, 43:12,

61:5, 61:10, 62:5, 62:10, 62:16, 62:20, 62:23, 63:10, 64:19, 66:18, 68:25, 69:20, 70:12, 72:8, 81:4, 81:7, 83:12, 93:17, 94:7, 97:3, 97:7, 98:18, 104:24, 106:1, 106:2, 107:7, 107:13, 108:4
**HONORABLE** [1] - 1:11
**honors** [1] - 41:1
**hopefully** [1] - 12:23
**hoping** [1] - 107:18
**hormone** [4] - 52:4, 52:5, 52:9, 52:10
**horseplay** [1] - 24:19
**hotel** [1] - 10:18
**hour** [2] - 66:24, 107:14
**hours** [7] - 26:22, 107:9, 107:11, 107:12, 107:15, 107:16, 107:17
**H█████** [1] - 21:21
**human** [13] - 23:3, 49:1, 49:11, 52:21, 52:23, 53:1, 53:2, 53:5, 74:23, 74:24, 89:25, 95:2, 95:21
**humans** [1] - 49:5
**H█████** [2] - 21:20, 27:9
**H████████** [1] - 26:25
**hundreds** [1] - 42:20
**HUNTON** [4] - 2:14, 2:17, 2:21, 3:1
**hyperactive** [1] - 44:15
**hypothetical** [1] - 105:7

# I

**i.e** [1] - 46:1
**idea** [1] - 43:7
**ideas** [1] - 57:12
**identified** [5] - 16:4, 16:20, 18:2, 62:3, 99:9
**identifies** [2] - 13:21, 16:15
**identify** [4] - 49:16, 51:10, 53:24, 99:18
**identifying** [2] - 49:13, 49:14
**III** [1] - 97:13
**illustration** [1] - 50:11

**illustrative** [1] - 81:19
**image** [2] - 52:19, 89:25
**imagine** [4] - 44:23, 50:22, 52:1, 107:14
**Imaging** [6] - 36:20, 37:1, 37:21, 38:2, 38:10, 38:12
**imaging** [2] - 37:5, 89:20
**immediately** [1] - 13:19
**impact** [1] - 74:2
**impactful** [1] - 46:18
**implications** [2] - 57:11, 57:16
**important** [13] - 14:6, 18:1, 24:6, 46:17, 46:18, 46:25, 49:6, 58:20, 86:18, 95:5, 95:18, 100:23, 100:25
**impression** [2] - 8:23, 72:15
**inappropriate** [4] - 8:9, 69:19, 71:10, 74:6
**incident** [4] - 18:19, 25:18, 25:22, 95:17
**include** [8] - 18:1, 18:8, 19:9, 23:5, 23:9, 23:18, 41:8, 87:20
**included** [2] - 48:25, 75:13
**includes** [2] - 21:11, 71:6
**including** [2] - 10:20, 99:12
**inconsistent** [2] - 62:18, 80:6
**increased** [3] - 36:16, 44:14, 44:15
**increases** [3] - 33:12, 78:24, 78:25
**incurred** [1] - 80:3
**indeed** [2] - 7:24, 7:25
**independently** [1] - 42:11
**indicated** [1] - 73:19
**indirect** [1] - 71:5
**indiscernible** [2] - 10:14, 69:10
**individual** [11] - 7:3, 9:21, 39:5, 43:7, 45:7, 47:7, 64:23, 65:8, 87:19, 88:15, 95:13
**individual's** [1] - 65:10

**individuals** [15] - 23:4, 39:20, 39:21, 40:1, 40:11, 40:15, 42:6, 49:12, 54:2, 57:24, 58:1, 58:2, 58:16, 76:17, 88:16
**induced** [2] - 34:21, 50:6
**indulgence** [2] - 98:11, 104:24
**industrious** [1] - 10:15
**infer** [1] - 77:21
**influence** [3] - 71:18, 71:21, 71:23
**inform** [2] - 42:21, 61:16
**information** [9] - 75:10, 75:14, 75:18, 75:22, 88:1, 90:25, 95:9, 101:16, 104:14
**informed** [2] - 43:8, 63:16
**informing** [1] - 55:10
**injured** [2] - 92:14, 93:24
**injuries** [13] - 34:2, 34:6, 34:24, 60:6, 64:1, 65:11, 66:10, 77:8, 77:13, 77:15, 78:13, 79:23, 105:7
**injury** [23] - 42:16, 64:14, 66:5, 78:11, 79:2, 79:4, 79:8, 79:10, 80:3, 80:11, 80:15, 80:19, 80:21, 80:23, 85:9, 85:18, 93:10, 93:15, 93:25, 94:10, 105:20, 105:21, 105:22
**input** [1] - 13:15
**inquire** [1] - 73:6
**insinuation** [1] - 69:21
**insinuations** [1] - 70:13
**instance** [1] - 92:6
**instead** [1] - 56:2
**Institute** [8] - 39:12, 39:23, 40:8, 46:12, 46:13, 46:19, 46:20, 47:4
**Institutes** [3] - 40:17, 40:20, 40:23
**instruction** [2] - 72:11, 73:14, 73:15
**instructions** [1] - 11:24
**interaction** [1] - 20:20
**interesting** [2] - 10:22, 89:1

**interfere** [1] - 68:16
**interfering** [4] - 68:14, 68:20, 68:22, 71:24
**internship** [2] - 35:24, 36:1
**interpret** [2] - 55:20, 56:5
**interpreted** [1] - 8:1
**interpreting** [2] - 95:2, 95:24
**interrupt** [1] - 32:13
**interventions** [1] - 40:14
**interviews** [1] - 90:24
**intimidated** [1] - 7:6
**introduce** [1] - 32:25
**investigate** [1] - 37:7
**investigating** [4] - 19:6, 36:15, 37:14, 38:19
**investigation** [5] - 13:11, 15:6, 15:11, 15:12, 24:7
**investigator** [1] - 41:17
**investigatory** [1] - 14:21
**involve** [1] - 100:12
**involved** [10] - 9:10, 15:5, 29:5, 53:12, 73:18, 73:23, 74:4, 74:5, 77:20, 77:22
**irrelevant** [1] - 94:24
**isolate** [3] - 50:7, 96:9, 101:9
**isolated** [1] - 95:17
**issue** [8] - 5:16, 5:21, 7:2, 9:6, 15:8, 31:17, 31:18, 31:20
**issues** [5] - 13:21, 13:24, 14:23, 14:25, 73:16
**IT** [1] - 32:23
**itself** [4] - 6:19, 55:13, 75:13, 93:10

## J

**J.F** [1] - 3:7
**J.H** [3] - 16:16, 19:2, 19:3
**J.O** [2] - 3:9, 5:6
**jfahey@ holtzmanvogel. com** [1] - 1:17
**job** [4] - 38:4, 38:14, 39:10, 74:25
**join** [3] - 5:8, 5:11, 19:18
**joining** [1] - 5:9

**joint** [1] - 16:23
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**Josh** [1] - 33:1
**Joshua** [2] - 4:6, 32:7
**JOSHUA** [1] - 32:9
**journal** [3] - 48:13, 48:14, 48:15
**JR** [1] - 1:11
**judge** [2] - 9:16, 80:17
**Judge** [2] - 30:7, 69:14
**JUDGE** [1] - 1:12
**judge's** [1] - 11:10
**judgment** [1] - 25:6
**jump** [1] - 29:4
**JUROR** [1] - 106:19
**JURY** [1] - 1:11
**Jury** [5] - 11:13, 67:2, 67:14, 107:4, 109:6
**jury** [21] - 5:1, 5:19, 16:18, 16:24, 32:25, 33:14, 33:18, 39:16, 40:5, 41:4, 46:9, 47:13, 50:13, 53:11, 56:11, 64:10, 72:5, 73:13, 87:22, 87:24, 106:10
**jury's** [1] - 38:24
**justice** [3] - 68:15, 71:24, 73:22

## K

**K's** [1] - 27:18
**Keefe** [6] - 2:9, 75:9, 79:22, 80:9, 94:10, 96:18
**KEEFE** [43] - 32:7, 32:22, 33:21, 33:25, 36:9, 43:12, 43:18, 43:21, 54:20, 54:23, 54:25, 55:1, 61:10, 61:11, 62:1, 62:10, 62:16, 62:20, 62:23, 63:3, 63:7, 63:22, 64:5, 64:12, 64:19, 64:21, 65:20, 65:22, 66:18, 70:12, 73:5, 74:11, 81:4, 81:15, 93:17, 97:3, 98:18, 99:3, 99:20, 105:1, 105:4, 105:23, 106:2
**Keefe.............** [1] - 4:8
**Keefe................** [1] - 4:7
**keep** [3] - 8:3, 11:19, 18:5
**kelliker@huntonak.**

**com** [1] - 3:3
**Kevin** [3] - 2:25, 67:19, 74:14
**keyword** [1] - 52:23
**kids** [3] - 17:11, 17:15, 19:10
**kind** [10] - 47:22, 59:15, 76:22, 82:2, 82:9, 86:15, 87:18, 88:22, 92:9, 102:15
**Kinney** [2] - 3:4, 67:9
**KINNEY** [2] - 3:5, 67:11
**knowing** [1] - 14:3
**knowledge** [4] - 40:13, 77:13, 100:24, 100:25
**known** [1] - 20:17
**knows** [2] - 10:19, 72:5
**KURTH** [4] - 2:14, 2:17, 2:21, 3:1

## L

**lab** [1] - 50:9
**labeled** [3] - 25:7, 25:9, 54:6
**laboratory** [4] - 49:9, 50:1, 50:5, 95:4
**ladies** [6] - 11:15, 66:20, 68:8, 73:13, 106:10, 107:3
**lady** [1] - 25:13
**large** [5] - 40:7, 53:5, 55:24, 58:6, 58:8
**largely** [3] - 44:13, 44:21, 55:5
**larger** [5] - 39:24, 43:7, 55:4, 58:2, 101:6
**largest** [4] - 40:20, 41:18, 46:13, 46:24
**last** [5] - 27:19, 31:21, 59:9, 59:10, 65:20
**launch** [1] - 39:24
**laundry** [1] - 21:3
**LAW** [1] - 3:5
**lawsuit** [1] - 24:4
**lawyer** [1] - 75:2
**lawyers** [8] - 9:10, 69:12, 73:15, 73:17, 73:20, 74:4, 74:5
**lead** [1] - 39:24
**leaders** [1] - 41:12
**leading** [4] - 38:18, 39:18, 41:9, 54:18
**learn** [1] - 40:13
**learned** [2] - 37:3, 69:8

**learning** [1] - 90:5, 102:23
**least** [5] - 8:17, 8:23, 11:17, 54:16, 107:15
**leave** [5] - 23:2, 46:9, 50:12, 56:10, 57:20
**leaving** [2] - 21:23, 38:12
**left** [10] - 21:18, 53:22, 53:23, 56:17, 56:24, 57:1, 57:4, 57:25, 72:14
**leg** [1] - 105:12
**less** [2] - 82:7, 84:24
**level** [12] - 14:10, 39:6, 39:16, 40:5, 40:9, 44:8, 44:10, 47:22, 47:24, 51:25, 53:10, 81:24
**leverage** [1] - 40:13
**licensed** [3] - 33:2, 41:23, 42:9, 42:11
**Life** [2] - 39:13, 39:23
**life** [6] - 33:11, 36:15, 38:5, 38:20, 40:2, 59:4
**lifetime** [1] - 60:8
**likelihood** [2] - 44:20, 60:7
**likely** [6] - 24:20, 25:1, 25:23, 39:21, 43:6, 100:18
**limited** [2] - 7:1, 55:13
**line** [9] - 56:17, 56:23, 57:2, 57:25, 58:2, 73:25, 74:7, 83:18, 95:23
**link** [2] - 87:2, 104:18
**linking** [1] - 38:5
**list** [1] - 107:18
**listen** [1] - 32:11
**listening** [1] - 87:22
**litigation** [1] - 9:14
**live** [2] - 11:24, 103:10
**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1
**loan** [5] - 27:23, 28:2, 28:17, 28:23, 29:3
**loaned** [1] - 28:1
**locker** [5] - 17:12, 17:16, 17:24, 18:4, 18:12
**logs** [1] - 29:9
**longitudinal** [2] - 87:11, 87:20
**longwinded** [1] - 101:7
**look** [17] - 16:22, 17:14, 22:6, 27:11,

**27:16, 30:22, 31:16, 41:13, 46:25, 50:10, 56:7, 57:2, 57:18, 90:2, 91:22, 97:9, 104:10
**looked** [6] - 27:17, 54:12, 61:13, 87:21, 99:16, 104:10
**looking** [8] - 11:19, 56:14, 94:12, 95:11, 96:4, 102:1, 102:3, 102:4
**looks** [6] - 22:3, 22:6, 23:14, 103:18
**Los** [1] - 1:20
**lose** [1] - 47:17
**loud** [1] - 32:18
**Louis** [2] - 35:9, 35:12
**love** [1] - 88:1
**loved** [1] - 92:13
**lunch** [3] - 12:8, 66:24, 108:3
**lunches** [2] - 12:6, 12:9

## M

**M.C** [1] - 3:6
**M.J** [3] - 16:16, 19:2, 19:3
**M.P.F** [2] - 3:6
**ma'am** [9] - 12:14, 24:9, 30:4, 30:6, 32:5, 68:17, 68:19, 68:23, 72:9
**machine** [5] - 90:5, 102:5, 102:23, 109:5, 109:12
**Madison** [1] - 38:15
**magnetic** [2] - 37:4, 89:20
**main** [1] - 37:14
**maintained** [1] - 42:12
**major** [9] - 35:10, 83:1, 84:5, 85:21, 86:4, 86:23, 99:12, 99:17, 101:19
**makeup** [1] - 52:16
**malingering** [1] - 98:16
**manage** [1] - 7:15
**manifest** [2] - 34:20, 92:17
**Manual** [1] - 91:11
**manuscript** [3] - 48:15, 48:16, 48:23
**mark** [1] - 40:22
**masters** [3] - 35:14, 35:16, 35:18
**matching** [1] - 55:17

**matter** [7] - 5:20, 20:5, 53:22, 54:2, 58:20, 102:7, 104:1
**matters** - 5:25, 6:10
**matters.....................
............** [1] - 4:10
**mean** [11] - 10:10, 22:17, 23:13, 27:11, 28:21, 48:11, 63:13, 78:17, 87:8, 100:16, 104:2
**means** [10] - 42:4, 46:10, 48:12, 50:13, 56:17, 56:19, 57:25, 58:2, 100:15, 100:19
**meant** [1] - 22:6
**measure** [4] - 37:6, 51:3, 56:15, 59:21
**measuring** [2] - 59:10, 59:16
**mechanisms** [1] - 40:1
**media** [3] - 12:1, 106:24, 106:25
**medical** [13] - 5:8, 5:16, 35:3, 36:21, 37:20, 47:13, 61:20, 65:25, 66:8, 66:13, 74:16, 97:20, 97:21
**Medical** [4] - 35:25, 36:1, 36:3, 36:10
**meet** [6] - 11:22, 61:24, 75:7, 89:11, 89:15, 94:4
**meeting** [2] - 21:14, 29:19
**member** [5] - 7:12, 10:9, 38:2, 38:9, 93:14
**members** [2] - 41:8, 73:2
**memo** [27] - 14:23, 15:8, 16:23, 17:5, 17:14, 17:22, 17:23, 17:25, 18:8, 18:17, 18:24, 19:10, 19:11, 21:7, 21:10, 22:23, 23:7, 23:9, 23:18, 23:23, 23:24, 23:25, 24:3, 24:8, 31:18, 31:19
**memorandum** [2] - 14:11, 14:17
**Mental** [7] - 40:9, 46:12, 46:13, 46:19, 46:20, 47:4, 91:11
**mental** [33] - 33:13, 36:17, 37:8, 38:7, 39:22, 41:10, 41:12,

41:19, 46:14, 46:17, 46:21, 46:24, 47:1, 47:5, 77:1, 81:2, 81:12, 81:21, 81:25, 82:3, 82:4, 82:6, 82:12, 83:19, 83:24, 84:13, 84:19, 85:3, 85:24, 89:2, 100:16, 104:15
**mention** [3] - 16:25, 17:5, 17:21
**mentioned** [9] - 17:1, 17:7, 18:25, 40:16, 41:23, 45:9, 55:17, 88:8, 102:5
**mentioning** [1] - 51:15
**menus** [1] - 12:7
**message** [2] - 11:2, 31:23
**messages** [2] - 28:22, 29:1
**met** [5] - 14:7, 14:9, 19:21, 21:17, 61:22
**meta** [5] - 55:23, 56:8, 56:12, 57:18, 101:3
**meta-analyses** [2] - 56:8, 101:3
**meta-analysis** [2] - 55:23, 56:12
**meta-analytic** [1] - 57:18
**methodology** [1] - 37:3
**Miami** [3] - 2:3, 2:7, 2:11
**mic** [2] - 32:17, 36:8
**mice** [2] - 49:25, 50:3
**Michael** [1] - 3:4
**MICHAEL** [1] - 3:5
**Middle** [1] - 22:25
**middle** [2] - 56:17, 108:3
**midst** [1] - 74:2
**might** [18] - 20:24, 21:21, 32:18, 37:7, 47:7, 47:8, 49:18, 55:14, 71:9, 72:14, 82:4, 87:12, 90:15, 92:6, 92:9, 92:17, 101:11
**mildly** [1] - 10:15
**mind** [1] - 74:23
**Minnesota** [1] - 35:14
**minute** [2] - 20:22, 30:8
**minutes** [6] - 67:1, 67:7, 94:6, 98:12, 102:21, 106:24
**MISCELLANY** [1] - 4:9
**misimpression** [1] -

7:1
**miss** [1] - 64:5
**misstates** [1] - 97:3
**mistake** [2] - 9:17, 74:5
**mk@kinneyesq.com** [1] - 3:7
**mom** [14] - 19:18, 20:24, 21:3, 21:14, 21:18, 21:20, 21:23, 26:5, 26:11, 27:18, 28:9, 29:5, 29:10
**moment** [2] - 14:15, 30:3
**Monday** [3] - 6:6, 10:9, 26:12
**months** [4] - 13:11, 24:1, 25:2, 30:1
**morning** [9] - 5:7, 5:25, 11:15, 11:16, 11:18, 12:20, 12:21, 26:12, 32:23
**mornings** [1] - 7:5
**morphological** [1] - 79:16
**morphology** [1] - 52:16
**most** [11] - 40:22, 41:8, 41:9, 43:6, 70:25, 82:12, 83:24, 85:2, 85:24, 100:22, 102:19
**mostly** [2] - 42:5, 42:17
**mother** [4] - 19:25, 20:6, 30:19, 30:23
**motion** [2] - 5:7, 5:9
**motivated** [1] - 27:5
**mouth** [1] - 21:1
**move** [7] - 43:18, 53:1, 60:13, 68:25, 70:18, 98:9, 98:20
**moved** [1] - 27:5
**MR** [114] - 5:3, 5:5, 5:13, 8:4, 8:8, 8:11, 8:15, 8:20, 9:17, 10:3, 10:13, 10:17, 10:23, 11:2, 11:7, 30:7, 30:12, 30:17, 31:2, 31:11, 31:15, 32:3, 32:7, 32:22, 33:21, 33:25, 36:9, 43:11, 43:12, 43:17, 43:18, 43:21, 54:18, 54:20, 54:23, 54:25, 55:1, 61:5, 61:10, 61:11, 62:1, 62:5, 62:7, 62:10, 62:16, 62:20, 62:23, 63:3, 63:7, 63:10, 63:22,

64:5, 64:12, 64:15, 64:19, 64:21, 65:20, 65:22, 66:18, 67:7, 67:11, 67:12, 67:18, 68:25, 69:7, 69:14, 69:21, 70:10, 70:12, 71:1, 72:7, 72:17, 72:20, 72:22, 73:1, 73:5, 74:11, 74:13, 79:18, 81:4, 81:7, 81:11, 81:15, 81:20, 83:12, 83:15, 83:16, 93:17, 93:21, 94:7, 94:8, 96:1, 97:3, 97:7, 97:11, 97:15, 97:18, 98:11, 98:14, 98:18, 98:20, 98:22, 99:3, 99:5, 99:8, 99:20, 99:23, 102:22, 104:23, 105:1, 105:4, 105:23, 106:1, 106:2
**MRI** [19] - 37:5, 65:9, 89:23, 90:2, 90:19, 90:21, 90:25, 91:7, 94:12, 96:7, 99:16, 100:4, 102:17, 103:11, 103:14, 103:17, 104:13, 104:17
**MRI's** [5] - 91:4, 96:3, 101:24, 102:1, 102:3
**MS** [35] - 5:2, 5:17, 5:19, 5:24, 6:13, 6:16, 6:23, 10:6, 12:12, 12:19, 15:17, 15:22, 15:25, 16:2, 16:9, 16:12, 16:14, 30:3, 30:5, 31:4, 31:8, 69:25, 70:3, 70:6, 70:8, 70:11, 71:20, 72:8, 72:10, 72:14, 107:7, 107:9, 107:13, 107:18, 108:4
**multiple** [2] - 13:5, 24:25
**murky** [1] - 95:22

**N**

**name** [3] - 33:1, 67:19, 109:16
**names** [5] - 9:4, 17:1, 22:9, 22:10, 22:14
**national** [1] - 39:6
**National** [9] - 40:8, 40:17, 40:20, 40:23, 46:12, 46:13, 46:19, 46:20, 47:4

**natural** [1] - 107:25
**necessarily** [2] - 58:22, 101:9
**necessary** [2] - 65:9
**need** [13] - 9:2, 11:1, 11:23, 68:12, 71:9, 73:16, 74:3, 89:3, 89:7, 106:14, 107:15, 107:21
**needs** [2] - 9:23, 71:19
**neurobehavioral** [1] - 45:21
**neurobiological** [15] - 33:15, 39:25, 40:1, 60:14, 65:18, 77:17, 82:1, 86:16, 86:23, 86:24, 94:5, 94:9, 99:25, 100:3
**neurobiology** [10] - 43:14, 57:12, 57:17, 60:10, 84:22, 86:14, 89:14, 89:18, 93:3, 94:11
**neurochemical** [1] - 79:15
**neurocircuitry** [6] - 37:23, 38:6, 38:19, 39:19, 40:10, 100:11
**neuroimaging** [2] - 37:3, 37:4
**neurological** [4] - 47:20, 47:21, 77:24, 85:3
**neurologist** [2] - 74:18, 74:22
**neuronal** [3] - 51:3, 51:4, 58:21
**neurons** [1] - 51:2
**neurophysiological** [1] - 45:22
**neuropsychopharma cology** [1] - 41:6
**Neuropsychopharm acology** [1] - 41:7
**neutral** [1] - 72:15
**never** [1] - 55:19
**nevertheless** [1] - 93:25
**new** [2] - 20:8, 40:14
**newspaper** [2] - 68:1, 68:3
**next** [16] - 31:10, 32:6, 35:19, 36:19, 37:18, 38:1, 39:9, 40:25, 43:12, 43:20, 45:23, 46:8, 56:9, 57:19, 101:24, 106:8
**nice** [1] - 11:5, 71:16
**nine** [4] - 30:1, 37:22, 89:6, 91:15

**non** [1] - 102:8
**non-PTSD** [1] - 102:8
**none** [4] - 22:11, 74:4, 74:5
**normal** [2] - 51:25, 52:3
**normative** [2] - 104:2, 104:20
**note** [1] - 58:20
**notes** [4] - 13:6, 13:8, 24:13, 109:12
**nothing** [2] - 18:3, 69:12
**November** [6] - 13:3, 13:11, 15:6, 19:21, 28:7, 30:20
**NTC** [1] - 53:14
**number** [2] - 89:4, 91:15
**Numeral** [1] - 97:13
**numerous** [3] - 17:11, 17:15, 19:10
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:1

## O

**o'clock** [3] - 12:5, 106:12
**oath** [2] - 12:13, 12:16
**object** [1] - 62:7
**objection** [14] - 32:14, 32:16, 43:9, 43:16, 43:17, 54:18, 61:5, 81:4, 81:15, 93:17, 97:3, 98:18, 99:3, 99:20
**obligations** [1] - 11:22
**observable** [7] - 45:25, 47:2, 54:10, 65:4, 65:5, 101:10
**observation** [1] - 69:22
**observe** [7] - 45:13, 47:1, 47:5, 47:10, 47:16, 47:18, 60:2
**observed** [2] - 77:14, 100:3
**obtained** [3] - 6:4, 6:17, 36:19
**obtaining** [1] - 35:18
**obviously** [4] - 8:13, 9:17, 69:9, 73:8
**occur** [1] - 47:23
**occurred** [2] - 13:13, 54:13
**occurring** [1] - 26:19
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 109:1

**offense** [1] - 25:8
**offer** [2] - 43:13, 69:17
**offered** [5] - 34:16, 62:7, 62:19, 69:14, 93:18
**offering** [3] - 31:7, 34:13, 63:7
**offers** [1] - 63:12
**OFFICE** [1] - 3:5
**office** [8] - 13:22, 14:2, 14:4, 27:1, 28:5, 28:6, 28:19, 29:22
**official** [2] - 109:5, 109:11
**Official** [3] - 3:12, 109:3, 109:22
**old** [2] - 103:20, 103:23
**once** [2] - 107:19, 107:23
**one** [61] - 6:1, 8:17, 12:2, 12:4, 17:21, 21:19, 22:20, 23:8, 30:3, 30:8, 31:7, 35:24, 41:5, 41:7, 44:12, 44:18, 47:25, 49:19, 50:14, 50:17, 53:8, 55:2, 55:4, 55:12, 55:13, 55:20, 55:22, 56:7, 56:12, 57:11, 57:12, 57:16, 57:18, 58:19, 61:13, 63:6, 63:11, 64:9, 71:5, 76:21, 77:8, 79:22, 82:10, 82:13, 84:1, 84:5, 87:5, 89:4, 91:22, 91:25, 92:13, 95:17, 96:7, 96:9, 96:10, 100:23, 101:19, 104:15, 105:5, 107:21, 107:23
**Open** [3] - 11:12, 64:18, 73:12
**opine** [1] - 64:13
**opinion** [42] - 34:9, 34:13, 34:21, 34:25, 44:2, 44:6, 44:9, 45:17, 46:5, 55:6, 55:11, 61:12, 61:16, 61:17, 61:18, 61:19, 62:2, 62:17, 63:5, 63:12, 63:16, 64:22, 65:1, 65:25, 66:8, 75:3, 75:4, 75:21, 76:22, 76:24, 77:3, 77:7, 77:12, 81:12, 83:21, 84:3, 85:15, 85:17, 93:13, 93:16,

93:23
**opinions** [26] - 33:19, 34:11, 34:16, 35:2, 35:7, 43:19, 60:14, 60:16, 61:12, 61:15, 62:7, 62:24, 63:11, 63:13, 63:24, 66:12, 68:13, 76:16, 78:3, 93:18, 96:19, 97:8, 97:13, 97:20, 98:19, 99:4
**opportunity** [3] - 9:5, 15:10, 107:24
**opposed** [1] - 64:8
**opposition** [1] - 5:7
**options** [1] - 7:23
**orange** [3] - 58:3, 58:10, 58:13
**orbitofrontal** [3] - 51:9, 51:14, 51:16
**order** [5] - 76:18, 83:17, 89:2, 89:6, 99:17
**organization** [1] - 62:25
**organizations** [1] - 41:8
**organized** [1] - 53:13
**origin** [5] - 45:16, 77:17, 77:25, 86:20, 87:1
**outpatient** [1] - 42:4
**output** [3] - 41:13, 41:21, 44:17
**outright** [1] - 48:24
**outside** [2] - 10:11, 68:12
**overheard** [1] - 72:20
**overlap** [1] - 53:7
**overlapping** [2] - 100:11, 100:12
**overly** [1] - 94:24
**overruled** [4] - 31:9, 81:16, 93:19, 99:21
**oversimplification** [2] - 51:24, 81:18
**oversimplifying** [1] - 75:2
**own** [1] - 70:23

## P

**P.A.H** [1] - 3:6
**p.m** [2] - 67:4, 108:7
**page** [6] - 16:10, 31:17, 31:19, 57:19, 83:18, 97:12
**pages** [3] - 14:12, 14:14, 109:10
**Panera** [1] - 12:6

**paper** [2] - 15:23, 48:21
**papers** [1] - 7:10
**paragraph** [6] - 31:16, 31:18, 31:20, 31:22, 97:8, 97:11
**Park** [1] - 1:19
**parlance** [2] - 105:20, 105:21
**parse** [1] - 100:9
**part** [8] - 8:24, 51:10, 53:24, 54:16, 68:16, 73:24, 100:23, 101:15
**participate** [1] - 8:2
**particular** [16] - 5:16, 7:9, 33:11, 33:13, 36:16, 36:17, 37:4, 37:5, 38:5, 40:11, 42:16, 52:6, 52:14, 55:2, 57:4, 64:8
**parties** [2] - 6:25, 11:11
**partner** [2] - 50:23, 52:1
**party** [1] - 9:14
**pass** [1] - 66:18
**past** [1] - 66:24
**patient** [6] - 66:4, 80:2, 90:14, 101:15, 101:19, 101:22
**patients** [3] - 42:18, 57:9, 90:12
**pause** [3] - 32:14, 75:23, 106:20
**pausing** [1] - 100:13
**pay** [1] - 46:15
**PC** [1] - 3:9
**pediatric** [1] - 57:8
**peer** [10] - 48:7, 48:11, 48:12, 48:25, 50:11, 52:22, 53:1, 53:2, 58:23, 59:3
**peer-reviewed** [9] - 48:7, 48:11, 48:25, 50:11, 52:22, 53:1, 53:2, 58:23, 59:3
**peers** [3] - 48:16, 48:21
**pending** [1] - 106:5
**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:1
**people** [38] - 7:9, 7:21, 19:5, 49:10, 49:11, 49:14, 55:14, 55:15, 71:22, 71:23, 73:23, 74:8, 87:6, 87:7, 87:15, 87:25, 88:5, 88:14, 88:17, 88:21, 88:23, 89:12, 89:15,

91:4, 96:4, 100:18, 100:21, 100:22, 101:1, 101:3, 101:4, 101:6
**people's** [1] - 87:21
**per** [1] - 79:10
**perceptions** [1] - 72:5
**perfect** [5] - 23:1, 23:4, 32:20, 44:25, 45:6
**period** [1] - 72:1
**permission** [4] - 30:13, 30:14, 31:2, 33:21
**persistent** [9] - 57:13, 57:17, 60:5, 60:11, 65:16, 65:18, 79:15, 82:11, 85:1
**person** [14] - 9:13, 10:13, 11:5, 12:4, 46:23, 47:23, 68:5, 71:15, 76:18, 82:8, 90:2, 90:20, 92:11, 96:8
**person's** [1] - 87:5
**personal** [4] - 21:9, 77:13, 87:8, 87:10
**personally** [3] - 10:1, 22:12, 70:21
**perspective** [2] - 61:18, 73:21
**Ph.D** [4] - 33:4, 33:5, 33:6, 36:19
**P▮** [1] - 21:21
**phone** [5] - 27:18, 29:9, 31:5, 92:13, 93:14
**photographed** [1] - 7:4
**photographs** [3] - 7:7, 7:8, 7:10
**phrase** [2] - 80:21, 80:23
**physical** [79] - 33:11, 34:2, 34:6, 34:24, 36:16, 37:16, 38:6, 38:20, 39:20, 43:24, 44:3, 45:12, 45:13, 45:15, 45:20, 46:2, 46:6, 47:3, 47:12, 47:22, 48:8, 51:21, 52:17, 53:3, 53:18, 53:20, 54:17, 55:7, 58:25, 59:7, 59:9, 59:13, 64:1, 64:14, 64:24, 65:11, 66:1, 66:5, 66:9, 78:4, 78:7, 78:10, 78:11, 78:12, 78:13, 78:18, 78:19, 79:2, 79:12,

119

79:23, 80:3, 80:12,
80:15, 80:19, 80:21,
80:23, 81:1, 81:13,
85:8, 85:9, 85:15,
85:17, 85:18, 85:22,
86:13, 92:3, 92:17,
92:18, 93:10, 93:15,
93:25, 94:10, 94:15,
96:5, 96:8, 96:10,
103:25, 104:6
**physically** [3] - 93:1,
93:7, 93:24
**pick** [1] - 49:25
**picking** [2] - 43:2,
43:3
**pictures** [2] - 7:7, 8:16
**piece** [3] - 95:9,
100:23, 100:25
**PITTLEMAN** [1] - 3:9
**place** [1] - 9:12
**placed** [1] - 106:22
**plaintiff** [10] - 6:5,
32:7, 62:9, 63:12,
75:5, 77:7, 98:23,
99:10, 103:12, 104:9
**Plaintiff** [4] - 1:4, 1:14,
2:1, 4:2
**Plaintiff's** [1] - 32:9
**plaintiff's** [11] - 5:7,
7:4, 7:11, 10:10,
16:10, 30:19, 30:23,
76:23, 77:5, 103:17,
107:11
**plaintiffs** [1] - 30:23
**plan** [1] - 30:8
**PLC** [1] - 3:5
**PLLC** [1] - 1:15
**pod** [6] - 17:12, 17:16,
17:24, 18:5, 18:13
**point** [7] - 12:10,
63:22, 70:14, 70:19,
94:17, 102:16, 106:7
**pointed** [1] - 97:9
**pointing** [1] - 57:25
**pool** [1] - 56:4
**pose** [1] - 105:7
**possible** [5] - 23:3,
92:12, 92:16,
102:15, 106:13
**postdoctoral** [7] -
36:20, 36:23, 37:1,
37:10, 37:17, 42:10,
42:13
**posttraumatic** [2] -
43:14, 43:23
**PowerPoint** [2] -
33:18, 33:22
**practice** [5] - 42:7,
42:12, 42:15, 42:22,
82:14

**practicing** [1] - 42:11
**prediction** [3] - 102:7,
102:11, 102:13
**preexisted** [1] - 95:22
**preface** [1] - 54:24
**prefrontal** [6] - 50:17,
50:24, 50:25, 51:5,
51:18, 52:20
**Preliminary** [1] - 4:10
**prepared** [1] - 80:8
**preparing** [2] - 23:3,
75:4
**present** [5] - 11:13,
19:19, 20:3, 20:4,
67:14
**presentation** [1] -
33:18
**presentations** [1] -
89:16
**presented** [1] - 48:20
**presents** [1] - 90:14
**press** [10] - 7:17, 8:17,
68:12, 68:16, 69:4,
71:5, 71:8, 71:15,
73:2, 73:24
**prestige** [1] - 40:22
**prestigious** [1] - 41:8
**pretty** [2] - 24:6, 62:25
**previous** [2] - 53:23,
57:22
**previously** [1] - 30:13
**primary** [4] - 38:4,
38:18, 39:3, 39:18
**principal** [1] - 20:8
**principals** [1] - 25:19
**Principles** [1] - 76:8
**print** [1] - 106:25
**printed** [1] - 7:10
**private** [4] - 6:10,
20:5, 20:6, 23:6
**probabilistically** [1] -
102:3
**probabilities** [3] -
98:6, 102:25, 103:7
**probability** [7] - 66:13,
97:1, 97:22, 97:25,
103:2, 103:4, 103:10
**problem** [4] - 49:17,
55:16, 58:11, 73:10
**problems** [1] - 26:19
**procedure** [1] - 43:4
**proceed** [2] - 64:19,
74:11
**proceeding** [1] - 70:24
**PROCEEDINGS** [1] -
1:11
**proceedings** [5] -
67:4, 106:20, 109:6,
109:11, 109:14
**Proceedings** [1] -

108:7
**process** [3] - 9:25,
39:1, 85:5
**processes** [2] - 75:1,
100:12
**produce** [3] - 51:11,
79:6, 94:3
**produced** [19] - 34:6,
34:24, 46:1, 46:5,
47:4, 47:11, 54:16,
65:6, 66:9, 79:12,
81:22, 82:1, 82:17,
83:20, 83:25, 84:2,
84:6, 84:13, 84:22
**produces** [3] - 48:4,
60:10, 89:18
**producing** [6] - 44:13,
47:25, 53:25, 77:20,
79:17, 89:14
**product** [5] - 47:2,
81:13, 82:21, 83:6,
85:22
**professional** [3] -
35:3, 97:20, 97:21
**professionally** [2] -
10:2, 70:20
**professionals** [1] -
71:6
**professor** [2] - 38:14,
38:24, 39:10
**program** [7] - 35:16,
35:17, 35:22, 38:4,
38:18, 39:18, 39:21
**projects** [2] - 40:8,
42:1
**prolonged** [5] - 52:7,
52:9, 52:14, 52:15,
52:17
**prominence** [1] - 39:6
**properties** [2] - 66:6,
78:8
**protections** [1] - 73:2
**provide** [5] - 9:15,
22:10, 40:21, 76:16,
88:1
**provided** [2] - 75:22,
87:17
**providing** [2] - 42:9,
64:9
**psychiatric** [3] -
60:17, 60:20, 60:24
**psychiatry** [1] - 37:19
**Psychiatry** [2] - 38:15,
39:11
**psychological** [9] -
34:14, 42:5, 63:7,
63:8, 63:17, 63:23,
76:16, 76:23, 76:24
**Psychological** [1] -
76:7

**psychologist** [8] -
33:2, 41:24, 42:10,
42:11, 74:23, 76:12,
90:10, 98:15
**Psychologist** [1] -
76:8
**psychologists** [1] -
76:16
**psychology** [8] - 33:5,
33:6, 35:11, 35:14,
35:20, 37:23, 43:10,
43:14
**PTSD** [187] - 33:13,
33:15, 34:1, 34:5,
34:17, 34:20, 34:23,
36:6, 36:18, 39:22,
40:11, 40:12, 40:15,
42:6, 42:17, 42:19,
43:23, 44:2, 44:11,
45:2, 45:12, 45:13,
45:15, 45:18, 45:19,
46:5, 47:13, 47:23,
48:7, 49:5, 49:7,
49:13, 49:15, 49:20,
49:23, 53:3, 53:5,
53:16, 53:19, 53:21,
54:3, 54:6, 54:9,
54:16, 55:6, 55:18,
56:16, 56:18, 56:19,
56:21, 56:22, 56:24,
57:1, 57:6, 57:7,
57:9, 57:12, 57:24,
58:1, 58:2, 58:16,
58:17, 60:7, 60:9,
60:10, 60:14, 60:21,
60:25, 61:3, 61:16,
61:24, 62:8, 63:3,
63:13, 63:25, 64:10,
64:11, 64:13, 64:23,
65:3, 65:8, 65:12,
65:15, 65:16, 65:17,
66:1, 66:4, 66:9,
75:1, 75:21, 77:16,
77:17, 77:18, 78:4,
79:7, 79:11, 79:17,
79:23, 80:3, 81:21,
81:24, 82:2, 82:3,
82:10, 83:19, 84:18,
84:24, 84:25, 85:7,
85:8, 85:13, 86:7,
86:17, 86:19, 86:20,
86:24, 87:1, 87:2,
87:5, 87:7, 87:15,
87:25, 88:5, 88:6,
88:10, 88:14, 88:16,
88:17, 88:21, 89:9,
89:12, 89:15, 89:16,
90:3, 90:7, 90:8,
90:12, 90:15, 90:16,
90:20, 91:4, 91:6,

91:17, 91:23, 92:11,
92:15, 93:15, 93:25,
94:1, 94:5, 94:12,
94:15, 95:12, 95:13,
96:3, 96:4, 96:13,
98:24, 99:17,
100:18, 100:21,
100:22, 101:2,
101:3, 101:6,
101:10, 101:11,
101:19, 101:23,
102:8, 102:12,
102:17, 104:9, 105:9
**public** [4] - 7:11, 8:8,
8:12, 9:6
**publication** [3] - 6:2,
8:18, 69:22
**publish** [8] - 15:18,
16:9, 30:13, 30:14,
31:2, 31:11, 36:11,
37:9
**published** [5] - 15:21,
16:13, 30:16, 31:14,
89:20
**publishing** [1] - 36:14
**pull** [1] - 15:17
**pulled** [1] - 13:19
**purports** [2] - 6:6,
6:17
**purpose** [2] - 9:11,
44:19
**put** [19] - 7:14, 10:15,
13:18, 13:23, 14:1,
16:23, 17:6, 21:8,
30:18, 31:9, 33:17,
75:25, 76:1, 85:12,
90:9, 101:24,
107:22, 108:1
**puts** [1] - 46:16
**putting** [3] - 14:3,
14:5, 14:8

---

### Q

**qualifications** [2] -
35:7, 86:1
**qualified** [2] - 43:10,
94:19
**qualify** [1] - 82:1
**quantified** [1] - 37:6
**quantify** [1] - 102:6
**quantitatively** [1] -
55:22
**QUESTION** [6] -
63:15, 83:19, 83:23,
84:1, 84:5, 84:8
**questioning** [1] -
62:13
**questions** [11] - 12:22,
30:5, 32:3, 32:12,

34:9, 63:1, 63:5, 63:6, 72:22, 72:24, 74:15
**quick** [1] - 6:20
**quickly** [2] - 12:23, 14:7
**quote** [1] - 70:11
**quoted** [1] - 69:23, 69:25
**quoting** [1] - 6:18

**R**

**R.'s** [1] - 107:6
**Rachel** [3] - 13:13, 13:16, 22:25
**raise** [1] - 5:20
**raised** [4] - 7:2, 8:6, 8:22, 13:24
**raises** [1] - 13:22
**random** [2] - 28:3, 43:2
**randomly** [4] - 49:8, 49:22, 49:25, 95:3
**rare** [1] - 100:18
**rather** [4] - 43:3, 48:14, 50:14, 55:21
**rbates@hunton.com** [1] - 2:16
**reach** [2] - 76:19, 91:23
**reached** [2] - 34:9, 96:19
**reaching** [1] - 98:3
**read** [9] - 17:17, 31:5, 31:21, 61:7, 61:8, 97:4, 97:5, 97:10, 97:15
**reading** [5] - 61:6, 61:9, 76:20, 79:19, 84:15
**ready** [1] - 5:1
**real** [2] - 72:2, 107:24
**reality** [2] - 100:16, 103:3
**really** [5] - 12:24, 40:12, 55:20, 83:4, 87:2
**realtime** [1] - 109:12
**reason** [1] - 36:3
**reasonable** [11] - 35:3, 47:15, 48:19, 65:25, 66:8, 66:13, 66:15, 96:20, 97:1, 97:20, 97:21
**reasonably** [1] - 79:7
**reasons** [1] - 102:19
**recap** [1] - 23:25
**receive** [7] - 36:2, 36:25, 38:21, 38:25,

49:9, 95:4, 103:11
**received** [9] - 13:12, 36:5, 37:2, 40:17, 41:1, 75:10, 75:18, 103:14, 104:14
**receiving** [3] - 39:3, 40:18, 41:17
**recently** [1] - 106:22
**receptors** [1] - 52:12
**Recess** [1] - 67:3
**recognize** [1] - 73:24
**recollection** [2] - 31:25, 97:19
**record** [9] - 5:4, 5:5, 6:22, 61:9, 69:11, 70:19, 71:20, 73:1, 97:11
**recorded** [1] - 18:23
**recording** [1] - 109:13
**records** [3] - 5:16, 27:18, 61:20
**Recross** [1] - 4:5
**recross** [1] - 30:8
**RECROSS** [1] - 30:11
**Recross-examination** [1] - 4:5
**recruit** [1] - 55:14
**recruiting** [1] - 55:14
**recurrent** [1] - 65:15
**redactions** [3] - 6:24, 9:6, 9:12
**REDIRECT** [2] - 12:18, 105:3
**Redirect** [2] - 4:4, 4:8
**redirect** [1] - 104:25
**refer** [1] - 58:4
**reference** [2] - 17:15, 31:6
**referenced** [1] - 31:12
**referring** [3] - 56:20, 78:25, 87:11
**refers** [1] - 53:17
**reflecting** [1] - 70:15
**refresh** [1] - 97:19
**refuted** [2] - 17:3, 17:21
**regard** [2] - 5:14, 63:2
**regarding** [2] - 6:8, 63:5
**region** [2] - 56:19, 57:25
**regions** [1] - 57:3
**regulate** [3] - 45:5, 48:2, 50:19
**regulating** [1] - 44:17
**rejected** [1] - 48:24
**related** [6] - 36:6, 40:21, 41:10, 41:12, 41:19, 63:5
**relates** [2] - 5:21, 63:2

**relatively** [2] - 59:10, 59:21
**release** [4] - 9:9, 52:3, 52:8, 52:9
**released** [2] - 52:10, 52:18
**releases** [1] - 79:14
**relevance** [1] - 94:25
**relevant** [1] - 95:10
**rely** [2] - 55:8, 55:10
**relying** [2] - 62:2, 63:25
**remained** [1] - 12:16
**remake** [1] - 69:17
**remember** [22] - 13:5, 13:8, 16:3, 16:21, 19:15, 19:16, 21:16, 24:22, 26:6, 27:7, 27:20, 28:4, 28:5, 31:24, 68:3, 75:15, 76:11, 84:10, 96:20, 97:2, 106:16
**remembered** [2] - 13:3, 16:18
**render** [1] - 63:16
**rendering** [2] - 76:22, 76:24
**reorder** [1] - 12:7
**reordered** [1] - 12:6
**repeat** [1] - 93:20
**repeated** [1] - 52:6
**rephrase** [5] - 54:19, 62:6, 77:12, 81:10, 105:17
**report** [22] - 6:7, 61:6, 61:7, 61:8, 61:9, 61:13, 62:11, 62:16, 62:24, 63:11, 75:11, 75:13, 75:22, 76:2, 87:17, 94:23, 96:23, 96:25, 97:4, 97:5, 97:12, 107:1
**reported** [2] - 7:3, 69:23, 109:5
**reporter** [10] - 6:3, 9:2, 9:7, 10:11, 10:14, 10:15, 70:2, 70:3, 70:17, 73:7
**REPORTER** [1] - 109:1
**Reporter** [3] - 3:12, 109:3, 109:22
**Reporter.................... ...** [1] - 4:10
**reporters** [2] - 6:16, 9:9
**reporting** [2] - 8:17, 28:13
**reports** [1] - 11:20
**represent** [1] - 67:20

**represents** [2] - 53:11, 57:23
**request** [1] - 43:12
**required** [2] - 18:15, 18:16
**research** [48] - 33:7, 33:9, 33:10, 35:23, 36:6, 36:11, 36:14, 37:9, 37:13, 38:4, 38:18, 39:19, 39:25, 40:3, 40:4, 40:6, 40:21, 41:9, 41:13, 41:19, 41:23, 42:1, 42:21, 43:5, 44:1, 46:4, 46:14, 46:17, 46:24, 48:17, 50:15, 55:5, 56:13, 59:5, 72:21, 72:23, 73:8, 78:22, 87:8, 87:10, 87:14, 87:18, 87:20, 91:3, 100:20, 101:17, 102:15
**Research** [10] - 36:21, 37:1, 37:21, 38:3, 38:10, 38:12, 39:13, 39:24, 41:16, 41:18
**researchers** [2] - 41:9, 49:4
**reseated** [1] - 12:17
**resolve** [1] - 82:10
**resonance** [2] - 37:4, 89:20
**respect** [4] - 62:9, 75:21, 77:4, 81:1
**responding** [4] - 44:13, 48:1, 48:2, 51:11
**response** [7] - 14:17, 20:22, 63:9, 68:18, 93:8, 105:10, 105:17
**responses** [2] - 11:16, 93:5
**responsibility** [1] - 73:22
**responsible** [4] - 44:13, 44:16, 50:18, 53:25
**rest** [1] - 12:3
**Reston** [2] - 3:7, 3:10
**result** [8] - 9:25, 50:14, 78:5, 86:13, 89:8, 92:18, 94:1, 99:25
**resulted** [1] - 61:21
**resulting** [7] - 34:2, 43:24, 44:3, 48:8, 55:7, 66:1, 79:24
**results** [14] - 44:11, 48:13, 51:21, 52:18, 55:3, 55:21, 55:23,

56:1, 56:4, 56:5, 56:6, 56:7, 79:15, 95:25
**resumed** [1] - 67:4
**retrieve** [2] - 26:22, 27:11
**review** [9] - 39:4, 48:12, 48:16, 48:21, 60:17, 60:20, 60:23, 61:20, 79:20
**reviewed** [10] - 6:13, 48:7, 48:11, 48:25, 50:11, 52:22, 53:1, 53:2, 58:23, 59:3
**revised** [1] - 48:23
**Rewari** [3] - 2:17, 8:8, 8:22
**REWARI** [8] - 5:19, 5:24, 6:13, 6:16, 6:23, 10:6, 107:13, 107:18
**rise** [1] - 40:11
**risk** [3] - 33:12, 36:16, 70:24
**river** [8] - 44:19, 44:20, 44:22, 44:23, 45:1, 51:15, 51:16, 58:18
**rkeefe@bsfllp.com** [1] - 2:12
**road** [2] - 5:10, 11:18
**Robert** [2] - 2:9, 3:6
**role** [5] - 38:16, 38:18, 39:12, 39:18, 39:22
**roles** [1] - 38:3
**Roman** [1] - 97:12
**room** [3] - 14:7, 14:9, 21:22
**ROSSIE** [1] - 1:11
**row** [1] - 68:7
**RPR** [2] - 3:12, 109:21
**Rule** [1] - 7:23
**rule** [1] - 71:4
**rules** [1] - 32:15
**run** [1] - 70:23
**Ryan** [11] - 2:13, 60:21, 60:24, 61:2, 62:3, 64:3, 64:6, 75:11, 75:18, 76:2, 99:9
**Ryan's** [10] - 60:17, 60:20, 60:23, 61:13, 61:15, 61:17, 61:20, 62:2, 75:13, 75:21

**S**

**S.T** [1] - 3:6
**sadness** [1] - 47:8
**safe** [1] - 106:3

**sample** [4] - 55:14, 56:2, 56:3, 102:9
**samples** [1] - 56:1
**sanctions** [1] - 10:1
**SANE** [2] - 6:7, 6:8
**sat** [1] - 26:8
**saw** [1] - 10:17
**scan** [3] - 90:17, 95:11, 95:15
**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10
**scholarly** [3] - 39:5, 41:13, 41:21
**school** [9] - 13:19, 20:8, 20:17, 26:11, 26:18, 27:6, 28:10, 29:2, 42:8
**School** [5] - 22:25, 67:20, 69:25, 70:11, 70:14
**science** [2] - 24:25, 43:8
**sciences** [2] - 36:22, 37:20
**scientific** [16] - 35:3, 43:5, 44:10, 45:19, 47:10, 48:7, 61:18, 61:19, 65:2, 65:12, 77:16, 78:18, 79:1, 79:9, 94:2, 97:21
**scientists** [2] - 51:20, 58:23
**scope** [3] - 81:4, 98:18, 99:3
**Scott** [1] - 2:20
**screen** [2] - 53:9, 88:7
**screens** [1] - 33:22
**SE** [3] - 2:2, 2:6, 2:10
**se** [1] - 79:10
**seat** [1] - 32:11
**seated** [5] - 11:14, 32:10, 67:15, 68:5, 107:5
**second** [9] - 31:21, 34:5, 34:23, 41:16, 41:18, 44:16, 45:24, 69:7, 100:25
**seductive** [3] - 22:3, 22:6, 23:14
**see** [38] - 11:20, 17:1, 17:14, 18:6, 19:11, 29:1, 30:20, 30:22, 40:12, 45:18, 47:7, 47:8, 47:9, 47:17, 47:19, 47:20, 50:4, 50:7, 51:1, 54:3, 57:3, 57:15, 68:6, 70:22, 71:25, 75:22, 77:25, 80:5, 90:12, 91:22, 94:13, 95:7,

95:12, 95:19, 95:23, 108:1
**seeing** [2] - 17:17, 94:1
**seem** [1] - 20:2
**selected** [2] - 39:3, 57:3
**selecting** [2] - 42:25, 43:1
**selection** [1] - 41:11
**send** [2] - 48:13, 90:16
**sends** [1] - 48:15
**sense** [1] - 22:18
**sensitive** [2] - 6:11, 73:1
**sensitivity** [2] - 73:5, 90:6
**sent** [3] - 22:23, 22:24, 30:19
**sentence** [2] - 18:6, 31:22
**separate** [2] - 14:23, 90:21
**serious** [2] - 10:1, 26:2
**service** [1] - 39:2
**SESSION** [1] - 1:8
**set** [1] - 32:23
**sets** [1] - 102:13
**setting** [1] - 101:13
**several** [2] - 27:9
**sexual** [19] - 20:1, 24:21, 25:1, 25:5, 25:7, 25:19, 25:23, 25:24, 33:11, 36:16, 37:16, 38:6, 38:20, 39:20, 53:18, 53:20, 58:24, 59:7, 59:9
**shared** [1] - 13:4
**shares** [1] - 74:1
**short** [2] - 66:22, 67:21
**shorter** [1] - 12:2
**shorthand** [2] - 109:5, 109:12
**shot** [4] - 61:10, 92:23, 92:24, 94:2
**show** [13] - 14:13, 14:15, 14:20, 14:25, 15:3, 15:4, 15:14, 15:15, 47:7, 47:8, 51:12, 62:10, 79:19
**showed** [1] - 52:19
**showing** [1] - 58:15
**shown** [6] - 48:7, 50:12, 53:2, 53:6, 59:4, 88:7
**shows** [1] - 25:3
**Sid** [1] - 75:14
**side** [6] - 5:2, 7:15,

8:13, 8:25, 107:11, 107:24
**Side** [3] - 5:23, 62:22, 69:2
**sidebar** [1] - 5:21
**sides** [2] - 9:5, 73:19
**sidewalk** [1] - 7:7
**significance** [2] - 40:18, 57:8
**significant** [3] - 25:24, 26:2, 58:5
**significantly** [2] - 57:5, 58:15
**signs** [2] - 47:7, 47:8
**similar** [8] - 45:2, 47:13, 55:3, 57:9, 57:22, 58:25, 89:9, 93:8
**simplify** [1] - 93:22
**single** [9] - 14:12, 17:21, 27:7, 55:8, 55:10, 84:12, 95:11, 96:7, 102:12
**single-spaced** [1] - 14:12
**situations** [1] - 47:9
**six** [1] - 25:2
**size** [7] - 55:14, 56:2, 56:3, 56:15, 57:23, 78:23, 102:9
**skis** [1] - 79:9
**slide** [12] - 38:1, 40:25, 43:20, 45:23, 46:8, 50:10, 53:23, 56:9, 62:8, 65:20, 79:19, 80:2
**slides** [2] - 79:22, 80:8
**slightly** [1] - 100:13
**slut** [1] - 22:11
**smaller** [5] - 54:3, 56:18, 57:5, 58:1, 58:15
**snapshots** [1] - 87:19
**social** [2] - 12:1, 106:24
**soldier** [5] - 92:6, 93:13, 93:23, 93:24, 94:1
**soldiers** [2] - 92:23, 94:2
**someone** [20] - 8:13, 47:5, 47:16, 48:12, 52:14, 68:1, 73:6, 74:20, 77:18, 84:19, 87:12, 89:12, 90:4, 93:3, 94:12, 94:14, 95:11, 100:6, 100:17, 101:8
**sometimes** [1] - 11:5
**somewhere** [1] -

42:20
**Sona** [1] - 2:17
**sorry** [5] - 23:8, 93:20, 97:7, 99:22, 105:17
**sort** [5] - 8:18, 20:16, 32:17, 72:10, 91:21
**sound** [4] - 37:24, 48:18, 80:4
**sounds** [2] - 101:12, 103:22
**South** [4] - 35:25, 36:2, 36:4, 36:10
**space** [4] - 7:11, 8:9, 8:12, 85:11
**spaced** [1] - 14:12
**SPEAKER** [3] - 68:20, 68:22, 68:24
**speaking** [6] - 16:19, 16:21, 19:18, 24:7, 37:12, 83:7
**specialist** [1] - 75:14
**specialized** [2] - 36:5, 37:2
**specific** [9] - 12:22, 18:2, 22:9, 22:10, 44:11, 48:3, 62:17, 63:12, 88:8
**specifically** [8] - 16:19, 29:13, 29:21, 62:9, 62:14, 63:6, 63:14
**specificity** [1] - 90:7
**specifics** [2] - 29:24, 35:6
**speed** [1] - 14:10
**spoken** [5] - 16:25, 17:11, 17:15, 70:8, 71:21
**spokesperson** [1] - 70:14
**spot** [3] - 17:11, 17:16, 19:10
**Sprint** [1] - 27:4
**Square** [1] - 3:13
**srewari@huntonak.com** [1] - 2:19
**St** [2] - 35:9, 35:12
**stable** [6] - 57:13, 60:5, 60:12, 82:11, 85:1, 94:3
**staff** [1] - 71:7
**stand** [5] - 23:16, 26:8, 32:8, 74:9
**standard** [1] - 90:8
**standing** [2] - 7:6, 55:8
**standpoint** [1] - 78:18
**start** [10] - 42:7, 49:3, 62:23, 74:14, 82:18, 96:18, 98:8, 106:12,

106:13, 106:15
**started** [6] - 10:19, 42:8, 50:4, 65:23, 71:21, 95:6
**starts** [2] - 31:22, 52:11
**State** [1] - 35:15
**state** [1] - 7:12
**statement** [19] - 16:4, 16:5, 16:15, 18:4, 18:21, 18:23, 18:25, 19:1, 20:10, 21:12, 21:15, 21:25, 22:3, 23:6, 23:13, 29:19, 29:20, 29:23, 72:11
**statements** [11] - 13:7, 18:2, 18:9, 18:12, 18:15, 23:10, 23:11, 23:16, 24:10, 24:13, 24:17
**STATES** [2] - 1:1, 1:12
**States** [1] - 3:13
**states** [1] - 6:3
**stating** [1] - 68:24
**Statistical** [1] - 91:11
**statistically** [3] - 37:6, 58:5, 58:8
**statistics** [1] - 48:18
**stay** [3] - 10:16, 106:24
**stayed** [1] - 12:1
**staying** [1] - 10:18
**step** [3] - 30:6, 32:5, 85:7
**steps** [2] - 14:21, 17:23
**stick** [1] - 85:6
**still** [7] - 12:13, 18:23, 28:1, 60:3, 102:10, 102:11, 102:18
**stop** [2] - 12:5, 20:19, 63:21, 68:8
**stopping** [1] - 106:7
**storm** [2] - 44:25, 45:7
**story** [2] - 17:3, 17:21
**street** [2] - 10:18, 105:12
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**strength** [2] - 51:4, 51:5
**stress** [9] - 36:5, 43:14, 43:23, 51:12, 52:3, 52:5, 52:9, 52:10, 93:7
**stressed** [3] - 50:23, 51:1, 51:4
**stressful** [2] - 82:9, 93:2
**stressor** [1] - 50:2,

50:5, 50:6, 52:1,
52:6, 92:21, 92:25,
93:1, 93:4, 93:10
**stressors** [3] - 49:10,
52:3, 52:7
**strict** [1] - 20:18
**stroke** - 47:15,
47:16, 77:24
**strong** [2] - 44:22
**stronger** [6] - 44:23,
45:3, 45:4, 48:5,
51:17, 52:20
**struck** [1] - 10:14
**structural** [3] - 66:6,
78:7, 96:16
**structure** [9] - 52:17,
53:3, 57:10, 57:23,
78:23, 81:23, 82:18,
82:21, 83:21
**structured** [1] - 90:23
**structures** [1] - 52:21
**student** [6] - 13:6,
24:24, 25:3, 28:2,
28:3, 28:16
**students** [14] - 16:19,
16:25, 17:20, 17:24,
18:4, 18:9, 18:12,
18:15, 19:6, 19:7,
24:25, 27:24, 28:18,
29:3
**studied** [1] - 98:3
**studies** [47] - 36:11,
40:16, 48:7, 48:25,
49:1, 49:3, 49:4,
49:6, 49:7, 49:11,
49:24, 50:11, 52:22,
53:1, 53:2, 53:5,
53:6, 55:3, 55:22,
55:24, 55:25, 56:5,
56:6, 58:23, 59:3,
87:4, 87:5, 87:8,
87:10, 87:13, 87:20,
88:6, 88:8, 88:9,
89:20, 90:5, 94:23,
95:1, 95:2, 95:19,
95:20, 95:21, 95:25,
101:1
**study** [26] - 37:6,
37:14, 48:11, 48:12,
50:14, 53:8, 53:11,
53:12, 54:7, 54:12,
55:2, 55:4, 55:8,
55:10, 55:12, 55:13,
55:21, 60:1, 74:23,
74:25, 83:4, 87:1,
87:11, 100:20
**stuff** [1] - 102:23
**subject** [5] - 6:24,
30:7, 52:22, 64:10,
105:24

**submit** [1] - 5:7
**subscribed** [1] -
109:15
**substance** [1] - 36:18
**subtle** [2] - 80:5,
80:10
**successful** [1] - 44:21
**suffered** [9] - 64:1,
64:14, 64:24, 65:11,
77:8, 77:13, 93:15,
93:25, 94:15
**suffers** [2] - 66:4, 80:2
**sufficiently** [1] - 63:15
**suggesting** [1] - 60:4
**suggestion** [1] - 70:25
**Suite** [7] - 1:16, 1:20,
2:3, 2:7, 2:11, 3:6,
3:10
**summarize** [1] - 55:22
**summarizes** [1] -
50:15
**summarizing** [1] -
15:12
**summary** [7] - 23:1,
23:2, 57:18, 62:24,
87:19, 97:8, 97:13
**sun** [1] - 11:20
**superintendent** [1] -
29:19
**superintendent's** [3] -
13:22, 14:2, 14:4
**supervised** [1] - 35:23
**supervision** [1] - 42:9
**support** [3] - 24:13,
53:6, 71:6
**supporting** [1] - 76:18
**supports** [1] - 55:5
**supposed** [2] - 9:19,
20:21
**suspect** [1] - 90:16
**suspended** [1] - 25:23
**sustained** [1] - 81:6
**sworn** [1] - 32:9
**S██████** [2] - 4:3, 12:16
**symptom** [5] - 77:20,
89:4, 89:9, 89:16,
102:20
**symptoms** [47] - 34:5,
34:23, 40:12, 45:9,
45:10, 45:12, 45:13,
45:15, 46:1, 46:5,
47:2, 47:6, 47:11,
54:11, 54:15, 60:7,
60:10, 61:23, 61:24,
65:3, 65:4, 65:16,
66:9, 79:11, 79:17,
81:22, 82:17, 82:20,
83:6, 83:20, 84:20,
85:13, 85:22, 86:12,
87:2, 89:4, 89:6,

89:10, 89:12, 89:13,
89:15, 89:18, 91:21,
99:25
**synaptic** [1] - 78:24
**system** [15] - 44:12,
44:14, 44:16, 44:18,
45:3, 45:5, 47:25,
48:1, 48:3, 48:5,
50:17, 50:18, 51:6,
51:8, 77:21
**systems** [4] - 44:12,
47:25, 50:16

# T

**T.B** [1] - 3:6
**TABLE** [1] - 4:1
**talks** [3] - 10:21,
21:25, 71:16
**tape** [1] - 109:13
**taxes** [1] - 46:15
**taxpayer** [1] - 46:15
**team** [4] - 10:8, 10:10,
69:12
**TEC** [1] - 53:17
**tech** [1] - 10:13
**technical** [2] - 10:25,
94:25
**ten** [5] - 50:1, 50:2,
50:3, 55:25, 60:4
**tend** [2] - 100:17,
101:5
**Tenth** [1] - 3:14
**tenure** [4] - 38:21,
38:25, 39:1, 39:3
**terminology** [2] -
80:7, 80:8
**terms** [8] - 6:7, 10:6,
70:15, 87:24, 88:24,
89:11, 91:19, 100:19
**T██████** [10] - 4:3, 12:13,
12:16, 15:23, 21:1,
27:19, 28:19, 30:18,
31:16, 31:21
**t██████** [1] - 12:20
**T██████** [1] - 12:3
**test** [3] - 40:14, 103:6,
103:7
**testified** [20] - 6:6,
13:2, 13:10, 17:11,
17:20, 19:12, 20:16,
21:13, 22:2, 22:13,
22:15, 27:20, 61:6,
65:24, 74:25, 88:3,
94:10, 105:9,
107:14, 107:23
**testify** [3] - 34:12,
64:7, 73:9
**testifying** [5] - 13:1,
16:3, 21:16, 27:21,

77:2
**testimony** [30] - 6:7,
8:2, 12:4, 15:5, 17:2,
17:19, 19:4, 19:15,
19:20, 20:1, 20:7,
20:9, 21:5, 25:11,
26:3, 26:5, 27:6,
27:8, 27:23, 28:3,
64:7, 68:13, 69:6,
71:11, 77:15, 84:10,
86:5, 96:19, 98:8,
109:6
**Texas** [2] - 39:11,
39:17
**THE** [131] - 1:1, 1:11,
3:5, 5:1, 5:4, 5:12,
5:14, 5:18, 6:10,
6:15, 6:20, 7:14, 8:7,
8:10, 8:12, 8:16, 9:8,
9:21, 10:5, 10:16,
10:21, 10:24, 11:4,
11:8, 11:14, 11:17,
12:13, 12:15, 15:20,
16:1, 16:11, 30:4,
30:6, 30:9, 30:15,
31:6, 31:9, 31:13,
32:5, 32:8, 32:11,
32:19, 32:20, 33:24,
36:7, 43:9, 43:16,
54:19, 54:22, 54:24,
61:7, 61:17, 61:19,
61:25, 62:6, 62:12,
62:18, 62:21, 62:25,
63:4, 63:21, 64:2,
64:6, 64:16, 64:20,
66:20, 67:5, 67:9,
67:13, 67:15, 68:8,
68:21, 68:23, 69:1,
69:3, 69:11, 70:2,
70:5, 70:7, 70:18,
71:2, 71:22, 72:9,
72:13, 72:16, 72:24,
73:4, 73:10, 73:13,
74:12, 78:17, 78:19,
78:21, 78:22, 79:1,
79:3, 81:6, 81:9,
81:16, 81:18, 83:14,
93:19, 93:20, 94:6,
94:20, 94:22, 97:5,
97:8, 97:9, 97:14,
97:17, 98:10, 98:13,
98:21, 99:6, 99:21,
99:22, 102:21,
104:25, 105:2,
105:24, 106:3,
106:7, 106:19,
106:21, 107:5,
107:8, 107:10,
107:16, 107:20,
108:5
**themselves** [1] - 73:7

**theoretical** [2] -
102:24, 103:1
**theory** [1] - 104:5
**therapy** [3] - 42:5,
42:9
**therefore** [1] - 56:1
**they've** [2] - 59:17,
76:17
**thick** [1] - 44:22
**thinking** [1] - 46:21
**thinner** [2] - 44:24,
51:19
**thorough** [2] - 14:20,
17:5
**thoroughness** [1] -
15:14
**thousand** [1] - 56:3
**threats** [2] - 51:10,
53:24
**three** [13] - 16:3,
16:15, 16:25, 19:2,
24:15, 24:16, 24:17,
53:13, 63:11, 85:25,
86:2, 86:12, 107:12
**throughout** [1] - 52:11
**tipping** [3] - 56:17,
56:18, 57:4
**today** [9] - 12:9, 12:22,
33:14, 65:24, 66:12,
66:24, 87:18, 87:23,
104:10
**together** [14] - 13:18,
13:23, 14:1, 14:4,
14:5, 14:7, 14:8,
16:24, 17:6, 33:17,
107:22, 108:1,
109:13
**tomorrow** [4] -
106:11, 106:22,
107:21, 108:3
**TONIA** [1] - 3:12
**Tonia** [2] - 109:3,
109:21
**took** [6] - 17:23,
38:14, 39:10, 67:20,
67:23, 107:17
**tool** [4] - 42:25, 43:2,
90:22, 103:5
**tools** [1] - 90:23
**topic** [2] - 27:19, 83:7
**TORCHINSKY** [1] -
1:14
**total** [1] - 35:25
**touched** [1] - 40:3
**tough** [1] - 52:2
**track** [1] - 36:5
**traditional** [1] - 12:8
**trained** [2] - 102:7,
102:10
**training** [8] - 36:2,

36:5, 36:25, 37:2, 37:22, 42:8, 44:1, 46:3
**trajectories** [1] - 104:21
**transcript** [8] - 6:4, 6:17, 6:19, 6:23, 8:25, 9:6, 10:8, 109:11
**TRANSCRIPT** [1] - 1:11
**transcripts** [6] - 6:25, 7:1, 9:9, 9:12, 9:13, 11:9
**transient** [3] - 57:14, 82:8, 84:25
**transition** [1] - 28:8
**trauma** [55] - 33:11, 34:2, 34:21, 34:25, 36:6, 36:15, 38:5, 38:20, 40:2, 43:24, 44:3, 48:8, 49:7, 49:15, 49:23, 50:2, 50:6, 51:21, 52:14, 52:15, 53:14, 53:15, 53:17, 55:7, 59:4, 59:11, 59:15, 59:17, 59:18, 59:22, 59:25, 60:2, 60:4, 61:23, 66:2, 66:10, 75:1, 78:5, 79:24, 87:12, 87:21, 92:1, 92:3, 92:18, 94:15, 94:16, 95:5, 95:6, 95:14, 95:15, 95:16, 96:6, 96:15
**traumas** [1] - 49:9
**traumatic** [16] - 36:5, 50:8, 52:6, 61:22, 79:6, 79:13, 79:14, 86:20, 87:1, 87:6, 92:9, 95:8, 96:13, 105:10, 105:15, 105:18
**travels** [1] - 106:3
**treat** [2] - 9:24, 82:14
**treating** [3] - 42:15, 49:5, 101:15
**treatment** [6] - 36:6, 41:10, 43:1, 43:2, 43:6, 60:11
**treats** [1] - 74:20
**trend** [1] - 30:10
**trial** [11] - 6:5, 6:17, 9:3, 68:16, 69:5, 69:23, 70:4, 70:5, 70:6, 71:24, 74:2
**TRIAL** [2] - 1:11, 4:1
**Trial** [1] - 109:6
**tried** [2] - 7:18, 11:18

**tries** [1] - 27:2
**true** [10] - 24:23, 56:6, 82:11, 85:10, 86:22, 88:17, 88:19, 91:17, 96:14, 103:9
**try** [5] - 12:5, 12:22, 69:18, 89:19, 93:9
**trying** [5] - 14:10, 40:9, 49:16, 73:5, 92:20
**turning** [1] - 34:11
**two** [24] - 28:17, 29:3, 35:17, 36:24, 41:5, 44:12, 44:21, 47:24, 49:18, 49:21, 50:16, 53:6, 56:20, 58:3, 61:4, 63:13, 81:19, 88:23, 89:12, 101:24, 102:3, 102:12, 102:21, 107:14
**two-year** [1] - 35:17
**type** [9] - 24:21, 25:1, 25:5, 36:2, 40:6, 40:18, 52:5, 85:3, 92:25
**types** [3] - 38:16, 40:11, 46:16
**typical** [1] - 80:23
**typically** [1] - 106:23

## U

**uncle** [1] - 77:23
**under** [9] - 6:25, 7:23, 12:13, 12:16, 31:16, 31:18, 31:20, 42:9, 71:19
**undergo** [1] - 51:25
**underlying** [25] - 45:21, 47:2, 47:11, 47:20, 47:21, 55:5, 57:12, 57:17, 60:9, 65:7, 65:17, 65:18, 79:12, 82:1, 84:22, 86:6, 86:14, 86:15, 86:16, 89:17, 93:3, 93:7, 94:5, 94:9, 99:5
**undermine** [1] - 9:24
**understood** [2] - 10:3, 80:17
**unfortunately** [1] - 71:22
**unhelpful** [1] - 69:18
**UNIDENTIFIED** [3] - 68:20, 68:22, 68:24
**unique** [2] - 86:19, 95:15
**unitary** [1] - 85:5

**united** [1] - 3:13
**UNITED** [2] - 1:1, 1:12
**University** [16] - 35:9, 35:13, 35:15, 35:21, 35:25, 36:1, 36:3, 36:10, 36:21, 37:20, 38:15, 38:17, 38:21, 39:7, 39:10, 39:17
**university** [3] - 39:2, 39:4, 46:23
**unlikely** [1] - 58:6
**unredacted** [1] - 9:13
**unrewarded** [1] - 11:6
**up** [36] - 10:14, 11:24, 15:17, 18:5, 21:2, 22:14, 22:17, 22:18, 27:18, 30:18, 31:8, 31:9, 32:8, 33:22, 34:19, 43:19, 45:23, 46:8, 48:13, 50:10, 53:8, 56:9, 57:19, 58:10, 62:21, 63:20, 69:1, 71:15, 72:16, 95:23, 103:11, 105:6, 108:2
**upset** [2] - 11:4, 26:11
**upstairs** [1] - 21:18
**useful** [1] - 49:4

## V

**VA** [3] - 3:7, 3:10, 3:14
**vaguely** [1] - 84:11
**validity** [1] - 75:23
**variation** [2] - 88:15, 89:18
**varied** [1] - 88:13
**verify** [1] - 75:17
**version** [2] - 50:1, 95:4
**versions** [1] - 49:9
**versus** [5] - 79:6, 80:11, 94:15, 102:8, 109:7
**viable** [1] - 70:25
**VIRGINIA** [1] - 1:1
**Virginia** [2] - 7:12, 109:4
**VOGEL** [1] - 1:14
**voice** [1] - 32:18
**voicemail** [15] - 21:18, 26:3, 26:6, 26:7, 26:9, 26:23, 27:7, 27:10, 27:12, 27:13, 27:14, 27:17, 28:13, 30:24, 31:23
**volume** [5] - 53:22, 54:2, 56:18, 56:24, 56:25
**VOLUME** [1] - 1:8

**volumes** [2] - 58:16, 58:21
**voluntarily** [1] - 20:7
**vulgar** [1] - 22:14

## W

**wait** [1] - 20:22
**walk** [1] - 105:12
**walked** [2] - 28:5, 28:19
**walks** [2] - 23:5, 23:10, 23:13
**wants** [7] - 20:7, 22:16, 22:17, 29:15, 48:13, 55:20, 72:24
**war** [3] - 92:7, 92:22, 93:24
**Washington** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**weakened** [1] - 44:18
**weaker** [6] - 45:6, 48:6, 51:5, 51:7, 51:18, 52:20
**weaknesses** [1] - 48:24
**weather** [4] - 10:20, 10:21, 10:23, 11:19
**weekend** [2] - 21:9, 69:23
**welcomed** [3] - 19:14, 20:9, 20:20
**whereas** [1] - 84:25
**whereof** [1] - 109:15
**whoa** [1] - 10:19
**whole** [2] - 7:23, 13:2
**whore** [1] - 22:11
**wide** [1] - 102:6
**Wiehle** [1] - 3:9
**window** [1] - 10:18
**Wisconsin** [4] - 38:15, 38:17, 38:22, 39:7
**Wisconsin-Madison** [1] - 38:15
**WITNESS** [13] - 12:15, 32:19, 61:19, 78:19, 78:22, 79:3, 81:18, 93:20, 94:22, 97:8, 97:14, 97:17, 99:22
**Witness** [2] - 32:10, 106:6
**witness** [23] - 5:14, 5:16, 7:12, 12:16, 32:6, 32:8, 32:9, 66:18, 71:11, 71:13, 72:17, 72:18, 73:7, 74:7, 74:9, 83:13, 92:9, 92:14, 92:23, 92:24, 105:24,

106:8, 109:15
**witness's** [1] - 71:11
**WITNESSES** [1] - 4:1
**witnesses** [16] - 16:3, 16:16, 16:20, 18:2, 19:2, 19:8, 19:9, 24:7, 24:15, 24:16, 24:17, 68:21, 69:6, 71:3, 71:6, 93:13
**witnesses'** [1] - 68:13
**witnessing** [1] - 93:2
**woman** [3] - 70:22, 71:19, 72:6
**women** [5] - 59:13, 59:14, 59:16, 59:25, 60:3
**word** [3] - 27:7, 96:22, 97:1
**words** [4] - 54:5, 54:15, 54:22, 80:6
**works** [1] - 26:22
**world** [1] - 103:10
**worried** [1] - 26:11
**wrap** [1] - 103:11
**write** [4] - 18:6, 18:9, 18:21, 29:19
**writes** [2] - 21:15, 48:13
**written** [2] - 23:11, 61:20, 69:22
**wrote** [4] - 21:12, 29:24, 29:25, 30:1

## Y

**year** [3] - 35:17, 35:24, 59:9
**years** [11] - 24:3, 35:23, 35:25, 36:24, 37:22, 38:11, 59:10, 60:4, 103:20, 103:23, 104:11
**yesterday** [13] - 6:2, 13:1, 16:3, 16:18, 17:8, 17:10, 17:19, 18:11, 20:16, 21:13, 22:15, 24:18, 30:19
**young** [2] - 25:13, 41:17
**yourself** [5] - 32:25, 63:15, 92:24, 93:1, 97:10
**youth** [2] - 56:22, 57:1
**yup** [3] - 18:20, 68:6, 73:10

## Z

**Zoll** [1] - 2:1
**zone** [2] - 92:7, 93:24

124

**zoom** [1] - 31:19
**Zuluaga** [3] - 13:10, 14:11, 22:24
**Zuluaga's** [1] - 29:22