1

1            UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2

3   B.R.,                        :
                                 :
4              Plaintiff,        :   Civil Action
                                 :   No. 1:19-cv-917
5        v.                      :
                                 :
6   F.C.S.B., et al.,            :   April 11, 2024
                                 :   9:54 a.m.
7                                :
             Defendants.         :
8                                :   VOLUME 17- A.M. SESSION
    ............................. :
9                                :

10

11        **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
       **BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
12          **UNITED STATES DISTRICT COURT JUDGE**

13   APPEARANCES:

14   For the Plaintiff:        **Jonathan Fahey, Esq.**
                               HOLTZMAN VOGEL BARAN TORCHINSKY
15                             & JOSEFIAK, PLLC
                               2300 N Street NW
16                             Suite 643a
                               Washington, DC 20037
17                             202-536-1702
                               Email: Jfahey@holtzmanvogel.com
18
                               **Alison Anderson, Esq.**
19                             BOIES SCHILLER FLEXNER, LLP
                               2029 Century Park East
20                             Suite 1520
                               Los Angeles, CA 90067
21                             213-995-5720
                               Email: Alanderson@bsfllp.com
22

23

24

25
     APPEARANCES:   (Cont.)

2

```
 1
    For the Plaintiff:            Brittany Zoll, Esq.
 2                                BOIES SCHILLER FLEXNER, LLP
                                  100 SE 2nd Street
 3                                Suite 2800
                                  Miami, FL 33131
 4                                610-804-1787
                                  Email: Britzoll@gmail.com
 5
                                  Andrew Brenner, Esq.
 6                                BOIES SCHILLER FLEXNER, LLP
                                  100 SE 2nd Street
 7                                Suite 2800
                                  Miami, FL 33131
 8                                305-539-8400
                                  Email: Abrenner@bsfllp.com
 9
                                  Robert Keefe, Esq.
10                                BOIES SCHILLER FLEXNER, LLP
                                  100 SE 2nd Street
11                                Suite 2800
                                  Miami, FL 33131
12                                850-585-3414
                                  Email: Rkeefe@bsfllp.com
13
    For Defendant F.C.S.B.:       Ryan Bates, Esq.
14                                HUNTON ANDREWS KURTH, LLP
                                  2200 Pennsylvania Avenue, NW
15                                Washington, DC 20037
                                  202-955-1596
16                                Email: Rbates@hunton.com

17                                Sona Rewari, Esq.
                                  HUNTON ANDREWS KURTH, LLP
18                                2200 Pennsylvania Avenue, NW
                                  Washington, DC 20037
19                                202-955-1974
                                  Email: Srewari@huntonak.com
20
                                  Scott W. Burton, Esq.
21                                HUNTON ANDREWS KURTH, LLP
                                  2200 Pennsylvania Ave NW
22                                Washington, DC 20037
                                  202-955-1664
23                                Email: Burtons@huntonak.com

24

25
    APPEARANCES:   (Cont.)        Kevin Elliker, Esq.
```

3

| | |
|---|---|
| For Defendant F.C.S.B.: | HUNTON ANDREWS KURTH, LLP<br>2200 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>804-788-8200<br>Email: Kelliker@huntonak.com |
| For the Defendants:<br>(S.T., A.F., P.A.H.,<br>T.B., B.H., M.P.F., M.C.,<br>F.T., J.F.) | **Michael E. Kinney, Esq.**<br>THE LAW OFFICE OF MICHAEL E.<br>KINNEY, PLC.<br>1801 Robert Fulton Drive<br>Suite 120<br>Reston, VA 20191<br>Email:  Mk@kinneyesq.com |
| For the Defendant J.O.: | **Bruce Blanchard, Esq.**<br>ODIN, FELDMAN & PITTLEMAN, PC.<br>1775 Wiehle Avenue<br>Suite 400<br>Reston, VA 20190<br>Email:  Bruce.blanchard@ofplaw.com |
| Official Court Reporter: | MS. TONIA M. HARRIS, RPR<br>United States District Court<br>401 Courthouse Square<br>Tenth Floor<br>Alexandria, VA 22314 |

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defendants:

C.K.

     Cross-examination by Mr. Brenner.............. 25
     Redirect examination by Mr. Bates............. 73
     Recross-examination by Mr. Brenner............ 110

Mary Ann Panarelli

     Direct examination by Ms. Rewari.............. 111

EXHIBITS

On behalf of the Plaintiff:

                                 Admitted

Number 814A...................................... 52

On behalf of the Defendants:

                                 Admitted

Number 257....................................... 119
Number 256....................................... 125

MISCELLANY

Preliminary matters.................................. 05
Certificate of Court Reporter....................... 136

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

5

1          THE COURT:  Good morning.

2          (Good morning responses.)

3          THE COURT:  A couple of administrative matters that

4    we need to address.

5          First we have a request from a juror.  It says,

6    "Dear Judge Alston, can you confirm our schedule for Friday

7    before lunch today?  We're currently scheduled from 10:00 to

8    4:00," and that's from Juror No. 12.  I will confirm that.

9    That's not a big problem.

10         Also, let me put this in context.  I received a

11   filing last night at 10:45, and it seems that both parties

12   like to file things at 10:30, 11 o'clock at night.  Yesterday

13   you had all day to deal with the issues that you want to deal

14   with before the Court, and it's unfair to the Court when you

15   all insist on filing things at 10:45 at night, 11 o'clock at

16   night, particularly when you have all of Wednesday to file

17   these things.  So please be considerate of the Court's time in

18   trying to address the issues that you have by trying to avoid

19   filing things at 10:45 and 11 o'clock at night.  The Court has

20   to prepare for these things, and a sense of fairness has to

21   pervade at least for everybody involved, including the Court.

22         Anybody want to say anything about that?

23         MS. REWARI:  Your Honor, we apologize for the late

24   filing.  We needed to take some time to digest the transcript.

25         THE COURT:  All day long on Wednesday?

B.R. v. F.C.S.B.

6

1     MS. REWARI:  I understand.  We also were trying to

2  coordinate with the other defendants as well.

3     THE COURT:  Do you not understand how it's unfair

4  for you to file things at 10:45 at night and expect the Court

5  to provide a cogent response?

6     The Court has an obligation to look at every filing

7  that you have, and when you file them 10:45 at night, it

8  really doesn't give us a chance.

9     MS. REWARI:  I understand, Your Honor.

10     THE COURT:  And don't do it anymore.  That goes for

11  both sides.

12     MS. REWARI:  Okay.

13     MR. BRENNER:  Yes, Your Honor.

14     THE COURT:  As far as the issue that has been

15  perfected for this morning, this matter comes before the Court

16  on Defendants' motion for a curative instruction Docket 934.

17  During trial on April 9, 2024, Plaintiff's counsel asked a

18  series of questions and insinuated that counsel for Defendants

19  had altered certain Facebook messages.

20     After bench conferences, the Court indicated that it

21  would likely give a curative instruction.  Defendants seek a

22  curative instruction that the Court has investigated and found

23  that even B.R. admits that those Facebook messages were not

24  doctored by anyone, Docket 934.

25     Defendants' proposed instruction goes much too far,

B.R. v. F.C.S.B.

7

1    but the Court agrees that a curative instruction is necessary.

2          Accordingly, it is hereby ordered that the motion

3    for curative instruction is granted in part and denied in

4    part.  The motion is granted, insofar as a curative

5    instruction is to be given, but denied insofar as the

6    Defendants' proposed curative instruction is inappropriate.

7          The Court is going to say, ladies and gentlemen of

8    the jury, there's been an insinuation that some records are

9    not in the form that they existed earlier, and that should

10   be -- that should be something that's drawn to your attention.

11         The Court has an obligation to investigate anything

12   that it believes is a fraud on the Court.  Based upon the

13   Court's investigation, there's no evidence, nothing to

14   suggest, and plaintiff even agrees that there's nothing to

15   suggest that either anybody associated with defense counsel

16   did anything to doctor those particular pieces of evidence.

17   That is the instruction that the Court will give.  I note

18   anybody's exception that they may have to that.

19         MR. BRENNER:  Our exception is noted in the

20   record -- I'm sorry, not noted -- noted in our response that

21   was filed this morning.

22         We would concur also it's -- I agree it's unfair to

23   the Court.  It's also unfair to us to -- I started drafting

24   that at 7 o'clock this morning when I woke up, the response.

25   So we do think -- we don't think a curative instruction is

B.R. v. F.C.S.B.

8

1    necessary, but I'm just concerned that the language is a

2    little -- how do I put this -- it is characterizing

3    subjectively that there was an insinuation that counsel had

4    done something wrong.

5            I think the record -- what we were actually accused

6    of was insinuating that counsel is the one that sent the

7    records to him, which was made clear the record -- in fact, I

8    went out of my way -- I guess the point of it was to show that

9    counsel wasn't involved and that C.K. was involved, and that

10   counsel wasn't there when he got them.

11           So if given the opportunity, I would ask to, first

12   of all, allow the instruction to be given at the end of the

13   examination so Your Honor has even more context for some of

14   this.  I'm not going back to the issue of how it was

15   portrayed, but just more context for the messages and sort of

16   the questionable nature of them, not from a technical

17   standpoint, but from his memory versus what's in those

18   messages, and have an opportunity then to see the Court's

19   instruction and writing a proposed -- some minor edits,

20   although we don't think any is required, but we would at least

21   like the opportunity to suggest minor edits to make it a

22   little more balanced.

23           I would point out again, which we did in our papers,

24   it is not the plaintiff that introduced the concept of the

25   lawyer involvement.  In fact, it was done by the defendant in

B.R. v. F.C.S.B.

9

1    an effort to bodyguard the witness.  That's what happened.

2           I mean, that's -- I'm sorry.  That's just a fact of

3    what happened, right.  They brought it up so they could --

4    they inserted themselves through the witness to say it was all

5    good because the lawyers are involved.  All we're all trying

6    to show is the lawyers weren't involved in the front end, and

7    no one has disputed that.  It's fine.  No one said anything

8    wrong there.

9           But there is a gap -- I think Your Honor may have

10   said a hole -- there's a gap of what happens with the messages

11   when C.K. has them and no lawyers are involved, and then it

12   gets to the lawyers.  I actually think Mr. Davis -- well, I

13   won't -- we would like an opportunity to at least propose some

14   minor edits to the instruction before it's given, and then it

15   not be given until we've had an opportunity to do that until

16   after the witness' testimony is concluded.  So that's our

17   objection to the record.

18          THE COURT:  Everybody is standing up.  We'll take

19   you first, Ms. Rewari.

20          MS. REWARI:  Thank you, Your Honor.  I believe what

21   Mr. Brenner has stated to the Court this morning is, sounds to

22   my ears, inconsistent with what was said at the sidebar on

23   Tuesday where he stated, "Yes, someone could change the

24   messages.  I mean, I have no evidence that anyone did that."

25          So the suggestion that perhaps there was something

B.R. v. F.C.S.B.

10

1   untoward done by C.K. we think is not anything that --

2   allowed -- there's no evidence from which that suggestion can

3   be made.  He made that admission, and it's consistent with

4   what we understand has happened.

5         We -- you know, as Your Honor has observed, there's

6   zealous advocacy on both sides of this case, and both sides

7   have fought zealously for their client, but there is a limit

8   to what we, as attorneys, are allowed to suggest and what the

9   suggestion, as Your Honor observed on Thursday -- excuse me,

10  on Tuesday, is a very volatile suggestion that has been made,

11  and a bomb has been thrown into this jury that perhaps these

12  messages were doctored, and Mr. Brenner has admitted that he

13  has no evidence that they were.

14        The explanation that was -- that was given at the

15  sidebar on Tuesday was at first that there was a question

16  about -- that he was just learning, you know, the origin of

17  these messages, and as we pointed out, they've had a letter

18  from Mr. Davis.  They've had this letter, they filed it with

19  the Court.  They knew what -- that counsel was involved in it.

20  They knew how it happened.  They had an opportunity to ask any

21  questions about what had happened to get any metadata about

22  that.

23        The way that it was produced to the plaintiff is

24  exactly the same way that plaintiff produced her Facebook

25  messages, and I'll remind the Court that plaintiff was under a

B.R. v. F.C.S.B.

11

1    court order to produce her Facebook messages.  They were

2    produced in exactly the same format, PDF, and so she did not

3    provide the HTML format.  She didn't ask for Mr. C.K.'s

4    messages to be provided in HTML format.  They've known that,

5    and there's a reason that this evidence is Defendants'

6    Exhibit 1.

7            As Your Honor knows, we consider this the most

8    critical piece of evidence in this case.  We filed the motion

9    for fraud on the Court based on these messages, and they have

10   known that the integrity of these messages are front and

11   center.

12           And so, the suggestion that, you know, there was

13   discovery -- these questions were being taken for the purpose

14   of discovery in front of the jury is highly prejudicial to the

15   defense.

16           We respect Your Honor's instruction.  The reason

17   that we edited it and proposed something slightly different, I

18   think, than what you had proposed is this:  The concept of

19   fraud on the Court is something the jury hasn't heard, and we

20   believe that it's incendiary -- you know, could be potentially

21   incendiary because they don't know what that means.

22           That's a concept that, largely, most of us were not

23   familiar with until, you know, we started doing some research.

24   And so, we're concerned that if the word "fraud" gets used,

25   that that could set off more questions than answers.

B.R. v. F.C.S.B.

12

1        We also are concerned that the instruction reminds

2   the jury that the implication that was made on Tuesday was an

3   implication and an insinuation against the attorneys.  And as

4   attorneys, you know, we don't have the luxury -- we can't get

5   ourselves on the stand, and so we can't call Mr. Davis and we

6   can't call Mr. Burton, who represented to you exactly what

7   they did and how these messages were collected, how they were

8   produced.

9        And it's totally consistent with what was in the

10  letter from Mr. Davis that was given to Mr. Brenner and his

11  team, you know, when they entered the case.

12       We had a conversation with Mr. Brenner and his team

13  when they first had the appearance -- entered their

14  appearances into this case, we had a discussion about these

15  messages.  We had a discussion with their predecessors about

16  these messages, and so, you know, we're concerned because this

17  instruction reminds the jury that the finger has been pointed

18  at lawyers in this case.  And we don't have the opportunity to

19  rehabilitate our reputations in the way that has been

20  challenged.

21       And we put into our motion the exchange because if

22  you'll recall, the exchange wasn't -- with C.K. wasn't just,

23  What did you do?  The questions were, Are you aware that this

24  file was never turned over to us.  Right.  That is implicating

25  the conduct of his attorney.  Are you aware that these can be

─── B.R. v. F.C.S.B. ───

13

1    altered?  And he said, No, I don't know that.  And he said,

2    You don't know, you don't know that these can be altered?

3           Who is that implication to then?  Because it wasn't

4    the implication of C.K.  It was at the attorneys.

5           THE COURT:  I understand your point.

6           Mr. Blanchard, did you want to say something?

7           MR. BLANCHARD:  Thank you, Your Honor.  Just to

8    amplify briefly on what Ms. Rewari said.  The infectious

9    nature of this allegation, it doesn't just affect the C.K.

10   Facebook messages.  It's -- it has the potential to infect --

11   to put distrust on defense counsel and call into question all

12   evidence.  And I think -- so the idea that this was just a

13   little thing, mistake, not --

14          THE COURT:  I don't think it was a little thing at

15   all.

16          MR. BLANCHARD:  Okay.  The other thing I was

17   concerned about in the Court's language was I think that you

18   had made a statement that the Court does an investigation when

19   it believes a fraud -- there is a fraud on the Court.

20          I think to suggest that the Court believed there was

21   a fraud on the Court from the defense side, as far as my view

22   was always being that any fraud on the Court was from the

23   implication raised from the plaintiff's side.

24          THE COURT:  Well, I think we need to make the record

25   clear, and for purposes of everyone who was not a part of the

B.R. v. F.C.S.B.

14

1  bench conference, we need to reiterate that when the Court

2  became aware that there was a suggestion that something was

3  not quite right, the Court took the very unusual step, and

4  quite frankly, the embarrassing step for the lawyers involved

5  to bring the two lawyers who were implicated in the suggestion

6  up to the bench and ask them very pointed questions regarding

7  their involvement.  The Court had an obligation to do that

8  because of the suggestion.

9       The Court considered the credibility of the two

10 lawyers involved, and it was clear to the Court that they had

11 done nothing to in any way affect the documents that had been

12 sent, and quite frankly were embarrassed as professionals that

13 someone would actually insinuate or suggest that, and actually

14 cause the Court to have to apologize to the lawyers to have to

15 bring that sort of allegation up, because those kinds of

16 things can affect your professional license.

17      And I appreciated the lawyers understanding that we

18 had to go through this process, but the bottom line is that

19 for purposes of dealing with this issue, the Court has to give

20 what I consider a balanced instruction so as not to draw any

21 unnecessary attention to it.  It doesn't need to be the focus

22 of the case.

23      As I have said plenty of times, the focus of the

24 case is whether Fairfax County was on notice and whether they

25 were reasonable in their responses to the notice that they had

─B. R. v. F. C. S. B.─

15

1    received.

2          And then there's another issue regarding your client

3    that we don't need to get into.

4          But the bottom line is it's been my experience, and

5    I've been doing this a long time, that if we focus on things

6    that are ancillary to the issues that we need to resolve, it's

7    going to get them focused on the things that they don't need

8    to be concerned about.

9          MR. BLANCHARD:  Understood.

10          THE COURT:  So I think what I'm trying to do is

11    provide a curative instruction that takes into consideration

12    all the perspectives of the things that we've had to deal

13    with.

14          MR. BLANCHARD:  And -- and just -- then the only

15    thing, Your Honor, again, is if I wrote down in words wrong, I

16    don't know, but if there's something in there that says when

17    the Court believes there is a fraud on the Court or maybe a

18    fraud on the Court it has a duty, I don't -- not a fan of the

19    word "believes" a fraud on the Court.  Maybe when there's a

20    question raised or something.  Because I wouldn't want the

21    jury -- I think the jury does take rightfully accused from the

22    bench, and I don't want them to think that you believed from

23    the testimony that there had been a fraud on the Court as

24    opposed to from the testimony you realized you needed to --

25    to --

B.R. v. F.C.S.B.

16

1          THE COURT:  I think I understand your point.

2          MR. BLANCHARD:  Thank you, Your Honor.

3          THE COURT:  Mr. Kinney.

4          MR. KINNEY:  Thank you, Your Honor.  I won't belabor

5   this by repeating arguments.  I just note my exceptions for

6   the same reason stated by Ms. Rewari and Mr. Blanchard.

7          THE COURT:  It seems to the Court -- and, again, I

8   don't question anybody's desirability to note their exception,

9   but it seems that everybody wants to put the Court in a box.

10  I have to make a determination.  You're not satisfied; they're

11  not satisfied.  So it tees it up for appeal so there's no

12  sweet spot for me.  What would you suggest in that regard?

13         MR. KINNEY:  Well, Your Honor, the question was

14  asked -- as admitted, the question was asked without any

15  evidence that the document had been altered.  I think the jury

16  deserves to hear that.

17         THE COURT:  All right, sir.

18         MR. BRENNER:  Your Honor, first of all, after Your

19  Honor's -- after the Court day Tuesday, I consulted with my

20  local counsel because I wanted his opinion if -- first -- I --

21  I apologized to the Court.  If -- the Court's determination

22  appears to be, and I respect the Court -- you were there and

23  you read the transcript, we can have a difference of opinion

24  on it, but your determination, as I understood what you --

25  what you said, was that there was an insinuation that the

B.R. v. F.C.S.B.

17

1    defense counsel had done something wrong.

2              I've laid out on papers, I've told you exactly -- I

3    said it at sidebar too, exactly what the insinuation is.

4    There's no secret.  You watched the cross of C.K.

5              The insinuation is twofold with C.K.  One, the

6    messages don't match his own memory, his own statements at the

7    time of what was going on between them.

8              THE COURT:  Which is legitimate cross-examination on

9    credibility.

10             MR. BRENNER:  Which is legitimate.  Right.

11             And the second insinuation -- I'm using the word

12   "insinuation," but what I'm trying to do, and what I set forth

13   the papers, I think the transcript represents what I'm trying

14   to do is to show when on direct examination they said, Well,

15   the lawyers are involved, I'm trying to show there's a gap in

16   time -- the lawyers -- Mr. Burton, first of all -- I know Your

17   Honor brought him up there.  Mr. Burton, if you read the

18   transcript, it has nothing to do with what F.C.S.B. does.

19             There was a -- there was an understanding by

20   F.C.S.B.'s counsel that said to me after court that, well, you

21   insinuated that F.C.S.B. had sent the messages, like instead

22   of Facebook.  I said if you're -- I said I think that's not

23   right --

24             THE COURT:  I think -- I think the context was a

25   little bit more pronounced than that.

B.R. v. F.C.S.B.

18

1          The testimony was that a lawyer from F.C.S.B.

2    contacted Mr. Davis, and nobody knew who that lawyer was at

3    that point to accomplish the discovery responsibilities that

4    were trying to be met.

5          MR. BRENNER:  Right.  So --

6          THE COURT:  Okay.

7          MR. BRENNER:  So the F.C.S.B. -- F.C.S.B.

8    involvement is to -- I assume they went through Mr. Davis

9    because C.K. was represented by counsel -- was to help him --

10   help C.K., through his counsel, get -- get access to his

11   archive, is what I think is the access, is the link.

12         So their involvement, which I made clear in the

13   cross because I don't want them involved, I don't want the

14   lawyers involved, I want C.K. to be the focus of the cross.

15   So that's when I said to the -- in the examination I said,

16   Well, they helped you get it.  Then what happened?

17         He -- I -- well, I led him, to be fair.  I said, You

18   got an email -- this is my question.  You got an email

19   directly from Facebook of the messages.  Okay?  No one

20   insinuated, no one stated that it came from F.C.S.B.  Of

21   course, it didn't come from F.C.S.B.

22         So -- so their -- Mr. Burton's involvement ends at

23   that point.  He was the one that helped get the -- get C.K. to

24   be -- but I assume the right word is make the right request of

25   Facebook, but whatever it is.  So F.C.S.B. is out.

B.R. v. F.C.S.B.

19

1          And then I say, You get the message, you send them

2    to your counsel?

3          So -- and I even -- and I even said, F.C.S.B. is not

4    representing you.

5          So they're out.

6          And then -- so the implication is, what I'm trying

7    to imply, I don't think it's particularly subtle, but I'm

8    trying to imply is that -- and then I -- if you remember, Your

9    Honor, if you look at the transcript, what I said to Mr. K.

10   was, When you get them, you are alone -- meaning this

11   conversation with the lawyers, the Zoom is over -- you put in

12   the request.  I said, It takes a day or two.  Because that's

13   my understanding.

14         He said, It takes -- I think he said -- a few hours.

15         I said, When you get them, you're alone.

16         And he says, Well, I'm not alone, my family was

17   there.

18         I said, No, I understand that.  But you're not with

19   lawyers at that time?

20         And he says, Yes, I'm not with lawyers at that time.

21         So my whole goal is not to insinuate the lawyers

22   there.  My whole goal is to say on direct they made it sound

23   like the lawyers blessed this.  And the fact is, the lawyers

24   don't know either.  The lawyers don't know what happened from

25   the time C.K. got --

B.R. v. F.C.S.B.

20

1          THE COURT:  Well, I think the reasonable analysis of

2    the exchange between you and Mr. C.K. is that you were probing

3    to some degree on the issue of metadata and PDFs.

4          MR. BRENNER:  Yes, yes.

5          THE COURT:  Trying to figure out if there's a

6    distinction between the two and if he knew whether there was a

7    distinction --

8          MR. BRENNER:  Correct.

9          THE COURT:  -- between the two.

10         But then it crossed over as to discussions about how

11   the information was retrieved, who was involved, what lawyers

12   are implicated, and that's where it sort of got off --

13         MR. BRENNER:  So I agree with you.  So there's a

14   question at the end -- there's two questions at the end.  One

15   of which was the last question which was not answered.

16         And what I -- what I put in the motion, what I was

17   going to say to him, was:  All you know -- you got it, you

18   have it for a gap -- an amount of time, and then you send it

19   to your lawyers, and then the lawyers sent it to us?

20         So I'm focusing on that gap.  That gap in time

21   before it gets to the lawyers.

22         And what Mr. Davis said at sidebar was you asked him

23   the alternate.  Now, he's -- he's at a -- even a -- more of a

24   disadvantage.  He doesn't even know what's going on at the

25   sidebar.

B.R. v. F.C.S.B.

21

1          But he comes up, and you said, You didn't alter it

2     in any way?

3          And he said, Well, I put a Bates stamp on it.  Which

4     is correct.  Which is technically an alteration.  No one's

5     complaining about the Bates stamping.

6          And even to this day, we still don't have what

7     was -- we still don't have the alleged -- not the alleged --

8     we don't still file that came from Facebook to C.K.  We don't.

9     We just don't.  And --

10          THE COURT:  But it's been suggested -- and, again, I

11     don't know because I'm not involved in the discovery process,

12     but the information that was provided from your side regarding

13     Facebook and text message and emails and the like was provided

14     in the same form --

15          MR. BRENNER:  What --

16          THE COURT:  -- that -- that you received that

17     information related to C.K.'s testimony.

18          MR. BRENNER:  So the short answer to that is I can't

19     recite the full history because I wasn't there.  I will tell

20     you that there have been multiple requests for -- for HTML --

21     when we were involved in -- starting in September, there was a

22     process where we had to go -- I understand the other counsel

23     did it first, but we had to go, again, I think, to actually a

24     lawyer sit with the -- the client and go through various

25     social media accounts, which we did, which is different than

B.R. v. F.C.S.B.

22

1    what happened with C.K.

2          But to -- to -- I'll just say that I think the

3    cross-examination on our client and our client's mother on

4    preservation of documents and deleting stuff has been --

5          THE COURT:  Yeah, there were a lot of, "Are you

6    aware" --

7          MR. BRENNER:  -- has been robust.

8          THE COURT:  Yeah, "Are you aware?"

9          MR. BRENNER:  Yes.  So --

10         THE COURT:  But I don't think that there is anything

11   to suggest or implicate the issues that have been raised with

12   regard to C.K.

13         MR. BRENNER:  Right.  So what I would say with

14   C.K. -- and this -- and it sounds like -- and I understand

15   Your Honor's predicament, both sides are not agreeing to the

16   instructions, that's not a great place to be.  Obviously,

17   you'll make the decision.

18         That's why I suggested we have a chance to

19   wordsmith.  They don't -- what I want the instruction to say,

20   what is important to me and I think important to them, is that

21   there is no -- there is no indication or no evidence that any

22   lawyers did anything wrong.

23         THE COURT:  Well --

24         MR. BRENNER:  That's what I'm happy to have given,

25   but when Your Honor starts weighing in on -- they wanted you

23

1    to basically bless C.K.'s side of the story, which Your Honor

2    I don't think is even going to consider.

3           THE COURT:  I'm not -- that's not going to happen.

4           MR. BRENNER:  So I think if both sides had an

5    opportunity to, now knowing where Your Honor's coming from,

6    proposed a revised instruction, but they don't want the words

7    "fraud in the Court."  I don't think they're appropriate

8    either.  It's a complete foreign concept to the jury.

9           But I do think because Your Honor took the same

10   implication that they are getting from it, which I will tell

11   you as an officer of the court, I'm trying to make the

12   opposite one, but that doesn't mean I did a good job.  But if

13   everyone agrees that -- and this is what you said at

14   counsel -- at sidebar, even B.R. agrees, that no one is saying

15   the lawyers did anything wrong.  I'm happy with that

16   instruction.  I'm fine with that.

17          THE COURT:  Well, the thing is I think it's

18   important from a recency privacy perspective that I deal with

19   this issue now as opposed to later so that we can make sure

20   that we close the door to some extent on that.  So I'm going

21   to evaluate this instruction a little bit more, and I'm going

22   to give it when the jury comes back in.  So if you can give me

23   a moment, that's what's going to happen.

24          MR. BRENNER:  Thank you.

25          (A pause in the proceedings.)

B.R. v. F.C.S.B.

24

1          THE COURT:  All right.  This is what I'm going to

2     say in pertinent part.

3          Ladies and gentlemen of the jury, there's been an

4     insinuation that some records were not in the form that they

5     existed earlier and that that should be something that is

6     drawn to your attention.  You might recall this examination in

7     the context of metadata versus PDF files.  The Court has an

8     obligation to investigate anything that it believes negatively

9     implicates the professional ethics of counsel.  Based upon the

10    Court's investigation, there's no evidence, nothing to

11    suggest, and plaintiff even agrees that there's nothing to

12    suggest, that either anybody associated with defense counsel

13    did anything to compromise the integrity of those particular

14    pieces of evidence.

15          And that's what we're going to do.  I note

16    everybody's exception.  Okay.

17          MR. BRENNER:  Can we get the witness?

18          THE COURT:  Yes.

19          (Jury present.)

20          THE COURT:  You may be seated.

21          Good morning, ladies and gentlemen.

22          (Good morning responses.)

23          THE COURT:  I hope you enjoyed the holiday and are

24    ready to get back to work.

25          Before we begin the examination of the witness on

B.R. v. F.C.S.B.

25

1    the stand, I'm going to read an instruction to you.

2           Ladies and gentlemen of the jury, there's been an

3    insinuation that some records were not in the form that they

4    existed earlier, and that that should be something that is

5    drawn to your attention.  You might recall this examination in

6    the context of metadata versus PDF files.  The Court has an

7    obligation to investigate anything that it believes negatively

8    implicates the professional ethics of counsel.

9           Based on the Court's investigation, there is no

10   evidence, nothing to suggest, and plaintiff even agrees that

11   there's nothing to suggest that either anybody associated with

12   defense counsel did anything to compromise the integrity of

13   those particular pieces of evidence.

14          All right.

15          (Witness seated.)

16          THE COURT:  Young man, you're still under oath.

17   Please listen to the questions of counsel.  Please remember

18   the Court's instruction.  If there's an objection or an

19   interruption, let the Court resolve that before you speak.

20                     CROSS-EXAMINATION

21   BY MR. BRENNER:

22   Q.   Good morning, C██████.

23   A.   Good morning.

24   Q.   A couple of just clean-up matters.  One issue is, do you

25   remember being shown a record that you said indicated that you

B.R. v. F.C.S.B.

26

1  weighed 80 to 90 pounds?

2  A.  Yes.

3  Q.  That record was not a medical record.  You were shown

4  something you had said previously in a deposition?

5  A.  Yes.

6  Q.  Okay.  What is -- you -- I think you said on direct

7  examination you worked for -- currently work for -- did you

8  say Jersey Mike's?

9  A.  Yes.

10  Q.  That's the sandwich shop?

11  A.  Yes.

12  Q.  Did you ever work for a company called Atlantech?

13  A.  Yes.

14  Q.  Atlantech Online?

15  A.  Yes.

16  Q.  What does Atlantech Online do?

17  A.  IT company.

18  Q.  Okay.  You testified on direct examination -- when I say

19  direct examination, that means when Mr. Bates is questioning

20  you, okay?

21  A.  Okay.

22  Q.  Do you understand?

23  A.  Yes.

24  Q.  You testified on direct examination that the messages,

25  meaning Defense Exhibit 1 that you spent a bunch of time on,

1  that you had, in fact, deleted those.  Do you remember that?

2  A.   The Facebook messages?

3  Q.   Yes.

4  A.   Yes.  A long time ago, yes.

5  Q.   Yeah.  In fact, you -- well, yeah, a long time ago.  You

6  actually said that you deleted those right after you and B.R.

7  stopped talking, right?

8  A.   Yes.

9  Q.   Okay.  So that would have been back in the fall of 2011?

10 A.   I believe so, yes.

11 Q.   Okay.  Now, I want to return back to the line of

12 questioning that we were going through, comparing your

13 testimony, and then what's in those messages with Facebook

14 user, okay?

15 A.   Yes.

16 Q.   You recall telling us that you -- at no time had you ever

17 asked B.R. to send you naked pictures.  Do you remember giving

18 that testimony?

19 A.   I don't remember.

20 Q.   Okay.  Let me show you that.

21         (A pause in the proceedings.)

22 BY MR. BRENNER:

23 Q.   I think you have your deposition up there.  Let me check.

24         MR. BRENNER:  May I approach, Your Honor?

25         THE COURT:  You may.

1   BY MR. BRENNER:

2   Q.   If you go to page 311 of your deposition.  I'm just going

3   to read what your sworn in testimony was, okay?  311, starting

4   at -- starting at line 22, to line 3, 3 of 12, line 3.  You

5   were asked the following questions and gave the following

6   answers:

7        "QUESTION:  Have you ever heard about B.R. sending

8   anyone naked pictures?"

9        Your answer was:  "No."

10       "QUESTION:  Did you ever ask B.R. to send naked

11  pictures?"

12       Your answer was:  "No."

13       Do you recall that testimony?

14  A.   Yes.  It says it here.

15  Q.   Well, you understand when you say it says it in here,

16  it's what you said under oath, right?

17  A.   Yes.

18  Q.   Now, you told Mr. Bates that since getting the Facebook

19  messages, you've had a chance to read them, right?

20  A.   Yes.

21  Q.   And did you go and look for how many times -- well,

22  first, confirm for me in those messages that you, C███████,

23  were asking whoever it was Facebook user for naked pictures?

24  A.   Yes.  We both did.

25  Q.   Well, it's your testimony that in those messages,

B.R. v. F.C.S.B.

29

1   Facebook user was asking you for naked pictures?

2   A.    They are in there.  I believe so.

3   Q.    Would it be fair to say that there are upwards of 35 to

4   40 times that C███████ asks Facebook user to send him naked

5   pictures?

6   A.    I don't know.

7   Q.    How many time -- well, you read them.  How many times in

8   there do you think C███████ asked Facebook user to send him

9   naked pictures?

10  A.    A couple of times.

11  Q.    A couple?  Is that what you said?

12        Why don't you go to -- to those messages.  Do you

13  have them up there?

14  A.    Are you going to pull it up on the screen or do I need to

15  look in the --

16  Q.    No, you can look in the book.

17  A.    Am I supposed to be looking at a certain page?

18  Q.    I'm going to give you a page, sir.  Give me a moment.

19  Let's start here.  Look on page 116.  Do you see that?

20  Page 116, you asked for naked pictures, right?

21  A.    Right.

22  Q.    Page 117, you asked two more times, right?

23  A.    Yes.

24  Q.    Page 118, you ask another time, right?

25  A.    Yes.

─────B.R. v. F.C.S.B.─────

30

1   Q.   Page -- let's go to 185.  You ask one time on 185, right?

2   Because your memory is just a couple, right?  So let's see,

3   we'll get up to about 10 and then we'll stop.

4            MR. BATES:  Objection, argumentative.

5   BY MR. BRENNER:

6   Q.   Your memory was just a couple of times --

7            THE COURT:  Mr. Brenner, there was an objection.

8            MR. BRENNER:  Oh, I'm sorry.  I'm sorry.

9            THE COURT:  The objection was argumentative, and

10  it's sustained.  So --

11  BY MR. BRENNER:

12  Q.   Your testimony a minute ago was that you think it

13  happened a couple of times, right, based on your review of the

14  messages.  So on 185 it's another time, right?

15  A.   I see that.

16  Q.   186, it's two more times, right?

17  A.   Yes.

18  Q.   187, it's two more times, right?

19  A.   Yes.

20  Q.   188, it's one more time, right?

21  A.   Yes.

22  Q.   Okay.  Let's do a few more.  103, it's another time,

23  correct?  Correct?  103, middle of the page?  "Are you going

24  to send them to" --

25  A.   Yes, I see that.  I was just looking.

Cross - C.K.

B.R. v. F.C.S.B.

31

1   Q.   Does it say, "Are you going to send them to me, and are

2   you naked right now?"

3   A.   Yes, I see that.  I was on the wrong page.

4   Q.   Okay.  That's okay.  Let's go to the very beginning of

5   the messages.  Page 230, 231, which appears to be -- appears

6   to be four days in.  You asked for naked pictures then, right?

7   A.   Yes.

8   Q.   Earlier in the day you say, "Can you send a picture of

9   you naked so I can," and I'll just -- I'll use -- pleasure

10  yourself?

11  A.   Yes.

12  Q.   Okay.  There's probably about 35 to 40 of these.  Is

13  that -- would that now jog your memory?

14  A.   Yes.

15  Q.   Okay.  And the pictures you asked for are quite graphic,

16  right?

17  A.   Yes.

18  Q.   For example, you asked for pictures of close-up of

19  Facebook user's private parts or her pubic area, right?

20  A.   Yes.

21  Q.   You asked her to do things to herself, to self-pleasure

22  for you in those pictures, right?

23  A.   Yes.

24  Q.   Okay.  Now, remember that the account that now says

25  "Facebook user" was not -- when you were having these

─ B.R. v. F.C.S.B. ─

32

1  messages, you remember it didn't say B███ or B.R. at the

2  time, right?

3  A.   These are between me and her, yes.

4  Q.   No, different question.  Let me ask you again.  Remember,

5  we looked at this at the very beginning of the messages.  If

6  you go back to page 254, which is the second to last page.

7  A.   Okay.

8  Q.   And these are the first messages.  The page before is

9  just a blank -- or they are not messages.

10         So we're at the very first messages.  When you first

11  get the message, the account is not in B█████ name because

12  you say, "Who dis," right?

13  A.   Yes.

14  Q.   And then the person who is using this account that has

15  some other name is then telling you that they are B████,

16  right?

17  A.   Yes.

18  Q.   Okay.  Now, if you're communicating with someone who is

19  using a fictitious name in their account, and you're asking

20  for pictures and they send you pictures, you would probably

21  know who they were, right?

22  A.   Yes.

23  Q.   Okay.  You asked for -- if you can accept my

24  representation that it's at least 35 times that you ask for

25  pictures, not once does the -- does this fictitious account

─────────────── B.R. v. F.C.S.B. ───────────────

33

1    send you a picture?

2    A.    No.

3    Q.    Correct?

4    A.    Yes.

5    Q.    And you keep trying, right?

6    A.    Yes.

7    Q.    And she, or whoever it is, does everything they can to

8    sort of string you along, right?  They tell you, for example,

9    I'm about to take them, right?

10   A.    Uh-huh.

11   Q.    They say, oh, I took them.  I'm just figuring out how to

12   upload them, right?

13   A.    Uh-huh.

14          THE COURT:  You need to answer yes or no.

15          THE WITNESS:  Yes.

16          MR. BRENNER:  I'm sorry, Judge.

17   BY MR. BRENNER:

18   Q.    Then it goes as far as saying, "I did send them," right?

19   Right?

20   A.    Yes.

21   Q.    And you say, "But I didn't get them," and they say, "Oh,

22   it must have been format.  I'll send it again," right?

23   A.    Yes.

24   Q.    And you never get a picture?

25   A.    No.

B.R. v. F.C.S.B.

34

1    Q.   Correct?

2    A.   Yes.

3    Q.   Now, the same thing happened.  Another way you would be

4    able to determine if you -- if the person you're -- the person

5    that you're communicating to by -- I don't mean -- in writing

6    is the person you think they are is if you could video chat

7    with them, right?

8    A.   Yes.

9    Q.   And you try that too, don't you?

10   A.   Yes.

11   Q.   You ask Facebook user to video chat with you, right?

12   A.   Yes.

13   Q.   And she says, "Cool, I'll do it," right?

14   A.   Yes.

15   Q.   And she sends you links, right?

16   A.   Yes.

17   Q.   And they don't work?

18   A.   I don't remember.

19   Q.   Okay.  So let's look at that.  Let's look at this

20   exchange.  If you could go in your book to page 141.  This is

21   an exchange back and forth between the two of you about a

22   video chat?

23   A.   Yes.

24   Q.   And she even says -- you guys are talking about it.  She

25   says, "Let's get on Tinychat," right?

B.R. v. F.C.S.B.

35

1              That's --

2    A.    On 140?

3    Q.    I'm sorry, it's 140.  I'm sorry, it's 140.

4    A.    I see --  I see -- yes.

5    Q.    All right.  She says, "Let's get on Tinychat," right?

6    A.    Yes.

7    Q.    You say, "Invite me.  Okay.  Invite me," right?

8    A.    Yes.

9    Q.    She sends you a link, right?

10   A.    Yes.

11   Q.    And then you say you're getting on, and then she says,

12   "Sorry, my parents came," right?

13   A.    Yes.

14   Q.    Then she says, "I'm getting on."  She sends you another

15   link, right?

16   A.    Yes.

17   Q.    And you wrote, "What happened," right?

18   A.    Yes.

19   Q.    And you -- she's saying, "Come on, get on."

20             And you're saying, "The link's not working," right,

21   at the top of 139?

22   A.    Yes.  And then I --

23   Q.    So --

24   A.    -- said that there's more invites.

25   Q.    Yeah, yeah.  Then you go to the next page, which we're

──────B.R. v. F.C.S.B.──────

36

1    going back -- we're going forward in time, back in -- back in

2    pages.

3              She sends you another link.  She sends you another

4    link.  None of them were working, right?

5    A.    Yeah.

6    Q.    So then you send her a link, right?  That's on 138.

7    A.    Yeah.

8    Q.    And it just keeps disappearing.  You say, "Stop leaving."

9    The person is not getting on the links, right?

10   A.    Yes.

11   Q.    And she says, "Grr.  It's not working."  What's -- what's

12   text language for "Grr"?

13   A.    Grr.

14   Q.    Grr, like in frustrated?  Okay.

15   A.    Yes.

16   Q.    "Ugh.  What happened?"

17             And she says, "My brother came.  I'm getting on."

18             And they never get on, right?

19   A.    Yes.

20   Q.    Okay.  So despite your best efforts to get photographs

21   and get video links, it doesn't happen, right?

22   A.    Yes.

23   Q.    Okay.  So let's -- let's move on.

24             There was -- there was --

25             MR. BRENNER:  If we could bring up, Your Honor, it

B.R. v. F.C.S.B.

37

1    was admitted into evidence, I believe, on Tuesday through --

2    through defense counsel, P527?

3              THE COURT:  You may.

4              MR. BRENNER:  Thank you.  May I publish?

5              THE COURT:  You may.

6              (Exhibit published.)

7    BY MR. BRENNER:

8    Q.   Okay.  Do you remember seeing this on Tuesday?

9    A.   Yes.

10   Q.   This was your -- I guess it's your attendance report

11   for -- well, your 8th grade year, the September -- the

12   2011/2012 school year?

13   A.   Yes.

14   Q.   And counsel brought your attention to November 21st.  Do

15   you see that?

16   A.   Yes.

17   Q.   And you had -- I think you -- I think you called it

18   in-school suspension, is that the word for it?

19   A.   Yes.

20   Q.   Okay.  That's when you said you sat for, I guess, a

21   couple of periods or two and -- three periods and you largely

22   stared at the wall?

23   A.   Yes.

24   Q.   Okay.  And that was in context of -- and then you -- then

25   you testified that that was in -- counsel asked you, Well, did

─ B.R. v. F.C.S.B. ─

38

1   you get ever get in trouble for anything -- anything because

2   of B.R.?

3           Do you remember that?

4   A.   Yes.

5   Q.   And that's what this was about, you understood that on or

6   about this date B.R. had made a complaint about several people

7   including yourself, right?

8   A.   Yes.

9   Q.   Okay.

10          MR. BRENNER:  Your Honor, can I publish Plaintiff's

11  Exhibit 77?

12          THE COURT:  You may.

13          (Exhibit published.)

14          MR. BRENNER:  And let's just go to the top few

15  lines.

16          MR. BATES:  Objection, Your Honor.  This was the --

17  there's an objection to this document as being out of scope,

18  and it was sustained on Tuesday.

19          MR. BRENNER:  No, Your Honor, you asked me to lay

20  the foundation, which I just did, to show that this is what

21  he's talking about, why he -- why -- why they testified he got

22  suspended.  They -- they brought this up.  As I said to you, I

23  will lay the foundation, which is what I believe I just did.

24          MR. BATES:  No.  That -- that conversation was with

25  regard to his statement.  This is B.R.'s statement.  That

1  objection was sustained.

2        MR. BRENNER:  Let me bring up -- let me bring up

3  Plaintiff's 529 so we can re-lay the foundation.

4        I'm sorry, Your Honor.  May I bring up 529?  This is

5  previously admitted.

6        THE COURT:  You may.

7        (Exhibit published.)

8  BY MR. BRENNER:

9  Q.   This is your statement at this time period, around this

10  November 21, 2011, time period, right?

11  A.   Yes.

12  Q.   Okay.  And did you -- so did you -- you just told me, but

13  I'll ask you again, did you understand that B.R. had made a

14  complaint about you and at least two other people, and this is

15  what your statement was about?

16  A.   I believe so.

17  Q.   Okay.  If you could just look in your book at --

18        MR. BRENNER:  May I approach, Your Honor?

19        THE COURT:  You may.

20  BY MR. BRENNER:

21  Q.   C███████, I've opened your -- your book up there to

22  Plaintiff's Exhibit 77.  Do you see that?

23  A.   Yes.

24  Q.   Did anyone -- first of all, did any -- have you ever seen

25  that document before?

1  A.   I don't remember.

2  Q.   You don't remember; is that right?

3  A.   I don't remember.

4  Q.   Okay.  You do remember that the contents of that

5  document, meaning what was alleged to -- to you to be doing,

6  did you ever -- were you ever made aware of that?

7  A.   I don't remember.

8  Q.   You don't remember --

9         MR. BRENNER:  Let's bring up 529 back again.

10        May I publish?

11        THE COURT:  You may.

12 BY MR. BRENNER:

13 Q.   You don't remember that 529 was your response to the

14 allegations in Exhibit 77?

15        MR. BATES:  Objection.  It's been asked and

16 answered.

17        THE COURT:  He said he didn't remember.

18        MR. BRENNER:  Yeah, but I'm now trying to refresh

19 his recollection.

20 BY MR. BRENNER:

21 Q.   Look at 529, and can you tell me?

22        THE COURT:  Objection is sustained.  He said he

23 didn't remember.

24        MR. BRENNER:  Okay.

25 BY MR. BRENNER:

B.R. v. F.C.S.B.

41

1    Q.   So this is 529.  This is your statement, right?

2    A.   I see that.

3    Q.   Okay.  When you wrote this statement, did you understand

4    that one of the allegations that you were -- being made

5    against you was that you were harassing B███ at her locker?

6    A.   I don't remember.

7    Q.   You don't remember.

8            No where in this statement do you say -- by the way,

9    who did you write this statement for?  Who was the

10   administrator, do you remember?

11   A.   It must have been Ms. M███.

12   Q.   Ms. M███ who's sometimes Ms. T████?

13   A.   Yes.

14   Q.   Same person?  Okay.

15           Nowhere in this statement do you say, Hey, she's

16   actually been inviting me to her locker all the time?  You

17   don't say that, right?

18   A.   It doesn't say it there, no.

19   Q.   Right.  You don't say, This all must be some

20   misunderstanding, she's -- she's my girlfriend?  You don't say

21   that, do you?

22   A.   No.

23   Q.   You don't say, Well, I see -- I know there's these

24   allegations or rumors about her promiscuity, and I don't want

25   to -- I don't want talk out of turn, but I just think you

B.R. v. F.C.S.B.

42

1   should know, like, we're currently engaged in a -- in a sexual

2   relationship?  You don't say that here either, do you?

3   A.   No.

4   Q.   Now, in fact, what you do is you -- you say that you --

5   you say that there are all these rumors going around school,

6   but it's really other people that are doing them, it's -- it's

7   J███ and David?

8           MR. BATES:  Objection.  Mischaracterizes.

9   BY MR. BRENNER:

10  Q.   Okay.  Let's look at what she said.

11          THE COURT:  The document speaks for itself.  Let's

12  work within the confines of the documents.

13  BY MR. BRENNER:

14  Q.   Okay.  In the -- in the document what you say is -- you

15  say, "And then they would send messages on the phone and call

16  and leave voicemails saying stuff," right?

17  A.   Yes, I see that.

18  Q.   So then -- and then you say, "So then I think J███

19  called her saying she was a slut," right?

20  A.   Yes.

21  Q.   And then you finish the statement by saying, "That's all

22  I know."  That's all I know about this whole thing with

23  this -- this girl, B███, right?

24  A.   Yes.

25          MR. BATES:  Objection.  Mischaracterizes.

B.R. v. F.C.S.B.

43

1          THE COURT:  The document speaks for itself.

2    BY MR. BRENNER:

3    Q.   The answer is yes?

4    A.   It says it right there, yes.

5    Q.   Okay.  Okay.  So let's move on -- so let me -- let me --

6    we're going to wrap up with the Facebook messages.

7               You would agree with me that if the -- the person

8    identified as Facebook user is, in fact, B▮▮▮▮, you would --

9    it would mean you forgot that you communicated her --

10   communicated with her hundreds of times after the so-called

11   incident you described, right?

12          MR. BATES:  Objection.

13          THE COURT:  Rephrase.  I kind of got lost in the

14   question, also.

15   BY MR. BRENNER:

16   Q.   Okay.  Remember, you told us that -- that you stopped

17   talking and communicating with -- with B.R. after the

18   November 14th incident?

19   A.   Yes.

20   Q.   You remember the Facebook messages show several hundred

21   communications after that date?

22   A.   Yes.

23   Q.   So if the Facebook messages were, in fact, Facebook user,

24   it means you forgot about all those hundreds of messages,

25   right?

B.R. v. F.C.S.B.

44

1   A.   Yes, like I stated before.

2   Q.   Okay.  The same thing, if -- if the Facebook user is, in

3   fact, B████, it would mean that you forgot the various sexual

4   things that it said you did to her in those messages, right?

5   A.   That I did to her?

6   Q.   Sure.  We went through this.  The messages show multiple

7   sexual encounters, right?  And you say there's only one?

8   A.   There is only one.

9   Q.   And the messages show that you say in that one encounter

10  she performed fellatio on you, and you used your -- your hands

11  inside her private parts?

12  A.   Yes.

13  Q.   But the Facebook messages --

14  A.   Which I have stated before.

15  Q.   I'm sorry?

16  A.   Which I have stated before.

17  Q.   Which you've stated before.

18        But the messages say, for example, that you -- other

19  things, including that you performed oral sex on her?

20  A.   I don't remember that.

21  Q.   Right.  You said it didn't happen, right?

22  A.   Yeah.

23  Q.   Okay.  If the Facebook messages were in fact -- were in

24  fact -- the Facebook user was, in fact, B████, or B.R. it

25  would mean that you simply forgot dozens and dozens of times

───────B.R. v. F.C.S.B.───────

45

1   asking her to send you lewd photographs of herself, naked

2   and -- and doing things to herself?

3          MR. BATES:  Objection, asked and answered.

4          THE COURT:  Sustained.

5   BY MR. BRENNER:

6   Q.   Let me --

7          MR. BRENNER:  Can I rephrase the question, Your

8   Honor?

9          THE COURT:  It's the same question.

10         THE WITNESS:  I mean, we just went through it, so

11  yes, I did ask multiple times.

12  BY MR. BRENNER:

13  Q.   Okay.  It would mean that when you wrote your statement

14  that we just went through to the school -- and you were

15  getting, as you said, disciplined for it, you just neglected

16  to tell the administrators, for example, that she was inviting

17  you to her locker?

18         THE COURT:  Sustained.  And it's asked and answered.

19  BY MR. BRENNER:

20  Q.   The truth is, C███████, you were handed a notebook of

21  messages by counsel, right?

22  A.   Yes.

23  Q.   When you were asked to read them, you were able -- you

24  read them to the record, right?

25  A.   Yes.

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

─────────── B.R. v. F.C.S.B. ───────────

46

```
 1   Q.   When he asked you what things meant, you usually said you

 2   don't recall, right?

 3   A.   Yes, because it was so long ago.

 4   Q.   Right.  The truth is you don't remember those messages

 5   today, correct?

 6   A.   I mean, no, not really.

 7   Q.   You don't really remember them.  You didn't really

 8   remember them in March of 2012 when you were being interviewed

 9   by the detective, correct?

10   A.   No.

11   Q.   Is that correct?

12   A.   Yes.

13   Q.   Okay.  And as we went through, those messages are not

14   consistent with what you say you actually do remember about

15   B███, correct?

16   A.   Yes.

17   Q.   Okay.  New topic.

18           MR. BRENNER:  Your Honor, may I approach?

19           THE COURT:  Approach the witness or the Court?  Yes.

20   BY MR. BRENNER:

21   Q.   Okay.  I've handed you the -- in the first batch, there

22   were a bunch of documents clipped together.  Now, you remember

23   on direct examination you first testified that your

24   recollection was you had stopped talking to J███ altogether

25   after you guys broke up.  Do you remember that?
```

B.R. v. F.C.S.B.

47

1   A.   Yes.

2   Q.   And then you were shown a message like that, like those

3   that I just gave to you, that refresh your recollection that

4   you were speaking with her -- the question you were asked was

5   in November 21st or 22nd.  Do you remember that?

6   A.   Yes.

7   Q.   Okay.  So if you look at the big document I just gave

8   you --

9           MR. BRENNER:  Which, Your Honor, we're not moving to

10  admit, but I'll just identify it -- well, I'll put it for

11  identification at this point as Exhibit 814.

12  BY MR. BRENNER:

13  Q.   First of all, that big stack, do you recognize that as a

14  series of Facebook messages between yourself and J▆▆▆▆?

15  A.   Yes.

16  Q.   Okay.  And if you could just go to the very last page,

17  and that -- could you just tell the jury what the date of that

18  communication was?

19  A.   November 11, 2011.

20  Q.   And according -- as I understood your testimony, that

21  would be sort of right when you claim you and B▆▆▆▆ were

22  dating, and right before the incident which you said was the

23  14th, right?

24  A.   Yes.

25  Q.   Now, these messages -- these messages pick up on November

———————————————B.R. v. F.C.S.B.———————————————

48

1    11th.  You had known J███ since --

2              MR. BRENNER:  He stood up --

3              THE COURT:  I think he's anticipating something to

4    object to.

5              MR. BATES:  Yeah, Judge, we've been handed six or

6    seven exhibits, so I would ask that counsel, if he's referring

7    to a specific document or an exhibit in this stack, that he

8    would identify that for the record.

9              THE COURT:  Okay.  Seems reasonable.

10             (Counsel confers.)

11             MR. BRENNER:  Your Honor, could we -- do you want to

12   go sidebar?

13             (Counsel confers.)

14             MR. BRENNER:  Thank you, Judge.

15   BY MR. BRENNER:

16   Q.   Back to 814.  I think it's the very last page, the --

17   they pick up on -- they start on November 11th?

18   A.   Yes.

19   Q.   And my understanding from your testimony is you met J.O.

20   early in the school year in September, right?

21   A.   Yes.

22   Q.   And you guys became boyfriend and girlfriend in

23   September, you think?

24   A.   I don't remember.

25   Q.   You start a friendship first before you became boyfriend

─B. R. v. F. C. S. B.─

49

1   and girlfriend?

2   A.   Yes.

3   Q.   And that lasted -- the boyfriend/girlfriend part lasted

4   until, I think you said about the end of October?  Does that

5   sound right?

6   A.   I believe so.

7   Q.   Okay.  But that chat starts on November 11th.  Did you

8   have Facebook messages with J█████ prior to November 11th?

9   A.   That was the only thing I could get from the archive.

10  Q.   So when you went to --

11  A.   So I don't remember.

12  Q.   Okay.  Just so I'm clear, when you went to the archive,

13  the messages that pulled up from J.O. started on November

14  11th?

15  A.   Yeah.  This is just all that I could get from there.

16  Q.   And by your memory, does it make sense to you that there

17  would have been earlier messages with her, that they wouldn't

18  have started 10 days or 12 days after you broke up?

19  A.   I don't know.

20  Q.   Do you think you guys messaged while you were dating?

21  A.   Yes.

22  Q.   So they would have started before the end of October?

23  A.   Yes.

24  Q.   And those are gone, right?

25  A.   Yes.

─────────── B.R. v. F.C.S.B. ───────────

50

1   Q.   Okay.  Now, if you could go to that stack of shorter

2   exhibits I gave you.

3   A.   Okay.

4        MR. BRENNER:  Ms. Barry, can I have them back just

5   for one minute.

6        Can you look at Defense Exhibit 354, Your Honor,

7   which I'll represent was admitted during the testimony of

8   J.O., or at least my understanding -- I'll confirm with the

9   clerk.

10       MR. BLANCHARD:  I believe that's correct.

11       THE COURT:  Okay.

12  BY MR. BRENNER:

13  Q.   So 354 has -- what we call a Bates stamp, which is that

14  number on the bottom.

15  A.   Okay.

16  Q.   And it's your name, and then it says 489 and 490?

17  A.   Yes.

18  Q.   That's within the page range of that big 814 I gave you,

19  right?

20  A.   Yes.

21  Q.   Okay.  And same for 355, it's just a subset of the larger

22  exhibit, the 814?

23  A.   Yes.

24  Q.   Okay.  And can you confirm for me the same for 356?

25  A.   Yes.

B.R. v. F.C.S.B.

51

1          MR. BRENNER:  Okay.  Your Honor, at this time, I'd

2    like to offer into evidence 3 -- it's actually two additional

3    pages, which I've provided to counsel from that set, of which

4    the defense admitted parts of the chat, and I want to admit

5    other parts.

6          MR. BATES:  I'm not clear what he's asking to be

7    admitted.

8          THE COURT:  I think what's being suggested is that

9    the document is a very voluminous document, and he's going to

10   offer two pages from that particular document as part of his

11   case.

12         MR. BRENNER:  Again, 454 and 468.

13         MR. BLANCHARD:  Your Honor, my -- I don't know what

14   the purpose is, but I don't have a problem with the entirety

15   of the -- of all the chat that's going in.

16         THE COURT:  Mr. Bates, do you agree with

17   Mr. Blanchard?

18         MR. BATES:  Can I have a moment to confer?

19         (Counsel confers.)

20         MR. BLANCHARD:  I don't have an objection to the

21   pages that he wants to refer to.  I think because of the other

22   rules of the Court -- I would not offer the entirety of this

23   because of some other things.

24         THE COURT:  So I take it there's no objection to

25   that particular provision of that particular exhibit being

B.R. v. F.C.S.B.

52

1    admitted into evidence?

2            MR. BLANCHARD:  The two pages that's been referred

3    to?

4            THE COURT:  Yes.  That's what I thought he was

5    trying to do.

6            MR. BRENNER:  Yes, for the very reason that

7    Mr. Blanchard pointed out.

8            MR. BATES:  Yeah, no objection, Your Honor.

9            THE COURT:  Thank you.

10           MR. BRENNER:  We'll mark that as Exhibit 814A, and

11   the pages are -- the pages for the clerk, for recordkeeping,

12   are going to be the Bates stamp that ends in 454 and the Bates

13   stamp that ends in 468.

14           THE COURT:  Very good.

15           MR. BATES:  So to be clear, it's going to be a

16   two-page exhibit?

17           MR. BRENNER:  Correct.

18           MR. BATES:  Thank you.

19   (Plaintiff's Exhibit No. 814A was admitted into evidence.)

20   BY MR. BRENNER:

21   Q.   Now, you were communicating with J████ in these Facebook

22   chats?

23   A.   Yes.

24   Q.   You guys were engaged in some pretty sexual banter; is

25   that fair to say?

B.R. v. F.C.S.B.

53

1   A.   Yes.

2   Q.   Some of it quite violent; is that fair to say?

3   A.   I guess so.

4   Q.   Let's look at -- first of all, who is Ata, A-T-A?

5   A.   Ata.

6   Q.   Who is that?

7   A.   It was a kid in our grade.

8   Q.   A kid in which grade?

9   A.   A kid in J████'s grade.

10  Q.   In J██████ grade.  It was a kid that J████ had a

11  relationship with, right?

12  A.   Yes.

13  Q.   And that I think -- and if I had this wrong, tell me.  I

14  think Ata broke up with J████?

15  A.   I believe so.

16  Q.   And J████ was, fair to say, super mad about that, right?

17  A.   I guess so.

18  Q.   Okay.  And let's look if we could publish 454, your

19  conversation with --

20        MR. BRENNER:  May I publish it, Your Honor?

21        THE COURT:  You may.

22        (Exhibit published.)

23  BY MR. BRENNER:

24  Q.   Your back and forth with J████ about Ata, A-T-A.  It

25  says -- you say, "Oh, do you still like Ata," right?

─B.R. v. F.C.S.B.─

54

1  A.   Ata.

2  Q.   Ata, still like Ata, right?

3  A.   Yes.

4  Q.   She says, "F Ata," right?

5  A.   Yes.

6  Q.   And she says "In the A," right?

7  A.   Yes.

8  Q.   With a pitchfork, right?

9  A.   Yes.

10  Q.   And then in all caps, "SHOVE IT IN, SHOVE IT IN"?

11  A.   Yes.

12       MR. BRENNER:  Okay.  You can take that down, please.

13  BY MR. BRENNER:

14  Q.   You guys also talked about things that were happening in

15  the school in these Facebook chats, right?

16  A.   I guess so.

17  Q.   Do you remember someone named Arianna?

18  A.   That's a girl in J███'s grade.

19  Q.   7th grade also?

20  A.   Yes.

21  Q.   And you recall there were times where J███ was really

22  mad at Arianna?

23  A.   I don't remember.

24  Q.   Okay.  Let's look at 468.

25       MR. BRENNER:  May I publish, Your Honor?

─── B.R. v. F.C.S.B. ───

55

1          THE COURT:  You may.

2          (Exhibit published.)

3          MR. BRENNER:  Okay.  Can you highlight the middle of

4    the page there?  Right there.

5    BY MR. BRENNER:

6    Q.   It says, "If that little B" -- this is J▊▊ talking.

7          "If that little B, Arianna, says one f'ing word to

8    me tomorrow, I'm shoving her into a wall and punching her in

9    the face."

10   A.   Yes, I see that.

11   Q.   This is consistent with the way you and J▊▊

12   communicated with each other, right?

13   A.   Yes.

14          MR. BRENNER:  Okay.  You can take that down, please.

15          Your Honor, may I publish -- well, let me ask

16   this -- well, may I publish Plaintiff's Exhibit 59, which I

17   believe is in evidence?  It's just page 1 we're going to

18   publish.

19          MR. BATES:  May I have a moment to confer with

20   counsel?

21          THE COURT:  Sure.

22          (Counsel confers.)

23          MR. BATES:  Can we approach, Your Honor?

24          THE COURT:  What's the issue?

25          MR. BATES:  It's an exhibit that's been admitted for

Cross - C.K.

─── B.R. v. F.C.S.B. ───

56

1    a limited purpose, and it's going beyond that purpose.

2             THE COURT:  Well, it's been -- if it's offered for a

3    limited purpose, I'm assuming that there's some limiting

4    instruction associated with it, correct?

5             MR. BATES:  Right.  But it's not properly used for

6    this witness, Your Honor.  And it's also outside of the scope

7    of direct.

8             THE COURT:  Well, let's see where we go.

9             MR. BRENNER:  I'll lay -- if I can --

10            THE COURT:  Try to lay a foundation, and then I'll

11   make a determination as to whether the document is admissible.

12            MR. BRENNER:  Okay.  Let me -- let me direct him to

13   it in the book, Your Honor.  Can I direct him in the book?

14            THE COURT:  Yes.

15            (A pause in the proceedings.)

16   BY MR. BRENNER:

17   Q.   C██████, if you look at Exhibit 59 in your book.  First

18   of all, do you recognize the incident that's described in this

19   document?

20   A.   Yes, it was a misunderstanding.

21   Q.   Okay.  We'll get to that.

22            It -- it's -- it's a school record, correct?

23   A.   Yes.

24   Q.   It -- it identifies the -- does it identify the

25   administrator that you were dealing with in that record as

B.R. v. F.C.S.B.

57

1   M███.  Do you see that?

2   A.   Yes.

3   Q.   So the school was aware of this incident, right?

4   A.   Yes.

5   Q.   It says "referred by McCrory," is that a teacher?

6   A.   Math teacher.

7   Q.   So the incident that described here happened in your math

8   class?

9   A.   Yes.

10  Q.   The teacher observed it?  Or did the teacher observe it?

11  A.   He didn't see what happened, no.

12  Q.   The other students reported it to the teacher?

13  A.   One person did, yes.

14  Q.   One girl did, right?

15  A.   Yes.

16  Q.   She reported to the teacher, and then the teacher

17  reported it to Ms. M███, right?

18  A.   He pulled me out and talked to me and then reported it,

19  yes.

20  Q.   And then you met with Ms. M███?

21  A.   Yes.

22  Q.   Okay.  So the school has -- has notice of this issue,

23  correct?

24         MR. BATES:  Objection.  Foundation.

25         THE COURT:  Overruled.

B.R. v. F.C.S.B.

58

1    MR. BRENNER:  Your Honor, may I now publish 59?

2    MR. BATES:  Yeah, we're going to note our same --

3    same objection.  Scope, 404.

4    THE COURT:  I'm going to allow you to ask him

5    questions like you did, but I'm not going to allow it to be

6    published.

7    BY MR. BRENNER:

8    Q.   In this exhibit you were -- you were found to the school

9    to have exposed your genitals to female students during the

10   7th grade science class, correct?

11   A.   Yes.

12   Q.   And you -- the school disciplined you for that, right?

13   A.   Yes.

14   Q.   And you -- to this day you deny that, right?

15   A.   Yes.

16   Q.   Your -- your -- your version of events is that you opened

17   your zipper and put your -- was it a finger or several fingers

18   out?  What -- what is your version of events?

19   A.   My thumb.

20   Q.   You put your thumb through your -- inside of your zipper

21   out towards the girls?

22   A.   I was facing forward towards the class.  The girls were

23   probably at least 10 feet away from me behind me.

24   Q.   And they -- and then you said they reported to the

25   teacher --

Cross - C.K.

—B.R. v. F.C.S.B.—

59

1    A.    Yeah, they did.

2    Q.    I'm sorry.  Let me finish -- let me finish my question.

3          They reported to the teacher that you had exposed

4    your genitals to them, correct?

5    A.    Devi reported that I exposed myself.

6    Q.    I'm sorry?

7    A.    Devi.

8    Q.    Debbie reported that you exposed --

9    A.    Devi, D-E-V-I.

10   Q.    D-E-V-I?

11   A.    Devi.

12   Q.    Devi.  A fellow student?

13   A.    Yes.

14   Q.    8th -- 7th grader?

15   A.    She was in my class.  I was in the same grade with

16   everybody.

17   Q.    Right.  But this was during your 7th grade year, right?

18   A.    Yes.

19   Q.    Okay.  And you said she's a fellow 7th grader?

20   A.    Yes.

21   Q.    Okay.  You -- you were later -- we talked about this a

22   little bit in your interview with the detective on March 2012,

23   you acknowledged that at another time you touched -- touched a

24   girl on her breast without her consent; do you remember that?

25             MR. BATES:  Same --

—B.R. v. F.C.S.B.—

60

1          THE WITNESS:  I don't remember.

2          MR. BATES:  Same objection, Your Honor.  Beyond the

3    scope and 404.

4          MR. BRENNER:  Your Honor, may we --

5          THE COURT:  No, no approach.  You can ask him

6    questions, but let's -- let's focus on what we need to resolve

7    in this case.

8    BY MR. BRENNER:

9    Q.   I -- did -- was there an incident where you acknowledged

10   that you touched a girl on her breast?

11   A.   I don't remember.

12   Q.   So let me see -- let me see -- let me see if I can

13   refresh your recollection.

14         MR. BATES:  Judge, I'm sorry.  Can we get some

15   clarity on what that ruling was because this is a clear 404

16   issue.

17         THE COURT:  All right.

18         MR. BATES:  And relevance --

19         THE COURT:  Hold it.  I think it's a good idea for

20   everybody that when the Court is speaking everyone shut it

21   down for a little bit.

22         The Court has made certain rulings in this case, and

23   I'm expecting counsel to abide by those rulings.

24         MR. BRENNER:  Your Honor --

25         THE COURT:  And stay within the scope and not try to

─────────── B. R. v. F.C.S.B. ───────────

61

1    backdoor any issues that you think you might want to resolve

2    that is inconsistent with the Court's determinations on the

3    motions in limine.

4              MR. BRENNER:  Your Honor, can I approach so I can

5    explain what the -- what -- what the basis for it?  I don't

6    want to do a speaking objection, but I would like to explain

7    the basis.

8              THE COURT:  All right.

9              (Side bar.)

10             MR. BRENNER:  The witness testified on direct

11   examination and on cross-examination that my client assaulted

12   him.  It is perfectly, in my opinion, within the scope of a

13   cross-examination of that statement to show that he has a

14   history of engaging in sexual misconduct, including unwanted

15   touching of girls.  It's directly a credibility issue.

16             THE COURT:  Make -- make the connection between the

17   two.  You stated one premise, and then you move to another

18   premise.  So state the connection between the two.

19             MR. BRENNER:  Right.  The premise on direct and

20   cross -- it's part of the cross -- is, "I am a victim.  I

21   don't touch" -- he actually said, "I've never touched anyone

22   nonconsensually."  He said that on direct.  You heard that.

23             And now on cross-examination I am showing him that

24   he has acknowledged doing that.  So -- that's the direct

25   examination, that's the cross.  That's what -- that's all I'm

Cross - C.K.

B.R. v. F.C.S.B.

62

1    trying do.

2          I don't know which pretrial ruling it would go to.

3          THE COURT:  What purpose -- what purpose does it

4    serve in dealing with the issues that we need to resolve in

5    this case?

6          MR. BRENNER:  Well, I think you and I probably would

7    have agreed that a lot of what they did over our objection and

8    probably is way beyond the scope of this case, what they did

9    in DX-1, but we made our objection to Your Honor --

10         COURT REPORTER:  I lost you at "Beyond the scope of

11   this case. . ."

12         MR. BRENNER:  Right.  Your Honor, over our

13   objection, allowed them to introduce into evidence DX-1 and go

14   page and page after page showing that -- suggesting that my

15   client was the sexual aggressor, ultimately in an incident

16   overcame this man physically and performed sex acts on him.

17         That -- and I've may agree with you, I tried to keep

18   that out; Your Honor allowed that in.  So it's -- now, I am

19   cross-examining him on his -- basically, his core testimony,

20   which was this girl -- this girl was the aggressor and this

21   girl overcame me and --

22         THE COURT:  About B.R.?

23         MR. BRENNER:  Yeah, yeah, yeah.

24         THE COURT:  You said "this girl."

25         MR. BRENNER:  Oh, I'm sorry.  I'm sorry, Judge.

─────B.R. v. F.C.S.B.─────

63

1    We're using the initials anyway, now -- now I'm using

2    pronounces.

3            So it's -- it's fair cross to ask the witness who

4    has now said for hours about my client, hey, wait, the truth

5    is you do this stuff to other girls.  And that goes to what

6    does he do with her.

7            This is not like four years before, this is in -- I

8    can't -- it's unclear whether it's in school.  It's at

9    school -- I don't know if he will say it's in school.

10           But he acknowledged in his interview with Detective

11   Chambers, which I'm being very careful in saying "in your

12   interview or your interview with the detective," that he did

13   this.  And I'm entitled to just --

14           THE COURT:  So what you're suggesting is because he

15   allegedly engaged in offensive sexual acts himself, that

16   precludes a suggestion that B.R. was not the aggressor in his

17   encounter -- alleged encounter with her?

18           MR. BRENNER:  It doesn't preclude the suggestion,

19   it's cross-examining the credibility of his claim.  Because

20   they obviously can make a suggestion.  They have made their

21   suggestion.  I'm just -- saying to the jury maybe you

22   shouldn't believe this guy because this is what he does.  He

23   always says he's -- he's the victim, just like he did with the

24   genital -- he's -- Mr. K. is never wrong.

25           So it's just a -- it's just a credibility -- it's a

──────B.R. v. F.C.S.B.──────

64

1  straight cross impeachment.  He says X; I'm saying, no, that's

2  not consistent with your behavior.

3          MR. BATES:  Judge, he just confirmed that this is a

4  404 issue.  He's trying to introduce an alleged incident that

5  is not in any of the school records, that allegedly involves

6  another girl that is not B.R. in a different year, and it's

7  not an issue of notice because, again, it's not in any of the

8  school records.  So this is a clear prior bad act that he's

9  trying to get into, and there's not any permitted use under

10  404(b)(2).

11          He actually said it's his propensity for engaging in

12  this type of behavior, which is squarely right in the target

13  of 404.

14          MR. BLANCHARD:  Can I --

15          THE COURT:  Yes, sir.

16          MR. BRENNER:  It is a direct challenge to his

17  credibility -- first of all, he's not a party anymore.  I'm

18  really -- honestly, Judge, I wasn't understanding when counsel

19  was saying it violates a pretrial ruling.  I don't understand

20  what ruling he's talking about.  He's not a party anymore.  He

21  decided to get on the stand and ask questions to elicit

22  testimony that he has never -- that he never engages in this

23  type of behavior.  How can I not be able to cross-examine him

24  and say, Well, actually, you do.  That's all I'm trying to do.

25  I'm not -- it's perfectly fair.

B.R. v. F.C.S.B.

65

1          It is has nothing to do -- it's not a notice issue,

2    it's a credibility.  They have --

3          THE COURT:  What you're trying to suggest, as I

4    understand it, is because he was involved in something sexual

5    in one context, thereby he must be responsible for the sexual

6    acts in this context.

7          MR. BRENNER:  No.  I think what he said on direct

8    was, I believe, and I'll have to check, but I believe -- he

9    certainly indicated, but I believe he said, I never touched

10   anyone nonconsensually.

11         How could I not be able to impeach the testimony?  I

12   didn't put that in, but I don't know -- I don't know that -- I

13   honestly have to check what those words were -- but that's his

14   -- Mr. Bates, can you --

15         MR. BATES:  Well, you're making a representation to

16   the Court that you --

17         THE COURT:  Hold it.  Talk to me.

18         MR. BATES:  I'm sorry.  I feel like he's making a

19   representation to the Court that he does not know to be true.

20   In other words, I solicited from C.K. that he's never sexually

21   assaulted any girls whatsoever.

22         My questions were limited to B.R.  I didn't even ask

23   any questions about this, the exposure incident, which he's

24   already gotten into, and now this is the second incident.

25         THE COURT:  Let's make it simple.

Cross - C.K.

B.R. v. F.C.S.B.

66

1          From the Court's perspective, how do you overcome

2     the 404 objection?

3          MR. BRENNER:  Because it's not a 404.  It's an

4     impeachment of his -- first of all, he's not a party.  I'm not

5     suggesting that he's a party.  He's no longer a party in this

6     case, so I don't have 404 up here with me.  So -- but it's a

7     direct impeachment of his testimony.  It's nothing to do with

8     404.  That is a use of evidence.  I'm not suggesting that

9     because -- I'm not -- I can't argue that because you did this,

10    it directly means you did this.

11         What I can argue is when you say you don't do these

12    types of things, actually --

13         THE COURT:  I don't think he broadly said that.  I

14    didn't hear that.  If you can point me to something in the

15    record that when he said, I do not do these kinds of things,

16    then we might have another --

17         MR. BRENNER:  So I would have to go check.  That's

18    why, Mr. Bates -- I'm sorry to upset him.  That's why I said,

19    "I don't know."  So I'll represent -- I would have to check

20    the record, because I do not.

21         (A pause in the proceedings.)

22         THE COURT:  I'm going to sustain the objection.  I

23    note your exception.

24         (Open court.)

25    BY MR. BRENNER:

┌─────────────── B.R. v. F.C.S.B.───────────────
                                                                67

1   Q.   Now, if you go back to the February 2012 time period.  So

2   this is -- do you recall that B.R. left school in February of

3   2012?

4   A.   I was aware she left, yes.

5   Q.   Okay.  And I'll represent to you that the parties have

6   stipulated that her last day of in-person meeting at the

7   school was February 9th, okay?

8   A.   Okay.

9   Q.   Sound about right to you?

10  A.   I don't know.

11  Q.   Okay.  Do you recall that after she left, or at or about

12  after she left, you understood that she had made an allegation

13  that you had raped her, right?

14  A.   Yes.

15  Q.   Okay.  And that was going around the school, people were

16  saying things to you, right?

17  A.   Yes.

18  Q.   It was kind of the talk of the school; is that fair to

19  say?  A pretty serious allegation?

20  A.   I just know people were coming up to me and asking, yes.

21  Q.   Right.  And at no point after that did a school official

22  ever talk to you about the allegation -- of B████ allegation

23  that you had raped her, correct?

24  A.   I don't remember.

25  Q.   Well, let's look at your deposition to refresh your

B.R. v. F.C.S.B.

68

1  recollection.  If you could go to page 202, Lines 18 to 20,

2  the question was:

3       "QUESTION:  Did any school administrators talk to you

4  about the alleged rape?"

5       And your answer was:  "No."

6       Correct?

7  A.  Yes, that's what it says.

8  Q.  I'm sorry?

9  A.  That's what it says.

10 Q.  That's what you said?

11 A.  Yes.

12 Q.  Yes?

13 A.  Yes.

14 Q.  All right.  So I want to wrap up by just going back to

15 the November 14th incident and ask you a couple more

16 questions.

17       You recall testifying on direct -- excuse me, on

18 cross, which means with me, that you had told your mom right

19 after what had happened with B.R., right?

20 A.  Yes.

21 Q.  And the reason you told your mom was that you believed

22 that she was -- that she was going to say something to the

23 school about it?

24 A.  If that's what it says, yes.

25 Q.  Well, let's look at -- let me refresh your recollection.

B.R. v. F.C.S.B.

69

1          THE COURT:  Ladies and gentlemen, the reason for

2    that call is we're trying to get the air conditioner turned

3    down in here so that we cannot freeze.

4    BY MR. BRENNER:

5    Q.   Let me --

6          MR. BRENNER:  Counsel, I'm going to go to page 50.

7    I'm sorry, page 50, line 17.

8          (Counsel confers.)

9    BY MR. BRENNER:

10   Q.   I ask you on March 2012, when you gave that interview,

11   you remember saying that the reason that you told your mom

12   pretty much right away is that you believed that B.R. was

13   going to say something to the school about it?

14   A.   On page 50?

15   Q.   No, no, I haven't given -- I'm just asking if you

16   remember that.

17   A.   I don't remember.

18         MR. BRENNER:  Your Honor, can I just read in what he

19   said in March of 2012?

20         MR. BATES:  This is not impeachment.  This is not a

21   deposition.  I think he needs to refresh his recollection.

22         MR. BRENNER:  Okay.

23         THE COURT:  Take a look at what Mr. Brenner is

24   handing you, read it to yourself, and then after you read it

25   to yourself, he may have another question for you.

B.R. v. F.C.S.B.

70

```
 1              THE WITNESS:  Okay.  I told her a couple of days, it

 2    says.

 3    BY MR. BRENNER:

 4    Q.   Right.  It says -- does that refresh your recollection

 5    that in a couple of days you told your mom, because you

 6    were -- you believed that B█████ was going to tell the school

 7    about it?

 8    A.   Yes.

 9    Q.   Now, but as you described the incident, you say that

10    B████ planned it, right, with you?

11    A.   Yes, we planned it.

12    Q.   She was eager for it, right?

13    A.   She was.

14    Q.   Facebook user was excited about it?

15    A.   Yes.

16    Q.   Facebook user was excited after the fact?

17    A.   Yes.

18    Q.   You guys parted on good terms?

19    A.   No.

20    Q.   You did not part on good terms?

21    A.   I don't remember.

22    Q.   So did something happen that you were concerned that

23    she -- if something happened, she would go to the school?

24    A.   I don't know.

25    Q.   Was she concerned -- were you concerned that she was
```

B.R. v. F.C.S.B.

71

1  going to go to the school because you had done something to

2  her?

3  A.   What we did was planned.

4  Q.   I'm sorry?

5  A.   What we did was planned.

6  Q.   Right.  So why did you think she was going to go report

7  to the school this planned consensual encounter she had with

8  you?

9  A.   I don't know.

10  Q.   You don't know, do you?

11  A.   I don't remember.

12  Q.   Okay.

13  A.   I don't know how many times I have to say it before you

14  understand that.  I don't remember.

15  Q.   Right.  You don't remember almost any of this, right?

16          MR. BATES:  Objection, argumentative.

17          THE COURT:  Sustained.

18  BY MR. BRENNER:

19  Q.   There's one other thing that you didn't talk about when

20  you talked about the incident.

21          Do you remember that you saw a person walking by

22  walking a dog?

23  A.   I do remember that.

24  Q.   To orient the jury, you're back at this spot that you say

25  B████ took you to, and she's doing what you said she did to

B.R. v. F.C.S.B.

72

1   you, and you see a person walking a dog?

2   A.   Yes.

3   Q.   You don't know that person?

4   A.   No.

5   Q.   You don't know what they saw?

6   A.   No, I don't.

7   Q.   Right.  But you think they saw something because you saw

8   them, so you think they may have seen you, right?

9   A.   It's pretty clear from the way they were standing, if

10  they looked over, they would have seen us.

11  Q.   And if they would have looked over, they would have seen

12  a -- as you described it, a sexual encounter which involved

13  pushing and shoving, right?

14  A.   Yes.

15  Q.   They would have seen a sexual encounter that involved one

16  person imposing their will on another?

17  A.   Yes.

18  Q.   And so, knowing that, what your version of events became

19  is that this encounter, this physical encounter of one person

20  imposing their sexual will on the other was actually you were

21  the victim and she was the pusher, correct?

22          MR. BATES:  Objection, argumentative.

23          THE COURT:  And it's speculation also.

24  BY MR. BRENNER:

25  Q.   Well, you did come up -- the version -- the version you

B.R. v. F.C.S.B.

73

1   then repeated from that time forward was that you were -- you

2   were the victim, right?

3              MR. BLANCHARD:  Objection --

4              THE COURT:  She was aggressive, yes.

5              MR. BLANCHARD:  -- foundation.

6              THE COURT:  Overruled.

7              MR. BRENNER:  May I confer with my colleagues?

8              THE COURT:  You may.

9              (Counsel confers.)

10             MR. BRENNER:  Thank you, C███████.  Thank you, Your

11  Honor.

12             THE COURT:  Redirect.  How long do you think you're

13  going to be?

14             MR. BATES:  Maybe 20 minutes, Your Honor.

15             THE COURT:  Okay.  Go ahead.

16                     REDIRECT EXAMINATION

17  BY MR. BATES:

18  Q.   C███████, you recall when we last spoke on Tuesday, we

19  went through those messages in great detail; is that correct?

20  A.   Yes.

21  Q.   And in those messages, you were, among other things,

22  planning to meet up with somebody; is that right?

23  A.   Yes.

24  Q.   And you arranged specific times to meet up with the

25  person you were communicating with; is that right?

B.R. v. F.C.S.B.

74

1          MR. BRENNER:  Objection, leading.

2          THE COURT:  It is.

3   BY MR. BATES:

4   Q.   Did you in those messages arrange a time to meet up with

5   the person you were communicating with?

6   A.   Yes.

7   Q.   And who showed up at those meetings?

8   A.   B█████.

9   Q.   And in those messages were you communicating -- did the

10  person disclose to the neighborhood that she lived in?

11  A.   No.

12  Q.   You don't recall whether she disclosed the neighborhood

13  that she lived in?

14  A.   Middleton Farms.  But that's it.

15  Q.   And who do you know that was in Rachel Carson Middle

16  School during that year that lived in Middleton Farms?

17  A.   B█████.

18  Q.   And you recall discussions of Facebook user asking you to

19  meet her at her locker; is that right?

20  A.   Yes.

21  Q.   And you recall Facebook user giving you her locker

22  number; is that right?

23          MR. BRENNER:  Objection, leading.

24          THE COURT:  Rephrase.

25  BY MR. BATES:

───B.R. v. F.C.S.B.───

75

1  Q.   Do you recall Facebook user disclosing to you her locker

2  number?

3  A.   Yes.

4       MR. BATES:  Okay.  Judge, can I publish Defense

5  Exhibit 1?

6       THE COURT:  That's in.

7       MR. BATES:  That's the Facebook messages.

8       THE COURT:  You may.

9       MR. BATES:  If we can go to 166?  And --

10      MR. BRENNER:  I'm sorry, what was the page?

11      MR. BATES:  166.

12      And, Judge, if we can also publish, we can do a

13  split screen with Defendants' Exhibit 44, which has already

14  been admitted?

15      THE COURT:  You can split screen 44 and 166.

16      (Exhibit published.)

17  BY MR. BATES:

18  Q.   And in this message on November 9th, what is the locker

19  number that Facebook user tells you to go to?

20  A.   498.

21  Q.   Okay.  And on the right side, this document that's

22  already been admitted into evidence, what is that handwritten

23  locker number there under the plaintiff's name?

24  A.   498.

25  Q.   Okay.  And when you went to 498, whose locker was it?

—— B.R. v. F.C.S.B. ——

76

1   A.    B███████.

2   Q.    Okay.

3          MR. BATES:  We can take those down.  And if we can

4   go to -- if we could publish the yearbook, which is

5   Defendants' Exhibit 79 -- I'm sorry, 279.

6          THE COURT:  You may.

7          (Exhibit published.)

8          MR. BATES:  If we can go to page 87.

9          And if we can split screen that with Defendants'

10  Exhibit 1 one more time, please.  On page 166 as well.  Yes.

11  166.

12          Exhibit 1.  Page 166.

13  BY MR. BATES:

14  Q.    On the right, C███████, do you see, does Facebook user

15  describe the -- after the locker number where her locker is?

16  A.    Yes.

17  Q.    And what does she say?

18  A.    It's where the Explorers' banner is.

19  Q.    Okay.  If we can have Grady zoom in on the bottom right

20  picture on the -- what is that in the background of the -- on

21  the wall?

22  A.    That's the Explorers' banner.

23  Q.    And do you recognize the person who is right in front of

24  the Explorers' banner?

25  A.    B████.

─────B.R. v. F.C.S.B.─────

77

1  Q.   Do you have any question in your mind that these messages

2  that we were -- went over exhaustively yesterday, that you

3  were communicating with B████?

4  A.   Yes.

5  Q.   I should rephrase that.

6          In these messages, is it your testimony that you

7  were -- you were absolutely communicating with B████?

8          MR. BRENNER:  Objection.  Leading.

9          THE WITNESS:  Yes.

10          THE COURT:  Sustained.  Just rephrase the question.

11  It was --

12  BY MR. BATES:

13  Q.   Who --

14          THE COURT:  -- a double negative in there.

15          MR. BATES:  I apologize.

16  BY MR. BATES:

17  Q.   Mr. Brenner asked you a lot of questions about -- about

18  who the real Facebook user was behind those messages.  Who was

19  that person?

20  A.   B████.

21  Q.   Okay.

22          MR. BATES:  If we can -- if we can -- while you have

23  Exhibit 279 up, that's the yearbook, can we publish page 54 of

24  the yearbook?  And if we can zoom in?

25  BY MR. BATES:

─B.R. v. F.C.S.B.─

78

1   Q.   Who is that in that middle square in that picture?

2   A.   That is me.

3   Q.   That's 13 year old you?

4   A.   Yes.

5   Q.   Okay.

6            MR. BATES:  Thank you.  You can take that down.

7   BY MR. BATES:

8   Q.   Do you recall we -- there was a discussion yesterday

9   about the intimate acts that were engaged in in B█████

10  neighborhood near the tree line?

11  A.   Yes.

12  Q.   Okay.  And do you recall the testimony that -- that you

13  received -- I'm sorry, B████ received several phone calls from

14  her family during that interaction?

15  A.   Yes.

16  Q.   And -- and did you testify that you saw her phone

17  ringing?

18  A.   Yes.

19  Q.   Okay.  And do you recall yesterday Mr. Brenner asked you

20  about some phone records?

21  A.   Yes.

22  Q.   Okay.

23           MR. BATES:  Can we pull up Defendants' Exhibit 87,

24  which is -- 84, I believe, the phone records that were already

25  admitted?

79

1          THE COURT:  You may publish.

2          (Exhibit published.)

3          MR. BATES:  And if we can go -- flip forward, no.

4    Okay.

5    BY MR. BATES:

6    Q.   And we talked about these -- yesterday these are the

7    phone calls from your call log on the date of that message?

8          MR. BRENNER:  I think that misstates the record.

9          THE COURT:  Refer specifically to the date.

10   BY MR. BATES:

11   Q.   You recall questions yesterday about looking at these

12   phone logs during the incident, is that -- is -- from the time

13   of the incident; is that right?

14   A.   Yes, sir.

15   Q.   And so here highlighted, these are outgoing phone

16   calls -- or let's just say this, phone calls between you and

17   B█████ on these phone records at this time, correct?

18   A.   Yes, sir.

19   Q.   And we talked about when school ended at three o'clock

20   and there's these series of messages?

21   A.   Yes, sir.

22   Q.   Okay.  And Mr. Brenner asked you yesterday whether there

23   was any -- I'm sorry, Tuesday whether there was any evidence

24   of these phone calls that were coming in while you two were

25   engaged in the intimate acts; is that correct?

B.R. v. F.C.S.B.

80

1   A.   Yes.

2   Q.   Okay.  Did -- while -- while her phone was ringing during

3   the intimate acts, did -- did B█████ pick up those phone calls?

4   A.   No.

5   Q.   Okay.  She just let it ring through?

6   A.   Yes.

7   Q.   Okay.  And do you know -- well, let me say this:  Based

8   on your testimony and your recollection, would your engagement

9   in these intimate acts occur between those top two phone calls

10  that you're looking at there, at 3:21 and 4:25?

11  A.   I believe so, yes.

12  Q.   Okay.  And do you know whether if a phone call is made

13  and it's not picked up whether it will show up on phone

14  records or not?

15           MR. BRENNER:  Objection, Your Honor.  This

16  witness has -- there's no foundation.

17           THE COURT:  Sustained.

18           MR. BATES:  I'm -- I'm -- I'm asking him if he -- if

19  he knows.  I'm trying to lay -- to see if there's any

20  foundation.

21           THE COURT:  It's going to be interesting for you to

22  get there, but I'll give you a little latitude.

23  BY MR. BATES:

24  Q.   Do you -- do you know, based on your own personal

25  knowledge, if a phone call is received -- I'm sorry, if a

B.R. v. F.C.S.B.

81

1  phone call is made and the person doesn't pick up, whether or

2  not it shows up on these records?

3  A.    No.

4  Q.    Okay.  Do you know while these phone calls are being

5  received, do you know if there was text messages as well that

6  she was receiving?

7  A.    I don't know.

8  Q.    You don't know?

9          Okay.  Do you --

10  A.    It just -- it vibrated a lot, that's all.

11  Q.    Okay.  All right.

12          MR. BATES:  And if we can do a split screen with

13  Defendants' Exhibit 1, republish that on page -- on page 73 of

14  Defendants' Exhibit 1.

15          73 on Defendants' Exhibit 1.

16          And if you can highlight that -- that passage, the

17  second passage from the top?  It says -- yeah.

18  BY MR. BATES:

19  Q.    So Mr. -- C████████, can you read that top message that

20  you sent?

21  A.    "Did your mom see me?"

22  Q.    Okay.  And -- and is this the date of the interaction in

23  the tree line between you and B.R.?

24  A.    Yes, sir.

25  Q.    Okay.

─────B.R. v. F.C.S.B.─────

82

1              MR. BATES:  If you can unzoom that, and zoom in on

2    the --

3    BY MR. BATES:

4    Q.   And what is the time of that interaction -- of that --

5    that you sent that message?

6    A.   4:29 p.m.

7    Q.   Okay.  And what is that middle phone call that is zoomed

8    in right there, what is the time of that middle phone call?

9    A.   4:25 p.m.

10   Q.   Okay.  So -- so based on this, did you send that message

11   within four minutes of this phone call being received?

12   A.   It appears so.

13   Q.   Okay.  And -- and why did you ask, "Did your mom see me?"

14   A.   Because I saw a car go by when I was leaving the

15   neighborhood.

16   Q.   Okay.  And -- and did you have Facebook Messenger on your

17   cell phone at that time?

18   A.   I don't remember.

19   Q.   You don't --

20   A.   Probably.

21   Q.   Okay.  That's fine.

22              MR. BATES:  Okay.  If we can -- if we can put down

23   Exhibit 1, and just do a split screen with DX-44.

24              Now, if you can take down Exhibit 1 on the right.

25              I'm putting Mr. Grady to work this morning.

B.R. v. F.C.S.B.

83

1          If you can -- Grady, if you can zoom in on that 4:25

2    call on the left on 84.  And highlight that 4:25 call.

3          And if you can move that down.  Zoom in if that's

4    possible.  Actually, you can just leave it unzoomed.  And if

5    you can highlight that phone number on the right?  There we

6    go.  If you can highlight and zoom in that phone number on the

7    right?

8          And if you can highlight that number on the left,

9    home phone?

10   BY MR. BATES:

11   Q.   Mr. -- Mr. -- C███████, does the phone numbers in these

12   two records line up?

13   A.   Yes, sir.

14   Q.   Okay.

15          MR. BATES:  Okay.  Thank you.  You can take that

16   down.

17   BY MR. BATES:

18   Q.   Mr. -- C███████ -- I apologize.  We usually call people

19   mister, we're calling you C███████.

20          You testified yesterday that you dated J████ for

21   about six to seven months; is that right?

22   A.   Yes, sir.

23   Q.   Now, are you 100 percent positive on that number, or was

24   that just your best estimate?

25   A.   Best estimate.

—B.R. v. F.C.S.B.—

84

1   Q.   Okay.  Well, let's try to -- let's try to nail down that

2   estimate a little bit better.

3            MR. BATES:  If you can pull up DX-81.  Permission to

4   publish?  This is the school calendar that's been admitted.

5            THE COURT:  You may.

6            (Exhibit published.)

7   BY MR. BATES:

8   Q.   Okay.  And you testified that you met J████ in 7th grade;

9   is that right, C███████?

10           I'm sorry, you were in 8th grade and she was in 7th

11  grade --

12  A.   Yes, sir.

13  Q.   -- when you met?

14           MR. BATES:  Okay.  And if you can zoom in on

15  September, October and November, in that calendar?

16  BY MR. BATES:

17  Q.   Do you see that F in -- on September 6th?

18  A.   Yes.

19  Q.   Okay.  September 6th.  Is that consistent with your

20  recollection as to when school started?

21  A.   Yes.

22  Q.   Okay.  And do you -- and you said that you dated J████

23  before you dated B████; is that right?

24  A.   Yes, sir.

25  Q.   Okay.  Do you recall from the messages that we looked at

B.R. v. F.C.S.B.

85

1    yesterday the date that you and B████ started dating?

2    A.   It was in November.

3    Q.   Okay.  Would -- would early November make sense?

4    A.   Yes.

5    Q.   Okay.  And so if you --

6            MR. BATES:  If we can highlight -- if we can

7    highlight November -- November 5th, Grady, on -- in there.

8    BY MR. BATES:

9    Q.   So if you -- if you started dating B████ on November 5th,

10   and you dated -- started dating J████ sometime after the start

11   of that school year, does this refresh your recollection or

12   give you the data to make a better estimate as to how long you

13   dated J████?

14   A.   Yes, sir.

15   Q.   What would you estimate then, based on looking at this

16   calendar, how long you dated J████?

17   A.   Probably a little over a month-and-a-half.

18   Q.   Okay.

19           MR. BATES:  Okay.  We can leave this calendar up for

20   a moment.  So if -- if actually we can split screen that

21   calendar and pull up Defendants' Exhibit 1 again.  And if we

22   can go to page 166.  And if you can highlight that message

23   right under the green message, Grady, please.

24   BY MR. BATES:

25   Q.   And what are you asking in that message?  If you can

B.R. v. F.C.S.B.

86

1    highlight it, please.  What are you asking in that message?

2    A.   Where is her locker.

3    Q.   Okay.  And what's the date of that message?

4    A.   November 9th.

5    Q.   Okay.  And so, would you agree that as of November 9th,

6    you did not know where B███████ locker was?

7    A.   Yes, sir.

8    Q.   Okay.  And so, looking at this calendar, if we can just

9    zoom in on November, actually.

10            And pull that to the left.

11            So you started dating B████ on the 5th, and you

12   found out where her locker was on the 9th; is that correct?

13   A.   Yes, sir.

14   Q.   What time did you -- what time did she tell you where her

15   locker was?

16   A.   10:23 p.m.

17   Q.   Okay.  So the first date that you could have gone to her

18   locker would have been what?

19   A.   On the 10th.

20            MR. BATES:  And, Grady, if you can go on the right

21   side on those messages, if you can go to page 7.

22   BY MR. BATES:

23   Q.   And if you can use this to refresh your recollection as

24   to the date that you told B████ you just wanted to be friends?

25   A.   November 20th.

Redirect - C.K.

B.R. v. F.C.S.B.

87

1   Q.   Okay.  So if we can highlight November 20th on that

2   calendar.  And we talked about that you spent the next day in

3   in-school suspension on the 21st; is that right?

4   A.   Yes, sir.

5   Q.   Okay.  So Mr. Brenner asked you about whether any school

6   officials had spoke to you about going to B.R.'s locker and

7   allegedly harassing her.  Do you remember that?

8   A.   Yes.

9   Q.   And he asked you about whether you had gotten in trouble

10  for going to her locker.  Do you remember that?

11  A.   Yes.

12  Q.   And he asked you whether you were told not to go to her

13  locker by any school officials.  Do you remember that?

14  A.   Yes.

15  Q.   Okay.  And was it your testimony that after you got

16  called into -- after you broke up with B███ and spent that

17  next day in in-school suspension, that you never interacted

18  with her after that date?

19  A.   Yes.

20  Q.   So is it fair to say that the only times that you could

21  have visited her locker, if your testimony is correct, would

22  be between November 10th and the 18th?

23           MR. BRENNER:  Objection, leading.

24           THE COURT:  It is.  Any time you start out with "is

25  it fair to say," you're going to get that objection.

B.R. v. F.C.S.B.

88

1   BY MR. BATES:

2   Q.   How many days, based on this information that you're

3   looking at, how many school days was there between the time

4   that you found out what her locker was on the night of

5   November 9th and the day that you stopped communicating with

6   her?

7   A.   About a week and a half.

8           MR. BATES:  Okay.  And we can take these down for a

9   moment.  Actually, can we leave up the messages and just go to

10  page 420.

11          THE COURT:  Is this part of Exhibit 1?

12          MR. BATES:  Yes.  It's in Defendants' Exhibit 361,

13  Which was already admitted.  If we can publish that.

14          THE COURT:  You may.

15          (Exhibit published.)

16          MR. BATES:  And if we can go to page 420.

17          THE COURT:  You may.

18          MR. BATES:  And if you can highlight that third

19  message from the top and zoom in on that, please, or just zoom

20  in on it.  Just -- yeah.

21  BY MR. BATES:

22  Q.   So that bottom message that you're looking at, can you

23  read that into the record?

24  A.   "I was in her office for three hours today.  I don't

25  remember no more."

B.R. v. F.C.S.B.

89

1    Q.    When you said you were in -- on November 21st, 2011, is

2    that the date of that message?

3    A.    Yes, sir.

4    Q.    When you said, "I was in her office for three hours

5    today," who were you talking about?

6    A.    Ms. M█████.

7    Q.    Do you recall -- and that's Ms. T█████?

8    A.    Yes.

9    Q.    And do you recall -- do you recall specifically what was

10   discussed between you and Ms. T█████ in that three hours?

11              MR. BRENNER:  Objection, hearsay to the extent he

12   testified as to what Ms. T█████ said.

13              THE COURT:  Rephrase.

14   BY MR. BATES:

15   Q.    Do you recall what the discussion was in that three-hour

16   meeting with Ms. T█████?

17              MR. BRENNER:  Same objection to the extent he

18   testifies to what another person said.

19              THE COURT:  What was the subject of the conversation

20   between you and Ms. T█████?

21              THE WITNESS:  I don't remember.

22   BY MR. BATES:

23   Q.    Okay.  Is it possible that Ms. T█████ asked you about

24   whether you had harassed B.R. at her locker?

25              THE COURT:  Sustained.

B.R. v. F.C.S.B.

90

1    MR. BATES:  We can -- you can take that exhibit

2    down.

3    BY MR. BATES:

4    Q.   You were asked by B███████ counsel, I believe it was on

5    Tuesday, about the interaction you had at the tree line with

6    B█████, and I believe the word "pushed" was used.  Do you

7    recall that discussion?

8    A.   Yes, sir.

9    Q.   And was it your testimony that you had initially pushed

10   B█████ off of you when she tried to perform oral sex?

11   MR. BRENNER:  Objection, leading.

12   THE COURT:  Yes.

13   He's providing predicate for the next question.  So

14   overruled.

15   MR. BATES:  Thank you, Judge.  Exactly.

16   BY MR. BATES:

17   Q.   Would you describe -- I don't know if the word "push"

18   came out of your mouth or counsel's mouth.  But would you

19   describe that as a push that you did to B█████ or would you use

20   another word to describe it?

21   A.   A shove.

22   Q.   And why did you shove her?

23   A.   Because I wasn't certain if I wanted to actually go

24   through with what we were doing at first.

25   Q.   Can you be more specific?  You were uncertain --

B.R. v. F.C.S.B.

91

1   A.   I was uncomfortable at first.

2   Q.   With what?

3   A.   With her performing oral sex on me.

4   Q.   Okay.  Can you show us with your -- sort of with your

5   hands how you shoved her?

6   A.   (Witness complied.)

7   Q.   So were you pushing her away from your body?

8   A.   Very lightly, yes.

9   Q.   Okay.  And what did she do after you very lightly pushed

10  her away from your body?

11  A.   She asked, why.

12  Q.   Okay.  And can you explain maybe in a little bit more

13  detail why you -- why you lightly shoved her away from you?

14          MR. BRENNER:  Objection, asked and answered.

15          THE COURT:  Sustained.

16  BY MR. BATES:

17  Q.   I believe you said something along the lines of you were

18  not sure you wanted to do that.

19          Given the messages that were between the two of you,

20  you had planned -- you had planned some type of sexual

21  encounter; is that right?

22  A.   Yes.

23  Q.   So given that this has been planned, why did you -- why

24  were you uncomfortable with what was happening?

25          MR. BRENNER:  Objection, asked and answered.

—————————B.R. v. F.C.S.B.—————————

92

1          THE COURT:  That's a little different question.

2   Overruled.  You can answer if you know.

3          THE WITNESS:  I mean, I was just uncomfortable when

4   it came down to actually following through with performing

5   what we talked about.

6          MR. BATES:  Okay.  Your Honor, may I approach the

7   witness?

8          THE COURT:  You may.

9          MR. BATES:  I'm going to refresh his recollection

10  with his deposition at page 140.

11         MR. BRENNER:  Your Honor, the witness did not say he

12  didn't recall.  The witness answered the question.

13         THE COURT:  Mr. Bates, the objection is that there's

14  no basis for proceeding on this particular course of an

15  examination.

16         MR. BATES:  Your Honor, I believe there's something

17  else that he doesn't recall that I'd like to refresh his

18  recollection on.

19         THE COURT:  What are you going to use?

20         MR. BATES:  His deposition transcript.

21         THE COURT:  The objection is sustained.

22         MR. BATES:  Okay.

23  BY MR. BATES:

24  Q.   C███████, you were asked about a -- an interview with

25  Detective Chambers from the Fairfax County Police Department;

─────B.R. v. F.C.S.B.─────

93

1    is that right?

2    A.    Yes, sir.

3    Q.    And do you recall that occurring around March 2012?

4    A.    Yes, sir.

5    Q.    Okay.  So that would be ballpark about four months after

6    the intimate acts at the tree line with B.R.?

7    A.    Yes, sir.

8    Q.    Okay.  And who brought you to the station there that day?

9    A.    My mom.

10   Q.    And did your mom speak with the police as well?

11   A.    Yes.

12   Q.    Okay.  How would you describe --

13            THE COURT:  Tread lightly here.

14            MR. BATES:  I will, Your Honor.

15   BY MR. BATES:

16   Q.    How would you describe what it was like for you to speak

17   with the police at that time?  What was your state of mind or

18   comfort level?

19   A.    Uncomfortable.

20   Q.    But during that investigation -- I'm sorry, during that

21   interview, you told the police officer that B████ had sent

22   nasty messages to you with dirty things; is that right?

23            MR. BRENNER:  Objection, Your Honor, leading.

24            THE COURT:  Remember the suggestion of the Court.

25   Whenever you hear an objection or the Court is speaking,

─────────────B.R. v. F.C.S.B.─────────────

94

1    please do not answer questions.

2              Rephrase the question, Mr. Bates.

3    BY MR. BATES:

4    Q.   Do you recall telling the detective about messages

5    between you and B▓▓▓▓?

6    A.   I don't remember.

7              MR. BATES:  Okay.  Can I refresh his recollection?

8              THE COURT:  No.

9              (Counsel confers.)

10             MR. BATES:  Counsel is refreshing his recollection

11   with -- refreshed his recollection with the same document that

12   I'm attempting to refresh his recollection on.

13             THE COURT:  That was cross-examination.

14             MR. BATES:  Okay.

15             THE COURT:  Are you refreshing his recollection with

16   the same document?

17             MR. BATES:  Yes, Your Honor.

18             THE COURT:  Oh, okay.  That's fine.  I thought it

19   was something new.

20             MR. BATES:  I apologize for not making that clear.

21             THE COURT:  Why don't we -- why don't we take a

22   break here.  I think we're at a pretty critical point of

23   taking a break because I don't want something to happen that

24   may happen.

25             Ladies and gentlemen of the jury, we're going to go

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

EASTERN DISTRICT OF VIRGINIA

1    ahead and take morning break.  It's going to be pretty short,

2    so we'll get you back in at 12:05.  12:05.

3            (Jury excused.)

4            THE COURT:  All right.  You all may be seated.

5            Wait just a moment there, young man.

6            Mr. Bates, I want you and counsel for Mr. K██████

7    to make sure we all understand the extent as to what he can

8    testify with regard to this police investigation.  I don't

9    want any voluntary or involuntary statement as to anything

10   related to that other than those questions that you asked.  So

11   let's be very careful here.

12           MR. BATES:  Understood, Your Honor.

13           THE COURT:  And, Counsel, if you could make sure

14   that he understands the extent of his testimony here.

15           MR. DAVIS:  Yes, sir.

16           THE COURT:  We'll see you back in at 12:05.

17           (Recess.)

18           (Court proceedings resumed at 12:15 p.m.)

19           THE COURT:  What we're going to do is I'm going to

20   bring the jury back in and sort of outline the schedule that

21   we have.

22           How much longer do you need with the witness?

23           MR. BATES:  Less than ten minutes, Judge.

24           THE COURT:  Okay.  You can come on up.

25           MR. BRENNER:  Your Honor, so we don't have to do it

B.R. v. F.C.S.B.

96

1    on the fly, I was going to ask for a one or two-question

2    recross on a new issue that came up.  It would literally be --

3             THE COURT:  If it's one or two questions -- if it's

4    one or two --

5             MR. BRENNER:  Compound question or --

6             THE COURT:  If it's one or two question, that's

7    fine.

8             MR. BRENNER:  Okay.

9             THE COURT:  We'll allow that.

10             MR. BRENNER:  Thank you.

11             THE COURT:  Just to avoid the witness having to

12    return.

13             (Jury present.)

14             THE COURT:  You may be seated, thank you, ladies and

15    gentlemen.

16             Ladies and gentlemen, in the interim we've actually

17    done a little homework to try to help you all manage your

18    time.

19             One of you has requested that on Wednesday,

20    April 17th, that we start court at ten o'clock.  We're going

21    to be able to accommodate that, so we'll start at ten o'clock

22    Wednesday, April 17th.

23             Let me go over with you the schedule that we've

24    developed so far so that you can understand.  And the lawyers

25    have worked with the Court to make sure that we can take full

1    advantage of your time.

2            Tomorrow, we'll go 10:00 to 4:00.  Next Monday,

3    the 15th, we'll go 9:00 to 3:00.  Tuesday, the 16th, we'll go

4    10:00 to 4:00.  Wednesday, the 17th, we'll go 10:00 to 4:00.

5    We will not have court on April 18th, next Thursday, no court

6    April 18th.  And then Friday, April 19th, we'll go 10:00 to

7    4:00.

8            We hope and anticipate with the hard work of all the

9    parties involved that the case will be ready for presentation

10   to you around the end of next week.  Okay?

11           And then so, going forward on April 20th, because

12   obviously you all have to deliberate and so we need to put in

13   time for that, we'll be flexible, and you will basically

14   govern the time that we work on those particular days.  All

15   right?

16           Very good.  And I appreciate you all making me aware

17   of circumstances that arise so that we can address them.  And

18   the parties have been much amenable to working within your

19   schedules, and I'm speaking for both sides.  More than willing

20   to work with your schedules.

21           All righty.  Mr. Bates.

22   BY MR. BATES:

23   Q.   C_____, when we stopped, do you recall we were talking

24   about your interview with the police detective?

25   A.   Yes, sir.

B.R. v. F.C.S.B.

98

1    Q.   And I had asked you did you send -- did you tell the

2    detective that B███ had sent you nasty messages with dirty

3    things, and what was your answer to that?

4    A.   I don't remember.

5    Q.   Okay.

6            MR. BATES:  Your Honor, may I approach --

7            THE COURT:  You may.

8            MR. BATES:  -- to refresh the witness's

9    recollection?

10            THE COURT:  You may in this limited fashion.

11            MR. BRENNER:  What page are you showing him?

12            MR. BATES:  Page 33.

13            Give me one moment, Your Honor.

14            I'm sorry, 32.

15    BY MR. BATES:

16    Q.   So, C█████████, I'm going to ask you to review on the

17    middle of page 32, there's a question to you, and then an

18    answer.  And then -- you read that to yourself, and then I

19    will ask you the question again.  Let me know when you're

20    ready.  Take your time.

21    A.   I'm ready.

22    Q.   Okay.  Did you tell the detective that B███ had sent you

23    nasty messages like dirty things?

24    A.   Yes.

25    Q.   Did you tell the detective that you had met B███ in

—B.R. v. F.C.S.B.—

99

1   Middleton Farms?

2          MR. BRENNER:  Objection, Your Honor.  Leading.

3   Misuse of this --

4          THE COURT:  Sustained.

5          THE WITNESS:  Yes.

6   BY MR. BATES:

7   Q.   Let me rephrase the question.

8          Was there any conversation with the detective about

9   you and B███ meeting in Middleton Farms?

10         MR. BRENNER:  Objection.

11         THE WITNESS:  Yes.

12         MR. BRENNER:  Objection.  Misuse of the document

13  pursuant to the Court's rulings.

14         MR. BATES:  You can -- to be clear, I'm asking him

15  from his -- from his recollection right now.  I'm not asking

16  him to --

17         THE COURT:  Okay.  Overruled.

18  BY MR. BATES:

19  Q.   So don't --

20         THE COURT:  Without looking at the document, you

21  need to answer the next question.

22  BY MR. BATES:

23  Q.   What is -- do you recall any conversation with the

24  detective about meeting B███?

25  A.   In her neighborhood, yes.

B.R. v. F.C.S.B.

100

1    Q.    Okay.  And what did you tell the detective about where

2    you met B▮▮▮▮?

3    A.    Can I read that?

4    Q.    Do you know off the top of your head?

5    A.    I know we planned to meet in her neighborhood.

6    Q.    Do you recall any -- telling the detective anything more

7    specific than that?

8    A.    Yes.

9    Q.    Okay.  What did you tell him, where in the neighborhood?

10   A.    I showed him on a map where -- where we met up at.

11   Q.    Okay.

12   A.    Where we went to.

13   Q.    And was that the same location you showed us on the map

14   on Tuesday?

15   A.    Yes, sir.

16   Q.    Okay.  Did you tell the detective that you and B▮▮▮▮ were

17   kissing?

18   A.    Yes, sir.

19   Q.    Okay.  Did you tell the detective that she pushed you to

20   the ground and pulled your pants down?

21   A.    Yes, I did.

22   Q.    Did you tell the detective that she performed oral sex on

23   you?

24   A.    Yes, I did.

25   Q.    Did you tell the detective that she asked you to come to

B.R. v. F.C.S.B.

101

1   her locker after this interaction?

2   A.    I don't remember.

3   Q.    Okay.  If you can take a look at page 43, and the numbers

4   are on the top right of that document.

5           And, again, this is the -- the bottom of the page,

6   read the question and answer to yourself, and then let me know

7   when you're done, and I'll re-ask the question.

8   A.    Okay.

9   Q.    Did you tell the detective that B████ had asked you to

10  come to her locker after this interaction?

11  A.    I mean, she asked me to come to her locker when we were

12  dating.

13  Q.    Okay.  Did you tell the detective that you had digitally,

14  in other words, with your fingers, penetrated her?

15  A.    Yes.

16  Q.    Okay.  And did you tell the detective that she wanted to

17  have sex with you, but you said no?

18  A.    Yes.

19  Q.    Did you tell the detective that you never left a dirty

20  voicemail for her?

21          MR. BRENNER:  Objection -- objection.  It's all

22  leading beyond the scope of how this document is to be used.

23          THE COURT:  Sustained.  At this point.

24          MR. BATES:  Okay.  If we can pull up -- you can set

25  that document aside.  If we can -- Your Honor, permission to

—B.R. v. F.C.S.B.—

102

1  publish Exhibit 1, which I think will be for the last time.

2  On page -- the first page of Exhibit 1, permission to publish?

3              THE COURT:  Just a moment.

4              (Counsel confers.)

5              MR. BATES:  We're good, Your Honor.  Permission to

6  publish?

7              THE COURT:  You may.

8              (Exhibit published.)

9  BY MR. BATES:

10  Q.   Okay.  And, sir, we talked about this yesterday.

11  What's -- is that your name at the top of these messages?

12  A.   Yes, sir.

13  Q.   Okay.  And do you remember me asking you about whether

14  that would connect to your profile?

15  A.   Yes.

16  Q.   Okay.

17              MR. BATES:  Grady, if I can ask you to hover over

18  the -- and can we zoom -- can you zoom that in, what is

19  populated, and hover that mouse?

20              MR. BRENNER:  Your Honor -- that's okay.

21  BY MR. BATES:

22  Q.   Can you -- can you read -- can you see what is populated

23  in that box when you hover over the link?

24  A.   Yeah, it says, "My Facebook page."

25  Q.   Okay.

B.R. v. F.C.S.B.

103

1          MR. BATES:  Your Honor, do I have permission to have

2   Mr. Grady click on that link?

3          MR. BRENNER:  Your Honor, this is -- well, for the

4   reasons we've already discussed, this is something that's -- I

5   don't know what it's going to say, but I know that I've never

6   seen it.

7          MR. BATES:  It's --

8          THE COURT:  Without being --

9          MR. BATES:  Your Honor --

10          THE COURT:  Hold on.

11          Without being too specific, give me a reasonable

12   proffer.

13          MR. BATES:  We believe that once -- this is the

14   exact same document that's been produced in this case.  We

15   believe once you click that link, it's an embedded link in

16   this document, it will take it to Mr. -- C████████'s Facebook

17   message.

18          MR. BRENNER:  Your Honor, the parties don't -- don't

19   disagree that this came from C████████.  There's no dispute

20   that this came from C████████'s Facebook page.  I don't think

21   that's --

22          THE COURT:  Okay.

23          MR. BRENNER:  -- the issue.

24          MR. BATES:  Well, then let's click the link.

25          THE COURT:  There's a stipulation of sorts that says

─────── B.R. v. F.C.S.B. ───────

104

1   that it says what it says.  So we don't need to get into too

2   much technology.

3           MR. BATES:  Can we get a stipulation that once this

4   link is clicked it will go to C███████ Facebook page?

5           THE COURT:  I think that's what I heard.

6           MR. BRENNER:  I don't know what -- I have no idea

7   what the click is going to do.  That's the problem.

8           THE COURT:  Okay.  Then, objection overruled.

9           MR. BATES:  Okay.  Please click the link.

10          Okay.  Okay.  Can we do that one more time?  I think

11  it -- okay.  Actually, that's fine.

12  BY MR. BATES:

13  Q.   Sir, what is this?

14  A.   It's my Facebook page.

15  Q.   Okay.

16          MR. BATES:  All right.  We can take that down.

17          And can -- Grady, can you just hover over that

18  question mark that's next to his name?

19  BY MR. BATES:

20  Q.   And what is that --

21          MR. BATES:  I'm sorry, the one to the left.

22  BY MR. BATES:

23  Q.   And what does that link go to?

24  A.   Facebook.

25  Q.   Okay.

B.R. v. F.C.S.B.

105

1          MR. BATES:  And if you can hover over that home?

2   BY MR. BATES:

3   Q.    Do you see a name in that?

4   A.    It says my last name and first name.

5   Q.    Okay.  Do you see another name that starts with a J?

6   A.    Yeah, Jim.

7   Q.    And who is Jim?

8   A.    My attorney.

9          MR. BATES:  All right.  And you can take that down.

10  BY MR. BATES:

11  Q.    Last -- last set of questions, C████████.

12         MR. BRENNER:  Your Honor --

13         THE COURT:  Did you have an objection?

14         MR. BRENNER:  No, I don't have -- I'll approach

15  after the witness is done.

16  BY MR. BATES:

17  Q.    You were asked by B██████ attorney about whether you were

18  aware of students at Rachel Carson Middle School creating fake

19  Facebook accounts.  Do you remember that?

20  A.    Yes.

21  Q.    And you had -- do you recall what your answer was to

22  that?

23  A.    I said, no, I don't know.

24  Q.    Do you recall a discussion about the Jenni Taylor

25  Facebook account?

─B.R. v. F.C.S.B.─

106

1   A.   Yes, sir.

2   Q.   And who, to your understanding, created that account?

3   A.   B████.

4   Q.   And if we can take a look at the Defendants' Exhibit 33.

5            MR. BATES:  This has already been admitted, Your

6   Honor.

7            THE COURT:  Okay.

8            MR. BATES:  Permission to publish?

9            THE COURT:  You may.

10           (Exhibit published.)

11  BY MR. BATES:

12  Q.   Mr. C██████, or -- if you can take a look at the bottom

13  right, those Bates numbers, is that your name on the bottom

14  right?

15  A.   Yes, it is.

16  Q.   And is this a document that you produced in discovery in

17  this case?

18  A.   Yes, it is.

19  Q.   And we talked earlier when you gathered all this Facebook

20  data, you got conversations from other individual; is that

21  right?

22  A.   Yes, sir.

23  Q.   Okay.  And let's take a look at -- let's go backwards and

24  let's go to the first -- 267, it's on the bottom right.  It's

25  the last page of this exhibit.  And that bottom notation, is

─B.R. v. F.C.S.B.─

1   that -- is that the same date that these messages were sent to

2   you from Facebook?

3   A.   Yes, sir.

4   Q.   And we can zoom out of that.  Is this another

5   conversation with "Facebook user"?

6   A.   Yes, it is.

7   Q.   That first message right there, can you read that for us?

8   A.   "Hey, you're cute."

9   Q.   Okay.  And did this individual put multiple letters at

10   the end of two of those three words?

11   A.   Yes.

12   Q.   Okay.  And when this was sent to you -- well, actually

13   let's just ask, three messages up, what do you ask this

14   individual?

15         MR. BRENNER:  Your Honor, at this point we are far

16   beyond the scope of --

17         THE COURT:  I think we are.

18         MR. BATES:  Your Honor, there was a question about

19   whether any other fake Facebook pages were created, and this

20   is -- what I'm getting to that.

21         THE COURT:  Well, you've asked seven questions to

22   get to it, so let's get to it.

23   BY MR. BATES:

24   Q.   What do you ask this individual about three questions

25   above, right there in the middle?

B.R. v. F.C.S.B.

108

1    A.    "Who are you?"

2    Q.    And on the next page, if you can look at 266, in the

3    middle -- on the bottom, do you ask this person for their

4    Skype account?

5    A.    Yes, I do.

6    Q.    And what's the name of Skype account that they give you?

7    A.    Christina something.

8    Q.    Do you know that Christina Affains?

9    A.    No, I do not.

10   Q.    You don't know that to be a Rachel Carson student?

11   A.    No.

12   Q.    And if you can turn to page 265.  Does this Christina

13   Affains person at that top highlighted message offer to take

14   her clothes off for you?

15   A.    Yes.

16   Q.    If we can turn to the next page, 264, in the middle, does

17   she ask you to strip?

18   A.    Yes.

19   Q.    I'm sorry?

20   A.    She asked -- she asked if I want her to strip.

21   Q.    Yes.  Thank you.

22         And who do you -- who do you believe sent you this

23   set of messages?

24   A.    B▇▇▇.

25   Q.    I'm sorry?

Redirect - C.K.

B.R. v. F.C.S.B.

109

1   A.   B███.

2   Q.   That's the plaintiff?

3   A.   Yes.

4   Q.   And the date of these messages are in what month and

5   year?

6   A.   January 24, 2012.

7   Q.   So this is a couple months after the intimate acts in her

8   neighborhood?

9   A.   Yes, sir.

10  Q.   Okay.  And in the middle -- I'm sorry, let's go to the

11  first page.  You can leave that up.  One more question.  That

12  top, can you read that top line for us that's highlighted?

13  A.   "I know it's you, B███.  Everyone knows it's you."

14  Q.   And that's what you told this person?

15  A.   Yes.

16          MR. BATES:  Okay.  No further questions, Your Honor.

17          THE COURT:  Is this witness subject to recall?

18          MR. BRENNER:  I have two questions.

19          THE COURT:  Oh, you can ask your two questions.  I'm

20  sorry.

21          MR. BATES:  Your Honor, I just wanted to note an

22  objection to the recross, considering that they did not have

23  him on the witness list, but I will defer to the Court.

24          THE COURT:  Objection overruled.  Two questions.

25          MR. BRENNER:  I'll do one, Judge.  Thank you.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────────B.R. v. F.C.S.B.─────────

110

1                        RECROSS-EXAMINATION

2   BY MR. BRENNER:

3   Q.   C███████, other students at Rachel Carson -- it's fair

4   to say other students at Rachel Carson would know B██████

5   name, where she lives, and where her locker was?

6   A.   I don't know if they would know where she live, but --

7   Q.   They would know her name and where her locker was?

8   A.   They would know her name.

9   Q.   And where her locker was?

10  A.   I can't speak for other people.

11            MR. BRENNER:  Okay.

12            THE COURT:  Thank you.  Is this witness subject to

13  recall?

14            MR. BATES:  No, Your Honor.

15            MR. BRENNER:  No, Your Honor.

16            THE COURT:  All right.  Thank you.  You may step

17  down.

18            (Witness excused.)

19            MR. BATES:  May I retrieve the documents?

20            THE COURT:  You may.

21            Mr. K██████, as this case is pending, please do not

22  discuss the case or any aspect of the case with anyone.

23            MS. REWARI:  Your Honor, the defense calls Mary Ann

24  Panarelli.

25  (Mary Ann Panarelli, Defendants' witness, sworn.)

─────────────────────────────────────────────────

B.R. v. F.C.S.B.

111

1              (Witness seated.)

2              THE COURT:  Please have a seat.  Listen to the

3    questions of counsel.  If the counsel interrupts you or if the

4    Court is speaking, please hold off on providing any response.

5    If you get as close to the mic as possible, that will be

6    helpful.

7              You may proceed.

8              MS. REWARI:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MS. REWARI:

11   Q.   Good afternoon, Dr. Panarelli.

12   A.   Good afternoon.

13   Q.   Would you please introduce to the jury?

14   A.   My name is Mary Ann Panarelli.

15   Q.   Dr. Panarelli, where are you currently employed?

16   A.   I currently work as a consultant.

17   Q.   And who do you consult for?

18   A.   A variety of people.  I consult for the Department of

19   Education in Arizona.  I'm often a speaker with the Department

20   of State for the U.S. State Department.

21   Q.   And on what subject are you a speaker for the U.S.

22   Department of State?

23   A.   Bullying, tolerance, increasing tolerance in classrooms

24   and mental health of teens.

25   Q.   Okay.  And prior to this consulting work, where did you

B.R. v. F.C.S.B.

112

1    work?

2    A.   I worked for Fairfax County Public Schools for 31 years.

3    Q.   Can you give the jury an example of some of the countries

4    that you've spoken in for the U.S. State Department on the

5    subjects of bullying and tolerance and student mental health?

6    A.   I spoke in China and I spoke --

7              THE COURT:  Hold it, hold it.  Ms. Tinsley.

8              (A pause in the proceedings.)

9              (Side bar.)

10             THE COURT:  I was able to observe Mr. K███████ and

11   B.R.'s boyfriend having some sort of interaction or engaging.

12   And so, I wanted to make sure we got ahead of it.  It looks

13   like they were getting ready to go down the elevators

14   together, and I want to get on top of that before this goes to

15   something not very good.

16             MS. ANDERSON:  Do you want one of us to go down

17   there.

18             THE COURT:  Yeah.  Let's do it very discreetly and

19   whomever is not during this examination --

20             MS. ANDERSON:  Okay.  Mr. Brenner.  I'll give --

21             THE COURT:  Because C.K. walked out, and then B.R.'s

22   boyfriend followed right behind him.

23             MS. ANDERSON:  Let me --

24             MR. BLANCHARD:  I think -- I think his plan is --

25             THE COURT:  Yup, that's why I wanted to get out in

─B.R. v. F.C.S.B.─

113

 1    front of it.

 2                (Open court.)

 3                THE COURT:  You may proceed.

 4    BY MS. REWARI:

 5    Q.   Dr. Panarelli, I think you were just telling the jury

 6    about some of the countries you spoke in?

 7    A.   Yes.  I've given presentations in China and in Moldova,

 8    and I've given virtual presentations to Romania, Ukraine,

 9    Slovenia.

10    Q.   Okay.  And when did you retire from the Fairfax County

11    Public Schools?

12    A.   In June of 2019.

13    Q.   How long had you worked there prior to your retirement?

14    A.   31 years.

15    Q.   I'm going to ask you about your work for Fairfax County

16    Public Schools, but let's first talk just briefly about your

17    educational background.

18                Where did you receive your undergraduate degree?

19    A.   I have an undergraduate degree in psychology from

20    Georgetown University.

21    Q.   And did you -- do you have a master's degree?

22    A.   I have a master's degree in school psychology from George

23    Mason University.

24    Q.   And do you also have a doctorate degree?

25    A.   I have a doctorate in education, in special education and

Recross - M. Panarelli

——B. R. v. F. C. S. B.——

114

1   public policy from George Washington University.

2   Q.   In what year did you first start working for the Fairfax

3   County Public Schools?

4   A.   Well, I worked briefly as an instructional assistant in

5   1976, and then I returned in 1979.

6   Q.   Okay.  And what was your first position when you came to

7   the school system?

8   A.   It might be 1989.  Sorry.  After I was the instructional

9   assistant, then I taught in a different school for a while as

10  a 5th grade teacher and then as a middle school teacher.  And

11  then when I returned to Fairfax County, I was a school

12  psychologist initially.

13  Q.   Okay.  And what was your next position after that?

14  A.   Then I was positioned -- they called it resource

15  specialist.  So I helped with individualized education plan

16  meetings to help parents sort of navigate the system and help

17  parents and schools come to resolutions if there were

18  differences of opinion about what a child might need or what

19  kind of services might be available.

20  Q.   Okay.  And what was the title in that position?

21  A.   At that time they were calling it a pyramid resource

22  specialist because we were assigned to one pyramid of schools.

23  Q.   Okay.  And when you say "pyramid," you're talking about a

24  high school, a --

25  A.   A high school, a middle school, and then a set of

Recross - M. Panarelli

─────B.R. v. F.C.S.B.─────

115

1   elementary schools.

2   Q.    Okay.  Thank you.  And where did you go from there?

3   A.    And then, I went to central -- well, for a while I was a

4   supervisor of other people who were pyramid resource

5   specialists, and then I went to the central office as a

6   coordinator over summer services for students with special

7   needs.

8          My office was responsible for training the teachers

9   on the online IEP system that Fairfax County now uses,

10  C-STARS.  And we also did summer services for kids with

11  disabilities and all the assessments that kids with

12  disabilities would take that weren't part of eligibility, but

13  were alternatives to the standard SOL assessments.

14  Q.    Okay.  And what was your next position in Fairfax County

15  Public Schools after that?

16  A.    And then after that, until the end of the time I was with

17  Fair County, I was the director of intervention and prevention

18  services.

19  Q.    Can you just explain what offices you oversaw as the

20  director of intervention and prevention services?

21  A.    Yes.  There were four offices at that time, with a fifth

22  coordinator, but there are four offices.  So the office of

23  school psychology, the office of school social work, the

24  office of student safety and wellness, which was where all the

25  prevention programs were housed, and the house of

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

——B. R. v. F.C.S.B.——

116

 1    nontraditional school programs.

 2              And then also in the mix was attendance

 3    homelessness, homebound, restorative justice, and a number of

 4    other social/emotional supports that we provided to children.

 5    Q.   So would it be fair to say that these offices largely had

 6    to do with the social and emotional development of children?

 7    A.   Social, emotional, and behavioral development.  And we

 8    also developed the -- the Students Rights and Responsibilities

 9    booklet and the review of that booklet each year.

10    Q.   Okay.  How many employees were there within the total

11    office of intervention and prevention services?

12    A.   So the total office, counting the -- like the

13    psychologist and the social workers who worked in the schools

14    but reported to central office, the teachers who worked in

15    nontraditional but reported to central office, et cetera,

16    there are about 700.

17    Q.   Okay.  And what would you say was the size of your

18    budget -- the budget of your office in terms both of material

19    and human resources?

20    A.   I don't remember the exact number, but it was somewhere

21    around $50 million.

22    Q.   Okay.  And in this role, did you interface with other

23    community agencies?

24    A.   Yes.  An important part of my role was that I was the

25    primary contact or liaison with people from Fairfax County

Recross - M. Panarelli

─B.R. v. F.C.S.B.─

117

1    government who worked in child-serving agencies.  So the

2    health department, the neighborhood and community services,

3    recreation, the juvenile courts, juvenile court services,

4    et cetera.

5    Q.   Okay.  So can you just sort of pin us down on the year

6    where -- when you started in this position?

7    A.   Let's see.  It was 2010, I started in December of 2010.

8    Q.   Okay.  And what was the -- well, first of all, did the

9    responsibility of this office include developing training for

10   schools?

11   A.   Yes.  Training -- presentations and training for schools.

12   We -- I often presented directly to principals, and then my

13   staff would implement training for teachers and other members

14   of schools, yes.

15   Q.   And does that training include training on bullying and

16   harassment?

17   A.   Yes.

18   Q.   When you started in this role as director of intervention

19   and prevention service, what was the first major initiative

20   that you undertook?

21   A.   It was something that we called the Resiliency Project.

22   So research had shown that if you could build protective

23   factors for students, that it would impact a broad variety of

24   things.  It reduced bullying, it reduced substance use, it

25   reduced depression, it reduced a variety of risk kinds of

─ B. R. v. F.C.S.B. ─

118

1  behaviors.

2          And so, we named it the Resiliency Project.  And

3  what we did was we looked at things that were already going on

4  within the office to see if we could embed resiliency

5  practices within those other things that we were already doing

6  to ensure that we were doing whatever we could to build that

7  resiliency.

8  Q.   And were the schools within Fairfax County already doing

9  some bullying and harassment work in the schools?

10 A.   The schools were doing extensive bullying and harassment

11 work.  Many had programs where they had an antibullying day or

12 they had things embedded at the school level, things embedded

13 for activities for students to sign contracts -- not

14 contracts, but sign agreements that they weren't going to be

15 engaged in bullying, et cetera.

16          Plus, the system had developed in health and through

17 our counseling office and also through IT had developed

18 various lessons for students in -- you know, everything from

19 developing personal space to empathy to how to treat one

20 another.  And in each of those areas, there were lessons

21 around bullying.  And in the office of school counseling,

22 there were additional lessons around sexual harassment.

23 Q.   Okay.  Would you please take a look at Defendants'

24 Exhibit 257 in your book.

25          Do you recognize this document?

B.R. v. F.C.S.B.

119

1   A.   Yes.  This is a document that I developed when --

2   Q.   Okay.  If I could just pause you right there.

3           MS. REWARI:  Your Honor, we move to admit

4   Defendants' Exhibit 257.

5           MS. ANDERSON:  Your Honor, can we just get a date on

6   that so that I can make sure it's relevant?

7           THE COURT:  Can you give her a date so she can make

8   sure?

9           MS. REWARI:  Sure.

10  BY MS. REWARI:

11  Q.   Was this created in 2011?

12  A.   Yes, it was created during that -- that first few months.

13          MS. ANDERSON:  No objection.

14          THE COURT:  No objection.  You may publish.

15          MS. REWARI:  Thank you.

16  (Defendants' Exhibit No. 257 was admitted into evidence.)

17          (Exhibit published.)

18  BY MS. ANDERSON:

19  Q.   All right.  And -- I'm sorry, was this a document that

20  you created?

21  A.   Yes, it was a document that I created.  I was being asked

22  to attend a variety of community-based groups.  Fairfax -- I

23  forget, Fairfax Partnership for Youth.  Some other groups in

24  any event.  And asked to address what the school system had

25  been doing around bullying.

B.R. v. F.C.S.B.

120

1          And so this -- I made this sort of as a note or a

2     crib sheet almost for me so that when I went into those

3     different groups I knew what information I was going to cover.

4     Q.   And so, was this document created sort of before the

5     Resiliency Project really got off the ground?

6     A.   Certainly before it got off the ground.  We had begun

7     talking about it, and we had identified bullying and

8     harassment as one of the areas that we wanted to focus on.

9          We had begun meeting, and we had begun doing some

10    research, formal research, but also having meetings with

11    parents and students and different groups to try to get a

12    sense of where they felt that there was things that the school

13    could be doing or information that we ought to be sharing with

14    parents, that sort of thing.

15    Q.   Okay.  And can you just explain -- you don't have to read

16    the document to the jury because they have it on the screen,

17    but what you were conveying on this?

18    A.   So the first thing that I wanted to be sure that we

19    conveyed was that they understood that there were universal

20    programs in place, universal lessons in place that came

21    through the health curriculum from kindergarten through --

22    kids take health through 10th grade.

23          And what I have here as guidance lessons, later we

24    call counseling lessons, where the counselors in the schools

25    provided lessons around bullying and harassment.  And I made a

B.R. v. F.C.S.B.

121

1    note to myself because it was something that I learned as I

2    came into this that the high school and middle school students

3    received from -- through their counselors by October 15th a

4    lesson on sexual harassment.

5              And then I also wanted it to be clear that we had --

6    that we started with the idea that we embed within our

7    expectations of positive behavior an expectation of respect

8    and how we treated each other, and that included prohibiting

9    bullying.

10             And so, the schools tried often to not -- to

11   integrate their approaches to many things as opposed to having

12   one day a lesson on bullying and one day a lesson on substance

13   use and one day a lesson -- they had those lessons, but also

14   throughout our approach, the school set up a positive behavior

15   approach where they, depending on the appropriate grade level

16   and the appropriate developmental level, they taught what

17   behaviors were expected in school.

18             And that was everything from how you walk down a

19   hallway.  So if we say that we're going to respect each other,

20   they spelled out:  In the hallway, respect looks like this.

21   You walk down, you're quiet, so you're not disturbing other

22   classes, et cetera.

23             In the cafeteria, respect looks like this:  When you

24   go through the line.  You say "thank you" to the cafeteria

25   workers.  You carefully take your food, you throw things in

B.R. v. F.C.S.B.

122

1    the trash.

2           It spelled out behaviors that were the expectation

3    across various environments in the school environment and

4    various types of behaviors.

5    Q.   And were there also spelled out expectations with respect

6    to treatment of other students in terms of bullying and

7    harassment?

8           MS. ANDERSON:  Your Honor, can we just get some

9    clarity on whether the testimony is about the schools in

10   general or Rachel Carson.

11          THE COURT:  Let's make that a subset of your

12   questioning.

13          MS. REWARI:  Sure, sure.

14          THE WITNESS:  Okay.  I'm talking about schools in

15   general at this point.  And that, again, I was going to go out

16   these various organizations to say these were common across

17   schools, these were the universal expectations that schools

18   had a positive behavior approach.

19          And, yes, that positive behavior approach in --

20   within the positive behavior approach, we were telling them

21   positive ways that we expected them to act.  So positively how

22   to resolve conflicts, positively how to support each other,

23   how to be caring for each other, how to demonstrate that care.

24          Within the Students Rights and Responsibilities, we

25   were sort of listing the behaviors they weren't supposed to

Recross - M. Panarelli

─B. R. v. F.C.S.B.─

123

1    do.  And there certainly was a prohibition against bullying in

2    there.

3    BY MS. REWARI:

4    Q.   Were you aware, at this time, whether Rachel Carson was a

5    school that had positive behavior, PBS?

6    A.   I -- I was aware that they did have it, because I had

7    previously worked with Mr. F████████, and I knew that he had

8    worked hard for a caring environment, and part of that was a

9    positive behavior program he had in place.

10   Q.   Okay.  And then can you just explain a little bit about

11   the interventions that you were discussing in this document

12   from 2011?

13   A.   Right.  So -- so as you can see, it says "future plans."

14   So we were saying at that point that we were -- that we were

15   aware that the schools were utilizing a variety of

16   different -- sometimes commercially available, sometimes

17   internally developed programs to address bullying, and to

18   prevent bullying.

19        And what the plan was, under the Resiliency Project,

20   was to create guidelines for the school so that you'd have a

21   more consistent plan across all schools.

22        So when I was doing these presentations, I was

23   saying that we were doing research to figure out what were the

24   most critical elements of a plan, we're a program to address

25   bullying, and then that we had been doing these focus groups,

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

B.R. v. F.C.S.B.

124

1    and then we had been talking to parents and students.

2    Q.    And when you say "schools in general," can you clarify,

3    are you talking Fairfax County schools in general or all

4    schools in general?

5    A.    Fairfax County schools.

6    Q.    And so, was this an effort to sort of unify and expand on

7    what was being already done in some schools?

8    A.    Yes, it was -- it was to unify and expand and to be sure

9    that all schools were addressing all elements of what the

10   research indicated was best practices.

11   Q.    Okay.  Would you please take a look at Defendants'

12   Exhibit 256 in your book.  And let me know when you get there.

13   A.    I'm there.

14   Q.    Okay.  Can you identify what this document is and when it

15   was prepared?

16   A.    So this document was also prepared in early 2011.  And it

17   was actually -- before we had started talking about the

18   Resiliency Project, we were meeting about it.  We were meeting

19   about the bullying and intervention project.  But this was

20   before we had gotten very far off the ground.

21          So very early, I think maybe at the end of 2010 and

22   in January of 2011, certainly I was being invited to come and

23   talk to different groups, and I wrote this as this was what

24   was currently going on in the schools sort of at the beginning

25   of 2011.

B.R. v. F.C.S.B.

125

1          MS. REWARI:  Your Honor, we'd move to admit

2   Defendants' Exhibit 256.

3          MS. ANDERSON:  No objection.

4          THE COURT:  Without objection.  You may publish.

5          MS. REWARI:  Thank you.

6   (Defendants' Exhibit No. 256 was admitted into evidence.)

7             (Exhibit published.)

8   BY MS. ANDERSON:

9   Q.   All right.  So starting with the first bullet, and,

10  again -- you know, we don't need you to read the document but

11  can you just explain what the first bullet pertains to?

12  A.   So I was trying to explain, because I was typically

13  talking to parent groups or community groups that the schools

14  had this systematic way of teaching expected behaviors and had

15  a sort of systematic way of encouraging and reinforcing kids

16  who were behaving appropriately as well as doing some

17  reteaching for kids who were not responding appropriately.

18             And that that was -- I wanted them to be sure that

19  they understood that we had these guidelines and that those

20  guidelines were intended also to address bullying and

21  harassment, and then how those guidelines were taught came

22  across in a variety of different ways.

23             So it might be a class meeting, it might be

24  intervening in a specific incident that occurred.  We had

25  parent coffees, parent evenings.  We did these TV programs on

B.R. v. F.C.S.B.

126

1    the Fairfax County channel addressing the issue, and that

2    there had also been some staff development training for

3    teachers, and many of the schools had character ed programs

4    going on, so it was integrated into that as well.

5    Q.    Okay.  And then, can you just explain what you were

6    conveying in the second bullet there?

7    A.    Again, I was trying to explain that within all of these

8    different ways, we were teaching self-respect, honesty,

9    resiliency, and responsibilities of citizenship, and that

10   included how to recognize types of bullying and how to react

11   and respond appropriately.

12           And then the bullets underneath that are programs

13   that we had in place.  Again, the students -- at that time it

14   was called Responsibilities and Rights.  It later changed to

15   Students Rights and Responsibilities the following year, which

16   is the handbook that all students get at the beginning of the

17   year.  The health curriculum, the counseling curriculum.

18           There's also an internet safety curriculum that had

19   been introduced that year.  And then, that second to last

20   bullet is saying the schools were using these strategies that

21   had come from research-based programs, but they weren't

22   necessarily implementing the whole program, but they were

23   picking out what seemed to be most appropriate for their

24   school.  And then often there were assemblies and workshops

25   and celebrations and those kinds of things around bullying and

B.R. v. F.C.S.B.

127

1   harassment.

2   Q.   And those two things, Second Step and Olweus?

3   A.   Olweus, yes.

4   Q.   And what are those?

5   A.   Those are commercially available curricula that you can

6   purchase that -- in order to utilize them, you have to train

7   the teachers on implementation, and then they have materials

8   for helping you utilize them, so charts.

9           In the case of Second Step, it's a series of lessons

10  that you would teach to students, and it goes all the way from

11  preschool up you can implement it.

12          The Olweus program was a more -- it had some

13  lessons, but it was more like an approach to teaching kids to

14  move from watching somebody being bullied or being a bystander

15  to being a defender was the core piece of the Olweus program.

16  Q.   So it was a curriculum on bullying?

17  A.   Both of those have curriculum -- Olweus is strictly

18  bullying.  Second Step has some additional things, but, yes,

19  it has a bullying unit.

20  Q.   Was -- were you distinguishing between bullying and

21  harassment?

22  A.   At the beginning of the time I was in this position,

23  bullying and harassment were being used sort of

24  interchangeably in everything that I was reading.  So I was

25  getting information -- so in the Olweus program, they'll talk

1    about bullying and harassment.

2           In Second Step they'll talk about bullying and

3    harassment.  In bullying.gov, the federal government's

4    resource for bullying, they talked about bullying and

5    harassment, and occasionally would say something about, you

6    know, discriminatory harassment or sexual harassment sort of

7    as a -- in other words, they'd say bullying harassment,

8    discriminatory harassment, and sexual harassment requires this

9    response.

10          So especially at that time, at the beginning in

11   2011, at the beginning, for K-12, those terms were kind of

12   being used very interchangeably.

13   Q.   Okay.  And in terms of what was being done in the schools

14   and that you were addressing, were there different strategies

15   and intervention, depending on the type of harassment or the

16   type of bullying?

17   A.   Before we unified what we were doing, I can't honestly

18   say 100 percent what the schools were doing, other than that I

19   know that we had explicit lessons about, as I said, the sexual

20   harassment lessons that were going on through the office of

21   school counseling, and we had embedded within reading,

22   embedded within stories that you read for English classes, et

23   cetera, there are many books that have as topics various forms

24   of discrimination, and how the people in the story overcame

25   that discrimination or how people stood up for people who were

B.R. v. F.C.S.B.

129

1   being discriminated against, et cetera.

2          And so, teachers would use that in the moment as an

3   example of talking about, this is wrong, and this is how we

4   should be responding to it.

5   Q.   You said a little while ago about developmentally

6   appropriate.  What was the age group that you were addressing?

7   A.   Our program was for K-12.

8   Q.   And so --

9   A.   But we had different resources for different age levels.

10  Q.   So were the lessons differentiated by age group?

11  A.   Yes.  Most of the materials that my office later

12  developed were lessons, per se.  They were resources that you

13  could use, but yes, those resources were differentiated.

14         So if you were going to show a video, the video that

15  we had available for kindergarten, 1st, and 2nd grade was

16  different than the video we had available for the high school

17  students.

18  Q.   Was the terminology that was used with kindergartners or

19  younger students different than the terminology used for older

20  students?

21  A.   Certainly in health lessons and in counseling lessons,

22  with young children, very young children, we used terms like

23  you should have a bubble around you, and you shouldn't, you

24  know, invade anybody's bubble.  In other words, you shouldn't

25  be touching them, you shouldn't be hanging on them, you

Recross - M. Panarelli

─B. R. v. F.C.S.B.─

130

1    shouldn't -- and we just talked about respecting space,

2    distance between people.

3        Again, our children in Fairfax County come from all

4    over the world, so what is culturally comfortable, in terms of

5    how close you stand to somebody, for example, when you're

6    talking to them is different from place to place.

7        So we took on as our responsibility here in the

8    United States, this is kind of the comfort level of distance

9    between one person and another.  We didn't use those terms

10    with the kids, but by defining this bubble, we -- and we had,

11    you know -- some of the kindergarten kids would do exercises

12    where they would draw a square on the floor, and the kid would

13    get into the square, and then another kid would join in,

14    another kid would join in, another kid would join in.  At what

15    point was it hard to keep your distance at the appropriate

16    distance.

17        Again, kindergartners spend a lot of time with just

18    how we walk down the hall without being on top of each other.

19    So all of those things, we didn't -- we didn't sexualize that

20    lesson.

21        In other words, in kindergarten the lesson was we

22    need to respect each other's space.  When we got to older

23    kids, we talked more explicitly about the importance to -- we

24    did talk to the little kids about good touch, bad touch, but

25    the older kids we talked about, you know, respecting each

B.R. v. F.C.S.B.

131

1  other's space in a different way.

2  Q.   Okay.  And then, on Exhibit 256, the third bubble -- I'm

3  sorry, the third bullet there, can you just explain what

4  you're discussing in this?

5  A.   So what I was discussing was that the principals used the

6  Students Rights and Responsibilities to outline what behaviors

7  had been -- the students had been notified these behaviors are

8  unacceptable, and within the Students Rights and

9  Responsibilities there was sort of a continuum of consequences

10 that -- disciplinary consequences that might occur if the

11 student engaged in, you know, one of the behaviors.

12        So many of the behaviors that were in there were

13 things that a -- a teacher might handle, and then there were

14 things that the principal might handle, and then there were

15 things that might have to go to a different level.

16 Q.   And then the next bullet.

17 A.   And then, again, what we were saying is if -- you know,

18 all of these other things were sort of to prevent bullying.

19 And then if bullying did occur, every effort was made to help

20 everybody involved.

21        One of the things we were trying to get across, even

22 right from the beginning, was that it wasn't sufficient to

23 punish the kid who had been involved, that you had to provide

24 some support to the kid who had been the target of the

25 bullying, and then some support to -- you needed to be aware

Case 1:19-cv-00917-RDA-LRV   Document 1056   Filed 08/26/24   Page 132 of 153
PageID# 23103
Recross - M. Panarelli
────B. R. v. F.C.S.B.────

132

1   of the interactions of the students who had witnessed it, and

2   they might also need some support, and then, obviously, the

3   student who had engaged in the bullying behavior might need a

4   disciplinary consequence, but might also need reteaching about

5   expectations or some counseling to help determine sort of why

6   this was the way that they were interacting with people.

7   Q.   And if we just look at the second page of this exhibit.

8   A.   Uh-huh.

9   Q.   Can you explain the concept of bystanders and defenders?

10  A.   Okay.  So, again, under Olweus was sort of the person who

11  originally came up with this term, but the idea that when

12  there are a group of students who witness a bullying

13  situation, within the group of kids who are not actively

14  engaging in the bullying, there are some kids usually who are

15  egging the bully on, and there are some kids who aren't saying

16  anything, and then there might be some kids who may be saying

17  something, may not be saying something, but wanted to -- would

18  side with the kid who was being targeted.

19          And so, Olweus envisioned this as a circle, and that

20  you're trying to move kids from, I'm supporting the kid who is

21  doing the bullying around to supporting the kid who is being

22  targeted.  And that you move from -- maybe move initially the

23  quiet supporters into verbally saying something or nonverbally

24  taking the kid out of the situation, that you move the kid

25  slowly to a more supportive, so from a bystander, I'm just

─B.R. v. F.C.S.B.─

133

1    watching, to a defender.

2    Q.   Why was that an important part of the bullying

3    intervention?

4    A.   Because we felt it was important not just to tell kids

5    what not to do, but also to tell kids what to do in a bullying

6    situation.  Because as any adult would say when they watch

7    someone who is perhaps being treated unfairly or treated in a

8    bullying-type way, we're not sure what to do.

9           You know, sometimes you feel uncomfortable.  You're

10   not sure whether you're going escalate the situation, et

11   cetera.

12          So we were trying to say in this school, this is the

13   expectation.  This is what we're going to do.  And as we

14   developed the bullying and harassment intervention program, we

15   gave more explicit examples to kids of some things that they

16   could do.

17   Q.   And on the first page you had said that -- if we go back

18   to the first page, you said, "Every effort is made to help all

19   involved learn and grow."  Does that include the student who

20   had allegedly -- or who had engaged in the behavior?

21   A.   Yes.  Again, a school is an educational institution, so

22   when a child engages in behavior that we don't want them to

23   engage in, yes, we want to stop the behavior, yes, there might

24   be a disciplinary consequence for that behavior, but also we

25   also want that student to not do that behavior again, and part

B.R. v. F.C.S.B.

134

 1  of that not doing it again is figuring out why it happened in

 2  the first time, and then either reteaching the expectation or

 3  supporting the student getting through whatever was going on

 4  that perhaps led them to engage in behavior that we didn't

 5  want them to.

 6        So, yes, we felt that all parties needed support,

 7  and again, it was a standard part of positive behavior

 8  interventions and supports that when a student didn't meet

 9  expectations, there was a reteaching of those expectations.

10  Not a formal lesson, but talking to the student again.  You

11  understand this is not how we behave.

12        MS. REWARI:  Your Honor, I'm going to switch topics,

13  so I want to be mindful of your schedule if you'd like to --

14        THE COURT:  How much longer do you think you're

15  going to need after switching topics?

16        MS. REWARI:  I have two topics to cover, so I think

17  it's going to be probably 30 minutes.

18        THE COURT:  Okay.  Let's go ahead and take our

19  break, ladies and gentlemen.

20        It looks like it's ten after 1:00 now.  So let's go

21  to 2 o'clock.  2 o'clock.

22        Remember don't discuss the case or any aspect of the

23  case with anyone.

24        You may step down, ma'am.

25        (Jury excused.)

B.R. v. F.C.S.B.

135

1          (Witness excused.)

2          THE COURT:  Ladies and gentlemen, we'll see you back

3 in at 2 o'clock.  If I can get Mr. Fahey and anyone from the

4 other side to come on back to chambers.

5          (Lunch Recess 1:10 p.m.)

6          (A.M. session concluded.)

1                        CERTIFICATE OF REPORTER

2

3              I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Jury Trial

7     in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8     Action No.: 1:19-cv-917, in said court on the 11th day of

9     April, 2024.

10             I further certify that the foregoing 153 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16    name, this August 26, 2024.

17

18

19

20

21    _____

22    Tonia M. Harris, RPR
      Official Court Reporter

23

24

25

                                                                    136

B.R. v. F.C.S.B.

137

## $

**$50** [1] - 116:21

## 0

**05** [1] - 4:16

## 1

**1** [15] - 11:6, 26:25, 55:17, 75:5, 76:10, 76:12, 81:13, 81:14, 81:15, 82:23, 82:24, 85:21, 88:11, 102:1, 102:2
**10** [3] - 30:3, 49:18, 58:23
**100** [5] - 2:2, 2:6, 2:10, 83:23, 128:18
**103** [2] - 30:22, 30:23
**10:00** [5] - 5:7, 97:2, 97:4, 97:6
**10:23** [1] - 86:16
**10:30** [1] - 5:12
**10:45** [5] - 5:11, 5:15, 5:19, 6:4, 6:7
**10th** [3] - 86:19, 87:22, 120:22
**11** [6] - 1:6, 5:12, 5:15, 5:19, 47:19, 136:16
**110** [1] - 4:5
**111** [1] - 4:7
**116** [2] - 29:19, 29:20
**117** [1] - 29:22
**118** [1] - 29:24
**119** [1] - 4:13
**11th** [6] - 48:1, 48:17, 49:7, 49:8, 49:14, 136:8
**12** [3] - 5:8, 28:4, 49:18
**120** [1] - 3:6
**125** [1] - 4:14
**12:05** [3] - 95:2, 95:16
**12:15** [1] - 95:18
**13** [1] - 78:3
**136** [2] - 4:16, 136:10
**138** [1] - 36:6
**139** [1] - 35:21
**140** [4] - 35:2, 35:3, 92:10
**141** [1] - 34:20
**14th** [3] - 43:18, 47:23, 68:15
**1520** [1] - 1:20
**15th** [2] - 97:3, 121:3
**166** [7] - 75:9, 75:11, 75:15, 76:10, 76:11, 76:12, 85:22

## 2

**16th** [1] - 97:3
**17** [2] - 1:8, 69:7
**1775** [1] - 3:9
**17th** [3] - 96:20, 96:22, 97:4
**18** [1] - 68:1
**1801** [1] - 3:6
**185** [3] - 30:1, 30:14
**186** [1] - 30:16
**187** [1] - 30:18
**188** [1] - 30:20
**18th** [3] - 87:22, 97:5, 97:6
**1976** [1] - 114:5
**1979** [1] - 114:5
**1989** [1] - 114:8
**19th** [1] - 97:6
**1:00** [1] - 134:20
**1:10** [1] - 135:5
**1:19-cv-917** [2] - 1:4, 136:8
**1st** [1] - 129:15

## 2

**2** [3] - 134:21, 135:3
**20** [2] - 68:1, 73:14
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2010** [3] - 117:7, 124:21
**2011** [10] - 27:9, 39:10, 47:19, 89:1, 119:11, 123:12, 124:16, 124:22, 124:25, 128:11
**2011/2012** [1] - 37:12
**2012** [8] - 46:8, 59:22, 67:1, 67:3, 69:10, 69:19, 93:3, 109:6
**2019** [1] - 113:12
**20190** [1] - 3:10
**20191** [1] - 3:7
**202** [1] - 68:1
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2024** [4] - 1:6, 6:17, 136:9, 136:16
**2029** [1] - 1:19
**20th** [3] - 86:25, 87:1, 97:11
**21** [1] - 39:10
**213-995-5720** [1] - 1:21

## 3

**21st** [4] - 37:14, 47:5, 87:3, 89:1
**22** [1] - 28:4
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**22nd** [1] - 47:5
**230** [1] - 31:5
**2300** [1] - 1:15
**231** [1] - 31:5
**24** [1] - 109:6
**25** [1] - 4:4
**254** [1] - 32:6
**256** [4] - 124:12, 125:2, 125:6, 131:2
**256**............................
............ [1] - 4:14
**257** [3] - 118:24, 119:4, 119:16
**257**............................
............ [1] - 4:13
**264** [1] - 108:16
**265** [1] - 108:12
**266** [1] - 108:2
**267** [1] - 106:24
**279** [2] - 76:5, 77:23
**2800** [3] - 2:3, 2:7, 2:11
**2nd** [4] - 2:2, 2:6, 2:10, 129:15

## 3

**3** [4] - 28:4, 51:2
**30** [1] - 134:17
**305-539-8400** [1] - 2:8
**31** [2] - 112:2, 113:14
**311** [2] - 28:2, 28:3
**32** [2] - 98:14, 98:17
**33** [2] - 98:12, 106:4
**33131** [3] - 2:3, 2:7, 2:11
**35** [3] - 29:3, 31:12, 32:24
**354** [2] - 50:6, 50:13
**355** [1] - 50:21
**356** [1] - 50:24
**361** [1] - 88:12
**3:00** [1] - 97:3
**3:21** [1] - 80:10

## 4

**40** [2] - 29:4, 31:12
**400** [1] - 3:10
**401** [1] - 3:13
**404** [9] - 58:3, 60:3, 60:15, 64:4, 64:13, 66:2, 66:3, 66:6, 66:8

## 5

**404(b)(2)** [1] - 64:10
**420** [2] - 88:10, 88:16
**43** [1] - 101:3
**44** [2] - 75:13, 75:15
**454** [3] - 51:12, 52:12, 53:18
**468** [3] - 51:12, 52:13, 54:24
**489** [1] - 50:16
**490** [1] - 50:16
**498** [3] - 75:20, 75:24, 75:25
**4:00** [5] - 5:8, 97:2, 97:4, 97:7
**4:25** [4] - 80:10, 82:9, 83:1, 83:2
**4:29** [1] - 82:6

## 5

**50** [3] - 69:6, 69:7, 69:14
**52** [1] - 41:13
**529** [6] - 39:3, 39:4, 40:9, 40:13, 40:21, 41:1
**54** [1] - 77:23
**59** [3] - 55:16, 56:17, 58:1
**5th** [4] - 85:7, 85:9, 86:11, 114:10

## 6

**610-804-1787** [1] - 2:4
**643a** [1] - 1:16
**6th** [2] - 84:17, 84:19

## 7

**7** [2] - 7:24, 86:21
**700** [1] - 116:16
**73** [3] - 4:5, 81:13, 81:15
**77** [3] - 38:11, 39:22, 40:14
**79** [1] - 76:5
**7th** [7] - 54:19, 58:10, 59:14, 59:17, 59:19, 84:8, 84:10

## 8

**80** [1] - 26:1
**804-788-8200** [1] - 3:2
**814** [4] - 47:11, 48:16, 50:18, 50:22
**814A** [2] - 52:10, 52:19
**814A**............................
............ [1] - 4:11

## 9

**84** [2] - 78:24, 83:2
**850-585-3414** [1] - 2:12
**87** [2] - 76:8, 78:23
**8th** [3] - 37:11, 59:14, 84:10

## 9

**9** [1] - 6:17
**90** [1] - 26:1
**90067** [1] - 1:20
**934** [2] - 6:16, 6:24
**9:00** [1] - 97:3
**9:54** [1] - 1:6
**9th** [6] - 67:7, 75:18, 86:4, 86:5, 86:12, 88:5

## A

**A-T-A** [1] - 53:24
**A.F** [1] - 3:6
**a.m** [2] - 1:6, 135:6
**A.M** [1] - 1:8
**abide** [1] - 60:23
**ability** [1] - 136:14
**able** [6] - 34:4, 45:23, 64:23, 65:11, 96:21, 112:10
**abrenner@bsfllp.com** [1] - 2:8
**absolutely** [1] - 77:7
**accept** [1] - 32:23
**access** [2] - 18:10, 18:11
**accommodate** [1] - 96:21
**accomplish** [1] - 18:3
**according** [1] - 47:20
**accordingly** [1] - 7:2
**account** [9] - 31:24, 32:11, 32:14, 32:19, 32:25, 105:25, 106:2, 108:4, 108:6
**accounts** [2] - 21:25, 105:19
**accused** [2] - 8:5, 15:21
**acknowledged** [4] - 59:23, 60:9, 61:24, 63:10
**act** [2] - 64:8, 122:21
**Action** [2] - 1:4, 136:8
**actively** [1] - 132:13
**activities** [1] - 118:13
**acts** [9] - 62:16, 63:15, 65:6, 78:9, 79:25, 80:3, 80:9, 93:6, 109:7

B. R. v. F. C. S. B.                                                            138

**additional** [3] - 51:2, 118:22, 127:18
**address** [7] - 5:4, 5:18, 97:17, 119:24, 123:17, 123:24, 125:20
**addressing** [4] - 124:9, 126:1, 128:14, 129:6
**adduced** [1] - 136:6
**administrative** [1] - 5:3
**administrator** [2] - 41:10, 56:25
**administrators** [2] - 45:16, 68:3
**admissible** [1] - 56:11
**admission** [1] - 10:3
**admit** [4] - 47:10, 51:4, 119:3, 125:1
**admits** [1] - 6:23
**Admitted** [2] - 4:10, 4:12
**admitted** [18] - 10:12, 16:14, 37:1, 39:5, 50:7, 51:4, 51:7, 52:1, 52:19, 55:25, 75:14, 75:22, 78:25, 84:4, 88:13, 106:5, 119:16, 125:6
**adult** [1] - 133:6
**advantage** [1] - 97:1
**advocacy** [1] - 10:6
**Affains** [2] - 108:8, 108:13
**affect** [3] - 13:9, 14:11, 14:16
**afternoon** [2] - 111:11, 111:12
**age** [3] - 129:6, 129:9, 129:10
**agencies** [2] - 116:23, 117:1
**aggressive** [1] - 73:4
**aggressor** [3] - 62:15, 62:20, 63:16
**ago** [5] - 27:4, 27:5, 30:12, 46:3, 129:5
**agree** [6] - 7:22, 20:13, 43:7, 51:16, 62:17, 86:5
**agreed** [1] - 62:7
**agreeing** [1] - 22:15
**agreements** [1] - 118:14
**agrees** [6] - 7:1, 7:14, 23:13, 23:14, 24:11, 25:10
**ahead** [4] - 73:15, 95:1, 112:12, 134:18

**air** [1] - 69:2
**al** [2] - 1:6, 136:7
**alanderson@bsfllp.com** [1] - 1:21
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**allegation** [6] - 13:9, 14:15, 67:12, 67:19, 67:22
**allegations** [3] - 40:14, 41:4, 41:24
**alleged** [6] - 21:7, 40:5, 63:17, 64:4, 68:4
**allegedly** [4] - 63:15, 64:5, 87:7, 133:20
**allow** [4] - 8:12, 58:4, 58:5, 96:9
**allowed** [4] - 10:2, 10:8, 62:13, 62:18
**almost** [2] - 71:15, 120:2
**alone** [3] - 19:10, 19:15, 19:16
**ALSTON** [1] - 1:11
**Alston** [1] - 5:6
**alter** [1] - 21:1
**alteration** [1] - 21:4
**altered** [4] - 6:19, 13:1, 13:2, 16:15
**alternate** [1] - 20:23
**alternatives** [1] - 115:13
**altogether** [1] - 46:24
**amenable** [1] - 97:18
**amount** [1] - 20:18
**amplify** [1] - 13:8
**analysis** [1] - 20:1
**ancillary** [1] - 15:6
**ANDERSON** [9] - 112:16, 112:20, 112:23, 119:5, 119:13, 119:18, 122:8, 125:3, 125:8
**Anderson** [1] - 1:18
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**Ann** [4] - 4:6, 110:23, 110:25, 111:14
**answer** [13] - 21:18, 28:9, 28:12, 33:14, 43:3, 68:5, 92:2, 94:1, 98:3, 98:18, 99:21, 101:6, 105:21
**answered** [7] - 20:15, 40:16, 45:3, 45:18, 91:14, 91:25, 92:12
**answers** [2] - 11:25,

28:6
**antibullying** [1] - 118:11
**anticipate** [1] - 97:8
**anticipating** [1] - 48:3
**anyway** [1] - 63:1
**apologize** [5] - 5:23, 14:14, 77:15, 83:18, 94:20
**apologized** [1] - 16:21
**appeal** [1] - 16:11
**appearance** [1] - 12:13
**APPEARANCES** [3] - 1:13, 1:25, 2:25
**appearances** [1] - 12:14
**appreciate** [1] - 97:16
**appreciated** [1] - 14:17
**approach** [16] - 27:24, 39:18, 46:18, 46:19, 55:23, 60:5, 61:4, 92:6, 98:6, 105:14, 121:14, 121:15, 122:18, 122:19, 122:20, 127:13
**approaches** [1] - 121:11
**appropriate** [6] - 23:7, 121:15, 121:16, 126:23, 129:6, 130:15
**appropriately** [3] - 125:16, 125:17, 126:11
**April** [10] - 1:6, 6:17, 96:20, 96:22, 97:5, 97:6, 97:11, 136:9, 136:16
**archive** [3] - 18:11, 49:9, 49:12
**area** [1] - 31:19
**areas** [2] - 118:20, 120:8
**argue** [2] - 66:9, 66:11
**argumentative** [4] - 30:4, 30:9, 71:16, 72:22
**arguments** [1] - 16:5
**Arianna** [3] - 54:17, 54:22, 55:7
**arise** [1] - 97:17
**Arizona** [1] - 111:19
**arrange** [1] - 74:4
**arranged** [1] - 73:24
**aside** [1] - 101:25
**aspect** [2] - 110:22, 134:22
**assaulted** [2] - 61:11,

65:21
**assemblies** [1] - 126:24
**assessments** [2] - 115:11, 115:13
**assigned** [1] - 114:22
**assistant** [2] - 114:4, 114:9
**associated** [4] - 7:15, 24:12, 25:11, 56:4
**assume** [2] - 18:8, 18:24
**assuming** [1] - 56:3
**Ata** [9] - 53:4, 53:5, 53:14, 53:24, 53:25, 54:1, 54:2, 54:4
**ATA** [1] - 53:4
**Atlantech** [3] - 26:12, 26:14, 26:16
**attempting** [1] - 94:12
**attend** [1] - 119:22
**attendance** [2] - 37:10, 116:2
**attention** [5] - 7:10, 14:21, 24:6, 25:5, 37:14
**attorney** [3] - 12:25, 105:8, 105:17
**attorneys** [4] - 10:8, 12:3, 12:4, 13:4
**available** [5] - 114:19, 123:16, 127:5, 129:15, 129:16
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**avoid** [2] - 5:18, 96:11
**aware** [14] - 12:23, 12:25, 14:2, 22:6, 22:8, 40:6, 57:3, 67:4, 97:16, 105:18, 123:4, 123:6, 123:15, 131:25

## B

**B.H** [1] - 3:6
**B.R** [24] - 1:3, 6:23, 23:14, 27:6, 27:17, 28:7, 28:10, 32:1, 38:2, 38:6, 39:13, 43:17, 44:24, 62:22, 63:16, 64:6, 65:22, 67:2, 68:19, 69:12, 81:23, 89:24, 93:6, 136:7
**B.R.'s** [4] - 38:25, 87:6, 112:11, 112:21
**backdoor** [1] - 61:1
**background** [2] -

76:20, 113:17
**backup** [1] - 136:13
**backwards** [1] - 106:23
**bad** [2] - 64:8, 130:24
**balanced** [2] - 8:22, 14:20
**ballpark** [1] - 93:5
**banner** [3] - 76:18, 76:22, 76:24
**banter** [1] - 52:24
**bar** [2] - 61:9, 112:9
**BARAN** [1] - 1:14
**Barry** [1] - 50:4
**based** [12] - 7:12, 11:9, 24:9, 25:9, 30:13, 80:7, 80:24, 82:10, 85:15, 88:2, 119:22, 126:21
**basis** [3] - 61:5, 61:7, 92:14
**batch** [1] - 46:21
**BATES** [142] - 30:4, 38:16, 38:24, 40:15, 42:8, 42:25, 43:12, 45:3, 48:5, 51:6, 51:18, 52:8, 52:15, 52:18, 55:19, 55:23, 55:25, 56:5, 57:24, 58:2, 59:25, 60:2, 60:14, 60:18, 64:3, 65:15, 65:18, 69:20, 71:16, 72:22, 73:14, 73:17, 74:3, 74:25, 75:4, 75:7, 75:9, 75:11, 75:17, 76:3, 76:8, 76:13, 77:12, 77:15, 77:16, 77:22, 77:25, 78:6, 78:7, 78:23, 79:3, 79:5, 79:10, 80:18, 80:23, 81:12, 81:18, 82:1, 82:3, 82:22, 83:10, 83:15, 83:17, 84:3, 84:7, 84:14, 84:16, 85:6, 85:8, 85:19, 85:24, 86:20, 86:22, 88:1, 88:8, 88:12, 88:16, 88:18, 88:21, 89:14, 89:22, 90:1, 90:3, 90:15, 90:16, 91:16, 92:6, 92:9, 92:16, 92:20, 92:22, 92:23, 93:14, 93:15, 94:3, 94:7, 94:10, 94:14, 94:17, 94:20, 95:12, 95:23, 97:22, 98:6, 98:8, 98:12, 98:15, 99:6, 99:14, 99:18, 99:22,

B. R. v. F. C. S. B.                                                        139

101:24, 102:5, 102:9, 102:17, 102:21, 103:1, 103:7, 103:9, 103:13, 103:24, 104:3, 104:9, 104:12, 104:16, 104:19, 104:21, 104:22, 105:1, 105:2, 105:9, 105:10, 105:16, 106:5, 106:8, 106:11, 107:18, 107:23, 109:16, 109:21, 110:14, 110:19
**Bates** [16] - 2:13, 21:3, 21:5, 26:19, 28:18, 50:13, 51:16, 52:12, 65:14, 66:18, 92:13, 94:2, 95:6, 97:21, 106:13
**Bates............** [1] - 4:5
**became** [4] - 14:2, 48:22, 48:25, 72:18
**BEFORE** [1] - 1:11
**begin** [1] - 24:25
**beginning** [8] - 31:4, 32:5, 124:24, 126:16, 127:22, 128:10, 128:11, 131:22
**begun** [3] - 120:6, 120:9
**behalf** [3] - 4:2, 4:9, 4:12
**behave** [1] - 134:11
**behaving** [1] - 125:16
**behavior** [18] - 64:2, 64:12, 64:23, 121:7, 121:14, 122:18, 122:19, 122:20, 123:5, 123:9, 132:3, 133:20, 133:22, 133:23, 133:24, 133:25, 134:4, 134:7
**behavioral** [1] - 116:7
**behaviors** [10] - 118:1, 121:17, 122:2, 122:4, 122:25, 125:14, 131:6, 131:7, 131:11, 131:12
**behind** [3] - 58:23, 77:18, 112:22
**belabor** [1] - 16:4
**believes** [6] - 7:12, 13:19, 15:17, 15:19, 24:8, 25:7
**B** [2] - 77:7, 90:19

**bench** [4] - 6:20, 14:1, 14:6, 15:22
**best** [5] - 36:20, 83:24, 83:25, 124:10, 136:14
**better** [2] - 84:2, 85:12
**between** [21] - 17:7, 20:2, 20:6, 20:9, 32:3, 34:21, 47:14, 61:16, 61:18, 79:16, 80:9, 81:23, 87:22, 88:3, 89:10, 89:20, 91:19, 94:5, 127:20, 130:2, 130:9
**Beyond** [1] - 62:10
**beyond** [5] - 56:1, 60:2, 62:8, 101:22, 107:16
**big** [4] - 5:9, 47:7, 47:13, 50:18
**bit** [7] - 17:25, 23:21, 59:22, 60:21, 84:2, 91:12, 123:10
**BLANCHARD** [13] - 13:7, 13:16, 15:9, 15:14, 16:2, 50:10, 51:13, 51:20, 52:2, 64:14, 73:3, 73:5, 112:24
**Blanchard** [5] - 3:8, 13:6, 16:6, 51:17, 52:7
**blank** [1] - 32:9
**bless** [1] - 23:1
**blessed** [1] - 19:23
**body** [2] - 91:7, 91:10
**bodyguard** [1] - 9:1
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**bomb** [1] - 10:11
**book** [9] - 29:16, 34:20, 39:17, 39:21, 56:13, 56:17, 118:24, 124:12
**booklet** [2] - 116:9
**books** [1] - 128:23
**bottom** [11] - 14:18, 15:4, 50:14, 76:19, 88:22, 101:5, 106:12, 106:13, 106:24, 106:25, 108:3
**box** [2] - 16:9, 102:23
**boyfriend** [4] - 48:22, 48:25, 112:11, 112:22
**boyfriend/girlfriend** [1] - 49:3
**break** [4] - 94:22, 94:23, 95:1, 134:19

**breast** [2] - 59:24, 60:10
**BRENNER** [142] - 6:13, 7:19, 16:18, 17:10, 18:5, 18:7, 20:4, 20:8, 20:13, 21:15, 21:18, 22:7, 22:9, 22:13, 22:24, 23:4, 23:24, 24:17, 25:21, 27:22, 27:24, 28:1, 30:5, 30:8, 30:11, 33:16, 33:17, 36:25, 37:4, 37:7, 38:10, 38:14, 38:19, 39:20, 40:9, 40:12, 40:18, 40:20, 40:24, 40:25, 42:9, 42:13, 43:2, 43:15, 45:5, 45:7, 45:12, 45:19, 46:18, 46:20, 47:9, 47:12, 48:2, 48:11, 48:14, 48:15, 50:4, 50:12, 51:1, 51:12, 52:6, 52:10, 52:17, 52:20, 53:20, 53:23, 54:12, 54:13, 54:25, 55:3, 55:5, 55:14, 56:9, 56:12, 56:16, 58:1, 58:7, 60:4, 60:8, 60:24, 61:4, 61:10, 61:19, 62:6, 62:12, 62:23, 62:25, 63:18, 64:16, 65:7, 66:3, 66:17, 66:25, 69:4, 69:6, 69:9, 69:18, 69:22, 70:3, 71:18, 72:24, 73:7, 73:10, 74:1, 74:23, 75:10, 77:8, 79:8, 80:15, 87:23, 89:11, 89:17, 90:11, 91:14, 91:25, 92:11, 93:23, 95:25, 96:5, 96:8, 96:10, 98:11, 99:2, 99:10, 99:12, 101:21, 102:20, 103:3, 103:18, 103:23, 104:6, 105:12, 105:14, 107:15, 109:18, 109:25, 110:2, 110:11, 110:15
**Brenner** [12] - 2:5, 9:21, 10:12, 12:10, 12:12, 30:7, 69:23, 77:17, 78:19, 79:22, 87:5, 112:20
**Brenner...........** [1] - 4:5

**Brenner.............** [1] - 4:4
**briefly** [3] - 13:8, 113:16, 114:4
**bring** [8] - 14:5, 14:15, 36:25, 39:2, 39:4, 40:9, 95:20
**Brittany** [1] - 2:1
**britzoll@gmail.com** [1] - 2:4
**broad** [1] - 117:23
**broadly** [1] - 66:13
**broke** [4] - 46:25, 49:18, 53:14, 87:16
**brother** [1] - 36:17
**brought** [5] - 9:3, 17:17, 37:14, 38:22, 93:8
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:11
**bubble** [4] - 129:23, 129:24, 130:10, 131:2
**budget** [2] - 116:18
**build** [2] - 117:22, 118:6
**bullet** [6] - 125:9, 125:11, 126:6, 126:20, 131:3, 131:16
**bullets** [1] - 126:12
**bullied** [1] - 127:14
**bully** [1] - 132:15
**bullying** [44] - 111:23, 112:5, 117:15, 117:24, 118:9, 118:10, 118:15, 118:21, 119:25, 120:7, 120:25, 121:9, 121:12, 122:6, 123:1, 123:17, 123:18, 123:25, 124:19, 125:20, 126:10, 126:25, 127:16, 127:18, 127:19, 127:20, 127:23, 128:1, 128:2, 128:4, 128:7, 128:16, 131:18, 131:19, 131:25, 132:3, 132:12, 132:14, 132:21, 133:2, 133:5, 133:8, 133:14
**bullying-type** [1] - 133:8
**bullying.gov** [1] - 128:3

**bunch** [2] - 26:25, 46:22
**Burton** [2] - 2:20, 12:6, 17:16, 17:17
**Burton's** [1] - 18:22
**burtons@huntonak. com** [1] - 2:23
**BY** [89] - 25:21, 27:22, 28:1, 30:5, 30:11, 33:17, 37:7, 39:8, 39:20, 40:12, 40:20, 40:25, 42:9, 42:13, 43:2, 43:15, 45:5, 45:12, 45:19, 46:20, 47:12, 48:15, 50:12, 52:20, 53:23, 54:13, 55:5, 56:16, 58:7, 60:8, 66:25, 69:4, 69:9, 70:3, 71:18, 72:24, 73:17, 74:3, 74:25, 75:17, 76:13, 77:12, 77:16, 77:25, 78:7, 79:5, 79:10, 80:23, 81:18, 82:3, 83:10, 83:17, 84:7, 84:16, 85:8, 85:24, 86:22, 88:1, 88:21, 89:14, 89:22, 90:3, 90:16, 91:16, 92:23, 93:15, 94:3, 97:22, 98:15, 99:6, 99:18, 99:22, 102:9, 102:21, 104:12, 104:19, 104:22, 105:2, 105:10, 105:16, 106:11, 107:23, 110:2, 111:10, 113:4, 119:10, 119:18, 123:3, 125:8
**bystander** [2] - 127:14, 132:25
**bystanders** [1] - 132:9

**C**

**C-STARS** [1] - 115:10
**C.K** [21] - 4:3, 8:9, 9:11, 10:1, 12:22, 13:4, 13:9, 17:4, 17:5, 18:9, 18:10, 18:14, 18:23, 19:25, 20:2, 21:8, 22:1, 22:12, 22:14, 65:20, 112:21
**C.K.'s** [3] - 11:3, 21:17, 23:1
**CA** [1] - 1:20
**cafeteria** [2] - 121:23, 121:24

B.R. v. F.C.S.B.                                                    140

**calendar** [7] - 84:4, 84:15, 85:16, 85:19, 85:21, 86:8, 87:2
**cannot** [1] - 69:3
**capacity** [1] - 136:5
**caps** [1] - 54:10
**car** [1] - 82:14
**care** [1] - 122:23
**careful** [2] - 63:11, 95:11
**carefully** [1] - 121:25
**caring** [1] - 122:23, 123:8
**Carson** [7] - 74:15, 105:18, 108:10, 110:3, 110:4, 122:10, 123:4
**case** [24] - 10:6, 11:8, 12:11, 12:14, 12:18, 14:22, 14:24, 51:11, 60:7, 60:22, 62:5, 62:8, 62:11, 66:6, 97:9, 103:14, 106:17, 110:21, 110:22, 127:9, 134:22, 134:23, 136:7
**celebrations** [1] - 126:25
**cell** [1] - 82:17
**center** [1] - 11:11
**central** [4] - 115:3, 115:5, 116:14, 116:15
**Century** [1] - 1:19
**certain** [4] - 6:19, 29:17, 60:22, 90:23
**certainly** [5] - 65:9, 120:6, 123:1, 124:22, 129:21
**CERTIFICATE** [1] - 136:1
**Certificate** [1] - 4:16
**certify** [2] - 136:4, 136:10
**cetera** [7] - 116:15, 117:4, 118:15, 121:22, 128:23, 129:1, 133:11
**challenge** [1] - 64:16
**challenged** [1] - 12:20
**chambers** [1] - 135:4
**Chambers** [2] - 63:11, 92:25
**chance** [3] - 6:8, 22:18, 28:19
**change** [1] - 9:23
**changed** [1] - 126:14
**channel** [1] - 126:1
**character** [1] - 126:3

**characterizing** [1] - 8:2
**charts** [1] - 127:8
**chat** [6] - 34:6, 34:11, 34:22, 49:7, 51:4, 51:15
**chats** [2] - 52:22, 54:15
**check** [5] - 27:23, 65:8, 65:13, 66:17, 66:19
**child** [3] - 114:18, 117:1, 133:22
**child-serving** [1] - 117:1
**children** [5] - 116:4, 116:6, 129:22, 130:3
**China** [2] - 112:6, 113:7
**C**████████ [22] - 25:22, 28:22, 29:4, 29:8, 39:21, 45:20, 56:17, 73:10, 73:18, 76:14, 81:19, 83:11, 83:18, 83:19, 84:9, 92:24, 97:23, 98:16, 103:19, 105:11, 106:12, 110:3
**C**████████ [3] - 103:16, 103:20, 104:4
**Christina** [3] - 108:7, 108:8, 108:12
**circle** [1] - 132:19
**circumstances** [1] - 97:17
**citizenship** [1] - 126:9
**Civil** [2] - 1:4, 136:7
**claim** [2] - 47:21, 63:19
**clarify** [1] - 124:2
**clarity** [2] - 60:15, 122:9
**class** [5] - 57:8, 58:10, 58:22, 59:15, 125:23
**classes** [2] - 121:22, 128:22
**classrooms** [1] - 111:23
**clean** [1] - 25:24
**clean-up** [1] - 25:24
**clear** [13] - 8:7, 13:25, 14:10, 18:12, 49:12, 51:6, 52:15, 60:15, 64:8, 72:9, 94:20, 99:14, 121:5
**clerk** [2] - 50:9, 52:11
**click** [5] - 103:2, 103:15, 103:24, 104:7, 104:9

**clicked** [1] - 104:4
**client** [7] - 10:7, 15:2, 21:24, 22:3, 61:11, 62:15, 63:4
**client's** [1] - 22:3
**clipped** [1] - 46:22
**close** [4] - 23:20, 31:18, 111:5, 130:5
**close-up** [1] - 31:18
**clothes** [1] - 108:14
**coffees** [1] - 125:25
**cogent** [1] - 6:5
**colleagues** [1] - 73:7
**collected** [1] - 12:7
**comfort** [2] - 93:18, 130:8
**comfortable** [1] - 130:4
**coming** [3] - 23:5, 67:20, 79:24
**commercially** [2] - 123:16, 127:5
**common** [1] - 122:16
**communicated** [3] - 43:9, 43:10, 55:12
**communicating** [10] - 32:18, 34:5, 43:17, 52:21, 73:25, 74:5, 74:9, 77:3, 77:7, 88:5
**communication** [1] - 47:18
**communications** [1] - 43:21
**community** [4] - 116:23, 117:2, 119:22, 125:13
**community-based** [1] - 119:22
**company** [2] - 26:12, 26:17
**comparing** [1] - 27:12
**complaining** [1] - 21:5
**complaint** [2] - 38:6, 39:14
**complete** [1] - 23:8
**complied** [1] - 91:6
**compound** [1] - 96:5
**compromise** [2] - 24:13, 25:12
**computer** [1] - 136:12
**concept** [5] - 8:24, 11:18, 11:22, 23:8, 132:9
**concerned** [9] - 8:1, 11:24, 12:1, 12:16, 13:17, 15:8, 70:22, 70:25
**concluded** [2] - 9:16, 135:6

**concur** [1] - 7:22
**conditioner** [1] - 69:2
**conduct** [1] - 12:25
**confer** [3] - 51:18, 55:19, 73:7
**conference** [1] - 14:1
**conferences** [1] - 6:20
**confers** [8] - 48:10, 48:13, 51:19, 55:22, 69:8, 73:9, 94:9, 102:4
**confines** [1] - 42:12
**confirm** [5] - 5:6, 5:8, 28:22, 50:8, 50:24
**confirmed** [1] - 64:3
**conflicts** [1] - 122:22
**connect** [1] - 102:14
**connection** [2] - 61:16, 61:18
**consensual** [1] - 71:7
**consent** [1] - 59:24
**consequence** [2] - 132:4, 133:24
**consequences** [2] - 131:9, 131:10
**consider** [3] - 11:7, 14:20, 23:2
**considerate** [1] - 5:17
**consideration** [1] - 15:11
**considered** [1] - 14:9
**considering** [1] - 109:22
**consistent** [7] - 10:3, 12:9, 46:14, 55:11, 64:2, 84:19, 123:21
**constitute** [1] - 136:11
**consult** [2] - 111:17, 111:18
**consultant** [1] - 111:16
**consulted** [1] - 16:19
**consulting** [1] - 111:25
**Cont** [2] - 1:25, 2:25
**contact** [1] - 116:25
**contacted** [1] - 18:2
**contents** [1] - 40:4
**CONTENTS** [1] - 4:1
**context** [9] - 5:10, 8:13, 8:15, 17:24, 24:7, 25:6, 37:24, 65:5, 65:6
**continuum** [1] - 131:9
**contracts** [2] - 118:13, 118:14
**conversation** [8] - 12:12, 19:11, 38:24, 53:19, 89:19, 99:8, 99:23, 107:5

**conversations** [1] - 106:20
**conveyed** [1] - 120:19
**conveying** [2] - 120:17, 126:6
**Cool** [1] - 34:13
**coordinate** [1] - 6:2
**coordinator** [2] - 115:6, 115:22
**core** [2] - 62:19, 127:15
**correct** [25] - 20:8, 21:4, 30:23, 33:3, 34:1, 46:5, 46:9, 46:11, 46:15, 50:10, 52:17, 56:4, 56:22, 57:23, 58:10, 59:4, 67:23, 68:6, 72:21, 73:19, 79:17, 79:25, 86:12, 87:21
**Counsel** [2] - 48:10, 48:13, 51:19, 55:22, 69:8, 73:9, 94:9, 95:13, 102:4
**counsel** [37] - 6:17, 6:18, 7:15, 8:3, 8:6, 8:9, 8:10, 10:19, 13:11, 16:20, 17:1, 17:20, 18:9, 18:10, 19:2, 21:22, 23:14, 24:9, 24:12, 25:8, 25:12, 25:17, 37:2, 37:14, 37:25, 45:21, 48:6, 51:3, 55:20, 60:23, 64:18, 69:6, 90:4, 94:10, 95:6, 111:3
**counsel's** [1] - 90:18
**counseling** [7] - 118:17, 118:21, 120:24, 126:17, 128:21, 129:21, 132:5
**counselors** [2] - 120:24, 121:3
**counting** [1] - 116:12
**countries** [2] - 112:3, 113:6
**County** [16] - 14:24, 92:25, 112:2, 113:10, 113:15, 114:3, 114:11, 115:9, 115:14, 115:17, 116:25, 118:8, 124:3, 124:5, 126:1, 130:3
**couple** [12] - 5:3, 25:24, 29:10, 29:11, 30:2, 30:6, 30:13, 37:21, 68:15, 70:1,

70:5, 109:7
**course** [2] - 18:21, 92:14
**Court** [63] - 3:12, 3:13, 4:16, 5:14, 5:19, 5:21, 6:4, 6:6, 6:15, 6:20, 6:22, 7:1, 7:7, 7:11, 7:12, 7:17, 7:23, 9:21, 10:19, 10:25, 11:9, 11:19, 13:18, 13:19, 13:20, 13:21, 13:22, 14:1, 14:3, 14:7, 14:9, 14:10, 14:14, 14:19, 15:17, 15:18, 15:19, 15:23, 16:7, 16:9, 16:19, 16:21, 16:22, 23:7, 24:7, 25:6, 25:19, 46:19, 51:22, 60:20, 60:22, 65:16, 65:19, 93:24, 93:25, 95:18, 96:25, 109:23, 111:4, 136:3, 136:22
**COURT** [183] - 1:1, 1:12, 5:1, 5:3, 5:25, 6:3, 6:10, 6:14, 9:18, 13:5, 13:14, 13:24, 15:10, 16:1, 16:3, 16:7, 16:17, 17:8, 17:24, 18:6, 20:1, 20:5, 20:9, 21:10, 21:16, 22:5, 22:8, 22:10, 22:23, 23:3, 23:17, 24:1, 24:18, 24:20, 24:23, 25:16, 27:25, 30:7, 30:9, 33:14, 37:3, 37:5, 38:12, 39:6, 39:19, 40:11, 40:17, 40:22, 42:11, 43:1, 43:13, 45:4, 45:9, 45:18, 46:19, 48:3, 48:9, 50:11, 51:8, 51:16, 51:24, 52:4, 52:9, 52:14, 53:21, 55:1, 55:21, 55:24, 56:2, 56:8, 56:10, 56:14, 57:25, 58:4, 60:5, 60:17, 60:19, 60:25, 61:8, 61:16, 62:3, 62:10, 62:22, 62:24, 63:14, 64:15, 65:3, 65:17, 65:25, 66:13, 66:22, 69:1, 69:23, 71:17, 72:23, 73:4, 73:6, 73:8, 73:12, 73:15, 74:2, 74:24, 75:6, 75:8, 75:15, 76:6, 77:10, 77:14, 79:1, 79:9, 80:17,

80:21, 84:5, 87:24, 88:11, 88:14, 88:17, 89:13, 89:19, 89:25, 90:12, 91:15, 92:1, 92:8, 92:13, 92:19, 92:21, 93:13, 93:24, 94:8, 94:13, 94:15, 94:18, 94:21, 95:4, 95:13, 95:16, 95:19, 95:24, 96:3, 96:6, 96:9, 96:11, 96:14, 98:7, 98:10, 99:4, 99:17, 99:20, 101:23, 102:3, 102:7, 103:8, 103:10, 103:22, 103:25, 104:5, 104:8, 105:13, 106:7, 106:9, 107:17, 107:21, 109:17, 109:19, 109:24, 110:12, 110:16, 110:20, 111:2, 112:7, 112:10, 112:18, 112:21, 112:25, 113:3, 119:7, 119:14, 122:11, 125:4, 134:14, 134:18, 135:2
**court** [10] - 11:1, 17:20, 23:11, 66:24, 96:20, 97:5, 113:2, 117:3, 136:8
**Court's** [11] - 5:17, 7:13, 8:18, 13:17, 16:21, 24:10, 25:9, 25:18, 61:2, 66:1, 99:13
**Courthouse** [1] - 3:13
**courts** [1] - 117:3
**cover** [2] - 120:3, 134:16
**create** [1] - 123:20
**created** [7] - 106:2, 107:19, 119:11, 119:12, 119:20, 119:21, 120:4
**creating** [1] - 105:18
**credibility** [7] - 14:9, 17:9, 61:15, 63:19, 63:25, 64:17, 65:2
**crib** [1] - 120:2
**critical** [3] - 11:8, 94:22, 123:24
**CROSS** [2] - 25:20, 110:1
**cross** [18] - 17:4, 17:8, 18:13, 18:14, 22:3, 61:11, 61:13, 61:20,

61:23, 61:25, 62:19, 63:3, 63:19, 64:1, 64:23, 68:18, 94:13
**Cross** [1] - 4:4
**CROSS-EXAMINATION** [2] - 25:20, 110:1
**cross-examination** [6] - 17:8, 22:3, 61:11, 61:13, 61:23, 94:13
**Cross-examination** [1] - 4:4
**cross-examine** [1] - 64:23
**cross-examining** [2] - 62:19, 63:19
**crossed** [1] - 20:10
**culturally** [1] - 130:4
**curative** [9] - 6:16, 6:21, 6:22, 7:1, 7:3, 7:4, 7:6, 7:25, 15:11
**curricula** [1] - 127:5
**curriculum** [6] - 120:21, 126:17, 126:18, 127:16, 127:17
**cute** [1] - 107:8

# D

**D-E-V-I** [1] - 59:9
**data** [2] - 85:12, 106:20
**date** [16] - 38:6, 43:21, 47:17, 79:7, 79:9, 81:22, 85:1, 86:3, 86:17, 86:24, 87:18, 89:2, 107:1, 109:4, 119:5, 119:7
**dated** [6] - 83:20, 84:22, 84:23, 85:10, 85:13, 85:16
**dating** [7] - 47:22, 49:20, 85:1, 85:9, 85:10, 86:11, 101:12
**David** [1] - 42:7
**DAVIS** [1] - 95:15
**Davis** [7] - 9:12, 10:18, 12:5, 12:10, 18:2, 18:8, 20:22
**days** [8] - 31:6, 49:18, 70:1, 70:5, 88:2, 88:3, 97:14
**DC** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**deal** [4] - 5:13, 15:12, 23:18
**dealing** [3] - 14:19, 56:25, 62:4
**Dear** [1] - 5:6

**Debbie** [1] - 59:8
**December** [1] - 117:7
**decided** [1] - 64:21
**decision** [1] - 22:17
**defendant** [1] - 8:25
**Defendant** [3] - 2:13, 3:1, 3:9
**Defendants** [5] - 1:7, 3:5, 4:2, 4:12, 6:18
**defendants** [2] - 6:2, 6:21
**Defendants'** [20] - 6:16, 7:6, 11:5, 75:13, 76:5, 76:9, 78:23, 81:13, 81:14, 81:15, 85:21, 88:12, 106:4, 110:25, 118:23, 119:4, 119:16, 124:11, 125:2, 125:6
**defendants'** [1] - 6:25
**defender** [2] - 127:15, 133:1
**defenders** [1] - 132:9
**defense** [10] - 7:15, 11:15, 13:11, 13:21, 17:1, 24:12, 25:12, 37:2, 51:4, 110:23
**Defense** [3] - 26:25, 50:6, 75:4
**defer** [1] - 109:23
**defining** [1] - 130:10
**degree** [6] - 20:3, 113:18, 113:19, 113:21, 113:22, 113:24
**deleted** [2] - 27:1, 27:6
**deleting** [1] - 22:4
**deliberate** [1] - 97:12
**demonstrate** [1] - 122:23
**denied** [2] - 7:3, 7:5
**deny** [1] - 58:14
**department** [1] - 117:2
**Department** [6] - 92:25, 111:18, 111:19, 111:20, 111:22, 112:4
**deposition** [7] - 26:4, 27:23, 28:2, 67:25, 69:21, 92:10, 92:20
**depression** [1] - 117:25
**describe** [6] - 76:15, 90:17, 90:19, 90:20, 93:12, 93:16
**described** [5] - 43:11, 56:18, 57:7, 70:9, 72:12

**deserves** [1] - 16:16
**desirability** [1] - 16:8
**despite** [1] - 36:20
**detail** [2] - 73:19, 91:13
**Detective** [2] - 63:10, 92:25
**detective** [20] - 46:9, 59:22, 63:12, 94:4, 97:24, 98:2, 98:22, 98:25, 99:8, 99:24, 100:1, 100:6, 100:16, 100:19, 100:22, 100:25, 101:9, 101:13, 101:16, 101:19
**determination** [4] - 16:10, 16:21, 16:24, 56:11
**determinations** [1] - 61:2
**determine** [2] - 34:4, 132:5
**developed** [8] - 96:24, 116:8, 118:16, 118:17, 119:1, 123:17, 129:12, 133:14
**developing** [2] - 117:9, 118:19
**development** [3] - 116:6, 116:7, 126:2
**developmental** [1] - 121:16
**developmentally** [1] - 129:5
**Devi** [5] - 59:5, 59:7, 59:9, 59:11, 59:12
**DEVI** [1] - 59:10
**difference** [1] - 16:23
**differences** [1] - 114:18
**different** [20] - 11:17, 21:25, 32:4, 64:6, 92:1, 114:9, 120:3, 120:11, 123:16, 124:23, 125:22, 126:8, 128:14, 129:9, 129:16, 129:19, 130:6, 131:1, 131:15
**differentiated** [2] - 129:10, 129:13
**digest** [1] - 5:24
**digitally** [1] - 101:13
**direct** [18] - 17:14, 19:22, 26:6, 26:18, 26:19, 26:24, 46:23, 56:7, 56:12, 56:13, 61:10, 61:19, 61:22,

B. R. v. F. C. S. B.                                                142

61:24, 64:16, 65:7, 66:7, 68:17

**DIRECT** [1] - 111:9

**Direct** [1] - 4:7

**directly** [4] - 18:19, 61:15, 66:10, 117:12

**director** [3] - 115:17, 115:20, 117:18

**dirty** [4] - 93:22, 98:2, 98:23, 101:19

**dis** [1] - 32:12

**disabilities** [2] - 115:11, 115:12

**disadvantage** [1] - 20:24

**disagree** [1] - 103:19

**disappearing** [1] - 36:8

**disciplinary** [3] - 131:10, 132:4, 133:24

**disciplined** [2] - 45:15, 58:12

**disclose** [1] - 74:10

**disclosed** [1] - 74:12

**disclosing** [1] - 75:1

**discovery** [5] - 11:13, 11:14, 18:3, 21:11, 106:16

**discreetly** [1] - 112:18

**discriminated** [1] - 129:1

**discrimination** [2] - 128:24, 128:25

**discriminatory** [2] - 128:6, 128:8

**discuss** [2] - 110:22, 134:22

**discussed** [2] - 89:10, 103:4

**discussing** [3] - 123:11, 131:4, 131:5

**discussion** [6] - 12:14, 12:15, 78:8, 89:15, 90:7, 105:24

**discussions** [2] - 20:10, 74:18

**display** [1] - 136:13

**dispute** [1] - 103:19

**disputed** [1] - 9:7

**distance** [4] - 130:2, 130:8, 130:15, 130:16

**distinction** [2] - 20:6, 20:7

**distinguishing** [1] - 127:20

**District** [2] - 3:13, 136:4

**DISTRICT** [3] - 1:1,

1:1, 1:12

**distrust** [1] - 13:11

**disturbing** [1] - 121:21

**Docket** [1] - 6:16

**docket** [1] - 6:24

**doctor** [1] - 7:16

**doctorate** [2] - 113:24, 113:25

**doctored** [2] - 6:24, 10:12

**document** [35] - 16:15, 38:17, 39:25, 40:5, 42:11, 42:14, 43:1, 47:7, 48:7, 51:9, 51:10, 56:11, 56:19, 75:21, 94:11, 94:16, 99:12, 99:20, 101:4, 101:22, 101:25, 103:14, 103:16, 106:16, 118:25, 119:1, 119:19, 119:21, 120:4, 120:16, 123:11, 124:14, 124:16, 125:10

**documents** [5] - 14:11, 22:4, 42:12, 46:22, 110:19

**dog** [2] - 71:22, 72:1

**done** [11] - 8:4, 8:25, 10:1, 14:11, 17:1, 71:1, 96:17, 101:7, 105:15, 124:7, 128:13

**door** [1] - 23:20

**double** [1] - 77:14

**down** [26] - 15:15, 54:12, 55:14, 60:21, 69:3, 76:3, 78:6, 82:22, 82:24, 83:3, 83:16, 84:1, 88:8, 90:2, 92:4, 100:20, 104:16, 105:9, 110:17, 112:13, 112:16, 117:5, 121:18, 121:21, 130:18, 134:24

**dozens** [2] - 44:25

**Dr** [3] - 111:11, 111:15, 113:5

**drafting** [1] - 7:23

**draw** [2] - 14:20, 130:12

**drawn** [3] - 7:10, 24:6, 25:5

**Drive** [1] - 3:6

**during** [12] - 6:17, 50:7, 58:9, 59:17, 74:16, 78:14, 79:12,

80:2, 93:20, 112:19, 119:12

**duty** [1] - 15:18

**DX-1** [2] - 62:9, 62:13

**DX-44** [1] - 82:23

**DX-81** [1] - 84:3

**E**

**eager** [1] - 70:12

**early** [4] - 48:20, 85:3, 124:16, 124:21

**ears** [1] - 9:22

**East** [1] - 1:19

**Eastern** [1] - 136:4

**EASTERN** [1] - 1:1

**ed** [1] - 126:3

**edited** [1] - 11:17

**edits** [3] - 8:19, 8:21, 9:14

**Education** [1] - 111:19

**education** [3] - 113:25, 114:15

**educational** [2] - 113:17, 133:21

**effort** [4] - 9:1, 124:6, 131:19, 133:18

**efforts** [1] - 36:20

**egging** [1] - 132:15

**either** [7] - 7:15, 19:24, 23:8, 24:12, 25:11, 42:2, 134:2

**elementary** [1] - 115:1

**elements** [2] - 123:24, 124:9

**elevators** [1] - 112:13

**elicit** [1] - 64:21

**eligibility** [1] - 115:12

**Elliker** [1] - 2:25

**email** [2] - 18:18

**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11

**emails** [1] - 21:13

**embarrassed** [1] - 14:12

**embarrassing** [1] - 14:4

**embed** [2] - 118:4, 121:6

**embedded** [5] - 103:15, 118:12, 128:21, 128:22

**emotional** [2] - 116:6, 116:7

**empathy** [1] - 118:19

**employed** [1] - 111:15

**employees** [1] - 116:10

**encounter** [9] - 44:9, 63:17, 71:7, 72:12, 72:15, 72:19, 91:21

**encounters** [1] - 44:7

**encouraging** [1] - 125:15

**end** [10] - 8:12, 9:6, 20:14, 49:4, 49:22, 97:10, 107:10, 115:16, 124:21

**ended** [1] - 79:19

**ends** [3] - 18:22, 52:12, 52:13

**engage** [2] - 133:23, 134:4

**engaged** [9] - 42:1, 52:24, 63:15, 78:9, 79:25, 118:15, 131:11, 132:3, 133:20

**engagement** [1] - 80:8

**engages** [2] - 64:22, 133:22

**engaging** [4] - 61:14, 64:11, 112:11, 132:14

**English** [1] - 128:22

**enjoyed** [1] - 24:23

**ensure** [1] - 118:6

**entered** [2] - 12:11, 12:13

**entirety** [2] - 51:14, 51:22

**entitled** [1] - 63:13

**environment** [2] - 122:3, 123:8

**environments** [1] - 122:3

**envisioned** [1] - 132:19

**escalate** [1] - 133:10

**especially** [1] - 128:10

**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8

**estimate** [5] - 83:24, 83:25, 84:2, 85:12, 85:15

**et** [9] - 1:6, 116:15, 117:4, 118:15, 121:22, 128:22, 129:1, 133:10, 136:7

**ethics** [2] - 24:9, 25:8

**evaluate** [1] - 23:21

**evenings** [1] - 125:25

**event** [1] - 119:24

**events** [3] - 58:16, 58:18, 72:18

**evidence** [25] - 7:13,

7:16, 9:24, 10:2, 10:13, 11:5, 11:8, 13:12, 16:15, 22:21, 24:10, 24:14, 25:10, 25:13, 37:1, 51:2, 52:1, 52:19, 55:17, 62:13, 66:8, 75:22, 79:23, 119:16, 125:6

**exact** [2] - 103:14, 116:20

**exactly** [6] - 10:24, 11:2, 12:6, 17:2, 17:3, 90:15

**examination** [25] - 4:4, 4:5, 4:5, 4:7, 8:13, 17:8, 17:14, 18:15, 22:3, 24:6, 24:25, 25:5, 26:7, 26:18, 26:19, 26:24, 46:23, 61:11, 61:13, 61:23, 61:25, 92:15, 94:13, 112:19

**EXAMINATION** [4] - 25:20, 73:16, 110:1, 111:9

**examine** [1] - 64:23

**examining** [2] - 62:19, 63:19

**example** [7] - 31:18, 33:8, 44:18, 45:16, 112:3, 129:3, 130:5

**examples** [1] - 133:15

**exception** [5] - 7:18, 7:19, 16:8, 24:16, 66:23

**exceptions** [1] - 16:5

**exchange** [5] - 12:21, 12:22, 20:2, 34:20, 34:21

**excited** [2] - 70:14, 70:16

**excuse** [2] - 10:9, 68:17

**excused** [4] - 95:3, 110:18, 134:25, 135:1

**exercises** [1] - 130:11

**exhaustively** [1] - 77:2

**Exhibit** [50] - 11:6, 26:25, 37:6, 38:11, 38:13, 39:7, 39:22, 40:14, 47:11, 50:6, 52:10, 52:19, 53:22, 55:2, 55:16, 56:17, 75:5, 75:13, 75:16, 76:5, 76:7, 76:10, 76:12, 77:23, 78:23, 79:2, 81:13, 81:14, 81:15, 82:23, 82:24, 84:6, 85:21, 88:11,

B.R. v. F.C.S.B.                                                          143

88:12, 88:15, 102:1,
102:2, 102:8, 106:4,
106:10, 118:24,
119:4, 119:16,
119:17, 124:12,
125:2, 125:6, 125:7,
131:2
**exhibit** [9] - 48:7,
50:22, 51:25, 52:16,
55:25, 58:8, 90:1,
106:25, 132:7
**EXHIBITS** [1] - 4:8
**exhibits** [2] - 48:6,
50:2
**existed** [3] - 7:9, 24:5,
25:4
**expand** [2] - 124:6,
124:8
**expect** [1] - 6:4
**expectation** [4] -
121:7, 122:2,
133:13, 134:2
**expectations** [6] -
121:7, 122:5,
122:17, 132:5, 134:9
**expected** [3] - 121:17,
122:21, 125:14
**expecting** [1] - 60:23
**experience** [1] - 15:4
**explain** [12] - 61:5,
61:6, 91:12, 115:19,
120:15, 123:10,
125:11, 125:12,
126:5, 126:7, 131:3,
132:9
**explanation** [1] -
10:14
**explicit** [2] - 128:19,
133:15
**explicitly** [1] - 130:23
**Explorers'** [3] - 76:18,
76:22, 76:24
**exposed** [4] - 58:9,
59:3, 59:5, 59:8
**exposure** [1] - 65:23
**extensive** [1] - 118:10
**extent** [5] - 23:20,
89:11, 89:17, 95:7,
95:14

## F

**f'ing** [1] - 55:7
**F.C.S.B** [13] - 1:6,
2:13, 3:1, 17:18,
17:21, 18:1, 18:7,
18:20, 18:21, 18:25,
19:3, 136:7
**F.C.S.B.'s** [1] - 17:20
**F.T** [1] - 3:7

**face** [1] - 55:9
**Facebook** [55] - 6:19,
6:23, 10:24, 11:1,
13:10, 17:22, 18:19,
18:25, 21:8, 21:13,
27:2, 27:13, 28:18,
28:23, 29:1, 29:4,
29:8, 31:19, 31:25,
34:11, 43:6, 43:8,
43:20, 43:23, 44:2,
44:13, 44:23, 44:24,
47:14, 49:8, 52:21,
54:15, 70:14, 70:16,
74:18, 74:21, 75:1,
75:7, 75:19, 76:14,
77:18, 82:16,
102:24, 103:16,
103:20, 104:4,
104:14, 104:24,
105:19, 105:25,
106:19, 107:2,
107:5, 107:19
**facing** [1] - 58:22
**fact** [14] - 8:7, 8:25,
9:2, 19:23, 27:1,
27:5, 42:4, 43:8,
43:23, 44:3, 44:23,
44:24, 70:16
**factors** [1] - 117:23
**Fahey** [2] - 1:14, 135:3
**Fair** [1] - 115:17
**fair** [12] - 18:17, 29:3,
52:25, 53:2, 53:16,
63:3, 64:25, 67:18,
87:20, 87:25, 110:3,
116:5
**Fairfax** [17] - 14:24,
92:25, 112:2,
113:10, 113:15,
114:2, 114:11,
115:9, 115:14,
116:25, 118:8,
119:22, 119:23,
124:3, 124:5, 126:1,
130:3
**fairness** [1] - 5:20
**fake** [2] - 105:18,
107:19
**fall** [1] - 27:9
**familiar** [1] - 11:23
**family** [2] - 19:16,
78:14
**fan** [1] - 15:18
**far** [7] - 6:14, 6:25,
13:21, 33:18, 96:24,
107:15, 124:20
**Farms** [4] - 74:14,
74:16, 99:1, 99:9
**fashion** [1] - 98:10
**February** [3] - 67:1,

67:2, 67:7
**federal** [1] - 128:3
**feet** [1] - 58:23
**FELDMAN** [1] - 3:9
**fellatio** [1] - 44:10
**fellow** [2] - 59:12,
59:19
**felt** [3] - 120:12, 133:4,
134:6
**female** [1] - 58:9
**few** [4] - 19:14, 30:22,
38:14, 119:12
**fictitious** [2] - 32:19,
32:25
**fifth** [1] - 115:21
**figure** [2] - 20:5,
123:23
**figuring** [2] - 33:11,
134:1
**file** [6] - 5:12, 5:16,
6:4, 6:7, 12:24, 21:8
**filed** [3] - 7:21, 10:18,
11:8
**files** [2] - 24:7, 25:6
**filing** [5] - 5:11, 5:15,
5:19, 5:24, 6:6
**fine** [6] - 9:7, 23:16,
82:21, 94:18, 96:7,
104:11
**finger** [2] - 12:17,
58:17
**fingers** [2] - 58:17,
101:14
**finish** [3] - 42:21, 59:2
**first** [42] - 5:5, 8:11,
9:19, 10:15, 12:13,
16:18, 16:20, 17:16,
21:23, 28:22, 32:8,
32:10, 39:24, 46:21,
46:23, 47:13, 48:25,
53:4, 56:17, 64:17,
66:4, 86:17, 90:24,
91:1, 102:2, 105:4,
106:24, 107:7,
109:11, 113:16,
114:2, 114:6, 117:8,
117:19, 119:12,
120:18, 125:9,
125:11, 133:17,
133:18, 134:2
**FL** [3] - 2:3, 2:7, 2:11
**flexible** [1] - 97:13
**FLEXNER** [4] - 1:19,
2:2, 2:6, 2:10
**flip** [1] - 79:3
**floor** [1] - 130:12
**Floor** [1] - 3:14
**fly** [1] - 96:1
**focus** [7] - 14:21,
14:23, 15:5, 18:14,

60:6, 120:8, 123:25
**focused** [1] - 15:7
**focusing** [1] - 20:20
**followed** [1] - 112:22
**following** [4] - 28:5,
92:4, 126:15
**food** [1] - 121:25
**FOR** [1] - 1:1
**foregoing** [1] - 136:10
**foreign** [1] - 23:8
**forget** [1] - 123:25
**forgot** [4] - 43:9,
43:24, 44:3, 44:25
**form** [4] - 7:9, 21:14,
24:4, 25:3
**formal** [2] - 120:10,
134:10
**format** [4] - 11:2, 11:3,
11:4, 33:22
**forms** [1] - 128:23
**forth** [3] - 17:12,
34:21, 53:24
**forward** [5] - 36:1,
58:22, 73:1, 79:3,
97:11
**fought** [1] - 10:7
**foundation** [8] -
38:20, 38:23, 39:3,
56:10, 57:24, 73:5,
80:16, 80:20
**four** [5] - 31:6, 63:7,
82:11, 93:5, 115:21,
115:22
**frankly** [2] - 14:4,
14:12
**F▓▓▓▓** [1] - 123:7
**fraud** [13] - 7:12, 11:9,
11:19, 11:24, 13:19,
13:21, 13:22, 15:17,
15:18, 15:19, 15:23,
23:7
**freeze** [1] - 69:3
**Friday** [2] - 5:6, 97:6
**friends** [1] - 86:24
**friendship** [1] - 48:25
**front** [5] - 9:6, 11:10,
11:14, 76:23, 113:1
**frustrated** [1] - 36:14
**full** [2] - 21:19, 96:25
**Fulton** [1] - 3:6
**future** [1] - 123:13

## G

**gap** [6] - 9:9, 9:10,
17:15, 20:18, 20:20
**gathered** [1] - 106:19
**general** [5] - 122:10,
122:15, 124:2,
124:3, 124:4

**genital** [1] - 63:24
**genitals** [2] - 58:9,
59:4
**gentlemen** [10] - 7:7,
24:3, 24:21, 25:2,
69:1, 94:25, 96:15,
96:16, 134:19, 135:2
**George** [2] - 113:22,
114:1
**Georgetown** [1] -
113:20
**girl** [10] - 42:23, 54:18,
57:14, 59:24, 60:10,
62:20, 62:21, 62:24,
64:6
**girlfriend** [3] - 41:20,
48:22, 49:1
**girls** [5] - 58:21,
58:22, 61:15, 63:5,
65:21
**given** [13] - 7:5, 8:11,
8:12, 9:14, 9:15,
10:14, 12:10, 22:24,
69:15, 91:19, 91:23,
113:7, 113:8
**goal** [2] - 19:21, 19:22
**govern** [1] - 97:14
**government** [1] -
117:1
**government's** [1] -
128:3
**grade** [17] - 37:11,
53:7, 53:8, 53:9,
53:10, 54:18, 54:19,
58:10, 59:15, 59:17,
84:8, 84:10, 84:11,
114:10, 120:22,
121:15, 129:15
**grader** [2] - 59:14,
59:19
**Grady** [9] - 76:19,
82:25, 83:1, 85:7,
85:23, 86:20,
102:17, 103:2,
104:17
**granted** [2] - 7:3, 7:4
**graphic** [1] - 31:15
**great** [2] - 22:16,
73:19
**green** [1] - 85:23
**ground** [4] - 100:20,
120:5, 120:6, 124:20
**group** [4] - 129:6,
129:10, 132:12,
132:13
**groups** [8] - 119:22,
119:23, 120:3,
120:11, 123:25,
124:23, 125:13
**grow** [1] - 133:19

B.R. v. F.C.S.B.                                                                    144

**Grr** [3] - 36:11, 36:12, 36:14
**grr** [1] - 36:13
**guess** [6] - 8:8, 37:10, 37:20, 53:3, 53:17, 54:16
**guidance** [1] - 120:23
**guidelines** [4] - 123:20, 125:19, 125:20, 125:21
**guy** [1] - 63:22
**guys** [7] - 34:24, 46:25, 48:22, 49:20, 52:24, 54:14, 70:18

**H**

**half** [2] - 85:17, 88:7
**hall** [1] - 130:18
**hallway** [2] - 121:19, 121:20
**handbook** [1] - 126:16
**handed** [3] - 45:20, 46:21, 48:5
**handing** [1] - 69:24
**handle** [2] - 131:13, 131:14
**hands** [2] - 44:10, 91:5
**handwritten** [1] - 75:22
**hanging** [1] - 129:25
**happy** [2] - 22:24, 23:15
**harassed** [1] - 89:24
**harassing** [2] - 41:5, 87:7
**harassment** [23] - 117:16, 118:9, 118:10, 118:22, 120:8, 120:25, 121:4, 122:7, 125:21, 127:1, 127:21, 127:23, 128:1, 128:3, 128:5, 128:6, 128:7, 128:8, 128:15, 128:20, 133:14
**hard** [3] - 97:8, 123:8, 130:15
**HARRIS** [1] - 3:12
**Harris** [2] - 136:3, 136:21
**head** [1] - 100:4
**health** [8] - 111:24, 112:5, 117:2, 118:16, 120:21, 120:22, 126:17, 129:21
**hear** [3] - 16:16,

66:14, 93:25
**heard** [4] - 11:19, 28:7, 61:22, 104:5
**hearsay** [1] - 89:11
**help** [8] - 18:9, 18:10, 96:17, 114:16, 131:19, 132:5, 133:18
**helped** [3] - 18:16, 18:23, 114:15
**helpful** [1] - 117:6
**helping** [1] - 127:8
**hereby** [2] - 7:2, 136:4
**hereto** [1] - 136:15
**herself** [3] - 31:21, 45:1, 45:2
**high** [4] - 114:24, 114:25, 121:2, 129:16
**highlight** [12] - 55:3, 81:16, 83:2, 83:5, 83:6, 83:8, 85:6, 85:7, 85:22, 86:1, 87:1, 88:18
**highlighted** [3] - 79:15, 108:13, 109:12
**highly** [1] - 114:14
**himself** [1] - 63:15
**history** [2] - 21:19, 61:14
**hold** [6] - 60:19, 65:17, 103:10, 111:4, 112:7
**hole** [1] - 9:10
**holiday** [1] - 24:23
**HOLTZMAN** [1] - 1:14
**home** [2] - 83:9, 105:1
**homebound** [1] - 116:3
**homelessness** [1] - 116:3
**homework** [1] - 96:17
**honestly** [3] - 64:18, 65:13, 128:17
**honesty** [1] - 126:8
**Honor** [86] - 5:23, 6:9, 6:13, 8:13, 9:9, 9:20, 10:5, 10:9, 11:7, 13:7, 15:15, 16:2, 16:4, 16:13, 16:18, 17:17, 19:9, 22:25, 23:1, 23:9, 27:24, 36:25, 38:10, 38:16, 38:19, 39:4, 39:18, 45:8, 46:18, 47:9, 48:11, 50:6, 51:1, 51:13, 52:8, 53:20, 54:25, 55:15, 55:23, 56:6, 56:13, 58:1,

60:2, 60:4, 60:24, 61:4, 62:9, 62:12, 62:18, 69:18, 73:11, 73:14, 80:15, 92:6, 92:11, 92:16, 93:14, 93:23, 94:17, 95:12, 95:25, 98:6, 98:13, 99:2, 101:25, 102:5, 102:20, 103:1, 103:3, 103:9, 103:18, 105:12, 106:6, 107:15, 107:18, 109:16, 109:21, 110:14, 110:15, 110:23, 111:8, 119:3, 119:5, 122:8, 125:1, 134:12
**Honor's** [4] - 11:16, 16:19, 22:15, 23:5
**HONORABLE** [1] - 1:11
**hope** [2] - 24:23, 97:8
**hour** [1] - 89:15
**hours** [5] - 19:14, 63:4, 88:24, 89:4, 89:10
**house** [1] - 115:25
**housed** [1] - 115:25
**hover** [5] - 102:17, 102:19, 102:23, 104:17, 105:1
**HTML** [3] - 11:3, 11:4, 21:20
**human** [1] - 116:19
**hundred** [1] - 43:20
**hundreds** [2] - 43:10, 43:24
**HUNTON** [2] - 2:14, 2:17, 2:21, 3:1

**I**

**idea** [5] - 13:12, 60:19, 104:6, 121:6, 132:11
**identification** [1] - 47:11
**identified** [2] - 43:8, 120:7
**identifies** [1] - 56:24
**identify** [4] - 47:10, 48:8, 56:24, 124:14
**IEP** [1] - 115:9
**impact** [1] - 117:23
**impeach** [1] - 65:11
**impeachment** [4] - 64:1, 66:4, 66:7, 69:20
**implement** [2] - 117:13, 127:11
**implementation** [1] -

127:7
**implementing** [1] - 126:22
**implicate** [1] - 22:11
**implicated** [2] - 14:5, 20:12
**implicates** [2] - 24:9, 25:8
**implicating** [1] - 12:24
**implication** [7] - 12:2, 12:3, 13:3, 13:4, 13:23, 19:6, 23:10
**imply** [2] - 19:7, 19:8
**importance** [1] - 130:23
**important** [6] - 22:20, 23:18, 116:24, 133:2, 133:4
**imposing** [2] - 72:16, 72:20
**IN** [2] - 54:10
**in-person** [1] - 67:6
**in-school** [3] - 37:18, 87:3, 87:17
**inappropriate** [1] - 7:6
**incendiary** [2] - 11:20, 11:21
**incident** [17] - 43:11, 43:18, 47:22, 56:18, 57:3, 57:7, 60:9, 62:15, 64:4, 65:23, 65:24, 68:15, 70:9, 71:20, 79:12, 79:13, 125:24
**include** [3] - 117:9, 117:15, 133:19
**included** [2] - 121:8, 126:10
**including** [4] - 5:21, 38:7, 44:19, 61:14
**inconsistent** [2] - 9:22, 61:2
**increasing** [1] - 111:23
**indicated** [4] - 6:20, 25:25, 65:9, 124:10
**indication** [1] - 22:21
**individual** [4] - 106:20, 107:9, 107:14, 107:24
**individualized** [1] - 114:15
**infect** [1] - 13:10
**infectious** [1] - 13:8
**information** [7] - 20:11, 21:12, 21:17, 88:2, 120:3, 120:13, 127:25
**initials** [1] - 63:1
**initiative** [1] - 117:19

**inserted** [1] - 9:4
**inside** [2] - 44:11, 58:20
**insinuate** [2] - 14:13, 19:21
**insinuated** [3] - 6:18, 17:21, 18:20
**insinuating** [1] - 8:6
**insinuation** [10] - 7:8, 8:3, 12:3, 16:25, 17:3, 17:5, 17:11, 17:12, 24:4, 25:3
**insist** [1] - 5:15
**insofar** [2] - 7:4, 7:5
**instead** [1] - 17:21
**institution** [1] - 133:21
**instruction** [25] - 6:16, 6:21, 6:22, 6:25, 7:1, 7:3, 7:5, 7:6, 7:17, 7:25, 8:12, 8:19, 9:14, 11:16, 12:1, 12:17, 14:20, 15:11, 22:19, 23:6, 23:16, 23:21, 25:1, 25:18, 56:4
**instructional** [2] - 114:4, 114:8
**instructions** [1] - 22:16
**integrate** [1] - 121:11
**integrated** [1] - 126:4
**integrity** [3] - 11:10, 24:13, 25:12
**intended** [1] - 125:20
**interacted** [1] - 87:17
**interacting** [1] - 132:6
**interaction** [7] - 78:14, 81:22, 82:4, 90:5, 101:1, 101:10, 112:11
**interactions** [1] - 132:1
**interchangeably** [2] - 127:24, 128:12
**interesting** [1] - 80:21
**interface** [1] - 116:22
**interim** [1] - 96:16
**internally** [1] - 123:17
**internet** [1] - 126:18
**interruption** [1] - 25:19
**interrupts** [1] - 111:3
**intervening** [1] - 125:24
**intervention** [8] - 115:17, 115:20, 116:11, 117:18, 124:19, 128:15, 133:3, 133:14
**interventions** [2] -

123:11, 134:8
**interview** [8] - 59:22, 63:10, 63:12, 69:10, 92:24, 93:21, 97:24
**interviewed** [1] - 46:8
**intimate** [6] - 78:9, 79:25, 80:3, 80:9, 93:6, 109:7
**introduce** [3] - 62:13, 64:4, 111:13
**introduced** [2] - 8:24, 126:19
**invade** [1] - 129:24
**investigate** [3] - 7:11, 24:8, 25:7
**investigated** [1] - 6:22
**investigation** [6] - 7:13, 13:18, 24:10, 25:9, 93:20, 95:8
**Invite** [1] - 35:7
**invite** [1] - 35:7
**invited** [1] - 124:22
**invites** [1] - 35:24
**inviting** [2] - 41:16, 45:16
**involuntary** [1] - 95:9
**involved** [22] - 5:21, 8:9, 9:5, 9:6, 9:11, 10:19, 14:4, 14:10, 17:15, 18:13, 18:14, 20:11, 21:11, 21:21, 65:4, 72:12, 72:15, 97:9, 131:20, 131:23, 133:19
**involvement** [5] - 8:25, 14:7, 18:8, 18:12, 18:22
**involves** [1] - 64:5
**issue** [17] - 6:14, 8:14, 14:19, 15:2, 20:3, 23:19, 25:24, 55:24, 57:22, 60:16, 61:15, 64:4, 64:7, 65:1, 96:2, 103:23, 126:1
**issues** [6] - 5:13, 5:18, 15:6, 22:11, 61:1, 62:4
**IT** [4] - 26:17, 54:10, 118:17
**itself** [2] - 42:11, 43:1

## J

**J.F** [1] - 3:7
**J.O** [4] - 3:9, 48:19, 49:13, 50:8
**January** [2] - 109:6, 124:22
**J▮▮** [20] - 42:7, 42:18, 46:24, 47:14,

48:1, 49:8, 52:21, 53:10, 53:14, 53:16, 53:24, 54:21, 55:6, 55:11, 83:20, 84:8, 84:22, 85:10, 85:13, 85:16
**J▮▮** [3] - 53:9, 53:10, 54:18
**Jenni** [1] - 105:24
**Jersey** [1] - 26:8
**jfahey@ holtzmanvogel. com** [1] - 1:17
**Jim** [2] - 105:6, 105:7
**job** [1] - 23:12
**jog** [1] - 31:13
**join** [3] - 130:13, 130:14
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**JR** [1] - 1:11
**judge** [2] - 60:14, 64:3
**Judge** [11] - 5:6, 33:16, 48:5, 48:14, 62:25, 64:18, 75:4, 75:12, 90:15, 95:23, 109:25
**JUDGE** [1] - 1:12
**June** [1] - 113:12
**juror** [1] - 5:5
**Juror** [1] - 5:8
**JURY** [1] - 1:11
**Jury** [5] - 24:19, 95:3, 96:13, 134:25, 136:6
**jury** [22] - 7:8, 10:11, 11:14, 11:19, 12:2, 12:17, 15:21, 16:15, 23:8, 23:22, 24:3, 25:2, 47:17, 63:21, 71:24, 94:25, 95:20, 111:13, 112:3, 113:5, 120:16
**justice** [1] - 116:3
**juvenile** [1] - 117:3

## K

**K-12** [2] - 128:11, 129:7
**Keefe** [1] - 2:9
**keep** [3] - 33:5, 62:17, 130:15
**keeps** [1] - 36:8
**kelliker@huntonak. com** [1] - 3:3
**Kevin** [1] - 2:25
**kid** [15] - 53:7, 53:8, 53:9, 53:10, 130:12, 130:13, 130:14, 131:23, 131:24,

132:18, 132:20, 132:21, 132:24
**kids** [19] - 115:10, 115:11, 120:22, 125:15, 125:17, 127:13, 130:10, 130:11, 130:23, 130:24, 132:25, 132:13, 132:14, 132:15, 132:16, 132:20, 133:4, 133:5, 133:15
**kind** [5] - 43:13, 67:18, 114:19, 128:11, 130:8
**kindergarten** [4] - 120:21, 129:15, 130:11, 130:21
**kindergartners** [2] - 129:18, 130:17
**kinds** [4] - 14:15, 66:15, 117:25, 126:25
**Kinney** [2] - 3:4, 16:3
**KINNEY** [3] - 3:5, 16:4, 16:13
**kissing** [1] - 100:17
**knowing** [2] - 23:5, 72:18
**knowledge** [1] - 80:25
**known** [3] - 11:4, 11:10, 48:1
**knows** [3] - 11:7, 80:19, 109:13
**K▮▮▮▮** [1] - 110:21
**KURTH** [4] - 2:14, 2:17, 2:21, 3:1

## L

**ladies** [10] - 7:7, 24:3, 24:21, 25:2, 69:1, 94:25, 96:14, 96:16, 134:19, 135:2
**laid** [1] - 17:2
**language** [3] - 8:1, 13:17, 36:12
**largely** [3] - 11:22, 37:21, 116:5
**larger** [1] - 50:21
**last** [13] - 5:11, 20:15, 32:6, 47:16, 48:16, 67:6, 73:18, 102:1, 105:4, 105:11, 106:25, 126:19
**lasted** [2] - 49:3
**late** [1] - 5:23
**latitude** [1] - 80:22
**LAW** [1] - 3:5
**lawyer** [4] - 8:25, 18:1,

18:2, 21:24
**lawyers** [27] - 9:5, 9:6, 9:11, 9:12, 12:18, 14:4, 14:5, 14:10, 14:14, 14:17, 17:15, 17:16, 18:14, 19:11, 19:19, 19:20, 19:21, 19:23, 19:24, 20:11, 20:19, 20:21, 22:22, 23:15, 96:24
**lay** [6] - 38:19, 38:23, 39:3, 56:9, 56:10, 80:19
**leading** [8] - 74:1, 74:23, 77:8, 87:23, 90:11, 93:23, 99:2, 101:22
**learn** [1] - 133:19
**learned** [1] - 121:1
**learning** [1] - 10:16
**least** [7] - 5:21, 8:20, 9:13, 32:24, 39:14, 50:8, 58:23
**leave** [5] - 42:16, 83:4, 85:19, 88:9, 109:11
**leaving** [2] - 36:8, 82:14
**led** [2] - 18:17, 134:4
**left** [9] - 67:2, 67:4, 67:11, 67:12, 83:2, 83:8, 86:10, 101:19, 104:21
**legitimate** [2] - 17:8, 17:10
**less** [1] - 95:23
**lesson** [7] - 121:4, 121:12, 121:13, 130:20, 130:21, 134:10
**lessons** [16] - 118:18, 118:20, 118:22, 120:20, 120:23, 120:24, 120:25, 121:13, 127:9, 127:13, 128:19, 128:20, 129:10, 129:12, 129:21
**letter** [3] - 10:17, 10:18, 12:10
**letters** [1] - 107:9
**level** [6] - 93:18, 118:12, 121:15, 121:16, 130:8, 131:15
**levels** [1] - 129:9
**lewd** [1] - 45:1
**liaison** [1] - 116:25
**license** [1] - 14:16
**lightly** [4] - 91:8, 91:9, 91:13, 93:13

**likely** [1] - 6:21
**limine** [1] - 61:3
**limit** [1] - 10:7
**limited** [4] - 56:1, 56:3, 65:22, 98:10
**limiting** [1] - 56:3
**line** [14] - 14:18, 15:4, 27:11, 28:4, 69:7, 78:10, 81:23, 83:12, 90:5, 93:6, 109:12, 121:24
**lines** [3] - 38:15, 68:1, 91:17
**link** [14] - 18:11, 35:9, 35:15, 36:3, 36:4, 36:6, 102:23, 103:2, 103:15, 103:24, 104:4, 104:9, 104:23
**link's** [1] - 35:20
**links** [3] - 34:15, 36:9, 36:21
**list** [1] - 109:23
**listen** [2] - 25:17, 111:2
**listing** [1] - 122:25
**literally** [1] - 96:2
**live** [1] - 110:6
**lived** [3] - 74:10, 74:13, 74:16
**lives** [1] - 110:5
**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1
**local** [1] - 16:20
**location** [1] - 100:13
**locker** [28] - 41:5, 41:16, 45:17, 74:19, 74:21, 75:1, 75:18, 75:23, 75:25, 76:15, 86:2, 86:6, 86:12, 86:15, 86:18, 87:6, 87:10, 87:13, 87:21, 88:4, 89:24, 101:1, 101:10, 101:11, 110:5, 110:7, 110:9
**log** [1] - 79:7
**logs** [1] - 79:12
**look** [28] - 6:6, 19:9, 28:21, 29:15, 29:16, 29:19, 34:19, 39:17, 40:21, 42:10, 47:7, 50:6, 53:4, 53:18, 54:24, 56:17, 67:25, 68:25, 69:23, 101:3, 106:4, 106:12, 106:23, 108:2, 118:23, 124:11, 132:7
**looked** [5] - 32:5, 72:10, 72:11, 84:25,

B. R. v. F.C.S.B.                                          146

118:3
**looking** [9] - 29:17, 30:25, 79:11, 80:10, 85:15, 86:8, 88:3, 88:22, 99:20
**looks** [4] - 112:12, 121:20, 121:23, 134:20
**Los** [1] - 1:20
**lost** [2] - 43:13, 62:10
**lunch** [1] - 5:7
**Lunch** [1] - 135:5
**luxury** [1] - 12:4

## M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [1] - 134:24
**machine** [2] - 136:5, 136:12
**m▇▇** [1] - 41:11
**M▇▇** [5] - 41:12, 57:1, 57:17, 57:20, 89:6
**mad** [2] - 53:16, 54:22
**major** [1] - 117:19
**man** [3] - 25:16, 62:16, 95:5
**manage** [1] - 96:17
**map** [2] - 100:10, 100:13
**March** [5] - 46:8, 59:22, 69:10, 69:19, 93:3
**mark** [2] - 52:10, 104:18
**Mary** [4] - 4:6, 110:23, 110:25, 111:14
**Mason** [1] - 113:23
**master's** [2] - 113:21, 113:22
**match** [1] - 17:6
**material** [1] - 116:18
**materials** [2] - 127:7, 129:11
**math** [2] - 57:6, 57:7
**matter** [1] - 6:15
**matters** [2] - 5:3, 25:24
**matters......................
............** [1] - 4:16
**McCrory** [1] - 57:5
**mean** [12] - 9:2, 9:24, 23:12, 34:5, 43:9, 44:3, 44:25, 45:10, 45:13, 46:6, 92:3, 101:11
**meaning** [3] - 19:10, 26:25, 40:5
**means** [5] - 11:21,

26:19, 43:24, 66:10, 68:18
**meant** [1] - 46:1
**media** [1] - 21:25
**medical** [1] - 26:3
**meet** [6] - 73:22, 73:24, 74:4, 74:19, 100:5, 134:8
**meeting** [8] - 67:6, 89:16, 99:9, 99:24, 120:9, 124:18, 125:23
**meetings** [3] - 74:7, 114:16, 120:10
**members** [1] - 117:13
**memory** [6] - 8:17, 17:6, 30:2, 30:6, 31:13, 49:16
**mental** [2] - 111:24, 112:5
**message** [20] - 19:1, 21:13, 32:11, 47:2, 75:18, 79:7, 81:19, 82:5, 82:10, 85:22, 85:23, 85:25, 86:1, 86:3, 88:19, 88:22, 89:2, 103:17, 107:7, 108:13
**messaged** [1] - 49:20
**messages** [77] - 6:19, 6:23, 8:15, 8:18, 9:10, 9:24, 10:12, 10:17, 10:25, 11:1, 11:4, 11:9, 11:10, 12:7, 12:15, 12:16, 13:10, 17:6, 17:21, 18:19, 26:24, 27:2, 27:13, 28:19, 28:22, 28:25, 29:12, 30:14, 31:5, 32:1, 32:5, 32:8, 32:9, 32:10, 42:15, 43:6, 43:20, 43:23, 43:24, 44:4, 44:6, 44:9, 44:13, 44:18, 44:23, 45:21, 46:4, 46:13, 47:14, 47:25, 49:8, 49:13, 49:17, 73:19, 73:21, 74:4, 74:9, 75:7, 77:1, 77:6, 77:18, 79:20, 81:5, 84:25, 86:21, 88:9, 91:19, 93:22, 94:4, 98:2, 98:23, 102:11, 107:1, 107:13, 108:23, 109:4
**Messenger** [1] - 82:16
**met** [8] - 18:4, 48:19, 57:20, 84:8, 84:13, 98:25, 100:2, 100:10

**metadata** [4] - 10:21, 20:3, 24:7, 25:6
**Miami** [3] - 2:3, 2:7, 2:11
**mic** [1] - 111:5
**Michael** [1] - 3:4
**MICHAEL** [1] - 3:5
**middle** [13] - 30:23, 55:3, 78:1, 82:7, 82:8, 98:17, 107:25, 108:3, 108:16, 109:10, 114:10, 114:25, 121:2
**Middle** [2] - 74:15, 105:18
**Middleton** [4] - 74:14, 74:16, 99:1, 99:9
**might** [18] - 24:6, 25:5, 61:1, 66:16, 114:8, 114:18, 114:19, 125:23, 131:10, 131:13, 131:14, 131:15, 132:2, 132:3, 132:4, 132:16, 133:23
**Mike's** [1] - 26:8
**million** [1] - 116:21
**mind** [2] - 77:1, 93:17
**mindful** [1] - 134:13
**minor** [3] - 8:19, 8:21, 9:14
**minute** [2] - 30:12, 50:5
**minutes** [4] - 73:14, 82:11, 95:23, 134:17
**MISCELLANY** [1] - 4:15
**mischaracterizes** [2] - 42:8, 42:25
**misconduct** [1] - 61:14
**misstates** [1] - 79:8
**mistake** [1] - 13:13
**mister** [1] - 83:19
**misunderstanding** [2] - 41:20, 56:20
**misuse** [2] - 99:3, 99:12
**mix** [1] - 116:2
**mk@kinneyesq.com** [1] - 3:7
**Moldova** [1] - 113:7
**mom** [8] - 68:18, 68:21, 69:11, 70:5, 81:21, 82:13, 93:9, 93:10
**moment** [10] - 23:23, 29:18, 51:18, 55:19, 85:20, 88:9, 95:5, 98:13, 102:3, 129:2

**Monday** [1] - 97:2
**month** [2] - 85:17, 109:4
**month-and-a-half** [1] - 85:17
**months** [4] - 83:21, 93:5, 109:7, 119:12
**morning** [12] - 5:1, 5:2, 6:15, 7:21, 7:24, 9:21, 24:21, 24:22, 25:22, 25:23, 82:25, 95:1
**most** [5] - 11:7, 11:22, 123:24, 126:23, 129:11
**mother** [1] - 22:3
**motion** [6] - 6:16, 7:2, 7:4, 11:8, 12:21, 20:16
**motions** [1] - 61:3
**mouse** [1] - 102:19
**mouth** [2] - 90:18
**move** [11] - 36:23, 43:5, 61:17, 83:3, 119:3, 125:1, 127:14, 132:20, 132:22, 132:24
**moving** [1] - 47:9
**MR** [300] - 6:13, 7:19, 13:7, 13:16, 15:9, 15:14, 16:2, 16:4, 16:13, 16:18, 17:10, 18:5, 18:7, 20:4, 20:8, 20:13, 21:15, 21:18, 22:7, 22:9, 22:13, 22:24, 23:4, 23:24, 24:17, 25:21, 27:22, 27:24, 28:1, 30:4, 30:5, 30:8, 30:11, 33:16, 33:17, 36:25, 37:4, 37:7, 38:10, 38:14, 38:16, 38:19, 38:24, 39:2, 39:8, 39:18, 39:20, 40:9, 40:12, 40:15, 40:18, 40:20, 40:24, 40:25, 42:8, 42:9, 42:13, 42:25, 43:2, 43:12, 43:15, 45:3, 45:5, 45:7, 45:12, 45:19, 46:18, 46:20, 47:9, 47:12, 48:2, 48:5, 48:11, 48:14, 48:15, 50:4, 50:10, 50:12, 51:1, 51:6, 51:12, 51:13, 51:18, 51:20, 52:2, 52:6, 52:8, 52:10, 52:15, 52:17, 52:18, 52:20, 53:20, 53:23, 54:12,

54:13, 54:25, 55:3, 55:5, 55:14, 55:19, 55:23, 55:25, 56:5, 56:9, 56:12, 56:16, 57:24, 58:1, 58:2, 58:7, 59:25, 60:2, 60:4, 60:8, 60:14, 60:18, 60:24, 61:4, 61:10, 61:19, 62:6, 62:12, 62:23, 62:25, 63:18, 64:3, 64:14, 64:16, 65:7, 65:15, 65:18, 66:3, 66:17, 66:25, 69:4, 69:6, 69:9, 69:18, 69:20, 69:22, 70:3, 71:16, 71:18, 72:22, 72:24, 73:3, 73:5, 73:7, 73:10, 73:14, 73:17, 74:1, 74:3, 74:23, 74:25, 75:4, 75:7, 75:9, 75:10, 75:11, 75:17, 76:3, 76:8, 76:13, 77:8, 77:12, 77:15, 77:16, 77:22, 77:25, 78:6, 78:7, 78:23, 79:3, 79:5, 79:8, 79:10, 80:15, 80:18, 80:23, 81:12, 81:18, 82:1, 82:3, 82:22, 83:10, 83:15, 83:17, 84:3, 84:7, 84:14, 84:16, 85:6, 85:8, 85:19, 85:24, 86:20, 86:22, 87:23, 88:1, 88:8, 88:12, 88:16, 88:18, 88:21, 89:11, 89:14, 89:17, 89:22, 90:1, 90:3, 90:11, 90:15, 90:16, 91:14, 91:16, 91:25, 92:6, 92:9, 92:11, 92:16, 92:20, 92:22, 92:23, 93:14, 93:15, 93:23, 94:3, 94:7, 94:10, 94:14, 94:17, 94:20, 95:12, 95:15, 95:23, 95:25, 96:5, 96:8, 96:10, 97:22, 98:6, 98:8, 98:11, 98:12, 98:15, 99:2, 99:6, 99:10, 99:12, 99:14, 99:18, 99:22, 101:21, 101:24, 102:9, 102:9, 102:17, 102:20, 102:21, 103:1, 103:3, 103:7, 103:9, 103:13, 103:18, 103:23, 103:24, 104:3, 104:6, 104:9,

B. R. v. F. C. S. B.                                                      147

104:12, 104:16, 104:19, 104:21, 104:22, 105:1, 105:2, 105:9, 105:10, 105:12, 105:14, 105:16, 106:5, 106:8, 106:11, 107:15, 107:18, 107:23, 109:16, 109:18, 109:21, 109:25, 110:2, 110:11, 110:14, 110:15, 110:19, 112:24
**MS** [28] - 5:23, 6:1, 6:9, 6:12, 9:20, 110:23, 111:8, 111:10, 112:16, 112:20, 112:23, 113:4, 119:3, 119:5, 119:9, 119:10, 119:13, 119:15, 119:18, 122:8, 122:13, 123:3, 125:1, 125:3, 125:5, 125:8, 134:12, 134:16
**multiple** [4] - 21:20, 44:6, 45:11, 107:9
**must** [4] - 33:22, 41:11, 41:19, 65:5

**N**

**nail** [1] - 84:1
**naked** [12] - 27:17, 28:8, 28:10, 28:23, 29:1, 29:4, 29:9, 29:20, 31:2, 31:6, 31:9, 45:1
**name** [18] - 32:11, 32:15, 32:19, 50:16, 75:23, 102:11, 104:18, 105:3, 105:4, 105:5, 106:13, 108:6, 110:5, 110:7, 110:8, 111:14, 136:16
**named** [2] - 54:17, 118:2
**nasty** [3] - 93:22, 98:2, 98:23
**nature** [2] - 8:16, 13:9
**navigate** [1] - 114:16
**near** [1] - 78:10
**necessarily** [1] - 126:22
**necessary** [2] - 7:1, 8:1
**need** [22] - 5:4, 13:24,

14:1, 14:21, 15:3, 15:6, 15:7, 29:14, 33:14, 60:6, 62:4, 95:22, 97:12, 99:21, 104:1, 114:18, 125:10, 130:22, 132:2, 132:3, 132:4, 134:15
**needed** [4] - 5:24, 15:24, 131:25, 134:6
**needs** [2] - 69:21, 115:7
**negative** [1] - 77:14
**negatively** [2] - 24:8, 25:7
**neglected** [1] - 45:15
**neighborhood** [9] - 74:10, 74:12, 78:10, 82:15, 99:25, 100:5, 100:9, 109:8, 117:2
**never** [12] - 12:24, 33:24, 36:18, 61:21, 63:24, 64:22, 65:9, 65:20, 87:17, 101:19, 103:5
**new** [3] - 46:17, 94:19, 96:2
**next** [14] - 35:25, 87:2, 87:17, 90:13, 97:2, 97:5, 97:10, 99:21, 104:18, 108:2, 108:16, 114:13, 115:14, 131:16
**night** [8] - 5:11, 5:12, 5:15, 5:16, 5:19, 6:4, 6:7, 88:4
**nobody** [1] - 18:2
**nonconsensually** [2] - 61:22, 65:10
**none** [1] - 36:4
**nontraditional** [2] - 116:1, 116:15
**nonverbally** [1] - 132:23
**notation** [1] - 106:25
**note** [9] - 7:17, 16:5, 16:8, 24:15, 58:2, 66:23, 109:21, 120:1, 121:1
**notebook** [1] - 45:20
**noted** [3] - 7:19, 7:20
**notes** [1] - 136:12
**nothing** [10] - 7:13, 7:14, 14:11, 17:18, 24:10, 24:11, 25:10, 25:11, 65:1, 66:7
**notice** [5] - 14:24, 14:25, 57:22, 64:7, 65:1
**notified** [1] - 131:7

**November** [26] - 37:14, 39:10, 43:18, 47:5, 47:19, 47:25, 48:17, 49:7, 49:8, 49:13, 68:15, 75:18, 84:15, 85:2, 85:3, 85:7, 85:9, 86:4, 86:5, 86:9, 86:25, 87:1, 87:22, 88:5, 89:1
**nowhere** [1] - 41:15
**Number** [3] - 4:11, 4:13, 4:14
**number** [12] - 50:14, 74:22, 75:2, 75:19, 75:23, 76:15, 83:5, 83:6, 83:8, 83:23, 116:3, 116:20
**numbers** [3] - 83:11, 101:3, 106:13
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:1

**O**

**o'clock** [10] - 5:12, 5:15, 5:19, 7:24, 79:19, 96:20, 96:21, 134:21, 135:3
**oath** [2] - 25:16, 28:16
**object** [1] - 48:4
**objection** [57] - 9:17, 25:18, 30:4, 30:7, 30:9, 38:16, 38:17, 39:1, 40:15, 40:22, 42:8, 42:25, 43:12, 45:3, 51:20, 51:24, 52:8, 57:24, 58:3, 60:2, 61:6, 62:7, 62:9, 62:13, 66:2, 66:22, 71:16, 72:22, 73:3, 74:1, 74:23, 77:8, 80:15, 87:23, 87:25, 89:11, 89:17, 90:11, 91:14, 91:25, 92:13, 92:21, 93:23, 93:25, 99:2, 99:10, 99:12, 101:21, 104:8, 105:13, 109:22, 109:24, 119:13, 119:14, 125:3, 125:4
**obligation** [5] - 6:6, 7:11, 14:7, 24:8, 25:7
**observe** [2] - 57:10, 112:10
**observed** [3] - 10:5, 10:9, 57:10
**obviously** [4] - 22:16,

63:20, 97:12, 132:2
**occasionally** [1] - 128:5
**occur** [3] - 80:9, 131:10, 131:19
**occurred** [1] - 125:24
**occurring** [1] - 93:3
**October** [4] - 49:4, 49:22, 84:15, 121:3
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 136:1
**offensive** [1] - 63:15
**offer** [4] - 51:2, 51:10, 51:22, 108:13
**offered** [1] - 56:2
**office** [18] - 88:24, 89:4, 115:5, 115:8, 115:22, 115:23, 115:24, 116:11, 116:12, 116:14, 116:15, 116:18, 117:9, 118:4, 118:17, 118:21, 128:20, 129:11
**OFFICE** [1] - 3:5
**officer** [2] - 23:11, 93:21
**offices** [4] - 115:19, 115:21, 115:22, 116:5
**official** [3] - 67:21, 136:5, 136:11
**Official** [3] - 3:12, 136:3, 136:22
**officials** [2] - 87:6, 87:13
**often** [4] - 111:19, 117:12, 121:10, 126:24
**old** [1] - 78:3
**older** [3] - 129:19, 130:22, 130:25
**Olweus** [8] - 127:2, 127:3, 127:12, 127:15, 127:17, 127:25, 132:10, 132:19
**once** [4] - 32:25, 103:13, 103:15, 104:3
**One** [1] - 17:5
**one** [46] - 8:6, 9:7, 18:19, 18:20, 18:23, 20:14, 23:12, 23:14, 25:24, 30:1, 30:20, 41:4, 44:7, 44:8, 44:9, 50:5, 55:7, 57:13, 57:14, 61:17, 65:5, 71:19, 72:15,

72:19, 76:10, 96:1, 96:3, 96:4, 96:6, 96:19, 98:13, 104:10, 104:21, 109:11, 109:25, 112:16, 114:22, 118:19, 120:8, 121:12, 121:13, 130:9, 131:11, 131:21
**one's** [1] - 21:4
**online** [1] - 115:9
**Online** [2] - 26:14, 26:16
**Open** [2] - 66:24, 113:2
**opened** [2] - 39:21, 58:16
**opinion** [4] - 16:20, 16:23, 61:12, 114:18
**opportunity** [8] - 8:11, 8:18, 8:21, 9:13, 9:15, 10:20, 12:18, 23:5
**opposed** [3] - 15:24, 23:19, 121:11
**opposite** [1] - 23:12
**oral** [4] - 44:19, 90:10, 91:3, 100:22
**order** [2] - 11:1, 127:6
**ordered** [1] - 7:2
**organizations** [1] - 122:16
**orient** [1] - 71:24
**origin** [1] - 10:16
**originally** [1] - 132:11
**ought** [1] - 120:13
**ourselves** [1] - 12:5
**outgoing** [1] - 79:15
**outline** [2] - 95:20, 131:6
**outside** [1] - 56:6
**overcame** [3] - 62:16, 62:21, 128:24
**overcome** [1] - 66:1
**overruled** [7] - 57:25, 73:6, 90:14, 92:2, 99:17, 104:8, 109:24
**oversaw** [1] - 115:19
**own** [3] - 17:6, 80:24

**P**

**P.A.H** [1] - 3:6
**p.m** [5] - 82:6, 82:9, 86:16, 95:18, 135:5
**P527** [1] - 37:2
**page** [60] - 28:2, 29:17, 29:18, 29:19, 29:20, 29:22, 29:24,

30:1, 30:23, 31:3, 31:5, 32:6, 32:8, 34:20, 35:25, 47:16, 48:16, 50:18, 52:16, 55:4, 55:17, 62:14, 68:1, 69:6, 69:7, 69:14, 75:10, 76:8, 76:10, 76:12, 77:23, 81:13, 85:22, 86:21, 88:10, 88:16, 92:10, 98:11, 98:12, 98:17, 101:3, 101:5, 102:2, 102:24, 103:20, 104:4, 104:14, 106:25, 108:2, 108:12, 108:16, 109:11, 132:7, 133:17, 133:18

**pages** [9] - 36:2, 51:3, 51:10, 51:21, 52:2, 52:11, 107:19, 136:10

**Panarelli** [7] - 4:6, 110:24, 110:25, 111:11, 111:14, 111:15, 113:5

**pants** [1] - 100:20

**papers** [3] - 8:23, 17:2, 17:13

**parent** [3] - 125:13, 125:25

**parents** [6] - 35:12, 114:16, 114:17, 120:11, 120:14, 124:1

**Park** [1] - 1:19

**part** [15] - 7:3, 7:4, 13:25, 24:2, 49:3, 51:10, 61:20, 70:20, 88:11, 115:12, 116:24, 123:8, 133:2, 133:25, 134:7

**parted** [1] - 70:18

**particular** [8] - 7:16, 24:13, 25:13, 51:10, 51:25, 92:14, 97:14

**particularly** [2] - 5:16, 19:7

**parties** [6] - 5:11, 67:5, 97:9, 97:18, 103:18, 134:6

**Partnership** [1] - 119:23

**parts** [4] - 31:19, 44:11, 51:4, 51:5

**party** [5] - 64:17, 64:20, 66:4, 66:5

**passage** [2] - 81:16, 81:17

**pause** [6] - 23:25,

27:21, 56:15, 66:21, 112:8, 119:2

**PBS** [1] - 123:5

**PC** [1] - 3:9

**PDF** [3] - 11:2, 24:7, 25:6

**PDFs** [1] - 20:3

**pending** [1] - 110:21

**penetrated** [1] - 101:14

**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:1

**people** [15] - 38:6, 39:14, 42:6, 67:15, 67:20, 83:18, 110:10, 111:18, 115:4, 116:25, 128:24, 128:25, 130:2, 132:6

**per** [1] - 129:12

**percent** [2] - 83:23, 128:18

**perfected** [1] - 6:15

**perfectly** [2] - 61:12, 64:25

**perform** [1] - 90:10

**performed** [4] - 44:10, 44:19, 62:16, 100:22

**performing** [2] - 91:3, 92:4

**perhaps** [4] - 9:25, 10:11, 133:7, 134:4

**period** [3] - 39:9, 39:10, 67:1

**periods** [2] - 37:21

**permission** [6] - 84:3, 101:25, 102:2, 102:5, 103:1, 106:8

**permitted** [1] - 64:9

**person** [26] - 32:14, 34:4, 34:6, 36:9, 41:14, 43:7, 57:13, 67:6, 71:21, 72:1, 72:3, 72:16, 72:19, 73:25, 74:5, 74:10, 76:23, 77:19, 81:1, 89:18, 108:3, 108:13, 109:14, 130:9, 132:10

**personal** [2] - 80:24, 118:19

**perspective** [2] - 23:18, 66:1

**perspectives** [1] - 15:12

**pertains** [1] - 125:11

**pertinent** [1] - 24:2

**pervade** [1] - 5:21

**phone** [27] - 42:15, 78:13, 78:16, 78:20,

78:24, 79:7, 79:12, 79:15, 79:16, 79:17, 79:24, 80:2, 80:3, 80:9, 80:12, 80:13, 80:25, 81:1, 81:4, 82:7, 82:8, 82:11, 82:17, 83:5, 83:6, 83:9, 83:11

**photographs** [2] - 36:20, 45:1

**physical** [1] - 72:19

**physically** [1] - 62:16

**pick** [4] - 47:25, 48:17, 80:3, 81:1

**picked** [1] - 80:13

**picking** [1] - 126:23

**picture** [5] - 31:8, 33:1, 33:24, 76:20, 78:1

**pictures** [15] - 27:17, 28:8, 28:11, 28:23, 29:1, 29:5, 29:9, 29:20, 31:6, 31:15, 31:18, 31:22, 32:20, 32:25

**piece** [2] - 11:8, 127:15

**pieces** [3] - 7:16, 24:14, 25:13

**pin** [1] - 117:5

**pitchfork** [1] - 54:8

**PITTLEMAN** [1] - 3:9

**place** [7] - 22:16, 120:20, 123:9, 126:13, 130:6

**plaintiff** [8] - 7:14, 8:24, 10:23, 10:24, 10:25, 24:11, 25:10, 109:2

**Plaintiff** [4] - 1:4, 1:14, 2:1, 4:9

**plaintiff's** [3] - 13:23, 38:10, 75:23

**Plaintiff's** [5] - 6:17, 39:3, 39:22, 52:19, 55:16

**plan** [5] - 112:24, 114:15, 123:19, 123:21, 123:24

**planned** [9] - 70:10, 70:11, 71:3, 71:5, 71:7, 91:20, 91:23, 100:5

**planning** [1] - 73:22

**plans** [1] - 123:13

**PLC** [1] - 3:5

**pleasure** [2] - 31:9, 31:21

**plenty** [1] - 14:23

**PLLC** [1] - 1:15

**plus** [1] - 118:16

**point** [15] - 8:8, 8:23, 13:5, 16:1, 18:3, 18:23, 47:11, 66:14, 67:21, 94:22, 101:23, 107:15, 122:15, 123:14, 130:15

**pointed** [4] - 10:17, 12:17, 14:6, 52:7

**Police** [1] - 92:25

**police** [5] - 93:10, 93:17, 93:21, 95:8, 97:24

**policy** [1] - 114:1

**populated** [2] - 102:19, 102:22

**portrayed** [1] - 8:15

**position** [6] - 114:6, 114:13, 114:20, 115:14, 117:6, 127:22

**positioned** [1] - 114:14

**positive** [10] - 83:23, 121:7, 121:14, 122:18, 122:19, 122:20, 122:21, 123:5, 123:9, 134:7

**positively** [2] - 122:21, 122:22

**possible** [5] - 83:4, 89:23, 111:5

**potential** [1] - 13:10

**potentially** [1] - 11:20

**pounds** [1] - 26:1

**practices** [2] - 118:5, 124:10

**preclude** [1] - 63:18

**precludes** [1] - 63:16

**predecessors** [1] - 12:15

**predicament** [1] - 22:15

**predicate** [1] - 90:13

**prejudicial** [1] - 11:14

**Preliminary** [1] - 4:16

**premise** [3] - 61:17, 61:18, 61:19

**prepare** [1] - 5:20

**prepared** [2] - 124:15, 124:16

**preschool** [1] - 127:11

**present** [2] - 24:19, 96:13

**presentation** [1] - 97:9

**presentations** [4] - 113:7, 113:8, 117:11, 123:22

**presented** [1] - 117:12

**preservation** [1] - 22:4

**pretrial** [2] - 62:2, 64:19

**pretty** [6] - 52:24, 67:19, 69:12, 72:9, 94:22, 95:1

**prevent** [2] - 123:18, 131:18

**prevention** [5] - 115:17, 115:20, 115:25, 116:11, 117:19

**previously** [3] - 26:4, 39:5, 123:7

**primary** [1] - 116:25

**principal** [1] - 131:14

**principals** [2] - 117:12, 131:5

**privacy** [1] - 23:18

**private** [2] - 31:19, 44:11

**probing** [1] - 20:2

**problem** [3] - 5:9, 51:14, 104:7

**proceed** [2] - 111:7, 113:3

**proceeding** [1] - 92:14

**PROCEEDINGS** [1] - 1:11

**proceedings** [9] - 23:25, 27:21, 56:15, 66:21, 95:18, 112:8, 136:6, 136:11, 136:14

**process** [3] - 14:18, 21:11, 21:22

**produce** [1] - 11:1

**produced** [6] - 10:23, 10:24, 11:2, 12:8, 103:14, 106:16

**professional** [3] - 14:16, 24:9, 25:8

**professionals** [1] - 14:12

**proffer** [1] - 103:12

**profile** [1] - 102:14

**program** [8] - 123:9, 123:24, 126:22, 127:12, 127:15, 127:25, 129:7, 133:14

**programs** [9] - 115:25, 116:1, 118:11, 120:20, 123:17, 125:25, 126:3, 126:12, 126:21

**prohibiting** [1] - 121:8

**prohibition** [1] - 123:1

**Project** [5] - 117:21,

B. R. v. F. C. S. B.                      149

118:2, 120:5,
123:19, 124:18
**project** [1] - 124:19
**promiscuity** [1] -
41:24
**pronounced** [1] -
17:25
**pronounces** [1] - 63:2
**propensity** [1] - 64:11
**properly** [1] - 56:5
**propose** [1] - 9:13
**proposed** [6] - 6:25,
7:6, 8:19, 11:17,
11:18, 23:6
**protective** [1] - 117:22
**provide** [4] - 6:5, 11:3,
15:11, 131:23
**provided** [6] - 11:4,
21:12, 21:13, 51:3,
116:4, 120:25
**providing** [2] - 90:13,
111:4
**provision** [1] - 51:25
**psychologist** [2] -
114:12, 116:13
**psychology** [3] -
113:19, 113:22,
115:23
**pubic** [1] - 31:19
**Public** [5] - 112:2,
113:11, 113:16,
114:3, 115:15
**public** [1] - 114:1
**publish** [23] - 37:4,
38:10, 40:10, 53:18,
53:20, 54:25, 55:15,
55:16, 55:18, 58:1,
75:4, 75:12, 76:4,
77:23, 79:1, 84:4,
88:13, 102:1, 102:2,
102:6, 106:8,
119:14, 125:4
**published** [15] - 37:6,
38:13, 39:7, 53:22,
55:2, 58:6, 75:16,
76:7, 79:2, 84:6,
88:15, 102:8,
106:10, 119:17,
125:7
**pull** [6] - 29:14, 78:23,
84:3, 85:21, 86:10,
101:24
**pulled** [3] - 49:13,
57:18, 100:20
**punching** [1] - 15:8
**punish** [1] - 131:23
**purchase** [1] - 127:6
**purpose** [7] - 11:13,
51:14, 56:1, 56:3,
62:3

**purposes** [2] - 13:25,
14:19
**pursuant** [1] - 99:13
**push** [2] - 90:17,
90:19
**pushed** [4] - 90:6,
90:9, 91:9, 100:19
**pusher** [1] - 72:21
**pushing** [2] - 72:13,
91:7
**put** [15] - 5:10, 8:2,
12:21, 13:11, 16:9,
19:11, 20:16, 21:3,
47:10, 58:17, 58:20,
65:12, 82:22, 97:12,
107:9
**putting** [1] - 82:25
**pyramid** [4] - 114:21,
114:22, 114:23,
115:4

## Q

**QUESTION** [3] - 28:7,
28:10, 68:3
**questionable** [1] -
8:16
**questioning** [3] -
26:19, 27:12, 122:12
**questions** [28] - 6:18,
10:21, 11:13, 11:25,
12:23, 14:6, 20:14,
25:17, 28:5, 58:5,
60:6, 64:21, 65:22,
65:23, 68:16, 77:17,
79:11, 94:1, 95:10,
96:3, 105:11,
107:21, 107:24,
109:16, 109:18,
109:19, 109:24,
111:3
**quiet** [2] - 121:21,
132:23
**quite** [5] - 14:3, 14:4,
14:12, 31:15, 53:2

## R

**Rachel** [7] - 74:15,
105:18, 108:10,
110:3, 110:4,
122:10, 123:4
**raised** [3] - 13:23,
15:20, 22:11
**range** [1] - 50:18
**rape** [1] - 68:4
**raped** [2] - 67:13,
67:23
**rbates@hunton.com**
[1] - 2:16

**re** [2] - 39:3, 101:7
**re-ask** [1] - 101:7
**re-lay** [1] - 39:3
**react** [1] - 126:10
**read** [22] - 16:23,
17:17, 25:1, 28:3,
28:19, 29:7, 45:23,
45:24, 69:18, 69:24,
81:19, 88:23, 98:18,
100:3, 101:6,
102:22, 107:7,
109:12, 120:15,
125:10, 128:22
**reading** [2] - 127:24,
128:21
**ready** [5] - 24:24, 97:9,
98:20, 98:21, 112:13
**real** [1] - 77:18
**realized** [1] - 15:24
**really** [8] - 6:8, 42:6,
46:6, 46:7, 54:21,
64:18, 120:5
**realtime** [1] - 136:12
**reason** [7] - 11:5,
11:16, 16:6, 52:6,
68:21, 69:1, 69:11
**reasonable** [4] -
14:25, 20:1, 48:9,
103:11
**reasons** [1] - 103:4
**receive** [1] - 113:18
**received** [9] - 5:10,
15:1, 21:16, 78:13,
80:25, 81:5, 82:11,
121:3
**receiving** [1] - 81:6
**recency** [1] - 23:18
**Recess** [2] - 95:17,
135:5
**recite** [1] - 21:19
**recognize** [5] - 47:13,
56:18, 76:23,
118:25, 126:10
**recollection** [21] -
40:19, 46:24, 47:3,
60:13, 68:1, 68:25,
69:21, 70:4, 80:8,
84:20, 85:11, 86:23,
92:9, 92:18, 94:7,
94:10, 94:11, 94:12,
94:15, 98:9, 99:15
**record** [16] - 7:20, 8:5,
8:7, 9:17, 13:24,
25:25, 26:3, 45:24,
48:8, 56:22, 56:25,
66:15, 66:20, 79:8,
88:23
**recording** [1] - 136:13
**recordkeeping** [1] -
52:11

**records** [12] - 7:8, 8:7,
24:4, 25:3, 64:5,
64:8, 78:20, 78:24,
79:17, 80:14, 81:2,
83:12
**recreation** [1] - 117:3
**Recross** [1] - 4:5
**recross** [2] - 96:2,
109:22
**Recross-**
**examination** [1] - 4:5
**redirect** [1] - 73:12
**Redirect** [1] - 4:5
**REDIRECT** [1] - 73:16
**reduced** [4] - 117:24,
117:25
**refer** [2] - 51:21, 79:9
**referred** [2] - 52:2,
57:5
**referring** [1] - 48:6
**refresh** [14] - 40:18,
47:3, 60:13, 67:25,
68:25, 69:21, 70:4,
85:11, 86:23, 92:9,
92:17, 94:7, 94:12,
98:8
**refreshed** [1] - 94:11
**refreshing** [2] - 94:10,
94:15
**regard** [4] - 16:12,
22:12, 38:25, 95:8
**regarding** [3] - 14:6,
15:2, 21:12
**rehabilitate** [1] - 12:19
**reinforcing** [1] -
125:15
**reiterate** [1] - 14:1
**related** [2] - 21:17,
95:10
**relationship** [2] - 42:2,
53:11
**relevance** [1] - 60:18
**relevant** [1] - 119:6
**remember** [65] - 19:8,
25:17, 25:25, 27:1,
27:17, 27:19, 31:24,
32:1, 32:4, 34:18,
37:8, 38:3, 40:1,
40:2, 40:3, 40:4,
40:7, 40:8, 40:13,
40:17, 40:23, 41:6,
41:7, 41:10, 43:16,
43:20, 44:20, 46:4,
46:7, 46:8, 46:14,
46:22, 46:25, 47:5,
48:24, 49:11, 54:17,
54:23, 59:24, 60:1,
60:11, 67:24, 69:11,
69:16, 69:17, 70:21,
71:11, 71:14, 71:15,

**71:21, 71:23, 82:18,
87:7, 87:10, 87:13,
88:25, 89:21, 93:24,
94:6, 98:4, 101:2,
102:13, 105:19,
116:20, 134:22
**remind** [1] - 10:25
**reminds** [2] - 12:1,
12:17
**repeated** [1] - 73:1
**repeating** [1] - 16:5
**rephrase** [8] - 43:13,
45:7, 74:24, 77:5,
77:10, 89:13, 94:2,
99:7
**report** [2] - 37:10, 71:6
**reported** [11] - 57:12,
57:16, 57:17, 57:18,
58:24, 59:3, 59:5,
59:8, 116:14,
116:15, 136:5
**Reporter** [3] - 3:12,
136:3, 136:22
**REPORTER** [2] -
62:10, 136:1
**Reporter.....................**
**...** [1] - 4:16
**represent** [3] - 50:7,
66:19, 67:5
**representation** [3] -
32:24, 65:15, 65:19
**represented** [2] - 12:6,
18:9
**representing** [1] -
19:4
**represents** [1] - 17:13
**republish** [1] - 81:13
**reputations** [1] -
12:19
**request** [3] - 5:5,
18:24, 19:12
**requested** [1] - 96:19
**requests** [1] - 21:20
**required** [1] - 8:20
**requires** [1] - 128:8
**research** [7] - 11:23,
117:22, 120:10,
123:23, 124:10,
126:21
**research-based** [1] -
126:21
**Resiliency** [5] -
117:21, 118:2,
120:5, 123:19,
124:18
**resiliency** [3] - 118:4,
118:7, 126:9
**resolutions** [1] -
114:17
**resolve** [6] - 15:6,

B. R. v. F. C. S. B.

150

25:19, 60:6, 61:1, 62:4, 122:22

**resource** [4] - 114:14, 114:21, 115:4, 128:4

**resources** [4] - 116:19, 129:9, 129:12, 129:13

**respect** [9] - 11:16, 16:22, 121:7, 121:19, 121:20, 121:23, 122:5, 126:8, 130:22

**respecting** [2] - 130:1, 130:25

**respond** [1] - 126:11

**responding** [2] - 125:17, 129:4

**response** [6] - 6:5, 7:20, 7:24, 40:13, 111:4, 128:9

**responses** [3] - 5:2, 14:25, 24:22

**responsibilities** [2] - 18:3, 126:9

**Responsibilities** [6] - 116:8, 122:24, 126:14, 126:15, 131:6, 131:9

**responsibility** [2] - 117:9, 130:7

**responsible** [2] - 65:5, 115:8

**Reston** [2] - 3:7, 3:10

**restorative** [1] - 116:3

**resumed** [1] - 95:18

**reteaching** [4] - 125:17, 132:4, 134:2, 134:9

**retire** [1] - 113:10

**retirement** [1] - 113:13

**retrieve** [1] - 110:19

**retrieved** [1] - 20:11

**return** [2] - 27:11, 96:12

**returned** [2] - 114:5, 114:11

**review** [3] - 30:13, 98:16, 116:9

**revised** [1] - 23:6

**Rewari** [4] - 2:17, 9:19, 13:8, 16:6

**REWARI** [19] - 5:23, 6:1, 6:9, 6:12, 9:20, 110:23, 111:8, 111:10, 113:4, 119:3, 119:9, 119:10, 119:15, 122:13, 123:3, 125:1, 125:5, 134:12, 134:16

**Rewari**............. [1] - 4:7

**rightfully** [1] - 15:21

**Rights** [6] - 116:8, 122:24, 126:14, 126:15, 131:6, 131:8

**righty** [1] - 97:21

**ring** [1] - 80:5

**ringing** [2] - 78:17, 80:2

**risk** [1] - 117:25

**rkeefe@bsfllp.com** [1] - 2:12

**Robert** [2] - 2:9, 3:6

**robust** [1] - 22:7

**role** [3] - 116:22, 116:24, 117:18

**Romania** [1] - 113:8

**ROSSIE** [1] - 1:11

**RPR** [2] - 3:12, 136:21

**rules** [1] - 51:22

**ruling** [4] - 60:15, 62:2, 64:19, 64:20

**rulings** [3] - 60:22, 60:23, 99:13

**rumors** [2] - 41:24, 42:5

**Ryan** [1] - 2:13

## S

**S.T** [1] - 3:6

**safety** [2] - 115:24, 126:18

**sandwich** [1] - 26:10

**sat** [1] - 37:20

**satisfied** [2] - 16:10, 16:11

**saw** [6] - 71:21, 72:5, 72:7, 78:16, 82:14

**schedule** [4] - 5:6, 95:20, 96:23, 134:13

**scheduled** [1] - 5:7

**schedules** [2] - 97:19, 97:20

**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10

**school** [64] - 37:12, 37:18, 42:5, 45:14, 48:20, 54:15, 56:22, 57:3, 57:22, 58:8, 58:12, 63:8, 63:9, 64:5, 64:8, 67:2, 67:7, 67:15, 67:18, 67:21, 68:3, 68:23, 69:13, 70:6, 70:23, 71:1, 71:7, 79:19, 84:4, 84:20, 85:11, 87:3, 87:5, 87:13, 87:17, 88:3, 113:22,

114:7, 114:9, 114:10, 114:11, 114:24, 114:25, 115:23, 116:1, 118:12, 118:21, 119:24, 120:12, 121:2, 121:14, 121:17, 122:3, 123:5, 123:20, 126:24, 128:21, 129:16, 133:12, 133:21

**School** [2] - 74:16, 105:18

**schools** [30] - 114:17, 114:22, 115:1, 116:13, 117:10, 117:11, 117:14, 118:8, 118:9, 118:10, 120:24, 121:10, 122:9, 122:14, 122:17, 123:15, 123:21, 124:2, 124:3, 124:4, 124:5, 124:7, 124:9, 124:24, 125:13, 126:3, 126:20, 128:13, 128:18

**Schools** [5] - 112:2, 113:11, 113:16, 114:3, 115:15

**science** [1] - 58:10

**scope** [10] - 38:17, 56:6, 58:3, 60:3, 60:25, 61:12, 62:8, 62:10, 101:22, 107:16

**Scott** [1] - 2:20

**screen** [8] - 29:14, 75:13, 75:15, 76:9, 81:12, 82:23, 85:20, 120:16

**se** [1] - 129:12

**SE** [3] - 2:2, 2:6, 2:10

**seat** [1] - 111:2

**seated** [5] - 24:20, 25:15, 95:4, 96:14, 111:1

**Second** [4] - 127:2, 127:9, 127:18, 128:2

**second** [7] - 17:11, 32:6, 65:24, 81:17, 126:6, 126:19, 132:7

**secret** [1] - 17:4

**see** [34] - 8:18, 29:19, 30:2, 30:15, 30:25, 31:3, 35:4, 37:15, 39:22, 41:2, 41:23, 42:17, 55:10, 56:8, 57:1, 57:11, 60:12,

72:1, 76:14, 80:19, 81:21, 82:13, 84:17, 95:16, 102:22, 105:3, 105:5, 117:7, 118:4, 123:13, 135:2

**seeing** [1] - 37:8

**seek** [1] - 6:21

**self** [2] - 31:21, 126:8

**self-pleasure** [1] - 31:21

**self-respect** [1] - 126:8

**send** [18] - 19:1, 20:18, 27:17, 28:10, 29:4, 29:8, 30:24, 31:1, 31:8, 32:20, 33:1, 33:18, 33:22, 36:6, 42:15, 45:1, 82:10, 98:1

**sending** [1] - 28:7

**sends** [5] - 34:15, 35:9, 35:14, 36:3

**sense** [4] - 5:20, 49:16, 85:3, 120:12

**sent** [12] - 8:6, 14:12, 17:21, 20:19, 81:20, 82:5, 93:21, 98:2, 98:22, 107:1, 107:12, 108:22

**September** [7] - 21:21, 37:11, 48:20, 48:23, 84:15, 84:17, 84:19

**series** [4] - 6:18, 47:14, 79:20, 127:9

**serious** [1] - 67:19

**serve** [1] - 62:4

**service** [1] - 117:19

**services** [8] - 114:19, 115:6, 115:10, 115:18, 115:20, 116:11, 117:2, 117:3

**serving** [1] - 117:1

**SESSION** [1] - 1:8

**session** [1] - 135:6

**set** [8] - 11:25, 17:12, 51:3, 101:24, 105:11, 108:23, 114:25, 121:14

**seven** [3] - 48:6, 83:21, 107:21

**several** [4] - 38:6, 43:20, 58:17, 78:13

**sex** [6] - 44:19, 62:16, 90:10, 91:3, 100:22, 101:17

**sexual** [18] - 42:1, 44:3, 44:7, 52:24, 61:14, 62:15, 63:15, 65:4, 65:5, 72:12, 72:15, 72:20, 91:20,

118:22, 121:4, 128:6, 128:8, 128:19

**sexualize** [1] - 130:19

**sexually** [1] - 65:20

**sharing** [1] - 120:13

**sheet** [1] - 120:2

**shop** [1] - 26:10

**short** [2] - 21:18, 95:1

**shorter** [1] - 50:1

**shorthand** [2] - 136:5, 136:12

**SHOVE** [2] - 54:10

**shove** [2] - 90:21, 90:22

**shoved** [2] - 91:5, 91:13

**shoving** [2] - 55:8, 72:13

**show** [13] - 8:8, 9:6, 17:14, 17:15, 27:20, 38:20, 43:20, 44:6, 44:9, 61:13, 80:13, 91:4, 129:14

**showed** [3] - 74:7, 100:10, 100:13

**showing** [3] - 61:23, 62:14, 98:11

**shown** [4] - 25:25, 26:3, 47:2, 117:22

**shows** [1] - 81:2

**shut** [1] - 60:20

**side** [9] - 13:21, 13:23, 21:12, 23:1, 75:21, 86:21, 112:9, 132:18, 135:4

**Side** [1] - 117:21

**sidebar** [7] - 9:22, 10:15, 17:3, 20:22, 20:25, 23:14, 48:12

**sides** [6] - 6:11, 10:6, 22:15, 23:4, 97:19

**sign** [2] - 118:13, 118:14

**simple** [1] - 65:25

**simply** [1] - 44:25

**sit** [1] - 21:24

**situation** [4] - 132:13, 132:24, 133:6, 133:10

**six** [2] - 48:5, 83:21

**size** [1] - 116:17

**Skype** [2] - 108:4, 108:6

**slightly** [1] - 11:17

**Slovenia** [1] - 113:9

**slowly** [1] - 132:25

**slut** [1] - 42:19

**so-called** [1] - 43:10

**social** [5] - 21:25, 115:23, 116:6,

B. R. v. F. C. S. B.

151

116:7, 116:13
**social/emotional** [1] -
116:4
**SOL** [1] - 115:13
**solicited** [1] - 65:20
**someone** [5] - 9:23,
14:13, 32:18, 54:17,
133:7
**sometime** [1] - 85:10
**sometimes** [4] -
41:12, 123:16, 133:9
**somewhere** [1] -
116:20
**Sona** [1] - 2:17
**Sorry** [1] - 35:12
**sorry** [35] - 7:20, 9:2,
30:8, 33:16, 35:3,
39:4, 44:15, 59:2,
59:6, 60:14, 62:25,
65:18, 66:18, 68:8,
69:7, 71:4, 75:10,
76:5, 78:13, 79:23,
80:25, 84:10, 93:20,
98:14, 104:21,
108:19, 108:25,
109:10, 109:20,
114:8, 119:19, 131:3
**sort** [23] - 8:15, 14:15,
20:12, 33:8, 47:21,
91:4, 95:20, 112:11,
114:16, 117:5,
120:1, 120:4,
120:14, 122:25,
124:6, 124:24,
125:15, 127:23,
128:6, 131:9,
131:18, 132:5,
132:10
**sorts** [1] - 103:25
**sound** [3] - 19:22,
49:5, 67:9
**sounds** [2] - 9:21,
22:14
**space** [4] - 118:19,
130:1, 130:22, 131:1
**speaker** [2] - 111:19,
111:21
**speaking** [6] - 47:4,
60:20, 61:6, 93:25,
97:19, 111:4
**speaks** [2] - 42:11,
43:1
**special** [2] - 113:25,
115:6
**specialist** [2] - 114:15,
114:22
**specialists** [1] - 115:5
**specific** [6] - 48:7,
73:24, 90:25, 100:7,
103:11, 125:24

**specifically** [2] - 79:9,
89:9
**speculation** [1] -
72:23
**spelled** [3] - 121:20,
122:2, 122:5
**spend** [1] - 130:17
**spent** [3] - 26:25,
87:2, 87:16
**split** [6] - 75:13, 75:15,
76:9, 81:12, 82:23,
85:20
**spoken** [1] - 112:4
**spot** [2] - 16:12, 71:24
**Square** [1] - 3:13
**square** [3] - 78:1,
130:12, 130:13
**squarely** [1] - 64:12
**srewari@huntonak.**
**com** [1] - 2:19
**stack** [3] - 47:13, 48:7,
50:1
**staff** [2] - 117:13,
126:2
**stamp** [4] - 21:3,
50:13, 52:12, 52:13
**stamping** [1] - 21:5
**stand** [4] - 12:5, 25:1,
64:21, 130:5
**standard** [2] - 115:13,
134:7
**standing** [2] - 9:18,
72:9
**standpoint** [1] - 8:17
**stared** [1] - 37:22
**STARS** [1] - 115:10
**start** [8] - 29:19,
48:17, 48:25, 85:10,
87:24, 96:20, 96:21,
114:2
**started** [15] - 7:23,
11:23, 49:13, 49:18,
49:22, 84:20, 85:1,
85:9, 85:10, 86:11,
117:6, 117:7,
117:18, 121:6,
124:17
**starting** [4] - 21:21,
28:3, 28:4, 125:9
**starts** [3] - 22:25,
49:7, 105:5
**state** [2] - 61:18, 93:17
**State** [4] - 111:20,
111:22, 112:4
**statement** [14] - 13:18,
38:25, 39:9, 39:15,
41:1, 41:3, 41:8,
41:9, 41:15, 42:21,
45:13, 61:13, 95:9
**statements** [1] - 17:6

**States** [3] - 3:13,
130:8
**STATES** [2] - 1:1, 1:12
**station** [1] - 93:8
**stay** [1] - 60:25
**step** [4] - 14:3, 14:4,
110:16, 134:24
**Step** [4] - 127:2,
127:9, 127:18, 128:2
**still** [6] - 21:6, 21:7,
21:8, 25:16, 53:25,
54:2
**stipulated** [1] - 67:6
**stipulation** [2] -
103:25, 104:3
**stood** [2] - 48:2,
128:25
**Stop** [1] - 36:8
**stop** [3] - 30:3, 133:23
**stopped** [5] - 27:7,
43:16, 46:24, 88:5,
97:23
**stories** [1] - 128:22
**story** [2] - 23:1,
128:24
**straight** [1] - 64:1
**strategies** [2] -
126:20, 128:14
**Street** [4] - 1:15, 2:2,
2:6, 2:10
**strictly** [1] - 127:17
**string** [1] - 33:8
**strip** [2] - 108:17,
108:20
**student** [11] - 59:12,
108:10, 112:5,
115:24, 131:11,
132:3, 133:19,
133:25, 134:3,
134:8, 134:10
**students** [22] - 57:12,
58:9, 105:18, 110:3,
110:4, 115:6,
117:23, 118:13,
118:18, 120:11,
121:2, 122:6, 124:1,
126:13, 126:16,
127:10, 129:17,
129:19, 129:20,
131:7, 132:1, 132:12
**Students** [4] - 116:8,
122:24, 126:15,
131:6, 131:8
**stuff** [3] - 22:4, 42:16,
63:5
**subject** [4] - 89:19,
109:17, 110:12,
111:21
**subjectively** [1] - 8:3
**subjects** [1] - 112:5

**subscribed** [1] -
136:15
**subset** [2] - 50:21,
122:11
**substance** [2] -
117:24, 121:12
**subtle** [1] - 19:7
**sufficient** [1] - 131:22
**suggest** [13] - 7:14,
7:15, 8:21, 10:8,
13:20, 14:13, 16:12,
22:11, 24:11, 24:12,
25:10, 25:11, 65:3
**suggested** [3] - 21:10,
22:18, 51:8
**suggesting** [4] -
62:14, 63:14, 66:5,
66:8
**suggestion** [13] -
9:25, 10:2, 10:9,
10:10, 11:12, 14:2,
14:5, 14:8, 63:16,
63:18, 63:20, 63:21,
93:24
**Suite** [7] - 1:16, 1:20,
2:3, 2:7, 2:11, 3:6,
3:10
**summer** [2] - 115:6,
115:10
**super** [1] - 53:16
**supervisor** [1] - 115:4
**support** [5] - 122:22,
131:24, 131:25,
132:2, 134:6
**supporters** [1] -
132:23
**supporting** [3] -
132:20, 132:21,
134:3
**supportive** [1] -
132:25
**supports** [2] - 116:4,
134:8
**supposed** [2] - 29:17,
122:25
**suspended** [1] - 38:22
**suspension** [3] -
37:18, 87:3, 87:17
**sustain** [1] - 66:22
**sustained** [14] - 30:10,
38:18, 39:1, 40:22,
45:4, 45:18, 71:17,
77:10, 80:17, 89:25,
91:15, 92:21, 99:4,
101:23
**sweet** [1] - 16:12
**switch** [1] - 134:12
**switching** [1] - 134:15
**sworn** [2] - 28:3,
110:25

**system** [5] - 114:7,
114:16, 115:9,
118:16, 119:24
**systematic** [2] -
125:14, 125:15

---

## T

**T.B** [1] - 3:6
**TABLE** [1] - 4:1
**tape** [1] - 136:13
**target** [2] - 64:12,
131:24
**targeted** [2] - 132:18,
132:22
**taught** [3] - 114:9,
121:16, 125:21
**Taylor** [1] - 105:24
**teach** [1] - 127:10
**teacher** [12] - 57:5,
57:6, 57:10, 57:12,
57:16, 58:25, 59:3,
114:10, 131:13
**teachers** [6] - 115:8,
116:14, 117:13,
126:3, 127:7, 129:2
**teaching** [1] - 125:14,
126:8, 127:13
**team** [2] - 12:11, 12:12
**technical** [1] - 8:16
**technically** [1] - 21:4
**technology** [1] - 104:2
**teens** [1] - 111:24
**tees** [1] - 16:11
**ten** [4] - 95:23, 96:20,
96:21, 134:20
**Tenth** [1] - 3:14
**term** [1] - 132:11
**terminology** [2] -
129:18, 129:19
**terms** [9] - 70:18,
70:20, 116:18,
122:6, 128:11,
128:13, 129:22,
130:4, 130:9
**testified** [9] - 26:18,
26:24, 37:25, 38:21,
46:23, 61:10, 83:20,
84:8, 89:12
**testifies** [1] - 89:18
**testify** [2] - 78:16, 95:8
**testifying** [1] - 68:17
**testimony** [27] - 9:16,
15:23, 15:24, 18:1,
21:17, 27:13, 27:18,
28:3, 28:13, 28:25,
30:12, 47:20, 48:19,

B. R. v. F. C. S. B.

50:7, 62:19, 64:22, 65:11, 66:7, 77:6, 78:12, 80:8, 87:15, 87:21, 90:9, 95:14, 122:9, 136:6

**text** [3] - 21:13, 36:12, 81:5

**THE** [193] - 1:1, 1:11, 3:5, 5:1, 5:3, 5:25, 6:3, 6:10, 6:14, 9:18, 13:5, 13:14, 13:24, 15:10, 16:1, 16:3, 16:7, 16:17, 17:8, 17:24, 18:6, 20:1, 20:5, 20:9, 21:10, 21:16, 22:5, 22:8, 22:10, 22:23, 23:3, 23:17, 24:1, 24:18, 24:20, 24:23, 25:16, 27:25, 30:7, 30:9, 33:14, 33:15, 37:3, 37:5, 38:12, 39:6, 39:19, 40:11, 40:17, 40:22, 42:11, 43:1, 43:13, 45:4, 45:9, 45:10, 45:18, 46:19, 48:3, 48:9, 50:11, 51:8, 51:16, 51:24, 52:4, 52:9, 52:14, 53:21, 55:1, 55:21, 55:24, 56:2, 56:8, 56:10, 56:14, 57:25, 58:4, 60:1, 60:5, 60:17, 60:19, 60:25, 61:8, 61:16, 62:3, 62:22, 62:24, 63:14, 64:15, 65:3, 65:17, 65:25, 66:13, 66:22, 69:1, 69:23, 70:1, 71:17, 72:23, 73:4, 73:6, 73:8, 73:12, 73:15, 74:2, 74:24, 75:6, 75:8, 75:15, 76:6, 77:9, 77:10, 77:14, 79:1, 79:9, 80:17, 80:21, 84:5, 87:24, 88:11, 88:14, 88:17, 89:13, 89:19, 89:21, 89:25, 90:12, 91:15, 92:1, 92:3, 92:8, 92:13, 92:19, 92:21, 93:13, 93:24, 94:8, 94:13, 94:15, 94:18, 94:21, 95:4, 95:13, 95:16, 95:19, 95:24, 96:3, 96:6, 96:9, 96:11, 96:14, 98:7, 98:10, 99:4, 99:5, 99:11, 99:17, 99:20, 101:23, 102:3, 102:7, 103:8,

103:10, 103:22, 103:25, 104:5, 104:8, 105:13, 106:7, 106:9, 107:17, 107:21, 109:17, 109:19, 109:24, 110:12, 110:16, 110:20, 111:2, 112:7, 112:10, 112:18, 112:21, 112:25, 113:3, 119:7, 119:14, 122:11, 122:14, 125:4, 134:14, 134:18, 135:2

**themselves** [1] - 9:4

**thereby** [1] - 65:5

**they've** [3] - 10:17, 10:18, 11:4

**third** [3] - 88:18, 131:2, 131:3

**three** [9] - 37:21, 79:19, 88:24, 89:4, 89:10, 89:15, 107:10, 107:13, 107:24

**three-hour** [1] - 89:15

**throughout** [1] - 121:14

**throw** [1] - 121:25

**thrown** [1] - 10:11

**thumb** [2] - 58:19, 58:20

**Thursday** [2] - 10:9, 97:5

**Tinsley** [1] - 112:7

**Tinychat** [2] - 34:25, 35:5

**title** [1] - 114:20

**today** [4] - 5:7, 46:5, 88:24, 89:5

**together** [3] - 46:22, 112:14, 136:13

**tolerance** [3] - 111:23, 112:5

**tomorrow** [2] - 55:8, 97:2

**TONIA** [1] - 3:12

**Tonia** [2] - 136:3, 136:21

**took** [5] - 14:3, 23:9, 33:11, 71:25, 130:7

**top** [14] - 35:21, 38:14, 80:9, 81:17, 81:19, 88:19, 100:4, 101:4, 102:11, 108:13, 109:12, 112:14, 130:18

**topic** [1] - 46:17

**topics** [4] - 128:23, 134:12, 134:15, 134:16

**TORCHINSKY** [1] - 1:14

**total** [2] - 116:10, 116:12

**totally** [1] - 12:9

**touch** [3] - 61:21, 130:24

**touched** [5] - 59:23, 60:10, 61:21, 65:9

**touching** [2] - 61:15, 129:25

**towards** [2] - 58:21, 58:22

**train** [1] - 127:6

**training** [8] - 115:8, 117:9, 117:11, 117:13, 117:15, 126:2

**TRANSCRIPT** [1] - 1:11

**transcript** [7] - 5:24, 16:23, 17:13, 17:18, 19:9, 92:20, 136:11

**trash** [1] - 122:1

**tread** [1] - 93:13

**treat** [1] - 118:19

**treated** [3] - 121:8, 133:7

**treatment** [1] - 122:6

**tree** [4] - 78:10, 81:23, 90:5, 93:6

**trial** [1] - 6:17

**Trial** [1] - 136:6

**TRIAL** [2] - 1:11, 4:1

**tried** [3] - 62:17, 90:10, 121:10

**trouble** [2] - 38:1, 87:9

**true** [1] - 65:19

**truth** [3] - 45:20, 46:4, 63:4

**try** [7] - 34:9, 56:10, 60:25, 84:1, 96:17, 120:11

**trying** [28] - 5:18, 6:1, 9:5, 15:10, 17:12, 17:13, 17:15, 18:4, 19:6, 19:8, 20:5, 23:11, 33:5, 40:18, 52:5, 62:1, 64:4, 64:9, 64:24, 65:3, 69:2, 80:19, 125:12, 126:7, 131:21, 132:20, 133:12

**Tuesday** [13] - 9:23, 10:10, 10:15, 12:2, 16:19, 37:1, 37:8, 38:18, 73:18, 79:23,

90:5, 97:3, 100:14

**turn** [3] - 41:25, 108:12, 108:16

**turned** [2] - 12:24, 69:2

**TV** [1] - 125:25

**two** [32] - 14:5, 14:9, 19:12, 20:6, 20:9, 20:14, 29:22, 30:16, 30:18, 34:21, 37:21, 39:14, 51:2, 51:10, 52:2, 52:16, 61:17, 61:18, 79:24, 80:9, 83:12, 91:19, 96:1, 96:3, 96:4, 96:6, 107:10, 109:18, 109:19, 109:24, 127:2, 134:16

**two-page** [1] - 52:16

**two-question** [1] - 96:1

**twofold** [1] - 17:5

**type** [6] - 64:12, 64:23, 91:20, 128:15, 128:16, 133:8

**types** [3] - 66:12, 122:4, 126:10

**typically** [1] - 125:12

**U**

**U.S** [3] - 111:20, 111:21, 112:4

**ugh** [1] - 36:16

**Ukraine** [1] - 113:8

**ultimately** [1] - 62:15

**unacceptable** [1] - 131:8

**uncertain** [1] - 90:25

**unclear** [1] - 63:8

**uncomfortable** [5] - 91:1, 91:24, 92:3, 93:19, 133:9

**under** [8] - 10:25, 25:16, 28:16, 64:9, 75:23, 85:23, 123:19, 132:10

**undergraduate** [2] - 113:18, 113:19

**underneath** [1] - 126:12

**understood** [8] - 15:9, 16:24, 38:5, 47:20, 67:12, 95:12, 120:19, 125:19

**undertook** [1] - 117:20

**unfair** [4] - 5:14, 6:3, 7:22, 7:23

**unfairly** [1] - 133:7

**unified** [1] - 128:17

**unify** [2] - 124:6, 124:8

**unit** [1] - 127:19

**united** [1] - 3:13

**UNITED** [2] - 1:1, 1:12

**United** [1] - 130:8

**universal** [3] - 120:19, 120:20, 122:17

**University** [3] - 113:20, 113:23, 114:1

**unnecessary** [1] - 14:21

**untoward** [1] - 10:1

**unusual** [1] - 14:3

**unwanted** [1] - 61:14

**unzoom** [1] - 82:1

**unzoomed** [1] - 83:4

**up** [60] - 7:24, 9:3, 9:18, 14:6, 14:15, 16:11, 17:17, 21:1, 25:24, 27:23, 29:13, 29:14, 30:3, 31:18, 36:25, 38:22, 39:2, 39:4, 39:21, 40:9, 43:6, 46:25, 47:25, 48:2, 48:17, 49:13, 49:18, 53:14, 66:6, 67:20, 68:14, 72:25, 73:22, 73:24, 74:4, 74:7, 77:23, 78:23, 80:3, 80:13, 81:1, 81:2, 83:12, 84:3, 85:19, 85:21, 87:16, 88:9, 95:24, 96:2, 100:10, 101:24, 107:13, 109:11, 121:14, 127:11, 128:25, 132:11

**upload** [1] - 33:12

**upset** [1] - 66:18

**upwards** [1] - 29:3

**user** [20] - 27:14, 28:23, 29:1, 29:4, 29:8, 31:25, 34:11, 43:8, 43:23, 44:2, 44:24, 70:14, 70:16, 74:18, 74:21, 75:1, 75:19, 76:14, 77:18, 107:5

**user's** [1] - 31:19

**uses** [1] - 115:9

**utilize** [2] - 127:6, 127:8

**utilizing** [1] - 123:15

**V**

**VA** [3] - 3:7, 3:10, 3:14

**variety** [6] - 111:18,

B.R. v. F.C.S.B.

117:23, 117:25, 119:22, 123:15, 125:22
**various** [7] - 21:24, 44:3, 118:18, 122:3, 122:4, 122:16, 128:23
**verbally** [1] - 132:23
**version** [5] - 58:16, 58:18, 72:18, 72:25
**versus** [4] - 8:17, 24:7, 25:6, 136:7
**vibrated** [1] - 81:10
**victim** [4] - 61:20, 63:23, 72:21, 73:2
**video** [7] - 34:6, 34:11, 34:22, 36:21, 129:14, 129:16
**view** [1] - 13:21
**violates** [1] - 64:19
**violent** [1] - 53:2
**VIRGINIA** [1] - 1:1
**Virginia** [1] - 136:4
**virtual** [1] - 113:8
**visited** [1] - 87:21
**VOGEL** [1] - 1:14
**voicemail** [1] - 101:20
**voicemails** [1] - 42:16
**volatile** [1] - 10:10
**VOLUME** [1] - 1:8
**voluminous** [1] - 51:9
**voluntary** [1] - 95:9

## W

**wait** [2] - 63:4, 95:5
**walk** [3] - 121:18, 121:21, 130:18
**walked** [1] - 112:21
**walking** [3] - 71:21, 71:22, 72:1
**wall** [3] - 37:22, 55:8, 76:21
**wants** [2] - 16:9, 51:21
**Washington** [6] - 1:16, 2:15, 2:18, 2:22, 3:2, 114:1
**watch** [1] - 133:6
**watched** [1] - 17:4
**watching** [2] - 127:14, 133:1
**ways** [3] - 122:21, 125:22, 126:8
**Wednesday** [5] - 5:16, 5:25, 96:19, 96:22, 97:4
**week** [2] - 88:7, 97:10
**weighed** [1] - 26:1
**weighing** [1] - 22:25
**wellness** [1] - 115:24

**whatsoever** [1] - 65:21
**whereof** [1] - 136:15
**whole** [4] - 19:21, 19:22, 42:22, 126:22
**Wiehle** [1] - 3:9
**willing** [1] - 97:19
**Witness** [5] - 25:15, 91:6, 110:18, 111:1, 135:1
**witness** [21] - 9:1, 9:4, 24:17, 24:25, 46:19, 56:6, 61:10, 63:3, 80:16, 92:7, 92:11, 92:12, 95:22, 96:11, 105:15, 109:17, 109:23, 110:12, 110:25, 132:12, 136:15
**WITNESS** [10] - 33:15, 45:10, 60:1, 70:1, 77:9, 89:21, 92:3, 99:5, 99:11, 122:14
**witness'** [1] - 9:16
**witness's** [1] - 98:8
**witnessed** [1] - 132:1
**WITNESSES** [1] - 4:1
**woke** [1] - 7:24
**word** [9] - 11:24, 15:19, 17:11, 18:24, 37:18, 55:7, 90:6, 90:17, 90:20
**words** [9] - 15:15, 23:6, 65:13, 65:20, 101:14, 107:10, 128:7, 129:24, 130:21
**wordsmith** [1] - 22:19
**workers** [2] - 116:13, 121:25
**workshops** [1] - 126:24
**world** [1] - 130:4
**wrap** [2] - 43:6, 68:14
**write** [1] - 41:9
**writing** [2] - 8:19, 34:5
**wrote** [5] - 15:15, 35:17, 41:3, 45:13, 124:23

## Y

**year** [15] - 37:11, 37:12, 48:20, 59:17, 64:6, 74:16, 78:3, 85:11, 109:5, 114:2, 116:9, 117:5, 126:15, 126:17, 126:19
**yearbook** [3] - 76:4,

77:23, 77:24
**years** [3] - 63:7, 112:2, 113:14
**yesterday** [10] - 5:12, 77:2, 78:8, 78:19, 79:6, 79:11, 79:22, 83:20, 85:1, 102:10
**young** [4] - 25:16, 95:5, 129:22
**younger** [1] - 129:19
**yourself** [7] - 31:10, 38:7, 47:14, 69:24, 69:25, 98:18, 101:6
**Youth** [1] - 119:23
**yup** [1] - 112:25

## Z

**zealous** [1] - 10:6
**zealously** [1] - 10:7
**zipper** [2] - 58:17, 58:20
**Zoll** [1] - 2:1
**Zoom** [1] - 19:11
**zoom** [13] - 76:19, 77:24, 82:1, 83:1, 83:3, 83:6, 84:14, 86:9, 88:19, 102:18, 107:4
**zoomed** [1] - 82:7