1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                           :
                                :
              Plaintiff,        :   Civil Action
                                :   No. 19-917
         v.                     :
                                :
F.C.S.B.,                       :   April 12, 2024
              et al.,           :   10:07 a.m.
                                :
                                :
                                :   VOLUME 18 - A.M. SESSION
Defendants.                     :
                                :
..............................
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES: (Cont.)

2

For the Plaintiff:         **Brittany Zoll, Esq.**
                           BOIES SCHILLER FLEXNER, LLP
                           100 SE 2nd Street
                           Suite 2800
                           Miami, FL 33131
                           610-804-1787
                           Email: Britzoll@gmail.com

                           **Andrew Brenner, Esq.**
                           BOIES SCHILLER FLEXNER, LLP
                           100 SE 2nd Street
                           Suite 2800
                           Miami, FL 33131
                           305-539-8400
                           Email: Abrenner@bsfllp.com

                           **Robert Keefe, Esq.**
                           BOIES SCHILLER FLEXNER, LLP
                           100 SE 2nd Street
                           Suite 2800
                           Miami, FL 33131
                           850-585-3414
                           Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:    **Ryan Bates, Esq.**
                           HUNTON ANDREWS KURTH, LLP
                           2200 Pennsylvania Avenue, NW
                           Washington, DC 20037
                           202-955-1596
                           Email: Rbates@hunton.com

                           **Sona Rewari, Esq.**
                           HUNTON ANDREWS KURTH, LLP
                           2200 Pennsylvania Avenue, NW
                           Washington, DC 20037
                           202-955-1974
                           Email: Srewari@huntonak.com

                           **Scott W. Burton, Esq.**
                           HUNTON ANDREWS KURTH, LLP
                           2200 Pennsylvania Ave NW
                           Washington, DC 20037
                           202-955-1664
                           Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

For Defendant F.C.S.B.:    **Kevin Elliker, Esq.**

3

```
                           HUNTON ANDREWS KURTH, LLP
                           2200 Pennsylvania Avenue, NW
                           Washington, DC 20037
                           804-788-8200
                           Email: Kelliker@huntonak.com

Court Reporter:      MS. TONIA M. HARRIS, RPR
                     United States District Court
                     401 Courthouse Square
                     Tenth Floor
                     Alexandria, VA 22314.
```

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defendants:

Cheryl Weaver

        Cross-examination by Ms. Anderson.............. 13
        Redirect examination by Ms. Rewari............ 17

On behalf of the Defendants:

B████    H████████

        Direct examination by Mr. Bates................ 21
        Cross-examination by Ms. Pedersen.............. 90
        Cross-examination by Mr. Kinney............... 116
        Cross-examination by Mr. Blanchard............ 120

EXHIBITS

On behalf of the Plaintiff:

                                              Admitted

Number 106......................................... 12
Number 252(Bates 2878-2881)........................ 08
Number 286......................................... 08
Number 324......................................... 08
Defendants' Number 177............................. 08

On behalf of the Defendants:

                                              Admitted

Number 105......................................... 67

MISCELLANY

Preliminary matters.................................. 05
Certificate of Court Reporter....................... 123

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

THE COURT:  Good morning.

(Good morning responses.)

THE COURT:  I thought what we would do while we're waiting for the juror who is stuck in traffic to get here is to basically go over a little bit of housekeeping that we need to.  Ms. Barry, as always, has been good to enough to inform the Court of the status of things.  But I'd like to go ahead and maybe get on the record as to what we're doing.

Who's taking the lead on the witnesses today?

MS. REWARI:  Good morning, Your Honor.  Mr. Bates and I are dividing the witnesses today.  I will finish Ms. Cheryl Weaver.  Mr. Bates will then present B█████ H██████ and Mr. F████ T██████.  And then we have Mr. P█ H█████ scheduled after that if, you know -- we think there will be time to do all three today, but I will be taking Mr. H█████.

THE COURT:  Okay.  And Mr. Bates is taking Weaver, H██████, and T██████?

MS. REWARI:  I'm going to finish Ms. Weaver.

THE COURT:  I'm sorry.  Obviously, I'm not going to hold you to this.  It depends on the direct examination.  How long do you all anticipate on cross on these witnesses?

MS. ANDERSON:  So for Ms. Weaver, it should be 15 minutes or less.

THE COURT:  Okay.

Cross - Weaver

────── B.R. v. F.C.S.B. ──────

6

MS. ANDERSON:  The next is H███████.

MS. PEDERSEN:  For Ms. H███████ probably less than 40 minutes, maybe closer to 30.

THE COURT:  Okay.  T███████?

MR. KEEFE:  Around 45 minutes, I think, Your Honor.

THE COURT:  Okay.  And Hudson?

MS. ANDERSON:  Like 45 to an hour depending on --

THE COURT:  Okay.

As you know, we have to try to, as best we can, to accommodate the religious concern here.  And I believe he wants to -- Joanna, is it somewhere between 1:30 and 2:30 is his prayer time?

1:30 is his prayer time.  What we'll try to do is -- and he's been very, very discreet, and he if says he just needs sometime between a time period for his prayer.  And so, we'll obviously accommodate that.  If we get somewhere around 1:15, 1:30, whomever is taking the course of the examination, if you can just give us a heads-up that you're at a good spot, we'll go ahead and let them break for lunch, generally, and we'll let him go do his afternoon prayers.

Okay.  The Court appreciates the fact that there wasn't something in our inbox this morning at 8 o'clock that you all filed at 10:50 last night.  So let's continue to be pointed in that direction.  That would be helpful.

Ms. Tinsley, do we have a juror?  We do not have a

────────── B.R. v. F.C.S.B. ──────────

7

juror.  Did they call you?

       (Discussion off the record.)

       (Recess.)

       (Court proceedings resumed at 10:20 a.m.)

       (Jury present.)

       THE COURT:  You may be seated.  Good morning, ladies and gentlemen.

       (Good morning responses.)

       THE COURT:  Thank you once again for being here, meeting your civic public responsibility.  I have to ask you this question:  Have all of you lived up to the Court's instruction not to discuss the case, any aspect of the case, with anyone, and you've managed to stay away from social and print media to the extent that you can?

       (Discussion off the record.)

       (Witness seated.)

       THE COURT:  I will let you know that we are going to be able to accommodate the circumstance that we're facing midday.  So we'll find a good place to take our break right around then.  Okay?

       Very good.  Ms. Anderson.

       MS. ANDERSON:  Thank you, Your Honor.

              CROSS-EXAMINATION

BY MS. ANDERSON:

Q.   Good morning, Ms. Weaver.

—B.R. v. F.C.S.B.—

8

A.    Good morning.

Q.    I'm Alison Anderson, and I represent B███, the plaintiff in this case.

A.    Okay.

Q.    And we've never spoke before, correct?

A.    Correct.

        MS. ANDERSON:  And actually, before we get into questions, Your Honor, the parties, in order to streamline some of the testimony, have agreed to admit certain exhibits.

        THE COURT:  Yes, ma'am.

        MS. ANDERSON:  And so if I can just read those, and then I'll move to admit them, if that works.

        THE COURT:  Very good.

        MS. ANDERSON:  Plaintiff's Exhibit 252, Bates ending in 2878 through 2881, Plaintiff's Exhibit 286, Plaintiff's Exhibit 324, and Defense Exhibit 177.

        THE COURT:  Concur?

        MS. REWARI:  Yes, Your Honor.

        THE COURT:  Very good.

(Plaintiff's Exhibit Nos. 252, 286, 324, were admitted into evidence.)

(Plaintiff offered Defendants' Exhibit No. 177 was admitted into evidence.)

BY MS. ANDERSON:

Q.    Ms. Weaver?

─────── B. R. v. F. C. S. B. ───────

9

A.   Yes.

Q.   So yesterday, do you remember speaking about a statement that you had written about a conversation that you had had with B█████ mom?

A.   Yes, the meeting, the unscheduled meeting.

Q.   And there was a statement about it.  Do you remember that?

A.   A statement.

Q.   That you were looking at?  That you had written -- a statement that you had written about that meeting, do you remember talking about that yesterday?

A.   Yes.

Q.   Okay.  And do you know that David N. never attended Floris Elementary?

A.   No.

Q.   And that statement, I think you had said you had looked at the date on the statement, December 6th.  Do you remember that?

A.   Yes.

Q.   And you don't really have a recollection, though, of sitting down and writing that statement and exactly when you did, do you?

A.   Yes.  It was following the meeting.

Q.   Okay.  And, in your mind, it was exactly that day?

A.   I believe so.

──────────────── B.R. v. F.C.S.B.────────────────

10

Q.    Okay.  And it couldn't have been in August of 2012 when other of your colleagues were writing similar statements?

A.    Oh, no.  No.

Q.    You talked a little bit about shadowing.  Do you remember that?

A.    Yes.

Q.    And I think you had said that B████ H██████ would discreetly walk behind B████ during periods between change of classes to -- making sure she wasn't being touched or talked to inappropriately.  Do you remember that?

A.    Correct, yes.

Q.    And I think you had testified that that was for a prolonged period of time?

A.    Yes.

Q.    Okay.  And do you remember it starting December 7th?

A.    I don't recall the date that it started.

Q.    Okay.  And do you remember your colleagues putting together a memo for the superintendent's office in February of 2012 when -- after B████ had been pulled out of school?

A.    A memo for the superintendent?

Q.    Uh-huh.

A.    I'm not sure I remember anything like that.

Q.    Okay.  You wouldn't have any reason to doubt that, if in that memo your colleagues had put that B████ was shadowed for several days, that that's incorrect?

B.R. v. F.C.S.B.

11

      MS. REWARI:  Objection.  Calls for speculation.

      THE COURT:  Rephrase.

BY MS. ANDERSON:

Q.  You would agree that your colleagues, when writing that

in 2012 -- was your memory in 2012 of these events better than

it is today?

A.  Of course.  Ha ha ha.  I've been retired for ten years.

Q.  Yeah.  I understand.

      THE COURT:  Let's ask questions.

      Do you have any firsthand knowledge as to how many

days B.R. was shadowed?

      THE WITNESS:  I don't recall the number of days.  I

know it was more than just three.

      THE COURT:  Okay.

BY MS. ANDERSON:

Q.  Okay.  And you were asked a little bit about a letter

that B███ had written to you.  Did you remember that -- in an

email?

A.  Yes.

Q.  And if you can look in your binder at Plaintiff's

Exhibit 106.  And it's going to be PX.

      MS. ANDERSON:  May I approach, Your Honor?

      THE COURT:  You may.

      MS. ANDERSON:  It's going to be behind the DX's.

      THE WITNESS:  Oh, I see it.  I see it.  Thank you.

──────B.R. v. F.C.S.B.──────

12

BY MS. ANDERSON:

Q.    And is that an email regarding B███ including counselors

on that email --

A.    Yes, it is.

Q.    -- FCPS?

A.    Uh-huh.

Q.    And is your name referenced in that email?

A.    It is.

        MS. ANDERSON:  I move to admit Plaintiff's

Exhibit 106.

        THE COURT:  Without objection?

        MS. REWARI:  No objection.

(Plaintiff's Exhibit No. 106 was admitted into evidence.)

BY MS. ANDERSON:

Q.    If we can start on the bottom, page 1, please.

        Okay.  And Ms. Weaver, again, that email is to

B███ H██████ , correct?

A.    It is from B█████.

Q.    From Monique to B█████ H███████, and the date is

January 20, 2012; is that right?

A.    January 22, 2012.

Q.    Okay.  So we're looking, I apologize, at the bottom

email.  You can look at your screen if that's easier.

A.    I keep forgetting that's there.

Q.    No problem.

—— B.R. v. F.C.S.B. ——

13

And so, email to B████ H██████, do you see that?

A.    Oh, yes.

Q.    And it's January 20, 2012?

A.    Yes.

Q.    And it says "B█████" --

And B█████, again, is one of the counselors that you supervised?

A.    Yes.

Q.    And it says, "B█████, B████ is in tears and is heading your way right now."

Do you see that?

A.    Yes.

Q.    And then if we can go to the top email.

And this email is the one, I think, you were looking at first, and that's from B████ H██████; is that right?

A.    Yes.

Q.    And on January 22, 2012; is that correct?

A.    Correct, yes.

Q.    And she writes, "I was out of the building, so Cheryl spoke with her first, and I spoke with her a little later." And so, you spoke with B███ that day, correct?

A.    Evidently.  I don't recall.

Q.    You don't have any memory of that conversation?

A.    No, I don't.

Q.    Did you -- I'm going to guess the answer to this, but

B.R. v. F.C.S.B.

14

just to make sure, do you remember calling Mom that day?

A.    No, I don't.

        MS. ANDERSON:  And if we can pull up what's already

been admitted.  If I may publish, Your Honor?

        THE COURT:  You may.

        MS. ANDERSON:  Exhibit 111.

        (Exhibit published.)

        MS. ANDERSON:  And we'll start at the bottom of

page 1, top of page 2, please.

BY MS. ANDERSON:

Q.    And we went over this a bit yesterday, and, again, you

can look at your screen if that's easier.

        And this is an email from -- it says the R█████

family, right?

A.    Yes.

Q.    But it's signed "B███."  Do you remember that from

yesterday?

A.    Yes.

Q.    And she writes to you and Mr. F██████; is that correct?

A.    Correct.

Q.    And now, at the time at the school -- I think you

explained this, but you were sort of the second in command to

Mr. F██████?

A.    Sort of, yes.

Q.    Because it was -- Mr. F██████'s in charge of the school;

B.R. v. F.C.S.B.

15

is that right?

A.    Yes.

Q.    And then he then had a direct reporting line to you?

A.    When he was away.

Q.    So you would -- so you would step in when he was away and
you would be in charge of the school?

A.    Yes.

Q.    And you received this email, and you weren't surprised.
This wasn't the first time you were hearing about the issues
with B███████; is that right?

A.    Correct.

Q.    And she talks to you about sexual harassment, physical
harassment and name-calling; is that right?

A.    Yes.

Q.    And then if we can go to the middle of page 2, please.

          Oh, no.  Sorry.  Can we go to page 1 middle, please.

          And so, then you forward this email to Mr.
F███████ -- or Mr. F███████ then forwards this email to you;
is that right?

A.    I would assume so, yes.

Q.    And so he says, "Check with P████ to see if a reply is
necessary."

          Do you see that?

A.    Yes.

Q.    And so then you -- the next email on top -- do you see

Redirect - Weaver

B.R. v. F.C.S.B.

16

that?  It looks like then you check with P███; is that right?

A.    Yes.

Q.    And that's Mr. H██████?

A.    Yes.

Q.    Okay.  And you write, "Did you address any of these issues in your meeting?"

A.    Correct.

Q.    And so you are aware there was a meeting already scheduled between Mr. H█████ and B██████ mom for that day?

A.    Yes.

Q.    Okay.  And so, if we can scroll up -- or sorry, go to page 1 top, please.

            And so then, Mr. H██████ -- he responds to you, "We had the parent come in," right?

A.    Uh-huh.

Q.    And then you respond to him, "I knew that, but were these issues addressed that B████ raises"; is that right?

A.    Yes.

Q.    So you're essentially asking him:  So I knew you had a meeting, but did you talk about what's in this email?

A.    Right, exactly.

Q.    And, again, neither you or Mr. F███████, to your knowledge, ever reply to B████ about this email?

A.    No, because I was reassured at the time that all of the different ways in which we addressed bullying was given.  They

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

17

went over that with the parent.

Q.   And that was assured to you by Mr. H████?

A.   I believe so.

MS. ANDERSON:  Okay.  Court's indulgence?

THE COURT:  Yes, ma'am.

MS. ANDERSON:  Okay.  No further questions.

Thank you, Ms. Weaver.

THE COURT:  Mr. Kinney?

MR. KINNEY:  Nothing from me, Your Honor.

THE COURT:  Mr. Blanchard?

MR. BLANCHARD:  No questions, Your Honor.

THE COURT:  Thank you.  Is this witness -- oh.

MS. REWARI:  Sorry, just a few questions on

redirect.

REDIRECT EXAMINATION

BY MS. REWARI:

Q.   Ms. Weaver, if you could just take a look at the letter

that Ms. Anderson just showed you, Plaintiff's Exhibit 111.

A.   Okay.

MS. REWARI:  And, Grady, if you can put that back on

the screen.

BY MS. REWARI:

Q.   If I can direct your attention to the second page of this

email.  I think it has a number 75 at the bottom.

A.   Okay.

B.R. v. F.C.S.B.

18

Q.   Okay.  And if you just look at the bottom paragraph there.

"My proposal is that we educate the students.  I do not think they understand what bullying is and how it hurts?"

Do you see that?

A.   Yes.

Q.   Is that what you were responding to in your email on the first page on January 27, 2012, at the bottom, at 3:32?

I'm going to have Grady put it on the screen.

A.   I'm sorry, could you repeat that?

Q.   Yes.  Grady is going to put the email -- is this -- were you responding to B.R.'s email that students don't understand what bullying is and that we have to educate the students when you asked, "Did she never hear her counselor do the lesson on bullying or hear the AP in the SR&R lessons?"

A.   What I was responding to basically was everything she had put in that letter, most everything, we had already done --

THE COURT:  Ma'am, if you could use a pronoun -- use a proper name or a reference as opposed to she or he or him.

THE WITNESS:  I'm sorry.

THE COURT:  That's okay.

THE WITNESS:  Everything that B.R. had written in her letter, or most everything, we had done, to excess almost.  But I was wondering -- everything that was stated in there -- it was very well written.  But everything that was stated in

─────B. R. v. F.C.S.B.─────

there, I thought, My goodness, wasn't she there for the

bullying lessons that Mrs. H███████ gave in her classes?

Wasn't she there -- I believe there also was an assembly

connected with the positive behavior program.  Did she never

hear the teachers talk about being respectful and responsible

and being ready for things?

          I was -- although the letter was very well written,

I really felt as if we had gone above and beyond to do those

very things that she was talking about, and I couldn't

understand why she had obviously missed them.

BY MS. REWARI:

Q.    In this email where you said, "Hear the AP in the SR&R

lessons" -- is "AP" assistant principals?

A.    Yes, it is.

Q.    And "SR&R" is a Students Rights and Responsibilities?

A.    Correct.

Q.    And so the assistant principals give those lessons?

A.    Yes.  Assistant principals give those and the FLE, or

Family, Life and Education, are given through Health.

Q.    Okay.  And the assembly is different than the SR&R

lesson?

A.    Right.

Q.    And in the email -- in this email, you also say, "B████████

checked to see if she was here the day she did the lesson, and

she was."  So is that -- the "she" in this email, are you

———— B.R. v. F.C.S.B. ————

20

referring to B.R.?

A.    Yes.

Q.    And -- so is attendance taken to see whether students are
there the day these guidance lessons are given?

A.    Yes.

        MS. REWARI:  All right.  Thank you.

        No further questions.

        THE COURT:  Thank you, ma'am.  You may step down.

        Is this witness subject to recall?

        MR. BRENNER:  Not for us.

        MS. REWARI:  Not for us, Your Honor.

        THE COURT:  All right.  Ma'am, you're free to go.
Please do not discuss the case or any aspect of the case with
anyone while the case is pending.

        THE WITNESS:  Do I remain in the courtroom, or do I
leave?

        THE COURT:  You can leave.

        THE WITNESS:  Oh, okay.  Happy Friday.

        (Witness excused.)

        THE COURT:  Next witness.

        MR. BATES:  Your Honor, the defense calls B██████
H██████.

        THE COURT:  B██████ H██████.

(B██████ H██████, Defendants' witness, was sworn.)

        THE COURT:  Ma'am, please listen to the questions of

B.R. v. F.C.S.B.

21

Counsel.  Answer them as best you can.  If you hear an

objection by either the Court or the lawyers, please hesitate

a moment before you answer the question.  Thank you.

(Witness seated.)

DIRECT EXAMINATION

BY MR. BATES:

Q.    Good morning, ma'am.

A.    Good morning.

Q.    I'm Ryan Bates.  I represent Fairfax County School Board.

Can you please tell the jury your name?

A.    I'm B████ H██████.

Q.    Are you currently employed, ma'am?

A.    Not at this time.  I'm retired.

Q.    And where did you retire from?

A.    I retired from Fairfax County Public Schools,

specifically at Rachel Carson Middle School.

Q.    And what year did you retire?

A.    I retired in 2021.

Q.    Let's talk about your background first.  What is your

educational background?

A.    I have a bachelor's degree in English with the option to

teach earned at North Carolina State University at Raleigh and

a master's of educational counseling from National University.

Q.    Before you retired, ma'am, how many years did you spend

in education?  Ballpark.

B.R. v. F.C.S.B.

22

A.    Ballpark, 35.

Q.    Okay.  And what was your first teaching or educational
job out of college?

A.    Out of college, my first teaching job was high school
English teacher in North Carolina.

Q.    North Carolina.

        And at some point did you transition from being a
teacher to a counselor or any different role?

A.    Yes.  I moved to Northern California in '82 -- '82.  And
in Northern California, I was an English teacher at what was
called a junior high school at the time.

Q.    And how many years were you a teacher before you
transitioned into a counselor role?

A.    I'm estimating three plus --

Q.    Just ballpark.

A.    About eight.

Q.    About eight years?

A.    About eight.

Q.    Okay.  And so, ballpark again -- it's not a memory
contest -- when did you become a counselor?  What year would
you say?

A.    At the same junior high in Vallejo, California, I became
a school counselor in -- I believe it was 1992.

Q.    Okay.  And what -- you mentioned that was a junior high
school.  What grades was that?

———B.R. v. F.C.S.B.———

23

A.   That would be 7, 8, and 9.

Q.   How many different school systems did you work for before you came to Fairfax County?

A.   Okay.  North Carolina -- I'm sorry.  I have to count. North Carolina, Northern California, and DuPage County, Illinois.  So three school districts before here.

Q.   And you mentioned in California, did you win any awards while you were in education out in California?

A.   The junior high school that -- where I served, the teachers, the staff had nominated me for teacher of the year for Vallejo City Unified School District.

Q.   Great.  Thank you.

     And what year did you come to Rachel Carson Middle School?

A.   I came in 2001.

Q.   And did you work continuously from 2001 until your retirement in 2021?

A.   I did.

     I think I need to make a correction.  The school year was 2001, but the first few months, I worked at an elementary school in Falls Church with the special education department as an instructional assistant, and then I came to Rachel Carson.

Q.   Okay.  And then that entire 20-year period then after that you stayed at Rachel Carson?

────── B. R. v. F.C.S.B. ──────

A.    Yes, I did.

Q.    Why did you decide to stay at Rachel Carson for 20 years?

A.    It felt like a good fit to me.  I was in an environment
where I looked around and I see all of these educators just
running around and staying after school and just very
supportive of me, being a new person, but I looked at the
leadership, and I felt very welcomed and very supportive --
there was a different principal at the time -- the leadership
and the student services department, Ms. Weaver had just
transitioned to being our director.  And just working with so
many different groups of kids from so many different
background.  I was excited.

Q.    So is it fair to say most of your 35 years in education
has been in middle school?

A.    Yes.

Q.    What do you enjoy most about working with middle
schoolers?

A.    Believe it or not, I love the unpredictability.  It keeps
me on my toes.  And I also have a special interest in that
group of kids because it reminds me of just how hard life is
as we grow up, and they can be cheerful one day and sad the
next.  But they were also very open to the help, and they were
exciting.

        It was just -- it -- I felt that that age group was
pretty tough, pretty hard, and I felt like, with the support I

B.R. v. F.C.S.B.

25

got at the school, I was able to serve them in a good way.

Q.   Okay.  And you mentioned Cheryl Weaver.  Was she your direct supervisor at least until her retirement?

A.   She was.

Q.   And last background question.

Did you win any awards while you were a counselor at Rachel Carson Middle School?

A.   Okay.  So yes, the group student services nominated me for middle school counselor of the year for Fairfax County.  I think that was 2012.  And then I learned in the fall of the following year that I had been awarded that honor of being the county's middle school counselor of the year.

Q.   Great.  Great.

So I know you were at Rachel Carson for 20 years. So to the extent you can, if you can focus your attention on the 2011-2012 school year.

How would you describe Rachel Carson as a school to someone who knew nothing about it?

A.   I would say, first of all, that it's a school.  It's a middle school.  Lots of unpredictability with a lot of students, but it was an environment where I've never seen so much energy with coworkers.  Positive energy and hard work, so I would -- and I've said this to parents as well as students -- is the people here, for the most part, bend over backwards to try to meet the needs of the students and to

B.R. v. F.C.S.B.

26

support their peers.  I'm thinking of myself right now.

So you got that environment, and you got a leader who, first of all, believes in kids based on everything that he said, everything that I saw him do.  And so, I felt that I could say without a doubt to parents, anyone with doubt, students, that if there's ever anything that you need help with, you got a group of people who are willing to support you, so.

Q.   When -- so during that school year were you a lead counselor?

A.   Yes, in that year.  Yes.

Q.   What -- just generally speaking, and we can dive deeper if need be, but maybe generally speaking, how would you describe your responsibilities as a school counselor?

A.   Do you mean -- well, first of all, just as a school counselor?

Q.   Yeah.

A.   Just being able to serve the students, being there to serve and support students in whatever capacity that was needed academic, social, emotional.  Being there for parents, communicating and supporting.  Being there for staff members, and sometimes staff don't understand as a team -- may struggle with not understanding what's going on with this student who's not doing what, but is their thinking, should be done.

So I'm -- I feel like my role was to be there to

advocate and also to educate at times because there may be

information that I know that they don't know.  So coming

together so we can meet the needs of the student.

          That lead part, as far as the lead counselor, I was

in the role of just being the assistant to the director of

student services in whatever capacity she wanted me to be.

That could mean lead meetings, supporting our department

through attending certain meetings, and it also included being

a liaison for certain middle schools and Thomas Jefferson High

School for Science and Technology, being that lead.  So a lot

of --

Q.   So in that 2011-2012 school year, what team were you

assigned to?

A.   I was assigned to the 7th-grade Explorers and 8th-grade

Voyagers.

Q.   Okay.  Let's focus in on the Explorers.

          Was P█████ H███████ the administrator over that --

A.   Yes, he was.

Q.   And the core teachers were who?

A.   Ms. Estrella was the English teacher; Ms. F███████, the

history; Ms. C████ was the math teacher at the time, and

Mr. T████████ was the science teacher as well as the lead for

the team, team leader.

Q.   What, if any, meetings did you have with that team of

teachers and Mr. H███████?

A.   We had weekly meetings.  It was a standard.  There are

two meetings every Tuesday, one for my 8th-grade team, the

7th-grade team we met in the afternoon, the last period of the

day, every Tuesday.

Q.   Can you walk us through what a -- what a typical day

looked like for you as a counselor in the 2011-2012

school year just from the moment that you arrived at school.

A.   Okay.  I usually arrive -- I try to arrive around --

somewhere around 7:15, whenever I got to school.  The day

started sometimes with phone calls because we had a meeting

Mondays, for example -- we had a student services meeting

every Monday, so we had a few minutes to have -- sometimes I

had parent conferences, short meetings, and also checking

emails.

      And then it went right into our duty.  So being out

in the hallway.  Sometimes I had cafeteria duty.  Sometimes I

had hallway duty, so that's the morning.  And the day just

continued throughout until the end of the day with meetings,

being in the classroom.  My typical routine was monitoring my

team area.  Both 7th and 8th grade every day that I was there.

Q.   How much time would you spend in the pod area there?

A.   It would be about ten minutes in the morning.

Q.   What about throughout the day, would you ever go back to

that area throughout the day?

A.   If I'm not in a meeting -- if I'm not in my office or in

a meeting, I'm in the halls, and I'm walking the halls,
starting with Explorers, and then I walked up the steps which
is right above the Explorers, the Voyagers, just kind of walk
around so they can see me, and then I walk back to my office.

Q.   So between the Explorers and Voyagers team, can you
estimate for us how many students you sort of had counseling
responsibilities for?

A.   Okay.  It would be about somewhere between 275 to 290.

Q.   How were students made aware that, Here is Ms. H████████,
the school counselor, she's available to you.  How are
students -- how is that relayed to students?

A.   We started relaying this information to students in
the 6th grade, not that they were expecting them all to
remember, but the counselors would go over to the elementary
schools.  We had a PowerPoint, and my school was Floris, for
example, and I would introduce myself but also in the
PowerPoint show them all of the counselors, giving them the
information on how to communicate with us through -- and we
post the email address, the phone numbers.  That's the first.
And then in the orientation that would be right before Labor
Day, they'd meet their -- meet us again.

        So there are about three or four times, and it ended
with September the introduction -- counselor introduction
where we went into the classrooms.

Q.   Let me stop you there.  Before the first day of school,

——B.R. v. F.C.S.B.——

30

are you saying there are a couple of interactions that they

would be aware of the counselors even before the first day of

school?

A.   Yes.

Q.   Tell me about in that first couple of weeks or month of

school how students are -- you know, assuming they forgot

everything that happened the year before, how they were told

about your services?

A.   So we usually give -- well, I'm still in the hallways,

greeting them, but the official meeting is September, and we

try to do it right before -- right around the back-to-school

night -- that's when parents come in.  So in the English

classes, all day, with the counselor introductions.

        And that's an opportunity for me to introduce myself

but also showing them how they get to see the counselor,

giving them -- showing them -- letting them to know about the

office but also the email address, the phone number, that's

done --

Q.   When you say "counselor introduction," is this some type

of presentation that you're giving?

A.   That's one of the four classroom lessons that we as

counselors present.

Q.   And you said something about the English class.  Are you

presenting this to a -- like a single class?

A.   We usually divide it up.  The introductions were done

───── B.R. v. F.C.S.B. ─────

31

through the English teacher because, for the most part, all of

our students have the same English teacher.  So the

introductions were during --

Q.   In other words, you would go into first period of

English, present to those 25 or 30 kids, and then do the same

thing with the second period; is that right?

A.   Yes, all day.

Q.   What was the purpose of having these small groups?

A.   It is more intimate, and I'm talking with just

about 28 -- sometime -- maybe 25, 25 to 30 students versus my

whole team which could really be really large.  And it's in a

comfortable place.  They're in their English class.  And so I

like the small group.

          MR. BATES:  Your Honor, can I have permission to

publish what was admitted yesterday, Defense Exhibit 258A?

          THE COURT:  You may.

          (Exhibit published.)

BY MR. BATES:

Q.   Go to page 3 on that.  It will be on your screen.  I

don't believe it's in your book.

          MR. BATES:  Grady, if you can zoom in on that

"counseling services" paragraph.

MR. BATES:

Q.   Ms. H█████, you're familiar with the Carson Courier

newsletter?

A.   Yes, I am.

Q.   In that newsletter there was paragraphs every issue about the counseling services?

A.   Yes.

Q.   And is this highlighted line another way that students and parents were informed about your services?

A.   Yes.

Q.   Okay.  You can take that down.

     Was there any type of -- that document mentioned a referral form, but was there any type of a form that a student can fill out if -- you know, if you weren't in the office or if you were on a phone call and they needed to see you, that they would complete that?

A.   Yes.  There's a form.  It was called "Request to See Counselor," which we also shared with the 6th-grade group and the 7th-grade when they got over there.  It's called "Request to See Counselor."

     MR. BATES:  And, Your Honor, if we have permission to publish Defendants' Exhibit 61.  This is the school map.

     THE COURT:  You may.

     (Exhibit published.)

     MR. BATES:  Grady, if you can zoom in, I'll point you.  Maybe to the left a little bit.  You can slide it -- a limit bit more to the left.  Yeah.  That's good.

BY MR. BATES:

Q.   So are you familiar with this map and what we're looking
at?

A.   Yes, yes.

Q.   Where are the counselor offices -- well, just to orient
everybody, where is the main door to the -- can you circle on
the screen where the main door to the school is, being the
front door?

A.   (Witness complied.)  I see the lobby.

Q.   Just do a big circle if you can.  Yeah, that's good.

     And where are the counselor offices located?

     Maybe just draw an arrow.

A.   (Witness complied.)  It's this wing here.  There.

Q.   And can you just maybe put a dot where your office was?

A.   (Witness complied.)  I'm trying to remember when we --
when walking in, this is the registrar, the guidance
assistance.  The "CF" is the -- our student services
conference room.  And so, beside the conference room is the
director of student services, and beside the director of
student services would be my office.

Q.   Would that be the F-111?

A.   It looks like F-111.

Q.   If a student needed help from a counselor and they --
they were in a classroom on the Explorers pod, for example,
would they enter in through the counseling wing right where
the start of that line is?

─B.R. v. F.C.S.B.─

34

A.   They typically would come through the student services entrance.

Q.   Right.  And is that where --

A.   For the most part.

Q.   Is that where the start of your line is, next to 0114?

A.   Yes.  So it was the desk for the registrar student.

Q.   Let's talk about that.  Who was that -- who is the person sitting at that desk right there on 0114?

A.   In 2011-2012, I believe, it was Ms. Lloyd -- was our registrar.

Q.   And was -- where would the request for counselor forms be located?

A.   There's a high -- there's a counter, and the forms would be on the side of the counter.

Q.   Okay.  By the way, if a student -- if I was a student; I wanted to come see Ms. H████, am I allowed to -- if I get a note from my teacher, am I allowed to just walk into the counseling wing?

A.   Yes, they could just come through.  May I -- Ms. Lloyd, but there's also an assistant to Ms. Lloyd, so there are two people in that area, but yes.

Q.   And I -- am I permitted to just say to them or just walk to your office and say, I'd like to see if Ms. H████ is in?

A.   They'd say, I'd like to see if Ms. H████ -- if I'm in and she would say, you know -- like, let's see if she's there,

───────────── B.R. v. F.C.S.B. ─────────────

35

yes.

Q.   Got you.

        MR. BATES:  And if we can pull up the school

pictures, Exhibit 1 -- Defendants' Exhibit 193.  This has

previously been admitted, Judge.

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. BATES:  If we can skip ahead.

BY MR. BATES:

Q.   This is the main entrance of the school?

A.   Yes.

Q.   If we can skip ahead to -- what are we looking at here?

A.   This is our wing, the counselors' wing, where you see the

exit sign.

Q.   And we talked about where the students would enter.

Would they enter from where the person holding the camera is,

or would they enter from the other side?

A.   They would be entering from the other side, all the way

down where --

Q.   Which office was yours?

A.   This is my office.

Q.   And what are those chairs lined along the hallways?  What

are those for?

A.   Where students sit and wait for their counselor if --

sometimes counselors have other students or are in their

B.R. v. F.C.S.B.

36

office with someone else.  So they are -- these are chairs for
the students, for waiting.

Q.   For example, if I came in and said, I've got an
emergency; I need to see Ms. H██████, and they say, Well,
she's in with another student, could I be directed to sit in
one of those chairs and wait for you?

A.   You would -- you could be if you were comfortable doing
that.

Q.   Okay.  We can flip forward.  We can keep going.  You can
keep going.

        Is this -- are we looking at sort of the entrance to
the counseling wing?

A.   Yes, to the left.

Q.   Okay.  And we can flip forward.

        What are we looking at here?  Is this -- explain
what we're looking at here, what this angle is?

A.   This is the entrance to student services.  To the left,
there's a door.  That's the clinic.  And to the right -- it
doesn't show in the picture, but that's where the registrar
and the assistant would be.

Q.   Sort of right to that door that we're looking at?

A.   Yes.

Q.   We can take those pictures down.

        So what type of issues -- just generally speaking,
just give us high level.  What type of issues would students

B.R. v. F.C.S.B.

37

bring to you at Rachel Carson?

A.   Academic, especially, with 7th graders, may be about the

schedules.  Friendships, relationships.  If there are

conflicts, sometimes about conflicts with teachers, we talk

about that.  Conflicts with parents, those kinds of things.

Q.   I'm going to skip my question about Principal F█████████

because I think you've already testified as to him.

        Since Mr. H██████ was the administrator for the

Explorers team, what can you tell us about him as an

administrator?

A.   I saw him as, first of all, very supportive, but he's

also very warm -- my description is very warm.  Attentive to

anything that I would bring to his attention.  Very

supportive.  Really good with following up if -- if -- any

issues that I would bring to him.  So -- pleasant.

Q.   What about the Explorers teachers that year?  You

mentioned Ms. Estrella, Mr. T███████, Mr. F███████, and

Ms. C████.  Those were just the core teachers.

A.   Yes.

Q.   Did you have any concern that any of those individuals

would not take student concerns seriously?

A.   No.  It was quite the opposite.  They would communicate

quite a bit.

Q.   Have you had the occasion in your time as a counselor to

be told of an allegation of or a suspicion of some type of

physical or sexual abuse of being suffered by a student?

A.   During that time?

Q.   Not -- I'm kind of zooming out to as a counselor in general.  Have you ever been faced with an allegation that, for instance, has required you to call child protective services?

A.   Yes, I've called child protective services.

Q.   And so, if you learned of some type of physical or -- if you learned that a student -- if a student reported to you that they had been subjected to physical abuse or sexual abuse, what would you have done?

A.   If it is reported that it is someone in the home, the parent, someone in the home --

        MS. PEDERSEN:  Objection, Your Honor.  Relevance.

        MR. BATES:  Judge, the allegation in this case is sexual assault was reported to her.

        THE COURT:  Overruled.

        MR. BATES:  Thank you.

BY MR. BATES:

Q.   So you were saying if there is an allegation in the home?

A.   If I'm told that something happened in the home with a family member, then my -- the steps that I would take is I, first of all, would report to the principal, the social worker and director of student services -- I have a little form -- that I got some information.  But my next is to call -- and

Case 1:19-cv-00917-RDA-LRV   Document 1057   Filed 08/26/24   Page 39 of 137
PageID# 23163
Direct - B.H.

—B.R. v. F.C.S.B.—

39

then I would call CPS for those.

Q.   And what if -- what did not involve a parent but a
student told you that they were sexually assaulted either at
school or outside of the school by a non-family member, what
would you have done?

A.   I would directly contact my administrator.  That would be
the team administrator at the time.

Q.   What about -- would you contact anybody else other than
the administrator?

A.   I'd start with the administrator.  If it's something
about abuse, I would go to the administrator and the
administrator follows up with the others.

Q.   Got you.

         And you mentioned the counselor -- so shift gears
for a moment and talk about some training.  You mentioned
that -- counselor introduction training that you had did --
done in the English classes every year; is that right?

A.   Yes.

Q.   Was that -- I think you said there's a four-part series
of counselor trainings that were given.  Did I hear that
correctly?

A.   Four -- classroom lessons for?

Q.   Right.

A.   Four presentations each year.

Q.   On different topics?

B.R. v. F.C.S.B.

40

A.   Different topics, yes.

Q.   And the first topic was introducing students to the counseling services?

A.   That was part of it.  I introduced myself, but that gives me an opportunity also to learn about them in a classroom in September.  I didn't want to spend a lot time about who I am. I told them about what I did and how they contact me, differences.  But we talked a lot of transition -- for 7th grade -- to this big school here from elementary.

I always got them to introduce themselves because we, not only had feeder schools coming together, but we had people in the classroom who were new to Fairfax County, new to Virginia, new to the country.  So I wanted them all to look around to see who were people they didn't know before.  So we spent time with that.

Q.   That's Unit No --

A.   That's No. 1.

Q.   What was Lesson No. 2?

A.   Lesson No. 2 is in October, and that's the bullying and sexual harassment.

MR. BATES:  Your Honor, if we can have permission to publish Defendants' Exhibit 267, which was already been admitted?

THE COURT:  You may publish.

(Exhibit published.)

—B.R. v. F.C.S.B.—

BY MR. BATES:

Q.   This training -- was this, like -- the first section, was

this given to just a single class of 25 to 30 children?

A.   In the small -- this was also in the classroom with

the -- my group.  I was there all day.  So I went through

every period.

Q.   Okay.  And so, is it -- were you, then, the counselor --

given that you were over the Explorers team, were you the

counselor, then, that provided this bullying and sexual

harassment training to B████?

A.   Yes.

Q.   Okay.  What are we looking at here in front of us?

A.   It looks like part of the -- a slide on the PowerPoint.

Q.   Was this the PowerPoint presentation that you presented

to the Explorers team that year?

A.   It looks like it.

Q.   Okay.  And just give us a little bit of a background

of -- did you spend the entire period presenting this or --

A.   Yes.

Q.   Okay.  So just give us a high-level kind of overview --

we're not going to go through every single slide, but give us

an overview of how you would present this material to the

students.

A.   I would, first of all, just remind them that I'm back in

September.  I went over the whole -- the lessons for the year,

———B.R. v. F.C.S.B.———

and I told the group that I would be back in October to

talk -- and what we would be talking about.  So just a

reminder.  And let them know that we're going to go through a

PowerPoint which -- PowerPoint itself would be about ten

minutes, but I was there the whole time to engage them, and we

were going to have some question and answers and discussions.

Q.   What do you mean the PowerPoint itself would be ten

minutes?

A.   If I just read the PowerPoint.

Q.   Did you do more than just reading the PowerPoint?

A.   Yes.

Q.   So -- are you saying that if you just read everything

that was on these slides, it would only take about ten

minutes?

A.   It would take about ten minutes.

Q.   But there was some conversation or discussion in between

that?

A.   The entire class period was set aside to discuss, ask

questions.

Q.   Okay.  Was there any reason why this topic was chosen to

be, you know, the very first topic after introducing yourself?

A.   Well, I think it is very timely at the beginning.  We

want this at the very beginning of the school year.  The

students coming together, meeting people they've not been

with, a lot of people in one place, so it's a very important

─────B.R. v. F.C.S.B.─────

43

topic.

          MR. BATES:  Grady, you can skip to the second page.

MR. BATES:

Q.   And do you just go over whether these things are myths or

facts, those statements on that page; is that correct?

A.   That and then we elaborate some.

Q.   And you can skip forward, the definition of "sexual

harassment."  You can skip forward to -- let's go ahead

two pages.  No.  I'm sorry.  On the bottom right, you can go

to page 4.  There we go.

          What are you doing with these slides?

A.   Again, we're going over with definitions.  Stressing that

these are some -- it says here it can be to let them know what

sexual harassment can be, and we're breaking it down between

verbal and nonverbal.  Here are some examples.  And this gives

me an opportunity also to engage them, and they tend to ask

questions or give examples.

Q.   You can skip forward to page 5.

          At the top are those examples of what can be

physical harassment?

A.   Yes.

Q.   And what is this bottom slide?  It looks like there's

just a question there.  What did you do with this slide?

A.   We spent time on talking about what flirting is and what

sexual harassment -- their understanding.  Is there a

─── B.R. v. F.C.S.B. ───

44

difference, and so the students would give me their -- they

would educate me a bit about what they thought flirting was

and sexual harassment.

Q.  So is this an interactive discussion between you and the

students?

A.  Yes.  This is when we were engaged in conversations.

Q.  Okay.  We can turn to page 6.

        Tell me about this bottom slide.

        MR. BATES:  If you can zoom in on that, Grady.

BY MR. BATES:

Q.  What was the purpose of that?

A.  Oh, the reporting.  Very important.  And this is just

part -- again, these are PowerPoint slides.  They only have,

for example, who to tell, teacher, counselor, administrator.

Those were examples of people -- trusted adults we talked

about.

        But I also stop to ask them who are some of the

other?  Who might be some of the other trusted adults?  I'm

just listing -- we listed three.  And then they would tell

me -- give me examples of who -- who else might be added to

this.

Q.  Got you.

        And you can turn to page 7.

        Is this where your presentation on bullying starts?

A.  Yes.

─────B.R. v. F.C.S.B.─────

Q.   You can turn to page 8.

        What are you doing in the -- just generally
speaking, in these slides?

A.   This is going over definition based on what was in the
SR&R on the bullying.

Q.   And I see there's a link there.  Was there some type of
video that was played?

A.   It shows there was a link.  And so, that would mean I
would click on it and share it.

        MR. BATES:  If we can turn to page -- actually,
Grady, well, let's just go to page 1.

BY MR. BATES:

Q.   What are the purpose of these slides?

A.   We're discussing the differences and the different
examples of physical versus verbal.

Q.   Physical versus bullying behavior?

A.   This can be considered physical harassment versus verbal
and the bullying.

Q.   Go to page 10.

        And is this top slide talking about nonverbal forms
of bullying?

A.   Non, yes.

Q.   And did you -- tell me about that last bullet point about
online -- what did you talk about online bullying?

A.   We talked about -- well, in 2011-2012, I remember this --

B.R. v. F.C.S.B.

46

this generated a chuckle from every class I had, because we

were still putting words like "Myspace." So we talked about

the internet, the types of ways to communicate via the

internet. And so, Myspace always generated a little chuckle.

They informed me that they'd moved past that, and so I'd ask

for other examples.

Q.   Got you.

      And at the bottom, is this another video that would

be watched?

A.   That would be another video.

Q.   We can go to page 11.

      And that top slide, is this just more information

about cyberbullying?

A.   Yes.

Q.   And what's that Topic No. 1 under there?

A.   Impersonation.

Q.   What was discussed about that?

A.   Talking about what it is, what it might look like.

Q.   What is --

A.   Pretending to be someone that you're not.

Q.   So in other words, like creating a fake account?

A.   Creating a fake account, we talked about that.

Q.   And page 12. We can -- if we can zoom in on that bottom

slide.

      Can you tell us about what you're relaying in this

B.R. v. F.C.S.B.

47

slide?

A.    This is -- it's a method of trying to help on how we

can -- help them avoid if they feel like they're being

harassed or what have you.  So these are some examples of

ways, like --

Q.    Turn to page 13.  And let's just maybe focus in on that

bottom slide, if we can zoom in on that.

         What are you discussing here?

A.    What to do.  It says, if you see someone being bullied,

these are things that you can do.  But we take a look at each

one and discuss whether this might be a reasonable action, a

comfortable action.  We talk about whether the students would

feel comfortable with -- each one, we'd take them.  And the

first one, especially, is not a comfortable step for many.

Q.    Okay.  Let's just go to page 14.  That top slide, if we

can zoom in on that.

         What is this slide about?

A.    Different communication styles, of just giving some

examples of passive behavior.

Q.    I'm sorry, communication styles of who?

A.    Of the students.  How we relate with one another.

Aggressive versus assertive.  And we left with the third one

being assertive would be ideal, trying to teach them that that

would be ideal.

         MR. BATES:  It looks like -- if we can zoom out and

─────B. R. v. F. C. S. B.─────

48

maybe from the bottom of page 14, Grady, if you can slowly

scroll to page 15 just so B█████ can see these.  16, 17.

BY MR. BATES:

Q.    What were those slides that we were just looking at -- if

you can flip back one more.  Go back one more.  Yeah.

A.    So there were just a few scenarios that would generate a

conversation and we -- based on what was presented, I would

ask the students what they thought, you think this is, yes or

-- and what kind.  Do you think it's bullying based on what's

there, yes or no, and then what kind was it.  And then this

would also generate conversations, and sometimes the students

didn't agree.  Sometimes they wouldn't agree on whether

something was bullying or not.

Q.    So these are essentially hypotheticals?

A.    Yes, these are all hypotheticals.

Q.    Okay.  And let's just go forward one more page.

        Was this last slide just to remind them of what?

A.    Yes.  What we're talking about and how important it is to

be able to -- when we talk about are you either part of the

problem, or you don't want to be a part of the problem.  You

don't want to ignore it.  So we took time to talk about why it

is that students may not come or why -- why they might ignore

it.

Q.    If you can just skip to one page ahead.  It looks like

there's the -- the start of another presentation.  We're not

─────B.R. v. F.C.S.B.─────

49

going to go through this.

What is the third -- what is this other presentation
that's in the packet?

A.   That's the 8th-grade presentation.  So once we finish the
week with the 7th graders, then we'll go and do the same thing
but a different type of slide for my 8th-grade team.

Q.   Is this -- the 8th-grade presentation a little bit
different than the 7th-grade presentation?

A.   It's a little bit different as they're 8th graders and
have gotten the same -- if they are at Carson, they would have
gotten the other one in 7th.

MR. BATES:  Grady, if we can go back to the first
page of this exhibit.

BY MR. BATES:

Q.   Do you see -- if we can highlight the subject line.  This
is -- I'm sorry, the attachment line.  Right.

And it says, "Bullying for 7th-grade classroom 2011
PPT."

Do you see that?

A.   Yes.

Q.   So is it your understanding that the presentation we just
looked at was the 7th-grade presentation for 2011?

A.   Yes.

Q.   And the second one, it was 8th grade?

A.   Yes.

B.R. v. F.C.S.B.

50

Q.   We can take that down.

     Just rather quickly, I think you heard some
testimony on this earlier.  So you're giving the counselor
presentations, but is there also other training given by
assistant principals, others, health teachers, others in the
building about sexual harassment?

A.   Yes.

Q.   So the presentation we just looked at was just your slice
of the training; is that right?

A.   Yes, that's just the counselor's part.

Q.   In your experience, how willing would you say students at
Rachel Carson were, during this time period, to report issues
that they were experiencing?

          MS. PEDERSEN:  Objection, Your Honor.  Speculation.

          THE COURT:  If she knows.

BY MR. BATES:

Q.   Based on your 20 years of working at Rachel Carson, how
willing were students to share --

          THE COURT:  Were students receptive of sharing
information with you?

          THE WITNESS:  Yes.

BY MR. BATES:

Q.   Can you expand on that a little bit?

A.   They would -- first of all, in the classroom lesson, the
first day, that first one, when I introduced myself, we talked

B.R. v. F.C.S.B.

51

about how to communicate, and we also talked about why it is
that sometimes students don't communicate when someone may be
in need.  So they talked about being afraid or being calling a
snitch or being afraid that, if they came to a counselor or
someone else, that that friend, that person who was considered
a friend may not talk to them again.

So we talked about that.  And I made it clear that,
you know, the bottom line here is to try to help and that
there are different ways that they could do it like email,
dropping a note or in the hall.  So they were --

Q.   Did you feel like -- maybe just to direct you a little
bit more.  Do you feel students took advantage of those
methods to bring issues to your attention?

A.   In my experience, yes.

Q.   Thank you.

Let's turn to talk about B.R. in this case.  Tell
the jury the first time that you recall meeting B.R.

A.   The first time I recall meeting B.R. was at Herndon
Community Center with my -- I had my daughter there who was
taking tennis and she -- and B.R. was there as well.

Q.   And how did you meet her?

A.   We were sitting out -- I can't remember the -- the
environment there, but just sitting there, waiting, and her
mother, Ms. R., we struck up a conversation because both kids
were just there.  We were just waiting.  She introduced -- she

B.R. v. F.C.S.B.

52

introduced herself.  I introduced myself.  And the

conversation was about what grade and what school she would be

coming to next, and that's where I learned she was a 6th

grader and would be coming to Rachel Carson in the fall.

Q.   Did you know her older brother?

A.   Yes.

Q.   Did you have him as a counselor?

A.   Yes.

Q.   So you -- he was there as well?

A.   Yes.

Q.   So that's essentially the first time you met his younger

sister?

A.   That's my first memory of her.

Q.   What's your next recollection of anything having to do

with B.R.?

A.   I remember the -- what we call going over -- when we went

over to Floris -- I don't have a clear memory, so I'm going to

pass on that, but the other was the orientation when the

students came over to Carson.  I remember seeing her -- seeing

B.R.

Q.   Did -- before we get there, did you -- were you familiar

with what neighborhood B.R. lived in?

A.   Yes.

Q.   And how did you become familiar with that?

A.   My friend and my daughter's best friend actually resided

B.R. v. F.C.S.B.

53

in the same home before B.R. and the family moved there.

Q.   So exact same home that B.R.'s family moved into, your

friend -- your friend lived in that house?

A.   Yes.

Q.   So had you ever visited Middleton Farms?

A.   Yes.

Q.   Ballpark how many times would you say you've been in

Middleton Farms?

A.   Oh, wow.  Over a dozen times.

Q.   How would you describe the neighborhood, just generally

speaking?

A.   Beautiful, large houses on small lots.  I'd see children

walking up and down in the neighborhood, and I noticed in that

that particular spot a horse pen.  I got to know there were

quite a few people, stay-at-home people, who were home during

the day.

Q.   Based on what you saw from when you visited the

neighborhood, did you ever witness any violence in that

neighborhood?

A.   I did not, no.

Q.   Okay.  So after -- so you meet B.R. at the community

center playing tennis.

         What's the next recollection you have of seeing her

in person?

A.   This would be when the -- that 7th grade -- well, now

B.R. v. F.C.S.B.

54

being 7th grade, coming over to Rachel Carson for the
orientation.

Q.   Okay.  What do you remember about that interaction?

A.   I remember at some point -- I don't know the exact
time -- when the students were leaving the lecture hall -- I
believe it was the lecture hall or the gym -- and they were
walking around the school, and I remember seeing B.R. coming
down the hall close to where I was housed at student services.
She's coming down, and I see -- I see her and greet her.

Q.   How do you greet her?

A.   I can't say her name, but I would say her name, You're
finally here, and we grin.  We smile.  And we hug.

Q.   You what?

A.   We hug.

Q.   Okay.  And do you recall getting some emails from B.R.
before the school year started that year?

A.   I believe there is one about academics, yes.

        MR. BATES:  Your Honor, permission to publish
Defendants' Exhibit 71, which has already been admitted?

        THE COURT:  You may.

        (Exhibit published.)

BY MR. BATES:

Q.   Ms. H▆▆▆▆, did school start in September of that year?

A.   Yes.

Q.   And -- sorry, take it down.  Thank you.

———B.R. v. F.C.S.B.———

55

THE COURT:  Just a second.  Just hold on, Mr. Bates.

MR. BATES:  I'm sorry PX-71.  I apologize for that.

THE COURT:  That's okay.

MR. BATES:  Plaintiff's Exhibit 71.

Can we just confirm it's been admitted?

THE COURTROOM CLERK:  Yes.

MR. BATES:  So Plaintiff's Exhibit 71.

And if we can zoom in on that, please.

BY MR. BATES:

Q.  So you said the school year started in September, Ms.
H██████?

A.  Yes.

Q.  Okay.  And did you -- what is this email we're looking
at?

Let me direct you.  Actually, can you -- when you've
got something on the screen, you drift from the mic.  Could
you move the mic a little closer to the screen.  I think that
will help.

A.  Okay.

Q.  Is this an email you received from B.R. before the school
year that year?

A.  Yes, it looks like.

Q.  So even before the school year started, she had your
email address?

A.  Yes.

56

Q.   And she actually had a personal -- she had her own email

account; is that right?

A.   It looks to be.

Q.   That's separate from the family email account we've seen?

A.   Yes.

Q.   And here she's asking you about placement in chorus?

A.   Yes.

        MR. BATES:  If we can -- you can take that down.  If

you can go to Plaintiff's Exhibit 72, which has been

stipulated to but I do not believe it's been admitted.

        THE COURT:  It's part of the stipulation.  I think

it's all in.

        MR. BATES:  Permission to publish Plaintiff's 72?

        THE COURT:  You may.

        (Exhibit published.)

BY MR. BATES:

Q.   And if you can zoom in on that.

        Is this also an email that you received from B.R. --

A.   Yes.

Q.   -- prior to the start of the school year?

A.   Yes.

Q.   And that's also from her personal email account?

A.   It looks to be.

Q.   And this is asking about her math placement?

A.   Yes.

B.R. v. F.C.S.B.

57

Q.   Okay.  All right.  We can take that down.

        So you mentioned you got these emails?

A.   Yes.

Q.   You saw her in orientation?

A.   Yes.

Q.   You received these emails?

A.   Yes.

Q.   In that year, what's your next recollection of seeing
B.R. or hearing from her in any form?

A.   I'm looking at the date, that date was August 17th, so
the -- the last orientation would have been right before
Labor Day, the Friday -- Friday before Labor Day, and I don't
recall anything offhand.  School starts.  I don't recall.

Q.   Let me ask it this way:  Other than maybe seeing somebody
in the hallway and saying hi to them, do you recall in that
first few months of school her bringing anything to your
attention that -- that -- other than saying, Hello, how are
you, things like that?

A.   No.

Q.   Okay.  Did she ever -- do you ever recall her reaching
out to you and telling you that she was being bothered?

A.   I don't recall the first few months of school being told
that.

Q.   Ever recall in the first few months of school her telling
you that she was being harassed?

B.R. v. F.C.S.B.

58

A.   No, not in the first few months.

Q.   Did she ever tell you that boys were going inside of her?

A.   No.

Q.   Did she ever tell you that boys or anyone had assaulted her in any way?

A.   No.

Q.   What would you have done if she had told you she was either being assaulted or boys were going inside of her?

A.   I would have expressed concern to her.  I would have checked, first of all, before going to the administrator, have a little conversation to see how -- what the temperature -- how she was feeling at the time.  And I would have directly notified the administrator about what my student just informed me of.

Q.   By the way, when I was asking you about her coming to you with substantive issues I'm -- I was sort of -- did you understand that to mean excluding, like, Hey I want to change my Spanish class, or things like that?

A.   No, I didn't at the time.

Q.   Did she come to you maybe about -- do you recall her either coming to you in person or email or maybe using a request for a counselor form to talk about academic issues?

A.   There was one about drama.  So, yes, she knew the request form.

          MR. BATES:  Yeah, let's do that.  If we can pull up

—————B. R. v. F.C.S.B.—————

59

Defendants' Exhibit 76.  This has been admitted, so permission

to publish?

          THE COURT:  You may.

          (Exhibit published.)

BY MR. BATES:

Q.   If we can zoom in on this.

          And is this an email that you received from B.R.'s

mother?

A.   Yes.

Q.   Okay.  And is this a request to transfer out of Spanish

class?

A.   Yes, it looks to be.  It was, actually, I think called

introduction to foreign language, but yes.

Q.   And this is about a month into the school year?

A.   Yes, it would be.

Q.   And this is marked high importance?

A.   Yes.

Q.   Do you see anything in this email reporting to you that

B.R. had been sexually harassed in any way?

A.   No.

Q.   Or sexually assaulted or touched in any way?

A.   No.

Q.   So you can take this down.

          So outside of academic issues, do you ever recall

B.R. telling you -- do you ever tell B.R. you were too busy to

B.R. v. F.C.S.B.

60

see her?

A.   No.

Q.   Do you recall any emails from her, other than the ones
that we've looked at, raising any issues about her being hurt
in any way?

A.   No.

Q.   Okay.  So what is, then, the next -- what's the first
time, I should say, that you -- anything was ever brought to
your attention that she was having any issues with any other
students?

A.   There was one time, and I believe it was that November
time where the parents, both parents, mother and father, and
B.R. were in my office.  I believe it was in November.

Q.   Was this this November 21st meeting that we've -- that
there's been testimony on?

A.   Yes, I believe so.

Q.   So before that, was that the first time, then, actually,
that you had heard that there were any issues with regard to
B.R.?

A.   That's the first that I can recall, yes.

Q.   What do you -- I know it was a long time ago, so just to
the best of your recollection, what do you recall the issues
that were verbally raised to you at that -- well, let me
actually back up a moment.

          During the time when the parents came in, were you

B.R. v. F.C.S.B.

61

involved in every single conversation with the parents that

day?

A.   No.

Q.   Okay.  Were you involved in some of those conversations?

A.   Yes.

Q.   So in some of those conversations, what do you recall?

A.   I recall the first -- the -- the mother and father and

the -- and B.R. in my office, and there was a -- there was a

comment that Ms. -- Ms. R. made about a phone message, a voice

message, that she was concerned about, and there was a

discussion about a pumpkin patch.  This is something, however,

that I -- that was discussed when Ms. T█████ and Mr. H█████

came.  But that's the first one.

Q.   Okay.  Do you recall any discussion -- oh, I'm sorry, did

I cut you off?

A.   No.

Q.   Do you recall anything else in -- any conversations that

you were a part of on that first day other than what you just

testified to?

A.   Just the voicemail that she was trying to retrieve and

the concern about a rumor -- I'm sorry -- rumors being spread.

Ms. R. said there are rumors being spread about her daughter

around the school.  They are all lies, and she said they are

talking about something that happened the weekend of the

pumpkin patch, and nothing happened.  That's what I recall.

B.R. v. F.C.S.B.

62

Q.   And you mentioned the voicemail.  Did Ms. R. tell you

what was on the voicemail?

A.   No.

Q.   Did she tell any of the administrators or other staff

members, to your knowledge, in your presence, what was on that

voicemail?

A.   In my presence, no, she said she couldn't retrieve it.

Ms. T████ asked for the subject or what was it about, and she

did not recall or she did not tell us.

Q.   Okay.  So you being B.R.'s counselor -- and this is,

what, two months into the school year?

A.   Yes.

Q.   So what was your reaction to hearing of these issues for

the first time?

A.   I was confused.  I was confused, surprised, I --

Q.   Why is that?

A.   I had been around in the classroom, actually been in the

halls.  I was just unaware of any of this.  So it was

confusion.

Q.   Okay.  Were you involved in -- in of the investigation of

the issues that were raised by B.R. or her family on that day?

A.   Involved?  Other than being present to hearing

information, no, I was not.

Q.   So in other words, you didn't interview any students?

A.   I did not, no.

─────── B.R. v. F.C.S.B. ───────

63

Q.   Who did that?

A.   That would be the administrators.

Q.   And is it typical for counselors not to be involved in
conducting potential disciplinary -- investigating
disciplinary matters?

A.   It is absolutely typical -- it is actually required -- we
do not investigate.

Q.   Thank you for clarifying that.

So given that, we'll set aside the investigation,
but were you involved in anything after the investigation with
regard to steps that were put in place to help B.R. feel safe
at school?

A.   Yes.

Q.   What was your involvement in that?

A.   In addition to what I already did, which was walk the
halls, I was shadowing -- I was asked to shadow B.R. from
class to class.

Q.   Tell us what that means when you say you were "shadowing"
her?

A.   I would meet B.R. at the one class from the beginning of
the day, that is, from the beginning of the day until the end,
all of the classes.  I would walk alongside, but not side by
side.  Maybe -- I would think two students could get between
us, so I would just kind of walk discreetly a little bit
behind and just follow her from class to class.  Got her to

B.R. v. F.C.S.B.

64

the class.  Once she got in the classroom, then I would leave.
And I would do the same thing each period.

Q.   What was your reason for giving space between the two of
you?

A.   I wanted -- I first of all, didn't want her to feel
uncomfortable with me being right up -- right next to her, and
I had explained that I'm not going to walk right beside you,
but I'd be there.  I just wanted to give that space.

Q.   Okay.  And did you -- were there times where you were in
other meetings that you -- that you left to go do this?

A.   Yes, that happened regularly.  I just leave five
minutes -- I would leave my department meeting.  I'd leave
whatever meeting I had to get to B.R.'s class before the class
ended.

Q.   Are these meetings that were still continuing?  You would
just get up and leave?

A.   Yes.  They were scheduled and continued, but I had to
excuse myself and to go.

Q.   These times that you were shadowing her -- well, yeah, in
the times that you were shadowing her, did you ever see
anything?  Did you ever see her being bothered or being
harassed, any name-calling, anything?

A.   No.

Q.   Other than you, was anybody else keeping a close eye on
her during this time?

B.R. v. F.C.S.B.

65

A.    In addition to my support, I know that Ms. F_____ had

a couple of periods for a couple of days.

Q.    Anyone else?

A.    The SRO was also involved in shadowing.

Q.    Okay.  What's your understanding of what he was doing?

A.    I'm not clear.  I knew at the beginning of the day he was

there just walking the -- keeping an eye on -- walking the

areas and looking for any signs of concern.

Q.    Was he informed of this situation with regard to the

claims she had made?

A.    I'm not sure when.  At some point, I'm guessing he did.

Q.    I guess my question is, after these claims were made, was

he doing this more often in the Explorers pod than he had been

doing like the first month of school?

A.    I would say yes.

Q.    Got you.

         So during that shadowing, you said you didn't see

anything out of place?

A.    No, I did not see anything.

Q.    And was the purpose of the shadowing to continue for the

rest of the school year?

A.    It was not my understanding that it would be the rest of

the school year.

         MR. BATES:  If we can take a look at -- if we can

publish Defendants' Exhibit 88, which has already been

Case 1:19-cv-00917-RDA-LRV    Document 1057    Filed 08/26/24    Page 66 of 137
PageID# 23190
Direct - B.H.

B.R. v. F.C.S.B.

66

admitted.  Permission to publish?

             THE COURT:  You may.

             (Exhibit published.)

BY MR. BATES:

Q.    If we can zoom in on that bottom email.

             Is this an email from plaintiff's mother to you and

two administrators?

A.    Yes.

Q.    On December 1st, 2011?

A.    Yes.

Q.    And that first sentence, did plaintiff's mother tell you

that "B███████ appears to be doing much better this week"?

A.    Yes.

Q.    And we can take that down.  Let's just go

chronologically.  If we can pull up Defendants' -- I would

like Defendants' Exhibit 105.  I think we have a stipulation

to the admission of that.

             THE COURT:  Is 105 in?

             MR. BATES:  It's not been admitted yet, Your Honor.

             THE COURT:  Any objection?

             MR. BATES:  It's been stipulated to, so permission

to publish?

             THE COURT:  Yes, sir.

             MR. BATES:  I'm sorry.  One moment.

             (Counsel confers.)

            THE COURT:  Is there a stipulation?

            MR. BATES:  One moment, Your Honor.

            (Counsel confers.)

            MR. BATES:  Yes, Your Honor.  I move to admit

Defendants' Exhibit 105.  My understanding is there is no

objection.

            THE COURT:  By stipulation?

            MS. PEDERSEN:  No objection.

            THE COURT:  Very good.

(Defendants' Exhibit No. 105 was admitted into evidence.)

            MR. BATES:  May I publish, please?

            THE COURT:  You may publish.

            (Exhibit published.)

BY MR. BATES:

Q.   This email is four days after the email we just looked

at; is that correct?

A.   Yes.

            MR. BATES:  Grady, if we can zoom in on the top

two-thirds of this email.

BY MR. BATES:

Q.   Is this an email from you to plaintiff's mother?

A.   Yes.

Q.   Okay.  And what were you doing in this email?

A.   I'm following up from a request from the parent regarding

a therapist.

B.R. v. F.C.S.B.

68

Q.   Did she ask you for referrals for therapists?

A.   It would have been under a list of -- yes, she asked me
for referrals.

Q.   That's what you were doing?  You were providing this to
plaintiff's mother?

A.   Yes.

         MR. BATES:  Okay.  You can take that down.  If we
can publish Defendants' Exhibit 140, which has already been
admitted, Your Honor.

         THE COURT:  You may publish.

         (Exhibit published.)

BY MR. BATES:

Q.   If you can zoom in on the top email there.

         And is this an email that you received four days
after the previous email from plaintiff's mother?

A.   Yes.

Q.   And in this email does she tell you that B.R. had --
yesterday had a great day at school?

A.   Yes.

Q.   Okay.  And what did she attribute the great day to?

A.   To the guidance and hallway shadowing provided by
Ms. F███████ and myself.

Q.   Okay.  In this email does plaintiff's mother ask you to
continue the shadowing until a certain day?

A.   Yes.

————————B.R. v. F.C.S.B.————————

69

Q.   And when did she ask you to continue it until?

A.   It would be through the early part of next week to

ensure --

Q.   Okay.

A.   Okay.

Q.   Okay.  And you had received this email on a Friday?

A.   Yes.

Q.   So was it your understanding that, essentially, mom had

asked this to continue until maybe Tuesday or Wednesday of

next week?

        MS. PEDERSEN:  Objection, leading.

        THE COURT:  Sustained.  It's leading.  Is it your

understanding.

        MR. BATES:  Okay.  We can take that down.

        If we can publish Defendants' Exhibit 141, which has

already been admitted, Your Honor?

        THE COURT:  You may.

        (Exhibit published.)

BY MR. BATES:

Q.   If we can zoom in on the note.

        Actually, I'm sorry, before we zoom in, do you see

the date there at the top right?

A.   Yes.

Q.   What is that date?

A.   December 21, 2011.

————————Tonia M. Harris OCR-USDC/EDVA 703-646-1438————————

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

70

Q.   So this would be probably about two weeks after the last
email that we just looked at?

A.   Yes.

Q.   If we can zoom in on this note.

        So what is this -- what are we looking at?

A.   This is a note that was left for me from B.R.

Q.   Is this a -- do you remember where she left this note for
you?

A.   It would have been in my box.

Q.   Did she know where your box was?

A.   Yes.

Q.   Is this the same box where you would put request for
counselor forms?

A.   Yes.

Q.   And where is your box, by the way?

A.   In 2011 and '12, we had a little -- I don't know what you
call them -- little folders with our names acrylic type.  So
there was one by my office.

Q.   So did students have access to the area to your box at
any time?

A.   Yes.  Yes.

Q.   Okay.  And is B.R. telling you in this message that
you -- thanking you for solving her problems?

A.   Yes.

Q.   Based on what you received, based on the receipt of this

B.R. v. F.C.S.B.

71

note, do you believe that -- at this time that you received

this note to B.R.'s problems that had been brought up the

month before or a couple weeks before had been solved?

A.   That is what I believed.

Q.   Okay.  We can take that document down.

          So we looked at that note in late December.  Was --

did you hear anything from B.R. in -- winter break is late

December through early January; is that right?

A.   That's when -- yes, that's when the break is.

Q.   This first couple weeks of school, did you hear anything

from B.R.?  Any problems brought to your attention?

A.   I don't recall any problems being brought to my

attention, no.

Q.   Do you recall an incident in late January that she

brought to your attention with regard to a student calling her

a name?

A.   Yes.

Q.   And what do you recall about that?

A.   She was in my office and said that someone had -- I don't

know the exact -- but she mentioned the word -- being called a

lesbian, I believe.

Q.   Do you know the name of the student that she alleged to

have done that?

A.   I don't remember.

Q.   Okay.

—B.R. v. F.C.S.B.—

72

MR. BATES:  Your Honor, permission to approach the

witness to refresh her recollection.

THE COURT:  Yes, sir.

Ma'am, take a look at this document.  Read it to

yourself.  After you read it to yourself, if you could look

up.  Mr. Bates may have another question for you.

(A pause in the proceedings.)

MS. PEDERSEN:  Your Honor, can we just confer with

counsel to see what she's being refreshed with.

MR. BATES:  Sure.

(Counsel confers.)

BY MR. BATES:

Q.   Ma'am, I'm going to re-ask that same question to see if

that document refreshed your recollection.

Do you recall the name of the student that she

alleged had called her a name?

A.   I don't remember the name of the student.

Q.   What about initials?

A.   I see that it -- it was.

THE COURT:  Okay.  Let's do it this way.

Ma'am, you've been given a document that Mr. Bates

has presented to you to attempt to refresh your recollection.

After reading that document, is your recollection refreshed

with regard to the name of the student?  Yes or no?

THE WITNESS:  No.

B.R. v. F.C.S.B.

73

          MR. BATES:  Okay.  That's fine.  Thank you, Your

Honor.

BY MR. BATES:

Q.   Regardless of the name of the student, do you recall, Ms.

H███████, this student being implicated in any of the issues

that B.R. was having a previous -- back in November or at any

time earlier in that school year?

A.   I don't -- I'm drawing a blank on the initials.  I don't

recall.

Q.   Do you recall if that student had any involvement in any

of the issues that she had previously reported?

          MS. PEDERSEN:  Objection.  Asked and answered.

          THE COURT:  I gave him one more chance.

          She says she doesn't recall.  Move on.

BY MR. BATES:

Q.   And so, is it fair to say that, at the time this was

brought to your attention, you had not heard anything -- other

than the note saying that issues were resolved, you hadn't

heard anything from B.R. in the last six or seven weeks?

          THE COURT:  It's leading.

          MS. PEDERSEN:  Objection.

          MR. BATES:  Oh, okay.

          THE COURT:  It's leading.  Anytime you start off

with "Is it fair to say," you're going to get that objection.

          Sustained.

B.R. v. F.C.S.B.

74

MR. BATES:  You reminded me of that a couple of times.  Thank you, Your Honor.  I appreciate it.

BY MR. BATES:

Q.   What did you do with this information that B.R. told you, that the student had called her a name?

A.   I passed this on to the administrator.

Q.   Did you -- were you involved in any investigation of that incident?

A.   I was not.

Q.   By the way, when you say "the administrator," who is that?

A.   It would have -- the assistant principal, Mr. H████.

Q.   Okay.  Do you recall following up with -- and, ma'am, you can close that document, yeah.  It's only to refresh your recollection.

     Do you recall any other -- so other than passing on to Mr. H████ to investigate, did you recall any other interactions with B.R. about this issue?

A.   I don't recall if B.R. came back.  I recall checking in to see how things were going.

Q.   Following this name-calling?

A.   Following that -- yes, yes.

Q.   Why did you do that?

A.   That's what I do to make sure that whatever was reported -- I wanted to see how she was impacted.  So I

typically would follow up with the student, if, you know, I
see them in the halls, to see how are things going.

MR. BATES:  Your Honor, permission to publish
Plaintiff's Exhibit 106, which was just admitted with the last
witness.

THE COURT:  You may.

(Exhibit published.)

MR. BATES:  I'm sorry take that down.  Plaintiff's
Exhibit 106.

Can you zoom in on the top half of this email?

BY MR. BATES:

Q.   What is the date of that bottom email?

A.   January 20th.

Q.   And is this what Ms. F█████ is sending it to you and
some other teachers?

A.   Yes.

Q.   And she told you that B████ is in tears and headed your
way?

A.   Yes.

Q.   And based on what's in the top email, what -- you were
out of the building that this happened?

A.   Yes.

Q.   Okay.  And it says that Cheryl spoke with her.  Is that
Cheryl Weaver?

A.   Yes.

B.R. v. F.C.S.B.

76

Q.   And it says you spoke with her a little bit later.  Who
is "her"?

A.   B.R.

Q.   Why did you follow up with B.R. after she had been in
tears on this day?

A.   I'm going to always follow up if I find out that one of
my students came down to see me and I'm not there.  I want to
follow up to see how things are going.

Q.   I want to direct your attention, then, sort of moving on
from that -- you can take that down.

            THE COURT:  How much longer for this witness?

            MR. BATES:  I would say 15 minutes, Your Honor.

            THE COURT:  Let's go ahead and take our morning
break.  We'll see you back in at 12:05, 12:05.

            (Jury excused.)

            THE COURT:  We'll see everyone back in about 12:05.

            (Recess.)

            (Court proceedings resumed at 12:13 p.m.)

            MR. BATES:  Your Honor, before we bring back in the
jury, I know a sidebar will be needed at some point, so --

            THE COURT:  You can be seated.

            MR. BATES:  -- I guess my question to the Court is
would you prefer to do it now before the jury come in or are
we just going to --

            THE COURT:  Relating to this witness?

MR. BATES:  Yes.

THE COURT:  Okay.  Let's do the sidebar now.

(Side bar.)

MR. BATES:  So Ms. Pedersen has given me the exhibits that she is going to use with this witness, and one of -- this is not an exhibit that she's going to use to refresh the witness's recollection, but it's --

THE COURT:  Before she can refresh her recollection, she needs to ask her a question.  So I'm assuming that's going to happen.

MR. BATES:  Yes.

And the issue is this document is C.K.'s neuropsych testing when he was in the 1st grade.

THE COURT:  Okay.

MR. BATES:  And this is his IEP records, his special education records.

THE COURT:  You're going to try to get all this in?

MS. PEDERSEN:  Absolutely not.  I'm not trying to move in any of it.

THE COURT:  What is going to be the nature of the questions?

MS. PEDERSEN:  The only thing I'm trying to do is establish notice of prior behavior by C.K. before he got to Rachel Carson.

THE COURT:  In 1st grade?

MS. PEDERSEN:  It's threatening weapons on a bus and
kissing girls.  It's --

THE COURT:  What kind of weapons were they?

MS. PEDERSEN:  Guns.

THE COURT:  A 1st grader had a gun on a bus?

MS. PEDERSEN:  It is in his file which the school
produced to us from C███████ IEP.  I am not trying to admit
it.  I simply want to establish that Ms. H██████, who was
part of C███████ IEP, she's in these documents, had
notice --

THE COURT:  Let me ask you this because this is
pretty significant and if we're going to allege that a 1st
grader had a gun on a bus, what evidence do you have to
support it other than this IEP?

MS. PEDERSEN:  Well, I don't have evidence of what
Mr. K. had or didn't have.  I am simply trying to see if Ms.
H█████ was aware -- if she was a part of his IEP, she would
have been aware of this information that was part of his bio
at Rachel Carson related to his IEP.

MR. BATES:  So, in other words, Are you aware that
in his special education records, there's a reference to him,
quote, having a gun, as a 1st grader?

MS. PEDERSEN:  I certainly --

MR. BATES:  That's highly inflammatory, and I can't
understand any legitimate purpose --

THE COURT:  And it's actually even more attenuated
than that.  These have included such things as kissing girls
and announcing that he had a gun while on the bus.

MS. PEDERSEN:  I can use that exact language.  I
mean I don't -- I'm sorry, I'm not understanding the issue,
Your Honor.

THE COURT:  The inquiry that I was originally making
was whether or not you had any evidence that he had a gun on a
bus.

MS. PEDERSEN:  Sure.  And to be clear, I'm not
trying to establish that Mr. K. had a gun on a bus.

THE COURT:  But if you prime the pump with a
reference to a gun, that's going to blow everything up.

MS. PEDERSEN:  I am simply trying to ask Ms.
H███████ if she's aware of prior behavior or incidents of Mr.
K. before he came to Rachel Carson.  She was on notice of --

THE COURT:  Stopping right there, or do you want to
go further?

MS. PEDERSEN:  Well, I was going to ask her about
the kissing the girls, and I was going to ask her -- I wasn't
going to say "gun," but I was going to say, Are you aware that
he's announced on school buses that --

THE COURT:  This was in 1st grade?

MS. PEDERSEN:  This was in his IEP file.

THE COURT:  Which is rank hearsay.

B.R. v. F.C.S.B.

80

MS. PEDERSEN:  I'm happy to ask the question and
not -- is there a way to ask a question where I don't talk
about the weapons?

THE COURT:  Well, you're pretty good at following
instructions.  Let me grab a pencil for you and I'll write
questions -- you can write the questions.

MS. PEDERSEN:  There's also another one in there.

THE COURT:  Which other one is that?

MS. PEDERSEN:  But I don't --

MR. BATES:  It's the other tab.  Here --

MS. PEDERSEN:  I'm not sure if he's taking issue.

MR. BATES:  I'm taking issue with all of these
alleged prior bad acts.  I guess, what in this document --

MS. PEDERSEN:  So, sure, sure.  So this is a student
observation.  It's dated 2010 when he was a 7th grader at
Rachel Carson and Ms. H█████ sat in for 25 minutes in his
class and took some notes.  I wanted to point out that in that
25 minutes she was sitting there, he called another classmate
nasty and disgusting to establish the school was on notice
that he had a history of name-calling.

MR. BATES:  This is a Title IX case involving sexual
harassment.  This is just --

THE COURT:  It's an attempt to impugn his character,
pure and simple.

MR. BATES:  Yeah.

B.R. v. F.C.S.B.

81

THE COURT:  But, ugh --

MS. PEDERSEN:  Well, my position is it is notice to the school.

THE COURT:  All right.  I'll let you ask questions about this particular student observation.  You can write this down so you're clear.

You can ask Ms. H███████:  Did she on, whatever date it is -- it looks like 11/17/10 -- have an opportunity to observe C.K. and a student observation.  If she says, I don't recall, let's deal with that.  You can have her read the document and ask her if it refreshes her recollection.

MS. PEDERSEN:  Okay.  Am I permitted to ask about what she observed, not just that she observed them.

THE COURT:  Yeah, what she observed personally. What she observed personally, her observations.

Tell me how we get to the term -- terms "nasty" and "disgusting" to be a Title IX issue.

MS. PEDERSEN:  Well, I think that a huge portion of this case has all been about the things that happened to B███ that -- the vulgar name-calling, bullying --

THE COURT:  Did he call B.R. "nasty" and "disgusting"?

MS. PEDERSEN:  No, no.  This is a different student. This is a different student.

THE COURT:  Again, I think that the term "nasty" and

"disgusting" has -- I don't even know what that means, and I

know it clearly probably doesn't fall into a Title IX

situation.  But I'll let you ask her about this generally, and

not specifically, falling in the line of the questions asked.

        If she says she doesn't recall, you can hand her

this document and refresh her recollection, ask her, Does this

refresh your recollection with regard to an interaction she

had with C.K. during a student observation period.  And if she

says, No, then you're stuck with the answers.  If she says,

Yes, then you can ask how long was the -- how long was the

interaction.

        MS. PEDERSEN:  Could I direct her to where, like, if

she doesn't --

        THE COURT:  Yeah, that's fine.  That's fine.

        MS. PEDERSEN:  And then when I ask her what she

personally observed as to that, I can direct her to where she

wrote her observations?

        MR. BLANCHARD:  Judge, if I may.  The problem is

when you get to the end of the road there's -- when you get to

the end of the road, it's nothing to do with this case.  You

can say:  Did you observe him?  I don't recall.  Read this or

did you -- does that refresh your recollection, is the

recollection is preserved.  What did you observe?  Nasty and

--

        THE COURT:  No, she doesn't get "nasty" and

B.R. v. F.C.S.B.

83

"disgusting." She gets -- she gets he was talking to his

neighbor during the first part of the exercise and typed dirty

words and -- if she wants to bring this up, you can probably

do it on redirect -- he remained quiet during this exercise

and typed 70 words.

        MR. BLANCHARD:  I guess --

        THE COURT:  She doesn't get the words.

        MS. PEDERSEN:  Your Honor, I don't think this is

worth doing, to be honest.  I don't need to do this.  It's not

a make or break for me.

        THE COURT:  Let's switch to this.  Are you --

        MS. PEDERSEN:  Neither of them are a break for me.

        THE COURT:  Okay.  Very good.

        MR. BATES:  Thank you.

        (Open court.)

        (Jury present.)

        THE COURT:  The jury is reseated.  You may be

seated, ladies and gentlemen.

        Continue your examination, Mr. Bates.

        MR. BATES:  Thank you, Judge.

BY MR. BATES:

Q.   Ms. H██████, do you recall an incident with regard to

B.R. as to some missing work or documents?

A.   Yes.

Q.   What do you recall about that?

B.R. v. F.C.S.B.

84

A.   The -- well, first, the science handbook, I got an -- it
was B.R.'s mother who notified me that the science handbook
was missing and asked me to help -- well, she wanted to let me
know that it was missing, so I offered to help her find it.
And so, the first thing I did was to notify the team to be on
the lookout for a missing science handbook.  And then I --
what's that?  Okay.

Q.   Let me ask you:  What is a science handbook?

A.   That's supplemental to the textbook, the Science 7.  So
it's -- I guess I would call it a workbook.  It's a thick
book.

Q.   Is this also a called a lab book?

A.   Lab book, I'm sorry, yes.

Q.   So you said you were notified by the plaintiff's mother.
You alerted the team.  Then what happened from there with
regard to this lab book?

A.   I went out and -- with the student, and we walked around.
I told her I was going to help her find -- we were going to be
on the lookout to try to find this lab book.

Q.   When you say "the student," do you mean --

A.   B.R., I'm sorry.  B.R.

        So we walked around every area in the pod first to
look for this book.  And I found it in the lost and found bin,
which is in our pod, right beside the girl's bathroom.

Q.   Would that be sort of right in the same area where B.R.'s

—B.R. v. F.C.S.B.—

85

locker is?

A.    Yes.  It's her locker, the row.  In back is the girl's

restroom, and on the floor -- if I'm going to the restroom and

if I look down and look to the right, there's a bin, lost and

found.

Q.    So it was just right in the lost and found bin?

A.    Yes.

Q.    Was there any profanity written on the front cover of

this book?

A.    No.

Q.    Was it ever -- what, if any, allegations were later

brought to your attention about there being profanity on this

book?

A.    I found out later, much later, that there was profanity

on the book.  I actually saw it later and was shocked to see

the book with the profanity on it.

Q.    Was the profanity on the book when you found it?

A.    It was not.

Q.    Do you -- so we looked at that email -- we'll move on to

a different subject.

        We looked at that email earlier about you sending

therapist recommendations to B.R.'s mom.  Do you remember

that?

A.    Yes.

Q.    Do you remember B.R.'s mother following up with you

B.R. v. F.C.S.B.

86

about -- after that email, more therapist recommendations?

A.   Ms. R. left me a voice message -- I heard a voice message

later asking for names, specifically of cognitive behavior

therapists.  And that was the voicemail.

Q.   What did you do in reaction to that voicemail?

A.   Pardon me?

Q.   What did you do in reaction to that voicemail?

A.   I reached out to our school psychologist through an email

asking -- well, I said, I believe in the email, that I had a

parent who wanted a list of cognitive behavior therapists, and

I asked her for names.

Q.   Did you send additional names to plaintiff's mother?

A.   I did once I got the list from the school psychologist.

Q.   So just to be clear, this would be a second list that you

had sent to them?

A.   Yes.  It's my understanding, and I think specifically it

had -- it was cognitive behavior therapists.

Q.   Okay.  So after that, do you recall an incident with

regard to B.R. about something occurring in the cafeteria?

A.   I do -- it is kind of vague, but I do recall hearing

about an incident in the cafeteria with some name-calling ,

yes.

Q.   What was your involvement in that matter?

A.   If memory serves me right -- well, any involvement would

be to provide a place for the student, for B.R., to write a

statement.

Q.    Okay.  You asked her to write a statement?

A.    That is my -- that's my recollection.  In the conference

room, in our student services conference room.

Q.    Were you involved at all in the investigation of that

incident?

A.    No.

Q.    Do you recall, sitting here today, what administrator

investigated that incident?

A.    I don't recall.  I just recall passing it on.

Q.    Okay.  Do you recall after that time having any

interactions with plaintiff's mother, receiving any calls or

making any calls, anything like that?

A.    I don't recall past the request for the therapist.  I

know I followed up with -- I followed up with the list, and I

said, "Let me know if you need others."  I don't recall I got

anything else.

Q.    Was there any point at any time in the future you had

made phone calls to plaintiff's mother that were not returned?

A.    I don't recall making a phone call to her and not

return -- I never got returned messages.  I don't recall that.

I'm sorry.

Q.    I want to ask you some specific questions about some

testimony and allegations that have been made in this case

that implicate you, okay, ma'am?

─B.R. v. F.C.S.B.─

88

A.   Okay.

Q.   Did you receive -- other than perhaps academic issues,
like going to change a class, the entire time that you were
the counselor at Rachel Carson Middle School when plaintiff
was a student there, did you ever receive any request for
counselor slips, that you can recall?

A.   Other than academics, no.

Q.   Okay.  Did you ever say to B.R. or her parents that you
did not realize things had gotten this bad?

A.   No.

Q.   Did B.R. ever tell you that she had been trying to see
you for the last few weeks but hadn't been able to do so?

A.   No.

Q.   Did you ever tell B.R. that you were too busy to see her
because you were busy with administrative things?

A.   No.

Q.   Did B.R. every tell you that she had an emergency
situation and needed to speak with you?

A.   No.

Q.   Did B.R. ever tell you that boys were going inside of
her?

A.   No.

          MS. PEDERSEN:  Objection.  Asked and answered.

          THE COURT:  Sustained.

          MR. BATES:  To be clear, my question now is focused

on any -- at any time.  My question earlier was focused on the

period before November.

            THE COURT:  The objection was sustained.

            MR. BATES:  Okay.

BY MR. BATES:

Q.   At any time did B.R. ever -- did you ever witness B.R.

being physically assaulted?

A.   No.

Q.   At any time did you ever witness B.R. being sexually

assaulted?

A.   No.

Q.   At any time did you witness her being harassed or

bothered in any fashion?

A.   No.

Q.   How does the level of shadowing that you provided to B.R.

compare to the level of shadowing that you've provided to any

other student in your time at Rachel Carson Middle School?

A.   It doesn't compare to any shadowing that I've ever done

in my whole teaching career.  I've never done that much of

specific shadowing.

Q.   What do you mean you've "never done that much"?

A.   The number of days and the number of periods being every

period, from the beginning of school to the end of school.  I

think that was done more with B.R. than anybody else.

Q.   Okay.

Case 1:19-cv-00917-RDA-LRV    Document 1057    Filed 08/26/24    Page 90 of 137
PageID# 23214
Cross - B.H.

B.R. v. F.C.S.B.

90

MR. BATES:  No further questions.

THE COURT:  Ms. Pedersen.

MR. BATES:  Judge, Mr. Kinney.

MR. KINNEY:  Your Honor, I noticed the last witness you invited me to cross, but I think I'm entitled to direct.

THE COURT:  Well, the problem is is that the situation that we have here is the individuals who you represent individually are being called by Fairfax County, and so there's been a suggestion of an alignment of interests, so I'm trying to manage as best I can.  I'll give you some latitude on your examination, but I'm going to go to Ms. Peterson so you won't be asking to do a redirect examination after she does her cross-examination.

Ms. Pedersen.  You're up.  I know that might have been confusing, but it's your turn.

MS. PEDERSEN:  Your Honor, may I approach?

THE COURT:  You may.

MS. PEDERSEN:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MS. PEDERSEN:

Q.   Good afternoon, Ms. H█████████.

A.   Good afternoon.

Q.   My name is Samantha Pedersen, and I represent B█████ in this case.

B.R. v. F.C.S.B.

A.   Okay.

Q.   During your direct with Mr. Bates, you were shown a presentation that discussed bullying and harassment.  Do you remember that?

A.   Yes.

Q.   You testified that this was a presentation that you give your students every year?

A.   Yes.

Q.   And you did this presentation because you -- you wanted to educate the students of things that maybe they'll encounter once they start school?

A.   It's done, first of all, because we're required to do it but certainly to educate, yes.

Q.   And the PowerPoint was based on different things that the school might have experienced happening, like bullying, or cyberbullying, sexual harassment?

A.   Would you ask that again?

Q.   Sure.  The topics that you put on your presentation, you came up with those topics based on things that you or the administrators had seen or experienced at Rachel Carson to notify the students ahead of time that these are things you might have to deal with?

A.   No, I wouldn't say they are based on things that I have seen.  This is something generated county-wide.  Some of the examples that were used were from others.  Nothing that I

B.R. v. F.C.S.B.

92

personally seen, but we created examples --

Q.    Maybe not personally but school-wide -- why would you put

things like bullying or sexual harassment --

            THE COURT:  How were the topics on the PowerPoint

developed?

            MS. PEDERSEN:  Thank you, Your Honor.

            THE WITNESS:  It was a collaboration of examples.

            MS. PEDERSEN:  Okay.  Let's pull up that

presentation quickly.  I think it was Defendants' Exhibit 267.

            Your Honor, may I publish?

            THE COURT:  You may.

            (Exhibit published.)

BY MS. PEDERSEN:

Q.    Do you recall seeing this slide in your examination with

Mr. Bates?

A.    Yes.

Q.    Okay.  I'd like to direct your attention to the top

slide, No. 1., under "Cyberbullying."  And it says,

"Impersonation, pretending to be someone else and sending or

posting material online or in a text to make that person look

bad, get in trouble or damage a person's reputation."

            So you would agree that students impersonating each

other or trying to be someone else online, that's a pretty

common form of cyberbullying?

A.    It's an example of -- I don't know how common it is, but

B.R. v. F.C.S.B.

93

it's an example.

Q.   It's important enough that it's the first bullet on your

cyberbullying slide?

A.   I didn't necessarily read -- did not necessarily number

it one because it was the most important, but it's one of

them.

Q.   Okay.  You can take that down.  Thank you.

        Let's talk a little bit about B████.

        So you had testified with Mr. Bates that you recall

meeting B████ at the Herndon Community Center, right?

A.   Yes.

Q.   And at that meeting, you had learned that B████ was

excited to be coming to Rachel Carson, right?

A.   Yes.  She appeared excited.

Q.   And your impression of B████ in that meeting at the

community center, excuse me, was that she was a little girl

who was excited to be at the middle school where her brother

was; is that right?

A.   Yes.

Q.   Okay.  And you might have already said this, but when

B████ started school, you were her assigned counselor in 7th

grade; is that right?

A.   Yes.

Q.   You had also testified with Mr. Bates that B████ never

brought anything to your attention, no concerns about B████

B.R. v. F.C.S.B.

94

were brought to your attention in the first few months of
school.

            Do you remember that?

A.   Yes, I remember that.

Q.   But it is possible that you became aware of concerns
related to B⬛ sometime in October?

            MR. BATES:  Objection.  Calls for speculation.

            THE COURT:  Rephrase.

BY MS. PEDERSEN:

Q.   Do you agree that you possibly learned about concerns
related to B⬛ sometime in October?

            MR. BATES:  Same objection.

            THE COURT:  Sustained.

            Rephrase, Counsel.

BY MS. PEDERSEN:

Q.   Do you recall whether you first became aware of concerns
related to B⬛ sometime in October?

A.   I do not recall that.

Q.   Let's look at your deposition.

            MS. PEDERSEN:  May I approach, Your Honor?

            THE COURT:  You may.

            MS. PEDERSEN:  Give me one second.  156.

BY MS. PEDERSEN:

Q.   So you want to flip to your binder on page 156.  Not the
tabbed binder, the deposition binder I just handed you.

—B. R. v. F.C.S.B.—

95

Line 4.

MS. PEDERSEN:  May I read, Your Honor?

THE COURT:  Is that the deposition?

MS. PEDERSEN:  It's her deposition, correct.

MR. BATES:  Your Honor, this is the exact same
question that was just answered and the objection was
sustained and the objection is also in the deposition.

THE COURT:  All right.  Well, the last objection
that the Court sustained related to the form of the question.
Making reference to something whether something is possible or
not.  That was the reason why the objection was sustained.
She reframed the question and rephrased it.

Are you suggesting to the Court that the possibility
standard is also articulated in the deposition?

MS. PEDERSEN:  It is, Your Honor.

THE COURT:  Okay.  Well, she can use anything to
refresh the witness's recollection, but the question has to be
consistent with the answer that is being provided in the
testimony here today.

So are you going to be able to phrase your question
in the manner that is consistent with the analysis in the
deposition?

MS. PEDERSEN:  I don't think so.

(Counsel confers.)

MS. PEDERSEN:  I can ask a different question.

—B.R. v. F.C.S.B.—

96

THE COURT:  Okay.

BY MS. PEDERSEN:

Q.   Can you, with certainty, rule out that you did not hear

concerns about B████ in October?

A.   As I said, I don't recall so I can't possibly -- I'm

looking at the deposition and it said --

THE COURT:  Hold it.  Okay, we're fine.  That's

okay.

MR. BATES:  Your Honor, can the witness be

instructed to close the deposition?

THE COURT:  She'll give it back.

MS. PEDERSEN:  You can just put it to the side

because we may come back to it.

THE WITNESS:  Okay.

BY MS. PEDERSEN:

Q.   You had talked a lot about shadowing with Mr. Bates; do

you recall that?

A.   Yes.

Q.   You don't recall the exact period of time that the

shadowing started for B████; is that right?

A.   I don't -- correct.

Q.   You recall it would have been some time after a meeting

with B████ parents?  I think that's what you testified to.

A.   I was given instructions to shadow, but that was -- the

instructions weren't from the parent.  It was from my

supervisor.

Q.    Right.  And you don't recall the exact amount of time

that you shadowed B████, right?

A.    Only that it was more than a week-and-a-half.  I do know

that.

Q.    Your testimony is that you shadowed B████ for more than a

week?

A.    I do believe that I shadowed for more than a week, yes.

Q.    Okay.

            MS. PEDERSEN:  Can we pull up Defendants' Exhibit

200?  It's already admitted.

            THE COURT:  You may.  You can publish.

            (Exhibit published.)

BY MS. PEDERSEN:

Q.    I'm not going to go through this whole document.  It will

be on your screen.  It's also in the binder if you want it,

because we don't need to go through the whole document.

            But if you could go to page 9, Mr. Brown.

            And this is -- we've already gone through this with

the jury, but I'll represent to you that this is the letter

that the administrators at Rachel Carson put together in

response to B████ family reaching out to the superintendent.

            And if you look at the bottom of the page there, all

the way at the end, and you can -- can you do it so you can

scroll onto the next page too, because the sentence continues.

———B.R. v. F.C.S.B.———

98

It says, "Mrs. H███████ would discreetly walk behind B██████ in the halls for several days to check for inappropriate contact and conversations."

Do you see that?

A.    Yes.

Q.    Does this refresh your recollection that you shadowed B████ for days, not weeks?

A.    I thought I said -- I said for at least a week.

Q.    Okay.  And you have no reason to believe that your administrators wouldn't be truthful in their memo here to the superintendent?

A.    I'm unclear because I see several and I -- when I hear several, I see that it's more than five days.  So let me be clear.

Q.    You agree it doesn't say "weeks" or "months."  It says "several days"?

A.    I agree that I used the word "week" and the words in here are "several."

Q.    Okay.  You also don't recall any formal written schedule of shadowing for B████; is that correct?

A.    That's correct.

Q.    You don't remember when the shadowing stopped?

A.    I don't know exactly when, only that the parent had asked us to continue until a certain time.

Q.    Your testimony is that your -- the parent told you to

———— B.R. v. F.C.S.B.————

99

stop shadowing?

A.   I remember an email where Mrs. R. had asked specifically

for us to continue to shadow until and I don't know the

exact -- there's an email to state that.

Q.   Let's look at that email.

          MS. PEDERSEN:   Permission to publish Plaintiff's 84.

This is already in evidence.

          THE COURT:   You may.

          (Exhibit published.)

BY MS. PEDERSEN:

Q.   Is this the email you were referring to from Ms. R█████,

Ms. R., excuse me?

A.   Yes.

Q.   And this is -- this was sent to you and a couple other

people?

A.   Yes.

Q.   And if you read the highlighted part, it says, "We would

appreciate if you can continue to monitor the situation in the

hallways during class changes during the early part of next

week to ensure the situation has truly simmered down."

          Do you see that?

A.   Yes.

Q.   Okay.  You would agree that this isn't exactly a call to

stop the shadowing, is it?

A.   I'm not clear on asking me if I would agree.  Are you --

B.R. v. F.C.S.B.

100

I don't know that I agree.

Q.   Do you read this as a call by Ms. R. to stop the

shadowing?

A.   It looks like it's the call until next week, until the

next week.

Q.   Do you agree that if the situation hadn't, as she put it,

"simmered down," you probably shouldn't have stopped the

shadowing?

A.   And I know that I would not have stopped the shadowing if

I had gotten instructions to do so.

Q.   Okay.  But you don't recall anyone telling you to stop

the shadowing, do you?

A.   I don't recall the specific instructions or a date of

when to stop.

Q.   My question was a little different.  You don't recall

anyone telling you to stop the shadowing?

A.   I don't recall that at this time.

Q.   And you, yourself, did not make the choice to stop

shadowing?

A.   No, I did not voluntarily stop the shadowing.

Q.   You don't recall if the shadowing had continued after

winter break?  You can take this email down.

         You don't recall if the shadowing had continued

after winter break?

A.   I don't remember.

B.R. v. F.C.S.B.

101

Q.   You also don't recall shadowing B▓▓▓ any time in
January?

A.   I don't recall the dates.

Q.   Now, separate from the shadowing you also talked about
some monitoring in the hallways that you would do?

A.   Yes.

Q.   And we'll talk a little bit more about the meeting you
had with B▓▓▓ mother and the administrators, but after that
meeting, you had talked with B▓▓▓ four core teachers about
a monitoring plan, right?

A.   Would you repeat, please?

Q.   Sure.  Sure.  Some time after that meeting with B▓▓▓ and
her parents and the administrators, you had met with B▓▓▓
core teachers, the four core teachers and you discussed
monitoring of B▓▓▓?

A.   The team met with the assistant principal and with me
that meeting facilitated by the assistant principal.

Q.   And in that meeting you guys discussed monitoring B▓▓▓?

A.   The discussion was, yes, monitoring in the halls, in the
classroom.

Q.   And in that meeting, you had told her core teachers that
the monitoring was in response to concerns expressed about
B▓▓▓ discomfort and accusations of students who were coming
into her locker bay; do you recall that?

A.   I do not recall those specific words.

─────B. R.  v.  F.C.S.B.─────

102

Q.    If you take the binder from your deposition, not the

tabbed one, and go to page 219.

A.    What page?

Q.    219?

A.    2-1-9?

Q.    Yes.

A.    Okay.

        MS. PEDERSEN:  Your Honor, may I read?

        THE COURT:  You may.

BY MS. PEDERSEN:

Q.    "QUESTION:  When you initially talked to B█████ four

core teachers about the monitoring plan, did you tell them why

this plan was being put into place?

        "ANSWER:  What I told the team was that there was some

concerns expressed about her discomfort and the accusations of

students who are coming into the locker bay.  I did not go

into full detail specifics, but there was a need to monitor

her to make sure she was feeling comfortable and to let me

know or the AP know if they notice anything that looked like

there was discomfort on her part."

A.    I see.

Q.    Does that refresh your recollection?

A.    Yes.  Thank you.

Q.    Now, that discomfort that you talked about with her four

core teachers -- you can close that -- you knew that that

B.R. v. F.C.S.B.

103

discomfort was related to the actions of three other students:

D.N., C.K., and J.O.?

A.    I don't know that I knew that.

Q.    Can we pull up -- sorry, were you -- I didn't want to --

A.    Yes.

        MS. PEDERSEN:  Can you pull up Plaintiff's

Exhibit 79.  This is already admitted.

        THE COURT:  You may.

        MS. PEDERSEN:  You can zoom out.  Maybe zoom in just

a little bit.

BY MS. PEDERSEN:

Q.    Okay.  You can see at the top here this is an email from

the R. family?

A.    Yes.

Q.    And then it's sent to three people and is that your email

address there B█h██████?

A.    Yes, it is.

Q.    And if you scroll down to the third paragraph -- and I'm

sorry, the date of this is November 21, 2011.

        You recall that's the date of the meeting with the

administrators and her mom?

A.    Yes.

Q.    Okay.  If you look at the bottom where it's highlighted

here, it says, "B█████ is scared about any retributions she

may be subjected to as a result of her sharing the details of

Cross - B.H.

B.R. v. F.C.S.B.

104

the hostile environment created by the demeaning words and

intimidating actions of David N., C█████ K., and her

friend, J████ O."

        Do you see that?

A.    I do, yes.

Q.    Does this refresh your recollection that the discomfort

that you discussed with the core teachers at the locker bay

was related to the actions of these three students?

A.    If the dates are aligned, if I had the meeting

afterwards, I don't --

Q.    I'll represent to you that that meeting was on

November 21st.  So you agree?

A.    The team meeting?

Q.    I'm sorry.  You agree that the discomfort described at

the team meeting was related to the actions of those three

students?

A.    That would have been.

Q.    Now, monitoring David N., J████ O., or C█████ K. was

never a part of your monitoring plan, was it?

A.    My monitoring?  You mean shadowing or monitoring?

Q.    I mean monitoring the actions of those three students,

that was never a part of your plan, was it?

A.    No, my plan -- no.

Q.    And you're unaware if anyone else at the school or on the

other teams were monitoring the actions of those three

B.R. v. F.C.S.B.

105

students?

A.    I can't speak to the others.

Q.    Let's talk a little bit about that meeting.

       So part of that meeting you had testified with
Mr. Bates was that you recall B████ mom was trying to
retrieve a phone message during that meeting, right?

A.    I recall her speaking about trying to retrieve it, yes.

Q.    Okay.  And you testified with certainty that B████ mom
never told you what the voicemail said; is that right?

A.    Yes.

Q.    But you agree that you don't really remember any of the
details about this meeting?

A.    That is not correct.

Q.    You don't even recall who was there?

A.    Yes, I recall.

Q.    Let's go to your deposition.

       MS. PEDERSEN:  One second.

       THE WITNESS:  Okay.

       (A pause in the proceedings.)

BY MS. PEDERSEN:

Q.    Okay.  If you go to page 162.

A.    Okay.

Q.    And we're going to go all the way to the bottom of the
page.

       MS. PEDERSEN:  May I read, Your Honor?

THE COURT:  You may.

BY MS. PEDERSEN:

Q.      "QUESTION:  And the initial meeting was between you,
mom, dad, in your office when mom first came in with the cell
phone; does that ring a bell to you?

        "ANSWER:  I don't remember the details.  I remember
the part about trying to retrieve the phone, but I don't
recall everybody who was there."

        Does that refresh your recollection that you don't
remember all of the details of this meeting?

A.   I'm sorry, but I was reading above there.  There was one
meeting that I spoke about, which I may have gotten the date
wrong, but it was the 21st above that statement it shows my
saying my understanding -- if I might, if you read there, I
say that there was the administrator -- that the assistant
principal was present.

Q.   Yes, I see that.  I can read additionally.

        MS. PEDERSEN:  Your Honor, can I?

        THE COURT:  You may.

BY MS. PEDERSEN:

Q.   Sure.

        "QUESTION:  Do you remember if she was trying to
access if she reported to you having heard a disturbing
voicemail left on B████ cell phone by another student?

        "ANSWER:  My understanding, my best memory, was that

────B. R.  v.  F. C. S. B.────

107

there was an assistant principal that was present, there was a

discussion about trying to retrieve that message and their

inability to get into that.

        "QUESTION:  So I believe there actually were two

meetings, one on the 21st, one on the 22nd?

        "ANSWER:  22nd.

        "QUESTION:  And the initial meeting was between you,

mom, dad in your office when mom first came in with the cell

phone.  Does that ring a bell to you?

        "ANSWER:  I don't remember the details.  I remember

the part about retrieving the phone, but I don't recall

everybody who was there."

        You also don't recall the SRO being called in to

help retrieve the voicemail?

A.   I do not, correct.

Q.   You would agree that the school calling in a SRO into a

meeting is usually if there's some threat or safety concern?

A.   I don't know all the reasons that the school would call

the SRO in.

Q.   Okay.  Now, I know you don't remember a lot of the

details of the meeting, but you do remember B███ mom

telling you and the others that kids were spreading rumors

about B███?

A.   I do vividly remember her concern about rumors being

spread around the school, lies being spread, and that -- about

─── B.R. v. F.C.S.B. ───

108

a pumpkin patch, and that nothing happened.  I remember that.

Q.   And you recall that the pumpkin patch incident was about

B█████ and another kid having some sort of sexual encounter?

A.   At the meeting with the mother.  Mother stated that

rumors were being spread about a pumpkin patch.  Before then I

didn't know anything about a pumpkin patch event, but she

stated in my office that rumors were being spread about

something happening during that pumpkin patch event and she

was concerned about that, and she stated "and that nothing

happened."  I just remember that.

Q.   And you recall that she had said that they were spreading

rumors about her daughter and another student in the basement

having a sexual encounter?

A.    I don't recall specifically there were sexual encounters.

It was rumors being spread.  The rumors and lies.

Q.   Let's go back to your deposition and you can turn to

page 173.

A.   Okay.

Q.   We're going to start at line 19.

        MS. PEDERSEN:  May I read, Your Honor?

        MR. BATES:  Can we have a moment?

        MS. PEDERSEN:  Sure.

        (Counsel confers.)

BY MS. PEDERSEN:

Q.     "QUESTION:  What did she tell you happened during that

B.R. v. F.C.S.B.

pumpkin patch incident?

  "ANSWER:  What I can remember is that she said that
kids were spreading rumors that her daughter and some kid,
another kid, had some -- in the basement -- had some kind of
sexual encounter."

A.    Yes.

Q.    Does that refresh your recollection that her mom told you
about sexual encounters -- rumors about sexual encounters?

A.    That refreshes my memory of my deposition.

Q.    Which was taken less than a year ago?

A.    I don't remember when it was taken.

Q.    I'll represent to you that it was taken May of last year.
Does that sound right to you?

A.    It could be.

Q.    And after learning about these sexual rumors, as B█████
guidance counselor, you did not ever have a conversation with
B█████ about this?

A.    I remember because the assistant principal -- the
administrators were in the meeting that that was something
that they took and they would address.

Q.    So you agree that you as her guidance counselor did not
speak to her about this incident?

A.    I did speak with her afterwards about the rumors being
spread or the people that -- that were being accused of
spreading rumors as we talked about my following her.  I

remember asking her about the -- in the hallways, what was

happening, that part.

Q.   So is it your testimony that you did speak to B███ after

learning about these rumors?

A.   I asked for clarification on the -- who was in the

hall -- if she knew of who was spreading the rumors in the

hallway.

Q.   Did you ever have a conversation with B███ about the

sexual encounter rumors after this meeting?

A.   I don't recall having a specific conversation about the

sexual encounter.

Q.   Do you recall an incident on -- or in December of that

year, 2011, when a cell phone went off in class?

A.   I do not.

          MS. PEDERSEN:  Can we publish or can we pull up

Plaintiff's Exhibit 95?  This is already in evidence.  It was

admitted as part of our stipulated list.

          THE COURT:  You may.

          MS. PEDERSEN:  May we publish?

          THE COURT:  You may.

          (Exhibit published.)

          MS. PEDERSEN:  Can you zoom out?  We're going to go

to the first email, which I guess is a little bit at the

bottom.  It might go into the next page.  Yup.  Okay.

BY MS. PEDERSEN:

─B.R. v. F.C.S.B.─

Q.   So this is an email from Ms. F███████.  Do you see that?

A.   Yes.

Q.   And that's one of her core teachers?

A.   Yes.

Q.   And it's sent to a couple of teachers and you're on that

email that it was sent to?

A.   Yes.

Q.   And in this email, Ms. F███████ is talking about an

incident about a -- about a phone going off in class?

A.   Oh, you were asking me a question.

Q.   I was giving you a minute to read it.

A.   Oh, yes, I see that.

Q.   And she talks about a little bit about how none of the

students would fess up to whose phone it was?

A.   Yes.

Q.   And Ms. F███████ tells you that "By chance B███████ is

sitting back there. . ." -- I think she's talking about the

back of the classroom -- "and she, unfortunately, feels that

the whole world is pointing fingers at her and blaming her

when that is completely not true."

          Do you see that?

A.   Yes.

Q.   If you zoom out a little bit.  You can go to the next --

just pull up the page.  Yes.  There we go.  You can leave it

there.  That's fine.

Cross - B.H.

B.R. v. F.C.S.B.

112

Okay.  So if you look at an email or two up, where Monique -- I'm sorry, Ms. F█████ replies again.

Do you see that there?

A.  Yes.

Q.  And she says, "Poor B███ came up to me, just came up to me and said that so many kids are blaming her and doesn't know how to handle it.  I told her that I know that it was not her and I will have a talk about this with the class again tomorrow, and there should be some apologies stated.  I also encouraged her to talk to you, B█████."

Do you see that?

A.  Yes.

Q.  Sitting here today you don't recall this incident; is that right?

A.  Reading this again, I'm reminded of the email, but I don't recall the specifics.

Q.  You don't have a separate recollection of this email other than seeing it here today?

A.  Right.  Right.  Correct.

Q.  And this specific incident you don't recall ever discussing this incident with B████ at the time?

A.  I don't recall.

Q.  You don't remember ever doing a check-in with her about this either?

A.  I remember check-ins periodically, but I don't remember

─────B.R. v. F.C.S.B.─────

113

this specific one offhand.

Q.   Well, I think Mr. Bates talked through this email on

direct, but you recall an email -- another email from

Ms. F███████ that was directed to you about B█████ being in

tears?

A.   Could you show --

Q.   I'll go back.

          MS. PEDERSEN:  Can we pull up 106?  This is already

in evidence, Your Honor.  May I publish?

          THE COURT:  You may?

          MS. PEDERSEN:  Thank you.

          (Exhibit published.)

BY MS. PEDERSEN:

Q.   And in this email, this is sent to you and a couple of

other teachers by Ms. F██████.  She says, "B██████, B████ is in

tears and headed your way right now."

          Do you see that?

A.   Yes.

Q.   Now, you testified that you followed up with B██████ about

this, but sitting here today you don't recall what this

incident was about?

A.   I don't.  I looked at the email and I remember the email.

Q.   But you don't recall what it's about?

A.   It's out of the building so Cheryl spoke with her and I

spoke with her a little.  I don't recall.

B.R. v. F.C.S.B.

Q.    You don't recall the circumstances surrounding this

incident?

A.    The circumstances.

Q.    You don't recall why she was in tears?

          MS. BATES:  Objection.  Asked and answered.

          THE COURT:  It has been.

          MS. PEDERSEN:  Excuse me.

          THE COURT:  Sustained.

BY MS. PEDERSEN:

Q.    I know in this email you wrote, "I spoke with her a

little later."

          But you don't actually recall any of the specifics

of the conversation that you might have had with her?

A.    I don't recall.  I didn't have notes on that.  But if I

said in the email to the team that I spoke with her a little

later, then I'm sure that I spoke with her a little later.

Q.    But aside from seeing this email here today you don't

have any recollection of this event?

A.    I do not.

Q.    Okay.

          (Counsel confers.)

          THE COURT:  Some of you may have seen me

communicating with the juror.  I was just simply checking his

schedule.

BY MS. PEDERSEN:

———B.R. v. F.C.S.B.———

115

Q.    That last email we looked at that was in January, right?

A.    It's not here anymore.

Q.    I'll represent to you that it was January 22, 2012?

A.    Okay.

Q.    Does everything that we just looked at refresh your recollection that there was problems with B███ at the school through December, through January, and until she left school in February?

A.    The emails that I just saw shows that a teacher did what they were supposed to do, send an email to say that she was upset.  I read that.

Q.    My question was a little different.  My question wasn't about the teachers.  It was, Does this refresh your recollection that B███ was experiencing problems in school in December, January, until she left in February?

A.    Okay.  It certainly -- to say she was having problems in school, but do you mean because the teachers sent her down because she was crying?

Q.    Sure, that could be a reason.

A.    Okay.  That could be a reason, yes.

        THE COURT:  The simple question, ma'am, is:  Does the information that you've been provided through the deposition that you've been provided, the questions that are being asked, suggest to you that B.R. was experiencing problems during the time that she was at Rachel Carson Middle

—B.R. v. F.C.S.B.—

116

School in the 7th grade?

THE WITNESS:  Yes, they would suggest.

THE COURT:  Okay.

MS. PEDERSEN:  I have no further questions, Your

Honor.

THE COURT:  Mr. Kinney.

MR. KINNEY:  Thank you.  Your Honor, may I proceed?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. KINNEY:

Q.  For the record, I'm Michael Kinney.  Ms. H█████ you

know me as your attorney, I assume?

A.  Yes.

Q.  Mr. Bates spoke with you about spending 20 years at

Rachel Carson Middle School; do you recall?

A.  Yes.

Q.  I'd like to ask you about those 20 years.

During that time, did you have any opportunity to

leave Rachel Carson and work at another school?

A.  Yes.

Q.  What opportunities -- what opportunity was that?

A.  Well, there are opportunities to transfer, you know, when

we had the transfer.  There were other opportunities that

other schools, high school, middle school, as well as

non-school related.

Q.   Did you choose to take those opportunities to leave Rachel Carson?

A.   I did not, no.

Q.   And why is that?

A.   For me it was the place for me.  I felt honestly very blessed to be there in that environment with the kids, with the staff, felt supported.  Got to see just how hard people work to try to meet the needs.  So, no, I felt like that was the place that I should be.

Q.   Other than leaving Rachel Carson for other work opportunities, did you have any occasion or opportunity to stop working at Rachel Carson?

        MS. PEDERSEN:  Objection, Your Honor, relevance.

        THE COURT:  Rephrase that.  I don't know where you are going with this so I can't predict how it might be relevant.

BY MR. KINNEY:

Q.   Did you have any other opportunity to leave Rachel Carson and not continue to work there in that 20 years?

        MS. PEDERSEN:  Objection, relevance.

        THE COURT:  I think she can answer that.

        Were you presented with an opportunity to leave the school that you were teaching at?

        THE WITNESS:  Yes, there were opportunities.

        THE COURT:  Did you follow through on those

opportunities?

          THE WITNESS:  No, I did not.

          THE COURT:  All right.  Next question.

BY MR. KINNEY:

Q.    Ms. H████████, did you enjoy being a school counselor?

A.    I did.

Q.    Did you have good days and less good days?

A.    Yes, I did.

Q.    May I ask you about your most difficult day as a school

counselor?

          MS. PEDERSEN:  Objection, relevance.

          THE COURT:  Sustained.

BY MR. KINNEY:

Q.    Ms. H████████, did you read the complaints that have been

filed in this case?

A.    I did, yes.

Q.    Have you read the allegations?

          MS. PEDERSEN:  Objection, Your Honor.  This is

outside the scope of cross.

          THE COURT:  Overruled.

BY MR. KINNEY:

Q.    Have you read the allegations that were made against you

in the complaints filed in this case?

A.    Yes.

Q.    Ms. H████████, did you ever observe anyone bully, harass,

B.R. v. F.C.S.B.

119

or touch B.R. in any inappropriate way?

A.    No.

Q.    Did you ever observe anyone hurting B.R.?

A.    No.

Q.    Did you ever observe any threat to B.R.'s safety?

A.    No.

Q.    Did you ever observe anyone harass B.R.?

A.    No.

Q.    Did you ever observe any inappropriate conduct directed

towards B.R.?

A.    No, I did not.

Q.    Were you ever aware, in any way, of any threat to B.R.'s

safety?

A.    To her safety?

Q.    Safety.

        MS. PEDERSEN:  Objection, asked and answered.

        MR. KINNEY:  I'll withdraw the question, Your Honor.

        THE COURT:  Okay.

BY MR. KINNEY:

Q.    Do you believe the allegations that B.R. has made against

you in this case are false?

A.    Yes, I believe they are false.

Q.    May I ask you to explain to the jury how these false

claims have affected you these last four-and-a-half years?

        MS. PEDERSEN:  Objection, Your Honor, relevance.

─────B.R. v. F.C.S.B.─────

120

THE COURT:  You can rephrase it.  Sustained.  But
you can rephrase it to try to get to the point that you are
trying to get to, I think.

BY MR. KINNEY:

Q.   Has this case affected you personally and professionally
in the last four-and-a-half years?

MS. PEDERSEN:  Objection, relevance.

THE WITNESS:  Yes.

THE COURT:  Overruled.

BY MR. KINNEY:

Q.   In what way?

A.   Well, it's difficult for me to fathom being accused of
what I've been accused of.

THE COURT:  Next question.

MR. KINNEY:  That's all I have, Your Honor.  Thank
you, Your Honor.

THE COURT:  Mr. Blanchard.

MR. BLANCHARD:  Briefly, Your Honor.

CROSS-EXAMINATION

BY MR. BLANCHARD:

Q.   Good afternoon, Ms. H██████.

A.   Good afternoon.

Q.   I represent J.O.

A.   Yes.

Q.   In the testimony you've given in terms of information

─────B.R. v. F.C.S.B.─────

121

that you got about complaints of issues involving B.R., did

almost all of that information come from her mother?

A.    Yes.

        MR. BLANCHARD:  No other questions.  Thank you.

        THE COURT:  Thank you.  You may step down.  I'm

sorry.  Let me check and see how long you're going to go.

        MR. BATES:  I have no further questions.

        THE COURT:  Okay.  That settles that.  You can step

down, ma'am.  Thank you.

        (Witness excused.)

        THE COURT:  Off the record.

        (Discussion off the record.)

        THE COURT:  We're going to go ahead and take our

afternoon break.  2:15?  We'll come back in at 2:15.  Very

good.

        (Jury excused.)

        THE COURT:  The next witness is T████?

        MR. BATES:  Yes, Your Honor.

        THE COURT:  Okay.  Very good.  All right.  We'll see

everybody at 2:15.

        (Lunch Recess 1:14 p.m.)

        (A.M. Session concluded.)

CERTIFICATE OF REPORTER

       I, Tonia Harris, an Official Court Reporter for
the Eastern District of Virginia, do hereby certify that I
reported by machine shorthand, in my official capacity, the
proceedings had and testimony adduced upon the Jury Trial
in the case of the **B.R. versus F.C.S.B., et al.**, Civil
Action No.: 1:19-cv-917, in said court on the 12th day of
April, 2024.

       I further certify that the foregoing 137 pages
constitute the official transcript of said proceedings, as
taken from my machine shorthand notes, my computer realtime
display, together with the backup tape recording of said
proceedings to the best of my ability.

       In witness whereof, I have hereto subscribed my
name, this August 26, 2024.

Tonia M. Harris, RPR
Official Court Reporter

**'**

**'12** [1] - 70:16
**'82** [2] - 22:9

**0**

**0114** [2] - 34:5, 34:8
**05** [1] - 4:19
**08** [4] - 4:13, 4:14, 4:14, 4:15

**1**

**1** [9] - 12:15, 14:9, 15:16, 16:12, 35:4, 40:17, 45:11, 46:15, 92:19
**10** [1] - 45:19
**100** [3] - 2:2, 2:6, 2:10
**105** [4] - 66:16, 66:18, 67:5, 67:10
**105.............................
................** [1] - 4:17
**106** [6] - 11:21, 12:10, 12:13, 75:4, 75:9, 113:9
**106.............................
................** [1] - 4:13
**10:07** [1] - 1:6
**10:20** [1] - 7:4
**10:50** [1] - 6:23
**11** [1] - 46:11
**11/17/10** [1] - 81:9
**111** [2] - 14:6, 17:18
**116** [1] - 4:9
**12** [3] - 4:13, 46:23, 122:16
**120** [1] - 4:9
**122** [1] - 122:10
**123** [1] - 4:20
**12:05** [3] - 76:14, 76:16
**12:13** [1] - 76:18
**12th** [1] - 122:8
**13** [3] - 1:6, 4:4, 47:6
**14** [2] - 47:15, 48:1
**140** [1] - 68:8
**141** [1] - 69:15
**15** [3] - 5:24, 48:2, 76:12
**1520** [1] - 1:20
**156** [2] - 94:23, 94:25
**16** [1] - 48:2
**162** [1] - 105:22
**17** [2] - 4:5, 48:2
**173** [1] - 108:18
**177** [2] - 8:16, 8:22
**177.............................
.** [1] - 4:15

**17th** [1] - 57:10
**18** [1] - 1:8
**19** [1] - 108:20
**19-917** [1] - 1:4
**193** [1] - 35:4
**1992** [1] - 22:23
**1:14** [1] - 121:22
**1:15** [1] - 6:17
**1:19-cv-917** [1] - 122:8
**1:30** [3] - 6:11, 6:13, 6:17
**1st** [7] - 66:9, 77:13, 77:25, 78:5, 78:12, 78:22, 79:24

**2**

**2** [4] - 14:9, 15:15, 40:18, 40:19
**2-1-9** [1] - 102:6
**20** [8] - 12:20, 13:3, 24:2, 25:14, 50:17, 116:15, 116:18, 117:20
**20-year** [1] - 23:24
**200** [1] - 97:12
**2001** [3] - 23:15, 23:16, 23:20
**20037** [5] - 1:17, 2:15, 2:18, 2:22, 3:2
**2010** [1] - 80:16
**2011** [7] - 49:17, 49:22, 66:9, 69:25, 70:16, 103:20, 110:14
**2011-2012** [5] - 25:16, 27:12, 28:6, 34:9, 45:25
**2012** [11] - 10:1, 10:19, 11:5, 12:20, 12:21, 13:3, 13:17, 18:8, 25:10, 115:4
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2021** [2] - 21:18, 23:17
**2024** [3] - 1:6, 122:9, 122:16
**2029** [1] - 1:20
**20th** [1] - 75:13
**21** [3] - 4:8, 69:25, 103:20
**213-995-5720** [1] - 1:21
**219** [2] - 102:3, 102:5

**21st** [4] - 60:14, 104:13, 106:14, 107:6
**22** [3] - 12:21, 13:17, 115:4
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:6
**22nd** [2] - 107:6, 107:7
**2300** [1] - 1:16
**25** [6] - 31:5, 31:10, 41:3, 80:17, 80:19
**252** [2] - 8:14, 8:20
**252(Bates** [1] - 4:13
**258A** [1] - 31:15
**267** [2] - 40:22, 92:10
**27** [1] - 18:8
**275** [1] - 29:8
**28** [1] - 31:10
**2800** [3] - 2:3, 2:7, 2:11
**286** [2] - 8:15, 8:20
**286.............................
................** [1] - 4:14
**2878** [1] - 8:15
**2878-2881).............
.........** [1] - 4:13
**2881** [1] - 8:15
**290** [1] - 29:8
**2:15** [3] - 121:15, 121:21
**2:30** [1] - 6:11
**2nd** [3] - 2:2, 2:6, 2:10

**3**

**3** [1] - 31:19
**30** [4] - 6:3, 31:5, 31:10, 41:3
**305-539-8400** [1] - 2:8
**324** [2] - 8:16, 8:20
**324.............................
................** [1] - 4:14
**33131** [3] - 2:3, 2:7, 2:11
**35** [2] - 22:1, 24:13
**3:32** [1] - 18:8

**4**

**4** [2] - 43:10, 95:2
**40** [1] - 6:3
**401** [1] - 3:5
**45** [2] - 6:5, 6:7

**5**

**5** [1] - 43:18

**6**

**6** [1] - 44:7
**61** [1] - 32:19
**610-804-1787** [1] - 2:4
**643a** [1] - 1:16
**67** [1] - 4:17
**6th** [4] - 9:17, 29:13, 32:15, 52:3
**6th-grade** [1] - 32:15

**7**

**7** [3] - 23:1, 44:23, 84:10
**70** [1] - 83:6
**71** [3] - 54:19, 55:4, 55:7
**72** [2] - 56:9, 56:13
**75** [1] - 17:24
**76** [1] - 59:1
**79** [1] - 103:8
**7:15** [1] - 28:9
**7th** [17] - 10:15, 27:14, 28:3, 28:20, 32:16, 37:2, 40:8, 49:5, 49:8, 49:11, 49:17, 49:22, 53:25, 54:1, 80:16, 93:22, 116:2
**7th-grade** [6] - 27:14, 28:3, 32:16, 49:8, 49:17, 49:22

**8**

**8** [3] - 6:22, 23:1, 45:1
**804-788-8200** [1] - 3:2
**84** [1] - 99:7
**850-585-3414** [1] - 2:12
**88** [1] - 65:25
**8th** [8] - 27:14, 28:2, 28:20, 49:4, 49:6, 49:7, 49:9, 49:24
**8th-grade** [5] - 27:14, 28:2, 49:4, 49:6, 49:7

**9**

**9** [2] - 23:1, 97:19
**90** [1] - 4:8
**90067** [1] - 1:21
**95** [1] - 110:17

**A**

**a.m** [2] - 1:6, 7:4
**A.M** [2] - 1:8, 121:23
**ability** [1] - 122:14

**able** [6] - 7:18, 25:1, 26:18, 48:19, 88:13, 95:21
**abrenner@bsfllp. com** [1] - 2:8
**absolutely** [2] - 63:6, 77:18
**abuse** [4] - 38:1, 38:10, 38:11, 39:11
**academic** [5] - 26:20, 37:2, 58:22, 59:24, 88:3
**academics** [2] - 54:17, 88:8
**access** [2] - 70:19, 106:24
**accommodate** [3] - 6:10, 6:16, 7:18
**account** [5] - 46:21, 46:22, 56:2, 56:4, 56:22
**accusations** [2] - 101:24, 102:16
**accused** [3] - 109:25, 120:13, 120:14
**acrylic** [1] - 70:17
**action** [2] - 47:11, 47:12
**Action** [2] - 1:4, 122:8
**actions** [6] - 103:2, 104:3, 104:9, 104:16, 104:22, 105:1
**acts** [1] - 80:14
**added** [1] - 44:20
**addition** [2] - 63:15, 65:1
**additional** [1] - 86:13
**additionally** [1] - 106:18
**address** [6] - 16:5, 29:19, 30:17, 55:24, 103:17, 109:21
**addressed** [2] - 16:17, 16:25
**adduced** [1] - 122:6
**administrative** [1] - 88:16
**administrator** [16] - 27:17, 37:8, 37:10, 39:6, 39:7, 39:9, 39:10, 39:11, 39:12, 44:14, 58:10, 58:13, 74:6, 74:10, 87:9, 106:16
**administrators** [10] - 62:4, 63:2, 66:7, 91:21, 97:22, 98:11, 101:9, 101:14, 103:22, 109:20

1

**admission** [1] - 66:17
**admit** [5] - 8:9, 8:12, 12:9, 67:4, 78:7
**Admitted** [2] - 4:12, 4:16
**admitted** [20] - 8:20, 8:22, 12:13, 14:4, 31:15, 35:5, 40:23, 54:19, 55:5, 56:10, 59:1, 66:1, 66:19, 67:10, 68:9, 69:16, 75:4, 97:12, 103:8, 110:18
**adults** [2] - 44:15, 44:18
**advantage** [1] - 51:12
**advocate** [1] - 27:1
**affected** [2] - 119:25, 120:6
**afraid** [2] - 51:3, 51:4
**afternoon** [7] - 6:20, 28:3, 90:23, 90:24, 120:22, 120:23, 121:15
**afterwards** [2] - 104:11, 109:24
**age** [1] - 24:24
**aggressive** [1] - 47:22
**ago** [2] - 60:21, 109:11
**agree** [16] - 11:4, 48:12, 92:23, 94:11, 98:16, 98:18, 99:24, 100:1, 100:2, 100:7, 104:13, 104:15, 105:12, 107:17, 109:22
**agreed** [1] - 8:9
**ahead** [6] - 5:7, 6:19, 35:8, 35:12, 43:8, 48:24, 76:13, 91:22, 121:14
**al** [2] - 1:6, 122:7
**alanderson@bsfllp. com** [1] - 1:22
**alerted** [1] - 84:16
**Alexandria** [1] - 3:6
**aligned** [1] - 104:10
**alignment** [1] - 90:10
**Alison** [2] - 1:19, 8:2
**allegation** [4] - 37:25, 38:4, 38:15, 38:20
**allegations** [5] - 85:12, 87:25, 118:18, 118:23, 119:21
**allege** [1] - 78:12
**alleged** [3] - 71:22, 72:16, 80:14
**allowed** [2] - 34:16, 34:17

**almost** [2] - 18:23, 121:3
**alongside** [1] - 63:22
**ALSTON** [1] - 1:12
**amount** [1] - 97:3
**analysis** [1] - 95:22
**ANDERSON** [22] - 5:23, 6:1, 6:7, 7:22, 7:24, 8:7, 8:11, 8:14, 8:24, 11:3, 11:15, 11:22, 11:24, 12:1, 12:9, 12:14, 14:3, 14:6, 14:8, 14:10, 17:4, 17:6
**Anderson** [4] - 1:19, 7:21, 8:2, 17:18
**Anderson.............** [1] - 4:4
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**Angeles** [1] - 1:21
**angle** [1] - 36:16
**announced** [1] - 79:23
**announcing** [1] - 79:3
**ANSWER** [6] - 102:15, 106:7, 107:1, 107:7, 107:11, 109:3
**answer** [5] - 13:25, 21:1, 21:3, 95:19, 117:22
**answered** [5] - 73:12, 88:24, 95:7, 114:6, 119:17
**answers** [2] - 42:6, 82:10
**anticipate** [1] - 5:22
**anytime** [1] - 73:23
**AP** [4] - 18:15, 19:12, 19:13, 102:20
**apologies** [1] - 112:10
**apologize** [2] - 12:22, 55:2
**APPEARANCES** [3] - 1:13, 1:25, 2:24
**appeared** [1] - 93:15
**appreciate** [2] - 74:2, 99:19
**appreciates** [1] - 6:21
**approach** [4] - 11:22, 72:1, 90:17, 94:21
**April** [3] - 1:6, 12:9, 122:16
**area** [7] - 28:20, 28:21, 28:24, 34:21, 70:19, 84:23, 85:1
**areas** [1] - 65:8
**arrive** [2] - 28:8
**arrived** [1] - 28:7
**arrow** [1] - 33:11

**articulated** [1] - 95:15
**aside** [3] - 42:18, 63:9, 114:18
**aspect** [2] - 7:12, 20:13
**assault** [1] - 38:16
**assaulted** [6] - 39:3, 58:4, 58:8, 59:21, 89:8, 89:11
**assembly** [2] - 19:3, 19:20
**assertive** [2] - 47:22, 47:23
**assigned** [3] - 27:13, 27:14, 93:22
**assistance** [1] - 33:16
**assistant** [14] - 19:13, 19:17, 19:18, 23:22, 27:5, 34:20, 36:20, 50:5, 74:12, 101:17, 101:18, 106:16, 107:2, 109:19
**assume** [2] - 15:20, 116:13
**assuming** [2] - 30:6, 77:9
**assured** [1] - 17:2
**attachment** [1] - 49:16
**attempt** [2] - 72:22, 80:24
**attendance** [1] - 20:3
**attended** [1] - 9:13
**attending** [1] - 27:8
**attention** [15] - 17:23, 25:15, 37:13, 51:13, 57:17, 60:9, 71:11, 71:13, 71:15, 73:17, 76:9, 85:13, 92:18, 94:1, 94:2
**attentive** [1] - 37:12
**attenuated** [1] - 79:1
**attorney** [1] - 116:13
**attribute** [1] - 68:20
**August** [2] - 10:1, 57:10
**available** [1] - 29:10
**Ave** [1] - 2:21
**Avenue** [3] - 2:14, 2:18, 3:1
**avoid** [1] - 47:3
**awarded** [1] - 25:11
**awards** [2] - 23:7, 25:6
**aware** [11] - 16:8, 29:9, 30:2, 78:17, 78:18, 78:20, 79:15, 79:22, 94:6, 94:17, 119:13

# B

**B.R** [64] - 1:3, 11:11, 18:22, 20:1, 51:16, 51:17, 51:18, 51:20, 52:15, 52:20, 52:22, 53:1, 53:21, 54:7, 54:15, 55:20, 56:18, 57:9, 59:19, 59:25, 60:13, 60:19, 61:8, 62:21, 63:11, 63:16, 63:20, 68:17, 70:6, 70:22, 71:7, 71:11, 73:6, 73:19, 74:4, 74:18, 74:19, 76:3, 76:4, 81:22, 83:24, 84:22, 86:20, 87:1, 88:9, 88:12, 88:15, 88:18, 88:21, 89:7, 89:10, 89:16, 89:25, 115:25, 119:2, 119:4, 119:8, 119:11, 119:21, 121:2, 122:7
**B.R.'s** [12] - 18:12, 53:2, 59:7, 62:10, 64:13, 71:2, 84:3, 85:1, 85:23, 86:1, 119:6, 119:13
**bachelor's** [1] - 21:21
**back-to-school** [1] - 30:11
**background** [5] - 21:19, 21:20, 24:12, 25:5, 41:17
**backup** [1] - 122:13
**backwards** [1] - 25:25
**bad** [3] - 80:14, 88:10, 92:22
**B▮▮h▮▮▮▮▮▮▮▮▮** [1] - 103:17
**ballpark** [5] - 21:25, 22:1, 22:15, 22:19, 53:7
**bar** [1] - 77:3
**BARAN** [1] - 1:15
**Barry** [1] - 5:6
**based** [2] - 26:3, 45:4, 48:7, 48:9, 50:17, 53:17, 70:25, 75:20, 91:15, 91:20, 91:24
**basement** [2] - 108:13, 109:5
**Bates** [18] - 2:13, 5:10, 5:12, 5:17, 8:14, 21:9, 55:1, 72:6, 72:21, 83:20, 91:3, 92:16, 93:10, 93:25, 96:17, 105:6, 113:3,

116:15
**BATES** [96] - 20:21, 21:6, 31:14, 31:18, 31:21, 31:23, 32:18, 32:22, 32:25, 35:3, 35:8, 35:9, 38:15, 38:18, 38:19, 40:21, 41:1, 43:2, 43:3, 44:9, 44:10, 45:10, 45:12, 47:25, 48:3, 49:12, 49:14, 50:16, 50:22, 54:18, 54:22, 55:2, 55:4, 55:7, 55:9, 56:8, 56:13, 56:16, 58:25, 59:5, 65:24, 66:4, 66:19, 66:21, 66:24, 67:2, 67:4, 67:11, 67:14, 67:18, 67:20, 68:7, 68:12, 69:14, 69:19, 72:1, 72:10, 72:12, 73:1, 73:3, 73:15, 73:22, 74:1, 74:3, 75:3, 75:8, 75:11, 76:12, 76:19, 76:22, 77:1, 77:4, 77:11, 77:15, 78:20, 78:24, 80:11, 80:13, 80:22, 81:1, 83:15, 83:21, 83:22, 89:1, 89:5, 89:6, 90:2, 90:4, 94:8, 94:13, 95:6, 96:10, 108:22, 114:6, 121:8, 121:19
**Bates...............** [1] - 4:8
**bathroom** [1] - 84:25
**bay** [3] - 101:25, 102:17, 104:8
**beautiful** [1] - 53:12
**became** [3] - 22:22, 94:6, 94:17
**become** [2] - 22:20, 52:24
**BEFORE** [1] - 1:12
**beginning** [6] - 42:22, 42:23, 63:20, 63:21, 65:6, 89:24
**behalf** [4] - 4:2, 4:6, 4:11, 4:16
**behavior** [8] - 19:4, 45:16, 47:19, 77:23, 79:15, 86:4, 86:11, 86:18
**behind** [4] - 10:8, 11:24, 63:25, 98:2
**believes** [1] - 26:3
**bell** [2] - 106:6, 107:10
**B▮▮▮▮▮▮▮▮] [1] - 106:25
**bend** [1] - 25:24

2

**beside** [4] - 33:17, 33:18, 64:7, 84:25
**best** [7] - 6:9, 21:1, 52:25, 60:22, 90:11, 107:1, 122:14
**better** [2] - 11:5, 66:12
**between** [13] - 6:11, 6:15, 10:8, 16:9, 29:5, 29:8, 42:16, 43:14, 44:4, 63:23, 64:3, 106:4, 107:8
**beyond** [1] - 19:8
**big** [2] - 33:9, 40:9
**bin** [3] - 84:24, 85:5, 85:7
**binder** [6] - 11:20, 94:25, 95:1, 97:17, 102:2
**bio** [1] - 78:19
**bit** [22] - 5:5, 10:4, 11:16, 14:11, 32:23, 32:24, 37:23, 41:17, 44:2, 49:7, 49:9, 50:23, 51:12, 63:24, 76:1, 93:9, 101:8, 103:11, 105:4, 110:24, 111:14, 111:24
**blaming** [2] - 111:20, 112:7
**Blanchard** [2] - 17:10, 120:18
**BLANCHARD** [6] - 17:11, 82:19, 83:7, 120:19, 120:21, 121:5
**Blanchard............** [1] - 4:9
**blank** [1] - 73:8
**blessed** [1] - 117:7
**blow** [1] - 79:13
**Board** [1] - 21:9
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**book** [12] - 31:20, 84:12, 84:13, 84:14, 84:17, 84:20, 84:24, 85:10, 85:14, 85:16, 85:17, 85:18
**bothered** [3] - 57:21, 64:21, 89:14
**bottom** [20] - 12:15, 12:22, 14:8, 17:24, 18:1, 18:8, 43:9, 43:22, 44:8, 46:8, 46:23, 47:7, 48:1, 51:8, 66:5, 75:12, 97:24, 103:24, 105:24, 110:25
**box** [5] - 70:9, 70:10,

70:12, 70:15, 70:19
**boys** [4] - 58:2, 58:4, 58:8, 88:21
**break** [10] - 6:19, 7:19, 71:7, 71:9, 76:14, 83:11, 83:13, 100:23, 100:25, 121:15
**breaking** [1] - 43:14
**B▇▇▇** [18] - 4:7, 5:12, 10:7, 12:17, 12:18, 12:19, 13:1, 13:5, 13:6, 13:9, 13:15, 19:23, 20:21, 20:23, 21:11, 48:2, 112:11, 113:16
**B▇▇▇** [1] - 20:24
**Brenner** [1] - 2:5
**BRENNER** [2] - 20:10
**briefly** [1] - 120:19
**bring** [6] - 37:1, 37:13, 37:15, 51:13, 76:19, 83:4
**bringing** [1] - 57:16
**Brittany** [1] - 2:1
**britzoll@gmail.com** [1] - 2:4
**brother** [2] - 52:5, 93:18
**brought** [9] - 60:8, 71:2, 71:11, 71:12, 71:15, 73:17, 85:13, 94:1, 94:2
**brown** [1] - 97:19
**building** [4] - 13:19, 50:6, 75:21, 113:25
**bullet** [2] - 45:23, 93:3
**bullied** [1] - 47:17
**bully** [1] - 119:1
**bullying** [19] - 16:25, 18:4, 18:13, 18:15, 19:2, 40:19, 41:9, 44:24, 45:5, 45:16, 45:18, 45:21, 45:24, 48:9, 48:13, 81:21, 91:4, 91:16, 92:4
**Bullying** [1] - 49:17
**Burton** [1] - 2:20
**burtons@huntonak.com** [1] - 2:23
**bus** [6] - 78:1, 78:5, 78:13, 79:3, 79:9, 79:11
**buses** [1] - 79:23
**busy** [3] - 59:25, 88:15, 88:16
**BY** [66] - 7:24, 8:24, 11:3, 11:15, 12:1, 12:14, 14:10, 17:16, 17:22, 19:11, 21:6,

31:18, 32:25, 35:9, 38:19, 41:1, 44:10, 45:12, 48:3, 49:14, 50:16, 50:22, 54:22, 55:9, 56:16, 59:5, 66:4, 67:14, 67:20, 68:12, 69:19, 72:12, 73:3, 73:15, 74:3, 75:11, 83:22, 89:6, 90:22, 92:14, 94:10, 94:16, 94:24, 96:3, 96:16, 97:15, 99:11, 102:11, 103:12, 105:21, 106:3, 106:21, 108:25, 111:1, 113:14, 114:10, 115:1, 116:11, 117:18, 118:5, 118:14, 118:22, 119:20, 120:5, 120:11, 120:21

## C

**C.K** [4] - 77:23, 81:10, 82:9, 103:3
**C.K.'s** [1] - 77:12
**CA** [1] - 1:21
**cafeteria** [3] - 28:16, 86:20, 86:22
**California** [6] - 22:9, 22:10, 22:22, 23:5, 23:7, 23:8
**camera** [1] - 35:16
**capacity** [3] - 26:19, 27:6, 122:5
**career** [1] - 89:20
**Carolina** [5] - 21:22, 22:5, 22:6, 23:4, 23:5
**C▇▇▇** [2] - 27:21, 37:18
**Carson** [32] - 21:16, 23:13, 23:23, 23:25, 24:2, 25:7, 25:14, 25:17, 31:24, 37:1, 49:10, 50:12, 50:17, 52:4, 52:19, 54:1, 77:24, 78:19, 79:16, 80:17, 88:5, 89:18, 91:21, 93:14, 97:22, 116:1, 116:16, 116:20, 117:3, 117:11, 117:13, 117:19
**case** [18] - 7:12, 8:3, 20:13, 20:14, 38:15, 51:16, 80:22, 81:20, 82:21, 87:25, 91:1, 118:16, 118:24,

119:22, 120:6, 122:7
**cell** [4] - 106:5, 106:25, 107:9, 110:14
**Center** [2] - 51:19, 93:11
**center** [2] - 53:22, 93:17
**Century** [1] - 1:20
**certain** [5] - 8:9, 27:8, 27:9, 68:24, 98:25
**certainly** [3] - 78:23, 91:14, 115:17
**certainty** [2] - 96:4, 105:9
**CERTIFICATE** [1] - 122:1
**Certificate** [1] - 4:20
**certify** [2] - 122:4, 122:10
**CF** [1] - 33:16
**chairs** [3] - 35:22, 36:1, 36:6
**chance** [2] - 73:13, 111:17
**change** [3] - 10:8, 58:17, 88:4
**changes** [1] - 99:20
**character** [1] - 80:24
**charge** [2] - 14:25, 15:6
**Check** [1] - 15:21
**check** [5] - 16:1, 98:3, 112:24, 113:1, 121:7
**check-in** [1] - 112:24
**check-ins** [1] - 113:1
**checked** [2] - 19:24, 58:10
**checking** [3] - 28:13, 74:19, 114:24
**cheerful** [1] - 24:21
**Cheryl** [7] - 4:3, 5:12, 13:19, 25:2, 75:23, 75:24, 113:25
**child** [2] - 38:5, 38:7
**children** [2] - 41:3, 53:12
**choice** [1] - 100:19
**choose** [1] - 117:2
**chorus** [1] - 56:6
**chosen** [1] - 42:20
**C▇▇▇** [2] - 104:3, 104:19
**C▇▇▇** [2] - 78:7, 78:9
**chronologically** [1] - 66:15
**chuckle** [2] - 46:1, 46:4
**Church** [1] - 23:21

**circle** [2] - 33:5, 33:9
**circumstance** [1] - 7:18
**circumstances** [2] - 114:2, 114:4
**City** [1] - 23:11
**civic** [1] - 7:10
**Civil** [2] - 1:4, 122:7
**claims** [3] - 65:10, 65:12, 119:25
**clarification** [1] - 110:6
**clarifying** [1] - 63:8
**class** [22] - 30:23, 30:24, 31:12, 41:3, 42:18, 46:1, 58:18, 59:11, 63:17, 63:20, 63:25, 64:1, 64:13, 80:18, 88:4, 99:20, 110:14, 111:10, 112:9
**classes** [5] - 10:9, 19:2, 30:13, 39:17, 63:22
**classmate** [1] - 80:19
**classroom** [13] - 28:19, 30:21, 33:23, 39:22, 40:5, 40:12, 41:4, 49:17, 50:24, 62:17, 64:1, 101:21, 111:19
**classrooms** [1] - 29:24
**clear** [9] - 51:7, 52:17, 65:6, 79:10, 81:7, 86:15, 89:1, 98:15, 100:1
**clearly** [1] - 82:3
**CLERK** [1] - 55:6
**click** [1] - 45:9
**clinic** [1] - 36:18
**close** [5] - 54:8, 64:24, 74:14, 96:11, 103:11
**closer** [2] - 6:3, 55:17
**cognitive** [3] - 86:4, 86:11, 86:18
**collaboration** [1] - 92:8
**colleagues** [4] - 10:2, 10:17, 10:24, 11:4
**college** [2] - 22:3, 22:4
**comfortable** [6] - 31:12, 36:7, 47:12, 47:13, 47:14, 102:19
**coming** [13] - 27:2, 40:11, 42:24, 52:3, 52:4, 54:1, 54:7, 54:9, 58:15, 58:21, 93:14, 101:24, 102:17

3

**command** [1] - 14:22
**comment** [1] - 61:9
**common** [2] - 92:25, 93:1
**communicate** [5] - 29:18, 37:22, 46:3, 51:1, 51:2
**communicating** [2] - 26:21, 114:24
**communication** [2] - 47:18, 47:20
**Community** [2] - 51:19, 93:11
**community** [2] - 53:21, 93:17
**compare** [2] - 89:17, 89:19
**complaints** [3] - 118:15, 118:24, 121:2
**complete** [1] - 32:13
**completely** [1] - 111:21
**complied** [3] - 33:8, 33:12, 33:14
**computer** [1] - 122:12
**concern** [7] - 6:10, 37:20, 58:9, 61:21, 65:8, 107:18, 107:25
**concerned** [2] - 61:10, 108:10
**concerns** [8] - 37:21, 94:1, 94:6, 94:11, 94:17, 96:5, 101:23, 102:16
**concluded** [1] - 121:23
**concur** [1] - 8:17
**conduct** [1] - 119:10
**conducting** [1] - 63:4
**confer** [1] - 72:8
**conference** [4] - 33:17, 87:4, 87:5
**conferences** [1] - 28:13
**confers** [6] - 66:25, 67:3, 72:11, 95:25, 108:24, 114:22
**confirm** [1] - 55:5
**conflicts** [3] - 37:4, 37:5
**confused** [2] - 62:15
**confusing** [1] - 90:16
**confusion** [1] - 62:19
**connected** [1] - 19:4
**considered** [2] - 45:17, 51:5
**consistent** [2] - 95:19, 95:22
**constitute** [1] - 122:11

**Cont** [2] - 1:25, 2:24
**contact** [4] - 39:6, 39:8, 40:7, 98:4
**CONTENTS** [1] - 4:1
**contest** [1] - 22:20
**continue** [10] - 6:23, 65:20, 68:24, 69:1, 69:9, 83:20, 98:25, 99:4, 99:19, 117:20
**continued** [4] - 28:18, 64:17, 100:22, 100:24
**continues** [1] - 98:1
**continuing** [1] - 64:15
**continuously** [1] - 23:16
**conversation** [12] - 9:3, 13:23, 42:16, 48:7, 51:24, 52:2, 58:11, 61:1, 109:17, 110:9, 110:11, 114:14
**conversations** [6] - 44:6, 48:11, 61:4, 61:6, 61:17, 98:4
**core** [10] - 27:19, 37:18, 101:10, 101:15, 101:22, 102:13, 103:1, 104:8, 111:4
**correct** [21] - 8:5, 8:6, 10:11, 12:17, 13:17, 13:18, 13:21, 14:19, 14:20, 15:11, 16:7, 19:16, 43:5, 67:16, 95:5, 96:22, 98:21, 98:22, 105:14, 107:16, 112:20
**correction** [1] - 23:19
**correctly** [1] - 39:21
**counsel** [2] - 21:1, 72:9
**Counsel** [7] - 66:25, 67:3, 72:11, 94:15, 95:25, 108:24, 114:22
**counseling** [8] - 21:23, 29:6, 31:22, 32:3, 33:24, 34:18, 36:12, 40:3
**Counselor** [2] - 32:15, 32:17
**counselor** [44] - 18:14, 22:8, 22:13, 22:20, 22:23, 25:6, 25:9, 25:12, 26:10, 26:14, 26:16, 27:4, 28:6, 29:10, 29:23, 30:13, 30:15, 30:19, 33:4, 33:10, 33:22,

34:11, 35:24, 37:24, 38:3, 39:14, 39:16, 39:20, 41:7, 41:9, 44:14, 50:3, 51:4, 52:7, 58:22, 62:10, 70:13, 88:5, 88:7, 93:22, 109:17, 109:22, 118:6, 118:11
**counselor's** [1] - 50:10
**counselors** [8] - 12:2, 13:6, 29:14, 29:17, 30:2, 30:22, 35:25, 63:3
**counselors'** [1] - 35:13
**count** [1] - 23:4
**counter** [2] - 34:13, 34:14
**country** [1] - 40:13
**county** [1] - 91:25
**County** [7] - 21:9, 21:15, 23:3, 23:5, 25:9, 40:12, 90:9
**county's** [1] - 25:12
**county-wide** [1] - 91:25
**couple** [10] - 30:1, 30:5, 65:2, 71:3, 71:10, 74:1, 99:15, 111:6, 113:15
**Courier** [1] - 31:24
**course** [2] - 6:17, 11:7
**Court** [13] - 3:4, 3:4, 4:20, 5:7, 6:21, 7:4, 21:2, 76:18, 76:22, 95:10, 95:14, 122:3, 122:22
**COURT** [149] - 1:1, 1:12, 5:1, 5:3, 5:17, 5:20, 5:25, 6:4, 6:6, 6:8, 7:6, 7:9, 7:17, 8:10, 8:13, 8:17, 8:19, 11:2, 11:9, 11:14, 11:23, 12:11, 14:5, 17:5, 17:8, 17:10, 17:12, 18:18, 18:21, 20:8, 20:12, 20:17, 20:20, 20:23, 20:25, 31:16, 32:20, 35:6, 38:17, 40:24, 50:15, 50:19, 54:20, 55:1, 55:3, 56:11, 56:14, 59:3, 66:2, 66:18, 66:20, 66:23, 67:1, 67:7, 67:9, 67:12, 68:10, 69:12, 69:17, 72:3, 72:20, 73:13, 73:20, 73:23,

75:6, 76:11, 76:13, 76:16, 76:21, 76:25, 77:2, 77:8, 77:14, 77:17, 77:20, 77:25, 78:3, 78:5, 78:11, 79:1, 79:7, 79:12, 79:18, 79:24, 80:1, 80:5, 80:9, 80:24, 81:2, 81:5, 81:15, 81:22, 82:1, 82:15, 83:1, 83:8, 83:12, 83:14, 83:18, 88:25, 89:4, 90:3, 90:7, 90:18, 90:20, 92:5, 92:12, 94:9, 94:14, 94:22, 95:4, 95:9, 95:17, 96:2, 96:8, 96:12, 97:13, 99:9, 102:10, 103:9, 106:2, 106:20, 110:19, 110:21, 113:11, 114:7, 114:9, 114:23, 115:22, 116:4, 116:7, 116:9, 117:15, 117:22, 118:1, 118:4, 118:13, 118:21, 119:19, 120:2, 120:10, 120:15, 120:18, 121:6, 121:9, 121:12, 121:14, 121:18, 121:20
**court** [2] - 83:16, 122:8
**Court's** [2] - 7:11, 17:4
**Courthouse** [1] - 3:5
**courtroom** [2] - 20:15
**COURTROOM** [1] - 55:6
**cover** [1] - 85:9
**coworkers** [1] - 25:22
**CPS** [1] - 39:1
**created** [2] - 92:2, 104:2
**creating** [2] - 46:21, 46:22
**CROSS** [4] - 7:23, 90:21, 116:10, 120:20
**Cross** [4] - 4:4, 4:8, 4:9, 4:9
**cross** [4] - 5:22, 90:6, 90:14, 118:20
**CROSS-EXAMINATION** [4] - 7:23, 90:21, 116:10, 120:20
**Cross-examination**

[4] - 4:4, 4:8, 4:9, 4:9
**cross-examination** [1] - 90:14
**crying** [1] - 115:19
**cut** [1] - 61:15
**cyberbullying** [4] - 46:13, 91:17, 92:25, 93:4
**Cyberbullying** [1] - 92:19

**D**

**D.N** [1] - 103:3
**dad** [2] - 106:5, 107:9
**damage** [1] - 92:22
**date** [13] - 9:17, 10:16, 12:19, 57:10, 69:22, 69:24, 75:12, 81:8, 100:14, 103:20, 103:21, 106:13
**dated** [1] - 80:16
**dates** [2] - 101:4, 104:10
**daughter** [4] - 51:19, 61:22, 108:13, 109:4
**daughter's** [1] - 52:25
**David** [3] - 9:13, 104:3, 104:19
**days** [13] - 10:25, 11:11, 11:12, 65:2, 67:15, 68:14, 89:23, 98:3, 98:8, 98:14, 98:17, 118:8
**DC** [5] - 1:17, 2:15, 2:18, 2:22, 3:2
**deal** [2] - 81:11, 91:23
**December** [9] - 9:17, 10:15, 66:9, 69:25, 71:6, 71:8, 110:13, 115:8, 115:16
**decide** [1] - 24:2
**deeper** [1] - 26:12
**Defendant** [2] - 2:13, 2:25
**Defendants** [4] - 1:8, 4:2, 4:6, 4:16
**Defendants'** [17] - 4:15, 8:22, 20:24, 32:19, 35:4, 40:22, 54:19, 59:1, 65:25, 66:15, 66:16, 67:5, 67:10, 68:8, 69:15, 92:10, 97:11
**Defense** [2] - 8:16, 31:15
**defense** [1] - 20:21
**definition** [2] - 43:7, 45:4
**definitions** [1] - 43:12

4

**degree** [1] - 21:21
**demeaning** [1] - 104:2
**department** [4] - 23:22, 24:9, 27:7, 64:12
**deposition** [14] - 94:20, 95:1, 95:4, 95:5, 95:8, 95:15, 95:23, 96:7, 96:11, 102:2, 105:17, 108:17, 109:10, 115:24
**describe** [3] - 25:17, 26:14, 53:10
**described** [1] - 104:15
**description** [1] - 37:12
**desk** [2] - 34:6, 34:8
**detail** [1] - 102:18
**details** [6] - 104:1, 105:13, 106:7, 106:11, 107:11, 107:22
**developed** [1] - 92:6
**difference** [1] - 44:1
**differences** [2] - 40:8, 45:14
**different** [22] - 16:25, 19:20, 22:8, 23:2, 24:8, 24:11, 39:25, 40:1, 45:14, 47:18, 49:6, 49:8, 49:9, 51:9, 81:24, 81:25, 85:21, 91:15, 96:1, 100:16, 115:13
**difficult** [2] - 118:10, 120:13
**Direct** [1] - 4:8
**direct** [13] - 5:21, 15:3, 17:23, 25:3, 51:11, 55:15, 76:9, 82:13, 82:17, 90:6, 91:3, 92:18, 113:4
**DIRECT** [1] - 21:5
**directed** [3] - 36:5, 113:5, 119:10
**direction** [1] - 6:24
**directly** [2] - 39:6, 58:12
**director** [5] - 24:10, 27:5, 33:18, 38:24
**dirty** [1] - 83:3
**disciplinary** [2] - 63:4, 63:5
**discomfort** [7] - 101:24, 102:16, 102:21, 102:25, 103:2, 104:7, 104:15
**discreet** [1] - 6:14
**discreetly** [3] - 10:8, 63:24, 98:2

**discuss** [4] - 7:12, 20:13, 42:18, 47:11
**discussed** [6] - 46:17, 61:12, 91:4, 101:15, 101:19, 104:8
**discussing** [3] - 45:14, 47:8, 112:22
**discussion** [6] - 42:16, 44:4, 61:11, 61:14, 101:20, 107:3
**Discussion** [3] - 7:2, 7:15, 121:13
**discussions** [1] - 42:6
**disgusting** [5] - 80:20, 81:18, 81:23, 82:2, 83:2
**display** [1] - 122:13
**District** [3] - 3:4, 23:11, 122:4
**DISTRICT** [3] - 1:1, 1:1, 1:12
**districts** [1] - 23:6
**disturbing** [1] - 106:24
**dive** [1] - 26:12
**divide** [1] - 30:25
**dividing** [1] - 5:11
**document** [13] - 32:9, 71:5, 72:4, 72:14, 72:21, 72:23, 74:14, 77:12, 80:14, 81:12, 82:7, 97:16, 97:18
**documents** [2] - 78:9, 83:24
**done** [15] - 18:17, 18:23, 26:24, 30:18, 30:25, 38:11, 39:5, 39:17, 58:7, 71:23, 89:19, 89:20, 89:22, 89:25, 91:13
**door** [5] - 33:5, 33:6, 33:7, 36:18, 36:21
**dot** [1] - 33:13
**doubt** [3] - 10:23, 26:5
**down** [31] - 9:21, 20:8, 32:8, 35:19, 36:23, 43:14, 50:1, 53:13, 54:8, 54:9, 54:25, 56:8, 57:1, 59:23, 66:14, 68:7, 69:14, 71:5, 75:8, 76:7, 76:10, 81:7, 85:5, 93:8, 99:21, 100:8, 100:23, 103:19, 115:18, 121:6, 121:10
**dozen** [1] - 53:9
**drama** [1] - 58:23
**draw** [1] - 33:11
**drawing** [1] - 73:8

**drift** [1] - 55:16
**dropping** [1] - 51:10
**DuPage** [1] - 23:5
**during** [20] - 10:8, 26:9, 31:3, 38:2, 50:12, 53:15, 60:25, 64:25, 65:17, 82:9, 83:3, 83:5, 91:3, 99:20, 105:7, 108:9, 109:1, 116:1, 116:19
**duty** [3] - 28:15, 28:16, 28:17
**DX's** [1] - 11:24

## E

**early** [4] - 69:2, 71:8, 99:20
**earned** [1] - 21:22
**easier** [2] - 12:23, 14:12
**East** [1] - 1:20
**Eastern** [1] - 122:4
**EASTERN** [1] - 1:1
**educate** [6] - 18:3, 18:13, 27:1, 44:2, 91:11, 91:14
**education** [6] - 21:25, 23:8, 23:21, 24:13, 77:16, 78:21
**Education** [1] - 19:19
**educational** [3] - 21:20, 21:23, 22:2
**educators** [1] - 24:4
**eight** [3] - 22:16, 22:17, 22:18
**either** [6] - 21:2, 39:3, 48:19, 58:8, 58:21, 112:25
**elaborate** [1] - 43:6
**Elementary** [1] - 9:14
**elementary** [3] - 23:21, 29:14, 40:9
**Elliker** [1] - 2:25
**Email** [9] - 1:18, 1:22, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3
**email** [84] - 11:18, 12:2, 12:3, 12:7, 12:16, 12:23, 13:1, 13:13, 13:14, 14:13, 15:8, 15:17, 15:18, 15:25, 16:20, 16:23, 17:24, 18:7, 18:11, 18:12, 19:12, 19:23, 19:25, 29:19, 30:17, 51:9, 55:13, 55:20, 55:24, 56:1, 56:4, 56:18, 56:22, 58:21, 59:7, 59:18, 66:5,

66:6, 67:15, 67:19, 67:21, 67:23, 68:13, 68:14, 68:15, 68:17, 68:23, 69:6, 70:2, 75:10, 75:12, 75:20, 85:20, 85:22, 86:2, 86:9, 86:10, 99:3, 99:5, 99:6, 99:12, 100:23, 103:13, 103:16, 110:24, 111:2, 111:7, 111:9, 112:2, 112:16, 112:18, 113:3, 113:4, 113:15, 113:23, 114:11, 114:16, 114:18, 115:2, 115:11
**emails** [6] - 28:14, 54:15, 57:2, 57:6, 60:3, 115:10
**emergency** [2] - 36:4, 88:18
**emotional** [1] - 26:20
**employed** [1] - 21:12
**encounter** [6] - 91:11, 108:4, 108:14, 109:6, 110:10, 110:12
**encounters** [3] - 108:15, 109:9
**encouraged** [1] - 112:11
**end** [6] - 28:18, 63:21, 82:20, 82:21, 89:24, 97:25
**ended** [2] - 29:22, 64:14
**ending** [1] - 8:14
**energy** [2] - 25:22
**engage** [2] - 42:5, 43:16
**engaged** [1] - 44:6
**English** [11] - 21:21, 22:5, 22:10, 27:20, 30:12, 30:23, 31:1, 31:2, 31:5, 31:12, 39:17
**enjoy** [2] - 24:16, 118:6
**ensure** [2] - 69:3, 99:21
**enter** [4] - 33:24, 35:15, 35:16, 35:17
**entering** [1] - 35:18
**entire** [4] - 23:24, 41:18, 42:18, 88:4
**entitled** [1] - 90:6
**entrance** [4] - 34:2, 35:10, 36:11, 36:17
**environment** [6] -

24:3, 25:21, 26:2, 51:23, 104:2, 117:7
**especially** [2] - 37:2, 47:14
**Esq** [9] - 1:14, 1:19, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25
**essentially** [4] - 16:19, 48:14, 52:11, 69:8
**establish** [4] - 77:23, 78:8, 79:11, 80:20
**estimate** [1] - 29:6
**estimating** [1] - 22:14
**Estrella** [2] - 27:20, 37:17
**et** [2] - 1:6, 122:7
**event** [3] - 108:7, 108:9, 114:19
**events** [1] - 11:5
**evidence** [10] - 8:21, 8:23, 12:13, 67:10, 78:13, 78:15, 79:8, 99:8, 110:17, 113:10
**evidently** [1] - 13:22
**exact** [8] - 53:2, 54:4, 71:20, 79:4, 95:6, 96:20, 97:3, 99:5
**exactly** [5] - 9:21, 9:24, 16:21, 98:24, 99:24
**examination** [13] - 4:4, 4:5, 4:8, 4:8, 4:9, 4:9, 5:21, 6:17, 83:20, 90:12, 90:14, 92:15
**EXAMINATION** [6] - 7:23, 17:15, 21:5, 90:21, 116:10, 120:20
**example** [7] - 28:11, 29:16, 33:23, 36:3, 44:14, 93:1, 93:2
**examples** [12] - 43:15, 43:17, 43:19, 44:15, 44:20, 45:15, 46:6, 47:4, 47:19, 92:1, 92:2, 92:8
**excess** [1] - 18:23
**excited** [4] - 24:12, 93:14, 93:15, 93:18
**exciting** [1] - 24:23
**excluding** [1] - 58:17
**excuse** [4] - 64:18, 93:17, 99:13, 114:8
**excused** [4] - 20:19, 76:15, 121:11, 121:17
**exercise** [2] - 83:3, 83:5
**Exhibit** [49] - 8:14,

5

8:15, 8:16, 8:20,
8:22, 11:21, 12:10,
12:13, 14:6, 14:7,
17:18, 31:15, 31:17,
32:19, 32:21, 35:4,
35:7, 40:22, 40:25,
54:19, 54:21, 55:4,
55:7, 56:9, 56:15,
59:1, 59:4, 65:25,
66:3, 66:16, 67:5,
67:10, 67:13, 68:8,
68:11, 69:15, 69:18,
75:4, 75:7, 75:9,
92:10, 92:13, 97:11,
97:14, 103:8,
110:17, 110:22
**exhibit** [4] - 49:13,
77:6, 99:10, 113:13
**exhibits** [2] - 8:9, 77:5
**EXHIBITS** [1] - 4:10
**exit** [1] - 35:14
**expand** [1] - 50:23
**expecting** [1] - 29:13
**experience** [2] -
50:11, 51:14
**experienced** [2] -
91:16, 91:21
**experiencing** [3] -
50:13, 115:15,
115:25
**explain** [2] - 36:15,
119:24
**explained** [2] - 14:22,
64:7
**Explorers** [11] - 27:14,
27:16, 29:2, 29:3,
29:5, 33:23, 37:9,
37:16, 41:8, 41:15,
65:13
**expressed** [3] - 58:9,
101:23, 102:16
**extent** [2] - 7:14,
25:15
**eye** [2] - 64:24, 65:7

**F**

**F-111** [2] - 33:20,
33:21
**F.C.S.B** [4] - 1:6, 2:13,
2:25, 122:7
**faced** [1] - 38:4
**facilitated** [1] - 101:18
**facing** [1] - 7:18
**fact** [1] - 6:21
**facts** [1] - 43:5
**Fahey** [1] - 1:14
**fair** [3] - 24:13, 73:16,
73:24
**Fairfax** [6] - 21:9,

21:15, 23:3, 25:9,
40:12, 90:9
**fake** [2] - 46:21, 46:22
**fall** [3] - 25:10, 52:4,
82:3
**falling** [1] - 82:5
**Falls** [1] - 23:21
**false** [3] - 119:22,
119:23, 119:24
**familiar** [4] - 31:24,
33:1, 52:21, 52:24
**Family** [1] - 19:19
**family** [9] - 14:14,
38:22, 39:4, 53:1,
53:2, 56:4, 62:21,
97:23, 103:14
**far** [1] - 27:4
**Farms** [2] - 53:5, 53:8
**F██████** [9] - 27:20,
37:17, 75:14, 111:2,
111:9, 111:17,
112:3, 113:5, 113:16
**fashion** [1] - 89:4
**father** [2] - 60:12, 61:7
**fathom** [1] - 120:13
**FCPS** [1] - 12:5
**February** [3] - 10:18,
115:9, 115:16
**feeder** [1] - 40:11
**felt** [9] - 19:8, 24:3,
24:7, 24:24, 24:25,
26:4, 117:6, 117:8,
117:9
**fess** [1] - 111:15
**few** [11] - 17:13, 23:20,
28:12, 48:6, 53:15,
57:16, 57:22, 57:24,
58:1, 88:13, 94:2
**file** [2] - 78:6, 79:25
**filed** [3] - 6:23, 118:16,
118:24
**fill** [1] - 32:11
**finally** [1] - 54:12
**fine** [5] - 73:1, 82:15,
96:8, 112:1
**fingers** [1] - 111:20
**finish** [3] - 5:11, 5:19,
49:4
**first** [58] - 13:15,
13:20, 15:9, 18:8,
21:19, 22:2, 22:4,
23:20, 25:19, 26:3,
26:15, 29:19, 29:25,
30:2, 30:5, 31:4,
37:11, 38:23, 40:2,
41:2, 41:24, 42:21,
47:14, 49:12, 50:24,
50:25, 51:17, 51:18,
52:11, 52:13, 57:16,
57:22, 57:24, 58:1,

58:10, 60:7, 60:17,
60:20, 61:7, 61:13,
61:18, 62:14, 64:5,
65:14, 66:11, 71:10,
83:3, 84:2, 84:6,
84:23, 91:13, 93:3,
94:2, 94:17, 106:5,
107:9, 110:24
**firsthand** [1] - 11:10
**fit** [1] - 24:3
**five** [2] - 64:11, 98:14
**FL** [3] - 2:3, 2:7, 2:11
**FLE** [1] - 19:18
**FLEXNER** [4] - 1:19,
2:2, 2:6, 2:10
**flip** [4] - 36:9, 36:14,
48:5, 94:25
**flirting** [2] - 43:24,
44:2
**floor** [1] - 85:4
**Floor** [1] - 3:5
**Floris** [3] - 9:14,
29:15, 52:17
**focus** [3] - 25:15,
27:16, 47:6
**focused** [2] - 89:1,
89:2
**folders** [1] - 70:17
**follow** [6] - 63:25,
75:1, 76:4, 76:6,
76:8, 118:1
**followed** [3] - 87:16,
113:20
**following** [10] - 9:23,
25:11, 37:14, 67:24,
74:13, 74:21, 74:22,
80:5, 86:1, 110:1
**follows** [1] - 39:12
**FOR** [1] - 1:1
**foregoing** [1] - 122:10
**foreign** [1] - 59:13
**forgetting** [1] - 12:24
**forgot** [1] - 30:6
**form** [9] - 32:10,
32:14, 38:24, 57:9,
58:22, 58:24, 92:25,
95:10
**formal** [1] - 98:20
**forms** [4] - 34:11,
34:13, 45:20, 70:13
**forward** [7] - 15:17,
36:9, 36:14, 43:7,
43:8, 43:18, 48:16
**forwards** [1] - 15:18
**four** [13] - 29:22,
30:21, 39:19, 39:22,
39:24, 67:15, 68:14,
101:10, 101:15,
102:12, 102:25,
119:25, 120:7

**four-and-a-half** [2] -
119:25, 120:7
**four-part** [1] - 39:19
**F██████** [1] - 5:13
**F██████** [6] - 14:19,
14:23, 15:18, 16:22,
37:6
**F██████** [1] - 14:25
**F██████** [2] - 65:1,
68:22
**free** [1] - 20:12
**Friday** [4] - 20:18,
57:12, 69:6
**friend** [7] - 51:5, 51:6,
52:25, 53:3, 104:4
**friendships** [1] - 37:3
**front** [3] - 33:7, 41:12,
85:9
**full** [1] - 102:18
**future** [1] - 87:19

**G**

**gears** [1] - 39:14
**general** [1] - 38:4
**generally** [7] - 6:19,
26:12, 26:13, 36:24,
45:2, 53:10, 82:4
**generate** [2] - 48:6,
48:11
**generated** [3] - 46:1,
46:4, 91:25
**gentlemen** [2] - 7:7,
83:19
**girl** [1] - 93:17
**girl's** [2] - 84:25, 85:3
**girls** [3] - 78:2, 79:2,
79:21
**given** [12] - 16:25,
19:19, 20:4, 39:20,
41:3, 41:8, 50:4,
63:9, 72:21, 77:4,
96:25, 121:1
**goodness** [1] - 19:1
**grab** [1] - 80:6
**grade** [24] - 27:14,
28:2, 28:3, 28:20,
29:13, 32:15, 32:16,
40:9, 49:4, 49:6,
49:7, 49:8, 49:17,
49:22, 49:24, 52:2,
53:25, 54:1, 77:13,
77:25, 79:24, 93:23,
116:2
**grader** [5] - 52:4, 78:5,
78:13, 78:22, 80:16
**graders** [3] - 37:2,
49:5, 49:9
**grades** [1] - 22:25
**Grady** [11] - 17:20,

18:9, 18:11, 31:21,
32:22, 43:2, 44:9,
45:11, 48:1, 49:12,
67:18
**great** [5] - 23:12,
25:13, 68:18, 68:20
**greet** [2] - 54:9, 54:10
**greeting** [1] - 30:10
**grin** [1] - 54:12
**group** [8] - 24:20,
24:24, 25:8, 26:7,
31:13, 32:15, 41:5,
42:1
**groups** [1] - 24:11,
31:8
**grow** [1] - 24:21
**guess** [7] - 13:25,
65:12, 76:22, 80:14,
83:7, 84:11, 110:24
**guessing** [1] - 65:11
**guidance** [5] - 20:4,
33:15, 68:21,
109:17, 109:22
**gun** [8] - 78:5, 78:13,
78:22, 79:3, 79:8,
79:11, 79:13, 79:22
**guns** [1] - 78:4
**guys** [1] - 101:19
**gym** [1] - 54:6

**H**

**half** [4] - 75:10, 97:5,
119:25, 120:7
**hall** [5] - 51:10, 54:5,
54:6, 54:8, 110:7
**halls** [5] - 29:1, 62:18,
63:16, 75:2, 98:3,
101:20
**hallway** [5] - 28:16,
28:17, 57:15, 68:21,
110:8
**hallways** [5] - 30:9,
35:22, 99:20, 101:6,
110:2
**hand** [1] - 82:6
**handbook** [4] - 84:2,
84:3, 84:7, 84:9
**handed** [1] - 95:1
**handle** [1] - 112:8
**happy** [2] - 20:18, 80:2
**harass** [2] - 119:1,
119:8
**harassed** [5] - 47:4,
57:25, 59:19, 64:22,
89:13
**harassment** [15] -
15:12, 15:13, 40:20,
41:10, 43:8, 43:14,
43:20, 43:25, 44:3,

6

45:17, 50:6, 80:23, 91:4, 91:17, 92:4
**hard** [4] - 24:20, 24:25, 25:22, 117:8
**Harris** [2] - 122:3, 122:21
**HARRIS** [1] - 3:4
**headed** [2] - 75:17, 113:17
**heading** [1] - 13:9
**heads** [1] - 6:18
**heads-up** [1] - 6:18
**Health** [1] - 19:19
**health** [1] - 50:5
**hear** [9] - 18:14, 18:15, 19:5, 21:1, 39:20, 71:7, 71:10, 96:4, 98:13
**Hear** [1] - 19:12
**heard** [6] - 50:2, 60:18, 73:17, 73:19, 86:3, 106:24
**hearing** [5] - 15:9, 57:9, 62:13, 62:22, 86:21
**hearsay** [1] - 80:1
**Hello** [1] - 57:17
**help** [12] - 24:22, 26:6, 33:22, 47:2, 47:3, 51:8, 55:18, 63:11, 84:4, 84:5, 84:19, 107:15
**helpful** [1] - 6:24
**hereby** [1] - 122:4
**hereto** [1] - 122:15
**Herndon** [2] - 51:18, 93:11
**herself** [1] - 52:1
**hesitate** [1] - 21:2
**hi** [1] - 57:15
**high** [10] - 22:4, 22:11, 22:22, 22:24, 23:9, 34:13, 36:25, 41:20, 59:16, 116:25
**High** [1] - 27:9
**high-level** [1] - 41:20
**highlight** [1] - 49:15
**highlighted** [3] - 32:5, 99:18, 103:24
**highly** [1] - 78:24
**history** [2] - 27:21, 80:21
**hold** [3] - 5:21, 55:1, 96:8
**holding** [1] - 35:16
**HOLTZMAN** [1] - 1:15
**home** [8] - 38:12, 38:13, 38:20, 38:21, 53:1, 53:2, 53:15
**honest** [1] - 83:10

**honestly** [1] - 117:6
**Honor** [56] - 5:10, 6:5, 7:22, 8:8, 8:18, 11:22, 14:4, 17:9, 17:11, 20:11, 20:21, 31:14, 32:18, 38:14, 40:21, 50:14, 54:18, 66:19, 67:2, 67:4, 68:9, 69:16, 72:1, 72:8, 73:2, 74:2, 75:3, 76:12, 76:19, 79:6, 83:9, 90:5, 90:17, 90:19, 92:7, 92:11, 94:21, 95:3, 95:6, 95:16, 96:10, 102:9, 106:1, 106:19, 108:21, 113:10, 116:6, 116:8, 117:14, 118:19, 119:18, 120:1, 120:16, 120:17, 120:19, 121:19
**honor** [1] - 25:11
**HONORABLE** [1] - 1:12
**horse** [1] - 53:14
**hostile** [1] - 104:2
**hour** [1] - 6:7
**house** [1] - 53:3
**housed** [1] - 54:8
**housekeeping** [1] - 5:5
**houses** [1] - 53:12
**H▮▮▮▮▮** [13] - 5:14, 5:16, 6:6, 16:3, 16:9, 16:13, 17:2, 27:17, 27:25, 37:8, 61:12, 74:12, 74:17
**hug** [2] - 54:12, 54:14
**huge** [1] - 81:19
**H▮▮▮▮▮▮** [36] - 4:7, 5:13, 5:18, 6:1, 6:2, 10:7, 12:17, 12:19, 13:1, 13:15, 19:2, 20:22, 20:23, 21:11, 29:9, 31:24, 34:16, 34:23, 34:24, 36:4, 54:23, 55:11, 73:5, 78:8, 78:17, 79:15, 80:17, 81:8, 83:23, 90:23, 98:2, 116:12, 118:6, 118:15, 119:1, 120:22
**H▮▮▮▮▮▮** [1] - 20:24
**HUNTON** [4] - 2:14, 2:17, 2:21, 3:1
**hurt** [1] - 60:4
**hurting** [1] - 119:4

**hurts** [1] - 18:4
**hypotheticals** [2] - 48:14, 48:15

## I

**ideal** [2] - 47:23, 47:24
**IEP** [7] - 77:15, 78:7, 78:9, 78:14, 78:17, 78:19, 79:25
**ignore** [2] - 48:21, 48:22
**Illinois** [1] - 23:6
**impacted** [1] - 74:25
**impersonating** [1] - 92:23
**impersonation** [1] - 46:16
**Impersonation** [1] - 92:20
**implicate** [1] - 88:1
**implicated** [1] - 73:5
**importance** [1] - 59:16
**important** [5] - 42:25, 44:12, 48:18, 93:3, 93:6
**impression** [1] - 93:16
**impugn** [1] - 80:4
**inability** [1] - 107:4
**inappropriate** [3] - 98:4, 119:2, 119:10
**inappropriately** [1] - 10:10
**inbox** [1] - 6:22
**incident** [17] - 71:14, 74:8, 83:23, 86:19, 86:22, 87:7, 87:10, 108:3, 109:2, 109:23, 110:13, 111:10, 112:14, 112:21, 112:22, 113:22, 114:3
**incidents** [1] - 79:15
**included** [2] - 27:8, 79:2
**including** [1] - 12:2
**incorrect** [1] - 10:25
**individually** [1] - 90:9
**individuals** [2] - 37:20, 90:8
**indulgence** [1] - 17:4
**inflammatory** [1] - 78:24
**inform** [1] - 5:6
**information** [12] - 27:2, 29:12, 29:18, 38:25, 46:12, 50:20, 62:23, 74:4, 78:18, 115:23, 121:1, 121:3
**informed** [4] - 32:6,

46:5, 58:13, 65:9
**initial** [2] - 106:4, 107:8
**initials** [1] - 72:18, 73:8
**inquiry** [1] - 79:7
**inside** [3] - 58:2, 58:8, 88:21
**instance** [1] - 38:5
**instructed** [1] - 96:11
**instruction** [1] - 7:12
**instructional** [1] - 23:22
**instructions** [5] - 80:6, 96:25, 97:1, 100:11, 100:14
**interaction** [1] - 54:3, 82:8, 82:12
**interactions** [3] - 30:1, 74:18, 87:13
**interactive** [1] - 44:4
**interest** [1] - 24:19
**interests** [1] - 90:10
**internet** [2] - 46:3, 46:4
**interview** [1] - 62:24
**intimate** [1] - 31:9
**intimidating** [1] - 104:3
**introduce** [3] - 29:16, 30:14, 40:10
**introduced** [5] - 40:4, 50:25, 51:25, 52:1
**introducing** [2] - 40:2, 42:21
**introduction** [5] - 29:23, 30:19, 39:16, 59:13
**introductions** [3] - 30:13, 30:25, 31:3
**investigate** [2] - 63:7, 74:17
**investigated** [1] - 87:10
**investigating** [1] - 63:4
**investigation** [5] - 62:20, 63:9, 63:10, 74:7, 87:6
**invited** [1] - 90:6
**involve** [1] - 39:2
**involved** [9] - 61:1, 61:4, 62:20, 62:22, 63:3, 63:10, 65:4, 74:7, 87:6
**involvement** [4] - 63:14, 73:10, 86:24, 86:25
**involving** [2] - 80:22, 121:2

**issue** [7] - 32:2, 74:18, 77:12, 79:5, 80:12, 80:13, 81:18
**issues** [22] - 15:9, 16:6, 16:17, 36:24, 36:25, 37:15, 50:12, 51:13, 58:16, 58:22, 59:24, 60:4, 60:9, 60:18, 60:22, 62:13, 62:21, 73:6, 73:11, 73:18, 88:3, 121:2
**itself** [2] - 42:4, 42:7
**IX** [3] - 80:22, 81:18, 82:3

## J

**J.O** [2] - 103:3, 120:24
**January** [13] - 12:20, 12:21, 13:3, 13:17, 18:8, 71:8, 71:14, 75:13, 101:3, 115:2, 115:4, 115:8, 115:16
**Jefferson** [1] - 27:9
**J▮▮▮▮▮** [2] - 104:4, 104:19
**jfahey@ holtzmanvogel. com** [1] - 1:18
**Joanna** [1] - 6:11
**job** [2] - 22:3, 22:4
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**JR** [1] - 1:12
**judge** [1] - 38:15
**JUDGE** [1] - 1:12
**Judge** [4] - 35:5, 82:19, 83:21, 90:4
**junior** [4] - 22:11, 22:22, 22:24, 23:9
**juror** [4] - 5:4, 6:25, 7:1, 114:24
**JURY** [1] - 1:11
**Jury** [5] - 7:5, 76:15, 83:17, 121:17, 122:6
**jury** [7] - 21:10, 51:17, 76:20, 76:23, 83:18, 97:21, 119:24

## K

**Keefe** [1] - 2:9
**KEEFE** [1] - 6:5
**keep** [3] - 12:24, 36:9, 36:10
**keeping** [2] - 64:24, 65:7
**keeps** [1] - 24:18
**kelliker@huntonak. com** [1] - 3:3

**Kevin** [1] - 2:25
**kid** [3] - 108:4, 109:4, 109:5
**kids** [9] - 24:11, 24:20, 26:3, 31:5, 51:24, 107:23, 109:4, 112:7, 117:7
**kind** [9] - 29:3, 38:3, 41:20, 48:9, 48:10, 63:24, 78:3, 86:21, 109:5
**kinds** [1] - 37:5
**Kinney** [4] - 17:8, 90:4, 116:7, 116:12
**KINNEY** [13] - 17:9, 90:5, 116:8, 116:11, 117:18, 118:5, 118:14, 118:22, 119:18, 119:20, 120:5, 120:11, 120:16
**Kinney**................ [1] - 4:9
**kissing** [3] - 78:2, 79:2, 79:21
**knowledge** [3] - 11:10, 16:23, 62:5
**knows** [1] - 50:15
**KURTH** [4] - 2:14, 2:17, 2:21, 3:1

**L**

**lab** [4] - 84:13, 84:14, 84:17, 84:20
**Labor** [3] - 29:20, 57:12
**ladies** [2] - 7:6, 83:19
**language** [2] - 59:13, 79:4
**large** [2] - 31:11, 53:12
**last** [16] - 6:23, 25:5, 28:3, 45:23, 48:17, 57:11, 70:1, 73:19, 75:4, 88:13, 90:5, 95:9, 109:13, 115:2, 119:25, 120:7
**late** [3] - 71:6, 71:7, 71:14
**latitude** [1] - 90:12
**lawyers** [1] - 21:2
**lead** [7] - 5:9, 26:9, 27:4, 27:7, 27:10, 27:22
**leader** [2] - 26:2, 27:23
**leadership** [2] - 24:7, 24:8
**leading** [4] - 69:11,

69:12, 73:20, 73:23
**learn** [1] - 40:5
**learned** [6] - 25:10, 38:8, 38:9, 52:3, 93:13, 94:11
**learning** [2] - 109:16, 110:5
**least** [2] - 25:3, 98:9
**leave** [12] - 20:16, 20:17, 64:1, 64:11, 64:12, 64:16, 111:25, 116:20, 117:2, 117:19, 117:23
**leaving** [2] - 54:5, 117:11
**lecture** [2] - 54:5, 54:6
**left** [12] - 32:23, 32:24, 36:13, 36:17, 47:22, 64:10, 70:6, 70:7, 86:3, 106:25, 115:8, 115:16
**legitimate** [1] - 78:25
**lesbian** [1] - 71:21
**less** [4] - 5:24, 6:2, 109:11, 118:8
**lesson** [5] - 18:14, 19:21, 19:24, 40:19, 50:24
**Lesson** [1] - 40:18
**lessons** [8] - 18:15, 19:2, 19:13, 19:17, 20:4, 30:21, 39:22, 41:25
**letter** [6] - 11:16, 17:17, 18:17, 18:23, 19:7, 97:21
**letting** [1] - 30:16
**level** [4] - 36:25, 41:20, 89:16, 89:17
**liaison** [1] - 27:9
**lies** [3] - 61:23, 108:1, 108:16
**life** [1] - 24:20
**Life** [1] - 19:19
**limit** [1] - 32:24
**line** [10] - 15:3, 32:5, 33:25, 34:5, 49:15, 49:16, 51:8, 82:5, 95:2, 108:20
**lined** [1] - 35:22
**link** [2] - 45:6, 45:8
**list** [6] - 68:2, 86:11, 86:14, 86:15, 87:16, 110:18
**listed** [1] - 44:19
**listen** [1] - 20:25
**listing** [1] - 44:19
**lived** [3] - 7:11, 52:22, 53:3

**Lloyd** [3] - 34:9, 34:19, 34:20
**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1
**lobby** [1] - 33:8
**located** [2] - 33:10, 34:12
**locker** [5] - 85:2, 85:3, 101:25, 102:17, 104:8
**look** [20] - 11:20, 12:23, 14:12, 17:17, 18:1, 40:13, 46:18, 47:10, 65:24, 72:4, 72:5, 84:24, 85:5, 92:21, 94:20, 97:24, 99:6, 103:24, 112:2
**looked** [16] - 9:16, 24:4, 24:6, 28:6, 49:22, 50:8, 60:4, 67:15, 70:2, 71:6, 85:20, 85:22, 102:20, 113:23, 115:2, 115:6
**looking** [16] - 9:9, 12:22, 13:14, 33:1, 35:12, 36:11, 36:15, 36:16, 36:21, 41:12, 48:4, 55:13, 57:10, 65:8, 70:5, 96:7
**lookout** [2] - 84:7, 84:20
**looks** [13] - 16:1, 33:21, 41:13, 41:16, 43:22, 47:25, 48:24, 55:22, 56:3, 56:23, 59:12, 81:9, 100:5
**Los** [1] - 1:21
**lost** [3] - 84:24, 85:5, 85:7
**love** [1] - 24:18
**lunch** [1] - 6:19
**Lunch** [1] - 121:22

**M**

**ma'am** [16] - 8:10, 17:5, 18:18, 20:8, 20:12, 20:25, 21:7, 21:12, 21:24, 72:4, 72:13, 72:21, 74:13, 88:1, 115:22, 121:10
**machine** [2] - 122:5, 122:12
**main** [3] - 33:5, 33:6, 35:10
**manage** [1] - 90:11
**managed** [1] - 7:13
**manner** [1] - 95:22

**map** [2] - 32:19, 33:1
**marked** [1] - 59:16
**master's** [1] - 21:23
**material** [2] - 41:22, 92:21
**math** [2] - 27:21, 56:24
**matter** [1] - 86:24
**matters** [1] - 63:5
**matters**.....................
............ [1] - 4:19
**mean** [11] - 26:15, 27:7, 42:7, 45:8, 58:17, 79:5, 84:21, 89:22, 104:21, 104:22, 115:18
**means** [2] - 63:18, 82:2
**media** [1] - 7:14
**meet** [8] - 25:25, 27:3, 29:21, 51:21, 53:21, 63:20, 117:9
**meeting** [47] - 7:10, 9:5, 9:10, 9:23, 16:6, 16:8, 16:20, 28:10, 28:11, 28:25, 29:1, 30:10, 42:24, 51:17, 51:18, 60:14, 64:12, 64:13, 93:11, 93:13, 93:16, 96:23, 101:8, 101:10, 101:13, 101:18, 101:19, 101:22, 103:21, 104:10, 104:12, 104:14, 104:16, 105:4, 105:5, 105:7, 105:13, 106:4, 106:11, 106:13, 107:8, 107:18, 107:22, 108:5, 109:20, 110:10
**meetings** [10] - 27:7, 27:8, 27:24, 28:1, 28:2, 28:13, 28:18, 64:10, 64:15, 107:6
**member** [2] - 38:22, 39:4
**members** [2] - 26:21, 62:5
**memo** [4] - 10:18, 10:20, 10:24, 98:11
**memory** [8] - 11:5, 13:23, 22:19, 52:13, 52:17, 86:25, 107:1, 109:10
**mentioned** [10] - 22:24, 23:7, 25:2, 32:9, 37:17, 39:14, 39:15, 57:2, 62:1, 71:20

**message** [7] - 61:9, 61:10, 70:22, 86:3, 105:7, 107:3
**messages** [1] - 87:22
**met** [4] - 28:3, 52:11, 101:14, 101:17
**method** [1] - 47:2
**methods** [1] - 51:13
**Miami** [3] - 2:3, 2:7, 2:11
**mic** [2] - 55:16, 55:17
**Michael** [1] - 116:12
**midday** [1] - 7:19
**middle** [10] - 15:15, 15:16, 24:14, 24:16, 25:9, 25:12, 25:20, 27:9, 93:18, 116:25
**Middle** [7] - 21:16, 23:13, 25:7, 88:5, 89:18, 116:1, 116:16
**Middleton** [2] - 53:5, 53:8
**might** [13] - 44:18, 44:20, 46:18, 47:11, 48:22, 90:15, 91:16, 91:23, 93:21, 106:15, 110:25, 114:14, 117:16
**mind** [1] - 9:24
**minute** [1] - 111:12
**minutes** [13] - 5:24, 6:3, 6:5, 28:12, 28:22, 42:5, 42:8, 42:14, 42:15, 64:12, 76:12, 80:17, 80:19
**MISCELLANY** [1] - 4:18
**missed** [1] - 19:10
**missing** [4] - 83:24, 84:4, 84:5, 84:7
**mom** [13] - 9:4, 16:9, 69:8, 85:23, 103:22, 105:6, 105:9, 106:5, 107:9, 107:22, 109:8
**Mom** [1] - 14:1
**moment** [7] - 21:3, 28:7, 39:15, 60:24, 66:24, 67:2, 108:22
**Monday** [1] - 28:12
**Mondays** [1] - 28:11
**M**█████ [2] - 12:19, 112:3
**monitor** [2] - 99:19, 102:18
**monitoring** [14] - 28:19, 101:6, 101:11, 101:16, 101:19, 101:20, 101:23, 102:13, 104:19, 104:20,

8

104:21, 104:22, 105:1
**month** [4] - 30:5, 59:14, 65:14, 71:3
**months** [8] - 23:20, 57:16, 57:22, 57:24, 58:1, 62:11, 94:2, 98:16
**morning** [13] - 5:1, 5:2, 5:10, 6:22, 7:6, 7:8, 7:25, 8:1, 21:7, 21:8, 28:17, 28:22, 76:13
**most** [9] - 18:17, 18:23, 24:13, 24:16, 25:24, 31:1, 34:4, 93:6, 118:10
**mother** [20] - 51:24, 59:8, 60:12, 61:7, 66:6, 66:11, 67:21, 68:5, 68:15, 68:23, 84:3, 84:15, 86:1, 86:13, 87:13, 87:20, 101:9, 108:5, 121:3
**move** [7] - 8:12, 12:9, 55:17, 67:4, 73:14, 77:19, 85:20
**moved** [4] - 22:9, 46:5, 53:1, 53:2
**moving** [1] - 76:9
**MR** [116] - 6:5, 17:9, 17:11, 20:10, 20:21, 21:6, 31:14, 31:18, 31:21, 31:23, 32:18, 32:22, 32:25, 35:3, 35:8, 35:9, 38:15, 38:18, 38:19, 40:21, 41:1, 43:2, 43:3, 44:9, 44:10, 45:10, 45:12, 47:25, 48:3, 49:12, 49:14, 50:16, 50:22, 54:18, 54:22, 55:2, 55:4, 55:7, 55:9, 56:8, 56:13, 56:16, 58:25, 59:5, 65:24, 66:4, 66:19, 66:21, 66:24, 67:2, 67:4, 67:11, 67:14, 67:18, 67:20, 68:7, 68:12, 69:14, 69:19, 72:1, 72:10, 72:12, 73:1, 73:3, 73:15, 73:22, 74:1, 74:3, 75:3, 75:8, 75:11, 76:12, 76:19, 76:22, 77:1, 77:4, 77:11, 77:15, 78:20, 78:24, 80:11, 80:13, 80:22, 81:1, 82:19, 83:7, 83:15, 83:21, 83:22,

89:1, 89:5, 89:6, 90:2, 90:4, 90:5, 94:8, 94:13, 95:6, 96:10, 108:22, 116:8, 116:11, 117:18, 118:5, 118:14, 118:22, 119:18, 119:20, 120:5, 120:11, 120:16, 120:19, 120:21, 121:5, 121:8, 121:19
**MS** [124] - 5:10, 5:19, 5:23, 6:1, 6:2, 6:7, 7:22, 7:24, 8:7, 8:11, 8:14, 8:18, 8:24, 11:1, 11:3, 11:15, 11:22, 11:24, 12:1, 12:9, 12:12, 12:14, 14:3, 14:6, 14:8, 14:10, 17:4, 17:6, 17:13, 17:16, 17:20, 17:22, 19:11, 20:6, 20:11, 38:14, 50:14, 67:8, 69:11, 72:8, 73:12, 73:21, 77:18, 77:22, 78:1, 78:4, 78:6, 78:15, 78:23, 79:4, 79:10, 79:14, 79:20, 79:25, 80:2, 80:8, 80:10, 80:12, 80:15, 81:3, 81:13, 81:19, 81:24, 82:13, 82:16, 83:9, 83:13, 88:24, 90:17, 90:19, 90:22, 92:7, 92:9, 92:14, 94:10, 94:16, 94:21, 94:23, 94:24, 95:3, 95:5, 95:16, 95:24, 96:1, 96:3, 96:13, 96:16, 97:11, 97:15, 99:7, 99:11, 102:9, 102:11, 103:7, 103:10, 103:12, 105:18, 105:21, 106:1, 106:3, 106:19, 106:21, 108:21, 108:23, 108:25, 110:16, 110:20, 110:23, 111:1, 113:9, 113:12, 113:14, 114:6, 114:8, 114:10, 115:1, 116:5, 117:14, 117:21, 118:12, 118:19, 119:17, 120:1, 120:8
**Myspace** [2] - 46:2, 46:4
**myths** [1] - 43:4

## N

**name** [21] - 12:7, 15:13, 18:19, 21:10, 54:11, 64:22, 71:16, 71:22, 72:15, 72:16, 72:17, 72:24, 73:4, 74:5, 74:21, 80:21, 81:21, 86:22, 90:25, 122:16
**name-calling** [6] - 15:13, 64:22, 74:21, 80:21, 81:21, 86:22
**names** [4] - 70:17, 86:4, 86:12, 86:13
**nasty** [6] - 80:20, 81:17, 81:22, 82:1, 82:24, 83:1
**National** [1] - 21:23
**nature** [1] - 77:20
**necessarily** [2] - 93:5
**necessary** [1] - 15:22
**need** [10] - 5:5, 23:19, 26:6, 26:13, 36:4, 51:3, 83:10, 87:17, 97:18, 102:18
**needed** [5] - 26:20, 32:12, 33:22, 76:20, 88:19
**needs** [5] - 6:15, 25:25, 27:3, 77:9, 117:9
**neighbor** [1] - 83:3
**neighborhood** [5] - 52:22, 53:10, 53:13, 53:18, 53:19
**neuropsych** [1] - 77:12
**never** [12] - 8:5, 9:13, 18:14, 19:4, 25:21, 87:22, 89:20, 89:22, 93:25, 104:20, 104:23, 105:10
**new** [4] - 24:6, 40:12, 40:13
**newsletter** [2] - 31:25, 32:2
**next** [23] - 6:1, 15:25, 20:20, 24:22, 34:5, 38:25, 52:3, 52:14, 53:23, 57:8, 60:7, 64:6, 69:2, 69:10, 98:1, 99:20, 100:5, 100:6, 110:25, 111:24, 118:4, 120:15, 121:18
**night** [2] - 6:23, 30:12
**nominated** [2] - 23:10, 25:8
**non** [3] - 39:4, 45:22,

117:1
**non-family** [1] - 39:4
**non-school** [1] - 117:1
**none** [1] - 111:14
**nonverbal** [2] - 43:15, 45:20
**North** [5] - 21:22, 22:5, 22:6, 23:4, 23:5
**Northern** [3] - 22:9, 22:10, 23:5
**Nos** [1] - 8:20
**note** [10] - 34:17, 51:10, 69:20, 70:4, 70:6, 70:7, 71:1, 71:2, 71:6, 73:18
**notes** [3] - 80:18, 114:15, 122:12
**nothing** [7] - 17:9, 25:18, 61:25, 82:21, 92:1, 108:2, 108:10
**notice** [6] - 77:23, 78:10, 79:16, 80:20, 81:3, 102:20
**noticed** [2] - 53:13, 90:5
**notified** [3] - 58:13, 84:3, 84:15
**notify** [2] - 84:6, 91:22
**November** [7] - 60:11, 60:13, 60:14, 73:6, 89:3, 103:20, 104:13
**number** [6] - 11:12, 17:24, 30:17, 89:23, 93:5
**Number** [4] - 4:13, 4:13, 4:14, 4:14, 4:15, 4:17
**numbers** [1] - 29:19
**NW** [5] - 1:16, 2:14, 2:18, 2:21, 3:1

## O

**o'clock** [1] - 6:22
**objection** [29] - 11:1, 12:11, 12:12, 21:2, 38:14, 50:14, 66:20, 67:6, 67:8, 69:11, 73:12, 73:21, 73:24, 88:24, 89:4, 94:8, 94:13, 95:7, 95:8, 95:9, 95:12, 114:6, 117:14, 117:21, 118:12, 118:19, 119:17, 120:1, 120:8
**observation** [4] - 80:16, 81:6, 81:10, 82:9
**observations** [2] -

81:16, 82:18
**observe** [8] - 81:10, 82:22, 82:24, 119:1, 119:4, 119:6, 119:8, 119:10
**observed** [5] - 81:14, 81:15, 81:16, 82:17
**obviously** [3] - 5:20, 6:16, 19:10
**occasion** [2] - 37:24, 117:12
**occurring** [1] - 86:20
**October** [6] - 40:19, 42:1, 94:7, 94:12, 94:18, 96:5
**OF** [4] - 1:1, 1:11, 4:1, 122:1
**offered** [2] - 8:22, 84:5
**offhand** [2] - 57:13, 113:2
**office** [18] - 10:18, 28:25, 29:4, 30:17, 32:11, 33:13, 33:19, 34:23, 35:20, 35:21, 36:1, 60:13, 61:8, 70:18, 71:19, 106:5, 107:9, 108:8
**offices** [2] - 33:4, 33:10
**Official** [2] - 122:3, 122:22
**official** [3] - 30:10, 122:5, 122:11
**often** [1] - 65:13
**older** [1] - 52:5
**once** [5] - 7:9, 49:4, 64:1, 86:14, 91:12
**one** [42] - 13:6, 13:14, 24:21, 28:2, 30:21, 36:6, 42:25, 47:11, 47:13, 47:14, 47:21, 47:22, 48:5, 48:16, 48:24, 49:11, 49:24, 50:25, 54:17, 58:23, 60:11, 61:13, 63:20, 66:24, 67:2, 70:18, 73:13, 76:6, 77:5, 80:8, 80:9, 93:6, 94:23, 102:3, 105:18, 106:12, 107:6, 111:4, 113:2
**ones** [1] - 60:3
**online** [4] - 45:24, 92:21, 92:24
**Open** [1] - 83:16
**open** [1] - 24:22
**opportunities** [7] - 116:22, 116:23, 116:24, 117:2, 117:12, 117:25,

118:2
**opportunity** [9] -
30:14, 40:5, 43:16,
81:9, 116:19,
116:22, 117:12,
117:19, 117:23
**opposed** [1] - 18:19
**opposite** [1] - 37:22
**option** [1] - 21:21
**order** [1] - 8:8
**orient** [1] - 33:4
**orientation** [5] -
29:20, 52:18, 54:2,
57:4, 57:11
**originally** [1] - 79:7
**outside** [3] - 39:4,
59:24, 118:20
**overruled** [3] - 38:17,
118:21, 120:10
**overview** [2] - 41:20,
41:22
**own** [1] - 56:1

# P

**p.m** [2] - 76:18, 121:22
**packet** [1] - 49:3
**page** [39] - 12:15,
14:9, 15:15, 15:16,
16:12, 17:23, 18:8,
31:19, 43:2, 43:5,
43:10, 43:18, 44:7,
44:23, 45:1, 45:10,
45:11, 45:19, 46:11,
46:23, 47:6, 47:15,
48:1, 48:2, 48:16,
48:24, 49:13, 94:25,
97:19, 97:24, 98:1,
102:3, 102:4,
105:22, 105:25,
108:18, 110:25,
111:25
**pages** [2] - 43:9,
122:10
**paragraph** [3] - 18:1,
31:22, 103:19
**paragraphs** [1] - 32:2
**pardon** [1] - 86:7
**parent** [10] - 16:14,
17:1, 28:13, 38:13,
39:2, 67:24, 86:11,
97:1, 98:24, 99:1
**parents** [1] - 25:23,
26:5, 26:20, 30:12,
32:6, 37:5, 60:12,
60:25, 61:1, 88:9,
96:24, 101:14
**Park** [1] - 1:20
**part** [28] - 25:24, 27:4,
31:1, 34:4, 39:19,

40:4, 41:13, 44:13,
48:19, 48:20, 50:10,
56:11, 61:18, 69:2,
78:9, 78:17, 78:18,
83:3, 99:18, 99:20,
102:21, 104:20,
104:23, 105:5,
106:8, 107:12,
110:3, 110:18
**particular** [2] - 53:14,
81:6
**parties** [1] - 8:8
**pass** [1] - 52:18
**passed** [1] - 74:6
**passing** [2] - 74:16,
87:11
**passive** [1] - 47:19
**past** [2] - 46:5, 87:15
**patch** [8] - 61:11,
61:25, 108:2, 108:3,
108:6, 108:7, 108:9,
109:2
**pause** [2] - 72:7,
105:20
**PEDERSEN** [89] - 6:2,
38:14, 50:14, 67:8,
69:11, 72:8, 73:12,
73:21, 77:18, 77:22,
78:1, 78:4, 78:6,
78:15, 78:23, 79:4,
79:10, 79:14, 79:20,
79:25, 80:2, 80:8,
80:10, 80:12, 80:15,
81:3, 81:13, 81:19,
81:24, 82:13, 82:16,
83:9, 83:13, 88:24,
90:17, 90:19, 90:22,
92:7, 92:9, 92:14,
94:10, 94:16, 94:21,
94:23, 94:24, 95:3,
95:5, 95:16, 95:24,
96:1, 96:3, 96:13,
96:16, 97:11, 97:15,
99:7, 99:11, 102:9,
102:11, 103:7,
103:10, 103:12,
105:18, 105:21,
106:1, 106:3,
106:19, 106:21,
108:21, 108:23,
108:25, 110:16,
110:20, 110:23,
111:1, 113:9,
113:12, 113:14,
114:8, 114:10,
115:1, 116:5,
117:14, 117:21,
118:12, 118:19,
119:17, 120:1, 120:8
**Pedersen** [4] - 77:4,

90:3, 90:15, 90:25
**Pedersen.............** [1] -
4:8
**peers** [1] - 26:1
**pen** [1] - 53:14
**pencil** [1] - 80:6
**pending** [1] - 20:14
**Pennsylvania** [4] -
2:14, 2:18, 2:21, 3:1
**people** [14] - 25:24,
26:7, 34:21, 40:12,
40:14, 42:24, 42:25,
44:15, 53:15, 99:16,
103:16, 109:25,
117:8
**perhaps** [1] - 88:3
**period** [15] - 6:15,
10:13, 23:24, 28:3,
31:4, 31:6, 41:6,
41:18, 42:18, 50:12,
64:2, 82:9, 89:3,
89:24, 96:20
**periodically** [1] -
113:1
**periods** [3] - 10:8,
65:2, 89:23
**permission** [11] -
31:14, 32:18, 40:21,
54:18, 56:13, 59:1,
66:1, 66:21, 72:1,
75:3, 99:7
**permitted** [2] - 34:22,
81:13
**person** [7] - 24:6,
34:7, 35:16, 51:5,
53:24, 58:21, 92:21
**person's** [1] - 92:22
**personal** [2] - 56:1,
56:22
**personally** [6] - 81:15,
81:16, 82:17, 92:2,
92:3, 120:6
**Peterson** [1] - 90:13
**P██** [4] - 5:13, 15:21,
16:1, 27:17
**phone** [16] - 28:10,
29:19, 30:17, 32:12,
61:9, 87:20, 87:21,
105:7, 106:6, 106:8,
106:25, 107:10,
107:12, 110:14,
111:10, 111:15
**phrase** [1] - 95:21
**physical** [8] - 15:12,
38:1, 38:8, 38:10,
43:20, 45:15, 45:16,
45:17
**physically** [1] - 89:8
**picture** [1] - 36:19
**pictures** [2] - 35:4,

36:23
**place** [9] - 7:19, 31:12,
42:25, 63:11, 65:18,
87:1, 102:14, 117:6,
117:10
**placement** [2] - 56:6,
56:24
**Plaintiff** [5] - 1:4, 1:14,
2:1, 4:11, 8:22
**plaintiff** [2] - 8:2, 88:5
**plaintiff's** [17] - 8:14,
55:4, 56:13, 66:6,
66:11, 67:21, 68:5,
68:15, 68:23, 75:8,
84:15, 86:13, 87:13,
87:20, 99:7, 103:7,
110:17
**Plaintiff's** [10] - 8:15,
8:20, 11:20, 12:9,
12:13, 17:18, 55:7,
56:9, 75:4
**plan** [6] - 101:11,
102:13, 102:14,
104:20, 104:23,
104:24
**played** [1] - 45:7
**playing** [1] - 53:22
**pleasant** [1] - 37:15
**PLLC** [1] - 1:15
**plus** [1] - 22:14
**pod** [5] - 28:21, 33:23,
65:13, 84:23, 84:25
**point** [9] - 22:7, 32:22,
45:23, 54:4, 65:11,
76:20, 80:18, 87:19,
120:3
**pointed** [1] - 6:24
**pointing** [1] - 111:20
**poor** [1] - 112:6
**portion** [1] - 81:19
**position** [1] - 81:3
**positive** [2] - 19:4,
25:22
**possibility** [1] - 95:14
**possible** [2] - 94:6,
95:11
**possibly** [1] - 94:11,
96:6
**post** [1] - 29:19
**posting** [1] - 92:21
**potential** [1] - 63:4
**PowerPoint** [12] -
29:15, 29:17, 41:13,
41:14, 42:4, 42:7,
42:9, 42:10, 44:13,
91:15, 92:5
**PPT** [1] - 49:18
**prayer** [3] - 6:12, 6:13,
6:15
**prayers** [1] - 6:20

**predict** [1] - 117:16
**prefer** [1] - 76:23
**Preliminary** [1] - 4:19
**presence** [2] - 62:5,
62:7
**present** [9] - 5:12, 7:5,
30:22, 31:5, 41:22,
62:22, 83:17,
106:17, 107:2
**presentation** [16] -
30:20, 41:14, 44:24,
48:25, 49:2, 49:4,
49:7, 49:8, 49:21,
49:22, 50:8, 91:4,
91:7, 91:10, 91:19,
92:10
**presentations** [2] -
39:24, 50:4
**presented** [4] - 41:14,
48:7, 72:22, 117:23
**preserved** [1] - 82:24
**presenting** [2] - 30:24,
41:18
**pretending** [2] -
46:20, 92:20
**pretty** [5] - 24:25,
78:12, 80:5, 92:24
**previous** [2] - 68:15,
73:6
**previously** [2] - 35:5,
73:11
**prime** [1] - 79:12
**principal** [8] - 24:8,
38:23, 74:12,
101:17, 101:18,
106:17, 107:2,
109:19
**Principal** [1] - 37:6
**principals** [4] - 19:13,
19:17, 19:18, 50:5
**print** [1] - 7:14
**problem** [5] - 12:25,
48:20, 82:19, 90:7
**problems** [6] - 70:23,
71:2, 71:11, 71:12,
115:7, 115:15,
115:17, 116:1
**proceed** [2] - 90:19,
116:8
**proceedings** [7] - 7:4,
72:7, 76:18, 105:20,
122:6, 122:11,
122:14
**PROCEEDINGS** [1] -
1:11
**produced** [1] - 78:7
**profanity** [5] - 85:9,
85:13, 85:15, 85:17,
85:18
**professionally** [1] -

10

120:6
**program** [1] - 19:4
**prolonged** [1] - 10:13
**pronoun** [1] - 18:18
**proper** [1] - 18:19
**proposal** [1] - 18:3
**protective** [2] - 38:5, 38:7
**provide** [1] - 87:1
**provided** [7] - 41:9, 68:21, 89:16, 89:17, 95:19, 115:23, 115:24
**providing** [1] - 68:4
**psychologist** [2] - 86:9, 86:14
**public** [1] - 7:10
**Public** [1] - 21:15
**publish** [24] - 14:4, 31:15, 32:19, 35:6, 40:22, 40:24, 54:18, 56:13, 59:2, 65:25, 66:1, 66:22, 67:11, 67:12, 68:8, 68:10, 69:15, 75:3, 92:11, 97:13, 99:7, 110:16, 110:20, 113:10
**published** [18] - 14:7, 31:17, 32:21, 35:7, 40:25, 54:21, 56:15, 59:4, 66:3, 67:13, 68:11, 69:18, 75:7, 92:13, 97:14, 99:10, 110:22, 113:13
**pull** [11] - 14:3, 35:3, 58:25, 66:15, 92:9, 97:11, 103:5, 103:7, 110:16, 111:25, 113:9
**pulled** [1] - 10:19
**pump** [1] - 79:12
**pumpkin** [8] - 61:11, 61:25, 108:2, 108:3, 108:6, 108:7, 108:9, 109:2
**pure** [1] - 80:25
**purpose** [5] - 31:8, 44:11, 45:13, 65:20, 78:25
**put** [14] - 10:24, 17:20, 18:9, 18:11, 18:17, 33:13, 63:11, 70:12, 91:19, 92:3, 96:13, 97:22, 100:7, 102:14
**putting** [2] - 10:17, 46:2
**PX** [1] - 11:21
**PX-71** [1] - 55:2

# Q

**QUESTION** [6] - 102:12, 106:4, 106:23, 107:5, 107:8, 109:1
**questions** [20] - 8:8, 11:9, 17:6, 17:11, 17:13, 20:7, 20:25, 42:19, 43:17, 77:21, 80:7, 81:5, 82:5, 87:24, 90:2, 115:24, 116:5, 121:5, 121:8
**quickly** [2] - 50:2, 92:10
**quiet** [1] - 83:5
**quite** [3] - 37:22, 37:23, 53:15
**quote** [1] - 78:22

# R

**Rachel** [29] - 21:16, 23:13, 23:23, 23:25, 24:2, 25:7, 25:14, 25:17, 37:1, 50:12, 50:17, 52:4, 54:1, 77:24, 78:19, 79:16, 80:17, 88:5, 89:18, 91:21, 93:14, 97:22, 116:1, 116:16, 116:20, 117:3, 117:11, 117:13, 117:19
**R⬛⬛⬛** [2] - 14:13, 99:12
**raised** [2] - 60:23, 62:21
**raises** [1] - 16:17
**raising** [1] - 60:4
**Raleigh** [1] - 21:22
**rank** [1] - 80:1
**rather** [1] - 50:2
**rbates@hunton.com** [1] - 2:16
**re** [1] - 72:13
**re-ask** [1] - 72:13
**reached** [1] - 86:9
**reaching** [2] - 57:20, 97:23
**reaction** [3] - 62:13, 86:6, 86:8
**read** [21] - 8:11, 42:9, 42:12, 72:4, 72:5, 81:11, 82:22, 93:5, 95:3, 99:18, 100:3, 102:9, 106:1, 106:15, 106:18, 108:21, 111:12, 115:12, 118:15,

118:18, 118:23
**reading** [4] - 42:10, 72:23, 106:12, 112:16
**ready** [1] - 19:6
**realize** [1] - 88:10
**really** [6] - 9:20, 19:8, 31:11, 37:14, 105:12
**realtime** [1] - 122:12
**reason** [7] - 10:23, 42:20, 64:3, 95:12, 98:10, 115:20, 115:21
**reasonable** [1] - 47:11
**reasons** [1] - 107:19
**reassured** [1] - 16:24
**receipt** [1] - 70:25
**receive** [2] - 88:3, 88:6
**received** [9] - 15:8, 55:20, 56:18, 57:6, 59:7, 68:14, 69:6, 70:25, 71:1
**receiving** [1] - 87:13
**receptive** [1] - 50:19
**Recess** [3] - 7:3, 76:17, 121:22
**recollection** [28] - 9:20, 52:14, 53:23, 57:8, 60:22, 72:2, 72:14, 72:22, 72:23, 74:15, 77:7, 77:8, 81:12, 82:7, 82:8, 82:23, 82:24, 87:4, 95:18, 98:7, 102:23, 104:7, 106:10, 109:8, 112:18, 114:19, 115:7, 115:15
**recommendations** [2] - 85:23, 86:2
**record** [6] - 5:8, 7:2, 7:15, 116:12, 121:12, 121:13
**recording** [1] - 122:13
**records** [3] - 77:15, 77:16, 78:21
**redirect** [3] - 17:14, 83:5, 90:13
**Redirect** [1] - 4:5
**REDIRECT** [1] - 17:15
**reference** [4] - 18:19, 78:21, 79:13, 95:11
**referenced** [1] - 12:7
**referral** [1] - 32:10
**referrals** [2] - 68:1, 68:3
**referring** [2] - 20:1, 99:12
**reframed** [1] - 95:13
**refresh** [16] - 72:2,

72:22, 74:14, 77:7, 77:8, 82:7, 82:8, 82:23, 95:18, 98:7, 102:23, 104:7, 106:10, 109:8, 115:6, 115:14
**refreshed** [3] - 72:9, 72:14, 72:23
**refreshes** [2] - 81:12, 109:10
**regard** [9] - 60:18, 63:11, 65:9, 71:15, 72:24, 82:8, 83:23, 84:17, 86:20
**regarding** [2] - 12:2, 67:24
**regardless** [1] - 73:4
**registrar** [4] - 33:15, 34:6, 34:10, 36:19
**regularly** [1] - 64:11
**relate** [1] - 47:21
**related** [9] - 78:19, 94:7, 94:12, 94:18, 95:10, 103:2, 104:9, 104:16, 117:1
**relating** [1] - 76:25
**relationships** [1] - 37:3
**relayed** [1] - 29:11
**relaying** [2] - 29:12, 46:25
**relevance** [6] - 38:14, 117:14, 117:21, 118:12, 120:1, 120:8
**relevant** [1] - 117:17
**religious** [1] - 6:10
**remain** [1] - 20:15
**remained** [1] - 83:5
**remember** [52] - 9:2, 9:6, 9:11, 9:17, 10:4, 10:10, 10:15, 10:17, 10:22, 11:17, 14:1, 14:16, 29:14, 33:14, 45:25, 51:22, 52:16, 52:19, 54:3, 54:4, 54:7, 70:7, 71:24, 72:17, 85:23, 86:1, 91:5, 94:4, 94:5, 98:23, 99:3, 101:1, 105:12, 106:7, 106:11, 106:23, 107:11, 107:21, 107:22, 107:25, 108:2, 108:11, 109:3, 109:12, 109:19, 110:2, 112:24, 113:1, 113:23
**remind** [2] - 41:24, 48:17

72:22, 74:14, 77:7, 77:8, 82:7, 82:8, 82:23, 95:18, 98:7, 102:23, 104:7, 106:10, 109:8, 115:6, 115:14
**reminded** [2] - 74:1, 112:16
**reminder** [1] - 42:3
**reminds** [1] - 24:20
**repeat** [2] - 18:10, 101:12
**rephrase** [6] - 11:2, 94:9, 94:15, 117:15, 120:2, 120:3
**rephrased** [1] - 95:13
**replies** [1] - 112:3
**reply** [2] - 15:21, 16:23
**report** [2] - 38:23, 50:12
**reported** [7] - 38:9, 38:12, 38:16, 73:11, 74:25, 106:24, 122:5
**Reporter** [3] - 3:4, 122:3, 122:22
**REPORTER** [1] - 122:1
**Reporter...................... [1] - 4:20
**reporting** [3] - 15:3, 44:12, 59:18
**represent** [8] - 8:2, 21:9, 90:9, 90:25, 97:21, 104:12, 109:13, 115:4, 120:24
**reputation** [1] - 92:22
**Request** [2] - 32:14, 32:16
**request** [8] - 34:11, 58:22, 58:23, 59:10, 67:24, 70:12, 87:15, 88:6
**required** [3] - 38:5, 63:6, 91:13
**reseated** [1] - 83:18
**resided** [1] - 52:25
**resolved** [1] - 73:18
**respectful** [1] - 19:5
**respond** [1] - 16:16
**responding** [3] - 18:7, 18:12, 18:16
**responds** [1] - 16:13
**response** [2] - 97:23, 101:23
**responses** [2] - 5:2, 7:8
**responsibilities** [2] - 26:14, 29:7
**Responsibilities** [1] - 19:15
**responsibility** [1] - 7:10
**responsible** [1] - 19:5
**rest** [2] - 65:21, 65:22
**restroom** [2] - 85:4

**result** [1] - 104:1
**resumed** [2] - 7:4, 76:18
**retire** [2] - 21:14, 21:17
**retired** [5] - 11:7, 21:13, 21:15, 21:18, 21:24
**retirement** [2] - 23:17, 25:3
**retributions** [1] - 103:25
**retrieve** [7] - 61:20, 62:7, 105:7, 105:8, 106:8, 107:3, 107:15
**retrieving** [1] - 107:12
**return** [1] - 87:22
**returned** [2] - 87:20, 87:22
**REWARI** [12] - 5:10, 5:19, 8:18, 11:1, 12:12, 17:13, 17:16, 17:20, 17:22, 19:11, 20:6, 20:11
**Rewari** [1] - 2:17
**Rewari..............** [1] - 4:5
**Rights** [1] - 19:15
**ring** [2] - 106:6, 107:10
**rkeefe@bsfllp.com** [1] - 2:12
**road** [2] - 82:20, 82:21
**Robert** [1] - 2:9
**role** [4] - 22:8, 22:13, 26:25, 27:5
**room** [4] - 33:17, 87:5
**ROSSIE** [1] - 1:12
**routine** [1] - 28:19
**row** [1] - 85:3
**RPR** [2] - 3:4, 122:21
**rule** [1] - 96:4
**rumor** [1] - 61:21
**rumors** [17] - 61:21, 61:22, 107:23, 107:25, 108:6, 108:8, 108:13, 108:16, 109:4, 109:9, 109:16, 109:24, 110:1, 110:5, 110:7, 110:10
**running** [1] - 24:5
**Ryan** [2] - 2:13, 21:9

**S**

**sad** [1] - 24:21
**safe** [1] - 63:11
**safety** [5] - 107:18, 119:6, 119:14,

119:15, 119:16
**Samantha** [1] - 90:25
**sat** [1] - 80:17
**saw** [6] - 26:4, 37:11, 53:17, 57:4, 85:16, 115:10
**scared** [1] - 103:25
**scenarios** [1] - 48:6
**schedule** [2] - 98:20, 114:25
**scheduled** [3] - 5:14, 16:9, 64:17
**schedules** [1] - 37:3
**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10
**School** [10] - 21:9, 21:16, 23:11, 23:14, 25:7, 27:10, 88:5, 89:18, 116:2, 116:16
**school** [94] - 10:19, 14:21, 14:25, 15:6, 22:4, 22:11, 22:23, 22:25, 23:2, 23:6, 23:9, 23:19, 23:21, 24:5, 24:14, 25:1, 25:9, 25:12, 25:16, 25:17, 25:19, 25:20, 26:9, 26:14, 26:15, 27:12, 28:7, 28:9, 29:10, 29:15, 29:25, 30:3, 30:6, 30:11, 32:19, 33:6, 35:3, 35:10, 39:4, 40:9, 42:23, 52:2, 54:7, 54:16, 54:23, 55:10, 55:20, 55:23, 56:20, 57:13, 57:16, 57:22, 57:24, 59:14, 61:23, 62:11, 63:12, 65:14, 65:21, 65:23, 68:18, 71:10, 73:7, 78:6, 79:23, 80:20, 81:4, 86:9, 86:14, 89:24, 91:12, 91:16, 92:3, 93:18, 93:22, 94:3, 104:25, 107:17, 107:19, 108:1, 115:7, 115:8, 115:15, 115:18, 116:20, 116:25, 117:1, 117:24, 118:6, 118:10
**school-wide** [1] - 92:3
**schoolers** [1] - 24:17
**schools** [4] - 27:9, 29:15, 40:11, 116:25
**Schools** [1] - 21:15
**Science** [2] - 27:10, 84:10
**science** [5] - 27:22,

84:2, 84:3, 84:7, 84:9
**scope** [1] - 118:20
**Scott** [1] - 2:20
**screen** [9] - 12:23, 14:12, 17:21, 18:9, 31:19, 33:6, 55:16, 55:17, 97:17
**scroll** [4] - 16:11, 48:2, 98:1, 103:19
**SE** [3] - 2:2, 2:6, 2:10
**seated** [5] - 7:6, 7:16, 21:4, 76:21, 83:19
**second** [9] - 14:22, 17:23, 31:6, 43:2, 49:24, 55:1, 86:15, 94:23, 105:18
**section** [1] - 41:2
**See** [2] - 32:14, 32:17
**see** [70] - 11:25, 13:1, 13:11, 15:21, 15:23, 15:25, 18:5, 19:24, 20:3, 24:4, 29:4, 30:15, 32:12, 33:8, 34:16, 34:23, 34:24, 34:25, 35:13, 36:4, 40:14, 45:6, 47:9, 48:2, 49:15, 49:19, 53:12, 54:9, 58:11, 59:18, 60:1, 64:20, 64:21, 65:17, 65:19, 69:21, 72:9, 72:13, 72:19, 74:20, 74:25, 75:2, 76:7, 76:8, 76:14, 76:16, 78:16, 85:16, 88:12, 88:15, 98:5, 98:13, 98:14, 99:22, 102:22, 103:13, 104:5, 106:18, 111:2, 111:13, 111:22, 112:4, 112:12, 113:18, 117:8, 121:7, 121:20
**seeing** [9] - 52:19, 53:23, 54:7, 57:8, 57:14, 92:15, 112:19, 114:18
**send** [2] - 86:13, 115:11
**sending** [3] - 75:14, 85:22, 92:20
**sent** [7] - 86:16, 99:15, 103:16, 111:6, 111:7, 113:15, 115:18
**sentence** [2] - 66:11, 98:1
**separate** [3] - 56:4, 101:5, 112:18

**September** [6] - 29:23, 30:10, 40:6, 41:25, 54:23, 55:10
**series** [1] - 39:19
**seriously** [1] - 37:21
**serve** [3] - 25:1, 26:18, 26:19
**served** [1] - 23:9
**serves** [1] - 86:25
**services** [19] - 24:9, 25:8, 27:6, 28:11, 30:8, 31:22, 32:3, 32:6, 33:16, 33:18, 33:19, 34:1, 36:17, 38:6, 38:7, 38:24, 40:3, 54:8, 87:5
**SESSION** [1] - 1:8
**Session** [1] - 121:23
**set** [2] - 42:18, 63:9
**settles** [1] - 121:9
**seven** [1] - 73:19
**several** [6] - 10:25, 98:3, 98:13, 98:14, 98:17, 98:19
**sexual** [23] - 15:12, 38:1, 38:10, 38:16, 40:20, 41:9, 43:7, 43:14, 43:25, 44:3, 50:6, 80:22, 91:17, 92:4, 108:4, 108:14, 108:15, 109:6, 109:9, 109:16, 110:10, 110:12
**sexually** [4] - 39:3, 59:19, 59:21, 89:10
**shadow** [3] - 63:16, 96:25, 99:4
**shadowed** [6] - 10:24, 11:11, 97:4, 97:7, 97:9, 98:7
**shadowing** [32] - 10:4, 63:16, 63:18, 64:19, 64:20, 65:4, 65:17, 65:20, 68:21, 68:24, 89:16, 89:17, 89:19, 89:21, 96:17, 96:21, 98:21, 98:23, 99:2, 99:25, 100:4, 100:9, 100:10, 100:13, 100:17, 100:20, 100:21, 100:22, 100:24, 101:2, 101:5, 104:21
**share** [2] - 45:9, 50:18
**shared** [1] - 32:15
**sharing** [2] - 50:19, 104:1
**shift** [1] - 39:14
**shocked** [1] - 85:16
**short** [1] - 28:13

**shorthand** [2] - 122:5, 122:12
**show** [3] - 29:17, 36:19, 113:7
**showed** [1] - 17:18
**showing** [2] - 30:15, 30:16
**shown** [1] - 91:3
**shows** [3] - 45:8, 106:14, 115:10
**Side** [1] - 77:3
**side** [6] - 34:14, 35:17, 35:18, 63:22, 63:23, 96:13
**sidebar** [2] - 76:20, 77:2
**sign** [1] - 35:14
**signed** [1] - 14:16
**significant** [1] - 78:12
**signs** [1] - 65:8
**similar** [1] - 10:2
**simmered** [2] - 99:21, 100:8
**simple** [2] - 80:25, 115:22
**simply** [4] - 78:8, 78:16, 79:14, 114:24
**single** [4] - 30:24, 41:3, 41:21, 61:1
**sister** [1] - 52:12
**sit** [2] - 35:24, 36:5
**sitting** [9] - 9:21, 34:8, 51:22, 51:23, 80:19, 87:9, 111:18, 112:14, 113:21
**situation** [7] - 65:9, 82:4, 88:19, 90:8, 99:19, 99:21, 100:7
**six** [1] - 73:19
**skip** [8] - 35:8, 35:12, 37:6, 43:2, 43:7, 43:8, 43:18, 48:24
**slice** [1] - 50:8
**slide** [18] - 32:23, 41:13, 41:21, 43:22, 43:23, 44:8, 45:20, 46:12, 46:24, 47:1, 47:7, 47:15, 47:17, 48:17, 49:6, 92:15, 92:19, 93:4
**slides** [6] - 42:13, 43:11, 44:13, 45:3, 45:13, 48:4
**slips** [1] - 88:7
**slowly** [1] - 48:1
**small** [4] - 31:8, 31:13, 41:4, 53:12
**smile** [1] - 54:12
**snitch** [1] - 51:4
**social** [3] - 7:13,

12

26:20, 38:23
**solved** [1] - 71:3
**solving** [1] - 70:23
**someone** [11] - 25:18, 36:1, 38:12, 38:13, 46:20, 47:9, 51:2, 51:5, 71:19, 92:20, 92:24
**sometime** [5] - 6:15, 31:10, 94:7, 94:12, 94:18
**sometimes** [10] - 26:22, 28:10, 28:12, 28:16, 35:25, 37:4, 48:11, 48:12, 51:2
**somewhere** [4] - 6:11, 6:16, 28:9, 29:8
**Sona** [1] - 2:17
**sorry** [27] - 5:20, 15:16, 16:11, 17:13, 18:10, 18:20, 23:4, 43:9, 47:20, 49:16, 54:25, 55:2, 61:14, 61:21, 66:24, 69:21, 75:8, 79:5, 84:14, 84:22, 87:23, 103:5, 103:20, 104:15, 106:12, 112:3, 121:7
**sort** [9] - 14:22, 14:24, 29:6, 36:11, 36:21, 58:16, 76:9, 85:1, 108:4
**sound** [1] - 109:14
**space** [2] - 64:3, 64:8
**Spanish** [2] - 58:18, 59:10
**speaking** [7] - 9:2, 26:12, 26:13, 36:24, 45:3, 53:11, 105:8
**special** [4] - 23:21, 24:19, 77:15, 78:21
**specific** [7] - 87:24, 89:21, 100:14, 102:1, 110:11, 112:21, 113:2
**specifically** [6] - 21:16, 82:5, 86:4, 86:17, 99:3, 108:15
**specifics** [3] - 102:18, 112:17, 114:13
**speculation** [3] - 11:1, 50:14, 94:8
**spend** [4] - 21:24, 28:21, 40:6, 41:18
**spending** [1] - 116:15
**spent** [2] - 40:15, 43:24
**spot** [2] - 6:18, 53:14
**spread** [8] - 61:21, 61:22, 108:1, 108:6,

108:8, 108:16, 109:25
**spreading** [5] - 107:23, 108:12, 109:4, 110:1, 110:7
**Square** [1] - 3:5
**SR&R** [5] - 18:15, 19:12, 19:15, 19:20, 45:5
**srewari@huntonak. com** [1] - 2:19
**SRO** [4] - 65:4, 107:14, 107:17, 107:20
**staff** [5] - 23:10, 26:21, 26:22, 62:4, 117:8
**standard** [2] - 28:1, 95:15
**start** [11] - 12:15, 14:8, 33:25, 34:5, 39:10, 48:25, 54:23, 56:20, 73:23, 91:12, 108:20
**started** [8] - 10:16, 28:10, 29:12, 54:16, 55:10, 55:23, 93:22, 96:21
**starting** [2] - 10:15, 29:2
**starts** [2] - 44:24, 57:13
**State** [1] - 21:22
**state** [1] - 99:5
**statement** [10] - 9:2, 9:6, 9:8, 9:10, 9:16, 9:17, 9:21, 87:2, 87:3, 106:14
**statements** [2] - 10:2, 43:5
**STATES** [2] - 1:1, 1:12
**States** [1] - 3:4
**status** [1] - 5:7
**stay** [3] - 7:13, 24:2, 53:15
**stay-at-home** [1] - 53:15
**stayed** [1] - 23:25
**staying** [1] - 24:5
**step** [5] - 15:5, 20:8, 47:14, 121:6, 121:9
**steps** [3] - 29:2, 38:22, 63:11
**still** [3] - 30:9, 46:2, 64:15
**stipulated** [3] - 56:10, 66:21, 110:18
**stipulation** [4] - 56:11, 66:16, 67:1, 67:7
**stop** [11] - 29:25, 44:17, 99:2, 99:25,

100:3, 100:12, 100:15, 100:17, 100:19, 100:21, 117:13
**stopped** [3] - 98:23, 100:8, 100:10
**stopping** [1] - 79:18
**streamline** [1] - 8:8
**Street** [4] - 1:16, 2:2, 2:6, 2:10
**stressing** [1] - 43:12
**struck** [1] - 51:24
**struggle** [1] - 26:22
**stuck** [2] - 5:4, 82:10
**student** [49] - 24:9, 25:8, 26:23, 27:3, 27:6, 28:11, 32:10, 33:16, 33:18, 33:19, 33:22, 34:1, 34:6, 34:15, 36:5, 36:17, 37:21, 38:1, 38:9, 38:24, 39:3, 54:8, 58:13, 71:15, 71:22, 72:15, 72:17, 72:24, 73:4, 73:5, 73:10, 74:5, 75:1, 80:15, 81:6, 81:10, 81:24, 81:25, 82:9, 84:18, 84:21, 87:1, 87:5, 88:6, 89:18, 106:25, 108:13
**students** [58] - 18:3, 18:12, 18:13, 20:3, 25:21, 25:24, 25:25, 26:6, 26:18, 26:19, 29:6, 29:9, 29:11, 29:12, 30:6, 31:2, 31:10, 32:5, 35:15, 35:24, 35:25, 36:2, 36:25, 40:2, 41:23, 42:24, 44:1, 44:5, 47:12, 47:21, 48:8, 48:11, 48:22, 50:11, 50:18, 50:19, 51:2, 51:12, 52:19, 54:5, 60:10, 62:24, 63:23, 70:19, 76:7, 91:8, 91:11, 91:22, 92:23, 101:24, 102:17, 103:2, 104:9, 104:17, 104:22, 105:2, 111:15
**Students** [1] - 19:15
**styles** [2] - 47:18, 47:20
**subject** [4] - 20:9, 49:15, 62:8, 85:21
**subjected** [2] - 38:10, 104:1
**subscribed** [1] -

122:15
**substantive** [1] - 58:16
**suffered** [1] - 38:1
**suggest** [2] - 115:25, 116:3
**suggesting** [1] - 95:14
**suggestion** [1] - 90:10
**Suite** [5] - 1:16, 1:20, 2:3, 2:7, 2:11
**superintendent** [3] - 10:20, 97:23, 98:12
**superintendent's** [1] - 10:18
**supervised** [1] - 13:7
**supervisor** [2] - 25:3, 97:2
**supplemental** [1] - 84:10
**support** [6] - 24:25, 26:1, 26:7, 26:19, 65:1, 78:14
**supported** [1] - 117:8
**supporting** [2] - 26:21, 27:7
**supportive** [4] - 24:6, 24:7, 37:11, 37:14
**supposed** [1] - 115:11
**surprised** [2] - 15:8, 62:15
**surrounding** [1] - 114:2
**suspicion** [1] - 37:25
**sustained** [11] - 69:12, 73:25, 88:25, 89:4, 94:14, 95:8, 95:10, 95:12, 114:9, 118:13, 120:2
**switch** [1] - 83:12
**sworn** [1] - 20:24
**systems** [1] - 23:2

**T**

**tab** [1] - 80:11
**tabbed** [2] - 95:1, 102:3
**TABLE** [1] - 4:1
**talks** [2] - 15:12, 111:14
**tape** [1] - 122:13
**T████** [6] - 5:13, 5:18, 6:4, 27:22, 37:17, 121:18
**teach** [2] - 21:22, 47:23
**teacher** [13] - 22:5, 22:8, 22:10, 22:12, 23:10, 27:20, 27:21, 27:22, 31:1, 31:2,

34:17, 44:14, 115:10
**teachers** [21] - 19:5, 23:10, 27:19, 27:25, 37:4, 37:16, 37:18, 50:5, 75:15, 101:10, 101:15, 101:22, 102:13, 103:1, 104:8, 111:4, 111:6, 113:16, 115:14, 115:18
**teaching** [4] - 22:2, 22:4, 89:20, 117:24
**team** [22] - 26:22, 27:12, 27:23, 27:24, 28:2, 28:3, 28:20, 29:5, 31:11, 37:9, 39:7, 41:8, 41:15, 49:6, 84:6, 84:16, 101:17, 102:15, 104:14, 104:16, 114:16
**teams** [1] - 105:1
**tears** [6] - 13:9, 75:17, 76:5, 113:6, 113:17, 114:5
**Technology** [1] - 27:10
**temperature** [1] - 58:11
**ten** [6] - 11:7, 28:22, 42:4, 42:7, 42:13, 42:15
**tend** [1] - 43:16
**tennis** [1] - 51:20, 53:22
**Tenth** [1] - 3:5
**term** [2] - 81:17, 82:1
**terms** [2] - 81:17, 121:1
**T████** [2] - 61:12, 62:8
**testified** [10] - 10:12, 37:7, 61:19, 91:7, 93:10, 93:25, 96:24, 105:5, 105:9, 113:20
**testimony** [10] - 8:9, 50:3, 60:15, 87:25, 95:20, 97:7, 99:1, 110:4, 121:1, 122:6
**testing** [1] - 77:13
**text** [1] - 92:21
**textbook** [1] - 84:10
**thanking** [1] - 70:23
**THE** [165] - 1:1, 1:12, 5:1, 5:3, 5:17, 5:20, 5:25, 6:4, 6:6, 6:8, 7:6, 7:9, 7:17, 8:10, 8:13, 8:17, 8:19, 11:2, 11:9, 11:12, 11:14, 11:23, 11:25, 12:11, 14:5, 17:5,

17:8, 17:10, 17:12, 18:18, 18:20, 18:21, 18:22, 20:8, 20:12, 20:15, 20:17, 20:18, 20:20, 20:23, 20:25, 31:16, 32:20, 35:6, 38:17, 40:24, 50:15, 50:19, 50:21, 54:20, 55:1, 55:3, 55:6, 56:11, 56:14, 59:3, 66:2, 66:18, 66:20, 66:23, 67:1, 67:7, 67:9, 67:12, 68:10, 69:12, 69:17, 72:3, 72:20, 72:25, 73:13, 73:20, 73:23, 75:6, 76:11, 76:13, 76:16, 76:21, 76:25, 77:2, 77:8, 77:14, 77:17, 77:20, 77:25, 78:3, 78:5, 78:11, 79:1, 79:7, 79:12, 79:18, 79:24, 80:1, 80:5, 80:9, 80:24, 81:2, 81:5, 81:15, 81:22, 82:1, 82:15, 83:1, 83:8, 83:12, 83:14, 83:18, 88:25, 89:4, 90:3, 90:7, 90:18, 90:20, 92:5, 92:8, 92:12, 94:9, 94:14, 94:22, 95:4, 95:9, 95:17, 96:2, 96:8, 96:12, 96:15, 97:13, 99:9, 102:10, 103:9, 105:19, 106:2, 106:20, 110:19, 110:21, 113:11, 114:7, 114:9, 114:23, 115:22, 116:3, 116:4, 116:7, 116:9, 117:15, 117:22, 117:25, 118:1, 118:3, 118:4, 118:13, 118:21, 119:19, 120:2, 120:9, 120:10, 120:15, 120:18, 121:6, 121:9, 121:12, 121:14, 121:18, 121:20
**themselves** [1] - 40:10
**therapist** [4] - 67:25, 85:23, 86:2, 87:15
**therapists** [4] - 68:1, 86:5, 86:11, 86:18
**they've** [1] - 42:24
**thick** [1] - 84:11
**thinking** [2] - 26:1, 26:24

**third** [3] - 47:22, 49:2, 103:19
**thirds** [1] - 67:19
**Thomas** [1] - 27:9
**threat** [3] - 107:18, 119:6, 119:13
**threatening** [1] - 78:1
**three** [12] - 5:15, 11:13, 22:14, 23:6, 29:22, 44:19, 103:2, 103:16, 104:9, 104:16, 104:22, 105:1
**throughout** [3] - 28:18, 28:23, 28:24
**timely** [1] - 42:22
**Tinsley** [1] - 6:25
**Title** [3] - 80:22, 81:18, 82:3
**today** [10] - 5:9, 5:11, 5:15, 11:6, 87:9, 95:20, 112:14, 112:19, 113:21, 114:18
**toes** [1] - 24:19
**together** [6] - 10:18, 27:3, 40:11, 42:24, 97:22, 122:13
**tomorrow** [1] - 112:10
**TONIA** [1] - 3:4
**Tonia** [2] - 122:3, 122:21
**took** [4] - 48:21, 51:12, 80:18, 109:21
**top** [15] - 13:13, 14:9, 15:25, 16:12, 43:19, 45:20, 46:12, 47:15, 67:18, 68:13, 69:22, 75:10, 75:20, 92:18, 103:13
**topic** [4] - 40:2, 42:20, 42:21, 43:1
**Topic** [1] - 46:15
**topics** [5] - 39:25, 40:1, 91:19, 91:20, 92:5
**TORCHINSKY** [1] - 1:15
**touch** [1] - 119:2
**touched** [2] - 10:9, 59:21
**tough** [1] - 24:25
**towards** [1] - 119:11
**traffic** [1] - 5:4
**training** [6] - 39:15, 39:16, 41:2, 41:10, 50:4, 50:9
**trainings** [1] - 39:20
**TRANSCRIPT** [1] - 1:11

**transcript** [1] - 122:11
**transfer** [3] - 59:10, 116:23, 116:24
**transition** [2] - 22:7, 40:8
**transitioned** [2] - 22:13, 24:10
**TRIAL** [2] - 1:11, 4:1
**Trial** [1] - 122:6
**trouble** [1] - 92:22
**true** [1] - 111:21
**truly** [1] - 99:21
**trusted** [2] - 44:15, 44:18
**truthful** [1] - 98:11
**try** [10] - 6:9, 6:13, 25:25, 28:8, 30:11, 51:8, 77:17, 84:20, 117:9, 120:3
**trying** [19] - 33:14, 47:2, 47:23, 61:20, 77:18, 77:22, 78:7, 78:16, 79:11, 79:14, 88:12, 90:11, 92:24, 105:6, 105:8, 106:8, 106:23, 107:3, 120:4
**Tuesday** [3] - 28:2, 28:4, 69:9
**turn** [8] - 44:7, 44:23, 45:1, 45:10, 47:6, 51:16, 90:16, 108:17
**two** [11] - 28:2, 34:20, 43:9, 62:11, 63:23, 64:3, 66:7, 67:19, 70:1, 107:5, 112:2
**two-thirds** [1] - 67:19
**type** [10] - 30:19, 32:9, 32:10, 36:24, 36:25, 37:25, 38:8, 45:6, 49:6, 70:17
**typed** [2] - 83:3, 83:6
**types** [1] - 46:3
**typical** [4] - 28:5, 28:19, 63:3, 63:6
**typically** [2] - 34:1, 75:1

**U**

**ugh** [1] - 81:2
**unaware** [2] - 62:18, 104:25
**unclear** [1] - 98:13
**uncomfortable** [1] - 64:6
**under** [3] - 46:15, 68:2, 92:19
**unfortunately** [1] - 111:19
**Unified** [1] - 23:11

**Unit** [1] - 40:16
**UNITED** [2] - 1:1, 1:12
**united** [1] - 3:4
**University** [2] - 21:22, 21:23
**unpredictability** [2] - 24:18, 25:20
**unscheduled** [1] - 9:5
**up** [44] - 6:18, 7:11, 14:3, 16:11, 24:21, 29:2, 30:25, 35:3, 37:14, 39:12, 51:24, 53:13, 58:25, 60:24, 64:6, 64:16, 66:15, 67:24, 71:2, 72:6, 74:13, 75:1, 76:4, 76:6, 76:8, 79:13, 83:4, 86:1, 87:16, 90:15, 91:20, 92:9, 97:11, 103:5, 103:7, 110:16, 111:15, 111:25, 112:2, 112:6, 113:9, 113:20
**upset** [1] - 115:12

**V**

**VA** [1] - 3:6
**vague** [1] - 86:21
**Vallejo** [2] - 22:22, 23:11
**verbal** [3] - 43:15, 45:15, 45:17
**verbally** [1] - 60:23
**versus** [6] - 31:10, 45:15, 45:16, 45:17, 47:22, 122:7
**via** [1] - 46:3
**video** [3] - 45:7, 46:8, 46:10
**violence** [1] - 53:18
**Virginia** [2] - 40:13, 122:4
**VIRGINIA** [1] - 1:1
**visited** [2] - 53:5, 53:17
**vividly** [1] - 107:25
**VOGEL** [1] - 1:15
**voice** [3] - 61:9, 86:3
**voicemail** [10] - 61:20, 62:1, 62:2, 62:6, 86:5, 86:6, 86:8, 105:10, 106:25, 107:15
**VOLUME** [1] - 1:8
**voluntarily** [1] - 100:21
**Voyagers** [3] - 27:15, 29:3, 29:5
**vulgar** [1] - 81:21

**W**

**wait** [2] - 35:24, 36:6
**waiting** [4] - 5:4, 36:2, 51:23, 51:25
**walk** [11] - 10:8, 28:5, 29:3, 29:4, 34:17, 34:22, 63:15, 63:22, 63:24, 64:7, 98:2
**walked** [3] - 29:2, 84:18, 84:23
**walking** [6] - 29:1, 33:15, 53:13, 54:7, 65:7
**wants** [2] - 6:11, 83:4
**warm** [1] - 37:12
**Washington** [5] - 1:17, 2:15, 2:18, 2:22, 3:2
**watched** [1] - 46:9
**ways** [4] - 16:25, 46:3, 47:5, 51:9
**weapons** [3] - 78:1, 78:3, 80:4
**Weaver** [12] - 4:3, 5:12, 5:19, 5:23, 7:25, 8:25, 12:16, 17:7, 17:17, 24:9, 25:2, 75:24
**weaver** [1] - 5:17
**Wednesday** [1] - 69:9
**week** [12] - 49:5, 66:12, 69:2, 69:10, 97:5, 97:8, 97:9, 98:9, 98:18, 99:21, 100:5, 100:6
**week-and-a-half** [1] - 97:5
**weekend** [1] - 61:24
**weekly** [1] - 28:1
**weeks** [8] - 30:5, 70:1, 71:3, 71:10, 73:19, 88:13, 98:8, 98:16
**welcomed** [1] - 24:7
**whereof** [1] - 122:15
**whole** [7] - 31:11, 41:25, 42:5, 89:20, 97:16, 97:18, 111:20
**wide** [2] - 91:25, 92:3
**willing** [3] - 26:7, 50:11, 50:18
**win** [2] - 23:7, 25:6
**wing** [6] - 33:12, 33:24, 34:18, 35:13, 36:12
**winter** [3] - 71:7, 100:23, 100:25
**withdraw** [1] - 119:18
**WITNESS** [15] - 11:12, 11:25, 18:10, 18:20, 18:22,

20:15, 20:18, 50:21, 72:25, 92:8, 96:15, 105:19, 116:3, 117:25, 118:3, 120:9

**witness** [17] - 17:12, 20:9, 20:20, 20:24, 53:18, 72:2, 75:5, 76:11, 76:25, 77:5, 89:7, 89:10, 89:13, 90:5, 96:10, 121:18, 122:15

**Witness** [7] - 7:16, 20:19, 21:4, 33:8, 33:12, 33:14, 121:11

**witness's** [2] - 77:7, 95:18

**witnesses** [3] - 5:9, 5:11, 5:22

**WITNESSES** [1] - 4:1

**wondering** [1] - 18:24

**word** [2] - 71:20, 98:18

**words** [11] - 31:4, 46:2, 46:21, 62:24, 78:20, 83:4, 83:6, 83:8, 98:18, 102:1, 104:2

**workbook** [1] - 84:11

**worker** [1] - 38:23

**works** [1] - 8:12

**world** [1] - 111:20

**worth** [1] - 83:10

**wow** [1] - 53:9

**write** [6] - 16:5, 80:6, 80:7, 81:6, 87:1, 87:3

**writes** [2] - 13:19, 14:19

**writing** [3] - 9:21, 10:2, 11:4

**written** [9] - 9:3, 9:9, 9:10, 11:17, 18:22, 18:25, 19:7, 85:9, 98:20

**wrote** [2] - 82:18, 114:11

## Y

**year** [38] - 21:17, 22:20, 23:10, 23:13, 23:20, 25:9, 25:11, 25:12, 25:16, 26:9, 26:11, 27:12, 28:7, 30:7, 37:16, 39:17, 39:24, 41:15, 41:25, 42:23, 54:16, 54:23, 55:10, 55:21, 55:23, 56:20, 57:8, 59:14, 62:11, 65:21, 65:23,

73:7, 91:8, 109:11, 109:13, 110:14

**years** [13] - 11:7, 21:24, 22:12, 22:17, 24:2, 24:13, 25:14, 50:17, 116:15, 116:18, 117:20, 119:25, 120:7

**yesterday** [6] - 9:2, 9:11, 14:11, 14:17, 31:15, 68:18

**younger** [1] - 52:11

**yourself** [4] - 42:21, 72:5, 100:19

**yup** [1] - 110:25

## Z

**Zoll** [1] - 2:1

**zoom** [21] - 31:21, 32:22, 44:9, 46:23, 47:7, 47:16, 47:25, 55:8, 56:17, 59:6, 66:5, 67:18, 68:13, 69:20, 69:21, 70:4, 75:10, 103:10, 110:23, 111:24

**zooming** [1] - 38:3