1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**B.R.,**                              :
                                       :
            **Plaintiff,**    :   Civil Action
                                       :   No. 1:19-cv-917
        **v.**                         :
                                       :
**F.C.S.B., et al.,**                  :   April 15, 2024
                                       :   9:02 a.m.
                                       :
            **Defendants.**   :
........................... :   VOLUME 19 - A.M./P.M.
                                       :   SESSION
                                       :   9:00 - 1:00 p.m.


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES:  (Cont.)

2

```
 1   For the Plaintiff:          Brittany Zoll, Esq.
                                 BOIES SCHILLER FLEXNER, LLP
 2                               100 SE 2nd Street
                                 Suite 2800
 3                               Miami, FL 33131
                                 610-804-1787
 4                               Email: Britzoll@gmail.com

 5                               Andrew Brenner, Esq.
                                 BOIES SCHILLER FLEXNER, LLP
 6                               100 SE 2nd Street
                                 Suite 2800
 7                               Miami, FL 33131
                                 305-539-8400
 8                               Email: Abrenner@bsfllp.com

 9                               Robert Keefe, Esq.
                                 BOIES SCHILLER FLEXNER, LLP
10                               100 SE 2nd Street
                                 Suite 2800
11                               Miami, FL 33131
                                 850-585-3414
12                               Email: Rkeefe@bsfllp.com

13   For Defendant F.C.S.B.:     Ryan Bates, Esq.
                                 HUNTON ANDREWS KURTH, LLP
14                               2200 Pennsylvania Avenue, NW
                                 Washington, DC 20037
15                               202-955-1596
                                 Email: Rbates@hunton.com
16
                                 Sona Rewari, Esq.
17                               HUNTON ANDREWS KURTH, LLP
                                 2200 Pennsylvania Avenue, NW
18                               Washington, DC 20037
                                 202-955-1974
19                               Email: Srewari@huntonak.com

20                               Scott W. Burton, Esq.
                                 HUNTON ANDREWS KURTH, LLP
21                               2200 Pennsylvania Ave NW
                                 Washington, DC 20037
22                               202-955-1664
                                 Email: Burtons@huntonak.com
23

24

25   APPEARANCES:  (Cont.)       Kevin Elliker, Esq.
                                 HUNTON ANDREWS KURTH, LLP
```

3

| | | |
|---|---|---|
| 1 | For Defendant F.C.S.B.: | 2200 Pennsylvania Avenue, NW Washington, DC 20037 |
| 2 | | 804-788-8200 Email: Kelliker@huntonak.com |
| 3 | | |
| 4 | | **Michael E. Kinney, Esq.** THE LAW OFFICE OF MICHAEL E. |
| 5 | For the Defendants: (S.T., A.F., P.A.H., | KINNEY, PLC. 1801 Robert Fulton Drive |
| 6 | T.B., B.H., M.P.F., M.C., F.T., J.F.) | Suite 120 Reston, VA 20191 |
| 7 | | Email:  Mk@kinneyesq.com |
| 8 | | **Bruce Blanchard, Esq.** ODIN, FELDMAN & PITTLEMAN, PC. |
| 9 | For the Defendant J.O.: | 1775 Wiehle Avenue Suite 400 |
| 10 | | Reston, VA 20190 Email:  Bruce.blanchard@ofplaw.com |
| 11 | | |
| 12 | Official Court Reporter: | MS. TONIA M. HARRIS, RPR United States District Court |
| 13 | | 401 Courthouse Square Tenth Floor |
| 14 | | Alexandria, VA 22314 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defendants:

M███████ P██████F█████

            Direct examination by Mr. Bates.............. 16
            Cross-examination by Mr. Kinney.............. 40
            Cross-examination by Mr. Fahey.............. 42

Dr. Jonathan DeRight

            Direct examination by Ms. Rewari............ 59
            Cross-examination by Mr. Brenner............ 114
            Redirect examination by Ms. Rewari.......... 167

EXHIBITS

On behalf of the Defendants:

                                              Admitted

Number 168......................................... 39
Number 313......................................... 90

PLAINTIFF'S STIPULATION

Number 802B (admitted through the clerk)

MISCELLANY

Preliminary matters.................................. 05
Certificate of Court Reporter....................... 183

After review of the record and upon agreement of counsel and
deputy clerk, all final exhibits can be found on CME at Docket
#975.

─────────── B.R. v. F.C.S.B. ───────────

5

1              THE COURT:  Good morning.

2              (Good morning responses.)

3              THE COURT:  We are still waiting for one juror.  So

4    we probably can now take care of some of our administrative

5    matters so that you all can prepare for the day.

6              First of all, I'm going to read an order into the

7    record.  We will have copies of the order for you after we

8    post it.

9              This matter comes before the Court following oral

10   argument on Friday, April 12, 2024, regarding the anticipated

11   of Dr. Seth Tuwiner, a neurologist.

12             Plaintiff B.R. had originally planned to present an

13   expert witness in trial who had diagnosed the plaintiff with a

14   traumatic brain injury, TBI, and a neurocognitive disorder.

15             Near the close of plaintiff's case in chief,

16   plaintiff decided not to call that expert.  Consequently,

17   plaintiff stipulated that plaintiff's other expert, Dr. Eileen

18   Ryan, would not be permitted to discuss any TBI or

19   neurocognitive disorder.

20             Moreover, at defendants' request, the Court required

21   plaintiffs to redact references to a TBI, a neurocognitive

22   disorder, from plaintiff's medical records.

23             Despite no expert witness ever diagnosing plaintiff

24   with a TBI or neurocognitive disorder and no medical records

25   making reference to a TBI or neurocognitive disorder,

─────── B.R. v. F.C.S.B. ───────

6

1  defendants have stated their intention to call Dr. Tuwiner to

2  testify that one of his opinions is that plaintiff does not

3  have a TBI or neurocognitive disorder.

4          In the Court's view, it is unnecessary and

5  irrelevant for the defendants to attempt to negate a theory

6  that plaintiff has not presented.

7          However, in oral argument, defendants noted that

8  plaintiff herself may have mentioned that she has a TBI or

9  neurocognitive disorder during her testimony.  To the extent

10  any such passing reference was made, the Court does not find

11  that such a passing reference by a nonexpert witness requires

12  an expert to contradict such testimony, especially where

13  there's no expert testimony or medical records to support such

14  a diagnosis.

15          To the extent defendants believe that a curative

16  instruction is necessary, they may propose one.  However,

17  defendants are warned that the Court will be hesitant to

18  reinject something into the case that was only made in passing

19  reference, and defendants are warned that any such proposed

20  instruction should be made in a more neutral form than

21  previously proposed instructions.

22          Accordingly, it is hereby ordered that Dr. Tuwiner

23  is precluded from opining that plaintiff does not have a TBI

24  or neurocognitive disorder because there is no evidence in the

25  case that plaintiff does have any such conditions.

———B.R. v. F.C.S.B.———

7

1          That order will be entered today.  We will have

2     copies of that order for you.

3          It probably is to defendants' benefit if they

4     discuss that Dr. Tuwiner -- the limitations of that testimony.

5     Okay.

6          The second thing, as the Court spent the weekend

7     listening to and going over the deposition testimony of Ms. R.

8     regarding her interview with Detective Chambers, the Court is

9     of the view that there is no need to actually play that

10    deposition to the Court.  Obviously people can ask any

11    questions that they think might be appropriate for Detective

12    Chambers -- I believe he's Major Chambers now -- when he takes

13    the stand.

14         So obviously you can take advantage of whatever was

15    said in that deposition, but the bottom line is that it's not

16    going to be played for the jury, and again, you can ask any

17    questions that are consistent with the Court's previous orders

18    regarding the extent of Detective and now Major Chambers'

19    perspective of the case.

20         MS. ANDERSON:  Your Honor, may we address some

21    limitations on what Detective Chambers can testify to?  It is

22    the plaintiff's position that the only thing that's relevant

23    for Detective Chambers is any information that he shared -- he

24    actually told the school in just facts, not necessarily his

25    entire investigation, whatever he did or did not do, if it

─ B.R. v. F.C.S.B. ─

8

1   didn't make its way to the school, it is our position that it

2   is wholly irrelevant.

3        THE COURT:  Well, I'm going to allow defendants to

4   at least put things in context.  In other words, why is he

5   here, what was his involvement in the circumstances, and at

6   least provide what I will call a predicate for his testimony.

7        I think quite frankly the best way to handle that is

8   to make objections as they are deemed appropriate because I

9   can't really predict how Detective Chambers is going to stay

10  within the scope of the Court's previous orders, so I think

11  you just need to be ready for contemporaneous objections

12  because I can't predict.

13       MS. ANDERSON:  Understood.  And then in regards

14  to -- I think I had heard, and please correct me if I'm wrong,

15  that there was an intention to also admit his investigation

16  reports, and it would be our position that those are sort of

17  rank hearsay.  They are filled with a lot of information.  We

18  don't have any proof it ever went to the school.

19       And so, it would be our position that those should

20  not be allowed into evidence.  He can testify along the lines

21  that Your Honor just said, but then to allow in his

22  investigation reports is just -- an out-of-court statement

23  offered for the truth.

24       THE COURT:  Ms. Rewari.

25       MS. REWARI:  Your Honor, I believe you ruled on this

──────B.R. v. F.C.S.B.──────

9

1  on a motion in limine before and said which parts of the

2  report could come in and which parts couldn't.  We've already

3  redacted that.  We did that before trial and sent it to the

4  other side.

5       We do believe that the report is relevant because

6  the plaintiff and her mother have testified that they told

7  Detective Chambers and the intake officer different

8  information than what is in the reports in terms of what they

9  reported, the number of assaults they reported, the number of

10 perpetrators they reported.  They've testified differently

11 than what's in the reports.  The reports --

12      THE COURT:  As long as he stays within the context

13 or, I guess, the structure of the decision on the motion in

14 limine, I'm going to let him testify, but the bottom line is

15 both sides need to be aware that contemporaneous objections

16 and suggestions are probably the best way to handle it.

17      I would hope that Detective Chambers would be as

18 sterile as he can possibly be in the presentation of his

19 testimony, and that's the suggestion I'm providing to you.

20      MS. REWARI:  Yes, and we will do our best to abide

21 by the rules, and I think you've made them clear from the

22 beginning, so we're going to stick to that.

23      I also want to clarify, I think you said plaintiff's

24 deposition -- I'm assuming you're talking about the interview.

25      THE COURT:  Interview.

B.R. v. F.C.S.B.

10

1          MS. REWARI:  And we have transcripts -- both sides

2     have transcripts of that interview on their exhibit list.

3          Does your ruling preclude us from putting the

4     transcript into evidence?

5          THE COURT:  The transcript -- again, and I'm

6     anticipating because I saw Mr. Blanchard get ready to stand

7     up, and I think I know what your concern is.

8          You can ask anything you want about the nature of

9     the interview.  For instance, I know Mr. Blanchard is going to

10    suggest to the Court that nothing was ever said in the

11    interview about J.O.  He can ask about that.  Any time during

12    the time that you questioned Ms. R., was J.O. ever mentioned?

13    No, she was not.  How long did the interview take?  It took an

14    hour and 15 minutes.  Was there anything that suggested that

15    you needed to do any investigation regarding J.O.?  No, there

16    was not.

17         He can ask those questions, but playing the tape is

18    unnecessary, particularly when you have a live witness.

19         MS. REWARI:  Yeah.  I guess our concern is we're

20    talking to someone who is now deputy chief of police 12 years

21    after he did an investigation.  I believe the reports are

22    admissible under a hearsay exception, and so, asking a -- I

23    mean, I guess we'll have to refresh recollection a lot

24    because --

25         THE COURT:  You may have to refresh recollection,

B.R. v. F.C.S.B.

11

1  but even in the context of criminal cases, those reports don't

2  come in because of the hearsay nature of them.  So the report

3  is not coming in.

4          MS. REWARI:  Okay.  Thank you.

5          THE COURT:  Yes, ma'am.

6          MR. BLANCHARD:  Thank you, Your Honor.

7          MR. BRENNER:  Your Honor, can I just raise one other

8  issue that we talked about that we'll probably need to raise

9  at the end of the day?  We don't want to take any more of the

10 jury's time, but we received notification this morning that

11 the defense intends to call -- I'm sorry, Judge.  Good

12 morning.

13          The defense intends to call B.R. back to the stand,

14 which was something we didn't hear until this morning, and I

15 just want -- at the end of the day I want to raise what their

16 intended scope of that is, because, as you know, there was a

17 rather large scope already covered in our case, so I'm -- I

18 don't know what their intention is, but I would like to --

19          THE COURT:  I'm interested in hearing what it is,

20 because as I recall, Ms. B.R. was on the stand for a good

21 amount of time and everybody had their opportunity to

22 question, and we're not going to get into the business of

23 rehashing witnesses.

24          MR. BRENNER:  Yeah, and I'm not presupposing what

25 they have in mind.  It may be totally legitimate.  I just

──────B.R. v. F.C.S.B.──────

12

1    don't know.  I just wanted to put a marker that we should talk

2    about at the end of court today.

3              MS. REWARI:  Your Honor, at this point, we expected

4    to be very limited to new issues that have been raised since

5    she testified with respect --

6              THE COURT:  What new issues?

7              MS. REWARI:  Well, we heard -- for example, we heard

8    on Friday about the science book that we had never seen before

9    that has tears in it.  It wasn't produced in discovery.

10             We've also heard -- in redirect with Mr. Brenner,

11   she also said that she had never seen the second amended

12   complaint, and we weren't --

13             THE COURT:  Well, that's her testimony, so what are

14   you going to do with that?

15             MS. REWARI:  Well, we have sworn answers from her

16   saying that she has, incorporating the second amended

17   complaint, so we may be able --

18             THE COURT:  In some of the interrogatories or

19   something?

20             MS. REWARI:  Yes.  Yes.  And we weren't permitted to

21   ask her about certain matters because it wasn't in the scope

22   of their case.

23             THE COURT:  Basically you want to cross-examine her

24   again?

25             MS. REWARI:  On a short list of issues that have

B.R. v. F.C.S.B.

13

1    arisen since she testified.

2         THE COURT:  We'll take that under advisement,

3    because, again, we're not going to start calling witnesses

4    back to the stand because we think that maybe we wanted to get

5    something else that wasn't gotten before.  So you all need to

6    work those things out.

7         But we're not going to do this thing where we're

8    going to go back and forth, we're going to call this witness

9    back.  You all made an agreement at the beginning of the trial

10   that you are going to put certain witnesses on, you're going

11   to open up the examination and allow the examination to go

12   into things that were not brought up on direct examination,

13   and that was the deal that you all made.

14        And so, the Court was not a part of that deal, but

15   it's going to hold you to your deal.

16        MS. REWARI:  Understood, and we don't intend to go

17   back over anything that we've already asked her about, but --

18        THE COURT:  Let me know when you think you might

19   want to call her.  The Court is not making any determination

20   as to whether you are going to be allowed to do that.

21        Because again, the Court has to depend on what you

22   say as far as the perspective of things.  This idea of the

23   torn science book, we've heard about that before.

24        It was interesting when I saw the evidence that one

25   side had the torn science book, and the other side had a copy

B.R. v. F.C.S.B.

14

1  of the torn science book, but it wasn't the same as the one

2  that you had, and one side said we didn't get into discovery,

3  but the other side had a copy of it.

4       Some of the things are actually baffling to the

5  Court as to -- the evidence that's presented in this case and

6  the exhibits that are used.  It's just almost confounding

7  sometimes as to why one side claims they don't have something,

8  but then they have a copy of something that's similar to it.

9       MS. REWARI:  Well, we have a copy of the cover of

10  the book.  The evidence that --

11       THE COURT:  How did you get a copy of the cover?

12       MS. REWARI:  It was provided to the assistant

13  superintendent, and the testimony from Ms. H███████ on Friday

14  was that when she saw the book, when she saw the book with the

15  plaintiff and found it in the lost and found bin, it did not

16  have any profanity on it.  When it came back to the school

17  through the assistant division superintendent, it had

18  profanity on it.

19       THE COURT:  Well, again, we're getting into things

20  that I believe are within the purview of the jury.  They can

21  decide whether they -- whatever they want to decide about the

22  inconsistency and the controversy with regard to exhibits that

23  exist in this case.

24       MS. REWARI:  And there may be some things that we

25  would want through the plaintiff that we can do by stipulation

B.R. v. F.C.S.B.

15

1  if we can get the exhibits admitted.  We may not need to call

2  her on, you know, most of the topics, so I think we have to

3  talk to the other side and see what we can --

4          THE COURT:  See what you can come up with.

5          One last thing, when are you going to call

6  Dr. Tuwiner?

7          MS. REWARI:  Dr. Tuwiner is on Wednesday.

8          THE COURT:  Okay.  All right.  Very good.  And

9  Dr. DeRight is testifying today?

10         MS. REWARI:  Yes.

11         THE COURT:  Okay.  Very good.  Anything else?

12         MR. BRENNER:  No, Your Honor.

13         MS. REWARI:  Not from us.

14         MR. BRENNER:  It's not DeRight first?  Oh, I didn't

15  hear that.  Okay.

16         (Jury present.)

17         THE COURT:  You may be seated.  Good morning, ladies

18  and gentlemen.  It's good to see you again on this Monday.

19         Have all of you lived up to the Court's instruction

20  not to discuss the case or any aspect of the case with anyone?

21  And to the extent that you have been able, have you stayed

22  away from print media and social media or anything regarding

23  this case.

24         Thank you.  And once again, we appreciate your time

25  and attention to this matter.

B.R. v. F.C.S.B.

16

1          Next witness.

2          MR. BATES:  Your Honor, the School Board calls

3   M█████ P███████ F██████.

4          THE COURT:  Ms. F█████, come on up, ma'am.

5   (M██████ P███████ F██████, Defendants' witness, sworn.)

6          THE COURT:  Please have a seat, ma'am.  Listen to

7   the questions of counsel and answer them as best you can.  If

8   you hear an objection or the Court starts to speak, please

9   hesitate before you say anything else.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Yes, ma'am.

12                    DIRECT EXAMINATION

13  BY MR. BATES:

14  Q.    Good morning.

15  A.    Good morning, Mr. Bates.

16  Q.    For the record, my name is Ryan Bates.  I represent

17  Fairfax County School Board.

18          Can you please state your name for the record?

19  A.    My name is M██████ F██████.

20  Q.    And are you a defendant in this case, ma'am?

21  A.    I am.

22  Q.    Can you tell us where you were born and raised and your

23  educational background before college?

24  A.    Sure.  I was born in Arlington, Virginia, raised in

25  Northern Virginia.  My entire K through 12 education took

B.R. v. F.C.S.B.

17

1   place in a Fairfax County Public School.

2   Q.   Can you tell us your journey about how you decided to

3   become a teacher?

4   A.   Well, as I said, my entire K through 12 education took

5   place in a Fairfax County Public School, and I was inspired by

6   amazing educators that molded my education.  And I'm a

7   first-generation American, and I was raised by South Asian

8   immigration parents.

9          And in our community usually success is defined by

10  being a doctor or an engineer, but I wanted to do what made my

11  heart happy, and that was being a teacher.  There's a saying

12  that, if you find something you love, you'll never have to

13  work a day in your life, and for me that love was in the

14  classroom, teaching young children.

15         And both my parents, they immigrated here to pursue

16  their American dream, and just as their friends and relatives

17  praise their children who got into medical school or became

18  engineers, they praised me with just the same amount of high

19  praise when I said that I wanted to become a history teacher.

20  Q.   Where did you attend college?

21  A.   George Mason University.

22  Q.   When did you graduate from George Mason?

23  A.   2007 with my undergrad and 2010 with my master's of

24  education in curriculum and instruction.

25  Q.   Okay.

─────────B.R. v. F.C.S.B.─────────

18

1          What was your first full-time teaching job?

2   A.    Rachel Carson Middle School, yeah, as a fully licensed

3   teacher.

4   Q.    What year was your first year at Rachel Carson?

5   A.    Fall 2009.  Yes.

6   Q.    How many total years did you spend at Rachel Carson?

7   A.    Four years.

8   Q.    And -- so, do you recall what the last school year was

9   that you taught at Rachel Carson?

10  A.    That would be fall 2012, spring 2013.

11  Q.    So would that be the year after B.R. was in your 7th

12  grade class?

13  A.    That would be correct.

14  Q.    Okay.  Got you.

15          And why did you -- why did you move on from Rachel

16  Carson Middle School after those four years?

17  A.    I got married.  So my husband lived outside of the

18  district, and we decided that -- you know, when you're

19  married, where are we going to live, and I chose to live where

20  he was, so.

21  Q.    So you moved out of the area?

22  A.    Yes.  It was hard because Carson was my first school, and

23  we were a family.  But life happens, and it was a new chapter.

24  Q.    Ma'am, you haven't been in the courtroom for this entire

25  trial.  Why is that?

───B.R. v. F.C.S.B.───

19

1   A.   I live 200 miles outside of this district.  And I am the

2   primary guardian of a young child who is currently coping with

3   grief from the sudden loss of her friend a few weeks ago.

4   Q.   Where are you -- and are you currently employed, ma'am?

5   A.   I am.

6   Q.   And are you still -- what's your profession?

7   A.   I'm still a teacher.

8   Q.   Okay.  Great.

9        So let's focus on the 2011/2012 school year.  What

10  grade and subject did you teach that year?

11  A.   In 2011/2012 I taught 7th grade U.S. history.

12  Q.   What team were you on that year?

13  A.   I was on the Explorers team.

14  Q.   How would you describe Rachel Carson to someone who

15  knows -- who doesn't know anything about it?

16  A.   It's a great school.  It's a large school.  But it's --

17  the staff is great; the administration is great.  I'm very

18  fortunate that I started my career in that school.  It really

19  molded to the type of teacher that I still am when it comes to

20  organization and being the best that I can be.

21       I didn't realize that me being a teacher would make

22  such an impact because I was a person of color, and for so

23  many of my students, I was their first person of color as

24  classroom teacher, and coming from a South Asian immigrant

25  background, a lot of my students saw themselves in me.  So

─────B.R. v. F.C.S.B.─────

20

1   that's how I would describe.

2   Q.   How would you describe the students at Rachel Carson?

3   A.   They were great.  They inspired me every day.  I'm still

4   teaching.  So certainly not the pay or for anything else.

5   Q.   How many classes a day did you teach?

6   A.   At Carson, I believe it was six classes.

7   Q.   Who is the team counselor for the Explorers team?

8   A.   For that year it was B███████ H████████.

9   Q.   And what is -- how would you describe Ms. H████████ as a

10   counselor?

11   A.   So she was a superhero that didn't wear a cape.  She was

12   phenomenal.  She attended -- she wasn't just there for the

13   students; she was also there at concerts, at award ceremonies.

14   She was always there.  And she supported us, the teachers, as

15   well.

16   Q.   What about the administration, what was it like working

17   under them?

18   A.   They were wonderful.  I mean, very organized, very kind.

19   You know, A███, he set the tone of what principals should be.

20   Professional, kind, following all protocol.

21   Q.   When you said "A███," were you referring to Principal

22   F███████?

23   A.   Sorry.  Yes.  Mr. F███████.

24   Q.   What type of environment did you create in your

25   classroom?

Case 1:19-cv-00917-RDA-LRV   Document 1058   Filed 08/26/24   Page 21 of 208
PageID# 23282                          Cross - M.F.

─────── B.R. v. F.C.S.B.───────

21

1   A.   So I'm a loving and nurturing person.  That's what I

2   wanted my classroom to be a reflection of.  For me, success

3   wasn't the scores that my students had on their tests or

4   assignments.  For me, it was knowing that there was an adult

5   in that room that cared for them and loved them.

6   Q.   Did students ever come to you with non-school-related

7   issues?

8   A.   Absolutely.  From asking me, What type of shoes should I

9   wear with my dress, to, you know, talking about what happens

10  if they don't get into TJ, the magnet school.  And I would

11  tell them as a graduate from a Fairfax County public high

12  school that's not TJ -- West Springfield High School, home of

13  Spartans, Your Honor -- so I will tell them that, Hey, there

14  is still success; that's not the end all, be all.

15          MR. BATES:  If we could, Your Honor, permission to

16  publish Defendants' Exhibit 61, the school map.

17          THE COURT:  Without objection, you may publish.

18          (Exhibit published.)

19          MR. BATES:  Grady, if I can have you zoom in on the

20  Explorers pod, as we've seen.

21  BY MR. BATES:

22  Q.   And, Ms. F█████, circle for us -- maybe just color in

23  where your classroom was.  It's a touch screen.

24  A.   Sure.  So when I was on the Explorers team?

25  Q.   Yeah.

B.R. v. F.C.S.B.

22

1   A.   That was my first classroom.

2        MR. BATES:  Can you erase that, Grady.

3   MR. BATES:

4   Q.   And where -- where -- what were you doing when -- in

5   between classes and before first period and after last period

6   of the day?

7   A.   So I would be outside my classroom door, which you can

8   see right there.

9   Q.   What's your classroom number, by the way?

10  A.   A109.

11  Q.   Can you just show us on the map, put a little X where you

12  would stand.  And if the location moved you can tell us other

13  locations where you would stand.

14  A.   (Witness complied.)

15  Q.   Generally right there?

16  A.   Yes.

17  Q.   And so, would you stand in this location both before

18  first period, in between classes, and also at the end of the

19  day?

20  A.   Correct.

21  Q.   Dismissal?

22  A.   Correct.

23        MR. BATES:  We can take that down.

24        Your Honor, if we can publish Defendants'

25  Exhibit 192.

B.R. v. F.C.S.B.

23

1          THE COURT:  You may.

2          (Exhibit published.)

3   BY MR. BATES:

4   Q.   These are the school photos.  If we can go to page 6.

5          THE COURT:  You may.

6   BY MR. BATES:

7   Q.   Can you see, what is that door that we're looking at

8   right there in the background?

9   A.   So there are -- two, three -- four doors.  Which door?

10  Q.   Which was your classroom door?

11  A.   So you see the three rows of lockers?

12  Q.   Yes.

13  A.   You see the center row of the locker, and you see how

14  it's kind of leading towards a classroom door, that was my

15  classroom door.

16  Q.   Can you mark on this picture where you would stand?

17  A.   Yes.  Here.

18          (Witness complied.)

19          So either side of the doors.

20  Q.   Okay.  And if we can skip forward to page 8, so two pages

21  forward.  And you can remove those markings.

22          Would this be the view or approximately the view

23  from where you would stand?

24  A.   Approximately, yes.

25  Q.   We can take that down.

B.R. v. F.C.S.B.

24

1          I'd like to ask you some questions about the

2    plaintiff, B.R., in this case.

3          What's your first recollection of her?

4    A.   My first recollection is probably the first week of

5    school.  So with 7th grade that's the first year of middle

6    school, and there's a lot of, you know, nervousness, anxiety.

7          As I said, it's a big school.  I believe we had

8    about four feeder elementary schools coming in to Carson

9    Middle School.  So there's lots of new people, lots of new

10   teachers.  They're used to just having one classroom teacher

11   and being in one classroom for most of the day at 6th grade.

12   So 7th graders, there's a lot of feelings of anxiety.

13   Teachers included.  There's over 120 names and personalities

14   to get to know and understand and guiding them through that.

15         So I remember first week of school, she came, and

16   she seemed to be really nervous and uncomfortable, and I told

17   her -- I'm like, Hey, you know, I'm really nervous too.  As I

18   said, I have so many new names, and I have to get ready for

19   back to school night and meeting parents, and I assured her

20   that you're in the same boat as a lot of us.  And, you know, I

21   told her -- I'm like, Hey, if you want, can I walk you to the

22   counseling office, and you can, you know, take a breather,

23   and, you know, until you're ready to come back.

24         And she said, Absolutely.

25         And I told her, Hey, let me walk you so you don't

──────── B.R. v. F.C.S.B. ────────

25

1   have to worry about looking at the map again and figuring out

2   where to go.

3           So I walked her to the counseling office, and then I

4   returned back to class.  And then when I saw her later, I

5   followed up, Hey, are you doing okay, and I remember her

6   giving me a hug.  And that's my first recollection of B█████.

7   Q.   When you said she was nervous, can you describe for us

8   how -- what led you to believe that she was nervous?

9   A.   You know, just the -- her facial expression.  She was

10  had -- some tears in her eyes, just the typical "deer in

11  headlights" look that a lot of us middle schoolers and

12  teachers have on the first day.

13  Q.   Did anything -- so after that -- by the way, at the time

14  that you met her, did you even know she was in your class?

15  A.   I believe she was because she was coming into my room.

16  So that's how she -- I believe she says, is this A109, and I'm

17  like, Yup, that's me, so.

18  Q.   Does anything -- what, if anything else, stands out to

19  you with regard to plaintiff being in your class during that

20  school year?

21  A.   So I remember, prior to my wedding, we were on a field

22  trip.  The whole class and team surprised me with flowers, and

23  we did a team picture, and I remember her being a few kids

24  away from me, smiling.  I remember around Christmastime, there

25  was a cell phone incident.  It wasn't hers, but it was the

B.R. v. F.C.S.B.

26

1   class, and she was -- felt uncomfortable about it, and then

2   the last I remembered her was her last direct communication to

3   me where she said that she missed me.

4   Q.   So outside of those three incidents, does anything else

5   really stand out with regard to B.R. in that school year,

6   anything out of the ordinary for a 7th grade student?

7   A.   No.  I mean, I did my best to care for her.  She made

8   friends, and then she was just kind of gone.

9   Q.   You mentioned the cell phone incident.

10          MR. BATES:  So if we can publish Plaintiff's

11  Exhibit 95, which has already been admitted into evidence.

12          THE COURT:  You may.

13          (Exhibit published.)

14  BY MR. BATES:

15  Q.   So if we can -- if we can zoom in on that bottom portion

16  of the email, please.

17          And is this the -- an email that pertains to the

18  cell phone incident that you were just referencing?

19  A.   Correct.

20  Q.   And who did you send this email to?

21  A.   As it shows, it was sent to my -- the core teachers on my

22  team and the counselor.

23  Q.   And what was the -- what was the purpose of sending this

24  email?

25  A.   So as you see the subject, it says, "Not a happy camper

1  at all with my third period right now."  If you notice the

2  date December 12, 2011, at 10:29.  I had been married for less

3  than two months with my husband, and we were living apart,

4  four and a half hours apart, and we were approaching Christmas

5  break, and this was our first holiday break together, no

6  honeymoon, nothing.  And so we had plans to finally have time

7  alone together, but unfortunately those plans were being

8  dictated by my new mother-in-law.

9        As a new bride in the family and with my husband

10 whom I love and I'm still married to, was not really telling

11 his mother what our plans actually were.  So I was pretty

12 stressed out personally.

13       And if you remember, in a school setting,

14 Christmastime, it's a very interesting time.  There's a lot of

15 joy in the air, and there's a lot of high-strung behavior.

16            THE COURT:  Just answer the question.

17            THE WITNESS:  Sorry.

18 BY MR. BATES:

19 Q.   What about -- how did this incident sort of pertain to

20 B████?

21 A.   So they were taking a test, and December 12th -- we're

22 trying to get the tests done before the kids were off for

23 winter break because I did not want to have a test first thing

24 when they came back from winter break.  So they were taking a

25 test, and the cell phone goes off.  During that year, U.S.

B.R. v. F.C.S.B.

28

1   History 2 is a SOL class, a Standard of Learning class.  So we

2   take testing settings very seriously at Carson.  If any sort

3   of noise, even from a watch and whatnot goes off, that's a

4   serious testing violation that has to be reported to the

5   State.  And so our in-classroom test is kind of practice for

6   that setting when they take the final assessment at the end of

7   the year.

8           So a cell phone goes off, and everyone is hearing

9   it, and it's coming from the back corner of the room.  And as

10  you can see, I said, Hey, whosever cell phone it is, you're

11  not in trouble.  Just turn it off and hand it over.  That's

12  it.  And then the kids were just kind of laughing at me

13  because I'm trying to find a cell phone that's going off, and

14  then there is, like, a domino effect.  The kids were saying,

15  Oh, it's not mine; mine is my locker, and all of this stuff.

16          And granted it's a test setting.  And so, B█████, she

17  was just as horrified as I was that a cell phone is going off,

18  and she felt like that the blame was being put on her, because

19  kids were laughing, but they were not laughing at her.  They

20  were more laughing at me because I'm trying to find a cell

21  phone that's going off in the room.  So it looked like there

22  was a mouse running around the room.

23  Q.   Gotcha.  If we can unzoom out of that.  If we can zoom in

24  on this middle email.

25          So right above that M█████ C████ asks you if anybody

B.R. v. F.C.S.B.

29

1    admitted to it.  Do you see that?

2    A.   Yes.

3    Q.   And then right above that, if you can zoom in on that

4    middle email, Grady.

5         That second paragraph where it says, "Poor B█████

6    just came up to me and said that so many kids were blaming her

7    and doesn't know how to handle it."  And then it continues and

8    says, "I told her that I know it was not her, and I will have

9    a talk about this with the class again tomorrow."

10        So what -- what conversation do you recall with

11   B████ about surrounding this?

12   A.   So when this was happening, once the cell phone ended,

13   our administrator for the team, P███ H█████, constantly does

14   rounds, and he was walking by my classroom at the time.  So

15   when he was walking by, I told him what happened, and he had a

16   talk with the entire class.

17        And then I encouraged her to -- when she came up and

18   told me about how she felt, I told her to talk to B█████,

19   Ms. H███████, and as you can see I cc'd it in the email.

20   Q.   Okay.  So by December 12th of that school year, is this

21   the only incident that you're aware of with regard to B█████

22   having issues?

23   A.   I mean, yes.  I felt like this issue was more towards me.

24   Q.   Right.  Right.

25   A.   But --

─────B.R. v. F.C.S.B.─────

30

1    Q.    Understood.  We can take that down.

2            At some point during that school year, did you

3    receive any instructions with regard to increased monitoring

4    of the locker pod?

5    A.    So as you saw on the map in the photos where I was,

6    that's where I had to be in between classes before school

7    started and right after school ended.  So me and along with

8    team teachers, we were already pretty present.  But any time,

9    you know, during our team meetings, we would get a message

10   from either counseling or administration, Hey, just be more

11   vigilant in the halls, which we were already doing.  We took

12   it as a reminder to continue following those procedures.

13   Q.    Okay.  And before receiving that instruction, had B.R.

14   reported to you that she was having any trouble in the locker

15   pod with other students or any other issues outside of this

16   cell phone incident?

17   A.    No, she did not.  This would probably be the only type of

18   report I've received from her.

19   Q.    Had you seen anything that would have led you to

20   believe -- despite the fact that she hadn't reported it to

21   you, had you seen anything that would have led you to believe

22   that she was in some type of distress or was having trouble

23   with other students?

24   A.    Certainly not that I recall.

25   Q.    And those instructions that you talked about from

1   administration to -- with regard to the monitoring, did you

2   follow those instructions and sort of keep an extra eye out?

3   A.   Yes.  I did my best.  I mean there are only four-minute

4   increments.  So I did my best to be out there.

5   Q.   I'm going to zoom out and talk about that entire school

6   year.  At any point during that entire school year, did you

7   ever observe any students touching B.R. in an unwanted way?

8   A.   No.

9   Q.   At any point during that school year did you observe any

10  students saying vulgar things to B.R.?

11  A.   No.

12  Q.   And what would you have done had you saw that type of

13  behavior?

14  A.   I would have reported it.

15  Q.   To who?

16  A.   To administration.

17  Q.   Throughout the entire year -- school year did B.R. ever

18  complain to you about any unwanted touching, sexual assaults

19  or any sexual harassment that had taken place?

20  A.   No.

21  Q.   Okay.  Did plaintiff have -- did B.R. have your email

22  address?

23  A.   Yes, she did.

24  Q.   Did her parents have your email address?

25  A.   Yes, they did.

B.R. v. F.C.S.B.

32

1   Q.   Did you ever receive any emails from her throughout that

2   entire year reporting any inappropriate behavior to you?

3   A.   I received emails but nothing that documented reporting

4   inappropriate behavior.

5            MR. BATES:  Let's -- if we can pull up Defendants'

6   Exhibits -- one second.  Let me make sure it's admitted.

7   Defendants' Exhibit 78, which is admitted, Your Honor

8   permission to publish.

9            THE COURT:  You may.

10            (Exhibit published.)

11            MR. BATES:  If we can just zoom in on both of these

12   strings.  If we can zoom out so we can see both of them.

13   BY MR. BATES:

14   Q.   What's the date of the email that you received on the

15   bottom?

16   A.   November 14, 2011.

17   Q.   Okay.  And just generally speaking, did plaintiff's

18   mother come observe a class of yours that year?

19   A.   Yes, according to this, on November 11th, Veterans Day,

20   we have school in session.  We invite veterans to come in, and

21   parents also come in for an open house where they shadow their

22   child and go from class to class.  And as you can see Mrs. R.

23   says she enjoyed being a student in my class.

24   Q.   Did plaintiff's mother report any wrongdoing to you in

25   this email, anything that was happening to B███ in school or

B.R. v. F.C.S.B.

33

1    in class?

2    A.    No.

3    Q.    Did she report any type of sexual harassment, sexual

4    touching or bullying of any kind?

5    A.    No, sir.

6    Q.    You can take that down.

7          Do you recall -- does -- does your history class

8    have a geography bee every year?

9    A.    Yes.  The school participates in it.

10   Q.    What, if anything, do you recall about a -- with regard

11   to B█████ and the geography bee that school year?

12   A.    I don't recall her winning the geography bee from our

13   team or from the school, but I do remember her asking --

14   sending me an email about it, but --

15   Q.    What did that email pertain to?

16   A.    I think it was probably around the specifics of the date.

17   I don't recall.

18   Q.    Do you recall ever -- plaintiff ever pointing to you in

19   that email wrongdoing that students had engaged in, whether

20   that be sexual touching, harassment, bullying of any kind?

21   A.    No.

22          Mr. BATES:  If we can pull up, Your Honor,

23   Plaintiff's Exhibit 106, which has been previously admitted.

24          THE COURT:  You may.

25          (Exhibit published.)

B.R. v. F.C.S.B.

34

```
 1  BY MR. BATES:
 2  Q.   If you can zoom in both strings of this email.
 3            Can you tell us about this bottom email,
 4  Ms. F████.  First, what is the date of this email?
 5  A.   Friday, January 20th.
 6  Q.   And did you mark that high importance?
 7  A.   Correct.
 8  Q.   And what do you recall about the circumstances that led
 9  to the email below?
10  A.   I don't recall much, but I see in the message that I
11  witnessed B████ in tears, and I sent her directly to the
12  counseling office, and the email I marked it as high
13  importance, and I also included, not just the counselor, but
14  all of her -- the core teachers as well.
15  Q.   Why did you include the core teachers on that bottom
16  email?
17  A.   Well, we work together as a team, and we did our best to
18  keep all of us in the loop if any child was upset or not doing
19  okay.
20  Q.   And why did you send -- why did you send B████ to
21  Ms. H██████?
22  A.   Well, any child that's upset, I would want them to get
23  the help that they needed.  I certainly could not require her
24  just be in my classroom, and how can anyone expect to learn or
25  teach when a child is upset like that.
```

B.R. v. F.C.S.B.

35

1   Q.   You can take that down.

2        Do you recall B.R. leaving in-person schooling at

3   some point during that year?

4   A.   Yes.

5   Q.   Do you recall anything -- does anything stand out that

6   you were involved in that led to her departure?

7   A.   No, sir.

8   Q.   Okay.  What was your reaction to hearing that she stopped

9   coming to school?

10  A.   It was perplexing, because it just happened all of a

11  sudden.  And there weren't any really signs that there were --

12  that she had a medical procedure or she was physically unable

13  to be in school.

14       So -- and as you saw from the communication that I

15  received from her or the parents, there was no notation of

16  anything that would cause her to not be able to come to school

17  anymore.

18       MR. BATES:  Okay.  If we can -- permission to

19  publish Defendants' Exhibit 170, which has been previously

20  admitted into evidence?

21       THE COURT:  You may.

22       (Exhibit published.)

23       MR. BATES:  And if we can go to page 2 of this

24  email.

25  BY MR. BATES:

B.R. v. F.C.S.B.

36

1   Q.    Ms. F███████, on Friday we had discussed this bottom email

2   from plaintiff's family to Mr. T██████.  We had discussed that

3   email with him.  We can zoom out and go back to the first page

4   of this email.

5            And do you see the response there, at the bottom of

6   that page?  Do you see the bottom string on this email?

7   A.    Yes.

8   Q.    And do you see that's from Mr. T██████ to Ms. H███████

9   and Mr. F███████?

10  A.    Correct.

11  Q.    Okay.  And is that your response at the top of this

12  email?

13  A.    Correct.

14  Q.    Okay.  And what are you responding to when you write this

15  email?

16  A.    So I'm still speechless about it.  As I said, I am

17  completely speechless, all of these allegations that kind of

18  came up out of nowhere, and it was very hurtful, because a lot

19  of them are directed to my colleague and team leader, Mr.

20  T██████, who is a phenomenal teacher.  His wife is an

21  educator.  He raised three remarkable educator daughters, and

22  we would always make that parallel how he raised three

23  daughters and then he had to deal with three daughters at

24  work.

25            THE COURT:  Move on.  Ma'am --

B.R. v. F.C.S.B.

37

BY MR. BATES:

Q.   The judge asked us to move on.

          Okay.  So let me just -- maybe to make this clear:
Were you speechless of the allegations that were raised
towards Mr. T███████ in the email below?

A.   Correct.

Q.   Okay.  Thank you.  You can take that down.

          The after-school -- I would like to ask you a few
questions about the after-school period.

A.   Yes.

Q.   Did you ever stay after school that school year?

A.   Yes.

Q.   What led you to stay after school?

A.   To provide academic support for my students, and I was
also the faculty advisor for the yearbook club.

Q.   Would the yearbook club meet after school?

A.   Yes.

Q.   And when you stayed after school, what room would you
usually be in?

A.   It would primarily be in my classroom or the computer lab
that is in the E and A pod sometimes.

Q.   Did you ever recall B.R. staying after school with you?

A.   Not with me, no.

Q.   Do you ever recall her being involved in the yearbook
club?

Cross - M.F.

─B.R. v. F.C.S.B.─

38

1   A.   Not that I recall.

2   Q.   Okay.  Due to the nature of these next set of questions,

3   I'm just going to ask that you just give a yes or no response.

4   Do you understand?

5   A.   Thank you.

6   Q.   Are you aware that the second amended complaint alleges

7   that B.R. was taken into a closet at school and raped by three

8   unknown males?

9           MR. FAHEY:  Objection, Your Honor.

10          THE COURT:  Basis?

11          MR. FAHEY:  Relevance.

12          THE COURT:  Overruled.

13  BY MR. BATES:

14  Q.   And are you aware that the complaint alleges that this

15  occurred numerous times after school hours?

16  A.   Yes.

17  Q.   Are you aware that it also alleges that this happened

18  between December 2011 and February 2012?

19  A.   Yes.

20  Q.   Did you ever witness anything happen to B.R. after

21  school --

22  A.   No, sir.

23  Q.   -- involving closets?

24  A.   No.

25  Q.   Did you ever encounter any groups of unknown men

39

```
 1   wandering the school during this after-school period?

 2   A.   No, sir.

 3   Q.   Okay.  One final document I want to show you.

 4            MR. BATES:  If we can -- Defendants' Exhibit 168.

 5   This is not admitted, so I would ask to move this into

 6   evidence.

 7            THE COURT:  168.

 8            MR. FAHEY:  No objection.

 9            THE COURT:  Without objection.  You may publish.

10   (Defendants' Exhibit No. 168 was admitted into evidence.)

11            (Exhibit published.)

12   BY MR. BATES:

13   Q.   Ms. F███████ -- if we can zoom in on the top half of this

14   document.  Ms. F██████, there's been testimony in this case

15   that the parties have stipulated that B.R. withdrew from

16   in-person classes on February 9, 2012.

17            Do you understand that?

18   A.   Yes.

19   Q.   And what is -- what, if anything, stands out to you about

20   this email that you received on March 21, 2012?

21   A.   This was my last communication with her that I remember.

22   Q.   And what is she telling you in that first sentence?

23   A.   "I miss you.  Yours truly, B█████ R███████."

24   Q.   Do you recall ever receiving any other emails or

25   communications from B.R. before you were personally sued in
```

Cross - M.F.

───────B. R. v. F.C.S.B.───────

40

1   this case after this one?

2   A.   After this, no.

3          MR. BATES:  No further questions.

4          THE COURT:  Cross?

5          MR. FAHEY:  Is Mr. Kinney on first, Your Honor?

6          THE COURT:  I'm assuming that's how you all are

7   doing it.

8          MR. KINNEY:  May I proceed, Your Honor?

9          THE COURT:  You may.

10                    CROSS-EXAMINATION

11  BY MR. KINNEY:

12  Q.   For the record, I'm Michael Kinney.

13  A.   Good morning, Mr. Kinney.

14  Q.   Ms. F███████, did you read the complaints that plaintiff

15  filed in this case?

16  A.   I did.

17  Q.   Did you read all three complaints, the initial complaint,

18  the first amended complaint, and the second amended complaint?

19  A.   I have.

20  Q.   As you read those complaints, were you aware of any

21  factual basis for what was alleged against you?

22  A.   No, sir.

23  Q.   Before reading those complaints, were you aware of any

24  report or claim that the plaintiff was raped by another

25  student?

B.R. v. F.C.S.B.

41

1   A.   No, sir.

2   Q.   Were you aware of any report or claim that the plaintiff

3   was raped by anyone?

4   A.   No, sir.

5   Q.   Ms. F█████, did B.R. ever tell you anything that made

6   you aware of a threat to her safety?

7   A.   No, sir.

8   Q.   Did B.R.'s parents tell you anything that made you aware

9   of her safety?

10  A.   No, sir.

11  Q.   That is, I'm sorry, a threat to her safety?

12  A.   No, sir.

13  Q.   In the time that she was a student in your class, in the

14  2011/2012 school year, did you ever observe any threat to her

15  safety?

16  A.   No, sir.

17  Q.   Do you believe the allegations that plaintiff has made

18  against you are false?

19  A.   Yes.

20  Q.   Would you -- Ms. F█████, would you ever turn your back

21  on any child in your care who was being harmed?

22  A.   Absolutely not.

23        MR. KINNEY:  That's all I have, Your Honor.  Thank

24  you, Ms. F█████.

25        THE COURT:  Mr. Blanchard?

─B.R. v. F.C.S.B.─

42

1        MR. BLANCHARD:  No questions, Your Honor.

2        THE COURT:  Thank you.

3                    CROSS-EXAMINATION

4  BY MR. FAHEY:

5  Q.   Good morning, Ms. F█████.

6  A.   Good morning.

7        MR. FAHEY:  May I approach the witness, Your Honor?

8        THE COURT:  You may.

9        MR. FAHEY:  May I proceed, Your Honor?

10       THE COURT:  You may.

11  BY MR. FAHEY:

12  Q.   Good morning, Ms. F█████.  Just for the record, I've

13  handed you a copy of your deposition and also some exhibits.

14  Do you have those in front of you if you need to refer to

15  them?

16  A.   The exhibits are this binder?

17  Q.   Yes.

18  A.   Yes.

19  Q.   And you gave a deposition in this case, I'm sure you

20  recall; is that right?

21  A.   I did give a deposition.

22  Q.   You were under oath, and you understood you were required

23  to tell the truth during that?

24  A.   Correct.

25  Q.   So we have to refer to it, just for the record on that.

B.R. v. F.C.S.B.

43

1      What did you review today, just for your testimony

2  today, what documents?  Did you review your deposition?

3  A.    Today?

4  Q.    For today's testimony.

5  A.    Aside from speaking with counsel, no.

6  Q.    Did you review any of the exhibits?

7  A.    Aside from speaking with my counsel, no.

8  Q.    Any -- other than the exhibits that were admitted, did

9  you review any other exhibits?

10  A.    No, sir.

11  Q.    As a teacher -- you were both a student at Fairfax County

12  Schools and a teacher.  You understand that the teachers and

13  the students don't always have the same perspective as to

14  what's going on, probably like almost any situation?

15  A.    Okay.

16  Q.    Do you agree with that?

17  A.    I mean, that's for anyone having different perspectives.

18  Q.    Right.  The students have a different perspective as to

19  what's going on amongst the students than maybe the teachers

20  do in some situations, right?

21  A.    Sure.

22  Q.    And you -- just going on the topics of bullying and

23  sexual harassment, you agree bullying, for lack of a better

24  word, is bad for the students, is that right, if they are

25  being bullied?

1    A.    It's bad for anyone.

2    Q.    Right.  And why is it bad for students?

3    A.    It's bad for anyone.

4    Q.    I know, but I'm not asking you who else is it bad for.

5    Why is it bad for the students if they are being bullied?

6    A.    It's inappropriate behavior and unacceptable in Fairfax

7    County Public Schools.

8    Q.    If you can listen to my question -- so does it harm the

9    students that are being bullied?

10   A.    Yes.  As I said, it's bad for anyone.

11   Q.    Okay.  In what ways does it harm them?

12   A.    I'm not an expert completely on bullying, but I assume

13   that it would hurt their feelings.

14   Q.    And could it hurt their academic performance?

15   A.    To an extent, yes.

16   Q.    And both verbal bullying and physical bullying could both

17   be harmful; is that right?

18   A.    Both are unacceptable, yes.

19   Q.    Unacceptable, right.  And it's important if somebody is

20   being bullied for the school to take it seriously, is that

21   right, when they know about it?

22   A.    Yes.

23   Q.    And it's -- because you want to prevent the person from

24   being bullied to continue to be victimized by the bullying; is

25   that right?

```
 1   A.   Can you repeat that question?

 2   Q.   One of the reasons you would want to take it seriously is

 3   because it's important to prevent the person from continuing

 4   to be bullied; is that right?

 5   A.   Yeah, and you said when it's reported, correct.

 6   Q.   Or even -- but -- but either way, you don't want it to

 7   continue, right?

 8   A.   No.

 9   Q.   Okay.  And it's also important for the bully to be taken

10   care of because you don't want them bullying somebody else; is

11   that right?

12   A.   What do you mean by "taken care of"?

13   Q.   Addressed, prevented.

14   A.   Yes.

15   Q.   And were you -- I know you've testified you weren't here,

16   and I haven't seen you every day.  But you've been here for

17   part of the testimony; is that right?

18   A.   Part, but not the entire time.

19   Q.   Not a lot.

20        But you were aware of some of the training that was

21   given to the teachers with respect to bullying, sexual

22   harassment?

23        MR. BATES:  Objection.  Outside the scope, Your

24   Honor.

25        THE COURT:  If she knows.
```

B.R. v. F.C.S.B.

46

1          You can answer, ma'am.  Are you aware of some of the

2    training that was given to you with respect to bullying and

3    sexual harassment?  Are you aware of that training?

4          THE WITNESS:  So --

5          THE COURT:  Yes or no.

6          THE WITNESS:  -- as an employee --

7          THE COURT:  Ma'am, yes or no.

8          THE WITNESS:  Yes.

9    BY MR. FAHEY:

10   Q.   Did you receive training on it?

11   A.   Yes.  Discrimination and harassment awareness training.

12   Q.   Were you here during Dr. Panarelli's testimony?

13   A.   No, sir.

14   Q.   Let me show you what's been marked as Defendants'

15   Exhibit 251.  It's a flier that's already been admitted into

16   evidence.

17          MR. BATES:  Renew my objection, Your Honor.  This is

18   all outside the scope.

19          MR. FAHEY:  Your Honor, this is certainly --

20          THE COURT:  Overruled.

21   BY MR. FAHEY:

22   Q.   If you can turn your book, it's Defendants' Exhibit 251.

23   It's sort of towards the back of that.  They start with some

24   plaintiff's exhibits, and then they go to Defendants' Exhibit

25   No. 251.  And if you can just let me know when you have turned

─── B. R. v. F.C.S.B. ───

47

1   to that page.

2   A.    251?

3   Q.    Yeah, it's in the book and towards the back.

4            THE COURT:  You can approach her, Ms. Fahey.

5            MR. FAHEY:  If we can publish Exhibits 251.

6            THE COURT:  You may.

7            (Exhibit published.)

8   BY MR. FAHEY:

9   Q.    Have you ever seen this before?

10  A.    When was it published because --

11  Q.    I'm just asking you have you ever seen it?

12  A.    I don't recall.

13  Q.    Do you recall -- you don't recall getting any training on

14  it or anything else?

15  A.    I received discrimination and harassment awareness

16  training at the beginning of my employment, and I completed

17  all the required coursework and standards needed to be a

18  high school, middle school, social studies teacher by the

19  Commonwealth of Virginia.

20  Q.    Do you remember getting any additional training than that

21  standard training when you started?

22  A.    In professional development courses, perhaps.  I would

23  have to see my transcripts.

24  Q.    Do you remember any sexual harassment or bullying

25  training?  Do you remember any other than initial training?

Cross - M.F.

─B.R. v. F.C.S.B.─

48

1  A.   I don't recall.  It's over ten years ago, and I'm no

2  longer employed by Fairfax County Public Schools.

3  Q.   Understood.

4        You don't recall any training whatsoever other than

5  the initial training?

6  A.   I don't recall specifics.

7  Q.   Do you recall general training?

8  A.   I mean, we always spoke about it, yes.

9  Q.   I'm going to show you Defendants' Exhibit 253.  And this

10  was already previously admitted by Dr. Panarelli in her

11  testimony, which you weren't here for.

12        Do you have 253 in front of you?

13  A.   Yes.

14  Q.   And do you recall this PowerPoint?

15  A.   I don't remember if this training took place while I was

16  employed at Fairfax County.

17  Q.   Fair enough.

18        If you can turn to the -- just the back of this

19  training, the very last page, and tell me how many pages those

20  is.

21  A.   60.

22  Q.   Does it appear to be a PowerPoint?

23  A.   A presentation of some sort, yes.

24  Q.   Do you recall ever viewing, participating or anything

25  else with respect to this 60-page PowerPoint?

─────────── B. R.  v.  F.C.S.B. ───────────
49

1   A.   Well, I see on page 12 is the emblem of my former high

2   school, the Spartans, so I wasn't a teacher at West

3   Springfield High School so I don't know how I would have seen

4   this presentation if this was used at West Springfield High

5   School.

6   Q.   You don't recall or you haven't seen it?

7   A.   I don't recall.

8   Q.   Okay.  So the question is, the training you received --

9   we focused on that -- on bullying and sexual harassment?

10  A.   It was discrimination harassment awareness.

11  Q.   It included bullying, sexual harassment?

12  A.   So as a teacher, I can't determine bullying.  I report,

13  and as a teacher, my role, I see the child for a sliver of

14  time.  Any inappropriate conduct I report.  The ones who

15  determine bullying are the administrators and counselors

16  because they can do the investigation collectively and see the

17  grand scope of things.

18          My role is a classroom teacher.  I teach the

19  content.  I teach the curriculum.  And any inappropriate

20  behavior that I have witnessed or have been reported to me in

21  my classroom or just outside of it in the hall, that is my

22  responsibility.  I am not one to determine bullying.

23  Q.   So you're not making the ultimate decision or the

24  ultimate outcome?

25  A.   Correct.

─B.R. v. F.C.S.B.─

50

1   Q.   But you are able to recognize certain things that are

2   bullying, right?

3   A.   No, because --

4   Q.   You are not able to?

5   A.   I can recognize inappropriate misconduct.  But I cannot

6   determine -- I am not -- in my role, I'm not in the capacity

7   to determine overall bullying.  I cannot investigate other

8   students.  I cannot look -- I can -- that is the job of the

9   administrator and the counselor.

10  Q.   So even if you witness something, you're unable to

11  determine if it's bullying or anything else --

12  A.   I determine if it's inappropriate conduct.

13  Q.   And sexual harassment, are you able to determine that?

14  A.   Harassment?  Any --

15  Q.   Sexual harassment.

16           (Court reporter clarification.)

17  Q.   I'm sorry.  Are you able to determine sexual harassment?

18  A.   Any type of harassment.  Any type of misconduct where

19  harassment falls under that category.

20  Q.   What type of things fall under the category of

21  harassment?

22  A.   Harassment is aggressive intimidation and sexual

23  harassment would be in the sexual context.

24  Q.   What are some examples?

25  A.   I don't feel comfortable answering that question.

─────────── B. R. v. F.C.S.B. ───────────

51

1   Q.   Would inappropriately touching someone be -- fall under

2   that category?

3   A.   So nonconsensual touching, that would be assault.

4   Q.   So you can make that determination, but you can't make a

5   determination whether or not sexual harassment or anything

6   else?

7   A.   I don't feel comfortable answering your question.

8   Q.   Let me ask you:  With the training that you received --

9   and do you know if the students received training on it as

10  well?

11  A.   I'm not aware.

12  Q.   You don't know if the students received --

13  A.   Not the same -- explain "training."  Training on what?

14  Q.   "Training" meaning -- on sexual harassment or bullying.

15  Do you know if they received --

16  A.   So at the beginning of the year, we have Students Rights

17  and Responsibilities.  It's this yellow booklet that, even

18  when I was a student in Fairfax County, you know, we went

19  through.  They had to do a quiz on it.  They had to get a

20  100 percent.  They signed it, and the parents signed it, and

21  then there would be ongoing lessons by the counselor or

22  administrator on that.

23  Q.   Do you remember any specifics about that training?

24  A.   My training or the students' training?

25  Q.   Students' training?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─B. R. v. F. C. S. B.─

52

1   A.   The first few days of school, that was the main lesson

2   that had to be administered in the learning seminar.

3   Q.   What types of things were they trained on with respect to

4   bullying?

5   A.   Well, in this Students Rights and Responsibilities, it's

6   defined, and any type of inappropriate conduct that the County

7   had deemed unacceptable is spelled out right there.

8   Q.   And, again, you don't know what any of that conduct is?

9   A.   Sir, it's been ten years since I've been employed with

10  Fairfax County Public Schools.  I cannot give you the

11  specifics.

12  Q.   Did the training work in terms of preventing bullying?

13  A.   I'm not in a position to answer that question.

14  Q.   So you weren't able to -- you had no examples of the --

15  of seeing how the training played into preventing bullying?

16          MR. BATES:  Your Honor, I'm going to renew my scope

17  objection.

18          THE COURT:  Well, he's within the scope, but the

19  question's been asked and answered.  So you can move on.

20          THE WITNESS:  Thank you.

21  BY MR. FAHEY:

22  Q.   Were you here during the day that the teacher survey --

23  or the student survey was discussed?

24  A.   Not in its -- well, what survey?

25  Q.   The student survey.  If I can draw your attention to

—B. R. v. F.C.S.B.—

53

 1    Plaintiff's Exhibit 554.

 2            MR. BATES:  Your Honor, again, have a scope

 3    objection.  This is not raised at all.

 4            THE COURT:  You're going to hear Ms. Harris say

 5    something to you if you all continue to speak at the same

 6    time.  So why don't you all take your turns.

 7            What is your objection?

 8            MR. BATES:  This is, again, outside the scope, and

 9    he's asking about a document.

10            THE COURT:  Mr. Fahey, this document was offered

11    through another witness.

12            How are you tying this witness into what is in that

13    particular survey?

14            MR. FAHEY:  Your Honor, this is directly related,

15    her testimony, about what the school did, what they didn't do,

16    and the fact that this training -- I've just asked her if this

17    training was effective --

18            THE COURT:  Let's talk about the survey.  The

19    survey, how do you tie that in.

20            MR. FAHEY:  It's going show that this training that

21    she testified about, although limitedly, was ineffective

22    because the number of people bullied and sexual harassment is

23    profound.

24            THE COURT:  Sustained.  Objection is sustained.

25    BY MR. FAHEY:

─B.R. v. F.C.S.B.─

54

1   Q.   Is -- was there bullying going on at Rachel Carson when

2   you were there that you witnessed?

3   A.   I did not witness any.

4   Q.   Did you witness any sexual harassment when you were

5   there?

6   A.   I did not personally witness any.

7   Q.   Do you recall -- I think you testified about it, you were

8   asked to keep an eye -- a greater eye on the lockers at some

9   point?

10  A.   All the teachers were, yes.

11  Q.   Was that related to anything specific?

12  A.   We just had to keep an eye.

13  Q.   Did you ever hear anything relating to B███ and keep a

14  greater eye on the lockers?

15  A.   It may have been communicated, Hey, just keep an eye on

16  certain students, but I don't recall specifics.

17  Q.   So you don't recall anything specifically being

18  communicated from the administration with respect to B███?

19  A.   It was ten years ago.  I don't recall.

20  Q.   That's my question.

21  A.   I don't recall.

22  Q.   And you don't recall any -- do you recall anything about

23  keeping an eye on lockers for students that were outside of

24  the team?

25  A.   Repeat that question.

—B.R. v. F.C.S.B.—

55

1  Q.   Yeah.  In the team -- the Explorers area, which I think

2  was shown to you in front of the lockers, was there any

3  direction given to you to keep an eye on the lockers for

4  people that were in other classes, meaning 8th grade or other

5  teams?

6  A.   Not specifically about people, but we, in general, did

7  not allow other teams or other students that were outside of

8  our team, you know, linger around our lockers because, A, it's

9  just four minutes passing time; everyone needs to go to class;

10  and, B, they need to be in their own area.

11  Q.   But people from other teams would be in the locker areas

12  on --

13  A.   Not necessarily.  We did have a music class, but not a

14  lot of people -- I mean, they used that main hallway, but a

15  lot of times it made more sense for them to use the other

16  doors, which is on the other side of the stairs.

17  Q.   For social reasons, were people from other classes ever

18  in the locker area?

19  A.   Sometimes, but we would usually just shoo them out, hey,

20  go to class.

21  Q.   But sometimes they would be there?

22  A.   Yeah.  But, again, it's just four minutes, so they

23  weren't there for the entire four minutes.  From bell to bell,

24  it's four minutes, so you're talking about time to get to the

25  area and then also making it back to class on time.

B.R. v. F.C.S.B.

56

1          So maybe for five- or 10-second snippets you might

2   see some students, like, hey, go to class, go to where you

3   need to be.

4   Q.   How about at the beginning of the day there's more time,

5   though?

6   A.   Yes, but not as much, because buses would be coming in

7   and carpool and --

8   Q.   So there would be less than four minutes at the beginning

9   of the day?

10  A.   No.  There was a little bit more, but it's the beginning

11  of the day.  They need to get things put away in their

12  lockers, their instruments and whatnot.  So even if there was

13  a few more minutes at the beginning of the day, those few

14  minutes were taken up very quickly.

15  Q.   Your interactions with B███, was she a nice kid, in your

16  class?

17  A.   Absolutely.

18  Q.   Was she a good kid?

19  A.   Yes.

20  Q.   And her mom wrote you that email I think Mr. Bates showed

21  you.  It was November 14th, right?

22  A.   Which email?

23  Q.   On the Veterans Day after she visited you.

24  A.   Yes.

25  Q.   Is that --

─────B.R. v. F.C.S.B.─────

57

1  A.   The one that we just saw?

2  Q.   Yeah, that Mr. Bates showed you?

3  A.   Yes.

4  Q.   Do you recall anything that occurred around November 21st

5  or afterwards relating to B████?

6  A.   No.

7  Q.   Was any -- did anyone inform you of anything occurring

8  after November 21st with --

9  A.   I don't recall anything being reported, or I was

10  informed.

11  Q.   No one shared anything with you if -- if there was

12  something going on?

13  A.   Not that I recall.

14  Q.   But all the time she was in your class, she was well

15  behaved?

16  A.   Yeah.

17  Q.   And she did her work?

18  A.   Yes.

19  Q.   Was she nice?

20  A.   Yes.

21  Q.   And Mr. Bates asked you a little bit about security or

22  after-school activities at the school.  Do you remember that?

23  A.   He asked me if I stayed after, yes.

24  Q.   And other students stayed after not just with you, but

25  with other teachers as well, right?

─B.R. v. F.C.S.B.─

58

```
 1   A.   Yes.

 2   Q.   So you wouldn't -- you only know who was staying after in

 3   your class; is that right?

 4   A.   Correct.

 5   Q.   So you don't know if B████ stayed after with another

 6   teacher, even if she wasn't with you?

 7   A.   She was not with me, yes.

 8   Q.   And the school -- the school had a process to ensuring --

 9   did they take attendance for after school?

10   A.   Yes.

11   Q.   And there are multiple doors in the school; is that

12   right?

13   A.   Yes.

14   Q.   And you had a school security officer that would check

15   the doors, is that right, to make sure they were locked?

16   A.   I don't know the specific responsibilities of the school

17   security officer, but --

18   Q.   You had one?

19   A.   Yes.

20   Q.   And on your testimony you testified that basically, I

21   think it was the January email or very end, all of a sudden

22   she just left, and you had no idea what had been going on the

23   entire time; is that right?

24   A.   Correct.

25   Q.   Have you heard the term "scooping" before this trial?
```

─ B.R. v. F.C.S.B. ─

59

 1  A.   No.

 2          MR. FAHEY:  Nothing further, Your Honor.  Thank you.

 3          THE COURT:  Redirect?

 4          MR. BATES:  Nothing, Your Honor.

 5          THE COURT:  Very good.  Thank you, ma'am.  You may

 6  step down.

 7          (Witness excused.)

 8          THE COURT:  Next witness.  Next witness.

 9          MS. REWARI:  Good morning, Your Honor.  Defendants

10  call Dr. Jonathan DeRight.

11          THE COURT:  Dr. DeRight.

12          (Witness sworn.)

13          THE COURT:  Sir, please listen to the questions of

14  counsel, answer them as best you can.  If you hear counsel

15  interrupt your response or if you hear the Court speaking,

16  please don't say anything until it's resolved.

17  (Dr. Jonathan DeRight, Defendants' witness, sworn.)

18          (Witness seated.)

19                    DIRECT EXAMINATION

20  BY MS. REWARI:

21  Q.   Good morning.

22  A.   Good morning.

23  Q.   Would you please introduce yourself to the jury?

24  A.   Yes.  My name is Jonathan DeRight.  I'm a clinical and

25  forensic neuropsychologist.

B.R. v. F.C.S.B.

60

1  Q.   Dr. DeRight, could you slide the mic just a little bit

2  closer?

3            THE COURT:  I turned it up.

4            MS. REWARI:  Okay.  Thank you.

5  BY MS. REWARI:

6  Q.   Dr. DeRight, did you conduct a forensic

7  neuropsychological assessment of B.R.?

8  A.   Yes.

9  Q.   And are you here to testify about the opinions you

10  reached based on that evaluation?

11  A.   Yes, I am.

12  Q.   Okay.  Have you worked with me to prepare a slide

13  presentation on -- that gives us an overview of what we're

14  going to talk about today?

15  A.   Yes.

16            MS. REWARI:  Your Honor, if I may hand this up?

17            THE COURT:  You may.

18            MS. REWARI:  I have copies.

19            THE COURT:  Who is doing the examination on your

20  side?

21            MR. BRENNER:  I am, Your Honor.  I've reviewed the

22  slide deck, and I have no objections for them being used as

23  demonstratives.

24            THE COURT:  Very good.  Thank you.

25            MS. REWARI:  Your Honor, may we publish?

B.R. v. F.C.S.B.

61

1          THE COURT:  You may.

2          MS. REWARI:  Thank you.

3          (Exhibit published.)

4          THE COURT:  Doctor, there's a video screen to your

5    left that you can work from if you would like.

6    BY MS. REWARI:

7    Q.   You can look at this or you can look at the screen,

8    whichever works better for you, okay?

9    A.   Sure.

10   Q.   Dr. DeRight, first I'd like to ask you a bit about your

11   educational background and training.  Let's start with Slide 2

12   in your formal education.

13   A.   I have my bachelor's degree in neuroscience from the

14   University of Rochester, and then I earned my master's and

15   Ph.D. in clinical psychology from Syracuse University.  Then I

16   did a two-year postdoctoral fellowship in clinical

17   neuropsychology at Johns Hopkins University School of

18   Medicine.

19   Q.   All right.  Let's take a look at Slide 3.  Are you

20   certified by any board?

21   A.   Yes.  I'm a board-certified clinical neuropsychologist.

22   Q.   Okay.  And are you licensed as a psychologist by any

23   states?

24   A.   Yes.  Virginia, Maryland, and Washington, D.C.

25   Q.   Okay.  Are you a member of any professional organizations

─B. R. v. F.C.S.B.─

62

1   in the field of psychology?

2   A.   Yes, several.  I am part of the American Academy of

3   Clinical Neuropsychology, which is the organization supporting

4   our board certification.  Also the National Academy of

5   Neuropsychology, of which I'm on one of the committees.  I'm

6   also a member of several others related to neuropsychology and

7   one related to psychology and the law.

8   Q.   And have you -- let's go to the next slide.  Have you

9   also published any articles in the field of neuropsychology?

10  A.   Yes.

11  Q.   And have you written any books or book chapters?

12  A.   Yes.  I wrote a book called Essential Neuropsychology.

13  That's a handbook that covers essentially all aspects of

14  neuropsychology.  It's meant to be a reference guide for

15  neuropsychologists.  I've also published several articles

16  related to malingering and effort, among others.

17  Q.   Okay.  And we can go to the next slide.

18           Do you participate in reviewing the works of others

19  who submit articles for publication in the field of

20  neuropsychology?

21  A.   Yes.  I'm a reviewer for several professional journals,

22  which means when we do research and we want to get our article

23  published, what happens is it gets sent to a group of people

24  in the field, and they have to read the study and critique it,

25  and make sure there aren't significant problems with it,

———— B. R. v. F.C.S.B. ————

63

1   perhaps give you things to improve on.

2           So that's one thing that I do very often in the area

3   of malingering.  I also am part of the forensic evaluation

4   oversight panel for the Commonwealth of Virginia, which means

5   I review other people's competency to stand trial and sanity

6   at the time of the offense reports to make sure they are up to

7   standard.

8   Q.   Okay.  Do you also give lectures and presentations in the

9   field of clinical and forensic neuropsychology?

10  A.   Yes.  I have given a talk at the American Academy of

11  Clinical Neuropsychologists Conference, which is a conference

12  primarily attended by board-certified neuropsychologists, and

13  that talk was on effort and malingering, among others that

14  I've given.

15  Q.   Okay.  When did you first start treating patients as a

16  clinical neuropsychologist?

17  A.   After my Ph.D., I went on internship, and then my

18  residency, which we call a postdoctoral fellowship.  And there

19  is where I started to see a heavy load of patients on my own.

20  And then I've been in private practice since 2016.

21  Q.   And do you currently have a private practice in which you

22  treat patients?

23  A.   Yes.

24  Q.   Okay.  And do you also have a private practice in which

25  you do forensic evaluations?

———— B. R. v. F.C.S.B. ————

64

1   A.   Yes.

2   Q.   Okay.  And in your clinical practice with patients and in

3   your forensic practice, do you have an area of specialty?

4   A.   Not particularly.  I do specialize in adults.  That's

5   compared to people who specialize in young children.  So the

6   patients that I usually see are 15 and older.  They can be

7   anywhere from 15 to -- I've had someone over 100 before, so it

8   varies wildly.

9           But the general idea is people come in with

10  different cognitive and/or emotional problems.  And my job is

11  to talk to them, give them tests, and figure out if they are

12  there.

13  Q.   Can you give a ballpark estimate of the number of

14  patients you have evaluated clinically as a neuropsychologist?

15  A.   Over 2,000, probably.

16  Q.   And could you give a ballpark of the number of forensic

17  neuropsychological assessments you've done?

18  A.   Over 500.

19  Q.   Could you just give the jury a few examples of the type

20  of work you do as a forensic neuropsychologist?

21  A.   Sure.  And forensic is very broad definition.

22  Unfortunately, I'm not one of the cool CSI people that you

23  might see on Law & Order, but what forensic means in my

24  context is I do what I was just describing, which was talk to

25  people, give them tests, figure out if they have thinking

─ B.R. v. F.C.S.B. ─

65

1  problems and/or emotional problem, but I apply it to a legal

2  question.

3          So my purpose in that kind of evaluation is to

4  assist the Court, or whatever decision-making body there is,

5  and apply my expertise to a decision that they have to make.

6  Q.   Are you compensated for your work as a forensic

7  neuropsychologist?

8  A.   Yes.

9  Q.   And how are you compensated?

10  A.   My standard rate is $350 an hour, and my rate for

11  testimony is 450.

12  Q.   Okay.  And are you here today as a forensic

13  neuropsychologist?

14  A.   Yes.

15  Q.   And you're being compensated for your time today?

16  A.   Yes, for my time.

17          MS. REWARI:  Okay, Your Honor, we offer Dr. DeRight

18  as an expert on neuropsychology and neuropsychological

19  assessments.

20          MR. BRENNER:  No objection, Your Honor.

21          THE COURT:  No objection.  He's qualified.

22  BY MS. REWARI:

23  Q.   So could you just talk a little bit more about what you

24  do as a clinical neuropsychologist?

25  A.   Sure.  So typically, as a clinical neuropsychologist, in

B.R. v. F.C.S.B.

66

1   the setting that I work in, people are referred by their

2   primary care physician or their psychiatrist or their

3   neurologist or sometimes self-referred because there's

4   concerns of a potential thinking problem or an emotional

5   problem.

6           So what I mean by that is someone could let's say

7   have problems with their memory, and they say, We need to get

8   this checked out.  Someone might be really depressed, but they

9   want to know if it's related to depression or early

10  Alzheimer's disease, for example.  So there's questions like

11  this, and they come in, and I do my evaluation of them.  And

12  the results are given to the patient and to the doctor, and

13  that is used to inform their treatment.

14  Q.   So what kind of -- when you test, what do the tests look

15  like?

16  A.   The tests might look like a word game or a puzzle, but

17  the idea of -- if you give the same word problem or puzzle to

18  a thousand people, then you have a group of scorers you can

19  compare things to.  So that's essentially what a psychological

20  test is.  It's a standardized measure that's given to a bunch

21  of people, and then you can give it to a new person and

22  determine where their score is based on that.

23          And we do that, you know, dozens of times in an

24  evaluation so that not just one test is going to say whether

25  someone has deficits, but it's actually the profile of scores,

─────── B. R. v. F.C.S.B. ───────

67

1    it's how they come together, and that's going to lead to

2    certain diagnostic criteria.

3    Q.   How does the work that you do as a clinical

4    neuropsychologist compare to the work that's done as a

5    forensic neuropsychologist?

6    A.   Well, there's a lot of different -- differences.  So, for

7    example, in my clinical setting, it's much less rigorous.  Of

8    course, I'm still doing validity measures, as we do in any

9    evaluation.  That's to make sure that the information we're

10   getting is credible or reliable.  And then I'm also -- the

11   role is different.  So when I'm seeing a person in my clinical

12   practice, my role is essentially to inform their treatment.

13          Whereas in a forensic practice, my role is to give

14   an opinion as to whether something is true within a reasonable

15   degree of certainty, or there might be a very specific

16   question that I'm asked, but my role there is to give

17   information to the Court or the decision-making body.

18              MS. REWARI:  If we could put the slides back up

19   and go to the next page, Grady.

20   BY MS. REWARI:

21   Q.   You talked about validity testing.  Can you explain what

22   that means?

23   A.   Validity testing is something fairly unique in

24   neuropsychology.  We're essentially the only field that can

25   have standardized measures to determine if the information

B.R. v. F.C.S.B.

68

1  we're getting is reliable, and that's essentially -- it's an

2  essential process in psychological or neuropsychological

3  evaluation.

4          A good comparison would be -- let's say you're

5  neighbor accuses you of hitting their car, and they call the

6  police and say, hey, you damaged my car, and what would be

7  stopping the person who says you hit their car from saying, I

8  know they did it because I saw them do it.  The way our legal

9  process works, you wouldn't just be expected to hand them over

10  money.  The insurance company, probably, would say, Okay, well

11  there's a way of determining this.  We can look at the dent

12  that's on your car and match it up to the other car, and we

13  can look at the paint.

14          And so what I'm getting at with that comparison is

15  that these validity measures are not used to say whether

16  someone is lying; they're used to determine whether the

17  information we're getting is accurate, expected and

18  appropriate in the setting.

19  Q.   And so, is there a way, I guess, to see if a person is

20  putting in an appropriate effort on tests?

21  A.   Yes.  And "effort" is a very interesting term.  One of

22  the papers I recently wrote with my group at Johns Hopkins

23  was -- it's called the "Do 'effort tests' really measure

24  effort?"  Because typically, historically, I guess, these

25  validity measures were synonymous with what we used to call

—B.R. v. F.C.S.B.—

69

1   "effort measures."

2           Essentially, if someone is not putting in enough

3   effort to perform well, then they would have done poorly and

4   potentially been malingering.  But what this paper really

5   talks about is it actually takes a lot of effort to malinger

6   as well.  You have to try really hard to purposely portray

7   symptoms in a certain way or exaggerate things.  So we've kind

8   of gotten away from the term "effort" as synonymous with

9   "validity," and we've used "performance" and "symptom

10  validity."

11  Q.   Can you just explain the differences between standalone

12  measures and embedded measures of validity?

13  A.   A standalone measure is a test that was designed only to

14  determine whether the information that we're getting is

15  accurate or a reliable source to base your information on.

16  And embedded measure is -- let's say a test of memory that is

17  a test of memory, but we've done a lot of research to show,

18  Hey, it's really, really unusual when someone does really well

19  here but not on this part or someone does really, really,

20  really poorly such that someone with severe Alzheimer's

21  disease could do better than them on a memory test.  So that's

22  an example of an embedded measure.

23  Q.   And what are cutoff scores?

24  A.   Cutoff scores are what we've used and researched to pick

25  a point where we say, Okay, if the score is beyond this point,

B.R. v. F.C.S.B.

70

1  it's most associated with people who are feigning or

2  exaggerating or otherwise producing inaccurate results.  So

3  we've done studies where people would be given a validity test

4  and it would be compared against known groups, either people

5  that are said, Hey, pretend like you're faking on this test;

6  we want to see what it looks like, or people that were deemed

7  to be having unreliable reports from multiple other measures.

8  Q.  And what are symptom validity measures in comparison to

9  performance validity measures?

10  A.  Symptom validity measures are very similar, but they're

11  getting at things that someone says rather than their

12  cognitive performances.  So the performance validity says,

13  Okay, you're claiming to have poor memory; we need to make

14  sure you're not just trying to make your memory look

15  especially poor.

16         Symptom validity is the same thing, but it's, Okay,

17  you're saying you're depressed; we want to make sure you're

18  not just saying you're really, really depressed to everything

19  such that your report would be noncredible.

20         And this is to give us a way to objectively identify

21  whether someone is given accurate information.

22  Q.  And can you explain the difference between underreporting

23  and overreporting?

24  A.  Yes.  There's two ways for a symptom validity test to be

25  invalid.  One way would be if someone is exaggerating

B.R. v. F.C.S.B.

71

1   symptoms, such that, for example, you can have a score that is

2   substantially higher than even a severely injured population,

3   and that would be very unlikely.

4          Or with underreporting, you could have a score that

5   says you're saying you have a lot more -- a lot fewer negative

6   qualities than pretty much anyone would say.  So, for example,

7   it would be a question that asks something very benign that

8   people do every day.  It might say, I read seven new books

9   every day.  That's an example of someone who would be

10  underreporting because they would be saying all -- too many

11  good things about themselves essentially.

12  BY MS. REWARI:

13  Q.  What do symptom validity measures look like when you're

14  administering them?

15  A.  There are a few that are standalone, but they're

16  typically embedded in very long questionnaires.  And the

17  questionnaires -- they are several hundred questions, and get

18  at various aspects of someone's thinking and personality and

19  symptoms.  There's no one question that tells you anything.

20  It's all about how the answers come together.

21         But embedded within those really long questionnaires

22  are certain measures of validity.  They could be overreporting

23  of psychiatric symptoms.  They could be overreporting of

24  bodily symptoms or cognitive or thinking symptoms, and they

25  could be underreporting as well.

─B.R. v. F.C.S.B.─

72

1  Q.   Are the tests that you administer as neuropsychologist

2  scientifically validated?

3  A.   Yes.  There's a lot of research and time that goes into

4  these, and even after the tests are created, there continues

5  to be research about the tests.  So not only is there a ton of

6  research that goes into creating a test, but once that test is

7  made, we continue to have research using that test, and it's

8  continually updated and improved.  But typically they're given

9  to hundreds, if not thousands of people to establish a, what

10 we call, normative database.  So those are the scores we're

11 comparing everything against.

12 Q.   You've mentioned a couple of times the concept of

13 malingering.  Can you just define what that is?

14 A.   Malingering is the intentional production or exaggeration

15 of symptoms.  They could be cognitive symptoms.  It could be

16 psychiatric symptoms.  But it's usually in the presence of

17 external incentive.

18 Q.   Just want to clarify, when we're talking about these

19 validity measures, are these tests that you personally create?

20 A.   I don't create them, no.  I could create one if I had

21 enough time and energy to do so.  But, no, these are things

22 that other psychologists and testing companies have created.

23 Q.   And so the data from the test that you administer, can it

24 be interpreted by another neuropsychologist?

25 A.   Yes.  So anyone who sees a score from this exam can look

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

─ B.R. v. F.C.S.B. ─

73

1    at it and consult the manual and say that's what the score

2    means.  So it's very systematic and scientific, such that I

3    can do a whole battery of tests and give it to another

4    neuropsychologist; they can look at those same test scores and

5    look at the manual and say that's what this score means.

6    Q.   You mentioned that it's not the answer to a specific

7    question.  Are the questions on the test publicly available?

8    A.   No.

9    Q.   Do you have an understanding as to why they're not

10   publicly available?

11   A.   There are several reasons.  The main one is that, if we

12   gave everyone the test questions, then the test wouldn't be

13   good at what they're doing anymore.  It's kind of like if Coke

14   gave away their recipe, then anyone could make Coke, but it's

15   actually even worse that than, because then Coke couldn't make

16   Coke anymore.

17          If we gave everyone the questions to our test, then

18   it would make them not useful anymore.  That means we can't

19   read individual questions to the public, but also, it wouldn't

20   matter if we couldn't because one single question doesn't

21   really change the test that much.

22   Q.   All right.

23          MS. REWARI:  If we can go to the next slide, Grady.

24   MS. REWARI:

25   Q.   Are there established diagnostic criteria for malingering

─ Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ─
EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

74

1   in a neuropsychological assessment?

2   A.   Yes.  So as we go through this process, you'll see how

3   systematic and scientific this decision-making process is.  So

4   we do an evaluation of someone; we talk to them; we get

5   multiple sources of information; and we do testing and review

6   records.  Put that all together, and then we do something even

7   more systematic where we say, Okay, with this evidence, the

8   first step is, is it a reliable estimate of their current

9   functioning.  We can't do anything else until we determine

10  that.  And we have these criteria that have been developed in

11  our field, and these are what are used to determine

12  systematically whether malingering is present.

13  Q.   What are the four criteria?  If you just briefly explain

14  the four.

15  A.   The first one is an external incentive.  So that could be

16  getting money from a lawsuit, but it could also be more

17  nontangible things, like even having certain tasks that you

18  don't have to do anymore or getting positive attention in one

19  way or another.  So the external incentive does not have to be

20  financial, although it often is.

21          The next one is an invalid presentation on exam.

22  That has to do primarily with those validity tests that I was

23  just talking about.  And the third party is marked

24  discrepancies.  That's where we can look at the interview and

25  the records and the test data and say, Hold on here, this

B.R. v. F.C.S.B.

75

1    doesn't make sense why is this way up here, and the other one

2    is way down here as far as scores, or why are they reporting

3    this symptom but they can also do this, this, and this.  So

4    it's a cluster of symptoms that is, what we call, discrepant

5    from known patterns of functioning.

6          And the last one is exclusionary criteria, and

7    essentially any psychological or psychiatric diagnosis, we're

8    going to have exclusionary criteria.  What that means is we

9    want to be able to make sure that we're not false positive --

10   we don't have a false positive result.

11         So let's say someone is severely intellectually

12   disabled.  We don't want to say they are malingering because

13   they did poorly on those tests when those tests might not have

14   been validated in their population.  So we want to consider

15   that as well.

16   Q.   All right.  We can go to the next slide.  Can you explain

17   what you have listed here on this slide?

18   A.   So this is not something that was necessarily part of my

19   determination in the present case, but one thing -- this is a

20   good example of one thing we can consider with regard to PTSD

21   because it's widely known in our field that PTSD is

22   characteristically easy to fake.

23         That doesn't mean that we should assume everyone who

24   says they have PTSD is faking.  What that means is we have to

25   have a rigorous approach in determining the likelihood that

B.R. v. F.C.S.B.

76

1   their symptoms are, in fact, accurate.  That's because we are

2   often making very important determinations, whether it's a

3   diagnosis or something related to a lawsuit.

4            So here is a group of unusual symptoms that we would

5   not expect in PTSD.  And I should add that the presence of one

6   of these doesn't necessarily mean someone is faking.  What

7   this is, is a good indication that something may be amiss, and

8   it's worth further evaluation.

9   Q.   All right.  So are these indicators that you came up

10  with?

11  A.   No.  These are from a research study that was published.

12  Q.   All right.  Let's take a look at the next page.

13  Actually, while we're on this one, can you just explain

14  number -- I think No. 1 calls attention to symptoms early and

15  frequently in the interview.  What is the interview?

16  A.   The interview is the clinical interview.  So it's when a

17  psychologist or psychiatrist is talking to a patient.  And

18  what this means is that -- and I've seen way more people with

19  trauma than I wish I had to, but characteristically when

20  you're talking to someone who's been through severe trauma,

21  they have an exceptionally hard time talking about it.  It's

22  really difficult.  You really have to pull it out of them.

23  You really have to establish rapport and give them a sense of

24  psychological safety.

25           So it would be very unusual for someone to not only

──────B.R. v. F.C.S.B.──────

77

```
1   have an easy time talking about it, but want to talk about it,

2   frequently bring it up, essentially ask you to talk about it.

3   That would be very unusual.

4   Q.   Okay.  And can you explain No. 2.

5   A.   One of the things that we've found in research in this

6   area is that flashbacks that are nongenuine or are not related

7   to true PTSD are often described in the way we would see them

8   in a movie, and that's because the -- in order to show

9   flashbacks in a movie, they've essentially shown a replaying

10  of a scene, and that's kind of the only way to show it in a

11  movie, but that is fairly unusual in actual PTSD.  It's not a

12  phenomenon that's frequently reported.

13  Q.   And the "reports frequent and repeated nightmares," can

14  you explain that?

15  A.   Yes.  Typically someone with PTSD is going to have some

16  sort of nightmare, but they're unlikely to have the same

17  nightmare over and over and over every day.  They are unlikely

18  to have it at the same intensity for years and years on end.

19  Again, it is not impossible, but it's very unlikely, and when

20  you start to have a lot of unlikely things in a row, that can

21  give you cause for concern.

22  Q.   Okay.  And No. 4, "Overtly and frequently blames others

23  for their condition."  Can you explain that?

24  A.   One thing that's fairly counterintuitive in PTSD is that

25  they often blame themselves, even when it's unequivocally
```

B.R. v. F.C.S.B.

78

1   related to someone else.

2           For example, a soldier who sees someone right next

3   to them getting shot and killed, they truly know in their

4   heart that they didn't kill that person, but the way that the

5   mind works in that situation is they are blaming themselves

6   for not doing something more, I should have told him to do

7   this or that.

8           So it's -- again, it's one of those things that is

9   not typically seen.

10  Q.  All right.  And then No. 5, "Exaggerates the severity of

11  symptoms"?

12  A.  People with genuine PTSD in research studies have been

13  found to report more of a moderate level of symptoms.  It is

14  unlikely that someone with PTSD is going to have --

15  essentially check every box of a possible symptom.  People

16  experience it differently.

17  Q.  And No. 6, "Presents classic textbook examples of

18  symptoms in a rehearsed manner"?

19  A.  This gets at someone telling the same story in the same

20  exact way over and over.  It's -- especially if you interrupt

21  them and ask them about certain parts of the story, you'll

22  often see them kind of get thrown off.  And in my experience

23  with many people with genuine PTSD, it's not the case.

24  Q.  All right.  We can go to the next slide.  And let's look

25  at the rest of this list.  No. 7, "Exaggerates the role of

─B.R. v. F.C.S.B.─

79

1    involvement in trauma to the extent of making oneself the

2    hero"?

3    A.    This is often something that is done in people who are

4    trying to gain something from their PTSD diagnosis.  And that

5    goes along with the external incentive that can be present in

6    malingering.

7              But people with PTSD that have accurate reporting of

8    the symptoms, they are much more likely to take a very, you

9    know, low level role, even when they did do something heroic,

10   it's going to be hard for them to accept it.

11   Q.    No. 8, "Reports having no problems before the event"?

12   A.    In malingering assessment, we call this the good old days

13   bias, and what the good old days bias means is before a

14   certain event happened, you said not only was everything fine,

15   but everything was amazing, and it's usually exaggerating

16   their level of baseline functioning.

17   Q.    And No. 9, "Seeks treatment in the context of

18   litigation"?

19   A.    Sometimes you will see -- I've had cases, for example,

20   where someone will have an event happen, and then six months

21   later have had no treatment, but then they -- the records show

22   that they hired an attorney and then went to a provider that

23   very day and asked them to ask them to give them a certain

24   diagnosis.  I've had cases where that's happened.

25              So sometimes you can really tell in a medical record

Direct - DeRight
B.R. v. F.C.S.B.

80

1   whether a certain kind of treatment is more associated or if

2   the treatment amps up once litigation starts, for example.

3   Q.   And then No. 10, "Denies psychotic symptoms"?

4   A.   It's very unusual in PTSD to not have at least one

5   psychotic symptom at some time.  Again, that doesn't mean that

6   everyone with PTSD is going to have a psychotic symptom, but

7   it's part of this whole process where it would be unlikely to

8   not have one.

9   Q.   What's a psychotic symptom?

10  A.   Psychotic symptom is essentially a hallucination.  So

11  hearing, seeing, smelling something that's not there, or a

12  delusion such that you're being followed, or someone is after

13  you, or you're unsafe in a place that's clearly safe.

14  Q.   All right.  No. 11, "Reports chronic nonfluctuating

15  symptoms that do not improve with time or treatment"?

16  A.   So one thing they found in people with nongenuine PTSD is

17  that they will have a lot of treatment, but have very, very

18  little progress.

19          And, of course, you can have someone with severe

20  PTSD who is just simply not showing progress because it's so

21  severe, but in most cases there's going to be at least some

22  aspects of the person's condition that improve, whether it's

23  with different medications or different therapies.

24          So that's what the nonfluctuating symptoms is, is

25  they are going to have some aspects that do respond to

Direct - DeRight

B.R. v. F.C.S.B.

81

1    treatment.

2    Q.   All right.  And then the last one, "Has a history of

3    lawsuits and unstable work history"?

4    A.   This is another correlation they found in people with

5    nongenuine PTSD is that they will often -- they are much more

6    likely to be involved in substantial lawsuits.  They are much

7    more likely to say they can't work because of the injury.

8               That's something I do in other aspects of my

9    forensic practice.  I do disability evaluations or fitness for

10   duty evaluations.  So let's say someone is saying they have

11   PTSD, and they can't work anymore.  I would be seeing them as

12   a third party to determine if the condition is present and how

13   severe it is and whether it affects their ability to work.

14   Q.   Okay.  And let's go to the next slide.  Can you just

15   explain what the components of a forensic neuropsychological

16   evaluation are?

17   A.   Yes.  There's three main components, and one of the

18   patterns you'll see is multiple sources of information.

19              So those sources can be from reviewing voluminous

20   records related to different aspects of someone's history and

21   treatment.  It can be the clinical interview, which is where

22   the psychologist will ask the person questions about their

23   background, their symptoms that they are having, and then the

24   neuropsychological testing can involve thinking tests and the

25   self-report measures that I was referring to earlier, and

—B. R. v. F.C.S.B.—

82

1   putting that all together is how a neuropsychologist can

2   objectively and systematically make conclusions.

3   Q.   Is it the goal of a forensic neuropsychological

4   evaluation to obtain objective evidence?

5   A.   Yes.  There are many cases where I give information to

6   the referring party that they are not excited to get.  And

7   ultimately they aren't happy that they get it because people

8   don't want to have a false impression that their case is

9   better than it is.  So I'm often in the position of saying --

10          MR. BRENNER:  Objection.  Beyond the scope of his

11   expertise or what attorneys want or don't want from his

12   results.

13          THE COURT:  Sustained.  Keep him focused.

14          MS. REWARI:  Thank you.

15   BY MS. REWARI:

16   Q.   All right.  Let's talk about the work you did in order to

17   arrive at your opinions in this case, okay.

18          Let's take a look at the next slide.  Did you

19   conduct an independent neuropsychological assessment of the

20   plaintiff, B.R.?

21   A.   Yes.  In June of last year.

22   Q.   Okay.  And did you do all three of the components that we

23   just looked at in the previous slide?

24   A.   Yes.

25   Q.   Okay.  So what types of records did you review as part of

B.R. v. F.C.S.B.

83

1   your evaluation?

2   A.   Various medical, school, therapy records, other records

3   related to the case.

4   Q.   Okay.  And did you also do -- did the records that you

5   reviewed, did they show whether B.R. has been administered

6   validity tests in the past?

7   A.   I reviewed over 5,000 pages of records in this case.

8   There was one evaluation that included performance validity

9   measures, but to my knowledge, there weren't any evaluations

10  that included symptom validity measures.

11  Q.   And the one evaluation that you saw that contains some

12  performance validity measures, without discussing the content

13  of that, when was that done?

14  A.   About five months before my evaluation.

15  Q.   Okay.  And so, did you find any evidence that anyone who

16  has treated B.R. therapeutically administered any performance

17  validity test or symptoms validity test to her?

18  A.   No.

19  Q.   All right.  And did you meet B.R. in person to evaluate

20  her?

21  A.   Yes.

22  Q.   And did you do a clinical interview with her?

23  A.   Yes.

24  Q.   Okay.  Did you also administer tests to her?

25  A.   Yes.

B.R. v. F.C.S.B.

84

1    Q.    Okay.  When did you meet with her?

2    A.    I believe June of 2023.

3    Q.    How long was your evaluation that day?

4    A.    About seven hours in total.

5    Q.    Could you just describe to the jury what it entailed?

6    A.    And this is the same thing I tell my clinical patients,

7    but I know that seven hours seems like a long time, but it

8    goes faster because there's different parts of the evaluation

9    that are happening.

10            So, for example, depending on the nature of the

11   case, the clinical interview might be somewhere between one

12   and three hours, and then there's the self-report tests, which

13   can take 30 to 45 minutes each.  That's where they are

14   bubbling in responses.

15            And then the other part is the thinking test.  These

16   are things like problem solving, memory and language.  Those

17   are almost always interactive measures such that I'm asking

18   questions or giving a set of questions for the respondent to

19   work on, and those tests are combined together with the other

20   information.

21   Q.    And when you met with her in June, did she, to your

22   knowledge -- had she taken the usual medications?

23   A.    Yes.  I advised her to take her medications as usual, and

24   I believe that she did.

25            MR. BRENNER:  Your Honor, can I ask Ms. Rewari to

B.R. v. F.C.S.B.

85

1    come a little closer to the mic?  I can't hear the question.

2            MS. REWARI:  I'm sorry.

3            MR. BRENNER:  No problem.  Thank you.

4    BY MS. REWARI:

5    Q.   Did you offer her breaks during your evaluation?

6    A.   Yes.  It is a standard part of a neuropsychological

7    evaluation to give breaks.  Again, it is several hours.  We

8    want to make sure that the results we're getting are accurate.

9    We don't want someone to be overly fatigued, so we offer

10   breaks routinely.  And I believe I offered her six breaks.

11   She took four of them.  One of them was an hour break for

12   lunch, which is usual.

13   Q.   And what did you observe about her emotional state during

14   the evaluation?

15   A.   The word that comes to mind is very stable.  She was kind

16   of unwavering in her expressions.  They certainly weren't

17   overly positive.  I would say slightly despondent is the word

18   that we use, meaning not super happy, but that's not really

19   inconsistent with what people usually look like when they have

20   to take these tests for several hours.

21   Q.   And what did you observe about her energy or fatigue

22   level during your evaluation?

23   A.   It was remarkable to me that she did not appear to be

24   extremely fatigued at the end.  And this is also why we do

25   validity measures throughout the assessment to make sure that

B.R. v. F.C.S.B.

86

1   the person's engagement is not wavering.  And such that, let's

2   say I have someone that's passing these measures, I can see

3   that they passed them throughout.  For example, on with

4   someone with Parkinson's disease, that's a disease that is

5   going to have a substantial fatigue.  You might see them start

6   to fail a performance validity test at the end because they

7   are noticeably very fatigued.

8   Q.    Who chose the test that you administered to her?

9   A.    I did.

10  Q.    And when did you choose the tests?

11  A.    Before I see a patient in this context, I have a sense of

12  which tests I'm going to give.  Sometimes that's due to

13  previous tests that have been administered.  Sometimes that's

14  due to certain questions that I want to answer, but really the

15  decisions about which test I'm giving are made as I'm talking

16  to the evaluee and seeing what kinds of things need to be

17  assessed.

18  Q.    And did you choose some tests during the evaluation of

19  her?

20  A.    Yes.

21  Q.    Okay.  And did you administer the test yourself?

22  A.    Yes, I did.

23  Q.    And who scored the tests?

24  A.    I did.

25  Q.    Who interpreted the results?

─B.R. v. F.C.S.B.─

87

1    A.    I did.

2    Q.    Did you use standalone measures of performance validity?

3    A.    Yes.  Consistent with the standards in our field, I gave

4    her several measures of standalone performance validity.

5    Q.    And did you also use embedded measures?

6    A.    Yes.

7    Q.    Did you use cutoff scores?

8    A.    Yes.

9    Q.    Okay.  So what we have on the slide under No. 3, are

10   those the kinds of tests that you gave her, cognitive tests,

11   performance validity tests, self-report questionnaires and

12   symptoms validity tests?

13   A.    Yes.

14   Q.    Now, based on all the work you did, were you confident

15   you had all the information you needed to arrive at your

16   opinions within a reasonable degree of psychological

17   certainty?

18   A.    Yes.

19   Q.    And based on your training, experience and the work you

20   did in your forensic evaluation, did you find any valid

21   evidence that B.R. has PTSD -- go ahead.

22   A.    No.  In my opinion, there was not valid evidence of PTSD

23   based on the exam.

24   Q.    Did you find any valid evidence that she has another

25   psychiatric disorder?

B.R. v. F.C.S.B.

88

1  A.   Yes.  I diagnosed her with malingering.

2  Q.   Okay.  All right.  If you could please take a look in

3  your binder at Defendants' Exhibit 313.

4           MS. REWARI:  We're starting a new topic.  I just

5  wanted to check in to see whether.

6           THE COURT:  Ladies and gentlemen, let's go ahead and

7  take our morning break at this point.  We'll see you back in

8  at 11:10, 11:10.

9           (Jury excused.)

10          THE COURT:  Thank you.  Doctor, you can step down.

11  We'll see you back in at 11:05, 11:10.

12          (Recess.)

13          (Court proceedings resumed at 11:12 a.m.)

14          (Jury present.)

15          THE COURT:  Thank you.  You may be seated.  We're

16  going to recommence the testimony of Dr. DeRight.

17          MS. REWARI:  Thank you.

18  BY MS. REWARI:

19  Q.   Dr. DeRight, before the break, you had told the jury that

20  you had diagnosed the plaintiff with malingering.

21          Can you just explain what criteria you used to make

22  that diagnosis?

23  A.   Yes.  The multidimensional criteria, the ones that I was

24  explaining have the A, B, C, D.  So I systematically took

25  information that was found in my exam, applied it to those

B.R. v. F.C.S.B.

89

1  criteria and came out with the diagnosis of malingering with

2  mixed presentation.  "Mixed" means cognitive and psychiatric.

3  Q.   Is "malingering" a term that's also used in the DSM?

4  A.   Yes.

5  Q.   And could you just remind us what the DSM?

6  A.   The DSM is the diagnostic and the statistical manuals.

7  It's the book that is used to have a shared language between

8  psychologist and psychiatrist.  So the diagnostic criteria

9  that are provided in that book are based on groups of people

10 that get together, and they say, Here is what we think should

11 make up diagnosis of major depressive disorder.  Here is what

12 should make up PTSD.  So these are groups of people that are

13 getting together, deciding -- and they update them every so

14 often.

15         And malingering is in the DSM-5.  As is mentioned in

16 the paper for the multidimensional criteria of malingering.

17 It is not really used my neuropsychologist.  It is not very

18 prominent in the DSM-5, and it's not very systematic.  It more

19 of describes what malingering is, but doesn't really say how

20 to assess it.

21         So these criteria are much more rigorous, much more

22 comprehensive.  And I should also say it's not unusual for

23 criteria like this to be used in the medical field.  For

24 example, if you have ever known someone with Parkinson's or

25 epilepsy or also Alzheimer's disease, all of these people have

———B.R. v. F.C.S.B.———

90

1   been diagnosed using criteria that have been developed in this

2   way.

3           MR. BRENNER:  Beyond the witness's qualifications.

4           MS. REWARI:  I believe he does diagnose these

5   disorders.

6           THE COURT:  "I believe he does" doesn't set the

7   standard.  Sustained.

8   BY MS. REWARI:

9   Q.   Can you just explain in layperson's language what

10  malingering is?

11  A.   Malingering in the most basic level is the intentional

12  fabrication or exaggeration of symptoms in the presence of

13  external incentive.

14  Q.   Okay.  Would you please take a look at what we have

15  marked as Defendants' Exhibit 313 in your binder.

16          MR. REWARI:  And, Your Honor, Mr. Brenner has

17  informed me that there's no objection to this exhibit.

18          MR. BRENNER:  That's correct, Your Honor.

19          THE COURT:  All right.  You may publish.

20  (Defendants' Exhibit No. 313 was admitted into evidence.)

21          (Exhibit published.)

22  BY MS. REWARI:

23  Q.   You can look at it on the screen as well.

24          Can you identify what we're looking at in this.

25  A.   This is the appendix from my evaluation.

Direct - DeRight
————B.R. v. F.C.S.B.————

91

1    Q.   Okay.  And if we can flip through, how many pages of test

2    results are there?

3    A.   Three.

4    Q.   Excuse me?

5    A.   Three.

6    Q.   And so does this list all of the tests that you've

7    administered to B.R. in your evaluation?

8    A.   Yes.

9    Q.   Can you sort of explain, did your testing include

10   cognitive testing?

11   A.   Yes.

12   Q.   Where in this document are the cognitive tests listed?

13   A.   The bulk of the tests that are shown on there are

14   cognitive tests.  At the very end of the table, there are

15   self-report measures, which are the personality and

16   psychiatric measures.

17   Q.   If we go back to the first page, how can we tell where a

18   test had a -- is a standalone or embedded measure of validity?

19   A.   In the far right column, there's the words "VAL," which

20   stands for validity.  And then within that column, there's

21   either F, which is fail; P, which is pass; or F/P, which is

22   partly failed, partly passed.

23   Q.   How many measures of the performance validity did B.R.

24   pass?

25   A.   I don't remember the specific number.  It was at least

B.R. v. F.C.S.B.

92

1   three standalone measures and at least three embedded

2   measures.

3   Q.   I'm sorry.  That's how many she passed or?

4   A.   Oh, I'm sorry.  I thought you asked how many I gave her.

5         She failed all three standalone measures of validity

6   that I administered.  She also produced failing scores on at

7   least two of the other embedded measures.

8   Q.   Okay.  And then how many symptoms of validity test did

9   you administer?

10  A.   Well, within a large test like the MMPI or the TSI, which

11  are two long self-report measures that I gave, there are

12  measures of validity.  It's not just one measure; it's

13  multiple measures because they're very specific.  It's

14  measures related to exaggeration or fabrication of psychiatric

15  symptoms.  One's related to bodily symptoms.  One's related to

16  thinking.  So within those, there is probably upwards of ten

17  different validity measures.

18  Q.   If we can go back to the first page, can you just explain

19  the first F that we see here, WAIS-IV.  What is that?

20  A.   That's a failing embedded measure.  That's called

21  excessive decline from premorbid functioning.  And that's a

22  research-derived measure in which someone's IQ is only

23  expected to drop a certain amount based on a certain mechanism

24  of injury such that an extremely large drop in IQ is unusual.

25  Q.   For this measure, what were you comparing the drop to --

1    what testing were you comparing to?

2    A.    The one that was administered five months earlier.

3    Q.    Okay.  And that was not administered by you?

4    A.    Correct.

5    Q.    All right.  Let's go --

6                (Phone rings.)

7                THE COURT:  Stop just a second, Ms. Rewari.

8                I know phones go off from time to time.  We don't

9    even know about them being on.  But if everyone could take a

10   look at your phone, and given the courtesy of being able to

11   bring it into the courtroom, if you could make sure that it's

12   secure or on mute or off.  Very good.

13               MS. REWARI:  Thank you.

14   BY MS. REWARI:

15   Q.    Let's look at the next column that is marked P/F.

16               Can you explain what that is?

17   A.    This is a measure called reliable digit span.  In this

18   test, she's read numbers and has to repeat them in the same

19   order as they're heard and in the reverse order.  And what

20   we've found researching this is that it's very unusual to not

21   get a certain level correct.  And she passes one part of that

22   barely, right at the threshold, and then another part, which

23   uses all three aspects of the test, that is a little more

24   current, she fails that one.

25   Q.    So how do you determine whether a person has failed one

─────── B.R. v. F.C.S.B. ───────

94

1  of these tests?

2  A.    In an embedded measure it's looking at the

3  research-derived metrics, and they will say, Here is the score

4  at which someone is substantially likely to have produced n

5  invalid performance.  So it gives it right in the research

6  paper.

7  Q.    And so in terms of -- what is a comparison of -- that

8  you're using to determine whether a person's giving a valid

9  performance or invalid performance?

10 A.    One good comparison is a COVID test.  When you take a

11 COVID test, you might recall there's two lines on there, and

12 one of the lines is called a control.  That's to make sure

13 that the test is working.  And you can imagine you wouldn't

14 feel very strong about your results if you took a COVID test

15 and that control wasn't there.  If you -- if it is negative,

16 you might say, Well, how do I know the test is working.  So

17 that's essentially what these validity measures do is they're

18 saying are the tests measuring what they're supposed to.

19         THE COURT:  Help me understand.  I got a little lost

20 there myself.  When you're giving this, I guess, memory test,

21 I think is the way you described it, what would you say to the

22 interviewee?  What would be their question?

23         THE WITNESS:  I should say in the beginning of the

24 evaluation, the person taking the test is informed that there

25 are going to be tests that are designed to measure whether

Direct - DeRight

B.R. v. F.C.S.B.

95

1   they're trying hard on the test, whether they're not

2   exaggerating things.  This was in the content form that I have

3   all my forensic cases sign.

4           So essentially, she knew they were going to be in

5   there, but no one knows exactly which tests they are.  And,

6   again, they wouldn't be very good at measuring it if people

7   did know which test they were.  In, for example, this test of

8   number repetition that I was talking about, there I said, I'm

9   going to say some numbers to you, and I want you to say them

10  back in the same order I say them.  And we do that and they

11  get longer and longer, and then we do it in the reverse order,

12  and then they have to order them in numeral order.

13          THE COURT:  So you would say, repeat after me if you

14  recall 1, 7, and 10, and the person would say, 1 7, 10.  And

15  then you would say, 1, 7, 10, 200, and the person would repeat

16  that number, and it would progress down the line?

17          THE WITNESS:  Correct, but they are all single-digit

18  numbers.

19          THE COURT:  Oh, I made the test harder then.

20          THE WITNESS:  Yes, you made the test harder.

21          THE COURT:  Very good.

22  BY MS. REWARI:

23  Q.   Okay.  And so are you comparing -- in terms of what you

24  would expect a person to perform at versus what they actually

25  perform at, how do you determine who the comparator is?

─B.R. v. F.C.S.B.─

96

1    A.   Well, especially this one, reliable digit span, has been

2    used in tons of different populations.  It's by no means a new

3    measure, and the enhanced reliable digit span takes in the new

4    part of the WAIS-IV because it used to be only two parts, and

5    now it's three parts, so they've updated the measure.

6    Q.   I guess what I'm getting at is how badly do you have to

7    do on one of these tests to fail?

8    A.   The way that most performance validity measures are made

9    is that it would be extremely unusual to have a performance

10   that poor.  And it doesn't say it's impossible, but the way

11   that the statistics work is that when you have one thing that

12   says extremely unusual and then another completely different

13   test that says extremely unusual and then another one, when

14   you combine all of those together, the odds that it happens by

15   chance or by accident is astronomically low.

16        THE COURT:  At what point during the seven-hour

17   interview that you apparently had with B.R. did you give her

18   this particular test?

19        THE WITNESS:  That's a good question.  So in the

20   beginning of the evaluation, I talked with her for about an

21   hour, and then we did all of the testing, and then I did an

22   interview at the end.  So it wasn't a seven-hour interview,

23   but the seven-hour evaluation.  These tests were sprinkled

24   throughout.  This test itself would have been on the earlier

25   side of the evaluation.

Direct - DeRight

B.R. v. F.C.S.B.

97

1          THE COURT:  All right.

2   BY MS. REWARI:

3   Q.   Let's look at the next F, which is next to b test.  And

4   can you explain why you have coded that an F here?

5   A.   So this is a standalone measure of validity, meaning that

6   its purpose is to make sure that people are trying hard on the

7   test.

8          This is not a memory measure.  This is a processing

9   speed, and what we call perceptual accuracy, so can you see

10  things correctly.

11         And essentially the task is very simple.  You need

12  to find lower case Bs, mark them off as fast as you can, and

13  do that over 15 pages.  The font does get smaller and smaller,

14  but even with that, it's a very, very low bar to meet to have

15  valid performance.

16         Her score on this test was probably the worst I've

17  ever seen, and I've given this test hundreds of times.  It was

18  so astronomically high that it is not even mentioned in the

19  manual as far as the error rate.

20  Q.   I'm sorry, you said her score was low, and then you said

21  it was astronomically high.  Can you just explain?

22  A.   Yes.  That's a complicated part of this one.  In this one

23  a high score is bad.  So this is more like golf scoring.  You

24  want a low score on the b test and the dot counting test.

25         THE COURT:  Let me ask another question again.  I'm

Direct - DeRight

B.R. v. F.C.S.B.

98

1    just trying to anticipate things.  If, say, a person was tired

2    and just for whatever reason didn't want to participate in

3    this test and just went through it to go through it, would

4    that be an indicator as to how this particular score was

5    achieved?

6            THE WITNESS:  It could be, and that's why in the

7    beginning of the evaluation, I give the examinee very specific

8    instructions to tell me if they need a break, and then before

9    every performance validity measure that I give, whether it's a

10   test that's all by itself standalone or embedded, I always

11   check in before and say, do you want to take a break.  We

12   definitely can take a break.

13           And that's not something that they would pick up on

14   because I'm routinely asking it throughout, but it's something

15   that I know so that when I'm testifying in a case like this, I

16   know that I've asked whether they needed a break before.

17           THE COURT:  And could this test be affected by

18   medication that the person is taking?

19           THE WITNESS:  Unlikely, and here is why:  Parts of

20   the way this test is scored is how fast you do it.

21           So let's say someone is taking a medication that

22   makes them very drowsy.  Maybe they do perform very poorly on

23   that.  But there's other parts of the test that are looking at

24   false positive errors, really, really unusual errors that are

25   made on the test, and that takes more effort to do.

B.R. v. F.C.S.B.

99

1          So you can imagine if someone is saying, I'm tired,

2     they are not going to pick the wrong ones.  They might just do

3     it very slowly.  So that's something that we know is very

4     unusual.

5          And then you can compare that speed to other tests

6     and say, she does fine on this test, as far as processing

7     speed, and this one is astronomically low.

8     BY MS. REWARI:

9     Q.   Can you point us to some -- another test, and we can zoom

10    out here, that you -- that might have tested this in a

11    different way when you said processing speed?

12    A.   Yes.  Well, the first one is a few lines below it.  It

13    says, "N&L A speed," that's numbers and letters test.  And she

14    performs at the 14th percentile on that, not amazing, but it's

15    certainly not astronomically low.  It is certainly not at the

16    level that would be indicative of someone falling asleep while

17    taking the test.

18         And then she also performs in the average range on

19    another measure of thinking speed on the next page called

20    coding.

21    Q.   Okay.  If you can flip to the next page, okay.

22    A.   You can see there the coding in the WAIS-IV is at the

23    25th percentile, which is average.

24    Q.   All right.  And just for everyone's edification, when you

25    say "percentile," what do you mean?

───────── B.R. v. F.C.S.B. ─────────

100

1   A.   A percentile is compared to the known group or the

2   standardized group what percent of those people did worse on

3   the test.

4          So the 99th percentile is the highest you can get,

5   because you can't be better than yourself, so that is the

6   highest the score can be.  Less than the first percentile,

7   which means .0001 or something like that.  That's the lowest

8   you can get.  And then the rest of it is as you might have

9   seen with the bell curve before, so the 50th percentile is

10  right in the middle of the bell curve.  It's exactly average.

11  25th to 75th percentile is within the average range, and so

12  forth.

13  Q.   All right.  If we go back to the first page, I see under

14  the WAIS-IV, you have -- is that an IQ test that you gave her?

15  A.   Yes.  The WAIS-IV is the most common IQ test given in the

16  field of neuropsychology.

17  Q.   And when you gave her the test, what was her full scale

18  IQ?

19  A.   She produced a full IQ scale of 86.

20  Q.   Can you just explain what percentile -- how did that

21  compare to an average person?

22  A.   That's at the 18th percentile, meaning that she scored

23  higher than 18 percent of people her age on that test.  It's

24  at the very low end of the average range, and it's borderline

25  on the low average range.  What that really means is someone

B.R. v. F.C.S.B.

101

1   that has a slightly limited IQ, but is not at the level of

2   intellectual disability.

3   Q.   Are there studies that compare, you know, what you would

4   expect the IQ of a college graduate to be?

5   A.   Yes.

6   Q.   Okay.  And what would you expect the IQ of a college

7   graduate to be?

8           MR. BRENNER:  Objection.  I believe it's beyond the

9   scope of his report.

10          THE COURT:  Sustained.

11          MS. REWARI:  Okay.

12  BY MS. REWARI:

13  Q.   All right.  Let's look at the next F on this page.  The

14  dot counting test, can you explain what that test -- how that

15  test is conducted and what you found?

16  A.   The dot counting test, the person is presented with a

17  page of dots on it.  It might be somewhere between let's say

18  five and 30 dots.  And they just need to count them as fast as

19  they can and say the number, and they do that 12 times, and

20  the time it takes them to count those dots is part of the

21  score that's used to determine if it's a valid assessment in

22  addition to errors that are made.  So if they get it wrong.

23          Again, they are essentially counting to anywhere

24  between five and 30, so even people with extremely limited

25  abilities can count that high.

B.R. v. F.C.S.B.

102

1   Q.   And how did her score --

2   A.   Her score was 24.  The standard cutoff for this

3   assessment in both the test manual and research that's been

4   done on it is 14.  So it's substantially higher than that.

5          One thing about the b test and the dot counting test

6   that I like is that they don't just give one cutoff score.

7   They give you multiple, and that's so you can look at

8   different error rates.

9          And 24 is so high that it is not even one of those

10  ones that it's listed as, as here is the known error rate for

11  it.

12  Q.   And so is this another test where it's like golf, you

13  want a low score?

14  A.   Exactly.

15  Q.   Okay.  And so anything above a 14 is -- what you

16  explain -- anything above 14 is unusual?

17  A.   Yes.

18  Q.   All right.  Let's look at the next page of these test

19  results.  And look at the next set of Fs under WMT.  Can you

20  explain what that is?

21  A.   This is called the word memory test.  In this test the

22  person is presented with pairs of words and they need to

23  remember them, and it looks like it would be hard, but really

24  the memory is, was it this word or this word, and that's a

25  much different memory system.

B.R. v. F.C.S.B.

103

1          That's a type of task that even someone with severe

2    intellectual limitations can pass because you don't

3    necessarily need to remember the word.  You just need to

4    remember that you didn't see the other word, and it's

5    immediately after it.  This is one of the most widely used

6    validity tests that's out there.

7          I should also mention that all three of these, the b

8    test, the dot counting test, and the word memory test are all

9    given as examples in that multidimensional criteria.  So I

10   think they list five or six tests, and these are three of

11   them, where they say, here are tests that are known to show

12   this.

13   Q.   Okay.  And what is the DR test?

14   A.   So the IR is immediate recognition, so right after you

15   saw them, can you remember them.  The DR is after a half hour,

16   can you remember them, and the CNS is consistency.

17          So essentially if you don't know something, you

18   should continually not know it rather than not know new

19   things.

20          So the cutoff for this is 82.5.  In this one you

21   want to be above that.  So a score of 82.5 or lower is

22   considered a failing score.

23   Q.   Okay.  And is that the IR that's the 82.5?

24   A.   Yes.

25   Q.   And then what is the cutoff for the DR?

Direct - DeRight

B.R. v. F.C.S.B.

104

1    A.   They are all the same.  It's 82.5.  And I know it might

2    sound hard to remember words a half hour later, but they've

3    given this test to multiple patient groups, people with

4    literally half a brain because it's been removed from epilepsy

5    surgery down to people with severe PTSD.

6              MR. BRENNER:  Object.  This goes beyond his -- I

7    believe it goes beyond his disclosed opinions, testifying

8    about people with half a brain.

9              MS. REWARI:  I think he's just explaining the test.

10             THE COURT:  Lay a foundation for it.

11   BY MS. REWARI:

12   Q.   All right.  Are you familiar with how these tests have

13   been validated?

14   A.   Yes.

15   Q.   Okay.  And so can you just explain what your

16   understanding of how the WMT test has been evaluated?

17   A.   So it's based on a known group's design such that many

18   different patient populations are given this test, and we can

19   see how they do on it.

20             What I was referring to with the half a brain is

21   there's a certain type of surgery in epilepsy called a

22   hemispherectomy, where half of the brain is removed.  This is

23   a group that has been administered this test and they can pass

24   it.

25             So my point in saying that is I know it seems like a

─ B.R. v. F.C.S.B. ─

105

1    hard test, but it is a very low bar to meet.

2    Q.   Okay.  All right.  And besides the validity measures that

3    you have listed here in this test data, were you also looking

4    at patterns and consistency within the other test that you

5    gave her?

6    A.   Yes.

7    Q.   Can you just explain what you did there?

8    A.   Well, the reason we give multiple tests is we don't want

9    to just rely on one piece of information.

10            So if I give you a test and you do poorly on it, it

11   might be just because you're having a bad day.  If I give you

12   one test and you do amazingly at it, it might be because you

13   happen to practice that exact kind of puzzle at home, and

14   you're used to it.  So we give multiple measures, and that's

15   because we want to really get a sense of how strong that --

16   that pattern is.

17            So, for example, in something like vocabulary, that

18   should be very stable across tests.  And I gave her two

19   measures of vocabulary.  One was where I show her a word and

20   say, tell me what this word means.  That's part of IQ test.

21            And I gave her another one that presents her with

22   two words, and she has to pick the real one.  You still have

23   to show your vocabulary because it's hard to pick the real one

24   from the fake one if you don't know it, but her score was

25   dramatically lower on that.  It was a whole standard deviation

B.R. v. F.C.S.B.

106

 1  lower.

 2          And to give you context for a standard deviation,

 3  that would be the difference between a low average IQ and an

 4  intellectually disabled IQ.  It's a big difference.

 5  Q.  And so, what did you find in the patterns that you saw in

 6  the nonvalidity test?

 7  A.  There were several inconsistencies like that.  So to

 8  close the loop on that, it would be very unusual to have a

 9  valid performance with a drastic difference in vocabulary

10  scores like that.

11  Q.  Let's look at the last page of the testing results and

12  the last set of Ps and Fs.  Can you explain what these tests

13  were?

14  A.  So these are the three self-report measures that she

15  completed.  And not all of the validity measures are listed on

16  here.  But this shows you that they -- that they were in there

17  and whether they were passed or failed, so it's the MMPI-3,

18  the MCMI-4, and the TSI-2.

19  Q.  When you said self-report measures -- or self-report

20  questionnaires?

21  A.  Yes.

22  Q.  And can you just explain what the process is, how a

23  person completes these?

24  A.  So they are presented with a test booklet.  It could be

25  on the computer or a paper booklet.  And I will give them

B.R. v. F.C.S.B.

107

1   standardized instructions, say, Here are the tests.  Here are

2   the test questions.  Just answer honestly.  The only thing you

3   could do wrong is purposely exaggerate things or downplay

4   things.  Just say things exactly as they are, and just make

5   sure you're paying attention throughout as well.

6           And they complete the measure.  They can take breaks

7   as needed.  Typically, it takes somewhere between 30 and 45

8   minutes.

9   Q.   Are these tests of cognition?

10  A.   These are tests of different psychiatric symptoms and

11  personality characteristics.

12  Q.   So the MMPI-3, the MCMI-4 and TSI-2, were these all tests

13  of personality or psychiatric symptoms?

14  A.   Yes.

15  Q.   And how did she -- how did she do on these tests?  One at

16  a time.

17  A.   Similar to the way cognitive testing, the first line of

18  processing we have to do is can we interpret these results,

19  and to do that, we have to look at the validity scales because

20  the rest of it is spoiled if the validity scales aren't

21  passed.

22          For example, on the MMPI-3, it's probably the most

23  commonly used self-report measure in this kind of case.  And

24  there's different validity measures related to was the person

25  paying attention, were they consistent in their responses.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

108

1  Those are ones she passed.  And then there are other ones

2  related to very unusual psychiatric symptoms and bodily

3  symptoms and thinking symptoms.  And those are ones that she

4  had extremely high scores on, meaning they were very, very

5  unlikely, even in severe, genuine populations.

6            And then there's two measures of underreporting,

7  which is is she presenting herself in an especially favorable

8  light, and those were moderately elevated.

9  Q.   Okay.  And when you say "moderately elevated," what does

10  that mean?

11  A.   So there is a test manual for these, and it will say, If

12  a score is above this, it's almost -- it's very, very strongly

13  associated with an invalid response dial, because it's unusual

14  for patient populations.  And then there's this middle area

15  that says there's some indication of that.  So that's what I

16  mean by the moderate symptoms.

17           When you see a profile of moderate underreporting

18  and very severe overreporting, in my experience, I've often

19  seen that in people who are reporting something very specific

20  and saying everything else is completely fine.

21  Q.   Okay.  Can you explain how her score on the MMPI compared

22  to -- what were you -- what populations were you comparing her

23  to?

24  A.   So similar to the other validity test, there are groups

25  of controls or standardized measures -- standardized groups

1    that we can compare them to.  So there is the regular,

2    normative sample.  But then we can get even more specific.

3    For example, I can compare her scores to someone that's in a

4    lawsuit related to a disability or someone that's a plaintiff

5    in a lawsuit in a personal injury matter.  And we can say how

6    high is this score compared to someone like that.

7           And in this case her score was higher than I think

8    95 to 99 percent of those people.  So it's extremely high even

9    when compared to someone who is in litigation for a personal

10   injury matter.

11   Q.   Okay.  Now, let's talk about the MCMI-4.  And I see

12   there's a P there.  So can you explain what that test is and

13   what the P means?

14   A.   The MCMI-4 is a measure of what are called personality

15   disorders.  It's a different kind of psychiatric symptom that

16   you can have that is more associated with a long-term

17   dysfunction in something like interpersonal relationships or

18   emotional reactivity.  You might have heard about some

19   personality disorders like borderline personality or

20   antisocial personality.  That's the kind of conditions that

21   this test assesses for.

22   Q.   And so what does a P score there -- what does that mean?

23   A.   This test is -- it does not have the most validity

24   measures, but it does have some.  She produced passing scores

25   on the overreporting aspect of this, although in research, it

1    is found to be one of the weaker measures, and then

2    underreporting it was moderately elevated.

3    Q.   So does that mean essentially that -- well --

4         THE COURT:  She is asking what does it mean as

5    opposed to suggesting a response.

6         MS. REWARI:  Thank you.

7    BY MS. REWARI:

8    Q.   So what does that mean that she produced a passing score?

9    A.   The passing score on the MCMI means that those results

10   are not showing that she's purposely making it look like she

11   has a personality disorder, for example, and the moderate

12   underreporting means there is some indication that she might

13   not have been fully transparent about it, but it's not an

14   extreme degree.

15   Q.   And let's talk about the TSI-2, and there's some subtest

16   under that or sub letters.  Can you explain what that is?

17   A.   So as opposed to the other two measures, which are very

18   broad -- they get all different kinds of psychiatric and

19   personality symptoms -- the TSI-2, the T is trauma.  It's the

20   trauma symptom inventory, and this is a self-report measure

21   specifically looking at PTSD symptoms.

22        And it has two measures.  One is an underreporting

23   measure, and one is an overreporting measure.  She passes the

24   underreporting one.  She's certainly not underreporting PTSD

25   symptoms, but her score is extremely high on the overreporting

Direct - DeRight

──B.R. v. F.C.S.B.──

111

1    symptoms.  It's higher than 99 percent of other people given

2    the assessment.

3    Q.   And so would it -- do you have an understanding of the

4    populations on which this test is validated?

5    A.   It's validated against regular clinical populations.

6    It's validated in forensic populations.  It's still beyond

7    what would be expected even in a very severe population.

8    Q.   All right.  Let's go back to the slide presentation and

9    just look at the last page.

10           Does this slide sort of capture the validity tests

11   results that you relied upon to reach your opinions?

12   A.   Yes.

13   Q.   Okay.  Now, the plaintiff's expert Dr. Eileen Ryan, has

14   rendered opinion that B.R. is not malingering.  Do you agree

15   with that opinion?

16   A.   No.

17   Q.   Why not?

18   A.   In Dr. Ryan's deposition, which I reviewed, I saw that

19   when she was asked this question, her answer was that she

20   considered the totality of the evidence, and it was her

21   opinion that she was not malingering.  There was no systematic

22   process; there was no objective indication of how she knows

23   that.

24           Whereas in this evaluation, I gave standardized

25   measures with objective result with essentially decision trees

B.R. v. F.C.S.B.

112

1  that can be replicated by someone else just looking at that

2  result.

3  Q.   To your knowledge, did Dr. Ryan give B.R. any performance

4  validity test?

5  A.   No.

6  Q.   And to your knowledge, did she give B.R. any symptoms

7  validity test?

8  A.   No.

9  Q.   How do you account for the fact that B.R. has been

10  treated by a number of psychologists and psychiatrists for

11  PTSD over the years?

12  A.   Well, I have to put myself in the role of a treating

13  provider, and it's a different role than a forensic provider.

14  When you go in and are seeking treatment, a good provider is

15  going to have some question as to whether the symptoms are

16  accurate, but they're not going to go to these comprehensive

17  lengths to determine that.

18        Essentially, when you're seeking treatment, the

19  treater is your advocate.  And if you tell them you have

20  symptoms, and there is no extremely clear reason not to

21  believe it, they're going to essentially mark down that

22  condition.  Sometimes it's people simply just looking at a

23  list of PTSD symptoms in the DSM and saying, Do you check all

24  of these boxes.  That would be an extremely simplified and

25  poor way to make a clinical diagnosis, but I have seen times

1    where it's happened.

2    Q.    And in your review of B.R.'s records, did you find that

3    she has been treated by -- what kinds of mental health

4    professionals has she been treated by?

5    A.    I don't remember all the specifics.  I know she had one

6    called eye movement desensitization -- it's EMDR.  She had

7    various medications, I think over ten.  She had various types

8    of individual therapy.

9    Q.    Okay.  And how do you account for the fact that she's

10   been prescribed -- B.R. has prescribed variety of medications

11   over the years?

12   A.    As I was alluding to before, it would be very unusual for

13   someone to have no response at all to any of those

14   medications.  Again, not impossible.  But it would be very

15   unusual.  And as we're going through all these things, you

16   have to think about, okay, unusual is one thing, but unusual

17   after unusual, after unusual, after unusual, that's the

18   pattern that we look for.

19           MS. REWARI:  Thank you.  I have no further

20   questions.

21           THE COURT:  Mr. Kinney.

22           MR. KINNEY:  No questions.

23           THE COURT:  Mr. Blanchard?

24           MR. BLANCHARD:  No questions, Your Honor.

25           THE COURT:  Mr. Brenner.

────────── B.R. v. F.C.S.B. ──────────

114

1          MR. BRENNER:  Thank you, Your Honor.  May I have one

2   moment.

3          THE COURT:  Yes, sir.

4                     CROSS-EXAMINATION

5   BY MR. BRENNER:

6   Q.   Good morning, Dr. DeRight.

7   A.   Good morning.

8   Q.   How are you, sir?

9   A.   Well, thank you.

10  Q.   I think we met, oh, about six months ago.  Does it sound

11  about right?

12  A.   Yes.  Virtually.

13  Q.   Virtually, yes, took your deposition by Zoom, right?

14  A.   Yes.

15  Q.   You issued a report in this case, right?

16  A.   Correct.

17  Q.   And then I think you did a slight supplement to correct

18  some tables?

19  A.   Yes.

20  Q.   The opinions you gave, the core opinions, are contained

21  in the original report?

22  A.   Correct.

23  Q.   And you understood that you were required in that report

24  to disclose all the opinions you intended to testify to in

25  this case?

─────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────

EASTERN DISTRICT OF VIRGINIA

Cross - DeRight

B.R. v. F.C.S.B.

115

```
 1  A.   Yes.

 2  Q.   And you, in fact, did that, right?

 3  A.   I believe so.

 4  Q.   Okay.  Now, I just want to get something clear at the

 5  beginning.  When Ms. Rewari asked you about actually whether

 6  my client had had or has PTSD your answer was that you had

 7  seen no valid evidence of that, correct?

 8  A.   Correct.

 9  Q.   But you actually have no opinion -- you have issued no

10  opinion and have no opinion that my client does not actually

11  have PTSD, correct?

12  A.   No, that's not correct.

13  Q.   Okay.  So let me -- let's look at your deposition.

14          MR. BRENNER:  Do you have a copy?  Ms. Rewari, do

15  you have a copy?

16          MS. REWARI:  Yes.

17          MR. BRENNER:  May I approach, Your Honor?

18          THE COURT:  You may.

19  BY MR. BRENNER:

20  Q.   This is the deposition you and I just talked about,

21  correct?

22  A.   Yes.

23  Q.   September, the end of the September right?

24  A.   Yes.

25  Q.   2023?
```

─────B. R. v. F.C.S.B.─────

116

1   A.   Yes.

2   Q.   Okay.  I'm reading from -- let's start at page 13, lines

3   1 through 4, and you can review it yourself before reading,

4   but it's talking about your report.  And it says:

5        "QUESTION:  And you did not disclose an opinion in

6   your report whether my client is currently suffering from

7   PTSD?"

8        And your answer was:  "That's right."

9        Correct?

10  A.   Yes.

11  Q.   Okay.  And then I also asked you to confirm for me that

12  you had not disclosed an opinion whether my client had ever

13  suffered from PTSD, and your answer to that one is:  "That's

14  right, too," correct?

15       Without looking at your deposition, sir, just

16  that's -- that's a correct statement.  In your report you also

17  did not offer any opinion that my client never suffered from

18  PTSD, correct?

19  A.   Correct.

20  Q.   So your opinion is because you didn't find valid evidence

21  of PTSD, not that she doesn't have it, correct?

22  A.   Well, those are one and the same.  And the standards in

23  my field are such that it's not as likely for someone to say,

24  this person does not have a diagnosis.  Instead we would be

25  more likely to say there is no evidence, there's no valid

————B. R. v. F.C.S.B.————

117

1  evidence of that diagnosis.

2  Q.   Well, we'll go through it.  When you say, "no valid

3  evidence," you're excluding thousands of pages of medical

4  records you reviewed that have tens, if not scores of

5  diagnoses of PTSD.  That, in your mind, is not valid evidence,

6  correct?

7  A.   Correct.

8  Q.   Okay.  And we'll go through those in a little bit.

9       Let's just talk about your involvement in the case.

10  You were retained by counsel for the defendants in this case,

11  correct?

12  A.   Yes.

13  Q.   Your engagement and your work and your -- everything

14  you've done is specific to that engagement, correct?

15  A.   Yes.

16  Q.   There was no time where you were acting as a healthcare

17  provider to my client, correct?

18  A.   Correct.

19  Q.   She did not choose to come to see you as someone to treat

20  her, correct?

21  A.   Correct.

22  Q.   You are a clinical psychologist?

23  A.   Yes.

24  Q.   You are not a medical doctor?

25  A.   Yes.

Cross - DeRight

B.R. v. F.C.S.B.

118

1    Q.    You're not licensed to prescribe medication?

2    A.    Correct.

3    Q.    Ms. Rewari asked you some questions and showed you a

4    slide about being a clinical psychologist and a forensic

5    psychologist.  Do you remember that?

6    A.    Yes.

7    Q.    Okay.  So a clinical psychologist is one who is -- when

8    you're acting as a clinical psychologist, you or anyone else,

9    you are providing care and treatment to your patients,

10   correct?

11   A.    Yes.

12   Q.    Okay.  And that's not what you did here?

13   A.    Correct.

14   Q.    And when you're a forensic psychologist, you are either

15   hired by a court, but in this case, hired by one of the

16   parties to the litigation to provide opinions related to the

17   litigation, correct?

18   A.    Yes.

19   Q.    And most of -- although you do both in your practice, you

20   do both clinical and forensic psychology, most of your income

21   comes from the forensic psychology side?

22   A.    Yes.

23   Q.    Okay.  Your first involvement in the case was May 2023;

24   does that sound right?

25   A.    Yes, that sounds right.

─────B.R. v. F.C.S.B.─────

119

1   Q.   Okay.  You were given -- by counsel you were given a set

2   of documents to review.  You went through that with

3   Ms. Rewari, right?

4   A.   Yes.

5   Q.   And you listed those in your report, correct?

6   A.   Yes.

7   Q.   And I think you testified to this.  There were about -- I

8   think you said over 5,000 pages of medical records?

9   A.   Yes.

10  Q.   You actually told us you reviewed them all.  Do you

11  remember that?

12  A.   I do.

13  Q.   Took no notes on them, right?

14  A.   Correct.

15  Q.   You reviewed them in a matter of -- I think we went

16  through your deposition -- a few hours; is that what we came

17  up to?

18  A.   I think it was more than a few hours.

19  Q.   How many?

20  A.   I don't recall.

21  Q.   But it's 5,000 pages you went through one by one?

22  A.   There is -- when you're looking at a lot of medical

23  records in a case like this, and I do very routinely, you get

24  a very good sense of what pages are going to be relevant to

25  you and what are not.

────────B.R. v. F.C.S.B.────────

                                                                    120

 1              For example, in looking through a medical record, if

 2      you've ever gone to the doctor, you have probably seen -- you

 3      might have gone just to get some blood work and you have

 4      30 pages of medical records, and that's because there's so

 5      much blanket information in there.

 6              So I get very good at scrolling through that

 7      information and stopping at things that are relevant to me.

 8      So it's not as though I sit and look at every page for five

 9      seconds, but I do review every page.

10      Q.   You would have certainly honed in on the pages where

11      there were diagnoses of PTSD made of my client, right?

12      A.   Yes.

13      Q.   Those would be, as you described them, relevant?

14      A.   Sorry?

15      Q.   Are those relevant?

16      A.   Are those relevant?

17      Q.   You said you looked for the relevant pages.  Does that

18      meet the Dr. DeRight definition of relevant?

19      A.   Sure.

20      Q.   Okay.  You were provided some, a very small set of

21      records that predated 2012.  Do you agree with that?

22      A.   Yes.

23      Q.   Okay.  And those were in the form of pediatric records

24      from Dr. Weaver; is that right?

25      A.   That sounds correct.  I don't remember exactly.

────────────────────────────────────────────────────────────

─────B.R. v. F.C.S.B.─────

                                                                    121

1   Q.   Well, do you have your -- let me hand you something that

2   maybe it will help you refresh your recollection.

3              MR. BRENNER:  May I approach, Your Honor?

4              THE COURT:  You may.

5              MR. BRENNER:  Your Honor, can I publish this part

6   of -- for demonstrative -- part of his records reviewed?

7              THE COURT:  Let me ask you this:  Are you going to

8   offer it or do you just want to be able to use as a reference

9   point for the --

10             MR. BRENNER:  Just a reference point as a

11  demonstrative.

12             THE COURT:  You may.

13             MR. BRENNER:  May I publish?

14             THE COURT:  You may.

15             (Exhibit published.)

16  BY MR. BRENNER:

17  Q.   You see that's on page 2.  Scroll down.

18             Do you see that's on page 2?

19             MR. BRENNER:  Take that down for a second, please.

20  BY MR. BRENNER:

21  Q.   Okay.  You see on page 2 there's medical records and

22  school records?

23  A.   Yes.

24  Q.   And they appear to be in -- well, if you could take a

25  look at them and confirm for me that the only records you

——————B. R. v. F.C.S.B.——————

122

1   received that were -- that predated 2012 were the Herndon

2   Family Medicine, which I think the jury heard was Dr. Weaver.

3   Do you see that?

4   A.   Yes.

5   Q.   And there was a single -- well, a single entry for a

6   radiology report in 2009.  Do you see that?

7   A.   Yes.

8   Q.   All the other records are from 2012 forward, right?

9   A.   All the other medical and school records, yes.

10  Q.   Yeah, I'm focused on that.  Agree.

11         Now, those records -- before 2012, in your review of

12  the records that were provided to you, there is no mention of

13  or no diagnoses of PTSD, is there?

14  A.   Not to my knowledge.

15  Q.   Right.  And then starting in 2012, there's lots of

16  diagnoses of PTSD; is that a fair statement?

17  A.   Yes.

18  Q.   Let's walk through some of those.

19         MR. BRENNER:  By the way, before I do, these folks

20  that are listed -- are we going to bring up just what we need

21  to bring up.

22  BY MR. BRENNER:

23  Q.   Okay.  Go to the next page.  But if you take a look at

24  all of these folks until the last few, which are other expert

25  witnesses, these are all healthcare providers whose sole job

───B.R. v. F.C.S.B.───

123

 1  it was was to provide care and treatment to B████, correct?

 2  A.   I believe so.

 3  Q.   They are not acting in a forensic or a litigation role,

 4  correct?

 5  A.   Right.

 6  Q.   Their job was to care for her, correct?

 7  A.   Yes.

 8  Q.   You don't dispute that that's what they were doing,

 9  right?  They were providing care and treatment to her,

10  correct?

11  A.   I have no reason not to believe that.

12  Q.   Right.  You don't suggest that any of these healthcare

13  professionals were doing anything out of -- for secondary

14  gain, meaning for litigation or anything else, correct?

15  A.   I have no reason to believe that.

16  Q.   Right.  They are just doing their best to provide the

17  care and treatment they can, correct?

18  A.   I don't know about that.  I have no reason to believe

19  that they weren't.

20  Q.   No reason to believe that they weren't.

21       In fact, you believe it's a solemn commitment for

22  all healthcare providers to use their best judgment to act in

23  what they believe is in their patient's best interest?

24  A.   Yes.

25  Q.   That includes prescribing them care that they believe

B.R. v. F.C.S.B.

124

1   they need, correct?

2   A.   Yes.

3   Q.   And not prescribing them care that they believe they

4   don't need, correct?

5   A.   Yes.

6   Q.   Okay.  Many of these providers -- you can take that down,

7   please.

8           Many of these providers saw B███ for a period of

9   years, right?

10  A.   I believe that's true.

11  Q.   Some of them saw her in an inpatient hospital setting?

12  A.   I don't remember that specifically.

13  Q.   You don't?  Okay.  What about in an outpatient intensive

14  care situation where she would go to a facility every day?

15  A.   I believe so.

16  Q.   Do you remember -- you don't remember any in-residence

17  facilities?

18  A.   I'm not saying it didn't happen.  I just don't recall it

19  off the top of my head.

20  Q.   Let's start with the earliest.

21          MR. BRENNER:  Your Honor, may we publish already in

22  evidence 457B at page 19?

23          THE COURT:  You may.

24          (Exhibit published.)

25  BY MR. BRENNER:

─── B.R. v. F.C.S.B. ───

125

1   Q.   So this is from Dr. Weaver.  Do you see that?

2   A.   Yes.

3   Q.   March 15, 2012.  Do you see that?

4   A.   Yes.

5   Q.   And notes and assessment of acute post-traumatic stress

6   disorder, right?

7   A.   Yes.

8   Q.   That's acute PTSD, right?

9   A.   Yes.

10  Q.   Let's go on.

11          MR. BRENNER:  If we can publish 472B at page 22.

12  BY MR. BRENNER:

13  Q.   This is from Children's National Hospital.  Do you see

14  that?

15  A.   Yes.

16  Q.   One of the records you reviewed?

17  A.   Yes.

18  Q.   Or one of the sets of records, I should say, correct?

19  A.   Yes.

20  Q.   And the diagnosis there is of PTSD, correct?

21  A.   Yes.

22  Q.   That's in March 2012, correct?

23  A.   Yes.

24  Q.   Let's go to 458B at pages 5 to 6.

25          MR. BRENNER:  Your Honor, do I have standing

—————B.R. v. F.C.S.B.—————

126

1   permission to publish these?

2          THE COURT:  Yes.  Anything that's in evidence you

3   can publish.

4          MR. BRENNER:  Thank you.

5          (Exhibits published.)

6   BY MR. BRENNER:

7   Q.   That's from the Inova Kellar Center.  Do you remember

8   that one in June of 2012?

9   A.   Yes.

10  Q.   And that, too, is a diagnosis of post-traumatic stress

11  disorder?

12  A.   Yes.

13  Q.   Let's go to November 2012.  It's 461B, at page 1.  This

14  is also a diagnosis of post-traumatic stress disorder meeting

15  the full DSM criteria for the disorder.  Do you see that?

16  A.   Yes.  I'm not sure you want to --

17  Q.   You're not sure of what?

18  A.   I'm not sure you want to publish this one, but --

19  Q.   Well, let me ask you a question.

20         MR. BRENNER:  You can take that down for a second.

21         THE WITNESS:  Sorry, I just wanted to protect the

22  name.

23         MR. BRENNER:  That's okay.

24  BY MR. BRENNER:

25  Q.   The DSM -- your testimony was that the DSM is a way for

B.R. v. F.C.S.B.

127

1  psychiatrists and psychologists to communicate with each

2  other.  That's what you said, right?

3  A.   Yes.

4  Q.   The DSM is actually the diagnostic bible, so to speak,

5  for diagnosing psychiatric and other mental and personality

6  disorders, correct?

7  A.   I do not view it as a bible.  In the -- in the DSM there

8  are criteria that can be used, and what I mean by a shared

9  language is that if I say someone has major depressive

10  disorder, someone else will know what that means because of a

11  certain type of symptoms that are present, but it is by no

12  means a checklist, and there is actually something in the very

13  front of the DSM that cautions against this in forensic cases

14  and says essentially that the DSM-5 is not to be used in legal

15  situations as a checklist.

16  Q.   Right.  Exactly.  That's my point.  What the DSM is

17  used -- is it's used by clinicians providing care and

18  treatment to patients to diagnose conditions such as PTSD,

19  correct?

20  A.   Yes.

21  Q.   Okay.  That is how the diagnose -- so, for example, if we

22  can bring up 476B at page 9.  It's a record from

23  December 2012.

24         So you see where it says PTSD?

25  A.   Yes.

Cross - DeRight

————B. R. v. F.C.S.B.————

128

1   Q.   And then what does it say on the left there next to PTSD?

2   A.   DSM-4 code 309.81.

3   Q.   If you went in the DSM-4 -- and just so the jury

4   understands, you testified to this a bit, the DSM is updated

5   and changed over time, right?

6   A.   Yes.

7   Q.   Are we 5-TR or 6 at this point?

8   A.   5-TR.

9   Q.   That means what happens, just to clarify the

10  nomenclature, the DSM, it starts at DSM, let's say, 1, and

11  then there's a period before there is a full DSM-2, which will

12  become DSM-1-TR, right?

13  A.   Typically.  Not always in that order.

14  Q.   Typically.  Not always as TR.

15           At this point, in 2012, the applicable DSM was

16  DSM-4?

17  A.   Yes.

18  Q.   And that 309.81, if you would go into the DSM-4, you

19  would see the diagnostic criteria for diagnosing DSM --

20  diagnosing PTSD, correct?

21  A.   Yes.

22  Q.   So that's what goes into medical records.  That's how

23  clinicians do it.  When clinicians diagnose PTSD, they go to

24  the DSM; they administer the DSM in clinical setting, and they

25  make a diagnosis or make a nondiagnosis?

─────────B. R. v. F. C. S. B.─────────

129

1   A.   In an ideal world, that is what would happen.  I can tell

2   you with very strong confidence that does not happen in every

3   case.

4   Q.   You have no reason to believe, as we go through these

5   medical records, that these physicians did not do what their

6   records said they did.  You have no basis for that; correct?

7   A.   Correct.

8   Q.   So this one is another DSM diagnosis of PTSD, correct?

9   A.   Correct.

10  Q.   You have the DSM in your office, don't you, sir?

11  A.   Yes.

12  Q.   You use it in clinical practice regularly, don't you?

13  A.   Not so much.  Usually, what I'm using is called the ICD,

14  the International Classification of Diseases.  That's what we

15  use for billing insurance.  That's one of the problems, in

16  looking at medical records and saying that a diagnosis is

17  there, because if someone comes in and they tell me they have

18  a concussion, what I'm going to put down on their medical

19  record for the billing diagnosis is concussion.  It doesn't

20  mean they had a concussion, but that's what I'm seeing them

21  for.

22       And sometimes it is more straightforward in the

23  medical records, saying, Here's what I diagnosed them with,

24  but not always.  And that's why the -- just looking at records

25  and saying, Was the diagnosis there, is fallible because they

Cross - DeRight

B.R. v. F.C.S.B.

130

1    don't usually go through in a systematic way and say they have

2    this criteria, this criteria, and this criteria.

3    Q.   Doctor, let's be clear here:  You know how medical

4    records work.  There's a section on the top called usually

5    "subjective" or "history," correct?

6    A.   Sometimes.

7    Q.   Typically, right?

8    A.   Sometimes.

9    Q.   Okay.  And that's what the patient reports to the doctor,

10   what he or she is experiencing, correct?

11   A.   Yes.

12   Q.   And there is something called "objective," where they go

13   through and, for example, if the patient says I -- I hurt my

14   leg, they may take an X-ray.  That's objective testing, right?

15   A.   Yes.

16           MR. BRENNER:  You can keep that up, please.

17   BY MR. BRENNER:

18   Q.   And then there's assessment or diagnosis, right?

19   A.   Yes.

20   Q.   And in other words, there's a clinical impression.  This

21   is not -- the clinical impression is not, I, as the doctor,

22   someone told me something, I just wrote it down.  This is the

23   physician's clinical impression, what they determined the

24   patient was suffering, correct?

25   A.   Right.

—B.R. v. F.C.S.B.—

131

1   Q.   Okay.

2   A.   Could you show me the objective section on that record,

3   for example.

4   Q.   I can probably dig it up if I can.  I can't promise

5   because I don't have it in hard copy in front of me.

6          Let's go on to the next one, which is 444B at

7   page 33.

8          Again, this is A under the primary diagnosis and the

9   orders are post-traumatic stress disorder.

10          Is that a DSM code, or do you not know?

11  A.   Yes.

12  Q.   So this doctor diagnosed PTSD pursuant to the DSM, right?

13  A.   As well as well-child exam, yes.

14  Q.   You are capable, in your clinical practice, you have the

15  expertise and the professional ability to make diagnoses

16  pursuant to the DSM, don't you?

17  A.   Yes.

18  Q.   You had a choice in this case whether to make a DSM

19  diagnosis or not.  That was solely up to you, right?

20  A.   There was not evidence of a DSM diagnosis.  I had no

21  diagnosis to make.

22  Q.   Sir, listen to me.  Ms. Rewari asked you who decided

23  which test to run.  Do you remember that?

24  A.   Yes.

25  Q.   And you ran a series of tests, right?

—B.R. v. F.C.S.B.—

132

1   A.   Yes.

2   Q.   You had her counting dots, right?

3   A.   Yes.

4   Q.   You had her doing math, right?  You had her trying to

5   memorize words?

6   A.   Yes.

7   Q.   You did not do, and you did not demonstrate that you did

8   a DSM clinical analysis, right?

9   A.   That's completely incorrect.

10  Q.   So can you -- do you have your report in front of you?

11  A.   I don't believe I do.

12  Q.   Okay.  Is it your testimony that in your report you

13  believe there's a DSM diagnosis listed?

14  A.   No, that's not what you said.

15  Q.   You didn't do -- you didn't do a DSM evaluation.  You did

16  an evaluation by doing validity testing on certain other

17  tests; is that correct?

18  A.   The buck stopped at the validity testing because it was

19  so obviously invalid that there was no diagnosis to make.  If

20  you asked me to make a determination if my tie is green, I

21  might not have said the tie is not green, but I might say

22  there's ten tests that is showing that the tie is not green;

23  therefore, there's no evidence that the tie is green.

24  Q.   We'll get to those tests in a minute.  Just see if you

25  can answer my question, please.

─────────B.R. v. F.C.S.B.─────────

133

1          You did not do -- DSM provides a way to test for

2     PTSD, you did not do that test.

3     A.   The DSM does not provide a way to test for PTSD.

4     Q.   Let's go to 452B at page 3.  That's from 2015 from the

5     Ramapo Ridge Psychiatric Hospital.

6          Do you see that?

7     A.   Yes.

8     Q.   And that also is a under -- not -- under diagnosis.

9     That's the discharge diagnosis by the physician.

10    Post-traumatic stress disorder, correct?

11    A.   Yes.

12    Q.   480B at page 2, please.  That's from -- do you see the

13    date there, Doctor?

14    A.   Yes.

15    Q.   2016, right?

16    A.   Yes.

17    Q.   So we're just going forward in date.  That's also a

18    diagnosis of PTSD, correct?

19    A.   Yes.

20    Q.   If we go to 2017, the next record is 450B at 18, 19.

21         Again, a diagnosis of chronic post-traumatic stress

22    disorder, yes?

23    A.   That's what it says, yes.

24    Q.   Okay.  If we go to 2018 that's 497B at page 19.

25         Again, "assessment" is another word for diagnosis,

B.R. v. F.C.S.B.

134

1  right?

2  A.   Yes.

3  Q.   And there, they're using what you like to use, which is

4  the ICD, right?

5  A.   Yes.  That's what's more commonly used in medical

6  practice.

7  Q.   The ICD diagnosis here under 43.10 is PTSD?

8  A.   Yes.  The F stands for psychiatric condition.  The ICD

9  uses different letters.  For example, medical conditions like

10  an endocrine disorder or a neurological disorder would have a

11  different letter associated with it.  So F43.10 is

12  post-traumatic stress disorder.

13  Q.   Under the DSM, right?  That's the number, that's the

14  current DSM number.

15  A.   That's the ICD number that's listed in the DSM.

16  Q.   That's listed in the DSM?

17  A.   Correct.

18  Q.   If we can go to 471B and 479B.  Just to bring the records

19  up side-by-side.

20         Again, two more diagnoses of post-traumatic stress

21  disorder using those same codes.

22  A.   Yes.

23  Q.   If we go to 455B at page 1.  Diagnosis under

24  post-traumatic stress disorder?

25  A.   Yes.

─────B.R. v. F.C.S.B.─────

135

1    Q.   In 2018 it looks like, right?

2    A.   Yes.

3    Q.   If we go to 2020, which is 427B at 10.  Again, under the

4    section, which is the A we talked about, the assessment, not

5    the history.  The psychiatric diagnosis is PTSD?

6    A.   Yes.

7    Q.   Okay.  Let's go to 2021, which is 475B at 3.  Again,

8    post-traumatic stress disorder using the DSM code, correct?

9    A.   Yes.

10   Q.   If we go to 449B at 2, that's the diagnosis

11   post-traumatic stress disorder.  We're now in 2022.

12   A.   Yes.

13   Q.   It looks like the DSM has gone to the next edition

14   because the code is now 43.12, right?

15   A.   Correct.

16   Q.   Again, pursuant to the DSM, correct?

17   A.   That's the ICD code, but yes.

18   Q.   So we went through, at least at my count, about 17

19   providers or hospitals or facility of where my client was

20   diagnosed with PTSD, correct?

21   A.   Yes.

22   Q.   You were not offering any opinion that any of those

23   doctors misdiagnosed her?

24   A.   I have no reason to believe that, no.

25   Q.   No reason to believe that any of them misdiagnosed her,

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

136

1    correct?

2    A.   No.  I don't have a reason to believe they misdiagnosed

3    her, but I do have a reason to believe that they might not

4    have comprehensively diagnosed.

5             And what I didn't see on any of those that you

6    showed me was any objective information, even a short

7    checklist that's often given in clinical situations called the

8    PCL-5; I didn't even see any assessments with that in there.

9    So I didn't see any objective information.

10   Q.   Let's look at your deposition, page 15, line 7.

11            "In your report, you disclosed no opinion whether

12   any of those doctors misdiagnosed my client in any way,

13   correct?"

14            Your answer was "Correct."

15   A.   Correct.

16   Q.   Now, those physicians also -- many of them also prescribe

17   medications, correct?

18   A.   Yes.

19   Q.   And you have no -- you offer no opinion that any of those

20   doctors inappropriately prescribed any of the medications to

21   her, correct?

22   A.   Correct.

23   Q.   And many of those medications were for her PTSD symptoms,

24   correct?

25   A.   Presumably.  They were given when she was diagnosed with

B.R. v. F.C.S.B.

137

1  PTSD.

2  Q.   Now, not a single one of the treating health

3  professionals in the 5,000 pages you went through -- not any

4  one of those made a finding, assessment, diagnosis, that B▮▮▮

5  was feigning her PTSD, correct?

6  A.   Not explicitly, no.

7  Q.   Not in any way.  You're -- you went through all these

8  records.  You're the only person that has come up with the

9  opinion that B▮▮▮ is feigning or malingering her PTSD.  That

10  is a correct statement, correct?

11        MS. REWARI:  Objection.  Argumentative.

12        THE COURT:  Overruled.

13  BY MR. BRENNER:

14  Q.   That's a correct statement, Doctor.

15  A.   I am the only person that gave systematic and

16  well-validated, objective measures to determine her --

17  validity of her responses.  So, yes, I'm the only person that

18  found that.

19        But I will say, at least one of the records that you

20  showed me where she was diagnosed with PTSD, she was being

21  treated for nonepileptic seizure.  That is a disorder that can

22  be seen in people that are having severe psychiatric symptoms,

23  where they appear to have a seizure, but it also is commonly

24  found in people that are mimicking or feigning a seizure.

25  Q.   Just so we have a clean answer for the record.  You're

─B.R. v. F.C.S.B.─

138

1    the only doctor --

2            THE COURT:  That's argumentative.

3    BY MR. BRENNER:

4    Q.   You're the only doctor that came up with a -- an opinion

5    that B███ was malingering or feigning her PTSD, correct?

6            MS. REWARI:  Objection.  Asked and answered.

7            THE COURT:  Overruled.

8            Yes or no, sir.

9            THE WITNESS:  Yes.  I'm the only one that looked for

10   and found it.

11   BY MR. BRENNER:

12   Q.   You did so in the context of being retained to give

13   forensic opinions by the counsel for the defendants, correct?

14   A.   Yes.

15   Q.   Now, I want to talk about your comprehensive evaluation

16   as you put it, in direct examination, okay?

17   A.   Yes.

18   Q.   To be clear, there was a little bit of confusion, but

19   let's be clear.  You did not -- as far as speaking to my

20   client in the forensic interview -- well, let me ask you this.

21   We'll do it this way.  Look at your -- let me hand you one

22   more thing.

23            MR. BRENNER:  May I approach?

24            THE COURT:  You may.

25            MR. BRENNER:  Permission to publish, just again as

─────B.R. v. F.C.S.B.─────

139

1    demonstrative, it's the doctor's invoice for his work through

2    July of 2023.

3                THE COURT:  Which doctor?

4                MR. BRENNER:  For the doctor's work through July

5    2023.

6                THE COURT:  You can publish.

7                (Exhibit published.)

8    BY MR. BRENNER:

9    Q.   So you were -- as we went through before, you were

10   retained to do a forensic evaluation in or about May 2023,

11   right?

12   A.   Yes.

13   Q.   You meet with my client on June 26th.  Do you see that?

14   A.   Yes.

15   Q.   Okay.  And the June 26th entry is broken down into

16   separate entries.  There's a five-hour entry and a two-hour

17   entry.  Do you see that?

18   A.   Yes.

19   Q.   Now, before you meet with her, you meet with the -- when

20   it says, "Consultation with attorneys," is that consultation

21   with the attorneys who retained you to offer your opinions in

22   this case?

23   A.   Yes.

24   Q.   Okay.  And that's the attorneys for the School Board?

25   A.   Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross - DeRight

B.R. v. F.C.S.B.

140

1    Q.    Okay.  So before you meet with B████, you have four

2    meetings with the attorneys, right?

3    A.    Yes.

4    Q.    You meet with them on May 3rd, right?

5    A.    Yes.

6    Q.    May 10th --

7    A.    Yes.

8    Q.    -- right?  May 26th?

9    A.    Yes.

10   Q.    And May -- and June 15th?

11   A.    Yes.

12   Q.    And then you actually meet with them again on the date of

13   your -- your sole meeting with B████, right?

14   A.    Yes.

15   Q.    Okay.  Now, the meetings with the attorneys, or at least

16   the first two are before you reviewed any records, correct?

17   A.    Yes.

18   Q.    And the next two are after you reviewed records for an

19   hour and a half, right?

20   A.    Yes.

21   Q.    So if we go down one more line where it says, "Forensic

22   eval interview," you testified to this on direct.  Your

23   interview of plaintiff was two hours, not seven hours,

24   correct?

25   A.    Correct.

Cross - DeRight

B.R. v. F.C.S.B.

141

1    Q.   And it was broken down into two separate pieces.  There

2    was a piece on the front end, meaning at the beginning of the

3    evaluation that you said lasted about an hour?

4    A.   Yes.

5    Q.   So fair to say the second one lasted about an hour too?

6    A.   That's right.

7    Q.   In-between there, the five hours, the bulk of it

8    consisted of her doing a bunch of self-administered tests,

9    right?

10   A.   Yes.

11   Q.   So there you are not involved at all, right?  She's

12   either filling out a questionnaire or bubbling things.  That's

13   self-assessment.  She does those, correct?

14   A.   I'm involved in the sense that if she has questions about

15   any of the items, I can answer them, but, yes.

16   Q.   I don't mean that you abandoned her.  If she had

17   questions, you can answer them, but these are -- she's filling

18   out tests?

19   A.   Yes.

20   Q.   And then in that five hours you're also giving her some

21   tests or assessments, I'm not sure of the right word?

22   A.   Yes.

23   Q.   Then you meet with the attorneys again, right, about two

24   weeks later?

25   A.   Yes.

─────────── B.R. v. F.C.S.B. ───────────

142

1    Q.   Okay.  And then you do your -- what appears to be the

2    bulk of your record review?

3    A.   Yes.

4    Q.   And then you spent a bunch of time writing the report,

5    right?

6    A.   Yes.

7    Q.   You can take that down.

8              Now, I want to talk a little bit about the tests

9    that you did.

10             MR. BRENNER:  If we can bring back up -- was it

11   Defense 313?  Defense 313, Your Honor, may we publish?

12             THE COURT:  Is that in, Trish?

13             THE COURTROOM CLERK:  Yes.

14             THE COURT:  You may.

15             (Exhibit published.)

16   BY MR. BRENNER:

17   Q.   So WAIS-IV, right, is an IQ test?

18   A.   Yes.

19   Q.   Okay.  There is not a score a person can get on the

20   WAIS-IV good or bad, medium, indifferent, that would lead to a

21   diagnosis of PTSD, correct?

22   A.   One essential component of a diagnosis of PTSD is

23   problems with concentration and thinking, and so measuring

24   thinking abilities are an important part of that process.

25   Q.   Let me ask the question again.

B.R. v. F.C.S.B.

143

1          If the test you give is an IQ test, that is not

2   going to tell you whether the person has PTSD in and of

3   itself, correct?

4   A.   Correct.

5   Q.   Okay.

6   A.   There's not a single test in the world that can tell you

7   whether someone has PTSD.

8   Q.   Right.  Because it is your position that clinical

9   physicians trained in and using the DSM is not a way to

10  diagnose PTSD, correct?

11  A.   That's not a test.

12  Q.   Well, it's a way to diagnose PTSD, correct?

13  A.   That's different.

14  Q.   Is it?

15  A.   It is not a test.

16  Q.   I asked, is it a way to diagnose PTSD?

17  A.   Yes.

18  Q.   Okay.  The next test is the SCOLP, S-C-O-L-P.

19          What does that stand for?

20  A.   Speed and comprehension of language processing.

21  Q.   Not a PTSD test, correct?

22  A.   I don't know what you mean by "a PTSD test."

23  Q.   It is not a test --

24          THE COURT:  Standing alone, is that a PTSD test?

25          THE WITNESS:  It's overly simplifying.  I'm afraid

Cross - DeRight

—B.R. v. F.C.S.B.—

144

 1    that if I give an answer, it is going to be inaccurate because

 2    one of the features listed in the DSM-5 is poor concentration,

 3    and this measures thinking speed, which is a symptom of PTSD

 4    in the DSM-5.

 5    BY MR. BRENNER:

 6    Q.   So at most, it is a test that could give you insight into

 7    a single symptom that goes into a diagnosis of PTSD; is that

 8    fair?

 9    A.   That's correct.

10    Q.   Okay.  The WRAT-5, what's that test?

11    A.   That's the wide range achievement test.

12    Q.   Okay.  And that one -- and you list word reading.  Is

13    that a reading comprehension or a reading speed test?

14    A.   Reading ability.

15    Q.   Reading ability test, okay.

16         The next one is NAB?

17    A.   Yes.

18    Q.   Okay.  NAB list learning trial?

19    A.   List learning test, Trial 1.

20    Q.   That's the one where the person recites back lists?

21    A.   That's where I read her a list of words, and she has to

22    tell me as many words as she remembers.

23    Q.   Memory test?

24    A.   Yes.

25    Q.   Okay.  Next one is the dot counting test.  That's where

Cross - DeRight

─B. R. v. F. C. S. B.─

145

1   you count a bunch of dots ranging from five to 30 dots on a

2   piece of paper?

3   A.   Correct.

4   Q.   NAB numbers and letters, that's -- is that a repeating of

5   numbers and letters?

6   A.   No, that's a test of speed of processing information and

7   accuracy, and then there's part of it where you have to do

8   multitasking.

9   Q.   Now, of all of the doctors that you saw that we went

10  through that diagnosed B███ with PTSD, you saw in the records

11  that they, at least according to their records, made a

12  DSM-based diagnosis, right?

13  A.   Yes, according to their records.

14  Q.   You didn't see any of them give an IQ test, correct?

15  A.   Correct.

16  Q.   You didn't see any of them give a SCOLP test, right?

17  A.   Yes.  No one did a comprehensive evaluation as I did.

18  Q.   Right.  None of them knew what they were doing.  They

19  didn't know what to look for, right?

20  A.   The evaluation was in a different context.

21  Q.   Yes.  It was in a clinical context where they're trying

22  to care and treat for -- it is not in the context of a person

23  acting as a forensic expert on the side of one side of a

24  lawsuit.

25  A.   I couldn't agree with you more.

B.R. v. F.C.S.B.

146

1   Q.   Sir, let me finish my --

2           THE COURT:  Wait a minute.  Both -- maybe,

3   Mr. Brenner, if you can slow down your pace and allow him to

4   answer.

5           MR. BRENNER:  Sure.

6   BY MR. BRENNER:

7   Q.   If you let me finish my question, one of the differences,

8   factually, one of the differences is those doctors we went

9   through -- we already established this -- were all there

10  solely to provide care and treatment for B████.  You were not

11  there to provide care and treatment for B████.  That's

12  correct, right?

13  A.   Yes.

14  Q.   Okay.  Another difference is those doctors were all

15  treating her outside the context of litigation.  Your

16  evaluation of her was solely within the context of litigation,

17  correct?

18  A.   I wouldn't say that that's a fair characterization.  She

19  was in potential ongoing litigation throughout most of these

20  meetings with her doctors.

21  Q.   So it's -- well, let's back up a bit.

22          You admit that your -- your involvement is solely in

23  litigation?

24  A.   Yes.

25  Q.   Okay.  Now, we went back all the way back to March of

1    2012, right?  You reviewed case documents in this case, right?

2    A.   Yes.

3    Q.   The lawsuit was filed what year?

4    A.   I don't remember.

5    Q.   You want to look at your report?  You don't have that

6    with you?

7         THE COURT:  I think we all agree when the lawsuit --

8    BY MR. BRENNER:

9    Q.   2019, right?  You can look at the bottom of your invoice

10   if you like.

11   A.   Okay.

12   Q.   In 2012 B███ is 12 years old?

13   A.   Yes.

14   Q.   Are you suggesting to this jury at 12 years old, when in

15   hospitalization and meeting with physicians, that she is

16   malingering her symptoms because she's going to bring a

17   lawsuit.  Is that your suggestion?

18   A.   I can't and wouldn't know.  What I can tell you that it

19   would not be unprecedented.  There's actually something called

20   "malingering by proxy" that happens when parents encourage

21   their children to tell symptoms.  I'm not saying it happened.

22   I'm saying it's a known condition that's possible.

23   Q.   I'm not concerned with what's possible.  You give a lot

24   of hypotheticals with Ms. Rewari.  You went through that whole

25   list of indicators or 12 of them.  You kept saying, I've seen

─B.R. v. F.C.S.B.─

148

1    cases of this; I've seen cases of that; it's possible this.

2          I want you to look at the jury and tell them it's

3    your opinion that 12-year-old B███ in hospitalization was

4    malingering her symptoms in 2012 because she was contemplating

5    a lawsuit.  Is that your opinion?

6    A.   My opinion is that there's no way to tell whether she

7    was.  It's not unprecedented for a child and/or a child

8    directed by their parent to do so.  It's not out of the

9    question.  It's in the malingering criteria that I was

10   discussing before.  It's a widely known phenomenon.

11   Q.   Another way to put that is you have no basis to make that

12   conclusion as to B███, correct?

13          MS. REWARI:  Objection.  Argumentative.

14          THE COURT:  Sustained.

15   BY MR. BRENNER:

16   Q.   Now, B███ is first person you've ever evaluated in the

17   litigation context who has claims to be the victim of sexual

18   violence and assault as a minor, correct?

19   A.   You asked me a very specific question on my deposition,

20   and you narrowed it down to that answer.  I believe it's a

21   little bit misleading.  I frequently see people who have had

22   sexual assault as a minor, but based on the question that you

23   narrowly asked me on the deposition, I believe that's true.

24   Q.   Let's look at what I asked you.  So the jury understands

25   what whether it was somehow misleading or narrow.  Page 44.

B.R. v. F.C.S.B.

149

1          "Let me make my question more clearer.  The number

2    is zero for amount of people that you have evaluated in the

3    litigation context that are bringing a lawsuit for alleged

4    sexual violence and assault when they were a minor?"

5          And your answer is "correct."

6    A.   You're going have to give me a minute to read the page

7    before that.

8    Q.   Page 44.

9    A.   I know, but I need to read the pages before it.

10         (A pause in the proceedings.)

11         THE WITNESS:  Okay.

12   BY MR. BRENNER:

13   Q.   Okay.  Now, you went through with Ms. Rewari a bunch of

14   test results and you --

15   A.   I'm sorry.  Did you want me to answer the question?

16   Q.   Did I read your answer?

17   A.   Oh, I meant "Okay" that I've read that part of my

18   deposition now.

19   Q.   Okay.

20   A.   Can you please repeat your question?

21   Q.   Let me refresh your recollection of your testimony.

22         If you would like the full context, we can start at

23   page 43.

24         "Doctor, as you sit here today, the extent of

25   individuals you have seen in the context of litigation or

─────B.R. v. F.C.S.B.─────

150

1  evaluation that claim sexual abuse as a minor is zero other

2  than my client" --

3  A.    I prefer you start on page 42.  Sorry to interrupt.  I

4  just don't want to give mischaracterizing testimony.

5              MR. BRENNER:  Your Honor, would you like me to read

6  pages of deposition.  I'm happy to.  It's not on this point,

7  but I'm happy to read many pages.

8              THE COURT:  What line do you want to start page 42

9  to presumptively give context to your response?  What line?

10             THE WITNESS:  Line 6.

11             THE COURT:  All right.  Start there.

12             MR. BRENNER:  All right.  So 42, lines 6 through 45,

13 line 5?

14             THE COURT:  That's fine.

15 BY MR. BRENNER:

16 Q.    (As read): "By the way --"

17             THE COURT:  Actually, let me stop you.  I'm sorry.

18             At this point, Mr. Brenner is going to read the

19 deposition into the record here.  It's not going to require

20 any response because he's going to purportedly provide your

21 answers.  After he does that, he may have a question for you.

22 And he'll let you know when he has a direct question for you

23 now.

24             THE WITNESS:  Thank you.

25             MR. BRENNER:  Page 42, line 6.

B.R. v. F.C.S.B.

151

1          "QUESTION:  Okay.  By the way, how many of these

2     evaluations have you done of in the context of litigation of

3     individuals who are alleging sexual assault?

4          "ANSWER:  I don't have an exact number on that.  Most

5     of the civil cases that I've deal" -- which I think means

6     dealt -- "that I've dealt with have not had anything to do --

7     have not had to do with sexual assaults.  There probably have

8     been some, but I don't know an exact number.  A lot of the

9     criminal cases that I've worked on involve someone as the

10    perpetrator of sexual assault.

11         "QUESTION:  But that's different because the

12    perpetrator would not be talking to you about their trauma,

13    right?

14         "ANSWER:  Yes, that's right.  But if you're talking

15    about trauma in general as you spoke of, then very, very

16    frequently, I'm doing evaluations of people who have endured

17    trauma.

18         "Okay.  I think it's fair, Doctor, that you understand

19    that, at least from my perspective, I'm going to treat the

20    alleged trauma of a young girl who claims she was viciously

21    and repeatedly sexually assaulted different than general

22    trauma?

23         "ANSWER:  Well, it depends on what you mean by

24    'general trauma.'  I have a great deal of patients, both

25    clinical and forensic, who have experienced physical assault

Cross - DeRight

B.R. v. F.C.S.B.

152

1  in some way and have had brain injuries related to them.  I

2  have people that have been around burning bodies in Iraq.  I

3  have a very large set of clinical data from patients that I

4  have seen to compare it to.  So I don't always have to have

5  seen that exact situation and that exact person in order to

6  make a clinical inference about.

7       "QUESTION:  Doctor, as you sit here today, the extent

8  of individuals as you have" -- excuse me.

9       "Doctor, as you sit here today, the extent of

10 individuals you have seen in the context of litigation or

11 evaluation that claims sexual abuse as a minor is zero other

12 than my client?"

13      "ANSWER:  That's correct.

14      "QUESTION:  Okay.  So when you make your comparison,

15 that is -- it's with that in mind, correct?

16      "ANSWER:  Well, I guess I should rephrase that.  There

17 are a lot of the criminal cases that I do in which people have

18 history of childhood trauma, and I do evaluations related to

19 that, so I think I may have misspoke saying it's zero.  I very

20 infrequently test with talking about someone's childhood

21 sexual abuse.

22      "QUESTION:  Let me make my question more clearer.  The

23 number is zero for the amount of people that you have

24 evaluated in the litigation context that are bringing a

25 lawsuit for alleged sexual violence and assault when they were

—B.R. v. F.C.S.B.—

153

1   a minor?

2          "ANSWER:  Correct.

3          "QUESTION:  The next thing you describe is --

4          You say, "Wait, I'm sorry.

5          "QUESTION: -- go to flashbacks --

6          And you said, "Did you say sexual assault or violence

7   assault?

8          "QUESTION:  Sexual.  Sexual assault and sexual

9   violence.

10         "ANSWER:  Okay.  That's correct.  Your answer stands,

11  yes."

12             Is that the context you wanted?

13             THE WITNESS:  Yes, thank you.

14  BY MR. BRENNER:

15  Q.   Now, when you did your -- those tests we went through,

16  the IQ and the memory test and the dot counting and the math

17  and the list from memory, you got scores that were indicative

18  of significant cognitive impairment, didn't you?

19  A.   No.

20  Q.   Okay.  And you say "no" because you found them invalid or

21  just the scores weren't indicative of cognitive impairment.

22  A.   Those are one and the same.  They were not valid scores

23  of cognitive impairment.  Therefore, the scores cannot be

24  considered impaired.

25  Q.   Putting aside the validity for a second?

─────B.R. v. F.C.S.B.─────

154

1    A.   I can't do that.

2    Q.   Okay, Doctor.  Putting aside the validity for a second,

3    The scores themselves were indicative of significant cognitive

4    impairment, right?

5    A.   I can't just put aside the validity.  That's not how the

6    testing is done.

7    Q.   For example, B▇▇▇ was worse than 90 percent of her peers

8    on reading comprehension speed, correct?

9    A.   This is like you saying ignore the health code violation.

10   Did the food taste good?  You can't separate them like that.

11   Q.   Food can taste good, and there still could be a health

12   code violation, right?

13          So you're unable to answer the question whether the

14   scores on your test were indicative of cognitive impairment.

15   A.   The scores she produced on the test in an assessment that

16   produced valid results would have been in the impaired range.

17   Q.   Same for her nonverbal problem solving ability, correct?

18   A.   I believe so.

19   Q.   Same for her -- excuse me.

20          If we can bring that back up for a second, the

21   D-313.

22          So you went through a bunch of the scores.  If you

23   could just highlight the column that says "percentile rank."

24   All the way down.

25          So you would agree with me that on some -- on some

B.R. v. F.C.S.B.

155

1    measures, B████'s was scored quite favorably to her peers,

2    some she scored in what you call the bell curve, and some she

3    scored well below.

4    A.    I answered this more directly in a previous page of my

5    report, if I can direct you to that.

6    Q.    Why don't you answer my question.  Just looking at the

7    numbers, do you agree with me -- because you didn't go through

8    all of them.  There's scores that she is -- she is doing well

9    above her peers, correct?

10   A.    Yes.

11   Q.    And there's scores that she's doing well below her peers;

12   right?

13   A.    Yes.

14   Q.    And there's scores that she's within what you described

15   as the bell curve, which I thought you said was between 25 to

16   75 percentile?

17   A.    The whole thing is on the bell curve.  That's in the

18   average range.

19   Q.    25 to 75 is in the average range?

20   A.    Yes.

21   Q.    So it's not that B████ came in and just sort of failed

22   all these tests and had low scores across the board, right?

23   She was like human beings are?  She was a mixed bag, right?

24   A.    No.  This is just not the product of someone who is just

25   a mixed bag of test results.

B.R. v. F.C.S.B.

156

1  Q.   That's where you've used, in part, your clinical

2  judgment, correct?

3  A.   No, sir.  I've used standardized measures that have

4  manuals with numbers that I can look at and say this score

5  means it's not valid.  This score means it's not valid.

6  Q.   So your malingering opinion is based, in part, on your

7  clinical judgment; is that correct?

8  A.   In part, yes.

9  Q.   Clinical judgment is a subjective judgment as opposed to

10 what you kept pointing to, the scoring system?

11 A.   It's a systematic clinical judgment that is much more

12 than just saying I reviewed the totality, and I think it was

13 fine.

14 Q.   That's not what I said.  I just want you to confirm for

15 me that you imported your own clinical judgment.  It's not, as

16 you said, it's not just a checklist.  You, Dr. DeRight, as a

17 forensic expert on behalf of the defendants, imported your own

18 clinical judgment in reaching the malingering opinion,

19 correct?

20         MS. REWARI:  Objection.  Argumentative.

21         THE COURT:  Overruled.  He can answer if he can.

22         THE WITNESS:  I administered several well-validated

23 measures of both cognitive testing and performance validity

24 consistent with the standards in my field, and I interpreted

25 them within the guidelines of the manuals, which the tests

1    were derived from in a systematic way such that another

2    neuropsychologist could look at same score and make the same

3    determination.

4    BY MR. BRENNER:

5    Q.    What you did is you took the scores from the actual raw

6    scores, and then you imported your own clinical judgment to

7    reach your malingering opinion?

8    A.    That's false.

9    Q.    Okay.  Let's look at your deposition again.  Page 208,

10   line 13.

11            And then in the --

12            "QUESTION:  And then in the interpretation is where

13   you are telling me that clinical judgment comes into play?

14            "ANSWER:  Correct, and indications for the manual.  So

15   in certain tests, the test manual will say, this is a higher

16   low score, and then the psychologist's job is to take all that

17   information together and say, what does this mean.  So on a

18   test level and an overall level.

19            "QUESTION:  So what happened here is you got -- as a

20   result of the testing, you got a set of scores because it was

21   several tests, right?

22            "ANSWER:  Yes.

23            "QUESTION:  And then from those scores you determine

24   that they were" -- and I struck the first part of that

25   question.

B.R. v. F.C.S.B.

158

1          I said, "From those scores in your validity testing,

2     you determined that the results were not valid because my

3     client was malingering?"

4     Your answer:

5          "ANSWER:  Well, they're -- they're not valid

6     regardless of why, and my clinical termination is that it also

7     indicates that she was malingering.  But aside from the -- but

8     aside from that determination, in my opinion, she was

9     malingering -- excuse me -- the results are not valid."

10          Did I read that correctly?

11    A.   You did.  Again, you missed the part right before that

12    where I talked about how the scores could be consulted in the

13    manual, and that any psychologist could interpret it, which is

14    consistent with my testimony here today.

15    Q.   Right.  Two prongs.  One, you say that scores can be

16    interpreted by the manual, and two, there's a clinical

17    judgment that you yourself imported?

18    A.   Of course.  But what I also said in that answer is that

19    ultimately the clinical judgment doesn't matter.  The results

20    were invalid, regardless of the clinical judgment piece.

21    Q.   Now, you went over with Ms. Rewari this idea that there

22    are certain questions that are either standalone validity

23    questions or embedded validity questions that will be multiple

24    within the test, right?

25    A.   There are standalone measures, not just single questions,

─────B.R. v. F.C.S.B.─────

159

1    but, yes.

2    Q.    Right.  It could be a single question, or it could be

3    several questions?

4    A.    No.

5    Q.    Okay.  You -- when I asked you to provide me with any

6    examples of questions to demonstrate the lack of validity, you

7    told me you couldn't do that, right?

8    A.    Correct.

9    Q.    And the reason you said you couldn't do that was that,

10   one, it was copyrighted?

11   A.    Yes.

12   Q.    And two, that you thought that the jurors could be

13   misled.  If they actually saw the things you were relying on,

14   that could be misleading to them.  Do you remember that?

15   A.    Yes.

16   Q.    Okay.  You said that one of the reasons you found that

17   B▮▮▮  failed the validity test is that she exaggerated certain

18   symptoms.  Do you remember that?

19   A.    Not specifically.  Could you direct it to me, please?

20   Q.    Well, that she was exaggerating the severity of her

21   symptoms.  Do you not remember that?

22   A.    Yes, I remember that.

23   Q.    And that was your opinion?

24   A.    Yes.

25   Q.    And when asked to provide a single example of a symptom

Cross - DeRight

B.R. v. F.C.S.B.

160

1    that she exaggerated, you said you can't do that, right?

2    A.    Yes.

3    Q.    For the same reason no one can check your work because

4    it's -- let me rephrase that.

5          You can't do it because you feel that you're limited

6    in the ability to share it because of copyright?

7    A.    Yeah.  The reason you rephrased your question is because

8    there is a way to do that, and it's by hiring an expert on

9    your side to review it.

10   Q.    Okay.  You refused to provide a single example of a

11   question or an answer to a question that demonstrated that she

12   was exaggerating the severity of her symptoms, correct?

13   A.    Correct.  There are ethical guidelines in my field that I

14   have to follow, and one of them is not disclose protected

15   information from people who are not qualified to interpret it.

16   Q.    This was also -- you covered this with Ms. Rewari.  One

17   of the reasons you found that B███████ answers were not valid

18   is because she both overreported and underreported her

19   symptoms?

20   A.    Mostly overreported.  There was a little indication of

21   underreporting.  If that was the only thing that was there,

22   what I mean is if -- if everything else was normal and she had

23   a little bit of underreporting, that wouldn't have been

24   problematic.

25   Q.    But, again, you provided no examples of that, correct?

—B.R. v. F.C.S.B.—

161

1   A.   Of the individual test questions, correct.

2   Q.   Right.  Another criticism you had was that you said that

3   people with PTSD are not often -- they don't want to talk

4   about -- they are not forthcoming.  You remember testifying to

5   that?

6   A.   Characteristically, yes.

7   Q.   Right.  And so one of the bases of your opinion you

8   shared with us is that you found that B███ was too willing to

9   describe to you the severity of her symptoms and what she had

10  gone through, correct?

11  A.   That's one of those qualitative features that I noticed.

12  It wasn't part of my decision-making or determinations, but it

13  was something I noticed, yes.

14  Q.   You actually noted that as one of the bases in your

15  report, and Ms. Rewari asked you about it today.  Do you

16  remember that?

17  A.   Correct, and I believe earlier I said that it's more of a

18  qualitative thing that I consider, but it is not of paramount

19  importance such as that having that or not having that

20  wouldn't make or break --

21  Q.   But just so the jury understands what the basis of the

22  criticism is, B███ is in your office, correct?

23  A.   Yes.

24  Q.   You make very clear to her what your role is, correct?

25  A.   Yes.

B.R. v. F.C.S.B.

162

1   Q.   You make very clear to her that you have been retained by

2   and are going to offer testimony on behalf of the School

3   Board, correct?

4   A.   I didn't say I would be doing any testimony.  I told her

5   that I could, and I told her I was doing an evaluation.  The

6   results could be used in her case.

7   Q.   Right, could be used in her case, sure.  And you then ask

8   her -- well, she then shares with you the severity of what

9   she's suffering, correct?

10  A.   Yes.

11  Q.   Okay.  And you say that that is -- that is one of the

12  factors you looked at to say that she is not suffering -- that

13  she was -- she's malingering?

14  A.   Well, that is a little bit characterized.  What I'm

15  referring to is the research article that I was referencing

16  that indicated that generally people who have endured severe

17  trauma have a very difficult time talking about it.  I didn't

18  say -- and I think I even made it explicitly clear that not

19  everyone who has experienced trauma has a hard time, but it's

20  one of those indications.

21  Q.   So when you put up that PowerPoint that had those 12

22  things that -- I think it was 12 factors, indicators?

23  A.   Yes.

24  Q.   And you spoke about them hypothetically?

25  A.   Yes.

B.R. v. F.C.S.B.

163

1    Q.    Right.  You were not talking about B░░░ on this one?

2    This was one of the ones you identified.

3    A.    They were all present in this case, but it wasn't a

4    direct part of my determination.

5    Q.    You would agree that B░░░░ recitation of her symptoms

6    and related facts, she's been remarkably consistent with all

7    of her treating physicians since 2012, right?

8    A.    I disagree with that, and I believe even Dr. Ryan said in

9    her deposition she has been very inconsistent.

10    Q.    Okay.  Let's look at your deposition.

11    A.    I said Dr. Ryan's deposition.

12    Q.    Yeah, but you disagree -- I'm going to go to the

13    statement you disagree.

14    A.    I'm sorry, I misunderstood.

15    Q.    Sure.

16          Question, Page 116, line 7:  "So just as factual

17    matter, as opposed to what it means and doesn't mean, my

18    client has been remarkably consistent over a ten-year-plus

19    period about describing what happened to her?

20          Your answer, "Yes."

21          "QUESTION:  And she's been remarkably consistent over

22    a ten-year period whether she's seen doctors as part of her

23    care and treatment or being evaluated by experts hired by the

24    defense.  She's been remarkably consistent in what she tells

25    both of them, right?

———B.R. v. F.C.S.B.———

164

1          "ANSWER:  Yes.

2          "QUESTION:  And you describe this in your opinion as

3     this consistency as a data point, which indicates she is

4     making this up?

5          "ANSWER:  I'm not saying she's making it up.  I'm

6     saying --

7          "QUESTION:  What are you saying?

8          "ANSWER:  That is something that has been identified

9     in people who have attempted to feign PTSD and it is a data

10    point.  I would say it's a fairly small one, but it is a data

11    point."

12         Correct?

13    A.   Yes.

14    Q.   Okay.  Another thing that was on the bullet point slide

15    you had was that people with PTSD tend to blame themselves.

16         Do you remember that?

17    A.   Yes.  It was the inverse of that, but, yes.

18    Q.   Well, you gave an example of a soldier in combat.

19    A.   Yes.

20    Q.   Who a -- witnesses a -- witnesses a fellow soldier get

21    shot and killed, I think you said, and they'll often blame

22    themselves for that.  They will say, I should have done more.

23    So that is something you see in PTSD?

24    A.   Yes.

25    Q.   So -- well, the --

─B.R. v. F.C.S.B.─

165

1  A.   On the slide it said, I think, the unusual part, not the

2  usual part.

3  Q.   Oh, you're talking about your slides, sir?

4  A.   Yes.

5  Q.   Right.  So one of the data points you used to say that

6  B████ is feigning her PTSD is when she's meeting with the

7  psychologist hired by the defense, that she did not accept

8  blame for herself.  That is one of your data points, correct?

9  A.   To be clear, these are not questions I was using to

10 formulate my determination or opinion in this case.  This was

11 part of it, but without these questions, I could have come to

12 the same determination.

13 Q.   That is one of the data points you used to say that she

14 was feigning PTSD?

15 A.   Yes.  As I was saying on my direct, it's one unusual

16 thing after another after another, and in isolation, one

17 unusual thing might not be that remarkable, but when they're

18 all put together, it gives cause for concern.

19 Q.   You said that when you went through the medical records,

20 you did not see signs of validity testing, right?

21 A.   Yes.

22 Q.   But you also didn't see signs that they chose to do the

23 types of tests you chose at all, right?

24 A.   There was only one other neuropsychological evaluation

25 that she had.

Cross - DeRight

B.R. v. F.C.S.B.

166

1   Q.   Right.  The five months prior, which you referred to?

2   A.   Right.

3   Q.   But in the medical records we went through, which are by

4   the people whose job it was solely to provide care and

5   treatment to her, it is not that you didn't see that they did

6   validity testing.  They just didn't do the types of

7   neurocognitive testing that you decided to use, correct?

8   A.   The only person that would be doing that would be a

9   neuropsychologist, and she didn't have another

10  neuropsychological evaluation.

11  Q.   Right.  Instead she was treated by psychiatrists,

12  correct?  Those are MDs?

13  A.   Yes.

14  Q.   By other mental health professionals like therapists and

15  psychologists?

16  A.   Yes.

17  Q.   The place you're different is you're a neuropsychologist.

18  You're trying to do -- you're evaluating cognitive impairment?

19  A.   A neuropsychologist.

20  Q.   Neuropsychologist, excuse me?

21  A.   Yes.  I evaluate cognitive impairment and psychiatric

22  symptoms.

23  Q.   Let me consult with my colleagues.

24          (A pause in the proceedings.)

25          (Counsel confers.)

─────────────── B.R. v. F.C.S.B. ───────────────

167

1            MR. BRENNER:  Thank you, Doctor.

2            THE WITNESS:  Thank you.

3            THE COURT:  Ms. Rewari, how long do you anticipate

4    on your redirect?

5            MS. REWARI:  15 minutes.

6            THE COURT:  Okay.  Ladies and gentlemen, we talked

7    about 1 o'clock.  I think if we go another little bit, we can

8    quit for the day.

9            Go ahead, Ms. Rewari.

10                       REDIRECT EXAMINATION

11   BY MS. REWARI:

12   Q.  Dr. DeRight, I'm going start from the -- where

13   Mr. Brenner ended.

14           Can you just explain how the -- some of the factors

15   that he asked you about that were on that slide, willingness

16   to discuss trauma, what did you observe in your clinical

17   interview with respect to that?

18   A.  One of the reasons that I wait until the end to talk

19   about trauma is because I don't want someone to have to talk

20   about very difficult information and then say, remember this

21   list of words.

22           It's not really a good mindset to be.  So I wait for

23   that for the end so that it doesn't get in the way of the

24   thinking tests.

25           She -- I advised her of this in the beginning

─── B.R. v. F.C.S.B. ───

168

1  because I didn't want to threaten the validity of the test

2  artificially, and she had a really hard time not talking about

3  it.  So that's what I noticed was unusual.

4          It wasn't one thing in itself that says she's faking

5  or this didn't happen.  What that means is that it's something

6  I noticed as curious, and it helped inform my opinion.

7  Q.   And when you did ask her about it, can you describe for

8  the jury how that interview went?

9  A.   She maintained a very, what we call a stable affect.  She

10 didn't really show large ups and downs in parts of the story

11 she was telling.

12         In fact, she probably talked for 45 minutes without

13 me interrupting.  She had a lot to say.  Luckily I'm a fast

14 typer, and I was able to write it all down, but she had not a

15 hard time at all talking about it.

16 Q.   He also asked you about the remarkably consistent

17 recitation.  Can you just explain how that factor -- how you

18 found that factor present?

19 A.   This is something I've seen routinely in cases that

20 involve malingering.  There are usually parts of a story that

21 is canned and almost artificially exact.  And then there are

22 other parts that are inconsistent, that are either

23 inconsistent with the way that the diagnoses work or

24 conditions are present or between one time point and another.

25 Q.   Okay.  And Mr. Brenner also asked you about the blaming

B.R. v. F.C.S.B.

169

1  others.  How did you find that present here?

2  A.   Well, it's not as though I expect her to blame herself,

3  but it is a known manifestation of PTSD that people often

4  experience this inexplicable desire to find blame in

5  themselves, even when it is objectively not at all present.

6  Q.   Mr. Brenner asked you about your invoice and some of the

7  time entries on your invoice.

8           Did you have to provide a declaration to the Court

9  in order to be able to do an evaluation of B.R. in this case?

10  A.   I believe so.

11  Q.   And did you have to consult with the attorneys in order

12  to prepare a declaration to file in the court?

13  A.   Yes.

14  Q.   And was a declaration intended to give -- explain why you

15  needed to do an evaluation?

16  A.   Correct.

17  Q.   And at that time when you did the evaluation, were you

18  trying to explain why you needed to do your own as opposed to

19  the one done by the plaintiff's expert?

20  A.   Yes.

21  Q.   Okay.  And did you give your testing data to the expert

22  hired by the plaintiff?

23  A.   I did.

24  Q.   And so, was he a neuropsychologist?

25  A.   Yes.

B.R. v. F.C.S.B.

170

1   Q.   Just like you?

2   A.   Yes, he's a board-certified neuropsychologist.

3   Q.   And in that declaration, did you explain -- well, did

4   that neuropsychologist administer any symptoms validity

5   testing to the plaintiff?

6          MR. BRENNER:  Objection, beyond the scope and

7   relevance.

8          THE COURT:  Overruled.

9          THE WITNESS:  He did not administer any symptom

10  validity test.

11  BY MS. REWARI:

12  Q.   All right.  Did you believe that his results that he

13  obtained from the plaintiff were valid?

14  A.   On the basis of PTSD, no.

15  Q.   Okay.  And so, when Mr. Brenner asked you about providing

16  the specific questions, did you provide essentially your data

17  on the same questionnaires that that neuropsychologist could

18  have administered?

19  A.   Yes.  As is standard in the fields, I sent my -- what we

20  call raw data -- that's the actual test forms -- to another

21  psychologist.  And that included the little bubble sheets so

22  he could make sure that I typed it in the computer correctly.

23  It also included the printouts that go along with it.  There's

24  everything that he needed to be able to make sure that I gave

25  the test correctly.

B.R. v. F.C.S.B.

171

1   Q.   Okay.  If we could take a look at Defendants'

2   Exhibit 115 --

3                MS. REWARI:  I believe this has been admitted, Your

4   Honor.  If I can just check.

5                THE COURT:  Plaintiff's 115?

6                MS. REWARI:  No, Defendants' 115.

7                THE COURT:  It's in.

8                MS. REWARI:  If we can publish, Your Honor?

9                THE COURT:  You may.

10               (Exhibit published.)

11  BY MS. REWARI:

12  Q.   Okay.  Dr. DeRight, is this note dated February 16, 2012?

13  A.   Yes.

14  Q.   Okay.  And is this among the Herndon Family Medicine

15  records from Dr. Weaver that you reviewed?

16  A.   Yes.

17  Q.   Okay.  Who is writing to Dr. Weaver in this appointment

18  request?

19  A.   It appears to be the plaintiff's mom.

20  Q.   Okay.  And is she asking for a note regarding PTSD-like

21  symptoms?

22  A.   Yes, very specifically.

23  Q.   If we go to Exhibit -- hang on.  Give me one second,

24  please.

25               (A pause in the proceedings.)

B.R. v. F.C.S.B.

172

```
 1  BY MS. REWARI:

 2  Q.   If we could please take a look at Defendants'

 3  Exhibit 112.

 4          MS. REWARI:  Your Honor, I believe it is in.

 5          THE COURT:  It is.

 6          (Exhibit published.)

 7  BY MS. REWARI:

 8  Q.   And is this a note from Herndon Family Medicine dated

 9  January 16, 2012?

10  A.   Yes.

11  Q.   Okay.  If you go to the second page, are the diagnoses

12  listed in this?

13  A.   Yes.

14  Q.   Do you see -- is that -- do we find that under assessment

15  there?

16  A.   Correct.

17  Q.   Do you see PTSD listed there?

18  A.   I do not.

19  Q.   Okay.  Let's take a look at Plaintiff's Exhibit 472B,

20  which is one of the ones that Dr. -- excuse me, Mr. Brenner

21  showed you.

22          Do you recall this is one of the documents that he

23  showed you?

24  A.   Yes.

25  Q.   And this is dated March 9, 2012?
```

─────────── B.R. v. F.C.S.B. ───────────

173

1   A.   Yes.

2   Q.   All right.  And let's take a look under -- just getting

3   you to the right page here.

4            All right.  If you look on the second page under

5   "Medical History," if we can zoom in on that, what does the

6   medical history -- does the medical history here provided to

7   Children's National Hospital on March 9, 2012, include

8   post-traumatic stress disorder?

9   A.   Yes.

10  Q.   Okay.  All right.  If you go under "Impression and Plan,"

11  further down on this, what's the diagnosis by Children's

12  National Hospital?

13  A.   Anxiety disorder, situational depression and aggression.

14  Q.   No PTSD there, right?

15  A.   Correct.

16  Q.   He asked you about PTSD in the DSM?

17  A.   Yes.

18  Q.   That relies on self-report of symptoms, right?

19  A.   Yes.

20  Q.   And if a parent is in the sessions with a patient, it can

21  also rely on the parent's report of symptoms, right?

22            MR. BRENNER:  Objection.  Leading.

23            THE COURT:  It is.  Sustained.

24  BY MS. REWARI:

25  Q.   Is it for a pediatric patient, it is it unusual to have a

B.R. v. F.C.S.B.

174

1    parent in the session?

2    A.    No.

3    Q.    And can a mental health professional who is evaluating a

4    pediatric patient for PTSD rely on the parent's report of

5    symptoms?

6    A.    Yes.  Even outside the presence of the patient, the

7    parent is often interviewed.

8    Q.    Okay.  And when a -- when mental health providers are

9    seeing a person years removed from an event, do they always

10   get the medical records that preceded that?

11   A.    No.

12   Q.    Are they -- do they record what the patient tells them as

13   their medical history?

14   A.    Typically.

15   Q.    And so if a patient -- or the parent tells a provider

16   that the patient had PTSD, will you find that in the records?

17   A.    In a clinical setting, it would be unusual for someone to

18   say, Hold on, let me make sure that's accurate.  They would

19   more likely just put it in the history.

20   Q.    And once you're years removed from an event, does the

21   treatment for PTSD look that different for a treatment for

22   anxiety?

23   A.    It could; not necessarily.

24   Q.    Okay.  And Mr. Brenner asked you about doctors; have some

25   of the people that have treated her been nondoctors?

B.R. v. F.C.S.B.

175

1   A.   As in therapists, yes.

2   Q.   And social workers?

3   A.   Yes.

4   Q.   And practicers of holistic medicine?

5   A.   Yes.

6          MS. REWARI:  Thank you.  No further questions.

7          THE COURT:  Thank you, Doctor.  You can step down.

8          THE WITNESS:  Thank you.

9          (Witness excused.)

10         THE COURT:  Please do not discuss the case or any

11  aspect of the case with anyone while the case is pending.

12         Is this witness subject to recall?

13         MR. BRENNER:  Not from the plaintiff.

14         MS. REWARI:  Not from us.

15         THE COURT:  Very good.  Ladies and gentlemen, we

16  came pretty close to our goal today.  That's a good thing.  As

17  you recall from the schedule that we discussed last week,

18  we're going to start tomorrow at 10 o'clock, so if you get

19  here some time around 9:45, that will be great.  We're

20  scheduled to go until 4 o'clock tomorrow afternoon, and the

21  same thing is the case on Wednesday.  I know that one of you

22  have something that you're taking care of tomorrow that's very

23  important, but we'll be here when you get here.

24         Remember what the Court's instruction was.  Do not

25  discuss the case or any aspect of the case with anyone while

─────── B.R. v. F.C.S.B. ───────

176

1   the case is pending.  Please try to the extent you can stay

2   away from social media and/or print media.

3          We'll see you tomorrow.

4          (Jury excused.)

5          THE COURT:  Thank you, ladies and gentlemen.  You

6   can be seated.

7          Ms. Rewari, what are we looking at tomorrow?

8          MS. REWARI:  Your Honor, we have an expert, Sara

9   Jennings, who is scheduled to be here, and so is Deputy Chief

10  Chambers, and we have a couple of fact witnesses, again,

11  depending on how fast we go, but we have -- we have Amy Moir

12  waiting outside, and we're going to see if she can come back

13  tomorrow.  She is a teacher and has had to take leave, so we

14  hope she can come back tomorrow.  If she's not, we will be

15  ready to put on other witness that we've already disclosed.

16         THE COURT:  How many more witnesses?

17         MS. REWARI:  We still have Mr. H███ needs to

18  testify, and Ms. B███ needs to testify.

19         THE COURT:  Correct.

20         MS. REWARI:  They are the defendants in the case.

21  And we also have Amy Moir, Demetri Kappatos.  And I'm sorry.

22  I'm blanking.

23         THE COURT:  Speak with your colleagues.

24         (Counsel confers.)

25         MS. REWARI:  We have Dr. Tuwiner coming on

———— B.R. v. F.C.S.B. ————

177

1   Wednesday.  We have the -- Tiffany Estrella, who was one of

2   the -- the fourth core teacher during the school year.  She

3   was the English teacher.  We expect her to be very short, both

4   her and Mr. Kappatos, as will Amy Moir.  And then -- I

5   think -- we have the deposition of Pricewaterhouse.

6           THE COURT:  We agreed on how that's going to be

7   presented?

8           MS. REWARI:  I believe there's agreement.

9           THE COURT:  It's a de bene deposition.  Is that what

10  you're talking about?

11          MS. REWARI:  It was a 30(b)(6) deposition of a

12  out-of-state party, so, yes.

13          MR. BRENNER:  On that issue, Your Honor, there's two

14  issues -- we do agree if it's read.  The process -- can I

15  just --

16          THE COURT:  Sure.

17          MR. BRENNER:  So if it's read, because we have an

18  objection we want to be heard, whether it should be read at

19  all.  If it's read, we agree on the process that one of the

20  lawyers from the defense will read all the questions, and one

21  of your law clerks, I think you said, or one of the court

22  staff will read the answers.  No problem with that.

23          I would say Mr. Elliker and I are working really

24  hard to try to reach an agreement on objections, and hope

25  springs eternal, but we haven't quite got there yet.

B.R. v. F.C.S.B.

178

1    THE COURT:  Well, to the extent -- I am hoping you

2   all can agree as to the resolution.  That's always the Court's

3   preference.  But if you cannot agree, if you could get

4   whatever the disagreement is to us no later than 5 o'clock the

5   day before this person's supposed to testify so that the Court

6   can have an opportunity to review the objections, review the

7   controversy, figure out where the best spot to try to resolve

8   it is.  As I said, I'm not expecting you to file it at 10:45,

9   but 5 o'clock would give us an opportunity to take a look at

10  the issues.

11   MR. BRENNER:  Would it be more efficient use of the

12  Court's time if we file just a one- or two-pager on the

13  overall objection to the page and line, but the overall

14  objection to the reading?

15   THE COURT:  That's fine.  That's fine.

16   MR. BRENNER:  It won't be long.  I promise.

17   THE COURT:  That's fine.  That's an efficient way of

18  handling things.

19   MR. BRENNER:  Okay.

20   THE COURT:  Ms. Rewari, based upon your

21  representations to the Court regarding the witnesses and how

22  long you anticipate they're going to be, it seems that we

23  might be getting close to a finality of the Defendants' case

24  sometime around Thursday afternoon; is that fair?

25   MS. REWARI:  Your Honor, my understanding is there's

B.R. v. F.C.S.B.

179

1   no --

2          THE COURT:  There's no court on Thursday.  I was

3   hopeful.  So sometime around Friday afternoon.  Is that fair?

4          MS. REWARI:  That's our hope.  That's how we're

5   budgeting our time.

6          THE COURT:  I will let you all know that the Court

7   has started the process of going through the instructions.  I

8   know that there are a good number of instructions that have

9   been agreed upon, but there are some other ones that we need

10  to kind of work through.  So I'm going to begin my process of

11  actually going through the instructions and determining

12  whether at this point I can make any determination as to the

13  appropriateness of them, so.

14         MS. REWARI:  Your Honor, I believe that when we

15  propose the instructions, we had sort of a -- you -- it was

16  before trial.  And so, we may need to look at some of those

17  and submit some proposed -- work with the other side to see if

18  we can either narrow the area of disagreement -- for example,

19  traumatic brain injury was in the case, and now it's not in

20  the case.  So some things like that that I do think --

21         THE COURT:  I've got 48 pages of instructions, so

22  there are more than enough.

23         MS. REWARI:  Right, right, right.  No, if we can cut

24  some things down that are no longer in the case, again, we'll

25  take a look, and we'll submit as soon as possible.

B.R. v. F.C.S.B.

180

1           THE COURT:  Yeah.  Submit as soon as possible,

2    because -- and, again, it's something I said earlier is that

3    sometimes we make the mistake of thinking that just because

4    our work is done that there's not other work that needs to be

5    done by other people, and I'm very sensitive to reading the

6    instructions while I'm very sensitive to the fact that I need

7    to read them to laypeople in the way that they can understand

8    the structure and how we're supposed to work through the

9    process and the like.

10          So as much lead-in time as you can give me with

11   these instructions, I would appreciate it.  And as you know, I

12   have no problem working in the evening, but, please, don't

13   give me something Friday morning and say, Judge, we need to

14   argue about this, because there's a whole lot of

15   considerations that are associated with that.

16          MS. REWARI:  Understood.

17          THE COURT:  Mr. Brenner.

18          MR. BRENNER:  Your Honor had asked me, I think,

19   Friday about a rebuttal case.  I told you at that point I

20   didn't anticipate one.  I would say the most potential ground

21   that there could be a rebuttal case is going to be dictated by

22   the scope of what Detective Chambers did or does -- is

23   permitted to testify to.  And just to give you a little

24   background, we had an expert -- the two experts that were

25   going to --

B.R. v. F.C.S.B.

181

1      THE COURT:  You wanted the experts to assess the way

2  that Detective Chambers asked the questions and --

3      MR. BRENNER:  That was one.  The other one was on

4  the investigation.  So I'm hoping that neither will be

5  necessary based on --

6      THE COURT:  Well, I can tell you right now because,

7  as I've said, I've already read the interview, and I kind of

8  know the background as to the investigation and all, and we

9  really don't need to get caught up in that too much because

10  it's ancillary, I believe, to the Title IX issues that we need

11  to resolve.

12      Obviously, there are some things that are associated

13  with the secondary case involving J.O. that there may be

14  questions on.  I'm anticipating that.  But, again, the Court

15  has made its determination that essentially what

16  Detective Chambers is going to be able to testify to is that

17  he conducted an interview, spoke with B.R., spoke with Ms. R.,

18  and did his job, and not getting into any real specifics,

19  because I think the closer that we get to any specifics, then

20  we get into the problem of assessing credibility.  I think the

21  more he testifies, the more risk we run.

22      MR. BRENNER:  So I just wanted to give you a heads

23  up because I'd given you that answer before, and so we'll just

24  have to see how it goes.  But I'll be in a position, I think,

25  after he testifies, at least by the next day, to give you a

—B.R. v. F.C.S.B.—

182

1    better sense of that.

2            THE COURT:  And, again, I'm depending on the good

3    counsel here to -- even though you may disagree with the

4    determinations made in motions in limine and the like, to the

5    extent that you can, stay within the confines of those

6    specific determinations.

7            All right.  Anything else we need to do?

8            MS. REWARI:  Not from us, Your Honor.

9            THE COURT:  Mr. Brenner?

10           MR. BRENNER:  Not from the plaintiff.

11           THE COURT:  Everybody be safe, and we'll see you

12   tomorrow morning at 10:00 a.m.

13

14                **(Proceedings adjourned at 1:13 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 15th day of

9    April, 2024.

10           I further certify that the foregoing 208 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 26, 2024.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              183

## $

**$350** [1] - 65:10

## '

**'effort** [1] - 68:23
**'general** [1] - 151:24

## 0

**0001** [1] - 100:7
**05** [1] - 4:14

## 1

**1** [10] - 76:14, 95:14, 95:15, 116:3, 126:13, 128:10, 134:23, 144:19, 167:7
**10** [6] - 80:3, 95:14, 95:15, 135:3, 175:18
**10-second** [1] - 56:1
**100** [5] - 2:2, 2:6, 2:10, 51:20, 64:7
**106** [1] - 33:23
**10:00** [1] - 182:12
**10:29** [1] - 27:2
**10:45** [1] - 178:8
**10th** [1] - 140:6
**11** [1] - 80:14
**112** [1] - 172:3
**114** [1] - 4:8
**115** [3] - 171:2, 171:5, 171:6
**116** [1] - 163:16
**11:05** [1] - 88:11
**11:10** [3] - 88:8, 88:11
**11:12** [1] - 88:13
**11th** [1] - 32:19
**12** [12] - 5:10, 10:20, 16:25, 17:4, 27:2, 49:1, 101:19, 147:12, 147:14, 147:25, 162:21, 162:22
**12-year-old** [1] - 148:3
**120** [2] - 3:6, 24:13
**12th** [2] - 27:21, 29:20
**13** [2] - 116:2, 157:10
**14** [4] - 32:16, 102:4, 102:15, 102:16
**14th** [2] - 56:21, 99:14
**15** [9] - 1:6, 10:14, 64:6, 64:7, 97:13, 125:3, 136:10, 167:5, 183:16
**1520** [1] - 1:19
**15th** [2] - 140:10,

183:8
**16** [3] - 4:4, 171:12, 172:9
**167** [1] - 4:8
**168** [3] - 39:4, 39:7, 39:10
**168............................**
**............. [1] - 4:12
**17** [1] - 135:18
**170** [1] - 35:19
**1775** [1] - 3:9
**18** [2] - 100:23, 133:20
**1801** [1] - 3:5
**183** [2] - 4:15, 183:10
**18th** [1] - 100:22
**19** [4] - 1:8, 124:22, 133:20, 133:24
**192** [1] - 22:25
**1:00** [1] - 1:9
**1:13** [1] - 182:14
**1:19-cv-917** [2] - 1:4, 183:8

## 2

**2** [9] - 28:1, 35:23, 61:11, 77:4, 121:17, 121:18, 121:21, 133:12, 135:10
**2,000** [1] - 64:15
**200** [2] - 19:1, 95:15
**20037** [5] - 1:16, 2:14, 2:18, 2:21, 3:1
**2007** [1] - 17:23
**2009** [2] - 18:5, 122:6
**2010** [1] - 17:23
**2011** [3] - 27:2, 32:16, 38:18
**2011/2012** [3] - 19:9, 19:11, 41:14
**2012** [23] - 18:10, 38:18, 39:16, 39:20, 120:21, 122:1, 122:8, 122:11, 122:15, 125:3, 125:22, 126:8, 126:13, 127:23, 128:15, 147:1, 147:12, 148:4, 163:7, 171:12, 172:9, 172:25, 173:7
**2013** [1] - 18:10
**2015** [1] - 133:4
**2016** [2] - 63:20, 133:15
**2017** [1] - 133:20
**2018** [2] - 133:24, 135:1
**2019** [1] - 147:9
**20190** [1] - 3:10

**20191** [1] - 3:6
**202-536-1702** [1] - 1:16
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:18
**2020** [1] - 135:3
**2021** [1] - 135:7
**2022** [1] - 135:11
**2023** [6] - 84:2, 115:25, 118:23, 139:2, 139:5, 139:10
**2024** [1] - 1:6, 5:10, 183:9, 183:16
**2029** [1] - 1:19
**208** [1] - 157:9
**20th** [1] - 34:5
**21** [1] - 39:20
**213-995-5720** [1] - 1:20
**21st** [2] - 57:4, 57:8
**22** [1] - 125:11
**2200** [4] - 2:14, 2:17, 2:21, 3:1
**22314** [1] - 3:14
**2300** [1] - 1:15
**24** [2] - 102:2, 102:9
**25** [2] - 155:15, 155:19
**251** [5] - 46:15, 46:22, 46:25, 47:2, 47:5
**253** [2] - 48:9, 48:12
**25th** [2] - 99:23, 100:11
**26th** [3] - 139:13, 139:15, 140:8
**2800** [3] - 2:2, 2:6, 2:10
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**3** [4] - 61:19, 87:9, 133:4, 135:7
**30** [6] - 84:13, 101:18, 101:24, 107:7, 120:4, 145:1
**30(b)(6** [1] - 177:11
**305-539-8400** [1] - 2:7
**309.81** [2] - 128:2, 128:18
**313** [5] - 88:3, 90:15, 90:20, 142:11
**313............................**
**............. [1] - 4:12
**33** [1] - 131:7
**33131** [3] - 2:3, 2:7, 2:11

**3rd** [1] - 140:4

## 4

**4** [3] - 77:22, 116:3, 175:20
**40** [2] - 4:5, 4:12
**400** [1] - 3:9
**401** [1] - 3:13
**42** [5] - 4:5, 150:3, 150:8, 150:12, 150:25
**427B** [1] - 135:3
**43** [1] - 149:23
**43.10** [1] - 134:7
**43.12** [1] - 135:14
**44** [2] - 148:25, 149:8
**444B** [1] - 131:6
**449B** [1] - 135:10
**45** [4] - 84:13, 107:7, 150:12, 168:12
**450** [1] - 65:11
**450B** [1] - 133:20
**452B** [1] - 133:4
**455B** [1] - 134:23
**457B** [1] - 124:22
**458B** [1] - 125:24
**461B** [1] - 126:13
**471B** [1] - 134:18
**472B** [2] - 125:11, 172:19
**475B** [1] - 135:7
**476B** [1] - 127:22
**479B** [1] - 134:18
**48** [1] - 179:21
**480B** [1] - 133:12
**497B** [1] - 133:24

## 5

**5** [5] - 78:10, 125:24, 150:13, 178:4, 178:9
**5,000** [4] - 83:7, 119:8, 119:21, 137:3
**5-TR** [2] - 128:7, 128:8
**500** [1] - 64:18
**50th** [1] - 100:9
**554** [1] - 53:1
**59** [1] - 4:7

## 6

**6** [7] - 23:4, 78:17, 125:24, 128:7, 150:10, 150:12, 150:25
**60** [1] - 48:21
**60-page** [1] - 48:25
**61** [1] - 21:16
**610-804-1787** [1] - 2:3

**643a** [1] - 1:15
**6th** [1] - 24:11

## 7

**7** [6] - 78:25, 95:14, 95:15, 136:10, 163:16
**75** [2] - 155:16, 155:19
**75th** [1] - 100:11
**78** [1] - 32:7
**7th** [5] - 18:11, 19:11, 24:5, 24:12, 26:6

## 8

**8** [2] - 23:20, 79:11
**804-788-8200** [1] - 3:2
**82.5** [4] - 103:20, 103:21, 103:23, 104:1
**850-585-3414** [1] - 2:11
**86** [1] - 100:19
**8th** [1] - 55:4

## 9

**9** [5] - 39:16, 79:17, 127:22, 172:25, 173:7
**90** [1] - 154:7
**90067** [1] - 1:20
**91** [1] - 4:12
**95** [2] - 26:11, 109:8
**99** [2] - 109:8, 111:1
**99th** [1] - 100:4
**9:00** [1] - 1:9
**9:02** [1] - 1:6
**9:45** [1] - 175:19

## A

**A.F** [1] - 3:5
**a.m** [3] - 1:6, 88:13, 182:12
**A.M./P.M** [1] - 1:8
**A109** [2] - 22:10, 25:16
**abandoned** [1] - 141:16
**abide** [1] - 9:20
**abilities** [2] - 101:25, 142:24
**ability** [7] - 81:13, 131:15, 144:14, 144:15, 154:17, 160:6, 183:14
**able** [15] - 12:17, 15:21, 35:16, 50:1, 50:4, 50:13, 50:17,

52:14, 75:9, 93:10, 121:8, 168:14, 169:9, 170:24, 181:16
**abrenner@bsfllp.com** [1] - 2:8
**absolutely** [3] - 21:8, 41:22, 56:17
**Absolutely** [1] - 24:24
**abuse** [3] - 150:1, 152:11, 152:21
**academic** [2] - 37:14, 44:14
**Academy** [3] - 62:2, 62:4, 63:10
**accept** [2] - 79:10, 165:7
**accident** [1] - 96:15
**according** [3] - 32:19, 145:11, 145:13
**accordingly** [1] - 6:22
**account** [2] - 112:9, 113:9
**accuracy** [2] - 97:9, 145:7
**accurate** [8] - 68:17, 69:15, 70:21, 76:1, 79:7, 85:8, 112:16, 174:18
**accuses** [1] - 68:5
**achieved** [1] - 98:5
**achievement** [1] - 144:11
**act** [1] - 123:22
**acting** [4] - 117:16, 118:8, 123:3, 145:23
**Action** [2] - 1:4, 183:8
**activities** [1] - 57:22
**actual** [3] - 77:11, 157:5, 170:20
**acute** [2] - 125:5, 125:8
**add** [1] - 76:5
**addition** [1] - 101:22
**additional** [1] - 47:20
**address** [3] - 7:20, 31:22, 31:24
**addressed** [1] - 45:13
**adduced** [1] - 183:6
**adjourned** [1] - 182:14
**administer** [8] - 72:1, 72:23, 83:24, 86:21, 92:9, 128:24, 170:4, 170:9
**administered** [13] - 52:2, 83:5, 83:16, 86:8, 86:13, 91:7, 92:6, 93:2, 93:3, 104:23, 141:8, 156:22, 170:18

**administering** [1] - 71:14
**administration** [6] - 19:17, 20:16, 30:10, 31:1, 31:16, 54:18
**administrative** [1] - 5:4
**administrator** [3] - 29:13, 50:9, 51:22
**administrators** [1] - 49:15
**admissible** [1] - 10:22
**admit** [2] - 8:15, 146:22
**Admitted** [1] - 4:11
**admitted** [14] - 15:1, 26:11, 29:1, 32:6, 32:7, 33:23, 35:20, 39:5, 39:10, 43:8, 46:15, 48:10, 90:20, 171:3
**adult** [1] - 21:4
**adults** [1] - 64:4
**advantage** [1] - 7:14
**advised** [2] - 84:23, 167:25
**advisement** [1] - 13:2
**advisor** [1] - 37:15
**advocate** [1] - 112:19
**affect** [1] - 168:9
**affected** [1] - 98:17
**affects** [1] - 81:13
**afraid** [1] - 143:25
**after-school** [4] - 37:8, 37:9, 39:1, 57:22
**afternoon** [3] - 175:20, 178:24, 179:3
**afterwards** [1] - 57:5
**age** [1] - 100:23
**aggression** [1] - 173:13
**aggressive** [1] - 50:22
**ago** [4] - 19:3, 48:1, 54:19, 114:10
**agree** [14] - 43:16, 43:23, 111:14, 120:21, 122:10, 145:25, 147:7, 154:25, 155:7, 163:5, 177:14, 177:19, 178:2, 178:3
**agreed** [2] - 177:6, 179:9
**agreement** [3] - 13:9, 177:8, 177:24
**ahead** [3] - 87:21, 88:6, 167:9
**air** [1] - 27:15

**al** [2] - 1:6, 183:7
**alanderson@bsfllp.com** [1] - 1:21
**Alexandria** [1] - 3:14
**Alison** [1] - 1:18
**allegations** [3] - 36:17, 37:4, 41:17
**alleged** [4] - 40:21, 149:3, 151:20, 152:25
**alleges** [3] - 38:6, 38:14, 38:17
**alleging** [1] - 151:3
**allow** [5] - 8:3, 8:21, 13:11, 55:7, 146:3
**allowed** [2] - 8:20, 13:20
**alluding** [1] - 113:12
**almost** [5] - 14:6, 43:14, 84:17, 108:12, 168:21
**alone** [2] - 27:7, 143:24
**ALSTON** [1] - 1:11
**Alzheimer's** [3] - 66:10, 69:20, 89:25
**amazing** [3] - 17:6, 79:15, 99:14
**amazingly** [1] - 105:12
**amended** [5] - 12:11, 12:16, 38:6, 40:18
**American** [4] - 17:7, 17:16, 62:2, 63:10
**amiss** [1] - 76:7
**amount** [5] - 11:21, 17:18, 92:23, 149:2, 152:23
**amps** [1] - 80:2
**Amy** [3] - 176:11, 176:21, 177:4
**analysis** [1] - 132:8
**ancillary** [1] - 181:10
**Anderson** [1] - 1:18
**ANDERSON** [2] - 7:20, 8:13
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:13, 2:17, 2:20, 2:25
**Angeles** [1] - 1:20
**ANSWER** [13] - 151:4, 151:14, 151:23, 152:13, 152:16, 153:2, 153:10, 157:14, 157:22, 158:5, 164:1, 164:5, 164:8
**answer** [32] - 16:7, 27:16, 46:1, 52:13, 59:14, 73:6, 86:14, 107:2, 111:19,

115:6, 116:8, 116:13, 132:25, 136:14, 137:25, 141:15, 141:17, 144:1, 146:4, 148:20, 149:5, 149:15, 149:16, 153:10, 154:13, 155:6, 156:21, 158:4, 158:18, 160:11, 163:20, 181:23
**answered** [3] - 52:19, 138:6, 155:4
**answering** [2] - 50:25, 51:7
**answers** [5] - 12:15, 71:20, 150:21, 160:17, 177:22
**anticipate** [4] - 98:1, 167:3, 178:22, 180:20
**anticipated** [1] - 5:10
**anticipating** [2] - 10:6, 181:14
**antisocial** [1] - 109:20
**anxiety** [4] - 24:6, 24:12, 173:13, 174:22
**apart** [2] - 27:3, 27:4
**appear** [4] - 48:22, 85:23, 121:24, 137:23
**APPEARANCES** [3] - 1:12, 1:25, 2:25
**appendix** [1] - 90:25
**applicable** [1] - 128:15
**applied** [1] - 88:25
**apply** [2] - 65:1, 65:5
**appointment** [1] - 171:17
**appreciate** [2] - 15:24, 180:11
**approach** [6] - 42:7, 47:4, 75:25, 115:17, 121:3, 138:23
**approaching** [1] - 27:4
**appropriate** [4] - 7:11, 8:8, 68:18, 68:20
**appropriateness** [1] - 179:13
**April** [4] - 1:6, 5:10, 183:9, 183:16
**area** [10] - 18:21, 55:1, 55:10, 55:18, 55:25, 63:2, 64:3, 77:6, 108:14, 179:18
**areas** [1] - 55:11

**argue** [1] - 180:14
**argument** [2] - 5:10, 6:7
**argumentative** [4] - 137:11, 138:2, 148:13, 156:20
**arisen** [1] - 13:1
**Arlington** [1] - 16:24
**arrive** [2] - 82:17, 87:15
**article** [2] - 62:22, 162:15
**articles** [3] - 62:9, 62:15, 62:19
**artificially** [2] - 168:2, 168:21
**Asian** [2] - 17:7, 19:24
**aside** [7] - 43:5, 43:7, 153:25, 154:2, 154:5, 158:7, 158:8
**asleep** [1] - 99:16
**aspect** [4] - 15:20, 109:25, 175:11, 175:25
**aspects** [7] - 62:13, 71:18, 80:22, 80:25, 81:8, 81:20, 93:23
**assault** [11] - 51:3, 148:18, 148:22, 149:4, 151:3, 151:10, 151:25, 152:25, 153:6, 153:7, 153:8
**assaulted** [1] - 151:21
**assaults** [3] - 9:9, 31:18, 151:7
**assess** [2] - 89:20, 181:1
**assessed** [1] - 86:17
**assesses** [1] - 109:21
**assessing** [1] - 181:20
**assessment** [17] - 28:6, 60:7, 74:1, 79:12, 82:19, 85:25, 101:21, 102:3, 111:2, 125:5, 130:18, 133:25, 135:4, 137:4, 141:13, 154:15, 172:14
**assessments** [4] - 64:17, 65:19, 136:8, 141:21
**assignments** [1] - 21:4
**assist** [1] - 65:4
**assistant** [2] - 14:12, 14:17
**associated** [7] - 70:1, 80:1, 108:13,

109:16, 134:11,
180:15, 181:12
**assume** [2] - 44:12,
75:23
**assuming** [2] - 9:24,
40:6
**assured** [1] - 24:19
**astronomically** [5] -
96:15, 97:18, 97:21,
99:7, 99:15
**attempt** [1] - 6:5
**attempted** [1] - 164:9
**attend** [1] - 17:20
**attendance** [1] - 58:9
**attended** [2] - 20:12,
63:12
**attention** [6] - 15:25,
52:25, 74:18, 76:14,
107:5, 107:25
**attorney** [1] - 79:22
**attorneys** [8] - 82:11,
139:20, 139:21,
139:24, 140:2,
140:15, 141:23,
169:11
**A**▮ [2] - 20:19, 20:21
**available** [2] - 73:7,
73:10
**Ave** [1] - 2:21
**Avenue** [4] - 2:14,
2:17, 3:1, 3:9
**average** [10] - 99:18,
99:23, 100:10,
100:11, 100:21,
100:24, 100:25,
106:3, 155:18,
155:19
**award** [1] - 20:13
**aware** [14] - 9:15,
29:21, 38:6, 38:14,
38:17, 40:20, 40:23,
41:2, 41:6, 41:8,
45:20, 46:1, 46:3,
51:11
**awareness** [3] - 46:11,
47:15, 49:10

## B

**B.H** [1] - 3:6
**B.R** [36] - 1:3, 5:12,
11:13, 11:20, 18:11,
24:2, 26:5, 30:13,
31:7, 31:10, 31:17,
31:21, 35:2, 37:22,
38:7, 38:20, 39:15,
39:25, 41:5, 60:7,
82:20, 83:5, 83:16,
83:19, 87:21, 91:7,
91:23, 96:17,

111:14, 112:3,
112:6, 112:9,
113:10, 169:9,
181:17, 183:7
**B.R.'s** [2] - 41:8, 113:2
**bachelor's** [1] - 61:13
**background** [7] -
16:23, 19:25, 23:8,
61:11, 81:23,
180:24, 181:8
**backup** [1] - 183:13
**bad** [10] - 43:24, 44:1,
44:2, 44:3, 44:4,
44:5, 44:10, 97:23,
105:11, 142:20
**badly** [1] - 96:6
**baffling** [1] - 14:4
**bag** [2] - 155:23,
155:25
**B**▮▮ [1] - 176:18
**ballpark** [2] - 64:13,
64:16
**bar** [2] - 97:14, 105:1
**BARAN** [1] - 1:14
**barely** [1] - 93:22
**base** [1] - 69:15
**based** [13] - 60:10,
66:22, 87:14, 87:19,
87:23, 89:9, 92:23,
104:17, 145:12,
148:22, 156:6,
178:20, 181:5
**baseline** [1] - 79:16
**bases** [2] - 161:7,
161:14
**basic** [1] - 90:11
**basis** [6] - 38:10,
40:21, 129:6,
148:11, 161:21,
170:14
**BATES** [32] - 16:2,
16:13, 21:15, 21:19,
21:21, 22:2, 22:3,
22:23, 23:3, 23:6,
26:10, 26:14, 27:18,
32:5, 32:11, 32:13,
33:22, 34:1, 35:18,
35:23, 35:25, 37:1,
38:13, 39:4, 39:12,
40:3, 45:23, 46:17,
52:16, 53:2, 53:8,
59:4
**Bates** [6] - 2:13,
16:15, 16:16, 56:20,
57:2, 57:21
**Bates**............. [1] - 4:4
**battery** [1] - 73:3
**became** [1] - 17:17
**become** [3] - 17:3,
17:19, 128:12

**bee** [3] - 33:8, 33:11,
33:12
**BEFORE** [1] - 1:11
**begin** [1] - 179:10
**beginning** [14] - 9:22,
13:9, 47:16, 51:16,
56:4, 56:8, 56:10,
56:13, 94:23, 96:20,
98:7, 115:5, 141:2,
167:25
**behalf** [4] - 4:2, 4:10,
156:17, 162:2
**behaved** [1] - 57:15
**behavior** [6] - 27:15,
31:13, 32:2, 32:4,
44:6, 49:20
**beings** [1] - 155:23
**bell** [7] - 55:23, 100:9,
100:10, 155:2,
155:15, 155:17
**below** [5] - 34:9, 37:5,
99:12, 155:3, 155:11
**bene** [1] - 177:9
**benefit** [1] - 7:3
**benign** [1] - 71:7
**best** [15] - 8:7, 9:16,
9:20, 16:7, 19:20,
26:7, 31:3, 31:4,
34:17, 59:14,
123:16, 123:22,
123:23, 178:7,
183:14
**better** [6] - 43:23,
61:8, 69:21, 82:9,
100:5, 182:1
**between** [5] - 22:5,
22:18, 30:6, 38:18,
69:11, 70:22, 84:11,
89:7, 101:17,
101:24, 106:3,
107:7, 141:7,
155:15, 168:24
**beyond** [8] - 69:25,
82:10, 90:3, 101:8,
104:6, 104:7, 111:6,
170:6
**bias** [2] - 79:13
**bible** [2] - 127:4, 127:7
**big** [2] - 24:7, 106:4
**billing** [2] - 129:15,
129:19
**bin** [1] - 14:15
**binder** [3] - 42:16,
88:3, 90:15
**bit** [14] - 56:10, 57:21,
60:1, 61:10, 65:23,
117:8, 128:4,
138:18, 142:8,
146:21, 148:21,
160:23, 162:14,

167:7
**blame** [7] - 28:18,
77:25, 164:15,
164:21, 165:8,
169:2, 169:4
**blames** [1] - 77:22
**blaming** [3] - 29:6,
78:5, 168:25
**Blanchard** [5] - 3:8,
10:6, 10:9, 41:25,
113:23
**BLANCHARD** [3] -
11:6, 42:1, 113:24
**blanket** [1] - 120:5
**blanking** [1] - 176:22
**blood** [1] - 120:3
**Board** [4] - 16:2,
16:17, 139:24, 162:3
**board** [6] - 61:20,
61:21, 62:4, 63:12,
155:22, 170:2
**board-certified** [3] -
61:21, 63:12, 170:2
**boat** [1] - 24:20
**bodies** [1] - 152:2
**bodily** [3] - 71:24,
92:15, 108:2
**body** [2] - 65:4, 67:17
**BOIES** [4] - 1:18, 2:1,
2:5, 2:9
**book** [13] - 12:8,
13:23, 13:25, 14:1,
14:10, 14:14, 46:22,
47:3, 62:11, 62:12,
89:7, 89:9
**booklet** [3] - 51:17,
106:24, 106:25
**books** [2] - 62:11,
71:8
**borderline** [2] -
100:24, 109:19
**born** [2] - 16:22, 16:24
**bottom** [10] - 7:15,
9:14, 26:15, 32:15,
34:3, 34:15, 36:1,
36:5, 36:6, 147:9
**box** [1] - 78:15
**boxes** [1] - 112:24
**brain** [7] - 5:14, 104:4,
104:8, 104:20,
104:22, 152:1,
179:19
**break** [12] - 27:5,
27:23, 27:24, 85:11,
88:7, 88:19, 98:8,
98:11, 98:12, 98:16,
161:20
**breaks** [5] - 85:5,
85:7, 85:10, 107:6
**breather** [1] - 24:22

**B**▮▮ [2] - 20:8,
29:18
**BRENNER** [73] - 11:7,
11:24, 15:12, 15:14,
60:21, 65:20, 82:10,
84:25, 85:3, 90:3,
90:18, 101:8, 104:6,
114:1, 114:5,
115:14, 115:17,
115:19, 121:3,
121:5, 121:10,
121:13, 121:16,
121:19, 121:20,
122:19, 122:22,
124:21, 124:25,
125:11, 125:12,
125:25, 126:4,
126:6, 126:20,
126:23, 126:24,
130:16, 130:17,
131:8, 138:2,
138:11, 138:23,
138:25, 139:4,
139:8, 142:10,
142:16, 144:5,
146:5, 146:6, 147:8,
148:15, 149:12,
150:5, 150:12,
150:15, 150:25,
153:14, 157:4,
167:1, 170:6,
173:22, 175:13,
177:13, 177:17,
178:11, 178:16,
178:19, 180:18,
181:3, 181:22,
182:10
**Brenner** [14] - 2:5,
12:10, 90:16,
113:25, 146:3,
150:18, 167:13,
168:25, 169:6,
170:15, 172:20,
174:24, 180:17,
182:9
**Brenner**............ [1] -
4:8
**bride** [1] - 27:9
**briefly** [1] - 74:13
**bring** [9] - 77:2, 93:11,
122:20, 122:21,
127:22, 134:18,
142:10, 147:16,
154:20
**bringing** [2] - 149:3,
152:24
**Brittany** [1] - 2:1
**britzoll@gmail.com**
[1] - 2:4
**broad** [2] - 64:21,

110:18
**broken** [2] - 139:15, 141:1
**brought** [1] - 13:12
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:10
**Bs** [1] - 97:12
**bubble** [1] - 170:21
**bubbling** [2] - 84:14, 141:12
**buck** [1] - 132:18
**budgeting** [1] - 179:5
**bulk** [3] - 91:13, 141:7, 142:2
**bullet** [1] - 164:14
**bullied** [7] - 43:25, 44:5, 44:9, 44:20, 44:24, 45:4, 53:22
**bully** [1] - 45:9
**bullying** [25] - 33:4, 33:20, 43:22, 43:23, 44:12, 44:16, 44:24, 45:10, 45:21, 46:2, 47:24, 49:9, 49:11, 49:12, 49:15, 49:22, 50:2, 50:7, 50:11, 51:14, 52:4, 52:12, 52:15, 54:1
**bunch** [6] - 66:20, 141:8, 142:4, 145:1, 149:13, 154:22
**burning** [1] - 152:2
**Burton** [1] - 2:20
**burtons@huntonak. com** [1] - 2:22
**buses** [1] - 56:6
**business** [1] - 11:22
**BY** [67] - 16:13, 21:21, 23:3, 23:6, 26:14, 27:18, 32:13, 34:1, 35:25, 37:1, 38:13, 39:12, 40:11, 42:4, 42:11, 46:9, 46:21, 47:8, 52:21, 53:25, 59:20, 60:5, 61:6, 65:22, 67:20, 71:12, 82:15, 85:4, 88:18, 90:8, 90:22, 93:14, 95:22, 97:2, 99:8, 101:12, 104:11, 110:7, 114:5, 115:19, 121:16, 121:20, 122:22, 124:25, 125:12, 126:6, 126:24, 130:17, 137:13, 138:3, 138:11, 139:8, 142:16,

144:5, 146:6, 147:8, 148:15, 149:12, 150:15, 153:14, 157:4, 167:11, 170:11, 171:11, 172:1, 172:7, 173:24

## C

**CA** [1] - 1:20
**camper** [1] - 26:25
**canned** [1] - 168:21
**cannot** [6] - 50:5, 50:7, 50:8, 52:10, 153:23, 178:3
**capable** [1] - 131:14
**capacity** [2] - 50:6, 183:5
**cape** [1] - 20:11
**capture** [1] - 111:10
**car** [21] - 5:4, 26:7, 41:21, 45:10, 45:12, 66:2, 118:9, 123:1, 123:6, 123:9, 123:17, 123:25, 124:3, 124:14, 127:17, 145:22, 146:10, 146:11, 163:23, 166:4, 175:22
**cared** [1] - 21:5
**career** [1] - 19:18
**carpool** [1] - 56:7
**C**█ [1] - 28:25
**Carson** [12] - 18:2, 18:4, 18:6, 18:9, 18:16, 18:22, 19:14, 20:2, 20:6, 24:8, 28:2, 54:1
**case** [61] - 5:15, 6:18, 6:25, 7:19, 11:17, 12:22, 14:5, 14:23, 15:20, 15:23, 16:20, 24:2, 39:14, 40:1, 40:15, 42:19, 75:19, 78:23, 82:8, 82:17, 83:3, 83:7, 84:11, 97:12, 98:15, 107:23, 109:7, 114:15, 114:25, 117:9, 117:10, 118:15, 118:23, 119:23, 129:3, 131:18, 139:22, 147:1, 162:6, 162:7, 163:3, 165:10, 169:9, 175:10, 175:11, 175:21,

175:25, 176:1, 176:20, 178:23, 179:19, 179:20, 179:24, 180:19, 180:21, 181:13, 183:7
**cases** [13] - 11:1, 79:19, 79:24, 80:21, 82:5, 95:3, 127:13, 148:1, 151:5, 151:9, 152:17, 168:19
**category** [3] - 50:19, 50:20, 51:2
**caught** [1] - 181:9
**cautions** [1] - 127:13
**cc'd** [1] - 29:19
**cell** [11] - 25:25, 26:9, 26:18, 27:25, 28:8, 28:10, 28:13, 28:17, 28:20, 29:12, 30:16
**Center** [1] - 126:7
**center** [1] - 23:13
**Century** [1] - 1:19
**ceremonies** [1] - 20:13
**certain** [22] - 12:21, 13:10, 50:1, 54:16, 67:2, 69:7, 71:22, 74:17, 78:21, 79:14, 79:23, 80:1, 86:14, 92:23, 93:21, 104:21, 127:11, 132:16, 157:15, 158:22, 159:17
**certainly** [19] - 20:4, 30:24, 34:23, 46:19, 85:16, 99:15, 110:24, 120:10
**certainty** [2] - 67:15, 87:17
**CERTIFICATE** [1] - 183:1
**Certificate** [1] - 4:15
**certification** [1] - 62:4
**certified** [4] - 61:20, 61:21, 63:12, 170:2
**certify** [2] - 183:4, 183:10
**Chambers** [12] - 7:8, 7:12, 7:21, 7:23, 8:9, 9:7, 9:17, 176:10, 180:22, 181:2, 181:16
**Chambers'** [1] - 7:18
**chance** [1] - 96:15
**change** [1] - 73:21
**changed** [1] - 128:5
**chapter** [1] - 18:23
**chapters** [1] - 62:11
**characteristically** [3] -

75:22, 76:19, 161:6
**characteristics** [1] - 107:11
**characterization** [1] - 146:18
**characterized** [1] - 162:14
**check** [7] - 58:14, 78:15, 88:5, 98:11, 112:23, 160:3, 171:4
**checked** [1] - 66:8
**checklist** [4] - 127:12, 127:15, 136:7, 156:16
**Chief** [1] - 176:9
**chief** [2] - 5:15, 10:20
**child** [10] - 19:2, 32:22, 34:18, 34:22, 34:25, 41:21, 49:13, 131:13, 148:7
**childhood** [2] - 152:18, 152:20
**children** [4] - 17:14, 17:17, 64:5, 147:21
**Children's** [3] - 125:13, 173:7, 173:11
**choice** [1] - 131:18
**choose** [3] - 86:10, 86:18, 117:19
**chose** [4] - 18:19, 86:8, 165:22, 165:23
**Christmas** [1] - 27:4
**Christmastime** [2] - 25:24, 27:14
**chronic** [2] - 80:14, 133:21
**circle** [1] - 21:22
**circumstances** [2] - 8:5, 34:8
**Civil** [2] - 1:4, 183:7
**civil** [1] - 151:5
**claim** [3] - 40:24, 41:2, 150:1
**claiming** [1] - 70:13
**claims** [4] - 14:7, 148:17, 151:20, 152:11
**clarification** [1] - 50:16
**clarify** [3] - 9:23, 72:18, 128:9
**class** [25] - 18:12, 25:4, 25:14, 25:19, 25:22, 26:1, 28:1, 29:9, 29:16, 32:18, 32:22, 32:23, 33:1, 33:7, 41:13, 55:9, 55:13, 55:20, 55:25, 56:2, 56:16, 57:14,

58:3
**classes** [8] - 20:5, 20:6, 22:5, 22:18, 30:6, 39:16, 55:4, 55:17
**classic** [1] - 78:17
**Classification** [1] - 129:14
**classroom** [19] - 17:14, 19:24, 20:25, 21:2, 21:23, 22:1, 22:7, 22:9, 23:10, 23:14, 23:15, 24:10, 24:11, 28:5, 29:14, 34:24, 37:20, 49:18, 49:21
**clean** [1] - 137:25
**clear** [11] - 9:21, 37:3, 112:20, 115:4, 130:3, 138:18, 138:19, 161:24, 162:1, 162:18, 165:9
**clearer** [2] - 149:1, 152:22
**clearly** [1] - 80:13
**CLERK** [1] - 142:13
**clerks** [1] - 177:21
**client** [15] - 115:6, 115:10, 116:6, 116:12, 116:17, 117:17, 120:11, 135:19, 136:12, 138:20, 139:13, 150:2, 152:12, 158:3, 163:18
**clinical** [51] - 59:24, 61:15, 61:16, 61:21, 63:9, 63:16, 64:2, 65:24, 65:25, 67:3, 67:7, 67:11, 76:16, 81:21, 83:22, 84:6, 84:11, 111:5, 112:25, 117:22, 118:4, 118:7, 118:8, 118:20, 128:24, 129:12, 130:20, 130:21, 130:23, 131:14, 132:8, 136:7, 143:8, 145:21, 151:25, 152:3, 152:6, 156:1, 156:7, 156:9, 156:11, 156:15, 156:18, 157:6, 157:13, 158:6, 158:16, 158:19, 158:20, 167:16, 174:17
**Clinical** [2] - 62:3, 63:11

**clinically** [1] - 64:14
**clinicians** [3] - 127:17, 128:23
**close** [4] - 5:15, 106:8, 175:16, 178:23
**closer** [3] - 60:2, 85:1, 181:19
**closet** [1] - 38:7
**closets** [1] - 38:23
**club** [3] - 37:15, 37:16, 37:25
**cluster** [1] - 75:4
**CNS** [1] - 103:16
**code** [7] - 128:2, 131:10, 135:8, 135:14, 135:17, 154:9, 154:12
**coded** [1] - 97:4
**codes** [1] - 134:21
**coding** [2] - 99:20, 99:22
**cognition** [1] - 107:9
**cognitive** [18] - 64:10, 70:12, 71:24, 72:15, 87:10, 89:2, 91:10, 91:12, 91:14, 107:17, 153:18, 153:21, 153:23, 154:3, 154:14, 156:23, 166:18, 166:21
**Coke** [4] - 73:13, 73:14, 73:15, 73:16
**colleague** [1] - 36:19
**colleagues** [2] - 166:23, 176:23
**collectively** [1] - 49:16
**college** [4] - 16:23, 17:20, 101:4, 101:6
**color** [3] - 19:22, 19:23, 21:22
**column** [4] - 91:19, 91:20, 93:15, 154:23
**combat** [1] - 164:18
**combine** [1] - 96:14
**combined** [1] - 84:19
**comfortable** [2] - 50:25, 51:7
**coming** [8] - 11:3, 19:24, 24:8, 25:15, 28:9, 35:9, 56:6, 176:25
**commitment** [1] - 123:21
**committees** [1] - 62:5
**common** [1] - 100:15
**commonly** [3] - 107:23, 134:5, 137:23
**Commonwealth** [2] -

47:19, 63:4
**communicate** [1] - 127:1
**communicated** [2] - 54:15, 54:18
**communication** [3] - 26:2, 35:14, 39:21
**communications** [1] - 39:25
**community** [1] - 17:9
**companies** [1] - 72:22
**company** [1] - 68:10
**comparator** [1] - 95:25
**compare** [8] - 66:19, 67:4, 99:5, 100:21, 101:3, 109:1, 109:3, 152:4
**compared** [6] - 64:5, 70:4, 100:1, 108:21, 109:6, 109:9
**comparing** [5] - 72:11, 92:25, 93:1, 95:23, 108:22
**comparison** [6] - 68:4, 68:14, 70:8, 94:7, 94:10, 152:14
**compensated** [3] - 65:6, 65:9, 65:15
**competency** [1] - 63:5
**complain** [1] - 31:18
**complaint** [7] - 12:12, 12:17, 38:6, 38:14, 40:17, 40:18
**complaints** [4] - 40:14, 40:17, 40:20, 40:23
**complete** [1] - 107:6
**completed** [2] - 47:16, 106:15
**completely** [5] - 36:17, 44:12, 96:12, 108:20, 132:9
**completes** [1] - 106:23
**complicated** [1] - 97:22
**complied** [2] - 22:14, 23:18
**component** [1] - 142:22
**components** [3] - 81:15, 81:17, 82:22
**comprehension** [3] - 143:20, 144:13, 154:8
**comprehensive** [4] - 89:22, 112:16, 138:15, 145:17
**comprehensively** [1] -

136:4
**computer** [4] - 37:20, 106:25, 170:22, 183:12
**concentration** [2] - 142:23, 144:2
**concept** [1] - 72:12
**concern** [4] - 10:7, 10:19, 77:21, 165:18
**concerned** [1] - 147:23
**concerns** [1] - 66:4
**concerts** [1] - 20:13
**conclusion** [1] - 148:12
**conclusions** [1] - 82:2
**concussion** [3] - 129:18, 129:19, 129:20
**condition** [6] - 77:23, 80:22, 81:12, 112:22, 134:8, 147:22
**conditions** [5] - 6:25, 109:20, 127:18, 134:9, 168:24
**conduct** [6] - 49:14, 50:12, 52:6, 52:8, 60:6, 82:19
**conducted** [2] - 101:15, 181:17
**Conference** [1] - 63:11
**conference** [1] - 63:11
**confers** [2] - 166:25, 176:24
**confidence** [1] - 129:2
**confident** [1] - 87:14
**confines** [1] - 182:5
**confirm** [3] - 116:11, 121:25, 156:14
**confounding** [1] - 14:6
**confusion** [1] - 138:18
**consequently** [1] - 5:16
**consider** [3] - 75:14, 75:20, 161:18
**considerations** [1] - 180:15
**considered** [3] - 103:22, 111:20, 153:24
**consisted** [1] - 141:8
**consistency** [3] - 103:16, 105:4, 164:3
**consistent** [10] - 7:17, 87:3, 107:25, 156:24, 158:14, 163:6, 163:18,

163:21, 163:24, 168:16
**constantly** [1] - 29:13
**constitute** [1] - 183:11
**consult** [3] - 73:1, 166:23, 169:11
**Consultation** [1] - 139:20
**consultation** [1] - 139:20
**consulted** [1] - 158:12
**Cont** [2] - 1:25, 2:25
**contained** [1] - 114:20
**contains** [1] - 83:11
**contemplating** [1] - 148:4
**contemporaneous** [2] - 8:11, 9:15
**content** [3] - 49:19, 83:12, 95:2
**CONTENTS** [1] - 4:1
**context** [23] - 8:4, 9:12, 11:1, 50:23, 64:24, 79:17, 86:11, 106:2, 138:12, 145:20, 145:21, 145:22, 146:15, 146:16, 148:17, 149:3, 149:22, 149:25, 150:9, 151:2, 152:10, 152:24, 153:12
**continually** [2] - 72:8, 103:18
**continue** [5] - 30:12, 44:24, 45:7, 53:5, 72:7
**continues** [2] - 29:7, 72:4
**continuing** [1] - 45:3
**contradict** [1] - 6:12
**control** [2] - 94:12, 94:15
**controls** [1] - 108:25
**controversy** [1] - 14:22, 178:7
**conversation** [1] - 29:10
**cool** [1] - 64:22
**copies** [3] - 5:7, 7:2, 60:18
**coping** [1] - 19:2
**copy** [9] - 13:25, 14:3, 14:8, 14:9, 14:11, 42:13, 115:14, 115:15, 131:5
**copyright** [1] - 160:6
**copyrighted** [1] - 159:10
**core** [5] - 26:21,

34:14, 34:15, 114:20, 177:2
**corner** [1] - 28:9
**correct** [138] - 8:14, 18:13, 22:20, 22:22, 26:19, 34:7, 36:10, 36:13, 37:6, 42:24, 45:5, 49:25, 58:4, 58:24, 90:18, 93:4, 93:21, 95:17, 114:16, 114:17, 114:22, 115:7, 115:8, 115:11, 115:12, 115:21, 116:9, 116:14, 116:16, 116:18, 116:19, 116:21, 117:6, 117:7, 117:11, 117:14, 117:17, 117:18, 117:20, 117:21, 118:2, 118:10, 118:13, 118:17, 119:5, 119:14, 120:25, 123:1, 123:4, 123:6, 123:10, 123:14, 123:17, 124:1, 124:4, 125:18, 125:20, 125:22, 127:6, 127:19, 128:20, 129:6, 129:7, 129:8, 129:9, 130:5, 130:10, 130:24, 132:17, 133:10, 133:18, 134:17, 135:8, 135:15, 135:16, 135:20, 136:1, 136:13, 136:15, 136:17, 136:21, 136:22, 136:24, 137:5, 137:10, 137:14, 138:5, 138:13, 140:16, 140:24, 140:25, 141:13, 142:21, 143:3, 143:4, 143:10, 143:12, 143:21, 144:9, 145:3, 145:14, 145:15, 146:12, 146:17, 148:12, 148:18, 149:5, 152:13, 152:15, 153:2, 153:10, 154:8, 154:17, 155:9, 156:2, 156:7, 156:19, 157:14, 159:8, 160:12, 160:13, 160:25,

188

161:1, 161:10, 161:17, 161:22, 161:24, 162:3, 162:9, 164:12, 165:8, 166:7, 166:12, 169:16, 172:16, 173:15, 176:19
**Correct** [1] - 136:14
**correctly** [4] - 97:10, 158:10, 170:22, 170:25
**correlation** [1] - 81:4
**Counsel** [2] - 166:25, 176:24
**counsel** [9] - 16:7, 43:5, 43:7, 59:14, 117:10, 119:1, 138:13, 182:3
**counseling** [4] - 24:22, 25:3, 30:10, 34:12
**counselor** [6] - 20:7, 20:10, 26:22, 34:13, 50:9, 51:21
**counselors** [1] - 49:15
**count** [5] - 101:18, 101:20, 101:25, 135:18, 145:1
**counterintuitive** [1] - 77:24
**counting** [9] - 97:24, 101:14, 101:16, 101:23, 102:5, 103:8, 132:2, 144:25, 153:16
**County** [10] - 16:17, 17:1, 17:5, 43:11, 44:7, 48:2, 48:16, 51:18, 52:6, 52:10
**county** [1] - 21:11
**couple** [2] - 72:12, 176:10
**course** [3] - 67:8, 80:19, 158:18
**courses** [1] - 47:22
**coursework** [1] - 47:17
**COURT** [148] - 1:1, 1:11, 5:1, 5:3, 8:3, 8:24, 9:12, 9:25, 10:5, 10:25, 11:5, 11:19, 12:6, 12:13, 12:18, 12:23, 13:2, 13:18, 14:11, 14:19, 15:4, 15:8, 15:11, 15:17, 16:4, 16:6, 16:11, 21:17, 23:1, 23:5, 26:12, 27:16, 32:9, 33:24, 35:21,

36:25, 38:10, 38:12, 39:7, 39:9, 40:4, 40:6, 40:9, 41:25, 42:2, 42:8, 42:10, 45:25, 46:5, 46:7, 46:20, 47:4, 47:6, 52:18, 53:4, 53:10, 53:18, 53:24, 59:3, 59:5, 59:8, 59:11, 59:13, 60:3, 60:17, 60:19, 60:24, 61:1, 61:4, 65:21, 82:13, 88:6, 88:10, 88:15, 90:6, 90:19, 93:7, 94:19, 95:13, 95:19, 95:21, 96:16, 97:1, 97:25, 98:17, 101:10, 104:10, 110:4, 113:21, 113:23, 113:25, 114:3, 115:18, 121:4, 121:7, 121:12, 121:14, 124:23, 126:2, 137:12, 138:2, 138:7, 138:24, 139:3, 139:6, 142:12, 142:14, 143:24, 146:2, 147:7, 148:14, 150:8, 150:11, 150:14, 150:17, 156:21, 167:3, 167:6, 170:8, 171:5, 171:7, 171:9, 172:5, 173:23, 175:7, 175:10, 175:15, 176:5, 176:16, 176:19, 176:23, 177:6, 177:9, 177:16, 178:1, 178:15, 178:17, 178:20, 179:2, 179:6, 179:21, 180:1, 180:17, 181:1, 181:6, 182:2, 182:9, 182:11
**court** [8] - 8:22, 12:2, 50:16, 118:15, 169:12, 177:21, 179:2, 183:8
**Court** [27] - 3:12, 3:12, 4:15, 5:9, 5:20, 6:10, 6:17, 7:6, 7:8, 7:10, 10:10, 13:14, 13:19, 13:21, 14:5, 16:8, 59:15, 65:4, 67:17, 88:13, 169:8, 178:5, 178:21, 179:6, 181:14, 183:3, 183:22

**Court's** [7] - 6:4, 7:17, 8:10, 15:19, 175:24, 178:2, 178:12
**courtesy** [1] - 93:10
**Courthouse** [1] - 3:13
**courtroom** [2] - 18:24, 93:11
**COURTROOM** [1] - 142:13
**cover** [2] - 14:9, 14:11
**covered** [2] - 11:17, 160:16
**covers** [1] - 62:13
**COVID** [3] - 94:10, 94:11, 94:14
**create** [4] - 20:24, 72:19, 72:20
**created** [2] - 72:4, 72:22
**creating** [1] - 72:6
**credibility** [1] - 181:20
**credible** [1] - 67:10
**criminal** [3] - 11:1, 151:9, 152:17
**criteria** [22] - 67:2, 73:25, 74:10, 74:13, 75:6, 75:8, 88:21, 88:23, 89:1, 89:8, 89:16, 89:21, 89:23, 90:1, 103:9, 126:15, 127:8, 128:19, 130:2, 148:9
**criticism** [2] - 161:2, 161:22
**critique** [1] - 62:24
**Cross** [3] - 4:5, 4:5, 4:8
**cross** [2] - 12:23, 40:4
**CROSS** [3] - 40:10, 42:3, 114:4
**Cross-examination** [3] - 4:5, 4:5, 4:8
**CROSS-EXAMINATION** [3] - 40:10, 42:3, 114:4
**cross-examine** [1] - 12:23
**CSI** [1] - 64:22
**curative** [1] - 6:15
**curious** [1] - 168:6
**current** [3] - 74:8, 93:24, 134:14
**curriculum** [2] - 17:24, 49:19
**curve** [5] - 100:9, 100:10, 155:2, 155:15, 155:17
**cut** [1] - 179:23
**cutoff** [7] - 69:23, 69:24, 87:7, 102:2,

102:6, 103:20, 103:25

# D

**D-313** [1] - 154:21
**D.C** [1] - 61:24
**damaged** [1] - 68:6
**data** [13] - 72:23, 74:25, 105:3, 152:3, 164:3, 164:9, 164:10, 165:5, 165:8, 165:13, 169:21, 170:16, 170:20
**database** [1] - 72:10
**date** [7] - 27:2, 32:14, 33:16, 34:4, 133:13, 133:17, 140:12
**dated** [3] - 171:12, 172:8, 172:25
**daughters** [2] - 36:21, 36:23
**days** [3] - 52:1, 79:12, 79:13
**DC** [5] - 1:16, 2:14, 2:18, 2:21, 3:1
**de** [1] - 177:9
**deal** [6] - 13:13, 13:14, 13:15, 36:23, 151:5, 151:24
**dealt** [2] - 151:6
**December** [5] - 27:2, 27:21, 29:20, 38:18, 127:23
**decide** [2] - 14:21
**decided** [5] - 5:16, 17:2, 18:18, 131:22, 166:7
**deciding** [1] - 89:13
**decision** [8] - 9:13, 49:23, 65:4, 65:5, 67:17, 74:3, 111:25, 161:12
**decision-making** [4] - 65:4, 67:17, 74:3, 161:12
**decisions** [1] - 86:15
**deck** [1] - 60:22
**declaration** [4] - 169:8, 169:12, 169:14, 170:3
**decline** [1] - 92:21
**deemed** [3] - 8:8, 52:7, 70:6
**deer** [1] - 25:10
**Defendant** [3] - 2:13, 3:1, 3:9
**defendant** [1] - 16:20
**defendants** [11] - 6:1,

6:5, 6:7, 6:15, 6:17, 6:19, 8:3, 117:10, 138:13, 156:17, 176:20
**Defendants** [5] - 1:7, 3:5, 4:2, 4:10, 59:9
**Defendants'** [24] - 16:5, 21:16, 22:24, 32:5, 32:7, 35:19, 35:22, 39:4, 39:10, 39:11, 46:14, 46:22, 46:24, 48:9, 59:17, 88:3, 90:15, 90:20, 171:1, 171:6, 171:10, 172:2, 172:6, 178:23
**defendants'** [2] - 5:20, 7:3
**defense** [6] - 11:11, 11:13, 142:11, 163:24, 165:7, 177:20
**Defense** [1] - 142:11
**deficits** [1] - 66:25
**define** [1] - 72:13
**defined** [2] - 17:9, 52:6
**definitely** [1] - 98:12
**definition** [2] - 64:21, 120:18
**degree** [4] - 61:13, 67:15, 87:16, 110:14
**delusion** [1] - 80:12
**Demetri** [1] - 176:21
**demonstrate** [2] - 132:7, 159:6
**demonstrated** [1] - 160:11
**demonstrative** [3] - 121:6, 121:11, 139:1
**demonstratives** [1] - 60:23
**Denies** [1] - 80:3
**dent** [1] - 68:11
**departure** [1] - 35:6
**deposition** [27] - 7:7, 7:10, 7:15, 9:24, 42:13, 42:19, 42:21, 43:2, 111:18, 114:13, 115:13, 115:20, 116:15, 119:16, 136:10, 148:19, 148:23, 149:18, 150:6, 150:19, 157:9, 163:9, 163:10, 163:11, 177:5, 177:9, 177:11
**depressed** [3] - 66:8, 70:17, 70:18

**depression** [2] - 66:9, 173:13

**depressive** [2] - 89:11, 127:9

**Deputy** [1] - 176:9

**deputy** [1] - 10:20

**DeRight** [18] - 4:6, 15:9, 15:14, 59:10, 59:11, 59:17, 59:24, 60:1, 60:6, 61:10, 65:17, 88:16, 88:19, 114:6, 120:18, 156:16, 167:12, 171:12

**derived** [3] - 92:22, 94:3, 157:1

**describe** [10] - 19:14, 20:1, 20:2, 20:9, 25:7, 84:5, 153:3, 161:9, 164:2, 168:7

**described** [4] - 77:7, 94:21, 120:13, 155:14

**describes** [1] - 89:19

**describing** [2] - 64:24, 163:19

**desensitization** [1] - 113:6

**design** [1] - 104:17

**designed** [2] - 69:13, 94:25

**desire** [1] - 169:4

**despite** [2] - 5:23, 30:20

**despondent** [1] - 85:17

**Detective** [11] - 7:8, 7:11, 7:18, 7:21, 7:23, 8:9, 9:7, 9:17, 180:22, 181:2, 181:16

**determination** [12] - 13:19, 51:4, 51:5, 75:19, 132:20, 157:3, 158:8, 163:4, 165:10, 165:12, 179:12, 181:15

**determinations** [4] - 76:2, 161:12, 182:4, 182:6

**determine** [23] - 49:12, 49:15, 49:22, 50:6, 50:7, 50:11, 50:12, 50:13, 50:17, 66:22, 67:25, 68:16, 69:14, 74:9, 74:11, 81:12, 93:25, 94:8, 95:25, 101:21, 112:17, 137:16, 157:23

**determined** [2] - 130:23, 158:2

**determining** [3] - 68:11, 75:25, 179:11

**developed** [2] - 74:10, 90:1

**development** [1] - 47:22

**deviation** [2] - 105:25, 106:2

**diagnose** [7] - 90:4, 127:18, 127:21, 128:23, 143:10, 143:12, 143:16

**diagnosed** [11] - 5:13, 88:1, 88:20, 90:1, 129:23, 131:12, 135:20, 136:4, 136:25, 137:20, 145:10

**diagnoses** [8] - 117:5, 120:11, 122:13, 122:16, 131:15, 134:20, 168:23, 172:11

**diagnosing** [4] - 5:23, 127:5, 128:19, 128:20

**diagnosis** [41] - 6:14, 75:7, 76:3, 79:4, 79:24, 88:22, 89:1, 89:11, 112:25, 116:24, 117:1, 125:20, 126:10, 126:14, 128:25, 129:8, 129:16, 129:19, 129:25, 130:18, 131:8, 131:19, 131:20, 131:21, 132:13, 132:19, 133:8, 133:9, 133:18, 133:21, 133:25, 134:7, 134:23, 135:5, 135:10, 137:4, 142:21, 142:22, 144:7, 145:12, 173:11

**diagnostic** [6] - 67:2, 73:25, 89:6, 89:8, 127:4, 128:19

**dial** [1] - 108:13

**dictated** [2] - 27:8, 180:21

**difference** [5] - 70:22, 106:3, 106:4, 106:9, 146:14

**differences** [4] - 67:6, 69:11, 146:7, 146:8

**different** [30] - 9:7,

43:17, 43:18, 64:10, 67:6, 67:11, 80:23, 81:20, 84:8, 92:17, 96:2, 96:12, 99:11, 102:8, 102:25, 104:18, 107:10, 107:24, 109:15, 110:18, 112:13, 134:9, 134:11, 143:13, 145:20, 151:11, 151:21, 166:17, 174:21

**differently** [2] - 9:10, 78:16

**difficult** [3] - 76:22, 162:17, 167:20

**dig** [1] - 131:4

**digit** [4] - 93:17, 95:17, 96:1, 96:3

**Direct** [2] - 4:4, 4:7

**DIRECT** [2] - 16:12, 59:19

**direct** [9] - 13:12, 26:2, 138:16, 140:22, 150:22, 155:5, 159:19, 163:4, 165:15

**directed** [2] - 36:19, 148:8

**direction** [1] - 55:3

**directly** [3] - 34:11, 53:14, 155:4

**disability** [3] - 81:9, 101:2, 109:4

**disabled** [2] - 75:12, 106:4

**disagree** [4] - 163:8, 163:12, 163:13, 182:3

**disagreement** [2] - 178:4, 179:18

**discharge** [1] - 133:9

**disclose** [3] - 114:24, 116:5, 160:14

**disclosed** [4] - 104:7, 116:12, 136:11, 176:15

**discovery** [2] - 12:9, 14:2

**discrepancies** [1] - 74:24

**discrepant** [1] - 75:4

**discrimination** [3] - 46:11, 47:15, 49:10

**discuss** [6] - 5:18, 7:4, 15:20, 167:16, 175:10, 175:25

**discussed** [4] - 36:1, 36:2, 52:23, 175:17

**discussing** [2] -

83:12, 148:10

**disease** [5] - 66:10, 69:21, 86:4, 89:25

**Diseases** [1] - 129:14

**dismissal** [1] - 22:21

**disorder** [29] - 5:14, 5:19, 5:22, 5:24, 5:25, 6:3, 6:9, 6:24, 87:25, 89:11, 110:11, 125:6, 126:11, 126:14, 126:15, 127:10, 131:9, 133:10, 133:22, 134:10, 134:12, 134:21, 134:24, 135:8, 135:11, 137:21, 173:8, 173:13

**disorders** [4] - 90:5, 109:15, 109:19, 127:6

**display** [1] - 183:13

**dispute** [1] - 123:8

**distress** [1] - 30:22

**district** [2] - 18:18, 19:1

**DISTRICT** [3] - 1:1, 1:1, 1:11

**District** [2] - 3:12, 183:4

**division** [1] - 14:17

**doctor** [16] - 17:10, 61:4, 66:12, 88:10, 117:24, 120:2, 130:3, 130:9, 130:21, 131:12, 138:1, 138:4, 139:3, 149:24, 152:7, 152:9

**Doctor** [6] - 133:13, 137:14, 151:18, 154:2, 167:1, 175:7

**doctor's** [2] - 139:1, 139:4

**doctors** [9] - 135:23, 136:12, 136:20, 145:9, 146:8, 146:14, 146:20, 163:22, 174:24

**document** [5] - 39:3, 39:14, 53:9, 53:10, 91:12

**documented** [1] - 32:3

**documents** [4] - 43:2, 119:2, 147:1, 172:22

**domino** [1] - 28:14

**done** [17] - 27:22, 31:12, 64:17, 67:4, 69:3, 69:17, 70:3, 79:3, 83:13, 102:4, 117:14, 151:2,

154:6, 164:22, 169:19, 180:4, 180:5

**door** [6] - 22:7, 23:7, 23:9, 23:10, 23:14, 23:15

**doors** [5] - 23:9, 23:19, 55:16, 58:11, 58:15

**dot** [7] - 97:24, 101:14, 101:16, 102:5, 103:8, 144:25, 153:16

**dots** [6] - 101:17, 101:18, 101:20, 132:2, 145:1

**down** [29] - 22:23, 23:25, 30:1, 33:6, 35:1, 37:7, 59:6, 75:2, 88:10, 95:16, 104:5, 112:21, 121:17, 121:19, 124:6, 126:20, 129:18, 130:22, 139:15, 140:21, 141:1, 142:7, 146:3, 148:20, 154:24, 168:14, 173:11, 175:7, 179:24

**downplay** [1] - 107:3

**downs** [1] - 168:10

**dozens** [1] - 66:23

**Dr** [37] - 4:6, 5:11, 5:17, 6:1, 6:22, 7:4, 15:6, 15:7, 15:9, 46:12, 48:10, 59:10, 59:11, 59:17, 60:1, 60:6, 61:10, 65:17, 88:16, 88:19, 111:13, 111:18, 112:3, 114:6, 120:18, 120:24, 122:2, 125:1, 156:16, 163:8, 163:11, 167:12, 171:12, 171:15, 171:17, 172:20, 176:25

**DR** [3] - 103:13, 103:15, 103:25

**dramatically** [1] - 105:25

**drastic** [1] - 106:9

**draw** [1] - 52:25

**dream** [1] - 17:16

**dress** [1] - 21:9

**Drive** [1] - 3:5

**drop** [3] - 92:23, 92:24, 92:25

**drowsy** [1] - 98:22

**DSM** [40] - 89:3, 89:5,

89:6, 112:23,
126:15, 126:25,
127:4, 127:7,
127:13, 127:16,
128:4, 128:10,
128:15, 128:19,
128:24, 129:8,
129:10, 131:10,
131:12, 131:16,
131:18, 131:20,
132:8, 132:13,
132:15, 133:1,
133:3, 134:13,
134:14, 134:15,
134:16, 135:8,
135:13, 135:16,
143:9, 145:12,
173:16
**DSM-1-TR** [1] - 128:12
**DSM-2** [1] - 128:11
**DSM-4** [4] - 128:2,
128:3, 128:16,
128:18
**DSM-5** [5] - 89:15,
89:18, 127:14,
144:2, 144:4
**DSM-based** [1] -
145:12
**due** [3] - 38:2, 86:12,
86:14
**during** [19] - 6:9,
10:11, 25:19, 27:25,
30:2, 30:9, 31:6,
31:9, 35:3, 39:1,
42:23, 46:12, 52:22,
85:5, 85:13, 85:22,
86:18, 96:16, 177:2
**duty** [1] - 81:10
**dysfunction** [1] -
109:17

## E

**earliest** [1] - 124:20
**early** [2] - 66:9, 76:14
**earned** [1] - 61:14
**East** [1] - 1:19
**Eastern** [1] - 183:4
**EASTERN** [1] - 1:1
**easy** [2] - 75:22, 77:1
**edification** [1] - 99:24
**edition** [1] - 135:13
**education** [5] - 16:25,
17:4, 17:6, 17:24,
61:12
**educational** [2] -
16:23, 61:11
**educator** [2] - 36:21
**educators** [1] - 17:6
**effect** [1] - 28:14

**effective** [1] - 53:17
**efficient** [2] - 178:11,
178:17
**effort** [10] - 62:16,
63:13, 68:20, 68:21,
68:24, 69:1, 69:3,
69:5, 69:8, 98:25
**Eileen** [2] - 5:17,
111:13
**either** [10] - 23:19,
30:10, 45:6, 70:4,
91:21, 118:14,
141:12, 158:22,
168:22, 179:18
**elementary** [1] - 24:8
**elevated** [1] - 108:8,
108:9, 110:2
**Elliker** [2] - 2:25,
177:23
**Email** [11] - 1:17, 1:21,
2:4, 2:8, 2:12, 2:15,
2:19, 2:22, 3:2, 3:7,
3:10
**email** [32] - 26:16,
26:17, 26:20, 26:24,
28:24, 29:4, 29:19,
31:21, 31:24, 32:14,
32:25, 33:14, 33:15,
33:19, 34:2, 34:3,
34:4, 34:9, 34:12,
34:16, 35:24, 36:1,
36:3, 36:4, 36:6,
36:12, 36:15, 37:5,
39:20, 56:20, 56:22,
58:21
**emails** [3] - 32:1, 32:3,
39:24
**embedded** [13] -
69:12, 69:16, 69:22,
71:16, 71:21, 87:5,
91:18, 92:1, 92:7,
92:20, 94:2, 98:10,
158:23
**emblem** [1] - 49:1
**EMDR** [1] - 113:6
**emotional** [5] - 64:10,
65:1, 66:4, 85:13,
109:18
**employed** [4] - 19:4,
48:2, 48:16, 52:9
**employee** [1] - 46:6
**employment** [1] -
47:16
**encounter** [1] - 38:25
**encourage** [1] -
147:20
**encouraged** [1] -
29:17
**end** [17] - 11:9, 11:15,
12:2, 21:14, 22:18,

28:6, 58:21, 77:18,
85:24, 86:6, 91:14,
96:22, 100:24,
115:23, 141:2,
167:18, 167:23
**ended** [3] - 29:12,
30:7, 167:13
**endocrine** [1] - 134:10
**endured** [2] - 151:16,
162:16
**energy** [2] - 72:21,
85:21
**engaged** [1] - 33:19
**engagement** [3] -
86:1, 117:13, 117:14
**engineer** [1] - 17:10
**engineers** [1] - 17:18
**English** [1] - 177:3
**enhanced** [1] - 96:3
**enjoyed** [1] - 32:23
**ensuring** [1] - 58:8
**entailed** [1] - 84:5
**entered** [1] - 7:1
**entire** [12] - 7:25,
16:25, 17:4, 18:24,
29:16, 31:5, 31:6,
31:17, 32:2, 45:18,
55:23, 58:23
**entries** [2] - 139:16,
169:7
**entry** [4] - 122:5,
139:15, 139:16,
139:17
**environment** [1] -
20:24
**epilepsy** [3] - 89:25,
104:4, 104:21
**erase** [1] - 22:2
**error** [3] - 97:19,
102:8, 102:10
**errors** [3] - 98:24,
101:22
**especially** [5] - 6:12,
70:15, 78:20, 96:1,
108:7
**Esq** [11] - 1:13, 1:18,
2:1, 2:5, 2:9, 2:13,
2:16, 2:20, 2:25, 3:4,
3:8
**essential** [2] - 68:2,
142:22
**Essential** [1] - 62:12
**essentially** [24] -
62:13, 66:19, 67:12,
67:24, 68:1, 69:2,
71:11, 75:7, 77:2,
77:9, 78:15, 80:10,
94:17, 95:4, 97:11,
101:23, 103:17,
110:3, 111:25,

112:18, 112:21,
127:14, 170:16,
181:15
**establish** [2] - 72:9,
76:23
**established** [2] -
73:25, 146:9
**estimate** [2] - 64:13,
74:8
**Estrella** [1] - 177:1
**et** [2] - 1:6, 183:7
**eternal** [1] - 177:25
**ethical** [1] - 160:13
**eval** [1] - 140:22
**evaluate** [2] - 83:19,
166:21
**evaluated** [6] - 64:14,
104:16, 148:16,
149:2, 152:24,
163:23
**evaluating** [1] -
166:18, 174:3
**evaluation** [47] -
60:10, 63:3, 65:3,
66:11, 66:24, 67:9,
68:3, 74:4, 76:8,
81:16, 82:4, 83:1,
83:8, 83:11, 83:14,
84:3, 84:8, 85:5,
85:7, 85:14, 85:22,
86:18, 87:20, 90:25,
91:7, 94:24, 96:20,
96:23, 96:25, 98:7,
111:24, 132:15,
132:16, 138:15,
139:10, 141:3,
145:17, 145:20,
146:16, 150:1,
152:11, 162:5,
165:24, 166:10,
169:9, 169:15,
169:17
**evaluations** [7] -
63:25, 81:9, 81:10,
83:9, 151:2, 151:16,
152:18
**evaluee** [1] - 86:16
**evening** [1] - 180:12
**event** [5] - 79:11,
79:14, 79:20, 174:9,
174:20
**evidence** [29] - 6:24,
8:20, 10:4, 13:24,
14:5, 14:10, 26:11,
35:20, 39:6, 39:10,
46:16, 74:7, 82:4,
83:15, 87:21, 87:22,
87:24, 90:20,
111:20, 115:7,
116:20, 116:25,

117:1, 117:3, 117:5,
124:22, 126:2,
131:20, 132:23
**exact** [7] - 78:20,
105:13, 151:4,
151:8, 152:5, 168:21
**exactly** [6] - 95:5,
100:10, 102:14,
107:4, 120:25,
127:16
**exaggerate** [2] - 69:7,
107:3
**exaggerated** [2] -
159:17, 160:1
**Exaggerates** [2] -
78:10, 78:25
**exaggerating** [6] -
70:2, 70:25, 79:15,
95:2, 159:20, 160:12
**exaggeration** [3] -
72:14, 90:12, 92:14
**exam** [5] - 72:25,
74:21, 87:23, 88:25,
131:13
**examination** [11] - 4:4,
4:5, 4:5, 4:7, 4:8,
4:8, 13:11, 13:12,
60:19, 138:16
**EXAMINATION** [6] -
16:12, 40:10, 42:3,
59:19, 114:4, 167:10
**examine** [1] - 12:23
**examinee** [1] - 98:7
**example** [29] - 12:7,
66:10, 67:7, 69:22,
71:1, 71:6, 71:9,
75:20, 78:2, 79:19,
80:2, 84:10, 86:3,
89:24, 95:7, 105:17,
107:22, 109:3,
110:11, 120:1,
127:21, 130:13,
131:3, 134:9, 154:7,
159:25, 160:10,
164:18, 179:18
**examples** [4] - 50:24,
52:14, 64:19, 78:17,
103:9, 159:6, 160:25
**exception** [1] - 10:22
**exceptionally** [1] -
76:21
**excessive** [1] - 92:21
**excited** [1] - 82:6
**excluding** [1] - 117:3
**exclusionary** [2] -
75:6, 75:8
**excuse** [6] - 91:4,
152:8, 154:19,
158:9, 166:20,
172:20

**excused** [4] - 59:7,
88:9, 175:9, 176:4
**Exhibit** [30] - 21:16,
21:18, 22:25, 23:2,
26:11, 26:13, 32:7,
32:10, 33:23, 33:25,
35:19, 39:4, 39:10,
46:15, 46:22, 46:24,
47:7, 48:9, 53:1,
61:3, 88:3, 90:15,
90:20, 90:21,
121:15, 124:24,
171:2, 171:23,
172:3, 172:19
**exhibit** [4] - 10:2,
90:17, 139:7, 142:15
**Exhibits** [2] - 32:6,
47:5
**exhibits** [10] - 14:6,
14:22, 15:1, 42:13,
42:16, 43:6, 43:8,
43:9, 46:24, 126:5
**EXHIBITS** [1] - 4:9
**exist** [1] - 14:23
**expect** [7] - 34:24,
76:5, 95:24, 101:4,
101:6, 169:2, 177:3
**expected** [5] - 12:3,
68:9, 68:17, 92:23,
111:7
**expecting** [1] - 178:8
**experience** [5] -
78:16, 78:22, 87:19,
108:18, 169:4
**experienced** [2] -
151:25, 162:19
**experiencing** [1] -
130:10
**expert** [17] - 5:13,
5:16, 5:17, 5:23,
6:12, 6:13, 44:12,
65:18, 111:13,
122:24, 145:23,
156:17, 160:8,
169:19, 169:21,
176:8, 180:24
**expertise** [3] - 65:5,
82:11, 131:15
**experts** [3] - 163:23,
180:24, 181:1
**explain** [34] - 51:13,
67:21, 69:11, 70:22,
74:13, 75:16, 76:13,
77:4, 77:14, 77:23,
81:15, 88:21, 90:9,
91:9, 92:18, 93:16,
97:4, 97:21, 100:20,
101:14, 102:16,
102:20, 104:15,
105:7, 106:12,

106:22, 108:21,
109:12, 110:16,
167:14, 168:17,
169:14, 169:18,
170:3
**explaining** [2] - 88:24,
104:9
**explicitly** [2] - 137:6,
162:18
**Explorers** [5] - 19:13,
20:7, 21:20, 21:24,
55:1
**expression** [1] - 25:9
**expressions** [1] -
85:16
**extent** [12] - 6:9, 6:15,
7:18, 15:21, 44:15,
79:1, 149:24, 152:7,
152:9, 176:1, 178:1,
182:5
**external** [5] - 72:17,
74:15, 74:19, 79:5,
90:13
**extra** [1] - 31:2
**extreme** [1] - 110:14
**extremely** [11] - 85:24,
92:24, 96:9, 96:12,
96:13, 101:24,
108:4, 109:8,
110:25, 112:20,
112:24
**eye** [9] - 31:2, 54:8,
54:12, 54:14, 54:15,
54:23, 55:3, 113:6
**eyes** [1] - 25:10

## F

**F.C.S.B** [4] - 1:6, 2:13,
3:1, 183:7
**F.T** [1] - 3:6
**F/P** [1] - 91:21
**F43.10** [1] - 134:11
**fabrication** [2] - 90:12,
92:14
**facial** [1] - 25:9
**facilities** [1] - 124:17
**facility** [2] - 124:14,
135:19
**fact** [10] - 30:20,
53:16, 76:1, 112:9,
113:9, 115:2,
123:21, 168:12,
176:10, 180:6
**factor** [2] - 168:17,
168:18
**factors** [3] - 162:12,
162:22, 167:14
**facts** [2] - 7:24, 163:6
**factual** [2] - 40:21,

163:16
**factually** [1] - 146:8
**faculty** [1] - 37:15
**Fahey** [3] - 1:13, 47:4,
53:10
**FAHEY** [18] - 38:9,
38:11, 39:8, 40:5,
42:4, 42:7, 42:9,
42:11, 46:9, 46:19,
46:21, 47:5, 47:8,
52:21, 53:14, 53:20,
53:25, 59:2
**fahey**.............. [1] - 4:5
**fail** [3] - 86:6, 91:21,
96:7
**failed** [6] - 91:22, 92:5,
93:25, 106:17,
155:21, 159:17
**failing** [3] - 92:6,
92:20, 103:22
**fails** [1] - 93:24
**fair** [8] - 48:17,
122:16, 141:5,
144:8, 146:18,
151:18, 178:24,
179:3
**Fairfax** [10] - 16:17,
17:1, 17:5, 21:11,
43:11, 44:6, 48:2,
48:16, 51:18, 52:10
**fairly** [4] - 67:23,
77:11, 77:24, 164:10
**fake** [2] - 75:22,
105:24
**faking** [4] - 70:5,
75:24, 76:6, 168:4
**fall** [4] - 18:5, 18:10,
50:20, 51:1
**fallible** [1] - 129:25
**falling** [1] - 99:16
**falls** [1] - 50:19
**false** [6] - 41:18, 75:9,
75:10, 82:8, 98:24,
157:8
**familiar** [1] - 104:12
**family** [3] - 18:23,
27:9, 36:2
**Family** [2] - 122:2,
171:14, 172:8
**far** [6] - 13:22, 75:2,
91:19, 97:19, 99:6,
138:19
**F**▮▮▮▮▮ [16] - 4:3,
16:3, 16:4, 16:5,
16:19, 21:22, 34:4,
36:1, 39:13, 39:14,
40:14, 41:5, 41:20,
41:24, 42:5, 42:12
**fast** [5] - 97:12, 98:20,
101:18, 168:13,

176:11
**faster** [1] - 84:8
**fatigue** [2] - 85:21,
86:5
**fatigued** [1] - 85:9,
85:24, 86:7
**favorable** [1] - 108:7
**favorably** [1] - 155:1
**features** [2] - 144:2,
161:11
**February** [3] - 38:18,
39:16, 171:12
**feeder** [1] - 24:8
**feelings** [2] - 24:12,
44:13
**feign** [1] - 164:9
**feigning** [7] - 70:1,
137:5, 137:9,
137:24, 138:5,
165:6, 165:14
**FELDMAN** [1] - 3:8
**fellow** [1] - 164:20
**fellowship** [2] - 61:16,
63:18
**felt** [4] - 26:1, 28:18,
29:18, 29:23
**few** [12] - 19:3, 25:23,
37:8, 52:1, 56:13,
64:19, 71:15, 99:12,
119:16, 119:18,
122:24
**fewer** [1] - 71:5
**field** [15] - 25:21, 62:1,
62:9, 62:19, 62:24,
63:9, 67:24, 74:11,
75:21, 87:3, 89:23,
100:16, 116:23,
156:24, 160:13
**fields** [1] - 170:19
**figure** [3] - 64:11,
64:25, 178:7
**figuring** [1] - 25:1
**file** [3] - 169:12, 178:8,
178:12
**filed** [2] - 40:15, 147:3
**filled** [1] - 8:17
**filling** [2] - 141:12,
141:17
**final** [2] - 28:6, 39:3
**finality** [1] - 178:23
**finally** [1] - 27:6
**financial** [1] - 74:20
**fine** [6] - 79:14, 99:6,
108:20, 150:14,
156:13, 178:15,
178:17
**finish** [2] - 146:1,
146:7
**first** [40] - 5:6, 15:14,
17:7, 18:1, 18:4,

18:22, 19:23, 22:1,
22:5, 22:18, 24:3,
24:4, 24:5, 24:15,
25:6, 25:12, 27:5,
27:23, 34:4, 36:3,
39:22, 40:5, 40:18,
52:1, 61:10, 63:15,
74:8, 74:15, 91:17,
92:18, 92:19, 99:12,
100:6, 100:13,
107:17, 118:23,
140:16, 148:16,
157:24
**first-generation** [1] -
17:7
**fitness** [1] - 81:9
**five** [12] - 56:1, 83:14,
93:2, 101:18,
101:24, 103:10,
120:8, 139:16,
141:7, 141:20,
145:1, 166:1
**five-hour** [1] - 139:16
**FL** [3] - 2:3, 2:7, 2:11
**flashbacks** [3] - 77:6,
77:9, 153:5
**FLEXNER** [4] - 1:18,
2:1, 2:5, 2:9
**flier** [1] - 46:15
**flip** [2] - 91:1, 99:21
**Floor** [1] - 3:13
**flowers** [1] - 25:22
**focus** [1] - 19:9
**focused** [3] - 49:9,
82:13, 122:10
**folks** [2] - 122:19,
122:24
**follow** [2] - 31:2,
160:14
**followed** [2] - 25:5,
80:12
**following** [3] - 5:9,
20:20, 30:12
**font** [1] - 97:13
**food** [2] - 154:10,
154:11
**FOR** [1] - 1:1
**foregoing** [1] - 183:10
**Forensic** [1] - 140:21
**forensic** [33] - 59:25,
60:6, 63:3, 63:9,
63:25, 64:3, 64:16,
64:20, 64:21, 64:23,
65:6, 65:12, 67:5,
67:13, 81:9, 81:15,
82:3, 87:20, 95:3,
111:6, 112:13,
118:4, 118:14,
118:20, 118:21,
123:3, 127:13,

138:13, 138:20, 139:10, 145:23, 151:25, 156:17
**form** [3] - 6:20, 95:2, 120:23
**formal** [1] - 61:12
**former** [1] - 49:1
**forms** [1] - 170:20
**formulate** [1] - 165:10
**forth** [2] - 13:8, 100:12
**forthcoming** [1] - 161:4
**fortunate** [1] - 19:18
**forward** [4] - 23:20, 23:21, 122:8, 133:17
**foundation** [1] - 104:10
**four** [15] - 18:7, 18:16, 23:9, 24:8, 27:4, 31:3, 55:9, 55:22, 55:23, 55:24, 56:8, 74:13, 74:14, 85:11, 140:1
**four-minute** [1] - 31:3
**fourth** [1] - 177:2
**frankly** [1] - 8:7
**F[ ]** [3] - 20:22, 20:23, 36:9
**frequent** [1] - 77:13
**frequently** [6] - 76:15, 77:2, 77:12, 77:22, 148:21, 151:16
**Friday** [5] - 5:10, 12:8, 14:13, 34:5, 36:1, 179:3, 180:13, 180:19
**friend** [1] - 19:3
**friends** [2] - 17:16, 26:8
**front** [7] - 42:14, 48:12, 55:2, 127:13, 131:5, 132:10, 141:2
**Fs** [2] - 102:19, 106:12
**full** [6] - 18:1, 100:17, 100:19, 126:15, 128:11, 149:22
**full-time** [1] - 18:1
**fully** [2] - 18:2, 110:13
**Fulton** [1] - 3:5
**functioning** [4] - 74:9, 75:5, 79:16, 92:21

### G

**gain** [2] - 79:4, 123:14
**game** [1] - 66:16
**general** [5] - 48:7, 55:6, 64:9, 151:15, 151:21
**generally** [3] - 22:15,

32:17, 162:16
**generation** [1] - 17:7
**gentlemen** [5] - 15:18, 88:6, 167:6, 175:15, 176:5
**genuine** [3] - 78:12, 78:23, 108:5
**geography** [3] - 33:8, 33:11, 33:12
**George** [2] - 17:21, 17:22
**girl** [1] - 151:20
**given** [22] - 45:21, 46:2, 55:3, 63:10, 63:14, 66:12, 66:20, 70:3, 70:21, 72:8, 93:10, 97:17, 100:15, 103:9, 104:3, 104:18, 111:1, 119:1, 136:7, 136:25, 181:23
**goal** [2] - 82:3, 175:16
**golf** [2] - 97:23, 102:12
**gotcha** [1] - 28:23
**grade** [7] - 18:12, 19:10, 19:11, 24:5, 24:11, 26:6, 55:4
**graders** [1] - 24:12
**graduate** [4] - 17:22, 21:11, 101:4, 101:7
**Grady** [5] - 21:19, 22:2, 29:4, 67:19, 73:23
**grand** [1] - 49:17
**granted** [1] - 28:16
**great** [7] - 19:8, 19:16, 19:17, 20:3, 151:24, 175:19
**greater** [2] - 54:8, 54:14
**green** [4] - 132:20, 132:21, 132:22, 132:23
**grief** [1] - 19:3
**ground** [1] - 180:20
**group** [7] - 62:23, 66:18, 68:22, 76:4, 100:1, 100:2, 104:23
**group's** [1] - 104:17
**groups** [7] - 38:25, 70:4, 89:9, 89:12, 104:3, 108:24, 108:25
**guardian** [1] - 19:2
**guess** [8] - 9:13, 10:19, 10:23, 68:19, 68:24, 94:20, 96:6, 152:16
**guide** [1] - 62:14

**guidelines** [2] - 156:25, 160:13
**guiding** [1] - 24:14

### H

**half** [9] - 27:4, 39:13, 103:15, 104:2, 104:4, 104:8, 104:20, 104:22, 140:19
**hall** [1] - 49:21
**halls** [1] - 30:11
**hallucination** [1] - 80:10
**hallway** [1] - 55:14
**hand** [5] - 28:11, 60:16, 68:9, 121:1, 138:21
**handbook** [1] - 62:13
**handed** [1] - 42:13
**handle** [3] - 8:7, 9:16, 29:7
**handling** [1] - 178:18
**hang** [1] - 171:23
**happy** [6] - 17:11, 26:25, 82:7, 85:18, 150:6, 150:7
**harassment** [25] - 31:19, 33:3, 33:20, 42:23, 45:22, 46:3, 46:11, 47:15, 47:24, 49:9, 49:10, 49:11, 50:13, 50:14, 50:15, 50:17, 50:18, 50:19, 50:21, 50:22, 50:23, 51:5, 51:14, 53:22, 54:4
**hard** [15] - 18:22, 69:6, 76:21, 79:10, 95:1, 97:6, 102:23, 104:2, 105:1, 105:23, 131:5, 162:19, 168:2, 168:15, 177:24
**harder** [2] - 95:19, 95:20
**harm** [2] - 44:8, 44:11
**harmed** [1] - 41:21
**harmful** [1] - 44:17
**HARRIS** [1] - 3:12
**Harris** [3] - 53:4, 183:3, 183:21
**head** [1] - 124:19
**headlights** [1] - 25:11
**heads** [1] - 181:22
**health** [7] - 113:3, 137:2, 154:9, 154:11, 166:14, 174:3, 174:8

**guidelines**

**healthcare** [4] - 117:16, 122:25, 123:12, 123:22
**hear** [8] - 11:14, 15:15, 16:8, 53:4, 54:13, 59:14, 59:15, 85:1
**heard** [10] - 8:14, 12:7, 12:10, 13:23, 58:25, 93:19, 109:18, 122:2, 177:18
**hearing** [4] - 11:19, 28:8, 35:8, 80:11
**hearsay** [3] - 8:17, 10:22, 11:2
**heart** [2] - 17:11, 78:4
**heavy** [1] - 63:19
**help** [5] - 34:23, 94:19, 121:2
**helped** [1] - 168:6
**hemispherectomy** [1] - 104:22
**hereby** [2] - 6:22, 183:4
**hereto** [1] - 183:15
**Herndon** [3] - 122:1, 171:14, 172:8
**hero** [1] - 79:2
**heroic** [1] - 79:9
**herself** [4] - 6:8, 108:7, 165:8, 169:2
**hesitant** [1] - 6:17
**hesitate** [1] - 16:9
**high** [16] - 17:18, 21:11, 27:15, 34:6, 34:12, 47:18, 49:1, 97:18, 97:21, 97:23, 101:25, 102:9, 108:4, 109:6, 109:8, 110:25
**High** [3] - 21:12, 49:3, 49:4
**high-strung** [1] - 27:15
**higher** [6] - 71:2, 100:23, 102:4, 109:7, 111:1, 157:15
**highest** [2] - 100:4, 100:6
**highlight** [1] - 154:23
**hired** [6] - 79:22, 118:15, 163:23, 165:7, 169:22
**hiring** [1] - 160:8
**historically** [1] - 68:24
**history** [13] - 17:19, 19:11, 33:7, 81:2, 81:3, 81:20, 130:5, 135:5, 152:18, 173:6, 174:13,

174:19
**History** [2] - 28:1, 173:5
**hit** [1] - 68:7
**hitting** [1] - 68:5
**Hold** [2] - 74:25, 174:18
**hold** [1] - 13:15
**holiday** [1] - 27:5
**holistic** [1] - 175:4
**HOLTZMAN** [1] - 1:14
**home** [2] - 21:12, 105:13
**honed** [1] - 120:10
**honestly** [1] - 107:2
**honeymoon** [1] - 27:6
**Honor** [56] - 7:20, 8:21, 8:25, 11:6, 11:7, 12:3, 15:12, 16:2, 16:10, 21:13, 21:15, 22:24, 32:7, 33:22, 38:9, 40:5, 40:8, 41:23, 42:1, 42:7, 42:9, 45:24, 46:17, 46:19, 52:16, 53:2, 53:14, 59:2, 59:4, 59:9, 60:16, 60:21, 60:25, 65:17, 65:20, 84:25, 90:16, 90:18, 113:24, 114:1, 115:17, 121:3, 121:5, 124:21, 125:25, 142:11, 150:5, 171:4, 171:8, 172:4, 176:8, 177:13, 178:25, 179:14, 180:18, 182:8
**HONORABLE** [1] - 1:11
**hope** [4] - 9:17, 176:14, 177:24, 179:4
**hopeful** [1] - 179:3
**hoping** [2] - 178:1, 181:4
**Hopkins** [2] - 61:17, 68:22
**horrified** [1] - 28:17
**hospital** [1] - 124:11
**Hospital** [2] - 125:13, 133:5, 173:7, 173:12
**hospitalization** [2] - 147:15, 148:3
**hospitals** [1] - 135:19
**hour** [14] - 10:14, 65:10, 85:11, 96:16, 96:21, 96:22, 96:23, 103:15, 104:2, 139:16, 140:19,

141:3, 141:5
**hours** [13] - 27:4,
38:15, 84:4, 84:7,
84:12, 85:7, 85:20,
119:16, 119:18,
140:23, 141:7,
141:20
**house** [1] - 32:21
**H**▬▬ [2] - 29:13,
176:17
**hug** [1] - 25:6
**human** [1] - 155:23
**H**▬▬ [6] - 14:13,
20:8, 20:9, 29:19,
34:21, 36:8
**hundred** [1] - 71:17
**hundreds** [2] - 72:9,
97:17
**HUNTON** [4] - 2:13,
2:17, 2:20, 2:25
**hurt** [3] - 44:13, 44:14,
130:13
**hurtful** [1] - 36:18
**husband** [3] - 18:17,
27:3, 27:9
**hypothetically** [1] -
162:24
**hypotheticals** [1] -
147:24

## I

**ICD** [6] - 129:13,
134:4, 134:7, 134:8,
134:15, 135:17
**idea** [5] - 13:22, 58:22,
64:9, 66:17, 158:21
**ideal** [1] - 129:1
**identified** [2] - 163:2,
164:8
**identify** [2] - 70:20,
90:24
**ignore** [1] - 154:9
**imagine** [2] - 94:13,
99:1
**immediate** [1] -
103:14
**immediately** [1] -
103:5
**immigrant** [1] - 19:24
**immigrated** [1] - 17:15
**immigration** [1] - 17:8
**impact** [1] - 19:22
**impaired** [2] - 153:24,
154:16
**impairment** [7] -
153:18, 153:21,
153:23, 154:4,
154:14, 166:18,
166:21

**importance** [3] - 34:6,
34:13, 161:19
**important** [6] - 44:19,
45:3, 45:9, 76:2,
142:24, 175:23
**imported** [4] - 156:15,
156:17, 157:6,
158:17
**impossible** [3] -
77:19, 96:10, 113:14
**impression** [4] - 82:8,
130:20, 130:21,
130:23
**Impression** [1] -
173:10
**improve** [3] - 63:1,
80:15, 80:22
**improved** [1] - 72:8
**in-between** [1] - 141:7
**in-classroom** [1] -
28:5
**in-person** [2] - 35:2,
39:16
**in-residence** [1] -
124:16
**inaccurate** [2] - 70:2,
144:1
**inappropriate** [8] -
32:2, 32:4, 44:6,
49:14, 49:19, 50:5,
50:12, 52:6
**inappropriately** [2] -
51:1, 136:20
**incentive** [5] - 72:17,
74:15, 74:19, 79:5,
90:13
**incident** [6] - 25:25,
26:9, 26:18, 27:19,
29:21, 30:16
**incidents** [1] - 26:4
**include** [3] - 34:15,
91:9, 173:7
**included** [6] - 24:13,
34:13, 49:11, 83:8,
83:10, 170:21,
170:23
**includes** [1] - 123:25
**income** [1] - 118:20
**inconsistencies** [1] -
106:7
**inconsistency** [1] -
14:22
**inconsistent** [4] -
85:19, 163:9,
168:22, 168:23
**incorporating** [1] -
12:16
**incorrect** [1] - 132:9
**increased** [1] - 30:3
**increments** [1] - 31:4

**independent** [1] -
82:19
**indicated** [1] - 162:16
**indicates** [2] - 158:7,
164:3
**indication** [5] - 76:7,
108:15, 110:12,
111:22, 160:20
**indications** [2] -
157:14, 162:20
**indicative** [5] - 99:16,
153:17, 153:21,
154:3, 154:14
**indicator** [1] - 98:4
**indicators** [3] - 76:9,
147:25, 162:22
**indifferent** [1] -
142:20
**individual** [3] - 73:19,
113:8, 161:1
**individuals** [4] -
149:25, 151:3,
152:8, 152:10
**ineffective** [1] - 53:21
**inexplicable** [1] -
169:4
**inference** [1] - 152:6
**inform** [4] - 57:7,
66:13, 67:12, 168:6
**information** [25] -
7:23, 8:17, 9:8, 67:9,
67:17, 67:25, 68:17,
69:14, 69:15, 70:21,
74:5, 81:18, 82:5,
84:20, 87:15, 88:25,
105:9, 120:5, 120:7,
136:6, 136:9, 145:6,
157:17, 160:15,
167:20
**informed** [3] - 57:10,
90:17, 94:24
**infrequently** [1] -
152:20
**initial** [3] - 40:17,
47:25, 48:5
**injured** [1] - 71:2
**injuries** [1] - 152:1
**injury** [6] - 5:14, 81:7,
92:24, 109:5,
109:10, 179:19
**Inova** [1] - 126:7
**inpatient** [1] - 124:11
**insight** [1] - 144:6
**inspired** [2] - 17:5,
20:3
**instance** [1] - 10:9
**instead** [2] - 116:24,
166:11
**instruction** [6] - 6:16,
6:20, 15:19, 17:24,

30:13, 175:24
**instructions** [13] -
6:21, 30:3, 30:25,
31:2, 98:8, 107:1,
179:7, 179:8,
179:11, 179:15,
179:21, 180:6,
180:11
**instruments** [1] -
56:12
**insurance** [2] - 68:10,
129:15
**intake** [1] - 9:7
**intellectual** [2] -
101:2, 103:2
**intellectually** [2] -
75:11, 106:4
**intend** [1] - 13:16
**intended** [3] - 11:16,
114:24, 169:14
**intends** [2] - 11:11,
11:13
**intensity** [1] - 77:18
**intensive** [1] - 124:13
**intention** [3] - 6:1,
8:15, 11:18
**intentional** [2] - 72:14,
90:11
**interactions** [1] -
56:15
**interactive** [1] - 84:17
**interest** [1] - 123:23
**interested** [1] - 11:19
**interesting** [3] - 13:24,
27:14, 68:21
**International** [1] -
129:14
**internship** [1] - 63:17
**interpersonal** [1] -
109:17
**interpret** [3] - 107:18,
158:13, 160:15
**interpretation** [1] -
157:12
**interpreted** [4] -
72:24, 86:25,
156:24, 158:16
**interrogatories** [1] -
12:18
**interrupt** [3] - 59:15,
78:20, 150:3
**interrupting** [1] -
168:13
**interview** [25] - 7:8,
9:24, 9:25, 10:2,
10:9, 10:11, 10:13,
74:24, 76:15, 76:16,
81:21, 83:22, 84:11,
96:17, 96:22,
138:20, 140:22,

140:23, 167:17,
168:8, 181:7, 181:17
**interviewed** [1] -
174:7
**interviewee** [1] - 94:22
**intimidation** [1] -
50:22
**introduce** [1] - 59:23
**invalid** [8] - 70:25,
74:21, 94:5, 94:9,
108:13, 132:19,
153:20, 158:20
**inventory** [1] - 110:20
**inverse** [1] - 164:17
**investigate** [1] - 50:7
**investigation** [8] -
7:25, 8:15, 8:22,
10:15, 10:21, 49:16,
181:4, 181:8
**invite** [1] - 32:20
**invoice** [4] - 139:1,
147:9, 169:6, 169:7
**involve** [3] - 81:24,
151:9, 168:20
**involved** [5] - 35:6,
37:24, 81:6, 141:11,
141:14
**involvement** [5] - 8:5,
79:1, 117:9, 118:23,
146:22
**involving** [2] - 38:23,
181:13
**IQ** [16] - 92:22, 92:24,
100:14, 100:15,
100:18, 100:19,
101:1, 101:4, 101:6,
105:20, 106:3,
106:4, 142:17,
143:1, 145:14,
153:16
**IR** [2] - 103:14, 103:23
**Iraq** [1] - 152:2
**irrelevant** [2] - 6:5, 8:2
**isolation** [1] - 165:16
**issue** [3] - 11:8, 29:23,
177:13
**issued** [2] - 114:15,
115:9
**issues** [9] - 12:4, 12:6,
12:25, 21:7, 29:22,
30:15, 177:14,
178:10, 181:10
**items** [1] - 141:15
**itself** [4] - 96:24,
98:10, 143:3, 168:4
**IV** [7] - 92:19, 96:4,
99:22, 100:14,
100:15, 142:17,
142:20
**IX** [1] - 181:10

194

# J

**J.F** [1] - 3:6
**J.O** [5] - 3:9, 10:11, 10:12, 10:15, 181:13
**January** [3] - 34:5, 58:21, 172:9
**Jennings** [1] - 176:9
**jfahey@ holtzmanvogel. com** [1] - 1:17
**job** [8] - 18:1, 50:8, 64:10, 122:25, 123:6, 157:16, 166:4, 181:18
**Johns** [2] - 61:17, 68:22
**Jonathan** [5] - 1:13, 4:6, 59:10, 59:17, 59:24
**JOSEFIAK** [1] - 1:14
**journals** [1] - 62:21
**journey** [4] - 17:2
**joy** [1] - 27:15
**JR** [1] - 1:11
**Judge** [1] - 11:11
**JUDGE** [1] - 1:11
**judge** [2] - 37:2, 180:13
**judgment** [13] - 123:22, 156:2, 156:7, 156:9, 156:11, 156:15, 156:18, 157:6, 157:13, 158:17, 158:19, 158:20
**July** [2] - 139:2, 139:4
**June** [7] - 82:21, 84:2, 84:21, 126:8, 139:13, 139:15, 140:10
**juror** [1] - 5:3
**jurors** [1] - 159:12
**Jury** [5] - 15:16, 88:9, 88:14, 176:4, 183:6
**jury** [13] - 7:16, 14:20, 59:23, 64:19, 84:5, 88:19, 122:2, 128:3, 147:14, 148:2, 148:24, 161:21, 168:8
**JURY** [1] - 1:10
**jury's** [1] - 11:10

# K

**Kappatos** [2] - 176:21, 177:4
**Keefe** [1] - 2:9
**keep** [9] - 31:2, 34:18,
54:8, 54:12, 54:13, 54:15, 55:3, 82:13, 130:16
**keeping** [1] - 54:23
**Kellar** [1] - 126:7
**kelliker@huntonak. com** [1] - 3:2
**kept** [2] - 147:25, 156:10
**Kevin** [1] - 2:25
**kid** [2] - 56:15, 56:18
**kids** [6] - 25:23, 27:22, 28:12, 28:14, 28:19, 29:6
**kill** [1] - 78:4
**killed** [2] - 78:3, 164:21
**kind** [23] - 20:18, 20:20, 23:14, 26:8, 28:5, 28:12, 33:4, 33:20, 36:17, 65:3, 66:14, 69:7, 73:13, 77:10, 78:22, 80:1, 85:15, 105:13, 107:23, 109:15, 109:20, 179:10, 181:7
**kinds** [4] - 86:16, 87:10, 110:18, 113:3
**Kinney** [5] - 3:4, 40:5, 40:12, 40:13, 113:21
**KINNEY** [5] - 3:5, 40:8, 40:11, 41:23, 113:22
**Kinney............** [1] - 4:5
**knowing** [1] - 21:4
**knowledge** [5] - 83:9, 84:22, 112:3, 112:6, 122:14
**known** [11] - 70:4, 75:5, 75:21, 89:24, 100:1, 102:10, 103:11, 104:17, 147:22, 148:10, 169:3
**knows** [4] - 19:15, 45:25, 95:5, 111:22
**KURTH** [4] - 2:13, 2:17, 2:20, 2:25

# L

**lab** [1] - 37:20
**lack** [2] - 43:23, 159:6
**ladies** [5] - 15:17, 88:6, 167:6, 175:15, 176:5
**language** [5] - 84:16, 89:7, 90:9, 127:9,
143:20
**large** [6] - 11:17, 19:16, 92:10, 92:24, 152:3, 168:10
**last** [15] - 15:5, 18:8, 22:5, 26:2, 39:21, 48:19, 75:6, 81:2, 82:21, 106:11, 106:12, 111:9, 122:24, 175:17
**lasted** [2] - 141:3, 141:5
**laughing** [4] - 28:12, 28:19, 28:20
**Law** [1] - 64:23
**LAW** [1] - 3:4
**law** [3] - 27:8, 62:7, 177:21
**lawsuit** [11] - 74:16, 76:3, 109:4, 109:5, 145:24, 147:3, 147:7, 147:17, 148:5, 149:3, 152:25
**lawsuits** [2] - 81:3, 81:6
**lawyers** [1] - 177:20
**lay** [1] - 104:10
**laypeople** [1] - 180:7
**layperson's** [1] - 90:9
**lead** [3] - 67:1, 142:20, 180:10
**lead-in** [1] - 180:10
**leader** [1] - 36:19
**leading** [2] - 23:14, 173:22
**learn** [1] - 34:24
**Learning** [1] - 28:1
**learning** [3] - 52:2, 144:18, 144:19
**least** [13] - 8:4, 8:6, 80:4, 80:21, 91:25, 92:1, 92:7, 135:18, 137:19, 140:15, 145:11, 151:19, 181:25
**leave** [1] - 176:13
**leaving** [1] - 35:2
**lectures** [1] - 63:8
**led** [6] - 25:8, 30:19, 30:21, 34:8, 35:6, 37:13
**left** [3] - 58:22, 61:5, 128:1
**leg** [1] - 130:14
**legal** [3] - 65:1, 68:8, 127:14
**legitimate** [1] - 11:25
**lengths** [1] - 112:17
**less** [4] - 27:2, 56:8, 67:7, 100:6
**lesson** [1] - 52:1
**lessons** [1] - 51:21
**letter** [1] - 134:11
**letters** [5] - 99:13, 110:16, 134:9, 145:4, 145:5
**level** [10] - 78:13, 79:9, 79:16, 85:22, 90:11, 93:21, 99:16, 101:1, 157:18
**licensed** [3] - 18:2, 61:22, 118:1
**life** [2] - 17:13, 18:23
**light** [1] - 108:8
**likelihood** [1] - 75:25
**likely** [7] - 79:8, 81:6, 81:7, 94:4, 116:23, 116:25, 174:19
**limine** [3] - 9:1, 9:14, 182:4
**limitations** [3] - 7:4, 7:21, 103:2
**limited** [4] - 12:4, 101:1, 101:24, 160:5
**limitedly** [1] - 53:21
**line** [14] - 7:15, 9:14, 95:16, 107:17, 136:10, 140:21, 150:8, 150:9, 150:10, 150:13, 150:25, 157:10, 163:16, 178:13
**lines** [6] - 8:20, 94:11, 94:12, 99:12, 116:2, 150:12
**linger** [1] - 55:8
**list** [13] - 10:2, 12:25, 78:25, 91:6, 103:10, 112:23, 144:12, 144:18, 144:19, 144:21, 147:25, 153:17, 167:21
**listed** [13] - 75:17, 91:12, 102:10, 105:3, 106:15, 119:5, 122:20, 132:13, 134:15, 134:16, 144:2, 172:12, 172:17
**listen** [4] - 16:6, 44:8, 59:13, 131:22
**listening** [1] - 7:7
**lists** [1] - 144:20
**literally** [1] - 104:4
**litigation** [17] - 79:18, 80:2, 109:9, 118:16, 118:17, 123:3, 123:14, 146:15, 146:16, 146:19, 146:23, 148:17,
149:3, 149:25, 151:2, 152:10, 152:24
**live** [4] - 10:18, 18:19, 19:1
**lived** [2] - 15:19, 18:17
**living** [1] - 27:3
**LLP** [8] - 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25
**load** [1] - 63:19
**location** [2] - 22:12, 22:17
**locations** [1] - 22:13
**locked** [1] - 58:15
**locker** [6] - 23:13, 28:15, 30:4, 30:14, 55:11, 55:18
**lockers** [8] - 23:11, 54:8, 54:14, 54:23, 55:2, 55:3, 55:8, 56:12
**long-term** [1] - 109:16
**look** [58] - 25:11, 50:8, 61:7, 61:19, 66:14, 66:16, 68:11, 68:13, 70:14, 71:13, 72:25, 73:4, 73:5, 74:24, 76:12, 78:24, 82:18, 85:19, 88:2, 90:14, 90:23, 93:10, 93:15, 97:3, 101:13, 102:7, 102:18, 102:19, 106:11, 107:19, 110:10, 111:9, 113:18, 115:13, 120:8, 121:25, 122:23, 136:10, 138:21, 145:19, 147:5, 147:9, 148:2, 148:24, 156:4, 157:2, 157:9, 163:10, 171:1, 172:2, 172:19, 173:2, 173:4, 174:21, 178:9, 179:16, 179:25
**looked** [5] - 28:21, 82:23, 120:17, 138:9, 162:12
**looking** [16] - 23:7, 25:1, 90:24, 94:2, 98:23, 105:3, 110:21, 112:1, 112:12, 116:15, 119:22, 120:1, 129:16, 129:24, 155:6, 176:7
**looks** [4] - 70:6, 102:23, 135:1,

135:13
**loop** [2] - 34:18, 106:8
**Los** [1] - 1:20
**loss** [1] - 19:3
**lost** [2] - 14:15, 94:19
**love** [3] - 17:12, 17:13, 27:10
**loved** [1] - 21:5
**loving** [1] - 21:1
**low** [14] - 79:9, 96:15, 97:14, 97:20, 97:24, 99:7, 99:15, 100:24, 100:25, 102:13, 105:1, 106:3, 155:22, 157:16
**lower** [4] - 97:12, 103:21, 105:25, 106:1
**lowest** [1] - 100:7
**luckily** [1] - 168:13
**lunch** [1] - 85:12
**lying** [1] - 68:16

# M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [11] - 11:5, 16:4, 16:6, 16:11, 16:20, 18:24, 19:4, 36:25, 46:1, 46:7, 59:5
**machine** [2] - 183:5, 183:12
**magnet** [1] - 21:10
**main** [4] - 52:1, 55:14, 73:11, 81:17
**maintained** [1] - 168:9
**major** [2] - 89:11, 127:9
**Major** [2] - 7:12, 7:18
**males** [1] - 38:8
**malinger** [1] - 69:5
**malingering** [36] - 62:16, 63:3, 63:13, 69:4, 72:13, 72:14, 73:25, 74:12, 75:12, 79:6, 79:12, 88:1, 88:20, 89:1, 89:3, 89:15, 89:16, 89:19, 90:10, 90:11, 111:14, 111:21, 137:9, 138:5, 147:16, 147:20, 148:4, 148:9, 156:6, 156:18, 157:7, 158:3, 158:7, 158:9, 162:13, 168:20
**manifestation** [1] - 169:3

**manner** [1] - 78:18
**manual** [9] - 73:1, 73:5, 97:19, 102:3, 108:11, 157:14, 157:15, 158:13, 158:16
**manuals** [3] - 89:6, 156:4, 156:25
**map** [4] - 21:16, 22:11, 25:1, 30:5
**March** [6] - 39:20, 125:3, 125:22, 146:25, 172:25, 173:7
**mark** [4] - 23:16, 34:6, 97:12, 112:21
**marked** [5] - 34:12, 46:14, 74:23, 90:15, 93:15
**marker** [1] - 12:1
**markings** [1] - 23:21
**married** [4] - 18:17, 18:19, 27:2, 27:10
**Maryland** [1] - 61:24
**Mason** [2] - 17:21, 17:22
**master's** [2] - 17:23, 61:14
**match** [1] - 68:12
**math** [2] - 132:4, 153:16
**matter** [8] - 5:9, 15:25, 73:20, 109:5, 109:10, 119:15, 158:19, 163:17
**matters** [2] - 5:5, 12:21
**matters......................
............** [1] - 4:14
**MCMI** [1] - 110:9
**MCMI-4** [4] - 106:18, 107:12, 109:11, 109:14
**MDs** [1] - 166:12
**mean** [28] - 10:23, 20:18, 26:7, 29:23, 31:3, 43:17, 45:12, 48:8, 55:14, 66:6, 75:23, 76:6, 80:5, 99:25, 108:10, 108:16, 109:22, 110:3, 110:4, 110:8, 127:8, 129:20, 141:16, 143:22, 151:23, 157:17, 160:22, 163:17
**meaning** [8] - 51:14, 55:4, 85:18, 97:5, 100:22, 108:4, 123:14, 141:2

**means** [27] - 62:22, 63:4, 64:23, 67:22, 73:2, 73:5, 73:18, 75:8, 75:24, 76:18, 79:13, 89:2, 96:2, 100:7, 100:25, 105:20, 109:13, 110:9, 110:12, 127:10, 127:12, 128:9, 151:5, 156:5, 163:17, 168:5
**meant** [2] - 62:14, 149:17
**measure** [25] - 66:20, 68:23, 69:13, 69:16, 69:22, 91:18, 92:12, 92:20, 92:22, 92:25, 93:17, 94:2, 94:25, 96:3, 96:5, 97:5, 97:8, 98:9, 99:19, 107:6, 107:23, 109:14, 110:20, 110:23
**measures** [58] - 67:8, 67:25, 68:15, 68:25, 69:1, 69:12, 70:7, 70:8, 70:9, 70:10, 71:13, 71:22, 72:19, 81:25, 83:9, 83:10, 83:12, 84:17, 85:25, 86:2, 87:2, 87:4, 87:5, 91:15, 91:16, 91:23, 92:1, 92:2, 92:5, 92:7, 92:11, 92:12, 92:13, 92:14, 92:17, 94:17, 96:8, 105:2, 105:14, 105:19, 106:14, 106:15, 106:19, 107:24, 108:6, 108:25, 109:24, 110:1, 110:17, 110:22, 111:25, 137:16, 144:3, 155:1, 156:3, 156:23, 158:25
**measuring** [3] - 94:18, 95:6, 142:23
**mechanism** [1] - 92:23
**media** [4] - 15:22, 176:2
**medical** [30] - 5:22, 5:24, 6:13, 17:17, 35:12, 79:25, 83:2, 89:23, 117:3, 117:24, 119:8, 119:22, 120:1, 120:4, 121:21, 122:9, 128:22,

129:5, 129:16, 129:18, 129:23, 130:3, 134:5, 134:9, 165:19, 166:3, 173:6, 174:10, 174:13
**Medical** [1] - 173:5
**medication** [3] - 98:18, 98:21, 118:1
**medications** [9] - 80:23, 84:22, 84:23, 113:7, 113:10, 113:14, 136:17, 136:20, 136:23
**medicine** [1] - 175:4
**Medicine** [4] - 61:18, 122:2, 171:14, 172:8
**medium** [1] - 142:20
**meet** [13] - 37:16, 83:19, 84:1, 97:14, 105:1, 120:18, 139:13, 139:19, 140:1, 140:4, 140:12, 141:23
**meeting** [5] - 24:19, 126:14, 140:13, 147:15, 165:6
**meetings** [4] - 30:9, 140:2, 140:15, 146:20
**M████** [1] - 28:25
**member** [2] - 61:25, 62:6
**memorize** [1] - 132:5
**memory** [16] - 66:7, 69:16, 69:17, 69:21, 70:13, 70:14, 84:16, 94:20, 97:8, 102:21, 102:24, 102:25, 103:8, 144:23, 153:16, 153:17
**men** [1] - 38:25
**mental** [5] - 113:3, 127:5, 166:14, 174:3, 174:8
**mention** [2] - 103:7, 122:12
**mentioned** [7] - 6:8, 10:12, 26:9, 72:12, 73:6, 89:15, 97:18
**message** [2] - 30:9, 34:10
**met** [3] - 25:14, 84:21, 114:10
**metrics** [1] - 94:3
**Miami** [3] - 2:3, 2:7, 2:11
**mic** [2] - 60:1, 85:1
**Michael** [2] - 3:4, 40:12

**MICHAEL** [1] - 3:4
**Middle** [3] - 18:2, 18:16, 24:9
**middle** [7] - 24:5, 25:11, 28:24, 29:4, 47:18, 100:10, 108:14
**might** [28] - 7:11, 13:18, 56:1, 64:23, 66:8, 66:16, 67:15, 71:8, 75:13, 84:11, 86:5, 94:11, 94:16, 99:2, 99:10, 100:8, 101:17, 104:1, 105:11, 105:12, 109:18, 110:12, 120:3, 132:21, 136:3, 165:17, 178:23
**miles** [1] - 19:1
**mimicking** [1] - 137:24
**mind** [6] - 11:25, 78:5, 85:15, 117:5, 152:15
**mindset** [1] - 167:22
**mine** [2] - 28:15
**minor** [6] - 148:18, 148:22, 149:4, 150:1, 152:11, 153:1
**minute** [4] - 31:3, 132:24, 146:2, 149:6
**minutes** [12] - 10:14, 55:9, 55:22, 55:23, 55:24, 56:8, 56:13, 56:14, 84:13, 107:8, 167:5, 168:12
**MISCELLANY** [1] - 4:13
**mischaracterizing** [1] - 150:4
**misconduct** [2] - 50:5, 50:18
**misdiagnosed** [4] - 135:23, 135:25, 136:2, 136:12
**misleading** [3] - 148:21, 148:25, 159:14
**misled** [1] - 159:13
**miss** [1] - 39:23
**missed** [2] - 26:3, 158:11
**misspoke** [1] - 152:19
**mistake** [1] - 180:3
**misunderstood** [1] - 163:14
**mixed** [4] - 89:2, 155:23, 155:25
**mk@kinneyesq.com** [1] - 3:7

196

**MMPI** [2] - 92:10, 108:21

**MMPI-3** [3] - 106:17, 107:12, 107:22

**moderate** [4] - 78:13, 108:16, 108:17, 110:11

**moderately** [3] - 108:8, 108:9, 110:2

**Moir** [3] - 176:11, 176:21, 177:4

**molded** [2] - 17:6, 19:19

**mom** [2] - 56:20, 171:19

**moment** [1] - 114:2

**Monday** [1] - 15:18

**money** [2] - 68:10, 74:16

**Monique** [4] - 4:3, 16:3, 16:5, 16:19

**monitoring** [2] - 30:3, 31:1

**months** [6] - 27:3, 79:20, 83:14, 93:2, 114:10, 166:1

**moreover** [1] - 5:20

**morning** [20] - 5:1, 5:2, 11:10, 11:12, 11:14, 15:17, 16:14, 16:15, 40:13, 42:5, 42:6, 42:12, 59:9, 59:21, 59:22, 88:7, 114:6, 114:7, 180:13, 182:12

**most** [16] - 15:2, 24:11, 70:1, 80:21, 90:11, 96:8, 100:15, 103:5, 107:22, 109:23, 118:19, 118:20, 144:6, 146:19, 151:4, 180:20

**mostly** [1] - 160:20

**mother** [5] - 9:6, 27:8, 27:11, 32:18, 32:24

**mother-in-law** [1] - 27:8

**motion** [2] - 9:1, 9:13

**motions** [1] - 182:4

**mouse** [1] - 28:22

**move** [5] - 18:15, 36:25, 37:2, 39:5, 52:19

**moved** [2] - 18:21, 22:12

**movement** [1] - 113:6

**movie** [3] - 77:8, 77:9, 77:11

**MR** [130] - 11:6, 11:7,

11:24, 15:12, 15:14, 16:2, 16:13, 21:15, 21:19, 21:21, 22:2, 22:3, 22:23, 23:3, 23:6, 26:10, 26:14, 27:18, 32:5, 32:11, 32:13, 34:1, 35:18, 35:23, 35:25, 37:1, 38:9, 38:11, 38:13, 39:4, 39:8, 39:12, 40:3, 40:5, 40:8, 40:11, 41:23, 42:1, 42:4, 42:7, 42:9, 42:11, 45:23, 46:9, 46:17, 46:19, 46:21, 47:5, 47:8, 52:16, 52:21, 53:2, 53:8, 53:14, 53:20, 53:25, 59:2, 59:4, 60:21, 65:20, 82:10, 84:25, 85:3, 90:3, 90:16, 90:18, 101:8, 104:6, 113:22, 113:24, 114:1, 114:5, 115:14, 115:17, 115:19, 121:3, 121:5, 121:10, 121:13, 121:16, 121:19, 121:20, 122:19, 122:22, 124:21, 124:25, 125:11, 125:12, 125:25, 126:4, 126:6, 126:20, 126:23, 126:24, 130:16, 130:17, 137:13, 138:3, 138:11, 138:23, 138:25, 139:4, 139:8, 142:10, 142:16, 144:5, 146:5, 146:6, 147:8, 148:15, 149:12, 150:5, 150:12, 150:15, 150:25, 153:14, 157:4, 167:1, 170:6, 173:22, 175:13, 177:13, 177:17, 178:11, 178:16, 178:19, 180:18, 181:3, 181:22, 182:10

**MS** [86] - 7:20, 8:13, 8:25, 9:20, 10:1, 10:19, 11:4, 12:3, 12:7, 12:15, 12:20, 12:25, 13:16, 14:9, 14:12, 14:24, 15:7, 15:10, 15:13, 59:9, 59:20, 60:4, 60:5,

60:16, 60:18, 60:25, 61:2, 61:6, 65:17, 65:22, 67:20, 71:12, 73:23, 73:24, 82:14, 82:15, 85:2, 85:4, 88:4, 88:17, 88:18, 90:4, 90:8, 90:22, 93:13, 93:14, 95:22, 97:2, 99:8, 101:11, 101:12, 104:9, 104:11, 110:6, 110:7, 113:19, 115:16, 137:11, 138:6, 148:13, 156:20, 167:5, 167:11, 170:11, 171:3, 171:6, 171:8, 171:11, 172:1, 172:4, 172:7, 173:24, 175:6, 175:14, 176:8, 176:17, 176:20, 176:25, 177:8, 177:11, 178:25, 179:4, 179:14, 179:23, 180:16, 182:8

**multidimensional** [3] - 88:23, 89:16, 103:9

**multiple** [10] - 58:11, 70:7, 74:5, 81:18, 92:13, 102:7, 104:3, 105:8, 105:14, 158:23

**multitasking** [1] - 145:8

**music** [1] - 55:13

**mute** [1] - 93:12

# N

**N&L** [1] - 99:13

**NAB** [3] - 144:16, 144:18, 145:4

**name** [6] - 16:16, 16:18, 16:19, 59:24, 126:22, 183:16

**names** [2] - 24:13, 24:18

**narrow** [2] - 148:25, 179:18

**narrowed** [1] - 148:20

**narrowly** [1] - 148:23

**National** [4] - 62:4, 125:13, 173:7, 173:12

**nature** [4] - 10:8, 11:2, 38:2, 84:10

**near** [1] - 5:15

**necessarily** [6] - 7:24,

55:13, 75:18, 76:6, 103:3, 174:23

**necessary** [2] - 6:16, 181:5

**need** [30] - 7:9, 8:11, 9:15, 11:8, 13:5, 15:1, 42:14, 55:10, 56:3, 56:11, 66:7, 70:13, 86:16, 97:11, 98:8, 101:18, 102:22, 103:3, 122:20, 124:1, 124:4, 149:9, 179:9, 179:16, 180:6, 180:13, 181:9, 181:10, 182:7

**needed** [9] - 10:15, 34:23, 47:17, 87:15, 98:16, 107:7, 169:15, 169:18, 170:24

**needs** [4] - 55:9, 176:17, 176:18, 180:4

**negate** [1] - 6:5

**negative** [2] - 71:5, 94:15

**neighbor** [1] - 68:5

**nervous** [4] - 24:16, 24:17, 25:7, 25:8

**nervousness** [1] - 24:6

**neurocognitive** [9] - 5:14, 5:19, 5:21, 5:24, 5:25, 6:3, 6:9, 6:24, 166:7

**neurological** [1] - 134:10

**neurologist** [2] - 5:11, 66:3

**neuropsychological** [12] - 60:7, 64:17, 65:18, 68:2, 74:1, 81:15, 81:24, 82:3, 82:19, 85:6, 165:24, 166:10

**neuropsychologist** [25] - 59:25, 61:21, 63:16, 64:14, 64:20, 65:7, 65:13, 65:24, 65:25, 67:4, 67:5, 72:1, 72:24, 73:4, 82:1, 89:17, 157:2, 166:9, 166:17, 166:19, 166:20, 169:24, 170:2, 170:4, 170:17

**neuropsychologists** [2] - 62:15, 63:12

**Neuropsychologists**

[1] - 63:11

**neuropsychology** [9] - 61:17, 62:6, 62:9, 62:14, 62:20, 63:9, 65:18, 67:24, 100:16

**Neuropsychology** [3] - 62:3, 62:5, 62:12

**neuroscience** [1] - 61:13

**neutral** [1] - 6:20

**never** [4] - 12:8, 12:11, 17:12, 116:17

**new** [14] - 12:4, 12:6, 18:23, 24:9, 24:18, 27:8, 27:9, 66:21, 71:8, 88:4, 96:2, 96:3, 103:18

**next** [34] - 16:1, 38:2, 59:8, 62:8, 62:17, 67:19, 73:23, 74:21, 75:16, 76:12, 78:2, 78:24, 81:14, 82:18, 93:15, 97:3, 99:19, 99:21, 101:13, 102:18, 102:19, 122:23, 128:1, 131:6, 133:20, 135:13, 140:18, 143:18, 144:16, 144:25, 153:3, 181:25

**nice** [2] - 56:15, 57:19

**night** [1] - 24:19

**nightmare** [2] - 77:16, 77:17

**nightmares** [1] - 77:13

**noise** [1] - 28:3

**nomenclature** [1] - 128:10

**non** [1] - 21:6

**non-school-related** [1] - 21:6

**nonconsensual** [1] - 51:3

**noncredible** [1] - 70:19

**nondiagnosis** [1] - 128:25

**nondoctors** [1] - 174:25

**none** [1] - 145:18

**nonepileptic** [1] - 137:21

**nonexpert** [1] - 6:11

**nonfluctuating** [2] - 80:14, 80:24

**nongenuine** [3] - 77:6, 80:16, 81:5

**nontangible** [1] - 74:17

**nonvalidity** [1] - 106:6
**nonverbal** [1] - 154:17
**normal** [1] - 160:22
**normative** [2] - 72:10,
109:2
**Northern** [1] - 16:25
**notation** [1] - 35:15
**note** [3] - 171:12,
171:20, 172:8
**noted** [2] - 6:7, 161:14
**notes** [3] - 119:13,
125:5, 183:12
**nothing** [5] - 10:10,
27:6, 32:3, 59:2,
59:4
**notice** [1] - 27:1
**noticeably** [1] - 86:7
**noticed** [4] - 161:11,
161:13, 168:3, 168:6
**notification** [1] - 11:10
**November** [6] - 32:16,
32:19, 56:21, 57:4,
57:8, 126:13
**nowhere** [1] - 36:18
**Number** [2] - 4:12,
4:12
**number** [20] - 9:9,
22:9, 53:22, 64:13,
64:16, 76:14, 91:25,
95:8, 95:16, 101:19,
112:10, 134:13,
134:14, 134:15,
149:1, 151:4, 151:8,
152:23, 179:8
**numbers** [8] - 93:18,
95:9, 95:18, 99:13,
145:4, 145:5, 155:7,
156:4
**numeral** [1] - 95:12
**numerous** [1] - 38:15
**nurturing** [1] - 21:1
**NW** [5] - 1:15, 2:14,
2:17, 2:21, 3:1

**O**

**o'clock** [5] - 167:7,
175:18, 175:20,
178:4, 178:9
**oath** [1] - 42:22
**object** [1] - 104:6
**objection** [25] - 16:8,
21:17, 38:9, 39:8,
39:9, 45:23, 46:17,
52:17, 53:3, 53:7,
53:24, 65:20, 65:21,
82:10, 90:17, 101:8,
137:11, 138:6,
148:13, 156:20,
170:6, 173:22,

177:18, 178:13,
178:14
**objections** [6] - 8:8,
8:11, 9:15, 60:22,
177:24, 178:6
**objective** [9] - 82:4,
111:22, 111:25,
130:12, 130:14,
131:2, 136:6, 136:9,
137:16
**objectively** [3] - 70:20,
82:2, 169:5
**observe** [7] - 31:7,
31:9, 32:18, 41:14,
85:13, 85:21, 167:16
**obtain** [1] - 82:4
**obtained** [1] - 170:13
**obviously** [4] - 7:10,
7:14, 132:19, 181:12
**occurred** [2] - 38:15,
57:4
**occurring** [1] - 57:7
**odds** [1] - 96:14
**ODIN** [1] - 3:8
**OF** [5] - 1:1, 1:10, 3:4,
4:1, 183:1
**offense** [1] - 63:6
**offer** [8] - 65:17, 85:5,
85:9, 116:17, 121:8,
136:19, 139:21,
162:2
**offered** [3] - 8:23,
53:10, 85:10
**offering** [1] - 135:22
**OFFICE** [1] - 3:4
**office** [5] - 24:22,
25:3, 34:12, 129:10,
161:22
**officer** [3] - 9:7, 58:14,
58:17
**official** [2] - 183:5,
183:11
**Official** [3] - 3:12,
183:3, 183:22
**often** [16] - 63:2,
74:20, 76:2, 77:7,
77:25, 78:22, 79:3,
81:5, 82:9, 89:14,
108:18, 136:7,
161:3, 164:21,
169:3, 174:7
**old** [4] - 79:12, 79:13,
147:12, 147:14
**older** [1] - 64:6
**once** [5] - 15:24,
29:12, 72:6, 80:2,
174:20
**one** [154] - 5:3, 6:2,
6:16, 11:7, 13:24,
14:1, 14:2, 14:7,

15:5, 24:10, 24:11,
32:6, 39:3, 40:1,
45:2, 49:22, 57:1,
57:11, 58:18, 62:5,
62:7, 63:2, 64:22,
66:24, 68:21, 70:25,
71:19, 72:20, 73:11,
73:20, 74:15, 74:18,
74:21, 75:1, 75:6,
75:19, 75:20, 76:5,
76:13, 77:5, 77:24,
78:8, 80:4, 80:8,
80:16, 81:2, 81:17,
83:8, 83:11, 84:11,
85:11, 92:12, 93:2,
93:21, 93:24, 93:25,
94:10, 94:12, 95:5,
96:1, 96:7, 96:11,
96:13, 97:22, 99:7,
99:12, 102:5, 102:6,
102:9, 103:5,
103:20, 105:9,
105:12, 105:19,
105:21, 105:22,
105:23, 105:24,
107:15, 110:1,
110:22, 110:23,
110:24, 113:5,
113:16, 114:1,
116:13, 116:22,
118:7, 118:15,
119:21, 125:16,
125:18, 126:8,
126:18, 129:8,
129:15, 131:6,
137:2, 137:4,
137:19, 138:9,
138:21, 140:21,
141:5, 142:22,
144:2, 144:12,
144:16, 144:20,
144:25, 145:17,
145:23, 146:7,
146:8, 153:22,
158:15, 159:10,
159:16, 160:3,
160:14, 160:16,
161:7, 161:11,
161:14, 162:11,
162:20, 163:1,
163:2, 164:10,
165:5, 165:8,
165:13, 165:15,
165:16, 165:24,
167:18, 168:4,
168:24, 169:19,
171:23, 172:20,
172:22, 175:21,
177:1, 177:19,
177:20, 177:21,
178:12, 180:20,

181:3
**one's** [2] - 92:15
**ones** [10] - 49:14,
88:23, 99:2, 102:10,
108:1, 108:3, 163:2,
172:20, 179:9
**oneself** [1] - 79:1
**ongoing** [2] - 51:21,
146:19
**open** [2] - 13:11,
32:21
**opining** [1] - 6:23
**opinion** [29] - 67:14,
87:22, 111:14,
111:15, 111:21,
115:9, 115:10,
116:5, 116:12,
116:17, 116:20,
135:22, 136:11,
136:19, 137:9,
138:4, 148:3, 148:5,
148:6, 156:6,
156:18, 157:7,
158:8, 159:23,
161:7, 164:2,
165:10, 168:6
**opinions** [12] - 6:2,
60:9, 82:17, 87:16,
104:7, 111:11,
114:20, 114:24,
118:16, 138:13,
139:21
**opportunity** [3] -
11:21, 178:6, 178:9
**opposed** [5] - 110:5,
110:17, 156:9,
163:17, 169:18
**oral** [2] - 5:9, 6:7
**Order** [1] - 64:23
**order** [16] - 5:6, 5:7,
7:1, 7:2, 77:8, 82:16,
93:19, 95:10, 95:11,
95:12, 128:13,
152:5, 169:9, 169:11
**ordered** [1] - 6:22
**orders** [3] - 7:17, 8:10,
131:9
**ordinary** [1] - 26:6
**organization** [2] -
19:20, 62:3
**organizations** [1] -
61:25
**organized** [1] - 20:18
**original** [1] - 114:21
**originally** [1] - 5:12
**otherwise** [1] - 70:2
**out-of-court** [1] - 8:22
**out-of-state** [1] -
177:12
**outcome** [1] - 49:24

**outpatient** [1] - 124:13
**outside** [14] - 18:17,
19:1, 22:7, 26:4,
30:15, 45:23, 46:18,
49:21, 53:8, 54:23,
55:7, 146:15, 174:6,
176:12
**overall** [4] - 50:7,
157:18, 178:13
**overly** [3] - 85:9,
85:17, 143:25
**overreported** [2] -
160:18, 160:20
**overreporting** [7] -
70:23, 71:22, 71:23,
108:18, 109:25,
110:23, 110:25
**overruled** [6] - 38:12,
46:20, 137:12,
138:7, 156:21, 170:8
**oversight** [1] - 63:4
**Overtly** [1] - 77:22
**overview** [1] - 60:13
**own** [6] - 55:10, 63:19,
156:15, 156:17,
157:6, 169:18

**P**

**P.A.H** [1] - 3:5
**p.m** [2] - 1:9, 182:14
**P/F** [1] - 93:15
**pace** [1] - 146:3
**page** [51] - 23:4,
23:20, 35:23, 36:3,
36:6, 47:1, 48:19,
49:1, 67:19, 76:12,
91:17, 92:18, 99:19,
99:21, 100:13,
101:13, 101:17,
102:18, 106:11,
111:9, 116:2, 120:8,
120:9, 121:17,
121:18, 121:21,
122:23, 124:22,
125:11, 126:13,
127:22, 131:7,
133:4, 133:12,
133:24, 134:23,
136:10, 148:25,
149:6, 149:8,
149:23, 150:3,
150:8, 150:25,
155:4, 157:9,
163:16, 172:11,
173:3, 173:4, 178:13
**pager** [1] - 178:12
**pages** [5] - 23:20,
48:19, 83:7, 91:1,
97:13, 117:3, 119:8,

119:21, 119:24, 120:4, 120:10, 120:17, 125:24, 137:3, 149:9, 150:6, 150:7, 179:21, 183:10
**paint** [1] - 68:13
**pairs** [1] - 102:22
**Panarelli** [1] - 48:10
**Panarelli's** [1] - 46:12
**panel** [1] - 63:4
**paper** [5] - 69:4, 89:16, 94:6, 106:25, 145:2
**papers** [1] - 68:22
**paragraph** [1] - 29:5
**parallel** [1] - 36:22
**paramount** [1] - 161:18
**parent** [5] - 148:8, 173:20, 174:1, 174:7, 174:15
**parent's** [2] - 173:21, 174:4
**parents** [9] - 17:8, 17:15, 24:19, 31:24, 32:21, 35:15, 41:8, 51:20, 147:20
**Park** [1] - 1:19
**Parkinson's** [2] - 86:4, 89:24
**part** [33] - 13:14, 45:17, 45:18, 62:2, 63:3, 69:19, 75:18, 80:7, 82:25, 84:15, 85:6, 93:21, 93:22, 96:4, 97:22, 101:20, 105:20, 121:5, 121:6, 142:24, 145:7, 149:17, 156:1, 156:6, 156:8, 157:24, 158:11, 161:12, 163:4, 163:22, 165:1, 165:2, 165:11
**participate** [2] - 62:18, 98:2
**participates** [1] - 33:9
**participating** [1] - 48:24
**particular** [3] - 53:13, 96:18, 98:4
**particularly** [2] - 10:18, 64:4
**parties** [2] - 39:15, 118:16
**partly** [2] - 91:22
**parts** [11] - 9:1, 9:2, 78:21, 84:8, 96:4, 96:5, 98:19, 98:23,

168:10, 168:20, 168:22
**party** [4] - 74:23, 81:12, 82:6, 177:12
**pass** [4] - 91:21, 91:24, 103:2, 104:23
**passed** [6] - 86:3, 91:22, 92:3, 106:17, 107:21, 108:1
**passes** [2] - 93:21, 110:23
**passing** [8] - 6:10, 6:11, 6:18, 55:9, 86:2, 109:24, 110:8, 110:9
**past** [1] - 83:6
**patient** [16] - 66:12, 76:17, 86:11, 104:3, 104:18, 108:14, 130:9, 130:13, 130:24, 173:20, 173:25, 174:4, 174:6, 174:12, 174:15, 174:16
**patient's** [1] - 123:23
**patients** [11] - 63:15, 63:19, 63:22, 64:2, 64:6, 64:14, 84:6, 118:9, 127:18, 151:24, 152:3
**pattern** [2] - 105:16, 113:18
**patterns** [4] - 75:5, 81:18, 105:4, 106:5
**P█████** [3] - 4:3, 16:3, 16:5
**P█████F█████** [3] - 4:3, 16:3, 16:5
**pause** [3] - 149:10, 166:24, 171:25
**pay** [1] - 20:4
**paying** [2] - 107:5, 107:25
**PC** [1] - 3:8
**PCL-5** [1] - 136:8
**pediatric** [3] - 120:23, 173:25, 174:4
**peers** [4] - 154:7, 155:1, 155:9, 155:11
**pending** [2] - 175:11, 176:1
**Pennsylvania** [4] - 2:14, 2:17, 2:21, 3:1
**people** [64] - 7:10, 24:9, 53:22, 55:4, 55:6, 55:11, 55:14, 55:17, 62:23, 64:5, 64:9, 64:22, 64:25, 66:1, 66:18, 66:21, 70:1, 70:3, 70:4,

70:6, 71:8, 72:9, 76:18, 78:12, 78:15, 78:23, 79:3, 79:7, 80:16, 81:4, 82:7, 85:19, 89:9, 89:12, 89:25, 95:6, 97:6, 100:2, 100:23, 101:24, 104:3, 104:5, 104:8, 108:19, 109:8, 111:1, 112:22, 137:22, 137:24, 148:21, 149:2, 151:16, 152:2, 152:17, 152:23, 160:15, 161:3, 162:16, 164:9, 164:15, 166:4, 169:3, 174:25, 180:5
**people's** [1] - 63:5
**percent** [6] - 51:20, 100:2, 100:23, 109:8, 111:1, 154:7
**percentile** [12] - 99:14, 99:23, 99:25, 100:1, 100:4, 100:6, 100:9, 100:11, 100:20, 100:22, 154:23, 155:16
**perceptual** [1] - 97:9
**perform** [4] - 69:3, 95:24, 95:25, 98:22
**performance** [22] - 44:14, 69:9, 70:9, 70:12, 83:8, 83:12, 83:16, 86:6, 87:2, 87:4, 87:11, 91:23, 94:5, 94:9, 96:8, 96:9, 97:15, 98:9, 106:9, 112:3, 156:23
**performances** [1] - 70:12
**performs** [2] - 99:14, 99:18
**perhaps** [2] - 47:22, 63:1
**period** [10] - 22:5, 22:18, 27:1, 37:9, 39:1, 124:8, 128:11, 163:19, 163:22
**permission** [5] - 21:15, 32:8, 35:18, 126:1, 138:25
**permitted** [3] - 5:18, 12:20, 180:23
**perpetrator** [2] - 151:10, 151:12
**perpetrators** [1] - 9:10
**perplexing** [1] - 35:10
**person** [38] - 19:22,

19:23, 21:1, 35:2, 39:16, 44:23, 45:3, 66:21, 67:11, 68:7, 68:19, 78:4, 81:22, 83:19, 93:25, 94:24, 95:14, 95:15, 95:24, 98:1, 98:18, 100:21, 101:16, 102:22, 106:23, 107:24, 116:24, 137:8, 137:15, 137:17, 142:19, 143:2, 144:20, 145:22, 148:16, 152:5, 166:8, 174:9
**person's** [4] - 80:22, 86:1, 94:8, 178:5
**personal** [2] - 109:5, 109:9
**personalities** [1] - 24:13
**personality** [11] - 71:18, 91:15, 107:11, 107:13, 109:14, 109:19, 109:20, 110:11, 110:19, 127:5
**personally** [4] - 27:12, 39:25, 54:6, 72:19
**perspective** [5] - 7:19, 13:22, 43:13, 43:18, 151:19
**perspectives** [1] - 43:17
**pertain** [2] - 27:19, 33:15
**pertains** [1] - 26:17
**Ph.D** [2] - 61:15, 63:17
**phenomenal** [2] - 20:12, 36:20
**phenomenon** [2] - 77:12, 148:10
**P████** [1] - 29:13
**phone** [13] - 25:25, 26:9, 26:18, 27:25, 28:8, 28:10, 28:13, 28:17, 28:21, 29:12, 30:16, 93:6, 93:10
**phones** [1] - 93:8
**photos** [2] - 23:4, 30:5
**physical** [4] - 44:16, 151:25
**physically** [1] - 35:12
**physician** [2] - 66:2, 133:9
**physician's** [1] - 130:23
**physicians** [5] - 129:5, 136:16, 143:9, 147:15, 163:7

**pick** [5] - 69:24, 98:13, 99:2, 105:22, 105:23
**picture** [2] - 23:16, 25:23
**piece** [4] - 105:9, 141:2, 145:2, 158:20
**pieces** [1] - 141:1
**PITTLEMAN** [1] - 3:8
**place** [6] - 17:1, 17:5, 31:19, 48:15, 80:13, 166:17
**Plaintiff** [4] - 1:4, 1:13, 2:1, 5:12
**plaintiff** [29] - 5:13, 5:16, 5:17, 5:23, 6:2, 6:6, 6:8, 6:23, 6:25, 9:6, 14:15, 14:25, 24:2, 25:19, 31:21, 33:18, 40:14, 40:24, 41:2, 41:17, 82:20, 88:20, 109:4, 140:23, 169:22, 170:5, 170:13, 175:13, 182:10
**Plaintiff's** [4] - 26:10, 33:23, 53:1, 172:19
**plaintiff's** [13] - 5:15, 5:17, 5:22, 7:22, 9:23, 32:17, 32:24, 36:2, 46:24, 111:13, 169:19, 171:5, 171:19
**plaintiffs** [1] - 5:21
**Plan** [1] - 173:10
**planned** [1] - 5:12
**plans** [3] - 27:6, 27:7, 27:11
**play** [2] - 7:9, 157:13
**played** [2] - 7:16, 52:15
**playing** [1] - 10:17
**PLC** [1] - 3:5
**PLLC** [1] - 1:14
**plus** [1] - 163:18
**pod** [4] - 21:20, 30:4, 30:15, 37:21
**point** [26] - 12:3, 30:2, 31:6, 31:9, 35:3, 54:9, 69:25, 88:7, 96:16, 99:9, 104:25, 121:9, 121:10, 127:16, 128:7, 128:15, 150:6, 150:18, 164:3, 164:10, 164:11, 164:14, 168:24, 179:12, 180:19
**pointing** [2] - 33:18, 156:10
**points** [3] - 165:5,

165:8, 165:13
**police** [2] - 10:20, 68:6
**poor** [5] - 70:13,
70:15, 96:10,
112:25, 144:2
**Poor** [1] - 29:5
**poorly** [5] - 69:3,
69:20, 75:13, 98:22,
105:10
**population** [3] - 71:2,
75:14, 111:7
**populations** [8] - 96:2,
104:18, 108:5,
108:14, 108:22,
111:4, 111:5, 111:6
**portion** [1] - 26:15
**portray** [1] - 69:6
**position** [8] - 7:22,
8:1, 8:16, 8:19,
52:13, 82:9, 143:8,
181:24
**positive** [5] - 74:18,
75:9, 75:10, 85:17,
98:24
**possible** [6] - 78:15,
147:22, 147:23,
148:1, 179:25, 180:1
**possibly** [1] - 9:18
**post** [13] - 5:8, 125:5,
126:10, 126:14,
131:9, 133:10,
133:21, 134:12,
134:20, 134:24,
135:8, 135:11, 173:8
**post-traumatic** [12] -
125:5, 126:10,
126:14, 131:9,
133:10, 133:21,
134:12, 134:20,
134:24, 135:8,
135:11, 173:8
**postdoctoral** [2] -
61:16, 63:18
**potential** [3] - 66:4,
146:19, 180:20
**potentially** [1] - 69:4
**PowerPoint** [4] -
48:14, 48:22, 48:25,
162:21
**practice** [14] - 28:5,
63:20, 63:21, 63:24,
64:2, 64:3, 67:12,
67:13, 81:9, 105:13,
118:19, 129:12,
131:14, 134:6
**practicers** [1] - 175:4
**praise** [2] - 17:17,
17:19
**praised** [1] - 17:18
**preceded** [1] - 174:10

**preclude** [1] - 10:3
**precluded** [1] - 6:23
**predated** [2] - 120:21,
122:1
**predicate** [1] - 8:6
**predict** [2] - 8:9, 8:12
**prefer** [1] - 150:3
**preference** [1] - 178:3
**Preliminary** [1] - 4:14
**premorbid** [1] - 92:21
**prepare** [2] - 5:5,
60:12, 169:12
**prescribe** [2] - 118:1,
136:16
**prescribed** [3] -
113:10, 136:20
**prescribing** [2] -
123:25, 124:3
**presence** [4] - 72:16,
76:5, 90:12, 174:6
**present** [14] - 5:12,
15:16, 30:8, 74:12,
75:19, 79:5, 81:12,
88:14, 127:11,
163:3, 168:18,
168:24, 169:1, 169:5
**presentation** [7] -
9:18, 48:23, 49:4,
60:13, 74:21, 89:2,
111:8
**presentations** [1] -
63:8
**presented** [6] - 6:6,
14:5, 101:16,
102:22, 106:24,
177:7
**presenting** [1] - 108:7
**Presents** [1] - 78:17
**presents** [1] - 105:21
**presumably** [1] -
136:25
**presumptively** [1] -
150:9
**presupposing** [1] -
11:24
**pretend** [1] - 70:5
**pretty** [4] - 27:11,
30:8, 71:6, 175:16
**prevent** [2] - 44:23,
45:3
**prevented** [1] - 45:13
**preventing** [2] - 52:12,
52:15
**previous** [5] - 7:17,
8:10, 82:23, 86:13,
155:4
**previously** [4] - 6:21,
33:23, 35:19, 48:10
**Pricewaterhouse** [1] -
177:5

**primarily** [3] - 37:20,
63:12, 74:22
**primary** [3] - 19:2,
66:2, 131:8
**Principal** [1] - 20:21
**principals** [1] - 20:8
**print** [2] - 15:22, 176:2
**printouts** [1] - 170:23
**private** [3] - 63:20,
63:21, 63:24
**problem** [10] - 65:1,
66:4, 66:5, 66:17,
84:16, 85:3, 154:17,
177:22, 180:12,
181:20
**problematic** [1] -
160:24
**problems** [7] - 62:25,
64:10, 65:1, 66:7,
79:11, 129:15,
142:23
**procedure** [1] - 35:12
**procedures** [1] - 30:12
**proceed** [2] - 40:8,
42:9
**proceedings** [7] -
88:13, 149:10,
166:24, 171:25,
183:6, 183:11,
183:14
**PROCEEDINGS** [1] -
1:10
**Proceedings** [1] -
182:14
**process** [14] - 58:8,
68:2, 68:9, 74:2,
74:3, 80:7, 106:22,
111:22, 142:24,
177:14, 177:19,
179:7, 179:10, 180:9
**processing** [6] - 97:8,
99:6, 99:11, 107:18,
143:20, 145:6
**produced** [8] - 12:9,
92:6, 94:4, 100:19,
109:24, 110:8,
154:15, 154:16
**producing** [1] - 70:2
**product** [1] - 155:24
**production** [1] - 72:14
**profanity** [2] - 14:16,
14:18
**profession** [1] - 19:6
**professional** [6] -
20:20, 47:22, 61:25,
62:21, 131:15, 174:3
**professionals** [4] -
113:4, 123:13,
137:3, 166:14
**profile** [2] - 66:25,

108:17
**profound** [1] - 53:23
**progress** [3] - 80:18,
80:20, 95:16
**prominent** [1] - 89:18
**promise** [2] - 131:4,
178:16
**prongs** [1] - 158:15
**proof** [1] - 8:18
**propose** [2] - 6:16,
179:15
**proposed** [3] - 6:19,
6:21, 179:17
**protect** [1] - 126:21
**protected** [1] - 160:14
**protocol** [1] - 20:20
**provide** [15] - 8:6,
37:14, 118:16,
123:1, 123:16,
133:3, 146:10,
146:11, 150:20,
159:5, 159:25,
160:10, 166:4,
169:8, 170:16
**provided** [6] - 14:12,
89:9, 120:20,
122:12, 160:25,
173:6
**provider** [6] - 79:22,
112:13, 112:14,
117:17, 174:15
**providers** [6] - 122:25,
123:22, 124:6,
124:8, 135:19, 174:8
**provides** [1] - 133:1
**providing** [5] - 9:19,
118:9, 123:9,
127:17, 170:15
**proxy** [1] - 147:20
**Ps** [1] - 106:12
**psychiatric** [17] -
71:23, 72:16, 75:7,
87:25, 89:2, 91:16,
92:14, 107:10,
107:13, 108:2,
109:15, 110:18,
127:5, 134:8, 135:5,
137:22, 166:21
**Psychiatric** [1] - 133:5
**psychiatrist** [3] - 66:2,
76:17, 89:8
**psychiatrists** [3] -
112:10, 127:1,
166:11
**psychological** [5] -
66:19, 68:2, 75:7,
76:24, 87:16
**psychologist** [13] -
61:22, 76:17, 81:22,
89:8, 117:22, 118:4,

118:5, 118:7, 118:8,
118:14, 158:13,
165:7, 170:21
**psychologist's** [1] -
157:16
**psychologists** [4] -
72:22, 112:10,
127:1, 166:15
**psychology** [5] -
61:15, 62:1, 62:7,
118:20, 118:21
**psychotic** [5] - 80:3,
80:5, 80:6, 80:9,
80:10
**PTSD** [86] - 75:20,
75:21, 75:24, 76:5,
77:7, 77:11, 77:15,
77:24, 78:12, 78:14,
78:23, 79:4, 79:7,
80:4, 80:6, 80:16,
80:20, 81:5, 81:11,
87:21, 87:22, 89:12,
104:5, 110:21,
110:24, 112:11,
112:23, 115:6,
115:11, 116:7,
116:13, 116:18,
116:21, 117:5,
120:11, 122:13,
122:16, 125:8,
125:20, 127:18,
127:24, 128:1,
128:20, 128:23,
129:8, 131:12,
133:2, 133:3,
133:18, 134:7,
135:5, 135:20,
136:23, 137:1,
137:5, 137:9,
137:20, 138:5,
142:21, 142:22,
143:2, 143:7,
143:10, 143:12,
143:16, 143:21,
143:22, 143:24,
144:3, 144:7,
145:10, 161:3,
164:9, 164:15,
164:23, 165:6,
165:14, 169:3,
170:14, 171:20,
172:17, 173:14,
173:16, 174:4,
174:16, 174:21
**PTSD-like** [1] - 171:20
**Public** [5] - 17:1, 17:5,
44:7, 48:2, 52:10
**public** [2] - 21:11,
73:19
**publication** [1] - 62:19

**publicly** [2] - 73:7, 73:10
**publish** [21] - 21:16, 21:17, 22:24, 26:10, 32:8, 35:19, 39:9, 47:5, 60:25, 90:19, 121:5, 121:13, 124:21, 125:11, 126:1, 126:3, 126:18, 138:25, 139:6, 142:11, 171:8
**published** [22] - 21:18, 23:2, 26:13, 32:10, 33:25, 35:22, 39:11, 47:7, 47:10, 61:3, 62:9, 62:15, 62:23, 76:11, 90:21, 121:15, 124:24, 126:5, 139:7, 142:15, 171:10, 172:6
**pull** [3] - 32:5, 33:22, 76:22
**purportedly** [1] - 150:20
**purpose** [3] - 26:23, 65:3, 97:6
**purposely** [3] - 69:6, 107:3, 110:10
**pursuant** [3] - 131:12, 131:16, 135:16
**pursue** [1] - 17:15
**purview** [1] - 14:20
**put** [17] - 8:4, 12:1, 13:10, 22:11, 28:18, 56:11, 67:18, 74:6, 112:12, 129:18, 138:16, 148:11, 154:5, 162:21, 165:18, 174:19, 176:15
**putting** [6] - 10:3, 68:20, 69:2, 82:1, 153:25, 154:2
**puzzle** [3] - 66:16, 66:17, 105:13

## Q

**qualifications** [1] - 90:3
**qualified** [2] - 65:21, 160:15
**qualitative** [2] - 161:11, 161:18
**qualities** [1] - 71:6
**QUESTION** [15] - 116:5, 151:1, 151:11, 152:7, 152:14, 152:22,

153:3, 153:5, 153:8, 157:12, 157:19, 157:23, 163:21, 164:2, 164:7
**question's** [1] - 52:19
**questioned** [1] - 10:12
**questionnaire** [1] - 141:12
**questionnaires** [6] - 71:16, 71:17, 71:21, 87:11, 106:20, 170:17
**questions** [41] - 7:11, 7:17, 10:17, 16:7, 24:1, 37:9, 38:2, 40:3, 42:1, 59:13, 66:10, 71:17, 73:7, 73:12, 73:17, 73:19, 81:22, 84:18, 86:14, 107:2, 113:20, 113:22, 113:24, 118:3, 141:14, 141:17, 158:22, 158:23, 158:25, 159:3, 159:6, 161:1, 165:9, 165:11, 170:16, 175:6, 177:20, 181:2, 181:14
**quickly** [1] - 56:14
**quit** [1] - 167:8
**quite** [3] - 8:7, 155:1, 177:25
**quiz** [1] - 51:19

## R

**Rachel** [8] - 18:2, 18:4, 18:6, 18:9, 18:15, 19:14, 20:2, 54:1
**radiology** [1] - 122:6
**R███████** [1] - 39:23
**raise** [3] - 11:7, 11:8, 11:15
**raised** [8] - 12:4, 16:22, 16:24, 17:7, 36:21, 36:22, 37:4, 53:3
**Ramapo** [1] - 133:5
**ran** [1] - 131:25
**range** [8] - 99:18, 100:11, 100:24, 100:25, 144:11, 154:16, 155:18, 155:19
**ranging** [1] - 145:1
**rank** [2] - 8:17, 154:23
**raped** [3] - 38:7, 40:24, 41:3

**rapport** [1] - 76:23
**rate** [4] - 65:10, 97:19, 102:10
**rates** [1] - 102:8
**rather** [3] - 11:17, 70:11, 103:18
**raw** [2] - 157:5, 170:20
**ray** [1] - 130:14
**rbates@hunton.com** [1] - 2:15
**reach** [3] - 111:11, 157:7, 177:24
**reached** [1] - 60:10
**reaching** [1] - 156:18
**reaction** [1] - 35:8
**reactivity** [1] - 109:18
**read** [26] - 5:6, 40:14, 40:17, 40:20, 62:24, 71:8, 73:19, 93:18, 144:21, 149:6, 149:9, 149:16, 149:17, 150:5, 150:7, 150:16, 150:18, 158:10, 177:14, 177:17, 177:18, 177:19, 177:20, 177:22, 180:7, 181:7
**reading** [11] - 40:23, 116:2, 116:3, 144:12, 144:13, 144:14, 144:15, 154:8, 178:14, 180:5
**ready** [5] - 8:11, 10:6, 24:18, 24:23, 176:15
**real** [3] - 105:22, 105:23, 181:18
**realize** [1] - 19:21
**really** [39] - 8:9, 19:18, 24:16, 24:17, 26:5, 27:10, 35:11, 66:8, 68:23, 69:4, 69:6, 69:18, 69:19, 69:20, 70:18, 71:21, 73:21, 76:22, 76:23, 79:25, 85:18, 86:14, 89:17, 89:19, 98:24, 100:25, 102:23, 105:15, 167:22, 168:2, 168:10, 177:23, 181:9
**realtime** [1] - 183:12
**reason** [15] - 98:2, 105:8, 112:20, 123:11, 123:15, 123:18, 123:20, 129:4, 135:24, 135:25, 136:2, 136:3, 159:9, 160:3, 160:7

**reasonable** [2] - 67:14, 87:16
**reasons** [6] - 45:2, 55:17, 73:11, 159:16, 160:17, 167:18
**rebuttal** [2] - 180:19, 180:21
**receive** [3] - 30:3, 32:1, 46:10
**received** [13] - 11:10, 30:18, 32:3, 32:14, 35:15, 39:20, 47:15, 49:8, 51:8, 51:9, 51:12, 51:15, 122:1
**receiving** [2] - 30:13, 39:24
**recently** [1] - 68:22
**Recess** [1] - 88:12
**recipe** [1] - 73:14
**recitation** [2] - 163:5, 168:17
**recites** [1] - 144:20
**recognition** [1] - 103:14
**recognize** [2] - 50:1, 50:5
**recollection** [7] - 10:23, 10:25, 24:3, 24:4, 25:6, 121:2, 149:21
**recommence** [1] - 88:16
**record** [16] - 5:7, 16:16, 16:18, 40:12, 42:12, 42:25, 79:25, 120:1, 127:22, 129:19, 131:2, 133:20, 137:25, 142:2, 150:19, 174:12
**recording** [1] - 183:13
**records** [49] - 5:22, 5:24, 6:13, 74:6, 74:25, 79:21, 81:20, 82:25, 83:2, 83:4, 83:7, 113:2, 117:4, 119:8, 119:23, 120:4, 120:21, 120:23, 121:6, 121:21, 121:22, 121:25, 122:8, 122:9, 122:11, 122:12, 125:16, 125:18, 128:22, 129:5, 129:6, 129:16, 129:23, 129:24, 130:4, 134:18, 137:8, 137:19, 140:16,

140:18, 145:10, 145:11, 145:13, 165:19, 166:3, 171:15, 174:10, 174:16
**redact** [1] - 5:21
**redacted** [1] - 9:3
**Redirect** [1] - 4:8
**REDIRECT** [1] - 167:10
**redirect** [3] - 12:10, 59:3, 167:4
**refer** [2] - 42:14, 42:25
**reference** [7] - 5:25, 6:10, 6:11, 6:19, 62:14, 121:8, 121:10
**references** [1] - 5:21
**referencing** [2] - 26:18, 162:15
**referred** [3] - 66:1, 66:3, 166:1
**referring** [5] - 20:21, 81:25, 82:6, 104:20, 162:15
**reflection** [1] - 21:2
**refresh** [4] - 10:23, 10:25, 121:2, 149:21
**refused** [1] - 160:10
**regard** [8] - 14:22, 25:19, 26:5, 29:21, 30:3, 31:1, 33:10, 75:20
**regarding** [7] - 5:10, 7:8, 7:18, 10:15, 15:22, 171:20, 178:21
**regardless** [2] - 158:6, 158:20
**regards** [1] - 8:13
**regular** [2] - 109:1, 111:5
**regularly** [1] - 129:12
**rehashing** [1] - 11:23
**rehearsed** [1] - 78:18
**reinject** [1] - 6:18
**related** [22] - 21:6, 53:14, 54:11, 62:6, 62:7, 62:16, 66:9, 76:3, 77:6, 78:1, 81:20, 83:3, 92:14, 92:15, 107:24, 108:2, 109:4, 118:16, 152:1, 152:18, 163:6
**relating** [2] - 54:13, 57:5
**relationships** [1] - 109:17
**relatives** [1] - 17:16
**relevance** [2] - 38:11,

170:7
**relevant** [9] - 7:22, 9:5, 119:24, 120:7, 120:13, 120:15, 120:16, 120:17, 120:18
**reliable** [7] - 67:10, 68:1, 69:15, 74:8, 93:17, 96:1, 96:3
**relied** [1] - 111:11
**relies** [1] - 173:18
**rely** [3] - 105:9, 173:21, 174:4
**relying** [1] - 159:13
**remarkable** [3] - 36:21, 85:23, 165:17
**remarkably** [5] - 163:6, 163:18, 163:21, 163:24, 168:16
**remember** [40] - 24:15, 25:5, 25:21, 25:23, 25:24, 27:13, 33:13, 39:21, 47:20, 47:24, 47:25, 48:15, 51:23, 57:22, 91:25, 102:23, 103:3, 103:4, 103:15, 103:16, 104:2, 113:5, 118:5, 119:11, 120:25, 124:12, 124:16, 126:7, 131:23, 147:4, 159:14, 159:18, 159:21, 159:22, 161:4, 161:16, 164:16, 167:20, 175:24
**remembered** [1] - 26:2
**remembers** [1] - 144:22
**remind** [1] - 89:5
**reminder** [1] - 30:12
**remove** [1] - 23:21
**removed** [4] - 104:4, 104:22, 174:9, 174:20
**rendered** [1] - 111:14
**renew** [2] - 46:17, 52:16
**repeat** [6] - 45:1, 54:25, 93:18, 95:13, 95:15, 149:20
**repeated** [1] - 77:13
**repeatedly** [1] - 151:21
**repeating** [1] - 145:4
**repetition** [1] - 95:8
**rephrase** [2] - 152:16, 160:4

**rephrased** [1] - 160:7
**replaying** [1] - 77:9
**replicated** [1] - 112:1
**report** [41] - 9:2, 9:5, 11:2, 30:18, 32:24, 33:3, 40:24, 41:2, 49:12, 49:14, 70:19, 78:13, 81:25, 84:12, 87:11, 91:15, 92:11, 101:9, 106:14, 106:19, 107:23, 110:20, 114:15, 114:21, 114:23, 116:4, 116:6, 116:16, 119:5, 122:6, 132:10, 132:12, 136:11, 142:4, 147:5, 155:5, 161:15, 173:18, 173:21, 174:4
**reported** [12] - 9:9, 9:10, 28:4, 30:14, 30:20, 31:14, 45:5, 49:20, 57:9, 77:12, 183:5
**REPORTER** [1] - 183:1
**reporter** [1] - 50:16
**Reporter** [3] - 3:12, 183:3, 183:22
**Reporter.....................** ... [1] - 4:15
**reporting** [5] - 32:2, 32:3, 75:2, 79:7, 108:19
**Reports** [2] - 79:11, 80:14
**reports** [11] - 8:16, 8:22, 9:8, 9:11, 10:21, 11:1, 63:6, 70:7, 77:13, 130:9
**represent** [1] - 16:16
**representations** [1] - 178:21
**request** [2] - 5:20, 171:18
**require** [2] - 34:23, 150:19
**required** [4] - 5:20, 42:22, 47:17, 114:23
**requires** [1] - 6:11
**research** [15] - 62:22, 69:17, 72:3, 72:5, 72:6, 72:7, 76:11, 77:5, 78:12, 92:22, 94:3, 94:5, 102:3, 109:25, 162:15
**research-derived** [2] - 92:22, 94:3
**researched** [1] - 69:24

**researching** [1] - 93:20
**residence** [1] - 124:16
**residency** [1] - 63:18
**resolution** [1] - 178:2
**resolve** [2] - 178:7, 181:11
**resolved** [1] - 59:16
**respect** [7] - 12:5, 45:21, 46:2, 48:25, 52:3, 54:18, 167:17
**respond** [1] - 80:25
**respondent** [1] - 84:18
**responding** [1] - 36:14
**response** [9] - 36:5, 36:11, 38:3, 59:15, 108:13, 110:5, 113:13, 150:9, 150:20
**responses** [4] - 5:2, 84:14, 107:25, 137:17
**responsibilities** [1] - 58:16
**Responsibilities** [2] - 51:17, 52:5
**responsibility** [1] - 49:22
**rest** [3] - 78:25, 100:8, 107:20
**Reston** [2] - 3:6, 3:10
**result** [4] - 75:10, 111:25, 112:2, 157:20
**results** [20] - 66:12, 70:2, 82:12, 85:8, 86:25, 91:2, 94:14, 102:19, 106:11, 107:18, 110:9, 111:11, 149:14, 154:16, 155:25, 158:2, 158:9, 158:19, 162:6, 170:12
**resumed** [1] - 88:13
**retained** [5] - 117:10, 138:12, 139:10, 139:21, 162:1
**returned** [1] - 25:4
**reverse** [2] - 93:19, 95:11
**review** [16] - 43:1, 43:2, 43:6, 43:9, 63:5, 74:5, 82:25, 113:2, 116:3, 119:2, 120:9, 122:11, 142:2, 160:9, 178:6
**reviewed** [14] - 60:21,

83:5, 83:7, 111:18, 117:4, 119:10, 119:15, 121:6, 125:16, 140:16, 140:18, 147:1, 156:12, 171:15
**reviewer** [1] - 62:21
**reviewing** [2] - 62:18, 81:19
**Rewari** [18] - 2:16, 8:24, 84:25, 93:7, 115:5, 115:14, 118:3, 119:3, 131:22, 147:24, 149:13, 158:21, 160:16, 161:15, 167:3, 167:9, 176:7, 178:20
**REWARI** [86] - 8:25, 9:20, 10:1, 10:19, 11:4, 12:3, 12:7, 12:15, 12:20, 12:25, 13:16, 14:9, 14:12, 14:24, 15:7, 15:10, 15:13, 59:9, 59:20, 60:4, 60:5, 60:16, 60:18, 60:25, 61:2, 61:6, 65:17, 65:22, 67:18, 67:20, 71:12, 73:23, 73:24, 82:14, 82:15, 85:2, 85:4, 88:4, 88:17, 88:18, 90:4, 90:8, 90:16, 90:22, 93:13, 93:14, 95:22, 97:2, 99:8, 101:11, 101:12, 104:9, 104:11, 110:6, 110:7, 113:19, 115:16, 137:11, 138:6, 148:13, 156:20, 167:5, 167:11, 170:11, 171:3, 171:6, 171:8, 171:11, 172:1, 172:4, 172:7, 173:24, 175:6, 175:14, 176:8, 176:17, 176:20, 176:25, 177:8, 177:11, 178:25, 179:4, 179:14, 179:23, 180:16, 182:8
**Rewari.......... ** [1] - 4:8
**Rewari............** [1] - 4:7
**Ridge** [1] - 133:5
**Rights** [2] - 51:16, 52:5

**rigorous** [3] - 67:7, 75:25, 89:21
**rings** [1] - 93:6
**risk** [1] - 181:21
**rkeefe@bsfllp.com** [1] - 2:12
**Robert** [2] - 2:9, 3:5
**Rochester** [1] - 61:14
**role** [13] - 49:13, 49:18, 50:6, 67:11, 67:12, 67:13, 67:16, 78:25, 79:9, 112:12, 112:13, 123:3, 161:24
**room** [6] - 21:5, 25:15, 28:9, 28:21, 28:22, 37:18
**ROSSIE** [1] - 1:11
**rounds** [1] - 29:14
**routinely** [4] - 85:10, 98:14, 119:23, 168:19
**row** [2] - 23:13, 77:20
**rows** [1] - 23:11
**RPR** [2] - 3:12, 183:21
**ruled** [1] - 8:25
**rules** [1] - 9:21
**ruling** [1] - 10:3
**run** [2] - 131:23, 181:21
**running** [1] - 28:22
**Ryan** [6] - 2:13, 5:18, 16:16, 111:13, 112:3, 163:8
**Ryan's** [2] - 111:18, 163:11

**S**

**S-C-O-L-P** [1] - 143:18
**S.T** [1] - 3:5
**safe** [2] - 80:13, 182:11
**safety** [5] - 41:6, 41:9, 41:11, 41:15, 76:24
**sample** [1] - 109:2
**sanity** [1] - 63:5
**Sara** [1] - 176:8
**saw** [20] - 10:6, 13:24, 14:14, 19:25, 25:4, 30:5, 31:12, 35:14, 57:1, 68:8, 83:11, 103:15, 106:5, 111:18, 124:8, 124:11, 145:9, 145:10, 159:13
**scale** [2] - 100:17, 100:19
**scales** [2] - 107:19, 107:20

**scene** [1] - 77:10
**schedule** [1] - 175:17
**scheduled** [2] - 175:20, 176:9
**SCHILLER** [4] - 1:18, 2:1, 2:5, 2:9
**school** [72] - 7:24, 8:1, 8:18, 14:16, 17:17, 18:8, 18:22, 19:9, 19:16, 19:18, 21:6, 21:10, 21:12, 21:16, 23:4, 24:5, 24:6, 24:7, 24:15, 24:19, 25:20, 26:5, 27:13, 29:20, 30:2, 30:6, 30:7, 31:5, 31:6, 31:9, 31:17, 32:20, 32:25, 33:9, 33:11, 33:13, 35:9, 35:13, 35:16, 37:8, 37:9, 37:11, 37:13, 37:16, 37:18, 37:22, 38:7, 38:15, 38:21, 39:1, 41:14, 44:20, 47:18, 49:2, 52:1, 53:15, 57:22, 58:8, 58:9, 58:11, 58:14, 58:16, 83:2, 121:22, 122:9, 177:2
**School** [13] - 16:2, 16:17, 17:1, 17:5, 18:2, 18:16, 21:12, 24:9, 49:3, 49:5, 61:17, 139:24, 162:2
**schoolers** [1] - 25:11
**schooling** [1] - 35:2
**Schools** [4] - 43:12, 44:7, 48:2, 52:10
**schools** [1] - 24:8
**science** [4] - 12:8, 13:23, 13:25, 14:1
**scientific** [2] - 73:2, 74:3
**scientifically** [1] - 72:2
**SCOLP** [2] - 143:18, 145:16
**scooping** [1] - 58:25
**scope** [15] - 8:10, 11:16, 11:17, 12:21, 45:23, 46:18, 49:17, 52:16, 52:18, 53:2, 53:8, 82:10, 101:9, 170:6, 180:22
**score** [35] - 66:22, 69:25, 71:1, 71:4, 72:25, 73:1, 73:5, 94:3, 97:16, 97:20, 97:23, 97:24, 98:4, 100:6, 101:21, 102:1, 102:2, 102:6,

102:13, 103:21, 103:22, 105:24, 108:12, 108:21, 109:6, 109:7, 109:22, 110:8, 110:9, 110:25, 142:19, 156:4, 156:5, 157:2, 157:16
**scored** [6] - 86:23, 98:20, 100:22, 155:1, 155:2, 155:3
**scorers** [1] - 66:18
**scores** [33] - 21:3, 66:25, 69:23, 69:24, 72:10, 73:4, 75:2, 87:7, 92:6, 106:10, 108:4, 109:3, 109:24, 117:4, 153:17, 153:21, 153:22, 153:23, 154:3, 154:14, 154:15, 154:22, 155:8, 155:11, 155:14, 155:22, 157:5, 157:6, 157:20, 157:23, 158:1, 158:12, 158:10
**scoring** [2] - 97:23, 156:10
**Scott** [1] - 2:20
**screen** [4] - 21:23, 61:4, 61:7, 90:23
**scroll** [1] - 121:17
**scrolling** [1] - 120:6
**SE** [3] - 2:2, 2:6, 2:10
**seat** [1] - 16:6
**seated** [4] - 15:17, 59:18, 88:15, 176:6
**second** [17] - 7:6, 12:11, 12:16, 29:5, 32:6, 38:6, 40:18, 93:7, 121:19, 126:20, 141:5, 153:25, 154:2, 154:20, 171:23, 172:11, 173:4
**secondary** [2] - 123:13, 181:13
**seconds** [1] - 120:9
**section** [3] - 130:4, 131:2, 135:4
**secure** [1] - 93:12
**security** [3] - 57:21, 58:14, 58:17
**see** [81] - 15:3, 15:4, 15:18, 22:8, 23:7, 23:11, 23:13, 26:25, 28:10, 29:1, 29:19, 32:12, 32:22, 34:10,

36:5, 36:6, 36:8, 47:23, 49:1, 49:13, 49:16, 56:2, 63:19, 64:6, 64:23, 68:19, 70:6, 74:2, 77:7, 78:22, 79:19, 81:18, 86:2, 86:5, 86:11, 88:5, 88:7, 88:11, 92:19, 97:9, 99:22, 100:13, 103:4, 104:19, 108:17, 109:11, 117:19, 121:17, 121:18, 121:21, 122:3, 122:6, 125:1, 125:3, 125:13, 126:15, 127:24, 128:19, 132:24, 133:6, 133:12, 136:5, 136:8, 136:9, 139:13, 139:17, 145:14, 145:16, 148:21, 164:23, 165:20, 165:22, 166:5, 172:14, 172:17, 176:3, 176:12, 179:17, 181:24, 182:11
**seeing** [7] - 52:15, 67:11, 80:11, 81:11, 86:16, 129:20, 174:9
**seeking** [2] - 112:14, 112:18
**Seeks** [1] - 79:17
**sees** [2] - 72:25, 78:2
**seizure** [3] - 137:21, 137:23, 137:24
**self** [14] - 66:3, 81:25, 84:12, 87:11, 91:15, 92:11, 106:14, 106:19, 107:23, 110:20, 141:8, 141:13, 173:18
**self-administered** [1] - 141:8
**self-assessment** [1] - 141:13
**self-referred** [1] - 66:3
**self-report** [11] - 81:25, 84:12, 87:11, 91:15, 92:11, 106:14, 106:19, 107:23, 110:20, 173:18
**seminar** [1] - 52:2
**send** [3] - 26:20, 34:20
**sending** [2] - 26:23, 33:14
**sense** [8] - 55:15, 75:1, 76:23, 86:11,

105:15, 119:24, 141:14, 182:1
**sensitive** [2] - 180:5, 180:6
**sent** [5] - 9:3, 26:21, 34:11, 62:23, 170:19
**sentence** [1] - 39:22
**separate** [3] - 139:16, 141:1, 154:10
**September** [2] - 115:23
**series** [1] - 131:25
**serious** [1] - 28:4
**seriously** [3] - 28:2, 44:20, 45:2
**SESSION** [1] - 1:8
**session** [2] - 32:20, 174:1
**sessions** [1] - 173:20
**set** [10] - 20:19, 38:2, 84:18, 90:6, 102:19, 106:12, 119:1, 120:20, 152:3, 157:20
**Seth** [1] - 5:11
**sets** [1] - 125:18
**setting** [9] - 27:13, 28:6, 28:16, 66:1, 67:7, 68:18, 124:11, 128:24, 174:17
**settings** [1] - 28:2
**seven** [7] - 71:8, 84:4, 84:7, 96:16, 96:22, 96:23, 140:23
**seven-hour** [3] - 96:16, 96:22, 96:23
**several** [13] - 62:2, 62:6, 62:15, 62:21, 71:17, 73:11, 85:7, 85:20, 87:4, 106:7, 156:22, 157:21, 159:3
**severe** [12] - 69:20, 76:20, 80:19, 80:21, 81:13, 103:1, 104:5, 108:5, 108:18, 111:7, 137:22, 162:16
**severely** [2] - 71:2, 75:11
**severity** [5] - 78:10, 159:20, 160:12, 161:9, 162:8
**Sexual** [1] - 153:8
**sexual** [33] - 31:18, 31:19, 33:3, 33:20, 43:23, 45:21, 46:3, 47:24, 49:9, 49:11, 50:13, 50:15, 50:17, 50:22, 50:23, 51:5,

51:14, 53:22, 54:4, 148:17, 148:22, 149:4, 150:1, 151:3, 151:7, 151:10, 152:11, 152:21, 152:25, 153:6, 153:8
**sexually** [1] - 151:21
**shadow** [1] - 32:21
**share** [1] - 160:6
**shared** [5] - 7:23, 57:11, 89:7, 127:8, 161:8
**shares** [1] - 162:8
**sheets** [1] - 170:21
**shoes** [1] - 21:8
**shoo** [1] - 55:19
**short** [3] - 12:25, 136:6, 177:3
**shorthand** [2] - 183:5, 183:12
**shot** [2] - 78:3, 164:21
**show** [15] - 22:11, 39:3, 46:14, 48:9, 53:20, 69:17, 77:8, 77:10, 79:21, 83:5, 103:11, 105:19, 105:23, 131:2, 168:10
**showed** [7] - 56:20, 57:2, 118:3, 136:6, 137:20, 172:21, 172:23
**showing** [3] - 80:20, 110:10, 132:22
**shown** [3] - 55:2, 77:9, 91:13
**shows** [2] - 26:21, 106:16
**side** [18] - 9:4, 13:25, 14:2, 14:3, 14:7, 15:3, 23:19, 55:16, 60:20, 96:25, 118:21, 134:19, 145:23, 160:9, 179:17
**side-by-side** [1] - 134:19
**sides** [2] - 9:15, 10:1
**sign** [1] - 95:3
**signed** [2] - 51:20
**significant** [3] - 62:25, 153:18, 154:3
**signs** [3] - 35:11, 165:20, 165:22
**similar** [4] - 14:8, 70:10, 107:17, 108:24
**simple** [1] - 97:11
**simplified** [1] - 112:24
**simplifying** [1] -

143:25
**simply** [2] - 80:20, 112:22
**single** [11] - 73:20, 95:17, 122:5, 137:2, 143:6, 144:7, 158:25, 159:2, 159:25, 160:10
**single-digit** [1] - 95:17
**sit** [4] - 120:8, 149:24, 152:7, 152:9
**situation** [4] - 43:14, 78:5, 124:14, 152:5
**situational** [1] - 173:13
**situations** [3] - 43:20, 127:15, 136:7
**six** [5] - 20:6, 79:20, 85:10, 103:10, 114:10
**skip** [1] - 23:20
**Slide** [2] - 61:11, 61:19
**slide** [19] - 60:1, 60:12, 60:22, 62:8, 62:17, 73:23, 75:16, 75:17, 78:24, 81:14, 82:18, 82:23, 87:9, 111:8, 111:10, 118:4, 164:14, 165:1, 167:15
**slides** [2] - 67:18, 165:3
**slight** [1] - 114:17
**slightly** [2] - 85:17, 101:1
**sliver** [1] - 49:13
**slow** [1] - 146:3
**slowly** [1] - 99:3
**small** [2] - 120:20, 164:10
**smaller** [1] - 97:13
**smelling** [1] - 80:11
**smiling** [1] - 25:24
**snippets** [1] - 56:1
**social** [5] - 15:22, 47:18, 55:17, 175:2, 176:2
**SOL** [1] - 28:1
**soldier** [3] - 78:2, 164:18, 164:20
**sole** [2] - 122:25, 140:13
**solely** [5] - 131:19, 146:10, 146:16, 146:22, 166:4
**solemn** [1] - 123:21
**solving** [2] - 84:16, 154:17
**someone** [57] - 10:20,

19:14, 51:1, 64:7, 66:6, 66:8, 66:25, 68:16, 69:2, 69:18, 69:19, 69:20, 70:11, 70:21, 70:25, 71:9, 74:4, 75:11, 76:6, 76:20, 76:25, 77:15, 78:1, 78:2, 78:14, 78:19, 79:20, 80:12, 80:19, 81:10, 85:9, 86:2, 86:4, 89:24, 94:4, 98:21, 99:1, 99:16, 100:25, 103:1, 109:3, 109:4, 109:6, 109:9, 112:1, 113:13, 116:23, 117:19, 127:9, 127:10, 129:17, 130:22, 143:7, 151:9, 155:24, 167:19, 174:17
**sometime** [2] - 178:24, 179:3
**sometimes** [14] - 14:7, 37:21, 55:19, 55:21, 66:3, 79:19, 79:25, 86:12, 86:13, 112:22, 129:22, 130:6, 130:8, 180:3
**somewhere** [3] - 84:11, 101:17, 107:7
**Sona** [1] - 2:16
**soon** [2] - 179:25, 180:1
**sorry** [17] - 11:11, 20:23, 27:17, 41:11, 50:17, 85:2, 92:3, 92:4, 97:20, 120:14, 126:21, 149:15, 150:3, 150:17, 153:4, 163:14, 176:21
**sound** [3] - 104:2, 114:10, 118:24
**sounds** [2] - 118:25, 120:25
**source** [1] - 69:15
**sources** [3] - 74:5, 81:18, 81:19
**South** [2] - 17:7, 19:24
**span** [3] - 93:17, 96:1, 96:3
**Spartans** [2] - 21:13, 49:2
**speaking** [5] - 32:17,

43:5, 43:7, 59:15, 138:19
**specialize** [2] - 64:4, 64:5
**specialty** [1] - 64:3
**specific** [13] - 54:11, 58:16, 67:15, 73:6, 91:25, 92:13, 98:7, 108:19, 109:2, 117:14, 148:19, 170:16, 182:6
**specifically** [6] - 54:17, 55:6, 110:21, 124:12, 159:19, 171:22
**specifics** [8] - 33:16, 48:6, 51:23, 52:11, 54:16, 113:5, 181:18, 181:19
**speechless** [3] - 36:16, 36:17, 37:4
**speed** [11] - 97:9, 99:5, 99:7, 99:11, 99:13, 99:19, 143:20, 144:3, 144:13, 145:6, 154:8
**spelled** [1] - 52:7
**spend** [1] - 18:6
**spent** [2] - 7:6, 142:4
**spoiled** [1] - 107:20
**spot** [1] - 178:7
**spring** [1] - 18:10
**Springfield** [3] - 21:12, 49:3, 49:4
**springs** [1] - 177:25
**sprinkled** [1] - 96:23
**Square** [1] - 3:13
**srewari@huntonak. com** [1] - 2:19
**stable** [3] - 85:15, 105:18, 168:9
**staff** [2] - 19:17, 177:22
**stairs** [1] - 55:16
**stand** [14] - 7:13, 10:6, 11:13, 11:20, 13:4, 22:12, 22:13, 22:17, 23:16, 23:23, 26:5, 35:5, 63:5, 143:19
**standalone** [12] - 69:11, 69:13, 71:15, 87:2, 87:4, 91:18, 92:1, 92:5, 97:5, 98:10, 158:22, 158:25
**standard** [9] - 47:21, 63:7, 65:10, 85:6, 90:7, 102:2, 105:25, 106:2, 170:19
**Standard** [1] - 28:1

**standardized** [8] - 66:20, 67:25, 100:2, 107:1, 108:25, 111:24, 156:3
**standards** [4] - 47:17, 87:3, 116:22, 156:24
**standing** [2] - 125:25, 143:24
**stands** [5] - 25:18, 39:19, 91:20, 134:8, 153:10
**start** [14] - 13:3, 46:23, 61:11, 63:15, 77:20, 86:5, 116:2, 124:20, 149:22, 150:3, 150:8, 150:11, 167:12, 175:18
**started** [5] - 19:18, 30:7, 47:21, 63:19, 179:7
**starting** [2] - 88:4, 122:15
**starts** [3] - 16:8, 80:2, 128:10
**State** [1] - 28:5
**state** [3] - 16:18, 85:13, 177:12
**statement** [6] - 8:22, 116:16, 122:16, 137:10, 137:14, 163:13
**States** [1] - 3:12
**STATES** [2] - 1:1, 1:11
**states** [1] - 61:23
**statistical** [1] - 89:6
**statistics** [1] - 96:11
**stay** [5] - 8:9, 37:11, 37:13, 176:1, 182:5
**stayed** [5] - 15:21, 37:18, 57:23, 57:24, 58:5
**staying** [2] - 37:22, 58:2
**stays** [1] - 9:12
**step** [4] - 59:6, 74:8, 88:10, 175:7
**sterile** [1] - 9:18
**stick** [1] - 9:22
**still** [13] - 5:3, 19:6, 19:7, 19:19, 20:3, 21:14, 27:10, 36:16, 67:8, 105:22, 111:6, 154:11, 176:17
**stipulated** [2] - 5:17, 39:15
**stipulation** [1] - 14:25
**stop** [2] - 93:7, 150:17
**stopped** [2] - 35:8, 132:18
**stopping** [2] - 68:7,

120:7
**story** [4] - 78:19, 78:21, 168:10, 168:20
**straightforward** [1] - 129:22
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**stress** [12] - 125:5, 126:10, 126:14, 131:9, 133:10, 133:21, 134:12, 134:20, 134:24, 135:8, 135:11, 173:8
**stressed** [1] - 27:12
**string** [1] - 36:6
**strings** [2] - 32:12, 34:2
**strong** [3] - 94:14, 105:15, 129:2
**strongly** [1] - 108:12
**struck** [1] - 157:24
**structure** [2] - 9:13, 180:8
**strung** [1] - 27:15
**student** [8] - 26:6, 32:23, 40:25, 41:13, 43:11, 51:18, 52:23, 52:25
**students** [27] - 19:23, 19:25, 20:2, 20:13, 21:3, 21:6, 30:15, 30:23, 31:7, 31:10, 33:19, 37:14, 43:13, 43:18, 43:19, 43:24, 44:2, 44:5, 44:9, 50:8, 51:9, 51:12, 54:16, 54:23, 55:7, 56:2, 57:24
**Students** [2] - 51:16, 52:5
**students'** [2] - 51:24, 51:25
**studies** [4] - 47:18, 70:3, 78:12, 101:3
**study** [2] - 62:24, 76:11
**stuff** [1] - 28:15
**sub** [1] - 110:16
**subject** [3] - 19:10, 26:25, 175:12
**subjective** [2] - 130:5, 156:9
**submit** [4] - 62:19, 179:17, 179:25, 180:1
**subscribed** [1] - 183:15
**substantial** [2] - 81:6, 86:5

**substantially** [3] - 71:2, 94:4, 102:4
**subtest** [1] - 110:15
**success** [3] - 17:9, 21:2, 21:14
**sudden** [3] - 19:3, 35:11, 58:21
**sued** [1] - 39:25
**suffered** [2] - 116:13, 116:17
**suffering** [4] - 116:6, 130:24, 162:9, 162:12
**suggest** [2] - 10:10, 123:12
**suggested** [1] - 10:14
**suggesting** [2] - 110:5, 147:14
**suggestion** [2] - 9:19, 147:17
**suggestions** [1] - 9:16
**Suite** [7] - 1:15, 1:19, 2:2, 2:6, 2:10, 3:6, 3:9
**super** [1] - 85:18
**superhero** [1] - 20:11
**superintendent** [2] - 14:13, 14:17
**supplement** [1] - 114:17
**support** [2] - 6:13, 37:14
**supported** [1] - 20:14
**supporting** [1] - 62:3
**supposed** [3] - 94:18, 178:5, 180:8
**surgery** [2] - 104:5, 104:21
**surprised** [1] - 25:22
**surrounding** [1] - 29:11
**survey** [7] - 52:22, 52:23, 52:24, 52:25, 53:13, 53:18, 53:19
**sustained** [7] - 53:24, 82:13, 90:7, 101:10, 148:14, 173:23
**sworn** [4] - 12:15, 16:5, 59:12, 59:17
**symptom** [19] - 69:9, 70:8, 70:10, 70:16, 70:24, 71:13, 75:3, 78:15, 80:5, 80:6, 80:9, 80:10, 83:10, 109:15, 110:20, 144:3, 144:7, 159:25, 170:9
**symptoms** [59] - 69:7, 71:1, 71:19, 71:23, 71:24, 72:15, 72:16,

75:4, 76:1, 76:4, 76:14, 78:11, 78:13, 78:18, 79:8, 80:3, 80:15, 80:24, 81:23, 83:17, 87:12, 90:12, 92:8, 92:15, 107:10, 107:13, 108:2, 108:3, 108:16, 110:19, 110:21, 110:25, 111:1, 112:6, 112:15, 112:20, 112:23, 127:11, 136:23, 137:22, 147:16, 147:21, 148:4, 159:18, 159:21, 160:12, 160:19, 161:9, 163:5, 166:22, 170:4, 171:21, 173:18, 173:21, 174:5
**synonymous** [2] - 68:25, 69:8
**Syracuse** [1] - 61:15
**system** [2] - 102:25, 156:10
**systematic** [9] - 73:2, 74:3, 74:7, 89:18, 111:21, 130:1, 137:15, 156:11, 157:1
**systematically** [3] - 74:12, 82:2, 88:24

# T

**T.B** [1] - 3:6
**table** [1] - 91:14
**TABLE** [1] - 4:1
**tables** [1] - 114:18
**talks** [1] - 69:5
**tape** [2] - 10:17, 183:13
**T▮▮▮▮** [4] - 36:2, 36:8, 36:20, 37:5
**task** [2] - 97:11, 103:1
**tasks** [1] - 74:17
**taste** [2] - 154:10, 154:11
**taught** [2] - 18:9, 19:11
**TBI** [8] - 5:14, 5:18, 5:21, 5:24, 5:25, 6:3, 6:8, 6:23
**teach** [5] - 19:10, 20:5, 34:25, 49:18, 49:19
**teacher** [22] - 17:3, 17:11, 17:19, 18:3, 19:7, 19:19, 19:21, 19:24, 24:10, 36:20,

43:11, 43:12, 47:18, 49:2, 49:12, 49:13, 49:18, 52:22, 58:6, 176:13, 177:2, 177:3
**teachers** [13] - 20:14, 24:10, 24:13, 25:12, 26:21, 30:8, 34:14, 34:15, 43:12, 43:19, 45:21, 54:10, 57:25
**teaching** [3] - 17:14, 18:1, 20:4
**team** [17] - 19:12, 19:13, 20:7, 21:24, 25:22, 25:23, 26:22, 29:13, 30:8, 30:9, 33:13, 34:17, 36:19, 54:24, 55:1, 55:8
**teams** [3] - 55:5, 55:7, 55:11
**tears** [3] - 12:9, 25:10, 34:11
**ten** [8] - 48:1, 52:9, 54:19, 92:16, 113:7, 132:22, 163:18, 163:22
**ten-year** [1] - 163:22
**ten-year-plus** [1] - 163:18
**tend** [1] - 164:15
**tens** [1] - 117:4
**Tenth** [1] - 3:13
**term** [5] - 58:25, 68:21, 69:8, 89:3, 109:16
**termination** [1] - 158:6
**terms** [4] - 9:8, 52:12, 94:7, 95:23
**test** [153] - 27:21, 27:23, 27:25, 28:5, 28:16, 66:14, 66:20, 66:24, 69:13, 69:16, 69:17, 69:21, 70:3, 70:5, 70:24, 72:6, 72:7, 72:23, 73:4, 73:7, 73:12, 73:17, 73:21, 74:25, 83:17, 84:15, 86:6, 86:8, 86:15, 86:21, 91:1, 91:18, 92:8, 92:10, 93:18, 93:23, 94:10, 94:11, 94:13, 94:14, 94:16, 94:20, 94:24, 95:1, 95:7, 95:19, 95:20, 96:13, 96:18, 96:24, 97:3, 97:7, 97:16, 97:17, 97:24, 98:3, 98:10, 98:17, 98:20, 98:23, 98:25, 99:6, 99:9, 99:13,

99:17, 100:3, 100:14, 100:15, 100:17, 100:23, 101:14, 101:15, 101:16, 102:3, 102:5, 102:12, 102:18, 102:21, 103:8, 103:13, 104:3, 104:9, 104:16, 104:18, 104:23, 105:1, 105:3, 105:4, 105:10, 105:12, 105:20, 106:6, 106:24, 107:2, 108:11, 108:24, 109:12, 109:21, 109:23, 111:4, 112:4, 112:7, 131:23, 133:1, 133:2, 133:3, 142:17, 143:1, 143:6, 143:11, 143:15, 143:18, 143:21, 143:22, 143:23, 143:24, 144:6, 144:10, 144:11, 144:13, 144:15, 144:19, 144:23, 144:25, 145:6, 145:14, 145:16, 149:14, 152:20, 153:16, 154:14, 154:15, 155:25, 157:15, 157:18, 158:24, 159:17, 161:1, 168:1, 170:10, 170:20, 170:25
**tested** [1] - 99:10
**testified** [11] - 9:6, 9:10, 12:5, 13:1, 45:15, 53:21, 54:7, 58:20, 119:7, 128:4, 140:22
**testifies** [2] - 181:21, 181:25
**testify** [11] - 6:2, 7:21, 8:20, 9:14, 60:9, 114:24, 176:18, 178:5, 180:23, 181:16
**testifying** [4] - 15:9, 98:15, 104:7, 161:4
**testimony** [27] - 6:9, 6:12, 6:13, 7:4, 7:7, 8:6, 9:19, 12:13, 14:13, 39:14, 43:1, 43:4, 45:17, 46:12, 48:11, 53:15, 58:20,

65:11, 88:16, 126:25, 132:12, 149:21, 150:4, 158:14, 162:2, 162:4, 183:6
**testing** [25] - 28:2, 28:4, 67:21, 67:23, 72:22, 74:5, 81:24, 91:9, 91:10, 93:1, 96:21, 106:11, 107:17, 130:14, 132:16, 132:18, 154:6, 156:23, 157:20, 158:1, 165:20, 166:6, 166:7, 169:21, 170:5
**tests** [69] - 21:3, 27:22, 64:11, 64:25, 66:14, 66:16, 68:20, 72:1, 72:4, 72:5, 72:19, 73:3, 74:22, 75:13, 81:24, 83:6, 83:24, 84:12, 84:19, 85:20, 86:10, 86:12, 86:13, 86:18, 86:23, 87:10, 87:11, 87:12, 91:6, 91:12, 91:13, 91:14, 94:1, 94:18, 94:25, 95:5, 96:7, 96:23, 99:5, 103:6, 103:10, 103:11, 104:12, 105:8, 105:18, 106:12, 107:1, 107:9, 107:10, 107:12, 107:15, 111:10, 131:25, 132:17, 132:22, 132:24, 141:8, 141:18, 141:21, 142:8, 153:15, 155:22, 156:25, 157:15, 157:21, 165:23, 167:24
**tests'** [1] - 68:23
**textbook** [1] - 78:17
**THE** [173] - 1:1, 1:11, 3:4, 5:1, 5:3, 8:3, 8:24, 9:12, 9:25, 10:5, 10:25, 11:5, 11:19, 12:6, 12:13, 12:18, 12:23, 13:2, 13:18, 14:11, 14:19, 15:4, 15:8, 15:11, 15:17, 16:4, 16:6, 16:10, 16:11, 21:17, 23:1, 23:5, 26:12, 27:16, 27:17, 32:9, 33:24, 35:21, 36:25, 38:10, 38:12, 39:7,

39:9, 40:4, 40:6, 40:9, 41:25, 42:2, 42:8, 42:10, 45:25, 46:4, 46:5, 46:6, 46:7, 46:8, 46:20, 47:4, 47:6, 52:18, 52:20, 53:4, 53:10, 53:18, 53:24, 59:3, 59:5, 59:8, 59:11, 59:13, 60:3, 60:17, 60:19, 60:24, 61:1, 61:4, 65:21, 82:13, 88:6, 88:10, 88:15, 90:6, 90:19, 93:7, 94:19, 94:23, 95:13, 95:17, 95:19, 95:20, 95:21, 96:16, 96:19, 97:1, 97:25, 98:6, 98:17, 98:19, 101:10, 104:10, 110:4, 113:21, 113:23, 113:25, 114:3, 115:18, 121:4, 121:7, 121:12, 121:14, 124:23, 126:2, 126:21, 137:12, 138:2, 138:7, 138:9, 138:24, 139:3, 139:6, 142:12, 142:13, 142:14, 143:24, 143:25, 146:2, 147:7, 148:14, 149:11, 150:8, 150:10, 150:11, 150:14, 150:17, 150:24, 153:13, 156:21, 156:22, 167:2, 167:3, 167:6, 170:8, 170:9, 171:5, 171:7, 171:9, 172:5, 173:23, 175:7, 175:8, 175:10, 175:15, 176:5, 176:16, 176:19, 176:23, 177:6, 177:9, 177:16, 178:1, 178:15, 178:17, 178:20, 179:2, 179:6, 179:21, 180:1, 180:17, 181:1, 181:6, 182:2, 182:9, 182:11
**themselves** [8] - 19:25, 71:11, 77:25, 78:5, 154:3, 164:15, 164:22, 169:5
**theory** [1] - 6:5
**therapeutically** [1] -

83:16
**therapies** [1] - 80:23
**therapists** [2] - 166:14, 175:1
**therapy** [2] - 83:2, 113:8
**therefore** [2] - 132:23, 153:23
**they've** [4] - 9:10, 77:9, 96:5, 104:2
**thinking** [14] - 64:25, 66:4, 71:18, 71:24, 81:24, 84:15, 92:16, 99:19, 108:3, 142:23, 142:24, 144:3, 167:24, 180:3
**third** [3] - 27:1, 74:23, 81:12
**thousand** [1] - 66:18
**thousands** [2] - 72:9, 117:3
**threat** [3] - 41:6, 41:11, 41:14
**threaten** [1] - 168:1
**three** [21] - 23:9, 23:11, 26:4, 36:21, 36:22, 36:23, 38:7, 40:17, 81:17, 82:22, 84:12, 91:3, 91:5, 92:1, 92:5, 93:23, 96:5, 103:7, 103:10, 106:14
**threshold** [1] - 93:22
**throughout** [8] - 31:17, 32:1, 85:25, 86:3, 96:24, 98:14, 107:5, 146:19
**thrown** [1] - 78:22
**Thursday** [2] - 178:24, 179:2
**tie** [5] - 53:19, 132:20, 132:21, 132:22, 132:23
**Tiffany** [1] - 177:1
**tired** [2] - 98:1, 99:1
**Title** [1] - 181:10
**TJ** [2] - 21:10, 21:12
**today** [15] - 7:1, 12:2, 15:9, 43:1, 43:2, 43:3, 60:14, 65:12, 65:15, 149:24, 152:7, 152:9, 158:14, 161:15, 175:16
**today's** [1] - 43:4
**together** [14] - 27:5, 27:7, 34:17, 67:1, 71:20, 74:6, 82:1, 84:19, 89:10, 89:13, 96:14, 157:17,

165:18, 183:13
**tomorrow** [9] - 29:9, 175:18, 175:20, 175:22, 176:3, 176:7, 176:13, 176:14, 182:12
**ton** [1] - 72:5
**tone** [1] - 20:19
**Tonia** [2] - 183:3, 183:21
**TONIA** [1] - 3:12
**tons** [1] - 96:2
**took** [11] - 10:13, 16:25, 17:4, 30:11, 48:15, 85:11, 88:24, 94:14, 114:13, 119:13, 157:5
**top** [4] - 36:11, 39:13, 124:19, 130:4
**topic** [1] - 88:4
**topics** [2] - 15:2, 43:22
**TORCHINSKY** [1] - 1:14
**torn** [3] - 13:23, 13:25, 14:1
**total** [2] - 18:6, 84:4
**totality** [2] - 111:20, 156:12
**totally** [1] - 11:25
**touch** [1] - 21:23
**touching** [6] - 31:7, 31:18, 33:4, 33:20, 51:1, 51:3
**towards** [5] - 23:14, 29:23, 37:5, 46:23, 47:3
**TR** [1] - 128:14
**trained** [2] - 52:3, 143:9
**training** [33] - 45:20, 46:2, 46:3, 46:10, 46:11, 47:13, 47:16, 47:20, 47:21, 47:25, 48:4, 48:5, 48:7, 48:15, 48:19, 49:8, 51:8, 51:9, 51:13, 51:14, 51:23, 51:24, 51:25, 52:12, 52:15, 53:16, 53:17, 53:20, 61:11, 87:19
**TRANSCRIPT** [1] - 1:10
**transcript** [3] - 10:4, 10:5, 183:11
**transcripts** [3] - 10:1, 10:2, 47:23
**transparent** [1] - 110:13
**trauma** [16] - 76:19,

76:20, 79:1, 110:19, 110:20, 151:12, 151:15, 151:17, 151:20, 151:22, 151:24, 152:18, 162:17, 162:19, 167:16, 167:19
**traumatic** [14] - 5:14, 125:5, 126:10, 126:14, 131:9, 133:10, 133:21, 134:12, 134:20, 134:24, 135:8, 135:11, 173:8, 179:19
**treat** [4] - 63:22, 117:19, 145:22, 151:19
**treated** [7] - 83:16, 112:10, 113:3, 113:4, 137:21, 166:11, 174:25
**treater** [1] - 112:9
**treating** [5] - 63:15, 112:12, 137:2, 146:15, 163:7
**treatment** [23] - 66:13, 67:12, 79:17, 79:21, 80:1, 80:2, 80:15, 80:17, 81:1, 81:21, 112:14, 112:18, 118:9, 123:1, 123:9, 123:17, 127:18, 146:10, 146:11, 163:23, 166:5, 174:21
**trees** [1] - 111:25
**trial** [8] - 5:13, 9:3, 13:9, 18:25, 58:25, 63:5, 144:18, 179:16
**Trial** [2] - 144:19, 183:6
**TRIAL** [2] - 1:10, 4:1
**trip** [1] - 25:22
**Trish** [1] - 142:12
**trouble** [3] - 28:11, 30:14, 30:22
**true** [4] - 67:14, 77:7, 124:10, 148:23
**truly** [2] - 39:23, 78:3
**truth** [2] - 8:23, 42:23
**try** [4] - 69:6, 176:1, 177:24, 178:7
**trying** [12] - 27:22, 28:13, 28:20, 70:14, 79:4, 95:1, 97:6, 98:1, 132:4, 145:21, 166:18, 169:18
**TSI** [1] - 92:10
**TSI-2** [4] - 106:18,

107:12, 110:15, 110:19
**turn** [4] - 28:11, 41:20, 46:22, 48:18
**turned** [2] - 46:25, 60:3
**turns** [1] - 53:6
**Tuwiner** [7] - 5:11, 6:1, 6:22, 7:4, 15:6, 15:7, 176:25
**two** [27] - 23:9, 23:20, 27:3, 61:16, 70:24, 92:7, 92:11, 94:11, 96:4, 105:18, 105:22, 108:6, 110:17, 110:22, 134:20, 139:16, 140:16, 140:18, 140:23, 141:1, 141:23, 158:15, 158:16, 159:12, 177:13, 178:12, 180:24
**two-hour** [1] - 139:16
**two-pager** [1] - 178:12
**two-year** [1] - 61:16
**tying** [1] - 53:12
**type** [15] - 19:19, 20:24, 21:8, 30:17, 30:22, 31:12, 33:3, 50:18, 50:20, 52:6, 64:19, 103:1, 104:21, 127:11
**typed** [1] - 170:22
**typer** [1] - 168:14
**types** [5] - 52:3, 82:25, 113:7, 165:23, 166:6
**typical** [1] - 25:10
**typically** [11] - 65:25, 68:24, 71:16, 72:8, 77:15, 78:9, 107:7, 128:13, 128:14, 130:7, 174:14

---

## U

**U.S** [2] - 19:11, 27:25
**ultimate** [2] - 49:23, 49:24
**ultimately** [2] - 82:7, 158:19
**unable** [3] - 35:12, 50:10, 154:13
**unacceptable** [4] - 44:6, 44:18, 44:19, 52:7
**uncomfortable** [2] - 24:16, 26:1
**under** [22] - 10:22, 13:2, 20:17, 42:22,

206

50:19, 50:20, 51:1, 87:9, 100:13, 102:19, 110:16, 131:8, 133:8, 134:7, 134:13, 134:23, 135:3, 172:14, 173:2, 173:4, 173:10

**undergrad** [1] - 17:23
**underreported** [1] - 160:18
**underreporting** [13] - 70:22, 71:4, 71:10, 71:25, 108:6, 108:17, 110:2, 110:12, 110:22, 110:24, 160:21, 160:23
**understood** [7] - 8:13, 13:16, 30:1, 42:22, 48:3, 114:23, 180:16
**unequivocally** [1] - 77:25
**unfortunately** [2] - 27:7, 64:22
**unique** [1] - 67:23
**UNITED** [2] - 1:1, 1:11
**united** [1] - 3:12
**University** [4] - 17:21, 61:14, 61:15, 61:17
**unknown** [2] - 38:8, 38:25
**unlikely** [9] - 71:3, 77:16, 77:17, 77:19, 77:20, 78:14, 80:7, 98:19, 108:5
**unnecessary** [2] - 6:4, 10:18
**unprecedented** [2] - 147:19, 148:7
**unreliable** [1] - 70:7
**unsafe** [1] - 80:13
**unstable** [1] - 81:3
**unusual** [31] - 69:18, 76:4, 76:25, 77:3, 77:11, 80:4, 89:22, 92:24, 93:20, 96:9, 96:12, 96:13, 98:24, 99:4, 102:16, 106:8, 108:2, 108:13, 113:12, 113:15, 113:16, 113:17, 165:1, 165:15, 165:17, 168:3, 173:25, 174:17
**unwanted** [2] - 31:7, 31:18
**unwavering** [1] - 85:16
**unzoom** [1] - 28:23
**up** [43] - 10:7, 13:11,

13:12, 15:4, 15:19, 16:4, 25:5, 29:6, 29:17, 32:5, 33:22, 36:18, 56:14, 60:3, 60:16, 63:6, 67:18, 68:12, 75:1, 76:9, 77:2, 80:2, 89:11, 89:12, 98:13, 119:17, 122:20, 122:21, 127:22, 130:16, 131:4, 131:19, 134:19, 137:8, 138:4, 142:10, 146:21, 154:20, 162:21, 164:4, 164:5, 181:9, 181:23
**update** [1] - 89:13
**updated** [3] - 72:8, 96:5, 128:4
**ups** [1] - 168:10
**upset** [3] - 34:18, 34:22, 34:25
**upwards** [1] - 92:16
**useful** [1] - 73:18
**uses** [2] - 93:23, 134:9
**usual** [4] - 84:22, 84:23, 85:12, 165:2

## V

**VA** [3] - 3:6, 3:10, 3:14
**VAL** [1] - 91:19
**valid** [41] - 87:20, 87:22, 87:24, 94:8, 97:15, 101:21, 106:9, 115:7, 116:20, 116:25, 117:2, 117:5, 153:22, 154:16, 156:5, 158:2, 158:5, 158:9, 160:17, 170:13
**validated** [8] - 72:2, 75:14, 104:13, 111:4, 111:5, 111:6, 137:16, 156:22
**validity** [70] - 67:8, 67:21, 67:23, 68:15, 68:25, 69:9, 69:10, 69:12, 70:3, 70:8, 70:9, 70:10, 70:12, 70:16, 70:24, 71:13, 71:22, 72:19, 74:22, 83:6, 83:8, 83:10, 83:12, 83:17, 85:25, 86:6, 87:2, 87:4, 87:11, 87:12, 91:18, 91:20, 91:23, 92:5, 92:8, 92:12, 92:17,

94:17, 96:8, 97:5, 98:9, 103:6, 105:2, 106:15, 107:19, 107:20, 107:24, 108:24, 109:23, 111:10, 112:4, 112:7, 132:16, 132:18, 137:17, 153:25, 154:2, 154:5, 156:23, 158:1, 158:22, 158:23, 159:6, 159:17, 165:20, 166:6, 168:1, 170:4, 170:10
**varies** [1] - 64:8
**variety** [1] - 113:10
**various** [4] - 71:18, 83:2, 113:7
**verbal** [1] - 44:16
**versus** [2] - 95:24, 183:7
**Veterans** [2] - 32:19, 56:23
**veterans** [1] - 32:20
**viciously** [2] - 151:20
**victim** [1] - 148:17
**victimized** [1] - 44:24
**video** [1] - 61:4
**view** [5] - 6:4, 7:9, 23:22, 127:7
**viewing** [1] - 48:24
**vigilant** [1] - 30:11
**violation** [3] - 28:4, 154:9, 154:12
**violence** [5] - 148:18, 149:4, 152:25, 153:6, 153:9
**Virginia** [6] - 16:24, 16:25, 47:19, 61:24, 63:4, 183:4
**VIRGINIA** [1] - 1:1
**virtually** [1] - 114:12
**Virtually** [1] - 114:13
**visited** [1] - 56:23
**vocabulary** [4] - 105:17, 105:19, 105:23, 106:9
**VOGEL** [1] - 1:14
**VOLUME** [1] - 1:8
**voluminous** [1] - 81:19
**vulgar** [1] - 31:10

## W

**WAIS** [7] - 92:19, 96:4, 99:22, 100:14, 100:15, 142:17, 142:20

**WAIS-IV** [7] - 92:19, 96:4, 99:22, 100:14, 100:15, 142:17, 142:20
**wait** [3] - 146:2, 167:18, 167:22
**Wait** [1] - 153:4
**waiting** [2] - 5:3, 176:12
**walk** [3] - 24:21, 24:25, 122:18
**walked** [1] - 25:3
**walking** [2] - 29:14, 29:15
**wandering** [1] - 39:1
**warned** [2] - 6:17, 6:19
**Washington** [6] - 1:16, 2:14, 2:18, 2:21, 3:1, 61:24
**watch** [1] - 28:3
**wavering** [1] - 86:1
**ways** [2] - 44:11, 70:24
**weaker** [1] - 110:1
**wear** [2] - 20:11, 21:9
**Weaver** [5] - 120:24, 122:2, 125:1, 171:15, 171:17
**wedding** [1] - 25:21
**Wednesday** [3] - 15:7, 175:21, 177:1
**week** [3] - 24:4, 24:15, 175:17
**weekend** [1] - 7:6
**weeks** [2] - 19:3, 141:24
**well-child** [1] - 131:13
**well-validated** [2] - 137:16, 156:22
**West** [3] - 21:12, 49:2, 49:4
**whatnot** [2] - 28:3, 56:12
**whatsoever** [1] - 48:4
**whereas** [2] - 67:13, 111:24
**whereof** [1] - 183:15
**whichever** [1] - 61:8
**whole** [7] - 25:22, 73:3, 80:7, 105:25, 147:24, 155:17, 180:14
**wholly** [1] - 8:2
**wide** [1] - 144:11
**widely** [3] - 75:21, 103:5, 148:10
**Wiehle** [1] - 3:9
**wife** [1] - 36:20
**wildly** [1] - 64:8

**willing** [1] - 161:8
**willingness** [1] - 167:15
**winning** [1] - 33:12
**winter** [2] - 27:23, 27:24
**wish** [1] - 76:19
**withdrew** [1] - 39:15
**Witness** [6] - 22:14, 23:18, 59:7, 59:12, 59:18, 175:9
**witness** [21] - 5:13, 5:23, 6:11, 10:18, 13:8, 16:1, 16:5, 38:20, 42:7, 50:10, 53:11, 53:12, 54:3, 54:4, 54:6, 59:8, 59:17, 175:12, 176:15, 183:15
**WITNESS** [23] - 16:10, 27:17, 46:4, 46:6, 46:8, 52:20, 94:23, 95:17, 95:20, 96:19, 98:6, 98:19, 126:21, 138:9, 143:25, 149:11, 150:10, 150:24, 153:13, 156:22, 167:2, 170:9, 175:8
**witness's** [1] - 90:3
**witnessed** [3] - 34:11, 49:20, 54:2
**witnesses** [9] - 11:23, 13:3, 13:10, 122:25, 164:20, 176:10, 176:16, 178:21
**WITNESSES** [1] - 4:1
**WMT** [2] - 102:19, 104:16
**wonderful** [1] - 20:18
**word** [16] - 43:24, 66:16, 66:17, 85:15, 85:17, 102:21, 102:24, 103:3, 103:4, 103:8, 105:19, 105:20, 133:25, 141:21, 144:12
**words** [10] - 8:4, 91:19, 102:22, 104:2, 105:22, 130:20, 132:5, 144:21, 144:22, 167:21
**workers** [1] - 175:2
**works** [4] - 61:8, 62:18, 68:9, 78:5
**world** [2] - 129:1, 143:6
**worry** [1] - 25:1

**worse** [3] - 73:15,
  100:2, 154:7
**worst** [1] - 97:16
**worth** [1] - 76:8
**WRAT-5** [1] - 144:10
**write** [2] - 36:14,
  168:14
**writing** [2] - 142:4,
  171:17
**written** [1] - 62:11
**wrongdoing** [2] -
  32:24, 33:19
**wrote** [4] - 56:20,
  62:12, 68:22, 130:22

## X

**X-ray** [1] - 130:14

## Y

**year** [34] - 18:4, 18:8,
  18:11, 19:9, 19:10,
  19:12, 20:8, 24:5,
  25:20, 26:5, 27:25,
  28:7, 29:20, 30:2,
  31:6, 31:9, 31:17,
  32:2, 32:18, 33:8,
  33:11, 35:3, 37:11,
  41:14, 51:16, 61:16,
  82:21, 147:3,
  163:18, 163:22,
  177:2
**yearbook** [3] - 37:15,
  37:16, 37:24
**years** [16] - 10:20,
  18:6, 18:7, 18:16,
  48:1, 52:9, 54:19,
  77:18, 112:11,
  113:11, 124:9,
  147:12, 147:14,
  174:9, 174:20
**yellow** [1] - 51:17
**young** [4] - 17:14,
  19:2, 64:5, 151:20
**yourself** [5] - 59:23,
  86:21, 100:5, 116:3,
  158:17
**Yup** [1] - 25:17

## Z

**zero** [5] - 149:2, 150:1,
  152:11, 152:19,
  152:23
**Zoll** [1] - 2:1
**Zoom** [1] - 114:13
**zoom** [12] - 21:19,
  26:15, 28:23, 29:3,
  31:5, 32:11, 32:12,

34:2, 36:3, 39:13,
99:9, 173:5