1

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
 2

 3    B.R.,                            :
                                       :
 4                    Plaintiff,       :   Civil Action
                                       :   No. 1:19-cv-917
 5              v.                     :
                                       :
 6    F.C.S.B., et al.,                :   April 16, 2024
                                       :   10:15 a.m.
 7                                     :
                    Defendants.        :
 8    ..............................   :   VOLUME 20 - A.M./P.M.
                                       :   SESSION
 9                                     :

10

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
12              UNITED STATES DISTRICT COURT JUDGE

13    APPEARANCES:

14    For the Plaintiff:        Jonathan Fahey, Esq.
                                HOLTZMAN VOGEL BARAN TORCHINSKY
15                              & JOSEFIAK, PLLC
                                2300 N Street NW
16                              Suite 643a
                                Washington, DC 20037
17                              202-536-1702
                                Email: Jfahey@holtzmanvogel.com
18
                                Alison Anderson, Esq.
19                              BOIES SCHILLER FLEXNER, LLP
                                2029 Century Park East
20                              Suite 1520
                                Los Angeles, CA 90067
21                              213-995-5720
                                Email: Alanderson@bsfllp.com
22

23

24

25
      APPEARANCES:  (Cont.)
```

2

```
 1
    For the Plaintiff:          Brittany Zoll, Esq.
 2                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 3                              Suite 2800
                                Miami, FL 33131
 4                              610-804-1787
                                Email: Britzoll@gmail.com
 5
                                Andrew Brenner, Esq.
 6                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
 7                              Suite 2800
                                Miami, FL 33131
 8                              305-539-8400
                                Email: Abrenner@bsfllp.com
 9
                                Robert Keefe, Esq.
10                              BOIES SCHILLER FLEXNER, LLP
                                100 SE 2nd Street
11                              Suite 2800
                                Miami, FL 33131
12                              850-585-3414
                                Email: Rkeefe@bsfllp.com
13
    For Defendant F.C.S.B.:     Ryan Bates, Esq.
14                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Avenue, NW
15                              Washington, DC 20037
                                202-955-1596
16                              Email: Rbates@hunton.com

17                              Sona Rewari, Esq.
                                HUNTON ANDREWS KURTH, LLP
18                              2200 Pennsylvania Avenue, NW
                                Washington, DC 20037
19                              202-955-1974
                                Email: Srewari@huntonak.com
20
                                Scott W. Burton, Esq.
21                              HUNTON ANDREWS KURTH, LLP
                                2200 Pennsylvania Ave NW
22                              Washington, DC 20037
                                202-955-1664
23                              Email: Burtons@huntonak.com

24

25
    APPEARANCES:   (Cont.)      Kevin Elliker, Esq.
```

3

| | |
|---|---|
| For Defendant F.C.S.B.: | HUNTON ANDREWS KURTH, LLP<br>2200 Pennsylvania Avenue, NW<br>Washington, DC 20037<br>804-788-8200<br>Email: Kelliker@huntonak.com |
| For the Defendants:<br>(S.T., A.F., P.A.H.,<br>T.B., B.H., M.P.F., M.C.,<br>F.T., J.F.) | **Michael E. Kinney, Esq.**<br>THE LAW OFFICE OF MICHAEL E. KINNEY, PLC.<br>1801 Robert Fulton Drive<br>Suite 120<br>Reston, VA 20191<br>Email: Mk@kinneyesq.com |
| For the Defendant J.O.: | **Bruce Blanchard, Esq.**<br>ODIN, FELDMAN & PITTLEMAN, PC.<br>1775 Wiehle Avenue<br>Suite 400<br>Reston, VA 20190<br>Email: Bruce.blanchard@ofplaw.com |
| Official Court Reporter: | MS. TONIA M. HARRIS, RPR<br>United States District Court<br>401 Courthouse Square<br>Tenth Floor<br>Alexandria, VA 22314 |

4

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defendants:

Dr. Sara Jennings

        Direct examination by Mr. Elliker.............. 10
        Cross-examination by Ms. Anderson.............. 41
        Redirect examination by Mr. Elliker............ 55

Dr. Deputy Chief Fred Chambers

        Direct examination by Ms. Rewari............... 56
        Direct examination by Mr. Blanchard............ 87
        Cross-examination by Ms. Brenner............... 94
        Redirect examination by Mr. Blanchard.......... 98

P███  H█████

        Direct examination by Ms. Rewari............... 99
        Direct examination by Mr. Kinney............... 171
        Cross-examination by Ms. Anderson.............. 177
        Redirect examination by Ms. Rewari............. 218

Demetrios Kappatos

        Direct examination by Mr. Bates................ 225
        Cross-examination by Mr. Keefe................. 234

EXHIBITS

On behalf of the Plaintiff:

                                                    Admitted

Defendants' Number 144............................. 192
Number 236......................................... 209
Number 809......................................... 211
Number 810......................................... 214
Number 811(pages 1 - 3)............................ 216

On behalf of the Defendants:

                                                    Admitted

Number 88.......................................... 147
Number 89.......................................... 145
Number 150......................................... 134
Number 152......................................... 156
Number 191......................................... 149
Number 192......................................... 149

EASTERN DISTRICT OF VIRGINIA

5

Number 193......................................... 149
Number 205......................................... 231
Number 263......................................... 117
Number 281......................................... 130
Number 284......................................... 135

MISCELLANY

Preliminary matters.................................. 05
Certificate of Court Reporter....................... 246

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

B.R. v. F.C.S.B.

6

1          THE COURT:  Good morning.

2          (Good morning responses.)

3          THE COURT:  I understand the first expert for the --

4    excuse me, the next witness for the defense is the expert,

5    correct?

6          MS. REWARI:  That is correct, Your Honor.

7          THE COURT:  I just want to make sure and we read

8    into the record so there's no confusion about what this person

9    can say.

10         Order of the Court with regard to this witness is

11   that plaintiff seeks to preclude certain testimony from

12   Dr. Sara Jennings.  As discussed during the hearing, no party

13   disputes that Dr. Jennings may testify that the findings of

14   the sexual assault exam were nonspecific.  With respect to

15   alternative theories of causation, Dr. Jennings concedes that

16   she is not offered as an expert on causation nor is she a

17   pediatric gastroenterologist.

18         Although Dr. Jennings may testify generally

19   regarding possible explanations for scarring and other areas,

20   she may testify or speculate as to causes in plaintiff's case

21   specifically.  And she may not validate or connect her

22   opinions regarding possible causes generally with plaintiff's

23   medical records or medical history.

24         Dr. Jennings lacks the requisite expertise to draw

25   that connection, and therefore, under the *Daubert* case and

B.R. v. F.C.S.B.

7

1    *Westberry*, she will not be permitted to validate her opinions

2    or opine whether a more likely cause of the scarring observed

3    on plaintiff, and it is further ordered that other things

4    regarding motions in limine are made a part of this case.

5            So I just want everybody to be clear what can and

6    cannot be said with regard to this witness.  And if you -- I'm

7    not suggesting anybody would do this:  But if you try to

8    back-door it, I'm going to admonish you.

9            Everyone clear on that?

10           Very good.

11           MS. ANDERSON:  Can we just address the issue of the

12   picture.  On cross we may be using the picture, and so I'm

13   wondering if -- we had discussed this a little bit before --

14   but if during that moment we can just turn -- have the screens

15   turned around on the back tables?

16           THE COURT:  Let me check.

17           Trish, can we turn all of this off and leave those

18   on?

19           (Discussion off the record.)

20           THE COURT:  We have pretty good technology here,

21   but, quite frankly, we're not going to be able to facilitate

22   turning it off for back there and leaving it on for over here.

23   So I would suggest -- and you do what you want to do -- but I

24   would suggest that you just publish it in the -- I don't know

25   if you're old enough to remember this, where we actually hand

─────B.R. v. F.C.S.B.─────

8

1  it to the jurors and we pass it around.  So Mr. -- Mr. Brenner

2  remembers, but you probably do not.

3          MR. BRENNER:  It's the first thing in the morning.

4          MS. ANDERSON:  I didn't want to say that, but you

5  did, not me.

6          Or if we turn them sideways just because then

7  they'll be maybe distracted while -- no?

8          THE COURT:  No.  Just -- I'm just uncomfortable with

9  them being out there because this is very personal and very

10  private, and we do not need to have that kind of information

11  readily available for people who are not involved in the case.

12  It's just too specific.

13          MS. ANDERSON:  Agreed.  Okay.  So then can I tab

14  them for the jury, so they don't have to flip through all the

15  pictures to get to the one picture that's the injury at issue

16  with this --

17          THE COURT:  Is there any way you can take the tab

18  out?

19          MS. ANDERSON:  Oh, take the page out?

20          THE COURT:  Yes.

21          MS. ANDERSON:  Yes.

22          THE COURT:  Why don't we do that?

23          MS. ANDERSON:  Okay.  Thank you.

24          THE COURT:  Very good.

25          And what I'll do -- what I'll do with the jury is

—B.R. v. F.C.S.B.—

9

1    tell them something about we generally publish for you, but

2    you will understand as I pass these pictures to you why we

3    want to do it this way.

4                Is everybody fine with that?

5                MS. ANDERSON:  Thank you, Your Honor.

6                (Discussion off the record.)

7                (Jury present.)

8                THE COURT:  You may be seated.  Thank you.

9                Good morning, ladies and gentlemen.

10               (Good morning responses.)

11               THE COURT:  It's my fault that we're starting a

12   little later today.  As you all probably know, if you have a

13   car and you drop it off at the service desk, you're at the

14   mercy of those people and when they want to wait on you.  So I

15   was patient and kind, and eventually they looked my way.  So

16   I'm sorry that I was a little late this morning.

17               Have all of you been able to live up to the Court's

18   instruction not to discuss the case or any aspect of the case

19   with anyone?  And you stayed away from social media and print

20   media to the extent you can?  Very good.

21               Next witness.

22               MR. ELLIKER:  Your Honor, the defense calls Dr. Sara

23   Jennings.

24               THE COURT:  Dr. Jennings.

25   (SARA JENNINGS, Defendants' witness, sworn.)

B.R. v. F.C.S.B.

10

1          THE COURT:  Please have a seat, ma'am.  Listen to

2    the questions of counsel.  If counsel interrupt or if the

3    Court is speaking, it's probably best not to say anything at

4    that point.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Thank you, ma'am.

7                    DIRECT EXAMINATION

8    BY MR. ELLIKER:

9    Q.   Good morning.

10   A.   Good morning.

11   Q.   I'm Kevin Elliker.  I represent Fairfax County School

12   Board in this case.

13          Dr. Jennings, could you introduce yourself to the

14   jury?

15   A.   Yes.  My name is Sara, S-A-R-A.  Last name is Jennings,

16   J-E-N-N-I-N-G-S.

17   Q.   And we'll just get it out of the way at the outset.

18          Dr. Jennings, did you review the sexual assault

19   nurse examination report that pertains to the allegations in

20   this case?

21   A.   Yes.

22   Q.   And are you here to testify about the opinions you

23   reached based on the findings that are contained within that

24   report?

25   A.   Yes, that's correct.

───B.R. v. F.C.S.B.───

11

1  Q.   And have you worked with me to prepare a slide show

2  that's going to help the jury get an overview of how we're

3  going to discuss the issues today?

4  A.   Yes, I have.

5           MR. ELLIKER:  Your Honor, we have a slide deck that

6  we've conferred with plaintiff about that I believe there's no

7  objections to, and we would like to publish.

8           THE COURT:  You may proceed.

9           (Exhibit published.)

10          MR. ELLIKER:  And, Your Honor, if I may approach the

11 witness.

12          THE COURT:  You may.

13 BY MR. ELLIKER:

14 Q.   Dr. Jennings, are you a medical doctor?

15 A.   I am not.

16 Q.   What kind of doctor are you?

17 A.   I have my doctorate in nursing practice.

18 Q.   Let's go to the next slide.

19          Could you please tell the jury about your

20 educational background?

21 A.   Absolutely.  So I achieved a diploma in nursing, so that

22 was a technical school to become a registered nurse.  I then

23 went on to get my bachelor's of nursing from Old Dominion

24 University and then my master's and my doctorate from Duquesne

25 University in Pittsburgh, both with a focus in forensic

B.R. v. F.C.S.B.

12

1    nursing.

2    Q.   And let's go to the next slide.

3         Dr. Jennings, do you have any licenses or

4    certifications?

5    A.   Yes.  I'm licensed as a registered nurse in the

6    Commonwealth of Virginia, and I also have several other

7    certifications, three of which are specific to forensic

8    nursing and one that's specific to nursing professional

9    development.

10   Q.   How long have you been a registered nurse?

11   A.   I've been a registered nurse since 2005.

12   Q.   And on here I see that there are two certifications that

13   are referred to as SANE certifications.  Could you explain to

14   the jury what that -- what "SANE" means and what those

15   certifications are?

16   A.   Yes.  So the SANE-A is sexual assault nurse examiner, and

17   the A stands for adult/adolescent.  Same with the pediatric,

18   so SANE, sexual assault nurse examiner, and the P stands for

19   pediatrics.  That's a certification from our professional

20   nursing organization, the International Association of

21   Forensic Nurses.  And that's a certification that you achieve

22   once you've practiced for several years and have at least 300

23   practice hours.

24   Q.   Could you discuss the -- you know, what boxes have to be

25   checked in order to obtain these certifications?

———B.R. v. F.C.S.B.———

13

1  A.   So at a minimum, you have to be a registered nurse.  You

2  then need to complete what we call "didactic," but that just

3  means a classroom training.  So each of those, the pediatric

4  and the adult/adolescent, are each 40 hours worth of training.

5  And then you have about 200 to 300 practice hours where you're

6  being precepted by an experienced forensic nurse before you

7  can be by yourself practicing.  And then you can sit for that

8  certification after you've had about two years of clinical

9  practice.

10 Q.   And why are there separate certifications for

11 adult/adolescent, and pediatric?

12 A.   So the adult/adolescent is for the -- exactly what it

13 says -- the adolescent, so what we consider postpubertal, so a

14 patient that's actually started their period for the female

15 patient.  And then pediatric is for under 18 but primarily for

16 those that are prepubertal, so have not started puberty and

17 have not started their period.

18 Q.   And so those are distinct from each other?

19 A.   Correct.  Separate and distinct.

20 Q.   Do you -- can you estimate about how many nurses have

21 these certifications?

22 A.   So in the country there's approximately 1,800 nurses that

23 are SANE-A certified, so the adult/adolescent, and roughly 700

24 that are the pediatric certified.

25 Q.   Do you know how many nurses have these certifications in

B.R. v. F.C.S.B.

14

1   the Commonwealth of Virginia?

2   A.   For the adult/adolescent, it's around 75; and for the

3   pediatric, it's around 40.

4   Q.   And you have both?

5   A.   Correct.

6   Q.   So you're one of around 40 nurses in the Commonwealth of

7   Virginia who have the pediatric certification?

8   A.   Yes, that's correct.

9   Q.   Let's go to the next slide.

10          Dr. Jennings, if you could tell the jury about your

11  career path as a nurse professional?

12  A.   Sure.  So my background in nursing started in the

13  emergency department.  I was an emergency

14  department-registered nurse, and I cared for patients that had

15  reported being sexually assaulted and then went on to take the

16  sexual assault nurse examiner training while I was still an

17  emergency department nurse.

18  Q.   And here at the Bon Secours Richmond Forensic Nursing

19  Services, talk about the progression of your positions within

20  that department?

21  A.   Yes.  So I started as an emergency room nurse in the Bon

22  Secours system, and then started to take what we called

23  "on call," so we would get called in for patients that had

24  reported some type of assault.  Once I started doing that, I

25  became part-time, and then I became a full-time forensic nurse

B.R. v. F.C.S.B.

15

1    and then expanded my career as our clinical coordinator and

2    then as the manager of the program still actively seeing

3    patients.

4    Q.   And during the course of these positions, did you conduct

5    SANE forensic examinations?

6    A.   Yes, I did.

7    Q.   Do you also, as part of your career path, have teaching

8    and instructional experience in this area?

9    A.   Yes.

10   Q.   Let's go to the next slide.

11        If you could talk to the jury a little bit about the

12   instructional roles you've had in this area?

13   A.   Sure.  So I have myself trained forensic nurses new to

14   practice in that 40-hour didactic classroom training that I

15   was speaking of for both the adult/adolescent and pediatric

16   patient population.

17        I've also trained many other stakeholders in our

18   community such as our advocates.  I've trained attorneys, law

19   enforcement, and other folks that were interested in this

20   field.  I also worked for the International Association of

21   Forensic Nurses as the education director, so we were in

22   charge of the international education that's provided on how

23   to become a forensic nurse.

24   Q.   And that International Association of Forensic Nurses, is

25   that the body that oversees the certification for SANE-A and

─────────B.R. v. F.C.S.B.─────────
16

1    SANE-P?

2    A.   Yes, that's correct.

3    Q.   And so, you were that organization's education director

4    for four years?

5    A.   That's correct.

6    Q.   Do you also hold adjunct faculty positions at

7    universities?

8    A.   Correct.

9    Q.   Could you talk a little bit about what role you play as

10   an adjunct at the university level?

11   A.   Yes.  So I have served as a doctorate dissertation chair.

12   So students that were completing their doctorate, I would be

13   their program chair.  I also have served and currently still

14   serve in a masters nursing program, teaching courses in that

15   particular program.

16   Q.   With respect to the SANE FME training, and just for the

17   record, what does FME stand for?

18   A.   Forensic nurse examiner.

19   Q.   So for this 2011 to 2022 bullet point at St. Mary's

20   Hospital, I think you mentioned that's the didactic training

21   as part of the certification process?

22   A.   That's correct.

23   Q.   How many times a year did you conduct that training?

24   A.   Twice a year, and then also anytime that we would be

25   onboarding or hiring a new forensic nurse, we would be putting

──────────────── B.R. v. F.C.S.B. ────────────────

17

1  them through that training.

2  Q.   Over the course of that eleven years, Dr. Jennings, do

3  you have an estimate of how many nurses you have educated or

4  trained for SANE certification purposes?

5  A.   Approximately a thousand.

6  Q.   Let's go to the next slide.  You also had some

7  professional affiliations that relate to forensic nurse

8  examining; is that right?

9  A.   Correct.

10  Q.   Could you talk a little bit about these professional

11  affiliations?

12  A.   Sure.  I'm a member of the International Association of

13  Forensic Nurses.  I'm also a member of the Academy of Forensic

14  Nurses, and I've served on several committees that are

15  specific to forensic nursing.

16  Q.   It says on here that you were appointed to a task force

17  by the governor of Virginia regarding survivors of sexual

18  assault?

19  A.   That's correct.

20  Q.   Could you talk a little bit about what that role was?

21  A.   Yes.  So I served a term with the survivors for sexual

22  assault task force.  I was appointed by the governor, as you

23  mentioned, and that was maintaining and making sure that all

24  patients had access to forensic nurses services across the

25  Commonwealth.

B.R. v. F.C.S.B.

18

1  Q.   Now, I also understand, it's not on here, but I recently

2  learned that you have testified before Congress; is that

3  right?

4  A.   Correct.

5  Q.   Could you talk about what your Congressional testimony

6  focused on?

7  A.   Access to forensic nursing care, making sure that

8  patients across the country had access to this service.

9  Q.   Now, even with this management and instructional and

10  professional affiliations, do you still, to this day, conduct

11  SANE forensic examinations?

12  A.   Yes.

13  Q.   If we could go to the next slide.

14        Do these bullet points reflect the current work you

15  do in this space as a forensic nurse examiner?

16  A.   They do.

17  Q.   Could you explain to the jury what these roles entail?

18  A.   Sure.  I service as the TeleSANE program manager for

19  George Washington University, and I also am on call for Texas

20  A & M University and the University of Arkansas medical

21  services as a TeleSANE.

22        So a TeleSANE is a forensic nurse that's providing

23  those services from a telehealth aspect.

24  Q.   Could you go into a little bit more detail about how that

25  TeleSANE practice works?

B.R. v. F.C.S.B.

19

1   A.   Yes.  So it's very similar to, if you have ever had a

2   telehealth visit with a provider.  So this could be your

3   primary care doctor or an urgent care provider that you're

4   seeing.  So it's via the computer, and I have a video screen

5   and I'm able to guide a nurse, and these nurses have not been

6   forensically trained on how to perform the sexual assault

7   examination.  They, essentially, are my hands.  So I'm guiding

8   them through the evidence collection, any photography that we

9   need to obtain, any medications that the patient may need

10  during that exam.  And so, I am developing a rapport with the

11  patient.  I'm talking to the patient through the process, but

12  also talking the nurse that's in the room through the process.

13  Q.   And so, in your experience, it's possible -- is it

14  possible to conduct a valid SANE forensic examination

15  remotely?

16  A.   Yes.

17  Q.   Can you give a ballpark, Dr. Jennings, for the number of

18  SANE forensic examinations you've conducted over the course of

19  your career?

20  A.   Over a thousand.

21  Q.   And of those what proportion would you say were minors?

22  A.   I would say it's very evenly split, about 50/50.

23  Q.   Have you testified previously -- well, sorry -- strike

24  that.

25          Have you had occasion to testify in court as an

———— B.R. v. F.C.S.B. ————

20

1   expert witness on SANE forensic examinations?

2   A.   Yes, I have.

3   Q.   And what kinds of cases have you served as an expert

4   witness?

5   A.   Criminal cases.

6   Q.   Is this your first civil case?

7   A.   Yes, it is.

8   Q.   In criminal cases, what was the split between testifying

9   on behalf of the prosecution versus on behalf of the defense?

10  A.   Very evenly split.

11  Q.   Are you being compensated for your time?

12  A.   I am.

13  Q.   How much are you being compensated?

14  A.   My daily rate for court testimony is 1,800.

15  Q.   And do you also have an hourly rate for preparation and

16  record review?

17  A.   Correct.  250 per hour.

18  Q.   And are the opinions that you're going to share today

19  based on your education, training, and experience?

20  A.   Yes, that's correct.

21          MR. ELLIKER:  Your Honor, we would offer Dr. Sara

22  Jennings as an expert in sexual assault examinations.

23          MS. ANDERSON:  No objection.

24          THE COURT:  Without objection, qualify.

25          MR. ELLIKER:  Thank you.  Why don't we take down the

B.R. v. F.C.S.B.

Direct - S. Jennings

1   slide for a moment.

2   BY MR. ELLIKER:

3   Q.   Dr. Jennings, could you walk the jury through, at a high

4   level, what a SANE forensic examination entails from the

5   moment a patient comes in before you?

6   A.   Sure.  So a forensic nurse, just by definition, we are

7   providers to patients that have experienced some type of

8   violence they're reporting.  Our patients can come through the

9   emergency department.  They may come through an advocacy

10  agency, or the patient may just come to the hospital by

11  themselves and let us know that they have reported some type

12  of incident that's occurred.  So by the very basic definition,

13  forensics is any time that there's an intersection between the

14  legal system and the medical system.  So what happens in my

15  practice is the patient will typically come in through the

16  emergency department, they will say that they have been

17  assaulted, and the forensic nurse responds to the emergency

18  department.

19       What we do first is we get a very brief history from

20  the patient, and then we offer them options for care.  So

21  currently in the Commonwealth, there's three options that they

22  can have.  They can report to law enforcement, have evidence

23  collected, if they are in an acute time frame.  So in Virginia

24  that's 120 hours from the time of the incident that they can

25  have potential biological DNA evidence collected.  They can

B.R. v. F.C.S.B.

22

1   come in, have that evidence collected but not report to law

2   enforcement, and that's what we, as providers, call a blind or

3   anonymous evidence collection kit, or they can simply come to

4   the hospital, still see the forensic nurse but not have

5   evidence collected and not report to law enforcement.

6   Q.   Now, the forensic examination in this case took place in

7   2012?

8   A.   Correct.

9   Q.   So, are there any differences between how you've just

10   described, because I think what you said, "currently," at one

11   point, are there any differences between what you've described

12   as a current practice compared to what would have been done in

13   2012?

14   A.   Many years ago, the time frame was different and we were

15   at 72 hours, but we have -- are now at 120 hours for that time

16   frame for evidence collection.

17   Q.   Now, in 2012 -- is there a difference between what

18   happened in 2012 versus now for the process if the examination

19   was taken place four months after the alleged assault?

20   A.   We would still offer the patient a forensic exam.  We

21   just would not be offering potential biological DNA evidence

22   collection.

23   Q.   Now, with respect to the physical exam component, could

24   you go into a little more detail about what that entails from

25   the forensic nurse perspective?

B.R. v. F.C.S.B.

23

```
 1   A.   Sure.  All of our patients still receive a -- what we
 2   call a medical clearance.  So they're still seen by a
 3   physician or a nurse practitioner or a physician assistant.
 4   Forensic nurses routinely are not considered advance practice
 5   nurses, so they are still seen by the ED doctor or the ED
 6   nurse practitioner.  Once that's done, the forensic nurse does
 7   do a detailed head-to-toe assessment.
 8   Q.   Talk to the jury about what that head-to-toe assessment
 9   is for?
10   A.   Sure.  So the purpose of the head-to-toe assessment is
11   for, one, making sure that the patient is medically okay and
12   that there's nothing that we need to have the provider
13   address.  But it's also for the purposes of documentation.  If
14   there's anything that we see that the patient reports is not
15   normally there, we're going to be documenting that in our
16   medical record, and we call it a forensic medical record.
17   Q.   Is that head-to-toe assessment informed by the
18   information the patient provides before the examination
19   begins?
20   A.   Correct.  So we do either from the patient or the
21   caretaker.  We do a detailed past medical history and current
22   medical history, that could be medications that they are
23   taking, surgeries that they've previously had, or anything
24   that they feel is pertinent to tell us during that history
25   taking.
```

─── B.R. v. F.C.S.B. ───

24

1   Q.   Regardless of the history that is shared by the patient

2   or the caregiver, is that head-to-toe assessment still done?

3   A.   Correct.  Every patient -- we're still registered nurses,

4   so one of our responsibilities is that detailed head-to-toe

5   assessment.

6   Q.   What's the next step of the physical exam after the

7   head-to-toe assessment?

8   A.   So we've talked to the patient about what their options

9   are.  We have -- I received consent, and we, of course, also

10  still maintain consent throughout the entire forensic exam.

11  So we're asking the patient if they are still willing to

12  participate in the process, but at this point, we would move

13  into what we call, from a medical perspective, the

14  anal/genital examination and the evidence collection.

15  Anal/genital means for the purposes of a female patient, the

16  vaginal area, the perineal area, and the anal/rectal area.

17  Q.   Again, just to make sure that we understand what the

18  medical terminology means, could you explain what the perineal

19  area is?

20  A.   So the perineal area is the area between the vaginal area

21  and the anal/rectal area.

22  Q.   What kind of examination is done during the -- this

23  portion of the physical exam?

24  A.   The forensic nurse does a visual inspection, and then if

25  there's anything that we see that is outside of what is

B.R. v. F.C.S.B.

25

1  considered normal, we would be photographing that.  If it was

2  an acute case, so that 120-hour time frame, we'd also be

3  collecting potential biological DNA evidence.

4  Q.   And is there a special equipment that's used to take the

5  photographs?

6  A.   Each program is different.  In my practice, I used a

7  digital camera for physical photos, and then what we call a

8  colposcope, which is a very large microscope on wheels that

9  magnifies things that we can see, more so, with our naked eye

10 multiple times, and that's called colposcopic photos.

11 Q.   Now, is there anything else that happens in the physical

12 exam after the anal vaginal examination?

13 A.   Just the evidence collection.

14 Q.   So what happens after the completion of the physical exam

15 portion of the SANE?

16 A.   Sure.  Once the actual physical exam is complete,

17 including the evidence collection if it's warranted for that

18 particular situation, then we would provide the patient with

19 any prophylactic medication, so prophylaxis, meaning that

20 we're treating them for something that they could receive, so

21 like an STD.  They also may see -- may receive pregnancy

22 prophylaxis or prophylaxis for HIV.

23        Once that's complete, we talk to them about safety

24 planning and make referrals potentially for counseling, for

25 therapy, or for other medical appointments they may need to

—— B.R. v. F.C.S.B. ——

26

1   have.

2   Q.    Is there a peer-review process for SANE examinations,

3   Dr. Jennings?

4   A.    So in my practice, yes.  All of our documentation was

5   100 percent peer-reviewed by either our coordinator or our

6   medical director for the purposes of validating findings and

7   also to ensure that the documentation was done correctly.

8   Q.    Now, let's turn to discussing the plaintiff, her SANE

9   examination.  Did you review the SANE report that was produced

10  as part of the examination on the plaintiff in March of 2012?

11  A.    I did.

12  Q.    Could you explain to the jury what that report consists

13  of?

14  A.    So the medical forensic exam, we include a detailed

15  documentation of everything that we've done.  So it's that

16  history that we've received from the patient, any of the

17  diagrams that we've utilized, any photography that we've

18  obtained during that is also included in the medical report.

19  Q.    And so did the plaintiff's SANE examination include

20  written comments from the forensic nurse examiner?

21  A.    It did.

22  Q.    Did it also include color photographs from the

23  anal/genital examination?

24  A.    It did.

25  Q.    Based on your review of the report, was there any

B.R. v. F.C.S.B.

27

1   difficulty for you in using those photographs to assess the

2   findings of the report?

3   A.   The photographs were clear and, in my opinion,

4   appropriate, and there was just an artifact that were in

5   multiple other photos like a U-shaped artifact.

6   Q.   In layman's terms, what does that mean?

7   A.   There was something that was on the screen.  It could

8   either be in the camera itself, or it could be some type of

9   particle that was on the lens itself, so every time the photo

10  was captured, that artifact or that object was still in the

11  photos, but it wasn't part of the patient's exam.

12  Q.   And so, the artifact, did that pose any difficulty in

13  your ability to assess the photographs?

14  A.   No, it did not.

15  Q.   If we could pull the slide show back up and go to

16  Slide 8.  We're going to take a look at what is part of this.

17          First of all, this is the heading for Section 3.0.

18  What were the first two sections of this report?

19  A.   The beginning of the report with the patient's

20  demographic information and what the report was received from

21  the detective.

22          MR. ELLIKER:  And for the record, Your Honor, these

23  are -- for demonstrative purposes, these are excerpts from

24  Plaintiff's Exhibit 581, which is already in evidence.

25          THE COURT:  Yes, sir.

B.R. v. F.C.S.B.

28

1    BY MR. ELLIKER:

2    Q.   So here we are at Section 3.0, the circumstances of the

3    reported assault, and then when it says "per

4    patient/caregiver," what does that mean?

5    A.   That means that this was what was provided by the patient

6    and/or the caregiver that was with the patient.

7    Q.   And so here, as you can see highlighted, the patient

8    provided information that the assailant had penetrated her

9    anus with his penis and that he also penetrated her vagina

10   with fingers and tried to put his penis in her mouth, but she

11   held her mouth shut to prevent it.

12            How does this information inform what the forensic

13   nurse does during the examination?

14   A.   So the history is important so that it helps guide that

15   head-to-toe assessment that I was speaking of but also can

16   help guide us when we're collecting potential DNA evidence as

17   to what area to collect evidence from.

18   Q.   And if the -- if a patient is reporting physical abuse

19   that's not in the genital area, would you expect that also to

20   be reported in this section of the report?

21   A.   Anything that the patient reports, we're going to

22   capture, both in a written form but also in the diagram form.

23   Q.   If we go to the next slide, 9.

24            This is 4.0.  It says "Physical Examination Report."

25            What portion of the report is Section 4,

B.R. v. F.C.S.B.

29

1  Dr. Jennings?

2  A.    So this is the physical exam portion.

3  Q.    And does this reflect the findings from the head-to-toe

4  assessment?

5  A.    Yes.

6  Q.    And according to the nurse examiner, who prepared this

7  report, what findings did she make based on the head-to-toe

8  assessment of the plaintiff's body?

9  A.    So in this section, it says "evidence of nongenital

10  trauma," so that essentially means areas that are not specific

11  to the genital area.  It says "none noted."

12  Q.    So if the patient had reported that they had been burned

13  or cut and that was observed by the forensic nurse, would you

14  expect that to be noted in that section?

15  A.    In my practice, yes, I would have documented if I had

16  observed anything.

17  Q.    And one note before we move on.  Is there a standardized

18  form that all forensic nurse examiners are -- use in their

19  practice?

20  A.    The only standardized form is what's included in the

21  physical evidence recovery kit.  So all forensic nurses in

22  Virginia use the same kit, but each of our documentation is

23  very specific to the hospital that they are practicing in.  So

24  they are individualized.

25  Q.    And so in your experience, then, you would expect that

─B. R. v. F. C. S. B.─

30

1   the form that was used in March of 2012 was the form that was

2   specific to the facility where the patient was seen?

3   A.   Correct.

4   Q.   If we go to the next slide.

5        What is Section 5 of the report?

6   A.   So this is the physical exam continued, but this is

7   specific to the genital areas.

8   Q.   And you see here there are -- there's a list down the

9   left side.  Could you explain to the jury what this list

10  covers.

11  A.   So these -- these are each of the anatomical structures

12  that the forensic nurse would be assessing during that

13  head-to-toe physical assessment.

14  Q.   And then on the right side, the columns say "positive,"

15  "negative," or "N/A."

16       What did those indicate?

17  A.   So the positive would mean that the forensic nurse

18  actually saw something during that exam and that would be what

19  they're documenting.  Negative would mean that they did not

20  see anything.  Nonapplicable, for example, would be, if it was

21  a male patient, we would not be assessing a cervix or the

22  vaginal area.  So we would put "nonapplicable."

23  Q.   You said a positive would indicate that the nurse

24  examiner saw something.  Could you explain what you mean by

25  that?

─B.R. v. F.C.S.B.─

31

1   A.   That would be something that is not normally there either

2   per the patient or something that the forensic nurse observed

3   as not a normal finding.

4   Q.   In your review of the report at issue here, was the

5   anus/buttocks the only area where positive was checked?

6   A.   Correct.

7   Q.   Let's go to Slide 11.

8        This is further down on that same section of the

9   form, an area called "Notes/Explanations."

10       Is this where the forensic nurse is documenting what

11  findings she made during the course of the physical

12  examination?

13  A.   That's correct.

14  Q.   You -- I'll take these in chunks here.  The first line

15  there says "methods of exam included direct visualization and

16  colposcopic magnification."

17       In other words, is that the naked eye and using that

18  special tool you talked about?

19  A.   So, yes.  Direct visualization just means what we're

20  seeing at the time of the exam.  And the colposcopic

21  magnification is using that microscope that I talked about to

22  magnify what we can't see normally with our naked eye.

23  Q.   And there's a sort of set of dashes there as bullet

24  points where the nurse has written, "There were no acute or

25  chronic injuries noted to the hymen or the vaginal

B.R. v. F.C.S.B.

32

1   structures."

2           What is that block of text indicating regarding the

3   physical findings?

4   A.   Sure.

5           So "no acute or chronic injuries noted" means that

6   there wasn't anything visualized to the vaginal area by the

7   forensic nurse and then she specifically discusses the hymen.

8   The hymen is that entrance to the vaginal area.  It looks

9   almost like a scrunchie that you would put into your hair, and

10  so that is a structure that we look for to see if there's any

11  potential findings that are present or could be chronic in

12  nature.

13  Q.   And so, based on your opinion, then, in that description,

14  was it appropriate for the nurse to have checked negative on

15  the systems related to the hymen and the vaginal structures?

16  A.   Correct, yes.  I agreed with her findings.

17  Q.   Before I forget, at the bottom of this here, it says

18  there's a U-shaped, black foreign artifact that is in the

19  cameral lens that shows up in the photos.

20          Is that describing what you talked about earlier?

21  A.   Yes.

22  Q.   Okay.  Now, let's talk about here, right in the middle.

23  The narrative says, "There's an old scar at 7 o'clock of the

24  anal folds which is approximately ten-millimeters in length.

25  There are also several small, red, linear abrasions at 3 and

B.R. v. F.C.S.B.

33

1    9 o'clock of the anal folds.  There was a black mole-like

2    lesion at 11 o'clock of the anus.

3              First, there's the 7 o'clock and 3 o'clock and

4    9 o'clock and 11 o'clock.  Could you tell the jury what that

5    means?

6    A.   Sure.  When we're performing our genital exam, we use a

7    clock.  Just like you would have a clock hanging on the wall,

8    12 o'clock is at the top, 6 o'clock at the bottom, 3:00 and

9    9:00 to the sides.  And that's how we document and describe

10   where the findings that we see on that exam actually are.

11   Q.   And then with the -- what's an abrasion?

12   A.   So "abrasion," by definition, is a break in the skin.  So

13   this is something that's observed where there is a disruption

14   of the tissue that's not presently there.

15   Q.   And then the -- I want to ask you about your view, having

16   reviewed the photographs and the documentation, would you have

17   used the same description that the nurse wrote here?

18   A.   No.  So by definition, the forensic nurse can't identify

19   a scar.  That's more of a diagnostic type of terminology.  I

20   do agree that there's something there.  I would not have

21   described it as a scar.  I would have described it

22   differently, as a hypopigmented area that's present in that

23   same exact location.

24   Q.   And explain to the jury what "hypopigmented" means.

25   A.   So it's a skin color that's not the normal skin color of

——B.R. v. F.C.S.B.——

34

1    the patient is the easiest way to describe it.

2    Q.   And so, in your view, it's not appropriate to refer to

3    something as a scar?

4    A.   Correct.  So "scar," by definition -- I wasn't present

5    for something that did or did not happen; so therefore, I

6    would be describing it from a nursing perspective as opposed

7    to diagnosing it.

8    Q.   Dr. Jennings, having reviewed the report, are these the

9    only findings that describe the anal/genital physical

10   examination?

11   A.   Correct.

12   Q.   And in your expert opinion, how would you classify these

13   findings?

14   A.   In my practice, these would be classified as a

15   nonspecific finding, meaning we can't determine what the cause

16   was or was not from.

17   Q.   And why can't you determine the cause of these findings?

18   A.   Partly because, one, we weren't present for something

19   that did or did not occur, and then we have to utilize other

20   tools such as follow-up exams or, what we call in the medical

21   world, a differential diagnosis, making sure that those

22   findings couldn't be from something like another medical type

23   of finding or something that's an anatomical variant, so

24   something that the patient may have been born with.

25   Q.   Now, when the examination is being conducted four months

─B.R. v. F.C.S.B.─

35

1    after the alleged assault, does that increase the likelihood

2    that the findings would be nonspecific?

3    A.   I don't have specific literature about time frame, but we

4    do know that, regardless of patient time frame for

5    presentation, they are still offered that same medical exam.

6    Q.   As a general matter, generally speaking, could there be

7    other possible explanations for the findings that are noted in

8    the SANE report?

9    A.   Yes, there could be.

10   Q.   What -- as a general matter, what are the kinds of things

11   that could lead to these findings?

12            THE COURT:  Sustained.

13            MS. ANDERSON:  Objection, Your Honor.

14            THE COURT:  Sustained.  In other words, don't

15   answer.

16            MR. ELLIKER:  Can we please approach?

17            THE COURT:  Sure.

18            (Side bar.)

19            THE COURT:  For the record, I think the doctor has

20   done a good job staying within the confines of what she is

21   entitled to opine about.

22            I want to highlight for you this:  Although

23   Dr. Jennings may testify generally regarding possible

24   explanations for the scarring in that area, she may not

25   testify or speculate as to causes of the plaintiff's case

─B.R. v. F.C.S.B.─

36

1   specifically.  And she may not validate or connect her

2   opinions regarding possible causes, generally, the plaintiff's

3   medical records or medical history.

4          And I think Ms. Anderson's objection was

5   anticipating the possibility that she could vary from the

6   specific direction of the Court's motion in limine.

7          So with Ms. Anderson's agreement, I'm going to let

8   you confer with the witness, make sure that she stays within

9   the confines of what she's able to say and nothing more.

10         MR. ELLIKER:  Yes.  And, Your Honor, that was --

11  maybe I overexaggerated generally with my hand gestures, but

12  the witness understands the confines of the Court's motion.

13         THE COURT:  Let's remind her.

14         MS. ELLIKER:  Yes, I will.

15         THE COURT:  Ms. Anderson, does that address your --

16         MS. ANDERSON:  Your Honor, since the question was

17  grounded -- this line of questioning has been grounded in the

18  SANE report, which is her.  So I -- I had anticipated he would

19  bring this up earlier in the process.

20         THE COURT:  When you go back to redirect her,

21  transition from a specific discussion of the individual in

22  this case to general findings.

23         MR. ELLIKER:  I think I can do that by -- if I take

24  the slide show down and I can say, "as a general matter, what

25  kinds of causes could lead to abrasions in this area."

B.R. v. F.C.S.B.

37

1          THE COURT:  Okay.  All right.

2          MS. ANDERSON:  I would ask that he -- if he's going

3    to go then -- he started in the SANE exam, he's going to come

4    back to the SANE exam.

5          Can we do it later in the testimony?  It feels like

6    --

7          MR. ELLIKER:  I have five questions left.

8          MS. ANDERSON:  -- he's trying to connect it directly

9    to Ms. Jennings.

10         THE COURT:  You have five questions left.

11         Again, I trust counsel reading an interpretation of

12   the specific order regarding this.  And I appreciate you

13   saying on the record that your hand gestures may have

14   highlighted something inappropriate.  And I didn't pick up on

15   that, but you did.  So that's a better gauge than me.

16         But, again, what we're going to do is we're going to

17   allow you to speak with this witness, remind her of the

18   parameters of the motion in limine, and be very careful in the

19   context that you ask the questions.

20         Was that your objection, Ms. Anderson?

21         MS. ANDERSON:  I think it's leaving an impression

22   that's connected to her SANE exam.

23         THE COURT:  Yes.  And You can ask that question on

24   cross-examination.  Mr. Elliker asked you questions about

25   general findings.  You are not equating these general

─── B.R. v. F.C.S.B. ───

38

1   findings.  Well, you can't say that because that's going to

2   open door to something else.  Mr. Elliker, thank you for that

3   too.

4            MS. ANDERSON:  I was going to say I'm opening the

5   door.  So I'm in a rock and a hard place.

6            MR. ELLIKER:  I understand the concern.  As Your

7   Honor can see in my notes, I have copied and pasted the word

8   verbatim from the order, and I tried to match my questions to

9   what the order says.

10           THE COURT:  All right.  Please spend a little time.

11  Do you have any objection to that, Ms. Anderson?

12           MS. ANDERSON:  I think the inference is related to

13  her SANE exam.  So I -- I do have a concern.  I thought that

14  this would be brought up in a more generalized manner.

15           THE COURT:  Sometimes when we talk about things we

16  highlight them too much.  And so, I guess, I'm comfortable

17  with the line Mr. Elliker is trying to walk.

18           I want to make sure, though, for the record, because

19  I sort of anticipated your objection.  Was that generally what

20  your objection was?

21           MS. ANDERSON:  Yes.  That is generally my objection.

22           THE COURT:  Okay.  Very good.  All right.

23           MR. BLANCHARD:  Should we leave this on so you can

24  talk to her?

25           THE COURT:  Yeah.

───────── B.R. v. F.C.S.B. ─────────

39

1            (Open court.)

2            MR. ELLIKER:  Thank you, Your Honor.  May I proceed?

3            THE COURT:  You may.

4   BY MR. ELLIKER:

5   Q.   Dr. Jennings, as a general matter, what are possible

6   explanations for scarring in that area -- in the area where

7   there were findings indicated in the report?

8   A.   Sure.  So findings such as those could come from a

9   magnitude of things.  Some of them could be something as

10  simple as poor hygiene.  It could be constipation.  Some type

11  of gastrointestinal issue.  It could be from another medical

12  finding that the patient doesn't know that they have.  So

13  that's why it's so important for those patients to follow up

14  with other providers as we see things such as this present.

15  It could also be something that they are born with.

16  Q.   How would -- could you just explain what you mean by

17  "poor hygiene"?

18  A.   If the patient does not wipe appropriately.  If they do

19  not shower routinely, those are things that would contribute

20  to poor hygiene.  It could also be where they have some type

21  of contact with a soap or a detergent that cause irritants,

22  also.

23  Q.   How would a forensic medical professional go about trying

24  to zero in on the cause of a finding in a SANE report?

25  A.   So that's why that detailed medical history is so

B.R. v. F.C.S.B.

40

1   important.  So we're asking that of the patient and also of

2   the caregiver, for the best of our ability, to talk about what

3   their daily practices are.  If there's other things that they

4   are experiencing in their day-to-day life that could

5   contribute to any of the findings that we see on the actual

6   medical forensic exam.

7   Q.   Now, stepping away from the general and back to this

8   particular report, can you tell whether this SANE examination

9   was peer-reviewed?

10  A.   From the report I was provided, I am not able to

11  determine that.

12  Q.   Right.  Would it be helpful to know if it had been

13  peer-reviewed?

14  A.   It would be.

15  Q.   And in your opinion, what would peer review have been

16  helpful towards with respect to the exam's findings?

17  A.   So in --

18           MS. ANDERSON:  Objection, Your Honor.  Speculation.

19           THE COURT:  She's an expert.  You may answer.

20           THE WITNESS:  Thank you, sir.

21           In my routine practice, that's where that

22  peer-review process comes in to play.  So in my role as the

23  manager of the program but also as our coordinator, but also a

24  forensic nurse myself, even my reports were peer-reviewed by

25  my boss.  And so, they would be looking at it from the

B.R. v. F.C.S.B.

41

1   perspective of what I was documenting.  Could I, as the

2   forensics nurse, say that based off of what our current

3   literature says.  So what our evidence-based practice says, as

4   well as what the national protocols that were guided by on our

5   processes.

6   BY MR. ELLIKER:

7   Q.   So, Dr. Jennings, in your opinion, and based on your

8   training, education and experience, is it possible to

9   determine whether the findings in the plaintiff's SANE report

10  resulted from a sexual assault?

11  A.   No.

12  Q.   Is it possible to determine whether they resulted from

13  any cause?

14  A.   In this particular case, no.

15           MR. ELLIKER:  Thank you, Your Honor.

16           THE COURT:  Ms. Anderson.

17           MS. ANDERSON:  Thank you, Judge.

18           THE COURT:  Ms. Anderson, if you could alert me when

19  we get to the issue that we previously discussed.  Thank you.

20           MS. ANDERSON:  I will, Your Honor.  Thank you.

21                        CROSS-EXAMINATION

22  BY MS. ANDERSON:

23  Q.   Good morning, Dr. Jennings.

24  A.   Good morning.

25  Q.   I'm Alison Anderson.  I represent the plaintiff in this

B.R. v. F.C.S.B.

42

1    case.

2            I think you spoke a little bit about acute versus

3    nonacute.  And I just wanted to break that down a bit.

4    A.    Sure.

5    Q.    So acute -- the acute states that some patients present

6    to the emergency department, it's close in time to when that

7    patient is alleging that they have been assaulted; is that

8    accurate?

9    A.    Correct.  We, in Virginia, define that as that 120-hour

10   time frame is the acute time frame.

11   Q.    And then nonacute, even though they may come through the

12   emergency department, they may be presenting nonacute, the

13   patient, which means it could be days, weeks, months?

14   A.    Years.

15   Q.    Even years after the alleged assault; is that correct?

16   A.    Yes, ma'am.

17   Q.    Okay.  And now B█████ SANE exam, that was in March of

18   2012; is that right?

19   A.    Correct.

20   Q.    So, give or take, about a month after February 9, 2012?

21   A.    Correct.

22   Q.    And, in your experience, the majority or -- the majority

23   of SANE exams that you've performed for children are nonacute;

24   is that accurate?

25   A.    I don't have exact numbers, but most children, so that

B.R. v. F.C.S.B.

43

1  prepubertal time frame, do present in a nonacute manner.

2  Q.    Okay.  And that's because children don't always tell

3  right away if -- that they've -- have been assaulted?

4  A.    The disclosure could come at varying time frames

5  throughout their life.

6  Q.    Now, you spoke a bit about the SANE exam, B████ SANE

7  exam on your direct examination.  I would like to walk through

8  just a little bit about with you as well some portions.  So if

9  we can pull -- and publish, Your Honor, and just -- this is

10  not the photos, but we are going to go through the other

11  portions.  Plaintiff's Exhibit 581, page 1, please.

12           THE COURT:  You may publish.

13           MS. ANDERSON:  Thank you.

14           (Exhibit published.)

15  BY MS. ANDERSON:

16  Q.    This is the first page of that SANE; is that right?

17  A.    Correct.

18  Q.    And if we can go to page 3, please, at the top.  And if

19  we can zoom in on the top portion.

20           So, Dr. Jennings, I think you had said it is

21  important to ask about the medical history when trying to

22  determine what may be going on with this patient; is that

23  correct?

24  A.    That's correct.

25  Q.    Okay.  And so, here this is, you know, it reports B████

─── B.R. v. F.C.S.B. ───

44

1    SANE exam.  She's 12 years old at the time, correct?

2    A.   That's correct.

3    Q.   Okay.  And she's asked or the -- you don't know if she

4    was asked.  So I'll reframe that.

5           The nurse examiner reports that the patient's

6    medical history includes; there's no history of urinary tract

7    infections, loose stools, or constipation.  And then she says

8    "since the incident," well, so she says that, correct?

9    A.   Correct.  That's correct.

10   Q.   Okay.  And she notes that since the incident, she has

11   complained of left-groin pain; is that correct?

12   A.   That's correct.

13   Q.   Okay.  And if we can go to page 3, at the bottom, please.

14   And this was a scheduled exam; is that correct?

15   A.   Yes.  That's correct.

16   Q.   And by a Detective Fred Chambers?

17   A.   Yes.  That's correct.

18   Q.   Okay.  If we can go to the top of page 3, please.  Oh,

19   I'm sorry, can we go to page 4, top.  Thank you.

20          Okay.  And you went over this a bit in your direct

21   exam.  That -- where it says "per patient slash caregiver."

22          Is that correct?

23   A.   That's correct.

24   Q.   Okay.  And here the first line says, "The mother saw

25   blood in the child's underwear in November 2011."

B.R. v. F.C.S.B.

45

1      Is that noted there?

2  A.   Yes, it is.

3  Q.   Okay.  And then separately, so the first sentence says

4  "the mother."  And, separately, it goes on to state, "The

5  child states."

6           Is that correct?

7  A.   That's correct.

8  Q.   Okay.  And then that's -- and then after that, it

9  describes what is being reported as the alleged assault?

10 A.   That's correct.

11 Q.   Okay.  If we can go to page 5, please.

12           Now, you had also spoken during direct about how

13 noting the patient's appearance could be important, right?

14 A.   Correct.

15 Q.   And it says, "She's well nourished and is dressed

16 appropriately."

17           Is that correct?

18 A.   That's correct.

19 Q.   And then it says, "Patient has clean appearance and good

20 hygiene."  Does it say that also?

21 A.   Yes.

22 Q.   And once again, it notes, "Since the incident, she states

23 she has had pain in the left groin area."

24           Does it say that there?

25 A.   That's correct.

1  Q.   Okay.  And then, the examiner also notes, "During the

2  genital exam, she had difficulty keeping her leg abducted in

3  the stirrup."

4           Is that correct?

5  A.   Correct.

6  Q.   And what's your understanding of -- since "abducted in

7  the stirrup" may be a little bit more medical, what is that?

8  A.   Sure.  This is for the females, it's very much like going

9  to your GYN for an annual visit.  Patients are put into what

10 we as a medical provider call a lithotomy position, their feet

11 are actually in the stirrups or that footrest, and we actually

12 ask them -- in my practice, I ask them to take their knee and

13 touch their knee with my hands so that we can have a

14 visualization of that -- what I spoke before of the

15 anal/genital area.

16 Q.   And then she also notes the patient's emotional state; is

17 that correct?

18 A.   Correct.

19 Q.   And "Patient became tearful when discussing the details

20 of the incident and during the exam."  She notes that?

21 A.   Correct.

22 Q.   And she notes, "Patient was very soft-spoken and seemed

23 embarrassed during the genital exam."

24           Do you see that there?

25 A.   I do.

B.R. v. F.C.S.B.

47

1   Q.   Before we get to --

2            MS. ANDERSON:  You can take that down.  Thank you,

3   Mr. Brown.

4   BY MS. ANDERSON:

5   Q.   Before we get to sort of the exam notations, let's talk

6   just a little bit about -- so -- where it said the patient got

7   emotional, that's -- that's not unusual, correct?

8   A.   Patients have a range of emotions during a medical

9   forensic exam.  No patient is the same.  Each of them are

10  treated individually.  And we're meeting them where they are,

11  is what our common terminology is.  So whenever the patient

12  presents to us, they could be having a wide range of emotions

13  at that time.

14  Q.   Okay.  And these exams, they take place on like a

15  hospital-type bed or an -- or like a doctor examination

16  type --

17  A.   It's okay.

18  Q.   Yeah, if you can describe it.

19  A.   It depends.  So each facility is different.  So in my

20  practice, we use an exam table, just like if you are going to

21  see your primary care doctor.  This particular bed, as it's

22  described, is very similar to mine, and it does have stirrups

23  that are built in, that footrest that we're utilizing for the

24  purposes of the exam.

25            That portion of the exam, though, takes the least

B.R. v. F.C.S.B.

48

1   amount of time because no patient, of course, would want to

2   stay in those footrests.  So that's the very brief part of our

3   exam.

4   Q.   And that's because it's a hard part of the exam; is that

5   right?

6   A.   Each patient interprets it differently.  Some people, of

7   course, are apprehensive to that process, and that's why it's

8   so important for the forensic nurse to build that rapport with

9   the patient, to guide them through that process.

10  Q.   And there's lights, and I think you said a colposcopic

11  camera?

12  A.   So the colposcope.  That's the magnification tool that

13  we're using during the exam.

14  Q.   And there's other instruments that are used in order to

15  separate and open the areas?

16  A.   No.  Actually, we just utilize our hands for separation

17  and traction.  Depending on the patient's age and if it's

18  developmentally appropriate, we may use a speculum, so that's

19  the duckbill -- typically it's plastic -- that we would use to

20  insert into the vagina.  But that's very specific to each

21  individualized patient.

22  Q.   Okay.  Speculum.  Thank you.

23            Okay.  If we can pull up page 6, please.

24            And I think you spoke about this page in your direct

25  examination.  So this is the physical examination of the

B.R. v. F.C.S.B.

49

1   genitalia; is that correct?

2   A.   That's correct.

3   Q.   And you noted there was a positive finding in the

4   anus/buttocks area; is that right?

5   A.   That's correct.

6           MS. ANDERSON:  We can take that down.  Thank you,

7   Mr. Brown.

8           Okay, Your Honor, at this time we now are going to

9   show the photo.

10          THE COURT:  Ladies and gentlemen of the jury, most

11  exhibits that are part of the case have been shared with you

12  or published through the monitors in front of you.  The

13  parties have agreed and the Court has concurred that, because

14  of the uniquely personal and private nature of this particular

15  unique exhibit, that this exhibit will be published to you in

16  historical form; that is, if you choose, look at the exhibit

17  and pass it to your fellow juror, and after review, return it

18  to Ms. Tinsley.

19          You can approach the jury.

20          MS. ANDERSON:  Okay.  And I'm going to approach the

21  witness as well, if that's okay.

22          THE COURT:  Is there any objection to the exhibit,

23  Mr. Elliker?

24          MR. ELLIKER:  No, Your Honor.  It's already in

25  evidence.

B.R. v. F.C.S.B.

50

1          THE COURT:  No objection.

2          Ladies and gentlemen, as I indicated to you, if you

3   choose, take a look at it, pass it to your fellow juror.

4          Ms. Tinsley, if you could retrieve it after they

5   look.

6          MS. ANDERSON:  Thank you to all parties and to

7   everyone for the discretion.  We really appreciate that.

8          THE COURT:  Yes, ma'am.

9   BY MS. ANDERSON:

10  Q.  So the injury that you were talking about on direct exam,

11  is that the injury that's reflected in this photo to the anal

12  area?

13  A.  Correct.

14  Q.  And when you said, sort of the clock -- the clocks, the

15  area that -- I know you disagree with the terminology but that

16  she -- that the examiner notes as the scar, that's at

17  the 7 o'clock area?

18  A.  Correct.  And there's a clock up there, but it would be

19  to the left of 6 o'clock.

20  Q.  And you had talked about how some pictures are -- and I'm

21  probably going get this word wrong again -- but the

22  colposcopic magnification is used, correct?

23  A.  Colposcope.

24  Q.  Colposcope magnification versus direct visualization,

25  right?

B.R. v. F.C.S.B.

51

1   A.   Correct.

2   Q.   And this picture is direct visualization?

3   A.   So this particular photo doesn't have an indication of

4   how many times it may have been magnified.  The colposcope

5   itself does start out at a baseline.  So it's like using your

6   camera phone -- or your phone for a camera.  It doesn't zoom

7   in initially.  You physically have to turn the dial on the

8   colposcope to zoom in.  So this could be just as they're

9   basically seeing it with their naked eye right at the very

10  beginning, because the colposcope does have that feature.

11  Q.   Okay.  And, again, this is a nonacute situation where

12  B███ came in at least a month after -- or about a month after

13  February 9th?

14  A.   That's correct.

15           MS. ANDERSON:  And so, I think we can collect the

16  pictures.

17           THE COURT:  We already did.

18           MS. ANDERSON:  We already did.  Okay.

19           MR. ELLIKER:  Your Honor, I think, just for purposes

20  of the record, if we could note that that was -- the Bates on

21  that exhibit?

22           MS. ANDERSON:  Oh, page.  So it's -- yes.  It's

23  Exhibit 581, page 21, as well as Bates ending in 31.

24           THE COURT:  And I take it no one has any objection

25  that these matters be made a part of the record under seal.

──────B.R. v. F.C.S.B.──────

52

1          MS. ANDERSON:  Correct, under seal.

2          MR. ELLIKER:  Of course.

3          THE COURT:  Okay.

4          MS. ANDERSON:  And then if I can pull up 581,

5   page 11, please, Your Honor.  If I may publish?

6          THE COURT:  You may.

7          MS. ANDERSON:  Thank you.

8          (Exhibit published.)

9   BY MS. ANDERSON:

10  Q.   And then this examiner goes on to make -- to make two

11  findings -- two conclusions; is that correct?

12  A.   Correct.

13  Q.   The first conclusion is that -- is related to the

14  behavior of the patient; is that correct?

15  A.   Yes.

16  Q.   And she notes "abnormal and the nature of the

17  abnormalities are consistent with the history given."

18          Do you see that there?

19  A.   Yes, that's what's written.

20  Q.   And then she writes below in the notes, "behavior may be

21  consistent."

22          Is that correct?

23  A.   That's correct.

24  Q.   Okay.  And then if we can go down on the page, the

25  examiner then also notes under the "Genital Findings,"

─ B.R. v. F.C.S.B. ─

53

1   "Abnormal and the nature of the abnormalities are consistent

2   with the history given."

3           Is that correct?

4   A.   That's correct.

5   Q.   She says that.

6           And then the history given is what we had already

7   covered, I think, both in your direct exam and with me --

8   A.   Correct.

9   Q.   -- that -- that the patient had reported an allegation of

10  penetration in the anus?

11  A.   That's correct.

12          MS. ANDERSON:  You can take that down.  Thank you,

13  Mr. Brown.

14  BY MS. ANDERSON:

15  Q.   Now, I think this was pretty clear in your direct exam,

16  but I just wanted to make sure.  Your testimony is that, when

17  you say "a nonspecific finding," just means that you can't

18  say, looking just at what's in this report, whether the

19  patient was assaulted or was not assaulted?

20  A.   Correct.  It would be the same way if I was present with

21  the patient.  As the forensic nurse for this particular

22  finding, the forensic nurse wouldn't be able to say if it did

23  or did not occur.

24  Q.   And that's your opinion if you were to have been the

25  forensic nurse?

B.R. v. F.C.S.B.

54

1   A.   That's correct.

2   Q.   And you're not finding that it's -- that she was not

3   assaulted, just to be clear.  That's not your opinion?

4   A.   My opinion is not that it occurred or did not occur.

5   Q.   Correct.  Okay.  And I think you said that you had -- if

6   you had been the one doing this, you would have just wanted

7   some additional information like a -- you would have wanted to

8   do a follow-up examination or refer to other doctors

9   potentially?

10  A.   That's correct.

11  Q.   Okay.  I think you spoke a bit about some of the other

12  findings on the physical chart.  And I can pull that back up

13  if helpful, just let me know.

14       But you would agree that the hymen itself can heal

15  itself within five days after sexual assault or penetration?

16  A.   The hymen itself, yes, can.  Each patient is dependent.

17  So to narrowly focus it to five days, I wouldn't be

18  comfortable with.  A patient could heal within 24 hours, or it

19  may take several weeks to a month to heal.

20  Q.   Okay.

21       MS. ANDERSON:  Your Honor, Court's indulgence?

22       THE COURT:  Yes, ma'am.

23       MS. ANDERSON:  Dr. Jennings, I have no questions.

24  Thank you very much.

25       THE COURT:  Mr. Kinney?

B.R. v. F.C.S.B.

55

1          MR. KINNEY:  Nothing to add, Your Honor.

2          THE COURT:  Mr. Blanchard?

3          MR. BLANCHARD:  Nothing.

4          THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6    BY MR. ELLIKER:

7    Q.   Dr. Jennings, just one question.  Ms. Anderson showed you

8    that Section 9 of the report where the forensic nurse

9    examiner -- the heading was "Conclusions."

10   A.   Correct.

11   Q.   And that's where those two sections that said

12   "consistent" -- "abnormal and consistent"?

13   A.   Correct.

14   Q.   In your practice, do you make conclusions in your reports

15   based on the findings?

16   A.   No, because that's going to the ultimate fact, which the

17   forensic nurse cannot do.

18          MR. ELLIKER:  Thank you, Your Honor.

19          THE COURT:  Is this witness subject to recall?

20          MS. ANDERSON:  Not from the plaintiff, Your Honor.

21          THE COURT:  Thank you, ma'am.  You may step down.

22   Please do not discuss the case or any aspect of the case with

23   anyone while the case is pending.

24          Next witness.

25          MS. REWARI:  Your Honor, the defense calls Deputy

─B.R. v. F.C.S.B.─

56

1    Chief Fred Chambers.

2              THE COURT:  Come on up, sir.

3    (FRED CHAMBERS, Defendants' witness, sworn.)

4              (Witness seated.)

5              THE COURT:  Please have a seat, sir.  Listen to the

6    questions of counsel, answer them as best you can.  If you

7    hear counsel interrupt or if the Court is speaking, please

8    pause before giving any response.

9              THE WITNESS:  Yes, sir.

10                       DIRECT EXAMINATION

11   BY MS. REWARI:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   Sir, would you please introduce yourself to the jury?

15   A.   My name is Deputy Chief Fred Chambers.  I'm a deputy

16   chief of the Fairfax County Police Department.

17   Q.   Sir, how long have you worked for the Fairfax County

18   Police Department?

19   A.   I'm in my 23rd year.

20   Q.   Okay.  I'm going to ask you a bit more about this in a

21   minute, but before that, let me ask whether you were assigned

22   to investigate an allegation of sexual assault involving the

23   plaintiff in this case who we're referring to as B.R.?

24   A.   Yes, ma'am.

25   Q.   Was that in 2012?

B.R. v. F.C.S.B.

1    A.    2012, yes, ma'am.

2    Q.    Okay.  All right.  When you joined the police department

3    as a police officer, what type of law enforcement training had

4    you received up to that point?

5    A.    When I joined this police department, I had prior law

6    enforcement experience.  Well, I had attended the Federal Law

7    Enforcement Training Center at Glynco, Georgia.  Once I came

8    here, I attended the Fairfax County Criminal Justice Academy

9    as well.

10   Q.    Okay.  Had you worked in law enforcement before you came

11   to the police department?

12   A.    Yes, ma'am.

13   Q.    Could you please describe that experience.

14   A.    I worked for the United States Secret Service Uniformed

15   Division as a police officer.

16   Q.    Thank you, sir.  And what was your first position with

17   the Fairfax County Police?

18   A.    I was patrol officer assigned to the Fair Oaks district

19   station.

20   Q.    And how many years did you do that?

21   A.    Approximately, three years.

22   Q.    Okay.  What was your next position?

23   A.    I was a School Resource Officer.

24   Q.    Can you just explain what that position means?

25   A.    The School Resource Officer is a police officer that's

─B.R. v. F.C.S.B.─

58

1    assigned to middle and high schools across Fairfax County.

2    Q.   Okay.  And did you receive any training specific for that

3    position?

4    A.   Yes, ma'am.

5    Q.   Could you please describe that training.

6    A.   That training is -- we have what we call School Resource

7    Officers are referred to as SROs, and the Fairfax County

8    Police Department puts on an SRO school that goes through

9    different things that -- and responsibilities of an SRO.

10   Q.   And what year did you first become an SRO?

11   A.   I first became an SRO in, I think it was 2005.

12   Q.   Okay.  Where were you assigned?

13   A.   Rachel Carson Middle School and Franklin Middle School.

14   Q.   How many years were you assigned to both of these

15   schools?

16   A.   Total of approximately five years.

17   Q.   Okay.  Did there come a time when you were assigned only

18   to Rachel Carson Middle School?

19   A.   Yes, ma'am.

20   Q.   And when was that?

21   A.   I can't remember the exact year, but part of my tour as

22   an SRO, they eventually created a position specifically for

23   Franklin Middle School, and then I was permanently assigned to

24   Rachel Carson.

25   Q.   Okay.  And did you receive any accommodations when you

B.R. v. F.C.S.B.

59

1    were a School Resource Officer?

2    A.    Yes, ma'am.

3    Q.    Could you please identify those?

4    A.    I was nominated three times for the SRO of the year and

5    was awarded SRO of the year 2009.

6    Q.    How many SROs are there in Fairfax County?

7    A.    At that time it was 52.

8    Q.    Okay.  And when you left Rachel Carson, as the SRO, what

9    year was that?

10   A.    2010.

11   Q.    Okay.  And where did you go from there?

12   A.    I went to the major crimes bureau.

13   Q.    Of the Fairfax County Police?

14   A.    Yes, ma'am.

15   Q.    Okay.  And how long were you in that position?

16   A.    From 2010 to about 2017.

17   Q.    Okay.  And were you, at some point, in the child abuse

18   squad?

19   A.    Yes, ma'am.

20   Q.    What year was that?

21   A.    I think that was 2011, March of 2011.

22   Q.    And so, child abuse squad was part of major crimes?

23   A.    Yes, ma'am.

24   Q.    Okay.  And how long were you in the child abuse squad?

25   A.    From March 2011 until July of 2014.

B.R. v. F.C.S.B.

60

1  Q.   Okay.  And when you left the child abuse squad, were you

2  still a detective?

3  A.   Yes, ma'am.

4  Q.   Okay.  So when you became, sorry, when you left Rachel

5  Carson and you went to major crimes, what was your position?

6  A.   I was assigned to the financial crimes squad.

7  Q.   Sorry, were you a detective?

8  A.   Yes, ma'am.

9  Q.   Okay.  Is that a lateral move from SRO to detective, or

10  was it a promotion?

11  A.   It's a lateral move, but it's a competitive process.

12  Q.   Okay.  And then when you left the child abuse squad, were

13  you still a detective?

14  A.   Yes, ma'am, I was assigned to the robbery squad as a

15  detective.

16  Q.   Okay.  And did there come a point where you were promoted

17  to a sergeant?

18  A.   Yes, ma'am.  In July of 2017.

19  Q.   Okay.  And since that time, what ranks have you held

20  within the Fairfax County Police Department?

21  A.   The rank of sergeant, second lieutenant, first

22  lieutenant, captain, major, and currently deputy chief.

23  Q.   Okay.  And as deputy chief, when did you become deputy

24  chief of police?

25  A.   About two weeks ago.

—————B.R. v. F.C.S.B.—————

61

1    Q.    Congratulations.

2    A.    Thank you.

3    Q.    And who do you report to?

4    A.    I report to Assistant Chief Brook Wright.

5    Q.    Okay.  And how many levels between you and the chief of

6    police?

7    A.    Two levels.

8    Q.    Okay.  I want to just talk a bit about your work in the

9    child abuse squad?

10   A.    Yes, ma'am.

11   Q.    Okay.  When you became a detective in that squad, did you

12   receive any training in conjunction with that position?

13   A.    Yes, ma'am.

14   Q.    Could you please describe that training?

15   A.    I went to what they call corner stone or CornerHouse, I'm

16   sorry.  It's a child abuse training that teaches you how to

17   interview children.  My mind is slipping now, but the correct

18   terminology for it is -- forensic interview.  Because in that

19   squad we were responsible for kids 13 and under.  So it could

20   be a three-year-old or it could be a 13-year-old.

21   Q.    Okay.  In that squad, were you also responsible for --

22   was the label child abuse large enough to cover both abuse to

23   children and then peer to peer?

24   A.    Yes, ma'am.  And it covered when -- if the crime occurred

25   when they were in the age of our responsibility.  So it could

─────────── B. R. v. F.C.S.B. ───────────

62

1   have been an adult, but if the crime occurred when they were

2   13 or below, we could have covered that.

3   Q.   How long was the course in forensic interviewing that you

4   took at CornerHouse?

5   A.   It was a week.

6   Q.   Okay.  Did you take any other classes on interviewing

7   children when you were in child abuse squad?

8   A.   Yes, ma'am.  I took a lot of interviewing classes,

9   numerous I can't remember each of them.

10  Q.   Okay.  And outside of your three years in child abuse

11  squad, have you also investigated sexual assaults or rape

12  allegations?

13  A.   I've assisted the sex crime squad on cases as well.

14  Q.   Okay.  How many different cases you've had over the years

15  that involve sexual assault or rape?

16  A.   I would say hundreds.

17  Q.   Okay.  And how many cases have you had that involved only

18  child -- under the age of 13?

19  A.   Yeah.  I would say hundreds.

20  Q.   Okay.  And in -- throughout your career, as a law

21  enforcement officer, how many interviews would you say that

22  you've conducted?

23  A.   Either myself or being a part of easily hundreds of

24  interviews.

25  Q.   Okay.  Let's talk about the allegation that started this

─── B.R. v. F.C.S.B. ───

63

1    conversation involving B.R.  Do you recall the month and the

2    year of that allegation?

3    A.   I recall it was March, I think March -- early March of

4    2012 was when I was assigned the case.

5    Q.   Okay.  And were you the officer that took that initial

6    report?

7    A.   No, ma'am.

8    Q.   Do you know -- do you recall when the initial report was

9    made to the police station?

10   A.   I want to say March 2nd or 3rd or somewhere there.

11   Q.   Okay.

12   A.   Of 2012.

13   Q.   All right.  And when were you assigned to the case?

14   A.   A couple days later.

15   Q.   Okay.  Do you recall what the allegation was when you

16   received the case?

17   A.   Initially, the allegation was harassing or being harassed

18   at school, but during the initial report, it turned into the

19   allegation of an attempted rape.

20   Q.   Okay.  And where was the attempted rape alleged to have

21   occurred?

22   A.   In Fairfax County off of West Ox Road.  I forget the name

23   of the actual street.

24   Q.   Okay.  Was there a determination made to whether that

25   attempted rape was a school event?

1    A.   Yes, ma'am.  And there wasn't a -- no, ma'am.  It was not

2    a school event.

3    Q.   Can you just explain what that means, "the school event"?

4    A.   At that time, we would consider school event something

5    that happened in the school.  The question that came out was

6    because it allegedly happened after getting off of a school

7    bus, which at that time we considered curtilage to curtilage,

8    would be covered under the school, but throughout the

9    investigation it revealed that.

10               MR. BRENNER:  Objection, Your Honor.

11               THE COURT:  Basis.

12               MR. BRENNER:  I think he was about to -- I think he

13   was going beyond the scope of the -- bound the question.

14               THE COURT:  All right.  Keep him focused,

15   Ms. Rewari.

16               MS. REWARI:  Sure.

17   BY MS. REWARI:

18   Q.   Was it determined to be a school event?

19   A.   No, ma'am.

20   Q.   Okay.  How many suspects were identified in the original

21   allegation?

22   A.   One.

23   Q.   And did the number of suspects ever change during the

24   course of the investigation?

25   A.   No, ma'am.

─B.R. v. F.C.S.B.─

65

1   Q.   Okay.  How many times was the suspect alleged to have

2   sexually assaulted B.R.?

3   A.   That -- the original allegation was one time.

4   Q.   Okay.  And did the number of sexual assaults, was the

5   number of sexual assaults changed during the course of your

6   investigation?

7   A.   Yes, ma'am.

8   Q.   Okay.  All right.  Let's -- do you recall meeting with

9   B.R.'s parents on March 5, 2012?

10  A.   Yes, ma'am.

11  Q.   Okay.  And did her mother provide you any information

12  about the date of the incident that was alleged?

13  A.   Yes, ma'am.

14  Q.   What was the date that the mom provided you?

15  A.   She said it was the week of November the 14, 2011.

16  Q.   Okay.  Did her mother also discuss a Facebook profile

17  that was using the name Jenni Taylor?

18  A.   Yes, ma'am.

19  Q.   And who did she allege was behind that account?

20  A.   The suspect.

21  Q.   Okay.  And was the suspect a person we're referring to as

22  C.K.?

23  A.   Yes, ma'am.

24  Q.   All right.  Did you subsequently speak to B.R. herself?

25  A.   Yes, ma'am.

Direct - F. Chambers

B.R. v. F.C.S.B.

66

1   Q.   Was that a sit-down interview with B.R.?

2   A.   Yes, ma'am.

3   Q.   And did you need the consent of a parent to conduct that

4   interview?

5   A.   Yes, ma'am.

6   Q.   So did you have the parents' consent?

7   A.   Yes, ma'am.

8   Q.   And did you need the parents' consent to do the interview

9   without a parent or guardian in the room?

10  A.   Yes, ma'am.

11  Q.   Did you get that?

12  A.   Yes, ma'am.

13  Q.   Where was the interview conducted?

14  A.   It was conducted at a facility called Child Help.

15  Q.   Could you explain what Child Help is?

16  A.   So Child Help is a child advocacy center, a facility that

17  had interview rooms.  It had a SANE room.  And it's designed

18  for children victims.  Each room is constructed for the age of

19  the child.  They have rooms that are designed for small kids,

20  all the way up to the age of 13, as well as a family room.

21  Q.   Are the interviews that are conducted at Child Help

22  recorded?

23  A.   Yes, ma'am.

24  Q.   And was B.R.'s interview recorded?

25  A.   Yes, ma'am.

B.R. v. F.C.S.B.

67

1   Q.   Okay.  Did you tell her whether the interview was

2   recorded?

3   A.   Yes, ma'am.

4   Q.   Okay.  And did you explain to B.R. why the interview was

5   being recorded?

6   A.   Yes, ma'am.

7   Q.   And what is the reason why these interviews are recorded?

8   A.   Well, I explained to her they audio and visually record

9   it.  One, for the investigator or the interviewer can focus on

10  the victim's story and not have to worry about taking so many

11  notes.  They can go back and be accurate in their reporting.

12  Q.   Okay.

13          MS. REWARI:  Your Honor, we understand the Court's

14  ruling on the video -- we would like to just show a screenshot

15  of what the room looked like as a demonstrative, and that's

16  Exhibit 202A.

17          THE COURT:  You can do that.

18          MS. REWARI:  All right.  Thank you.

19          (Exhibit published.)

20  BY MS. REWARI:

21  Q.   And, sir, could you identify what this photograph shows?

22  A.   This is what we would call the family room that was at

23  child advocacy center.

24  Q.   If you can show the next.

25          And can you just identify what this photograph

B.R. v. F.C.S.B.

68

1   shows?

2   A.   It's just myself and B.R. in the room conducting the

3   interview.

4   Q.   Okay.  All right.  Is this another photograph of the same

5   interview?

6   A.   Yes, ma'am.

7   Q.   Do you recall -- you can take that down.

8          Do you recall approximately how long this interview

9   was?

10  A.   An hour, I would guess.

11  Q.   Okay.  And during this interview, did you have a chance

12  to ask her questions about what had occurred?

13  A.   Yes, ma'am.

14  Q.   All right.  Did you ask her whether there was any prior

15  relationship between her and C.K.?

16  A.   Yes, ma'am.

17  Q.   What did she tell you?

18  A.   She met him through another friend, and my recollection

19  is that it seemed like it was pretty recent they had met.

20  Q.   Did she tell you when this incident had occurred?

21  A.   Yes, ma'am.

22  Q.   Okay.  And was that consistent with what her mother had

23  told you?

24  A.   Yes, ma'am.

25  Q.   And was that the week of November 14th?

B.R. v. F.C.S.B.

69

1   A.    Yes, ma'am.

2   Q.    That's November 14, 2011?

3   A.    Yes, ma'am.

4   Q.    And did she tell you whether she and C.K. had ever been

5   friends before that?

6   A.    I just recall her saying she met him through someone

7   else.

8   Q.    Okay.  And -- all right.  Did she tell you whether the --

9   the time of day that the incident had occurred?

10  A.    About 4:15 in the afternoon.

11  Q.    Okay.  Did she tell you where she had been coming from?

12  A.    She said she was coming from school.

13  Q.    And had she -- was she coming off the school bus?

14  A.    She was coming off the late bus, yes.

15  Q.    What's the late bus?

16  A.    The schools provided for students who had to stay after

17  for extra instruction the opportunity to take a school bus

18  home.  It's just not the regular route at release time.

19  Q.    Okay.  And then did she describe to you what had happened

20  in that incident?

21  A.    Yes, ma'am.

22  Q.    Okay.  What did she tell you had happened?

23  A.    She stated as she was getting off the late bus, walking,

24  she saw C.K. approach her and eventually knocks her binder out

25  of her hand or a book out of her hand.  As she bends down to

B.R. v. F.C.S.B.

70

1   pick the book up, he pushes her over.  She says that she

2   struggled to get away, and she's trying to get away from him.

3   He grabs her by her ankle to which she can't get away from

4   him, and pushes her on the ground and pins her to the ground.

5   She described him pinning her hands behind her back, laying

6   his body across her body, while lifting up her shirt and

7   fondling her breast.

8            Eventually, still pinning her arms underneath her

9   body with his body, he slides down and is able to pull her

10  pants down, where he digitally penetrates her with her [sic]

11  fingers, holding her with one arm, penetrating her with

12  another arm.  She continued to say that he eventually turns

13  her over on her side, still pinning her arms underneath her

14  with one arm, pulls her pants down, and anally penetrates her

15  with his penis.

16           She eventually states she's able to get up.  I know

17  at some point he tries to -- I can't quite remember that, but

18  anyway, she eventually is able to get up.  He walks away,

19  calls her a loser and tells her she has to give him $50; if

20  she didn't give him the $50, he was going to kill her; if she

21  didn't -- if she told someone, that he was going to kill her

22  worse and her family.  And then he walks away.

23  Q.   Okay.  And did she tell you whether she gave him the $50?

24  A.   She did not give him the $50 at that point.  She gave it

25  to him later.

B.R. v. F.C.S.B.

71

1  Q.   Okay.  Did she tell you when she gave him the $50?

2  A.   A day or so later.

3  Q.   Okay.  And did she tell you where she gave him the $50?

4  A.   It was after school.  So somewhere in the neighborhood.

5  Q.   Okay.  And did she tell you whether she had an

6  understanding as to why he needed the $50?

7  A.   There was something about a skateboard that he -- I guess

8  lost or was responsible for losing of another child, so he

9  needed to pay for the skateboard.

10 Q.   Okay.  And then did she tell you whether she had a -- she

11 had been Facebook friends with C.K. before this incident?

12 A.   I don't recall.

13         MS. REWARI:  Your Honor, if I may approach the

14 witness with a document?

15         THE COURT:  Is it already in?

16         MS. REWARI:  No.  I just want to refresh his

17 recollection.  He said he did not recall.

18         THE COURT:  You may approach.

19         MS. REWARI:  Thank you.

20         MR. BRENNER:  Can I just inquire as to what the

21 witness is being shown?

22         MS. REWARI:  Sure.

23         (Counsel confers.)

24 BY MS. REWARI:

25 Q.   Sir, I'm going to ask you to look at some pages in this

B.R. v. F.C.S.B.

72

1   document and read them to yourself.

2   A.   Okay.

3   Q.   And see if that can help refresh your recollection.

4   A.   Okay.

5   Q.   Could you please take a look at page 33 and 34, and the

6   numbers are in the top corners.

7             (A pause in the proceedings.)

8             THE WITNESS:  Okay.

9             THE COURT:  He looked at the document.

10            MS. REWARI:  Thank you.

11   BY MS. REWARI:

12   Q.   And do you recall whether she told you whether she had

13   any kind of a Facebook connection with C.K. before this

14   incident?

15   A.   She just said he friended her, I guess sent her a friend

16   request, but she didn't accept it.

17   Q.   Okay.  Did she tell you whether they -- they exchanged

18   phone calls or text messages before this incident?

19   A.   She said that he had -- he had gotten her phone number

20   from someone else, but she didn't give it to him directly --

21   and sent her text messages.

22   Q.   Did she say whether she had ever texted him back?

23   A.   No, ma'am.

24   Q.   Okay.  And did she tell you whether her phone had ever

25   called his phone?

─────── B.R. v. F.C.S.B. ───────

73

1  A.   I don't recall her --

2  Q.   All right.  Would you please in that document take a look

3  at page 32 and -- 31 and 32 and let me know when you're

4  finished.

5            (A pause in the proceedings.)

6            THE WITNESS:  Okay.

7  BY MS. REWARI:

8  Q.   Do you recall whether she told you if her phone had ever

9  dialed his phone?

10  A.   Yes.  She said it had accidentally dialed his number

11  while it was in her pocket.

12  Q.   Did she tell you whether that happened more than once?

13  A.   The comment was it's happened more than once, yes.

14  Q.   But the -- from what she told you, was it that it was

15  just a pocket dial, no conversation?

16  A.   Yes, ma'am.

17  Q.   Okay.  Did she tell you about a voicemail that he had

18  left on her phone?

19  A.   Yes, ma'am.

20  Q.   Okay.  Did she tell you whether that was -- voicemail was

21  before or after the alleged assault?

22  A.   I think it was after the assault.

23  Q.   Okay.  And did she tell you whether she had heard it

24  herself or someone else had heard it?

25  A.   Her mom had heard it because she saved the message on the

─────────── B.R. v. F.C.S.B. ───────────

74

1    phone.

2    Q.    Okay.  And did anyone ever play that voicemail for you?

3    A.    No, ma'am.

4    Q.    All right.  Did she tell you whether C.K. had come to her

5    locker at school?

6    A.    Yes, ma'am.

7    Q.    Did she tell you when that started?

8    A.    After the incident, she said he would come to her locker.

9    Q.    Okay.  And did she tell you whether her parents went to

10   the school about him coming to her locker?

11   A.    Yes, ma'am.

12   Q.    Okay.  And did she tell you what the school did about

13   that?

14   A.    Told him to stay away from her.

15   Q.    And did she tell you whether he had talked to anybody --

16   any administrators at the school?

17   A.    I think Ms. T█████.

18   Q.    Okay.  Did she tell you whether C.K. had respected that

19   after Ms. T█████ talked to him?

20   A.    Yes, ma'am.  She said he stayed away from her.

21   Q.    Okay.  Did she talk to you also about a student named

22   David?

23   A.    Yes, ma'am.

24   Q.    Okay.  And did she tell you whether -- what did she tell

25   you about David?

B.R. v. F.C.S.B.

75

1   A.   David was a friend of hers.  She said that David would

2   have categorized their relationship as being boyfriend and

3   girlfriend, but he was just a friend to her.

4   Q.   Did she tell you whether something had happened with

5   David in his basement?

6   A.   Yes, ma'am.

7   Q.   What did she tell you about that?

8   A.   She said David tried kissing her and tried touching her,

9   but she told him that was outside of her comfort zone.

10  Q.   Did she tell you whether he respected that?

11  A.   Yes, ma'am.  He did.

12  Q.   Did she tell you whether he had touched her?

13  A.   She said he tried to touch her, yes.

14  Q.   Did she tell you whether he started coming to her locker?

15  A.   I don't recall about David coming to a locker.

16  Q.   Okay.  Again, if you please take a look at page 37 and 38

17  in the exhibit before you.  And just look -- let me know when

18  you're finished looking at it.

19          MR. BRENNER:  Did you say 37, 38?

20          MS. REWARI:  Correct.

21          THE WITNESS:  Okay.

22  BY MS. REWARI:

23  Q.   Do you recall whether she told you whether David had come

24  to her locker at school?

25  A.   Yes, ma'am.

B.R. v. F.C.S.B.

76

1  Q.   And did she tell you whether he had ever touched her when

2  he came to the locker at school?

3  A.   He said him and C██████ -- sorry -- him and C.K. would

4  come and intimidate her at the locker.

5  Q.   Okay.  Did she tell you whether there was any touching?

6  A.   No, ma'am.

7  Q.   Okay.

8  A.   No.  I don't recall any touching.

9  Q.   Okay.  Did she describe to you any boys putting their

10 hands down her pants at school?

11 A.   She described them trying to, yes.

12 Q.   Okay.  But did she tell you that somebody had actually

13 put their hands down her pants?

14 A.   I don't recall that.

15 Q.   Okay.  Did she tell you about some rumors about her that

16 were going around the school?

17 A.   Yes, ma'am.

18 Q.   Did she tell you when those rumors started?

19 A.   After the incident.

20 Q.   And when you say "the incident," are you talking about

21 the assault in her neighborhood?

22 A.   Yes, ma'am.

23 Q.   At the bus stop?

24 A.   Yes, ma'am.

25 Q.   Okay.  And that was the week of November 14th?

─B.R. v. F.C.S.B.─

77

1    A.    Yes, ma'am.

2    Q.    Did she tell you where she had gotten the $50 that she

3    gave to C.K.?

4    A.    Yes, ma'am.

5    Q.    What did she tell you about that?

6    A.    That she worked for her father to earn the money.

7    Q.    Okay.  And did she tell you whether she had told her

8    mother that she had given C.K. the $50?

9    A.    She did not tell her mother.

10   Q.    Okay.  And did she tell you whether the $50 was

11   eventually returned to her?

12   A.    Yes, ma'am.

13   Q.    And what do you recall about that?

14   A.    I recall that the $50 was returned to Ms. T████, who in

15   turn, called her mother and gave the money back to her mother.

16   Q.    Okay.  Did she tell you what her mother's reaction was

17   from getting the $50 back from Ms. T████?

18   A.    I don't recall the reaction.

19   Q.    Okay.  Would you please take a look at page 51 and 52 in

20   the document in front of you, and just let me know when you're

21   done.

22              (A pause in the proceedings.)

23              THE WITNESS:  Okay.

24   BY MS. REWARI:

25   Q.    Okay.  So do you recall -- well, do you recall what --

─B.R. v. F.C.S.B.─

78

1   whether she told you what her mom's reaction was to getting

2   the $50 back from Ms. T⬛⬛⬛?

3   A.   Her mom didn't know that she had gave the $50, so she was

4   shocked to get the money back.

5   Q.   Okay.  Did she tell you whether she continued to stay

6   after school after this incident?

7   A.   Yes, ma'am.

8   Q.   And what did she tell you?

9   A.   That she'd stayed after before on another day.

10  Q.   Okay.  And did she tell you whether she stayed after

11  again after this incident?

12  A.   Yes, ma'am.

13  Q.   Okay.  And what did she tell you about that?

14  A.   Just that she stayed after school, and after coming home,

15  that was one of the days that she gave him the $50.

16  Q.   Okay.  And then did she also tell you that after all this

17  happened, she stopped staying after school?

18  A.   I don't recall that.

19  Q.   Okay.  Would you take a look at page 56 and 57 of the

20  document in front of you.

21  A.   Okay.

22  Q.   All right.  Do you recall whether she told you that she

23  had stopped staying after school after this?

24  A.   Yes, ma'am.

25  Q.   And what did she say?

B.R. v. F.C.S.B.

79

1   A.   That she was scared after the incident happened, so she

2   didn't stay after anymore.

3   Q.   Okay.  In talking to her, were you able to pin down which

4   day of the week of November 14th this incident at the bus stop

5   had occurred?

6   A.   I think it was a Friday.  I'm not sure.

7   Q.   Okay.  Would you please take a look at page 64 and 60- --

8   I think 64 through 66.

9           (A pause in the proceedings.)

10          THE WITNESS:  Okay.  It was on a Wednesday.

11  BY MS. REWARI:

12  Q.   It was on a Wednesday?

13  A.   Yes, ma'am.

14  Q.   So would that have been Wednesday, November 16th?

15  A.   Yes, ma'am.

16  Q.   Okay.  And then did she tell you whether there had been

17  any problems at school before that incident on Wednesday,

18  November 16th?

19  A.   I don't recall any problems at school beforehand.

20  Q.   Okay.  If you take a look at page 41 of the document in

21  front of you.  Look at line 16 through line 19.  Let me know

22  when you're done.

23  A.   Yes, ma'am.

24  Q.   Okay.  So do you recall what she told you as to when the

25  rumors and problems at school started?

─────B.R. v. F.C.S.B.─────

80

1   A.   The day after the assault, the alleged assault.

2   Q.   Okay.  And did she tell you whether there were any

3   problems at school before that assault on November 16th?

4   A.   No problems before.

5   Q.   Okay.  And do you recall whether you asked her if

6   anything else had happened between her and C.K.?

7   A.   Yes.

8   Q.   Okay.  And did she tell you whether she remembered

9   anything else happening?

10  A.   I don't recall her saying anything else happened.

11  Q.   Okay.  Please take a look at page 31 of the document in

12  front of you.

13             (A pause in the proceedings.)

14             THE WITNESS:  Okay.  I'm ready.

15  BY MS. REWARI:

16  Q.   And do you recall what she said as to whether there

17  had -- anything else had happened between her and C.K.?

18  A.   No, she didn't remember anything else happening.

19  Q.   Okay.  Do you recall whether you asked her whether there

20  was anything else with C.K. or David that her parents didn't

21  know about?

22  A.   I don't recall that.

23  Q.   Okay.  Please take a look at page 85 of the document in

24  front of you.

25             (A pause in the proceedings.)

─B.R. v. F.C.S.B.─

81

1        THE WITNESS:  Okay.

2   BY MS. REWARI:

3   Q.   Okay.  And do you recall whether you asked her if there

4   were any -- there was anything else that happened between her

5   and David and C.K. that her parents didn't know about?

6   A.   Yes, I did ask.

7   Q.   And what did she tell you?

8   A.   The answer was "no."

9   Q.   Okay.  Did you also ask her if she had any other sexual

10  contact with anyone?

11  A.   Yes.

12  Q.   Okay.  And what was her answer?

13  A.   "No."

14  Q.   Did she also -- did she also mention the Jenni-Taylor

15  messages to you?

16  A.   Yes.

17  Q.   Okay.  What did she tell you about that?

18  A.   I don't recall the exact, but she was getting harassing

19  messages from this Jenni-Taylor account.

20  Q.   Okay.  Would you please take a look at page 80 of the

21  document in front of you.  And if you read from page 80 to

22  page 80 -- bottom of page 81, and let me know when you're

23  done.

24  A.   Okay.

25  Q.   And did you recall what she told you about this -- these

─────B. R. v. F.C.S.B.─────

82

1    Jenni-Taylor messages?

2    A.   Yes.  She received calls from other friends who asked her

3    if she knew about this page that was, I guess, having

4    derogatory remarks about her.

5    Q.   Were those other friends Co███████ and Olivia?

6    A.   Yes.

7    Q.   Okay.  And then did she tell you whether she had been on

8    Facebook?

9    A.   She's been on Facebook, yes.

10   Q.   Right.  Did she tell you whether she had been on Facebook

11   recently?

12   A.   I don't recall recently.

13   Q.   Okay.  Please take a look at page 81, lines 15 through

14   18.

15   A.   Okay.

16   Q.   What did she tell you about whether she had been on

17   Facebook.

18   A.   At that time, she said she hadn't been on for a while.

19   Q.   Okay.  Did she -- did she tell you whether she had seen

20   all the messages or only some of the messages from Jenni

21   Taylor?

22   A.   I don't recall how many she saw.

23   Q.   Okay.  Take a look at page 80, line 17 through 18.

24   A.   Okay.

25   Q.   And did she tell you whether she had seen all the

B.R. v. F.C.S.B.

83

1    Jenni-Taylor messages or only some of them?

2    A.    Some of them.

3    Q.    Okay.  And did she tell you why she had only seen some of

4    them?

5    A.    She said they were disturbing.

6    Q.    Did you ask her how many Facebook accounts she has or she

7    had, excuse me?

8    A.    I do remember asking her that, yes.

9    Q.    Okay.  And do you remember her telling you how many

10   Facebook accounts she had?

11   A.    I don't remember the answer.

12   Q.    Okay.  Please take a look at page 83, lines 19 to 25.

13   And, actually, you can continue to read from 83 to 84 to the

14   end of 84.

15            (A pause in the proceedings.)

16            THE WITNESS:  Okay.

17   BY MS. REWARI:

18   Q.    What did she tell you about how many Facebook accounts

19   she had?

20   A.    She's -- she said she had one previously that she

21   deactivated.  So she's had more than one Facebook account.

22   Q.    Okay.  Did she tell you why she deactivated the prior

23   account?

24   A.    She said that C.K. continued to send her friend requests,

25   if she didn't answer, they would keep coming.  So she shut the

—B.R. v. F.C.S.B.—

84

1    account down.

2    Q.    Okay.  Did she tell you whether her parents knew about

3    her Facebook accounts?

4    A.    She said they knew about all of her accounts.

5    Q.    Okay.  Did she also tell you, at another point in your

6    conversation, that her mother had all of her Facebook

7    passwords?

8    A.    Yes.

9              MS. REWARI:  Your Honor, I'm about to switch to

10   another topic.  Would you like to take the morning break now?

11             THE COURT:  Sure.  All right.  Ladies and gentlemen,

12   let's go ahead and take our morning break.  Why don't we come

13   back in at 10 after 12:00, 10 after 12:00.

14             (Jury excused.)

15             THE COURT:  All right.  Thank you, ladies and

16   gentlemen, you may be seated.  We'll see everyone back at

17   12:10.

18             MS. REWARI:  Your Honor.

19             (Recess.)

20             (Court proceedings resumed at 12:20 p.m.)

21             (Jury present.)

22             THE COURT:  You may be seated.  Ladies and

23   gentlemen, for planning purposes, I believe that we're going

24   to get pretty close to being able to hit our mark around 1:00,

25   1:15 for our lunch break.

B.R. v. F.C.S.B.

85

 1              MS. REWARI:  Okay.

 2    BY MS. REWARI:

 3    Q.    Deputy Chambers, before the break, we were talking about

 4    your interview of B.R.  Did you also have a sit-down interview

 5    with B.R.'s mother?

 6    A.    Yes.

 7    Q.    And was that interview also reported?

 8    A.    Yes.

 9    Q.    Okay.  And at the conclusion of that interview, had your

10    understanding about the date of this incident changed?

11    A.    I don't recall the date.

12    Q.    Okay.  It was still one incident?

13    A.    Yes, ma'am.

14    Q.    Okay.  And still the week of November 14th?

15    A.    Yes, ma'am.

16    Q.    Okay.  Did you, then, also interview C.K.?

17    A.    Yes.

18    Q.    Did you also speak to his mother?

19    A.    Yes, ma'am.

20    Q.    Okay.  And from what B.R. told you, did you have an

21    understanding as to why she had stayed after school on

22    November 16th?

23    A.    Yes.

24    Q.    Well, what was the reason?

25    A.    For some math equation help.

B.R. v. F.C.S.B.

86

1  Q.   And did she tell you which teacher she had stayed after

2  school with?

3  A.   Yes, ma'am, Ms. C███.

4  Q.   And so, did you -- even though you had determined it was

5  not a school event, did you, at some point, notify or make the

6  school aware that you were looking into this allegation?

7  A.   Yes, ma'am.

8  Q.   Okay.  And who did you tell at the school?

9  A.   I went to the school, met with the administration, and I

10 eventually spoke with Ms. C███ as well.

11 Q.   And did the administration cooperate fully with your

12 investigation?

13 A.   Yes, ma'am.

14 Q.   Did you speak to other people at the school other than

15 the administration?

16 A.   Ms. C███.

17 Q.   Okay.  And did you -- was everyone at the school

18 cooperative?

19 A.   Yes, ma'am.

20 Q.   Was there anything you asked for that they did not

21 provide to you?

22 A.   No, ma'am.

23 Q.   Okay.  And was your investigation then closed in spring

24 2012?

25 A.   Yes, ma'am.

B.R. v. F.C.S.B.

87

1   Q.   Did you inform B.R.'s mother that you had closed the

2   investigation?

3   A.   Yes, ma'am.

4   Q.   Did you also inform the school that you had closed the

5   investigation?

6   A.   Yes, ma'am.

7            MS. REWARI:  Thank you.  No further questions.

8            THE COURT:  Mr. Kinney?

9            MR. KINNEY:  Nothing from me, Your Honor.

10           THE COURT:  Mr. Blanchard?

11           MR. BLANCHARD:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13  BY MR. BLANCHARD:

14  Q.   Good afternoon, Deputy Chief.

15  A.   Good afternoon, sir.

16           When you started the interview with the plaintiff,

17  did you have a discussion with her about being truthful?

18  A.   Yes, sir.

19  Q.   Can you just generally discuss with the jury what you --

20  what you said in that regard?

21  A.   Yes, sir.

22           So all the interviews that I start, the child

23  interviews, I first introduce myself, explain the room, why

24  I'm there, and what we're there to talk about.  But I also,

25  while building a rapport with the child, just let them know

B.R. v. F.C.S.B.

88

1    they can say anything this the room.  It's safe.  And the

2    biggest -- the No. 1 rule is just to be honest.

3    Q.   And was that something you repeated -- repeated both

4    during and at the end of the interview?

5    A.   Yes, sir.

6    Q.   Okay.  The plaintiff never told you that there was any

7    sexual contact between her and J████, correct?

8    A.   No, sir.

9    Q.   And she never told you there was any sexual assault

10   committed against her by or involving J████?

11   A.   No, sir.

12        THE COURT:  The record is going to read a little

13   strange because there was a double negative in your question,

14   and he tried to follow the double negative.

15        MR. BLANCHARD:  So let me see if I can clear that

16   up.

17   BY MR. BLANCHARD:

18   Q.   Did she ever tell you that she was attacked by two people

19   in a little park near her house?

20   A.   I don't recall that.  No, sir.

21   Q.   Did she ever tell you that J████ participated in a sexual

22   assault against her along with someone else?

23   A.   No, sir.  I don't recall that.

24   Q.   She never told you that she had been sexual assaulted by

25   C.K. or J████ in October -- she did not tell you that,

B.R. v. F.C.S.B.

89

1  correct?

2  A.    No, sir, not in October.

3  Q.    I've done it again.  I'm asking the questions wrong.

4        The first sexual assault, as I understand it, that

5  you were made aware of was the November 16th assault.

6  A.    Yes, sir.

7  Q.    And she did not tell you that she was sexual assaulted by

8  C.K. and J███    in October?

9  A.    No, sir.

10 Q.    And the order of events she described to you was that she

11 had some interaction with David N. in his basement after a

12 pumpkin patch incident; is that correct?

13 A.    Yes, sir, after visiting the pumpkin patch.

14 Q.    And that roughly two weeks later is the sexual assault

15 allegation against C.K.?

16 A.    I'm not sure of the time frame, but it was afterwards.

17 Q.    Okay.  With respect to the incident that she described

18 with C.K. to you, you said it was located near the bus stop?

19 A.    Yes, sir.

20 Q.    And if I said to you that the plaintiff's neighborhood

21 was Middleton Farms, would that refresh your recollection?

22 A.    Yes, sir.

23 Q.    And is the bus stop there located at the interaction of

24 West Ox and Middleton Farms?

25 A.    Yes, sir.

─────────── B.R. v. F.C.S.B. ───────────

90

1   Q.   And did you go look at that scene?

2   A.   Yes, sir.

3   Q.   The area where she described the event with C.K., where

4   was that, as you enter the neighborhood?

5   A.   So as you enter the neighborhood, it was on the right.

6   There's a neighborhood sign, it's a -- a sign with the

7   neighborhood name on it, and it's actually in the yard of the

8   first house.  And she said the incident occurred behind that

9   sign.

10  Q.   So behind the sign that is -- is the order of what's

11  there the sign, the yard, and the side of the house?

12  A.   Yes, sir.  So the house is facing Middleton Farms.  And

13  the sign is on the corner of West Ox and Middleton Farms.  If

14  you can picture -- I guess, it being like on the corner of the

15  yard, per se.

16  Q.   And is the location she described to you visible from the

17  sidewalk?

18  A.   Yes, sir.

19  Q.   As you sit in the juror's chair, can you tell me, looking

20  at that back wall, about how far it would have been from the

21  sidewalk to the area where the plaintiff said this occurred?

22          THE COURT:  Let's correct the record.  You meant to

23  say in the witness chair.  Is that what you meant?

24          MR. BLANCHARD:  Yes, sir.

25          THE WITNESS:  I would say from me and to the

─── B.R. v. F.C.S.B. ───

91

1    stenographer in front of me.

2    BY MR. BLANCHARD:

3    Q.    So the location she described was right off the sidewalk?

4    A.    Yes, sir.

5    Q.    And did she also tell you that there was an eyewitness?

6    A.    She stated that a lady walked by.

7    Q.    And was that a lady walking the dog?

8    A.    Yes, sir.

9    Q.    Did she tell you that, when the lady walked by, that she

10   was struggling with C.K.?

11   A.    Yes, sir.

12   Q.    And that she was screaming at the top of her lungs?

13   A.    I can't remember if she was screaming at that moment, but

14   she did say she was struggling to get away from him.

15   Q.    And do you recall that she told you that she made eye

16   contact with the eyewitness?

17   A.    I don't recall that.

18   Q.    What did she tell you the woman did?

19   A.    She kept walking her dog.

20   Q.    Do you recall her telling you anything about why she

21   thought C.K. may have targeted her?

22   A.    No, sir, I don't remember that.

23   Q.    Do you recall her saying anything about C.K. formally

24   dating J███?

25   A.    Yes, sir.

─────────────── B.R. v. F.C.S.B. ───────────────

92

1   Q.   Do you recall her making any statement about the

2   plaintiff thought she and J███ looked alike?

3   A.   I don't recall that statement.

4   Q.   Okay.

5             MR. BLANCHARD:  One moment, Your Honor.

6             THE COURT:  You may.

7             (A pause in the proceedings.)

8   BY MR. BLANCHARD:

9   Q.   Ms. Rewari asked you about talking about to plaintiff's

10  mother.  Do you recall whether you discussed looking into

11  potentially the origins of -- or the sources of digital

12  communications like Facebook and Google?

13  A.   Did I look into them?

14  Q.   Or discuss that that would be something you may do?

15  A.   Yes, sir.  I did discuss it.

16  Q.   So she was -- at that point in time, when you told her

17  that that might be something that you would be doing, were you

18  still under the impression that B.R. was not Jenni Taylor?

19  A.   I'm not sure I understand your question.

20  Q.   It is bad -- let me break it up.

21            You testified on direct that B.R. told you about the

22  Jenni Taylor account.

23  A.   Yes, sir.

24  Q.   She didn't tell you that she was the person who created

25  that account, did she?

B.R. v. F.C.S.B.

93

1   A.   No, sir.

2   Q.   And when you talked to her mother, her mother didn't tell

3   you after the interview that her daughter was Jenni Taylor?

4   A.   Her mother told me that later.

5   Q.   So at some point later, her mother told you that?

6   A.   Yes, sir.

7   Q.   And she also told you that after you had the discussion

8   with her that you would be looking into the source or origins

9   potentially of all Facebook and digital communications to

10  track the location?

11  A.   Yes, sir.  I explained to her the process that I would

12  have to go through to get that information.

13  Q.   And you told her that, by getting that information, you

14  can -- potentially identify the URL or location of where the

15  message was sent from?

16  A.   Yes, sir.

17  Q.   And it was after that that the plaintiff's mother told

18  you -- sometime after that that your plaintiff's mother told

19  you that her daughter was Jenni Taylor?

20  A.   Yes, sir.

21           MR. BLANCHARD:  I don't have any other questions.

22           THE COURT:  Before you start, Mr. Brenner.  Ladies

23  and gentlemen, again, if you have a cell phone, please secure

24  it or put it on vibrate.  As a courtesy, the Court has entered

25  an order allowing people associated with this case to bring in

B.R. v. F.C.S.B.

94

1   cell phones and electronic equipment.  Please don't cause me

2   to rescind that order.

3           As Mr. Brenner takes his cell phone and turns it

4   off.

5           MR. BRENNER:  Is that me, Judge?  No, I didn't.

6   Mine has been on silent.

7           May I proceed, Your Honor?

8           THE COURT:  You may.

9                   CROSS-EXAMINATION

10  BY MR. BRENNER:

11  Q.   Good afternoon, Deputy Chief Chambers.  How are you

12  today?

13  A.   Good, sir.  Thank you.

14  Q.   I'm going to be really quick.  Okay.

15  A.   All right.  I appreciate it.

16  Q.   No worries.  I knew that wouldn't break your heart.

17          I'm just going to jump around to a couple of areas,

18  so I'll make sure you know where I'm at.

19          I was just curious, when you started, you said, your

20  stint as an SRO, was there a time when you were doing Franklin

21  and Rachel Carson at the same time, and then Franklin got its

22  own one and you were strictly Rachel Carson?

23  A.   Yes, sir.  That's correct.

24  Q.   And you talked about this a little bit.  I think you knew

25  some administrators there, right?

─────B.R. v. F.C.S.B.─────

95

1   A.   Yes.

2   Q.   Mr. F████, you knew?

3   A.   Yes, sir.

4   Q.   Ms. T███, is that how you referred to her?

5   A.   Yes.

6   Q.   Okay.  So let me ask you just a couple of questions about

7   the facility.  I think you called it the Child Help facility?

8   A.   Yes, sir.

9   Q.   And the Child Help facility actually served -- serves at

10  the time -- served two roles sort of auxiliary to the police

11  department, right; they were a place to do the interviews?

12  A.   Yes, sir.

13  Q.   And you showed her an interview room, and I think you

14  were saying there were several different interview rooms,

15  depending on the circumstances or the age of the child?

16  A.   Yes, sir.

17  Q.   And the other thing that was done -- or one of the other

18  things, I should say, done at Child Help were SANE

19  examinations, right?

20  A.   Yes, sir.

21  Q.   And that was -- so the reason the family found themselves

22  at the Child Help facility is that you told them to meet you

23  there, right?

24  A.   Yes, sir.

25  Q.   And that's just the facility that the county used --

─B.R. v. F.C.S.B.─

96

1   entrusted to do this type of thing?

2   A.   Yes, sir.

3   Q.   So I just wanted to go and talk to you, really generally

4   about -- not even about your interviews in this case.  Just

5   generally, you talked about your training and your experience

6   in interviewing, and I just wanted to get some concepts out

7   there to make sure that I understand them.  Just again, not

8   having to do with my client.

9        I should have introduced myself.  I'm sorry.  My

10  name is Andrew Brenner, and I represent B███ in this case.

11  Okay.

12  A.   Okay.

13  Q.   That was rude of me, I apologize.

14  A.   No problem.

15  Q.   There's -- as a general matter, when you're dealing with

16  alleged victims of childhood sexual assault, there's nothing

17  out of the ordinary for them to delay reporting of the crimes

18  against them, right?

19  A.   That's correct.

20  Q.   There's a concept called "partial disclosure" that you're

21  familiar with?

22  A.   Yes, sir.

23  Q.   Right.  It is not uncommon for childhood sexual assault

24  victims to not give, for example, a detective the whole story

25  of their abuse the first time?

——B.R. v. F.C.S.B.——

97

1    A.   Yes, sir.

2    Q.   Right.  Sometimes they don't give the full story because

3    of fear, right?

4    A.   Okay.

5    Q.   And sometimes maybe they are just not comfortable in the

6    interview?

7    A.   Okay.

8    Q.   And sometimes they are just -- they are just not ready

9    to.

10            MR. BLANCHARD:  Your Honor, there's no foundation in

11   terms of his questioning.  I think it goes beyond the scope.

12            THE COURT:  Overruled.

13   BY MR. BRENNER:

14   Q.   And sometimes they're just -- for whatever reason, they

15   are just not ready to fully disclose?

16   A.   Yes, sir.

17   Q.   Okay.  Sometimes, again, just generally, in your training

18   and experience that you talked about, sometimes childhood

19   sexual assault victims can become re-traumatized just by the

20   interview itself?

21   A.   Yes, sir.

22   Q.   And they can shut down?

23   A.   Yes, sir.

24   Q.   Right?

25            MR. BRENNER:  May I consult with my colleagues?

─────────B. R. v. F.C.S.B.─────────

98

1                    (Counsel confers.)

2                    MR. BRENNER:  That's all I have.  Thank you.

3                    THE COURT:  Thank you.  Ms. Rewari.

4                    MS. REWARI:  Nothing from me, Your Honor.

5                    THE COURT:  All right.

6                    MR. BLANCHARD:  I have some questions.

7                    THE COURT:  Yes.  One.

8                         REDIRECT EXAMINATION

9    BY MR. BLANCHARD:

10   Q.   During your interview of B.R., did she shut down?

11   A.   No, sir.

12                   MR. BLANCHARD:  Thank you.

13                   THE COURT:  Is the deputy chief subject to recall?

14                   MR. BRENNER:  Not from the plaintiff, Your Honor.

15                   MS. REWARI:  Not from us.

16                   THE COURT:  All right.  You may step down, sir.

17   Please don't discuss the case or any aspect of the case with

18   anyone while the case is pending.

19                   Congratulations on the promotion.

20                   THE WITNESS:  Thank you, sir.  I appreciate it.

21                   (Witness excused.)

22                   THE COURT:  Next witness.

23                   MR. BATES:  Your Honor, we have one long witness and

24   one short witness.

25                   THE COURT:  Let's do the short one.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

99

1         MR. BATES:  Well, the short witness, things have

2    been a lot more efficient than we thought we would this

3    morning.  So, I would either propose that we start the long

4    witness now or have our lunch, start our lunch break and our

5    short witness will be here.

6         THE COURT:  Let's do the long witness as much as we

7    can.

8         MR. BATES:  Okay.  Thank you, Your Honor.

9         THE COURT:  Uh-huh.  Who is it?

10         MR. BATES:  The defendants would call P███ H█████.

11         THE COURT:  Come on up, sir.

12         MS. ANDERSON:  Your Honor, this -- since we're

13    switching order, could we just have two minutes to grab some

14    binders, please.

15         THE COURT:  Yeah.  Absolutely.

16    (P██████ A█████ H█████, Defendants' witness, sworn.)

17         (Witness seated.)

18         THE COURT:  Sir, you've been in the courtroom a good

19    long time, so you've heard it said to other witnesses, if the

20    attorneys object or if the Court is speaking, please hesitate

21    before providing your answer.

22         THE WITNESS:  Yes, sir.

23                    DIRECT EXAMINATION

24    BY MS. REWARI:

25    Q.   Good afternoon.

─────────────── B.R. v. F.C.S.B. ───────────────

                                                              100

1    A.    Good afternoon.

2    Q.    Would you please tell the jury your name.

3    A.    P███████ A██████ H█████.

4    Q.    Mr. H█████, are you a defendant in this lawsuit?

5    A.    I am.

6    Q.    Where were you employed in 2011 to 2012?

7    A.    Fairfax County Public Schools.

8    Q.    And let's talk a little bit about your educational

9    background.

10           Where did you receive your undergraduate degree?

11   A.    Through Frostburg State University.  And I had a bachelor

12   in science, next I went to George Mason where I received my

13   educational leadership degree, my masters.

14   Q.    Okay.  And what year was that?

15   A.    Oh.  I think it was 2009.  2008.  Somewhere in that

16   general ballpark, I apologize.

17   Q.    Okay.  Let's walk through the positions you've held.

18   Where was your first job as an educator?

19   A.    I taught elementary school at a school named Jermantown

20   Elementary that changed to Providence Elementary.  So I worked

21   there for roughly six years.  And then I had the great

22   opportunity to switch to middle school and go to Rachel Carson

23   Middle School as the department chair for physical education.

24   Q.    Okay.  And what year was that that you came to Rachel

25   Carson?

B.R. v. F.C.S.B.

101

1   A.   2004, I believe.

2   Q.   Okay.  And at some point, did you become assistant

3   principal at Rachel Carson?

4   A.   I did.  2011, I became assistant principal.  2010, I

5   transitioned into a staff development position, and then 2011

6   assistant principal.

7   Q.   Okay.  And can you just explain what a staff development

8   position means?

9   A.   Mr. F█████ was -- we were growing in population.  So we

10  were at a place where, in Fairfax County, we weren't truly

11  staffed at that time for an exposition, but he was able to

12  move staffing around so that I can move into a position to be

13  able to support the school.  A lot of it was more of an

14  instructional standpoint.  But then be able to support with

15  certain items until I was able to move into a full position

16  when it was the next year in 2011.

17  Q.   Okay.  And then how long were you the assistant principal

18  at Rachel Carson?

19  A.   I believe I stayed there from 2011 to roughly 2016, '17.

20  Q.   Okay.  And then?

21  A.   '18, actually, I apologize.  2018, yes, ma'am.

22  Q.   Okay.  And where did you go from there?

23  A.   I was able to switch over to assistant principal at Stone

24  Middle School to work with Emilia Mitchell (ph).

25  Q.   Okay.  And how long were you at Stone?

B.R. v. F.C.S.B.

1  A.    Roughly three to four years.

2  Q.    Also that's a Fairfax County school?

3  A.    It is.

4  Q.    Okay.  And where are you an assistant principal now?

5  A.    I went from Stone Middle School to Frost Middle School to

6  be able to do the renovation project there.  So they actually

7  called me and asked me if I could come to Frost to be able to

8  work on the renovation project at that school.  So I've been

9  at Frost Middle School since then.

10 Q.    So have you been at Fairfax County Public Schools for

11 your entire career as an educator?

12 A.    I have since 1998.

13 Q.    And can you just tell the jury briefly why you chose to

14 become an educator?

15 A.    It's a long story.  My mom was an instructional assistant

16 in kindergarten for 24 years.  So, I think you've heard in

17 other people's testimonies about their parents being

18 educators, but I can remember cutting lamination as a little

19 kid, and just going in to help my mom set up wigwams and, you

20 name it.  Whatever is needed for kids.

21        But school and I, we were not friends.  So I

22 struggled.  I remember in third grade I had a reading

23 specialist that told me that I wasn't going to make it out of

24 high school.  But I think that the reason why I became an

25 educator, not to focus on the negative, was there was so many

B.R. v. F.C.S.B.

103

1    people -- if I get choked up, I apologize -- so many people

2    along the way that supported me.  And in high school we had a

3    Spanish teacher, we had to call her bruha, which is "the

4    witch," but she found the best in us and pushed us to do

5    things.  And a coach in football -- excuse me.

6              THE COURT:  Let him take a minute.  Let him take a

7    moment.

8              THE WITNESS:  A coach in football that really found

9    the inner things in people.  So going to college and being

10   able to come back and give back to that was just something

11   that I wanted to do.

12   BY MS. REWARI:

13   Q.   And where was your mom an instructional assistant?

14   A.   Fox Mill Elementary.  Fox Mill Elementary, which was a

15   school that actually fed Rachel Carson.

16   Q.   And did you go to the Fairfax County Public Schools for

17   your education?

18   A.    I did.  I went to Fox Mill, Franklin, and Oakton High

19   School, which is home of the Panthers.  The Cougars, I almost

20   changed up on me.  I've been to so many schools now.  Excuse

21   me.

22   Q.   All right.  Why did you choose to get into

23   administration?

24   A.   Susie Cane (ph), who was my first principal, she started

25   pushing me in the direction when we were going through the

─────B.R. v. F.C.S.B.─────

104

1  renovation project from it being Jermantown to Providence, it

2  was a very small school, and she allowed for me to take on a

3  lot of the administrative tasks as a first-year teacher, and

4  then through that -- that -- that time that I was there.  So

5  she really pushed me to do those types of things, and whether

6  that would be the safety drills or from that standpoint, but I

7  was the lead teacher that worked on the construction phase

8  there.  And then I was a coach at Oakton High School, and

9  ended up becoming the head coach there.  I think it was just

10 one of those things where I felt that if I was going to be on

11 the bus, I wanted to be helped driving it.  So that was -- one

12 of the directions -- when I moved to Rachel Carson, you've

13 heard a lot of different testimony about that building, but

14 one of the great things about that building was Mr. F█████

15 and the rest of the leadership team gave us an opportunity to

16 move in directions and take chances in areas that might not

17 have been something you're used to.  So I really started

18 taking on an instructional lens there, and I was allowed to do

19 that.  So from there, I went into my administrative

20 endorsement.

21 Q.   Okay.  As an educator, how do you build trust with

22 students?

23 A.   Lots of different ways.  I think that one of the biggest

24 things is being able to tell them that you're sorry -- that

25 you've made a mis- -- that you see different sides from their

B.R. v. F.C.S.B.

105

1   perspective.  I think that the biggest thing is being present.

2   I'm a visible person.  I'm not in my office much.  Still until

3   this day.  When I was at Carson the same way.  So being

4   around, being silly.  Going to their games.  So I was a coach,

5   a part of the reason why I'm where I am today is because of

6   the coaches.  They taught me work ethic and drive.  So I

7   believed that I -- in order to be able to have difficult

8   conversations with those students, I needed to share that with

9   them.  So I was at their games or whatever.  At school we --

10  all the pencil sharpeners were breaking, and the teachers were

11  going crazy and Mr. F███████ ordered electric pencil

12  sharpeners for everyone and a costume for me.  So I was

13  delivering pencil sharpeners dressed up as a giant pencil.

14          I had been slimed, I've been pied, you name it, you

15  just do it.  And I think I learned a lot of that in my

16  elementary roots, because you just really needed to build that

17  trust with those kids and you needed them to feel that ability

18  to come to you for anything.

19  Q.   Okay.  And for the sake of the court reporter, I'm just

20  going to ask -- she hasn't said anything, but I think you're

21  talking faster than we're used to, so if you could just slow

22  down a little bit.

23  A.   I will slow down, I apologize.

24  Q.   And she's excellent.  So I'm -- I'm jumping in here

25  because you're talking at a pace that's --

                                        Direct - P.H.

───────────B.R. v. F.C.S.B.───────────

                                                                106

1           THE COURT:  Tonia gets lots of compliments all the

2  time, she doesn't need anymore.

3           THE WITNESS:  I did not say that.  I would give you

4  a compliment.

5  BY MS. REWARI:

6  Q.   You said you were a coach.  Were you a -- at Oakton high

7  school.

8  A.   I coached track and field, indoor and outdoor at Oakton

9  High School and at Thomas Jefferson.

10 Q.   Okay.  And so, was that in supplement to your work at the

11 middle schools that we talked about?

12 A.   Correct.  I never believed in working and coaching in the

13 same building, because I really wanted to show that first, my

14 school came first, so, yes, it was extra.  So when I was at

15 Providence Elementary, I was coaching at Oakton High School,

16 and then at the beginning of my career at Carson, I was

17 coaching Oakton and then transitioned to Thomas Jefferson High

18 School.

19 Q.   And so, does Rachel Carson feed students into Oakton High

20 School?

21 A.   Correct.  And that was one of the reasons why I wanted to

22 apply to the position at Rachel Carson.

23 Q.   Okay.  And does Rachel Carson also sometimes feed

24 students to Thomas Jefferson High School?

25 A.   It does.  It depends how many students would go through

───────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438───────────────

—B.R. v. F.C.S.B.—

107

1    that process and go there, but it was not what we would

2    consider to be one of our direct feeders.

3    Q.   When you say "go through the process," are you talking

4    about the application process?

5    A.   Yes, ma'am.

6    Q.   What is the most -- and you've touched on this.

7            What is the most challenging part about -- of your

8    job as a middle school administrator?

9    A.   I would say -- everyone is going to say this, but

10   balance.  I mean, we would come in, and I really believe in

11   paper during the day -- I mean, people during the day, paper

12   at night.  So a lot of the challenges comes down to the

13   effects on -- for my own family.  You know, during the day,

14   I'm visible; I'm going around, working with students, staff;

15   getting into classrooms.  And then really triaging my email

16   and those types of things, more during downtime.  But in order

17   to do that effectively, it takes a toll on all of us and the

18   team that's there.

19           But we were told a lot at Carson that we're not on a

20   teacher contract when you're an administrator.  And it was

21   kind of a joke, but it was the truth, and we were there late

22   and we did different things, but because of that, there was a

23   lot of great things that were going on.  So you had to put in

24   the work to see the outcomes.

25   Q.   And when you say, "not on a teacher contract," what's the

B.R. v. F.C.S.B.

108

1   difference between a teacher contract and an administrator

2   contract, to your understanding?

3   A.   You do it until the job is done and sometimes that's

4   weekends, football games, whatever is needed.  If a local

5   high school that we feed needs extra help, you're there.  If

6   we're doing a pilot program or things, that we're putting in

7   that extra time to do that because that's -- that's part of

8   that community.  That's how Carson was.

9   Q.   And during your time at Carson, were there pilot programs

10  for the county that were -- for the county public schools that

11  were started at Rachel Carson?

12  A.   Yes, ma'am.  Endless.  One of the reasons why I stayed

13  there -- you know, I had an opportunity to go to other

14  schools -- was because I was able to professionally grow

15  through the projects and things that we were doing there.  I

16  believe actually the connective learning team, which we

17  were -- we are now what they call one-to-one, especially

18  through the pandemic, but originally the connective learning

19  team was the Explorers and an 8th grade team as well.  We were

20  the POG, which is the Portrait of a Graduate skills, which is

21  now leading the way through Fairfax County, which was back

22  then were the four C's, which is really looking at the

23  different approach to learning opposed to just rote learning.

24          We were also a -- the school that started piloting

25  the Bring Your Own Device to school.  So that year, actually

————B.R. v. F.C.S.B.————

109

1   2011 -- I think 2010 the start of that, but 2011 was students

2   were able to bring their own device to school to be able to

3   increase the instructional environment when a teacher deemed

4   the need with that.  So we had to work with our teachers of --

5   what would that look like in the classroom, what are some of

6   the safety things we would put in place, but how could we use

7   that to enhance instruction.

8   Q.   Okay.  And when you're at Rachel Carson, were you the

9   administrator that was in charge of building-related matters

10  there?

11  A.   Well, we worked collaboratively; but, yes, I was the

12  administrator that worked with my amazing custodians and

13  building supervisor and building engineer as well as looking

14  at safety and security means when it came to tornado drills --

15          (Court reporter clarification.)

16  A.   -- fire drills, evacuation drills, lock-down drills --

17  the -- any of the safety and security drills.

18          I apologize.  Usually I don't talk fast, but, you

19  know, I'm a talker.  I apologize.

20  Q.   Okay.  I may interrupt you at points.

21  A.   Yes, ma'am.

22  Q.   You said building supervisor.  What's a building

23  supervisor?

24  A.   That was the head custodian.

25  Q.   Okay.  And building engineer?

B.R. v. F.C.S.B.

110

1  A.   So not every middle school, most middle schools, though,

2  have a building engineer that's assigned to work with HVAC,

3  the electrical, just the infrastructure of the building

4  outside of cleaning it.

5  Q.   Did you have any background experience in sort of

6  building -- these building-related matters before you came to

7  Rachel Carson?

8  A.   Growing up, I always worked construction and those types

9  of jobs, so I don't have anything that was a license or

10 things, from that standpoint, but I've always worked in that

11 field.  And when I was at my elementary school, I worked with

12 Falls Church Construction on the entire renovation project for

13 the elementary school.  So I had a background in that area.

14        I actually asked Mr. F██████ if I can work with the

15 custodians because they were such an amazing group.  It was

16 just pride to be able to help them continue the work that they

17 were doing.

18 Q.   Okay.  Let's talk about the layout of the building at

19 Rachel Carson and how it relates to student safety at the

20 school.

21 A.   Sure.

22        MS. REWARI:  Your Honor, if we can publish

23 Defendants' Exhibit 61?  This is the school maps.

24        THE COURT:  You may.

25        (Exhibit published.)

————— B. R. v. F.C.S.B. —————

111

1   BY MS. REWARI:

2   Q.   Can we first just go to the last page of this exhibit.

3   Can you explain what this photograph -- or this, not

4   photograph, but layout shows, this design?

5   A.   Sure.  This is just the entire grounds with the building,

6   and you can see the fields in the back as well as you can --

7   like, basically the tree line.  There's one entrance that

8   comes in for our bus lanes as well as kiss and ride, as well

9   as you can see our building.

10  Q.   Okay.  And can you just explain to the jury some of the

11  things that make this layout of this school unique or

12  different than other middle schools?

13  A.   Well, in 2011, to the right of this pink line, was just

14  fields.  So I don't know if you want -- over here was just --

15  was grass and fields, but there was a chain-link fence, as you

16  can see, that surrounded the building all the way around.  And

17  then there was just one way in and out.

18          So, as I stood here, almost -- right above there in

19  the mornings for kiss and ride, I was able to view the only

20  entrance in and out for the students as they were being

21  dropped off by cars and we had about 35 to 43 busses -- it

22  changed year to year -- that would pull into this area here.

23  So it really allowed for us in the morning and in the

24  afternoon to have a great scope of what was going on in front

25  of our building.  As well as, if a parent -- because since we

─B.R. v. F.C.S.B.─

112

1  were an AA center, we had lot of students that were coming to

2  our school that were from multiple other schools because they

3  applied to be in the AA program.

4          So because of that, a lot of them took kiss and

5  ride.  So sometimes -- it was really rare -- a parent might

6  try to drop their student off instead of bringing them through

7  kiss and ride like this.  And so I would be able to, then, see

8  the student walking down and be able to talk with them and

9  then call their parent to let them know that they have to keep

10  their student all the way in the car through kiss and ride.

11  So that wasn't something that was permitted.  It gave us a

12  great ability to be able to see all aspects of the front of

13  the building.

14  Q.   And you said "AA center," is that advanced academic

15  center?

16  A.   Yes.

17  Q.   Was that like a magnet program?

18  A.   Students in elementary school had to test into the

19  advanced academic center, and then if they were in that

20  program in elementary school, they were able to then track to

21  Rachel Carson as well, but that would have been extra outside

22  of our regular feeder elementary schools, and they would be in

23  the AA program.  Yes, ma'am.

24  Q.   And do you recall whether Rachel Carson had any walkers

25  in the 2011-2012 school year?

B.R. v. F.C.S.B.

113

1    A.    We had no walkers.

2    Q.    When we say "walkers," we're talking about students who

3    walk to school?

4    A.    Yes, ma'am.

5    Q.    And can you also just give a description -- I don't think

6    we've heard this yet -- about sort of what that road is that

7    runs in front of the school and, you know, how that relates to

8    safety at the school?

9    A.    So there was one road that runs right in front.  This is

10   actually a private school on the other side.  There were no

11   sidewalks along this area here.  There's a gas station a

12   little further over in this area here, further down, and

13   between the gas station, the sidewalk stops and then it does

14   not connect.  And so there was no sidewalk along that area.

15   So there was no way for any walkers to go.  They would have to

16   cross a fairly busy intersection.

17   Q.    And in your responsibilities as an assistant principal at

18   the school, did the safety and security plans that you made

19   take into account the logistics and layout of the school?

20   A.    Yes, ma'am.

21   Q.    Okay.  And did you also take into account the logistics

22   and layout of where the school was relative to a surrounding

23   community?

24   A.    Yes, ma'am.

25   Q.    How many -- can you just talk about how access to the

B.R. v. F.C.S.B.

114

1    school was regulated in order to serve student safety and

2    security?

3    A.   Well, in the morning, students -- it's kind of hard to

4    see right here, but this would be where Door 1 would be.  So

5    the primary entrance into the building would have been right

6    about here.  And then if they were coming into the building to

7    be able to have breakfast, they would come into the cafeteria

8    where it was staffed with three adults, but it allowed for us

9    to be able to see the students coming in.  In the afternoon,

10   students would come out this -- this door here or this door

11   here to be able to --

12   Q.   Can I just pause you for a moment at the first page of

13   this document because now we're looking at -- I think you're

14   talking about the building itself.

15   A.   Yes, ma'am.

16   Q.   All right.  Please go ahead.

17   A.   So in the morning, this would be the primary entrance

18   they would go in.  They would come into the cafeteria for

19   breakfast, and then the afternoon, they would be able to --

20   they would come out this door here or back out Door 1 to be

21   able to monitor them coming in and out.  As well as in the

22   afternoon, we had walking paths for them to be able -- escort

23   coming out of the building, that way we wouldn't have a lot of

24   students that were coming into one area.

25            So an example would be this is the 8th grade pod

B.R. v. F.C.S.B.

115

1   that's up -- this is on the first floor -- well, we would

2   just -- if this is the first floor here, these students would

3   have to leave and come this direction to make sure that they

4   wouldn't be able to go throughout the entire building, and we

5   would have a large group just making their way -- getting

6   stuck down by the library.

7           The only students that really would come this

8   direction was if they had to come to get an instrument or

9   something along the lines of that.  We really -- we had these

10  set up at the beginning of the year, these walking patterns,

11  so they can make sure that they were exiting the building in a

12  safer manner.

13  Q.   Okay.  And when we look at some pictures of the school,

14  I'm going to ask you a little bit more about that.

15          But during your time there, how did visitors enter

16  the school during school hours?

17  A.   They all had to come in through Door 1 and there was a

18  scanning system that's there.  So if it was a Fairfax County

19  visitor, they might have a prox badge that they would scan and

20  come into the main office.  If not, they would have to -- it

21  was a video surveillance system that they would have to push a

22  button, and it would show their face before they would be able

23  to enter into the building.

24  Q.   Okay.  And was -- were the other doors to the building

25  locked?

B.R. v. F.C.S.B.

116

1   A.   Yes, always.

2   Q.   Always.  Okay.  And for the coming into the building

3   during the after-school program, what were the procedures?

4   A.   The same procedures.  They came in through Door 1, and

5   the after-school specialist actually paid an extra person to

6   be in the office to be able to manage that in case our office

7   staff was in and out.

8   Q.   Okay.  You talked a little bit about the Bring Your Own

9   Device to school program.

10  A.   Yes, ma'am.

11         MS. REWARI:  Your Honor, we would like to show the

12  first minute of the video of Defendants' Exhibit 263, which is

13  about that program because it shows the layout of the school.

14         MS. ANDERSON:  Copy of that?

15         MS. REWARI:  It's Defendants' Exhibit 263.

16         MS. ANDERSON:  Can I pull up the front of it?

17         THE COURT:  Just a moment.  I think she's checking

18  to see if she's got an objection.

19         MS. REWARI:  263.

20         (Counsel confers.)

21         MS. ANDERSON:  Sorry.  But the foundation was that

22  he's seen this?

23         MS. REWARI:  Yes, it is a video provided by the

24  school system regarding Rachel Carson.

25         MS. ANDERSON:  Okay.  No objection.

———B.R. v. F.C.S.B.———

117

1          THE COURT:  Without objection, you may publish one

2     minute.

3          MS. REWARI:  And we'll stop at the 1 minute 3 second

4     mark.  Thank you.

5     (Defendants' Exhibit No. 263 was admitted into evidence.)

6     BY MS. REWARI:

7     Q.   First of all, before we start this video.  Just for

8     context, is this a video that was produced in January 2012?

9     A.   Yes.

10          MS. REWARI:  Okay.  Please go ahead.

11          (Video played.)

12          MS. REWARI:  All right.  Would you just stop it

13     there?

14     BY MS. REWARI:

15     Q.   Is this a video about Rachel Carson Middle School?

16     A.   Yes.  This is the student, yes.

17     Q.   Right.  Do you recognize the hallway in this photograph?

18     A.   Yes, it's actually in -- this is a pod on the other side

19     of B.R.'s team.  That's the windows that you've seen in a lot

20     of the different exhibits at the end of the hallway from her

21     teachers.

22     Q.   What is the door right there on the right?

23     A.   There's a teacher's area on the right-hand side behind

24     the students, and then that is the custodial closet.

25     Q.   Is that the only custodial closet in pod -- excuse me, in

B.R. v. F.C.S.B.

118

1   Pod A?

2   A.    Yes.

3   Q.    Okay.  And are you familiar with whether -- who had

4   access to custodial closets?

5   A.    The only people that have access to custodial closets are

6   people with master keys, which would be administration and the

7   assistant building supervisor and supervisor.

8   Q.    Okay.  And were the custodial closets locked during the

9   day?

10  A.    They were.

11  Q.    Were they also locked during the after-school program?

12  A.    They were.

13  Q.    All right.  Let's -- if we could go back to -- you can

14  take that down and go back to Defendants' Exhibit 61.  We're

15  looking at the first page there.

16  A.    Yes, ma'am.

17  Q.    All right.  And can you just -- on -- if we can zoom in

18  on Pod A Grady.  And can you mark on this map where that

19  closet was that we just looked at?

20  A.    It has the J.

21  Q.    Okay.  And then I think you -- talked about the window

22  and the exit sign, can you show where that is, please?

23  A.    The window was right here (indicating).

24  Q.    Okay.  And could you just remind us again where the

25  locker pod, B.R.'s locker pod was that year?

B.R. v. F.C.S.B.

119

1   A.   Hers was about right there (indicating).

2   Q.   Okay.  Great.  And if we could zoom out.  Can you show

3   the jury where your office was during this school year?

4          Sorry.  We can take these marks down.

5   A.   Sure.  My office was down here.  I'm not circling very

6   well.  But right there (indicating).

7   Q.   Okay.  Where was that relative to the teams to which you

8   were assigned that year?

9   A.   It was at the other end of the building.  Remember, I was

10  an extra for years.  There was only two assistant principals.

11  So, one was already here, (indicating), and then one was

12  upstairs.  Mr. F███████ wanted to make sure that my office,

13  when we are looking at as a whole from a safety standpoint,

14  that we had spread the assistant principals throughout the

15  building.

16  Q.   And have you been in other middle schools in Fairfax

17  County?

18  A.   I've been in two other middle schools.

19  Q.   Okay.  And is it -- do you have an understanding -- well,

20  are you familiar with the layouts of other middle schools in

21  Fairfax County?

22  A.   Many.  Especially through the renovation and going to

23  other schools to look at things, yes, ma'am.

24  Q.   Okay.  Was it typical to have administrators distributed

25  through the building?

B.R. v. F.C.S.B.

120

 1   A.   Not like this.  There are sometimes where there would be

 2   one or things from that standpoint.  Even the new model of

 3   renovation, they are putting an administrative suite where

 4   they have everyone more centralized, but Mr. F█████ really

 5   worked on making sure that we were spread through the

 6   building.  It was part of -- one for safety, but for second,

 7   because we wanted to be visible to be able to build those

 8   relationships with students.

 9   Q.   Okay.  And the -- you circled your office, who is in the

10   other office that you've circled there?

11   A.   That year was Ms. B█████.

12   Q.   That's one of the defendants in this case?

13   A.   Yes, ma'am.

14   Q.   Okay.  And her office then was in a pod; is that right?

15   A.   Yes, ma'am.

16   Q.   Okay.  Can you just explain how the pod model supports --

17   of this building design, supports the efforts to create a safe

18   learning environment for students?

19              MS. ANDERSON:  Objection, leading.

20              THE COURT:  Sustained.

21   BY MS. REWARI:

22   Q.   Okay.  Can you explain how the pod -- what the pod model

23   is?

24   A.   Sure.  The great thing about Carson if you look at these

25   triangles.  Lots of schools, the model was always

B.R. v. F.C.S.B.

121

1    interdisciplinary teams.  We've talked about that.  But most

2    schools are not designed where you have the entire team in one

3    area.  For example, at Frost where I'm at now, even through

4    renovation math is together, science is together, and they've

5    designed the building more from a curriculum standpoint.  They

6    both have some strengths, but this building was designed for

7    teaming.  And its sister school, which is Liberty, is the

8    other school that's designed like it as well.  The great thing

9    about it is, in one area you have science, English, math and

10   history.  I mean, you've heard about transition time.  So when

11   I first started at Carson, it was three minutes to transition

12   from class to class.  And the main reason was because they

13   walk five feet.  If they went to their locker, they are

14   walking ten feet.  It was great for that.  And then the

15   bathrooms are located in the same pod.  So this school was --

16   when it was designed, and I believe it was 1998, '99 when they

17   were going through the process, that was the model that the

18   county was going with.  And the school was actually designed

19   to support that, both from a curriculum standpoint and as well

20   as from a safety standpoint because you were able to know your

21   students, because they were there, you were able to support

22   them and see them.

23   Q.   Okay.  And you talked a little bit about walking paths,

24   can you elaborate on that.  How were walking paths developed

25   at the school?

─ B. R. v. F. C. S. B. ─

122

1   A.   At the beginning of the year when we met with teachers,

2   they understood we had different paths, and then they worked

3   with their students to help understand.  Sometimes students

4   need a little extra guidance.  For example, the teachers here

5   in C pod would come stand in this area (indicating), to make

6   sure that these students know at the end of the day, that they

7   were using this route to be able to leave the building.  And

8   then, like I said, we would have some students that had to go

9   to get their instruments, but the great thing about the team

10  is, teachers knew who those students were.  We -- that first

11  week, we did a getting -- we did all getting-to-know-you

12  activities that Friday.  So they knew, they had a really good

13  understanding of who were the students that had to come to

14  this area to get an instrument.  And then the same thing.

15  This group here, this team here, (indicating), would come and

16  go this way (indicating) where this team joined this one.  So

17  we had -- we had paths where all the students would go to be

18  able to keep up -- when you have over 1200 students, to be

19  able to support them as they're coming in and out of the

20  building for safety.

21  Q.   And were the walking paths, then, shared with the

22  students at the beginning of the year?

23  A.   Correct.

24  Q.   And did they get adjusted through the course of the year?

25  A.   If they would -- at times we would meet every week in

B.R. v. F.C.S.B.

123

1   admin, as well as in our team meetings.  So those

2   interdisciplinary team meetings, you know, we spend a lot of

3   time talking about the great things kids are doing, but it's

4   something more to come up, for example, after lunch and PE,

5   kids were all leaving and, say, this area down here

6   (indicating), kids were starting to gather there in-between

7   exchange, then we would move a staff member to that area and

8   we might also move a team to be able to walk a different path.

9   So we were always constantly adjusting it because they are

10  kids, and they are smart, and they are learning.  And so, we

11  worked with that.

12  Q.   Okay.  And how did you -- did you collect data to make

13  these types of adjustments?

14  A.   Like I said, when we were in the interdisciplinary team

15  meetings, I can speak, we would talk to teachers, and then we

16  would also grove out in the halls.  We would be able to see

17  these things by having those conversations.  We would come to

18  admin meeting that we had every week, and we would talk about

19  those decisions, and then we would either make a decision

20  right away, or we would take it to a leadership team, which

21  was made up of teachers, as well as communicating with

22  counselors to see what would be the best effort or best need

23  to be able to support our students.

24  Q.   Did you also sometimes make adjustments in walking paths

25  for specific students?

—B.R. v. F.C.S.B.—

124

1   A.   Of course.

2   Q.   Can you give us some examples of that?

3   A.   I'm sorry.  Can you clear that.  I'm sorry.  I'm a bad

4   artist.  If you look at the building, it could have been as

5   simple as, if we had a student in C pod and the student in A

6   pod that were having an issue, we might have one student use

7   the front path to be able to go to PE, where another student

8   would use the back hallway.  And we would talk with them to do

9   that, and that might just be a -- to be -- as a support method

10  as we're going through a situation.

11  Q.   Okay.  Can you just -- designate on the map what you are

12  referring to?

13  A.   Sure.  Like this group here (indicating) would come this

14  way (indicating) to go to PE, where this person (indicating)

15  might go this way (indicating) to go to PE.

16  Q.   Okay.  And I think you talked about where you stood in

17  the morning.  Where did you stand or did you have an

18  assignment of where you were supposed to be during the day,

19  and then at the end of school?

20  A.   So in the morning, I was always at Kiss and Ride, and

21  then p.m.  So I always did Kiss and Ride.  Actually -- I asked

22  for it, it was a great time because it would gave me an

23  opportunity to have face time with my families.  Parents are

24  dropping kids off, I can say hi, checking on on students from

25  that standpoint.  So it gave me an opportunity to have

———B. R. v. F.C.S.B.———

125

 1  convers- -- quick conversations with parents as they are

 2  dropping their kids off.  As soon as I was done, I would come

 3  into the building and my teams were down at this end here

 4  (indicating.)  So I would definitely -- would come to this

 5  area here (indicating), but I rarely was in my office.  So I

 6  was always moving around throughout the building.  So I would

 7  come in, check -- check my team, depending upon when my team

 8  meetings were or whatever meetings I had, then would also then

 9  check in with my counselors.

10  Q.   Okay.  And then where -- where were your assignments at

11  dismissal, or where were you posted at dismissal?

12  A.   I was back at Kiss and Ride.

13  Q.   Okay.  And then did you -- did you stay after school?

14  A.   Always.

15  Q.   Okay.  Did you have any specific assignment after school?

16  A.   When students were transitioning outside for dismissal,

17  the rule was, if you left the building, you couldn't come back

18  in.  So we had students that were staying in for after-school

19  activities, while we had staff members out front with

20  Ms. T█████ as well as our safety and security specialist doing

21  the bus lanes.  I would be over in Kiss and Ride with

22  teachers, and then I would go back in and we would make sure

23  that we would sweep the halls and make sure students are in --

24  in activity, whether that would be intramurals or science

25  bowl.

B.R. v. F.C.S.B.

126

1   Q.   Okay.

2            MS. REWARI:  Your Honor, I'm about to switch to

3   another topic.  Would this be a good time for lunch?

4            THE COURT:  Yes, ma'am.  All right, ladies and

5   gentlemen, we're at lunch break time.  Let's go from 1:15 to

6   about 2:15.  Today we're going to try to go around 4,

7   4:30 p.m. if you agree.

8            All right.  Please remember do not discuss the case

9   or any aspect of the case with anyone.  You may step down,

10  sir.

11           (Jury excused.)

12           THE COURT:  All right.  Ladies and gentlemen, we'll

13  see you back in at 2:15.  ]

14           (Lunch Recess 1:15 p.m.)

15           (Court proceedings resumed at 2:20 p.m.)

16           THE COURT:  Are we ready to bring the jury in?

17           (Jury present.)

18           THE COURT:  Thank you.  You may be seated.

19  Resumption of the testimony.

20           MS. REWARI:  Thank you.

21  BY MS. REWARI:

22  Q.   Mr. H████, when you were -- when you were -- you're

23  still employed by Fairfax County Public Schools, did you learn

24  before 2011-2012 school year, how to conduct investigations of

25  peer conflicts?

B.R. v. F.C.S.B.

127

```
 1  A.   Yes, ma'am.  When I was actually working at Rachel

 2  Carson, Mr. F█████ allowed for me to work with Shawn Brown,

 3  the assistant principal, who allowed for me to do his

 4  investigations with him, alongside him, to work on when to

 5  talk to students, when to contact home, what are things to

 6  look for.  So that was one of the, I would say, non structural

 7  things, but then, also, as I went into my 2011 school year,

 8  every year we had a "leaders-need-to-know training" that went

 9  through -- how to investigate, which was run by the hearings

10  office.

11  Q.   Okay.  And was Shawn Brown an assistant principal at

12  Rachel Carson?

13  A.   Shawn Brown was an assistant principal at Rachel Carson.

14  Q.   When you were learning under him, were you still a

15  teacher?

16  A.   I was still a teacher.

17  Q.   And so then when you talked about the training that you

18  would receive annually, was that the training that you

19  received as an administrator?

20  A.   Correct.

21  Q.   And you talked about the hearings office.  Can you

22  explain what that is?

23  A.   The hearings office is -- Daniel Scanlon at the time ran

24  the hearings office.  It was a group of hearing officers that,

25  when we had a large consequences, a weapon, drugs, or things
```

─────────── B. R. v. F. C. S. B.───────────

128

1   of that nature, the students would receive a recommendation to

2   the division of superintendent, and they would look at the

3   investigation to determine whether a ten-day suspension was

4   appropriate or what would be the next steps for that.

5   Q.    Was the hearings office for the entire school division?

6   A.    Yes.

7   Q.    So all of Fairfax County Public Schools?

8   A.    Yes, ma'am.

9   Q.    As an administrator, did you have occasion to attend

10  hearings before the hearings office?

11  A.    To go in -- myself, I've taken -- I've been in the

12  hearings office with multiple cases, yes.

13  Q.    In your experience, are there student witnesses who

14  attend the hearings office proceedings?

15  A.    They are not in the actual hearing, but it's part of the

16  cumulative packet that is put together that goes up.

17  Q.    When you say "it's part," what are you referring to,

18  "it's"?

19  A.    We have to put together a packet to the hearings office.

20  We have 48 hours to do that.  In there, there is an incident

21  report and then all of the student statements or investigation

22  that takes place for the determination.

23  Q.    Okay.  And then that -- is there -- are there written

24  rules as to what sorts of things go to the hearings office?

25  A.    Correct.  That's all outlined in SR&R, which would be a

Direct - P.H.

B.R. v. F.C.S.B.

129

1    mandated hearings packet or other items that are in there.

2    It's an SR&R.

3    Q.   When your were an administrator, did you provide training

4    to students on the SR&R?

5    A.   We definitely did, yes, in the fall, and we also did that

6    in the spring.

7    Q.   And when we say "SR&R," we're talking about the Students'

8    Rights & Responsibilities?

9    A.   Yes, ma'am.

10   Q.   And did you receive training on how to give that training

11   to students?

12   A.   We had like -- every year we had a leader -- leaders need

13   to know, which was when they actually reviewed any updates to

14   SR&R from year to year as well as any other pertinent

15   information.  It was a requirement through Fairfax County for

16   the students to take the test as well as parents signed off on

17   the acknowledgment.

18         There was also optional lessons that students could

19   do.  The PowerPoint presentation wasn't actually mandated.  We

20   did that as extra at Carson.

21   Q.   And when you talk about the PowerPoint presentation, if

22   we could --

23         MS. REWARI:  Your Honor, if we could publish

24   Defendants' Exhibit 281.  I believe this is in.

25         THE COURT:  Just a moment.  You have

Direct - P.H.

B.R. v. F.C.S.B.

130

1   Defendants' 281?

2           MS. REWARI:  Maybe it comes in as a plaintiff's

3   number.

4           MS. ANDERSON:  We have no objection to this being

5   admitted.

6           MS. REWARI:  Okay.  Sorry.

7           THE COURT:  We still need to know what it is up

8   here.

9           MS. ANDERSON:  That is Defendants' Exhibit 281.

10          MS. REWARI:  Defendants' Exhibit 281.  We move to

11  admit that.

12          THE COURT:  Without objection.

13  (Defendants' Exhibit No. 281 was admitted into evidence.)

14  BY MS. REWARI:

15  Q.   Is this the PowerPoint presentation you were just telling

16  us about?

17  A.   Yes, ma'am.

18  Q.   We're looking at the 2011-2012 version?

19  A.   Yes, ma'am.

20  Q.   Which teams -- well, first of all, which teams were you

21  responsible for presenting this to and during this school

22  year?

23  A.   Actually, in order to have the appropriate amount of time

24  to review this, we did it through the health and physical

25  education classes so that we had a full block of time.  So we

B.R. v. F.C.S.B.

131

1  restructured the schedule to make sure that we could pull

2  students.  So I worked predominantly with the 7th grade for

3  this.

4  Q.  Did you personally present this to you 7th grade teams?

5  A.  We all -- all the administrators presented it to -- all

6  the students depending upon what the schedule was so that we

7  could get all the students through and have -- ample amount of

8  time to review it.

9  Q.  Okay.  And was there a deadline by which this training

10  had to be given in Fairfax County?

11  A.  There was a deadline by when the test had to be

12  completed, which I believe was sometime in October.

13  Q.  Okay.  And when you said "the test," is this the test

14  that the students take?

15  A.  Yes, ma'am.

16  Q.  Okay.  And we can just flip through this quickly.  I'm

17  not going to ask you questions about all the pages, but I

18  think you said that this was something that was prepared for

19  Rachel Carson?

20  A.  Correct.  We put a PowerPoint presentation, reviewed this

21  for Carson.

22  Q.  All right.  So let's -- if we could just take a look

23  quickly at the page that's numbered 7183.

24      And what is readiness, respect, responsibility?

25  A.  This was the PBIS system that we had at Rachel Carson

Direct - P.H.

B.R. v. F.C.S.B.

132

1   where we worked with students and staff to design a -- our

2   PBIS, which was being respectful of readiness and

3   responsibility.  This would have been outlined for all

4   locations within the building.

5   Q.   Did this presentation -- again, we don't have to look at

6   every page, but did this presentation, to your recollection,

7   cover bullying and harassment?

8   A.   Yes, ma'am.

9   Q.   And let's take a look at page 7197.

10          Was this explanation then shared with students in

11   the SR&R presentation?

12   A.   Yes, ma'am.

13   Q.   This explanation being about bullying?

14   A.   Yes, ma'am.

15   Q.   Okay.  All right.  Let's look at the next page.

16          Again, this is -- is this another slide about

17   bullying?

18   A.   Yes, ma'am.

19   Q.   Okay.  And it says, "All bullying incidents will be

20   reported to the School Resource Officer"?

21   A.   Yes, ma'am.

22   Q.   Was that something that was done at Rachel Carson

23   uniquely?

24   A.   I'm not positive if it was just Carson or if it was part

25   of MOU, the memorandum of understanding, that year.

B.R. v. F.C.S.B.

133

1    Q.    When you say "MOU," what are you referring to?

2    A.    The memorandum of understanding.  It's the document and

3    the rules between us and the police department.

4    Q.    Okay.  Do you recall how long it would take to give this

5    training to students?

6    A.    We took the entire PE -- the reason why we selected PE

7    was it was right next to the lecture hall, so students could

8    report there and they could take attendance, and we would have

9    a full block of time to be able to review this so we wouldn't

10   be rushed.

11   Q.    And what is the time block?

12   A.    Roughly 55 minutes, 57 minutes.

13   Q.    All right.  And were parents also required to acknowledge

14   that they had received a copy of the SR&R?

15   A.    They were.

16   Q.    Okay.  You talked about a middle school -- excuse me --

17   the SR&R test?

18   A.    Correct.  So through their learning seminar class, the

19   students took the SR&R test and did an optional lesson.

20   Q.    Could you please take a look at Defendants' Exhibit 150

21   in your book.

22   A.    Yes, ma'am.

23   Q.    Is -- can you identify this is the test that you were

24   just talking about?

25   A.    Yes, ma'am.

B.R. v. F.C.S.B.

134

1   Q.   Is this the test for the 2011-2012 school year?

2   A.   Yes.

3            MS. REWARI:  Your Honor, we move to admit

4   Defendants' Exhibit 150.

5            MS. ANDERSON:  No objection.

6            THE COURT:  Without objection.  You may publish.

7   (Defendants' Exhibit No. 150 was admitted into evidence.)

8            (Exhibit published.)

9   BY MS. REWARI:

10  Q.   You see at the top that it says "Middle School"?

11  A.   Yes, ma'am.

12  Q.   So was this, to your understanding, the test that was

13  given to all middle school students in Fairfax County that

14  year?

15  A.   Yes, ma'am.

16  Q.   And just we don't need to go through every question, but

17  how many questions are in this test total?

18  A.   22 and then individual response.

19  Q.   I see there's a individual response discussion on

20  cyberbullying on the last page?

21  A.   Yes, ma'am.

22  Q.   And so, the lines there, was that something where -- what

23  were students asked to do with those lines?

24  A.   To provide their own personal response to what

25  cyberbullying has become -- to the prompt.

B.R. v. F.C.S.B.

135

1   Q.   Okay.  Let's -- would you please take a look at

2   Defendants' Exhibit 284 in your book.

3            Could you please identify what this document is.

4   A.   This is the Students' Rights & Responsibility PowerPoint.

5   Q.   Was this for the spring of that year?

6   A.   Yes, ma'am.

7            MS. REWARI:  Okay.  Your Honor, we move to admit

8   Defendants' Exhibit 284.

9            MS. ANDERSON:  No objection, Your Honor.

10           THE COURT:  Without objection.  You may publish.

11  (Defendants' Exhibit No. 284 was admitted into evidence.)

12           (Exhibit published.)

13  BY MS. REWARI:

14  Q.   And so, is this the second training, then, that you all

15  gave that school year to students at Rachel Carson?

16  A.   Correct.

17  Q.   Okay.  And was it always twice a year?

18  A.   Yes, ma'am.  The second one we did once students had

19  switched into their second semester classes as well as if we

20  had any other students that came into the building.  So we

21  always did the second half of the year.

22  Q.   Was bullying and harassment also topics that were covered

23  in this --

24  A.   Yes, ma'am.

25  Q.   Okay.  Can you just describe generally what else in terms

B.R. v. F.C.S.B.

136

1   of training was given at the school to students about bullying

2   and harassment?

3   A.   I know that it was incorporated into the health

4   curriculum, where they -- the students had lessons dealing

5   with bullying and harassment.  Our counselors went in at the

6   beginning of the year and did a lesson on bullying and

7   harassment as well.

8   Q.   Were there other activities at the school around

9   antibullying?

10  A.   I think it's October was antibullying month, so we had --

11  students in the cafeteria would sign a pledge on like a

12  banner.  Staff purchased orange antibullying shirts, and we

13  wore them -- I want to say one of the spirit days.  I can't

14  remember if it was an orange day.  And we just did other

15  activities during that month for antibullying month.

16  Q.   Okay.  All right.  Now, during the 2011 --

17          MS. REWARI:  We can take that down.  Thank you,

18  Grady.

19  BY MS. REWARI:

20  Q.   During the 2011 school year, how many teams were you

21  assigned to?

22  A.   I believe I had four.

23  Q.   And do you recall whether -- what grades those teams

24  were?

25  A.   I had two 7th, and I had two 8th.

Direct - P.H.
───────B.R. v. F.C.S.B.───────
137

1   Q.   And was one of the 7th grade teams -- you had the

2   Explorers team?

3   A.   Yes, ma'am.

4   Q.   And what were your responsibilities for overseeing the

5   Explorers team?

6   A.   Working collaboratively with the teachers.  A lot of time

7   keeping up with their ideas.  So really just going in,

8   seeing -- we really spent a lot of time working on the

9   positive things that students were doing instructionally, but

10  then also taking information from leadership as well as from

11  the principal and getting that information to them.  So it was

12  a collaborative approach back and forth.

13  Q.   Was it communicated to students that you were the

14  administrator assigned to their team?

15  A.   That first week, I do believe, that the teachers spent

16  time going through their classes, letting them know --

17  definitely on that Friday during team time.  It was -- like

18  early release, and they went through fun activities, and I was

19  part of that.  And then we also got on the news, and we went

20  through on the news who was the assistant principals and

21  things like that in the morning.

22  Q.   So morning announcements?

23  A.   Yes, ma'am.

24  Q.   And were students permitted to skip the teachers and

25  counselors and come to you directly with any issues they might

─────── B.R. v. F.C.S.B. ───────

138

 1  have?

 2  A.   Sure.  Yes, ma'am.

 3  Q.   And when you were an administrator at Rachel Carson, did

 4  students sometimes do that?

 5  A.   Constantly.  Students saw things.  They told us.

 6  Q.   Okay.  Now I'm going to take you to the meeting on

 7  November 21, 2011, that we've heard so much about.

 8          Did you know who B.R. was prior to that meeting?

 9  A.   I don't remember having any -- like, a situation of

10  talking with her or going through anything, no.

11  Q.   Okay.  Were you aware of any issues she was having at the

12  school prior to that meeting?

13  A.   No, ma'am.

14  Q.   Had you heard from her mother prior to that meeting?

15  A.   No, ma'am.

16  Q.   Okay.  How frequently did you check in with counselors on

17  your team during the first quarter of that year?

18  A.   Regularly.  Every day.  So it was part of my process to

19  check in with counselors either before or at the end of the

20  day.  They did so much that a lot -- it allowed for me to know

21  what was going on with the students.  So we checked in

22  regularly.

23  Q.   And how -- can you compare that to how frequently you

24  checked in with teachers on your team?

25  A.   I think I checked in with my teachers every day as well.

1  Like I said, I was not in my office.  I was visible, moving

2  around.  I do my job by being out and about.

3  Q.   And by second quarter -- November 21st is into the second

4  quarter of the school year?

5  A.   Yes, ma'am.

6  Q.   By second quarter, what types of issues will typically

7  have come to your attention?

8  A.   Some friendship issues or things from that standpoint.

9  Maybe students that were working on transitioning to the

10  building.  We had -- I can't remember how many elementary

11  schools, but a lot of times, some of it was they had a friend

12  group in elementary school and then, because of the teaming

13  aspect, that they are not with those students.  So working

14  through what types of supports and things we can put into

15  place with that pretty much.

16  Q.   And -- all right.  So on the meeting on November 21,

17  2011, did you attend the whole meeting?

18  A.   I was in and out of the meeting, no.

19  Q.   Do you recall who else from the school was in that

20  meeting?

21  A.   I recall -- downstairs -- when it started downstairs,

22  Ms. H█████ was there, myself, Ms. T███.  I believe Ms. R.

23  and B.R. were there.  And then I believe Officer Genus might

24  have been in there at the beginning and then left.

25  Q.   For parts of meeting that you were present in, did B.R.

─────B.R. v. F.C.S.B.─────

140

1    or her mother report any sexual touching?

2    A.    No.

3    Q.    For the parts of the meeting that you were in, did she or

4    her mother report any students were going inside her?

5    A.    No.

6    Q.    Were you aware that Ms. T███ spoke to some students

7    after that meeting?

8    A.    I definitely was.  We collaborated all day.

9    Q.    Were you involved in any of those interviews?

10   A.    I didn't -- with the students of allegations, no, ma'am.

11   Q.    Okay.  Were you aware of the steps that were taken

12   following that meeting?

13   A.    I was -- yes.  Ms. T███ and I collaborated on steps that

14   she was taking with them as well as with B███.

15   Q.    All right.  So what are the steps that you recall being

16   taken?

17   A.    I know that immediately the two students --

18           MS. ANDERSON:  Objection.  Hearsay.  This is just

19   coming from Ms. T███.

20           MS. REWARI:  I asked him what he was aware of.

21           THE COURT:  Okay.  Ask him what he was aware of.  I

22   think you started to drift to something else.

23           MS. REWARI:  Sure.

24   BY MS. REWARI:

25   Q.    What were you aware of having been done following that

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

———B.R. v. F.C.S.B.———

141

1   meeting?

2   A.   Ms. T████ put the two students that she was investigating

3   in AIA.  And then I worked with the team to make sure that we

4   were keeping an extra eye out in the area, as well as

5   Ms. T████ sent an email to the PE department, so I followed up

6   with the PE department on a locker change.  Partially because

7   we were -- being over capacity, there weren't lockers

8   available.  As well as following up with Ms. H████ on how

9   we were going to shadow.

10  Q.   All right.  So let me -- if I can just break some of that

11  down.

12        So you said you made the teachers aware about the

13  area.  What area are you talking about?

14  A.   The locker pod outside of their classrooms.

15  Q.   And that's a locker -- Explorers locker pod?

16  A.   Yes, ma'am.

17  Q.   And then what were you -- what's the gym locker situation

18  that you're talking about?

19  A.   Ms. T████ had informed me that, during her investigation

20  J.O. and her were having -- there was something that was going

21  on, and she had asked for a locker change.  And at that point

22  in time, since we were over capacity, we had many students in

23  the PE offices that had either crates or lockers.  So I

24  checked with them to see if we can move another student out of

25  a locker so that we can move her over.  So that's what I

─────B.R. v. F.C.S.B.─────

142

1   did -- took place in that.

2   Q.   So when you say she asked for locker, B.R.'s locker to be

3   moved --

4   A.   Correct.  B.R.'s locker to be moved to another area.

5   Q.   Okay.  And were you involved in -- in any discussion

6   about walking paths?

7   A.   Correct.  So Ms. T███ had worked with the 8th grade

8   students to walk down the 8th grade hallway, which is

9   upstairs, and use the main stairs when transitioning through

10  the building.  And then I worked with B███ to make sure she

11  was using the 7th grade hallway, which is downstairs,

12  utilizing the C pod hallway in the back, which was close to

13  her class that was upstairs.

14  Q.   All right.  Let's see if we can show this on Defendants'

15  Exhibit 61.

16  A.   Yes, ma'am.

17          MS. REWARI:  May I publish, Your Honor?

18          THE COURT:  You may.

19  BY MS. REWARI:

20  Q.   So in -- 7th grade was on the first floor, right?

21  A.   Yes, ma'am.

22  Q.   Can you show us what you worked on with regard to

23  movement of B.R.?

24  A.   So when I refer to the 7th grade hallway, that would

25  be -- when she was transitioning, she would use this hallway.

B.R. v. F.C.S.B.

143

1   And then this is the stairwell that led upstairs right to

2   where her Spanish class would have been.

3   Q.   Okay.  And prior to making this change, what would have

4   been the way for her to get to Spanish class?

5   A.   She could have used this stairwell here, or she could use

6   this stairwell here, but then she would have had to transition

7   through the -- if you imagine the upstairs, down the same

8   hallway through 8th grade.

9   Q.   Let's look at the second page, which I think shows the

10  second floor.

11          MS. REWARI:  And if we can remove these lines,

12  Grady.

13  BY MS. REWARI:

14  Q.   And all right.  So now we're -- second floor plan.  So

15  does this show the second floor?

16  A.   Yes, ma'am.

17  Q.   Okay.  So can you just --

18  A.   This would have been -- you want me to show where -- so

19  this would have been C pod stairs where she came up, and then

20  she would have come into this area here where her class was.

21  Q.   I see.  And where is the Spanish class?  Draw a circle.

22  A.   It would have been in this area here.

23          (Witness complies.)

24  Q.   I see.

25          Okay.  And so, if you had not done that path, I

─B.R. v. F.C.S.B.─

144

1   think you were showing us on the first floor, the couple of

2   ways that she could have gotten to --

3   A.   She would have come up the main stairs, and she would

4   have walked through the middle pod with 8th grade all the way

5   through the next pod of 8th grade to here.

6   Q.   I see.  And then you said Ms. T███ was working with the

7   8th graders.  Are you talking about the two 8th graders, C.K.

8   and D.N.?

9   A.   Yes, ma'am.

10  Q.   What was the walking path they were given?

11  A.   Can we take that off, please.

12          So they were told to use -- when they were

13  transitioning, to use this hallway and come down this set of

14  stairs.

15  Q.   Okay.  All right.  Was there anything done with respect

16  to monitoring B.R. during transitions?

17  A.   We had -- we already had the teachers that were out in

18  the locker pod area, but then the counselor, Ms. H██████, was

19  shadowing her as well, and then later on Ms. F███████

20  shadowed as well.  And then, myself, I was out in the pod

21  areas and then Officer Genus who usually stood in that -- if I

22  have the map, in the area where the benches were moved over

23  closer to the team area.

24  Q.   Okay.  Let's see if we can put Defendants' Exhibit 61

25  back up and we show where Officer Genus stood, the first floor

B.R. v. F.C.S.B.

145

1   there.

2   A.   So he was in the -- a lot of times he was standing here,

3   and then he moved over closer to this area to be able to see

4   the locker pod in between.

5   Q.   Okay.  Would you -- we can take that down.

6            Would you please take a look at

7   Defendants' Exhibit 89 in your book.

8   A.   Yes, ma'am.

9   Q.   Okay.  And can you identify what this is?

10  A.   It's an email from the R███████ family.

11  Q.   To you and others?

12  A.   To me and others, yes.

13           MS. REWARI:  Your Honor, we move to admit

14  Defendants' 89.

15           MS. ANDERSON:  No objection.

16           THE COURT:  Without objection.  You may publish.

17  (Defendants' Exhibit No. 89 was admitted into evidence.)

18           (Exhibit published.)

19  BY MS. REWARI:

20  Q.   Let's start with the email at the bottom, Thursday,

21  December 1, 2011.

22  A.   Yes, ma'am.

23  Q.   So we're now in the week after Thanksgiving; is that

24  right?

25  A.   Yes, ma'am.

─────B.R. v. F.C.S.B.─────

146

1  Q.   Okay.  And this email from Mrs. -- from Mrs. R. to you;

2  is that right?

3  A.   It's to me, Ms. T▮▮▮, and Ms. H▮▮▮▮▮.

4  Q.   Okay.  And she -- what is the issue that she's asking to

5  be addressed in this email, to your understanding?

6  A.   The email really is pertaining to the PE locker and that

7  she's still changing in the office.  And so it says, she's

8  still changing in the office and storing belongings in a

9  crate.  When we met last week, we thought this was going to --

10  a new locker would be provided.

11  Q.   And was she the only student who had a crate in the PE

12  office?

13  A.   Absolutely not.  Both in the boys and girls office, we

14  had crates as well as we had purchased lockers that could

15  stand in the offices because we were over capacity.

16  Q.   Okay.  All right.  In the email above, did you write her

17  back right away?

18  A.   I said -- yes, I did.

19  Q.   Did you get B.R. an actual locker in the locker room?

20  A.   Yes.  We were able to move her to an area.  We wanted to

21  make sure there was a teacher that -- that was there for

22  visibility purposes.  Actually, the teachers aren't in the

23  office while students are dressing because then they wouldn't

24  be able to see the locker room.  So we wanted to make sure we

25  were moving her to an area that was visible by a teacher that

─────Tonia M. Harris  OCR-USDC/EDVA 703-646-1438─────

B.R. v. F.C.S.B.

147

1   monitored that area.

2   Q.   Was there a female teacher in the locker room during her

3   PE?

4   A.   Yes.

5   Q.   All right.  Could you please take a look at Defendants'

6   Exhibit 88 in your book.

7   A.   Yes, ma'am.

8   Q.   Is this an email exchange further on the chain we just

9   looked at?

10  A.   Yes, ma'am.

11  Q.   The first email is the same, but the second two emails

12  are different.

13  A.   The first being an email at the bottom, December 1st,

14  "appears to be doing much better," and then there's another

15  email on December 1st, "Did someone contact you yet about the

16  PE locker issue?"

17          MS. REWARI:  Your Honor, we move to admit

18  Defendants' Exhibit 88.

19          MS. ANDERSON:  No objection.

20          THE COURT:  Without objection.

21  (Defendants' Exhibit No. 88 was admitted into evidence.)

22          MS. REWARI:  Can we publish?

23          THE COURT:  You may.

24          (Exhibit published.)

25  BY MS. REWARI:

B.R. v. F.C.S.B.

148

1   Q.   And so, the email down at the bottom is the same one from

2   Mrs. R. that we looked at, Thursday, December 1st.  And the

3   next email from that is a response from Ms. H████████, right?

4   A.   Correct.

5   Q.   Okay.  And then the email above that is a reply from

6   B.R.'s mother, right?

7   A.   Yes, ma'am.

8   Q.   And you're copied on this?

9   A.   I am, yes.

10  Q.   And so, the next morning at 6:42 a.m., her mother informs

11  Mrs. H██████ you had emailed her yesterday?

12  A.   Correct.

13  Q.   So is this consistent with your recollection that she got

14  a locker on Thursday -- got a new PE locker on Thursday,

15  December 1st?

16  A.   Yes, ma'am.

17  Q.   Did you receive any other emails or complaints from

18  B.R.'s mother before winter break that year?

19  A.   No, ma'am.

20          MS. REWARI:  Okay.  If we can take a look at

21  Defendants' Exhibit 191.

22          Your Honor, these are photos of the school that I

23  believe were admitted earlier.

24          THE COURT:  You may publish.

25          MS. REWARI:  Thank you.

B.R. v. F.C.S.B.

149

1          What exhibits?

2          I'm sorry.  191.  Mr. Bates tells me they may not

3     have been admitted yet.

4          MS. ANDERSON:  Oh, they're not admitted.  We have

5     192.

6          THE COURT:  We have 192, but not 191.

7          MS. REWARI:  I think we have 192 and 193.  And these

8     are the pictures of the locker room.

9          THE COURT:  Are they in or out?

10          MS. ANDERSON:  No objection.

11          THE COURT:  Okay.  No objection.

12          (Discussion off the record.)

13          MS. REWARI:  May we publish?

14          THE COURT:  Ladies and gentlemen, you might hear me

15     talking with the deputy clerk here from time to time.  She's

16     got one of the hardest jobs here.  She has to keep track of

17     all the paperwork and all the exhibits.  And what we do is we

18     sometimes have a conversation to make sure that things are in.

19     It's good for the lawyers and it's good for the administration

20     of the case.  She does a great job, so.

21          MS. REWARI:  I apologize for the confusion, Your

22     Honor.

23          THE COURT:  It's okay.

24     (Defendants' Exhibit Nos. 191, 192, 193, were admitted into

25     evidence.)

Direct - P.H.
B.R. v. F.C.S.B.

150

1   BY MS. REWARI:

2   Q.   So first photograph, self-explanatory, girls' locker

3   room.

4           Can we look at the next picture.

5           All right.  And can you just explain what we're

6   looking at here?

7   A.   This is the entrance into the girls' locker room.

8           MS. REWARI:  And can we just flip through the next

9   couple of pictures, Grady.

10          If we get to page 5 of the photographs.

11  BY MS. REWARI:

12  Q.   What is the window?

13  A.   That's the office --

14  Q.   Okay.

15  A.   -- where the PE teachers are.

16  Q.   And maybe pictures, if we go to the next one -- it's hard

17  to tell from the pictures.  How high are the lockers?

18  A.   The lockers in the middle are -- they're about the same

19  height as the lockers in the hallway, and then lockers around

20  the outside go taller.  That way there could be visibility.

21          THE COURT:  Using the witness box as an example, if

22  you were to stand in front of witness box, where would the

23  lockers come up to you on the witness box.

24          You can step out and step back in.

25          THE WITNESS:  (Witness complied.)

―B.R. v. F.C.S.B.―

151

1           Here.

2           THE COURT:  Very good.

3           MS. REWARI:  Thank you.  And I guess we could put in

4    the record, he designated about his chest, below his chest.

5           THE COURT:  Depends on how tall he is.

6           MS. REWARI:  On me, it would be high.

7           THE COURT:  About eye height for you.  I would

8    say -- is it fair to say that's about 4 feet, Counsel?

9    About 4 feet?

10          THE WITNESS:  I believe they're -- they're 44 inches

11   with a 6-inch lift on the bottom.

12          THE COURT:  That's a little bit more than 4 feet.

13   Very good.  All right.

14   BY MS. REWARI:

15   Q.   All right.  Now, I think we talked about whether there

16   are any emails or complaints from Mom before winter break.

17          Were there any complaints or interactions that you

18   had with B.R. indicating that there was any issue before

19   winter break?

20   A.   No, ma'am.

21   Q.   All right.  Do you recall an incident in late January

22   regarding a student calling B.R. a lesbian?

23   A.   Yes.

24   Q.   Do you recall who the student was?  And can we just use

25   first name and last initial, please.

B.R. v. F.C.S.B.

152

1  A.   It was Ben and last initial G.

2  Q.   And was this something that you addressed?

3  A.   Most definitely.

4  Q.   How did you to address it?

5  A.   I met with him, investigated the situation.  He was very

6  honest.  Said that he called her a lesbian.  He received a

7  consequence.  I communicated home and then followed up to make

8  sure that it wasn't a recurrence.

9  Q.   When you said, "He received a consequence," what was the

10 consequence?

11 A.   I believe he had a lunch detention.

12 Q.   And did he call her -- that to her face?

13 A.   He did not.

14 Q.   Did you have understanding of how many times he had

15 called her that?

16 A.   From my understanding, once.

17 Q.   And had you received any complaints from her about that

18 student before -- Ben G. before that time?

19 A.   No.  And never again.

20 Q.   Okay.  And had you received any complaints from her

21 mother before -- about Ben G. before that incident?

22 A.   No, ma'am.

23 Q.   Did you receive any complaints from her mother about

24 Ben G. after that incident?

25 A.   No, ma'am.

─────────── B.R. v. F.C.S.B. ───────────

153

1   Q.   All right.  Do you recall an allegation from B.R. in late

2   January 2012 that students were stealing her work?

3              MS. ANDERSON:  Objection, leading.

4              THE COURT:  Overruled.  You can answer.

5              THE WITNESS:  The information didn't come directly

6   to me from B.R.  Ms. H█████████ informed me that B.R. was

7   concerned about work that was missing.

8   BY MS. REWARI:

9   Q.   Do you recall how the timing of that issue related to

10  when the quarter --

11  A.   That was part of the -- the concerning part with it was

12  it was at the end of the quarter.  So if she was missing work,

13  with us putting grades in, it was concerning with the fact

14  that it could affect her grades.

15  Q.   Okay.  And did you look into the concerns that were

16  raised?

17  A.   Yes.

18  Q.   And can you please tell the jury what you found when you

19  looked into those concerns?

20  A.   I believe her testimony about the science lab, lab book

21  that was -- actually, vocab book that was missing --

22              MS. ANDERSON:  Objection, Your Honor.  I'm not sure

23  it's clear if it's --

24              THE COURT:  Is this firsthand knowledge?

25              THE WITNESS:  Oh, yeah.

─────────────────────────────────────────

1    THE COURT:  Sir, sir.

2    THE WITNESS:  I'm so sorry.

3    THE COURT:  Is this firsthand knowledge or something

4  you heard from someone else?

5    THE WITNESS:  No, firsthand knowledge.

6    THE COURT:  Okay.  Testify to things that you have

7  firsthand knowledge of.

8    THE WITNESS:  Yes, sir.  I apologize.

9    THE COURT:  It's okay.

10    THE WITNESS:  So her science vocabulary book was

11  missing.  Ms. H█████ worked with her and found the vocab

12  book.  The information from that, Mr. T█████ -- once that was

13  found, accepted the work that was there.  There was also

14  information about her stamp sheet in her math class that she

15  needed to turn in, but when talking with Ms. C███, that

16  work -- she on -- I think it was after school, she found B████

17  had found that in her binder, and Ms. C███ provided the

18  opportunity for her to turn that in for grades.  And then I

19  believe there was also a stamp sheet in Mrs. Estrella's room

20  that went missing, but it wasn't found and Ms. Estrella worked

21  to just excuse the work.

22  BY MS. REWARI:

23  Q.   And Ms. Estrella, which subject did she teach B.R. in?

24  A.   English.

25  Q.   And when you looked into these concerns, did you find any

B.R. v. F.C.S.B.

155

1   evidence other students had stolen B.R.'s work?

2   A.   No, not from my recollection.  No, there was no.

3   Q.   And did you meet with B.R.'s mother on January 27th?

4   A.   Yes, ma'am.

5   Q.   Okay.  Who was in that meeting?

6   A.   Ms. B█████ and myself.

7   Q.   Was this related to this concern about the missing work?

8   A.   It was related to the concern about missing work, and

9   then Ms. R. had also brought up concerns with B.R. being

10  pulled.

11  Q.   Can you explain what you mean by that?

12  A.   From us following up with her, checking in, and things

13  from that standpoint, B.R. had told her mom -- her mom had

14  told us that she was feeling like she was being pulled out too

15  much.  And so we worked with Mom to come up with a plan of how

16  we could support her so she wouldn't be being pulled out of

17  class and things from that standpoint.

18  Q.   What was -- do you have an understanding of what she

19  meant, "being pulled out of class"?  Who was pulling her out?

20  A.   I think that, if counselors or administration was going

21  to class and taking her out of class to check in either on the

22  missing work or those types of things or when talking with her

23  from, you know, B.G. that -- that she felt that it was drawing

24  attention to her.

25              So we worked with Mom to come up with a plan to

─B. R. v. F.C.S.B.─

156

1   support those concerns.

2   Q.   What was the plan that you worked with Mom to come up

3   with?

4   A.   The plan was either send passes to the teachers so that

5   she could come out at the beginning or the end or we would,

6   you know -- that Ms. B████'s office was right there.  She

7   could stop in and see Ms. B████ at any point in time she

8   wanted.

9        I believe I followed up with an email to Mom, and

10   then she even told us that B████ felt comfortable with

11   checking in with us quickly in between transitions.

12   Q.   Would you please take a look at Defendants' Exhibit 152

13   in your book.

14        Are these emails between you and B.R.'s mother and

15   some other folks at the school regarding this issue that we

16   just talked about?

17   A.   Yes, ma'am, the email at the bottom is to Ms. R████.

18   It has Mr. F████ and Ms. B████.

19        MS. REWARI:  And Your Honor, before we talk about it

20   if we could just move to admit Defendants' Exhibit 152.

21        MS. ANDERSON:  No objection.

22        THE COURT:  Without objection.

23        MS. REWARI:  If we may publish?

24        THE COURT:  You may.

25   (Defendants' Exhibit No. 152 was admitted into evidence.)

Direct - P.H.
B.R. v. F.C.S.B.

157

1              (Exhibit published.)

2    BY MS. REWARI:

3    Q.    If we can start at the email at the bottom.  Was this

4    email following up the meeting Friday, January 27th?

5    A.    Yes, ma'am.

6    Q.    By the way, do you recall whether there was school on the

7    Monday and the Tuesday of this week?

8    A.    I do not remember -- there might have been teacher

9    workdays that week.  I'm not positive.

10             MS. REWARI:  If we could quickly take a look at

11   Defendants' Exhibit 81, which is the school calendar, and I

12   believe it has been admitted.

13             THE COURT:  It has been.  You may publish.

14             (Exhibit published.)

15   BY MS. REWARI:

16   Q.    If we can flip to it.  Just look at January.

17             So looking at the calendar, can you tell whether

18   there was -- were there students at school on Monday and

19   Tuesday of that week?

20   A.    They did not.

21   Q.    You're writing to her mom the Thursday, and this is -- so

22   the second day back in school for students after the 27th?

23   A.    Correct.

24   Q.    Okay.  All right.

25             MS. REWARI:  You can take the calendar down.  Thank

─B. R. v. F.C.S.B.─

158

1    you, Grady.

2              So let's go back to Defendants' Exhibit 152.  We can

3    zero in on that email down at the bottom.

4    BY MS. REWARI:

5    Q.   And so does this email outline the plan that was

6    developed together with Mom -- her mom on Friday,

7    February 27th?

8    A.   Yes, ma'am, and with Ms. B████.

9    Q.   And Ms. B████ is the other administrator who was in the

10   email?

11   A.   Yes, ma'am.

12   Q.   All right.  And let's look at the email from Mom back to

13   you above that, Friday, February 3rd.  What was your

14   understanding of what she was communicating here?

15   A.   My understanding on top of the other information that we

16   provided below, that B███ felt comfortable with talking with

17   us between class exchange, switching periods.

18   Q.   Okay.  And then you wrote back to her, February 3rd,

19   2012?

20   A.   Yes, ma'am.

21   Q.   "Thank you for the reply.  That's fine."

22             Do you recall whether her mother asked for any other

23   change to this plan?

24   A.   No, ma'am.

25             MS. REWARI:  All right.  If we can take a look at

B.R. v. F.C.S.B.

159

1  Defendants' Exhibit 122, which I believe is attendance

2  records.

3          THE COURT:  Yes.  Those are in.  You may publish.

4          MS. REWARI:  Thank you.

5          (Exhibit published.)

6  BY MS. REWARI:

7  Q.   Would you please take a look at February 3, 2012.  And

8  B.R.'s attendance record.

9          Sorry, just trying to zoom in on the right period

10 there.

11 A.   No worries.

12 Q.   Do you see a line of Es there?

13 A.   Yes, ma'am.

14 Q.   Does that mean she was absent that day?

15 A.   Excused, yes.

16 Q.   Do you recall receiving an email from Mom as to why her

17 daughter was not in school that day?

18 A.   I do not.

19 Q.   Now, B.R. went out on homebound instruction on

20 February 9th -- after February 9, 2012, right?

21 A.   Correct.

22 Q.   And then so those Es that we see after that, starting

23 February 10th, that's -- they start with excused, and then

24 turn into Bs after that?

25 A.   Yes, ma'am.

─────────B. R. v. F. C. S. B.─────────

160

1  Q.  And is that when the homebound instruction started?

2  A.  I do believe.

3  Q.  Okay.  Do you recall having a meeting with Dr. Zuluaga

4  and Dr. Dreyfuss in February?

5  A.  I don't remember exactly when it took place, but I

6  remember that Dr. Zuluaga and Dreyfuss came out to meet with

7  us, yes.

8  Q.  Do you recall a discussion in that meeting about the

9  science --

10          MS. ANDERSON:  Objection, leading.

11          THE COURT:  Sustained.

12          MS. REWARI:  Okay.

13  BY MS. REWARI:

14  Q.  What do you recall about the discussion of missing work

15  in that meeting?

16  A.  They came out to discuss the information after they

17  had -- they met with the R███████, and I believe B.R. was

18  there.  They provided a copy of the science book and what the

19  parents and B.R. had provided them and during that situation

20  in the room it was -- I'm sorry.  Go ahead.

21  Q.  If I may pause you.  So who was in the meeting that you

22  had with Dr. Zuluaga and Dr. Dreyfuss?

23  A.  At that point in time, it was the administrative team and

24  the counselors involved, so Ms. H██████.

25  Q.  And do you recall whether they showed you the science lab

B.R. v. F.C.S.B.

161

1    book?

2    A.   Yes.  They showed us the science lab -- vocab book, yes.

3    Q.   Do you recall whether it was a photocopy or the actual

4    book?

5    A.   I don't remember if it was the book or a photocopy, but

6    they showed us a copy of what was provided to them.

7    Q.   What do you recall the discussion about what the book

8    looked like?

9    A.   As soon as they put it out, Ms. H█████ was shocked

10   because --

11              MS. ANDERSON:  Objection, hearsay.

12              THE COURT:  Sustained.

13              MS. REWARI:  Your Honor, this is excited utterance.

14              THE COURT:  You have to provide a predicate for an

15   exciting utterance.

16              MS. REWARI:  Okay.

17   BY MS. REWARI:

18   Q.   When they showed the book -- were you with Ms. H█████?

19   A.   I was.

20   Q.   Okay.  And without you saying the words she used, what

21   was, to your observation, her reaction?

22   A.   Surprised.

23   Q.   Okay.  And was it -- how close in time was -- that

24   expression "surprised" to when the book came out?

25   A.   Pretty immediate.

B.R. v. F.C.S.B.

162

1    Q.   Okay.

2            THE COURT:  You're there.

3    BY MS. REWARI:

4    Q.   And what did she say?

5    A.   That the -- that the information that was written on the

6    front cover of the vocab book was not there when she helped

7    find it in the lost and found.

8    Q.   And what was the information that you saw written on the

9    top of the book?

10   A.   It was inappropriate language and some things that were

11   on the book.

12   Q.   Okay.  And if I may show you Plaintiff's Exhibit 531A.

13           MS. REWARI:  I just have a paper copy of it.  If I

14   may hand that to the witness, Your Honor.

15           THE COURT:  You may.

16           MS. ANDERSON:  What exhibit?  Oh.

17   BY MS. REWARI:

18   Q.   I don't need you to read the language.

19           Is that the profanity that you're referring to?

20   A.   Yes, ma'am.

21   Q.   And it's eff you B?

22   A.   Well, the words spelled out, yes.

23   Q.   Right.  The word -- the F-word spelled out?

24   A.   Yes, ma'am.

25   Q.   What else does it say after that?

Direct - P.H.

B.R. v. F.C.S.B.

163

1   A.   The name of the student.

2   Q.   When B.R. went out on homebound instruction, did B.R. or

3   her family make that request to the school?

4   A.   Yes.

5   Q.   Okay.  Did you have any role in the homebound process?

6   A.   Supporting once she was on homebound, yes.

7   Q.   I appreciate that clarification.

8           So can you explain what your role was once she was

9   on homebound?

10  A.   Worked with the teachers and the homebound teachers to

11  make sure that we had the work -- the appropriate work and the

12  appropriate teaching was taking place or supplies that were

13  needed.

14  Q.   Did the process run as it should from your standpoint?

15  A.   Yes.

16  Q.   Was there anything out of the ordinary in how the process

17  was operated for her?

18  A.   No.

19  Q.   Did you do anything differently for her than you had done

20  for other students on homebound instruction?

21  A.   No.

22  Q.   You heard some testimony from B.R. or her mother that she

23  was not able to do certain things while on homebound?

24          Do you agree with that?

25  A.   That she was not able to -- no.

Direct - P.H.
B.R. v. F.C.S.B.

164

1  Q.   Okay.  Was there -- was there anything that she was not

2  permitted to do that other students who are on homebound are

3  permitted to do?

4  A.   No.

5  Q.   Okay.  When you are on homebound -- when a student is on

6  homebound, are they allowed to participate in electives like

7  chorus or drama?

8  A.   It would have to depend on the situation.  If the student

9  was transitioning off of homebound back into the building.

10  But typically, it's the four core that they are provided

11  services through for the teaching.  So when she was on

12  homebound she -- that's what she was receiving support

13  through.

14  Q.   Now B.R.'s mother testified that you had accused B.R. of

15  cheating on something when she was on homebound.

16          Do you recall that testimony?

17  A.   I do.

18  Q.   And did you ever accuse B.R. of cheating when she was on

19  homebound?

20  A.   I did not.

21  Q.   Do you have any understanding of what she could have been

22  referring to?

23  A.   I was working with one of the homebound teachers to make

24  sure they were using the correct resources to prepare B.R. for

25  her assessments and for her learning.  The -- one of my

B.R. v. F.C.S.B.

165

1  teachers identified that it looked like there were other

2  resources opposed to what they were placing on Blackboard was

3  being used.

4  Q.   Okay.  And was that resolved to your satisfaction?

5  A.   Yes.

6  Q.   Okay.  In your discussion with the homebound teacher, did

7  you suggest that B.R. was cheating?

8  A.   No.

9  Q.   All right.  Now, B.R.'s mother testified about going into

10  the girls' locker room with her son to get B.R.'s belongings

11  some point after she was on homebound?

12         MS. ANDERSON:  Objection, leading.

13         THE COURT:  Overruled.

14  BY MS. REWARI:

15  Q.   Do you recall that testimony?

16  A.   I do.

17  Q.   Okay.  Did that -- did that happen, to your recollection?

18  A.   No.

19  Q.   Okay.  Would a parent and her teenage son be permitted to

20  go into the girls' locker room unsupervised?

21  A.   Absolutely not.

22  Q.   She also testified about going through an exterior door

23  by the gym that was propped open and running into you there.

24         Do you recall that?

25  A.   Yeah.  I remember her saying that, yes.

Direct - P.H.

─────────── B. R. v. F.C.S.B. ───────────

166

1   Q.   Did you ever run into her mother by the door of the gym?

2   A.   No.

3        MS. REWARI:  All right.  If we could show

4   Defendants' Exhibit 61, which is the map.

5        THE COURT:  You may.

6        MS. REWARI:  Thank you.

7        (Exhibit published.)

8   BY MS. REWARI:

9   Q.   All right.  Can you show where the gym door is in this

10  map?

11  A.   The gym door is right here.  (Witness complied.)

12  Q.   Where is the parking lot relative to that?

13  A.   Here.

14  Q.   Okay.  Was this -- was the gym door, to your

15  recollection, ever left propped open?

16  A.   No.  There was a badge reader and a video scan system

17  there, so no.

18  Q.   All right.  B.R.'s mother also testified that she said to

19  you that you were responsible for her daughter's rape.

20       Do you recall that testimony?

21  A.   No, that was never said to me.

22  Q.   Do you recall her testifying to that here, though?

23  A.   I do.

24  Q.   Okay.  Do you recall her testifying that you called her

25  daughter a liar?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

───────B. R. v. F. C. S. B.───────

167

1    A.    I do.

2    Q.    And did you ever call her daughter a liar?

3    A.    Never.

4    Q.    All right.  Did --

5              MS. REWARI:  And we can take this down.  Thank you,

6    Grady.

7    BY MS. REWARI:

8    Q.    Did you, at some point, become aware that there was a

9    police investigation into an allegation of rape?

10   A.    Yes.

11   Q.    Okay.  And did you learn about that police investigation

12   from B.R.'s mother?

13   A.    No.

14   Q.    Okay.  Was that -- was that information that came to you

15   through administration?

16   A.    Yes.

17   Q.    Okay.  Was that the first time you heard any allegation

18   that B.R. had been raped?

19   A.    Yes.

20   Q.    Okay.  At any point, when you -- when B.R. was your

21   student, did she tell you that she had been sexually assaulted

22   at school?

23   A.    No.

24   Q.    At any point, did she tell you that boys were putting

25   their hands down her pants?

B.R. v. F.C.S.B.

168

 1  A.   No.

 2  Q.   At any point, did she tell you that boys were putting

 3  their hands up her blouse?

 4  A.   No.

 5  Q.   At any point, did she tell you that boys were going

 6  inside her?

 7  A.   No.

 8  Q.   Did you hear any of those reports about hands down the

 9  pants, hands up the blouse, or going inside her from B.R.'s

10  mother?

11  A.   No.

12  Q.   Did her mother ever report to you that her daughter was

13  being sexual assaulted at school?

14  A.   No.

15  Q.   Did her mother ever report to you that her daughter was

16  being inappropriately touched at school?

17  A.   No.

18  Q.   Now, are you aware that the second amended complaint

19  alleges that B.R. was taken into a closet at school and raped

20  by three unknown males?

21          MS. ANDERSON:  Objection, cumulative.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes.

24  BY MS. REWARI:

25  Q.   Okay.  Are you aware that the second amended complaint

─B. R.  v.  F.C.S.B.─

169

1  also alleges that this type of rape happened on numerous

2  occasions between December 2011 and February 2012?

3  A.   Yes.

4  Q.   In your experience, are the closets at Rachel Carson

5  always locked?

6  A.   Yes.

7  Q.   Can you just describe, from your experience, what the

8  size of the closets are, the janitorial closets?

9  A.   It's an odd shaped.  It has an angled wall, and it's

10  smaller than the area that I'm sitting in now, with a six-foot

11  blue metal shelf and a mop sink.

12  Q.   Okay.  Are you aware of anything happening -- anything

13  untoward happening to B.R. at school during the after-school

14  period?

15  A.   No.

16  Q.   Did you ever observe groups of unknown men wandering

17  through the school?

18  A.   Absolutely not.

19         MS. REWARI:  No further questions.

20         THE COURT:  Ladies and gentlemen, we're going to

21  take our afternoon break.  It's about 3:15, so we'll go until

22  3:30.  Can I convince you all to stay until 4:30, quarter to

23  5:00?

24         Very good.  So that's what we'll shoot for today.

25         Very good.

B.R. v. F.C.S.B.

170

1          (Jury excused.)

2          THE COURT:  You can step down, sir.  Ladies and

3  gentlemen, we're on break until 3:30.

4          (Recess.)

5          THE COURT:  Ms. Anderson, how long do you anticipate

6  on your examination, ma'am?

7          MS. ANDERSON:  About 45 minutes or less, and I think

8  Mr. Kinney is going first, too.

9          THE COURT:  Did you want to ask a lot of questions,

10  Mr. Kinney?

11          MR. KINNEY:  Not a lot, Your Honor.  I should think

12  no more than ten minutes.

13          THE COURT:  Mr. Blanchard?

14          MR. BLANCHARD:  Right now, no.

15          THE COURT:  The reason I'm asking these questions is

16  I would like to the extent we can, to get to the short

17  witness -- I think there was a reference to a short witness.

18          MS. REWARI:  Yes.  We have a short witness.

19          THE COURT:  Okay.  And when you say "short,"

20  somewhere between 15, 30 minutes?

21          MS. REWARI:  Correct.

22          THE COURT:  Very good.  Let's try as best we can to

23  get there.

24          MS. REWARI:  Thank you.

25          THE COURT:  We're going to go to you first,

─B.R. v. F.C.S.B.─

171

1      Mr. Kinney.

2                  MS. ANDERSON:  I'll try to be quick.

3                  (Jury present.)

4                  THE COURT:  Thank you.  Ladies and gentlemen, you

5      may have a seat.  Just for your information, and I know that I

6      like information too so I can plan, we're probably going to be

7      able to get through this witness and likely a shorter witness

8      at the end of the day.

9                  Mr. Kinney.

10                 MR. KINNEY:  Thank you, Your Honor.

11                          DIRECT EXAMINATION

12     BY MR. KINNEY:

13     Q.   Mr. H██████, I'm Michael Kinney, I have to say for the

14     record.

15     A.   Yes, sir.

16     Q.   I'd like to ask you some questions about the

17     November 21st meeting that Ms. Rewari asked you about.

18     A.   Okay.

19     Q.   Do you recall you outlined some steps you put in place

20     after that meeting?

21     A.   Correct.

22     Q.   Including speaking to the core teachers and having them

23     keeping an extra eye on the locker pod?

24     A.   Yes.

25     Q.   Including having Ms. H██████ shadow B.R.?

─ B.R. v. F.C.S.B. ─

172

1    A.    Correct.

2    Q.    Did you also have Ms. F██████ shadow B.R. for a time?

3    A.    I didn't directly have that happen then, but later on

4    Ms. F██████ did shadow B.R.

5    Q.    And there was some other measures you put in place at

6    that time?

7    A.    As well as supporting a walking path through the

8    building, yes.

9    Q.    Were these steps taken before any investigation was

10   begun?

11   A.    These steps were taken while an investigation was going

12   on.  So simultaneously, as Ms. T████ was looking into the

13   situation, we started working on the other information.

14   Q.    And what was -- what was the purpose, then, of putting

15   those measures in place before the investigation was

16   completed?

17   A.    We always like to err on the side of making sure.  So

18   that we wouldn't have any other situations while an allegation

19   was being looked into.

20   Q.    While those measures were in place, did you receive any

21   report of any other issue?

22   A.    No.

23   Q.    Mr. H█████, remaining on that topic, did you hear

24   testimony from B.R. and from her mother that you instructed

25   B.R. to stay home until after the Thanksgiving break?

─────────B.R. v. F.C.S.B.─────────

173

1   A.    I did.

2   Q.    Did you tell her to stay home until after the

3   Thanksgiving break?

4   A.    No, I did not.

5   Q.    In your view, was there any -- any necessity for her to

6   stay home until after the Thanksgiving break?

7   A.    No.

8   Q.    To your knowledge, did Ms. T███ tell Ms. B.R. to stay

9   home until after the Thanksgiving break?

10            MS. ANDERSON:  Objection, hearsay.

11            THE COURT:  Sustained.

12  BY MR. KINNEY:

13  Q.    What was your understanding of B.R. staying home after

14  the Thanksgiving break?

15  A.    The mother had emailed us and said she was keeping her

16  home.

17  Q.    Do you remember the date of that email?

18  A.    I believe it was on the Monday, the 21st.

19  Q.    How many days -- as I think about it, how many days were

20  there between Monday, the 21st, and the Thanksgiving break?

21  A.    I don't have the calendar in front of me, but I believe

22  it was two-and-a-half.  At that point in time, we had a

23  half-day before the Thanksgiving break.

24  Q.    I should specify.  My question was school days?

25  A.    I believe two-and-a-half.

—B.R. v. F.C.S.B.—

174

1          Can I fix something there?  It had been

2     one-and-a-half past the 21st.  So that week was

3     two-and-a-half.

4          THE COURT:  Why don't you post the calendar from

5     that year and let him see it.

6          MR. KINNEY:  Thank you, Your Honor.  May we post

7     that.

8          THE COURT:  You may.

9          (Exhibit published.)

10    BY MR. KINNEY:

11    Q.   So, Mr. H█████, do you see the calendar on your screen?

12    A.   I do.

13    Q.   Calendar for November of 2011?

14    A.   Correct.

15    Q.   And is this consistent with your memory that between

16    November 21 and the Thanksgiving holiday, there were

17    two-and-a-half school days?

18    A.   Correct.  The "2E" is an early release, yes.

19    Q.   Mr. H█████, in the time that B.R. was a student at Rachel

20    Carson Middle School, were you ever -- did you ever observe

21    any threat to her safety?

22    A.   No.

23    Q.   Did anyone ever report to you a threat to her safety?

24    A.   No.

25    Q.   Did you read the pleadings that were filed in this case?

B.R. v. F.C.S.B.

175

1    A.    Yes.

2    Q.    All three of the complaints?

3    A.    In detail, all three.

4    Q.    As you read those complaints in detail, were you aware of

5    any factual basis for what was being alleged?

6    A.    None.

7    Q.    Do you believe the allegations that B.R. made against you

8    are false?

9    A.    Yes.

10   Q.    You remain employed by Fairfax County Public Schools?

11   A.    Proudly.

12   Q.    And you have been while this case was pending?

13         THE COURT:  You're leading.

14   BY MR. KINNEY:

15   Q.    Have you been employed while this case was pending?

16   A.    Yes.

17   Q.    How has this case impacted the work that you do these

18   last four-and-a-half years?

19   A.    Professionally, I build everything on my word, working

20   with my families and my communities.  So in order to be able

21   to do my job, they have to trust that, when they drop their

22   children off at that front door, that I'm taking care of their

23   babies.  And to be able to put, just in a shadow of a doubt

24   into my community members has made my job much more difficult

25   to the point where, you know, the parents have brought it up

B.R. v. F.C.S.B.

176

1    in 504 meetings, where I've been dealing with the

2    circumstances from things.  So it is really --

3                THE COURT:  He's answered.

4                THE WITNESS:  Oh, okay.

5    BY MR. KINNEY:

6    Q.   Are you aware of whether students are aware of this case?

7    A.   Most definitely, yes.

8    Q.   How are you aware of that?

9    A.   To the point where my civics students this year wanted to

10   use this case to research.

11   Q.   To research their civics class?

12   A.   Yes.

13   Q.   Have your students asked you about this case?

14   A.   Most definitely.

15   Q.   What do you tell your students --

16               MS. ANDERSON:  Objection, Your Honor.

17               THE COURT:  Sustained.

18               MR. KINNEY:  One moment, Your Honor.

19               THE COURT:  You may.

20               MR. KINNEY:  Thank you, Your Honor.  That's all I

21   got.

22               Thank you, Mr. H█████.

23               THE COURT:  Mr. Blanchard?

24               MR. BLANCHARD:  No questions, Your Honor.

25               THE COURT:  Ms. Anderson.

B.R. v. F.C.S.B.

177

1          MS. ANDERSON:  Thank you, Your Honor.

2          May I approach?

3          THE COURT:  You may.

4                    CROSS-EXAMINATION

5   BY MS. ANDERSON:

6   Q.   Good afternoon, Mr. H██████.

7   A.   Good afternoon.

8   Q.   I'm Alison Anderson, one of B██████ attorneys.  And I'll

9   be asking you a few questions.

10         Aside from in the hallways, you and I haven't met

11  before, correct?

12  A.   No, ma'am.

13  Q.   And so speaking about B█████ and going back to 2011, that

14  school year.  B█████ was your student, correct?

15  A.   Correct.

16  Q.   So -- by saying "your student," that means that she was

17  assigned to you, as her assistant principal; is that right?

18  A.   I was assigned to her team, yes.

19  Q.   And for the kids that are on -- you were assigned to her

20  team, you just said, so the Explorer team?

21  A.   Yes, ma'am.

22  Q.   And she was the member of the Explorer team, correct?

23  A.   Correct.

24  Q.   And for the kids on your teams, you were responsible for

25  them, correct?

B.R. v. F.C.S.B.

178

1  A.   We were all responsible for them, but I was responsible

2  for supporting that team, yes.

3  Q.   And for helping those kids, correct?

4  A.   Correct.

5  Q.   And looking out for their safety, correct?

6  A.   Correct.

7  Q.   And you owed them a duty to look out for their safety and

8  for them regardless of how you may have felt about their

9  parents, correct?

10          MR. KINNEY:  Objection.

11          THE COURT:  Rephrase, Ms. Anderson.

12  BY MS. ANDERSON:

13  Q.   You had this responsibility to students regardless of

14  whether you thought their parent may have been really involved

15  or not?

16  A.   Can you repeat that.

17  Q.   Yeah.  I think we've heard the word "helicopter mom"

18  thrown out in this trial, but you had a responsibility to

19  students regardless of whether their parent was someone who

20  never came to school, who came to school a lot, who was a,

21  quote/unquote, "helicopter mom," correct?  You still had that

22  responsibility for those students?

23  A.   I worked for my students, yes, so.

24  Q.   And I think on direct, you talked a lot about training

25  and PowerPoints about bullying and harassment.

B.R. v. F.C.S.B.

179

1          Do you remember that?

2    A.   I remember speaking about some, yes.

3    Q.   And I think that included an antibullying month.  You

4    spoke about that?

5    A.   I -- yes.

6    Q.   Okay.  And you would agree with me, though, that while

7    it's important to have those things, it's also really

8    important, the school's response, when a student reports

9    bullying and harassment, correct?

10   A.   Most definitely.

11   Q.   Okay.  And that includes how the school responds toward

12   the alleged harasser as well, correct?

13   A.   In an allegation or if it's founded?

14   Q.   In an allegation that it's important -- how you respond

15   and interact with the individual student who is alleged to be

16   the harasser, that that's important?

17   A.   I think it's important to support all the students.

18   Q.   And including the bystanders, anyone who might have been

19   a witness to any bullying or harassment, correct?

20   A.   I think it's important to support all the students.

21   Q.   And you testified about your November 21st meeting with

22   B███, her mom, her dad, and other school administrators.

23          Do you remember talking about that?

24   A.   I remember talking about the November 21st, yes.

25   Q.   Okay.  And this meeting where B███ and her family

B.R. v. F.C.S.B.

180

1    reported that she had been sexually harassed and about the $50

2    and the voicemail?

3    A.    I didn't talk about any of that in my testimony.

4    Q.    Okay.  So I'm not asking about your testimony, but do you

5    remember that from the meeting?

6    A.    I do not.

7    Q.    Okay.  And you testified here today that you were in and

8    out of this meeting, correct?

9    A.    Correct.

10   Q.    And now, B████, again, she was your student, right?

11   A.    She was a Rachel Carson student, yes.

12   Q.    And she was assigned to your team, correct?

13   A.    Yes.

14   Q.    Okay.  And she was reporting -- you would agree with me

15   some serious issues that day; is that right?

16   A.    From my recollection, that day I wasn't involved in her

17   reporting any of those issues.  It was predominantly to a

18   voicemail.

19   Q.    Okay.  And you would have read her statement, correct --

20   A.    I believe --

21   Q.    -- about that day?

22   A.    Not necessarily.

23   Q.    Okay.  So she's your student, but you didn't read the

24   statement that she wrote that day at that meeting?

25   A.    At some point in time, I believe that Ms. T████ and I,

────── B.R. v. F.C.S.B. ──────

181

1    when we were working through the plan, there was a statement,

2    but I don't recall her writing a statement, but I wasn't in

3    the room.  But I've seen the statement 200 times now.

4    Q.   So you don't recall her writing the statement, but I

5    think it's fair to say you're pretty sure you saw it within

6    that day or two, November 21st or 22nd?

7    A.   Correct.

8            MS. ANDERSON:  Okay.  So if we could just pull that

9    up quickly.  May I publish, Your Honor, Plaintiff's

10   Exhibit 77?

11           THE COURT:  You may.

12           MS. ANDERSON:  Page 1.

13           THE COURT:  You may.

14           (Exhibit published.)

15   BY MS. ANDERSON:

16   Q.   So you would agree that in her statement she said she's

17   scared to come to school; correct?

18   A.   It's highlighted, yes.

19   Q.   And you would agree that that's serious if a student says

20   they are scared to come to school?

21   A.   I think all allegations can be serious, but yes.

22   Q.   And that -- if we can scroll down to the bottom.

23           And that she is saying that this started three weeks

24   ago, but is really escalated for the last two weeks, correct?

25           Do you see that there?

Cross - P.H.

─B. R. v. F.C.S.B.─

182

1  A.    I do.

2  Q.    Okay.  And you would agree that that's something

3  important to look into, correct?

4  A.    I think all aspects are important to look into.

5  Q.    You would agree that what she is alleging, at least in

6  here, is sexual harassment, correct?

7  A.    I would have to see the specifics.

8  Q.    Okay.  I think you testified you've seen this a number of

9  times, but if you'd like to read through it, it's also in the

10  binder in front of you, I believe.

11  A.    I think it's an allegation, and it would depend on what

12  is the outcome when looking into this.  This is one

13  perspective in a situation.

14  Q.    Okay.  So I asked you, based on the allegations, would

15  you call this sexual harassment?

16  A.    Not necessarily.

17  Q.    Okay.  And so, you don't report this to the Title IX

18  office for superintendent's office, correct?

19  A.    It would depend on what is the outcome of the situation

20  to whether -- what we would do from there outlined in SR&R.

21  Q.    You didn't report this one though, right?  You didn't

22  call the Title IX office on this occasion here in November 21,

23  2011?

24  A.    I didn't investigate this situation.

25  Q.    You didn't investigate it, correct?

─────B.R. v. F.C.S.B.─────

183

1   A.   No, ma'am, I did not.

2   Q.   But to be clear, you did not call the Title IX office; is

3   that right?

4   A.   No, ma'am.

5   Q.   No, ma'am, as in you did call the Title IX office or --

6   A.   I did not -- no, ma'am.

7   Q.   Too many negatives maybe.

8          THE COURT:  Did you or did you not call --

9          THE WITNESS:  I did not call the Title IX office.  I

10  apologize if that was mine.

11  BY MS. ANDERSON:

12  Q.   No problem.  I just want to make sure the record is

13  clear.

14          So this is your student.  You do not investigate it,

15  though, correct; Ms. T███ investigates?

16  A.   Ms. T███ investigated because the students were on her

17  teams.

18  Q.   And that was part of the design of how Rachel Carson

19  responded and investigated was that it was the -- the

20  assistant principal who was assigned to the person who was

21  accused of doing something?

22  A.   Yes, ma'am.

23  Q.   Okay.  And you knew that C.K. had had a history of

24  discipline at the school, correct?

25  A.   I believe there -- there was one situation, but it wasn't

B.R. v. F.C.S.B.

184

1    something that came into play, no.

2    Q.    Okay.  But you were aware -- you had disciplined him

3    twice before this, correct?

4    A.    Yes, ma'am.

5    Q.    You yourself, correct?

6    A.    Correct.

7    Q.    And then you had been aware of the incident where he had

8    exposed his genitals, correct?

9    A.    I believe, at some point in time, Ms. T█████ talked with

10   us about an allegation of that, yes.

11   Q.    And you, yourself, you did not interview any of the

12   witnesses that B█████ lists on her statement as having

13   witnessed what has happened to her, correct?

14   A.    I didn't do that investigation.  Ms. T█████ did.

15   Q.    But just to be clear, you did not speak with those

16   witnesses on her statement?

17   A.    No, ma'am.

18   Q.    Okay.  And you would agree with me that -- you spoke

19   about building trust, right, on direct, with your students?

20   A.    Yes, ma'am.

21   Q.    Okay.  And you would agree with me that it can sometimes

22   be challenging for a 12-year-old to approach an assistant

23   principal to seek help, right?

24   A.    I think it depends on the student.  I had students coming

25   to me all the time, regularly, and I -- I spent years building

B.R. v. F.C.S.B.

185

1   that relationship within the community.  It didn't just happen

2   in September and October.  That was what I had done for a

3   really long time.

4   Q.   And this student in particular, B████, had been at the

5   school just for a few weeks at this point, right?

6   A.   Correct.

7   Q.   And you were there in that November 22nd meeting as well

8   when Ms. T████ tells B████ that her report is -- is

9   unverified?

10  A.   I wasn't in that meeting, no, ma'am.

11  Q.   You were not in that meeting?

12  A.   No, ma'am.

13  Q.   Ms. T████, though, informs you of the results of the

14  investigation, correct?  That it's unverified?

15  A.   I don't know at what point in time she informed me.  We

16  just put measures in place to be able to support.

17  Q.   So you're not sure when Ms. T████ told you that; you were

18  just focused on the measures.  Is that your testimony?

19  A.   No.  My testimony is we were in constant communication

20  through the situation, so I can't pinpoint an exact time

21  because I wasn't in the meeting.

22  Q.   But you would have heard about it at some point in

23  November 21st to November 22nd time period?

24  A.   Yes, ma'am.

25  Q.   And you knew that B████ was scared and worried about

B.R. v. F.C.S.B.

186

1   potential retribution, correct?

2   A.   No, ma'am.  Is there -- was there a document or something

3   towards that?

4   Q.   Yeah.  Why don't we go ahead and pull up --

5           MS. ANDERSON:  If I may publish, Your Honor -- it's

6   already admitted -- Plaintiff's Exhibit 79.

7           THE COURT:  You may.

8           (Exhibit published.)

9   BY MS. ANDERSON:

10  Q.   And this is in your book, or you can look on the screen.

11  It might be easier.

12          This is an email dated November 21, 2011, correct?

13  A.   Yes, ma'am.

14  Q.   Okay.  And it's addressed to you, correct?

15  A.   It's addressed to myself, Ms. T███ and Ms. H██████.

16  Q.   Correct.  And that includes you?

17  A.   Yes, ma'am.

18  Q.   And it's from the R█████ family email address, correct?

19  A.   Correct.

20  Q.   And that's the email address that B█████ mom, she signs

21  below -- we can show that in a second -- correct?

22          Do you see that?

23  A.   Yes, ma'am.

24  Q.   Okay.  And she's talking about this meeting that she had

25  just had that day, correct, November 21st?

1   A.   She's outlining things, yes.

2   Q.   And she says -- and sorry my mic is blocking it, but --

3   at that bottom paragraph, "B███████ is scared about any

4   retribution she may be subjected to as a result of her sharing

5   the details of the hostile environment created by the

6   demeaning words and intimidating actions of" -- and then she

7   names the three students, D.N., C.K. and J.O., correct?

8   A.   She does, yes.

9   Q.   So you were aware that B██████ was worried about

10  retribution after having come to the school?

11  A.   Mom informed of that, yes.

12  Q.   Okay.  So you're aware that mom informed you of it?

13  A.   Correct.  Yes, ma'am.

14  Q.   Okay.

15        MS. ANDERSON:  And we can take that down.  Thank

16  you, Mr. Brown.

17  BY MS. ANDERSON:

18  Q.   And you would agree that, if a student speaks out, that

19  sometimes they might be more vulnerable in those situations

20  afterwards to their potential harassers?

21        MR. KINNEY:  Objection, Your Honor.  Speculation.

22        MS. ANDERSON:  He's talking about all of

23  his training --

24        THE COURT:  I'm going to allow it -- you won.

25        MS. ANDERSON:  What's that?

─────────── B.R. v. F.C.S.B. ───────────

188

1    THE COURT:  You won.

2    MS. ANDERSON:  Okay.  Thank you.

3    THE WITNESS:  Can you repeat the question?

4  BY MS. ANDERSON:

5  Q.   Yes.  So you would agree if a student speaks up about

6  harassment or bullying, that they could potentially become

7  more vulnerable to increased harassment or bullying because

8  they've gone to the administration if those harassers find

9  out?

10  A.   I don't know if I would agree with that.  Every situation

11  is a little different.  I think any time a student were to

12  report things, there could be a concern with that, but part of

13  our job is to make sure that they understand that we have

14  those steps in place to support them.  And as an

15  administrator, we don't go around telling other students that

16  this student told us.  That's one of the glories of having

17  teachers in the hallway.  We can blame it on teachers.

18  Q.   Okay.  But you would agree with me that D.N. and C.K.

19  were approached about these allegations specific to B███,

20  correct?

21  A.    I know Ms. T███ investigated and talked with them, yes.

22  Q.   So you're not aware whether or not they would have

23  figured out that -- that B███ had gone to assistant

24  principals?

25  A.   Could you repeat the question, please?

1   Q.   I think you're saying that you're just not aware whether

2   or not D.N. and C.K. would have been told that B█████ had gone

3   and reported?

4   A.   I'm not sure how it was explained to them, how the

5   information was provided.

6   Q.   Okay.  Now, let's talk about the -- your one

7   investigation that you do.  I think you spoke about on direct.

8   And that was into a student -- and just to be clear, the

9   initials are B and G, correct?

10  A.   Yes, ma'am.

11  Q.   I just wanted to be clear, the kids name is not Benji but

12  Ben and then G is --

13  A.   Yes, ma'am.

14  Q.   And this is on January 19, 2019 [sic], correct?

15  A.   I don't have the exact date, but yes.

16  Q.   Sounds about right?

17  A.   It was in January sometime, yes, ma'am.

18  Q.   And you go and you speak to the student B.G., correct?

19  A.   Yes, ma'am.

20  Q.   And he -- you said he admitted to calling her a lesbian;

21  is that right?

22  A.   When we talked and we were going through, he told me that

23  he called her a lesbian, yes.

24  Q.   And so he himself admits to having done that, correct?

25  A.   Correct.

B.R. v. F.C.S.B.

190

1    Q.    And then you find that to be verified, right?

2    A.    Correct.

3    Q.    Okay.  And then you give him the consequence, correct?

4    A.    Yes, ma'am.

5    Q.    Okay.  And so at this point, you've heard, at a minimum,

6    about C.K., D.N., J.O. and B.G., correct, having potentially

7    called B█████ these types of names and sexual harassment,

8    correct?

9    A.    When we look at situations, we don't put them all into

10   one thing.  So I think you're taking one and lumping it into

11   something else.

12   Q.    Right.

13   A.    So that wouldn't be a trend.

14   Q.    Right.  So you don't take -- you don't look at the bigger

15   picture, the trend or the pattern, of what might be occurring

16   between multiple incidents.  You take the one, correct?

17   A.    No, that's -- actually I was trying to say the

18   opposite -- is we do look for those types of trends and

19   patterns and that just because the language was used doesn't

20   mean that it's involved with the situation before.

21   Q.    And because you're starting to see a trend or a pattern,

22   then you start to become more concerned about what is

23   occurring with B█████ at the school, correct?

24   A.    I think that I look at all circumstances for what they

25   are, and I dealt with them.  That's why that student had a

B.R. v. F.C.S.B.
191

1   consequence.

2   Q.   Okay.  And so, you then spoke about your January 27th

3   meeting.  Do you remember that on direct?

4   A.   The -- the one with Ms. R███████?

5   Q.   The one with Ms. R██████.

6   A.   And Ms. B██████?

7   Q.   Yup.

8   A.   Yes, ma'am.

9   Q.   And I think, just to make sure we're all on the same

10  page.  If you could take a look at Defendants' Exhibit 144 in

11  your binder.

12  A.   Sure.

13  Q.   And this is an email about that meeting, correct?

14  A.   Did you say 144?

15  Q.   Defendants' Exhibit 144, so those would be behind the

16  Plaintiff's.  I can --

17           MS. ANDERSON:  Your Honor, may I approach?

18           THE COURT:  You can approach.

19  BY MS. ANDERSON:

20  Q.   Okay.  And so is that an email in reference to this

21  meeting?

22  A.   I don't think this is a response to that meeting.

23  Q.   Not a response.  So is this an email between you and

24  Mr. F███████ where he is forwarding an email from the R██████

25  family?

─────B.R. v. F.C.S.B.─────

192

1    A.    I see it from the Carson attendance line.

2    Q.    From the Carson attendance line, correct?

3    A.    Which is an automated system, that it sends out when

4    people aren't there.

5    Q.    Correct.

6    A.    And they can respond back.

7    Q.    Yes.  So -- but it's an email from Ms. R█████ to the

8    attendance line, and it's being forwarded to you, and it says

9    "FYI, please see A███."

10    A.    So this was on the 26th, and then -- correct, and then we

11    had a meeting with the parent on the 27th.

12              MS. ANDERSON:  So I move to admit Defendants'

13    Exhibit 144, please.

14              MS. REWARI:  No objection.

15              THE COURT:  Without objection.

16    (Plaintiffs offered Defendants' Exhibit No. 144, was admitted

17    into evidence.)

18    BY MS. ANDERSON:

19    Q.    Okay.  So I think we've already talked about the email,

20    but this is Ms. R█████ responding to the attendance line,

21    correct?

22    A.    Yes, ma'am.

23    Q.    Okay.  And she says, "Please be advised we kept our

24    daughter, B█████, home due to increased level of bullying and

25    vandalism she experienced this week.  We will remain home on

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────B.R. v. F.C.S.B.─────────────

193

 1   Friday as well."

 2          Is that correct?

 3   A.   That's what it says, yes, ma'am.

 4   Q.   And it gets forwarded to you, correct?

 5   A.   Yes, ma'am.

 6   Q.   And that's the next day, on Friday, the 27th?

 7   A.   Correct.

 8   Q.   And it says "FYI, please see A████."

 9          Is that correct?

10   A.   Yes.

11   Q.   Okay.  And that's generally Mr. F███████?

12   A.   Yes, ma'am.

13   Q.   This is the day that you end up meeting with

14   Ms. R██████ -- or Ms. R.?

15   A.   Yes, ma'am.

16   Q.   So that day you meet with her --

17          MS. ANDERSON:  We can take that down.  Thank you,

18   Mr. Brown.

19   BY MS. ANDERSON:

20   Q.   So that day it's not -- you're not the only one who meets

21   with Mrs. R., correct?

22   A.   Correct.

23   Q.   And that's also -- Ms. B█████ joins you?

24   A.   Yes, ma'am.

25   Q.   Okay.  And in that meeting, I think you talked about

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────
EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

194

1    issues of vandalism or paperwork being missing, but I want to

2    talk about:  Mom also told you about threats that were going

3    on at the school; isn't that correct?

4    A.   I do not remember that, no.

5    Q.   So you have no recall of Mom bringing up the individuals

6    were also threatening --

7    A.   Not during that meeting.

8    Q.   -- B█████?

9            And you have no recall whatsoever of her talking

10   about Facebook messages in that meeting?

11   A.   No.

12   Q.   And no recall of what Ms. B█████ responds to those issues

13   in that meeting?

14   A.   Ms. B█████ -- she'd asked for some resources.  Ms. B█████

15   said she would provide some resources.

16   Q.   And that's all you remember about what Ms. B█████ says?

17   A.   At this point, yes, I don't remember vividly the meeting.

18   I know that Mom's concerns from that email were regarding the

19   missing work as well as she had brought up some information

20   about B████ not liking being pulled in and out of class.  So

21   we spent predominantly that -- that was the meeting, and

22   that's when I followed up with an email to the parent

23   reviewing the plan after that meeting.

24   Q.   So you have no memory about anything about Facebook

25   messages, correct?

B.R. v. F.C.S.B.

195

1  A.   I mean, there's a lot of Facebook messages.  I don't

2  remember in that meeting about the Facebook messages.  No,

3  ma'am.

4  Q.   You talked about -- let's talk about B████ last day at

5  school.

6          Were you aware that she had been pulled from

7  in-person learning at Rachel Carson on February 9th that day?

8  A.   Yes, ma'am.

9  Q.   So you were informed of that, correct?

10 A.   She was one of my students, yes.  She was in our school,

11 yes, ma'am.

12 Q.   She was one of your students.  And she, that day also,

13 had an incident in the cafeteria between her and a kid named

14 Ben F.; do you remember that?

15 A.   Yes, ma'am.

16 Q.   And later that day, after she's pulled out of school --

17 so the family also, then, reaches out to the superintendent's

18 office; is that correct?

19 A.   At some point in time -- I don't know when she did, but

20 at some point in time they reached out to the superintendent's

21 office, yes, ma'am.

22 Q.   And you don't remember that that was certainly by the

23 next day?

24 A.   I don't know what day it is, the day they contacted them.

25 I just know there was a contact, yes, ma'am.

B.R. v. F.C.S.B.

196

1  Q.   And there's a significant investigation that begins into

2  that cafeteria incident; do you remember that?

3  A.   I think we investigated all aspects.  Ms. B███ did

4  investigate the situation in the cafeteria, yes, ma'am.

5  Q.   So, again, that was Ms. B███ that investigated that,

6  correct?

7  A.   Yes, ma'am.

8  Q.   Okay.  And not you?

9  A.   No, the student was on Ms. B███ team.

10 Q.   But B███ was on your team, correct?

11 A.   But the -- the alleged aggressor in that situation was on

12 the other team.

13 Q.   Even though at some points the school ultimately decided

14 that if B███ came back, she would have been disciplined for

15 that cafeteria incident?

16 A.   I don't have the specifics of that, but if -- if it

17 would -- if one administrator started a situation, another one

18 wouldn't take it over.

19 Q.   Okay.  But you would be involved, given that it's your

20 student?

21 A.   We collaborate all the time, so.

22 Q.   And do you remember during that time other students

23 coming to you to talk to you about harassment that B███ had

24 been enduring while she was at Rachel Carson?

25 A.   No, ma'am.

B.R. v. F.C.S.B.

197

1   Q.   So you have no memory having met with Co██████ K.?

2   A.   I remember supporting other people while we were looking

3   into the situation.  But I didn't, no.

4   Q.   And by "supporting," you mean attending meetings with

5   students?

6   A.   I might have pulled a student out of class and walked

7   them down or things from that standpoint, but I did not

8   interview him.

9   Q.   Okay.  You don't remember any meeting with

10  Co██████    K.?

11  A.   I didn't say that.

12          MS. REWARI:  Asked and answered.

13          THE COURT:  Sustained.

14  BY MS. ANDERSON:

15  Q.   Although I think you just said, "I didn't say that."

16          Okay.  Let's talk a little bit about -- so that --

17  that week the assistant principals then worked together on a

18  14-page, single-spaced memo that gets sent to the

19  superintendent's office?

20          MS. REWARI:  Objection.  Outside the scope.

21          THE COURT:  I'm going to allow him to answer.

22          THE WITNESS:  Which week are you referring to?

23  BY MS. ANDERSON:

24  Q.   The week that B███ is pulled out of school and the

25  family reaches out to the superintendent's office.  You and

─────B.R. v. F.C.S.B.─────

198

1  Ms. T███ and Ms. B████ worked together on a memo that's then

2  sent to the superintendent's office; is that correct?

3  A.   Except I don't know what time frame, but, yes, we worked

4  on that.

5  Q.   Okay.  And the three of you worked on that together,

6  correct?

7  A.   Correct.

8  Q.   And the purpose of that was "to make sure that we

9  documented all of our notes and things from that and what

10  steps were taken and placed to show the information was

11  there."

12  A.   Correct.

13  Q.   Okay.  And you also spoke with Ms. H████ as well?

14  A.   I think we spoke with everyone that was part of all the

15  situations, yes.

16  Q.   Okay.  And it was important to get all the important

17  information into that memo, correct?

18  A.   Yes.

19  Q.   And in that memo, there's no mention of anyone

20  interviewing B███ witnesses on November 21st?

21  A.   Which witnesses?

22  Q.   The witnesses that she identifies in her statement as

23  witnesses to her harassment on the 21st?

24       I'm happy to pull that up.  Would it be helpful?

25  A.   That would be great, yes.

─────B.R. v. F.C.S.B.─────

199

1          MS. ANDERSON:  Publish once again, Your Honor, 77?

2          THE COURT:  You may.

3          MS. ANDERSON:  And we'll go to page 2.

4          THE COURT:  You may.

5          MS. ANDERSON:  Page 2, please.

6          (Exhibit published.)

7    BY MS. ANDERSON:

8    Q.   So she identifies A.J., M.J., and J.H. in her statement.

9    Do you see that there?

10   A.   Yes, ma'am.

11   Q.   Okay.  And there was no mention of anyone having

12   interviewed those three students in that memo the three of you

13   worked on?

14   A.   I don't have that in front of me, but if it's not

15   mentioned, then it's not in there.

16          MS. ANDERSON:  Okay.  We can take that down.  Thank

17   you, Mr. Brown.

18   BY MS. ANDERSON:

19   Q.   I think you spoke about receiving a lot of training on

20   investigations; is that right?

21   A.   Can I -- can I say something?  I don't think I answered

22   your last question because -- you -- I wanted to state that,

23   if it's not in the memo or from that area, that it -- possibly

24   the students didn't have information to provide, or there

25   could be something along the lines of that.  So there's a lot

─────────B. R.  v.  F. C. S. B.─────────

                                                          200

1    of reasons why there couldn't be information in on those

2    students.

3    Q.   So you -- your testimony is that any memo where the whole

4    purpose is to make sure you document everything from your

5    notes and all steps taken, that if you had spoken to the

6    witnesses identified by the student who is complaining of

7    harassment, it wouldn't be important to note that?

8              MS. REWARI:  Objection.  Argumentative.

9              THE COURT:  And it was a long, long question too.

10   There was a lot of twists and turns in it.

11             Why don't you break it down a little bit,

12   Ms. Anderson.

13             MS. ANDERSON:  Sure.  I'll break it down.  Thank

14   you, Your Honor.

15   BY MS. ANDERSON:

16   Q.   So you're testifying that in a memo where the purpose was

17   to document all of your notes and all the steps that you have

18   taken, that you would have potentially left out an interview

19   of witnesses identified by the complainant?

20   A.   I'm just saying all the pertinent information would be in

21   there.  Since I didn't do the investigation, but all the

22   information that was needed to document would be there.

23   Q.   Okay.  So it's your view that it's not pertinent?

24   A.   I didn't say that.

25   Q.   Okay.  You had a lot -- you talked about training in

B.R. v. F.C.S.B.

201

1   investigations on direct.  Do you remember that?

2   A.   Yes, ma'am.

3   Q.   And I think you spoke about it being important to take

4   notes?

5   A.   It's important to take notes, yes.

6   Q.   And you weren't trained to get rid of those notes,

7   correct?

8   A.   No, ma'am.

9   Q.   Okay.  So I think you said you don't recall running into

10   Mrs. R. and her son at all in March of 2012 in the school; is

11   that correct?

12   A.   I don't believe that's what I said.

13   Q.   Okay.  So do you remember having some other conversation

14   with Ms. R. and her son in March of 2012 in the school?

15   A.   I know that Mom was coming in to pick up work for a while

16   and so was her brother, so.

17   Q.   And you don't remember a conversation where she goes and

18   gets things from the locker, the PE locker?

19   A.   No, ma'am.

20   Q.   Never seeing her leaving with a trash bag of materials

21   from the PE locker, no memory of it?

22   A.   I never let them go into the PE locker room with her son.

23   Q.   Did you say you never let her?

24   A.   Like, I never walked her over, and they did not go into

25   the PE locker room.  I did not have that -- that situation.

─────B. R. v. F.C.S.B.─────

202

1   Q.   Well, you just know that you're saying you don't remember

2   having taken her there.  You can't possibly know if she ever

3   went there?

4            MS. REWARI:  Objection.  Misstate his testimony.

5            THE COURT:  Rephrase.

6            MS. ANDERSON:  I'm actually trying to understand the

7   answer a little bit.

8            THE WITNESS:  It did not happen.  No.

9            THE COURT:  Hold it, hold it, hold it.

10            THE WITNESS:  I apologize.

11            THE COURT:  That's okay.  When the lawyers are

12   speaking, I'm speaking -- particularly when I'm speaking, it's

13   probably a good idea to hesitate.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  What is the objection?

16            MS. REWARI:  Misstates his testimony.

17            THE COURT:  Rephrase, Ms. Anderson.

18   BY MS. ANDERSON:

19   Q.   I'm totally lost for what question I was on, but I think

20   I was trying to understand your testimony.

21            But your testimony is that you don't have any memory

22   of having run into Ms. R. carrying materials from the PE

23   locker or getting those materials?

24   A.   I'm just saying that that did not happen.

25            THE COURT:  So the predicate for the question was

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

—B.R. v. F.C.S.B.—

203

 1  two part.  It was whether Ms. R. and her -- whether --

 2           THE WITNESS:  I apologize, sir.

 3           THE COURT:  -- whether Ms. R. and her son came to

 4  the school and whether you observed them?  That's first part

 5  of the question.  Did you ever observe that at any point?

 6           THE WITNESS:  No, sir.

 7           THE COURT:  Did you ever observe Ms. R. retrieve

 8  anything from the PE locker room?

 9           THE WITNESS:  No, sir.

10           THE COURT:  Okay.

11  BY MS. ANDERSON:

12  Q.   Now, in September 2012, you're also a part of -- you end

13  up disciplining J⬛ O. as well; correct?

14           MS. REWARI:  Objection, Your Honor.  Outside the

15  scope, and I believe --

16           THE COURT:  Sustained.

17  BY MS. ANDERSON:

18  Q.   When -- and B⬛ is a student -- remains a student of

19  Rachel Carson until she is removed by her mother March 1,

20  2013, correct?

21  A.   Correct.

22  Q.   Okay.  She remains your student and assigned to you,

23  correct?

24  A.   I believe so.  She's assigned to Rachel Carson.

25  Q.   And I think you testified about your role in regards to

—B.R. v. F.C.S.B.—

204

1  her homebound services; is that correct?

2  A.   Yes, ma'am.

3  Q.   And you said that you had never heard from Mom that she

4  had been raped; is that correct?

5  A.   Correct.

6  Q.   Okay.  But as part of her homebound paperwork, there was

7  included the statement that she had been raped, correct?

8         MS. REWARI:  Objection, Your Honor, assume facts not

9  in evidence.

10         THE COURT:  Sustained.

11         MS. ANDERSON:  Your Honor, may we sidebar.

12         THE COURT:  No.

13         MS. ANDERSON:  Okay.

14         192 is already in evidence.

15         If I may publish, Your Honor.  Plaintiff's

16  Exhibit 192.

17         THE COURT:  If it's in, you may publish.  You may

18  publish.

19         (Exhibit published.)

20  BY MS. ANDERSON:

21  Q.   This is not the homebound paperwork, correct?  This is an

22  email with Kurt Mills?

23  A.   It is an email from Kurt Mills, yes.

24  Q.   Who is Kurt Mills?

25  A.   Kurt Mills works for the county, and he is in charge of

B.R. v. F.C.S.B.

205

1    the homebound office.

2    Q.    Okay.  And did you interact with Mr. Mills regarding

3    B███████  homebound?

4    A.    At times, but once she was on homebound, we interacted

5    more with the teachers.

6    Q.    But to set up homebound, you interacted with Mr. Mills?

7    A.    Actually, it goes through the social worker that worked

8    with the family, and it goes to Mr. Mills.

9    Q.    So you never -- you never had contact with Mr. Mills?

10   A.    I didn't say that.  I just know that other people were --

11   that were -- were more in charge.  I took over once the

12   teachers and people were supporting her with homebound

13   instruction.

14   Q.    So you had contact with Mr. Mills at the time?

15   A.    I'm sure I contacted him once or twice, yes.

16   Q.    And he also works for Fairfax County Public Schools?

17   A.    Yes, ma'am.

18   Q.    Okay.  And in this email, he's speaking about forms from

19   Dr. Weaver?

20   A.    He's speaking with the R██████ about that, yes.

21         MS. REWARI:  Objection, Your Honor.  This witness is

22   not on this email, and he's being asked to interpret an email

23   that he's --

24         THE COURT:  Tie it in as quickly as you can,

25   Ms. Anderson.

———B.R. v. F.C.S.B.———

206

1           MS. ANDERSON:  Will do.

2  BY MS. ANDERSON:

3  Q.   It says there, "Please ask Dr. Weaver to limit his

4  statements to B███████ condition.  Statements which speak to

5  incidents which are under investigation will complicate my

6  ability to make an approval on the documentation."

7           Is that said there?

8  A.   It is.

9  Q.   Okay.  And so -- and your testimony is you have no idea

10 what Dr. Weaver had put in that statement?

11          MS. REWARI:  Objection.  That question was not

12 asked --

13          THE COURT:  Sustained.

14 BY MS. ANDERSON:

15 Q.   I'll ask it open-ended, then.

16          Were you ever told what Dr. Weaver put in those

17 forms?

18 A.   No, ma'am.

19 Q.   Okay.  And, again, Mr. Mills works for Fairfax County

20 Public Schools?

21          MR. KINNEY:  Asked and answered.

22          THE COURT:  Sustained.

23 BY MS. ANDERSON:

24 Q.   And you spoke about, while B█████ was on homebound and

25 some interactions you had with her family.

1          Do you remember that on direct?

2   A.   I spoke that -- I don't remember having saying that

3   during my -- during direct, no.

4   Q.   You never spoke about whether you treated B███ the same

5   as other students who are on homebound?

6   A.   I didn't say that.  I just didn't about interactions --

7   Q.   And you testified, I think, that you had treated her the

8   same as all other students you had on homebound at the time?

9   A.   Correct.

10  Q.   Okay.  And how many students did you have on homebound

11  to -- from 2011 to 2012?

12  A.   I don't think I had any that year, but I've had many

13  students through my career on homebound, and when I was

14  answering that question, I was looking at how I've always

15  worked with all my students on homebound.

16  Q.   And most of those students -- homebound is meant for

17  short term, correct?

18  A.   Not necessarily.

19  Q.   Okay.  So the goal -- in your view, the goal is not to

20  get the student back to school as soon as possible?

21          MS. REWARI:  Objection, misstates his testimony.

22          THE COURT:  Sustained.

23  BY MS. ANDERSON:

24  Q.   Is it the goal to get the student back to school as

25  quickly as possible?

B.R. v. F.C.S.B.

208

1  A.   The goal is to support the student whatever they need,

2  whether that would be back to school full-time, partial, look

3  at other schools.  So it depends on the situation.  There's

4  not -- a one -- you know -- one size fits all.

5  Q.   Do you remember -- were you here when Dr. Panarelli

6  discussed that it was up to the school, the decision of things

7  like whether a student can participate in field trips or

8  extracurriculars?

9  A.   I did hear her say that, yes.

10  Q.   Okay.  And you recall B████ mom asking if she could

11  participate in a field trip to Hershey Park?

12  A.   I don't remember that, no.

13  Q.   So you just have no memory of that conversation?

14  A.   I actually I do not.

15  Q.   Okay.  And but you knew that B███ was struggling at the

16  time she was on homebound; is that right?

17  A.   No, I do not know that she was struggling on homebound.

18  Q.   Or just struggling with her emotional state?

19  A.   No, ma'am.

20  Q.   Okay.  If you can look at Plaintiff's Exhibit 236 in your

21  binder, please, Page 1.

22         Is that an email chain with you, Mr. T████, and

23  Ms. Smith?

24         Oh, here, I can --

25  A.   I've got it.  Thank you.

B.R. v. F.C.S.B.

209

1    Q.   Is that email chain with you, Mr. T██████, and Ms. Smith?

2    A.   Yes, ma'am.

3              MS. ANDERSON:  I move to admit Plaintiff's

4    Exhibit 236.

5              MS. REWARI:  No objection.

6              THE COURT:  Without objection.  You may publish.

7    (Plaintiff's Exhibit No. 236 was admitted into evidence.)

8              (Exhibit published.)

9              MS. ANDERSON:  Thank you.

10   BY MS. ANDERSON:

11   Q.   And so this is an email chain that you're on, correct?

12   A.   Yes, ma'am.

13   Q.   Okay.  And who is Ms. Smith?

14   A.   She was one of the homebound teachers.

15   Q.   And she was in communication with you about B██████

16   homebound; is that correct?

17   A.   And Mr. T██████, yes.

18   Q.   But I mean just in general.  So before we focus on the

19   email, she's in communication with you about B██████

20   homebound, correct?

21   A.   Either me or the teachers, yes.  Typically with the

22   teachers directly.

23   Q.   Okay.  And here she is advising Mr. T██████ and yourself

24   cc'd, "It is difficult working with B████ these days, she goes

25   to therapy every day from morning until to the time we have to

1  start.  She is tired, frustrated and nervous."

2         Do you see that?

3  A.   Yes, ma'am.

4  Q.   Okay.

5         MS. ANDERSON:  We can take that down.  Thank you,

6  Mr. Brown.

7  BY MS. ANDERSON:

8  Q.   So you knew she was struggling.  And did you also --

9         MS. REWARI:  Objection.

10  BY MS. ANDERSON:

11  Q.   I'm sorry.  Did you know she was struggling?  Does that

12  refresh your memory?

13  A.   I don't know if that refreshes my memory that she was

14  struggling.  I think that she was going to doctor's

15  appointments and there was things from that standpoint that

16  teachers trying to schedule when they can go in to support,

17  so.

18  Q.   Okay.  And you're aware also of a time that B▬▬ mom

19  had requested that she be able to work on a project with two

20  other students?

21  A.   I heard some testimony to that, but I don't have the

22  specifics.  Is there something --

23  Q.   Okay.  If you can take a look at Plaintiff's Exhibit 809

24  in your binder.

25  A.   Yes, ma'am.

Cross - P.H.
─────── B.R. v. F.C.S.B.───────

211

1  Q.  And that's an email chain including you, and it's

2  regarding B████?

3  A.  It's included -- yes and Ms. Estrella.

4        MS. ANDERSON:  And I would move to admit Plaintiff's

5  Exhibit 809, please.

6        MS. REWARI:  No objection.

7        THE COURT:  Without objection.

8  (Plaintiff's Exhibit No. 809 was admitted into evidence.)

9  BY MS. ANDERSON:

10  Q.  And we'll start on the bottom of page of page 2 top of --

11        MS. ANDERSON:  Oh, may I publish?

12        THE COURT:  You may.

13        (Exhibit published.)

14  BY MS. ANDERSON:

15  Q.  So it's -- this email chain starts between B████ mom

16  and Mr. Sheehan, correct?

17  A.  Correct.

18  Q.  And, again, who is Mr. Sheehan?

19  A.  He's one of the homebound instructors.

20  Q.  Okay.  And he says, "Also, B████ would like to do her

21  fourth quarter IR projects with two other classmates who

22  invited her to join them, O. and J."  Do you see that?

23  A.  I do.

24  Q.  And their names are redacted, but, presumably, two

25  students, as it says, classmates?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────────── B.R. v. F.C.S.B. ───────────

212

1  A.   Presumably, yes, ma'am.

2  Q.   And then if we can go to page 1, bottom, please.

3       And then Ms. Estrella responds saying that the

4  students were told they could work in pairs, but there's no

5  groups of three.  And that B█████ needs to turn in her own

6  project; is that correct?

7  A.   That's what's highlighted, yes.

8  Q.   And if you can go then to page 1 -- top of page 1,

9  please.

10      And then Mrs. R., so B█████ mom, reaches out, do

11 you see that in the next email?

12 A.   On May 6th?

13 Q.   Yes, correct.

14      Do you see that, and that's Mrs. R. reaching out,

15 B█████ mom?

16 A.   Correct.

17 Q.   Okay.  And she's saying, "This decision seems a bit

18 unfair."  Do you see that there?

19 A.   I do.  Yes, ma'am.

20 Q.   And she's asking to understand.  Do you see that?

21 A.   I do.

22 Q.   And she says, "I hope you will reconsider your position."

23 Do you see that?

24 A.   Correct.

25 Q.   And then Mrs. Estrella, she's -- she forwards that to

Cross - P.H.

B.R. v. F.C.S.B.

213

1  you; is that right?

2  A.   She forwards it to myself and Mr. F███████, yup.

3  Q.   And she says, "Should I reply?  The instructions are for

4  the student to either work in pairs or alone?"

5          Do you see that?

6  A.   I do.

7  Q.   And so do you remember instructing Ms. Estrella that she

8  -- that B███ could not work on this project with those two

9  students?

10          MS. REWARI:  Objection.  Assumes facts not in

11  evidence.

12          THE COURT:  If he did, he can answer.

13          THE WITNESS:  I do not remember the outcome of this.

14          MS. ANDERSON:  Okay.  We can take that down.  Thank

15  you, Mr. Brown.

16  BY MR. FAHEY:

17  Q.   And I think on direct -- well, one more question.

18          You also told the family, B██████ mom and dad, that

19  at some point they couldn't pick up work from the school

20  anymore.

21          Do you recall that?

22  A.   Is there a document for that?  I don't remember stating

23  that.

24  Q.   Okay.  Then I might have misheard.

25          Do you remember telling Mrs. R. and the family that

─B.R. v. F.C.S.B.─

214

1  they could no longer come to pick up work from the school?

2  A.   I do not remember that.

3  Q.   Okay.  And if we can -- if you can look at Exhibit 810 in

4  your binder.  Plaintiff's Exhibit 810.

5  A.   Okay.

6  Q.   Is that a student work pickup form?

7  A.   It is.

8  Q.   For B███████?

9  A.   It is.

10  Q.   Okay.

11          MS. ANDERSON:  Your Honor, I'd move to admit

12  Exhibit 810.

13          THE COURT:  Without objection?

14          MS. REWARI:  No objection.

15          THE COURT:  You may publish.

16  (Plaintiff's Exhibit No. 810 was admitted into evidence.)

17          (Exhibit published.)

18  BY MS. ANDERSON:

19  Q.   Does that show Mr. R███████, I'm sorry -- Mr. R., B███████

20  dad, picking up homework for some time?

21  A.   It does.

22  Q.   And then the last pick up is May 8, 2012?

23  A.   Yes.

24  Q.   Okay.

25          MS. ANDERSON:  We can that take that down.  Thank

—B. R. v. F.C.S.B.—

215

1    you, Mr. Brown.

2    BY MS. ANDERSON:

3    Q.   I think on direct you also testified about a cheating

4    allegation.  Do you remember that?

5    A.   Yes, I do.

6    Q.   Okay.  And if you can look at Exhibit 811 in the binder

7    in front of you.  Plaintiff's Exhibit 811.

8    A.   I'm there.  I'm sorry.  I thought you were looking for

9    something.

10   Q.   You were actually waiting on me.

11             Is that an email between you and Mr. Sheehan about

12   B████?

13   A.   It's an email exchange also with Ms. F██████, yes.

14             MS. ANDERSON:  Your Honor, I move to admit

15   plaintiff's Exhibit 811.

16             THE COURT:  Without objection?

17             MS. REWARI:  No objection.

18             THE COURT:  You may publish.

19             (Exhibit published.)

20             (Counsel confers.)

21             MS. ANDERSON:  Sorry, Your Honor.

22             (Counsel confers.)

23             (Discussion off the record.)

24             MS. ANDERSON:  Just to clarify we're going to move

25   in plaintiff's Exhibit 811, just the first three pages.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────────────── B.R. v. F.C.S.B. ───────────────

216

1        THE COURT:  Without objection.

2   (Plaintiff's Exhibit No. 811, pages 1 - 3, were admitted into

3   evidence.)

4   BY MS. ANDERSON:

5   Q.   And this is an email from Mr. Sheehan to yourself; is

6   that correct?

7   A.   Yes, ma'am.

8   Q.   Okay.  And is this related to that -- the topic you were

9   speaking about on direct about the, quote/unquote, "cheating

10  allegation"?

11  A.   It's around the situation with some of the cheating

12  allegation, sure, yes.

13  Q.   And he writes to you, "Can you let me know what led you

14  to the conclusion that the student used an internet source so

15  I can explain it to the parents.  I'm at a loss to explain

16  this to both parent and student."

17          Do you see that there?

18  A.   Yes.

19          MS. ANDERSON:  Okay.  Take that down.  Thank you,

20  Mr. Brown.

21  BY MS. ANDERSON:

22  Q.   Now, B█████ is out on homebound for some time, correct?

23  A.   Yes, ma'am.

24  Q.   Okay.  And I think we establish she's still your student

25  all the way through homebound, correct?

─────────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────────

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

217

1   A.   She's a Rachel Carson student, yes.

2   Q.   And assigned still to you?

3   A.   Yes.

4   Q.   Okay.  And you do not personally reach out and speak with

5   B█████ either on the phone or in person during that time?

6   A.   No, ma'am.

7   Q.   Okay.  And she's out on homebound for about a year and

8   until March 1, 2013; is that right?

9   A.   I don't remember the specific date, but she was out on

10  homebound for a while, yes.

11  Q.   And about a year sounds about right?

12  A.   Sure.

13          MS. ANDERSON:  Okay.  Your Honor, Court's

14  indulgence?

15          THE COURT:  You may.

16          MS. ANDERSON:  Your Honor, just for the sake of the

17  record, I think it got a little bit muddled.  If I can just

18  ask one more question about the Co█████?

19          THE COURT:  Go ahead.

20  BY MS. ANDERSON:

21  Q.   So is your testimony -- is it your testimony that you did

22  not meet with Co██████ K. or that you did?

23  A.   I wasn't saying that I didn't investigate, where I was

24  pulling him for information.  I said I might have gotten him

25  to -- to you know walk to -- if someone else was pulling him

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

Case 1:19-cv-00917-RDA-LRV    Document 1059    Filed 08/26/24    Page 218 of 277
PageID# 23687
Redirect - P.H.
─B.R. v. F.C.S.B.─

218

1    or things from that standpoint, but I did not have him write

2    information or do things from that standpoint.

3          MS. ANDERSON:  Okay.  Okay.  No further questions.

4    Thank you.

5          MS. REWARI:  Very briefly.

6                    REDIRECT EXAMINATION

7    BY MS. REWARI:

8    Q.   Mr. H███████, you were asked by Ms. Anderson about

9    helicopter parents or helicopter mom?

10   A.   Yes, ma'am.

11   Q.   Do you have helicopter -- what is your understanding what

12   that term means?

13   A.   Parents that are very dedicated to their students' lives.

14   Q.   Okay.  And do you have parents -- or did you have parents

15   at Rachel Carson who were very dedicated to their children's

16   lives?

17   A.   Yes.  And the school I'm at now, so there's many of them,

18   yes.

19   Q.   Was there significant proportion of parents that you had

20   that were pretty dedicated to their students?

21   A.   I would say at Rachel Carson we had a very high

22   percentage of parents that were very dedicated to their

23   students' needs.

24   Q.   Thank you.

25          Ms. Anderson asked you about some prior discipline

1    that you had given to C.K.  If you would, please take a look

2    at Plaintiff's Exhibit 59.  That's in your book.

3    A.    What was the number?  I apologize.

4    Q.    59.  If I could just direct your attention to the ones

5    that -- the -- page 233 of that.  Let me know when you're

6    there.  Purple.

7    A.    Oh, in purple book.  I apologize.

8              MS. ANDERSON:  Did you say a page?

9              MS. REWARI:  I'm sorry.  8233.

10             MS. ANDERSON:  Okay.

11             THE WITNESS:  What page on 59?  I apologize.

12             MS. REWARI:  It's 8233.  And, Your Honor, if we may

13   show that page on the screen.

14             THE COURT:  You may.

15             (Exhibit published.)

16   BY MS. REWARI:

17   Q.    What was the incident for which you disciplined him?

18   A.    "C█████████ had been engaged in horseplay and loud

19   disruptive behavior on the bus while it was in motion.  He was

20   counseled by Mr. H██████ and a bus warning letter was sent

21   home."

22   Q.    What was the bus warning letter?

23   A.    To start off, we send a letter home that let's the

24   parents know that, if the behavior continues, he could be

25   removed from the bus and they would have to transport him to

B.R. v. F.C.S.B.

220

1   and from school.

2           MS. REWARI:  Okay.  And if you could turn to -- the

3   next page of this.  And Grady, if you could flip to that.

4   BY MS. REWARI:

5   Q.   This was the letter to the parent associated with this

6   discipline?

7   A.   Yes, ma'am.

8   Q.   Okay.  And then let's turn the page to the next incident

9   that you disciplined C.K. for.

10           And what was this incident for?

11  A.   "C███████ was disrupting his classroom by hiding other

12  students' -- hiding other students' personal property.  He was

13  counseled by Mr. H█████.  Assigned to one day of LS detention

14  and AIA."

15  Q.   What is "LS detention and AIA"?

16  A.   He had a learning seminar and a lunch detention.  So it

17  was the entire block.

18  Q.   Ms. Anderson asked you about a field trip to Hershey

19  Park.  And I just want to clarify, do you recall that some

20  students at Rachel Carson went on a field trip to Hershey Park

21  in the spring of 2012?

22  A.   Yes.  The entire music department went at the end of the

23  year.

24  Q.   And you don't recall her mother asking --

25           THE COURT:  Watch your form.

—B.R. v. F.C.S.B.—

221

1   BY MS. REWARI:

2   Q.   Do you recall her mother asking whether she could go on

3   that trip?

4   A.   No.

5   Q.   Can you just tell the jury what that trip entails and

6   what that trip is?

7   A.   Sure.  It's -- it's not just going to Hershey Park.  It's

8   a culminating activity that the students work on through the

9   course of the year for the first, I believe, two-and-a-half to

10  three hours -- actually, I don't want to call it completing,

11  but they're performing, and then they have judges that are

12  providing follow-up and information so that they can become

13  better with their craft.

14          After that, they then are in the park for four to

15  five hours, and then they come home.  So they've been working

16  together with that all year long for that activity.

17  Q.   And the class that B.R. had that, before she went on

18  homebound, in the music department, do you recall what class

19  that was?

20  A.   It was chorus.

21  Q.   And was that an elective she could take while on

22  homebound?

23  A.   No.

24  Q.   Can you just explain why not?

25  A.   We wouldn't be able to provide a -- a person to go to do

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

B. R. v. F. C. S. B.

222

1  direct singing.  That would be more like a voice lesson

2  opposed to working with an entire coral class to be able to be

3  prepare to sing together with all the different levels within

4  the -- her choir group -- chorus group, excuse me.

5  Q.  If you would just take a look at Exhibit 811, which is, I

6  think, first three pages plaintiff's Exhibit 811 that

7  Ms. Anderson just showed you.

8         Sorry, Grady does not have that.  So if you would

9  just look at it in your book.  This is the -- I think she

10 called the cheating allegation?

11 A.  Yes, ma'am.

12 Q.  And I think she directed your attention to the second

13 paragraph from Mr. Sheehan's email.  "Can you let me know what

14 led you to the conclusion that the student used an internet

15 source so I can explain it to the parent."

16 A.  Correct.

17 Q.  Okay.  And so, understand these are not your words, but

18 can you just give the jury an explanation for -- what does --

19 was "internet source" an allegation -- or an accusation of

20 cheating?

21 A.  No --

22        MS. ANDERSON:  Objection.  This has got to be from

23 his understanding.

24        MS. REWARI:  Sure.  I'm asking for his

25 understanding.

B.R. v. F.C.S.B.

223

1          THE COURT:  From your perspective, sir.

2          THE WITNESS:  No, it is not.

3   BY MS. REWARI:

4   Q.   Can you explain what this email from Mr. Sheehan relates

5   to -- from what you had said to him?

6   A.   It was actually more generated towards Mr. Sheehan for

7   his teaching practice with working with student.  I was trying

8   to make sure that he was using the correct resources to

9   prepare the student for this assessments.  The teacher had

10  provided information on Blackboard for the teacher to use, and

11  when work was coming back, it was not showing the same type of

12  work that was identifying that other resources was being used

13  for that.  So we wanted to make sure the student set up for

14  success before the assessment.

15  Q.   And when you're saying the teacher was identifying,

16  you're talking about Ms. F██████, the history teach?

17  A.   Ms. F██████, yes.

18  Q.   And so -- the concern was about how Mr. Sheehan was

19  providing Ms. F██████'s --

20          MS. ANDERSON:  Objection, leading.

21  BY MS. REWARI:

22  Q.   -- curriculum?

23          I'm just trying to understand.

24          THE COURT:  Well, I think it's not for you to

25  understand.  I think it's for the jury to understand.  Why

─B.R. v. F.C.S.B.─

224

1   don't you rephrase?

2   BY MS. REWARI:

3   Q.    Sure.  So can you explain -- I think there were a lot of

4   pronouns in your answer.  So can you explain which teacher

5   you're talking about and which teacher you're correcting?

6   A.    So I apologize for that.

7              Ms. F█████, when looking at the work that was

8   coming back, was concerned that what was being used by

9   Mr. Sheehan to help teach B███ the content was not aligned

10  with what she was providing on Blackboard -- Ms. F█████ was

11  providing on Blackboard for Mr. Sheehan to use.  So the

12  concern came out about that.  So I was addressing Mr. Sheehan

13  to make sure he knew, when working with B███, he was using

14  the provided resources.

15             MS. REWARI:  Thank you.  I don't have any further

16  questions.

17             THE COURT:  Thank you.  You may have a seat, sir.

18             (Witness excused.)

19             THE COURT:  Who did you want to call next?

20             MR. BATES:  I'm sorry.  What was that, Judge?

21             THE COURT:  Who did you want to call next?

22             MR. BATES:  Demetri Kappatos.

23             THE COURT:  And how long is that going to be?

24             MR. BATES:  I can do it in less than 15 minutes or

25  we can bring him back tomorrow.

B.R. v. F.C.S.B.

225

1          THE COURT:  Let's do it now.

2          MR. BATES:  The defense calls Demetri Kappatos.

3  (DEMETRIOS KAPPATOS, Defendants' witness, sworn.)

4          THE COURT:  Please have a seat, sir.  Listen to the

5  questions of the lawyer.  If lawyers start speaking or the

6  Court interrupts, please pause before you answer the question.

7          (Witness seated.)

8                    DIRECT EXAMINATION

9  BY MR. BATES:

10 Q.  Good afternoon, Mr. Kappatos.

11          Could you please state your name for the record?

12 A.  Demetrios Kappatos.

13 Q.  And where are you currently employed?

14 A.  Rachel Carson Middle School.

15 Q.  And what is your current position there?

16 A.  I'm the department chair of the health and physical

17 education department.

18 Q.  And when did you -- when were you first hired at Rachel

19 Carson?

20 A.  2021 -- or 2001.  I apologize.  2001.

21 Q.  Have you been in that same PE, physical education, and

22 health teacher role since 2001?

23 A.  Correct.

24 Q.  If I could direct your attention to the 2011-2012 school

25 year.  Based on your 20-plus years of experience at the

B.R. v. F.C.S.B.

226

1  school, how did the school administration respond to issues

2  that were brought to its attention?

3  A.   Overall, since I've been there from my first year, it's

4  been a very positive environment.  Tried to build each other

5  up and make students and staff just better people in general,

6  and they were pretty quick to handle issues that were brought

7  up.

8          MR. BATES:  Permission to publish Defendants'

9  Exhibit 61, the school map.

10         THE COURT:  You may.

11         (Exhibit published.)

12 BY MR. BATES:

13 Q.   Mr. Kappatos, if we can -- you can leave it at this

14 zoom -- that's a touch screen in front of you.

15         Can you identify for the jury where the school

16 gymnasium is?

17 A.   Sure.

18         (Witness complies.)

19 Q.   And where are the health classrooms?

20 A.   (Witness complies.)

21 Q.   Okay.  Can you -- can you actually remove those marks,

22 Grady?

23         And then if you could circle for us the girls'

24 locker room.

25         Okay.  Is there an exterior door from the girls'

B.R. v. F.C.S.B.

227

 1  locker room to the outside?

 2  A.    There is.

 3  Q.    Is that door ever left open and unattended?

 4  A.    It should not be, no.

 5  Q.    Okay.  If -- so for the next series of questions, you can

 6  take that down I'd like to, again, direct your attention, to

 7  the extent possible, to the 2011-2012 school year.  Ballpark,

 8  how many PE and health teachers were there during that school

 9  year?

10  A.    I think at that time six to seven.

11  Q.    Okay.  And is it -- you teach both physical education and

12  health?

13  A.    Correct.

14  Q.    Okay.  How does that -- how does that work -- how do you

15  divide the time between those two disciplines?

16  A.    So starting second quarter during the winter months going

17  into third quarter to have space in the gym what we would do

18  is, rotate every two weeks.  A grade level going into health,

19  and the other grade level would stay in the gym, and then we

20  would rotate every two weeks for the next two quarters.

21  Q.    Would you do two weeks of PE class and then two weeks of

22  health class, essentially?

23  A.    Correct.

24  Q.    Okay.  And, ballpark, how many students did you have in

25  each class?

B.R. v. F.C.S.B.

228

1  A.   40 or so.

2  Q.   Okay.  Let's talk about some of the lessons that you

3  provided in health class.

4        What, if any, lessons did you provide regarding

5  social and emotional learning of -- for students?

6  A.   We do have in both the 7th and 8th grade curriculum, a

7  couple lessons on bullying, and those lessons entailed

8  teaching about what bullying is, what types of bullying there

9  are.  What a victim is, different types of bystanders, and

10  basically how to get help if you are being bullied, or if you

11  know someone who is being bullied, get them help.  And at the

12  end, to demonstrate their knowledge of what we taught them,

13  they had a variety of options to kind of like present to the

14  class.  They could do, like, a PowerPoint presentation they

15  develop, share it with the class, they could do -- create a

16  song or a skit, or -- yeah, any type of way to demonstrate

17  what they knew.

18  Q.   Were these student-created skits or presentations or

19  songs?

20  A.   Yes.  They were in groups of like three or four students

21  that they chose.  And they had -- they could create however

22  they wanted to, and to show us what they've learned.

23  Q.   Okay.  And what was the subject of those skits or

24  presentations that the students were put on?

25  A.   It was, basically, like an antibullying project.

B.R. v. F.C.S.B.

229

1  Q.   Okay.  And this lesson that you provided on bullying, was

2  this presented during an entire period?

3  A.   Yes.

4  Q.   Ballpark, how long was the period?

5  A.   At that time, I think it would be over two class periods.

6  At that time, I think our class periods were only 45 minutes

7  at the time.  So, basically, it would be about one class of

8  45 minutes, and then the next class they would have time to

9  create and then present it at the end.

10 Q.   Okay.  Is this -- is the bullying lessons that you're

11 talking about, in addition to the counselor lessons on

12 bullying and the SR&R training on bullying and any other

13 trainings?

14 A.   It is additional to it.

15 Q.   Okay.  Thank you.  So if -- do you recall B.R. being a

16 student of yours during that school year?

17 A.   I do.  Yeah.

18 Q.   Okay.  So would she have been in your class during this

19 presentation in health class?

20 A.   It depends.  Because usually we start going in the

21 rotation of health starting in -- like, October, and then we

22 would end health April or March.  So I can't remember when we

23 actually did that particular lesson.

24 Q.   Okay.  Do you recall any incidents -- and I understand

25 this is 12 years ago, but do you recall any incidents in your

B.R. v. F.C.S.B.

230

1  class involving B.R.?

2  A.   Nothing that stands out, nothing, like, yeah, I don't.

3  No.

4  Q.   If I can have you, Your Honor, may I approach?

5         THE COURT:  You may.

6  BY MR. BATES:

7  Q.   I've handed the witness Defendants' Exhibit 205.

8         Mr. Kappatos, what is this document you're looking

9  at?

10  A.   This is a statement.  I was asked to write about an

11  incident that did take place in PE.

12  Q.   Okay.  Is this your signature on the document?

13  A.   It is.

14  Q.   Did you write this statement?

15  A.   I did.

16         MR. BATES:  Your Honor, permission -- we move to

17  admit the statement.

18         MR. KEEFE:  Objection, rank hearsay.  Not within the

19  exception.

20         THE COURT:  Let me see it.

21         MR. BATES:  May I approach, Your Honor?

22         THE COURT:  You may.

23         (A pause in the proceedings.)

24         THE COURT:  Before I rule, are D.R. and D. people

25  that have been mentioned in this case at all?

B.R. v. F.C.S.B.

231

1          MR. BATES:  Yes.  This incident involves B.R.

2          THE COURT:  All right.  Let me read it again.

3          MR. BATES:  It doesn't say it in the statement, but

4     if I can lay that foundation.

5          THE COURT:  Sir, the document that's in front of

6     you, I believe Mr. Bates asked you the question, is this a

7     document that you wrote?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  And was this document created

10    from your observation of the incident on February 9th?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  Overruled.

13         MR. BATES:  Okay.  Permission to publish, Your

14    Honor.

15         THE COURT:  You may.

16    (Defendants' Exhibit No. 205 was admitted into evidence.)

17              (Exhibit published.)

18    BY MR. BATES:

19    Q.  Mr. Kappatos, if we can zoom in on that top.  Can you, in

20    your own words, tell us what happened on -- well, first let me

21    ask this, does this incident involve the plaintiff, B███, in

22    this case?

23    A.  Yes.

24    Q.  Okay.  In your own words, can you tell us what happened

25    on this day, and what led you to create this statement?

─B.R. v. F.C.S.B.─

232

1  A.    Apparently, I must have been asked to write a statement

2  of something -- of what occurred, and it looks like students

3  were waiting to play in a game that we were doing.  And a

4  student tossed the ball up, up into the air, and hits her.

5  And then I talked to the student that threw the ball, and it

6  was like -- it's a common kid -- middle school kids do this

7  all the time.  So that's why I didn't think anything of it.

8  It's a common mishap that takes place during physical

9  education.

10 Q.    Okay.  Did you -- what, if any, discipline did you

11 administer to the student who looks like his name starts with

12 the D.  The student D.  What, if any, discipline did you

13 administer to him after this -- after he tossed this ball?

14 A.    I went over and I talked with him.  I pulled him off to

15 the side, asked him to stand outside in the hallway.  I asked

16 him what he was doing.  And he said, "just goofing off."  I

17 said, "are these your expectations, to do something like

18 this."  And he said, "no."  I said, "well, sit down for a few

19 minutes and I'll let you back in."

20 Q.    At the time this happened, did you see if the ball

21 actually hit anybody?

22 A.    I didn't really see it.  I saw the ball go up into the

23 air, and into a mass group of people.

24 Q.    Okay.  Did you later learn that it had, apparently, or

25 allegedly, hit B████?

B.R. v. F.C.S.B.

233

```
 1  A.    Correct.

 2  Q.    Okay.  So did you -- did you discipline the student

 3  before you heard anything from B██████ or any parents?

 4  A.    I disciplined him as soon as I saw the ball being tossed

 5  into the air is when I went over to addressed the issue.

 6              MR. BATES:  Okay.  We can take that statement down.

 7              At any point, sir, while B.R. was a student, did you

 8  ever recall observing any students touching or sexually

 9  assaulting her in any way?

10  A.    No.

11  Q.    Okay.  At any time while B.R. was a student, did you ever

12  recall observing students saying vulgar things to B.R.?

13  A.    No.

14  Q.    Okay.  At any time while B.R. was a student, did you ever

15  recall B.R. complaining to you directly about any unwanted

16  touching or sexual assaults?

17  A.    No.

18  Q.    And at any time that B.R. was a student of yours, did you

19  ever recall B.R. complaining to you that any type of sexual

20  harassment had taken place with regard to her?

21  A.    No.

22  Q.    Okay.

23              MR. BATES:  No further questions.

24              THE COURT:  Mr. Keefe.  Mr. Kinney, I'm sorry.

25              MR. KINNEY:  Nothing to add, Your Honor.
```

B.R. v. F.C.S.B.

234

1        THE COURT:  Mr. Blanchard.

2        MR. BLANCHARD:  No, sir.

3        THE COURT:  Mr. Keefe.

4        MR. KEEFE:  Thank you.

5                    CROSS-EXAMINATION

6   BY MR. KEEFE:

7   Q.    Good afternoon, Mr. Kappatos.

8   A.    Good afternoon.

9   Q.    Other than when I introduced myself to you earlier this

10  afternoon, you and I have never met, correct?

11  A.    Correct.

12  Q.    Okay.  Let me start with Defendants' Exhibit 205, which I

13  think is the one that you have up there in front of you.

14          Do you remember typing this statement?

15  A.    I do remember typing it.  I remember being asked what

16  happened in PE, this particular day, and then I typed up what

17  I recalled.

18  Q.    Who asked you to type the statement?

19  A.    That I can't remember.

20  Q.    Have you ever, and I think it's the 23 years you've been

21  at Rachel Carson, been asked to write a statement like this

22  other than this occasion?

23  A.    Um, not like this, normally when there's a major incident

24  like something like this, is very common for an instant like

25  this to take place.  So I've never really written something up

———B. R. v. F.C.S.B.———

235

1  like this.  If there is a deliberate action in class or if

2  someone is trying to hurt someone or put them down -- or do

3  something negative, that's when I would officially write

4  something.

5  Q.  So why would you write something that -- write a

6  statement like this about something minor like a ball throw?

7  A.  I had no idea at the time.  My -- my administration asked

8  me what happened, if I could write up a statement.

9  Q.  Who in the administration asked you?

10  A.  I can't remember.

11  Q.  But you remember it was the administration?

12  A.  Yeah.

13  Q.  Okay.  Is my math right, I think you testified you've

14  been at Rachel Carson since 2001?

15  A.  Correct.

16  Q.  And did you say -- did you testify that you actually give

17  that lesson or presentation on bullying to the students?

18  A.  Yes, I do.

19  Q.  Did that presentation eliminate bullying at Rachel

20  Carson?

21  A.  I can't answer that.  I mean, I would hope that the

22  lesson helped improve the situation if there was bullying

23  going on.  But I can't say it stopped it.

24  Q.  Did it stop sexual harassment at Rachel Carson?

25  A.  I can't say that it did or it did not.  If there was

─── B. R. v. F.C.S.B. ───

236

1  sexual harassment going on at Rachel Carson.

2  Q.   In your 23 years at Rachel Carson, have you ever

3  witnessed sexual harassment?

4  A.   Not that I can remember.

5  Q.   Have you ever witnessed bullying in your 23 years at

6  Rachel Carson?

7  A.   I have.

8  Q.   What type of bullying?

9  A.   Verbal, um, probably some pushing but it's very difficult

10 because at this age you see pushing and you see kids talking

11 to each other context is important because you could see kids

12 say something that could be it's inappropriate but they may

13 say it to someone that they know and so the contexts is

14 important but, yes, I've --

15          MR. KEEFE:  No further questions, Your Honor.

16          THE COURT:  Redirect?

17          MR. BATES:  No redirect, Your Honor.

18          THE COURT:  Thank you.  Is this witness subject to

19 recall?

20          MR. BATES:  Not from us.

21          MR. KEEFE:  No.

22          THE COURT:  All right, sir.  You're free to leave.

23 While the case is pending, please do not discuss the case or

24 any aspect of the case with anyone.

25          THE WITNESS:  Okay.  Thank you.

B.R. v. F.C.S.B.

237

1              THE COURT:  Thank you, sir.

2              (Witness excused.)

3              THE COURT:  All right.  Ladies and gentlemen, that

4    brings an end to our day today.  I have us down starting

5    tomorrow at -- all the days are blending into one another.

6              I have us down tomorrow starting at 10 o'clock.  Is

7    that your recollection?

8              Very good.  If you can be here about 9:45.

9              Please remember the Court's constant instruction to

10   please do not discuss the case or any aspect of the case with

11   anyone, and try to stay away from social media.

12             As always, your connection with to the Court is

13   Ms. Tinsley.  If any issues arise, please let us know.

14             The goal tomorrow will be to finish some time around

15   4:00, maybe a little bit later, depending on the witness

16   presentation.  Then we have Thursday off.  Work hard tomorrow

17   and see where we are.  Have a good evening.

18             (Jury excused.)

19             THE COURT:  Thank you, Ladies and gentlemen.  You

20   can be seated.  All right.  Off the record.

21             (Discussion off the record.)

22             THE COURT:  As far as I'm concerned, I've had a lot

23   of experience with de bene esse depositions, and there have

24   been a whole lot of ways that we've tried to do them.  And

25   what happens when we sort of lose control is improper

B.R. v. F.C.S.B.

238

 1   inflection is given; there's mannerisms and the like

 2   associated with the reader, and, quite frankly, not the cast

 3   any aspersions on anyone here, I trust Ms. August to be more

 4   objective in reading the responses -- yes, I'm complimenting

 5   you, Alexis -- than any of the other people who might want to

 6   participate.

 7            MR. ELLIKER:  No doubt, Your Honor.  We have -- I

 8   think our position would be the same.

 9            THE COURT:  All right.

10            MR. BRENNER:  We'll figure out the questions.

11            THE COURT:  Very good.

12            Who are we anticipating tomorrow as our witnesses?

13            MS. REWARI:  Your Honor, first, we have Dr. Tuwiner

14   who will be very short because of Your Honor's ruling.  And

15   then we also have Tiffany Estrella, whose emails were shown

16   today by plaintiff; Amy Moir.  We expect both of them to be

17   short witnesses as well.  And then we have Ms. B███████, who is

18   the last defendant.  And we have, obviously, the PWC

19   deposition.

20            We've sent -- I think -- we have proposed a

21   stipulation with the other side with respect to exhibits that

22   we anticipate will obviate the need to call plaintiff.  And

23   so, at this point, we're going to identify the specific

24   exhibits.  We sent a list of all exhibits that we want, and

25   I'm going to -- I've told Mr. Brenner I'll identify which

B.R. v. F.C.S.B.

239

1    ones.  We would, you know, need B.R. if there isn't a

2    stipulation, but I think it's a short list at this point.  So

3    at this point, we don't anticipate that we would need to call

4    her again.

5            THE COURT:  Very good.  What I'm thinking -- and

6    this is up to you all -- is we'll get through as many of these

7    witnesses as we can on Wednesday, and that even though we're

8    not going to have formal court on Thursday, this is a good

9    time to get with Ms. Armentrout and maybe go through the

10   exhibits and make sure that everything matches up or make sure

11   that we have verification as to what is evidence, what

12   everyone thought was evidence and maybe was not, and come to a

13   resolution on that so we won't need to use the jury's time as

14   we're working through the things we need to work through.

15           It's looks like we may be getting into end of the

16   actual presentation of evidence, and so I think Thursday would

17   be a really good day to get with Ms. Armentrout, and then we

18   can fill in the blank on Friday.  Were you are planning on

19   going somewhere, Trish?

20           (Discussion off the record.)

21           THE COURT:  This what we will do.  Ms. Armentrout is

22   embarrassed now, but she has a life, too, outside this

23   courtroom.  What we'll do is we'll have either Ms. Barry or

24   Ms. Armentrout -- excuse me, Ms. Barry will not be here

25   either.

B.R. v. F.C.S.B.

240

1          (Discussion off the record.)

2          THE COURT:  This what we will do so we can

3   accommodate everybody:  If you can come in Friday before

4   10 o'clock.  In other words, we're going to start court on

5   Friday at 10 o'clock.  So maybe if you all could come in at

6   9:00 o'clock and get with Ms. Armentrout so you can do your

7   final review.

8          MR. BRENNER:  Of the exhibits?

9          THE COURT:  Yes.

10          MR. BRENNER:  Do you need full teams here?

11          THE COURT:  Just somebody that's got authority.

12          MR. BRENNER:  So it sounds to me, Judge, that we

13   have a chance to close on Friday?

14          THE COURT:  Potentially, and I'll tell you what I --

15   my approach is, and, again, some of your appear before me;

16   some of you have not.  But I never like to instruct at the end

17   of a day because that can cause all kinds of things that we

18   don't want to happen.

19          I always like to see where we are in the

20   instruction, what type of reasonable deliberation I can think

21   that they could do in a day.  In other words, if I read the

22   instruction at 3 o'clock, that's not going to happen because

23   they're thinking 4 o'clock, we're out of here.  We'll sort of

24   play around with our time to see where we are.  We've already

25   discussed in chambers the amount of time we're looking at for

B.R. v. F.C.S.B.

241

1    closing argument.  So I think we have a pretty good handle on

2    that.

3            The Court has the instructions.  We've gone through

4    your proposed and agreements and the like, and what I will

5    spend -- probably part of Thursday and Friday is coming up

6    with what I believe is a systematic way to presenting all of

7    the issues to the jury so that they are able to understand all

8    the legal principles in context and in order.

9            MR. BRENNER:  When you were going through the

10   Wednesday schedule, we can -- they have the PWC read also as

11   part of it, so I think it's possible we'll finish the evidence

12   tomorrow.  I think we will be close.

13           THE COURT:  Yeah, what I would think to suggest to

14   everyone is that let's assume the best that we're going to

15   finish the presentation of the evidence Wednesday and that we

16   may be ready for closings on Friday.

17           MR. BRENNER:  If we -- I was just trying to

18   understand.  I was just trying to understand the last part.

19   If we got to the point where -- let's just say we had hour and

20   a half of testimony for Friday -- meaning we didn't finish

21   Wednesday; we had hour and a half left -- is it Your

22   Honor's -- where would that fall.

23           THE COURT:  What I would do in that instance and

24   just for example purpose -- Tonia, we're off the record again.

25           (Discussion off the record.)

B.R. v. F.C.S.B.

242

1          MR. BRENNER:  I would request that they be released

2   from that rule so they can be with their daughter and sister

3   at least for the last day or two days.

4          THE COURT:  If there is a commitment that these

5   people are not going to be called as witnesses, and I'm sure

6   that that's what the defense wants to hear before that

7   happens, I don't see any problem with that.

8          Ms. Rewari, did you have a concern?

9          MS. REWARI:  No.  I just told Mr. Brenner this

10  morning that, if we could have until tomorrow morning, because

11  we need to go back and make sure that we have everything.

12         THE COURT:  Yeah, I think he was talking about at

13  the conclusion of the case, and so they could have the

14  opportunity to hear and see and experience the closing that

15  are going to be made.

16         MS. REWARI:  Sure, yes.  And I think tomorrow

17  morning is our last opportunity to provide notice for anybody,

18  you know, if we don't finish on Wednesday or if we need

19  somebody on Friday.  So after tomorrow morning, I think.

20         THE COURT:  I was anticipating that they were going

21  to be able to return to the courtroom when the case is over

22  except for closings and Rule 50 if they want to sit through

23  that.

24         MS. REWARI:  Okay.

25         MR. BRENNER:  I didn't catch that last part.

─B.R. v. F.C.S.B.─

243

1          THE COURT:  They can be in here closing arguments

2    and the rulings on the Rule 50 motions, if they want to be

3    there.

4          MR. BRENNER:  Maybe they'll let us know tomorrow

5    morning, but that's fine.

6          THE COURT:  Very good.

7          Let me ask this because I know IT is going to ask me

8    questions:  Are in any of you going to be using any technical

9    things like easel boards or PowerPoints or anything like that?

10         MR. BRENNER:  I think -- for our perspective, I

11   think anything we would use would probably just be on the

12   Court's existing AV system.

13         THE COURT:  Okay.  And, Mr. Brown, and I'm not sure

14   if that's -- is it Mr. Grady or Grady something else?

15         MR. WALTERS:  Just Grady.

16         THE COURT:  I'm not calling him Brown, so I need to

17   have something to call you.  What would you prefer me call

18   you, sir?

19         MR. WALTERS:  What's that?

20         THE COURT:  What's your last name?

21         MR. WALTERS:  Walters.

22         THE COURT:  What we'll do, then, is depend on

23   Mr. Walters and Mr. Brown to basically take care of any

24   audio-visual things, but what I did not have happen, because

25   the IT people get upset, is you to need something special, we

B.R. v. F.C.S.B.

244

1  haven't planned for it, and then they got to come in and set

2  it up.  That's my concern.

3          MS. REWARI:  Your Honor, I do have -- I have a

4  blowup that I would use -- need an easel for, so.  I think we

5  have an easel?  Yes.  We have an easel, if I'm allowed to use

6  that, in addition to the audio-visual system.

7          THE COURT:  While I don't need to counsel

8  Mr. Walters and Mr. Brown on that, I would ask that you be

9  particularly vigilant with regard to what you put up and make

10 sure that you know that this is something that has been placed

11 in evidence, and obviously you two gentlemen have done an

12 excellent job during the course of the trial, and I trust you

13 to do the right thing, but I'm going to ask that you be very

14 vigilant about things that are appropriate to be put up.

15         MR. BRENNER:  We did this before openings.  I would

16 recommend before I start my closing, I provide them with any

17 nonevidence, meaning demonstratives, that they could have at

18 least a few minutes and raise any objections with Your Honor,

19 and then when I sit down, they can hand me theirs, because I

20 think it will be not just evidence; there will also be some

21 demonstratives.

22         THE COURT:  That's fine.  All right, ladies and

23 gentlemen.  Still nice outside.  I believe it's 65 degrees, so

24 I think we can take advantage of that, at least some of us.

25 So we'll see you tomorrow morning.

B.R. v. F.C.S.B.

245

1        MR. BRENNER:  Thank you, Judge.  Good night.

2              **(Proceedings adjourned at 5:11 p.m.)**

1                        CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 16th day of

9    April, 2024.

10          I further certify that the foregoing 277 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this April 16, 2024.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

**$**

**$50** [16] - 70:19, 70:20, 70:23, 70:24, 71:1, 71:3, 71:6, 77:2, 77:8, 77:10, 77:14, 77:17, 78:2, 78:3, 78:15, 179:25

**'**

**'17** [1] - 101:19
**'18** [1] - 101:21
**'99** [1] - 121:15

**0**

**05** [1] - 5:4

**1**

**1** [17] - 4:20, 43:11, 88:2, 114:4, 114:20, 115:17, 116:4, 117:3, 145:20, 181:11, 203:18, 208:20, 212:1, 212:7, 216:1, 217:7
**1,800** [2] - 13:22, 20:14
**10** [6] - 4:4, 84:13, 237:5, 240:3, 240:4
**100** [4] - 2:2, 2:6, 2:10, 26:5
**10:15** [1] - 1:6
**10th** [1] - 159:22
**11** [4] - 31:7, 33:2, 33:4, 52:5
**12** [3] - 33:8, 44:1, 229:24
**12-year-old** [1] - 184:21
**120** [3] - 3:6, 21:24, 22:15
**120-hour** [2] - 25:2, 42:9
**1200** [1] - 122:17
**122** [1] - 158:25
**12:00** [2] - 84:13
**12:10** [1] - 84:17
**12:20** [1] - 84:20
**13** [4] - 61:19, 62:2, 62:18, 66:20
**13-year-old** [1] - 61:20
**130** [1] - 5:2
**134** [1] - 4:24
**135** [1] - 5:2
**14** [2] - 65:15, 69:2
**14-page** [1] - 197:17
**144** [5] - 191:9,

191:13, 191:14, 192:12, 192:15
**144**.............................
**.** [1] - 4:18
**145** [1] - 4:23
**147** [1] - 4:23
**149** [3] - 4:25, 4:25, 5:1
**14th** [4] - 68:25, 76:25, 79:4, 85:14
**15** [3] - 82:13, 170:19, 224:23
**150** [3] - 133:19, 134:3, 134:6
**150**.............................
.............. [1] - 4:24
**152** [4] - 156:11, 156:19, 156:24, 158:1
**152**.............................
.............. [1] - 4:24
**1520** [1] - 1:20
**16** [2] - 79:21, 246:16
**16th** [6] - 79:14, 79:18, 80:3, 85:22, 89:5, 246:8
**17** [2] - 1:6, 82:23
**171** [1] - 4:11
**177** [1] - 4:12
**175** [1] - 3:9
**18** [3] - 13:15, 82:14, 82:23
**1801** [1] - 3:6
**19** [3] - 79:21, 83:12, 189:13
**191** [4] - 148:20, 149:1, 149:5, 149:23
**191**.............................
.............. [1] - 4:25
**192** [7] - 4:18, 149:4, 149:5, 149:6, 149:23, 204:13, 204:15
**192**.............................
.............. [1] - 4:25
**193** [2] - 149:6, 149:23
**193**.............................
.............. [1] - 5:1
**1998** [2] - 102:12, 121:15
**1:00** [1] - 84:24
**1:15** [3] - 84:25, 126:4, 126:13
**1:19-cv-917** [2] - 1:4, 246:8
**1st** [4] - 147:12, 147:14, 148:1, 148:14

**2**

**2** [3] - 199:2, 199:4, 211:9
**20** [1] - 1:8
**20-plus** [1] - 225:24
**200** [2] - 13:5, 181:2
**2001** [4] - 225:19, 225:21, 235:13
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2004** [1] - 101:1
**2005** [2] - 12:11, 58:11
**2008** [1] - 100:15
**2009** [2] - 59:5, 100:15
**2010** [4] - 59:10, 59:16, 101:4, 109:1
**2011** [27] - 16:19, 44:25, 59:21, 59:25, 65:15, 69:2, 100:6, 101:4, 101:5, 101:16, 101:19, 109:1, 111:13, 127:6, 136:15, 136:19, 138:6, 139:16, 145:20, 169:1, 174:12, 177:12, 182:22, 186:11, 207:10
**2011-2012** [6] - 112:25, 126:23, 130:17, 133:25, 225:23, 227:6
**2012** [27] - 22:7, 22:13, 22:17, 22:18, 26:10, 30:1, 42:18, 42:20, 56:25, 57:1, 63:4, 63:12, 65:9, 86:24, 100:6, 117:7, 153:1, 158:18, 159:6, 159:19, 169:1, 201:9, 201:13, 203:11, 207:10, 214:21, 220:20
**2013** [2] - 203:19, 217:7
**2014** [1] - 59:25
**2016** [1] - 101:19
**2017** [2] - 59:16, 60:18
**2018** [1] - 101:21
**2019** [1] - 189:13
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] -

2:19
**2021** [1] - 225:19
**2022** [1] - 16:19
**2024** [3] - 1:6, 246:9, 246:16
**2029** [1] - 1:19
**202A** [1] - 67:16
**205** [3] - 230:6, 231:15, 234:11
**205**.............................
.............. [1] - 5:1
**209** [1] - 4:19
**21** [6] - 51:23, 138:6, 139:15, 174:15, 182:21, 186:11
**211** [1] - 4:19
**213-995-5720** [1] - 1:21
**214** [1] - 4:20
**216** [1] - 4:20
**218** [1] - 4:12
**21st** [12] - 139:2, 171:16, 173:17, 173:19, 174:1, 179:20, 179:23, 181:5, 185:22, 186:24, 198:19, 198:22
**22** [1] - 134:17
**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**225** [1] - 4:14
**22nd** [3] - 181:5, 185:6, 185:22
**23** [3] - 234:19, 236:1, 236:4
**2300** [1] - 1:15
**231** [1] - 5:1
**233** [1] - 219:4
**234** [1] - 4:15
**236** [3] - 208:19, 209:3, 209:6
**236**.............................
.............. [1] - 4:19
**23rd** [1] - 56:19
**24** [2] - 54:18, 102:16
**246** [2] - 5:5, 246:10
**25** [1] - 83:12
**250** [1] - 20:17
**263** [3] - 116:12, 116:15, 116:19
**26th** [1] - 192:9
**27th** [7] - 155:2, 157:3, 157:21, 158:6, 191:1, 192:10, 193:5
**2800** [3] - 2:3, 2:7, 2:11
**281** [5] - 129:23, 129:25, 130:8,

130:9, 130:12
**281**.............................
.............. [1] - 5:2
**284** [3] - 135:1, 135:7, 135:10
**284**.............................
.............. [1] - 5:2
**2:15** [2] - 126:5, 126:12
**2:20** [1] - 126:14
**2E** [1] - 174:17
**2nd** [4] - 2:2, 2:6, 2:10, 63:10

**3**

**3** [9] - 32:25, 33:3, 43:18, 44:13, 44:18, 117:3, 159:6, 216:1, 240:21
**3)**.............................
.............. [1] - 4:20
**3.0** [2] - 27:17, 28:2
**30** [1] - 170:19
**300** [2] - 12:22, 13:5
**305-539-8400** [1] - 2:8
**31** [3] - 51:23, 73:3, 80:11
**32** [2] - 73:3
**33** [1] - 72:5
**33131** [3] - 2:3, 2:7, 2:11
**34** [1] - 72:5
**35** [1] - 111:21
**37** [2] - 75:16, 75:19
**38** [2] - 75:16, 75:19
**3:00** [1] - 33:8
**3:15** [1] - 169:20
**3:30** [2] - 169:21, 170:2
**3rd** [3] - 63:10, 158:12, 158:17

**4**

**4** [7] - 28:25, 44:19, 126:5, 151:7, 151:8, 151:11, 240:22
**4.0** [1] - 28:24
**40** [4] - 13:4, 14:3, 14:6, 227:25
**40-hour** [1] - 15:14
**400** [1] - 3:10
**401** [1] - 3:13
**41** [2] - 4:5, 79:20
**43** [1] - 111:21
**44** [1] - 151:9
**45** [3] - 170:6, 229:5, 229:7
**48** [1] - 128:19

**4:00** [1] - 237:14
**4:15** [1] - 69:10
**4:30** [2] - 126:6,
169:21

**5**

**5** [4] - 30:5, 45:11,
65:9, 150:9
**50** [2] - 242:21, 243:1
**50/50** [1] - 19:22
**504** [1] - 175:25
**51** [1] - 77:19
**52** [2] - 59:7, 77:19
**531A** [1] - 162:11
**55** [2] - 4:5, 133:11
**56** [2] - 4:7, 78:19
**57** [2] - 78:19, 133:11
**581** [4] - 27:24, 43:11,
51:23, 52:4
**59** [3] - 219:1, 219:3,
219:10
**5:00** [1] - 169:22
**5:11** [1] - 245:1

**6**

**6** [3] - 33:8, 48:23,
50:19
**6-inch** [1] - 151:10
**60** [1] - 79:7
**61** [6] - 110:23,
118:13, 142:14,
144:23, 166:3, 226:8
**610-804-1787** [1] - 2:4
**64** [2] - 79:7, 79:8
**643a** [1] - 1:16
**65** [1] - 244:22
**66** [1] - 79:8
**6:42** [1] - 148:9
**6th** [1] - 212:11

**7**

**7** [3] - 32:23, 33:3,
50:17
**700** [1] - 13:23
**7183** [1] - 131:22
**7197** [1] - 132:8
**72** [1] - 22:15
**75** [1] - 14:2
**77** [2] - 181:9, 198:25
**79** [1] - 186:5
**7th** [8] - 131:1, 131:3,
136:24, 136:25,
142:10, 142:19,
142:23, 228:5

**8**

**8** [2] - 27:16, 214:21
**80** [4] - 81:20, 81:21,
81:22, 82:23
**804-788-8200** [1] - 3:2
**809** [3] - 210:22,
211:4, 211:7
**809.............................
............ [1] - 4:19
**81** [3] - 81:22, 82:13,
157:10
**810** [4] - 214:2, 214:3,
214:11, 214:15
**810.............................
............ [1] - 4:20
**811** [7] - 215:5, 215:6,
215:14, 215:24,
216:1, 222:4, 222:5
**811(pages** [1] - 4:20
**8233** [2] - 219:8,
219:11
**83** [2] - 83:12, 83:13
**84** [2] - 83:13, 83:14
**85** [1] - 80:23
**850-585-3414** [1] -
2:12
**87** [1] - 4:8
**88** [3] - 147:5, 147:17,
147:20
**88.............................
............ [1] - 4:23
**89** [3] - 145:6, 145:13,
145:16
**89.............................
............ [1] - 4:23
**8th** [11] - 108:19,
114:25, 136:24,
142:6, 142:7, 143:7,
144:3, 144:4, 144:6,
228:5

**9**

**9** [6] - 28:23, 33:1,
33:4, 42:20, 55:8,
159:19
**90067** [1] - 1:20
**94** [1] - 4:8
**98** [1] - 4:9
**99** [1] - 4:11
**9:00** [2] - 33:9, 240:5
**9:45** [1] - 237:7
**9th** [4] - 51:13, 159:19,
195:6, 231:9

**A**

**A.F** [1] - 3:6
**A.J** [1] - 199:7

112:19
**Academy** [2] - 17:13,
57:8
**accept** [1] - 72:16
**accepted** [1] - 154:12
**access** [6] - 17:24,
18:7, 18:8, 113:25,
118:3, 118:4
**accidentally** [1] -
73:10
**accommodate** [1] -
240:2
**accommodations** [1]
- 58:25
**according** [1] - 29:6
**account** [9] - 65:19,
81:19, 83:21, 83:23,
84:1, 92:22, 92:25,
113:19, 113:21
**accounts** [5] - 83:6,
83:10, 83:18, 84:3,
84:4
**accurate** [2] - 42:8,
42:24, 67:11
**accusation** [1] -
222:18
**accuse** [1] - 164:17
**accused** [2] - 164:13,
183:20
**achieve** [1] - 12:21
**achieved** [1] - 11:21
**acknowledge** [1] -
133:12
**acknowledgment** [1] -
129:16
**Action** [2] - 1:4, 246:8
**action** [1] - 234:25
**actions** [1] - 187:5
**actively** [1] - 15:2
**activities** [5] - 122:11,
125:18, 136:7,
136:14, 137:17
**activity** [3] - 125:23,
221:7, 221:15
**actual** [7] - 25:16,
40:5, 63:23, 128:14,
146:18, 161:2,
239:15
**acute** [8] - 21:23, 25:2,
31:24, 32:5, 42:2,
42:5, 42:10
**add** [2] - 55:1, 233:24
**addition** [2] - 229:10,
244:5
**additional** [2] - 54:7,
229:13
**address** [6] - 7:11,
23:13, 36:15, 152:3,
186:17, 186:19
**addressed** [5] - 146:4,

**a.m** [2] - 1:6, 148:9
**A.M./P.M** [1] - 1:8
**AA** [4] - 112:1, 112:3,
112:14, 112:23
**abducted** [2] - 46:2,
46:6
**ability** [6] - 27:13,
40:2, 105:17,
112:12, 206:5,
246:14
**able** [64] - 7:21, 9:17,
19:5, 36:9, 40:10,
53:22, 70:9, 70:16,
70:18, 79:3, 84:24,
101:11, 101:13,
101:14, 101:15,
101:23, 102:6,
102:7, 103:10,
104:24, 105:7,
108:14, 109:2,
110:16, 111:19,
112:7, 112:8,
112:12, 112:20,
114:7, 114:9,
114:11, 114:19,
114:21, 114:22,
115:4, 115:22,
116:6, 120:6,
121:19, 121:20,
122:6, 122:17,
122:18, 123:7,
123:15, 123:22,
124:6, 133:8, 145:2,
146:19, 146:23,
163:22, 163:24,
171:6, 175:19,
175:22, 185:15,
210:18, 221:24,
222:1, 241:6, 242:20
**abnormal** [2] - 52:16,
55:12
**Abnormal** [1] - 53:1
**abnormalities** [2] -
52:17, 53:1
**abrasion** [2] - 33:11,
33:12
**abrasions** [2] - 32:25,
36:25
**abrenner@bsfllp.
com** [1] - 2:8
**absent** [1] - 159:13
**absolutely** [5] - 11:21,
99:15, 146:12,
165:20, 169:17
**abuse** [13] - 28:18,
59:17, 59:22, 59:24,
60:1, 60:12, 61:9,
61:16, 61:22, 62:7,
62:10, 96:25
**academic** [2] - 112:14,

152:1, 186:13,
186:14, 233:4
**addressing** [1] -
224:11
**adduced** [1] - 246:6
**adjourned** [1] - 245:1
**adjunct** [2] - 16:6,
16:10
**adjusted** [1] - 122:23
**adjusting** [1] - 123:8
**adjustments** [2] -
123:12, 123:23
**admin** [2] - 122:25,
123:17
**administer** [2] -
232:10, 232:12
**administration** [13] -
86:9, 86:11, 86:15,
103:23, 118:5,
149:18, 155:19,
167:14, 188:7,
225:25, 235:6,
235:8, 235:10
**administrative** [4] -
104:3, 104:19,
120:2, 160:22
**administrator** [13] -
107:8, 107:20,
108:1, 109:9,
109:12, 127:18,
128:8, 129:2,
137:13, 138:2,
158:8, 188:14,
196:16
**administrators** [5] -
74:16, 94:25,
119:23, 131:4,
179:21
**admit** [12] - 130:10,
134:2, 135:6,
145:12, 147:16,
156:19, 192:11,
209:2, 211:3,
214:10, 215:13,
230:16
**admits** [1] - 189:23
**Admitted** [2] - 4:17,
4:22
**admitted** [20] - 130:4,
130:12, 134:6,
135:10, 145:16,
147:20, 148:22,
149:2, 149:3,
149:23, 156:24,
157:11, 186:5,
189:19, 192:15,
209:6, 211:7,
214:15, 216:1,
231:15
**admonish** [1] - 7:8

**adolescent** [1] - 13:13
**adult** [1] - 62:1
**adult/adolescent** [7] -
  12:17, 13:4, 13:11,
  13:12, 13:23, 14:2,
  15:15
**adults** [1] - 114:8
**advance** [1] - 23:4
**advanced** [2] - 112:14,
  112:19
**advantage** [1] -
  244:23
**advised** [1] - 192:22
**advising** [1] - 209:22
**advocacy** [3] - 21:9,
  66:16, 67:23
**advocates** [1] - 15:18
**affect** [1] - 153:13
**affiliations** [3] - 17:7,
  17:11, 18:10
**after-school** [5] -
  116:3, 116:5,
  118:10, 125:17,
  169:12
**afternoon** [17] - 69:10,
  87:14, 87:15, 94:11,
  99:25, 100:1,
  111:24, 114:9,
  114:19, 114:22,
  169:20, 177:5,
  177:6, 225:9, 234:6,
  234:7, 234:9
**afterwards** [2] - 89:16,
  187:19
**age** [7] - 48:17, 61:25,
  62:18, 66:18, 66:20,
  95:15, 236:9
**agency** [1] - 21:10
**aggressor** [1] - 196:10
**ago** [4] - 22:14, 60:25,
  181:23, 229:24
**agree** [16] - 33:20,
  54:14, 126:6,
  163:23, 179:5,
  180:13, 181:15,
  181:18, 182:1,
  182:4, 184:17,
  184:20, 187:17,
  188:4, 188:9, 188:17
**agreed** [3] - 8:13,
  32:16, 49:13
**agreement** [1] - 36:7
**agreements** [1] -
  241:3
**ahead** [6] - 84:12,
  114:16, 117:9,
  160:19, 186:3,
  217:18
**AIA** [3] - 141:2,
  220:13, 220:14

**air** [3] - 232:3, 232:22,
  233:4
**al** [2] - 1:6, 246:7
**alanderson@bsfllp.**
  **com** [1] - 1:21
**alert** [1] - 41:18
**Alexandria** [1] - 3:14
**Alexis** [1] - 238:4
**aligned** [1] - 224:8
**alike** [1] - 92:2
**Alison** [3] - 1:18,
  41:25, 177:7
**allegation** [24] - 53:9,
  56:22, 62:25, 63:2,
  63:15, 63:17, 63:19,
  64:21, 65:3, 86:6,
  89:15, 152:25,
  167:8, 167:16,
  172:17, 179:12,
  179:13, 182:10,
  184:9, 215:3, 216:9,
  216:11, 222:9,
  222:18
**allegations** [7] -
  10:19, 62:12, 140:9,
  175:6, 181:20,
  182:13, 188:18
**allege** [1] - 65:19
**alleged** [14] - 22:19,
  35:1, 42:15, 45:9,
  63:20, 65:1, 65:12,
  73:21, 80:1, 96:16,
  175:4, 179:11,
  179:14, 196:10
**allegedly** [2] - 64:6,
  232:24
**alleges** [2] - 168:18,
  168:25
**alleging** [2] - 42:7,
  182:4
**allow** [3] - 37:17,
  187:23, 197:20
**allowed** [9] - 104:2,
  104:18, 111:23,
  114:8, 127:1, 127:2,
  138:19, 164:5, 244:4
**allowing** [1] - 93:25
**almost** [3] - 32:9,
  103:19, 111:18
**alone** [1] - 213:3
**alongside** [1] - 127:3
**ALSTON** [1] - 1:11
**alternative** [1] - 6:15
**amazing** [2] - 109:12,
  110:15
**amended** [2] - 168:17,
  168:24
**amount** [4] - 48:1,
  130:22, 131:6,
  240:24

**ample** [1] - 131:6
**Amy** [1] - 238:15
**anal** [4] - 25:12, 32:24,
  33:1, 50:11
**anal/genital** [5] -
  24:14, 24:15, 26:23,
  34:9, 46:15
**anal/rectal** [2] - 24:16,
  24:21
**anally** [1] - 70:14
**anatomical** [2] -
  30:11, 34:23
**Anderson** [19] - 1:18,
  36:15, 37:20, 38:11,
  41:16, 41:18, 41:25,
  55:7, 170:4, 176:24,
  177:7, 178:10,
  200:11, 202:16,
  205:24, 218:7,
  218:24, 220:17,
  222:6
**ANDERSON** [139] -
  7:11, 8:4, 8:13, 8:19,
  8:21, 8:23, 9:5,
  20:23, 35:13, 36:16,
  37:2, 37:8, 37:21,
  38:4, 38:12, 38:21,
  40:18, 41:17, 41:20,
  41:22, 43:13, 43:15,
  47:2, 47:4, 49:6,
  49:20, 50:6, 50:9,
  51:15, 51:18, 51:22,
  52:1, 52:4, 52:7,
  52:9, 53:12, 53:14,
  54:21, 54:23, 55:20,
  99:12, 116:14,
  116:16, 116:21,
  116:25, 120:18,
  130:3, 130:8, 134:4,
  135:8, 140:17,
  145:14, 147:18,
  149:3, 149:9, 153:2,
  153:21, 156:20,
  160:9, 161:10,
  162:15, 165:11,
  168:20, 170:6,
  171:1, 173:9,
  176:15, 176:25,
  177:4, 178:11,
  181:7, 181:11,
  181:14, 183:10,
  186:4, 186:8,
  187:14, 187:16,
  187:21, 187:24,
  188:1, 188:3,
  191:16, 191:18,
  192:11, 192:17,
  193:16, 193:18,
  197:13, 197:22,
  198:25, 199:2,

199:4, 199:6,
  199:15, 199:17,
  200:12, 200:14,
  202:5, 202:17,
  203:10, 203:16,
  204:10, 204:12,
  204:19, 205:25,
  206:1, 206:13,
  206:22, 207:22,
  209:2, 209:8, 209:9,
  210:4, 210:6, 210:9,
  211:3, 211:8,
  211:10, 211:13,
  213:13, 214:10,
  214:17, 214:24,
  215:1, 215:13,
  215:20, 215:23,
  216:3, 216:18,
  216:20, 217:12,
  217:15, 217:19,
  218:2, 219:7, 219:9,
  222:21, 223:19
**Anderson's** [2] - 36:4,
  36:7
**Anderson.............** [2]
  - 4:5, 4:12
**Andrew** [3] - 2:5,
  96:10, 100:3
**ANDREW** [1] - 99:16
**ANDREWS** [4] - 2:14,
  2:17, 2:21, 3:1
**Angeles** [1] - 1:20
**angled** [1] - 169:8
**ankle** [1] - 70:3
**announcements** [1] -
  137:21
**annual** [1] - 46:9
**annually** [1] - 127:17
**anonymous** [1] - 22:3
**answer** [15] - 35:15,
  40:19, 56:6, 81:8,
  81:12, 83:11, 83:25,
  99:21, 153:3,
  197:20, 202:6,
  213:11, 224:3,
  225:5, 235:20
**answered** [4] - 176:2,
  197:11, 199:20,
  206:20
**answering** [1] -
  207:13
**antibullying** [6] -
  136:8, 136:9,
  136:11, 136:14,
  179:2, 228:24
**anticipate** [3] - 170:4,
  238:21, 239:2
**anticipated** [2] -
  36:18, 38:19
**anticipating** [3] - 36:5,

238:11, 242:19
**anus** [3] - 28:9, 33:2,
  53:10
**anus/buttocks** [2] -
  31:5, 49:4
**anytime** [1] - 16:24
**anyway** [1] - 70:18
**apologize** [17] - 96:13,
  100:16, 101:21,
  103:1, 105:23,
  109:18, 109:19,
  149:20, 154:7,
  183:9, 202:9, 203:1,
  219:2, 219:6,
  219:10, 224:5,
  225:19
**appear** [1] - 240:14
**appearance** [2] -
  45:13, 45:19
**APPEARANCES** [3] -
  1:13, 1:25, 2:25
**application** [1] - 107:4
**applied** [1] - 112:3
**apply** [1] - 106:22
**appointed** [2] - 17:16,
  17:22
**appointments** [2] -
  25:25, 210:14
**appreciate** [5] - 37:12,
  50:7, 94:15, 98:20,
  163:6
**apprehensive** [1] -
  48:7
**approach** [16] - 11:10,
  35:16, 49:19, 49:20,
  69:24, 71:13, 71:18,
  108:23, 137:11,
  177:1, 184:21,
  191:16, 191:17,
  230:3, 230:20,
  240:14
**approached** [1] -
  188:18
**appropriate** [9] - 27:4,
  32:14, 34:2, 48:18,
  128:3, 130:22,
  163:10, 163:11,
  244:13
**appropriately** [2] -
  39:18, 45:16
**approval** [1] - 206:5
**April** [4] - 1:6, 229:21,
  246:9, 246:16
**area** [60] - 15:8, 15:12,
  24:16, 24:19, 24:20,
  24:21, 28:17, 28:19,
  29:11, 30:22, 31:5,
  31:9, 32:6, 32:8,
  33:22, 35:24, 36:25,
  39:6, 45:23, 46:15,

49:4, 50:12, 50:15,
50:17, 90:3, 90:21,
110:13, 111:22,
113:11, 113:12,
113:14, 114:24,
117:22, 121:2,
121:8, 122:4,
122:13, 123:4,
123:6, 125:4, 141:3,
141:12, 142:3,
143:19, 143:21,
144:17, 144:21,
144:22, 145:2,
146:19, 146:24,
146:25, 169:9,
199:22
**areas** [7] - 6:19, 29:10,
30:7, 48:15, 94:17,
104:16, 144:20
**argument** [1] - 240:25
**argumentative** [1] -
200:7
**arguments** [1] -
242:25
**arise** [1] - 237:12
**Arkansas** [1] - 18:20
**arm** [3] - 70:11, 70:12,
70:14
**Armentrout** [5] -
239:8, 239:16,
239:20, 239:23,
240:5
**arms** [2] - 70:8, 70:13
**artifact** [5] - 27:4,
27:5, 27:10, 27:12,
32:18
**artist** [1] - 124:3
**aside** [1] - 177:7
**aspect** [8] - 9:18,
18:23, 55:22, 98:17,
126:8, 139:12,
236:23, 237:9
**aspects** [3] - 112:12,
182:3, 196:2
**aspersions** [1] - 238:2
**assailant** [1] - 28:8
**assault** [33] - 6:14,
10:18, 12:16, 12:18,
14:16, 14:24, 17:18,
17:22, 19:6, 20:22,
22:19, 28:3, 35:1,
41:10, 42:15, 45:9,
54:15, 56:22, 62:15,
73:21, 73:22, 76:21,
80:1, 80:3, 88:9,
88:22, 89:4, 89:5,
89:14, 96:16, 96:23,
97:19
**assaulted** [12] - 14:15,
21:17, 42:7, 43:3,

53:19, 54:3, 65:2,
88:24, 89:7, 167:20,
168:12
**assaulting** [1] - 233:8
**assaults** [4] - 62:11,
65:4, 65:5, 233:15
**assess** [2] - 27:1,
27:13
**assessing** [2] - 30:12,
30:21
**assessment** [12] -
23:7, 23:8, 23:10,
23:17, 24:2, 24:5,
24:7, 28:15, 29:4,
29:8, 30:13, 223:13
**assessments** [2] -
164:24, 223:8
**assigned** [24] - 56:21,
57:18, 58:1, 58:12,
58:14, 58:17, 58:23,
60:6, 60:14, 63:4,
63:13, 110:2, 119:7,
136:20, 137:13,
177:16, 177:17,
177:18, 180:11,
183:19, 203:21,
203:23, 217:1,
220:12
**assignment** [2] -
124:17, 125:14
**assignments** [1] -
125:9
**assistant** [22] - 23:3,
101:2, 101:4, 101:6,
101:17, 101:23,
102:4, 102:15,
103:13, 113:17,
118:6, 119:9,
119:13, 127:2,
127:10, 127:12,
137:19, 177:16,
183:19, 184:21,
188:22, 197:16
**Assistant** [1] - 61:4
**assisted** [1] - 62:13
**associated** [3] -
93:25, 220:4, 238:1
**Association** [4] -
12:20, 15:20, 15:24,
17:12
**assume** [2] - 204:7,
241:13
**assumes** [1] - 213:9
**attacked** [1] - 88:18
**attempted** [3] - 63:19,
63:20, 63:25
**attend** [3] - 128:8,
128:13, 139:16
**attendance** [7] -
133:7, 158:25,

159:7, 191:25,
192:1, 192:7, 192:19
**attended** [2] - 57:6,
57:8
**attending** [1] - 197:3
**attention** [7] - 139:6,
155:23, 219:3,
222:11, 225:23,
226:1, 227:5
**attorneys** [3] - 15:18,
99:20, 177:7
**audio** [3] - 67:8,
243:23, 244:5
**audio-visual** [2] -
243:23, 244:5
**A[ ]** [2] - 192:8, 193:7
**August** [1] - 238:2
**authority** [1] - 240:10
**automated** [1] - 192:2
**auxiliary** [1] - 95:10
**AV** [1] - 243:11
**available** [2] - 8:11,
141:7
**Ave** [1] - 2:21
**Avenue** [4] - 2:14,
2:18, 3:1, 3:9
**awarded** [1] - 59:5
**aware** [25] - 86:6,
89:5, 138:10, 140:5,
140:10, 140:19,
140:20, 140:24,
141:11, 167:7,
168:17, 168:24,
169:11, 175:3,
176:5, 176:7, 184:1,
184:6, 187:8,
187:11, 188:21,
188:25, 195:5,
210:17

## B

**B.G** [3] - 155:22,
189:17, 190:5
**B.H** [1] - 3:6
**B.R** [63] - 1:3, 56:23,
63:1, 65:2, 65:24,
66:1, 67:4, 68:2,
85:4, 85:20, 92:18,
92:21, 98:10, 138:7,
139:22, 139:24,
142:22, 144:15,
146:18, 151:17,
151:21, 152:25,
153:5, 154:22,
155:8, 155:12,
159:18, 160:16,
160:18, 163:1,
163:21, 164:13,
164:17, 164:23,

165:6, 167:17,
167:19, 168:18,
169:12, 171:24,
172:1, 172:3,
172:23, 172:24,
173:7, 173:12,
174:18, 175:6,
221:16, 229:14,
229:25, 230:25,
233:6, 233:10,
233:11, 233:13,
233:14, 233:17,
233:18, 238:25,
246:7
**B.R.'s** [20] - 65:9,
66:24, 85:5, 87:1,
117:18, 118:24,
142:1, 142:3, 148:5,
148:17, 154:25,
155:2, 156:13,
159:7, 164:13,
165:8, 165:9,
166:17, 167:11,
168:8
**babies** [1] - 175:22
**bachelor** [1] - 100:11
**bachelor's** [1] - 11:23
**back-door** [1] - 7:8
**background** [5] -
11:20, 14:12, 100:9,
110:5, 110:13
**backup** [1] - 246:13
**bad** [2] - 92:20, 124:2
**badge** [2] - 115:19,
166:15
**bag** [1] - 201:19
**balance** [1] - 107:10
**ball** [7] - 232:3, 232:4,
232:12, 232:19,
232:21, 233:3, 235:5
**B[ ]** [15] - 155:5,
156:6, 156:17,
158:7, 158:8, 191:5,
193:22, 194:11,
194:13, 194:15,
196:2, 196:4,
197:25, 238:16
**b[ ]** [1] - 120:10
**B[ ]** [2] - 156:5,
196:8
**ballpark** [5] - 19:17,
100:16, 227:6,
227:23, 229:3
**banner** [1] - 136:11
**bar** [1] - 35:18
**BARAN** [1] - 1:14
**Barry** [2] - 239:22,
239:23
**based** [11] - 10:23,
20:19, 26:25, 29:7,

32:13, 41:2, 41:3,
41:7, 55:15, 182:13,
225:24
**baseline** [1] - 51:5
**basement** [2] - 75:5,
89:11
**basic** [1] - 21:12
**basis** [2] - 64:11,
175:4
**Bates** [5] - 2:13,
51:20, 51:23, 149:1,
231:5
**BATES** [22] - 98:23,
99:1, 99:8, 99:10,
224:19, 224:21,
224:23, 225:1,
225:8, 226:7,
226:11, 230:5,
230:15, 230:20,
230:25, 231:2,
231:12, 231:17,
233:5, 233:22,
236:16, 236:19
**Bates...............** [1] -
4:14
**bathrooms** [1] -
121:14
**became** [8] - 14:25,
46:19, 58:11, 60:4,
61:11, 101:4, 102:24
**become** [12] - 11:22,
15:23, 58:10, 60:23,
97:19, 101:2,
102:14, 134:24,
167:7, 188:5,
190:21, 221:11
**becoming** [1] - 104:9
**bed** [2] - 47:15, 47:21
**BEFORE** [1] - 1:11
**beforehand** [1] -
79:19
**beginning** [9] - 27:19,
51:10, 106:16,
115:10, 121:25,
122:21, 136:5,
139:23, 156:4
**begins** [2] - 23:19,
195:25
**begun** [1] - 172:9
**behalf** [5] - 4:2, 4:17,
4:21, 20:9
**behavior** [4] - 52:14,
52:20, 219:18,
219:23
**behind** [6] - 65:19,
70:5, 90:8, 90:10,
117:22, 191:14
**belongings** [2] -
146:7, 165:9
**below** [5] - 52:20,

62:2, 151:3, 158:15, 186:20
**Ben** [6] - 151:25, 152:17, 152:20, 152:23, 189:11, 195:13
**benches** [1] - 144:21
**bends** [1] - 69:25
**bene** [1] - 237:22
**Benji** [1] - 189:10
**best** [9] - 10:3, 40:2, 56:6, 103:4, 123:21, 170:21, 241:13, 246:14
**better** [4] - 37:15, 147:13, 221:12, 226:4
**between** [30] - 20:8, 21:13, 22:9, 22:11, 22:17, 24:20, 61:5, 68:15, 80:6, 80:17, 81:4, 88:7, 108:1, 113:13, 123:5, 133:2, 145:3, 156:10, 156:13, 158:16, 169:1, 170:19, 173:19, 174:14, 190:15, 191:22, 195:12, 211:14, 215:10, 227:14
**beyond** [2] - 64:13, 97:11
**bigger** [1] - 190:13
**biggest** [3] - 88:2, 104:23, 105:1
**binder** [8] - 69:24, 154:16, 182:9, 191:10, 208:20, 210:23, 214:3, 215:5
**binders** [1] - 99:14
**biological** [3] - 21:25, 22:21, 25:3
**bit** [29] - 7:13, 15:11, 16:9, 17:10, 17:20, 18:24, 42:2, 42:3, 43:6, 43:8, 44:20, 46:7, 47:6, 54:11, 56:20, 61:8, 94:24, 100:8, 105:22, 115:14, 116:8, 121:22, 151:11, 197:15, 200:10, 202:6, 212:16, 217:16, 237:14
**black** [2] - 32:18, 33:1
**Blackboard** [4] - 165:1, 223:9, 224:9, 224:10
**blame** [1] - 188:16

**BLANCHARD** [18] - 38:23, 55:3, 87:11, 87:13, 88:15, 88:17, 90:24, 91:2, 92:5, 92:8, 93:21, 97:10, 98:6, 98:9, 98:12, 170:13, 176:23, 234:1
**Blanchard** [6] - 3:8, 55:2, 87:10, 170:12, 176:22, 233:25
**Blanchard..........** [1] - 4:9
**Blanchard............** [1] - 4:8
**blank** [1] - 239:17
**blending** [1] - 237:4
**blind** [1] - 22:2
**block** [5] - 32:2, 130:24, 133:8, 133:10, 220:16
**blocking** [1] - 187:1
**blood** [1] - 44:25
**blouse** [2] - 168:2, 168:8
**blowup** [1] - 244:3
**blue** [1] - 169:10
**Board** [1] - 10:12
**boards** [1] - 243:8
**body** [6] - 15:25, 29:8, 70:6, 70:9
**BOIES** [4] - 1:19, 2:2, 2:6, 2:10
**Bon** [2] - 14:18, 14:21
**book** [26] - 69:25, 70:1, 133:20, 135:1, 145:6, 147:5, 153:19, 153:20, 154:9, 154:11, 156:12, 160:17, 160:25, 161:1, 161:3, 161:4, 161:6, 161:17, 161:23, 162:5, 162:8, 162:10, 186:9, 219:1, 219:6, 222:8
**born** [2] - 34:24, 39:15
**boss** [1] - 40:25
**bottom** [15] - 32:17, 33:8, 44:13, 81:22, 145:19, 147:12, 147:25, 151:10, 156:16, 157:2, 158:2, 181:21, 187:2, 211:9, 212:1
**bound** [1] - 64:13
**bowl** [1] - 125:24
**box** [3] - 150:20, 150:21, 150:22
**boxes** [1] - 12:24

**boyfriend** [1] - 75:2
**boys** [5] - 76:9, 146:12, 167:23, 168:1, 168:4
**break** [25] - 33:12, 42:3, 84:10, 84:12, 84:25, 85:3, 92:20, 94:16, 99:4, 126:4, 141:9, 148:17, 151:15, 151:18, 169:20, 170:2, 172:24, 173:2, 173:5, 173:8, 173:13, 173:19, 173:22, 200:10, 200:12
**breakfast** [2] - 114:7, 114:19
**breaking** [1] - 105:10
**breast** [1] - 70:7
**BRENNER** [23] - 8:3, 64:10, 64:12, 71:20, 75:19, 94:5, 94:10, 97:13, 97:25, 98:2, 98:14, 238:9, 240:7, 240:9, 240:11, 241:8, 241:16, 241:25, 242:24, 243:3, 243:9, 244:14, 244:25
**Brenner** [7] - 2:5, 8:1, 93:22, 94:3, 96:10, 238:24, 242:8
**Brenner...............** [1] - 4:8
**brief** [2] - 21:19, 48:2
**briefly** [2] - 102:13, 218:4
**bring** [5] - 36:19, 93:25, 109:2, 126:15, 224:24
**Bring** [1] - 108:25, 116:8
**bringing** [2] - 112:6, 194:4
**brings** [1] - 237:3
**Brittany** [1] - 2:1
**britzoll@gmail.com** [1] - 2:4
**Brook** [1] - 61:4
**brother** [1] - 201:15
**brought** [6] - 38:14, 155:8, 175:24, 194:18, 226:1, 226:5
**brown** [5] - 49:7, 199:16, 243:12, 243:22, 244:7
**Brown** [12] - 47:3, 53:13, 127:1, 127:10, 127:12,

187:15, 193:17, 210:5, 213:14, 214:25, 216:19, 243:15
**Bruce** [1] - 3:8
**bruce.blanchard@ ofplaw.com** [1] - 3:11
**bruha** [1] - 103:3
**Bs** [1] - 159:23
**build** [6] - 48:8, 104:21, 105:16, 120:6, 175:18, 226:3
**building** [51] - 87:25, 104:13, 104:14, 106:13, 109:9, 109:13, 109:22, 109:25, 110:2, 110:3, 110:6, 110:18, 111:5, 111:9, 111:16, 111:25, 112:13, 114:5, 114:6, 114:14, 114:23, 115:4, 115:11, 115:23, 115:24, 116:2, 118:6, 119:8, 119:14, 119:24, 120:5, 120:16, 121:4, 121:5, 122:6, 122:19, 124:3, 125:2, 125:5, 125:16, 132:3, 135:19, 139:9, 142:9, 164:8, 172:7, 184:18, 184:24
**building-related** [2] - 109:9, 110:6
**built** [1] - 47:23
**bullet** [3] - 16:19, 18:14, 31:23
**bullied** [2] - 228:9, 228:10
**bullying** [26] - 132:6, 132:12, 132:16, 132:18, 135:21, 135:25, 136:4, 136:5, 178:24, 179:8, 179:18, 188:5, 188:6, 192:23, 228:6, 228:7, 228:25, 229:9, 229:11, 235:16, 235:18, 235:21, 236:4, 236:7
**bureau** [1] - 59:12
**burned** [1] - 29:12
**Burton** [1] - 2:20
**burtons@huntonak. com** [1] - 2:23

**bus** [17] - 64:7, 69:13, 69:14, 69:15, 69:17, 69:23, 76:23, 79:4, 89:18, 89:23, 104:11, 111:8, 125:20, 219:18, 219:19, 219:21, 219:24
**busses** [1] - 111:21
**busy** [1] - 113:16
**button** [1] - 115:22
**BY** [118] - 10:8, 11:13, 21:2, 28:1, 39:4, 41:6, 41:22, 43:15, 47:4, 50:9, 52:9, 53:14, 55:6, 56:11, 64:17, 67:20, 71:24, 72:11, 73:7, 75:22, 77:24, 79:11, 80:15, 81:2, 83:17, 85:2, 87:13, 88:17, 91:2, 92:8, 94:10, 97:13, 98:9, 99:24, 103:12, 106:5, 111:1, 117:5, 117:13, 120:20, 126:20, 130:13, 134:8, 135:12, 136:18, 140:23, 142:18, 143:12, 145:18, 147:24, 149:25, 150:10, 151:13, 153:7, 154:21, 157:1, 157:14, 158:3, 159:5, 160:12, 161:16, 162:2, 162:16, 165:13, 166:7, 167:6, 168:23, 171:11, 173:11, 174:9, 175:13, 176:4, 177:4, 178:11, 181:14, 183:10, 186:8, 187:16, 188:3, 191:18, 192:17, 193:18, 197:13, 197:22, 199:6, 199:17, 200:14, 202:17, 203:10, 203:16, 204:19, 206:1, 206:13, 206:22, 207:22, 209:9, 210:6, 210:9, 211:8, 211:13, 213:15, 214:17, 215:1, 216:3, 216:20, 217:19, 218:6, 219:15, 220:3, 220:25, 223:2,

223:20, 224:1,
225:8, 226:11,
230:5, 231:17, 234:5
**bystanders** [2] -
179:17, 228:8

## C

**C's** [1] - 108:22
**C.K** [33] - 65:22,
68:15, 69:4, 69:24,
71:11, 72:13, 74:4,
74:18, 76:3, 77:3,
77:8, 80:6, 80:17,
80:20, 81:5, 83:24,
85:16, 88:25, 89:8,
89:15, 89:18, 90:3,
91:10, 91:21, 91:23,
144:6, 183:22,
187:6, 188:17,
189:1, 190:5,
218:25, 220:8
**CA** [1] - 1:20
**cafeteria** [7] - 114:7,
114:18, 136:10,
195:12, 196:1,
196:3, 196:14
**calendar** [7] - 157:10,
157:16, 157:24,
173:20, 174:3,
174:10, 174:12
**camera** [5] - 25:7,
27:8, 48:11, 51:6
**cameral** [1] - 32:19
**Cane** [1] - 103:24
**cannot** [2] - 7:6, 55:17
**capacity** [4] - 141:6,
141:21, 146:14,
246:5
**captain** [1] - 60:22
**capture** [1] - 28:22
**captured** [1] - 27:10
**car** [2] - 9:13, 112:10
**care** [7] - 18:7, 19:3,
21:20, 47:21,
175:21, 243:22
**cared** [1] - 14:14
**career** [8] - 14:11,
15:1, 15:7, 19:19,
62:20, 102:11,
106:16, 207:12
**careful** [1] - 37:18
**caregiver** [4] - 24:2,
28:6, 40:2, 44:21
**caretaker** [1] - 23:21
**C▮▮▮▮** [5] - 86:3, 86:10,
86:16, 154:14,
154:16
**carrying** [1] - 202:21
**cars** [1] - 111:21

**Carson** [65] - 58:13,
58:18, 58:24, 59:8,
60:5, 94:21, 94:22,
100:22, 100:25,
101:3, 101:18,
103:15, 104:12,
105:3, 106:16,
106:19, 106:22,
106:23, 107:19,
108:8, 108:9,
108:11, 109:8,
110:7, 110:19,
112:21, 112:24,
116:24, 117:14,
120:23, 121:10,
127:1, 127:11,
127:12, 129:19,
131:18, 131:20,
131:24, 132:21,
132:23, 135:14,
138:2, 169:3,
174:19, 180:10,
183:17, 191:25,
192:1, 195:6,
196:23, 203:18,
203:23, 216:25,
218:14, 218:20,
220:19, 225:13,
225:18, 234:20,
235:13, 235:19,
235:23, 235:25,
236:1, 236:5
**case** [51] - 6:20, 6:25,
7:4, 8:11, 9:18,
10:12, 10:20, 20:6,
22:6, 25:2, 35:25,
36:22, 41:14, 42:1,
49:11, 55:22, 55:23,
56:23, 63:4, 63:13,
63:16, 93:25, 96:4,
96:10, 98:17, 98:18,
116:6, 120:11,
126:7, 126:8,
149:19, 174:24,
175:11, 175:14,
175:16, 176:5,
176:9, 176:12,
230:24, 231:21,
236:22, 236:23,
237:9, 242:12,
242:20, 246:7
**cases** [7] - 20:3, 20:5,
20:8, 62:13, 62:14,
62:17, 128:11
**cast** [1] - 238:1
**catch** [1] - 242:24
**categorized** [1] - 75:2
**causation** [2] - 6:15,
6:16
**causes** [1] - 6:20,

6:22, 35:25, 36:2,
36:25
**cc'd** [1] - 209:23
**cell** [3] - 93:23, 94:1,
94:3
**Center** [1] - 57:7
**center** [6] - 66:16,
67:23, 112:1,
112:14, 112:15,
112:19
**centralized** [1] - 120:3
**Century** [1] - 1:19
**certain** [3] - 6:11,
101:15, 163:22
**certainly** [1] - 195:21
**CERTIFICATE** [1] -
246:1
**Certificate** [1] - 5:5
**certification** [7] -
12:19, 12:21, 13:8,
14:7, 15:25, 16:21,
17:4
**certifications** [9] -
12:4, 12:7, 12:12,
12:13, 12:15, 12:25,
13:10, 13:21, 13:25
**certified** [2] - 13:23,
13:24
**certify** [2] - 246:4,
246:10
**cervix** [1] - 30:21
**chain** [7] - 111:15,
147:7, 208:21,
208:25, 209:10,
210:25, 211:14
**chain-link** [1] - 111:15
**chair** [6] - 16:11,
16:13, 90:19, 90:23,
100:23, 225:15
**challenges** [1] -
107:12
**challenging** [2] -
107:7, 184:21
**chambers** [1] - 240:24
**Chambers** [6] - 4:6,
44:16, 56:1, 56:15,
85:3, 94:11
**CHAMBERS** [1] - 56:3
**chance** [2] - 68:11,
240:12
**chances** [1] - 104:16
**change** [5] - 64:23,
141:5, 141:20,
143:2, 158:22
**changed** [5] - 65:5,
85:10, 100:20,
103:20, 111:22
**changing** [2] - 146:6,
146:7
**charge** [4] - 15:22,

109:9, 204:24,
205:10
**chart** [1] - 54:12
**cheating** [8] - 164:14,
164:17, 165:6,
215:2, 216:8,
216:10, 222:9,
222:19
**check** [7] - 7:16,
125:6, 125:8,
138:15, 138:18,
155:20
**checked** [7] - 12:25,
31:5, 32:14, 138:20,
138:23, 138:24,
141:23
**checking** [4] - 116:17,
124:23, 155:11,
156:10
**chest** [2] - 151:3
**chief** [6] - 56:16,
60:22, 60:23, 60:24,
61:5, 98:13
**Chief** [4] - 4:6, 56:1,
56:15, 61:4, 87:14,
94:11
**child** [19] - 44:5,
59:17, 59:22, 59:24,
60:1, 60:12, 61:9,
61:16, 61:22, 62:7,
62:10, 62:18, 66:16,
66:19, 67:23, 71:8,
87:22, 87:25, 95:15
**Child** [8] - 66:14,
66:15, 66:16, 66:21,
95:7, 95:9, 95:18,
95:22
**child's** [1] - 44:25
**childhood** [3] - 96:16,
96:23, 97:18
**children** [8] - 42:23,
42:25, 43:2, 61:17,
61:23, 62:7, 66:18,
175:21
**children's** [1] - 218:14
**choir** [1] - 222:3
**choked** [1] - 103:1
**choose** [3] - 49:16,
50:3, 103:22
**chorus** [3] - 164:6,
221:19, 222:3
**chose** [2] - 102:13,
228:20
**C▮▮▮▮** [3] - 76:3,
219:17, 220:10
**chronic** [3] - 31:25,
32:5, 32:11
**chunks** [1] - 31:14
**Church** [1] - 110:12
**circle** [2] - 143:20,

226:22
**circled** [2] - 120:8,
120:9
**circling** [1] - 119:4
**circumstances** [4] -
28:2, 95:15, 176:1,
190:23
**civics** [2] - 176:8,
176:10
**Civil** [2] - 1:4, 246:7
**civil** [1] - 20:6
**clarification** [2] -
109:15, 163:6
**clarify** [2] - 215:23,
220:18
**class** [34] - 121:11,
133:17, 142:12,
143:1, 143:3,
143:19, 143:20,
154:13, 155:16,
155:18, 155:20,
158:16, 176:10,
194:19, 197:5,
221:16, 221:17,
222:1, 227:20,
227:21, 227:24,
228:2, 228:13,
228:14, 229:4,
229:5, 229:6, 229:7,
229:17, 229:18,
229:25, 234:25
**classes** [5] - 62:6,
62:8, 130:24,
135:18, 137:15
**classified** [1] - 34:14
**classify** [1] - 34:12
**classmates** [2] -
211:20, 211:24
**classroom** [4] - 13:3,
15:14, 109:5, 220:10
**classrooms** [3] -
107:15, 141:13,
226:18
**clean** [1] - 45:19
**cleaning** [1] - 110:4
**clear** [13] - 7:5, 7:9,
27:3, 53:15, 54:3,
88:15, 124:2,
153:22, 183:1,
183:12, 184:14,
189:7, 189:10
**clearance** [1] - 23:2
**clerk** [1] - 149:14
**client** [1] - 96:8
**clinical** [2] - 13:8, 15:1
**clock** [4] - 33:7, 50:14,
50:18
**clocks** [1] - 50:14
**close** [6] - 42:6, 84:24,
142:11, 161:22,

240:12, 241:11
**closed** [3] - 86:23,
87:1, 87:4
**closer** [2] - 144:22,
145:2
**closet** [4] - 117:23,
117:24, 118:18,
168:18
**closets** [6] - 118:3,
118:4, 118:7, 169:3,
169:7
**closing** [4] - 240:25,
242:13, 242:25,
244:15
**closings** [2] - 241:15,
242:21
**coach** [6] - 103:5,
103:8, 104:8, 104:9,
105:4, 106:6
**coached** [1] - 106:8
**coaches** [1] - 105:6
**coaching** [3] - 106:12,
106:15, 106:17
**collaborate** [1] -
196:20
**collaborated** [2] -
140:7, 140:12
**collaborative** [1] -
137:11
**collaboratively** [2] -
109:11, 137:5
**colleagues** [1] - 97:25
**collect** [3] - 28:17,
51:15, 123:11
**collected** [4] - 21:23,
21:25, 22:1, 22:5
**collecting** [2] - 25:3,
28:16
**collection** [7] - 19:8,
22:3, 22:16, 22:22,
24:14, 25:13, 25:17
**college** [1] - 103:9
**color** [3] - 26:22,
33:25
**colposcope** [7] - 25:8,
48:12, 50:23, 50:24,
51:4, 51:8, 51:10
**colposcopic** [5] -
25:10, 31:16, 31:20,
48:10, 50:22
**columns** [1] - 30:14
**comfort** [1] - 75:9
**comfortable** [5] -
38:16, 54:18, 97:5,
156:9, 158:15
**coming** [24] - 69:11,
69:12, 69:13, 69:14,
74:10, 75:14, 75:15,
78:14, 83:25, 112:1,
114:6, 114:9,

114:21, 114:23,
114:24, 116:2,
122:18, 140:18,
184:23, 196:22,
201:14, 223:10,
224:7, 241:4
**comment** [1] - 73:13
**comments** [1] - 26:20
**commitment** [1] -
242:3
**committed** [1] - 88:10
**committees** [1] -
17:14
**common** [4] - 47:11,
232:5, 232:7, 234:23
**Commonwealth** [5] -
12:6, 14:1, 14:6,
17:25, 21:21
**communicated** [2] -
137:12, 152:6
**communicating** [2] -
123:20, 158:13
**communication** [3] -
185:18, 209:14,
209:18
**communications** [2] -
92:12, 93:9
**communities** [1] -
175:19
**community** [5] -
15:18, 108:8,
113:23, 175:23,
184:25
**compare** [1] - 138:22
**compared** [1] - 22:12
**compensated** [2] -
20:11, 20:13
**competitive** [1] -
60:11
**complainant** [1] -
200:18
**complained** [1] -
44:11
**complaining** [3] -
200:5, 233:14,
233:18
**complaint** [2] -
168:17, 168:24
**complaints** [8] -
148:16, 151:15,
151:16, 152:16,
152:19, 152:22,
175:1, 175:3
**complete** [3] - 13:2,
25:16, 25:23
**completed** [2] -
131:11, 172:15
**completing** [2] -
16:12, 221:9
**completion** [1] - 25:14

**complicate** [1] - 206:4
**complied** [2] - 150:24,
166:10
**complies** [3] - 143:22,
226:17, 226:19
**compliment** [1] -
106:4
**complimenting** [1] -
238:3
**compliments** [1] -
106:1
**component** [1] - 22:23
**computer** [2] - 19:4,
246:12
**concedes** [1] - 6:15
**concept** [1] - 96:20
**concepts** [1] - 96:6
**concern** [9] - 38:6,
38:13, 155:6, 155:7,
188:11, 223:17,
224:11, 242:7, 244:1
**concerned** [4] - 153:6,
190:21, 224:7,
237:21
**concerning** [2] -
153:10, 153:12
**concerns** [6] - 153:14,
153:18, 154:24,
155:8, 155:25,
194:17
**conclusion** [5] -
52:13, 85:9, 216:13,
222:13, 242:12
**conclusions** [2] -
52:11, 55:14
**Conclusions** [1] -
55:9
**concurred** [1] - 49:13
**condition** [1] - 206:3
**conduct** [6] - 15:4,
16:23, 18:10, 19:14,
66:3, 126:23
**conducted** [6] - 19:18,
34:25, 62:22, 66:13,
66:14, 66:21
**conducting** [1] - 68:2
**confer** [1] - 36:8
**conferred** [1] - 11:6
**confers** [5] - 71:23,
98:1, 116:20,
215:19, 215:21
**confines** [3] - 35:20,
36:9, 36:12
**conflicts** [1] - 126:24
**confusion** [2] - 6:8,
149:20
**congratulations** [2] -
61:1, 98:19
**Congress** [1] - 18:2
**congressional** [1] -

18:5
**conjunction** [1] -
61:12
**connect** [4] - 6:21,
36:1, 37:8, 113:14
**connected** [1] - 37:22
**connection** [3] - 6:25,
72:13, 237:11
**connective** [2] -
108:16, 108:18
**consent** [5] - 24:9,
24:10, 66:3, 66:6,
66:8
**consequence** [5] -
152:6, 152:8, 152:9,
190:2, 190:25
**consequences** [1] -
127:24
**consider** [3] - 13:13,
64:4, 107:2
**considered** [2] - 23:4,
25:1, 64:7
**consistent** [8] - 52:17,
52:21, 53:1, 55:12,
68:22, 148:12,
174:14
**consists** [1] - 26:12
**constant** [2] - 185:18,
237:8
**Co███████** [5] -
82:5, 196:25, 197:9,
217:17, 217:21
**constantly** [2] - 123:8,
138:4
**constipation** [2] -
39:10, 44:7
**constitute** [1] - 246:11
**constructed** [1] -
66:18
**construction** [2] -
104:7, 110:8
**Construction** [1] -
110:12
**consult** [1] - 97:25
**Cont** [2] - 1:25, 2:25
**contact** [9] - 39:21,
81:10, 88:7, 91:16,
127:4, 147:14,
195:24, 205:8,
205:13
**contacted** [2] -
195:23, 205:14
**contained** [1] - 10:23
**content** [1] - 224:8
**CONTENTS** [1] - 4:1
**context** [3] - 37:19,
117:7, 236:10, 241:7
**contexts** [1] - 236:12
**continue** [2] - 83:13,
110:16

**continued** [4] - 30:6,
70:12, 78:5, 83:24
**continues** [1] - 219:23
**contract** [4] - 107:20,
107:25, 108:1, 108:2
**contribute** [2] - 39:19,
40:5
**control** [1] - 237:24
**convers** [1] - 124:25
**conversation** [7] -
63:1, 73:15, 84:6,
149:17, 201:12,
201:16, 208:12
**conversations** [3] -
105:8, 123:16,
124:25
**convince** [1] - 169:21
**cooperate** [1] - 86:11
**cooperative** [1] -
86:18
**coordinator** [3] - 15:1,
26:5, 40:23
**copied** [2] - 38:7,
148:7
**copy** [5] - 116:14,
133:13, 160:17,
161:5, 162:12
**coral** [1] - 222:1
**core** [2] - 164:9,
171:21
**corner** [3] - 61:15,
90:13, 90:14
**CornerHouse** [2] -
61:15, 62:4
**corners** [1] - 72:6
**correct** [221] - 6:5, 6:6,
10:25, 13:19, 14:5,
14:8, 16:2, 16:5,
16:8, 16:22, 17:9,
17:19, 18:4, 20:17,
20:20, 22:8, 23:20,
24:3, 30:3, 31:6,
31:13, 32:16, 34:4,
34:11, 42:9, 42:15,
42:19, 42:21, 43:17,
42:23, 43:24, 44:1,
44:2, 44:8, 44:9,
44:11, 44:12, 44:14,
44:15, 44:17, 44:22,
44:23, 45:6, 45:7,
45:10, 45:14, 45:17,
45:18, 45:25, 46:4,
46:5, 46:17, 46:18,
46:21, 47:7, 49:1,
49:2, 49:5, 50:13,
50:18, 50:22, 51:1,
51:14, 52:1, 52:11,
52:12, 52:14, 52:22,
52:23, 53:3, 53:4,
53:8, 53:11, 53:20,

54:1, 54:5, 54:10,
55:10, 55:13, 61:17,
75:20, 88:7, 89:1,
89:12, 90:22, 94:23,
96:19, 106:12,
106:21, 122:22,
127:19, 128:24,
131:19, 133:17,
135:15, 142:3,
142:6, 148:3,
148:11, 157:22,
159:20, 164:23,
170:20, 171:20,
171:25, 174:13,
174:17, 177:10,
177:13, 177:14,
177:21, 177:22,
177:24, 178:2,
178:3, 178:4, 178:5,
178:8, 178:20,
179:8, 179:11,
179:18, 180:7,
180:8, 180:11,
180:18, 181:6,
181:16, 181:23,
182:2, 182:5,
182:17, 182:24,
183:14, 183:23,
184:2, 184:4, 184:5,
184:7, 184:12,
185:5, 185:13,
185:25, 186:11,
186:13, 186:15,
186:17, 186:18,
186:20, 186:24,
187:6, 187:12,
188:19, 189:8,
189:13, 189:17,
189:23, 189:24,
190:1, 190:2, 190:5,
190:7, 190:15,
190:22, 191:12,
192:1, 192:4, 192:9,
192:20, 193:1,
193:3, 193:6, 193:8,
193:20, 193:21,
194:2, 194:24,
195:8, 195:17,
196:5, 196:9, 198:1,
198:5, 198:6,
198:11, 198:16,
201:6, 201:10,
203:12, 203:19,
203:20, 203:22,
203:25, 204:3,
204:4, 204:6,
204:20, 207:8,
207:16, 209:10,
209:15, 209:19,
211:15, 211:16,
212:5, 212:12,

212:15, 212:23,
216:5, 216:21,
216:24, 222:15,
223:7, 225:22,
227:12, 227:22,
232:25, 234:9,
234:10, 235:14
**correcting** [1] - 224:4
**correctly** [1] - 26:7
**costume** [1] - 105:12
**Cougars** [1] - 103:19
**Counsel** [6] - 71:23,
98:1, 116:20, 151:7,
215:19, 215:21
**counsel** [6] - 10:2,
37:11, 56:6, 56:7,
244:6
**counseled** [2] -
219:19, 220:12
**counseling** [1] - 25:24
**counselor** [2] -
144:17, 229:10
**counselors** [8] -
123:21, 125:8,
136:4, 137:24,
138:15, 138:18,
155:19, 160:23
**country** [2] - 13:22,
18:8
**county** [5] - 95:25,
108:10, 121:17,
204:24
**County** [28] - 10:11,
56:16, 56:17, 57:8,
57:17, 58:1, 58:7,
59:6, 59:13, 60:20,
63:22, 100:7,
101:10, 102:2,
102:10, 103:16,
108:21, 115:18,
119:16, 119:20,
126:22, 128:6,
129:14, 131:9,
134:12, 175:9,
205:15, 206:18
**couple** [6] - 63:14,
94:17, 95:6, 143:25,
150:8, 228:6
**course** [15] - 15:4,
17:2, 19:18, 24:9,
31:11, 48:1, 48:7,
52:2, 62:3, 64:24,
65:5, 122:23,
123:25, 221:8,
244:11
**courses** [1] - 16:14
**Court** [16] - 3:12, 3:13,
5:5, 6:10, 10:3,
49:13, 56:7, 84:20,
93:24, 99:20,

126:14, 225:5,
237:11, 241:2,
246:3, 246:22
**court** [8] - 19:25,
20:14, 39:1, 105:19,
109:15, 239:7,
240:3, 246:8
**COURT** [247] - 1:1,
1:12, 6:1, 6:3, 6:7,
7:16, 7:20, 8:8, 8:17,
8:20, 8:22, 8:24, 9:8,
9:11, 9:24, 10:1,
10:6, 11:8, 11:12,
10:24, 27:25, 35:12,
35:14, 35:17, 35:19,
36:13, 36:15, 36:20,
37:1, 37:10, 37:23,
38:10, 38:15, 38:22,
38:25, 39:3, 40:19,
41:16, 41:18, 43:12,
49:10, 49:22, 50:1,
50:8, 51:17, 51:24,
52:3, 52:6, 54:22,
54:25, 55:2, 55:4,
55:19, 55:21, 56:2,
56:5, 64:11, 64:14,
67:17, 71:15, 71:18,
72:9, 84:11, 84:15,
84:22, 87:8, 87:10,
88:12, 90:22, 92:6,
93:22, 94:8, 97:12,
98:3, 98:5, 98:7,
98:13, 98:16, 98:22,
98:25, 99:6, 99:9,
99:11, 99:15, 99:18,
103:6, 106:1,
110:24, 116:17,
117:1, 120:19,
126:3, 126:11,
126:15, 126:17,
129:24, 130:6,
130:11, 134:5,
135:9, 140:20,
142:17, 145:15,
147:19, 147:22,
148:23, 149:5,
149:8, 149:10,
149:13, 149:22,
150:20, 151:1,
151:4, 151:6,
151:11, 153:3,
153:23, 153:25,
154:2, 154:5, 154:8,
156:21, 156:23,
157:12, 159:2,
160:10, 161:11,
161:13, 162:1,
162:14, 165:12,
166:4, 168:21,
169:19, 170:1,
170:4, 170:8,

170:12, 170:14,
170:18, 170:21,
170:24, 171:3,
173:10, 174:3,
174:7, 175:12,
176:2, 176:16,
176:18, 176:22,
176:24, 177:2,
178:10, 181:10,
181:12, 183:7,
186:6, 187:23,
187:25, 191:17,
192:14, 197:12,
197:20, 199:1,
199:3, 200:8, 202:4,
202:8, 202:10,
202:14, 202:16,
202:24, 203:2,
203:6, 203:9,
203:15, 204:9,
204:11, 204:16,
205:23, 206:12,
206:21, 207:21,
209:5, 211:6,
211:11, 213:11,
214:12, 214:14,
215:15, 215:17,
215:25, 217:14,
217:18, 219:13,
220:24, 222:25,
223:23, 224:16,
224:18, 224:20,
224:22, 224:25,
225:3, 226:9, 230:4,
230:19, 230:21,
230:23, 231:1,
231:4, 231:8,
231:11, 231:14,
233:23, 233:25,
234:2, 236:15,
236:17, 236:21,
236:25, 237:2,
237:18, 237:21,
238:8, 238:10,
239:4, 239:20,
240:1, 240:8,
240:10, 240:13,
241:12, 241:22,
242:3, 242:11,
242:19, 242:25,
243:5, 243:12,
243:15, 243:19,
243:21, 244:6,
244:21
**Court's** [8] - 9:17,
36:6, 36:12, 54:21,
67:13, 217:12,
237:8, 243:11
**courtesy** [1] - 93:24
**Courthouse** [1] - 3:13
**courtroom** [2] - 99:18,

239:22, 242:20
**cover** [3] - 61:22,
132:6, 162:5
**covered** [5] - 53:7,
61:24, 62:2, 64:8,
135:21
**covers** [1] - 30:10
**craft** [1] - 221:12
**crate** [2] - 146:8,
146:10
**crates** [2] - 141:22,
146:13
**crazy** [1] - 105:11
**create** [5] - 120:16,
228:14, 228:20,
229:8, 231:24
**created** [5] - 58:22,
92:24, 187:4,
228:17, 231:8
**crime** [3] - 61:24,
62:1, 62:13
**crimes** [5] - 59:12,
59:22, 60:5, 60:6,
96:17
**Criminal** [1] - 57:8
**criminal** [2] - 20:5,
20:8
**cross** [3] - 7:12,
37:24, 113:16
**CROSS** [4] - 41:21,
94:9, 177:3, 234:4
**Cross** [4] - 4:5, 4:8,
4:12, 4:15
**cross-examination** [1]
- 37:24
**CROSS-
EXAMINATION** [4] -
41:21, 94:9, 177:3,
234:4
**Cross-examination**
[4] - 4:5, 4:8, 4:12,
4:15
**culminating** [1] -
221:7
**cumulative** [2] -
128:15, 168:20
**curious** [1] - 94:19
**current** [5] - 18:14,
22:12, 23:21, 41:2,
225:14
**curriculum** [5] -
121:4, 121:18,
136:3, 223:21, 228:5
**curtilage** [2] - 64:7
**custodial** [5] - 117:23,
117:24, 118:3,
118:4, 118:7
**custodian** [1] - 109:24
**custodians** [2] -
109:12, 110:15

**cut** [1] - 29:13
**cutting** [1] - 102:18
**cyberbullying** [2] - 134:19, 134:24

# D

**D.N** [5] - 144:7, 187:6, 188:17, 189:1, 190:5
**D.R** [1] - 230:23
**dad** [3] - 179:21, 213:17, 214:19
**daily** [2] - 20:14, 40:3
**Daniel** [1] - 127:22
**dashes** [1] - 31:23
**data** [1] - 123:11
**date** [7] - 65:12, 65:14, 85:10, 85:11, 173:16, 189:14, 217:8
**dated** [1] - 186:11
**dating** [1] - 91:24
**Daubert** [1] - 6:25
**daughter** [9] - 93:3, 93:19, 159:16, 166:24, 167:1, 168:11, 168:14, 192:23, 242:1
**daughter's** [1] - 166:18
**David** [11] - 74:22, 74:25, 75:1, 75:5, 75:8, 75:15, 75:23, 80:20, 81:5, 89:11
**day-to-day** [1] - 40:4
**days** [13] - 42:13, 54:15, 54:17, 63:14, 78:15, 136:12, 173:18, 173:23, 174:16, 209:23, 237:4, 242:2
**DC** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**de** [1] - 237:22
**deactivated** [2] - 83:21, 83:22
**deadline** [2] - 131:8, 131:10
**dealing** [3] - 96:15, 136:3, 175:25
**dealt** [1] - 190:24
**December** [6] - 145:20, 147:12, 147:14, 148:1, 148:14, 169:1
**decided** [1] - 196:12
**decision** [3] - 123:18, 208:5, 212:16
**decisions** [1] - 123:18
**deck** [1] - 11:5

**dedicated** [4] - 218:12, 218:14, 218:19, 218:21
**deemed** [1] - 109:3
**Defendant** [3] - 2:13, 3:1, 3:9
**defendant** [2] - 100:4, 238:17
**Defendants** [4] - 1:7, 3:5, 4:2, 4:21
**defendants** [2] - 99:10, 120:11
**Defendants'** [45] - 4:18, 9:25, 56:3, 99:16, 110:23, 116:12, 116:15, 118:13, 129:23, 129:25, 130:8, 130:9, 130:12, 133:19, 134:3, 134:6, 135:1, 135:7, 135:10, 142:13, 144:23, 145:6, 145:13, 145:16, 147:4, 147:17, 147:20, 148:20, 149:23, 156:11, 156:19, 156:24, 157:10, 158:1, 158:25, 166:3, 191:9, 191:14, 192:11, 192:15, 225:2, 226:7, 230:6, 231:15, 234:11
**defense** [6] - 6:4, 9:22, 20:9, 55:25, 225:1, 242:5
**define** [1] - 42:9
**definitely** [8] - 125:3, 129:4, 137:16, 140:7, 152:2, 176:6, 176:13, 179:9
**definition** [5] - 21:6, 21:12, 33:12, 33:18, 34:4
**degree** [2] - 100:10, 100:13
**degrees** [1] - 244:22
**delay** [1] - 96:17
**deliberate** [1] - 234:25
**deliberation** [1] - 240:19
**delivering** [1] - 105:13
**demeaning** [1] - 187:5
**Demetri** [2] - 224:21, 225:1
**Demetrios** [2] - 4:13, 225:11
**DEMETRIOS** [1] - 225:2

**demographic** [1] - 27:20
**demonstrate** [2] - 228:11, 228:15
**demonstrative** [2] - 27:23, 67:5
**demonstratives** [2] - 244:16, 244:20
**department** [21] - 14:13, 14:14, 14:17, 14:20, 21:9, 21:16, 21:18, 42:6, 42:12, 57:2, 57:5, 57:11, 95:11, 100:23, 133:2, 141:4, 141:5, 220:21, 221:17, 225:15, 225:16
**Department** [4] - 56:16, 56:18, 58:8, 60:20
**department-registered** [1] - 14:14
**dependent** [1] - 54:16
**deposition** [1] - 238:18
**depositions** [1] - 237:22
**Deputy** [5] - 4:6, 55:25, 56:15, 87:14, 94:11
**deputy** [7] - 56:15, 60:22, 60:23, 85:3, 98:13, 149:14
**derogatory** [1] - 82:4
**describe** [11] - 33:9, 34:1, 34:9, 47:18, 57:13, 58:5, 61:14, 69:19, 76:9, 135:24, 169:6
**described** [12] - 22:10, 22:11, 33:21, 47:22, 70:5, 76:11, 89:10, 89:17, 90:3, 90:16, 91:3
**describes** [1] - 45:9
**describing** [2] - 32:20, 34:6
**description** [3] - 32:13, 33:17, 113:5
**design** [4] - 111:4, 120:16, 131:25, 183:17
**designate** [1] - 124:10
**designated** [1] - 151:3
**designed** [6] - 66:17, 66:19, 121:1, 121:4, 121:5, 121:7, 121:15, 121:17
**desk** [1] - 9:13

**detail** [4] - 18:24, 22:24, 175:2, 175:3
**detailed** [5] - 23:7, 23:21, 24:4, 26:14, 39:25
**details** [2] - 46:19, 187:4
**Detective** [1] - 44:16
**detective** [8] - 27:21, 60:2, 60:7, 60:9, 60:13, 60:15, 61:11, 96:24
**detention** [4] - 152:10, 220:12, 220:14, 220:15
**detergent** [1] - 39:21
**determination** [2] - 63:24, 128:21
**determine** [7] - 34:15, 34:17, 40:11, 41:9, 41:12, 43:22, 128:2
**determined** [2] - 64:18, 86:4
**develop** [1] - 228:14
**developed** [2] - 121:23, 158:5
**developing** [1] - 19:10
**development** [3] - 12:9, 101:5, 101:7
**developmentally** [1] - 48:18
**Device** [2] - 108:25, 116:9
**device** [1] - 109:2
**diagnosing** [1] - 34:7
**diagnosis** [1] - 34:21
**diagnostic** [1] - 33:19
**diagram** [1] - 28:22
**diagrams** [1] - 26:17
**dial** [2] - 51:7, 73:15
**dialed** [2] - 73:9, 73:10
**didactic** [3] - 13:2, 15:14, 16:20
**difference** [2] - 22:17, 108:1
**differences** [2] - 22:9, 22:11
**different** [19] - 22:14, 25:6, 47:19, 58:9, 62:14, 95:14, 104:13, 104:23, 104:25, 107:22, 108:23, 111:12, 117:19, 122:1, 123:7, 147:11, 188:10, 222:2, 228:8
**differential** [1] - 34:21
**differently** [3] - 33:22, 48:6, 163:18
**difficult** [4] - 105:7,

175:23, 209:23, 236:8
**difficulty** [3] - 27:1, 27:12, 46:2
**digital** [3] - 25:7, 92:11, 93:9
**digitally** [1] - 70:10
**diploma** [1] - 11:21
**DIRECT** [5] - 10:7, 56:10, 87:12, 99:23, 225:7
**direct** [28] - 31:15, 31:19, 43:7, 44:20, 45:12, 48:24, 50:10, 50:24, 51:2, 53:7, 53:15, 92:21, 107:2, 171:10, 178:23, 184:18, 189:6, 191:2, 200:25, 206:25, 207:2, 213:16, 215:2, 216:8, 219:3, 221:25, 225:23, 227:5
**Direct** [6] - 4:4, 4:7, 4:8, 4:11, 4:11, 4:14
**directed** [1] - 222:11
**direction** [4] - 36:6, 103:25, 115:3, 115:8
**directions** [2] - 104:12, 104:16
**directly** [7] - 37:8, 72:20, 137:24, 153:4, 172:2, 209:21, 233:14
**director** [3] - 15:21, 16:3, 26:6
**disagree** [1] - 50:15
**discipline** [6] - 183:23, 218:24, 220:5, 232:9, 232:11, 233:1
**disciplined** [5] - 184:1, 196:13, 219:16, 220:8, 233:3
**disciplines** [1] - 227:14
**disciplining** [1] - 203:12
**disclose** [1] - 97:15
**disclosure** [2] - 43:4, 96:20
**discretion** [1] - 50:7
**discuss** [13] - 9:18, 11:3, 12:24, 55:22, 65:16, 87:19, 92:14, 92:15, 98:17, 126:7, 160:15, 236:22, 237:9
**discussed** [6] - 6:12,

7:13, 41:19, 92:10,
208:5, 240:24
**discusses** [1] - 32:7
**discussing** [2] - 26:8,
46:19
**Discussion** [8] - 7:19,
9:6, 149:11, 215:22,
237:20, 239:19,
239:25, 241:24
**discussion** [9] -
36:21, 87:17, 93:7,
134:18, 142:4,
160:7, 160:13,
161:6, 165:5
**dismissal** [3] - 125:10,
125:15
**display** [1] - 246:13
**disputes** [1] - 6:13
**disrupting** [1] -
220:10
**disruption** [1] - 33:13
**disruptive** [1] - 219:18
**dissertation** [1] -
16:11
**distinct** [2] - 13:18,
13:19
**distracted** [1] - 8:7
**distributed** [1] -
119:23
**DISTRICT** [3] - 1:1,
1:1, 1:12
**district** [1] - 57:18
**District** [2] - 3:13,
246:4
**disturbing** [1] - 83:5
**divide** [1] - 227:14
**division** [2] - 128:1,
128:4
**Division** [1] - 57:15
**DNA** [4] - 21:25,
22:21, 25:3, 28:16
**doctor** [7] - 11:14,
11:16, 19:3, 23:5,
35:19, 47:15, 47:21
**doctor's** [1] - 210:13
**doctorate** [4] - 11:17,
11:24, 16:11, 16:12
**doctors** [1] - 54:8
**document** [24] - 33:9,
71:14, 72:1, 72:9,
73:2, 77:20, 78:20,
79:20, 80:11, 80:23,
81:21, 114:13,
133:1, 135:2, 186:1,
200:3, 200:16,
200:21, 213:21,
230:7, 230:11,
231:4, 231:6, 231:8
**documentation** [7] -
23:13, 26:4, 26:7,

26:15, 29:22, 33:16,
206:5
**documented** [2] -
29:15, 198:8
**documenting** [4] -
23:15, 30:19, 31:10,
41:1
**dog** [2] - 91:7, 91:19
**Dominion** [1] - 11:23
**done** [23] - 22:12,
23:6, 24:2, 24:22,
26:7, 26:15, 35:20,
77:21, 79:22, 81:23,
89:3, 95:17, 95:18,
108:3, 125:1,
132:21, 140:24,
143:24, 144:14,
163:18, 185:1,
189:23, 244:10
**Door** [4] - 114:4,
114:20, 115:17,
116:4
**door** [15] - 7:8, 38:2,
38:5, 114:10,
114:20, 117:21,
165:21, 165:25,
166:8, 166:10,
166:13, 175:21,
226:24, 227:2
**doors** [1] - 115:24
**double** [2] - 88:13,
88:14
**doubt** [2] - 175:22,
238:6
**down** [68] - 20:25,
30:8, 31:8, 36:24,
42:3, 47:2, 49:6,
52:24, 53:12, 55:21,
66:1, 68:7, 69:25,
70:9, 70:10, 70:14,
76:10, 76:13, 79:3,
84:1, 85:4, 97:22,
98:10, 98:16,
105:22, 105:23,
107:12, 109:16,
112:8, 113:12,
115:6, 118:13,
119:3, 119:4, 123:4,
125:2, 126:8,
136:16, 141:10,
142:7, 143:6,
144:12, 145:4,
147:25, 157:24,
158:2, 167:4,
167:24, 168:7,
170:1, 181:21,
187:14, 193:16,
197:6, 199:15,
200:10, 200:12,
210:4, 213:13,

214:24, 216:18,
227:5, 232:17,
233:5, 235:1, 237:3,
237:5, 244:18
**downstairs** [3] -
139:20, 142:10
**downtime** [1] - 107:16
**Dr** [39] - 4:3, 4:6, 6:12,
6:13, 6:15, 6:18,
6:24, 9:22, 9:24,
10:13, 10:18, 11:14,
12:3, 14:10, 17:2,
19:17, 20:21, 21:3,
26:3, 29:1, 34:8,
35:23, 39:5, 41:7,
41:23, 43:20, 54:23,
55:7, 160:2, 160:3,
160:5, 160:21,
205:18, 206:2,
206:9, 206:15,
208:4, 238:12
**drama** [1] - 164:6
**draw** [2] - 6:24, 143:20
**drawing** [1] - 155:22
**dressed** [2] - 45:15,
105:13
**dressing** [1] - 146:22
**Dreyfuss** [3] - 160:3,
160:5, 160:21
**drift** [1] - 140:21
**drills** [6] - 104:6,
109:14, 109:16,
109:17
**Drive** [1] - 3:6
**drive** [1] - 105:6
**driving** [1] - 104:11
**drop** [3] - 9:13, 112:6,
175:20
**dropped** [1] - 111:21
**dropping** [2] - 124:23,
125:1
**drugs** [1] - 127:24
**duckbill** [1] - 48:19
**due** [1] - 192:23
**Duquesne** [1] - 11:24
**During** [1] - 46:1
**during** [57] - 6:12,
7:14, 15:4, 19:10,
23:24, 24:22, 26:18,
28:13, 30:12, 30:18,
31:11, 45:12, 46:20,
46:23, 47:8, 48:13,
63:18, 64:23, 65:5,
68:11, 88:4, 98:10,
107:11, 107:13,
107:16, 108:9,
115:15, 115:16,
116:3, 118:7,
118:10, 119:2,
124:17, 130:20,

136:14, 136:15,
136:19, 137:16,
138:16, 141:18,
144:15, 147:1,
160:18, 169:12,
194:6, 196:21,
207:2, 217:4, 227:7,
227:15, 229:1,
229:15, 229:17,
232:7, 244:11
**duty** [1] - 178:6

---

# E

**early** [3] - 63:3,
137:17, 174:17
**earn** [1] - 77:6
**easel** [4] - 243:8,
244:3, 244:4
**easier** [1] - 186:10
**easiest** [1] - 34:1
**easily** [1] - 62:23
**East** [1] - 1:19
**EASTERN** [1] - 1:1
**Eastern** [1] - 246:4
**ED** [2] - 23:5
**educated** [1] - 17:3
**education** [12] - 15:21,
15:22, 16:3, 20:19,
41:8, 100:23,
103:17, 130:24,
225:16, 225:20,
227:10, 232:8
**educational** [3] -
11:20, 100:8, 100:13
**educator** [5] - 100:18,
102:11, 102:14,
102:25, 104:21
**educators** [1] - 102:18
**eff** [1] - 162:20
**effectively** [1] - 107:17
**effects** [1] - 107:13
**efficient** [1] - 99:2
**effort** [1] - 123:21
**efforts** [1] - 120:16
**either** [16] - 23:20,
26:5, 27:8, 31:1,
62:23, 99:3, 123:18,
138:18, 141:22,
155:20, 156:3,
209:20, 213:3,
217:4, 239:22,
239:24
**elaborate** [1] - 121:23
**elective** [1] - 221:20
**electives** [1] - 164:5
**electric** [1] - 105:11
**electrical** [1] - 110:3
**electronic** [1] - 94:1
**elementary** [9] -

100:19, 105:16,
110:11, 110:13,
112:18, 112:20,
112:22, 139:9,
139:11
**Elementary** [5] -
100:20, 103:14,
106:15
**eleven** [1] - 17:2
**eliminate** [1] - 235:18
**Elliker** [6] - 2:25,
10:11, 37:24, 38:2,
38:17, 49:23
**ELLIKER** [26] - 9:22,
10:8, 11:5, 11:10,
11:13, 20:21, 20:25,
21:2, 27:22, 28:1,
35:16, 36:10, 36:14,
36:23, 37:7, 38:6,
39:2, 39:4, 41:6,
41:15, 49:24, 51:19,
52:2, 55:6, 55:18,
238:6
**Elliker............** [1] - 4:5
**Elliker..............** [1] -
4:4
**Email** [11] - 1:17, 1:21,
2:4, 2:8, 2:12, 2:16,
2:19, 2:23, 3:3, 3:7,
3:11
**email** [53] - 107:15,
141:4, 145:9,
145:19, 145:25,
146:4, 146:5,
146:15, 147:7,
147:10, 147:12,
147:14, 147:25,
148:2, 148:4, 156:8,
156:16, 157:2,
157:3, 158:2, 158:4,
158:9, 158:11,
159:15, 173:16,
186:11, 186:17,
186:19, 191:12,
191:19, 191:22,
191:23, 192:6,
192:18, 194:17,
194:21, 204:21,
204:22, 205:17,
205:21, 208:21,
208:25, 209:10,
209:18, 210:25,
211:14, 212:10,
215:10, 215:12,
216:4, 222:12, 223:3
**emailed** [2] - 148:10,
173:14
**emails** [5] - 147:10,
148:16, 151:15,
156:13, 238:14

**embarrassed** [2] - 46:23, 239:21
**emergency** [9] - 14:13, 14:17, 14:21, 21:9, 21:16, 21:17, 42:6, 42:12
**Emilia** [1] - 101:24
**emotional** [4] - 46:16, 47:7, 208:17, 228:4
**emotions** [2] - 47:8, 47:12
**employed** [5] - 100:6, 126:22, 175:9, 175:14, 225:12
**end** [20] - 83:14, 88:4, 117:19, 119:8, 122:5, 124:18, 125:2, 138:18, 153:11, 156:4, 171:7, 193:12, 203:11, 220:21, 228:11, 229:8, 229:21, 237:3, 239:14, 240:15
**ended** [2] - 104:9, 206:14
**ending** [1] - 51:23
**endless** [1] - 108:12
**endorsement** [1] - 104:20
**enduring** [1] - 196:23
**Enforcement** [1] - 57:7
**enforcement** [8] - 15:19, 21:22, 22:2, 22:5, 57:3, 57:6, 57:10, 62:21
**engaged** [1] - 219:17
**engineer** [3] - 109:13, 109:25, 110:2
**English** [2] - 121:8, 154:23
**enhance** [1] - 109:7
**ensure** [1] - 26:7
**entail** [1] - 18:17
**entailed** [1] - 228:6
**entails** [3] - 21:4, 22:24, 221:4
**enter** [4] - 90:4, 90:5, 115:15, 115:23
**entered** [1] - 93:24
**entire** [12] - 24:10, 102:11, 110:12, 111:5, 115:4, 121:1, 128:4, 133:5, 220:16, 220:21, 222:1, 229:1
**entitled** [1] - 35:21
**entrance** [6] - 32:8, 111:7, 111:20,

114:5, 114:17, 150:6
**entrusted** [1] - 96:1
**environment** [4] - 109:3, 120:17, 187:4, 226:3
**equating** [1] - 37:25
**equation** [1] - 85:25
**equipment** [2] - 25:4, 94:1
**err** [1] - 172:16
**Es** [2] - 159:11, 159:21
**escalated** [1] - 181:23
**escort** [1] - 114:22
**especially** [2] - 108:17, 119:21
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8
**esse** [1] - 237:22
**essentially** [3] - 19:7, 29:10, 227:21
**establish** [1] - 216:23
**estimate** [2] - 13:20, 17:3
**Estrella** [7] - 154:19, 154:22, 211:2, 212:2, 212:24, 213:6, 238:14
**Estrella's** [1] - 154:18
**et** [2] - 1:6, 246:7
**ethic** [1] - 105:6
**evacuation** [1] - 109:16
**evening** [1] - 237:16
**evenly** [2] - 19:22, 20:10
**event** [7] - 63:25, 64:2, 64:3, 64:4, 64:18, 86:5, 90:3
**events** [1] - 89:10
**eventually** [9] - 9:15, 58:22, 69:24, 70:8, 70:12, 70:16, 70:18, 77:11, 86:10
**evidence** [43] - 19:8, 21:22, 21:25, 22:1, 22:3, 22:5, 22:16, 22:21, 24:14, 25:3, 25:13, 25:17, 27:24, 28:16, 28:17, 29:9, 29:21, 41:3, 49:25, 130:12, 134:6, 135:10, 145:16, 147:20, 149:24, 154:25, 156:24, 192:16, 204:8, 204:13, 209:6, 211:7, 213:10, 214:15, 216:2,

231:15, 239:10, 239:11, 239:15, 241:10, 241:14, 244:10, 244:19
**evidence-based** [1] - 41:3
**exact** [6] - 33:23, 42:25, 58:21, 81:18, 185:19, 189:14
**exactly** [2] - 13:12, 160:4
**exam** [45] - 6:14, 19:10, 22:20, 22:23, 24:6, 24:10, 24:23, 25:12, 25:14, 25:16, 26:14, 27:11, 29:2, 30:6, 30:18, 31:15, 31:20, 33:6, 33:10, 35:5, 37:3, 37:4, 37:22, 38:13, 40:6, 42:17, 43:6, 43:7, 44:1, 44:14, 44:21, 46:2, 46:20, 46:23, 47:5, 47:9, 47:20, 47:24, 47:25, 48:3, 48:4, 48:13, 50:10, 53:7, 53:15
**exam's** [1] - 40:16
**Examination** [1] - 28:24
**EXAMINATION** [13] - 10:7, 41:21, 55:5, 56:10, 87:12, 94:9, 98:8, 99:23, 171:10, 177:3, 218:5, 225:7, 234:4
**examination** [39] - 4:4, 4:5, 4:5, 4:7, 4:8, 4:8, 4:9, 4:11, 4:11, 4:12, 4:12, 4:14, 4:15, 10:19, 19:7, 19:14, 21:4, 22:6, 22:18, 23:18, 24:14, 24:22, 25:12, 26:9, 26:10, 26:19, 26:23, 28:13, 31:12, 34:10, 34:25, 37:24, 40:8, 43:7, 47:15, 48:25, 54:8, 170:5
**examinations** [7] - 15:5, 18:11, 19:18, 20:1, 20:22, 26:2, 95:19
**examiner** [14] - 12:16, 12:18, 14:16, 16:18, 18:15, 26:20, 29:6, 30:24, 44:5, 46:1, 50:16, 52:10, 52:25, 55:9
**examiners** [1] - 29:18

**examining** [1] - 17:8
**example** [8] - 30:20, 96:24, 114:25, 121:2, 122:3, 123:3, 150:20, 241:23
**examples** [1] - 124:1
**exams** [3] - 34:20, 42:23, 47:14
**excellent** [2] - 105:24, 244:11
**except** [2] - 198:2, 242:21
**exception** [1] - 230:18
**excerpts** [1] - 27:23
**exchange** [4] - 123:6, 147:7, 158:16, 215:12
**exchanged** [1] - 72:17
**excited** [1] - 161:12
**exciting** [1] - 161:14
**excuse** [8] - 6:4, 83:7, 103:5, 117:24, 133:15, 154:20, 222:3, 239:23
**Excuse** [1] - 103:20
**excused** [2] - 84:14, 98:21, 126:10, 159:14, 159:22, 169:25, 224:17, 237:1, 237:17
**exhibit** [10] - 49:15, 49:16, 49:22, 51:21, 52:8, 75:17, 111:2, 162:15, 166:6
**Exhibit** [87] - 11:9, 27:24, 43:11, 43:14, 51:23, 67:16, 67:19, 110:23, 110:25, 116:12, 116:15, 118:13, 129:23, 130:8, 130:9, 130:12, 133:19, 134:3, 134:6, 134:7, 135:1, 135:7, 135:10, 135:11, 142:14, 144:23, 145:6, 145:16, 145:17, 147:5, 147:17, 147:20, 147:23, 148:20, 149:23, 156:11, 156:19, 156:24, 156:25, 157:10, 157:13, 158:1, 158:25, 159:4, 162:11, 166:3, 174:8, 181:9, 181:13, 186:5, 186:7, 191:9, 191:14, 192:12,

192:15, 199:5, 204:15, 204:18, 208:19, 209:3, 209:6, 209:7, 210:22, 211:4, 211:7, 211:12, 214:2, 214:3, 214:11, 214:15, 214:16, 215:5, 215:6, 215:14, 215:18, 215:24, 216:1, 219:1, 219:14, 222:4, 222:5, 226:8, 226:10, 230:6, 231:15, 231:16, 234:11
**EXHIBITS** [1] - 4:16
**exhibits** [9] - 49:11, 117:19, 148:25, 149:16, 238:20, 238:23, 239:9, 240:7
**existing** [1] - 243:11
**exit** [1] - 118:21
**exiting** [1] - 115:11
**expanded** [1] - 15:1
**expect** [4] - 28:19, 29:14, 29:25, 238:15
**expectations** [1] - 232:16
**experience** [17] - 15:8, 19:13, 20:19, 29:25, 41:8, 42:22, 57:6, 57:13, 96:5, 97:18, 110:5, 128:12, 169:3, 169:6, 225:24, 237:22, 242:13
**experienced** [3] - 13:6, 21:7, 192:24
**experiencing** [1] - 40:4
**expert** [8] - 6:3, 6:4, 6:16, 20:1, 20:3, 20:22, 34:12, 40:19
**expertise** [1] - 6:24
**explain** [29] - 12:13, 18:17, 24:18, 26:12, 30:9, 30:24, 33:24, 39:16, 57:24, 64:3, 66:15, 67:4, 87:23, 101:7, 111:3, 111:10, 120:15, 120:21, 127:21, 150:4, 155:10, 163:7, 216:14, 221:23, 222:14, 223:3, 224:2, 224:3
**explained** [3] - 67:8, 93:11, 189:3

**explanation** [3] - 132:9, 132:12, 222:17
**explanations** [4] - 6:19, 35:7, 35:24, 39:6
**explanatory** [1] - 150:1
**Explorer** [2] - 177:19, 177:21
**Explorers** [4] - 108:19, 137:1, 137:4, 141:14
**exposed** [1] - 184:7
**exposition** [1] - 101:11
**expression** [1] - 161:23
**extent** [3] - 9:20, 170:15, 227:6
**exterior** [2] - 165:21, 226:24
**extra** [11] - 69:17, 106:14, 108:5, 108:7, 112:21, 116:5, 119:9, 122:3, 129:19, 141:3, 171:22
**extracurriculars** [1] - 208:7
**eye** [8] - 25:9, 31:17, 31:22, 51:9, 91:15, 141:3, 151:6, 171:22
**eyewitness** [2] - 91:5, 91:16

**F**

**F-word** [1] - 162:22
**F.C.S.B** [4] - 1:6, 2:13, 3:1, 246:7
**F.T** [1] - 3:7
**face** [3] - 115:22, 124:22, 152:11
**Facebook** [19] - 65:16, 71:11, 72:13, 82:8, 82:9, 82:10, 82:17, 83:6, 83:10, 83:18, 83:21, 84:3, 84:6, 92:12, 93:9, 194:9, 194:23, 194:25, 195:1
**facilitate** [1] - 7:21
**facility** [9] - 30:2, 47:19, 66:14, 66:16, 95:7, 95:9, 95:22, 95:25
**facing** [1] - 90:12
**fact** [2] - 55:16, 153:12
**facts** [2] - 204:7, 213:9
**factual** [1] - 175:4

**faculty** [1] - 16:6
**Fahey** [1] - 1:14
**FAHEY** [1] - 213:15
**fair** [2] - 151:7, 181:4
**Fair** [1] - 57:18
**Fairfax** [28] - 10:11, 56:16, 56:17, 57:8, 57:17, 58:1, 58:7, 59:6, 59:13, 60:20, 63:22, 100:7, 101:10, 102:2, 102:10, 103:16, 108:21, 115:18, 119:15, 119:20, 126:22, 128:6, 129:14, 131:9, 134:12, 175:9, 205:15, 206:18
**fairly** [1] - 113:16
**fall** [2] - 129:4, 241:21
**Falls** [1] - 110:12
**false** [1] - 175:7
**familiar** [3] - 96:21, 118:2, 119:19
**families** [2] - 124:22, 175:19
**family** [16] - 66:20, 67:22, 70:22, 95:21, 107:13, 145:9, 163:2, 179:24, 186:17, 191:24, 195:16, 197:24, 205:7, 206:24, 213:17, 213:24
**far** [2] - 90:20, 237:21
**Farms** [4] - 89:21, 89:24, 90:12, 90:13
**F**▮▮▮▮▮ [5] - 215:12, 223:15, 223:16, 224:6, 224:9
**F**▮▮▮▮▮▮ [1] - 223:18
**fast** [1] - 109:18
**faster** [1] - 105:21
**father** [1] - 77:6
**fault** [1] - 9:11
**fear** [1] - 97:3
**feature** [1] - 51:10
**February** [13] - 42:20, 51:13, 158:6, 158:12, 158:17, 159:6, 159:19, 159:22, 160:3, 169:1, 195:6, 231:9
**fed** [1] - 103:15
**Federal** [1] - 57:6
**feed** [3] - 106:19, 106:23, 108:5
**feeder** [1] - 112:22
**feeders** [1] - 107:2
**feet** [6] - 46:10,

121:12, 121:13, 151:7, 151:8, 151:11
**FELDMAN** [1] - 3:9
**fellow** [2] - 49:17, 50:3
**felt** [5] - 104:10, 155:22, 156:9, 158:15, 178:7
**female** [3] - 13:14, 24:15, 147:1
**females** [1] - 46:8
**fence** [1] - 111:15
**few** [4] - 177:8, 185:4, 232:17, 244:17
**field** [7] - 15:20, 106:8, 110:11, 208:6, 208:10, 220:17, 220:19
**fields** [3] - 111:6, 111:14, 111:15
**figure** [1] - 238:9
**figured** [1] - 188:22
**filed** [1] - 174:24
**fill** [1] - 239:17
**final** [1] - 240:6
**financial** [1] - 60:6
**Findings** [1] - 52:25
**findings** [29] - 6:13, 10:23, 26:6, 27:2, 29:3, 29:7, 31:11, 32:3, 32:11, 32:16, 33:10, 34:9, 34:13, 34:17, 34:22, 35:2, 35:7, 35:11, 36:22, 37:25, 38:1, 39:7, 39:8, 40:5, 40:16, 41:9, 52:11, 54:12, 55:15
**fine** [4] - 9:4, 158:20, 243:4, 244:21
**fingers** [2] - 28:10, 70:11
**finish** [5] - 237:13, 241:10, 241:14, 241:19, 242:17
**finished** [2] - 73:4, 75:18
**fire** [1] - 109:16
**first** [55] - 6:3, 8:3, 20:6, 21:19, 27:17, 27:18, 31:14, 33:3, 43:16, 44:24, 45:3, 52:13, 57:16, 58:10, 58:11, 60:21, 87:23, 89:4, 90:8, 96:25, 100:18, 103:24, 104:3, 106:13, 106:14, 111:2, 114:12, 115:1, 115:2, 116:12, 117:6, 118:14,

121:10, 122:9, 130:19, 137:14, 138:16, 142:19, 143:25, 144:24, 147:10, 147:12, 150:1, 151:24, 167:16, 170:7, 170:24, 203:3, 215:24, 221:8, 222:5, 225:17, 226:2, 231:19, 238:12
**first-year** [1] - 104:3
**firsthand** [4] - 153:23, 154:2, 154:4, 154:6
**fits** [1] - 208:3
**five** [7] - 37:7, 37:10, 54:15, 54:17, 58:16, 121:12, 221:14
**fix** [1] - 173:25
**FL** [3] - 2:3, 2:7, 2:11
**FLEXNER** [4] - 1:19, 2:2, 2:6, 2:10
**flip** [5] - 8:14, 131:15, 150:7, 157:15, 220:2
**forensically** [1] - 19:6
**forensics** [2] - 21:13, 41:2
**forget** [2] - 32:17, 63:22
**form** [10] - 28:22, 29:18, 29:20, 30:1, 31:9, 49:16, 214:5, 220:24
**formal** [1] - 239:7
**formally** [1] - 91:23
**forms** [2] - 205:17, 206:16
**forth** [1] - 137:11
**forwarded** [2] - 192:7, 193:3
**forwarding** [1] - 191:23
**forwards** [2] - 212:24, 213:1
**foundation** [3] - 97:10, 116:21, 231:3
**founded** [1] - 179:12
**four** [10] - 16:4, 22:19, 34:25, 102:1, 108:22, 136:21, 164:9, 175:17, 221:13, 228:19
**four-and-a-half** [1] - 175:17
**fourth** [1] - 211:20
**fox** [2] - 103:14
**Fox** [1] - 103:18
**frame** [11] - 21:23, 22:14, 22:16, 25:2, 35:3, 35:4, 42:10,

**foregoing** [1] - 246:10
**foreign** [1] - 32:18
**Forensic** [6] - 12:21, 14:18, 15:21, 15:24, 17:13
**forensic** [55] - 11:25, 12:7, 13:6, 14:25, 15:5, 15:13, 15:23, 16:18, 16:25, 17:7, 17:15, 17:24, 18:7, 18:11, 18:15, 18:22, 19:14, 19:18, 20:1, 21:4, 21:6, 21:17, 22:4, 22:6, 22:20, 22:25, 23:4, 23:6, 23:16, 24:10, 24:24, 26:14, 26:20, 28:12, 29:13, 29:18, 29:21, 30:12, 30:17, 31:2, 31:10, 32:7, 33:18, 39:23, 40:6, 40:24, 47:9, 48:8, 53:21, 53:22, 53:25, 55:8, 55:17, 61:18, 62:3
**Floor** [1] - 3:14
**floor** [8] - 115:1, 115:2, 142:19, 143:9, 143:13, 143:14, 143:25, 144:24
**FME** [2] - 16:16, 16:17
**focus** [5] - 11:25, 54:17, 67:9, 102:25, 209:17
**focused** [3] - 18:6, 64:14, 185:17
**folds** [2] - 32:24, 33:1
**folks** [2] - 15:19, 156:14
**follow** [5] - 34:20, 39:13, 54:8, 88:14, 221:11
**follow-up** [3] - 34:20, 54:8, 221:11
**followed** [4] - 141:4, 152:6, 156:8, 194:21
**following** [5] - 140:11, 140:24, 141:7, 155:11, 157:3
**fondling** [1] - 70:7
**foot** [1] - 169:9
**football** [3] - 103:5, 103:8, 108:4
**footrest** [2] - 46:11, 47:23
**footrests** [1] - 48:2
**FOR** [1] - 1:1
**force** [2] - 17:16, 17:22

258

43:1, 89:16, 198:2
**frames** [1] - 43:4
**Franklin** [5] - 58:13,
58:23, 94:20, 94:21,
103:18
**frankly** [2] - 7:21,
238:1
**F████** [12] - 95:2,
101:9, 104:14,
105:11, 110:14,
119:11, 120:3,
127:1, 156:17,
191:23, 193:10,
213:1
**F████** [3] -
144:18, 172:1, 172:3
**Fred** [4] - 4:6, 44:16,
56:1, 56:15
**FRED** [1] - 56:3
**free** [1] - 236:21
**frequently** [2] -
138:15, 138:22
**Friday** [16] - 79:6,
122:11, 137:16,
157:3, 158:5,
158:12, 192:25,
193:5, 239:17,
240:2, 240:4,
240:12, 241:4,
241:15, 241:19,
242:18
**friend** [6] - 68:18,
72:15, 75:1, 75:3,
83:24, 139:10
**friended** [1] - 72:15
**friends** [5] - 69:5,
71:11, 82:2, 82:5,
102:21
**friendship** [1] - 139:7
**front** [25] - 49:12,
77:20, 78:20, 79:21,
80:12, 80:24, 81:21,
91:1, 111:24,
112:12, 113:7,
113:9, 116:16,
124:6, 125:18,
150:21, 162:5,
173:20, 175:21,
182:9, 199:13,
215:6, 226:13,
231:4, 234:12
**Frost** [4] - 102:5,
102:7, 102:9, 121:2
**Frostburg** [1] - 100:11
**frustrated** [1] - 209:25
**full** [7] - 14:25, 97:2,
101:15, 130:24,
133:8, 208:1, 240:9
**full-time** [2] - 14:25,
208:1

**fully** [2] - 86:11, 97:15
**Fulton** [1] - 3:6
**fun** [1] - 137:17
**FYI** [2] - 192:8, 193:7

## G

**game** [1] - 232:2
**games** [3] - 105:4,
105:9, 108:4
**gas** [2] - 113:11,
113:13
**gastroenterologist** [1]
- 6:17
**gastrointestinal** [1] -
39:11
**gather** [1] - 123:5
**gauge** [1] - 37:15
**general** [12] - 35:6,
35:10, 36:22, 36:24,
37:25, 39:5, 40:7,
96:15, 100:16,
209:17, 226:4
**generalized** [1] -
38:14
**generally** [15] - 6:18,
6:22, 9:1, 35:6,
35:23, 36:2, 36:11,
38:19, 38:21, 87:19,
96:3, 96:5, 97:17,
135:24, 193:10
**generated** [1] - 223:5
**genital** [6] - 28:19,
29:11, 30:7, 33:6,
46:2, 46:23
**Genital** [1] - 52:25
**genitalia** [1] - 49:1
**genitals** [1] - 184:7
**gentlemen** [17] - 9:9,
49:10, 50:2, 84:11,
84:16, 84:23, 93:23,
126:4, 126:11,
149:13, 169:19,
170:2, 171:3, 237:2,
237:18, 244:10,
244:22
**Genus** [3] - 139:22,
144:20, 144:24
**George** [2] - 18:19,
100:12
**Georgia** [1] - 57:7
**gestures** [2] - 36:11,
37:13
**getting-to-know-you**
[1] - 122:10
**giant** [1] - 105:13
**girlfriend** [1] - 75:3
**girls** [1] - 146:12
**girls'** [6] - 150:1,
150:6, 165:9,

165:19, 226:22,
226:24
**given** [11] - 52:17,
53:2, 53:6, 77:8,
131:9, 134:12,
135:25, 144:9,
196:18, 218:25,
237:25
**glories** [1] - 188:15
**Glynco** [1] - 57:7
**goal** [5] - 207:18,
207:23, 207:25,
237:13
**goofing** [1] - 232:15
**Google** [1] - 92:12
**governor** [2] - 17:17,
17:22
**grab** [1] - 99:13
**grabs** [1] - 70:3
**grade** [17] - 102:22,
108:19, 114:25,
131:1, 131:3,
136:25, 142:6,
142:7, 142:10,
142:19, 142:23,
143:7, 144:3, 144:4,
227:17, 227:18,
228:5
**graders** [2] - 144:6
**grades** [4] - 136:22,
153:12, 153:13,
154:17
**graduate** [1] - 108:20
**Grady** [12] - 118:17,
136:17, 143:11,
150:8, 157:25,
167:5, 220:2, 222:7,
226:21, 243:13,
243:14
**grass** [1] - 111:15
**great** [14] - 100:21,
104:14, 107:23,
111:24, 112:12,
119:1, 120:23,
121:7, 121:13,
122:8, 123:2,
124:21, 149:19,
198:24
**groin** [2] - 44:11,
45:23
**ground** [2] - 70:4
**grounded** [2] - 36:17
**grounds** [1] - 111:5
**group** [9] - 110:15,
115:5, 122:14,
124:12, 127:23,
139:11, 222:3,
232:22
**groups** [3] - 169:15,
212:4, 228:19

**grove** [1] - 123:15
**grow** [1] - 108:14
**growing** [2] - 101:9,
110:8
**guardian** [1] - 66:9
**guess** [7] - 38:16,
68:10, 71:7, 72:15,
82:3, 90:14, 151:2
**guidance** [1] - 122:3
**guide** [4] - 19:5,
28:14, 28:16, 48:9
**guided** [1] - 41:4
**guiding** [1] - 19:7
**gym** [8] - 141:16,
165:22, 165:25,
166:8, 166:10,
166:13, 227:16,
227:18
**gymnasium** [1] -
226:15
**GYN** [1] - 46:9

## H

**hair** [1] - 32:9
**half** [11] - 135:20,
173:21, 173:22,
173:24, 174:1,
174:2, 174:16,
175:17, 221:8,
241:19, 241:20
**half-day** [1] - 173:22
**hall** [1] - 133:6
**halls** [2] - 123:15,
125:22
**hallway** [13] - 117:16,
117:19, 124:7,
142:7, 142:10,
142:11, 142:23,
142:24, 143:7,
144:12, 150:18,
188:16, 232:14
**hallways** [1] - 177:9
**hand** [8] - 7:25, 36:11,
37:13, 69:25,
117:22, 162:13,
244:18
**handed** [1] - 230:6
**handle** [2] - 226:5,
240:25
**hands** [10] - 19:7,
46:13, 48:16, 70:5,
76:10, 76:13,
167:24, 168:2,
168:7, 168:8
**hanging** [1] - 33:7
**happy** [1] - 198:23
**harassed** [2] - 63:17,
179:25
**harasser** [2] - 179:11,

179:15
**harassers** [2] -
187:19, 188:7
**harassing** [2] - 63:17,
81:18
**harassment** [20] -
132:6, 135:21,
136:1, 136:4, 136:6,
178:24, 179:8,
179:18, 182:5,
182:14, 188:5,
188:6, 190:6,
196:22, 198:22,
200:6, 233:19,
235:23, 235:25,
236:2
**hard** [5] - 38:5, 48:4,
114:3, 150:15,
237:15
**hardest** [1] - 149:15
**Harris** [2] - 246:3,
246:21
**HARRIS** [1] - 3:12
**head** [13] - 23:7, 23:8,
23:10, 23:17, 24:2,
24:4, 24:7, 28:15,
29:3, 29:7, 30:13,
104:9, 109:24
**head-to-toe** [11] -
23:7, 23:8, 23:10,
23:17, 24:2, 24:4,
24:7, 28:15, 29:3,
29:7, 30:13
**heading** [1] - 27:17,
55:9
**heal** [3] - 54:14, 54:18,
54:19
**health** [13] - 130:23,
136:2, 225:15,
225:21, 226:18,
227:7, 227:11,
227:17, 227:21,
228:2, 229:18,
229:20, 229:21
**hear** [7] - 56:7,
149:13, 168:7,
172:22, 208:8,
242:5, 242:13
**heard** [19] - 73:23,
73:24, 73:25, 99:19,
102:16, 104:13,
113:6, 121:9, 138:6,
138:13, 154:3,
163:21, 167:16,
178:16, 185:21,
190:4, 204:2,
210:20, 233:2
**hearing** [6] - 6:12,
127:23, 128:14
**hearings** [12] - 127:8,

127:20, 127:22, 127:23, 128:4, 128:9, 128:11, 128:13, 128:18, 128:23, 128:25
**hearsay** [4] - 140:17, 161:10, 173:9, 230:17
**heart** [1] - 94:16
**height** [2] - 150:18, 151:6
**held** [3] - 28:11, 60:19, 100:17
**helicopter** [5] - 178:16, 178:20, 218:8, 218:10
**Help** [8] - 66:14, 66:15, 66:16, 66:21, 95:7, 95:9, 95:18, 95:22
**help** [12] - 11:2, 28:16, 72:3, 85:25, 102:19, 108:5, 110:16, 122:2, 184:22, 224:8, 228:9, 228:10
**helped** [3] - 104:11, 162:5, 235:21
**helpful** [4] - 40:12, 40:16, 54:13, 198:23
**helping** [1] - 178:2
**helps** [1] - 28:14
**hereby** [1] - 246:4
**hereto** [1] - 246:15
**herself** [2] - 65:24, 73:24
**Hershey** [4] - 208:10, 220:17, 220:19, 221:6
**hesitate** [2] - 99:20, 202:12
**hi** [1] - 124:23
**hiding** [2] - 220:10, 220:11
**high** [9] - 21:3, 58:1, 102:24, 103:2, 106:6, 108:5, 150:16, 151:5, 218:20
**High** [7] - 103:18, 104:8, 106:9, 106:15, 106:17, 106:19, 106:24
**highlight** [2] - 35:22, 38:16
**highlighted** [4] - 28:7, 37:14, 181:17, 212:6
**himself** [1] - 189:23
**hired** [1] - 225:17
**hiring** [1] - 16:25
**historical** [1] - 49:16

**history** [19] - 6:23, 21:19, 23:21, 23:22, 23:24, 24:1, 26:16, 28:14, 36:3, 39:25, 43:21, 44:6, 52:17, 53:2, 53:6, 121:9, 183:22, 223:15
**hit** [3] - 84:24, 232:20, 232:24
**hits** [1] - 232:3
**HIV** [1] - 25:22
**hold** [4] - 16:6, 202:8
**holding** [1] - 70:11
**holiday** [1] - 174:15
**HOLTZMAN** [1] - 1:14
**home** [16] - 69:18, 78:14, 103:19, 127:4, 152:6, 172:24, 173:1, 173:5, 173:8, 173:12, 173:15, 192:23, 192:24, 219:20, 219:22, 221:14
**homebound** [46] - 159:18, 159:25, 163:1, 163:4, 163:5, 163:8, 163:9, 163:19, 163:22, 164:1, 164:4, 164:5, 164:8, 164:11, 164:14, 164:18, 164:22, 165:5, 165:10, 203:25, 204:5, 204:20, 204:25, 205:2, 205:3, 205:5, 205:11, 206:23, 207:4, 207:7, 207:9, 207:12, 207:14, 207:15, 208:15, 208:16, 209:13, 209:15, 209:19, 211:18, 216:21, 216:24, 217:6, 217:9, 221:17, 221:21
**homework** [1] - 214:19
**honest** [2] - 88:2, 152:5
**Honor** [92] - 6:6, 9:5, 9:22, 11:5, 11:10, 20:21, 27:22, 35:13, 36:10, 36:16, 38:7, 39:2, 40:18, 41:15, 41:20, 43:9, 49:8, 49:24, 51:19, 52:5, 54:21, 55:1, 55:18, 55:20, 55:25, 64:10,

67:13, 71:13, 84:9, 84:18, 87:9, 87:11, 92:5, 94:7, 97:10, 98:4, 98:14, 98:23, 99:8, 99:12, 110:22, 116:11, 126:1, 129:22, 134:2, 135:6, 135:8, 142:16, 145:12, 147:16, 148:21, 149:21, 153:21, 156:18, 161:12, 162:13, 170:10, 171:9, 174:5, 176:15, 176:17, 176:19, 176:23, 176:25, 181:8, 186:4, 187:20, 191:16, 198:25, 200:13, 203:13, 204:7, 204:10, 204:14, 205:20, 214:10, 215:13, 215:20, 217:12, 217:15, 219:11, 230:3, 230:15, 230:20, 231:13, 233:24, 236:14, 236:16, 238:6, 238:12, 244:2, 244:17
**Honor's** [2] - 238:13, 241:21
**HONORABLE** [1] - 1:11
**hope** [2] - 212:21, 235:20
**horseplay** [1] - 219:17
**hospital** [4] - 21:10, 22:4, 29:23, 47:15
**Hospital** [1] - 16:20
**hospital-type** [1] - 47:15
**hostile** [1] - 187:4
**hour** [4] - 20:17, 68:10, 241:18, 241:20
**hourly** [1] - 20:15
**hours** [11] - 12:23, 13:4, 13:5, 21:24, 22:15, 54:18, 115:16, 128:19, 221:9, 221:14
**house** [4] - 88:19, 90:8, 90:11, 90:12
**H████** [1] - 99:16
**H████** [14] - 4:10, 99:10, 100:3, 100:4, 126:21, 171:12, 172:22, 174:10,

174:18, 176:21, 177:5, 218:7, 219:19, 220:12
**H████** [14] - 139:21, 141:7, 144:17, 146:2, 148:2, 148:10, 153:5, 154:10, 160:23, 161:8, 161:17, 171:24, 186:14, 198:12
**hundreds** [3] - 62:16, 62:19, 62:23
**HUNTON** [4] - 2:14, 2:17, 2:21, 3:1
**hurt** [1] - 235:1
**HVAC** [1] - 110:2
**hygiene** [4] - 39:10, 39:17, 39:20, 45:20
**hymen** [6] - 31:25, 32:7, 32:8, 32:15, 54:14, 54:16
**hypopigmented** [2] - 33:22, 33:24

### I

**idea** [3] - 202:12, 206:8, 235:6
**ideas** [1] - 137:6
**identified** [4] - 64:20, 164:25, 200:5, 200:18
**identifies** [2] - 198:21, 199:7
**identify** [11] - 33:18, 59:3, 67:21, 67:25, 93:14, 133:22, 135:2, 145:8, 226:14, 238:22, 238:24
**identifying** [2] - 223:11, 223:14
**imagine** [1] - 143:6
**immediate** [1] - 161:24
**immediately** [1] - 140:16
**impacted** [1] - 175:16
**important** [21] - 28:14, 39:13, 40:1, 43:21, 45:13, 48:8, 179:6, 179:7, 179:13, 179:15, 179:16, 179:19, 182:2, 182:3, 198:15, 200:6, 201:2, 201:4, 236:10, 236:13
**impression** [2] - 37:21, 92:18

**improper** [1] - 237:24
**improve** [1] - 235:21
**in-between** [1] - 123:5
**in-person** [1] - 195:6
**inappropriate** [3] - 37:14, 162:9, 236:11
**inappropriately** [1] - 168:15
**inches** [1] - 151:9
**incident** [42] - 21:12, 21:24, 44:8, 44:10, 45:22, 46:20, 65:12, 68:20, 69:9, 69:20, 71:11, 72:14, 72:18, 74:8, 76:19, 76:20, 78:6, 78:11, 79:1, 79:4, 79:17, 85:10, 85:12, 89:12, 89:17, 90:8, 128:19, 151:20, 152:20, 152:23, 184:6, 195:12, 196:1, 196:14, 219:16, 220:7, 220:9, 230:10, 230:25, 231:9, 231:20, 234:22
**incidents** [5] - 132:18, 190:15, 206:4, 229:23, 229:24
**include** [3] - 26:14, 26:19, 26:22
**included** [6] - 26:18, 29:20, 31:15, 179:2, 204:6, 211:2
**includes** [2] - 44:6, 179:10, 186:15
**including** [5] - 25:17, 171:21, 171:24, 179:17, 210:25
**incorporated** [1] - 136:2
**increase** [2] - 35:1, 109:3
**increased** [2] - 188:6, 192:23
**indicate** [2] - 30:16, 30:23
**indicated** [2] - 39:7, 50:2
**indicating** [13] - 32:2, 119:10, 122:4, 122:14, 122:15, 123:5, 124:12, 124:13, 124:14, 125:3, 125:4, 151:17
**indicating)** [3] - 118:22, 118:25, 119:5
**indication** [1] - 51:3

**individual** [4] - 36:21,
134:17, 134:18,
179:14
**individualized** [2] -
29:24, 48:21
**individually** [1] -
47:10
**individuals** [1] - 194:4
**indoor** [1] - 106:8
**indulgence** [2] -
54:21, 217:13
**infections** [1] - 44:7
**inference** [1] - 38:12
**inflection** [1] - 237:25
**inform** [3] - 28:12,
87:1, 87:4
**information** [35] -
8:10, 23:18, 27:20,
28:8, 28:12, 54:7,
65:11, 93:12, 93:13,
129:14, 137:9,
137:10, 153:4,
154:11, 154:13,
158:14, 160:15,
162:4, 162:7,
167:13, 171:4,
171:5, 172:12,
189:4, 194:18,
198:9, 198:16,
199:23, 199:25,
200:19, 200:21,
217:23, 218:1,
221:11, 223:9
**informed** [7] - 23:17,
141:18, 153:5,
185:14, 187:10,
187:11, 195:8
**informs** [2] - 148:9,
185:12
**infrastructure** [1] -
110:3
**initial** [5] - 63:5, 63:8,
63:18, 151:24,
151:25
**initials** [1] - 189:8
**injuries** [2] - 31:25,
32:5
**injury** [3] - 8:15,
50:10, 50:11
**inner** [1] - 103:9
**inquire** [1] - 71:20
**insert** [1] - 48:20
**inside** [3] - 140:3,
168:5, 168:8
**inspection** [1] - 24:24
**instance** [1] - 241:22
**instant** [1] - 234:23
**instead** [1] - 112:6
**instruct** [1] - 240:15
**instructed** [1] - 172:23

**instructing** [1] - 213:6
**instruction** [11] - 9:18,
69:17, 109:7,
159:18, 159:25,
163:1, 163:19,
205:12, 237:8,
240:19, 240:21
**instructional** [8] -
15:8, 15:12, 18:9,
101:14, 102:15,
103:13, 104:18,
109:3
**instructionally** [1] -
137:8
**instructions** [2] -
213:2, 241:2
**instructors** [1] -
211:18
**instrument** [2] -
115:8, 122:13
**instruments** [2] -
48:14, 122:8
**interact** [2] - 179:14,
205:1
**interacted** [2] - 205:3,
205:5
**interaction** [2] - 89:11,
89:23
**interactions** [3] -
151:16, 206:24,
207:5
**interdisciplinary** [3] -
120:25, 123:1,
123:13
**interested** [1] - 15:19
**International** [4] -
12:20, 15:20, 15:24,
17:12
**international** [1] -
15:22
**internet** [3] - 216:13,
222:13, 222:18
**interpret** [1] - 205:21
**interpretation** [1] -
37:11
**interprets** [1] - 48:6
**interrupt** [3] - 10:2,
56:7, 109:20
**interrupts** [1] - 225:5
**intersection** [2] -
21:13, 113:16
**interview** [30] - 61:17,
61:18, 66:1, 66:4,
66:8, 66:13, 66:17,
66:24, 67:1, 67:4,
68:3, 68:5, 68:8,
68:11, 85:4, 85:7,
85:9, 85:16, 87:16,
88:4, 93:3, 95:13,
95:14, 97:6, 97:20,

98:10, 184:10,
197:7, 200:17
**interviewed** [1] -
199:11
**interviewer** [1] - 67:9
**interviewing** [5] -
62:3, 62:6, 62:8,
96:6, 198:19
**interviews** [9] - 62:21,
62:24, 66:21, 67:7,
87:22, 87:23, 95:11,
96:4, 140:8
**intimidate** [1] - 76:4
**intimidating** [1] -
187:5
**intramurals** [1] -
125:23
**introduce** [3] - 10:13,
56:14, 87:23
**introduced** [2] - 96:9,
234:8
**investigate** [7] -
56:22, 127:8,
182:23, 182:24,
183:13, 196:3,
217:22
**investigated** [7] -
62:11, 152:4,
183:15, 183:18,
188:20, 196:2, 196:4
**investigates** [1] -
183:14
**investigating** [1] -
141:1
**investigation** [21] -
64:9, 64:24, 65:6,
86:12, 86:23, 87:2,
87:5, 128:2, 128:20,
141:18, 167:8,
167:10, 172:8,
172:10, 172:14,
184:13, 185:13,
189:6, 195:25,
200:20, 206:4
**investigations** [4] -
126:23, 127:3,
199:19, 200:25
**investigator** [1] - 67:9
**invited** [1] - 211:21
**involve** [2] - 62:15,
231:20
**involved** [9] - 8:11,
62:17, 140:8, 142:4,
160:23, 178:13,
180:15, 190:19,
196:18
**involves** [1] - 230:25
**involving** [4] - 56:22,
63:1, 88:10, 229:25
**IR** [1] - 211:20

**irritants** [1] - 39:21
**issue** [13] - 7:11, 8:15,
31:4, 39:11, 41:19,
124:5, 146:3,
147:15, 151:17,
153:8, 156:14,
172:20, 233:4
**issues** [13] - 11:3,
137:24, 138:10,
139:5, 139:7,
180:14, 180:16,
193:25, 194:11,
225:25, 226:5,
237:12, 241:6
**IT** [2] - 243:6, 243:24
**items** [2] - 101:15,
128:25
**itself** [8] - 27:8, 27:9,
51:5, 54:14, 54:15,
54:16, 97:20, 114:14
**IX** [5] - 182:16, 182:21,
183:1, 183:4, 183:8

**J**

**J-E-N-N-I-N-G-S** [1] -
10:16
**J.F** [1] - 3:7
**J.H** [1] - 199:7
**J.O** [4] - 3:9, 141:19,
187:6, 190:5
**janitorial** [1] - 169:7
**January** [9] - 117:7,
151:20, 153:1,
155:2, 157:3,
157:15, 189:13,
189:16, 191:1
**Jefferson** [3] - 106:9,
106:17, 106:24
**J____** [8] - 88:7,
88:10, 88:21, 88:25,
89:8, 91:24, 92:2,
203:12
**Jenni** [10] - 65:17,
81:14, 81:19, 82:1,
82:20, 83:1, 92:18,
92:22, 93:3, 93:19
**Jenni-Taylor** [4] -
81:14, 81:19, 82:1,
83:1
**Jennings** [29] - 4:3,
6:12, 6:13, 6:15,
6:18, 6:24, 9:23,
9:24, 10:13, 10:15,
10:18, 11:14, 12:3,
14:10, 17:2, 19:17,
20:22, 21:3, 26:3,
29:1, 34:8, 35:23,
37:9, 39:5, 41:7,
41:23, 43:20, 54:23,

55:7
**JENNINGS** [1] - 9:25
**Jermantown** [2] -
100:19, 104:1
**jfahey@**
**holtzmanvogel.**
**com** [1] - 1:17
**job** [10] - 35:20,
100:18, 107:8,
108:3, 139:1,
149:19, 175:20,
175:23, 188:12,
244:11
**jobs** [2] - 110:9,
149:15
**join** [1] - 211:21
**joined** [3] - 57:2, 57:5,
122:15
**joins** [1] - 193:22
**joke** [1] - 107:21
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**JR** [1] - 1:11
**Judge** [5] - 41:17,
94:5, 224:19,
240:11, 244:25
**JUDGE** [1] - 1:12
**judges** [1] - 221:10
**July** [2] - 59:25, 60:18
**jump** [1] - 94:17
**jumping** [1] - 105:24
**juror** [2] - 49:17, 50:3
**juror's** [1] - 90:19
**jurors** [1] - 8:1
**JURY** [1] - 1:11
**jury** [30] - 8:14, 8:25,
10:14, 11:2, 11:19,
12:14, 14:10, 15:11,
18:17, 21:3, 23:8,
26:12, 30:9, 33:4,
33:24, 49:10, 49:19,
56:14, 87:19, 100:2,
102:13, 111:10,
119:2, 126:15,
153:17, 221:4,
222:17, 223:24,
226:14, 241:6
**Jury** [9] - 9:7, 84:14,
84:21, 126:10,
126:16, 169:25,
171:2, 237:17, 246:6
**jury's** [1] - 239:12
**Justice** [1] - 57:8

**K**

**Kappatos** [9] - 4:13,
224:21, 225:1,
225:9, 225:11,
226:12, 230:7,

231:18, 234:6
**KAPPATOS** [1] -
225:2
**Keefe** [3] - 2:9,
233:23, 234:2
**KEEFE** [5] - 230:17,
234:3, 234:5,
236:14, 236:20
**Keefe.................** [1] -
4:15
**keep** [5] - 64:14,
83:25, 112:9,
122:17, 149:15
**keeping** [5] - 46:2,
137:6, 141:3,
171:22, 173:14
**kelliker@huntonak.
com** [1] - 3:3
**kept** [2] - 91:19,
192:22
**Kevin** [2] - 2:25, 10:11
**keys** [1] - 118:5
**kid** [3] - 102:19,
195:12, 232:5
**kids** [17] - 61:19,
66:19, 102:20,
105:17, 123:2,
123:4, 123:5, 123:9,
124:23, 125:1,
177:18, 177:23,
178:2, 189:10,
232:5, 236:9, 236:10
**kill** [2] - 70:20, 70:21
**kind** [8] - 8:10, 9:15,
11:16, 24:22, 72:13,
107:21, 114:3,
228:12
**kindergarten** [1] -
102:16
**kinds** [4] - 20:3, 35:10,
36:25, 240:16
**Kinney** [9] - 3:4,
54:25, 87:8, 170:7,
170:9, 170:25,
171:8, 171:12,
233:23
**KINNEY** [17] - 3:5,
55:1, 87:9, 170:10,
171:9, 171:11,
173:11, 174:5,
174:9, 175:13,
176:4, 176:17,
176:19, 178:9,
187:20, 206:20,
233:24
**Kinney................** [1] -
4:11
**Kiss** [4] - 124:19,
124:20, 125:11,
125:20

**kiss** [5] - 111:8,
111:19, 112:4,
112:7, 112:10
**kissing** [1] - 75:8
**kit** [3] - 22:3, 29:21,
29:22
**knee** [2] - 46:12, 46:13
**knocks** [1] - 69:24
**knowledge** [6] -
153:23, 154:2,
154:4, 154:6, 173:7,
228:11
**Kurt** [4] - 204:21,
204:22, 204:23,
204:24
**KURTH** [4] - 2:14,
2:17, 2:21, 3:1

# L

**lab** [4] - 153:19,
160:24, 161:1
**label** [1] - 61:22
**lacks** [1] - 6:24
**ladies** [16] - 9:9,
49:10, 50:2, 84:11,
84:15, 84:22, 93:22,
126:3, 126:11,
149:13, 169:19,
170:1, 171:3, 237:2,
237:18, 244:21
**lady** [3] - 91:6, 91:7,
91:9
**lamination** [1] -
102:18
**lanes** [2] - 111:8,
125:20
**language** [3] - 162:9,
162:17, 190:18
**large** [4] - 25:8, 61:22,
115:5, 127:24
**last** [16] - 111:2,
134:19, 146:8,
151:24, 151:25,
175:17, 181:23,
195:3, 199:21,
214:21, 238:17,
241:17, 242:2,
242:16, 242:24,
243:19
**Last** [1] - 10:15
**late** [7] - 9:16, 69:14,
69:15, 69:23,
107:21, 151:20,
152:25
**lateral** [2] - 60:9,
60:11
**Law** [1] - 57:6
**law** [8] - 15:18, 21:22,
22:1, 22:5, 57:3,

57:5, 57:10, 62:20
**LAW** [1] - 3:5
**lawsuit** [1] - 100:4
**lawyer** [1] - 225:4
**lawyers** [3] - 149:18,
202:10, 225:4
**lay** [1] - 231:3
**laying** [1] - 70:5
**layman's** [1] - 27:6
**layout** [6] - 110:18,
111:4, 111:11,
113:19, 113:22,
116:13
**layouts** [1] - 119:19
**lead** [3] - 35:11, 36:25,
104:7
**leader** [1] - 129:11
**leaders** [2] - 127:7,
129:11
**leaders-need-to-
know** [1] - 127:7
**leadership** [4] -
100:13, 104:15,
123:19, 137:9
**leading** [7] - 108:21,
120:18, 153:2,
160:9, 165:11,
175:12, 223:19
**learn** [3] - 126:22,
167:10, 232:23
**learned** [3] - 18:2,
105:15, 228:21
**learning** [12] - 108:16,
108:18, 108:23,
120:17, 123:9,
127:13, 133:17,
164:24, 195:6,
220:15, 228:4
**least** [7] - 12:22,
47:25, 51:12, 182:4,
242:2, 244:17,
244:23
**leave** [6] - 7:17, 38:23,
115:3, 122:6,
226:12, 236:21
**leaving** [4] - 7:22,
37:21, 123:4, 201:19
**lecture** [1] - 133:6
**led** [4] - 142:25,
216:12, 222:13,
231:24
**left** [17] - 30:9, 37:7,
37:10, 44:11, 45:23,
50:19, 59:8, 60:1,
60:4, 60:12, 73:18,
125:16, 139:23,
166:14, 200:17,
227:2, 241:20
**left-groin** [1] - 44:11
**leg** [1] - 46:2

**legal** [2] - 21:14, 241:7
**length** [1] - 32:24
**lens** [3] - 27:9, 32:19,
104:18
**lesbian** [4] - 151:21,
152:5, 189:19,
189:22
**lesion** [1] - 33:2
**less** [2] - 170:6,
224:23
**lesson** [7] - 133:18,
136:5, 221:25,
228:25, 229:22,
235:16, 235:21
**lessons** [8] - 129:17,
136:3, 228:1, 228:3,
228:6, 229:9, 229:10
**letter** [4] - 219:19,
219:21, 219:22,
220:4
**letting** [1] - 137:15
**level** [5] - 16:10, 21:4,
192:23, 227:17,
227:18
**levels** [3] - 61:5, 61:7,
222:2
**liar** [2] - 166:24, 167:1
**Liberty** [1] - 121:6
**library** [1] - 115:6
**license** [1] - 110:9
**licensed** [1] - 12:5
**licenses** [1] - 12:3
**lieutenant** [2] - 60:21,
60:22
**life** [3] - 40:4, 43:5,
239:21
**lift** [1] - 151:10
**lifting** [1] - 70:6
**lights** [1] - 48:10
**likelihood** [1] - 35:1
**likely** [2] - 7:2, 171:6
**limine** [3] - 7:4, 36:6,
37:18
**limit** [1] - 206:2
**line** [14] - 31:14,
36:17, 38:17, 44:24,
79:21, 82:23, 111:7,
111:13, 159:11,
191:25, 192:1,
192:7, 192:19
**linear** [1] - 32:25
**lines** [7] - 82:13,
83:12, 115:9,
134:21, 134:22,
143:10, 199:24
**link** [1] - 111:15
**list** [4] - 30:8, 30:9,
238:23, 239:1
**listen** [3] - 10:1, 56:5,
225:3

**lists** [1] - 184:11
**literature** [2] - 35:3,
41:3
**lithotomy** [1] - 46:10
**live** [1] - 9:17
**lives** [2] - 218:12,
218:15
**LLP** [8] - 1:19, 2:2,
2:6, 2:10, 2:14, 2:17,
2:21, 3:1
**local** [1] - 108:4
**located** [3] - 89:18,
89:23, 121:14
**location** [5] - 33:23,
90:16, 91:3, 93:10,
93:14
**locations** [1] - 132:3
**lock** [1] - 109:16
**lock-down** [1] -
109:16
**locked** [4] - 115:25,
118:7, 118:10, 169:4
**locker** [4] - 74:5,
74:8, 74:10, 75:14,
75:15, 75:24, 76:2,
76:4, 118:24,
121:12, 141:5,
141:13, 141:14,
141:16, 141:20,
141:24, 142:1,
142:3, 144:17,
145:3, 146:5, 146:9,
146:18, 146:23,
147:1, 147:15,
148:13, 149:7,
150:1, 150:6, 165:9,
165:19, 171:22,
201:17, 201:20,
201:21, 201:24,
202:22, 203:7,
226:23, 226:25
**lockers** [8] - 141:6,
141:22, 146:13,
150:16, 150:17,
150:18, 150:22
**logistics** [2] - 113:19,
113:21
**look** [65] - 27:16,
32:10, 49:16, 50:3,
50:5, 71:25, 72:5,
73:2, 75:16, 75:17,
77:19, 78:19, 79:7,
79:20, 79:21, 80:11,
80:23, 81:20, 82:13,
82:23, 83:12, 90:1,
92:13, 109:5,
115:13, 119:22,
120:23, 124:3,
127:5, 128:1,
131:21, 132:4,

262

132:8, 132:14, 133:19, 134:25, 143:8, 145:5, 147:4, 148:19, 150:3, 153:14, 156:11, 157:9, 157:15, 158:11, 158:24, 159:6, 178:6, 182:2, 182:3, 186:9, 190:8, 190:13, 190:17, 190:23, 191:9, 208:1, 208:19, 210:22, 214:2, 215:5, 218:25, 222:4, 222:8
**looked** [12] - 9:15, 67:15, 72:9, 92:2, 118:18, 147:8, 148:1, 153:18, 154:24, 161:7, 164:25, 172:18
**looking** [24] - 40:25, 53:18, 75:18, 86:6, 90:19, 92:10, 93:8, 108:22, 109:13, 114:13, 118:14, 119:12, 130:17, 150:5, 157:16, 172:11, 178:4, 182:11, 197:1, 207:13, 215:7, 224:6, 230:7, 240:24
**looks** [4] - 32:8, 232:1, 232:10, 239:14
**loose** [1] - 44:7
**Los** [1] - 1:20
**lose** [1] - 237:24
**loser** [1] - 70:19
**losing** [1] - 71:8
**loss** [1] - 216:14
**lost** [3] - 71:8, 162:6, 202:18
**loud** [1] - 219:17
**LS** [2] - 220:12, 220:14
**lumping** [1] - 190:9
**lunch** [8] - 84:25, 99:4, 123:3, 126:2, 126:4, 152:10, 220:15
**Lunch** - 126:13
**lungs** [1] - 91:12

**M**

**M.C** [1] - 3:6
**M.J** [1] - 199:7
**M.P.F** [1] - 3:6
**ma'am** [214] - 10:1, 10:6, 42:16, 50:8,

54:22, 55:21, 56:24, 57:1, 57:12, 58:4, 58:19, 59:2, 59:14, 59:19, 59:23, 60:3, 60:8, 60:14, 60:18, 61:10, 61:13, 61:24, 62:8, 63:7, 64:1, 64:19, 64:25, 65:7, 65:10, 65:13, 65:18, 65:23, 65:25, 66:2, 66:5, 66:7, 66:10, 66:12, 66:23, 66:25, 67:3, 67:6, 68:6, 68:13, 68:16, 68:21, 68:24, 69:1, 69:3, 69:21, 72:23, 73:16, 73:19, 74:3, 74:6, 74:11, 74:20, 74:23, 75:6, 75:11, 75:25, 76:6, 76:17, 76:22, 76:24, 77:1, 77:4, 77:12, 78:7, 78:12, 78:24, 79:13, 79:15, 79:23, 85:13, 85:15, 85:19, 86:3, 86:7, 86:13, 86:19, 86:22, 86:25, 87:3, 87:6, 101:21, 107:5, 108:12, 109:21, 112:23, 113:4, 113:20, 113:24, 114:15, 116:10, 118:15, 119:22, 120:12, 120:14, 126:3, 126:25, 128:7, 129:8, 130:16, 130:18, 131:14, 132:7, 132:11, 132:13, 132:17, 132:20, 133:21, 133:24, 134:10, 134:14, 134:20, 135:5, 135:17, 135:23, 137:2, 137:22, 138:1, 138:12, 138:14, 139:4, 140:9, 141:15, 142:15, 142:20, 143:15, 144:8, 145:7, 145:21, 145:24, 147:6, 147:9, 148:6, 148:15, 148:18, 151:19, 152:21, 152:24, 155:3, 156:16, 157:4, 158:7, 158:10, 158:19, 158:23, 159:12, 159:24, 162:19, 162:23,

170:5, 177:11, 177:20, 182:25, 183:3, 183:4, 183:5, 183:21, 184:3, 184:16, 184:19, 185:9, 185:11, 185:23, 186:1, 186:12, 186:16, 186:22, 187:12, 189:9, 189:12, 189:16, 189:18, 190:3, 191:7, 192:21, 193:2, 193:4, 193:11, 193:14, 193:23, 195:2, 195:7, 195:10, 195:14, 195:20, 195:24, 196:3, 196:6, 196:24, 199:9, 201:1, 201:7, 201:18, 204:1, 205:16, 206:17, 208:18, 209:1, 209:11, 210:2, 210:24, 211:25, 212:18, 216:6, 216:22, 217:5, 218:9, 220:6, 222:10
**machine** [2] - 246:5, 246:12
**magnet** [1] - 112:17
**magnification** [5] - 31:16, 31:21, 48:12, 50:22, 50:24
**magnified** [1] - 51:4
**magnifies** [1] - 25:9
**magnify** [1] - 31:22
**magnitude** [1] - 39:9
**main** [4] - 115:20, 121:11, 142:8, 144:2
**maintain** [1] - 24:10
**maintaining** [1] - 17:23
**major** [5] - 59:12, 59:22, 60:5, 60:22, 234:22
**majority** [2] - 42:22
**male** [1] - 30:21
**males** [1] - 168:19
**manage** [1] - 116:6
**management** [1] - 18:9
**manager** [3] - 15:2, 18:18, 40:23
**mandated** [2] - 128:25, 129:18
**manner** [2] - 38:14, 43:1, 115:12
**mannerisms** [1] -

237:25
**map** [6] - 118:17, 124:10, 144:21, 166:3, 166:9, 226:8
**maps** [1] - 110:23
**March** [15] - 26:10, 30:1, 42:17, 59:21, 59:25, 63:3, 63:10, 65:9, 201:9, 201:13, 203:18, 217:7, 229:21
**mark** [3] - 84:24, 117:4, 118:17
**marks** [2] - 119:3, 226:20
**Mary's** [1] - 16:19
**Mason** [1] - 100:12
**mass** [1] - 232:22
**master** [1] - 118:5
**master's** [1] - 11:24
**masters** [2] - 16:14, 100:13
**match** [1] - 38:8
**matches** [1] - 239:9
**materials** [3] - 201:19, 202:21, 202:22
**math** [5] - 85:25, 121:3, 121:8, 154:13, 235:12
**matter** [5] - 35:6, 35:10, 36:24, 39:5, 96:15
**matters** [1] - 51:25, 109:9, 110:6
**matters.....................
............** [1] - 5:4
**mean** [16] - 27:6, 28:4, 30:17, 30:19, 30:24, 39:16, 107:10, 107:11, 121:9, 155:10, 159:13, 190:19, 194:25, 197:3, 209:17, 235:20
**meaning** [4] - 25:19, 34:15, 241:19, 244:16
**means** [18] - 12:14, 13:3, 24:15, 24:18, 28:5, 29:10, 31:19, 32:5, 33:5, 33:24, 42:13, 53:17, 57:24, 64:3, 101:8, 109:14, 177:15, 218:11
**meant** [4] - 90:22, 90:23, 155:18, 207:15
**measures** [5] - 172:4, 172:14, 172:19, 185:15, 185:17

**media** [3] - 9:19, 9:20, 237:10
**medical** [30] - 6:23, 11:14, 18:20, 21:14, 23:2, 23:16, 23:21, 23:22, 24:13, 24:18, 25:25, 26:6, 26:14, 26:18, 34:20, 34:22, 35:5, 36:3, 39:11, 39:23, 39:25, 40:6, 43:21, 44:6, 46:7, 46:10, 47:8
**medically** [1] - 23:11
**medication** [1] - 25:19
**medications** [2] - 19:9, 23:22
**meet** [6] - 95:22, 122:24, 155:2, 160:5, 193:15, 217:21
**meeting** [49] - 47:10, 65:8, 123:17, 138:5, 138:7, 138:11, 138:13, 139:15, 139:16, 139:17, 139:19, 139:24, 140:2, 140:6, 140:11, 140:25, 155:4, 157:3, 160:2, 160:7, 160:14, 160:20, 171:16, 171:19, 179:20, 179:24, 180:4, 180:7, 180:23, 185:6, 185:9, 185:10, 185:20, 186:23, 191:2, 191:12, 191:20, 191:21, 192:10, 193:12, 193:24, 194:6, 194:9, 194:12, 194:16, 194:20, 194:22, 195:1, 197:8
**meetings** [7] - 122:25, 123:1, 123:14, 125:7, 175:25, 197:3
**meets** [1] - 193:19
**member** [4] - 17:12, 17:13, 123:6, 177:21
**members** [2] - 125:18, 175:23
**memo** [8] - 197:17, 197:25, 198:16, 198:18, 199:11, 199:22, 200:2, 200:15
**memorandum** [2] - 132:24, 133:1
**memory** [8] - 174:14,

194:23, 196:25,
201:20, 202:20,
208:12, 210:11,
210:12
**men** [1] - 169:15
**mention** [3] - 81:14,
198:18, 199:10
**mentioned** [4] - 16:20,
17:23, 199:14,
230:24
**mercy** [1] - 9:14
**message** [2] - 73:25,
93:15
**messages** [12] -
72:18, 72:21, 81:15,
81:19, 82:1, 82:20,
83:1, 194:9, 194:24,
194:25, 195:1
**met** [11] - 68:18,
68:19, 69:6, 86:9,
121:25, 146:8,
152:4, 160:16,
177:9, 196:25, 234:9
**metal** [1] - 169:10
**method** [1] - 124:8
**methods** [1] - 31:15
**Miami** [3] - 2:3, 2:7,
2:11
**mic** [1] - 187:1
**Michael** [2] - 3:4,
171:12
**MICHAEL** [1] - 3:5
**microscope** [2] - 25:8,
31:21
**Middle** [13] - 58:13,
58:18, 58:23,
100:23, 101:24,
102:5, 102:9,
117:14, 134:9,
174:19, 225:13
**middle** [16] - 32:22,
58:1, 100:22,
106:11, 107:8,
110:1, 111:12,
119:15, 119:17,
119:19, 133:15,
134:12, 144:3,
150:17, 232:5
**Middleton** [4] - 89:21,
89:24, 90:12, 90:13
**might** [20] - 92:17,
104:16, 112:5,
115:19, 123:7,
124:5, 124:8,
124:14, 137:24,
139:22, 149:13,
157:7, 179:17,
186:10, 187:18,
190:14, 197:5,
213:23, 217:23,

238:4
**Mill** [3] - 103:14,
103:18
**millimeters** [1] - 32:24
**Mills** [10] - 204:21,
204:22, 204:23,
204:24, 205:1,
205:5, 205:7, 205:8,
205:13, 206:18
**mind** [1] - 61:17
**mine** [3] - 47:22, 94:6,
183:9
**minimum** [2] - 13:1,
190:4
**minor** [1] - 235:5
**minors** [1] - 19:21
**minute** [5] - 56:21,
103:6, 116:12,
117:2, 117:3
**minutes** [12] - 99:13,
121:10, 133:11,
170:6, 170:11,
170:19, 224:23,
229:5, 229:7,
232:18, 244:17
**mis** [1] - 104:25
**MISCELLANY** [1] - 5:3
**mishap** [1] - 232:7
**misheard** [1] - 213:23
**missing** [11] - 153:6,
153:11, 153:20,
154:10, 154:19,
155:6, 155:7,
155:21, 160:13,
193:25, 194:18
**misstate** [1] - 202:3
**misstates** [2] - 202:15,
207:20
**Mitchell** [1] - 101:24
**mk@kinneyesq.com**
[1] - 3:7
**model** [5] - 120:1,
120:15, 120:21,
120:24, 121:16
**Moir** [1] - 238:15
**mole** [1] - 33:1
**mole-like** [1] - 33:1
**mom** [23] - 65:14,
73:25, 78:3, 102:15,
102:19, 103:13,
155:12, 157:20,
158:5, 178:16,
178:20, 179:21,
186:19, 187:10,
187:11, 208:9,
210:17, 211:14,
212:9, 212:14,
213:17, 218:8
**Mom** [12] - 151:15,
155:14, 155:24,

156:1, 156:8, 158:5,
158:11, 159:15,
194:1, 194:4,
201:14, 204:2
**mom's** [1] - 78:1
**Mom's** [1] - 194:17
**moment** [10] - 7:14,
21:1, 21:5, 91:13,
92:5, 103:7, 114:12,
116:17, 129:24,
176:17
**Monday** [4] - 157:6,
157:17, 173:17,
173:19
**money** [3] - 77:6,
77:15, 78:4
**monitor** [1] - 114:21
**monitored** [1] -
146:25
**monitoring** [1] -
144:15
**monitors** [1] - 49:12
**month** [9] - 42:20,
51:12, 54:19, 63:1,
136:9, 136:14, 179:2
**months** [4] - 22:19,
34:25, 42:13, 227:15
**mop** [1] - 169:10
**morning** [30] - 6:1,
6:2, 8:3, 9:9, 9:10,
9:16, 10:9, 10:10,
41:23, 41:24, 56:12,
56:13, 84:10, 84:12,
99:3, 111:23, 114:3,
114:17, 124:16,
124:19, 137:20,
137:21, 148:9,
209:24, 242:9,
242:16, 242:18,
243:4, 244:24
**mornings** [1] - 111:19
**most** [11] - 42:25,
49:10, 107:6, 107:7,
110:1, 120:25,
152:2, 176:6,
176:13, 179:6,
207:15
**mother** [45] - 44:24,
45:4, 65:11, 65:16,
68:22, 77:8, 77:9,
77:15, 84:6, 85:5,
85:18, 87:1, 92:10,
93:2, 93:4, 93:5,
93:17, 93:18,
138:13, 139:25,
140:3, 148:5, 148:9,
148:17, 152:20,
152:22, 155:2,
156:13, 158:21,
163:21, 164:13,

165:8, 165:25,
166:17, 167:11,
168:9, 168:11,
168:14, 172:23,
173:14, 203:18,
220:23, 221:1
**mother's** [1] - 77:16
**motion** [4] - 36:6,
36:12, 37:18, 219:18
**motions** [2] - 7:4,
243:1
**MOU** [2] - 132:24,
132:25
**mouth** [2] - 28:10,
28:11
**move** [26] - 24:12,
29:17, 60:9, 60:11,
101:12, 101:15,
104:16, 123:6,
123:7, 130:9, 134:2,
135:6, 141:23,
141:24, 145:12,
146:19, 147:16,
156:19, 192:11,
209:2, 211:3,
214:10, 215:13,
215:23, 230:15
**moved** [5] - 104:12,
142:2, 142:3,
144:21, 145:2
**movement** [1] -
142:22
**moving** [3] - 125:5,
138:25, 146:24
**MR** [113] - 8:3, 9:22,
10:8, 11:5, 11:10,
11:13, 20:21, 20:25,
21:2, 27:22, 28:1,
35:16, 36:10, 36:23,
37:7, 38:6, 38:23,
39:2, 39:4, 41:6,
41:15, 49:24, 51:19,
52:2, 55:1, 55:3,
55:6, 55:18, 64:10,
64:12, 71:20, 75:19,
87:9, 87:11, 87:13,
88:15, 88:17, 90:24,
91:2, 92:5, 92:8,
93:21, 94:5, 94:10,
97:10, 97:13, 97:25,
98:2, 98:6, 98:9,
98:12, 98:14, 98:23,
99:1, 99:8, 99:10,
170:10, 170:13,
171:9, 171:11,
173:11, 174:5,
174:9, 175:13,
176:4, 176:17,
176:19, 176:23,
178:9, 187:20,

206:20, 213:15,
224:19, 224:21,
224:23, 225:1,
225:8, 226:7,
226:11, 230:5,
230:15, 230:17,
230:20, 230:25,
231:2, 231:12,
231:17, 233:5,
233:22, 233:24,
234:1, 234:3, 234:5,
236:14, 236:16,
236:19, 236:20,
238:6, 238:9, 240:7,
240:9, 240:11,
241:8, 241:16,
241:25, 242:24,
243:3, 243:9,
243:14, 243:18,
243:20, 244:14,
244:25
**MS** [288] - 6:6, 7:11,
8:4, 8:13, 8:19, 8:21,
8:23, 9:5, 20:23,
35:13, 36:14, 36:16,
37:2, 37:8, 37:21,
38:4, 38:12, 38:21,
40:18, 41:17, 41:20,
41:22, 43:13, 43:15,
47:2, 47:4, 49:6,
49:20, 50:6, 50:9,
51:15, 51:18, 51:22,
52:1, 52:4, 52:7,
52:9, 53:12, 53:14,
54:21, 54:23, 55:20,
55:25, 56:11, 64:16,
64:17, 67:13, 67:18,
67:20, 71:13, 71:16,
71:19, 71:22, 71:24,
72:10, 72:11, 73:7,
75:20, 75:22, 77:24,
79:11, 80:15, 81:2,
83:17, 84:9, 84:18,
85:1, 85:2, 87:7,
98:4, 98:15, 99:12,
99:24, 103:12,
106:5, 110:22,
111:1, 116:11,
116:14, 116:15,
116:16, 116:19,
116:21, 116:23,
116:25, 117:3,
117:5, 117:9,
117:11, 117:13,
120:18, 120:20,
126:1, 126:19,
126:20, 129:22,
130:1, 130:3, 130:5,
130:8, 130:9,
130:13, 134:2,
134:4, 134:8, 135:6,

135:8, 135:12, 136:16, 136:18, 140:17, 140:19, 140:22, 140:23, 142:16, 142:18, 143:10, 143:12, 145:12, 145:14, 145:18, 147:16, 147:18, 147:21, 147:24, 148:19, 148:24, 149:3, 149:6, 149:9, 149:12, 149:20, 149:25, 150:7, 150:10, 151:2, 151:5, 151:13, 153:2, 153:7, 153:21, 154:21, 156:18, 156:20, 156:22, 157:1, 157:9, 157:14, 157:24, 158:3, 158:24, 159:3, 159:5, 160:9, 160:11, 160:12, 161:10, 161:12, 161:15, 161:16, 162:2, 162:12, 162:15, 162:16, 165:11, 165:13, 166:2, 166:5, 166:7, 167:4, 167:6, 168:20, 168:23, 169:18, 170:6, 170:17, 170:20, 170:23, 171:1, 173:9, 176:15, 176:25, 177:4, 178:11, 181:7, 181:11, 181:14, 183:10, 186:4, 186:8, 187:14, 187:16, 187:21, 187:24, 188:1, 188:3, 191:16, 191:18, 192:11, 192:13, 192:17, 193:16, 193:18, 197:11, 197:13, 197:19, 197:22, 198:25, 199:2, 199:4, 199:6, 199:15, 199:17, 200:7, 200:12, 200:14, 202:3, 202:5, 202:15, 202:17, 203:10, 203:13, 203:16, 204:7, 204:10, 204:12, 204:19, 205:20, 205:25,

206:1, 206:10, 206:13, 206:22, 207:20, 207:22, 209:2, 209:4, 209:8, 209:9, 210:4, 210:6, 210:8, 210:9, 211:3, 211:5, 211:8, 211:10, 211:13, 213:9, 213:13, 214:10, 214:13, 214:17, 214:24, 215:1, 215:13, 215:16, 215:20, 215:23, 216:3, 216:18, 216:20, 217:12, 217:15, 217:19, 218:2, 218:4, 218:6, 219:7, 219:8, 219:9, 219:11, 219:15, 220:1, 220:3, 220:25, 222:21, 222:23, 223:2, 223:19, 223:20, 224:1, 224:14, 238:12, 242:8, 242:15, 242:23, 244:2
**muddled** [1] - 217:16
**multiple** [5] - 25:10, 27:5, 112:2, 128:11, 190:15
**music** [2] - 220:21, 221:17
**must** [1] - 231:25

# N

**N/A** [1] - 30:15
**naked** [4] - 25:9, 31:17, 31:22, 51:9
**name** [17] - 10:15, 56:15, 63:22, 65:17, 90:7, 96:10, 100:2, 102:20, 105:14, 151:24, 162:25, 189:10, 225:10, 232:10, 243:19, 246:16
**named** [3] - 74:21, 100:19, 195:12
**names** [3] - 187:6, 190:6, 211:23
**narrative** [1] - 32:23
**narrowly** [1] - 54:17
**national** [1] - 41:4
**nature** [5] - 32:12, 49:14, 52:16, 53:1, 127:25
**near** [2] - 88:19, 89:18

**necessarily** [3] - 180:21, 182:15, 207:17
**necessity** [1] - 173:4
**need** [30] - 8:10, 13:2, 19:9, 23:12, 25:25, 66:3, 66:8, 106:2, 109:4, 122:3, 123:21, 127:7, 129:11, 130:6, 134:15, 162:17, 207:25, 238:21, 238:25, 239:2, 239:12, 239:13, 240:9, 242:10, 242:17, 243:15, 243:24, 244:3, 244:6
**needed** [10] - 71:6, 71:9, 102:20, 105:8, 105:16, 105:17, 108:4, 154:14, 163:12, 200:21
**needs** [3] - 108:5, 212:4, 218:22
**negative** [7] - 30:15, 30:19, 32:14, 88:13, 88:14, 102:25, 235:2
**negatives** [1] - 183:6
**neighborhood** [7] - 71:4, 76:21, 89:20, 90:4, 90:5, 90:6, 90:7
**nervous** [1] - 209:25
**never** [19] - 88:6, 88:9, 88:24, 106:12, 152:18, 166:20, 167:2, 178:19, 201:19, 201:21, 201:22, 201:23, 204:2, 205:8, 207:3, 234:9, 234:24, 240:15
**new** [5] - 15:13, 16:25, 120:1, 146:9, 148:13
**news** [2] - 137:18, 137:19
**next** [36] - 6:4, 9:21, 11:18, 12:2, 14:9, 15:10, 17:6, 18:13, 24:6, 28:23, 30:4, 55:24, 57:22, 67:24, 98:22, 100:12, 101:16, 128:3, 132:14, 133:6, 144:4, 148:2, 148:9, 150:3, 150:7, 150:15, 193:5, 195:22, 212:10, 220:2, 220:7, 224:18, 224:20,

227:4, 227:19, 229:7
**nice** [1] - 244:22
**night** [2] - 107:12, 244:25
**nominated** [1] - 59:4
**non** [1] - 127:5
**nonacute** [6] - 42:3, 42:11, 42:12, 42:23, 43:1, 51:11
**nonapplicable** [2] - 30:20, 30:22
**none** [2] - 29:11, 175:5
**nonevidence** [1] - 244:16
**nongenital** [1] - 29:9
**nonspecific** [4] - 6:14, 34:15, 35:2, 53:17
**normal** [3] - 25:1, 31:3, 33:25
**normally** [4] - 23:15, 31:1, 31:22, 234:22
**Nos** [1] - 149:23
**notations** [1] - 47:5
**note** [3] - 29:17, 51:20, 200:6
**noted** [7] - 29:11, 29:14, 31:25, 32:5, 35:7, 45:1, 49:3
**notes** [19] - 38:7, 44:10, 45:22, 46:1, 46:16, 46:20, 46:22, 50:16, 52:16, 52:20, 52:25, 67:11, 198:8, 200:4, 200:16, 201:3, 201:4, 201:5, 246:12
**Notes/Explanations** [1] - 31:9
**nothing** [10] - 23:12, 36:9, 55:1, 55:3, 87:9, 96:16, 98:4, 230:1, 233:24
**notice** [1] - 242:16
**notify** [1] - 86:5
**noting** [1] - 45:13
**nourished** [1] - 45:15
**November** [28] - 44:25, 65:15, 68:25, 69:2, 76:25, 79:4, 79:14, 79:18, 80:3, 85:14, 85:22, 89:5, 138:6, 139:2, 139:15, 171:16, 174:12, 174:15, 179:20, 179:23, 181:5, 182:21, 185:6, 185:22, 186:11, 186:24, 198:19

**Number** [15] - 4:18, 4:19, 4:19, 4:20, 4:20, 4:23, 4:23, 4:24, 4:24, 4:25, 4:25, 5:1, 5:1, 5:2, 5:2
**number** [9] - 19:17, 64:23, 65:4, 65:5, 72:19, 73:10, 130:2, 182:7, 219:2
**numbered** [1] - 131:22
**numbers** [2] - 42:25, 72:6
**numerous** [2] - 62:9, 168:25
**nurse** [55] - 10:19, 11:22, 12:5, 12:10, 12:11, 12:16, 12:18, 13:1, 13:6, 14:11, 14:14, 14:16, 14:17, 14:21, 14:25, 15:23, 16:18, 16:25, 17:7, 18:15, 18:22, 19:5, 19:12, 21:6, 21:17, 22:4, 22:25, 23:3, 23:6, 24:24, 26:20, 28:13, 29:6, 29:13, 29:18, 30:12, 30:17, 30:23, 31:2, 31:10, 31:24, 32:7, 32:14, 33:17, 33:18, 40:24, 41:2, 44:5, 48:8, 53:21, 53:22, 53:25, 55:8, 55:17
**Nurses** [5] - 12:21, 15:21, 15:24, 17:13, 17:14
**nurses** [12] - 13:20, 13:22, 13:25, 14:6, 15:13, 17:3, 17:24, 19:5, 23:4, 23:5, 24:3, 29:21
**nursing** [12] - 11:17, 11:21, 11:23, 12:1, 12:8, 12:20, 14:12, 16:14, 17:15, 18:7, 34:6
**Nursing** [1] - 14:18
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:1

# O

**o'clock** [17] - 32:23, 33:1, 33:2, 33:3, 33:4, 33:8, 50:17, 50:19, 237:5, 240:3, 240:4, 240:5, 240:21, 240:22
**Oaks** [1] - 57:18

**Oakton** [7] - 103:18, 104:8, 106:6, 106:8, 106:15, 106:17, 106:19
**object** [2] - 27:10, 99:20
**objection** [68] - 20:23, 20:24, 35:13, 36:4, 37:20, 38:11, 38:19, 38:20, 38:21, 40:18, 49:22, 50:1, 51:24, 64:10, 116:18, 116:25, 117:1, 120:18, 130:3, 130:11, 134:4, 134:5, 135:8, 135:9, 140:17, 145:14, 145:15, 147:18, 147:19, 149:9, 149:10, 153:2, 153:21, 156:20, 156:21, 160:9, 161:10, 165:11, 168:20, 173:9, 176:15, 178:9, 187:20, 192:13, 192:14, 197:19, 200:7, 202:3, 202:14, 203:13, 204:7, 205:20, 206:10, 207:20, 209:4, 209:5, 210:8, 211:5, 211:6, 213:9, 214:12, 214:13, 215:15, 215:16, 215:25, 222:21, 223:19, 230:17
**objections** [2] - 11:7, 244:17
**objective** [1] - 238:3
**observation** [2] - 161:20, 231:9
**observe** [4] - 169:15, 174:19, 203:4, 203:6
**observed** [6] - 7:2, 29:13, 29:16, 31:2, 33:13, 203:3
**observing** [2] - 233:7, 233:11
**obtain** [2] - 12:25, 19:9
**obtained** [1] - 26:18
**obviate** [1] - 238:21
**obviously** [2] - 238:17, 244:10
**occasion** [4] - 19:25, 128:8, 182:21, 234:21
**occasions** [1] - 169:1
**occur** [3] - 34:19,

53:23, 54:4
**occurred** [12] - 21:12, 54:4, 61:24, 62:1, 63:21, 68:12, 68:20, 69:9, 79:5, 90:8, 90:21, 232:1
**occurring** [2] - 190:14, 190:22
**October** [7] - 88:25, 89:2, 89:8, 131:11, 136:9, 185:1, 229:20
**odd** [1] - 169:8
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 246:1
**offer** [3] - 20:21, 21:20, 22:20
**offered** [3] - 6:16, 35:5, 192:15
**offering** [1] - 22:21
**office** [41] - 105:2, 115:20, 116:6, 119:2, 119:4, 119:11, 120:8, 120:9, 120:13, 125:4, 127:9, 127:20, 127:22, 127:23, 128:4, 128:9, 128:11, 128:13, 128:18, 128:23, 138:25, 146:6, 146:7, 146:11, 146:12, 146:22, 150:12, 156:5, 182:17, 182:21, 183:1, 183:4, 183:8, 195:17, 195:20, 197:18, 197:24, 198:1, 204:25
**OFFICE** [1] - 3:5
**officer** [6] - 57:3, 57:15, 57:18, 57:25, 62:21, 63:5
**Officer** [7] - 57:23, 57:25, 59:1, 132:19, 139:22, 144:20, 144:24
**officers** [1] - 127:23
**Officers** [1] - 58:7
**offices** [2] - 141:22, 146:14
**official** [2] - 246:5, 246:11
**Official** [3] - 3:12, 246:3, 246:22
**officially** [1] - 235:2
**old** [4] - 7:25, 32:23, 44:1, 61:20
**Old** [1] - 11:23

**Olivia** [1] - 82:5
**onboarding** [1] - 16:25
**once** [18] - 12:22, 14:24, 23:6, 25:16, 25:23, 45:22, 57:7, 73:12, 73:13, 135:17, 152:15, 154:11, 163:5, 163:7, 198:25, 205:3, 205:10, 205:14
**one** [87] - 8:15, 12:8, 14:6, 22:10, 23:11, 24:4, 29:17, 34:18, 51:24, 54:6, 55:7, 64:22, 65:3, 67:9, 70:11, 70:14, 78:15, 83:20, 83:21, 85:12, 92:5, 94:22, 95:17, 98:7, 98:23, 98:24, 98:25, 104:10, 104:11, 104:14, 104:23, 106:21, 107:2, 108:12, 108:17, 111:7, 111:17, 113:9, 114:24, 117:1, 119:10, 120:1, 120:5, 120:11, 121:1, 121:8, 122:15, 124:5, 127:5, 135:17, 136:12, 136:25, 147:25, 149:15, 150:15, 164:22, 164:24, 174:1, 176:17, 177:7, 182:11, 182:20, 183:24, 188:15, 189:5, 190:9, 190:15, 191:3, 191:4, 193:19, 195:9, 195:11, 196:16, 208:3, 209:13, 211:18, 213:16, 217:17, 220:12, 229:6, 234:12, 237:4
**one-and-a-half** [1] - 174:1
**one-to-one** [1] - 108:17
**ones** [2] - 219:3, 238:25
**open** [9] - 38:2, 48:15, 165:22, 166:14, 206:14, 227:2
**Open** [1] - 39:1
**open-ended** [1] -

206:14
**opening** [1] - 38:4
**openings** [1] - 244:14
**operated** [1] - 163:16
**opine** [2] - 7:2, 35:21
**opinion** [8] - 27:3, 32:13, 34:12, 40:15, 41:7, 53:24, 54:3, 54:4
**opinions** [5] - 6:22, 7:1, 10:22, 20:18, 36:2
**opportunity** [9] - 69:17, 100:22, 104:15, 108:13, 124:22, 124:24, 154:17, 242:13, 242:16
**opposed** [4] - 34:6, 108:23, 165:1, 222:1
**opposite** [1] - 190:17
**optional** [2] - 129:17, 133:18
**options** [4] - 21:20, 21:21, 24:8, 228:12
**orange** [2] - 136:11, 136:13
**order** [17] - 6:10, 12:25, 37:12, 38:8, 38:9, 48:14, 89:10, 90:10, 93:25, 94:2, 99:13, 105:7, 107:16, 114:1, 130:22, 175:19, 241:7
**ordered** [2] - 7:3, 105:11
**ordinary** [2] - 96:17, 163:15
**organization** [1] - 12:20
**organization's** [1] - 16:3
**original** [2] - 64:20, 65:3
**originally** [1] - 108:18
**origins** [2] - 92:11, 93:8
**outcome** [3] - 182:11, 182:18, 213:12
**outcomes** [1] - 107:24
**outdoor** [1] - 106:8
**outline** [1] - 158:4
**outlined** [4] - 128:24, 132:2, 171:18, 182:19
**outlining** [1] - 186:25
**outset** [1] - 10:17
**outside** [14] - 24:25, 62:10, 75:9, 110:4,

112:21, 125:15, 141:13, 150:19, 197:19, 203:13, 226:25, 232:14, 239:21, 244:22
**overall** [1] - 226:2
**overexaggerated** [1] - 36:11
**overruled** [5] - 97:12, 153:3, 165:12, 168:21, 231:11
**overseeing** [1] - 137:3
**oversees** [1] - 15:25
**overview** [1] - 11:2
**owed** [1] - 178:6
**own** [7] - 94:22, 107:13, 109:2, 134:23, 212:4, 231:19, 231:23
**Own** [2] - 108:25, 116:8
**Ox** [3] - 63:22, 89:24, 90:13

## P

**P.A.H** [1] - 3:6
**p.m** [6] - 84:20, 124:20, 126:6, 126:13, 126:14, 245:1
**pace** [1] - 105:25
**packet** [3] - 128:15, 128:18, 128:25
**page** [57] - 8:19, 43:11, 43:16, 43:18, 44:13, 44:18, 44:19, 45:11, 48:23, 48:24, 51:22, 51:23, 52:5, 52:24, 72:5, 73:3, 75:16, 77:19, 78:19, 79:7, 79:20, 80:11, 80:23, 81:20, 81:21, 81:22, 82:3, 82:13, 82:23, 83:12, 111:2, 114:12, 118:14, 131:22, 132:5, 132:8, 132:14, 134:19, 143:8, 150:9, 181:11, 191:9, 199:2, 199:4, 208:20, 211:9, 212:1, 212:7, 219:4, 219:7, 219:10, 219:12, 220:2, 220:7
**pages** [6] - 71:25, 131:16, 215:24, 216:1, 222:5, 246:10
**paid** [1] - 116:5
**pain** [2] - 44:11, 45:23

266

**pairs** [2] - 212:3, 213:3
**Panarelli** [1] - 208:4
**pandemic** [1] - 108:18
**Panthers** [1] - 103:19
**pants** [6] - 70:10, 70:14, 76:10, 76:13, 167:24, 168:8
**paper** [3] - 107:11, 162:12
**paperwork** [4] - 149:16, 193:25, 204:5, 204:20
**paragraph** [2] - 187:2, 222:12
**parameters** [1] - 37:18
**parent** [13] - 66:3, 66:9, 111:25, 112:5, 112:9, 165:18, 178:13, 178:18, 192:10, 194:21, 216:15, 220:4, 222:14
**parents** [22] - 65:9, 74:9, 80:20, 81:5, 84:2, 102:17, 124:22, 124:25, 129:15, 133:12, 160:18, 175:24, 178:8, 216:14, 218:8, 218:12, 218:13, 218:18, 218:21, 219:23, 233:2
**parents'** [2] - 66:6, 66:8
**Park** [5] - 1:19, 208:10, 220:18, 220:19, 221:6
**park** [2] - 88:19, 221:13
**parking** [1] - 166:11
**part** [36] - 7:4, 14:25, 15:7, 16:21, 26:10, 27:11, 27:16, 48:2, 48:4, 49:11, 51:25, 58:21, 59:22, 62:23, 105:5, 107:7, 108:7, 120:5, 128:14, 128:16, 132:23, 137:18, 138:17, 153:10, 183:17, 188:11, 198:13, 202:25, 203:3, 203:11, 204:5, 241:4, 241:10, 241:17, 242:24
**part-time** [1] - 14:25
**partial** [2] - 96:20, 208:1

**partially** [1] - 141:5
**participate** [5] - 24:12, 164:5, 208:6, 208:10, 238:5
**participated** [1] - 88:21
**particle** [1] - 27:9
**particular** [11] - 16:15, 25:18, 40:8, 41:14, 47:21, 49:14, 51:3, 53:21, 185:3, 229:22, 234:15
**particularly** [2] - 202:11, 244:8
**parties** [2] - 49:13, 50:6
**partly** [1] - 34:18
**parts** [2] - 139:24, 140:2
**party** [1] - 6:12
**pass** [4] - 8:1, 9:2, 49:17, 50:3
**passes** [1] - 156:3
**passwords** [1] - 84:7
**past** [2] - 23:21, 174:1
**pasted** [1] - 38:7
**patch** [2] - 89:12, 89:13
**path** [7] - 14:11, 15:7, 123:7, 124:6, 143:24, 144:9, 172:6
**paths** [8] - 114:22, 121:22, 121:23, 122:1, 122:16, 122:20, 123:23, 142:5
**patient** [55] - 9:15, 13:14, 13:15, 15:16, 19:9, 19:11, 21:5, 21:10, 21:15, 21:20, 22:20, 23:11, 23:14, 23:18, 23:20, 24:1, 24:3, 24:8, 24:11, 24:15, 25:18, 26:16, 28:5, 28:6, 28:7, 28:18, 28:21, 29:12, 30:2, 30:21, 31:2, 34:1, 34:24, 35:4, 39:12, 39:18, 40:1, 42:7, 42:13, 43:22, 44:21, 47:6, 47:9, 47:11, 48:1, 48:6, 48:9, 48:21, 52:14, 53:9, 53:19, 53:21, 54:16, 54:18
**Patient** [3] - 45:19, 46:19, 46:22
**patient's** [6] - 27:11, 27:19, 44:5, 45:13, 46:16, 48:17

**patient/caregiver** [1] - 28:4
**patients** [12] - 14:14, 14:23, 15:3, 17:24, 18:8, 21:7, 21:8, 23:1, 39:13, 42:5, 46:9, 47:8
**patrol** [1] - 57:18
**pattern** [2] - 190:14, 190:20
**patterns** [2] - 115:10, 190:18
**pause** [13] - 56:8, 72:7, 73:5, 77:22, 79:9, 80:13, 80:25, 83:15, 92:7, 114:12, 160:20, 225:5, 230:22
**pay** [1] - 71:9
**PBIS** [2] - 131:24, 132:1
**PC** [1] - 3:9
**PE** [26] - 123:3, 124:6, 124:13, 124:14, 133:5, 141:4, 141:5, 141:22, 146:5, 146:10, 147:2, 147:15, 148:13, 150:14, 201:17, 201:20, 201:21, 201:24, 202:21, 203:7, 225:20, 227:7, 227:20, 230:10, 234:15
**pediatric** [9] - 6:17, 12:17, 13:3, 13:11, 13:15, 13:24, 14:3, 14:7, 15:15
**pediatrics** [1] - 12:19
**peer** [10] - 26:2, 26:5, 40:9, 40:13, 40:15, 40:22, 40:24, 61:23, 126:24
**peer-review** [2] - 26:2, 40:22
**peer-reviewed** [4] - 26:5, 40:9, 40:13, 40:24
**pencil** [4] - 105:10, 105:11, 105:13
**pending** [5] - 55:23, 98:18, 175:11, 175:14, 236:22
**penetrated** [2] - 28:8, 28:9
**penetrates** [2] - 70:10, 70:14
**penetrating** [1] - 70:11
**penetration** [2] -

53:10, 54:15
**penis** [3] - 28:9, 28:10, 70:15
**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:1
**people** [22] - 8:11, 9:14, 48:6, 86:14, 88:18, 93:25, 103:1, 103:9, 107:11, 118:4, 118:5, 192:3, 197:1, 205:9, 205:11, 226:4, 230:23, 232:22, 238:4, 242:4, 243:24
**people's** [1] - 102:17
**per** [5] - 20:17, 28:3, 31:2, 44:21, 90:15
**percent** [1] - 26:5
**percentage** [1] - 218:21
**perform** [1] - 19:6
**performed** [1] - 42:23
**performing** [2] - 33:6, 221:10
**perineal** [3] - 24:16, 24:18, 24:20
**period** [7] - 13:14, 13:17, 159:8, 169:13, 185:22, 229:1, 229:3
**periods** [3] - 158:16, 229:4, 229:5
**permanently** [1] - 58:23
**permission** [3] - 226:7, 230:15, 231:12
**permitted** [6] - 7:1, 112:11, 137:23, 164:1, 164:2, 165:18
**person** [10] - 6:8, 65:21, 92:24, 105:2, 116:5, 124:13, 183:19, 195:6, 217:4, 221:24
**personal** [4] - 8:9, 49:14, 134:23, 220:11
**personally** [2] - 131:3, 217:3
**perspective** [8] - 22:25, 24:13, 34:6, 41:1, 105:1, 182:12, 222:25, 243:9
**pertaining** [1] - 146:5
**pertains** [1] - 10:19
**pertinent** [4] - 23:24, 129:13, 200:19, 200:22
**ph** [1] - 103:24

**ph)** [1] - 101:24
**phase** [1] - 104:7
**P▓▓** [2] - 4:10, 99:10
**P▓▓** [1] - 99:16
**P▓▓** [1] - 100:3
**phone** [13] - 51:6, 72:18, 72:19, 72:24, 72:25, 73:8, 73:9, 73:18, 74:1, 93:23, 94:3, 217:4
**phones** [1] - 94:1
**photo** [4] - 27:9, 49:9, 50:11, 51:3
**photocopy** [2] - 161:2, 161:4
**photograph** [7] - 67:21, 67:25, 68:4, 111:3, 111:4, 117:16, 150:1
**photographing** [1] - 25:1
**photographs** [7] - 25:5, 26:22, 27:1, 27:3, 27:13, 33:16, 150:9
**photography** [2] - 19:8, 26:17
**photos** [7] - 25:7, 25:10, 27:5, 27:11, 32:19, 43:10, 148:21
**physical** [23] - 22:23, 24:6, 24:23, 25:7, 25:11, 25:14, 25:16, 28:18, 29:2, 29:21, 30:6, 30:13, 31:11, 32:3, 34:9, 48:25, 54:12, 100:23, 130:23, 225:15, 225:20, 227:10, 232:7
**Physical** [1] - 28:24
**physically** [1] - 51:7
**physician** [2] - 23:3
**pick** [6] - 37:14, 70:1, 201:14, 213:18, 213:25, 214:21
**picking** [1] - 214:19
**pickup** [1] - 214:5
**picture** [7] - 7:12, 8:15, 51:2, 90:14, 150:3, 190:14
**pictures** [9] - 8:15, 9:2, 50:20, 51:16, 115:13, 149:7, 150:8, 150:15, 150:16
**pied** [1] - 105:14
**pilot** [2] - 108:6, 108:9
**piloting** [1] - 108:24
**pin** [1] - 79:3

**pink** [1] - 111:13
**pinning** [3] - 70:5, 70:8, 70:13
**pinpoint** [1] - 185:19
**pins** [1] - 70:4
**PITTLEMAN** [1] - 3:9
**Pittsburgh** [1] - 11:25
**place** [22] - 22:6, 22:19, 38:5, 47:14, 95:11, 101:10, 109:6, 128:21, 139:14, 141:25, 160:4, 163:11, 171:18, 172:4, 172:14, 172:19, 185:15, 188:13, 230:10, 232:7, 233:19, 234:24
**placed** [2] - 198:9, 244:9
**placing** [1] - 165:1
**plaintiff** [16] - 6:11, 7:3, 11:6, 26:8, 26:10, 41:25, 55:20, 56:23, 87:16, 88:6, 90:21, 92:2, 98:14, 231:20, 238:15, 238:21
**Plaintiff** [4] - 1:4, 1:14, 2:1, 4:17
**Plaintiff's** [16] - 27:24, 162:11, 181:8, 186:5, 191:15, 204:14, 208:19, 209:2, 209:6, 210:22, 211:3, 211:7, 214:3, 214:15, 215:6, 216:1
**plaintiff's** [17] - 6:20, 6:22, 26:19, 29:8, 35:25, 36:2, 41:9, 43:11, 89:20, 92:9, 93:17, 93:18, 130:1, 215:14, 215:24, 219:1, 222:5
**Plaintiffs** [1] - 192:15
**plan** [10] - 143:13, 155:14, 155:24, 156:1, 156:3, 158:4, 158:22, 171:5, 180:25, 194:22
**planned** [1] - 243:25
**planning** [3] - 25:24, 84:23, 239:17
**plans** [1] - 113:18
**plastic** [1] - 48:19
**play** [6] - 16:9, 40:22, 74:2, 183:25, 232:2, 240:23
**played** [1] - 117:10

**PLC** [1] - 3:5
**pleadings** [1] - 174:24
**pledge** [1] - 136:10
**PLLC** [1] - 1:15
**pocket** [2] - 73:11, 73:15
**pod** [23] - 114:25, 117:17, 117:24, 118:24, 120:13, 120:15, 120:21, 121:14, 122:4, 124:4, 124:5, 141:13, 141:14, 142:11, 143:18, 144:3, 144:4, 144:17, 144:19, 145:3, 171:22
**Pod** [2] - 117:25, 118:17
**POG** [1] - 108:20
**point** [42] - 10:4, 16:19, 22:11, 24:12, 57:4, 59:17, 60:16, 70:17, 70:24, 84:5, 86:5, 92:16, 93:5, 101:2, 141:20, 156:6, 160:22, 165:10, 167:7, 167:19, 167:23, 168:1, 168:4, 173:21, 175:24, 176:8, 180:24, 184:8, 185:4, 185:14, 185:21, 190:4, 194:16, 195:18, 195:19, 203:4, 213:18, 233:6, 238:22, 239:1, 239:2, 241:18
**points** [4] - 18:14, 31:24, 109:20, 196:12
**Police** [6] - 56:16, 56:18, 57:17, 58:8, 59:13, 60:20
**police** [13] - 57:2, 57:3, 57:5, 57:11, 57:15, 57:25, 60:24, 61:6, 63:9, 95:10, 133:2, 167:8, 167:10
**poor** [3] - 39:10, 39:17, 39:20
**population** [2] - 15:16, 101:9
**portion** [6] - 24:23, 25:15, 28:25, 29:2, 43:19, 47:25
**portions** [2] - 43:8, 43:11
**Portrait** [1] - 108:20

**pose** [1] - 27:12
**position** [17] - 46:10, 57:16, 57:22, 57:24, 58:3, 58:22, 59:15, 60:5, 61:12, 101:5, 101:8, 101:12, 101:15, 106:22, 212:21, 225:14, 238:7
**positions** [4] - 14:19, 15:4, 16:6, 100:17
**positive** [9] - 30:14, 30:17, 30:23, 31:5, 49:3, 132:23, 137:8, 157:8, 226:3
**possibility** [1] - 36:5
**possible** [14] - 6:19, 6:22, 19:13, 19:14, 35:7, 35:23, 36:2, 39:5, 41:8, 41:12, 207:19, 207:24, 227:6, 241:10
**possibly** [2] - 199:22, 202:1
**post** [2] - 174:3, 174:5
**posted** [1] - 125:10
**postpubertal** [1] - 13:13
**potential** [7] - 21:25, 22:21, 25:3, 28:16, 32:11, 185:25, 187:19
**potentially** [9] - 25:24, 54:9, 92:11, 93:9, 93:14, 188:5, 190:5, 200:17, 240:13
**PowerPoint** [6] - 129:18, 129:20, 130:14, 131:19, 135:3, 228:13
**PowerPoints** [2] - 178:24, 243:8
**practice** [20] - 11:17, 12:23, 13:5, 13:9, 15:14, 18:25, 21:15, 22:12, 23:4, 25:6, 26:4, 29:15, 29:19, 34:14, 40:21, 41:3, 46:12, 47:20, 55:14, 223:6
**practiced** [1] - 12:22
**practices** [1] - 40:3
**practicing** [2] - 13:7, 29:23
**practitioner** [2] - 23:3, 23:6
**precepted** [1] - 13:6
**preclude** [1] - 6:11
**predicate** [2] - 161:13, 202:24

**predominantly** [3] - 131:1, 180:16, 194:20
**prefer** [1] - 243:16
**pregnancy** [1] - 25:21
**Preliminary** [1] - 5:4
**preparation** [1] - 20:15
**prepare** [4] - 11:1, 164:23, 222:2, 223:8
**prepared** [2] - 29:6, 131:17
**prepubertal** [2] - 13:16, 43:1
**present** [17] - 9:7, 32:11, 33:22, 34:4, 34:18, 39:14, 42:5, 43:1, 53:20, 84:21, 105:1, 126:16, 131:3, 139:24, 171:2, 228:12, 229:8
**presentation** [15] - 35:5, 129:18, 129:20, 130:14, 131:19, 132:4, 132:5, 132:10, 228:13, 229:18, 235:16, 235:18, 237:15, 239:15, 241:14
**presentations** [2] - 228:17, 228:23
**presented** [2] - 131:4, 229:1
**presenting** [3] - 42:12, 130:20, 241:5
**presently** [1] - 33:14
**presents** [1] - 47:12
**presumably** [2] - 211:23, 211:25
**pretty** [10] - 7:20, 53:15, 68:19, 84:24, 139:14, 161:24, 181:4, 218:19, 226:5, 240:25
**prevent** [1] - 28:11
**previously** [4] - 19:23, 23:23, 41:19, 83:20
**pride** [1] - 110:16
**primarily** [1] - 13:15
**primary** [4] - 19:3, 47:21, 114:5, 114:17
**principal** [15] - 101:3, 101:4, 101:6, 101:17, 101:23, 102:4, 103:24, 113:17, 127:2, 127:10, 127:12, 137:10, 177:16, 183:19, 184:22

**principals** [5] - 119:9, 119:13, 137:19, 188:23, 197:16
**principles** [1] - 241:7
**print** [1] - 9:19
**private** [3] - 8:10, 49:14, 113:10
**problem** [2] - 96:14, 183:11, 242:6
**problems** [5] - 79:17, 79:19, 79:25, 80:3, 80:4
**procedures** [2] - 116:3, 116:4
**proceed** [3] - 11:8, 39:2, 94:7
**PROCEEDINGS** [1] - 1:11
**Proceedings** [1] - 245:1
**proceedings** [15] - 72:7, 73:5, 77:22, 79:9, 80:13, 80:25, 83:15, 84:20, 92:7, 126:14, 128:13, 230:22, 246:6, 246:11, 246:14
**process** [20] - 16:21, 19:11, 19:12, 22:18, 24:12, 26:2, 36:19, 40:22, 48:7, 48:9, 60:11, 93:11, 107:1, 107:3, 107:4, 121:16, 138:17, 163:4, 163:13, 163:15
**processes** [1] - 41:5
**produced** [2] - 26:9, 117:7
**profanity** [1] - 162:18
**professional** [7] - 12:8, 12:19, 14:11, 17:7, 17:10, 18:10, 39:23
**professionally** [2] - 108:14, 175:18
**profile** [1] - 65:16
**program** [16] - 15:2, 16:13, 16:14, 16:15, 18:18, 25:6, 40:23, 108:6, 112:3, 112:17, 112:20, 112:23, 116:3, 116:9, 116:13, 118:10
**programs** [1] - 108:9
**progression** [1] - 14:19
**project** [8] - 102:6, 102:8, 104:1,

110:12, 210:18,
212:5, 213:7, 228:24
**projects** [2] - 108:15,
211:20
**promoted** [1] - 60:16
**promotion** [2] - 60:10,
98:19
**prompt** [1] - 134:24
**pronouns** [1] - 224:3
**property** [1] - 220:11
**prophylactic** [1] -
25:19
**prophylaxis** [3] -
25:19, 25:22
**proportion** [2] - 19:21,
218:18
**propose** [1] - 99:3
**proposed** [2] - 238:19,
241:3
**propped** [2] - 165:22,
166:14
**prosecution** [1] - 20:9
**protocols** [1] - 41:4
**proudly** [1] - 175:10
**provide** [12] - 25:18,
65:11, 86:21, 129:2,
134:23, 161:13,
194:14, 199:23,
221:24, 228:3,
242:16, 244:15
**provided** [19] - 15:22,
28:5, 28:8, 40:10,
65:14, 69:16,
116:23, 146:9,
154:16, 158:15,
160:17, 160:18,
161:5, 164:9, 189:4,
223:9, 224:13,
228:2, 228:25
**Providence** [3] -
100:20, 104:1,
106:15
**provider** [4] - 19:2,
19:3, 23:12, 46:10
**providers** [3] - 21:7,
22:2, 39:14
**provides** [1] - 23:18
**providing** [6] - 18:22,
99:21, 221:11,
223:18, 224:9,
224:10
**prox** [1] - 115:19
**puberty** [1] - 13:16
**public** [1] - 108:10
**Public** [8] - 100:7,
102:10, 103:16,
126:22, 128:6,
175:9, 205:15,
206:19
**publish** [31] - 7:24,

9:1, 11:7, 43:9,
43:12, 52:5, 110:22,
117:1, 129:22,
134:5, 135:9,
142:16, 145:15,
147:21, 148:23,
149:12, 156:22,
157:12, 159:2,
181:8, 186:4,
198:25, 204:14,
204:16, 204:17,
209:5, 211:10,
214:14, 215:17,
226:7, 231:12
**published** [27] - 11:9,
43:14, 49:12, 49:15,
52:8, 67:19, 110:25,
134:7, 135:11,
145:17, 147:23,
156:25, 157:13,
159:4, 166:6, 174:8,
181:13, 186:7,
199:5, 204:18,
209:7, 211:12,
214:16, 215:18,
219:14, 226:10,
231:16
**pull** [12] - 27:15, 43:9,
48:23, 52:4, 54:12,
70:9, 111:22,
116:16, 130:25,
181:7, 186:3, 198:23
**pulled** [10] - 155:9,
155:13, 155:15,
155:18, 194:19,
195:5, 195:15,
197:5, 197:23,
232:13
**pulling** [3] - 155:18,
217:23, 217:24
**pulls** [1] - 70:14
**pumpkin** [2] - 89:12,
89:13
**purchased** [2] -
136:11, 146:13
**purple** [2] - 219:5,
219:6
**purpose** [6] - 23:10,
172:13, 198:7,
200:3, 200:15,
241:23
**purposes** [9] - 17:4,
23:13, 24:15, 26:6,
27:23, 47:24, 51:19,
84:23, 146:21
**push** [1] - 115:19
**pushed** [2] - 103:4,
104:5
**pushes** [2] - 70:1,
70:4

**pushing** [3] - 103:25,
236:8, 236:9
**put** [27] - 28:10, 30:22,
32:9, 46:9, 76:13,
93:24, 107:23,
109:6, 128:15,
128:18, 131:19,
139:13, 141:1,
144:23, 151:2,
161:8, 171:18,
172:4, 175:22,
185:15, 190:8,
206:9, 206:15,
228:23, 235:1,
244:8, 244:13
**puts** [1] - 58:8
**putting** [8] - 16:25,
76:9, 108:6, 120:2,
153:12, 167:23,
168:1, 172:13
**PWC** [2] - 238:17,
241:9

## Q

**qualify** [1] - 20:24
**quarter** [10] - 138:16,
139:2, 139:3, 139:5,
153:9, 153:11,
169:21, 211:20,
227:15, 227:16
**quarters** [1] - 227:19
**questioning** [2] -
36:17, 97:11
**questions** [30] - 10:2,
37:7, 37:10, 37:19,
37:24, 38:8, 54:23,
56:6, 68:12, 87:7,
89:3, 93:21, 95:6,
98:6, 131:16,
134:16, 169:18,
170:8, 170:14,
171:15, 176:23,
177:8, 218:2,
224:15, 225:4,
227:4, 233:22,
236:14, 238:9, 243:7
**quick** [4] - 94:14,
124:25, 171:1, 226:5
**quickly** [7] - 131:15,
131:22, 156:10,
157:9, 181:8,
205:23, 207:24
**quite** [3] - 7:21, 70:17,
238:1
**quote/unquote** [2] -
178:20, 216:8

## R

**Rachel** [53] - 58:13,
58:18, 58:24, 59:8,
60:4, 94:21, 94:22,
100:22, 100:24,
101:3, 101:18,
103:15, 104:12,
106:19, 106:22,
106:23, 108:11,
109:8, 110:7,
110:19, 112:21,
112:24, 116:24,
117:14, 126:25,
127:11, 127:12,
131:18, 131:24,
132:21, 135:14,
138:2, 169:3,
174:18, 180:10,
183:17, 195:6,
196:23, 203:18,
203:23, 216:25,
218:14, 218:20,
220:19, 225:13,
225:17, 234:20,
235:13, 235:18,
235:23, 235:25,
236:1, 236:5
**raise** [1] - 244:17
**raised** [1] - 153:15
**ran** [1] - 127:22
**range** [2] - 47:8, 47:12
**rank** [2] - 60:21,
230:17
**ranks** [1] - 60:19
**rape** [8] - 62:11,
62:15, 63:19, 63:20,
63:25, 166:18,
167:8, 168:25
**raped** [4] - 167:17,
168:18, 204:3, 204:6
**rapport** [3] - 19:10,
48:8, 87:25
**rare** [1] - 112:5
**rarely** [1] - 125:4
**rate** [2] - 20:14, 20:15
**rbates@hunton.com**
- 2:16
**re** [1] - 97:19
**re-traumatized** [1] -
97:19
**reach** [1] - 217:3
**reached** [2] - 10:23,
195:19
**reaches** [3] - 195:16,
197:24, 212:9
**reaching** [1] - 212:13
**reaction** [4] - 77:16,
77:18, 78:1, 161:20
**read** [14] - 6:7, 72:1,

81:21, 83:13, 88:12,
162:17, 174:24,
175:3, 180:18,
180:22, 182:8,
231:1, 240:20, 241:9
**reader** [2] - 166:15,
238:1
**readily** [1] - 8:11
**readiness** [1] -
131:23, 132:1
**reading** [3] - 37:11,
102:22, 238:3
**ready** [5] - 80:14, 97:8,
97:15, 126:15,
241:15
**really** [28] - 50:7,
94:14, 96:3, 103:8,
104:5, 104:17,
105:16, 106:13,
107:10, 107:15,
108:22, 111:23,
112:5, 115:7, 115:9,
120:3, 122:11,
137:6, 137:7, 146:5,
176:1, 178:13,
179:6, 181:23,
185:2, 232:21,
234:24, 239:16
**realtime** [1] - 246:12
**reason** [9] - 67:7,
85:24, 95:21, 97:14,
102:24, 105:5,
121:11, 133:5,
170:14
**reasonable** [1] -
240:19
**reasons** [3] - 106:21,
108:12, 199:25
**recalled** [1] - 234:16
**receive** [13] - 23:1,
25:20, 25:21, 58:2,
58:25, 61:12,
100:10, 127:17,
127:25, 129:9,
148:16, 152:22,
172:19
**received** [13] - 24:9,
26:16, 27:20, 57:4,
63:16, 82:2, 100:12,
127:18, 133:13,
152:5, 152:8,
152:16, 152:19
**receiving** [3] - 159:15,
164:11, 199:18
**recent** [1] - 68:19
**recently** [3] - 18:1,
82:11, 82:12
**Recess** [5] - 84:19,
126:13, 170:3
**recognize** [1] - 117:16

269

**recollection** [11] - 68:18, 71:17, 72:3, 89:21, 132:5, 148:12, 155:1, 165:16, 166:14, 180:15, 237:6
**recommend** [1] - 244:15
**recommendation** [1] - 127:25
**reconsider** [1] - 212:21
**record** [30] - 6:8, 7:19, 9:6, 16:17, 20:16, 23:16, 27:22, 35:19, 37:13, 38:18, 51:20, 51:25, 67:8, 88:12, 90:22, 149:11, 151:3, 159:7, 171:13, 183:11, 215:22, 217:16, 225:10, 237:19, 237:20, 239:19, 239:25, 241:23, 241:24
**recorded** [5] - 66:22, 66:24, 67:2, 67:5, 67:7
**recording** [1] - 246:13
**records** [3] - 6:23, 36:3, 159:1
**recovery** [1] - 29:21
**recurrence** [1] - 152:7
**red** [1] - 32:25
**redacted** [1] - 211:23
**redirect** [4] - 36:20, 55:4, 236:15, 236:16
**Redirect** [3] - 4:5, 4:9, 4:12
**REDIRECT** [1] - 55:5, 98:8, 218:5
**refer** [3] - 34:2, 54:8, 142:23
**reference** [2] - 170:16, 191:19
**referrals** [1] - 25:24
**referred** [3] - 12:13, 58:7, 95:4
**referring** [8] - 56:23, 65:21, 124:11, 128:16, 132:25, 162:18, 164:21, 197:21
**reflect** [2] - 18:14, 29:3
**reflected** [1] - 50:11
**reframe** [1] - 44:4
**refresh** [4] - 71:16, 72:3, 89:21, 210:11
**refreshes** [1] - 210:12

**regard** [6] - 6:10, 7:6, 87:20, 142:21, 233:19, 244:8
**regarding** [15] - 6:19, 6:22, 7:4, 17:17, 32:2, 35:23, 36:2, 37:12, 116:24, 151:21, 156:14, 194:17, 205:1, 211:1, 228:3
**regardless** [5] - 24:1, 35:4, 178:7, 178:12, 178:18
**regards** [1] - 203:24
**registered** [7] - 11:22, 12:5, 12:10, 12:11, 13:1, 14:14, 24:3
**regular** [2] - 69:18, 112:22
**regularly** [3] - 138:17, 138:21, 184:24
**regulated** [1] - 114:1
**relate** [1] - 17:7
**related** [9] - 32:15, 38:12, 52:13, 109:9, 110:6, 153:8, 155:6, 155:7, 216:7
**relates** [3] - 110:19, 113:7, 223:3
**relationship** [3] - 68:15, 75:2, 184:25
**relationships** [1] - 120:7
**relative** [3] - 113:22, 119:6, 166:11
**release** [3] - 69:18, 137:17, 174:17
**released** [1] - 241:25
**remain** [2] - 175:9, 192:24
**remaining** [1] - 172:22
**remains** [2] - 203:17, 203:21
**remarks** [1] - 82:4
**remember** [63] - 7:25, 58:21, 62:9, 70:17, 80:18, 83:8, 83:9, 83:11, 91:13, 91:22, 102:18, 102:22, 119:8, 126:7, 136:13, 138:8, 139:9, 157:7, 160:4, 160:5, 161:4, 165:24, 173:16, 178:25, 179:1, 179:22, 179:23, 180:4, 191:2, 194:3, 194:15, 194:16, 195:1, 195:13, 195:21, 196:1,

196:21, 197:1, 197:8, 200:25, 201:12, 201:16, 201:25, 206:25, 207:1, 208:4, 208:11, 213:6, 213:12, 213:21, 213:24, 214:1, 215:3, 217:8, 229:21, 234:13, 234:14, 234:18, 235:9, 235:10, 236:3, 237:8
**remembered** [1] - 80:8
**remembers** [1] - 8:2
**remind** [3] - 36:13, 37:17, 118:23
**remotely** [1] - 19:15
**remove** [2] - 143:10, 226:20
**removed** [2] - 203:18, 219:24
**renovation** [7] - 102:6, 102:8, 104:1, 110:12, 119:21, 120:2, 121:3
**repeat** [3] - 178:15, 188:2, 188:24
**repeated** [2] - 88:3
**rephrase** [4] - 178:10, 202:4, 202:16, 223:25
**reply** [3] - 148:4, 158:20, 213:2
**Report** [1] - 28:24
**report** [45] - 10:19, 10:24, 21:22, 22:1, 22:5, 26:9, 26:12, 26:18, 26:25, 27:2, 27:18, 27:19, 27:20, 28:20, 28:25, 29:7, 30:5, 31:4, 34:8, 35:8, 36:18, 39:7, 39:24, 40:8, 40:10, 41:9, 53:18, 55:8, 61:3, 61:4, 63:6, 63:8, 63:18, 128:20, 133:7, 139:25, 140:3, 168:11, 168:14, 172:20, 174:22, 182:16, 182:20, 185:7, 188:11
**reported** [13] - 14:15, 14:24, 21:11, 28:3, 28:20, 29:12, 45:9, 53:9, 85:7, 132:19, 185:25, 189:2, 246:5
**reporter** [2] - 105:19, 109:15

**REPORTER** [1] - 246:1
**Reporter** [3] - 3:12, 246:3, 246:22
**Reporter.................... ...** [1] - 5:5
**reporting** [6] - 21:8, 28:18, 67:11, 96:17, 180:13, 180:16
**reports** [8] - 23:14, 28:21, 40:24, 43:25, 44:5, 55:14, 168:7, 179:7
**represent** [3] - 10:11, 41:25, 96:10
**request** [3] - 72:16, 163:2, 241:25
**requested** [1] - 210:18
**requests** [1] - 83:24
**required** [1] - 133:12
**requirement** [1] - 129:14
**requisite** [1] - 6:24
**rescind** [1] - 94:2
**research** [2] - 176:9, 176:10
**resolution** [1] - 239:12
**resolved** [1] - 165:3
**Resource** [5] - 57:23, 57:25, 58:6, 59:1, 132:19
**resources** [7] - 164:23, 165:1, 194:13, 194:14, 223:7, 223:11, 224:13
**respect** [8] - 6:14, 16:16, 22:23, 40:16, 89:17, 131:23, 144:14, 238:20
**respected** [2] - 74:18, 75:10
**respectful** [1] - 132:1
**respond** [3] - 179:13, 192:5, 225:25
**responded** [1] - 183:18
**responding** [1] - 192:19
**responds** [4] - 21:17, 179:10, 194:11, 212:2
**response** [8] - 56:8, 134:17, 134:18, 134:23, 148:2, 179:7, 191:21, 191:22
**responses** [3] - 6:2, 9:10, 238:3
**responsibilities** [4] -

24:4, 58:9, 113:17, 137:3
**Responsibilities** [1] - 129:7
**Responsibility** [1] - 135:3
**responsibility** [6] - 61:25, 131:23, 132:2, 178:12, 178:17, 178:21
**responsible** [8] - 61:19, 61:21, 71:8, 130:20, 166:18, 177:23, 177:25
**rest** [1] - 104:15
**Reston** [2] - 3:7, 3:10
**restructured** [1] - 130:25
**result** [1] - 187:3
**resulted** [2] - 41:10, 41:12
**results** [1] - 185:12
**resumed** [2] - 84:20, 126:14
**resumption** [1] - 126:18
**retribution** [3] - 185:25, 187:3, 187:9
**retrieve** [2] - 50:4, 203:6
**return** [2] - 49:17, 242:20
**returned** [2] - 77:11, 77:14
**revealed** [1] - 64:9
**review** [13] - 10:18, 20:16, 26:2, 26:9, 26:25, 31:4, 40:15, 40:22, 49:17, 130:23, 131:7, 133:8, 240:6
**reviewed** [8] - 26:5, 33:16, 34:8, 40:9, 40:13, 40:24, 129:12, 131:19
**reviewing** [1] - 194:22
**Rewari** [6] - 2:17, 64:15, 92:9, 98:3, 171:16, 242:7
**REWARI** [148] - 6:6, 55:25, 56:11, 64:16, 64:17, 67:13, 67:18, 67:20, 71:13, 71:16, 71:19, 71:22, 71:24, 72:10, 72:11, 73:7, 75:20, 75:22, 77:24, 79:11, 80:15, 81:2, 83:17, 84:9, 84:18, 85:1, 85:2, 87:7, 98:4, 98:15, 99:24,

270

103:12, 106:5, 110:22, 111:1, 116:11, 116:15, 116:19, 116:23, 117:3, 117:5, 117:9, 117:11, 117:13, 120:20, 126:1, 126:19, 126:20, 129:22, 130:1, 130:5, 130:9, 130:13, 134:2, 134:8, 135:6, 135:12, 136:16, 136:18, 140:19, 140:22, 140:23, 142:16, 142:18, 143:10, 143:12, 145:12, 145:18, 147:16, 147:21, 147:24, 148:19, 148:24, 149:6, 149:12, 149:20, 149:25, 150:7, 150:10, 151:2, 151:5, 151:13, 153:7, 154:21, 156:18, 156:22, 157:1, 157:9, 157:14, 157:24, 158:3, 158:24, 159:3, 159:5, 160:11, 160:12, 161:12, 161:15, 161:16, 162:2, 162:12, 162:16, 165:13, 166:2, 166:5, 166:7, 167:4, 167:6, 168:23, 169:18, 170:17, 170:20, 170:23, 192:13, 197:11, 197:19, 200:7, 202:3, 202:15, 203:13, 204:7, 205:20, 206:10, 207:20, 209:4, 210:8, 211:5, 213:9, 214:13, 215:16, 218:4, 218:6, 219:8, 219:11, 219:15, 220:1, 220:3, 220:25, 222:23, 223:2, 223:20, 224:1, 224:14, 238:12, 242:8, 242:15, 242:23, 244:2

**Rewari**.............. [1] - 4:12
**Rewari**.............. [2] - 4:7, 4:11

**Richmond** [1] - 14:18
**rid** [1] - 201:5
**ride** [5] - 111:8, 111:19, 112:5, 112:7, 112:10
**Ride** [4] - 124:19, 124:20, 125:11, 125:20
**right-hand** [1] - 117:22
**Rights** [2] - 129:7, 135:3
**rkeefe@bsfllp.com** [1] - 2:12
**Road** [1] - 63:22
**road** [2] - 113:6, 113:9
**robbery** [1] - 60:14
**Robert** [2] - 2:9, 3:6
**rock** [1] - 38:5
**role** [7] - 16:9, 17:20, 40:22, 163:4, 163:7, 203:24, 225:21
**roles** [3] - 15:12, 18:17, 95:10
**room** [28] - 14:21, 19:12, 66:9, 66:17, 66:18, 66:20, 67:15, 67:22, 68:2, 87:23, 88:1, 95:13, 146:18, 146:23, 147:1, 149:7, 150:2, 150:6, 154:18, 160:19, 165:9, 165:19, 181:2, 201:21, 201:24, 203:7, 226:23, 226:25
**rooms** [3] - 66:17, 66:19, 95:14
**roots** [1] - 105:16
**ROSSIE** [1] - 1:11
**rotate** [2] - 227:17, 227:19
**rotation** [1] - 229:20
**rote** [1] - 108:23
**roughly** [6] - 13:23, 89:14, 100:21, 101:19, 102:1, 133:11
**route** [2] - 69:18, 122:6
**routine** [1] - 40:21
**routinely** [2] - 23:4, 39:19
**RPR** [2] - 3:12, 246:21
**rude** [1] - 96:13
**rule** [4] - 88:2, 125:16, 230:23, 242:1
**Rule** [2] - 242:21, 243:1
**rules** [2] - 128:23,

133:2
**ruling** [2] - 67:14, 238:13
**rulings** [1] - 243:1
**rumors** [3] - 76:15, 76:18, 79:25
**run** [4] - 127:8, 163:13, 165:25, 202:21
**running** [2] - 165:22, 201:8
**runs** [2] - 113:7, 113:9
**rushed** [1] - 133:9
**Ryan** [1] - 2:13

## S

**S-A-R-A** [1] - 10:15
**S.T** [1] - 3:6
**safe** [2] - 88:1, 120:16
**safer** [1] - 115:12
**safety** [18] - 25:23, 104:6, 109:6, 109:14, 109:17, 110:19, 113:8, 113:18, 114:1, 119:12, 120:5, 121:19, 122:19, 125:19, 174:20, 174:22, 178:4, 178:6
**sake** [2] - 105:19, 217:15
**SANE** [37] - 12:13, 12:14, 12:16, 12:18, 13:23, 15:5, 15:25, 16:1, 16:16, 17:4, 18:11, 19:14, 19:18, 20:1, 21:4, 25:15, 26:2, 26:8, 26:9, 26:19, 35:8, 36:18, 37:3, 37:4, 37:22, 38:13, 39:24, 40:8, 41:9, 42:17, 42:23, 43:6, 43:16, 44:1, 66:17, 95:18
**SANE-A** [3] - 12:16, 13:23, 15:25
**SANE-P** [1] - 16:1
**SARA** [1] - 9:25
**Sara** [5] - 4:3, 6:12, 9:22, 10:15, 20:21
**satisfaction** [1] - 165:3
**saved** [1] - 73:25
**saw** [10] - 30:18, 30:24, 44:24, 69:24, 82:22, 138:4, 162:7, 181:4, 232:21, 233:3
**scan** [2] - 115:19, 166:15

**Scanlon** [1] - 127:22
**scanning** [1] - 115:18
**scar** [6] - 32:23, 33:19, 33:21, 34:3, 34:4, 50:16
**scared** [5] - 79:1, 181:16, 181:19, 185:24, 187:2
**scarring** [4] - 6:19, 7:2, 35:24, 39:6
**scene** [1] - 90:1
**schedule** [4] - 130:25, 131:5, 210:15, 241:9
**scheduled** [1] - 44:14
**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10
**school** [166] - 11:22, 58:8, 63:18, 63:25, 64:2, 64:3, 64:4, 64:5, 64:6, 64:8, 64:18, 69:12, 69:13, 69:17, 71:4, 74:5, 74:10, 74:12, 74:16, 75:24, 76:2, 76:10, 76:16, 78:6, 78:14, 78:17, 78:23, 79:17, 79:19, 79:25, 80:3, 85:21, 86:2, 86:5, 86:6, 86:8, 86:9, 86:14, 86:17, 87:4, 100:19, 100:22, 101:13, 102:2, 102:8, 102:21, 102:24, 103:2, 103:15, 104:2, 105:9, 106:7, 106:14, 107:8, 108:5, 108:24, 108:25, 109:2, 110:1, 110:11, 110:13, 110:20, 110:23, 111:11, 112:2, 112:18, 112:20, 112:25, 113:3, 113:7, 113:8, 113:10, 113:18, 113:19, 113:22, 114:1, 115:13, 115:16, 116:3, 116:5, 116:9, 116:13, 116:24, 118:10, 119:2, 121:6, 121:7, 121:14, 121:17, 121:24, 124:18, 125:12, 125:14, 125:17, 126:23, 127:6, 128:4, 130:20, 133:15, 133:25, 134:12,

135:14, 135:25, 136:7, 136:19, 138:11, 139:3, 139:11, 139:18, 148:21, 154:15, 156:14, 157:5, 157:10, 157:17, 157:21, 159:16, 163:2, 167:21, 168:12, 168:15, 168:18, 169:12, 169:16, 173:23, 174:16, 177:13, 178:19, 179:10, 179:21, 181:16, 181:19, 183:23, 185:4, 187:9, 190:22, 194:2, 195:4, 195:9, 195:15, 196:12, 197:23, 201:9, 201:13, 203:3, 207:19, 207:23, 208:1, 208:5, 213:18, 213:25, 218:16, 219:25, 225:23, 225:25, 226:8, 226:14, 227:6, 227:7, 229:15, 232:5
**School** [26] - 10:11, 57:23, 57:25, 58:6, 58:13, 58:18, 58:23, 59:1, 100:23, 101:24, 102:5, 102:9, 103:19, 104:8, 106:9, 106:15, 106:18, 106:20, 106:24, 117:14, 132:19, 134:9, 174:19, 225:13
**school's** [1] - 179:7
**schools** [19] - 58:1, 58:15, 69:16, 103:20, 106:11, 108:10, 108:14, 110:1, 111:12, 112:2, 112:22, 119:15, 119:17, 119:19, 119:22, 120:24, 121:1, 139:10, 208:2
**Schools** [8] - 100:7, 102:10, 103:16, 126:22, 128:6, 175:9, 205:15, 206:19
**science** [10] - 100:12, 121:3, 121:8,

125:23, 153:19, 154:9, 160:8, 160:17, 160:24, 161:1

**scope** [5] - 64:13, 97:11, 111:24, 197:19, 203:14

**Scott** [1] - 2:20

**screaming** [2] - 91:12, 91:13

**screen** [6] - 19:4, 27:7, 174:10, 186:9, 219:12, 226:13

**screens** [1] - 7:14

**screenshot** [1] - 67:14

**scroll** [1] - 181:21

**scrunchie** [1] - 32:9

**SE** [3] - 2:2, 2:6, 2:10

**se** [1] - 90:15

**seal** [2] - 51:25, 52:1

**seat** [5] - 10:1, 56:5, 171:4, 224:16, 225:3

**seated** [8] - 9:8, 56:4, 84:16, 84:22, 99:17, 126:17, 225:6, 237:19

**second** [21] - 60:21, 117:3, 120:5, 135:13, 135:17, 135:18, 135:20, 139:2, 139:5, 143:8, 143:9, 143:13, 143:14, 147:10, 157:21, 168:17, 168:24, 186:20, 222:11, 227:15

**Secours** [2] - 14:18, 14:22

**Secret** [1] - 57:14

**Section** [5] - 27:17, 28:2, 28:25, 30:5, 55:8

**section** [4] - 28:20, 29:9, 29:14, 31:8

**sections** [2] - 27:18, 55:11

**secure** [1] - 93:23

**security** [5] - 109:14, 109:17, 113:18, 114:2, 125:19

**see** [79] - 12:12, 22:4, 23:14, 24:25, 25:9, 25:21, 28:7, 30:8, 30:20, 31:22, 32:10, 33:10, 38:7, 39:14, 40:5, 46:24, 47:21, 52:18, 72:3, 84:16, 88:15, 104:25, 107:24, 111:6, 111:9, 111:16,

112:7, 112:12, 114:4, 114:9, 116:18, 121:21, 123:15, 123:21, 126:12, 134:9, 134:18, 141:23, 142:13, 143:20, 143:23, 144:5, 144:23, 145:2, 146:23, 156:6, 159:11, 159:21, 174:4, 174:10, 181:24, 182:6, 186:21, 190:20, 191:25, 192:8, 193:7, 199:8, 210:1, 211:21, 212:10, 212:13, 212:17, 212:19, 212:22, 213:4, 216:16, 230:19, 232:19, 232:21, 236:9, 236:10, 237:16, 240:18, 240:23, 242:6, 242:13, 244:24

**seeing** [6] - 15:2, 19:4, 31:20, 51:9, 137:7, 201:19

**seek** [1] - 184:22

**seeks** [1] - 6:11

**selected** [1] - 133:5

**self** [1] - 150:1

**self-explanatory** [1] - 150:1

**semester** [1] - 135:18

**seminar** [2] - 133:17, 220:15

**send** [3] - 83:24, 156:3, 219:22

**sends** [1] - 192:2

**sent** [9] - 72:15, 72:21, 93:15, 141:4, 197:17, 198:1, 219:19, 238:19, 238:23

**sentence** [1] - 45:3

**separate** [3] - 13:10, 13:19, 48:15

**separately** [2] - 45:3, 45:4

**separation** [1] - 48:16

**September** [2] - 185:1, 203:11

**sergeant** [2] - 60:17, 60:21

**series** [1] - 227:4

**serious** [3] - 180:14, 181:18, 181:20

**serve** [2] - 16:14,

114:1

**served** [7] - 16:11, 16:13, 17:14, 17:21, 20:3, 95:9, 95:10

**serves** [1] - 95:9

**Service** [1] - 57:14

**service** [3] - 9:13, 18:8, 18:18

**Services** [1] - 14:19

**services** [5] - 17:24, 18:21, 18:23, 164:10, 203:25

**SESSION** [1] - 1:8

**set** [7] - 31:23, 102:19, 115:10, 144:12, 205:5, 223:12, 243:25

**seven** [1] - 227:9

**several** [6] - 12:6, 12:22, 17:14, 32:25, 54:19, 95:14

**sex** [1] - 62:13

**sexual** [37] - 6:14, 10:18, 12:16, 12:18, 14:16, 17:17, 17:21, 19:6, 20:22, 41:10, 54:15, 56:22, 62:11, 62:15, 65:4, 65:5, 81:9, 88:7, 88:9, 88:21, 88:24, 89:4, 89:7, 89:14, 96:16, 96:23, 97:19, 139:25, 168:12, 182:5, 182:14, 190:6, 233:15, 233:18, 235:23, 235:25, 236:2

**sexually** [5] - 14:15, 65:2, 167:20, 179:25, 233:7

**shadow** [5] - 141:8, 171:24, 172:1, 172:3, 175:22

**shadowed** [1] - 144:19

**shadowing** [1] - 144:18

**shaped** [3] - 27:5, 32:18, 169:8

**share** [3] - 20:18, 105:8, 228:14

**shared** [4] - 24:1, 49:11, 122:20, 132:9

**sharing** [1] - 187:3

**sharpeners** [3] - 105:10, 105:12, 105:13

**Shawn** [3] - 127:1, 127:10, 127:12

**Sheehan** [10] - 211:15,

211:17, 215:10, 216:4, 223:3, 223:5, 223:17, 224:8, 224:10, 224:11

**Sheehan's** [1] - 222:12

**sheet** [2] - 154:13, 154:18

**shelf** [1] - 169:10

**shirt** [1] - 70:6

**shirts** [1] - 136:11

**shocked** [2] - 78:4, 161:8

**shoot** [1] - 169:23

**short** [12] - 98:24, 98:25, 99:1, 99:5, 170:15, 170:16, 170:17, 170:18, 207:16, 238:13, 238:16, 239:1

**shorter** [1] - 171:6

**shorthand** [2] - 246:5, 246:12

**show** [24] - 11:1, 27:15, 36:24, 49:9, 67:14, 67:24, 106:13, 115:22, 116:11, 118:21, 119:1, 142:13, 142:21, 143:14, 143:17, 144:24, 162:11, 166:2, 166:8, 186:20, 198:9, 214:18, 219:12, 228:21

**showed** [7] - 55:7, 95:13, 160:24, 161:1, 161:5, 161:17, 222:6

**shower** [1] - 39:19

**showing** [2] - 143:25, 223:10

**shown** [2] - 71:21, 238:14

**shows** [6] - 32:19, 67:21, 68:1, 111:4, 116:13, 143:8

**shut** [4] - 28:11, 83:25, 97:22, 98:10

**sic** [2] - 70:10, 189:13

**side** [10] - 30:9, 30:14, 35:18, 70:13, 90:11, 113:10, 117:17, 117:22, 172:16, 232:14, 238:20

**sidebar** [1] - 204:10

**sides** [2] - 33:9, 104:25

**sidewalk** [5] - 90:17, 90:21, 91:3, 113:13,

113:14

**sidewalks** [1] - 113:11

**sideways** [1] - 8:6

**sign** [8] - 90:6, 90:9, 90:10, 90:11, 90:13, 118:21, 136:10

**signature** [1] - 230:11

**signed** [1] - 129:15

**significant** [2] - 195:25, 218:18

**signs** [1] - 186:19

**silent** [1] - 94:6

**silly** [1] - 105:4

**similar** [2] - 19:1, 47:22

**simple** [2] - 39:10, 124:4

**simply** [1] - 22:3

**simultaneously** [1] - 172:11

**sing** [1] - 222:2

**singing** [1] - 221:25

**single** [1] - 197:17

**single-spaced** [1] - 197:17

**sink** [1] - 169:10

**sister** [2] - 121:6, 242:1

**sit** [7] - 13:7, 66:1, 85:4, 90:19, 232:17, 242:21, 244:18

**sit-down** [2] - 66:1, 85:4

**sitting** [1] - 169:9

**situation** [24] - 25:18, 51:11, 124:9, 138:8, 141:16, 152:4, 160:18, 164:7, 172:12, 182:12, 182:18, 182:23, 183:24, 185:19, 188:9, 190:19, 196:3, 196:10, 196:16, 197:2, 201:24, 208:2, 216:10, 235:21

**situations** [4] - 172:17, 187:18, 190:8, 198:14

**six** [3] - 100:21, 169:9, 227:9

**six-foot** [1] - 169:9

**size** [2] - 169:7, 208:3

**skateboard** [2] - 71:7, 71:9

**skills** [1] - 108:20

**skin** [3] - 33:12, 33:25

**skip** [1] - 137:23

**skit** [1] - 228:15

**skits** [2] - 228:17,

228:22
**slash** [1] - 44:21
**slide** [14] - 11:1, 11:5, 11:18, 12:2, 14:9, 15:10, 17:6, 18:13, 21:1, 27:15, 28:23, 30:4, 36:24, 132:15
**Slide** [2] - 27:16, 31:7
**slides** [1] - 70:9
**slimed** [1] - 105:14
**slipping** [1] - 61:17
**slow** [2] - 105:21, 105:23
**small** [3] - 32:25, 66:19, 104:2
**smaller** [1] - 169:9
**smart** [1] - 123:9
**Smith** [3] - 208:22, 208:25, 209:12
**soap** [1] - 39:21
**social** [4] - 9:19, 205:6, 228:4, 237:10
**soft** [1] - 46:22
**soft-spoken** [1] - 46:22
**someone** [13] - 69:6, 70:21, 72:20, 73:24, 88:22, 147:14, 154:3, 178:18, 217:24, 228:10, 235:1, 236:12
**sometime** [3] - 93:18, 131:11, 189:16
**sometimes** [17] - 38:15, 97:2, 97:5, 97:8, 97:14, 97:17, 97:18, 106:23, 108:3, 112:5, 119:25, 122:2, 123:23, 138:3, 149:17, 184:20, 187:18
**somewhere** [5] - 63:10, 71:4, 100:15, 170:19, 239:18
**son** [6] - 165:9, 165:18, 201:9, 201:13, 201:21, 203:2
**Sona** [1] - 2:17
**song** [1] - 228:15
**songs** [1] - 228:18
**soon** [4] - 125:1, 161:8, 207:19, 233:3
**sorry** [27] - 9:16, 19:23, 44:19, 60:4, 60:7, 61:16, 76:3, 96:9, 104:24, 116:21, 119:3, 124:2, 130:5, 149:1,

154:1, 159:8, 160:19, 187:1, 210:10, 214:18, 215:7, 215:20, 219:8, 222:7, 224:19, 233:23
**sort** [9] - 31:23, 38:19, 47:5, 50:14, 95:10, 110:5, 113:6, 237:24, 240:22
**sorts** [1] - 128:23
**sounds** [3] - 189:15, 217:10, 240:11
**source** [4] - 93:8, 216:13, 222:14, 222:18
**sources** [1] - 92:11
**space** [2] - 18:15, 227:16
**spaced** [1] - 197:17
**Spanish** [4] - 103:3, 143:1, 143:3, 143:20
**speaking** [6] - 10:3, 15:15, 28:15, 35:6, 56:7, 99:20, 171:21, 177:12, 179:1, 202:11, 205:17, 205:19, 216:8, 225:4
**speaks** [2] - 187:17, 188:4
**special** [3] - 25:4, 31:18, 243:24
**specialist** [3] - 102:23, 116:5, 125:19
**specific** [19] - 8:12, 12:7, 12:8, 17:15, 29:10, 29:23, 30:2, 30:7, 35:3, 36:6, 36:21, 37:12, 48:20, 58:2, 123:24, 125:14, 188:18, 217:8, 238:22
**specifically** [4] - 6:21, 32:7, 36:1, 58:22
**specifics** [3] - 182:6, 196:15, 210:21
**specify** [1] - 173:23
**speculate** [2] - 6:20, 35:25
**speculation** [2] - 40:18, 187:20
**speculum** [2] - 48:18, 48:22
**spelled** [2] - 162:21, 162:22
**spend** [3] - 38:10, 123:1, 241:4
**spent** [4] - 137:7, 137:14, 184:24, 194:20

**spirit** [1] - 136:12
**split** [3] - 19:22, 20:8, 20:10
**spoken** [3] - 45:12, 46:22, 200:4
**spread** [2] - 119:13, 120:4
**spring** [4] - 86:23, 129:5, 135:4, 220:20
**squad** [14] - 59:18, 59:22, 59:24, 60:1, 60:6, 60:12, 60:14, 61:9, 61:11, 61:19, 61:21, 62:7, 62:11, 62:13
**Square** [1] - 3:13
**SR&R** [11] - 128:24, 129:1, 129:3, 129:6, 129:13, 132:10, 133:13, 133:16, 133:18, 182:19, 229:11
srewari@huntonak. com [1] - 2:19
**SRO** [10] - 58:8, 58:9, 58:10, 58:11, 58:22, 59:4, 59:5, 59:8, 60:9, 94:20
**SROs** [2] - 58:7, 59:6
**St** [1] - 16:19
**staff** [9] - 101:5, 101:7, 107:14, 116:7, 123:6, 125:18, 131:25, 136:11, 226:4
**staffed** [2] - 101:11, 114:8
**staffing** [1] - 101:12
**stairs** [4] - 142:8, 143:18, 144:2, 144:17
**stairwell** [3] - 142:25, 143:4, 143:5
**stakeholders** [1] - 15:17
**stamp** [2] - 154:13, 154:18
**stand** [6] - 16:17, 122:4, 124:16, 146:14, 150:21, 232:14
**standardized** [2] - 29:17, 29:20
**standing** [1] - 145:1
**standpoint** [17] - 101:14, 104:6, 110:10, 119:12, 120:1, 121:4, 121:18, 121:19, 124:24, 139:7,

155:12, 155:16, 163:13, 197:6, 210:14, 217:25, 218:1
**stands** [3] - 12:17, 12:18, 230:1
**start** [19] - 51:5, 87:22, 93:22, 99:3, 99:4, 109:1, 117:6, 145:19, 157:2, 159:22, 190:21, 209:25, 211:9, 219:22, 225:4, 229:19, 234:11, 240:3, 244:15
**started** [26] - 13:14, 13:16, 13:17, 14:12, 14:21, 14:22, 14:24, 37:3, 62:25, 74:7, 75:14, 76:18, 79:25, 87:16, 94:19, 103:24, 104:17, 108:11, 108:24, 121:10, 139:20, 140:21, 159:25, 172:12, 181:22, 196:16
**starting** [8] - 9:11, 123:5, 159:21, 190:20, 227:15, 229:20, 237:3, 237:5
**starts** [2] - 211:14, 232:10
**State** [1] - 100:11
**state** [5] - 45:4, 46:16, 199:21, 208:17, 225:10
**statement** [27] - 92:1, 92:3, 180:18, 180:23, 180:25, 181:1, 181:2, 181:3, 181:15, 184:11, 184:15, 198:21, 199:7, 204:6, 206:9, 230:9, 230:13, 230:16, 231:2, 231:24, 231:25, 233:5, 234:13, 234:17, 234:20, 235:5, 235:7
**statements** [3] - 128:20, 206:3
**States** [2] - 3:13, 57:14
**STATES** [2] - 1:1, 1:12
**states** [4] - 42:5, 45:5, 45:22, 70:16
**stating** [1] - 213:21
**station** [4] - 57:19, 63:9, 113:11, 113:13

**stay** [13] - 48:2, 69:16, 74:14, 78:5, 79:2, 125:12, 169:21, 172:24, 173:1, 173:5, 173:7, 227:18, 237:10
**stayed** [9] - 9:19, 74:20, 78:9, 78:10, 78:14, 85:21, 86:1, 101:19, 108:12
**staying** [5] - 35:20, 78:17, 78:23, 125:17, 173:12
**stays** [1] - 36:8
**STD** [1] - 25:21
**stealing** [1] - 153:1
**stenographer** [1] - 91:1
**step** [7] - 24:6, 55:21, 98:16, 126:8, 150:23, 170:1
**stepping** [1] - 40:7
**steps** [12] - 128:3, 140:10, 140:12, 140:14, 171:18, 172:8, 172:10, 188:13, 198:9, 200:4, 200:16
**still** [33] - 14:16, 15:2, 16:13, 18:10, 22:4, 22:20, 23:1, 23:2, 23:5, 24:2, 24:3, 24:10, 24:11, 27:10, 35:5, 60:2, 60:13, 70:8, 70:13, 85:12, 85:14, 92:18, 105:2, 126:22, 127:13, 127:15, 130:6, 146:6, 146:7, 178:20, 216:23, 217:1, 244:22
**stint** [1] - 94:20
**stipulation** [2] - 238:20, 239:1
**stirrup** [2] - 46:3, 46:7
**stirrups** [2] - 46:11, 47:22
**stolen** [1] - 154:25
**stone** [1] - 61:15
**Stone** [3] - 101:23, 101:25, 102:5
**stood** [4] - 111:18, 124:15, 144:20, 144:24
**stools** [1] - 44:7
**stop** [8] - 76:23, 79:4, 89:18, 89:23, 117:3, 117:11, 156:6, 235:23
**stopped** [3] - 78:17,

78:23, 235:22
**stops** [1] - 113:13
**storing** [1] - 146:7
**story** [4] - 67:10, 96:24, 97:2, 102:15
**strange** [1] - 88:13
**street** [1] - 63:23
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**strengths** [1] - 121:5
**strictly** [1] - 94:22
**strike** [1] - 19:23
**structural** [1] - 127:5
**structure** [1] - 32:10
**structures** [3] - 30:11, 32:1, 32:15
**struggled** [2] - 70:2, 102:22
**struggling** [8] - 91:10, 91:14, 208:14, 208:16, 208:17, 210:7, 210:10, 210:13
**stuck** [1] - 115:6
**student** [73] - 74:21, 110:19, 112:6, 112:8, 112:10, 114:1, 117:15, 124:4, 124:5, 124:6, 128:12, 128:20, 141:23, 146:10, 151:21, 151:23, 152:17, 162:25, 164:4, 164:7, 167:20, 174:18, 177:13, 177:15, 179:7, 179:14, 180:9, 180:10, 180:22, 181:18, 183:13, 184:23, 185:3, 187:17, 188:4, 188:10, 188:15, 189:7, 189:17, 190:24, 196:8, 196:19, 197:5, 200:5, 203:17, 203:21, 207:19, 207:23, 207:25, 208:6, 213:3, 214:5, 216:13, 216:15, 216:23, 216:25, 222:13, 223:6, 223:8, 223:12, 228:17, 229:15, 232:3, 232:4, 232:10, 232:11, 233:1, 233:6, 233:10, 233:13, 233:17

**student-created** [1] - 228:17
**students** [127] - 16:12, 69:16, 104:22, 105:8, 106:19, 106:24, 106:25, 107:14, 109:1, 111:20, 112:1, 112:18, 113:2, 114:3, 114:9, 114:10, 114:24, 115:2, 115:7, 117:23, 120:17, 120:17, 121:20, 122:2, 122:5, 122:7, 122:9, 122:12, 122:16, 122:17, 122:21, 123:22, 123:24, 124:23, 125:15, 125:17, 125:22, 127:4, 127:25, 129:3, 129:10, 129:15, 129:17, 131:1, 131:5, 131:6, 131:13, 131:25, 132:9, 133:4, 133:6, 133:18, 134:12, 134:22, 135:14, 135:17, 135:19, 135:25, 136:3, 136:10, 137:8, 137:12, 137:23, 138:3, 138:4, 138:20, 139:8, 139:12, 140:3, 140:5, 140:9, 140:16, 141:1, 141:21, 142:7, 146:22, 153:1, 154:25, 157:17, 157:21, 163:19, 164:1, 176:5, 176:8, 176:12, 176:14, 176:12, 178:18, 178:21, 178:22, 179:16, 179:19, 183:15, 184:18, 184:23, 187:6, 188:14, 195:9, 195:11, 196:21, 197:4, 199:11, 199:23, 200:1, 207:4, 207:7, 207:9, 207:12, 207:14, 207:15, 210:19, 211:24, 212:3, 213:8, 218:19, 220:19, 221:7, 226:4, 227:23, 228:4, 228:19,

228:23, 232:1, 233:7, 233:11, 235:16
**students'** [4] - 218:12, 218:22, 220:11
**Students'** [2] - 129:6, 135:3
**subject** [5] - 55:19, 98:13, 154:22, 228:22, 236:17
**subjected** [1] - 187:3
**subscribed** [1] - 246:15
**subsequently** [1] - 65:24
**success** [1] - 223:13
**suggest** [4] - 7:23, 7:24, 165:6, 241:12
**suggesting** [1] - 7:7
**suite** [1] - 120:2
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:6, 3:10
**superintendent** [1] - 128:1
**superintendent's** [6] - 182:17, 195:16, 195:19, 197:18, 197:24, 198:1
**supervisor** [5] - 109:13, 109:22, 109:23, 118:6
**supplement** [1] - 106:10
**supplies** [1] - 163:11
**support** [16] - 101:13, 101:14, 121:18, 121:20, 122:18, 123:22, 124:8, 155:15, 155:25, 164:11, 179:16, 179:19, 185:15, 188:13, 207:25, 210:15
**supported** [1] - 103:2
**supporting** [6] - 163:5, 172:6, 178:1, 197:1, 197:3, 205:11
**supports** [3] - 120:15, 120:16, 139:13
**supposed** [1] - 124:17
**surgeries** [1] - 23:23
**surprised** [2] - 161:21, 161:23
**surrounded** [1] - 111:16
**surrounding** [1] - 113:22
**surveillance** [1] - 115:21

**survivors** [2] - 17:17, 17:21
**Susie** [1] - 103:24
**suspect** [3] - 65:1, 65:20, 65:21
**suspects** [2] - 64:20, 64:23
**suspension** [1] - 128:2
**sustained** [13] - 35:12, 35:14, 120:19, 160:10, 161:11, 173:10, 176:16, 197:12, 203:15, 204:9, 206:12, 206:21, 207:21
**sweep** [1] - 125:22
**switch** [4] - 84:9, 100:22, 101:23, 126:1
**switched** [1] - 135:18
**switching** [2] - 99:13, 158:16
**sworn** [4] - 9:25, 56:3, 99:16, 225:2
**system** [11] - 14:22, 21:14, 115:18, 115:21, 116:24, 131:24, 166:15, 192:2, 243:11, 244:5
**systematic** [1] - 241:5
**systems** [1] - 32:15

## T

**T.B** [1] - 3:6
**tab** [2] - 8:13, 8:17
**table** [1] - 47:20
**TABLE** [1] - 4:1
**tables** [1] - 7:15
**talker** [1] - 109:19
**tall** [1] - 151:4
**taller** [1] - 150:19
**tape** [1] - 246:13
**targeted** [1] - 91:21
**T████** [5] - 154:11, 208:21, 208:25, 209:16, 209:22
**task** [2] - 17:16, 17:22
**tasks** [1] - 104:3
**taught** [3] - 100:19, 105:6, 228:11
**Taylor** [10] - 65:17, 81:14, 81:19, 82:1, 82:21, 83:1, 92:18, 92:22, 93:3, 93:19
**teach** [4] - 154:22, 223:15, 224:8, 227:10
**teacher** [21] - 86:1,

103:3, 104:3, 104:7, 107:20, 107:25, 108:1, 109:3, 127:14, 127:15, 146:20, 146:24, 147:1, 157:7, 165:5, 223:8, 223:9, 223:14, 224:3, 224:4, 225:21
**teacher's** [1] - 117:22
**teachers** [33] - 105:10, 109:4, 117:20, 121:25, 122:3, 122:9, 123:14, 123:20, 125:21, 137:5, 137:14, 137:23, 138:23, 138:24, 141:11, 144:16, 146:21, 150:14, 156:3, 163:9, 164:22, 164:25, 171:21, 188:16, 205:4, 205:11, 209:13, 209:20, 209:21, 210:15, 227:7
**teaches** [1] - 61:16
**teaching** [6] - 15:7, 16:14, 163:11, 164:10, 223:6, 228:7
**team** [35] - 104:15, 107:18, 108:16, 108:19, 117:18, 121:1, 122:8, 122:14, 122:15, 122:25, 123:1, 123:7, 123:13, 123:19, 125:6, 137:1, 137:4, 137:13, 137:16, 138:16, 138:23, 141:2, 144:22, 160:22, 177:17, 177:19, 177:21, 178:1, 180:11, 196:8, 196:9, 196:11
**teaming** [2] - 121:6, 139:11
**teams** [12] - 119:6, 120:25, 125:2, 130:19, 131:3, 136:19, 136:22, 136:25, 177:23, 183:16, 240:9
**tearful** [1] - 46:19
**technical** [2] - 11:22, 243:7
**technology** [1] - 7:20
**teenage** [1] - 165:18
**telehealth** [2] - 18:23,

19:2
**TeleSANE** [4] - 18:18,
18:21, 18:22, 18:25
**ten** [4] - 32:24, 121:13,
128:2, 170:11
**ten-day** [1] - 128:2
**ten-millimeters** [1] -
32:24
**Tenth** [1] - 3:14
**term** [3] - 17:21,
207:16, 218:11
**terminology** [5] -
24:18, 33:19, 47:11,
50:15, 61:18
**terms** [3] - 27:6,
97:11, 135:24
**T███████** [29] - 74:17,
74:19, 77:14, 78:2,
95:4, 125:19,
139:21, 140:5,
140:12, 140:18,
141:1, 141:4,
141:18, 142:6,
144:5, 146:2,
172:11, 173:7,
180:24, 183:14,
183:15, 184:8,
184:13, 185:7,
185:12, 185:16,
186:14, 188:20,
197:25
**t██████** [1] - 77:17
**test** [11] - 112:18,
129:15, 131:10,
131:12, 133:16,
133:18, 133:22,
133:25, 134:11,
134:16
**testified** [14] - 18:2,
19:23, 92:21,
164:13, 165:8,
165:21, 166:17,
179:20, 180:6,
182:7, 203:24,
207:6, 215:2, 235:12
**testify** [9] - 6:13, 6:18,
6:20, 10:22, 19:25,
35:23, 35:25, 154:5,
235:15
**testifying** [4] - 20:8,
166:21, 166:23,
200:15
**testimonies** [1] -
102:17
**testimony** [29] - 6:11,
18:5, 20:14, 37:5,
53:16, 104:13,
126:18, 153:19,
163:21, 164:15,
165:14, 166:19,

172:23, 180:2,
180:3, 185:17,
185:18, 200:2,
202:3, 202:15,
202:19, 202:20,
206:8, 207:20,
210:20, 217:20,
241:19, 246:6
**Texas** [1] - 18:19
**text** [3] - 32:2, 72:18,
72:21
**texted** [1] - 72:22
**Thanksgiving** [9] -
145:22, 172:24,
173:2, 173:5, 173:8,
173:13, 173:19,
173:22, 174:15
**THE** [289] - 1:1, 1:11,
3:5, 6:1, 6:3, 6:7,
7:16, 7:20, 8:8, 8:17,
8:20, 8:22, 8:24, 9:8,
9:11, 9:24, 10:1,
10:5, 10:6, 11:8,
11:12, 20:24, 27:25,
35:12, 35:14, 35:17,
35:19, 36:13, 36:15,
36:20, 37:1, 37:10,
37:23, 38:10, 38:15,
38:22, 38:25, 39:3,
40:19, 40:20, 41:16,
41:18, 43:12, 49:10,
49:22, 50:1, 50:8,
51:17, 51:24, 52:3,
52:6, 54:22, 54:25,
55:2, 55:4, 55:19,
55:21, 56:2, 56:5,
56:9, 64:11, 64:14,
67:17, 71:15, 71:18,
72:8, 72:9, 73:6,
75:21, 77:23, 79:10,
80:14, 81:1, 83:16,
84:11, 84:15, 84:22,
87:8, 87:10, 88:12,
90:22, 90:25, 92:6,
93:22, 94:8, 97:12,
98:3, 98:5, 98:7,
98:13, 98:16, 98:20,
98:22, 98:25, 99:6,
99:9, 99:11, 99:15,
99:18, 99:22, 103:6,
103:8, 106:1, 106:3,
110:24, 116:17,
117:1, 120:19,
126:3, 126:11,
126:15, 126:17,
129:24, 130:6,
130:11, 134:5,
135:9, 140:20,
142:17, 145:15,
147:19, 147:22,

148:23, 149:5,
149:8, 149:10,
149:13, 149:22,
150:20, 150:24,
151:1, 151:4, 151:6,
151:9, 151:11,
153:3, 153:4,
153:23, 153:24,
153:25, 154:1,
154:2, 154:4, 154:5,
154:7, 154:8, 154:9,
156:21, 156:23,
157:12, 159:2,
160:10, 161:11,
161:13, 162:1,
162:14, 165:12,
166:4, 168:21,
168:22, 169:19,
170:1, 170:4, 170:8,
170:12, 170:14,
170:18, 170:21,
170:24, 171:3,
173:10, 174:3,
174:7, 175:12,
176:2, 176:3,
176:16, 176:18,
176:22, 176:24,
177:2, 178:10,
181:10, 181:12,
183:7, 183:8, 186:6,
187:23, 187:25,
188:2, 191:17,
192:14, 197:12,
197:20, 197:21,
199:1, 199:3, 200:8,
202:4, 202:7, 202:8,
202:9, 202:10,
202:13, 202:14,
202:16, 202:24,
203:1, 203:2, 203:5,
203:6, 203:8, 203:9,
203:15, 204:9,
204:11, 204:16,
205:23, 206:12,
206:21, 207:21,
209:5, 211:6,
211:11, 213:11,
213:12, 214:12,
214:14, 215:15,
215:17, 215:25,
217:14, 217:18,
219:10, 219:13,
220:24, 222:25,
223:1, 223:23,
224:16, 224:18,
224:20, 224:22,
224:25, 225:3,
226:9, 230:4,
230:19, 230:21,
230:23, 231:1,
231:4, 231:7, 231:8,

231:10, 231:11,
231:14, 233:23,
233:25, 234:2,
236:15, 236:17,
236:21, 236:24,
236:25, 237:2,
237:18, 237:21,
238:8, 238:10,
239:4, 239:20,
240:1, 240:8,
240:10, 240:13,
241:12, 241:22,
242:3, 242:11,
242:19, 242:25,
243:5, 243:12,
243:15, 243:19,
243:21, 244:6,
244:21
**theirs** [1] - 244:18
**themselves** [2] -
21:11, 95:21
**theories** [1] - 6:15
**therapy** [2] - 25:25,
209:24
**therefore** [2] - 6:25,
34:5
**they've** [6] - 23:23,
43:3, 121:3, 188:7,
221:14, 228:21
**thinking** [2] - 239:4,
240:22
**third** [2] - 102:22,
227:16
**Thomas** [3] - 106:9,
106:17, 106:24
**thousand** [2] - 17:5,
19:20
**threat** [2] - 174:20,
174:22
**threatening** [1] -
194:5
**threats** [1] - 194:1
**three** [22] - 12:7,
21:21, 57:21, 59:4,
61:20, 62:10, 102:1,
114:8, 121:10,
168:19, 175:1,
175:2, 181:22,
187:6, 198:4,
199:11, 212:4,
215:24, 221:9,
222:5, 228:19
**three-year-old** [1] -
61:20
**threw** [1] - 232:4
**throughout** [7] -
24:10, 43:5, 62:20,
64:8, 115:4, 119:13,
125:5
**throw** [1] - 235:5

**thrown** [1] - 178:17
**Thursday** [9] - 145:19,
148:1, 148:13,
157:20, 237:15,
239:7, 239:15, 241:4
**tie** [1] - 205:23
**Tiffany** [1] - 238:14
**timing** [1] - 153:8
**Tinsley** [3] - 49:18,
50:4, 237:12
**tired** [1] - 209:25
**tissue** [1] - 33:14
**Title** [5] - 182:16,
182:21, 183:1,
183:4, 183:8
**today** [10] - 9:12, 11:3,
20:18, 94:12, 105:5,
126:5, 169:23,
180:6, 237:3, 238:15
**toe** [11] - 23:7, 23:8,
23:10, 23:17, 24:2,
24:4, 24:7, 28:15,
29:3, 29:7, 30:13
**together** [11] - 121:3,
128:15, 128:18,
158:5, 197:16,
197:25, 198:4,
221:15, 222:2,
246:13
**toll** [1] - 107:17
**tomorrow** [12] -
224:24, 237:4,
237:5, 237:13,
237:15, 238:11,
241:11, 242:9,
242:15, 242:18,
243:3, 244:24
**tonia** [1] - 106:1
**TONIA** [1] - 3:12
**Tonia** [3] - 241:23,
246:3, 246:21
**took** [10] - 22:6, 62:4,
62:8, 63:5, 112:4,
133:5, 133:18,
141:25, 160:4,
205:10
**tool** [2] - 31:18, 48:12
**tools** [1] - 34:20
**top** [13] - 33:8, 43:18,
43:19, 44:18, 44:19,
72:6, 91:12, 134:9,
158:14, 162:8,
211:9, 212:7, 231:18
**topic** [4] - 84:10,
126:2, 172:22, 216:7
**topics** [1] - 135:21
**TORCHINSKY** [1] -
1:14
**tornado** [1] - 109:14
**tossed** [3] - 232:3,

275

232:12, 233:3
**total** [2] - 58:16, 134:16
**totally** [1] - 202:18
**touch** [3] - 46:13, 75:13, 226:13
**touched** [4] - 75:12, 76:1, 107:6, 168:15
**touching** [6] - 75:8, 76:5, 76:8, 139:25, 233:7, 233:15
**tour** [1] - 58:21
**toward** [1] - 179:10
**towards** [3] - 40:16, 186:2, 223:5
**track** [4] - 93:10, 106:8, 112:20, 149:15
**tract** [1] - 44:6
**traction** [1] - 48:17
**trained** [6] - 15:13, 15:17, 15:18, 17:4, 19:6, 201:5
**training** [34] - 13:3, 13:4, 14:16, 15:14, 16:16, 16:20, 16:23, 17:1, 20:19, 41:8, 57:3, 58:2, 58:5, 58:6, 61:12, 61:14, 61:16, 96:5, 97:17, 127:7, 127:16, 127:17, 129:2, 129:9, 131:8, 133:4, 135:13, 135:25, 178:23, 187:22, 199:18, 200:24, 229:11
**Training** [1] - 57:7
**trainings** [1] - 229:12
**TRANSCRIPT** [1] - 1:11
**transcript** [1] - 246:11
**transition** [4] - 36:21, 121:9, 121:10, 143:5
**transitioned** [2] - 101:5, 106:17
**transitioning** [6] - 125:15, 139:8, 142:8, 142:24, 144:12, 164:8
**transitions** [2] - 144:15, 156:10
**transport** [1] - 219:24
**trash** [1] - 201:19
**trauma** [1] - 29:10
**traumatized** [1] - 97:19
**treated** [3] - 47:10, 207:3, 207:6
**treating** [1] - 25:20

**tree** [1] - 111:7
**trend** [3] - 190:12, 190:14, 190:20
**trends** [1] - 190:17
**triaging** [1] - 107:15
**trial** [2] - 178:17, 244:11
**TRIAL** [2] - 1:11, 4:1
**Trial** [1] - 246:6
**triangles** [1] - 120:24
**tried** [8] - 28:10, 38:8, 75:8, 75:13, 88:14, 226:3, 237:23
**tries** [1] - 70:17
**trip** [6] - 208:10, 220:17, 220:19, 221:2, 221:4, 221:5
**trips** [1] - 208:6
**Trish** [2] - 7:17, 239:18
**truly** [1] - 101:10
**trust** [7] - 37:11, 104:21, 105:17, 175:20, 184:18, 238:2, 244:11
**truth** [1] - 107:21
**truthful** [1] - 87:17
**try** [6] - 7:7, 112:6, 126:5, 170:21, 171:1, 237:10
**trying** [16] - 37:8, 38:17, 39:23, 43:21, 70:2, 76:11, 159:8, 190:16, 202:5, 202:19, 210:15, 223:6, 223:22, 235:1, 241:16, 241:17
**Tuesday** [2] - 157:6, 157:18
**turn** [12] - 7:14, 7:17, 8:6, 26:8, 51:7, 77:15, 154:14, 154:17, 159:23, 212:4, 220:1, 220:7
**turned** [2] - 7:15, 63:18
**turning** [1] - 7:22
**turns** [3] - 70:12, 94:3, 200:9
**Tuwiner** [1] - 238:12
**twice** [4] - 16:24, 135:16, 184:2, 205:14
**twists** [1] - 200:9
**two** [41] - 12:12, 13:8, 27:18, 52:10, 52:11, 55:11, 60:25, 61:7, 88:18, 89:14, 95:10, 99:13, 119:9,

119:17, 136:24, 140:16, 141:1, 144:6, 147:10, 173:21, 173:24, 174:2, 174:16, 181:5, 181:23, 202:25, 210:18, 211:20, 211:23, 213:7, 221:8, 227:14, 227:17, 227:19, 227:20, 229:4, 242:2, 244:10
**two-and-a-half** [5] - 173:21, 173:24, 174:2, 174:16, 221:8
**type** [19] - 14:24, 21:7, 21:11, 27:8, 33:19, 34:22, 39:10, 39:20, 47:15, 47:16, 57:3, 96:1, 168:25, 223:10, 228:15, 233:18, 234:17, 236:7, 240:19
**typed** [1] - 234:15
**types** [11] - 104:5, 107:16, 110:8, 123:12, 139:5, 139:13, 155:21, 190:6, 190:17, 228:7, 228:8
**typical** [1] - 119:23
**typically** [5] - 21:15, 48:19, 139:5, 164:9, 209:20
**typing** [2] - 234:13, 234:14

## U

**U-shaped** [1] - 27:5, 32:18
**ultimate** [1] - 55:16
**ultimately** [1] - 196:12
**unattended** [1] - 227:2
**uncomfortable** [1] - 8:8
**uncommon** [1] - 96:23
**under** [11] - 6:25, 13:15, 51:25, 52:1, 52:25, 61:19, 62:18, 64:8, 92:18, 127:13, 206:4
**undergraduate** [1] - 100:10
**underneath** [2] - 70:8, 70:13
**understood** [1] - 122:1
**underwear** [1] - 44:25
**unfair** [1] - 212:17

**Uniformed** [1] - 57:14
**unique** [2] - 49:15, 111:11
**uniquely** [2] - 49:14, 132:22
**UNITED** [2] - 1:1, 1:12
**united** [1] - 3:13
**United** [1] - 57:14
**universities** [1] - 16:7
**University** [6] - 11:24, 11:25, 18:19, 18:20, 100:11
**university** [1] - 16:10
**unknown** [2] - 168:19, 169:15
**unsupervised** [1] - 165:19
**untoward** [1] - 169:12
**unusual** [1] - 47:7
**unverified** [2] - 185:8, 185:13
**unwanted** [1] - 233:14
**up** [88] - 9:17, 27:15, 32:19, 34:20, 36:19, 37:14, 38:14, 39:13, 48:23, 50:18, 52:4, 54:8, 54:12, 56:2, 57:4, 66:20, 70:1, 70:6, 70:16, 70:18, 88:16, 92:20, 99:11, 102:19, 103:1, 103:20, 104:9, 105:13, 110:8, 115:1, 115:10, 116:16, 122:17, 123:3, 123:20, 128:15, 130:6, 137:6, 141:4, 141:7, 143:18, 144:2, 144:24, 150:22, 152:6, 155:8, 155:11, 155:14, 155:24, 156:1, 156:8, 157:3, 168:2, 168:8, 175:24, 181:8, 186:3, 188:4, 193:12, 194:4, 194:18, 194:21, 198:23, 201:14, 203:12, 205:5, 208:5, 213:18, 213:25, 214:19, 214:21, 221:11, 223:12, 226:4, 226:6, 232:3, 232:21, 234:12, 234:15, 234:24, 235:7, 239:5, 239:9, 241:4, 244:1, 244:8, 244:13

## V

**VA** [3] - 3:7, 3:10, 3:14
**vagina** [2] - 28:9, 48:20
**vaginal** [8] - 24:16, 24:20, 25:12, 30:22, 31:25, 32:6, 32:8, 32:15
**valid** [1] - 19:14
**validate** [3] - 6:21, 7:1, 36:1
**validating** [1] - 26:6
**vandalism** [2] - 192:24, 193:25
**variant** [1] - 34:23
**variety** [1] - 228:12
**vary** [1] - 36:5
**varying** [1] - 43:4
**verbal** [2] - 236:8
**verbatim** [1] - 38:8
**verification** [1] - 239:10
**verified** [1] - 189:25
**version** [1] - 130:17
**versus** [5] - 20:9, 22:18, 42:2, 50:24, 246:7
**via** [1] - 19:4
**vibrate** [1] - 93:24
**victim** [1] - 228:8
**victim's** [1] - 67:10
**victims** [4] - 66:18, 96:16, 96:24, 97:19
**video** [9] - 19:4, 67:14, 115:21, 116:12, 116:23, 117:6, 117:7, 117:14, 166:15
**Video** [1] - 117:10
**view** [6] - 33:15, 34:2, 111:19, 173:4, 200:22, 207:18
**vigilant** [2] - 244:8,

**updates** [1] - 129:12
**upset** [1] - 243:24
**upstairs** [5] - 119:11, 142:8, 142:12, 142:25, 143:6
**urgent** [1] - 19:3
**urinary** [1] - 44:6
**URL** [1] - 93:14
**utilize** [2] - 34:19, 48:16
**utilized** [1] - 26:17
**utilizing** [2] - 47:23, 142:11
**utterance** [2] - 161:12, 161:14

276

244:13
**violence** [1] - 21:8
**Virginia** [8] - 12:6, 14:1, 14:7, 17:17, 21:23, 29:22, 42:9, 246:4
**VIRGINIA** [1] - 1:1
**visibility** [2] - 146:21, 150:19
**visible** [6] - 90:16, 105:2, 107:14, 120:6, 138:25, 146:24
**visit** [2] - 19:2, 46:9
**visiting** - 89:13
**visitor** [1] - 115:19
**visitors** [1] - 115:15
**visual** [3] - 24:24, 243:23, 244:5
**visualization** [5] - 31:15, 31:19, 46:14, 50:24, 51:2
**visualized** [1] - 32:6
**visually** [1] - 67:8
**vividly** [1] - 194:16
**vocab** [4] - 153:20, 154:10, 161:1, 162:5
**vocabulary** [1] - 154:9
**VOGEL** [1] - 1:14
**voice** [1] - 221:25
**voicemail** [5] - 73:17, 73:20, 74:2, 180:1, 180:17
**VOLUME** [1] - 1:8
**vulgar** [1] - 233:11
**vulnerable** [2] - 187:18, 188:6

## W

**wait** [1] - 9:14
**waiting** [2] - 215:9, 232:2
**walk** [9] - 21:3, 38:17, 43:7, 100:17, 113:3, 121:12, 123:7, 142:7, 217:24
**walked** [5] - 91:6, 91:9, 144:3, 197:5, 201:23
**walkers** [4] - 112:24, 113:1, 113:2, 113:15
**walking** [14] - 69:23, 91:7, 91:19, 112:8, 114:22, 115:10, 121:13, 121:22, 121:23, 122:20, 123:23, 142:5, 144:9, 172:6
**walks** [2] - 70:18,

70:22
**wall** [3] - 33:7, 90:20, 169:8
**WALTERS** [3] - 243:14, 243:18, 243:20
**Walters** [3] - 243:20, 243:22, 244:7
**wandering** [1] - 169:15
**wants** [1] - 242:5
**warning** [2] - 219:19, 219:21
**warranted** [1] - 25:17
**Washington** [6] - 1:16, 2:15, 2:18, 2:22, 3:2, 18:19
**watch** [1] - 220:24
**ways** [3] - 104:23, 144:1, 237:23
**weapon** [1] - 127:24
**Weaver** [4] - 205:18, 206:2, 206:9, 206:15
**Wednesday** [9] - 79:10, 79:12, 79:14, 79:17, 239:6, 241:9, 241:14, 241:20, 242:17
**week** [20] - 62:5, 65:15, 68:25, 76:25, 79:4, 85:14, 122:10, 122:24, 123:17, 137:14, 145:22, 146:8, 157:6, 157:8, 157:18, 174:1, 192:24, 197:16, 197:21, 197:23
**weekends** [1] - 108:4
**weeks** [11] - 42:13, 54:19, 60:25, 89:14, 181:22, 181:23, 185:4, 227:17, 227:19, 227:20
**West** [3] - 63:22, 89:24, 90:13
**Westberry** [1] - 7:1
**whatsoever** [1] - 194:8
**wheels** [1] - 25:8
**whereof** [1] - 246:15
**whole** [5] - 96:24, 119:12, 139:16, 200:2, 237:23
**wide** [1] - 47:12
**Wiehle** [1] - 3:9
**wigwams** [1] - 102:19
**willing** [1] - 24:11
**window** [3] - 118:20, 118:22, 150:11
**windows** [1] - 117:18

**winter** [4] - 148:17, 151:15, 151:18, 227:15
**wipe** [1] - 39:18
**witch** [1] - 103:4
**witness** [43] - 6:4, 6:10, 7:6, 9:21, 9:25, 11:11, 20:1, 20:4, 36:8, 36:12, 37:17, 49:21, 55:19, 55:24, 56:3, 71:14, 71:21, 90:23, 98:22, 98:23, 98:24, 99:1, 99:4, 99:5, 99:6, 99:16, 150:20, 150:21, 150:22, 162:13, 170:16, 170:17, 171:6, 179:18, 205:20, 225:2, 226:19, 230:6, 236:17, 237:14, 246:15
**WITNESS** [41] - 10:5, 40:20, 56:9, 72:8, 73:6, 75:21, 77:23, 79:10, 80:14, 81:1, 83:16, 90:25, 98:20, 99:22, 103:8, 106:3, 150:24, 151:9, 153:4, 153:24, 154:1, 154:4, 154:7, 154:9, 168:22, 176:3, 183:8, 188:2, 197:21, 202:7, 202:9, 202:13, 203:1, 203:5, 203:8, 213:12, 219:10, 223:1, 231:7, 231:10, 236:24
**Witness** [10] - 56:4, 98:21, 99:17, 143:22, 150:24, 166:10, 224:17, 225:6, 226:17, 237:1
**witnessed** [3] - 184:12, 236:2, 236:4
**witnesses** [14] - 99:19, 128:12, 184:11, 184:15, 198:19, 198:20, 198:21, 198:22, 200:5, 200:18, 238:11, 238:16, 239:6, 242:4
**WITNESSES** [1] - 4:1
**woman** [1] - 91:18
**won** [2] - 187:23, 187:25
**wondering** [1] - 7:13
**word** [6] - 38:7, 50:21,

162:22, 175:18, 178:16
**words** [10] - 31:17, 35:14, 161:19, 162:21, 187:5, 222:16, 231:19, 231:23, 240:3, 240:20
**wore** [1] - 136:12
**workdays** [1] - 157:8
**worker** [1] - 205:6
**works** [4] - 18:25, 204:24, 205:15, 206:18
**world** [1] - 34:21
**worried** [2] - 185:24, 187:8
**worries** [2] - 94:16, 159:10
**worry** [1] - 67:10
**worse** [1] - 70:22
**worth** [1] - 13:4
**Wright** [1] - 61:4
**write** [10] - 146:15, 217:25, 230:9, 230:13, 231:25, 234:20, 235:2, 235:4, 235:7
**writes** [1] - 52:20, 216:12
**writing** [3] - 157:20, 181:1, 181:3
**written** [8] - 26:20, 28:22, 31:24, 52:19, 128:22, 162:4, 162:7, 234:24
**wrote** [4] - 33:17, 158:17, 180:23, 231:6

## Y

**yard** [3] - 90:7, 90:11, 90:15
**year** [60] - 16:23, 16:24, 56:19, 58:10, 58:21, 59:4, 59:5, 59:9, 59:20, 61:20, 63:2, 100:14, 100:24, 101:16, 104:3, 108:25, 111:22, 112:25, 115:10, 118:24, 119:2, 119:7, 120:10, 121:25, 122:21, 122:23, 126:23, 127:6, 127:7, 129:11, 129:13, 130:21, 132:24, 133:25,

134:13, 135:4, 135:14, 135:16, 135:20, 136:5, 136:19, 138:16, 139:3, 148:17, 174:4, 176:8, 177:13, 207:11, 217:6, 217:10, 220:22, 221:8, 221:15, 225:24, 226:2, 227:6, 227:8, 229:15
**Years** [1] - 42:14
**years** [24] - 12:22, 13:8, 16:4, 17:2, 22:14, 42:15, 44:1, 57:20, 57:21, 58:14, 58:16, 62:10, 62:14, 100:21, 102:1, 102:16, 119:9, 175:17, 184:24, 225:24, 229:24, 234:19, 236:1, 236:4
**yesterday** [1] - 148:10
**yourself** [8] - 10:13, 13:7, 56:14, 72:1, 184:4, 184:10, 209:22, 216:4
**yup** [2] - 191:6, 213:1

## Z

**zero** [2] - 39:24, 158:2
**Zoll** [1] - 2:1
**zone** [1] - 75:9
**zoom** [8] - 43:19, 51:6, 51:8, 118:16, 119:1, 159:8, 226:13, 231:18
**Zuluaga** [3] - 160:2, 160:5, 160:21