1

```
1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2

3   B.R.,                          :
                                   :
4              Plaintiff,          :   Civil Action
                                   :   No. 1:19-cv-917
5          v.                      :
                                   :
6   F.C.S.B., et al.,              :   April 24, 2024
                                   :   9:23 a.m.
7                                  :
              Defendants.          :
8                                  :   VOLUME 23 - A.M./P.M.
    ........................... :      SESSIONS
9                                  :

10

11            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
12              UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Plaintiff:         Jonathan Fahey, Esq.
                                HOLTZMAN VOGEL BARAN TORCHINSKY
15                              & JOSEFIAK, PLLC
                                2300 N Street NW
16                              Suite 643a
                                Washington, DC 20037
17                              202-536-1702
                                Email: Jfahey@holtzmanvogel.com
18
                                Alison Anderson, Esq.
19                              BOIES SCHILLER FLEXNER, LLP
                                2029 Century Park East
20                              Suite 1520
                                Los Angeles, CA 90067
21                              213-995-5720
                                Email: Alanderson@bsfllp.com
22

23

24

25
     APPEARANCES:  (Cont.)
```

```
                                                                    2
 1
     For the Plaintiff:        Brittany Zoll, Esq.
 2                             BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
 3                             Suite 2800
                               Miami, FL 33131
 4                             610-804-1787
                               Email: Britzoll@gmail.com
 5
                               Andrew Brenner, Esq.
 6                             BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
 7                             Suite 2800
                               Miami, FL 33131
 8                             305-539-8400
                               Email: Abrenner@bsfllp.com
 9
                               Robert Keefe, Esq.
10                             BOIES SCHILLER FLEXNER, LLP
                               100 SE 2nd Street
11                             Suite 2800
                               Miami, FL 33131
12                             850-585-3414
                               Email: Rkeefe@bsfllp.com
13
     For Defendant F.C.S.B.:   Ryan Bates, Esq.
14                             HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Avenue, NW
15                             Washington, DC 20037
                               202-955-1596
16                             Email: Rbates@hunton.com

17                             Sona Rewari, Esq.
                               HUNTON ANDREWS KURTH, LLP
18                             2200 Pennsylvania Avenue, NW
                               Washington, DC 20037
19                             202-955-1974
                               Email: Srewari@huntonak.com
20
                               Scott W. Burton, Esq.
21                             HUNTON ANDREWS KURTH, LLP
                               2200 Pennsylvania Ave NW
22                             Washington, DC 20037
                               202-955-1664
23                             Email: Burtons@huntonak.com

24

25
     APPEARANCES:  (Cont.)     Kevin Elliker, Esq.
```

3

|   |   |   |
|---|---|---|
| 1 | For Defendant F.C.S.B.: | HUNTON ANDREWS KURTH, LLP |
| 2 | | 2200 Pennsylvania Avenue, NW |
| | | Washington, DC 20037 |
| | | 804-788-8200 |
| 3 | | Email: Kelliker@huntonak.com |

For the Defendants:
(S.T., A.F., P.A.H.,
T.B., B.H., M.P.F., M.C.,
F.T., J.F.)

**Michael E. Kinney, Esq.**
THE LAW OFFICE OF MICHAEL E.
KINNEY, PLC.
1801 Robert Fulton Drive
Suite 120
Reston, VA 20191
Email:  Mk@kinneyesq.com

For the Defendant J.O.:

**Bruce Blanchard, Esq.**
ODIN, FELDMAN & PITTLEMAN, PC.
1775 Wiehle Avenue
Suite 400
Reston, VA 20190
Email:  Bruce.blanchard@ofplaw.com

Official Court Reporter:

MS. TONIA M. HARRIS, RPR
United States District Court
401 Courthouse Square
Tenth Floor
Alexandria, VA 22314

4

TABLE OF CONTENTS

MISCELLANY

Preliminary matters.................................. 05
Motions............................................. 05
Jury Instructions................................... 29
Closing arguments by Mr. Brenner.................... 84
Closing arguments by Ms. Rewari..................... 124
Closing arguments by Mr. Kinney..................... 156
Closing arguments by Mr. Blanchard.................. 166
Rebuttal closing arguments by Mr. Brenner........... 172
Certificate of Court Reporter....................... 180

EXHIBITS

On behalf of the Defendants:

Admitted

Number 187.......................................... 28
Number 194A......................................... 28

After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

5

1          THE COURT:  Good morning.

2          What we will do now is go over the instructions that

3  are objected to.  I will make reference to the instruction.

4  If you could, for purposes of the Court's ability to sort of

5  manage the instructions, let me know from each party whether

6  you have any objections.  Please limit your discussion of the

7  instructions to no more than five minutes a piece.

8          The first one up is No. 31, 1983, Count 3, First

9  Amendment retaliations.

10          MR. KINNEY:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. KINNEY:  Michael Kinney for the record.

13  Respectfully, Your Honor, I believe that 31 is incomplete.  In

14  particular with respect to the but-for causation element of

15  the First Amendment retaliation claim.  Interestingly, Your

16  Honor, in the 12(b)(6) order, this was specifically noted by

17  the Court that this would be the plaintiff's burden to prove

18  at trial, and the Court cited *Nieves v. Bartlett*.  The defense

19  proposed Instruction No. 27 addresses that.  And I believe

20  that that needs to be included in the Court's No. 31.

21          THE COURT:  Mr. Keefe.

22          MR. KEEFE:  Yes, Your Honor.  I just think the

23  Fourth Circuit's 2023 published opinion the Court cited in its

24  instruction where the Fourth Circuit laid out the three

25  elements, that's the *Curtis* case.  It phrases the element as

B.R. v. F.C.S.B.

6

1  -- the causation element as there's a causal relationship

2  between protected activity and the Defendants' conduct, we

3  think that suffices.

4       THE COURT:  The Court is going to include that

5  language consistent with cases cited by both and will amend it

6  to reflect retaliatory animus and her subsequent injury.

7       The next one is -- the next one is missing

8  instruction FCSB No. 15 Title IX, school must exercise

9  substantial control.

10       MR. ELLIKER:  Yes.  Good morning, Your Honor.

11       THE COURT:  Good morning.

12       MR. ELLIKER:  Substantial control is an issue in

13  this case, as Your Honor knows, because there's conduct that's

14  been at issue over the last five weeks that happened both --

15  alleged to both happen on campus at Rachel Carson and off

16  campus.  And the Fourth Circuit and the Supreme Court have

17  emphasized both *Davis*, under the Supreme Court, and then

18  *Feminist Majority* from the Fourth Circuit emphasized the need

19  for the recipient to have substantial control over the context

20  in which the harassment occurs.  I think that's especially

21  important here, Your Honor, because, obviously, one of the

22  defendants in the case and the claims against her relates

23  solely to conduct that happened off campus.

24       And so, I believe this was one of the only

25  instructions that we had submitted with respect to an element.

—————————————————————— B.R. v. F.C.S.B. ——————————————————————

7

1              THE COURT:  A conduct that happens -- if there's

2    conduct that happens off campus which leads to conduct that

3    happens on campus, wouldn't that be something that's

4    compensable.

5              MR. ELLIKER:  If --

6              THE COURT:  For instance, if there was something

7    that happened off campus.  And let's use the allegations in

8    the context of this case.  The sexual offense happened off

9    campus, and because of the sexual offense that allegedly

10   happened off campus a student starts talking about that on

11   campus, allegedly subjecting the victim to enhancement and the

12   like.

13             Wouldn't that be something that could be considered?

14             MR. ELLIKER:  Certainly.  It's in the context in

15   terms of what the jury would be asked to consider what they

16   are on notice of and what they're being deliberately

17   indifferent to is being on notice of the conduct that happens

18   that's within their substantial control.

19             In other words, if it were solely an incident of off

20   campus conduct, and then there were no in-school effects, I

21   don't think there would be any argument that there's Title IX

22   liability that arises from that.

23             THE COURT:  Doesn't that analysis, though, or your

24   suggestion belie the alleged facts in this case?

25             MR. ELLIKER:  Well, and I'm not trying to argue

B.R. v. F.C.S.B.

8

1    against -- I'm not -- I'm not trying to make a jury argument;

2    I'm just saying as a matter of law it is -- it's clear that a

3    school can only be liable for its substantial control over

4    both the harasser and the context.  I think that's especially

5    important.  Let me look at my notes again, Your Honor.

6            *Feminist Majority*, as Your Honor knows, is a case

7    that's specifically about retaliatory harassment.

8            THE COURT:  And the principle from that case says,

9    "An educational institution can only be liable for

10   student-on-student sexual harassment" or however the

11   instruction -- excuse me -- an institution exercises

12   substantial control over both the harasser and the context in

13   which the known harassment occurs.

14           MR. ELLIKER:  Right.  And so, the clearest sort of

15   line from A to B from that case to this case, is, I think, it

16   would be argued to the jury, based on testimony from Mrs. R.

17   that the off campus assaults against the plaintiff were

18   retaliatory.  They were retaliatory assaults based on her

19   having gone to the school to make a complaint.  In fact, I

20   think that's actually what Ms. R. testified was that after

21   November 21st there were assaults that were because of that.

22           The question of whether the off campus retaliatory

23   harassment is something that the school can be deliberately

24   indifferent to calls out the question of what is their control

25   over what's happening off campus.

B.R. v. F.C.S.B.

9

1      THE COURT:  All right.  Mr. Keefe.

2      MR. ELLIKER:  And sorry, and also with the

3  cyberbullying, obviously, there is -- I totally understand

4  there can be in-school effects, but what the school is -- has

5  to be on notice of and has to respond to is what they have

6  control over in the school or control over in the -- even if

7  it's off campus whether they have control over what that

8  student is doing off campus.

9      THE COURT:  All right.  Thank you.  Mr. Keefe.

10      MR. KEEFE:  Your Honor, our briefs on the jury

11  instructions that was filed pretrial, there's both binding

12  Fourth Circuit law and cases from other circuits where

13  although you may snip accurately a statement of law from an

14  appellate decision, it doesn't mean it's helpful as a jury

15  instruction.  And I think in this case, it's clear that the

16  theory of the deliberate indifference claim is what's going on

17  at school and that injecting, although perhaps a correct

18  statement of law, quoting from the *Feminist Majority*

19  *Foundation,* would not assist the jury in resolving the issues

20  they need to in this case, which is whether the school is

21  deliberately indifferent to the sexual harassment of B█████

22  occurring on school grounds.

23      In terms of whether there's an argument or evidence

24  that the assaults that happened after the November 21st

25  meeting were retaliatory, that's not the theory of liability.

B.R. v. F.C.S.B.

10

1   The theory of the liability is the deliberate indifference to

2   the known on-campus sexual harassment led to --

3           THE COURT:  Doesn't the retaliation theory provide

4   you, essentially, a separate cause of action or a separate

5   theory of recovery?

6           MR. ELLIKER:  Yes.  If the school knows that

7   students are retaliating against B███ for reporting and are

8   deliberately indifferent to that, that is also a separate

9   theory of liability.

10          THE COURT:  Okay.  Thank you.  The Court is going to

11  stay within the confines of *Feminist Majority* and the *Davis*

12  case.

13          MR. BATES:  What we'll do is after we go over all

14  the instructions, I'm going to have to go through and make

15  them make sense.  And so, we'll let you know the order that

16  we're going to go in after we work through all of them.  Okay.

17          There's another one, I believe, there's an

18  agreement.  The School Board's proposed revision to Court's

19  Instruction 19, Title IX generally.  And it's striking the

20  conjunctive "and" in paragraph 3.

21          MR. ELLIKER:  No objection to that.

22          THE COURT:  Very good.  Thank you.

23          The School Board's suggested revision to the Court

24  Instruction 24, the actual notice, purpose of Title IX,

25  et cetera, in education, institution has actual notice,

B.R. v. F.C.S.B.

11

1   et cetera.

2           MR. ELLIKER:  Thank you, Your Honor.

3   With Instruction 24, the revisions suggested by the School

4   Board are aimed at avoiding the risk of conflating

5   constructive notice with actual notice.

6           THE COURT:  That's what Judge O'Grady got in trouble

7   last time.

8           MR. ELLIKER:  Yes.  I think that even in this --

9   luckily, we're not as far down that path -- I shouldn't say

10  "luckily."  This case doesn't present those same -- those same

11  facts.

12          THE COURT:  It is luckily.

13          MR. ELLIKER:  Luckily, for both you and for us, I

14  think.

15          But in that case, the focus was on sort of the

16  subjective versus objective knowledge for purposes of actual

17  notice.  I think here our concern, in looking through this, is

18  the terminology, talking about a substantial danger to a

19  student or talking about the possibility of sexual harassment,

20  suggests that, if the school is on notice of a particular risk

21  of a particular type of conduct.  I think that moves it

22  towards talking about a constructive notice regime.  And, of

23  course, you know, the Supreme Court emphasized in *Gebser*,

24  which is one of the foundational cases of this area of the law

25  with respect to the notice that's required -- has emphasized

B.R. v. F.C.S.B.

12

1    that damages under Title IX cannot lie unless the recipient

2    has actual knowledge of the discrimination.  And, so that's

3    why -- twofold, one was to simplify the instruction from that

4    first sentence just to go from straight from "or sees a report

5    or complaint that can objectively -- be objectively

6    construed," using that "objectively construed" solves the

7    problem that was confronted by Judge O'Grady in the *Doe* case.

8              And then adding at the end the explanation, which I

9    think is a direct quote from the *Gebser* case, that actual

10   notice does not include things the school did not know about,

11   even if they might have discovered those things through

12   further investigation.

13             THE COURT:  Mr. Keefe.

14             MR. KEEFE:  Your Honor, I think the Court's

15   instruction appropriately hues to how the Fourth Circuit

16   applied the -- or interpreted and instructed district courts

17   to apply the actual notice or actual knowledge standard.  The

18   Fourth Circuit had considered *Gebser* in its opinion.  I think

19   the Court's instruction appropriately instructs the jury on

20   the actual notice standard as articulated in *Doe* and that it

21   should stick with its current formulation.

22             THE COURT:  The Court notes that in both the *Doe*

23   case and the *Gebser* case, fortunately for us, it provides a

24   format for explaining this to the jury.  Particularly in the

25   *Doe* case, it notes that "actual notice" means "being alerted

B.R. v. F.C.S.B.

13

1    to the possibility of sexual harassment occurring such that a

2    report alleging sexual harassment is really sufficient to

3    establish it and holding that when a school official with

4    authority to address complaints of sexual harassment and to

5    institute correct measures receives a report that can

6    objectively be construed as alleging sexual harassment that

7    receipt establishes actual notice of such harassment for

8    Title IX purposes."

9           And also, the *Gebser* case talks about "damage remedy

10   will not lie under Title IX unless an official who, at a

11   minimum, has authority to address the alleged discrimination

12   and to institute corrective measures on the recipient's behalf

13   has actual notice of discrimination in the recipient's

14   programs and fails adequately to address" -- excuse me, "fails

15   adequately to respond."

16          The Court is going to restructure this particular

17   institution as follows:

18          For Title IX purposes, an educational institution

19   has actual knowledge, sometimes called actual notice, if an

20   appropriate person at the institution receives a report or

21   complaint that can be objectively construed as alleging in

22   sexual harassment.  Actual notice does not include things that

23   the school official did not know about, even if the school

24   official might have discovered those things through further

25   investigation.

B.R. v. F.C.S.B.

14

1    That's the way the instruction will read.

2         Okay.  Deliberate indifference.  I think there's

3    just some semantics that we're dealing with here.

4         MR. ELLIKER:  Thank you, Your Honor.  I agree that,

5    with respect to striking "and therefore," that's just a

6    semantic revision because what follows after "therefore" isn't

7    because of what comes before it.

8         With respect to the use of the phrase "half-hearted

9    investigation," I recognize that --

10        THE COURT:  That's not the best terminology, but it

11   apparently comes out of *Doe v. Fairfax County School Board*.

12        MR. ELLIKER:  Right.  Yes, and so the "half-hearted

13   investigation" is actually when Judge Nguyen quotes that, he's

14   quoting back to the *S.B. ex rel. A.L.* case.  The quote from

15   the *S.B.* case is "That is not to say, of course, that only a

16   complete failure to act can constitute deliberate indifference

17   or that any half-hearted investigation or remedial action will

18   suffice to shield the school from liability."

19        It's almost saying, you can't just do -- it's not as

20   though any half-hearted investigation.  I suppose using that

21   shorthand, is, even though it appears in The Federal Reporter,

22   "half-hearted" is -- I think it suggests that there is --

23        THE COURT:  It's not a very -- and, again, I'm not

24   wanting to criticize the Fourth Circuit.  They're my bosses --

25   but the bottom line is that that term has -- it's not a term

B.R. v. F.C.S.B.

15

1    that you can objectively weigh.  And I think the reason why

2    Judge Nguyen may have cited the term "half-hearted" is because

3    he was looking at the particular facts of that case.

4            MR. ELLIKER:  Yes.  I would agree with that, and I

5    think that, even to put a finer point on it, Judge,

6    Half-hearted is still something that requires an intentional

7    act by the school.  And now we're getting up against this

8    idea -- from *Davis*, we know that the school cannot stand idle.

9    And so, we're talking about half-hearted; just like you said,

10   it's asking the jury to put themselves into the head of the

11   administrators and determine how much of -- how much effort

12   were they really putting into -- or what was their subjective

13   point of view about the actions they were taking.

14           THE COURT:  I think, ultimately, though, that's the

15   decision that the fact finder is going to need to make

16   globally.  In other words, they are going to be charged with

17   assessing all of the circumstances of the case and making a

18   determination as to whether or not the School Board and the

19   individual teachers met their obligations pursuant to the

20   Title IX standard.

21           MR. ELLIKER:  Yes.  With respect to the parlance

22   that's used in the Court's opinions, the Supreme Court and the

23   Fourth Circuit's opinions, it's clear that negligence is not

24   sufficient.  So you can imagine a circumstance in which an

25   official, obviously, not in this case, but an official engages

B.R. v. F.C.S.B.

16

1   in something that they subjectively are not putting a lot of

2   effort into, but they're taking steps.  And they actually

3   believe -- they are not aware that what they have done is not

4   enough.

5           THE COURT:  Are there any cases out there that you

6   are aware of that actually define the term "half-hearted" in a

7   Title IX context?

8           MR. ELLIKER:  I'm not aware of any, Your Honor.

9           And the last thing I'll say is we've also requested

10  adding in remedial -- after "remedial actions" "that school

11  officials know leave student-on-student harassment unchecked."

12  Otherwise, if you just say, "on the other hand, remedial

13  actions that are not successful," that runs straight up

14  against what *Davis* says, which is, we're not holding the

15  schools to deliberate indifferent standards by showing that

16  what they did didn't actually work.

17          THE COURT:  Mr. Keefe.

18          MR. KEEFE:  Your Honor, if the Court is inclined to

19  change what it has currently as its proposed Instruction 26,

20  plaintiff would propose just having the first two sentences.

21  Defining "deliberate indifference" as "clearly unreasonable in

22  light of known circumstances" and stating that it's "A high

23  standard that requires more than a showing of mere

24  negligence," we think those two sentences suffice to leave the

25  jury able to determine, based on the facts of this case,

B.R. v. F.C.S.B.

17

1  whether FCSB was deliberately indifferent.  I don't think --

2  in terms of the second half of the instruction, if the Court

3  is going to take out "half-hearted investigation," then I

4  think we should also take out the parts about defining what is

5  "not deliberate indifference" and just leave it to the jury to

6  discuss.

7          THE COURT:  There is a -- this particular

8  instruction defines "deliberate indifference" at its very

9  start.  "'Deliberate difference' means that the school's

10  officials' response or lack of response to the alleged

11  harassment was clearly unreasonable in light of all of the

12  known circumstances."  That's how the instruction begins.

13          I think I'm going to agree with Mr. Keefe on this.

14  What I will do, Mr. Elliker, is this:  If the jury comes back

15  with a specific question delving into this, we might expand

16  the instruction that we give to the jury.

17          So the instruction will read:  "'Deliberate

18  indifference' means that the school officials' response or

19  lack of response to the alleged harassment was clearly

20  unreasonable in light of all of the known circumstances.

21  Deliberate indifference is a high standard that requires more

22  than a showing of mere negligence."

23          And if the jury has a question about this particular

24  instruction, the Court will take your argument under

25  advisement again.

1          I will say for the record, that the Court is a

2     little bit uncomfortable with these references to

3     "half-hearted investigations," because there's no definitive

4     language in any of the cases that the Court's been able to

5     review or either counsel has been able to review that really

6     help us as to how we can actually provide the jury some

7     direction as to what that means.  So we'll leave it at that

8     for now.

9          The next one is adverse action, Instruction No. 29.

10         MR. ELLIKER:  Your Honor, we request inserting the

11    word "intentional conduct" to make clear that it is an

12    intentional standard with respect to what's considered an

13    adverse action.

14         The objection and revisions to the latter part of

15    the instruction relate to the concept of retaliatory

16    harassment.  So I understand the *Feminist Majority Foundation*

17    decision written by Judge King talks about, essentially, that

18    it's another deliberate indifference in that it's essentially

19    deliberate indifference to retaliatory harassment.  And so,

20    therefore, that deliberate indifference analysis that the jury

21    will have already been instructed on with respect to Count 1

22    feeds into how they are supposed to analyze whether

23    harassment -- or whether retaliatory harassment is sufficient

24    to show the adverse action.

25         And so, those are quotes from Judge King's decision

B.R. v. F.C.S.B.

19

1   in the *Feminist Majority* case to just make clear that it's

2   essentially another deliberate indifference analysis.

3           THE COURT:  Does that particular decision make

4   reference to the term "intentional"?

5           MR. ELLIKER:  I don't have in front of me that it

6   does, Your Honor.

7           THE COURT:  Okay.

8           MR. ELLIKER:  But certainly with respect to the

9   deliberate indifference to retaliatory harassment that's

10  something that comes from the *Feminist Majority* decision.

11          THE COURT:  Mr. Keefe.

12          MR. KEEFE:  Your Honor, as to the insertion of the

13  word "intentional," it's our position that isn't based in the

14  case law and just overemphasizes or makes it seem like a

15  higher standard than it is.  And then in terms of adding,

16  again, this -- the --

17          THE COURT:  Well, just from my, I guess, law school

18  perspective when we go through the continuum of what you need

19  to do, is always this thing where it's negligence, gross

20  negligence, and intentional conduct.  And it seems to be, in

21  my view, as a continuum, with the intentional conduct being a

22  more specific reference.

23          In other words, this person had in their mind or

24  reasonably could conclude that what would happen would be the

25  natural consequences of their thoughts, gets you to an

B.R. v. F.C.S.B.

20

1    intentional conduct as opposed to the discussion throughout

2    all of the instructions which focus mostly on gross

3    negligence.

4              Would you agree?

5              MR. KEEFE:  Well, for the individual school

6    defendants.

7              THE COURT:  Yes.

8              MR. KEEFE:  But this is separate in the Title IX

9    context about retaliation.

10             THE COURT:  Okay.

11             MR. KEEFE:  I don't think the gross negligence

12   standard translates into the analysis of the School Board's

13   liability under Title IX.

14             THE COURT:  Okay.  What standard do you believe

15   applies under the retaliatory theory?

16             MR. KEEFE:  Well, I mean -- I guess, Your Honor,

17   I --

18             THE COURT:  You sort of split the difference for me,

19   so I was making sure that we're consistent.

20             MR. KEEFE:  No, but I -- I'm not -- I guess I --

21             THE COURT:  Mr. Brenner has got a smile on his face.

22             MR. BRENNER:  I was smiling to his reaction.

23             MR. KEEFE:  No, it's a good question.  I don't have

24   a good answer for you, but I don't know that -- I mean, I -- I

25   guess our -- the best I can come up with here on the spot is

B. R. v. F. C. S. B.

21

1    just that it seems to create a higher bar just like

2    recklessness, intentional towards gross negligence,

3    negligence.  I just don't know that we need to define it here.

4    The case law doesn't seem to impose any of those and

5    differentiate between those levels of conduct.  It's enough

6    that these school officials engaged in conduct.  That will be

7    enough to deter/dissuade.

8             As to the second part of this, the School Board's

9    proposed changes, I think the -- the jury would now be based

10   on the -- the Instruction 15 about exercising substantial

11   control.  This is now twice that the jury will be instructed

12   about whether the School Board exercised substantial control

13   over the student and the context, and I think this should be

14   either one or the other and not included twice.

15             (Counsel confers.)

16             MR. KEEFE:  Ms. Anderson helpfully reminded me.  It

17   is appropriate here in that this is the retaliation, but now

18   that we have it in the deliberate indifference instructions,

19   I'm actually -- I think it should be here and not the other,

20   if that makes sense.

21             THE COURT:  All right.

22             MR. ELLIKER:  Your Honor, if I may, I also --

23             THE COURT:  Yes.

24             MR. ELLIKER:  -- *Jackson v. Birmingham Board of*

25   *Education.*  It's a Supreme Court decision from 2005, 544 U.S.

B.R. v. F.C.S.B.

22

1    Reports 167 at page 168.  The quote is, "Retaliation is by

2    definition an intentional act."

3            THE COURT:  All right.  Thank you.  The way the

4    instruction will read is as follows:  An adverse action is

5    intentional conduct by a school that would be enough to deter

6    or dissuade a reasonable person from making a complaint of

7    sexual harassment.  Intimidating, threatening, coercing, or

8    discriminating against a person because she made a complaint

9    of sexual harassment or to keep her from making such a

10   complaint can be an adverse action.  Adverse actions could

11   also include so-called retaliatory harassment; that is, where

12   the school is deliberately indifferent to known acts of

13   student-on-student retaliatory harassment.

14           As with traditional student-on-student harassment, a

15   school can be liable for retaliatory harassment only if it's

16   exercised a substantial control over both the student engaged

17   in retaliatory harassment and the context in which the no --

18   in which he knew retaliatory harassment occurs.

19           MS. ANDERSON:  Your Honor, may I just for the 15,

20   the missing instruction.  I just actually have a --

21           THE COURT:  I'm sorry.  I didn't hear the first part

22   of what you said.

23           MS. ANDERSON:  For the missing instruction on this

24   same issue of having substantial control for retaliatory

25   harassment.  I do actually have a concern that that is --

—B. R. v. F.C.S.B.—

23

1  that -- that including what you include here makes sense, but

2  if we include a stand-alone student-on-student retaliation

3  near the first claim, the Title IX deliberate indifference

4  claim, we are conflating the two --

5            THE COURT:  Which instruction?

6            MS. ANDERSON:  So the FCSB's No. 15, Title IX,

7  "school must exercise substantial control."

8            THE COURT:  All right.  Let me see if I can dig that

9  one out.

10           MR. BRENNER:  Your Honor, may I be excused for one

11  moment?

12           THE COURT:  Sure.

13           (Discussion off the record.)

14           MS. ANDERSON:  The language in there makes it clear

15  that it's related to retaliatory harassment and not just the

16  deliberate indifference to sexual harassment.  And so, we

17  would argue that what you've included now with the retaliation

18  instruction makes sense, but then to strike this additional,

19  it's basically the same language, but --

20           THE COURT:  So basically what you're saying, if the

21  Court is inclined to modify Instruction 29, that there's no

22  longer any need for 15?

23           MS. ANDERSON:  Correct.  And I actually think it's a

24  little bit worse than that, because I think it will confuse

25  the jury that it may be part of the deliberate indifference

B.R. v. F.C.S.B.

24

1    claim versus just the retaliation claim.

2                THE COURT:  All right.  Mr. Elliker.

3                MR. ELLIKER:  Very briefly, Your Honor, and I'll

4    fall on the sword.  I think that the issue can be resolved by

5    an oversight on my part.  In the missing instruction document

6    that I provided to counsel and to your law clerk, FCSB's

7    No. 15 missing instruction, I think if you strike the word

8    "retaliatory" from the first line of what I've submitted, it

9    solves the problem.

10               The reason I know that solves the problem with

11   respect to binding case law, Your Honor, is because the -- the

12   *Feminist Majority Foundation* is about retaliatory harassment,

13   and it pulls that directly from *Davis*, which is just about

14   traditional student-on-student harassment.  So substantial

15   control is an element of both traditional student-on-student

16   harassment and retaliatory harassment.  The Supreme Court said

17   in *Davis* at page 645 of that decision, Because the harassment

18   must occur, quote, under, quote, the operations of, closed

19   quote, a funding recipient, the harassment must take place in

20   the context -- in a context subject to the District's control.

21               Ms. Anderson, does it satisfy you if in FCB --

22   FCSB's No. 15 we remove the term "retaliatory"?

23               MS. ANDERSON:  I think that would be fine, but then

24   it should probably not be repeated again in the later

25   instruction.  And I would also remove the "only where

B.R. v. F.C.S.B.

25

1   exercises substantial control," but just "where."  It should

2   just say, Harassment where it exercises substantial control.

3   And then over -- the "both" should be gone as well, because it

4   can be the harasser or where the harassment occurs.  Because

5   it just seems duplicative to have it --

6               THE COURT:  Okay.  I hear you.

7               MS. ANDERSON:  Yeah.  Okay.  Thank you, Your Honor.

8               THE COURT:  So you want to suggest that on No. 15,

9   if I'm inclined to give it, strike the conjunctive "and" and

10  put the disjunctive "or."

11              MS. ANDERSON:  Or just strike the word "both," I

12  think is -- and the "and" -- yes, so I think --

13              THE COURT:  Okay.  I'm okay with that.

14              MS. ANDERSON:  -- you have to strike the "both" and

15  the "ands."

16              THE COURT:  Okay.  I'm okay with that.

17              MR. ELLIKER:  Your Honor, I'm sorry.  I don't

18  mean -- I don't want to gum up the words.  That's a direct

19  quote from *Davis*.  Both these factors combine to limit a

20  recipient's damage to liability or circumstances wherein the

21  recipient exercises substantial control over both the harasser

22  and the context in which the known harassment occurs.

23              That's, again at page 645 of the Supreme Court's

24  *Davis* decision.

25              THE COURT:  What about the next, excuse me, the next

B.R. v. F.C.S.B.

26

1    language from *Davis* which says:  Explaining the recipient

2    retains substantial control over the context in which a

3    harassment occurs, when the harassment occurs during school

4    hours and on school grounds, or when the harasser is under the

5    school's disciplinary authority.  I would never criticize the

6    Supreme Court, but it seems that they -- maybe took us in a

7    bit of a circle.

8           MR. ELLIKER:  Well, Your Honor, if I'm looking at

9    the pincite -- if I'm looking at the footnote from the Court's

10   order, "or" is not in a quote.  So I don't know that -- and --

11   but I also have -- I can double check where the pincite falls

12   with respect to the *Feminist Majority Foundation*, but I'm just

13   looking right at the actual reporter -- the reported decision

14   from *Davis* that uses both "and" --

15          THE COURT:  What we're going to do on that, Counsel,

16   is this, I'm going to -- the Instruction 29 is going to read

17   as I originally stated.  I'm going to take a look at the case

18   law to make sure that this instruction is consistent.  As I

19   said, it seems to me that the Supreme Court may have said

20   "and" in one context and "or" in another context, and I don't

21   want to be in a position of guessing what they meant.  So let

22   me take a look at it.

23          MS. ANDERSON:  Thank you, Your Honor.

24          THE COURT:  The next one is School Board's proposed

25   revision to Court's Instruction 30 regarding damages.

B.R. v. F.C.S.B.

27

1      MR. ELLIKER:  Yes, Your Honor.  And for purposes of

2  the record, the School Board would like to make clear that it

3  want to preserve its objection to there being a jury question

4  regarding physical injury and the exclusion of the

5  contract-based language that was in the proposed

6  Instruction 23 that was, I think, from one of the contract

7  treatises about the amount of economic losses being

8  established with reasonable certainty.

9      With respect to the proposal that we have here, as

10  sort of our fall back, some of this is about just shifting

11  around the order in which the jury is being talked or --

12  instructed on the emotional distress issues.

13      The way that the Court's -- the Court's proposed

14  instruction reads puts the emotional distress instruction that

15  they cannot recover -- that the plaintiff cannot recover

16  damages for emotional harms after it's been instructed on

17  whether or not it can -- whether or not there's been

18  sufficient finding on the PTSD issues.

19      Under *Cummings*, and Court's summary judgment order,

20  there are already damages that have been determined to be --

21  that would be related to emotional distress.  There's been

22  evidence about some of those conditions at trial and those are

23  outside the bounds of what Title IX would allow.  And so, I

24  think making clear at the outset that the fighting ground on

25  PTSD is this question:  Is it an emotional harm or is it a

B.R. v. F.C.S.B.

28

1   physical condition, instructing the jury that if it's an

2   emotional harm, they can't award damages for it.  I think what

3   we're suggesting here is giving an instruction that makes

4   clear why it is that they are being asked to decide PTSD,

5   physical injury, or emotional harm.

6           And then, the next -- and then further down, again,

7   we have suggested or proposed that if you find -- if -- it is

8   for you to decide whether the plaintiff suffers from PTSD, and

9   then we request that the next question be:  Whether the

10  plaintiff has established that PTSD is a physical injury as

11  opposed to an emotional harm, because that, again, sets out

12  what it is that they are being asked to decide.

13          THE COURT:  You're not suggesting a special verdict

14  form in that regard, are you?

15          MR. ELLIKER:  No.  We are not requesting a special

16  verdict form in that regard.  But we are suggesting that this

17  question of PTSD, I think that's being presented to them, it's

18  important for them to understand that physical injury, as

19  opposed to what.  Because we sort of get into metaphysical

20  questions about physical and emotional and those kinds of

21  things and whether neurochemical changes should be considered

22  physical injuries, those kinds of things, as opposed to an

23  emotional harm.

24          THE COURT:  Didn't one of plaintiff's experts

25  suggest that unlike a broken leg or a broken arm or something

B.R. v. F.C.S.B.

29

1    like that, that you can see with certain devices -- and I'm

2    using a term of mine, not his, might be able to detect things

3    which would suggest a physical injury associated with PTSD?

4              MR. ELLIKER:  I think that that is a critically

5    disputed factual matter, or at least -- I should say this, on

6    our Rule 50 motion we put forward why we think that the facts

7    undisputedly show that PTSD is an emotional harm as opposed to

8    a physical injury.

9              THE COURT:  Plaintiff put on the opposite, and you

10   get into what we always see, a battle of the experts.

11             MR. ELLIKER:  I understand.  And I think that what

12   the jury is going to be asked to think about, with respect to

13   that battle of the experts is, is it really a physical injury

14   or is it an emotional harm, because the testimony from the

15   experts asked them to compare PTSD to things like depression

16   and anxiety, which we know from the Court's summary judgment

17   order are not compensable under Title IX.  And so, comparing

18   them to those things, I think helps the jury understand -- you

19   know, are we trying to say that this is like a physical injury

20   like a broken arm, or are we saying that these are no

21   different than these other mental health conditions which are

22   emotional harm issues.

23             I think we just want to make clear with the

24   instruction here that's being given that the jury understands

25   what they are being -- physical injury as opposed to what?

B.R. v. F.C.S.B.

30

1          THE COURT:  Doesn't that leave it to both you and

2   plaintiff's counsel to argue to the jury exactly what the

3   scope and significance of PTSD is, and whether or not one

4   expert should be believed over another expert, and basically

5   leaving it to the jury to decide what theory is most viable

6   based upon the facts in the case?

7          MR. ELLIKER:  I think that's absolutely right, Your

8   Honor.  And I submit that the objection and the revisions

9   we're proposing don't ask the Court to try to start to delve

10  into that.  I think it's just essentially setting what the

11  playing field is on this question.  Because, again, we know,

12  you know, the black letter law of *Cummings* is emotional

13  distress, not recoverable.

14         THE COURT:  And I don't think that's plaintiff's

15  position.

16         MR. ELLIKER:  Right.

17         THE COURT:  They disagree with the analysis in the

18  case, but that's not their position generally in this case.

19  Their focus is on PTSD.

20         MR. ELLIKER:  Right.  And I think that if we stand

21  up and we say, It's not a physical injury, it's emotional

22  distress, the plaintiff can say, Well, it doesn't matter if

23  it's emotional distress because it's chemical, it's

24  neurophysical, it's biology, and the human brain and all of

25  that stuff.

B.R. v. F.C.S.B.

31

1           But, again, I think that establishing that there is

2   particular conditions that, as a matter of law, the jury

3   cannot award damages for and saying what those are, which is,

4   again, a matter of what you already have decided on summary

5   judgment from *Cummings*, and then being able to -- I think that

6   this is just trying to set the context for what the PTSD

7   question they are facing is.

8           The last thing I'll say on the PTSD-related

9   instruction, Your Honor, is that the plaintiff's theory is not

10  that her PTSD, specifically, is a physical injury; it's that

11  all PTSD is a physical injury.

12          THE COURT:  Excuse me.  Ladies and gentlemen, if you

13  could take a seat, one way or the other.  Thank you.

14          MR. ELLIKER:  There's more people here now.

15          That her -- the instructions, as written by the

16  Court, says -- refers to "her PTSD."  But again, the theory

17  from the plaintiff is not that it's her PTSD specifically,

18  it's that all PTSD is the result -- is itself a physical

19  injury.  And so, those are the submissions we make with

20  respect to that instruction, Your Honor.

21          MR. BRENNER:  Your Honor, you had it exactly right,

22  which is Ms. Rewari, who I assume is doing the closing, can

23  certainly argue what it means to be a physical injury or not a

24  physical injury.  What the defense proposed instruction is it

25  introduces this concept, which is their argument of emotional

B.R. v. F.C.S.B.

32

1   harm, something that's never been discussed with the jury.  We

2   have no idea what they're talking about.  They may want to

3   describe it to them.

4          The question is, one of the threshold question,

5   which Your Honor's instruction includes, is whether PTSD is a

6   physical injury.  And as you pointed out in your Rule 50

7   order, there's conflicting evidence or at least there's

8   evidence from which the jury could not -- not credit what

9   Dr. Cisler said -- I think that's how you put it in your

10  order, because of how it described the word "injury."

11         So the defense proposed instruction is nothing more

12  than trying to cede their argument.  That's what it is.  They

13  are adding all these things about emotional harm or whatever.

14  They can make that argument, and we can make the opposite

15  argument, which we've made all along.

16         I would be remiss in telling you that their position

17  is ultimately going to be, that even with a physical injury

18  you don't get the normal damages that's associated with

19  physical injury.  I know that because I showed them my slides

20  of how I was going to present my closing.  Which, Your Honor,

21  at some point -- well, I would just ask Your Honor to go back

22  and look at the summary judgment order, to the extent, I'm

23  sure you know it very well.

24         THE COURT:  I wrote it.

25         MR. BRENNER:  We had this litigation.  The

B.R. v. F.C.S.B.

33

 1   litigation was over -- the defense position was, the defense

 2   position was TBI was a physical injury, PTSD was not.  They

 3   didn't contest damages on pain and suffering for TBI; they did

 4   contest it for PTSD.  Your Honor ruled at the summary judgment

 5   stage that there was conflicting evidence about whether PTSD

 6   was a physical injury.  The evidence came in, I think, pretty

 7   much what we thought it was going to come in on the PTSD to

 8   physical injury.  Our expert said what he was going to say,

 9   their expert --

10   (Simultaneously speaking between the Court and Mr. Brenner.)

11              MR. BRENNER:  -- what he was going to say.  And it's

12   an issue.  But I just want to preview for you their position

13   now is we want to go back to the summary judgment, and we want

14   to say, even if it's a physical injury, you don't get damages

15   for it.  You just get the cost of treatment, which is not what

16   Your Honor --

17              THE COURT:  That would make Title IX a nullity,

18   would it not?

19              MR. BRENNER:  Correct.

20              THE COURT:  Nothing.  There's no -- I guess, a cause

21   of action but no remedy, which doesn't make sense.

22              MR. BRENNER:  So I would say in the -- and

23   I understand why they have sort of seized this opportunity to

24   go back to your summary judgment, because in your order -- in

25   your proposed instruction on paragraph 2, just by way of

B.R. v. F.C.S.B.

34

1   example, you give examples on damages and you list economic

2   damages.  And I think their position is, well, therefore, you

3   can't get noneconomic damages.  We think that needs to be made

4   clear that examples of damages include the cost of treatment

5   and the pain and suffering associated with that treatment.

6   And that sentence is the last sentence of paragraph 2.  But I

7   just want to preview for Your Honor, because it's, I know that

8   they object to us asking for actual damages in this case, but

9   that's what plaintiffs do and that's what defendants argue

10  against.

11          THE COURT:  There you go.  The instruction will stay

12  in the form that the Court wrote it.  The next one.

13          MR. ELLIKER:  I think Mr. Brenner started to go into

14  another issue that is -- that informs a different dispute

15  that -- as he alluded to arose when he showed the School Board

16  copy of the slides that -- and the amount --

17          THE COURT:  Sir, if you could find a seat, that

18  would be appreciated.  Thank you.

19          (Discussion off the record.)

20          MR. ELLIKER:  With respect to what Mr. Brenner just

21  said, there was no objection lodged to the Court's instruction

22  that under Title IX, a plaintiff may recover only economic

23  losses for a -- for economic losses or physical injuries

24  measured by the monetary loss or damage actually sustained by

25  the plaintiff.  And that the examples of that given include,

B.R. v. F.C.S.B.

35

1    replacement education costs and the cost for treatment of

2    bodily injury.  I respectfully suggest, Your Honor, that this

3    is not -- that our proposal is not to render Title IX a

4    nullity, because if a student -- if a student incurs things

5    like the cost of replacement education or the cost of

6    tutoring, or there are physical injuries and there's medical

7    bills associated with those physical injuries, this all just

8    goes back to what the Supreme Court said in 2022 about the

9    nature of damages under -- in *Cummings* under the spending

10   clause statutes.

11           We are not attempting, Your Honor, to relitigate

12   what happened on summary judgment.  I would just make clear,

13   the School Board moved for summary judgment only as it

14   pertained to the emotional harm.  I don't think there was any

15   kind of finding as to whether or not there was physical injury

16   or as to -- so the -- so the question of pain and suffering

17   with respect to a physical injury was not decided.  I would

18   just submit, Your Honor, that pain and suffering, as

19   understood among lawyers, referring to any number that the

20   jury sees fit to impose, is not a contract remedy.

21           And so, that is why with the instruction that we are

22   not objecting to here, talking about what the examples are,

23   right, cost of treatment for bodily injury, if such bodily

24   injury was caused by the actions or inactions of the School

25   Board.  If the plaintiff convinces the jury that PTSD is a

B.R. v. F.C.S.B.

36

1    physical injury, and there are costs associated with the

2    treatment for that physical injury, that would fall within the

3    language of the instruction here.  Asking the jury to go

4    beyond that and say "it's up to you to come up with a

5    nonpecuniary figure to determine what you think her pain and

6    suffering might be," that's something that is not a contract

7    remedy, and that's why we don't have an objection to the way

8    that's written, and I understand the Court is going to stick

9    with that.  The reason this comes up is because we understand

10   that the plaintiff is going to ask for a substantial figure

11   that's not tethered to what the Court is going to instruct.

12              THE COURT:  Okay.  I understand your point.

13              The next one is Court Instruction 44, the special

14   verdict form.

15              MR. ELLIKER:  I think we have an agreement on this,

16   Your Honor.

17              THE COURT:  Okay.  Let me make sure that we have the

18   agreement that we think.  I'll read in what I have been led to

19   believe is the agreement; you tell me if it's wrong.

20              A special verdict form has been prepared for your

21   convenience.  You'll take this form to the jury room.  Then it

22   says read special verdict form.

23              The interrogatories or questions are organized by

24   defendant.  Each section begins with a question calling for

25   you to answer to who should prevail on the given claim.

B.R. v. F.C.S.B.

37

1          The answer to each question must be the unanimous

2   answer of the jury.  Your foreperson will indicate the

3   unanimous answer of the jury in the space provided for each

4   question.  If you find for the plaintiff on the claim, you

5   will then proceed to the subsequent question regarding damages

6   and provide the unanimous answer -- I guess that should be

7   from the jury, correct, do you agree on that?  It should be

8   "from the jury" as opposed "to the jury."

9          MR. ELLIKER:  Maybe "of" or "from," yes, Your Honor.

10          THE COURT:  You okay with that, Mr. Keefe?

11          MR. KEEFE:  Yes, Your Honor.

12          THE COURT:  All right.  If you find for the

13   defendant on a claim, you will skip the question regarding

14   damages and proceed to the next claim, parenthetical,

15   identifying instructions regarding order of answering and

16   explain the effect of answering no to any question.

17          After the foreperson has written the unanimous

18   answer of the jury with respect to each interrogatory or

19   question, your foreperson will sign and date the verdict form

20   and advise the marshal or bailiff that you are ready to return

21   to the courtroom.

22          Is that the agreement?

23          MR. KEEFE:  The plaintiff is okay with that

24   instruction, Your Honor.

25          MR. ELLIKER:  Thank you, Your Honor.

38

1          THE COURT:  All right.  Very good.  Thank you.

2    Maybe I'm just being a grammatician here, but I think we

3    should say "whom" as opposed to "who."  It says, Each section

4    begins with a question calling for you to answer to who should

5    prevail.  It should be "to whom"?

6          MR. KEEFE:  I defer to Mr. Elliker.

7          MR. KINNEY:  Your Honor, it should be "whom."

8          THE COURT:  Whom?

9          MR. KINNEY:  Yes.

10          THE COURT:  Very good.  My English teacher would be

11    proud of me for remembering that.  Okay.  So we'll make that

12    little change to "whom should prevail" and "answer of the

13    jury."

14          Okay.  Very good.  All right.  I think we only have

15    a couple more.  There's the suggestion on proposed

16    Instruction 1.

17          Now that you have heard the evidence -- and it's

18    sort of a tweak -- as to the traditional instructions that are

19    given in the Court.  Because I do instructions before argument

20    that we are taking out "and the argument."

21          Everyone fine with that?

22          MR. KEEFE:  Yes, Your Honor.  And also on the second

23    page of the printout, the paragraph started "with the

24    lawyers."

25          THE COURT:  May refer to?  That's fine.  Everyone

─────────── B.R. v. F.C.S.B. ───────────

39

1    agree?

2             MR. ELLIKER:  Yes, Your Honor.  No objection.

3             THE COURT:  Very good.  Thank you.

4             The next one is B.  "In this trial you have heard

5    that certain evidence is no longer available.  If you find

6    that any witness or any party, including any organization took

7    steps in order to make that evidence unavailable to another

8    party in this lawsuit, then you may conclude that the

9    information not preserved would have disclosed information

10   damaging to the party with whom that witness or party is

11   aligned."

12            Essentially, it's including a party, an organization

13   and their language to proposed Instruction 11.

14            Anyone have any objection to that?

15            MR. ELLIKER:  Yes, Your Honor.  We understand from

16   Friday the Court explained the spoliation instruction was

17   written neutrally.  We submit that using the phrase "including

18   any organization" is a little bit too suggestive.  I think

19   there's already an instruction that makes clear that the

20   Fairfax -- or part of the Court's instructions make clear that

21   the School Board is a party to the case.

22            It also is a little confusing if you say, "any

23   witness" or "any party," including any organization, talking

24   about an organization being a witness.  I think the Court can

25   maintain the neutrality of this instruction just by striking

—B. R. v. F.C.S.B.—

40

1    the phrase "including any organization."

2            I just don't think there's any confusion that the

3    School Board is a party to the case.

4            MR. KEEFE:  Your Honor, we just think it ensures

5    that the jury -- there's no confusion that it has to be a

6    human involved in that organization like the School Board can

7    be.

8            THE COURT:  Well, because of the unique posture of

9    this case where we have parties that are somewhat aligned and

10   somewhat not aligned, I think that it's clear that we need to

11   talk about witnesses and parties and not necessarily singling

12   out "organization."  I think that might just cause more

13   problems.

14           I think we also, though, should add as a disjunctive

15   that "witness" or "party" is aligned in this case.  That

16   should be added.  All right.

17           Very good.  The next one, proposed Instruction C.  I

18   think, basically, it's making lower case on School Board.

19           I don't think anybody has any problem with that, do

20   we.

21           MR. ELLIKER:  No objection, you're making School

22   Board lower case.  I think there's additional --

23           THE COURT:  There's a deliberately indifferent

24   language that's in this also.

25           MR. KEEFE:  We propose removing "idle" and replacing

─────── B.R. v. F.C.S.B. ───────

41

1    with "deliberately indifferent" just to maintain consistency

2    throughout the Title IX instructions.

3             THE COURT:  Let me ask Mr. Elliker a quick question.

4             Where does the term "idle" come from?

5             MR. ELLIKER:  "Idle" comes from *Davis*, Your Honor.

6             THE COURT:  Read me the context, if you could.

7             MR. ELLIKER:  It is at pages 640 through 41 of the

8    *Davis* decision.  "We disagree with respondent's assertion,

9    however, that petitioner seeks to hold the board liable for

10   G.F.'s actions instead of its own.  Here petitioner attempts

11   to hold the board liable for its own decision to remain idle

12   in the face of known student-on-student harassment in its

13   schools."

14            I also think, if you talk about the decision to

15   remain deliberately indifferent, it's sort of making a meta

16   intention suggestion.  I think deliberate indifference already

17   explains the -- if -- our position is that, as written, the

18   instruction is, it's fine with us.  If the Court is going to

19   strike out the word "idle," then I would say, only "for its

20   own deliberate indifference," but again, "idle" comes straight

21   from the Supreme Court decision.

22            THE COURT:  Mr. Keefe, why are we of a mind to

23   interject another term into the discussion?

24            The standard, and I think we all can agree on this

25   is deliberate indifference.  And "idle" might be a first

B.R. v. F.C.S.B.

42

1   cousin to "deliberate indifference," but why do we want to put

2   in that?

3           MR. KEEFE:  Your Honor, our position is we do not

4   want to interject --

5           THE COURT:  But you believe that the term

6   "deliberate indifference" should be in there?

7           MR. KEEFE:  I agree with Mr. Elliker that it should

8   be appropriately phrased if the Court is inclined to strike

9   "idle" "for its own deliberate indifference in the face."

10  Again, there's -- as the cases we cited in our memo on the

11  jury instructions, cherry-picking appellate court decisions

12  dealing with the factual -- the facts of these separate

13  cases -- and in that case, apparently, that was a plaintiff's

14  theory, "remaining idle" -- we should stick with the

15  deliberate indifference standard.

16          THE COURT:  Mr. Elliker, has there -- to your

17  knowledge -- and I know that you're really good on these kinds

18  of things -- has any court provided any definition to the term

19  "idle" other than the sort of passing reference in the case

20  that you cited?

21          MR. ELLIKER:  Your Honor, frankly, I think that the

22  direct answer to your question is, I'm not aware.

23          But -- excuse me.  What I would note is, this is not

24  citing -- citing a case from appellate court decision.  This

25  is the Supreme Court of the United States in the foundational

————B. R. v. F.C.S.B.————

43

1   case of this issue.  Moreover, I don't think -- this is the

2   instruction at the beginning of Title IX, talking about

3   generally -- this is what Title IX is about.

4           The known student-on-student harassment gets into

5   the deliberate indifference standard.  The jury is going to be

6   instructed after this instruction on what the elements of the

7   claim are and what they're being asked to decide.  I think

8   that using the language from Justice O'Connor's decision in

9   *Davis* to say, "This is what this is about generally," is an

10  appropriate way to do it because --

11          THE COURT:  Wouldn't you agree that, with all due

12  respect to Justice O'Connor, that Title IX has really

13  developed since Justice O'Connor made the reference to "idle."

14  There are things the Supreme Court decided after that which

15  have given us better instructions as to how to evaluate these

16  Title IX cases.  There's been some forward motion and back

17  motion with regard to Title IX, and sort of picking a case

18  from Justice O'Connor -- and I'm assuming that the case is

19  from either the '80s or the '90s.

20          MR. ELLIKER:  It's from 1999, Your Honor.

21          THE COURT:  Okay.  I would suggest to us that maybe,

22  if we just focus on the deliberate indifference standard in

23  the context of this as opposed to providing some language from

24  a 1999 case, which may or may not be as viable as it once was,

25  might be confusing to the jury.

B.R. v. F.C.S.B.

44

1          I will tell you this:  I'm going to go with

2    deliberate indifference there.  And that if the jury comes

3    back with a question, and I hope that they do not, as to what

4    types of things are deliberate indifference, maybe your

5    argument about the application of the term "idle" might carry

6    more weight.  I note your exception.

7          MR. ELLIKER:  Understand.  Thank you.

8          THE COURT:  Thank you.

9          So for purposes of everyone, "The school board is

10   liable under Title IX," lower case, "from its own misconduct

11   with respect to student-on-student sexual harassment.  A

12   school board," lower case, "is not liable for the actions of a

13   student who sexually harasses another, but a," lower case,

14   "school board is liable only for its own decisions to remain

15   deliberate indifference in the face of known

16   student-on-student harassment."

17         The next one is D.  I think there's a suggestion

18   that we should add a little bit more language on the end of

19   that one, and so it would say "meaning that it involves

20   unwanted sexual touching or sexual assault."

21         MR. ELLIKER:  There's no objection to that

22   submission, Your Honor.

23         THE COURT:  Very good.  Proposed Instruction 28

24   Title IX Count 2.  "Plaintiff B.R. was subjected to an

25   adverse" attributable action, excuse me, "an adverse action

45

1    attributable to the School Board at the time or after the

2    protective conduct took place."

3            MR. ELLIKER:  Your Honor, I think that actually is

4    just correcting an "it," that there was no word there

5    otherwise.  So we don't object to "it."

6            THE COURT:  How should this read?

7            MR. ELLIKER:  Exactly as it's written in the

8    plaintiff's proposal.  I think that the -- the Court's

9    instruction just skips -- it just goes "the protected took

10   place."

11           THE COURT:  Okay.  All right.  "Protected conduct

12   took place."  That's the way it will read.

13           I believe the last one is proposed Instruction F,

14   which I believe there's agreement to read with respect to the

15   adverse action.  "The challenged conduct must be conduct that

16   would likely deter a similarly situated person of ordinary

17   firmness from the exercise of First Amendment rights."

18           Bless you.

19           MR. KINNEY:  Your Honor, there is not an agreement

20   on my behalf.

21           THE COURT:  All right.

22           MR. KINNEY:  I object to this.  It seems to me that

23   the proposed addition is either unnecessary surplusage or it's

24   contrary to case law.

25           On the first issue, "a person of ordinary firmness"

───── B.R. v. F.C.S.B. ─────

46

1    is always and already similarly situated to persons of

2    ordinary firmness.  It's -- and perhaps better argument, Your

3    Honor, it's an objective standard.  And this comes right out

4    of the Fourth Circuit's decision in *Snoeyenbos v. Curtis*, that

5    was decided last year.

6            THE COURT:  What does "ordinary firmness" mean?  I'm

7    glad you made that face, because it's the same face everybody

8    is making.  What does that mean?

9            MR. KINNEY:  I take it at face value, Your Honor.

10   Someone who is managing his or her own responses in the

11   ordinary course of things.

12           THE COURT:  Sort of a hybrid reasonable man or

13   reasonable woman standard.

14           MR. KINNEY:  I believe so, specific to the context,

15   yes.

16           THE COURT:  Okay.  All right.

17           MR. KINNEY:  And quoting from *Snoeyenbos*, Your

18   Honor, at 60 Federal.4th 731.  The Court says, summarizing,

19   "In First Amendment retaliation claims, we ask, from an

20   objective standpoint, whether the challenged conduct would

21   likely deter a person of ordinary firmness from the exercise

22   of First Amendment rights.

23           "Inserting the concept of similar situation here

24   erodes the objective standpoint that the Court insists upon."

25           THE COURT:  Okay.  Mr. Keefe.

B.R. v. F.C.S.B.

47

1          MR. KEEFE:  Your Honor, the "similarly situated"

2   phraseology is actually -- it's in the Court's proposed

3   Instruction 31, Element 2.  And the test is whether the action

4   would deter a similarly situated person.

5          THE COURT:  So there's a specific reference to the

6   term "similarly situated" in another instruction.

7          MR. KEEFE:  Yes, Your Honor.  And so, it's

8   plaintiff's position that -- and this paragraph comes after

9   the elements that, again, the standard is not whether a person

10  of ordinary firmness who is an adult.  The test in this case

11  is whether a 12-year-old girl in similar circumstances would

12  be deterred from exercising her First Amendment rights.  And

13  so, it's plaintiff's position that, to remain consistent with

14  the elements of the claim, and that's Element 2 about a

15  similarly-situated person.

16         THE COURT:  Can you read that instruction for the

17  record.

18         MR. KEEFE:  Yes, Your Honor.

19         This is Element 2 in the Court's proposed

20  Instruction 31.  "That the individual defendant took some

21  action that adversely affected Plaintiff B.R. such that the

22  individual defendant's action would deter a similarly situated

23  person from engaging in similar reports."

24         And so, Your Honor, the question is not whether,

25  again, an adult of ordinary firmness; it is whether a

B.R. v. F.C.S.B.

48

 1  12-year-old girl in the circumstances of ordinary firmness.

 2  And so, inserting "similarly situated" there makes it

 3  consistent with the elements of the claim and also avoids

 4  confusion.

 5          THE COURT:  All right.

 6          Well, the term "similarly situated" is referenced

 7  specifically in an instruction, and I'm going to leave it to

 8  counsel to argue the specific facts of this case and make

 9  whatever reference they want to that they believe the evidence

10  support with regard to the term "ordinary firmness."

11          As I understand it -- uh-oh.

12          MS. ANDERSON:  Your Honor, if we just may, for the

13  record, note -- have you note and renew all our objections

14  regarding the jury instructions, all the way from our

15  beginning filings up until this point, and if you can just

16  note that for us, I'd appreciate it.  Thank you.

17          THE COURT:  I appreciate the way you said that.

18  Thirty-four days of Court making determinations, and you want

19  to protect the record on each one that I made there?

20          MS. ANDERSON:  Jury instructions.

21          THE COURT:  All right.  Very good.  And the same

22  thing on your side?

23          MR. ELLIKER:  Yes, Your Honor.

24          And, again, I think that with respect to the issue

25  that we referenced to the proposed opening from the plaintiff,

B.R. v. F.C.S.B.

49

1    I think that we may just be in preservation mode on this

2    issue, but we understand there's a slide from plaintiff's

3    proposed opening where they're going to ask for an

4    eight-figure damages amount with respect to the PTSD damages.

5         Again, I understand what the Court's decision on

6    that is.  We'd love to sway you otherwise here at the eleventh

7    hour, but I think we want to preserve that objection, but out

8    of courtesy to Mr. Brenner not to objecting in the middle of

9    his --

10        THE COURT:  That objection will be noted.  And I

11   appreciate your civility and professionalism with regard to

12   that, because I will say that it is typically of the Court's

13   view that after explaining to the jury that opening statements

14   and closing arguments are not evidence and the like, that they

15   are going to be expected to adhere to that instruction.

16        And, again, I think that the common courtesy and

17   civility would suggest that unless there is something that is

18   very, very important, that we stay out of objecting to the

19   other sides when they are making their closing arguments.

20        MR. ELLIKER:  Understood.  Thank you.

21        MR. BRENNER:  Your Honor, there's two other issues.

22   One, I wanted to remind Your Honor, I'm sure you do remember,

23   but we have one juror who needed to leave tomorrow.  So I

24   didn't know what Your Honor's intention with that was.

25        THE COURT:  What we're going to do is this, I'm

─────B.R. v. F.C.S.B.─────

50

1  going to go ahead and instruct them when they may come back.

2  All counsel and I have talked about the amount of time that

3  the Court expects for your arguments, closing arguments.  What

4  I'm likely to do, because we're going to start about 15 or 20

5  minutes later than 10 o'clock, is instruct and then let

6  everybody take a break for about 10 or 15 minutes so that you

7  can get yourself situated for your closing arguments, and then

8  we'll go into the closing arguments which will probably take

9  us pretty close to 12:30, 1, o'clock, based upon my assessment

10  of things.

11          MR. BRENNER:  I think, well, I think we'll probably

12  going to -- you mean we'll start at 12:30?

13          THE COURT:  No, no, no.  We're going to start at

14  about 10:30 with the instructions.

15          MR. BRENNER:  Right.  So that will take us to like

16  11:15, and then 11:30 we'll start.

17          THE COURT:  Thereabout.

18          MR. BRENNER:  Right.  Just so we have clear -- what

19  I understood the timing was going to be is the plaintiff had

20  an hour to divide between opening and closing and rebuttal.  I

21  mean, the first -- divide the total, including rebuttal.  The

22  School Board had 50 minutes and the other two, the individual

23  school defendants and J.O. had 30 minutes to divide between

24  them as they desired.

25          THE COURT:  And that Ms. Rewari can give some of her

B.R. v. F.C.S.B.

51

1   time to the others if she chooses to do so.

2           MR. BRENNER:  Betting against that one, but, yes,

3   that is correct.

4           And then what, Your Honor, I think told me back is

5   that, if I were -- I'm trying to save ten minutes for

6   rebuttal.  And Your Honor said if I ran a little over, you

7   would probably still give me the ten minutes, but if you did,

8   I would expect you would add that time to the defense side.

9           THE COURT:  As I said, I'm not of the mind to

10  restrict anybody in their ability to present their cases.

11  This is an important part of the case where we present closing

12  arguments, but we do have to set limits on everything.

13          MR. BRENNER:  Yeah.  I just wanted to let you know

14  that was my intention to go 50 and 10.  If I spill over a

15  little bit, then I assume an hour for defense.

16          THE COURT:  I --

17          MR. BRENNER:  So I guess that has us starting my

18  closing at about 11:30, that will take us until 12:20-ish.

19  And then we'll see where we are.

20          THE COURT:  See where we are.  And because we're

21  starting a little later, I probably may tell the jury that we

22  want to work with them on their lunch.  And it's been my

23  experience, I don't know if this jury is the same, but it's

24  been my experience that once the jury gets the case, they like

25  to eat lunch while they are deliberating.  That's been my

B.R. v. F.C.S.B.

52

1   experience.

2           MR. BRENNER:  Sure.

3           THE COURT:  All right.  So let's go ahead and take a

4   comfort -- I'm sorry, Ms. Rewari.

5           MS. REWARI:  Your Honor, we do have one housekeeping

6   matter.  You'll recall on Friday we moved in a list of

7   stipulated exhibits, and I understand from Mr. Burton that

8   there were two exhibits that were stipulated to, but somehow I

9   think were missed on the record.  And so, I believe there's a

10  stipulation.  We just want to make clear that Defendants'

11  Exhibit 187 and Defendants' Exhibit 194A should be part of the

12  stipulated set of exhibits.

13          THE COURT:  Counsel agree?

14          MR. KEEFE:  Yes, Your Honor, We agree.

15          THE COURT:  Ms. Armentrout, does the record reflect

16  that now?  Can we make sure?

17          (Discussion off the record.)

18          THE COURT:  All right.  We'll see everyone in at

19  about 10:30.

20          (Recess.)

21          (Court proceedings resumed at 10:39 a.m.)

22          THE COURT:  Ladies and gentlemen, before we bring

23  the jury in, we're getting to the start of the Court

24  instructing the jury of the law that will apply in this case,

25  and then the lawyers will have an opportunity after we take a

─B. R. v. F.C.S.B.─

53

1    short break to present their arguments.  The Court has no

2    problem with everyone coming in and listening to the

3    arguments, but as far as the expectation of all members of the

4    gallery, there should be no exhibitions, there should be no

5    responses, there should be nothing undermining the ability of

6    these lawyers to present their case to the jury.  If you feel

7    that you're unable to live to that standard, this is the time

8    to leave.  If you do not live to this standard, you will be

9    escorted out.

10          All right.

11          (Jury present.)

12          THE COURT:  You may be seated.

13          Good morning, ladies and gentlemen.

14          (Good morning responses.)

15          THE COURT:  Thank you once again for your service

16   and administration of justice.

17          Have all of you lived up to the Court's instruction

18   not to discuss the case or any aspect of the case with anyone,

19   and you've been able to stay away from social and print media

20   to the extent practicable.

21          Thank you.  And before I get started with the

22   instructions, I want to let you know, personally, in case I

23   don't get to say this to you directly, we appreciate the many

24   weeks that you've put into this trial.  You've been an

25   attentive group.  You've paid attention to the lawyers and let

─B. R. v. F.C.S.B.─

54

1  them have the opportunity to present their cases.  You were a

2  good jury.  And I'm very proud that we have good citizens like

3  you who are willing to come forward and serve in this very,

4  very important function by way of doing business in our

5  government.

6                    JURY INSTRUCTIONS

7          THE COURT:  Members of the jury, now that you've

8  heard the evidence, it is my duty to instruct you on the

9  applicable law.  It is your duty to follow the law as I will

10  state it.  You must apply the law to the facts as you find

11  them from the evidence in the case.  Do not single out one

12  instruction as stating the law, but consider the instructions

13  as a whole.  Do not be concerned about the wisdom of any rule

14  of law stated by me.  You must follow and apply the law.  The

15  lawyers may refer to some of the governing rules of law and

16  their arguments.  If there's any difference between the law

17  stated by the lawyers and these instructions, you must follow

18  my instructions.  Nothing I say in these instructions

19  indicates I have any opinion about the facts.  You, not I,

20  have the duty to determine the facts.

21          You must perform your duties as jurors without bias

22  or prejudice to any party.  The law does not permit you to be

23  controlled by sympathy, prejudice, or public opinion.  All

24  parties are expected that you will carefully and impartially

25  consider all the evidence, follow the law as it is now being

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

55

1    given to you, and reach a just verdict regardless of the

2    consequences.  You will be given a copy of these instructions

3    for your purposes when you deliberate.

4           The evidence in the case consists of the sworn

5    testimony of the witnesses.  Regardless of who called the

6    witness, all exhibits received in the evidence, regardless of

7    who may have produced then, and all facts and events that may

8    have been admitted or stipulated to, and all the facts and

9    events that may have been judicially noticed.

10          Statements and arguments by the lawyers are not

11   evidence.  The lawyers are not witnesses.  What they have said

12   in their opening statements and what they will likely say in

13   their closing arguments and at other times is intended to help

14   you understand the evidence, but it is not evidence.

15          However, when the lawyers on both sides stipulate or

16   agree of the existence of a fact, unless otherwise instructed,

17   you must accept the stipulation and regard that fact as

18   proved.

19          I may take judicial notice of certain facts or

20   events.  When I declare that I will take judicial notice of

21   some fact or event and unless otherwise instructed, you must

22   accept my declaration as evidence and regard as proved the

23   fact or event that has been judicially noticed.

24          Any evidence to which I have sustained an objection

25   and evidence I have ordered stricken, must be entirely

B.R. v. F.C.S.B.

56

1   disregarded.  You may use your notes taken by you during the

2   trial.  However, the notes should not be substituted for your

3   memory.  Remember, notes are not evidence.  If your memory

4   should differ from your notes, then you should rely on your

5   memory and not on your notes.

6           There's nothing particularly different in a way that

7   a juror should consider the evidence in a trial from that in

8   which any reasonable and careful person would deal with any

9   very important question that must be resolved by examining

10  fact, opinions, and evidence.  You're expected to use your

11  good sense in considering and evaluating the evidence in the

12  case.  Use the evidence only for the purpose for which it has

13  been received and give the evidence a reasonable and fair

14  construction in light of the common knowledge of the natural

15  tendencies and inclinations of human beings.

16          Generally speaking, there are two types of evidence

17  presented during a trial:  Direct evidence and circumstantial

18  evidence.  Direct evidence is the testimony of a person who

19  asserts or claims to have actual knowledge of a fact such as

20  an eyewitness.  Indirect or circumstantial evidence is proof

21  of a chain of facts and circumstances indicating the existence

22  or nonexistence of a fact.

23          The law generally makes no distinction between the

24  weight or value to be given to either direct or circumstantial

25  evidence.  A greater degree of certainty is not required of

B.R. v. F.C.S.B.

57

1  circumstantial evidence.  You're required find the facts in

2  accordance with the preponderance of all of the evidence in

3  this case both direct and circumstantial.  You are to consider

4  only the evidence in this case; however, you are not limited

5  to the statements of the witnesses.  You may draw from the

6  facts you have found to be proved such reasonable inferences

7  as seem justified in light of your experience.  Indifferences

8  or deductions or conclusions that reason and common sense lead

9  you to draw from facts established by the evidence in the

10  case.

11        The law permits me to comment on the evidence in the

12  case.  These comments are only an expression of my opinion to

13  the facts.  You may disregard my comments entirely since you

14  as the jurors are the sole judges of the facts and are not

15  bound by my comments or opinions.  If a lawyer asks a witness

16  a question concerning an assertion of fact, you may consider

17  the assertion as evidence of that fact.  The lawyers'

18  questions and statements are not evidence.  You should

19  consider and decide this case as a dispute between persons of

20  equal standing in the community, of equal worth, and holding

21  the same or similar situations in life -- excuse me, stations

22  in life.

23        An organization such as a School Board is entitled

24  to the same fair trial as a private individual.  All persons,

25  including School Boards and other organizations, stand equal

B.R. v. F.C.S.B.

58

1   before the law and are to be treated as equals.

2        Plaintiff has the burden to prove every essential

3   element of her claims by a preponderance of the evidence.  If

4   plaintiff should fail to establish any essential element of

5   one of her claims by a preponderance of the evidence, you

6   should find for the defendant or Defendants as to that claim.

7   Established by a preponderance of the evidence means evidence,

8   that as a whole, shows that the facts sought to be proved is

9   more provable than more probable than not.

10       In other words, a preponderance of the evidence

11  means such evidence as when considered and compared with the

12  evidence opposed to it has more convincing force and produces

13  in your mind a belief that what is sought to be proved is more

14  likely true than not true.  The standard does not require

15  proof to an absolute certainty since proof of an absolute

16  certainty is seldom possible in any case.

17       In determining whether any facts in issue has been

18  proved by a preponderance of the evidence, unless otherwise

19  instructed, you may consider the testimony of all witnesses

20  regardless of who may have called them, and all exhibits

21  received in evidence regardless who may have produced them.

22       When I instruct you that a party has a burden of

23  proof on any proposition or use the expression "if you find"

24  or "if you decide," I mean that you must be persuaded

25  considering all the evidence in the case that the proposition

B.R. v. F.C.S.B.

59

1  is probably [sic] true than not.

2          In this trial, you've heard that certain evidence is

3  no longer available.  If you find that any witness or any

4  party took steps in order to make that evidence unavailable to

5  another party in this lawsuit, then you may conclude that the

6  information not preserved would have disclosed the information

7  damaging to the party with whom that witness or party is

8  aligned in this case.  The law does not require any party to

9  call, as witnesses, all persons who may have been present at

10 any time or place involved in the case or whom may appear to

11 have some knowledge of matters in issue at this trial.  Nor

12 does the law require any party to produce as exhibits all

13 papers and things mentioned in the evidence in the case.

14          The rules of evidence ordinarily do not permit

15 witnesses to testify as to opinions or conclusions.  There's

16 an exception to this rule for expert witnesses.  An expert

17 witness is a person who by education and experience has become

18 expert in some art, science, profession or calling.  Expert

19 witnesses give their opinions as to matters in which they

20 profess to be expert and may also state their reasons for

21 their opinions.  You should consider each expert opinion

22 received in this case and give it such weight as you think it

23 deserves.

24          If you decide the opinion of an expert witness is

25 not based upon sufficient education and experience, or if you

B.R. v. F.C.S.B.

60

1   conclude that the reason given in support of the opinion are

2   not sound, or if you feel the expert opinion is outweighed by

3   other evidence, you may disregard the opinion entirely.

4          You are the sole judges of the credibility of the

5   witnesses and the weight of their testimony it deserves.  You

6   may be guided by the appearance and kind of a witness or by

7   the manner in which a witness testifies or by the character of

8   the testimony given or by the evidence contrary to the

9   testimony.  You should carefully examine all the testimony

10  given, the circumstances under which witness has testified,

11  and every matter in evidence tending to show whether a witness

12  is worthy of belief.  Consider each witness's intelligence,

13  motive, and state of mind, and demeanor or manner while

14  testifying.  Consider the witness's ability to observe the

15  matters as to which the witness has testified and whether the

16  witness impresses you as having an accurate recollection of

17  these matters.

18         Also, consider any relation each witness may have

19  had with either side of the case, the manner in which each

20  witness might have been affected by the verdict, and the

21  extent to which the testimony of each witness is either

22  supported or contradicted by other evidence in the case.

23         Inconsistencies or discrepancies in the testimony of

24  a witness, or between the testimony of different witnesses,

25  may or may not cause you to discredit such testimony.  Two or

B.R. v. F.C.S.B.

61

1  more persons seeing an event may see or hear it differently.

2  In weighing the effect of a discrepancy, always consider

3  whether it pertains to a matter of importance or unimportant

4  detail and whether the discrepancy results from innocent error

5  or intentional falsehood.

6      After making your own judgment, you will give the

7  testimony of each witness such weight, if any, that you may

8  think it deserves.  In short, you may accept or reject the

9  testimony of any witness in whole or in part.

10      In addition, the weight of the evidence is not

11  necessarily determined by the number of witnesses testifying

12  to the existence or nonexistence of any fact.  You may find

13  that the testimony of a small number of witnesses as to any

14  fact is more credible than the testimony of a larger number of

15  witnesses to the contrary.

16      A witness may be discredited or impeached by

17  contradictory evidence or by evidence that at some other time

18  the witness has said or done something or has failed to say or

19  do something that is inconsistent with the witness's present

20  testimony.  If you believe any witness has been impeached and

21  thus discredited, you may give the testimony of that witness

22  such credibility, if any, you think it deserves.

23      You should also ask yourself whether there was

24  evidence that a witness testified falsely about an important

25  fact or an unimportant detail, and whether it was because of

B.R. v. F.C.S.B.

62

1  an innocent lapse in memory or intentional deception.  And ask

2  whether there was evidence if at some other time a witness

3  said or did something or didn't say or do something that was

4  different from the testimony the witness gave during this

5  trial.  If a witness has shown knowingly, to have testified

6  falsely about any material matter, you have a right to

7  distrust such witnesses of the testimony, and you may reject

8  all the testimony of that witness or give it such credibility

9  as you think it may deserve.  An act or omission is knowingly

10  done.  If the act is done voluntarily and intentionally and

11  not because of mistake or accident or other innocent reason.

12          Evidence that at some other time, while under oath,

13  a witness who is not a party to this action has said or done

14  something inconsistent with the witness's testimony at the

15  trial, may be considered for the sole purpose of judging the

16  credibility of the witness.

17          A prior inconsistent statement of a nonparty witness

18  may also be considered as evidence of the truth of the fact or

19  facts so admitted by the witness if such statement was made

20  while the witness was under oath, for example, during a

21  deposition.  Where the witness is a party to the case and by

22  such statement or other conduct admits some fact or facts

23  against a witness's interest then such statement or conduct --

24  other conduct if knowingly made or done may be considered as

25  evidence of the truth of the fact or facts so admitted by such

B.R. v. F.C.S.B.

63

1    party, as well as for the purpose of judging the credibility

2    of the witness of the party as a witness.

3            Although there is more than one defendant in this

4    action, it does not follow from the fact alone that if one

5    defendant is liable to the plaintiff, all defendants are

6    liable.  Each defendant is entitled to a fair consideration of

7    the evidence.  No defendant is to be prejudiced should you

8    find against one or more of the others.  Unless otherwise

9    stated, all instructions I give you govern the case as to each

10   defendant.  Any verdict must represent the considered judgment

11   of each of you.  You must give separate consideration to each

12   claim and each party in this case.  In considering a claim

13   against a Defendant, you must not consider evidence admitted

14   against one or more of the other Defendants, only -- or only

15   as to other claims.

16           Each party is entitled to have the case decided

17   solely on the evidence that applies to that party.

18           Some of the evidence in this case is limited under

19   the rules of evidence to one of the parties and cannot be

20   considered against the others.  When evidence was admitted

21   with respect to only one party, I informed you and now remind

22   you that such evidence can only be considered for the purpose

23   for which it was admitted.

24           The next set of instructions set forth Plaintiff

25   B.R.'s claim against Fairfax County School Board and the law

B.R. v. F.C.S.B.

64

1    applicable to those claims.  Plaintiff B.R. has brought this

2    lawsuit against Defendants', Fairfax County School Board,

3    under a federal statute called Title IX.  Title IX provides

4    that no person in the United States on the basis of sex be

5    excluded from participation in and be denied the benefits of

6    or be subjected to discrimination under any education program

7    or activity receiving federal assistance.  The Fairfax County

8    School Board receives federal financial assistance and is

9    therefore subject to Title IX.  The Fairfax County School

10   Board is the proper defendant in this case.  The Fairfax

11   County School Board is a different government entity from

12   Fairfax County and is not affiliated with the Fairfax County

13   Board of Supervisors or the Fairfax County Police Department.

14          Specifically, B.R. claims that the School Board

15   violated Title IX by discriminating against her on the basis

16   of sex by failing to appropriately respond to her complaints

17   of sexual harassment and sexual assault.  The School Board

18   denies each of Plaintiff's allegation.  Plaintiff must prove

19   each of her claims by a preponderance of the evidence.

20          The parties used pseudonyms for the plaintiff, the

21   individual teachers, and administrators, and other former

22   students involved in this case.  In your consideration of the

23   claims and evidence of this case, you should not assign any

24   relevance to the use of pseudonyms or to the fact that the

25   parties agreed to use pseudonyms.

B.R. v. F.C.S.B.

65

1          To establish a Title IX claim, Plaintiff B.R. must

2     establish by a preponderance of the evidence that:  One, she

3     suffered sexual harassment that was so severe, pervasive, and

4     objectively offensive that it deprived her of equal access to

5     the educational opportunities or benefits provided by her

6     school;

7          Two, that the School Board, through an official who

8     has authority to address the alleged harassment and to

9     institute corrective actions, had knowledge or notice of the

10    alleged harassments;

11         And three, the School Board acted with deliberate

12    indifference to the alleged harassment.

13         A School Board is liable under Title IX only for its

14    own misconduct.  With respect to student on STOOUNT sexual

15    harassment, a School Board is not liable for the actions of a

16    student who sexually harasses another student, but a School

17    Board is liable only for its own decision for its own

18    deliberate indifference in the face of known

19    student-on-student harassment.

20         In order to be actionable as sexual harassment,

21    conduct must be unwelcomed.  Conduct is unwelcomed if the

22    student did not request or invite it and regarded the conduct

23    as undesirable and offensive.  Sexual harassment can be

24    verbal -- meaning it involves sex-specific language aimed to

25    humiliate, ridicule, or intimidate -- or physical -- meaning

─B.R. v. F.C.S.B.─

66

1    that it involves unwanted sexual touching or sexual assault.

2            A victim of sexual harassment can be said to be

3    deprived of equal access to educational opportunities of

4    benefit if the harassment:

5            One, results in the physical exclusion of the victim

6    from an educational program or activity;

7            Two, so undermines and detracts from the victim's

8    educational experience as to effectively deny her equal access

9    to an institutions resources and opportunities;

10           Or three, has a concrete, negative effect on the

11   victim's ability to participate in an educational program or

12   activity.

13           For Title IX purposes, an educational institution

14   has actual knowledge, sometimes called "actual notice," if an

15   appropriate person at the institution receives a report or a

16   complaint that can be objectively construed as alleging sexual

17   harassment.  Actual notice does not include things that the

18   school officials did not know about, even if the school

19   official might have discovered those things through further

20   investigation.

21           An appropriate person for Title IX is a person with

22   authority to address complaints of sexual harassment or to

23   institute corrective measures.  Various school officials may

24   be appropriate persons depending on their power to take

25   corrective action and to address harassment and institute

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

B.R. v. F.C.S.B.

67

1    corrective measures.

2            A School Board can be liable for student-on-student

3    harassment when it exercises substantial control over the

4    harasser or the context in which the known harassment occurs.

5    Substantial control can be shown by proving the School Board

6    has control over the physical location where the harassment

7    takes place or that the School Board has disciplinary

8    authority over the harasser in the setting where the

9    harassment takes place.

10           Deliberate indifference means that the school

11   officials' response or lack of response of the alleged

12   harassment was clearly unreasonable in light of all the known

13   circumstances.  Deliberate indifference is a high standard

14   that requires more than showing of mere negligence.

15           A failure to adopt sexual harassment policies or to

16   follow administrative guidelines or internal sexual harassment

17   policies does not alone establish deliberate indifference.

18   You are to evaluate evidence of deliberate indifference by

19   looking at the totality of the circumstances.

20           Plaintiff B.R. also claims that the School Board

21   retaliated against her under Title IX.  The School Board is

22   liable for Plaintiff's claims of retaliation under Title IX if

23   plaintiff proves by a preponderance of the evidence that:

24           One, Plaintiff B.R. engaged in conduct protected by

25   Title IX by reporting any sexual harassment, sexual assault,

B.R. v. F.C.S.B.

68

1   sexual batteries, or sexual abuse against her;

2           Two, Plaintiff B.R. was subjected to an adverse

3   action attributable to the School Board at the time or after

4   the protective conduct took place;

5           And three, the School Board took an adverse action

6   against Plaintiff B.R. because of her protected conduct.

7           An adverse action is intentional conduct by a school

8   that would be enough to deter or dissuade a reasonable person

9   from making a complaint of sexual harassment.  Intimidating,

10  threatening, coercing, or discriminating against a person

11  because she made a compliant of sexual harassment or to keep

12  her from making such a complaint can be an adverse action.

13          Adverse actions can also include so-called

14  retaliatory harassment, that is where the school is

15  deliberately indifferent to known acts of student-on-student

16  retaliatory harassment.

17          As with traditional student-on-student harassment, a

18  school can be liable for retaliatory harassment only if it

19  exercises substantial control over the student engaged in

20  retaliatory harassment or the context in which the known

21  retaliatory harassment occurred.

22          Need a break.

23          If you find in favor of Plaintiff B.R. that the

24  School Board violated Title IX, then you must determine the

25  amount of money that will fairly compensate B.R. for any

B.R. v. F.C.S.B.

69

1   damages that you find were proximately caused by the School

2   Board.  An injury or damage is proximately caused by an act or

3   failure to act where the injury or damage was either a direct

4   result of a reasonable, probable consequence of the act or

5   omission.  Thus, you may award damages for injuries that B.R.

6   proves were caused by the School Board's allegedly wrongful

7   conduct.  The damages that you award must be fair

8   compensation, no more and no less.

9          Under Title IX, a plaintiff may recover only for

10  economic loss or physical injuries which are measured by

11  monetary losses or damages actually sustained by the

12  plaintiff.  Examples of such damages may include the cost of

13  replacement education or cost of treatment for bodily injury

14  if such bodily injury as caused by the plaintiff or inactions

15  of the School Board.

16         You have heard evidence regarding the plaintiff has

17  properly been diagnosed with posttraumatic stress disorder,

18  PTSD.  It is for you to decide whether the plaintiff suffers

19  from PTSD and if so whether the alleged diagnosis is

20  attributable to the actions or inactions of the School Board

21  and whether plaintiff has established that her PTSD qualifies

22  as a physical injury.  Unless plaintiff has established by the

23  preponderance of the evidence that she suffers from PTSD and

24  that her PTSD is a result of a physical injury, plaintiff may

25  not recover for any of the symptoms of her alleged PTSD and

B.R. v. F.C.S.B.

70

1   plaintiff may not otherwise recover against the School Board

2   for any emotional harms or injuries or the treatments

3   associated with such conditions.

4          In determining the amount of any damages that you

5   decide to award, you should be guided by common sense.  You

6   must use your sound judgment in fixing an award of damages,

7   drawing reasonable inferences from the facts in evidence.  You

8   may not award damages based upon sympathy, speculation, or

9   guesswork.

10          On the other hand, the law does not require that

11  B.R. prove the amount of her losses with mathematical

12  precision, but only with such definiteness as accuracy and

13  circumstances permit.

14          If you find in favor of plaintiff against the School

15  Board but you find her damages have no monetary value, then

16  you must return a verdict for plaintiff in a nominal or small

17  value.

18          B.R. also claims that the school administrators

19  S█████ T█████, A█████ F████████, P█████ H██████ each retaliated

20  against her because of her exercise of her rights under the

21  First Amendment of the United States Constitution and 42

22  U.S.C. 1983 by reporting sexual harassment.

23          A student's right to report sexual harassment is

24  protected by the First Amendment.  To succeed on this claim,

25  Plaintiff B.R. must prove by a preponderance of the evidence

B.R. v. F.C.S.B.

71

1   that each of S.T., A.F., and P.A.H.:

2          One, Plaintiff B.R. engaged in protective activity

3   by making statements and reports of sexual harassment, sexual

4   abuse, and sexual violence;

5          Two, that the individual defendants took some action

6   that adversely affected Plaintiff B.R. such that the

7   individual defendants' action would deter a similarly situated

8   person from engaging in similar reports;

9          And three, there was a causal connection -- excuse

10  me, a causal relationship between her protective activity and

11  the individual defendants' conduct.

12         The parties have agreed that S.T., A.F., and P.A.H.

13  acted under cover of law so you should accept that fact as

14  proven.

15         To prevail on the First Amendment claim, retaliation

16  claim, plaintiff must prove by a preponderance of the evidence

17  a causal connection between the Defendants' retaliatory animus

18  and her subsequent injury.  That is she must show that the

19  defendants' retaliatory motive was the but-for cause of the

20  adverse action she suffered, meaning that the adverse action

21  would not have been taken absent the retaliatory motive.

22         With respect to the adverse action the challenged

23  conduct must be conduct that would likely deter a person of

24  ordinary firmness from the exercise of First Amendment rights.

25  The conduct must prove more than a de minimis inconvenience,

B.R. v. F.C.S.B.

72

1   and hurt feelings are not themselves a constitutional

2   violation.  Moreover, with respect to an adverse action in the

3   context of a First Amendment claim, as opposed to the prior

4   instructions that I gave you with respect to Title IX,

5   inaction is not enough.

6          If you find that plaintiff -- Plaintiff B.R. has

7   proved each of the elements as discussed above, then you must

8   decide the issue of B.R.'s damages resulting from the alleged

9   First Amendment violation.  However, if you find that

10  Plaintiff B.R. did not prove each of the facts that she must

11  prove for any defendant or for the three individual

12  defendants, then you must find for the defendant or those

13  defendants.

14         If you find that Plaintiff B.R. has proved by a

15  preponderance of the evidence that the defendant S.T., A.F.,

16  or P.A.H. violated B.R.'s First Amendment rights, then you

17  must determine the amount of money that would fairly

18  compensate Plaintiff B.R. for any injury that you find she

19  sustained or is reasonably certain to sustain in the future as

20  a result of that individual's defendant's violation of her

21  First Amendment rights.

22         You must make this calculation separately as to each

23  defendant that you found liable to plaintiff.  Plaintiff B.R.

24  must prove the amount of damages she is entitled to by a

25  preponderance of the evidence.  Your award must be based on

B.R. v. F.C.S.B.

73

1   the evidence and no speculation or guesswork and you must not

2   award any damages under this instruction by way of punishment

3   or sympathy.  This does not mean, however, that compensatory

4   damages are restricted to the actual loss of money.  They

5   include both the physical and mental aspects of an injury even

6   if they are not easy to measure.  Plaintiff B.R. does not need

7   to introduce evidence of a monetary value for intangible

8   things like physical or emotional pain.  You must determine

9   what amounts would fairly compensate her for those claims.

10          You should consider the following elements of

11   damages:  One, the physical pain and emotional suffering

12   including mental and emotional distress that the Plaintiff

13   B.R. may have experienced or is reasonably certain to

14   experience in the future, the nature and extent of the

15   injuries, whether the injuries are temporary or permanent;

16          Two, the reasonable value of the medical care and

17   supplies reasonably needed and actually provided to plaintiff

18   and reasonably certain to be needed and provided in the

19   future;

20          Three, the wages, salary, and reasonable value of

21   the working time plaintiff may have lost and the reasonable

22   value of the earning capacity that plaintiff is reasonably

23   certain to lose in the future because of any inability to

24   work.

25          If you find in favor of Plaintiff B.R. or her First

B.R. v. F.C.S.B.

74

1    Amendment claim against one or more of the defendants, but you

2    find that her damages against that defendant have no monetary

3    value, then you must return a verdict for Plaintiff B.R. in a

4    nominal or small amount.

5           Plaintiff B.R. claims that the defendant teachers

6    M███ C███, F████ T██████, M█████ P██████ F███████; the

7    Defendants' guidance counselors B█████ H███████, J█████

8    F█████████; and the Defendants' administrators S████ T████,

9    A█████ F██████, P██████ H█████, and T█████ B█████ were grossly

10   negligent in the performance of their duties as a public

11   school employee, failed to supervise and care for Plaintiff

12   B.R. as a student.  The individual defendants each deny that

13   they were negligent and assert that plaintiff was

14   contributorily negligent for failing to disclose or report the

15   incidents that plaintiff claims to have occurred.

16          Gross negligence is that degree of negligence which

17   shows indifference to others as constitutes an utter disregard

18   or prudence or caution amounting to a complete neglect of the

19   safety of the other person.  It must be of such a degree of

20   negligence as would shock fair-minded people although it is

21   something less than willful recklessness.

22          To prove gross negligence, Plaintiff B.R. must

23   establish by a preponderance of the evidence as to each

24   individual defendant:  One , that the individual defendant was

25   grossly negligent;

B.R. v. F.C.S.B.

75

1      Two, that the individual school defendant's gross

2  negligence was a proximate cause of B.R.'s injuries.

3      Plaintiff B.R. claims that Defendants' teachers

4  M███ C██, F████ T██████, and M██████ P██████ F██████; the

5  Defendants' guidance counselors B█████ H██████ and J█████

6  F██████████; and the Defendants S█████ T█████, A█████ F███████,

7  P████ H██████, and T█████ B██ assumed the duty of care by

8  promising to take steps to protect Plaintiff B.R. from sexual

9  harassment at Rachel Carson Middle School.

10      Plaintiff B.R. claims that the individual school

11 defendants acted in a grossly negligent manner by failing to

12 care for and supervise Plaintiff B.R. at Rachel Carson Middle

13 School.  The individual defendants each deny that they were

14 negligent and assert that plaintiff was contributorily

15 negligent for failing to disclose to report the incidents that

16 plaintiff claims to have occurred.

17      As I have already said, gross negligence is that

18 degree of negligence which shows indifference to others as

19 constitutes an utter disregard, or prudence or caution

20 amounting to a complete neglect of the safety of the other

21 person.  It must be of such degree of negligence as would

22 shock fair-minded people although it's something less than

23 willful recklessness.

24      To prove gross negligence, Plaintiff B.R. must

25 establish by a preponderance of the evidence as to each

B.R. v. F.C.S.B.

76

1   individual school defendant:

2          One, that the individual school defendant was

3   grossly negligent;

4          And two, that the individual school defendants'

5   gross negligence was a proximate cause of B.R.'s injuries.

6          If you find that the gross negligence of multiple

7   defendants proximately caused plaintiff a single indivisible

8   injury, meaning, that it is not possible to differentiate

9   between grossly negligent defendants as to the cause of the

10  injury then the liable defendants are jointly and severally

11  liable for the entire damage suffered, and you may not

12  apportion damages between the liable defendants.

13         A proximate cause of an injury is a cause that in a

14  natural and continuance sequence produced the event or injury.

15  It can be an act or omission.  It is a cause without which the

16  event or injury would not have occurred, provided that such an

17  event could reasonably have been anticipated by a prudent

18  person in the light of the circumstances.

19         B.R. claims that J.O. assaulted and battered her.

20  An assault is any threatening acts that is intended to put

21  another person in reasonable fear of imminent physical injury.

22         A battery is an intentional and unwanted touching of

23  another without justification, excuse, or the consent of the

24  other.

25         You shall find your verdict in favor of B.R. if she

B.R. v. F.C.S.B.

77

1  proved by a preponderance of the evidence that J.O.

2  intentionally assaulted her or battered her.  You shall find

3  your verdict in favor of J.O. if Plaintiff B.R. failed to

4  prove the elements of an assault or battery.

5          To prove that J.O. assaulted Plaintiff B.R., you

6  must prove by preponderance of the evidence that J.O.

7  intentionally threatened her by some act that put her in

8  reasonable fear of physical injury.  Intent may be inferred

9  from the natural nature of the act and the surrounding

10  circumstances.  To prove that J.O. battered her, Plaintiff

11  B.R. must prove by a preponderance of the evidence that:

12          One, J.O. intentionally touched Plaintiff B.R.;

13          Two, the touching was unwanted;

14          And three, the touching was without justification,

15  excuse, or B.R.'s consent.

16          If you find your verdict in favor of B.R. in her

17  gross negligence assault or battery claims, then in

18  determining the damages which she is entitled, you may

19  consider any of the following you believe by the preponderance

20  of the evidence was caused by the particular act or gross

21  negligence, assault or battery by the relevant defendant:

22          One, all financial loss resulting from the injury

23  that caused -- that defendant caused to B.R.;

24          Two, all physical injuries B.R. has suffered;

25          Three, any shame, humiliation or embarrassment or

B.R. v. F.C.S.B.

78

1    indignity B.R. had suffered.

2           In awarding damages, you may also consider the

3    insulting character of the injury to B.R., the relevant

4    defendants' reason for injuring B.R., and any of the other

5    circumstances shown by the evidence which make the injury more

6    serious.

7           Your verdict shall be for such sums that would

8    fairly and fully compensate B.R. for the damages sustained as

9    a result of the particular act of gross negligence, assault,

10   or battery.

11          If you find that Plaintiff B.R. is entitled to be

12   compensated for damages caused by J.O.'s conduct, and if you

13   further believe by a preponderance of the evidence that J.O.

14   acted with actual malice towards B.R. or acted under some

15   circumstances amounting to a willful and wanton disregard of

16   B.R.'s rights, then you may also award punitive damage to B.R.

17   to punish J.O. for her actions and to serve as an example to

18   deter her and others from acting in a similar way.

19          For purposes of these instructions, actual malice is

20   a sinister or corrupt motive such as hatred, personal spite,

21   ill will, or a desire to injure plaintiff.  Willful and wanton

22   conduct is acting consciously in disregard of another person's

23   right or acting with reckless indifference of the consequences

24   to another person when the defendant is aware of her conduct,

25   and is also aware from her knowledge of existing circumstances

B.R. v. F.C.S.B.

79

 1    and conditions that her conduct would probably result in

 2    injury to another.

 3           If you award the punitive damage to B.R., you must

 4    state separately in your verdict the amount that you allow as

 5    compensatory damages and the amount that you allow as punitive

 6    damages.

 7           The fact I have instructed you as to the proper

 8    measure of damages should not be considered as indicating any

 9    view of mind as to which party is entitled to your verdict in

10    this case.  Instructions as to the measure of damages are

11    given for your guidance only in the event you should find in

12    favor of plaintiff from a preponderance of the evidence in the

13    case in accordance with the other instructions.

14           I am sending the exhibits that have been received in

15    evidence during the trial with you as you retire for your

16    deliberations.

17           The verdict must represent the considered judgment

18    of each of you.  In order to return a verdict, it is necessary

19    that each juror agree.  Your verdict must be unanimous.

20           It is your duty as jurors to consult with one

21    another and to deliberate with a view to reaching an agreement

22    if you can do so without disregard of individual judgment.

23    You must each decide the case for yourself but only after an

24    impartial consideration of the evidence in the case with your

25    fellow jurors.  In the course of your deliberations, do not

B.R. v. F.C.S.B.

80

1   hesitate to reexamine your own views and change your opinions

2   if convinced it is erroneous.  But do not surrender your

3   honest conviction as to the weight or effect of the evidence

4   solely because of the opinion of your fellow jurors or for the

5   mere purpose of returning a verdict.

6           Remember, at all times you are not partisans.  You

7   are judges, judges of the facts.  Your sole interest is to

8   seek the truth from the evidence in this case.

9           You must follow these rules while deliberating and

10  returning your verdict.  First, when you go to the jury room,

11  you must select a foreperson.  The foreperson will preside

12  over your discussions and speak for you here in court.

13          Second, it is your duty as jurors to discuss this

14  case with one another in the jury room to try to reach

15  agreement.  Each of you must make your own conscientious

16  decision but only after you've considered all the evidence,

17  discussed it fully with other jurors, and listened to the

18  views of the other jurors.  Do not be afraid to change your

19  opinions if the discussions persuade you you should.  But do

20  not make a decision simply because other jurors think it's

21  right or simply to reach a verdict.  Remember at all times you

22  are the judges of the facts.  Your sole interest is to seek

23  the truth from the evidence in the case.

24          Third, if you need to communicate with me during

25  your deliberations, you may send a note to me through the

B.R. v. F.C.S.B.

81

1    marshal or bailiff, signed by one or more of the jurors.  Your

2    representative in that regard is Ms. Tinsley.  I will respond

3    as soon as possible either in writing or orally in open court.

4    Remember you should not tell anyone, including me, how your

5    votes stand numerically.

6            Fourth, your verdict must be based solely on the

7    evidence on the law I have given to you in these instructions.

8    The verdict must be unanimous.

9            Nothing I have said or done is intended to suggest

10   to you what your verdict should be; that is entirely for you

11   to decide.

12           Finally, the verdict form is simply the written

13   notice of the decision that you reached in this case.  A

14   special verdict form has been prepared for your convenience.

15   You will take this special verdict form to the jury room.

16           The verdict form is in specific form.  It is your

17   responsibility as the foreperson to fill it out after you get

18   unanimous consent with regard to how that disposition should

19   be reached.

20           The interrogatories or questions are organized by

21   the defendant.  Each section begins with questions calling for

22   you to answer whom should prevail on the given claim.  To

23   answer each question, it must be the unanimous answer of the

24   jury.  Your foreperson will indicate the unanimous answer of

25   the jury and the space provided for each question.  If you

B.R. v. F.C.S.B.

82

1    find the plaintiff -- if you find for the plaintiff on a

2    claim, you will then proceed to the subsequent question

3    regarding damages and provide the unanimous answer to the

4    jury.  If you find for the defendant on a claim, you will skip

5    the question regarding damages and proceed to the next claim.

6          After the foreperson has written the unanimous

7    answer of the jury with respect to each interrogatory

8    question, your foreperson will sign and date the verdict form

9    and advise Ms. Tinsley that you're ready to return to the

10   courtroom.

11         Ladies and gentlemen, these are the instructions

12   that you are to apply in deciding this case.  These are the

13   written statements of law that are applicable to this case.

14   As I said at the beginning, I will be giving each of you a

15   copy of these written instructions so that you may have your

16   own copy.

17         Ladies and gentlemen, what I would like to do now

18   because we need to prepare for the closing arguments, I'm

19   going to let you take a very short recess, about 11:25, so

20   that we can get situated for the closing arguments, and then

21   we'll go forward.

22         Remember, do not discuss the case until the entire

23   case has been presented to you.

24         (Jury excused.)

25         THE COURT:  Thank you, ladies and gentlemen.  We'll

─────B.R. v. F.C.S.B.─────

83

1   see you at 11:25.

2          MR. BRENNER:  Your Honor, permission to move the

3   podium.

4          THE COURT:  Sure.  Standing rule.  Permission to

5   move about the well.  It's my suggestion that you not get any

6   closer to the jury than the tables and the bar right there.

7          MR. BRENNER:  But I can move the podium?

8          THE COURT:  But you can move in there.  Yes, sir.

9   Very good.  See you in about 10 minutes.

10         (Recess.)

11         (Court proceedings resumed at 11:28 a.m.)

12         THE COURT:  Counsel, before we bring the jury in, I

13  want to discuss one thing, and I think I know the answer, but

14  I want to make sure that the record is clear on this.

15         Because of the possibility and the length of this

16  trial, we impaneled eight jurors instead of six.  All of the

17  eight jurors were able to make it through the process.  The

18  Court is inclined to allow all eight to continue the

19  deliberations unless I hear some strenuous objections to that.

20         MR. BRENNER:  No objection from the plaintiff, Your

21  Honor.

22         MS. REWARI:  Not from the School Board, Your Honor.

23         MR. KINNEY:  No objection.

24         MR. BLANCHARD:  No objection, Your Honor.

25         THE COURT:  Very good.  Thank you for that, Counsel.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────── B. R. v. F.C.S.B. ───────

84

1    Are we ready to bring the jury in?

2             MR. BRENNER:  The plaintiff is.

3             (Jury present.)

4             THE COURT:  Thank you all.  You may be seated.

5             Ladies and gentlemen of the jury, we're at the point

6    now we're going to hear closing arguments of the lawyers.  As

7    I have indicated throughout, the closing arguments of the

8    lawyers are not evidence.  They are basically the perspective

9    of the lawyers as to how you should consider your

10   deliberations.

11            We have spoken with counsel and we've agreed on some

12   time restrictions so that we can get through this in a very

13   efficient and productive manner, and counsel will adhere to,

14   and whom you may, from time to time, hear me say something to

15   the effect of 10 minutes or 5 minutes, Counsel.  And we're

16   going to work within those parameters, but we're obviously

17   going to be respectful and give everyone the leeway that they

18   need to present the case.

19            Is plaintiff ready to begin?

20            MR. BRENNER:  We are, Your Honor.

21            THE COURT:  You may proceed.

22                       **CLOSING ARGUMENTS**

23            MR. BRENNER:  May it please the Court.

24            THE COURT:  Thank you, sir.

25            MR. BRENNER:  Counsel.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─

85

1           Good morning.  Well, it's been a long trial.  On

2    behalf of B█████ and our team, I want to start off by thanking

3    you for all of your time and your patience, and really for

4    taking your role seriously, and for the effort we know you all

5    are going to put into deliberations to reach a fair and just

6    verdict.

7           One way to think about your job is to think about

8    trials as being sort of like puzzles.  What's the first thing

9    you do when you open a puzzle box, you spill all the pieces on

10   the floor or on the table.  And what does it look like?  Well,

11   it looks like a big pile of cardboard cut up in different

12   shapes.  With puzzles you also have the box it comes out of,

13   and on that box you have a picture of the puzzle pieces that

14   are supposed to form when you put the pieces together.

15          So you know from the very beginning what the puzzle

16   is going to look like when it is done if you are lucky enough

17   to complete it.

18          In trial, the pieces of the puzzle are the evidence.

19   But you don't have the box at the beginning of the trial.  You

20   don't know what the picture is going to look like at the end.

21   And that is my job today to try to help you understand about

22   how the pieces of the puzzle fit together and what the picture

23   looks like when the puzzle is complete.

24          So we've been together for over five weeks.  We've

25   listened to hundreds of hours of testimony from 33 witnesses.

———B. R. v. F.C.S.B.———

86

1   We've looked at more than 400 exhibits on those little TV

2   screens in front of you.  But with every puzzle, there's just

3   certain pieces or parts of the puzzle that when you see them

4   they help you understand what the whole thing is going to look

5   like when it comes together.

6          And this way trials are no different.  So just as we

7   tried to do, as I promised in opening, during the trial and

8   today I'm going to spend almost all my time talking with you

9   about what happened at Rachel Carson Middle School in 2011 and

10  2012.  What happened to B█████ there and what school officials

11  did or did not do about it.

12         It is important to remember, back at that time,

13  B█████ was a 12-year-old girl and all the teachers, counselors,

14  and administrators she was interacting with were all adults

15  who had a duty to protect her.  On the other hand, the defense

16  in this case seems determined to have you focus on a bunch of

17  other things, other than what happened at the school between

18  2011 and 2012.  For example, the final witness you heard from,

19  that was one you heard from by deposition, talked about a

20  resume that was submitted for B█████ internship at

21  PricewaterhouseCoopers.  What does that have to do with that

22  happened to her at RCMS in 2011 and 2012?  Nothing.

23         As I was thinking about today's discussion with you,

24  I came across this quote.  It's from an author named Margaret

25  Heffernan.  She wrote a book called <u>Willful Blindness:  Why we</u>

B.R. v. F.C.S.B.

87

1  Ignore the Obvious at Our Peril.  And in there there's a quote

2  that says you cannot fix a problem that you refuse to

3  acknowledge.  As you will see, as we walk through the

4  evidence, the school officials at RCMS refused to acknowledge

5  even the possibility that there were significant problems at

6  their school.  And therefore, they refused to believe B███

7  when she was pleading for their help.  And, in fact, as you

8  saw through this trial, they still refused to acknowledge that

9  there were any problems at the school.  And by doing so, they

10  never saw a problem they needed to fix.

11        As we walk through the evidence, I want to make one

12  other thing clear, the Court instructed you, and you'll see in

13  your instructions, that Fairfax County School Board is

14  responsible for the acts of the officials that are -- at

15  Rachel Carson that had the ability and the authority to

16  address B███ complaints and institute corrective measures.

17  Those people include all of the administrators at RCMS and

18  Dr. Zuluaga.  So most of the time I'm going to talk about RCMS

19  and the School Board interchangeably.

20        The Court instructed you on the standard of proof

21  that plaintiff must prove, and that's a preponderance of the

22  evidence.  And what that means is that the issue is more

23  likely than not.  And you can think about it in terms of

24  scales.  The plaintiff has to tip those scales ever so

25  slightly in her favor to prevail on any issue or any claim.

───────────────────── B.R. v. F.C.S.B. ─────────────────────

88

1          Perhaps the two most important witnesses you heard

2     in this case were two former Rachel Carson Middle School

3     students we brought to testify.  You will recall Mr. K.,

4     Co███████, and Ms. S., J████.  Neither of those witnesses

5     had any personal stake in the outcome of the case.  Neither

6     are currently friends with B████ and neither had seen her

7     since 2012.  Yet, they agreed to come to trial to do one

8     simple thing.  They agreed to tell you the truth.  And even

9     though they've been out of the Fairfax County Public School

10    system for several years, it couldn't have been easy for them

11    to sit in that witness box and look at their former teachers,

12    guidance counselors, assistant principals, and the principal

13    himself and tell them that they failed to protect the students

14    who were entrusted to their care, but they did so.  They spoke

15    truth to power.

16          Indeed, one of the things Mr. Ki█ said is exactly

17    what Ms. Heffernan's quote is meant to demonstrate.  He was

18    asked about his discussions with school officials about what

19    was going on and this was specifically as to B████.  And here

20    is what he said.  He said "They were interested in hearing

21    what I had to say, but once I told them what I had to say" --

22    and remember we'll go through what he told them -- "they

23    didn't seem very interested in listening what I had to say, if

24    that makes sense."

25          And that's exactly what happened.  School officials

B.R. v. F.C.S.B.

89

1    had a view of the school that, frankly, didn't exist.  We

2    asked Mr. Ki█ about the environment at Rachel Carson Middle

3    School.  "During the school year did you observe students

4    sexually harassing other students?"  "Yes."  He talked about

5    cyberbullying in particular.  He also went on, he described

6    something called "scooping," which is when male students will

7    feel the breast of a female student without their consent.  He

8    said, "It happened at the school.  It was so common that it

9    had its own term."

10        And he was asked, based on his observations, "Did

11   school officials know about it or do anything about it?"  And

12   he said, "I don't remember them doing anything about it."

13        He's asked about some of the name-calling and some

14   of the sexualized slurs.  "Do you observe students calling

15   female students sluts?"  "Yes."

16        "Do you observe students calling female students

17   whore?"  "Yes."  And then he's asked, based on his

18   observations:  "How did school officials handle this?"  And he

19   says, "They didn't handle it at all."

20        We also asked Mr. Ki█ specifically about B███.  And

21   here is what he had to say.  He said, "He observed B███

22   having suicidal ideations."  And did he also observe her being

23   subjected to rumors at school.  And he says, "Yes."  And he

24   went through what those rumors included, exactly what B███

25   reported all along to school officials.  And he went forward

B.R. v. F.C.S.B.

90

1    and talked about C████████, who is C.K., and David N.

2    specifically.

3            Now, before looking at what J████ had to say about

4    these issues, I want to pause and reflect on one other thing

5    Mr. Ki█ talked about.  There's been a lot of discussions in

6    this case about what school officials were told or not told.

7    And one by one school officials got on the stand and largely

8    said, Well, if this was happening, we didn't know about.  And

9    Mr. Ki█ addressed that too in his testimony.

10           He's talking about these school officials.

11           "Did you give them specific examples of the rumors?"

12           "Yes, I did."

13           "Do you recall which examples those were?"

14           "So the rumors I heard.  I told them about the same

15   rumors about C████████ and the same rumors about David that I

16   previously told you."

17           "And what did you tell him about B████ emotional

18   state."

19           "I told them, I mean, the same thing as before.

20   She's very depressed, she's suicidal, and she didn't want to

21   come to school anymore."

22           "And based on your observations of Ms. T████ and

23   Mr. H████, how did they react when you told them?"

24           "The same way Ms. B████ did, not really surprised."

25           He specifically told them -- told us that he told

———B.R. v. F.C.S.B.———

91

1  school officials about C.K.'s rape of B███.  But yet, the

2  school officials all stood up here and got on the stand and

3  said they didn't really know any of this.  They never saw

4  B███ in states of distress, in states of emotional crying.

5          I want to look at what J███ said too because she

6  was another perspective from a female student at Rachel Carson

7  Middle School.  She too was asked to describe the general

8  environment at Rachel Carson Middle School.  And she described

9  it, I'm sure you will recall as quote, Very toxic, a lot of

10  bullying going around, a lot of harassment.  Very, yeah, like

11  I said, very toxic.

12          And then she was specifically asked, and we'll cover

13  this in a little bit.  "What about all those PowerPoints you

14  were shown?  What about all those seminars?  What about the

15  assemblies the school officials talked about?"  And she said,

16  they had a PowerPoint that they would have us go through

17  saying that you can be expelled, suspended for bullying, but

18  that was never the case.  And she talked about her own

19  bullying in a very sad way.

20          J███ also talked about B████ bullying.

21          "Did you personally witness B███ be bullied?"  She

22  said she did.

23          "What bullying of B███ did you witness?"

24          "A lot of harassment and sexual harassment towards

25  her.  Her being called names, sexual names, like W, B, S, to

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

—B.R. v. F.C.S.B.—

92

1  name a few."

2          And then she's asked a very important question.  She

3  said, "Was it common knowledge in the school that B was being

4  bullied."

5          Answer, "Yes."

6          "Were there rumors in the school about B?"

7          Answer, "Yes, there was."

8          "Do you remember those rumors that she was bi, that

9  she was having sex with a bunch of people?"

10          Yet, how do the school officials all not hear any of

11  this?  It's because they weren't listening.  Because they had

12  a view that nothing could happen at Rachel Carson.  So what is

13  happening right under their noses, right before their eyes?

14  They just say they don't see.

15          J.S. [sic] talked more about the B███ -- the

16  bullying of B███; she talks specifically about J.O. bullying

17  her.  She talks specifically about C.K. bullying her.  And I

18  think this last part on the bottom right is very important.

19  She's talking about C███████ and she says, "I observed him on

20  numerous accounts talking very sexually towards B as well as

21  J.O.  Both of them, meaning C.K. and J.O., together at the

22  same time will call her names like W, B, S, and would make

23  derogatory terms about B about sex, wanting -- like saying

24  about having sex with her, and, yeah."

25          And then J.O. was asked, "Did you witness this

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────────────── B.R. v. F.C.S.B. ───────────────

93

1    multiple times?"  And her answer was, "Yes."

2         There's no question of the credibility of these two

3    witnesses.  They had no incentive to tell you anything other

4    than the truth.  But just as they did back then, the adults in

5    the courtroom, the adults at the time, tell you that these

6    students somehow are not to be believed.  Don't believe what

7    they're telling you.  They came up one by one and said none of

8    this was happening.  Importantly, Ms. J███ and Co███████

9    testimony is entirely consistent with what B███ was telling

10   the school official since October when she met

11   Ms. F█████████ -- or excuse me when Ms. F█████████ found her

12   crying at her locker.

13        Now, we know the school has no, quote, record of

14   this meeting, because the counselors had been taught by the

15   School Board that, quote, less is more, when it came to

16   documenting student complaints.  B███ also described with, in

17   detail, who she tried to meet with, who she actually was able

18   to meet with and what they told her.  She was told that she

19   just needed to adjust better to middle school or that she

20   needed to not provoke the boys.

21        By November, she's told that, quote, It's a boy/girl

22   thing.  When she names C.K. specifically as someone who is

23   tormenting her, she and her mother are asked, "Why do you want

24   to ruin a boy's life?"

25        You've seen Exhibit 77, that's B█████ written

─────────────────────────────────────────────────────

1  statement to the school in November.  You've seen it many

2  times.  I don't need to go through it with you in detail.  But

3  let me just point out a couple of things.  One is, we'll see

4  later, one of the elements of the claim in the Title IX claim

5  against the School Board, is whether they were on notice of

6  B██████ complaints.  And as you know from this document what's

7  in here is clearly unequivocally sexual harassment.  The

8  school doesn't deny that.  They just say it wasn't true.  But

9  for Title IX notice, the first question you will have to ask

10 or one of the questions you will have to ask is looking at

11 these things subjectively, would anyone consider them sexual

12 harassment, and of course you would.

13         Now, B████ continues to report to the school after

14 the November meeting into December and January about the

15 escalating harassment, including escalating threats to her

16 life and her safety.  On January 27th, B████ writes to the

17 principal and the director of student services.  Aside from

18 the testimony of Mr. Ki█ and Ms. S█████, this letter is one of

19 the most important pieces of evidence in the case.  It's

20 Plaintiff's Exhibit 111.

21         If you recall this, this is her letter -- B███████

22 letter to Mr. F██████ and Mrs. Weaver.  Mrs. Weaver was the

23 director of student services, Mr. F█████ was the principal.

24 Perhaps the most interesting thing about this letter is how

25 much it is devoted to B████ pleading with the school to

B.R. v. F.C.S.B.

95

1  protect not just her but other students too.  Remember, this

2  is late January.  By this point B█████ has been asking the

3  school to help her for months and probably realizes that the

4  school officials are not going to prevent what is happening to

5  her.

6          Nonetheless, she's asking to make changes for

7  others, to make sure others do not have to endure what she is

8  going through.  B█████ tells the school the same things that

9  Mr. Ki██ and Ms. S█████ told you.  She describes the school's

10 bullying culture.  She tells them kids are scared to speak up

11 and instead must suffer quietly, and they are afraid of being

12 called a snitch.  She even repeats back to the school some of

13 the empty promises that had been made to them at the beginning

14 of the school year and lets them know directly that what's

15 actually happening is different than what was promised in the

16 various assemblies and PowerPoint presentations.

17         But the school's response is exactly what you would

18 expect from an organization that refuses to even acknowledge

19 the existence of a problem.  Instead of making a single change

20 to what they've been doing, they appear dumbfounded that their

21 PowerPoints and slogans had not resulted in an environment

22 where these things possibly could not occur.  They send an

23 email to each other shortly after receiving B█████ letter.

24 They don't ask, What can we do differently?  They don't ask,

25 Why do the students feel this way?  They don't ask, How can we

B.R. v. F.C.S.B.

96

1    make our student's environment better?  In fact, they don't

2    ask B█████ anything.  In fact, they write to each other and

3    ask, Wait, was she not there when we did our lesson on

4    bullying?  Did she not get the SR&R lessons?  We better check

5    to make sure that we have her on record being there.

6          We asked Mr. F████████ about this letter.  He

7    dismissed what B█████ wrote as "her perception."  And you know

8    for now from the testimony of Mr. Ki██ and Ms. S██████ that the

9    concerns B█████ was raising about the environment at the school

10   were entirely accurate, were widely shared by other students.

11   But, again, the school refused to acknowledge that there was

12   any problem.

13         To a person, school officials in this courtroom

14   talked about, at RCMS, that frankly was too good to be true.

15   Remember Mr. T██████ showed you a video montage he made of

16   kids smiling in pictures being taken of them at school.  As if

17   to suggest that Rachel Carson was a place where the kids were

18   all happy all of the time.

19         Ms. B██████ described Rachel Carson as, quote, The

20   jewel, the jewel and the crown of what she called the Fairfax

21   County Public School system.  And Mr. F████████ told you that

22   in the five years preceding the 2011-2012 school year his

23   administrators have not verified even a single case of sexual

24   harassment in the school.  But how can that be?  Were Mr. Ki██

25   and Ms. S██████ just all wrong?  Did the students not know what

B.R. v. F.C.S.B.

97

1    was going on?

2          Now, no large public middle school in this country

3    could possibly live up to the image that the defense tried to

4    paint of Rachel Carson.  In fact, we know from studies

5    cosponsored by the Fairfax County Public Schools that bullying

6    and sexual harassment were significant problems in Fairfax

7    County in 2011-2012.  You remember these student surveys.  In

8    some ways, the participants in these surveys were the silent

9    witnesses in the courtroom.

10          In this first one you see that for 8th graders in

11   Fairfax County at the exact time of what's going on at Rachel

12   Carson.  58.7 percent of them report being bullied.  If you go

13   to the next slide, specific as to sexual harassment, about

14   17.7 percent, just under 18 percent.  It's about one in every

15   six students.  And over half -- one of every six students had

16   been subject to sexual harassment, sometimes -- some many

17   times, and well over half the students reported being bullied.

18          But was the environment at Rachel Carson Middle

19   School so different than everywhere else in the county?  Well,

20   that's a testimony you heard from the defendants.  They gave

21   that testimony even after they sat through the testimony of

22   Mr. Ki█ and Ms. S█████.  They remained steadfast.  They swore

23   that the things that B████ said happened to her just couldn't

24   happen and just wouldn't happen at Rachel Carson.

25          You saw a lot of these things in the trial.  So

B.R. v. F.C.S.B.

98

 1    these are the various PowerPoints and videos and slogans that

 2    the middle school, Rachel Carson Middle School, gave to their

 3    students.  And let me be very clear.  There's nothing wrong

 4    with having PowerPoints, newsletters, other ways to

 5    communicate with their students.  But it's not the solution

 6    when you know that they're not working, when you know that the

 7    environment of the school, as was described by Mr. Ki█ and

 8    Ms. S█████, you can't just say, "But we had PowerPoints, but

 9    we had newsletters."  You have to act and you have to listen.

10          If Mr. S█████ -- excuse me, Ms. S█████ and Mr. Ki█

11    are not to be believed, ask yourself:  Could the Fairfax

12    County Public School system not find a single student from

13    that time to come in and back up their story in this courtroom

14    about how amazing Rachel Carson was; and, how the things that

15    B█████ and Mr. Ki█ and Mr. S█████ said just couldn't happen

16    there?

17          Again, going back to the quote from Ms. Heffernan.

18    "You cannot fix a problem if you do not acknowledge it

19    exists."

20          Now, we spent a lot of time in this trial talking

21    about lockers, so I just want to touch upon it a little bit

22    because that is where much of the in-school abuse of B█████

23    took place.  Again, what the administrators, counselors, and

24    teachers testified about the lockers all sounded really great.

25    It just turns out that none of it was what the students were

B.R. v. F.C.S.B.

99

1    experiencing.  Whereas, the teachers said that, Nope, no 8th

2    graders could ever come in the 7th grader's lockers.  We would

3    shoo them away immediately.  The only 8th graders you heard

4    testify said they were there -- one said he was there every

5    day, and one said he was there regularly.

6            In fact, one expressed surprise on the witness stand

7    that there would be any such rule because it was so common.

8    Why did the school spend so much time showing you the pictures

9    of empty locker bays?  And publish to you a schematic to point

10   out where the teachers, allegedly, stood sentry and watch like

11   hawks.  Why not show pictures of locker pods with kids in it?

12   A daily scene Mr. T█████ described as "like Times Square."

13   Is it because much of the abuse B███ suffered at the school

14   was in the locker pods?  And the School Board is determined to

15   claim that everything she says must be false.

16           In fact, the last live witness you heard from was

17   Ms. B████, one of the assistant principals.  And she

18   confirmed that the lockers were placed in the school where

19   boys were harassing and assaulting their fellow classmates

20   just as B███ said.

21           You have on the left a record from January where a

22   male student is punching girls in the locker pod, and you have

23   on your right a record from April -- these are both 2012 --

24   where students are pinching girls in the hallways outside the

25   locker pods, pinching them in their buttocks.

B.R. v. F.C.S.B.

100

1          Yet, throughout November, December, January, and

2     February school officials downplayed all of B██████

3     complaints.  As I told you during opening, they didn't believe

4     her then, and they don't believe her now.  You heard about

5     shadowing.  Yes, they did shadow her for a few days.  And it

6     actually seemed to work.  But then they abruptly shut it down.

7          Regarding the death threats, the physical threats of

8     violence she was receiving, the school threw up their hands

9     when B████ said, "These are kids I don't know.  I'm not going

10    to be able to pick them out of a yearbook."

11         Now, you know that the response by school officials

12    changes dramatically once the superintendent's office is

13    involved.  And the superintendent's office is involved only

14    because the R. family went there on February 10th.

15         Now, before I get to that, I want to spend just a

16    few minutes talking about some of the evidence that defense

17    brought you and why that evidence will not help you decide the

18    claims the Court instructed you on.

19         I want to start with the Facebook messages between

20    C██████ and Facebook user.  The defense relies so heavily

21    upon them.  Let me start with one basic fact that may have

22    gotten lost.  No one at the school based any of their

23    decisions in 2011 or 2012 on these messages.  In fact, the

24    evidence of these messages surfaced for the first time in

25    2023.  Whatever the school did or did not do in 2011 or 2012

B.R. v. F.C.S.B.

101

1   was not impacted by these messages because they did not see

2   them until over ten years later.

3           Now, you will have the messages back with you during

4   your deliberations if you want to look at them.  No doubt they

5   are salacious and even disturbing at points.  Whoever is

6   writing this Facebook user seems to know a whole lot about

7   B████.  But as we went over with C██████ whenever Facebook

8   user is given the opportunity to identify themselves in any

9   way beyond words, they make sure that doesn't happen.

10          They're constantly being requested for pictures or

11  video chats.  They refused to do so.  They make excuses.  They

12  send video links that do not work.  They say they send

13  pictures but then claim they are not going through.  C███████

14  told you he tried scores of times to get pictures of Facebook

15  user, but it never happened.  And why is that?  But the most

16  important thing to remember about the messages is that they

17  are not consistent with C██████ or B█████ memory.

18          In fact, as to mere months after the encounters

19  between them, C██████ tells Detective Chambers that he and

20  B███ essentially did not communicate at all through Facebook.

21  As C███████ finally admitted at the end of his

22  cross-examination, the truth is he has no memory of those

23  messages today.  He had no memory of them in March of 2012

24  when he met with Detective Chambers.  And what he does

25  remember is inconsistent with what those messages say.

B.R. v. F.C.S.B.

102

1          Another thing that the defense asked you to focus on

2    was Mrs. R. or as the defense witnesses call her, "the mom."

3    Was Ms. R., Mrs. R., deeply invested with what was going on

4    with her children?  Absolutely.  Could she even be

5    characterized or even caricatured as a helicopter mom?  I

6    suppose.  But is it fair to excuse her of manufacturing her

7    daughter's diagnosis of PTSD?  That is a bridge too far.

8    Think about it.  Has Mrs. R. forced 17 healthcare providers

9    over a 12-year period to ignore their own medical

10   responsibilities and simply do what she says and give a

11   diagnosis of PTSD?  Did these doctors prescribe medications

12   not because they believe B███ needs them, but because Mom

13   tells them to?  Had they repeatedly, these physicians,

14   hospitalized B███ over the last decade because Mom tells them

15   to?  Has B███ spent months in inpatient treatment facilities

16   of PTSD because Mom told them to?  Is the suggestion that

17   Mrs. R. wants her daughter to live like this?  Does that make

18   any sense?

19          Now, you heard from Dr. Weaver, again, uninterested

20   party, just doing his job.  He treated B███ starting when she

21   was about seven years old when the family moved to Virginia.

22   He had an opportunity to meet with the family regularly.  He

23   described them as a tight-knit, loving family and B███ had --

24   had a respect for her parents, and is basically a normal

25   family environment.  But he also talked about that before the

—B.R. v. F.C.S.B.—

103

 1   assaults and the events at Rachel Carson in the fall of 2011,

 2   B███ had no significant behavioral or mental health issues.

 3   He noted that all of that changed in the fall of 2011, and he,

 4   like the many doctors who have seen B███ since 2012 and

 5   through today, note that she has severe PTSD.

 6        That PTSD was caused by what happened to her during

 7   her 7th grade year at Rachel Carson.  It is not made up by her

 8   mother.  In fact, other than witnesses paid by the defense in

 9   this litigation, no one supports the idea that B█████ PTSD is

10   not real or that these diagnoses were somehow created by her

11   mother.

12        Another issue that the defense focused on throughout

13   the trial was how many times was B████ raped by C.K.  The

14   defense repeatedly questioned why B███ only reported one rape

15   when she was 12, and she revealed over the years that there

16   were multiple assaults.  Are the Defendants suggesting that if

17   there were only one rape or her family knew about one rape,

18   they would have less responsibility?  They suggest that

19   B█████ initial report of a single rape and later disclosure

20   of multiple rapes by C.K. during the same time frame makes her

21   a liar.  But you heard Deputy Chief Chambers.  The defense

22   called him as a witness.  He's conducted hundreds of

23   interviews of childhood sex abuse victims.  And he testified

24   it's not unusual at all for them not to tell the whole story

25   during their first time they are telling it.  And

B.R. v. F.C.S.B.

104

1   Dr. Jennings, another witness called by the defense,

2   acknowledged that children's reports of sexual abuse can come

3   at various times throughout their lifetime.  And Dr. Ryan told

4   you the same thing.

5           Now, I want to be clear, B████ was raped.  There

6   could be no real dispute about it.  You will have the same

7   report back with you in the jury room, and I want to warn you

8   ahead of time that it contains really graphic photographs in

9   it.  That is the nature of that examination.  You've seen a

10  copy of one of those pictures.  There's more in the report

11  that you will have.  If you want to see the physical evidence

12  of the rape, it's in that report.  But you need not view the

13  pictures if you do not want to.  You can review the

14  conclusions of the report.

15          From the left of your screen you have B█████

16  narrative of being anally raped by 13-year-old boy in November

17  of 2011.  And on the right you have conclusion of the nurse

18  who examined her at the time that the abnormalities and the

19  nature of those abnormalities are consistent with the report

20  of rape she gave.

21          Another issue that the defense asked you to focus on

22  was that, well, the rapes occurred off campus and they also

23  asked you to focus on the police involvement.  But the

24  school's obligations under Title IX are completely independent

25  of what the police did or did not do and they must investigate

B.R. v. F.C.S.B.

105

 1  off campus conduct that impact the school environment that's

 2  happened here.  We went over this with Mr. F█████.  This is

 3  the guidance that was received by the Fairfax County School

 4  Board regarding Title IX and forwarded as a matter of course

 5  at Rachel Carson.

 6          And as you can see, it doesn't matter if it happens

 7  off campus as long as it's having an effect on campus which it

 8  certainly was here.  And also it says, An investigation at the

 9  allegations of sexual violence -- a criminal investigation,

10  does not relieve the school of its duty under Title IX to

11  resolve claims promptly and equitably.

12          But we know that after learning about the rape

13  allegations against C.K., which Mr. Ki█ tells you he

14  specifically told school officials about, they do nothing.

15  C.K. remains at the school.  He testified no one talked to him

16  about it.

17          Now, I want to talk to you about one other thing

18  that the defense covered during B█████ cross-examination

19  because frankly it was a little bit emotional and a little bit

20  disturbing.  And as you know, B████ has been under constant

21  medical care since about March of 2012.  Much of that medical

22  care is in the form of therapy or talk therapy.  Sometimes the

23  therapist asks the patient to write what is happening to them

24  and what they are experiencing and the pain they're

25  experiencing.  B████ wrote a story about another boy.  It's

—B. R. v. F.C.S.B.—

106

1   about a sexual encounter that took place in 2014 or '15.  And

2   in that story B█████ recounts the flashback she's having to

3   what happened to her when she was 12.  But, yet, the School

4   Board decided to force her to explain why she would write

5   these things to her therapist and why was she conflating or

6   merging the two things that have happened to her.

7          To be clear, B█████ never accused this boy of

8   anything.  Instead, she was working with her own therapist to

9   address her own problems associated with the rape and abuse

10  she suffered as a 12-year-old.

11         I want to return to the timeline of what happened at

12  Rachel Carson Middle School in 2011 and 2012 and specifically

13  what happens when the R. family goes to the superintendent's

14  office.  Remember, school officials never, never raised this

15  issue with the Title IX office at the superintendent's office.

16  They tried to keep everything in house where only they could

17  control the outcomes.

18         You learn that Rachel Carson did not even have a

19  single person designated at the school to deal with Title IX

20  issues.  Mr. F█████ told you that the Fairfax County School

21  Board's office had such experts.  It was called the Office of

22  Equity and Compliance.  He explained that you could engage

23  that office; they could help with the investigation; they

24  could help with their expertise; and if nothing else they

25  provided an outside impartial party separate from the school

———————B.R. v. F.C.S.B.———————

107

1   officials and their relationships while they were there.

2           Now, Mr. F███ told you it was up to him and him

3   alone to decide whether anything ever got elevated to that

4   office.  And he told you that he, and he alone, refused to

5   find any claims of sexual harassment to be verified.  How can

6   that be?  How can that be, given Mr. Ki██ and Ms. S████'s

7   testimony?

8           But even more directly, you will have in the record

9   Plaintiff's Exhibit 59.  Plaintiff's Exhibit 59 is a

10  documented, verified case where C██████ exposed his genitals

11  in a classroom to two female girls, two females.  They were in

12  7th grade at the time, as was he.

13          What did the school officials do?  They got

14  together, the whole team, the assistant principals and the

15  principals, and say said, Well, yeah, we're not going to call

16  that sexual harassment either.  We're just going to say that's

17  a one-off event.  We don't have to report that either.

18          So now you know why nothing ever gets reported

19  because nothing is ever enough.  Nothing is ever verified,

20  nothing meets the school's definition, and, therefore, they

21  refused to see the problem that exist and they take no steps

22  to improve on it or fix it.

23          All the while, the evidence is B███ has

24  disintegrated before their eyes.  Students are reporting that

25  she is regularly in tears, she is suicidal, she's afraid to

———B.R. v. F.C.S.B.———

108

 1   come to school.  She meets with the principal.  She meets with

 2   all three assistant principals.  She meets with the director

 3   of student services.  She meets with at least two different

 4   counselors and numerous teachers, yet, it is not until the R.

 5   family goes to the superintendent's office, do the school

 6   officials all get together and coordinate their efforts.  But

 7   they don't coordinate their efforts to help B██████.  They

 8   coordinate their efforts to cover their own tracks, to come up

 9   with a memo which explains what they supposedly did for the

10   last four months, even though most of that is found nowhere in

11   the school's records.

12          Well, prior investigations related to B██████ almost

13   involve no documentation beyond a few student statements.  All

14   of a sudden they spring in action.  There is a very minor

15   incident in a school lunch line where B██████ and another boy

16   exchange profanity.  They take ten student statements on that.

17   This is all after B██████ is gone with her family to the

18   superintendent's office.  They draw charts and graphs.  They

19   are doing, trying to cover what they didn't do before.

20   Compare to B██████ far more serious complaints in November,

21   December, and January of sexual slurs, rumors that she was

22   giving people oral sex, that others were sexually harassing

23   and touching her at lockers, and her complaints of violent

24   threats.

25          The February 9th incident seems like it's all

—B.R. v. F.C.S.B.—

109

1   hands-on deck.  In fact, once the R.'s go to the

2   superintendent's office, the assistant principals all get

3   together and they actually sit down for the first time, in a

4   coordinated effort, and within a day they type out a single

5   spaced 14-page memo to the superintendent explaining how

6   everything they did was perfect.  You've seen this -- that's

7   the incident memo.  They even, and you'll see it in the

8   record, they even send each other emails patting themselves on

9   the back claiming that anything more being done would have

10  been superhuman.  They go to a bunch of teachers and ask them

11  to write statements, something they've never documented

12  before, something these teachers have never been asked to do

13  before, because now the problem has gone outside of the

14  school.

15          But there's a problem even with the efforts to write

16  the incident memo.  First, it purports to document things that

17  happened in November, but there's no evidence that these

18  things happened as in the memo.  All we have is Ms. T████'s

19  memory that she interviewed -- I think she said 10 or 12

20  students.  There's no evidence of that.  None.  In fact, the

21  only evidence that we have from the November investigation is

22  B████ statement and then the statements from three other

23  students.  None of which were identified as witnesses.

24          And interestingly, the statements confirm what B████

25  said.  You can look at C███████'s statement.  He confirms

B.R. v. F.C.S.B.

110

1   basically everything B████ said except he does two things:

2   One, he blames it on others.  Blames it on -- on J.O. and D.N.

3   And two, he writes the words throughout the statement "I

4   think."  So the school officials take those words and say "I

5   think" and in less than 24 hours they conclude that everything

6   B████ has said was unverified.  But think about that.  The

7   complaint is made against three students:  C.K., J.O. and D.N.

8   None of them deny it.  C.K. is a student that they know, the

9   school knows, has just exposed his genitals to other students

10  mere months before and that J.O. is a student that has also

11  engaged in serious sexual misconduct in the form of

12  threatening to publish inappropriate photos of a male student.

13          Yet, in 24 hours, B████ complaints are all

14  unverified, everything is in-house, school is ready to move

15  on.  The other thing that Ms. B████ does in that memo is she

16  conveniently leaves out that B████ complaints have been

17  going on for weeks to a month before November.  And we know

18  that's true.  We know it from Ms. F████████, we know it from

19  C.K.'s statement, but that's nowhere in the memo.  Because the

20  school knows, when reporting to the superintendent's office,

21  if it's been going on since October, what's the excuse for not

22  having done anything, which is what happened.

23          But the most troubling part of the school's response

24  is the efforts they go to make sure the evidence, regarding

25  B████ abuse, does not get out.  The first thing they do is

——————————————B.R. v. F.C.S.B.——————————————

111

1    they discipline the students that are telling them about

2    what's happening to B█████.

3            This is J████'s statement.  Ms. B█████ talks to

4    J████ about some rumors that she was spreading about a girl

5    and told her to stop doing it.  When we asked J████ what were

6    those rumors.  Well, the rumors were J████ reporting what was

7    happening to B█████.  So J████ is actually suspended.  And she

8    says, "What did you want the school to do?"  She said, "I

9    wanted them to take matters into their own hands and actually

10   listen to what I was making statements about and have

11   disciplinary action for the people who bullied me."  As

12   opposed to her.

13           They do that to another student.  This is Kevin

14   Miller.  And he says, "People are threatening to jump B█████."

15   He too is warned and amazingly the school's position seems to

16   be that the reference to jumping is cyberbullying.  Jumping is

17   what B█████ exactly testified it was.  Students were making

18   threats to her, physical threats to her safety, and one of the

19   ways that students did that is they told B█████ she was going

20   to get jumped in the hallway or other places in the school.

21           That's not the worst thing the school did.  You

22   heard from Co██████████ Ki██.  Co██████████ Ki██ wrote a statement

23   in February 2012 detailing what was happening to B█████.  The

24   school calls him back three more times.  They tried to get him

25   to change his statement.  All three assistant principals bring

B.R. v. F.C.S.B.

112

1   him in the office, stand over him, put check marks on his

2   statement and asked him to reconsider.  How could they do

3   that?  Well, Ms. B████ knows that's not defensible conduct so

4   she denies it ever happened.  But you see it in her own

5   discipline log.  The first statement on the left is

6   February 15th, I believe, and then C████████ is back on

7   March 5th.  Co████████ told you what was going on during this

8   time.  He told you about four meetings.  He told you they

9   tried to get him to change his testimony or his statements.

10  But we asked:  "How did they try to get you to change them?"

11  And it was always the same way.  Water them down.  Not make

12  them seem as bad, not make what's happening to B████ seem as

13  bad.

14         Ask yourselves, if as the incidents memo and the

15  internal emails between them were true and the school had done

16  everything so perfectly why are they hauling this 13-year-old

17  boy into the assistant principal's office four times to get

18  him to change what he had told them.

19         As you know -- you know the story, the rumors start

20  intensifying back in October into November; B████ suddenly

21  becomes the girl that's easy, the girl that's promiscuous, the

22  girl that will let boys do anything, and the results are

23  tragic but predictable.

24         Professor Cantalupo told you that potential

25  harassers and perpetrators look for victims just like B████

─ B.R. v. F.C.S.B. ─

113

1  who think -- they think are less likely to be believed and

2  that potential victims are especially vulnerable if they are

3  promiscuous or perceived to be promiscuous.

4        The incident in the park happens with J.O. and C.K.

5  They both sexually assault her in the park behind her home.

6  They laughed at her, they took photos of her assaulting --

7  took photos of her while she's being assaulted.  They

8  threatened her with more harm to her and her family if she

9  told anyone.

10        Now, J.O. took the witness stand and portrayed

11  herself as the innocent former friend of B.R.  The evidence

12  about -- but the evidence about her does not fit that picture.

13  You saw her messages with C.K. where she prepondered [sic]

14  sticking a pitchfork deep in the anus of a boyfriend who broke

15  up with her.  C.K. told us that he and J.O. spoke in these

16  violent sexual terms regularly.  J.O. had been disciplined for

17  sexual misconduct and she was disciplined for bullying other

18  students shortly after B███ withdrew from Rachel Carson.  And

19  she admits to being in the park behind B██████ house with C.K.

20  on the same day B███ says they assaulted her.  She had to

21  acknowledge this because there's a photo of her with a bloody

22  knee on the -- in the park on that date.  She claims that is

23  because she slipped in a stream earlier that day.

24        B███ returned to school after the assault by J.O.

25  and C.K.; the rumors intensify.  She begins to be called a

—B.R. v. F.C.S.B.—

114

1  lesbian.  And shortly thereafter she begins to be assaulted by

2  C.K.

3          B███ candidly told you she doesn't know how many

4  times C.K. assaulted her.  We know that the school knew about

5  these rumors because Mr. Ki█ told you he told the school about

6  them.  And some of you may be asking:  How could B███ be

7  assaulted in November, December, and January and not tell her

8  own mother until February.  Sadly this too is not unusual.  As

9  defense own expert, Dr. Jennings, explained there's simply no

10  normal or usual way for childhood victims of sexual assaults

11  to report.

12          Now, I want to move on to the last part of the

13  school year story.  B███ goes into homebound in March --

14  well, in February she is out of school.  I think she

15  officially starts homebound in March.  She doesn't understand

16  why she's the one that's being forced to leave the school when

17  she was the victim.  She wants to go back to a normal life as

18  a student in school learning alongside her friends and her

19  peers.  But the school, frankly, treats her in petty, shameful

20  ways.  They did not let her go on field trips; they did not

21  let her do group projects.  They do not even let her parents

22  come to the school to get assignments, which results in her

23  homebound teachers having to do that which counts against

24  B███ time with them.  They even excuse her of cheating.

25  Her own teacher points out that what they are doing to her in

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─B.R. v. F.C.S.B.─

115

1    homebound is odd, if not poorly done.

2          B███ is on homebound for a year and decide -- her

3    parents decided enough is enough.  And in 2013, she withdraws

4    from the Fairfax County School system.

5          Now, I want to walk through the verdict form really

6    quickly.  This is the first question on the verdict form.

7    It's the title -- it's one of the Title IX claims against the

8    School Board.  These are the elements of that claim.  I just

9    want to walk through them with you.  The first element of the

10   claim is:  Was there harassment so severe or pervasive and

11   objectively offensive.  Meaning if anyone looked at it, would

12   they say it's so offensive that it deprived B███ of equal

13   access to the educational opportunities or benefits provided

14   by her school.

15         Well, that one is largely not in dispute, I don't

16   believe.  B███ is deprived of the opportunities because she's

17   out of school.  She's on homebound, in fact, never gets to go

18   back to school again.

19         The second element is the actual notice element, and

20   you'll see the instruction on that.  But as I said the School

21   Board is clearly on notice of what's happening with B███.

22         But they don't want to see it.

23         You heard from B███, you heard from Mr. Ki█, you

24   heard from Ms. S████ what B███ was saying was happening was,

25   in fact, happening.

B.R. v. F.C.S.B.

116

1          The third element is deliberate indifference and the

2   Court will give you instructions on that.  And basically it

3   boils down to:  Was what the school did clearly unreasonable?

4   And we believe the evidence shows that it was.

5          THE COURT:  Ten-minute mark.

6          MR. BRENNER:  I'm sorry.

7          THE COURT:  Ten-minute mark.

8          MR. BRENNER:  Okay.  So we believe we've satisfied

9   all of those elements for question one.  And you should check

10  "Yes" for Plaintiff B█████ on that question on the verdict

11  form.

12         The same for the retaliation claim.  We went through

13  what they did to B█████ after she had the nerve to both report

14  her sexual harassment to them and to the -- and to the

15  superintendent's office and we went through the actions of --

16  that placed them.

17         The verdict form also has questions about the

18  individual defendants, most of which I've now gone through

19  with you.  One is a gross negligence claim and the other is a

20  retaliation claim and the same evidence that we went through

21  will apply to those individuals, and you'll see those

22  questions on the verdict form.

23         And the claim against J.O. you know relates to the

24  assault in the park.

25         The last issue for your consideration will be

─────────── B.R. v. F.C.S.B. ───────────

117

1    damages.  There will be multiple questions on the verdict form

2    on that issue.  Let's start with the facts:  Before 2011 and

3    2012, B███ did not have any physical or mental health

4    problems.  Plaintiff -- the defense points to her record when

5    she's six that she had an outburst.  Yes, she was six and she

6    had an outburst.  Beginning in the fall of 2011 and from then

7    she's been consistently diagnosed with PTSD.

8              Recall the testimony from her mother that led to

9    that first hospitalization when he finds her standing by a

10   window and is afraid she is going to jump.  Thereafter, B███

11   is diagnosed no less by 17 different providers in the last

12   12 years.  And it's not like the defense suggested when you

13   see the medical records.  These are not her self reports.

14   These are the diagnoses and assessments of the doctors who

15   treated her.

16             After leaving Fairfax County, B███ attends multiple

17   schools.  She tries boarding schools, she tries large public

18   schools, she tries a private all-girls school.  She ends up

19   graduating through the help of some homebound.  She goes to

20   John Jay College and is accepted into a special program at

21   Columbia University for nontraditional students.

22             During that time there, she has two stints in a

23   residential treatment facility.  But B███ keeps fighting to

24   have a normal life and she graduates in 2021.

25             She's tried working multiple times.  She's worked at

B.R. v. F.C.S.B.

118

1   Sloan Kettering, she's worked at Pricewaterhouse, she's worked

2   at Sidley Austin, and each time she's unable to work.  But

3   despite these efforts B████ has been portrayed in this case as

4   a malingerer.

5           In other words, let me explain what that means.  The

6   Defendants are arguing that B████ is faking her PTSD.  That is

7   what they are suggesting to you.  They are suggesting to you

8   that for the last 12 years she's been going to doctors three

9   to four times a week, apparently, for the fun of it.  They are

10  suggesting that she was seeing doctors for seven years before

11  this lawsuit was filed somehow in connection to this lawsuit.

12  To suggest that B████ is faking it based on a bunch of

13  standardized neurocognitive tests, one that required her to

14  count how many dots are on a piece of paper, and another that

15  tested her ability to remember words, is not a sound opinion

16  and is not the way anyone diagnoses PTSD outside of a

17  courtroom.

18          Indeed the psychologist the defendants hired, not a

19  medical doctor, even he admits that he's not saying she

20  doesn't have PTSD, just his test didn't confirm it.

21          But Dr. Ryan, who you heard from, who interviewed

22  B████ for over 16 hours, reviewed all of her medical records,

23  told you unequivocally there's no basis to conclude that B████

24  is malingering.

25          You've heard from B████ on the stand.  She can be

─────────────── B.R. v. F.C.S.B. ───────────────

119

1    sweet and soft-spoken, she can be confident, she could be

2    happy and good natured, she can have a good sense of humor.

3    But she was on the witness stand for six different days and

4    you got to see other sides of B██ too.  She can get angry.

5    She can experience debilitating physical pain, whether it be

6    severe headaches or excruciating pelvic pain.  She began

7    crying at times you wouldn't expect it.  She could lose her

8    focus and appear to drift away.  And you got to see all of

9    that in the courtroom.  But she is a fighter.  She could have

10   quit anytime along her journey in the last 12 years, but she

11   is here standing.  She's fighting for what she believes is

12   right.

13          You saw one of the things that made her most upset

14   on the stand is when she recounted how much it hurt her when

15   she realized the school officials did not believe her then and

16   that they still do not believe her now.

17          When you get to damages, there's no way to --

18   there's two types of damages.  There's economic damages.

19   B██ has past medical expenses of just over $64,000.  You

20   heard from Mr. Karras that she has future medical expenses of

21   $1.5 million.  She also has what's called "noneconomic

22   damages."  And those are damages related to her pain and

23   suffering.

24          There's an issue in the case of whether PTSD is a

25   physical injury.  You heard from Dr. Cisler.  There is no such

—B.R. v. F.C.S.B.—

120

1    thing as PTSD that is not a physical injury.  And defense

2    expert really didn't say otherwise.  PTSD causes physical

3    changes to the brain.  Dr. Cisler explained it to you with his

4    dam and river analogy.  The only thing that the defense expert

5    told you is that there were different types of changes to the

6    brain, biological changes -- biochemical changes, excuse me.

7         How do you value B████ damages?  Well, we know

8    from Mr. Karras that in 2023 she had a life expectancy of 57

9    more years.  She's supposed to live until about 80.  So she's

10   lived with and is living with PTSD for 68 years since she was

11   12 years old.  And so, it's entirely up to you and the judge

12   is going to instruct you can come up with any sort of way to

13   measure these damages.  There's no book to look to.  There's

14   no guide.  It's what you feel is right.  We suggest a range of

15   200- to 300,000 per year of suffering for those 68 years.

16   But, again, you can give more and you can give less.

17        When you total those all together, her total damages

18   are between $15 million and $22 million.  It sounds like a lot

19   of money.  It is a lot of money.  But this is B████ only

20   chance.  She doesn't get to come back in 10 or 15 years and

21   have another claim.  Your job is to award her, if you find in

22   her favor, to award her damages for the pain and suffering

23   she's likely to endure for the rest of her life.

24        I want to end where I started, which is, on behalf

25   of B████ and our team, I want to thank you again for your

B.R. v. F.C.S.B.

121

1  service as jurors.  And I respectfully ask that you give my

2  colleagues on the defense side the same attention you gave me.

3           When they are done, I will have the chance to

4  address you briefly again before you retire to your

5  deliberations.

6           Thank you, Your Honor.

7           THE COURT:  Ladies and gentlemen, we're going to go

8  ahead and take a little bit of a break.  I will have you come

9  back in at 12:30, 12:30.  Remember, please do not discuss the

10 case or any aspect of the case even amongst yourselves.

11          (Audience stands and hold conversations.)

12          THE COURT:  Ladies and gentlemen, please allow the

13 jury to leave.  Respect the jury.

14          (Jury excused.)

15          THE COURT:  Thank you.  See you at 12:30.

16          (Recess.)

17          MR. BLANCHARD:  Your Honor --

18          THE COURT:  Hold it.  Hold it, Tinsley.  Tinsley.

19 I'm sorry.

20          MR. BLANCHARD:  Your Honor, may counsel approach

21 briefly on an issue?

22          (Side bar.)

23          THE COURT:  Go ahead.

24          MR. BLANCHARD:  Your Honor, heeding the Court's

25 comments regarding objecting in opening, I did not object but

B.R. v. F.C.S.B.

122

1  Mr. Brenner used -- made a reference to a prior sexual

2  disciplinary matter against my client, which the actual

3  document shows that it was for an inappropriate picture.  It

4  didn't say anything more than that.  But it was used as a

5  character issue with respect to my client as opposed to a

6  notice issue to the County.  And I didn't object to or

7  interrupt at that time, but I want to preserve my objection to

8  this because I think that was abused in closing purely as a

9  bad act.  I believe that the reference was "this is who she

10  was."

11         THE COURT:  Mr. Brenner.

12         MR. BRENNER:  I might recall using this here in my

13  closing talking about -- get the number of complaints -- the

14  School Board does, they think that -- they immediately -- the

15  complaints are against C.K. and J.O.  They tell -- they --

16  they disbelieve B██████, even though that C.K. and J.O. had this

17  prior incident.  It is exactly prior notice.

18         MR. BLANCHARD:  I don't believe that's a notice

19  issue because they are using it to show that they disbelieved

20  B██████ because -- not because of a prior 6th grade incident,

21  they are saying they shouldn't have --

22         THE COURT:  Let me.  People are talking too much.

23         (Open court.)

24         THE COURT:  Ladies and gentlemen, ladies and

25  gentlemen, as we're trying to take care of these things up

B.R. v. F.C.S.B.

123

1  here.  I appreciate that this is a good time to stretch and

2  get a little bit of a break, but please keep your voices down,

3  because we can't hear from all of the back noise that's being

4  produced.  Thank you.

5              (Side bar continues.)

6              MR. BLANCHARD:  The context is they disbelieve B█████

7  because they didn't -- they believed J.O., who they know had a

8  sexual disciplinary matter.  I didn't see it as notice.  I

9  think it was -- it was intended to go to the jury as she was a

10 sexual predator, and they didn't believe B████, even though

11 they had a sexual predator --

12             THE COURT:  Well, obviously, I'm not going to

13 preclude you from characterizing the evidence in the way that

14 you think is most advantageous from your perspective.  There

15 is a basis, I don't think it is the strongest basis, that the

16 plaintiffs have for a notice issue, it's not the strongest,

17 but it is a basis, and it is something that the jury can

18 resolve by listening to the evidence.  But, obviously, you can

19 make your point in closing arguments.  If Mr. Brenner objects,

20 I'm going to overrule the objection.  So we are not to object.

21             MR. BLANCHARD:  Otherwise, I will just -- I'll note

22 the objection.

23             THE COURT:  Absolutely.

24             MR. BLANCHARD:  Thank you.

25             THE COURT:  Thank you.

—B.R. v. F.C.S.B.—

124

1          (Open court.)

2          THE COURT:  You may be seated.

3          (Jury present.)

4          THE COURT:  We'll now hear from the other side.

5                          **CLOSING ARGUMENTS**

6          MS. REWARI:  Ladies and gentlemen, good afternoon.

7    On behalf of my client and my team, I want to really thank you

8    for your service and for all the time and attention you have

9    given to this matter.  I know it's been a long five-plus

10   weeks.  We can only imagine all the sacrifices you each have

11   made to be here with us every single day and we want to thank

12   you for doing that.

13         As the Court explained to you, you are the judges of

14   the facts in this case.  You will apply the facts as you find

15   them to the law that you have been given.  And as you know,

16   B.R. makes two claims against the School Board.  Both claims

17   are under Title IX which protects students against sexual

18   discrimination in education.

19         Now, as the Court told you, Title IX does not make

20   schools liable for -- for what one student may do to another,

21   but a school is responsible for its own decision, for its own

22   deliberate indifference in the face of known

23   student-on-student harassment.  That did not happen here.

24         The fine educators at Rachel Carson Middle School

25   bent over backwards to support B███.  They tried to partner

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

B.R. v. F.C.S.B.

125

1   with her parents.  They stood ready and willing to do more.

2   So did the entire school system.

3          Now, as you'll recall school started for B████ 7th

4   grade on September 6th.  And as you have seen and you have

5   heard, there were no documents of complaints from B████ or her

6   mother to the school before November 21, 2011.  Her mother

7   sent a handful of emails about homework and you can see some

8   of those examples in Defendants' Exhibit 76, 77, 78.  Mom

9   marked each one of those emails "high importance."  But there

10  are no emails about anyone bothering her daughter at school.

11         Now, as you've heard, they complain to the school

12  about a number of things between November 21st and February 9,

13  2012.  But most of those complaints had nothing to do with

14  sexual harassment and the school jumped into action each time,

15  same day, and they did it effectively.  There are no repeat

16  players.  There are no repeat issues.

17         Now, let's look at the claims that B.R. has made

18  against the School Board.  The first one is a Title IX

19  deliberate indifference claim.  There are three elements to

20  this claim.  B████ has the burden to prove each element.  If

21  she fails to prove any one of these elements, her claim fails

22  and you can move on to the next claim.  So let's talk about

23  the first element and how we see the evidence that has been

24  presented to you over the past few weeks.

25         For this element, the question to be asked is:  Has

B.R. v. F.C.S.B.

126

1    B███ proved that she suffered sexual harassment that was so

2    severe, pervasive, and objectively offensive that it deprived

3    her of equal access to the educational opportunities and

4    benefits provided by Rachel Carson.  The answer we submit to

5    you is, no.

6            B███ has certainly told you about things that would

7    be severe sexual harassment if they'd actually happened.  She

8    told you that she was regularly assaulted at school, that boys

9    were putting their hands down her pants, that they were

10   putting their hands down her blouse, touching her sexual

11   organs.  All right in her locker pod and all during that

12   handful of minutes that kids had before school and in the

13   bells between classes.

14           Now, you're all familiar with this photo by now.

15   Her locker.  This is the Explorers locker pod.  Her locker was

16   in the last row, back -- her back was to the wall, she faced

17   out towards the hallway.  There were kids with lockers to the

18   left of her, there were kids with lockers to the right of her,

19   there were kids with lockers in front of her, there were kids

20   with lockers behind her.  This is very little square footage.

21   It's a small section of the building.  It's home to the

22   same -- about 140 kids who were in there every day.

23           You saw the schematic of the locker pod a lot.  And

24   these are the people that you heard from who had classrooms,

25   who stood at their doors in this locker pod.  You heard how

B.R. v. F.C.S.B.

127

1   strict this requirement was that the teachers be outside their

2   classroom between class transitions, that they be outside

3   their classrooms before school starts.

4          And B███ didn't tell you that this misconduct

5   happened once.  She told you it happened all the time for four

6   months.  You heard from all of these people, you heard where

7   they stood, none of them saw B███ being inappropriately

8   touched.  Some of them are defendants in this case, but some

9   of them are not.

10         Now, B███ told you that she told the three teachers

11  that she sued in this case:  Ms. C███, Ms. F██████,

12  Mr. T█████.  But what about Ms. Estrella whose door is right

13  next to Ms. C█████, feet away.  She didn't go to Ms. Estrella.

14  Ms. Estrella didn't receive any report.  She testified.  And

15  what about Ms. Moir?  Ms. Moir was right across the locker pod

16  on the other side.  She taught B███ every day, just like

17  Ms. Estrella.  She was in her classroom every day walking

18  right past her.  There were a lot of adults in this area.

19  Every door that you see there had an adult on it you've heard.

20         Where are those witnesses?  There were also students

21  throughout this area.  Now, you've heard a lot of things about

22  what middle schoolers are like.  One thing you've heard over

23  and over is that they talk, and they talked a lot.  They

24  sometimes talked to adults but they certainly talk to each

25  other, and at this school they tell adults.  You saw this when

B.R. v. F.C.S.B.

128

1    the whole Jenni Taylor thing happened in February of 2012, but

2    not one student and not one adult who saw -- saw anyone

3    touching B███ inappropriately, not Co████████, not J███,

4    the two students they brought in, no one saw this.  How is it

5    possible?

6              Now, with the same conviction that B███ told you

7    about these inappropriate touchings at school, she also told

8    you that she was raped in her neighborhood, in her own

9    neighborhood regularly, near the bus stop, that is right at

10   the entrance to her neighborhood.  She told you that it didn't

11   happen just once, twice, or even three times, she told you it

12   happened regularly for months.  She can't count the number of

13   times, October to February.

14             And where did she tell you that it happened?  One of

15   the main stops -- spots.  There were two spots.  One of them

16   was the bus stop.  There's only one way in and out of this

17   neighborhood.  There's dozens of families in this

18   neighborhood.  Hundreds of kids.  B███ told you that these

19   rapes occurred after school between the hours of 3:00 and

20   5:00.  The same window of time when dozens of high school

21   students, middle school students, elementary school students

22   are coming home from school.  They are getting picked up at

23   bus stops; they are walking through the neighborhood; they're

24   going to activities.  People are coming home from work; they

25   are driving their kids to sports.  They all have to go past

———B.R. v. F.C.S.B.———

129

1   that entrance going in and going out.  The bus stop is

2   adjacent to someone's house.  There's the fence and the fence

3   is see-through.

4         The bus borders a very busy road, West Ox Road.  The

5   person -- the bus stop is practically in this person's yard,

6   yet that person never saw a thing.  B███████ mom told you that

7   this was a friendly neighborhood, a pretty, a serene, a safe

8   neighborhood.  There's a stop sign right at this entrance.

9   Everyone coming out of this neighborhood has to stop at this

10   stop sign.  They have to look left.  Where is this house?  It

11   is to the left.  They have to look right into this yard.  No

12   one saw a thing.

13         The elementary school bus stop, you heard, was in

14   the neighborhood.  The elementary school bus driver is

15   dropping these kids off in the neighborhood.  He or she has to

16   stop at this stop sign, look left, look into -- to see to

17   cross the street.  B████ is telling you that she was being

18   raped right there in that yard.  Not on the school's watch.

19   In her neighborhood where her parents were picking her up at

20   the bus stop every day she told you.

21         She also told you that she was raped by C████████

22   and J████ in a park, catty-corner from her house, on a Friday

23   afternoon in October.  Right where the Floris Elementary

24   school bus stop was in Middleton Farms.  Right at that park.

25   Steps from her yard, in the middle of the afternoon.

—B. R. v. F.C.S.B.—

130

1        Now this park near her house is where three

2    different streets intersect, including the main thoroughfare

3    for the entire neighborhood.  She told you that she even saw

4    her brother and her dad drive by in a car as she was laying

5    there on the ground being assaulted.  She saw her brother

6    holding a bag of food in his lap.  So who did you hear from

7    that saw any of this horrific stuff happening in the

8    neighborhood?  No one.  Not even her mom who is a very

9    attentive and involved parent.

10        Her mom admitted that she didn't know about any

11    rapes or any sexual assaults in the neighborhood of B████

12    until several weeks after she pulled her daughter out of

13    school.  You never even heard from B████ dad or her brother.

14    The people who drove by in this car as this assault was

15    happening.  Someone getting raped regularly, tortured you were

16    told.  She was tortured with knives, she was cut, burned with

17    lighters.  This was not business as usual in Middleton Farms.

18    You didn't hear from any neighbors.

19        Now, you heard what -- who C█████ was.  He was a

20    13-year-old boy.  He went around on a skateboard.  J███ was a

21    12-year-old girl.  She drew on her face with marker on spirit

22    day.  You saw that.  These were kids.  They depended on

23    parents and grandparents to drive them places.  These are not

24    the making of criminal masterminds.  C█████ could not even

25    pull off a skateboard prank on his buddy.  He put it in the

————B.R. v. F.C.S.B.————

131

1    back of a pickup truck and the truck drove away.  This is a

2    kid who was scared of David's mom and worried about how to pay

3    him back for the lost board.  Yet you're asked to believe that

4    he pulled off repeated rapes over a period of four months in a

5    busy neighborhood, often in someone's yard next to a bus stop

6    in broad daylight without a single witness.  And you're asked

7    to believe that it happened for months right under B███████

8    mother's nose, her father's nose, her brother's nose, and even

9    during that time that her mother said they were picking her

10   daughter up from school every day.  They started picking her

11   up from school after November.  So how is this happening?  Her

12   mom couldn't tell you that.

13           So ask yourself, Is this plausible?  No one other

14   than B█████ said they saw any of this happen.  You heard from

15   two students that she called, Co███████████, who was her

16   boyfriend starting in January.  He dated -- he dated her

17   during the time that she said she was being raped and burned

18   and cut and tortured.  He dated her.  He didn't figure this

19   out.

20           The report that Mr. Brenner told you that he made to

21   the school was after there was a police investigation.  After

22   the police had received this allegation of a rape in

23   March 2012.  Co███████████ didn't tell you that he saw any

24   touching of B█████ at school or out of school by anybody.

25   He -- they told you, Well, he -- he said there was scooping.

B.R. v. F.C.S.B.

132

1   Do you recall what he testified.  He said, "He only saw it

2   once.  He never saw it happen to B███."  They wanted you to

3   believe this pervasive problem.  He didn't see it happen to

4   her.

5          They told you about J███.  J███ told you all about

6   Jenni Taylor.  And who did you learn was Jenni Taylor?  It was

7   B███.  She created Jenni Taylor.  J███ has believed since

8   2012 that B███ was the victim of cyberbullying by Jenni

9   Taylor.  She didn't know until a month before she came and

10  testified in this case that B███ had been Jenni Taylor.  She

11  didn't see any bullying of B███ in school.  She reported

12  Jenni Taylor to the school.  And who told J███ about Jenni

13  Taylor?  Her friend Lauren who heard it from B███.

14         As the judge told you, you are the judges of

15  credibility in this case.  You decide what is fact; you decide

16  what is fiction; you decide who came in here and who told the

17  truth and who came in here and did not tell the truth.

18  Mr. Brenner told you that his client -- that B███ was on the

19  stand for a long time.  She was on and off for six days, but

20  he really didn't talk about what she testified to.  He told

21  you a lot about what Co███████ said and what J███ said, but

22  why didn't he talk about what his client said.  Because she

23  has not been truthful.  She has not been truthful with you and

24  she was not truthful with the school.  She's not been truthful

25  about a lot of things, even little things.

B.R. v. F.C.S.B.

133

1    But let's talk about some of the bigger things that

2    she has not been truthful about.  She hasn't been truthful

3    about David.  She told you that David was not her boyfriend.

4    But he was her boyfriend, even in the records back from

5    November they had dated.  What she told you about David was

6    even different than what she told Ms. T█████ about David.  She

7    told Ms. T█████ about being in David's basement with him and

8    going up and down with him.  What she told you about David was

9    different than what she told Detective Chambers about David.

10   You recall Detective Chambers, he testified that she told him

11   David respected that.  There was no touching at school.

12   She told you that she distanced herself from J█████

13   starting with the start of 7th grade.  She was not truthful

14   about J█████.  That was untrue.

15   She's been untruthful about C████████.  Now, you've

16   heard about some Facebook messages from C██████.  We are

17   going to look at some of those in a bit, but you don't need to

18   read those messages to know that B████ dated C████████ in the

19   fall of 2011.  It was common knowledge that B████ and

20   C████████ had dated for a short period of time in

21   November 2011.  C████████ and J█████ were talking about it in

22   their Facebook messages back in November 2011.  David talked

23   about it in his statement to the school on November 21st.  You

24   heard the Facebook messages that C████████ produced are

25   over -- are about 250 pages, over 2500 chats back and forth.

B.R. v. F.C.S.B.

134

1        Now, you may have recalled that the first time that

2   you heard anything in this case about those messages existing

3   was when I asked B███ about it in my questioning.  She was on

4   the witness stand and she looked you in the eyes and denied

5   that she was the person who sent those messages.  Those

6   denials are false.  Even before C██████ testified and told

7   you the messages were from her, the evidence in this case was

8   overwhelming that B███ is the Facebook user in these

9   messages.

10       Yes, they were only discovered last summer, four

11   years into this case.  Now, they've tried to suggest to you

12   that maybe there's something fishy about these messages in

13   some way.  There is not.  C██████ got his messages from his

14   Facebook archive the same way that B███ produced messages

15   from her Facebook archive.  Now, the difference is that

16   B█████ 2011 account -- the account that she had at the time

17   she was talking to him has been deleted.  She produced

18   messages from a new account that she created in 2013.  But you

19   recall with C███████, Mr. Bates hovered the mouse over the

20   top of those messages and you can see the path to Facebook,

21   you can see one link goes to his Facebook profile page, and

22   it's exactly the same way in B█████ Facebook messages.

23   Defendants' Exhibit 1 and 1A you can compare those hyperlinks

24   in C███████ messages to the hyperlinks that are in

25   Defendants' Exhibit 352A, and you can see that C█████████

———B.R. v. F.C.S.B.———

135

1   messages were obtained the same way through Facebook's

2   protocols that B█████ obtained her messages.  And his were

3   obtained in August -- on August 8, 2023.  She collected hers

4   after that.

5           Now, she told you that these were not her messages,

6   but a few months ago when these messages were found, B█████

7   told her therapist that she felt validated when these messages

8   were found.  Now, this is an exhibit that you haven't seen

9   before, but this is a note from Ms. Trahan who testified in

10  this case.  She told Ms. Trahan she wondered what had happened

11  to these chats.  She found them confirming to her story.  She

12  told you that she -- and then she came in this court and told

13  you, Well, I did send him text messages that were sexual, that

14  said I loved him, that I wanted to see him.  But then she told

15  you, Well, I was forced to send those messages to him.

16          Now, she didn't explain to you how this 13-year-old

17  kid was making her send these messages to him.  And when I

18  questioned her, I asked her about that.  I also pointed out

19  that these messages in Defendants' Exhibit 1, are also sexual,

20  the Facebook user also tells C█████████ that she loves him,

21  that she wants to see him, and that they are during the same

22  month, November 2011.  But B██████ flatly denied that the --

23  those messages were from her.  Even after I pointed out your

24  mom blocked C████████████ phone number from your phone so you

25  couldn't text him anymore, so how are you exchanging these

B.R. v. F.C.S.B.

136

 1    messages.  She still denied that the Facebook messages are

 2    from her.  Well, she's smart.  She knows that these messages

 3    are devastating to her case.  But you're the ones who get to

 4    decide if these messages are from her and you will have a

 5    chance to examine them closely.

 6            For now, I want to point out some of them to you.

 7    In these messages, C████████ addresses Facebook user as B████.

 8    Facebook user answers every time he calls her B████.  She

 9    refers to herself as B████.  You can take a look through

10    Defendant's Exhibit 279, which is a yearbook from Rachel

11    Carson for this year.  You're not going to find another B████

12    in the yearbook.

13            B████ and Facebook user had the same locker at

14    Rachel Carson.  Facebook user told him, "My locker is 498,

15    like, you know, where Explorers banner thingy is on the wall.

16    My locker is there."  And who is in the yearbook standing

17    under, at her locker, under the Explorers banner, B████.

18    Whose handwritten note says locker No. 498 in a document

19    produced by her family?  B████.

20            There's a lot of other things that B████ and

21    Facebook user have in common.  They both dated David.  B████

22    lived in Middleton Farms; so did Facebook user.  B████ lived

23    with a mom, a dad, and a brother; so did Facebook user.  B████

24    had a dad with a business; so did Facebook user.  B████ worked

25    for her dad's business; so did Facebook user.  B████ had

───────────────── B.R. v. F.C.S.B. ─────────────────

137

1    friends named J████, Olivia, Arianna, and Patrick; so did

2    Facebook user.  B█████ went to J█████ birthday party on

3    November 4, 2011; so did Facebook user.  B█████ mom's

4    birthday is in mid-November; so is Facebook user's.  B█████

5    gave C███████ money for David's lost longboard; so did

6    Facebook user.

7           Now, Mr. Brenner said to you, Well, maybe somebody

8    was impersonating her.  He never sent pictures.  But recall

9    what C███████ said, Every time a meetup is arranged in these

10   messages, who shows up?  B████.  He asked for money.  They

11   arrange that she is going to loan him money.  Who gave him the

12   money?  B████.

13          These messages also talk about phone calls.  You

14   have the phone logs.  The phone logs were provided to the

15   school in Defendants' Exhibit 84.  Who is calling who?  Who

16   are all the calls to on November 14, 2011?  Who is the only

17   number that calls C███████?  B████.  And in these messages,

18   Facebook user says, "My mom went through my phone records and

19   saw that we talked for a long time."  Who is the longest call

20   on C████████ phone log that day?  B████.

21          The only way these messages aren't her is if there's

22   a parallel universe with a girl just exactly like her,

23   everything else is the same except she's sending text

24   messages, and the other girl is sending Facebook messages.

25   But she admits that they were text messages.  She just doesn't

B.R. v. F.C.S.B.

138

1    admit that they were Facebook messages.

2         And Facebook user didn't keep her identity secret as

3    Mr. Brenner said.  The reason we don't see the user's name is

4    because B███ used a fake account and then it was deleted.

5    You can see at the start of the messages, he says "Who is

6    this?"  And she says, "The one you defriended."  And then he

7    figures out who she is.  He addresses her as B███, she

8    answers as B███.  She describes herself as B███.

9         Now, as I said, credibility in this case is

10   everything.  She is the only witness, but she looked you in

11   the eyes and said that she was not the Facebook user in these

12   messages.  That she could sit there under oath and deny that

13   these messages are from her tells you the brazenness; it tells

14   you about the confidence and the ability to manipulate people.

15        Now, B███ and her own expert, Dr. Ryan, told you

16   that she doesn't have a condition that causes her to

17   hallucinate.  She doesn't have a condition that causes her to

18   create false memories.  This is not a case of repressed

19   memories.

20        So what is the only conclusion to be drawn here?

21   The conclusion is that she has not been honest with you.  She

22   has tried to deceive you about what really happened.  What

23   really happened was that, like a lot of Rachel Carson Middle

24   schoolers, B███ settled into 7th grade, she showed signs of

25   adolescent independence, there were new friendships with

B.R. v. F.C.S.B.

139

1    David, new friendships with C⬛⬛⬛, and she is hanging out

2    with J⬛⬛ and her friends after school.  There's a lot of

3    photos from the school that show that she was having a normal

4    start to 7th grade.  We're the only ones that showed you

5    photos of her from 7th grade.  All of B⬛⬛⬛ family photos,

6    all of B⬛⬛⬛ photos are from 6th grade.  Where are there

7    pictures?  In the pictures the school has, she's smiling.

8           The first picture is outside the building at Rachel

9    Carson.  You can see the trailers in the back.  The second

10   picture, as you heard, was a field trip in October.  This is a

11   picture taken in class in the Explorers pod in the fall of

12   2011.  These are photos taken in her neighborhood, taken in

13   the community.

14          Now, in late October, early November there was some

15   friend group drama.  J⬛⬛ and C⬛⬛⬛ broke up.  B⬛⬛ made

16   a fake Facebook account to start talking to C⬛⬛⬛.  B⬛⬛

17   and David broke up, and then B⬛⬛ went to J⬛⬛ birthday

18   party.  And what happened over the next three weeks, leading

19   to that November 21 meeting that you heard so much about, is

20   displayed in those messages that are Defendants' Exhibit 1.

21          So let's look at a few of these.  On November 5

22   B⬛⬛ and C⬛⬛⬛ started dating.  B⬛⬛ initiated the

23   relationship by telling him "I like you more than a friend."

24   He asked her if she wanted to go out.  There was a discussion

25   about the fact that now she was going to be dating her best

B.R. v. F.C.S.B.

140

1   friend's ex-boyfriend.  The messages show conclusively that

2   B███ and C██████ were boyfriend and girlfriend.  She

3   repeatedly bragged about C██████ being her "amazing

4   boyfriend" about being "the best boyfriend in the world."

5           She told him that she loved him nearly 100 times in

6   these messages over and over and over.  In fact, she said it

7   so much that he eventually asked her to stop saying it so

8   much.  And she promised not to be so clingy.  You'll see that

9   in the messages.  B███ repeatedly asked C██████ to come to

10  her locker.  She begged him to come to her locker.  And

11  remember, C██████ didn't even know where her locker was.

12  She had to give him the number.  She had to tell him how to

13  find it.  And by the way, these messages are the week before

14  they go to the school, November 14th.

15          "When are you going to stop by my locker, baby?"

16  The week before they go to the school and complain.  This is

17  the week the mom writes in Plaintiff's Exhibit 171 the

18  chronology to the school.  This is when the problems at school

19  start.  This is when my daughter starts getting bothered by

20  her locker.  The week of November 14, 2011, "When are you

21  going to stop by my locker, baby?"

22          What also really happened was that B████ bashed

23  J████.  She was concerned that B███ was going to try to break

24  them up.  And she used the same kind of bad language,

25  inappropriate language, derogatory language that we've heard

B.R. v. F.C.S.B.

141

1   so much about middle schoolers using.  She used the same kinds

2   of bad words that you have been asked to judge the other kids

3   in this case as bad kids for using.  She was right there with

4   them using all of that language.

5          The messages also show that B███ was having

6   problems at home.  In fact, the things got so bad at home that

7   B███ told C██████ at one point that she was going to run

8   away from home.  The messages show that B███ parents

9   threatened to pull her out of Rachel Carson.  This is in

10  November, November 7, 2011.  Before the dates on Mom's

11  chronology.  The messages show that when C██████ lost

12  David's longboard B███ offered him money to help pay for it

13  so they could keep seeing each other because he was grounded.

14  His grandpa grounded him and he couldn't go out.

15         On November 14th, B███ confided in C███████ that

16  someone else had left her a horrible voicemail.  The voicemail

17  that we've heard so much about that was left on November 14th

18  B███ told C██████ that somebody else had left it.  The

19  messages show that B███ knew that the message was from David

20  or his friend.  And once C███████ heard about the voicemail,

21  what was his advice to B███?  Your mom should go to the

22  school.  He was being a supportive boyfriend.  The message

23  show -- messages show that B███ invited C██████ to have

24  sex.

25         Now, I'm going to warn you that these messages that

B.R. v. F.C.S.B.

142

1   you will see in Defendants' Exhibit 1 are eye-wateringly

2   graphic.  They are very sexual.  Some of them -- we've given

3   you a -- some of the tamer examples of what's in here.  She

4   sent him a lot of very graphic, very sexual, very explicit

5   messages.

6           She graphically described the sexual things that she

7   wanted to do with C█████████.  I'm not going to display them on

8   the screen.  These messages are riddled with intimate acts

9   that she said, she, as a 12-year-old, said that she wanted to

10  do with C████████.

11          She, B████, joked about raping C█████████.  This is

12  the only time that you are going to see "rape" mentioned in

13  these messages.  It's B█████.  She uses the word multiple

14  times, jokes about raping him.  He never says -- jokes about

15  raping her.  He never uses that word.

16          The messages show that B████ arranged a secret

17  rendezvous with C██████████ in her neighborhood on

18  November 14th, told him she was going to tell her mom that she

19  was going to stay after school.  Now, this date,

20  November 14th, is one that you've heard a lot, because that's

21  the date -- that's the week that mom told the police that this

22  rape happened.  The messages show that they met up again on

23  November 16th and that B████ gushed about her romantic

24  interactions with him.  She contemplated him; she told him how

25  much she enjoyed it.

B.R. v. F.C.S.B.

143

1      Now, November 16th is another important date that

2   you're going to want to pay attention to because that's the

3   date that Detective Chambers told you was pinpointed by B█

4   as the date of the rape in the neighborhood.  That's the date

5   she said I was after school with Ms. C█ for equations.  And

6   that's the date that Ms. C█ told you, "I didn't work at all

7   that day."  And we checked, she wasn't in after school with

8   any teacher that whole week.

9      The messages show that C█ broke up with B█

10  on the night of November 20th.  She blamed J█ for the

11  breakup.  In that moment, at that night, everything fell

12  apart.  The messages ended that night.  She told him I don't

13  like anyone but you, but he never messaged her back.  Her mom

14  told you that her daughter trashed her room that night and

15  they went into the school the next day to complain.  Yes, they

16  did.  About 12 hours later they went into the school to

17  complain.  And what did B█ tell the school?  You've seen

18  this statement so many times.  They keep coming back to it.

19  She gave them a story that was very different than what is in

20  those Facebook messages and what the school found out about

21  the relationship between the two of them.

22      Now, she wrote in the statement that it all started

23  about three weeks ago, which puts the time frame at exactly

24  the same time period that is in the Facebook messages.  And we

25  know exactly what happened in those three weeks.  We have a

B.R. v. F.C.S.B.

144

1    day-by-day, hour-by-hour, minute-by-minute recitation of what

2    was happening between the two of them.

3           Almost all of their messages are in Defendants'

4    Exhibit 1.  There are more of them in Defendants' Exhibit 3.

5    You should look closely.  Look at the dates, look at the

6    times, look who is initiating, look who is responding, look is

7    complimenting.

8           Everything that B███ wrote in this statement was

9    untrue.  The voicemail that she told the school about was not

10   left by C████████.  B███ knew it.  Her mom knew it.  Her mom

11   was the only person who heard this voicemail.  We know from

12   the Facebook message that the whole family believed it was

13   David.  Yet her mom came into the school and accused

14   C████████.  B███ accused C████████.  Her mom came into this

15   court and testified to you what that message said.  She said

16   it was C████████.  She said it talked about his race.  That

17   testimony was false.

18          As the judge has instructed you, conduct that is

19   welcomed or invited is not sexual harassment.  The messages

20   show that B███ invited and welcomed C█████████ attention,

21   his sexual contact.  She arranged to meet him in her

22   neighborhood behind her parents' back; she initiated sexual

23   contact; she urged him to do more and to go further.  And even

24   when he broke up with her on November 20th, she was telling

25   him, "I don't like anyone but you."  There had been no sexual

B.R. v. F.C.S.B.

145

1   harassment by C████████ before November 21st when this

2   complaint was made to the school.  B████ hadn't been raped by

3   J████ in October.  She'd secretly dated J████████ ex-boyfriend.

4   She called J████ all sorts of names.  They are on-again and

5   off-again friends, and she'd been dumped by David a couple of

6   weeks before that.  He hadn't been coming to her locker.

7   You'll see in those Facebook messages that he was back with

8   the girl named Melanie, his ex-girlfriend.

9           Now, B████ best friend, Olivia, confirmed this in

10  her statement that she gave to the school on November 22nd.

11  Olivia, you'll recall, was also in the Explorers pod.  She

12  didn't see David or C████████ bothering anyone at their

13  locker.  She didn't even -- she said, I've only seen David N.

14  once briefly and he has not approached B████ or me in that

15  time.  I also haven't seen C████████ or David sexually harass

16  B████ in the locker pod or anywhere else.

17          Now, Ms. T████ pieced all of this together when she

18  started investigating B████ statement.  Before that, there

19  was a safety plan implemented.  But Ms. T████ met with B████.

20  She interviewed students, she called parents, she looked at

21  J████████ phone, she took steps to protect B.R., and followed

22  B████ -- and followed up with her all in the same day.  And

23  she quickly learned there was a lot more to the story than

24  what appears in the statement and what her mother had said.

25  She learned that B████ and David had dated, she learned that

B.R. v. F.C.S.B.

146

1   B███ and C██████ had been friends, and B████ and J███ had

2   been friends.  She learned the kids had been hanging out after

3   school.  They've been calling each other, making plans to go

4   to the park.

5        She learned about the pumpkin patch, which is not in

6   that statement.  She learned about being in the basement, in

7   David's basement.  Not in that statement.  She learned that

8   J████ had dated C██████ and then after they broke up B████

9   had dated C██████.  She learned that B████ had loaned

10  C██████ $50 to help him pay for David's longboard.  None of

11  this history was in B█████ statement.

12       Now, Ms. T████ didn't judge or criticize B████ for

13  writing a statement that didn't give any of the story.  She

14  understood that peer relationships can change quickly and kids

15  were best friends one day or boyfriend and girlfriend one day,

16  can fall out the next day.  So even though she didn't

17  substantiate the allegation of harassment, she directed

18  C██████, David, and J████ to stay away from B████.  And the

19  teachers in B█████ pod were asked to keep a particular eye

20  out for her in the locker pod to ensure that the 8th grade

21  boys were not coming to her locker to bother her.

22       Mr. H█████ changed the walking route so that B████

23  wouldn't see C██████ and David going to or from Spanish,

24  which was her only class on the second floor where the 8th

25  graders were.  And Mr. H█████ and Ms. T████ had her gym locker

B.R. v. F.C.S.B.

147

1    moved away from J████'s, first to a crate in the office and

2    then to a new locker visible to the teacher.  Ms. H███████

3    shadowed B████ during class transitions.  Officer Genus also

4    monitored the locker pod for a while.

5            Now, Ms. T████ told you she cultivates her

6    reputation as "Scary T████."  The students know Ms. T████

7    doesn't play.  And you will see that -- in the Facebook

8    messages between J████ and C███████, the kids got the message

9    loud and clear what the school did worked.  And how do we know

10   that?  Because the kids are griping about how hard Ms. T████

11   was on them in those messages.  And neither B████ nor her mom

12   ever come back to complain about J████, or David, or C███████

13   actually bothering B████ again.

14           Now, recall when Detective Chambers testified he

15   told you that when he interviewed B████ in March 2012 she

16   said, Well, after Ms. T████ told C███████ to stay away from

17   her, he respected that.

18           Now, B████ and her mom have told you that they

19   complained in this November 21st meeting about boys touching

20   B████ at the locker.  That was untrue.  Look at Plaintiff's

21   Exhibit 79 and 80.  These are Mom's emails from that afternoon

22   after that meeting.  They are long, they say a lot of things,

23   but they don't say anything about anyone touching her

24   daughter.  The emails also don't mention the $50 because Mom

25   only learned about that from Ms. T████ the next day.

B.R. v. F.C.S.B.

148

1   Ms. T███ was also the one who informed her about the basement

2   and the hangouts in the park, which she, Mom, described as

3   making her enraged at the insinuation that she didn't know

4   what her daughter was up to.

5          Now, after the school jumped into action, Mom

6   visited B███ pediatrician, Dr. Weaver, without B███ on

7   November 28th.  She told him that she was unhappy about some

8   of B███ friends.  She told him that B███ was hanging out

9   with the wrong crowd.  She told him that she was having

10  adolescent independence resistant behavior.  What did she not

11  tell him?  That anyone is touching her daughter

12  inappropriately at school.  That her daughter is getting

13  sexually assaulted at school.

14         A week later, Mom brought B███ into to see

15  Dr. Weaver.  What did they report?  Kids bullying her,

16  spreading rumors about her, no complaints of inappropriate

17  touching at school, and B███ tells Dr. Weaver she hasn't had

18  sexual contact with anyone, consensual or not.  He told you my

19  questions were broad enough to cover both types of sexual

20  contact.

21         But later the same day Mom went to the school, told

22  the SRO and Cheryl Weaver that B███ had heard things from

23  some unknown kids about C███████.  About what maybe -- what

24  she had heard from other kids that C███████ had said.

25  Officer Genus and Ms. Weaver made a plan to investigate.

B.R. v. F.C.S.B.

149

1  Officer Genus spoke to C██████, the school made a plan to

2  protect B███ with the counselors shadowing her between class

3  transitions and Ms. F████████ talking to her.  And by the

4  end of the week, things had settled.  Mom sent an email

5  saying, Thanks.  She asked for the shadowing to continue

6  through the early part of next week and said, "I will continue

7  to stay in touch and update you as necessary."  There isn't

8  another email from Mom saying, Oh, you know what, can we

9  extend that?

10         Going into winter break B███ sent Ms. H██████ a

11  note saying, "Thank you so much for always helping me solve my

12  problems."  The key word there is "solve."

13         Now, after winter break and into 2012, the family

14  took a trip to New York City for winter break.  All signs look

15  normal, right.  She's -- three days she gets an illness, she's

16  sick for three days.  January 16th she's back at the doctor's

17  office and said, "School is going well."  No one is really

18  bothering her at school.  She's currently involved with high

19  school theater.  That's the South Lakes High School musical.

20  She's enjoying herself.  This is the month that she starts

21  dating Co██████.  And then later that month she starts

22  creating fake Facebook accounts that call herself some of the

23  names that has been complained about in this case.  Saying

24  hateful things about herself.

25         She's denied to you that she sent these messages,

─────────────── B.R. v. F.C.S.B. ───────────────

150

1  but Co███████ told you how he figured out it was her after

2  they broke up.  C████████ figured out in the messages after a

3  few days that it was her.

4          THE COURT:  Ten-minute mark.

5          MS. REWARI:  Thank you.

6          Last week of January B█████ claimed that her work was

7  being stolen and the mom was emailing teachers about improving

8  grades.  This letter, through January 27th, that they told you

9  about, proposes more bullying education.  It doesn't say:  I'm

10 getting touched at school.  I'm getting raped in my

11 neighborhood.  Boys are putting their hands down my pants.

12 That's not in these messages.  There's a physical altercation

13 at home with mom over the cell phone and Facebook on the last

14 day of January.  The altercation is so significant that it

15 sends Mom into the doctor's office the next day, February 1,

16 2012, without her daughter.  And where is her daughter?  She's

17 insisting on going to school.

18         The school is not told about this altercation.  It's

19 not told what emotional impact it's having on B█████.  The

20 school is checking in and the mom is emailing about grades.

21 The things that pop up at the end of January and into February

22 are not about sexual harassment.  Mr. Brenner said there is a

23 minor argument, a minor altercation with Ben F. in the

24 cafeteria.  It was no big deal.  No big deal.  Yet, that is

25 the day that they pull her out of in-person instruction.  That

B.R. v. F.C.S.B.

151

1   is the -- that is the event that causes the camel's back to

2   break in this case, right.

3           Read Mom's February 10 email when she announces that

4   she's keeping her daughter home from school.  That she's going

5   to request homebound instruction.  This is the day after the

6   last day of in-person at Rachel Carson.  It's a long email,

7   multiple pages.  You can find it at Defendants' Exhibit 156.

8   What's not in this email is that my daughter had been sexually

9   touched at school.  My daughter has been inappropriately

10  touched at school.  There's a discussion about the gym ball

11  that we heard about being thrown at her.  But this major thing

12  doesn't make it into this email.

13          Now, you heard Mom is a PR expert.  A master's in

14  communication.  Long, long emails.  That's a pretty important

15  detail.  This is an email that eventually gets sent to the

16  superintendent of schools to Dr. Jack Dale.  That's what gets

17  Dr. Zuluaga involved.  This is the best case Mom is going to

18  put forward to the superintendent for what is happening to her

19  daughter at school.  No mention of anyone touching her

20  daughter at school.

21          In this note, Mom announces that the family doctor,

22  an independent psychologist and others familiar have told --

23  have advised her to pull her out of school.  This note is

24  written on February 10th.  When was the last time Dr. Weaver

25  saw her?  January 16th.  He hadn't given any advice to pull

B.R. v. F.C.S.B.

152

1   her out of school.  There was no independent psychologist.

2   Mom testified that she didn't start seeing a therapist until

3   after they had pulled her out.

4           This is not the only example of Mom rewriting the

5   facts to suit a result that she wanted.  After she had made

6   this decision, she wrote to Dr. Weaver and said -- asked him

7   for a note describing PTSD like symptoms.  There's no

8   diagnosis of PTSD in any of Dr. Weaver's notes before Mom

9   suggests it.

10          Now, you heard a discussion about PwC.  Why did we

11  talk about PwC?  Why did we spend so much time looking at

12  that?  Because B█████ looked you in the eyes and said, "I never

13  sent that resume.  I didn't make that."  That resume is filled

14  with falsehoods, and she was so good at it, she, at 17 years

15  old, she fooled a Big Four accounting firm into giving her an

16  internship into having them think that she was a college

17  junior or a college senior.  She performed that job.  She said

18  she was in the Army Reserve.  Remember what she said, "That

19  would be offensive for someone to pretend they were a part of

20  the Army."  And what did PwC tell you in that deposition.  She

21  submitted this resume multiple times, not just to get the

22  internship but to get the permanent job offer at the end of

23  this internship.

24          She used that PwC internship, pretending that she

25  was a Columbia student, to then get into Columbia.  This was

B.R. v. F.C.S.B.

153

1    her admissions essay to Columbia.  This example shows you the

2    pattern that has been followed.  You get it into the resume,

3    you get the first lie accepted and then it's documented there

4    forever and no one is looking to see how it got there.  No one

5    is looking how did you get that internship.  No one is looking

6    how did you get that PTSD diagnosis.  Look, it's there.  It's

7    followed.  The person before said it so it must have been

8    true.  It's -- PwC is in every resume after this and no one

9    will see what happened, how did she get that job.

10        Dr. DeRight was the first person, the only person

11   who tried to validate this diagnosis of PTSD with any

12   objective measures.  And what did he tell you?  She failed

13   every test.  No one else checked.  They had their own expert.

14   Their expert got Dr. DeRight's data.  If there was any problem

15   with it, you would have heard about it.  You didn't.

16        Why is this debate about PTSD is a physical injury,

17   it is not a physical injury.  It's about money.  It's about

18   the damages in this case.  You'll see that in the

19   instructions.

20        We submit that your job ends at the first question.

21   There was no severe sexual harassment.  If you find that she

22   has met that burden, you still have to answer:  Was there

23   actual knowledge and what was actually reported to the school?

24        When the school heard about an allegation of rape,

25   they heard about it from the police.  They also heard from the

B.R. v. F.C.S.B.

154

1   police that the investigation was closed.  You've heard about

2   the dates.  You've heard about what happened on the dates that

3   are alleged this rape actually occurred.

4           And if you find that she's met her burden on the

5   second question, you still have to answer the third question,

6   which is:  Was the school deliberately indifferent?  There was

7   no deliberate indifference here.

8           Look at Defendants' Exhibit 200.  That's the B.R.

9   incidents memo.  The school did a lot.  They bent over

10  backwards.

11          Now, coming into this case, Title IX may not have

12  been something you were familiar with, but as the Court

13  explained, you're not just applying the law, you're applying

14  your good sense and your common knowledge of the natural

15  tendencies and inclinations of human beings.

16          Over the past five weeks, you've watched this case

17  turn from a case about horrific rapes by groups of men in a

18  closet at school to a case about torture and rapes in broad

19  daylight by a 13-year-old kid on a skateboard, to a case about

20  whose cell phone went off in history class, and why wasn't she

21  allowed to partner with somebody else on a homebound project.

22  We're not here 12 years later because kids called each other

23  names in middle school.  Children regularly use language that

24  would not be acceptable among adults.  B███ was no different.

25  The effort to demonize and label behavior that was

———— B.R. v. F.C.S.B. ————

155

 1    developmentally appropriate and normal for 12 and 13-year-old

 2    kids is wrong.

 3            Middle school children are at a critical and

 4    challenging stage of their development.  The educators work

 5    hard to make school a safe place to make mistakes, to learn

 6    and grow from mistakes, and they try to see the good in every

 7    kid.  The educators at Rachel Carson did that every day.  They

 8    did it for B███, and they did it for every other kid.

 9            Taking responsibility is a big part of growing up.

10    It's owning your choices, owning your actions.  B███ spread a

11    lot of lies when she was a kid.  She spread lies about other

12    people herself.  She spread lies about herself.  She spent the

13    last five years spreading lies about the school and about

14    these fine educators.  She hasn't owned her choices, she

15    hasn't owned her role in what happened, and she hasn't owned

16    the truth of what happened.

17            In here, with you, truth matters, the facts matter.

18    We ask that you return your verdict for the School Board.

19            THE COURT:  Ladies and gentlemen of the jury, we

20    have a couple of options right now.  We have about 30 more

21    minutes of argument.  As you know, there are several

22    defendants in the matter.  We have about 30 more minutes of

23    argument.  We can take a lunch break or we can go ahead and

24    get through the next 30 minutes.  It is your choice.

25            (Discussion off the record.)

B.R. v. F.C.S.B.

156

1        JUROR 41:  We'll go through, Your Honor.

2        THE COURT:  Okay.  Mr. Kinney.

3                          **CLOSING ARGUMENTS**

4        MR. KINNEY:  Your Honor, members of the jury, good

5   afternoon.  On behalf of each one of my clients, thank you for

6   the extraordinary commitment this case has been for you, to be

7   here every day, to listen to the evidence, to listen to the

8   testimony.  We appreciate it.

9        I've got two claims to talk to you about.  The First

10  Amendment retaliation and gross negligence.  I'll start with

11  the First Amendment retaliation.  B.R. alleged in her pleading

12  in this case that Mr. F███████ went to her elementary school

13  to dig up dirt on her to find out if she was a troubled child.

14  You haven't heard any testimony to that effect.  You haven't

15  seen any evidence that supports that.  And the reason is

16  because there is no evidence to support it.  What actually

17  happened, and Mr. F███████ testified to it, he said his team

18  was running into dead ends in their investigations of what she

19  was reporting.  And so he called the elementary school teacher

20  to see if they had any supports in place in elementary school

21  that he didn't know about.  He was following up on visits to

22  the elementary school that he makes for every student that

23  attends Rachel Carson before they come to school so that

24  supports can be in place on day one.

25        Cheryl Weaver, the director of student services,

B.R. v. F.C.S.B.

157

1   testified -- supported Mr. F███████'s testimony.  She was

2   there with him the year before B.R. became a 7th grade student

3   at Rachel Carson.  And you heard no testimony, you saw no

4   evidence that contradicts Mr. F███████ testimony.  We know

5   now, we know now, why they were running into dead ends.  We

6   didn't know at the time, Mr. F███████ didn't know at the time,

7   and he called the elementary school to help her, not to

8   retaliate against her.

9           The allegation against Mr. H██████, that is the

10  allegation in the pleading against Mr. H██████, is that on

11  November 22nd he sent B.R. home to stay until after the

12  Thanksgiving break.  Well, that doesn't work.  Because you've

13  seen in Plaintiff's Exhibit 80 that B.R.'s own mother emailed

14  the school, emailed Mr. H██████ and Ms. T██████ and Ms. H████████

15  that she -- that she had decided to keep B.R. home until after

16  the Thanksgiving break.  So what do they say now?  And I saw

17  "now" because it's not in the pleading.  It's come up at

18  trial.  She accuses -- I'm sorry, she claims that Mr. H███████

19  accused her of cheating.  Well, Mr. H██████ explained what that

20  was about.  He denied accusing her of cheating.  The issue was

21  not that she was cheating, but that her home school

22  instructor -- I'm sorry her homebound instructor was using

23  information obtained from the internet, instead of the

24  information provided by Ms. F██████, the history teacher.

25  Well, B.R. was going to be tested on the information that her

B.R. v. F.C.S.B.

158

1  teacher provided.  She wasn't going to be tested on

2  information obtained from the internet.  Again, no accusation

3  of cheating.  It was a matter of supporting B.R. while she was

4  studying at home.

5         They claim now that Mr. H███ prohibited the family

6  from going to the school to pick up homework and drop off

7  homework.  Well, this is merely the job of the homebound

8  instructor who may have needed to speak with the core teachers

9  at the time.  There's no retaliatory motive shown in this.

10 It's just a matter of managing the homebound arrangement and

11 supporting B.R. while she was studying at home.

12        They claimed that it was Mr. H███ that prohibited

13 B.R. from participating in a field trip.  There's no evidence

14 to support this.  In fact, the evidence was in the form of

15 testimony from Ms. Moir, the chorus teacher.  She explained

16 that B.R. was not eligible for the field trip because it

17 wasn't merely a field trip.  There was a choral performance

18 involved, and because B.R. had not been attending chorus, she

19 couldn't perform so she wasn't eligible to go on the field

20 trip.  That wasn't Mr. H███'s decision.

21        And finally, the claim is that Mr. H███ prohibited

22 B.R. from doing a group project with classmates.  Again, the

23 evidence establishes that this was not Mr. H███'s decision.

24 Certainly wasn't retaliatory.  Ms. Estrella, the English

25 teacher, testified that it was her decision, that the students

————— B.R. v. F.C.S.B. —————

159

 1    that B.R. wanted to work with had already -- had already

 2    formed a group to work together, and there was no one else for

 3    B.R. to work with.  In any case, she was working at home.

 4            And finally, Ms.  T███ is accused of retaliating by

 5    asking B.R. and her mother, "Why do you want to ruin a boy's

 6    life?"  Ms. T███ testified that she didn't say that.

 7    Ms. T███ testified further that B.R. and her mother didn't

 8    tell her anything that would have ruined a boy's life.  In any

 9    event, whatever Ms. T███ said or didn't say, she immediately

10    started investigating B.R.'s claims.  She put C.K. and

11    David N. in in-school suspension while she interviewed them

12    and other students.

13            She warned them about going to B.R.'s locker, which

14    apparently was successful.  B.R.'s mother even testified that

15    she didn't have to request the locker be moved because the

16    boys never went back to the locker.

17            She rerouted the boys so they would stay out of the

18    locker Pod A.  She and Mr. H███ rerouted B.R. so that she

19    could get to Spanish class on the second floor without going

20    through the 8th grade pods.  And all of this was done without

21    ruining anyone's life.

22            So what you're asked to believe is that

23    Mr. F█████, Ms. T███, and Mr. H███ had some motive to

24    retaliate against B.R. for reporting student conduct -- or

25    student misconduct.  She's presented no direct evidence of

B.R. v. F.C.S.B.

160

1    retaliatory motive on any of their parts, and why would they

2    retaliate?  Why would they retaliate against any student for

3    making a report?  What conceivable reason would any school

4    administrator have to retaliate against a student for

5    reporting this conduct?  They are teachers.  They are in the

6    business -- they are in the profession of educating children,

7    and part of educating children is helping them to -- helping

8    them to grow in their conduct, helping them to learn what's

9    appropriate conduct and what's not appropriate conduct.

10          I would like to talk now about gross negligence.

11   Nothing about my clients will shock you.  You may recall

12   that's what I told you when this case first began, when I

13   first had the opportunity to address you.  Nothing about my

14   clients will shock you.  I would like to -- like to explain

15   what I meant by that.

16          They are accused, my clients, of gross negligence.

17   Gross negligence is the entire absence of any care.  It's the

18   absence of even slight diligence.  It's the lack of scant

19   care.  It's standing by with folded arms and ignoring

20   supervision and care of a child.  And you haven't heard any

21   evidence of that.  What you've heard are complaints that they

22   didn't do enough or they didn't do the right thing.  You

23   haven't heard any evidence that they did nothing.  In fact,

24   the evidence is to the contrary.

25          Plaintiff's own testimony doesn't support this

B.R. v. F.C.S.B.

161

1  claim.  What she testified -- and she emphasized it by

2  repeating it.  She told her teachers; she told her counselor;

3  she told the administrators she was being bullied, harassed

4  and touched.  And she testified that, in her perception, and

5  I'm quoting, "They did not respond adequately."  She didn't

6  say they didn't respond at all.  She said they did not respond

7  adequately.  Well, the test for gross negligence is not

8  adequacy.  It is indifference.

9         The evidence shows that my clients intentionally

10  created a safe environment at the school.  Mr. H█████

11  testified that the entire building is designed with safety in

12  mind.  The interior of this large building is broken up into

13  individual pods, and teams -- teams of core teachers are

14  housed in these individual pods so the students don't have to

15  wander the buildings.

16        So let me talk about the A pod, where B.R. was the

17  member of the Explorers team.  Mr. Brenner says much of the

18  abuse took place here.

19        My clients, M████ C███, taught math there; M██████

20  P████████F█████ taught history; Mr. T█████ taught science,

21  and Ms. Estrella taught English.  Ms. Estrella is not a party

22  to this case.

23        You've heard this a number of times, but before

24  class and between class changes, all of the students [sic]

25  were required by Mr. F███████ to be outside their classrooms

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

───── B.R. v. F.C.S.B. ─────

162

1  monitoring the locker pod.  This requirement was so strongly

2  enforced that, many years later, Ms. Moir, chorus teacher,

3  came here and testified that she could remember how many

4  seconds she was away from the locker pod because she had to go

5  to the ladies' room, and it just so happened that Mr. F█████

6  observed that on that particular day.

7        Mr. T█████ testified that he's not only outside his

8  classroom monitoring the pod, he's often in the pod itself,

9  helping the students open their lockers when they needed help.

10 If anyone had bothered B.R. in her locker pod like she claims,

11 one of her teachers, at least one of her teachers, would have

12 seen it.  And if they had seen it, they would have informed

13 one another.

14        You've seen several emails between the core

15 teachers.  B.R. was going to see a counselor, they told one

16 another.  If B.R. was out sick, they told one another.

17        Take a look at Plaintiff's Exhibit 95.  Ms. F█████

18 was giving a test and the cell phone went off.  B.R. told

19 Ms. F█████ that she feared that other students were blaming

20 her.  And Ms. F█████ informed all the teachers on the team.

21 Is it believable, is it reasonable, that Ms. F█████ would

22 have informed all of her teachers on the team of a cell phone

23 going off in class but she wouldn't tell her fellow teachers

24 and counselor that a child in her class had reported being

25 bullied, harassed or touched?

B.R. v. F.C.S.B.

163

1    On November 21st, the day after Facebook user broke

2    up or -- I'm sorry C▇▇▇▇ broke up with Facebook user, B.R.

3    and her mother went to B▇▇▇ H▇▇▇▇ to complain about a

4    voicemail that B.R. had received.  B.R.'s mother said that it

5    was C▇▇▇ K., although, she testified here that she had

6    never heard his voice before.  B.R. testified that she herself

7    did not hear the voicemail.  While B.R.'s mother went home to

8    get a phone log, B.R. stayed at school, and she wrote a

9    statement.  You've seen it multiple times.

10    What did Ms. T▇▇▇ and Mr. H▇▇▇ do?  Did they

11    refuse to acknowledge what B.R. was telling them?  Even before

12    they started the investigation, they developed a plan to

13    support B.R. to help her feel safe, help her to be safe.

14    Ms. H▇▇▇▇ would shadow B.R. between classes.  That was

15    done.

16    Mr. H▇▇▇ told B.R.'s core teacher B.R. can see a

17    counselor at any time, and she was allowed to do that.  He

18    also told core teachers to be on lookout for 8th graders in

19    the pod and to report to him anything that concerned them.

20    Again, they rerouted B.R. so she could get to Spanish on the

21    second floor without going through 8th grade pods, and they

22    rerouted C▇▇▇▇ K. and David N. to keep them out of A pod,

23    and they would change B.R.'s gym locker to separate her from

24    J.O.

25    This is not indifference.  This is not the want of

B.R. v. F.C.S.B.

164

1   even the scant care.  And these actions were effective.

2   Again, B.R.'s mother testified she didn't have to request

3   changing B.R.'s main lock main locker because the boys stopped

4   going there.

5           THE COURT:  You're at the 20-minute mark.

6           MR. KINNEY:  I'm sorry?

7           THE COURT:  You're at the 20-minute mark.

8           MR. KINNEY:  January 20.

9           I'll conclude quickly, Your Honor.

10          January 20, B.R. reported that someone was saying

11  she was a lesbian.  This was Ben G. on the bus.  Mr. H█████

12  spoke to Ben G.  Ben G. admitted it.  Mr. H█████ gave him a

13  consequence.  It never happened again.  This is not standing

14  idly by and not taking the safety and supervision of a child

15  seriously.

16          Members of the jury, for my clients, the accusation

17  that they would -- that they would ignore a child's safety is

18  an accusation -- it calls into question their own motivations

19  for becoming teachers.  They chose to become teachers, and

20  they chose to teach middle school because it's difficult.

21  They each had their own individual motivations.  As it

22  happened, M████ C███ and S████ T███ and P██ H████ became

23  educators because they observed their mothers being educators.

24  M█████ F████ became a teacher, because, as she says, it was

25  the desire of her heart, even though in her culture, the

B.R. v. F.C.S.B.

165

1  expectation is to become a professional.  Mr. T█████ became a

2  teacher to join his wife.

3          And some had personal experience that they told you

4  about that made them especially attentive to child safety.

5  Ms. C██'s brother had been abused.  She felt confident in the

6  safety of Rachel Carson, so she had him transferred there.

7  Mr. B█████ struggled to tell you the reason why she is

8  hypervigilant about student safety.

9          There's no evidence that my clients are entirely

10  without care.  They've lived under the cloud of these

11  accusations for five years, and I'm asking you, on their

12  behalf, to return a verdict in their favor.  Thank you.

13          THE COURT:  Mr. Blanchard.

14          THE JUROR:  Judge, may we have a five-minute break?

15          THE COURT:  Sure.  Absolutely.  Ladies and

16  gentlemen, let's take a break until 2 o'clock.

17          (Jury excused.)

18          THE COURT:  Thank you, ladies and gentlemen.  You

19  may be seated.

20          Mr. Blanchard, I think you're somewhere, based upon

21  what Mr. Kinney did, somewhere around 10 to 15?

22          MR. BLANCHARD:  Less than 10.

23          THE COURT:  Okay.  Mr. Brenner, you are at 5.

24          MR. BRENNER:  Can I get 6.

25          THE COURT:  Very good.  Thank you.  We're in recess.

B.R. v. F.C.S.B.

166

1          (Recess.)

2          (Court proceedings resumed at 2:09 p.m.)

3          THE COURT:  We ran a little late.  Apparently

4   Squirt, the service dog, had to use the facilities.

5          MR. BLANCHARD:  What are the odds on that?

6          THE COURT:  So we have to accommodate Squirt.

7          (Jury present.)

8          THE COURT:  Thank you.  You may be seated.

9          MR. BLANCHARD:  May I proceed.

10         THE COURT:  Did you take care of Squirt?

11         You may.

12                    **CLOSING ARGUMENTS**

13         MR. BLANCHARD:  Good afternoon.  I want to start and

14  let me join the Court and all counsel for thanking you.

15  Giving up a month and a half of your life is not an easy

16  thing, but I can tell you that the system wouldn't work

17  without you.  Jury is the most important part, and you all

18  have answered your call in a way that, I think, is not only

19  beneficial to the parties to this action but to the Court

20  itself.  So thank you for that.

21         I hope I'm going to make your afternoon better and

22  be very brief.  Ms. Rewari covered a lot of territory that

23  dealt with J.O. and that explained to you what the real

24  relationships were between the parties.  Like she said, there

25  were ups and downs, but the fact of the matter is they were

B.R. v. F.C.S.B.

167

1    close and always got back together again.  You know that

2    because the witness that Mr. Brenner talked about the most,

3    Mr. Ki█, said that he was B███ boyfriend.  They started out

4    in mid-December and that they were best friends until B████

5    last day of school, and on B████ last day of school, you

6    know, according to the one of the student statement charts,

7    that J.O. is in the cafeteria that morning sitting with B███.

8           So they had this relationship of friends, and never

9    once during school, never once with the police did B███

10   accuse J.O. of any sexual assault.  And I stand here today,

11   and I tell you, as you've heard a month and a half of

12   evidence, that the tale of sexual assault with C.K. and J.O.

13   defies common sense.  It is inherently unbelievable.  It is

14   devoid of any witnesses, as Ms. Rewari went through, in the

15   neighborhood.

16          This takes place steps off the sidewalks, steps from

17   the street in an open area of a grassy area in broad daylight.

18   And no one sees a thing.

19          And that becomes a common pattern in this case.

20   Because, as you go through these records and most of the

21   things that B███ reports, there's an investigation, and from

22   B███, it's unidentified people, people she doesn't know,

23   people she can't go through yearbooks to look at.  The rumors

24   are always someone told me that someone was saying.  But there

25   is never anybody that came in and said, I heard Bill Smith say

B.R. v. F.C.S.B.

168

1    this.  And at the origin -- the only origin of rumors that the

2    evidence has shown in this case was B█████.

3            What I would like to do very quickly is Mr. Brenner

4    started, and he talked about this case being like putting

5    together like a puzzle, and what struck me as I was listening

6    to it was all the pieces to that puzzle that Mr. Brenner left

7    in the box, and I just wanted to just briefly mention them.

8            The piece about the multiple claims of strange adult

9    males roaming the halls in the school and raping the plaintiff

10   on numerous times without a single witness, without a single

11   detail offered to you, the plaintiff testified they happened

12   but there was no detail; there was no discussion; there were

13   no facts.  That piece just disappeared.

14           How about the disappearance of all the plaintiff's

15   electronic devices and all of her accounts, her social media

16   accounts?  That piece got left in the box.  And the fact that

17   we know that that happened, according to Deputy Chief

18   Chambers, after he met with B█████ mother and told her that

19   his investigation, should it go forward, would include looking

20   at source code and location data and looking at the parties'

21   electronic devices to determine where things came from.

22           So the plaintiff comes in here and says you know,

23   it's not clear whether she's Facebook user.  It's easy to say

24   when you've deleted all of your accounts.  And they didn't

25   give that evidence to the police, saying, here, this is Jenni

B.R. v. F.C.S.B.

169

1  Taylor, an account B████ created.  They gave it to the police.

2  They gave it to Detective Chambers as evidence that C██████████

3  was bullying her, that C████████ was Jenni Taylor.  And the

4  only time they told the police that it was -- that it was

5  B████ was, again, after Deputy Chambers said, as I go forward,

6  I'm going to have to look at electronic devices, and I'm going

7  to have to subpoena Google and other thing -- other mechanisms

8  I can use to find locations of the records.

9         That's when the admission comes, okay, it was B████,

10 and that's when all the accounts and things start

11 disappearing.

12        The piece of the puzzle that shows that there is a

13 lack of a single witness to a single act of sexual assault of

14 the plaintiff at any time.  1,250 students, I think over 130

15 staff members in that school.  B.R. says every day boys were

16 putting hands down her pants; they are touching her

17 inappropriately; they are going under her shirt.  Not one

18 witness saw it.  Nobody saw it in the neighborhood, the rapes

19 in the neighborhood.  Nobody saw the men in the school or the

20 rapes in the school.  Not one witness.

21        Mr. Brenner left the Jenni Taylor piece in the

22 puzzle box.  That's not a good piece for him.  Those things

23 are disturbing, those conversations, and they were used to

24 catfish other students to get C.K. and other students blamed

25 and in trouble.

─── B.R. v. F.C.S.B. ───

170

1      There were other fake accounts.  He didn't mention

2  those.  Another fake account to C.K., the Facebook user

3  account, the subsequent account of -- for Mr. Ki█ where he was

4  again catfished about four or five months after he broke up

5  with B.R.

6      Didn't mention the D.N. incident in the basement and

7  the pumpkin patch piece because, again, if you look at the

8  timeline, you have to make sense of this.  B.R. goes -- is

9  walking through a neighborhood.  She's attacked and tackled by

10  C.K. and J███, who brutally sexual assault her.  She goes

11  home, and within a couple of days, if not the next day, she

12  goes on a date with David N., D.N., to the pumpkin patch.

13  What happens?  As soon as they are alone, D.N. sexually

14  attacked her.  Goes to touch her and exposes himself.

15      What's the next development and missing piece?  My

16  client's birthday party, a couple days after D.N. alleged

17  incident, so she's now been attacked according to her story

18  twice in a very short time period.  She goes to the birthday

19  party of one of her attackers, and she starts dating the

20  other.

21      The three amended complaints in this case.  You know

22  from the questions to B.R. that her complaint in this case was

23  amended three times.  Details were changed.  Her answer is the

24  lawyers didn't let me read it.  In fact, she said she fired

25  some of the lawyers or said that's not why they're not my

B.R. v. F.C.S.B.

171

1    lawyers anymore.  But then she had to admit there were two or

2    three firms of the lawyers.  It wasn't the same lawyers.

3             So the same lawyers did the same thing three times,

4    said, You can't read your pleading.  You can't read your

5    lawsuit.

6             And I think the one that gets me -- the piece that I

7    didn't see was the piece that was discussed first three weeks

8    of this case by the plaintiff:  The gun toting, knife

9    wielding, extortionist, lighter burning, cutting, monster

10   known as C.K.

11            And then he came in the courtroom, and you all saw

12   him.  Where was the monster?  There was a 25-year-old, very

13   uncomfortable young man, having to sit in that seat and tell

14   you about a embarrassing relationship he had when he was 13

15   and uncomfortable Facebook messages with B███ and an

16   uncomfortable discussion about their sexual interaction.  What

17   monster?  Where are the pictures of burn marks?  Where the

18   scars from the knifes -- the knives?

19            Ladies and gentlemen, when we started, I said use

20   your common sense.  Ask yourself questions.  Test the

21   evidence.  Listen to everything.  Look at the realtime

22   conversations of 2011 and 2012.  That's where you will find

23   the answer, and that's where you will find the truth.  I stand

24   by that.

25            You'll see in your instructions your job here is to

B.R. v. F.C.S.B.

172

1   find the truth.  I submit to you the evidence in this case is

2   the truth is my client never sexually attacked anybody.  And

3   what the plaintiff said happened did not happen.  So I ask you

4   to find the verdict in favor of my client.  Thank you.

5            THE COURT:  Thank you, Mr. Blanchard.

6            Mr. Brenner, since the plaintiff has burden of proof

7   in this case, he gets the last word.

8            MR. BRENNER:  Can I have one second, Your Honor?

9            THE COURT:  Yes, sir.

10                 **REBUTTAL CLOSING ARGUMENTS**

11            MR. BRENNER:  May it please the Court.

12            THE COURT:  Yes, sir.  Thank you.

13            MR. BRENNER:  Counsel.

14            Okay.  Got a very short time.  Let me walk through a

15   couple of issues very quickly.

16            Can you bring up DX 370, please.

17            So this is a note Ms. Rewari showed you.  B████ and

18   her therapist.  One line she didn't highlight in that note is

19   B████ telling her therapist the same thing she told you:  She

20   doubts that those chats were valid for the same reason she

21   told you.  That was not highlighted when showed to you, but

22   listen, what we know about the Facebook messages that everyone

23   has to agree with is they are not consistent with what B████

24   says happened, and they are not consistent with what C████████

25   says happened.

─────── B. R. v. F.C.S.B. ───────

173

1          Let me repeat that:  They are not consistent with

2     anyone's memory.  We went through it great detail with

3     C███████, but he explained the things that he remembers

4     doing, saying, talking about, experiencing with B███, which

5     B███ disagrees with, are not what the Facebook messages show.

6               Can you bring up 178, please?

7               Ms. Rewari spent a lot of time talking about the

8     Facebook messages, talking about just about everything else

9     about -- except what was happening in the school.  And just

10    amazingly said to you, We never knew that there was an

11    allegation of inappropriate touching.  We never ever knew

12    that.  Over and over she said it.  This is the letter from

13    Dr. Zuluaga, the assistant superintendent of the Fairfax

14    County Public School System, to the R. family, confirming,

15    "Here is what was brought to the school's attention by you:

16    Sexual harassment, inappropriate touching, name-calling and

17    other bullying.  The instance of harassment inappropriate

18    touching and other bullying."

19              Exactly what B███ says she reported, exactly what

20    the School Board knows she reported, and, yet, you were told

21    over and over again in this courtroom, this never happened, we

22    never knew.  Of course, they knew.  So where are we left?

23              We're left with the picture on the -- on the front

24    of the puzzle box.  What do we all know?  We know the picture

25    is that we had a 12-year-old girl who suddenly, in the fall of

B.R. v. F.C.S.B.

174

1    2011, deteriorates, collapses, and ends up being treated for

2    the last 12 years for PTSD.  Look at the medical records.

3    It's not disputed.  It is not disputable.  She's hospitalized.

4    She's in intensive treatment.  That's what we know.  That's

5    the picture.  So who is telling you what the puzzle pieces

6    show?  My colleagues on the defense now have told you what the

7    story is.  Here is how they explain how B█████ went from a

8    perfectly healthy, happy 12-year-old girl to where she is for

9    the last 12 years ago until today.

10           The defense story is as follows:  B████ had a

11   three-week relationship with a boy, they broke up, and that

12   has ruined her life.  Does that make any sense?  Does that fit

13   with any of your common sense?  Has that ever happened to

14   anyone you know, that they had a relationship in 7th grade,

15   they broke up, and it has literally ruined their entire life?

16           Or is it the other story makes sense, that B████,

17   the 7th grade student was raped, just like the SANE exam said

18   she was; that B████, as a 12-year-old girl, was serially and

19   consistently and constantly abused and harassed in her school.

20   She begged her school administrators, teachers and counselors

21   to help her, just as Ms. S█████ and Mr. Ki█ told you was

22   happening to her.  And is that what has resulted in where

23   B████ is today?  Is that result that B████ has a condition she

24   has now?

25           You have to judge this case by the preponderance of

B.R. v. F.C.S.B.

175

1    the evidence standard.  Which of those stories make sense?

2    Which of those stories is consistent with how we all live our

3    own lives and how we view common sense.

4              On behalf of B███ and our entire team, I want to

5    close by, again, thanking you.  And I want you, and I know you

6    will, go back to the jury room; I want you to look at a couple

7    of exhibits when you start.  I want you to look at PX-56

8    because it tells you what the school is supposed to do as

9    opposed to what they did and did not do, and I want you to

10   look at PX-84, 111, and 261.

11             And all I'm going to ask you to do is what I asked

12   you to do at the beginning of the case, which is go back, view

13   all of the evidence, use your common sense, and return a just

14   and fair verdict in favor of the plaintiff in this case.

15   Thank you very much.

16             THE COURT:  Ladies and gentlemen of the jury, the

17   case has now been submitted to you in its entirety.  As I

18   indicated to you earlier, we will have a copy of all of the

19   instruction that Court provided to you earlier so that you can

20   have them individually.  Your first responsibility is to

21   select a foreperson.  He or she is to see that deliberations

22   go forward in a orderly manner.  And please remember, do not

23   discuss the case unless all members of jury are present and

24   have the opportunity to participate in all of your

25   deliberations.

─B.R. v. F.C.S.B.─

176

1          As usual, your liaison between you and the Court is

2    Ms. Tinsley, and she will be able to communicate with me

3    through any notes that you provide.  It's best that you send

4    notes.  That's the best way to communicate with the Court if

5    you need to.

6          Again, thank you for your participation in this

7    matter.  You may now retire to deliberate.

8          (Jury excused to deliberate at 2:27 p.m.)

9          THE COURT:  All right.  Thank you, ladies and

10   gentlemen.  You may be seated.  If I can see all counsel in

11   chambers for about a minute.

12         (Recess.)

13         (Court proceedings resumed at 4:59 p.m.)

14         THE COURT:  You may be seated.  Thank you.  We have

15   an inquiry from the jury, and I use the term inquiry because

16   it's better than a question.

17         The note says:  "Judge Alston, the jury is finished

18   for the day.  We will reconvene at 10:00 a.m. tomorrow.

19   Respectfully, Foreperson."

20         I took the liberty of asking this question -- I'm

21   sure no one will object:  "Will all of you be able to come

22   tomorrow at 10 o'clock a.m.?  I know that one juror has a

23   class reunion."

24         Response:

25         "One of the jurors has to go to a class reunion

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

B.R. v. F.C.S.B.

177

1   tomorrow."

2          So these are my thoughts:  Obviously, they can't

3   deliberate unless all of them are there.  I think they missed

4   that point even though I said it about three times.

5          What I am going to suggest the response be as

6   follows:  First, did anyone have any problem with me

7   clarifying what they wanted to do?

8          MR. BRENNER:  What you did already?  Is that the

9   question?

10          THE COURT:  Yes.

11          MR. BRENNER:  No, no problem.

12          MS. REWARI:  No, Your Honor.

13          THE COURT:  Very good.

14          What I would propose we do -- and I think we should

15   all sit here and wait for the response -- is this:  "You

16   cannot deliberate unless all of you are present."

17          See what they say.  And then the answer again.  Does

18   anybody have any problem with that?

19          MR. BRENNER:  No problem from the plaintiff.

20          MS. REWARI:  No, Your Honor.

21          THE COURT:  Mr. Blanchard?  Mr. Kinney?

22          MR. BLANCHARD:  No, Your Honor.  That's fine.

23          (A pause in the proceedings.)

24          THE COURT:  I'm going to send this note to the jury:

25   "You cannot deliberate unless all of you are present.  Judge

1    Alston.  5 o'clock, 4/23/24."

2          You can all be at ease while Ms. Tinsley takes that

3    in, and we'll see what they say.

4          (A pause in the proceedings.)

5          THE COURT:  Okay.  Response says:  "Understand.  We

6    will come in tomorrow at 9:00 a.m.  We will go until noon

7    or 1 o'clock p.m. until the juror has to leave.  We will

8    reassess at that point, with the understanding we cannot

9    deliberate unless we are all present."

10         So I guess the bottom line is they are going to show

11   up at 9:00 tomorrow, and we'll deal with it.

12         Tell them they may leave.  Let me actually charge

13   them for the day.  Bring them back in.  I'll charge them for

14   the day.

15         (Jury present.)

16         THE COURT:  Thank you, everyone.  You may be seated.

17         Ladies and gentlemen of the jury, we received the

18   note and the response to the note and my response to you.  And

19   it's my understanding that you want to come in tomorrow

20   morning at 9:00 a.m., so that's what we will do.

21         Let me charge you for the day.  It's the thing I say

22   to you at the end of every day.  Do not discuss the case or

23   any aspect of the case with anyone.  Try to stay away from

24   social or print media to the extent you can.  It's going to be

25   a bit of a temptation with your loved ones when they -- might

B.R. v. F.C.S.B.

179

1   mention to them that the case has been presented to you and

2   now you're deliberating.  Don't even volunteer that because

3   that's going to probably generate conversation that you do not

4   want.

5          So just say that the judge has instructed us not to

6   talk to anyone about the case.  And that will suffice.

7          We'll see you here at 9 o'clock next morning.  If

8   you have any problems or issues, your contact is Ms. Tinsley.

9   Enjoy your day.

10          (Jury excused.)

11          THE COURT:  You may be seated.

12          (A pause in the proceedings.)

13          THE COURT:  All right.  Ladies and gentlemen, enjoy

14   your evening, and we'll see you tomorrow morning.

15          MR. BRENNER:  What's your practice?  Are you going

16   to bring them in, or are they going to go right to

17   deliberations?

18          THE COURT:  Go right to deliberations.

19          MR. BRENNER:  So we don't need to be in the

20   courtroom?

21          THE COURT:  Don't need be here at 9:00.  9:01 -- no,

22   just kidding.  Just be on call.  You all got here reasonably

23   quick.  So that's fine.  But as I like to say, try to be

24   within five minutes.  Thank you.  Enjoy your evening.

25          **(Proceedings adjourned at 5:16 p.m.)**

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **B.R. versus F.C.S.B., et al.**, Civil

8    Action No.: 1:19-cv-917, in said court on the 23rd day of

9    April, 2024.

10           I further certify that the foregoing 211 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 13, 2024.

17

18

19

20

21   _____
            Tonia M. Harris, RPR
22          Official Court Reporter

23

24

25

                                                              180

## $

**$15** [1] - 120:18
**$22** [1] - 120:18
**$50** [2] - 146:10, 147:24
**$64,000** [1] - 119:19

## '

**'15** [1] - 106:1
**'80s** [1] - 43:19
**'90s** [1] - 43:19
**'deliberate** [2] - 17:9, 17:17

## 0

**05** [2] - 4:3, 4:3

## 1

**1** [10] - 18:21, 38:16, 50:9, 134:23, 135:19, 139:20, 142:1, 144:4, 150:15, 178:7
**1,250** [1] - 169:14
**1.5** [1] - 119:21
**10** [11] - 50:5, 50:6, 51:14, 83:9, 84:15, 109:19, 120:20, 151:3, 165:21, 165:22, 176:22
**100** [4] - 2:2, 2:6, 2:10, 140:5
**10:00** [1] - 176:18
**10:30** [2] - 50:14, 52:19
**10:39** [1] - 52:21
**10th** [2] - 100:14, 151:24
**11** [1] - 39:13
**111** [2] - 94:20, 175:10
**11:15** [1] - 50:16
**11:25** [2] - 82:19, 83:1
**11:28** [1] - 83:11
**11:30** [2] - 50:16, 51:18
**12** [12] - 103:15, 106:3, 109:19, 117:12, 118:8, 119:10, 120:11, 143:16, 154:22, 155:1, 174:2, 174:9
**12(b)(6** [1] - 5:16
**12-year** [1] - 102:9
**12-year-old** [9] - 47:11, 48:1, 86:13, 106:10, 130:21,

142:9, 173:25, 174:8, 174:18
**120** [1] - 3:6
**124** [1] - 4:4
**12:20-ish** [1] - 51:18
**12:30** [5] - 50:9, 50:12, 121:9, 121:15
**13** [1] - 171:14
**13-year-old** [6] - 104:16, 112:16, 130:20, 135:16, 154:19, 155:1
**130** [1] - 169:14
**14** [2] - 137:16, 140:20
**14-page** [1] - 109:5
**140** [1] - 126:22
**14th** [5] - 140:14, 141:15, 141:17, 142:18, 142:20
**15** [12] - 6:8, 21:10, 22:19, 23:16, 23:22, 24:7, 24:22, 25:8, 50:4, 50:6, 120:20, 165:21
**1520** [1] - 1:20
**156** [2] - 4:5, 151:7
**15th** [1] - 112:6
**16** [1] - 118:22
**166** [1] - 4:5
**167** [1] - 22:1
**168** [1] - 22:1
**16th** [4] - 142:23, 143:1, 149:16, 151:25
**17** [3] - 102:8, 117:11, 152:14
**17.7** [1] - 97:14
**171** [1] - 140:17
**172** [1] - 4:6
**1775** [1] - 3:9
**178** [1] - 173:6
**18** [1] - 97:14
**180** [1] - 180:10
**1801** [1] - 3:6
**181** [1] - 4:6
**187** [1] - 52:11
**19** [1] - 10:19
**194A** [1] - 52:11
**1983** [2] - 5:8, 70:22
**1999** [2] - 43:20, 43:24
**1:19-cv-917** [2] - 1:4, 180:8
**1A** [1] - 134:23

## 2

**2** [7] - 33:25, 34:6, 44:24, 47:3, 47:14, 47:19, 165:16
**20** [3] - 50:4, 164:8,

164:10
**20-minute** [2] - 164:5, 164:7
**200** [2] - 120:15, 154:8
**20037** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**2005** [1] - 21:25
**2011** [24] - 86:9, 86:18, 86:22, 100:23, 100:25, 103:1, 103:3, 104:17, 106:12, 117:2, 117:6, 125:6, 133:19, 133:21, 133:22, 134:16, 135:22, 137:3, 137:16, 139:12, 140:20, 141:10, 171:22, 174:1
**2011-2012** [2] - 96:22, 97:7
**2012** [21] - 86:10, 86:18, 86:22, 88:7, 99:23, 100:23, 100:25, 101:23, 103:4, 105:21, 106:12, 111:23, 117:3, 125:13, 128:1, 131:23, 132:8, 147:15, 149:13, 150:16, 171:22
**2013** [2] - 115:3, 134:18
**2014** [1] - 106:1
**20190** [1] - 3:10
**20191** [1] - 3:7
**202-536-1702** [1] - 1:17
**202-955-1596** [1] - 2:15
**202-955-1664** [1] - 2:22
**202-955-1974** [1] - 2:19
**2021** [1] - 117:24
**2022** [1] - 35:8
**2023** [4] - 5:23, 100:25, 120:8, 135:3
**2024** [3] - 1:6, 180:9, 180:16
**2029** [1] - 1:19
**20th** [2] - 143:10, 144:24
**21** [2] - 125:6, 139:19
**213-995-5720** [1] - 1:21
**21st** [7] - 8:21, 9:24, 125:12, 133:23, 145:1, 147:19, 163:1

**2200** [4] - 2:14, 2:18, 2:21, 3:1
**22314** [1] - 3:14
**22nd** [2] - 145:10, 157:11
**23** [3] - 1:8, 27:6, 180:8
**2300** [1] - 1:15
**24** [6] - 1:6, 10:24, 11:3, 110:5, 110:13, 180:16
**25-year-old** [1] - 171:12
**250** [1] - 133:25
**2500** [1] - 133:25
**26** [1] - 16:19
**261** [1] - 175:10
**27** [1] - 5:19
**279** [1] - 136:10
**27th** [2] - 94:16, 150:8
**28** [1] - 44:23
**2800** [3] - 2:3, 2:7, 2:11
**28th** [1] - 148:7
**29** [3] - 18:9, 23:21, 26:16
**2:09** [1] - 166:2
**2:27** [1] - 176:8
**2nd** [3] - 2:2, 2:6, 2:10

## 3

**3** [3] - 5:8, 10:20, 144:4
**30** [5] - 26:25, 50:23, 155:20, 155:22, 155:24
**300,000** [1] - 120:15
**305-539-8400** [1] - 2:8
**31** [5] - 5:8, 5:13, 5:20, 47:3, 47:20
**33** [1] - 85:25
**33131** [3] - 2:3, 2:7, 2:11
**352A** [1] - 134:25
**370** [1] - 172:16
**3:00** [1] - 128:19

## 4

**4** [1] - 137:3
**4/23/24** [1] - 178:1
**400** [2] - 3:10, 86:1
**401** [1] - 3:13
**41** [2] - 41:7, 156:1
**42** [1] - 70:21
**44** [1] - 36:13
**498** [2] - 136:14, 136:18
**4:59** [1] - 176:13

## 5

**5** [4] - 84:15, 139:21, 165:23, 178:1
**50** [4] - 29:6, 32:6, 50:22, 51:14
**544** [1] - 21:25
**57** [1] - 120:8
**58.7** [1] - 97:12
**59** [2] - 107:9
**5:00** [1] - 128:20
**5:16** [1] - 179:25
**5th** [1] - 112:7

## 6

**6** [1] - 165:24
**60** [1] - 46:18
**610-804-1787** [1] - 2:4
**640** [1] - 41:7
**643a** [1] - 1:16
**645** [2] - 24:17, 25:23
**68** [2] - 120:10, 120:15
**6th** [3] - 122:20, 125:4, 139:6

## 7

**7** [1] - 141:10
**731** [1] - 46:18
**76** [1] - 125:8
**77** [2] - 93:25, 125:8
**78** [1] - 125:8
**79** [1] - 147:21
**7th** [11] - 99:2, 103:7, 107:12, 125:3, 133:13, 138:24, 139:4, 139:5, 157:2, 174:14, 174:17

## 8

**8** [1] - 135:3
**80** [3] - 120:9, 147:21, 157:13
**804-788-8200** [1] - 3:2
**84** [2] - 4:4, 137:15
**850-585-3414** [1] - 2:12
**8th** [8] - 97:10, 99:1, 99:3, 146:20, 146:24, 159:20, 163:18, 163:21

## 9

**9** [2] - 125:12, 179:7
**90067** [1] - 1:20
**95** [1] - 162:17
**9:00** [4] - 178:6,

181

178:11, 178:20, 179:21
**9:01** [1] - 179:21
**9:23** [1] - 1:6
**9th** [1] - 108:25

# A

**A.F** [4] - 3:6, 71:1, 71:12, 72:15
**A.L** [1] - 14:14
**a.m** [7] - 1:6, 52:21, 83:11, 176:18, 176:22, 178:6, 178:20
**A.M./P.M** [1] - 1:8
**ability** [9] - 5:4, 51:10, 53:5, 60:14, 66:11, 87:15, 118:15, 138:14, 180:14
**able** [11] - 16:25, 18:4, 18:5, 29:2, 31:5, 53:19, 83:17, 93:17, 100:10, 176:2, 176:21
**abnormalities** [2] - 104:18, 104:19
**abrenner@bsfllp. com** [1] - 2:8
**abruptly** [1] - 100:6
**absence** [2] - 160:17, 160:18
**absent** [1] - 71:21
**absolute** [2] - 58:15
**absolutely** [4] - 30:7, 102:4, 123:23, 165:15
**abuse** [9] - 68:1, 71:4, 98:22, 99:13, 103:23, 104:2, 106:9, 110:25, 161:18
**abused** [3] - 122:8, 165:5, 174:19
**accept** [4] - 55:17, 55:22, 61:8, 71:13
**acceptable** [1] - 154:24
**accepted** [2] - 117:20, 153:3
**access** [5] - 65:4, 66:3, 66:8, 115:13, 126:3
**accident** [1] - 62:11
**accommodate** [1] - 166:6
**accordance** [2] - 57:2, 79:13
**according** [3] - 167:6, 168:17, 170:17

**account** [9] - 134:16, 134:18, 138:4, 139:16, 169:1, 170:2, 170:3
**accounting** [1] - 152:15
**accounts** [7] - 92:20, 149:22, 168:15, 168:16, 168:24, 169:10, 170:1
**accuracy** [1] - 70:12
**accurate** [2] - 60:16, 96:10
**accurately** [1] - 9:13
**accusation** [3] - 158:2, 164:16, 164:18
**accusations** [1] - 165:11
**accuse** [1] - 167:10
**accused** [6] - 106:7, 144:13, 144:14, 157:19, 159:4, 160:16
**accuses** [1] - 157:18
**accusing** [1] - 157:20
**acknowledge** [8] - 87:3, 87:4, 87:8, 95:18, 96:11, 98:18, 113:21, 163:11
**acknowledged** [1] - 104:2
**act** [16] - 14:16, 15:7, 22:2, 62:9, 62:10, 69:2, 69:3, 69:4, 76:15, 77:7, 77:9, 77:20, 78:9, 98:9, 122:9, 169:13
**acted** [5] - 65:11, 71:13, 75:11, 78:14
**acting** [3] - 78:18, 78:22, 78:23
**Action** [2] - 1:4, 180:8
**action** [32] - 10:4, 14:17, 18:9, 18:13, 18:24, 22:4, 22:10, 33:21, 44:25, 45:15, 47:3, 47:21, 47:22, 62:13, 63:4, 66:25, 68:3, 68:5, 68:7, 68:12, 71:5, 71:7, 71:20, 71:22, 72:2, 108:14, 111:11, 125:14, 148:5, 166:19
**actionable** [1] - 65:20
**actions** [15] - 15:13, 16:10, 16:13, 22:10, 35:24, 41:10, 44:12, 65:9, 65:15, 68:13,

69:20, 78:17, 116:15, 155:10, 164:1
**activities** [1] - 128:24
**activity** [6] - 6:2, 64:7, 66:6, 66:12, 71:2, 71:10
**acts** [5] - 22:12, 68:15, 76:20, 87:14, 142:8
**actual** [27] - 10:24, 10:25, 11:5, 11:16, 12:2, 12:9, 12:17, 12:20, 12:25, 13:7, 13:13, 13:19, 13:22, 26:13, 34:8, 56:19, 66:14, 66:17, 73:4, 78:14, 78:19, 115:19, 122:2, 153:23
**add** [3] - 40:14, 44:18, 51:8
**added** [1] - 40:16
**adding** [4] - 12:8, 16:10, 19:15, 32:13
**addition** [2] - 45:23, 61:10
**additional** [2] - 23:18, 40:22
**address** [10] - 13:4, 13:11, 13:14, 65:8, 66:22, 66:25, 87:16, 106:9, 121:4, 160:13
**addressed** [1] - 90:9
**addresses** [3] - 5:19, 136:7, 138:7
**adduced** [1] - 180:6
**adequacy** [1] - 161:8
**adequately** [4] - 13:14, 13:15, 161:5, 161:7
**adhere** [2] - 49:15, 84:13
**adjacent** [1] - 129:2
**adjourned** [1] - 179:25
**adjust** [1] - 93:19
**administration** [1] - 53:16
**administrative** [1] - 67:16
**administrator** [1] - 160:4
**administrators** [10] - 15:11, 64:21, 70:18, 74:8, 86:14, 87:17, 96:23, 98:23, 161:3, 174:20
**admission** [1] - 169:9
**admissions** [1] - 153:1
**admit** [2] - 138:1,

171:1
**admits** [4] - 62:22, 113:19, 118:19, 137:25
**admitted** [9] - 55:8, 62:19, 62:25, 63:13, 63:20, 63:23, 101:21, 130:10, 164:12
**adolescent** [2] - 138:25, 148:10
**adopt** [1] - 67:15
**adult** [5] - 47:10, 47:25, 127:19, 128:2, 168:8
**adults** [7] - 86:14, 93:4, 93:5, 127:18, 127:24, 127:25, 154:24
**advantageous** [1] - 123:14
**adverse** [18] - 18:9, 18:13, 18:24, 22:4, 22:10, 44:25, 45:15, 68:2, 68:5, 68:7, 68:12, 68:13, 71:20, 71:22, 72:2
**adversely** [2] - 47:21, 71:6
**advice** [2] - 141:21, 151:25
**advise** [2] - 37:20, 82:9
**advised** [1] - 151:23
**advisement** [1] - 17:25
**affected** [3] - 47:21, 60:20, 71:6
**affiliated** [1] - 64:12
**afraid** [4] - 80:18, 95:11, 107:25, 117:10
**afternoon** [7] - 124:6, 129:23, 129:25, 147:21, 156:5, 166:13, 166:21
**ago** [3] - 135:6, 143:23, 174:9
**agree** [14] - 14:4, 15:4, 17:13, 20:4, 37:7, 39:1, 41:24, 42:7, 43:11, 52:13, 52:14, 55:16, 79:19, 172:23
**agreed** [5] - 64:25, 71:12, 84:11, 88:7, 88:8
**agreement** [9] - 10:18, 36:15, 36:18, 36:19, 37:22, 45:14, 45:19, 79:21, 80:15

**ahead** [6] - 50:1, 52:3, 104:8, 121:8, 121:23, 155:23
**aimed** [2] - 11:4, 65:24
**al** [2] - 1:6, 180:7
**alanderson@bsfllp. com** [1] - 1:21
**alerted** [1] - 12:25
**Alexandria** [1] - 3:14
**aligned** [5] - 39:11, 40:9, 40:10, 40:15, 59:8
**Alison** [1] - 1:18
**all-girls** [1] - 117:18
**allegation** [7] - 64:18, 131:22, 146:17, 153:24, 157:9, 157:10, 173:11
**allegations** [3] - 7:7, 105:9, 105:13
**alleged** [15] - 6:15, 7:24, 13:11, 17:10, 17:19, 65:8, 65:10, 65:12, 67:11, 69:19, 69:25, 72:8, 154:3, 156:11, 170:16
**allegedly** [4] - 7:9, 7:11, 69:6, 99:10
**alleging** [4] - 13:2, 13:6, 13:21, 66:16
**allow** [5] - 27:23, 79:4, 79:5, 83:18, 121:12
**allowed** [2] - 154:21, 163:17
**alluded** [1] - 34:15
**almost** [4] - 14:19, 86:8, 108:12, 144:3
**alone** [6] - 23:2, 63:4, 67:17, 107:3, 107:4, 170:13
**alongside** [1] - 114:18
**Alston** [2] - 176:17, 178:1
**ALSTON** [1] - 1:11
**altercation** [4] - 150:12, 150:14, 150:18, 150:23
**amazing** [2] - 98:14, 140:3
**amazingly** [2] - 111:15, 173:10
**amend** [1] - 6:5
**amended** [2] - 170:21, 170:23
**Amendment** [17] - 5:9, 5:15, 45:17, 46:19, 46:22, 47:12, 70:21, 70:24, 71:15, 71:24, 72:3, 72:9, 72:16, 72:21, 74:1, 156:10,

156:11
**amount** [12] - 27:7, 34:16, 49:4, 50:2, 68:25, 70:4, 70:11, 72:17, 72:24, 74:4, 79:4, 79:5
**amounting** [3] - 74:18, 75:20, 78:15
**amounts** [1] - 73:9
**anally** [1] - 104:16
**analogy** [1] - 120:4
**analysis** [5] - 7:23, 18:20, 19:2, 20:12, 30:17
**analyze** [1] - 18:22
**Anderson** [3] - 1:18, 21:16, 24:21
**ANDERSON** [12] - 22:19, 22:23, 23:6, 23:14, 23:23, 24:23, 25:7, 25:11, 25:14, 26:23, 48:12, 48:20
**Andrew** [1] - 2:5
**ANDREWS** [4] - 2:14, 2:17, 2:21, 3:1
**ands** [1] - 25:15
**Angeles** [1] - 1:20
**angry** [1] - 119:4
**animus** [2] - 6:6, 71:17
**announces** [2] - 151:3, 151:21
**Answer** [1] - 92:7
**answer** [25] - 20:24, 36:25, 37:1, 37:2, 37:3, 37:6, 37:18, 38:4, 38:12, 42:22, 81:22, 81:23, 81:24, 82:3, 82:7, 83:13, 92:5, 93:1, 126:4, 153:22, 154:5, 170:23, 171:23, 177:17
**answered** [1] - 166:18
**answering** [2] - 37:15, 37:16
**answers** [2] - 136:8, 138:8
**anticipated** [1] - 76:17
**anus** [1] - 113:14
**anxiety** [1] - 29:16
**anytime** [1] - 119:10
**apart** [1] - 143:12
**appear** [3] - 59:10, 95:20, 119:8
**appearance** [1] - 60:6
**APPEARANCES** [3] - 1:13, 1:25, 2:25
**appellate** [3] - 9:14, 42:11, 42:24

**applicable** [3] - 54:9, 64:1, 82:13
**application** [1] - 44:5
**applied** [1] - 12:16
**applies** [2] - 20:15, 63:17
**apply** [7] - 12:17, 52:24, 54:10, 54:14, 82:12, 116:21, 124:14
**applying** [2] - 154:13
**apportion** [1] - 76:12
**appreciate** [6] - 48:16, 48:17, 49:11, 53:23, 123:1, 156:8
**appreciated** [1] - 34:18
**approach** [1] - 121:20
**approached** [1] - 145:14
**appropriate** [9] - 13:20, 21:17, 43:10, 66:15, 66:21, 66:24, 155:1, 160:9
**appropriately** [4] - 12:15, 12:19, 42:8, 64:16
**April** [4] - 1:6, 99:23, 180:9, 180:16
**archive** [2] - 134:14, 134:15
**area** [5] - 11:24, 127:18, 127:21, 167:17
**argue** [6] - 7:25, 23:17, 30:2, 31:23, 34:9, 48:8
**argued** [1] - 8:16
**arguing** [1] - 118:6
**argument** [15] - 7:21, 8:1, 9:23, 17:24, 31:25, 32:12, 32:14, 32:15, 38:19, 38:20, 44:5, 46:2, 150:23, 155:21, 155:23
**arguments** [22] - 4:4, 4:4, 4:5, 4:5, 4:6, 49:14, 49:19, 50:3, 50:7, 50:8, 51:12, 53:1, 53:3, 54:16, 55:10, 55:13, 82:18, 82:20, 84:6, 84:7, 123:19
**ARGUMENTS** [5] - 84:22, 124:5, 156:3, 166:12, 172:10
**Arianna** [1] - 137:1
**arises** [1] - 7:22
**arm** [2] - 28:25, 29:20
**Armentrout** [1] - 52:15

**arms** [1] - 160:19
**army** [2] - 152:18, 152:20
**arose** [1] - 34:15
**arrange** [1] - 137:11
**arranged** [3] - 137:9, 142:16, 144:21
**arrangement** [1] - 158:10
**art** [1] - 59:18
**articulated** [1] - 12:20
**aside** [1] - 94:17
**aspect** [3] - 53:18, 121:10, 178:23
**aspects** [1] - 73:5
**assault** [17] - 44:20, 64:17, 66:1, 67:25, 76:20, 77:4, 77:17, 77:21, 78:9, 113:5, 113:24, 116:24, 130:14, 167:10, 167:12, 169:13, 170:10
**assaulted** [11] - 76:19, 77:2, 77:5, 113:7, 113:20, 114:1, 114:4, 114:7, 126:8, 130:5, 148:13
**assaulting** [2] - 99:19, 113:6
**assaults** [8] - 8:17, 8:18, 8:21, 9:24, 103:1, 103:16, 114:10, 130:11
**assemblies** [2] - 91:15, 95:16
**assert** [2] - 74:13, 75:14
**assertion** [3] - 41:8, 57:16, 57:17
**asserts** [1] - 56:19
**assessing** [1] - 15:17
**assessment** [1] - 50:9
**assessments** [1] - 117:14
**assign** [1] - 64:23
**assignments** [1] - 114:22
**assist** [1] - 9:19
**assistance** [2] - 64:7, 64:8
**assistant** [8] - 88:12, 99:17, 107:14, 108:2, 109:2, 111:25, 112:17, 173:13
**associated** [7] - 29:3, 32:18, 34:5, 35:7, 36:1, 70:3, 106:9
**assume** [2] - 31:22,

51:15
**assumed** [1] - 75:7
**assuming** [1] - 43:18
**attacked** [4] - 170:9, 170:14, 170:17, 172:2
**attackers** [1] - 170:19
**attempting** [1] - 35:11
**attempts** [1] - 41:10
**attending** [1] - 158:18
**attends** [2] - 117:16, 156:23
**attention** [6] - 53:25, 121:2, 124:8, 143:2, 144:20, 173:15
**attentive** [3] - 53:25, 130:9, 165:4
**attributable** [4] - 44:25, 45:1, 68:3, 69:20
**audience** [1] - 121:11
**A█████** [5] - 70:19, 74:9, 75:6, 135:3
**Austin** [1] - 118:2
**author** [1] - 86:24
**authority** [7] - 13:4, 13:11, 26:5, 65:8, 66:22, 67:8, 87:15
**available** [2] - 39:5, 59:3
**Ave** [1] - 2:21
**Avenue** [4] - 2:14, 2:18, 3:1, 3:9
**avoiding** [1] - 11:4
**avoids** [1] - 48:3
**award** [13] - 28:2, 31:3, 69:5, 69:7, 70:5, 70:6, 70:8, 72:25, 73:2, 78:16, 79:3, 120:21, 120:22
**awarding** [1] - 78:2
**aware** [6] - 16:3, 16:6, 16:8, 42:22, 78:24, 78:25

## B

**B.H** [1] - 3:6
**B.R** [94] - 1:3, 44:24, 47:21, 64:1, 64:14, 65:1, 67:20, 67:24, 68:2, 68:6, 68:23, 68:25, 69:5, 70:11, 70:18, 70:25, 71:2, 71:6, 72:6, 72:10, 72:14, 72:18, 72:23, 73:6, 73:13, 73:25, 74:3, 74:5, 74:12, 74:22, 75:3, 75:8, 75:10, 75:12, 75:24,

76:19, 76:25, 77:3, 77:5, 77:11, 77:12, 77:16, 77:23, 77:24, 78:1, 78:3, 78:4, 78:8, 78:11, 78:14, 78:16, 79:3, 113:11, 124:16, 125:17, 145:21, 154:8, 156:11, 157:2, 157:11, 157:15, 157:25, 158:3, 158:11, 158:13, 158:16, 158:18, 158:22, 159:1, 159:3, 159:5, 159:7, 159:18, 159:24, 161:16, 162:10, 162:15, 162:16, 162:18, 163:2, 163:4, 163:6, 163:8, 163:11, 163:13, 163:14, 163:16, 163:20, 164:10, 169:15, 170:5, 170:8, 170:22, 180:7
**B.R.'s** [17] - 63:25, 72:8, 72:16, 75:2, 76:5, 77:15, 78:16, 157:13, 159:10, 159:13, 159:14, 163:4, 163:7, 163:16, 163:23, 164:2, 164:3
**baby** [2] - 140:15, 140:21
**backup** [1] - 180:13
**backwards** [2] - 124:25, 154:10
**bad** [7] - 112:12, 112:13, 122:9, 140:24, 141:2, 141:3, 141:6
**bag** [1] - 130:6
**bailiff** [2] - 37:20, 81:1
**ball** [1] - 151:10
**B█████** [9] - 74:9, 75:7, 90:24, 96:19, 99:17, 110:15, 111:3, 112:3, 165:7
**banner** [2] - 136:15, 136:17
**bar** [4] - 21:1, 83:6, 121:22, 123:5
**BARAN** [1] - 1:14
**Bartlett** [1] - 5:18
**based** [18] - 8:16, 8:18, 16:25, 19:13, 21:9, 27:5, 30:6, 50:9, 59:25, 70:8, 72:25, 81:6, 89:10,

89:17, 90:22, 100:22, 118:12, 165:20

**basement** [5] - 133:7, 146:6, 146:7, 148:1, 170:6

**bashed** [1] - 140:22

**basic** [1] - 100:21

**basis** [6] - 64:4, 64:15, 118:23, 123:15, 123:17

**BATES** [1] - 10:13

**Bates** [2] - 2:13, 134:19

**battered** [3] - 76:19, 77:2, 77:10

**batteries** [1] - 68:1

**battery** [5] - 76:22, 77:4, 77:17, 77:21, 78:10

**battle** [2] - 29:10, 29:13

**bays** [1] - 99:9

**became** [4] - 157:2, 164:22, 164:24, 165:1

**become** [3] - 59:17, 164:19, 165:1

**becomes** [2] - 112:21, 167:19

**becoming** [1] - 164:19

**BEFORE** [1] - 1:11

**began** [2] - 119:6, 160:12

**begged** [2] - 140:10, 174:20

**begin** [1] - 84:19

**beginning** [8] - 43:2, 48:15, 82:14, 85:15, 85:19, 95:13, 117:6, 175:12

**begins** [6] - 17:12, 36:24, 38:4, 81:21, 113:25, 114:1

**behalf** [8] - 13:12, 45:20, 85:2, 120:24, 124:7, 156:5, 165:12, 175:4

**behavior** [2] - 148:10, 154:25

**behavioral** [1] - 103:2

**behind** [4] - 113:5, 113:19, 126:20, 144:22

**beings** [2] - 56:15, 154:15

**belie** [1] - 7:24

**belief** [2] - 58:13, 60:12

**believable** [1] - 162:21

**believes** [1] - 119:11

**B█████** [3] - 10:7, 94:25, 96:9

**B█████** [2] - 113:19, 139:6

**bells** [1] - 126:13

**Ben** [4] - 150:23, 164:11, 164:12

**beneficial** [1] - 166:19

**benefit** [1] - 66:4

**benefits** [4] - 64:5, 65:5, 115:13, 126:4

**bent** [2] - 124:25, 154:9

**best** [11] - 14:10, 20:25, 139:25, 140:4, 145:9, 146:15, 151:17, 167:4, 176:3, 176:4, 180:14

**better** [7] - 43:15, 46:2, 93:19, 96:1, 96:4, 166:21, 176:16

**betting** [1] - 51:2

**between** [31] - 6:2, 21:5, 33:10, 50:20, 50:23, 54:16, 56:23, 57:19, 60:24, 71:10, 71:17, 76:9, 76:12, 86:17, 100:19, 101:19, 112:15, 120:18, 125:12, 126:13, 127:2, 128:19, 143:21, 144:2, 147:8, 149:2, 161:24, 162:14, 163:14, 166:24, 176:1

**beyond** [2] - 36:4, 101:9, 108:13

**bi** [1] - 92:8

**bias** [1] - 54:21

**big** [4] - 85:11, 150:24, 155:9

**Big** [1] - 152:15

**bigger** [1] - 133:1

**Bill** [1] - 167:25

**bills** [1] - 35:7

**binding** [2] - 9:11, 24:11

**biochemical** [1] - 120:6

**biological** [1] - 120:6

**biology** [1] - 30:24

**Birmingham** [1] - 21:24

**birthday** [5] - 137:2, 137:4, 139:17, 170:16, 170:18

**bit** [14] - 18:2, 23:24,

26:7, 39:18, 44:18, 51:15, 91:13, 98:21, 105:19, 121:8, 123:2, 133:17, 178:25

**black** [1] - 30:12

**blamed** [2] - 143:10, 169:24

**blames** [2] - 110:2

**blaming** [1] - 162:19

**BLANCHARD** [13] - 83:24, 121:17, 121:20, 121:24, 122:18, 123:6, 123:21, 123:24, 165:22, 166:5, 166:9, 166:13, 177:22

**Blanchard** [5] - 3:8, 165:13, 165:20, 172:5, 177:21

**Blanchard.................. .** [1] - 4:5

**bless** [1] - 45:18

**blindness** [1] - 86:25

**blocked** [1] - 135:24

**bloody** [1] - 113:21

**blouse** [1] - 126:10

**board** [6] - 41:9, 41:11, 44:9, 44:12, 44:14, 131:3

**Board** [58] - 11:4, 14:11, 15:18, 21:12, 21:24, 27:2, 34:15, 35:13, 35:25, 39:21, 40:3, 40:6, 40:18, 40:22, 45:1, 50:22, 57:23, 63:25, 64:2, 64:8, 64:10, 64:11, 64:13, 64:14, 64:17, 65:7, 65:11, 65:13, 65:15, 65:17, 67:2, 67:5, 67:7, 67:20, 67:21, 68:3, 68:5, 68:24, 69:2, 69:15, 69:20, 70:1, 70:15, 83:22, 87:13, 87:19, 93:15, 94:5, 99:14, 105:4, 106:4, 115:8, 115:21, 122:14, 124:16, 125:18, 155:18, 173:20

**Board's** [7] - 10:18, 10:23, 20:12, 21:8, 26:24, 69:6, 106:21

**boarding** [1] - 117:17

**Boards** [1] - 57:25

**bodily** [5] - 35:2, 35:23, 69:13, 69:14

**BOIES** [4] - 1:19, 2:2,

2:6, 2:10

**boils** [1] - 116:3

**book** [2] - 86:25, 120:13

**borders** [1] - 129:4

**bosses** [1] - 14:24

**bother** [1] - 146:21

**bothered** [2] - 140:19, 162:10

**bothering** [4] - 125:10, 145:12, 147:13, 149:18

**bottom** [3] - 14:25, 92:18, 178:10

**bound** [1] - 57:15

**bounds** [1] - 27:23

**box** [9] - 85:9, 85:12, 85:13, 85:19, 88:11, 168:7, 168:16, 169:22, 173:24

**boy** [7] - 104:16, 105:25, 106:7, 108:15, 112:17, 130:20, 174:11

**boy's** [3] - 93:24, 159:5, 159:8

**boy/girl** [1] - 93:21

**boyfriend** [12] - 113:14, 131:16, 133:3, 133:4, 140:1, 140:2, 140:4, 141:22, 145:3, 146:15, 167:3

**boys** [11] - 93:20, 99:19, 112:22, 126:8, 146:21, 147:19, 150:11, 159:16, 159:17, 164:3, 169:15

**bragged** [1] - 140:3

**brain** [3] - 30:24, 120:3, 120:6

**brazenness** [1] - 138:13

**break** [15] - 50:6, 53:1, 68:22, 121:8, 123:2, 140:23, 149:10, 149:13, 149:14, 151:2, 155:23, 157:12, 157:16, 165:14, 165:16

**breakup** [1] - 143:11

**breast** [1] - 89:7

**B█████** [3] - 74:7, 75:5, 163:3

**Brenner** [21] - 2:5, 20:21, 33:10, 34:13, 34:20, 49:8, 122:1, 122:11, 123:19, 131:20, 132:18,

137:7, 138:3, 150:22, 161:17, 165:23, 167:2, 168:3, 168:6, 169:21, 172:6

**BRENNER** [34] - 20:22, 23:10, 31:21, 32:25, 33:11, 33:19, 33:22, 49:21, 50:11, 50:15, 50:18, 51:2, 51:13, 51:17, 52:2, 83:2, 83:7, 83:20, 84:2, 84:20, 84:23, 84:25, 116:6, 116:8, 122:12, 165:24, 172:8, 172:11, 172:13, 177:8, 177:11, 177:19, 179:15, 179:19

**Brenner............** [1] - 4:6

**Brenner..................** [1] - 4:4

**bridge** [1] - 102:7

**brief** [1] - 166:22

**briefly** [5] - 24:3, 121:4, 121:21, 145:14, 168:7

**briefs** [1] - 9:10

**bring** [8] - 52:22, 83:12, 84:1, 111:25, 172:16, 173:6, 178:13, 179:16

**Brittany** [1] - 2:1

**britzoll@gmail.com** [1] - 2:4

**broad** [4] - 131:6, 148:19, 154:18, 167:17

**broke** [12] - 113:14, 139:15, 139:17, 143:9, 144:24, 146:8, 150:2, 163:1, 163:2, 170:4, 174:11, 174:15

**broken** [4] - 28:25, 29:20, 161:12

**brother** [5] - 130:4, 130:5, 130:13, 136:23, 165:5

**brother's** [1] - 131:8

**brought** [6] - 64:1, 88:3, 100:17, 128:4, 148:14, 173:15

**Bruce** [1] - 3:8

**bruce.blanchard@ ofplaw.com** [1] - 3:11

**brutally** [1] - 170:10

**buddy** [1] - 130:25

**building** [4] - 126:21, 139:8, 161:11, 161:12
**buildings** [1] - 161:15
**bullied** [7] - 91:21, 92:4, 97:12, 97:17, 111:11, 161:3, 162:25
**bullying** [18] - 91:10, 91:17, 91:19, 91:20, 91:23, 92:16, 92:17, 95:10, 96:4, 97:5, 113:17, 132:11, 148:15, 150:9, 169:3, 173:17, 173:18
**bunch** [4] - 86:16, 92:9, 109:10, 118:12
**burden** [7] - 5:17, 58:2, 58:22, 125:20, 153:22, 154:4, 172:6
**burn** [1] - 171:17
**burned** [2] - 130:16, 131:17
**burning** [1] - 171:9
**Burton** [2] - 2:20, 52:7
**burtons@huntonak. com** [1] - 2:23
**bus** [12] - 128:9, 128:16, 128:23, 129:1, 129:4, 129:5, 129:13, 129:14, 129:20, 129:24, 131:5, 164:11
**business** [5] - 54:4, 130:17, 136:24, 136:25, 160:6
**busy** [2] - 129:4, 131:5
**but-for** [2] - 5:14, 71:19
**buttocks** [1] - 99:25

## C

**C.K** [25] - 90:1, 92:17, 92:21, 93:22, 103:13, 103:20, 105:13, 105:15, 110:7, 110:8, 113:4, 113:13, 113:15, 113:19, 113:25, 114:2, 114:4, 122:15, 122:16, 159:10, 167:12, 169:24, 170:2, 170:10, 171:10
**C.K.'s** [2] - 91:1, 110:19
**CA** [1] - 1:20
**cafeteria** [2] - 150:24,

167:7
**calculation** [1] - 72:22
**camel's** [1] - 151:1
**campus** [20] - 6:15, 6:16, 6:23, 7:2, 7:3, 7:7, 7:9, 7:10, 7:11, 7:20, 8:17, 8:22, 8:25, 9:7, 9:8, 10:2, 104:22, 105:1, 105:7
**candidly** [1] - 114:3
**cannot** [2] - 12:1, 15:8, 27:15, 31:3, 63:19, 87:2, 98:18, 177:16, 177:25, 178:8
**Cantalupo** [1] - 112:24
**capacity** [2] - 73:22, 180:5
**car** [2] - 130:4, 130:14
**cardboard** [1] - 85:11
**care** [14] - 73:16, 74:11, 75:7, 75:12, 88:14, 105:21, 105:22, 122:25, 160:17, 160:19, 160:20, 164:1, 165:10, 166:10
**careful** [1] - 56:8
**carefully** [2] - 54:24, 60:9
**caricatured** [1] - 102:5
**C█████** [7] - 74:6, 75:4, 127:11, 143:5, 143:6, 161:19, 164:22
**C█████** [2] - 127:13, 165:5
**carry** [1] - 44:5
**Carson** [36] - 6:15, 75:9, 75:12, 86:9, 87:15, 88:2, 89:2, 91:6, 91:8, 92:12, 96:17, 96:19, 97:4, 97:12, 97:18, 97:24, 98:2, 98:14, 103:1, 103:7, 105:5, 106:12, 106:18, 113:18, 124:24, 126:4, 136:11, 136:14, 138:23, 139:9, 141:9, 151:6, 155:7, 156:23, 157:3, 165:6
**case** [155] - 5:25, 6:13, 6:22, 7:8, 7:24, 8:6, 8:8, 8:15, 9:15, 9:20, 10:12, 11:10, 11:15, 12:7, 12:9, 12:23, 12:25, 13:9, 14:14,

14:15, 15:3, 15:17, 15:25, 16:25, 19:1, 19:14, 21:4, 24:11, 26:17, 30:6, 30:18, 34:8, 39:21, 40:3, 40:9, 40:15, 40:18, 40:22, 42:13, 42:19, 42:24, 43:1, 43:17, 43:18, 43:24, 44:10, 44:12, 44:13, 45:24, 47:10, 48:8, 51:11, 51:24, 52:24, 53:6, 53:18, 53:22, 54:11, 55:4, 56:12, 57:3, 57:4, 57:10, 57:12, 57:19, 58:16, 58:25, 59:8, 59:10, 59:13, 59:22, 60:19, 60:22, 62:21, 63:9, 63:12, 63:16, 63:18, 64:10, 64:22, 64:23, 79:10, 79:13, 79:23, 79:24, 80:8, 80:14, 80:23, 81:13, 82:12, 82:13, 82:22, 82:23, 84:18, 86:16, 88:2, 88:5, 90:6, 91:18, 94:19, 96:23, 107:10, 118:3, 119:24, 121:10, 124:14, 127:8, 127:11, 132:10, 132:15, 134:2, 134:7, 134:11, 135:10, 136:3, 138:9, 138:18, 141:3, 149:23, 151:2, 151:17, 153:18, 154:11, 154:16, 154:17, 154:18, 154:19, 156:6, 156:12, 159:3, 160:12, 161:22, 167:19, 168:2, 168:4, 170:21, 170:22, 171:8, 172:1, 172:7, 174:25, 175:12, 175:14, 175:17, 175:23, 178:22, 178:23, 179:1, 179:6, 180:7
**cases** [10] - 6:5, 9:12, 11:24, 16:5, 18:4, 42:10, 42:13, 43:16, 51:10, 54:1
**catfish** [1] - 169:24
**catfished** [1] - 170:4
**catty** [1] - 129:22
**catty-corner** [1] -

129:22
**causal** [4] - 6:1, 71:9, 71:10, 71:17
**causation** [2] - 5:14, 6:1
**caused** [11] - 35:24, 69:1, 69:2, 69:6, 69:14, 76:7, 77:20, 77:23, 78:12, 103:6
**causes** [4] - 120:2, 138:16, 138:17, 151:1
**caution** [2] - 74:18, 75:19
**cede** [1] - 32:12
**cell** [4] - 150:13, 154:20, 162:18, 162:22
**Century** [1] - 1:19
**certain** [9] - 29:1, 39:5, 55:19, 59:2, 72:19, 73:13, 73:18, 73:23, 86:3
**certainly** [7] - 7:14, 19:8, 31:23, 105:8, 126:6, 127:24, 158:24
**certainty** [4] - 27:8, 56:25, 58:15, 58:16
**Certificate** [1] - 4:6
**CERTIFICATE** [1] - 180:1
**certify** [2] - 180:4, 180:10
**cetera** [2] - 10:25, 11:1
**chain** [1] - 56:21
**challenged** [3] - 45:15, 46:20, 71:22
**challenging** [1] - 155:4
**chambers** [1] - 176:11
**Chambers** [10] - 101:19, 101:24, 103:21, 133:9, 133:10, 143:3, 147:14, 168:18, 169:2, 169:5
**chance** [3] - 120:20, 121:3, 136:5
**change** [11] - 16:19, 38:12, 80:1, 80:18, 95:19, 111:25, 112:9, 112:10, 112:18, 146:14, 163:23
**changed** [3] - 103:3, 146:22, 170:23
**changes** [9] - 21:9, 28:21, 95:6, 100:12, 120:3, 120:5, 120:6,

161:24
**changing** [1] - 164:3
**character** [3] - 60:7, 78:3, 122:5
**characterized** [1] - 102:5
**characterizing** [1] - 123:13
**charge** [3] - 178:12, 178:13, 178:21
**charged** [1] - 15:16
**charts** [2] - 108:18, 167:6
**chats** [4] - 101:11, 133:25, 135:11, 172:20
**cheating** [5] - 114:24, 157:19, 157:20, 157:21, 158:3
**check** [4] - 26:11, 96:4, 112:1, 116:9
**checked** [2] - 143:7, 153:13
**checking** [1] - 150:20
**chemical** [1] - 30:23
**cherry** [1] - 42:11
**cherry-picking** [1] - 42:11
**Cheryl** [2] - 148:22, 156:25
**Chief** [2] - 103:21, 168:17
**child** [5] - 156:13, 160:20, 162:24, 164:14, 165:4
**child's** [1] - 164:17
**childhood** [2] - 103:23, 114:10
**children** [4] - 102:4, 155:3, 160:6, 160:7
**Children** [1] - 154:23
**children's** [1] - 104:2
**choice** [1] - 155:24
**choices** [2] - 155:10, 155:14
**chooses** [1] - 51:1
**choral** [1] - 158:17
**chorus** [3] - 158:15, 158:18, 162:2
**chose** [2] - 164:19, 164:20
**C█████** [1] - 146:18
**chronology** [2] - 140:18, 141:11
**circle** [1] - 26:7
**Circuit** [7] - 5:24, 6:16, 6:18, 9:12, 12:15, 12:18, 14:24
**Circuit's** [3] - 5:23, 15:23, 46:4

**circuits** [1] - 9:12
**circumstance** [1] - 15:24
**circumstances** [17] - 15:17, 16:22, 17:12, 17:20, 25:20, 47:11, 48:1, 56:21, 60:10, 67:13, 67:19, 70:13, 76:18, 77:10, 78:5, 78:15, 78:25
**circumstantial** [5] - 56:17, 56:20, 56:24, 57:1, 57:3
**Cisler** [3] - 32:9, 119:25, 120:3
**cited** [6] - 5:18, 5:23, 6:5, 15:2, 42:10, 42:20
**citing** [2] - 42:24
**citizens** [1] - 54:2
**City** [1] - 149:14
**Civil** [2] - 1:4, 180:7
**civility** [2] - 49:11, 49:17
**claim** [46] - 5:15, 9:16, 23:3, 23:4, 24:1, 36:25, 37:4, 37:13, 37:14, 43:7, 47:14, 48:3, 58:6, 63:12, 63:25, 65:1, 70:24, 71:15, 71:16, 72:3, 74:1, 81:22, 82:2, 82:4, 82:5, 87:25, 94:4, 99:15, 101:13, 115:8, 115:10, 116:12, 116:19, 116:20, 116:23, 120:21, 125:19, 125:20, 125:21, 125:22, 158:5, 158:21, 161:1
**claimed** [2] - 150:6, 158:12
**claiming** [1] - 109:9
**claims** [34] - 6:22, 46:19, 56:19, 58:3, 58:5, 63:15, 64:1, 64:14, 64:19, 64:23, 67:20, 67:22, 70:18, 73:9, 74:5, 74:15, 75:3, 75:10, 75:16, 76:19, 77:17, 100:18, 105:11, 107:5, 113:22, 115:7, 124:16, 125:17, 156:9, 157:18, 159:10, 162:10, 168:8
**clarifying** [1] - 177:7
**class** [13] - 127:2,

139:11, 146:24, 147:3, 149:2, 154:20, 159:19, 161:24, 162:23, 162:24, 176:23, 176:25
**classes** [2] - 126:13, 163:14
**classmates** [2] - 99:19, 158:22
**classroom** [4] - 107:11, 127:2, 127:17, 162:8
**classrooms** [3] - 126:24, 127:3, 161:25
**clause** [1] - 35:10
**clear** [24] - 8:2, 9:15, 15:23, 18:11, 19:1, 23:14, 27:2, 27:24, 28:4, 29:23, 34:4, 35:12, 39:19, 39:20, 40:10, 50:18, 52:10, 83:14, 87:12, 98:3, 104:5, 106:7, 147:9, 168:23
**clearest** [1] - 8:14
**clearly** [7] - 16:21, 17:11, 17:19, 67:12, 94:7, 115:21, 116:3
**clerk** [1] - 24:6
**client** [7] - 122:2, 122:5, 124:7, 132:18, 132:22, 172:2, 172:4
**client's** [1] - 170:16
**clients** [8] - 156:5, 160:11, 160:14, 160:16, 161:9, 161:19, 164:16, 165:9
**clingy** [1] - 140:8
**close** [3] - 50:9, 167:1, 175:5
**closed** [2] - 24:18, 154:1
**closely** [2] - 136:5, 144:5
**closer** [1] - 83:6
**closet** [1] - 154:18
**Closing** [4] - 4:4, 4:4, 4:5, 4:5
**CLOSING** [5] - 84:22, 124:5, 156:3, 166:12, 172:10
**closing** [19] - 4:6, 31:22, 32:20, 49:14, 49:19, 50:3, 50:7, 50:8, 50:20, 51:11, 51:18, 55:13, 82:18,

82:20, 84:6, 84:7, 122:8, 122:13, 123:19
**cloud** [1] - 165:10
**code** [1] - 168:20
**coercing** [2] - 22:7, 68:10
**collapses** [1] - 174:1
**colleagues** [2] - 121:2, 174:6
**collected** [1] - 135:3
**college** [2] - 152:16, 152:17
**College** [1] - 117:20
**Columbia** [4] - 117:21, 152:25, 153:1
**combine** [1] - 25:19
**comfort** [1] - 52:4
**coming** [8] - 53:2, 128:22, 128:24, 129:9, 143:18, 145:6, 146:21, 154:11
**comment** [1] - 57:11
**comments** [4] - 57:12, 57:13, 57:15, 121:25
**commitment** [1] - 156:6
**common** [6] - 49:16, 56:14, 57:8, 70:5, 89:8, 92:3, 99:7, 133:19, 136:21, 154:14, 167:13, 167:19, 171:20, 174:13, 175:3, 175:13
**communicate** [5] - 80:24, 98:5, 101:20, 176:2, 176:4
**communication** [1] - 151:14
**community** [2] - 57:20, 139:13
**compare** [3] - 29:15, 108:20, 134:23
**compared** [1] - 58:11
**comparing** [1] - 29:17
**compensable** [2] - 7:4, 29:17
**compensate** [4] - 68:25, 72:18, 73:9, 78:8
**compensated** [1] - 78:12
**compensation** [1] - 69:8
**compensatory** [2] - 73:3, 79:5
**complain** [2] - 125:11, 140:16, 143:15,

143:17, 147:12, 163:3
**complained** [2] - 147:19, 149:23
**complaint** [12] - 8:19, 12:5, 13:21, 22:6, 22:8, 22:10, 66:16, 68:9, 68:12, 110:7, 145:2, 170:22
**complaints** [18] - 13:4, 64:16, 66:22, 87:16, 93:16, 94:6, 100:3, 108:20, 108:23, 110:13, 110:16, 122:13, 122:15, 125:5, 125:13, 148:16, 160:21, 170:21
**complete** [5] - 14:16, 74:18, 75:20, 85:17, 85:23
**completely** [1] - 104:24
**Compliance** [1] - 106:22
**compliant** [1] - 68:11
**complimenting** [1] - 144:7
**computer** [1] - 180:12
**conceivable** [1] - 160:3
**concept** [3] - 18:15, 31:25, 46:23
**concern** [2] - 11:17, 22:25
**concerned** [3] - 54:13, 140:23, 163:19
**concerning** [1] - 57:16
**concerns** [1] - 96:9
**conclude** [7] - 19:24, 39:8, 59:5, 60:1, 110:5, 118:23, 164:9
**conclusion** [3] - 104:17, 138:20, 138:21
**conclusions** [3] - 57:8, 59:15, 104:14
**conclusively** [1] - 140:1
**concrete** [1] - 66:10
**condition** [4] - 28:1, 138:16, 138:17, 174:23
**conditions** [5] - 27:22, 29:21, 31:2, 70:3, 79:1
**conduct** [48] - 6:2, 6:13, 6:23, 7:1, 7:2, 7:17, 7:20, 11:21, 18:11, 19:20, 19:21,

20:1, 21:5, 21:6, 22:5, 45:2, 45:11, 45:15, 46:20, 62:22, 62:23, 62:24, 65:21, 65:22, 67:24, 68:4, 68:6, 68:7, 69:7, 71:11, 71:23, 71:25, 78:12, 78:22, 78:24, 79:1, 105:1, 112:3, 144:18, 159:24, 160:5, 160:8, 160:9
**conducted** [1] - 103:22
**confers** [1] - 21:15
**confided** [1] - 141:15
**confidence** [1] - 138:14
**confident** [2] - 119:1, 165:5
**confines** [1] - 10:11
**confirm** [2] - 109:24, 118:20
**confirmed** [2] - 99:18, 145:9
**confirming** [2] - 135:11, 173:14
**confirms** [1] - 109:25
**conflating** [3] - 11:4, 23:4, 106:5
**conflicting** [2] - 32:7, 33:5
**confronted** [1] - 12:7
**confuse** [1] - 23:24
**confusing** [2] - 39:22, 43:25
**confusion** [3] - 40:2, 40:5, 48:4
**conjunctive** [2] - 10:20, 25:9
**connection** [3] - 71:9, 71:17, 118:11
**conscientious** [1] - 80:15
**consciously** [1] - 78:22
**consensual** [1] - 148:18
**consent** [4] - 76:23, 77:15, 81:18, 89:7
**consequence** [2] - 69:4, 164:13
**consequences** [3] - 19:25, 55:2, 78:23
**consider** [19] - 7:15, 54:12, 54:25, 56:7, 57:3, 57:16, 57:19, 58:19, 59:21, 60:12, 60:14, 60:18, 61:2, 63:13, 73:10, 77:19, 78:2, 84:9, 94:11

**consideration** [5] - 63:6, 63:11, 64:22, 79:24, 116:25
**considered** [14] - 7:13, 12:18, 18:12, 28:21, 58:11, 62:15, 62:18, 62:24, 63:10, 63:20, 63:22, 79:8, 79:17, 80:16
**considering** [3] - 56:11, 58:25, 63:12
**consistency** [1] - 41:1
**consistent** [12] - 6:5, 20:19, 26:18, 47:13, 48:3, 93:9, 101:17, 104:19, 172:23, 172:24, 173:1, 175:2
**consistently** [2] - 117:7, 174:19
**consists** [1] - 55:4
**constant** [1] - 105:20
**Co[____]** [1] - 93:8
**constantly** [2] - 101:10, 174:19
**constitute** [2] - 14:16, 180:11
**constitutes** [2] - 74:17, 75:19
**constitution** [1] - 70:21
**constitutional** [1] - 72:1
**construction** [1] - 56:14
**constructive** [2] - 11:5, 11:22
**construed** [5] - 12:6, 13:6, 13:21, 66:16
**consult** [1] - 79:20
**Cont** [2] - 1:25, 2:25
**contact** [5] - 144:21, 144:23, 148:18, 148:20, 179:8
**contains** [1] - 104:8
**contemplated** [1] - 142:24
**CONTENTS** [1] - 4:1
**contest** [2] - 33:3, 33:4
**context** [23] - 6:19, 7:8, 7:14, 8:4, 8:12, 16:7, 20:9, 21:13, 22:17, 24:20, 25:22, 26:2, 26:20, 31:6, 41:6, 43:23, 46:14, 67:4, 68:20, 72:3, 123:6
**continuance** [1] - 76:14

**continue** [3] - 83:18, 149:5, 149:6
**continues** [2] - 94:13, 123:5
**continuum** [2] - 19:18, 19:21
**contract** [4] - 27:5, 27:6, 35:20, 36:6
**contract-based** [1] - 27:5
**contradicted** [1] - 60:22
**contradictory** [1] - 61:17
**contradicts** [1] - 157:4
**contrary** [4] - 45:24, 60:8, 61:15, 160:24
**contributorily** [2] - 74:14, 75:14
**control** [26] - 6:9, 6:12, 6:19, 7:18, 8:3, 8:12, 8:24, 9:6, 9:7, 21:11, 21:12, 22:16, 22:24, 23:7, 24:15, 24:20, 25:1, 25:2, 25:21, 26:2, 67:3, 67:5, 67:6, 68:19, 106:17
**controlled** [1] - 54:23
**convenience** [2] - 36:21, 81:14
**conveniently** [1] - 110:16
**conversation** [1] - 179:3
**conversations** [3] - 121:11, 169:23, 171:22
**conviction** [2] - 80:3, 128:6
**convinced** [1] - 80:2
**convinces** [1] - 35:25
**convincing** [1] - 58:12
**coordinate** [3] - 108:6, 108:7, 108:8
**coordinated** [1] - 109:4
**copy** [6] - 34:16, 55:2, 82:15, 82:16, 104:10, 175:18
**core** [5] - 158:8, 161:13, 162:14, 163:16, 163:18
**corner** [1] - 129:22
**correct** [6] - 9:17, 15:5, 23:23, 33:19, 37:7, 51:3
**correcting** [1] - 45:4
**corrective** [6] - 13:12, 65:9, 66:23, 66:25,

67:1, 87:16
**corrupt** [1] - 78:20
**cosponsored** [1] - 97:5
**cost** [8] - 33:15, 34:4, 35:1, 35:5, 35:23, 69:12, 69:13
**costs** [2] - 35:1, 36:1
**counsel** [14] - 18:5, 24:6, 30:2, 48:8, 50:2, 52:13, 83:12, 84:11, 84:13, 84:25, 121:20, 166:14, 172:13, 176:10
**Counsel** [4] - 21:15, 26:15, 83:25, 84:15
**counselor** [4] - 161:2, 162:15, 162:24, 163:17
**counselors** [9] - 74:7, 75:5, 86:13, 88:12, 93:14, 98:23, 108:4, 149:2, 174:20
**Count** [3] - 5:8, 18:21, 44:24
**count** [2] - 118:14, 128:12
**country** [1] - 97:2
**counts** [1] - 114:23
**county** [2] - 97:19, 122:6
**County** [21] - 14:11, 63:25, 64:2, 64:7, 64:9, 64:11, 64:12, 64:13, 87:13, 88:9, 96:21, 97:5, 97:7, 97:11, 98:12, 105:3, 106:20, 115:4, 117:16, 173:14
**couple** [8] - 38:15, 94:3, 145:5, 155:20, 170:11, 170:16, 172:15, 175:6
**course** [7] - 11:23, 14:15, 46:11, 79:25, 94:12, 105:4, 173:22
**COURT** [164] - 1:1, 1:12, 5:1, 5:11, 5:21, 6:4, 6:11, 7:1, 7:6, 7:23, 8:8, 9:1, 9:9, 10:3, 10:10, 10:22, 11:6, 11:12, 12:13, 12:22, 14:10, 14:23, 15:14, 16:5, 16:17, 17:7, 19:3, 19:7, 19:11, 19:17, 20:7, 20:10, 20:14, 20:18, 20:21, 21:21, 21:23, 22:3, 22:21, 23:5, 23:8, 23:12, 23:20,

24:2, 25:6, 25:8, 25:13, 25:16, 25:25, 26:15, 26:24, 28:13, 28:24, 29:9, 30:1, 30:14, 30:17, 31:12, 32:24, 33:17, 33:20, 34:11, 34:17, 36:12, 36:17, 37:10, 37:12, 38:1, 38:8, 38:10, 38:25, 39:3, 40:8, 40:23, 41:3, 41:6, 41:22, 42:5, 42:16, 43:11, 43:21, 44:8, 44:23, 45:6, 45:11, 45:21, 46:6, 46:12, 46:16, 46:25, 47:5, 47:16, 48:5, 48:17, 48:21, 49:10, 49:25, 50:13, 50:17, 50:25, 51:9, 51:16, 51:20, 52:3, 52:13, 52:15, 52:18, 52:22, 53:12, 53:15, 54:7, 82:25, 83:4, 83:8, 83:12, 83:25, 84:4, 84:21, 84:24, 116:5, 116:7, 121:7, 121:12, 121:15, 121:18, 121:23, 122:11, 122:22, 122:24, 123:12, 123:23, 123:25, 124:2, 124:4, 150:4, 155:19, 156:2, 164:5, 164:7, 165:13, 165:15, 165:18, 165:23, 165:25, 166:3, 166:6, 166:8, 166:10, 172:5, 172:9, 172:12, 175:16, 176:9, 176:14, 177:10, 177:13, 177:21, 177:24, 178:5, 178:16, 179:11, 179:13, 179:18, 179:21
**Court** [67] - 3:12, 3:13, 4:6, 5:17, 5:18, 5:23, 6:4, 6:16, 6:17, 10:10, 10:23, 11:23, 12:22, 13:16, 15:22, 16:18, 17:2, 17:24, 18:1, 21:25, 23:21, 24:16, 26:6, 26:19, 30:9, 31:16, 33:10, 34:12, 35:8, 36:8, 36:11, 36:13, 38:19, 39:16, 39:24, 41:18, 41:21, 42:8, 42:25,

43:14, 46:18, 46:24, 48:18, 50:3, 52:21, 52:23, 53:1, 83:11, 83:18, 84:23, 87:12, 87:20, 100:18, 116:2, 124:13, 124:19, 154:12, 166:2, 166:14, 166:19, 172:11, 175:19, 176:1, 176:4, 176:13, 180:3, 180:22
**court** [10] - 42:11, 42:18, 42:24, 80:12, 81:3, 122:23, 124:1, 135:12, 144:15, 180:8
**Court's** [23] - 5:4, 5:20, 10:18, 12:14, 12:19, 15:22, 18:4, 25:23, 26:9, 26:25, 27:13, 27:19, 29:16, 34:21, 39:20, 45:8, 47:2, 47:19, 49:5, 49:12, 53:17, 121:24
**courtesy** [2] - 49:8, 49:16
**Courthouse** [1] - 3:13
**courtroom** [11] - 37:21, 82:10, 93:5, 96:13, 97:9, 98:13, 118:17, 119:9, 171:11, 173:21, 179:20
**courts** [1] - 12:16
**cousin** [1] - 42:1
**cover** [5] - 71:13, 91:12, 108:8, 108:19, 148:19
**covered** [2] - 105:18, 166:22
**crate** [1] - 147:1
**create** [2] - 21:1, 138:18
**created** [5] - 103:10, 132:7, 134:18, 161:10, 169:1
**creating** [1] - 149:22
**credibility** [8] - 60:4, 61:22, 62:8, 62:16, 63:1, 93:2, 132:15, 138:9
**credible** [1] - 61:14
**credit** [1] - 32:8
**criminal** [2] - 105:9, 130:24
**critical** [1] - 155:3
**critically** [1] - 29:4
**criticize** [3] - 14:24, 26:5, 146:12

**cross** [3] - 101:22, 105:18, 129:17
**cross-examination** [2] - 101:22, 105:18
**crowd** [1] - 148:9
**crown** [1] - 96:20
**crying** [3] - 91:4, 93:12, 119:7
**cultivates** [1] - 147:5
**culture** [2] - 95:10, 164:25
**Cummings** [4] - 27:19, 30:12, 31:5, 35:9
**current** [1] - 12:21
**Curtis** [2] - 5:25, 46:4
**cut** [3] - 85:11, 130:16, 131:18
**cutting** [1] - 171:9
**cyberbullying** [4] - 9:3, 89:5, 111:16, 132:8

# D

**D.N** [6] - 110:2, 110:7, 170:6, 170:12, 170:13, 170:16
**dad** [4] - 130:4, 130:13, 136:23, 136:24
**dad's** [1] - 136:25
**daily** [1] - 99:12
**Dale** [1] - 151:16
**dam** [1] - 120:4
**damage** [8] - 13:9, 25:20, 34:24, 69:2, 69:3, 76:11, 78:16, 79:3
**damages** [56] - 12:1, 26:25, 27:16, 27:20, 28:2, 31:3, 32:18, 33:3, 33:14, 34:1, 34:2, 34:3, 34:4, 34:8, 35:9, 37:5, 37:14, 49:4, 69:1, 69:5, 69:7, 69:11, 69:12, 70:4, 70:6, 70:8, 70:15, 72:8, 72:24, 73:2, 73:4, 73:11, 74:2, 76:12, 77:18, 78:2, 78:8, 78:12, 79:5, 79:6, 79:8, 79:10, 82:3, 82:5, 117:1, 119:17, 119:18, 119:22, 120:7, 120:13, 120:17, 120:22, 153:18
**damaging** [2] - 39:10,

59:7
**danger** [1] - 11:18
**data** [2] - 153:14, 168:20
**date** [11] - 37:19, 82:8, 113:22, 142:19, 142:21, 143:1, 143:3, 143:4, 143:6, 170:12
**dated** [11] - 131:16, 131:18, 133:5, 133:18, 133:20, 136:21, 145:3, 145:25, 146:8, 146:9
**dates** [4] - 141:10, 144:5, 154:2
**dating** [4] - 139:22, 139:25, 149:21, 170:19
**daughter** [17] - 102:17, 125:10, 130:12, 131:10, 140:19, 143:14, 147:24, 148:4, 148:11, 148:12, 150:16, 151:4, 151:8, 151:9, 151:19, 151:20
**daughter's** [1] - 102:7
**David** [26] - 90:1, 90:15, 133:3, 133:5, 133:6, 133:8, 133:9, 133:11, 133:22, 136:21, 139:1, 139:17, 141:19, 144:13, 145:5, 145:12, 145:13, 145:15, 145:25, 146:18, 146:23, 147:12, 159:11, 163:22, 170:12
**David's** [6] - 131:2, 133:7, 137:5, 141:12, 146:7, 146:10
**Davis** [13] - 6:17, 10:11, 15:8, 16:14, 24:13, 24:17, 25:19, 25:24, 26:1, 26:14, 41:5, 41:8, 43:9
**day-by-day** [1] - 144:1
**daylight** [3] - 131:6, 154:19, 167:17
**days** [9] - 48:18, 100:5, 119:3, 132:19, 149:15, 149:16, 150:3, 170:11, 170:16
**DC** [5] - 1:16, 2:15, 2:18, 2:22, 3:2

**de** [1] - 71:25
**dead** [2] - 156:18, 157:5
**deal** [5] - 56:8, 106:19, 150:24, 178:11
**dealing** [2] - 14:3, 42:12
**dealt** [1] - 166:23
**death** [1] - 100:7
**debate** [1] - 153:16
**debilitating** [1] - 119:5
**decade** [1] - 102:14
**deceive** [1] - 138:22
**December** [5] - 94:14, 100:1, 108:21, 114:7, 167:4
**deception** [1] - 62:1
**decide** [20] - 28:4, 28:8, 28:12, 30:5, 43:7, 57:19, 58:24, 59:24, 69:18, 70:5, 72:8, 79:23, 81:11, 100:17, 107:3, 115:2, 132:15, 132:16, 136:4
**decided** [8] - 31:4, 35:17, 43:14, 46:5, 63:16, 106:4, 115:3, 157:15
**deciding** [1] - 82:12
**decision** [27] - 9:14, 15:15, 18:17, 18:25, 19:3, 19:10, 21:25, 24:17, 25:24, 26:13, 41:8, 41:11, 41:14, 41:21, 42:24, 43:8, 46:4, 49:5, 65:17, 80:16, 80:20, 81:13, 124:21, 152:6, 158:20, 158:23, 158:25
**decisions** [3] - 42:11, 44:14, 100:23
**deck** [1] - 109:1
**declaration** [1] - 55:22
**declare** [1] - 55:20
**deductions** [1] - 57:8
**deep** [1] - 113:14
**deeply** [1] - 102:3
**defendant** [25] - 36:24, 37:13, 47:20, 58:6, 63:3, 63:5, 63:6, 63:7, 63:10, 64:10, 72:11, 72:12, 72:15, 72:23, 74:2, 74:5, 74:24, 76:1, 76:2, 77:21, 77:23, 78:24, 81:21, 82:4
**Defendant** [4] - 2:13, 3:1, 3:9, 63:13

**defendant's** [3] - 47:22, 72:20, 75:1
**Defendant's** [1] - 136:10
**defendants** [21] - 6:22, 20:6, 34:9, 50:23, 63:5, 71:5, 72:12, 72:13, 74:1, 74:12, 75:11, 75:13, 76:7, 76:9, 76:10, 76:12, 97:20, 116:18, 118:18, 127:8, 155:22
**Defendants** [7] - 1:7, 3:5, 58:6, 63:14, 75:6, 103:16, 118:6
**defendants'** [6] - 71:7, 71:11, 71:19, 75:3, 76:4, 78:4
**Defendants'** [19] - 6:2, 52:10, 52:11, 64:2, 71:17, 74:7, 74:8, 75:5, 125:8, 134:23, 134:25, 135:19, 137:15, 139:20, 142:1, 144:3, 144:4, 151:7, 154:8
**defense** [28] - 5:18, 31:24, 32:11, 33:1, 51:8, 51:15, 86:15, 97:3, 100:16, 100:20, 102:1, 102:2, 103:8, 103:12, 103:14, 103:21, 104:1, 104:21, 105:18, 114:9, 117:4, 117:12, 120:1, 120:4, 121:2, 174:6, 174:10
**defensible** [1] - 112:3
**defer** [1] - 38:6
**defies** [1] - 167:13
**define** [2] - 16:6, 21:3
**defines** [1] - 17:8
**defining** [1] - 16:21, 17:4
**definiteness** [1] - 70:12
**definition** [3] - 22:2, 42:18, 107:20
**definitive** [1] - 18:3
**defriended** [1] - 138:6
**degree** [5] - 56:25, 74:16, 74:19, 75:18, 75:21
**deleted** [3] - 134:17, 138:4, 168:24
**deliberate** [48] - 9:16, 10:1, 14:2, 14:16,

16:15, 16:21, 17:5, 17:8, 17:21, 18:18, 18:19, 18:20, 19:2, 19:9, 21:18, 23:3, 23:16, 23:25, 41:16, 41:20, 41:25, 42:1, 42:6, 42:9, 42:15, 43:5, 43:22, 44:2, 44:4, 44:15, 55:3, 65:11, 65:18, 67:10, 67:13, 67:17, 67:18, 79:21, 116:1, 124:22, 125:19, 154:7, 176:7, 176:8, 177:3, 177:16, 177:25, 178:9
**deliberately** [11] - 7:16, 8:23, 9:21, 10:8, 17:1, 22:12, 40:23, 41:1, 41:15, 68:15, 154:6
**deliberating** [3] - 51:25, 80:9, 179:2
**deliberations** [12] - 79:16, 79:25, 80:25, 83:19, 84:10, 85:5, 101:4, 121:5, 175:21, 175:25, 179:17, 179:18
**delve** [1] - 30:9
**delving** [1] - 17:15
**demeanor** [1] - 60:13
**demonize** [1] - 154:25
**demonstrate** [1] - 88:17
**denials** [1] - 134:6
**denied** [6] - 64:5, 134:4, 135:22, 136:1, 149:25, 157:20
**denies** [2] - 64:18, 112:4
**deny** [6] - 66:8, 74:12, 75:13, 94:8, 110:8, 138:12
**Department** [1] - 64:13
**depended** [1] - 130:22
**deposition** [3] - 62:21, 86:19, 152:20
**depressed** [1] - 90:20
**depression** [1] - 29:15
**deprived** [3] - 65:4, 66:3, 115:12, 115:16, 126:2
**Deputy** [3] - 103:21, 168:17, 169:5
**DeRight** [1] - 153:10
**DeRight's** [1] - 153:14
**derogatory** [2] -

92:23, 140:25
**describe** [2] - 32:3, 91:7
**described** [10] - 32:10, 89:5, 91:8, 93:16, 96:19, 98:7, 99:12, 102:23, 142:6, 148:2
**describes** [2] - 95:9, 138:8
**describing** [1] - 152:7
**deserve** [1] - 62:9
**deserves** [4] - 59:23, 60:5, 61:8, 61:22
**designated** [1] - 106:19
**designed** [1] - 161:11
**desire** [2] - 78:21, 164:25
**desired** [1] - 50:24
**despite** [1] - 118:3
**detail** [8] - 61:4, 61:25, 93:17, 94:2, 151:15, 168:11, 168:12, 173:2
**detailing** [1] - 111:23
**details** [1] - 170:23
**detect** [1] - 29:2
**Detective** [7] - 101:19, 101:24, 133:9, 133:10, 143:3, 147:14, 169:2
**deter** [9] - 22:5, 45:16, 46:21, 47:4, 47:22, 68:8, 71:7, 71:23, 78:18
**deter/dissuade** [1] - 21:7
**deteriorates** [1] - 174:1
**determination** [1] - 15:18
**determinations** [1] - 48:18
**determine** [8] - 15:11, 16:25, 36:5, 54:20, 68:24, 72:17, 73:8, 168:21
**determined** [4] - 27:20, 61:11, 86:16, 99:14
**determining** [3] - 58:17, 70:4, 77:18
**deterred** [1] - 47:12
**detracts** [1] - 66:7
**devastating** [1] - 136:3
**developed** [2] - 43:13, 163:12
**development** [2] - 155:4, 170:15

**developmentally** [1] - 155:1
**devices** [4] - 29:1, 168:15, 168:21, 169:6
**devoid** [1] - 167:14
**devoted** [1] - 94:25
**diagnosed** [3] - 69:17, 117:7, 117:11
**diagnoses** [3] - 103:10, 117:14, 118:16
**diagnosis** [6] - 69:19, 102:7, 102:11, 152:8, 153:6, 153:11
**differ** [1] - 56:4
**difference** [3] - 20:18, 54:16, 134:15
**difference'** [1] - 17:9
**different** [19] - 29:21, 34:14, 56:6, 60:24, 62:4, 64:11, 85:11, 86:6, 95:15, 97:19, 108:3, 117:11, 119:3, 120:5, 130:2, 133:6, 133:9, 143:19, 154:24
**differentiate** [2] - 21:5, 76:8
**differently** [2] - 61:1, 95:24
**difficult** [1] - 164:20
**dig** [2] - 23:8, 156:13
**diligence** [1] - 160:18
**direct** [9] - 12:9, 25:18, 42:22, 56:17, 56:18, 56:24, 57:3, 69:3, 159:25
**directed** [1] - 146:17
**direction** [1] - 18:7
**directly** [4] - 24:13, 53:23, 95:14, 107:8
**director** [4] - 94:17, 94:23, 108:2, 156:25
**dirt** [1] - 156:13
**disagree** [2] - 30:17, 41:8
**disagrees** [1] - 173:5
**disappearance** [1] - 168:14
**disappeared** [1] - 168:13
**disappearing** [1] - 169:11
**disbelieve** [2] - 122:16, 123:6
**disbelieved** [1] - 122:19
**disciplinary** [5] - 26:5, 67:7, 111:11, 122:2,

123:8
**discipline** [1] - 111:1, 112:5
**disciplined** [2] - 113:16, 113:17
**disclose** [2] - 74:14, 75:15
**disclosed** [2] - 39:9, 59:6
**disclosure** [1] - 103:19
**discovered** [4] - 12:11, 13:24, 66:19, 134:10
**discredit** [1] - 60:25
**discredited** [2] - 61:16, 61:21
**discrepancies** [1] - 60:23
**discrepancy** [2] - 61:2, 61:4
**discriminating** [3] - 22:8, 64:15, 68:10
**discrimination** [5] - 12:2, 13:11, 13:13, 64:6, 124:18
**discuss** [8] - 17:6, 53:18, 80:13, 82:22, 83:13, 121:9, 175:23, 178:22
**discussed** [4] - 32:1, 72:7, 80:17, 171:7
**Discussion** [4] - 23:13, 34:19, 52:17, 155:25
**discussion** [9] - 5:6, 20:1, 41:23, 86:23, 139:24, 151:10, 152:10, 168:12, 171:16
**discussions** [4] - 80:12, 80:19, 88:18, 90:5
**disintegrated** [1] - 107:24
**disjunctive** [2] - 25:10, 40:14
**dismissed** [1] - 96:7
**disorder** [1] - 69:17
**display** [2] - 142:7, 180:13
**displayed** [1] - 139:20
**disposition** [1] - 81:18
**disputable** [1] - 174:3
**dispute** [4] - 34:14, 57:19, 104:6, 115:19
**disputed** [2] - 29:5, 174:3
**disregard** [7] - 57:13, 60:3, 74:17, 75:19,

78:15, 78:22, 79:22
**disregarded** [1] - 56:1
**dissuade** [2] - 22:6, 68:8
**distanced** [1] - 133:12
**distinction** [1] - 56:23
**distress** [8] - 27:12, 27:14, 27:21, 30:13, 30:22, 30:23, 73:12, 91:4
**district** [1] - 12:16
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [2] - 3:13, 180:4
**district's** [1] - 24:20
**distrust** [1] - 62:7
**disturbing** [3] - 101:5, 105:20, 169:23
**divide** [3] - 50:20, 50:21, 50:23
**doctor** [2] - 118:19, 151:21
**doctor's** [2] - 149:16, 150:15
**doctors** [5] - 102:11, 103:4, 117:14, 118:8, 118:10
**document** [5] - 24:5, 94:6, 109:16, 122:3, 136:18
**documentation** [1] - 108:13
**documented** [3] - 107:10, 109:11, 153:3
**documenting** [1] - 93:16
**documents** [1] - 125:5
**Doe** [5] - 12:7, 12:20, 12:22, 12:25, 14:11
**dog** [1] - 166:4
**done** [16] - 16:3, 61:18, 62:10, 62:13, 62:24, 81:9, 85:16, 109:9, 110:22, 112:15, 115:1, 121:3, 159:20, 163:15
**door** [2] - 127:12, 127:19
**doors** [1] - 126:25
**dots** [1] - 118:14
**double** [1] - 26:11
**doubt** [1] - 101:4
**doubts** [1] - 172:20
**down** [12] - 11:9, 28:6, 100:6, 109:3, 112:11, 116:3, 123:2, 126:9,

126:10, 133:8, 150:11, 169:16
**downplayed** [1] - 100:2
**downs** [1] - 166:25
**dozens** [2] - 128:17, 128:20
**Dr** [21] - 32:9, 87:18, 102:19, 104:1, 104:3, 114:9, 118:21, 119:25, 120:3, 138:15, 148:6, 148:15, 148:17, 151:16, 151:17, 151:24, 152:6, 152:8, 153:10, 153:14, 173:13
**drama** [1] - 139:15
**dramatically** [1] - 100:12
**draw** [3] - 57:5, 57:9, 108:18
**drawing** [1] - 70:7
**drawn** [1] - 138:20
**drew** [1] - 130:21
**drift** [1] - 119:8
**Drive** [1] - 3:6
**drive** [2] - 130:4, 130:23
**driver** [1] - 129:14
**driving** [1] - 128:25
**drop** [1] - 158:6
**dropping** [1] - 129:15
**drove** [2] - 130:14, 131:1
**due** [1] - 43:11
**dumbfounded** [1] - 95:20
**dumped** [1] - 145:5
**duplicative** [1] - 25:5
**during** [23] - 26:3, 56:1, 56:17, 62:4, 62:20, 79:15, 80:24, 86:7, 89:3, 100:3, 101:3, 103:6, 103:20, 103:25, 105:18, 112:7, 117:22, 126:11, 131:9, 131:17, 135:21, 147:3, 167:9
**duties** [2] - 54:21, 74:10
**duty** [8] - 54:8, 54:9, 54:20, 75:7, 79:20, 80:13, 86:15, 105:10
**DX** [1] - 172:16

# E

**early** [2] - 139:14, 149:6
**earning** [1] - 73:22
**ease** [1] - 178:2
**East** [1] - 1:19
**EASTERN** [1] - 1:1
**Eastern** [1] - 180:4
**easy** [5] - 73:6, 88:10, 112:21, 166:15, 168:23
**eat** [1] - 51:25
**economic** [6] - 27:7, 34:1, 34:22, 34:23, 69:10, 119:18
**educating** [2] - 160:6, 160:7
**education** [9] - 10:25, 35:1, 35:5, 59:17, 59:25, 64:6, 69:13, 124:18, 150:9
**Education** [1] - 21:25
**educational** [10] - 8:9, 13:18, 65:5, 66:3, 66:6, 66:8, 66:11, 66:13, 115:13, 126:3
**educators** [6] - 124:24, 155:4, 155:7, 155:14, 164:23
**effect** [7] - 37:16, 61:2, 66:10, 80:3, 84:15, 105:7, 156:14
**effective** [1] - 164:1
**effectively** [2] - 66:8, 125:15
**effects** [2] - 7:20, 9:4
**efficient** [1] - 84:13
**effort** [5] - 15:11, 16:2, 85:4, 109:4, 154:25
**efforts** [6] - 108:6, 108:7, 108:8, 109:15, 110:24, 118:3
**eight** [4] - 49:4, 83:16, 83:17, 83:18
**eight-figure** [1] - 49:4
**either** [11] - 18:5, 21:14, 43:19, 45:23, 56:24, 60:19, 60:21, 69:3, 81:3, 107:16, 107:17
**electronic** [3] - 168:15, 168:21, 169:6
**element** [16] - 5:14, 5:25, 6:1, 6:25, 24:15, 47:3, 47:14, 58:3, 58:4, 115:9,

115:19, 116:1, 125:20, 125:23, 125:25
**Element** [1] - 47:19
**elementary** [9] - 128:21, 129:13, 129:14, 129:23, 156:12, 156:19, 156:20, 156:22, 157:7
**elements** [13] - 5:25, 43:6, 47:9, 47:14, 48:3, 72:7, 73:10, 77:4, 94:4, 115:8, 116:9, 125:19, 125:21
**elevated** [1] - 107:3
**eleventh** [1] - 49:6
**eligible** [2] - 158:16, 158:19
**ELLIKER** [51] - 6:10, 6:12, 7:5, 7:14, 7:25, 8:14, 9:2, 10:6, 10:21, 11:2, 11:8, 11:13, 14:4, 14:12, 15:4, 15:21, 16:8, 18:10, 19:5, 19:8, 21:22, 21:24, 24:3, 25:17, 26:8, 27:1, 28:15, 29:4, 29:11, 30:7, 30:16, 30:20, 31:14, 34:13, 34:20, 35:9, 37:9, 37:25, 39:2, 39:15, 40:21, 41:5, 41:7, 42:21, 43:20, 44:7, 44:21, 45:3, 45:7, 48:23, 49:20
**Elliker** [7] - 2:25, 17:14, 24:2, 38:6, 41:3, 42:7, 42:16
**Email** [11] - 1:17, 1:21, 2:4, 2:8, 2:12, 2:16, 2:19, 2:23, 3:3, 3:7, 3:11
**email** [8] - 95:23, 149:4, 149:8, 151:3, 151:6, 151:8, 151:12, 151:15
**emailed** [2] - 157:13, 157:14
**emailing** [2] - 150:7, 150:20
**emails** [9] - 109:8, 112:15, 125:7, 125:9, 125:10, 147:21, 147:24, 151:14, 162:14
**embarrassing** [1] - 171:14

**embarrassment** [1] - 77:25
**emotional** [27] - 27:12, 27:14, 27:16, 27:21, 27:25, 28:2, 28:5, 28:11, 28:20, 28:23, 29:7, 29:14, 29:22, 30:12, 30:21, 30:23, 31:25, 32:13, 35:14, 70:2, 73:8, 73:11, 73:12, 90:17, 91:4, 105:19, 150:19
**emphasized** [5] - 6:17, 6:18, 11:23, 11:25, 161:1
**employee** [1] - 74:11
**empty** [2] - 95:13, 99:9
**encounter** [1] - 106:1
**encounters** [1] - 101:18
**end** [2] - 12:8, 44:18, 85:20, 101:21, 120:24, 149:4, 150:21, 152:22, 178:22
**ended** [1] - 143:12
**ends** [5] - 117:18, 153:20, 156:18, 157:5, 174:1
**endure** [2] - 95:7, 120:23
**enforced** [1] - 162:2
**engage** [1] - 106:22
**engaged** [6] - 21:6, 22:16, 67:24, 68:19, 71:2, 110:11
**engages** [1] - 15:25
**engaging** [2] - 47:23, 71:8
**English** [3] - 38:10, 158:24, 161:21
**enhancement** [1] - 7:11
**enjoy** [3] - 179:9, 179:13, 179:24
**enjoyed** [1] - 142:25
**enjoying** [1] - 149:20
**enraged** [1] - 148:3
**ensure** [1] - 146:20
**ensures** [1] - 40:4
**entire** [8] - 76:11, 82:22, 125:2, 130:3, 160:17, 161:11, 174:15, 175:4
**entirely** [8] - 55:25, 57:13, 60:3, 81:10, 93:9, 96:10, 120:11, 165:9
**entirety** [1] - 175:17
**entitled** [7] - 57:23,

63:6, 63:16, 72:24, 77:18, 78:11, 79:9
**entity** [1] - 64:11
**entrance** [3] - 128:10, 129:1, 129:8
**entrusted** [1] - 88:14
**environment** [10] - 89:2, 91:8, 95:21, 96:1, 96:9, 97:18, 98:7, 102:25, 105:1, 161:10
**equal** [8] - 57:20, 57:25, 65:4, 66:3, 66:8, 115:12, 126:3
**equals** [1] - 58:1
**equations** [1] - 143:5
**equitably** [1] - 105:11
**Equity** [1] - 106:22
**erodes** [1] - 46:24
**erroneous** [1] - 80:2
**error** [1] - 61:4
**escalating** [2] - 94:15
**escorted** [1] - 53:9
**especially** [4] - 6:20, 8:4, 113:2, 165:4
**Esq** [11] - 1:14, 1:18, 2:1, 2:5, 2:9, 2:13, 2:17, 2:20, 2:25, 3:4, 3:8
**essay** [1] - 153:1
**essential** [2] - 58:2, 58:4
**essentially** [7] - 10:4, 18:17, 18:18, 19:2, 30:10, 39:12, 101:20
**establish** [7] - 13:3, 58:4, 65:1, 65:2, 67:17, 74:23, 75:25
**established** [6] - 27:8, 28:10, 57:9, 58:7, 69:21, 69:22
**establishes** [2] - 13:7, 158:23
**establishing** [1] - 31:1
**Estrella** [7] - 127:12, 127:13, 127:14, 127:17, 158:24, 161:21
**et** [4] - 1:6, 10:25, 11:1, 180:7
**evaluate** [2] - 43:15, 67:18
**evaluating** [1] - 56:11
**evening** [2] - 179:14, 179:24
**event** [10] - 55:21, 55:23, 61:1, 76:14, 76:16, 76:17, 79:11, 107:17, 151:1, 159:9
**events** [4] - 55:7, 55:9,

55:20, 103:1
**eventually** [2] - 140:7, 151:15
**everywhere** [1] - 97:19
**evidence** [148] - 9:23, 27:22, 32:7, 32:8, 33:5, 33:6, 38:17, 39:5, 39:7, 48:9, 49:14, 54:8, 54:11, 54:25, 55:4, 55:6, 55:11, 55:14, 55:22, 55:24, 55:25, 56:3, 56:7, 56:10, 56:11, 56:12, 56:13, 56:16, 56:17, 56:18, 56:20, 56:25, 57:1, 57:2, 57:4, 57:9, 57:11, 57:17, 57:18, 58:3, 58:5, 58:7, 58:10, 58:11, 58:12, 58:18, 58:21, 58:25, 59:2, 59:4, 59:13, 59:14, 60:3, 60:8, 60:11, 60:22, 61:10, 61:17, 61:24, 62:2, 62:12, 62:18, 62:25, 63:7, 63:13, 63:17, 63:18, 63:19, 63:20, 63:22, 64:19, 64:23, 65:2, 67:18, 67:23, 69:16, 69:23, 70:7, 70:25, 71:16, 72:15, 72:25, 73:1, 73:7, 74:23, 75:25, 77:1, 77:6, 77:11, 77:20, 78:5, 78:13, 79:12, 79:15, 79:24, 80:3, 80:8, 80:16, 80:23, 81:7, 84:8, 85:18, 87:4, 87:11, 87:22, 94:19, 100:16, 100:17, 100:24, 104:11, 107:23, 109:17, 109:20, 109:21, 110:24, 113:11, 113:12, 116:4, 116:20, 123:13, 123:18, 125:23, 134:7, 156:7, 156:15, 156:16, 157:4, 158:13, 158:14, 158:23, 159:25, 160:21, 160:23, 160:24, 161:9, 165:9, 167:12, 168:2, 168:25, 169:2, 171:21, 172:1, 175:1, 175:13
**ex** [4] - 14:14, 140:1,

145:3, 145:8
**ex-boyfriend** [2] - 140:1, 145:3
**ex-girlfriend** [1] - 145:8
**exact** [1] - 97:11
**exactly** [15] - 30:2, 31:21, 45:7, 88:16, 88:25, 89:24, 95:17, 111:17, 122:17, 134:22, 137:22, 143:23, 143:25, 173:19
**exam** [1] - 174:17
**examination** [3] - 101:22, 104:9, 105:18
**examine** [2] - 60:9, 136:5
**examined** [1] - 104:18
**examining** [1] - 56:9
**example** [6] - 34:1, 62:20, 78:17, 86:18, 152:4, 153:1
**examples** [9] - 34:1, 34:4, 34:25, 35:22, 69:12, 90:11, 90:13, 125:8, 142:3
**except** [3] - 110:1, 137:23, 173:9
**exception** [2] - 44:6, 59:16
**exchange** [1] - 108:16
**exchanging** [1] - 135:25
**excluded** [1] - 64:5
**exclusion** [2] - 27:4, 66:5
**excruciating** [1] - 119:6
**excuse** [16] - 8:11, 13:14, 25:25, 31:12, 42:23, 44:25, 57:21, 71:9, 76:23, 77:15, 93:11, 98:10, 102:6, 110:21, 114:24, 120:6
**excused** [6] - 23:10, 82:24, 121:14, 165:17, 176:8, 179:10
**excuses** [1] - 101:11
**exercise** [6] - 6:8, 23:7, 45:17, 46:21, 70:20, 71:24
**exercised** [2] - 21:12, 22:16
**exercises** [6] - 8:11, 25:1, 25:2, 25:21, 67:3, 68:19

**exercising** [2] - 21:10, 47:12
**exhibit** [1] - 135:8
**Exhibit** [22] - 52:11, 93:25, 94:20, 107:9, 125:8, 134:23, 134:25, 135:19, 136:10, 137:15, 139:20, 140:17, 142:1, 144:4, 147:21, 151:7, 154:8, 157:13, 162:17
**exhibitions** [1] - 53:4
**exhibits** [9] - 52:7, 52:8, 52:12, 55:6, 58:20, 59:12, 79:14, 86:1, 175:7
**exist** [2] - 89:1, 107:21
**existence** [4] - 55:16, 56:21, 61:12, 95:19
**existing** [2] - 78:25, 134:2
**exists** [1] - 98:19
**expand** [1] - 17:15
**expect** [3] - 51:8, 95:18, 119:7
**expectancy** [1] - 120:8
**expectation** [2] - 53:3, 165:1
**expected** [3] - 49:15, 54:24, 56:10
**expects** [1] - 50:3
**expelled** [1] - 91:17
**expenses** [2] - 119:19, 119:20
**experience** [10] - 51:23, 51:24, 52:1, 57:7, 59:17, 59:25, 66:8, 73:14, 119:5, 165:3
**experienced** [1] - 73:13
**experiencing** [4] - 99:1, 105:24, 105:25, 173:4
**expert** [19] - 30:4, 33:8, 33:9, 59:16, 59:18, 59:20, 59:21, 59:24, 60:2, 114:9, 120:2, 120:4, 138:15, 151:13, 153:13, 153:14
**expertise** [1] - 106:24
**experts** [5] - 28:24, 29:10, 29:13, 29:15, 106:21
**explain** [6] - 37:16, 106:4, 118:5, 135:16, 160:14,

174:7
**explained** [10] - 39:16, 106:22, 114:9, 120:3, 124:13, 154:13, 157:19, 158:15, 166:23, 173:3
**Explaining** [1] - 26:1
**explaining** [3] - 12:24, 49:13, 109:5
**explains** [2] - 41:17, 108:9
**explanation** [1] - 12:8
**explicit** [1] - 142:4
**Explorers** [5] - 126:15, 136:17, 139:11, 145:11, 161:17
**explorers** [1] - 136:15
**exposed** [2] - 107:10, 110:9
**exposes** [1] - 170:14
**expressed** [1] - 99:6
**expression** [2] - 57:12, 58:23
**extend** [1] - 149:9
**extent** [5] - 32:22, 53:20, 60:21, 73:14, 178:24
**extortionist** [1] - 171:9
**extraordinary** [1] - 156:6
**eye** [2] - 142:1, 146:19
**eye-wateringly** [1] - 142:1
**eyes** [5] - 92:13, 107:24, 134:4, 138:11, 152:12
**eyewitness** [1] - 56:20

# F

**F.C.S.B** [4] - 1:6, 2:13, 3:1, 180:7
**F.T** [1] - 3:7
**face** [10] - 20:21, 41:12, 42:9, 44:15, 46:7, 46:9, 65:18, 124:22, 130:21
**Facebook** [51] - 100:19, 100:20, 101:6, 101:7, 101:14, 101:20, 133:16, 133:22, 133:24, 134:8, 134:14, 134:15, 134:20, 134:21, 134:22, 135:20, 136:1, 136:7, 136:8, 136:13, 136:14,

136:21, 136:22, 136:23, 136:24, 136:25, 137:2, 137:3, 137:4, 137:6, 137:18, 137:24, 138:1, 138:2, 138:11, 139:16, 143:20, 143:24, 144:12, 145:7, 147:7, 149:22, 150:13, 163:1, 163:2, 168:23, 170:2, 171:15, 172:22, 173:5, 173:8
**Facebook's** [1] - 135:1
**faced** [1] - 126:16
**facilities** [2] - 102:15, 166:4
**facility** [1] - 117:23
**facing** [1] - 31:7
**fact** [44] - 8:19, 15:15, 55:16, 55:17, 55:21, 55:23, 56:10, 56:19, 56:22, 57:16, 57:17, 61:12, 61:14, 61:25, 62:18, 62:22, 62:25, 63:4, 64:24, 71:13, 79:7, 87:7, 96:1, 96:2, 97:4, 99:6, 99:16, 100:21, 100:23, 101:18, 103:8, 109:1, 109:20, 115:17, 115:25, 132:15, 139:25, 140:6, 141:6, 158:14, 160:23, 166:25, 168:16, 170:24
**factors** [1] - 25:19
**facts** [35] - 7:24, 11:11, 15:3, 16:25, 29:6, 30:6, 42:12, 48:8, 54:10, 54:19, 54:20, 55:7, 55:8, 55:19, 56:21, 57:1, 57:6, 57:9, 57:13, 57:14, 58:8, 58:17, 62:19, 62:22, 62:25, 70:7, 72:10, 80:7, 80:22, 117:2, 124:14, 152:5, 155:17, 168:13
**factual** [2] - 29:5, 42:12
**Fahey** [1] - 1:14
**fail** [1] - 58:4
**failed** [5] - 61:18, 74:11, 77:3, 88:13, 153:12

**failing** [4] - 64:16, 74:14, 75:11, 75:15
**fails** [4] - 13:14, 125:21
**failure** [3] - 14:16, 67:15, 69:3
**fair** [9] - 56:13, 57:24, 63:6, 69:7, 74:20, 75:22, 85:5, 102:6, 175:14
**fair-minded** [2] - 74:20, 75:22
**Fairfax** [22] - 14:11, 39:20, 63:25, 64:2, 64:7, 64:9, 64:10, 64:12, 64:13, 87:13, 88:9, 96:20, 97:5, 97:6, 97:11, 98:11, 105:3, 106:20, 115:4, 117:16, 173:13
**fairly** [4] - 68:25, 72:17, 73:9, 78:8
**fake** [5] - 138:4, 139:16, 149:22, 170:1, 170:2
**faking** [2] - 118:6, 118:12
**fall** [10] - 24:4, 27:10, 36:2, 103:1, 103:3, 117:6, 133:19, 139:11, 146:16, 173:25
**falls** [1] - 26:11
**false** [4] - 99:15, 134:6, 138:18, 144:17
**falsehood** [1] - 61:5
**falsehoods** [1] - 152:14
**falsely** [2] - 61:24, 62:6
**familiar** [3] - 126:14, 151:22, 154:12
**families** [1] - 128:17
**family** [17] - 100:14, 102:21, 102:22, 102:23, 102:25, 103:17, 106:13, 108:5, 108:17, 113:8, 136:19, 139:5, 144:12, 149:13, 151:21, 158:5, 173:14
**far** [4] - 11:9, 53:3, 102:7, 108:20
**Farms** [3] - 129:24, 130:17, 136:22
**F▮▮▮▮** [10] - 74:6, 75:4, 127:11,

157:24, 161:20, 162:17, 162:19, 162:20, 162:21, 164:24

**father's** [1] - 131:8

**favor** [12] - 68:23, 70:14, 73:25, 76:25, 77:3, 77:16, 79:12, 87:25, 120:22, 165:12, 172:4, 175:14

**FCB** [1] - 24:21

**FCSB** [2] - 6:8, 17:1

**FCSB's** [3] - 23:6, 24:6, 24:22

**fear** [2] - 76:21, 77:8

**feared** [1] - 162:19

**February** [14] - 100:2, 100:14, 108:25, 111:23, 112:6, 114:8, 114:14, 125:12, 128:1, 128:13, 150:15, 150:21, 151:3, 151:24

**federal** [3] - 64:3, 64:7, 64:8

**Federal** [1] - 14:21

**federal.4th** [1] - 46:18

**feeds** [1] - 18:22

**feelings** [1] - 72:1

**feet** [1] - 127:13

**FELDMAN** [1] - 3:9

**fell** [1] - 143:11

**fellow** [4] - 79:25, 80:4, 99:19, 162:23

**felt** [2] - 135:7, 165:5

**female** [5] - 89:7, 89:15, 89:16, 91:6, 107:11

**females** [1] - 107:11

**Feminist** [9] - 6:18, 8:6, 9:18, 10:11, 18:16, 19:1, 19:10, 24:12, 26:12

**fence** [2] - 129:2

**few** [8] - 92:1, 100:5, 100:16, 108:13, 125:24, 135:6, 139:21, 150:3

**fiction** [1] - 132:16

**field** [7] - 30:11, 114:20, 139:10, 158:13, 158:16, 158:17, 158:19

**fighter** [1] - 119:9

**fighting** [3] - 27:24, 117:23, 119:11

**figure** [4] - 36:5, 36:10, 49:4, 131:18

**figured** [2] - 150:1, 150:2

**figures** [1] - 138:7

**filed** [2] - 9:11, 118:11

**filings** [1] - 48:15

**fill** [1] - 81:17

**filled** [1] - 152:13

**final** [1] - 86:18

**finally** [4] - 81:12, 101:21, 158:21, 159:4

**financial** [2] - 64:8, 77:22

**finder** [1] - 15:15

**fine** [8] - 24:23, 38:21, 38:25, 41:18, 124:24, 155:14, 177:22, 179:23

**finer** [1] - 15:5

**finished** [1] - 176:17

**fired** [1] - 170:24

**firm** [1] - 152:15

**firmness** [10] - 45:17, 45:25, 46:2, 46:6, 46:21, 47:10, 47:25, 48:1, 48:10, 71:24

**firms** [1] - 171:2

**first** [36] - 5:8, 12:4, 16:20, 22:21, 23:3, 24:8, 41:25, 45:25, 50:21, 80:10, 85:8, 94:9, 97:10, 100:24, 103:25, 109:3, 109:16, 110:25, 112:5, 115:6, 115:9, 117:9, 125:18, 125:23, 134:1, 139:8, 147:1, 153:3, 153:10, 153:20, 160:12, 160:13, 171:7, 175:20, 177:6

**First** [16] - 5:15, 45:17, 46:19, 46:22, 47:12, 70:21, 70:24, 71:15, 71:24, 72:3, 72:9, 72:16, 72:21, 73:25, 156:9, 156:11

**fishy** [1] - 134:12

**fit** [4] - 35:20, 85:22, 113:12, 174:12

**five** [11] - 5:7, 6:14, 85:24, 96:22, 124:9, 154:16, 155:13, 165:11, 165:14, 170:4, 179:24

**five-minute** [1] - 165:14

**five-plus** [1] - 124:9

**fix** [4] - 87:2, 87:10, 98:18, 107:22

**fixing** [1] - 70:6

**FL** [3] - 2:3, 2:7, 2:11

**flashback** [1] - 106:2

**flatly** [1] - 119:20

**FLEXNER** [4] - 1:19, 2:2, 2:6, 2:10

**Floor** [1] - 3:14

**floor** [4] - 85:10, 146:24, 159:19, 163:21

**Floris** [1] - 129:23

**focus** [9] - 11:15, 20:2, 30:19, 43:22, 86:16, 102:1, 104:21, 104:23, 119:8

**focused** [1] - 103:12

**folded** [1] - 160:19

**follow** [7] - 54:9, 54:14, 54:17, 54:25, 63:4, 67:16, 80:9

**followed** [4] - 145:21, 145:22, 153:2, 153:7

**following** [3] - 73:10, 77:19, 156:21

**follows** [5] - 13:17, 14:6, 22:4, 174:10, 177:6

**food** [1] - 130:6

**fooled** [1] - 152:15

**footage** [1] - 126:20

**footnote** [1] - 26:9

**FOR** [1] - 1:1

**force** [2] - 58:12, 106:4

**forced** [2] - 102:8, 114:16, 135:15

**foregoing** [1] - 180:10

**foreperson** [10] - 37:2, 37:17, 37:19, 80:11, 81:17, 81:24, 82:6, 82:8, 175:21

**Foreperson** [1] - 176:19

**forever** [1] - 153:4

**form** [24] - 28:14, 28:16, 34:12, 36:14, 36:20, 36:21, 36:22, 37:19, 81:12, 81:14, 81:15, 81:16, 82:8, 85:14, 105:22, 110:11, 115:5, 115:6, 116:11, 116:17, 116:22, 117:1, 158:14

**format** [1] - 12:24

**formed** [1] - 159:2

**former** [4] - 64:21, 88:2, 88:11, 113:11

**formulation** [1] -

12:21

**forth** [2] - 63:24, 133:25

**fortunately** [1] - 12:23

**forward** [9] - 29:6, 43:16, 54:3, 82:21, 89:25, 151:18, 168:19, 169:5, 175:22

**forwarded** [1] - 105:4

**Foundation** [3] - 18:16, 24:12, 26:12

**foundation** [1] - 9:19

**foundational** [2] - 11:24, 42:25

**four** [9] - 48:18, 108:10, 112:8, 112:17, 118:9, 127:5, 131:4, 134:10, 170:4

**Four** [1] - 152:15

**fourth** [1] - 81:6

**Fourth** [10] - 5:23, 5:24, 6:16, 6:18, 9:12, 12:15, 12:18, 14:24, 15:23, 46:4

**frame** [2] - 103:20, 143:23

**frank** [2] - 74:6, 75:4

**frankly** [5] - 42:21, 89:1, 96:14, 105:19, 114:19

**F███** [16] - 70:19, 74:9, 75:6, 94:22, 94:23, 96:6, 96:21, 105:2, 106:20, 107:2, 156:12, 156:17, 157:6, 159:23, 161:25, 162:5

**F███** [2] - 157:1, 157:4

**F███** [6] - 74:8, 75:6, 93:11, 110:18, 149:3

**Friday** [3] - 39:16, 52:6, 129:22

**friend** [6] - 113:11, 132:13, 139:15, 139:23, 141:20, 145:9

**friend's** [1] - 140:1

**friendly** [1] - 129:7

**friends** [11] - 88:6, 114:18, 137:1, 139:2, 145:5, 146:1, 146:2, 146:15, 148:8, 167:4, 167:8

**friendships** [2] - 138:25, 139:1

**front** [4] - 19:5, 86:2, 126:19, 173:23

**fully** [2] - 78:8, 80:17

**Fulton** [1] - 3:6

**fun** [1] - 118:9

**function** [1] - 54:4

**funding** [1] - 24:19

**future** [5] - 72:19, 73:14, 73:19, 73:23, 119:20

## G

**G.F.'s** [1] - 41:10

**gallery** [1] - 53:4

**Gebser** [5] - 11:23, 12:9, 12:18, 12:23, 13:9

**general** [1] - 91:7

**generally** [6] - 10:19, 30:18, 43:3, 43:9, 56:16, 56:23

**generate** [1] - 179:3

**genitals** [2] - 107:10, 110:9

**gentlemen** [20] - 31:12, 52:22, 53:13, 82:11, 82:17, 82:25, 84:5, 121:7, 121:12, 122:24, 122:25, 124:6, 155:19, 165:16, 165:18, 171:19, 175:16, 176:10, 178:17, 179:13

**Genus** [3] - 147:3, 148:25, 149:1

**girl** [14] - 47:11, 48:1, 86:13, 111:4, 112:21, 112:22, 130:21, 137:22, 137:24, 145:8, 173:25, 174:8, 174:18

**girlfriend** [3] - 140:2, 145:8, 146:15

**girls** [4] - 99:22, 99:24, 107:11, 117:18

**given** [20] - 29:24, 34:25, 36:25, 38:19, 43:15, 55:1, 55:2, 56:24, 60:1, 60:8, 60:10, 79:11, 81:7, 81:22, 101:8, 107:6, 124:9, 124:15, 142:2, 151:25

**glad** [1] - 46:7

**globally** [1] - 15:16

**Google** [1] - 169:7

192

**govern** [1] - 63:9
**governing** [1] - 54:15
**government** [2] - 54:5, 64:11
**grade** [15] - 103:7, 107:12, 122:20, 125:4, 133:13, 138:24, 139:4, 139:5, 139:6, 146:20, 157:2, 159:20, 163:21, 174:14, 174:17
**grader's** [1] - 99:2
**graders** [5] - 97:10, 99:2, 99:3, 146:25, 163:18
**grades** [2] - 150:8, 150:20
**graduates** [1] - 117:24
**graduating** [1] - 117:19
**grammatician** [1] - 38:2
**grandpa** [1] - 141:14
**grandparents** [1] - 130:23
**graphic** [3] - 104:8, 142:2, 142:4
**graphically** [1] - 142:6
**graphs** [1] - 108:18
**grassy** [1] - 167:13
**great** [2] - 98:24, 173:2
**greater** [1] - 56:25
**griping** [1] - 147:10
**gross** [20] - 19:19, 20:2, 20:11, 21:2, 74:16, 74:22, 75:1, 75:17, 75:24, 76:5, 76:6, 77:17, 77:20, 78:9, 116:19, 156:10, 160:10, 160:16, 160:17, 161:7
**grossly** [5] - 74:9, 74:25, 75:11, 76:3, 76:9
**ground** [2] - 27:24, 130:5
**grounded** [2] - 141:13, 141:14
**grounds** [2] - 9:22, 26:4
**group** [5] - 53:25, 114:21, 139:15, 158:22, 159:2
**groups** [1] - 154:17
**grow** [2] - 155:6, 160:8
**growing** [1] - 155:9

**guess** [8] - 19:17, 20:16, 20:20, 20:25, 33:20, 37:6, 51:17, 178:10
**guessing** [1] - 26:21
**guesswork** [2] - 70:9, 73:1
**guidance** [5] - 74:7, 75:5, 79:11, 88:12, 105:3
**guide** [1] - 120:14
**guided** [2] - 60:6, 70:5
**guidelines** [1] - 67:16
**gum** [1] - 25:18
**gun** [1] - 171:8
**gushed** [1] - 142:23
**gym** [3] - 146:25, 151:10, 163:23

## H

**half** [16] - 14:8, 14:12, 14:17, 14:20, 14:22, 15:2, 15:6, 15:9, 16:6, 17:2, 17:3, 18:3, 97:15, 97:17, 166:15, 167:11
**half-hearted** [11] - 14:8, 14:12, 14:17, 14:20, 14:22, 15:2, 15:6, 15:9, 16:6, 17:3, 18:3
**halls** [1] - 168:9
**hallucinate** [1] - 138:17
**hallway** [2] - 111:20, 126:17
**hallways** [1] - 99:24
**hand** [3] - 16:12, 70:10, 86:15
**handful** [2] - 125:7, 126:12
**handle** [2] - 89:18, 89:19
**hands** [7] - 100:8, 109:1, 111:9, 126:9, 126:10, 150:11, 169:16
**hands-on** [1] - 109:1
**handwritten** [1] - 136:18
**hanging** [3] - 139:1, 146:2, 148:8
**hangouts** [1] - 148:2
**happy** [3] - 96:18, 119:2, 174:8
**harass** [1] - 145:15
**harassed** [3] - 161:3, 162:25, 174:19
**harasser** [7] - 8:4,

8:12, 25:4, 25:21, 26:4, 67:4, 67:8
**harassers** [1] - 112:25
**harasses** [2] - 44:13, 65:16
**harassing** [3] - 89:4, 99:19, 108:22
**harassment** [106] - 6:20, 8:7, 8:10, 8:13, 8:23, 9:21, 10:2, 11:19, 13:1, 13:2, 13:4, 13:6, 13:7, 13:22, 16:11, 17:11, 17:19, 18:16, 18:19, 18:23, 19:9, 22:7, 22:9, 22:11, 22:13, 22:14, 22:15, 22:17, 22:18, 22:25, 23:15, 23:16, 24:12, 24:14, 24:16, 24:17, 24:19, 25:2, 25:4, 25:22, 26:3, 41:12, 43:4, 44:11, 44:16, 64:17, 65:3, 65:8, 65:12, 65:15, 65:19, 65:20, 65:23, 66:2, 66:4, 66:17, 66:22, 66:25, 67:3, 67:4, 67:6, 67:9, 67:12, 67:15, 67:16, 67:25, 68:9, 68:11, 68:14, 68:16, 68:17, 68:18, 68:20, 68:21, 70:22, 70:23, 71:3, 75:9, 91:10, 91:24, 94:7, 94:12, 94:15, 96:24, 97:6, 97:13, 97:16, 107:5, 107:16, 115:10, 116:14, 124:23, 125:14, 126:1, 126:7, 144:19, 145:1, 146:17, 150:22, 153:21, 173:16, 173:17
**harassments** [1] - 65:10
**hard** [2] - 147:10, 155:5
**harm** [12] - 27:25, 28:2, 28:5, 28:11, 28:23, 29:7, 29:14, 29:22, 32:1, 32:13, 35:14, 113:8
**harms** [2] - 27:16, 70:2
**HARRIS** [1] - 3:12
**Harris** [3] - 180:3, 180:21
**hateful** [1] - 149:24
**hatred** [1] - 78:20

**hauling** [1] - 112:16
**hawks** [1] - 99:11
**head** [1] - 15:10
**headaches** [1] - 119:6
**health** [3] - 29:21, 103:2, 117:3
**healthcare** [1] - 102:8
**healthy** [1] - 174:8
**hear** [12] - 22:21, 25:6, 61:1, 83:19, 84:6, 84:14, 92:10, 123:3, 124:4, 130:6, 130:18, 163:7
**heard** [67] - 38:17, 39:4, 54:8, 59:2, 69:16, 86:18, 86:19, 88:1, 90:14, 97:20, 99:3, 99:16, 100:4, 102:19, 103:21, 111:22, 115:23, 115:24, 118:21, 118:25, 119:20, 119:25, 125:5, 125:11, 126:24, 126:25, 127:6, 127:19, 127:21, 127:22, 129:13, 130:13, 130:19, 131:14, 132:13, 133:16, 133:24, 134:2, 139:10, 139:19, 140:25, 141:17, 141:20, 142:20, 144:11, 148:22, 148:24, 151:11, 151:13, 152:10, 153:15, 153:24, 153:25, 154:1, 154:2, 156:14, 157:3, 160:20, 160:21, 160:23, 161:23, 163:6, 167:11, 167:25
**hearing** [1] - 88:20
**heart** [1] - 164:25
**hearted** [11] - 14:8, 14:12, 14:17, 14:20, 14:22, 15:2, 15:6, 15:9, 16:6, 17:3, 18:3
**heavily** [1] - 100:20
**heeding** [1] - 121:24
**Heffernan** [2] - 86:25, 98:17
**Heffernan's** [1] - 88:17
**helicopter** [1] - 102:5
**help** [18] - 18:6, 55:13, 85:21, 86:4, 87:7,

95:3, 100:17, 106:23, 106:24, 108:7, 117:19, 141:12, 146:10, 157:7, 162:9, 163:13, 174:21
**helpful** [1] - 9:14
**helpfully** [1] - 21:16
**helping** [5] - 149:11, 160:7, 160:8, 162:9
**helps** [1] - 29:18
**hereby** [1] - 180:4
**hereto** [1] - 180:15
**herself** [10] - 113:11, 133:12, 136:9, 138:8, 149:20, 149:22, 149:24, 155:12, 163:6
**hesitate** [1] - 80:1
**High** [1] - 149:19
**high** [6] - 16:22, 17:21, 67:13, 125:9, 128:20, 149:18
**higher** [2] - 19:15, 21:1
**highlight** [1] - 172:18
**highlighted** [1] - 172:21
**himself** [2] - 88:13, 170:14
**hired** [1] - 118:18
**history** [4] - 146:11, 154:20, 157:24, 161:20
**hold** [4] - 41:9, 41:11, 121:11, 121:18
**Hold** [1] - 121:18
**holding** [4] - 13:3, 16:14, 57:20, 130:6
**HOLTZMAN** [1] - 1:14
**home** [17] - 113:5, 126:21, 128:22, 128:24, 141:6, 141:8, 150:13, 151:4, 157:11, 157:15, 157:21, 158:4, 158:11, 159:3, 163:7, 170:11
**homebound** [12] - 114:13, 114:15, 114:23, 115:1, 115:2, 115:17, 117:19, 151:5, 154:21, 157:22, 158:7, 158:10
**homework** [3] - 125:7, 158:6, 158:7
**honest** [2] - 80:3, 138:21
**Honor** [89] - 5:10,

5:13, 5:16, 5:22,
6:10, 6:13, 6:21, 8:5,
8:6, 9:10, 11:2,
12:14, 14:4, 16:8,
16:18, 18:10, 19:6,
19:12, 20:16, 21:22,
22:19, 23:10, 24:3,
24:11, 25:7, 25:17,
26:8, 26:23, 27:1,
30:8, 31:9, 31:20,
31:21, 32:20, 32:21,
33:4, 33:16, 34:7,
35:2, 35:11, 35:18,
36:16, 37:9, 37:11,
37:24, 37:25, 38:7,
38:22, 39:2, 39:15,
40:4, 41:5, 42:3,
42:21, 43:20, 44:22,
45:3, 45:19, 46:3,
46:9, 46:18, 47:1,
47:7, 47:18, 47:24,
48:12, 48:23, 49:21,
49:22, 51:4, 51:6,
52:5, 52:14, 83:2,
83:21, 83:22, 83:24,
84:20, 121:6,
121:17, 121:20,
121:24, 156:1,
156:4, 164:9, 172:8,
177:12, 177:20,
177:22
**Honor's** [2] - 32:5,
49:24
**HONORABLE** [1] -
1:11
**hope** [2] - 44:3,
166:21
**horrible** [1] - 141:16
**horrific** [2] - 130:7,
154:17
**hospitalization** [1] -
117:9
**hospitalized** [2] -
102:14, 174:3
**hour** [5] - 49:7, 50:20,
51:15, 144:1
**hour-by-hour** [1] -
144:1
**hours** [7] - 26:4,
85:25, 110:5,
110:13, 118:22,
128:19, 143:16
**house** [7] - 106:16,
110:14, 113:19,
129:2, 129:10,
129:22, 130:1
**housed** [1] - 161:14
**housekeeping** [1] -
52:5
**hovered** [1] - 134:19

**H**[____][22] - 70:19,
74:9, 75:7, 90:23,
146:22, 146:25,
157:9, 157:10,
157:14, 157:18,
157:19, 158:5,
158:12, 158:21,
159:18, 159:23,
161:10, 163:10,
163:16, 164:11,
164:12, 164:22
**H**[____][2] - 158:20,
158:23
**hues** [1] - 12:15
**human** [4] - 30:24,
40:6, 56:15, 154:15
**humiliate** [1] - 65:25
**humiliation** [1] - 77:25
**humor** [1] - 119:2
**H**[____][1] - 147:2
**H**[____][6] - 74:7,
75:5, 149:10,
157:14, 163:3,
163:14
**hundreds** [3] - 85:25,
103:22, 128:18
**HUNTON** [4] - 2:14,
2:17, 2:21, 3:1
**hurt** [2] - 72:1, 119:14
**hybrid** [1] - 46:12
**hyperlinks** [2] -
134:23, 134:24
**hypervigilant** [1] -
165:8

**I**

**idea** [3] - 15:8, 32:2,
103:9
**ideations** [1] - 89:22
**identified** [1] - 109:23
**identify** [1] - 101:8
**identifying** [1] - 37:15
**identity** [1] - 138:2
**idle** [13] - 15:8, 40:25,
41:4, 41:5, 41:11,
41:19, 41:20, 41:25,
42:9, 42:14, 42:19,
43:13, 44:5
**idly** [1] - 164:14
**Ignore** [1] - 87:1
**ignore** [2] - 102:9,
164:17
**ignoring** [1] - 160:19
**ill** [1] - 78:21
**illness** [1] - 149:15
**image** [1] - 97:3
**imagine** [2] - 15:24,
124:10
**immediately** [3] -

99:3, 122:14, 159:9
**imminent** [1] - 76:21
**impact** [2] - 105:1,
150:19
**impacted** [1] - 101:1
**impaneled** [1] - 83:16
**impartial** [2] - 79:24,
106:25
**impartially** [1] - 54:24
**impeached** [2] -
61:16, 61:20
**impersonating** [1] -
137:8
**implemented** [1] -
145:19
**importance** [2] - 61:3,
125:9
**important** [17] - 6:21,
8:5, 28:18, 49:18,
51:11, 54:4, 56:9,
61:24, 86:12, 88:1,
92:2, 92:18, 94:19,
101:16, 143:1,
151:14, 166:17
**importantly** [1] - 93:8
**impose** [2] - 21:4,
35:20
**impresses** [1] - 60:16
**improve** [1] - 107:22
**improving** [1] - 150:7
**in-house** [1] - 110:14
**in-person** [2] - 150:25,
151:6
**in-school** [4] - 7:20,
9:4, 98:22, 159:11
**inability** [1] - 73:23
**inaction** [1] - 72:5
**inactions** [3] - 35:24,
69:14, 69:20
**inappropriate** [8] -
110:12, 122:3,
128:7, 140:25,
148:16, 173:11,
173:16, 173:17
**inappropriately** [5] -
127:7, 128:3,
148:12, 151:9,
169:17
**incentive** [1] - 93:3
**incident** [10] - 7:19,
108:15, 108:25,
109:7, 109:16,
113:4, 122:17,
122:20, 170:6,
170:17
**incidents** [4] - 74:15,
75:15, 112:14, 154:9
**inclinations** [2] -
56:15, 154:15
**inclined** [5] - 16:18,

23:21, 25:9, 42:8,
83:18
**include** [14] - 6:4,
12:10, 13:22, 22:11,
23:1, 23:2, 34:4,
34:25, 66:17, 68:13,
69:12, 73:5, 87:17,
168:19
**included** [4] - 5:20,
21:14, 23:17, 89:24
**includes** [1] - 32:5
**including** [12] - 23:1,
39:6, 39:12, 39:17,
39:23, 40:1, 50:21,
57:25, 73:12, 81:4,
94:15, 130:2
**incomplete** [1] - 5:13
**inconsistencies** [1] -
60:23
**inconsistent** [4] -
61:19, 62:14, 62:17,
101:25
**inconvenience** [1] -
71:25
**incurs** [1] - 35:4
**indeed** [2] - 88:16,
118:18
**independence** [2] -
138:25, 148:10
**independent** [3] -
104:24, 151:22,
152:1
**indicate** [2] - 37:2,
81:24
**indicated** [2] - 84:7,
175:18
**indicates** [1] - 54:19
**indicating** [2] - 56:21,
79:8
**indifference** [44] -
9:16, 10:1, 14:2,
14:16, 16:21, 17:5,
17:8, 17:21, 18:18,
18:19, 18:20, 19:2,
19:9, 21:18, 23:3,
23:16, 23:25, 41:16,
41:20, 41:25, 42:1,
42:6, 42:9, 42:15,
43:5, 43:22, 44:2,
44:4, 44:15, 65:12,
65:18, 67:10, 67:13,
67:17, 67:18, 74:17,
75:18, 78:23, 116:1,
124:22, 125:19,
154:7, 161:8, 163:25
**indifference'** [1] -
17:18
**indifferences** [1] -
57:7
**indifferent** [12] - 7:17,

8:24, 9:21, 10:8,
16:15, 17:1, 22:12,
40:23, 41:1, 41:15,
68:15, 154:6
**indignity** [1] - 78:1
**indirect** [1] - 56:20
**individual** [25] - 15:19,
20:5, 47:20, 47:22,
50:22, 57:24, 64:21,
71:5, 71:7, 71:11,
72:11, 74:12, 74:24,
75:1, 75:10, 75:13,
76:1, 76:2, 76:4,
79:22, 116:18,
161:13, 161:14,
164:21
**individual's** [1] -
72:20
**individually** [1] -
175:20
**individuals** [1] -
116:21
**indivisible** [1] - 76:7
**inferences** [2] - 57:6,
70:7
**inferred** [1] - 77:8
**information** [8] - 39:9,
59:6, 157:23,
157:24, 157:25,
158:2
**informed** [5] - 63:21,
148:1, 162:12,
162:20, 162:22
**informs** [1] - 34:14
**inherently** [1] - 167:13
**initial** [1] - 103:19
**initiated** [2] - 139:22,
144:22
**initiating** [1] - 144:6
**injecting** [1] - 9:17
**injure** [1] - 78:21
**injuries** [12] - 28:22,
34:23, 35:6, 35:7,
69:5, 69:10, 70:2,
73:15, 75:2, 76:5,
77:24
**injuring** [1] - 78:4
**injury** [55] - 6:6, 27:4,
28:5, 28:10, 28:18,
29:3, 29:8, 29:13,
29:19, 29:25, 30:21,
31:10, 31:11, 31:19,
31:23, 31:24, 32:6,
32:10, 32:17, 32:19,
33:2, 33:6, 33:8,
33:14, 35:2, 35:15,
35:17, 35:23, 35:24,
36:1, 36:2, 69:2,
69:3, 69:13, 69:14,
69:22, 69:24, 71:18,

72:18, 73:5, 76:8, 76:10, 76:13, 76:14, 76:16, 76:21, 77:8, 77:22, 78:3, 78:5, 79:2, 119:25, 120:1, 153:16, 153:17
**innocent** [4] - 61:4, 62:1, 62:11, 113:11
**inpatient** [1] - 102:15
**inquiry** [2] - 176:15
**inserting** [3] - 18:10, 46:23, 48:2
**insertion** [1] - 19:12
**insinuation** [1] - 148:3
**insisting** [1] - 150:17
**insists** [1] - 46:24
**instance** [2] - 7:6, 173:17
**instead** [6] - 41:10, 83:16, 95:11, 95:19, 106:8, 157:23
**institute** [6] - 13:5, 13:12, 65:9, 66:23, 66:25, 87:16
**institution** [8] - 8:9, 8:11, 10:25, 13:17, 13:18, 13:20, 66:13, 66:15
**institutions** [1] - 66:9
**instruct** [6] - 36:11, 50:1, 50:5, 54:8, 58:22, 120:12
**instructed** [15] - 12:16, 18:21, 21:11, 27:12, 27:16, 43:6, 55:16, 55:21, 58:19, 79:7, 87:12, 87:20, 100:18, 144:18, 179:5
**instructing** [2] - 28:1, 52:24
**instruction** [58] - 5:3, 5:24, 6:8, 8:11, 9:15, 12:3, 12:15, 12:19, 14:1, 17:2, 17:8, 17:12, 17:16, 17:17, 17:24, 18:15, 22:4, 22:20, 22:23, 23:5, 23:18, 24:5, 24:7, 24:25, 26:18, 27:14, 28:3, 29:24, 31:9, 31:20, 31:24, 32:5, 32:11, 33:25, 34:11, 34:21, 35:21, 36:3, 37:24, 39:16, 39:19, 39:25, 41:18, 43:2, 43:6, 45:9, 47:6, 47:16, 48:7, 49:15, 53:17, 54:12, 73:2, 115:20, 150:25,

151:5, 175:19
**Instruction** [19] - 5:19, 10:19, 10:24, 11:3, 16:19, 18:9, 21:10, 23:21, 26:16, 26:25, 27:6, 36:13, 38:16, 39:13, 40:17, 44:23, 45:13, 47:3, 47:20
**INSTRUCTIONS** [1] - 54:6
**instructions** [38] - 5:2, 5:5, 5:7, 6:25, 9:11, 10:14, 20:2, 21:18, 31:15, 37:15, 38:18, 38:19, 39:20, 41:2, 42:11, 43:15, 48:14, 48:20, 50:14, 53:22, 54:12, 54:17, 54:18, 55:2, 63:9, 63:24, 72:4, 78:19, 79:10, 79:13, 81:7, 82:11, 82:15, 87:13, 116:2, 153:19, 171:25
**instructor** [3] - 157:22, 158:8
**instructs** [1] - 12:19
**insulting** [1] - 78:3
**intangible** [1] - 73:7
**intelligence** [1] - 60:12
**intended** [4] - 55:13, 76:20, 81:9, 123:9
**intensify** [1] - 113:25
**intensifying** [1] - 112:20
**intensive** [1] - 174:4
**intent** [1] - 77:8
**intention** [3] - 41:16, 49:24, 51:14
**intentional** [15] - 15:6, 18:11, 18:12, 19:4, 19:13, 19:20, 19:21, 20:1, 21:2, 22:2, 22:5, 61:5, 62:1, 68:7, 76:22
**intentionally** [5] - 62:10, 77:2, 77:7, 77:12, 161:9
**interacting** [1] - 86:14
**interaction** [1] - 171:16
**interactions** [1] - 142:24
**interchangeably** [1] - 87:19
**interest** [3] - 62:23, 80:7, 80:22
**interested** [2] - 88:20, 88:23
**interesting** [1] - 94:24

**interestingly** [2] - 5:15, 109:24
**interior** [1] - 161:12
**interject** [2] - 41:23, 42:4
**internal** [2] - 67:16, 112:15
**internet** [2] - 157:23, 158:2
**internship** [6] - 86:20, 152:16, 152:22, 152:23, 152:24, 153:5
**interpreted** [1] - 12:16
**interrogatories** [2] - 36:23, 81:20
**interrogatory** [2] - 37:18, 82:7
**interrupt** [1] - 122:7
**intersect** [1] - 130:2
**interviewed** [5] - 109:19, 118:21, 145:20, 147:15, 159:11
**interviews** [1] - 103:23
**intimate** [1] - 142:8
**intimidate** [1] - 65:25
**intimidating** [2] - 22:7, 68:9
**introduce** [1] - 73:7
**introduces** [1] - 31:25
**invested** [1] - 102:3
**investigate** [2] - 104:25, 148:25
**investigating** [2] - 145:18, 159:16
**investigation** [17] - 12:12, 13:25, 14:9, 14:13, 14:17, 14:20, 17:3, 66:20, 105:8, 105:9, 106:23, 109:21, 131:21, 154:1, 163:12, 167:21, 168:19
**investigations** [3] - 18:3, 108:12, 156:18
**invite** [1] - 65:22
**invited** [3] - 141:23, 144:19, 144:20
**involve** [1] - 108:13
**involved** [9] - 40:6, 59:10, 64:22, 100:13, 130:9, 149:18, 151:17, 158:18
**involvement** [1] - 104:23
**involves** [3] - 44:19, 65:24, 66:1
**issue** [27] - 6:12, 6:14,

22:24, 24:4, 33:12, 34:14, 43:1, 45:25, 48:24, 49:2, 58:17, 59:11, 72:8, 87:22, 87:25, 103:12, 104:21, 106:15, 116:25, 117:2, 119:24, 121:21, 122:5, 122:6, 122:19, 123:16, 157:20
**issues** [11] - 9:19, 27:12, 27:18, 29:22, 49:21, 90:4, 103:2, 106:20, 125:16, 172:15, 179:8
**itself** [3] - 31:18, 162:8, 166:20
**IX** [53] - 6:8, 7:21, 10:19, 10:24, 12:1, 13:8, 13:10, 13:18, 15:20, 16:7, 20:8, 20:13, 23:3, 23:6, 27:23, 29:17, 33:17, 34:22, 35:3, 41:2, 43:2, 43:3, 43:12, 43:16, 43:17, 44:10, 44:24, 64:3, 64:9, 64:15, 65:1, 65:13, 66:13, 66:21, 67:21, 67:22, 67:25, 68:24, 69:9, 72:4, 94:4, 94:9, 104:24, 105:4, 105:10, 106:15, 106:19, 115:7, 124:17, 124:19, 125:18, 154:11

**J**

**J.F** [1] - 3:7
**J.O** [32] - 3:9, 50:23, 76:19, 77:1, 77:3, 77:5, 77:6, 77:10, 77:12, 78:13, 78:17, 92:16, 92:21, 92:25, 110:2, 110:7, 110:10, 113:4, 113:10, 113:15, 113:16, 113:24, 116:23, 122:15, 122:16, 123:7, 163:24, 166:23, 167:7, 167:10, 167:12
**J.O.'s** [1] - 78:12
**J.S** [1] - 92:15
**Jack** [1] - 151:16
**Jackson** [1] - 21:24
**January** [16] - 94:14,

94:16, 95:2, 99:21, 100:1, 108:21, 114:7, 131:16, 149:16, 150:6, 150:8, 150:14, 150:21, 151:25, 164:8, 164:10
**Jay** [1] - 117:20
**J██████** [15] - 88:4, 90:3, 91:5, 91:20, 93:8, 111:4, 111:5, 111:6, 111:7, 128:3, 132:5, 132:7, 132:12, 132:21
**J██████** [1] - 111:3
**J██████** [18] - 129:22, 130:20, 133:12, 133:14, 133:21, 137:1, 139:2, 139:15, 140:23, 143:10, 145:3, 145:4, 146:1, 146:8, 146:18, 147:8, 147:12, 170:10
**J██████** [5] - 137:2, 139:17, 145:3, 145:21, 147:1
**Jenni** [11] - 128:1, 132:6, 132:7, 132:8, 132:10, 132:12, 168:25, 169:3, 169:21
**Jennings** [2] - 104:1, 114:9
**jewel** [2] - 96:20
**jfahey@ holtzmanvogel. com** [1] - 1:17
**J██████** [2] - 74:7, 75:5
**job** [10] - 85:7, 85:21, 102:20, 120:21, 152:17, 152:22, 153:9, 153:20, 158:7, 171:25
**John** [1] - 117:20
**join** [2] - 165:2, 166:14
**jointly** [1] - 76:10
**joked** [1] - 142:11
**jokes** [2] - 142:14
**Jonathan** [1] - 1:14
**JOSEFIAK** [1] - 1:15
**journey** [1] - 119:10
**JR** [1] - 1:11
**judge** [7] - 120:11, 132:14, 141:2, 144:18, 146:12, 174:25, 179:5
**JUDGE** [1] - 1:12
**Judge** [10] - 11:6,

12:7, 14:13, 15:2,
15:5, 18:17, 18:25,
165:14, 176:17,
177:25

**judges** [7] - 57:14,
60:4, 80:7, 80:22,
124:13, 132:14

**judging** [2] - 62:15,
63:1

**judgment** [14] - 27:19,
29:16, 31:5, 32:22,
33:4, 33:13, 33:24,
35:12, 35:13, 61:6,
63:10, 70:6, 79:17,
79:22

**judicial** [2] - 55:19,
55:20

**judicially** [2] - 55:9,
55:23

**jump** [2] - 111:14,
117:10

**jumped** [3] - 111:20,
125:14, 148:5

**jumping** [2] - 111:16

**junior** [1] - 152:17

**JUROR** [2] - 156:1,
165:14

**juror** [5] - 49:23, 56:7,
79:19, 176:22, 178:7

**jurors** [14] - 54:21,
57:14, 79:20, 79:25,
80:4, 80:13, 80:17,
80:18, 80:20, 81:1,
83:16, 83:17, 121:1,
176:25

**jury** [84] - 7:15, 8:1,
8:16, 9:10, 9:14,
9:19, 12:19, 12:24,
15:10, 16:25, 17:5,
17:14, 17:16, 17:23,
18:6, 18:20, 21:9,
21:11, 23:25, 27:3,
27:11, 28:1, 29:12,
29:18, 29:24, 30:2,
30:5, 31:2, 32:1,
32:8, 35:20, 35:25,
36:3, 36:21, 37:2,
37:3, 37:7, 37:8,
37:18, 38:13, 40:5,
42:11, 43:5, 43:25,
44:2, 48:14, 48:20,
49:13, 51:21, 51:23,
51:24, 52:23, 52:24,
53:6, 54:2, 54:7,
80:10, 80:14, 81:15,
81:24, 81:25, 82:4,
82:7, 83:6, 83:12,
84:1, 84:5, 104:7,
121:13, 123:9,
123:17, 155:19,

156:4, 164:16,
166:17, 175:6,
175:16, 175:23,
176:15, 176:17,
177:24, 178:17

**Jury** [11] - 53:11,
82:24, 84:3, 121:14,
124:3, 165:17,
166:7, 176:8,
178:15, 179:10,
180:6

**JURY** [2] - 1:11, 54:6

**Justice** [4] - 43:8,
43:12, 43:13, 43:18

**justice** [1] - 53:16

**justification** [2] -
76:23, 77:14

**justified** [1] - 57:7

## K

**Karras** [2] - 119:20,
120:8

**Keefe** [11] - 2:9, 5:21,
9:1, 9:9, 12:13,
16:17, 17:13, 19:11,
37:10, 41:22, 46:25

**KEEFE** [24] - 5:22,
9:10, 12:14, 16:18,
19:12, 20:5, 20:8,
20:11, 20:16, 20:20,
20:23, 21:16, 37:11,
37:23, 38:6, 38:22,
40:4, 40:25, 42:3,
42:7, 47:1, 47:7,
47:18, 52:14

**keep** [10] - 22:9,
68:11, 106:16,
123:2, 138:2,
141:13, 143:18,
146:19, 157:15,
163:22

**keeping** [1] - 151:4

**keeps** [1] - 117:23

**kelliker@huntonak.
com** [1] - 3:3

**Kettering** [1] - 118:1

**Kevin** [2] - 2:25,
111:13

**key** [1] - 149:12

**kid** [6] - 131:2, 135:17,
154:19, 155:7,
155:8, 155:11

**kidding** [1] - 179:22

**kids** [26] - 95:10,
96:16, 96:17, 99:11,
100:9, 126:12,
126:17, 126:18,
126:19, 126:22,
128:18, 128:25,

129:15, 130:22,
141:2, 141:3, 146:2,
146:14, 147:8,
147:10, 148:15,
148:23, 148:24,
154:22, 155:2

**kind** [3] - 35:15, 60:6,
140:24

**kinds** [4] - 28:20,
28:22, 42:17, 141:1

**King** [1] - 18:17

**King's** [1] - 18:25

**Kinney** [5] - 3:4, 5:12,
156:2, 165:21,
177:21

**KINNEY** [14] - 3:5,
5:10, 5:12, 38:7,
38:9, 45:19, 45:22,
46:9, 46:14, 46:17,
83:23, 156:4, 164:6,
164:8

**Kinney....................
.** - 4:5

**Ki█** [19] - 88:16, 89:2,
89:20, 90:5, 90:9,
94:18, 95:9, 96:8,
96:24, 97:22, 98:7,
98:10, 98:15,
105:13, 114:5,
115:23, 167:3,
170:3, 174:21

**Ki█████** [1] - 107:6

**knee** [1] - 113:22

**knife** [1] - 171:8

**knifes** [1] - 171:18

**knit** [1] - 102:23

**knives** [2] - 130:16,
171:18

**knowingly** [3] - 62:5,
62:9, 62:24

**knowledge** [15] -
11:16, 12:2, 12:17,
13:19, 42:17, 56:14,
56:19, 59:11, 65:9,
66:14, 78:25, 92:3,
133:19, 153:23,
154:14

**known** [17] - 8:13,
10:2, 16:22, 17:12,
17:20, 22:12, 25:22,
41:12, 43:4, 44:15,
65:18, 67:4, 67:12,
68:15, 68:20,
124:22, 171:10

**knows** [8] - 6:13, 8:6,
10:6, 110:9, 110:20,
112:3, 136:2, 173:20

**KURTH** [4] - 2:14,
2:17, 2:21, 3:1

## L

**label** [1] - 154:25

**lack** [5] - 17:10, 17:19,
67:11, 160:18,
169:13

**ladies** [20] - 31:12,
52:22, 53:13, 82:11,
82:17, 82:25, 84:5,
121:7, 121:12,
122:24, 124:6,
155:19, 165:15,
165:18, 171:19,
175:16, 176:9,
178:17, 179:13

**ladies'** [1] - 162:5

**laid** [1] - 5:24

**Lakes** [1] - 149:19

**language** [18] - 6:5,
18:4, 23:14, 23:19,
26:1, 27:5, 36:3,
39:13, 40:24, 43:8,
43:23, 44:18, 65:24,
140:24, 140:25,
141:4, 154:23

**lap** [1] - 130:6

**lapse** [1] - 62:1

**large** [3] - 97:2,
117:17, 161:12

**largely** [2] - 90:7,
115:15

**larger** [1] - 61:14

**last** [28] - 6:14, 11:7,
16:9, 31:8, 34:6,
45:13, 46:5, 92:18,
99:16, 102:14,
108:10, 114:12,
116:25, 117:11,
118:8, 119:10,
126:16, 134:10,
150:6, 150:13,
151:6, 151:24,
155:13, 167:5,
172:7, 174:2, 174:9

**late** [3] - 95:2, 139:14,
166:3

**latter** [1] - 18:14

**laughed** [1] - 113:6

**Lauren** [1] - 132:13

**law** [37] - 8:2, 9:12,
9:13, 9:18, 11:24,
19:14, 19:17, 21:4,
24:6, 24:11, 26:18,
30:12, 31:2, 45:24,
52:24, 54:9, 54:10,
54:12, 54:14, 54:15,
54:16, 54:22, 54:25,
56:23, 57:11, 58:1,
59:8, 59:12, 63:25,
70:10, 71:13, 81:7,

82:13, 124:15,
154:13

**LAW** [1] - 3:5

**lawsuit** [6] - 39:8,
59:5, 64:2, 118:11,
171:5

**lawyer** [1] - 57:15

**lawyers** [19] - 35:19,
38:24, 52:25, 53:6,
53:25, 54:15, 54:17,
55:10, 55:11, 55:15,
84:6, 84:8, 84:9,
170:24, 170:25,
171:1, 171:2, 171:3

**lawyers'** [1] - 57:17

**laying** [1] - 130:4

**lead** [1] - 57:8

**leading** [1] - 139:18

**leads** [1] - 7:2

**learn** [4] - 106:18,
132:6, 155:5, 160:8

**learned** [9] - 145:23,
145:25, 146:2,
146:5, 146:6, 146:7,
146:9, 147:25

**learning** [2] - 105:12,
114:18

**least** [5] - 24:5, 32:7,
108:3, 162:11

**leave** [12] - 16:11,
16:24, 17:5, 18:7,
30:1, 48:7, 49:23,
53:8, 114:16,
121:13, 178:7,
178:12

**leaves** [1] - 110:16

**leaving** [2] - 30:5,
117:16

**led** [3] - 10:2, 36:18,
117:8

**leeway** [1] - 84:17

**left** [16] - 99:21,
104:15, 112:5,
126:18, 129:10,
129:11, 129:16,
141:16, 141:17,
141:18, 144:10,
168:6, 168:16,
169:21, 173:22,
173:23

**leg** [1] - 28:25

**length** [1] - 83:15

**lesbian** [2] - 114:1,
164:11

**less** [10] - 69:8, 74:21,
75:22, 93:15,
103:18, 110:5,
113:1, 117:11,
120:16, 165:22

**lesson** [1] - 96:3

**lessons** [1] - 96:4
**letter** [9] - 30:12, 94:18, 94:21, 94:22, 94:24, 95:23, 96:4, 150:8, 173:12
**levels** [1] - 21:5
**liability** [7] - 7:22, 9:25, 10:1, 10:9, 14:18, 20:13, 25:20
**liable** [21] - 8:3, 8:9, 22:15, 41:9, 41:11, 44:10, 44:12, 44:14, 63:5, 63:6, 65:13, 65:15, 65:17, 67:2, 67:22, 68:18, 72:23, 76:10, 76:11, 76:12, 124:20
**liaison** [1] - 176:1
**liar** [1] - 103:21
**liberty** [1] - 176:20
**lie** [3] - 12:1, 13:10, 153:3
**lies** [4] - 155:11, 155:12, 155:13
**life** [14] - 57:21, 57:22, 93:24, 94:16, 114:17, 117:24, 120:8, 120:23, 159:6, 159:8, 159:21, 166:15, 174:12, 174:15
**lifetime** [1] - 104:3
**light** [7] - 16:22, 17:11, 17:20, 56:14, 57:7, 67:12, 76:18
**lighter** [1] - 171:9
**lighters** [1] - 130:17
**likely** [9] - 45:16, 46:21, 50:4, 55:12, 58:14, 71:23, 87:23, 113:1, 120:23
**limit** [2] - 5:6, 25:19
**limited** [2] - 57:4, 63:18
**limits** [1] - 51:12
**line** [6] - 8:15, 14:25, 24:8, 108:15, 172:18, 178:10
**link** [1] - 134:21
**links** [1] - 101:12
**list** [2] - 34:1, 52:6
**listen** [6] - 98:9, 111:10, 156:7, 171:21, 172:22
**listened** [2] - 80:17, 85:25
**listening** [5] - 53:2, 88:23, 92:11, 123:18, 168:5
**literally** [1] - 174:15

**litigation** [3] - 32:25, 33:1, 103:9
**live** [7] - 53:7, 53:8, 97:3, 99:16, 102:17, 120:9, 175:2
**lived** [5] - 53:17, 120:10, 136:22, 165:10
**lives** [1] - 175:3
**living** [1] - 120:10
**LLP** [8] - 1:19, 2:2, 2:6, 2:10, 2:14, 2:17, 2:21, 3:1
**loan** [1] - 137:11
**loaned** [1] - 146:9
**location** [2] - 67:6, 168:20
**locations** [1] - 169:8
**lock** [1] - 164:3
**locker** [42] - 93:12, 99:9, 99:11, 99:14, 99:22, 99:25, 126:11, 126:15, 126:23, 126:25, 127:15, 136:13, 136:14, 136:16, 136:17, 136:18, 140:10, 140:11, 140:15, 140:20, 140:21, 145:6, 145:13, 145:16, 146:20, 146:21, 146:25, 147:2, 147:4, 147:20, 159:13, 159:15, 159:18, 162:1, 162:4, 162:10, 163:23, 164:3
**lockers** [10] - 98:21, 98:24, 99:2, 99:18, 108:23, 126:17, 126:18, 126:19, 126:20, 126:9
**lodged** [1] - 34:21
**log** [3] - 112:5, 137:20, 163:8
**logs** [2] - 137:14
**longboard** [3] - 137:5, 141:12, 146:10
**longest** [1] - 137:19
**look** [41] - 8:5, 26:17, 26:22, 32:22, 85:10, 85:16, 85:20, 86:4, 88:11, 91:5, 101:4, 109:25, 112:25, 120:13, 125:17, 129:10, 129:11, 129:16, 133:17, 136:9, 139:21,

144:5, 144:6, 147:20, 149:14, 153:6, 154:8, 162:17, 167:23, 169:6, 170:7, 171:21, 174:2, 175:6, 175:7, 175:10
**looked** [6] - 86:1, 115:11, 134:4, 138:10, 145:20, 152:12
**looking** [14] - 11:17, 15:3, 26:8, 26:9, 26:13, 67:19, 90:3, 94:10, 152:11, 153:4, 153:5, 168:19, 168:20
**lookout** [1] - 163:18
**looks** [2] - 85:11, 85:23
**Los** [1] - 1:20
**lose** [2] - 73:23, 119:7
**loss** [4] - 34:24, 69:10, 73:4, 77:22
**losses** [5] - 27:7, 34:23, 69:11, 70:11
**lost** [5] - 73:21, 100:22, 131:3, 137:5, 141:11
**loud** [1] - 147:9
**love** [1] - 49:6
**loved** [3] - 135:14, 140:5, 178:25
**loves** [1] - 135:20
**loving** [1] - 102:23
**lower** [5] - 40:18, 40:22, 44:10, 44:12, 44:13
**luckily** [4] - 11:9, 11:10, 11:12, 11:13
**lucky** [1] - 85:16
**lunch** [4] - 51:22, 51:25, 108:15, 155:23

## M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**machine** [2] - 180:5, 180:12
**main** [4] - 128:15, 130:2, 164:3
**maintain** [2] - 39:25, 41:1
**major** [1] - 151:11
**majority** [4] - 6:18, 8:6, 9:18, 101:12
**Majority** [5] - 18:16, 19:1, 19:10, 24:12,

26:12
**male** [3] - 89:6, 99:22, 110:12
**males** [1] - 168:9
**malice** [2] - 78:14, 78:19
**malingerer** [1] - 118:4
**malingering** [1] - 118:24
**man** [2] - 46:12, 171:13
**manage** [1] - 5:5
**managing** [2] - 46:10, 158:10
**manipulate** [1] - 138:14
**manner** [6] - 60:7, 60:13, 60:19, 75:11, 84:13, 175:22
**manufacturing** [1] - 102:6
**March** [7] - 101:23, 105:21, 112:7, 114:13, 114:15, 131:23, 147:15
**Margaret** [1] - 86:24
**mark** [5] - 116:5, 116:7, 150:4, 164:5, 164:7
**marked** [1] - 125:9
**marker** [1] - 130:21
**marks** [2] - 112:1, 171:17
**marshal** [2] - 37:20, 81:1
**master's** [1] - 151:13
**masterminds** [1] - 130:24
**material** [1] - 62:6
**math** [1] - 161:19
**mathematical** [1] - 70:11
**matter** [20] - 8:2, 29:5, 30:22, 31:2, 31:4, 52:6, 60:11, 61:3, 62:6, 105:4, 105:6, 122:2, 123:8, 124:9, 155:17, 155:22, 158:3, 158:10, 166:25, 176:7
**matters** [6] - 59:11, 59:19, 60:15, 60:17, 111:9, 155:17
**matters......................
.............** [1] - 4:3
**mean** [11] - 9:14, 20:16, 20:24, 25:18, 46:6, 46:8, 50:12, 50:21, 58:24, 73:3, 90:19

**meaning** [7] - 44:19, 65:24, 65:25, 71:20, 76:8, 92:21, 115:11
**means** [10] - 12:25, 17:9, 17:18, 18:7, 31:23, 58:7, 58:11, 67:10, 87:22, 118:5
**meant** [3] - 26:21, 88:17, 160:15
**measure** [4] - 73:6, 79:8, 79:10, 120:13
**measured** [2] - 34:24, 69:10
**measures** [6] - 13:5, 13:12, 66:23, 67:1, 87:16, 153:12
**mechanisms** [1] - 169:7
**media** [3] - 53:19, 168:15, 178:24
**medical** [11] - 35:6, 73:16, 102:9, 105:21, 117:13, 118:19, 118:22, 119:19, 119:20, 174:2
**medications** [1] - 102:11
**meet** [4] - 93:17, 93:18, 102:22, 144:21
**meeting** [6] - 9:25, 93:14, 94:14, 139:19, 147:19, 147:22
**meetings** [1] - 112:8
**meets** [5] - 107:20, 108:1, 108:2, 108:3
**meetup** [1] - 137:9
**M█████** [4] - 74:6, 75:4, 161:19, 164:22
**Melanie** [1] - 145:8
**member** [1] - 161:17
**members** [6] - 53:3, 54:7, 156:4, 164:16, 169:15, 175:23
**memo** [10] - 42:10, 108:9, 109:5, 109:7, 109:16, 109:18, 110:15, 110:19, 112:14, 154:9
**memories** [2] - 138:18, 138:19
**memory** [9] - 56:3, 56:5, 62:1, 101:17, 101:22, 101:23, 109:19, 173:2
**men** [2] - 154:17, 169:19
**mental** [5] - 29:21,

73:5, 73:12, 103:2,
117:3
**mention** [6] - 147:24,
151:19, 168:7,
170:1, 170:6, 179:1
**mentioned** [2] - 59:13,
142:12
**mere** [6] - 16:23,
17:22, 67:14, 80:5,
101:18, 110:10
**merely** [2] - 158:7,
158:17
**merging** [1] - 106:6
**message** [5] - 141:19,
141:22, 144:12,
144:15, 147:8
**messaged** [1] - 143:13
**messages** [82] -
100:19, 100:23,
100:24, 101:1,
101:3, 101:16,
101:23, 101:25,
113:13, 133:16,
133:18, 133:22,
133:24, 134:2,
134:5, 134:7, 134:9,
134:12, 134:13,
134:14, 134:18,
134:20, 134:22,
134:24, 135:1,
135:2, 135:5, 135:6,
135:7, 135:13,
135:15, 135:17,
135:19, 135:23,
136:1, 136:2, 136:4,
136:7, 137:10,
137:13, 137:17,
137:21, 137:24,
137:25, 138:1,
138:5, 138:12,
138:13, 139:20,
140:1, 140:6, 140:9,
140:13, 141:5,
141:8, 141:11,
141:19, 141:23,
141:25, 142:5,
142:8, 142:13,
142:16, 142:22,
143:9, 143:12,
143:20, 143:24,
144:3, 144:19,
145:7, 147:8,
147:11, 149:25,
150:2, 150:12,
171:15, 172:22,
173:5, 173:8
**met** [8] - 15:19, 93:10,
101:24, 142:22,
145:19, 153:22,
154:4, 168:18

**meta** [1] - 41:15
**metaphysical** [1] -
28:19
**Miami** [3] - 2:3, 2:7,
2:11
**Michael** [2] - 3:4, 5:12
**MICHAEL** [1] - 3:5
**mid** [2] - 137:4, 167:4
**mid-December** [1] -
167:4
**mid-November** [1] -
137:4
**Middle** [12] - 75:9,
75:12, 86:9, 88:2,
89:2, 91:7, 91:8,
97:18, 98:2, 106:12,
124:24, 138:23
**middle** [11] - 49:8,
93:19, 97:2, 98:2,
127:22, 128:21,
129:25, 141:1,
154:23, 155:3,
164:20
**Middleton** [3] -
129:24, 130:17,
136:22
**might** [13] - 12:11,
13:24, 17:15, 29:2,
36:6, 40:12, 41:25,
43:25, 44:5, 60:20,
66:19, 122:12,
178:25
**Miller** [1] - 111:14
**million** [3] - 119:21,
120:18
**mind** [7] - 19:23,
41:22, 51:9, 58:13,
60:13, 79:9, 161:12
**minded** [2] - 74:20,
75:22
**mine** [1] - 29:2
**minimis** [1] - 71:25
**minimum** [1] - 13:11
**minor** [3] - 108:14,
150:23
**minute** [7] - 116:5,
116:7, 144:1, 150:4,
165:14, 176:11
**minute-by-minute** [1]
- 144:1
**minutes** [16] - 5:7,
50:5, 50:6, 50:22,
50:23, 51:5, 51:7,
83:9, 84:15, 100:16,
126:12, 155:21,
155:22, 155:24,
179:24
**MISCELLANY** [1] - 4:2
**misconduct** [6] -
44:10, 65:14,

110:11, 113:17,
127:4, 159:25
**missed** [2] - 52:9,
177:3
**missing** [6] - 6:7,
22:20, 22:23, 24:5,
24:7, 170:15
**mistake** [1] - 62:11
**mistakes** [2] - 155:5,
155:6
**mk@kinneyesq.com**
[1] - 3:7
**mode** [1] - 49:1
**modify** [1] - 23:21
**Moir** [4] - 127:15,
158:15, 162:2
**Mom** [5] - 102:12,
102:14, 102:16,
147:24, 152:4
**mom** [37] - 102:2,
102:5, 125:8, 129:6,
130:8, 130:10,
131:2, 131:12,
135:24, 136:23,
137:18, 140:17,
141:21, 142:18,
142:21, 143:13,
144:10, 144:13,
144:14, 147:11,
147:18, 148:2,
148:5, 148:14,
148:21, 149:4,
149:8, 150:7,
150:13, 150:15,
150:20, 151:13,
151:17, 151:21,
152:2, 152:8
**mom's** [2] - 137:3,
147:21
**Mom's** [2] - 141:10,
151:3
**moment** [2] - 23:11,
143:11
**monetary** [5] - 34:24,
69:11, 70:15, 73:7,
74:2
**money** [11] - 68:25,
72:17, 73:4, 120:19,
137:5, 137:10,
137:11, 137:12,
141:12, 153:17
**M▇▇▇** [4] - 74:6,
75:4, 161:19, 164:24
**monitored** [1] - 147:4
**monitoring** [2] -
162:1, 162:8
**monster** [3] - 171:9,
171:12, 171:17
**montage** [1] - 96:15
**month** [7] - 110:17,

132:9, 135:22,
149:20, 149:21,
166:15, 167:11
**months** [11] - 95:3,
101:18, 102:15,
108:10, 110:10,
127:6, 128:12,
131:4, 131:7, 135:6,
170:4
**moreover** [2] - 43:1,
72:2
**morning** [12] - 5:1,
5:10, 5:11, 6:10,
6:11, 53:13, 53:14,
85:1, 167:7, 178:20,
179:7, 179:14
**most** [15] - 30:5,
87:18, 88:1, 94:19,
94:24, 101:15,
108:10, 110:23,
116:18, 119:13,
123:14, 125:13,
166:17, 167:2,
167:20
**mostly** [1] - 20:2
**mother** [18] - 93:23,
103:8, 103:11,
114:8, 117:8, 125:6,
131:9, 145:24,
157:13, 159:5,
159:7, 159:14,
163:3, 163:4, 163:7,
164:2, 168:18
**mother's** [1] - 131:8
**mothers** [1] - 164:23
**motion** [3] - 29:6,
43:16, 43:17
**Motions.....................
.......................** [1] -
4:3
**motivations** [2] -
164:18, 164:21
**motive** [7] - 60:13,
71:19, 71:21, 78:20,
158:9, 159:23, 160:1
**mouse** [1] - 134:19
**move** [7] - 83:2, 83:5,
83:7, 83:8, 110:14,
114:12, 125:22
**moved** [5] - 35:13,
52:6, 102:21, 147:1,
159:15
**moves** [1] - 11:21
**MR** [136] - 5:10, 5:12,
5:22, 6:10, 6:12, 7:5,
7:14, 7:25, 8:14, 9:2,
9:10, 10:6, 10:13,
10:21, 11:2, 11:8,
11:13, 12:14, 14:4,
14:12, 15:4, 15:21,

16:8, 16:18, 18:10,
19:5, 19:8, 19:12,
20:5, 20:8, 20:11,
20:16, 20:20, 20:22,
20:23, 21:16, 21:22,
21:24, 23:10, 24:3,
25:17, 26:8, 27:1,
28:15, 29:4, 29:11,
30:7, 30:16, 30:20,
31:14, 31:21, 32:25,
33:11, 33:19, 33:22,
34:13, 34:20, 36:15,
37:9, 37:11, 37:23,
37:25, 38:6, 38:7,
38:9, 38:22, 39:2,
39:15, 40:4, 40:21,
40:25, 41:5, 41:7,
42:3, 42:7, 42:21,
43:20, 44:7, 44:21,
45:3, 45:7, 45:19,
45:22, 46:9, 46:14,
46:17, 47:1, 47:7,
47:18, 48:23, 49:20,
49:21, 50:11, 50:15,
50:18, 51:2, 51:13,
51:17, 52:2, 52:14,
83:2, 83:7, 83:20,
83:23, 83:24, 84:2,
84:20, 84:23, 84:25,
116:6, 116:8,
121:17, 121:20,
121:24, 122:12,
122:18, 123:6,
123:21, 123:24,
156:4, 164:6, 164:8,
165:22, 165:24,
166:5, 166:9,
166:13, 172:8,
172:11, 172:13,
177:8, 177:11,
177:19, 177:22,
179:15, 179:19
**MS** [18] - 22:19, 22:23,
23:6, 23:14, 23:23,
24:23, 25:7, 25:11,
25:14, 26:23, 48:12,
48:20, 52:5, 83:22,
124:6, 150:5,
177:12, 177:20
**multiple** [12] - 76:6,
93:1, 103:16,
103:20, 117:1,
117:16, 117:25,
142:13, 151:7,
152:21, 163:9, 168:8
**musical** [1] - 149:19
**must** [61] - 6:8, 23:7,
24:18, 24:19, 37:1,
45:15, 54:10, 54:14,
54:17, 54:21, 55:17,
55:21, 55:25, 56:9,

58:24, 63:10, 63:11, 63:13, 64:18, 65:1, 65:21, 68:24, 69:7, 70:6, 70:16, 70:25, 71:16, 71:18, 71:23, 71:25, 72:7, 72:10, 72:12, 72:17, 72:22, 72:24, 72:25, 73:1, 73:8, 74:3, 74:19, 74:22, 75:21, 75:24, 77:6, 77:11, 79:3, 79:17, 79:19, 79:23, 80:9, 80:11, 80:15, 81:6, 81:8, 81:23, 87:21, 95:11, 99:15, 104:25, 153:7

## N

**name** [5] - 89:13, 92:1, 138:3, 173:16, 180:16
**name-calling** [2] - 89:13, 173:16
**named** [3] - 86:24, 137:1, 145:8
**names** [7] - 91:25, 92:22, 93:22, 145:4, 149:23, 154:23
**narrative** [1] - 104:16
**natural** [5] - 19:25, 56:14, 76:14, 77:9, 154:14
**nature** [5] - 35:9, 73:14, 77:9, 104:9, 104:19
**natured** [1] - 119:2
**near** [3] - 23:3, 128:9, 130:1
**nearly** [1] - 140:5
**necessarily** [2] - 40:11, 61:11
**necessary** [2] - 79:18, 149:7
**need** [18] - 6:18, 9:20, 15:15, 19:18, 21:3, 23:22, 40:10, 68:22, 73:6, 80:24, 82:18, 84:18, 94:2, 104:12, 133:17, 176:5, 179:19, 179:21
**needed** [8] - 49:23, 73:17, 73:18, 87:10, 93:19, 93:20, 158:8, 162:9
**needs** [3] - 5:20, 34:3, 102:12
**negative** [1] - 66:10
**neglect** [2] - 74:18, 75:20

**negligence** [30] - 15:23, 16:24, 17:22, 19:19, 19:20, 20:3, 20:11, 21:2, 21:3, 67:14, 74:16, 74:20, 74:22, 75:2, 75:17, 75:18, 75:21, 75:24, 76:5, 76:6, 77:17, 77:21, 78:9, 116:19, 156:10, 160:10, 160:16, 160:17, 161:7
**negligent** [9] - 74:10, 74:13, 74:14, 74:25, 75:11, 75:14, 75:15, 76:3, 76:9
**neighborhood** [25] - 128:8, 128:9, 128:10, 128:17, 128:18, 128:23, 129:7, 129:8, 129:9, 129:14, 129:15, 129:19, 130:3, 130:8, 130:11, 131:5, 139:12, 142:17, 143:4, 144:22, 150:11, 167:15, 169:18, 169:19, 170:9
**neighbors** [1] - 130:18
**nerve** [1] - 116:13
**neurochemical** [1] - 28:21
**neurocognitive** [1] - 118:13
**neurophysical** [1] - 30:24
**neutrality** [1] - 39:25
**neutrally** [1] - 39:17
**never** [31] - 26:5, 32:1, 87:10, 91:3, 91:18, 101:15, 106:7, 106:14, 109:11, 109:12, 115:17, 129:6, 130:13, 132:2, 137:8, 142:14, 142:15, 143:13, 152:12, 159:16, 163:6, 164:13, 167:8, 167:9, 167:25, 172:2, 173:10, 173:11, 173:21, 173:22
**new** [4] - 134:18, 138:25, 139:1, 147:2
**New** [1] - 149:14
**newsletters** [2] - 98:4, 98:9
**next** [30] - 6:7, 18:9,

25:25, 26:24, 28:6, 28:9, 34:12, 36:13, 37:14, 39:4, 40:17, 44:17, 63:24, 82:5, 97:13, 125:22, 127:13, 131:5, 139:18, 143:15, 146:16, 147:25, 149:6, 150:15, 155:24, 170:11, 170:15, 179:7
**Nguyen** [2] - 14:13, 15:2
**Nieves** [1] - 5:18
**night** [4] - 143:10, 143:11, 143:12, 143:14
**nobody** [2] - 169:18, 169:19
**noise** [1] - 123:3
**nominal** [2] - 70:16, 74:4
**none** [7] - 93:7, 98:25, 109:20, 109:23, 110:8, 127:7, 146:10
**noneconomic** [2] - 34:3, 119:21
**nonetheless** [1] - 95:6
**nonexistence** [2] - 56:22, 61:12
**nonparty** [1] - 62:17
**nonpecuniary** [1] - 36:5
**nontraditional** [1] - 117:21
**noon** [1] - 178:6
**normal** [8] - 32:18, 102:24, 114:10, 114:17, 117:24, 139:3, 149:15, 155:1
**nose** [3] - 131:8
**noses** [1] - 92:13
**note** [20] - 42:23, 44:6, 48:13, 48:16, 80:25, 103:5, 123:21, 135:9, 136:18, 149:11, 151:21, 151:23, 152:7, 172:17, 172:18, 176:17, 177:24, 178:18
**noted** [3] - 5:16, 49:10, 103:3
**notes** [12] - 8:5, 12:22, 12:25, 56:1, 56:2, 56:3, 56:4, 56:5, 152:8, 176:3, 176:4, 180:12
**nothing** [18] - 32:11, 53:5, 54:18, 56:6,

81:9, 86:22, 92:12, 98:3, 105:14, 106:24, 107:18, 107:19, 107:20, 125:13, 160:11, 160:13, 160:23
**Nothing** [1] - 33:20
**notice** [34] - 7:16, 7:17, 9:5, 10:24, 10:25, 11:5, 11:17, 11:20, 11:22, 11:25, 12:10, 12:17, 12:20, 12:25, 13:7, 13:13, 13:19, 13:22, 55:19, 55:20, 65:9, 66:14, 66:17, 81:13, 94:5, 94:9, 115:19, 115:21, 122:6, 122:17, 122:18, 123:8, 123:16
**noticed** [2] - 55:9, 55:23
**November** [45] - 8:21, 9:24, 93:21, 94:1, 94:14, 100:1, 104:16, 108:20, 109:17, 109:21, 110:17, 112:20, 114:7, 125:6, 125:12, 131:11, 133:5, 133:21, 133:22, 133:23, 135:22, 137:3, 137:4, 137:16, 139:14, 139:19, 139:21, 140:14, 140:20, 141:10, 141:15, 141:17, 142:18, 142:20, 142:23, 143:1, 143:10, 144:24, 145:1, 145:10, 147:19, 148:7, 157:11, 163:1
**nowhere** [1] - 108:10, 110:19
**nullity** [2] - 33:17, 35:4
**number** [11] - 35:19, 61:11, 61:13, 61:14, 122:13, 125:12, 128:12, 135:24, 137:17, 140:12, 161:23
**numerically** [1] - 81:5
**numerous** [3] - 92:20, 108:4, 168:10
**nurse** [1] - 104:17
**NW** [5] - 1:15, 2:14, 2:18, 2:21, 3:1

## O

**o'clock** [7] - 50:5, 50:9, 165:16, 176:22, 178:1, 178:7, 179:7
**O'Connor** [3] - 43:12, 43:13, 43:18
**O'Connor's** [1] - 43:8
**O'Grady** [2] - 11:6, 12:7
**oath** [3] - 62:12, 62:20, 138:12
**object** [7] - 34:8, 45:5, 45:22, 121:25, 122:6, 123:20, 176:21
**objected** [1] - 5:3
**objecting** [4] - 35:22, 49:8, 49:18, 121:25
**objection** [19] - 10:21, 18:14, 27:3, 30:8, 34:21, 36:7, 39:2, 39:14, 40:21, 44:21, 49:7, 49:10, 55:24, 83:20, 83:23, 83:24, 122:7, 123:20, 123:22
**objections** [3] - 5:6, 48:13, 83:19
**objective** [5] - 11:16, 46:3, 46:20, 46:24, 153:12
**objectively** [10] - 12:5, 12:6, 13:6, 13:21, 15:1, 65:4, 66:16, 115:11, 126:2
**objects** [1] - 123:19
**obligations** [2] - 15:19, 104:24
**observations** [3] - 89:10, 89:18, 90:22
**observe** [5] - 60:14, 89:3, 89:14, 89:16, 89:22
**observed** [4] - 89:21, 92:19, 162:6, 164:23
**obtained** [5] - 135:1, 135:2, 135:3, 157:23, 158:2
**Obvious** [1] - 87:1
**obviously** [7] - 6:21, 9:3, 15:25, 84:16, 123:12, 123:18, 177:2
**occur** [2] - 24:18, 95:22
**occurred** [7] - 68:21, 74:15, 75:16, 76:16, 104:22, 128:19,

154:3
**occurring** [2] - 9:22, 13:1
**occurs** [8] - 6:20, 8:13, 22:18, 25:4, 25:22, 26:3, 67:4
**October** [8] - 93:10, 110:21, 112:20, 128:13, 129:23, 139:10, 139:14, 145:3
**odd** [1] - 115:1
**odds** [1] - 166:5
**ODIN** [1] - 3:9
**OF** [5] - 1:1, 1:11, 3:5, 4:1, 180:1
**off-again** [1] - 145:5
**offense** [2] - 7:8, 7:9
**offensive** [6] - 65:4, 65:23, 115:11, 115:12, 126:2, 152:19
**offer** [1] - 152:22
**offered** [2] - 141:12, 168:11
**office** [18] - 100:12, 100:13, 106:14, 106:15, 106:21, 106:23, 107:4, 108:5, 108:18, 109:2, 110:20, 112:1, 112:17, 116:15, 147:1, 149:17, 150:15
**Office** [1] - 106:21
**OFFICE** [1] - 3:5
**officer** [3] - 147:3, 148:25, 149:1
**official** [11] - 13:3, 13:10, 13:23, 13:24, 15:25, 65:7, 66:19, 93:10, 180:5, 180:11
**Official** [3] - 3:12, 180:3, 180:22
**officially** [1] - 114:15
**officials** [30] - 16:11, 21:6, 66:18, 66:23, 86:10, 87:4, 87:14, 88:18, 88:25, 89:11, 89:18, 89:25, 90:6, 90:7, 90:10, 91:1, 91:2, 91:15, 92:10, 95:4, 96:13, 100:2, 100:11, 105:14, 106:14, 107:1, 107:13, 108:6, 110:4, 119:15
**officials'** [3] - 17:10, 17:18, 67:11
**often** [2] - 131:5,

162:8
**old** [3] - 102:21, 120:11, 152:15
**Olivia** [3] - 137:1, 145:9, 145:11
**omission** [3] - 62:9, 69:5, 76:15
**on-again** [1] - 145:4
**on-campus** [1] - 10:2
**once** [13] - 43:24, 51:24, 53:15, 88:21, 100:12, 109:1, 127:5, 128:11, 132:2, 141:20, 145:14, 167:9
**one** [139] - 5:8, 6:7, 6:21, 6:24, 10:17, 11:24, 12:3, 18:9, 21:14, 23:9, 23:10, 26:20, 26:24, 27:6, 28:24, 30:3, 31:13, 32:4, 34:12, 36:13, 39:4, 40:17, 44:17, 44:19, 45:13, 48:19, 49:22, 49:23, 51:2, 52:5, 54:11, 58:5, 63:3, 63:4, 63:8, 63:14, 63:19, 63:21, 65:2, 66:5, 67:24, 71:2, 73:11, 74:1, 74:24, 76:2, 77:12, 77:22, 79:20, 80:14, 81:1, 83:13, 85:7, 86:19, 87:11, 88:7, 88:16, 90:4, 90:7, 93:7, 94:3, 94:4, 94:10, 94:18, 97:10, 97:14, 97:15, 99:4, 99:5, 99:6, 99:17, 100:21, 100:22, 103:9, 103:14, 103:17, 104:10, 105:15, 105:17, 107:17, 110:2, 111:18, 114:16, 115:7, 115:15, 116:9, 116:19, 118:13, 119:13, 124:20, 125:9, 125:18, 125:21, 127:22, 128:2, 128:4, 128:14, 128:15, 128:16, 129:12, 130:8, 131:13, 134:21, 138:6, 141:7, 142:20, 146:15, 148:1, 149:17, 153:4, 153:5, 153:8, 153:13, 156:5,

156:24, 159:2, 162:11, 162:13, 162:15, 162:16, 167:6, 167:18, 169:17, 169:20, 170:19, 171:6, 172:8, 172:18, 176:21, 176:22, 176:25
**one-off** [1] - 107:17
**ones** [3] - 136:3, 139:4, 178:25
**Open** [2] - 122:23, 124:1
**open** [4] - 81:3, 85:9, 162:9, 167:17
**opening** [8] - 48:25, 49:3, 49:13, 50:20, 55:12, 86:7, 100:3, 121:25
**operations** [1] - 24:18
**opinion** [12] - 5:23, 12:18, 54:19, 54:23, 57:12, 59:21, 59:24, 60:1, 60:2, 60:3, 80:4, 118:15
**opinions** [9] - 15:22, 15:23, 56:10, 57:15, 59:15, 59:19, 59:21, 80:1, 80:19
**opportunities** [6] - 65:5, 66:3, 66:9, 115:13, 115:16, 126:3
**opportunity** [7] - 33:23, 52:25, 54:1, 101:8, 102:22, 160:13, 175:24
**opposed** [14] - 20:1, 28:11, 28:19, 28:22, 29:7, 29:25, 37:8, 38:3, 43:23, 58:12, 72:3, 111:12, 122:5, 175:9
**opposite** [2] - 29:9, 32:14
**options** [1] - 155:20
**oral** [1] - 108:22
**orally** [1] - 81:3
**order** [15] - 5:16, 10:15, 26:10, 27:11, 27:19, 29:17, 32:7, 32:10, 32:22, 33:24, 37:15, 39:7, 59:4, 65:20, 79:18
**ordered** [1] - 55:25
**orderly** [1] - 175:22
**ordinarily** [1] - 59:14
**ordinary** [11] - 45:16, 45:25, 46:2, 46:6,

46:11, 46:21, 47:10, 47:25, 48:1, 48:10, 71:24
**organization** [10] - 39:6, 39:12, 39:18, 39:23, 39:24, 40:1, 40:6, 40:12, 57:23, 95:18
**organizations** [1] - 57:25
**organized** [2] - 36:23, 81:20
**organs** [1] - 126:11
**origin** [2] - 168:1
**originally** [1] - 26:17
**Otherwise** [1] - 16:12
**otherwise** [9] - 45:5, 49:6, 55:16, 55:21, 58:18, 63:8, 70:1, 120:2, 123:21
**outburst** [2] - 117:5, 117:6
**outcome** [1] - 88:5
**outcomes** [1] - 106:17
**outset** [1] - 27:24
**outside** [10] - 27:23, 99:24, 106:25, 109:13, 118:16, 127:1, 127:2, 139:8, 161:25, 162:7
**outweighed** [1] - 60:2
**overemphasizes** [1] - 19:14
**overrule** [1] - 123:20
**oversight** [1] - 24:5
**overwhelming** [1] - 134:8
**own** [35] - 41:10, 41:11, 41:20, 42:9, 44:10, 44:14, 46:10, 61:6, 65:14, 65:17, 80:1, 80:15, 82:16, 89:9, 91:18, 102:9, 106:8, 106:9, 108:8, 111:9, 112:4, 114:8, 114:9, 114:25, 124:21, 128:8, 138:15, 153:13, 157:13, 160:25, 164:18, 164:21, 175:3
**owned** [3] - 155:14, 155:15
**owning** [2] - 155:10
**Ox** [1] - 129:4

**P**

**P.A.H** [4] - 3:6, 71:1, 71:12, 72:16

**p.m** [5] - 166:2, 176:8, 176:13, 178:7, 179:25
**page** [5] - 22:1, 24:17, 25:23, 38:23, 134:21
**pages** [4] - 41:7, 133:25, 151:7, 180:10
**paid** [2] - 53:25, 103:8
**pain** [12] - 33:3, 34:5, 35:16, 35:18, 36:5, 73:8, 73:11, 105:24, 119:5, 119:6, 119:22, 120:22
**paint** [1] - 97:4
**pants** [3] - 126:9, 150:11, 169:16
**paper** [1] - 118:14
**papers** [1] - 59:13
**paragraph** [5] - 10:20, 33:25, 34:6, 38:23, 47:8
**parallel** [2] - 137:22
**parameters** [1] - 84:16
**parent** [1] - 130:9
**parenthetical** [1] - 37:14
**parents** [2] - 102:24, 114:21, 115:3, 125:1, 129:19, 130:23, 141:8, 145:20
**parents'** [1] - 144:22
**Park** [1] - 1:19
**park** [10] - 113:4, 113:5, 113:19, 113:22, 116:24, 129:22, 129:24, 130:1, 146:4, 148:2
**parlance** [1] - 15:21
**part** [17] - 18:14, 21:8, 22:21, 23:25, 24:5, 39:20, 51:11, 52:11, 61:9, 92:18, 110:23, 114:12, 149:6, 152:19, 155:9, 160:7, 166:17
**participants** [1] - 97:8
**participate** [2] - 66:11, 175:24
**participating** [1] - 158:13
**participation** [2] - 64:5, 176:6
**particular** [14] - 5:14, 11:20, 11:21, 13:16, 15:3, 17:7, 17:23, 19:3, 31:2, 77:20, 78:9, 89:5, 146:19, 162:6

**particularly** [2] - 12:24, 56:6
**parties** [9] - 40:9, 40:11, 54:24, 63:19, 64:20, 64:25, 71:12, 166:19, 166:24
**parties'** [1] - 168:20
**partisans** [1] - 80:6
**partner** [2] - 124:25, 154:21
**parts** [3] - 17:4, 86:3, 160:1
**party** [34] - 5:5, 39:6, 39:8, 39:10, 39:12, 39:21, 39:23, 40:3, 40:15, 54:22, 58:22, 59:4, 59:5, 59:7, 59:8, 59:12, 62:13, 62:21, 63:1, 63:2, 63:12, 63:16, 63:17, 63:21, 79:9, 102:20, 106:25, 137:2, 139:18, 161:21, 170:16, 170:19
**passing** [1] - 42:19
**past** [5] - 119:19, 125:24, 127:18, 128:25, 154:16
**patch** [3] - 146:5, 170:7, 170:12
**path** [2] - 11:9, 134:20
**patience** [1] - 85:3
**patient** [1] - 105:23
**Patrick** [1] - 137:1
**pattern** [2] - 153:2, 167:19
**patting** [1] - 109:8
**P**▮▮▮ [3] - 74:6, 75:4, 161:20
**P**▮▮▮▮**F**▮▮▮ [3] - 74:6, 75:4, 161:20
**pause** [4] - 90:4, 177:23, 178:4, 179:12
**pay** [4] - 131:2, 141:12, 143:2, 146:10
**PC** [1] - 3:9
**pediatrician** [1] - 148:6
**peer** [1] - 146:14
**peers** [1] - 114:19
**pelvic** [1] - 119:6
**Pennsylvania** [4] - 2:14, 2:18, 2:21, 3:1
**people** [18] - 31:14, 74:20, 75:22, 87:17, 92:9, 108:22, 111:11, 111:14, 122:22, 126:24,

127:6, 128:24, 130:14, 138:14, 155:12, 167:22, 167:23
**per** [1] - 120:15
**perceived** [1] - 113:3
**percent** [3] - 97:12, 97:14
**perception** [2] - 96:7, 161:4
**perfect** [1] - 109:6
**perfectly** [2] - 112:16, 174:8
**perform** [1] - 54:21, 158:19
**performance** [2] - 74:10, 158:17
**performed** [1] - 152:17
**perhaps** [4] - 9:17, 44:2, 88:1, 94:24
**Peril** [1] - 87:1
**period** [5] - 102:9, 131:4, 133:20, 143:24, 170:18
**permanent** [2] - 73:15, 152:22
**permission** [2] - 83:2, 83:4
**permit** [3] - 54:22, 59:14, 70:13
**permits** [1] - 57:11
**perpetrators** [1] - 112:25
**person** [38] - 13:20, 19:23, 22:6, 22:8, 45:16, 45:25, 46:21, 47:4, 47:9, 47:15, 47:23, 56:8, 56:18, 59:17, 64:4, 66:15, 66:21, 68:8, 68:10, 71:8, 71:23, 74:19, 75:21, 76:18, 76:21, 78:24, 96:13, 106:19, 129:5, 129:6, 134:5, 144:11, 150:25, 151:6, 153:7, 153:10
**person's** [2] - 78:22, 129:5
**personal** [3] - 78:20, 88:5, 165:3
**personally** [2] - 53:22, 91:21
**persons** [6] - 46:1, 57:19, 57:24, 59:9, 61:1, 66:24
**perspective** [4] - 19:18, 84:8, 91:6, 123:14

**persuade** [1] - 80:19
**persuaded** [1] - 58:24
**pertained** [1] - 35:14
**pertains** [1] - 61:3
**pervasive** [4] - 65:3, 115:10, 126:2, 132:3
**petitioner** [2] - 41:9, 41:10
**petty** [1] - 114:19
**P**▮▮ [1] - 164:22
**P**▮▮ [3] - 70:19, 74:9, 75:7
**phone** [13] - 135:24, 137:13, 137:14, 137:18, 137:20, 145:21, 150:13, 154:20, 162:18, 162:22, 163:8
**photo** [2] - 113:21, 126:14
**photographs** [1] - 104:8
**photos** [8] - 110:12, 113:6, 113:7, 139:3, 139:5, 139:6, 139:12
**phrase** [3] - 14:8, 39:17, 40:1
**phrased** [1] - 42:8
**phraseology** [1] - 47:2
**phrases** [1] - 5:25
**physical** [55] - 27:4, 28:1, 28:5, 28:10, 28:18, 28:20, 28:22, 29:3, 29:8, 29:13, 29:19, 29:25, 30:21, 31:10, 31:11, 31:18, 31:23, 31:24, 32:6, 32:17, 32:19, 33:2, 33:6, 33:8, 33:14, 34:23, 35:6, 35:7, 35:15, 35:17, 36:1, 36:2, 65:25, 66:5, 67:6, 69:10, 69:22, 69:24, 73:5, 73:8, 73:11, 76:21, 77:8, 77:24, 100:7, 104:11, 111:18, 117:3, 119:5, 119:25, 120:1, 120:2, 150:12, 153:16, 153:17
**physicians** [1] - 102:13
**pick** [2] - 100:10, 158:6
**picked** [1] - 128:22
**picking** [5] - 42:11, 43:17, 129:19, 131:9, 131:10
**pickup** [1] - 131:1

**picture** [11] - 85:13, 85:20, 85:22, 113:12, 122:3, 139:8, 139:10, 139:11, 173:23, 173:24, 174:5
**pictures** [12] - 96:16, 99:8, 99:11, 101:10, 101:13, 101:14, 104:10, 104:13, 137:8, 139:7, 171:17
**piece** [12] - 5:7, 118:14, 168:8, 168:13, 168:16, 169:12, 169:21, 169:22, 170:7, 170:15, 171:6, 171:7
**pieced** [1] - 145:17
**pieces** [9] - 85:9, 85:13, 85:14, 85:18, 85:22, 86:3, 94:19, 168:6, 174:5
**pile** [1] - 85:11
**pinching** [2] - 99:24, 99:25
**pincite** [2] - 26:9, 26:11
**pinpointed** [1] - 143:3
**pitchfork** [1] - 113:14
**PITTLEMAN** [1] - 3:9
**place** [16] - 24:19, 45:2, 45:10, 45:12, 59:10, 67:7, 67:9, 68:4, 96:17, 98:23, 106:1, 155:5, 156:20, 156:24, 161:18, 167:16
**placed** [2] - 99:18, 116:16
**places** [2] - 111:20, 130:23
**plaintiff** [63] - 8:17, 16:20, 27:15, 28:8, 28:10, 29:9, 30:22, 31:17, 34:22, 34:25, 35:25, 36:10, 37:4, 37:23, 48:25, 50:19, 58:2, 58:4, 63:5, 64:18, 64:20, 67:23, 69:9, 69:12, 69:14, 69:16, 69:18, 69:21, 69:22, 69:24, 70:1, 70:14, 70:16, 71:16, 72:6, 72:23, 73:17, 73:21, 73:22, 74:13, 74:15, 75:14, 75:16, 76:7, 78:21, 79:12, 82:1, 83:20, 84:2, 84:19, 87:21, 87:24, 117:4, 168:9,

168:11, 168:22, 169:14, 171:8, 172:3, 172:6, 175:14, 177:19
**Plaintiff** [39] - 1:4, 1:14, 2:1, 44:24, 47:21, 63:24, 64:1, 65:1, 67:20, 67:24, 68:2, 68:6, 68:23, 70:25, 71:2, 71:6, 72:6, 72:10, 72:14, 72:18, 72:23, 73:6, 73:12, 73:25, 74:3, 74:5, 74:11, 74:22, 75:3, 75:8, 75:10, 75:12, 75:24, 77:3, 77:5, 77:10, 77:12, 78:11, 116:10
**Plaintiff's** [6] - 64:18, 67:22, 107:9, 147:20, 162:17
**plaintiff's** [15] - 5:17, 28:24, 30:2, 30:14, 31:9, 42:13, 45:8, 47:8, 47:13, 49:2, 94:20, 140:17, 157:13, 160:25, 168:14
**plaintiffs** [2] - 34:9, 123:16
**plan** [4] - 145:19, 148:25, 149:1, 163:12
**plans** [1] - 146:3
**plausible** [1] - 131:13
**play** [1] - 147:7
**players** [1] - 125:16
**playing** [1] - 30:11
**PLC** [1] - 3:5
**pleading** [6] - 87:7, 94:25, 156:11, 157:10, 157:17, 171:4
**PLLC** [1] - 1:15
**plus** [1] - 124:9
**Pod** [1] - 159:18
**pod** [20] - 99:22, 126:11, 126:15, 126:23, 126:25, 127:15, 139:11, 145:11, 145:16, 146:19, 146:20, 147:4, 161:16, 162:1, 162:4, 162:8, 162:10, 163:19, 163:22
**podium** [2] - 83:3, 83:7
**pods** [7] - 99:11, 99:14, 99:25,

159:20, 161:13, 161:14, 163:21

**point** [14] - 15:5, 15:13, 32:21, 36:12, 48:15, 84:5, 94:3, 95:2, 99:9, 123:19, 136:6, 141:7, 177:4, 178:8

**pointed** [3] - 32:6, 135:18, 135:23

**points** [3] - 101:5, 114:25, 117:4

**police** [11] - 104:23, 104:25, 131:21, 131:22, 142:21, 153:25, 154:1, 167:9, 168:25, 169:1, 169:4

**Police** [1] - 64:13

**policies** [2] - 67:15, 67:17

**poorly** [1] - 115:1

**pop** [1] - 150:21

**portrayed** [2] - 113:10, 118:3

**position** [14] - 19:13, 26:21, 30:15, 30:18, 32:16, 33:1, 33:2, 33:12, 34:2, 41:17, 42:3, 47:8, 47:13, 111:15

**possibility** [4] - 11:19, 13:1, 83:15, 87:5

**possible** [4] - 58:16, 76:8, 81:3, 128:5

**possibly** [2] - 95:22, 97:3

**posttraumatic** [1] - 69:17

**posture** [1] - 40:8

**potential** [2] - 112:24, 113:2

**power** [2] - 66:24, 88:15

**powerpoint** [1] - 91:16

**PowerPoint** [1] - 95:16

**PowerPoints** [5] - 91:13, 95:21, 98:1, 98:4, 98:8

**PR** [1] - 151:13

**practicable** [1] - 53:20

**practically** [1] - 129:5

**practice** [1] - 179:15

**prank** [1] - 130:25

**preceding** [1] - 96:22

**precision** [1] - 70:12

**preclude** [1] - 123:13

**predator** [2] - 123:10, 123:11

**predictable** [1] - 112:23

**prejudice** [2] - 54:22, 54:23

**prejudiced** [1] - 63:7

**Preliminary** [1] - 4:3

**prepare** [1] - 82:18

**prepared** [2] - 36:20, 81:14

**preponderance** [24] - 57:2, 58:3, 58:5, 58:7, 58:10, 58:18, 64:19, 65:2, 67:23, 69:23, 70:25, 71:16, 72:15, 72:25, 74:23, 75:25, 77:1, 77:6, 77:11, 77:19, 78:13, 79:12, 87:21, 174:25

**prepondered** [1] - 113:13

**prescribe** [1] - 102:11

**present** [19] - 11:10, 32:20, 51:10, 51:11, 53:1, 53:6, 53:11, 54:1, 59:9, 61:19, 84:3, 84:18, 124:3, 166:7, 175:23, 177:16, 177:25, 178:9, 178:15

**presentations** [1] - 95:16

**presented** [6] - 28:17, 56:17, 82:23, 125:24, 159:25, 179:1

**preservation** [1] - 49:1

**preserve** [3] - 27:3, 49:7, 122:7

**preserved** [2] - 39:9, 59:6

**preside** [1] - 80:11

**pretend** [1] - 152:19

**pretending** [1] - 152:24

**pretrial** [1] - 9:11

**pretty** [4] - 33:6, 50:9, 129:7, 151:14

**prevail** [6] - 36:25, 38:5, 38:12, 71:15, 81:22, 87:25

**prevent** [1] - 95:4

**preview** [2] - 33:12, 34:7

**previously** [1] - 90:16

**Pricewaterhouse** [1] - 118:1

**PricewaterhouseCoopers** [1] - 86:21

**principal** [4] - 88:12, 94:17, 94:23, 108:1

**principal's** [1] - 112:17

**principals** [7] - 88:12, 99:17, 107:14, 107:15, 108:2, 109:2, 111:25

**principle** [1] - 8:8

**print** [2] - 53:19, 178:24

**printout** [1] - 38:23

**private** [2] - 57:24, 117:18

**probable** [2] - 58:9, 69:4

**problem** [19] - 12:7, 24:9, 24:10, 40:19, 53:2, 87:2, 87:10, 95:19, 96:12, 98:18, 107:21, 109:13, 109:15, 132:3, 153:14, 177:6, 177:11, 177:18, 177:19

**problems** [10] - 40:13, 87:5, 87:9, 97:6, 106:9, 117:4, 140:18, 141:6, 149:12, 179:8

**proceed** [6] - 37:5, 37:14, 82:2, 82:5, 84:21, 166:9

**Proceedings** [1] - 179:25

**PROCEEDINGS** [1] - 1:11

**proceedings** [10] - 52:21, 83:11, 166:2, 176:13, 177:23, 178:4, 179:12, 180:6, 180:11, 180:14

**process** [1] - 83:17

**produce** [1] - 59:12

**produced** [8] - 55:7, 58:21, 76:14, 123:4, 133:24, 134:14, 134:17, 136:19

**produces** [1] - 58:12

**productive** [1] - 84:13

**profanity** [1] - 108:16

**profess** [1] - 59:20

**profession** [2] - 59:18, 160:6

**professional** [1] - 165:1

**professionalism** [1] - 49:11

**Professor** [1] - 112:24

**profile** [1] - 134:21

**program** [4] - 64:6,

66:6, 66:11, 117:20

**programs** [1] - 13:14

**prohibited** [3] - 158:5, 158:12, 158:21

**project** [2] - 154:21, 158:22

**projects** [1] - 114:21

**promiscuous** [3] - 112:21, 113:3

**promised** [3] - 86:7, 95:15, 140:8

**promises** [1] - 95:13

**promising** [1] - 75:8

**promptly** [1] - 105:11

**proof** [6] - 56:20, 58:15, 58:23, 87:20, 172:6

**proper** [2] - 64:10, 79:7

**properly** [1] - 69:17

**proposal** [2] - 27:9, 35:3, 45:8

**propose** [3] - 16:20, 40:25, 177:14

**proposed** [21] - 5:19, 10:18, 16:19, 21:9, 26:24, 27:5, 27:13, 28:7, 31:24, 32:11, 33:25, 38:15, 39:13, 40:17, 44:23, 45:13, 45:23, 47:2, 47:19, 48:25, 49:3

**proposes** [1] - 150:9

**proposing** [1] - 30:9

**proposition** [2] - 58:23, 58:25

**protect** [7] - 48:19, 75:8, 86:15, 88:13, 95:1, 145:21, 149:2

**protected** [6] - 6:2, 45:9, 45:11, 67:24, 68:6, 70:24

**protective** [4] - 45:2, 68:4, 71:2, 71:10

**protects** [1] - 124:17

**protocols** [1] - 135:2

**proud** [2] - 38:11, 54:2

**provable** [1] - 58:9

**prove** [20] - 5:17, 58:2, 64:18, 70:11, 70:25, 71:16, 71:25, 72:10, 72:11, 72:24, 74:22, 75:24, 77:4, 77:5, 77:6, 77:10, 77:11, 87:21, 125:20, 125:21

**proved** [10] - 55:18, 55:22, 57:6, 58:8, 58:13, 58:18, 72:7, 72:14, 77:1, 126:1

**proven** [1] - 71:14

**proves** [2] - 67:23, 69:6

**provide** [5] - 10:3, 18:6, 37:6, 82:3, 176:3

**provided** [15] - 24:6, 37:3, 42:18, 65:5, 73:17, 73:18, 76:16, 81:25, 106:25, 115:13, 126:4, 137:14, 157:24, 158:1, 175:19

**providers** [2] - 102:8, 117:11

**provides** [2] - 12:23, 64:3

**providing** [1] - 43:23

**proving** [1] - 67:5

**provoke** [1] - 93:20

**proximate** [3] - 75:2, 76:5, 76:13

**proximately** [3] - 69:1, 69:2, 76:7

**prudence** [2] - 74:18, 75:19

**prudent** [1] - 76:17

**pseudonyms** [3] - 64:20, 64:24, 64:25

**psychologist** [3] - 118:18, 151:22, 152:1

**PTSD** [51] - 27:18, 27:25, 28:4, 28:8, 28:10, 28:17, 29:3, 29:7, 29:15, 30:3, 30:19, 31:6, 31:8, 31:10, 31:11, 31:16, 31:17, 31:18, 32:5, 33:2, 33:4, 33:5, 33:7, 35:25, 49:4, 69:18, 69:19, 69:21, 69:23, 69:24, 69:25, 102:7, 102:11, 102:16, 103:5, 103:6, 103:9, 117:7, 118:6, 118:16, 118:20, 119:24, 120:1, 120:2, 120:10, 152:7, 152:8, 153:6, 153:11, 153:16, 174:2

**PTSD-related** [1] - 31:8

**public** [4] - 54:23, 74:10, 97:2, 117:17

**Public** [5] - 88:9, 96:21, 97:5, 98:12, 173:14

**publish** [2] - 99:9, 110:12
**published** [1] - 5:23
**pull** [5] - 130:25, 141:9, 150:25, 151:23, 151:25
**pulled** [3] - 130:12, 131:4, 152:3
**pulls** [1] - 24:13
**pumpkin** [3] - 146:5, 170:7, 170:12
**punching** [1] - 99:22
**punish** [1] - 78:17
**punishment** [1] - 73:2
**punitive** [3] - 78:16, 79:3, 79:5
**purely** [1] - 122:8
**purports** [1] - 109:16
**purpose** [6] - 10:24, 56:12, 62:15, 63:1, 63:22, 80:5
**purposes** [9] - 5:4, 11:16, 13:8, 13:18, 27:1, 44:9, 55:3, 66:13, 78:19
**pursuant** [1] - 15:19
**put** [16] - 15:5, 15:10, 25:10, 29:6, 29:9, 32:9, 42:1, 53:24, 76:20, 77:7, 85:5, 85:14, 112:1, 130:25, 151:18, 159:10
**puts** [2] - 27:14, 143:23
**putting** [7] - 15:12, 16:1, 126:9, 126:10, 150:11, 168:4, 169:16
**puzzle** [14] - 85:9, 85:13, 85:15, 85:18, 85:22, 85:23, 86:2, 86:3, 168:5, 168:6, 169:12, 169:22, 173:24, 174:5
**puzzles** [2] - 85:8, 85:12
**PwC** [5] - 152:10, 152:11, 152:20, 152:24, 153:8
**PX-56** [1] - 175:7
**PX-84** [1] - 175:10

## Q

**qualifies** [1] - 69:21
**questioned** [2] - 103:14, 135:18
**questioning** [1] - 134:3

**questions** [12] - 28:20, 36:23, 57:18, 81:20, 81:21, 94:10, 116:17, 116:22, 117:1, 148:19, 170:22, 171:20
**quick** [2] - 41:3, 179:23
**quickly** [6] - 115:6, 145:23, 146:14, 164:9, 168:3, 172:15
**quietly** [1] - 95:11
**quit** [1] - 119:10
**quote** [17] - 12:9, 14:14, 22:1, 24:18, 24:19, 25:19, 26:10, 86:24, 87:1, 88:17, 91:9, 93:13, 93:15, 93:21, 96:19, 98:17
**quotes** [2] - 14:13, 18:25
**quoting** [4] - 9:18, 14:14, 46:17, 161:5

## R

**R.'s** [1] - 109:1
**race** [1] - 144:16
**Rachel** [36] - 6:15, 75:9, 75:12, 86:9, 87:15, 88:2, 89:2, 91:6, 91:8, 92:12, 96:17, 96:19, 97:4, 97:11, 97:18, 97:24, 98:2, 98:14, 103:1, 103:7, 105:5, 106:12, 106:18, 113:18, 124:24, 126:4, 136:10, 136:14, 138:23, 139:8, 141:9, 151:6, 155:7, 156:23, 157:3, 165:6
**raised** [1] - 106:14
**raising** [1] - 96:9
**ran** [2] - 51:6, 166:3
**range** [1] - 120:14
**rape** [15] - 91:1, 103:14, 103:17, 103:19, 104:12, 104:20, 105:12, 106:9, 131:22, 142:12, 142:22, 143:4, 153:24, 154:3
**raped** [11] - 103:13, 104:5, 104:16, 128:8, 129:18, 129:21, 130:15, 131:17, 145:2, 150:10, 174:17

**rapes** [9] - 103:20, 104:22, 128:19, 130:11, 131:4, 154:17, 154:18, 169:18, 169:20
**raping** [4] - 142:11, 142:14, 142:15, 168:9
**rbates@hunton.com** [1] - 2:16
**RCMS** [5] - 86:22, 87:4, 87:17, 87:18, 96:14
**reach** [4] - 55:1, 80:14, 80:21, 85:5
**reached** [2] - 81:13, 81:19
**reaching** [1] - 79:21
**react** [1] - 90:23
**reaction** [1] - 20:22
**read** [14] - 1:1, 17:17, 22:4, 26:16, 36:18, 36:22, 41:6, 45:6, 45:12, 45:14, 47:16, 133:18, 151:3, 170:24, 171:4
**reads** [1] - 27:14
**ready** [6] - 37:20, 82:9, 84:1, 84:19, 110:14, 125:1
**real** [3] - 103:10, 104:6, 166:23
**realized** [1] - 119:15
**realizes** [1] - 95:3
**really** [19] - 13:2, 15:12, 18:5, 29:13, 42:17, 43:12, 85:3, 90:24, 91:3, 98:24, 104:8, 115:5, 120:2, 124:7, 132:20, 138:22, 138:23, 140:22, 149:17
**realtime** [2] - 171:21, 180:12
**reason** [12] - 15:1, 24:10, 36:9, 57:8, 60:1, 62:11, 78:4, 138:3, 156:15, 160:3, 165:7, 172:20
**reasonable** [16] - 22:6, 27:8, 46:12, 46:13, 56:8, 56:13, 57:6, 68:8, 69:4, 70:7, 73:16, 73:20, 73:21, 76:21, 77:8, 162:21
**reasonably** [8] - 19:24, 72:19, 73:13, 73:17, 73:18, 73:22, 76:17, 179:22
**reasons** [1] - 59:20

**reassess** [1] - 178:8
**rebuttal** [3] - 50:20, 50:21, 51:6
**REBUTTAL** [1] - 172:10
**Rebuttal** [1] - 4:6
**recalled** [1] - 134:1
**receipt** [1] - 13:7
**receive** [1] - 127:14
**received** [9] - 55:6, 56:13, 58:21, 59:22, 79:14, 105:3, 131:22, 163:4, 178:17
**receives** [4] - 13:5, 13:20, 64:8, 66:15
**receiving** [3] - 64:7, 95:23, 100:8
**Recess** [5] - 52:20, 83:10, 121:16, 166:1, 176:12
**recess** [2] - 82:19, 165:25
**recipient** [5] - 6:19, 12:1, 24:19, 25:21, 26:1
**recipient's** [3] - 13:12, 13:13, 25:20
**recitation** [1] - 144:1
**reckless** [1] - 78:23
**recklessness** [3] - 21:2, 74:21, 75:23
**recognize** [1] - 14:9
**recollection** [1] - 60:16
**reconsider** [1] - 112:2
**reconvene** [1] - 176:18
**record** [20] - 5:12, 18:1, 23:13, 27:2, 34:19, 47:17, 48:13, 48:19, 52:9, 52:15, 52:17, 83:14, 93:13, 96:5, 99:21, 99:23, 107:8, 109:8, 117:4, 155:25
**recording** [1] - 180:13
**records** [8] - 108:11, 117:13, 118:22, 133:4, 137:18, 167:20, 169:8, 174:2
**recounted** [1] - 119:14
**recounts** [1] - 106:2
**recover** [6] - 27:15, 34:22, 69:9, 69:25, 70:1
**recoverable** [1] - 30:13
**recovery** [1] - 10:5
**reexamine** [1] - 80:1

**refer** [2] - 38:25, 54:15
**reference** [10] - 5:3, 19:4, 19:22, 42:19, 43:13, 47:5, 48:9, 111:16, 122:1, 122:9
**referenced** [2] - 48:6, 48:25
**references** [1] - 18:2
**referring** [1] - 35:19
**refers** [2] - 31:16, 136:9
**reflect** [3] - 6:6, 52:15, 90:4
**refuse** [2] - 87:2, 163:11
**refused** [7] - 87:4, 87:6, 87:8, 96:11, 101:11, 107:4, 107:21
**refuses** [1] - 95:18
**regard** [9] - 28:14, 28:16, 43:17, 48:10, 49:11, 55:17, 55:22, 81:2, 81:18
**regarded** [1] - 65:22
**regarding** [13] - 26:25, 27:4, 37:5, 37:13, 37:15, 48:14, 69:16, 82:3, 82:5, 100:7, 105:4, 110:24, 121:25
**regardless** [5] - 55:1, 55:5, 55:6, 58:20, 58:21
**regime** [1] - 11:22
**regularly** [9] - 99:5, 102:22, 107:25, 113:16, 126:8, 128:9, 128:12, 130:15, 154:23
**reject** [2] - 61:8, 62:7
**rel** [1] - 14:14
**relate** [1] - 18:15
**related** [5] - 23:15, 27:21, 31:8, 108:12, 119:22
**relates** [2] - 6:22, 116:23
**relation** [1] - 60:18
**relationship** [8] - 6:1, 71:10, 139:23, 143:21, 167:8, 171:14, 174:11, 174:14
**relationships** [3] - 107:1, 146:14, 166:24
**relevance** [1] - 64:24
**relevant** [2] - 77:21, 78:3

**relies** [1] - 100:20
**relieve** [1] - 105:10
**relitigate** [1] - 35:11
**rely** [1] - 56:4
**remain** [4] - 41:11, 41:15, 44:14, 47:13
**remained** [1] - 97:22
**remaining** [1] - 42:14
**remains** [1] - 105:15
**remedial** [4] - 14:17, 16:10, 16:12
**remedy** [4] - 13:9, 33:21, 35:20, 36:7
**remember** [21] - 49:22, 80:6, 80:21, 81:4, 82:22, 86:12, 88:22, 89:12, 92:8, 95:1, 96:15, 97:7, 101:16, 101:25, 106:14, 118:15, 121:9, 140:11, 152:18, 162:3, 175:22
**Remember** [1] - 56:3
**remembering** [1] - 38:11
**remembers** [1] - 173:3
**remind** [2] - 49:22, 63:21
**reminded** [1] - 21:16
**remiss** [1] - 32:16
**remove** [2] - 24:22, 24:25
**removing** [1] - 40:25
**render** [1] - 35:3
**rendezvous** [1] - 142:17
**renew** [1] - 48:13
**repeat** [3] - 125:15, 125:16, 173:1
**repeated** [2] - 24:24, 131:4
**repeatedly** [4] - 102:13, 103:14, 140:3, 140:9
**repeating** [1] - 161:2
**repeats** [1] - 95:12
**replacement** [3] - 35:1, 35:5, 69:13
**replacing** [1] - 40:25
**report** [24] - 12:4, 13:2, 13:5, 13:20, 66:15, 70:23, 74:14, 75:15, 94:13, 97:12, 103:19, 104:7, 104:10, 104:12, 104:14, 104:19, 107:17, 114:11, 116:13, 127:14, 131:20, 148:15,

160:3, 163:19
**reported** [12] - 26:13, 89:25, 97:17, 103:14, 107:18, 132:11, 153:23, 162:24, 164:10, 173:19, 173:20, 180:5
**Reporter** [4] - 3:12, 14:21, 180:3, 180:22
**reporter** [1] - 26:13
**REPORTER** [1] - 180:1
**Reporter.................. ...** [1] - 4:6
**reporting** [9] - 10:7, 67:25, 70:22, 107:24, 110:20, 111:6, 156:19, 159:24, 160:5
**reports** [7] - 22:1, 47:23, 71:3, 71:8, 104:2, 117:13, 167:21
**represent** [2] - 63:10, 79:17
**representative** [1] - 81:2
**repressed** [1] - 138:18
**reputation** [1] - 147:6
**request** [6] - 18:10, 28:9, 65:22, 151:5, 159:15, 164:2
**requested** [2] - 16:9, 101:10
**requesting** [1] - 28:15
**require** [4] - 58:14, 59:8, 59:12, 70:10
**required** [5] - 11:25, 56:25, 57:1, 118:13, 161:25
**requirement** [2] - 127:1, 162:1
**requires** [4] - 15:6, 16:23, 17:21, 67:14
**rerouted** [4] - 159:17, 159:18, 163:20, 163:22
**reserve** [1] - 152:18
**residential** [1] - 117:23
**resistant** [1] - 148:10
**resolve** [2] - 105:11, 123:18
**resolved** [2] - 24:4, 56:9
**resolving** [1] - 9:19
**resources** [1] - 66:9
**respect** [31] - 5:14, 6:25, 11:25, 14:5,

14:8, 15:21, 18:12, 18:21, 19:8, 24:11, 26:12, 27:9, 29:2, 31:20, 34:20, 35:17, 37:18, 43:12, 44:11, 45:14, 48:24, 49:4, 63:21, 65:14, 71:22, 72:2, 72:4, 82:7, 102:24, 121:13, 122:5
**respected** [2] - 133:11, 147:17
**respectful** [1] - 84:17
**respectfully** [4] - 5:13, 35:2, 121:1, 176:19
**respond** [7] - 9:5, 13:15, 64:16, 81:2, 161:5, 161:6
**respondent's** [1] - 41:8
**responding** [1] - 144:6
**response** [15] - 17:10, 17:18, 17:19, 67:11, 95:17, 100:11, 110:23, 176:24, 177:5, 177:15, 178:5, 178:18
**responses** [3] - 46:10, 53:5, 53:14
**responsibilities** [1] - 102:10
**responsibility** [4] - 81:17, 103:18, 155:9, 175:20
**responsible** [2] - 87:14, 124:21
**rest** [1] - 120:23
**Reston** [3] - 3:7, 3:10
**restrict** [1] - 51:10
**restricted** [1] - 73:4
**restrictions** [1] - 84:12
**restructure** [1] - 13:16
**result** [8] - 31:18, 69:4, 69:24, 72:20, 78:9, 79:1, 152:5, 174:23
**resulted** [2] - 95:21, 174:22
**resulting** [2] - 72:8, 77:22
**results** [4] - 61:4, 66:5, 112:22, 114:22
**resume** [6] - 86:20, 152:13, 152:21, 153:2, 153:8
**resumed** [4] - 52:21, 83:11, 166:2, 176:13
**retains** [1] - 26:2
**retaliate** [5] - 157:8,

159:24, 160:2, 160:4
**retaliated** [2] - 67:21, 70:19
**retaliating** [2] - 10:7, 159:4
**retaliation** [15] - 5:15, 10:3, 20:9, 21:17, 22:1, 23:2, 23:17, 24:1, 46:19, 67:22, 71:15, 116:12, 116:20, 156:10, 156:11
**retaliations** [1] - 5:9
**retaliatory** [33] - 6:6, 8:7, 8:18, 8:22, 9:25, 18:15, 18:19, 18:23, 19:9, 20:15, 22:11, 22:13, 22:15, 22:17, 22:18, 22:24, 23:15, 24:8, 24:12, 24:16, 24:22, 68:14, 68:16, 68:18, 68:20, 68:21, 71:17, 71:19, 71:21, 158:9, 158:24, 160:1
**retire** [3] - 79:15, 121:4, 176:7
**return** [9] - 37:20, 70:16, 74:3, 79:18, 82:9, 106:11, 155:18, 165:12, 175:13
**returned** [1] - 113:24
**returning** [2] - 80:5, 80:10
**reunion** [2] - 176:23, 176:25
**revealed** [1] - 103:15
**review** [3] - 18:5, 104:13
**reviewed** [1] - 118:22
**revision** [4] - 10:18, 10:23, 14:6, 26:25
**revisions** [3] - 11:3, 18:14, 30:8
**REWARI** [6] - 52:5, 83:22, 124:6, 150:5, 177:12, 177:20
**Rewari** [8] - 2:17, 31:22, 50:25, 52:4, 166:22, 167:14, 172:17, 173:7
**Rewari.................. ...** [1] - 4:4
**rewriting** [1] - 152:4
**riddled** [1] - 142:8
**ridicule** [1] - 65:25
**rights** [8] - 45:17, 46:22, 47:12, 70:20, 71:24, 72:16, 72:21, 78:16

**risk** [2] - 11:4, 11:20
**river** [1] - 120:4
**rkeefe@bsfllp.com** [1] - 2:12
**road** [1] - 129:4
**Road** [1] - 129:4
**roaming** [1] - 168:9
**Robert** [2] - 2:9, 3:6
**role** [2] - 85:4, 155:15
**romantic** [1] - 142:23
**room** [8] - 36:21, 80:10, 80:14, 81:15, 104:7, 143:14, 162:5, 175:6
**ROSSIE** [1] - 1:11
**route** [1] - 146:22
**row** [1] - 126:16
**RPR** [2] - 3:12, 180:21
**ruin** [2] - 93:24, 159:5
**ruined** [3] - 159:8, 174:12, 174:15
**ruining** [1] - 159:21
**Rule** [2] - 29:6, 32:6
**rule** [4] - 54:13, 59:16, 83:4, 99:7
**ruled** [1] - 33:4
**rules** [4] - 54:15, 59:14, 63:19, 80:9
**rumors** [18] - 89:23, 89:24, 90:11, 90:14, 90:15, 92:6, 92:8, 108:21, 111:4, 111:6, 112:19, 113:25, 114:5, 148:16, 167:23, 168:1
**run** [1] - 141:7
**running** [2] - 156:18, 157:5
**runs** [1] - 16:13
**Ryan** [4] - 2:13, 104:3, 118:21, 138:15

**S**

**S.B** [2] - 14:14, 14:15
**S.T** [4] - 3:6, 71:1, 71:12, 72:15
**sacrifices** [1] - 124:10
**sad** [1] - 91:19
**sadly** [1] - 114:8
**safe** [5] - 129:7, 155:5, 161:10, 163:13
**safety** [11] - 74:19, 75:20, 94:16, 111:18, 145:19, 161:11, 164:14, 164:17, 165:4, 165:6, 165:8
**salacious** [1] - 101:5

**salary** [1] - 73:20
**SANE** [1] - 174:17
**sat** [1] - 97:21
**satisfied** [1] - 116:8
**satisfy** [1] - 24:21
**save** [1] - 51:5
**saw** [30] - 87:8, 87:10, 91:3, 97:25, 113:13, 119:13, 126:23, 127:7, 127:25, 128:2, 128:4, 129:6, 129:12, 130:3, 130:5, 130:7, 130:22, 131:14, 131:23, 132:1, 132:2, 137:19, 151:25, 157:3, 157:16, 169:18, 169:19, 171:11
**scales** [2] - 87:24
**scant** [2] - 160:18, 164:1
**scared** [2] - 95:10, 131:2
**scars** [1] - 171:18
**scary** [1] - 147:6
**scene** [1] - 99:12
**schematic** [2] - 99:9, 126:23
**SCHILLER** [4] - 1:19, 2:2, 2:6, 2:10
**School** [81] - 10:18, 10:23, 11:3, 14:11, 15:18, 20:12, 21:8, 21:12, 26:24, 27:2, 34:15, 35:13, 35:24, 39:21, 40:3, 40:6, 40:18, 40:21, 45:1, 50:22, 57:23, 57:25, 63:25, 64:2, 64:8, 64:9, 64:11, 64:14, 64:17, 65:7, 65:11, 65:13, 65:15, 65:16, 67:2, 67:5, 67:7, 67:20, 67:21, 68:3, 68:5, 68:24, 69:1, 69:6, 69:15, 69:20, 70:1, 70:14, 75:9, 75:13, 83:22, 86:9, 87:13, 87:19, 88:2, 88:9, 89:3, 91:7, 91:8, 93:15, 94:5, 96:21, 97:19, 98:2, 98:12, 99:14, 105:3, 106:3, 106:12, 106:20, 115:4, 115:8, 115:20, 122:14, 124:16, 124:24, 125:18, 149:19, 155:18,

173:14, 173:20
**school** [247] - 6:8, 7:20, 8:3, 8:19, 8:23, 9:4, 9:6, 9:17, 9:20, 9:22, 10:6, 11:20, 12:10, 13:3, 13:23, 14:18, 15:7, 15:8, 16:10, 17:18, 19:17, 20:5, 21:6, 22:5, 22:12, 22:15, 23:7, 26:3, 26:4, 44:9, 44:12, 44:14, 50:23, 65:6, 66:18, 66:23, 67:10, 68:7, 68:14, 68:18, 70:18, 74:11, 75:1, 75:10, 76:1, 76:2, 76:4, 86:10, 86:17, 87:4, 87:6, 87:9, 88:18, 88:25, 89:1, 89:3, 89:8, 89:11, 89:18, 89:23, 89:25, 90:6, 90:7, 90:10, 90:21, 91:1, 91:2, 91:15, 92:3, 92:6, 92:10, 93:10, 93:13, 93:19, 94:1, 94:8, 94:13, 94:25, 95:3, 95:4, 95:8, 95:12, 95:14, 96:9, 96:11, 96:13, 96:16, 96:22, 96:24, 97:2, 98:2, 98:7, 98:22, 99:8, 99:13, 99:18, 100:2, 100:8, 100:11, 100:22, 100:25, 105:1, 105:10, 105:14, 105:15, 106:14, 106:19, 106:25, 107:13, 108:1, 108:5, 108:15, 109:14, 110:4, 110:9, 110:14, 110:20, 111:8, 111:20, 111:21, 111:24, 112:15, 113:24, 114:4, 114:5, 114:13, 114:14, 114:16, 114:18, 114:19, 114:22, 115:14, 115:17, 115:18, 116:3, 117:18, 119:15, 124:21, 125:2, 125:3, 125:6, 125:10, 125:11, 125:14, 126:8, 126:12, 127:3, 127:25, 128:7, 128:19, 128:20, 128:21, 128:22,

129:13, 129:14, 129:24, 130:13, 131:10, 131:11, 131:21, 131:24, 132:11, 132:12, 132:24, 133:11, 133:23, 137:15, 139:2, 139:3, 139:7, 140:14, 140:16, 140:18, 141:22, 142:19, 143:5, 143:7, 143:15, 143:16, 143:17, 143:20, 144:9, 144:13, 145:2, 145:10, 146:3, 147:9, 148:5, 148:12, 148:13, 148:17, 148:21, 149:1, 149:17, 149:18, 149:19, 150:10, 150:17, 150:18, 150:20, 151:4, 151:9, 151:10, 151:19, 151:20, 151:23, 152:1, 153:23, 153:24, 154:6, 154:9, 154:18, 154:23, 155:3, 155:5, 155:13, 156:12, 156:19, 156:20, 156:22, 156:23, 157:7, 157:14, 157:21, 158:6, 159:11, 160:3, 161:10, 163:8, 164:20, 167:5, 167:9, 168:9, 169:15, 169:19, 169:20, 173:9, 174:19, 174:20, 175:8
**school's** [11] - 17:9, 26:5, 95:9, 95:17, 104:24, 107:20, 108:11, 110:23, 111:15, 129:18, 173:15
**schoolers** [3] - 127:22, 138:24, 141:1
**schools** [8] - 16:15, 41:13, 97:5, 117:17, 117:18, 124:20, 151:16
**science** [2] - 59:18, 161:20
**scooping** [2] - 89:6, 131:25

**scope** [1] - 30:3
**scores** [1] - 101:14
**Scott** [1] - 2:20
**screen** [2] - 104:15, 142:8
**screens** [1] - 86:2
**SE** [3] - 2:2, 2:6, 2:10
**seat** [3] - 31:13, 34:17, 171:13
**seated** [9] - 53:12, 84:4, 124:2, 165:19, 166:8, 176:10, 176:14, 178:16, 179:11
**second** [11] - 17:2, 21:8, 38:22, 80:13, 115:19, 139:9, 146:24, 154:5, 159:19, 163:21, 172:8
**seconds** [1] - 162:4
**secret** [2] - 138:2, 142:16
**secretly** [1] - 145:3
**section** [4] - 36:24, 38:3, 81:21, 126:21
**see** [67] - 23:8, 29:1, 29:10, 51:19, 51:20, 52:18, 61:1, 83:1, 83:9, 86:3, 87:3, 87:12, 92:14, 94:3, 97:10, 101:1, 104:11, 105:6, 107:21, 109:7, 112:4, 115:20, 115:22, 116:21, 117:13, 119:4, 119:8, 121:15, 123:8, 125:7, 125:23, 127:19, 129:3, 129:16, 132:3, 132:11, 134:20, 134:21, 134:25, 135:14, 135:21, 138:3, 138:5, 139:9, 140:8, 142:1, 142:12, 145:7, 145:12, 146:23, 147:7, 148:14, 153:4, 153:9, 153:18, 155:6, 156:20, 162:15, 163:16, 171:7, 171:25, 175:21, 176:10, 177:17, 178:3, 179:7, 179:14
**see-through** [1] - 129:3
**seeing** [4] - 61:1,

118:10, 141:13, 152:2
**seek** [2] - 80:8, 80:22
**seeks** [1] - 41:9
**seem** [6] - 19:14, 21:4, 57:7, 88:23, 112:12
**sees** [3] - 12:4, 35:20, 167:18
**seized** [1] - 33:23
**seldom** [1] - 58:16
**select** [2] - 80:11, 175:21
**self** [1] - 117:13
**semantic** [1] - 14:6
**semantics** [1] - 14:3
**seminars** [1] - 91:14
**send** [10] - 80:25, 95:22, 101:12, 109:8, 135:13, 135:15, 135:17, 176:3, 177:24
**sending** [3] - 79:14, 137:23, 137:24
**sends** [1] - 150:15
**senior** [1] - 152:17
**sense** [21] - 10:15, 21:20, 23:1, 23:18, 33:21, 56:11, 57:8, 70:5, 88:24, 102:18, 119:2, 154:14, 167:13, 170:8, 171:20, 174:12, 174:13, 174:16, 175:1, 175:3, 175:13
**sent** [10] - 125:7, 134:5, 137:8, 142:4, 149:4, 149:10, 149:25, 151:15, 152:13, 157:11
**sentence** [3] - 12:4, 34:6
**sentences** [2] - 16:20, 16:24
**sentry** [1] - 99:10
**separate** [8] - 10:4, 10:8, 20:8, 42:12, 63:11, 106:25, 163:23
**separately** [2] - 72:22, 79:4
**September** [1] - 125:4
**sequence** [1] - 76:14
**serene** [1] - 129:7
**serially** [1] - 174:18
**serious** [3] - 78:6, 108:20, 110:11
**seriously** [2] - 85:4, 164:15
**serve** [2] - 54:3, 78:17
**S███** [11] - 94:18,

95:9, 96:8, 96:25, 97:22, 98:8, 98:10, 98:15, 115:24, 174:21
S█████[1] - 107:6
**service** [4] - 53:15, 121:1, 124:8, 166:4
**services** [4] - 94:17, 94:23, 108:3, 156:25
**SESSIONS** [1] - 1:8
**set** [5] - 31:6, 51:12, 52:12, 63:24
**sets** [1] - 28:11
**setting** [2] - 30:10, 67:8
**settled** [2] - 138:24, 149:4
**seven** [2] - 102:21, 118:10
**several** [4] - 88:10, 130:12, 155:21, 162:14
**severally** [1] - 76:10
**severe** [7] - 65:3, 103:5, 115:10, 119:6, 126:2, 126:7, 153:21
**sex** [9] - 64:4, 64:16, 65:24, 92:9, 92:23, 92:24, 103:23, 108:22, 141:24
**sex-specific** [1] - 65:24
**sexual** [90] - 7:8, 7:9, 8:10, 9:21, 10:2, 11:19, 13:1, 13:2, 13:4, 13:6, 13:22, 22:7, 22:9, 23:16, 44:11, 44:20, 64:17, 65:3, 65:14, 65:20, 65:23, 66:1, 66:2, 66:16, 66:22, 67:15, 67:16, 67:25, 68:1, 68:9, 68:11, 70:22, 70:23, 71:3, 71:4, 75:8, 91:24, 91:25, 94:7, 94:11, 96:23, 97:6, 97:13, 97:16, 104:2, 105:9, 106:1, 107:5, 107:16, 108:21, 110:11, 113:16, 113:17, 114:10, 116:14, 122:1, 123:8, 123:10, 123:11, 124:17, 125:14, 126:1, 126:7, 126:10, 130:11, 135:13, 135:19, 142:2, 142:4, 142:6,

144:19, 144:21, 144:22, 144:25, 148:18, 148:19, 150:22, 153:21, 167:10, 167:12, 169:13, 170:10, 171:16, 173:16
**sexualized** [1] - 89:14
**sexually** [11] - 44:13, 65:16, 89:4, 92:20, 108:22, 113:5, 145:15, 148:13, 151:8, 170:13, 172:2
**shadow** [2] - 100:5, 163:14
**shadowed** [1] - 147:3
**shadowing** [3] - 100:5, 149:2, 149:5
**shall** [3] - 76:25, 77:2, 78:7
**shame** [1] - 77:25
**shameful** [1] - 114:19
**shapes** [1] - 85:12
**shared** [1] - 96:10
**shield** [1] - 14:18
**shifting** [1] - 27:10
**shirt** [1] - 169:17
**shock** [4] - 74:20, 75:22, 160:11, 160:14
**shoo** [1] - 99:3
**short** [6] - 53:1, 61:8, 82:19, 133:20, 170:18, 172:14
**shorthand** [3] - 14:21, 180:5, 180:12
**shortly** [3] - 95:23, 113:18, 114:1
**show** [21] - 18:24, 29:7, 60:11, 71:18, 99:11, 122:19, 139:3, 140:1, 141:5, 141:8, 141:11, 141:19, 141:23, 142:16, 142:22, 143:9, 144:20, 173:5, 174:6, 178:10
**showed** [7] - 32:19, 34:15, 96:15, 138:24, 139:4, 172:17, 172:21
**showing** [5] - 16:15, 16:23, 17:22, 67:14, 99:8
**shown** [6] - 62:5, 67:5, 78:5, 91:14, 158:9, 168:2
**shows** [9] - 58:8, 74:17, 75:18, 116:4, 122:3, 137:10,

153:1, 161:9, 169:12
**shut** [1] - 100:6
**sic** [4] - 59:1, 92:15, 113:13, 161:24
**sick** [2] - 149:16, 162:16
**Side** [2] - 121:22, 123:5
**side** [6] - 48:22, 51:8, 60:19, 121:2, 124:4, 127:16
**sides** [3] - 49:19, 55:15, 119:4
**sidewalks** [1] - 167:16
**Sidley** [1] - 118:2
**sign** [5] - 37:19, 82:8, 129:8, 129:10, 129:16
**signed** [1] - 81:1
**significance** [1] - 30:3
**significant** [4] - 87:5, 97:6, 103:2, 150:14
**signs** [2] - 138:24, 149:14
**silent** [1] - 97:8
**similar** [6] - 46:23, 47:11, 47:23, 57:21, 71:8, 78:18
**similarly** [10] - 45:16, 46:1, 47:1, 47:4, 47:6, 47:15, 47:22, 48:2, 48:6, 71:7
**similarly-situated** [1] - 47:15
**simple** [1] - 88:8
**simplify** [1] - 12:3
**simply** [5] - 80:20, 80:21, 81:12, 102:10, 114:9
**simultaneously** [1] - 33:10
**single** [14] - 54:11, 76:7, 95:19, 96:23, 98:12, 103:19, 106:19, 109:4, 124:11, 131:6, 168:10, 169:13
**singling** [1] - 40:11
**sinister** [1] - 78:20
**sit** [5] - 88:11, 109:3, 138:12, 171:13, 177:15
**sitting** [1] - 167:7
**situated** [12] - 45:16, 46:1, 47:1, 47:4, 47:6, 47:15, 47:22, 48:2, 48:6, 50:7, 71:7, 82:20
**situation** [1] - 46:23
**situations** [1] - 57:21

**six** [7] - 83:16, 97:15, 117:5, 119:3, 132:19
**skateboard** [3] - 130:20, 130:25, 154:19
**skip** [2] - 37:13, 82:4
**skips** [1] - 45:9
**slide** [2] - 49:2, 97:13
**slides** [2] - 32:19, 34:16
**slight** [1] - 160:18
**slightly** [1] - 87:25
**slipped** [1] - 113:23
**Sloan** [1] - 118:1
**slogans** [2] - 95:21, 98:1
**slurs** [2] - 89:14, 108:21
**sluts** [1] - 89:15
**small** [4] - 61:13, 70:16, 74:4, 126:21
**smart** [1] - 136:2
**smile** [1] - 20:21
**smiling** [3] - 20:22, 96:16, 139:7
**Smith** [1] - 167:25
**snip** [1] - 9:13
**snitch** [1] - 95:12
**Snoeyenbos** [2] - 46:4, 46:17
**so-called** [2] - 22:11, 68:13
**social** [3] - 53:19, 168:15, 178:24
**soft** [1] - 119:1
**soft-spoken** [1] - 119:1
**sole** [5] - 57:14, 60:4, 62:15, 80:7, 80:22
**solely** [5] - 6:23, 7:19, 63:17, 80:4, 81:6
**solution** [1] - 98:5
**solve** [2] - 149:11, 149:12
**solves** [3] - 12:6, 24:9, 24:10
**someone** [8] - 46:10, 93:22, 130:15, 141:16, 152:19, 164:10, 167:24
**sometimes** [5] - 13:19, 66:14, 97:16, 105:22, 127:24
**somewhat** [2] - 40:9, 40:10
**somewhere** [2] - 165:20, 165:21
**Sona** [1] - 2:17
**soon** [2] - 81:3, 170:13

**sorry** [10] - 9:2, 22:21, 25:17, 52:4, 116:6, 121:19, 157:18, 157:22, 163:2, 164:6
**sort** [14] - 5:4, 8:14, 11:15, 20:18, 27:10, 28:19, 33:23, 38:18, 41:15, 42:19, 43:17, 46:12, 85:8, 120:12
**sorts** [1] - 145:4
**sought** [2] - 58:8, 58:13
**sound** [3] - 60:2, 70:6, 118:15
**sounded** [1] - 98:24
**sounds** [1] - 120:18
**source** [1] - 168:20
**South** [1] - 119:1
**space** [2] - 37:3, 81:25
**spaced** [1] - 109:5
**Spanish** [3] - 146:23, 159:19, 163:20
**speaking** [2] - 33:10, 56:16
**special** [8] - 28:13, 28:15, 36:13, 36:20, 36:22, 81:14, 81:15, 117:20
**specific** [9] - 17:15, 19:22, 46:14, 47:5, 48:8, 65:24, 81:16, 90:11, 97:13
**specifically** [16] - 5:16, 8:7, 31:10, 31:17, 48:7, 64:14, 88:19, 89:20, 90:2, 90:25, 91:12, 92:16, 92:17, 93:22, 105:14, 106:12
**speculation** [2] - 70:8, 73:1
**spend** [4] - 86:8, 99:8, 100:15, 152:11
**spending** [1] - 35:9
**spent** [4] - 98:20, 102:15, 155:12, 173:7
**spill** [2] - 51:14, 85:9
**spirit** [1] - 130:21
**spite** [1] - 78:20
**split** [1] - 20:18
**spoken** [2] - 84:11, 119:1
**spoliation** [1] - 39:16
**sports** [1] - 128:25
**spot** [1] - 20:25
**spots** [2] - 128:15
**spread** [3] - 155:10, 155:11, 155:12
**spreading** [3] - 111:4,

148:16, 155:13
**spring** [1] - 108:14
**square** [2] - 99:12, 126:20
**Square** [1] - 3:13
**Squirt** [3] - 166:4, 166:6, 166:10
**SR&R** [1] - 96:4
**srewari@huntonak. com** [1] - 2:19
**SRO** [1] - 148:22
**staff** [1] - 169:15
**stage** [2] - 33:5, 155:4
**stake** [1] - 88:5
**stand** [17] - 15:8, 23:2, 30:20, 57:25, 81:5, 90:7, 91:2, 99:6, 112:1, 113:10, 118:25, 119:3, 119:14, 132:19, 134:4, 167:10, 171:23
**stand-alone** [1] - 23:2
**standard** [22] - 12:17, 12:20, 15:20, 16:23, 17:21, 18:12, 19:15, 20:12, 20:14, 41:24, 42:15, 43:5, 43:22, 46:3, 46:13, 47:9, 53:7, 53:8, 58:14, 67:13, 87:20, 175:1
**standardized** [1] - 118:13
**standards** [1] - 16:15
**standing** [7] - 57:20, 83:4, 117:9, 119:11, 136:16, 160:19, 164:13
**standpoint** [2] - 46:20, 46:24
**stands** [1] - 121:11
**start** [22] - 17:9, 30:9, 50:4, 50:12, 50:13, 50:16, 52:23, 85:2, 100:19, 100:21, 112:19, 117:2, 133:13, 138:5, 139:4, 139:16, 140:19, 152:2, 156:10, 166:13, 169:10, 175:7
**started** [14] - 34:13, 38:23, 53:21, 120:24, 125:3, 131:10, 139:22, 143:22, 145:18, 159:10, 163:12, 167:3, 168:4, 171:19
**starting** [5] - 51:17, 51:21, 102:20,

131:16, 133:13
**starts** [7] - 7:10, 114:15, 127:3, 140:19, 149:20, 149:21, 170:19
**state** [5] - 54:10, 59:20, 60:13, 79:4, 90:18
**statement** [29] - 9:13, 9:18, 62:17, 62:19, 62:22, 62:23, 94:1, 109:22, 109:25, 110:3, 110:19, 111:3, 111:22, 111:25, 112:2, 112:5, 133:23, 143:18, 143:22, 144:8, 145:10, 145:18, 145:24, 146:6, 146:7, 146:11, 146:13, 163:9, 167:6
**statements** [14] - 49:13, 55:10, 55:12, 57:5, 57:18, 71:3, 82:13, 108:13, 108:16, 109:11, 109:22, 109:24, 110:10, 112:9
**States** [4] - 3:13, 42:25, 64:4, 70:21
**states** [2] - 91:4
**STATES** [2] - 1:1, 1:12
**stating** [2] - 16:22, 54:12
**stations** [1] - 57:21
**statute** [1] - 64:3
**statutes** [1] - 35:10
**stay** [11] - 10:11, 34:11, 49:18, 53:19, 142:19, 146:18, 147:16, 149:7, 157:11, 159:17, 178:23
**stayed** [1] - 163:8
**steadfast** [1] - 97:22
**steps** [9] - 16:2, 39:7, 59:4, 75:8, 107:21, 129:25, 145:21, 167:16
**stick** [3] - 12:21, 36:8, 42:14
**sticking** [1] - 113:14
**still** [7] - 15:6, 51:7, 87:8, 119:16, 136:1, 153:22, 154:5
**stints** [1] - 117:22
**stipulate** [1] - 55:15
**stipulated** [4] - 52:7, 52:8, 52:12, 55:8

**stipulation** [2] - 52:10, 55:17
**stolen** [1] - 150:7
**stood** [5] - 91:2, 99:10, 125:1, 126:25, 127:7
**STOOUNT** [1] - 65:14
**stop** [17] - 111:5, 128:9, 128:16, 129:1, 129:5, 129:8, 129:9, 129:10, 129:13, 129:16, 129:20, 129:24, 131:5, 140:7, 140:15, 140:21
**stopped** [1] - 164:3
**stops** [2] - 128:15, 128:23
**stories** [2] - 175:1, 175:2
**story** [14] - 98:13, 103:24, 105:25, 106:2, 112:19, 114:13, 135:11, 143:19, 145:23, 146:13, 170:17, 174:7, 174:10, 174:16
**straight** [3] - 12:4, 16:13, 41:20
**strange** [1] - 168:8
**stream** [1] - 113:23
**street** [2] - 129:17, 167:17
**Street** [4] - 1:15, 2:2, 2:6, 2:10
**streets** [1] - 130:2
**strenuous** [1] - 83:19
**stress** [1] - 69:17
**stretch** [1] - 123:1
**stricken** [1] - 55:25
**strict** [1] - 127:1
**strike** [7] - 23:18, 24:7, 25:9, 25:11, 25:14, 41:19, 42:8
**striking** [3] - 10:19, 14:5, 39:25
**strongest** [2] - 123:15, 123:16
**strongly** [1] - 162:1
**struck** [1] - 168:5
**struggled** [1] - 165:7
**student** [75] - 7:10, 8:10, 9:8, 11:19, 16:11, 21:13, 22:13, 22:14, 22:16, 23:2, 24:14, 24:15, 35:4, 41:12, 43:4, 44:11, 44:13, 44:16, 65:14, 65:16, 65:19, 65:22,

67:2, 68:15, 68:17, 68:19, 74:12, 89:7, 91:6, 93:16, 94:17, 94:23, 97:7, 98:12, 99:22, 108:3, 108:13, 108:16, 110:8, 110:10, 110:12, 111:13, 114:18, 124:20, 124:23, 128:2, 152:25, 156:22, 156:25, 157:2, 159:24, 159:25, 160:2, 160:4, 165:8, 167:6, 174:17
**student's** [2] - 70:23, 96:1
**student-on-student** [16] - 8:10, 16:11, 22:13, 22:14, 23:2, 24:14, 24:15, 41:12, 43:4, 44:11, 44:16, 65:19, 67:2, 68:15, 68:17, 124:23
**students** [51] - 10:7, 64:22, 88:3, 88:13, 89:3, 89:4, 89:6, 89:14, 89:15, 89:16, 93:6, 95:1, 95:25, 96:10, 96:25, 97:15, 97:17, 98:3, 98:5, 98:25, 99:24, 107:24, 109:20, 109:23, 110:7, 110:9, 111:1, 111:17, 111:19, 113:18, 117:21, 124:17, 127:20, 128:4, 128:21, 131:15, 145:20, 147:6, 158:25, 159:12, 161:14, 161:24, 162:9, 162:19, 169:14, 169:24
**studies** [1] - 97:4
**studying** [2] - 158:4, 158:11
**stuff** [2] - 30:25, 130:7
**subject** [3] - 24:20, 64:9, 97:16
**subjected** [4] - 44:24, 64:6, 68:2, 89:23
**subjecting** [1] - 7:11
**subjective** [2] - 11:16, 15:12
**subjectively** [2] - 16:1, 94:11
**submission** [1] - 44:22

**submissions** [1] - 31:19
**submit** [6] - 30:8, 35:18, 39:17, 126:4, 153:20, 172:1
**submitted** [5] - 6:25, 24:8, 86:20, 152:21, 175:17
**subpoena** [1] - 169:7
**subscribed** [1] - 180:15
**subsequent** [5] - 6:6, 37:5, 71:18, 82:2, 170:3
**substantial** [21] - 6:9, 6:12, 6:19, 7:18, 8:3, 8:12, 11:18, 21:10, 21:12, 22:16, 22:24, 23:7, 24:14, 25:1, 25:2, 25:21, 26:2, 36:10, 67:3, 67:5, 68:19
**substantiate** [1] - 146:17
**substituted** [1] - 56:2
**succeed** [1] - 70:24
**successful** [2] - 16:13, 159:14
**sudden** [1] - 108:14
**suddenly** [2] - 112:20, 173:25
**sued** [1] - 127:11
**suffer** [1] - 95:11
**suffered** [8] - 65:3, 71:20, 76:11, 77:24, 78:1, 99:13, 106:10, 126:1
**suffering** [9] - 33:3, 34:5, 35:16, 35:18, 36:6, 73:11, 119:23, 120:15, 120:22
**suffers** [3] - 28:8, 69:18, 69:23
**suffice** [3] - 14:18, 16:24, 179:6
**suffices** [1] - 6:3
**sufficient** [5] - 13:2, 15:24, 18:23, 27:18, 59:25
**suggest** [13] - 25:8, 28:25, 29:3, 35:2, 43:21, 49:17, 81:9, 96:17, 103:18, 118:12, 120:14, 134:11, 177:5
**suggested** [4] - 10:23, 11:3, 28:7, 117:12
**suggesting** [7] - 28:3, 28:13, 28:16, 103:16, 118:7,

118:10
**suggestion** [6] - 7:24, 38:15, 41:16, 44:17, 83:5, 102:16
**suggestive** [1] - 39:18
**suggests** [3] - 11:20, 14:22, 152:9
**suicidal** [3] - 89:22, 90:20, 107:25
**suit** [1] - 152:5
**Suite** [7] - 1:16, 1:20, 2:3, 2:7, 2:11, 3:6, 3:10
**summarizing** [1] - 46:18
**summary** [9] - 27:19, 29:16, 31:4, 32:22, 33:4, 33:13, 33:24, 35:12, 35:13
**summer** [1] - 134:10
**sums** [1] - 78:7
**superhuman** [1] - 109:10
**superintendent** [4] - 109:5, 151:16, 151:18, 173:13
**superintendent's** [9] - 100:12, 100:13, 106:13, 106:15, 108:5, 108:18, 109:2, 110:20, 116:15
**supervise** [2] - 74:11, 75:12
**supervision** [2] - 160:20, 164:14
**Supervisors** [1] - 64:13
**supplies** [1] - 73:17
**support** [7] - 48:10, 60:1, 124:25, 156:16, 158:14, 160:25, 163:13
**supported** [2] - 60:22, 157:1
**supporting** [2] - 158:3, 158:11
**supportive** [1] - 141:22
**supports** [4] - 103:9, 156:15, 156:20, 156:24
**suppose** [2] - 14:20, 102:6
**supposed** [4] - 18:22, 85:14, 120:9, 175:8
**supposedly** [1] - 108:9
**Supreme** [13] - 6:16, 6:17, 11:23, 15:22,

21:25, 24:16, 25:23, 26:6, 26:19, 35:8, 41:21, 42:25, 43:14
**surfaced** [1] - 100:24
**surplusage** [1] - 45:23
**surprise** [1] - 99:6
**surprised** [1] - 90:24
**surrender** [1] - 80:2
**surrounding** [1] - 77:9
**surveys** [2] - 97:7, 97:8
**suspended** [2] - 91:17, 111:7
**suspension** [1] - 159:11
**sustain** [1] - 72:19
**sustained** [5] - 34:24, 55:24, 69:11, 72:19, 78:8
**sway** [1] - 49:6
**sweet** [1] - 119:1
**sword** [1] - 24:4
**swore** [1] - 97:22
**sworn** [1] - 55:4
**S███** [4] - 70:19, 74:8, 75:6, 164:22
**sympathy** [3] - 54:23, 70:8, 73:3
**symptoms** [2] - 69:25, 152:7
**system** [6] - 88:10, 96:21, 98:12, 115:4, 125:2, 166:16
**System** [1] - 173:14

## T

**T.B** [1] - 3:6
**table** [1] - 85:10
**TABLE** [1] - 4:1
**tables** [1] - 83:6
**tackled** [1] - 170:9
**tale** [1] - 167:12
**talks** [5] - 13:9, 18:17, 92:16, 92:17, 111:3
**T███** [2] - 74:9, 75:7
**tamer** [1] - 142:3
**tape** [1] - 180:13
**T███** [8] - 74:6, 75:4, 96:15, 99:12, 127:12, 161:20, 162:7, 165:1
**taught** [6] - 93:14, 127:16, 161:19, 161:20, 161:21
**Taylor** [11] - 128:1, 132:6, 132:7, 132:9, 132:10, 132:12, 132:13, 169:1,

169:3, 169:21
**TBI** [2] - 33:2, 33:3
**teach** [1] - 164:20
**teacher** [13] - 38:10, 114:25, 143:8, 147:2, 156:19, 157:24, 158:1, 158:15, 158:25, 162:2, 163:16, 164:24, 165:2
**teachers** [31] - 15:19, 64:21, 74:5, 75:3, 86:13, 88:11, 98:24, 99:1, 99:10, 108:4, 109:10, 109:12, 114:23, 127:1, 127:10, 146:19, 150:7, 158:8, 160:5, 161:2, 161:13, 162:11, 162:15, 162:20, 162:22, 162:23, 163:18, 164:19, 174:20
**team** [9] - 85:2, 107:14, 120:25, 124:7, 156:17, 161:17, 162:20, 162:22, 175:4
**teams** [2] - 161:13
**tears** [1] - 107:25
**temporary** [1] - 73:15
**temptation** [1] - 178:25
**ten** [7] - 51:5, 51:7, 101:2, 108:16, 116:5, 116:7, 150:4
**ten-minute** [3] - 116:5, 116:7, 150:4
**tendencies** [2] - 56:15, 154:15
**tending** [1] - 60:11
**Tenth** [1] - 3:14
**term** [17] - 14:25, 15:2, 16:6, 19:4, 24:22, 29:2, 41:4, 41:23, 42:5, 42:18, 44:5, 47:6, 48:6, 48:10, 89:9, 176:15
**terminology** [2] - 11:18, 14:10
**terms** [7] - 7:15, 9:23, 17:2, 19:15, 87:23, 92:23, 113:16
**territory** [1] - 166:22
**T███** [25] - 70:19, 74:8, 75:6, 90:22, 133:6, 133:7, 145:17, 145:19, 146:12, 146:25, 147:5, 147:6,

147:10, 147:16, 147:25, 148:1, 157:14, 159:4, 159:6, 159:7, 159:9, 159:23, 163:10, 164:22
**T███** [1] - 109:18
**test** [7] - 47:3, 47:10, 118:20, 153:13, 161:7, 162:18, 171:20
**tested** [3] - 118:15, 157:25, 158:1
**testified** [34] - 8:20, 60:10, 60:15, 61:24, 62:5, 98:24, 103:23, 105:15, 111:17, 127:14, 132:1, 132:10, 132:20, 133:10, 134:6, 135:9, 144:15, 147:14, 152:2, 156:17, 157:1, 158:25, 159:6, 159:7, 159:14, 161:1, 161:4, 161:11, 162:3, 162:7, 163:5, 163:6, 164:2, 168:11
**testifies** [1] - 60:7
**testify** [3] - 59:15, 88:3, 99:4
**testifying** [2] - 60:14, 61:11
**testimony** [43] - 8:16, 29:14, 55:5, 56:18, 58:19, 60:5, 60:8, 60:9, 60:21, 60:23, 60:24, 60:25, 61:7, 61:9, 61:13, 61:14, 61:20, 61:21, 62:4, 62:7, 62:8, 62:14, 85:25, 90:9, 93:9, 94:18, 96:8, 97:20, 97:21, 107:7, 112:9, 117:8, 144:17, 156:8, 156:14, 157:1, 157:3, 157:4, 158:15, 160:25, 180:6
**tests** [1] - 118:13
**tethered** [1] - 36:11
**text** [4] - 135:13, 135:25, 137:23, 137:25
**thanking** [3] - 85:2, 166:14, 175:5
**Thanksgiving** [2] - 157:12, 157:16
**THE** [166] - 1:1, 1:11,

3:5, 5:1, 5:11, 5:21, 6:4, 6:11, 7:1, 7:6, 7:23, 8:8, 9:1, 9:9, 10:3, 10:10, 10:22, 11:6, 11:12, 12:13, 12:22, 14:10, 14:23, 15:14, 16:5, 16:17, 17:7, 19:3, 19:7, 19:11, 19:17, 20:7, 20:10, 20:14, 20:18, 20:21, 21:21, 21:23, 22:3, 22:21, 23:5, 23:8, 23:12, 23:20, 24:2, 25:6, 25:8, 25:13, 25:16, 25:25, 26:15, 26:24, 28:13, 28:24, 29:9, 30:1, 30:14, 30:17, 31:12, 32:24, 33:17, 33:20, 34:11, 34:17, 36:12, 36:17, 37:10, 37:12, 38:1, 38:8, 38:10, 38:25, 39:3, 40:8, 40:23, 41:3, 41:6, 41:22, 42:5, 42:16, 43:11, 43:21, 44:8, 44:23, 45:6, 45:11, 45:21, 46:6, 46:12, 46:16, 46:25, 47:5, 47:16, 48:5, 48:17, 48:21, 49:10, 49:25, 50:13, 50:17, 50:25, 51:9, 51:16, 51:20, 52:3, 52:13, 52:15, 52:18, 52:22, 53:12, 53:15, 54:7, 82:25, 83:4, 83:8, 83:12, 83:25, 84:4, 84:21, 84:24, 116:5, 116:7, 121:7, 121:12, 121:15, 121:18, 121:23, 122:11, 122:22, 122:24, 123:12, 123:23, 123:25, 124:2, 124:4, 150:4, 155:19, 156:2, 164:5, 164:7, 165:13, 165:14, 165:15, 165:18, 165:23, 165:25, 166:3, 166:6, 166:8, 166:10, 172:5, 172:9, 172:12, 175:16, 176:9, 176:14, 177:10, 177:13, 177:21, 177:24, 178:5, 178:16, 179:11, 179:13, 179:18, 179:21

**theater** [1] - 149:19
**themselves** [4] - 15:10, 72:1, 101:8, 109:8
**theory** [11] - 9:16, 9:25, 10:1, 10:3, 10:5, 10:9, 20:15, 30:5, 31:9, 31:16, 42:14
**therapist** [7] - 105:23, 106:5, 106:8, 135:7, 152:2, 172:18, 172:19
**therapy** [2] - 105:22
**thereabout** [1] - 50:17
**thereafter** [2] - 114:1, 117:10
**therefore** [7] - 14:5, 14:6, 18:20, 34:2, 64:9, 87:6, 107:20
**they've** [6] - 88:9, 95:20, 109:11, 134:11, 146:3, 165:10
**thingy** [1] - 136:15
**thinking** [1] - 86:23
**third** [3] - 80:24, 116:1, 154:5
**Thirty** [1] - 48:18
**Thirty-four** [1] - 48:18
**thoroughfare** [1] - 130:2
**thoughts** [2] - 19:25, 177:2
**threatened** [3] - 77:7, 113:8, 141:9
**threatening** [5] - 22:7, 68:10, 76:20, 110:12, 111:14
**threats** [6] - 94:15, 100:7, 108:24, 111:18
**three** [31] - 5:24, 65:11, 66:10, 68:5, 71:9, 72:11, 73:20, 77:14, 77:25, 108:2, 109:22, 110:7, 111:24, 111:25, 118:8, 125:19, 127:10, 128:11, 130:1, 139:18, 143:23, 143:25, 149:15, 149:16, 170:21, 170:23, 171:2, 171:3, 171:7, 174:11, 177:4
**three-week** [1] - 174:11
**threshold** [1] - 32:4
**threw** [1] - 100:8

**throughout** [8] - 20:1, 41:2, 84:7, 100:1, 103:12, 104:3, 110:3, 127:21
**thrown** [1] - 151:11
**tight** [1] - 102:23
**tight-knit** [1] - 102:23
**timeline** [2] - 106:11, 170:8
**timing** [1] - 50:19
**Tinsley** [7] - 81:2, 82:9, 121:18, 176:2, 178:2, 179:8
**tip** [1] - 87:24
**title** [1] - 115:7
**Title** [53] - 6:8, 7:21, 10:19, 10:24, 12:1, 13:8, 13:10, 13:18, 15:20, 16:7, 20:8, 20:13, 23:3, 23:6, 27:23, 29:17, 33:17, 34:22, 35:3, 41:2, 43:2, 43:3, 43:12, 43:16, 43:17, 44:10, 44:24, 64:3, 64:9, 64:15, 65:1, 65:13, 66:13, 66:21, 67:21, 67:22, 67:25, 68:24, 69:9, 72:4, 94:4, 94:9, 104:24, 105:4, 105:10, 106:15, 106:19, 115:7, 124:17, 124:19, 125:18, 154:11
**today** [7] - 85:21, 86:8, 101:23, 103:5, 167:10, 174:9, 174:23
**today's** [1] - 86:23
**together** [14] - 85:14, 85:22, 85:24, 86:5, 92:21, 107:14, 108:6, 109:3, 120:17, 145:17, 159:2, 167:1, 168:5, 180:13
**tomorrow** [8] - 49:23, 176:18, 176:22, 177:1, 178:6, 178:11, 178:19, 179:14
**Tonia** [2] - 180:3, 180:21
**TONIA** [1] - 3:12
**took** [19] - 26:6, 39:6, 45:2, 45:9, 45:12, 47:20, 59:4, 68:4, 68:5, 71:5, 98:23, 106:1, 113:6, 113:7, 113:10, 145:21,

149:14, 161:18, 176:20
**top** [1] - 134:20
**TORCHINSKY** [1] - 1:14
**tormenting** [1] - 93:23
**torture** [1] - 154:18
**tortured** [3] - 130:15, 130:16, 131:18
**total** [3] - 50:21, 120:17
**totality** [1] - 67:19
**totally** [1] - 9:3
**toting** [1] - 171:8
**touch** [3] - 98:21, 149:7, 170:14
**touched** [7] - 77:12, 127:8, 150:10, 151:9, 151:10, 161:4, 162:25
**touching** [19] - 44:20, 66:1, 76:22, 77:13, 77:14, 108:23, 126:10, 128:3, 131:24, 133:11, 147:19, 147:23, 148:11, 148:17, 151:19, 169:16, 173:11, 173:16, 173:18
**touchings** [1] - 128:7
**towards** [6] - 11:22, 21:2, 78:14, 91:24, 92:20, 126:17
**toxic** [2] - 91:9, 91:11
**tracks** [1] - 108:8
**traditional** [5] - 22:14, 24:14, 24:15, 38:18, 68:17
**tragic** [1] - 112:23
**Trahan** [2] - 135:9, 135:10
**trailers** [1] - 139:9
**TRANSCRIPT** [1] - 1:11
**transcript** [1] - 180:11
**transferred** [1] - 165:6
**transitions** [3] - 127:2, 147:3, 149:3
**translates** [1] - 20:12
**trashed** [1] - 143:14
**treated** [4] - 58:1, 102:20, 117:15, 174:1
**treatises** [1] - 27:7
**treatment** [10] - 33:15, 34:4, 34:5, 35:1, 35:23, 36:2, 69:13, 102:15, 117:23, 174:4

**treatments** [1] - 70:2
**treats** [1] - 114:19
**trial** [24] - 5:18, 27:22, 39:4, 53:24, 56:2, 56:7, 56:17, 57:24, 59:2, 59:11, 62:5, 62:15, 79:15, 83:16, 85:1, 85:18, 85:19, 86:7, 87:8, 88:7, 97:25, 98:20, 103:13, 157:18
**Trial** [1] - 180:6
**TRIAL** [1] - 1:11
**trials** [2] - 85:8, 86:6
**tried** [12] - 86:7, 93:17, 97:3, 101:14, 106:16, 111:24, 112:9, 117:25, 124:25, 134:11, 138:22, 153:11
**tries** [3] - 117:17, 117:18
**trip** [6] - 139:10, 149:14, 158:13, 158:16, 158:17, 158:20
**trips** [1] - 114:20
**trouble** [2] - 11:6, 169:25
**troubled** [1] - 156:13
**troubling** [1] - 110:23
**truck** [2] - 131:1
**true** [8] - 58:14, 59:1, 94:8, 96:14, 110:18, 112:15, 153:8
**truth** [15] - 62:18, 62:25, 80:8, 80:23, 88:8, 88:15, 93:4, 101:22, 132:17, 155:16, 155:17, 171:23, 172:1, 172:2
**truthful** [7] - 132:23, 132:24, 133:2, 133:13
**try** [8] - 30:9, 80:14, 85:21, 112:10, 140:23, 155:6, 178:23, 179:23
**trying** [8] - 7:25, 8:1, 29:19, 31:6, 32:12, 51:5, 108:19, 122:25
**turn** [1] - 154:17
**turns** [1] - 98:25
**tutoring** [1] - 35:6
**TV** [1] - 86:1
**tweak** [1] - 38:18
**twice** [4] - 21:11, 21:14, 128:11, 170:18
**two** [36] - 16:20,

16:24, 23:4, 49:21, 50:22, 52:8, 56:16, 60:25, 65:7, 66:7, 68:2, 71:5, 73:16, 75:1, 76:4, 77:13, 77:24, 88:1, 88:2, 93:2, 106:6, 107:11, 108:3, 110:1, 110:3, 117:22, 119:18, 124:16, 128:4, 128:15, 131:15, 143:21, 144:2, 156:9, 171:1
**twofold** [1] - 12:3
**type** [2] - 11:21, 109:4
**types** [10] - 44:4, 56:16, 119:18, 120:5, 148:19
**typically** [1] - 49:12

**U**

**U.S** [1] - 21:25
**U.S.C** [1] - 70:22
**uh-oh** [1] - 48:11
**ultimately** [2] - 15:14, 32:17
**unable** [2] - 53:7, 118:2
**unanimous** [11] - 37:1, 37:3, 37:6, 37:17, 79:19, 81:8, 81:18, 81:23, 81:24, 82:3, 82:6
**unavailable** [2] - 39:7, 59:4
**unbelievable** [1] - 167:13
**unchecked** [1] - 16:11
**uncomfortable** [4] - 18:2, 171:13, 171:15, 171:16
**under** [40] - 6:17, 12:1, 13:10, 17:24, 20:13, 20:15, 24:18, 26:4, 27:19, 29:17, 34:22, 35:9, 44:10, 60:10, 62:12, 62:20, 63:18, 64:3, 64:6, 65:13, 67:21, 67:22, 69:9, 70:20, 71:13, 73:2, 78:14, 92:13, 97:14, 104:24, 105:10, 105:20, 124:17, 131:7, 136:17, 138:12, 165:10, 169:17
**undermines** [1] - 66:7
**undermining** [1] - 53:5

209

**understood** [3] - 35:19, 50:19, 146:14
**Understood** [1] - 49:20
**undesirable** [1] - 65:23
**undisputedly** [1] - 29:7
**unequivocally** [2] - 94:7, 118:23
**unhappy** [1] - 148:7
**unidentified** [1] - 167:22
**unimportant** [2] - 61:3, 61:25
**uninterested** [1] - 102:19
**unique** [1] - 40:8
**united** [1] - 3:13
**United** [3] - 42:25, 64:4, 70:21
**UNITED** [2] - 1:1, 1:12
**universe** [1] - 137:22
**University** [1] - 117:21
**unknown** [1] - 148:23
**unless** [14] - 12:1, 13:10, 49:17, 55:16, 55:21, 58:18, 63:8, 69:22, 83:19, 175:23, 177:3, 177:16, 177:25, 178:9
**unlike** [1] - 28:25
**unnecessary** [1] - 45:23
**unreasonable** [5] - 16:21, 17:11, 17:20, 67:12, 116:3
**untrue** [3] - 133:14, 144:9, 147:20
**untruthful** [1] - 133:15
**unusual** [2] - 103:24, 114:8
**unverified** [2] - 110:6, 110:14
**unwanted** [4] - 44:20, 66:1, 76:22, 77:13
**unwelcomed** [2] - 65:21
**up** [59] - 5:8, 15:7, 16:13, 20:25, 25:18, 30:21, 36:4, 36:9, 48:15, 53:17, 85:11, 91:2, 93:7, 95:10, 97:3, 98:13, 100:8, 103:7, 107:2, 108:8, 113:15, 117:18, 120:11, 120:12, 122:25, 128:22, 129:19, 131:10,

131:11, 133:8, 137:10, 139:15, 139:17, 140:24, 142:22, 143:9, 144:24, 145:22, 146:8, 148:4, 150:2, 150:21, 155:9, 156:13, 156:21, 157:17, 158:6, 161:12, 163:2, 166:15, 170:4, 172:16, 173:6, 174:1, 174:11, 174:15, 178:11
**update** [1] - 149:7
**ups** [1] - 166:25
**upset** [1] - 119:13
**urged** [1] - 144:23
**user** [25] - 100:20, 101:6, 101:8, 101:15, 134:8, 135:20, 136:7, 136:8, 136:13, 136:14, 136:21, 136:22, 136:23, 136:24, 136:25, 137:2, 137:3, 137:6, 137:18, 138:2, 138:11, 163:1, 163:2, 168:23, 170:2
**user's** [2] - 137:4, 138:3
**uses** [3] - 26:14, 142:13, 142:15
**usual** [3] - 114:10, 130:17, 176:1
**utter** [2] - 74:17, 75:19

---

**V**

---

**VA** [3] - 3:7, 3:10, 3:14
**valid** [1] - 172:20
**validate** [1] - 153:11
**validated** [1] - 135:7
**value** [10] - 46:9, 56:24, 70:15, 70:17, 73:7, 73:16, 73:20, 73:22, 74:3, 120:7
**various** [4] - 66:23, 95:16, 98:1, 104:3
**verbal** [1] - 65:24
**verdict** [42] - 28:13, 28:16, 36:14, 36:20, 36:22, 37:19, 55:1, 60:20, 63:10, 70:16, 74:3, 76:25, 77:3, 77:16, 78:7, 79:4, 79:9, 79:17, 79:18, 79:19, 80:5, 80:10, 80:21, 81:6, 81:8,

81:10, 81:12, 81:14, 81:15, 81:16, 82:8, 85:6, 115:5, 115:6, 116:10, 116:17, 116:22, 117:1, 155:18, 165:12, 172:4, 175:14
**verified** [4] - 96:23, 107:5, 107:10, 107:19
**versus** [3] - 11:16, 24:1, 180:7
**viable** [2] - 30:5, 43:24
**victim** [5] - 7:11, 66:2, 66:5, 114:17, 132:8
**victim's** [2] - 66:7, 66:11
**victims** [4] - 103:23, 112:25, 113:2, 114:10
**video** [3] - 96:15, 101:11, 101:12
**videos** [1] - 98:1
**view** [10] - 15:13, 19:21, 49:13, 79:9, 79:21, 89:1, 92:12, 104:12, 175:3, 175:12
**views** [2] - 80:1, 80:18
**violated** [3] - 64:15, 68:24, 72:16
**violation** [3] - 72:2, 72:9, 72:20
**violence** [3] - 71:4, 100:8, 105:9
**violent** [2] - 108:23, 113:16
**VIRGINIA** [1] - 1:1
**Virginia** [2] - 102:21, 180:4
**visible** [1] - 147:2
**visited** [1] - 148:6
**visits** [1] - 156:21
**VOGEL** [1] - 1:14
**voice** [1] - 163:6
**voicemail** [7] - 141:16, 141:20, 144:9, 144:11, 163:4, 163:7
**voices** [1] - 123:2
**VOLUME** [1] - 1:8
**voluntarily** [1] - 62:10
**volunteer** [1] - 179:2
**votes** [1] - 81:5
**vulnerable** [1] - 113:2

---

**W**

---

**wages** [1] - 73:20
**wait** [2] - 96:3, 177:15
**walk** [5] - 87:3, 87:11,

115:5, 115:9, 172:14
**walking** [4] - 127:17, 128:23, 146:22, 170:9
**wall** [2] - 126:16, 136:15
**wander** [1] - 161:15
**wanton** [2] - 78:15, 78:21
**wants** [3] - 102:17, 114:17, 135:21
**warn** [2] - 104:7, 141:25
**warned** [2] - 111:15, 159:13
**Washington** [5] - 1:16, 2:15, 2:18, 2:22, 3:2
**watch** [2] - 99:10, 129:18
**watched** [1] - 154:16
**water** [1] - 112:11
**wateringly** [1] - 142:1
**ways** [4] - 97:8, 98:4, 111:19, 114:20
**Weaver** [11] - 94:22, 102:19, 148:6, 148:15, 148:17, 148:22, 148:25, 151:24, 152:6, 156:25
**Weaver's** [1] - 152:8
**week** [12] - 118:9, 140:13, 140:16, 140:17, 140:20, 142:21, 143:8, 148:14, 149:4, 149:6, 150:6, 174:11
**weeks** [13] - 6:14, 53:24, 85:24, 110:17, 124:10, 125:24, 130:12, 139:18, 143:23, 143:25, 145:6, 154:16, 171:7
**weigh** [1] - 15:1
**weighing** [1] - 61:2
**weight** [7] - 44:6, 56:24, 59:22, 60:5, 61:7, 61:10, 80:3
**welcomed** [2] - 144:19, 144:20
**West** [1] - 129:4
**whereas** [1] - 99:1
**wherein** [1] - 25:20
**whereof** [1] - 180:15
**whole** [10] - 54:13, 58:8, 61:9, 86:4, 101:6, 103:24, 107:14, 128:1,

143:8, 144:12
**whore** [1] - 89:17
**widely** [1] - 96:10
**Wiehle** [1] - 3:9
**wielding** [1] - 171:9
**wife** [1] - 165:2
**willful** [5] - 74:21, 75:23, 78:15, 78:21, 86:25
**willing** [2] - 54:3, 125:1
**window** [2] - 117:10, 128:20
**winter** [3] - 149:10, 149:13, 149:14
**wisdom** [1] - 54:13
**withdraws** [1] - 115:3
**withdrew** [1] - 113:18
**witness** [60] - 39:6, 39:10, 39:23, 39:24, 40:15, 55:6, 57:15, 59:3, 59:7, 59:17, 59:24, 60:6, 60:7, 60:10, 60:11, 60:15, 60:16, 60:18, 60:20, 60:21, 60:24, 61:7, 61:9, 61:16, 61:18, 61:20, 61:21, 61:24, 62:2, 62:4, 62:5, 62:8, 62:13, 62:16, 62:17, 62:19, 62:20, 62:21, 63:2, 86:18, 88:11, 91:21, 91:23, 92:25, 99:6, 99:16, 103:22, 104:1, 113:10, 119:3, 131:6, 134:4, 138:10, 167:2, 168:10, 169:13, 169:18, 169:20, 180:15
**witness's** [5] - 60:12, 60:14, 61:19, 62:14, 62:23
**witnesses** [25] - 40:11, 55:5, 55:11, 57:5, 58:19, 59:9, 59:15, 59:16, 59:19, 60:5, 60:24, 61:11, 61:13, 61:15, 62:7, 85:25, 88:1, 88:4, 93:3, 97:9, 102:2, 103:8, 109:23, 127:20, 167:14
**woman** [1] - 46:13
**wondered** [1] - 135:10
**word** [11] - 18:11, 19:13, 24:7, 25:11, 32:10, 41:19, 45:4, 142:13, 142:15,

149:12, 172:7
**words** [11] - 7:19, 15:16, 19:23, 25:18, 58:10, 101:9, 110:3, 110:4, 118:5, 118:15, 141:2
**world** [1] - 140:4
**worried** [1] - 131:2
**worse** [1] - 23:24
**worst** [1] - 111:21
**worth** [1] - 57:20
**worthy** [1] - 60:12
**write** [5] - 96:2, 105:23, 106:4, 109:11, 109:15
**writes** [3] - 94:16, 110:3, 140:17
**writing** [3] - 81:3, 101:6, 146:13
**written** [13] - 18:17, 31:15, 36:8, 37:17, 39:17, 41:17, 45:7, 81:12, 82:6, 82:13, 82:15, 93:25, 151:24
**wrongful** [1] - 69:6
**wrote** [10] - 32:24, 34:12, 86:25, 96:7, 105:25, 111:22, 143:22, 144:8, 152:6, 163:8

## Y

**yard** [5] - 129:5, 129:11, 129:18, 129:25, 131:5
**year** [10] - 46:5, 89:3, 95:14, 96:22, 103:7, 114:13, 115:2, 120:15, 136:11, 157:2
**yearbook** [4] - 100:10, 136:10, 136:12, 136:16
**yearbooks** [1] - 167:23
**years** [22] - 88:10, 96:22, 101:2, 102:21, 103:15, 117:12, 118:8, 118:10, 119:10, 120:9, 120:10, 120:11, 120:15, 120:20, 134:11, 152:14, 154:22, 155:13, 162:2, 165:11, 174:2, 174:9
**York** [1] - 149:14
**young** [1] - 171:13
**yourself** [6] - 50:7,

61:23, 79:23, 98:11, 131:13, 171:20
**yourselves** [2] - 112:14, 121:10

## Z

**Zoll** [1] - 2:1
**Zuluaga** [3] - 87:18, 151:17, 173:13