UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **B.R.,** | : | |
| | : | |
| **Plaintiff,** | : | Civil Action |
| | : | No. 1:19-cv-00917-RDA-WEF |
| **v.** | : | |
| | : | March 28, 2024 |
| **F.C.S.B.,** | : | 2:05 p.m. |
| **et al.,** | : | |
| | : | |
| | : | VOLUME 9 - PM SESSION |
| **Defendants.** | : | |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES:   (Cont.)

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:      **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

```
APPEARANCES:   (Cont.)

For Defendant F.C.S.B.:      Kevin Elliker, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            804-788-8200
                            Email: Kelliker@huntonak.com

For the Defendants          Michael E. Kinney, Esq.
S.T., A.F., P.A.H., T.B.,    THE LAW OFFICE OF MICHAEL E.
B.H., M.P.F., M.C., F.T.,    KINNEY, PLC.
J.F.:                        1801 Robert Fulton Drive
                            Suite 120
                            Reston, VA 20191
                            Email:  Mk@kinneyesq.com

For the Defendant J.O.:      Bruce Blanchard, Esq.
                            ODIN, FELDMAN & PITTLEMAN, PC.
                            1775 Wiehle Avenue
                            Suite 400
                            Reston, VA 20190
                            Email:  Bruce.blanchard@ofplaw.com

Court Reporter:              Scott L. Wallace, RDR, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            Eastern District of Virginia
                            401 Courthouse Square
                            Alexandria, VA  22314-5798
                            Cell: 443-584-6558
                            Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                           **Page**

CONTINUED CROSS-EXAMINATION OF MICHAEL KEVIN              6
WEAVER, M.D.
BY MS. REWARI

CROSS-EXAMINATION OF MICHAEL KEVIN WEAVER, M.D.          33
BY MR. BLANCHARD

REDIRECT EXAMINATION OF MICHAEL KEVIN WEAVER, M.D.       34
BY MS. PEDERSEN

CONTINUED CROSS-EXAMINATION OF B.R.                      39
BY MS. REWARI

CROSS-EXAMINATION OF B.R.                                104
BY MR. BLANCHARD

**EXHIBITS**

**DESCRIPTION**

**After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.**

Defendants' Exhibit 115 admitted                         7

Defendants' Exhibit 163 admitted                         11

Defendants' Exhibit 125 admitted                         22

Defendants' Exhibit 126 admitted                         24

Defendants' Exhibit 50 admitted                          40

Page 251 of Defendants' Exhibit 130 admitted            63

Defendants' Exhibit 132 admitted                         68

Defendants' Exhibit 134 admitted                         85

Defendants' Exhibit 39 admitted                          90

1                                **EXHIBITS**

2       **DESCRIPTION**                                                    **Page**

3

4       Defendants moved Plaintiff's Exhibit 688 and it        93
        was admitted

5       Defendants moved Plaintiff's Exhibit 659 and it        94
        was admitted

6

7

8

9       Defendants moved Plaintiff's Exhibit 660 and it
        was admitted

10                                                              94

11      Defendants moved Plaintiff's Exhibit 662 and it        95
        was admitted

12      Defendants' Exhibit 40 admitted                        99

13      Defendants' Exhibit 315 admitted                       87

14

15

16

17

18

19

20

21

22

23

24

25

**AFTERNOON SESSION, MARCH 28, 2024**

(2:04 p.m.)

THE COURT:  Are we ready to bring the jury in?

MS. REWARI:  Yes.

(Jury in at 2:04 p.m.)

THE COURT:  Let the record reflect that the jury is in.
You may be seated.  Thank you.

I trust y'all had a good lunch.

ALL PARTIES PRESENT:  Yes.

THE COURT:  Very good.  Homestretch for the week.

MS. REWARI:  Thank you.

CONTINUED CROSS-EXAMINATION OF MICHAEL KEVIN WEAVER, M.D.

BY MS. REWARI:

Q.    Dr. Weaver, if you could take a look in your notebook
behind tab Defendants' Exhibit 115.  And can you please tell us
if this is an employment request from B.R.'s mother?

A.    It says "appointment request," but actually it's really a
request for a letter.

Q.    A request for a letter to your office, right?

A.    Yes.

Q.    And what's the date of this request?

A.    It is dated February 16th, 2012.

Q.    Okay.

MS. REWARI:  Your Honor, we move to admit Defendants'
Exhibit 115.

1            MS. PEDERSEN:  No objection.

2            THE COURT:  Without objection.  You may publish.

3            MS. REWARI:  Thank you.

4            (Defendants' Exhibit 115 admitted into the record.)

5    BY MS. REWARI:

6    **Q.**    And so this is a request that came to your office

7    Thursday, February 16th, 2012 at 8:36 p.m., at the top, right?

8    **A.**    That's correct, what it says.

9    **Q.**    Okay.  And if we could focus on the last paragraph there?

10   **A.**    Um-hmm.

11   **Q.**    And in the first sentence, her mom writes, "As per our

12   discussion at B.R.'s last appointment with you, the school has

13   not been able to address the bullying, and we have pulled her

14   out after a recent incident."

15            Did -- the last appointment you had with B.R. was

16   January 16th, 2012, right?

17   **A.**    That's right.

18   **Q.**    Okay.  And that was the appointment that we looked at in

19   Defendants' Exhibit 112.

20            MS. REWARI:  So if we could put -- put that also up on the

21   screen.  Grady, if you could split-screen that.

22   BY MS. REWARI:

23   **Q.**    That was the visit at which Ms. -- B.R. had told you that

24   no one was really bothering at school, right?

25   **A.**    Yes.  Specifically, I think it said that no one had

1   bothered her recently.  I don't know the exact words.  No one

2   was really bothering her at school.

3   **Q.**    Yes.  School was going well, was her report, right?

4   **A.**    Yes.

5   **Q.**    Okay.

6   **A.**    No specific timeline was outlined.

7   **Q.**    Okay.  All right.  So if we go back to Exhibit 115,

8   her -- her mother wrote to you that:  "She's been out for the

9   last five days scared and depressed, not getting out of bed.

10  FCPS district is requesting a letter from you for her absence

11  and in order to get homebound instruction."

12       And so had you spoken to her mother about an interest in

13  homebound instruction prior to getting this note?

14  **A.**    Uh, I don't -- I think this is the first time that we had

15  spoke about that.

16  **Q.**    All right.  And then she writes to you.  "Please include

17  the following:  B.R.'s fragile emotional and mental condition as

18  a result of the trauma/stress of ongoing bullying, sexual

19  harassment, and death threats since November," parentheses,

20  quote, "PTSD-like systems," end quote.

21       And the mom had not described any sexual harassment to

22  you any time before February 16th, 2012, correct?

23  **A.**    No.

24  **Q.**    And neither had B.R., correct?

25  **A.**    No.

1    **Q.**    And neither B.R. nor her mother had described to you any

2    death threats prior to February 16th, 2012, correct?

3    **A.**    Not that I have documented.

4    **Q.**    And you had not diagnosed her with any PTSD prior to

5    February 16th, 2012, correct?

6    **A.**    Correct.

7    **Q.**    And so did you -- you did provide a note as Mrs. R. had

8    requested in this --

9    **A.**    I did.

10    **Q.**    -- message to you, right?

11    **A.**    Yes.

12    **Q.**    And I believe we looked at a note in Plaintiff's

13    Exhibit 161.  A copy of that is also in the same binder.  If you

14    could flip to that.

15    **A.**    Under where?

16    **Q.**    Plaintiff's --

17    **A.**    161.

18    **Q.**    Plaintiff's 161.

19    **A.**    Thank you.

20    **Q.**    Yes.

21    **A.**    Um-hmm.

22         MS. REWARI:  Your Honor, I believe this was

23    what Ms. Pedersen admitted.

24         THE COURT:  It is.

25         MS. REWARI:  May we publish?

1           THE COURT:  You may.

2    BY MS. REWARI:

3    **Q.**     All right.

4           MS. REWARI:  If you could put Plaintiff's Exhibit 161.

5    BY MS. REWARI:

6    **Q.**     And we looked at your note on the second page.  The first

7    page is an e-mail from Mrs. R., and the second page is your

8    note?

9    **A.**     Yes.

10   **Q.**     And -- and so all of the information in this note is --

11   well, let me start that again.

12          This note is dated February 17th, 2012, right?

13   **A.**     It is.

14   **Q.**     So it's the day after the appointment request that we

15   just saw?  I'm sorry, the note from the mother that we just saw?

16   **A.**     Yes, a request for a letter.

17   **Q.**     Right.  And so this is the letter that's requested, and

18   this letter is written by you based on what -- the information

19   provided in that request?

20   **A.**     Yes.

21   **Q.**     And you had not seen B.R. yourself when you write this

22   letter?

23   **A.**     I had not.

24   **Q.**     All right.  Let's take a look at Defendants' Exhibit 163

25   in your binder.  Can you please identify what -- what this is?

1    **A.**    This is from Donna Winston at Rachel Carson Middle

2    School, and it's a quick note from her saying, "Please complete

3    the enclosed forms by FCPS in order for your patient to be

4    eligible for homebound services."

5    **Q.**    Okay.  So this is a faxed request to you from someone at

6    the school, right?

7    **A.**    The social worker.

8    **Q.**    The social worker at the school dated February 22nd,

9    2012?

10   **A.**    Correct.

11         MS. REWARI:  Your Honor, we move to admit Defendants'

12   Exhibit 163.

13         MS. PEDERSEN:  No objection.

14         THE COURT:  Without objection.

15         (Defendants' Exhibit 163 admitted into the record.)

16         THE COURT:  You may publish.

17         MS. REWARI:  Thank you.  And so if we could -- if you

18   could flip to the letter that is the fourth page of 807.

19   BY MS. REWARI:

20   **Q.**    And is this a letter that you asked to have sent to you?

21   **A.**    No.

22   **Q.**    And was this letter sent to you at the -- to your

23   understanding, at the request of Mrs. R.?

24   **A.**    I don't recall offhand.

25   **Q.**    Okay.  But this was from the school social worker asking

1    for you to sign a form in order for your patient, B.R., to be

2    eligible for homebound services?

3    **A.**     Correct.

4    **Q.**     And on the next page, which is a form memo, it looks

5    like --

6    **A.**     Um-hmm.

7    **Q.**     -- to a medical professional?

8    **A.**     Yes.

9    **Q.**     All right.  And the italicized language says, "The form

10   may be signed only by a licensed physician, licensed clinical

11   psychologist, nurse practitioner, or physician's assistant,"

12   correct?

13   **A.**     Yes.

14   **Q.**     And to your knowledge, were you the only licensed

15   physician treating B.R. at this point?

16   **A.**     As far as I knew.

17   **Q.**     Right.  You weren't aware of any licensed clinical

18   psychologist treating her at this point, right?

19   **A.**     I -- if there was, I was not aware of a specific person

20   or name.

21   **Q.**     Okay.  And the form that's attached to this on the next

22   page, in the blank, is what the social worker has filled out for

23   you here?

24   **A.**     The top, yes.

25   **Q.**     Yeah.  Yeah.  And then that's the -- the filled-out form

```
 1    is what we looked at in Defendants' Exhibit --

 2            THE COURT:  Prior exhibit.  In the prior exhibit.

 3            MS. REWARI:  Right.  In Defendants' Exhibit 165.  If we

 4    could -- Your Honor, I believe that has already been admitted.

 5            THE COURT:  It has.

 6            MS. REWARI:  May I publish that?

 7            THE COURT:  Yes.

 8            MS. REWARI:  Okay.

 9    BY MS. REWARI:

10    Q.    All right.  So this is a form then that you signed the

11    next day, right, February 23rd, 2012?

12    A.    Yes.

13    Q.    And before you signed this form, you had not -- again,

14    you had not seen B.R. since January 16th, 2012, right?

15    A.    Correct.

16    Q.    And you had not spoken to anybody other than her mother

17    about her condition -- about "her" condition, meaning B.R.'s

18    condition, since your last visit with her, right?

19    A.    I had not spoken to B██████.  I did speak to the mother

20    twice.

21    Q.    Yeah, and --

22    A.    Or once at least.

23    Q.    And my only question is, you were basing the information

24    here on what her mother was telling you, right?

25    A.    Yes, information that she shared with me.
```

1  **Q.**    Correct.  And you assumed that her mother was being

2  accurate and truthful in what she was telling you?

3  **A.**    Yes, indeed.

4  **Q.**    Okay.  And you didn't speak to anybody at the school

5  about what was happening at the school before writing this note,

6  right?

7  **A.**    No, I did not.

8  **Q.**    Okay.  Were you ever asked to provide the school a

9  release to exchange information?

10 **A.**    Not that I recall any form coming in about that.

11 **Q.**    Right.  Did the parents ever -- did B.R.'s parents ever

12 ask you to execute a release that would allow to you exchange

13 information with the school?

14 **A.**    Not that I recall.

15 **Q.**    Okay.  And you didn't speak to anyone in her family other

16 than her mother, right, before -- before writing this note?

17 **A.**    That's correct.

18 **Q.**    And when you completed this note, you didn't have any

19 understanding of the incident that had prompted the family to

20 pull her out of school other than it was just labeled bullying,

21 right?

22 **A.**    Well, it was -- her mother shared information that the

23 bullying was back again and that she was being sexually harassed

24 and receiving death threats, which was new information which

25 concerned me.

1    **Q.**    Okay.  And so that's why you --

2    **A.**    Yes.

3    **Q.**    -- completed this note?

4         And then when you wrote in this note --

5         MS. REWARI:  If we could put that back up.

6    BY MS. REWARI:

7    **Q.**    The medical condition at this point that you're

8    describing there is -- or relating there is depression with

9    anxiety, right?

10   **A.**    That's correct.

11   **Q.**    And you didn't recommend any kind of limitation on her

12   physical activity at this point, right?

13   **A.**    That's right.  I thought that the exercise would be

14   actually healthy for her.

15   **Q.**    And you -- you never recommended any kind of limitations

16   on her physical activity?

17   **A.**    On physical activity, no.

18   **Q.**    And I believe that Ms. Pedersen asked you about your

19   March 6th, 2012 visit with B.R., and that was in the office,

20   right?

21   **A.**    It was.

22   **Q.**    And you then examined her in person yourself?

23   **A.**    I did not -- I'm not sure I did really as much of a

24   physical exam.  I think it was more evaluating her mental

25   status.

1    **Q.**    Okay.  If you could take a look behind tab Defendants'

2    Exhibit 117.

3    **A.**    I'm sorry, you're right.  I -- this is the one about the

4    hip and the scalp, yes.  So I did an examination of the hip and

5    the skin.

6    **Q.**    Right.  And the reason that was -- the visit was

7    requested from you was for left hip pain?

8    **A.**    One of three.

9    **Q.**    Yeah.

10   **A.**    Oftentimes people will call in with one, and they bring

11   in many problems.

12   **Q.**    Okay.  And during this visit -- you said one of three --

13   there were three things that were reported to you?

14   **A.**    Correct.

15   **Q.**    Correct?  One of the things was the diffuse pruritus on

16   her scalp that you talked about?

17   **A.**    Correct.  Yes.

18   **Q.**    And so you examined her head during this visit?

19   **A.**    Yes.

20   **Q.**    And then the second thing that she reported to you at

21   this visit was left hip pain since November 2011?

22   **A.**    Yes.

23   **Q.**    But you hadn't seen her for any left hip pain in any of

24   the prior visits, right?

25   **A.**    From November until then, no.

1   **Q.**     Right.  So she had never reported to you that she

2   actually had left hip pain during any of your prior visits with

3   her?

4   **A.**     Not until this note.

5   **Q.**     Okay.  And then you didn't find during this examination

6   any cause for the left hip pain?

7   **A.**     Well, I found muscular.  She was tender with me palpating

8   her muscles in the front of the hip and the side.  In addition,

9   when I put it through a range of motion, seemed to reproduce it

10  and not with standing or walking.

11  **Q.**     Okay.  And when you say she was tender, she was reporting

12  pain, right?

13  **A.**     When palpating, feeling the area, she's reporting pain.

14  **Q.**     Okay.  And you then recommended or you sent her out for

15  x-rays?

16  **A.**     I did.

17  **Q.**     For the hip, right.

18          And ultimately, the x-ray did not find anything?

19  **A.**     Perfectly normal.

20  **Q.**     Okay.  And the third thing that she reported to you at

21  this visit is that she had been raped?

22  **A.**     That's right.

23  **Q.**     In November 2011, right?

24  **A.**     That's right.

25  **Q.**     And she told you that she had never been sexually active

1    until this incident of a rape?

2    **A.**     Correct.

3    **Q.**     And what she reported to you on March 6th was a single

4    incident of rape that had occurred in November 2011, right?

5    **A.**     Never mentioned anything other than that particular

6    incident in November.

7    **Q.**     Okay.  And when you examined her scalp, you looked for

8    bruises and bumps, right?

9    **A.**     Yes.

10   **Q.**     And you didn't find any signs of any bruises or bumps on

11   her head?

12   **A.**     I did not.

13   **Q.**     Okay.  And you asked to write a letter to the school the

14   next day -- or you did send a letter to the school the next day,

15   right?

16   **A.**     Yes, I did.

17   **Q.**     Okay.  And Ms. Pedersen asked you a little bit about

18   that, but what I want to clarify, is that letter was based on

19   the information that B.R. and her mother gave you in the March

20   6th appointment, right?

21   **A.**     Yes.

22   **Q.**     About the incident that had happened in November?

23   **A.**     Correct.

24   **Q.**     And they gave you a description of that incident, right?

25   **A.**     Yes.

1   **Q.**     And it was your understanding that B.R. had been sexually

2   assaulted, raped by a boy in the presence of his friends, right?

3   **A.**     Yes.

4   **Q.**     And it was your understanding from what they described

5   that they were surrounding her and shielding her -- blocking the

6   view of other people during this incident, right?

7          MS. PEDERSEN:  Objection.

8          THE COURT:  Objection.  What's your response to lack of

9   foundation, hearsay, among other things?

10          MS. REWARI:  Well, this is information being provided for

11   the purposes of medical treatment, which is a hearsay exception.

12   This is a party admission.

13          THE COURT:  But now you're talking about things that have

14   absolutely nothing to do with the incident.  You're making

15   references to other things.  You can talk about the incident, but

16   you can't talk about the specifics of the incident unless the

17   doctor was there, and obviously he was not.

18          MS. REWARI:  His letter is based on this information.

19          THE COURT:  Okay.  Now, I want you to recall that you had

20   a problem with the letter earlier.

21          MS. REWARI:  Right.

22          THE COURT:  And you opened the door for a whole lot of

23   discussion of this letter.

24          MS. REWARI:  Well, she was -- she was -- the testimony on

25   direct was a letter was sent to the school based on the report.

1          MS. PEDERSEN:  Your Honor, can we go to the sidebar for

2   this?

3          THE COURT:  No, no, it's resolved.  The objection's

4   sustained.

5          MS. REWARI:  Okay.  All right.

6   BY MS. REWARI:

7   Q.     The next time that you saw B.R. was on March 15th, 2012,

8   correct?

9   A.     Yes.

10  Q.     And this was -- this was a follow-up to the visit on

11  March 6th, right?

12  A.     It was.

13  Q.     And during this visit, there was no report of left hip

14  pain, right?

15  A.     No, that was not discussed on this visit.

16  Q.     Okay.  And there was a new complaint of chest pain,

17  right?

18  A.     Yes.

19  Q.     And that was pretty unusual to have a 12-year-old patient

20  with chest pain, right?

21  A.     Um, I'm not sure about unusual.  Certainly it's unusual

22  to have a young person have chest pain that's not related to

23  some type of excess exercise or trauma or vigorous coughing that

24  causes injuries.

25         Yes, it would be unusual except for under those

```
 1   circumstances.

 2   Q.    Okay.  And you were asked to send another letter to the

 3   school after this visit, right?

 4   A.    I was.

 5   Q.    Okay.  And you did do that?

 6   A.    I did.

 7   Q.    At this point, do you have an understanding whether there

 8   was any licensed psychologist or licensed physician treating

 9   B.R.?

10   A.    No.  I was not aware that there was, and it was something

11   that was on my mind that I talked with the parents about, the

12   absolute necessity, and they assured me that they were going to

13   be seen within a week.

14   Q.    Okay.  And you, yourself, were waiting for the

15   psychiatrist or the psychologist to actually make a diagnosis as

16   to whether there was PTSD, right?

17   A.    Yes.  It was -- that was what I was starting to -- really

18   starting to think about in formulating that I thought that most

19   of what this was about, but since I had very limited experience

20   in terms of making that diagnosis, I really wanted the

21   psychiatrist's opinion.

22   Q.    Okay.  And then after March 15th, 2012, you were not her

23   primary source of mental health treatment, right?

24   A.    I was not -- I was not actively managing her medicines

25   after that because she was being seen at the Kellar Center.
```

1    **Q.**    Okay.

2    **A.**    And the doctors there were changing her medicines, yes.

3    So, for a period of time I was not, and then I resumed again.

4    **Q.**    Okay.  And when you -- you gave her medication -- when

5    you say resumed again, you're talking about you gave her --

6    **A.**    Refills on her sertraline.

7    **Q.**    Okay.  But you weren't providing her therapy, right?

8    **A.**    No, I was not.

9    **Q.**    Okay.

10   **A.**    It's not part of my practice.

11   **Q.**    Now, you saw her in -- for a routine physical again on

12   March -- in March 2013, right, about a year later?

13   **A.**    Yes.

14   **Q.**    And if you could go to Defendants' Exhibit 125.

15        Is this your record of that visit with her?

16   **A.**    Yes.

17        MS. REWARI:  Okay.  Your Honor, we move to admit

18   Defendants' Exhibit 125.

19        MS. PEDERSEN:  No objection, Your Honor.

20        THE COURT:  Without objection you may publish.

21        MS. REWARI:  Thank you.

22        (Defendants' Exhibit 125 admitted into the record.)

23        MS. REWARI:  Thank you.

24   BY MS. REWARI:

25   **Q.**    If we could focus first on the reason for the visit.

1    **A.**     Routine physical exam.

2    **Q.**     Okay.  And what did she report to you in this visit?

3    **A.**     That she was feeling well, didn't have any specific

4    complaints.  She had recently returned to school, going to a

5    boarding school.  She was enjoying it so far.  Seeing a

6    therapist twice a week, which she thought was being really

7    helpful for her.  Feels that the therapist -- she and the

8    therapist both agreed that she could possibly get off the

9    sertraline.  Her mood was -- she was feeling upbeat, happy, her

10   anxiety level was quite low, and felt like she was settling into

11   her new school.

12   **Q.**     And she was playing tennis regularly?

13   **A.**     Yes.

14   **Q.**     And were you consulted by her family about whether it was

15   a good idea for her to go to -- away to boarding school?

16   **A.**     Not specifically about boarding school.  You know, as I

17   think I put in my note from -- was it March of 2012, I thought

18   it was a good idea that she change to a new school.  I didn't

19   say specifically "boarding" but a new school different from her

20   one where everything -- the bullying and the rape had happened.

21   **Q.**     And a new school could have been a different Fairfax

22   County public school in your mind, right?

23   **A.**     Yes.

24   **Q.**     All right.  The next time that you saw B.R. in your

25   office -- by the way, did you know where the boarding school

```
 1   was, which state?
 2   A.    I'm pretty sure at this time that she -- B███ and her
 3   mother were living in New York.
 4   Q.    Okay.  So if you could go to Defendants' Exhibit 126 in
 5   your binder.
 6   A.    Yes.
 7   Q.    And was this the next visit that you had with B.R. in
 8   your practice?
 9   A.    It was.
10   Q.    Was this also the last visit that you had with her?
11   A.    It is.
12   Q.    The okay.  And what's the date of that visit?
13   A.    September 6th, 2014.
14   Q.    Okay.
15         MS. REWARI:  We move to admit Defendants' Exhibit 126.
16         MS. PEDERSEN:  No objection, Your Honor.
17         THE COURT:  Without objection.
18         (Defendants' Exhibit 126 admitted into the record.)
19         THE COURT:  You may publish.
20         MS. REWARI:  Thank you.
21   BY MS. REWARI:
22   Q.    And in this -- what was the reason for this visit?
23   A.    A follow-up on her depression and PTSD.
24   Q.    Okay.  And just to be clear, you never reached a
25   conclusion that she had PTSD, right?
```

1    **A.**    This was passed on, I think, by B█████.

2    **Q.**    Okay.

3    **A.**    So I assumed that this was a term that was being used by

4    her therapist.

5    **Q.**    Okay.  All right.

6    **A.**    So, no, I never officially diagnosed that.

7    **Q.**    Right.  You, in fact, thought -- the reason you never

8    reached the diagnosis is that you thought she improved, right?

9    **A.**    I thought she improved, but it was also -- I mean, I

10    thought she was trending more towards PTSD and away from

11    depression based on a number of things, the cyclical really good

12    periods.  People who have depression usually have depression,

13    low mood, and that drags on most -- most days, week after week,

14    as opposed to better periods of time when they're happy, and

15    then all of a sudden something triggers, and they go back down

16    and getting anxious again.

17         So, again, I was suspecting PTSD, but since I didn't have

18    a lot of experience in terms of making the diagnosis, I didn't

19    want to do that until a psychiatrist was involved.

20    **Q.**    And you also --

21         THE COURT:  Doctor, if I could get to you back up the mic

22    just a little bit.

23         THE WITNESS:  I'm sorry.

24         THE COURT:  You have a good, deep, resonant voice, so we

25    get a little feedback.  So if you'd just --

1          THE WITNESS:  It will be easier on my back also.

2          THE COURT:  Yes, sir.

3     BY MS. REWARI:

4     Q.    And your suspicion of PTSD was also based on the fact

5     that a really traumatic incident was reported to you, right?

6     A.    Absolutely.  Most PTSDs are a result of some type of

7     traumatic stress.

8     Q.    Okay.  And in this visit on September 6th, 2013, how was

9     she doing?

10    A.    She was doing very well, actually.

11    Q.    And what did you observe -- what did she report to you?

12    A.    That she was feeling much better.  She was seeing

13    Dr. Saylor intermittently.  Attending school full-time in New

14    York.  Just began the 9th grade.  Doing well academically in

15    school, trying to develop new relationships at her new school

16    and intentionally was dropping some weight, sleeping well,

17    energy level was good, mood was positive and happy.  Denied any

18    depressive symptoms.  And then documented that they were living

19    full-time in New York.

20    Q.    Okay.  And she had dropped -- she had stopped taking the

21    antidepressant medication as discussed in the March 2013 record?

22    A.    Yes.  That's when we discussed tapering her off of the

23    medicine.

24    Q.    Okay.  And you didn't find any areas of concern during

25    your last visit with her, right?

 1   **A.**    Yes.  Everything seemed to be doing very well at that

 2   point in time.

 3   **Q.**    And she was only seeing Dr. Saylor intermittently at this

 4   point?

 5   **A.**    Yes.  That's what I have documented.

 6   **Q.**    Okay.  Now, one -- during your training for -- to become

 7   a doctor, you had focused -- you took a particular interest in

 8   sports medicine, right?

 9   **A.**    Yes, I did.

10   **Q.**    And in your course of education and training, you

11   received instruction on how to spot the signs of a concussion?

12   **A.**    Yes.

13   **Q.**    And in your practice at Herndon Family Medicine, you had

14   occasion to treat many patients for -- for concussions, right?

15   **A.**    Yes.

16   **Q.**    And you also were a team doctor for your children's

17   sports teams for a number of years?

18   **A.**    Not my children's sports teams.  It was high schools that

19   were in the area that I was team doctor for three different high

20   schools.

21   **Q.**    Okay.  Thank you for that clarification.

22        And you had 24 years' experience serving as a sports team

23   doctor?

24   **A.**    Yes.

25   **Q.**    Okay.  And so during the time period from October 2011 to

```
 1    February 2012, you never treated B.R. for a suspected

 2    concussion, correct?

 3    A.    No.

 4    Q.    And you didn't treat her for a suspected concussion after

 5    February 2012, right?

 6    A.    No.

 7    Q.    And just for everyone's edification, is -- what is a

 8    concussion?

 9    A.    A concussion is an injury to the brain.  Structurally,

10    you cannot see anything abnormal; there's no bleeding.  CAT

11    scans, MRIs will not show any abnormalities.  EEGs look

12    absolutely normal.

13          But the problem is it is a injury that is result of

14    sudden acceleration and then deceleration.

15          So let's just take an automobile, car.  Our brain floats

16    on fluid inside of bone, spherical bone, and so it's floating on

17    the fluid.  And it's -- you're accelerating in a car going

18    70 miles an hour, and all of a sudden you stop because you hit

19    another car or something, your body and brain keep on moving

20    forward.  And when it stops suddenly, it smashes into the front

21    bone in the skull here.  And then after it hits there, it

22    rebounds, and it goes the other way.

23          So you will have a bruising injury here (indicating) and

24    here (indicating) in those parts of the brain.  And, also, the

25    structures, all the various axons and dendrites, which connect
```

1    the various nerve cells together, gets stretched.

2         You can't see it, but that's actually what's going on.

3    It's a -- it's a structure -- it's an injury to those individual

4    nerves because of that sudden acceleration, deceleration where

5    the brain just goes and bounces back and forth.

6         THE COURT:  When that happens, does the fluid in the brain

7    displace temporarily causing it to go bone on bone or bone

8    against another structure?

9         THE WITNESS:  The fluid will flow out to other areas

10   between the brain and the skull, so that the brain actually bangs

11   into the bone.

12   BY MS. REWARI:

13   Q.    And -- and then symptoms of a concussion will be seen

14   acutely, right?

15   A.    Yes.

16   Q.    Okay.  So there will be -- and what do the symptoms of a

17   concussion look like?

18   A.    Headache, fatigue, disorientation, feeling lethargic,

19   nausea, vomiting.  It probably depends upon the severity of the

20   concussion, too; problems with memory.

21   Q.    Right.  And so when a patient comes in, and you do a

22   concussion check, what does that check look like?

23   A.    Well, I usually do a good neurological examination, which

24   checking out all the cranial nerves in addition to checking out

25   movement and strength, arms and legs, coordination.  I have them

1    put up -- I have them put up their finger, and then I have them

2    touch my finger and then back to their nose, and I'm moving my

3    finger and watching what they do.  Looks at correlation,

4    balance, standing up.  Closing their eyes, see how their balance

5    is doing.

6         If there's an injury towards the back of the brain, the

7    cerebellum, that will be abnormal.  So I'm checking out all the

8    various nerves to make sure we don't see any kind of focal

9    abnormality.

10        People who have concussions but don't have any other kind

11   of injury to the brain, their physical exam is usually going to

12   be normal from that -- well, their balance may not be great.

13   That, oftentimes, can be off.

14        So the biggest find -- the biggest thing that we tend to

15   find with people who have concussions is more in terms of mental

16   memory in regards to what happened.  And it's often -- is

17   typically the recent memory, not past memory.  And so we'll do

18   evaluations for that.

19   **Q.**   Did you --

20   **A.**   I'm sorry.

21   **Q.**   I'm sorry, go ahead.

22   **A.**   No.  I said do you want me to talk a little bit more

23   about that?

24   **Q.**   Well --

25        THE COURT:  I think we're good.

1      MS. REWARI:  Yeah.  I appreciate that.

2      THE WITNESS:  That's why I stopped.  I don't want to go

3  more than anybody needs.

4      MS. REWARI:  No, it's been very educational.

5  BY MS. REWARI:

6  **Q.**    You never observed during your treatment of B.R. any

7  problems with her memory, did you?

8  **A.**    No.  There were times when she wasn't focusing well,

9  which -- which I initially attributed to depression, but

10  probably a little bit later, you know, was thinking more about

11  PTSD and not -- and not sleeping well.

12  **Q.**    Okay.  Now, the School Board asked for your deposition

13  last summer.  Do you remember that?

14  **A.**    Yes.

15  **Q.**    And before your testimony, B.R.'s mother tried to reach

16  out to you?

17  **A.**    She did.

18  **Q.**    And you had not heard from B.R. or her mother since you

19  stopped treating B.R., right?

20  **A.**    That's right.

21  **Q.**    And then her mother tried to contact you?

22  **A.**    She sent an e-mail, I believe it was, and it was

23  forwarded to me.

24  **Q.**    Yeah, it was sent to your sister?

25  **A.**    That's right.

1    **Q.**    And the e-mail told you things that you did not know

2    about B.R., right?

3    **A.**    I think it shared, you know, that -- that a lawsuit had

4    been brought, and it gave me just the basic about the lawsuit.

5    And then she included, I think, was some news reports, whatever,

6    that were on the bottom that I could click, which I --

7            THE COURT:  Thank you.

8            THE WITNESS:  -- declined to do.

9            THE COURT:  Thank you.

10   BY MS. REWARI:

11   **Q.**    Okay.  And -- but she told you in that e-mail that her

12   daughter had been raped multiple times, right?

13   **A.**    If you -- I don't remember all the details.  As I said, I

14   quickly just glanced over it because I didn't want to be

15   prejudiced by reading --

16   **Q.**    Okay.

17   **A.**    -- [too] much material.

18   **Q.**    And she sent you some information about what B.R. was

19   alleging in this lawsuit in that e-mail, right?

20   **A.**    Perhaps so.  I -- as I said, I glanced over it quickly

21   and -- but did not spend any time really looking at it in

22   detail.

23   **Q.**    Right.  Because you didn't want to be -- you didn't want

24   your testimony --

25   **A.**    I was -- I was trying to be unprejudiced.

1  Q.    Thank you.  I appreciate that.  And thank you for coming

2  to testify.

3        THE COURT:  Mr. Kinney.

4        MR. KINNEY:  No questions.

5        THE COURT:  Mr. Blanchard.

6        MR. BLANCHARD:  Thank you, Your Honor.

7        CROSS-EXAMINATION OF MICHAEL KEVIN WEAVER, M.D.

8  BY MR. BLANCHARD:

9  Q.    Good afternoon, Doctor.

10 A.    Good afternoon.

11 Q.    My name is Bruce Blanchard, and I represent the Defendant

12 J.O. in this case.

13       I just -- I think I just have one question for you.  You

14 never received any complaint from B.R. or her mother that she

15 had been sexually assaulted by a female, did you?

16 A.    By a female?

17 Q.    Correct.

18 A.    No.

19 Q.    And not by a female student?

20 A.    No.

21       MR. BLANCHARD:  That's all I have, Your Honor.

22       THE COURT:  Redirect.

23       MS. PEDERSEN:  Could we put up Defendants' Exhibit 87.  I

24 believe this is already admitted into evidence.

25       THE COURT:  87?

 1          MS. PEDERSEN:  87.

 2          THE COURT:  Yes.

 3          REDIRECT EXAMINATION OF MICHAEL KEVIN WEAVER, M.D.

 4    BY MS. PEDERSEN:

 5    Q.    So Ms. -- Ms. Rewari spent a little bit of time talking

 6    about the reports of sexual harassment?

 7    A.    Yes.

 8    Q.    And she -- she had said you -- you hadn't mentioned

 9    sexual harassment until later in February.

10    A.    And you're right.  This -- this actually is sexual

11    harassment.

12    Q.    Can you point --

13    A.    Specifically the last line.  It says on here --

14          THE COURT:  The doctor -- when the doctor said that this

15    is sexual harassment, this is what he focused on as part of it,

16    he does not get to make the determination as to whether or not

17    something is sexual harassment or not; that is up to you as a

18    jury.

19          THE WITNESS:  I'll rephrase.

20          THE COURT:  Yes, and thank you.

21          THE WITNESS:  It says here, "Admits to students who are

22    bullying her, spreading false gossip of B███ being loose and

23    promiscuous, and that this was placed on Facebook.  B███ feeling

24    embarrassed, ashamed, and angry."

25          In my reading and understanding of sexual harassment and

```
 1   bullying, this would be part of that.

 2        Part of bullying is not just physically dominating

 3   somebody, hitting them, or pushing them, but it's also verbally

 4   tormenting them and psychologically hurting them.  And that's why

 5   doing this -- you know, this is -- this is the current way that a

 6   lot of bullying happens is on social media.

 7        MS. PEDERSEN:  Thank you.

 8        THE COURT:  Thank you.

 9   BY MS. PEDERSEN:

10   Q.   At another point in your examination, Ms. Rewari asked

11   you about some of your professional reporting duties and how you

12   had made certain reports related to your professional duties

13   about B.R.?

14   A.   Yes.

15   Q.   Were any of those reports about abuse happening within

16   the home?

17   A.   No.

18   Q.   What was the report of the abuse?

19   A.   The report that I submitted?  It was in regards to rape.

20        MS. PEDERSEN:  Thank you, Dr. Weaver.

21        THE COURT:  Is the doctor subject to recall?

22        MS. REWARI:  We're happy to release him.

23        THE COURT:  Okay.

24        MS. PEDERSEN:  We're good.

25        THE COURT:  Okay.  Thank you, Doctor.  You may step down.
```

```
 1          While the case is pending, please do not discuss the case
 2   or any aspects of the case with anyone.  Thank you, sir.
 3          THE WITNESS:  Thank you.
 4          THE COURT:  Enjoy your retirement.
 5          MR. BRENNER:  Could we have a three-minute sidebar before
 6   we start, or maybe five seconds?
 7          THE COURT:  Sure.
 8          (Following sidebar discussion had on the record:)
 9          MR. BRENNER:  And so I'm trying to cut this off at the
10   pass, but during the examination, you'll recall this letter.
11          THE COURT:  The cross-examination.
12          MR. BRENNER:  The cross-examination.  You'll recall this
13   letter, Judge.
14          THE COURT:  Just a sec.
15          MR. BRENNER:  For the record, it's DX 119.  It was the
16   March 6th -- excuse me, March 7th letter from Dr. Weaver to the
17   school.  It was discussed on direct, Your Honor, and you said
18   it's not coming in, and then Ms. Rewari covered it.  She did not
19   put it in, but all of a sudden she just started reading things
20   that are in this letter even.  She said -- she says, Your Honor,
21   "Looking at your letter," she said, "Didn't she say that there
22   were boys surrounding her and forming a circle around her while
23   she's being assaulted?"
24          And I don't know --
25          THE COURT:  Well, the concern that you're raising is the
```

1    same one that I had because I actually wrote myself a note.  On

2    the transcript at 148, line 1, there were questions regarding

3    PTSD; at 204 lines 12 through 14, there were questions regarding

4    PTSD with reference to specific letters; and at line [sic] 208,

5    lines 18 through 20, there were specific references to PTSD; and

6    at line 11, page 159, there were specific questions and

7    discussions of rape.

8         And so, you brought these things up.  Why can't they get

9    the letter in now?

10         MS. REWARI:  So, to address his point, that's from his

11    deposition.  That's what he said in his deposition, page 237 to

12    239.  But he explained that when he wrote this letter, that was

13    the understanding he was given about how this incident happened.

14    So that's what I was reading from.  I wasn't reading from the

15    note.  I was reading from this.

16         With respect to this document, the -- I believe the

17    part -- we don't object to the letter coming in.  What we object

18    to is the redaction of one of the lines.

19         MR. BRENNER:  My point -- I believe they have opened the

20    door to PTSD in a lot of ways, but we'll address that separately.

21         But Ms. Rewari didn't -- she could have asked him

22    questions about what he said, but she stood in front of the jury

23    and said, "I have this letter" and started reading like it's

24    coming from the letter, which we can't do as lawyers.  We can't

25    insinuate to the jury we have the evidence in front of us.

```
 1          If she says he said it in deposition -- look, the
 2   transcript is going to say what it's going to say.  I was alarmed
 3   when it happened.  I don't want it to happen again.  If a lawyer
 4   has a letter -- if a lawyer references an exhibit and says,
 5   "Doctor, I have your letter in front of me, and isn't it true you
 6   said this," and I'm not referring to the letter, we can't do
 7   that.  As lawyers we don't have the foundation to ask that
 8   question.
 9          THE COURT:  Going forward, I think it's best -- and a
10   couple of times because of accident and the excitement of asking
11   the questions --
12          MR. BRENNER:  Sure.
13          THE COURT:  -- people forget to give the witness a
14   reference.  And that's why I say reference the witness.
15          MR. BRENNER:  Yes.
16          THE COURT:  I think that's helpful, and I think if we use
17   that standard or protocol as we go forward, we probably will be
18   in a better position because, for purposes of the record being
19   straight, what the letter says and what you referenced in the
20   deposition do coincide; so it may have been misleading to the
21   jury to think that you were actually reading from the letter.
22   I'm not saying that you were.  If you say you were reading from
23   the deposition, that's fine.  I accept that representation.  But
24   let's do as best we can to provide a reference as to what we're
25   talking about.
```

```
1         MS. REWARI:  Sure.  I was trying to not read from the
2    letter.  I was trying to get his understanding because I believe
3    that what Ms. Pedersen asked was, "Did you send the letter," you
4    know, and I was trying to say this is the information that he was
5    trying to report based on his understanding.
6         THE COURT:  I think we all understand what we need to do
7    going forward.
8         MS. REWARI:  Okay.
9         THE COURT:  Thank you.
10        MR. BRENNER:  Thank you.
11        (Sidebar discussion concluded.)
12        THE COURT:  Ladies and gentlemen, as you heard me indicate
13   earlier in the day, we're sort of taking people out of turn to
14   basically accommodate witnesses who may need to go.  What we're
15   now doing is we are recommencing the examination of B.R.
16        MS. REWARI:  Court's indulgence for a moment, Your Honor.
17        THE COURT:  Yes, ma'am.
18             CONTINUED CROSS-EXAMINATION OF B.R.
19   BY MS. REWARI:
20   Q.   Good afternoon.
21   A.   Good afternoon.
22   Q.   Ms. R., yesterday we were talking about your work
23   history.
24   A.   Um-hmm.
25   Q.   And I believe that with Mr. Brenner you talked about
```

1    working at Sidley Austin?

2    **A.**    Yes, ma'am.

3    **Q.**    That's an international law firm, right?

4    **A.**    Yes, it is.

5    **Q.**    Okay.  And if you look at Defendants' Exhibit 50 in your

6    tab, black notebook?

7    **A.**    Okay.

8    **Q.**    Okay.  And is this the résumé that you provided Sidley

9    Austin?

10   **A.**    Um, I think so.

11   **Q.**    Okay.  And did you apply for that job in 2021?

12   **A.**    I believe I did after I graduated from college, yes.

13   **Q.**    Okay.

14        MS. REWARI:  And, Your Honor, we move to admit Defendants'

15   Exhibit 50.

16        MR. BRENNER:  No objection.

17        THE COURT:  Without objection.

18        (Defendants' Exhibit 50 admitted into the record.)

19   BY MS. REWARI:

20   **Q.**    Okay.  And to your knowledge, is everything on this

21   résumé correct?

22   **A.**    Um, to my knowledge.

23        MS. REWARI:  May we publish?

24        THE COURT:  You may.

25        MS. REWARI:  Thank you.

```
 1    BY MS. REWARI:

 2    Q.    Sorry.

 3    A.    I'm sorry.  What was that again?

 4    Q.    To your knowledge, is everything on this résumé correct?

 5    A.    Just by a simple scan, yes, it looks --

 6    Q.    Is this a résumé you prepared?

 7    A.    Yes.

 8    Q.    Okay.  And down at the bottom under "Distinctions and

 9    Skills" --

10    A.    Uh-huh.

11    Q.    -- where it says, "Ranked tennis player by USTA 2015"?

12    A.    Uh-huh.

13    Q.    Is that U.S. Tennis Association?

14    A.    Something like that, yep.

15    Q.    All right.  So, I want to switch gears here for a moment.

16    Mr. Brenner also asked you about some of your medical history --

17    A.    Um-hmm.

18    Q.    -- your -- the therapists you've seen and the treaters

19    you've seen.

20          One of the places that he asked you about was Holy Name

21    hospital?

22    A.    That's correct, ma'am.

23    Q.    All right.  And you talked about an episode that you said

24    they thought might have been a seizure?

25    A.    Something like that, yes.
```

1    **Q.**    Right.  It turned out it was a severe urinary tract

2    infection, right?

3    **A.**    That's not my understanding.

4    **Q.**    Okay.

5         MS. REWARI:  If I can hand this up.

6         THE WITNESS:  Thank you.

7         MR. BRENNER:  Thank you.

8         THE WITNESS:  Okay.

9    BY MS. REWARI:

10   **Q.**    Are these some of your treatment records from Holy Name

11   Medical Center?

12   **A.**    I'm only on the front page, but it says Holy Name Medical

13   Center on the top.

14   **Q.**    Okay.  And you were seen there on March 2017 for

15   bronchopneumonia?

16   **A.**    That's what it says.

17   **Q.**    Okay.  And then on the next page you were seen there in

18   July 2017 for a viral syndrome?

19   **A.**    I --

20   **Q.**    We're looking at the next page.

21   **A.**    I -- oh, okay.  Sorry.

22        That's what it says.  But also it says multiple medical

23   complaints.

24   **Q.**    Right.  But the provisional diagnosis there is "viral

25   syndrome," right?

1    **A.**    I recall when I went to Holy Name I went for a variety of

2    reasons, so . . .

3    **Q.**    Okay.  And then the next provisional -- on the next

4    record --

5    **A.**    So you want me to flip to the next page.  Is that --

6    **Q.**    Yeah --

7    **A.**    I'm sorry.

8    **Q.**    -- flip to the next page.  October 30th, 2017, the

9    provisional diagnosis is "dysuria, urinary frequency, and

10   vaginal discharge"?

11   **A.**    Okay.

12   **Q.**    And the chief complaint is "urinary bladder trouble,"

13   right?

14   **A.**    Um, that's not what I recall exactly coming in for.  What

15   I recall -- and I don't know if you want me to elaborate on it,

16   but it was for my pelvic pain as well that I was having.

17   **Q.**    Well, you then saw a urologist, right?

18   **A.**    Yes -- I think so.  I don't know the exact timeline of

19   it, but --

20   **Q.**    Right.  But Daniel Lowe is listed there.  That was the

21   urologist you saw?

22   **A.**    I don't have a vivid recollection of that, but if that's

23   what the records say, that's what the records say.

24   **Q.**    I'm sorry.  I'm looking at the next record on November

25   3rd, 2017.

1  **A.**    You said November?  I'm sorry.

2  **Q.**    Yes.  One we were just looking at was --

3  **A.**    Okay.

4  **Q.**    -- October 30th, and then on November 3rd you have a

5  private physician, Daniel Lowe, listed there?

6  **A.**    I don't know what that -- I see it on here.

7  **Q.**    And he was a urologist, right?

8  **A.**    I think so.  I don't really have a vivid recollection.  I

9  trust what you say, but I just don't have a vivid recollection

10  of it.

11  **Q.**    Okay.  And then behind that record on November 3rd, 2017,

12  there was a CT of your abdomen and pelvis with contrast, right?

13  **A.**    Yes.  I was having severe pelvic pain.

14  **Q.**    Right.  And the history there is listed as "Severe UTI,"

15  right?

16  **A.**    Yes, and then it says, "Pelvic pain."

17  **Q.**    Okay.  And then the next time you're seen at Holy Name,

18  at least according to this set of records, is February 6th,

19  2018?

20  **A.**    Yes.

21  **Q.**    And the chief complaint then is vomiting?

22  **A.**    That's what it says on here.

23  **Q.**    Yeah, and the provisional diagnosis is "vomiting,

24  diarrhea, abdominal pain"?

25  **A.**    That's what it says on here.

1    **Q.**    Okay.  And then after that, May 15, 2019, and then the

2    provisional diagnosis is "Headache and anxiety"?

3    **A.**    That's what it says here.

4    **Q.**    Okay.

5    **A.**    Should I put this aside or --

6    **Q.**    Yes.

7    **A.**    Thank you.

8    **Q.**    Severe UTI is a bacterial infection, right?

9    **A.**    I'm not a doctor, but you take antibiotics.

10    **Q.**    One of the treaters that you talked to Mr. Brenner about

11    was Dr. Saylor?

12    **A.**    Yes.

13    **Q.**    And he was someone you started seeing here in Virginia?

14    **A.**    That's correct, yes.

15    **Q.**    And he was in Herndon, right?

16    **A.**    That's correct.

17    **Q.**    And then you continued to see him until when?

18    **A.**    I think 2014 or 2015, something like that.

19    **Q.**    Okay.  And you continued to see him even when you were

20    living in New York, right?

21    **A.**    That's correct, yes.

22    **Q.**    And you would travel here from time to time -- when I say

23    "here," you traveled to Virginia from time to time to see him in

24    person?

25    **A.**    That's -- that's correct.

1    **Q.**    Okay.  And you told him in 2014 that you had been raped

2    by a friend in 2013, right?

3        MR. BRENNER:  Your Honor, objection.  May we approach?

4        (Following sidebar discussion had:)

5        THE COURT:  Before we get started, why don't you read the

6    last question into the record.

7        (Court reporter read back as requested.)

8        MR. BRENNER:  Yes.  This is from Dr. Saylor's records, so

9    I'm trying to set the boundaries at the beginning so we don't --

10   so we understand what the real issue is.

11       So this is -- I believe what she's provided -- Ms. Rewari

12   provided this in the exhibits.  There's a handwritten document --

13   it seems to be a handwritten -- we call it a letter, but that's

14   probably a little strong, but a handwritten document from B.R. to

15   her doctor where she goes through a lot of things, including

16   stuff relating to this a case and other stuff.

17       In there is a description of an incident which also shows

18   up in the doctor's records.  So the doctor has this note

19   differently than how she has it in her notes.  But in her notes,

20   which I understand counsel intends to use, in the letter she

21   describes a -- she describes an assault by another boy.  So it's

22   when I think she's 14 or 15.  Don't hold me to the age, 14 or 15.

23       This came up in the motion in limine hearing.

24       THE COURT:  It did?

25       MR. BRENNER:  The motion in limine hearing.  The issue was

```
 1   that -- we actually filed the motion in limine, but it's about a

 2   medical report that {indiscernible} it.  And Your Honor said the

 3   medical record could come in.

 4        And just so you know, and so Your Honor can give us

 5   guidance, what she'll testify to is that what she writes in that

 6   note, handwritten note, is not what she says happened, and what

 7   the doctor has in his actual typed note is closer to what she

 8   says happened.  It's quite graphic in the note.  She's going to

 9   say I was -- she'll explain how she -- she'll essentially say

10   that's not what happened, and she's never accused this boy of

11   sexual assault.

12        She'll say, if asked, that -- this is in her depo, by the

13   way; it's in her depo -- that the boy didn't know he was doing

14   anything wrong.  She -- she -- she felt that she was being

15   assaulted, but she feels the boy would have no way to know that

16   because she wasn't communicating her boundaries.

17        So we could go really far afield on this going through

18   graphic detail of her letter.  I think Your Honor ruled the

19   doctor's note about this is admissible.  So I want to be clear,

20   it did come in that motion in limine.

21        But what they're intending to do -- I believe what they're

22   intending to use is this letter, which I think I should have

23   brought up here with me.  Do you have the letter up here with

24   you?

25        MS. REWARI:  So the motion was on -- the motion in limine
```

1    was on the record itself, the same one I'm about to ask her

2    about, which is her handwritten note.  It was not on the doctor's

3    note because it's not in any doctors' records.  We maybe --

4         MR. BRENNER:  It is.

5         MS. REWARI:  Maybe it's in the doctor's record.

6         THE COURT:  Well, why don't you make it simpler for me.

7    Why don't you give me a proffer as to what you believe the

8    questions and answers are going to be?

9         MS. REWARI:  Well, I'm going to ask her whether she wrote

10   this note --

11        THE COURT:  Okay.

12        MS. REWARI:  -- describing a very graphic sexual assault

13   that happened.  I'm not going to make her read it in front of the

14   jury; I just want to ask her about it, and then they can read it

15   separately.  I don't want to put it up on the screen for

16   everybody to read, but it's very detailed, it's very graphic.

17        She's going to say -- she had not said before that that's

18   what happened.  She didn't say that in the deposition.  If she's

19   going to say that today, I would be surprised.  She said it was

20   not -- she doesn't consider it a rape.  But in the way that she's

21   written it, she said she told him to stop; this is rape.

22        THE COURT:  Let me see the letter here.

23        MS. REWARI:  May I go get a copy?

24        This is where it starts.  It's three or four pages.

25        MR. BRENNER:  It's about a ten-page document?

```
 1          MS. REWARI:  Right.  Right.  This is -- there are other

 2   pages about other things.

 3          THE COURT:  Okay.

 4          (Brief pause in proceedings.)

 5          THE COURT:  Something's missing.  Take it from this page

 6   here.

 7          MR. BRENNER:  Let's look from the bottom because it may

 8   help give some guidance.  What page do you have?

 9          MS. REWARI:  It's double-sided.

10          THE COURT:  Oh, okay.  Okay.  Thank you.

11          MR. BRENNER:  My mistake.  It's double-sided.

12          (Brief pause in proceedings.)

13          THE COURT:  What do you want to do with this?

14          MS. REWARI:  Well, one, it goes to causation with respect

15   to her damages because this sounds like a very traumatic

16   incident.

17          And the other thing is that there's a description --

18   there's a comparing and contrasting of this incident to what --

19   with C.K. that's made in this entry, and what this then suggests

20   is that there was only one incident with C.K., and certain things

21   that she's testified to that happened with him are inconsistent

22   with this report.

23          THE COURT:  Does this circumstance allegedly occur before

24   or after the alleged situation with C.K.?

25          MS. REWARI:  After.
```

```
 1              THE COURT:  Okay.  Mr. Brenner.

 2              MR. BRENNER:  So, the second point.  So again, I think

 3      it's {indiscernible}, so I think it's far afield from what she's

 4      trying to do.

 5              THE COURT:  Yeah.

 6              MR. BRENNER:  So, I think the argument makes more sense to

 7      find out -- because I think there's potentially a --

 8              THE COURT:  I don't want -- I don't want there to be fits

 9      and stops.  I want to --

10              MR. BRENNER:  That's what I'm trying to do here.

11              THE COURT:  So what are we doing?  Where are we going?

12              MR. BRENNER:  So, if we can get a proffer of what she's

13      going to do.  She started to give that, and then she said, I was

14      going to ask her if she ever said anyone else ever assaulted her.

15      If that's the only question she asks, then -- I still think it's

16      irrelevant, but it's not -- it doesn't go -- if she's going go

17      into details of it --

18              THE COURT:  Well, as I understand the case law associated

19      with this area, is that -- it's not like what you would typically

20      see in a criminal prosecution for rape, you know.  Past sex acts

21      between them have absolutely no relevance unless you can show a

22      connection with what's going on with the prosecuting of the rape

23      at issue.

24              Title IX seems to recognize, though, that if other

25      allegations of sexual harassment -- unfounded sexual harassment
```

```
 1  have been suggested by evidence that, from a Title IX standpoint,

 2  those things might be relevant and probative.

 3       MR. BRENNER:  But there's no evidence -- there will not be

 4  any evidence that she ever made this allegation to anyone other

 5  than writing it and to her therapist.  It's not like she sued

 6  someone else for this or made a public demand or made charges

 7  that could arguably make that relevant.  That's not -- I don't

 8  think that's what the evidence is going to be --

 9       THE COURT:  -- okay --

10       MR. BRENNER:  -- based on my discussions.

11       MS. REWARI:  So it goes to credibility with respect to

12  what she's going to say.  I wrote all of this and made this

13  account, and it didn't happen; then it goes to credibility with

14  respect to --

15       THE COURT:  Do you believe she's going to say this didn't

16  happen?

17       MS. REWARI:  Well, that's what I understood this to say.

18       THE COURT:  Well --

19       MR. BRENNER:  Let's be clear what I think she's going to

20  say.  She's going to say that she had a sexual encounter with

21  this boy.

22       THE COURT:  Um-hmm.

23       MR. BRENNER:  His name is James -- not that that matters;

24  that's not the point -- a sexual encounter with this boy, and

25  that she felt -- she's telling her therapist afterwards -- she's
```

```
 1    basically saying to her therapist -- just to be honest with you,

 2    she's basically saying to her therapist, why do I keep finding

 3    myself in this position.  That's the context of why she's having

 4    this discussion with the therapist.

 5         She will say, looking back on it, that she doesn't believe

 6    the boy knew he was doing anything wrong because she didn't

 7    communicate the boundaries.  She --

 8         THE COURT:  Not in the letter, not in the letter, but in

 9    the account she said, "No, no, stop it."

10         MR. BRENNER:  Right.  So she -- when I say she's going to

11    say it didn't happen, "it" is not the sexual encounter.  If she's

12    going to say "it," what she's describing in the letter didn't

13    happen.

14         So the "it; I told him to stop, and he sodomized me" and

15    all of that --

16         THE COURT:  Right.

17         MR. BRENNER:  She's going to say that didn't happen.

18    She's going to say -- I don't want to put words in her mouth,

19    but, essentially, I'm lumping together all my trauma.

20         But I don't want you to think she's going to say that

21    nothing ever happened to her.  She's going to say -- what I think

22    she's going to say -- what I told you was that there was a sexual

23    encounter with the boy.  She believes it was nonconsensual, but

24    he had no idea it was nonconsensual.

25         THE COURT:  Okay.  You said that --
```

```
 1          MR. BRENNER:  And I think it's one account, but I'm not

 2    sure.

 3          THE COURT:  Okay.  But you believe that she's going to say

 4    now that she didn't say no to this other person?

 5          MR. BRENNER:  If she testifies consistent with her

 6    deposition, what I understand she's -- those -- she's going to

 7    say, I did not communicate clearly enough to him that I wanted

 8    him to stop.  I think that's how she's going to testify.

 9          THE COURT:  Okay.

10          MS. REWARI:  I'll just remind you that this was -- this

11    was the ruling on the motion in limine on this very exhibit, and

12    we have another one like this involving another boy.

13          MR. BRENNER:  And on that issue, which I want to draw the

14    Court's attention to, I actually -- I'll have to check.  I

15    actually think a motion was directed at the therapy note, but it

16    is -- whatever our motion said it was it is, but my memory is

17    that there's a note from the doctor that's similar, something

18    like that.

19          So I think our motion is directed at that, but I don't

20    know.  It will be -- I don't want to represent something that's

21    incorrect.

22          THE COURT:  All right.  This is what I'm going to let you

23    do, Ms. Rewari, because, again, I don't know what she's going to

24    say.  If she says something inconsistent with her deposition

25    testimony, then that's another federal rule.  And if she says
```

1    something that's supportive of your theory, then I'll allow you

2    some latitude.  But it just depends on how it plays out, and I

3    really can't make a determination until I hear some of her

4    answers to some of your questions.  And just pay attention to my

5    cues as to when we might be getting into an area that might be

6    subject to controversy.

7         MS. REWARI:  And just so we're not back up here, there

8    were two records like this.

9         THE COURT:  Same -- same standards for the second

10   situation.

11        MS. REWARI:  Okay.

12        THE COURT:  Also --

13        MR. BRENNER:  And just so I know my marching orders, I

14   have a standing objection, and I can rely on the Court's cues,

15   but, for the record, I have to object.

16        THE COURT:  Yeah.  And, again, as I indicated in the

17   motions in limine, I'm relying on the *United States versus*

18   *Berkley* case and the *United States versus Kettles* case, and

19   *Betsinger versus University of Hawaii*.

20        I will note for the record that at least two of those

21   cases look like they're criminal cases, which actually impose

22   another layer that we would not impose in a civil case.  But

23   those cases seem to suggest to the Court a format or framework

24   for the Court to look at.

25        MR. BRENNER:  And just so my record is clear, can I have a

```
 1   standing objection?

 2        THE COURT:  Yes, sir.

 3        MR. BRENNER:  And the Court will give guidance to counsel

 4   as to when --

 5        THE COURT:  Yeah, I'll -- we'll communicate.

 6        MR. BRENNER:  Thank you.

 7        THE COURT:  Very good.

 8        (Sidebar discussion concluded.)

 9        THE COURT:  Ms. B.R., there are going to be some questions

10   that are going to be asked.  I'm going to ask you to take your

11   time in answering those questions, depending on whether the Court

12   is interjecting or saying something before you answer the

13   question, and answer only those questions that are asked and

14   nothing more.

15        THE WITNESS:  Okay.

16        THE COURT:  Thank you.

17   BY MS. REWARI:

18   Q.    Ms. R., do you recall writing a journal entry for

19   Dr. Saylor in May 2014?

20   A.    I only recall in the context of you showing it to me in

21   my deposition.

22   Q.    Okay.  If you could go to tab 130 in the black binder?

23        THE COURT:  Read it to yourself.

24        (Brief pause in proceedings.)

25        THE WITNESS:  All right.
```

1    BY MS. REWARI:

2    **Q.**    All right.  And do you recall that you described for

3    Dr. Saylor a rape of you that had been perpetrated by a friend

4    in Thanksgiving 2013?

5    **A.**    I don't know if that's the exact date.  And it's a bit

6    more complicated than how you're explaining it.  I don't know if

7    I agree with that characterization exactly.

8    **Q.**    Well, in the diary entry you described it as the day

9    after Thanksgiving 2013, right?

10   **A.**    Okay.  If that's what it says, that's what it says.

11   **Q.**    I'm looking at page NeuroScience 249.  You're welcome to

12   check it.

13   **A.**    I trust you.

14   **Q.**    And the person that you said had perpetrated this rape

15   was a person named James?

16   **A.**    Again, I feel like it was a violation, but, yes, his name

17   was James.  But you're not really -- I just can't answer this

18   question.

19   **Q.**    Well, you called it a rape in your journal entry, right?

20   **A.**    It felt like a violation.  I'm happy to explain the

21   details of it to you in the sense of it felt like a continuation

22   of what happened to me when I was 12.

23   **Q.**    You described him vaginally and anally raping you, right?

24   **A.**    Well, Ms. Rewari, it's a little bit more complicated than

25   that, because what happened to me is that I completely froze.

1    As I explained to you in my deposition, when I was 12 years old,

2    I completely lost my entire life, basically, and I had to

3    relearn how to have boundaries with people, and I had to relearn

4    my entire life, and I froze in a moment when someone wanted to

5    initiate something sexually with me, and I just became

6    completely disassociated.  That's really it.  And completely

7    outing me about something is just totally inappropriate.

8        THE COURT:  Ms. B.R. --

9        THE WITNESS:  I need a break.  I can't.....

10       THE COURT:  I appreciate you wanting to have a break,

11   ma'am, but I'm the one who gets to maintain control of the

12   courtroom, and you just can't announce what you want to do.  We

13   will take a break to allow you an opportunity to compose

14   yourself, so we will take a break.  Ladies and gentlemen, we'll

15   see you back in at 3:25.

16       (Jury out at 3:14 p.m.)

17       THE COURT:  Mr. Brenner, please, one representative from

18   each party please come back to the library.

19       (Following in-chambers discussion had on the record:)

20       THE COURT:  We're in the library.  We're in the Chambers

21   library having a conference outside the hearing of the jury and

22   outside of the hearing of any potential witnesses in the case,

23   and I'm going to direct my comments first to you, Mr. Brenner.

24       MR. BRENNER:  Yes, Your Honor.

25       THE COURT:  I appreciate the fact that the young lady

```
 1    doesn't understand how court works, and for her to simply

 2    announce that we're going to take a break now is unacceptable.

 3    And I'm going to leave it to your good office to discuss with her

 4    what she can and cannot do.  I've had plenty of people get upset

 5    on the stand; it's the nature of what we do sometimes, but she

 6    doesn't get to control the courtroom, and she needs to understand

 7    that.

 8         She needs to answer the questions that are asked.  The

 9    questions that were just recently asked by Ms. Rewari were not

10    responded to by your client.  She wanted to talk about what she

11    wanted to talk about, and so that's unacceptable, too.  And I

12    appreciate that she wants to get her message out, and what I'm

13    going to do is leave it to you and Ms. Anderson and Ms. Pedersen

14    to do whatever you need to do to help the record look better for

15    you, but --

16         MR. BRENNER:  I understand.

17         THE COURT:  -- she doesn't get to do that, and we

18    discussed before that she just can't decide to shut down when

19    she's subject to appropriate cross-examination.

20         MR. BRENNER:  So, you have advised her before.  I've

21    advised her.  I understand.  I'm not disagreeing with anything.

22    The only thing I have to push back a little on is -- and I don't

23    think you mean to say it like this -- maybe you do -- but I don't

24    think that she's deciding to shut down.  I think it's a reaction

25    that she's having.  It's still not appropriate in the courtroom.
```

1    I agree with you on that.

2         And I have advised her, if she needs a break, to ask you

3    if she can take a break, because I think that's the appropriate

4    procedure for any witness, including her, which she did not do.

5    That's not what she did.  She said, "I'm taking a break."  I

6    would note, it's the first time she did that.

7         THE COURT:  But I will note -- and, again, I appreciate

8    your presence during this proceeding.  You've been an absolute

9    professional and a gentleman, but the problem is that, from the

10   Court's perspective, she thinks she controls everything that's

11   happening, and that's my perception.  I could be wrong.  You

12   might disagree, but that's the perception that she's giving, that

13   she gets to decide what questions are asked, how they're to be

14   answered, what she can do or say in the courtroom.  And just sort

15   of declaring -- I won't say deciding -- declaring that she needed

16   a break is not the way to do it.

17        MR. BRENNER:  Right.  No.  There's no daylight between us

18   on what the appropriate procedure is --

19        THE COURT:  Okay.

20        MR. BRENNER:  -- on that.  I was only saying that at that

21   point she did declare that she was taking break.  I was just

22   saying that I think her -- some of her emotional reactions are

23   not -- she's not saying I'm going to have an emotional reaction;

24   she's having an emotional reaction.  It doesn't excuse the fact

25   that she needs to follow the Court's rules.  That's the only

1    thing I'm pushing back on, and obviously I'm assuming you're

2    giving me the right to have another conversation with her.

3         THE COURT:  Have another conversation with her, and I will

4    tell you.  With all due respect, Mr. Brenner -- and we're off the

5    record at this point.

6         (Thereupon, a discussion was had off the record

7    between Court and counsel.)

8         THE COURT:  We can go back on the record now.  I think if

9    she is amenable to more direct responses to questions, the

10   examinations will be over soon, but the more she volunteers

11   information, the more she provides her perspective on things, it

12   slows down the process, and Ms. Rewari has on several occasions

13   just let her go.  And that's the great fear of a court when you

14   just let a lay witness just start talking, you know,

15   contemporaneously, and you don't know what they're going to say.

16   And so I don't want the jury to, you know, develop any bias or

17   prejudice or feelings one way or another based upon the dynamics

18   they see in the courtroom.

19        MS. REWARI:  And, Your Honor, I would say that I am trying

20   to be -- I haven't cut her offer very much because I'm also

21   mindful that I don't want to come across as being hard on her,

22   and, you know, feeding into any feeling that, perhaps, you know,

23   I'm not --

24        THE COURT:  -- respectful --

25        MR. BATES:  -- that I'm not being respectful.

```
 1          THE COURT:  No, I get it, I get it.  I don't have any

 2    problem with the lawyers.  The lawyers are fine.  We're

 3    litigating a case; this is what we do for a living, but we cannot

 4    allow lay persons or witnesses to control what we have been

 5    trained to do, and that's make sure there's a fair adjudication

 6    of the case.  That's my goal.

 7          MR. BRENNER:  Understood.  Can we go off the record for

 8    one second?

 9          THE COURT:  Sure.

10          (Thereupon, a discussion was had off the record

11    between Court and counsel.)

12          (In-chambers discussion concluded.)

13          (Jury in at 3:32 p.m.)

14          THE COURT:  You may have a seat.  Thank you.  B.R., I need

15    you to understand something now.  You have very good lawyers who

16    are representing your interest in the case and that there are

17    certain rules that we all have to follow when we conduct our

18    business.  Your lawyers will get the opportunity after the

19    examination by the people on the other side to ask you any

20    questions that they think are important, relevant, or appropriate

21    to give you the opportunity to tell your side of the story.

22          However, you need to understand that it is this Judge who

23    controls the courtroom, and you have to respect my

24    responsibility.  Okay, ma'am?

25          THE WITNESS:  (Nodded head affirmatively.)
```

```
 1          THE COURT:  All right.  Can we bring the jury back?

 2          MR. BRENNER:  Yes, Your Honor.

 3          (Jury in at 3:33 p.m.)

 4          THE COURT:  You may be seated.  Let the record reflect the

 5   jury is reseated.

 6          Ladies and gentlemen, I want to talk to you about our work

 7   for the day.  Can I work from the presumption that you can go

 8   from between 4:30 and 5?

 9          Okay.  Very good.  Thank you.

10          MS. REWARI:  Thank you, Your Honor.

11   BY MS. REWARI:

12   Q.    So, Ms. R., we were talking about your -- your journal

13   that you shared with your therapist in May 2014.  In one of the

14   entries in this journal that you shared, you wrote that you

15   remembered in this incident crying, saying, "No, stop, please

16   stop, why are you hurting me?" right?

17   A.    That's what it says.

18   Q.    And then you also wrote in this incident -- describing

19   this incident that this was someone that you loved like a

20   brother, right?

21   A.    If that's what it says.

22   Q.    Well --

23          MR. BRENNER:  Ms. Rewari, can you give me the page number?

24          MS. REWARI:  Sure.  You can look at page NeuroScience 251

25   in Exhibit 130.
```

1          MR. BRENNER:  Thank you.

2          MS. REWARI:  Your Honor, we're going to move to admit

3     this.  I'm not going to publish it, but we would like to move its

4     admission.

5          THE COURT:  Over objection, it's admitted.

6          MS. REWARI:  Thank you.

7          (Page 251 of Defendants' Exhibit 130 admitted into the

8     record.)

9     BY MS. REWARI:

10    **Q.**     So, on page 251, you told him, "I loved you like a

11    brother.  I said, 'Stop, please stop, this is rape'," right?

12    **A.**     I don't recall.

13    **Q.**     Well, please take a look at page 251.

14    **A.**     If that's what it says, that's what it says.

15    **Q.**     In this journal entry, you also contrasted this rape to

16    what had happened with C.K., right?

17    **A.**     I don't know if that's accurate, but if that's what it

18    says, that's what it says.  I trust you.

19    **Q.**     Well, on page 252 you said that C.K. had only sodomized

20    you, right?

21    **A.**     I don't think -- as I mentioned in my deposition, I don't

22    really feel that this is a characterization and correct way of

23    what this one journal entry was talking about.  When I wrote

24    this, I was extremely triggered, having a flashback, in a

25    dissociated state.  I was talking about one incident that

1   C████████  had assaulted me on.  This would have never happened

2   had I not been assaulted when I was 12.

3   **Q.**    And the only incident with C██████, with C.K., that you

4   wrote about in this journal entry was an incident with J.O.,

5   right?

6   **A.**    I don't know.

7   **Q.**    Well, if you would take a look at page 246, it's

8   Number 6.

9   **A.**    What exhibit is this again?  Is this 62?

10          MS. REWARI:  Page 246 of Defendants' Exhibit 130.

11          (Discussion had off the record between counsel.)

12   BY MS. REWARI:

13   **Q.**    And this is Number 6 in a list that starts on page 245 of

14   other things that have hurt you, right?

15   **A.**    Sure.

16   **Q.**    And the list includes "9/11, being teased, slash, bullied

17   by some of the same people who bullied me since second or third

18   grade," right?

19   **A.**    Um-hmm.

20   **Q.**    And there's also, "Having a bad accident in [sic] 3.

21   That's Number 4, right?

22   **A.**    Sure.

23   **Q.**    And the bad accident was an injury to your face when you

24   were 3?

25   **A.**    It was injury to my lip.

1    **Q.**    To your lip.

2    **A.**    It's my lip.

3    **Q.**    Okay.  And that's Number 4 on this list, right?

4    **A.**    Sure.

5    **Q.**    And then Number 6 on this list is a discussion about your

6    "Best friend, J.O., who was dating C.K. attacked me as C.K.

7    assaulted me," is what you wrote, right?

8    **A.**    I mean, that's what it says --

9    **Q.**    Yeah.

10    **A.**    -- on Number 6.

11    **Q.**    Okay.  And then this is the only entry in this list about

12    C.K., this incident, right?

13    **A.**    I mean, I don't know.  I haven't looked through it all,

14    but I'm sure this wasn't an all-encompassing document.

15    **Q.**    And actually, on Number 7 you talk about gym class, and

16    Number 8 you do say, "I remember teachers used to watch C.K. and

17    this boy, D.N., touch me all over my body while I tried to get

18    stuff out of my locker."

19    **A.**    That's correct.

20    **Q.**    And Number 9 says, "I remember being hit a lot."

21    **A.**    Okay.

22    **Q.**    And then Number 10 talks about people calling you names,

23    right?

24    **A.**    Yep.

25    **Q.**    And Number 11 says that "I remember even some teachers

1  bullied me and were mean"?

2  **A.**    That's correct.

3  **Q.**    And Number 12 is, "There are so many more examples"?

4  **A.**    Um-hmm.

5  **Q.**    And Number 13 is about Storm King?

6  **A.**    Yep.

7  **Q.**    And then Number 14, then you say, "Then when the second

8  time something similar happened, was the day after Thanksgiving,

9  2013," right?

10  **A.**    Right.

11  **Q.**    And that is then a four-page entry about -- in this diary

12  about this rape by James, correct?

13  **A.**    I would have to read it more carefully, but that sounds

14  about right.  It was violating.

15  **Q.**    And on the last page of this entry is where you contrast

16  what this boy James did to you in this incident to what had

17  happened with C.K., right?

18  **A.**    Um, I'm sure being violated has parallels.  Like I

19  mentioned in my deposition, I was in a very triggered state of

20  mind when I wrote this.

21  **Q.**    And after this incident, you -- you noted that you were

22  concerned about the fact that you saw blood because C.K. had

23  only sodomized you, right?

24  **A.**    Like I said, this was not -- this was something that I

25  wrote when I was triggered.  I'm pretty sure I say somewhere in

1  here that I felt like I was underwater, which meant that I felt

2  dissociated when I wrote this.  So I was referring to a time

3  that had happened with C██████, and it reminded me of that

4  time.

5  **Q.**    Would you agree that what you have described there in

6  that entry on Number 14 for three or four pages is rape?

7  **A.**    I think so, but I don't think you're giving it the full

8  context.

9  **Q.**    Were you raped by James?

10 **A.**    I was violated.

11 **Q.**    Were you raped by James?

12 **A.**    I was violated.  You can say that I was raped, but I

13 never accused him of that.

14 **Q.**    Did you consider it rape?

15 **A.**    I felt violated because I couldn't say no.  I couldn't

16 push him.  I felt completely unable to physically because I was

17 reliving what happened to me when I was 12 years old.  I was not

18 able to move.  I was out of it.  Had I been able to be in that

19 moment, I would have been able to protect myself better, and it

20 wouldn't have happened.

21 **Q.**    Was the account that you gave in this diary entry true?

22 **A.**    I think it had the intention of being truthful.  However,

23 like I said, I was dissociated.  I was flooded with memories, so

24 I did the best that I can, but I wrote this in the context of

25 processing it with my therapist.

1   **Q.**    Okay.  All right.  You can put that aside.

2         After you were treated by Dr. Saylor, you were also

3   treated by someone named -- Ms. Gluck?

4   **A.**    Yes.

5   **Q.**    And that was somebody that -- or is it Dr. Gluck?

6   **A.**    It's Dr. Gluck, yeah.

7   **Q.**    Okay.  And that was also somebody that Mr. Brenner talked

8   to you about, right?

9   **A.**    Yes, I saw her.

10  **Q.**    And you reported to her that the boyfriend you had when

11  you were 16, 17 had beaten and coerced you into sex?

12  **A.**    Not beaten, but I think peer pressure would be a better

13  description.  If you recall, I know exactly what you're talking

14  about, and that therapy note said I was extremely dissociated.

15  And the therapist had a hard time following along with the

16  session.

17  **Q.**    Yeah, turn to Defendants' Exhibit 132 in your book.

18        And this is a note -- a psychotherapy progress note from

19  Dr. Gluck dated November 12, 2018, right?

20  **A.**    Yeah, that sounds right.

21  **Q.**    Okay.  And --

22        MS. REWARI:  We move to admit Defendants' Exhibit 132.

23        MR. BRENNER:  No objection, Your Honor.

24        THE COURT:  Without objection.

25        (Defendants' Exhibit 132 admitted into the record.)

```
 1              MS. REWARI:  May I publish this?

 2              THE COURT:  You may.

 3     BY MS. REWARI:

 4     Q.    If you look under "System, description, and subjective

 5     report."

 6     A.    Okay.

 7     Q.    And Dr. Gluck relates in this note that you describe your

 8     relationship you had with an abusive boyfriend from ages 16 to

 9     17, correct?

10     A.    That's what she describes it as.

11     Q.    Well, she's documenting a session with you, right?

12     A.    She's documenting a session, but these are her notes.

13     Q.    Okay.  And then she also wrote, "B.R. described being

14     beaten and coerced to have sex with boyfriend," right?

15     A.    I don't recall telling her beaten.  What I told her was I

16     felt peer pressured which is different than being violently

17     raped like I was when I was 12.

18     Q.    Okay.  So is it your testimony that the boyfriend you had

19     when you were at age 16 to 17 did not beat and coerce you into

20     sex?

21     A.    I felt peer pressured by him.

22     Q.    Okay.  You've -- the therapists that you have seen since

23     you left Virginia started with Dr. Saylor, and continued

24     afterwards, right?

25     A.    I'm sorry, could you repeat that?
```

1    **Q.**    Dr. -- you were seeing Dr. Saylor when you moved from

2    Virginia, correct?

3    **A.**    Yes.

4    **Q.**    And then you saw other people after that?

5    **A.**    That's correct.

6    **Q.**    And is it fair to say that all of the therapists that you

7    have seen from then on had been told about multiple people

8    raping you by you?

9    **A.**    I've told them that I struggled with relationships with

10   people because I didn't know how to set boundaries.  I don't

11   describe what these incidents that you just described to be

12   traumatic like what happened to me when I was 12.  There's a

13   very big difference of what happened.

14   **Q.**    And you believe that you've been raped by people other

15   than C.K. and J.O., right?

16   **A.**    I feel like -- can you restate that question?

17   **Q.**    Well, how many people by your estimation have raped you?

18        MR. BRENNER:  Your Honor, may we approach on an issue

19   we've addressed before?

20        THE COURT:  Let's make your question more finite,

21   Ms. Rewari.  Make your question more finite.

22        MS. REWARI:  Okay.

23   BY MS. REWARI:

24   **Q.**    How many people other than C.K. and J.O. do you believe

25   have raped you?

1          MR. BRENNER:  Same objection.

2          THE COURT:  Rephrase it.

3     BY MS. REWARI:

4     Q.    Have you been raped by somebody other than C.K. and J.O.?

5     A.    I have, in fact, yes.

6     Q.    How many people other than C.K. and J.O.?

7          MR. BRENNER:  Same objection.

8          THE WITNESS:  I feel like this is --

9          MR. BRENNER:  Objection.

10          THE COURT:  How many people, other than those people named

11     as defendants in this action, have you suggested have had

12     inappropriate sexual actions with you?

13          THE WITNESS:  I am not able to count that because then you

14     want me to start talking about what happened in the closet, and I

15     can't.

16          THE COURT:  That's her answer.

17     BY MS. REWARI:

18     Q.    Before you left Virginia in 2013, had you been raped by

19     people other than C.K. and J.O.?

20          MR. BRENNER:  Same objection.

21          THE COURT:  Sustained.  Sustained.  I think we're as far

22     as we're going to be able to go on this.

23          MS. REWARI:  Okay.

24     BY MS. REWARI:

25     Q.    I'm going to switch gears here.  Let's talk about your

1    Facebook account.

2            Now, you stated under oath that your Facebook account was

3    deleted in 2013, correct?

4    **A.**    I don't recall stating that.

5    **Q.**    Okay.

6    **A.**    I don't know what happened to it.

7            THE COURT:  Are you going to be using her deposition?

8            MS. REWARI:  I'm going to be using interrogatory answer.

9            THE COURT:  Okay.  Go ahead.

10           Ladies and gentlemen, an interrogatory is a method by

11   which lawyers in the beginning or during the pendency of a case

12   communicate on certain things which may be issues in the case,

13   and the person who the interrogatories or questions are sent to

14   are required to answer them under oath.  It's sort of like a

15   written deposition and should be considered in the same way.

16   BY MS. REWARI:

17   **Q.**    Do you recognize this first document as your amended

18   answers to the School Board's first set of interrogatories?

19   **A.**    I don't know.  You sent me a lot of interrogatories.

20   **Q.**    Okay.  That's your signature on the fourth page of the

21   document, right?

22   **A.**    That's correct, but I don't recall reviewing this.

23   **Q.**    Well, you stated -- that's your signature under -- on the

24   paragraph that says, "I verify under penalty of perjury that the

25   interrogatory responses contained in Plaintiff's Amended Answers

1    to Defendant FCSB's First Set of Interrogatories dated

2    November 6th, 2023, are true and correct to the best of my

3    knowledge, information, and belief," right?

4    **A.**    Okay.

5    **Q.**    And that's your signature there, correct?

6    **A.**    Sure.

7    **Q.**    And the page before, the amended answer to Interrogatory

8    Number 10, has a section about your Facebook accounts, right?

9    **A.**    You said on page 10?

10   **Q.**    Interrogatory Number 10 on page 3.  It's highlighted on

11   your copy.

12   **A.**    Right.  Like I said in my deposition, I don't know what

13   happened to those accounts, and you would have to talk to my mom

14   about it.

15   **Q.**    Your answer here under oath was that --

16        THE COURT:  Read the question and the answer.

17        MS. REWARI:  All right.

18   BY MS. REWARI:

19   **Q.**    So the question was:  "Identify each and every e-mail and

20   social media account you've had from September 6, 2009, to the

21   present.  For the purposes of this interrogatory, 'social media

22   account' means an online communication, channel for user-based

23   input, interaction, content sharing or collaboration,

24   specifically included but is not limited to Facebook," and I

25   don't think I need to read the whole list.

1           "For each, state the e-mail address, user name, or handle

2    for each account, the date range when the account was used, and

3    whether the account is currently active.  If the account is not

4    active, please identify when it was deactivated"?

5           THE COURT:  And what is the answer?

6    BY MS. REWARI:

7    **Q.**    And the answer -- your answer under Facebook is

8    "March 2013 to present, user name" -- and that's your name --

9    "B.R., under my current e-mail address.  And date is

10   January 12th.  User name, Jenni Taylor.  I believe this account

11   was deleted in early 2013."

12          And Answer C is:  "2010 to 2012 approximately.  User

13   name" -- and it's your name -- "B.R.  I believe this account was

14   deleted in early 2013."

15          Right?

16   **A.**    Yes, that's what it says.

17   **Q.**    Okay.  And that's what -- that was the answer you gave

18   under oath, right?

19   **A.**    I said "I believe."  I'm not sure what happened.  I don't

20   know.  My mom took over.  I told you this in my deposition.

21   **Q.**    All right.  And then your attorneys sent us a letter

22   saying your mom deleted these accounts, right?

23   **A.**    I don't know.

24   **Q.**    Well, take a look at the second document that I gave

25   Ms. Barry for you, letter dated October 9, 2023, right?

1    A.      Okay.

2    Q.      And if you start with -- look at paragraph 8 on the third

3    page of this letter.

4    A.      Okay.

5    Q.      And again, this is an attorney -- a letter from your

6    lawyers, right?

7    A.      That's what it looks like.

8    Q.      Okay.  And it says, "With regard to the Facebook

9    2010-2012 account and the Jenni Taylor account, Facebook

10   account, questions in paragraphs 8 and 9 of your letter,

11   plaintiff's mother deleted both of these accounts in early

12   2013," right?

13   A.      If that's what it says, that's what it says.

14   Q.      Your cell phone was also taken by your mother, correct?

15           THE COURT:  Give her a timeframe.

16   BY MS. REWARI:

17   Q.      The cell phone you had when you were in 7th grade was

18   then taken by your mother, right?

19   A.      I think so, yep.

20   Q.      And it was taken by your mother before you started at

21   Storm King, correct?

22   A.      I don't think she took it that late, no.  I think it was

23   much earlier to protect me once I -- I don't know what the time

24   frame of that was.

25   Q.      And when you went -- you received a new phone or your

1   brother's phone, right, in 2013?

2   **A.**    I don't recall receiving my brother's phone.  We switched

3   lines.

4   **Q.**    Okay.  So you switched phone numbers with your brother?

5   **A.**    Yes.

6   **Q.**    Okay.  And then the physical phone that you had was given

7   to your mom, right?

8   **A.**    I don't know.

9   **Q.**    Okay.  But to your knowledge, the text messages on that

10  phone were not preserved, right?

11  **A.**    I don't know.

12  **Q.**    You haven't produced any text messages with C.K. or with

13  any student --

14  **A.**    I don't know.

15  **Q.**    Excuse me, from 2011 to 2012?

16  **A.**    I don't know.

17  **Q.**    All right.  You -- we talked about Mr. Pachter yesterday.

18  That was the social worker that you were seeing in February

19  2012, right?

20  **A.**    Yes.

21  **Q.**    Okay.  And the whole time that you were seeing him, you

22  told him about a single incident of sexual assault with C.K.,

23  right?

24  **A.**    Um, I don't recall what I told him.

25  **Q.**    Okay.  You can take a look.  His records are at

```
 1    Plaintiff's Exhibit 451 in the small binder.

 2         THE LAW CLERK:  451?

 3         MS. REWARI:  Yes.

 4         THE LAW CLERK:  I'm not seeing it, Counsel.

 5         MS. REWARI:  Plaintiff's 451?  Oh, that's their binder.

 6         Our binder.

 7         THE LAW CLERK:  Thank you.

 8         THE WITNESS:  Okay.

 9    BY MS. REWARI:

10    Q.    And so you saw him until March 27, 2012, right?  That's

11    the last entry in these records.

12    A.    Yeah, I think I saw him for a very short period of time.

13    Q.    And so you only reported, during the time that you were

14    seeing him, about a single incident with C.K.?

15    A.    If that's what it says, that's what it says.

16    Q.    Okay.  And then when you went to the day treatment

17    program at Inova Hospital in April 2012, you also reported a

18    single incident of sexual assault that occurred in November

19    2011, right?

20    A.    I don't know what I -- at this point what I said at the

21    Kellar Center.

22    Q.    Ms. Barry has just handed you your discharge summary from

23    the Inova Kellar Center Adolescent Day Treatment Program.

24         Do you see that?

25    A.    I see that.
```

1    **Q.**    Okay.  And it goes -- the date of discharge there is

2    April 30th, 2012.

3    **A.**    Okay.

4    **Q.**    And under the "History of Present Illness," if you

5    look -- just take a minute to review that, and then I'll ask you

6    a question.

7    **A.**    Okay.

8    **Q.**    Okay.  And in these records, it's reflected that you

9    alleged a sexual assault that had occurred in November 2011,

10   right?

11   **A.**    Yes, but that also says in that sentence "sexual

12   harassment," too.

13   **Q.**    Yes.  But you didn't report multiple rapes as of April

14   30th, 2012, right?

15   **A.**    I don't recall what I said during my time at the Kellar

16   Center.

17   **Q.**    Okay.  You'd agree that this discharge summary from the

18   Kellar Center, though, indicates that you reported a single

19   sexual assault in addition to the sexual harassment you just

20   mentioned?

21   **A.**    I mean, that's what it says on the paper.

22   **Q.**    Okay.  And it also indicates that in the "History of

23   Present Illness," that you had "a long-standing history of

24   social anxiety since the 6th grade but were able to function

25   well at school," right?

1    **A.**    That's what it says, but I don't think that's a fair

2    assessment.

3    **Q.**    And Mr. Brenner asked you about when you had to go

4    back -- or went back to Inova in the summer of 2012?

5    **A.**    Um-hmm.

6    **Q.**    And then you were seen by a Dr. McMurrer?

7    **A.**    At the Kellar Center, that sounds right, yeah.

8    **Q.**    Yeah.  And you reported to Dr. McMurrer that C.K. had

9    tried to touch your breasts, exposed his genitals to you, and

10   made lewd requests, but you didn't report to him there had been

11   a sexual assault, right?

12          MR. BRENNER:  I'm sorry, did you show her a record?

13          MS. REWARI:  I'm asking her if she remembers.

14          THE WITNESS:  I don't recall.

15   BY MS. REWARI:

16   **Q.**    Ms. Barry has just handed you the Inova Kellar Center

17   Adolescent Day Treatment Program Psychiatric Evaluation dated

18   August 22nd, 2012, right?

19   **A.**    Okay.

20   **Q.**    And the attending physician is James McMurrer, M.D.?

21   **A.**    Okay.

22   **Q.**    And under "Chief Complaint," can you read that to

23   yourself?

24   **A.**    Okay.

25   **Q.**    And what you reported to him is that you were sexually

 1    harassed by an older boy who was about a year older by the name

 2    of C.K., right?

 3    **A.**    Well, I don't know if that's a fair characterization of

 4    the document, but okay.

 5    **Q.**    Well, that's what it says under "Chief Complaint," right?

 6    **A.**    It says, "B███ is a 13-year-old female who reports that

 7    she was sexually harassed and abused by a boy by the name

 8    C██████ who is one year older than her."

 9    **Q.**    And then it says, "B.R. reports that C.K. tried to touch

10    her breast, exposed his genitals to her, and made lewd requests

11    to her," right?

12    **A.**    That definitely was part of what happened to me, but

13    there's a lot of abuse that happened to me.

14    **Q.**    And there's no discussion in this history of presenting

15    problem of a sexual assault, right?

16    **A.**    I mean, it says "sexual abuse" right here.

17    **Q.**    Where does it say "sexual abuse"?

18    **A.**    "B███ is a 13-year old female who reports that she was

19    sexually harassed and abused by a boy by the name of C███████

20    who is one year older than her."

21    **Q.**    Okay.  And then it doesn't describe any rape in this

22    record, correct?

23    **A.**    I mean, it doesn't use the word "rape," but "sexual

24    abuse."

25    **Q.**    It doesn't describe any penetration in this record,

1    right?

2    **A.**    Sure, it's not what it says in the document.

3    **Q.**    And it doesn't describe any touching of your genital area

4    in these records, right?

5    **A.**    Okay, it doesn't say that here.

6    **Q.**    And you're claiming in this case that C.K. raped on you a

7    near daily basis from October to November 21, 2011, right?

8    **A.**    He sexually abused me frequently.

9    **Q.**    You -- you -- you told your expert psychiatrist that was

10   hired by your legal team, Dr. Ryan, that C.K. raped you over 50

11   times between October and February -- October 2011 and February

12   2012, right?

13   **A.**    I never gave a number, like I told you in my deposition.

14   **Q.**    Well, that number is in her report, right?

15   **A.**    I don't know.

16        MR. BRENNER:  Objection, Your Honor.  Lack of foundation

17   for this witness.  She can ask the expert.

18        THE COURT:  Sustained.

19   BY MS. REWARI:

20   **Q.**    Okay.  Ms. Barry has just handed you a letter from --

21   it's four pages -- from the letter that was written by Dr. Ryan

22   to your lawyers, right?

23   **A.**    Okay.

24   **Q.**    And this is her expert report in this lawsuit, correct?

25        MR. BRENNER:  Your Honor, there's a lack of foundation for

```
 1    this witness to --

 2           THE COURT:  Sustained.

 3    BY MS. REWARI:

 4    Q.     Have you seen this document before?

 5    A.     No.

 6    Q.     Did you ever see the expert report?

 7    A.     No.

 8    Q.     Did you tell Dr. Ryan that you were raped several times a

 9    week by C.K. for about a month?

10    A.     I said several times a week at times.

11    Q.     At times?  Can you explain what you mean by that?

12    A.     It means sometimes it happened more, sometimes it

13    happened less.

14    Q.     Okay.  And did you tell her that you were raped every

15    week between October 2011 and February 2012?

16    A.     I said I was raped during that timeframe, from October to

17    February.

18    Q.     Okay.  Did you tell her that it happened several times a

19    week?

20           MR. BRENNER:  Objection, asked and answered.

21           THE COURT:  Overruled.  If she knows.

22           THE WITNESS:  I mean, that sounds about right.  I don't

23    recall my conversation with Dr. Ryan.

24    BY MS. REWARI:

25    Q.     Did you tell her that by the time that you came to the
```

1    meeting with the school on November 21st, 2011, C.K. was raping

2    you almost daily and doing sadistic things to you like putting

3    clothespins on your breasts and then knocking them off?

4    **A.**    C.K. was raping me at that time, yes.

5    **Q.**    Did you tell her that by the time of the November 21st,

6    2011 meeting, that C.K. was raping you almost daily?

7    **A.**    I don't recall saying "almost daily," but I said

8    frequently.

9    **Q.**    Did you tell her that he was doing sadistic things to you

10    before you had the meeting with the school on November 21st,

11    2011?

12    **A.**    Yes.

13    **Q.**    And did you tell her that you had been raped multiple

14    times before that November 21st, 2011 meeting?

15    **A.**    Yes.

16    **Q.**    And did you tell her that most of the rapes involved anal

17    penetration, but there was also vaginal penetration?

18    **A.**    I just told her that I was penetrated both ways.

19    **Q.**    And did you tell her that that had occurred before the

20    meeting with the school on November 21st?

21    **A.**    I'm sorry, can you rephrase that?  Is there somewhere you

22    want me to look to read this?

23    **Q.**    I'm just asking for your recollection.  Did you tell

24    Dr. Ryan that you had been raped --

25         THE COURT:  "Particular sex acts that you referred to."

1          MS. REWARI:  Excuse me?

2          THE COURT:  We've heard those terms enough.  Just say "the

3     particular sex acts that you referred to."

4          MS. REWARI:  Right.  Thank you.

5     BY MS. REWARI:

6     **Q.**     Did you tell Dr. Ryan that these sex acts had occurred

7     against your will before the November 21st meeting?

8     **A.**     Yes.

9     **Q.**     And did you tell her that they continued until you were

10    pulled out of school on February 9th, 2012?

11    **A.**     Yes.

12    **Q.**     And so were you being raped even when you were dating

13    C█████████?

14    **A.**     I think so, yes.

15    **Q.**     And were you being raped with the same frequency while

16    you were dating C█████████?

17    **A.**     I don't recall the frequency, but it was often.

18    **Q.**     Okay.  Did you tell C███████ that the cuts on your

19    arms were self-inflicted?

20    **A.**     I don't recall.

21    **Q.**     Were they self-inflicted?

22    **A.**     Not at that time, no.

23    **Q.**     With Mr. Brenner you described two locations for these

24    rapes, right?

25    **A.**     Um-hmm.

1    **Q.**    And they were both in your neighborhood?

2    **A.**    Um-hmm, yes.

3    **Q.**    One was near the bus stop?

4    **A.**    Yes.

5    **Q.**    And one was in the woods near your house?

6    **A.**    Yes.

7    **Q.**    Okay.  If you could take a look at Exhibit 134 in your

8    binder.

9         MS. REWARI:  I'm not sure if this is in.  This is a

10   photograph of the neighborhood.

11        THE COURT:  134 -- 134 in?

12        MR. BRENNER:  If it's -- it's just the one page?

13        THE COURT:  There is no 134 in the record.

14        MS. REWARI:  Defendants' Exhibit 134?

15        THE LAW CLERK:  It's not admitted.

16        MS. REWARI:  Yeah, okay.

17        THE COURT:  Not admitted.

18        MS. REWARI:  All right.  Thank you.  Just checking.  We've

19   seen a lot of photographs.

20        I move to admit Defendants' Exhibit 134.

21        MR. BRENNER:  I have no objection to 134, Your Honor.

22        THE COURT:  Without objection.

23        (Defendants' Exhibit 134 admitted into the record.)

24        THE WITNESS:  Okay.

25   BY MS. REWARI:

1    Q.    And do you recognize this as an aerial overview of where

2    you lived in the fall of 2011?

3    A.    Yes.

4    Q.    Okay.  And your house was on Horsepen Woods Lane, right?

5    A.    Yes.

6    Q.    And so if you're come --

7          THE COURT:  If it's in the picture, can you circle it?

8          THE WITNESS:  Sure.

9          THE COURT:  I'm sorry.  You can't circle it.

10         There are four houses that intersect towards Horsepen Lane

11   and looks like Middleton Farms.  There's a house on the corner,

12   let's say that one is one.  Is your house the second one?

13         THE WITNESS:  I'm sorry, could you say that again?

14         THE COURT:  The intersection of Middleton Farm Lane and

15   Horsepen Woods Lane there.

16         THE WITNESS:  Um-hmm.

17         THE COURT:  There's a house that abuts with Middleton Farm

18   Line, is your house the one next to that on my left?

19         THE WITNESS:  If you go on Horsepen Woods Lane, so if you

20   turn from Middleton to Horsepen, it's the second house.

21         THE COURT:  Very good.  Thank you.

22         THE WITNESS:  Of course.

23   BY MS. REWARI:

24   Q.    The second house?

25   A.    On Horsepen Woods Lane.

1          THE COURT:  Is it the house with the car in the driveway

2     or the house beside that one?

3          THE WITNESS:  It's the one to the right of the house with

4     that white car, if that makes sense.

5          THE COURT:  That makes sense.

6          THE WITNESS:  Okay.

7          THE COURT:  There's a big red tree or bush in the front

8     yard?

9          THE WITNESS:  That's correct.

10         THE COURT:  Okay.

11    BY MS. REWARI:

12    Q.   Okay.  And if you'd take a look at -- in your binder at

13    Exhibit 315.

14         MR. BRENNER:  Still Defendants' exhibit?

15         MS. REWARI:  Yes, sorry.  Thank you.  Defendants'

16    Exhibit 315.

17         MR. BRENNER:  There will be no objection to 315, Your

18    Honor.

19         THE COURT:  Without objection.  It can be published.

20         (Defendants' Exhibit 315 admitted into the record.)

21    BY MS. REWARI:

22    Q.   Does -- does this aerial photograph show the interaction

23    where your bus stop was located?

24         MS. REWARI:  I'm sorry, may we publish this?

25         THE COURT:  You may.

1          MS. REWARI:   Thank you.

2    BY MS. REWARI:

3    Q.     So I don't know if you can see it well on this picture,

4    but there's a little blue --

5    A.     Yeah, I see it.

6    Q.     -- dot there.  And that's what -- was that where your bus

7    stop was?

8    A.     Near there, yes.

9    Q.     (Indicating).  And that's the intersection of Middleton

10   Farms Road and West Ox Road?

11   A.     Yes.

12   Q.     Okay.  And so to get from the bus stop to your house, you

13   go down Middleton Farms Road towards -- Middleton Farms Road

14   towards Horsepen Woods and then a right at the corner?

15   A.     I think if I'm understanding what you're saying, that

16   makes sense.

17   Q.     Okay.  And was your house the first one, once you turn

18   the corner on your right?

19   A.     You said once you turn on Horsepen, right?

20   Q.     Right.

21   A.     Yes, that sounds right.

22   Q.     Okay.

23          MR. BRENNER:  It's -- in the previous picture you could

24   see it better.  It depends on what you're calling the first one,

25   though.

```
 1          THE COURT:  Yeah.

 2          MR. BRENNER:  There's one on the corner that's on both --

 3          THE WITNESS:  Yeah.

 4          THE COURT:  I think the first picture, I think, had a

 5   better point of reference.  And I'm sure the jury is having the

 6   same struggle.  Can we put up the previous exhibit?

 7          MS. REWARI:  Sure, yeah.

 8          THE COURT:  And I believe the witness was able to verify

 9   her home more particularly on that one.  See the intersection of

10   Horsepen and Middleton Farm Lane, it's the second house in with

11   the red bushes in front of it.

12          MS. REWARI:  This one?

13          THE COURT:  Yes.

14   BY MS. REWARI:

15   Q.     (Indicating).  Is that the right one?

16   A.     Should I turn back to that one?  The --

17          THE COURT:  That would be best, yes.

18          THE WITNESS:  Which one is that again?

19          THE COURT:  134.

20          THE WITNESS:  Thank you.

21   BY MS. REWARI:

22   Q.     Ma'am, if you could take a look at Defendants'

23   Exhibits 39 in your book, there's some photographs there.  If

24   you prefer to look at the pictures on the screen, it might be

25   easier, but it's up to you.
```

```
 1          THE COURT:  She's more comfortable with the binder.

 2          MS. REWARI:  Okay.

 3          MR. BRENNER:  You said 39, Ms. Rewari?

 4          MS. REWARI:  Yes.

 5          THE WITNESS:  Okay.

 6   BY MS. REWARI:

 7   Q.     And are these pictures of the bus stop from -- that you

 8   used for Rachel Carson in 7th grade year?

 9   A.     Yes.

10   Q.     Okay.

11          MS. REWARI:  Your Honor, we move to admit Defendants'

12   Exhibits 39.

13          MR. BRENNER:  No objection.

14          THE COURT:  Without objection, 39.

15          (Defendants' Exhibit 39 admitted into the record.)

16          THE COURT:  You may publish.

17   BY MS. REWARI:

18   Q.     Okay.  So in the first picture, there's a sign there that

19   says -- looks like a little red sign.  Is that the Middleton

20   Farms entrance?

21   A.     You mean like where it says "Middleton Farms"?

22   Q.     Yes.  It's harder for --

23   A.     Yeah.

24   Q.     -- for everybody else to see what's in the picture, but

25   we can zoom in.
```

1    **A.**      Yeah, that makes sense, yep.

2          MS. REWARI:  We'll see if Grady can zoom us in a little

3    bit so we can see the sign.

4          THE COURT:  I think we can get a stipulation that it says

5    what it says.

6          MS. REWARI:  All right.

7    BY MS. REWARI:

8    **Q.**      And then the second photograph --

9    **A.**      Do you want me to flip to the --

10   **Q.**      Yeah, flip to the next page.

11         And this is -- this is another view of the entrance?

12   **A.**      Yes.

13   **Q.**      Okay.  And then in the -- in the third photograph, is

14   that the house that's at the corner?

15   **A.**      Yes.

16   **Q.**      One second, we're going to get Grady caught up here.

17   There we go.

18         And that's -- that's the house as you turn on to

19   Middleton Farms Lane, right -- or Road, excuse me?

20   **A.**      Yes, it's the first house in the community.

21   **Q.**      Okay.  And the -- that's -- that's where you allege that

22   these -- that's one of the two locations that you allege where

23   these sexual assaults took place, right?

24   **A.**      I'm confused.  You're saying -- can you clarify that?

25   **Q.**      Yeah.  Thank you.

1          So it is in the yard of this house behind the sign for

2    Middleton Farms community is where -- is one of the two

3    locations where you say C.K. raped you, right?

4    **A.**    I mean, I don't know if it's the yard, but it's behind

5    the sign.

6    **Q.**    Okay.

7    **A.**    In the area where there's the mulch.

8    **Q.**    Okay.  If you could take a look in the white binder at

9    Plaintiff's Exhibit 688.

10         MR. BRENNER:  It's not in mine.

11         THE COURT:  Show him 68, your proposed 68.

12         MR. BRENNER:  688?

13         MS. REWARI:  Yeah, 688.

14         MR. BRENNER:  Oh, 688.  I'm sorry.  I thought you said 68.

15   BY MS. REWARI:

16   **Q.**    Do you have that?

17   **A.**    Yes, I do.

18   **Q.**    Okay.  And is that the Middleton Farms entrance sign, I

19   mean, apart from the foliage, which I understand can change?

20   **A.**    Yes, that is the sign.

21   **Q.**    Okay.  And it's behind this sign that you've alleged that

22   some of these rapes took place?

23   **A.**    That's where they happened.

24   **Q.**    Okay.

25         THE COURT:  Did you want to offer 688?

1    MS. REWARI:  Yeah.  Your Honor, I move to admit 688.

2    MR. BRENNER:  And I think -- is it -- I think it's a DX,

3    not a -- is it a PX.

4    MS. REWARI:  I think it's a PX.

5    MR. BRENNER:  Well, whatever it is, Your Honor, the one

6    she showed me, we have no objection to that one.  We'll figure

7    out the number later.

8    THE COURT:  Okay.  All right.  Why don't we go ahead and

9    provisionally publish it to make sure that we're all working from

10   the same sheet of music.

11   Is that what you believe 688 is -- to be?

12   MR. BRENNER:  I do, no objection.

13   THE COURT:  All right.  Very good.  It's admitted.

14   MS. REWARI:  Thank you.

15   (Defendants moved Plaintiff's Exhibit 688 and it was

16   admitted into the record.)

17   BY MS. REWARI:

18   **Q.**    When -- please take a look at Plaintiff's Exhibit 659.

19   **A.**    I'm sorry.  You said 659?

20   **Q.**    Yes, six-five-nine.

21   **A.**    Okay.

22   MR. BRENNER:  Your Honor, may I just stand and see what it

23   is, because --

24   THE COURT:  You don't have a problem with that,

25   Ms. Rewari, do you?

94

1          MS. REWARI:  I'm sorry.  I will share.

2          MR. BRENNER:  No objection to 659.

3          THE COURT:  Without objection.

4          (Defendants moved Plaintiff's Exhibit 659 and it was

5     admitted into the record.)

6          THE COURT:  You may publish.

7     BY MS. REWARI:

8     Q.    Is this a close-up of the sign at the entrance to your

9     community?

10    A.    It's behind the sign that we were just talking about.

11    Q.    Okay.  And that's the fence?

12    A.    Yes.

13    Q.    Would you please take a look at Plaintiff's Exhibit 660?

14         THE COURT:  Any objection?

15         MR. BRENNER:  No objection to 660, Your Honor.

16         THE COURT:  No objection.

17         (Defendants moved Plaintiff's Exhibit 660 and it was

18    admitted into the record.)

19         THE COURT:  You may publish.

20         THE WITNESS:  Okay.

21    BY MS. REWARI:

22    Q.    And is this another photograph of the sign?

23    A.    Behind the sign.

24    Q.    Yeah, thank you.  Behind the sign?

25    A.    Or to the side, I should say, of it is the vantage point

```
 1   of behind the sign.

 2   Q.    All right.  And is this mulch area that we see in this

 3   photograph where the November 2011 rape that you reported to the

 4   police occurred?

 5   A.    It's where my assaults by C██████ happened at times.

 6   Q.    Okay.  And the one that you told the police detective

 7   about was at this location, right?

 8   A.    Sounds about right.

 9   Q.    And this -- this entrance to your neighborhood is the

10   only way in and out of your community, right?

11   A.    I think so.

12   Q.    Please take a look at Plaintiff's Exhibit 662.

13   A.    Okay.

14         MR. BRENNER:  No objection.

15         THE COURT:  Without objection.

16         (Defendants moved Plaintiff's Exhibit 662 and it was

17   admitted into the record.)

18         THE COURT:  You may publish.

19   BY MS. REWARI:

20   Q.    And is this the view from behind the sign?

21   A.    It's taken to the side of behind the sign, but, yes,

22   that's what I think it's trying to show.

23   Q.    Okay.  And to your recollection, all of these assaults

24   occurred after school, right?

25   A.    Yes.
```

1    **Q.**    Between 3 p.m. and 5 p.m.?

2    **A.**    Approximately.  I'm not exactly sure on the time, but

3    sounds right.

4    **Q.**    Did they all occur on your way home from the bus stop?

5    **A.**    In terms of the assaults by C█████, yeah.

6    **Q.**    Please take a look at Defendants' Exhibit 40 in your

7    book.

8         THE COURT:  Counsel, you may see me from time to time

9    interacting with the jury.  I'm simply asking things about

10   comfort, so I'm making sure the record is clean on that.  Thank

11   you.

12        MS. REWARI:  I apologize if I'm paying attention up there.

13        THE COURT:  No, no, no.  I'm just making sure that the

14   record is clear.

15        MS. REWARI:  Thank you.

16   BY MS. REWARI:

17   **Q.**    Are these photographs of the park area near your house?

18   **A.**    It's one vantage point.

19   **Q.**    Okay.  And take a look at the other pictures.  There's a

20   few in there.

21   **A.**    Okay.

22   **Q.**    And so, do these photographs capture what that park area

23   near your house at the corner of, looks like, Cherry Branch Lane

24   and Middleton Farms Lane, looks like?

25   **A.**    I'm sorry, can you repeat that question?

1    **Q.**    Yeah, it's a terrible question.

2        So, you had talked with Mr. Brenner about a park area

3    with some benches near your house?

4    **A.**    Yes.

5    **Q.**    And you had said that this was the park area where C.K.

6    and J.O. assaulted you?

7    **A.**    That's correct.

8    **Q.**    And if we can go back to the first photograph, the aerial

9    photograph of your subdivision, Exhibit --

10        THE WITNESS:  I'm sorry.  Are you telling me to go to

11    another one?  I'm sorry.  And I interrupted you.  Sorry.

12    BY MS. REWARI:

13    **Q.**    I'm going to see if Mr. Grady can put the right one up,

14    and then I'll make sure that's the right one to send you to.

15        Exhibit 315.  Just so we can orient everyone to what

16    we're looking at here.

17    **A.**    Okay.

18    **Q.**    Your house is on Horsepen Woods Lane, right?

19    **A.**    Yes.

20    **Q.**    And then right behind that on the corner of Cherry Branch

21    Lane and Middleton Farms Lane, there's a little park area there?

22    **A.**    I'm sorry, can you say that one more time?

23    **Q.**    Well, at the intersection of Cherry Branch Lane and

24    Middleton Farms Lane, there's a park area with some trees.  Is

25    that the park that you described with Mr. Brenner?

1    **A.**    Yes.

2    **Q.**    And so this park is like catty-corner to your back yard,

3    right?

4    **A.**    Yeah, that sounds like that might make sense, yeah.

5    **Q.**    And this is the park where you say J.O. and C.K. sexually

6    assaulted you?

7    **A.**    Yes.

8    **Q.**    And that was the incident in October?

9    **A.**    That's correct.

10   **Q.**    And that was the incident that was the day those

11   photographs -- the selfies were taken?

12   **A.**    I believe of the pictures you showed me, it was like two

13   of them or three of them, not all of them that were taken that

14   day.

15   **Q.**    The ones with you and J.O., right?

16   **A.**    That's correct, yes.

17   **Q.**    And they were taken in this park?

18   **A.**    Yes.

19   **Q.**    Okay.  So, if you go back to Defendants' Exhibit 40 in

20   your book, are these photographs of that park?

21   **A.**    I'm sorry, what was your question again?

22   **Q.**    Are the pictures in Defendants' Exhibit 40 photographs of

23   the park that we were just talking about?

24   **A.**    Again, it's a different vantage point than the first one,

25   but, yeah.  There are some that precede that are -- they're a

1    more proper vantage appointment.

2    **Q.**    Right.  So the vantage point on the first one is if

3    you're coming down Cherry Branch Lane and then intersecting with

4    Middleton Farms Road, right?

5    **A.**    Sure.

6    **Q.**    And then --

7        MS. REWARI:  Your Honor, we move to admit Defendants'

8    Exhibit 40.

9        THE COURT:  Without objection?

10        MR. BRENNER:  I don't have an objection, except I believe

11    one of the pictures is not in the same place as the other ones.

12    The last one I don't think is --

13        THE COURT:  Goes to weight.

14        MR. BRENNER:  But no objection to the exhibit.

15        THE COURT:  Just a moment.

16        All right, you may continue.

17        MS. REWARI:  May I publish, Your Honor?

18        THE COURT:  You may.

19        (Defendants' Exhibit 40 admitted into the record.)

20    BY MS. REWARI:

21    **Q.**    All right.  So in the first photograph, the park is shown

22    from -- going from Cherry Branch Lane to Middleton Farms Lane --

23    Middleton Farms Road, right?

24    **A.**    I think so, if I understand what you're saying.

25    **Q.**    Okay.  And the next photo, this is coming down Middleton

1   Farms Lane towards Horsepen Woods, right?

2   **A.**     Sounds about right.

3   **Q.**     Okay.  And then in the next photograph, now, this is what

4   it looks like from Horsepen Woods Lane?

5   **A.**     I'm sorry, what was that?

6   **Q.**     The third photograph --

7   **A.**     This is on Middleton Farms Lane, it says.

8   **Q.**     I'm sorry, you're right.  This is Middleton Farms Lane.

9        So this is looking at the park before you get to Horsepen

10  Woods, right?

11  **A.**     That's correct, yes.

12  **Q.**     And then we can skip the fourth photograph.

13       The next one is still from Middleton Farms Lane looking

14  at this park, right?

15  **A.**     So you said skip one, so it says -- and just so I'm

16  clear, the one that says at the top, the 3236 one?  Is that the

17  one?

18  **Q.**     Cherry Branch Lane --

19       THE COURT:  Skip one more page, I believe, in your binder.

20       THE WITNESS:  Okay.

21       THE COURT:  At the top it says 13236.

22       THE WITNESS:  Okay.  I think I'm on that one.

23       THE COURT:  All right.

24  BY MS. REWARI:

25  **Q.**     Okay.  And so this is -- this is still on the Middleton

1    Farms Lane, and you can see the park there on the right with the

2    benches, right?

3    **A.**    Yes.

4    **Q.**    And then you would turn from Middleton Farms Lane and

5    take a right to get to Horsepen Woods, correct?

6    **A.**    From Middleton Farms Lane you would take a right to get

7    to Horsepen, yes.

8    **Q.**    Okay.  And then the last photograph there shows your

9    house, the house you lived in in the fall of 2011, right?

10   **A.**    I don't see that.

11   **Q.**    Well, it's the last photograph.

12   **A.**    Yeah, that's my house.

13   **Q.**    Okay.

14         THE COURT:  How many more areas of inquiry do you have,

15   Ms. Rewari?

16         MS. REWARI:  I just have like five more questions.

17         THE COURT:  Very good.

18   BY MS. REWARI:

19   **Q.**    Now, you claim that by the time that you came to the

20   meeting with the school on November 21st, 2011, you'd been raped

21   multiple times, right?

22         MR. BRENNER:  Objection.  Asked and answered.

23         THE COURT:  Sustained.

24   BY MS. REWARI:

25   **Q.**    You didn't tell your mother before this meeting that

```
 1   you'd been raped, correct?

 2   A.    That's correct.  I was being threatened.

 3   Q.    Okay.  And you didn't tell any school employee that you

 4   had been raped, correct?

 5   A.    I didn't use the word "rape."

 6   Q.    You never once used the word "rape" to describe what was

 7   happening to you?

 8   A.    That's correct, yeah, I never did.

 9   Q.    You told us in your deposition that the word "rape" was

10   not in your vocabulary at age 12, right?

11   A.    That's what I said, but I'm happy to elaborate a little

12   bit further to give you more clarity as to what I meant by that.

13   Q.    Well, you said you gestured to your body parts.

14   A.    Um-hmm, yes.

15   Q.    But you didn't say that you were being raped.

16   A.    Um-hmm, yep.

17   Q.    Because you didn't know the word "rape," right?

18   A.    I think that I knew the word "rape," but I don't think

19   that I knew how to put two and two together.  There was a lot of

20   shame and embarrassment that I felt using the word, and I just

21   didn't know how to put two and two together and verbalize that.

22   That word at least, the word "rape."

23   Q.    Well, Jenni Taylor used the word "rape" in her messages,

24   right?

25   A.    That was after I had been raped since October until
```

```
 1   February.

 2         MS. REWARI:  I have no further questions.

 3         THE COURT:  How long do you anticipate on your

 4   examination, Mr. Kinney?

 5         MR. BLANCHARD:  Your Honor, if it's all right, Mr. Kinney

 6   says I can go next because --

 7         THE COURT REPORTER:  I'm sorry, counsel, say that again.

 8         MR. BLANCHARD:  Mr. Kinney, if it's okay, was asking --

 9         THE COURT:  Come to the lectern, for the benefit of the

10   court reporter.

11         MR. BLANCHARD:  If I can -- if I could go next, Your

12   Honor.  Ms. Rewari, where she was with those pictures is an area

13   I want to cover.  And I have very little at this point --

14         THE COURT:  Okay.

15         MR. BLANCHARD:  -- with respect to what she's covered, so

16   I thought --

17         THE COURT:  We'll see what we can do.

18         MR. BRENNER:  Just so I understand, Mr. Kinney is then

19   going to go next?

20         MR. BLANCHARD:  He's going to follow me.  We're just

21   batting out of order a little bit --

22         MR. BRENNER:  That's fine.

23         MR. BLANCHARD:  -- I thought, for time purposes.

24         MR. BRENNER:  That's fine.

25         MR. BLANCHARD:  Can we put the pictures of Exhibit 40 back
```

1  up?  And if we could look at the third -- I think it's the third

2  picture.

3          THE COURT:  What's the caption at the top of Google Maps?

4          MR. BLANCHARD:  Yeah, that picture right there.

5          THE COURT:  Caption is 13235.

6  Yeah, for the record, 13235 Middleton Farms Lane.

7                      CROSS-EXAMINATION OF B.R.

8  BY MR. BLANCHARD:

9  Q.     Ms. R., do you have that picture in front of you?

10  A.     Yes, I do, Mr. Blanchard.

11  Q.     Okay.  Can you describe -- the interaction or the

12  altercation, I think in your words, were -- "the attack" by J.O.

13  and C.K. occurred in that park, correct?

14  A.     That's correct.

15  Q.     And you said that J.O. pushed her down -- pushed you down

16  from behind, and you fell against the bushes --

17          THE COURT:  Mr. Blanchard, you need to speak in front of

18  the microphone so the jurors can hear you.

19          MR. BLANCHARD:  I can, Your Honor.  I'm working on the

20  eyesight issue and not of the picture, but I think I can do it

21  from here.  Thank you.

22          THE COURT:  Okay.

23  BY MR. BLANCHARD:

24  Q.     You said that J.O. pushed you, and you fell to the ground

25  beside the bushes, correct?

1    **A.**    Something like that, yes.

2    **Q.**    Well, what do you mean by "something like that"?

3    **A.**    She pushed me down in front of the ground.

4    **Q.**    But you were not in the bushes?

5    **A.**    Eventually I was in the bushes.

6    **Q.**    Okay.  When were you in the bushes?

7    **A.**    I don't know how to answer that.  Could you reclarify

8    that?

9    **Q.**    No, it's your -- I'm asking you about what happened, and

10   you're telling me eventually you were in the bushes.

11         When were you in the bushes?

12   **A.**    At some point during the assault.

13   **Q.**    Well, are the bushes that you're talking about the ones

14   that are there on the left side of that photograph?

15   **A.**    That's correct.

16   **Q.**    And those are -- let me ask you this:  From the middle of

17   Middleton Road to those bushes, how far is it?

18   **A.**    I don't know.

19   **Q.**    Well, sitting in this courtroom, is it about the distance

20   to that wall?

21   **A.**    I have no idea.

22   **Q.**    Well, how big was your front yard in your house in that

23   neighborhood?

24   **A.**    Are you asking me like how many bedrooms or like was --

25   **Q.**    No, your front yard.

1    **A.**    I don't know.

2    **Q.**    You don't remember how big your front yard was?

3    **A.**    I mean, I don't know like the yards, acres, I don't know.

4    **Q.**    But just looking sizewise, can you tell the distance from

5    if I'm standing on Middletown (sic) Road, and I'm looking at

6    those bushes in the park, is it farther than from me to that

7    wall?

8    **A.**    I'm confused.  I thought you said my front yard.

9    **Q.**    Well, I was trying to give you some point of reference,

10   ma'am.

11        THE COURT:  How many steps would it take you from getting

12   to the -- from the sidewalk to those bushes?

13        THE WITNESS:  Um, I really don't know how to quantify that

14   now.  I'm not sure.

15        THE COURT:  Okay.

16   BY MR. BLANCHARD:

17   **Q.**    When was the last time you were in that neighborhood?

18   **A.**    A few months ago.

19   **Q.**    It wasn't some time in the last two weeks?

20   **A.**    No.

21   **Q.**    Okay.  Well, does the picture you're looking at that

22   shows 13235 Middleton Farm, does that -- is that an accurate

23   representation of how far the bushes appear to be from the road?

24   **A.**    I mean, I guess.

25   **Q.**    Okay.  Can we get the overhead picture of the park?  315.

1    Can we put up 315?

2         THE LAW CLERK:  You want Defendants' 315?

3         MR. BLANCHARD:  Yes, please.

4    BY MR. BLANCHARD:

5    **Q.**    All right.  Ma'am, if you'd look at that picture.

6    **A.**    I don't have it up yet, Mr. Blanchard.  One second.

7    **Q.**    Thank you.

8    **A.**    Okay.  I do now.

9    **Q.**    Okay.  If you look at that picture, do you see the park,

10   the vacant park?

11   **A.**    Um, yeah, I can kind of see it.

12   **Q.**    Okay.  Would you be comfortable having the screen moved

13   and look at that on -- for a blown-up picture?

14   **A.**    I mean, if it helps, sure, for a second I can do it.

15        Okay.

16   **Q.**    Does that give you a better reference point to figure out

17   how far it was from Middleton Farms to those bushes?

18   **A.**    I still don't understand your question.

19   **Q.**    All right.  If you look at the house at the corner of

20   Horsepen and Middleton Farms, you see the front door of that

21   house, correct?

22   **A.**    You're saying the house on the corner?

23   **Q.**    Yes.

24   **A.**    Can I see that -- I'm sorry.  I just don't --

25        THE COURT:  Can we orient the blow-up where we can push up

1    further up the road so we can see the tip end of Cherry Branch

2    and the bottom of the intersection of Middleton Farms and --

3            MR. BLANCHARD:  Can we raise that a little bit?

4            THE COURT:  Other way.

5            MR. BLANCHARD:  The other way.

6            THE COURT:  Other way.  Okay.

7    BY MR. BLANCHARD:

8    **Q.**    Do you see that house on the corner of Horsepen Woods and

9    Middleton Farms, correct?

10   **A.**    Yeah, I'm just going to draw on it, so you can make sure

11   that I -- yeah, this one, right?

12   **Q.**    Correct.

13   **A.**    Okay.

14   **Q.**    You would agree with me that the edge of those bushes is

15   closer to Middleton Farms Lane than the front door of the house

16   at the corner of Horsepen Woods and Middleton Farms, correct?

17   **A.**    I'm really not following your questions.

18   **Q.**    Okay.  If you'll look at the lines --

19           MR. BRENNER:  Can he have the witness identify the

20   picture?

21           We're all looking at the same picture.  The jury can

22   conclude how far one thing is.  She has no idea how many feet or

23   yards.  I'm not sure what Mr. Blanchard wants the witness to do

24   that the picture doesn't do for itself.

25           MR. BLANCHARD:  Your Honor, what I'm trying to get --

1    do --

2        THE COURT:  I'll give you a few more times to orient her,

3    if she knows.

4    BY MR. BLANCHARD:

5    **Q.**    Let me start with, how long did you live in Middleton

6    Farms?

7    **A.**    A few years.

8    **Q.**    Okay.  And if you look now at the picture that we have --

9    and this park was -- was one house away from your home, correct?

10   **A.**    I mean, it looks like that on the map, but there was

11   fencing around it, so it's not like I had access to go from my

12   house to the park.  You had to walk around the block.

13   **Q.**    I understand that.  You had to walk -- well, around the

14   block, you had to walk out your door, past one house, turn left,

15   and you were -- at the end of that house you were at the park,

16   correct?

17   **A.**    If I'm following you, that sounds right.  I'm not sure I

18   am, though.

19   **Q.**    Okay.  And you had to pass that park any time you left

20   your house to leave the neighborhood, correct?

21   **A.**    Yeah.

22   **Q.**    Let me ask you this:  Middleton Farms goes, in this

23   picture, away, which is down in this picture, away from West Ox

24   Road, back, correct?

25       In other words, your neighborhood goes past Horsepen?

1    **A.**     I'm confused.

2          THE COURT:  How many houses on Horsepen, using your house

3    as a point of reference, how many other houses on Horsepen on

4    your side of the road?

5          THE WITNESS:  I -- I don't remember that.  I don't know.

6    A few.  There was -- I'm not sure if that even --

7    BY MR. BLANCHARD:

8    **Q.**     Well, let me ask it another way.

9          How far past Horsepen Road did Middleton Lane --

10   Middleton Farms Lane run?

11   **A.**     So are you asking me just there's that one house on the

12   corner?  I'm not really sure I'm getting your question.

13   **Q.**     I'm asking you how long Middleton Lane Farms Road is.

14   **A.**     I don't -- I don't know -- to where?

15   **Q.**     To where it ends.

16   **A.**     I mean, to the beginning of the community.  I don't --

17   I'm not sure I'm really following your question.

18   **Q.**     Not -- not back to the beginning of the community; I'm

19   talking about back to the end of the community.  Middleton Farms

20   Lane is a dead-end, correct?

21   **A.**     Sure, yeah.

22   **Q.**     So how far was it from your house to the dead-end of

23   Middleton Farms Lane?

24   **A.**     I have no idea.  It was like a road.  It was like right

25   next to my house.  It wasn't a few doors down.  I don't know.

```
 1            THE COURT:  Let me ask it this way.  Just -- we're just
 2    trying to get oriented to the size.
 3            In the area that Mr. Blanchard is referring to, could
 4    there be another house put in the lot that's the same size of the
 5    houses that were generally in that community?
 6            THE WITNESS:  You're saying next to my house --
 7            MR. BLANCHARD:  Actually, Judge, I'm getting to something
 8    different.  I may have to get it with another witness, but if I
 9    can just ask --
10            THE COURT:  Let's hope so, because --
11    BY MR. BLANCHARD:
12    Q.    Ma'am, how many houses -- do you have any idea how many
13    houses were in your neighborhood?
14    A.    I have no idea.  I was 12.
15    Q.    Can I take --
16            MR. BLANCHARD:  Can we pull up Plaintiff's 604?
17    Exhibit 604.  Yeah, don't -- don't publish it yet.
18            Oh, it's already in?
19            Can we put it up?
20            THE COURT:  Just a second.
21    BY MR. BLANCHARD:
22    Q.    Ma'am, do you have Plaintiff's 604?
23    A.    I'm looking at the screen because that's what -- you want
24    me to look at the screen, right?
25    Q.    Whatever helps you remember.
```

1          MR. BRENNER:  You'd have to give her a hard copy if you

2    want her not to look at the screen.

3    BY MR. BLANCHARD:

4    Q.    Can you -- looking at that picture, do you see the vacant

5    lot?

6    A.    The what?

7    Q.    The lot, the park?

8    A.    Can you speak -- I can't really hear you, I'm sorry.

9    Q.    Um-hmm.  Can you see the park near your house in that

10   picture?

11   A.    Yes.

12   Q.    Okay.  And you see Middleton Road -- Middleton Farms Lane

13   continuing on past Horsepen, right?  Correct?

14   A.    Yes.

15   Q.    And you see Horsepen going up past your house up and

16   around to the left, correct?

17   A.    Sure, that's what the map says.

18   Q.    Well, you lived there.  Were those the way -- where the

19   roads went when you lived there?

20   A.    I said yes, there's one entrance, and I told you that,

21   yes.

22   Q.    Right.  And Horsepen and Middleton Farms Lanes are both

23   lined with houses, correct?

24   A.    It appears to be the case, yep.

25   Q.    Well, was it -- did it appear to be the case when you

1    lived there?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, is there also -- I think it's Thistleberry

4    Court that goes off of Horsepen that you can see between

5    Horsepen and Middleton Farms Lane?

6    **A.**    Okay.

7    **Q.**    And it's got houses along it, correct?

8    **A.**    Sure.

9    **Q.**    And do you recall Blue Holly Lane also being in that back

10   part of the neighborhood?

11   **A.**    I don't --

12          THE COURT:  You can't see it from this exhibit unless it's

13   moved down.

14          MR. BLANCHARD:  Yeah, I don't think it's in -- in this

15   picture, Your Honor, so I was just asking if she recalls it.

16          THE COURT:  All right.

17          THE WITNESS:  The street name sounds familiar.

18   BY MR. BLANCHARD:

19   **Q.**    Okay.  And did all those lanes, Middleton Farms Lane,

20   Horsepen Woods Lane, Thistleberry Court, and Blue Holly Lane

21   dead-end?

22   **A.**    Okay.

23   **Q.**    So anybody who lived in that back part of the

24   neighborhood had to go by the park you're talking about to go in

25   or out of their house?

1  **A.**    Sounds about right.

2  **Q.**    Okay.  Now, the incident you said that involved C.K. and

3  J.O. occurred around 4:00 in the afternoon, correct?

4  **A.**    Something like that, yep.

5  **Q.**    And it was daylight?

6  **A.**    Something -- yeah, the light was still out.

7  **Q.**    Well, was it bright, or was it dark?

8  **A.**    There was still light out.

9  **Q.**    Okay.  And is it my understanding that the only car that

10  passed during this alleged assault was your father's and your

11  brother?

12  **A.**    That is correct.

13  **Q.**    Okay.  So despite all those houses being there, and it's

14  4:00 in the afternoon, no other cars went by the park that you

15  recall?

16  **A.**    That I recall, yes.

17  **Q.**    Okay.  What kind of car did your father have?

18  **A.**    I believe he had a Toyota.

19  **Q.**    And is that what he was driving that day?

20  **A.**    I'm not a hundred percent sure.  I think he was, yeah.  I

21  don't know what kind of car, but it was, I believe, silver.

22  **Q.**    It -- was it a sedan?

23  **A.**    I'm not good with cars.  If -- a four-door, is that what

24  that means, is that what a sedan is?

25  **Q.**    Four-door.

1    **A.**      Yeah, I believe it was a sedan.

2    **Q.**      And your brother was sitting in the passenger seat?

3    **A.**      That's correct.

4    **Q.**      And he was 16 years old about -- at that time?

5    **A.**      Yeah, sounds about right.

6    **Q.**      Okay.  Now, as I understand, you've told the jury you

7    were lying by the bushes.  J.O. was on top of you, and C.K. was

8    to the side of you; is that correct?

9    **A.**      At the start of the assault, yes.

10   **Q.**      Okay.  And did that change?

11   **A.**      So, eventually, yes, it did.

12   **Q.**      Okay.  Was there ever a time when no one was beside you

13   or on top of you?

14   **A.**      Can you repeat that?  I'm sorry.

15   **Q.**      Was there ever a time once the assault started where no

16   one was beside you or on top of you?

17   **A.**      I don't really know how to answer that question.

18   **Q.**      But you've told the jury that you could -- you turned

19   your head, and you could see your father's car come by with your

20   brother in the front seat, and you were close enough to see that

21   he had food?

22   **A.**      I don't recall saying I turned my head.

23   **Q.**      Okay.  So, how did you -- what happened?  How did you see

24   them?

25   **A.**      I was laying flat on my back.

1    **Q.**    Okay.

2    **A.**    I lifted my head, and there was a -- I tried to fight.

3    **Q.**    Okay.  So you were lying on your back; you lift your

4    head.  So were your feet pointing towards the road?

5    **A.**    Yes.

6    **Q.**    Okay.  And when you lift your head, who's on top of you?

7    **A.**    So, at first J████ is.  She stayed on there.  She takes

8    pictures of my breasts.

9    **Q.**    Okay.

10   **A.**    Do you want me to continue?

11   **Q.**    No, I just want to tell -- I want to know who's on top of

12   you during this -- because you're telling me now you're lifting

13   your head, and either J.O. or C.K. has been on top of you,

14   correct?  To hold you down.  Somebody is holding you down.

15   **A.**    Yes, that's correct.

16   **Q.**    Okay.  So if your feet are facing the road, and C.K. or

17   J.O. is on top of you, and you lift your head, aren't they

18   blocking your view of the road?

19   **A.**    Well, I don't know if you're characterizing the entire

20   assault correctly.

21   **Q.**    I'm just asking you to explain what you told this jury

22   from that point, and how you could see your brother in the car

23   with your dad and that your brother had food?

24   **A.**    I just saw it.  I don't know how you want me to explain

25   that.

1    Q.    All right.  Well, let me ask you this:  In your father's

2    sedan, did the windows of the car start at about shoulder -- a

3    little under shoulder length?

4    A.    I'm not sure what that means.

5    Q.    Sitting in your car and you put your window down, is the

6    door of the car equal to about mid shoulder?

7    A.    I have no idea.  I don't remember.

8    Q.    Okay.  What did you see when you say you saw food?

9    A.    I just saw my brother, I saw his face --

10   Q.    Right.

11   A.    -- and I saw that he had like a bag of food on his lap.

12   Q.    So you could see his lap?

13   A.    No, I just know if you see a bag, it's on his legs,

14   right?

15   Q.    Right.  So the bag of food he had was big enough that in

16   a sitting position he had it on his lap, and you could see the

17   bag from by the bushes during the assault?

18   A.    I'm sorry, can you repeat that?

19   Q.    Yeah.  I'm saying I just want to understand -- that I

20   understand your testimony.

21        You're saying that while lying on your back during an

22   assault, you lift your head.  At some point when you lift your

23   head, you can see your brother in a car with a bag that you've

24   told the jury was of food.  And I'm trying to understand how, if

25   that's what you're saying.

1    **A.**    Yeah, that's what I'm saying.

2    **Q.**    Okay.

3         MR. BLANCHARD:  Can we look at the last page of

4    Exhibit 40, please.  Defendants' 40.

5         Okay.  I think it's already been --

6         THE COURT:  Admitted.

7         MR. BLANCHARD:  -- admitted.

8    BY MR. BLANCHARD:

9    **Q.**    Is that a picture of your dad's car?

10   **A.**    No.

11   **Q.**    It's not?

12   **A.**    No.

13   **Q.**    Okay.  What was the day -- you said a silver Toyota.

14        Does that appear to be a silver Toyota?

15   **A.**    I don't know, but that doesn't appear to be my dad's car,

16   because he usually parked in the driveway.

17   **Q.**    Well, is it only because it's parked on the street you're

18   saying it's not your dad's car?

19   **A.**    It just doesn't look like it from the picture.

20   **Q.**    You would agree with me that that car has tinted windows,

21   doesn't it?

22   **A.**    No, my dad didn't have tinted windows.

23        MR. BRENNER:  Mr. Blanchard, identify the date of the

24   photo?

25        MR. BLANCHARD:  It says August of 2012.

BY MR. BLANCHARD:

**Q.**    Were you still living in the house -- was your family
still living in the house in August of 2012?

**A.**    Yeah, that sounds about right.

**Q.**    And did your family have a minivan at that time?

**A.**    We did have a minivan, yep.

**Q.**    But again, under oath, your testimony is that's not your
dad's car?

**A.**    It does not look to be my dad's car, no.

**Q.**    And your dad's car did not have tinted windows?

**A.**    Um, I would be absolutely shocked if my dad had tinted
windows, but . . .

**Q.**    I'm not asking if you would be shocked.  I'm asking you,
did he or did he not have tinted windows on his car?

     MR. BRENNER:  Objection.  Asked and answered and
argumentative.

     THE COURT:  I'll give you one more chance.  To your
recollection, did the car have tinted windows?

     THE WITNESS:  Not to my recollection.

BY MR. BLANCHARD:

**Q.**    Ma'am, when you first filed this lawsuit, you filed a
complaint in July of 2019, correct?

**A.**    Yes.

**Q.**    And in that case, you said that the D.N. event
regarding -- around the pumpkin patch occurred on or about

1    October 30, 2011, correct?

2    **A.**    I can't really speak to what's in the first complaint.  I

3    never read it.

4    **Q.**    Okay.  Did you read the second complaint?

5    **A.**    I was not shown by counsel.

6    **Q.**    So, your lawyers filed a suit on October -- I'm sorry,

7    July 12th of 2019 stating your claims against all the defendants

8    in this case, and your testimony is that they never showed it to

9    you?

10   **A.**    I told them what happened, and then they wrote it up, and

11   I don't know.  I never was given a chance to look at it.

12   **Q.**    Okay.  So, if I told you paragraph 60 of your first

13   complaint says, "Beginning on or about October 30, 2011, Jane

14   Doe fended off the unwelcomed sexual advances of her peer

15   D.N." --

16        And for the record, when you filed this original you

17   filed it under the name Jane Doe, correct?

18        MR. BRENNER:  Objection, relevance.

19        MR. BLANCHARD:  I just for the record --

20        THE COURT:  The Court takes judicial notice that the

21   pseudonym for the suit was filed in the manner that as counsel

22   has described.

23        Next question, please.

24        MR. BLANCHARD:  Thank you.

25   BY MR. BLANCHARD:

1    **Q.**    So is that a true statement, "Beginning on or about

2    October 30 of 2011, B.R. fended off the unwelcomed sexual

3    advances of her peer, D.N."?

4    **A.**    I mean, I don't know if that -- I don't think that date

5    sounds right.

6    **Q.**    Okay.  Is it also not true in your first complaint you

7    allege that the C.K. and J.O. assault occurred after the David

8    Neill -- I'm sorry, the D.N. pumpkin patch event?

9    **A.**    I'm sorry, one more time, please?

10    **Q.**    Um-hmm, is it also not true that in the first complaint

11    you filed, you said that the C.K. and J.O. assault occurred

12    after the D.N. pumpkin patch incident?

13    **A.**    I'm not a hundred percent sure I understand your

14    question, but to give you --

15        THE COURT:  Read the allegation in the complaint to her

16    and ask her is that true or not.

17    BY MR. BLANCHARD:

18    **Q.**    "In early November of 2011, Jane Doe is sexually

19    assaulted by two RCMS students, C.K. and J.O."

20        And again, for the record, Jane Doe is B.R.

21        So, in early November of 2011, B.R. was sexually

22    assaulted by two RCMS students, C.K. and J.O., true or false?

23    **A.**    I mean, I don't know about the date, but the pumpkin

24    patch happened first, and then the assault with J.O. and

25    C█████ happened.

1    **Q.**    Okay.  Is that --

2         MR. BLANCHARD:  One second, Your Honor.

3         THE COURT:  Yes, sir.

4    BY MR. BLANCHARD:

5    **Q.**    What is the date that you're contending -- or time period

6    that you're contending that the C.K. and J.O. assault occurred?

7    **A.**    October 2011.

8    **Q.**    Okay.  And you're saying it was before or after the D.N.

9    event?

10        MR. BRENNER:  Objection.  Asked and answered two questions

11   ago, Your Honor.

12        THE COURT:  Sustained.

13   BY MR. BLANCHARD:

14   **Q.**    Let me ask you:  Did you read the third complaint that

15   was filed in this case?

16   **A.**    As I mentioned, I never got a chance to read any

17   complaint before they were filed.

18   **Q.**    So, your lawyers file suit in July of 2012, and they

19   don't let you read --

20   **A.**    You mean 2019?

21   **Q.**    2019.

22        MR. BRENNER:  Your Honor, it appears that Mr. Blanchard is

23   replowing the same questions over and over again.

24        THE COURT:  Well, we'll see if there's a question here.

25   Right now I'm allowing him to orient her, if that's what he's

1    trying to do.

2    BY MR. BLANCHARD:

3    **Q.**    So the complaint that was filed in July of 2019, your

4    lawyers did not let you read, is your testimony?

5         MR. BRENNER:  Asked and answered.

6         THE COURT:  Sustained.

7    BY MR. BLANCHARD:

8    **Q.**    How about the complaint filed -- the amended complaint

9    filed on November 27th, 2019?

10        MR. BRENNER:  Objection, asked and answered.  She said she

11   hasn't read any of them.

12        THE COURT:  Well, the question is actually a little bit

13   different.  Her response was that her lawyers -- her response was

14   not that her lawyers did not let her read it; it was that she

15   didn't read it.  It's different.

16   BY MR. BLANCHARD:

17   **Q.**    Okay.  After they filed it, did you read them?

18   **A.**    I don't recall reading the first two.  Maybe I did, but I

19   don't recall at what point in time.

20   **Q.**    Do you recall reading the third one?

21   **A.**    I have read it.

22   **Q.**    Is it true that the first two complaints allege that all

23   your clothing was removed during the C.K. and J.O. assault?

24   **A.**    I don't remember what the first two say.  I don't -- I

25   wouldn't -- I don't know what it says.

1    Q.    Okay.  Well, let me read you this statement and ask you

2    if this is true or false.  This is paragraph 134 of the November

3    complaint.

4         "C.K. sat on top of B.R. while J.O. photographed B.R.

5    using a cell phone as she lay helpless with her shirts and pants

6    removed."

7    A.    So she did photograph me, yep.

8    Q.    Were your shirts and pants removed?

9    A.    I don't recall about my pants, but my shirt was lifted

10   up.  Like I mentioned, my breasts were exposed and photographs

11   were taken.

12   Q.    But when you testified in response to Mr. Brenner's

13   questions, you said your clothing was not removed other than

14   lifted up.

15   A.    That's what I said right now.

16   Q.    So, the allegation in your November of 2019 complaint

17   that all your clothing was removed is false.

18        MR. BRENNER:  Objection, argumentative.

19        THE WITNESS:  I don't . . .

20   BY MR. BLANCHARD:

21   Q.    Is it incorrect?

22   A.    Um, I mean, I'm telling you now --

23        THE COURT:  Just a moment, ma'am.

24        Try another question, Mr. Blanchard.  And I think the

25   suggestion is that the question is argumentative -- I'm not

1  suggesting that you're arguing with the witness, obviously, but

2  I'm just trying to get people focused on what you're trying to

3  get out.

4       MR. BLANCHARD:  Understood.  I'm -- to be clear, Your

5  Honor, I'm just trying to find out which allegations against my

6  client --

7       THE COURT:  I think a reasonable interpretation by the

8  jury is that a first complaint was filed, a second amended

9  complaint was filed, and a third amended complaint was filed.

10 She had some option or opportunity to read the third one, maybe

11 she didn't read the first and second one, and so I think her

12 testimony suggests she really doesn't know what's in the first

13 and second one.

14 BY MR. BLANCHARD:

15 Q.    Is that correct, you really don't know what's in your

16 first and second complaint?

17 A.    I just don't remember.  I was not given a chance before

18 it was filed.

19 Q.    And were you given a chance on the third one?

20 A.    I was not given a chance on the third one.

21 Q.    So let me ask you if this statement -- to listen to this

22 statement and then I'll ask you a question.  Paragraph 127 --

23      THE COURT:  Which complaint are you reading from?

24      MR. BLANCHARD:  Of the third amendment -- or second

25 amended complaint filed on June 15th of 2022.

1    BY MR. BLANCHARD:

2    Q.    Paragraph 127.  "On the day of the C.K. and J.O. assault,

3    J.O. approached plaintiff in class at RCMS and invited plaintiff

4    to hang out with her and an older FCPS and RCMS student, C.K.,

5    after school.  Plaintiff declined the invitation.  C.K. and J.O.

6    then met plaintiff at her bus stop and again invited plaintiff

7    to hang out with them.  Plaintiff again declined, and C.O.

8    and -- J.O. and C.K. then tackled her from behind."

9          Is that an accurate statement?

10          THE WITNESS:  For the most part.

11   BY MR. BLANCHARD:

12   Q.    Well, what's inaccurate?

13   A.    I -- it's hard for me to recall what you just read.  If

14   you were to hand it to me, I could probably, but she did ask me

15   in school if I wanted to hang out with her.  I said I wasn't

16   able to.  It wasn't my bus stop.

17          If you recall when I testified with Mr. Brenner, I said

18   it was the elementary school bus stop, and I went to pick up

19   that girl Faith, if you recall.

20          So just that -- it's not -- just so we're clear on what

21   I'm saying, it wasn't my bus stop, if that makes sense.

22   Q.    But you would agree with me that the language in this

23   complaint, would you not, where it says, "Plaintiff declined the

24   invitation.  C.K. and J.O. then met plaintiff at her bus stop."

25   So you -- this pleading alleges, does it not, that they met you

```
 1   at your bus stop?
 2   A.     Sure, that's what it says.  But like I said, I was not
 3   given a chance to read it before it was filed.
 4   Q.     So three times lawyers filed suit on your -- amended
 5   pleadings on your behalf in this case, and your testimony is
 6   that all three times the lawyers declined to let you read
 7   them --
 8          MR. BRENNER:  Objection, argumentative.
 9   BY MR. BLANCHARD:
10   Q.     -- in advance?
11          THE COURT:  Sustained.
12          MR. BLANCHARD:  Your Honor, that's all I have of this
13   witness.
14          THE COURT:  Mr. Kinney.
15          MR. KINNEY:  Your Honor, I think I'm trespassing on the
16   jury's time.
17          THE COURT:  But are you going to eventually have some
18   questions?  That's --
19          MR. KINNEY:  Yes, Your Honor, I will.
20          THE COURT:  About how long?
21          MR. KINNEY:  Um, Your Honor, I plan to spend some time
22   this weekend reviewing today's proceedings.  I would like to
23   compress my examination as much as I can.  I can commit to the
24   Court 30 minutes.
25          THE COURT:  All right.  We're not going to go 30 minutes
```

    1    today.

    2         Thank you, ma'am.  You may step down.

    3         Ladies and gentlemen, I know you're going to smile at me

    4    now because I know I'm getting ready to tell you that this is the

    5    end of the day and actually the end of the week.

    6         Again, thank you for your attention.  Thank you for your

    7    willingness to sit beyond the -- sort of the time guidelines that

    8    the Court tried to set.  Your attention to the matter is greatly

    9    appreciated.

   10         You have a long weekend, long weekends are tempting in

   11    several ways, so let me, once again, strongly encourage you not

   12    to discuss the case or any aspect of the case with anyone.

   13         Please stay away from social media; please stay away from

   14    print media to the extent that you can.

   15         I know that during holidays we usually gather around

   16    friends and relatives and people that we love, and if you simply

   17    say, I'm serving on a jury, it's going to generate questions.

   18    And so if anyone says anything, what are you doing, I heard

   19    you're on a jury, say, I simply cannot say anything about it.

   20    And please use discretion and walk away, because people don't

   21    understand the process that we all understand and the obligations

   22    that we all have to make sure that this matter is fairly

   23    adjudicated.

   24         So I wish you a happy holiday, whatever holiday you

   25    experience or celebrate.  Enjoy it, take advantage of family and

```
 1    friends, and not too much good food, and we'll see you Monday

 2    morning at 9:00.

 3              (Jury out at 5:03 p.m.)

 4         THE COURT:  You may be seated.  Thank you.

 5         All right.  Mr. Kinney, to the extent you can, I'm hoping

 6    that you'll adhere to the suggestion of 30 minutes because we are

 7    slowing down.  30 minutes turns into 45 minutes, an hour turns

 8    into an hour and a half, and so we need to be more judicious in

 9    the use of our time.  From both sides.  I'm not blaming anybody

10    necessarily when I say these things.

11         Let me kind of give you an outline of the next week so

12    that you'll be aware.

13         On Monday, we will start at 9.  We'll probably go up to

14    about 3 on Monday, about 3 on Monday.

15         Tuesday, I will start at 10, and we'll go as long as we

16    can.

17         Wednesday is an interesting day.  This can be off the

18    record.

19              (Thereupon, a discussion was had off the record

20    between Court and counsel.)

21         THE COURT:  Back on the record.

22         I have a small criminal docket at 11:00.  I hope I can get

23    through that by noon.  That's always the goal.  So if you all

24    could be ready to go, say, around 11:30 on that Wednesday, and

25    we'll start sometime around 11:30, 12:00, whenever I finish that
```

```
 1   docket, and we'll have a long day on Wednesday.

 2        Thursday, we'll start at 10, and we'll see where we are.

 3   If we're doing well, I may be of the mind to give you a break on

 4   Friday because I know we all have other professional obligations

 5   and things that we need to do on other cases that we're working

 6   on.  So if we're moving at a good pace by Thursday, we'll take a

 7   look at -- yes, sir?  Uh-oh.

 8        MR. BRENNER:  Friday is the one day that we had to move

 9   our expert because of all the delays.

10        THE COURT:  Okay.  So you're intending on calling that

11   expert on Friday?

12        MR. BRENNER:  Yes.

13        THE COURT:  All right.  Let me ask you this -- and, again,

14   I'm not holding you to anything.  I'm just trying to manage the

15   case as best I can.  By Friday, how far along do you think you're

16   going to be in your case --

17        MR. BRENNER:  I was hoping -- no, I was hoping to be done

18   before Friday but take her out of turn on Friday.

19        THE COURT:  So you --

20        MR. BRENNER:  So -- I'm sorry.  I interrupted you.

21        THE COURT:  No, go ahead.  Go ahead.

22        MR. BRENNER:  So that was my hope.

23        I also hoped that we would be done with my client's

24   examination yesterday, so my hopes -- you know, I get to hope and

25   then things happen.
```

1        So -- but that was my plan.  If I could, Your Honor, we

2    will regroup over the weekend.  I know we're taking one witness

3    out of turn for the defense on Monday.  They're calling one of

4    their witnesses, so my expectation, I actually advised defense a

5    couple of days ago that they should at least start thinking about

6    being prepared to have a witness on Wednesday to start their

7    case.

8        THE COURT:  Okay.

9        MR. BRENNER:  Judge, I'm trying my best to shrink, I

10    really am.

11        THE COURT:  I understand.

12        MR. BRENNER:  But --

13        THE COURT:  We all have to do what we all have to do.

14    But, again, my -- my big concern -- because I'm going to be here

15    one way or the other.  My big concern is I want to communicate to

16    the jury what the Court's reasonable expectations are for them

17    because obviously they have other things in their lives.

18        I've already got an inquiry from one of the jurors about a

19    boss calling and suggesting that he needs to get back to work,

20    and so I like to give people an opportunity to give their

21    employers at least some assurance that I will be back soon, and

22    sort of quantify what "soon" is.

23        MR. BRENNER:  So what I'll do, Judge, is over the weekend

24    we'll try to sort of figure it out, and we'll -- we've been

25    keeping in touch with Joanna.  We'll try to send her --

```
 1    Ms. Barry, excuse me -- send her -- and a copy to defense

 2    counsel, of course, our best expectation of where we think we'll

 3    be.

 4         THE COURT:  Ms. Barry works all hours of the day and night

 5    forcing me to do so also, so that's fine.

 6         MR. BRENNER:  Yeah, well -- we'll just regroup over the

 7    weekend.

 8         THE COURT:  From the defense side, again, just trying to

 9    manage.  We've heard from a lot of witnesses who have sort of

10    been taken out of turn, some of the witnesses that are supportive

11    of your theory of the case have already testified to some degree.

12    How long do you all anticipate your case being?

13         Ms. Rewari, I'll listen to you first.

14         MS. REWARI:  Well, Your Honor, we expect to call all of

15    the defendants, and then we have a number of other witnesses who

16    worked at the school and --

17         THE COURT:  How many of them are you intending to call?

18         MS. REWARI:  I'm doing a mental count.  We have the other

19    teachers, we have a couple of other administrators.

20         THE COURT:  The other teachers.  I need numbers.

21         MS. REWARI:  Sorry.  Maybe ten more in addition to the

22    defendants.

23         THE COURT:  You've got ten more teachers in addition to

24    the defendants who have been called, some of whom are teachers?

25         MS. REWARI:  Some of them are teachers, some of them are
```

1    administrators.  We do have Dr. Zuluaga who's coming on Monday.

2         THE COURT:  What -- what are administrators who have no

3    involvement in the case going to testify to?

4         MS. REWARI:  They are -- Ms. Weaver, for example, whose

5    name you saw on some forms today, she is one of the

6    administrators.  She's not a defendant in this case, but she was

7    an administrator.

8         THE COURT:  So she should be a relatively short witness --

9         MS. REWARI:  Yes.

10         THE COURT:  -- because she's simply sending out documents

11    and information supporting your theory of the case that she's

12    responding to people who have concerns about B.R.?

13         MS. REWARI:  Yes.  And also, you know, you've heard how

14    the counselors work and the department works.  And so, yes, we're

15    going to try not to --

16         THE COURT:  I don't think -- I don't think the jury needs

17    to hear, nor does the Court need to hear, ten people say the same

18    thing.

19         MS. REWARI:  Absolutely.  We don't want to do that either.

20    We don't want anybody to have to do that.

21         THE COURT:  So having said that, when do you think you

22    might be in a position to say that you could conclude your case,

23    two days, three days, six months?  What do you think?

24         MS. REWARI:  Somewhere between two days and six months.

25         I think that, you know, we had estimated that it would

1    take us two weeks.  I think they've called -- they have called

2    only three of our people so far, so, you know, there's only been

3    three witness over -- well, I guess other than --

4         THE COURT:  I will say this to you and all the defendants'

5    counsel.  If you get into the point where you're rehashing

6    evidence and information that's already been provided to the

7    jury, those witnesses are not going to testify, so you need to

8    manage the witnesses.  I will tell you that it is my experience

9    that jurors do not like hearing things over and over and over

10   again.  So --

11        MS. REWARI:  No, absolutely, I agree with that.

12        And we -- I think our witnesses will be much shorter.  I

13   think, you know, we have different pieces of the case that we

14   were going to put through each witness, but we're going to try to

15   have, you know, as little overlap as possible.

16        And so -- because there were so many people who had a hand

17   or, you know, touched some part of this, we need to present their

18   testimony with respect to some -- that part of it that they were

19   involved with, but we've certainly delivered the message that

20   we're not covering -- retreading old ground.

21        THE COURT:  The Court's going to give a specific

22   instruction that the amount of witnesses called has nothing to do

23   with the resolution of the case, so thinking that you can stack

24   in 20 or 30 people to overwhelm the jury with people saying the

25   same thing over and over again is not going to work.

1      MS. REWARI:  I understand.

2      THE COURT:  All right.

3      MS. REWARI:  I understand.

4      THE COURT:  Mr. Blanchard, other than those Ms. Rewari

5  might call, do you have any particular witnesses?  Obviously, you

6  have your client who may or may not testify, but any other

7  special people that you think you might call?

8      MR. BLANCHARD:  My client will testify, but I think the

9  other witnesses will be --

10     THE COURT REPORTER:  Counsel, I can't hear you.

11     MR. BLANCHARD:  I'm sorry.

12     My client will testify.  I think the other witnesses that

13  are encompassed within the School Board's list will be -- I don't

14  think I'll be adding on to that.

15     THE COURT:  Okay.  Mr. Kinney.

16     MR. KINNEY:  Your Honor, my witnesses are also encompassed

17  in the Defendant School Board.

18     THE COURT:  All right.  Just to kind of get a feel for how

19  you all are conducting the examination, I'm assuming, Mr. Kinney,

20  you're going to be the lead counsel on asking questions of your

21  clients?

22     MR. KINNEY:  Your Honor, we haven't decided that yet.  My

23  clients are also witnesses of the school board.

24     THE COURT:  Okay.  All right.  Well, as I said, I respect

25  all counsel in this case, and I think that the Court's concern is

1    ringing true, that we need to efficiently and justly try this

2    matter, and we don't need a lot of duplication of evidence, quite

3    frankly.

4         All right.  Thank you all.  Enjoy your holiday.  We'll see

5    you Monday morning.

6         (Proceedings adjourned at 5:12 p.m.)

7                    **C E R T I F I C A T E**

8

9              I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
10       proceedings in the above-entitled matter.

11

         /s/ Scott L. Wallace              3/29/24
12       ----------------------------      ----------------
         **Scott L. Wallace, RDR, CRR**         **Date**
13          **Official Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25

'

**'social** [1] - 73:21
**'Stop** [1] - 63:11

---

**/**

**/s** [1] - 136:11

---

**1**

**1** [1] - 37:2
**10** [6] - 65:22; 73:8-10; 129:15; 130:2
**100** [3] - 2:3, 7, 11
**104** [1] - 4:9
**11** [3] - 4:14; 37:6; 65:25
**112** [1] - 7:19
**115** [5] - 4:13; 6:15, 25; 7:4; 8:7
**117** [1] - 16:2
**119** [1] - 36:15
**11:00** [1] - 129:22
**11:30** [2] - 129:24
**12** [11] - 37:3; 56:22; 57:1; 64:2; 66:3; 67:17; 68:19; 69:17; 70:12; 102:10; 111:14
**12-year-old** [1] - 20:19
**120** [1] - 3:7
**125** [4] - 4:15; 22:14, 18, 22
**126** [4] - 4:16; 24:4, 15, 18
**127** [2] - 125:22; 126:2
**12:00** [1] - 129:25
**12th** [2] - 74:10; 120:7
**13** [1] - 66:5
**13-year** [1] - 80:18
**13-year-old** [1] - 80:6
**130** [5] - 4:18; 55:22; 62:25; 63:7; 64:10
**132** [4] - 4:19; 68:17, 22, 25
**13235** [3] - 104:5; 106:22
**13236** [1] - 100:21
**134** [11] - 4:20; 85:7, 11, 13-14, 20-21, 23; 89:19; 124:2
**14** [5] - 37:3; 46:22; 66:7; 67:6
**148** [1] - 37:2
**15** [3] - 45:1; 46:22
**1520** [1] - 1:21
**159** [1] - 37:6
**15th** [3] - 20:7; 21:22; 125:25
**16** [4] - 68:11; 69:8, 19; 115:4
**161** [4] - 9:13, 17-18; 10:4
**163** [4] - 4:14; 10:24; 11:12, 15
**165** [1] - 13:3
**16th** [7] - 6:22; 7:7, 16; 8:22; 9:2, 5; 13:14
**17** [3] - 68:11; 69:9, 19
**1775** [1] - 3:10
**17th** [1] - 10:12

**18** [1] - 37:5
**1801** [1] - 3:7
**1:19-cv-00917-RDA-WEF** [1] - 1:5

---

**2**

**20** [2] - 37:5; 134:24
**20037** [5] - 1:18; 2:16, 19, 23; 3:3
**2009** [1] - 73:20
**2010** [1] - 74:12
**2010-2012** [1] - 75:9
**2011** [24] - 16:21; 17:23; 18:4; 27:25; 76:15; 77:19; 78:9; 81:7, 11; 82:15; 83:1, 6, 11, 14; 86:2; 95:3; 101:9, 20; 120:1, 13; 121:2, 18, 21; 122:7
**2012** [31] - 6:22; 7:7, 16; 8:22; 9:2, 5; 10:12; 11:9; 13:11, 14; 15:19; 20:7; 21:22; 23:17; 28:1, 5; 74:12; 76:15, 19; 77:10, 17; 78:2, 14; 79:4, 18; 81:12; 82:15; 84:10; 118:25; 119:3; 122:18
**2013** [14] - 22:12; 26:8, 21; 46:2; 56:4, 9; 66:9; 71:18; 72:3; 74:8, 11, 14; 75:12; 76:1
**2014** [5] - 24:13; 45:18; 46:1; 55:19; 62:13
**2015** [2] - 41:11; 45:18
**2017** [5] - 42:14, 18; 43:8, 25; 44:11
**2018** [2] - 44:19; 68:19
**2019** [8] - 45:1; 119:22; 120:7; 122:20; 123:3, 9; 124:16
**20190** [1] - 3:11
**20191** [1] - 3:8
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:20
**2021** [1] - 40:11
**2022** [1] - 125:25
**2023** [2] - 73:2; 74:25
**2024** [2] - 1:6; 6:1
**2029** [1] - 1:21
**204** [1] - 37:3
**208** [1] - 37:4
**21** [1] - 81:7
**213-995-5720** [1] - 1:22
**21st** [7] - 83:1, 5, 10, 14, 20; 84:7; 101:20
**22** [1] - 4:15
**2200** [4] - 2:15, 19, 22; 3:3
**22314-5798** [1] - 3:15
**22nd** [2] - 11:8; 79:18
**2300** [1] - 1:17
**237** [1] - 37:11
**239** [1] - 37:12
**23rd** [1] - 13:11
**24** [2] - 4:16; 27:22
**245** [1] - 64:13
**246** [2] - 64:7, 10
**249** [1] - 56:11

**251** [5] - 4:18; 62:24; 63:7, 10, 13
**252** [1] - 63:19
**27** [1] - 77:10
**27th** [1] - 123:9
**28** [2] - 1:6; 6:1
**2800** [3] - 2:4, 8, 12
**2:04** [2] - 6:2, 5
**2:05** [1] - 1:6
**2nd** [3] - 2:3, 7, 11

---

**3**

**3** [6] - 64:20, 24; 73:10; 96:1; 129:14
**3/29/24** [1] - 136:11
**30** [8] - 120:1, 13; 121:2; 127:24; 129:6; 134:24
**305-539-8400** [1] - 2:9
**30th** [4] - 43:8; 44:4; 78:2, 14
**315** [9] - 5:8; 87:13, 16-17, 20; 97:15; 106:25; 107:1
**3236** [1] - 100:16
**33** [1] - 4:5
**33131** [3] - 2:4, 8, 12
**34** [1] - 4:6
**39** [7] - 4:8, 21; 89:23; 90:3, 12, 14
**3:14** [1] - 57:16
**3:25** [1] - 57:15
**3:32** [1] - 61:13
**3:33** [1] - 62:3
**3rd** [3] - 43:25; 44:4, 11

---

**4**

**4** [2] - 64:21; 65:3
**40** [10] - 4:17; 5:7; 96:6; 98:19, 22; 99:8, 19; 103:25; 118:4
**400** [1] - 3:11
**401** [1] - 3:15
**443-584-6558** [1] - 3:16
**45** [1] - 129:7
**451** [2] - 77:1, 5
**4:00** [2] - 114:3, 14
**4:30** [1] - 62:8

---

**5**

**5** [2] - 62:8; 96:1
**50** [5] - 4:17; 40:5, 15, 18; 81:10
**5:03** [1] - 129:3
**5:12** [1] - 136:6

---

**6**

**6** [6] - 4:3; 64:8, 13; 65:5, 10; 73:20
**60** [1] - 120:12
**604** [3] - 111:16, 22
**610-804-1787** [1] - 2:5

**62** [1] - 64:9
**63** [1] - 4:18
**643a** [1] - 1:17
**659** [5] - 4:24; 93:18; 94:2, 4
**660** [4] - 5:4; 94:13, 15, 17
**662** [3] - 5:5; 95:12, 16
**68** [4] - 4:19; 92:11, 14
**688** [9] - 4:22; 92:9, 12-14, 25; 93:1, 11, 15
**6th** [10] - 15:19; 18:3, 20; 20:11; 24:13; 26:8; 36:16; 44:18; 73:2; 78:24

### 7

**7** [2] - 4:13; 65:15
**70** [1] - 28:18
**7th** [3] - 36:16; 75:17; 90:8

### 8

**8** [3] - 65:16; 75:2, 10
**804-788-8200** [1] - 3:4
**807** [1] - 11:18
**85** [1] - 4:20
**850-585-3414** [1] - 2:13
**87** [4] - 5:8; 33:23, 25; 34:1
**8:36** [1] - 7:7

### 9

**9** [5] - 1:8; 65:20; 74:25; 75:10; 129:13
**9/11** [1] - 64:16
**90** [1] - 4:21
**90067** [1] - 1:22
**93** [1] - 4:22
**94** [2] - 4:24; 5:4
**95** [1] - 5:5
**99** [1] - 5:7
**9:00** [1] - 129:2
**9th** [2] - 26:14; 84:10

### A

**A.F** [1] - 3:6
**abdomen** [1] - 44:12
**abdominal** [1] - 44:24
**able** [9] - 7:13; 67:18; 71:13, 22; 78:24; 89:8; 126:16
**abnormal** [2] - 28:10; 30:7
**abnormalities** [1] - 28:11
**abnormality** [1] - 30:9
**above-entitled** [1] - 136:10
**abrenner@bsfllp.com** [1] - 2:9
**absence** [1] - 8:10
**absolute** [2] - 21:12; 59:8
**absolutely** [7] - 19:14; 26:6; 28:12; 50:21; 119:11; 133:19; 134:11

**abuse** [6] - 35:15, 18; 80:13, 16-17, 24
**abused** [3] - 80:7, 19; 81:8
**abusive** [1] - 69:8
**abuts** [1] - 86:17
**academically** [1] - 26:14
**accelerating** [1] - 28:17
**acceleration** [2] - 28:14; 29:4
**accept** [1] - 38:23
**access** [1] - 109:11
**accident** [3] - 38:10; 64:20, 23
**accommodate** [1] - 39:14
**according** [1] - 44:18
**account** [16] - 51:13; 52:9; 53:1; 67:21; 72:1; 73:20; 74:2, 10, 13; 75:9
**account'** [1] - 73:22
**accounts** [4] - 73:8, 13; 74:22; 75:11
**accurate** [4] - 14:2; 63:17; 106:22; 126:9
**accused** [2] - 47:10; 67:13
**acres** [1] - 106:3
**Action** [1] - 1:4
**action** [1] - 71:11
**actions** [1] - 71:12
**active** [3] - 17:25; 74:3
**actively** [1] - 21:24
**activity** [3] - 15:12, 16
**acts** [4] - 50:20; 83:25; 84:3, 6
**actual** [1] - 47:7
**acutely** [1] - 29:14
**adding** [1] - 135:14
**addition** [5] - 17:8; 29:24; 78:19; 132:21, 23
**address** [5] - 7:13; 37:10, 20; 74:1, 9
**addressed** [1] - 70:19
**adhere** [1] - 129:6
**adjourned** [1] - 136:6
**adjudicated** [1] - 128:23
**adjudication** [1] - 61:5
**administrator** [1] - 133:7
**administrators** [4] - 132:19; 133:1, 6
**admissible** [1] - 47:19
**admission** [2] - 19:12; 63:4
**admit** [11] - 6:24; 11:11; 22:17; 24:15; 40:14; 63:2; 68:22; 85:20; 90:11; 93:1; 99:7
**Admits** [1] - 34:21
**admitted** [39] - 4:13-21, 23-24; 5:4, 6-8; 7:4; 9:23; 11:15; 13:4; 22:22; 24:18; 33:24; 40:18; 63:5, 7; 68:25; 85:15, 17, 23; 87:20; 90:15; 93:13, 16; 94:5, 18; 95:17; 99:19; 118:6
**Adolescent** [4] - 77:23; 79:17
**advance** [1] - 127:10
**advances** [2] - 120:14; 121:3
**advantage** [1] - 128:25
**advised** [4] - 58:20; 59:2; 131:4
**aerial** [3] - 86:1; 87:22; 97:8
**affirmatively** [1] - 61:25
**afield** [2] - 47:17; 50:3

**AFTERNOON** [1] - 6:1
**afternoon** [6] - 33:9; 39:20; 114:3, 14
**afterwards** [2] - 51:25; 69:24
**age** [3] - 46:22; 69:19; 102:10
**ages** [1] - 69:8
**ago** [3] - 106:18; 122:11; 131:5
**agree** [8] - 56:7; 59:1; 67:5; 78:17; 108:14; 118:20; 126:22; 134:11
**agreed** [1] - 23:8
**ahead** [5] - 30:21; 72:9; 93:8; 130:21
**aided** [1] - 3:18
**al** [1] - 1:7
**alanderson@bsfllp.com** [1] - 1:23
**alarmed** [1] - 38:2
**Alexandria** [1] - 3:15
**Alison** [1] - 1:20
**ALL** [1] - 6:9
**all-encompassing** [1] - 65:14
**allegation** [3] - 51:4; 121:15; 124:16
**allegations** [2] - 50:25; 125:5
**allege** [4] - 49:24; 78:9; 92:21; 114:10
**allegedly** [1] - 49:23
**alleges** [1] - 126:25
**alleging** [1] - 32:19
**allow** [4] - 14:12; 54:1; 57:13; 61:4
**allowing** [1] - 122:25
**almost** [3] - 83:2, 6
**ALSTON** [1] - 1:12
**altercation** [1] - 104:12
**amenable** [1] - 60:9
**amended** [7] - 72:17; 73:7; 123:8; 125:8, 25; 127:4
**Amended** [1] - 72:25
**amendment** [1] - 125:24
**amount** [1] - 134:22
**anal** [1] - 83:16
**anally** [1] - 56:23
**Anderson** [2] - 1:20; 58:13
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:15, 18, 22; 3:2
**Angeles** [1] - 1:22
**angry** [1] - 34:24
**announce** [2] - 57:12; 58:2
**Answer** [1] - 74:12
**answer** [16] - 55:12; 56:17; 58:8; 71:16; 72:8, 14; 73:7, 15-16; 74:5, 7, 17; 105:7; 115:17
**answered** [7] - 54:19; 82:20; 101:22; 119:15; 122:10; 123:5, 10
**answering** [1] - 55:11
**answers** [3] - 48:8; 54:4; 72:18
**Answers** [1] - 72:25
**antibiotics** [1] - 45:9
**anticipate** [2] - 103:3; 132:12
**antidepressant** [1] - 26:21
**anxiety** [4] - 15:9; 23:10; 45:2; 78:24
**anxious** [1] - 25:16
**apart** [1] - 92:19

apologize [1] - 96:12
appear [4] - 106:23; 112:25; 118:14
APPEARANCES [3] - 1:14; 2:1; 3:1
apply [1] - 40:11
appointment [7] - 6:17; 7:12, 15, 18; 10:14; 18:20; 99:1
appreciate [6] - 31:1; 33:1; 57:10, 25; 58:12; 59:7
appreciated [1] - 128:9
approach [2] - 46:3; 70:18
approached [1] - 126:3
appropriate [5] - 58:19, 25; 59:3, 18; 61:20
April [3] - 77:17; 78:2, 13
area [15] - 17:13; 27:19; 50:19; 54:5; 81:3; 92:7; 95:2; 96:17, 22; 97:2, 5, 21, 24; 103:12; 111:3
areas [3] - 26:24; 29:9; 101:14
arguably [1] - 51:7
arguing [1] - 125:1
argument [1] - 50:6
argumentative [4] - 119:16; 124:18, 25; 127:8
arms [2] - 29:25; 84:19
ashamed [1] - 34:24
aside [2] - 45:5; 68:1
aspect [1] - 128:12
aspects [1] - 36:2
assault [22] - 46:21; 47:11; 48:12; 76:22; 77:18; 78:9, 19; 79:11; 80:15; 105:12; 114:10; 115:9, 15; 116:20; 117:17, 22; 121:7, 11, 24; 122:6; 123:23; 126:2
assaulted [12] - 19:2; 33:15; 36:23; 47:15; 50:14; 64:1; 65:7; 97:6; 98:6; 121:19, 22
assaults [4] - 91:23; 95:5, 23; 96:5
assessment [1] - 79:2
assistant [1] - 12:11
associated [1] - 50:18
Association [1] - 41:13
assumed [2] - 14:1; 25:3
assuming [2] - 60:1; 135:19
assurance [1] - 131:21
assured [1] - 21:12
attached [1] - 12:21
attack [1] - 104:12
attacked [1] - 65:6
attending [2] - 26:13; 79:20
attention [5] - 53:14; 54:4; 96:12; 128:6, 8
attorney [1] - 75:5
attorneys [1] - 74:21
attributed [1] - 31:9
A█████ [3] - 79:18; 118:25; 119:3
Austin [2] - 40:1, 9
automobile [1] - 28:15
Ave [1] - 2:22
Avenue [4] - 2:15, 19; 3:3, 10

aware [4] - 12:17, 19; 21:10; 129:12
axons [1] - 28:25

# B

B.H [1] - 3:6
B.R [43] - 1:3; 4:8; 7:15, 23; 8:24; 9:1; 10:21; 12:1, 15; 13:14; 15:19; 18:19; 19:1; 20:7; 21:9; 23:24; 24:7; 28:1; 31:6, 18-19; 32:2, 18; 33:14; 35:13; 39:15, 18; 46:14; 55:9; 57:8; 61:14; 69:13; 74:9, 13; 80:9; 104:7; 121:2, 20-21; 124:4; 133:12
B.R.'s [6] - 6:16; 7:12; 8:17; 13:17; 14:11; 31:15
bacterial [1] - 45:8
bad [2] - 64:20, 23
bag [5] - 117:11, 13, 15, 17, 23
balance [3] - 30:4, 12
bangs [1] - 29:10
BARAN [1] - 1:16
Barry [6] - 74:25; 77:22; 79:16; 81:20; 132:1, 4
based [10] - 10:18; 18:18; 19:18, 25; 25:11; 26:4; 39:5; 51:10; 60:17; 73:22
basic [1] - 32:4
basing [1] - 13:23
basis [1] - 81:7
Bates [1] - 2:14
BATES [1] - 60:25
batting [1] - 103:21
beat [1] - 69:19
beaten [2] - 68:11; 69:14
became [1] - 57:5
become [1] - 27:6
bed [1] - 8:9
bedrooms [1] - 105:24
BEFORE [1] - 1:12
began [1] - 26:14
Beginning [2] - 120:13; 121:1
beginning [4] - 46:9; 72:11; 110:16, 18
behalf [1] - 127:5
behind [15] - 6:15; 16:1; 44:11; 92:1, 4, 21; 94:10, 23-24; 95:1, 20-21; 97:20; 104:16; 126:8
belief [1] - 73:3
believes [1] - 52:23
B████ [7] - 13:19; 24:2; 25:1; 34:22; 80:6, 18
benches [2] - 97:3; 101:2
benefit [1] - 103:9
Berkley [1] - 54:18
beside [4] - 87:2; 104:25; 115:12, 16
Best [1] - 65:6
best [8] - 38:9, 24; 67:24; 73:2; 89:17; 130:15; 131:9; 132:2
Betsinger [1] - 54:19
better [9] - 25:14; 26:12; 38:18; 58:14; 67:19; 68:12; 88:24; 89:5; 107:16

between [13] - 29:10; 50:21; 59:17; 60:7; 61:11; 62:8; 64:11; 81:11; 82:15; 96:1; 113:4; 129:20; 133:24
beyond [1] - 128:7
bias [1] - 60:16
big [7] - 70:13; 87:7; 105:22; 106:2; 117:15; 131:14
biggest [2] - 30:14
binder [12] - 9:13; 10:25; 24:5; 55:22; 77:1, 5-6; 85:8; 87:12; 90:1; 92:8; 100:19
bit [12] - 18:17; 25:22; 30:22; 31:10; 34:5; 56:5, 24; 91:3; 102:12; 103:21; 108:3; 123:12
black [2] - 40:6; 55:22
bladder [1] - 43:12
blaming [1] - 129:9
blanchard [1] - 108:23
Blanchard [11] - 3:9; 33:5, 11; 104:10, 17; 107:6; 111:3; 118:23; 122:22; 124:24; 135:4
BLANCHARD [58] - 4:5, 10; 33:6, 8, 21; 103:5, 8, 11, 15, 20, 23, 25; 104:4, 8, 19, 23; 106:16; 107:3; 108:3, 5, 7, 25; 109:4; 110:7; 111:7, 11, 16, 21; 112:3; 113:14, 18; 118:3, 7-8, 25; 119:1, 20; 120:19, 24-25; 121:17; 122:2, 4, 13; 123:2, 7, 16; 124:20; 125:4, 14, 24; 126:1, 11; 127:9, 12; 135:8, 11
blank [1] - 12:22
bleeding [1] - 28:10
block [2] - 109:12, 14
blocking [1] - 19:5; 116:18
blood [1] - 66:22
blow [1] - 107:25
blow-up [1] - 107:25
blown [1] - 107:13
blown-up [1] - 107:13
Blue [2] - 113:9, 20
blue [1] - 88:4
Board [2] - 31:12; 135:17
board [1] - 135:23
Board's [2] - 72:18; 135:13
boarding [5] - 23:5, 15-16, 19, 25
body [3] - 28:19; 65:17; 102:13
BOIES [4] - 1:20; 2:3, 7, 11
bone [2] - 28:16, 21; 29:7, 11
book [4] - 68:17; 89:23; 96:7; 98:20
boss [1] - 131:19
bothered [1] - 8:1
bothering [2] - 7:24; 8:2
bottom [4] - 32:6; 41:8; 49:7; 108:2
bounces [1] - 29:5
boundaries [5] - 46:9; 47:16; 52:7; 57:3; 70:10
boy [15] - 19:2; 46:21; 47:10, 13, 15; 51:21, 24; 52:6, 23; 53:12; 65:17; 66:16; 80:1, 7, 19
boyfriend [4] - 68:10; 69:8, 14, 18

boys [1] - 36:22
brain [10] - 28:9, 15, 19, 24; 29:5, 10; 30:6, 11
Branch [7] - 96:23; 97:20, 23; 99:3, 22; 100:18; 108:1
break [11] - 57:9, 13-14; 58:2; 59:2, 5, 16, 21; 130:3
breast [1] - 80:10
breasts [4] - 79:9; 83:3; 116:8; 124:10
BRENNER [97] - 36:5, 9, 12, 15; 37:19; 38:12, 15; 39:10; 40:16; 42:7; 46:3, 8, 25; 48:4, 25; 49:7, 11; 50:2, 6, 10, 12; 51:3, 10, 19, 23; 52:10, 17; 53:1, 5, 13; 54:13, 25; 55:3, 6; 57:24; 58:16, 20; 59:17, 20; 61:7; 62:2, 23; 63:1; 68:23; 70:18; 71:1, 7, 9, 20; 79:12; 81:16, 25; 82:20; 85:12, 21; 87:14, 17; 88:23; 89:2; 90:3, 13; 92:10, 12, 14; 93:2, 5, 12, 22; 94:2, 15; 95:14; 99:10, 14; 101:22; 103:18, 22, 24; 108:19; 112:1; 118:23; 119:15; 120:18; 122:10, 22; 123:5, 10; 124:18; 127:8; 130:8, 12, 17, 20, 22; 131:9, 12, 23; 132:6
Brenner [14] - 2:6; 39:25; 41:16; 45:10; 50:1; 57:17, 23; 60:4; 68:7; 79:3; 84:23; 97:2, 25; 126:17
Brenner's [1] - 124:12
Brief [3] - 49:4, 12; 55:24
bright [1] - 114:7
bring [3] - 6:3; 16:10; 62:1
Brittany [1] - 2:2
britzoll@gmail.com [1] - 2:5
bronchopneumonia [1] - 42:15
brother [10] - 62:20; 63:11; 76:4; 114:11; 115:2, 20; 116:22; 117:9, 23
brother's [1] - 76:1
brought [3] - 32:4; 37:8; 47:23
Bruce [2] - 3:9; 33:11
bruce.blanchard@ofplaw.com [1] - 3:12
bruises [2] - 18:8, 10
bruising [1] - 28:23
bullied [3] - 64:16; 66:1
bullying [9] - 7:13; 8:18; 14:20, 23; 23:20; 34:22; 35:1, 6
bumps [2] - 18:8, 10
Burton [1] - 2:21
burtons@huntonak.com [1] - 2:24
bus [12] - 85:3; 87:23; 88:6, 12; 90:7; 96:4; 126:6, 16, 18, 21, 24; 127:1
bush [1] - 87:7
bushes [17] - 89:11; 104:16, 25; 105:4-6, 10-11, 13, 17; 106:6, 12, 23; 107:17; 108:14; 115:7; 117:17
business [1] - 61:18
BY [94] - 4:4, 7-8, 10; 6:13; 7:5, 22; 10:2, 5; 11:19; 13:9; 15:6; 20:6; 22:24; 24:21; 26:3; 29:12; 31:5; 32:10; 33:8; 34:4; 35:9; 39:19; 40:19; 41:1; 42:9; 55:17; 56:1; 62:11; 63:9; 64:12; 69:3;

70:23; 71:3, 17, 24; 72:16; 73:18; 74:6; 75:16; 77:9; 79:15; 81:19; 82:3, 24; 84:5; 85:25; 86:23; 87:11, 21; 88:2; 89:14, 21; 90:6, 17; 91:7; 92:15; 93:17; 94:7, 21; 95:19; 96:16; 97:12; 99:20; 100:24; 101:18, 24; 104:8, 23; 106:16; 107:4; 108:7; 109:4; 110:7; 111:11, 21; 112:3; 113:18; 118:8; 119:1, 20; 120:25; 121:17; 122:4, 13; 123:2, 7, 16; 124:20; 125:14; 126:1, 11; 127:9

## C

C.K [49] - 49:19, 24; 63:16, 19; 64:3; 65:6, 12, 16; 66:17, 22; 70:15, 24; 71:4, 6, 19; 76:12, 22; 77:14; 79:8; 80:2, 9; 81:6, 10; 82:9; 83:1, 4, 6; 92:3; 97:5; 98:5; 104:13; 114:2; 115:7; 116:13, 16; 121:7, 11, 19, 22; 122:6; 123:23; 124:4; 126:2, 4-5, 8, 24
C.O [1] - 126:7
CA [1] - 1:22
can't.... [1] - 57:9
cannot [4] - 28:10; 58:4; 61:3; 128:19
caption [2] - 104:3, 5
capture [1] - 96:22
car [23] - 28:15, 17, 19; 87:1, 4; 114:9, 17, 21; 115:19; 116:22; 117:2, 5-6, 23; 118:9, 15, 18, 20; 119:8-10, 14, 18
carefully [1] - 66:13
cars [2] - 114:14, 23
Carson [2] - 11:1; 90:8
case [36] - 33:12; 36:1; 46:16; 50:18; 54:18, 22; 57:22; 61:3, 6, 16; 72:11; 81:6; 112:24; 119:24; 120:8; 122:15; 127:5; 128:12; 130:15; 131:7; 132:11; 133:3, 6, 11, 22; 134:13, 23; 135:25
cases [4] - 54:21, 23; 130:5
CAT [1] - 28:10
catty [1] - 98:2
catty-corner [1] - 98:2
caught [1] - 91:16
causation [1] - 49:14
causes [1] - 20:24
causing [1] - 29:7
celebrate [1] - 128:25
cell [3] - 75:14, 17; 124:5
Cell [1] - 3:16
cells [1] - 29:1
Center [9] - 21:25; 42:11, 13; 77:21, 23; 78:16, 18; 79:7, 16
Century [1] - 1:21
cerebellum [1] - 30:7
certain [4] - 35:12; 49:20; 61:17; 72:12
certainly [2] - 20:21; 134:19
certify [1] - 136:9
chambers [2] - 57:19; 61:12
Chambers [1] - 57:20
chance [7] - 119:17; 120:11; 122:16;

125:17, 19-20; 127:3
change [3] - 23:18; 92:19; 115:10
changing [1] - 22:2
channel [1] - 73:22
characterization [3] - 56:7; 63:22; 80:3
characterizing [1] - 116:19
charges [1] - 51:6
check [4] - 29:22; 53:14; 56:12
checking [4] - 29:24; 30:7; 85:18
Cherry [7] - 96:23; 97:20, 23; 99:3, 22; 100:18; 108:1
chest [3] - 20:16, 20, 22
chief [2] - 43:12; 44:21
Chief [2] - 79:22; 80:5
children's [2] - 27:16, 18
C████████ [8] - 64:1, 3; 67:3; 80:8, 19; 95:5; 96:5; 121:25
circle [3] - 36:22; 86:7, 9
circumstance [1] - 49:23
circumstances [1] - 21:1
civil [1] - 54:22
Civil [1] - 1:4
claim [1] - 101:19
claiming [1] - 81:6
claims [1] - 120:7
clarification [1] - 27:21
clarify [2] - 18:18; 91:24
clarity [1] - 102:12
class [2] - 65:15; 126:3
clean [1] - 96:10
clear [8] - 24:24; 47:19; 51:19; 54:25; 96:14; 100:16; 125:4; 126:20
clearly [1] - 53:7
CLERK [5] - 77:2, 4, 7; 85:15; 107:2
click [1] - 32:6
client [5] - 58:10; 125:6; 135:6, 8, 12
client's [1] - 130:23
clients [2] - 135:21, 23
clinical [2] - 12:10, 17
close [2] - 94:8; 115:20
close-up [1] - 94:8
closer [2] - 47:7; 108:15
closet [1] - 71:14
closing [1] - 30:4
clothespins [1] - 83:3
clothing [3] - 123:23; 124:13, 17
coerce [1] - 69:19
coerced [2] - 68:11; 69:14
coincide [1] - 38:20
collaboration [1] - 73:23
college [1] - 40:12
comfort [1] - 96:10
comfortable [2] - 90:1; 107:12
coming [9] - 14:10; 33:1; 36:18; 37:17, 24; 43:14; 99:3, 25; 133:1
comments [1] - 57:23
commit [1] - 127:23
communicate [5] - 52:7; 53:7; 55:5;

72:12; 131:15
**communicating** [1] - 47:16
**communication** [1] - 73:22
**community** [8] - 91:20; 92:2; 94:9; 95:10; 110:16, 18-19; 111:5
**comparing** [1] - 49:18
**complaint** [25] - 20:16; 33:14; 43:12; 44:21; 119:22; 120:2, 4, 13; 121:6, 10, 15; 122:14, 17; 123:3, 8; 124:3, 16; 125:8, 16, 23, 25; 126:23
**Complaint** [2] - 79:22; 80:5
**complaints** [3] - 23:4; 42:23; 123:22
**complete** [1] - 11:2
**completed** [2] - 14:18; 15:3
**completely** [5] - 56:25; 57:2, 6; 67:16
**complicated** [2] - 56:6, 24
**compose** [1] - 57:13
**compress** [1] - 127:23
**computer** [1] - 3:18
**computer-aided** [1] - 3:18
**concern** [5] - 26:24; 36:25; 131:14; 135:25
**concerned** [2] - 14:25; 66:22
**concerns** [1] - 133:12
**conclude** [2] - 108:22; 133:22
**concluded** [3] - 39:11; 55:8; 61:12
**conclusion** [1] - 24:25
**concussion** [9] - 27:11; 28:2, 4, 8-9; 29:13, 17, 20, 22
**concussions** [3] - 27:14; 30:10, 15
**condition** [5] - 8:17; 13:17; 15:7
**conduct** [1] - 61:17
**conducting** [1] - 135:19
**conference** [1] - 57:21
**confused** [3] - 91:24; 106:8; 110:1
**connect** [1] - 28:25
**connection** [1] - 50:22
**consider** [2] - 48:20; 67:14
**considered** [1] - 72:15
**consistent** [1] - 53:5
**C▮▮▮▮▮▮** [3] - 84:13, 16, 18
**consulted** [1] - 23:14
**Cont** [2] - 2:1; 3:1
**contact** [1] - 31:21
**contained** [1] - 72:25
**contemporaneously** [1] - 60:15
**contending** [2] - 122:5
**content** [1] - 73:23
**context** [4] - 52:3; 55:20; 67:8, 24
**continuation** [1] - 56:21
**continue** [2] - 99:16; 116:10
**CONTINUED** [4] - 4:3, 8; 6:12; 39:18
**continued** [4] - 45:17, 19; 69:23; 84:9
**continuing** [1] - 112:13
**contrast** [2] - 44:12; 66:15
**contrasted** [1] - 63:15
**contrasting** [1] - 49:18
**control** [3] - 57:11; 58:6; 61:4
**controls** [2] - 59:10; 61:23

**controversy** [1] - 54:6
**conversation** [3] - 60:2; 82:23
**coordination** [1] - 29:25
**copy** [5] - 9:13; 48:23; 73:11; 112:1; 132:1
**corner** [13] - 86:11; 88:14, 18; 89:2; 91:14; 96:23; 97:20; 98:2; 107:19, 22; 108:8, 16; 110:12
**correct** [81] - 7:8; 8:22, 24; 9:2, 5-6; 11:10; 12:3, 12; 13:15; 14:1, 17; 15:10; 16:14, 17; 18:2, 23; 20:8; 28:2; 33:17; 40:21; 41:4, 22; 45:14, 16, 21, 25; 63:22; 65:19; 66:2, 12; 69:9; 70:2, 5; 72:3, 22; 73:2, 5; 75:14, 21; 80:22; 81:24; 87:9; 97:7; 98:9, 16; 100:11; 101:5; 102:1, 4, 8; 104:13, 25; 105:15; 107:21; 108:9, 12, 16; 109:9, 16, 20, 24; 110:20; 112:13, 16, 23; 113:7; 114:3, 12; 115:3, 8; 116:14; 119:22; 120:1, 17; 125:15; 136:9
**correctly** [1] - 116:20
**correlation** [1] - 30:3
**coughing** [1] - 20:23
**counsel** [15] - 46:20; 55:3; 60:7; 61:11; 64:11; 96:8; 103:7; 120:5, 21; 129:20; 132:2; 134:5; 135:10, 20, 25
**Counsel** [1] - 77:4
**counselors** [1] - 133:14
**count** [2] - 71:13; 132:18
**County** [1] - 23:22
**couple** [3] - 38:10; 131:5; 132:19
**course** [3] - 27:10; 86:22; 132:2
**court** [3] - 58:1; 60:13; 103:10
**Court** [18] - 3:13; 46:7; 54:23; 55:3, 11; 60:7; 61:11; 113:4, 20; 120:20; 127:24; 128:8; 129:20; 133:17; 136:13
**Court's** [8] - 39:16; 53:14; 54:14; 59:10, 25; 131:16; 134:21; 135:25
**Courthouse** [1] - 3:15
**courtroom** [7] - 57:12; 58:6, 25; 59:14; 60:18; 61:23; 105:19
**cover** [1] - 103:13
**covered** [2] - 36:18; 103:15
**covering** [1] - 134:20
**cranial** [1] - 29:24
**credibility** [2] - 51:11, 13
**criminal** [3] - 50:20; 54:21; 129:22
**cross** [3] - 36:11; 58:19
**CROSS** [8] - 4:3, 5, 8-9; 6:12; 33:7; 39:18; 104:7
**cross-examination** [3] - 36:11; 58:19
**CROSS-EXAMINATION** [8] - 4:3, 5, 8-9; 6:12; 33:7; 39:18; 104:7
**CRR** [3] - 3:13; 136:9, 12
**crying** [1] - 62:15
**CT** [1] - 44:12
**cues** [2] - 54:5, 14
**current** [2] - 35:5; 74:9
**cut** [2] - 36:9; 60:20
**cuts** [1] - 84:18

**cyclical** [1] - 25:11

## D

**D.N** [7] - 65:17; 119:24; 120:15; 121:3, 8, 12; 122:8
**dad** [3] - 116:23; 118:22; 119:11
**dad's** [6] - 118:9, 15, 18; 119:8
**daily** [4] - 81:7; 83:2, 6
**damages** [1] - 49:15
**Daniel** [2] - 43:20; 44:5
**dark** [1] - 114:7
**Date** [1] - 136:12
**date** [10] - 6:21; 24:12; 56:5; 74:2, 9; 78:1; 118:23; 121:4, 23; 122:5
**dated** [1] - 6:22; 10:12; 11:8; 68:19; 73:1; 74:25; 79:17
**dating** [3] - 65:6; 84:12, 16
**daughter** [1] - 32:12
**David** [1] - 121:7
**daylight** [2] - 59:17; 114:5
**days** [8] - 8:9; 25:13; 131:5; 133:23
**DC** [5] - 1:18; 2:16, 19, 23; 3:3
**deactivated** [1] - 74:4
**dead** [3] - 110:20, 22; 113:21
**dead-end** [3] - 110:20, 22; 113:21
**death** [3] - 8:19; 9:2; 132:5
**deceleration** [2] - 28:14; 29:4
**decide** [2] - 58:18; 59:13
**decided** [1] - 135:22
**deciding** [2] - 58:24; 59:15
**declare** [1] - 59:21
**declaring** [1] - 59:15
**declined** [5] - 32:8; 126:5, 7, 23; 127:6
**deep** [1] - 25:24
**Defendant** [4] - 2:14; 3:2, 9; 33:11; 73:1; 135:17
**defendant** [1] - 133:6
**defendants** [5] - 71:11; 120:7; 132:15, 22, 24
**Defendants** [10] - 1:8; 3:5; 4:22, 24; 5:4; 93:15; 94:4, 17; 95:16
**Defendants'** [52] - 4:13-21; 5:7; 6:15, 24; 7:4, 19; 10:24; 11:11, 15; 13:1, 3; 16:1; 22:14, 18, 22; 24:4, 15, 18; 33:23; 40:5, 14, 18; 63:7; 64:10; 68:17, 22, 25; 85:14, 20, 23; 87:14, 20; 89:22; 90:11, 15; 96:6; 98:19, 22; 99:7, 19; 107:2; 118:4
**defendants'** [1] - 134:4
**defense** [4] - 131:3; 132:1, 8
**definitely** [1] - 80:12
**degree** [1] - 132:11
**delays** [1] - 130:9
**deleted** [5] - 72:3; 74:11, 14, 22; 75:11
**delivered** [1] - 134:19
**demand** [1] - 51:6
**dendrites** [1] - 28:25
**denied** [1] - 26:17

**department** [1] - 133:14
**depo** [2] - 47:12
**deposition** [19] - 31:12; 37:11; 38:1, 20, 23; 48:18; 53:6, 24; 55:21; 57:1; 63:21; 66:19; 72:7, 15; 73:12; 74:20; 81:13; 102:9
**depressed** [1] - 8:9
**depression** [6] - 15:8; 24:23; 25:11; 31:9
**depressive** [1] - 26:18
**describe** [7] - 69:7; 70:11; 80:21, 25; 81:3; 102:6; 104:11
**described** [12] - 8:21; 9:1; 19:4; 56:2, 8, 23; 67:5; 69:13; 70:11; 84:23; 97:25; 120:22
**describes** [2] - 46:21; 69:10
**describing** [4] - 15:8; 48:12; 52:12; 62:18
**DESCRIPTION** [2] - 4:12; 5:3
**description** [5] - 18:24; 46:17; 49:17; 68:13; 69:4
**despite** [1] - 114:13
**detail** [2] - 32:22; 47:18
**detailed** [1] - 48:16
**details** [3] - 32:13; 50:17; 56:21
**detective** [1] - 95:6
**determination** [2] - 34:16; 54:3
**develop** [2] - 26:15; 60:16
**diagnosed** [2] - 9:4; 25:6
**diagnosis** [8] - 21:15, 20; 25:8, 18; 42:24; 43:9; 44:23; 45:2
**diarrhea** [1] - 44:24
**diary** [3] - 56:8; 66:11; 67:21
**difference** [1] - 70:13
**different** [9] - 23:19, 21; 27:19; 69:16; 98:24; 111:8; 123:13, 15; 134:13
**differently** [1] - 46:19
**diffuse** [1] - 16:15
**direct** [4] - 19:25; 36:17; 57:23; 60:9
**directed** [2] - 53:15, 19
**disagree** [1] - 59:12
**disagreeing** [1] - 58:21
**disassociated** [1] - 57:6
**discharge** [4] - 43:10; 77:22; 78:1, 17
**discretion** [1] - 128:20
**discuss** [3] - 36:1; 58:3; 128:12
**discussed** [5] - 20:15; 26:21; 36:17; 58:18
**discussion** [14] - 7:12; 19:23; 36:8; 39:11; 46:4; 52:4; 55:8; 57:19; 60:6; 61:10, 12; 65:5; 80:14; 129:19
**Discussion** [1] - 64:11
**discussions** [2] - 37:7; 51:10
**disorientation** [1] - 29:18
**displace** [1] - 29:7
**dissociated** [4] - 63:25; 67:2, 23; 68:14
**distance** [2] - 105:19; 106:4
**Distinctions** [1] - 41:8

**DISTRICT** [3] - 1:1, 12
**District** [2] - 3:14
**district** [1] - 8:10
**docket** [2] - 129:22; 130:1
**doctor** [14] - 19:17; 25:21; 27:7, 16, 19, 23; 34:14; 35:21; 45:9; 46:15, 18; 47:7; 53:17
**Doctor** [3] - 33:9; 35:25; 38:5
**doctor's** [4] - 46:18; 47:19; 48:2, 5
**doctors** [1] - 22:2
**doctors'** [1] - 48:3
**document** [11] - 37:16; 46:12, 14; 48:25; 65:14; 72:17, 21; 74:24; 80:4; 81:2; 82:4
**documented** [2] - 9:3; 26:18; 27:5
**documenting** [2] - 69:11
**documents** [2] - 133:10
**Doe** [4] - 120:14, 17; 121:18, 20
**dominating** [1] - 35:2
**done** [2] - 130:17, 23
**Donna** [1] - 1:1
**door** [8] - 19:22; 37:20; 107:20; 108:15; 109:14; 114:23, 25; 117:6
**doors** [1] - 110:25
**dot** [1] - 88:6
**double** [2] - 49:9, 11
**double-sided** [2] - 49:9, 11
**down** [20] - 25:15; 35:25; 41:8; 58:18, 24; 60:12; 88:13; 99:3, 25; 104:15; 105:3; 109:23; 110:25; 113:13; 116:14; 117:5; 128:2; 129:7
**Dr** [26] - 6:14; 26:13; 27:3; 35:20; 36:16; 45:11; 46:8; 55:19; 56:3; 68:2, 5-6, 19; 69:7, 23; 70:1; 79:6, 8; 81:10, 21; 82:8, 23; 83:24; 84:6; 133:1
**drags** [1] - 25:13
**draw** [2] - 53:13; 108:10
**Drive** [1] - 3:7
**driveway** [2] - 87:1; 118:16
**driving** [1] - 114:19
**dropped** [1] - 26:20
**dropping** [1] - 26:16
**due** [1] - 60:4
**duplication** [1] - 136:2
**during** [23] - 16:12, 18; 17:2, 5; 19:6; 20:13; 26:24; 27:6, 25; 31:6; 36:10; 59:8; 72:11; 77:13; 78:15; 82:16; 105:12; 114:10; 116:12; 117:17, 21; 123:23; 128:15
**duties** [2] - 35:11
**DX** [2] - 36:15; 93:2
**dynamics** [1] - 60:17
**dysuria** [1] - 43:9

# E

**e-mail** [8] - 10:7; 31:22; 32:1, 11, 19; 73:19; 74:1, 9
**early** [5] - 74:11, 14; 75:11; 121:18, 21

**easier** [2] - 26:1; 89:25
**East** [1] - 1:21
**Eastern** [1] - 3:14
**EASTERN** [1] - 1:2
**edge** [1] - 108:14
**edification** [1] - 28:7
**education** [1] - 27:10
**educational** [1] - 31:4
**EEGs** [1] - 28:11
**efficiently** [1] - 136:1
**either** [2] - 116:13; 133:19
**elaborate** [2] - 43:15; 102:11
**elementary** [1] - 126:18
**eligible** [1] - 11:4; 12:2
**Elliker** [1] - 3:2
**Email** [12] - 1:19, 23; 2:5, 9, 13, 17, 20, 24; 3:4, 8, 12, 16
**embarrassed** [1] - 34:24
**embarrassment** [1] - 102:20
**emotional** [4] - 8:17; 59:22
**employee** [1] - 102:3
**employers** [1] - 131:21
**employment** [1] - 6:16
**enclosed** [1] - 11:3
**encompassed** [2] - 135:13, 16
**encompassing** [1] - 65:14
**encounter** [4] - 51:20, 24; 52:11, 23
**encourage** [1] - 128:11
**end** [9] - 8:20; 108:1; 109:15; 110:19, 22; 113:21; 128:5
**ends** [1] - 110:15
**energy** [1] - 26:17
**enjoy** [3] - 36:4; 128:25; 136:4
**enjoying** [1] - 23:5
**entire** [3] - 57:2, 4; 116:19
**entitled** [1] - 136:10
**entrance** [6] - 90:20; 91:11; 92:18; 94:8; 95:9; 112:20
**entries** [1] - 62:14
**entry** [13] - 49:19; 55:18; 56:8, 19; 63:15, 23; 64:4; 65:11; 66:11, 15; 67:6, 21; 77:11
**episode** [1] - 41:23
**equal** [1] - 117:6
**Esq** [11] - 1:15, 20; 2:2, 6, 10, 14, 18, 21; 3:2, 5, 9
**essentially** [2] - 47:9; 52:19
**estimated** [1] - 133:25
**estimation** [1] - 70:17
**et** [1] - 1:7
**evaluating** [1] - 15:24
**Evaluation** [1] - 79:17
**evaluations** [1] - 30:18
**event** [3] - 119:24; 121:8; 122:9
**eventually** [4] - 105:5, 10; 115:11; 127:17
**evidence** [8] - 33:24; 37:25; 51:1, 3-4, 8; 134:6; 136:2
**exact** [3] - 8:1; 43:18; 56:5

**exactly** [4] - 43:14; 56:7; 68:13; 96:2
**exam** [3] - 15:24; 23:1; 30:11
**EXAMINATION** [10] - 4:3, 5-6, 8-9; 6:12; 33:7; 34:3; 39:18; 104:7
**examination** [14] - 16:4; 17:5; 29:23; 35:10; 36:10-12; 39:15; 58:19; 61:19; 103:4; 127:23; 130:24; 135:19
**examinations** [1] - 60:10
**EXAMINATIONS** [1] - 4:2
**examined** [3] - 15:22; 16:18; 18:7
**example** [1] - 133:4
**examples** [1] - 66:3
**except** [2] - 20:25; 99:10
**exception** [1] - 19:11
**excess** [1] - 20:23
**exchange** [2] - 14:9, 12
**excitement** [1] - 38:10
**excuse** [6] - 36:16; 59:24; 76:15; 84:1; 91:19; 132:1
**execute** [1] - 14:12
**exercise** [2] - 15:13; 20:23
**Exhibit** [71] - 4:13-22, 24; 5:4, 7-8; 6:15, 25; 7:4, 19; 8:7; 9:13; 10:4, 24; 11:12, 15; 13:1, 3; 16:2; 22:14, 18, 22; 24:4, 15, 18; 33:23; 40:5, 15, 18; 62:25; 63:7; 64:10; 68:17, 22, 25; 77:1; 85:7, 14, 20, 23; 87:13, 16, 20; 90:15; 92:9; 93:15, 18; 94:4, 13, 17; 95:12, 16; 96:6; 97:9, 15; 98:19, 22; 99:8, 19; 103:25; 111:17; 118:4
**exhibit** [9] - 13:2; 38:4; 53:11; 64:9; 87:14; 89:6; 99:14; 113:12
**exhibits** [1] - 46:12
**EXHIBITS** [2] - 4:11; 5:2
**Exhibits** [2] - 89:23; 90:12
**expect** [1] - 132:14
**expectation** [2] - 131:4; 132:2
**expectations** [1] - 131:16
**experience** [5] - 21:19; 25:18; 27:22; 128:25; 134:8
**expert** [6] - 81:9, 17, 24; 82:6; 130:9, 11
**explain** [5] - 47:9; 56:20; 82:11; 116:21, 24
**explained** [2] - 37:12; 57:1
**explaining** [1] - 56:6
**exposed** [3] - 79:9; 80:10; 124:10
**extent** [2] - 128:14; 129:5
**extremely** [2] - 63:24; 68:14
**eyes** [1] - 30:4
**eyesight** [1] - 104:20

---

## F

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**face** [2] - 64:23; 117:9
**Facebook** [8] - 34:23; 72:1; 73:8, 24; 74:7; 75:8

**facing** [1] - 116:16
**fact** [6] - 25:7; 26:4; 57:25; 59:24; 66:22; 71:5
**Fahey** [1] - 1:15
**fair** [4] - 61:5; 70:6; 79:1; 80:3
**Fairfax** [1] - 23:21
**fairly** [1] - 128:22
**Faith** [1] - 126:19
**fall** [2] - 86:2; 101:9
**false** [4] - 34:22; 121:22; 124:2, 17
**familiar** [1] - 113:17
**Family** [1] - 27:13
**family** [6] - 14:15, 19; 23:14; 119:2, 5; 128:25
**far** [13] - 12:16; 23:5; 47:17; 50:3; 71:21; 105:17; 106:23; 107:17; 108:22; 110:9, 22; 130:15; 134:2
**Farm** [4] - 86:14, 17; 89:10; 106:22
**Farms** [39] - 86:11; 88:10, 13; 90:20; 91:19; 92:2, 18; 96:24; 97:21, 24; 99:4, 22-23; 100:1, 7-8, 13; 101:1, 4, 6; 104:6; 107:17, 20; 108:2, 9, 15-16; 109:6, 22; 110:10, 13, 19, 23; 112:12, 22; 113:5, 19
**father** [1] - 114:17
**father's** [1] - 114:10; 115:19; 117:1
**fatigue** [1] - 29:18
**faxed** [1] - 11:5
**FCPS** [3] - 8:10; 11:3; 126:4
**FCSB's** [1] - 73:1
**fear** [1] - 60:13
**February** [19] - 6:22; 7:7; 8:22; 9:2, 5; 10:12; 11:8; 13:11; 28:1, 5; 34:9; 44:18; 76:18; 81:11; 82:15, 17; 84:10; 103:1
**federal** [1] - 53:25
**feedback** [1] - 25:25
**feeding** [1] - 60:22
**feelings** [1] - 60:17
**feet** [3] - 108:22; 116:4, 16
**FELDMAN** [1] - 3:10
**fell** [2] - 104:16, 24
**felt** [12] - 23:10; 47:14; 51:25; 56:20; 67:1, 15-16; 69:16, 21; 102:20
**female** [5] - 33:15, 19; 80:6, 18
**fence** [1] - 94:11
**fencing** [1] - 109:11
**fended** [2] - 120:14; 121:2
**few** [6] - 96:20; 106:18; 109:2, 7; 110:6, 25
**fight** [1] - 116:2
**figure** [3] - 93:6; 107:16; 131:24
**file** [1] - 122:18
**filed** [21] - 47:1; 119:21; 120:6, 16-17, 21; 121:11; 122:15, 17; 123:3, 8-9, 17; 125:8, 18, 25; 127:3
**filled** [2] - 12:22, 25
**filled-out** [1] - 12:25
**fine** [5] - 38:23; 61:2; 103:22, 24; 132:5
**finger** [3] - 30:1

**finish** [1] - 129:25
**finite** [2] - 70:20
**firm** [1] - 40:3
**first** [32] - 7:11; 8:14; 10:6; 22:25; 57:23; 59:6; 72:17; 88:17, 24; 89:4; 90:18; 91:20; 97:8; 98:24; 99:2, 21; 116:7; 119:21; 120:2, 12; 121:6, 10, 24; 123:18, 22, 24; 125:8, 11-12, 16; 132:13
**First** [1] - 73:1
**fits** [1] - 50:8
**five** [4] - 8:9; 36:6; 93:20; 101:16
**FL** [3] - 2:4, 8, 12
**flashback** [1] - 63:24
**flat** [1] - 115:25
**FLEXNER** [4] - 1:20; 2:3, 7, 11
**flip** [6] - 9:14; 11:18; 43:5, 8; 91:9
**floating** [1] - 28:16
**floats** [1] - 28:15
**flooded** [1] - 67:23
**flow** [1] - 29:9
**fluid** [4] - 28:16; 29:6, 9
**focal** [1] - 30:8
**focus** [2] - 7:9; 22:25
**focused** [3] - 27:7; 34:15; 125:2
**focusing** [1] - 31:8
**foliage** [1] - 92:19
**follow** [5] - 20:10; 24:23; 59:25; 61:17; 103:20
**follow-up** [2] - 20:10; 24:23
**following** [5] - 8:17; 68:15; 108:17; 109:17; 110:17
**Following** [1] - 36:8; 46:4; 57:19
**food** [7] - 115:21; 116:23; 117:8, 11, 15, 24; 129:1
**FOR** [1] - 1:2
**forcing** [1] - 132:5
**foregoing** [1] - 136:9
**forget** [1] - 38:13
**form** [8] - 12:1, 4, 9, 21, 25; 13:10, 13; 14:10
**format** [1] - 54:23
**forming** [1] - 36:22
**forms** [2] - 11:3; 133:5
**formulating** [1] - 21:18
**forth** [1] - 29:5
**forward** [4] - 28:20; 38:9, 17; 39:7
**forwarded** [1] - 31:23
**foundation** [4] - 19:9; 38:7; 81:16, 25
**four** [7] - 48:24; 66:11; 67:6; 81:21; 86:10; 114:23, 25
**four-door** [2] - 114:23, 25
**four-page** [1] - 66:11
**fourth** [3] - 11:18; 72:20; 100:12
**fragile** [1] - 8:17
**frame** [1] - 75:24
**framework** [1] - 54:23
**frankly** [1] - 136:3
**frequency** [2] - 43:9; 84:15, 17

**frequently** [2] - 81:8; 83:8
**Friday** [5] - 130:4, 11, 15, 18
**friday** [1] - 130:8
**friend** [3] - 46:2; 56:3; 65:6
**friends** [3] - 19:2; 128:16; 129:1
**front** [19] - 17:8; 28:20; 37:22, 25; 38:5; 42:12; 48:13; 87:7; 89:11; 104:9, 17; 105:3, 22, 25; 106:2, 8; 107:20; 108:15; 115:20
**froze** [2] - 56:25; 57:4
**full** [3] - 26:13, 19; 67:7
**full-time** [2] - 26:13, 19
**Fulton** [1] - 3:7
**function** [1] - 78:24

## G

**gather** [1] - 128:15
**gears** [2] - 41:15; 71:25
**generally** [1] - 111:5
**generate** [1] - 128:17
**genital** [1] - 81:3
**genitals** [2] - 79:9; 80:10
**gentleman** [1] - 59:9
**gentlemen** [5] - 39:12; 57:14; 62:6; 72:10; 128:3
**gestured** [1] - 102:13
**girl** [1] - 126:19
**given** [7] - 37:13; 76:6; 120:11; 125:17, 19-20; 127:3
**glanced** [2] - 32:14, 20
**Gluck** [5] - 68:3, 5-6, 19; 69:7
**goal** [2] - 61:6; 129:23
**Google** [1] - 104:3
**gossip** [1] - 34:22
**grade** [5] - 26:14; 64:18; 75:17; 78:24; 90:8
**graduated** [1] - 40:12
**Grady** [4] - 7:21; 91:2, 16; 97:13
**graphic** [4] - 47:8, 18; 48:12, 16
**great** [2] - 30:12; 60:13
**greatly** [1] - 128:8
**ground** [3] - 104:24; 105:3; 134:20
**guess** [2] - 106:24; 134:3
**guidance** [3] - 47:5; 49:8; 55:3
**guidelines** [1] - 128:7
**gym** [1] - 65:15

## H

**half** [1] - 129:8
**hand** [3] - 42:5; 126:14; 134:16
**handed** [3] - 77:22; 79:16; 81:20
**handle** [1] - 74:1
**handwritten** [5] - 46:12-14; 47:6; 48:2
**hang** [1] - 126:4, 7, 15
**happy** [7] - 23:9; 25:14; 26:17; 35:22; 56:20; 102:11; 128:24

**harassed** [4] - 14:23; 80:1, 7, 19
**harassment** [12] - 8:19, 21; 34:6, 9, 11, 15, 17, 25; 50:25; 78:12, 19
**hard** [4] - 60:21; 68:15; 112:1; 126:13
**harder** [1] - 90:22
**Hawaii** [1] - 54:19
**head** [12] - 16:18; 18:11; 61:25; 115:19, 22; 116:2, 4, 6, 13, 17; 117:22
**headache** [1] - 29:18
**Headache** [1] - 45:2
**health** [1] - 21:23
**healthy** [1] - 15:14
**hear** [6] - 54:3; 104:18; 112:8; 133:17; 135:10
**heard** [6] - 31:18; 39:12; 84:2; 128:18; 132:9; 133:13
**hearing** [5] - 46:23, 25; 57:21; 134:9
**hearsay** [2] - 19:9, 11
**help** [2] - 49:8; 58:14
**helpful** [2] - 23:7; 38:16
**helpless** [1] - 124:5
**helps** [2] - 107:14; 111:25
**Herndon** [2] - 27:13; 45:15
**high** [2] - 27:18
**highlighted** [1] - 73:10
**hip** [10] - 16:4, 7, 21, 23; 17:2, 6, 8, 17; 20:13
**hired** [1] - 81:10
**History** [2] - 78:4, 22
**history** [5] - 39:23; 41:16; 44:14; 78:23; 80:14
**hit** [2] - 28:18; 65:20
**hits** [1] - 28:21
**hitting** [1] - 35:3
**hmm** [16] - 7:10; 9:21; 12:6; 39:24; 41:17; 51:22; 64:19; 66:4; 79:5; 84:25; 85:2; 86:16; 102:14, 16; 112:9; 121:10
**hold** [2] - 46:22; 116:14
**holding** [2] - 116:14; 130:14
**holiday** [3] - 128:24; 136:4
**holidays** [1] - 128:15
**Holly** [2] - 113:9, 20
**HOLTZMAN** [1] - 1:16
**Holy** [5] - 41:20; 42:10, 12; 43:1; 44:17
**home** [4] - 35:16; 89:9; 96:4; 109:9
**homebound** [4] - 8:11, 13; 11:4; 12:2
**homestretch** [1] - 6:10
**honest** [1] - 52:1
**Honor** [53] - 6:24; 9:22; 11:11; 13:4; 20:1; 22:17, 19; 24:16; 33:6, 21; 36:17, 20; 39:16; 40:14; 46:3; 47:2, 4, 18; 57:24; 60:19; 62:2, 10; 63:2; 68:23; 70:18; 81:16, 25; 85:21; 87:18; 90:11; 93:1, 5, 22; 94:15; 99:7, 17; 103:5, 12; 104:19; 108:25; 113:15; 122:2, 11, 22; 125:5; 127:12, 15, 19, 21; 131:1; 132:14; 135:16, 22
**HONORABLE** [1] - 1:12
**hope** [4] - 111:10; 129:22; 130:22, 24

**hoped** [1] - 130:23
**hopes** [1] - 130:24
**hoping** [3] - 129:5; 130:17
**Horsepen** [28] - 86:4, 10, 15, 19-20, 25; 88:14, 19; 89:10; 97:18; 100:1, 4, 9; 101:5, 7; 107:20; 108:8, 16; 109:25; 110:2, 9; 112:13, 15, 22; 113:4, 20
**hospital** [1] - 41:21
**Hospital** [1] - 77:17
**hour** [3] - 28:18; 129:7
**hours** [1] - 132:4
**house** [47] - 85:5; 86:4, 11-12, 17-18, 20, 24; 87:1-3; 88:12, 17; 89:10; 91:14, 18, 20; 92:1; 96:17, 23; 97:3, 18; 101:9, 12; 105:22; 107:19, 21-22; 108:8, 15; 109:9, 12, 14-15, 20; 110:2, 11, 22, 25; 111:4, 6; 112:9, 15; 113:25; 119:2
**houses** [5] - 86:10; 110:2; 111:5, 12-13; 112:23; 113:7; 114:13
**hundred** [2] - 114:20; 121:13
**HUNTON** [4] - 2:15, 18, 22; 3:2
**hurt** [1] - 64:14
**hurting** [2] - 35:4; 62:16

## I

**idea** [9] - 23:15, 18; 52:24; 105:21; 108:22; 110:24; 111:12, 14; 117:7
**identify** [4] - 10:25; 74:4; 108:19; 118:23
**Identify** [1] - 73:19
**Illness** [2] - 78:4, 23
**important** [1] - 61:20
**impose** [1] - 54:21
**improved** [1] - 25:8
**In-chambers** [1] - 61:12
**in-chambers** [1] - 57:19
**inaccurate** [1] - 126:12
**inappropriate** [2] - 57:7; 71:12
**incident** [33] - 7:14; 14:19; 18:1, 4, 6, 22, 24; 19:6, 14-16; 26:5; 37:13; 46:17; 49:16, 18, 20; 62:15, 18-19; 63:25; 64:3; 65:12; 66:16, 21; 76:22; 77:14, 18; 98:8, 10; 114:2; 121:12
**incidents** [1] - 70:11
**include** [1] - 8:16
**included** [2] - 32:5; 73:24
**includes** [1] - 64:16
**including** [2] - 46:15; 59:4
**inconsistent** [2] - 49:21; 53:24
**incorrect** [2] - 53:21; 124:21
**indeed** [1] - 14:3
**indicate** [1] - 39:12
**indicated** [1] - 54:16
**indicates** [2] - 78:18, 22
**indicating** [2] - 28:23
**indicating)** [2] - 88:9; 89:15
**indiscernible** [2] - 47:2; 50:3
**individual** [1] - 29:3

**indulgence** [1] - 39:16
**infection** [2] - 42:2; 45:8
**inflicted** [2] - 84:19, 21
**information** [17] - 10:10, 18; 13:23, 25; 14:9, 13, 22, 24; 18:19; 19:10, 18; 32:18; 39:4; 60:11; 73:3; 133:11; 134:6
**initiate** [1] - 57:5
**injuries** [1] - 20:24
**injury** [8] - 28:9, 13, 23; 29:3; 30:6, 11; 64:23, 25
**Inova** [4] - 77:17, 23; 79:4, 16
**input** [1] - 73:23
**inquiry** [2] - 101:14; 131:18
**inside** [1] - 28:16
**insinuate** [1] - 37:25
**instruction** [4] - 8:11, 13; 27:11; 134:22
**intending** [4] - 47:21; 130:10; 132:17
**intends** [1] - 46:20
**intention** [1] - 67:22
**intentionally** [1] - 26:16
**interacting** [1] - 96:9
**interaction** [3] - 73:23; 87:22; 104:11
**interest** [3] - 8:12; 27:7; 61:16
**interesting** [1] - 129:17
**interjecting** [1] - 55:12
**intermittently** [2] - 26:13; 27:3
**international** [1] - 40:3
**interpretation** [1] - 125:7
**interrogatories** [2] - 72:13, 18
**Interrogatories** [1] - 73:1
**interrogatory** [4] - 72:8, 10, 25; 73:21
**Interrogatory** [2] - 73:7, 10
**interrupted** [2] - 97:11; 130:20
**intersect** [1] - 86:10
**intersecting** [1] - 99:3
**intersection** [5] - 86:14; 88:9; 89:9; 97:23; 108:2
**invitation** [2] - 126:5, 24
**invited** [2] - 126:3, 6
**involved** [4] - 25:19; 83:16; 114:2; 134:19
**involvement** [1] - 133:3
**involving** [1] - 53:12
**irrelevant** [1] - 50:16
**issue** [6] - 46:10, 25; 50:23; 53:13; 70:18; 104:20
**issues** [1] - 72:12
**italicized** [1] - 12:9
**itself** [2] - 48:1; 108:24
**IX** [2] - 50:24; 51:1

## J

**J.F** [1] - 3:7
**J.O** [32] - 3:9; 33:12; 64:4; 65:6; 70:15, 24; 71:4, 6, 19; 97:6; 98:5, 15; 104:12, 15, 24; 114:3; 115:7; 116:13, 17; 121:7, 11, 19, 22, 24; 122:6; 123:23; 124:4;

126:2, 5, 8, 24
**James** [8] - 51:23; 56:15, 17; 66:12, 16; 67:9, 11; 79:20
**Jane** [4] - 120:13, 17; 121:18, 20
**January** [3] - 7:16; 13:14; 74:10
**J▇▇** [1] - 116:7
**Jenni** [3] - 74:10; 75:9; 102:23
**jfahey@holtzmanvogel.com** [1] - 1:19
**Joanna** [1] - 131:25
**job** [1] - 40:11
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**journal** [7] - 55:18; 56:19; 62:12, 14; 63:15, 23; 64:4
**JR** [1] - 1:12
**judge** [1] - 131:9
**JUDGE** [1] - 1:12
**Judge** [4] - 36:13; 61:22; 111:7; 131:23
**judicial** [1] - 120:20
**judicious** [1] - 129:8
**July** [5] - 42:18; 119:22; 120:7; 122:18; 123:3
**June** [1] - 125:25
**jurors** [3] - 104:18; 131:18; 134:9
**jury** [25] - 6:3, 6; 34:18; 37:22, 25; 38:21; 48:14; 57:21; 60:16; 62:1, 5; 89:5; 96:9; 108:21; 115:6, 18; 116:21; 117:24; 125:8; 128:17, 19; 131:16; 133:16; 134:7, 24
**JURY** [1] - 1:11
**Jury** [5] - 6:5; 57:16; 61:13; 62:3; 129:3
**jury's** [1] - 127:16
**justly** [1] - 136:1

## K

**Keefe** [1] - 2:10
**keep** [2] - 28:19; 52:2
**keeping** [1] - 131:25
**Kellar** [7] - 21:25; 77:21, 23; 78:15, 18; 79:7, 16
**kelliker@huntonak.com** [1] - 3:4
**Kettles** [1] - 54:18
**KEVIN** [6] - 4:3, 5-6; 6:12; 33:7; 34:3
**Kevin** [1] - 3:2
**kind** [9] - 15:11, 15; 30:8, 10; 107:11; 114:17, 21; 129:11; 135:18
**King** [2] - 66:5; 75:21
**Kinney** [10] - 3:5; 33:3; 103:4, 8, 18; 127:14; 129:5; 135:15, 19
**KINNEY** [7] - 3:6; 33:4; 127:15, 19, 21; 135:16, 22
**knocking** [1] - 83:3
**knowledge** [6] - 12:14; 40:20, 22; 41:4; 73:3; 76:9
**knows** [2] - 82:21; 109:3
**KURTH** [4] - 2:15, 18, 22; 3:2

## L

**labeled** [1] - 14:20
**lack** [3] - 19:8; 81:16, 25
**ladies** [5] - 39:12; 57:14; 62:6; 72:10; 128:3
**lady** [1] - 57:25
**Lane** [40] - 86:4, 10, 14-15, 19, 25; 89:10; 91:19; 96:23; 97:18, 21, 23-24; 99:3, 22; 100:1, 4, 7-8, 13, 18; 101:1, 4, 6; 104:6; 108:15; 110:9, 13, 20, 23; 112:12; 113:5, 9, 19
**Lanes** [1] - 112:22
**lanes** [1] - 113:19
**language** [2] - 12:9; 126:22
**lap** [3] - 117:11, 16
**last** [18] - 7:9, 12, 15; 8:9; 13:18; 24:10; 26:25; 31:13; 34:13; 46:6; 66:15; 77:11; 99:12; 101:8, 11; 106:17, 19; 118:3
**late** [1] - 75:22
**latitude** [1] - 54:2
**law** [2] - 40:3; 50:18
**LAW** [6] - 3:6; 77:2, 4, 7; 85:15; 107:2
**lawsuit** [2] - 32:3, 19; 81:24; 119:21
**lawyer** [1] - 38:3
**lawyers** [16] - 37:24; 38:7; 61:2, 15, 18; 72:11; 75:6; 81:22; 120:6; 122:18; 123:4, 13-14; 127:4, 6
**lay** [3] - 60:14; 61:4; 124:5
**layer** [1] - 54:22
**laying** [1] - 115:25
**lead** [1] - 135:20
**least** [6] - 13:22; 44:18; 54:20; 102:22; 131:5, 21
**leave** [3] - 58:3, 13; 109:20
**lectern** [1] - 103:9
**left** [13] - 16:7, 21, 23; 17:2, 6; 20:13; 69:23; 71:18; 86:18; 105:14; 109:14, 19; 112:16
**legal** [1] - 81:10
**legs** [2] - 29:25; 117:13
**length** [1] - 117:3
**less** [1] - 82:13
**lethargic** [1] - 29:18
**letter** [51] - 6:18; 8:10; 10:16-18, 22; 11:18, 20, 22; 18:13, 18; 19:18, 20, 23, 25; 21:2; 36:10, 13, 16, 20-21; 37:9, 12, 17, 23-24; 38:4-6, 19, 21; 39:2; 46:13, 20; 47:18, 22-23; 48:22; 52:8, 12; 74:21, 25; 75:3, 5, 10; 81:20
**letters** [1] - 37:4
**level** [2] - 23:10; 26:17
**lewd** [2] - 79:10; 80:10
**library** [1] - 57:18, 20
**licensed** [6] - 12:10, 14, 17; 21:8
**life** [2] - 57:2, 4
**lift** [5] - 116:3, 6, 17; 117:22
**lifted** [3] - 116:2; 124:9, 14

**lifting** [1] - 116:12
**light** [2] - 114:6, 8
**limine** [7] - 46:23, 25; 47:1, 20, 25; 53:11; 54:17
**limitation** [1] - 15:11
**limitations** [1] - 15:15
**limited** [2] - 21:19; 73:24
**Line** [1] - 86:18
**line** [4] - 34:13; 37:2, 4, 6
**lined** [1] - 112:23
**lines** [5] - 37:3, 5, 18; 76:3; 108:18
**lip** [3] - 64:25; 65:1
**list** [7] - 64:13, 16; 65:3, 5, 11; 73:25; 135:13
**listed** [3] - 43:20; 44:5, 14
**listen** [2] - 125:21; 132:13
**litigating** [1] - 61:3
**live** [1] - 109:5
**lived** [6] - 86:2; 101:9; 112:18; 113:1, 23
**lives** [1] - 131:17
**living** [6] - 24:3; 26:18; 45:20; 61:3; 119:2
**LLP** [8] - 1:20; 2:3, 7, 11, 15, 18, 22; 3:2
**located** [1] - 87:23
**location** [1] - 95:7
**locations** [3] - 84:23; 91:22; 92:3
**locker** [1] - 65:18
**long-standing** [1] - 78:23
**look** [45] - 6:14; 10:24; 16:1; 28:11; 29:17, 22; 38:1; 40:5; 49:7; 54:21, 24; 58:14; 62:24; 63:13; 64:7; 69:4; 74:24; 75:2; 76:25; 78:5; 83:22; 85:7; 87:12; 89:22, 24; 92:8; 93:18; 94:13; 95:12; 96:6, 19; 104:1; 107:5, 9, 13, 19; 108:18; 109:8; 111:24; 112:2; 118:3, 19; 119:9; 120:11; 130:7
**looked** [6] - 7:18; 9:12; 10:6; 13:1; 18:7; 65:13
**looking** [15] - 32:21; 42:20; 43:24; 44:2; 52:5; 56:11; 97:16; 100:9, 13; 106:4, 21; 108:21; 111:23; 112:4
**Looking** [1] - 36:21
**looks** [10] - 12:4; 30:3; 41:5; 75:7; 86:11; 90:19; 96:23; 100:4; 109:10
**loose** [1] - 34:22
**Los** [1] - 1:22
**lost** [1] - 57:2
**love** [1] - 128:16
**loved** [2] - 62:19; 63:10
**low** [2] - 23:10; 25:13
**Lowe** [2] - 43:20; 44:5
**lumping** [1] - 52:19
**lunch** [1] - 6:8
**lying** [3] - 115:7; 116:3; 117:21

# M

**M.C** [1] - 3:6
**M.D** [7] - 4:3, 5-6; 6:12; 33:7; 34:3; 79:20
**M.P.F** [1] - 3:6
**ma'am** [13] - 39:17; 40:2; 41:22; 57:11; 61:24; 89:22; 106:10; 107:5; 111:12, 22; 119:21; 124:23; 128:2
**machine** [1] - 3:17
**mail** [8] - 10:7; 31:22; 32:1, 11, 19; 73:19; 74:1, 9
**maintain** [1] - 57:11
**manage** [3] - 130:14; 132:9; 134:8
**managing** [1] - 21:24
**manner** [1] - 120:21
**map** [2] - 109:10; 112:17
**Maps** [1] - 104:3
**MARCH** [1] - 6:1
**March** [16] - 1:6; 15:19; 18:3, 19; 20:7, 11; 21:22; 22:12; 23:17; 26:21; 36:16; 42:14; 74:8; 77:10
**marching** [1] - 54:13
**material** [1] - 32:17
**matter** [4] - 128:8, 22; 136:2, 10
**matters** [1] - 51:23
**McMurrer** [3] - 79:6, 8, 20
**mean** [21] - 25:9; 58:23; 65:8, 13; 66:1; 78:21; 80:16, 23; 82:11, 22; 90:21; 92:4, 19; 105:2; 106:3, 24; 107:14; 109:10; 110:16; 121:4, 23; 122:20; 124:22
**meaning** [1] - 13:17
**means** [4] - 73:22; 82:12; 114:24; 117:4
**meant** [2] - 67:1; 102:12
**media** [5] - 35:6; 73:20; 128:13
**Medical** [2] - 42:11
**medical** [7] - 12:7; 15:7; 19:11; 41:16; 42:22; 47:2
**medication** [2] - 22:4; 26:21
**medicine** [2] - 26:23; 27:8
**Medicine** [1] - 27:13
**medicines** [2] - 21:24; 22:2
**meeting** [8] - 83:1, 6, 10, 14, 20; 84:7; 101:20, 25
**memo** [1] - 12:4
**memories** [1] - 67:23
**memory** [6] - 29:20; 30:16; 31:7; 53:16; 132:18
**mental** [5] - 8:17; 15:24; 21:23; 30:15; 132:18
**mentioned** [7] - 18:5; 34:8; 63:21; 66:19; 78:20; 122:16; 124:10
**message** [3] - 9:10; 58:12; 134:19
**messages** [3] - 79:6, 12; 102:23
**met** [3] - 126:6, 24
**method** [1] - 72:10
**Miami** [3] - 2:4, 8, 12
**mic** [1] - 25:21

**MICHAEL** [7] - 3:6; 4:3, 5-6; 6:12; 33:7; 34:3
**Michael** [1] - 3:5
**microphone** [1] - 104:18
**mid** [1] - 117:6
**Middle** [1] - 11:1
**middle** [1] - 105:16
**Middleton** [47] - 86:11, 14, 17, 20; 88:9, 13; 89:10; 90:19, 21; 91:19; 92:2, 18; 96:24; 97:21, 24; 99:4, 22-23, 25; 100:7, 13, 25; 101:4, 6; 104:6; 105:17; 106:22; 107:17, 20; 108:2, 9, 15-16; 109:5, 22; 110:9, 13, 19, 23; 112:12, 22; 113:5, 19
**Middletown** [1] - 106:5
**might** [10] - 41:24; 51:2; 54:5; 59:12; 89:24; 98:4; 133:22; 135:5, 7
**miles** [1] - 28:18
**mind** [4] - 21:11; 23:22; 66:20; 130:3
**mindful** [1] - 60:21
**mine** [1] - 92:10
**minivan** [2] - 119:5
**minute** [2] - 36:5; 78:5
**minutes** [2] - 127:24; 129:6
**misleading** [1] - 38:20
**missing** [1] - 49:5
**mistake** [1] - 49:11
**mk@kinneyesq.com** [1] - 3:8
**mom** [6] - 7:11; 8:21; 73:13; 74:20, 22; 76:7
**moment** [6] - 39:16; 41:15; 57:4; 67:19; 99:15; 124:23
**Monday** [7] - 129:1, 13-14; 131:3; 133:1; 136:5
**month** [1] - 82:9
**months** [3] - 106:18; 133:23
**mood** [2] - 23:9; 25:13; 26:17
**morning** [2] - 129:2; 136:5
**most** [6] - 21:18; 25:13; 26:6; 83:16; 126:10
**mother** [22] - 6:16; 8:8, 12; 9:1; 10:15; 13:16, 19, 24; 14:1, 16, 22; 18:19; 24:3; 31:15, 18, 21; 33:14; 75:11, 14, 18, 20; 101:25
**motion** [11] - 17:9; 46:23, 25; 47:1, 20, 25; 53:11, 15-16, 19
**motions** [1] - 54:17
**mouth** [1] - 52:18
**move** [14] - 6:24; 11:11; 22:17; 24:15; 40:14; 63:2; 67:18; 68:22; 85:20; 90:11; 93:1; 99:7; 130:8
**moved** [11] - 4:22, 24; 5:4; 70:1; 93:15; 94:4, 17; 95:16; 107:12; 113:13
**movement** [1] - 29:25
**moving** [3] - 28:19; 30:2; 130:6
**MR** [162] - 4:5, 10; 33:4, 6, 8, 21; 36:5, 9, 12, 15; 37:19; 38:12, 15; 39:10; 40:16; 42:7; 46:3, 8, 25; 48:4, 25; 49:7, 11; 50:2, 6, 10, 12; 51:3, 10, 19, 23; 52:10, 17; 53:1, 5, 13; 54:13, 25; 55:3,

6; 57:24; 58:16, 20; 59:17, 20; 60:25; 61:7; 62:2, 23; 63:1; 68:23; 70:18; 71:1, 7, 9, 20; 79:12; 81:16, 25; 82:20; 85:12, 21; 87:14, 17; 88:23; 89:2; 90:3, 13; 92:10, 12, 14; 93:2, 5, 12, 22; 94:2, 15; 95:14; 99:10, 14; 101:22; 103:5, 8, 11, 15, 18, 20, 22-25; 104:4, 8, 19, 23; 106:16; 107:3; 108:3, 5, 7, 19, 25; 109:4; 110:7; 111:7, 11, 16, 21; 112:1, 3; 113:14, 18; 118:3, 7-8, 23, 25; 119:1, 15, 20; 120:18, 24-25; 121:17; 122:2, 4, 10, 13, 22; 123:2, 5, 7, 10, 16; 124:18, 20; 125:4, 14, 24; 126:1, 11; 127:8, 12, 15, 19, 21; 130:8, 12, 17, 20, 22; 131:9, 12, 23; 132:6; 135:8, 11, 16, 22

**MRIs** [1] - 28:11

**MS** [179] - 4:4, 7-8; 6:4, 11, 13, 24; 7:1, 3, 5, 20, 22; 9:22, 25; 10:2, 4-5; 11:11, 13, 17, 19; 13:3, 6, 8-9; 15:5; 19:7, 10, 18, 21, 24; 20:1, 5-6; 22:17, 19, 21, 23-24; 24:15, 20-21; 26:3; 29:12; 31:1, 4-5; 32:10; 33:23; 34:1, 4; 35:7, 9, 20, 22, 24; 37:10; 39:1, 8, 16, 19; 40:14, 19, 23, 25; 41:1; 42:5, 9; 47:25; 48:5, 9, 12, 23; 49:1, 9, 14, 25; 51:11, 17; 53:10; 54:7, 11; 55:17; 56:1; 60:19; 62:10, 24; 63:2, 6, 9; 64:10, 12; 68:22; 69:1, 3; 70:22; 71:3, 17, 23-24; 72:8, 16; 73:17; 74:6; 75:16; 77:3, 5, 9; 79:13, 15; 81:19; 82:3, 24; 84:1, 4-5; 85:9, 14, 16, 18, 25; 86:23; 87:11, 15, 21, 24; 88:1; 89:7, 12, 14, 21; 90:2, 4, 6, 11, 17; 91:2, 6-7; 92:13, 15; 93:1, 4, 14, 17; 94:1, 7, 21; 95:19; 96:12, 15-16; 97:12; 99:7, 17, 20; 100:24; 101:16, 18, 24; 103:2; 132:14, 18, 21, 25; 133:4, 9, 13, 19, 24; 134:11; 135:1, 3

**mulch** [2] - 92:7; 95:2

**multiple** [6] - 32:12; 42:22; 70:7; 78:13; 83:13; 101:21

**muscles** [1] - 17:8

**muscular** [1] - 17:7

**music** [1] - 93:10

# N

**Name** [5] - 41:20; 42:10, 12; 43:1; 44:17

**name** [16] - 12:20; 33:11; 51:23; 56:16; 74:1, 8, 10, 13; 80:1, 7, 19; 113:17; 120:17; 133:5

**named** [3] - 56:15; 68:3; 71:10

**names** [1] - 65:22

**nature** [1] - 58:5

**nausea** [1] - 29:19

**near** [8] - 81:7; 85:3, 5; 88:8; 96:17, 23; 97:3; 112:9

**necessarily** [1] - 129:10

**necessity** [1] - 21:12

**need** [16] - 39:6, 14; 57:9; 58:14; 61:14, 22; 73:25; 104:17; 129:8; 130:5; 132:20; 133:17; 134:7, 17; 136:1

**needed** [1] - 59:15

**needs** [7] - 31:3; 58:6, 8; 59:2, 25; 131:19; 133:16

**neighborhood** [10] - 85:1, 10; 95:9; 105:23; 106:17; 109:20, 25; 111:13; 113:10, 24

**Neill** [1] - 121:8

**nerve** [1] - 29:1

**nerves** [3] - 29:4, 24; 30:8

**neurological** [1] - 29:23

**NeuroScience** [2] - 56:11; 62:24

**never** [20] - 15:15; 17:1, 25; 18:5; 24:24; 25:6; 28:1; 31:6; 33:14; 47:10; 64:1; 67:13; 81:13; 102:6, 8; 120:3, 8, 11; 122:16

**New** [4] - 24:3; 26:13, 19; 45:20

**new** [9] - 14:24; 20:16; 23:11, 18-19, 21; 26:15; 75:25

**news** [1] - 32:5

**next** [28] - 12:4, 21; 13:11; 18:14; 20:7; 23:24; 24:7; 42:17, 20; 43:3, 5, 8, 24; 44:17; 86:18; 91:10; 99:25; 100:3, 13; 103:6, 11, 19; 110:25; 111:6; 120:23; 129:11

**night** [1] - 132:4

**nine** [1] - 93:20

**nonconsensual** [2] - 52:23

**noon** [1] - 129:23

**normal** [3] - 17:19; 28:12; 30:12

**nose** [1] - 30:2

**note** [36] - 8:13; 9:7, 12; 10:6, 8, 10, 12, 15; 11:2; 14:5, 16, 18; 15:3; 17:4; 23:17; 37:1, 15; 46:18; 47:6-8, 19; 48:2, 10; 53:15, 17; 54:20; 59:6; 68:14, 18; 69:7

**notebook** [2] - 6:14; 40:6

**noted** [1] - 66:21

**notes** [3] - 46:19; 69:12

**nothing** [4] - 19:14; 52:21; 55:14; 134:22

**notice** [1] - 120:20

**November** [29] - 8:19; 16:21, 25; 17:23; 18:4, 6, 22; 43:24; 44:1, 4, 11; 68:19; 73:2; 77:18; 78:9; 81:7; 83:1, 5, 10, 14, 20; 84:7; 95:3; 101:20; 121:18, 21; 123:9; 124:2, 16

**number** [7] - 25:11; 27:17; 62:23; 81:13; 93:7; 132:15

**Number** [17] - 64:8, 13, 21; 65:3, 5, 10, 15-16, 20, 22, 25; 66:3, 5, 7; 67:6; 73:8, 10

**numbers** [2] - 76:4; 132:20

**nurse** [1] - 12:11

**NW** [5] - 1:17; 2:15, 19, 22; 3:3

# O

**oath** [5] - 72:2, 14; 73:15; 74:18; 119:7

**object** [3] - 37:17; 54:15

**objection** [49] - 7:1; 11:13; 19:7; 22:19; 24:16; 40:16; 46:3; 54:14; 55:1; 63:5; 68:23; 71:1, 7, 9, 20; 81:16; 82:20; 85:21; 87:17, 19; 90:13; 93:6, 12; 94:2, 14-16; 95:14; 99:9, 14; 101:22; 119:15; 120:18; 122:10; 123:10; 124:18; 127:8

**objection's** [1] - 20:3

**obligations** [2] - 128:21; 130:4

**observe** [1] - 26:11

**observed** [1] - 31:6

**obviously** [5] - 19:17; 60:1; 125:1; 131:17; 135:5

**occasion** [1] - 27:14

**occasions** [1] - 60:12

**occur** [2] - 49:23; 96:4

**occurred** [13] - 18:4; 77:18; 78:9; 83:19; 84:6; 95:4, 24; 104:13; 114:3; 119:25; 121:7, 11; 122:6

**October** [16] - 27:25; 43:8; 44:4; 74:25; 81:7, 11; 82:15; 98:8; 102:25; 120:1, 6, 13; 121:2; 122:7

**ODIN** [1] - 3:10

**OF** [13] - 1:2, 11; 3:6; 4:3, 5-6, 8-9; 6:12; 33:7; 34:3; 39:18; 104:7

**offer** [2] - 60:20; 92:25

**offhand** [1] - 11:24

**OFFICE** [1] - 1:19

**office** [5] - 6:19; 7:6; 15:19; 23:25; 58:3

**Official** [2] - 3:13; 136:13

**officially** [1] - 25:6

**often** [2] - 30:16; 84:17

**oftentimes** [2] - 16:10; 30:13

**old** [5] - 57:1; 67:17; 80:18; 115:4; 134:20

**older** [5] - 80:1, 8, 20; 126:4

**once** [7] - 13:22; 75:23; 88:17, 19; 102:6; 115:15; 128:11

**one** [93] - 7:24; 8:1; 16:3, 8, 10, 12, 15; 23:20; 27:6; 33:13; 37:1, 18; 41:20; 44:2; 45:10; 48:1; 49:14, 20; 53:1, 12; 57:11, 17; 60:17; 61:8; 62:13; 63:23, 25; 80:8, 20; 85:3, 5, 12; 86:12, 18; 87:2; 88:17, 24; 89:2, 9, 12, 15-16, 18; 91:16, 22; 92:2; 93:5; 95:6; 96:18; 97:11, 13-14, 22; 98:24; 99:2, 11-12; 100:13, 15-17, 19, 22; 107:6; 108:11, 22; 109:9, 14; 110:11; 112:20; 115:12, 16; 119:17; 121:9; 122:2; 123:20; 125:10, 13, 19-20; 130:8; 131:2, 15, 18; 133:5

**ones** [3] - 98:15; 99:11; 105:13

**ongoing** [1] - 8:18

**online** [1] - 73:22

**opened** [2] - 19:22; 37:19
**opinion** [1] - 21:21
**opportunity** [5] - 57:13; 61:18, 21; 125:10; 131:20
**opposed** [1] - 25:14
**option** [1] - 125:10
**order** [4] - 8:11; 11:3; 12:1; 103:21
**orders** [1] - 54:13
**orient** [4] - 97:15; 107:25; 109:2; 122:25
**oriented** [1] - 111:2
**original** [1] - 120:16
**outing** [1] - 57:7
**outline** [1] - 129:11
**outlined** [1] - 8:6
**outside** [2] - 57:21
**overhead** [1] - 106:25
**overlap** [1] - 134:15
**Overruled** [1] - 82:21
**overview** [1] - 86:1
**overwhelm** [1] - 134:24
**Ox** [2] - 88:10; 109:23

## P

**P.A.H** [1] - 3:6
**p.m** [11] - 1:6; 6:2, 5; 7:7; 57:16; 61:13; 62:3; 96:1; 129:3; 136:6
**pace** [1] - 130:6
**Pachter** [1] - 76:17
**Page** [3] - 4:2, 18; 5:2
**page** [37] - 10:6; 11:18; 12:4, 22; 37:6, 11; 42:12, 17, 20; 43:5, 8; 48:25; 49:5, 8; 56:11; 62:23; 63:7, 10, 13, 19; 64:7, 10, 13; 66:11, 15; 72:20; 73:7, 9-10; 75:3; 85:12; 91:10; 100:19; 118:3
**pages** [4] - 48:24; 49:2; 67:6; 81:21
**pain** [15] - 16:7, 21, 23; 17:2, 6, 12-13; 20:14, 16, 20, 22; 43:16; 44:13, 16, 24
**palpating** [2] - 17:7, 13
**pants** [3] - 124:5, 8
**paper** [1] - 78:21
**paragraph** [7] - 7:9; 72:24; 75:2; 120:12; 124:2; 125:22; 126:2
**paragraphs** [1] - 75:10
**parallels** [1] - 66:18
**parentheses** [1] - 8:19
**parents** [3] - 14:11; 21:11
**park** [29] - 96:17, 22; 97:2, 5, 21, 24-25; 98:2, 5, 17, 20, 23; 99:21; 100:9, 14; 101:1; 104:13; 106:6, 25; 107:9; 109:9, 12, 15, 19; 112:7, 9; 113:24; 114:14
**Park** [1] - 1:21
**parked** [2] - 118:16
**part** [11] - 22:10; 34:15; 35:1; 37:17; 80:12; 113:10, 23; 126:10; 134:17
**particular** [5] - 18:5; 27:7; 83:25; 84:3; 135:5

**particularly** [1] - 89:9
**PARTIES** [1] - 6:9
**parts** [2] - 28:24; 102:13
**party** [2] - 19:12; 57:18
**pass** [2] - 36:10; 109:19
**passed** [2] - 25:1; 114:10
**passenger** [1] - 115:2
**past** [7] - 30:17; 50:20; 109:14, 25; 110:9; 112:13, 15
**patch** [4] - 119:25; 121:8, 12, 24
**patient** [4] - 11:3; 12:1; 20:19; 29:21
**patients** [1] - 27:14
**pause** [3] - 49:4, 12; 55:24
**pay** [1] - 54:4
**paying** [1] - 96:12
**PC** [1] - 3:10
**PEDERSEN** [14] - 4:7; 7:1; 11:13; 19:7; 20:1; 22:19; 24:16; 33:23; 34:1, 4; 35:7, 9, 20, 24
**Pedersen** [5] - 9:23; 15:18; 18:17; 39:3; 58:13
**peer** [5] - 68:12; 69:16, 21; 120:14; 121:3
**pelvic** [3] - 43:16; 44:13, 16
**pelvis** [1] - 44:12
**penalty** [1] - 72:24
**pendency** [1] - 72:11
**pending** [1] - 36:1
**penetrated** [1] - 83:18
**penetration** [3] - 80:25; 83:17
**Pennsylvania** [4] - 2:15, 19, 22; 3:3
**people** [33] - 16:10; 19:6; 25:12; 30:10, 15; 38:13; 39:13; 57:3; 58:4; 61:19; 64:17; 65:22; 70:4, 7, 10, 14, 17, 24; 71:6, 10, 19; 125:2; 128:16, 20; 131:20; 133:12, 17; 134:2, 16, 24; 135:7
**per** [1] - 7:11
**percent** [2] - 114:20; 121:13
**perception** [2] - 59:11
**perfectly** [1] - 17:19
**perhaps** [2] - 32:20; 60:22
**period** [4] - 22:3; 27:25; 77:12; 122:5
**periods** [2] - 25:12, 14
**perjury** [1] - 72:24
**perpetrated** [2] - 56:3, 14
**person** [8] - 12:19; 15:22; 20:22; 45:24; 53:4; 56:14; 72:13
**persons** [1] - 61:4
**perspective** [2] - 59:10; 60:11
**phone** [9] - 75:14, 17, 25; 76:1, 4, 6, 10; 124:5
**photo** [2] - 99:25; 118:24
**photograph** [16] - 85:10; 87:22; 91:8, 13; 94:22; 95:3; 97:8; 99:21; 100:3, 6, 12; 101:8, 11; 105:14; 124:7
**photographed** [1] - 124:4
**photographs** [8] - 85:19; 89:23; 96:17, 22; 98:11, 20, 22; 124:10
**physical** [8] - 15:12, 16-17, 24; 22:11;

23:1; 30:11; 76:6
**physically** [2] - 35:2; 67:16
**physician** [5] - 12:10, 15; 21:8; 44:5; 79:20
**physician's** [1] - 12:11
**pick** [1] - 126:18
**picture** [26] - 86:7; 88:3, 23; 89:4; 90:18, 24; 104:2, 4, 9, 20; 106:21, 25; 107:5, 9, 13; 108:20, 24; 109:8, 23; 112:4, 10; 113:15; 118:9, 19
**pictures** [9] - 89:24; 90:7; 96:19; 98:12, 22; 99:11; 103:12, 25; 116:8
**pieces** [1] - 134:13
**PITTLEMAN** [1] - 3:10
**place** [3] - 91:23; 92:22; 99:11
**placed** [1] - 34:23
**places** [1] - 41:20
**Plaintiff** [4] - 1:4, 15; 2:2; 126:23
**plaintiff** [7] - 126:3, 5-7, 24
**Plaintiff's** [18] - 4:22, 24; 5:4; 9:12; 10:4; 72:25; 77:1; 92:9; 93:15, 18; 94:4, 13, 17; 95:12, 16; 111:16, 22
**plaintiff's** [4] - 9:16, 18; 75:11; 77:5
**plan** [2] - 127:21; 131:1
**player** [1] - 41:11
**playing** [1] - 23:12
**plays** [1] - 54:2
**PLC** [1] - 3:6
**pleading** [1] - 126:25
**pleadings** [1] - 127:5
**plenty** [1] - 58:4
**PLLC** [1] - 1:16
**PM** [1] - 1:8
**point** [30] - 12:15, 18; 15:7, 12; 21:7; 27:2, 4; 34:12; 35:10; 37:10, 19; 50:2; 51:24; 59:21; 60:5; 77:20; 89:5; 94:25; 96:18; 98:24; 99:2; 103:13; 105:12; 106:9; 107:16; 110:3; 116:22; 117:22; 123:19; 134:5
**pointing** [1] - 116:4
**police** [2] - 95:4, 6
**position** [4] - 38:18; 52:3; 117:16; 133:22
**positive** [1] - 26:17
**possible** [1] - 134:15
**possibly** [1] - 23:8
**potential** [1] - 57:22
**potentially** [1] - 50:7
**practice** [3] - 22:10; 24:8; 27:13
**practitioner** [1] - 12:11
**precede** [1] - 98:25
**prefer** [1] - 89:24
**prejudice** [1] - 60:17
**prejudiced** [1] - 32:15
**prepared** [2] - 41:6; 131:6
**presence** [2] - 19:2; 59:8
**Present** [2] - 78:4, 23
**PRESENT** [1] - 6:9
**present** [3] - 73:21; 74:8; 134:17

**presenting** [1] - 80:14
**preserved** [1] - 76:10
**pressure** [1] - 68:12
**pressured** [2] - 69:16, 21
**presumption** [1] - 62:7
**pretty** [3] - 20:19; 24:2; 66:25
**previous** [2] - 88:23; 89:6
**primary** [1] - 21:23
**print** [1] - 128:14
**private** [1] - 44:5
**probative** [1] - 51:2
**problem** [6] - 19:20; 28:13; 59:9; 61:2; 80:15; 93:24
**problems** [3] - 16:11; 29:20; 31:7
**procedure** [2] - 59:4, 18
**proceeding** [1] - 59:8
**Proceedings** [2] - 3:17; 136:6
**proceedings** [5] - 49:4, 12; 55:24; 127:22; 136:10
**PROCEEDINGS** [1] - 1:11
**process** [2] - 60:12; 128:21
**processing** [1] - 67:25
**produced** [2] - 3:17; 76:12
**professional** [2] - 12:7; 35:11; 59:9; 130:4
**proffer** [2] - 48:7; 50:12
**program** [1] - 77:17
**Program** [2] - 77:23; 79:17
**progress** [1] - 68:18
**promiscuous** [1] - 34:23
**prompted** [1] - 14:19
**proper** [1] - 99:1
**proposed** [1] - 92:11
**prosecuting** [1] - 50:22
**prosecution** [1] - 50:20
**protect** [2] - 67:19; 75:23
**protocol** [1] - 38:17
**provide** [3] - 9:7; 14:8; 38:24
**provided** [6] - 10:19; 19:10; 40:8; 46:11; 134:6
**provides** [1] - 60:11
**providing** [1] - 22:7
**provisional** [5] - 42:24; 43:3, 9; 44:23; 45:2
**provisionally** [1] - 93:9
**pruritus** [1] - 16:15
**pseudonym** [1] - 120:21
**Psychiatric** [1] - 79:17
**psychiatrist** [3] - 21:15; 25:19; 81:9
**psychiatrist's** [1] - 21:21
**psychologically** [1] - 35:4
**psychologist** [4] - 12:11, 18; 21:8, 15
**psychotherapy** [1] - 68:18
**PTSD** [13] - 8:20; 9:4; 21:16; 24:23, 25; 25:10, 17; 26:4; 31:11; 37:3-5, 20
**PTSD-like** [1] - 8:20
**PTSDs** [1] - 26:6
**public** [2] - 23:22; 51:6
**publish** [17] - 7:2; 9:25; 11:16; 13:6;

22:20; 24:19; 40:23; 63:3; 69:1; 87:24; 90:16; 93:9; 94:6, 19; 95:18; 99:17; 111:17
**published** [1] - 87:19
**pull** [2] - 14:20; 111:16
**pulled** [2] - 7:13; 84:10
**pumpkin** [4] - 119:25; 121:8, 12, 23
**purposes** [4] - 19:11; 38:18; 73:21; 103:23
**push** [3] - 58:22; 67:16; 107:25
**pushed** [4] - 104:15, 24; 105:3
**pushing** [2] - 35:3; 60:1
**put** [24] - 7:20; 10:4; 15:5; 17:9; 23:17; 30:1; 33:23; 36:19; 45:5; 48:15; 52:18; 68:1; 89:6; 97:13; 102:19, 21; 103:25; 107:1; 111:4, 19; 117:5; 134:14
**putting** [1] - 83:2
**PX** [2] - 93:3

## Q

**quantify** [2] - 106:13; 131:22
**questions** [27] - 33:4; 37:2, 6, 22; 38:11; 48:8; 54:4; 55:9, 11, 13; 58:8; 59:13; 60:9; 61:20; 72:13; 75:10; 101:16; 103:2; 108:17; 122:10, 23; 124:13; 127:18; 128:17; 135:20
**quick** [1] - 11:2
**quickly** [2] - 32:14, 20
**quite** [3] - 23:10; 47:8; 136:2
**quote** [2] - 8:20

## R

**Rachel** [2] - 11:1; 90:8
**raise** [1] - 108:3
**raising** [1] - 36:25
**range** [2] - 17:9; 74:2
**ranked** [1] - 41:11
**rape** [26] - 18:1, 4; 23:20; 35:19; 37:7; 48:20; 50:20, 22; 56:3, 14, 19; 63:15; 66:12; 67:6, 14; 80:21, 23; 95:3; 102:5, 9, 17-18, 22
**rape'** [1] - 63:11
**raped** [28] - 17:21; 19:2; 32:12; 46:1; 67:9, 11-12; 69:17; 70:14, 17, 25; 71:4, 18; 81:6, 10; 82:8, 14, 16; 83:13, 24; 84:12, 15; 92:3; 101:20; 102:1, 4, 15, 25
**rapes** [4] - 78:13; 83:16; 84:24; 92:22
**raping** [5] - 56:23; 70:8; 83:1, 4, 6
**ray** [1] - 17:18
**rays** [1] - 17:15
**rbates@hunton.com** [1] - 2:17
**RCMS** [4] - 121:19, 22; 126:3
**RDR** [3] - 3:13; 136:9, 12
**RDR-CRR** [1] - 136:9
**reach** [1] - 31:15

**reached** [2] - 24:24; 25:8
**reaction** [3] - 58:24; 59:23
**reactions** [1] - 59:22
**read** [30] - 39:1; 46:5, 7; 48:13, 16; 55:23; 66:13; 73:16, 25; 79:22; 83:22; 120:3; 121:15; 122:14, 16, 19; 123:4, 11, 14-15, 17, 21; 124:1; 125:10; 126:13; 127:3, 6
**reading** [12] - 32:15; 34:25; 36:19; 37:14, 23; 38:21; 123:18, 20; 125:23
**ready** [2] - 6:3; 128:4; 129:24
**real** [1] - 46:10
**really** [26] - 6:17; 7:24; 8:2; 15:23; 21:17, 20; 23:6; 25:11; 26:5; 32:21; 44:8; 47:17; 54:3; 56:17; 57:6; 63:22; 106:13; 108:17; 110:12, 17; 112:8; 115:17; 120:2; 125:12, 15; 131:10
**reason** [4] - 16:6; 22:25; 24:22; 25:7
**reasonable** [2] - 125:7; 131:16
**reasons** [1] - 43:2
**rebounds** [1] - 28:22
**received** [3] - 27:11; 33:14; 75:25
**receiving** [2] - 14:24; 76:2
**recent** [2] - 7:14; 30:17
**recently** [3] - 8:1; 23:4; 58:9
**reclarify** [1] - 105:7
**recognize** [3] - 50:24; 72:17; 86:1
**recollection** [7] - 43:22; 44:8; 83:23; 95:23; 119:18
**recommencing** [1] - 39:15
**recommend** [1] - 15:11
**recommended** [2] - 15:15; 17:14
**record** [54] - 6:6; 7:4; 11:15; 22:15, 22; 24:18; 26:21; 36:8, 15; 38:18; 40:18; 43:4, 24; 44:11; 46:6; 47:3; 48:1, 5; 54:15, 20, 25; 57:19; 58:14; 60:5, 8; 61:7, 10; 62:4; 63:8; 64:11; 68:25; 79:12; 80:22, 25; 85:13, 23; 87:20; 90:15; 93:16; 94:5, 18; 95:17; 96:10, 14; 99:19; 104:6; 120:16, 19; 121:20; 129:18, 21; 136:9
**records** [12] - 42:10; 43:23; 44:18; 46:8, 18; 48:3; 54:8; 76:25; 77:11; 78:8; 81:4
**red** [3] - 87:7; 89:11; 90:19
**redaction** [1] - 37:18
**REDIRECT** [2] - 4:6; 34:3
**redirect** [1] - 33:22
**reference** [5] - 37:4; 38:14, 24; 89:5; 106:9; 107:16; 110:3
**referenced** [1] - 38:19
**references** [3] - 19:15; 37:5; 38:4
**referred** [2] - 83:25; 84:3
**referring** [3] - 38:6; 67:2; 111:3
**refills** [1] - 22:6
**reflect** [2] - 6:6; 62:4
**reflected** [1] - 78:8
**regard** [1] - 75:8
**regarding** [3] - 37:2; 119:25
**regards** [2] - 30:16; 35:19

**regroup** [2] - 131:2; 132:6
**regularly** [1] - 23:12
**rehashing** [1] - 134:5
**related** [2] - 20:22; 35:12
**relates** [1] - 69:7
**relating** [2] - 15:8; 46:16
**relationship** [1] - 69:8
**relationships** [2] - 26:15; 70:9
**relatively** [1] - 133:8
**relatives** [1] - 128:16
**relearn** [2] - 57:3
**release** [3] - 14:9, 12; 35:22
**relevance** [2] - 50:21; 120:18
**relevant** [3] - 51:2, 7; 61:20
**reliving** [1] - 67:17
**rely** [1] - 54:14
**relying** [1] - 54:17
**remember** [11] - 31:13; 32:13; 65:16, 20, 25; 106:2; 110:5; 111:25; 117:7; 123:24; 125:17
**remembered** [1] - 62:15
**remembers** [1] - 79:13
**remind** [1] - 53:10
**reminded** [1] - 67:3
**removed** [5] - 123:23; 124:6, 8, 13, 17
**repeat** [4] - 69:25; 96:25; 115:14; 117:18
**rephrase** [3] - 34:19; 71:2; 83:21
**replowing** [1] - 122:23
**report** [16] - 8:3; 19:25; 20:13; 23:2; 26:11; 35:18; 39:5; 47:2; 49:22; 69:5; 78:13; 79:10; 81:14, 24; 82:6
**reported** [14] - 3:17; 16:13, 20; 17:1, 20; 18:3; 26:5; 68:10; 77:13, 17; 78:18; 79:8, 25; 95:3
**reporter** [2] - 46:7; 103:10
**Reporter** [3] - 3:13; 136:13
**REPORTER** [2] - 103:7; 135:10
**reporting** [3] - 17:11, 13; 35:11
**reports** [7] - 32:5; 34:6; 35:12, 15; 80:6, 9, 18
**represent** [2] - 33:11; 53:20
**representation** [2] - 38:23; 106:23
**representative** [1] - 57:17
**representing** [1] - 61:16
**reproduce** [1] - 17:9
**request** [11] - 6:16-19, 21; 7:6; 10:14, 16, 19; 11:5, 23
**requested** [4] - 9:8; 10:17; 16:7; 46:7
**requesting** [1] - 8:10
**requests** [2] - 79:10; 80:10
**required** [1] - 72:14
**reseated** [1] - 62:5
**resolution** [1] - 134:23
**resolved** [1] - 20:3
**resonant** [1] - 25:24
**respect** [9] - 37:16; 49:14; 51:11, 14; 60:4; 61:23; 103:15; 134:18; 135:24
**respectful** [2] - 60:24

**responded** [1] - 58:10
**responding** [1] - 133:12
**response** [4] - 19:8; 123:13; 124:12
**responses** [2] - 60:9; 72:25
**responsibility** [1] - 61:24
**restate** [1] - 70:16
**Reston** [2] - 3:8, 11
**result** [3] - 8:18; 26:6; 28:13
**resumed** [2] - 22:3, 5
**retirement** [1] - 36:4
**retreading** [1] - 134:20
**returned** [1] - 23:4
**review** [1] - 78:5
**reviewing** [2] - 72:22; 127:22
**REWARI** [165] - 4:4, 8; 6:4, 11, 13, 24; 7:3, 5, 20, 22; 9:22, 25; 10:2, 4-5; 11:11, 17, 19; 13:3, 6, 8-9; 15:5; 19:10, 18, 21, 24; 20:5; 22:17, 21, 23-24; 24:15, 20-21; 26:3; 29:12; 31:1, 4-5; 32:10; 35:22; 37:10; 39:1, 8, 16, 19; 40:14, 19, 23, 25; 41:1; 42:5, 9; 47:25; 48:5, 9, 12, 23; 49:1, 9, 14, 25; 51:11, 17; 53:10; 54:7, 11; 55:17; 56:1; 60:19; 62:10, 24; 63:2, 6, 9; 64:10, 12; 68:22; 69:1, 3; 70:22; 71:3, 17, 23-24; 72:8, 16; 73:17; 74:6; 75:16; 77:3, 5, 9; 79:13, 15; 81:19; 82:3, 24; 84:1, 4-5; 85:9, 14, 16, 18, 25; 86:23; 87:11, 15, 21, 24; 88:1; 89:7, 12, 14, 21; 90:2, 4, 6, 11, 17; 91:2, 6-7; 92:13, 15; 93:1, 4, 14, 17; 94:1, 7, 21; 95:19; 96:12, 15-16; 97:12; 99:7, 17, 20; 100:24; 101:16, 18, 24; 103:2; 132:14, 18, 21, 25; 133:4, 9, 13, 19, 24; 134:11; 135:1, 3
**Rewari** [18] - 2:18; 34:5; 35:10; 36:18; 37:21; 46:11; 53:23; 56:24; 58:9; 60:12; 62:23; 70:21; 90:3; 93:25; 101:15; 103:12; 132:13; 135:4
**ringing** [1] - 136:1
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:13
**Road** [13] - 88:10, 13; 91:19; 99:4, 23; 105:17; 106:5; 109:24; 110:9, 13; 112:12
**road** [7] - 106:23; 108:1; 110:4, 24; 116:4, 16, 18
**roads** [1] - 112:19
**Robert** [2] - 2:10; 3:7
**ROSSIE** [1] - 1:12
**routine** [2] - 22:11; 23:1
**rule** [1] - 53:25
**ruled** [1] - 47:18
**rules** [2] - 59:25; 61:17
**ruling** [1] - 53:11
**run** [1] - 110:10
**Ryan** [7] - 2:14; 81:10, 21; 82:8, 23; 83:24; 84:6
**résumé** [4] - 40:8, 21; 41:4, 6

# S

**S.T** [1] - 3:6
**sadistic** [2] - 83:2, 9
**sat** [1] - 124:4
**saw** [18] - 10:15; 20:7; 22:11; 23:24; 43:17, 21; 66:22; 68:9; 70:4; 77:10, 12; 116:24; 117:8, 11; 133:5
**Saylor** [6] - 26:13; 45:11; 55:19; 68:2; 69:23; 70:1
**saylor** [2] - 27:3; 56:3
**saylor's** [1] - 46:8
**scalp** [3] - 16:4, 16; 18:7
**scan** [1] - 41:5
**scans** [1] - 28:11
**scared** [1] - 8:9
**SCHILLER** [4] - 1:20; 2:3, 7, 11
**School** [5] - 11:2; 31:12; 72:18; 135:13, 17
**school** [43] - 7:12, 24; 8:2; 11:6, 8, 25; 14:4, 8, 13, 20; 18:13; 19:25; 21:3; 23:4, 11, 15-16, 18-19, 21-22, 25; 26:13, 15; 36:17; 78:25; 83:1, 10, 20; 84:10; 95:24; 101:20; 102:3; 126:5, 15, 18; 132:16; 135:23
**schools** [2] - 27:18, 20
**Scott** [5] - 2:21; 3:13; 136:9, 11
**scottwallace.edva@gmail.com** [1] - 3:16
**screen** [8] - 7:21; 48:15; 89:24; 107:12; 111:23; 112:2
**SE** [3] - 2:3, 7, 11
**seat** [3] - 61:14; 115:2, 20
**seated** [3] - 6:7; 62:4; 129:4
**sec** [1] - 36:14
**second** [20] - 10:6; 16:20; 50:2; 54:9; 61:8; 64:17; 66:7; 74:24; 86:12, 20, 24; 89:10; 91:8, 16; 107:6, 14; 111:20; 120:4; 122:2; 125:8, 11, 13, 16, 24
**seconds** [1] - 36:6
**section** [1] - 73:8
**sedan** [4] - 114:22, 24; 115:1; 117:2
**see** [54] - 28:10; 29:2; 30:4, 8; 44:6; 45:17, 19, 23; 48:22; 50:20; 57:15; 60:18; 77:24; 82:6; 88:3, 5, 24; 89:9; 90:24; 91:2; 93:22; 95:2; 96:8; 97:13; 101:1, 10; 103:17; 107:9, 11, 20, 24; 108:1, 8; 112:4, 9, 12, 15; 113:4, 12; 115:19, 23; 116:22; 117:8, 12-13, 16, 23; 122:24; 129:1; 130:2; 136:4
**seeing** [9] - 23:5; 26:12; 27:3; 45:13; 70:1; 76:18, 21; 77:4, 14
**seem** [1] - 54:23
**seizure** [1] - 41:24
**self** [2] - 84:19, 21
**self-inflicted** [2] - 84:19, 21
**selfies** [1] - 98:11
**send** [6] - 18:14; 21:2; 39:3; 97:14; 131:25; 132:1

**sending** [1] - 133:10
**sense** [8] - 50:6; 56:21; 87:4; 88:16; 91:1; 98:4; 126:21
**sent** [10] - 11:20, 22; 17:14; 19:25; 31:22, 24; 32:18; 72:13, 19; 74:21
**sentence** [2] - 7:11; 78:11
**separately** [2] - 37:20; 48:15
**September** [3] - 24:13; 26:8; 73:20
**sertraline** [2] - 22:6; 23:9
**services** [2] - 11:4; 12:2
**serving** [2] - 27:22; 128:17
**SESSION** [2] - 1:8; 6:1
**session** [3] - 68:16; 69:11
**Set** [1] - 73:1
**set** [5] - 44:18; 46:9; 70:10; 72:18; 128:8
**settling** [1] - 23:10
**several** [5] - 60:12; 82:8, 10, 18; 128:11
**severe** [3] - 42:1; 44:13; 45:8
**Severe** [1] - 44:14
**severity** [1] - 29:19
**sex** [7] - 50:20; 68:11; 69:14, 20; 83:25; 84:3, 6
**sexual** [31] - 8:18, 21; 34:6, 9-10, 15, 17, 25; 47:11; 48:12; 50:25; 51:20, 24; 52:11, 22; 71:12; 76:22; 77:18; 78:9, 11, 19; 79:11; 80:15-17, 23; 91:23; 120:14; 121:2
**sexually** [12] - 14:23; 17:25; 19:1; 33:15; 57:5; 79:25; 80:7, 19; 81:8; 98:5; 121:18, 21
**shame** [1] - 102:20
**share** [1] - 94:1
**shared** [5] - 13:25; 14:22; 32:3; 62:13
**sharing** [1] - 73:23
**sheet** [1] - 93:10
**shielding** [1] - 19:5
**shirt** [1] - 124:9
**shirts** [2] - 124:5, 8
**shocked** [2] - 119:11, 13
**short** [2] - 77:12; 133:8
**shorter** [1] - 134:12
**shorthand** [1] - 3:17
**shoulder** [3] - 117:2, 6
**show** [6] - 28:11; 50:21; 79:12; 87:22; 92:11; 95:22
**showed** [3] - 93:6; 98:12; 120:8
**showing** [1] - 55:20
**shown** [2] - 99:21; 120:5
**shows** [3] - 46:17; 101:8; 106:22
**shrink** [1] - 131:9
**shut** [2] - 58:18, 24
**sic** [3] - 37:4; 64:20; 106:5
**side** [9] - 17:8; 61:19, 21; 94:25; 95:21; 105:14; 110:4; 115:8; 132:8
**Sidebar** [2] - 39:11; 55:8
**sidebar** [4] - 20:1; 36:5, 8; 46:4
**sided** [2] - 49:9, 11

**sides** [1] - 129:9
**sidewalk** [1] - 106:12
**Sidley** [2] - 40:1, 8
**sign** [17] - 12:1; 90:18; 91:3; 92:1, 5, 18, 20-21; 94:8, 10, 22-24; 95:1, 20
**signature** [3] - 72:20, 23; 73:5
**signed** [3] - 12:10; 13:10, 13
**signs** [2] - 18:10; 27:11
**silver** [3] - 114:21; 118:13
**similar** [2] - 53:17; 66:8
**simple** [1] - 41:5
**simpler** [1] - 48:6
**simply** [5] - 58:1; 96:9; 128:16, 19; 133:10
**single** [5] - 18:3; 76:22; 77:14, 18; 78:18
**sister** [1] - 31:24
**sit** [1] - 128:7
**sitting** [4] - 105:19; 115:2; 117:5, 16
**situation** [2] - 49:24; 54:10
**six** [3] - 93:20; 133:23
**six-five-nine** [1] - 93:20
**size** [2] - 111:2, 4
**sizewise** [1] - 106:4
**Skills** [1] - 41:9
**skin** [1] - 16:5
**skip** [3] - 100:12, 15, 19
**skull** [2] - 28:21; 29:10
**slash** [1] - 64:16
**sleeping** [2] - 26:16; 31:11
**slowing** [1] - 129:7
**slows** [1] - 60:12
**small** [2] - 77:1; 129:22
**smashes** [1] - 28:20
**smile** [1] - 128:3
**social** [9] - 11:7, 25; 12:22; 35:6; 73:20; 76:18; 78:24; 128:13
**sodomized** [3] - 52:14; 63:19; 66:23
**someone** [6] - 11:5; 45:13; 51:6; 57:4; 62:19; 68:3
**something's** [1] - 49:5
**sometime** [1] - 129:25
**sometimes** [3] - 58:5; 82:12
**somewhere** [3] - 66:25; 83:21; 133:24
**Sona** [1] - 2:18
**soon** [2] - 60:10; 131:21
**sorry** [40] - 10:15; 16:3; 25:23; 30:20; 41:2; 42:21; 43:7, 24; 44:1; 69:25; 79:12; 83:21; 86:9, 13; 87:15, 24; 92:14; 93:19; 94:1; 96:25; 97:10, 22; 98:21; 100:5, 8; 103:7; 107:24; 112:8; 115:14; 117:18; 120:6; 121:8; 130:20; 132:21; 135:11
**sort** [7] - 39:13; 59:14; 72:14; 128:7; 131:22, 24; 132:9
**sounds** [16] - 49:15; 66:13; 68:20; 79:7; 82:22; 88:21; 95:8; 96:3; 98:4; 100:2; 109:17; 113:17; 114:1; 115:5; 119:4; 121:5

**source** [1] - 21:23
**special** [1] - 135:7
**specific** [7] - 8:6; 12:19; 23:3; 37:4-6; 134:21
**specifically** [5] - 7:25; 23:16, 19; 34:13; 73:24
**specifics** [1] - 19:16
**spend** [2] - 32:21; 127:21
**spent** [1] - 34:5
**spherical** [1] - 28:16
**split** [1] - 7:21
**split-screen** [1] - 7:21
**spoken** [3] - 8:12; 13:16, 19
**sports** [4] - 27:8, 17-18, 22
**spot** [1] - 27:11
**spreading** [1] - 34:22
**Square** [1] - 3:15
**srewari@huntonak.com** [1] - 2:20
**stack** [1] - 134:23
**stand** [2] - 58:5; 93:22
**standard** [1] - 38:17
**standards** [1] - 54:9
**standing** [6] - 17:10; 30:4; 54:14; 55:1; 78:23; 106:5
**standpoint** [1] - 51:1
**start** [14] - 10:11; 36:6; 60:14; 71:14; 75:2; 109:5; 115:9; 117:2; 129:13, 15, 25; 130:2; 131:5
**started** [8] - 36:19; 37:23; 45:13; 46:5; 50:13; 69:23; 75:20; 115:15
**starting** [2] - 21:17
**starts** [2] - 48:24; 64:13
**state** [4] - 24:1; 63:25; 66:19; 74:1
**statement** [5] - 121:1; 124:1; 125:21; 126:9
**States** [3] - 3:14; 54:17
**STATES** [2] - 1:1, 12
**stating** [2] - 72:4; 120:7
**status** [1] - 15:25
**stay** [2] - 128:13
**stayed** [1] - 116:7
**step** [2] - 35:25; 128:2
**steps** [1] - 106:11
**still** [10] - 50:15; 58:25; 87:14; 100:13, 25; 107:18; 114:6, 8; 119:2
**stipulation** [1] - 91:4
**stood** [1] - 37:22
**stop** [20] - 28:18; 48:21; 52:9, 14; 53:8; 62:15; 63:11; 85:3; 87:23; 88:7, 12; 90:7; 96:4; 126:6, 16, 18, 21, 24; 127:1
**stopped** [3] - 26:20; 31:2, 19
**stops** [2] - 28:20; 50:9
**Storm** [2] - 66:5; 75:21
**story** [1] - 61:21
**straight** [1] - 38:19
**Street** [4] - 1:17; 2:3, 7, 11
**street** [2] - 113:17; 118:17
**strength** [1] - 29:25
**stress** [1] - 26:7

**stretched** [1] - 29:1
**strong** [1] - 46:14
**strongly** [1] - 128:11
**structurally** [1] - 28:9
**structure** [2] - 29:3, 8
**structures** [1] - 28:25
**struggle** [1] - 89:6
**struggled** [1] - 70:9
**student** [3] - 33:19; 76:13; 126:4
**students** [3] - 34:21; 121:19, 22
**stuff** [2] - 46:16; 65:18
**subdivision** [1] - 97:9
**subject** [3] - 35:21; 54:6; 58:19
**subjective** [1] - 69:4
**submitted** [1] - 35:19
**sudden** [5] - 25:15; 28:14, 18; 29:4; 36:19
**suddenly** [1] - 28:20
**sued** [1] - 51:5
**suggest** [1] - 54:23
**suggested** [2] - 51:1; 71:11
**suggesting** [2] - 125:1; 131:19
**suggestion** [2] - 124:25; 129:6
**suggests** [2] - 49:19; 125:12
**suit** [4] - 120:6, 21; 122:18; 127:4
**Suite** [7] - 1:17, 21; 2:4, 8, 12; 3:7, 11
**summary** [2] - 77:22; 78:17
**summer** [2] - 31:13; 79:4
**supporting** [1] - 133:11
**supportive** [2] - 54:1; 132:10
**surprised** [1] - 48:19
**surrounding** [2] - 19:5; 36:22
**suspected** [2] - 28:1, 4
**suspecting** [1] - 25:17
**suspicion** [1] - 26:4
**sustained** [4] - 20:4; 71:21; 81:18
**Sustained** [5] - 82:2; 101:23; 122:12; 123:6; 127:11
**switch** [2] - 41:15; 71:25
**switched** [2] - 76:2, 4
**symptoms** [3] - 26:18; 29:13, 16
**syndrome** [2] - 42:18, 25
**System** [1] - 69:4
**systems** [1] - 8:20

**T**

**T.B** [1] - 3:6
**tab** [4] - 6:15; 16:1; 40:6; 55:22
**tackled** [1] - 126:8
**talks** [1] - 65:22
**tapering** [1] - 26:22
**Taylor** [3] - 74:10; 75:9; 102:23
**teachers** [7] - 65:16, 25; 132:19, 23
**team** [4] - 27:16, 19, 22; 81:10
**teams** [2] - 27:17
**teased** [1] - 64:16
**temporarily** [1] - 29:7

**tempting** [1] - 128:10
**ten** [4] - 48:25; 132:21, 23; 133:17
**ten-page** [1] - 48:25
**tend** [1] - 30:14
**tender** [2] - 17:7, 11
**Tennis** [1] - 41:13
**tennis** [2] - 23:12; 41:11
**term** [1] - 25:3
**terms** [5] - 21:20; 25:18; 30:15; 84:2; 96:5
**terrible** [1] - 97:1
**testified** [4] - 49:21; 124:12; 126:17; 132:11
**testifies** [1] - 53:5
**testify** [8] - 33:2; 47:5; 53:8; 133:3; 134:7; 135:6, 8, 12
**testimony** [12] - 19:24; 31:15; 32:24; 53:25; 69:18; 117:20; 119:7; 120:8; 123:4; 125:12; 127:5; 134:18
**text** [2] - 76:9, 12
**Thanksgiving** [3] - 56:4, 9; 66:8
**theory** [3] - 54:1; 132:11; 133:11
**therapist** [12] - 23:6-8; 25:4; 51:5, 25; 52:1, 4; 62:13; 67:25; 68:15
**therapists** [3] - 41:18; 69:22; 70:6
**therapy** [3] - 22:7; 53:15; 68:14
**Thereupon** [3] - 60:6; 61:10; 129:19
**they've** [1] - 134:1
**thinking** [3] - 31:10; 131:5; 134:23
**thinks** [1] - 59:10
**third** [14] - 17:20; 64:17; 75:2; 91:13; 100:6; 104:1; 122:14; 123:20; 125:9, 19-20, 24
**Thistleberry** [2] - 113:3, 20
**threatened** [1] - 102:2
**threats** [3] - 8:19; 9:2; 14:24
**three** [13] - 16:8, 12-13; 27:19; 36:5; 48:24; 67:6; 98:13; 127:4, 6; 133:23; 134:2
**three-minute** [1] - 36:5
**Thursday** [2] - 7:7; 130:2, 6
**timeframe** [2] - 75:15; 82:16
**timeline** [2] - 8:6; 43:18
**tinted** [6] - 118:20, 22; 119:10, 14, 18
**tip** [1] - 108:1
**Title** [2] - 50:24; 51:1
**today** [3] - 48:19; 128:1; 133:5
**today's** [1] - 127:22
**together** [4] - 29:1; 52:19; 102:19, 21
**took** [5] - 27:7; 74:20; 75:22; 91:23; 92:22
**top** [14] - 7:7; 12:24; 42:13; 100:16, 21; 104:3; 115:7, 13, 16; 116:6, 11, 13, 17; 124:4
**TORCHINSKY** [1] - 1:16
**tormenting** [1] - 35:4
**totally** [1] - 57:7
**touch** [5] - 30:2; 65:17; 79:9; 80:9; 131:25

**touched** [1] - 134:17
**touching** [1] - 81:3
**towards** [7] - 25:10; 30:6; 86:10; 88:13; 100:1; 116:4
**Toyota** [3] - 114:18; 118:13
**tract** [1] - 42:1
**trained** [1] - 61:5
**training** [2] - 27:6, 10
**TRANSCRIPT** [1] - 1:11
**transcript** [4] - 3:17; 37:2; 38:2; 136:9
**transcription** [1] - 3:18
**trauma** [2] - 20:23; 52:19
**trauma/stress** [1] - 8:18
**traumatic** [4] - 26:5, 7; 49:15; 70:12
**travel** [1] - 45:22
**traveled** [1] - 45:23
**treat** [2] - 27:14; 28:4
**treated** [3] - 28:1; 68:2
**treaters** [2] - 41:18; 45:10
**treating** [4] - 12:15, 18; 21:8; 31:19
**treatment** [5] - 19:11; 21:23; 31:6; 42:10; 77:16
**Treatment** [2] - 77:23; 79:17
**tree** [1] - 87:7
**trees** [1] - 97:24
**trending** [1] - 25:10
**trespassing** [1] - 127:15
**TRIAL** [1] - 1:11
**tried** [7] - 31:15, 21; 65:17; 79:9; 80:9; 116:2; 128:8
**triggered** [2] - 63:24; 66:19, 25
**triggers** [1] - 25:15
**trouble** [1] - 43:12
**true** [11] - 38:5; 67:21; 73:2; 121:1, 6, 10, 16, 22; 123:22; 124:2; 136:1
**trust** [4] - 6:8; 44:9; 56:13; 63:18
**truthful** [1] - 14:2; 67:22
**try** [6] - 124:24; 131:24; 133:15; 134:14; 136:1
**trying** [23] - 26:15; 32:25; 36:9; 39:1, 4-5; 46:9; 50:4, 10; 60:19; 95:22; 106:9; 108:25; 111:2; 117:24; 123:1; 125:2, 5; 130:14; 131:9; 132:8
**Tuesday** [1] - 129:15
**turn** [12] - 39:13; 68:17; 86:20; 88:17, 19; 89:16; 91:18; 101:4; 109:14; 130:18; 131:3; 132:10
**turned** [3] - 42:1; 115:18, 22
**turns** [2] - 129:7
**twice** [2] - 13:20; 23:6
**two** [21] - 54:8, 20; 84:23; 91:22; 92:2; 98:12; 102:19, 21; 106:19; 121:19, 22; 122:10; 123:18, 22, 24; 133:23; 134:1
**type** [2] - 20:23; 26:6
**typed** [1] - 47:7
**typically** [2] - 30:17; 50:19

## U

**U.S** [1] - 41:13
**uh-oh** [1] - 130:7
**ultimately** [1] - 17:18
**um-hmm** [15] - 7:10; 9:21; 12:6; 39:24; 41:17; 51:22; 64:19; 66:4; 79:5; 84:25; 85:2; 102:14, 16; 112:9; 121:10
**Um-hmm** [1] - 86:16
**unable** [1] - 67:16
**unacceptable** [2] - 58:2, 11
**under** [18] - 9:15; 20:25; 41:8; 69:4; 72:2, 14, 23-24; 73:15; 74:7, 9, 18; 78:4; 79:22; 80:5; 117:3; 119:7; 120:17
**understood** [3] - 51:17; 61:7; 125:4
**underwater** [1] - 67:1
**unfounded** [1] - 50:25
**United** [3] - 3:14; 54:17
**UNITED** [2] - 1:1, 12
**University** [1] - 54:19
**unless** [3] - 19:16; 50:21; 113:12
**unprejudiced** [1] - 32:25
**unusual** [4] - 20:19, 21, 25
**unwelcomed** [2] - 120:14; 121:2
**up** [40] - 7:20; 15:5; 20:10; 24:23; 25:21; 30:1, 4; 33:23; 34:17; 37:8; 42:5; 46:18, 23; 47:23; 48:15; 54:7; 89:6, 25; 91:16; 94:8; 96:12; 97:13; 104:1; 107:1, 6, 13, 25; 108:1; 111:16, 19; 112:15; 120:10; 124:10, 14; 126:18; 129:13
**upbeat** [1] - 23:9
**upset** [1] - 58:4
**urinary** [4] - 42:1; 43:9, 12
**urologist** [3] - 43:17, 21; 44:7
**user** [5] - 73:22; 74:1, 8, 10, 12
**user-based** [1] - 73:22
**USTA** [1] - 41:11
**UTI** [2] - 44:14; 45:8

## V

**VA** [3] - 3:8, 11, 15
**vacant** [2] - 107:10; 112:4
**vaginal** [2] - 43:10; 83:17
**vaginally** [1] - 56:23
**vantage** [5] - 94:25; 96:18; 98:24; 99:1
**variety** [1] - 43:1
**various** [3] - 28:25; 29:1; 30:8
**verbalize** [1] - 102:21
**verbally** [1] - 35:3
**verify** [2] - 72:24; 89:8
**versus** [1] - 54:17
**view** [4] - 19:6; 91:11; 95:20; 116:18
**vigorous** [1] - 20:23
**violated** [4] - 66:18; 67:10, 12, 15
**violating** [1] - 66:14
**violation** [2] - 56:16, 20
**violently** [1] - 69:16

**viral** [2] - 42:18, 24
**VIRGINIA** [1] - 1:2
**Virginia** [6] - 3:14; 45:13, 23; 69:23; 70:2; 71:18
**visit** [21] - 7:23; 13:18; 15:19; 16:6, 12, 18, 21; 17:21; 20:10, 13, 15; 21:3; 22:15, 25; 23:2; 24:7, 10, 12, 22; 26:8, 25
**visits** [2] - 16:24; 17:2
**vivid** [3] - 43:22; 44:8
**vocabulary** [1] - 102:10
**VOGEL** [1] - 1:16
**voice** [1] - 25:24
**VOLUME** [1] - 1:8
**volunteers** [1] - 60:10
**vomiting** [3] - 29:19; 44:21, 23

## W

**waiting** [1] - 21:14
**walk** [4] - 109:12-14; 128:20
**walking** [1] - 17:10
**wall** [2] - 105:20; 106:7
**Wallace** [4] - 3:13; 136:9, 11
**wants** [2] - 58:12; 108:23
**Washington** [5] - 1:18; 2:16, 19, 23; 3:3
**watch** [1] - 65:16
**watching** [1] - 30:3
**ways** [5] - 37:20; 83:18; 128:11
**WEAVER** [6] - 4:3, 5-6; 6:12; 33:7; 34:3
**Weaver** [4] - 6:14; 35:20; 36:16; 133:4
**Wednesday** [4] - 129:17, 24; 130:1; 131:6
**week** [11] - 6:10; 21:13; 23:6; 25:13; 82:9, 15, 19; 128:5; 129:11
**weekend** [5] - 127:22; 128:10; 131:2, 23; 132:7
**weekends** [1] - 128:10
**weeks** [2] - 106:19; 134:1
**weight** [2] - 26:16; 99:13
**welcome** [1] - 56:11
**West** [2] - 88:10; 109:23
**white** [2] - 87:4; 92:8
**whole** [3] - 19:22; 73:25; 76:21
**Wiehle** [1] - 3:10
**willingness** [1] - 128:7
**window** [1] - 117:5
**windows** [7] - 117:2; 118:20, 22; 119:10, 12, 14, 18
**Winston** [1] - 11:1
**wish** [1] - 128:24
**WITNESS** [43] - 25:23; 26:1; 29:9; 31:2; 32:8; 34:19, 21; 36:3; 42:6, 8; 55:15, 25; 57:9; 61:25; 71:8, 13; 77:8; 79:14; 82:22; 85:24; 86:8, 13, 16, 19, 22; 87:3, 6, 9; 89:3, 18, 20; 90:5; 94:20; 97:10; 100:20, 22; 106:13; 110:5;

111:6; 113:17; 119:19; 124:19; 126:10
**witness** [17] - 38:13; 59:4; 60:14; 81:17; 82:1; 89:8; 108:19, 23; 111:8; 125:1; 127:13; 131:2, 6; 133:8; 134:3, 14
**witnesses** [16] - 39:14; 57:22; 61:4; 131:4; 132:9, 15; 134:7, 12, 22; 135:5, 9, 12, 16, 23
**woods** [1] - 85:5
**Woods** [13] - 86:4, 15, 19, 25; 88:14; 97:18; 100:1, 4, 10; 101:5; 108:8, 16; 113:20
**word** [10] - 80:23; 102:5, 9, 17-18, 20, 22
**words** [4] - 8:1; 52:18; 104:12; 109:25
**worker** [5] - 11:7, 25; 12:22; 76:18
**works** [3] - 58:1; 132:4; 133:14
**write** [2] - 10:21; 18:13
**writes** [3] - 7:11; 8:16; 47:5
**writing** [4] - 14:5, 16; 51:5; 55:18
**written** [4] - 10:18; 48:21; 72:15; 81:21
**wrote** [17] - 8:8; 15:4; 37:1, 12; 48:9; 51:12; 62:14, 18; 63:23; 64:4; 65:7; 66:20, 25; 67:2, 24; 69:13; 120:10

## X

**x-ray** [1] - 17:18
**x-rays** [1] - 17:15

## Y

**y'all** [1] - 6:8
**yard** [8] - 87:8; 92:1, 4; 98:2; 105:22, 25; 106:2, 8
**yards** [2] - 106:3; 108:23
**year** [3] - 22:12; 80:1, 8, 20; 90:8
**years** [5] - 27:17; 57:1; 67:17; 109:7; 115:4
**years'** [1] - 27:22
**yesterday** [3] - 39:22; 76:17; 130:24
**York** [4] - 24:3; 26:14, 19; 45:20
**young** [2] - 20:22; 57:25
**yourself** [6] - 10:21; 15:22; 21:14; 55:23; 57:14; 79:23

## Z

**Zoll** [1] - 2:2
**zoom** [2] - 90:25; 91:2
**Zuluaga** [1] - 133:1