UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **B.R.,** | : |
| | : |
| **Plaintiff,** | : Civil Action |
| | : No. 1:19-cv-00917-RDA-WEF |
| **v.** | : |
| | : April 2, 2024 |
| **F.C.S.B.,** | : 2:00 p.m. |
| **et al.,** | : |
| | : |
| | : VOLUME 11 - PM SESSION |
| **Defendants.** | : |
| | : |
| .............................. | : |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

APPEARANCES:   (Cont.)

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:      **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

APPEARANCES:  (Cont.)

For Defendant F.C.S.B.:      **Kevin Elliker, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            804-788-8200
                            Email: Kelliker@huntonak.com

For the Defendants          **Michael E. Kinney, Esq.**
S.T., A.F., P.A.H., T.B.,   THE LAW OFFICE OF MICHAEL E.
B.H., M.P.F., M.C., F.T.,   KINNEY, PLC.
J.F.:                       1801 Robert Fulton Drive
                            Suite 120
                            Reston, VA 20191
                            Email:  Mk@kinneyesq.com

For the Defendant J.O.:     **Bruce Blanchard, Esq.**
                            ODIN, FELDMAN & PITTLEMAN, PC.
                            1775 Wiehle Avenue
                            Suite 400
                            Reston, VA 20190
                            Email:  Bruce.blanchard@ofplaw.com

Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            Eastern District of Virginia
                            401 Courthouse Square
                            Alexandria, VA  22314-5798
                            Cell: 443-584-6558
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

## EXAMINATIONS                                    Page

DIRECT EXAMINATION OF S████ T████             7
BY MS. ANDERSON

CROSS-EXAMINATION OF S████ T████              86
BY MR. BATES

CROSS-EXAMINATION OF S████ T████             140
BY MR. KINNEY

CROSS-EXAMINATION OF S████ T████             142
BY MR. BLANCHARD

## EXHIBITS

**DESCRIPTION**

**After review of the record and upon agreement of
counsel and deputy clerk, all final exhibits can
be found on CME at Docket #975.**

Plaintiff's Exhibit 52 admitted                 47

Plaintiff's Exhibit 59 admitted                 64

Defendants' Exhibit 229 admitted                80

Defendants' Exhibit 65 admitted                109

Defendants' Exhibit 135 admitted               116

Defendants' Exhibit 83 admitted                118

1          **AFTERNOON SESSION, APRIL 2, 2024**

2     (2:00 p.m.)

3          THE COURT:  As I indicated before, I respect each one of

4     the lawyers involved.  Each lawyer is doing his or her job as far

5     as the presentation of this case, but I do want to read something

6     in the record that will cover the way things are handled going

7     forward.  This is from the case of *Raynor versus G4S Secure*

8     *Solutions*, 327 Fed Supp. 3d 925, 2018.

9          And it states in pertinent part:  "It is undisputed that a

10    Court has broad discretion to set time limits in matters before

11    the Court.  Rule 1 of the Federal Rule of Civil Procedures

12    provides that the Rules of Civil Procedure shall be construed,

13    administered, and employed by the Court and the parties to secure

14    the just, speedy, and inexpensive determination of every action

15    and proceeding."

16         Rule 611 of the Federal Rules of Evidence states that the

17    Court should exercise reasonable care of the mode and order of

18    examining witnesses and presenting evidence so as to make those

19    procedures effective for determining the truth, avoid wasting

20    time, and to protect witnesses from harassment or undue

21    embarrassment.  Given these provisions, numerous circuit courts

22    and district courts have found courts have broad discretion to

23    control and manage these trials in civil cases by setting time

24    limits.

25         Up until this time, I have not set specific time limits,

1    but suffice it to say, that the estimations that have been given

2    have not been consistent with what has occurred.

3         The Court has a responsibility to make sure that the fair

4    and just adjudication in this matter takes place.  We need to

5    focus on what is important to resolve in the context of this

6    litigation and not get caught up in things that are not going to

7    help us administer justice.

8         So going forward, if counsel continues to proceed to not

9    fall within the time limits that it sets, the Court's going to

10   cut you off.  So I hope everybody understands that.

11        Thank you, Ms. Tinsley.

12        Who's the next witness?

13        MS. ANDERSON:  Ms. S█████ T█████.

14        THE COURT:  Ms. T█████, you can come on up, ma'am.

15        (Jury in at 2:03 p.m.)

16        THE COURT:  Again, you may be seated.

17        Ladies and gentlemen, have you lived up to the Court's

18   instruction not to discuss the case or any aspect of the case

19   with anyone?

20        Very good.

21        The next witness is Ms. S█████ T█████.

22        Going forward, you may hear me set time limits on the

23   amount of time that witnesses can be examined, and the lawyers

24   are going to do their very best to stay within those confines.

25        I ask the deputy clerk to please swear the witness.

1            (S████ T████, PLAINTIFF'S WITNESS, SWORN)

2        THE COURT:  And listen to the questions of counsel and

3    answer them as best you can.  If you hear the Court interrupt or

4    the lawyers start having a discussion with the Court, you might

5    want to pause and let us resolve the issues before us.  Thank

6    you.

7        This witness should take about an hour, hour and a half,

8    depending on the circumstances.

9        MS. ANDERSON:  Thank you, Your Honor.  May I proceed?

10       THE COURT:  You may.

11            DIRECT EXAMINATION OF S████ T████

12   BY MS. ANDERSON:

13   **Q.**    Good afternoon, Ms. T████.

14   **A.**    Good afternoon.

15   **Q.**    I'm Alison Anderson, and I represent B████, the

16   plaintiff.

17       And we've never met before, correct?

18   **A.**    Correct.

19   **Q.**    Okay.  And I'm going to try to keep my

20   questions concise --

21       THE COURT:  Just a moment.  Just a moment.  Stop.  We're

22   getting that feedback --

23       MS. ANDERSON:  Oh, we're getting that feedback again?

24       (Brief pause in proceedings.)

25       THE COURT:  Test one, two, three.  Test one, two, three.

8

1          MS. ANDERSON:  Testing.  Okay.  Great.

2          THE COURT:  Thank you.

3     BY MS. ANDERSON:

4     Q.    Okay.  I'm going to try to keep my questions concise so

5     that we can hopefully move along, but if at any point you don't

6     understand my question, please let me know.

7     A.    Absolutely, thank you.

8     Q.    Thank you.

9          So you've been working for Fairfax County School Board

10    for a long time; am I right?

11    A.    Yes.

12    Q.    Yes?

13    A.    Yes.

14    Q.    And I think you spent more than 18 years as an assistant

15    principal, specifically?

16    A.    I have.  I think this is my 20th or 21st year, yes.

17    Q.    And more than 14 of those years have been at Rachel

18    Carson Middle School, is that right, as an assistant principal?

19    A.    You're testing my math.  I think this is my 15th year

20    there, this year, yes.

21    Q.    Great.  Thank you.

22         And in your role as assistant principal, you've obviously

23    received a lot of training from the Fairfax County School Board?

24    A.    Absolutely, yes.

25    Q.    Yeah, and a lot of training --

1          THE COURT:  Please get a little closer to the mic, ma'am.

2     Yes, ma'am.  Thank you.

3          THE WITNESS:  Is that better?

4          THE COURT:  Yes.  Thank you.

5          THE WITNESS:  Okay.  Thank you.

6          MS. ANDERSON:  Thank you.

7          THE WITNESS:  Um-hmm.

8     BY MS. ANDERSON:

9     **Q.**     And a lot of training about investigations that's been

10    provided by the School Board?

11    **A.**     We receive multiple trainings every year.  They encompass

12    a variety of topics, but yes.

13    **Q.**     Okay.  Great.

14         And those trainings also include sexual harassment and

15    sexual assault-related trainings?

16    **A.**     We get sexual harassment training and updates annually,

17    yes.

18    **Q.**     Okay.  And specifically in the year of 2011 to 2012, you

19    were an assistant principal at Rachel Carson during those years?

20    **A.**     Yes.

21    **Q.**     Okay.  Now, I think you were in the courtroom when you

22    saw Mr. F████████ testifying in this case, correct?

23    **A.**     Yes.

24    **Q.**     And -- and a few times he said, you know, that we should

25    speak with you about your investigation that was at issue in

1    this case; is that correct?

2    **A.**    Yes.

3    **Q.**    Okay.

4    **A.**    Um-hmm.

5    **Q.**    And just to refresh, Mr. F▬▬▬ was the principal

6    during those years, 2011 to 2012, when you were at Rachel

7    Carson?

8    **A.**    Correct.

9    **Q.**    And he was in charge of a -- as principal, he's in charge

10   of the school; is that correct?

11   **A.**    He oversees the school, yes.

12   **Q.**    And he -- I think you've described him as being very

13   involved, very hands-on; is that right?

14   **A.**    You think I described him that way?  Are you quoting what

15   I'm saying?

16   **Q.**    But you -- do you describe him -- would you describe

17   him --

18   **A.**    I describe him as being an excellent principal.

19   **Q.**    Okay.

20   **A.**    Um-hmm.  That's how I describe him.

21   **Q.**    Okay.

22   **A.**    Yes.

23   **Q.**    And that he -- and that he is involved and you would

24   report to him about how you conducted your investigations?

25   **A.**    We would keep Mr. F▬▬▬ informed, yes.  I would, too,

```
 1   yes.
 2   Q.    Okay.  And, in fact, you cleared any decision about
 3   discipline by Mr. F████████?
 4   A.    We weren't required to clear every decision we made about
 5   discipline, but we were a very unified administrative team, so
 6   we would discuss discipline that we were issuing with students,
 7   yes.
 8   Q.    Okay.  And when you say "we," does that include the other
 9   assistant principals --
10   A.    Yes.
11   Q.    -- and Mr. F████████?
12   A.    Yes.
13   Q.    Okay.
14   A.    Um-hmm.
15   Q.    And so -- so anything in your role in investigations as
16   an assistant principal would have been consistent with your
17   training with -- that you received from Fairfax County School
18   Board and from directions from Mr. F████████?
19   A.    I think that's fair to say, yes.
20   Q.    And you would all -- and it was your understanding that,
21   at Rachel Carson Middle School in 2011 to 2012, that the
22   understanding was only verified complaints of sexual harassment
23   were reported to the office of ethics and compliance in those
24   years?
25   A.    Ask me that question again.  In those years?
```

1    **Q.**    No problem.

2    **A.**    I think I missed part of it.

3    **Q.**    Yeah, so in -- in those years, 2011 to 2012, at Rachel

4    Carson Middle School, it was your understanding that only

5    verified complaints of sexual harassment were then reported to

6    the office of ethics and compliance?

7    **A.**    Not necessarily sure that was my understanding.  If we

8    had a verified case of sexual harassment, which we did not, that

9    I would let Mr. F███████ know, and then he would then do what

10   was necessary with that information.

11   **Q.**    Okay.  So he would make the decision, then, whether it

12   was reported to the office of ethics [sic] and compliance?

13   **A.**    We would probably all make the decision.

14   **Q.**    Okay.

15   **A.**    Yes.

16   **Q.**    And the office of ethics and compliance, that's within

17   the superintendant's office, correct?

18   **A.**    I think you're calling it -- you're saying "ethics and

19   compliance," or do you mean "equity and compliance"?

20   **Q.**    Equity.  Yes, thank you.

21   **A.**    I was, like, confused by that.

22   **Q.**    No, I appreciate that.  Yes.  Equity and compliance.

23   **A.**    Okay.  Okay.

24   **Q.**    Yes.

25   **A.**    So ask me your question again now that we know the

1    correct name of the office.

2    **Q.**    Yes.  So that office, that is within sort of the

3    superintendent's organization?

4    **A.**    It's -- it's at Gatehouse, yes.

5    **Q.**    Okay.

6    **A.**    It's above my pay grade, yes.

7    **Q.**    And when you -- and when you say "Gatehouse," just for

8    the jury, that's -- that's like the street address, right, for

9    the --

10    **A.**    That's the --

11    **Q.**    -- superintendent?

12    **A.**    -- the headquarters, yes.  Um-hmm.

13    **Q.**    Okay.  And I think you've said this before, but the

14    assistant principals, you would have regular meetings during

15    those years at Rachel Carson Middle School?

16    **A.**    Yes.

17    **Q.**    And you would discuss what was going on with students at

18    that time?

19    **A.**    Part of our admin meetings were devoted to, you know,

20    student concerns and things that were going on with students,

21    absolutely.

22    **Q.**    Okay.  And -- and you would discuss also with the

23    counselors issues that are going on with the students at that

24    time?

25    **A.**    If we had issues, yes.

1    Q.    Okay.  And you heard the testimony that this had -- what

2    was occurring in this case with B████ had begun in October of

3    2011, correct?

4    A.    Yes, I heard that testimony.

5    Q.    Okay.

6    A.    Yes.

7    Q.    And -- and that Ms. F██████████ had spoken with B████

8    about some of the issues she was experiencing in October in

9    2011?

10   A.    I know that she spoke with -- with B████ about some

11   issues.  I'm not sure if she was talking about the issues --

12   some issues from October because I'm not --

13   Q.    Okay.

14   A.    -- aware of issues in October, so --

15   Q.    Fair enough.

16   A.    Yeah.

17   Q.    Now, I'm -- we're going to talk a little bit about your

18   investigation that you do in November -- on November 21st.  Do

19   you remember that?

20   A.    Yes, I do.

21   Q.    Okay.  But before we get to that, at some point before

22   that, B████ tries to talk to you about boys touching her up and

23   down.  Do you remember that?

24   A.    I didn't talk to B████ until November 21st.  I didn't

25   even know who she was, so that did not happen, no.

```
 1              THE COURT:  One second, Ms. Anderson.

 2         Are you okay, Mr. F█████████?

 3         (Brief pause in proceedings.)

 4         MS. ANDERSON:  Thank you.

 5         THE COURT:  I appreciate it.  We are always going to try

 6    to be kind to everybody.

 7         MS. ANDERSON:  Of course.  Of course.  No, I appreciate

 8    you stopping me.

 9    BY MS. ANDERSON:

10    Q.    I might have lost where we were at, but I think we were

11    talking about -- do you remember a conversation -- so whether --

12    I think you said it was after -- or it wasn't before

13    November 21st, but do you remember a conversation at all

14    where -- where B████ is speaking with you directly and

15    explaining how boys are touching her up and down her body?

16    A.    The way I found out -- met B████ was on November 21st.

17    B████ disclosed to me at that November 21st meeting that she had

18    engaged in some activity in a basement with David N., and that

19    consisted of, "No big deal, Ms. T█████, we just went up and down

20    on each other while his mom was doing the laundry."

21         That was the first time I heard anything about going "up

22    and down" on B█████, and it came from B████.

23    Q.    And your recollection is that that is on November 21st?

24    A.    She told me -- my conversations with B█████ consisted of

25    November 21st and 22nd, so I can't pinpoint the exact time, but
```

```
1   I do believe it was November 21st that we had that conversation,

2   because it was -- I was asking her about her statement.

3   Q.     Okay.  And November 21st, would that be with her mother

4   in the room?

5   A.     Her mother was not in the room.  Her mother had left to

6   go to try to retrieve the voicemails.

7   Q.     Okay.  So your memory is that this is a conversation that

8   occurs after the meeting with her and her mother on

9   November 21st?

10  A.     The meeting with her and her mother and Ms. H████ when

11  she came in about the voicemails happened first, and then we

12  came up to my office.  And when we came up to my office, B███

13  was writing her statement, and the mom was trying to still

14  retrieve the voicemail while Ms. H████ and I were there.  And

15  she could not, so she then said she was going to leave and go

16  home and call Sprint and see if they could unlock the phone or

17  the number and retrieve the voicemail.  And she left, at which

18  time Ms. H████ then left, walked Ms. R████ out -- sorry,

19  Ms. R.  I'm sorry.

20  Q.     That's okay.

21  A.     And I continued to talk with B███, and that's how I

22  found out about the incident that had occurred in the basement

23  with her and David N.

24  Q.     And your memory is that she's telling you about touching

25  up and down on her body and -- and you tell her to stop talking
```

```
1    about it, correct?
2    A.    Let me put it in order for you.  I think it will make
3    more sense if I can put it in -- in order for you, and then
4    you'll probably --
5    Q.    Actually --
6    A.    -- understand it better.
7    Q.    -- I -- I think I understand the order.
8    A.    Well, I want them to understand as well.
9    Q.    I understand.
10   A.    Um-hmm.
11   Q.    I understand, Ms. T█████, but I would just like to focus
12   on that --
13   A.    Okay.  Go ahead.
14   Q.    -- that conversation that you had just with B█████.
15   A.    Um-hmm.  Um-hmm.
16   Q.    And -- and we're -- trust me, we're going to go through
17   November 21st.
18   A.    That's fine.  That's fine.
19   Q.    So I would like you to just focus on the conversation
20   that you remember having with just B█████.
21   A.    Okay.
22   Q.    And do you remember that, after she starts to tell you
23   about touching up and down on her body, that you asked her to
24   stop telling you about it?
25   A.    She had not gotten that part of her -- her statement out
```

1    yet.  She -- when I said to her, I'm going to ask David N. about

2    this part of your statement where you're saying that he's saying

3    these things about you -- because I said, Why would he be saying

4    these things about you?

5          And she says, I don't know, I think he's mad.

6          And I was like, Mad about?

7          And she goes, Well, we used to date.

8          And I said, Well, I'm going to ask him because I need to

9    make sure he's not saying those things about you.

10         And she says, Okay, Ms. T█████.  She says, We had gone to

11   a pumpkin patch, we went back to his house, and we did go in his

12   basement.  We fooled around in his basement, but it was no big

13   deal.  He just -- we just went up and down on each other while

14   his mom was doing the laundry.

15   **Q.**    So --

16   **A.**    I will never forget that statement because it shocked me.

17   And so before she got to that part about what they did, when she

18   said, We just went down in his basement, I was like, Whoa, whoa,

19   whoa.  I don't need to know what happened in the basement,

20   that's a conversation you should have with your mom.

21         And that's when she said to me, Ms. T█████, it was no big

22   deal.  All we did was go up and down on each other while his mom

23   was doing the laundry.

24   **Q.**    And you told her, Whoa, whoa, don't tell me about what's

25   happening in the basement?

1    **A.**     Prior --

2    **Q.**     What's --

3    **A.**     Yes, prior to her saying that.

4    **Q.**     And -- and in your view, that's -- that's because you

5    decided it's off school -- it was happening off school grounds?

6    **A.**     It was happening over a weekend off school grounds, and I

7    also felt like, if there was something she was about to tell me,

8    I felt her mom should be privy to it before her assistant

9    principal.

10   **Q.**     Okay.  Did you ask her again about that in front of her

11   mother?

12   **A.**     She actually told her mother in front of me.  When her

13   mom came in to get the $50, she shared that she had been in the

14   basement with David Neill.

15   **Q.**     Okay.  And so going back to November 21st, when B████ and

16   her mom come in --

17   **A.**     Yes.

18   **Q.**     -- and they make -- and they make a report to you about

19   things that had been occurring with B████; is that right?

20   **A.**     They make a report about a voicemail.  And I don't

21   remember the mother saying things to me about rumors, but in her

22   statement, she wrote about the rumors.  But she made -- her

23   primary concern that day was that voicemail.  We were trying to

24   get to the bottom of the voicemail.

25   **Q.**     Okay.  And there's an -- there's an entire conversation

```
 1    that occurs --
 2    A.      Yes.
 3    Q.      -- before B████ writes her statement; isn't that right?
 4    A.      With whom?
 5    Q.      With you, with B████, and her mom, and I believe P███ --
 6    P███ H██████ and B█████ H███████.  But there's a conversation
 7    that's happening with you before she writes her statement; is
 8    that right?
 9    A.      When I came -- when I was brought into the conversation,
10    there had already been a conversation taking place with -- with
11    Ms. H██████.  And when I came into the conversation, I remember
12    the mom talking specifically about, you know, I need to find out
13    about this voicemail, I need to report this voicemail.
14    Q.      Ms. T█████ --
15    A.      I don't recall a lot of -- can I please finish?  Do you
16    mind just so I can finish?
17    Q.      You can --
18            THE COURT:  Ma'am, ma'am, ma'am.  Counsel.
19            The way it works is she's going to ask you questions.
20            THE WITNESS:  Correct.
21            THE COURT:  Answer them as best you can.  I believe
22    Mr. Bates is going to do the --
23            THE WITNESS:  Correct.
24            THE COURT:  -- cross-examination.
25            So anything that needs to be cleaned up or cleared up,
```

```
 1    you'll have that opportunity.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  So just answer the questions as best you can.

 4          THE WITNESS:  Thank you, Your Honor.

 5    BY MS. ANDERSON:

 6    Q.    Yeah, so I'll -- I'll -- again, I'll try to ask very

 7    specific questions, and if you --

 8    A.    Okay.

 9    Q.    -- can answer those, I would appreciate that.  Thank you,

10    Ms. T█████.

11    A.    Okay.

12    Q.    And so after she -- so let's go back to -- there's a

13    conversation, though, that you're involved in with B████ and her

14    mom before she writes the statement, correct?

15    A.    Yes.

16    Q.    Okay.  And in that conversation, they, B████ and her

17    mother, are reporting issues of sexual harassment, correct?

18    A.    No.

19    Q.    Okay.  So you -- you would not say that whatever was

20    reported there was sexual harassment, correct?

21    A.    What I recall is being called in because of a vulgar

22    voicemail.  I had not heard the voicemail.  She was not able to

23    play the voicemail, and she would not tell me what the voicemail

24    said.

25    Q.    Okay.
```

```
 1   A.     So I knew I had to investigate the voicemail.

 2   Q.     Okay.  So -- so you asked her then to write a statement;

 3   is that right?

 4   A.     I'm not sure if I asked her; but, yes, I probably did.

 5   I -- we went to my office.  We were downstairs.  We moved

 6   upstairs to my office, yes.

 7   Q.     Okay.  And when she's in your office --

 8   A.     She writes a statement.

 9   Q.     -- she writes a statement; is that correct?

10   A.     Correct.

11   Q.     Okay.  And -- and the statement that she writes --

12          MS. ANDERSON:  And, Your Honor, may we publish -- it's

13   already admitted -- Plaintiff's Exhibit 77, page 1?

14          THE COURT:  You may.

15   BY MS. ANDERSON:

16   Q.     Okay.  And so she -- does this look familiar to you,

17   Ms. T█████?

18   A.     It does.

19   Q.     That's her statement?

20   A.     Yes, it does.  Sorry.

21   Q.     Okay.  And should you ever need the hard copies, they're

22   sitting in front of you, but we will be pulling them up on the

23   screen, which may be easier.

24   A.     Can you tell me, which one is it?

25   Q.     77.
```

1           And so if we take a look at her statement, she starts by

2    saying, "I'm scared to come to school."

3           Is that correct?

4    **A.**     Correct.

5    **Q.**     Okay.  And she includes in there that:  "C.K. and D.N.

6    come very close to me.  They say, 'Hey, B███.'  They laugh at

7    me, harass me, tease me, and give me seductive looks," correct?

8    **A.**     Yes.

9    **Q.**     Okay.  And she also writes in there that:  "C.K. left me

10   a very inappropriate voicemail," correct?

11   **A.**     That's what it says, yes.

12   **Q.**     And then she's also saying that:  "C.K. and D.N." -- or,

13   "C.K. says D.N. wants to come up to me and call me vulgar

14   names."

15          And I -- I don't need to read those, those are in the

16   document, correct?

17   **A.**     Yes.  I'm reading with you, yes.

18   **Q.**     Okay.  And then she says, "J.O. calls me a B word and

19   makes offensive wall posts on my Facebook calling me the B word

20   and a" -- I guess we'll just -- and it's on the document,

21   correct?

22   **A.**     Yes.

23   **Q.**     Okay.  "And D.N. said that I gave him oral sex, which is

24   completely false."

25          And she says that as well, right?

1    **A.**     Yes.

2    **Q.**     Okay.  And you would agree that what is written in here

3    should be verified as sexual harassment, correct?

4    **A.**     If it had been verified, it would be sexual harassment,

5    yes.

6    **Q.**     And she also states at the bottom, if we can go to the

7    bottom, that:  "It all started three weeks ago, but recently

8    escalated two weeks to present," right?

9    **A.**     Yes.  She writes that, yes.

10   **Q.**     So she indicates that it's been going on for some time?

11   **A.**     Correct.

12   **Q.**     Okay.  And if we can go to page 2, please.

13         And she identifies on this statement the, quote-unquote,

14   "bullies," right?  She uses the word "bullies"?

15   **A.**     Yes.  Yes.  Sorry.

16   **Q.**     And she identifies C.K., J.O., and D.N., correct?

17   **A.**     Correct.

18   **Q.**     Okay.  And then you go and you interview those three

19   students, correct, as part of your investigation?

20   **A.**     I do.  I talk to all those students on that page.

21   **Q.**     Okay.  And you were in charge of this investigation

22   because it related to accusations against students who were

23   within your group that you were an assistant principal for?

24   **A.**     They were on teams that I was assigned to oversee, yes.

25   **Q.**     Okay.  And that includes C.K.?

1    **A.**     Yes.

2    **Q.**     And D.N.?

3    **A.**     Yes.

4    **Q.**     And J.O.?

5    **A.**     She was not on one of my teams, no.

6    **Q.**     And so first, we'll talk about J.O.

7           So you go and you speak to J.O., correct?

8    **A.**     I didn't speak to her first, but I did speak to her, yes,

9    um-hmm.

10   **Q.**     And if you remember the order, great, but we'll go

11   through -- it's 12 years ago, but we'll -- so we'll talk about

12   J.O. first.

13   **A.**     That's fine.

14   **Q.**     And she basically says -- she has a statement that just

15   says, "Explained what happened with rumors about B████," "

16   correct?

17   **A.**     Correct.

18   **Q.**     And then I think you've said that she admits to -- in

19   your conversation, she admits to calling B████ the B word,

20   right?

21   **A.**     She said they were both going back and forth with names,

22   and she did call her a bitch, yes.  She was very honest about

23   that.

24   **Q.**     Okay.  And she doesn't write --

25           MS. ANDERSON:  Let's go ahead and pull that statement up.

1        If we -- if I may publish, Your Honor -- it's already

2    admitted -- Plaintiff's Exhibit 81 page 1.

3        THE COURT:  You may publish.

4        MS. ANDERSON:  Thank you.

5    BY MS. ANDERSON:

6    Q.    So that's within a conversation with you; that's not in

7    her statement, right?

8    A.    Correct.

9    Q.    And her statement does not say that they're going back

10    and forth or anything like that?

11    A.    It does not.  She spoke to me.

12    Q.    Okay.  And -- but in that conversation she confirms to

13    you that she did call B█████ the B word?

14    A.    She did.

15    Q.    Okay.  And we can then -- we're going to go ahead and

16    look at D.N. and C.K.'s statements in a minute, but in your

17    investigation, did you find -- you found that those statements

18    were inconsistent, correct?

19    A.    I found -- you're talking about J.O.'s -- which one are

20    you talking about?

21    Q.    D.N. and C.K.

22    A.    That they were inconsistent?  That they didn't match?

23    They didn't --

24    Q.    Correct.

25    A.    -- match exactly, no.  I wouldn't have expected them to,

```
1    you know.

2    Q.    So you would agree, though, that they're not

3    consistent --

4    A.    They're not consistent, no.

5    Q.    -- statements.  Okay.

6          MS. ANDERSON:  And if we can go ahead and pull up --

7          And, once again, these are both admitted, Plaintiff's

8    Exhibit 78 and Plaintiff's Exhibit 529, Your Honor, if we may

9    publish.

10         THE COURT:  You may.

11   BY MS. ANDERSON:

12   Q.    And we're just going to go through these statements

13   quickly here, but you have -- on the left, that's D.N.'s

14   statement that you took that day, correct?

15   A.    Correct.

16   Q.    And you have C.K.'s statement on the right, correct?

17   A.    Yes, I do.

18   Q.    Okay.  And I think you were in the courtroom when

19   Dr. Zuluaga said it's -- students often respond to questions

20   that administrators are asking when they write their statements?

21   A.    Yes.  Yes.

22   Q.    And so, I just want to go through some of the questions

23   that I would -- that you may have asked based off of B████

24   statement.

25         So did you ask them, I was -- did you ask them about the
```

1     sexually explicit voicemail?

2     **A.**    I did.

3     **Q.**    Okay.

4         MS. ANDERSON:  And if we can go ahead and show what each

5     of them says.

6     BY MS. ANDERSON:

7     **Q.**    So, on the top you've got what D.N. says in his

8     statement, and on the bottom we have what C.K. says in his

9     statement.

10        So D.N. says, "I explained to her that I have no idea who

11    is leaving voicemails," right?  That's what D.N. says?

12    **A.**    He's on the top, yes.

13    **Q.**    Okay.  So he denies any involvement in the voicemail --

14    **A.**    Correct.

15    **Q.**    -- correct?

16    **A.**    Um-hmm.

17    **Q.**    And on the bottom, C.K. says, "And they would send

18    messages on the phone and call and leave voicemails saying

19    stuff"; and there, he's referring to -- and you can look at the

20    document in front of you, if it's not visible -- David N. and

21    J.O., correct?

22        THE COURT:  Why don't we isolate the one on the left.

23        MS. ANDERSON:  I'm sorry?

24        THE WITNESS:  That would --

25        THE COURT:  Isolate the statement on the left.

1    BY MS. ANDERSON:

2    **Q.**    So on the left, that's the one we just did with D.N., and

3    so on the right is C.K.  And C.K. says, "They would send

4    messages on the phone and call and leave voicemails saying

5    stuff," right?  In his statement he's saying that?

6    **A.**    If I could just read that whole statement without the --

7         MS. ANDERSON:  Yeah, and it's actually also right in front

8    of you.

9         THE WITNESS:  I understand.

10   BY MS. ANDERSON:

11   **Q.**    Okay.  You can read it on the --

12   **A.**    Just make it a regular statement for me.

13   **Q.**    Okay.  There you go.

14   **A.**    That's perfect.  Thank you.

15   **Q.**    Okay.  And you see the section we're referring to --

16   we're looking at?

17   **A.**    I'm just reading it through completely to refresh my

18   memory, if you don't --

19   **Q.**    Okay.

20   **A.**    -- if that's okay.

21   **Q.**    Take your time.

22   **A.**    Okay.

23        (Brief pause in proceedings.)

24        THE WITNESS:  So what I notice in this statement is that

25   C.K. is saying he thinks that this is what happened.  He's not

```
1   saying it happened.  He's saying he thinks this -- that's what's

2   happened, and I remember that sticking out to me because I told

3   him I needed him to be sure.  Did he know for sure?  Had he heard

4   that him making these phone calls and leaving these voice

5   messages?  And his answer was "No."

6   BY MS. ANDERSON:

7   Q.    Okay.  But the statement -- in the statement he says --

8   and we'll get to that.  So he says, "I think," about four or

9   five times in that statement, right?

10  A.    Correct.

11  Q.    So you're -- you disregarded anything that he said as

12  long as it had an "I think," either at the beginning or the end

13  of that sentence?

14  A.    No, I didn't disregard it.  It just -- I just knew I

15  needed to talk to more people to try to verify it.

16  Q.    Okay.  Okay.  So let's go back and pull up what we were

17  talking about, the voicemail.

18  A.    Okay.

19  Q.    And if you recall, the question was just, "What did C.K.

20  write in his statement about the voicemail?"

21  A.    The bottom part?

22  Q.    Yeah.  So he says, "And then" --

23  A.    Okay.

24  Q.    -- "they would send messages on the phone and call and

25  leave voicemails saying stuff," right?
```

1    **A.**    That's what it says in this statement, yes.

2    **Q.**    Okay.  So D.N. says, "I don't know what you're talking

3    about," right?  He sort of denies voicemails in general?

4    **A.**    Um-hmm, um-hmm.

5    **Q.**    And C.K. points to somebody else, right, and says he

6    thinks -- it's all included -- he thinks it's D.N. and J.O.,

7    right?

8         MR. BLANCHARD:  Your Honor, I think she has to read the

9    whole document as to who the "they" is that's referred to in

10   that.

11        THE COURT:  You'll get an opportunity to examine the

12   witness.

13        MR. BLANCHARD:  Okay.

14   BY MS. ANDERSON:

15   **Q.**    Okay.  And so then did you ask both D.N. and C.K. about

16   sexual slurs and rumors?

17   **A.**    I asked both D.N. and C.K. about any names, if at all,

18   they were calling and directing towards B███.  I wanted to know

19   each and every name they were using towards B███, if they were

20   doing that, yes.

21   **Q.**    Okay.

22   **A.**    It didn't just encompass just, you know, slurs.

23   Anything.

24   **Q.**    Any names.

25   **A.**    Um-hmm.

1    Q.    And so here, on the top, once again, we have D.N., and he

2    says, "I also don't know where the rumors are coming from that

3    are insulting her," right?  He says that in his statement?

4    A.    He says that, yes.

5    Q.    And then C.K., who's on the bottom, says, "Then they

6    broke up, and him and his friends started saying she was a

7    whore," right?  He says that in his statement?

8    A.    He said that in his statement, but when I asked him

9    directly about that, I said, "Did you hear him call her a

10   whore?"  And he said, "No."

11   Q.    Okay.  And there's no supplemental statement, right?

12   There's --

13   A.    No, there's no supplemental statement.

14   Q.    And there's no notes from that conversation, correct?

15   A.    There's no notes from that conversation, to my knowledge,

16   no.

17   Q.    Okay.  And so, once again, D.N., he's saying, "Don't know

18   anything about rumors," right?

19   A.    Okay -- I'm sorry.  He's at the top, right?

20   Q.    He's at the top.

21   A.    Yes.  Okay.

22   Q.    D.N. is at the top.  And he's saying, "I don't know

23   anything about rumors," correct?

24   A.    Correct.  That's what he says.

25   Q.    And then C.K. is corroborating that there are rumors but

1    saying -- once again, pointing the finger at somebody else,

2    correct?

3    **A.**    D.N. is at the top, and he's saying that "He don't know

4    where the rumors are coming from." And then C.K. is saying,

5    "They broke up, and him and his friends started saying she was a

6    whore."

7    **Q.**    Right. Okay. And then you also asked them about J.O.'s

8    involvement in this, correct?

9    **A.**    I did.

10   **Q.**    Okay. And let's see what they had to say about that.

11   Mr. Brown's faster than me.

12        So D.N., on the top, says, "I didn't think that she did

13   anything wrong or did anything to encourage this than make B█████

14   jealous," right? Is that what D.N. says in his statement?

15   **A.**    That's what it says, yes. Um-hmm.

16   **Q.**    So, once again, he denies knowing anything about J.O.'s

17   involvement, correct?

18   **A.**    He does.

19   **Q.**    And then at the bottom, we have C.K.'s statement, which

20   is "I think J████ called her, saying she was a slut." Correct?

21   **A.**    That's correct.

22   **Q.**    Okay. So, once again, then, C.K. is corroborating what

23   B████ says but saying somebody else did it and pointing the

24   finger.

25   **A.**    He's saying, "I think J████ called her, saying she was a

1    slut," and so my question to him was the same.  Do you think she

2    did it?  Do you know she did it?  Have you heard her do that?

3    And his answer was, "No."

4    Q.    Okay.  And so he's just putting a bunch of things in his

5    statement that you say now he was unaware of at the time?

6    A.    Well, I'm not saying now.  I'm saying -- I'm just saying,

7    based on his statement even back then, he said "I think," and he

8    couldn't tell me that, yes, he had heard her say it.  He

9    couldn't tell me anybody else that had heard her make any names

10   of calling her a slut.  And when I spoke directly to J▇▇▇, she

11   said she had not called her a slut.  She admitted she had called

12   her a bitch.

13   Q.    Okay.  And to you, what individuals, what the students

14   say initially is not relevant as long as, when you press them,

15   they say they take it -- they take it back or say they don't

16   know or "I think"?

17   A.    Ask that again.

18   Q.    So what C.K. is saying here, it's not relevant, in your

19   determination in weighing what may have happened, what the

20   student says initially?

21   A.    What they say in their statement, of course, is relevant.

22   It's all encompassed.  It's what they say in their statement.

23   It's what they tell me personally, absolutely.  I don't just

24   take one piece of something and make a determination.  I have to

25   get the whole story.  I want the whole story, complete story.

```
 1   Q.     Okay.  And --

 2   A.     I want -- yeah.

 3   Q.     And if they change what they're saying, you don't ask

 4   them to write another statement?

 5   A.     No, I don't.  He wasn't changing his story; but, no, I

 6   don't ask them to write another statement unless it is something

 7   completely off the wall.  You know, I would not ask them to

 8   write another statement, no.

 9   Q.     Okay.  And then you asked them about the $50, correct?

10   A.     I talked to David about the $50, and then I talked to

11   C███████ about the $50 because I think I talked to David first.

12   Q.     Okay.

13   A.     Right.

14   Q.     And D.N., he says in his statement, "I did also try to

15   text B███ on the 20th of November to ask her about the money

16   problem, that C██████ supposedly stole money from her"?

17   A.     Um-hmm.

18   Q.     Right?

19   A.     Um-hmm.

20   Q.     So he says that in his statement.

21          And then C.K., his statement says nothing about the $50,

22   correct?

23   A.     He does not mention the $50, no.

24   Q.     Okay.  And -- and presumably you asked both of them about

25   whether or not they were going to B██████ locker, correct?
```

```
 1   A.      I talked to both of them about the locker, and I talked

 2   to both of them about the $50.  And I guess you'll ask me about

 3   the $50 later, I imagine.  Because I can --

 4   Q.      Maybe.

 5   A.      -- explain it to you if you want.

 6   Q.      I think we will get to that a little bit later.

 7   A.      Okay.  Okay.

 8   Q.      And so nowhere in their statements, though, do they say

 9   anything about whether or not they're going to B█████ locker

10   for anything?

11   A.      No.

12   Q.      Okay.

13   A.      Uhn-uhn.

14           MS. ANDERSON:  You can take that down.  Thank you.

15   BY MS. ANDERSON:

16   Q.      And now in your conversation with David, he acknowledges

17   that he was aware of rumors that had been going around about

18   B███; isn't that right?

19   A.      I think David told me that he had heard someone say that

20   there had been a rumor, and when I asked him, you know, Please

21   tell me who that was, I want to talk to them, he didn't know who

22   the student was.

23           I even gave him the opportunity to look in the yearbook

24   to try to identify who he heard that from, and he could not

25   identify the student.  Because it was -- it was upstairs, so
```

1    they would have been in the yearbook.

2    Q.    Okay.  So he -- he says he hears a rumor, but he doesn't

3    want to tell you who that student -- what student said that?

4    A.    I don't think he didn't want to tell me.  I don't think

5    he knew who the student was.

6    Q.    Okay.

7    A.    That's the way it was presented to me.  So I said, Well,

8    who was the student?

9         He said, I don't know.

10        I said, You don't know their name?

11        No.

12        Do you know what they look like?

13        Well, I know what they were wearing.

14        I said, Can you pick them out of a yearbook?

15        And I gave him the yearbook to try to pick the student

16   out.

17   Q.    Okay.  And then you -- and -- but what he tells you about

18   the rumor is that she let people go up and down on her body,

19   correct?

20   A.    He told me that there was a rumor that she allowed that.

21   Q.    Okay.

22   A.    But -- yeah.

23   Q.    And -- and that would corroborate B██████ statement that

24   somebody was saying that she lets them get into her shirt and

25   pants, correct?

1   **A.**     He didn't say that the person said she lets them get in

2   her shirt and pants.

3   **Q.**     Okay.

4   **A.**     Yeah.

5   **Q.**     So, in your view, that doesn't corroborate it because of

6   the fact that she says in her shirt and pants and he says up and

7   down on her body?

8   **A.**     He said "up and down"; he didn't say "shirt and pants."

9   **Q.**     Okay.

10  **A.**     No.

11  **Q.**     Now, in C.K.'s statement, he had said that he thought the

12  voicemails were coming from D.N., correct?

13  **A.**     Oh, in his statement we just went over?  I believe that's

14  what it said, yes, um-hmm.

15  **Q.**     Okay.  And -- and you ultimately had a copy of B█████

16  call logs, correct?

17  **A.**     I did.

18  **Q.**     Okay.

19  **A.**     But I was -- it was reported to me that they were coming

20  from C.K., so I also got a copy of C.K.'s call logs.

21  **Q.**     Okay.  And -- and -- but when C.K. says that he thinks

22  it -- and I think you say he thinks it was David.  You don't --

23  you didn't request David's call logs, correct?

24  **A.**     It was reported to me by the mom that it was C.K.

25  **Q.**     Okay.

1    **A.**    I did not request David's call logs because the mother

2    told me it was C.K.

3    **Q.**    Okay.

4    **A.**    Um-hmm.

5    **Q.**    And so then C.K. also tells you at some point that he had

6    met B████ at a park; isn't that correct?

7    **A.**    I believe so.  I don't -- if you have something to

8    refresh my memory on that, that would be great.

9    **Q.**    I do.  So let me --

10    **A.**    Okay.

11    **Q.**    -- lay a little foundation on that.

12    **A.**    Thanks.  Thank you.

13    **Q.**    And then I -- and then I will do so.

14    **A.**    Okay.

15    **Q.**    So you're aware that in -- B████ and her family file a

16    complaint made to the U.S. Department of Education, Office of

17    Civil Rights, correct?

18    **A.**    Yes, I was made aware of that one, yes.

19    **Q.**    And -- and the U.S. Department of Education investigated

20    that complaint, correct?

21         THE COURT:  That's as far as it can go.

22         MR. BATES:  Objection, Your Honor.

23         MS. ANDERSON:  I can just show her the statement, then.

24         THE COURT:  That's as far as it can go.  Remember, we're

25    not going to allow things that are irrelevant to deal with the

```
 1    issue that the jury needs to decide.  What the Department of
 2    Education did has nothing to do with this case.
 3           MS. ANDERSON:  Okay.  Can -- may I show her something to
 4    refresh her recollection about C.K. having told her --
 5           THE COURT:  Yes.
 6           MS. ANDERSON:  -- that he --
 7           THE COURT:  But we're not going to get into what the
 8    Department of Education --
 9           MS. ANDERSON:  I won't lay the foundation.  I'll move on.
10    Thank you.
11           Okay.  This -- this is just marked.  We're not going to
12    admit this, but it's just marked as Plaintiff's Exhibit 496-A.
13           So, may I approach, Your Honor?
14           MR. BATES:  I'm -- Judge, this is -- this is not a
15    statement written by the witness.
16           THE COURT:  Apparently, what Ms. Anderson is planning to
17    try to do is refresh the witness's recollection with regard to a
18    question that she asked.  And what's going to happen with this
19    particular document is the witness can take a look at it, read it
20    to herself.  If it refreshes her recollection, fine; if it does
21    not, fine.  But refresh recollection, you can use anything.
22           MR. BATES:  Thank you, Your Honor.
23           MS. ANDERSON:  May I approach, Your Honor?
24           THE COURT:  You may.
25    BY MS. ANDERSON:
```

1   **Q.**    And take your time, and take a look at that.

2   **A.**    Okay.

3   **Q.**    Have you had a chance to look at --

4   **A.**    I understand.  I know what we're doing now.

5   **Q.**    Does that refresh your memory about whether or not C.K.

6   had told you that he met B█████ at a park?

7   **A.**    No.  They all met at the park.  They were friends.

8   **Q.**    Okay.

9   **A.**    At one point, yes.

10  **Q.**    Thank you.

11  **A.**    You're welcome.

12  **Q.**    And so then you just -- let me --

13         THE COURT:  Why don't we retrieve the document so it

14  doesn't --

15         MS. ANDERSON:  Oh, yeah.

16         THE WITNESS:  That's the only paragraph you wanted me to

17  read?

18  BY MS. ANDERSON:

19  **Q.**    Yeah.

20  **A.**    Okay.

21  **Q.**    And so let's -- so you speak to some other witnesses,

22  correct, when you're investigating?  And just to take us back to

23  November -- the 21st complaint that B█████ raises, when you're

24  investigating that, you speak to other witnesses, correct?

25  **A.**    Yes, you're not -- we're done with the document?

1  **Q.**    Oh, yes.

2  **A.**    Okay.  Yes, yes, I talked to other witnesses.

3  **Q.**    And one of those witnesses you speak to is an Olivia B.,

4  correct?

5  **A.**    I do.

6  **Q.**    Okay.  And she was not identified as one of the

7  witnesses --

8  **A.**    That's --

9  **Q.**    -- in these incidents, correct?

10  **A.**    That's correct.

11  **Q.**    Okay.  And she ultimately says she wasn't a witness to

12  the incident, correct?

13  **A.**    Correct.  I talked to Olivia B. because her mother --

14  B███████ mother asked me if I had -- when I was following up with

15  her mom, she asked me if I had talked to Olivia B., and I told

16  her no, she wasn't identified on her statement.  She said that

17  it was her best friend; she knew everything.

18      You need to talk to her.  She knows everything.  She can

19  tell you everything.

20      So I talked to her, and she told me nothing.

21  **Q.**    Well, she -- she did tell you that B████ had told her

22  about the harassment, correct?  She just hadn't witnessed any of

23  it?

24  **A.**    I don't believe that's what her statement says.  If you

25  want to show me her statement, I'm happy to go through that with

```
1   you.

2   Q.     Maybe we will a little bit later.

3   A.     Um-hmm.

4   Q.     But -- but I'm -- I'll keep us moving.

5   A.     Okay.

6   Q.     So if we --

7          MS. ANDERSON:  I would like to pull up, once again, and

8   republish Plaintiff's 77, page 2, Your Honor, if I may?

9          THE COURT:  You may.

10         MS. ANDERSON:  Thank you.

11  BY MS. ANDERSON:

12  Q.     And so B████ identifies as potential witnesses on this --

13  on her statement, A.J., M.J., and J.H., correct?

14  A.     Correct.

15  Q.     Okay.  And you did not interview, A.J., M.J., and J.H.,

16  correct?

17  A.     That's incorrect.

18  Q.     Okay.

19  A.     I actually did talk to them.  And in my deposition --

20  when I gave my deposition, I thought I had spoken with them -- I

21  had gotten statements from them, and I realized I had not.  I

22  talked to them down in the locker pod.  So I didn't get

23  statements from them.  They didn't have information to give me,

24  and I did not get a statement.

25         When I tried to make that correction after my deposition,
```

1    her side of her attorneys at the time would not let me make the

2    correction when I realized I had not received a statement.

3    **Q.**    Okay.  So your testimony today --

4    **A.**    Um-hmm.

5    **Q.**    -- is that you believe you -- you interviewed them, but

6    they did not make a statement -- once you went back and saw

7    there were no statements?

8    **A.**    My testimony today is that I know that I interviewed

9    them.  Okay?

10    **Q.**    Okay.

11    **A.**    And when I spoke to each of them separately in their pod

12    area downstairs, they each told me, I have not seen anything, I

13    haven't heard anything, I haven't seen anybody around her

14    locker.

15         I asked them, If you had seen someone -- if you see

16    someone, will you tell me?

17         Yes, we will.

18         Has anybody been crowding her?  Have you ever noticed a

19    crowd?

20         No.

21         I explained to them that they were listed as a -- you

22    know, as a person that might have seen some of these things that

23    she was alleging, and they had not.  So I basically told them,

24    if they saw anything, to please let me know.  And if the

25    investigation had started going towards where I was finding out

1    that things were going on, I just would have circled back around

2    to them.

3    Q.    Okay.  But you -- you don't take a statement from any of

4    the three of them, correct?

5    A.    I do not take them upstairs and have them write down that

6    "I did not see anything," no.

7    Q.    And you didn't take any notes about having spoken with

8    them correct?

9    A.    No, but I remember having spoken with them, and that's

10   why I made the --

11   Q.    Okay.  And --

12   A.    -- you know, in the deposition.

13   Q.    And in the midst of this, B████, in her statement,

14   complains about things happening on Facebook, correct?

15   A.    In her statement?

16   Q.    Correct.  Yeah, in her statement.

17   A.    I think something about the wall or something, yes.

18   Q.    And throughout this investigation, you were provided with

19   information about what's happening on Facebook from B████

20   mother, correct?

21   A.    I wasn't provided with any additional information about

22   anything happening on Facebook by B█████ mom.  I know I asked

23   J████ O████ to see her Facebook, which she showed me, and there

24   was no postings on her Facebook.

25   Q.    Okay.  Did you ask the witnesses if they had been posting

1  on Facebook?

2  **A.**    I did, and they had said no.

3  **Q.**    Okay.

4  **A.**    No.

5  **Q.**    Did you ask to see their Facebook posts?

6  **A.**    I did.

7  **Q.**    Okay.

8  **A.**    I didn't see their Facebook posts.  Are you talking

9  about -- are you talking about these three witnesses, or are you

10 talking about --

11 **Q.**    These thee witness.

12 **A.**    Oh, I didn't ask these three witnesses to see their

13 Facebook post.

14 **Q.**    You didn't ask them --

15 **A.**    No.

16 **Q.**    -- to see their Facebook post?

17 **A.**    No.

18        MS. ANDERSON:  Okay.  I would -- this is not yet in

19 evidence, if you can take that down, Mr. Brown, please.

20 BY MS. ANDERSON:

21 **Q.**    If you can take a look at Exhibit 52 in your binder.

22 **A.**    All right.  I'm here.

23 **Q.**    And does that appear to be a Facebook wall?

24 **A.**    Oh, gosh, that's so small.  I'm showing my age.  Yes.

25 **Q.**    I can grab glasses.

```
 1   A.      I have --

 2   Q.      Okay.

 3   A.      I have glasses on.

 4   Q.      Oh, you have them.

 5   A.      Yes, yes, I can see it.

 6   Q.      Okay.  And does that appear to be a Facebook post by

 7   J.H.?

 8   A.      Where would I see that?

 9   Q.      At the bottom of the first page.

10   A.      Oh, I see at the bottom.  Yes, yes, yes.  I'm at the

11   bottom.

12           MS. ANDERSON:  Your Honor, I move --

13           THE WITNESS:  I just don't know what it says yet.  I

14   just . . .

15   BY MS. ANDERSON:

16   Q.      And in the bottom right-hand corner, is that an FCSB

17   Bates label?

18   A.      Yes, okay.

19           MS. ANDERSON:  Your Honor, I move to admit Exhibit 52,

20   please.

21           MR. BATES:  No objection.

22           THE COURT:  Without objection.  You may publish it.

23           (Plaintiff's Exhibit 52 admitted into the record.)

24   BY MS. ANDERSON:

25   Q.      If we can just go to the bottom of the first page.
```

```
 1          THE COURT:  It might be easier to use the screen, ma'am.

 2          THE WITNESS:  Okay.

 3   BY MS. ANDERSON:

 4   Q.     Yeah.  Either way.  It is a bit bigger on the screen, but

 5   please feel free to use the paper if you want to see more of it.

 6          And J.H. is posting, "Truth is I hate all 8th graders

 7   because they keep calling you a ho, and I miss you Monday,

 8   Tuesday, and yesterday at school."

 9          Do you -- is that what that says?

10   A.     That's what that says.  Can you tell me the date of this?

11   I can't find the date.

12   Q.     And you'll see, if we back out, that it's in 2011.

13          Okay.  And you know that that week of 11-21, that was

14   Thanksgiving week, correct?

15   A.     That's correct, yes.

16   Q.     And B█████ stayed home from school Monday, Tuesday, and

17   Wednesday of that week, did not go to classes?

18   A.     What day was the 21st on?

19   Q.     A Monday.

20   A.     Okay.  She came in on the 21st with her mom.  She came in

21   a little late.  She stayed at school that day.  She didn't go

22   home with her mother because I had told her not to go to PE but

23   to go to Ms. H█████ 8th period, and she went to PE anyway.

24          The 22nd she stayed home and came in with her mother to

25   pick up the $50, and then they decided -- they sent us an e-mail
```

1  telling us they were going to keep her home the rest of the

2  time.

3  **Q.**    Okay.

4  **A.**    Okay?  So, I just need to know what the date of this is.

5  I just can't find -- I see 2011, I do, ma'am, but I don't see

6  the date.

7  **Q.**    Yeah, I -- okay.  It's not exactly on there.  It's 2011,

8  but I think we can move to the next question.

9        So you were also in the courtroom when Mr. F█████████

10 testified that it is important for the school to keep track of a

11 student's disciplinary history because it's more serious if a

12 student commits multiple offenses than a single -- than a first

13 offense, correct?

14       MR. BATES:  Objection, Your Honor.  This is just

15 restating.

16       THE COURT:  Simply ask her was she in the courtroom, yes

17 or no?

18       MS. ANDERSON:  Was she in the courtroom when he said --

19       THE COURT:  Were you in the courtroom --

20       THE WITNESS:  I was --

21       THE COURT:  -- for Mr. F██████ testimony?

22       THE WITNESS:  Yes, sir, I was.  Yes.

23 BY MS. ANDERSON:

24 **Q.**    Okay.  And do you agree that it's important to look at a

25 student's disciplinary file when making decisions about who may

```
 1   be telling the correct version of events?

 2   A.    When I'm doing an investigation and I'm trying to

 3   determine whether a student's telling me the truth, I may look

 4   at their discipline file; I may not.  I mean, I don't tend to

 5   make current decisions, basing them on past mistakes.  Do you

 6   know what I'm saying?  I make my decisions based on that

 7   particular incident at that time, and I don't let a student's

 8   past define them in that way.  I don't just, Oh, well, you were

 9   in trouble twice over here, so you certainly must have done

10   this.

11        I don't operate that way.

12   Q.    And would it be relevant if they had an escalating series

13   of discipline before that moment that you were --

14   A.    If I was taking that student, yes, ma'am, to the hearings

15   office or something along those lines, then absolutely, yes, I

16   would look -- if I'm looking at an offense like that, yes.

17   Q.    Okay.  So let's first talk about J.O., and you would have

18   had access to her disciplinary file, correct?

19   A.    I have access to every student's disciplinary file, yes.

20   Q.    Okay.  And you were aware that she had been disciplined,

21   correct?

22        MR. BLANCHARD:  Objection, foundation, relevance.

23        (Reporter clarification.)

24        MR. BLANCHARD:  Objection, foundation and relevance.

25        THE COURT REPORTER:  I'm sorry, counsel.  I can't hear
```

```
 1   you.

 2        MS. ANDERSON:  Your Honor, the relevant -- I'm trying not

 3   to do a speaking --

 4        THE COURT:  Before we can address the relevance as to

 5   whether something is probative or not, let's deal with the

 6   foundation issue.

 7        The objection to foundation is overruled.  She says that

 8   she has access to the records of students who attend the school.

 9   So let's go to the relevance.  What is this probative of?

10        MS. ANDERSON:  This is probative of whether or not she

11   looked at this discipline and whether or not she took that into

12   account in her determinations.

13        THE COURT:  I'll let you ask that question, but it needs

14   to be specific and precise.

15        MS. ANDERSON:  Okay.

16        THE COURT:  If it's not, I'm going to give a cautionary

17   instruction.

18   BY MS. ANDERSON:

19   Q.   Did you take into account the fact that J.O. had previous

20   discipline?

21   A.   I did not look at J.O.'s discipline file.

22   Q.   And --

23   A.   She wasn't my student, you know.

24   Q.   She wasn't your -- because she wasn't your student?

25   A.   She wasn't my student.  I wouldn't be issuing her, you
```

1    know, under normal circumstance, discipline.  I did not review

2    her file.

3    **Q.**    Okay.

4         THE COURT:  At this point, the objection to foundation is

5    sustained.

6    BY MS. ANDERSON:

7    **Q.**    And you're -- were you aware of the allegation that just

8    a week later, J.O. had slapped B████?

9    **A.**    I was not.

10   **Q.**    Okay.  And --

11        MR. BLANCHARD:  Objection.  It's an allegation with no

12   foundation.  If counsel wants to lay a foundation --

13        THE COURT:  Said she wasn't aware of it.

14        MS. ANDERSON:  Yeah, I mean --

15        THE COURT:  Okay -- overruled.

16        MR. BLANCHARD:  It assumes a fact not in evidence.

17        THE COURT:  Overruled.

18   BY MS. ANDERSON:

19   **Q.**    Now, you said J.O. was not your student, but C.K. was

20   your student, correct?

21   **A.**    Correct.

22   **Q.**    Okay.  And you were aware that he had a history of

23   discipline, correct?

24   **A.**    I don't know if you would call it a history.  I know that

25   he had another incident in his record, yes.

**Q.**     Okay.  So you were aware of at least some discipline of

C.K.?

**A.**     I was familiar with that, yes.

**Q.**     Okay.  And were you aware of whether or not he had --

          MS. ANDERSON:  Actually, I'm just -- I'll go ahead and --

Your Honor, I would like to move Exhibit 59 into evidence.  You

have it.  It's in your binder.  Plaintiff's Exhibit 59.  And,

Your Honor, this is the subject of an MIL.

          THE COURT:  Can you hand up 59 so I can take a look at it.

          MS. ANDERSON:  Can I hand up?  I'm sorry?

          THE COURT:  59.

          MS. ANDERSON:  Oh.

          THE COURT:  59 redacted is in.

          MS. ANDERSON:  I think one page is in, and I am seeking to

move in the exhibit, and it's subject to an MIL, and I'm happy to

approach.

          THE COURT:  All right.  I'm looking at Bates Number 8230.

Is that what you are trying to get in, Plaintiff's

Exhibit Number 59, Bates 230 -- 8230?

          MS. ANDERSON:  {Indiscernible}.  Your Honor, I am going to

try to do three pages to put in.

          THE COURT:  I want to make sure I'm working from the same

sheet of music.  You want to -- you're offering the alleged

disciplinary record for C.K.; the letter informing the parents, I

guess, which is two pages.  Is that what you are offering?

```
1         MS. ANDERSON:  So I'm looking to do page -- I'm

2    offering -- I'm trying to offer the entire exhibit.  I would like

3    to talk about his actual disciplines on page 1, 4, and 6.

4         THE COURT:  All right.  Let me try again.  Which ones are

5    you trying to offer to be admitted as part of --

6         MS. ANDERSON:  The entire exhibit.

7         THE COURT:  The entire exhibit.

8         MS. ANDERSON:  Yeah.

9         THE COURT:  Okay.  So to make sure that I'm correct on the

10   record, a part of 59 has already been offered and admitted.

11        MS. ANDERSON:  Correct.

12        THE COURT:  But now you want to offer all of --

13        MS. ANDERSON:  Correct, Your Honor.  Page 1 has been

14   admitted, and I'm looking to offer the entire six pages of the

15   exhibit.

16        And, Your Honor, this was the subject of an MIL, and I'm

17   happy to pass it up.

18        THE COURT:  All right.

19        MR. BATES:  I think we may need to approach for this,

20   Your Honor.

21        THE COURT:  Come on.

22        (Following sidebar discussion had on the record:)

23        THE COURT:  Okay.  Before we hear argument on it, what I'm

24   going to do is make specific reference as to what we're trying to

25   resolve.
```

1           The exhibit that has been referenced is original

2     Plaintiff's Exhibit Number 59.  59 was admitted in part through

3     another witness.  Now, plaintiff, through its request, has

4     offered to admit 159 [sic] with the specific reference to the

5     letter that was sent on May 19th, 2011, to Ms. Stacy K███████,

6     signed by Assistant Principal, S████ D. M████, along with another

7     letter dated February 16, 2011, serving as a warning to advisory

8     official in receipt of plus referral for inappropriate bus

9     behavior."

10          Let's start with the easy one first.  What does horseplay

11    on a bus have to do with what we need to decide?

12          MS. ANDERSON:  Your Honor, I think given that C.K. is no

13    longer a party in this case, it really goes to notice to the

14    school on his discipline, and it's escalating.  So this is all

15    within the files of Rachel Carson.  This is within the system.

16    That's what the screenshots are, and the last page shows that as

17    well, and that his behavior is continuing to escalate.  And

18    that's relevant for the known circumstances when they decide what

19    they're going to do.

20          THE COURT:  I think you get closer to that with regard to

21    the first exhibit.  And, again, these actions have to have some

22    connection.  It seems to me, and maybe I'm just naive, that

23    horseplay is significantly different than an allegation that a

24    person is exposing his genitals, and so I think there's a

25    distinction between the two.

1          I'm going read in the record the decision on the motion in

2    limine.  The motion is granted -- and this is a motion in limine

3    by the defendant, C.K., Docket 632, which is granted in part and

4    denied in part.  And the motion in limine response says, "The

5    motion is granted with respect to certain Twitter posts made by

6    Defendant C.K. and with respect to general disciplinary records

7    pertaining to C.K., except to the extent that Plaintiff may use

8    disciplinary records that predate Plaintiff's withdrawal from

9    Fairfax County Public Schools to establish notice to Defendant

10   FCSB.  The motion is denied with respect to school disciplinary

11   records relating to C.K. exposing himself to a female student.

12   With respect to the request for a general limiting instruction

13   regarding the relevance of certain evidence, counsel may draft in

14   consultation with counsel for all parties a suggested limiting

15   instruction for the Court to read to the jury at the beginning of

16   the case that wasn't provided.  Any such instruction should be

17   submitted to the Court no later than Thursday, March 14, 2024."

18          To my knowledge, that wasn't provided.  So if it was, I

19   can be corrected on that.

20          I'll hear from you, Mr. Bates.

21          MR. BATES:  Well, Judge, I think you hit the nail on the

22   head.  I don't know what the relevance is of a 12-year-old

23   engaging in horseplay on a bus, and the other incident as well

24   has no relevance whatsoever to show that he engaged in some type

25   of sexual misconduct.  They're just trying to railroad a

1    12-year-old boy with meaningless write-ups.

2         MS. ANDERSON:  Your Honor, at the time of the motion in

3    limine, the issue was propensity evidence for C.K.  C.K. is no

4    longer in the case.

5         THE COURT:  Right.

6         MS. ANDERSON:  And so we believe that it's relevant that

7    he's escalating -- I mean, he has three disciplinary records

8    before -- when she's doing her investigation, that his behavior

9    is escalating over the one year that he's been at Rachel Carlson.

10        THE COURT:  Well, as I understand the law -- and the law

11   is actually a little bit unclear in the context of a civil case,

12   but is more, I guess, attuned to a criminal case -- is that these

13   types of evidence typically can come in for *modus operandi*,

14   identity, you know, things like that.  And you haven't suggested

15   to the Court anything suggesting *modus operandi*.  That, you know,

16   takes a whole lot more than just doing something more than twice.

17        Is it identity?  I don't think anyone has denied that C.K.

18   is involved.

19        So what -- what would be the exception that you would cite

20   to allowing this sort of evidence that really doesn't relate

21   directly to the issue that we have to decide?  And I grant you

22   that the School Board has a responsibility, when they're on

23   notice of something, to take appropriate steps, but what does

24   exposing his genitalia have to do with notice?

25        MS. ANDERSON:  So -- well, I think the genitalia, one, we

1    all agree, it's already in evidence, but the other two -- when --

2    when we're talking about MO and we're talking about all of that,

3    that's when the individual is actually still a defendant in the

4    case.

5         Here, C.K. is not a defendant.  So the propensity is

6    not -- is not an issue.  The only issue here now is relevance,

7    and we're -- and we're arguing that it's relevant that he's

8    continuing to escalate a behavior -- he's there one year.  He's

9    getting multiple disciplines, so assistant principals are going

10   to give warnings, they're suspending him, and he's just

11   continuing to act out and that that would be a relevant

12   consideration.  And there's no propensity issue for the

13   School Board, that's -- that's for C.K., and he's no longer a

14   defendant.

15        THE COURT:  All right.  Tell me what your analysis would

16   be when we evaluate this for probative value outweighing its

17   prejudicial effect?  What -- what does it go to prove?  And I

18   hear what you're saying, that it goes to prove some element of

19   notice, but how do we balance the prejudicial effect of getting

20   into evidence about all these other things that really has

21   nothing directly to do with the resolution of the issue before

22   us?

23        MS. ANDERSON:  So I think the prejudicial effect would

24   have been to C.K.  I don't think it's prejudicial to the school

25   that he had prior discipline, especially -- if they're -- if they

1   want to argue on cross or their, slash, direct that it's not

2   relevant, I think they can do that, but the prejudice is little

3   to none given that C.K. is not in this case anymore so --

4        THE COURT:  How would you -- how would you suggest that

5   this does not -- that the -- impact the other defendants because

6   they have not elected to sever the case, but how does this impact

7   the other defendants by bringing in evidence relating to a person

8   that, as you've noted, no longer is part of the case?

9        MS. ANDERSON:  Because it's part of his discipline record

10  with the school that they're aware of when they're making these

11  decisions of what to do, that he has escalating discipline all

12  within one year at the school, where he's being punished, and

13  he's just continuing to act out.

14       THE COURT:  Are you going to -- go ahead, Mr. Bates.

15       MR. BATES:  I was just going to say, Judge, this is not a

16  case about whether the school has appropriately disciplined C.K.;

17  this is whether -- the question is whether the school has been

18  deliberately indifferent to the issues raised by B██████, and so --

19       THE COURT:  So what Ms. Anderson is going to do is that --

20  what Ms. Anderson is going to suggest, though, is by them knowing

21  that C.K. had a disciplinary record, that that might suggest that

22  they're being deliberately indifferent.  That would be part of

23  her argument, I'm thinking.

24       If I'm wrong on that, correct me.

25       MS. ANDERSON:  No, that's correct.  And I actually think

```
1   whether or not he was disciplined in this case on this issue

2   regarding B███ is -- actually, it's very important to this case.

3   I don't think that's irrelevant.

4        MR. BATES:  And this is a prior bad act, and as you've

5   said.  They've not made -- one of the appropriate ways to get

6   into prior bad acts has not been shown other than --

7        MR. BLANCHARD:  Your Honor, I just -- I'm one of the other

8   ones, the other defendants.

9        They're trying to link -- they're trying to link in J.O.

10  with C.K.  These three kids have separately -- they put on

11  evidence they were separately interviewed and what they said.

12       Any disciplinary record of C.K. has nothing to do with my

13  client.  And putting it in to suggest somehow they were all

14  together because they all got in this interview at the same time

15  is -- is prejudicial to me.  Because they're going to try and say

16  C.K. was a friend of my client, but she's not bound by his bad

17  acts.  And I think this is unduly prejudicial.

18       I also -- you've got evidence that there was a

19  disciplinary record of a slap before?

20       MS. ANDERSON:  I can show you the e-mail of Officer Genus

21  confirming that he had found a witness to the slap a week

22  after --

23       THE COURT:  Was there a disciplinary record, though?

24       MR. BLANCHARD:  You said -- you said the week before,

25  because, if it was a week after, it has no value on notice with
```

1    respect to this matter.

2         MS. ANDERSON:  I disagree.  She continues to be involved

3    in what's going on with B███ throughout this case.

4         MR. BLANCHARD:  That's post - {indiscernible} in the

5    e-mail in March.  The e-mail is in March because the mother

6    didn't report it until March.

7         THE COURT:  Okay.  This is what -- this is what we're

8    going to do because I believe that, arguably, it could go to --

9    the second part of the inquiry that we make in a Title IX case,

10   whether there was a difference to the probable cause.  I'm going

11   to let you ask this witness whether she was aware that there were

12   disciplinary records relating to C.K., not J.O., because I

13   haven't seen a disciplinary record for J.O.

14        MS. ANDERSON:  And we're going to be more careful with

15   J.O. --

16        THE COURT:  -- Okay --

17        MS. ANDERSON:  -- because she is --

18        THE COURT:  Was there a disciplinary record with regard to

19   C.K., what timeframe this disciplinary record fell into, and

20   whether that was part of your process in deciding how to

21   investigate the case.

22        MS. ANDERSON:  Okay.  So -- so I got it right, was she

23   aware of the disciplinary record of C.K.?

24        THE COURT:  When was it?

25        MS. ANDERSON:  Was she aware of the timeframe, and was it

```
 1    part of her decision-making process?

 2            THE COURT:  In investigating the matter.

 3            MS. ANDERSON:  In investigating the matter.

 4            THE COURT:  Yeah.

 5            MS. ANDERSON:  Okay.

 6            THE COURT:  All right.

 7            (Sidebar discussion concluded.)

 8            THE COURT:  Ladies and gentlemen, I think I generally

 9    instructed you on this at the very beginning of the case, because

10    we have multiple defendants in the case, sometimes their

11    interests do not necessarily align or coincide.  I'm instructing

12    you that you can consider evidence about one individual or one

13    group of individuals, but you cannot allow that consideration to

14    leak over into other people who may also be involved.

15            So, for instance, I'm going to give an example.  I'm going

16    use me and my deputy clerk.  If my deputy clerk was accused of

17    stealing my pen, and I happen to be with her when my pen was

18    stolen, the fact that I was with her could not necessarily be

19    deemed against me because I happen to be there.

20            That's the easy example.  And, again, my deputy clerk

21    would never steal my pen.

22            All right.  So, again, things have to be balanced.  You

23    must focus on the evidence for the purpose that it's being

24    offered for.

25    BY MS. ANDERSON:
```

1    **Q.**    Ms. T█████, were you aware of disciplinary records for

2    C.K. at this time in November of 2011?

3    **A.**    I was aware.

4    **Q.**    Okay.  And were you aware of the general timeframe for

5    these disciplinary records?

6    **A.**    I was.

7    **Q.**    And did you take that into account, or did it have any

8    impact into your decision-making investigation in November of

9    2011?

10    **A.**    Did his previous discipline record have -- that I -- say

11    it -- say it one more time.  I'm sorry.

12    **Q.**    I'm sorry.  I'm trying to be very careful.

13            THE COURT:  Did it at all impact your investigation?

14            THE WITNESS:  No.

15            MS. ANDERSON:  Okay.  And -- I haven't asked a question,

16    but --

17            MR. BATES:  Judge, part of me -- given the nature of the

18    questions, we're going to withdraw our objection to the entire

19    exhibit and ask that it be admitted.

20            MS. ANDERSON:  Okay.

21            THE COURT:  Okay.

22            MS. ANDERSON:  Then I will move to admit it, Your Honor,

23    Exhibit 59.

24            THE COURT:  We just had a ten-minute conversation about

25    something, and then everybody changes their mind so --

```
 1          MR. BLANCHARD:  Your Honor, I'm okay with that just as

 2    long as --

 3          THE REPORTER:  Say that one more time.

 4          MR. BLANCHARD:  Yeah, I'm letting the Court know, I'm okay

 5    with that because the Court's given a limiting instruction that

 6    has nothing to do with my client.

 7          THE COURT:  Okay.

 8          MS. ANDERSON:  Okay.  Thank you, Your Honor.

 9          THE COURT:  I think, based upon the stipulation or

10    concession that it's admissible, you can give it to the witness

11    and you can publish it.

12          MS. ANDERSON:  Okay.  Great.  Thank you, Your Honor.

13          (Plaintiff's Exhibit 59 admitted into the record.)

14          MS. ANDERSON:  So can we pull up Exhibit 59, page 6,

15    please.

16          THE COURT:  Yes.

17          MS. ANDERSON:  May I publish it?  Thank you, Your Honor.

18    BY MS. ANDERSON:

19    Q.    Okay.  And on this -- on page 6 of Exhibit 59 -- and you

20    also have the hard copy in front of you if you want to take a

21    look -- what is the date of this incident?

22    A.    December 14th, 2010.

23    Q.    Okay.  And was C.K. at Rachel Carson Middle School at the

24    time?

25    A.    Yes.
```

1    Q.    Okay.  And what did he -- what did he receive discipline

2    for?

3    A.    He disrupted the classroom by hiding other students'

4    personal property.

5    Q.    And did he get one day of detention for that?

6    A.    He got detention for that.

7          THE COURT:  What -- what is LSL and AIA?

8          THE WITNESS:  Say it again.  I'm sorry.

9          THE COURT:  What is LSL and AIA?  That last part, what

10   does mean?

11         THE WITNESS:  Oh, learning seminar/lunch detention, and

12   AIA.

13         THE COURT:  What's AIA?

14         THE WITNESS:  Oh, he had -- he spent his entire learning

15   seminar period in there, including his lunch period in there.

16   Alternative instructional arrangement.

17         THE COURT:  Thank you.

18         THE WITNESS:  Um-hmm.

19   BY MS. ANDERSON:

20   Q.    And if we can go to page 4, please.  And then he's

21   disciplined again February 10, 2011, correct?

22   A.    Correct.

23   Q.    And that's by Mr. H████?

24   A.    And the last one was by Mr. H███ as well, yes.

25   Q.    Okay.  And that's for some horseplay and loud, disruptive

1    behavior on the bus while in motion, correct?

2    **A.**    Yes.

3    **Q.**    And then his latest, which I believe you were involved

4    in, if we can go to page 1.

5    **A.**    Um-hmm.  Yes.

6    **Q.**    And what date did this take place on?

7    **A.**    May 18th, 2011.

8    **Q.**    Okay.  And so that would have been six months before your

9    investigation in November, correct?

10   **A.**    Correct.

11   **Q.**    Into B███████ complaint of sexual harassment?

12   **A.**    Correct.

13   **Q.**    And you personally investigate this one, correct?

14   **A.**    Correct.

15   **Q.**    And --

16   **A.**    He denied this -- I talked to the other student as well,

17   yes.

18   **Q.**    Okay.  And just for the jury, it says, Ms. M███, but is

19   that also you, Ms. T████?

20   **A.**    Yes, um-hmm.

21   **Q.**    And what he did in this instance is he exposed his

22   genitals to female students, correct?

23   **A.**    In a science class.

24   **Q.**    Yeah, and he did --

25   **A.**    Yes.

1    **Q.**    And so he did that in class, correct?

2    **A.**    That's what was told to me, yes, that he did that in

3    science class.

4    **Q.**    All right.  And you found this one to be verified,

5    though, right?

6    **A.**    I believed the young lady when she told me.  C.K. said

7    that it was actually his finger, and I told him, whether it was

8    his finger or whether it was his penis, it was inappropriate and

9    he can't disrupt the class like that, and that's why I gave him

10   the consequence that I did.

11   **Q.**    So you suspended him.  What's the description, the

12   discipline description, in that box?

13   **A.**    So he -- it's considered a sexual offense, no force.  So

14   he didn't touch anybody.  It's like a lewd act.

15   **Q.**    Okay.

16   **A.**    Um-hmm.

17   **Q.**    And you wouldn't discipline a student for something like

18   sexual offense, no force, if you believed that he had just

19   pointed his finger at a student, correct?

20   **A.**    That's what he told me.  Like I said, I believed the

21   young lady.

22   **Q.**    Okay.

23   **A.**    Um-hmm.

24   **Q.**    And you believed her and you found this to be verified,

25   correct?

1    **A.**    Yes.

2    **Q.**    Okay.

3         MS. ANDERSON:  You can take that down, Mr. Brown.  Thank

4    you.

5    BY MS. ANDERSON:

6    **Q.**    And C.K. denied having done that, correct?

7    **A.**    He did.

8    **Q.**    Okay.  And you decided, though, that this was not an

9    incident of sexual harassment, correct?

10   **A.**    That I decided it was not an incident -- it a was -- it

11   was a lewd act, it was.

12   **Q.**    But you would not qualify it as or describe it as sexual

13   harassment?

14   **A.**    No, I did not.

15   **Q.**    Okay.

16   **A.**    He -- it was inappropriate.  Could it fall under there?

17   Yes.  But it was inappropriate act from a middle schooler in a

18   class, and he shouldn't have done it.

19   **Q.**    And you -- you thought or decided that it wasn't sexual

20   harassment because he'd only done it once, correct?

21   **A.**    I don't think I looked at it that way.  I looked at it as

22   him disrupting the class and being a lewd act, and we identified

23   it in his record as a sexual offense, no force, because he

24   didn't touch anybody.  So is that a form of sexual harassment?

25   Technically, yes.

```
 1   Q.     Okay.  But that's not what you determined at the time,

 2   correct?

 3   A.     I don't recall what I determined at the time.  I mean,

 4   I -- this is how it was put into our system.

 5   Q.     And -- but you didn't report this as sexual harassment,

 6   correct?

 7   A.     To whom?  To the Office of Equity?

 8   Q.     To the Office of Equity, to anyone, about sexual

 9   harassment?

10   A.     I mean -- I mean, I talked to Mr. F███████ about it.  He

11   was made aware of it, but I don't recall whether we reported it

12   or not.

13   Q.     Okay.  And, in fact, you had a discussion with the other

14   assistant principals and agreed that this was not sexual

15   harassment, correct?

16   A.     I don't recall if I had a -- a discussion.  We get a --

17   I'm not sure if you're aware.  We get a report of everything

18   that goes into our system like this, so -- and that report goes

19   and generates to the County as well, so if we get that report,

20   this offense will be on there.

21   Q.     Okay.  You were deposed on May 25th, 2023, correct?

22   A.     If that's what it says on there.  I don't remember the

23   date.

24   Q.     The date sounds about right, though?

25   A.     About right.
```

1    **Q.**    Okay.  And you were -- you were under oath during that

2    deposition?

3    **A.**    I was, yes.

4    **Q.**    I'm going to hand you up -- I'm pretty sure you have a

5    copy of it.

6         THE COURT:  We can shortcut this.  This is past

7    recollection recorded, so you can just read it.

8         MS. ANDERSON:  Thank you, Your Honor.

9         THE WITNESS:  Thank you.

10   BY MS. ANDERSON:

11   **Q.**    And in that deposition, so I'll point you to

12   page 143, 22, to 144, 10.

13   **A.**    Um-hmm.

14   **Q.**    Did you discuss this incident --

15        "Question:" -- sorry.

16        "Question:  Did you discuss this incident with the other

17   assistant principals?

18        "Yes.

19        "Were they in agreement that this case was not sexual

20   harassment?

21        "Yes."

22   **A.**    Okay.

23   **Q.**    Okay.

24   **A.**    There we go.

25   **Q.**    So you all agreed that it was not sexual harassment?

1    **A.**     We agreed.

2    **Q.**     Okay.  And it was not, then, reported as an incident as

3    verified -- as a verified complaint of sexual harassment to the

4    Office of Equity and Compliance, correct?

5    **A.**     It would not have been.  He received consequences.  We

6    taught the behavior we expected for him, and he -- we expect him

7    to behave accordingly.  I mean, we're dealing with middle

8    schoolers.  They're 12 years old.

9    **Q.**     Okay.

10   **A.**     Yeah.

11   **Q.**     And, in fact -- so, you decided that B███████ complaints,

12   after all of that, were unverified, correct?

13   **A.**     I'm not --

14   **Q.**     After your investigation -- yeah, you can put that to the

15   side.  Thank you, Ms. T█████.

16          After your investigation in November, you determined that

17   B██████ complaints were unverified, correct?

18   **A.**     I received a lot of information that we haven't

19   discussed, but, yes, I did determine that I wasn't able -- based

20   on the fact that I wasn't able to get anybody to verify that she

21   was being called these names, that people were at her lockers,

22   that anybody was doing, you know, anything to her -- I could not

23   obtain that information; I couldn't get names of other

24   individuals to talk to -- and I talked to numerous kids, not

25   just the kids on her statement.  I did spot checks.  I was

1    trying to talk to as many kids as possible, and I was not able

2    to verify that she was being sexually harassed.

3    **Q.**    Okay.  And so the answer is, no, you did not find it to

4    be a verified complaint, correct?

5    **A.**    I did not find it to be a verified sexual harassment

6    complaint.

7    **Q.**    And you did not report that as sexual harassment to the

8    Office of Equity and Compliance, correct?

9    **A.**    I did not.

10   **Q.**    Okay.  And you never suggested to B██████ or her mom that

11   they reach out to the Title IX office, correct?

12   **A.**    I didn't suggest that, no, but the mom did receive an

13   SR&R book, and in there it does give her instructions on what

14   she can do in the event that she doesn't agree with the decision

15   that we make at the school.

16   **Q.**    Okay.  So a book that's handed to the parents that's

17   quite a few pages at the beginning of the school year, you're

18   suggesting that she should have gone and found that herself,

19   correct?

20   **A.**    Well, she signed the document saying that she read the

21   book, so it's in there.

22   **Q.**    Okay.  But you never told her that she could go and speak

23   with them, correct?

24   **A.**    I did not, no, not that I recall.

25   **Q.**    And you've done investigations for more than 18 years,

1    right?

2    **A.**      I have.

3    **Q.**      And you've served as an assistant principal for more than

4    probably 10,000 students over those years?

5    **A.**      Probably so, yes.

6    **Q.**      Probably more?

7    **A.**      If you do the math, yes.

8    **Q.**      And these students are at a co-ed middle school, right?

9    **A.**      I think in my career, yes.

10   **Q.**      12- and 13-year-olds, right?

11   **A.**      Some 11.  11, 12, and 13, um-hmm.

12   **Q.**      And boys and girls together, correct?

13   **A.**      Yes.

14   **Q.**      And you have only found one complaint of sexual

15   harassment to be verified, correct?

16   **A.**      I found one at a school previous to coming to Carson, and

17   I have found one at a school since I've been at Carson.

18   **Q.**      Okay.  So, two, then, over your 18 years?

19   **A.**      Two, yeah, yeah.

20   **Q.**      Okay.  And everything else that you investigated was

21   either determined to be not sexual harassment or was not

22   verified, correct?

23   **A.**      You mean everything that I've investigated in my career,

24   or do you mean --

25   **Q.**      Correct.  All the other investigations that you've done

1    throughout your career, they either were not sexual harassment

2    or you found them to not be verified?

3    **A.**    I've investigated many things that have nothing to do

4    with sexual harassment, so I'm not sure quite how you want me to

5    answer that question.  I have -- if it was involving something

6    like that, if it was founded to be sexual harassment, then it

7    was founded, but if I didn't have the information for it to be

8    founded, then it would not be sexual harassment.

9        If I'm only -- if you're just talking specifically about

10   those types of cases.  But I investigate fights; I investigate,

11   you know, weapons; I investigate a lot of things in the past 20

12   years.

13   **Q.**    And a lot of those happening at Rachel Carson Middle

14   School?

15   **A.**    A lot of them happened in any school.  Not a lot.  I

16   mean, we have our instances.  We have our spots.  We have, you

17   know, hot spots, and sometimes periods of time during the year

18   when, you know, kids get a little squirrely, I mean, but it's

19   not a lot that's happened at Rachel Carson.

20   **Q.**    Right.  It's a middle school.

21   **A.**    It's a middle school in general.

22   **Q.**    And then you tell B█████ and her mom the next day,

23   November 22nd, that -- and you meet with them, right, that day?

24   **A.**    I do.

25   **Q.**    Okay.  And you tell them that you found her report to be

1    unverified, correct, or I think you used the word "unfounded"?

2    **A.**    I'm not sure of the word.

3    **Q.**    Either word.

4    **A.**    I had a -- I had a whole conversation with the mom,

5    sharing about the $50, sharing about how he came to get the $50,

6    sharing about the phone records, because I had -- C.K.'s mom had

7    brought in the $50 and C.K.'s phone records.  So, I talked about

8    a lot of things and told her I wasn't able to verify and find

9    the people to verify that she was being bothered at a locker or

10   anywhere.

11   **Q.**    Okay.  And you gave the $50 back from C.K. -- you give

12   that back to B██████ and her mom, correct, that day?

13   **A.**    I do give it back that day, yes.

14   **Q.**    Okay.  And --

15        THE COURT:  About ten minutes, counsel.

16        MS. ANDERSON:  Your Honor, I think we had a lengthy

17   sidebar.  I have -- right after this, I have maybe three more

18   topics, but this is --

19        THE COURT:  About ten minutes.

20        MS. ANDERSON:  Okay.

21   BY MS. ANDERSON:

22   **Q.**    All right.  And in that meeting, you tell B██████ and her

23   mom that you determined it to be a boy-girl thing, correct?

24   **A.**    I don't think I referred to it as a boy-girl thing.  I

25   explained to the mom that they were all friends, that they had

```
 1   all been hanging out together.  I think the friendship had gone,

 2   you know, south.

 3         Her mom already knew about her being in the basement with

 4   David.  The mom -- B███ and C██████ were dating at that time.

 5   And I told her, on the phone logs, because she had talked about

 6   the voicemail, that I couldn't verify that, who was calling and

 7   leaving a voicemail because I had C.K.'s voicemails and hers,

 8   and it looked like they were calling each other, and I did not

 9   tell her that it was a boy-girl thing.  I wouldn't have called

10   it a boy-girl thing.

11   BY MS. ANDERSON:

12   Q.    And, Ms. T████, I appreciate that -- that there's more

13   that you want to say, and I know that you've got your counsel

14   coming up, and I think you've heard that --

15         {Simultaneous conversation}

16   Q.    -- I've got ten minutes --

17   A.    -- I'm sorry.  I'm sorry.  I thought that's what you were

18   asking me.  I'm sorry.

19   Q.    I think the very end of that is what I was asking you, so

20   if we -- if we could keep it succinct, I would appreciate that.

21   A.    Absolutely.

22   Q.    And -- and I know you'll have plenty of time.

23   A.    Sorry about that.

24   Q.    No.  No apologies necessary.

25         So -- and you would agree, then, that -- well, actually,
```

1    I'll move on.

2          So then you're aware that February 9th, 2012, B████████

3    pulled from school, correct?

4    **A.**    Correct.

5    **Q.**    Okay.  And at that time there had been an incident a

6    couple of days beforehand in a cafeteria with B████ and another

7    student, correct?

8    **A.**    I know about that incident, but I didn't deal with that

9    particular incident, yes.

10   **Q.**    But you're involved in then speaking with students about

11   statements that they had made about what was happening with

12   B████, correct?

13   **A.**    I don't recall being involved with that.

14   **Q.**    And --

15   **A.**    If you can refresh my memory with something, that would

16   be great.

17   **Q.**    -- do you recall C██████████ K.'s testimony that he had

18   met with you twice about statements he had written about what

19   was happening to B████?

20   **A.**    I do recall that, but C██████████ did not meet with me

21   twice.

22   **Q.**    Okay.  So -- so it's your testimony he did not meet with

23   you at all?

24   **A.**    I don't recall meeting with C██████████.  I think --

25   well, no, I met with him once.  I think I met with him once.

1   And it was Mr. H████ and I, but that was it.

2   **Q.**    Okay.  And in that meeting, he wrote a statement,

3   correct?

4   **A.**    I believe so, yes.

5   **Q.**    Okay.  And he -- and he stated in that statement that

6   there had been -- that B████ was suicidal, correct?

7   **A.**    I'd have to see that statement.

8   **Q.**    Okay.

9   **A.**    I --

10  **Q.**    Well, in that statement, actually, were -- do you recall

11  C███████ K. saying that it no longer exists?

12  **A.**    It wouldn't -- I don't remember him ever writing a

13  statement with -- with me that said that B████ was suicidal.

14  **Q.**    Okay.  Do you remember him telling you that there was a

15  rumor that C.K. had raped B█████?

16  **A.**    No.

17  **Q.**    Okay.  And did you ever ask him to reevaluate or rethink

18  his statements?

19  **A.**    No.

20  **Q.**    Okay.  Okay.  Last topic.

21          So after March of 2012, you're not asked to do any more

22  investigating or -- or looking into what happened with B████,

23  correct?

24  **A.**    I didn't talk to B████ after February 22nd.

25  **Q.**    Okay.

```
 1    A.      Yeah.

 2    Q.      And -- and you're aware, though, that November --

      November 22nd --

 3

 4    A.      I'm sorry, November 22nd.  Thank you.

 5    Q.      And you're aware that B█████ family was meeting with the

 6    superintendent's office on August 13, 2012, correct?

 7    A.      I don't know if I was aware of that --

 8    Q.      Okay.

 9    A.      -- or not, you know.

10    Q.      Okay.  And were -- you were aware that B████ and her

11    family had requested her entire file; isn't that right?

12    A.      That they had spoke with us?

13    Q.      Um-hmm.

14    A.      I was aware of that.  Um-hmm.

15    Q.      Okay.  And on August 14th, you write a statement,

16    correct?

17    A.      I believe so, yes.  Um-hmm.

18    Q.      And I'd like to -- so that is not yet in evidence,

19    Defendants' Exhibit 229, if you can take a look at it in your

20    binder.

21            THE COURT:  Any objection, Mr. Bates?

22            MR. BATES:  One moment, Your Honor.

23            THE COURT:  Yes, sir.

24            MS. ANDERSON:  May I ask foundational questions while he's

25    looking, Your Honor?
```

```
 1            THE COURT:  Let's wait just a second.

 2            MS. ANDERSON:  Okay.

 3            THE COURT:  I think he's close.  I'm not going to --

 4            MS. ANDERSON:  Okay.

 5            THE COURT:  -- hold you to his investigative time.

 6            MR. BATES:  No objection, Your Honor.

 7            THE COURT:  All right.  No objection.  That

 8    tookk15 seconds.

 9            MS. ANDERSON:  Okay.  I get those back on the clock.

10            THE COURT:  All right.

11    BY MS. ANDERSON:

12    Q.    Okay.  And do --

13            MS. ANDERSON:  So no objection.  Let's -- if we can go

14    ahead and move in Defendants' Exhibit 229?

15            (Defendants' Exhibit 229 admitted into the record.)

16            THE COURT:  And you may publish.

17            MS. ANDERSON:  May I publish?  Thank you.

18    BY MS. ANDERSON:

19    Q.    And this statement is dated August 14th, 2012, correct?

20    A.    Correct.

21    Q.    And that's your signature at the bottom?

22    A.    It is.

23    Q.    S. T█████?

24    A.    Um-hmm.

25    Q.    Okay.  And this -- this day, on August 14, 2012, this --
```

1    you're writing about a conversation that you had with B███ in

2    the fall of 2011, correct?

3    **A.**    About the $50, yes.

4    **Q.**    Okay.

5    **A.**    Um-hmm.

6    **Q.**    And you write this statement.  It's about nine months

7    after the fall of 2011?

8    **A.**    If that's the math, yes.

9    **Q.**    Okay.  Approximately, we'll say.

10           And then one day, that's one day after that meeting with

11    Zuluaga?

12    **A.**    I can't remember the date of the meeting with

13    Mr. Zuluaga.

14    **Q.**    Okay.  Fair enough.

15    **A.**    Okay.

16    **Q.**    And -- and you would agree that there's nothing in that

17    statement about sexual slurs, correct?

18    **A.**    This is the statement that's only pertaining to the 50 --

19    $50, which I was asked to give.

20    **Q.**    Okay.

21    **A.**    Yes.

22    **Q.**    And who asked you to give that?

23    **A.**    I can't remember who asked me to give it, but I was asked

24    to write up what had happened with the $50.

25    **Q.**    Okay.

```
 1   A.     And that's what I did.

 2   Q.     And you were asked to only write about the $50?

 3   A.     In this particular situation, yes.

 4   Q.     Okay.  And there -- there are no other statements on this

 5   date regarding anything other than this -- this is the only

 6   statement that you have from this date, August 14th, correct?

 7   A.     Correct.

 8   Q.     Okay.  And it doesn't say anything about sexual slurs in

 9   this statement, correct?

10   A.     Not in this one, no.

11   Q.     Okay.  And nothing about touching, correct?

12   A.     No.

13   Q.     And nothing about an explicit voicemail, correct?

14   A.     No.  That's not what this was pertaining to.

15   Q.     There's nothing in there that you would describe as

16   sexual harassment, correct?

17   A.     No.

18   Q.     Okay.

19          MS. ANDERSON:  Your Honor, one moment, please.

20          THE COURT:  Yes, ma'am.

21          (Brief pause in proceedings.)

22          MS. ANDERSON:  No further questions.  Thank you.

23          THE COURT:  All right.  We're going to go ahead and take

24   our late afternoon break at this point.  It's about 3:26.  Let's

25   take until 3:40.  3:40.  That will give you a good 15 minutes.
```

1        Remember, don't discuss the case or any aspect of the case

2    with anyone.

3            (Jury out at 3:27 p.m.)

4        THE COURT:  You can step down also, ma'am, and take your

5    break.

6        All right.  You may be seated.

7        How long on the examination, Mr. Bates?

8        MR. BATES:  Judge, yesterday I estimated -- this is one of

9    the witnesses we were going to call in our direct, so we're doing

10   a little crossover.  I'm going to do cross/direct.  Yesterday I

11   anticipated two to two and a half hours.  I think it's going to

12   be closer to the two because a lot of these topics have been

13   covered, but I'm going to try to go as fast as we can.

14       THE COURT:  Okay.  And, again, I'm not encouraging counsel

15   to go fast.  I'm encouraging all counsel to be efficient.  That's

16   the goal, is efficiency.

17       Let me ask you this:  After there -- and I understand what

18   you said, and that was a good way of putting it, the cross/direct

19   examination of your -- of the witness.  Do you anticipate that

20   she's going to be called back again in your regular

21   case-in-chief?

22       MR. BATES:  No.

23       THE COURT:  Okay.

24       MR. BATES:  No.

25       THE COURT:  All right.  I appreciate that.

1       We'll see everyone back in at 3:40.  I'm going to try to

2  talk this jury into staying until 5:00, so maybe we can get

3  through your examination.  So that's going to be the goal.

4       MR. BATES:  That'd be great.

5       THE COURT:  All right.  Thank you.

6       MR. BLANCHARD:  Your Honor, just so you know, right now I

7  have two questions that are very quick for -- so I don't think

8  I'll be adding on to --

9       THE COURT:  You said -- you said five yesterday, and there

10 were 35.  Mr. -- I have to tease -- I have to tease Mr. Brenner

11 also.  I wrote down what he said:  "Just one more question, just

12 a little topic, I'm almost done."  And an hour and a half later,

13 we were there, so --

14      MR. BLANCHARD:  I've got them written down.

15      MR. BRENNER:  And, Judge, I was wondering who this

16 Mr. Brenner was you were talking about.

17      MR. BATES:  Judge, just so I can be clear on one thing, if

18 I may?

19      THE COURT:  Um-hmm.

20      MR. BATES:  On -- we talked about overlapping issues

21 between the School Board and the individual school defendants.  I

22 think 95 percent of my questions -- in conversations with

23 Mr. Kinney, I believe, he -- he may have a few questions that

24 pertain to his clients and not my client, so I just wanted to

25 make that clear with Your Honor.

```
1          THE COURT:  That -- that's fine, that's fine.

2          MR. BATES:  Okay.

3          THE COURT:  So I think -- I think I understand.

4          MR. BATES:  All right.  Thank you.

5          THE COURT:  All right.  We'll see you back in about ten

6    minutes.

7          (Thereupon, a recess in the proceedings occurred from

8    3:30 p.m. until 3:42 p.m.)

9          (Jury in at 3:42 p.m.)

10          THE COURT:  Have a seat.  Thank you.

11          All right.  Ladies and gentlemen, I need to ask you a

12    question.  Keep in mind that our schedule tomorrow is actually a

13    short day, 11:00 to 2:00.  Let me ask you this:  Can I talk you

14    all into staying until 5:00 today?

15          All right.  5:00.  We'll go to 5:00.  We're hoping

16    Mr. Bates can finish his examination today, and then we'll finish

17    up with Dr. --  or excuse me, Ms. T██████ tomorrow and maybe one

18    other witness.  I've got some matters on the morning docket that

19    I'm going to try to take care of so that we can be able to start

20    some time around 11:00, but I've got some other things that I

21    need to do.

22          Mr. Bates.

23          MR. BATES:  Thank you, Your Honor.

24

25
```

1              CROSS-EXAMINATION OF S██████ T████

2  BY MR. BATES:

3  **Q.**    Good afternoon, Ms. T████.  My name is Ryan Bates.  I

4  represent Fairfax County School Board.

5  **A.**    Good afternoon.

6  **Q.**    And you're currently employed at Rachel Carson Middle

7  School?

8  **A.**    I am.

9  **Q.**    And you're an assistant principal?

10  **A.**    I am, yes.

11  **Q.**    And did you say you had been at the school for the

12  last 15 years?

13  **A.**    Fifteen years.

14  **Q.**    Okay.  I just want to get into your background really

15  quickly.

16  **A.**    Okay.

17  **Q.**    Can you give us an overview of your educational

18  background, what degrees you have?

19  **A.**    I have a bachelor of science degree in communication

20  disorders.  I was a speech therapist first.  And then I got my

21  master's in educational leadership.

22  **Q.**    Okay.  And how many years total, sitting here today, have

23  you been in education?

24  **A.**    Thirty-seven.

25  **Q.**    Okay.  And what led you to get into education?

```
 1   A.      Um, I'm probably following my mom's footsteps.  My mom

 2   was a principal for several years.  Just seeing -- watching her

 3   made me want to get into education.

 4   Q.      Okay.  Other than Fairfax County Public Schools, have you

 5   worked for any other school districts?

 6   A.      I have, yes.

 7   Q.      How many?

 8   A.      Gosh, Virginia Beach.  My goodness, in New Jersey;

 9   Berkley, South Carolina.  I think -- I think I'm forgetting one,

10   but I think there are three others, three more.

11   Q.      Okay.

12   A.      Would be one more.

13   Q.      And then in terms of assistant principal, I think you

14   said to Ms. Anderson's questions you've been an assistant

15   principal about 21 years?  Is that what you said?

16   A.      About 20 years.  I started in 2004, I believe.  So 20 --

17   Q.      And were you assistant principal at other schools before

18   coming to Rachel Carson?

19   A.      I was, yes.

20   Q.      And what schools were they?

21   A.      Langston Hughes Middle School and Franklin Middle School.

22   Q.      Okay.  And how would those schools compare to Rachel

23   Carson, in your experience?

24   A.      Franklin Middle School and Rachel Carson were similar in

25   demographics and makeup and programming.
```

1          I think Langston Hughes was the -- diversity-wise was a

2    little bit more diverse, just on a different level of diversity

3    but still had good programming, an ivey school, so not vast

4    differences but just slight differences.

5    **Q.**    Okay.

6    **A.**    The AP program at Carson.

7          THE COURT:  Carson is described as a majority minority

8    school.  Were those schools similar in demographic makeup?

9          THE WITNESS:  Languages Hughes, I think, is majority

10   minority.  Carson, we have several -- several --

11         THE COURT:  Ethnicities.

12         THE WITNESS:  -- ethnicities at our school, and I think a

13   majority -- yes, you're absolutely, correct, yes.  Just -- when I

14   say "minorities," I'm not just saying African-American.  I'm

15   saying across the board.

16         THE COURT:  I hear you.

17         THE WITNESS:  Yes, okay.  Thank you.

18   BY MR. BATES:

19   **Q.**    Were there programs offered at Rachel Carson Middle

20   School different than the other two middle schools you worked

21   at?

22   **A.**    Rachel Carson has an AAP center, advanced academics, so I

23   don't think Franklin did, but Hughes was an IB.

24   **Q.**    What does that mean, for something to be an AAP center?

25   **A.**    Advanced academics, like gifted.

1    **Q.**    Okay.  So what does that mean in practice, in terms of

2    the population that goes to school there?

3    **A.**    Well, they're smart.

4    **Q.**    Are there -- let me ask it this way:  These gifted kids,

5    are they zoned to go to other schools but instead, because of

6    this programming, come to Rachel Carson?

7    **A.**    I understand, yes.  And if they don't offer the AAP

8    program at their zoned school, they will get to come to Carson.

9    And we do have a lot of that, students that live outside of the

10   feeder of Carson.

11   **Q.**    Gotcha.

12        Were there any other programs or offerings at Rachel

13   Carson that brought in students, children from other schools or

14   parts of the county into Rachel Carson?

15   **A.**    We also have a Japanese immersion program, and if that's

16   not offered at their regular feeder school, they're able to come

17   to Carson for that as well.

18   **Q.**    What does that mean, Japanese immersion?

19   **A.**    They've probably taken Japanese, you know, since they

20   were young and they're learning that language, and so there's a

21   specific program for that, and we house that program at Carson.

22   So . . .

23   **Q.**    Okay.  And, I'm sorry, what year did you say you came to

24   Rachel Carson?

25   **A.**    I think it was 2009-'10 school year.

```
 1   Q.      Okay.  So, at the time that B.R. arrived, you had been at
 2   the school what, two or three years?
 3   A.      She got there in 2011, so if I got there '9-'10, I had
 4   been there -- that would have been my second year, '10-'11.  So
 5   if she came . . .
 6   Q.      How would you describe your style as an administrator?
 7   A.      Well, I have a nickname as an administrator.  I don't
 8   know if I -- can I tell my nickname?
 9   Q.      Go ahead.
10   A.      My nickname is Scary T███.  And it started off Scary
11   T███ the Dress Code Fairy.  And I embrace it.  I mean, I
12   actually embrace the name because I am.  I am strict; I'm stern;
13   but at the same time, I'm nurturing.  And so I've had kids come
14   see me and -- to be disciplined and I'll be issuing a
15   consequence or what have you, and they'll say, You know you have
16   a nickname?
17           Yes.
18           Scary T███.  But you're not scary.
19           I said, Well, don't -- don't tell anybody.  You know, I
20   want them to continue to think I'm scary.
21           So, my discipline style, I'm very -- I'm strict, I'm
22   stern.
23   Q.      Where does that style come from?
24   A.      I was raised a military brat.  You know, my dad is --
25   well, he's no longer here, anyway.  My dad is a retired army
```

1    officer.  He was a pilot.  He flew two tours in Vietnam.  My

2    mom's a principal.  We were raised with certain values, how we

3    treat people, that we treat them the way you want to be treated.

4    You're respectful to your elders.  You know, I grew up and you

5    couldn't be in the room when adults were having a conversation,

6    you know, kids went elsewhere, so I think I get that firmness

7    and sternness from -- probably from my father.

8    **Q.**    Okay.  Principal F███████, I know you were asked some

9    questions about him.

10   **A.**    Sure.

11   **Q.**    How would you describe him, his administrative style, and

12   how he ran the school?

13   **A.**    Mr. F██████ was a no-nonsense principal, but he was very

14   nurturing.  He expected a lot from us as assistant principals,

15   and he wanted to make sure that we adhered to the needs of the

16   kids in that school and the staff.  So, although I don't -- I

17   mean, I'd say he was strict in the sense of making sure that his

18   school ran smooth and that kids remained safe and that we did

19   what we needed to do as administrators.  An excellent principal.

20   **Q.**    Let's just talk -- you mentioned safety.  Let's just talk

21   about -- and I just want to touch on this for a moment --

22   security at the school.  What -- you know, was -- talk about --

23   tell the jury about the physical security that was at the school

24   that would prevent intruders from entering the school.

25   **A.**    So we had a door system.  You had to buzz to get in.  And

1   so, you would have to buzz to come in the building to then go

2   into the main office, and there's a little camera thingy on the

3   buzzer, that's how you get in.  The doors are locked.  Our SRO

4   would walk the building after the morning when all the stools --

5   students, sorry, would come in the building.  He would then walk

6   and check and make sure that all the doors were closed and

7   pulled shut because we had some students going out to -- they're

8   not trailers anymore, they're -- you know, trailers.

9   **Q.**    Yeah.

10  **A.**    Yeah.  So he would make sure all the doors were shut and

11  locked --

12  **Q.**    So this --

13  **A.**    -- and he would check periodically during the day.

14  **Q.**    I apologize.

15        So if a visitor wanted to enter the school, how would

16  they do that?

17  **A.**    They would, you know, push the button and tell them what

18  they were there for, and they would let them in.

19  **Q.**    And that's at the main office door?

20  **A.**    That's at the main office.

21  **Q.**    Okay.  You mentioned the SRO on site at the school.  Were

22  there any other security or personnel?

23  **A.**    We had a safety and security assistant, as well, there.

24  **Q.**    Okay.

25  **A.**    And then we're all there, as well, administrators.

1    Q.    And did you, as the administration, have any requirements

2    with regard to monitoring what goes on in between classes or

3    when kids are getting on and off the buses?  Can you talk about

4    that?

5    A.    We all were assigned duties.  I had bus duty, and so I

6    would be outside in the morning until all the buses came in.  I

7    would account for the buses coming in.  I would be out there

8    with our safety and security specialist.

9         And then Mr. H████ and Ms. B████, they had duties as

10   well.  I can't remember where they were stationed, whether it

11   was the cafeteria or a different entrance.  I can't remember

12   what the location was.

13        But once all the students got in the building, then my

14   duty transferred upstairs to the hallway, the main hallway,

15   coming up the main staircase, and then once the kids go to

16   class, start going to class, their duties would also adjust.

17        We had teachers that had duties every morning.  Cafeteria

18   duty for breakfast --

19   Q.    Did the teachers have any duty with regard to in between

20   classes?

21   A.    They had to be outside in the halls at their doors in the

22   hallways in their --

23   Q.    What's the --

24   A.    -- in their pod area.

25   Q.    Okay.  What's the purpose of that?

1    **A.**     Well, one nice purpose is to welcome kids into your

2    classroom, but another purpose is to make sure that nothing's

3    going on in the pod area and that the kids are safe; they're

4    getting their lockers open -- generally, one teacher on each

5    team would have a locker key.  So we had some students that

6    struggled with lockers.  They would be able to open their

7    lockers -- you know, to supervise the bathrooms because the pod

8    areas had the bathrooms.  So, they need to be able to supervise

9    the going and comings and making sure that students are moving

10   along to class so that they're on time.

11   **Q.**     Where is your office in conjunction with the main office?

12   **A.**     I'm up -- right now?

13   **Q.**     At the time -- I'm sorry, during the 2011-2012 school

14   year.

15   **A.**     I was upstairs, down towards B pod, and my office was off

16   of the main hall upstairs.

17   **Q.**     Okay.  So you were with -- essentially within those

18   classroom pods?

19   **A.**     Correct.

20   **Q.**     Okay.  I gotcha.

21          And let's shift focus to B.R. and your involvement in

22   that.  I believe you said in your questions [sic] to

23   Ms. Anderson you were only involved with B.R. for a couple of

24   days?

25   **A.**     Correct.

1    Q.    And that was because the students were on -- the students

2    that were being accused, some of -- two of the three of them

3    were on your teams?

4    A.    Correct.

5    Q.    Okay.  What's -- I know there's a little bit of popping

6    around in your earlier questions as to what happened, when.  To

7    the extent you can -- I know it happened 12 years ago, but to

8    the extent you can, let's try to take this chronologically --

9    A.    Okay.

10   Q.    -- into what your involvement with B.R. is.

11         So, what was the first -- your first recollection of

12   meeting or handling anything with regard to B.R.?

13   A.    When her mom came in about the voicemail on the 21st, and

14   she went to Ms. H█████ office, and then I got called to come

15   down and hear about the voicemail.

16   Q.    Okay.  And so when you got called, were you in -- on the

17   first floor with Ms. H█████ or were you in your office?

18   A.    I got called down.  I came down to Ms. H██████ office.

19   Q.    Okay.  And then at that point, what happened after you

20   came down to Ms. H█████ office?

21   A.    After talking to her, I asked her if we could go to my

22   office, so we went up at the -- after the students got into the

23   classroom, we went upstairs to my office area.

24   Q.    Okay.  And at the point that you went downstairs, had

25   B.R. written a statement yet?

**A.**     Not to my knowledge.

**Q.**     Okay.  So you go upstairs, and who are you meeting with upstairs, then?  Can you remind us of that?

**A.**     So Ms. H████ was there, Ms. R., B.R., and I think Mr. H████ popped in and out.  I think he was there, as well, for a few minutes and then left and came back at that point.

**Q.**     And I think you said that the nature of that conversation was about the voicemail; is that right?

**A.**     Correct.

**Q.**     And what did Ms. R. tell you about the voicemail?

**A.**     That she had received a vulgar voicemail from C.K., and I asked her -- she said she had been trying to retrieve it -- you know, Ms. H████, she had told me that, and so I asked her to just tell me what it said.

I said, Well, just tell me what it says.  We'll go from there.

She said, I can't remember.

And I said -- I said, Well, it's a vulgar voicemail. Just try to remember.  I heard it all before.  Just tell me what it said.

And she did not tell me what it said.  She said she was going to go home and try to retrieve it with Sprint and see if they can unlock the -- she had blocked the number, see if they can unlock it so that she could retrieve the voicemail and she would let me know.  And that's what she ended up leaving to go

1    do.

2    Q.    So when you're having this conversation with her up in

3    your office with Ms. H████████, is -- is B.R. in the office with

4    you?

5    A.    I have an outer office.  So I -- you walk into like my

6    little conference area at that time, and then right next to it

7    was a door.  Like, here's my conference area; there's the door

8    to my office.

9         So we were in the office area.  There's a table in that

10   conference area, and she was sitting at the table.

11   Q.    What was she doing at the table?

12   A.    She was writing her statement.

13   Q.    Okay.  And other than the voicemail, anything else that

14   you can recall that was discussed in that meeting upstairs in

15   your office?

16   A.    I don't recall her mom talking to me about anything else

17   other than the voicemail.

18   Q.    Okay.  Did Mom report to you that -- that B████ had been

19   sexually assaulted at any point during that meeting?

20   A.    No.

21   Q.    Okay.  Did -- did B████ report to you that she had been

22   sexually assaulted at any point in that meeting?

23   A.    No, she did not.

24   Q.    Okay.  And that pertains to both, you know, in school and

25   out of school.

1    **A.**    Yes.

2    **Q.**    Okay.  What would you have done had B███ or her mom

3    reported to you that she had been sexually assaulted?

4    **A.**    We would have gone directly back downstairs to our -- our

5    school resource who was a Fairfax County Police.  Because

6    that's a -- that's a crime, so it would go to him.  And I would

7    then step back and await, you know, instructions after his

8    investigation.

9    **Q.**    Okay.  So, walk me through, to the best you can, after

10   that first meeting -- I think you mentioned in your testimony

11   that mom left and went home and tried to call Sprint to get the

12   voicemail?

13   **A.**    Correct.

14   **Q.**    Is that right?

15        Okay.  So then what happened after that?

16   **A.**    So mom leaves, Ms. H██████ goes back downstairs.  She

17   finishes writing her statement, and I start going over her

18   statement with her about who she thought was -- was calling the

19   names, had she heard them calling the -- her the names.

20        When they say "Hey" to you at your locker, what do you

21   do?

22        And her response was, I say "Hey" back."

23        And then it was like a -- I couldn't confirm even from

24   B███ that they were calling her specifically what she was

25   hearing them call her the names.  So we continued going through

```
 1   her statement.  We went on through, and I got to the bottom

 2   portion --

 3   Q.    Can -- can I stop you there for a moment?

 4   A.    Sure, sure.

 5   Q.    And if we can put up B.R.'s --

 6         MR. BATES:  Your Honor, can we publish PX-77?  It's

 7   previously been admitted.

 8         THE COURT:  You may.

 9   BY MR. BATES:

10   Q.    PX-77.

11         Now, Ms. T████, this statement has been shown many times

12   in the last two weeks.  So I'm going to ask some -- some very

13   pointed questions on this.  And I'm going to not try to ask

14   questions that you've already -- you've already been asked by --

15   by other counsel.

16   A.    Okay.

17   Q.    Did you -- in that second sentence, it says, "They come

18   to my" -- I'm sorry, it says, "They come very close to me and

19   they say, 'Hey, B████.'  They laugh at me, harass me, tease me,

20   and give me seductive looks."

21         Do you see that?

22   A.    I do.

23   Q.    Did you ask B████ what she meant by "harassing" her?

24   A.    I asked her what she meant by "seductive looks."  I

25   remember -- I said, Well, what do you mean by "seductive looks"?
```

```
 1              She says, Well, they look at me funny.

 2              And then I said, Are they -- when you say "harass," tell

 3    me what -- tell me what they're doing.

 4              And she said that they laugh at her, and they say "Hey"

 5    to her.

 6    Q.    Did she say anything else?

 7    A.    Not that I recall, no.

 8    Q.    And again --

 9    A.    Not in that particular --

10    Q.    Yeah.

11    A.    Not in that particular --

12    Q.    I'm sorry.  Let me rephrase my question.

13              In terms of -- of the quote, "harassment," did she

14    explain to you further anything else other than that they look

15    at her and they say, "Hey, B█████," and they laugh?

16    A.    She did not.

17    Q.    Okay.

18    A.    At that moment, no.

19    Q.    Okay.  And so is there anything else you remember in that

20    conversation with B████.  After you review the statement, you're

21    going over it with her -- I think I cut you off.  Is there

22    anything else that you remember about that conversation that

23    might not be in this statement?

24    A.    There is, but there's also -- I remember asking her, it

25    says, "David Neill wants to come up to me and call me vulgar
```

1  names." So I remember getting confused by "wants to come up to

2  me."

3         I said, Well, did he come up to you, or why are you

4  saying he wants to come up to you? Did he actually come up to

5  you and call you names like whore, bitch, and lesbian?

6         And she did not answer me at all in regards to that

7  statement.

8         And then I asked her about J████ O████ -- I'm -- gosh,

9  I'm sorry -- J.O. calling her a bitch and making an offensive

10 wall post.

11        I asked her if she could show me any of those Facebook

12 posts where they were offensive from J.O., and she could not.

13        And then I also talked to her about why she thought he

14 would be -- D.N. -- I have to really work on these initials --

15 D.N. would say that she had done the things in that statement,

16 and that's when she explained to me that he may have been mad

17 because they had been dating and they had broken up.

18        And I explained to her that I was going to -- going to

19 talk to him as well, and I would find out, you know, what he had

20 to say about it, and then that's when she told me about the

21 incident after the pumpkin patch that had happened in the

22 basement between her and D.N.

23 **Q.**    Okay. Well, before we get there, at this point, had --

24 had B███ ever told you that her and C██████ had been dating?

25 **A.**    Not at that point.

1    **Q.**     Okay.

2    **A.**     No.

3    **Q.**     And from that conversation with Mom about the voicemail,

4    was there any reference in that conversation -- did Mom tell you

5    that B██████ had dated either C███████ or -- or C.K. -- I'm

6    sorry, C.K. or David N.?

7    **A.**     No.  Mom did not, no.

8    **Q.**     So after this, after you go over this statement, if you

9    can, what -- what do you recall is the next step that you took?

10   **A.**     So when I finish going over this -- this statement, I

11   explain to -- oh, the initials -- B.R. that I wanted her to go

12   to Ms. H████████ 8th period because I wanted to make sure that

13   she did not bump into J.O. because I knew J.O. was in her PE

14   class.

15        And so I instructed her to go to Ms. H██████ and not go

16   to -- to PE that period because we were going to work on moving

17   her locker because she had requested her locker be moved.

18        And then I moved C.K. and D.N. into AIA so that I could

19   continue to investigate, and I could keep them out of the -- you

20   know, the population, because I didn't want her to -- I'm

21   getting a statement.  I didn't want her to run into them during

22   the course of the day until I knew exactly what was going on.

23   **Q.**     Okay.  You -- you call it -- I know the school calls it

24   AIA --

25   **A.**     It's like in-school suspension.

1    **Q.**    Okay.  All right.  Thank you.

2    **A.**    Yes.

3    **Q.**    So is that something that you always do?  Do you always

4    put accused students in essentially in-school suspension while

5    you're investigating something?

6    **A.**    No.

7    **Q.**    Okay.

8    **A.**    No.

9    **Q.**    Why did you decide to do that here?

10   **A.**    Because the nature of her statement, it's serious, and so

11   I wanted to make sure that she was comfortable going to class

12   through the day, and so I wanted to take them out of the loop

13   while I investigated.

14   **Q.**    Okay.  You had -- you had looked at a statement from J.O.

15   We don't have to publish it right now --

16   **A.**    Okay, yes.

17   **Q.**    -- and it just said something about explain what happened

18   with something.

19         Do students have the right not to write a statement?

20   **A.**    They do.  You cannot make them write a statement.

21   **Q.**    Okay.  You cannot make them write a statement?

22   **A.**    No.

23   **Q.**    Okay.  Is that a Rachel Carson rule, or is that a School

24   Board -- kind of school division-wide rule?

25   **A.**    I actually think that's a school division-wide rule that

1    we can't make them write a statement.

2    **Q.**    Okay.

3    **A.**    Um-hmm.

4    **Q.**    So after you put those three students, D.N., C.K., and

5    J.O., in in-school suspension, what do you recall happens next?

6    **A.**    J.O. goes to -- doesn't go to in-school, to my

7    understanding.  It's C.K. and D.N.

8    **Q.**    Okay.

9    **A.**    And -- so that she can continue to go to class.

10        And then I continue to talk to the -- I think I talk to

11   David N. next, and find out what he knew about the situation.

12   He thought I was calling him in about the board, but I hadn't --

13   I found out about the board between my conversation with B.R.

14   and then David N. coming in.  So I called him right after I

15   found out about this $50, and I found out about that with a kid

16   popping in my office and saying, Hey, you know, B.R. gave C.K.

17   $50.

18   **Q.**    Okay.  Let me -- let's -- let's --

19   **A.**    So that was the sequence.

20   **Q.**    Yeah, let's -- let's talk about that for a moment.

21   **A.**    Okay.

22   **Q.**    So, tell us about this -- well, first of all, was this

23   $50, had this been mentioned at all in -- in B████ earlier

24   statement?

25   **A.**    No.

1    **Q.**    So how did you find out anything about $50?

2    **A.**    A student came into my office and said, Ms. T███, did

3    you know B.R. gave C.K. $50 for a board?

4          And I was like, No.  For -- for a what?

5          And then he said, A board.

6          And I was, like, A board?

7          And he goes, Like a skateboard.  A board.

8          And I said, No.

9          I said -- he said, Well, she did.

10         And I said, Okay.  I said, Well, thank you for letting me

11   know that.  I'm going to look into that.

12         And I ended up getting B.R. back because I wanted to ask

13   her about the $50, and I had asked her if she had given C.K. --

14   **Q.**    Did she -- by the way, did she tell you about giving

15   C.K., you know, this boy that she had just accused of these

16   horrible things in a statement, did she tell you that she had

17   given him $50?

18   **A.**    No.

19   **Q.**    Okay.

20   **A.**    No.

21   **Q.**    So you had to find out this from other student?

22   **A.**    I found out from another student.

23   **Q.**    Sitting here today, do you remember who that other

24   student is?

25   **A.**    I have no idea.

1    **Q.**    Okay.

2    **A.**    No.

3    **Q.**    Okay.  So I stopped you when you said you were bringing

4    in B.R. to ask her about the $50.

5    **A.**    So I brought her back, and I asked her, I said, B█████,

6    did you give C.K. $50?

7            And she said, Yes, I did.

8            And I said, For what?

9            And she said, A board.

10            And I said -- I said, That's a lot of money, and so why

11    would you do that?

12            She said, Well, he wanted it.

13            And I said, I understand, but that's a lot of money to

14    give someone.

15            So she says, Well, I did give it to him.  She goes, Well,

16    I loaned it.

17            I said, Well, that's a lot of money to loan someone.

18            She says, Well, I liked him, and we had been hanging out,

19    and he needed the money.

20            I said, Well, does your mom know or your dad know that

21    you gave him $50?

22            And she said, No, I have my own money because, you know,

23    I work.  I have an allowance and I work.

24            And I said, I understand, but I need to make them aware

25    that you gave a student $50, and I'm going to get the $50 back

1    for you and give it back to your parents to give to you.

2    Q.    Is this all on, you know, the -- the November 21st, all

3    in that same day or within that next day?

4    A.    That I gave the money back?

5    Q.    I'm sorry, that you have this conversation with B.R.

6    A.    I have a conversation with B.R., if I'm not mistaken, on

7    the 21st.

8    Q.    Okay.  Okay.

9    A.    And I informed the mother on the 21st about the $50 as

10   well.

11   Q.    Yeah.  So just to be clear, make sure we understand this,

12   you first have a meeting with B.R. and her mom; is that right?

13   A.    Um-hmm.  Correct.

14   Q.    Okay.  Then B.R.'s mom leaves, and then you review the

15   statement with B.R. --

16   A.    Correct.

17   Q.    -- right?

18        Then she goes back to class, and then the third time you

19   meet with her about this $50?

20   A.    Correct.

21   Q.    Okay.  Other than the $50 being mentioned in that third

22   meeting with B.R., did she say anything else to you about her

23   and any of these other boys who had been accused of anything?

24   A.    Not during that $50 conversation, no.

25   Q.    Did you have another conversation with her before the

1    meeting the next day?

2    **A.**    I did not, no.

3    **Q.**    Okay.  Did she explain to you -- well, actually, so in

4    the meantime, I take it you're investigating, you know, what's

5    in that written statement; is that right?

6    **A.**    Correct.  I talked to David N. next.

7    **Q.**    Okay.  So you already mentioned this.  I don't want to go

8    over this again, but -- so you met with C.K., and you got a

9    written statement from him; is that correct?

10   **A.**    Correct.

11   **Q.**    And you met with D.N., and you got a written statement

12   from him; is that correct?

13   **A.**    Correct.

14   **Q.**    You met with J.O., got a written statement from her --

15   **A.**    Correct.

16   **Q.**    -- is that right?

17          You eventually met with Olivia B.; is that right?

18   **A.**    Correct.

19   **Q.**    And I think you said on your direct that you met with her

20   the next day?

21   **A.**    I think I met with her the next day.  She wasn't there,

22   and her mom is the one that told me that I needed to talk to

23   her.

24   **Q.**    Okay.

25   **A.**    I didn't know about her.

```
 1   Q.    Was Olivia disclosed in B.R.'s original statement as one

 2   of these witnesses?

 3   A.    No.

 4   Q.    Okay.  But Mom told you that she was a witness?

 5   A.    Mom told me that she would know everything; they were

 6   best friends; I needed to talk to her; she would know

 7   everything; B███ tells her everything.  So I talked to her.

 8   Q.    Okay.  You called Oliva on --

 9   A.    No, I mean, I didn't call her.  I mean, I talked to her.

10   Q.    Okay.  Did Olivia write a statement?

11   A.    She did.

12   Q.    Okay.

13         MR. BATES:  If we can -- I'd like to admit Defendants'

14   Exhibit 65, which is in the book.

15         MS. ANDERSON:  No objection.

16         THE COURT:  Without objection.

17         (Defendants' Exhibit 65 admitted into the record.)

18         MR. BATES:  If we can publish that, Your Honor?

19         THE COURT:  You may.

20   BY MR. BATES:

21   Q.    And this will show up on your screen here in a moment.

22         And is this -- what is this document that we're looking

23   at?

24   A.    That's a student statement from Olivia B.

25   Q.    Okay.  And Olivia told you that "B████ and I are good
```

1    friends and she has confided in me that she has some issues with

2    David N. and J.O."

3         Did I read that correctly?

4    **A.**    Yes.

5    **Q.**    But she says, "But she never gave me anything specific."

6         Do you see that?

7    **A.**    I do.

8    **Q.**    Is that consistent with what Olivia told you, that she

9    didn't know anything specific about the issues between these

10   folks?

11   **A.**    It is.

12   **Q.**    Okay.  And then it continues, "I have only seen David N.

13   once briefly, and he has not approached B███ or me in that

14   time."

15        Did I read that correctly?

16   **A.**    Yes.

17   **Q.**    Is that consistent with what she told you when you met

18   with her, that he had not approached B███ or her?

19   **A.**    It is.  She said she saw them one time downstairs

20   standing, you know, closer to this staircase area in that open

21   area, but they had not approached her.

22   **Q.**    Okay.  And was Olivia in B.R.'s Explorer's team?

23   **A.**    I could not tell you.  I have no idea.

24   **Q.**    Okay.  That's fine.

25        And continuing, it says, "Also, I haven't seen

1    C███████ K. or David N. sexually harass B██████ in the locker

2    pod or anywhere else."

3        Did I read that correctly?

4    **A.**    Yes.

5    **Q.**    Is that consistent with what she told you, that she had

6    not seen any sexual harassment by C.K. or D.N.?

7    **A.**    That is, yes.

8    **Q.**    Okay.

9        MR. BATES:  We can take that down.

10   BY MR. BATES:

11   **Q.**    You had mentioned your questions from Ms. Anderson that

12   you had -- there were three students that were referenced in

13   B.R.'s statement, an A.J., an M.J., and a J.H.

14       Did you interview those students?

15   **A.**    I talked to them down in the pod area, I did, yes.

16   **Q.**    And can you remind us what -- your recollection of what

17   they said?

18       Well, first of all, why did you meet with them?

19   **A.**    Because they were listed as witnesses for her on her

20   statement.

21   **Q.**    Okay.  And what did they tell you?

22   **A.**    Individually, that they had not seen anybody crowding

23   around her locker, hadn't seen any -- heard of anybody calling

24   her names.  They had not heard personally themselves her being

25   called names.  I asked them, if they did see anything or hear

1  anything, would they please let me know, and they all said, yes,

2  they would.

3        And I did explain to them that they had been listed, you

4  know, as a witness on her statement that -- to people that had

5  heard these things, and they each told me individually, "I have

6  not heard or seen her being bothered at her locker or seen those

7  two individuals down in the pod area."

8  **Q.**    Did they ever come back to you and say, Ms. T█████, you

9  told me to come back to you if I saw anything, and I actually

10  saw something now?

11       Did they ever do that?

12  **A.**    No.

13  **Q.**    Okay.  And did you get statements from these three?

14  **A.**    I did not.

15  **Q.**    Why not?

16  **A.**    I was trying to get them back into class.  I wouldn't --

17  I would have to walk them down the hall to write a line to say,

18  I didn't see anything.

19       If I needed to circle back to them to get that, I always

20  had that option.

21  **Q.**    Is that consistent with your practice sometimes if a

22  student really says, I didn't see anything?

23  **A.**    It is, yes.

24  **Q.**    Okay.  So other than C.K., D.N., J.O., O.B., and the

25  three students we just mentioned -- a lot of alphabet here --

1    outside of those seven students, do you remember speaking to any

2    other students about these allegations that B.R. had referenced?

3    **A.**    I randomly spoke to several students in that pod area.

4    We were trying to figure out if -- because she didn't recognize

5    some students, so I was like, Well, I'm going to ask some

6    students randomly, and I did do that.

7        I remember talking to students that were in her actual

8    row, row of lockers.  You know, Have you seen any 8th graders

9    down here, two boys down here crowding around a student?

10        No.

11        Have you seen anybody down here pushing, calling names?

12    Have you heard of any names being called?

13        No.

14        Okay.  Well, I want you to know that we're down here and

15    we're watching because, if we find out, you know, that that's

16    happening, you know, kids will start getting consequences for

17    it.

18        And that is pretty much exactly how I spoke to them.

19    **Q.**    Okay.  Do you recall ballpark about how many of those

20    folks that were around her locker that you spoke to?

21    **A.**    Roughly four, four or five kids just in that pod area and

22    a couple that were around her locker.

23    **Q.**    Okay.  So --

24    **A.**    So four or five more additional, but I think there was

25    two that were in that -- the line.

```
1    Q.    Would it be fair to say, then, that you met with at least

2    ten students to ask questions about the allegations --

3    A.    Easily.

4    Q.    -- that B.R. made?

5    A.    Easily, yes.

6    Q.    You mentioned in your questions with Ms. Anderson that at

7    some point B.R. shared with you something about something that

8    happened in a basement.

9    A.    Yes.

10   Q.    When did that -- when did she share that with you?

11   A.    Um, when I was talking to her about her statement.

12   Q.    Okay.  Okay.  Okay.  And you referenced -- I believe you

13   said in your direct testimony that you felt that was an issue

14   that she should share with her parents?

15   A.    Right.  Before she got the whole statement out of her

16   mouth, when she started to say, Okay, Ms. T█████, we did go in

17   his basement.

18         And I said, Wait a minute.  I said -- I use the word

19   "honey" a lot, and I probably said, Honey, that's probably

20   something you need to talk to your mom about first.  I didn't

21   know what she was going to say to me.  I just -- when you talk

22   about you're going into a basement with a boy, I was like, You

23   probably need to talk to your mom about that first, and I tried

24   to stop her from telling me what it was because it had happened

25   on the weekend, on her Saturday.
```

1    And she said, Ms. T███, it was no big deal.  We just

2    went in his basement, and we went up and down on each other

3    while his mom was doing the laundry.

4    And I said, You need to talk to your mom about that.

5    Q.    And when she's describing this to you, did it sound like

6    it was welcomed contact or unwelcomed contact?

7    A.    Oh, it was welcomed, yeah.

8    Q.    Um, and with regard to -- what, if anything, did you do

9    with regard to B.R.'s PE locker, her gym locker?

10   A.    We wanted to move her locker so she would not be anywhere

11   near J.O., and we had lockers available, but they were near

12   J.O.'s locker.  So, to make sure she had a place to put her

13   things, we had -- we got a crate and we put it inside of the

14   office where the PE teachers reside, and that way we knew that,

15   you know, her things would be safe and that she would be able to

16   access her things without having an encounter with J.O.

17   And then once we were able to get a locker for her, her

18   things then transitioned to that locker.

19   Q.    Okay.  You can flip in your book to Defendants'

20   Exhibit 135.

21   THE COURT:  I'm going to let the jury take a stretch break

22   right now because I want to stretch.

23   MR. BATES:  Okay.

24   THE COURT:  Let's go ahead and go and, ladies and

25   gentlemen, take a little stretch break.

1          MS. ANDERSON:  And while they're breaking, no objection.

2     No, I mean, not to the break, to the exhibit.

3          THE COURT:  Oh.

4          MS. ANDERSON:  There will be no objection to the break.

5          (Thereupon, a brief break was had.)

6          THE COURT:  All right, Mr. Bates, homestretch, sir.

7          MR. BATES:  All right.  Your Honor, permission to publish

8     Defendants' 135.

9          THE COURT:  Without objection.

10          (Defendants' Exhibit 135 admitted into the record.)

11     BY MR. BATES:

12     **Q.**     Ms. T███, you can take a look at -- either in your book

13     or on the screen, whatever is easier for you.  What -- what are

14     we looking at here?

15     **A.**     My request to have her locker moved -- I'm e-mailing

16     Mr. Kappatos, who's the department chair.

17     **Q.**     Was Mr. Kappatos her PE teacher?

18     **A.**     No, I don't believe so.

19     **Q.**     Okay.

20     **A.**     I can't remember who her PE teacher was.

21     **Q.**     Okay.  So you're not sure who her PE teacher was?

22     **A.**     I'm not sure, no.

23     **Q.**     Okay.  But he was the chair of the physical education

24     department?

25     **A.**     Yes.

1    **Q.**    Okay.  So you sent this e-mail to him to -- to get her

2    locker moved?

3    **A.**    I did, yes.

4    **Q.**    And was this to move it away from J.O., is that what you

5    said?

6    **A.**    Yes.

7    **Q.**    Okay.  And why did you -- why did you do that?

8    **A.**    Because she was complaining about J.O.

9    **Q.**    Okay.

10    **A.**    I think -- to be honest, I think her mom asked us to move

11    the PE locker that morning, I do believe, if I remember that

12    correctly, because I sent that e-mail as soon as I got that

13    request.

14    **Q.**    Okay.

15    **A.**    Um-hmm.

16          MR. BATES:  Okay.  We can take that down.

17    BY MR. BATES:

18    **Q.**    Just jumping back to the comment that -- that B███████

19    shared with you about what had happened in the basement.  Why

20    did you think it was important for B.R.'s mom -- well, first,

21    let me back up for a moment.

22          At the time that you learned that, was it your

23    understanding that B.R.'s mom knew or did not know about what

24    had happened in the basement?

25    **A.**    I didn't know whether her mom knew or not.  I told her

1    that she needed to talk to her mom.

2    **Q.**    Why did you think that she should have talked to her mom

3    about that incident?

4    **A.**    It's her daughter, and that's private information,

5    personal.  It happened on a weekend while she was at home under

6    her mother's care.

7    **Q.**    Did you think it was important for her mom to know that

8    before you knew that?

9    **A.**    Absolutely.

10   **Q.**    Okay.

11   **A.**    Yeah.

12   **Q.**    And if we can pull up -- if you can turn in your book to

13   Defendants' Exhibit 83.

14         MR. BATES:  I don't think this has been admitted from us.

15   It might have been admitted from --

16         MS. ANDERSON:  No objection.

17         THE COURT:  Without objection.

18         (Defendants' Exhibit 83 admitted into the record.)

19         MR. BATES:  Permission to publish?

20         THE COURT:  You may.

21   BY MR. BATES:

22   **Q.**    Ms. T███, is this the e-mail that you received from

23   B.R.'s mother?

24   **A.**    It is, yes.

25   **Q.**    Okay.  I'll give you a moment to look at this document,

1    but let me ask you, based on this e-mail -- whenever you're

2    ready, based on this e-mail, was B.R.'s mom able to retrieve

3    this voicemail, this alleged voicemail?

4    **A.**    No.

5    **Q.**    Okay.  And what's the subject line of this e-mail?

6    **A.**    "Thank you."

7    **Q.**    Okay.  And in that first line she says, "Thank you so

8    much for taking the time to help us with the sexual harassment

9    and bullying problems our daughter, B██████, has been

10   encountering at Rachel Carson since the end of October."

11       Do you see that?

12   **A.**    I do, yes.

13   **Q.**    By the way, when she says "since the end of October," do

14   you -- do you know what she's talking about, other than what was

15   put in this statement and what was discussed?

16   **A.**    I don't know about the end of October.

17   **Q.**    Okay.  Did -- did plaintiff's mother report to you or the

18   other administrators -- well, let me rephrase that.

19       Did plaintiff's -- B.R.'s mother report to you,

20   Ms. H██████, or Mr. H████ anywhere in this e-mail that

21   plaintiff had been sexually assaulted at school?

22   **A.**    No.

23   **Q.**    Did she report to you anywhere in this e-mail that

24   plaintiff had been sexually touched at school in any manner?

25   **A.**    No.

1   **Q.**     Okay.  And --

2          MR. BATES:  You can take that down.

3   BY MR. BATES:

4   **Q.**     And the next -- chronologically speaking, to the extent

5   you can -- well, first, let me ask you:  All those interviews

6   that we talked about with those students, those ten-plus

7   interviews, were all those conducted on, you know, that same day

8   of November 21st?

9   **A.**     I think I talked to all of them except for O.B.  I think

10  I talked to her on the 22nd, that morning.

11  **Q.**     That's right.  Thank you.

12         Okay.  And so what was the next thing you had done after

13  you had spoken to all of the students, spoken to B.R. multiple

14  times, what was the -- what came after that?

15  **A.**     On the 21st, I contacted her mom to let her know where I

16  was in the investigation and that I hadn't found anything.  And

17  that's when she had told me to talk to O.B.

18         And I also explained to her about the $50 that I had

19  found out that B.R. had loaned or given to C.K., explained to

20  her I was getting that money back.

21         And in addition to that, I told her I had spoken with

22  C.K.'s mother and that, in addition to giving me back the $50

23  for her, she was also going to bring a copy of his phone records

24  as well and that he had -- she had done that.

25  **Q.**     Okay.  And did you -- did you -- around that time, did

1   you also schedule a meeting for -- for the family to come in?

2   **A.**     I did.

3   **Q.**     Okay.  And do you recall when that meeting was?

4   **A.**     The time I asked her to come in was in the morning, but

5   she had another meeting, and so they ended up coming in the

6   afternoon the next day.

7   **Q.**     Okay.  Tell us what you can recall about what was said

8   and what happened in that -- that meeting the next day,

9   November 22nd.

10  **A.**     I explained to the mom, basically recapped my

11  conversation with her, that I had not been able to verify that

12  students were bothering her around her locker or calling her

13  inappropriate names, that I did verify that one student had

14  admitted to calling her a bitch.

15         And I also shared the phone records with the mom, and I

16  told her I had been looking at the phone records and had tried

17  to compare them.  And I saw that they were both calling each

18  other, but that in the phone records, it did appear that more

19  calls were coming from B.R.'s phone to -- to C.K.'s phone.

20  **Q.**     And I'm sorry to interrupt.

21         When you said they were both calling each other, you mean

22  B.R. and C.K. were calling each other?

23  **A.**     Correct.  Correct.

24  **Q.**     Did -- did Mom know that there were calls between the two

25  of them?

1    **A.**    She didn't know that.  And by this time, I understood

2    why.  Because I was told that they were boyfriend and

3    girlfriend.

4    **Q.**    Okay.  So continue -- continue with what -- what else you

5    recall about that meeting.

6    **A.**    And then I explained to her that I did, per her

7    suggestion, speak to Olivia B., and that she did not have any

8    information to help me -- or to determine -- she hadn't seen

9    anything; she hadn't heard anything.  And B.R. had not told her

10   anything specific about anything that was going on with her.  So

11   I told her I was not able to verify with her.

12         And that we had moved her -- the way we had moved her

13   locker, I shared that information as well.

14         And then I started telling her some things that we were

15   going to put into place for B.R. to make sure that she was

16   comfortable, you know, coming to school.  Even though we

17   couldn't corroborate it, we still wanted to make sure that she

18   felt safe, and we still wanted to keep our eyes out in case, you

19   know, we had -- by chance, something was going on and we had

20   missed it, so we wanted to make sure we were there.

21   **Q.**    Anything else that you recall about that meeting with the

22   parents?

23   **A.**    Um, after I started telling her things that we were going

24   to put into place, the mom -- and I was going over the incidents

25   that had happened, I told the mom that -- they were friends, it

```
1   was clear that this group of students was friends.  The

2   friendship had dissipated.  I said, I know they had all, you

3   know, had gone to a pumpkin patch.  I know that had happened.

4   And I think at some point, you know, B▒▒ will have

5   conversations with you, I said, but I can't corroborate it.

6        And so she says, Well, what do you mean that she'll have

7   a conversation with me?

8        And she says about -- she asked B▒▒ why she had given

9   the $50.  She asked her, you know, what was the deal with the

10  pumpkin patch.

11       And B▒▒ just -- she blurted out.  She said, She's

12  talking about the fact that I went in the basement with David N.

13       And I said to her at that time, I said, Ms. -- I'm trying

14  so hard not to say the names.  I said, Ms. R., I explained to

15  your daughter that that was a conversation that she needed to

16  have with you in private, and I suggested that to her when she

17  told me.  I thought she was going to have that conversation with

18  you in private.

19       And at that point, Ms. R. became, I guess, enraged, is a

20  good word.  She was very angry.  And she instructed B.R. to go

21  get her things, get her things.  It was the end of the day, and

22  she had kept her home that day.

23       And I said, Well, wait a minute, I have this, you know,

24  this $50.  And I hand -- go to hand the $50 to her, and I said

25  to B.R., I said, It's the holidays; this is a lot of money; this
```

1    is something you should be using to buy yourself something for

2    Christmas.  You can't -- not giving it to a student.

3         She took the $50.  She told her to go.  She got up and

4    told me, How dare you imply my daughter is being promiscuous.

5         And they left.

6    Q.    Were you ever implying that her daughter was promiscuous?

7    A.    No.

8    Q.    Okay.  I -- I don't know if we had covered this, but

9    where did you get that $50 from?

10   A.    C.K.'s mom brought it up to me.  It seemed like within

11   minutes of me calling her.  But she brought it up to me on

12   the 21st after I called her and told her he had gotten -- had

13   gotten it from her.

14   Q.    Okay.  Was plaintiff's -- was B.R.'s father at that

15   meeting?

16   A.    I remember his [sic] father being at that meeting.

17   Because I remember the order they were sitting in in my office.

18   Q.    What do you recall about his involvement in that meeting?

19   A.    He didn't say a word.

20   Q.    Do you remember any discussions about the three of them

21   meeting up outside of school?

22   A.    In that particular meeting?

23   Q.    Yeah.

24   A.    I don't remember it being in that particular meeting.  I

25   know that they were hanging out at the park, and that came

1    through discussions with -- with David N., with C████████, that

2    they were hanging out at a park near -- in their neighborhood or

3    near her neighborhood, that they would hang out there.

4    **Q.**    By the way, did you -- were you -- were you friends with

5    C.K.'s parents at all?

6    **A.**    No.

7    **Q.**    Okay.  Okay.  So, were you able -- I believe you said

8    this on direct, but -- that you were able to -- to -- you found

9    that there was some name-calling that had happened between --

10   well, let me just ask you:  What was the results of your

11   investigation after speaking with all these individuals?

12   **A.**    I did confirm that there had -- there was name-calling

13   going back and forth between B.R., J.O., and I believe C.K., as

14   well, yes.

15   **Q.**    Okay.  And was any discipline issued to -- to anyone as a

16   result of everything that you had done?

17   **A.**    Other than putting them in in-school for the day, no.

18   **Q.**    I'm just asking you generally.

19   **A.**    No.

20   **Q.**    Okay.

21   **A.**    No.

22   **Q.**    Would you consider putting students in in-school

23   suspension to be a form of discipline?

24   **A.**    It is.

25   **Q.**    What -- what is -- what is generally students' reactions

```
 1   to being put in in-school suspension?
 2   A.    Well, they don't -- they don't like me for it.  They
 3   don't like it.
 4   Q.    What do they do in in-school suspension?
 5   A.    They do their work.  They get all of their work sent to
 6   that particular room.  They're not allowed to talk to each
 7   other.  They sit at a separate desk, and they do their work.
 8   Q.    Okay.  Did you have any conversations with any of the
 9   parents of the three individuals that B.R. had accused?  Did you
10   call their parents?
11   A.    I talked to all the parents of the students that I
12   brought into my office.
13   Q.    What did you tell them?
14   A.    That they had --
15   Q.    To the extent you can remember.
16         THE REPORTER:  I'm sorry?
17         MR. BATES:  I said to the extent you can remember.
18         THE WITNESS:  When I spoke with C.K.'s parents, I told her
19   that I had to have a conversation with him because his name was
20   mentioned as a student that was bothering a young lady and
21   harassing a young lady.
22         I also had known about the $50 at that point, so I told
23   her that I had met with him about that, as well.  I told her
24   during my investigation I had put him in in-school suspension so
25   that I can investigate and determine whether or not he was
```

 1    actually participating in bothering this young lady at her

 2    locker.

 3         And I went on to tell her that he was going to stay there

 4    until I was able to determine, you know, one way or the other

 5    whether he had had certain involvement, and I explained to her

 6    also about the $50, as well.

 7    **Q.**    Okay.  Did you issue any warnings to any of the three

 8    students?

 9    **A.**    Absolutely.

10    **Q.**    Tell us about that.

11    **A.**    They were instructed to stay away from B████, to stay

12    upstairs.  8th graders, generally, their classes are upstairs

13    except for their electives.  They're down -- like PE, home ec,

14    family consumer science, what have you, that's all downstairs,

15    and gym, but their classes were upstairs.

16         They were instructed to stay upstairs, and unless they

17    were traveling to an elective, they were -- or to lunch, you

18    know, they were not to be down there.  I changed their travel

19    route, the way that they would travel, so that they wouldn't

20    encounter her in their travels down to PE or lunch or something

21    like that.  I did that as well, and I told all the parents that

22    I changed their travel route.

23    **Q.**    So was -- what was the purpose of changing their travel

24    route, going between floors?

25    **A.**    Because B███ had a class upstairs.  She had Spanish

1    upstairs.  So normally a 7th grader doesn't, you know, need to

2    come up unless -- at that time our foreign language was

3    upstairs.  So she had to travel upstairs.  I did not want them

4    to cross her path, so I rerouted them so that they would not.

5    And we rerouted -- you know, we told her, Use the stairs closest

6    to your class.  You use this staircase.  We're having them use

7    this staircase, and your paths will not cross.

8    **Q.**     Okay.  So my next question was going to be what, if any,

9    actions did you put in place, after this investigation had

10   concluded, to ensure -- to ensure B.R.'s safety or just

11   generally coming out of this meeting?  And you mentioned

12   changing the paths of the -- where the 8th graders were walking.

13         What else was put in place after that?

14   **A.**     Ms. H████████ was shadowing her.  At one point

15   Ms. F██████████ was, but I think Ms. F████████ was just pulled

16   back because Ms. H████████ was her counselor.  So Ms. H████████

17   was shadowing her.  Officer Genus was stationed in her pod area

18   on the side closest to -- let me see -- the music, the chorus

19   area, so he was able to have direct site of everything going on

20   in the locker pod.  He was stationed there during transitions.

21   She was being shadowed.  We rerouted the students.  We changed

22   her PE locker.  Mr. H█████ and Ms. F██████████ were doing

23   check-ins with her.

24         MS. ANDERSON:  Objection, Your Honor.  Is this personal

25   knowledge?  Is this hearsay from the mother?

1        THE WITNESS:  This is -- no, this is what --

2        MR. BATES:  Hold on.

3        MS. ANDERSON:  -- you witnessed?

4        THE WITNESS:  Oh, I'm sorry.  I'm sorry.

5        THE COURT:  I get to make that determination.

6        What's your objection, ma'am?

7        MS. ANDERSON:  My objection is that this is not to her

8   personal knowledge but appears to be what she's heard from the

9   other administrators.

10        THE COURT:  I thought the question was what did she do,

11  what was done, what was put in place after an investigation, and

12  I think she was testifying to that, so . . .

13        MS. ANDERSON:  I think she's testifying to what others did

14  after the --

15        THE COURT:  You're going to have to, ma'am, testify to the

16  things that you have firsthand knowledge of, things that you

17  observed, things that you directed, and the like.

18        THE WITNESS:  That -- I think that's what I'm doing.  We

19  were -- we were working together, Your Honor.

20        MR. BATES:  Let me rephrase.

21  BY MR. BATES:

22  **Q.**    Do you have firsthand knowledge of all of the things that

23  you just talked about?

24  **A.**    I do.

25  **Q.**    Okay.  To your recollection, was B.R. kept out of school

```
 1   for the rest of that week?
 2   A.     Her mom did keep her home, yes.
 3   Q.     Okay.  That was not a request by the school, to stay out
 4   of school?
 5   A.     No.
 6   Q.     Okay.
 7   A.     Uhn-uhn.
 8   Q.     And after that did -- in the days following your
 9   investigation, did any students come up to you and tell you that
10   they had seen anything with regard to B.R.?
11   A.     No, they did not.
12   Q.     Did B.R. ever complain directly to you about anything
13   else after this two-day period?
14   A.     She did not.
15   Q.     Yeah.  And were you involved in any of the other
16   investigations that pertained to B.R. --
17   A.     -- um --
18   Q.     -- the rest of that school year?
19   A.     No.
20   Q.     I'm going to ask you a few things about some allegations
21   that have been made in this case.
22          Did you ever say to B.R. or her family or to anyone that
23   you didn't want this allegation to ruin a boy's life?
24   A.     No, there was nothing said to me that would have -- I
25   thought would have ruined his life, but I wouldn't have said
```

 1    that to a parent anyway, but no.

 2    **Q.**    Okay.  I think you were here during B.R.'s testimony; is

 3    that correct?

 4    **A.**    Yes.

 5    **Q.**    And I believe she testified something along the lines of

 6    that she heard you say to C.K., How many times am I going to

 7    bail you out, something along those lines.

 8          Do you recall that testimony?

 9    **A.**    I do.

10    **Q.**    Did you ever tell C.K. or any of the other students

11    involved with this, you know, How many times am I going to have

12    to bail you out?

13    **A.**    No.

14    **Q.**    Do you feel like you've ever bailed C.K. out of anything?

15    **A.**    No.

16    **Q.**    Okay.  And, in fact, that incident that we talked about

17    with regard to allegedly exposing himself, was it your testimony

18    C.K. told you it was his finger?

19    **A.**    It is, yes.

20    **Q.**    Okay.  And you still disciplined him for that?

21    **A.**    I did.

22          MS. ANDERSON:  Objection, this is --

23    BY MR. BATES:

24    **Q.**    Why did you --

25          MS. ANDERSON:  -- leading.

1        THE COURT:  {Indiscernible}.

2   BY MR. BATES:

3   **Q.**    Why you did you discipline him for that?

4        THE COURT:  Let me rule on the objection.

5        The objection is leading?

6        MS. ANDERSON:  Well, now it's -- we've moved on to a new

7   question, so I'll take this new question.

8        MR. BATES:  I'm sorry, I thought you said "Overruled."

9        Okay.  I apologize.

10        THE COURT:  You were wishing that.

11   BY MR. BATES:

12   **Q.**    Did -- why -- why did you still discipline C.K. for that

13   incident, despite him telling you, It was my finger; it wasn't

14   anything else?

15   **A.**    Because, to me, whether it was his finger or whether it

16   was, his penis, it was inappropriate; it was a disruption in

17   that class and he should not behave that way.  And I believed

18   the young lady when she told me.

19   **Q.**    Okay.  Did you ever tell B.R. that there was some

20   testimony along the lines of you could not take a complaint of

21   sexual harassment?

22   **A.**    No.

23   **Q.**    Okay.  You can accept and investigate a claim of sexual

24   harassment, right?

25   **A.**    Yes, I can.

1    Q.    I think there was some -- perhaps some insinuation from

2    some of the questions that you don't take --

3         MS. ANDERSON:  Objection, Your Honor.

4         THE COURT:  Rephrase.

5    BY MR. BATES:

6    Q.    Do you take complaints of sexual harassment seriously,

7    Ms. T████?

8    A.    I do, yes.

9    Q.    Okay.  Do you investigate them in conjunction with all of

10   your responsibilities as an administrator?

11   A.    I do, yes.

12   Q.    Um, does the fact that a child engages in horseplay on a

13   bus in 7th grade, in your experience, make it more likely that

14   he will engage in some type of sexual harassment in 8th grade?

15   A.    No.

16   Q.    Okay.  Is that why you -- I'll just leave it at that.

17        Are you aware of any requirements under School Board

18   policy that you're required to report what B████ reported in her

19   statement to the Office of Equity and Compliance?

20   A.    No.

21   Q.    Okay.

22   A.    Uhn-uhn.

23   Q.    I just want to shift topics for one moment.

24   A.    Okay.

25   Q.    After school, in the after-school period, is there an

1    after-school program at Rachel Carson Middle School?

2    **A.**    There is, yes.

3    **Q.**    Okay.  And, by the way, I'm sort of referring to the

4    2011-2012 school year.  Is that still correct?

5    **A.**    It was, yes.

6    **Q.**    Okay.  And were you in the building after school?

7    **A.**    I was, yes.

8    **Q.**    Okay.  Generally speaking, how late would you stay until?

9    **A.**    4:00.  It depends.  I've sponsored a club, so if they

10   were practicing, I'd be there longer than 4:00, but . . .

11   **Q.**    And there are some clubs that happen in the after-school

12   program?

13   **A.**    Yes.

14   **Q.**    Your ballpark, how many -- if you can estimate for us

15   back in that school year, you know, ballpark how many clubs were

16   there?

17   **A.**    Over 50.

18   **Q.**    Okay.

19   **A.**    Yeah.

20   **Q.**    How many days a week were kids allowed to stay after

21   school and participate in these programs?

22   **A.**    You're really testing my memory.  I think it was three.

23   I think was Monday, Wednesday, and Thursday initially.

24   **Q.**    Okay.  And other than yourself -- you said you stayed

25   until 4:00 or whenever.

1    **A.**    Um-hmm.

2    **Q.**    Other than yourself, were there any other administrators

3    in the building during that after-school period when there's

4    still kids in the building?

5    **A.**    There was, yes.

6    **Q.**    Who?

7    **A.**    Oftentimes, we were all there around -- until around that

8    time, but there was generally -- for sure there was always two

9    of us and then the after-school specialist as well, so --

10   **Q.**    Who was in charge of the after-school program?

11   **A.**    Who -- who oversaw that?

12   **Q.**    Right.

13   **A.**    Who, like, supervised it?

14   **Q.**    What's their name or position?

15   **A.**    I don't know who supervised the after-school program,

16   but -- and I think it was Tracy Bromberg that was the person

17   that was there at that time.

18   **Q.**    Okay.  Did you -- did you participate in any clubs in the

19   after-school program?

20   **A.**    I sponsored the step -- the step team.

21   **Q.**    Okay.

22        MR. BATES:  Your Honor, if I -- Defendants' Exhibit 279, I

23   believe that's admitted.  It's the school yearbook.  If so,

24   permission to publish that?

25        MS. ANDERSON:  If it's not admitted, no objection.

1          THE COURT:  Just a moment.

2          MR. BATES:  279.

3          THE COURT:  It's in.

4          MR. BATES:  Okay.  Can we publish that?

5    BY MR. BATES:

6    **Q.**    If -- is this the Rachel Carson yearbook from that

7    2011/2012 school year?

8    **A.**    It is, yes.

9    **Q.**    Okay.  If you can --

10          MR. BATES:  If I can have Grady go to page 23 of the

11   yearbook.  If possible, 23 -- I'm sorry, 22 and 23 at the same

12   time.  And I'm -- not the Bates number, but the -- the page

13   number.

14          Are you able to do side-by-side?

15   BY MR. BATES:

16   **Q.**    The -- was this the team that you said you sponsored, the

17   dance and step team?

18   **A.**    It is.  It is, yes.

19   **Q.**    Okay.  And do -- do you see yourself in any of these

20   pictures?

21   **A.**    I do, yes.

22   **Q.**    Okay.  Where -- actually, you can just use your finger,

23   can you just circle yourself with your finger?

24   **A.**    (Indicating.)

25   **Q.**    Okay.  And did this -- did this organization -- was this

1    one of the clubs that was in after-school period?

2    **A.**    Yes.

3    **Q.**    Okay.  In that picture --

4        MR. BATES:  Grady, if we can -- if you can un -- undo the

5    writing, and you can zoom in on the picture on the left on

6    page 23 that she put her -- no, the other one.  Yeah.

7    BY MR. BATES:

8    **Q.**    Where did the -- where did the step team practice in the

9    after-school period?

10    **A.**    In the main lobby.

11    **Q.**    Okay.  And is -- are we looking at a picture of the main

12    lobby?

13    **A.**    You are, Entrance 1, yes.

14    **Q.**    Okay.  So this picture, this would be in -- you know,

15    after school in that -- in that hour or so after school, would

16    you say?

17    **A.**    Correct.

18    **Q.**    Okay.  And so if a visitor or if a group of, you know,

19    unknown men wanted to come into the school in the after-school

20    period, where -- where's the door that they're going to enter

21    into?

22        MS. ANDERSON:  Objection, speculative.

23        THE COURT:  Were any other entrances in the school for

24    people to come in during after-school time?

25        THE WITNESS:  They have to enter through Entrance 1.  We

```
 1   have signs on the other doors that direct visitors to Entrance 1.

 2         THE COURT:  Is Entrance 1 the entrance that's depicted in

 3   that picture with the "1" over it?

 4         THE WITNESS:  Yes, Your Honor, it is.

 5         THE COURT:  Okay.

 6   BY MR. BATES:

 7   Q.    So if anyone wanted to enter the building, they would

 8   have to go in that door that's right to the -- right behind you

 9   or to the left of you?

10   A.    To the left of me.

11   Q.    Okay.  And during your time -- your time at Rachel Carson

12   Middle School, have you ever seen any groups of unknown men

13   enter the building during this after-school period?

14   A.    I have not.

15   Q.    Okay.  And ballpark, it looks like a lot of folks in

16   there, but just generally speaking, how many -- how many

17   people -- how many kids were on the step team?

18   A.    I think there was, like, 24.  You can't see them all --

19   Q.    Okay.

20   A.    -- in this picture.

21         THE COURT:  About ten minutes, Mr. Bates.

22         MR. BATES:  I'm sorry?

23         THE COURT:  About ten minutes.

24         MR. BATES:  Yeah, I'll be less than that, Your Honor.

25         THE COURT:  Thank you.
```

1    BY MR. BATES:

2    **Q.**    Ma'am, I have three more questions for you.

3    **A.**    Okay.

4    **Q.**    Before we end, I want to make sure I'm clear on

5    something.

6        At any point, did B.R. or her parents ever tell you that

7    she had been sexually assaulted at school?

8    **A.**    No.

9    **Q.**    Okay.  At any point, did B.R. ever insinuate to you -- by

10    motioning to parts of her body or anything like that, did she

11    ever insinuate to you that she had been sexually assaulted at

12    school?

13    **A.**    No.

14    **Q.**    Okay.  At any point, did any of B.R.'s family members

15    ever tell you that she had been sexually assaulted at school?

16    **A.**    No.

17        MR. BATES:  Okay.  I have no further questions.

18        THE COURT:  Take your shot here, Mr. Kinney.

19        MR. KINNEY:  Thank you, Your Honor.  May I proceed?

20        THE COURT:  Yes.

21        And how long are you going to need?

22        MR. KINNEY:  I'll -- I'll keep this within ten minutes,

23    Your Honor.

24        THE COURT:  Okay.

25        MR. KINNEY:  Thank you.

                   CROSS-EXAMINATION OF S█████ T█████

BY MR. KINNEY:

**Q.**    For the record, I'm Michael Kinney, Ms. T█████.  I don't
have to --

**A.**    Hi.

**Q.**    -- introduce myself to you.

        You spoke with Ms. Anderson about asking B.R. to stop
telling you about going into the basement with David N.?

**A.**    Correct.

**Q.**    What was her reaction to what you were telling her?

**A.**    She continued to tell me what happened in the basement.

**Q.**    And when she -- when you told her that that was a private
conversation she needed to have with her mother, what was her
reaction to that?

**A.**    I don't recall her responding to my statement about --
about that.

        Well, you know what, she did actually respond to my
statement about that.

**Q.**    How did she respond to your statement?

**A.**    She was going to tell her mother, but she wanted to tell
her mother with me present, and I told her I didn't want her to
do that.

**Q.**    Why didn't you want her to do that?

**A.**    Because it's a private conversation.

**Q.**    Ms. T█████, you -- you remain working at Rachel Carson; is

1    that right?

2    **A.**    Yes.

3    **Q.**    Let me back up.

4         You've been sued personally in this case, haven't you?

5    **A.**    I have been, yes.

6    **Q.**    How did you react to being sued personally?

7         MS. ANDERSON:  Objection, Your Honor, relevance.

8         THE COURT:  Sustained.

9    BY MR. KINNEY:

10   **Q.**    Has being sued personally affected the way you do your

11   job?

12        MS. ANDERSON:  Objection, Your Honor, relevance.

13        THE COURT:  Overruled.  She can answer if she knows.

14        THE WITNESS:  I'm a little more hypervigilant, I think,

15   with my job, yes.  A little more paranoid.

16   BY MR. KINNEY:

17   **Q.**    Has it -- has it affected your work in any other way?

18   **A.**    I -- I literally write down every word that is said to me

19   any time I talk to a kid now.

20   **Q.**    Do you understand you've been accused of standing idly by

21   while a child in your care was hurt?

22   **A.**    I do.

23   **Q.**    How do you respond to that?

24        THE COURT:  Next question.

25   BY MR. KINNEY:

```
 1   Q.     Based on what --

 2          THE WITNESS:  I can respond.  If you want me to.

 3          I -- it -- it saddens me because I feel like -- I feel

 4   like we did a lot to make sure that she was safe and made -- to

 5   make sure that she hadn't been bothered.  I take it personally

 6   because -- because I'm a woman, because I'm a mom, I'm a

 7   grandmother, and I am a survivor, and I would not ever have a

 8   student, male or female, come and tell me something like that and

 9   do nothing.

10   BY MR. KINNEY:

11   Q.     Based on what B.R. and her family told you --

12   A.     -- Um-hmm --

13   Q.     -- were you ever aware of any threat to her safety?

14   A.     No.

15   Q.     Based on your experience of working with your colleagues

16   who are here in the courtroom, would any of them have stood idly

17   by while a child in their care was being harmed?

18          MS. ANDERSON:  Objection, Your Honor.

19          THE COURT:  Sustained.

20          MR. KINNEY:  That's all I've got, Your Honor.

21          THE COURT:  Mr. Blanchard.

22          MR. BLANCHARD:  Very briefly, Your Honor.

23                    CROSS-EXAMINATION OF S██████ T██████

24   BY MR. BLANCHARD:

25   Q.     Good afternoon, Ms. T█████.
```

1    **A.**    Good afternoon.

2    **Q.**    In your testimony, you mentioned when you called J.O.

3    in --

4    **A.**    Um-hmm.

5    **Q.**    -- on -- I think it was November 21st, correct?

6    **A.**    Yes.

7    **Q.**    Was that something that you gave her advance notice of,

8    or did you just find her and bring her in?

9    **A.**    I just found her and brought her in.

10   **Q.**    Okay.  So, you didn't tell her beforehand, I'm going to

11   need to talk to you about these things?

12   **A.**    No.

13   **Q.**    And her statement said that she explained what happened?

14   **A.**    Correct.

15   **Q.**    Did she explain that to you in --

16   **A.**    She did.

17   **Q.**    -- conversation?

18   **A.**    Yes.

19   **Q.**    And she said that she and B████ called each other?

20   **A.**    Correct.

21   **Q.**    And you made a comment that you asked for her phone?

22   **A.**    I did.

23   **Q.**    So, again, she comes into your office without advance

24   notice.  She's got her phone.  You told her you'd like to see

25   her phone.  Did she agree to let you see it?

1    **A.**    I don't know if she had it.  I might have had to send her

2    to get her phone out of her locker.  That was our policy, but

3    she did -- we did -- I did see it, and I think she did have her

4    phone, honestly, yes.

5    **Q.**    And you don't remember any delay of time in between --

6    **A.**    No.

7    **Q.**    -- she -- when she was asked and when she gave it to you?

8    **A.**    No.

9    **Q.**    And did she have to provide you her password?

10   **A.**    She put her password in.

11   **Q.**    Okay.

12   **A.**    And I sat there while she did that and watched her open

13   her page.

14   **Q.**    Okay.  And you found nothing on the Facebook page that

15   was attacking or insulting or offensive towards B.R.?

16   **A.**    I found nothing.

17         MR. BLANCHARD:  Thank you.

18         THE WITNESS:  Thank you.

19         THE COURT:  All right.  Ladies and gentlemen, that

20   concludes our work for today.

21         Tomorrow, when we come back, Ms. Anderson, I believe, will

22   have the opportunity to engage in a rehabilitative or redirect

23   examination.

24         Let me, once again, ask you to avoid print media and

25   social media to the extent you can.  Do not discuss the case or

1    any aspect of the case with anyone.

2          Tomorrow, we have our short day.  We'll start at 11:00.

3          Again, I wanted to remind you that the Court has certain

4    other matters on the docket.  I anticipate that they're going to

5    be relatively quick, but sometimes I can't control those things,

6    so we might run a little bit later, but the goal is to get you in

7    at 11:00 and out by 2:00.

8          Thank you, again.  It's still sort of slick out there, so

9    be careful.

10          (Jury out at 4:56 p.m.)

11          THE COURT:  You can step down, ma'am.

12          You all may be seated.

13          Ms. Anderson, how long do you expect on your redirect?

14          MS. ANDERSON:  Your Honor, since I'm doing redirect and

15    cross of what was done today, I think it looks like about 40,

16    45 minutes.

17          THE COURT:  Okay.  And who's your next witness?

18          MS. ANDERSON:  We might actually need to just step back

19    and think about that, based on the schedule, but it will either

20    be Dr. Cisler or Ms. R.

21          THE COURT:  Okay.  And I imagine Ms. R. would be the

22    longer of the two.

23          MS. ANDERSON:  Absolutely the longer of the two.

24          THE COURT:  Okay.

25          MS. ANDERSON:  And that's --

1        THE COURT:  Now, keep in mind she's already testified, so

2   we don't need to plow ground we've already plowed.

3        MS. ANDERSON:  We're absolutely not going over what we

4   already went over.  But if you recall, what we skipped was her

5   entire interaction period with the school.

6        THE COURT:  Sure.

7        MS. ANDERSON:  So it's going to be substantial.

8        THE COURT:  Okay.  And how about the other witness?

9        MS. ANDERSON:  Dr. Cisler.

10        MR. BRENNER:  So -- yeah, so Dr. Cisler, I think if we

11   had -- Mr. Keefe is putting him on, but my guess is if we had two

12   hours, we could get him on and off total, between direct and

13   cross, is my -- my guess.  I was actually hoping that could

14   happen tomorrow.

15        THE COURT:  Okay.  Let's put our heads together.

16        MR. BRENNER:  He's an out of town -- if I could just --

17   he's an out-of-town expert, Your Honor, so we have to get him off

18   by Thursday, so we're trying not to break up the mother's

19   testimony again.  So ideally we would get him started and off

20   before --

21        THE COURT:  So we would start with Dr. Cisler tomorrow?

22        MR. BRENNER:  I think that's probably what's going to make

23   sense.  I just want to make sure -- Mr. Keefe's nodding, but I

24   think that's probably what we're going to do.

25        THE COURT:  Okay, all right.  Very good.

```
1           MS. ANDERSON:  It is after the redirect.

2           THE COURT:  Sure, sure.

3           MR. ELLIKER:  Your Honor, to the -- to the extent of that,

4    I'm doing the -- the cross-examination of Dr. Cisler, and I don't

5    know how long the direct is accounted for, but I don't expect

6    it'll be more than 20 to 30 minutes.

7           THE COURT:  Okay.

8           MR. BRENNER:  I think -- if that's the case, I really

9    think we can get him on and off in two hours, maybe a little

10   less.

11          THE COURT:  Okay, All right.  Let that be our goal

12   tomorrow, and then maybe, I guess, it's even more efficient if we

13   start with Mrs. B.R. -- Mrs. R., I'm sorry, on Thursday.

14          MR. BRENNER:  I think that -- I think that's probably

15   going to make more sense.

16          THE COURT:  Okay, all right.  That makes sense.

17          MR. BRENNER:  We'll confer -- with Your Honor's

18   indulgence, we'll -- we'll talk it over, and we'll confirm with

19   Ms. Barry tonight and, of course, copy defense counsel.

20          THE COURT:  Very good.

21          Okay.  Thank you.  I think we're done for the day.

22          (Proceedings adjourned at 4:59 p.m.)

23

24

25
```

```
 1

 2

 3

 4                    C E R T I F I C A T E

 5

 6              I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
 7      proceedings in the above-entitled matter.

 8
        /s/ Scott L. Wallace                 4/2/24
 9      ---------------------------     ----------------
        Scott L. Wallace, RDR, CRR           Date
10        Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$50** [42] - 20:13; 36:9-11, 21, 23; 37:2; 49:25; 76:5, 7, 11; 82:3, 19, 24; 83:2; 105:15, 17, 23; 106:1, 3, 13, 17; 107:4, 6, 21, 25; 108:9, 19, 21, 24; 121:18, 22; 124:9, 24; 125:3, 9; 127:22; 128:6

## '

**'10-'11** [1] - 91:4
**'9-'10** [1] - 91:3
**'Hey** [2] - 24:6; 100:19

## /

**/s** [1] - 149:8

## 1

**1** [11] - 6:11; 23:13; 27:2; 55:3, 13; 67:4; 138:13, 25; 139:1
**10** [2] - 66:21; 71:12
**10,000** [1] - 74:4
**100** [3] - 2:3, 7, 11
**11** [3] - 1:7; 74:11
**11-21** [1] - 49:13
**110** [1] - 5:16
**117** [1] - 5:17
**119** [1] - 5:18
**11:00** [4] - 86:13, 20; 146:2, 7
**12** [5] - 26:11; 72:8; 74:10; 96:7
**12-year-old** [2] - 57:22; 58:1
**120** [1] - 3:7
**13** [2] - 74:11; 80:6
**13-year-olds** [1] - 74:10
**135** [4] - 5:17; 116:20; 117:8, 10
**14** [3] - 9:17; 57:17; 81:25
**141** [1] - 5:7
**143** [2] - 5:9; 71:12
**144** [1] - 71:12
**14th** [4] - 65:22; 80:15; 81:19; 83:6
**15** [2] - 83:25; 87:12
**1520** [1] - 1:21
**159** [1] - 56:4
**15th** [1] - 9:19
**16** [1] - 56:7
**1775** [1] - 3:10
**18** [3] - 9:14; 73:25; 74:18
**1801** [1] - 3:7
**18th** [1] - 67:7
**19th** [1] - 56:5
**1:19-cv-00917-RDA-WEF** [1] - 1:4

## 2

**2** [4] - 1:5; 6:1; 25:12; 44:8
**20** [4] - 75:11; 88:16; 148:6
**20037** [5] - 1:17; 2:15, 19, 22; 3:3
**2004** [1] - 88:16
**2009-'10** [1] - 90:25
**2010** [1] - 65:22
**2011** [18] - 10:18; 11:6; 12:21; 13:3; 15:3, 9; 49:12; 50:5, 7; 56:5, 7; 64:2, 9; 66:21; 67:7; 82:2, 7; 91:3
**2011-2012** [2] - 95:13; 135:4
**2011/2012** [1] - 137:7
**2012** [9] - 10:18; 11:6; 12:21; 13:3; 78:2; 79:21; 80:6; 81:19, 25
**2018** [1] - 6:8
**20190** [1] - 3:11
**20191** [1] - 3:8
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:19
**2023** [1] - 70:21
**2024** [3] - 1:5; 6:1; 57:17
**2029** [1] - 1:20
**20th** [2] - 9:16; 36:15
**21** [1] - 88:15
**213-995-5720** [1] - 1:22
**21st** [24] - 9:16; 15:18, 24; 16:13, 16-17, 23, 25; 17:1, 3, 9; 18:17; 20:15; 42:23; 49:18, 20; 96:13; 108:2, 7, 9; 121:8, 15; 125:12; 144:5
**22** [2] - 71:12; 137:11
**2200** [4] - 2:15, 18, 22; 3:3
**22314-5798** [1] - 3:15
**229** [4] - 5:15; 80:19; 81:14
**22nd** [8] - 16:25; 49:24; 75:23; 79:24; 80:3; 121:10; 122:9
**23** [2] - 137:10; 138:6
**230** [1] - 54:19
**2300** [1] - 1:16
**24** [1] - 139:18
**25th** [1] - 70:21
**279** [2] - 136:22; 137:2
**2800** [2] - 2:3, 7, 11
**2:00** [4] - 1:6; 6:2; 86:13; 146:7
**2:03** [1] - 7:15
**2nd** [3] - 2:3, 7, 11

## 3

**30** [1] - 148:6
**305-539-8400** [1] - 2:8
**327** [1] - 6:8
**33131** [3] - 2:4, 8, 12
**35** [1] - 85:10
**3:26** [1] - 83:24
**3:27** [1] - 84:3

**3:30** [1] - 86:8
**3:40** [3] - 83:25; 85:1
**3:42** [2] - 86:8
**3d** [1] - 6:8

## 4

**4** [2] - 55:3; 66:20
**4/2/24** [1] - 149:8
**40** [1] - 146:15
**400** [1] - 3:11
**401** [1] - 3:15
**443-584-6558** [1] - 3:16
**45** [1] - 146:16
**48** [1] - 5:13
**496-A** [1] - 41:12
**4:00** [3] - 135:9, 25
**4:56** [1] - 146:10
**4:59** [1] - 148:22

## 5

**50** [2] - 82:18; 135:17
**52** [4] - 5:13; 47:21; 48:19, 23
**529** [1] - 28:8
**59** [14] - 5:14; 54:6, 9, 11, 13, 19; 55:10; 56:2; 64:23; 65:13, 19
**5:00** [4] - 85:2; 86:14

## 6

**6** [3] - 55:3; 65:14, 19
**610-804-1787** [1] - 2:4
**611** [1] - 6:16
**632** [1] - 57:3
**643a** [1] - 1:17
**65** [4] - 5:14, 16; 110:14, 17

## 7

**77** [3] - 23:13, 25; 44:8
**78** [1] - 28:8
**7th** [2] - 129:1; 134:13

## 8

**8** [1] - 5:4
**804-788-8200** [1] - 3:4
**81** [2] - 5:15; 27:2
**8230** [2] - 54:17, 19
**83** [3] - 5:18; 119:13, 18
**850-585-3414** [1] - 2:12
**87** [1] - 5:6
**8th** [7] - 49:6, 23; 103:12; 114:8; 128:12; 129:12; 134:14

## 9

**90067** [1] - 1:21
**925** [1] - 6:8
**95** [1] - 85:22
**9th** [1] - 78:2

## A

**A.F** [1] - 3:6
**A.J** [3] - 44:13, 15; 112:13
**AAP** [3] - 89:22, 24; 90:7
**able** [19] - 22:22; 72:19; 73:1; 76:8;
86:19; 90:16; 95:6, 8; 116:15, 17;
120:2; 122:11; 123:11; 126:7; 128:4;
129:19; 137:14
**above-entitled** [1] - 149:7
**abrenner@bsfllp.com** [1] - 2:9
**absolutely** [11] - 9:7, 24; 14:21; 35:23;
51:15; 77:21; 89:13; 119:9; 128:9;
146:23; 147:3
**academics** [2] - 89:22, 25
**accept** [1] - 133:23
**access** [4] - 51:18; 52:8; 116:16
**accordingly** [1] - 72:7
**account** [4] - 52:12, 19; 64:7; 94:7
**accounted** [1] - 148:5
**accusations** [1] - 25:22
**accused** [7] - 63:16; 96:2; 104:4;
106:15; 108:23; 127:9; 142:20
**acknowledges** [1] - 37:16
**act** [7] - 59:11; 60:13; 61:4; 68:14;
69:11, 17, 22
**action** [1] - 6:14
**Action** [1] - 1:4
**actions** [2] - 56:21; 129:9
**activity** [1] - 16:18
**acts** [2] - 61:6, 17
**actual** [2] - 55:3; 114:7
**adding** [1] - 85:8
**addition** [2] - 121:21
**additional** [2] - 46:21; 114:24
**address** [2] - 14:8; 52:4
**adhered** [1] - 92:15
**adjourned** [1] - 148:22
**adjudication** [1] - 7:4
**adjust** [1] - 94:16
**admin** [1] - 14:19
**administer** [1] - 7:7
**administered** [1] - 6:13
**administration** [1] - 94:1
**administrative** [2] - 12:5; 92:11
**administrator** [3] - 91:6; 134:10
**administrators** [6] - 28:20; 92:19;
93:25; 120:18; 130:9; 136:2
**admissible** [1] - 65:10
**admit** [5] - 41:12; 48:19; 56:4; 64:22;
110:13

**admits** [2] - 26:18
**admitted** [27] - 5:13-18; 23:13; 27:2;
28:7; 35:11; 48:23; 55:5, 10, 14; 56:2;
64:19; 65:13; 81:15; 100:7; 110:17;
117:10; 119:14, 18; 122:14; 136:23, 25
**adults** [1] - 92:5
**advance** [2] - 144:7, 23
**advanced** [2] - 89:22, 25
**advisory** [1] - 56:7
**affected** [2] - 142:10, 17
**African** [1] - 89:14
**African-American** [1] - 89:14
**after-school** [13] - 134:25; 135:1, 11;
136:3, 9-10, 15, 19; 138:1, 9, 19, 24;
139:13
**afternoon** [8] - 8:13; 83:24; 87:3, 5;
122:6; 143:25; 144:1
**AFTERNOON** [1] - 6:1
**age** [1] - 47:24
**ago** [3] - 25:7; 26:11; 96:7
**agree** [8] - 25:2; 28:2; 50:24; 59:1;
73:14; 77:25; 82:16; 144:25
**agreed** [3] - 70:14; 71:25; 72:1
**agreement** [1] - 71:19
**ahead** [11] - 18:13; 26:25; 27:15; 28:6;
29:4; 54:5; 60:14; 81:14; 83:23; 91:9;
116:24
**AIA** [6] - 66:7, 9, 12-13; 103:18, 24
**aided** [1] - 3:18
**al** [1] - 1:6
**alanderson@bsfllp.com** [1] - 1:22
**Alexandria** [1] - 3:15
**align** [1] - 63:11
**Alison** [2] - 1:19; 8:15
**allegation** [4] - 53:7, 11; 56:23; 131:23
**allegations** [3] - 114:2; 115:2; 131:20
**alleged** [2] - 54:23; 120:3
**allegedly** [1] - 132:17
**alleging** [1] - 45:23
**allow** [2] - 40:25; 63:13
**allowance** [1] - 107:23
**allowed** [4] - 38:20; 127:6; 135:20
**allowing** [1] - 58:20
**almost** [1] - 85:12
**alphabet** [1] - 113:25
**ALSTON** [1] - 1:11
**alternative** [1] - 66:16
**American** [1] - 89:14
**amount** [1] - 7:23
**analysis** [1] - 59:15
**Anderson** [12] - 1:19; 8:15; 16:1;
41:16; 60:19; 95:23; 112:11; 115:6;
141:7; 145:21; 146:13
**ANDERSON** [135] - 5:5; 7:13; 8:9, 12,
23; 9:1, 3; 10:6, 8; 16:4, 7, 9; 22:5;
23:12, 15; 26:25; 27:4; 28:6, 11; 29:4,
6, 23; 30:1, 7, 10; 31:6; 32:14; 37:14;
40:23; 41:3, 6, 9, 23, 25; 42:15, 18;
44:7, 10-11; 47:18, 20; 48:12, 15, 19,

24; 49:3; 50:18, 23; 52:2, 10, 15, 18;
53:6, 14, 18; 54:5, 10, 12, 14, 20; 55:1,
6, 8, 11, 13; 56:12; 58:2, 6, 25; 59:23;
60:9, 25; 61:20; 62:2, 14, 17, 22, 25;
63:3, 5, 25; 64:15, 20, 22; 65:8, 12, 14,
17-18; 66:19; 69:3, 5; 71:8, 10; 76:16,
20-21; 77:11; 80:24; 81:2, 4, 9, 11, 13,
17-18; 83:19, 22; 110:15; 117:1, 4;
119:16; 129:24; 130:3, 7, 13; 132:22,
25; 133:6; 134:3; 136:25; 138:22;
142:7, 12; 143:18; 146:14, 18, 23, 25;
147:3, 7, 9; 148:1
**Anderson's** [1] - 88:14
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:14, 18, 21; 3:2
**Angeles** [1] - 1:21
**angry** [1] - 124:20
**annually** [1] - 10:16
**answer** [10] - 8:3; 21:21; 22:3, 9; 31:5;
35:3; 73:3; 75:5; 102:6; 142:13
**anticipate** [2] - 84:19; 146:4
**anticipated** [1] - 84:11
**anyway** [3] - 49:23; 91:25; 132:1
**AP** [1] - 89:6
**apologies** [1] - 77:24
**apologize** [2] - 93:14; 133:9
**appear** [3] - 47:23; 48:6; 122:18
**APPEARANCES** [3] - 1:13; 2:1; 3:1
**appreciate** [7] - 13:22; 16:5, 7; 22:9;
77:12, 20; 84:25
**approach** [4] - 41:13, 23; 54:16; 55:19
**approached** [3] - 111:13, 18, 21
**appropriate** [2] - 58:23; 61:5
**appropriately** [1] - 60:16
**APRIL** [1] - 6:1
**April** [1] - 1:5
**area** [16] - 45:12; 94:24; 95:3; 96:23;
98:6, 9-10; 111:20; 112:15; 113:7;
114:3, 21; 129:17, 19
**areas** [1] - 95:8
**arguably** [1] - 62:8
**argue** [1] - 60:1
**arguing** [1] - 59:7
**argument** [2] - 55:23; 60:23
**army** [1] - 91:25
**arrangement** [1] - 66:16
**arrived** [1] - 91:1
**aspect** [3] - 7:18; 84:1; 146:1
**assault** [1] - 10:15
**assault-related** [1] - 10:15
**assaulted** [7] - 98:19, 22; 99:3;
120:21; 140:7, 11, 15
**assigned** [2] - 25:24; 94:5
**assistant** [19] - 9:14, 18, 22; 10:19;
12:9, 16; 14:14; 20:8; 25:23; 59:9;
70:14; 71:17; 74:3; 87:9; 88:13, 17;
92:14; 93:23
**Assistant** [1] - 56:6
**assumes** [1] - 53:16
**attacking** [1] - 145:15

**attend** [1] - 52:8
**attorneys** [1] - 45:1
**attuned** [1] - 58:12
**August** [5] - 80:6, 15; 81:19, 25; 83:6
**available** [1] - 116:11
**Ave** [1] - 2:22
**Avenue** [4] - 2:15, 18; 3:3, 10
**avoid** [2] - 6:19; 145:24
**await** [1] - 99:7
**aware** [28] - 15:14; 37:17; 40:15, 18; 51:20; 53:7, 13, 22; 54:1, 4; 60:10; 62:11, 23, 25; 64:1, 3-4; 70:11, 17; 78:2; 80:2, 5, 7, 10, 14; 107:24; 134:17; 143:13

## B

**B.H** [1] - 3:6
**B.R** [44] - 1:3; 91:1; 95:21, 23; 96:10, 12, 25; 97:4; 98:3; 103:11; 105:13, 16; 106:3, 12; 107:4; 108:5, 12, 15, 22; 114:2; 115:4, 7; 121:13, 19; 122:22; 123:9, 15; 124:20, 25; 126:13; 127:9; 130:25; 131:10, 12, 16, 22; 133:19; 140:6, 9; 141:7; 143:11; 145:15; 148:13
**B.R.'s** [16] - 100:5; 108:14; 110:1; 111:22; 112:13; 116:9; 118:20, 23; 119:23; 120:2, 19; 122:19; 125:14; 129:10; 132:2; 140:14
**bachelor** [1] - 87:19
**background** [2] - 87:14, 18
**bad** [3] - 61:4, 6, 16
**bail** [2] - 132:7, 12
**bailed** [1] - 132:14
**balance** [1] - 59:19
**balanced** [1] - 63:22
**B████** [1] - 94:9
**ballpark** [4] - 114:19; 135:14; 139:15
**BARAN** [1] - 1:15
**Barry** [1] - 148:19
**based** [11] - 28:23; 35:7; 51:6; 65:9; 72:19; 120:1; 143:1, 11, 15; 146:19
**basement** [19] - 16:18; 17:22; 19:12, 18-19, 25; 20:14; 77:3; 102:22; 115:8, 17, 22; 116:2; 118:19, 24; 124:12; 141:8, 11
**basing** [1] - 51:5
**bates** [1] - 86:22
**Bates** [14] - 2:14; 21:22; 48:17; 54:17, 19; 57:20; 60:14; 80:21; 84:7; 86:16; 87:3; 117:6; 137:12; 139:21
**BATES** [63] - 5:6; 40:22; 41:14, 22; 48:21; 50:14; 55:19; 57:21; 60:15; 61:4; 64:17; 80:22; 81:6; 84:8, 22, 24; 85:4, 17, 20; 86:2, 4, 23; 87:2; 89:18; 100:6, 9; 110:13, 18, 20; 112:9; 116:23; 117:7, 11; 118:16; 119:14, 19, 21; 121:2; 127:17; 130:2, 20-21; 132:23; 133:2, 8, 11; 134:5; 136:22; 137:2, 4-5, 10, 15;

138:4, 7; 139:6, 22, 24; 140:1, 7
**bathrooms** [2] - 95:7
**Beach** [1] - 88:8
**became** [1] - 124:19
**BEFORE** [1] - 1:11
**beforehand** [2] - 78:6; 144:10
**beginning** [4] - 31:12; 57:15; 63:9; 73:17
**begun** [1] - 15:2
**behave** [2] - 72:7; 133:17
**behavior** [6] - 56:9, 17; 58:8; 59:8; 67:1; 72:6
**behind** [1] - 139:8
**B████** [81] - 8:15; 15:2, 7, 10, 22, 24; 16:14, 16-17, 22, 24; 17:12, 21; 18:14, 20; 20:15, 19; 21:3, 5; 22:13, 16; 24:6; 26:15, 19; 27:13; 32:18; 34:13, 23; 36:15; 37:18; 40:6, 15; 42:6, 23; 43:21; 44:12; 46:13; 49:16; 53:8; 60:18; 61:2; 62:3; 73:10; 75:22; 76:12, 22; 77:4; 78:6, 12, 19; 79:6, 13, 15, 22, 24; 80:10; 82:1; 98:18, 21; 99:2, 24; 100:19, 23; 101:15, 20; 102:24; 103:5; 107:5; 110:7; 111:13, 18; 118:18; 124:4, 8, 11; 128:11, 25; 134:18; 144:19
**B████** [14] - 28:23; 36:25; 37:9; 38:23; 39:15; 43:14; 46:19, 22; 67:11; 72:11, 17; 78:2; 80:5; 105:23
**B████** [3] - 110:25; 112:1; 120:9
**Berkley** [1] - 88:9
**best** [7] - 7:24; 8:3; 21:21; 22:3; 43:17; 99:9; 110:6
**better** [2] - 10:3; 18:6
**between** [13] - 56:25; 85:21; 94:2, 19; 102:22; 105:13; 111:9; 122:24; 126:9, 13; 128:24; 145:5; 147:12
**big** [4] - 16:19; 19:12, 21; 116:1
**bigger** [1] - 49:4
**binder** [3] - 47:21; 54:7; 80:20
**bit** [8] - 15:17; 37:6; 44:2; 49:4; 58:11; 89:2; 96:5; 146:6
**bitch** [5] - 26:22; 35:12; 102:5, 9; 122:14
**BLANCHARD** [17] - 5:9; 32:8, 13; 51:22, 24; 53:11, 16; 61:7, 24; 62:4; 65:1, 4; 85:6, 14; 143:22, 24; 145:17
**Blanchard** [2] - 3:9; 143:21
**blocked** [1] - 97:23
**blurted** [1] - 124:11
**board** [8] - 89:15; 105:12; 106:3, 5-7; 107:9
**Board** [10] - 9:9, 23; 10:10; 12:18; 58:22; 59:13; 85:21; 87:4; 104:24; 134:17
**body** [6] - 16:15; 17:25; 18:23; 38:18; 39:7; 140:10
**BOIES** [1] - 1:20; 2:2, 6, 10
**book** [7] - 73:13, 16, 21; 110:14; 116:19; 117:12; 119:12

**bothered** [3] - 76:9; 113:6; 143:5
**bothering** [3] - 122:12; 127:20; 128:1
**bottom** [15] - 20:24; 25:6; 29:8, 17; 31:21; 33:5; 34:19; 48:9-11, 16, 25; 81:21; 100:1
**bound** [1] - 61:16
**box** [1] - 68:12
**boy** [7] - 58:1; 76:23; 77:9; 106:15; 115:22
**boy's** [1] - 131:23
**boy-girl** [4] - 76:23; 77:9
**boyfriend** [1] - 123:2
**boys** [5] - 15:22; 16:15; 74:12; 108:23; 114:9
**brat** [1] - 91:24
**break** [8] - 83:24; 84:5; 116:21, 25; 117:2, 4-5; 147:18
**breakfast** [1] - 94:18
**breaking** [1] - 117:1
**B████** [1] - 21:6
**BRENNER** [7] - 85:15; 147:10, 16, 22; 148:8, 14, 17
**Brenner** [3] - 2:6; 85:10, 16
**Brief** [4] - 8:24; 16:3; 30:23; 83:21
**brief** [1] - 117:5
**briefly** [2] - 111:13; 143:22
**bring** [2] - 121:23; 144:8
**bringing** [2] - 60:7; 107:3
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**broad** [2] - 6:10, 22
**broke** [2] - 33:6; 34:5
**broken** [1] - 102:17
**Bromberg** [1] - 136:16
**brought** [8] - 21:9; 76:7; 90:13; 107:5; 125:10; 127:12; 144:9
**Brown** [1] - 69:3
**brown** [1] - 47:19
**brown's** [1] - 34:11
**Bruce** [1] - 3:9
**bruce.blanchard@ofplaw.com** [1] - 3:9
**building** [9] - 93:1, 4-5; 94:13; 135:6; 136:3; 139:7, 13
**bullies** [2] - 25:14
**bullying** [1] - 120:9
**bump** [1] - 103:13
**bunch** [1] - 35:4
**Burton** [1] - 2:21
**burtons@huntonak.com** [1] - 2:23
**bus** [6] - 56:8, 11; 57:23; 67:1; 94:5; 134:13
**buses** [3] - 94:3, 6
**button** [1] - 93:17
**buy** [1] - 125:1
**buzz** [2] - 92:25; 93:1
**buzzer** [1] - 93:3
**BY** [63] - 5:5, 8-9; 8:12; 9:3; 10:8; 16:9; 22:5; 23:15; 27:5; 28:11; 29:6; 30:1, 10;

31:6; 32:14; 37:15; 41:25; 42:18; 44:11;
47:20; 48:15, 24; 49:3; 50:23; 52:18;
53:6, 18; 63:25; 65:18; 66:19; 69:5;
71:10; 76:21; 77:11; 81:11, 18; 87:2;
89:18; 100:9; 110:20; 112:10; 117:11;
118:17; 119:21; 121:3; 130:21; 132:23;
133:2, 11; 134:5; 137:5, 15; 138:7;
139:6; 140:1; 141:2; 142:9, 16, 25;
143:10, 24

# C

**C.K** [80] - 24:5, 9, 12-13; 25:16, 25;
27:21; 29:8, 17; 30:3, 25; 31:19; 32:5,
15, 17; 33:5, 25; 34:4, 22; 35:18; 36:21;
39:20, 24; 40:2, 5; 41:4; 42:5; 53:19;
54:2, 24; 56:12; 57:3, 6-7, 11; 58:3, 17;
59:5, 13, 24; 60:3, 16, 21; 61:10, 12,
16; 62:12, 19, 23; 64:2; 65:23; 68:6;
69:6; 76:11; 79:15; 97:11; 103:5, 18;
105:4, 7, 16; 106:3, 13, 15; 107:6;
109:8; 112:6; 113:24; 121:19; 122:22;
126:13; 132:6, 10, 14, 18; 133:12
**C.K.'s** [13] - 27:16; 28:16; 34:19;
39:11, 20; 76:6; 77:7; 121:22; 122:19;
125:10; 126:5; 127:18
**CA** [1] - 1:21
**cafeteria** [3] - 78:6; 94:11, 17
**camera** [1] - 93:2
**cannot** [3] - 63:13; 104:20
**care** [5] - 6:17; 86:19; 119:6; 142:21;
143:17
**career** [3] - 74:9, 23; 75:1
**careful** [3] - 62:14; 64:12; 146:9
**Carlson** [1] - 58:9
**Carolina** [1] - 88:9
**Carson** [35] - 9:18; 10:19; 11:7; 12:21;
13:4; 14:15; 56:15; 65:23; 74:16; 75:13,
19; 87:6; 88:18, 23-24; 89:6, 10, 19, 22;
90:6, 8, 10, 13-14, 17, 21, 24; 104:23;
120:10; 135:1; 137:6; 139:11; 141:25
**case** [36] - 6:5, 7; 7:18; 10:22; 11:1;
13:8; 15:2; 41:2; 56:13; 57:16; 58:4,
11-12; 59:4; 60:3, 6, 8, 16; 61:1; 62:3,
9, 21; 63:9; 71:19; 84:1, 21; 123:18;
131:21; 142:4; 145:25; 146:1; 148:8
**case-in-chief** [1] - 84:21
**cases** [2] - 6:23; 75:10
**caught** [1] - 7:6
**cautionary** [1] - 52:16
**Cell** [1] - 3:16
**center** [2] - 89:22, 24
**Century** [1] - 1:20
**certain** [5] - 57:5, 13; 92:2; 128:5;
146:3
**certainly** [1] - 51:9
**certify** [1] - 149:6
**chair** [2] - 117:16, 23
**chance** [2] - 42:3; 123:19

**change** [1] - 36:3
**changed** [3] - 128:18, 22; 129:21
**changes** [1] - 64:25
**changing** [3] - 36:5; 128:23; 129:12
**charge** [4] - 11:9; 25:21; 136:10
**check** [3] - 93:6, 13; 129:23
**check-ins** [1] - 129:23
**checks** [1] - 72:25
**chief** [1] - 84:21
**child** [3] - 134:12; 142:21; 143:17
**children** [1] - 90:13
**chorus** [1] - 129:18
**C███████** [7] - 36:11, 16; 77:4; 102:24;
103:5; 112:1; 126:1
**Christmas** [1] - 125:2
**chronologically** [2] - 96:8; 121:4
**circle** [2] - 113:19; 137:23
**circled** [1] - 46:1
**circuit** [1] - 6:21
**circumstance** [1] - 53:1
**circumstances** [2] - 8:8; 56:18
**Cisler** [5] - 146:20; 147:9, 21; 148:4
**cite** [1] - 58:19
**Civil** [4] - 1:4; 6:11; 40:17
**civil** [2] - 6:23; 58:11
**claim** [1] - 133:23
**clarification** [1] - 51:23
**class** [17] - 67:23; 68:1, 3, 9; 69:18,
22; 94:16; 95:10; 103:14; 104:11;
105:9; 108:18; 113:16; 128:25; 129:6;
133:17
**classes** [5] - 49:17; 94:2, 20; 128:12,
15
**classroom** [4] - 66:3; 95:2, 18; 96:23
**cleaned** [1] - 21:25
**clear** [6] - 12:4; 85:17, 25; 108:11;
124:1; 140:4
**cleared** [2] - 12:2; 21:25
**clerk** [1] - 7:25; 63:16, 20
**client** [4] - 61:13, 16; 65:6; 85:24
**clients** [1] - 85:24
**clock** [1] - 81:9
**close** [3] - 24:6; 81:3; 100:18
**closed** [1] - 93:6
**closer** [4] - 10:1; 56:20; 84:12; 111:20
**closest** [2] - 129:5, 18
**club** [1] - 135:9
**clubs** [4] - 135:11, 15; 136:18; 138:1
**co** [1] - 74:8
**co-ed** [1] - 74:8
**Code** [1] - 91:11
**coincide** [1] - 63:11
**colleagues** [1] - 143:15
**comfortable** [2] - 104:11; 123:16
**coming** [14] - 33:2; 34:4; 39:12, 19;
74:16; 77:14; 88:18; 94:7, 15; 105:14;
122:5, 19; 123:16; 129:11
**comings** [1] - 95:9
**comment** [2] - 118:18; 144:21

**commits** [1] - 50:12
**communication** [1] - 87:19
**compare** [2] - 88:22; 122:17
**complain** [1] - 131:12
**complaining** [1] - 118:8
**complains** [1] - 46:14
**complaint** [9] - 40:16, 20; 42:23;
67:11; 72:3; 73:4, 6; 74:14; 133:20
**complaints** [5] - 12:22; 13:5; 72:11,
17; 134:6
**complete** [1] - 35:25
**completely** [3] - 24:24; 30:17; 36:7
**Compliance** [3] - 72:4; 73:8; 134:19
**compliance** [7] - 12:23; 13:6, 12, 16,
19, 22
**computer** [1] - 3:18
**computer-aided** [1] - 3:18
**concern** [1] - 20:23
**concerns** [1] - 14:20
**concession** [1] - 65:10
**concise** [2] - 8:20; 9:4
**concluded** [2] - 63:7; 129:10
**concludes** [1] - 145:20
**conducted** [2] - 11:24; 121:7
**confer** [1] - 148:17
**conference** [3] - 98:6, 10
**confided** [1] - 111:1
**confines** [1] - 7:24
**confirm** [3] - 99:23; 126:12; 148:18
**confirming** [1] - 61:21
**confirms** [1] - 27:12
**confused** [2] - 13:21; 102:1
**conjunction** [2] - 95:11; 134:9
**connection** [1] - 56:22
**consequence** [2] - 68:10; 91:15
**consequences** [2] - 72:5; 114:16
**consider** [2] - 63:12; 126:22
**consideration** [2] - 59:12; 63:13
**considered** [2] - 11:24; 121:7
**consisted** [2] - 16:19, 24
**consistent** [8] - 7:2; 12:16; 28:3;
111:8, 17; 112:5; 113:21
**C████** [4] - 78:17, 20, 24; 79:11
**construed** [1] - 6:12
**consultation** [1] - 57:14
**consumer** [1] - 128:14
**Cont** [2] - 2:1; 3:1
**contact** [2] - 116:6
**contacted** [1] - 121:15
**context** [2] - 7:5; 58:11
**continue** [6] - 91:20; 103:19; 105:9;
123:4
**continued** [2] - 17:21; 99:25; 141:11
**continues** [2] - 7:8; 62:2; 111:12
**continuing** [5] - 56:17; 59:8, 11;
60:13; 111:25
**control** [2] - 6:23; 146:5
**conversation** [44] - 16:11, 13; 17:1, 7;
18:14, 19; 19:20; 20:25; 21:6, 9-11;

22:13, 16; 26:19; 27:6, 12; 33:14;
37:16; 64:24; 76:4; 77:15; 82:1; 92:5;
97:7; 98:2; 101:20, 22; 103:3; 105:13;
108:5, 24-25; 122:11; 124:7, 15, 17;
127:19; 141:13, 24; 144:17
  **conversations** [4] - 16:24; 85:22;
124:5; 127:8
  **copies** [1] - 23:21
  **copy** [6] - 39:15, 20; 65:20; 71:5;
121:23; 148:19
  **corner** [1] - 48:16
  **correct** [169] - 8:17; 10:22; 11:1, 8, 10;
13:17; 14:1; 15:3; 18:1; 21:20, 23;
22:14, 17, 20; 23:9; 24:3, 7, 10, 16, 21;
25:3, 11, 16-17, 19; 26:7, 16-17; 27:8,
18, 24; 28:14-16; 29:14, 21; 31:10;
33:14, 23-24; 34:2, 8, 17, 20-21; 36:9,
22, 25; 38:19, 25; 39:12, 16, 23; 40:6,
17, 20; 42:22, 24; 43:4, 9-10, 12-13, 22;
44:13, 16; 46:4, 8, 14, 16, 20; 49:14;
50:13; 51:1, 18, 21; 53:20, 23; 55:9, 11,
13; 60:24; 66:21; 67:1, 9-10, 12-14, 22;
68:1, 19, 25; 69:6, 9, 20; 70:2, 6, 15,
21; 72:4, 12, 17; 73:4, 8, 11, 19, 23;
74:12, 15, 22, 25; 76:1, 12, 23; 78:3, 7,
12; 79:3, 6, 23; 80:6, 16; 81:19; 82:2,
17; 83:6, 9, 11, 13, 16; 89:13; 95:19,
25; 96:4; 97:9; 99:13; 108:13, 16, 20;
109:6, 9-10, 12-13, 15, 18; 122:23;
132:3; 135:4; 138:17; 141:9; 144:5, 14,
20; 149:6
  **corrected** [1] - 57:19
  **correction** [2] - 44:25; 45:2
  **correctly** [4] - 111:3, 15; 112:3; 118:12
  **corroborate** [4] - 38:23; 39:5; 123:17;
124:5
  **corroborating** [2] - 33:25; 34:22
  **counsel** [13] - 7:8; 8:2; 21:18; 51:25;
53:12; 57:13; 76:15; 77:13; 84:14;
100:15; 148:19
  **counselor** [1] - 129:16
  **counselors** [1] - 14:23
  **county** [1] - 90:14
  **County** [8] - 9:9, 23; 12:17; 57:9;
70:19; 87:4; 88:4; 99:5
  **couple** [3] - 78:6; 95:23; 114:22
  **course** [5] - 16:7; 35:21; 103:22;
148:19
  **Court** [16] - 3:13; 6:10, 13, 17; 7:3; 8:3;
57:15, 17; 58:15; 65:4; 146:3; 149:10
  **Court's** [3] - 7:9, 17; 65:5
  **Courthouse** [1] - 3:15
  **courtroom** [7] - 10:21; 28:18; 50:9, 16,
18-19; 143:16
  **courts** [3] - 6:21
  **cover** [1] - 6:6
  **covered** [2] - 84:13; 125:8
  **crate** [1] - 116:13
  **crime** [1] - 99:6
  **criminal** [1] - 58:12

  **cross** [7] - 21:24; 60:1; 129:4, 7;
146:15; 147:13; 148:4
  **CROSS** [6] - 5:6, 9; 87:1; 141:1;
143:23
  **cross-examination** [2] - 21:24; 148:4
  **CROSS-EXAMINATION** [6] - 5:6, 9;
87:1; 141:1; 143:23
  **cross/direct** [2] - 84:10, 18
  **crossover** [1] - 84:10
  **crowd** [1] - 45:19
  **crowding** [3] - 45:18; 112:22; 114:9
  **CRR** [3] - 3:13; 149:6, 9
  **current** [1] - 51:5
  **cut** [2] - 7:10; 101:21

# D

  **D.N** [33] - 24:5, 12-13, 23; 25:16; 26:2;
27:16, 21; 29:7, 10-11; 30:2; 32:2, 6,
15, 17; 33:1, 17, 22; 34:3, 12, 14;
36:14; 39:12; 102:14, 22; 103:18;
105:4, 7; 109:11; 112:6; 113:24
  **D.N.'s** [1] - 28:13
  **dad** [3] - 91:24; 107:20
  **dance** [1] - 137:17
  **dare** [1] - 125:4
  **Date** [1] - 149:9
  **date** [12] - 19:7; 49:10; 50:4, 6; 65:21;
67:6; 70:23; 82:12; 83:5
  **dated** [3] - 56:7; 81:19; 103:5
  **dating** [3] - 77:4; 102:17, 24
  **daughter** [5] - 119:4; 120:9; 124:15;
125:4, 6
  **David** [22] - 16:18; 17:23; 19:1; 20:14;
29:20; 36:10; 37:16, 19; 39:22; 77:4;
101:25; 103:6; 105:11, 14; 109:6;
111:2, 12; 112:1; 124:12; 126:1; 141:8
  **David's** [2] - 39:23; 40:1
  **days** [4] - 78:6; 95:24; 131:8; 135:20
  **DC** [5] - 1:17; 2:15, 19, 22; 3:3
  **deal** [8] - 16:19; 19:13, 22; 40:25; 52:5;
78:8; 116:1; 124:9
  **dealing** [1] - 72:7
  **December** [1] - 65:22
  **decide** [5] - 41:1; 56:11, 18; 58:21;
104:9
  **decided** [6] - 20:5; 49:25; 69:8, 10, 19;
72:11
  **deciding** [1] - 62:20
  **decision** [8] - 12:2, 4; 13:11, 13; 57:1;
63:1; 64:8; 73:14
  **decision-making** [2] - 63:1; 64:8
  **decisions** [4] - 50:25; 51:5; 60:11
  **deemed** [1] - 63:19
  **Defendant** [5] - 2:14; 3:2, 9; 57:6, 9
  **defendant** [4] - 57:3; 59:3, 5, 14
  **Defendants** [2] - 1:8; 3:5
  **defendants** [5] - 60:5, 7; 61:8; 63:10;
85:21

  **Defendants'** [15] - 5:15-18; 80:19;
81:14; 110:13, 17; 116:19; 117:8, 10;
119:13, 18; 136:22
  **defense** [1] - 148:19
  **define** [1] - 51:8
  **degree** [1] - 87:19
  **degrees** [1] - 87:18
  **delay** [1] - 145:5
  **deliberately** [2] - 60:18, 22
  **demographic** [1] - 89:8
  **demographics** [1] - 88:25
  **denied** [5] - 57:4, 10; 58:17; 67:16;
69:6
  **denies** [3] - 29:13; 32:3; 34:16
  **department** [2] - 117:16, 24
  **Department** [4] - 40:16, 19; 41:1, 8
  **depicted** [1] - 139:2
  **deposed** [1] - 70:21
  **deposition** [6] - 44:19, 25; 46:12; 71:2,
11
  **deputy** [4] - 7:25; 63:16, 20
  **describe** [8] - 11:16, 18, 20; 69:12;
83:15; 91:6; 92:11
  **described** [3] - 11:12, 14; 89:7
  **describing** [1] - 116:5
  **description** [2] - 68:11
  **DESCRIPTION** [1] - 5:12
  **desk** [1] - 127:7
  **despite** [1] - 133:13
  **detention** [3] - 66:5, 11
  **determination** [4] - 6:14; 35:19, 24;
130:5
  **determinations** [1] - 52:12
  **determine** [5] - 51:3; 72:19; 123:8;
127:25; 128:4
  **determined** [5] - 70:1, 3; 72:16; 74:21;
76:23
  **determining** [1] - 6:19
  **devoted** [1] - 14:19
  **difference** [1] - 62:10
  **differences** [2] - 89:4
  **different** [4] - 56:23; 89:2, 20; 94:11
  **DIRECT** [2] - 5:4; 8:11
  **direct** [9] - 60:1; 84:9; 109:19; 115:13;
126:8; 129:19; 139:1; 147:12; 148:5
  **directed** [1] - 130:17
  **directing** [1] - 32:18
  **directions** [1] - 12:18
  **directly** [7] - 16:14; 33:9; 35:10; 58:21;
59:21; 99:4; 131:12
  **disagree** [1] - 62:2
  **disciplinary** [20] - 50:11, 25; 51:18;
54:24; 57:6, 8, 10; 58:7; 60:21; 61:12,
19, 23; 62:12, 18-19, 23; 64:1, 5
  **discipline** [24] - 12:3, 5-6; 51:4, 13;
52:11, 20-21; 53:1, 23; 54:1; 56:14;
59:25; 60:9, 11; 64:10; 66:1; 68:12, 17;
91:21; 126:15, 23; 133:3, 12
  **disciplined** [6] - 51:20; 60:16; 61:1;

66:21; 91:14; 132:20
**disciplines** [2] - 55:3; 59:9
**disclosed** [2] - 16:17; 110:1
**discretion** [2] - 6:10, 22
**discuss** [8] - 7:18; 12:6; 14:17, 22; 71:14, 16; 84:1; 145:25
**discussed** [3] - 72:19; 98:14; 120:15
**discussion** [5] - 8:4; 55:22; 63:7; 70:13, 16
**discussions** [2] - 125:20; 126:1
**disorders** [1] - 87:20
**disregard** [1] - 31:14
**disregarded** [1] - 31:11
**disrupt** [1] - 68:9
**disrupted** [1] - 66:3
**disrupting** [1] - 69:22
**disruption** [1] - 133:16
**disruptive** [1] - 66:25
**dissipated** [1] - 124:2
**distinction** [1] - 56:25
**District** [2] - 3:14
**DISTRICT** [3] - 1:1, 12
**district** [1] - 6:22
**districts** [1] - 88:5
**diverse** [1] - 89:2
**diversity** [2] - 89:1
**diversity-wise** [1] - 89:1
**division** [2] - 104:24
**division-wide** [2] - 104:24
**Docket** [1] - 57:3
**docket** [2] - 86:18; 146:4
**document** [10] - 24:16, 20; 29:20; 32:9; 41:19; 42:13, 25; 73:20; 110:22; 119:25
**done** [16] - 42:25; 51:9; 69:6, 18, 20; 73:25; 74:25; 85:12; 99:2; 102:15; 121:12, 24; 126:16; 130:11; 146:15; 148:21
**door** [6] - 92:25; 93:19; 98:7; 138:20; 139:8
**doors** [5] - 93:3, 6, 10; 94:21; 139:1
**down** [41] - 15:23; 16:15, 19, 22; 17:25; 18:23; 19:13, 18, 22; 37:14; 38:18; 39:7; 44:22; 46:5; 47:19; 69:3; 84:4; 85:11, 14; 95:15; 96:15, 18, 20; 112:9, 15; 113:17; 114:9, 11, 14; 116:2; 118:16; 121:2; 128:13, 18, 20; 142:18; 146:11
**downstairs** [7] - 23:5; 45:12; 96:24; 99:4, 16; 111:19; 128:14
**Dr** [6] - 28:19; 86:17; 146:20; 147:10, 21; 148:4
**dr** [1] - 147:9
**draft** [1] - 57:13
**Dress** [1] - 91:11
**Drive** [1] - 3:7
**during** [17] - 10:19; 11:6; 14:14; 71:1; 75:17; 93:13; 95:13; 98:19; 103:21; 108:24; 127:24; 129:20; 132:2; 136:3; 138:24; 139:11, 13

**duties** [4] - 94:5, 9, 16
**duty** [4] - 94:5, 14, 18

# E

**e-mail** [12] - 49:25; 61:20; 62:5; 118:1, 12; 119:22; 120:1, 5, 20, 23
**e-mailing** [1] - 117:15
**easier** [3] - 23:23; 49:1; 117:13
**easily** [2] - 115:3, 5
**East** [1] - 1:20
**Eastern** [1] - 3:14
**EASTERN** [1] - 1:1
**easy** [2] - 56:10; 63:20
**ec** [1] - 128:13
**ed** [1] - 74:8
**education** [4] - 87:23, 25; 88:3; 117:23
**Education** [4] - 40:16, 19; 41:2, 8
**educational** [2] - 87:17, 21
**effect** [3] - 59:17, 19, 23
**effective** [1] - 6:19
**efficiency** [1] - 84:16
**efficient** [2] - 84:15; 148:12
**either** [8] - 31:12; 49:4; 74:21; 75:1; 76:3; 103:5; 117:12; 146:19
**elders** [1] - 92:4
**elected** [1] - 60:6
**elective** [1] - 128:17
**electives** [1] - 128:13
**element** [1] - 59:18
**Elliker** [1] - 3:2
**ELLIKER** [1] - 148:3
**elsewhere** [1] - 92:6
**Email** [12] - 1:18, 22; 2:5, 9, 13, 16, 20, 23; 3:4, 8, 12, 16
**embarrassment** [1] - 6:21
**embrace** [1] - 91:11
**employed** [2] - 6:13; 87:6
**encompass** [2] - 10:11; 32:22
**encompassed** [1] - 35:22
**encounter** [2] - 116:16; 128:20
**encountering** [1] - 120:10
**encourage** [1] - 34:13
**encouraging** [2] - 84:14
**end** [7] - 31:12; 77:19; 120:10, 13, 16; 124:21; 140:4
**ended** [3] - 97:25; 106:12; 122:5
**engage** [2] - 134:14; 145:22
**engaged** [2] - 16:18; 57:24
**engages** [1] - 134:12
**engaging** [1] - 57:23
**enraged** [1] - 124:19
**ensure** [2] - 129:10
**enter** [5] - 93:15; 138:20, 25; 139:7, 13
**entering** [1] - 92:24
**entire** [9] - 20:25; 55:2, 6-7, 14; 64:18; 66:14; 80:11; 147:5
**entitled** [1] - 149:7
**entrance** [2] - 94:11; 139:2

**Entrance** [4] - 138:13, 25; 139:1
**entrances** [1] - 138:23
**equity** [3] - 13:19, 22
**Equity** [5] - 70:7; 72:4; 73:8; 134:19
**escalate** [2] - 56:17; 59:8
**escalated** [1] - 25:8
**escalating** [5] - 51:12; 56:14; 58:7, 9; 60:11
**especially** [1] - 59:25
**Esq** [11] - 1:15, 19; 2:2, 6, 10, 14, 17, 21; 3:2, 5, 9
**essentially** [2] - 95:17; 104:4
**establish** [1] - 57:9
**estimate** [1] - 135:14
**estimated** [1] - 84:8
**estimations** [1] - 7:1
**et** [1] - 1:6
**ethics** [5] - 12:23; 13:6, 12, 16, 18
**ethnicities** [1] - 89:11
**evaluate** [1] - 59:16
**event** [1] - 73:14
**events** [1] - 51:1
**eventually** [1] - 109:17
**Evidence** [1] - 6:16
**evidence** [16] - 6:18; 47:19; 53:16; 54:6; 57:13; 58:3, 13, 20; 59:1, 20; 60:7; 61:11, 18; 63:12, 23; 80:18
**exact** [1] - 16:25
**exactly** [4] - 27:25; 50:7; 103:22; 114:18
**EXAMINATION** [8] - 5:4, 6-7, 9; 8:11; 87:1; 141:1; 143:23
**examination** [7] - 21:24; 84:7, 19; 85:3; 86:16; 145:23; 148:4
**EXAMINATIONS** [1] - 5:3
**examine** [1] - 32:11
**examined** [1] - 7:23
**examining** [1] - 6:18
**example** [2] - 63:15, 20
**excellent** [2] - 11:18; 92:19
**except** [3] - 57:7; 121:9; 128:13
**exception** [1] - 58:19
**excuse** [1] - 86:17
**exercise** [1] - 6:17
**Exhibit** [32] - 5:13-18; 23:13; 27:2; 28:8; 41:12; 47:21; 48:19, 23; 54:6, 19; 56:2; 64:23; 65:13, 19; 80:19; 81:14; 110:14, 17; 116:20; 117:10; 119:13, 18; 136:22
**exhibit** [9] - 54:15; 55:2, 6-7, 15; 56:1, 21; 64:19; 117:2
**EXHIBITS** [1] - 5:11
**exists** [1] - 79:11
**expect** [3] - 72:6; 146:13; 148:5
**expected** [3] - 27:25; 72:6; 92:14
**experience** [3] - 88:23; 134:13; 143:15
**experiencing** [1] - 15:8
**expert** [1] - 147:17
**explain** [7] - 37:5; 101:14; 103:11;

104:17; 109:3; 113:3; 144:15
**explained** [13] - 26:15; 29:10; 45:21; 76:25; 102:16, 18; 121:18; 122:10; 123:6; 124:14; 128:5; 144:13
**explaining** [1] - 16:15
**explicit** [2] - 29:1; 83:13
**Explorer's** [1] - 111:22
**exposed** [1] - 67:21
**exposing** [4] - 56:24; 57:11; 58:24; 132:17
**extent** [8] - 57:7; 96:7; 121:4; 127:15, 17; 145:25; 148:3
**eyes** [1] - 123:18

## F

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**Facebook** [15] - 24:19; 46:14, 19, 22-24; 47:1, 5, 8, 13, 16, 23; 48:6; 102:11; 145:14
**fact** [11] - 12:2; 39:6; 52:19; 53:16; 63:18; 70:13; 72:11, 20; 124:12; 132:16; 134:12
**Fahey** [1] - 1:15
**fair** [5] - 7:3; 12:19; 15:15; 82:14; 115:1
**Fairfax** [7] - 9:9, 23; 12:17; 57:9; 87:4; 88:4; 99:5
**Fairy** [1] - 91:11
**fall** [4] - 7:9; 69:16; 82:2, 7
**false** [1] - 24:24
**familiar** [2] - 23:16; 54:3
**family** [8] - 40:15; 80:5, 11; 122:1; 128:14; 131:22; 140:14; 143:11
**far** [3] - 6:4; 40:21, 24
**fast** [2] - 84:13, 15
**faster** [1] - 34:11
**father** [3] - 92:7; 125:14, 16
**FCSB** [2] - 48:16; 57:10
**February** [4] - 56:7; 66:21; 78:2; 79:24
**Fed** [1] - 6:8
**Federal** [2] - 6:11, 16
**feedback** [2] - 8:22
**feeder** [2] - 90:10, 16
**FELDMAN** [1] - 3:10
**fell** [1] - 62:19
**felt** [4] - 20:7; 115:13; 123:18
**female** [3] - 57:11; 67:22; 143:8
**few** [5] - 10:24; 73:17; 85:23; 97:6; 131:20
**fifteen** [1] - 87:13
**fights** [1] - 75:10
**figure** [1] - 114:4
**file** [8] - 40:15; 50:25; 51:4, 18-19; 52:21; 53:2; 80:11
**files** [1] - 56:15
**fine** [8] - 18:18; 26:13; 41:20; 86:1; 111:24

**finger** [1] - 34:1, 24; 68:7, 19; 132:18; 133:13, 15; 137:22
**finish** [5] - 21:15; 86:16; 103:10
**finishes** [1] - 99:17
**firmness** [1] - 92:6
**first** [25] - 16:21; 17:11; 26:6, 8, 12; 36:11; 48:9, 25; 50:12; 51:17; 56:10, 21; 87:20; 96:11, 17; 99:10; 105:22; 108:12; 112:18; 115:20, 23; 118:20; 120:7; 121:5
**firsthand** [2] - 130:16, 22
**five** [4] - 31:9; 85:9; 114:21, 24
**FL** [3] - 2:4, 8, 12
**flew** [1] - 92:1
**FLEXNER** [4] - 1:20; 2:2, 6, 10
**flip** [1] - 116:19
**floor** [1] - 96:17
**floors** [1] - 128:24
**focus** [5] - 7:5; 18:11, 19; 63:23; 95:21
**folks** [3] - 111:10; 114:20; 139:15
**following** [3] - 43:14; 88:1; 131:8
**Following** [1] - 55:22
**fooled** [1] - 19:12
**footsteps** [1] - 88:1
**FOR** [1] - 1:1
**force** [3] - 68:13, 18; 69:23
**foregoing** [1] - 149:6
**foreign** [1] - 129:2
**forget** [1] - 19:16
**forgetting** [1] - 88:9
**form** [2] - 69:24; 126:23
**forth** [3] - 26:21; 27:10; 126:13
**forward** [3] - 6:7; 7:8, 22
**foundation** [6] - 40:11; 41:9; 51:22, 24; 52:6; 53:4, 12
**foundational** [1] - 80:24
**founded** [1] - 75:6
**four** [4] - 31:8; 114:21, 24
**Franklin** [3] - 88:21, 24; 89:23
**F[████]** [12] - 10:22; 11:5, 25; 12:3, 11, 18; 13:9; 16:2; 50:9; 70:10; 92:8, 13
**F[████]** [1] - 50:21
**F[████]** [4] - 15:7; 129:15, 22
**free** [1] - 49:5
**friend** [2] - 43:17; 61:16
**friends** [9] - 33:6; 34:5; 42:7; 76:25; 110:6; 111:1; 123:25; 124:1; 126:4
**friendship** [2] - 77:1; 124:2
**front** [6] - 20:10, 12; 23:22; 29:20; 30:7; 65:20
**Fulton** [1] - 3:7
**funny** [1] - 101:1

## G

**G4S** [1] - 6:7
**Gatehouse** [2] - 14:4, 7
**general** [5] - 32:3; 57:6, 12; 64:4; 75:21

**generally** [9] - 63:8; 95:4; 126:18, 25; 128:12; 129:11; 135:8; 136:8; 139:16
**generates** [1] - 70:19
**genitalia** [2] - 58:24
**genitals** [2] - 56:24; 67:22
**gentlemen** [5] - 7:17; 63:8; 86:11; 116:25; 145:19
**Genus** [2] - 61:20; 129:17
**gifted** [2] - 89:25; 90:4
**girl** [4] - 76:23; 77:9
**girlfriend** [1] - 123:3
**girls** [1] - 74:12
**Given** [1] - 6:21
**given** [9] - 7:1; 56:12; 60:3; 64:17; 65:5; 106:13, 17; 121:19; 124:8
**glasses** [2] - 47:25; 48:3
**goal** [4] - 84:16; 85:3; 146:6; 148:11
**goodness** [1] - 88:8
**gosh** [3] - 47:24; 88:8; 102:8
**gotcha** [2] - 90:11; 95:20
**grab** [1] - 47:25
**grade** [3] - 14:6; 134:13
**grader** [1] - 129:1
**graders** [4] - 49:6; 114:8; 128:12; 129:12
**Grady** [2] - 137:10; 138:4
**grandmother** [1] - 143:7
**grant** [1] - 58:21
**granted** [3] - 57:2, 5
**great** [8] - 9:1, 21; 10:13; 26:10; 40:8; 65:12; 78:16; 85:4
**grew** [1] - 92:4
**ground** [1] - 147:2
**grounds** [2] - 20:5
**group** [4] - 25:23; 63:13; 124:1; 138:18
**groups** [1] - 139:12
**guess** [8] - 24:20; 37:2; 54:25; 58:12; 124:19; 147:11, 13; 148:12
**gym** [2] - 116:9; 128:15

## H

**half** [3] - 8:7; 84:11; 85:12
**hall** [2] - 95:16; 113:17
**halls** [1] - 94:21
**hallway** [1] - 94:14
**hallways** [1] - 94:22
**hand** [6] - 48:16; 54:9; 71:4; 124:24
**handed** [1] - 73:16
**handled** [1] - 6:6
**handling** [1] - 96:12
**hands** [1] - 11:13
**hands-on** [1] - 11:13
**hang** [1] - 126:3
**hanging** [4] - 77:1; 107:18; 125:25; 126:2
**happy** [3] - 43:25; 54:15; 55:17
**harass** [4] - 24:7; 100:19; 101:2; 112:1
**harassed** [1] - 73:2

**harassing** [2] - 100:23; 127:21
**harassment** [38] - 6:20; 10:14; 16; 12:22; 13:5, 8; 22:17, 20; 25:3; 43:22; 67:11; 69:9, 13, 20, 24; 70:5, 9, 15; 71:20, 25; 72:3; 73:5, 7; 74:15, 21; 75:1, 4, 6, 8; 83:16; 101:13; 112:6; 120:8; 133:21, 24; 134:6, 14
**hard** [3] - 23:21; 65:20; 124:14
**harmed** [1] - 143:17
**hate** [1] - 49:6
**head** [1] - 57:22
**headquarters** [1] - 14:12
**heads** [1] - 147:15
**hear** [10] - 7:22; 8:3; 33:9; 51:25; 55:23; 57:20; 59:18; 89:16; 96:15; 112:25
**heard** [22] - 15:1, 4; 16:21; 22:22; 31:3; 35:2, 8-9; 37:19, 24; 45:13; 77:14; 97:19; 99:19; 112:23; 113:5; 114:12; 123:9; 130:8; 132:6
**hearing** [1] - 99:25
**hearings** [1] - 51:14
**hears** [1] - 38:2
**hearsay** [1] - 129:25
**help** [3] - 7:7; 120:8; 123:8
**herself** [2] - 41:20; 73:18
**hi** [1] - 141:5
**hiding** [1] - 66:3
**himself** [2] - 57:11; 132:17
**history** [3] - 50:11; 53:22, 24
**hit** [1] - 57:21
**hmm** [39] - 10:7; 11:4, 20; 12:14; 14:12; 18:10, 15; 26:9; 29:16; 32:4, 25; 34:15; 36:17, 19; 39:14; 40:4; 44:3; 45:4; 66:18; 67:5, 20; 68:16, 23; 71:13; 74:11; 80:13, 17; 81:24; 82:5; 85:19; 105:3; 108:13; 118:15; 136:1; 143:12; 144:4
**ho** [1] - 49:7
**hold** [2] - 81:5; 130:2
**holidays** [1] - 124:25
**HOLTZMAN** [1] - 1:15
**home** [11] - 17:16; 49:16, 22, 24; 50:1; 97:22; 99:11; 119:5; 124:22; 128:13; 131:2
**homestretch** [1] - 117:6
**honest** [2] - 26:22; 118:10
**honestly** [1] - 145:4
**honey** [1] - 115:19
**Honey** [1] - 115:19
**Honor** [57] - 8:9; 22:4; 23:12; 27:1; 28:8; 32:8; 40:22; 41:13, 22-23; 44:8; 48:12, 19; 50:14; 52:2; 54:6, 8, 20; 55:13, 16, 20; 56:12; 58:2; 61:7; 64:22; 65:1, 8, 12, 17; 71:8; 76:16; 80:22, 25; 81:6; 83:19; 85:6, 25; 86:23; 100:6; 110:18; 117:7; 129:24; 130:19; 134:3; 136:22; 139:4, 24; 140:19, 23; 142:7, 12; 143:18, 20, 22; 146:14; 147:17; 148:3

**Honor's** [1] - 148:17
**HONORABLE** [1] - 1:11
**hope** [1] - 7:10
**hopefully** [1] - 9:5
**hoping** [2] - 86:15; 147:13
**horrible** [1] - 106:16
**horseplay** [5] - 56:10, 23; 57:23; 66:25; 134:12
**hot** [1] - 75:17
**hour** [4] - 8:7; 85:12; 138:15
**hours** [3] - 84:11; 147:12; 148:9
**house** [2] - 19:11; 90:21
**H███████** [8] - 21:6; 66:23; 79:1; 94:9; 97:5; 120:20; 129:22
**Hughes** [4] - 88:21; 89:1, 9, 23
**H███████** [17] - 17:10, 14, 18; 21:6, 11; 49:23; 96:17; 97:4, 13; 98:3; 99:16; 103:12, 15; 120:20; 129:14, 16
**H███████** [3] - 96:14, 18, 20
**HUNTON** [4] - 2:14, 18, 21; 3:2
**hurt** [1] - 142:21
**hypervigilant** [1] - 142:14

## I

**IB** [1] - 89:23
**idea** [3] - 29:10; 106:25; 111:23
**ideally** [1] - 147:19
**identified** [3] - 43:6, 16; 69:22
**identifies** [3] - 25:13, 16; 44:12
**identify** [1] - 37:24
**identity** [2] - 58:14, 17
**idly** [2] - 142:20; 143:16
**imagine** [2] - 37:3; 146:21
**immersion** [2] - 90:15, 18
**impact** [4] - 60:5; 64:8, 13
**imply** [1] - 125:4
**implying** [1] - 125:6
**important** [6] - 7:5; 50:10, 24; 61:2; 118:20; 119:7
**in-school** [9] - 103:25; 104:4; 105:5; 126:17, 22; 127:1, 4, 24
**inappropriate** [7] - 24:10; 56:8; 68:8; 69:16; 122:13; 133:16
**incident** [18] - 17:22; 43:12; 51:7; 53:25; 57:23; 65:21; 69:9; 71:14, 16; 72:2; 78:5, 8-9; 102:21; 119:3; 132:16; 133:13
**incidents** [2] - 43:9; 123:24
**include** [2] - 10:14; 12:8
**included** [1] - 32:6
**includes** [2] - 24:5; 25:25
**including** [1] - 66:15
**inconsistent** [2] - 27:18, 22
**incorrect** [1] - 44:17
**indicated** [1] - 6:3
**indicates** [1] - 25:10
**indicating** [1] - 137:24
**indifferent** [2] - 60:18, 22

**indiscernible** [1] - 62:4
**indiscernible}** [2] - 54:20; 133:1
**individual** [3] - 59:3; 63:12; 85:21
**individually** [2] - 112:22; 113:5
**individuals** [6] - 35:13; 63:13; 72:24; 113:7; 126:11; 127:9
**indulgence** [1] - 148:18
**inexpensive** [1] - 6:14
**information** [10] - 13:10; 44:23; 46:19, 21; 72:18, 23; 75:7; 119:4; 123:8, 13
**informed** [2] - 11:25; 108:9
**informing** [1] - 54:24
**initials** [2] - 102:14; 103:11
**inquiry** [1] - 62:9
**inside** [1] - 116:13
**insinuate** [2] - 140:9, 11
**insinuation** [1] - 134:1
**instance** [2] - 63:15; 67:21
**instances** [1] - 75:16
**instead** [1] - 90:5
**instructed** [5] - 63:9; 103:15; 124:20; 128:11, 16
**instructing** [1] - 63:11
**instruction** [6] - 7:18; 52:17; 57:12, 15-16; 65:5
**instructional** [1] - 66:16
**instructions** [2] - 73:13; 99:7
**insulting** [2] - 33:3; 145:15
**interaction** [1] - 147:5
**interests** [1] - 63:11
**interrupt** [2] - 8:3; 122:20
**interview** [4] - 25:18; 44:15; 61:14; 112:14
**interviewed** [3] - 45:5, 8; 61:11
**interviews** [2] - 121:5, 7
**introduce** [1] - 141:6
**intruders** [1] - 92:24
**investigate** [10] - 23:1; 62:21; 67:13; 75:10; 103:19; 127:25; 133:23; 134:9
**investigated** [5] - 40:19; 74:20, 23; 75:3; 104:13
**investigating** [4] - 42:22, 24; 63:2; 79:22; 104:5; 109:4
**investigation** [21] - 10:25; 15:18; 25:19, 21; 27:17; 45:25; 46:18; 51:2; 58:8; 64:8, 13; 67:9; 72:14, 16; 99:8; 121:16; 126:11; 127:24; 129:9; 130:11; 131:9
**investigations** [6] - 10:9; 11:24; 12:15; 73:25; 74:25; 131:16
**investigative** [1] - 81:5
**involved** [13] - 6:4; 11:13, 23; 22:13; 58:18; 62:2; 63:14; 67:3; 78:10, 13; 95:23; 131:15; 132:11
**involvement** [7] - 29:13; 34:8, 17; 95:21; 96:10; 125:18; 128:5
**involving** [1] - 75:5
**irrelevant** [2] - 40:25; 61:3
**isolate** [2] - 29:22, 25

**issue** [12] - 10:25; 41:1; 52:6; 58:3, 21; 59:6, 12, 21; 61:1; 115:13; 128:7
**issued** [1] - 126:15
**issues** [13] - 8:5; 14:23, 25; 15:8, 11-13, 14; 22:17; 60:18; 85:20; 111:1, 9
**issuing** [3] - 12:6; 52:25; 91:14
**it'll** [1] - 148:6
**ivey** [1] - 89:3
**IX** [2] - 62:9; 73:11

## J

**J.F** [1] - 3:7
**J.H** [5] - 44:13, 15; 48:7; 49:6; 112:13
**J.O** [33] - 3:9; 24:18; 25:16; 26:4, 6-7, 12; 29:21; 32:6; 51:17; 52:19; 53:8, 19; 61:9; 62:12, 15; 102:9, 12; 103:13; 104:14; 105:5; 109:14; 111:2; 113:24; 116:11, 16; 118:4, 8; 126:13; 144:2
**J.O.'s** [5] - 27:19; 34:7, 16; 52:21; 116:12
**Japanese** [3] - 90:15, 18
**jealous** [1] - 34:14
**J██████** [5] - 34:20, 25; 35:10; 46:23; 102:8
**Jersey** [1] - 88:8
**jfahey@holtzmanvogel.com** [1] - 1:18
**job** [3] - 6:4; 142:11, 15
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**JR** [1] - 1:11
**Judge** [4] - 41:14; 57:21; 60:15; 85:15
**JUDGE** [1] - 1:12
**judge** [3] - 64:17; 84:8; 85:17
**jumping** [1] - 118:18
**Jury** [4] - 7:15; 84:3; 86:9; 146:10
**jury** [7] - 14:8; 41:1; 57:15; 67:18; 85:2; 92:23; 116:21
**JURY** [1] - 1:11
**justice** [1] - 7:7

## K

**K.'s** [1] - 78:17
**Kappatos** [2] - 117:16
**Keefe** [2] - 2:10; 147:11
**Keefe's** [1] - 147:23
**keep** [14] - 8:19; 9:4; 11:25; 44:4; 49:7; 50:1, 10; 77:20; 86:12; 103:19; 123:18; 131:2; 140:22; 147:1
**kelliker@huntonak.com** [1] - 3:4
**kept** [2] - 124:22; 130:25
**Kevin** [1] - 3:2
**key** [1] - 95:5
**kid** [2] - 105:15; 142:19
**kids** [19] - 61:10; 72:24; 73:1; 75:18; 90:4; 91:13; 92:6, 16, 18; 94:3, 15; 95:1, 3; 114:16, 21; 135:20; 136:4;

139:17
**kind** [2] - 16:6; 104:24
**Kinney** [4] - 3:5; 85:23; 140:18; 141:3
**KINNEY** [11] - 3:6; 5:8; 140:19, 22, 25; 141:2; 142:9, 16, 25; 143:10, 20
**knowing** [2] - 34:16; 60:20
**knowledge** [7] - 33:15; 57:18; 97:1; 129:25; 130:8, 16, 22
**known** [2] - 56:18; 127:22
**knows** [2] - 43:18; 142:13
**K███████** [1] - 56:5
**KURTH** [4] - 2:14, 18, 21; 3:2

## L

**label** [1] - 48:17
**ladies** [5] - 7:17; 63:8; 86:11; 116:24; 145:19
**lady** [6] - 68:6, 21; 127:20; 128:1; 133:18
**Langston** [2] - 88:21; 89:1
**language** [2] - 90:20; 129:2
**languages** [1] - 89:9
**last** [5] - 56:16; 66:9, 24; 79:20; 87:12; 100:12
**late** [3] - 49:21; 83:24; 135:8
**latest** [1] - 67:3
**laugh** [4] - 24:6; 100:19; 101:4, 15
**laundry** [4] - 16:20; 19:14, 23; 116:3
**LAW** [1] - 3:6
**law** [2] - 58:10
**lawyer** [1] - 6:4
**lawyers** [3] - 6:4; 7:23; 8:4
**lay** [3] - 40:11; 41:9; 53:12
**leadership** [1] - 87:21
**leading** [2] - 132:25; 133:5
**leak** [1] - 63:14
**learned** [1] - 118:22
**learning** [3] - 66:11, 14; 90:20
**least** [2] - 54:1; 115:1
**leave** [5] - 17:15; 29:18; 30:4; 31:25; 134:16
**leaves** [2] - 99:16; 108:14
**leaving** [4] - 29:11; 31:4; 77:7; 97:25
**led** [1] - 87:25
**left** [14] - 17:5, 17-18; 24:9; 28:13; 29:22, 25; 30:2; 97:6; 99:11; 125:5; 138:5; 139:9
**lengthy** [1] - 76:16
**lesbian** [1] - 102:5
**less** [2] - 139:24; 148:10
**letter** [3] - 54:24; 56:5, 7
**letting** [2] - 65:4; 106:10
**level** [1] - 89:2
**lewd** [3] - 68:14; 69:11, 22
**life** [2] - 131:23, 25
**likely** [1] - 134:13
**limine** [4] - 57:2, 4; 58:3
**limiting** [3] - 57:12, 14; 65:5

**limits** [5] - 6:10, 24-25; 7:9, 22
**line** [4] - 113:17; 114:25; 120:5, 7
**lines** [4] - 51:15; 132:5, 7; 133:20
**link** [2] - 61:9
**listed** [3] - 45:21; 112:19; 113:3
**listen** [1] - 8:2
**literally** [1] - 142:18
**litigation** [1] - 7:6
**live** [1] - 90:9
**lived** [1] - 7:17
**LLP** [8] - 1:20; 2:2, 6, 10, 14, 18, 21; 3:2
**loan** [1] - 107:17
**loaned** [2] - 107:16; 121:19
**lobby** [2] - 138:10, 12
**location** [1] - 94:12
**locked** [2] - 93:3, 11
**locker** [30] - 36:25; 37:1, 9; 44:22; 45:14; 76:9; 95:5; 99:20; 103:17; 112:1, 23; 113:6; 114:20, 22; 116:9, 12, 17-18; 117:15; 118:2, 11; 122:12; 123:13; 128:2; 129:20, 22; 145:2
**lockers** [6] - 72:21; 95:4, 6-7; 114:8; 116:11
**logs** [5] - 39:16, 20, 23; 40:1; 77:5
**look** [22] - 23:16; 24:1; 27:16; 29:19; 37:23; 38:12; 41:19; 42:1, 3; 47:21; 50:24; 51:3, 16; 52:21; 54:9; 65:21; 80:19; 101:1, 14; 106:11; 117:12; 119:25
**looked** [5] - 52:11; 69:21; 77:8; 104:14
**looking** [11] - 30:16; 51:16; 54:17; 55:1, 14; 79:22; 80:25; 110:22; 117:14; 122:16; 138:11
**looks** [6] - 24:7; 100:20, 24-25; 139:15; 146:15
**loop** [1] - 104:12
**Los** [1] - 1:21
**lost** [1] - 16:10
**loud** [1] - 66:25
**LSL** [2] - 66:7, 9
**lunch** [3] - 66:15; 128:17, 20

## M

**M.C** [1] - 3:6
**M.J** [3] - 44:13, 15; 112:13
**M.P.F** [1] - 3:6
**ma'am** [15] - 7:14; 10:1; 21:18; 49:1; 50:5; 51:14; 83:20; 84:4; 130:6, 15; 140:2; 146:11
**machine** [1] - 3:17
**M██████** [2] - 56:6; 67:18
**mad** [2] - 19:5; 102:16
**Mad** [1] - 19:6
**mail** [12] - 49:25; 61:20; 62:5; 118:1, 12; 119:22; 120:1, 5, 20, 23
**mailing** [1] - 117:15
**main** [9] - 93:2, 19-20; 94:14; 95:11,

16; 138:10
**majority** [3] - 89:7, 9, 13
**makeup** [2] - 88:25; 89:8
**male** [1] - 143:8
**manage** [1] - 6:23
**manner** [1] - 120:24
**March** [5] - 57:17; 62:5; 79:21
**marked** [2] - 41:11
**master's** [1] - 87:21
**match** [2] - 27:22, 25
**math** [3] - 9:19; 74:7; 82:8
**matter** [5] - 7:4; 62:1; 63:2; 149:7
**matters** [3] - 6:10; 86:18; 146:4
**mean** [24] - 13:19; 51:4; 53:14; 58:7;
66:10; 70:3, 10; 72:7; 74:23; 75:16, 18;
89:24; 90:1, 18; 91:11; 92:17; 100:25;
110:9; 117:2; 122:21; 124:6
**meaningless** [1] - 58:1
**meant** [2] - 100:23
**meantime** [1] - 109:4
**media** [2] - 145:24
**meet** [5] - 75:23; 78:20, 22; 108:19;
112:18
**meeting** [31] - 16:17; 17:8, 10; 76:22;
78:24; 79:2; 80:5; 82:10, 12; 96:12;
97:2; 98:14, 19, 22; 99:10; 108:12, 22;
109:1; 122:1, 3, 5, 8; 123:5, 21; 125:15,
18, 21-22, 24; 129:11
**meetings** [2] - 14:14, 19
**members** [1] - 140:14
**memory** [7] - 17:7, 24; 30:18; 40:8;
42:5; 78:15; 135:22
**men** [2] - 138:19; 139:12
**mention** [1] - 36:23
**mentioned** [12] - 92:20; 93:21; 99:10;
105:23; 108:21; 109:7; 112:11; 113:25;
115:6; 127:20; 129:11; 144:2
**messages** [4] - 29:18; 30:4; 31:5, 24
**met** [17] - 8:17; 16:16; 40:6; 42:6;
78:18, 25; 109:8, 11, 14, 19, 21;
111:17; 115:1; 127:23
**Miami** [3] - 2:4, 8, 12
**mic** [1] - 10:1
**MICHAEL** [1] - 3:6
**Michael** [2] - 3:5; 141:3
**middle** [6] - 69:17; 72:7; 74:8; 75:20;
89:20
**Middle** [13] - 9:18; 12:21; 13:4; 14:15;
65:23; 75:13; 87:6; 88:21, 24; 89:19;
135:1; 139:12
**midst** [1] - 46:13
**might** [10] - 8:4; 16:10; 45:22; 49:1;
60:21; 101:23; 119:15; 145:1; 146:6, 18
**MIL** [3] - 54:8, 15; 55:16
**military** [1] - 91:24
**mind** [4] - 21:16; 64:25; 86:12; 147:1
**minorities** [1] - 89:14
**minority** [2] - 89:7, 10
**minute** [4] - 27:16; 64:24; 115:18;

124:23
**minutes** [12] - 76:15, 19; 77:16; 83:25;
86:6; 97:6; 125:11; 139:21, 23; 140:22;
146:16; 148:6
**misconduct** [1] - 57:25
**miss** [1] - 49:7
**missed** [2] - 13:2; 123:20
**mistaken** [1] - 108:6
**mistakes** [1] - 51:5
**mk@kinneyesq.com** [1] - 3:8
**MO** [1] - 59:2
**mode** [1] - 6:17
**modus** [2] - 58:13, 15
**Mom** [5] - 98:18; 103:3; 110:4; 122:24
**mom** [57] - 16:20; 17:13; 19:14, 20, 22;
20:8, 13, 16; 21:5, 12; 22:14; 39:24;
43:15; 46:22; 49:20; 73:10, 12; 75:22;
76:4, 6, 12, 23, 25; 77:3; 88:1; 96:13;
98:16; 99:2, 11, 16; 103:7; 107:20;
108:12, 14; 109:22; 110:5; 115:20, 23;
116:3; 118:10, 20, 23, 25; 119:1, 7;
120:2; 121:15; 122:10, 15; 123:24;
125:10; 131:2; 143:6
**mom's** [2] - 88:1; 92:2
**moment** [14] - 8:21; 51:13; 80:22;
83:19; 92:21; 100:3; 101:18; 105:20;
110:21; 118:21; 119:25; 134:23; 137:1
**Monday** [4] - 49:7, 16, 19; 135:23
**money** [10] - 36:15; 107:10, 13, 17, 19,
22; 108:4; 121:20; 124:25
**monitoring** [1] - 94:2
**months** [2] - 67:8; 82:6
**morning** [7] - 86:18; 93:4; 94:6, 17;
118:11; 121:10; 122:4
**mother** [25] - 17:3, 5, 8, 10; 20:11, 21;
22:17; 40:1; 43:13; 46:20; 49:22, 24;
62:5; 108:9; 119:23; 120:17, 19;
121:22; 129:25; 141:13, 20
**mother's** [2] - 119:6; 147:18
**motion** [8] - 57:1, 4-5, 10; 58:2; 67:1
**motioning** [1] - 140:10
**mouth** [1] - 115:16
**move** [13] - 9:5; 41:9; 48:12, 19; 50:8;
54:6, 15; 64:22; 78:1; 81:14; 116:10;
118:4, 10
**moved** [8] - 23:5; 103:17; 117:15;
118:2; 123:12; 133:6
**moving** [3] - 44:4; 95:9; 103:16
**MR** [98] - 5:6, 8-9; 32:8, 13; 40:22;
41:14, 22; 48:21; 50:14; 51:22, 24;
53:11, 16; 55:19; 57:21; 60:15; 61:4, 7,
24; 62:4; 64:17; 65:1, 4; 80:22; 81:6;
84:8, 22, 24; 85:4, 6, 14-15, 17, 20;
86:2, 4, 23; 87:2; 89:18; 100:6, 9;
110:13, 18, 20; 112:9; 116:23; 117:7,
11; 118:16; 119:14, 19, 21; 121:2;
127:17; 130:2, 20-21; 132:23; 133:2, 8,
11; 134:5; 136:22; 137:2, 4-5, 10, 15;
138:4, 7; 139:6, 22, 24; 140:1, 17, 19,
22, 25; 141:2; 142:9, 16, 25; 143:10,

20, 22, 24; 145:17; 147:10, 16, 22;
148:3, 8, 14, 17
**MS** [135] - 5:5; 7:13; 8:9, 12, 23; 9:1, 3;
10:6, 8; 16:4, 7, 9; 22:5; 23:12, 15;
26:25; 27:4; 28:6, 11; 29:4, 6, 23; 30:1,
7, 10; 31:6; 32:14; 37:14; 40:23; 41:3,
6, 9, 23, 25; 42:15, 18; 44:7, 10-11;
47:18, 20; 48:12, 15, 19, 24; 49:3;
50:18, 23; 52:2, 10, 15, 18; 53:6, 14,
18; 54:5, 10, 12, 14, 20; 55:1, 6, 8, 11,
13; 56:12; 58:2, 6, 25; 59:23; 60:9, 25;
61:20; 62:2, 14, 17, 22, 25; 63:3, 5, 25;
64:15, 20, 22; 65:8, 12, 14, 17-18;
66:19; 69:3, 5; 71:8, 10; 76:16, 20-21;
77:11; 80:24; 81:2, 4, 9, 11, 13, 17-18;
83:19, 22; 110:15; 117:1, 4; 119:16;
129:24; 130:3, 7, 13; 132:22, 25; 133:6;
134:3; 136:25; 138:22; 142:7, 12;
143:18; 146:14, 18, 23, 25; 147:3, 7, 9;
148:1
**multiple** [5] - 10:11; 50:12; 59:9;
63:10; 121:13
**music** [2] - 54:23; 129:18
**must** [2] - 51:9; 63:23

# N

**nail** [1] - 57:21
**naive** [1] - 56:22
**name** [9] - 14:1; 32:19; 38:10; 87:3;
91:12; 126:9, 12; 127:19; 136:14
**name-calling** [2] - 126:9, 12
**names** [18] - 24:14; 26:21; 32:17, 24;
35:9; 72:21, 23; 99:19, 25; 102:1, 5;
112:24; 114:11; 122:13; 124:14
**nature** [3] - 64:17; 97:7; 104:10
**near** [4] - 116:11; 126:2
**necessarily** [3] - 13:7; 63:11, 18
**necessary** [2] - 13:10; 77:24
**need** [23] - 7:4; 19:8, 19; 21:12; 23:21;
24:15; 43:18; 50:4; 55:19; 56:11; 86:11,
21; 95:8; 107:24; 115:20, 23; 116:4;
129:1; 140:21; 144:11; 146:18; 147:2
**needed** [10] - 31:3, 15; 92:19; 107:19;
109:22; 110:6; 113:19; 119:1; 124:15;
141:13
**needs** [4] - 21:25; 41:1; 52:13; 92:15
**neighborhood** [2] - 126:2
**Neill** [2] - 20:14; 101:25
**never** [6] - 8:17; 19:16; 63:21; 73:10,
22; 111:5
**New** [1] - 88:8
**new** [2] - 133:6
**next** [20] - 7:12, 21; 50:8; 75:22; 98:6;
103:9; 105:5, 11; 108:3; 109:1, 6,
20-21; 121:4, 12; 122:6, 8; 129:8;
142:24; 146:17
**nice** [1] - 95:1
**nickname** [4] - 91:7, 10, 16

nine [1] - 82:6
no-nonsense [1] - 92:13
none [1] - 60:3
nonsense [1] - 92:13
normal [1] - 53:1
normally [1] - 129:1
noted [1] - 60:8
notes [3] - 33:14; 46:7
nothing [15] - 36:21; 41:2; 43:20;
59:21; 61:12; 65:6; 75:3; 82:16; 83:11,
13, 15; 131:24; 143:9; 145:14, 16
nothing's [1] - 95:2
notice [9] - 30:24; 56:13; 57:9; 58:23;
59:19; 61:25; 144:7, 24
noticed [1] - 45:18
November [27] - 15:18, 24; 16:13,
16-17, 23, 25; 17:1, 3, 9; 18:17; 20:15;
36:15; 42:23; 64:2, 8; 67:9; 72:16;
75:23; 80:2-4; 108:2; 121:8; 122:9;
144:5
nowhere [1] - 37:8
number [4] - 17:17; 97:23; 137:12
Number [3] - 54:17, 19; 56:2
numerous [2] - 6:21; 72:24
nurturing [2] - 91:13; 92:14
NW [5] - 1:16; 2:15, 18, 22; 3:3

## O

O.B [3] - 113:24; 121:9, 17
oath [1] - 71:1
objection [33] - 40:22; 48:21; 50:14;
51:22, 24; 52:7; 53:4, 11; 64:18; 80:21;
81:6, 13; 110:15; 117:1, 4, 9; 119:16;
129:24; 130:6; 132:22; 133:4; 134:3;
136:25; 138:22; 142:7, 12; 143:18
observed [1] - 130:17
obtain [1] - 72:23
obviously [1] - 9:22
occurred [3] - 7:2; 17:22; 86:7
occurring [2] - 15:2; 20:19
occurs [2] - 17:8; 21:1
October [7] - 15:2, 8, 12, 14; 120:10,
13, 16
ODIN [1] - 3:10
OF [11] - 1:1, 11; 3:6; 5:4, 6-7, 9; 8:11;
87:1; 141:1; 143:23
O███ [2] - 46:23; 102:8
offense [6] - 50:13; 51:16; 68:13, 18;
69:23; 70:20
offenses [1] - 50:12
offensive [4] - 24:19; 102:9, 12;
145:15
offer [5] - 55:2, 5, 12, 14; 90:7
offered [5] - 55:10; 56:4; 63:24; 89:19;
90:16
offering [3] - 54:23, 25; 55:2
offerings [1] - 90:12
Office [6] - 40:16; 70:7; 72:4; 73:8;

134:19
office [39] - 12:23; 13:6, 12, 16-17;
14:1; 17:12; 23:5-7; 51:15; 73:11; 80:6;
93:2, 19-20; 95:11, 15; 96:14, 17-18,
20, 22-23; 98:3, 5, 8-9, 15; 105:16;
106:2; 116:14; 125:17; 127:12; 144:23
OFFICE [1] - 3:6
officer [1] - 92:1
Officer [2] - 61:20; 129:17
official [1] - 56:8
Official [2] - 3:13; 149:10
often [1] - 28:19
oftentimes [1] - 136:7
old [1] - 72:8
Oliva [1] - 110:8
Olivia [11] - 43:3, 13, 15; 109:17;
110:1, 10, 24-25; 111:8, 22; 123:7
once [16] - 28:7; 33:1, 17; 34:1, 16, 22;
44:7; 45:6; 69:20; 78:25; 94:13, 15;
111:13; 116:17; 145:24
one [54] - 6:3; 8:25; 23:24; 26:5; 27:19;
29:22; 30:2; 35:24; 40:18; 42:9; 43:3, 6;
54:14; 56:10; 58:9, 25; 59:8; 60:12;
61:5, 7; 63:12; 64:11; 65:3; 66:5, 24;
67:13; 68:4; 74:14, 16-17; 80:22; 82:10;
83:10, 19; 84:8; 85:11, 17; 86:17; 88:9,
12; 95:1, 4; 109:22; 110:1; 111:19;
122:13; 128:4; 129:14; 134:23; 138:1, 6
One [1] - 16:1
ones [2] - 55:4; 61:8
open [4] - 95:4, 6; 111:20; 145:12
operandi [2] - 58:13, 15
operate [1] - 51:11
opportunity [4] - 22:1; 32:11; 37:23;
145:22
option [1] - 113:20
oral [1] - 24:23
order [6] - 6:17; 18:2, 7; 26:10; 125:17
organization [2] - 14:3; 137:25
original [2] - 56:1; 110:1
out-of-town [1] - 147:17
outer [1] - 98:5
outside [5] - 90:9; 94:6, 21; 114:1;
125:21
outweighing [1] - 59:16
overlapping [1] - 85:20
Overruled [2] - 133:8; 142:13
overruled [3] - 52:7; 53:15, 17
oversaw [1] - 136:11
oversee [1] - 25:24
oversees [1] - 11:11
overview [1] - 87:17
own [1] - 107:22

## P

P.A.H [1] - 3:6
p.m [9] - 1:6; 6:2; 7:15; 84:3; 86:8;
146:10; 148:22

page [22] - 23:13; 25:12, 20; 27:2;
44:8; 48:9, 25; 54:14; 55:1, 3, 13;
56:16; 65:14, 19; 66:20; 67:4; 71:12;
137:10, 12; 138:6; 145:13
Page [1] - 5:3
pages [4] - 54:21, 25; 55:14; 73:17
pants [3] - 38:25; 39:2, 6, 8
paper [1] - 49:5
paragraph [1] - 42:16
paranoid [1] - 142:15
parent [1] - 132:1
parents [12] - 54:24; 73:16; 108:1;
115:14; 123:22; 126:5; 127:9-11, 18;
128:21; 140:6
Park [1] - 1:20
park [5] - 40:6; 42:6; 125:25; 126:2
part [21] - 6:9; 13:2; 14:19; 18:25; 19:2,
17; 25:19; 31:21; 55:5, 10; 56:2; 57:3;
60:8, 22; 62:9, 20; 63:1; 64:17; 66:9
participate [2] - 135:21; 136:18
participating [1] - 128:1
particular [9] - 41:19; 51:7; 78:9; 83:3;
101:9, 11; 125:22, 24; 127:6
parties [2] - 6:13; 57:14
parts [2] - 90:14; 140:10
party [1] - 56:13
pass [1] - 55:17
password [2] - 145:9
past [4] - 51:5, 8; 71:6; 75:11
patch [4] - 19:11; 102:21; 124:3, 10
path [1] - 129:4
paths [2] - 129:7, 12
pause [5] - 8:5, 24; 16:3; 30:23; 83:21
pay [1] - 14:6
PC [1] - 3:10
PE [13] - 49:22; 103:13, 16; 116:9, 14;
117:17, 20-21; 118:11; 128:13, 20;
129:22
pen [3] - 63:17, 21
penis [2] - 68:8; 133:16
Pennsylvania [4] - 2:15, 18, 22; 3:3
people [9] - 31:15; 38:18; 63:14;
72:21; 76:9; 92:3; 113:4; 138:24;
139:17
per [1] - 123:6
percent [1] - 85:22
perfect [1] - 30:14
perhaps [1] - 134:1
period [14] - 49:23; 66:15; 103:12, 16;
131:13; 134:25; 136:3; 138:1, 9, 20;
139:13; 147:5
periodically [1] - 93:13
periods [1] - 75:17
permission [3] - 117:7; 119:19; 136:24
person [5] - 39:1; 45:22; 56:24; 60:7;
136:16
personal [4] - 66:4; 119:5; 129:24;
130:8
personally [7] - 35:23; 67:13; 112:24;

142:4, 6, 10; 143:5
**personnel** [1] - 93:22
**pertain** [1] - 85:24
**pertained** [1] - 131:16
**pertaining** [3] - 57:7; 82:18; 83:14
**pertains** [1] - 98:24
**pertinent** [1] - 6:9
**P███** [2] - 21:5
**phone** [19] - 17:16; 29:18; 30:4; 31:4, 24; 76:6; 77:5; 121:23; 122:15, 18-19; 144:21, 24-25; 145:2, 4
**physical** [2] - 92:23; 117:23
**pick** [3] - 38:14; 49:25
**picture** [6] - 138:3, 5, 11, 14; 139:3, 20
**pictures** [1] - 137:20
**piece** [1] - 35:24
**pilot** [1] - 92:1
**pinpoint** [1] - 16:25
**PITTLEMAN** [1] - 3:10
**place** [9] - 7:4; 21:10; 67:6; 116:12; 123:15, 24; 129:9, 13; 130:11
**plaintiff** [4] - 8:16; 56:3; 120:21, 24
**Plaintiff** [4] - 1:4, 15; 2:2; 57:7
**plaintiff's** [2] - 120:17, 19; 125:14
**Plaintiff's** [14] - 5:13; 23:13; 27:2; 28:7; 41:12; 44:8; 48:23; 54:7, 18; 56:2; 57:8; 65:13
**PLAINTIFF'S** [1] - 8:1
**planning** [1] - 41:16
**play** [1] - 22:23
**PLC** [1] - 3:6
**plenty** [1] - 77:22
**PLLC** [1] - 1:16
**plow** [1] - 147:2
**plowed** [1] - 147:2
**plus** [2] - 56:8; 121:6
**PM** [1] - 1:7
**pod** [13] - 44:22; 45:11; 94:24; 95:3, 7, 15; 112:2, 15; 113:7; 114:3, 21; 129:17, 20
**pods** [1] - 95:18
**point** [22] - 9:5; 15:21; 40:5; 42:9; 53:4; 71:11; 83:24; 96:19, 24; 97:6; 98:19, 22; 102:23, 25; 115:7; 124:4, 19; 127:22; 129:14; 140:6, 9, 14
**pointed** [2] - 68:19; 100:13
**pointing** [2] - 34:1, 23
**points** [1] - 32:5
**Police** [1] - 99:5
**policy** [2] - 134:18; 145:2
**popped** [1] - 97:5
**popping** [2] - 96:5; 105:16
**population** [2] - 90:2; 103:20
**portion** [1] - 100:2
**position** [1] - 136:14
**possible** [2] - 73:1; 137:11
**post** [5] - 47:13, 16; 48:6; 62:4; 102:10
**posting** [2] - 46:25; 49:6
**postings** [1] - 46:24

**posts** [5] - 24:19; 47:5, 8; 57:5; 102:12
**potential** [1] - 44:12
**practice** [3] - 90:1; 113:21; 138:8
**practicing** [1] - 135:10
**precise** [1] - 52:14
**predate** [1] - 57:8
**prejudice** [1] - 60:2
**prejudicial** [6] - 59:17, 19, 23-24; 61:15, 17
**present** [2] - 25:8; 141:21
**presentation** [1] - 6:5
**presented** [1] - 38:7
**presenting** [1] - 6:18
**press** [1] - 35:14
**presumably** [1] - 36:24
**pretty** [2] - 71:4; 114:18
**prevent** [1] - 92:24
**previous** [3] - 52:19; 64:10; 74:16
**previously** [1] - 100:7
**primary** [1] - 20:23
**Principal** [2] - 56:6; 92:8
**principal** [19] - 9:15, 18, 22; 10:19; 11:5, 9, 18; 12:16; 20:9; 25:23; 74:3; 87:9; 88:2, 13, 15, 17; 92:2, 13, 19
**principals** [6] - 12:9; 14:14; 59:9; 70:14; 71:17; 92:14
**print** [1] - 145:24
**private** [5] - 119:4; 124:16, 18; 141:12, 24
**privy** [1] - 20:8
**probable** [1] - 62:10
**probative** [4] - 52:5, 9-10; 59:16
**problem** [2] - 13:1; 36:16
**problems** [1] - 120:9
**Procedure** [1] - 6:12
**Procedures** [1] - 6:11
**procedures** [1] - 6:19
**proceed** [3] - 7:8; 8:9; 140:19
**proceeding** [1] - 6:15
**PROCEEDINGS** [1] - 1:11
**proceedings** [6] - 8:24; 16:3; 30:23; 83:21; 86:7; 149:7
**Proceedings** [2] - 3:17; 148:22
**process** [2] - 62:20; 63:1
**produced** [1] - 3:17
**program** [10] - 89:6; 90:8, 15, 21; 135:1, 12; 136:10, 15, 19
**programming** [3] - 88:25; 89:3; 90:6
**programs** [3] - 89:19; 90:12; 135:21
**promiscuous** [2] - 125:4, 6
**propensity** [3] - 58:3; 59:5, 12
**property** [1] - 66:4
**protect** [1] - 6:20
**prove** [2] - 59:17
**provide** [1] - 145:9
**provided** [5] - 10:10; 46:18, 21; 57:16, 18
**provides** [1] - 6:12
**provisions** [1] - 6:21

**Public** [2] - 57:9; 88:4
**publish** [16] - 23:12; 27:1, 3; 28:9; 48:22; 65:11, 17; 81:16; 100:6; 104:15; 110:18; 117:7; 119:19; 136:24; 137:4
**pull** [6] - 26:25; 28:6; 31:16; 44:7; 65:14; 119:12
**pulled** [2] - 78:3; 93:7; 129:15
**pulling** [1] - 23:22
**pumpkin** [4] - 19:11; 102:21; 124:3, 10
**punished** [1] - 60:12
**purpose** [5] - 63:23; 94:25; 95:1; 128:23
**push** [1] - 93:17
**pushing** [1] - 114:11
**put** [22] - 18:2; 54:21; 61:10; 70:4; 72:14; 100:5; 104:4; 105:4; 116:12; 120:15; 123:15, 24; 127:1, 24; 129:9, 13; 130:11; 138:6; 145:10; 147:15
**putting** [6] - 35:4; 61:13; 84:18; 126:17, 22; 147:11
**PX-77** [2] - 100:6, 10

## Q

**qualify** [1] - 69:12
**questions** [26] - 8:2, 20; 9:4; 21:19; 22:3, 7; 28:19, 22; 64:18; 80:24; 83:22; 85:7, 22-23; 88:14; 92:9; 95:22; 96:6; 100:13; 112:11; 115:2, 6; 134:2; 140:2, 17
**quick** [2] - 85:7; 146:5
**quickly** [2] - 28:13; 87:15
**quite** [2] - 73:17; 75:4
**quote** [2] - 25:13; 101:13
**quote-unquote** [1] - 25:13
**quoting** [1] - 11:14

## R

**Rachel** [2] - 9:17; 10:19; 11:6; 12:21; 13:3; 14:15; 56:15; 58:9; 65:23; 75:13, 19; 87:6; 88:18, 22, 24; 89:19, 22; 90:6, 12, 14, 24; 104:23; 120:10; 135:1; 137:6; 139:11; 141:25
**R███** [1] - 17:18
**railroad** [1] - 57:25
**raised** [3] - 60:18; 91:24; 92:2
**raises** [1] - 42:23
**ran** [2] - 92:12, 18
**randomly** [2] - 114:3, 6
**raped** [1] - 79:15
**Raynor** [1] - 6:7
**rbates@hunton.com** [1] - 2:16
**RDR** [3] - 3:13; 149:6, 9
**RDR-CRR** [1] - 149:6
**reach** [1] - 73:11
**react** [1] - 142:6
**reaction** [2] - 141:10, 14

reactions [1] - 126:25
read [14] - 6:5; 24:15; 30:6, 11; 32:8; 41:19; 42:17; 57:1, 15; 71:7; 73:20; 111:3, 15; 112:3
reading [2] - 24:17; 30:17
ready [1] - 120:2
realized [2] - 44:21; 45:2
really [8] - 56:13; 58:20; 59:20; 87:14; 102:14; 113:22; 135:22; 148:8
reasonable [1] - 6:17
recapped [1] - 122:10
receipt [1] - 56:8
receive [3] - 10:11; 66:1; 73:12
received [7] - 9:23; 12:17; 45:2; 72:5, 18; 97:11; 119:22
recently [1] - 25:7
recess [1] - 86:7
recognize [1] - 114:4
recollection [9] - 16:23; 41:4, 17, 20-21; 71:7; 96:11; 112:16; 130:25
record [25] - 6:6; 48:23; 53:25; 54:24; 55:10, 22; 57:1; 60:9, 21; 61:12, 19, 23; 62:13, 18-19, 23; 64:10; 65:13; 69:23; 81:15; 110:17; 117:10; 119:18; 141:3; 149:6
recorded [1] - 71:7
records [14] - 52:8; 57:6, 8, 11; 58:7; 62:12; 64:1, 5; 76:6; 121:23; 122:15, 18
redacted [1] - 54:13
redirect [4] - 145:22; 146:13; 148:1
reevaluate [1] - 79:17
reference [3] - 55:24; 56:4; 103:4
referenced [4] - 56:1; 112:12; 114:2; 115:12
referral [1] - 56:8
referred [2] - 32:9; 76:24
referring [3] - 29:19; 30:15; 135:3
refresh [8] - 11:5; 30:17; 40:8; 41:4, 17, 21; 42:5; 78:15
refreshes [1] - 41:20
regard [10] - 41:17; 56:20; 62:18; 94:2, 19; 96:12; 116:8; 131:10; 132:17
regarding [3] - 57:13; 61:2; 83:5
regards [1] - 102:6
regular [4] - 14:14; 30:12; 84:20; 90:16
rehabilitative [1] - 145:22
relate [1] - 58:20
related [2] - 10:15; 25:22
relating [3] - 57:11; 60:7; 62:12
relatively [1] - 146:5
relevance [10] - 51:22, 24; 52:4, 9; 57:13, 22, 24; 59:6; 142:7, 12
relevant [10] - 35:14, 18, 21; 51:12; 52:2; 56:18; 58:6; 59:7, 11; 60:2
remain [1] - 141:25
remained [1] - 92:18
remember [39] - 15:19, 23; 16:11, 13; 18:20, 22; 20:21; 21:11; 26:10; 31:2; 40:24; 46:9; 70:22; 79:12, 14; 82:12,

23; 84:1; 94:10; 97:17, 19; 100:25; 101:19, 22, 24; 102:1; 106:23; 114:1, 7; 117:20; 118:11; 125:16, 20, 24; 127:15, 17; 145:5
remind [1] - 97:3; 112:16; 146:3
rephrase [4] - 101:12; 120:18; 130:20; 134:4
report [17] - 11:24; 20:18, 20; 21:13; 62:6; 70:5, 17-19; 73:7; 75:25; 98:18, 21; 120:17, 19, 23; 134:18
reported [3] - 3:17; 12:23; 13:5, 12; 22:20; 39:19, 24; 70:11; 72:2; 99:3; 134:18
REPORTER [3] - 51:25; 65:3; 127:16
Reporter [4] - 3:13; 51:23; 149:10
reporting [1] - 22:17
represent [2] - 8:15; 87:4
republish [1] - 44:8
request [7] - 39:23; 40:1; 56:3; 57:12; 117:15; 118:13; 131:3
requested [2] - 80:11; 103:17
required [2] - 12:4; 134:18
requirements [2] - 94:1; 134:17
rerouted [3] - 129:4, 21
reside [1] - 116:14
resolution [1] - 59:21
resolve [3] - 7:5; 8:5; 55:25
resource [1] - 99:5
respect [6] - 6:3; 57:5, 10, 12; 62:1
respectful [1] - 92:4
respond [5] - 28:19; 141:17, 19; 142:23; 143:2
responding [1] - 141:15
response [2] - 57:4; 99:22
responsibilities [1] - 134:10
responsibility [2] - 7:3; 58:22
rest [3] - 50:1; 131:1, 18
restating [1] - 50:15
Reston [2] - 3:8, 11
result [1] - 126:16
results [1] - 126:10
rethink [1] - 79:17
retired [1] - 91:25
retrieve [8] - 17:6, 14, 17; 42:13; 97:12, 22, 24; 120:2
review [3] - 53:1; 101:20; 108:14
Rewari [1] - 2:17
right-hand [1] - 48:16
Rights [1] - 40:17
rkeefe@bsfllp.com [1] - 2:13
RMR [1] - 3:13
Robert [2] - 2:10; 3:7
role [2] - 9:22; 12:15
room [4] - 17:4; 92:5; 127:6
ROSSIE [1] - 1:11
roughly [1] - 114:21
route [3] - 128:19, 22, 24
row [2] - 114:8
ruin [1] - 131:23

ruined [1] - 131:25
Rule [3] - 6:11, 16
rule [4] - 104:23-25; 133:4
Rules [2] - 6:12, 16
rumor [5] - 37:20; 38:2, 18, 20; 79:15
rumors [10] - 20:21; 26:15; 32:16; 33:2, 18, 23, 25; 34:4; 37:17
run [2] - 103:21; 146:6
Ryan [2] - 2:14; 87:3

## S

S.T [1] - 3:6
saddens [1] - 143:3
safe [5] - 92:18; 95:3; 116:15; 123:18; 143:4
safety [5] - 92:20; 93:23; 94:8; 129:10; 143:13
sat [1] - 145:12
Saturday [1] - 115:25
saw [7] - 10:22; 45:6, 24; 111:19; 113:9; 122:17
scared [1] - 24:2
Scary [3] - 91:10, 18
scary [2] - 91:18, 20
schedule [3] - 86:12; 122:1; 146:19
SCHILLER [4] - 1:20; 2:2, 6, 10
School [23] - 9:9, 18, 23; 10:10; 12:17, 21; 13:4; 14:15; 58:22; 59:13; 65:23; 75:14; 85:21; 87:4, 7; 88:21, 24; 89:20; 104:23; 134:17; 135:1; 139:12
school [98] - 11:10; 20:5; 24:2; 49:8, 16, 21; 50:10; 52:8; 56:14; 57:10; 59:24; 60:10, 12, 16-17; 73:15, 17; 74:8, 16-17; 75:15, 20-21; 78:3; 85:21; 87:11; 88:5; 89:3, 8, 12; 90:2, 8, 16, 25; 91:2; 92:12, 16, 18, 22-24; 93:15, 21; 95:13; 98:24; 99:5; 103:23, 25; 104:4, 24-25; 105:5; 120:21, 24; 123:16; 125:21; 126:17, 22; 127:1, 4, 24; 130:25; 131:3, 18; 134:25; 135:1, 4, 6, 11, 15, 21; 136:3, 9-10, 15, 19, 23; 137:7; 138:1, 9, 15, 19, 23-24; 139:13; 140:7, 12, 15; 147:5
schooler [1] - 69:17
schoolers [1] - 72:8
Schools [2] - 57:9; 88:4
schools [7] - 88:17, 20, 22; 89:8, 20; 90:5, 13
science [4] - 67:23; 68:3; 87:19; 128:14
Scott [5] - 2:21; 3:13; 149:6, 8
scottwallace.edva@gmail.com [1] - 3:16
screen [5] - 23:23; 49:1, 4; 110:21; 117:13
screenshots [1] - 56:16
SE [3] - 2:3, 7, 11
seat [1] - 86:10

**seated** [3] - 7:16; 84:6; 146:12
**second** [5] - 16:1; 62:9; 81:1; 91:4; 100:17
**seconds** [1] - 81:8
**section** [1] - 30:15
**secure** [1] - 6:13
**Secure** [1] - 6:7
**security** [5] - 92:22; 93:22; 94:8
**seductive** [4] - 24:7; 100:20, 24
**see** [35] - 17:16; 30:15; 34:10; 45:15; 46:6, 23; 47:5, 8, 12, 16; 48:5, 8, 10; 49:5, 12; 50:5; 79:7; 85:1; 86:5; 91:14; 97:22; 100:21; 111:6; 112:25; 113:18, 22; 120:11; 129:18; 137:19; 139:18; 144:24; 145:3
**seeing** [1] - 88:2
**seeking** [1] - 54:14
**seminar** [1] - 66:15
**seminar/lunch** [1] - 66:11
**send** [4] - 29:17; 30:3; 31:24; 145:1
**sense** [5] - 18:3; 92:17; 147:23; 148:15
**sent** [5] - 49:25; 56:5; 118:1, 12; 127:5
**sentence** [2] - 31:13; 100:17
**separate** [1] - 127:7
**separately** [3] - 45:11; 61:10
**sequence** [1] - 105:19
**series** [1] - 51:12
**serious** [2] - 50:11; 104:10
**seriously** [1] - 134:6
**served** [1] - 74:3
**serving** [1] - 56:7
**SESSION** [2] - 1:7; 6:1
**set** [3] - 6:10, 25; 7:22
**sets** [1] - 7:9
**setting** [1] - 6:23
**seven** [2] - 87:24; 114:1
**sever** [1] - 60:6
**several** [4] - 88:2; 89:10; 114:3
**sex** [1] - 24:23
**sexual** [43] - 10:14-16; 12:22; 13:5, 8; 22:17, 20; 25:3; 32:16; 57:25; 67:11; 68:13, 18; 69:9, 12, 19, 23-24; 70:5, 8, 14; 71:19, 25; 72:3; 73:5, 7; 74:14, 21; 75:1, 4, 6, 8; 82:17; 83:8, 16; 112:6; 120:8; 133:21, 23; 134:6, 14
**sexually** [11] - 29:1; 73:2; 98:19, 22; 99:3; 112:1; 120:21, 24; 140:7, 11, 15
**shadowed** [1] - 129:21
**shadowing** [2] - 129:14, 17
**shall** [1] - 6:12
**share** [2] - 115:10, 14
**shared** [5] - 20:13; 115:7; 118:19; 122:15; 123:13
**sharing** [3] - 76:5
**sheet** [1] - 54:23
**shift** [2] - 95:21; 134:23
**shirt** [4] - 38:24; 39:2, 6, 8
**shocked** [1] - 19:16
**short** [2] - 86:13; 146:2

**shortcut** [1] - 71:6
**shorthand** [1] - 3:17
**shot** [1] - 140:18
**show** [8] - 29:4; 40:23; 41:3; 43:25; 57:24; 61:20; 102:11; 110:21
**showed** [1] - 46:23
**showing** [1] - 47:24
**shown** [2] - 61:6; 100:11
**shows** [1] - 56:16
**shut** [2] - 93:7, 10
**sic** [14] - 13:12; 56:4; 95:22; 125:16
**side** [5] - 45:1; 72:15; 129:18; 137:14
**side-by-side** [1] - 137:14
**Sidebar** [1] - 63:7
**sidebar** [2] - 55:22; 76:17
**signature** [1] - 81:21
**signed** [2] - 56:6; 73:20
**significantly** [1] - 56:23
**signs** [1] - 139:1
**similar** [2] - 88:24; 89:8
**simply** [1] - 50:16
**simultaneous** [1] - 77:15
**single** [1] - 50:12
**sit** [1] - 127:7
**site** [2] - 93:21; 129:19
**sitting** [5] - 23:22; 87:22; 98:10; 106:23; 125:17
**situation** [2] - 83:3; 105:11
**six** [2] - 55:14; 67:8
**skateboard** [1] - 106:7
**skipped** [1] - 47:24
**slap** [2] - 61:19, 21
**slapped** [1] - 53:8
**slash** [1] - 60:1
**slick** [1] - 146:8
**slight** [1] - 89:4
**slurs** [4] - 32:16, 22; 82:17; 83:8
**slut** [4] - 34:20; 35:1, 10
**small** [1] - 47:24
**smart** [1] - 90:3
**smooth** [1] - 92:18
**social** [1] - 145:25
**Solutions** [1] - 6:8
**someone** [5] - 37:19; 45:15; 107:14, 17
**sometimes** [4] - 63:10; 75:17; 113:21; 146:5
**Sona** [1] - 2:17
**soon** [1] - 118:12
**sorry** [33] - 17:18; 23:20; 25:15; 29:23; 33:19; 51:25; 54:10; 64:11; 66:8; 71:15; 77:17, 23; 80:4; 90:23; 93:5; 95:13; 100:18; 101:12; 102:9; 103:6; 108:5; 122:20; 127:16; 130:4; 133:8; 137:11; 139:22; 148:13
**sort** [5] - 14:2; 32:3; 58:20; 135:3; 146:8
**sound** [1] - 116:5
**sounds** [1] - 70:24

**South** [1] - 88:9
**south** [1] - 77:2
**Spanish** [1] - 128:25
**speaking** [8] - 16:14; 52:3; 78:10; 114:1; 121:4; 126:11; 135:8; 139:16
**specialist** [2] - 94:8; 136:9
**specific** [9] - 6:25; 22:7; 52:14; 55:24; 56:4; 90:21; 111:5, 9; 123:10
**specifically** [5] - 9:15; 10:18; 21:12; 75:9; 99:24
**speculative** [1] - 138:22
**speech** [1] - 87:20
**speedy** [1] - 6:14
**spent** [2] - 9:14; 66:14
**spoken** [7] - 15:7; 44:20; 46:7, 9; 121:13, 21
**sponsored** [3] - 135:9; 136:20; 137:16
**spot** [1] - 72:25
**spots** [2] - 75:16
**Sprint** [3] - 17:16; 97:22; 99:11
**Square** [1] - 3:15
**squirrely** [1] - 75:18
**SR&R** [1] - 73:13
**srewari@huntonak.com** [1] - 2:20
**SRO** [2] - 93:3, 21
**Stacy** [1] - 56:5
**staff** [1] - 92:16
**staircase** [4] - 94:15; 111:20; 129:6
**stairs** [1] - 129:5
**standing** [2] - 111:20; 142:20
**start** [9] - 8:4; 56:10; 86:19; 94:16; 99:17; 114:16; 146:2; 147:21; 148:13
**started** [10] - 25:7; 33:6; 34:5; 45:25; 88:16; 91:10; 115:16; 123:14, 23; 147:19
**starts** [2] - 18:22; 24:1
**statement** [121] - 17:2, 13; 18:25; 19:2, 16; 20:22; 21:3, 7; 22:14; 23:2, 8-9, 11, 19; 24:1; 25:13; 26:14, 25; 27:7, 9; 28:14, 16, 24; 29:8, 25; 30:5, 12, 24; 31:7, 9, 20; 32:1; 33:3, 7-8, 11, 13; 34:14, 19; 35:5, 7, 21-22; 36:4, 6, 8, 14, 20-21; 38:23; 39:11, 13; 40:23; 41:15; 43:16, 24-25; 44:13, 24; 45:2, 6; 46:3, 13, 15-16; 72:25; 79:2, 5, 7, 10, 13; 80:15; 81:19; 82:6, 17-18; 83:6, 9; 96:25; 98:12; 99:17; 100:1, 11; 101:20, 23; 102:7, 15; 103:8, 10, 21; 104:10, 14, 19-21; 105:1, 24; 106:16; 108:15; 109:5, 9, 11, 14; 110:1, 10, 24; 112:13, 20; 113:4; 115:11, 15; 120:15; 134:19; 141:15, 18-19; 144:13
**statements** [14] - 27:16; 28:5, 12, 20; 37:8; 44:21, 23; 45:7; 78:11, 18; 79:18; 83:4; 113:13
**states** [3] - 6:9, 16; 25:6
**States** [1] - 3:14
**STATES** [2] - 1:1, 12
**stationed** [3] - 94:10; 129:17, 20
**stay** [8] - 7:24; 128:3, 11, 16; 131:3;

135:8, 20
**stayed** [4] - 49:16, 21, 24; 135:24
**staying** [2] - 85:2; 86:14
**steal** [1] - 63:21
**stealing** [1] - 63:17
**step** [10] - 84:4; 99:7; 103:9; 136:20; 137:17; 138:8; 139:17; 146:11, 18
**steps** [1] - 58:23
**stern** [2] - 91:12, 22
**sternness** [1] - 92:7
**sticking** [1] - 31:2
**still** [10] - 17:13; 59:3; 89:3; 123:17; 132:20; 133:12; 135:4; 136:4; 146:8
**stipulation** [1] - 65:9
**stole** [1] - 36:16
**stolen** [1] - 63:18
**stood** [1] - 143:16
**stools** [1] - 93:4
**stop** [6] - 8:21; 17:25; 18:24; 100:3; 115:24; 141:7
**stopped** [1] - 107:3
**stopping** [1] - 16:8
**story** [4] - 35:25; 36:5
**street** [1] - 14:8
**Street** [4] - 1:16; 2:3, 7, 11
**stretch** [3] - 116:21, 25
**strict** [3] - 91:12, 21; 92:17
**struggled** [1] - 95:6
**student** [33] - 14:20; 35:20; 37:22, 25; 38:3, 5, 8, 15; 50:12; 51:14; 52:23-25; 53:19; 57:11; 67:16; 68:17, 19; 78:7; 106:2, 21-22, 24; 107:25; 110:24; 113:22; 114:9; 122:13; 125:2; 127:20; 143:8
**student's** [5] - 50:11, 25; 51:3, 7, 19
**students** [47] - 12:6; 14:17, 20, 23; 25:19, 22; 28:19; 35:13; 52:8; 67:22; 74:4, 8; 78:10; 90:9, 13; 93:5, 7; 94:13; 95:5, 9; 96:1, 22; 104:4, 19; 105:4; 112:12, 14; 113:25; 114:1-3, 5-7; 115:2; 121:6, 13; 122:12; 124:1; 126:22; 127:11; 128:8; 129:21; 131:9; 132:10
**students'** [2] - 66:3; 126:25
**stuff** [3] - 29:19; 30:5; 31:25
**style** [4] - 91:6, 21, 23; 92:11
**subject** [4] - 54:8, 15; 55:16; 120:5
**submitted** [1] - 57:17
**substantial** [1] - 147:7
**succinct** [1] - 77:20
**sued** [3] - 142:4, 6, 10
**suffice** [1] - 7:1
**suggest** [5] - 60:4, 20-21; 61:13; 73:12
**suggested** [4] - 57:14; 58:14; 73:10; 124:16
**suggesting** [1] - 58:15; 73:18
**suggestion** [1] - 123:7
**suicidal** [2] - 79:6, 13
**Suite** [7] - 1:17, 21; 2:3, 7, 11; 3:7, 11
**superintendant's** [1] - 13:17

**superintendent** [1] - 14:11
**superintendent's** [2] - 14:3; 80:6
**supervise** [2] - 95:7
**supervised** [2] - 136:13, 15
**Supp** [1] - 6:8
**supplemental** [2] - 33:11, 13
**supposedly** [1] - 36:16
**survivor** [1] - 143:7
**suspended** [1] - 68:11
**suspending** [1] - 59:10
**suspension** [2] - 103:25; 104:4; 105:5; 126:23; 127:1, 4, 24
**sustained** [2] - 53:5; 142:8
**Sustained** [1] - 143:19
**swear** [1] - 7:25
**SWORN** [1] - 8:1
**S█████** [9] - 5:4, 6-7, 9; 8:1, 11; 87:1; 141:1; 143:23
**S████** [3] - 7:13, 21; 56:6
**system** [4] - 56:15; 70:4, 18; 92:25

### T

**T.B** [1] - 3:6
**table** [1] - 98:9
**taught** [1] - 72:6
**teacher** [4] - 95:4; 117:17, 20
**teachers** [3] - 94:17, 19; 116:14
**team** [8] - 12:5; 95:5; 111:22; 136:20; 137:16; 138:8; 139:17
**teams** [3] - 25:24; 26:5; 96:3
**tease** [4] - 24:7; 85:10; 100:19
**technically** [1] - 69:25
**ten** [10] - 64:24; 76:15, 19; 77:16; 86:5; 115:2; 121:6; 139:21, 23; 140:22
**ten-minute** [1] - 64:24
**ten-plus** [1] - 121:6
**tend** [1] - 51:4
**terms** [3] - 88:13; 90:1; 101:13
**T████** [6] - 5:4, 6-7, 9; 8:1, 11; 87:1; 141:1; 143:23
**T████** [32] - 7:13, 21; 8:13; 16:19; 18:11; 19:10, 21; 21:14; 22:10; 23:17; 64:1; 67:19; 72:15; 77:12; 81:23; 86:17; 87:3; 91:10, 18; 100:11; 106:2; 113:8; 115:16; 116:1; 117:12; 119:22; 134:7; 141:3, 25; 143:25
**test** [2] - 8:25
**testified** [3] - 50:10; 132:5; 147:1
**testify** [1] - 130:15
**testifying** [1] - 10:22; 130:12
**testimony** [15] - 15:1, 4; 45:3, 8; 50:21; 78:17, 22; 99:10; 115:13; 132:2, 8, 17; 133:20; 144:2; 147:19
**testing** [3] - 9:1, 19; 135:22
**text** [1] - 36:15
**Thanksgiving** [1] - 49:14
**that'd** [1] - 85:4
**thee** [1] - 47:11

**themselves** [1] - 112:24
**therapist** [1] - 87:20
**Thereupon** [2] - 86:7; 117:5
**they've** [2] - 61:5; 90:19
**thingy** [1] - 93:2
**thinking** [1] - 60:23
**thinks** [6] - 30:25; 31:1; 32:6; 39:21
**third** [2] - 108:18, 21
**thirty** [1] - 87:24
**thirty-seven** [1] - 87:24
**threat** [1] - 143:13
**three** [24] - 8:25; 25:7, 18; 46:4; 47:9, 12; 54:21; 58:7; 61:10; 76:17; 88:10; 91:2; 96:2; 105:4; 112:12; 113:13, 25; 125:20; 127:9; 128:7; 135:22; 140:2
**throughout** [3] - 46:18; 62:3; 75:1
**Thursday** [3] - 57:17; 135:23; 147:18; 148:13
**timeframe** [3] - 62:19, 25; 64:4
**Tinsley** [1] - 7:11
**Title** [2] - 62:9; 73:11
**today** [8] - 45:3, 8; 86:14, 16; 87:22; 106:23; 145:20; 146:15
**together** [5] - 61:14; 74:12; 77:1; 130:19; 147:15
**tomorrow** [7] - 86:12, 17; 145:21; 146:2; 147:14, 21; 148:12
**tonight** [1] - 148:19
**took** [4] - 28:14; 52:11; 103:9; 125:3
**tookk15** [1] - 81:8
**top** [4] - 29:7, 12; 33:1, 19-20, 22; 34:3, 12
**topic** [2] - 79:20; 85:12
**topics** [4] - 10:12; 76:18; 84:12; 134:23
**TORCHINSKY** [1] - 1:15
**total** [2] - 87:22; 147:12
**touch** [3] - 68:14; 69:24; 92:21
**touched** [1] - 120:24
**touching** [5] - 15:22; 16:15; 17:24; 18:23; 83:11
**tours** [1] - 92:1
**towards** [5] - 32:18; 45:25; 95:15; 145:15
**town** [2] - 147:16
**track** [1] - 50:10
**Tracy** [1] - 136:16
**trailers** [2] - 93:8
**training** [5] - 9:23, 25; 10:9, 16; 12:17
**trainings** [3] - 10:11, 14
**TRANSCRIPT** [1] - 1:11
**transcript** [2] - 3:17; 149:6
**transcription** [1] - 3:18
**transferred** [1] - 94:14
**transitioned** [1] - 116:18
**transitions** [1] - 129:20
**travel** [5] - 128:18, 22-23; 129:3
**traveling** [1] - 128:17
**travels** [1] - 128:20

**treat** [2] - 92:3
**treated** [1] - 92:3
**TRIAL** [1] - 1:11
**trials** [1] - 6:23
**tried** [4] - 44:25; 99:11; 115:23; 122:16
**tries** [1] - 15:22
**trouble** [1] - 51:9
**trust** [1] - 18:16
**truth** [3] - 6:19; 49:6; 51:3
**try** [20] - 8:19; 9:4; 16:5; 17:6; 22:6; 31:15; 36:14; 37:24; 38:15; 41:17; 54:21; 55:4; 61:15; 84:13; 85:1; 86:19; 96:8; 97:19, 22; 100:13
**trying** [18] - 17:13; 20:23; 51:2; 52:2; 54:18; 55:2, 5, 24; 57:25; 61:9; 64:12; 73:1; 97:12; 113:16; 114:4; 124:13; 147:18
**Tuesday** [2] - 49:8, 16
**turn** [1] - 119:12
**twice** [4] - 51:9; 58:16; 78:18, 21
**Twitter** [1] - 57:5
**two** [27] - 8:25; 25:8; 54:25; 56:25; 59:1; 74:18; 84:11; 85:7; 89:20; 91:2; 92:1; 96:2; 100:12; 113:7; 114:9, 25; 122:24; 131:13; 136:8; 146:22; 147:11; 148:9
**two-day** [1] - 131:13
**type** [2] - 57:24; 134:14
**types** [2] - 58:13; 75:10
**typically** [1] - 58:13

## U

**U.S** [2] - 40:16, 19
**uhn** [6] - 37:13; 131:7; 134:22
**uhn-uhn** [3] - 37:13; 131:7; 134:22
**ultimately** [2] - 39:15; 43:11
**um-hmm** [32] - 11:4, 20; 12:14; 14:12; 18:10, 15; 26:9; 29:16; 32:4, 25; 34:15; 36:17, 19; 39:14; 40:4; 44:3; 45:4; 66:18; 67:20; 74:11; 80:13, 17; 81:24; 82:5; 85:19; 105:3; 108:13; 118:15; 144:4
**Um-hmm** [7] - 10:7; 67:5; 68:16, 23; 71:13; 136:1; 143:12
**unaware** [1] - 35:5
**unclear** [1] - 58:11
**under** [5] - 53:1; 69:16; 71:1; 119:5; 134:17
**understood** [1] - 123:1
**undisputed** [1] - 6:9
**undo** [1] - 138:4
**undue** [1] - 6:20
**unduly** [1] - 61:17
**unfounded** [1] - 76:1
**unified** [1] - 12:5
**UNITED** [2] - 1:1, 12
**United** [1] - 3:14
**unknown** [2] - 138:19; 139:12

**unless** [3] - 36:6; 128:16; 129:2
**unlock** [3] - 17:16; 97:23
**unquote** [1] - 25:13
**unverified** [2] - 72:12, 17; 76:1
**unwelcomed** [1] - 116:6
**up** [64] - 6:25; 7:6, 14, 17; 15:22; 16:15, 19, 21; 17:12, 25; 18:23; 19:13, 22; 21:25; 23:22; 24:13; 26:25; 28:6; 31:16; 33:6; 34:5; 38:18; 39:6, 8; 43:14; 44:7; 49:25; 54:9; 55:17; 65:14; 71:4; 77:14; 82:24; 86:17; 92:4; 94:15; 95:12; 96:22; 97:25; 98:2; 100:5; 101:25; 102:1, 3-4, 17; 106:12; 110:21; 116:2; 118:21; 119:12; 122:5; 125:3, 10-11, 21; 129:2; 131:9; 142:3; 147:18
**updates** [1] - 10:16
**ups** [1] - 58:1
**upstairs** [18] - 23:6; 37:25; 46:5; 94:14; 95:15; 96:23; 97:2; 98:14; 128:12, 15-16, 25; 129:1, 3
**uses** [1] - 25:14

## V

**VA** [3] - 3:8, 11, 15
**value** [2] - 59:16; 61:25
**values** [1] - 92:2
**variety** [1] - 10:12
**vast** [1] - 89:3
**verified** [14] - 12:22; 13:5, 8; 25:3; 68:4, 24; 72:3; 73:4; 74:15, 22; 75:2
**verify** [9] - 31:15; 72:20; 73:2; 76:8; 77:6; 122:11, 13; 123:11
**version** [1] - 51:1
**versus** [1] - 6:7
**Vietnam** [1] - 92:1
**view** [2] - 20:4; 39:5
**Virginia** [2] - 3:14; 88:8
**VIRGINIA** [1] - 1:1
**visible** [1] - 29:20
**visitor** [2] - 93:15; 138:18
**visitors** [1] - 139:1
**VOGEL** [1] - 1:15
**voice** [1] - 31:4
**voicemail** [33] - 17:14, 17; 20:20, 23-24; 21:13; 22:22; 23:1; 24:10; 29:1, 13; 31:17, 20; 77:6; 83:13; 96:13, 15; 97:8, 10-11, 18, 24; 98:13, 17; 99:12; 103:3; 120:3
**voicemails** [9] - 17:6, 11; 29:11, 18; 30:4; 31:25; 32:3; 39:12; 77:7
**VOLUME** [1] - 1:7
**vulgar** [5] - 22:21; 24:13; 97:11, 18; 101:25

## W

**wait** [2] - 81:1; 124:23

**Wait** [1] - 115:18
**walk** [5] - 93:4; 98:5; 99:9; 113:17
**walked** [1] - 17:18
**walking** [1] - 129:12
**wall** [5] - 24:19; 36:7; 46:17; 47:23; 102:10
**Wallace** [4] - 3:13; 149:6, 8
**wants** [5] - 24:13; 53:12; 101:25; 102:1, 4
**warning** [1] - 56:7
**warnings** [2] - 59:10; 128:7
**Washington** [5] - 1:17; 2:15, 19, 22; 3:3
**wasting** [1] - 6:19
**watched** [1] - 145:12
**watching** [2] - 88:2; 114:15
**ways** [1] - 61:5
**weapons** [1] - 75:11
**wearing** [1] - 38:13
**Wednesday** [2] - 49:17; 135:23
**week** [9] - 49:13, 17; 53:8; 61:21, 24-25; 131:1; 135:20
**weekend** [3] - 20:6; 115:25; 119:5
**weeks** [3] - 25:7; 100:12
**weighing** [1] - 35:19
**welcome** [2] - 42:11; 95:1
**welcomed** [2] - 116:6
**whatsoever** [1] - 57:24
**Whoa** [2] - 19:18, 24
**whoa** [3] - 19:18, 24
**whole** [7] - 30:6; 32:9; 35:25; 58:16; 76:4; 115:15
**whore** [4] - 33:7, 10; 34:6; 102:5
**wide** [2] - 104:24
**Wiehle** [1] - 3:10
**wise** [1] - 89:1
**wishing** [1] - 133:10
**withdraw** [1] - 64:18
**withdrawal** [1] - 57:8
**witness** [19] - 7:12, 21, 25; 8:7; 32:12; 41:15, 19; 43:11; 47:11; 56:3; 61:21; 62:11; 65:10; 84:19; 86:18; 110:4; 113:4; 146:17; 147:8
**WITNESS** [34] - 8:1; 10:3, 5, 7; 21:20, 23; 22:2, 4; 29:24; 30:9, 24; 42:16; 48:13; 49:2; 50:20, 22; 64:14; 66:8, 11, 14, 18; 71:9; 89:9, 12, 17; 127:18; 130:1, 4, 18; 138:25; 139:4; 142:14; 143:2; 145:18
**witness's** [1] - 41:17
**witnessed** [2] - 43:22; 130:3
**witnesses** [15] - 6:18, 20; 7:23; 42:21, 24; 43:2, 7; 44:12; 46:25; 47:9, 12; 84:9; 110:2; 112:19
**woman** [1] - 143:6
**wondering** [1] - 85:15
**word** [12] - 24:18; 25:14; 26:19; 27:13; 76:1-3; 115:18; 124:20; 125:19; 142:18
**works** [1] - 21:19

**write** [20] - 23:2; 26:24; 28:20; 31:20; 36:4, 6, 8; 46:5; 58:1; 80:15; 82:6, 24; 83:2; 104:19-21; 105:1; 110:10; 113:17; 142:18

**write-ups** [1] - 58:1

**writes** [8] - 21:3, 7; 22:14; 23:8, 11; 24:9; 25:9

**writing** [6] - 17:13; 79:12; 82:1; 98:12; 99:17; 138:5

**written** [9] - 25:2; 41:15; 78:18; 85:14; 96:25; 109:5, 9, 11, 14

**wrote** [3] - 20:22; 79:2; 85:11

## Y

**year** [18] - 9:16, 19-20; 10:11, 18; 58:9; 59:8; 60:12; 73:17; 75:17; 90:23, 25; 91:4; 95:14; 131:18; 135:4, 15; 137:7

**yearbook** [7] - 37:23; 38:1, 14-15; 136:23; 137:6, 11

**years** [22] - 9:14, 17; 10:19; 11:6; 12:24; 13:3; 14:15; 26:11; 72:8; 73:25; 74:4, 18; 75:12; 87:12, 22; 88:2, 15-16; 91:2; 96:7

**yesterday** [4] - 49:8; 84:8, 10; 85:9

**young** [7] - 68:6, 21; 90:20; 127:20; 128:1; 133:18

**yourself** [5] - 125:1; 135:24; 136:2; 137:19, 23

## Z

**Zoll** [1] - 2:2
**zoned** [2] - 90:5, 8
**zoom** [1] - 138:5
**Zuluaga** [3] - 28:19; 82:11, 13