UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **B.R.,** | : | |
| | : | |
| **Plaintiff,** | : | Civil Action |
| | : | No. 1:19-cv-00917-RDA-WEF |
| **v.** | : | |
| | : | March, 18 2024 |
| **F.C.S.B.,** | : | 2:05 p.m. |
| **et al.,** | : | |
| | : | |
| | : | VOLUME 1 - PM SESSION |
| **Defendants.** | : | |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Jonathan Fahey, Esq.**
                            HOLTZMAN VOGEL BARAN TORCHINSKY
                            & JOSEFIAK, PLLC
                            2300 N Street NW
                            Suite 643a
                            Washington, DC 20037
                            202-536-1702
                            Email: Jfahey@holtzmanvogel.com

                            **Alison Anderson, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            2029 Century Park East
                            Suite 1520
                            Los Angeles, CA 90067
                            213-995-5720
                            Email: Alanderson@bsfllp.com

```
APPEARANCES:  (Cont.)

For the Plaintiff:          Brittany Zoll, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            Andrew Brenner, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            Robert Keefe, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     Ryan Bates, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            Sona Rewari, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            Scott W. Burton, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com
```

```
   APPEARANCES:  (Cont.)
                              Kevin Elliker, Esq.
   For Defendant F.C.S.B.:    HUNTON ANDREWS KURTH, LLP
                              2200 Pennsylvania Avenue, NW
                              Washington, DC 20037
                              804-788-8200
                              Email: Kelliker@huntonak.com


   Court Reporter:           Scott L. Wallace, RDR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              Eastern District of Virginia
                              401 Courthouse Square
                              Alexandria, VA  22314-5798
                              Cell: 443-584-6558
                              Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

DIRECT EXAMINATION OF B█████ R.                              6
BY MS. ANDERSON

### EXHIBITS

**DESCRIPTION**

**After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.**

Plaintiff's Exhibit 804 admitted                            12

Plaintiff's Exhibit 61 admitted                             18

Plaintiff's Exhibit 60 admitted                             20

Plaintiff's Exhibit 604 admitted                            25

Plaintiff's Exhibit 174 admitted                            67

1          **AFTERNOON SESSION, MARCH 18, 2024**

2    (2:05 p.m.)

3          MS. ANDERSON:  Your Honor, before the jury comes in, I

4    just wanted to ask one quick question.  I was going to have the

5    witness just spell her first name and last initial.  Is that --

6          THE COURT:  That's fine.

7          MS. ANDERSON:  Okay.

8          MS. REWARI:  My apologies, Your Honor, we were stuck in

9    the security line.  Sorry about that.

10          (Jury in at 2:06 p.m.)

11          THE COURT:  Circumstances and situations remind me of

12    funny stories, and I notice, sir, you remained standing while

13    everyone was standing coming in for you, but they're standing for

14    you.  That's a good thing.

15          A story I like to tell is when I had my first job as a

16    judge, they had this thing called an investiture where they give

17    everybody that's going to be part of your bench, all your

18    friends, all your lawyer friends and the like, and it's a real,

19    real nice event where they say nice things about you and say what

20    a great job you're going to do, and I had my very first

21    investiture and it was real exciting and I was blessed by a lot

22    of nice things that were said.  And my wife and I were coming

23    back from the investiture, and I have a long driveway leading up

24    to the house, and so I'm getting ready to pull in, and my wife

25    says, stop right here.  What's the matter?  She says, I just want

1   you to know that all that judge stuff stops right here.

2   (Laughter).

3         So, there you go.  All right, ladies and gentlemen.  Are

4   we ready for our first witness?  Are there any other witnesses in

5   the courtroom?  Let's just make sure.  Are any of your witnesses

6   in the courtroom?

7         MS. ANDERSON:  No witnesses in the courtroom.  We're about

8   to grab the one we're about to announce.

9         THE COURT:  Okay.  Very good.  You can do that.

10        MS. ANDERSON:  Okay.  Thank you.  Your Honor, plaintiffs

11   call as their first witness, Mrs. B█ R.

12        THE COURT:  If we could, because we had to switch court

13   reporters, identify yourself for the record.

14        MS. ANDERSON:  Oh, yes.  I apologize.  Alison Anderson for

15   the plaintiff.  Thank you.

16        THE COURT:  Ma'am, if you would do so, please place your

17   hand on the Bible.

18              (B█ R., PLAINTIFF'S WITNESS, SWORN)

19        THE COURT:  Thank you, ma'am.  Listen to the questions of

20   counsel and answer them as best you can.  Thank you.  You may

21   have a seat.

22              DIRECT EXAMINATION OF B█ R.

23   BY MS. ANDERSON:

24   Q.    Good afternoon, Ms. B█ R.  Can you please state your

25   first name and last initial and spell it for the court reporter.

1  **A.**      Of course.  My name is B████, ████████, last initial is R.

2  BY MS. ANDERSON:

3  **Q.**      And, Mrs. R████, how are you related to the plaintiff

4  in this case?

5  **A.**      I'm her mother.  Proud to be her mother.

6  **Q.**      And what is her first name?  Your daughter's first name?

7  **A.**      B████.

8  **Q.**      And were you a witness to any changes in your daughter in

9  the year of 2011 and 2012?

10  **A.**      I was.

11  **Q.**      And were you the primary parent engaging with the school

12  during those times?

13  **A.**      I was.

14  **Q.**      I want to talk first about where you lived before coming

15  to Virginia.  Where did you -- where did you live then?

16  **A.**      In Palm Beach County, Florida.

17         MS. ANDERSON:  And, Your Honor, I just want to check, this

18  mic -- it's red, so I want to make sure it's --

19         THE COURT:  I think you're fine.

20         MS. ANDERSON:  It's fine?  Okay.

21  BY MS. ANDERSON:

22  **Q.**      In Palm Beach County, Florida?

23  **A.**      That's correct.

24  **Q.**      And what was -- just briefly, what was your life like

25  there with your family?

1    **A.**    It was idyllic.  My husband and I started a family there.

2    We're from New York, and long beautiful days, beautiful

3    children, wonderful community, just a great life.

4    **Q.**    And what was your husband's first name?

5    **A.**    S█████.

6    **Q.**    And what are the names of your children that you were

7    living with in Florida?

8    **A.**    My son D███, and my daughter B███.

9    **Q.**    And at some point, did you decide to move to Virginia?

10    **A.**    We did.

11    **Q.**    And can you just walk us through that decision and what

12    you were thinking when you decided to move to Virginia?

13    **A.**    Um, my husband and I put a huge priority on our

14    children's education, and they were overachievers.  They did

15    really well in school, very special kids, and we put them

16    through private school from the time they were PK2, PK3, and by

17    the time my son was about to go into, I think it was the sixth

18    grade, maybe, we thought that we needed to find a more

19    affordable solution.

20         The private schools were costing a lot, and we needed --

21    Florida wasn't doing well in terms of public schools.  It was

22    Number 49 or 50 at the time, so we talked about moving to find

23    the right school district and the right community to raise our

24    family going forward.

25    **Q.**    Okay.  And before we get to that decision, you mentioned

1    your son.  Is he older or younger than your daughter B████?

2    **A.**      D████ is four years older than B████.

3    **Q.**      And when you started to decide where you wanted to move

4    to look for schools, what's -- what areas did you start to look

5    at?

6    **A.**      So, we read articles on the best school districts in the

7    country.  We were wide open, just looking for where we could

8    plant ourselves, and there were three options that kept coming

9    up.  One was Nassau County, Long Island, which was rated highly.

10   The other one was in Silicon Valley, and the third one was

11   Fairfax County.

12   **Q.**      And what drew you to Fairfax County?

13   **A.**      It was a combination of factors.  Our families are in New

14   York, for the most part, so we wanted to be close by.  We

15   eliminated New York.  It was a little too unaffordable for us,

16   and we also wanted to go to a place that had job opportunities

17   for both myself and my husband because we were going to move

18   without jobs.

19          So we were looking for job opportunities for ourselves,

20   an area that was cosmopolitan, gave our kids a diversification

21   of education and good opportunities, so that's how we picked

22   Fairfax.  California was too far.

23   **Q.**      And did safety matter at all to you?

24   **A.**      Of course.  We were looking for community, and that's

25   what we looked at when we looked at gradeschools.net.  We looked

1    at the ratings, safety, discipline records, AP courses, things

2    like that.

3    **Q.**    And where did you ultimately move to and when?

4    **A.**    Um, I believe it was 2006, and we moved Herndon,

5    Virginia, to be in the Rachel Carson -- I think it's the Oakton

6    pyramid.  It's been 12 years, and it had a high TJ acceptance.

7    I think Rachel Carson fed into TJ at a really high rate, so we

8    liked -- and it had good performance, academically, college

9    acceptances, things like that, and very quaint communities.

10    **Q.**    And many people probably already know this, but just to

11    be sure, is Herndon, Virginia within Fairfax County?

12    **A.**    Yes.

13        THE COURT:  Ma'am, when you refer to TJ, you're referring

14    to Thomas Jefferson?

15        THE WITNESS:  Yes, sir, I'm sorry.

16    BY MS. ANDERSON:

17    **Q.**    And when you got to Virginia, what grade was B███ in?

18    **A.**    I believe it was the second grade.

19    **Q.**    And what school was she attending?

20    **A.**    Floris.

21    **Q.**    And was that within Fairfax County School Board?

22    **A.**    Yes, Herndon, as well.

23    **Q.**    And could you just walk through the area that you were

24    living in at the time?

25    **A.**    It -- it felt very quaint.  There were, like, farm-like

1    roads.  At the time 12 years ago, I think there was also a

2    petting farm.  It looked like farms had been made into

3    residential communities, so it was still really kind of windy

4    and very pretty.  Homes were a nice size.  It just looked like a

5    friendly, lovely neighborhood.

6    **Q.**    And did you move again around 2009, 2010?

7    **A.**    Yes, I'm sorry.  We lived in an apartment when we first

8    moved to Herndon because we didn't know where to move to, so we

9    rented for a couple of years, and then we went to a house.

10   **Q.**    And what sort of community name or area was that?

11   **A.**    And that's what I was describing before, I apologize.  So

12   that was Middleton Farms, and that's off of West Ox Road.

13   **Q.**    And what did you like about Middleton Farms?

14   **A.**    Just a quiet, very pretty, serene, safe area.

15   **Q.**    And what middle school was assigned to that neighborhood

16   or to your home?

17   **A.**    Rachel Carson Middle School.

18   **Q.**    And who, then, was living in your home at that time in

19   around 2010, 2011?

20   **A.**    Our nuclear family, my husband, myself, D███, and B███.

21   **Q.**    If you can, please, in front of you there's an exhibit

22   marked No. 804.

23   **A.**    Okay.  I'm sorry.

24   **Q.**    Is that -- are those family photos?

25   **A.**    I'm sorry, I'm at 604 --

1    **Q.**    Take your time.

2    **A.**    Yes, I am.

3        MS. ANDERSON:  Your Honor, I move to admit Exhibit --

4    Plaintiff's Exhibit 804.

5        THE COURT:  Without objection?

6        (Brief pause in proceedings.)

7        THE COURT:  As you're working through that, it seems it's

8    just a photo.  Should there be any objection to a photo?

9        (Discussion had off the record.)

10       MR. KINNEY:  I think it's cumulative and repetitive.

11       THE COURT:  Overruled.

12       MS. ANDERSON:  Could I please have permission to publish?

13       THE COURT:  You may.

14       MS. ANDERSON:  Thank you.  And if we could please go to

15   page 44.

16       (Plaintiff's Exhibit 804 admitted into the record.)

17   BY MS. ANDERSON:

18   **Q.**    Now, Mrs. R█████ -- or Mrs. R., I apologize.  Please

19   strike that.

20       I apologize if my back is to you.  It's just a little

21   awkward.  The exhibit is over here for me.  Can you please just

22   walk through with the jury who the members of your family were?

23   **A.**    Sure.  The gentleman in the gray suit is my husband,

24   S█████.  The young man next to him is my stepson Jesse, who had

25   just graduated, and then you have me, and in my arms is B████.

1    I think she must have been three.  And S█████ has his arms

2    around D███, who must have been seven or so.

3    Q.     Great, thank you.  And what schools -- when you moved to

4    Middleton Farms, what schools were your two children in at that

5    time?

6    A.     B█████ went to Floris Elementary.  Oh, I'm sorry, you said

7    when I was at Middleton Farms?  I'm so sorry.

8    Q.     When you moved to Middleton Farms --

9    A.     Got it.

10   Q.     -- what schools were your children in at that time?

11   A.     So my son D███ was at Westfield High School, and my

12   daughter was at Rachel Carson.

13   Q.     And can you just describe sort of just a -- your basic

14   life before B█████ starts Rachel Carson Middle School?

15   A.     I think just a very tight-knit family.  We did almost

16   everything together.  We had dinner together seven days a week.

17   My husband and I always took jobs and worked around the

18   children's schedule.  Somebody was always home with them.

19          The kids had extracurricular activities.  My son was an

20   extemporaneous debater, excelled at that.  My daughter was a

21   blossoming tennis champion, and she was playing piano and also

22   singing.

23   Q.     And can you just walk us through what sort of a typical

24   day -- and I'm sorry, what did S████ do?  Was he working at the

25   time?

1    **A.**      Yes.  S███████ was a hairdresser.

2    **Q.**      And were you working at the time?

3    **A.**      When B████ started Rachel Carson, I was working part-time

4    from home, yes.

5    **Q.**      Okay.  And can you walk us through just sort of a typical

6    day right before B████ started Rachel Carson Middle School?

7    **A.**      Basically morning routine, everyone's rushing to get

8    dressed.  You know, breakfast, at least two people together,

9    whoever was leaving the house together, and then initially B████

10   would take the bus, so she would walk to the bus.

11        I believe at times D███ by now had a driver's license.

12   He was driving sometimes to school.  And so the kids were at

13   school.  My husband would go to work.  I was working mostly from

14   home at the time, and then when they were ready to come home

15   from school, we'd get ready for the extracurricular activities.

16   If it was tennis, my husband was in charge of -- he took great

17   pride in teaching B█████ tennis, so he would take her to her

18   practices and meets.

19        When it was music lessons, it was usually me who took

20   them.  If we didn't have time, we packed coolers in the car and

21   go directly from school, home, wherever we had to go.

22   **Q.**      And what about friends, did the kids have friends, and

23   what were those interactions like?

24   **A.**      Yes, they had friends -- you know, during the school week

25   there wasn't very much time to interact with friends.

1   Occasionally on the weekends, you know, there would be some

2   outings or visiting or that sort of thing.

3   **Q.**    And at the time who was B█████ friends?

4   **A.**    In the seventh grade -- before the seventh grade, I would

5   say it was Olivia.  There were two Olivias.

6         There was a -- I'm sorry, Arianna.  There was -- I'm

7   trying to remember names.  I'm sorry.

8   **Q.**    That's okay.  And do you remember Olivia's last name?

9   **A.**    One was Palchus, Olivia Palchus, and the other one was

10  Olivia Brassingram.

11  **Q.**    And would B████ -- how would she interact with her

12  friends, or what types of things would they do?

13  **A.**    Most of it -- at that age, most of the interactions were

14  either at Olivia Brassingram's house or our house, and, you

15  know, they were just eating, giggling, you know, that sort of

16  thing.  B████ didn't sleep over anyone's house.  Olivia

17  Brassingram did sleep over at our house a couple of times.

18  **Q.**    Before starting Rachel Carson Middle School, did B█████

19  have a friend named J.O.?

20  **A.**    Oh, I'm sorry, I forgot.  Yes.

21  **Q.**    And what was her -- what was her relationship with J.O.

22  like?

23  **A.**    So, Ms. J████ came to Floris, I think in the sixth grade,

24  and --

25         THE COURT:  Counsel, clean up the record a little bit.

```
 1   There's a transition that some might not follow.

 2         THE WITNESS:  I'm sorry?

 3         MS. ANDERSON:  Yeah, I wasn't completely sure where we

 4   landed on, but --

 5         THE COURT:  Is the person you referred to as J████, J.O.?

 6         THE WITNESS:  Yes.  So J████ had just moved -- I think her

 7   mother had sent her to live with her father.  Her mother was in

 8   Florida.

 9         MR. KINNEY:  I think that's hearsay.

10         THE COURT:  Let's just focus on the relationship.

11         Ma'am, when you ask a question, try as best you can, and I

12   know sometimes questions can be difficult to follow because of

13   the context, and the lawyer is trying to do a good job, but try

14   as best you can to focus on the question and the answer.

15         Essentially the question was, what was the relationship

16   between your daughter and J████?

17         THE WITNESS:  Okay.

18         MR. KINNEY:  Just based on her observation.

19         THE COURT:  Yes.

20         THE WITNESS:  B████ befriended her in the sixth grade.

21   BY MS. ANDERSON:

22   Q.    And what were -- what types of interactions did you

23   witness or see with B████?  And I don't -- we don't need

24   specifics, but just generally.

25   A.    They're -- I mean, whatever interaction they had was
```

1    limited after school.  I mean, it was mostly in school.

2    **Q.**    And how did -- how did B███ do in the sixth grade

3    before -- at Floris Elementary School before coming to Rachel

4    Carson?

5    **A.**    She was doing fine.  Her teacher commended her progress,

6    her efforts, her accomplishments, and ended up being a mentor.

7         MS. REWARI:  Objection, Your Honor, hearsay.

8         THE COURT:  Ma'am, again, try to focus on the question as

9    best you can.

10        THE WITNESS:  Okay.

11   BY MS. ANDERSON:

12   **Q.**    Well, why don't we go ahead and we'll -- if you can grab

13   Exhibit 61 that's in front of you.

14   **A.**    Okay.

15   **Q.**    Is that B███ sixth grade final report card?

16   **A.**    I'm sorry, I'm looking in the wrong place.

17        THE COURT:  I don't have any problem with you approaching

18   the witness and helping her find the document.

19        THE WITNESS:  I've got it.  Thank you.  61, right?

20        MS. ANDERSON:  Yes.

21        THE WITNESS:  Okay.

22   BY MS. ANDERSON:

23   **Q.**    Is that B███ sixth grade final report card?

24   **A.**    It is.

25        MS. ANDERSON:  I move to admit.

1          THE COURT:  Without objection?

2          MS. REWARI:  No objection.

3          THE COURT:  Without objection.

4          (Plaintiff's Exhibit 61 admitted into the record.)

5          MS. ANDERSON:  If we could pull that up, please.  And I

6     think if we can just zoom in on the top just to show that that's

7     B██████.

8     BY MS. ANDERSON:

9     Q.    And is that her sixth grade report card?

10    A.    Yes.

11    Q.    And if we look at the definitions for O and G are what?

12    A.    I'm sorry, did you ask me a question?  I'm sorry.

13    Q.    Yes.  What does it say the definitions for O and G are?

14    A.    Oh, okay.  O is outstanding, and G is good.

15    Q.    Okay.  Great.  And if we can scroll down, please, or go

16    down on the page.  One more, please.

17          And if you look there, do you see Os and Gs for accepts

18    responsibility?

19    A.    I see straight Os for accepts responsibility.

20    Q.    What about courteous behavior?

21    A.    Oh, got it.  Okay.  Sorry.

22          THE COURT:  Can we all agree that the document speaks for

23    itself?

24          MS. ANDERSON:  Great.

25    BY MS. ANDERSON:

1    **Q.**    And so she has those for self control and plays

2    cooperatively; is that right?

3    **A.**    That's correct.

4    **Q.**    What types of grades did B█████ get at Floris Elementary

5    before coming to Rachel Carson?

6    **A.**    She was a great student.  All the teachers commented --

7         MS. REWARI:  Objection, hearsay.

8         THE COURT:  Ma'am, try to focus on the question and try to

9    restrict your answers as best you can.  I appreciate that because

10   you're not a lawyer, things might not be easy for you, but the

11   lawyer is asking very specific and precise questions, so please

12   answer those questions without any editorializing.

13        THE WITNESS:  She was a great student.  Is that an answer?

14   BY MS. ANDERSON:

15   **Q.**    What types of grades was she getting -- was B████ getting

16   at Floris Elementary School?

17   **A.**    As, Bs.

18   **Q.**    And I want to talk just a minute about B█████ health

19   before going to Rachel Carson Middle School.  How was her

20   overall health?

21   **A.**    She was in great health.

22   **Q.**    Did she have any issues with headaches or migraines?

23   **A.**    No.

24   **Q.**    Any physical illness?

25   **A.**    No.

1    **Q.**    Any hospitalizations?

2    **A.**    No.

3    **Q.**    Did she have mental health challenges?

4    **A.**    No.

5    **Q.**    And any issues with her sight?

6    **A.**    I believe she started wearing glasses for distance in the

7    fifth grade, sixth grade.

8    **Q.**    And who was her pediatrician at the time?

9    **A.**    Dr. Kevin Weaver.

10    **Q.**    And how is -- before going to Rachel Carson, how was

11    B███ feeling about going to middle school?

12    **A.**    She was so excited.

13    **Q.**    And if I can point your attention to Exhibit 60, please.

14    **A.**    Okay.

15    **Q.**    And is that an e-mail about journalism elective from the

16    school?

17    **A.**    Yes.  Her sixth grade teacher had forwarded it to us.

18    MS. ANDERSON:  Okay.  I move to admit Exhibit 60.

19    MS. REWARI:  No objection, Your Honor.

20    THE COURT:  Without objection.

21    (Plaintiff's Exhibit 60 admitted into the record.)

22    BY MS. ANDERSON:

23    **Q.**    And if we can start at the bottom of the e-mail, please.

24    **A.**    At "by the way"?  Is that where you want me to start, "By

25    the way?"

1    **Q.**    So, if you -- do you see the screen in front of you?

2    **A.**    Yep.

3    **Q.**    So if we could start with that e-mail.  Who was that from

4    and who is that to?

5    **A.**    It is from Ellen Bickford to Jennifer Hertzberg, and

6    B█████ H██████ and Cheryl Weaver are copied.

7    **Q.**    Okay.  And is that about a new journalism elective at

8    Rachel Carson Middle School for the 2011-2012 year?

9    **A.**    Yes, that's correct.

10   **Q.**    Okay.  If we can go to the next e-mail in the middle of

11   the page.

12          And what's this e-mail in the middle on the page?

13   **A.**    It's from her sixth grade teacher, Jennifer Hertzberg, to

14   us, and she's asking if B████ would like this journalism course.

15   **Q.**    And when you say "to us," what do you mean by that e-mail

16   address?

17   **A.**    That e-mail address is my husband's and mine.

18   **Q.**    And then you write -- if we go up to the top, it says,

19   "She is ecstatic about her placement in all honors classes."

20          What were you saying there?

21   **A.**    Jennifer Hertzberg had recommended that she be placed in

22   honors classes.

23          MS. REWARI:  Your Honor, objection.

24          THE COURT:  I'll allow it.  It provides context.

25          MS. ANDERSON:  You can take that down.

1    BY MS. ANDERSON:

2    **Q.**    I want to speak briefly just about the electronics in

3    your home.  At this time, 2011, before starting Rachel Carson

4    Middle School, who has what sort of electronics in your home?

5    **A.**    We have one computer.  I think it was a Dell in the

6    study, and then we had just gotten the kids flip phones because

7    we had made a trip to Italy, and my husband -- I had a flip

8    phone, and my husband had a -- a more advanced phone because he

9    was conducting business.

10    **Q.**    And you -- when you say "more advanced," was that like

11    what we might call nowadays a smartphone?

12    **A.**    That's correct.

13    **Q.**    And the one computer, whose computer was that?

14    **A.**    It was the family computer.

15    **Q.**    And did you have any rules about technology?

16    **A.**    I limited time, of course, but I think the one rule was

17    that nobody was allowed to bring phones to the table, the dinner

18    table, which also seconded as our homework table, and nobody was

19    allowed to take phones up to bedrooms, including my husband.

20    **Q.**    And so, where would -- including your husband -- and so

21    where would that be -- where would they be, if it was nighttime?

22    **A.**    The kitchen area had a desk, and we had a docking station

23    that everybody put their phones.

24    **Q.**    And what about at dinnertime?  What did dinnertime look

25    like?

```
 1   A.      Dinnertime was home-cooked meals altogether, no phones,
 2   conversation.
 3   Q.      And you mentioned the trip to Italy right before --
 4   during that summer.
 5   A.      Correct.
 6   Q.      Can you describe that briefly?
 7   A.      It was a family dream vacation that we had planned for.
 8   All of us went for a few weeks.  Had the time of our lives.
 9   Q.      And how was Bella on that trip?
10   A.      She was having a great time.  She was blossoming, and I
11   don't know if I should say more.
12   Q.      I think it's fair to answer the questions.
13   A.      Okay.
14   Q.      But I think that was plenty.  Thank you.
15           After the trip, do you attend an orientation at Rachel
16   Carson Middle School?
17   A.      Yes.
18   Q.      And who do you attend that orientation with?
19   A.      It's Bella and myself.  We go.
20   Q.      And who else do you interact with while you're at that
21   orientation?
22   A.      Mr. F███████ was there, Ms. Weaver was there, and B██████
23   H████████ was there.
24   Q.      And when you say Mr. F████████, just for this first round,
25   can you please say his first name?
```

1    **A.**    So A████ F██████ is the school principal.

2    **Q.**    Okay.  And Ms. Weaver, can you please say her full name?

3    **A.**    Cheryl, Cheryl Weaver is the dean of students, or -- I

4    think that's her title, something like that.

5    **Q.**    And I believe you said Ms. H███████?

6    **A.**    B█████ H██████ was the guidance counselor.  She was also

7    my son's guidance counselor, and known to our family.

8    **Q.**    And how was your family familiar with Ms. H███████?

9    **A.**    Mr. H██████ used to take her daughter to play tennis

10   practice, and we played right next to her and got to know her

11   well.

12   **Q.**    And can you just describe what your interactions were

13   like with Ms. H██████ that day at the orientation?

14   **A.**    Yeah.  Bella was excited to see her, and she said, I hope

15   you're my guidance counselor, and Ms. H██████ said, let's go

16   see, but if not, we'll see what we can do, and it was like a

17   mutual admiration.

18   **Q.**    And what about Mr. F██████?

19   **A.**    Mr. F███████ just said hello, and he was sort of

20   conducting the tours, so he was busy.

21   **Q.**    And had you known Mr. F██████ before this orientation?

22   **A.**    Yes.

23   **Q.**    How so?

24   **A.**    My son went to the school.  My son did really well at the

25   school.  We met at various functions.

1    **Q.**    And before sort of getting into Rachel Carson Middle

2    School, did it have a reputation in your mind?

3    **A.**    Yes.  As I mentioned before, it was one of the most

4    highly rated in Fairfax County.

5    **Q.**    Did they have any sayings that you recall?

6    **A.**    I'm probably going to misstate it, but something about

7    truth, integrity, responsibility -- some virtues that I liked.

8    **Q.**    And I'd like to -- if you could take a look at

9    Exhibit 604, please.

10    **A.**    Sure.  Okay.

11    **Q.**    Is that an aerial photo of your neighborhood at the time,

12    2011?

13    **A.**    It looks like it.

14         MS. ANDERSON:  I'd like to move to admit Exhibit 604,

15    please.

16         THE COURT:  Without objection?

17         MS. REWARI:  Yes, no objection.

18         THE COURT:  Without objection.

19         (Plaintiff's Exhibit 604 admitted into the record.)

20    BY MS. ANDERSON:

21    **Q.**    Okay.  If we can zoom in, please.

22         So, Ms. R., if you can please show us on the map where on

23    this map the -- your home was at in 2011.

24    **A.**    Okay.  Yeah.  So, this is Horsepen Woods Lane, and our

25    house was like this one, the second one, I think, right there

```
1    (indicating).

2    Q.    And if you can either adjust the microphone or just speak

3    a little closer.

4    A.    Sorry.

5    Q.    Thank you.  And where in relation to your house was the

6    bus stop?

7    A.    So, you would have to walk down Middleton Farms Lane, and

8    the bus stop was right on West Ox.

9    Q.    Okay.  Is that in this area (indicating)?

10   A.    Correct.

11   Q.    And when we say "the bus," what bus are we talking about?

12   A.    The one for Rachel Carson.

13   Q.    And did you -- in the beginning of the year, did you

14   drive Bella to school or did she take the bus?

15   A.    For the most part, she took the bus.

16   Q.    And whose decision was that?

17   A.    Honestly, I think it was a family decision.  She wanted

18   to be a big girl, be independent.  My husband had to go to work.

19   Logistically it worked out.  It was not far.

20   Q.    And how would she get from the bus to your house?

21   A.    Walk.

22   Q.    Now, I want to pull up, which is already admitted,

23   Exhibit 804, page 26.

24         So it will be on your screen.

25   A.    Okay.
```

1    **Q.**    About how old is Bella in this photo?

2    **A.**    About to turn 11, I think.

3    **Q.**    And at this time, before starting Rachel Carson Middle

4    School, how would you describe sort of her maturity?

5    **A.**    My kids were always super mature, teaching us things.

6            THE COURT:  Take it down?

7            MS. ANDERSON:  Yes, sir.  Yes, please, thank you.

8    BY MS. ANDERSON:

9    **Q.**    And what was she most excited about to start middle

10   school?

11   **A.**    I think just feeling like she was getting older, you

12   know, making new friends, new courses, different types of

13   challenges, you know.

14   **Q.**    Any particular courses she was excited about?

15   **A.**    Drama, chorus.

16   **Q.**    And how did the first few weeks go?

17   **A.**    She seemed fine.  Everything was good the first few

18   weeks.

19   **Q.**    What about -- did she seem to have a lot of homework or

20   anything like that?

21   **A.**    Very responsible.  You know, she would come home and say,

22   I've got lots of work to do, sit at the table.

23   **Q.**    And was she able to keep up with her extracurricular

24   activities?

25   **A.**    Yes.

1    **Q.**    Okay.  I'm going to draw your attention to October of

2    2011.  Do you remember Bella bringing up a conversation about a

3    pumpkin patch?

4    **A.**    Yes.

5    **Q.**    Can you please walk the jury through sort of how that

6    conversation and how it went?

7    **A.**    Bella was cleaning the house, which raised my antenna.  I

8    was, like, "What are you doing?  What do you want?"  And she

9    said, "Nothing," and she just kept cleaning and helping me.  She

10   said, "You work too hard.  I want to help you," and I said,

11   "Just tell me what you want," and she said, "Mom, I want to go

12   to the pumpkin patch, but I'm sure you're going to say no," and

13   I said, "Why would I say no?"  And she said, "Because there's a

14   boy that asked me to go."  And I said, "And is it a group?"

15   Because we talked about, you know, groups are okay in middle

16   school and things like that, and she said, "No, but his parents

17   are going."  I said, "Oh, no problem, just have the parents call

18   me.  That's perfectly acceptable."

19   **Q.**    Okay.  And what was the boy's name?

20   **A.**    David Neill.

21   **Q.**    And did Bella have anything to say about the boy?

22   **A.**    She was just -- you could tell she liked him, that's all.

23   **Q.**    Had Bella ever, to your knowledge -- understanding you're

24   a mom, had Bella ever told you about going on a date with a boy

25   before?

1    **A.**    No.

2    **Q.**    Had she ever told you about kissing a boy?

3    **A.**    No.

4    **Q.**    What about holding hands?

5    **A.**    No.  Not until that point, no.

6    **Q.**    And how did this pumpkin patch date or going out, how did

7    that end up getting set up?

8    **A.**    So David Neil's -- I'm confused, it was a blended family,

9    so I don't know if it was the mother or the stepmother, but one

10   of them called me, and said, "We'd like to invite Bella to join

11   our family.  It's going to be David's younger sister, who I

12   think was three, and my husband, and we're just going to be gone

13   for the afternoon.  We'll pick Bella up, and then we'll bring

14   her home," and I said, "That would be great."

15   **Q.**    Okay.  And what about the day of?  Can you walk us

16   through what you observed the day of when Bella went to the

17   pumpkin patch?

18   **A.**    So they came and picked her up.  They sat in our living

19   room waiting for Bella, and there was some, you know, nice

20   conversation, and then they were off.

21   **Q.**    What about when Bella came down?  Did they have any

22   interactions?

23   **A.**    You know, I just -- I think David looked at Bella, and

24   Bella looked at David, I remember seeing that, and there was a

25   little bit of a crush kind of thing going on.  I don't know.

1    Q.    And can you describe then for us when Bella came home?

2    A.    When she came home, she was a little quiet, and I said,

3    "How was it?"  And she said, "Okay," and I said, "I notice you

4    came home in another car."  I said, "What's that about?"

5    Q.    And what did she say?

6    A.    She said, "We had to stop at his house because his mom

7    needed to put his younger sister down for a nap, and then while

8    we were there, she decided she wanted to put in a load of

9    laundry, and we went with her to put that load of laundry in."

10   Q.    And then what about in the next few days?  Did Bella say

11   anything about David Neill?

12   A.    Um, she was not talking about him at all, and I couldn't

13   tell you the exact words, but the feeling was she wasn't -- she

14   didn't like him.

15   Q.    Let's talk after the pumpkin patch.  Do you start to

16   notice any changes in your daughter's behavior?

17   A.    Yes.

18   Q.    Can you describe those for us, please?

19   A.    Yes.  She was quieter, more isolated, more emotional.

20   Q.    How did she feel about school?

21   A.    She -- at that point she was -- she wasn't complaining.

22   She was just quiet, and...

23   Q.    Okay.  Now, is there a point in which she starts to tell

24   you just -- that something is happening at school?

25   A.    Yes.  I -- I think she was crying one day, and I asked

```
1    her what was going on, and she said --

2            MS. REWARI:  Objection, Your Honor, hearsay.

3            THE COURT:  Overruled.

4            THE WITNESS:  And she said -- she said, "Mom, they're

5    saying horrible things about me at school."  And I said, "Like

6    what kind of things?"  And she said, "They're calling me bitch,

7    lesbian, and she said I give blow jobs, I'm a whore and a slut."

8    And I said, "Do you -- that's horrible, that's unacceptable.  I

9    can go to school and talk to them."  And I said, "That shouldn't

10   be going on."  And she said, "I'd like to handle it myself.  I've

11   tried to see my counselor, and I think I can handle it."

12           THE COURT:  Next question.

13   BY MS. ANDERSON:

14   Q.    And after you talked to Bella, did you end up going to

15   the school at that point?

16   A.    No.

17   Q.    At some point do you go to an open house at Rachel Carson

18   Middle School?

19   A.    I do.

20   Q.    Okay.  About when was that?

21   A.    It was November 11th.

22   Q.    And is that in 2011?

23   A.    Oh, I'm sorry, yes.

24   Q.    And can you just walk us through what happens when you

25   get there for the open house?
```

1    **A.**     So, I think the open house was on Veterans Day, and

2    parents are allowed to visit the classrooms, sort of walk the

3    day with their kids, and you visit with each teacher, the

4    classroom, you watch it in action, that sort of thing, and check

5    on --

6    **Q.**     And during that open house, did you end up having a

7    conversation with a specific teacher, Mr. F██████ T████████?

8    **A.**     Mr. T████████, yes.

9    **Q.**     T████████, my apologies.  Can you please walk us through

10   that conversation?

11   **A.**     Sure.  So Mr. T████████ knew our family rather well, and we

12   had some niceties about how D███ was doing in high school.  I

13   told him about some science fair that D███ had won, some

14   research he had done.  He said he would love to see it, and then

15   I said, "How is Bella doing?"  And his answer was, "She's the

16   most troubling kind of student."  And I was shocked because I

17   had never heard any teacher say that.

18   **Q.**     And what did you respond?

19   **A.**     I said, "What do you mean?"  And he said, "It's

20   inconsistent performance.  When she is with us" -- and he wasn't

21   talking about physically with us, but when she is present in the

22   classroom, she's a top performer, and he said, "Other times

23   she's just not with us, even though she's sitting there and

24   she's not doing anything."

25   **Q.**     And did you have any response to that?

1    **A.**    Yeah.  I started asking him, "Can you help me understand

2    that?  What are you saying?"  And he said, "Look, this is not

3    the time for a conference.  This is an open house."  I said,

4    "I'm sorry, I apologize," but I was shaken by that.  I had never

5    heard a teacher describe my daughter like that.

6          So I said, "So what do I do?"  He said, "You need to see

7    the counselor, the guidance counselor to set up appointments.

8    That's how parent teachers are set."

9    **Q.**    And what were you thinking after this conversation?

10   **A.**    I was -- I was so confused.  I didn't understand that

11   statement.  I mean, B_____ always been a high-performing --

12   teachers are always saying they wish they had more students like

13   her.

14   **Q.**    And so what did you do after you had that conversation

15   and left that open house?

16   **A.**    I called B_____ H_____, and I said, "Can you please

17   make arrangements for me to see all of the teachers for

18   parent/teacher conferences individually.  I would like to

19   understand what they're observing as well."

20   **Q.**    And why did you call B_____ -- Ms. H_____?

21   **A.**    Because she was B_____ guidance counselor.

22   **Q.**    And did you hear back from Ms. H_____?

23   **A.**    No.  I called her two or three times.

24   **Q.**    And did you ever end up connecting with Ms. H_____ in

25   order to schedule these meetings?

1    **A.**    No.

2    **Q.**    When do you ultimately end up speaking to the school

3    about what's going on with B█████?

4    **A.**    So, I went to the school on November 21st, which was a

5    Monday.

6    **Q.**    Now, between October and this November 21st, can you

7    describe what's happening with your daughter now?

8    **A.**    Yeah.  She's unraveling.  She is angry.  She's more

9    isolated.  She's not talking to her friends.  She's not talking

10   to us.  She's crying all the time.

11         And the three or four days preceding November 21st, I

12   actually saw her take everything in her room and just throw it.

13   Her room was beautiful, and she was just destroying it and I

14   didn't understand that, and that worried me.

15   **Q.**    Was she talking to you about what was going on?

16   **A.**    She was just saying -- well, we had that voice message,

17   and that's what got us to talk.

18   **Q.**    Before the voice message, though, was she talking

19   about -- what was she saying about what was going on?

20   **A.**    Just the name calling, the sexual name calling.

21   **Q.**    And how was it going with her extracurriculars like

22   tennis and piano?

23   **A.**    No, she stopped going.  She didn't want to.  I had to

24   cancel her piano lessons.  Her tennis team had to be told she

25   wasn't going to be playing tennis.  She didn't want to do any of

 1   that anymore.

 2   Q.    And what about when she would first get home from school,

 3   did she go through her usual patterns?

 4   A.    No, her typical pattern -- my typical pattern was when

 5   the kids got home, I offered them a snack.  They'd put down

 6   their book packs, and we'd sort of chat about the day.  She

 7   would just run upstairs.

 8   Q.    And what about her relationship with J.O.?

 9   A.    So she said that J.O. was --

10        THE COURT:  Hold on.

11        THE WITNESS:  I'm sorry.

12        THE COURT:  Stop.  Particularize your question a little

13   bit more.

14   BY MS. ANDERSON:

15   Q.    Did you notice any changes in her relationship with J.O.

16   at that time before November 21st?

17        MR. KINNEY:  If I may, the question -- I don't know that

18   there's any foundation laid for her basis for knowing the

19   relationship.  She said that the interaction was with the school,

20   if I understood her testimony before.  So if she can lay a

21   foundation for what she observed, I have no problem.

22        MS. ANDERSON:  I'll ask more specifically.

23        THE COURT:  Lay a little bit more of a foundation.

24   BY MS. ANDERSON:

25   Q.    Did Bella ever talk to you about her friendship with J.O.

1  during this time?

2  **A.**     In the sense that she was saying J█████ was part of the

3  name-calling, she was spreading the rumors.

4  **Q.**     And --

5  **A.**     And she was also hurting her in the PE area, locker area.

6  **Q.**     Now, you talked about a voicemail.

7  **A.**     Uh-huh.

8  **Q.**     So what made you finally decide to go to the school on

9  November 21st?

10  **A.**     So I would say about three weeks had transpired where I

11  was seeing my daughter change drastically -- although gradually,

12  it was a drastic change, and she became kind of like a shell of

13  herself.

14       And then she was asleep one day, and I saw a flashing

15  light on her phone, and it was after hours, as far as I can

16  remember, and I thought, that's odd, who would call her so late?

17  And I picked up the phone, and I listened to the voice message.

18  **Q.**     Okay.  And --

19       MS. ANDERSON:  With the Court's indulgence and

20  understanding that the language may be what we don't normally say

21  in court --

22       THE COURT:  Well, I think you still need to lay a little

23  bit more of a foundation.  Did she recognize the voice on the

24  voicemail, et cetera.

25       MS. ANDERSON:  Okay.

1    BY MS. ANDERSON:

2    **Q.**    Did you -- did you recognize the voice on the --

3    **A.**    I did not.

4    **Q.**    And was this your daughter's phone?

5    **A.**    Yes, it was.

6    **Q.**    And how did you retrieve the voicemail?

7    **A.**    It was 2011, so all you had to do was, I think, press

8    star or something like that.

9    **Q.**    And what was said on the voicemail?

10   **A.**    I'm still uncomfortable saying it.

11        THE WITNESS:  Judge --

12        THE COURT:  You have to say it, ma'am.

13        THE WITNESS:  Okay.  He said, "I'm going to stick my big

14   fat black dick in your ass like you like it.  Call me, bitch."

15   BY MS. ANDERSON:

16   **Q.**    And did you have any idea who this person was?

17   **A.**    No.

18   **Q.**    What were you thinking after hearing this?

19   **A.**    I was horrified, I was horrified.  I was, like, who could

20   be talking to my 12-year-old like this?

21   **Q.**    And so what were your next steps?  What did you do?

22   **A.**    My instinct was just, I've got to block this number, and

23   I don't want her hearing this.  So I went online.  I didn't know

24   how to block a number, and I followed Sprint's instructions on

25   how to block a number.

1    **Q.**    Okay.  And why -- why did you block the number?

2    **A.**    I didn't want her to hear this type of message.

3    **Q.**    And when you say "her," who --

4    **A.**    I'm sorry, my daughter, Bella.

5    **Q.**    Okay.  And what was Steve's reaction?

6    **A.**    He was horrified.  You know, he -- I told him about the

7    message, and he was just horrified.  He didn't know who it was,

8    he didn't know what it meant.  We were just -- this was not --

9    we'd never experienced anything like this.

10   **Q.**    And did you end up speaking to your daughter about this

11   voicemail?

12   **A.**    Yes.  So --

13   **Q.**    And can you --

14        THE COURT:  Wait for the next question.

15        THE WITNESS:  I'm sorry.

16        THE COURT:  That's okay.

17        THE WITNESS:  Sorry.

18   BY MS. ANDERSON:

19   **Q.**    Can you please -- I know you're nervous.

20        Can you please walk us through the conversation you had

21   with your daughter about the voice message?

22   **A.**    So the next day I said to B▆▆▆, I said, "Do you

23   recognize a number," and I read it to her, I had jotted it down.

24        And she said, "Yes."

25        And I said, "Whose number is that?"

1          And she said "It's this boy named C███████."

2          And I said, "Well, he left a very sexually inappropriate

3    threatening message."  And I said, "Did you know that?"

4          And she said -- she cried.  And she said, "Mom, he's been

5    leaving me these kinds of messages for a while now."

6    **Q.**     And just for sake of following it, is -- does C███████

7    start with a C?

8    **A.**     Correct.

9    **Q.**     Okay.  And does his last name start with a K?

10   **A.**     Yes.

11   **Q.**     So to the extent we talk about C.K., is that who we're

12   referring to?

13   **A.**     Yes.

14   **Q.**     Okay.  And did she tell you anything about her

15   interactions with C.K.?

16   **A.**     She -- so that weekend she told me everything.  She was

17   saying that he and David Neill and some other people were coming

18   to her locker, and they were touching her inside her blouse and

19   inside her pants.  And they were calling her names, and it was

20   spreading through the school, sexual names.

21   **Q.**     And did she tell you anything about some money?

22   **A.**     Yes.  She told me that he had threatened her --

23          THE COURT:  Use a -- use a -- either an initial or --

24          THE WITNESS:  I'm sorry.  Okay.

25          C.K. had threatened her and asked -- demanded $50.

1    BY MS. ANDERSON:

2    Q.    Now let's talk about the meeting on November 21st or walk

3    us through just how you arrived on campus that morning?

4    A.    So Bella didn't want to go to school, she said, "I don't

5    want to go to school."

6          And I said, "Bella, you love school, you don't have to be

7    afraid, Daddy and I will go with you.  And we're going to talk

8    to the principal."

9          And she said, "I don't want to go.  I don't want them to

10   see me."

11         And I said, "What do you mean?"

12         She goes, "If they see me going to the school, they'll

13   hurt me more."

14         And I said, "So we'll wait until school starts, and we'll

15   go afterwards."  And so we waited until a little after school

16   had started.

17   Q.    Okay.  And so when you arrived at the school, who's with

18   you?

19   A.    It's Bella, my husband, S███████, and myself.

20   Q.    And where do you go?

21   A.    To the main office, and I ask to see Mr. F███████.

22   Q.    Okay.  And what happened when you asked to speak with --

23   and, again, just so that -- I know it's the beginning, so who

24   was Mr. F███████?

25   A.    I'm sorry, I'm sorry.  I asked to see the principal,

1   Mr. F████████.

2   **Q.**    And what was the response?

3   **A.**    "I'm sorry, he's unavailable."

4        And at that point B█████ H█████████ sees me, and she says,

5   "Mrs. R███████, I had no idea things had gotten so bad."

6   **Q.**    And, again, who's Ms. H█████████?

7   **A.**    She was known to our family, and she was B████████

8   counselor.

9   **Q.**    And what was your understanding about why she was saying,

10  "I had no idea that things had gotten this bad"?

11       MS. REWARI:  Objection, Your Honor.

12       THE COURT:  Sustained, rephrase.

13  BY MS. ANDERSON:

14  **Q.**    Okay.  What -- what was your response?

15  **A.**    I said, "What things, Mrs. H█████████?  What are you

16  referring to?"

17       And she said, "Let's go back to my office."

18       THE COURT:  Hold it.  Okay.  I know it's hard, ma'am,

19  because you're not a lawyer, but I'll give you a little primer on

20  what hearsay is.

21       THE WITNESS:  Okay.

22       THE COURT:  Essentially you cannot, unless there's an

23  exception or an exemption to the hearsay rule, testify about what

24  something said to you or what they said to you or in response to

25  a question.  In other words, you can answer what you did in

```
 1   response to that, but you can't say that this person said this
 2   because that's hearsay; it's an out-of-court statement offered
 3   for the truth of the matter asserted therein.  So you really
 4   can't talk about what someone said, but you can say what you did
 5   in response to what they said to you.
 6        MS. ANDERSON:  Your Honor, I do believe there's an
 7   exception, though, for parties and their admissions and
 8   statements.
 9        THE COURT:  Response?
10        MS. REWARI:  Your Honor, I think it's admissible against
11   the party but not against the ten other defendants.
12        THE COURT:  Ladies and gentlemen of the jury, at some
13   point during the course of the litigation today I explained to
14   you that there may be what I call limiting instructions.
15   Limiting instructions are such that you can only consider them
16   for one specific purpose.
17        In this case, it's being suggested that something was said
18   by one person who's a party defendant to this case.  That
19   statement that is made or allegedly made by that party defendant
20   cannot be attributed to anyone else.
21        Essentially saying it another way is that if someone said
22   something that might have been incriminating or bad, you can't
23   impose that against someone else unless other factors are proven.
24        MS. ANDERSON:  Your Honor, I do believe that Ms. H███████
25   would be considered an agent of the School Board, so it would be
```

1    Ms. H█████ and the defendant School Board.

2         THE COURT:  Okay.  I think you can get there, but it would

3    not be applied to other people who are not in that sort of

4    universe of individuals that you're talking about.

5         MS. ANDERSON:  Understood.

6    BY MS. ANDERSON:

7    **Q.**    Okay.  So I think -- and I apologize, I should have

8    marked where we left off, but I think we were talking about your

9    response to --

10        THE COURT:  I think you can go a little bit further back

11   than that.

12        MS. ANDERSON:  Okay.

13        THE COURT:  You said that Ms. H█████ approached you and

14   said, "I don't know that it had gotten that far," and then your

15   response is, "What are we talking about?"

16        What did she say in response to that?

17        THE WITNESS:  She said, "Bella may -- has been trying to

18   see me for more than a month, but they have us so busy doing back

19   to school administrative things that I didn't get back to her."

20   BY MS. ANDERSON:

21   **Q.**    Okay.  And what happens next?

22   **A.**    So we now are in the main office, and we go to her office

23   area, and I give her details about the sexual slurs that are

24   being hurled at Bella, and I tell her --

25   **Q.**    And -- and --

1    **A.**      I'm sorry.

2    **Q.**      -- before we get to the details, can you just walk us

3    through who's in the room at the time?

4    **A.**      Right now it's just my husband, myself, Bella, and

5    Mrs. H██████, the guidance counselor.

6    **Q.**      Okay.

7    **A.**      Yeah.

8    **Q.**      Now, in that room with those individuals, what do you

9    say?

10   **A.**      I tell her that there are lots of rumors and sexual slurs

11   going around school where people are calling her whore, slut,

12   bitch.  She's giving blow jobs to everybody, she lets you in her

13   pants.  And I then tell her about a message, and I tell her the

14   message.

15         And she goes, "You know, hold on," and she says, "I have

16   to go get Officer Jennis."

17   **Q.**      Okay.  And who is Officer Jennis?

18   **A.**      He's the school's police officer.

19   **Q.**      And what happens?  Is it just Officer Jennis that joins

20   the same group of people?

21   **A.**      That's correct.

22   **Q.**      Okay.  And what happens once Officer Jennis enters the

23   room?

24   **A.**      So I go to play -- I have B█████ phone, and I go to

25   play --

```
 1         THE COURT:  Direct her a little bit more because we
 2    need -- we don't need to get too far afield, so focus her to the
 3    extent that you can.
 4    BY MS. ANDERSON:
 5    Q.    Okay.  What do you tell Officer Jennis when he enters the
 6    room?
 7    A.    I tell him I want him to listen to a message, and I tell
 8    him that B██████ been experiencing this sexual name-calling.
 9    Q.    And do you play the message for him?
10    A.    I go to press "play" and it's not playing.
11    Q.    And what happens next?  Do you try to do anything?
12    A.    Yes.  I told them that I blocked his number, and perhaps
13    there's something I needed to do to unblock the message, so
14    Ms. H██████ said, "Why don't you sit at my desk and try to call
15    Sprint."
16    Q.    And do you try to call Sprint?
17    A.    I did.
18    Q.    And what's happening while you try to call Sprint?
19    A.    Sprint tells me that when you block a number, everything
20    related to that number is removed from the device.
21    Q.    Okay.  And while -- while you're doing that, where is
22    Ms. H██████?
23    A.    So, Ms. H██████ went and she got Mr. H█████, who is the
24    seventh grade -- P███ H████, who is the seventh grade
25    principal, and Ms. S████ T████, you might know her as Dunigan
```

1  M███.  I don't know which name she had at the time, but she was

2  the eighth grade principal.

3  **Q.**    Okay.  And did Ms. H██████ explain why she was going to

4  go get Mr. H██████ and Ms. T█████?

5  **A.**    She didn't explain when she went, but when they came

6  back, they told me Ms. T█████ is the eighth grade principal, and

7  since the boys that I was complaining about were eighth graders,

8  that she would handle the matter.

9  **Q.**    Okay.  And where do you go after that?

10 **A.**    She wants to take us -- Ms. T█████ wants to take us to her

11 office on the eighth floor, and I asked her to wait because

12 there were students in the hallway.  There was a bell change, so

13 I asked if we could wait.

14 **Q.**    And so did you wait?

15 **A.**    We did.  It was just a minute or two.

16 **Q.**    Okay.  And then when you get to Ms. T██████ office, if

17 you can just tell us who's in the room?

18 **A.**    Yes.  Ms. T█████ office -- Ms. H██████, the guidance

19 counselor; Mr. H█████, the seventh grade principal; myself;

20 Ms. T████; and my daughter.

21 **Q.**    And do you talk to Ms. T█████ about what happened at the

22 pumpkin patch?

23 **A.**    Yes, because she had not heard anything downstairs in

24 Ms. H███████ office.

25 **Q.**    Okay.  And what do you tell her?

1   **A.**    I bring her up to speed that Bella had gone to the

2   pumpkin patch with David and his family, and that he had

3   attempted to touch her in the basement while his mother had

4   left.

5        MS. REWARI:  Objection, Your Honor.  Hearsay.

6        MS. ANDERSON:  This is what she's giving notice to the

7   school and the individuals in the room.

8        THE COURT:  What exception/exemption to the hearsay rule

9   do you articulate?

10       MS. ANDERSON:  Well, I think there's also the issue of an

11  opening attack on my client's credibility, so prior consistent

12  statements, as well as what the -- so it's not for the truth of

13  the matter necessarily, but the fact that the parent is informing

14  the School Board.

15       THE COURT:  But your client hasn't testified, so how can

16  we in any way attribute some sort of inconsistent statement if

17  she hasn't testified in court before the jury?

18       MS. ANDERSON:  I mean, I think they opened on whether or

19  not these things happened.  I think they're going to cross her on

20  that.  But I also think it's not necessarily for the truth of the

21  matter, but for what was told to the School Board.

22       THE COURT:  You might be able to get to that later, but I

23  don't think that you're there now with this particular witness.

24       MS. ANDERSON:  So, may I approach, Your Honor?

25       THE COURT:  Sure.

1        (Following sidebar discussion had on the record:)

2        MS. ANDERSON:  So, this entire case is about -- and even

3    according to the defendants in our opening, what was told to the

4    school and when, and so if she's not able to tell the school what

5    she told them, then, you know, the whole question of what they

6    were on notice on, which is something we have to prove and show.

7        THE COURT:  The problem that I'm having right now is that

8    I've heard testimony, and again, I can be corrected if I'm wrong

9    on this, that there was a trip to the pumpkin patch.  My mother

10   used to call it a pumpkin patch, but a trip to the pumpkin patch,

11   and that your client was somewhat stressed after going to the

12   pumpkin patch.

13       But I really haven't heard anything about what allegedly

14   happened at the pumpkin patch, which would now let this witness

15   sort of start talking generally about the circumstances which

16   caused her to talk to Ms. H███████ about it.

17       Again, I think you might be able to get there at some

18   point, but this witness, I don't think you can --

19       MS. ANDERSON:  Well, the issue is that it's -- when

20   witnesses, they can sometimes connect testimony, and we don't

21   obviously want to recall Ms. R██████ back up to say what she told

22   them, and in my view, it's not even hearsay because it's not

23   necessarily for the truth of what happened in that basement, but

24   that Ms. R██████ is telling --

25       THE COURT:  Well, then we kind of run into a secondary

     1    issue regarding evidence, and that is the probative value being

     2    outweighed by the prejudicial effect.

     3         So it doesn't really -- it has some bearing of relevancy.

     4    I understand why you want to get it in, and I think there's a

     5    method for you to get it in, but I don't think from this witness

     6    at this point you can get in.

     7         MS. ANDERSON:  Or what she told the school about --

     8         THE COURT:  At this point, no.

     9         MS. ANDERSON:  One of the students and what they were

    10    doing to her?

    11         THE COURT:  At this point, no.  Again, your client's

    12    testimony originally was limited to the fact that B.R. went to

    13    the pumpkin patch, and when she came back from the pumpkin patch,

    14    she was distressed, but there's been no foundation whatsoever as

    15    to what Bella may have said or what her response is to what Bella

    16    may have told her.  None of these things have happened yet.

    17         Again, I think you might be able to get it in either

    18    through your own client or some other source, but at this point I

    19    don't think you can get it in.

    20         MS. ANDERSON:  Well, then I think we're going to have to

    21    recall Ms. R███████ later because she's the one who -- her child

    22    is 12 years old, and she's the one giving the school the notice.

    23         THE COURT:  You might have to do that.  It's not my

    24    preference, but you might well have to do that at this point.

    25    Again, we have to work from the context of the litigation, and at

1    this point we're just not there yet.

2         Now, it may be a situation where your client testifies,

3    this is what I told my mom, and you might want to call Mom back

4    to the stand to corroborate that that's what my daughter told

5    her.

6         MS. ANDERSON:  And I see that for the inconsistent

7    statements.  I guess where I'm struggling is even if it's not for

8    the truth of the matter, but just for what they had been told in

9    that meeting.

10        THE COURT:  I think you can ask the question, what did

11   Ms. ██████████ do in response to what you told her, what the

12   substance of what you told her; what she told her could not be

13   elicited at this point.

14        MS. ANDERSON:  But the whole question in this case is

15   whether they acted reasonably under what they knew, and then I

16   can't share what they knew.  I can't tell them what --

17        THE COURT:  Again, I think from an evidentiary standpoint

18   you may eventually be able to get there, but just not at this

19   moment.

20        MS. ANDERSON:  So anything that Bella tells her and she

21   tells the school is going to need to come after B█████

22   testimony?

23        THE COURT:  I would think so at this point, based on the

24   context of the way the case is being presented.

25        MS. ANDERSON:  Given that it's 3:15, and I know you asked

1    that we find a great breaking point around 3:15 to 3:30 because

2    it may just make sense to shuffle our case around versus having

3    her on for hours and make --

4         THE COURT:  I made a call, and so the commitment that I

5    had later in the afternoon, I don't have it anymore.

6         MS. ANDERSON:  Oh, I see.

7         THE COURT:  That's what I mentioned earlier I was going to

8    try to move some things around, and I was able to do that.

9         Why don't you do this, as a suggestion.  Maybe you can

10   inquire about another area that's important to this witness, and

11   then I won't have any problem with tomorrow, if she's still on

12   the stand, kind of going back and readdressing the things that

13   you're trying to address, and maybe after you speak to counsel,

14   you'll have a better understanding where I may be coming on this.

15        MS. ANDERSON:  Okay.  So maybe I'll do that, and then

16   we'll think about breaking her testimony and bringing in the

17   plaintiff because I think -- I don't see how we get over this.

18        THE COURT:  That's fine.

19        MS. ANDERSON:  And it's obviously critically important

20   what she told the school.

21        THE COURT:  And again, I think we all can agree that the

22   nature of this litigation is very cumbersome, and so sometimes

23   when we're dealing with cumbersome situations, we have to do

24   things that are a little unusual.

25        MS. ANDERSON:  Okay.  So I'll move to another topic, and

1    then we may end up doing something different.

2         THE COURT:  Yes, ma'am.

3         MS. ANDERSON:  Okay.

4              (Open court.)

5         THE COURT:  Ladies and gentlemen of the jury, I'm going to

6    consider giving you your late afternoon break around 3:30.  I

7    made a couple of calls, and I'm going to be able to stay a little

8    later today than I thought I would be able to stay.

9         So does anyone have any problem with us sort of going to

10   about 5:00 this evening?  Does anybody have a problem with that?

11   Okay.  Very good.  I appreciate that.

12        Counsel.

13   BY MS. ANDERSON:

14   Q.   Okay.  I think we're going to skip a little bit in the

15   timeline and then come back.

16        Let's talk about the day that you pull your daughter from

17   school, and so I'll direct your attention to February 9th of

18   2012.  What happened -- what's the first thing that happens with

19   the school that morning from your perspective that you learn

20   about?

21   A.   I receive a call from this T███ B███, who is an

22   assistant principal.  I -- I'm not sure.  I think she's a

23   general assistant principal, I'm not sure, but she gives me a

24   call at 1:15, and she says, "Mrs. R███, we've had another day

25   of threats, death threats against Bella, 15 or so people," and

1    she said -- I said, "Is she safe, is she okay?"  And she said --

2    she said, "I don't think it's anything to be worried about.  I

3    think it's just what kids say," and I said, "Ms. B███████," I

4    said, "I went to the school in the South Bronx, we never said

5    that in the '70s.  It's not acceptable."  I said, "Where is she

6    now?"  And she said, "I can't investigate this right now.

7    B██████ back in class."  And she said, "I have a meeting at Gate

8    House Road with the deputy superintendent."

9    **Q.**    Okay.  And did you ask her to do anything?

10   **A.**    I did.  I said, "If you sent Bella back to the classroom,

11   could you perhaps ask Ms. H██████ to check in on her since all

12   these death threats keep happening?"  And I said, "Maybe she

13   could just check in to see if she's okay and help her in the

14   transition of classes so she's not hurt," and Ms. B██████ said,

15   "Why didn't I think of that?"  And she said she would, but there

16   was a feeling of uneasiness I had, so I called Ms. H███████.

17   **Q.**    Okay.  And did you speak with Ms. H████████?

18   **A.**    She was not there.  She had a voice message that said she

19   had left the office -- left the building earlier in the day.

20   **Q.**    And so what did you do next?

21   **A.**    I was scared for my daughter.  I really thought something

22   was going to happen to her, and so I called the front office,

23   and I said, "I would like to pick up my daughter.  It's an

24   emergency.  I would like for you to have someone discreetly pull

25   her out and bring her to the front office and don't leave her

1    alone."  I said, "Either my husband or myself will be picking

2    her up."

3    **Q.**    And did you pick her up?

4    **A.**    We did.

5    **Q.**    And did you have a conversation with your daughter when

6    you picked her up?

7    **A.**    She was distraught -- yes, she was sobbing, and she was

8    trying to tell me what was going on during the day.  So I was

9    getting bits and pieces from her, but she had basically said

10   that, you know, people were saying that C███████ had knives and

11   guns, and that they were -- I'm sorry.

12   **Q.**    If you could just hold on.  We'll come back to some of

13   those things.

14   **A.**    Sure.

15   **Q.**    What did you say to your daughter?

16   **A.**    I said, "You're safe, you're going home, you will not

17   return to that school."

18   **Q.**    I would like to pull up Exhibit 132, so if you can -- if

19   you can look at that in your binder, please.

20        Actually, I'm going to skip this portion, too, for now,

21   and we may go back to that.

22        I know this is a hard conversation, but after your

23   daughter -- you pulled your daughter out of school, did she end

24   up telling you whether or not she had been raped?

25   **A.**    Yes.  She was home for about two weeks.

1    **Q.**    And can you please describe what happened in that

2    conversation?

3    **A.**    She was very depressed, and she was laying on the sofa.

4    And my husband came back home with smoothies for all of us.

5    There was just a sadness in the house, and so he thought he

6    would bring smoothies, we tried different flavors.  And --

7    **Q.**    And when you say she had been home for two weeks, what

8    was she doing during that time?

9    **A.**    No.  She -- she was just sad, crying, angry that she had

10   to give up school.  "I shouldn't have to give up school.  I love

11   school."

12   **Q.**    And then what happened once you had the smoothies that

13   S█████ brought?

14   **A.**    So she had a flavor I had never heard of.  I don't -- I

15   don't remember the flavor, I'm sorry.  So I jokingly said, you

16   know, "Could I have a sip," and she didn't answer me.  So I just

17   sort of grabbed for it.

18          And I went to take a sip and she said, "Don't do it,

19   Mommy."

20          And I was like, "What?"

21          And she said, "My mouth is so dirty."

22          And I said, "What are you talking about?"

23          And she said, "They put their" -- and she couldn't say

24   the word, and she buried her head in my shirt.  And she started

25   crying.  And she said, "They put their private parts in my

1    mouth."

2         And I said, "What are you talking about, B____?  What are

3    you talking about?"

4         And then she just told me about being raped by C____.

5    **Q.**    Okay.  And what did she say happened to her?  And if you

6    can use C.K., please.

7    **A.**    I'm sorry.  I'm sorry.

8         THE COURT:  Pick up your voice just a little.

9         MS. ANDERSON:  Oh, I'm sorry.

10   BY MS. ANDERSON:

11   **Q.**    And what did she say had happened to her?  And please use

12   C.K.

13   **A.**    Yes.  She said that after I had gone to the school to

14   report the sexual harassment, the unwanted touching in -- at the

15   locker area, that he got angrier and angrier.  And more people

16   were coming to the school, coming to her, strangers, people she

17   didn't know.  And they said, "Christian's got guns, knives,

18   ropes, and he's not afraid, he's going to kill you.  He's not

19   afraid to use them on you.  He's going to kill you."

20        And she said that one day he was waiting at the bus stop,

21   and he tackled her, basically.

22   **Q.**    And just that day, what did she say as far as attacked

23   her, like what -- what was her explanation?  Like, how did she

24   say it?

25   **A.**    She said there was a wall of some sort where the bus is

1    near the entrance.  And she said that he pulled her top off --

2    up, her pants down.  You know, he forced her to put his penis in

3    her mouth.  He put his penis in her butt.

4    Q.    And how was she acting as she's telling you these things?

5    A.    She's -- I mean --

6          THE COURT:  Ms. Anderson, can -- the volume.

7          MS. ANDERSON:  I'm sorry, I'm sorry, it's just so hard.

8    BY MS. ANDERSON:

9    Q.    How was she acting as she's telling you these things?

10   A.    She's sobbing, and the words are not coming out in

11   complete sentences.  She's just sobbing, and she's telling me

12   what had happened.

13   Q.    And were you asking a lot of questions in this

14   conversation?

15   A.    As much as I could.  You know, when someone -- well, I

16   know my daughter -- as I'm talking to her, I just wanted her to

17   know that she was safe and that I loved her.  I made a comment

18   about she was pure, she was not dirty, that she was the sweetest

19   girl and that we would figure this all out.

20         You know, I didn't want to ask too many questions.  I

21   didn't want to shut her down.  I wanted her to tell me what she

22   felt comfortable with.

23   Q.    Okay.  And did she say anything about what she may or may

24   not have told the school?

25   A.    Well, I knew about what she was telling the school.  She

1    had conveyed that to me.

2    **Q.**    After you learn this, at some point do you hear

3    information about some Facebook messages?

4    **A.**    There was information before even that I had on Facebook.

5    **Q.**    So I'll direct your attention to afterwards.  Did you

6    receive any information from a C███████ kid about Facebook

7    messages?

8    **A.**    Oh, yes.  So, do I say his name?

9    **Q.**    So now we can say Co.K.

10   **A.**    Okay.

11   **Q.**    So this young boy, Co.K., was a friend of B█████.  He

12   was at our house quite a bit.  And he was aware of what Bella

13   had been going through.  He had been reporting it to the school

14   as well and writing statements.

15        And I watched Co.K. when his mother was working outside

16   of town, you know, just keep an eye on the kids.  They had a

17   nanny but --

18        THE COURT:  And just try to make sure that you direct her

19   in a way that she doesn't start providing hearsay information.

20   BY MS. ANDERSON:

21   **Q.**    And did he provide you with anything?

22   **A.**    Yes.  So he said that he had a conversation --

23        MR. KINNEY:  Objection.

24        THE COURT:  Sustained.

25        MS. ANDERSON:  Did he provide you with a copy of anything?

 1          THE WITNESS:  Yes, a Facebook conversation.

 2    BY MS. ANDERSON:

 3    **Q.**    Okay.  And who was the name of that Facebook account?

 4    **A.**    Jenny Taylor.

 5    **Q.**    And did you get a copy of these messages?

 6    **A.**    I did.

 7    **Q.**    And can you just describe for us what you saw in those

 8    messages?

 9    **A.**    I haven't looked at them in a long time since 2012.  But

10    as far as I can recall, it was C███████ having a conversation

11    with this person, and they were talking about what they were

12    going to do to Bella.

13          And it sounded like multiple people with sexual acts, and

14    I got scared.  I felt like there was an imminent threat to my

15    daughter.

16          THE COURT:  Next question.

17          THE WITNESS:  Sorry.

18    BY MS. ANDERSON:

19    **Q.**    And what did you do after you received these messages?

20    **A.**    I said to Bella, I have to go to the police.  The

21    school's not helping us.

22    **Q.**    And did you go to the police?

23    **A.**    I did.

24    **Q.**    And did your daughter speak with the police?

25    **A.**    She did.

1    **Q.**    Okay.  Did --

2        MS. ANDERSON:  Actually, Your Honor, do you mind if we can

3    approach for two seconds?

4        THE COURT:  Let's go ahead and take our 3:30 break at this

5    point, and then we can recommence.

6        Ladies and gentlemen, this is our late afternoon break.

7    We're probably going to go -- oh, I'll give you 15 minutes, so

8    3:45, and then we're going to stop somewhere at 5:00.  I don't

9    have a problem if you need to make a call for childcare issues

10   and the like, Ms. Tinsley can help you do that, but we're going

11   to break until about 3:45.

12       All right.  Ma'am, you can step down right now.  And if I

13   can ask you to please exit the courtroom, and don't discuss any

14   aspect of the case with anyone while we're taking our break or at

15   any point thereafter.

16       All right.  We'll come and get you when we need you.

17       THE WITNESS:  Exit that way?

18       THE COURT:  Yes, ma'am.  You're fine.

19       (Jury out at 3:29 p.m.)

20       THE COURT:  You don't get to go there.  No, no, no, no.

21   Good try.

22       You can have a seat.

23       All right.  We'll take up your issue.

24       MS. ANDERSON:  Your Honor, I just wanted to say we're

25   about to get into the SANE exam, and I was going to ask --

```
 1    there's actually no objections to the SANE exam, so we will be

 2    showing photos.  And I wondered if we can have either counsel's

 3    screens turned around or --

 4         THE COURT:  Facing the Court so that they're not --

 5         MS. ANDERSON:  Facing the Court.

 6         THE COURT:  -- facing the gallery.

 7         MS. ANDERSON:  Or at least to one of the sides or

 8    something.

 9         THE COURT:  All right.  What I'm going to ask is my staff

10    to see if we can situate the courtroom and actually see if we can

11    turn the monitors there a little bit more to the right side.

12         Did you have something you want to say?

13         MS. ANDERSON:  Thank you, Your Honor.

14         MS. REWARI:  Yes, I don't want to -- I mean, I want to

15    save time.  I'm not sure how this witness can talk about the

16    medical report.  I believe the SANE nurse is on the --

17         THE COURT:  How are you going to lay a foundation for

18    that?

19         MS. ANDERSON:  So she was there, and we're going to go

20    through some of the statements in there and pictures.  But our

21    understanding of the Court's ruling was that we really shouldn't

22    be calling Diane Burkhart, and they don't have an objection to

23    the report itself.  So besides Ms. R., the only other person who

24    was there for the exam would be the plaintiff, and we think

25    that's too much for her to -- to go through to testify through
```

1     that.

2           THE COURT:  Can we -- since there's no objection to the

3     report itself, can you all agree to a stipulation, that if we had

4     a witness to testify, this is what the witness would testify as

5     the results and findings of the SANE report and then post

6     whatever you think you can post and then move on from that

7     instead of having the lady testify to her daughter's alleged

8     injuries?  That's going to be pretty particular.

9           MS. ANDERSON:  It is.  Given our ability to reach

10    stipulations, I don't -- I don't know that we'll be able to say

11    what they would testify to, but if we can at least just walk

12    through the report as counsel, we would be willing to do that.

13          MS. REWARI:  So I understood that the Court's ruling on

14    Dr. Jennings was that she couldn't tie the findings.  And both --

15    both Ms. Burkhart and Ms. Jennings -- or Dr. Jennings agree that

16    they're inconclusive, and so if -- I'm not sure --

17          THE COURT:  I think what they can do, even in light of the

18    Court's prior determination, what they can do is lay a record

19    that a SANE report was conducted, which is legitimate, and I

20    believe -- we all agree that that report suggests that they were

21    inconclusive.  Is that what you're saying?

22          MS. REWARI:  Correct.

23          THE COURT:  So why can't there be a stipulation that the

24    report says what it says and that it's inconclusive?

25          MS. REWARI:  Yeah, and I would -- there's an ambiguity in

1    the report, which is what Ms. Burkhart clarified in her

2    testimony.  And so that was her testimony before she was

3    designated as a -- a nonretained expert.

4        So we -- our objection -- well, I believe that she was

5    designated as a nonretained expert in response to Dr. Jennings.

6    And so she's a fact witness, she's on our list, and she will be

7    testifying as a fact witness, not rendering expert opinion about

8    what she did and what her exam was and what the box she

9    checked -- why she checked the box she checked.

10       And our concern is if the report comes in -- her testimony

11   is there were only two choices or three choices, and I picked

12   this one, I wish there was a fourth choice on there, that's the

13   one I would have picked.

14       It's not clear if you just get the report that that would

15   be her explanation, so we do need her as a witness.

16       MS. ANDERSON:  Your Honor, we've been trying to cut down

17   witnesses, we're trying to cut witnesses, just introduce this.

18   I'm happy to admit --

19       THE COURT:  This --

20       MS. ANDERSON:  -- and walk through it.

21       THE COURT:  This is -- this is the way we're going to do

22   it, even though the parties are not able to stipulate.  I'm just

23   going to take judicial notice of the fact that the SANE exam was

24   conducted and that the evidence tends to suggest that it's

25   inconclusive.  We can -- you can offer the SANE --

1          MS. ANDERSON:  And it's not -- it's -- that's -- I think

2    an unfair characterization because it notes anal injuries, and I

3    think --

4          THE COURT:  If that's what it says, that's what it says.

5          MS. ANDERSON:  The jury's -- so if the exam is coming in,

6    then that's -- then that's fine.

7          And so are you suggesting that we can just walk through it

8    versus Mrs. R or -- because I do think the jury has to see it at

9    some point.

10          THE COURT:  Well, it's the Court's preference that that is

11    not done through this witness.

12          MS. ANDERSON:  And I would -- and I would like to do that.

13    And if we can just at some point walk through it.  It's just we

14    don't -- as far as after trimming our witnesses down, the two

15    witnesses who were there, I'd rather not have the plaintiff, but

16    if we can just walk through it without a witness, I'm happy to do

17    that.

18          THE COURT:  Well, we've got a lot of time that we can

19    do -- use to take advantage of those suggestions, and I don't

20    think that they're necessarily bad suggestions.

21          But the bottom line is it's the Court's preference to not

22    do it through this witness.  I think we've got evidentiary

23    considerations to worry about.  And even though there's a

24    stipulation of sorts, that SANE exam says what it says, this

25    witness is not the proper one to do it.  Maybe after you put your

1    heads together and we are working through things a little bit

2    more we can figure out a better methodology for getting it in.

3        MS. ANDERSON:  Yeah, she can -- I definitely did not take

4    that to mean that she can't testify about her experience during

5    the exam and being in the room and all of that.  Just not walking

6    through the --

7        THE COURT:  She can testify -- this is what I believe she

8    can testify to, what the Court is going to say.  She can testify

9    that her daughter had the benefit of a SANE examination, that she

10   attended that SANE examination, and that examination was

11   conducted by whoever it was conducted by, that's it.

12       MS. ANDERSON:  Well, and I think the experience of going

13   through the SANE exam, I think, is important.  I mean, here we're

14   talking about --

15       THE COURT:  How does --

16       MS. ANDERSON:  -- underlying damages based on trauma.

17       THE COURT:  How does the mother's experience in going

18   through being with her daughter during a SANE examination go to

19   the damages for your client?

20       MS. ANDERSON:  She's just going to describe it because I

21   think you'll hear from our client that she's largely in a

22   disassociated state.

23       THE COURT:  Yeah, and obviously she can testify to that,

24   but having Mom to opine about those kind of things --

25       MS. ANDERSON:  No.  She'll just describe what it was

```
 1   looking like, what was happening, those types of things.
 2        THE COURT:  Well, as I say, I think you need to stay
 3   within the strictures of the Court's suggestion, because if you
 4   don't, then I'm going to cut you off, so I'll try to understand
 5   as best I can that this witness is not the best witness that you
 6   can use for that, and the best way, I think, for everybody to
 7   accomplish the objective of getting that SANE examination in is
 8   to come up with a stipulation as to this is the exam and this is
 9   what it says, and then if you want to put on experts later to
10   describe the significance and what this means, fine.
11        MS. ANDERSON:  Okay.  I'm just trying to trim it down.
12        THE COURT:  I get it.  I'm for that.  We have about seven
13   minutes for ourselves, so let's take advantage of it.
14        (Thereupon, a recess in the proceedings occurred from
15   3:37 p.m. until 3:50 p.m.
16        THE COURT:  Before we bring the jury back in, does anyone
17   have any problem on Wednesday -- not tomorrow, I have a doctor's
18   appointment, but on Wednesday starting a little bit earlier, if
19   they have no problem?  Does anyone have any problem with that?
20        MS. REWARI:  No.
21        THE COURT:  Very good.  I wanted to ask you all before I
22   asked them.
23        MS. ANDERSON:  Your Honor, if I could just give you a
24   quick roadmap of where I'm at.  I think so much of her testimony
25   is obviously with the school, so given the ruling, I think I'm
```

1    going to skip to just the very end, after she's done interacting

2    with the school, go through that.  We may not make it till 5:00,

3    and then we'll just have to recall her after --

4            THE COURT:  That's fine.  I appreciate that.

5            MS. ANDERSON:  Okay.

6            (Jury in at 3:52 p.m.)

7            THE COURT:  All right.  The jury's reseated.  Let's go

8    ahead and recommence the testimony of the last witness.  Thank

9    you, ma'am.

10           MS. ANDERSON:  Thank you, Your Honor.

11           THE COURT:  Ma'am, you're still under oath.

12   BY MS. ANDERSON:

13   Q.    Ms. R -- oh, I'm sorry.  Ms. R., we're going to go ahead

14   and skip quite a bit, and I'm going to ask you to take a look at

15   Exhibit 174 in front of you.

16   A.    Okay.

17   Q.    And is that the formal withdrawal notice from FCPS?

18   A.    Yes.  It's a formal notice, even though it's handwritten,

19   yes.

20           MS. ANDERSON:  I move to admit Exhibit 174.

21           THE COURT:  Without objection?

22           MS. REWARI:  Yes, no objection.

23           THE COURT:  It's admitted.

24           (Plaintiff's Exhibit 174 admitted into the record.)

25           MS. ANDERSON:  So if we can pull that up, please.

1    BY MS. ANDERSON:

2    **Q.**    Ms. R., can you say who this is to?

3    **A.**    Yes.  It was addressed to Mr. Kurt Mills, who was the

4    director of home education.  I think that's his title.

5    **Q.**    And was he in that role for Fairfax County Public

6    Schools?

7    **A.**    Yes, I apologize, that's correct.

8    **Q.**    And can you just read the note that you wrote?

9    **A.**    "Mr. Mills, please be advised we will no longer need

10   home-based instruction services, as B████ is no longer attending

11   school within FCPS, effective immediately."

12   **Q.**    And is that your signature?

13   **A.**    It is.

14   **Q.**    And what's the date?

15   **A.**    March 1st, 2013.

16   **Q.**    And can you remind us what date you originally picked

17   Bella up for her last day at in-person learning at RCMS?

18   **A.**    Yes.  February 9th, 2012.

19   **Q.**    And can we go to the second page, the top of it, please,

20   or the third page.

21          And does that look like the formal notice?

22   **A.**    Yes.

23   **Q.**    And if we can just go down.  And you can take that down.

24   Thank you.

25          After deciding to withdraw Bella from Fairfax County

1    Public Schools on March 1st, 2013, what did you then decide to

2    do with her education?

3    **A.**     We had her go to a boarding school until we could figure

4    out a long-term solution and leave Virginia.

5    **Q.**     And where was this boarding school?

6    **A.**     Near Bear Mountain, New York.

7    **Q.**     And what type of boarding school was it?

8    **A.**     It was a private secondary school, middle/secondary

9    school.

10   **Q.**     Had you considered first, before going there, looking for

11   another school in the Virginia area?

12   **A.**     We did extensive research.  We looked at private schools

13   in Virginia.  We even went, I think, to West Virginia a couple

14   of schools.  We looked in the area, but our doctors advised us

15   that Bella needed to get out of the area.

16   **Q.**     And --

17        MS. REWARI:  Objection, Your Honor.

18        MR. KINNEY:  She's answering questions with hearsay

19   responses.

20        MS. ANDERSON:  Are they both objecting?

21        THE COURT:  They're both objecting.  And I think the issue

22   that they have concern with is the last statement regarding what

23   someone who was not her may have said.

24        Sustained.

25        MR. KINNEY:  {Indiscernible}.

```
 1   BY MS. ANDERSON:

 2   Q.     What was your reasoning for leaving the Virginia area,

 3   without repeating what anyone said to you, but your own

 4   reasoning?

 5   A.     We took the advice of --

 6          THE COURT:  Okay, ma'am, what did you do in response to

 7   what you were told by other people?  Did you withdraw your child

 8   from school?

 9          THE WITNESS:  Yes.

10          THE COURT:  Okay.

11   BY MS. ANDERSON:

12   Q.     And how did Bella do at this boarding school?

13   A.     Her grades went right back up.

14   Q.     And how was your interaction with the school?  Without

15   describing what they said to you, but how was your interaction

16   with the school?

17   A.     Which school?  I'm sorry.

18   Q.     The boarding school in New York.

19   A.     They were very supportive.  They knew she had an IEP at

20   this time, and they knew about her trauma.

21          THE COURT:  And we all agree that an IEP is an independent

22   education plan?  Can we all agree on that?

23          MS. ANDERSON:  Yes, although I believe it's

24   individualized.

25          THE COURT:  Individualized education plan.
```

1          MS. ANDERSON:  But I think we're in agreement.

2          THE COURT:  All right.  Ladies and gentlemen, the term

3     "IEP" was used.  I misstated one of the words associated with

4     that plan.  Basically it's a plan that is set up by a student --

5     excuse me, by teachers and social workers and the like to allow a

6     student to be more successful in a school environment, from my

7     days as a juvenile and domestic relations court judge.

8     BY MS. ANDERSON:

9     Q.    And did she attend extracurricular activities there?

10    A.    Um, she didn't want to do too much.  She tried.  She

11    played a little bit of tennis.  She tried to participate in

12    musical classes.  She was still struggling, so academically she

13    was doing well.

14    Q.    And after, did you end up leaving that school -- does

15    Bella end up leaving that school?

16    A.    Yes.

17    Q.    And what was the basis of your decision to leave that

18    school?

19    A.    So, it was hard to send her to a boarding school in the

20    first place after her trauma.  We wanted her to be with family,

21    and we had now moved to an area in New York, and thirdly, she

22    wanted to get back to a public school to prove that she could do

23    it and it wasn't taken away from her, and she felt guilty about

24    us paying the tuition.

25          THE COURT:  Just --

1           THE WITNESS:  Sorry.

2           THE COURT:  It's probably a good idea whenever I'm trying

3    to speak, just to pause just a moment.

4           THE WITNESS:  I've got to face you.

5           THE COURT:  I have to tell all witnesses that.  It's not

6    something that just you do.  A lot of witnesses don't pause when

7    the Court's attempting to speak.

8           THE WITNESS:  I'm sorry.

9           THE COURT:  What the Court is going to do is I'll strike

10   the -- go back up to Line 15 to the end.

11          The order is to disregard the last part of the answer to

12   the question.

13          Go ahead.

14   BY MS. ANDERSON:

15   **Q.**     What school did you wind up taking B███ to next?

16   **A.**     Great Neck Public High School.

17   **Q.**     And where was that?

18   **A.**     Great Neck, New York, Long Island.

19   **Q.**     And what grade was she in when she went there?

20   **A.**     I believe it was ninth.

21   **Q.**     And how did she do at that school?

22   **A.**     She did well academically, but there were challenges

23   still being in a public school.

24   **Q.**     And what were some of the challenges that you were seeing

25   her experience?

1    **A.**     The hypervigilance, the focus, the nervousness that she

2    might be harmed.  PE, not being able to do PE, things like that.

3    **Q.**     And can you describe for me what you mean by

4    "hypervigilance"?

5    **A.**     So --

6          THE COURT:  What do you understand the term

7    "hypervigilance" to mean?

8          THE WITNESS:  When you're on guard, when you're worried

9    that something is going to happen to you so you're alert always,

10   worried about who's behind you, who's to the side of you.

11         THE COURT:  Next question.

12   BY MS. ANDERSON:

13   **Q.**     And how long was she at that school?

14   **A.**     She finished her ninth grade there.

15   **Q.**     And where did she go after that?

16   **A.**     After that, she went to the Academy of Holy Angels.

17   **Q.**     Was that a private or public school?

18   **A.**     That was a private school, all girls.

19   **Q.**     And how did B████ do at that school?

20   **A.**     Fabulously.

21   **Q.**     What has life been like since Rachel Carson Middle School

22   for Bella?

23         THE COURT:  Can you be a little bit more specific?

24         Have you noticed --

25         MS. ANDERSON:  Again, so I'm not accused of leading --

1          THE COURT:  Have you noticed any change in your daughter's

2    personality, attitude, post life between the time that she went

3    to Rachel Carson and when she enrolled at the last school that

4    she was enrolled in, yes or no?

5          THE WITNESS:  Yes, huge changes.

6          THE COURT:  And what types of things did you observe about

7    her personality?

8          THE WITNESS:  So, again, her life has been changed

9    entirely, from eating --

10         THE COURT:  My question is very -- let me be very clear

11   with my question.  What did you observe about her changes in

12   personality?

13         THE WITNESS:  Everything.  The joy is gone.  There is

14   fear.  There is worry.  There is sleepless nights, so she's

15   tired.  She, you know, has issues with focus.  Even things like

16   balance are --

17         THE COURT:  Next question.

18   BY MS. ANDERSON:

19   Q.    Okay.  And what sort of physical changes have you noticed

20   in B███?

21   A.    Some of which I just said, you know, balance, headaches,

22   focus, light sensitivity, eating issues, sleep problems,

23   flashbacks.

24   Q.    What are some of the sleep problems she's experiencing?

25   A.    So, she has a hard time falling asleep, staying asleep

1   because of her hypervigilance, because of her trauma.

2          THE COURT:  Does she still live with you, ma'am?

3          THE WITNESS:  Yes, to some extent.

4          THE COURT:  Okay.

5          THE WITNESS:  Yes.

6   BY MS. ANDERSON:

7   **Q.**     And how long did she sleep with you in your bed?

8   **A.**     So from the time she was 12 until about the time she was

9   15 or 16, she slept with me.

10  **Q.**     And do you all go on trips together as a family?

11  **A.**     We -- our lives have changed.  We don't travel.  We don't

12  do much of anything anymore, we spend time just taking care of

13  B█████.

14  **Q.**     And what have you noticed about her ability to enjoy the

15  things in life like piano or tennis?

16  **A.**     She hasn't touched a piano.  She hasn't played tennis.

17  **Q.**     Is it always -- is she always getting better or worse in

18  a linear way or --

19  **A.**     No.

20  **Q.**     -- can you describe for us how that works?

21  **A.**     So the trauma affects your brain a certain way as --

22         THE COURT:  Ma'am, you can't testify to things that you're

23  not an expert witness on, so don't testify as to what someone may

24  have told you about any medical diagnosis.

25         THE WITNESS:  Okay.

1        THE COURT:  Or anything like that.  You can tell us what

2    you observed about your daughter.

3        THE WITNESS:  Uh-huh.  So there -- there are good days,

4    and there are bad days.  There are days when she seems like she's

5    functioning normally, and there are days when we're back to when

6    she's 12 years old and has had -- experienced the trauma fresh.

7    BY MS. ANDERSON:

8    Q.    And how has your relationship with your daughter changed

9    since Rachel Carson Middle School?

10   A.    Well, we're as strong and as tight as ever, maybe even --

11   or tightly so.  I've learned how to support her.  And, you know,

12   little things that I would have liked to have done, I can't do,

13   but our relationship is solid.

14   Q.    What are some of those things that you can't do?

15   A.    I can't travel with her.  It's a huge challenge to

16   travel, even getting in a car for a road trip for a very long

17   time.  Confined spaces are an issue for her now.  I can't go

18   shopping with her for very long.  She is now getting better

19   where we can go to a store.  I have never gone to a movie

20   theater with her since she was 12.

21        I can't go into a crowded New York City street or a

22   subway with her.

23   Q.    How has -- how have you seen her relationship with her

24   brother, D███, change?

25   A.    They've gotten stronger as well.  He -- you know, he

1   loves his sister.  We're all working to support her.  She feels

2   bad that he has to do, you know, so much to support her.

3   **Q.**    And what about her relationship with her father?  What

4   have you seen and how that's changed?

5   **A.**    That one's a really hard one.  My husband is older than I

6   am, and it's affected his health.  Ever since he's --

7          THE COURT:  Ah --

8          THE WITNESS:  Sorry.

9   BY MS. ANDERSON:

10  **Q.**    Setting the health aside, but just the relationship

11  between Bella and him?

12  **A.**    It's -- it's not so strong because there's this area that

13  is so painful for him to talk about to her so the --

14         THE COURT:  Next question before she gets off track.

15  BY MS. ANDERSON:

16  **Q.**    And at some point, does Bella try to go to college?

17  **A.**    She does.

18  **Q.**    Okay.  And what school does she go to?

19  **A.**    She went to John Jay Criminal first, city college,

20  because --

21         THE COURT:  You don't need to tell us why she went there.

22         THE WITNESS:  Okay.  Got it.

23  BY MS. ANDERSON:

24  **Q.**    And does she end up going to another college as well?

25  **A.**    Yes, she does.

1    **Q.**    Okay.  And what college is that?

2    **A.**    She ended up getting into Columbia University.

3    **Q.**    And does she graduate from Columbia?

4    **A.**    Yes, she does.

5    **Q.**    And can you walk us through what support, if any, you

6    provided to your daughter while she was going to these two

7    colleges?

8    **A.**    Yes.  We moved to Manhattan because she could not stay in

9    a dorm.  She could not be on campus.  And she was going to stop

10   college, and we said, no, we'll figure out a way.  So even

11   though we couldn't afford it, we found a way to be within a

12   short Uber drive or a walk for her classes.

13   **Q.**    And were there times that you had to assist her with

14   inpatient care?

15   **A.**    Yes.  She -- she was hospitalized several times.

16   **Q.**    Do you remember where?

17   **A.**    Yes.  I'm just trying to think of the order.  Robert Wood

18   Johnson for -- for an eating disorder.  She was there for about

19   a month.

20   **Q.**    And where -- where was that located?

21   **A.**    New Jersey.

22   **Q.**    And any other inpatient that you remember?

23   **A.**    Yes.

24   **Q.**    She started out at Inova Kellar in Fairfax, and that was

25   a partial inpatient.  What do they call it, partial

 1    hospitalization.

 2         And there was one more.

 3         THE COURT:  What was the name of that one?

 4         THE WITNESS:  That one was Sabino residential in Tucson,

 5    Arizona.

 6    BY MS. ANDERSON:

 7    Q.    And did she attend that one while in college at Colombia?

 8    A.    She had to take a leave of absence.

 9         MS. ANDERSON:  Court's indulgence?

10         THE COURT:  Yes, ma'am.

11         MS. ANDERSON:  It's like the music at the academy awards.

12         This would be a good time for us to break if that works

13    for Your Honor.

14         THE COURT:  That's fine.

15         Thank you, ma'am, you may step down.  You're subject to

16    recall, so we'll see you here in the morning.

17         THE WITNESS:  Okay.  Thank you.

18         THE COURT:  Thank you, ma'am.  Please step down.

19         All right.  Ladies and gentlemen of the jury, this

20    concludes our work for today.  I might have mentioned -- heard me

21    mention earlier that I would like to start at 10:30 tomorrow.  If

22    you could be on-site at 10:15.  I don't mind sharing this with

23    you.  I have to go to the doctor for something that's not really

24    that bad.  I've gotten a diagnosis that I read too much and that

25    I need to hold my head up.  And so the doctor cracked me back

```
 1   into the position that I need to be cracked into.  So it's not

 2   that bad, and I'll be feeling good when I get here.

 3        So if you could get here at 10:15, we'll start as close as

 4   we can to 10:15.

 5        Remember the instruction of the Court, and that is not to

 6   discuss the case with any aspect of the case with anyone.  When

 7   your spouse asks you tonight what you did today, remember that

 8   $10,000 that I talked about earlier in the day, all right.

 9        And the gentleman in the back, just let us know if your

10   service dog needs to be accommodated, and we'll take care of

11   that.

12        A JUROR:  Thank you.

13        THE COURT:  All right.  We'll see you in the morning at

14   10:15.

15        (Jury out at 4:13 p.m.)

16        THE COURT:  All right.  You all can have a seat.

17        We had a -- what I would call a pretty good day today

18   getting through things.  And, again, I compliment counsel on the

19   process of the voir dire and opening statements.

20        I still encourage you all to put your heads together to

21   come up with things that can be stipulated to.  It's going to

22   make the case a whole lot less cumbersome if -- if we do that, so

23   I encourage you to go ahead and make sure that you can take care

24   of a lot of administrative things.

25        Another thing is if you have something that you need the
```

1    Court to resolve prior to seating the jury, you need to get that

2    to us as soon as possible because when I tell the jury we're

3    going to start at 10:15, 10:30 I want to start then, not being in

4    here resolving issues that the parties have come up as we go

5    through the process.

6        How long do you anticipate with --

7        MS. ANDERSON:  Well, Your Honor, so I think we're going to

8    have to break her, as we talked about, because a large portion of

9    her testimony is what she told the school.

10       THE COURT:  Uh-huh.

11       MS. ANDERSON:  So tomorrow we think we know who we're

12   going to take up, we've noticed up some witnesses.  I think we

13   are probably going to have to go back and reshuffle a bit, but

14   we'll let them know.

15       THE COURT:  Without holding you to anything, how many

16   witnesses do you reasonably think you're going to be able to get

17   through tomorrow?

18       MR. BRENNER:  May I address the Court, Your Honor?  So we

19   honestly thought we were putting her on first -- tomorrow based

20   on our discussion at the hearing, so the schedule got all off, so

21   I'm not sure -- is Your Honor going to do -- start

22   cross-examination of her on the subjects she covered or are

23   we going to --

24       THE COURT:  I think it's probably more efficiently done is

25   if we withhold cross-examination so we don't have to bring her

```
 1    back up, put her back down unless the defense has a problem with

 2    that.   In other words, what we're going to do is I'll basically

 3    interrupt her testimony, and you'll be able to inquire with

 4    regard to the things that she testified to today and what she's

 5    going to testify to whenever she takes the stand again.   I think

 6    that's probably more efficient than another way.   Does anyone

 7    have a problem with that?

 8            MS. REWARI:   Yes, I guess I would just want to clarify, is

 9    she going to be treated as if she's still on the stand?   Normally

10    you break.

11            THE COURT:   Yes.   Oh, yes.   The rule will still apply.

12    It'll be like she's never stepped down from the stand.   So the

13    rule on witnesses will apply.   There can't be any discussions

14    with counsel as to what she's going to testify about, because

15    that's typically what happens when a person takes the stand.   So

16    it's like she's still there, but we're just trying to administer

17    things more efficiently.   So --

18            MS. REWARI:   Okay.   And that's fine.

19            THE COURT:   All right.   And, again, I think you

20    understand, Mr. Brenner, that they will be able to inquire on

21    cross-examination of things that we were discussing today and

22    anything else that she testifies at -- testifies to at a later

23    date.

24            MR. BRENNER:   Right.   So we had -- we have an agreement

25    amongst counsel to give 48 hours' notice, it's kind of got -- so
```

```
1   I think we had notified defense counsel that we had just on

2   standby who I didn't think we'd even get to, to have A.F. on

3   standby for tomorrow, so we can do him.

4        THE COURT:  Uh-huh.

5        MR. BRENNER:  I hadn't notified anyone else for tomorrow.

6   We can do J.F. too, but they -- without getting 24 hours' notice,

7   not 48.  I just want -- I just want to let you know what

8   happened.  So we --

9        THE COURT:  Yeah.  And, again, it's the right thing to do.

10  And the way that we conduct our litigation is that the other side

11  is put on reasonable notice.  But what I don't want to have

12  happen, if we can avoid it is that everybody does their job so

13  well that at 2:00 we don't have any more witnesses.

14       MR. BRENNER:  Yes, so I would anticipate, that we -- if

15  there's no objection, we could put on A.F. and J.F. tomorrow.

16       I would say they are -- I would say neither of them is

17  more than two hours of direct, probably closer to an hour to an

18  hour and a half.

19       But -- but I think it's one -- just so you know, Judge, I

20  think it's the intention of the defendants, which of course is

21  their right to -- and these are their witnesses, they're going

22  to -- we're calling them as adverse witnesses, so I would

23  anticipate that maybe their examination may go longer than you

24  would normally expect.  I -- that's for them to say, but I think

25  we can -- I think we can put both those on, try to get them on
```

```
 1    and off tomorrow.

 2          THE COURT:  Okay.

 3          MR. BRENNER:  I hope.

 4          THE COURT:  Well, that -- that will be the goal, and we

 5    will try as best we can to work to accomplish that objective.

 6          All right.  Anything else?

 7          MS. REWARI:  That's fine, Your Honor.  I'm just clarifying

 8    that we will be allowed to go outside the scope of direct for

 9    school witnesses so that everybody only has to testify once.

10          THE COURT:  That -- that would be the goal unless I hear

11    something from Mr. Brenner or Ms. Anderson suggesting that that

12    is not something that can be done, and then I'll hear them out on

13    what they want to do.

14          But, again, it's my preference to -- if we have a witness,

15    and this one was a little bit unusual, it's a hybrid witness, she

16    has information that's firsthand knowledge and other things that

17    she may be able to testify once a certain foundation is laid.

18    But for our general witnesses, I don't have any problem with

19    trying to get them in and out as best we can.

20          MS. REWARI:  Thank you.

21          MR. BRENNER:  We would not have an objection to that

22    except if they go beyond the scope, that will be the one time to

23    call the witness.  I don't want to agree they go beyond the scope

24    in our case and then they call them again in theirs.

25          THE COURT:  Well typically what I -- I do at the end of
```

1    testimony of all is I will ask each counsel if -- are these

2    people subject to recall, and then you can say they are not or

3    they are, and that will take care of that.  That's typically what

4    I do if I'm on my game.

5         MR. BRENNER:  And then, Your Honor, I don't know if you

6    want to do it tonight or some other time or today, but I see a

7    problem coming down the pike that I want to bring Your Honor's

8    attention to.

9         THE COURT:  We have time.

10        MR. BRENNER:  Thank you.  So, if you'll recall at the

11   March 6th hearing -- it was a long time ago -- our last hearing,

12   we had a conversation -- I don't even remember in what context

13   the motion was, I honestly don't, but there was a conversation

14   about documents collected from third parties via subpoena.  So it

15   was about medical records -- and where I thought we left it was

16   we're not going to need records custodians for those people, and

17   I thought we were fine.  I think from a conversation I had today,

18   I'm not sure we're fine anymore.

19        THE COURT:  Who did you have that conversation with?

20        MR. BRENNER:  With counsel for FCS.  The conversation came

21   up in the context of -- I was showing them slides for the

22   opening, and the slides had references to things that we all --

23   they're all in the medical records.  And they objected to those

24   and said the medical records aren't coming in, and I said, whoa,

25   we don't have to deal with this now.  We'll do it with the judge.

1      THE COURT:  Let's make sure that we're all working from

2  the same page.  I'm assuming, Ms. Rewari, you were taking the

3  lead on suggesting that there was a problem?

4      MS. REWARI:  Yes.  We responded to them on authenticity.

5  That's a different question than Your Honor's ruling about who

6  can testify about diagnosis, so we had talked about this at the

7  last hearing.

8      THE COURT:  So this is not an authentication issue.

9      MS. REWARI:  No, no, it's a hearsay issue, also a

10  foundation issue.

11      THE COURT:  I think we're fine then.

12      MR. BRENNER:  I think we are as long as -- so, for

13  example, it's our intention just to move in records.  I

14  understand their position of what doctors can and cannot testify.

15  We're going to have to deal with that because Your Honor's ruling

16  said treating physicians can't testify to diagnoses.

17      With all due respect, I think what you're saying is they

18  can't give a diagnosis other than what's reflected in their

19  medical records.  They have to testify to their medical records.

20      THE COURT:  That's the way it usually works, but again, I

21  think the issue is there may have been some confusion is --

22      MR. BRENNER:  Sure.

23      THE COURT:  -- the authentication, and from what I'm

24  hearing from opposing counsel, authentication is not at issue.

25      MR. BRENNER:  So we'll put together a set of medical

```
 1   records to move in.  I understand their objection to which

 2   witnesses can testify about what are in medical records.  I get

 3   that.  I just wanted to make sure that that wasn't -- maybe I

 4   misunderstood.

 5        THE COURT:  I'll just give you an example, and this is the

 6   real obtuse example.  There's an agreement that these documents

 7   were authenticated.  That doesn't mean that this last witness --

 8   and I'm not picking on her -- can testify with regard to what

 9   those particular records may or may not say.

10        MR. BRENNER:  Right.  Sometimes evidence goes in, and what

11   happens is lawyers use them in closing.  That's when they talk

12   about them, and so -- okay.  So we will put together some medical

13   records to propose, and we've already started this process.

14   Okay.  I just wanted to make sure that we weren't creating a new

15   problem, so apparently we're not.

16        THE COURT:  I think we're all on the same page.

17        MR. BRENNER:  Thank you, Judge.

18        MS. REWARI:  Your Honor, we did talk about this on March

19   6th, and what I said back then was they have some exhibits that

20   are hundreds of pages of medical records, and we said, look,

21   there's hearsay, there's double hearsay, and so I think your

22   direction at that time was for them to identify what specific

23   parts they want to send them to us --

24        THE COURT:  That was the encouragement.  Instead of 100

25   pages of a document coming in with all kinds of hearsay and
```

1    inadmissible things, that you come up with a way to present

2    whatever can be properly authenticated pursuant to the rules

3    without the surplusage that might exist with regard to all of

4    those records.  And I was leaving it to you all to try to figure

5    out the best way to try to accommodate that.

6        MS. REWARI:  Thank you.  That's my concern, that, you

7    know, having a jury take 500 pages of medical records --

8        THE COURT:  That's not going to happen.

9        MS. REWARI:  Okay.  Thank you.

10        MR. BRENNER:  Again, I didn't mean to skip over that, but

11    we absolutely did talk about that.  That's not the problem I was

12    identifying.

13        So what we'll do, and I think what we said at the hearing

14    is we will cull down -- take Medical Records Set A, we'll cull

15    down and say, we intend to introduce these 30 pages, and then

16    they obviously would have the opportunity either to give a

17    different objection to the 30 pages --

18        THE COURT:  Or say that --

19        MR. BRENNER:  -- and then add pages if they want to.

20        THE COURT:  -- if you're going to include 1 through 5, 10

21    through 17, 20 through 30, we also want page 42 in or whatever.

22        MR. BRENNER:  Right, or they ask to preserve, and I don't

23    disagree with, they may say, in addition, we want to add these,

24    we think on page 3 there's hearsay within hearsay, and they can

25    identify that, and then we can argue it, but, yes, I did not mean

1    to skip over that part.

2         THE COURT:  Yes, that's fine.  And I think we're on the

3    same page.  I encourage counsel, because we did end a little bit

4    early today, that this would be a good time for you to get

5    together and figure out what you can agree on, and that -- that

6    would be very, very helpful.

7         Anything else?

8         MR. BRENNER:  No, Your Honor.

9         MS. REWARI:  Your Honor, we do have one matter that we

10   want to raise, and Mr. Elliker is going to address it because

11   it's his witness with respect to Ms. Cantalupo, who I believe

12   they're calling on Wednesday.

13        THE COURT:  Yes.  I've got some information that was

14   submitted by -- Ms. Anderson submitted it regarding

15   Ms. Cantalupo.  Do you have a copy of that?

16        MR. ELLIKER:  Yes, Your Honor, I do.

17        THE COURT:  All right.  Is that what we want to talk

18   about?

19        MR. ELLIKER:  Yes, Your Honor.

20        THE COURT:  Okay.  Go ahead.

21        MR. ELLIKER:  And in the neighborhood of stipulations, at

22   the hearing on March 6th, Your Honor, I believe what you --

23   one -- the main point that you made was to say that it might be

24   helpful to have someone who could tell the jury about what Title

25   IX is, its purpose, so that they have some context for that.

1      And I will admit that I think the first four questions in

2  this proffered -- you know, the questions and anticipated

3  testimony, what is it that people refer to as Title IX, what's

4  its purpose, what types of discrimination does it address, what

5  schools have to adhere to it?

6      I think -- I hope that's all something that we could quite

7  easily put into a stipulation that could be read to the jury.

8      We may on No. 3 just want to figure out the bullet points

9  and maybe some semantics and the wording and all that, but my

10  concern is that the remaining questions basically put us right

11  back to where we were arguing the *Daubert* motion about raising

12  standards from Title IX, raising standards from regulations that

13  are not at issue here, because ultimately the jury is supposed to

14  be determining whether they knew -- I mean, it was in the opening

15  statements.

16      I think both sides agreed in the opening statements this

17  is about was there sexual harassment, was there actual knowledge,

18  was the school deliberately indifferent in its response.

19      And one of the -- something that I found telling, I

20  suppose, is that I don't see any questions that would be proposed

21  to Ms. Cantalupo to ask her anything that has to do with the

22  facts of this case, anything where they ask about B.R. or Fairfax

23  County or Rachel Carson, and it's -- I think that we have -- we

24  have an expert on the law, and I don't think that we need another

25  one who's an expert on a special area of the law.

1          THE COURT:  And I appreciate your argument.  The concern

2     that I have is that obviously I am the law finder as composed --

3     or compared to the fact-finder, and I think in the instructions

4     that the Court's going to give at the end of the case, the jury

5     has to have some context from a factual standpoint what Title IX

6     is all about.

7          I do agree with you that some of these questions may not

8     be ones that I would think would be appropriate, but I do think

9     that some sort of predicate should be given to the fact-finder so

10    that they can understand generally why we are here as opposed to

11    hearing it from me at the end of the case.

12         MR. ELLIKER:  And that may well be, Your Honor, and if

13    they would like to call Ms. Cantalupo and ask her the first four

14    questions that are on here so that they can have a law professor

15    say this is what it is, I suspect I -- don't hold me to it, I

16    suspect I wouldn't have to do any cross-examination of that

17    expert on those four questions.

18         But the critical concern we have here is discussion of

19    regulations that do not -- they are not the legal standard in

20    this case.  Talking about the "Dear Colleague" letters, what were

21    the OCR regulations, what does it mean to have a Title IX

22    coordinator?  What was the guidance in 2001?  What's the guidance

23    in 2008, 2010, 2011?

24         All of those are going to be confusing to the jury to have

25    an expert, a law professor who may have particular information

```
1    that contextually could be helpful for them in this case.

2         THE COURT:  I would respond by simply asking this

3    question:  The standard for evaluating some of this context is a

4    standard of gross negligence, and whenever you're talking about

5    gross negligence, you're talking about a duty, generally.

6         Whenever we're talking about negligence, we're talking

7    about duty, and when we're talking about gross negligence, we're

8    talking about super negligence.

9         Isn't it appropriate for someone to provide a standard for

10   assessing simple negligence and gross negligence?

11        MR. ELLIKER:  Yes, Your Honor, and negligence would be

12   determined as to what a reasonable person would do.  The Title IX

13   regulations apply to institutions.  And so the regulations are

14   supposed to be telling the schools what the Department of

15   Education and the Office of Civil Rights has decided this is the

16   guidance that we want the schools to follow, and not individual

17   liability for individual teachers and educators based on their

18   failure to do that, so I think we may be mixing apples and

19   oranges.

20        THE COURT:  And that's a good point, but this jury, and

21   they've been very attentive up until now, are probably going to

22   at some point ask me two questions that I anticipate are coming:

23   What happened with the police investigation?  I know that

24   question is coming.  And No. 2, how are we supposed to assess the

25   reasonable person standard in the context of a Title IX case?
```

1          So how are we going to do that?  Listen to the -- focusing

2     on the second point, the first point I know is coming.  I'll tell

3     them not to worry themselves about that.

4          MR. ELLIKER:  I think both sides have submitted jury

5     instructions on that, and the Supreme Court's guidance is the

6     deliberate indifference is based on what a -- was it clearly

7     unreasonable for that person in that setting, meaning these

8     individual people based on the information that they knew in the

9     building in 2011, the jury puts themselves in their shoes and

10     asks a reasonable person in that situation, did they react with

11     deliberate indifference based on what they knew?

12          And deliberate indifference is also something that we have

13     a jury instruction on that's defined.  Both sides have submitted

14     deliberate indifference jury instructions, and I think what we're

15     talking about now, Judge, is the actual legal standard that

16     applies in this case.

17          THE COURT:  Okay.  Let me hear from Ms. Anderson.

18          MS. ANDERSON:  Yes, Your Honor.  So back at the hearing,

19     what we were talking about with Ms. Cantalupo was actually

20     drawing conclusions based on the facts in this case.  And so

21     that's -- that's what we were talking about removing, and we did

22     remove.

23          The cases are clear, though, that while the decision is

24     not, did they violate this particular piece of guidance.  The

25     decision -- that helps the fact-finder determine if they're

1    acting reasonably under the circumstances to know what

2    expectations were of these schools at this time, and I would also

3    add we expect that these -- that the defendants' witnesses are

4    themselves going to get up and testify about what they understood

5    Title IX to require or not require, and then we have no

6    competing --

7        THE COURT:  I think those witnesses are going to be more

8    restricted to what did they do as opposed to an application or

9    analysis of Title IX.  I don't think those witnesses are going to

10   be able to testify to their understanding of how Title IX works.

11   I think they can testify as to what they did.

12       MS. ANDERSON:  But what they did and whether it was

13   reasonable is absolutely relevant to the known circumstances of

14   the time of what was being required of schools under Title IX.

15       THE COURT:  But you think, and again, this is just

16   speaking hypothetically, that getting into all of this stuff

17   about Sexual Violence "Dear Colleague" Letter, and sexual

18   harassment is not academic?  All of those things are such that we

19   should be educating the jury on things like that?

20       MS. ANDERSON:  This is guidance that's sent to the

21   schools, that they're told, this is guidance for you to follow --

22       THE COURT:  Oh, so what you want to do is with regard to

23   all of these PXs that you have listed, you're going to want to

24   inquire of these expert witnesses as to whether or not under the

25   circumstances these particular defendants met these standards?

1        MS. ANDERSON:  No.  I'm just going to have her explain

2    that this guidance was given to schools at the time, and so that

3    that shows that the schools had this guidance of how you should

4    react to the types of reports that they were getting at the time

5    to show that they weren't acting reasonably, given that this is

6    what they were told to be doing.

7        THE COURT:  That gets us to the point that I was trying to

8    avoid all along, and that is having some expert witness opine as

9    to the ultimate issue in the case.

10       MS. ANDERSON:  That she's not going to talk at all about

11   what they did hear, what they didn't do.  She's going to just say

12   these are guidance documents that came from the Department of

13   Education that the schools had in their hand at this time that

14   helped give them guidance on how to follow Title IX and what they

15   should be doing.  And that's it.

16       THE COURT:  So in your view the burden then shifts to the

17   defendants to basically come up with some explanation or

18   testimony as to why they didn't do certain things that are in

19   this guidance.  Because that's what's going to happen.  If we go

20   through every guidance that you are suggesting that should be

21   considered in the context of a Title IX case, if I allow you to

22   do that, then the other side is going to have the opportunity to

23   engage in things that maybe you don't want them to engage in.

24       MS. ANDERSON:  Well, the cases -- the cases explain that

25   it's -- it's like other cases where there are policies the

1    employees have.

2        THE COURT:  Can you point to me any specific case that

3    outlines the types of questions that you're asking, setting aside

4    1 through 4, which I believe there's no objection to, to have an

5    expert witness go through all of these bullet points as to the

6    guidance that is appropriate in a Title IX case.  Is there a case

7    out there like that?

8        MS. ANDERSON:  So I don't believe anyone's been asked to

9    proffer their testimony in advance.  I did look to see if I could

10   find that.

11       But the cases that we cite in the letter, like *Roohbakhsh*

12   {ph}, Doe -- even *Doe versus Coastal Carolina*, the expert was

13   allowed to talk about the guidance that schools had received as

14   the backdrop of what -- it's like the policies.  They're going to

15   bring up their policies, there's going to be talk about what

16   policies people had at the time.  And it's part of the backdrop

17   of what -- what were they told as far as how they should be

18   implementing Title IX at the time.  We're not going to say -- the

19   expert is not going to say they should have done this, they

20   should have done that.  They're going to say here's what they

21   were told in these guidance documents that they should be doing

22   in order to implement Title IX at the time.

23       THE COURT:  But doesn't that accomplish what you just said

24   would not be accomplished?

25       MS. ANDERSON:  She's not going to talk at all about what

```
 1   Fairfax was doing or not doing or what they had --
 2        THE COURT:  But to suggest that these --  there's these
 3   guidelines and policies and all of these things that you suggest
 4   have to be adhered to as a matter of course --
 5        MS. ANDERSON:  Well, guidance actually doesn't have to be
 6   adhered to; it's more like best practices, which the cases talk
 7   about are relevant, best practices and what -- what the
 8   Department of Education has said are best practices at schools
 9   for these types of issues.
10        THE COURT:  What we're going to do is this, it's going to
11   be a long night.  Obviously 1 through 4, I'm going to obviously
12   give you the benefit of that.
13        I'll take a look at the rest of the things that you're
14   suggesting might be appropriate for this person to opine about.
15   And I will tell you in advance, and I've looked at it generally
16   as I've been sitting here, you're not going to get in as much as
17   you want.  You may get some of it in.  But getting into these
18   guidelines and policies and, you know, asking how does having a
19   Title IX coordinator and a procedure impact the school's ability
20   to make a determination about an allegation, that just gets us
21   down a road that we really don't need to get down.  But as I
22   said, I'll take a look at it tonight.
23        MS. ANDERSON:  Okay.  I do think it's critical that there
24   are certain things that they're required by regulations to be
25   doing at that point.  And that if they -- and then they can
```

1    testify whether they were or were not doing them.

2         But as far as laying out what they were required to do at

3    the time when trying to prove deliberate indifference and trying

4    to prove gross negligence --

5         THE COURT:  And make sure that I understand what you're

6    saying, your position would be generally that if they failed to

7    adhere to any or all of these provisions in these guidelines or

8    position, that carries your case?

9         MS. ANDERSON:  No, no.  My position is is that it's

10   relevant, known circumstances, what the schools were told at the

11   time that they should be doing.  I'm not saying that if they --

12   if they missed some piece of the guidance that means it's

13   deliberate indifference, no.

14        But these cases make clear that what they're on notice of

15   and what guidance they perceived is part of their reasonableness,

16   part of how they react and what they do based on what's --

17   what's, you know, required at the time, and what's understood at

18   the time.

19        So it's -- it's sort of akin to a policy.  Just breaking

20   the policy doesn't mean that you acted grossly negligent, but

21   it's relevant in was there this policy and did you adhere to it

22   as relevant to the question.

23        THE COURT:  Why wouldn't these types of questions be more

24   germane to a fact witness as opposed to an expert witness?  In

25   other words, I'm just picking a person at random, the principal

1    of the school.  Why wouldn't those types of questions, not all of

2    them, but those types of questions be more germane to be asked of

3    that individual as opposed to just a so-called expert witness?

4         MS. ANDERSON:  Our position would be those would be very

5    self-serving statements.  I mean, the principal of the school is

6    a defendant here, and so if he's being asked what's -- what's

7    expected under Title IX, then he's -- he's informing the jury

8    what's expected, and then he's proving whether he lived up to it

9    or not versus we get an opportunity to our -- they get to cross.

10   They can say it themselves, too, and they can challenge what our

11   expert has to say about it.

12        THE COURT:  But let's use the principal again just as an

13   example.

14        MS. ANDERSON:  Uh-huh.

15        THE COURT:  The principal is testifying, and he testifies

16   in a position that's supportive of their theory of the case.

17        MS. ANDERSON:  Uh-huh.

18        THE COURT:  What would prevent you from asking that

19   principal, sir, are you aware of the Sexual Violence "Dear

20   Colleague" Letter, have you ever heard of that; says yes or no,

21   and you go at it at that point as opposed to having some expert

22   witness essentially suggest that this is the expectation or these

23   are the expectations in the context of every Title IX case?

24        MS. ANDERSON:  Because if he says no, what do I get to do?

25   I don't get to show, Well, he may have said no, but that's not

1    what the guidance was at the time; here is this guidance.  You

2    know, he just --

3           THE COURT:  Theoretically, that's robust

4    cross-examination; you're very good at what you do.  And I think

5    that you could probably do a very good job if he says in the

6    context of that particular example, I know nothing about a Sexual

7    Violence "Dear Colleague" Letter, I would imagine that that would

8    be helpful to your case.

9           MS. ANDERSON:  Could we then move -- I would assume then

10   we could move it into evidence and show the jury and ask them

11   questions about it?

12          THE COURT:  Theoretically.  It depends on what he says.

13          MS. ANDERSON:  If he --

14          THE COURT:  But again --

15          MS. ANDERSON:  If he says no, then -- then I would think

16   hopefully we would get to then use it as impeachment.

17          THE COURT:  I would imagine that you would be able to make

18   a very strong argument.

19          My problem is allowing this expert witness to sort of set

20   the standard for how this jury is going to consider the case.

21   That's not what an expert witness is intended to do in the

22   Court's view.  Expert witnesses provide some sort of basic

23   context, not tell them how the case should be resolved.

24          MS. ANDERSON:  And I -- and I think we've attempted to

25   strike that balance.

1          I think that in a Title IX case it's very difficult that

2     we have to just rely on what it is the defendants say.  You know,

3     we -- they were -- our client was a student at the time, so she

4     can't testify about what her understanding of their obligations

5     were under Title IX at the time, and so the only way for us to

6     really do that is through an expert who is very familiar with

7     these -- this guidance.

8          THE COURT:  Okay.  Well, as I said, the Court will take it

9     under advisement.  The first four questions, I think, are

10    legitimate under any circumstances, based upon the way the Court

11    wants to handle the case.  But we'll take a look at the other

12    ones and see if there's some reasonable basis for that type of

13    information to be provided to the fact-finder.

14         MS. ANDERSON:  The only thing I would add is outside of

15    Title IX, she's also an expert on sexual harassment and

16    gender-based violence.  And her expertise is really around what

17    happens in, you know, these types -- in investigations and how --

18         THE COURT:  And I expect that she's not going to say that

19    individuals such as this typically suffer post-traumatic stress

20    disorder.

21         MS. ANDERSON:  No, no, no.  I think her key point is that

22    when you don't have established policies and procedures, that

23    these stereotypes then fill the gap.  And so you -- you have

24    these situations where then they're less likely to believe if

25    they're promiscuous, those types of things.  But, no, she's not

1    saying anything about PTSD or anything like that.

2        THE COURT:  I'll let you close, and then I'll take my

3    leave.

4        MR. ELLIKER:  Yes, Your Honor, and I do appreciate the

5    intense attention we're paying to this issue.  Because I think

6    it's -- obviously, it's the core of what we're talking about, the

7    question of what the standard is for the liability for the school

8    system under Title IX.

9        The regulations don't go to principals and teachers; they

10   go to the school system.  And so there's a disconnect between

11   asking individual educators whether they're aware of a particular

12   piece of guidance that may have come down from the Department of

13   Education.  And --

14       THE COURT:  I don't think Ms. Rewari liked what you just

15   said.

16       MS. REWARI:  I'm just writing a note to myself.

17       THE COURT:  All right.

18       MR. ELLIKER:  No, she's making -- I think I got that one

19   right, Judge.

20       The other point I'll make is I think when both sides are

21   citing the same case, it's probably --

22       THE COURT:  It's up to the Court to come up with a

23   reasonable interpretation as to what that case really means.

24       MR. ELLIKER:  I wouldn't want to suggest what -- what I

25   think -- I don't want you to have a late night.  I think the

1    *Coastal Carolina* case, actually, is fairly clear.

2         I don't have -- I looked as well for whether there's a

3    transcript of that testimony.  I think that case may actually be

4    on appeal to the Fourth Circuit right now, and the transcript is

5    sealed.

6         But a note from Judge Lydon's opinion.  What she said was

7    this expert may not testify about specific regulations, rules, or

8    standards derived from OCR guidance, period.  She said that.

9         And the other two cases that are cited in the letter with

10   this proffer of questions, I think essentially go in the same

11   direction.

12        And then the last thing I'll say, Judge, is the known

13   circumstances here can't be what the law or regulations in 2011

14   were because I think, as your colloquy just, I think, got to, I

15   think that's a way to backdoor a theory of constructive notice,

16   right?  What was the state of the law at the time, and therefore,

17   because that was the law at the time, you were on notice that

18   these were things that you were supposed to have done.

19        And the Supreme Court has expressly said the standard for

20   Title IX as to schools for student-on-student harassment is

21   actual notice, and that's, you know -- there's all the stuff

22   about whether it's subjective, objective, all of that.  But

23   there's no question that it's not about constructive notice we --

24   like -- like it would be for we assume that you are aware of what

25   the law is and ignorance is not a defense, that kind of thing.

 1          In this case, it's what were they actually told about

 2     those circumstances on the ground in 2011, 2012?  Was their

 3     response clearly unreasonable in light of what they actually

 4     knew.

 5          And if -- and if those known circumstances become well,

 6     let me show you this, did you know about this standard, did you

 7     read this?  No, I didn't.  I'm not sure about that.  Or whatever

 8     the answers may be, now the jury is going to have in their mind,

 9     hmmm, they didn't know, you know, this OCR guidance, this Dear

10     Colleague Letter, this that and the other.  That's going to be

11     infecting the jury's mind into thinking that somehow those things

12     are going to dictate the legal outcome of this case, and they

13     just can't.  So I will leave it at that, Judge.

14          THE COURT:  Thank you.  I appreciate it.

15          MS. ANDERSON:  I'm sorry, Your Honor, just 30 seconds to

16     respond to two things.

17          One is, *Coastal Carolina* was --

18          THE COURT REPORTER:  I'm sorry.  I can't hear you.

19          MS. ANDERSON:  I'm sorry.

20          Even under that case.  So, we are saying it's the

21     defense's case, and we cite three of our own, but we're saying

22     even under that case.

23          And then the second issue that he raised, I think it's

24     exactly to the point here in that we're also trying to hold the

25     School Board accountable.  And so to say, well, this -- you know,

```
 1    this principal wasn't aware of all of these -- these issues under

 2    Title IX and guidance --

 3         THE COURT:  Well, a better way of putting it, had no

 4    obligation to be aware of all of these guidelines and policies

 5    under Title IX.  And I agree with your opponent colleague that

 6    there's a different assessment between what the School Board did

 7    and what the individuals did.  There's -- there's a different

 8    inquiry that we need to make with regard to that.  And, again, I

 9    just don't want it to get confusing because there's enough in

10    this case to confuse the jury.

11         MS. ANDERSON:  But you see our struggle that then they

12    just get to say, well, you don't get to come in and show what the

13    School Board should have told these people.  And then if they

14    don't know about it, you know, then you don't get to ask about

15    it.

16         But the point is it's showing that schools like this who

17    received federal funds received this guidance and went to the

18    School Board.  If it didn't make it from the School Board down to

19    the principals, that's part of our argument, that's part of our

20    case, is that the School Board then failed.  They're a defendant.

21    Yeah, I mean, they're a defendant as well in this case.

22         THE COURT:  I understand.

23         All right.  Again, I can appreciate counsel's arguments.

24    We'll put our heads together and figure out what the best way to

25    resolve this issue.
```

1         And I do agree with both parties that the *Coastal Carolina*

2    case and trying to figure out what is in the penumbra of this

3    case might be the best way for this Court to resolve the issue.

4    So we'll take a hard look at it tonight.

5         Thank you.  We'll see you in the morning.

6         (Proceedings adjourned at 4:44 p.m.)

7         **C E R T I F I C A T E**

8

9                   I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
10   proceedings in the above-entitled matter.

11

     /s/ Scott L. Wallace              3/18/24
12   ----------------------------      ----------------
     **Scott L. Wallace, RDR, CRR**        **Date**
13      **Official Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 80:8
**$50** [1] - 39:25

## '

**'70s** [1] - 53:5

## /

**/s** [1] - 106:11

## 1

**1** [4] - 1:8; 88:20; 96:4; 97:11
**10** [1] - 88:20
**100** [4] - 2:3, 7, 11; 87:24
**10:15** [5] - 79:22; 80:3, 14; 81:3
**10:30** [2] - 79:21; 81:3
**11** [1] - 27:2
**11th** [1] - 31:21
**12** [7] - 4:7; 10:6; 11:1; 49:22; 75:8; 76:6, 20
**12-year-old** [1] - 37:20
**132** [1] - 54:18
**15** [4] - 52:25; 60:7; 72:10; 75:9
**1520** [1] - 1:21
**16** [1] - 75:9
**17** [1] - 88:21
**174** [4] - 4:11; 67:15, 20, 24
**18** [3] - 1:6; 4:8; 5:1
**1:15** [1] - 52:24
**1:19-cv-00917-RDA-WEF** [1] - 1:5
**1st** [2] - 68:15; 69:1

## 2

**2** [1] - 92:24
**20** [2] - 4:9; 88:21
**2001** [1] - 91:22
**20037** [5] - 1:18; 2:16, 19, 23; 3:3
**2006** [1] - 10:4
**2008** [1] - 91:23
**2009** [1] - 11:6
**2010** [3] - 11:6, 19; 91:23
**2011** [12] - 7:9; 11:19; 22:3; 25:12, 23; 28:2; 31:22; 37:7; 91:23; 93:9; 103:13; 104:2
**2011-2012** [1] - 21:8
**2012** [5] - 7:9; 52:18; 59:9; 68:18; 104:2
**2013** [2] - 68:15; 69:1
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23

**202-955-1974** [1] - 2:20
**2024** [2] - 1:6; 5:1
**2029** [1] - 1:21
**213-995-5720** [1] - 1:22
**21st** [6] - 34:4, 6, 11; 35:16; 36:9; 40:2
**2200** [4] - 2:15, 19, 22; 3:2
**22314-5798** [1] - 3:7
**2300** [1] - 1:17
**24** [1] - 83:6
**25** [1] - 4:10
**26** [1] - 26:23
**2800** [3] - 2:4, 8, 12
**2:00** [1] - 83:13
**2:05** [2] - 1:6; 5:2
**2:06** [1] - 5:10
**2nd** [3] - 2:3, 7, 11

## 3

**3** [2] - 88:24; 90:8
**3/18/24** [1] - 106:11
**30** [4] - 88:15, 17, 21; 104:15
**305-539-8400** [1] - 2:9
**33131** [3] - 2:4, 8, 12
**3:15** [2] - 50:25; 51:1
**3:29** [1] - 60:19
**3:30** [3] - 51:1; 52:6; 60:4
**3:37** [1] - 66:15
**3:45** [2] - 60:8, 11
**3:50** [1] - 66:15
**3:52** [1] - 67:6

## 4

**4** [2] - 96:4; 97:11
**401** [1] - 3:7
**42** [1] - 88:21
**44** [1] - 12:15
**443-584-6558** [1] - 3:8
**48** [2] - 82:25; 83:7
**49** [1] - 8:22
**4:13** [1] - 80:15
**4:44** [1] - 106:6

## 5

**5** [1] - 88:20
**50** [1] - 8:22
**500** [1] - 88:7
**5:00** [3] - 52:10; 60:8; 67:2

## 6

**6** [1] - 4:3
**60** [4] - 4:9; 20:13, 18, 21
**604** [5] - 4:10; 11:25; 25:9, 14, 19
**61** [4] - 4:8; 17:13, 19; 18:4

**610-804-1787** [1] - 2:5
**643a** [1] - 1:17
**67** [1] - 4:11
**6th** [3] - 85:11; 87:19; 89:22

## 8

**804** [5] - 4:7; 11:22; 12:4, 16; 26:23
**804-788-8200** [1] - 3:3
**850-585-3414** [1] - 2:13

## 9

**90067** [1] - 1:22
**9th** [2] - 52:17; 68:18

## A

**A.F** [2] - 83:2, 15
**ability** [3] - 62:9; 75:14; 97:19
**able** [18] - 57:23; 47:22; 48:4, 17; 49:17; 50:18; 51:8; 52:7; 62:10; 63:22; 73:2; 81:16; 82:3, 20; 84:17; 94:10; 100:17
**above-entitled** [1] - 106:10
**abrenner@bsfllp.com** [1] - 2:9
**absence** [1] - 79:8
**absolutely** [2] - 88:11; 94:13
**academic** [1] - 94:18
**academically** [3] - 10:8; 71:12; 72:22
**Academy** [1] - 73:16
**academy** [1] - 79:11
**acceptable** [2] - 28:18; 53:5
**acceptance** [1] - 10:6
**acceptances** [1] - 10:9
**accepts** [2] - 18:17, 19
**accommodate** [1] - 88:5
**accommodated** [1] - 80:10
**accomplish** [3] - 66:7; 84:5; 96:23
**accomplished** [1] - 96:24
**accomplishments** [1] - 17:6
**according** [1] - 48:3
**account** [1] - 59:3
**accountable** [1] - 104:25
**accused** [1] - 73:25
**acted** [2] - 50:15; 98:20
**acting** [4] - 57:4, 9; 94:1; 95:5
**action** [1] - 32:4
**Action** [1] - 1:4
**activities** [4] - 13:19; 14:15; 27:24; 71:9
**acts** [1] - 59:13
**actual** [3] - 90:17; 93:15; 103:21
**add** [4] - 88:19, 23; 94:3; 101:14
**addition** [1] - 88:23
**address** [6] - 21:16; 51:13; 81:18; 89:10; 90:4

**addressed** [1] - 68:3
**adhere** [3] - 90:5; 98:7, 21
**adhered** [2] - 97:4, 6
**adjourned** [1] - 106:6
**adjust** [1] - 26:2
**administer** [1] - 82:16
**administrative** [2] - 43:19; 80:24
**admiration** [1] - 24:17
**admissible** [1] - 42:10
**admissions** [1] - 42:7
**admit** [7] - 12:3; 17:25; 20:18; 25:14; 63:18; 67:20; 90:1
**admitted** [12] - 4:7-11; 12:16; 18:4; 20:21; 25:19; 26:22; 67:23
**advance** [2] - 96:9; 97:15
**advanced** [2] - 22:8, 10
**advantage** [2] - 64:19; 66:13
**adverse** [1] - 83:22
**advice** [1] - 70:5
**advised** [2] - 68:9; 69:14
**advisement** [1] - 101:9
**aerial** [1] - 25:11
**affected** [1] - 77:6
**affects** [1] - 75:21
**afford** [1] - 78:11
**affordable** [1] - 8:19
**afield** [1] - 45:2
**afraid** [3] - 40:7; 56:18
**AFTERNOON** [1] - 5:1
**afternoon** [5] - 6:24; 29:13; 51:5; 52:6; 60:6
**afterwards** [2] - 40:15; 58:5
**age** [1] - 15:13
**agent** [1] - 42:25
**ago** [2] - 11:1; 85:11
**agree** [12] - 18:22; 51:21; 62:3, 15, 20; 70:21; 84:23; 89:5; 91:7; 105:5; 106:1
**agreed** [1] - 90:16
**agreement** [3] - 71:1; 82:24; 87:6
**ahead** [7] - 17:12; 60:4; 67:8, 13; 72:13; 80:23; 89:20
**aided** [1] - 3:10
**akin** [1] - 98:19
**al** [1] - 1:7
**alanderson@bsfllp.com** [1] - 1:23
**alert** [1] - 73:9
**Alexandria** [1] - 3:7
**Alison** [2] - 1:20; 6:14
**allegation** [1] - 97:20
**alleged** [1] - 62:7
**allegedly** [2] - 42:19; 48:13
**allow** [3] - 21:24; 71:5; 95:21
**allowed** [5] - 22:17, 19; 32:2; 84:8; 96:13
**allowing** [1] - 100:19
**almost** [1] - 13:15
**alone** [1] - 54:1
**ALSTON** [1] - 1:12
**altogether** [1] - 23:1

**ambiguity** [1] - 62:25
**anal** [1] - 64:2
**analysis** [1] - 94:9
**and..** [1] - 30:22
**Anderson** [6] - 1:20; 6:14; 57:6; 84:11; 89:14; 93:17
**ANDERSON** [149] - 4:4; 5:3, 7; 6:7, 10, 14, 23; 7:2, 17, 20-21; 10:16; 12:3, 12, 14, 17; 16:3, 21; 17:11, 20, 22, 25; 18:5, 8, 24-25; 19:14; 20:18, 22; 21:25; 22:1; 25:14, 20; 27:7; 31:13; 35:14, 22, 24; 36:19, 25; 37:1, 15; 38:18; 40:1; 41:13; 42:6, 24; 43:5, 12, 20; 45:4; 47:6, 10, 18, 24; 48:2, 19; 49:7, 9, 20; 50:6, 14, 20, 25; 51:6, 15, 19, 25; 52:3, 13; 56:9; 57:7; 58:20, 25; 59:2, 18; 60:2, 24; 61:5, 7, 13, 19; 62:9; 63:16, 20; 64:1, 5, 12; 65:3, 12, 16, 20, 25; 66:11, 23; 67:5, 10, 12, 20, 25; 68:1; 69:20; 70:1, 11, 23; 71:1, 8; 72:14; 73:12, 25; 74:18; 75:6; 76:7; 77:9, 15, 23; 79:6, 9, 11; 81:7, 11; 93:18; 94:12, 20; 95:1, 10, 24; 96:8, 25; 97:5, 23; 98:9; 99:4, 14, 17, 24; 100:9, 13, 15, 24; 101:14, 21; 104:15, 19; 105:11
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:15, 18, 22; 3:2
**Angeles** [1] - 1:22
**Angels** [1] - 73:16
**angrier** [1] - 56:15
**angry** [2] - 34:8; 55:9
**announce** [1] - 6:8
**answer** [9] - 6:20; 16:14; 19:12; 23:12; 32:15; 41:25; 55:16; 72:11
**answering** [1] - 69:18
**answers** [2] - 19:9; 104:8
**antenna** [1] - 28:7
**anticipate** [4] - 81:6; 83:14, 23; 92:22
**anticipated** [1] - 90:2
**AP** [1] - 10:1
**apartment** [1] - 11:7
**apologies** [2] - 5:8; 32:9
**apologize** [7] - 6:14; 11:11; 12:18, 20; 33:4; 43:7; 68:7
**appeal** [1] - 103:4
**APPEARANCES** [3] - 1:14; 2:1; 3:1
**apples** [1] - 92:18
**application** [1] - 94:8
**applied** [1] - 43:3
**applies** [1] - 93:16
**apply** [3] - 82:11, 13; 92:13
**appointment** [1] - 66:18
**appointments** [1] - 33:7
**appreciate** [7] - 19:9; 52:11; 67:4; 91:1; 102:4; 104:14; 105:23
**approach** [2] - 47:24; 60:3
**approached** [1] - 43:13
**approaching** [1] - 17:17
**appropriate** [4] - 91:8; 92:9; 96:6; 97:14

**area** [18] - 9:20; 10:23; 11:10, 14; 22:22; 26:9; 36:5; 43:23; 51:10; 56:15; 69:11, 14-15; 70:2; 71:21; 77:12; 90:25
**areas** [1] - 9:4
**argue** [1] - 88:25
**arguing** [1] - 90:11
**argument** [3] - 91:1; 100:18; 105:19
**arguments** [1] - 105:23
**Arianna** [1] - 15:6
**Arizona** [1] - 79:5
**arms** [2] - 12:25; 13:1
**arrangements** [1] - 33:17
**arrived** [2] - 40:3, 17
**articles** [1] - 9:6
**articulate** [1] - 47:9
**aside** [2] - 77:10; 96:3
**asleep** [3] - 36:14; 74:25
**aspect** [2] - 60:14; 80:6
**ass** [1] - 37:14
**asserted** [1] - 42:3
**assess** [1] - 92:24
**assessing** [1] - 92:10
**assessment** [1] - 105:6
**assigned** [1] - 11:15
**assist** [1] - 78:13
**assistant** [2] - 52:22
**associated** [1] - 71:3
**assume** [2] - 100:9; 103:24
**assuming** [1] - 86:2
**attack** [1] - 47:11
**attacked** [1] - 56:22
**attempted** [2] - 47:3; 100:24
**attempting** [1] - 72:7
**attend** [4] - 23:15, 18; 71:9; 79:7
**attended** [1] - 65:10
**attending** [2] - 10:19; 68:10
**attention** [6] - 20:13; 28:1; 52:17; 58:5; 85:8; 102:5
**attentive** [1] - 92:21
**attitude** [1] - 74:2
**attribute** [1] - 47:16
**attributed** [1] - 42:20
**A█████** [1] - 24:1
**authenticated** [2] - 87:7; 88:2
**authentication** [3] - 86:8, 23
**authenticity** [1] - 86:4
**Ave** [1] - 2:22
**Avenue** [3] - 2:15, 19; 3:2
**avoid** [2] - 83:12; 95:8
**awards** [1] - 79:11
**aware** [6] - 58:12; 99:19; 102:11; 103:24; 105:1, 4
**awkward** [1] - 12:21

## B

**B.R** [3] - 1:3; 49:12; 90:22
**backdoor** [1] - 103:15

**backdrop** [2] - 96:14, 16
**bad** [8] - 41:5, 10; 42:22; 64:20; 76:4; 77:2; 79:24; 80:2
**balance** [3] - 74:16, 21; 100:25
**B██████** [3] - 52:21; 53:3, 14
**BARAN** [1] - 1:16
**based** [13] - 16:18; 50:23; 65:16; 68:10; 81:19; 92:17; 93:6, 8, 11, 20; 98:16; 101:10, 16
**basement** [2] - 47:3; 48:23
**basic** [2] - 13:13; 100:22
**basis** [3] - 35:18; 71:17; 101:12
**Bates** [1] - 2:14
**Beach** [2] - 7:16, 22
**Bear** [1] - 69:6
**bearing** [1] - 49:3
**beautiful** [3] - 8:2; 34:13
**became** [1] - 36:12
**become** [1] - 104:5
**bed** [1] - 75:7
**bedrooms** [1] - 22:19
**BEFORE** [1] - 1:12
**befriended** [1] - 16:20
**beginning** [2] - 26:13; 40:23
**behavior** [2] - 18:20; 30:16
**behind** [1] - 73:10
**bell** [1] - 46:12
**Bella** [78] - 7:7; 8:8; 9:1; 10:17; 11:20; 12:25; 13:6, 14; 14:3, 6, 9, 17; 15:11, 16, 18; 16:20, 23; 17:2; 18:7; 19:4, 15; 20:11; 21:14; 23:9, 19; 24:14; 26:14; 27:1; 28:2, 7, 21, 23-24; 29:10, 13, 16, 19, 21, 23-24; 30:1, 10; 31:14; 32:15; 34:3; 35:25; 38:4, 22; 40:4, 6, 19; 43:17, 24; 44:4; 47:1; 49:15; 50:20; 52:25; 53:10; 56:2; 58:12; 59:12, 20; 68:10, 17, 25; 69:15; 70:12; 71:15; 72:15; 73:19, 22; 74:20; 75:13; 77:11, 16
**B██████** [12] - 15:3; 17:15, 23; 19:18; 33:11, 21; 41:7; 44:24; 45:8; 50:21; 53:7; 58:11
**bench** [1] - 5:17
**benefit** [2] - 65:9; 97:12
**best** [17] - 6:20; 9:6; 16:11, 14; 17:9; 19:9; 66:5; 84:5, 19; 88:5; 97:6-8; 105:24; 106:3
**better** [5] - 51:14; 65:2; 75:17; 76:18; 105:3
**between** [6] - 16:16; 34:6; 74:2; 77:11; 102:10; 105:6
**beyond** [1] - 84:22
**Bible** [1] - 6:17
**Bickford** [1] - 21:5
**big** [2] - 26:18; 37:13
**B██████** [4] - 4:3; 6:18, 22; 7:1
**B██████** [3] - 6:11, 24; 7:1
**binder** [1] - 54:19
**bit** [18] - 15:25; 29:25; 35:13, 23; 36:23; 43:10; 45:1; 52:14; 58:12; 61:11;

65:1; 66:18; 67:14; 71:11; 73:23; 81:13; 84:15; 89:3
**bitch** [3] - 31:6; 37:14; 44:12
**bits** [1] - 54:9
**black** [1] - 37:14
**blended** [1] - 29:8
**blessed** [1] - 5:21
**block** [5] - 37:22, 24-25; 38:1; 45:19
**blocked** [1] - 45:12
**blossoming** [2] - 13:21; 23:10
**blouse** [1] - 39:18
**blow** [2] - 31:7; 44:12
**Board** [11] - 10:21; 42:25; 43:1; 47:14, 21; 104:25; 105:6, 13, 18, 20
**boarding** [6] - 69:3, 5, 7; 70:12, 18; 71:19
**BOIES** [4] - 1:20; 2:3, 7, 11
**book** [1] - 35:6
**bottom** [2] - 20:23; 64:21
**box** [2] - 63:8
**boy** [6] - 28:14, 21, 24; 29:2; 39:1; 58:11
**boy's** [1] - 28:19
**boys** [1] - 46:7
**brain** [1] - 75:21
**Brassingram** [2] - 15:10, 17
**Brassingram's** [1] - 15:14
**break** [8] - 52:6; 60:4, 6, 11, 14; 79:12; 81:8; 82:10
**breakfast** [1] - 14:8
**breaking** [3] - 51:1, 16; 98:19
**B██████** [6] - 21:6; 23:22; 24:6; 33:16, 20; 41:4
**BRENNER** [18] - 81:18; 82:24; 83:5, 14; 84:3, 21; 85:5, 10, 20; 86:12, 22, 25; 87:10, 17; 88:10, 19, 22; 89:8
**Brenner** [3] - 2:6; 82:20; 84:11
**Brief** [1] - 12:6
**briefly** [3] - 7:24; 22:2; 23:6
**bring** [9] - 22:17; 29:13; 47:1; 53:25; 55:6; 66:16; 81:25; 85:7; 96:15
**bringing** [2] - 28:2; 51:16
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**Bronx** [1] - 53:4
**brother** [1] - 76:24
**brought** [1] - 55:13
**Bs** [1] - 19:17
**building** [2] - 53:19; 93:9
**bullet** [2] - 90:8; 96:5
**burden** [1] - 95:16
**buried** [1] - 55:24
**Burkhart** [3] - 61:22; 62:15; 63:1
**Burton** [1] - 2:21
**burtons@huntonak.com** [1] - 2:24
**bus** [14] - 14:10; 26:6, 8, 11, 14-15, 20; 56:20, 25
**business** [1] - 22:9
**busy** [2] - 24:20; 43:18

**butt** [1] - 57:3
**BY** [47] - 4:4; 6:23; 7:2, 21; 10:16; 12:17; 16:21; 17:11, 22; 18:8, 25; 19:14; 20:22; 22:1; 25:20; 27:8; 31:13; 35:14, 24; 37:1, 15; 38:18; 40:1; 41:13; 43:6, 20; 45:4; 52:13; 56:10; 57:8; 58:20; 59:2, 18; 67:12; 68:1; 70:1, 11; 71:8; 72:14; 73:12; 74:18; 75:6; 76:7; 77:9, 15, 23; 79:6

# C

**C.K** [5] - 39:11, 15, 25; 56:6, 12
**CA** [1] - 1:22
**California** [1] - 9:22
**campus** [2] - 40:3; 78:9
**cancel** [1] - 34:24
**cannot** [3] - 41:22; 42:20; 86:14
**Cantalupo** [5] - 89:11, 15; 90:21; 91:13; 93:19
**car** [3] - 14:20; 30:4; 76:16
**card** [3] - 17:15, 23; 18:9
**care** [5] - 75:12; 78:14; 80:10, 23; 85:3
**Carolina** [4] - 96:12; 103:1; 104:17; 106:1
**carries** [1] - 98:8
**Carson** [23] - 10:5, 7; 11:17; 13:12, 14; 14:3, 6; 15:18; 17:4; 19:5, 19; 20:10; 21:8; 22:3; 23:16; 25:1; 26:12; 27:3; 31:17; 73:21; 74:3; 76:9; 90:23
**case** [47] - 7:4; 42:17; 48:2; 50:14, 24; 51:2; 60:14; 80:6, 22; 84:24; 90:22; 91:4, 11, 20; 92:1, 25; 93:16, 20; 95:9, 21; 96:2, 6; 98:8; 99:16, 23; 100:8, 20, 23; 101:1, 11; 102:21, 23; 103:1, 3; 104:1, 12, 20-22; 105:10, 20-21; 106:2
**cases** [8] - 93:23; 95:24; 96:11; 97:6; 98:14; 103:9
**caused** [1] - 48:16
**Cell** [1] - 3:8
**Century** [1] - 1:21
**certain** [4] - 75:21; 84:17; 95:18; 97:24
**certify** [1] - 106:9
**cetera** [1] - 36:24
**challenge** [2] - 76:15; 99:10
**challenges** [4] - 20:3; 27:13; 72:22, 24
**champion** [1] - 13:21
**change** [5] - 36:11; 46:12; 74:1; 76:24
**changed** [4] - 74:8; 75:11; 76:8; 77:4
**changes** [6] - 7:8; 30:16; 35:15; 74:5, 11, 19
**characterization** [1] - 64:2
**charge** [1] - 14:16
**chat** [1] - 35:6
**check** [4] - 7:17; 32:4; 53:11, 13
**checked** [1] - 63:9
**Cheryl** [3] - 21:6; 24:3
**child** [2] - 49:21; 70:7
**childcare** [1] - 60:9

**children** [4] - 8:3, 6; 13:4, 10
**children's** [2] - 8:14; 13:18
**choice** [1] - 63:12
**choices** [2] - 63:11
**chorus** [1] - 27:15
**C█████** [4] - 39:1, 6; 54:10; 56:4
**Christian's** [1] - 56:17
**Circuit** [1] - 103:4
**Circumstances** [1] - 5:11
**circumstances** [9] - 48:15; 94:1, 13, 25; 98:10; 101:10; 103:13; 104:2, 5
**cite** [2] - 96:11; 104:21
**cited** [1] - 103:9
**citing** [1] - 102:21
**City** [1] - 76:21
**city** [1] - 77:19
**Civil** [2] - 1:4; 92:15
**clarified** [1] - 63:1
**clarify** [1] - 82:8
**clarifying** [1] - 84:7
**class** [1] - 53:7
**classes** [5] - 21:19, 22; 53:14; 71:12; 78:12
**classroom** [3] - 32:4, 22; 53:10
**classrooms** [1] - 32:2
**clean** [1] - 15:25
**cleaning** [2] - 28:7, 9
**clear** [5] - 63:14; 74:10; 93:23; 98:14; 103:1
**clearly** [2] - 93:6; 104:3
**client** [7] - 47:15; 48:11; 49:18; 50:2; 65:19, 21; 101:3
**client's** [2] - 47:11; 49:11
**close** [3] - 9:14; 80:3; 102:2
**closer** [2] - 26:3; 83:17
**closing** [1] - 87:11
**Co.K** [3] - 58:9, 11, 15
**Coastal** [4] - 96:12; 103:1; 104:17; 106:1
**Colleague** [5] - 91:20; 94:17; 99:20; 100:7; 104:10
**colleague** [1] - 105:5
**collected** [1] - 85:14
**college** [7] - 10:8; 77:16, 19, 24; 78:1, 10; 79:7
**colleges** [1] - 78:7
**colloquy** [1] - 103:14
**Colombia** [1] - 79:7
**Columbia** [1] - 78:2
**combination** [1] - 9:13
**comfortable** [1] - 57:22
**coming** [18] - 5:13, 22; 7:14; 9:8; 17:3; 19:5; 39:17; 51:14; 56:16; 57:10; 64:5; 85:7, 24; 87:25; 92:22, 24; 93:2
**commended** [1] - 17:5
**comment** [1] - 57:17
**commented** [1] - 19:6
**commitment** [1] - 51:4
**communities** [2] - 10:9; 11:3

**community** [4] - 8:3, 23; 9:24; 11:10
**compared** [1] - 91:3
**competing** [1] - 94:6
**complaining** [2] - 30:21; 46:7
**complete** [1] - 57:11
**completely** [1] - 16:3
**compliment** [1] - 80:18
**composed** [1] - 91:2
**computer** [3] - 3:10; 22:5, 13
**computer-aided** [1] - 3:10
**concern** [4] - 10:3; 69:22; 88:6; 90:10; 91:1, 18
**concludes** [1] - 79:20
**conclusions** [1] - 93:20
**conduct** [1] - 83:10
**conducted** [4] - 62:19; 63:24; 65:11
**conducting** [2] - 22:9; 24:20
**conference** [1] - 33:3
**conferences** [1] - 33:18
**confined** [1] - 76:17
**confuse** [1] - 105:10
**confused** [2] - 29:8; 33:10
**confusing** [2] - 91:24; 105:9
**confusion** [1] - 86:21
**connect** [1] - 48:20
**connecting** [1] - 33:24
**consider** [3] - 42:15; 52:6; 100:20
**considerations** [1] - 64:23
**considered** [3] - 42:25; 69:10; 95:21
**consistent** [1] - 47:11
**C█████** [2] - 58:6; 59:10
**constructive** [2] - 103:15, 23
**Cont** [2] - 2:1; 3:1
**context** [14] - 16:13; 21:24; 49:25; 50:24; 85:12, 21; 89:25; 91:5; 92:3, 25; 95:21; 99:23; 100:6, 23
**contextually** [1] - 92:1
**control** [1] - 19:1
**conversation** [21] - 23:2; 28:2, 6; 29:20; 32:7, 10; 33:9, 14; 38:20; 54:5, 22; 55:2; 57:14; 58:22; 59:1, 10; 85:12, 17, 19
**conveyed** [1] - 58:1
**cooked** [1] - 23:1
**coolers** [1] - 14:20
**cooperatively** [1] - 19:2
**coordinator** [2] - 91:22; 97:19
**copied** [1] - 21:6
**copy** [3] - 58:25; 59:5; 89:15
**core** [1] - 102:6
**correct** [11] - 7:23; 19:3; 21:9; 22:12; 23:5; 26:10; 39:8; 44:21; 62:22; 68:7; 106:9
**corrected** [1] - 48:8
**corroborate** [1] - 50:4
**cosmopolitan** [1] - 9:20
**costing** [1] - 8:20
**counsel** [13] - 6:20; 15:25; 51:13; 52:12; 62:12; 80:18; 82:14, 25; 83:1;

85:1, 20; 86:24; 89:3
**counsel's** [2] - 61:2; 105:23
**counselor** [10] - 24:6, 15; 31:11; 33:7, 21; 41:8; 44:5; 46:19
**country** [1] - 9:7
**County** [11] - 7:16, 22; 9:9, 11-12; 10:11, 21; 25:4; 68:5, 25; 90:23
**couple** [4] - 11:9; 15:17; 52:7; 69:13
**course** [7] - 7:1; 9:24; 21:14; 22:16; 42:13; 83:20; 97:4
**courses** [3] - 10:1; 27:12, 14
**Court** [16] - 3:5; 61:4; 65:8; 72:9; 80:5; 81:1, 18; 101:8, 10; 102:22; 103:19; 106:3, 13
**court** [7] - 6:12, 25; 36:21; 42:2; 47:17; 52:4; 71:7
**Court's** [12] - 36:19; 61:21; 62:13, 18; 64:10, 21; 66:3; 72:7; 79:9; 91:4; 93:5; 100:22
**courteous** [1] - 18:20
**Courthouse** [1] - 3:7
**courtroom** [5] - 6:5-7; 60:13; 61:10
**covered** [1] - 81:22
**cracked** [2] - 79:25; 80:1
**creating** [1] - 87:14
**credibility** [1] - 47:11
**cried** [1] - 39:4
**Criminal** [1] - 77:19
**critical** [2] - 91:18; 97:23
**critically** [1] - 51:19
**cross** [7] - 47:19; 81:22, 25; 82:21; 91:16; 99:9; 100:4
**cross-examination** [5] - 81:22, 25; 82:21; 91:16; 100:4
**crowded** [1] - 76:21
**CRR** [3] - 3:5; 106:9, 12
**crush** [1] - 29:25
**crying** [4] - 30:25; 34:10; 55:9, 25
**cull** [2] - 88:14
**cumbersome** [3] - 51:22; 80:22
**cumulative** [1] - 12:10
**custodians** [1] - 85:16
**cut** [3] - 63:16; 66:4

---

# D

**Daddy** [1] - 40:7
**damages** [2] - 65:16, 19
**Dash** [9] - 8:8; 9:2; 11:20; 13:2, 11; 14:11; 32:12; 76:24
**Date** [1] - 106:12
**date** [5] - 28:24; 29:6; 68:14, 16; 82:23
**Daubert** [1] - 90:11
**daughter** [30] - 7:8; 8:8; 9:1; 13:12, 20; 16:16; 24:9; 33:5; 34:7; 36:11; 38:4, 10, 21; 46:20; 50:4; 52:16; 53:21, 23; 54:5, 15, 23; 57:16; 59:15, 24; 65:9, 18; 76:2, 8; 78:6
**daughter's** [5] - 7:6; 30:16; 37:4; 62:7;

74:1
**David** [7] - 28:20; 29:8, 23-24; 30:11; 39:17; 47:2
**David's** [1] - 29:11
**days** [9] - 8:2; 13:16; 30:10; 34:11; 71:7; 76:3
**DC** [5] - 1:18; 2:16, 19, 23; 3:3
**deal** [2] - 85:25; 86:15
**dealing** [1] - 51:23
**dean** [1] - 24:3
**Dear** [5] - 91:20; 94:17; 99:19; 100:7; 104:9
**death** [2] - 52:25; 53:12
**debater** [1] - 13:20
**decide** [4] - 8:9; 9:3; 36:8; 69:1
**decided** [3] - 8:12; 30:8; 92:15
**deciding** [1] - 68:25
**decision** [7] - 8:11, 25; 26:16; 71:17; 93:23, 25
**Defendant** [2] - 2:14; 3:2
**defendant** [6] - 42:18; 43:1; 99:6; 105:20
**Defendants** [1] - 1:8
**defendants** [6] - 42:11; 48:3; 83:20; 94:25; 95:17; 101:2
**defendants'** [1] - 94:3
**defense** [2] - 82:1; 83:1; 103:25
**defense's** [1] - 104:21
**defined** [1] - 93:13
**definitely** [1] - 65:3
**definitions** [2] - 18:11, 13
**deliberate** [6] - 93:6, 11-12, 14; 98:3, 13
**deliberately** [1] - 90:18
**Dell** [1] - 22:5
**demanded** [1] - 39:25
**Department** [4] - 92:14; 95:12; 97:8; 102:12
**depressed** [1] - 55:3
**deputy** [1] - 53:8
**derived** [1] - 103:8
**describe** [15] - 13:13; 23:6; 24:12; 27:4; 30:1, 18; 33:5; 34:7; 55:1; 59:7; 65:20, 25; 66:10; 73:3; 75:20
**describing** [2] - 11:11; 70:15
**DESCRIPTION** [1] - 4:6
**designated** [2] - 63:3, 5
**desk** [2] - 22:22; 45:14
**destroying** [1] - 34:13
**details** [2] - 43:23; 44:2
**determination** [2] - 62:18; 97:20
**determine** [1] - 93:25
**determined** [1] - 92:12
**determining** [1] - 90:14
**device** [1] - 45:20
**diagnoses** [1] - 86:16
**diagnosis** [4] - 75:24; 79:24; 86:6, 18
**Diane** [1] - 61:22
**dick** [1] - 37:14

**dictate** [1] - 104:12
**different** [7] - 27:12; 52:1; 55:6; 86:5; 88:17; 105:6
**difficult** [2] - 16:12; 101:1
**dinner** [2] - 13:16; 22:17
**dinnertime** [1] - 22:24; 23:1
**dire** [1] - 80:19
**DIRECT** [2] - 4:3; 6:22
**direct** [6] - 4:1; 52:17; 58:5, 18; 83:17; 84:8
**direction** [2] - 87:22; 103:11
**directly** [1] - 14:21
**director** [1] - 68:4
**dirty** [2] - 55:21; 57:18
**disagree** [1] - 88:23
**disassociated** [1] - 65:22
**discipline** [1] - 10:1
**disconnect** [1] - 102:10
**discreetly** [1] - 53:24
**discrimination** [1] - 90:4
**discuss** [2] - 60:13; 80:6
**discussing** [1] - 82:21
**discussion** [3] - 48:1; 81:20; 91:18
**Discussion** [1] - 12:9
**discussions** [1] - 82:13
**disorder** [2] - 78:18; 101:20
**disregard** [1] - 72:11
**distance** [1] - 20:6
**distraught** [1] - 54:7
**distressed** [1] - 49:14
**district** [1] - 8:23
**District** [2] - 3:6
**DISTRICT** [3] - 1:1, 12
**districts** [1] - 9:6
**diversification** [1] - 9:20
**docking** [1] - 22:22
**doctor** [2] - 79:23, 25
**doctor's** [1] - 66:17
**doctors** [2] - 69:14; 86:14
**document** [3] - 17:18; 18:22; 87:25
**documents** [4] - 85:14; 87:6; 95:12; 96:21
**Doe** [2] - 96:12
**dog** [1] - 80:10
**domestic** [1] - 71:7
**done** [9] - 32:14; 64:11; 67:1; 76:12; 81:24; 84:12; 96:19; 103:18
**dorm** [1] - 78:9
**double** [1] - 87:21
**down** [28] - 18:15; 21:25; 26:7; 27:6; 29:21; 30:7; 35:5; 38:23; 57:2, 21; 60:12; 63:16; 64:14; 66:11; 68:23; 79:15, 18; 82:1, 12; 85:7; 88:14; 97:21; 102:12; 105:18
**downstairs** [1] - 46:23
**Dr** [4] - 20:9; 62:14; 63:5
**drama** [1] - 27:15
**drastic** [1] - 36:12
**drastically** [1] - 36:11

**draw** [1] - 28:1
**drawing** [1] - 93:20
**dream** [1] - 23:7
**dressed** [1] - 14:8
**drew** [1] - 9:12
**drive** [2] - 26:14; 78:12
**driver's** [1] - 14:11
**driveway** [1] - 5:23
**driving** [1] - 14:12
**due** [1] - 86:17
**Dunigan** [1] - 45:25
**during** [10] - 7:12; 14:24; 23:4; 32:6; 36:1; 42:13; 54:8; 55:8; 65:4, 18
**duty** [2] - 92:5, 7

## E

**e-mail** [7] - 20:15, 23; 21:3, 10, 12, 15, 17
**early** [1] - 89:4
**easily** [1] - 90:7
**East** [1] - 1:21
**EASTERN** [1] - 1:2
**Eastern** [1] - 3:6
**easy** [1] - 19:10
**eating** [4] - 15:15; 74:9, 22; 78:18
**ecstatic** [1] - 21:19
**editorializing** [1] - 19:12
**educating** [1] - 94:19
**Education** [4] - 92:15; 95:13; 97:8; 102:13
**education** [6] - 8:14; 9:21; 68:4; 69:2; 70:22, 25
**educators** [2] - 92:17; 102:11
**effect** [1] - 49:2
**effective** [1] - 68:11
**efficient** [1] - 82:6
**efficiently** [2] - 81:24; 82:17
**efforts** [1] - 17:6
**eighth** [4] - 46:2, 6-7, 11
**either** [6] - 15:14; 26:2; 39:23; 49:17; 61:2; 88:16
**Either** [1] - 54:1
**elective** [2] - 20:15; 21:7
**electronics** [2] - 22:2, 4
**Elementary** [4] - 13:6; 17:3; 19:4, 16
**elicited** [1] - 50:13
**eliminated** [1] - 9:15
**Ellen** [1] - 21:5
**Elliker** [2] - 3:1; 89:10
**ELLIKER** [9] - 89:16, 19, 21; 91:12; 92:11; 93:4; 102:4, 18, 24
**Email** [10] - 1:19, 23; 2:5, 9, 13, 17, 20, 24; 3:4, 8
**emergency** [1] - 53:24
**emotional** [1] - 30:19
**employees** [1] - 96:1
**encourage** [3] - 80:20, 23; 89:3
**encouragement** [1] - 87:24

**end** [17] - 29:7; 31:14; 32:6; 33:24; 34:2; 38:10; 52:1; 54:23; 67:1; 71:14; 72:10; 77:24; 84:25; 89:3; 91:4, 11
**ended** [2] - 17:6; 78:2
**engage** [2] - 95:23
**engaging** [1] - 7:11
**enjoy** [1] - 75:14
**enrolled** [2] - 74:3
**enters** [2] - 44:22; 45:5
**entire** [1] - 48:2
**entirely** [1] - 74:9
**entitled** [1] - 106:10
**entrance** [1] - 57:1
**environment** [1] - 71:6
**Esq** [9] - 1:15, 20; 2:2, 6, 10, 14, 18, 21; 3:1
**essentially** [5] - 16:15; 41:22; 42:21; 99:22; 103:10
**established** [1] - 101:22
**et** [2] - 1:7; 36:24
**evaluating** [1] - 92:3
**evening** [1] - 52:10
**event** [1] - 5:19
**eventually** [1] - 50:18
**evidence** [4] - 49:1; 63:24; 87:10; 100:10
**evidentiary** [2] - 50:17; 64:22
**exact** [1] - 30:13
**exactly** [1] - 104:24
**exam** [10] - 60:25; 61:1, 24; 63:8, 23; 64:5, 24; 65:5, 13; 66:8
**examination** [11] - 65:9, 18; 66:7; 81:22, 25; 82:21; 83:23; 91:16; 100:4
**EXAMINATION** [2] - 4:3; 6:22
**EXAMINATIONS** [1] - 4:2
**example** [5] - 86:13; 87:5; 99:13; 100:6
**excelled** [1] - 13:20
**except** [1] - 84:22
**exception** [2] - 41:23; 42:7
**exception/exemption** [1] - 47:8
**excited** [4] - 20:12; 24:14; 27:9, 14
**exciting** [1] - 5:21
**excuse** [1] - 71:5
**exemption** [1] - 41:23
**Exhibit** [21] - 4:7-11; 12:3, 16; 17:13; 18:4; 20:13, 18, 21; 25:9, 14, 19; 26:23; 54:18; 67:15, 20, 24
**exhibit** [2] - 11:21; 12:21
**EXHIBITS** [1] - 4:5
**exhibits** [1] - 87:19
**exist** [1] - 88:3
**exit** [2] - 60:13, 17
**expect** [3] - 83:24; 94:3; 101:18
**expectation** [1] - 99:22
**expectations** [2] - 94:2; 99:23
**expected** [2] - 99:7
**experience** [4] - 65:4, 12, 17; 72:25
**experienced** [2] - 38:9; 76:6
**experiencing** [2] - 45:8; 74:24

**expert** [23] - 63:3, 5, 7; 75:23; 90:24; 91:17, 25; 94:24; 95:8; 96:5, 12, 19; 98:24; 99:3, 11, 21; 100:19, 21-22; 101:6, 15; 103:7
**expertise** [1] - 101:16
**experts** [1] - 66:9
**explain** [4] - 46:3, 5; 95:1, 24
**explained** [1] - 42:13
**explanation** [3] - 56:23; 63:15; 95:17
**expressly** [1] - 103:19
**extemporaneous** [1] - 13:20
**extensive** [1] - 69:12
**extent** [3] - 39:11; 45:3; 75:3
**extracurricular** [4] - 13:19; 14:15; 27:23; 71:9
**extracurriculars** [1] - 34:21
**eye** [1] - 58:16

**F**

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**fabulously** [1] - 73:20
**face** [1] - 72:4
**Facebook** [5] - 58:3, 6; 59:1, 3
**facing** [3] - 61:4
**fact** [10] - 47:13; 49:12; 63:6, 23; 91:3, 9; 93:25; 98:24; 101:13
**fact-finder** [4] - 91:3, 9; 93:25; 101:13
**factors** [2] - 9:13; 42:23
**facts** [2] - 90:22; 93:20
**factual** [1] - 91:5
**Fahey** [1] - 1:15
**failed** [2] - 98:6; 105:20
**failure** [1] - 92:18
**fair** [2] - 23:12; 32:13
**Fairfax** [11] - 9:11, 22; 10:11, 21; 25:4; 68:5, 25; 78:24; 90:22; 97:1
**fairly** [1] - 103:1
**falling** [1] - 74:25
**familiar** [2] - 24:8; 101:6
**families** [1] - 9:13
**family** [19] - 7:25; 8:1, 24; 11:20, 24; 12:22; 13:15; 22:14; 23:7; 24:7; 26:17; 29:8, 11; 32:11; 41:7; 47:2; 71:20; 75:10
**far** [10] - 9:22; 26:19; 36:15; 43:14; 45:2; 56:22; 59:10; 64:14; 96:17; 98:2
**farm** [2] - 10:25; 11:2
**farm-like** [1] - 10:25
**farms** [1] - 11:2
**Farms** [6] - 11:12; 13:4, 7-8; 26:7
**fat** [1] - 37:14
**father** [2] - 16:7; 77:3
**FCPS** [2] - 67:17; 68:11
**FCS** [1] - 85:20
**fear** [1] - 74:14
**February** [2] - 52:17; 68:18
**fed** [1] - 10:7
**federal** [1] - 105:17

**felt** [4] - 10:25; 57:22; 59:14; 71:23
**few** [2] - 23:8; 27:16; 30:10
**fifth** [1] - 20:7
**figure** [9] - 57:19; 65:2; 69:3; 78:10; 88:4; 89:5; 90:8; 105:24; 106:2
**fill** [1] - 101:23
**final** [2] - 17:15, 23
**finally** [1] - 36:8
**finder** [5] - 91:2, 9; 93:25; 101:13
**findings** [2] - 62:5, 14
**fine** [15] - 5:6; 7:19; 17:5; 27:17; 51:18; 60:18; 64:6; 66:10; 67:4; 79:14; 82:18; 84:7; 85:17; 86:11; 89:2
**finished** [1] - 73:14
**first** [25] - 5:5, 15, 20; 6:4, 11, 25; 7:6, 14; 8:4; 11:7; 23:24; 27:16; 35:2; 52:18; 69:10; 71:20; 77:19; 81:19; 90:1; 91:13; 93:2; 101:9
**firsthand** [1] - 84:16
**FL** [3] - 2:4, 8, 12
**flashbacks** [1] - 74:23
**flashing** [1] - 36:14
**flavor** [2] - 55:14
**flavors** [1] - 55:6
**FLEXNER** [4] - 1:20; 2:3, 7, 11
**flip** [2] - 22:6
**floor** [1] - 46:11
**Florida** [5] - 7:16, 22; 8:7, 21; 16:8
**Floris** [6] - 10:20; 13:6; 15:23; 17:3; 19:4, 16
**focus** [8] - 16:10, 14; 17:8; 19:8; 45:2; 73:1; 74:15, 22
**focusing** [1] - 93:1
**follow** [5] - 16:1, 12; 92:16; 94:21; 95:14
**followed** [1] - 37:24
**following** [1] - 39:6
**Following** [1] - 48:1
**FOR** [1] - 1:2
**forced** [1] - 57:2
**foregoing** [1] - 106:9
**forgot** [1] - 15:20
**formal** [3] - 67:17; 68:21
**forward** [1] - 8:24
**forwarded** [1] - 20:17
**foundation** [6] - 35:18, 21, 23; 36:23; 49:14; 61:17; 84:17; 86:10
**four** [6] - 9:2; 34:11; 90:1; 91:13, 17; 101:9
**Fourth** [1] - 103:4
**fourth** [1] - 63:12
**F█████** [1] - 32:7
**F████** [9] - 23:22, 24; 24:1, 18-19, 21; 40:21, 24; 41:1
**fresh** [1] - 76:6
**friend** [2] - 15:19; 58:11
**friendly** [1] - 11:5
**friends** [10] - 5:18; 14:22, 24-25; 15:3, 12; 27:12; 34:9

friendship [1] - 35:25
front [6] - 11:21; 17:13; 21:1; 53:22, 25; 67:15
full [1] - 24:2
functioning [1] - 76:5
functions [1] - 24:25
funds [1] - 105:17
funny [1] - 5:12

## G

gallery [1] - 61:6
game [1] - 85:4
gap [1] - 101:23
Gate [1] - 53:7
gender [1] - 101:16
gender-based [1] - 101:16
general [2] - 52:23; 84:18
generally [6] - 16:24; 48:15; 91:10; 92:5; 97:15; 98:6
gentleman [2] - 12:23; 80:9
gentlemen [6] - 6:3; 42:12; 52:5; 60:6; 71:2; 79:19
germane [2] - 98:24; 99:2
giggling [1] - 15:15
girl [2] - 26:18; 57:19
girls [1] - 73:18
given [6] - 50:25; 62:9; 66:25; 91:9; 95:2, 5
glasses [1] - 20:6
goal [2] - 84:4, 10
grab [2] - 6:8; 17:12
grabbed [1] - 55:17
grade [22] - 8:18; 10:17; 15:4, 23; 16:20; 17:2, 15, 23; 18:9; 20:7, 17; 21:13; 45:24; 46:2, 6, 19; 72:19; 73:14
graders [1] - 46:7
grades [3] - 19:4, 15; 70:13
gradeschools.net [1] - 9:25
gradually [1] - 36:11
graduate [1] - 78:3
graduated [1] - 12:25
gray [1] - 12:23
Great [2] - 72:16, 18
great [12] - 5:20; 8:3; 13:3; 14:16; 18:15, 24; 19:6, 13, 21; 23:10; 29:14; 51:1
gross [5] - 92:4, 7, 10; 98:4
grossly [1] - 98:20
ground [1] - 104:2
group [2] - 28:14; 44:20
groups [1] - 28:15
Gs [1] - 18:17
guard [1] - 73:8
guess [2] - 50:7; 82:8
guidance [34] - 24:6, 15; 33:7, 21; 44:5; 46:18; 91:22; 92:16; 93:5, 24; 94:20; 95:2, 12, 14, 19-20; 96:6, 13, 21; 97:5; 98:12, 15; 100:1; 101:7; 102:12;

103:8; 104:9; 105:2, 17
guidelines [4] - 97:3, 18; 98:7; 105:4
guilty [1] - 71:23
guns [2] - 54:11; 56:17

## H

hairdresser [1] - 14:1
half [1] - 83:18
hallway [1] - 46:12
hand [2] - 6:17; 95:13
handle [4] - 31:10; 46:8; 101:11
hands [1] - 29:4
handwritten [1] - 67:18
happy [2] - 63:18; 64:16
harassment [5] - 56:14; 90:17; 94:18; 101:15; 103:20
hard [8] - 28:10; 41:18; 54:22; 57:7; 71:19; 74:25; 77:5; 106:4
harmed [1] - 73:2
head [2] - 55:24; 79:25
headaches [2] - 19:22; 74:21
heads [1] - 65:1; 80:20; 105:24
health [6] - 19:18, 20-21; 20:3; 77:6, 10
hear [9] - 33:22; 38:2; 58:2; 65:21; 84:10, 12; 93:17; 95:11; 104:18
heard [8] - 32:17; 33:5; 46:23; 48:8, 13; 55:14; 79:20; 99:20
hearing [11] - 37:18, 23; 81:20; 85:11; 86:7, 24; 88:13; 89:22; 91:11; 93:18
hearsay [18] - 16:9; 17:7; 19:7; 31:2; 41:20, 23; 42:2; 47:5, 8; 48:22; 58:19; 69:18; 86:9; 87:21, 25; 88:24
hello [1] - 24:19
help [4] - 28:10; 33:1; 53:13; 60:10
helped [1] - 95:14
helpful [4] - 89:6, 24; 92:1; 100:8
helping [3] - 17:18; 28:9; 59:21
helps [1] - 93:25
Herndon [4] - 10:4, 11, 22; 11:8
herself [1] - 36:13
Hertzberg [3] - 21:5, 13, 21
High [2] - 13:11; 72:16
high [4] - 16:0; 32:12; 33:11
high-performing [1] - 33:11
highly [2] - 9:9; 25:4
hmmm [1] - 104:9
hold [7] - 35:10; 41:18; 44:15; 54:12; 79:25; 91:15; 104:24
holding [2] - 29:4; 81:15
HOLTZMAN [1] - 1:16
Holy [1] - 73:16
home [24] - 11:16, 18; 13:18; 14:4, 14, 21; 22:3; 23:1; 25:23; 27:21; 29:14; 30:1, 4; 35:2, 5; 54:16, 25; 55:4, 7; 68:4, 10
home-based [1] - 68:10
home-cooked [1] - 23:1

homes [1] - 11:4
homework [2] - 22:18; 27:19
honestly [3] - 26:17; 81:19; 85:13
Honor [39] - 5:3, 8; 6:10; 7:17; 12:3; 17:7; 20:19; 21:23; 31:2; 41:11; 42:6, 10, 24; 47:5, 24; 60:2, 24; 61:13; 63:16; 66:23; 67:10; 69:17; 79:13; 81:7, 18, 21; 84:7; 85:5; 87:18; 89:8, 16, 19, 22; 91:12; 92:11; 93:18; 102:4; 104:15
Honor's [2] - 85:7; 86:5, 15
HONORABLE [1] - 1:12
honors [2] - 21:19, 22
hope [3] - 24:14; 84:3; 90:6
hopefully [1] - 100:16
horrible [2] - 31:5, 8
horrified [4] - 37:19; 38:6
Horsepen [1] - 25:24
hospitalization [1] - 79:1
hospitalizations [1] - 20:1
hospitalized [1] - 78:15
hour [2] - 83:17
hours [3] - 36:15; 51:3; 83:17
hours' [2] - 82:25; 83:6
House [1] - 53:8
house [20] - 5:24; 11:9; 14:9; 15:14, 16-17; 25:25; 26:5, 20; 28:7; 30:6; 31:17, 25; 32:1, 6; 33:3, 15; 55:5; 58:12
H▮▮▮▮ [4] - 45:23; 46:4, 19
huge [3] - 8:13; 74:5; 76:15
H▮▮▮▮ [28] - 21:6; 23:23; 24:5, 8-9, 13, 15; 33:16, 20, 22, 24; 41:4, 6, 15; 42:24; 43:1, 13; 44:5; 45:14, 22-23; 46:3, 18; 48:16; 53:11, 16
H▮▮▮▮ [1] - 46:24
▮▮▮▮ [1] - 50:11
hundreds [1] - 87:20
HUNTON [4] - 2:15, 18, 22; 3:2
hurled [1] - 43:24
hurt [2] - 40:13; 53:14
hurting [1] - 36:5
husband [19] - 8:1, 13; 9:17; 11:20; 12:23; 13:17; 14:13, 16; 22:7, 19-20; 26:18; 29:12; 40:19; 44:4; 54:1; 55:4; 77:5
husband's [2] - 8:4; 21:17
hybrid [1] - 84:15
hypervigilance [4] - 73:1, 4, 7; 75:1
hypothetically [1] - 94:16

## I

idea [4] - 37:16; 41:5, 10; 72:2
identify [3] - 6:13; 87:22; 88:25
identifying [1] - 88:12
idyllic [1] - 8:1
IEP [3] - 70:19, 21; 71:3
ignorance [1] - 103:25
illness [1] - 19:24
imagine [2] - 100:7, 17

**immediately** [1] - 68:11
**imminent** [1] - 59:14
**impact** [1] - 97:19
**impeachment** [1] - 100:16
**implement** [1] - 96:22
**implementing** [1] - 96:18
**important** [3] - 51:10, 19; 65:13
**impose** [1] - 42:23
**in-person** [1] - 68:17
**inadmissible** [1] - 88:1
**inappropriate** [1] - 39:2
**include** [1] - 88:20
**including** [2] - 22:19
**inconclusive** [4] - 62:16, 21, 24; 63:25
**inconsistent** [3] - 32:20; 47:16; 50:6
**incriminating** [1] - 42:22
**independent** [2] - 26:18; 70:21
**indicating** [1] - 26:9
**indicating)** [1] - 26:1
**indifference** [6] - 93:6, 11-12, 14;
98:3, 13
**indifferent** [1] - 90:18
**indiscernible}** [1] - 69:25
**individual** [5] - 92:16; 93:8; 99:3;
102:11
**individualized** [2] - 70:24
**individually** [1] - 33:18
**individuals** [5] - 43:4; 44:8; 47:7;
101:19; 105:7
**indulgence** [2] - 36:19; 79:9
**infecting** [1] - 104:11
**information** [9] - 58:3, 6, 19; 84:16;
89:13; 91:25; 93:8; 101:13
**informing** [2] - 47:13; 99:7
**initial** [4] - 5:5; 6:25; 7:1; 39:23
**injuries** [2] - 62:8; 64:2
**Inova** [1] - 78:24
**inpatient** [3] - 78:14, 22, 25
**inquire** [4] - 51:10; 82:3, 20; 94:24
**inquiry** [1] - 105:8
**inside** [2] - 39:18
**instead** [2] - 62:7; 87:24
**instinct** [1] - 37:22
**institutions** [1] - 92:13
**instruction** [3] - 68:10; 80:5; 93:13
**instructions** [6] - 37:24; 42:14; 91:3;
93:5, 14
**integrity** [1] - 25:7
**intend** [1] - 88:15
**intended** [1] - 100:21
**intense** [1] - 102:5
**intention** [2] - 83:20; 86:13
**interact** [3] - 14:25; 15:11; 23:20
**interacting** [1] - 67:1
**interaction** [4] - 16:25; 35:19; 70:14
**interactions** [6] - 14:23; 15:13; 16:22;
24:12; 29:22; 39:15
**interpretation** [1] - 102:23
**interrupt** [1] - 82:3

**introduce** [2] - 63:17; 88:15
**investigate** [1] - 53:6
**investigation** [1] - 92:23
**investigations** [1] - 101:17
**investiture** [3] - 5:16, 21, 23
**invite** [1] - 29:10
**Island** [2] - 9:9; 72:18
**isolated** [2] - 30:19; 34:9
**issue** [17] - 47:10; 48:19; 49:1; 60:23;
69:21; 76:17; 86:8-10, 21, 24; 90:13;
95:9; 102:5; 104:23; 105:25; 106:3
**issues** [8] - 19:22; 20:5; 60:9; 74:15,
22; 81:4; 97:9; 105:1
**it'll** [1] - 82:12
**Italy** [2] - 22:7; 23:3
**itself** [3] - 18:23; 61:23; 62:3
**IX** [26] - 89:25; 90:3, 12; 91:5, 21;
92:12, 25; 94:5, 9-10, 14; 95:14, 21;
96:6, 18, 22; 97:19; 99:7, 23; 101:1, 5,
15; 102:8; 103:20; 105:2, 5

### J

**J.F** [2] - 83:6, 15
**J.O** [7] - 15:19, 21; 16:5; 35:8, 15, 25
**Jay** [1] - 77:19
**Jefferson** [1] - 10:14
**J██████** [5] - 15:23; 16:5, 16; 36:2
**Jennifer** [3] - 21:5, 13, 21
**Jennings** [4] - 62:14; 63:5
**Jennis** [5] - 44:16, 19, 22; 45:5
**Jenny** [1] - 59:4
**Jersey** [1] - 78:21
**Jesse** [1] - 12:24
**jfahey@holtzmanvogel.com** [1] - 1:19
**job** [7] - 5:15, 20; 9:16, 19; 16:13;
83:12; 100:5
**jobs** [4] - 9:18; 13:17; 31:7; 44:12
**John** [1] - 77:19
**Johnson** [1] - 78:18
**join** [1] - 29:10
**joins** [1] - 44:19
**jokingly** [1] - 55:15
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**jotted** [1] - 38:23
**journalism** [3] - 20:15; 21:7, 14
**joy** [1] - 74:13
**JR** [1] - 1:12
**judge** [4] - 5:16; 6:1; 71:7; 85:25
**JUDGE** [1] - 1:12
**Judge** [8] - 37:11; 83:19; 87:17; 93:15;
102:19; 103:6, 12; 104:13
**judicial** [1] - 63:23
**JUROR** [1] - 80:12
**jury** [28] - 5:3; 12:22; 28:5; 42:12;
47:17; 52:5; 64:8; 66:16; 79:19; 81:1;
88:7; 89:24; 90:7, 13; 91:4, 24; 92:20;
93:4, 9, 13-14; 94:19; 99:7; 100:10, 20;

104:8; 105:10
**JURY** [1] - 1:11
**Jury** [4] - 5:10; 60:19; 67:6; 80:15
**jury's** [3] - 64:5; 67:7; 104:11
**juvenile** [1] - 71:7

### K

**Keefe** [1] - 2:10
**keep** [3] - 27:23; 53:12; 58:16
**Kellar** [1] - 78:24
**kelliker@huntonak.com** [1] - 3:4
**kept** [2] - 9:8; 28:9
**Kevin** [2] - 3:1; 20:9
**key** [1] - 101:21
**kid** [1] - 58:6
**kids** [11] - 8:15; 9:20; 13:19; 14:12, 22;
22:6; 27:5; 32:3; 35:5; 53:3; 58:16
**kill** [2] - 56:18
**kind** [10] - 11:3; 29:25; 31:6; 32:16;
36:12; 48:25; 51:12; 65:24; 82:25;
103:25
**kinds** [2] - 39:5; 87:25
**KINNEY** [7] - 12:10; 16:9, 18; 35:17;
58:23; 69:18, 25
**kissing** [1] - 29:2
**kitchen** [1] - 22:22
**knit** [1] - 13:15
**knives** [2] - 54:10; 56:17
**knowing** [1] - 35:18
**knowledge** [3] - 28:23; 84:16; 90:17
**known** [7] - 24:7, 21; 41:7; 94:13;
98:10; 103:12; 104:5
**Kurt** [1] - 68:3
**KURTH** [4] - 2:15, 18, 22; 3:2

### L

**ladies** [6] - 6:3; 42:12; 52:5; 60:6; 71:2;
79:19
**lady** [1] - 62:7
**laid** [2] - 35:18; 84:17
**landed** [1] - 16:4
**Lane** [2] - 25:24; 26:7
**language** [1] - 36:20
**large** [1] - 81:8
**largely** [1] - 65:21
**last** [14] - 5:5; 6:25; 7:1; 15:8; 39:9;
67:8; 68:17; 69:22; 72:11; 74:3; 85:11;
86:7; 87:7; 103:12
**late** [4] - 36:16; 52:6; 60:6; 102:25
**Laughter)** [1] - 6:2
**laundry** [2] - 30:9
**law** [9] - 90:24; 91:2, 14, 25; 103:13,
16-17, 25
**lawyer** [5] - 5:18; 16:13; 19:10; 41:19
**lawyers** [1] - 87:11
**lay** [5] - 35:20, 23; 36:22; 61:17; 62:18

**laying** [2] - 55:3; 98:2
**lead** [1] - 86:3
**leading** [2] - 5:23; 73:25
**learn** [2] - 52:19; 58:2
**learned** [1] - 76:11
**learning** [1] - 68:17
**least** [3] - 14:8; 61:7; 62:11
**leave** [6] - 53:25; 69:4; 71:17; 79:8; 102:3; 104:13
**leaving** [6] - 14:9; 39:5; 70:2; 71:14; 88:4
**left** [7] - 33:15; 39:2; 43:8; 47:4; 53:19; 85:15
**legal** [3] - 91:19; 93:15; 104:12
**legitimate** [2] - 62:19; 101:10
**lesbian** [1] - 31:7
**less** [2] - 80:22; 101:24
**lessons** [2] - 14:19; 34:24
**Letter** [4] - 94:17; 99:20; 100:7; 104:10
**letter** [2] - 96:11; 103:9
**letters** [1] - 91:20
**liability** [2] - 92:17; 102:7
**license** [1] - 14:11
**life** [7] - 7:24; 8:3; 13:14; 73:21; 74:2, 8; 75:15
**light** [4] - 36:15; 62:17; 74:22; 104:3
**likely** [1] - 101:24
**limited** [3] - 17:1; 22:16; 49:12
**limiting** [2] - 42:14
**line** [2] - 5:9; 64:21
**Line** [1] - 72:10
**linear** [1] - 75:18
**list** [1] - 63:6
**listed** [1] - 94:23
**listen** [3] - 6:19; 45:7; 93:1
**listened** [1] - 36:17
**litigation** [4] - 42:13; 49:25; 51:22; 83:10
**live** [3] - 7:15; 16:7; 75:2
**lived** [3] - 7:14; 11:7; 99:8
**lives** [2] - 23:8; 75:11
**living** [4] - 8:7; 10:24; 11:18; 29:18
**LLP** [8] - 1:20; 2:3, 7, 11, 15, 18, 22; 3:2
**load** [2] - 30:8
**located** [1] - 78:20
**locker** [3] - 36:5; 39:18; 56:15
**logistically** [1] - 26:19
**long-term** [1] - 69:4
**look** [15] - 9:4; 18:11, 17; 22:24; 25:8; 54:19; 67:14; 68:21; 87:20; 96:9; 97:13, 22; 101:11; 106:4
**Look** [1] - 33:2
**looked** [12] - 9:25; 11:2, 4; 29:23; 59:9; 69:12, 14; 97:15; 103:2
**looking** [6] - 9:7, 19, 24; 17:16; 66:1; 69:10
**looks** [1] - 25:13
**Los** [1] - 1:22

**love** [3] - 32:14; 40:6; 55:10
**loved** [1] - 57:17
**lovely** [1] - 11:5
**loves** [1] - 77:1
**Lydon's** [1] - 103:6

## M

**ma'am** [19] - 6:16, 19; 10:13; 16:11; 17:8; 19:8; 37:12; 41:18; 52:2; 60:12, 18; 67:9, 11; 70:6; 75:2, 22; 79:10, 15, 18
**machine** [1] - 3:9
**M▮▮▮** [1] - 46:1
**mail** [7] - 20:15, 23; 21:3, 10, 12, 15, 17
**main** [3] - 40:21; 43:22; 89:23
**man** [1] - 12:24
**Manhattan** [1] - 78:8
**map** [1] - 25:22
**MARCH** [1] - 5:1
**March** [6] - 1:6; 68:15; 69:1; 85:11; 87:18; 89:22
**marked** [2] - 11:22; 43:8
**matter** [10] - 5:25; 9:23; 42:3; 46:8; 47:13, 21; 50:8; 89:9; 97:4; 106:10
**mature** [1] - 27:5
**maturity** [1] - 27:4
**meals** [1] - 23:1
**mean** [21] - 16:25; 17:1; 21:15; 32:19; 33:11; 40:11; 47:18; 57:5; 61:14; 65:4, 13; 73:3, 7; 87:7; 88:10, 25; 90:14; 91:21; 98:20; 99:5; 105:21
**meaning** [1] - 93:7
**means** [3] - 66:10; 98:12; 102:23
**meant** [1] - 38:8
**Medical** [1] - 88:14
**medical** [12] - 61:16; 75:24; 85:15, 23-24; 86:19, 25; 87:2, 12, 20; 88:7
**meeting** [3] - 40:2; 50:9; 53:7
**meetings** [1] - 33:25
**meets** [1] - 14:18
**members** [1] - 12:22
**mental** [1] - 20:3
**mention** [1] - 79:21
**mentioned** [5] - 8:25; 23:3; 25:3; 51:7; 79:20
**mentor** [1] - 17:6
**message** [13] - 34:16, 18; 36:17; 38:2, 7, 21; 39:3; 44:13; 45:7, 9, 13; 53:18
**messages** [4] - 39:5; 58:3, 7; 59:5, 8, 19
**met** [2] - 24:25; 94:25
**method** [1] - 49:5
**methodology** [1] - 65:2
**Miami** [3] - 2:4, 8, 12
**mic** [1] - 7:18
**microphone** [1] - 26:2
**middle** [6] - 11:15; 20:11; 21:10, 12;

27:9; 28:15
**Middle** [13] - 11:17; 13:14; 14:6; 15:18; 19:19; 21:8; 22:4; 23:16; 25:1; 27:3; 31:18; 73:21; 76:9
**middle/secondary** [1] - 69:8
**Middleton** [6] - 11:12; 13:4, 7-8; 26:7
**might** [17] - 16:1; 19:10; 22:11; 42:22; 45:25; 47:22; 48:17; 49:17, 23-24; 50:3; 73:2; 79:20; 88:3; 89:23; 97:14; 106:3
**migraines** [1] - 19:22
**Mills** [1] - 68:3
**mills** [1] - 68:9
**mind** [5] - 25:2; 60:2; 79:22; 104:8, 11
**mine** [1] - 21:17
**minute** [2] - 19:18; 46:15
**minutes** [2] - 60:7; 66:13
**missed** [1] - 98:12
**misstate** [1] - 25:6
**misstated** [1] - 71:3
**misunderstood** [1] - 87:4
**mixing** [1] - 92:18
**mom** [3] - 28:24; 30:6; 50:3
**Mom** [5] - 28:11; 31:4; 39:4; 50:3; 65:24
**moment** [2] - 50:19; 72:3
**Mommy** [1] - 55:19
**Monday** [1] - 34:5
**money** [1] - 39:21
**monitors** [1] - 61:11
**month** [2] - 43:18; 78:19
**morning** [4] - 14:7; 40:3; 52:19; 79:16; 80:13; 106:5
**most** [7] - 9:14; 15:13; 25:3; 26:15; 27:9; 32:16
**mostly** [2] - 14:13; 17:1
**mother** [8] - 7:5; 16:7; 29:9; 47:3; 48:9; 58:15
**mother's** [1] - 65:17
**motion** [2] - 85:13; 90:11
**Mountain** [1] - 69:6
**mouth** [3] - 55:21; 56:1; 57:3
**move** [19] - 8:9, 12; 9:3, 17; 10:3; 11:6, 8; 12:3; 17:25; 20:18; 25:14; 51:8, 25; 62:6; 67:20; 86:13; 87:1; 100:9
**moved** [7] - 10:4; 11:8; 13:3, 8; 16:6; 71:21; 78:8
**movie** [1] - 76:19
**moving** [1] - 8:22
**MR** [34] - 12:10; 16:9, 18; 35:17; 58:23; 69:18, 25; 81:18; 82:24; 83:5, 14; 84:3, 21; 85:5, 10, 20; 86:12, 22, 25; 87:10, 17; 88:10, 19, 22; 89:8, 16, 19, 21; 91:12; 92:11; 93:4; 102:4, 18, 24
**MS** [177] - 4:4; 5:3, 8; 6:7, 10, 14, 23; 7:2, 17, 20-21; 10:16; 12:3, 12, 14, 17; 16:3, 21; 17:7, 11, 20, 22, 25; 18:2, 5, 8, 24-25; 19:7, 14; 20:18, 22; 21:23, 25; 22:1; 25:14, 17, 20; 27:7; 31:2, 13; 35:14, 22, 24; 36:19, 25; 37:1, 15; 38:18; 40:1; 41:11, 13; 42:6, 10, 24;

43:5, 12, 20; 45:4; 47:5, 10, 18, 24;
48:2, 19; 49:7, 9, 20; 50:6, 14, 20, 25;
51:6, 15, 19, 25; 52:3, 13; 56:9; 57:7;
58:20, 25; 59:2, 18; 60:2, 24; 61:5, 7,
13-14, 19; 62:9, 13, 22, 25; 63:16, 20;
64:1, 5, 12; 65:3, 12, 16, 20, 25; 66:11,
20, 23; 67:5, 10, 12, 20, 22, 25; 68:1;
69:17, 20; 70:1, 11, 23; 71:1, 8; 72:14;
73:12, 25; 74:18; 75:6; 76:7; 77:9, 15,
23; 79:6, 9, 11; 81:7, 11; 82:8, 18; 84:7,
20; 86:4, 9; 87:18; 88:6, 9; 89:9; 93:18;
94:12, 20; 95:1, 10, 24; 96:8, 25; 97:5,
23; 98:9; 99:4, 14, 17, 24; 100:9, 13,
15, 24; 101:14, 21; 102:16; 104:15, 19;
105:11
**multiple** [1] - 59:13
**music** [2] - 14:19; 79:11
**musical** [1] - 71:12
**must** [2] - 13:1
**mutual** [1] - 24:17

## N

**name** [20] - 5:5; 6:25; 7:1, 6; 8:4;
11:10; 15:8; 23:25; 24:2; 28:19; 34:20;
36:3; 39:9; 45:8; 46:1; 58:8; 59:3; 79:3
**name-calling** [2] - 36:3; 45:8
**named** [2] - 15:19; 39:1
**names** [4] - 8:6; 15:7; 39:19
**nanny** [1] - 58:17
**nap** [1] - 30:7
**Nassau** [1] - 9:9
**nature** [1] - 51:22
**near** [2] - 57:1; 69:6
**necessarily** [4] - 47:13, 20; 48:23;
64:20
**Neck** [2] - 72:16, 18
**need** [20] - 16:23; 33:6; 36:22; 45:2;
50:21; 60:9, 16; 63:15; 66:2; 68:9;
77:21; 79:25; 80:1, 25; 81:1; 85:16;
90:24; 97:21; 105:8
**needed** [5] - 8:18, 20; 30:7; 45:13;
69:15
**needs** [1] - 80:10
**negligence** [9] - 92:4-8, 10-11; 98:4
**negligent** [1] - 98:20
**neighborhood** [4] - 11:5, 15; 25:11;
89:21
**Neil's** [1] - 29:8
**Neill** [3] - 28:20; 30:11; 39:17
**nervous** [1] - 38:19
**nervousness** [1] - 73:1
**never** [7] - 32:17; 33:4; 38:9; 53:4;
55:14; 76:19; 82:12
**new** [4] - 21:7; 27:12; 87:14
**New** [9] - 8:2; 9:13, 15; 69:6; 70:18;
71:21; 72:18; 76:21; 78:21
**next** [16] - 12:24; 21:10; 24:10; 30:10;
31:12; 37:21; 38:14, 22; 43:21; 45:11;

53:20; 59:16; 72:15; 73:11; 74:17;
77:14
**nice** [5] - 5:19, 22; 11:4; 29:19
**niceties** [1] - 32:12
**night** [2] - 97:11; 102:25
**nights** [1] - 74:14
**nighttime** [1] - 22:21
**ninth** [2] - 72:20; 73:14
**nobody** [2] - 22:17
**none** [1] - 49:16
**nonretained** [2] - 63:3, 5
**normally** [4] - 36:20; 76:5; 82:9; 83:24
**note** [3] - 68:8; 102:16; 103:6
**notes** [1] - 64:2
**Nothing** [2] - 28:9
**nothing** [1] - 100:6
**notice** [19] - 5:12; 30:3, 16; 35:15;
47:6; 48:6; 49:22; 63:23; 67:17; 68:21;
82:25; 83:6, 11; 98:14; 103:15, 17, 21,
23
**noticed** [5] - 73:24; 74:1, 19; 75:14;
81:12
**notified** [2] - 83:1, 5
**November** [7] - 31:21; 34:4, 6, 11;
35:16; 36:9; 40:2
**nowadays** [1] - 22:11
**nuclear** [1] - 11:20
**Number** [1] - 8:22
**number** [9] - 37:22, 24-25; 38:1, 23,
25; 45:12, 19
**nurse** [2] - 61:16
**NW** [5] - 1:17; 2:15, 19, 22; 3:2

## O

**Oakton** [1] - 10:5
**oath** [1] - 67:11
**objected** [1] - 85:23
**objecting** [2] - 69:20
**objection** [28] - 12:5, 8; 17:7; 18:1-3;
19:7; 20:19; 21:23; 25:16-18; 31:2;
41:11; 47:5; 58:23; 61:22; 62:2; 63:4;
67:21; 69:17; 83:15; 84:21; 87:1; 88:17;
96:4
**objections** [1] - 61:1
**objective** [3] - 66:7; 84:5; 103:22
**obligation** [1] - 105:4
**obligations** [1] - 101:4
**observation** [1] - 16:18
**observe** [2] - 74:6, 11
**observed** [3] - 29:16; 35:21; 76:2
**observing** [1] - 33:19
**obtuse** [1] - 87:6
**obviously** [9] - 48:21; 51:19; 65:23;
66:25; 88:16; 91:2; 97:11; 102:6
**occasionally** [1] - 15:1
**occurred** [1] - 66:14
**OCR** [3] - 91:21; 103:8; 104:9
**October** [2] - 28:1; 34:6

**odd** [1] - 36:16
**OF** [4] - 1:2, 11; 4:3; 6:22
**offer** [1] - 63:25
**offered** [2] - 35:5; 42:2
**Office** [1] - 92:15
**office** [11] - 40:21; 41:17; 43:22; 46:11,
16, 18, 24; 53:19, 22, 25
**Officer** [5] - 44:16, 19, 22; 45:5
**officer** [1] - 44:18
**Official** [2] - 3:5; 106:13
**old** [3] - 27:1; 49:22; 76:6
**older** [4] - 9:1; 27:11; 77:5
**Olivia** [5] - 15:5, 9-10, 14, 16
**Olivia's** [1] - 15:8
**Olivias** [1] - 15:5
**on-site** [1] - 79:22
**once** [4] - 44:22; 55:12; 84:9, 17
**one** [43] - 5:4; 6:8; 9:9; 15:9; 18:16;
22:5, 13, 16; 25:3, 25; 26:12; 29:9;
30:25; 36:14; 42:16, 18; 49:9, 21-22;
56:20; 61:7; 63:12; 64:25; 71:3; 77:5;
79:2-4, 7; 83:19; 84:15, 22; 89:9, 23;
90:19, 25; 102:18; 104:17
**one's** [1] - 77:5
**ones** [2] - 91:8; 101:12
**online** [1] - 37:23
**open** [7] - 9:7; 31:17, 25; 32:1, 6; 33:3,
15
**Open** [1] - 52:4
**opened** [1] - 47:18
**opening** [6] - 47:11; 48:3; 80:19;
85:22; 90:14, 16
**opine** [2] - 65:24; 95:8; 97:14
**opinion** [2] - 63:7; 103:6
**opponent** [1] - 105:5
**opportunities** [3] - 9:16, 19, 21
**opportunity** [3] - 88:16; 95:22; 99:9
**opposed** [5] - 91:10; 94:8; 98:24; 99:3,
21
**opposing** [1] - 86:24
**options** [1] - 9:8
**oranges** [1] - 92:19
**order** [4] - 33:25; 72:11; 78:17; 96:22
**orientation** [5] - 23:15, 18, 21; 24:13,
21
**originally** [2] - 49:12; 68:16
**Os** [2] - 18:17, 19
**ourselves** [3] - 9:8, 19; 66:13
**out-of-court** [1] - 42:2
**outcome** [1] - 104:12
**outings** [1] - 15:2
**outlines** [1] - 96:3
**outside** [3] - 58:15; 84:8; 101:14
**outstanding** [1] - 18:14
**outweighed** [1] - 49:2
**overachievers** [1] - 8:14
**overall** [1] - 19:20
**Overruled** [2] - 12:11; 31:3
**own** [3] - 49:18; 70:3; 104:21

**Ox** [2] - 11:12; 26:8

# P

**p.m** [9] - 1:6; 5:2, 10; 60:19; 66:15; 67:6; 80:15; 106:6
**packed** [1] - 14:20
**packs** [1] - 35:6
**page** [12] - 12:15; 15:11; 18:16; 21:11; 26:23; 68:19; 86:2; 87:16; 88:21, 24; 89:3
**Page** [1] - 4:2
**pages** [6] - 87:20, 25; 88:7, 15, 17, 19
**painful** [1] - 77:13
**Palchus** [2] - 15:9
**Palm** [2] - 7:16, 22
**pants** [3] - 39:19; 44:13; 57:2
**parent** [3] - 7:11; 33:8; 47:13
**parent/teacher** [1] - 33:18
**parents** [3] - 28:16; 32:2
**Park** [1] - 1:21
**part** [12] - 5:17; 9:14; 14:3; 26:15; 36:2; 72:11; 89:1; 96:16; 98:15; 105:19
**part-time** [1] - 14:3
**partial** [2] - 78:25
**participate** [1] - 71:11
**particular** [9] - 27:14; 47:23; 62:8; 87:9; 91:25; 93:24; 94:25; 100:6; 102:11
**particularize** [1] - 35:12
**parties** [5] - 42:7; 63:22; 81:4; 85:14; 106:1
**parts** [2] - 55:25; 87:23
**party** [2] - 42:11, 18
**patch** [14] - 28:3, 12; 29:6, 17; 30:15; 46:22; 47:2; 48:9, 12, 14; 49:13
**pattern** [2] - 35:4
**patterns** [1] - 35:3
**pause** [3] - 12:6; 72:3, 6
**paying** [2] - 71:24; 102:5
**PE** [3] - 36:5; 73:2
**pediatrician** [1] - 20:8
**penis** [2] - 57:2
**Pennsylvania** [4] - 2:15, 19, 22; 3:2
**penumbra** [1] - 106:2
**people** [18] - 10:10; 14:8; 39:17; 43:3; 44:11, 20; 52:25; 54:10; 56:15; 59:13; 70:7; 85:2, 16; 90:3; 93:8; 96:16; 105:13
**perceived** [1] - 98:15
**perfectly** [1] - 28:18
**performance** [2] - 10:8; 32:20
**performer** [1] - 32:22
**performing** [1] - 33:11
**perhaps** [2] - 45:12; 53:11
**period** [1] - 103:8
**permission** [1] - 12:12
**person** [14] - 16:5; 37:16; 42:1, 18; 59:11; 61:23; 68:17; 82:15; 92:12, 25; 93:7, 10; 97:14; 98:25

**personality** [3] - 74:2, 7, 12
**perspective** [1] - 52:19
**petting** [1] - 11:2
**ph** [1] - 96:12
**P▮▮** [1] - 45:24
**phone** [6] - 22:8; 36:15, 17; 37:4; 44:24
**phones** [5] - 22:6, 17, 19, 23; 23:1
**photo** [4] - 12:8; 25:11; 27:1
**photos** [2] - 11:24; 61:2
**physical** [2] - 19:24; 74:19
**physically** [1] - 32:21
**physicians** [1] - 86:16
**piano** [5] - 13:21; 34:22, 24; 75:15
**pick** [4] - 29:13; 53:23; 54:3; 56:8
**picked** [7] - 9:21; 29:18; 36:17; 54:6; 63:11, 13; 68:16
**picking** [1] - 54:1; 87:8; 98:25
**pictures** [1] - 61:20
**piece** [3] - 93:24; 98:12; 102:12
**pieces** [1] - 54:9
**pike** [1] - 85:7
**PK2** [1] - 8:16
**PK3** [1] - 8:16
**place** [4] - 6:16; 9:16; 17:16; 71:20
**placed** [1] - 21:21
**placement** [1] - 21:19
**Plaintiff** [3] - 1:4, 15; 2:2
**plaintiff** [5] - 6:15; 7:3; 51:17; 61:24; 64:15
**Plaintiff's** [11] - 4:7-11; 12:4, 16; 18:4; 20:21; 25:19; 67:24
**PLAINTIFF'S** [1] - 6:18
**plaintiffs** [1] - 6:10
**plan** [4] - 70:22, 25; 71:4
**planned** [1] - 23:7
**plant** [1] - 9:8
**play** [5] - 24:9; 44:24; 45:9
**played** [3] - 24:10; 71:11; 75:16
**playing** [3] - 13:21; 34:25; 45:10
**plays** [1] - 19:1
**plenty** [1] - 23:14
**PLLC** [1] - 1:16
**PM** [1] - 1:8
**point** [38] - 8:9; 20:13; 29:5; 30:21, 23; 31:15, 17; 41:4; 42:13; 48:18; 49:6, 8, 11, 18, 24; 50:1, 13, 23; 51:1; 58:2; 60:5, 15; 64:9, 13; 77:16; 89:23; 92:20, 22; 93:2; 95:7; 96:2; 97:25; 99:21; 101:21; 102:20; 104:24; 105:16
**points** [2] - 90:8; 96:5
**police** [5] - 44:18; 59:20, 22, 24; 92:23
**policies** [8] - 95:25; 96:14-16; 97:3, 18; 101:22; 105:4
**policy** [3] - 98:19
**portion** [2] - 54:20; 81:8
**position** [7] - 80:1; 86:14; 98:6, 8-9; 99:4, 16
**possible** [1] - 81:2

**post** [4] - 62:5; 74:2; 101:19
**post-traumatic** [1] - 101:19
**practice** [1] - 24:10
**practices** [4] - 14:18; 97:6
**preceding** [1] - 34:11
**precise** [1] - 19:11
**predicate** [1] - 91:9
**preference** [4] - 49:24; 64:10, 21; 84:14
**prejudicial** [1] - 49:2
**present** [2] - 32:21; 88:1
**presented** [1] - 50:24
**preserve** [1] - 88:22
**press** [2] - 37:7; 45:10
**pretty** [4] - 11:4, 14; 62:8; 80:17
**prevent** [1] - 99:18
**pride** [1] - 14:17
**primary** [1] - 7:11
**primer** [1] - 41:19
**principal** [15] - 24:1; 40:8, 25; 45:25; 46:2, 6, 19; 52:22; 98:25; 99:5, 12, 15, 19; 105:1
**principals** [2] - 102:9; 105:19
**priority** [1] - 8:13
**private** [7] - 8:16, 20; 55:25; 69:8, 12; 73:17
**probative** [1] - 49:1
**problem** [19] - 17:17; 28:17; 35:21; 48:7; 51:11; 52:9; 60:9; 66:17, 19; 82:1, 7; 84:18; 85:7; 86:3; 87:15; 88:11; 100:19
**problems** [2] - 74:22, 24
**procedure** [1] - 97:19
**procedures** [1] - 101:22
**Proceedings** [2] - 3:9; 106:6
**proceedings** [3] - 12:6; 66:14; 106:10
**PROCEEDINGS** [1] - 1:11
**process** [3] - 80:19; 81:5; 87:13
**produced** [1] - 3:9
**professor** [2] - 91:14, 25
**proffer** [2] - 96:9; 103:10
**proffered** [1] - 90:2
**progress** [1] - 17:5
**promiscuous** [1] - 101:25
**proper** [1] - 64:25
**properly** [1] - 88:2
**propose** [1] - 87:13
**proposed** [1] - 90:20
**proud** [1] - 7:5
**prove** [4] - 48:6; 71:22; 98:3
**proven** [1] - 42:23
**provide** [4] - 58:21, 25; 92:9; 100:22
**provided** [2] - 78:6; 101:13
**provides** [1] - 21:24
**providing** [1] - 58:19
**proving** [1] - 99:8
**provisions** [1] - 98:7
**PTSD** [1] - 102:1
**Public** [3] - 68:5; 69:1; 72:16

**public** [4] - 8:21; 71:22; 72:23; 73:17
**publish** [1] - 12:12
**pull** [7] - 5:24; 18:5; 26:22; 52:16; 53:24; 54:18; 67:25
**pulled** [2] - 54:23; 57:1
**pumpkin** [14] - 28:3, 12; 29:6, 17; 30:15; 46:22; 47:2; 48:9, 12, 14; 49:13
**pure** [1] - 57:18
**purpose** [3] - 42:16; 89:25; 90:4
**pursuant** [1] - 88:2
**put** [23] - 8:13, 15; 22:23; 30:7-9; 35:5; 55:23, 25; 57:2; 64:25; 66:9; 80:20; 82:1; 83:11, 15, 25; 86:25; 87:12; 90:7, 10; 105:24
**puts** [1] - 93:9
**putting** [2] - 81:19; 105:3
**PXs** [1] - 94:23
**pyramid** [1] - 10:6

## Q

**quaint** [2] - 10:9, 25
**questions** [23] - 6:19; 16:12; 19:11; 23:12; 57:13, 20; 69:18; 90:1, 10, 20; 91:7, 14, 17; 92:22; 96:3; 98:23; 99:1; 100:11; 101:9; 103:10
**quick** [2] - 5:4; 66:24
**quiet** [3] - 11:14; 30:2, 22
**quieter** [1] - 30:19
**quite** [3] - 58:12; 67:14; 90:6

## R

**Rachel** [23] - 10:5, 7; 11:17; 13:12, 14; 14:3, 6; 15:18; 17:3; 19:5, 19; 20:10; 21:8; 22:3; 23:15; 25:1; 26:12; 27:3; 31:17; 73:21; 74:3; 76:9; 90:23
**R██████** [7] - 7:3; 12:18; 41:5; 48:21, 24; 49:21; 52:24
**raise** [2] - 8:23; 89:10
**raised** [2] - 28:7; 104:23
**raising** [2] - 90:11
**random** [1] - 98:25
**raped** [2] - 54:24; 56:4
**rate** [1] - 10:7
**rated** [2] - 9:9; 25:4
**ratings** [1] - 10:1
**rbates@hunton.com** [1] - 2:17
**RCMS** [1] - 68:17
**RDR** [3] - 3:5; 106:9, 12
**RDR-CRR** [1] - 106:9
**reach** [1] - 62:9
**react** [3] - 93:10; 95:4; 98:16
**reaction** [1] - 38:5
**read** [6] - 9:6; 38:23; 68:8; 79:24; 90:7; 104:7
**readdressing** [1] - 51:12

**ready** [4] - 5:24; 6:4; 14:14
**real** [4] - 5:18, 21; 87:6
**really** [15] - 8:15; 10:7; 11:3; 24:24; 42:3; 48:13; 49:3; 53:21; 61:21; 77:5; 79:23; 97:21; 101:6, 16; 102:23
**reasonable** [7] - 83:11; 92:12, 25; 93:10; 94:13; 101:12; 102:23
**reasonableness** [1] - 98:15
**reasonably** [4] - 50:15; 81:16; 94:1; 95:5
**reasoning** [2] - 70:2, 4
**receive** [2] - 52:21; 58:6
**received** [4] - 59:19; 96:13; 105:17
**recess** [1] - 66:14
**recognize** [3] - 36:23; 37:2; 38:23
**recommence** [2] - 60:5; 67:8
**recommended** [1] - 21:21
**record** [11] - 6:13; 12:9, 16; 15:25; 18:4; 20:21; 25:19; 48:1; 62:18; 67:24; 106:9
**Records** [1] - 88:14
**records** [15] - 10:1; 85:15, 23-24; 86:13, 19; 87:1, 9, 13, 20; 88:4, 7
**red** [1] - 7:18
**refer** [2] - 10:13; 90:3
**references** [1] - 85:22
**referred** [1] - 16:5
**referring** [3] - 10:13; 39:12; 41:16
**reflected** [1] - 86:18
**regard** [5] - 82:4; 87:8; 88:3; 94:22; 105:8
**regarding** [3] - 49:1; 69:22; 89:14
**regulations** [9] - 90:12; 91:19, 21; 92:13; 97:24; 102:9; 103:7, 13
**related** [2] - 7:3; 45:20
**relation** [1] - 26:5
**relations** [1] - 71:7
**relationship** [11] - 15:21; 16:10, 15; 35:8, 15, 19; 76:8, 13, 23; 77:3, 10
**relevancy** [1] - 49:3
**relevant** [5] - 94:13; 97:7; 98:10, 21
**rely** [1] - 101:2
**remained** [1] - 5:12
**remaining** [1] - 90:10
**remember** [11] - 15:7; 28:2; 29:24; 36:16; 55:15; 78:16, 22; 80:5, 7; 85:12
**remind** [2] - 5:11; 68:16
**remove** [1] - 93:22
**removed** [1] - 45:20
**removing** [1] - 93:21
**rendering** [1] - 63:7
**rented** [1] - 11:9
**repeating** [1] - 70:3
**repetitive** [1] - 12:10
**rephrase** [1] - 41:12
**report** [15] - 17:15, 23; 18:9; 56:14; 61:16, 23; 62:3, 5, 12, 19-20, 24; 63:1, 10, 14
**reported** [1] - 3:9

**REPORTER** [1] - 104:18
**Reporter** [3] - 3:5; 106:13
**reporter** [1] - 6:25
**reporters** [1] - 6:13
**reporting** [1] - 58:13
**reports** [1] - 95:4
**reputation** [1] - 25:2
**require** [2] - 94:5
**required** [4] - 94:14; 97:24; 98:2, 17
**research** [2] - 32:14; 69:12
**reseated** [1] - 67:7
**reshuffle** [1] - 81:13
**residential** [2] - 11:3; 79:4
**resolve** [3] - 81:1; 105:25; 106:3
**resolved** [1] - 100:23
**resolving** [1] - 81:4
**respect** [2] - 86:17; 89:11
**respond** [3] - 32:18; 92:2; 104:16
**responded** [1] - 86:4
**response** [16] - 32:25; 41:2, 14, 24; 42:1, 5, 9; 43:9, 15-16; 49:15; 50:11; 63:5; 70:6; 90:18; 104:3
**responses** [1] - 69:19
**responsibility** [2] - 18:18; 25:7
**responsible** [1] - 27:21
**rest** [1] - 97:13
**restrict** [1] - 19:9
**restricted** [1] - 94:8
**results** [1] - 62:5
**retrieve** [1] - 37:6
**return** [1] - 54:17
**REWARI** [29] - 5:8; 17:7; 18:2; 19:7; 20:19; 21:23; 25:17; 31:2; 41:11; 42:10; 47:5; 61:14; 62:13, 22, 25; 66:20; 67:22; 69:17; 82:8, 18; 84:7, 20; 86:4, 9; 87:18; 88:6, 9; 89:9; 102:16
**Rewari** [3] - 2:18; 86:2; 102:14
**Rights** [1] - 92:15
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:5
**road** [2] - 76:16; 97:21
**Road** [2] - 11:12; 53:8
**roadmap** [1] - 66:24
**roads** [1] - 11:1
**Robert** [2] - 2:10; 78:17
**robust** [1] - 100:3
**role** [1] - 68:5
**Roohbakhsh** [1] - 96:11
**room** [10] - 29:19; 34:12; 44:3, 8, 23; 45:6; 46:17; 47:7; 65:5
**ropes** [1] - 56:18
**ROSSIE** [1] - 1:12
**round** [1] - 23:24
**routine** [1] - 14:7
**rule** [5] - 22:16; 41:23; 47:8; 82:11, 13
**rules** [3] - 22:15; 88:2; 103:7
**ruling** [5] - 61:21; 62:13; 66:25; 86:5, 15
**rumors** [2] - 36:3; 44:10

**run** [2] - 35:7; 48:25
**rushing** [1] - 14:7
**Ryan** [1] - 2:14

## S

**Sabino** [1] - 79:4
**sad** [1] - 55:9
**sadness** [1] - 55:5
**safe** [4] - 11:14; 53:1; 54:16; 57:17
**safety** [2] - 9:23; 10:1
**sake** [1] - 39:6
**SANE** [13] - 60:25; 61:1, 16; 62:5, 19; 63:23, 25; 64:24; 65:9, 13, 18; 66:7
**sat** [1] - 29:18
**save** [1] - 61:15
**saw** [3] - 34:12; 36:14; 59:7
**sayings** [1] - 25:5
**scared** [2] - 53:21; 59:14
**schedule** [3] - 13:18; 33:25; 81:20
**SCHILLER** [4] - 1:20; 2:3, 7, 11
**school** [100] - 7:11; 8:15, 23; 9:6; 10:19; 11:15; 14:12, 15, 21, 24; 17:1; 20:11, 16; 24:1, 24-25; 26:14; 27:10; 28:16; 30:20, 24; 31:5, 9, 15; 32:12; 34:2, 4; 35:2, 19; 36:8; 39:20; 40:4-6, 12, 14-15, 17; 43:19; 44:11; 47:7; 48:4; 49:7, 22; 50:21; 51:20; 52:17, 19; 53:4; 54:17, 23; 55:10; 56:13, 16; 57:24; 58:13; 66:25; 67:2; 68:11; 69:3, 5, 7-9, 11; 70:8, 12, 14, 16-18; 71:6, 14-15, 18-19, 22; 72:15, 21, 23; 73:13, 17-19; 74:3; 77:18; 81:9; 84:9; 90:18; 99:1, 5; 102:7, 10
**School** [28] - 10:21; 11:17; 13:11, 14; 14:6; 15:18; 17:3; 19:16, 19; 21:8; 22:4; 23:16; 25:2; 27:4; 31:18; 42:25; 43:1; 47:14, 21; 72:16; 73:21; 76:9; 104:25; 105:6, 13, 18, 20
**school's** [3] - 44:18; 59:21; 97:19
**schools** [22] - 8:20; 9:4; 13:3, 10; 69:12, 14; 90:5; 92:14, 16; 94:2, 14, 21; 95:2, 13; 96:13; 97:8; 98:10; 103:20; 105:16
**Schools** [2] - 68:6; 69:1
**science** [1] - 32:13
**scope** [1] - 84:8, 22
**Scott** [5] - 2:21; 3:5; 106:9, 11
**scottwallace.edva@gmail.com** [1] - 3:8
**screen** [1] - 21:1; 26:24
**screens** [1] - 61:3
**scroll** [1] - 18:15
**SE** [3] - 2:3, 7, 11
**sealed** [1] - 103:5
**seat** [3] - 6:21; 60:22; 80:16
**seating** [1] - 81:1
**second** [5] - 10:18; 25:25; 68:19; 93:2; 104:23

**secondary** [2] - 48:25; 69:8
**seconded** [1] - 22:18
**seconds** [2] - 60:3; 104:15
**security** [1] - 5:9
**see** [31] - 16:23; 18:17, 19; 21:1; 24:14, 16; 31:11; 32:14; 33:6, 17; 40:10, 12, 21, 25; 43:18; 50:6; 51:6, 17; 53:13; 61:10; 64:8; 79:16; 80:13; 85:6; 90:20; 96:9; 101:12; 105:11; 106:5
**seeing** [3] - 29:24; 36:11; 72:24
**seem** [1] - 27:19
**sees** [1] - 41:4
**self** [2] - 19:1; 99:5
**self-serving** [1] - 99:5
**semantics** [1] - 90:9
**send** [2] - 71:19; 87:23
**sense** [2] - 36:2; 51:2
**sensitivity** [1] - 74:22
**sent** [3] - 16:7; 53:10; 94:20
**sentences** [1] - 57:11
**serene** [1] - 11:14
**service** [1] - 80:10
**services** [1] - 68:10
**serving** [1] - 99:5
**SESSION** [2] - 1:8; 5:1
**set** [6] - 29:7; 33:7; 71:4; 86:25; 100:19
**Set** [1] - 88:14
**setting** [3] - 77:10; 93:7; 96:3
**seven** [3] - 13:2, 16; 66:12
**seventh** [5] - 15:4; 45:24; 46:19
**several** [1] - 78:15
**Sexual** [3] - 94:17; 99:19; 100:6
**sexual** [10] - 34:20; 39:20; 43:23; 44:10; 45:8; 56:14; 59:13; 90:17; 94:17; 101:15
**sexually** [1] - 39:2
**shaken** [1] - 33:4
**share** [1] - 50:16
**sharing** [1] - 79:22
**shell** [1] - 36:12
**shifts** [1] - 95:16
**shirt** [1] - 55:24
**shocked** [1] - 32:16
**shoes** [1] - 93:9
**shopping** [1] - 76:18
**short** [1] - 78:12
**shorthand** [1] - 3:9
**show** [8] - 18:6; 25:22; 48:6; 95:5; 99:25; 100:10; 104:6; 105:12
**showing** [1] - 61:2; 85:21; 105:16
**shows** [1] - 95:3
**shuffle** [1] - 51:2
**shut** [1] - 57:21
**side** [4] - 61:11; 73:10; 83:10; 95:22
**sidebar** [1] - 48:1
**sides** [5] - 61:7; 90:16; 93:4, 13; 102:20
**sight** [1] - 20:5
**signature** [1] - 68:12

**significance** [1] - 66:10
**Silicon** [1] - 9:10
**simple** [1] - 92:10
**simply** [1] - 92:2
**singing** [1] - 13:22
**sip** [2] - 55:16, 18
**sister** [2] - 29:11; 30:7; 77:1
**sit** [2] - 27:22; 45:14
**site** [1] - 79:22
**sitting** [2] - 32:23; 97:16
**situate** [1] - 61:10
**situation** [2] - 50:2; 93:10
**situations** [3] - 5:11; 51:23; 101:24
**sixth** [10] - 8:17; 15:23; 16:20; 17:2, 15, 23; 18:9; 20:7, 17; 21:13
**size** [1] - 11:4
**skip** [6] - 52:14; 54:20; 67:1, 14; 88:10; 89:1
**sleep** [5] - 15:16; 74:22, 24; 75:7
**sleepless** [1] - 74:14
**slept** [1] - 75:9
**slides** [1] - 85:21
**slurs** [2] - 43:23; 44:10
**slut** [1] - 31:7; 44:11
**smartphone** [1] - 22:11
**smoothies** [1] - 55:4, 6, 12
**snack** [1] - 35:5
**so-called** [1] - 99:3
**sobbing** [2] - 54:7; 57:10
**social** [1] - 71:5
**sofa** [1] - 55:3
**solid** [1] - 76:13
**solution** [2] - 8:19; 69:4
**someone** [9] - 42:4, 21, 23; 53:24; 57:15; 69:23; 75:23; 89:24; 92:9
**sometimes** [5] - 14:12; 16:12; 48:20; 51:22; 87:10
**somewhat** [1] - 48:11
**somewhere** [1] - 60:8
**son** [7] - 8:8, 17; 9:1; 13:11, 19; 24:24
**son's** [1] - 24:7
**Sona** [1] - 2:18
**soon** [1] - 81:2
**sorry** [44] - 5:9; 10:15; 11:7, 23, 25; 13:6, 24; 15:6, 20; 16:2; 17:16; 18:12, 21; 26:4; 31:23; 33:4; 35:11; 38:4, 15, 17; 39:24; 40:25; 41:3; 44:1; 54:11; 55:15; 56:7, 9; 57:7; 59:17; 67:13; 70:17; 72:1, 8; 77:8; 104:15, 18
**sort** [25] - 11:10; 13:13, 23; 14:5; 15:2, 15; 22:4; 24:19; 25:1; 27:4; 28:5; 32:2, 4; 35:6; 43:3; 47:16; 48:15; 52:9; 55:17; 56:25; 74:19; 91:9; 98:19; 100:19, 22
**sorts** [1] - 64:24
**sounded** [1] - 59:13
**source** [1] - 49:18
**South** [1] - 53:4
**spaces** [1] - 76:17
**speaking** [3] - 34:2; 38:10; 94:16

**speaks** [1] - 18:22
**special** [2] - 8:15; 90:25
**specific** [7] - 19:11; 32:7; 42:16; 73:23; 87:22; 96:2; 103:7
**specifically** [1] - 35:22
**specifics** [1] - 16:24
**speed** [1] - 47:1
**spell** [2] - 5:5; 6:25
**spend** [1] - 75:12
**spouse** [1] - 80:7
**spreading** [2] - 36:3; 39:20
**Sprint** [4] - 45:15, 18
**Sprint's** [1] - 37:24
**Square** [1] - 3:7
**srewari@huntonak.com** [1] - 2:20
**staff** [1] - 61:9
**stand** [6] - 50:4; 51:12; 82:5, 9, 12, 15
**standard** [10] - 91:19; 92:3, 9, 25; 93:15; 100:20; 102:7; 103:19; 104:6
**standards** [4] - 90:12; 94:25; 103:8
**standby** [2] - 83:2
**standing** [3] - 5:12
**standpoint** [2] - 50:17; 91:5
**star** [1] - 37:8
**start** [15] - 9:4; 20:23; 21:3; 27:9; 30:15; 39:7, 9; 48:15; 58:19; 79:21; 80:3; 81:3, 21
**started** [10] - 8:1; 9:3; 14:3, 6; 20:6; 33:1; 40:16; 55:24; 78:24; 87:13
**starting** [4] - 15:18; 22:3; 27:3; 66:18
**starts** [3] - 13:14; 30:23; 40:14
**state** [3] - 6:24; 65:22; 103:16
**statement** [5] - 33:11; 42:2, 19; 47:16; 69:22
**statements** [9] - 42:8; 47:12; 50:7; 58:14; 61:20; 80:19; 90:15; 99:5
**STATES** [2] - 1:1, 12
**States** [1] - 3:6
**station** [1] - 22:22
**stay** [4] - 52:7; 66:2; 78:8
**staying** [1] - 74:25
**step** [3] - 60:12; 79:15, 18
**stepmother** [1] - 29:9
**stepped** [1] - 82:12
**steps** [1] - 37:21
**stepson** [1] - 12:24
**stereotypes** [1] - 101:23
**S██████** [2] - 13:24; 55:13
**Steve's** [1] - 38:5
**S██████** [5] - 8:5; 12:24; 13:1; 14:1; 40:19
**stick** [1] - 37:13
**still** [12] - 11:3; 36:22; 37:10; 51:11; 67:11; 71:12; 72:23; 75:2; 80:20; 82:9, 11, 16
**stipulate** [1] - 63:22
**stipulated** [1] - 80:21
**stipulation** [5] - 62:3, 23; 64:24; 66:8; 90:7

**stipulations** [2] - 62:10; 89:21
**stop** [8] - 5:25; 26:6, 8; 30:6; 35:12; 56:20; 60:8; 78:9
**stopped** [1] - 34:23
**stops** [1] - 6:1
**store** [1] - 76:19
**stories** [1] - 5:12
**story** [1] - 5:15
**straight** [1] - 18:19
**strangers** [1] - 56:16
**Street** [4] - 1:17; 2:3, 7, 11
**street** [1] - 76:21
**stress** [1] - 101:19
**stressed** [1] - 48:11
**strictures** [1] - 66:3
**strike** [3] - 12:19; 72:9; 100:25
**strong** [1] - 76:10; 77:12; 100:18
**stronger** [1] - 76:25
**struggle** [1] - 105:11
**struggling** [2] - 50:7; 71:12
**stuck** [1] - 5:8
**student** [8] - 19:6, 13; 32:16; 71:4, 6; 101:3; 103:20
**student-on-student** [1] - 103:20
**students** [4] - 24:3; 33:12; 46:12; 49:9
**study** [1] - 22:6
**stuff** [3] - 6:1; 94:16; 103:21
**subject** [2] - 79:15; 85:2
**subjective** [1] - 103:22
**subjects** [1] - 81:22
**submitted** [4] - 89:14; 93:4, 13
**subpoena** [1] - 85:14
**substance** [1] - 50:12
**subway** [1] - 76:22
**successful** [1] - 71:6
**suffer** [1] - 101:19
**suggest** [5] - 63:24; 97:2; 99:22; 102:24
**suggested** [1] - 42:17
**suggesting** [5] - 64:7; 84:11; 86:3; 95:20; 97:14
**suggestion** [2] - 51:9; 66:3
**suggestions** [2] - 64:19
**suggests** [1] - 62:20
**suit** [1] - 12:23
**Suite** [5] - 1:17, 21; 2:4, 8, 12
**summer** [1] - 23:4
**super** [2] - 27:5; 92:8
**superintendent** [1] - 53:8
**support** [4] - 76:11; 77:1; 78:5
**supportive** [2] - 70:19; 99:16
**suppose** [1] - 90:20
**supposed** [4] - 90:13; 92:14, 24; 103:18
**Supreme** [2] - 93:5; 103:19
**surplusage** [1] - 88:3
**suspect** [2] - 91:15
**sustained** [2] - 41:12; 69:24
**Sustained** [1] - 58:24

**sweetest** [1] - 57:18
**switch** [1] - 6:12
**SWORN** [1] - 6:18
**S██████** [1] - 45:25
**system** [2] - 102:8, 10

## T

**table** [4] - 22:17; 27:22
**tackled** [1] - 56:21
**T██████** [1] - 52:21
**T██████** [4] - 32:7-9, 11
**Taylor** [1] - 59:4
**teacher** [7] - 17:5; 20:17; 21:13; 32:3, 7, 17; 33:5
**teachers** [7] - 19:6; 33:8, 12, 17; 71:5; 92:17; 102:9
**teaching** [2] - 14:17; 27:5
**team** [1] - 34:24
**technology** [1] - 22:15
**ten** [1] - 42:11
**tends** [1] - 63:24
**tennis** [10] - 13:21; 14:16; 24:9; 34:22, 24-25; 71:11; 75:15
**term** [1] - 69:4; 71:2; 73:6
**terms** [1] - 8:21
**T██████** [6] - 45:25; 46:4, 6, 10, 20
**T██████** [2] - 46:16, 18
**testified** [3] - 47:15, 17; 82:4
**testifies** [4] - 60:3; 82:22; 99:15
**testify** [29] - 41:23; 61:25; 62:4, 7, 11; 65:4, 7-8, 23; 75:22; 82:5, 14; 84:9, 17; 86:6, 14, 16, 19; 87:2, 8; 94:4, 10-11; 98:1; 101:4; 103:7
**testifying** [2] - 63:7; 99:15
**testimony** [18] - 35:20; 48:8, 20; 49:12; 50:22; 51:16; 63:2, 10; 66:24; 67:8; 81:9; 82:3; 85:1; 90:3; 95:18; 96:9; 103:3
**theater** [1] - 76:20
**theirs** [1] - 84:24
**themselves** [4] - 93:3, 9; 94:4; 99:10
**theoretically** [2] - 100:3, 12
**theory** [2] - 99:16; 103:15
**thereafter** [1] - 60:15
**therefore** [1] - 103:16
**therein** [1] - 42:3
**Thereupon** [1] - 66:14
**they've** [2] - 76:25; 92:21
**thinking** [4] - 8:12; 33:9; 37:18; 104:11
**third** [3] - 9:10; 68:20; 85:14
**thirdly** [1] - 71:21
**Thomas** [1] - 10:14
**threat** [1] - 59:14
**threatened** [2] - 39:22, 25
**threatening** [1] - 39:3
**threats** [2] - 52:25; 53:12
**three** [8] - 9:8; 13:1; 29:12; 33:23; 34:11; 36:10; 63:11; 104:21

**throw** [1] - 34:12
**tie** [1] - 62:14
**tight** [2] - 13:15; 76:10
**tight-knit** [1] - 13:15
**tightly** [1] - 76:11
**timeline** [1] - 52:15
**Tinsley** [1] - 60:10
**tired** [1] - 74:15
**Title** [26] - 89:24; 90:3, 12; 91:5, 21; 92:12, 25; 94:5, 9-10, 14; 95:14, 21; 96:6, 18, 22; 97:19; 99:7, 23; 101:1, 5, 15; 102:8; 103:20; 105:2, 5
**title** [2] - 24:4; 68:4
**TJ** [3] - 10:6, 13
**today** [10] - 42:13; 52:8; 79:20; 80:7, 17; 82:4, 21; 85:6, 17; 89:4
**together** [11] - 13:16; 14:8; 65:1; 75:10; 80:20; 86:25; 87:12; 89:5; 105:24
**tomorrow** [10] - 51:11; 66:17; 79:21; 81:11, 17, 19; 83:3, 5, 15; 84:1
**tonight** [4] - 80:7; 85:6; 97:22; 106:4
**took** [5] - 13:17; 14:16, 19; 26:15; 70:5
**top** [5] - 18:6; 21:18; 32:22; 57:1; 68:19
**topic** [1] - 51:25
**TORCHINSKY** [1] - 1:16
**touch** [1] - 47:3
**touched** [1] - 75:16
**touching** [2] - 39:18; 56:14
**tours** [1] - 24:20
**town** [1] - 58:16
**track** [1] - 77:14
**transcript** [4] - 3:9; 103:3; 106:9
**TRANSCRIPT** [1] - 1:11
**transcription** [1] - 3:10
**transition** [2] - 16:1; 53:14
**transpired** [1] - 36:10
**trauma** [6] - 65:16; 70:20; 71:20; 75:1, 21; 76:6
**traumatic** [1] - 101:19
**travel** [3] - 75:11; 76:15
**treated** [1] - 82:9
**treating** [1] - 86:16
**TRIAL** [1] - 1:11
**tried** [4] - 31:11; 55:6; 71:10
**trim** [1] - 66:11
**trimming** [1] - 64:14
**trip** [7] - 22:7; 23:3, 9, 15; 48:9; 76:16
**trips** [1] - 75:10
**troubling** [1] - 32:16
**truth** [6] - 25:7; 42:3; 47:12, 20; 48:23; 50:8
**try** [18] - 16:11, 13; 17:8; 19:8; 45:11, 14, 16, 18; 51:8; 58:18; 60:21; 66:4; 77:16; 83:25; 84:5; 88:4
**trying** [17] - 15:7; 16:13; 43:17; 51:13; 54:8; 63:16; 66:11; 72:2; 78:17; 82:16; 84:19; 95:7; 98:3; 104:24; 106:2

**Tucson** [1] - 79:4
**tuition** [1] - 71:24
**turn** [2] - 27:2; 61:11
**turned** [1] - 61:3
**two** [15] - 13:4; 14:8; 15:5; 33:23; 46:15; 54:25; 55:7; 60:3; 63:11; 64:14; 78:6; 83:17; 92:22; 103:9; 104:16
**type** [3] - 38:2; 69:7; 101:12
**types** [16] - 15:12; 16:22; 19:4, 15; 27:12; 66:1; 74:6; 90:4; 95:4; 96:3; 97:9; 98:23; 99:1; 101:17, 25
**typical** [4] - 13:23; 14:5; 35:4
**typically** [4] - 82:15; 84:25; 85:3; 101:19

## U

**Uber** [1] - 78:12
**ultimate** [1] - 95:9
**ultimately** [3] - 10:3; 34:2; 90:13
**unacceptable** [1] - 31:8
**unaffordable** [1] - 9:15
**unavailable** [1] - 41:3
**unblock** [1] - 45:13
**uncomfortable** [1] - 37:10
**under** [14] - 50:15; 67:11; 94:1, 14, 24; 99:7; 101:5, 9-10; 102:8; 104:20, 22; 105:1, 5
**underlying** [1] - 65:16
**understood** [5] - 35:20; 43:5; 62:13; 94:4; 98:17
**uneasiness** [1] - 53:16
**unfair** [1] - 64:2
**UNITED** [2] - 1:1, 12
**United** [1] - 3:6
**universe** [1] - 43:4
**University** [1] - 78:2
**unless** [4] - 41:22; 42:23; 82:1; 84:10
**unraveling** [1] - 34:8
**unreasonable** [2] - 93:7; 104:3
**unusual** [2] - 51:24; 84:15
**unwanted** [1] - 56:14
**up** [61] - 5:23; 9:9; 15:25; 17:6; 18:5; 21:18; 22:19; 26:22; 27:23; 28:2; 29:7, 13, 18; 31:14; 32:6; 33:7, 24; 34:2; 36:17; 38:10; 47:1; 48:21; 52:1; 53:23; 54:2, 6, 18, 24; 55:10; 56:8; 57:2; 60:23; 66:8; 67:25; 68:17; 70:13; 71:4, 14-15; 72:10, 15; 77:24; 78:2; 79:25; 80:21; 81:4, 12; 82:1; 85:21; 88:1; 92:21; 94:4; 95:17; 96:15; 99:8; 102:22
**upstairs** [1] - 35:7
**usual** [1] - 35:3

## V

**VA** [1] - 3:7
**vacation** [1] - 23:7

**Valley** [1] - 9:10
**value** [1] - 49:1
**various** [1] - 24:25
**versus** [4] - 51:2; 64:8; 96:12; 99:9
**Veterans** [1] - 32:1
**via** [1] - 85:14
**view** [3] - 48:22; 95:16; 100:22
**violate** [1] - 93:24
**Violence** [3] - 94:17; 99:19; 100:7
**violence** [1] - 101:16
**VIRGINIA** [1] - 1:2
**Virginia** [12] - 3:6; 7:15; 8:9, 12; 10:5, 11, 17; 69:4, 11, 13; 70:2
**virtues** [1] - 25:7
**visit** [2] - 32:2
**visiting** [1] - 15:2
**VOGEL** [1] - 1:16
**voice** [8] - 34:16, 18; 36:17, 23; 37:2; 38:21; 53:18; 56:8
**voicemail** [5] - 36:6, 24; 37:6, 9; 38:11
**voir** [1] - 80:19
**volume** [1] - 57:6
**VOLUME** [1] - 1:8

## W

**wait** [5] - 38:14; 40:14; 46:11, 13
**waited** [1] - 40:15
**waiting** [2] - 29:19; 56:20
**walk** [23] - 8:11; 10:23; 12:22; 13:23; 14:5, 10; 26:7, 21; 28:5; 29:15; 31:24; 32:2, 9; 38:20; 40:2; 44:2; 62:11; 63:20; 64:7, 13, 16; 78:5, 12
**walking** [1] - 65:5
**wall** [1] - 56:25
**Wallace** [3] - 3:5; 106:9, 11
**wants** [3] - 46:10; 101:11
**Washington** [5] - 1:18; 2:16, 19, 23; 3:3
**watch** [1] - 32:4
**watched** [1] - 58:15
**wearing** [1] - 20:6
**Weaver** [5] - 20:9; 21:6; 23:22; 24:2
**Wednesday** [3] - 66:17; 89:12
**week** [2] - 13:16; 14:24
**weekend** [1] - 39:16
**weekends** [1] - 15:1
**weeks** [6] - 23:8; 27:16, 18; 36:10; 54:25; 55:7
**West** [3] - 11:12; 26:8; 69:13
**Westfield** [1] - 13:11
**whatsoever** [1] - 49:14
**whoa** [1] - 85:24
**whole** [3] - 48:5; 50:14; 80:22
**whore** [2] - 31:7; 44:11
**wide** [1] - 9:7
**wife** [2] - 5:22, 24
**willing** [1] - 62:12
**wind** [1] - 72:15

**windy** [1] - 11:3
**wish** [2] - 33:12; 63:12
**withdraw** [2] - 68:25; 70:7
**withdrawal** [1] - 67:17
**withhold** [1] - 81:25
**WITNESS** [38] - 6:18; 10:15; 16:2, 6, 17, 20; 17:10, 19, 21; 19:13; 31:4; 35:11; 37:11, 13; 38:15, 17; 39:24; 41:21; 43:17; 59:1, 17; 60:17; 70:9; 72:1, 4, 8; 73:8; 74:5, 8, 13; 75:3, 5, 25; 76:3; 77:8, 22; 79:4, 17
**witness** [38] - 5:5; 6:4, 11; 7:8; 16:23; 17:18; 47:23; 48:14, 18; 49:5; 51:10; 61:15; 62:4; 63:6, 15; 64:11, 16, 22, 25; 66:5; 67:8; 75:23; 84:14, 23; 87:7; 89:11; 95:8; 96:5; 98:24; 99:3, 22; 100:19, 21
**witnesses** [24] - 6:4, 7; 48:20; 63:17; 64:14; 72:5; 81:12, 16; 82:13; 83:13, 21-22; 84:9, 18; 87:2; 94:3, 7, 9, 24; 100:22
**won** [1] - 32:13
**wondered** [1] - 61:2
**wonderful** [1] - 8:3
**Wood** [1] - 78:17
**Woods** [1] - 25:24
**word** [1] - 55:24
**wording** [1] - 90:9
**words** [6] - 30:13; 41:25; 57:10; 71:3; 82:2; 98:25
**workers** [1] - 71:5
**works** [4] - 75:20; 79:12; 86:20; 94:10
**worried** [4] - 34:14; 53:2; 73:8, 10
**worry** [3] - 64:23; 74:14; 93:3
**worse** [1] - 75:17
**write** [1] - 21:18
**writing** [2] - 58:14; 102:16
**wrote** [1] - 68:8

## Y

**year** [3] - 7:9; 21:8; 26:13
**years** [6] - 9:2; 10:6; 11:1, 9; 49:22; 76:6
**York** [8] - 8:2; 9:14; 69:6; 70:18; 71:21; 72:18; 76:21
**young** [2] - 12:24; 58:11
**younger** [3] - 9:1; 29:11; 30:7
**yourself** [1] - 6:13

## Z

**Zoll** [1] - 2:2
**zoom** [2] - 18:6; 25:21