```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA


   B.R.,                          :
                                  :
            Plaintiff,            :   Civil Action
                                  :   No. 1:19-cv-00917-RDA-WEF
         v.                       :
                                  :   March 19, 2024
   F.C.S.B.,                      :   1:48 p.m.
            et al.,               :
                                  :
                                  :   VOLUME 2 - PM SESSION
            Defendants.           :
                                  :
   .............................. :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**


APPEARANCES:


  For the Plaintiff:          **Jonathan Fahey, Esq.**
                              HOLTZMAN VOGEL BARAN TORCHINSKY
                              & JOSEFIAK, PLLC
                              2300 N Street NW
                              Suite 643a
                              Washington, DC 20037
                              202-536-1702
                              Email: Jfahey@holtzmanvogel.com

                              **Alison Anderson, Esq.**
                              BOIES SCHILLER FLEXNER, LLP
                              2029 Century Park East
                              Suite 1520
                              Los Angeles, CA 90067
                              213-995-5720
                              Email: Alanderson@bsfllp.com

```
APPEARANCES:  (Cont.)

For the Plaintiff:          Brittany Zoll, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            Andrew Brenner, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            Robert Keefe, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     Ryan Bates, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            Sona Rewari, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            Scott W. Burton, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com
```

```
APPEARANCES:  (Cont.)

For Defendant F.C.S.B.:        Kevin Elliker, Esq.
                              HUNTON ANDREWS KURTH, LLP
                              2200 Pennsylvania Avenue,
                              NW
                              Washington, DC 20037
                              804-788-8200
                              Email: Kelliker@huntonak.com

For the Defendants            Michael E. Kinney, Esq.
S.T., A.F., P.A.H., T.B.,     THE LAW OFFICE OF MICHAEL E.
B.H., M.P.F., M.C., F.T.,     KINNEY, PLC.
J.F.:                         1801 Robert Fulton Drive
                              Suite 120
                              Reston, VA 20191
                              Email:  Mk@kinneyesq.com

For the Defendant J.O.:       Bruce Blanchard, Esq.
                              ODIN, FELDMAN & PITTLEMAN, PC.
                              1775 Wiehle Avenue
                              Suite 400
                              Reston, VA 20190
                              Email:  Bruce.blanchard@ofplaw.com

Court Reporter:               Scott L. Wallace, RDR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              Eastern District of Virginia
                              401 Courthouse Square
                              Alexandria, VA  22314-5798
                              Cell: 443-584-6558
                              Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# C O N T E N T S

**EXAMINATIONS**                                              **Page**

CONTINUED DIRECT EXAMINATION OF A█████ F█████        19
BY MR. BRENNER

CROSS-EXAMINATION OF A█████ F█████                   99
BY MR. BATES

## EXHIBITS

**DESCRIPTION**

**After review of the record and upon agreement of
counsel and deputy clerk, all final exhibits can
be found on CME at Docket #975.**

Plaintiff's Exhibit 79 admitted                              23

Plaintiff's Exhibit 81 admitted                              31

Plaintiff's Exhibit 198 admitted                             42

Plaintiff's Exhibit 122 admitted                             48

Plaintiff's Exhibit 111 admitted                             66

Defendant's Exhibits 190, 192, and 193 admitted             120

Defendant's Exhibit 61 admitted                             122

1              **AFTERNOON SESSION, MARCH 19, 2024**

2    (1:48 p.m.)

3         MR. BRENNER:  Yeah, can I just give you one heads-up?

4         THE COURT:  Sure.

5         MR. BRENNER:  So when I estimated my outline, there's one

6    other issue, so we need -- because we're the plaintiff and

7    they're the defendant, I need a defendant to move in their

8    documents, their, like, e-mails and stuff, because someone needs

9    to do it.  I can't do it.  So -- I'm trying not to waste the

10   jury's time with it, but we haven't been able to come to an

11   agreement.  I'm happy to not do it now and then just as long

12   as --

13        THE COURT:  Who are the e-mails from?

14        MR. BRENNER:  They're all like internal e-mails, like

15   School Board stuff.

16        THE COURT:  School Board stuff?  And what do you suggest

17   they may say?  Just for purposes of --

18        MR. BRENNER:  I'm sorry?

19        THE COURT:  What do you suggest they may say just for the

20   Court's consideration?

21        MR. BRENNER:  What do I suggest they may say?

22        THE COURT:  Yes.

23        MR. BRENNER:  Oh, they're just all this stuff, like when

24   e-mails that run back and forth with the mom, you know, the

25   internal e-mails between them.  It's just -- to me, it's a

1    housekeeping thing, but I can't --

2         THE COURT:  What is the problem on this end?

3         MS. REWARI:  Your Honor, there's a different question from

4    authenticity.

5         MR. BRENNER:  Yeah, different.

6         MS. REWARI:  It's a question of laying a foundation with

7    the witness, you know.  If we have a hundred exhibits come in

8    without a witness talking about what is in the exhibits, I think

9    the jury is going to get a lot of information that no one has

10   explained.

11        THE COURT:  Well, first of all, let me ask you this:  Who

12   generated the e-mails?  Who wrote them?

13        MS. REWARI:  I think it's all variety.  They're all on the

14   witness list, so those people -- you know, you can get the

15   exhibit in with --

16        THE COURT:  So if we have -- we have 75 different e-mails,

17   you're suggesting we need 75 different witnesses to get them into

18   evidence?

19        MS. REWARI:  I don't think --

20        THE COURT:  And this is getting to the point that I'm

21   making earlier, is that certain things, there shouldn't be fights

22   over.  I can get, you know, we have a different theory and

23   different approach, but we seem to be fighting over everything.

24        MS. REWARI:  Your Honor, it's a question of the list that

25   we got includes, you know, school system policies on a variety of

1   things.  And so if the -- the exhibit comes in, there isn't a

2   witness who's going to talk about it, and when we get into

3   closing statement, well, the policy says this and it means this,

4   no witness has talked about it.  You know, the --

5       THE COURT:  So it gets back to my question, so for every

6   piece of e-mail you want someone here to testify to the

7   authenticity of it, the appropriateness of it being admitted, the

8   fact that it was kept in the regular course of business, so you

9   want all of that from every witness?

10      MS. REWARI:  No, no, no.  We have not --  no.  No, no, no.

11  I'm sorry.  I don't mean to say -- suggest that, no.  We've

12  agreed to the authenticity of all of that.  There's no record

13  custodian who needs to do that.

14      But, for example, if Mr. --

15      THE COURT:  Brenner.

16      MS. REWARI:  -- Brenner would like to ask about an e-mail

17  between two people who are not testifying, and that is a school

18  document and no one hears from those two people or that

19  conversation, it is both -- there's a lack of foundation and

20  there's a question of relevance.  And if the jury gets to look at

21  it in the closing -- or, I mean, excuse me, take it back, and no

22  one has explained who these people are, what is the e-mail

23  about --

24      THE COURT:  Well, it gets back to my original question,

25  Mr. Brenner, what are these e-mails, and who are they about?

1          MR. BRENNER:  They're about this.  And if they say to me

2     there's three -- we have a relevance objection to them, I'm happy

3     to address them.  Otherwise, I've got to literally talk to this

4     man and have him authenticate the e-mail addresses.

5          There's no rule of evidence that says you need to have a

6     witness talk about every document in existence.

7          THE COURT:  Well, I don't know if Mr. -- I'm sorry, the

8     principal here can be a custodian of records for things that are

9     part of the Fairfax County system.  I don't think that he gets

10    there.

11         Now, if they're records and notes that were generated

12    through his school and were sent by him, or people that were

13    under his authority, then we probably get there, as far as a

14    custodian of records if they were kept in the regular course of

15    business and all the prerequisites are met.

16         But I'm just trying to understand what it is you're trying

17    to get in and figure out why the other side is -- is fighting it.

18         MR. BRENNER:  So I should say overwhelmingly it's at the

19    school level.

20         THE COURT:  At the school level?

21         MR. BRENNER:  Overwhelmingly, but not exclusively.

22         THE COURT:  Okay.

23         MR. BRENNER:  Why don't we do this, with Your Honor's

24    indulgence.

25         THE COURT:  Uh-huh.

1        MR. BRENNER:  Why don't we -- at the next break, I'll take

2  a look at the list, and I'm happy to table this.  And if we

3  have -- I just don't think we should ever have to call a witness

4  back to do that, but if we have to, but I don't think Your Honor

5  wants me to call every one of these folks --

6        THE COURT:  It seems that -- and the defendant is entitled

7  to do this, but there's a roadblock for everything, so --

8        MR. BRENNER:  Yeah, so I'm hoping we can work it out.

9  Right now the response we've gotten is, if we have an objection

10  on our exhibit list, we're objecting.  That's just --

11        THE COURT:  And, again, that gets back to my point earlier

12  is that, you know, good lawyers who are effective can streamline

13  cases to make it simpler for everybody as opposed to bringing

14  everybody who may be tangentially related to the circumstance or

15  situation, in the courses, they can testify as to one requirement

16  for the authentication of a document.  I just don't get it.

17        MR. BRENNER:  I agree with Your Honor.

18        MS. REWARI:  Your Honor, again, it's not authentication

19  issue.  We got a list of over a hundred exhibits last night, and

20  they run the gamut from student statements to e-mails, parent

21  e-mails, to policies, to students --

22        THE COURT:  Okay.  Okay.  Let's take those things one at a

23  time.

24        Student e-mails.  Are they coming through the school?

25        MS. REWARI:  Are they coming through the school?

```
 1          THE COURT:  In other words, are these student e-mails that

 2   have come through the school somehow?

 3          MS. REWARI:  I'm sorry, student statements.

 4          THE WITNESS:  Student statements.

 5          MS. REWARI:  Yeah.

 6          THE COURT:  Okay.

 7          MS. REWARI:  Student statements.  I -- yeah, we're not

 8   going to have a witness -- we're not going to have the students

 9   testifying.  We agree, those -- if you have a certain witness,

10   you can move to admit 28 exhibits through that witness.

11          For example, when Ms. Terry testifies, you can put in all

12   the exhibits or you can just say, can we agree that these are the

13   students' statements that were in the student files or that, you

14   know, the investigation file for this.  Absolutely, that's fine.

15   We're not -- we're not saying someone is going to come in and say

16   here's the student statement I collected.  But it was over a

17   hundred exhibits.

18          THE COURT:  Next -- next category that you're concerned

19   about.  That was student e-mails.  Next category.

20          MS. REWARI:  Okay.  So there are student discipline files

21   with students' names on them.  So --

22          THE COURT:  What's the relevance of those, you believe,

23   Mr. Brenner?

24          MR. BRENNER:  We believe the student -- well, I don't know

25   exactly what she's talking about.
```

1       THE COURT:  Okay.

2       MR. BRENNER:  So my guess is because they were produced,

3  they're student discipline files for students who were --

4       THE COURT:  Implicated in all of these discussions.

5       MR. BRENNER:  Or witnesses named in the statements.

6       But I would agree, it's a student statement, or there's an

7  issue, Your Honor, that --

8       THE COURT:  Well, again, if Johnny Jones, who has nothing

9  to do with this at all, has a student record for spitting in the

10  cafeteria, we don't need that.

11       MR. BRENNER:  Right.  So -- I would just -- here's the one

12  small caveat is that one of the issues in the case, as Your Honor

13  has already pointed out, is notice and what they do about it.

14  So -- I don't want to get too far into it, but how they react and

15  don't react to things is relevant to --

16       THE COURT:  But when does that become all ancillary to

17  what we decide in this case?

18       MR. BRENNER:  My guess is there's three of these, and I'm

19  happy -- look, Your Honor, I'm happy to -- if they say to me,

20  look, we have a real problem with 12 of these.  Like, it's a

21  legitimate issue, it's relevance, it's -- whatever, I'm happy to

22  do it.  I don't want to waste the Court's time and the witness's

23  time saying, is this an FCPS e-mail address?  Is this within your

24  school?  Is this going to these people within your employ?

25       THE COURT:  And I believe that those types of questions

```
 1   could be reasonably resolved, but apparently they can't be, so

 2   we're stuck.

 3        MR. BRENNER:  That's what we'll do at the end of the day,

 4   we'll keep Mr. F███████ here.

 5        MR. BLANCHARD:  Your Honor, Bruce Blanchard.  Can I speak

 6   for the students?

 7        THE COURT:  Sure.

 8        MR. BLANCHARD:  My understanding is from the list -- the

 9   first list that was sent last night to us, they include my

10   client's disciplinary files that I think the Court has already

11   ruled on, and I just want to make sure -- I'm not trying to set

12   up a roadblock, but I'm just trying to make sure we don't wind up

13   through one that the Court has already set up.

14        THE COURT:  Well, I'm expecting -- and I said this before,

15   we have good and competent counsel to be able to read court

16   orders and interpret reasonably what they say.

17        And I respect Mr. Brenner.  And as you know, I respect

18   you.  And I'm not in any way expecting he's going to try to slip

19   something in that's been the subject of a motion in limine.

20        MR. BLANCHARD:  I want to make sure because it was in --

21   my entire -- my client's entire disciplinary file was included in

22   what they sent me last night.

23        THE COURT:  But I think what I heard another lawyer as

24   part of the defense teams actually say is that we're concerned

25   about the rule of completeness.  I think I heard that in the
```

```
1   motion in limine.  And it seems to me that he's caught either

2   way.  If he doesn't send you the complete document, you argue

3   rule of completeness.  If he sends you a part of it, you say,

4   well, it's not substantiated.  So you really can't have it both

5   ways.

6       MR. BLANCHARD:  I'm not raising -- I -- my concern is, and

7   I'll be specific.

8       THE COURT:  Uh-huh.

9       MR. BLANCHARD:  I'm concerned if there's an issue, for

10  example, the student disciplinary statements for my client, that

11  postdate the time the plaintiff left the school.

12      THE COURT:  And from what I can understand, they spun --

13  the way that things work, what happened after the fact has

14  nothing to do with it because, as the principal has testified, we

15  look at things that happen before to determine how we want to

16  assess things going forward.

17      But if she did something in 12th grade, I don't see how

18  that's relevant in any way unless you can show a pattern of

19  behavior -- or they can show a pattern of behavior or something.

20      MR. BLANCHARD:  And I just want to make sure the date

21  we're operating off is the date -- the last day the plaintiff was

22  in school.  Because now I'm hearing, well, she was on homeschool

23  for a while where things -- like still in the system, but she

24  wasn't in the school, and that's what I'm concerned about.

25      THE COURT:  Do you have any suggestion that any suggestion
```

1    could be made that there was any bullying that occurred of the

2    plaintiff after she left the school?

3        MR. BLANCHARD:  No.

4        MR. BRENNER:  Well --

5        MR. BLANCHARD:  No, no.  And certainly not by my client.

6    No -- no evidence of that whatsoever.

7        THE COURT:  Okay.

8        MR. BRENNER:  So, Your Honor, first of all, as an officer

9    of the Court, there are exhibits that are -- that the defendant

10   put together as composite exhibits, and then Your Honor made

11   rulings.  I absolutely will make sure that Mr. Blanchard sees

12   that nothing goes back that's not -- I'm not trying to sneak

13   anything in, I promise Your Honor.  That's not my intention.

14       THE COURT:  And I would never expect that.

15       MR. BLANCHARD:  I didn't --

16       MR. BRENNER:  Right.  That's what I'm saying.  So --

17       THE COURT:  One at a time.  We can sing together, but we

18   can't talk together.

19       MR. BRENNER:  Yeah, I'm trying to move our trial along.

20       THE COURT:  Yeah, I -- I understand.  But they have a

21   responsibility to advocate on behalf of their clients.  And if

22   they want to make you jump through every hoop, there's nothing I

23   can do to force them to do that.

24       MR. BRENNER:  Okay.  So we'll probably be with Mr. F█████

25   into -- well into tomorrow.

```
 1        MR. BLANCHARD:  And if I can speak again, Judge?  My

 2   client -- that shouldn't be an issue with my client.  As far as

 3   anything that's relevant to the allegation against my client in

 4   that timeframe.

 5        But there's -- the Court said after -- does not -- the

 6   anti-sematic issues are not, because they came up after, as I

 7   read the order, and that you had reserved ruling on something

 8   that happened in 6th grade with a photograph.  So, that one, you

 9   know, I --

10        THE COURT:  Subject to debate.

11        MR. BLANCHARD:  -- I see foundation and everything else.

12        But I -- and I think Mr. Brenner has -- has helped satisfy

13   my concern that he will show them to me beforehand before they

14   come up, because I assume -- I'm trying to avoid them -- us

15   having this discussion --

16        THE COURT:  And I understand your point.  As I will say, I

17   have never, in my experience as a judge, and I've been here

18   for 24 years in one way or another, seen a case where there is

19   not really one significant stipulation, and it's -- it's

20   troubling.

21        MR. BLANCHARD:  Understood.

22        THE COURT:  All right.

23        MS. REWARI:  Your Honor, I would -- I just want to

24   clarify.  Again, our position is not that they need to get a

25   witness to identify every document.  If they want to do the
```

```
 1   e-mails about this case, about this student, that would be
 2   perfectly fine with us.  That's not what is on this list.
 3   There's e-mails about, you know, C.K.'s performance in class when
 4   he was in 6th grade or 7th grade and like academic performance.
 5   So -- and when you say e-mails, yeah, they're e-mails, but
 6   they're not always about --
 7           THE COURT:  Are you going to be offering C.K.'s report
 8   card, Mr. Brenner?
 9           MR. BRENNER:  No.
10           THE COURT:  Okay.
11           MR. BRENNER:  This is -- this is an example where --
12           THE COURT:  This is an example where just simple
13   communication would allow us not to have this conversation.
14           MR. BRENNER:  Yeah, I -- look, I hate to be tattletale,
15   it's not -- it's not professional or whatever.  I can just assure
16   you, Your Honor, this -- this is what we're trying to do.  We're
17   asking for stipulations.  And then now, instead of saying this to
18   me last night, hey, buddy -- or, hey -- excuse me, hey, this is a
19   problem with this one, that one, that one, how do I know?  And
20   then we get here and say, you know what, C.K.'s grades, then I
21   would have said, yes, it's out.  That could have been the whole
22   conversation.
23           So I don't know -- Your Honor's pointed out many times you
24   want stipulations; I do too.  And -- but I don't know what else
25   to say.
```

```
1        THE COURT:  Well, that's the nature of stipulations, they

2   can't be one-sided.

3        MR. BRENNER:  I agree.

4        THE COURT:  Everyone has to agree so --

5        MR. BRENNER:  I'd agree.

6        MR. BLANCHARD:  Your Honor, also, it doesn't help when you

7   get a hundred exhibits that came in last night, and they could

8   have -- come in this morning or -- or there's a --

9        THE COURT:  Well, even -- even if you cannot come to a

10  stipulation, it seems to me that, if you indeed received a

11  hundred documents, somebody should have said, well, you know,

12  we're just sending them to make sure that they're part of the

13  record, not something that's coming into evidence, but simply

14  part of the record.  With regard to these hundred exhibits, I'm

15  only going use ten of them, and I'm only going to use these

16  specific portions of them.

17       And I keep hearing from Ms. Rewari that there's no

18  objection to authenticity, but there's some subset of something

19  that she wants to do to keep them out altogether, and I -- I'm

20  not following.

21       MR. BLANCHARD:  And, Your Honor, we know it's not like

22  that.  And these are the exhibits we intend to {indiscernible} --

23       MR. BRENNER:  No.

24       MR. BLANCHARD:  I think that --

25       THE COURT:  Okay.  There's a disagreement as what's been
```

```
1    communicated, but communication has apparently been a real

2    problem in this case from the outset.  So we'll just deal with it

3    as best we can.

4          MR. BRENNER:  Yep.

5          THE COURT:  I'll say it again, I said it yesterday, I

6    would encourage counsel at the end of the day to try to put your

7    heads together on something, all right?

8          (Jury in at 2:02 p.m.)

9          THE COURT:  You may have a seat.  Thank you.

10          Welcome back, ladies and gentlemen, I trust you lived up

11    to the Court's instruction not to discuss the case or any aspect

12    of the case with anyone.

13          I'll give you something to sort of chuckle about.  We were

14    talking about smoked meat the other day.  You and I had a really

15    good conversation.  And so I brought in some day-old or

16    two-day-old smoked meat, and my law clerk here smelled what I was

17    eating, and she looked at me very, you know, longingly.  And so I

18    gave her one of my sandwiches, so -- and she liked it.

19          (Laughter.)

20          THE COURT:  Okay.  Counsel, if I could encourage you, as

21    you're examining the witnesses to, as best you can, keep your

22    voices up and, to the extent that you cannot, block the jurors

23    from being able to see the witnesses.

24          Okay.  Very good.  You're up, Mr. Brenner.

25          MR. BRENNER:  Your Honor, may I just inquire of the juror
```

```
 1   if I'm blocking?

 2          THE COURT:  Anyone unable to see the witness?

 3          A JUROR:  When you stand to side, I can hardly hear you.

 4          MR. BRENNER:  Oh, when I move off the podium like that?

 5   Okay.

 6          THE COURT:  Okay.  Very good.  Thank you for that, ma'am.

 7           CONTINUED DIRECT EXAMINATION OF A████ F███████

 8   BY MR. BRENNER:

 9   Q.     Okay.  Good afternoon, Mr. F██████, I hope you had a good

10   lunch break.

11   A.     Yes, thank you.

12   Q.     Let me ask you this:  I'm going to pick a -- pick a --

13   start four years before the time -- before 2011.

14          So in the 2007 to 2008 school year -- because I think you

15   started in 2003, right --

16   A.     Correct.

17   Q.     -- at Rachel Carson.

18          I'm not going to go all the way back, but if you want to,

19   you can.  I'm just trying to get a sense.

20          In the 2008/2007, school year, how many complaints of

21   sexual harassment were verified and reported to the office of

22   equity by you?

23   A.     Sir, I would actually have to have the records in front

24   of me to do that.

25   Q.     Do you know of any?
```

1    **A.**    Sir, there was a -- we're in 2024.  That was a long

2    period of time.  Were there any?  Yeah, I know there were

3    reports, but I do not know the outcomes.

4    **Q.**    As you sit here today, up until from 2007 through the

5    time when my client stopped being a student at all at

6    Rachel Carson -- I'll go through the -- the at-home period --

7    can you recall a single time that you verified a report of

8    sexual harassment and sent it to the offices of equity?

9    **A.**    I don't know what the timeline would have been.

10   **Q.**    All right.  So you can't do one?

11   **A.**    I cannot --

12   **Q.**    Okay.

13   **A.**    -- in good conscience give you a yes without seeing a

14   disciplinary report.

15   **Q.**    Okay.  Let's go to -- back to the --

16        MR. BRENNER:  If we could bring up Exhibit 77, Your Honor,

17   and publish?  It's already in evidence.

18        THE COURT:  You may.

19   BY MR. BRENNER:

20   **Q.**    So this is the November student statement.  I want to go

21   just to refresh you back -- your recollection back after lunch.

22   I'm going to talk a little bit more with you about the alleged

23   e-mail from C.K. -- voicemail.  Do you remember that?

24   **A.**    Correct.

25   **Q.**    Okay.  Now, you know that, in addition to B███████

1   statement, that her mom had told Ms. T█████ that she herself had

2   heard the voicemail?

3   **A.**    Yes.

4   **Q.**    Okay.  And so you had a mom saying she heard the

5   voicemail.  Now, C.K., if you recall, he doesn't -- he says, "I

6   didn't do any voicemail, but I think someone else may have,"

7   right?

8          Do you remember that, or do you want to go back to his

9   statement?

10  **A.**    Um, I remember his statement.

11  **Q.**    Right.  So the school has a mom there telling you -- I

12  stepped away from the podium -- a mom there telling you that she

13  herself heard the voicemail.  You have the person who allegedly

14  sent the voicemail saying, "I didn't, but someone else did."

15  And you determined that the allegation is unverified, right?

16  **A.**    So Mom suggested that, yes, she heard an e-mail [sic],

17  but she was unable to remember what was on it.

18         Now -- and if it was that high level of

19  inappropriateness, and me as a parent, I would remember what was

20  on that voicemail.

21  **Q.**    So -- so, first of all, let me just correct the record.

22  You misspoke.  You meant voicemail, not e-mail, right?  We're

23  talking about voicemails, not e-mails?  I think you --

24  **A.**    Oh, I'm sorry.  Voicemail.  I'm sorry.

25  **Q.**    No problem.

1    **A.**    Correct.

2    **Q.**    So the analysis, as I understand you went through, Mom

3    says it's a vulgar e-mail, she told you that, right?  Do you

4    remember that?

5    **A.**    Um, she didn't tell me.

6    **Q.**    Okay.  So -- Mom tells your assistant principals, in

7    fact, two of them, S.T. T████, is that S█████ T██████ e-mail

8    address?

9    **A.**    Um --

10   **Q.**    Sound right?

11   **A.**    It sounds right.

12   **Q.**    Okay.  P.A. H█████, that's P███ H██████, another assistant

13   principal?

14   **A.**    Correct.

15   **Q.**    And B.A. H███████ is B██████ H███████, B██████ guidance

16   counselor?

17   **A.**    Correct.

18   **Q.**    Okay.  So if we could -- if we could -- if you could look

19   in your book under Exhibit 79, is that an e-mail from Mrs. R. to

20   two assistant principals, Ms. T█████ and H█████ and to a guidance

21   counselor, Ms. H███████?

22   **A.**    Correct.

23   **Q.**    Okay.  It's right at the same exact time, the same date

24   of the statement, 11-21, correct, 2011?

25   **A.**    Correct.

1          MR. BRENNER:  Your Honor, may we admit and publish

2     Exhibit 79?

3          THE COURT:  Any objection?

4          MR. BATES:  No objection.

5          THE COURT:  Thank you.

6          You may publish.

7          (Plaintiff's Exhibit 79 admitted into the record.)

8     BY MR. BRENNER:

9     Q.    Okay.  So we want to focus on the -- well, let's start

10    from -- let's start from the beginning.  It says --

11         MR. BRENNER:  Can you pull up the first paragraph, please?

12    BY MR. BRENNER:

13    Q.    "Thank you so much for taking the time to help us with

14    the sexual harassment and bullying problems our daughter,

15    B██████, has been encountering at Rachel Carson since the end of

16    October."

17         Does that refresh your recollection that the bullying and

18    harassment of my client started in October?

19    A.    I do not agree with that.

20    Q.    Okay.  And then if you go with the next paragraph.  Well,

21    let me go back.

22         Do you not agree with the date, or do you not agree that

23    she was subject to bullying and harassment or both?

24    A.    We do not have any proven evidence that she was sexually

25    harassed.

1    **Q.**    Okay.

2    **A.**    And there were some name-calling.

3    **Q.**    Well --

4    **A.**    But not to the extent of bullying because it wasn't a

5    consistent pattern.

6    **Q.**    But we went over this before.  We can go back to it.

7          Name-calling, even a single instant, is vulgar

8    name-calling, for example, which I think you would agree, bitch,

9    slut, whore.  Pretty vulgar, right?  Right?

10   **A.**    Yes, it's vulgar.

11   **Q.**    Falls within the School Board's policies for sexual

12   harassment.  No question about it, right?

13   **A.**    Not -- not bullying, not sexual harassment.  It's over

14   time.  It's not just a single incident.  We look into it.  It

15   may be --

16   **Q.**    So --

17   **A.**    -- but --

18   **Q.**    Okay.  Go ahead.

19   **A.**    -- we're in middle school.  These kids, you know, they

20   watch movies.  They -- they interact with one another.

21   They're 12-year-olds, 13-year-olds.  Sometimes they use vulgar

22   language.

23   **Q.**    Right.  But that's not --

24   **A.**    And every time, you know, they're out on a playground

25   playing basketball, you know, and getting called -- was the word

1    to another student, "You're a dick," is that sexual harassment?

2         THE COURT:  He gets to ask the questions, sir.

3         THE WITNESS:  Oh, okay.  I'm sorry.

4         THE COURT:  You're giving an example of your perspective

5    of things.  Just answer the question.

6    BY MR. BRENNER:

7    Q.    To be clear, in all those policies we went through

8    before -- well, firstly, you're using the word "bullying," and

9    I'm using the word "sexual harassment."  Do you think they're

10   the same thing?

11   A.    No.

12   Q.    Okay.  Are you saying that sexual harassment requires

13   repetitive conduct?

14   A.    Not on a physical level, no.

15   Q.    Verbal, vulgar name-calling, you believe the Fairfax

16   County School Board policy is that, for it to be sexual

17   harassment, it needs to be repetitive?

18   A.    Again, it depends on the situation and what was going on

19   and who was doing what.

20   Q.    Let me try my question again:  Does it need to be

21   repetitive under your understanding of the Fairfax County School

22   Board policy?

23   A.    It depends on the situation.

24        THE COURT:  Sir, would it be fair to say that, in your

25   perspective -- from your perspective, that it depends on the

1    degree of the circumstance?

2         THE WITNESS:  Yes.

3    BY MR. BRENNER:

4    Q.    All right.  So let's go to the next paragraph.  Ms. R.

5    actually brings the phone in, right?

6    A.    Correct.

7    Q.    You know about this, right?

8    A.    Yes.

9    Q.    So, pretty good evidence that she heard something, right?

10   A.    How do I make that assumption?

11   Q.    I don't know.  Did you?  Did you think that she --

12   A.    She brought the phone in.

13   Q.    Well, she brought the phone in and sat for two hours in

14   the office, trying to unblock it.  Is it your testimony that

15   that is not indicative to you that she believed the message was

16   still on her phone that she heard?

17        MR. BATES:  Objection, foundation.  He's asking about what

18   she believes.

19        THE COURT:  Rephrase.

20   BY MR. BRENNER:

21   Q.    I'm talking about what you believed.  Did you come to a

22   conclusion, one way or the other, when Mrs. R. brought the phone

23   to your assistant principal, to your administrators, said she

24   had heard a, quote, sexually explicit message, do you see that,

25   and sat for two hours trying to open it, as the final sign-off

1    person -- did you find that to be persuasive evidence that she

2    had, in fact, heard this phone call, this voicemail?

3    **A.**    So are you asking me, is there persuasive evidence that

4    the voicemail was on that phone?

5    **Q.**    Yes, that's what I'm asking you.

6    **A.**    How can I do that?

7    **Q.**    Well, someone has to investigate.  So who made that call?

8    **A.**    We didn't -- we did make an investigation.

9    **Q.**    So who --

10   **A.**    We had no evidence of the voicemail.

11   **Q.**    Okay.  Just so we're clear, "no evidence" means when the

12   mom brings the phone in, tries to unlock it for two hours, tells

13   you it's a sexually explicit message, so one of two things

14   happen:  One, she's either lying, right?  Or two, there's a

15   message on that phone.  Those are the two options, right?

16   **A.**    And she also said she could not recall what was on that

17   voicemail.

18   **Q.**    We'll get to that.  In an e-mail she says it's sexually

19   explicit, so which is it?  Did the school determine that she was

20   lying or that she was unable to retrieve it?  Which of the two

21   did you conclude?

22   **A.**    Sir, to confirm, if somebody is bringing in evidence --

23   if I don't have the evidence --

24            THE COURT:  Let's break the question down into two parts

25   so it's not a compound question with confusion.  Did you have any

1    reason to believe that Ms. R. was lying about her concerns

2    regarding her daughter?

3          THE WITNESS:  I didn't know, sir.  I didn't have --

4          THE COURT:  Okay.  That's all.

5          THE WITNESS:  I didn't have the voicemail.

6          THE COURT:  That's fine.

7    BY MR. BRENNER:

8    **Q.**    Do you have an understanding, one way or the other,

9    whether Mrs. R. told Ms. T███ what the voicemail was?  Do you

10   have any knowledge of that, one way or the other?

11   **A.**    Um, I was not there.  You'd have to ask Ms. T███ that.

12   **Q.**    Not my question.  You're the one that made the call.

13   You're the one that decided whether it was verified or not.  So

14   someone had to tell you, right?  You didn't just sit there and

15   say, "I didn't know anything.  It's unverified."  So I want to

16   know what analysis you went through.  Did you determine that the

17   call -- the voicemail didn't exist?

18   **A.**    I'm saying we did not have the voicemail.  How am I going

19   to give a child a consequence for something that I didn't have

20   or could not retrieve?

21         THE COURT:  Let me ask the question another way, sir.

22   Let's take it out of the context of a voicemail.  If a parent who

23   was not present when an alleged bullying incident occurred came

24   to your office and said, "My child has been bullied," without you

25   being there, without there being any other independent witness,

1      what would you have done?

2            THE WITNESS:  Investigate the situation, sir, immediately.

3            THE COURT:  Okay.

4      BY MR. BRENNER:

5      Q.    And if there was no other witness -- I'll move on.

6            Okay.  So let's talk about the next part of the --

7            MR. BRENNER:  Can we republish 77, Your Honor?

8            THE COURT:  You may.

9      BY MR. BRENNER:

10     Q.    Can we focus on the sentence that starts with J.O., which

11     is about two lines above the D.M. redaction.

12           So this is the allegation that J.O. was calling B████ a

13     bitch and making offensive wall posts on her Facebook, calling

14     her a bitch and a whore.  Right?  Was a statement taken from

15     J.O.?

16     A.    I know -- I'm not sure about the statement, but I know

17     that she provided her phone, and they went to that Facebook

18     location, and that was not found.

19     Q.    Well, there's two parts to this.  One is a Facebook, and

20     the other is what J.O. is allegedly calling her, right?  It

21     says, "J.O. calls me bitch and makes offensive wall posts."  So

22     you looked at the phone and you decided it wasn't on Facebook

23     anymore.  Is that what happened?

24           MR. BLANCHARD:  Objection, Your Honor.  That assumes it

25     was on Facebook in the first place.

```
 1          THE COURT:  Lay a foundation.
 2   BY MR. BRENNER:
 3   Q.     The allegation is that there were -- what you were
 4   investigating was that J.O. was verbally calling her vulgar
 5   names and was also posting things on Facebook, right?
 6   A.     Well, it says, sir, "J███ O███" --
 7          THE COURT:  J.O.
 8          THE WITNESS:  I'm sorry -- "calls me bitch and makes
 9   offensive" --
10          THE COURT:  "Wall posts on my Facebook."
11          THE WITNESS:  -- "wall posts on my Facebook, calling me a
12   bitch and a whore."
13   BY MR. BRENNER:
14   Q.     Right.  And your investigation or the investigation of
15   your assigned assistant principal is to look at her phone and
16   pull up her Facebook page?
17   A.     Sir, you're pulling little pieces of an investigation,
18   and determining that that -- that's all we did.
19   Q.     Well --
20   A.     When you talk to the assistant principals who do the
21   investigations, they can go through each piece and what led to
22   what.
23   Q.     So let's at least look at what the written statement from
24   J.O. said in response to this, okay?
25   A.     Okay.
```

1    **Q.**    If we could look at Exhibit 81 in your book.  Oh, I'm

2    told it may not be in your binder.

3         MR. BRENNER:  May I approach, Your Honor?

4         THE COURT:  You may.

5         MR. BATES:  No objection to the admission of this exhibit,

6    Your Honor.

7         THE COURT:  Without objection.

8         (Plaintiff's Exhibit 81 admitted into the record.)

9         THE COURT:  Mr. Blanchard?

10        MR. BLANCHARD:  No objection.

11        MR. BRENNER:  May I publish?

12        THE COURT:  You may.

13   BY MR. BRENNER:

14   **Q.**    Okay.  So this is the -- again, the same day.  This is

15   the investigative piece, at least the written investigative

16   piece of J.O.'s response, right?

17   **A.**    Correct.

18   **Q.**    "Explained what happened with rumors about B███."

19   **A.**    Correct.

20   **Q.**    Any idea what that means?

21   **A.**    Yes.  That B███ [sic] was telling Ms. T███ her

22   statement, and Ms. T███ was writing what was communicated

23   during that time.

24   **Q.**    Okay.  You may have misspoke.  Let me make sure -- you

25   said B███ was.  Are you saying J.O. was?

```
 1   A.     Oh, I'm sorry.

 2   Q.     That's okay.  Take your time.

 3   A.     J.O.

 4   Q.     Okay.  And so that's -- so the full statement is

 5   "explained what happened with rumors about B████," right?

 6   A.     Correct.

 7          MR. BRENNER:  Your Honor, may I have 30 seconds to --

 8          THE COURT:  Sure.

 9          MR. BRENNER:  Your Honor, may we approach for a minute,

10   please?

11          THE COURT:  Go ahead.

12          (Bench conference.)

13          MR. BRENNER:  When we had our last conversation,

14   Mr. Blanchard had said he believed the J.O. disciplinary record

15   from February 2011 would be taken under advisement, which I

16   didn't think you had and you had not, and you ruled --

17          THE COURT:  Wait a minute.  Remind me of the date that

18   B.R. left.

19          MR. BRENNER:  So she's from October -- she leaves school

20   in -- she leaves school in-person February in 2012, this is

21   pre --

22          THE COURT:  Okay.

23          MR. BRENNER:  And I just didn't want to throw it up --

24          MR. BLANCHARD:  I didn't know -- is this from sixth grade?

25          MR. BRENNER:  Yeah.  You said it was under advisement, and
```

1    it was not.

2        MR. BLANCHARD:  So the sixth grade incident -- a motion

3    was denied, but I think the Court said that maybe -- I'd have to

4    look at the notation, but it was -- depending on what the

5    evidence was, this was the issue where my client was in sixth

6    grade, a year before in sixth grade, had gotten disciplined for

7    threatening to show a picture the boy had sent her because she

8    had sent him one, and I don't see how that's in any way relevant

9    to this case, and I don't see how any foundation has been laid to

10   make it relevant.

11       THE COURT:  Okay.  Well, if this were an incident, say,

12   involving her -- I used the term earlier "speeding in the

13   cafeteria," that's not even close, as far as I'm concerned, but

14   the nature of this particular incident, which at a minimum is

15   sexually provocative, okay, I think does have some weight to it.

16       So I think I've already ruled on -- that it is admissible.

17   I wanted to know specifically what it was, and because I've been

18   told this information, I think it gets close enough to the

19   predicate, I guess, for a Title IX evaluation and what this

20   particular principal did based upon the past history of this

21   particular individual.

22       MR. BLANCHARD:  Well, this incident that they're looking

23   at now doesn't -- I'm just trying to figure out, is this

24   admissible against my client or is this admissible for notice?

25   Because my client hasn't been -- I mean, I just don't know what

1    purpose it's being admitted for.

2         Your Honor, we would not object to crafting a limiting

3    instruction that says this particular piece of evidence goes to

4    notice to the school, and perhaps individual school defendants

5    who got or knew about it, and it does not go directly to the

6    substantive claim against J.O.  I'm happy to do that afterwards

7    or if you want to craft it now, but he's right, because it's not

8    her with B████, so it's not -- I'm not --

9         THE COURT:  I'm going to give a limiting instruction and

10   I'll tell them --

11        MR. BLANCHARD:  If I could just for the record.

12        THE COURT:  I note your exception.

13        MR. BLANCHARD:  This -- this is unduly prejudicial.

14        THE COURT:  The bottom line is, and this goes for not you

15   but for everyone, we cannot sanitize the evidence; we cannot keep

16   out everything that is disadvantageous to one side and

17   advantageous to another.  It's just not the way it works.

18        So I -- I recognize that this information is such that it

19   may be something that someone might consider provocative, but the

20   bottom line is, when we're talking about a Title IX case and

21   we're talking about notice and we're talking about reasonable

22   steps that were taken by the administrators and the School Board

23   with regard to conduct that existed in the workplace -- excuse

24   me, in the school place, prior to the incident which brings us

25   here today, it does go to that point so --

1      MR. BLANCHARD:  Understood, Your Honor, but there's no

2  foundation that that incident was in any way like this.  To just

3  say it's sexually -- this is sexually provocative and that had

4  some relationship to being a picture of a partially clad student

5  a year before where she's defending herself and the jury is not

6  going to -- I'm going to have to put all this in in my case on a

7  different issue.

8      And when they're saying that they can -- this doesn't

9  prove anything in a case against my client.  I'm not sure it

10  proves any notice against the County with no foundation.  All it

11  does is --

12  THE COURT:  The question is whether they did anything

13  about it.  I don't know if they did anything about it or what.

14      MR. BLANCHARD:  In 6th grade she got a suspension, that's

15  it.  But what does that have to do -- why does my client -- it is

16  unduly prejudicial, Your Honor.  Here I am.  I can't go into the

17  police investigation, and they found things unfounded, but they

18  get to put in what the school did and who said what and other

19  things.  And so now talking about shortening the trial, now I'm

20  going to have to go through in my case and have my client explain

21  about an incident and a boy they don't know and exactly what

22  happened, and they have no evidence to contradict what they said.

23      THE COURT:  Well, obviously, you can adopt any strategy

24  that you want, as far as how you want to approach it, but I think

25  going into the detail or depth regarding this incident is

```
 1    probably going to draw more attention to it than you want.

 2         MR. BLANCHARD:  I agree.  But the question is as to the

 3    probative value versus the prejudicial.  And that's the box it

 4    puts me in.  And I think even a limiting instruction is not fair

 5    to my client.

 6         THE COURT:  Okay.

 7         MR. BLANCHARD:  It's prejudicial.

 8         THE COURT:  I think I understand your point.  You can ask

 9    questions.

10         MR. BLANCHARD:  Thank you, Your Honor.

11         MR. BRENNER:  Am I waiting for you to do a limiting or --

12         THE COURT:  Yes.

13         MR. BLANCHARD:  Is the limiting instruction coming now?

14         THE COURT:  Yes.

15         (Sidebar discussion concluded.)

16         THE COURT:  Ladies and gentlemen of the jury, I'm going to

17    give you, again, a limiting instruction.  As I indicated earlier,

18    some evidence comes in for one purpose, and it may be something

19    that you might want to consider it for another purpose, but I'm

20    instructing you with regard to this particular circumstance,

21    you're not to consider this evidence other than for purposes of

22    notice.

23         We believe that there's going to be evidence suggesting

24    some other things involving one of the defendants in the matter.

25    You're not to consider what happened in that matter as relevant
```

1    to anything that happens in this case.  It only goes to the issue

2    of notice and what the school and the School Board did with

3    regard to prior circumstances that may have existed with regard

4    to another individual.

5            Thank you.

6            MR. BRENNER:  May I proceed, Your Honor?

7            THE COURT:  You may.  And stay within the confines of what

8    we talked about.

9            MR. BRENNER:  Yes, Your Honor.

10           THE COURT:  Okay.

11   BY MR. BRENNER:

12   **Q.**    Mr. F▮▮▮▮▮, if you could go to Exhibit 198.

13   **A.**    198?

14   **Q.**    Yes.

15           Do you have it?

16   **A.**    I'm there, sir.

17   **Q.**    Okay.  Is that a letter from Fairfax County Public

18   Schools dated February 17th, 2011, to the parents of J.O.?

19           THE COURT:  Can we stipulate to that?

20           THE WITNESS:  So I'm just -- I'm just trying to figure

21   out what --

22           THE COURT:  I know that there's an objection, but can we

23   stipulate that the letter says what it says?

24           MS. REWARI:  Yes, absolutely.  I think the confusion is

25   there's more pages behind this tab.  He's having difficulty

1    finding it.

2         THE COURT:  All right.

3         MR. BRENNER:  Oh, do you not have it?

4         MS. REWARI:  There's -- I think the page you want him on

5    is deep in there.

6         MR. BRENNER:  Yes, and I will -- I will state for the

7    record, Your Honor, we're only trying to put in one page.  Let

8    me -- can I just show it, Counsel?

9         MS. REWARI:  Sure.

10        MR. BLANCHARD:  Your Honor, if I can just see it?

11        (Brief pause in proceedings.)

12        THE COURT:  Remember, Counsel, that I said we're speaking

13   with one voice.  And as I take it, you're taking on this

14   examination of this witness and you're not, Ms. Rewari, so let

15   your colleague take care of his business.

16        MR. BLANCHARD:  Your Honor, I'm -- I don't object to the

17   authenticity.  I think the Court wanted to look -- I think there

18   are parts in here that --

19        THE COURT:  Let me look at the letter.

20        MR. BLANCHARD:  May I approach?

21        THE COURT:  You may.

22        All right.  I think the simplest way for me to make sure

23   that there's no mistakes, I'm going to ask the questions related

24   to this, and if you want to follow up on this, Mr. Brenner, you

25   can.

```
 1        MR. BRENNER:  Yeah, can I get the Bate -- because it's

 2   part of bigger things, can I just put on the record what the

 3   actual page is so I have it for the record?

 4        THE COURT:  Yes, sir.

 5        MR. BRENNER:  Okay.  The record is under Bates stamp

 6   FCSB-BR-009751.

 7        THE COURT:  Very good.

 8        Mr. F_____, you've had an opportunity to look at the

 9   letter from Fairfax County Public Schools dated February 17th,

10   2011, regarding J.O.?  Just the first page.

11        MR. BLANCHARD:  Your Honor, it may be the second page of

12   his exhibit.

13        THE COURT:  All right.

14        MR. BLANCHARD:  I don't know.

15        MR. BRENNER:  Do you want me to help the witness, Your

16   Honor?

17        THE COURT:  Yes.

18        THE WITNESS:  Oh, it's the second page.

19        THE COURT:  Okay.

20        MR. BRENNER:  Do you have it?

21        THE WITNESS:  On the referral -- on the --

22        THE COURT:  Wait a minute, wait a minute.

23        THE WITNESS:  Okay.

24        THE COURT:  Take a look at that.  Is that a document from

25   Fairfax County Public Schools through Floris Elementary School
```

1    dated February 17, 2011?

2         THE WITNESS:  Yes, sir.

3         THE COURT:  Does it reference J.O.?  Without saying J.O.'s

4    name, does it reference J.O.?

5         J.O. is the proper name referred to as the seventh word in

6    the first paragraph.

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.

9         THE WITNESS:  Yes, there is --

10        THE COURT:  Was this particular correspondence related to

11   some disciplinary action regarding J.O.?  Yes or no?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.  Was this disciplinary action that was

14   taken on part of J.O. -- because of J.O. something that was made

15   part of her permanent record?

16        THE WITNESS:  Sir, I'm just trying to determine what the

17   consequence is at this point.

18        MR. BLANCHARD:  There may be confusion because this is a

19   different school and a --

20        THE COURT:  Yeah, I'm trying as best I can.  The witness

21   is not helping me very much.

22        Sir, were you aware of this particular letter?

23        THE WITNESS:  No, Your Honor.

24        THE COURT:  All right.

25        THE WITNESS:  But --

```
1          THE COURT:  No, no, no, no.  No buts, no buts.

2          Let me ask you this question, sir.  Sir?

3          THE WITNESS:  Yeah.

4          THE COURT:  Let me ask you this question:  If you were

5   aware of the existence of these circumstances involved in this

6   letter, would it have affected your ability to investigate

7   something that may have occurred in another school year?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  Ladies and gentlemen of the jury, I'm

10  going to direct you as follows:  It's been stipulated that this

11  is a record regarding J.O.  The circumstances and the information

12  in that letter with regard to what J.O. may or may not have done

13  and the circumstances regarding any suspension that she may have

14  had taken advantage of her regarding the situation are not to be

15  considered by you as evidence of anything other than the fact

16  that J.O. apparently had some other disciplinary action

17  effectuated against her in the Fairfax County Public School

18  system, and for that reason only.

19         MR. BRENNER:  And, Your Honor, is that -- without

20  publishing, is that admitted into evidence?

21         THE COURT:  Yes.

22         MR. BRENNER:  But don't publish?

23         THE COURT:  Without publish.

24         MR. BRENNER:  And don't -- no follow-up?

25         THE COURT:  Just be careful.
```

```
 1              (Plaintiff's Exhibit 198 admitted into the record.)

 2      BY MR. BRENNER:

 3      Q.      Um, was the conduct discussed in the letter of what --

 4      discussed in the letter regarding J.O. of a sexual nature?

 5              MR. BLANCHARD:  Objection, Your Honor --

 6              THE COURT:  Sustained, sustained.

 7              MR. BRENNER:  I'll move on, Your Honor.

 8      BY MR. BRENNER:

 9      Q.      Okay.  So in addition -- so now we've gone through sort

10      of an investigation you did of B█████ complaint and of the

11      other people that were named.  Now --

12      A.      Partial -- partial investigation, because all the

13      information's not included.

14      Q.      That's -- let me make the record clear.

15      A.      Okay.

16      Q.      It's the -- we've gone through at least what I believe to

17      be the written record of the investigation, where you're saying

18      Ms. T█████ may have additional information.

19      A.      Yes, sir.

20      Q.      Okay.  Satisfied?

21      A.      Yes.

22      Q.      Okay.  I didn't mean to misstate what you were saying.

23              Now, another -- there's one time in your career where, as

24      part of an investigation, you went to a student's prior school

25      and started asking about them; do you remember that?
```

1    **A.**    Yes.

2    **Q.**    Okay.  So the only time you did that ever was in

3    connection with this complaint, and what you did was you went to

4    Floris Elementary School, and you asked questions about B██████,

5    right?

6    **A.**    No, sir.

7    **Q.**    Did you go to -- did you go to Floris Elementary School?

8    **A.**    No, sir.

9    **Q.**    Did you talk to the principal at Floris Elementary

10    School?

11    **A.**    It was either the principal or the assistant principal.

12    **Q.**    Okay.  So what --

13    **A.**    On the phone.

14    **Q.**    I'm sorry.

15        So what you were telling me I was wrong was is that you

16    didn't physically go there; you did it on the phone?

17    **A.**    Yes, sir.

18    **Q.**    Okay.  So you -- the only time in your career where you

19    ever made the -- took the additional step of going to a child's

20    prior school and interviewing or talking to the prior

21    administrator was with regard to my client, and you did it as to

22    her, not to anyone she was complaining about?

23    **A.**    No, sir.

24    **Q.**    Okay.  Let's look at that.  Let's go to -- well -- your

25    deposition, Page 271, Line 20, to 272, Line 11.

```
 1          MR. BRENNER:  I'm just -- Your Honor, I'm going to

 2    impeach -- propose to impeach with that testimony.  272/21 to

 3    273/24.

 4          May I proceed, Your Honor?

 5          THE COURT:  You may.

 6    BY MR. BRENNER:

 7    Q.    Sir, this is again the deposition you gave in May of this

 8    year?

 9          Yes?

10    A.    Correct.

11    Q.    You were under oath, yes?

12    A.    Correct.

13    Q.    You were asked the following questions and gave the

14    following answers:

15          "QUESTION:  Okay.  Who did you speak" from -- I'm sorry.

16          "QUESTION:  Who did you speak with from B.R.'s Elementary

17    School?

18          "ANSWER:  Gail Porter, principal.

19          "QUESTION:  What did you talk to" --

20          MR. BRENNER:  I'm backwards.  I apologize, Your Honor.

21          Give me one second.  I started at the wrong place.  It's

22    271/20 is where we'll start.

23          THE WITNESS:  271 what, sir?

24    BY MR. BRENNER:

25    Q.    20.
```

1          "QUESTION:  In a difficult case where you're not able

2     to -- a difficult case to verify, do you ever look into the

3     student's past such as going to their elementary school and

4     talking to their elementary school teacher or their elementary

5     school principal?

6          "ANSWER:  Yes, I have done that once.  And we were

7     running into some roadblocks, you know, and I wanted additional

8     information.  I know that we did talk in the summer of 6th grade

9     to teachers about each individual student, but I just wanted to

10    know if there's something I'm missing.  Are you -- or is there

11    other information that might help me understand, you know,

12    what's going on, are there any other things that you have done

13    that were successful to the student.

14         "QUESTION:  Are you specifically talking about B.R.?

15         ANSWER:  Yes, I am.

16         QUESTION:  Who did you speak with for B.R.?

17         ANSWER:  Gail Porter, her principal."

18    **A.**    Okay.  And, sir -- yes, one is for her.

19    **Q.**    Oh, so you did at other -- that testimony you meant other

20    times in your career, but only once for B███? Is that what

21    that meant?

22    **A.**    Yes.  Yes, sir, I contacted high schools, elementary

23    schools.  We're a pyramid of schools.

24    **Q.**    Okay.

25    **A.**    And I have six feeders -- elementaries, and high schools,

```
 1   we had five feeders.  We had a lot of communication with one

 2   another due to the large number of facilities to talk about the

 3   different students that may have trouble transitioning, or if --

 4        THE COURT:  Okay, sir, you've answered the question.  Wait

 5   for another question.

 6        THE WITNESS:  Okay.

 7   BY MR. BRENNER:

 8   Q.    Switching topics.

 9   A.    Okay.

10   Q.    Part of the school's response to B.R.'s November 2011

11   complaint was to have two guidance counselors shadow her at

12   school, correct?

13   A.    Correct.

14   Q.    And those guidance counselors were Ms. H███████ and

15   Ms. F██████████, correct?

16   A.    Correct.

17   Q.    And you would defer to their testimony about how many

18   times they did that, correct?

19   A.    Correct.

20   Q.    If Ms. F██████████ were to testify that she did it for

21   two days and stopped because the school told her to, you would

22   have no reason to dispute that, right?

23        MR. BATES:  Objection, speculation.

24        THE COURT:  Rephrase.

25   BY MR. BRENNER:
```

1  **Q.**    Did the school tell Ms. F███████ to stop her shadowing

2  of B████ after only two days?

3  **A.**    Sir, can you repeat that?  I missed the front part of

4  that.

5  **Q.**    Did the school tell Ms. F███████, after she had

6  shadowed B████ for two days, to stop?

7  **A.**    No.  You'd need to ask Ms. F███████.

8        THE COURT:  Did you ever do that, sir?  Did you ever tell

9  her to stop shadowing B████?

10        THE WITNESS:  No, sir.

11  BY MR. BRENNER:

12  **Q.**    And that would have been done at the assistant principal

13  level if that happened?  The direction to Ms. F███████ would

14  have come from the assistant principal level?

15  **A.**    Or the -- or from the parent or an agreement with the

16  parent, as far as the time.

17  **Q.**    Okay.  New subject.  We've moving right along.

18        February 9th, 2012, you encountered B████ crying in the

19  hallway at school, right?

20  **A.**    Yes, sir -- no, sir.  I'm sorry.  I was called to a

21  classroom because B████ was crying.

22  **Q.**    Okay.  You were informed that B████ was crying in the

23  hallway?

24  **A.**    Yes, sir.  They were looking for another assistant

25  principal, and there was no one available at that time.

1    **Q.**    Okay.  You asked B████ to come to your office so you

2    could talk to her about what was bothering her?

3    **A.**    Yes, sir.

4    **Q.**    And B███ told you that two girls had come up to her and

5    said, quote, "B███, everyone hates you," and something about

6    "They would like to kill you," correct?

7    **A.**    Correct.

8    **Q.**    And the school had B███ write a statement about that,

9    right?

10   **A.**    Correct.

11   **Q.**    If we could -- if you could look at 122.

12   **A.**    And that statement was done in the counselor's office, a

13   counselor that's here.

14   **Q.**    Okay.  Just for the Rules of Evidence, I've got to make

15   sure we get the statement admitted before we talk about it.

16   **A.**    Okay.  I'm sorry.

17   **Q.**    So did you find 122?

18   **A.**    Yes.

19           MR. BATES:  No objection, Your Honor.

20           THE COURT:  Without objection.

21           (Plaintiff's Exhibit 122 admitted into the record.)

22           MR. BRENNER:  May I publish, Your Honor?

23           THE COURT:  You may.

24   BY MR. BRENNER:

25   **Q.**    So that's a statement that B███ wrote on 2-9-12?

1    **A.**    Correct.

2    **Q.**    Okay.  And she wrote:  "When the bell had rang and I was

3    walking back from lunch, all of a sudden, these two girls, one

4    with brown hair, tall, and another with black hair, medium

5    high" -- she misspells that -- "that I had never seen nor talked

6    to ever before suddenly approached me saying, 'Everyone hates

7    you, B████, and someone is going to kill you.'  I just walked

8    away and stayed quiet rest day, and my friend J.S. said a girl

9    named J" -- I'm not sure -- maybe "other friend said, 'It's all

10   B████ fault just because she's a whore.'"

11        Do you see that?

12   **A.**    Correct.

13   **Q.**    Other than the death threat, which we're going to talk

14   about, the whore comment is what has been reported now for

15   months, right?

16   **A.**    Correct, sir.  But there's a statement missing here.

17   It's Jay Lynn's.

18   **Q.**    J.S.'s statement, or someone else?

19   **A.**    J., someone else.

20   **Q.**    You said the report was concerning to you, very

21   concerning?

22   **A.**    It was very concerning.

23   **Q.**    She was reporting two other students had made death

24   threats against her?

25   **A.**    Correct.

1    **Q.**    That was coming from B█████ firsthand knowledge, which

2    she said she heard, right?

3    **A.**    Yes.

4    **Q.**    But you determined because it said, "Somebody is going to

5    kill you," not "I am going to kill you," you made the

6    determination that actually is not a direct threat.  Didn't you

7    do that, sir?

8    **A.**    No, sir.

9    **Q.**    Okay.  So let's go to your deposition again.  We'll go

10   page 318.

11   **A.**    318?

12   **Q.**    Yes, sir.

13   **A.**    Okay.

14   **Q.**    We'll start, to give it some context, on page -- Line 2

15   or 3.

16        "QUESTION:  Was that two students threatened her life?"

17        There's a legal objection that it says, "That was the

18   report from B. to you and Ms. Farro.

19        Your answer:  "The report is what the comment says here

20   on the report."

21        "ANSWER:  Right, and I quote, everybody -- 'everyone

22   hates you, B., and someone is going to kill you.'  Is it fair --

23   do you dispute that the fact that part of the quote that someone

24   is going to kill you is a death threat?"

25        And your answer was:  "It's not a death threat, not a

1  direct threat because they're not saying 'I'm going to kill

2  you.'"

3       That was your testimony, correct?

4  **A.**    Right.

5  **Q.**    Okay.  After that, the school sends B███ right back to

6  class?

7  **A.**    No, sir.

8  **Q.**    Okay.  Let's continue reading your deposition.

9  **A.**    We were waiting --

10 **Q.**    Sir, there's not a -- let me go to your deposition before

11 we get on to the next one.

12 **A.**    Okay.

13 **Q.**    Page 335, Line 1:  "So was it not administration's

14 decision to send B.R. back to class after she made the report?

15      ANSWER:  Ms. B. sent her back to class, correct."

16      Is that your testimony?

17 **A.**    Sir, you said if she was immediately sent back to class.

18 She wasn't because I talked to her again before I contacted

19 Ms. B███, and she was free then.  Ms. B███ came and picked

20 her up -- not picked her up, but brought her to her office, and

21 after she was done, then she sent her back to her classroom and

22 called her mom.

23 **Q.**    The fact is B███ was sent back to her class without

24 resolving what the threat was, correct?

25 **A.**    Um, I talked to the school resource officer --

1    Q.    Sir, the question was, did the school resolve the threat

2    before it sent her back to class?  Yes or no?

3          MR. BATES:  Objection, Your Honor.  He's trying to answer

4    the question.

5          THE COURT:  Well, the question is a simple question, so

6    let's see if he can answer it.

7          Go ahead.

8          THE WITNESS:  Repeat the question, please.

9    BY MR. BRENNER:

10   Q.    Did the school resolve the death threat against B███

11   before it sent her back to class?

12   A.    Um, that's something you probably want to ask Ms. B███

13   from her testimony.

14   Q.    Okay.  All right.  You agree -- new topic.

15         You agree that keeping records of the school's

16   investigations of students' complaints of sexual harassment is

17   important?

18   A.    Correct.

19   Q.    If the school collected any evidence during its

20   investigation of a complaint of sexual harassment, the school

21   would keep it, right?

22   A.    Repeat that.

23   Q.    Try again?

24   A.    Yes.

25   Q.    If the school collected any evidence during its

1    investigation of a claim of sexual harassment, the school would

2    keep it?

3    **A.**     Yes.

4    **Q.**     For example, the school kept the statements the students

5    wrote about what they witnessed, right?

6    **A.**     So, what -- are you on a certain incident, or are you

7    just asking generally?

8    **Q.**     Yes, the incident involving my client.

9    **A.**     Well, which one?

10   **Q.**     Let's do more broad:  Does the school retain student

11   statements about claims of sexual harassment?

12   **A.**     Yes.

13   **Q.**     No different -- it did the same thing with my client?

14   **A.**     Yes.

15   **Q.**     Okay.  In fact, you reviewed all of the students'

16   statements that the school collected regarding whether students

17   called B███ vulgar sexual names, didn't you?

18   **A.**     Can you repeat that?  You collected --

19   **Q.**     You reviewed all of the students' statements that the

20   school collected regarding whether other students had called

21   B███ vulgar sexual names, didn't you?

22   **A.**     No, sir.

23   **Q.**     You did not review those?

24   **A.**     Not all the statements, no.

25   **Q.**     Okay.  Okay.  Well, let's look at your deposition again.

 1    Page 285.  By the way, before -- well, let me ask that and then

 2    I'll ask a couple questions.

 3         285, Line 10 to 16:  Okay.

 4         "QUESTION:  Okay.  So at no point in time were you ever

 5    made aware of statements that other students, like, physically

 6    wrote statements?

 7         "ANSWER:  I saw the statements from the students that did

 8    write statements and were interviewed by Mrs. T. and sometimes

 9    Mrs. T. and Mr. H."

10         Is that your testimony?

11    **A.**    Yes, but if the statements were not pertinent, I don't

12    think I looked at -- or I just put them aside.  I'm not sure I

13    reviewed them.

14    **Q.**    Okay.

15    **A.**    The ones that were pertinent, I did.

16    **Q.**    It's your testimony that the only student statements you

17    reviewed where a student wrote that they had witnessed

18    name-calling sexual terms for B▮▮▮ firsthand was Olivia

19    Brassingram, right, O.B.?

20    **A.**    Um, sir, I'm kind of lost here a little bit.  Could you

21    tell me what incident we're talking about and --

22    **Q.**    How many incidents were there with B▮▮▮?  How many are

23    there that you want me to clarify?  You don't know how many

24    incidents involved B▮▮▮.

25    **A.**    Sir, the one you're talking about, I'd appreciate it.

```
 1          THE COURT:  I think what he's suggesting is that there
 2   were several circumstances or incidents regarding interaction
 3   between B.R. and other persons in the staff, and whether we're
 4   talking about with J.K. or D.M. or whomever.  I think that's his
 5   struggle.
 6          MR. BRENNER:  I'll try to narrow it for him.
 7          THE COURT:  Okay.
 8   BY MR. BRENNER:
 9   Q.    We're talking about statements that -- was it ever
10   brought to your attention that there were statements,
11   handwritten statements, from other students that confirmed
12   name-calling using sexual terms directed towards B. that they
13   witnessed firsthand?
14   A.    Directed toward B.?
15   Q.    Yes, sir.
16   A.    B., you're talking about all the incidents at this point?
17          THE COURT:  There -- there were several different reports
18   that were admitted into evidence, and they were statements from
19   other students.  At some point, did you become aware of those
20   statements?
21          THE WITNESS:  Yes.
22          THE COURT:  Okay.
23   BY MR. BRENNER:
24   Q.    Okay.  The only one that you claim exists is from O.B.;
25   isn't that correct?
```

```
1          Only -- the only student statement that you claim exists

2     that witnessed firsthand name-calling of B███, you think, is

3     from O.B.?

4     A.    No, sir.  It was other statements.  And Mom specifically

5     told us specifically to go to O.B. because she was a friend of

6     B.O. -- I mean, I'm sorry, B.

7     Q.    Okay.

8     A.    And B.O. were good friends, and she felt that we would

9     get the appropriate information from her.  When we did tell her,

10    we could not confirm that those statements were made down in the

11    locker area, and she was --

12          THE COURT:  Let me correct the record really quick before

13    we get too far afield.

14          Sir, the court reporter at line 10 on the page that you're

15    writing, he made reference to "O.B.," and he said, "I'm sorry,

16    B."  I think he was making reference to B.R.

17          MR. BRENNER:  Yes, Your Honor.

18          THE COURT:  Thank you.

19    BY MR. BRENNER:

20    Q.    Okay.  Let me see if I can clarify.

21          Now -- now what I understand you're saying is there was,

22    other than O.B., you're aware of other students that wrote

23    statements firsthand witnessing vulgar name-calling of B.R.; is

24    that fair?

25    A.    Witnessing?
```

```
 1    Q.    Yes.

 2    A.    Down in the locker area?

 3    Q.    Sir, I didn't use the word -- I'm not talking about the

 4    locker area.  I'm going to ask again.

 5          Is it your testimony that there were multiple student

 6    statements from people who firsthand witnessed vulgar

 7    name-calling of B█████ anywhere in the school?

 8    A.    Yes.

 9    Q.    Okay.  All right.  Let's go to -- new topic.  As the

10    principal of Rachel Carson, you were issued a laptop by the

11    school, correct?

12    A.    Correct.

13    Q.    After that -- at that -- on that school-issued laptop was

14    the main computer that you used, correct?

15    A.    On the laptop was the --

16    Q.    Yes.

17    A.    -- was the --

18    Q.    On the lap -- on the school --

19          THE COURT:  Stop.  The court reporter is concerned,

20    justifiably, that people are talking at the same time.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  So what we need to try to do, and I know it's

23    difficult sometimes for both, is let Mr. Brenner ask a question,

24    and then take your time and digest it and answer as best you can.

25          THE WITNESS:  Okay.
```

1        THE COURT:  Did I do it right, Mr. Court Reporter?

2        THE REPORTER:  Yes.  Thank you.

3        THE COURT:  All righty.

4        MR. BRENNER:  My apologies.

5    BY MR. BRENNER:

6    **Q.**    At -- the school-issued laptop was the main computer that

7    you used, correct?

8    **A.**    Correct.

9    **Q.**    You saved a lot of materials on that computer, correct?

10   **A.**    Yes.

11   **Q.**    And we established that the school administrators would

12   sometimes type up student statements, correct?

13   **A.**    No, sir.  The statements were not on my computer.

14   **Q.**    That wasn't my question.  My question is:  Did school

15   administrators sometimes type student statements?

16   **A.**    Student statements?

17   **Q.**    Yeah.

18       THE COURT:  We've seen some student statements that were

19   handwritten.  Does anyone in administration reduce those or

20   actually write written reports by a typewriter or computer?

21       THE WITNESS:  I believe so.

22   BY MR. BRENNER:

23   **Q.**    Okay.  And the school administrators would provide you

24   with students' written statements for review, correct?

25   **A.**    Not all incidences, no.

1   **Q.**     Sometimes?

2   **A.**     Sometimes, yes.

3   **Q.**     The school -- when you -- you retired in 2015, correct?

4   **A.**     Correct.

5   **Q.**     When you retired, the school wiped your laptop, correct?

6   **A.**     Well, they didn't completely wipe it.  They reimaged it

7   for -- to repurpose it for another -- other uses.  And when they

8   reimage, the data is lost.

9   **Q.**     Right.  In fact, the information that you had saved on

10  your laptop was destroyed and no longer exists?

11  **A.**     Um, not -- not all of it, sir, because a lot of that

12  information that I pulled down, say with data, student data and

13  whatnot, came from portals.

14  **Q.**     I'm sorry?

15  **A.**     Portals are like student information systems, and I would

16  pull down data on scores for --

17  **Q.**     My question is a little unfair.  The stuff that was on

18  your computer doesn't exist anymore, but it could be on someone

19  else's computer or some other portal?

20  **A.**     It could be on some other portal.

21  **Q.**     Okay.

22  **A.**     If that -- those portals still exist.

23  **Q.**     In fact, you yourself -- you personally made sure, when

24  you retired, to witness when your laptop was wiped so that

25  information you saved on it was not preserved anywhere else?

1    MR. BATES:  Object to form.  I'm sorry, objecting

2    compound.

3         THE COURT:  Break it up.

4    BY MR. BRENNER:

5    **Q.**    When you retired in 2015, you witnessed the wiping of

6    your laptop, correct?

7         MR. BLANCHARD:  Objection, misstates.  He didn't say what.

8    He said -- {indiscernible} --

9         THE COURT:  When you use the term, sir --

10        THE WITNESS:  I did use the term in my deposition, right.

11        THE COURT:  When you use the term "reimage," what does

12    that mean?

13        THE WITNESS:  That means they take the computer and --

14    well, you know, they -- they blank it out, and then they reimage

15    it, putting all the Fairfax County apps and portals and whatnot

16    on it so that it could be utilized again.

17        THE COURT:  Your knowledge, when that computer is

18    reimaged, based upon what you said reimaging is, was the

19    information that was on that computer at that time retained, or

20    is it lost forever?

21        THE WITNESS:  If it was taken down from school sites and

22    whatnot or discipline records and whatnot, they're retained.

23        THE COURT:  Okay.  So some aspects of what may have been

24    on your computer are retained.  Certain other parts which the

25    Court determines need not be retained are essentially lost

1    forever?

2         THE WITNESS:  Right.  I cannot leave Fairfax County with

3    student information.

4         THE COURT:  Okay.

5         MR. BRENNER:  Your Honor, with all -- let -- here --

6    BY MR. BRENNER:

7    Q.    I'm going to ask you what you testified to in deposition.

8    If you want to change it, you tell me.

9         What you said in deposition was, you have firsthand

10   knowledge of the fact that it, meaning your computer, was wiped

11   and the information was not preserved anywhere, and your answer

12   was "Correct"; is that right?

13        MR. BATES:  Judge, can we have a cite for that deposition?

14        MR. BRENNER:  Sure.  It's on Page 106, Line 14 to 18.

15        Actually, we could start at Line 11, let's start at

16   Line 11.

17        "QUESTION:  Okay.  So you witnessed it being wiped?

18        "ANSWER:  (Witness nods head.)

19        "QUESTION:  And none of that can be used -- so, you know,

20   you have firsthand knowledge of the fact that it was wiped and

21   the information was not preserved anywhere?

22        "Answer:  Correct."

23        THE WITNESS:  That was on that laptop.

24   BY MR. BRENNER:

25   Q.    That was on that laptop.  Okay.

```
 1          All right.  Let's go to the next topic.

 2          MR. BRENNER:  Your Honor, what time would you like to

 3     take -- shoot for a comfort break?

 4          THE COURT:  I think we're there.

 5          All right.  Ladies and gentlemen, what I'm going to do is

 6     I'm going to give you a ten-minute break.  I have a question I

 7     need to ask you at this point.  Does anyone have any difficulty

 8     if we stop today between 4:30 and 5:00?  Would that inconvenience

 9     anyone?

10          Okay.  I will tell you this, that each day we extend a

11     little longer, it might lessen the number of days we need to be

12     here, so I'm trying to pick up time where I can.  But if there's

13     a circumstance or situation that you need to address in the late

14     afternoon, early evening, simply let me know, and we will

15     accommodate you as best we can.

16          So we'll try to shoot for between 4:30 and 5:00 today, and

17     we'll come back in at 3:10.

18          (Jury out at 3:00 p.m.)

19          THE COURT:  All right.  Sir, you can step down.  You can

20     step down.  You can --

21          THE WITNESS:  I can step down?

22          THE COURT:  Yes, sir.

23          You can leave that all there, yeah.

24          THE WITNESS:  Thank you.

25          THE COURT:  Yes, sir.
```

```
1          You said you were at 30 percent earlier.  Where are we

2     now?

3          MR. BRENNER:  I'm really close except for the issue we

4     talked about at the break, which if we have to do documents, it's

5     going to be --

6          THE COURT:  All right.  Take advantage of the ten minutes,

7     and see what we can resolve.

8          (Thereupon, a break was had from 3:01 p.m. until

9     3:24 p.m.)

10         THE COURT:  Before we bring the jury in, I have one

11    housekeeping matter.

12         One of the individual jurors celebrating his faith during

13    this period of time has informed me that he would like to go to

14    his Friday services.  He says that his Friday services -- and

15    he's actually -- did a really good job with his note.  He said

16    that he's going to a center that's closest to the courthouse,

17    that it's 14 to 15 minutes' drive, that the worship begins at

18    1:30, should end by 2:00, 2:15, and he has a 14 or 15-minute

19    drive back to the courthouse, which would put him here some time

20    around 2:30.

21         I'm not going to have him rush.  What I'm going to suggest

22    we do is take our lunch break sometime around the time where he

23    can go to his services, and then maybe try to find a witness at

24    the end of the day on Friday around 2:30 or 3:00 where we can get

25    out around 4:00.  So we can do it that way.
```

```
1        But I'm always of a mind to accommodate people's faiths,

2   particularly when we have a celebration and sort of thinking it

3   through, we're taking off Good Friday for -- so for us

4   Christians.  If we're going to do that on Good Friday, then we

5   have accommodate what this gentleman is doing on Ramadan.

6        So I just wanted to make you aware of that.  Any time I

7   get any kind of note from the jury, I typically share it with

8   counsel so they're aware that I am communicating with the jury.

9        MR. BRENNER:  And, Judge, I have, I think, what's good

10  news.  The parties have worked together diligently.  And thank

11  you for the extra time during the break.  We've reached

12  stipulations on somewhere in the neighborhood of 50 exhibits.

13  We'll continue on others, but it should mean that we won't need

14  to spend time with this witness.

15       THE COURT:  Well, my prayers have been answered.  Very

16  good.

17       MR. BRENNER:  All this talk of religious service, I guess.

18       THE COURT:  Yeah, I guess everyone was inspired.  There we

19  go.  Very good.

20       So you say you're --

21       MR. BRENNER:  And -- and one more thing, we're starting

22  early tomorrow, right?

23       THE COURT:  Yes.  If the jury's agreeable to it.

24       MR. BRENNER:  What time is that?

25       THE COURT:  9:00.
```

```
1          MR. BRENNER:  9:00?

2          THE COURT:  Uh-huh.

3          MR. BRENNER:  Okay.

4          THE COURT:  All right.  So we still need this witness

5   or --

6          MR. BRENNER:  Oh, yeah.  No, we're not -- you know, I need

7   to finish up.

8          THE COURT:  Okay.

9          MR. BRENNER:  And then he's, I'm sure -- Mr. Bates has --

10         THE COURT:  Come on back, Mr. F███████.

11         (Jury in at 3:26 p.m.)

12         THE COURT:  All right.  Thank you.  You may have a seat.

13         Ladies and gentlemen, I like to compliment lawyers when I

14  can, and during the time that you all were waiting in the back,

15  the lawyers worked diligently to come up with some things that

16  will more expedite matters being presented to you, so we thank

17  them for that.

18         MR. BRENNER:  May I proceed?

19         THE COURT:  Yes, sir.

20  BY MR. BRENNER:

21  Q.    All right.  Mr. F██████, three more sections, I promise.

22  A.    Okay, sir.

23  Q.    Okay.  Can you look in your binder under 111?

24  A.    111.  I'm there, sir.

25  Q.    Okay.  It's one of those e-mail chains that starts -- the
```

1    first e-mail is on the very bottom of the first page.  Do you

2    see that?

3    **A.**     Yes, sir.

4    **Q.**     That's an e-mail from B▮▮▮▮▮ family to you and

5    Ms. Weaver?

6    **A.**     Correct.

7    **Q.**     And then there's an e-mail above it from you to

8    Ms. Weaver, right?  The e-mails go up.

9    **A.**     Yes.

10   **Q.**     Okay.  And then there's between Mr. Weaver and --

11   Ms. Weaver and Mr. H▮▮▮▮▮, and Mr. H▮▮▮▮▮ and Ms. Weaver, and

12   back and forth again.

13         Is this an e-mail exchange regarding -- the subject line

14   is regarding B▮▮▮▮ and her time at Rachel Carson?

15   **A.**     Yes.

16   **Q.**     Okay.

17         MR. BRENNER:  Your Honor, we would like to move into

18   evidence 111.

19         MR. BATES:  No objection.

20         THE COURT:  Without objection.

21         (Plaintiff's Exhibit 111 admitted into the record.)

22   BY MR. BRENNER:

23   **Q.**     Okay.  So if we could start at the top of the second

24   page -- well, no, go to the bottom of the first page.  So, the

25   bottom of the first page, this is the first e-mail in the trail.

 1   It's an e-mail from B███████ family to you and Ms. Weaver,

 2   correct?

 3   **A.**    Correct.

 4   **Q.**    Subject line is "Bullying at RCMS."  Do you see that, the

 5   subject line?

 6   **A.**    Oh, I'm sorry, I went to the other page.  Okay.

 7   **Q.**    You got it?

 8   **A.**    I have it.

 9   **Q.**    Do you see the subject line is "Bullying at RCMS"?

10   **A.**    Yes.

11   **Q.**    And if you scroll to the very bottom, even though the

12   e-mail came from the family e-mail address, it's actually an

13   e-mail from -- can you go to the bottom of Page 3?  Can you

14   highlight that?  The e-mail is actually from B████?

15   **A.**    Correct.

16   **Q.**    So she's writing to the principal of the school and the

17   director of student services, right?

18   **A.**    Yes, sir.

19   **Q.**    Two top administrators?

20   **A.**    Yes.

21   **Q.**    Okay.  So let's go to the top of the e-mail, and let's

22   read through it.  On the very top -- you're there.  Top of the

23   second page.  Highlight the first paragraph, please.  Thank you.

24        She starts off and says, "As you all know, I've been

25   severely bullied this year."  Right?  So she's telling you this

```
 1   is not the first time she's raising this issue, right?

 2   A.      Correct.

 3   Q.      Correct?  She says, "I never expected the transition to

 4   middle school to be easy, but never did I expect it to be as

 5   difficult and heart wrenching."

 6           Do you see that?

 7   A.      Correct.

 8   Q.      She says she's gone through many types of bullying at

 9   school, including sexual harassment, physical harassment,

10   name-calling, et cetera.  So there was a statement -- physical

11   harassment is touching, right?

12   A.      Correct.

13   Q.      Okay.  So, if there were -- if there were a claim or a

14   statement made that B███ never reported physical touching, that

15   wouldn't be true, right?

16           MR. BATES:  Objection, speculation.

17           THE COURT:  Rephrase.

18   BY MR. BRENNER:

19   Q.      B███ reported physical touching, did she not?

20   A.      No.

21   Q.      Okay.  So here's where she's reporting physical

22   harassment, which you just told me is physical touching, but

23   this doesn't count for reporting?  Sending to the principal and

24   the director of student services doesn't count at Rachel Carson

25   for a report?
```

1    **A.**    I just need to be clear.  Okay, so she never did report

2    physical harassment to the staff.

3    **Q.**    Well, she's reporting it to you and Ms. Weaver.  So

4    that's not the staff?  Is that the distinction you're drawing?

5    **A.**    She didn't report it, so she's saying it here.

6    **Q.**    So just so the jury understands --

7    **A.**    Um-hmm.

8    **Q.**    -- a 12-year-old girl --

9    **A.**    Right.

10   **Q.**    -- is writing the principal and the second in command at

11   the school --

12   **A.**    Right.

13   **Q.**    -- and she's saying, "I've gone through many types of

14   bullying in school, including physical harassment," and your

15   testimony is that that doesn't count as a report to the school?

16   **A.**    No, that's a report, but she never claimed that she was

17   physically harassed.

18   **Q.**    So when she says, "I've gone through many times of

19   bullying at school, sexual harassment, physical harassment,

20   name-calling, et cetera," that does not count as claiming that

21   she was physically harassed?

22   **A.**    She never reported an incident where there was physical

23   harassment.

24   **Q.**    Never -- other than this or this doesn't count either?

25   **A.**    This is just what she's writing at this point, listing

1    bullying, sexual harassment, physical harassment, and

2    name-calling --

3    **Q.**    So you're --

4    **A.**    -- but --

5    **Q.**    I'm sorry, go ahead.

6    **A.**    -- even after this letter, she never reported an incident

7    where there was physical harassment.

8    **Q.**    Okay.  So, you must have -- we'll look at it later.  You

9    must have had someone -- yourself would be nice, since this

10   little girl is reaching out to the principal -- you must have

11   wrote back and said, "B███, I don't know what you're talking

12   about.  You've never told us about this."  Have you seen that

13   e-mail?  Did you write that?  Did you ever write back to her?

14   **A.**    No, sir.

15         MR. BATES:  Objection.

16         THE COURT:  You sort of --

17         THE WITNESS:  You --

18         THE COURT:  Hold it.  Hold it.  Just a second.  Let me

19   try.  There's a reference from the -- as to physical harassment

20   and her letter to you and Ms. Weaver.

21         THE WITNESS:  Right, correct.

22         THE COURT:  Is it your testimony that this is the first

23   time that you heard the term "physical harassment"?

24         THE WITNESS:  Correct.

25         THE COURT:  Okay.

1          MR. BRENNER:  Well, I'm sorry.

2          THE COURT:  Follow up.  I'm trying to give him context.

3     BY MR. BRENNER:

4     Q.     Well, I don't think that's what you were telling me.

5     You're saying even this is not a report of physical harassment,

6     not that it's the first one.  You're saying she still hasn't

7     made one.  As of January 27, 2012, B████ had still not made any

8     report of physical harassment, notwithstanding what we're all

9     looking at in Exhibit 111.  Is that your testimony?

10    A.     She states physical harassment here, but the next day she

11    had a meeting with two of the assistant principals with Mom to

12    go over this letter and to talk about how we approach, you know,

13    sexual harassment, bullying, and whatnot.

14         And I would have to, you know -- I suggest that you have

15    a conversation -- we have a conversation with those two APs,

16    that they would be able to clarify what was discussed during

17    that time.

18    Q.     Okay.

19         THE COURT:  Okay.  Let's ask it another way.

20         In this particular letter, there's a reference to physical

21    harassment, and we can all see that it says that in the letter.

22         THE WITNESS:  Correct.

23         THE COURT:  Based upon this letter, assuming for the sake

24    of discussion that there was nothing else out there regarding

25    physical harassment, did you follow up on that?

```
 1          THE WITNESS:  Um, I can't recall what the follow-up was.

 2   I know they met with the two assistant principals.

 3          THE COURT:  Okay, and who are "they"?

 4          THE WITNESS:  I believe it was Mrs. B██████ and Mr. H██████.

 5   BY MR. BRENNER:

 6   Q.     Okay.  She goes on.  Now she's talking about school in

 7   general.  She's saying to you there's constant bullying at her

 8   school.  I assume you just think that that is incorrect, right?

 9   Or is it correct?

10   A.     I believe it's not totally correct.

11   Q.     Well, was it partially correct?

12   A.     There's been bullying in middle school, and when there

13   is, we address it, we investigate, and we provide the

14   appropriate --

15          THE COURT:  Is your struggle with the term "constant"?  Is

16   your struggle with the term "constant"?  The sentence reads,

17   "There is constant bullying at our school."

18          Do you recognize that there is some degree of bullying at

19   your school?

20          THE WITNESS:  True.

21   BY MR. BRENNER:

22   Q.     But you disagree with there being constant bullying?

23   A.     Yes, sir.

24   Q.     What's the adjective -- I think it's adjective -- what's

25   the adjective you would use before "bullying" there?
```

1    **A.**    There are instances of bullying --

2    THE COURT:  I think it's an adverb.

3    MR. BRENNER:  The L-Ys are really tough for me, Judge.

4    THE COURT:  Yeah, I think it's an adverb.

5    THE WITNESS:  There are instances of bullying.

6    BY MR. BRENNER:

7    **Q.**    There's instances?  Like, is it a -- I'm just trying to

8    get a sense because you were the guy in charge, and you actually

9    remember you promised a bully-free environment.  Was there three

10   instances, five, 20, 50 during that school year?  What would you

11   say?

12   **A.**    I'm not going to guess at a number.  I would have to take

13   a look.  Every year is different.

14   **Q.**    She says, "I'm not the only one to be a victim.  There

15   are many students at our school who are scared to speak out and

16   tell their stories because they're afraid to be made fun of, or

17   even more (being called a snitch and more rude names)."  Right?

18   **A.**    Yes, that's what she says.

19   **Q.**    That would be troubling for the principal, right?

20   **A.**    Yeah, that would be troubling.

21   **Q.**    Are you going to tell me the two assistant principals

22   investigated that, too?

23   **A.**    The assistant principal -- I'm sorry, the counselors at

24   the beginning of the year go in and do lessons on bullying.

25   They talk about the process of reporting bullying, and it was

```
 1   not -- how do I say this -- it was not per -- students reported

 2   bullying on a consistent basis when it happened.

 3   Q.     We're not talking about the beginning of the year.  We're

 4   talking after January 7th.  I wanted to know -- January 27th.  I

 5   want to know what you did or didn't do in response to B█████

 6   e-mail, okay?  Are you with me?

 7   A.     Right.

 8   Q.     She's telling you that there's an atmosphere in the

 9   school where people are afraid to speak up.  So did you -- did

10   anyone investigate that?

11          MR. BATES:  Asked and answered.

12          THE WITNESS:  You would have to talk to the two

13   principals.  I met with Mom and the student.

14   BY MR. BRENNER:

15   Q.     The assistant principal being the same two --

16   A.     The same two, yes.

17   Q.     Mr. H█████ and Ms. B█████?

18   A.     Right.

19          THE COURT:  When your lawyer objects, that's probably a

20   good time to slow your roll a little bit.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  Okay.

23          THE WITNESS:  I'm a little hard of hearing.  I'm sorry.

24   BY MR. BRENNER:

25   Q.     She says -- I'm reading a little further down the third
```

1    paragraph:  "Every morning from the moment we arrive at school,

2    the first period is where I observed the most bullying

3    happening."

4          Do you see that?

5    **A.**    Correct.

6    **Q.**    Okay.  Consistent with her reports of being bullied at

7    her locker?

8    **A.**    Correct.

9    **Q.**    Okay.  She says, "There's ridiculous racist comments

10   especially targeted to Asians, Jews, and African-Americans or

11   Muslims."

12         Do you see that?

13   **A.**    Correct.

14   **Q.**    All this was -- first of all, it's pretty brave for a

15   little girl to write to her principal, correct?

16   **A.**    Correct.  About her perceptions, correct.

17   **Q.**    Her perceptions, right.  And we'll see your response in a

18   moment.

19         She's asking for everyone to work together?

20         MR. BRENNER:  The next paragraph.

21   BY MR. BRENNER:

22   **Q.**    Be nice to one another and make a great school community

23   by learning in peace and being in harmony.  That's beautiful,

24   right?

25         Yes?

1    **A.**    Correct.

2    **Q.**    Okay.  She says that that's not happening at the school

3    right now?

4    **A.**    Right.

5    **Q.**    Okay.  It's sad, right?

6    **A.**    That's her perception.  Yes, it is sad for her.  Correct.

7    **Q.**    It would be sad if it was true for everyone, right?

8    **A.**    Sure.

9    **Q.**    And it would be a failure of the administration if that

10    were happening, right?

11    **A.**    If it were happening, yes.

12    **Q.**    She says, "Not once this year have we had an assembly

13    about bullying," and she puts an explanation point.  Do you see

14    that?

15    **A.**    Correct.

16    **Q.**    Next paragraph, I assume you're going to say that she's

17    wrong about that, or are you?

18    **A.**    There are -- yes.

19    **Q.**    Okay.  She says, "The only time I received a lesson on

20    bullying was about five minutes in health."

21    **A.**    Incorrect.

22    **Q.**    If that were the case, that would be a failure in the

23    administration, right?

24    **A.**    It would be --

25        MR. BATES:  Facts not in evidence.  He just said it's not

1    correct.

2         THE COURT:  Why don't you go ahead and reformulate that

3    question because there's been testimony that might counter that.

4    BY MR. BRENNER:

5    **Q.**    If B███████ were correct that there was -- that the only

6    lesson she received on bullying was about five minutes in

7    health, you agree with me that would be a failure in -- from the

8    administration?

9    **A.**    Right, correct.

10   **Q.**    She tells you bullying is horrendous to experience,

11   right?

12   **A.**    Correct.

13   **Q.**    "It makes you dislike yourself, question yourself,

14   distrust others, and gets in the way of achieving academic and

15   personal success"?

16   **A.**    Right.

17   **Q.**    "You dread the following day and another round of mean

18   words."  That's all pretty consistent of what she was telling

19   you back for sure in November, and we can debate October with

20   some of your colleagues, right?

21   **A.**    Correct.

22   **Q.**    She says her proposal seems pretty reasonable that you

23   educate the students, right?

24   **A.**    Correct.

25   **Q.**    "I don't think they understand what bullying is and how

1    it hurts," right?

2    **A.**    Correct.

3    **Q.**    She would like to have bullying assemblies at least every

4    couple of months.  You agree with that, that would be a good

5    goal, right?

6    **A.**    Um, correct.

7    **Q.**    Okay.  And she says that bullying happens in front of us

8    every single day, and it's a sad reality, right?

9    **A.**    Correct.

10   **Q.**    She says, "There are people with terrible stories about

11   bullying, and I would be willing to share my story with

12   everyone," right?

13   **A.**    Correct.

14   **Q.**    "I know so many students at RCMS, it's nearly impossible

15   to take the time out of the day to just do this" -- I'm sorry, I

16   read it wrong.

17        "I know with so many students at RCMS, it's nearly

18   impossible to take the time out of a day" to -- "just to do

19   this, but in the long run, it will help and stop many cases of

20   bullying at our school," right?

21   **A.**    Yes.

22   **Q.**    And then she thanks you so much for taking the time out

23   of your busy day, for both of you, you and Ms. Weaver, to read

24   this, and she hopes you will consider her idea.

25        Do you remember what you did next?

1   **A.**     Um, I talked to Mrs. Weaver.  I -- there's some e-mails

2   going back and forth, as you can see on the next page.

3   **Q.**     Okay.  So let's go up so we can see them.

4   **A.**     Okay.

5          MR. BRENNER:  You can go up to the next -- I guess it's

6   the previous page.

7          The bottom e-mail above where it says, "The R. family."

8   Nope, nope.  The one below it.  No.  It's the one that says

9   {indiscernible}.

10  BY MR. BRENNER:

11  **Q.**     That's an e-mail from Ms. Weaver, right?

12  **A.**     Um-hmm.

13  **Q.**     To you.

14         Is that who you think that is?

15  **A.**     Correct.

16  **Q.**     And she's saying, "What's going on?  She doesn't remember

17  our lessons?"  Things like that, right?

18         MR. BATES:  Objection.  Misstates the document.

19         MR. BRENNER:  All right.  I'll read it.

20  BY MR. BRENNER:

21  **Q.**     Ms. Weaver writes, "Did she never hear her counselor do

22  the lesson on bullying or hear the AP in the SRS lessons?

23  B███ checked to see if she was here the day she did the

24  lesson, and she was.  So does she not remember that at all?  Do

25  you want to respond together or separately on this?"

```
 1          That's what Ms. Weaver writes to you, right?
 2   A.     Correct.
 3   Q.     And your response is, you write to P███ -- or you write
 4   back to Ms. Weaver, you say, "Check with P███ to see if a reply
 5   is necessary"?
 6   A.     Right.  Because I knew they were meeting the next day.
 7   Q.     You knew within three hours they were meeting the next
 8   day?  Why did you need to check if you already knew?
 9          MS. REWARI:  Objection.  Compound.
10          THE COURT:  Yeah.  Ask one question at a time.
11   BY MR. BRENNER:
12   Q.     Why did you need to check with -- with P███ if you
13   already knew they were meeting the next day?
14   A.     To see if he would be addressing this -- the student's
15   response -- or letter.  I'm sorry.
16   Q.     Okay.  Let's go to the very top e-mail.  So --
17          THE COURT:  Just for purposes of the jury, who is P███?
18          THE WITNESS:  Assistant principal.
19          THE COURT:  And that is Mr. H█████?
20          THE WITNESS:  Yes, sir.
21          THE COURT:  Okay.  Very good.  Thank you.
22   BY MR. BRENNER:
23   Q.     And so this is the last e-mail in the trail.  And this is
24   from Ms. Weaver to Mr. H████.  And you know what, it's not fair
25   to read it out of context.  Let's -- let's go down a little bit.
```

1     Let's read the whole thing.

2          So you write, "Check with P████ to see if a reply is

3     necessary"?

4     **A.**     Right.

5     **Q.**     And Ms. Weaver writes to P████, "Did you address any of

6     these issues at your meeting?  See below."

7          So he's -- he's -- at 3:39 apparently he's asking about

8     the meeting.  Mr. H█████ says to Ms. Weaver, "We had the parents

9     come in," right?

10    **A.**     Correct.

11    **Q.**     They go up.  And here's what Ms. Weaver says, "I knew

12    that, but were any of the issues that B█████ addresses below

13    specifically addressed in your meeting?  Did Mom say that her

14    daughter never had any staff members talk to the students about

15    bullying?"

16         Now she's talking about you, "A█████ and I" -- you're

17    A█████, right?

18    **A.**     Yes, sir.

19    **Q.**     I said that at the beginning, I could have called you

20    A█████ all day.

21    **A.**     I like that.

22    **Q.**     "A█████ and I are trying to find out whether or not to

23    reply and do a long explanation of what has been done already by

24    our staff or if these issues have already been addressed with

25    the parents in your meeting," right?

1    **A.**    Yes.

2    **Q.**    And you end up never responding, right?  You?

3    **A.**    No, I guess that was the end of the chain.  I guess that

4    doesn't mean we weren't discussing that.

5    **Q.**    You were discussing it internally?

6    **A.**    I said it doesn't mean we didn't, you know, have a

7    discussion with that later on.  I -- sir, we're talking 12 years

8    ago, so I -- I can't go back and say for sure, you know, when

9    these things happened.

10   **Q.**    All right.  Next section.  Second to last, quick one.

11   We talked about this before, but B█████ stopped for

12   in-person instruction in February 2012?

13   **A.**    Correct.

14   **Q.**    But when she goes on homebound instruction, she's still a

15   student at Rachel Carson, correct?

16   **A.**    Correct.

17   **Q.**    And that lasts about a year; is that right?

18   **A.**    Yes, sir.

19   **Q.**    I think it's into March?

20   **A.**    March of the following year, I believe.

21   **Q.**    March of 2013?

22   **A.**    Yes.

23   **Q.**    Okay.  Kurt Mills ran the homebound instruction program?

24   **A.**    Yes, sir.

25   **Q.**    Kurt Mills worked for Fairfax County School Board?

 1   **A.**     Yes, he -- he was head of the homebound program.

 2   **Q.**     At Rachel Carson or for Fairfax County?

 3   **A.**     No, Fairfax County.

 4   **Q.**     Okay.  And Kurt Mills worked with P▮▮ H▮▮▮ with regard

 5   in particular to -- to B▮▮▮ homebound education, correct?

 6   **A.**     Do you have a document on that?

 7   **Q.**     I don't.  But maybe we'll --

 8   **A.**     You'd have to ask P▮▮.

 9   **Q.**     You don't remember?

10   **A.**     Mr. H▮▮▮.

11   **Q.**     Okay.  Fair enough.

12          When a student is on homebound, Rachel Carson did not

13   provide access to electives, correct?

14   **A.**     The electives -- no -- all take place within the school

15   setting.

16   **Q.**     Okay.  When a student was on homebound, Rachel Carson did

17   not allow them to participate in any extracurricular activities?

18   **A.**     And I'm not sure if they requested that.

19   **Q.**     Rachel Carson didn't allow it?

20   **A.**     If they requested it, we'd have to bring that up to the

21   homebound office and the assistant superintendent.

22   **Q.**     When a student is on homebound, they don't get to

23   interact with other students at school, obviously, right?

24   **A.**     Unless they have recreation outside of, you know, school.

25   **Q.**     All right.  Last one.

1        So, in March of 2012, so now B███ is on in-person --

2   excuse me, she's an at-home Rachel Carson Middle School student?

3   **A.**    Yes.

4   **Q.**    March of 2012.

5        You learn that -- you learn that B███ had claimed that

6   C.K. had raped her in November 2011, correct?

7   **A.**    Correct.

8   **Q.**    And you understand that Title IX requires the school to

9   do its own independent investigation of an alleged rape?

10       MR. BATES:  Objection.  Calls for a legal conclusion.

11       THE COURT:  What was your understanding as to what your

12   expectations were once you received this information?

13       THE WITNESS:  That when we talk to the officer, we told

14   him that we would cooperate with the investigation, and we would

15   look into her -- the timeline that we were provided, where she

16   was -- was she on an after-school bus that day, or was she in an

17   after-school activity.

18       And when we were presented with that information, she

19   reported that she was with a specific teacher.  And so we

20   went in -- Officer Chambers went into her classroom and discussed

21   that date.

22   **Q.**    Putting aside anything that -- put the police out for a

23   second and just look at the school.  You understood that under

24   Fairfax County School Board policy, the school had an obligation

25   to do its own independent investigation of an alleged rape?

```
 1          MR. BATES:  Objection.  Assumes facts not in evidence.

 2          THE COURT:  Overruled.

 3     BY MR. BRENNER:

 4     Q.     Am I correct?

 5     A.     Pardon me?

 6     Q.     Am I correct?

 7     A.     We did do our investigation.

 8     Q.     You -- well, first answer my question, and then we'll

 9     talk about the investigation.

10     A.     All right.

11     Q.     You understood that, under the Fairfax County School

12     Board policies, regardless of having anything to do with the

13     police, you had an obligation to do an independent investigation

14     of an alleged rape?

15     A.     We cooperated with the police.  We worked with the --

16          THE COURT:  Sir, the question was more specific than that.

17          THE WITNESS:  Okay.

18          THE COURT:  Pursuant to the information that you were

19     provided, setting aside anything that had to do with any outside

20     authority, do you believe that it was your responsibility to

21     conduct an investigation of that particular incident?

22          THE WITNESS:  Yes.

23          THE COURT:  And did you?

24          THE WITNESS:  Yes.

25     BY MR. BRENNER:
```

1  **Q.**    Okay.  And the only thing you did as an investigation is

2  you said the whole thing about you confirmed that B████ was not

3  at school -- I'm sorry, what did you say, was or was not?

4  **A.**    Um, she was not in school, um, or she did not stay after

5  with that teacher after school.

6  **Q.**    Okay.  So the sum total of your investigation, to be

7  clear, of what you guys did, putting aside what anybody else

8  did, the sum total of what you guys did is that you confirmed

9  that she was not after school on a particular day, and you had a

10  conversation with the school board's counsel, and that's it.

11  Correct?

12  **A.**    Correct.

13  **Q.**    Okay.

14      MR. BRENNER:  Your Honor, may I consult with -- may I

15  consult with my colleague?

16      THE COURT:  I was going to fill in the blanks for you, but

17  I thought that that's what you wanted to do, but that's fine.

18  Yes, you may.

19      (Brief pause in proceedings.)

20  BY MR. BRENNER:

21  **Q.**    And last question:  From March of 2012 forward -- that's

22  what we're talking about there -- C.K. was allowed to stay in

23  school, correct?

24  **A.**    Correct.

25  **Q.**    Okay.  Thank you, Mr. F████.

1    **A.**      Thank you, sir.

2          THE COURT:  Cross-examination?

3          MR. BATES:  May the parties approach, please?

4          THE COURT:  Sure.

5          (Following sidebar discussion had on the record:)

6          MR. BATES:  Judge, this issue is a continuation of a

7    motion in limine.  I'll let Ms. Rawari --

8          THE COURT:  Okay.  But you're going to take the witness?

9          MR. BATES:  Yeah, I would be happy to raise it myself,

10   Judge.

11         THE COURT:  Go ahead.

12         MR. BATES:  Okay.  So they have painted the picture with

13   this witness that he has not done anything when he received a

14   report of rape, okay.

15         The truth is the police officer told him that they

16   deferred the investigation -- because it's a crime outside of the

17   school, they deferred the investigation to the police.  The

18   police investigate and tell them that it is unfounded, and that

19   Mom has dropped the charges, and so --

20         THE COURT:  I can --

21         MR. BATES:  -- the door is open.

22         THE COURT:  I'll allow you to get into a little bit of

23   this, but again, I'm not going to allow this police investigation

24   or anything that occurred as a result of this police

25   investigation to affect the Title IX case.

1     I don't have any problem with you getting into a question

2  following up on the direct examination, did you follow up?  Yes,

3  we followed up.  Did you stop your follow-up?  Yes, we were

4  directed to do so by authority, you know, and I don't have any

5  problem with that.  But saying that the police did an

6  investigation and they found that it was unfounded, that goes

7  down the road we don't need to go down because there's a

8  different standard in a criminal case as to whether or not

9  there's probable cause for an arrest and all of that.  That's the

10  standard that we are looking at in a Title IX case, and it's a

11  completely different standard, and I don't want this jury to get

12  confused.

13     MR. BATES:  Right, but the police investigation results

14  informed -- this is a case that's about notice.  You can't shield

15  from the jury what they -- what the school system was on notice

16  of.  You can't --

17     THE COURT:  So the police -- are you suggesting that the

18  police can tell the School Board that they should stop their

19  investigation?

20     MR. BATES:  The police can tell the School Board that

21  there's no evidence that this occurred.

22     THE COURT:  Well, that wasn't my question.  Can the police

23  tell the School Board to stop their investigation?

24     MR. BATES:  No, the police can't tell the School Board to

25  do that.

```
1          THE COURT:  Okay.  So why do we need to go down this road?

2          MR. BATES:  But it informs the school's action after that

3     entire moment.  This is a case about notice.  You can't tell them

4     that they're only on notice of half of this, but they're not

5     on -- you can't tell half of the story of what they're on notice

6     of.

7          They want to tell half of the story because they want to

8     tell the good half of the story, the rape allegation.

9          THE COURT:  And you want to bring the police in?

10         MR. BATES:  They just opened the door to do that, Judge,

11    and we were perfectly happy not to do that.

12         THE COURT:  I don't think they opened the door that wide

13    as you think they did.

14         MR. BATES:  I understand, but Mr. F███████ can't tell his

15    side of the story on this, which is, if the police came back to

16    him and said, "We found serious evidence of a rape and you've got

17    a rapist in your school," he would have done something

18    differently.

19         THE COURT:  Likely.

20         MR. BATES:  They came back and said there's no evidence

21    against --

22         THE COURT:  But again, Counsel, what the police say has no

23    real impact on what they're responsible to do pursuant to

24    Title IX.  The police cannot tell them, you should stop

25    investigating this because we're taking it over.  They can't do
```

1    that.

2        MR. BATES:  It informs -- they defer the investigation to

3    those who are experts in investigating crimes.

4        THE COURT:  I don't have a problem with the term "defer."

5    I don't have a problem with that.  It's because of what you were

6    told by the police and the police have been mentioned, and I'm

7    not comfortable with it, that we deferred our investigation, but

8    you're not going to get into credibility determinations made by

9    the police.  That's not going to happen under any circumstances.

10        MR. KINNEY:  Your Honor, may I address this?

11        THE COURT:  Yes.

12        MR. KINNEY:  Because I think it bears upon the gross

13    negligence.

14        THE COURT:  Let me tell the jury.

15        (Open court.)

16        THE COURT:  Ladies and gentlemen, if you want to stand and

17    stretch, that's fine.  I think we're going to be a while.

18        (Bench discussion:)

19        THE COURT:  Go ahead.  Sorry, Mr. Kinney.

20        MR. KINNEY:  The alleged rape occurred off campus.

21        THE COURT:  Yes, that's what is alleged.

22        MR. KINNEY:  The criminal investigative agency empowered

23    to investigate the allegation investigated; he told my client,

24    Mr. F█████, that the allegation was unfounded.

25        Now, is the expectation then that Mr. F█████ or the

```
1    School Board should itself go out into the community and

2    investigate?

3         THE COURT:  I think under Title IX, they have an

4    independent responsibility to do what is expected, and just

5    because the police say that there's nothing there doesn't

6    necessarily preclude them from doing what they need to do to meet

7    their obligations under Title IX.  It's a completely separate and

8    distinct determination, as I indicated to you.

9         They can make a determination as to whether to arrest just

10   based on probable cause.  You're an experienced counsel.  You

11   know that.  It's an entirely different standard as to whether or

12   not from the standpoint of notice under Title IX they did what

13   they should have done.

14        Now, I don't have any problem with them touching on the

15   outside of it, but what the police did in their investigation and

16   the result of that investigation and credibility determinations

17   that they make, that's not coming in.

18        MR. BATES:  So let me just maybe approach this from one

19   slightly different angle.  It's not just about notice.  The last

20   prong is, was the school deliberately indifferent, okay.

21        And so we're shielding from the jury key facts as to the

22   question as to whether they were deliberately indifferent.  If

23   the police tell them, this kid is a rapist and they do nothing, I

24   think that may be deliberately indifferent, but if they say it's

25   unfounded, and then they --
```

```
 1          THE COURT:  So whatever the police determine in a Title IX

 2   case decides whether or not they were deliberately indifferent or

 3   not?

 4          MR. BATES:  No, it depends on the timing of the

 5   allegation.  If this happened nine years later, it is completely

 6   irrelevant.  It happened at the same --

 7          THE COURT:  But again, please answer my question.  Please

 8   an answer my question.  If the police decide not to arrest, then

 9   you're suggesting that that should be the end of the

10   responsibility on the part of the school?

11          MR. BATES:  No, no, but they have to take the information

12   that is known to them, and the information that is known to them

13   is that they withdrew this allegation --

14          THE COURT:  Who is "they"?

15          MR. BATES:  The family withdrew the allegation, the

16   criminal allegation.  They asked the officer to drop the charges,

17   and the police -- and that's because the police told them -- I

18   mean, the police officer -- it's because the police officer, you

19   know -- well, I won't get into what the police officer said, but

20   the school was told that Mom had withdrawn the charges, and it

21   was unfounded.

22          THE COURT:  So why have I not precluded you -- have I not

23   suggested that you're precluded from asking this particular

24   witness or any other witness, was he informed that the allegation

25   regarding the police had been withdrawn?  Have I precluded you
```

```
 1    from doing that?

 2         MR. BATES:  I thought you had.  The question I have --

 3    well, let's do it this way.  Here's what I want to be able to ask

 4    him.

 5         THE COURT:  Um-hmm.

 6         MR. BATES:  Um --

 7         THE COURT:  And I will say that the reason why I'm asking

 8    the question is because it has been adjusted -- I have to adjust

 9    my ruling a little bit because I believe that they opened the

10    door somewhat, but I don't believe they opened the door to the

11    extent where you can seek credibility determinations from the

12    police, suggest to this jury that what the police decided in

13    their criminal investigation somehow absolves him of any other

14    responsibly or liability under Title IX.  That didn't happen.

15         MR. BATES:  And for this, I'm not focused on the police

16    right now.  I'm focused on -- I'm focused on Mr. F███████.  I

17    would like to ask him, because they had raised all of this

18    suspicion.  I would like to ask him, what did the police -- and

19    this is very simple -- what did the police officer tell you about

20    the allegations at work, and he would say --

21         THE COURT:  That it was closed.

22         MR. BATES:  -- that they were unfounded, and that Mom

23    dropped the investigation.

24         THE COURT:  You get it's closed?

25         MR. BATES:  Okay, closed, but --
```

```
 1        THE COURT:  The jury -- the jury is going to be -- the

 2   jury is going to be confused if we get into this idea that the

 3   police are controlling what their responsibility is under

 4   Title IX.

 5        I think the jury is going to be able to easily surmise or

 6   make their own determination as to what is the significance of

 7   the fact that the police investigation is closed and what

 8   Mr. F████ did based upon that information.

 9        MR. BLANCHARD:  If I can --

10        THE COURT:  We'll get to everybody.  That's why I told the

11   jury to stretch.  You're up.

12        MR. BLANCHARD:  I think the door is open a little wider

13   because I think they asked the mother yesterday, what did she

14   tell the police and she testified about some things.

15        THE COURT:  And I think when the subject -- I thought when

16   the subject of the police was brought up, I said tread lightly,

17   and that was the end of it.

18        MR. BLANCHARD:  Okay.  I thought the door was opened.  I

19   think what the issue here is, and he started to get into it, and

20   I don't want to speak for you, but the issue for me, from my end

21   is, if the police reported that the specific allegation of rape

22   was alleged to have occurred on this day and that she said she

23   went to this class --

24        THE COURT:  I'm sorry, I didn't hear that last word.

25        MR. BLANCHARD:  That she went to this after-school class
```

1    and she took this late bus on this day, and the police

2    investigated that part as well when they came to school and found

3    that she wasn't on the late bus, she wasn't in the class, they

4    had a teacher record and all that, that information, I think,

5    is --

6            THE COURT:  That's a little different from what your

7    colleague is suggesting.

8            MR. BLANCHARD:  I just want to make sure that --

9            THE COURT:  That is a lot different from what he's

10   suggesting.

11           MR. BATES:  I think -- okay.  So we can say they're

12   closed, and I believe Your Honor said that Mom stopped -- he can

13   say that the Mom --

14           THE COURT:  I'm sorry, this thing is so loud, I can't --

15           MR. BATES:  That he said Mom stopped the investigation.

16           THE COURT:  Okay.

17           MR. BRENNER:  Your Honor --

18           THE COURT:  Okay.  I'll let you have a word.

19           MR. BRENNER:  Every time you rule, Mr. Bates comes up with

20   a new thing that's barred.

21           THE COURT:  It's called advocacy.

22           MR. BRENNER:  That's fair.  That's fair.

23           Your Honor, you picked up on exactly what I laid out,

24   which I got him -- I asked him, which is the truth, which is --

25           MR. BATES:  Can you speak up?

1          MR. BRENNER:  Yes.

2          I asked the witness, I said --

3          THE COURT:  Let's do this.  This thing is driving me

4     crazy.  Let's go into my library.  If we can come into the

5     library, That way we can all hear.

6          (Following further proceeding held in chambers:)

7          THE COURT:  All right. Let the record reflect that we've

8     retired to the chambers library so we have a better opportunity

9     to speak without having all of us having to hone in on the court

10    reporter.

11         MR. BRENNER:  So is this my big moment?

12         THE COURT:  Yes, sir.

13         MR. BRENNER:  So, Your Honor, I know you picked up on it

14    because you said it back to Mr. Bates, which is -- the question

15    to him was, and you said, Put aside the police, because it's

16    important in a Title IX case to establish, which he admitted,

17    that the school or the School Board has an independent obligation

18    to investigate in this case a sexual assault.  They can't rely on

19    the police.  That's what he admitted, okay.

20         So how that can open the door to what the police did --

21    putting aside the police -- this is what was asked:  Do you have

22    an independent obligation to do an investigation?  He said "yes,"

23    and I said, Your investigation was -- because he had gone on

24    before about checking that she wasn't on the late bus, and did

25    you call the FCPS lawyer, which is all that he did, and he said

1    yes.  That was the examination.  That is what I did.  I have to

2    establish, because it's important, that they have an independent

3    obligation, and this is what he did.

4         And all this stuff -- First of all, I disagree factually

5    with a bunch of this stuff that was told, but how can this

6    witness -- and I don't want to get into hearsay -- but he can't

7    just testify as to what someone told him.  But I don't think --

8    what you ruled already, nothing has changed.  You said the

9    police -- you said the reference -- I think you said the police

10   investigation was closed.  I think that's what your order said.

11   And that's the way to do it.  I don't think -- I think we wanted

12   that out, and that's what your ruling was.  The idea -- and what

13   Mr. Bates keep asking you to do is to go against the core of your

14   ruling, which is he wants Mr. F█████ to say the police told us

15   that she was lying about it.  That's what he wants to say.

16        THE COURT:  Okay.

17        MR. BATES:  I have nothing more to say other than the door

18   has been opened.  We were prepared to follow the order, but the

19   door has been opened by painting the picture that he did nothing

20   and did not have information that he actually had.

21        THE COURT:  Okay.  This is what you're going to be

22   entitled to do:  As I said, I think the door has been slightly

23   opened but not as widely as you suggested it's been open.  You

24   can follow-up with Mr. F█████ about what he did as a result of

25   what he was told about the police investigation.  I'll let you

1  have a moment to speak with him because he is a little bit

2  chatty, and I don't want him to volunteer something that he

3  doesn't need to volunteer.

4       He can state to the fact-finder that the information that

5  he received was that the investigation was closed and what did he

6  do after he was informed that the investigation was closed.  He

7  can say, I felt no need to follow-up at that point.  The jury can

8  do whatever they want with that.

9       MR. BATES:  Okay.

10      THE COURT:  Okay?  Did you get all that?

11      THE COURT REPORTER:  Yep, I think so.

12      MR. BRENNER:  {Indiscernible}.

13      THE COURT REPORTER:  I'm sorry, counsel, say that again.

14      MR. BRENNER:  I said, he's going to talk to the witness.

15  I think that's a wise --

16      THE COURT:  What I'm going to allow is this gentleman and

17  this gentleman to go up to the witness and make it clear what he

18  can and cannot say.  Okay.  That way you'll have the benefit of

19  him hearing that you haven't instructed him to do anything

20  improper.

21      MR. BATES:  Okay.

22      THE COURT:  I think that's important to protect the record

23  in that regard.

24      MR. KINNEYR:  May I join that discussion?

25      THE COURT:  Sure.  There will be a lot of people up there.

1        (Sidebar discussion concluded.)

2        (Discussion had off the record between counsel and the

3   witness.)

4        THE COURT:  Ladies and gentlemen, oftentimes in the course

5   of litigation, the Court needs to make evidentiary

6   determinations.  A lot of times, when the lawyers ask to

7   approach, it's a very, very good way of saying that we need to

8   discuss something outside the hearing of the jury.

9        During the course of litigation, the Court made certain

10  determinations as to regards to the admissibility of certain

11  evidence, and some evidence, as I've indicated earlier, can be

12  admitted for limited purposes.

13       You might have had an opportunity to watch the lawyers

14  spoke with Mr. F██████, who is on the stand, and the reason why

15  that happened and everybody was present that needed to be present

16  is so that the information that is appropriate for you to hear

17  will be heard and nothing else.

18       Yes, sir.

19            CROSS-EXAMINATION OF A██████ F███████

20  BY MR. BATES:

21  Q.    Good afternoon, Mr. F██████.

22       THE COURT:  It's always nice to say good afternoon when

23  someone says good afternoon to you.  You can say that back.

24       THE WITNESS:  Good afternoon, sir.

25       THE COURT:  There you go.

1   BY MR. BATES:

2   **Q.**    Can you hear me okay?

3   **A.**    Yes, sir.

4   **Q.**    First and foremost.

5          Okay.  My name is Ryan Bates.  I represent Fairfax County

6   School Board.

7   **A.**    Yes.

8   **Q.**    I will be asking you some questions.

9   **A.**    Okay.

10  **Q.**    If at any moment if you can't hear me, please let me

11  know.  I will raise my voice; I will repeat the question.

12  **A.**    Yes.

13  **Q.**    Okay.  I want to start where we ended up because I think

14  that's rather important to this case, and then we'll go back.

15          MR. BRENNER:  Objection to the colloquy, Your Honor.

16          THE COURT:  All right.  He's going to ask a question in a

17  minute.

18  BY MR. BATES:

19  **Q.**    Mr. F████, when -- how did you learn that B.R. had

20  alleged that she had been raped or sexually assaulted outside of

21  the school?

22  **A.**    Um, during the day, one of the days, Officer Chambers

23  came to the school and asked to meet with me personally.

24  **Q.**    Can I stop you right there.

25          Who is Officer Chambers?

1    A.     He's a -- I'm sorry.  It's Detective Chambers.  He's a

2    Fairfax County police detective.

3    Q.     Okay.  So he is a detective with the Fairfax County

4    Police Department?

5    A.     Yes, sir.

6    Q.     Okay.  Is he the SRO, the school resource officer, that

7    is stationed in the school that year?

8    A.     No.

9    Q.     Okay.  Okay.  So can you pick up your story about --

10   A.     So he came in and --

11        MR. BRENNER:  Your Honor, just a hearsay objection to the

12   extent that he's going to start talking about --

13        THE COURT:  Yeah, I'm going to allow him to set the

14   predicate for the conversation.

15        And make sure you stay as precise as you can with your

16   question so the witness doesn't wander off into areas we don't

17   need him to wander off to.

18        MR. BATES:  Understood.

19   BY MR. BATES:

20   Q.     How did you -- let me back up for a moment.

21        How did you learn that there was an allegation by B.R.

22   of -- of rape outside of the school?

23   A.     Detective Chambers came to the school and asked to see

24   me.  He came into my office, and he informed me that there was

25   an allegation.

1          MR. BRENNER:  Objection, hearsay, Your Honor.

2          THE COURT:  Overruled.  State of mind.

3          Go ahead.

4     BY MR. BATES:

5     Q.     You can continue.

6     A.     The way I was going?

7     Q.     Yes.

8     A.     Okay.  There was an allegation that Ms. B. -- Ms. R, I'm

9     sorry, made an allegation that her daughter was raped, and I

10    believe it was some time in November, when she exited a bus

11    that -- at her bus stop, and she was taken behind a wall of --

12    kind of a low wall with bushes and whatnot and raped by a

13    student.

14    Q.     And what was your -- let me set the stage here in this.

15    Was -- was B.R. attending classes at Rachel Carson Middle School

16    at this time?

17    A.     Not at that time.

18    Q.     Okay.  Do you remember, ballpark, when this occurred?

19    A.     Um, as far as when --

20         THE COURT:  The meeting with the officer.

21         THE WITNESS:  Oh, meeting with the officer.  I believe it

22    was somewhere late February or early March, somewhere in there.

23    BY MR. BATES:

24    Q.     Okay.  And after the officer told you this, what happened

25    next?

1    A.    Well, I told him, you know, this is alarming, and if this

2    happened, you know, certainly we need to find this out and we'd

3    cooperate with him in his investigation.  And we would, you

4    know, cooperate as far as having him speak to different folks or

5    what he needed within the school.

6    Q.    And did you and other school officials fully cooperate

7    with Detective Chambers in his investigation?

8    A.    Yes.

9    Q.    Did you provide him with any information that he had

10   asked you for?

11   A.    Yes.

12   Q.    What did --

13   A.    Yes.

14   Q.    After he relayed this to you, what, if any, specific

15   requests were made of you or the school?

16   A.    He wanted to speak to a teacher that B.R. said that she

17   stayed after school with that day in November, and, you know,

18   asked if he could go down to her classroom and speak with her.

19   Q.    What was your understanding of the importance as to why

20   he wanted to speak with this particular teacher?

21   A.    He wanted to verify that she -- number one, she was in

22   the school; and number two, that she took the late bus home.

23   Q.    Okay.  So, in other words, there was the allegation that

24   she had stayed after on the late bus and stayed with this

25   teacher; is that correct?

1    **A.**    Correct.

2    **Q.**    And so Detective Chambers wanted to verify whether B.R.

3    stayed late at school that day?

4    **A.**    Yes, sir.

5    **Q.**    And that she had stayed with this particular teacher?

6    **A.**    Yes, sir.

7    **Q.**    Okay.  And so after he relays that to you, what -- what

8    happened next?

9    **A.**    Then he came back to my office and said the teacher said

10   that she was not there that day and could not have stayed after

11   with her.

12   **Q.**    Okay.  So -- and what's the name of this teacher?

13   **A.**    Ms. C████.

14   **Q.**    Okay.  So Ms. C████ had not stayed after with B██████ on

15   that day?

16   **A.**    No, she was not there.

17   **Q.**    Okay.  Did you conduct --

18          THE COURT:  B.R.

19          THE WITNESS:  B.R.

20          MR. BATES:  Okay.  B.R., I apologize.

21   BY MR. BATES:

22   **Q.**    Did -- from the time that Detective Chambers first

23   relayed this to you and the time that you had that conversation,

24   did you yourself do anything with the information in conjunction

25   with looking into this?

 1   **A.**     Yes.  We -- we felt that -- well, she didn't -- maybe she

 2   was confused, she didn't stay after with Ms. C██████, maybe she

 3   stayed in an after-school club or with another teacher.

 4        So we went to the after-school specialist who keeps

 5   attendance daily on what students are in the building during

 6   that after-school time.

 7        So we brought her in and told her the date.  She went and

 8   looked into her files and found that, indeed, she was not in

 9   that after-school period of time.

10   **Q.**     When you say "she" was not in the after-school time?

11   **A.**     B.R.

12   **Q.**     Okay.  So --

13        THE COURT:  But you also said, "We brought her in and told

14   her the date."  Who are you referring to when you said, "We

15   brought her in"?  You're making reference to that after-school

16   representative?

17        THE WITNESS:  I'm sorry.

18   BY MR. BATES:

19   **Q.**     Were you referring -- were you referring to -- when you

20   said, "I brought her in," were you referring to Tracy Bromberg,

21   that you brought --

22   **A.**     Yes.

23   **Q.**     -- Tracy Bromberg in?

24   **A.**     Yes.

25   **Q.**     Okay.  And we're doing this a little bit backwards, but

1    we think it's important, so we're going to talk about this now.

2    First, is what -- you mentioned after-school program and

3    attendance.  Can you just give the jury a quick overview as to

4    what the attendance process is for this after-school period?

5    **A.**    Right.  Once the school bell rings and students go out to

6    their buses or their rides, the kiss and ride, and depart the

7    building, certain students would stay after school for a variety

8    of reasons.

9          Some would be tutoring with a teacher or looking for

10   additional assistance.  We had a vast number of after-school

11   programs for the kids to stay, either academic, athletic, or

12   competition teams.  So once they were in -- they had about three

13   minutes to get into their areas, and then the -- Ms. Bromberg,

14   who is the after-school specialist, would go area to area within

15   the building and take attendance on who was there, and --

16   **Q.**    Can I stop you on that?

17   **A.**    Yes, sir.

18   **Q.**    Was this an electronic attendance, or was this a manual

19   attendance?

20   **A.**    It was electronic.

21   **Q.**    Tell us about that.

22   **A.**    It was something that she had in her hand.  It was almost

23   like a large iPad where she would go in and then she would check

24   off names on who was there, and she would be able to pull that

25   up.  If a parent called and wanted to know if the student stayed

1     after school, she was able to find that student and see if they

2     were in the building.

3     **Q.**     Okay.  Did Ms. Bromberg use any kind of scanning device

4     or anything like that?

5     **A.**     Yes, I believe that apparatus was a scanner.

6     **Q.**     Okay.  Do you know whether the attendance records for

7     that after-school period was -- were electronic or not?

8     **A.**     It was electronic.

9     **Q.**     Okay.  So, we took a little detour to explain the

10    attendance process.  So, to bring it back to -- you had spoken

11    with Ms. Bromberg, and can you relate to us what else, if

12    anything, occurred in that time period from your first

13    conversation with Detective Chambers and the second

14    conversation?

15    **A.**     Well, I believe the period of time was approximately

16    between a half a week and a week that Detective Chambers called

17    the school and asked to speak with me.  I spoke with him, and he

18    said -- he knew me, so he called me A███ -- the case is closed.

19    **Q.**     Okay.

20    **A.**     And at that time, I felt there was no further actions

21    that we had to take towards this investigation.

22    **Q.**     And at the time this occurred, B.R. was not an in-person

23    student at Rachel Carson Middle School; is that correct?

24    **A.**     That is correct.

25    **Q.**     And this alleged event occurred in her neighborhood; is

1    that correct?

2    **A.**      That is correct.

3    **Q.**      And just to be clear, prior to Detective Chambers

4    relaying this to you, did you have any knowledge, in other

5    words -- let me rephrase my question.

6          Prior to Detective Chambers relaying this to you, did

7    B.R. ever report to you that she had been raped in her

8    neighborhood?

9    **A.**      No.

10   **Q.**      Prior to Detective Chambers relaying this to you, did

11   B.R.'s family members ever report that she had been raped in her

12   neighborhood?

13   **A.**      No.

14   **Q.**      In any of the e-mail correspondence that B.R. or B.R.'s

15   mother sent to you that entire school year before you met with

16   Detective Chambers, did B.R. or her family members relay to you

17   in those e-mails that she had been raped in her neighborhood?

18   **A.**      No.

19   **Q.**      And after -- after you were alerted to this by Detective

20   Chambers, did B.R. herself ever come back and report to you what

21   had occurred in -- that she had been raped in her neighborhood?

22   **A.**      No.

23          MR. BATES:  Okay.  We can -- that was an important issue,

24   so I wanted to address it directly.  We're going to --

25          MR. BRENNER:  Objection to the colloquy, Your Honor.

1        MR. BATES:  Your Honor, counsel has had a lot of

2   colloquies in the four hours of examination.

3        THE COURT:  Just because something is going to happen

4   doesn't mean it's going to continue to happen, so try to ask

5   questions.

6        MR. BATES:  I understand.  Thank you, Your Honor.

7   BY MR. BATES:

8   **Q.**    Mr. F██████, are you currently retired?

9   **A.**    Yes.

10  **Q.**    What year did you retire from the school system?

11  **A.**    2015.

12  **Q.**    That was nine years ago?

13  **A.**    Approximately.

14  **Q.**    Okay.

15       THE COURT:  You're asking a prior principal to do math?

16  That's not fair.

17       THE WITNESS:  Sir, I taught science and math.  I just

18  thought you should know.

19  BY MR. BATES:

20  **Q.**    So, this may seem obvious by now, but you were the

21  principal at Rachel Carson Middle School from 2011 to 2012; is

22  that correct?

23  **A.**    Correct.

24  **Q.**    Okay.  I want to ask a few background questions for you,

25  I think, given the claims in this case.

1        Just generally speaking, ballpark for me, how many years

2   have you been in education?

3   **A.**      Okay.  I'm 69 now, and then I was 21 when I started in

4   education, so a very long time.

5        THE COURT:  69 minus the nine you've been retired, you

6   retired when you were a certain age, so that makes it about 39

7   years.

8        THE WITNESS:  No, sir, I'm still involved in education.

9        THE COURT:  Okay.

10  BY MR. BATES:

11  **Q.**      Does that sound correct, sir, about 30 -- well, 39 years

12  until your retirement, plus any postretirement activities?

13  **A.**      Yes.

14  **Q.**      Okay.  Why did you get into education?

15  **A.**      Because -- I have to be honest with you, I was not a

16  great kid.  I had -- you know, I was a little bit problematic,

17  and education kind of turned me off.  I was bored.  I was trying

18  to find my way in life, and military academy helped a little

19  bit, but I always wanted to do better and provide children a

20  better education than I felt that I had.

21       And I had teachers coming up to me when I was a kid and

22  saying, "You're never going to college," and what I say to my

23  staff these days is "Never judge a child at middle school and

24  what they are, because they can grow and they can change."

25  **Q.**      Okay.  So, at some point you became an administrator in

1    that 38-plus years; is that correct?

2    **A.**    Yes, sir.

3    **Q.**    Just generally speaking, we don't need to get into much

4    detail of your résumé, but what type of positions did you have

5    before becoming an administrator?

6    **A.**    Well, I worked with children from East Harlem, Lenox Hill

7    Neighborhood Association, and I worked with them.  We would

8    bring them up in buses up to Connecticut, Litchfield,

9    Connecticut, and gave them outdoor experiences, so that was my

10   first work with students.

11   **Q.**    Did you hold teaching positions, other teaching

12   positions?

13   **A.**    Yes.

14   **Q.**    You mentioned a math and science teacher?

15   **A.**    Right.  I was an elementary teacher to begin with for a

16   number of schools.  Then from there I became an assistant

17   principal, and --

18   **Q.**    Before you get to becoming an assistant principal, other

19   than -- just to bring it up -- what grade levels did you teach

20   before becoming an assistant principal?

21   **A.**    Sixth and eighth.

22   **Q.**    Okay.  Did you work in -- for any colleges or

23   universities or --

24   **A.**    George Mason University.

25   **Q.**    Okay.  What did you do for George Mason?

```
 1    A.      I was an outreach coordinator for graduate programs for

 2    in-state and, um, foreign countries that students would attend

 3    during the summer, and I also worked with districts within this

 4    area to build English language learner programs in those

 5    districts.

 6    Q.      Do you remember what year you became -- you got your

 7    first administrator position?

 8    A.      Oh, boy.  My first administrator's position --

 9    Q.      Just ballpark.

10    A.      In the early 20,000 [sic].

11    Q.      And what was your first administrator role you had?

12    A.      I was an assistant principal at an elementary school,

13    which was a magnet, science/art magnet.

14    Q.      And how many years did you hold that position?

15    A.      One-and-a-half years.

16    Q.      Okay.  And what positions did you have after that?

17    A.      Assistant principal at a middle school.

18    Q.      And what middle school was that?

19    A.      Franklin Middle School.

20    Q.      And how many years did you hold that position?

21    A.      I believe around three years.

22    Q.      Okay.  And where did you go after Franklin Middle School?

23    A.      Well, Franklin Middle School was a small building, so

24    there was about 1,400 students there, so they had to build

25    another school up the road, which is Rachel Carson Middle
```

1    School, so -- and I was transferred there by the assistant

2    superintendent.

3    **Q.**    And do you remember what year that was?

4    **A.**    1998.

5    **Q.**    Okay.  Did you say that that was the same year that

6    Rachel Carson opened?

7    **A.**    Yes.

8    **Q.**    Okay.  And how many years did you hold that assistant

9    principal position?

10   **A.**    Five years.

11   **Q.**    Okay.  And do you recall the year that you were promoted

12   to principal -- I'm sorry.  What was your next position after

13   assistant principal?

14   **A.**    Principal.

15   **Q.**    Okay.  Do you recall what year that was?

16   **A.**    Um, 20-3.

17   **Q.**    2003?

18   **A.**    Yeah.

19   **Q.**    Okay.  And you mentioned -- so 2003 you become the

20   principal at Rachel Carson Middle School.  You retired in 2015?

21   **A.**    2015, yeah.

22   **Q.**    Were you the principal at Rachel Carson Middle School

23   from 2003 to 2015?

24   **A.**    Correct.

25   **Q.**    Okay.  And you mentioned retirement.  That -- why did you

1  leave your principal position at Rachel Carson?

2  **A.**    Um, I was there for a long time and felt that the school

3  could use a change.  You know, I felt that they were in a place

4  where they would carry on systematically on what we did over the

5  years and wanted some new challenges and spend more time with my

6  wife and child.

7  **Q.**    Okay.  Now, at the time that you were retired in 2015,

8  how many years had it been since B.R. had been a student at

9  Rachel Carson Middle School?

10  **A.**    '15 to -- what is it, 12th, so...

11  **Q.**    So B.R. left Rachel Carson Middle School --

12  **A.**    Three years.

13  **Q.**    -- about three years?

14  **A.**    Yeah.

15  **Q.**    Okay, I apologize.

16  **A.**    I just wanted to make sure I had the right --

17  **Q.**    And -- and this was raised in your questions with

18  Mr. Brenner.  We might as well address it right now.

19        So at your retirement, you mentioned that your laptop was

20  imaged; is that correct?

21  **A.**    Yes, sir.

22  **Q.**    And is that typically what happens when an employee

23  either retires or leaves the school system for other reasons,

24  for another job, for example?

25  **A.**    Yes.  Unfortunately, they don't give out laptops for

1    retirement, but what they do is that you turn in your laptop,

2    and if you have a school phone, you also turn that in and give

3    it to the technology specialist, and what they do is they

4    reimage the laptop or desktop so that it can be utilized -- it

5    can be repurposed within the building with other programs or

6    other staff members.

7    **Q.**    Now, to your knowledge, when you retired in 2015, had

8    B.R. filed this lawsuit against the school system?

9    **A.**    No.

10   **Q.**    Are you aware of any legal claims that were pending

11   against the school system at the time you retired --

12   **A.**    No.

13   **Q.**    -- involving B.R.?

14   **A.**    Um --

15          THE COURT:  Ask the question again.  I think it got lost

16   in the translation.

17   BY MR. BATES:

18   **Q.**    Let me -- let me come at this from a little bit of a

19   different angle.

20          At the -- when B.R. left in-person schooling, was there

21   anything that were -- was done with records that pertained to

22   her schooling?  Were they gathered in any -- in any way?

23   **A.**    Oh, FERPA.

24   **Q.**    I'm just saying, just generally speaking, was there

25   any -- was there any way that physical copies of records

1    pertaining to B.R. were gathered?

2    **A.**    Yes.

3    **Q.**    Okay.  Tell us about that.

4    **A.**    Okay.  There were -- in June, I believe there was a FERPA

5    where -- in 2012, I believe.

6    **Q.**    And just to be clear, is a -- is a FERPA, is that a

7    records request under the educational laws to -- to provide a

8    copy of a student's educational records and other records?

9    **A.**    Yes.

10   **Q.**    Okay.  And so who had made the -- the records request?

11   **A.**    Well, it came through County counsel so --

12   **Q.**    Which student had made the request?

13   **A.**    B.R.

14   **Q.**    Okay.  And did the school system respond to that request?

15   **A.**    Yes.

16   **Q.**    And did the school system keep a copy of the records that

17   were produced in that request?

18   **A.**    Yes.

19   **Q.**    Okay.  And -- and where were those records kept?

20   **A.**    In the records room, which is a locked area with student

21   information, and only certain folks have a key to that.

22   **Q.**    Can you be more specific?  Where -- was there a specific

23   location?

24   **A.**    It was in the counseling wing, student services wing.

25   **Q.**    Were the records kept sort of co-mingled with other

1    student records, or were they kept in -- in a similar location?

2    **A.**    A similar location.

3    **Q.**    And what was that location?

4    **A.**    It was on top of some of the filing cabinets, and it was

5    labeled.

6    **Q.**    It was -- this was kept in a box or something?

7    **A.**    In a box.

8    **Q.**    Okay.  And at the time that you were handling anything

9    related to B.R. when she was in school or after that, what, if

10   anything, did you do with records that you had?

11   **A.**    I printed them off.  I went through my computer.  I made

12   sure I did searches to make sure there was no information or

13   e-mails that were remaining on the laptop.  I made copies.  We

14   had -- one of our APs took responsibility for getting all those

15   records from all the staff that had anything or dealings with

16   B.R.

17   **Q.**    Let's focus specifically on you, because there's been an

18   allegation, based on the questions, that -- that potentially

19   materials were destroyed related to B.R. that were on your

20   laptop.  So let's focus on you.

21        Did you -- did you put materials related to B.R. in that

22   box?

23   **A.**    Yes.

24   **Q.**    Okay.  And when your -- what was your process with regard

25   to student materials -- let me phrase it this way:  When you

1    retired in 2015, tell the jury about what you did to remove

2    student records from your computer before it was imaged.

3    **A.**    What I did was I did a search for any student information

4    that was on the laptop, and, um -- you have to realize that

5    three years had passed when I retired from when we put all that

6    information on B.R. in the box.  So -- but I wanted to make

7    sure -- you can't -- you can't have student information

8    remaining on -- or taking it with you when you retire.  You have

9    to make sure it's -- it's collected, it's placed in its

10   appropriate place.

11       Most of the records that I've had after the box or the

12   FERPA were student scores or records or testing material.  So

13   making sure that that was taken off prior to turning in the

14   computer.

15   **Q.**    And did -- so did you make sure that any materials with

16   regard to B.R. were not on that computer before it was -- was

17   forensically imaged?

18   **A.**    Yeah, her and other students.

19   **Q.**    Okay.  And did you keep student statements related to

20   B.R. on that computer?

21   **A.**    I never had student statements on my laptop.

22   **Q.**    So in 2015, would it be true that all the student

23   statements that the school had with regard to B.R. were in that

24   box?

25   **A.**    Correct.

1    **Q.**    And did you ever witness or did you ever instruct that

2    box to be destroyed?

3    **A.**    I talked to the principal before I left and said that

4    there is a box that's labeled with B.R.'s information in a

5    locked records room, and to make sure that this box -- you

6    usually -- records from schools are usually destroyed like after

7    five years or whatnot, and told him, no, this is not to be

8    destroyed in any way, and -- but to be kept, and if anyone asked

9    for it, to let me know.

10   **Q.**    Okay.  So the last question on this topic.

11   **A.**    Okay.

12   **Q.**    Based on everything that you just said, you're -- you're

13   not aware of a single record related to B.R. that would have

14   been on your computer that was destroyed in 2015 when you

15   retired?

16   **A.**    No.

17   **Q.**    Okay.  So let's -- let's talk about Rachel Carson Middle

18   School.  And we're going to get into a little bit of details

19   here.

20        MR. BATES:  If I can ask -- we're going to have -- pull up

21   a few photos, Defendant's Exhibit 190, 192, and 193.

22        THE COURT:  Anticipate any objection to these,

23   Mr. Brenner?

24        MR. BRENNER:  No.  But I want to -- before we get to the

25   ones --

```
 1            (Discussion had off the record.)

 2            MR. BRENNER:  We have no objection to photos.

 3            THE COURT:  Without objection, you may publish if you want

 4    to.

 5            (Defendant's Exhibits 190, 192, and 193 admitted into the

 6    record.)

 7            MR. BRENNER:  May we can keep walking, getting the binders

 8    while he's doing that?

 9            THE COURT:  That's fine.

10    BY MR. BATES:

11    Q.    Mr. F███████, we're looking at -- on the screen in front

12    of you has been marked Defendant's Exhibit 190.

13            MR. BATES:  If I can ask Grady or our technology

14    coordinator to flip through these, give you maybe a second or two

15    with each picture.

16    BY MR. BATES:

17    Q.    And -- what are these pictures depicting, Mr. F██████?

18    A.    The entrances to Rachel Carson and the different

19    locations.

20    Q.    Okay.

21            MR. BATES:  And if we can pull up 192.

22            THE WITNESS:  Should -- when I see it, should I say

23    something or --

24    BY MR. BATES

25    Q.    You can wait for a question.  I'm going to have Grady
```

1    flip -- flip through some of these pictures, and I'm just going

2    to quickly ask you if you recognize what we're -- what we're

3    looking at here.

4    **A.**    Yes, that is one of the pods.  And in each pod there are

5    two teams.  And in that team --

6    **Q.**    Just -- just what are we looking at pictures-wise.

7    **A.**    Oh, I'm sorry.  This is a pod area.

8    **Q.**    Okay.  And to your knowledge, is this the -- are you able

9    to tell if this is the explorers pod?

10   **A.**    Yes.

11   **Q.**    Okay.

12        MR. BATES:  And we can bring up 193.

13   BY MR. BATES:

14   **Q.**    Let's just take a look at that first -- first picture.

15   What -- what is that first picture?

16   **A.**    The one I'm looking at right now?

17   **Q.**    Yes.

18   **A.**    This is the main entrance and the main stairwell.

19        Upstairs, if you walk in.

20        Further, where you see the picture of the colored tree,

21   to the left is a pod where explorers were.

22        If you take a right, there'll be another pod.  And so

23   there would be A, B, C, each would house two teams upstairs and

24   downstairs.

25   **Q.**    Okay.  That's fine.

1          MR. BATES:  If we can take a look at Exhibit 61, please.

2          MR. BRENNER:  No objection, Your Honor.

3          THE COURT:  Without objection.

4     BY MR. BATES:

5     Q.     And we can stick to the first page of Exhibit 61, and I

6     just want to have you -- if we can flip through this a couple of

7     pages.  I want to just have you just generally tell us what

8     we're looking at here.

9          THE COURT:  Why don't we start at the gym because we can

10    all see that, and then work your way around.

11         THE WITNESS:  Okay.  That's upstairs.

12    BY MR. BATES:

13    Q.     Okay.  Keep going.

14    A.     So -- do you want me to speak to this or --

15    Q.     Let's -- so can you -- actually, we're going to -- we're

16    going to come back to this in a moment.

17    A.     Okay.

18    Q.     That's fine.  You can put that down.

19         Let's just talk generally about Rachel Carson Middle

20    School.  How many staff members are there?

21    A.     During that time, there was about 130, approximately,

22    with itinerants and part-time folks.

23    Q.     And by the way, Mike [sic], I understand you've been

24    retired for nine years now, and I'm asking you questions about

25    things that happened about 12 years ago, but if you can focus

1    your answers when I'm asking questions about Rachel Carson on

2    the 2011 to 2012 timeframe to the extent -- to the extent you

3    can.

4         So -- and out of that total number, do you recall

5    ballpark how many teachers there were at the school?

6    **A.**    Oh, boy.  I believe it was around 90.

7    **Q.**    Okay.  Can you describe for us how, if at all, Carson was

8    different than other middle schools?

9    **A.**    Um, Carson really started with a commitment to creating a

10   culture where students felt welcome, safe, and they were able to

11   expand their knowledge in different ways, not just through the

12   classroom.

13        We wanted to make sure that anyone that worked in this

14   environment, that they had a heart for children, and we did

15   that -- we accomplished that by a number of ways.  One was

16   certainly hiring -- the hiring process, making sure that

17   teachers were not only instructionally sound but also that were

18   able to build relationships with middle schoolers, which is a

19   lot different than high schoolers or elementary school.

20   **Q.**    Let me stop you there.

21        For -- for a regular teaching job, ballpark, how many --

22   how many applicants would you get for that job?

23   **A.**    So, back then, because this is not true now with teacher

24   shortages, if I put out a -- for a teacher, say in English or

25   social studies, I could get as much as between 130 and 150

1   applicants for Rachel Carson.  For administrators, we would get

2   around 80 applicants that we would have to cycle through.

3   **Q.**    So who was the ultimate decision-maker for hiring

4   teachers at Rachel Carson?

5   **A.**    It was a collaborative process between the administrator

6   and teachers.  During the interviews, we had panel interviews

7   with the folks, and counselors, I believe, also sat in, to make

8   sure that we have many eyes on that person to locate the

9   strengths that this person would bring in to the school.

10  **Q.**    And how did you go about identifying -- out of a

11  hundred-plus applicants, how did go about identifying the type

12  of teacher that you wanted for -- for your school?

13  **A.**    Right.  First, we looked -- you know, we did a review of

14  résumés, and we would sit down.  And usually the department

15  chair, assistant principals, principals would sit down and go

16  and mark folks that they felt would qualify for the position.

17       Second, we set up interviews with folks.  And usually

18  that was two interviews before they were hired.

19       And during that interview, we would provide questions

20  that were scenarios for them.  A scenario might be, all right, a

21  student has three A's, two B's, and forgot one homework

22  assignment, what grade would you provide this child?

23       And you would not believe --

24  **Q.**    What are you looking for in that scenario?

25  **A.**    Empathy, that they care about the child, that they care

1    more about what happened in the classroom and, you know, would

2    they want to speak to this child or was it all grades.  And --

3    Q.    Tell -- tell us about the expectations that you set at

4    Rachel Carson.  First -- first, I think we can focus on the

5    staff and then -- and then the students.

6    A.    Well, the staff that -- that everybody has to be in the

7    hallways during transitions, and that was not a maybe, that was

8    a strong expectation, to make sure that during transitions in

9    middle school that the hall -- hallways were safe.

10          Second, that their teaching was engaging, that they

11   needed to build strong relationships with the kids, and that

12   they cared about them beyond what they were doing in school.

13   Q.    What was your expectations that you set for -- for your

14   teachers?  I'm sorry, how would you describe -- what words would

15   you describe -- use to describe the expectations that you set

16   for -- for the teachers in your building?

17   A.    Um, they were above and beyond.  You know, we did --

18   we -- people made jokes that we were a group of type A's, and

19   they would go above and beyond what a normal teaching position

20   would entail.

21   Q.    I cut you off.

22          What about expectations in terms of students?

23   A.    Students that -- number one, that they respect, not only

24   the teachers and the staff, but they respect one another.  There

25   was some ingredients that I gave them on how to be successful as

1    a middle school student.  You know, come prepared.  Come to

2    participate.  I'm trying to -- it's a while ago.

3    Q.    How, if at all, was the building design of Rachel Carson

4    different than other middle schools?

5    A.    Well, it was --

6    Q.    Tell us about that.

7    A.    It's built to accommodate teams.  And let me describe

8    what a team is.  It's four core teachers that have about 140

9    students in common, so that those students would be located in a

10   specific pod area where their lockers will be right outside the

11   teachers' doors.  And -- I'm sorry, I'm a little thirsty.  Could

12   I take a drink.

13   Q.    Please.

14         MR. BATES:  And while you're doing that, if we can pull of

15   Exhibit 61 again.

16         THE COURT:  Mr. Bates, if you will find a good place for

17   us to stop for the end of our day, that would be appreciated too.

18   If you find a good place.

19         MR. BATES:  We can stop right now, Judge.

20         THE COURT:  All right.  Very good, very good.  Thank you,

21   sir.

22         All right.  Ladies and gentlemen, now we've completed

23   Day 2.  I appreciate you all being on time as we were conducting

24   our business and accommodating me as I took care of a personal

25   matter.

```
 1         Does anyone have any problem with us starting a little

 2   earlier tomorrow, say 9:00?

 3         I'm -- I'm getting one face.  Ma'am?

 4         A JUROR:  Because I'm coming from Culpeper.

 5         THE COURT:  Oh, you're coming from Culpeper?

 6         A JUROR:  Stafford.

 7         THE COURT:  That's almost Culpeper.

 8         All right.  Let's go -- how about 9:30?  Is that a little

 9   better for you?  Because I'm coming from a similar direction, and

10   it seems to me that the traffic going north of 95 seems to settle

11   down around 8:45.

12         Obviously, I have made that trip before to know that it

13   settles down around 8:45.

14         So we'll start at 9:30 to accommodate you.  And if you run

15   a little late or traffic is bad, we understand.  I'm stuck in the

16   same traffic, so I'll probably be coming in with you, so don't

17   worry about that.

18         Again, ladies and gentlemen, I really appreciate your

19   attentiveness today as we work through the process.  We'll try to

20   have a different menu for you tomorrow for lunch.  We'll try to

21   come up with something different.

22         Right, Trish?

23         THE COURTROOM CLERK:  They're going to have three days of

24   Potbelly.

25         THE COURT:  Oh, you have to eat three days of Potbelly.
```

```
 1    That's just a real tragedy.

 2         But -- but we'll see you tomorrow at 9:30, and we want to

 3    try to start at 9:30.  So if you get here at 9:20 or so, that

 4    would be great.

 5         Remember the instruction that I gave to you at the very

 6    beginning, and I will continue to give to you, to please do not

 7    discuss the case or any aspect of the case with anyone while the

 8    case is pending.

 9         Enjoy the rest of your day.

10         (Jury out at 4:51 p.m.)

11         THE COURT:  All right.  Ladies and gentlemen, I would

12    request that you take a little time this afternoon.  You don't

13    have to stay late, but see if you can come to agreement on any

14    other things.

15         I think that the last hour or so that we've been

16    conducting our business has been a lot more fluid, so take

17    advantage of the fluidity that we saw at the end of the day.

18         We'll start at 9:30 tomorrow.  I'm going to let you know

19    this:  Tomorrow I have a couple of intervening criminal matters,

20    and what I'm going to try to do is work them in at a time where

21    we're sort of taking a break.

22         There are four criminal matters.  They're not particularly

23    complicated, so I should be able to knock them out in about

24    45 minutes or so.  Unfortunately, I'm not going to be able to

25    allow you to leave your materials at the tables, so you might
```

1    have to clear them out.  And at that time, maybe since we won't

2    be using the jury then, we can stick them in the jury box so you

3    don't have to take them completely out of the courtroom and bring

4    them back in.

5         So feel free tomorrow, when we do take a break, to just

6    move your materials right over there.  The lawyers that are

7    coming in on those cases will be very, very disturbed to see that

8    there are a lot of people in the courtroom working on a large

9    case, and I will let them know that we're going to get to them on

10   time, and they'll be happy, which is my job.

11        Anything else we need to do?

12        MR. BRENNER:  Nothing for the plaintiff, Your Honor.

13        MR. BATES:  Nothing, Your Honor.

14        THE COURT:  Very good.  Enjoy the rest of your evening.

15        (Proceedings adjourned at 4:53 p.m.)

16

17

18

19

20

21

22

23

24

25

**'**

'15 [1] - 114:10
'everyone [2] - 49:6; 50:21

# 1

1 [1] - 51:13
1,400 [1] - 112:24
10 [2] - 54:3; 56:14
100 [3] - 2:3, 7, 11
106 [1] - 61:14
11 [3] - 43:25; 61:15
11-21 [1] - 22:24
111 [6] - 4:13; 65:23; 66:18, 21; 71:9
12 [3] - 11:20; 82:7; 122:25
12-year-old [1] - 69:8
12-year-olds [1] - 24:21
120 [2] - 3:7; 4:14
122 [4] - 4:12; 48:11, 17, 21
12th [2] - 13:17; 114:10
13-year-olds [1] - 24:21
130 [2] - 122:21; 123:25
14 [3] - 61:14; 63:17
140 [1] - 126:8
15 [1] - 63:17
15-minute [1] - 63:18
150 [1] - 123:25
1520 [1] - 1:21
16 [1] - 54:3
17 [1] - 40:1
1775 [1] - 3:10
17th [2] - 37:18; 39:9
18 [1] - 61:14
1801 [1] - 3:7
19 [3] - 1:5; 4:3; 5:1
190 [4] - 4:14; 119:21; 120:5, 12
192 [4] - 4:14; 119:21; 120:5, 21
193 [4] - 4:14; 119:21; 120:5; 121:12
198 [4] - 4:11; 37:12; 42:1
1998 [1] - 113:4
1:19-cv-00917-RDA-WEF [1] - 1:4
1:30 [1] - 63:18
1:48 [2] - 1:6; 5:2

# 2

2 [3] - 1:7; 50:14; 126:23
2-9-12 [1] - 48:25
20 [3] - 43:25; 44:25; 73:10
20,000 [1] - 112:10
20-3 [1] - 113:16
2003 [4] - 19:15; 113:17, 19, 23
20037 [5] - 1:17; 2:15, 19, 22; 3:3
2007 [2] - 19:14; 20:4
2008 [1] - 19:14
2008/2007 [1] - 19:20

2011 [10] - 19:13; 22:24; 32:15; 37:18;
39:10; 40:1; 46:10; 84:6; 109:21; 123:2
2012 [10] - 32:20; 47:18; 71:7; 82:12;
84:1, 4; 86:21; 109:21; 116:5; 123:2
2013 [1] - 82:21
2015 [11] - 59:3; 60:5; 109:11; 113:20,
23; 114:7; 115:7; 118:1, 22; 119:14
20190 [1] - 3:11
20191 [1] - 3:8
202-536-1702 [1] - 1:18
202-955-1596 [1] - 2:16
202-955-1664 [1] - 2:23
202-955-1974 [1] - 2:19
2023 [1] - 1:5
2024 [2] - 5:1; 20:1
2029 [1] - 1:20
21 [1] - 110:3
213-995-5720 [1] - 1:22
2200 [4] - 2:15, 18, 22; 3:3
22314-5798 [1] - 3:15
23 [1] - 4:9
2300 [1] - 1:16
24 [1] - 15:18
27 [1] - 71:7
271 [2] - 43:25; 44:23
271/20 [1] - 44:22
272 [1] - 43:25
272/21 [1] - 44:2
273/24 [1] - 44:3
27th [1] - 74:4
28 [1] - 10:10
2800 [3] - 2:3, 7, 11
285 [2] - 54:1, 3
2:00 [1] - 63:18
2:02 [1] - 18:8
2:15 [1] - 63:18
2:30 [2] - 63:20, 24
2nd [3] - 2:3, 7, 11

# 3

3 [2] - 50:15; 67:13
30 [3] - 32:7; 63:1; 110:11
305-539-8400 [1] - 2:8
31 [1] - 4:10
318 [2] - 50:10
33131 [3] - 2:4, 8, 12
335 [1] - 51:13
38-plus [1] - 111:1
39 [2] - 110:6, 11
3:00 [2] - 62:18; 63:24
3:01 [1] - 63:8
3:10 [1] - 62:17
3:24 [1] - 63:9
3:26 [1] - 65:11
3:39 [1] - 81:7

# 4

400 [1] - 3:11
401 [1] - 3:15
42 [1] - 4:11
443-584-6558 [1] - 3:16
45 [1] - 128:24
48 [1] - 4:12
4:00 [1] - 63:25
4:30 [2] - 62:8, 16
4:51 [1] - 128:10
4:53 [1] - 129:15

# 5

50 [2] - 64:12; 73:10
5:00 [2] - 62:8, 16

# 6

61 [3] - 122:1, 5; 126:15
610-804-1787 [1] - 2:4
643a [1] - 1:17
66 [1] - 4:13
69 [2] - 110:3, 5
6th [4] - 15:8; 16:4; 35:14; 45:8

# 7

75 [1] - 6:16
77 [2] - 20:16; 29:7
79 [4] - 4:9; 22:19; 23:2, 7
7th [2] - 16:4; 74:4

# 8

80 [1] - 124:2
804-788-8200 [1] - 3:4
81 [3] - 4:10; 31:1, 8
850-585-3414 [1] - 2:12
8:45 [2] - 127:11, 13

# 9

90 [1] - 123:6
90067 [1] - 1:21
95 [1] - 127:10
99 [1] - 4:5
9:00 [3] - 64:25; 65:1; 127:2
9:20 [1] - 128:3
9:30 [5] - 127:8, 14; 128:2, 18
9th [1] - 47:18

# A

**A's** [2] - 124:21; 125:18
**A.F** [1] - 3:6
**ability** [1] - 41:6
**able** [14] - 5:10; 12:15; 18:23; 45:1; 71:16; 93:3; 94:5; 106:24; 107:1; 121:8; 123:10, 18; 128:23
**abrenner@bsfllp.com** [1] - 2:9
**absolutely** [3] - 10:14; 14:11; 37:24
**absolves** [1] - 93:13
**academic** [3] - 16:4; 77:14; 106:11
**academy** [1] - 110:18
**access** [1] - 83:13
**accommodate** [5] - 62:15; 64:1, 5; 126:7; 127:14
**accommodating** [1] - 126:24
**accomplished** [1] - 123:15
**achieving** [1] - 77:14
**Action** [1] - 1:4
**action** [4] - 40:11, 13; 41:16; 89:2
**actions** [1] - 107:20
**activities** [2] - 83:17; 110:12
**activity** [1] - 84:17
**actual** [1] - 39:3
**addition** [2] - 20:25; 42:9
**additional** [4] - 42:18; 43:19; 45:7; 106:10
**address** [10] - 8:3; 11:23; 22:8; 62:13; 67:12; 72:13; 81:5; 90:10; 108:24; 114:18
**addressed** [2] - 81:13, 24
**addresses** [2] - 8:4; 81:12
**addressing** [1] - 80:14
**adjective** [3] - 72:24
**adjourned** [1] - 129:15
**adjust** [1] - 93:8
**adjusted** [1] - 93:8
**administration** [4] - 58:19; 76:9, 23; 77:8
**administration's** [1] - 51:13
**administrator** [6] - 43:21; 110:25; 111:5; 112:7, 11; 124:5
**administrator's** [1] - 112:8
**administrators** [7] - 26:23; 34:22; 58:11, 15, 23; 67:19; 124:1
**admissibility** [1] - 99:10
**admissible** [3] - 33:16, 24
**admission** [1] - 31:5
**admit** [2] - 10:10; 23:1
**admitted** [20] - 4:9-14; 7:7; 23:7; 31:8; 34:1; 41:20; 42:1; 48:15, 21; 55:18; 66:21; 96:16, 19; 99:12; 120:5
**adopt** [1] - 35:23
**advantage** [3] - 41:14; 63:6; 128:17
**advantageous** [1] - 34:17
**adverb** [2] - 73:2, 4
**advisement** [2] - 32:15, 25

**advocacy** [1] - 95:21
**advocate** [1] - 14:21
**affect** [1] - 87:25
**affected** [1] - 41:6
**afield** [1] - 56:13
**afraid** [2] - 73:16; 74:9
**African** [1] - 75:10
**African-Americans** [1] - 75:10
**after-school** [14] - 84:16; 94:25; 105:3, 6, 9-10, 15; 106:2, 4, 10, 14; 107:7
**afternoon** [7] - 19:9; 62:14; 99:21-24; 128:12
**AFTERNOON** [1] - 5:1
**afterwards** [1] - 34:6
**age** [1] - 110:6
**agency** [1] - 90:22
**ago** [4] - 82:8; 109:12; 122:25; 126:2
**agree** [16] - 9:17; 10:9, 12; 11:6; 17:3-5; 23:19, 22; 24:8; 36:2; 52:14; 77:7; 78:4
**agreeable** [1] - 64:23
**agreed** [1] - 7:12
**agreement** [3] - 5:11; 47:15; 128:13
**ahead** [8] - 24:18; 32:11; 52:7; 70:5; 77:2; 87:11; 90:19; 102:3
**aided** [1] - 3:18
**al** [1] - 1:6
**alanderson@bsfllp.com** [1] - 1:22
**alarming** [1] - 103:1
**alerted** [1] - 108:19
**Alexandria** [1] - 3:15
**Alison** [1] - 1:19
**allegation** [19] - 15:3; 21:15; 29:12; 30:3; 89:8; 90:23; 92:5, 13, 15-16, 24; 94:21; 101:21, 25; 102:8; 103:23; 117:18
**allegations** [1] - 93:20
**alleged** [10] - 20:22; 28:23; 84:9, 25; 85:14; 90:20; 94:22; 100:20; 107:25
**allegedly** [2] - 21:13; 29:20
**allow** [8] - 16:13; 83:17, 19; 87:22; 98:16; 101:13; 128:25
**allowed** [1] - 86:22
**almost** [2] - 106:22; 127:7
**ALSTON** [1] - 1:11
**altogether** [1] - 17:19
**Americans** [1] - 75:10
**analysis** [2] - 22:2; 28:16
**ancillary** [1] - 11:16
**Anderson** [1] - 1:19
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:14, 18, 21; 3:2
**Angeles** [1] - 1:21
**angle** [2] - 91:19; 115:19
**Answer** [1] - 61:22
**answer** [10] - 25:5; 50:19, 25; 52:3, 6; 57:24; 61:11; 85:8; 92:7
**ANSWER** [8] - 44:18; 45:6, 15, 17; 50:21; 51:15; 54:7; 61:18

**answered** [3] - 46:4; 64:15; 74:11
**answers** [2] - 44:14; 123:1
**anti** [1] - 15:6
**anti-sematic** [1] - 15:6
**anticipate** [1] - 119:22
**AP** [1] - 79:22
**apologies** [1] - 58:4
**apologize** [3] - 44:20; 104:20; 114:15
**apparatus** [1] - 107:5
**APPEARANCES** [3] - 1:13; 2:1; 3:1
**applicants** [2] - 123:22; 124:1, 11
**appreciate** [3] - 54:25; 126:23; 127:18
**appreciated** [1] - 126:17
**approach** [9] - 6:23; 31:3; 32:9; 35:24; 38:20; 71:12; 87:3; 91:18; 99:7
**approached** [1] - 49:6
**appropriate** [4] - 56:9; 72:14; 99:16; 118:10
**appropriateness** [1] - 7:7
**apps** [1] - 60:15
**April** [1] - 1:5
**APs** [2] - 71:15; 117:14
**area** [9] - 56:11; 57:2, 4; 106:14; 112:4; 116:20; 121:7; 126:10
**areas** [2] - 101:16; 106:13
**argue** [1] - 13:2
**arrest** [3] - 88:9; 91:9; 92:8
**arrive** [1] - 75:1
**Asians** [1] - 75:10
**aside** [6] - 54:12; 84:22; 85:19; 86:7; 96:15, 21
**aspect** [2] - 18:11; 128:7
**aspects** [1] - 60:23
**assault** [1] - 96:18
**assaulted** [1] - 100:20
**assemblies** [1] - 78:3
**assembly** [1] - 76:12
**assess** [1] - 13:16
**assigned** [1] - 30:15
**assignment** [1] - 124:22
**assistance** [1] - 106:10
**assistant** [26] - 22:6, 12, 20; 26:23; 30:15, 20; 43:11; 47:12, 14, 24; 71:11; 72:2; 73:21, 23; 74:15; 80:18; 83:21; 111:16, 18, 20; 112:12, 17; 113:1, 8, 13; 124:15
**Association** [1] - 111:7
**assume** [3] - 15:14; 72:8; 76:16
**assumes** [2] - 29:24; 85:1
**assuming** [1] - 71:23
**assumption** [1] - 26:10
**assure** [1] - 16:15
**at-home** [2] - 20:6; 84:2
**athletic** [1] - 106:11
**atmosphere** [1] - 74:8
**attend** [1] - 112:2
**attendance** [8] - 105:5; 106:3, 15, 18-19; 107:6, 10
**attending** [1] - 102:15

**attention** [2] - 36:1; 55:10
**attentiveness** [1] - 127:19
A▮▮▮▮ [5] - 81:16, 20, 22; 107:18
A▮▮▮ [4] - 4:3, 5; 19:7; 99:19
**authenticate** [1] - 8:4
**authentication** [2] - 9:16, 18
**authenticity** [5] - 6:4; 7:7, 12; 17:18;
38:17
**authority** [3] - 8:13; 85:20; 88:4
**available** [1] - 47:25
**Ave** [1] - 2:22
**Avenue** [4] - 2:15, 18; 3:3, 10
**avoid** [1] - 15:14
**aware** [9] - 40:22; 41:5; 54:5; 55:19;
56:22; 64:6, 8; 115:10; 119:13

## B

**B's** [1] - 124:21
**B.A** [1] - 22:15
**B.H** [1] - 3:6
**B.O** [2] - 56:6, 8
**B.R** [38] - 1:3; 32:18; 45:14, 16; 51:14;
55:3; 56:16, 23; 100:19; 101:21;
102:15; 103:16; 104:2, 18-20; 105:11;
107:22; 108:7, 14, 16, 20; 114:8, 11;
115:8, 13, 20; 116:1, 13; 117:9, 16, 19,
21; 118:6, 16, 20, 23; 119:13
**B.R.'s** [5] - 44:16; 46:10; 108:11, 14;
119:4
**background** [1] - 109:24
**backwards** [2] - 44:20; 105:25
**bad** [1] - 127:15
B▮▮▮▮ [5] - 51:19; 52:12; 72:4; 74:17
**ballpark** [5] - 102:18; 110:1; 112:9;
123:5, 21
**BARAN** [1] - 1:15
**barred** [1] - 95:20
**based** [7] - 33:20; 60:18; 71:23; 91:10;
94:8; 117:18; 119:12
**basis** [1] - 74:2
**basketball** [1] - 24:25
**Bate** [1] - 39:1
**bates** [1] - 95:19
**BATES** [76] - 4:5; 23:4; 26:17; 31:5;
46:23; 48:19; 52:3; 60:1; 61:13; 66:19;
68:16; 70:15; 74:11; 76:25; 79:18;
84:10; 85:1; 87:3, 6, 9, 12, 21; 88:13,
20, 24; 89:2, 10, 14, 20; 90:2; 91:18;
92:4, 11, 15; 93:2, 6, 15, 22, 25; 95:11,
15, 25; 97:17; 98:9, 21; 99:20; 100:1,
18; 101:18; 102:4, 23; 104:20; 105:18;
108:23; 109:1, 6-7, 19; 110:10; 115:17;
119:20; 120:10, 13, 16, 24; 121:12;
122:1, 4, 12; 126:14, 19; 129:13
**Bates** [7] - 2:14; 39:5; 65:9; 96:14;
97:13; 100:5; 126:16
**bears** [1] - 90:12
**beautiful** [1] - 75:23

**became** [3] - 110:25; 111:16; 112:6
**become** [3] - 11:16; 55:19; 113:19
**becoming** [3] - 111:5, 18, 20
**BEFORE** [1] - 1:11
**beforehand** [1] - 15:13
**begin** [1] - 111:15
**beginning** [5] - 23:10; 73:24; 74:3;
81:19; 128:6
**begins** [1] - 63:17
**behalf** [1] - 14:21
**behavior** [2] - 13:19
**behind** [2] - 37:25; 102:11
**believes** [1] - 26:18
**bell** [2] - 49:2; 106:5
B▮▮▮▮ [42] - 29:12; 31:18, 21, 25; 32:5;
34:8; 43:4; 45:20; 47:2, 6, 9, 18, 21-22;
48:1, 4-5, 8, 25; 49:7; 51:5, 23; 52:10;
53:17, 21; 54:18, 22, 24; 56:2; 57:7;
66:14; 67:14; 68:14, 19; 70:11; 71:7;
77:5; 81:12; 82:11; 84:1, 5; 86:2
B▮▮▮▮ [20] - 20:25; 22:15; 42:10; 49:10;
50:1; 66:4; 67:1; 74:5; 83:5
B▮▮▮▮ [2] - 23:15; 104:14
**below** [3] - 79:8; 81:6, 12
**Bench** [2] - 32:12; 90:18
**benefit** [1] - 98:18
**best** [5] - 18:3, 21; 40:20; 57:24; 62:15
**better** [4] - 96:8; 110:19; 127:9
**between** [10] - 5:25; 7:17; 55:3; 62:8,
16; 66:10; 99:2; 107:16; 123:25; 124:5
**beyond** [3] - 125:12, 17, 19
**big** [1] - 96:11
**bigger** [1] - 39:2
**binder** [2] - 31:2; 65:23
**binders** [1] - 120:7
**bit** [12] - 20:22; 54:20; 74:20; 80:25;
87:22; 93:9; 98:1; 105:25; 110:16, 19;
115:18; 119:18
**bitch** [6] - 24:8; 29:13, 21; 30:8, 12
**black** [1] - 49:4
**Blanchard** [5] - 3:9; 12:5; 14:11; 31:9;
32:14
**BLANCHARD** [41] - 12:5, 8, 20; 13:6,
9, 20; 14:3, 5, 15; 15:1, 11, 21; 17:6,
21, 24; 29:24; 31:10; 32:24; 33:2, 22;
34:11, 13; 35:1, 14; 36:2, 7, 10, 13;
38:10, 16, 20; 39:11, 14; 40:18; 42:5;
60:7; 94:9, 12, 18, 25; 95:8
**blank** [1] - 60:14
**blanks** [1] - 86:16
**block** [1] - 18:22
**blocking** [1] - 19:1
**Board** [16] - 5:15; 25:16, 22; 34:22;
37:2; 82:25; 84:24; 85:12; 88:18, 20,
23-24; 91:1; 96:17; 100:6
**board's** [1] - 86:10
**Board's** [1] - 24:11
**BOIES** [4] - 1:20; 2:2, 6, 10
**book** [2] - 22:19; 31:1

**bored** [1] - 110:17
**bothering** [1] - 48:2
**bottom** [8] - 34:14, 20; 66:1, 24-25;
67:11, 13; 79:7
**box** [11] - 36:3; 117:6, 22; 118:6, 11,
24; 119:2, 4-5; 126:2
**boy** [4] - 33:7; 35:21; 112:8; 123:6
**Brassingram** [1] - 54:19
**brave** [1] - 75:14
**break** [12] - 9:1; 19:10; 27:24; 60:3;
62:3, 6; 63:4, 8, 22; 64:11; 128:21;
129:5
B▮▮▮▮ [2] - 22:15; 79:23
**BRENNER** [152] - 4:4; 5:3, 5, 14, 18,
21, 23; 6:5; 8:1, 18, 21, 23; 9:1, 8, 17;
10:24; 11:2, 5, 11, 18; 12:3; 14:4, 8, 16,
19, 24; 16:9, 11, 14; 17:3, 5, 23; 18:4,
25; 19:4, 8; 20:16, 19; 23:1, 8, 11-12;
25:6; 26:3, 20; 28:7; 29:4, 7, 9; 30:2,
13; 31:3, 11, 13; 32:7, 9, 13, 19, 23, 25;
36:11; 37:6, 9, 11; 38:3, 6; 39:1, 5, 15,
20; 41:19, 22, 24; 42:2, 7-8; 44:1, 6, 20,
24; 46:7, 25; 47:11; 48:22, 24; 52:9;
55:6, 8, 23; 56:17, 19; 58:4, 22; 60:4;
61:5, 14, 24; 62:2; 63:3; 64:9, 17, 21,
24; 65:1, 3, 6, 9, 18, 20; 66:17, 22;
68:18; 71:1, 3; 72:5, 21; 73:3, 6; 74:14,
24; 75:20; 77:4; 79:5, 10, 19-20; 80:11,
22; 85:3, 25; 86:14, 20; 95:17, 19, 22;
96:1, 11, 13; 98:12, 14; 100:15; 101:11;
102:1; 108:25; 119:24; 120:2, 7; 122:2;
129:12
**Brenner** [13] - 2:6; 7:15, 25; 10:23;
12:17; 15:12; 16:8; 18:24; 38:24; 57:23;
114:18; 119:23
**Brief** [2] - 38:11; 86:19
**bring** [10] - 20:16; 63:10; 83:20; 89:9;
107:10; 111:8, 19; 121:12; 124:9; 129:3
**bringing** [2] - 9:13; 27:22
**brings** [3] - 26:5; 27:12; 34:24
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**broad** [1] - 53:10
**Bromberg** [5] - 105:20, 23; 106:13;
107:3, 11
**brought** [12] - 18:15; 26:12, 22; 51:20;
55:10; 94:16; 105:7, 13, 15, 20
**brown** [1] - 49:4
**Bruce** [2] - 3:9; 12:5
**bruce.blanchard@ofplaw.com** [1] -
3:12
**buddy** [1] - 16:18
**build** [4] - 112:4, 24; 123:18; 125:11
**building** [4] - 105:5; 106:7, 15; 107:2;
112:23; 115:5; 125:16; 126:3
**built** [1] - 126:7
**bullied** [3] - 28:24; 67:25; 75:6
**bully** [1] - 73:9
**bully-free** [1] - 73:9
**Bullying** [2] - 67:4, 9

**bullying** [36] - 14:1; 23:14, 17, 23; 24:4, 13; 25:8; 28:23; 68:8; 69:14, 19; 70:1; 71:13; 72:7, 12, 17-18, 22, 25; 73:1, 5, 24-25; 74:2; 75:2; 76:13, 20; 77:6, 10, 25; 78:3, 7, 11, 20; 79:22; 81:15

**bunch** [1] - 97:5
**Burton** [1] - 2:21
**burtons@huntonak.com** [1] - 2:23
**bus** [8] - 84:16; 95:1, 3; 96:24; 102:10; 103:22, 24
**buses** [2] - 106:6; 111:8
**bushes** [1] - 102:12
**business** [5] - 7:8; 8:15; 38:15; 126:24; 128:16
**busy** [1] - 78:23
**buts** [2] - 41:1
**BY** [69] - 4:4; 19:8; 20:19; 23:8, 12; 25:6; 26:3, 20; 28:7; 29:4, 9; 30:2, 13; 31:13; 37:11; 42:2, 8; 44:6, 24; 46:7, 25; 47:11; 48:24; 52:9; 55:8, 23; 56:19; 58:5, 22; 60:4; 61:6, 24; 65:20; 66:22; 68:18; 71:3; 72:5, 21; 73:6; 74:14, 24; 75:21; 77:4; 79:10, 20; 80:11, 22; 85:3, 25; 86:20; 99:20; 100:1, 18; 101:19; 102:4, 23; 104:21; 105:18; 109:7, 19; 110:10; 115:17; 120:10, 16, 24; 121:13; 122:4, 12

**C**

**C.K** [4] - 20:23; 21:5; 84:6; 86:22
**C.K.'s** [3] - 16:3, 7, 20
**CA** [1] - 1:21
**cabinets** [1] - 117:4
**cafeteria** [2] - 11:10; 33:13
**campus** [1] - 90:20
**cannot** [8] - 17:9; 18:22; 20:11; 34:15; 61:2; 89:24; 98:18
**card** [1] - 16:8
**care** [4] - 38:15; 124:25; 126:24
**cared** [1] - 125:12
**career** [3] - 42:23; 43:18; 45:20
**careful** [1] - 41:25
**C▮▮** [3] - 104:13; 105:2
**carry** [1] - 114:4
**Carson** [32] - 19:17; 20:6; 23:15; 57:10; 66:14; 68:24; 82:15; 83:2, 12, 16, 19; 84:2; 102:15; 107:23; 109:21; 112:25; 113:6, 20, 22; 114:1, 9, 11; 119:17; 120:18; 122:19; 123:1, 7, 9; 124:1, 4; 125:4; 126:3
**case** [31] - 11:12, 17; 15:18; 16:1; 18:2, 11-12; 33:9; 34:20; 35:6, 9, 20; 37:1; 45:1; 76:22; 87:25; 88:8, 10, 14; 89:3; 92:2; 96:16, 18; 100:14; 107:18; 109:25; 128:7; 129:9
**cases** [3] - 9:13; 78:19; 129:7
**category** [2] - 10:18

**caught** [1] - 13:1
**caveat** [1] - 11:12
**celebrating** [1] - 63:12
**celebration** [1] - 64:2
**Cell** [1] - 3:16
**center** [1] - 63:16
**Century** [1] - 1:20
**certain** [9] - 6:21; 10:9; 53:6; 60:24; 99:9; 106:7; 110:6; 116:21
**certainly** [3] - 14:5; 103:2; 123:16
**cetera** [2] - 68:10; 69:20
**chain** [1] - 82:3
**chains** [1] - 65:25
**chair** [1] - 124:15
**challenges** [1] - 114:5
**chambers** [2] - 96:6, 8
**Chambers** [15] - 84:20; 100:22, 25; 101:1, 23; 103:7; 104:2, 22; 107:13, 16; 108:3, 6, 10, 16, 20
**change** [3] - 61:8; 110:24; 114:3
**changed** [1] - 97:8
**charge** [1] - 73:8
**charges** [3] - 87:19; 92:16, 20
**chatty** [1] - 98:2
**Check** [2] - 80:4; 81:2
**check** [3] - 80:8, 12; 106:23
**checked** [1] - 79:23
**checking** [1] - 96:24
**child** [7] - 28:19, 24; 110:23; 114:6; 124:22, 25; 125:2
**child's** [1] - 43:19
**children** [3] - 110:19; 111:6; 123:14
**Christians** [1] - 64:4
**chuckle** [1] - 18:13
**circumstance** [4] - 9:14; 26:1; 36:20; 62:13
**circumstances** [6] - 37:3; 41:5, 11, 13; 55:2; 90:9
**cite** [1] - 61:13
**Civil** [1] - 1:4
**clad** [1] - 35:4
**claim** [5] - 34:6; 53:1; 55:24; 56:1; 68:13
**claimed** [2] - 69:16; 84:5
**claiming** [1] - 69:20
**claims** [3] - 53:11; 109:25; 115:10
**clarify** [4] - 15:24; 54:23; 56:20; 71:16
**class** [11] - 16:3; 51:6, 14-15, 17, 23; 52:2, 11; 94:23, 25; 95:3
**classes** [1] - 102:15
**classroom** [6] - 47:21; 51:21; 84:20; 103:18; 123:12; 125:1
**clear** [9] - 25:7; 27:11; 42:14; 69:1; 86:7; 98:17; 108:3; 116:6; 129:1
**clerk** [1] - 18:16
**CLERK** [1] - 127:23
**client** [18] - 13:10; 14:5; 15:2; 20:5; 23:18; 33:5, 24-25; 35:9, 15, 20; 36:5; 43:21; 53:8, 13; 90:23

**client's** [2] - 12:10, 21
**clients** [1] - 14:21
**close** [3] - 33:13, 18; 63:3
**closed** [9] - 93:21, 24-25; 94:7; 95:12; 97:10; 98:5; 107:18
**closest** [1] - 63:16
**closing** [2] - 7:3, 21
**club** [1] - 105:3
**co** [1] - 116:25
**co-mingled** [1] - 116:25
**collaborative** [1] - 124:5
**colleague** [3] - 38:15; 86:15; 95:7
**colleagues** [1] - 77:20
**collected** [7] - 10:16; 52:19, 25; 53:16, 18, 20; 118:9
**college** [1] - 110:22
**colleges** [1] - 111:22
**colloquies** [1] - 109:2
**colloquy** [2] - 100:15; 108:25
**colored** [1] - 121:20
**comfort** [1] - 62:3
**comfortable** [1] - 90:7
**coming** [12] - 9:24; 17:13; 36:13; 50:1; 91:17; 110:21; 127:4, 9, 16; 129:7
**command** [1] - 69:10
**comment** [2] - 49:14; 50:19
**comments** [1] - 75:9
**commitment** [1] - 123:9
**common** [1] - 126:9
**communicated** [2] - 18:1; 31:22
**communicating** [1] - 64:8
**communication** [3] - 16:13; 18:1; 46:1
**community** [2] - 75:22; 91:1
**competent** [1] - 12:15
**competition** [1] - 106:12
**complaining** [1] - 43:22
**complaint** [4] - 42:10; 43:3; 46:11; 52:20
**complaints** [2] - 19:20; 52:16
**complete** [1] - 13:2
**completed** [1] - 126:22
**completely** [5] - 59:6; 88:11; 91:7; 92:5; 129:3
**completeness** [2] - 12:25; 13:3
**complicated** [1] - 128:23
**compliment** [1] - 65:13
**composite** [1] - 14:10
**compound** [3] - 27:25; 60:2; 80:9
**computer** [9] - 3:18; 57:14; 58:6, 9, 13, 20; 59:18; 60:13, 17, 19, 24; 61:10; 117:11; 118:2, 14, 16, 20; 119:14
**computer-aided** [1] - 3:18
**concern** [2] - 13:6; 15:13
**concerned** [6] - 10:18; 12:24; 13:9, 24; 33:13; 57:19
**concerning** [3] - 49:20
**concerns** [1] - 28:1
**conclude** [1] - 27:21
**concluded** [2] - 36:15; 99:1

**conclusion** [2] - 26:22; 84:10
**conduct** [5] - 25:13; 34:23; 42:3; 85:21; 104:17
**conducting** [2] - 126:23; 128:16
**conference** [1] - 32:12
**confines** [1] - 37:7
**confirm** [2] - 27:22; 56:10
**confirmed** [3] - 55:11; 86:2, 8
**confused** [2] - 88:12; 94:2; 105:2
**confusion** [3] - 27:25; 37:24; 40:18
**conjunction** [1] - 104:24
**Connecticut** [2] - 111:8
**connection** [1] - 43:3
**conscience** [1] - 20:13
**consequence** [2] - 28:19; 40:17
**consider** [5] - 34:19; 36:19, 21, 25; 78:24
**consideration** [1] - 5:20
**considered** [1] - 41:15
**consistent** [4] - 24:5; 74:2; 75:6; 77:18
**constant** [5] - 72:7, 15-17, 22
**consult** [2] - 86:14
**Cont** [2] - 2:1; 3:1
**contacted** [2] - 45:22; 51:18
**context** [4] - 28:22; 50:14; 71:2; 80:25
**continuation** [1] - 87:6
**continue** [5] - 51:8; 64:13; 102:5; 109:4; 128:6
**CONTINUED** [2] - 4:3; 19:7
**contradict** [1] - 35:22
**controlling** [1] - 94:3
**conversation** [12] - 7:19; 16:13, 22; 18:15; 32:13; 71:15; 86:10; 101:14; 104:23; 107:13
**cooperate** [4] - 84:14; 103:3, 6
**cooperated** [1] - 85:15
**coordinator** [2] - 112:1; 120:14
**copies** [2] - 115:25; 117:13
**copy** [2] - 116:8, 16
**core** [2] - 97:13; 126:8
**Correct** [1] - 61:12
**correct** [109] - 19:16; 20:24; 21:21; 22:1, 14, 17, 22, 24-25; 26:6; 31:17, 19; 32:6; 44:10, 12; 46:12, 15-16, 18-19; 48:6, 10; 49:1, 12, 16, 25; 51:3, 15, 24; 52:18; 55:25; 56:12; 57:11, 14; 58:7-9, 12, 24; 59:3-5; 60:6; 61:22; 66:6; 67:2, 15; 68:2, 7, 12; 70:21, 24; 71:22; 72:9-11; 75:5, 8, 13, 15-16; 76:1, 6, 15; 77:1, 5, 9, 12, 21, 24; 78:2, 6, 9, 13; 79:15; 80:2; 81:10; 82:13, 15-16; 83:5, 13; 84:6; 85:4, 6; 86:11, 23-24; 103:25; 104:1; 107:23; 108:1; 109:22; 110:11; 111:1; 113:24; 114:20; 118:25
**correspondence** [2] - 40:10; 108:14
**counsel** [10] - 12:15; 18:6, 20; 64:8; 86:10; 91:10; 98:13; 99:2; 109:1; 116:11
**Counsel** [3] - 38:8, 12; 89:22

**counseling** [1] - 116:24
**counselor** [4] - 22:16, 21; 48:13; 79:21
**counselor's** [1] - 48:12
**counselors** [4] - 46:11, 14; 73:23; 124:7
**count** [5] - 68:23; 69:15, 20, 24
**counter** [1] - 77:3
**countries** [1] - 112:2
**County** [19] - 8:9; 25:16, 21; 35:10; 37:17; 39:9, 25; 41:17; 60:15; 61:2; 82:25; 83:2; 84:24; 85:11; 100:5; 101:2; 116:11
**couple** [4] - 54:2; 78:4; 122:6; 128:19
**course** [4] - 7:8; 8:14; 99:4, 9
**courses** [1] - 9:15
**court** [5] - 12:15; 56:14; 57:19; 90:15; 96:9
**Court** [13] - 3:13; 12:10, 13; 14:9; 15:5; 33:3; 38:17; 58:1; 60:25; 99:5, 9
**Court's** [3] - 5:20; 11:22; 18:11
**Courthouse** [1] - 3:15
**courthouse** [2] - 63:16, 19
**courtroom** [2] - 129:3, 8
**COURTROOM** [1] - 127:23
**craft** [1] - 34:7
**crafting** [1] - 34:2
**crazy** [1] - 96:4
**creating** [1] - 123:9
**credibility** [3] - 90:8; 91:16; 93:11
**crime** [1] - 87:16
**crimes** [1] - 90:3
**criminal** [6] - 88:8; 90:22; 92:16; 93:13; 128:19, 22
**CROSS** [2] - 4:5; 99:19
**cross** [1] - 87:2
**CROSS-EXAMINATION** [2] - 4:5; 99:19
**cross-examination** [1] - 87:2
**CRR** [1] - 3:13
**crying** [3] - 47:18, 21
**Culpeper** [3] - 127:4, 7
**culture** [1] - 123:10
**custodian** [3] - 7:13; 8:8, 14
**cut** [1] - 125:21
**cycle** [1] - 124:2

# D

**D.M** [2] - 29:11; 55:4
**daily** [1] - 105:5
**data** [4] - 59:8, 12, 16
**date** [8] - 13:20; 22:23; 23:22; 32:17; 84:21; 105:7, 14
**dated** [3] - 37:18; 39:9; 40:1
**daughter** [4] - 23:14; 28:2; 81:14; 102:9
**day-old** [1] - 18:15
**days** [8] - 46:21; 47:2, 6; 62:11; 100:22; 110:23; 127:23, 25

**DC** [5] - 1:17; 2:15, 19, 22; 3:3
**deal** [1] - 18:2
**dealings** [1] - 117:15
**death** [5] - 49:13, 23; 50:24; 52:10
**debate** [2] - 15:10; 77:19
**decide** [2] - 11:17; 92:8
**decided** [3] - 28:13; 29:22; 93:12
**decides** [1] - 92:2
**decision** [2] - 51:14; 124:3
**decision-maker** [1] - 124:3
**deep** [1] - 38:5
**defendant** [4] - 5:7; 9:6; 14:9
**Defendant** [3] - 2:14; 3:2, 9
**Defendant's** [4] - 4:14; 119:21; 120:5, 12
**defendants** [2] - 34:4; 36:24
**Defendants** [2] - 1:8; 3:5
**defending** [1] - 35:5
**defense** [1] - 12:24
**defer** [3] - 46:17; 90:2, 4
**deferred** [2] - 87:16; 90:7
**degree** [2] - 26:1; 72:18
**deliberately** [4] - 91:20, 22, 24; 92:2
**denied** [1] - 33:3
**depart** [1] - 106:6
**Department** [1] - 101:4
**department** [1] - 124:14
**depicting** [1] - 120:17
**deposition** [10] - 43:25; 44:7; 50:9; 51:8, 10; 53:25; 60:10; 61:7, 9, 13
**depth** [1] - 123:7
**describe** [5] - 123:7; 125:14; 126:7
**DESCRIPTION** [1] - 4:7
**design** [1] - 126:3
**desktop** [1] - 115:4
**destroyed** [6] - 59:10; 117:19; 119:2, 6, 8, 14
**detail** [2] - 35:25; 111:4
**details** [1] - 119:18
**Detective** [12] - 101:1, 23; 103:7; 104:2, 22; 107:13, 16; 108:3, 6, 10, 16, 19
**detective** [2] - 101:2
**determination** [4] - 50:6; 91:8; 94:6
**determinations** [5] - 90:8; 91:16; 93:11; 99:6, 10
**determine** [5] - 13:15; 27:19; 28:16; 40:16; 92:1
**determined** [2] - 21:15; 50:4
**determines** [1] - 60:25
**determining** [1] - 30:18
**detour** [1] - 107:9
**device** [1] - 107:3
**dick** [1] - 25:1
**different** [27] - 6:3, 5, 16-17, 22-23; 35:7; 40:19; 46:3; 53:13; 55:17; 73:13; 88:8, 11; 91:11, 19; 95:6, 9; 103:4; 115:19; 120:18; 123:8, 11, 19; 126:4; 127:20

**differently** [1] - 89:18
**difficult** [4] - 45:1; 57:23; 68:5
**difficulty** [2] - 37:25; 62:7
**digest** [1] - 57:24
**diligently** [2] - 64:10; 65:15
**DIRECT** [2] - 4:3; 19:7
**direct** [4] - 41:10; 50:6; 51:1; 88:2
**directed** [3] - 55:12, 14; 88:4
**direction** [2] - 47:13; 127:9
**directly** [2] - 34:5; 108:24
**director** [2] - 67:17; 68:24
**disadvantageous** [1] - 34:16
**disagree** [2] - 72:22; 97:4
**disagreement** [1] - 17:25
**disciplinary** [8] - 12:10, 21; 13:10;
20:14; 32:14; 40:11, 13; 41:16
**discipline** [3] - 10:20; 11:3; 60:22
**disciplined** [1] - 33:6
**discuss** [3] - 18:11; 99:8; 128:7
**discussed** [4] - 42:3; 71:16; 84:20
**discussing** [1] - 82:4
**Discussion** [1] - 120:1
**discussion** [9] - 15:15; 36:15; 71:24;
82:7; 87:5; 90:18; 98:24; 99:1
**discussions** [1] - 11:4
**dislike** [1] - 77:13
**dispute** [2] - 46:22; 50:23
**distinct** [1] - 91:8
**distinction** [1] - 69:4
**DISTRICT** [3] - 1:1, 12
**District** [2] - 3:14
**districts** [2] - 112:3, 5
**distrust** [1] - 77:14
**disturbed** [1] - 129:7
**document** [8] - 7:18; 8:6; 9:16; 13:2;
15:25; 39:24; 79:18; 83:6
**documents** [3] - 5:8; 17:11; 63:4
**done** [12] - 29:1; 41:12; 45:6, 12;
47:12; 48:12; 51:21; 81:23; 87:13;
89:17; 91:13; 115:21
**door** [11] - 87:21; 89:10, 12; 93:10;
94:12, 18; 96:20; 97:17, 19, 22
**doors** [1] - 126:11
**down** [20] - 27:24; 56:10; 57:2; 59:12,
16; 60:21; 62:19-21; 74:25; 80:25; 88:7;
89:1; 103:18; 122:18; 124:14; 127:11,
13
**downstairs** [1] - 121:24
**draw** [1] - 36:1
**drawing** [1] - 69:4
**dread** [1] - 77:17
**drink** [1] - 126:12
**Drive** [1] - 3:7
**drive** [2] - 63:17, 19
**driving** [1] - 96:3
**drop** [1] - 92:16
**dropped** [2] - 87:19; 93:23
**due** [1] - 46:2
**during** [17] - 31:23; 52:19, 25; 63:12;

64:11; 65:14; 71:16; 73:10; 99:9;
100:22; 105:5; 112:3; 122:21; 124:6,
19; 125:7

# E

**e-mail** [31] - 7:6, 16, 22; 8:4; 11:23;
20:23; 21:16, 22; 22:3, 7, 19; 27:18;
65:25; 66:1, 4, 7, 13, 25; 67:1, 12-14,
21; 70:13; 74:6; 79:7, 11; 80:16, 23;
108:14
**e-mails** [22] - 5:8, 13-14, 24-25; 6:12,
16; 7:25; 9:20, 24; 10:1, 19; 16:1, 3, 5;
21:23; 66:8; 79:1; 108:17; 117:13
**early** [4] - 62:14; 64:22; 102:22; 112:10
**easily** [1] - 94:5
**East** [2] - 1:20; 111:6
**Eastern** [1] - 3:14
**EASTERN** [1] - 1:1
**easy** [1] - 68:4
**eat** [1] - 127:25
**eating** [1] - 18:17
**educate** [1] - 77:23
**education** [7] - 83:5; 110:2, 4, 8, 14,
17, 20
**educational** [2] - 116:7
**effective** [1] - 9:12
**effectuated** [1] - 41:17
**eighth** [1] - 114:23
**either** [6] - 13:1; 27:14; 43:11; 69:24;
106:11; 114:23
**electives** [2] - 83:13
**electronic** [4] - 106:18, 20; 107:7
**elementaries** [1] - 45:25
**Elementary** [5] - 39:25; 43:4, 7, 9;
44:16
**elementary** [7] - 45:3, 22; 111:15;
112:12; 123:19
**Elliker** [1] - 3:2
**Email** [12] - 1:18, 22; 2:5, 9, 13, 16, 20,
23; 3:4, 8, 12, 16
**empathy** [1] - 124:25
**employ** [1] - 11:24
**employee** [1] - 114:22
**empowered** [1] - 90:22
**encountered** [1] - 47:18
**encountering** [1] - 23:15
**encourage** [2] - 18:6, 20
**end** [13] - 6:2; 12:3; 18:6; 23:15; 63:18,
24; 82:2; 92:9; 94:17, 20; 126:17;
128:17
**ended** [1] - 100:13
**engaging** [1] - 125:10
**English** [2] - 112:4; 123:24
**enjoy** [2] - 128:9; 129:14
**entail** [1] - 125:20
**entire** [4] - 12:21; 89:3; 108:15
**entirely** [1] - 91:11
**entitled** [2] - 9:6; 97:22

**entrance** [1] - 121:18
**entrances** [1] - 120:18
**environment** [2] - 73:9; 123:14
**equity** [2] - 19:22; 20:8
**especially** [1] - 75:10
**Esq** [11] - 1:15, 19; 2:2, 6, 10, 14, 17,
21; 3:2, 5, 9
**essentially** [1] - 60:25
**establish** [2] - 96:16; 97:2
**established** [1] - 58:11
**estimated** [1] - 5:5
**et** [3] - 1:6; 68:10; 69:20
**evaluation** [1] - 33:19
**evening** [2] - 62:14; 129:14
**event** [1] - 107:25
**evidence** [33] - 6:18; 8:5; 14:6; 17:13;
20:17; 23:24; 26:9; 27:1, 3, 10-11,
22-23; 33:5; 34:3, 15; 35:22; 36:18, 21,
23; 41:15, 20; 52:19, 25; 55:18; 66:18;
76:25; 85:1; 88:21; 89:16, 20; 99:11
**Evidence** [1] - 48:14
**evidentiary** [1] - 99:5
**exact** [1] - 22:23
**exactly** [3] - 10:25; 35:21; 95:23
**EXAMINATION** [4] - 4:3, 5; 19:7; 99:19
**examination** [5] - 38:14; 87:2; 88:2;
97:1; 109:2
**EXAMINATIONS** [1] - 4:2
**examining** [1] - 18:21
**example** [9] - 7:14; 10:11; 13:10;
16:11; 24:8; 25:4; 53:4; 114:24
**except** [1] - 63:3
**exception** [1] - 34:12
**exchange** [1] - 66:13
**exclusively** [1] - 8:21
**excuse** [4] - 7:21; 16:18; 34:23; 84:2
**exhibit** [5] - 6:15; 7:1; 9:10; 31:5;
39:12
**Exhibit** [21] - 4:9-13; 20:16; 22:19;
23:2, 7; 31:1, 8; 37:12; 42:1; 48:21;
66:21; 71:9; 119:21; 120:12; 122:1, 5;
126:15
**exhibits** [12] - 6:7; 9:19; 10:10, 12, 17;
14:9; 17:7, 14, 22; 64:12
**EXHIBITS** [1] - 4:6
**Exhibits** [2] - 4:14; 120:5
**exist** [3] - 28:17; 59:18, 22
**existed** [2] - 34:23; 37:3
**existence** [2] - 8:6; 41:5
**exists** [3] - 55:24; 56:1; 59:10
**exited** [1] - 102:10
**expand** [1] - 123:11
**expect** [2] - 14:14; 68:4
**expectation** [2] - 90:25; 125:8
**expectations** [5] - 84:12; 125:3, 13,
15, 22
**expected** [2] - 68:3; 91:4
**expecting** [2] - 12:14, 18
**expedite** [1] - 65:16

**experience** [2] - 15:17; 77:10
**experienced** [1] - 91:10
**experiences** [1] - 111:9
**experts** [1] - 90:3
**explain** [2] - 35:20; 107:9
**explained** [4] - 6:10; 7:22; 31:18; 32:5
**explanation** [2] - 76:13; 81:23
**explicit** [3] - 26:24; 27:13, 19
**explorers** [2] - 121:9, 21
**extend** [1] - 62:10
**extent** [6] - 18:22; 24:4; 93:11; 101:12; 123:2
**extra** [1] - 64:11
**extracurricular** [1] - 83:17
**eyes** [1] - 124:8

## F

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**face** [1] - 127:3
**Facebook** [9] - 29:13, 17, 19, 22, 25; 30:5, 10-11, 16
**facilities** [1] - 46:2
**fact** [14] - 7:8; 13:13; 22:7; 27:2; 41:15; 50:23; 51:23; 53:15; 59:9, 23; 61:10, 20; 94:7; 98:4
**fact-finder** [1] - 98:4
**facts** [3] - 76:25; 85:1; 91:21
**factually** [1] - 97:4
**Fahey** [1] - 1:15
**failure** [3] - 76:9, 22; 77:7
**fair** [9] - 25:24; 36:4; 50:22; 56:24; 80:24; 83:11; 95:22; 109:16
**Fairfax** [17] - 8:9; 25:15, 21; 37:17; 39:9, 25; 41:17; 60:15; 61:2; 82:25; 83:2; 84:24; 85:11; 100:5; 101:2
**faith** [1] - 63:12
**faiths** [1] - 64:1
**falls** [1] - 24:11
**family** [7] - 66:4; 67:1, 12; 79:7; 92:15; 108:11, 16
**far** [9] - 8:13; 11:14; 15:2; 33:13; 35:24; 47:16; 56:13; 102:19; 103:4
**Farro** [1] - 50:18
**fault** [1] - 49:10
**FCPS** [2] - 11:23; 96:25
**FCSB-BR-009751** [1] - 39:6
**February** [8] - 32:15, 20; 37:18; 39:9; 40:1; 47:18; 82:12; 102:22
**feeders** [2] - 45:25; 46:1
**FELDMAN** [1] - 3:10
**felt** [9] - 56:8; 98:7; 105:1; 107:20; 110:20; 114:2; 123:10; 124:16
**FERPA** [4] - 115:23; 116:4, 6; 118:12
**few** [2] - 109:24; 119:21
**fighting** [2] - 6:23; 8:17
**fights** [1] - 6:21
**figure** [3] - 8:17; 33:23; 37:20

**file** [2] - 10:14; 12:21
**filed** [1] - 115:8
**files** [5] - 10:13, 20; 11:3; 12:10; 105:8
**filing** [1] - 117:4
**fill** [1] - 86:16
**final** [1] - 26:25
**finder** [1] - 98:4
**fine** [8] - 10:14; 16:2; 28:6; 86:17; 90:17; 120:9; 121:25; 122:18
**finish** [1] - 65:7
**First** [1] - 97:4
**first** [35] - 6:11; 12:9; 14:8; 21:21; 23:11; 29:25; 39:10; 40:6; 66:1, 24-25; 67:23; 68:1; 70:22; 71:6; 75:2, 14; 85:8; 100:4; 104:22; 106:2; 107:12; 111:10; 112:7, 11; 121:14; 122:5; 124:13; 125:4
**firsthand** [8] - 50:1; 54:18; 55:13; 56:2, 23; 57:6; 61:9, 20
**firstly** [1] - 25:8
**five** [6] - 46:1; 73:10; 76:20; 77:6; 113:10; 119:7
**FL** [3] - 2:4, 8, 12
**FLEXNER** [4] - 1:20; 2:2, 6, 10
**flip** [4] - 120:14; 121:1; 122:6
**Floris** [4] - 39:25; 43:4, 7, 9
**fluid** [1] - 128:16
**fluidity** [1] - 128:17
**focus** [6] - 23:9; 29:10; 117:17, 20; 122:25; 125:4
**focused** [3] - 93:15
**folks** [7] - 9:5; 103:4; 116:21; 122:2; 124:7, 16
**follow** [10] - 38:24; 41:24; 71:2, 25; 72:1; 88:2; 97:18, 24; 98:7
**follow-up** [5] - 41:24; 72:1; 88:3; 97:24; 98:7
**followed** [1] - 88:3
**following** [6] - 17:20; 44:13; 77:17; 82:20; 88:2
**Following** [2] - 87:5; 96:6
**follows** [1] - 41:10
**FOR** [1] - 1:1
**force** [1] - 14:23
**foreign** [1] - 112:2
**foremost** [1] - 100:4
**forensically** [1] - 118:17
**forever** [2] - 60:20; 61:1
**forgot** [1] - 124:21
**form** [1] - 60:1
**forth** [3] - 5:24; 66:12; 79:2
**forward** [2] - 13:16; 86:21
**foundation** [8] - 6:6; 7:19; 15:11; 26:17; 30:1; 33:9; 35:2, 10
**four** [4] - 19:13; 109:2; 126:8; 128:22
**Franklin** [3] - 112:19, 22
**F████** [21] - 12:4; 14:25; 19:9; 37:12; 39:8; 65:10, 21; 86:25; 89:14; 90:24; 93:16; 94:8; 97:14, 24; 99:14, 21; 100:19; 109:8; 120:11, 17

**F█** [4] - 4:3, 5; 19:7; 99:19
**F██████** [6] - 46:15, 20; 47:1, 5, 7, 13
**free** [3] - 51:19; 73:9; 129:5
**Friday** [5] - 63:14, 24; 64:3
**friend** [3] - 49:8; 56:5
**friends** [1] - 56:8
**front** [4] - 19:23; 47:3; 78:7; 120:11
**full** [1] - 32:4
**fully** [1] - 103:6
**Fulton** [1] - 3:7
**fun** [1] - 73:16

## G

**gail** [1] - 44:18
**Gail** [1] - 45:17
**gamut** [1] - 9:20
**gathered** [2] - 115:22; 116:1
**general** [1] - 72:7
**generally** [6] - 53:7; 110:1; 111:3; 115:24; 122:7, 19
**generated** [2] - 6:12; 8:11
**gentleman** [3] - 64:5; 98:16
**gentlemen** [10] - 18:10; 36:16; 41:9; 62:5; 65:13; 90:16; 99:4; 126:22; 127:18; 128:11
**George** [2] - 111:24
**girl** [4] - 49:8; 69:8; 70:10; 75:15
**girls** [2] - 48:4; 49:3
**given** [1] - 109:25
**goal** [1] - 78:5
**grade** [12] - 13:17; 15:8; 16:4; 32:24; 33:2, 6; 35:14; 45:8; 111:19; 124:22
**grades** [2] - 16:20; 125:2
**graduate** [1] - 112:1
**Grady** [2] - 120:13, 25
**great** [3] - 75:22; 110:16; 128:4
**gross** [1] - 90:12
**group** [1] - 125:18
**grow** [1] - 110:24
**guess** [9] - 11:2, 18; 33:19; 64:17; 73:12; 79:5; 82:3
**guidance** [4] - 22:15, 20; 46:11, 14
**guy** [1] - 73:8
**guys** [2] - 86:7
**gym** [1] - 122:9

## H

**hair** [2] - 49:4
**half** [6] - 89:4, 7-8; 107:16; 112:15
**hall** [1] - 125:9
**hallway** [2] - 47:19, 23
**hallways** [2] - 125:7, 9
**hand** [1] - 106:22
**handling** [1] - 117:8
**handwritten** [2] - 55:11; 58:19

**happy** [10] - 5:11; 8:2; 9:2; 11:19, 21; 34:6; 87:9; 89:11; 129:10
**harassed** [3] - 23:25; 69:17, 21
**harassment** [35] - 19:21; 20:8; 23:14, 18, 23; 24:12; 25:1, 9, 12, 17; 52:16, 20; 53:1, 11; 68:9, 11, 22; 69:2, 14, 19, 23; 70:1, 7, 19, 23; 71:5, 8, 10, 13, 21, 25
**hard** [1] - 74:23
**hardly** [1] - 19:3
**Harlem** [1] - 111:6
**harmony** [1] - 75:23
**hate** [1] - 16:14
**hates** [3] - 48:5; 49:6; 50:22
**head** [2] - 61:18; 83:1
**heads** [2] - 5:3; 18:7
**heads-up** [1] - 5:3
**health** [2] - 76:20; 77:7
**hear** [8] - 19:3; 79:21; 94:24; 96:5; 99:16; 100:2, 10
**heard** [13] - 12:23, 25; 21:2, 4, 13, 16; 26:9, 16, 24; 27:2; 50:2; 70:23; 99:17
**hearing** [5] - 13:22; 17:17; 74:23; 98:19; 99:8
**hears** [1] - 7:18
**hearsay** [3] - 97:6; 101:11; 102:1
**heart** [2] - 68:5; 123:14
**held** [1] - 96:6
**help** [5] - 17:6; 23:13; 39:15; 45:11; 78:19
**helped** [2] - 15:12; 110:18
**helping** [1] - 40:21
**herself** [4] - 21:1, 13; 35:5; 108:20
**high** [5] - 21:18; 45:22, 25; 49:5; 123:19
**highlight** [2] - 67:14, 23
**Hill** [1] - 111:6
**hired** [1] - 124:18
**hiring** [3] - 123:16; 124:3
**history** [1] - 33:20
**hmm** [3] - 69:7; 79:12; 93:5
**hold** [6] - 70:18; 111:11; 112:14, 20; 113:8
**HOLTZMAN** [1] - 1:15
**home** [3] - 20:6; 84:2; 103:22
**homebound** [8] - 82:14, 23; 83:1, 5, 12, 16, 21
**homeschool** [1] - 13:22
**homework** [1] - 124:21
**hone** [1] - 96:9
**honest** [1] - 110:15
**Honor** [65] - 6:3, 24; 9:4, 17-18; 11:7, 12, 19; 12:5; 14:8, 10, 13; 15:23; 16:16; 17:6, 21; 18:25; 20:16; 23:1; 29:7, 24; 31:3, 6; 32:7, 9; 34:2; 35:1, 16; 36:10; 37:6, 9; 38:7, 10, 16; 39:11, 16; 40:23; 41:19; 42:5, 7; 44:1, 4, 20; 48:19, 22; 52:3; 56:17; 61:5; 62:2; 66:17; 86:14; 90:10; 95:12, 17, 23; 96:13; 100:15; 101:11; 102:1; 108:25; 109:1, 6; 122:2;

129:12
**Honor's** [2] - 8:23; 16:23
**HONORABLE** [1] - 1:11
**hoop** [1] - 14:22
**hope** [1] - 19:9
**hopes** [1] - 78:24
**hoping** [1] - 9:8
**horrendous** [1] - 77:10
**hour** [1] - 128:15
**hours** [5] - 26:13, 25; 27:12; 80:7; 109:2
**house** [1] - 121:23
**housekeeping** [2] - 6:1; 63:11
**H████** [12] - 22:12, 20; 66:11; 72:4; 74:17; 80:19, 24; 81:8; 83:4, 10
**H████** [4] - 22:15, 21; 46:14
**hundred** [7] - 6:7; 9:19; 10:17; 17:7, 11, 14; 124:11
**hundred-plus** [1] - 124:11
**HUNTON** [2] - 2:14, 18, 21; 3:2
**hurts** [1] - 78:1

---

**I**

**idea** [4] - 31:20; 78:24; 94:2; 97:12
**identify** [1] - 15:25
**identifying** [2] - 124:10
**imaged** [3] - 114:20; 118:2, 17
**immediately** [2] - 29:2; 51:17
**impact** [1] - 89:23
**impeach** [2] - 44:2
**implicated** [4] - 11:4
**importance** [1] - 103:19
**important** [7] - 52:17; 96:16; 97:2; 98:22; 100:14; 106:1; 108:23
**impossible** [2] - 78:14, 18
**improper** [1] - 98:20
**in-person** [5] - 32:20; 82:12; 84:1; 107:22; 115:20
**in-state** [1] - 112:2
**inappropriateness** [1] - 21:19
**incidences** [1] - 58:25
**incident** [16] - 24:14; 28:23; 33:2, 11, 14, 22; 34:24; 35:2, 21, 25; 53:6, 8; 54:21; 69:22; 70:6; 85:21
**incidents** [4] - 54:22, 24; 55:2, 16
**include** [1] - 12:9
**included** [2] - 12:21; 42:13
**includes** [1] - 6:25
**including** [2] - 68:9; 69:14
**inconvenience** [1] - 62:8
**incorrect** [2] - 72:8; 76:21
**indeed** [2] - 17:10; 105:8
**independent** [8] - 28:25; 84:9, 25; 85:13; 91:4; 96:17, 22; 97:2
**indicated** [3] - 36:17; 91:8; 99:11
**indicative** [1] - 26:15
**indifferent** [4] - 91:20, 22, 24; 92:2
**indiscernible** [2] - 17:22; 60:8

**Indiscernible}** [1] - 98:12
**indiscernible}** [1] - 79:9
**individual** [5] - 33:21; 34:4; 37:4; 45:9; 63:12
**indulgence** [1] - 8:24
**information** [34] - 6:9; 33:18; 34:18; 41:11; 42:18; 45:8, 11; 56:9; 59:9, 12, 15, 25; 60:19; 61:3, 11, 21; 84:12, 18; 85:18; 92:11; 94:8; 95:4; 97:20; 98:4; 99:16; 103:9; 104:24; 116:21; 117:12; 118:3, 6-7; 119:4
**information's** [1] - 42:13
**informed** [6] - 47:22; 63:13; 88:14; 92:24; 98:6; 101:24
**informs** [2] - 89:2; 90:2
**ingredients** [1] - 125:25
**inquire** [1] - 18:25
**inspired** [1] - 64:18
**instances** [4] - 73:1, 5, 7, 10
**instant** [1] - 24:7
**instead** [1] - 16:17
**instruct** [1] - 119:1
**instructed** [1] - 98:19
**instructing** [1] - 36:20
**instruction** [10] - 18:11; 34:3, 9; 36:4, 13, 17; 82:12, 14, 23; 128:5
**instructionally** [1] - 123:17
**intend** [1] - 17:22
**intention** [1] - 14:13
**interact** [2] - 24:20; 83:23
**interaction** [1] - 55:2
**internal** [2] - 5:14, 25
**internally** [1] - 82:5
**interpret** [1] - 12:16
**intervening** [1] - 128:19
**interview** [1] - 124:19
**interviewed** [1] - 54:8
**interviewing** [1] - 43:20
**interviews** [4] - 124:6, 17
**investigate** [9] - 27:7; 29:2; 41:6; 72:13; 74:10; 87:18; 90:23; 91:2; 96:18
**investigated** [3] - 73:22; 90:23; 95:2
**investigating** [3] - 30:4; 89:25; 90:3
**investigation** [46] - 10:14; 27:8; 30:14, 17; 35:17; 42:10, 12, 17, 24; 52:20; 53:1; 84:9, 14, 25; 85:7, 9, 13, 21; 86:1, 6; 87:16, 23, 25; 88:6, 13, 19, 23; 90:2, 7; 91:15; 93:13, 23; 94:7; 95:15; 96:22; 97:10, 25; 98:5; 103:3, 7; 107:21
**investigations** [2] - 30:21; 52:16
**investigative** [3] - 31:15; 90:22
**involved** [3] - 41:5; 54:24; 110:8
**involving** [4] - 33:12; 36:24; 53:8; 115:13
**iPad** [1] - 106:23
**irrelevant** [1] - 92:6
**issue** [15] - 5:6; 9:19; 11:7, 21; 13:9; 15:2; 33:5; 35:7; 37:1; 63:3; 68:1; 87:6; 94:19; 108:23

**issued** [3] - 57:10, 13; 58:6
**issues** [5] - 11:12; 15:6; 81:6, 12, 24
**itinerants** [1] - 122:22
**itself** [1] - 91:1
**IX** [13] - 33:19; 34:20; 84:8; 87:25; 88:10; 89:24; 91:3, 7, 12; 92:1; 93:14; 94:4; 96:16

## J

**J.F** [1] - 3:7
**J.K** [1] - 55:4
**J.O** [25] - 3:9; 29:10, 12, 15, 20-21; 30:4, 7, 24; 31:25; 32:3, 14; 34:6; 37:18; 39:10; 40:3-5, 11, 14; 41:11, 16; 42:4
**J.O.'s** [2] - 31:16; 40:3
**J.S** [1] - 49:8
**J.S.'s** [1] - 49:18
**January** [3] - 71:7; 74:4
**Jay** [1] - 49:17
**J▮▮▮▮** [1] - 30:6
**Jews** [1] - 75:10
**jfahey@holtzmanvogel.com** [1] - 1:18
**job** [5] - 63:15; 114:24; 123:21; 129:10
**Johnny** [1] - 11:8
**join** [1] - 98:24
**jokes** [1] - 125:18
**Jonathan** [1] - 1:15
**Jones** [1] - 11:8
**JOSEFIAK** [1] - 1:16
**JR** [1] - 1:11
**Judge** [6] - 15:1; 64:9; 73:3; 87:10; 89:10; 126:19
**JUDGE** [1] - 1:12
**judge** [4] - 15:17; 61:13; 87:6; 110:23
**jump** [1] - 14:22
**June** [1] - 116:4
**juror** [1] - 18:25
**JUROR** [3] - 19:3; 127:4, 6
**jurors** [2] - 18:22; 63:12
**JURY** [1] - 1:11
**Jury** [4] - 18:8; 62:18; 65:11; 128:10
**jury** [26] - 6:9; 7:20; 35:5; 36:16; 41:9; 63:10; 64:7; 69:6; 80:17; 88:11, 15; 90:14; 91:21; 93:12; 94:1, 5, 11; 98:7; 99:8; 106:3; 118:1; 129:2
**jury's** [2] - 5:10; 64:23
**justifiably** [1] - 57:20

## K

**Keefe** [1] - 2:10
**keep** [12] - 12:4; 17:17, 19; 18:21; 34:15; 52:21; 53:2; 97:13; 116:16; 118:19; 120:7; 122:13
**keeping** [1] - 52:15
**keeps** [1] - 105:4

**kelliker@huntonak.com** [1] - 3:4
**kept** [8] - 7:8; 8:14; 53:4; 116:19, 25; 117:1, 6; 119:8
**Kevin** [1] - 3:2
**key** [2] - 91:21; 116:21
**kid** [3] - 91:23; 110:16, 21
**kids** [3] - 24:19; 106:11; 125:11
**kill** [7] - 48:6; 49:7; 50:5, 22, 24; 51:1
**kind** [5] - 54:20; 64:7; 102:12; 107:3; 110:17
**Kinney** [2] - 3:5; 90:19
**KINNEY** [5] - 3:6; 90:10, 12, 20, 22
**KINNEYR** [1] - 98:24
**kiss** [1] - 106:6
**knock** [1] - 128:23
**knowledge** [9] - 28:10; 50:1; 60:17; 61:10, 20; 108:4; 115:7; 121:8; 123:11
**known** [2] - 92:12
**Kurt** [2] - 82:23, 25; 83:4
**KURTH** [4] - 2:14, 18, 21; 3:2

## L

**L-Ys** [1] - 73:3
**labeled** [2] - 117:5; 119:4
**lack** [1] - 7:19
**ladies** [10] - 18:10; 36:16; 41:9; 62:5; 65:13; 90:16; 99:4; 126:22; 127:18; 128:11
**laid** [2] - 33:9; 95:23
**language** [2] - 24:22; 112:4
**lap** [1] - 57:18
**laptop** [17] - 57:10, 13, 15; 58:6; 59:5, 10, 24; 60:6; 61:23, 25; 114:19; 115:1, 4; 117:13, 20; 118:4, 21
**laptops** [1] - 114:25
**large** [3] - 46:2; 106:23; 129:8
**last** [15] - 9:19; 12:9, 22; 13:21; 16:18; 17:7; 32:13; 80:23; 82:10; 83:25; 86:21; 91:19; 94:24; 119:10; 128:15
**lasts** [1] - 82:17
**late** [10] - 62:13; 95:1, 3; 96:24; 102:22; 103:22, 24; 104:3; 127:15; 128:13
**Laughter** [1] - 18:19
**LAW** [1] - 3:6
**law** [1] - 18:16
**laws** [1] - 116:7
**lawsuit** [1] - 115:8
**lawyer** [3] - 12:23; 74:19; 96:25
**lawyers** [6] - 9:12; 65:13, 15; 99:6, 13; 129:6
**lay** [1] - 30:1
**laying** [1] - 6:6
**learn** [4] - 84:5; 100:19; 101:21
**learner** [1] - 112:4
**learning** [1] - 75:23
**least** [4] - 30:23; 31:15; 42:16; 78:3
**leave** [4] - 61:2; 62:23; 114:1; 128:25

**leaves** [3] - 32:19; 114:23
**led** [1] - 30:21
**left** [7] - 13:11; 14:2; 32:18; 114:11; 115:20; 119:3; 121:21
**legal** [3] - 50:17; 84:10; 115:10
**legitimate** [1] - 11:21
**Lenox** [1] - 111:6
**lessen** [1] - 62:11
**lesson** [4] - 76:19; 77:6; 79:22, 24
**lessons** [3] - 73:24; 79:17, 22
**letter** [16] - 37:17, 23; 38:19; 39:9; 40:22; 41:6, 12; 42:3; 70:6, 20; 71:12, 20-21, 23; 80:15
**level** [6] - 8:19; 21:18; 25:14; 47:13
**levels** [1] - 111:19
**liability** [1] - 93:14
**library** [3] - 96:4, 8
**life** [2] - 50:16; 110:18
**lightly** [1] - 94:16
**likely** [1] - 89:19
**limine** [3] - 12:19; 13:1; 87:7
**limited** [1] - 99:12
**limiting** [6] - 34:2, 9; 36:4, 11, 13, 17
**Line** [8] - 43:25; 50:14; 51:13; 54:3; 61:14
**line** [7] - 34:14, 20; 56:14; 66:13; 67:4, 9
**lines** [1] - 29:11
**list** [8] - 6:14, 24; 9:2, 10, 19; 12:8; 16:2
**listing** [1] - 69:25
**Litchfield** [1] - 111:8
**literally** [1] - 8:3
**litigation** [2] - 99:5, 9
**lived** [1] - 18:10
**LLP** [8] - 1:20; 2:2, 6, 10, 14, 18, 21; 3:2
**locate** [1] - 124:8
**located** [1] - 126:9
**location** [5] - 29:18; 116:23; 117:1
**locations** [1] - 120:19
**locked** [2] - 116:20; 119:5
**locker** [4] - 56:11; 57:2, 4; 75:7
**lockers** [1] - 126:10
**longingly** [1] - 18:17
**look** [27] - 7:20; 9:2; 11:19; 13:15; 16:14; 22:18; 24:14; 30:15, 23; 31:1; 33:4; 38:17, 19; 39:8, 24; 43:24; 45:2; 48:11; 53:25; 65:23; 70:8; 73:13; 84:15, 23; 121:14; 122:1
**looked** [5] - 18:17; 29:22; 54:12; 105:8; 124:13
**looking** [12] - 33:22; 47:24; 71:9; 88:10; 104:25; 106:9; 120:11; 121:3, 6, 16; 122:8; 124:24
**Los** [1] - 1:21
**lost** [5] - 54:20; 59:8; 60:20, 25; 115:15
**loud** [1] - 95:14
**low** [1] - 102:12

**lunch** [5] - 19:10; 20:21; 49:3; 63:22; 127:20
**lying** [4] - 27:14, 20; 28:1; 97:15
**Lynn's** [1] - 49:17

# M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [2] - 19:6; 127:3
**machine** [1] - 3:17
**magnet** [2] - 112:13
**mail** [31] - 7:6, 16, 22; 8:4; 11:23; 20:23; 21:16, 22; 22:3, 7, 19; 27:18; 65:25; 66:1, 4, 7, 13, 25; 67:1, 12-14, 21; 70:13; 74:6; 79:7, 11; 80:16, 23; 108:14
**mails** [22] - 5:8, 13-14, 24-25; 6:12, 16; 7:25; 9:20, 24; 10:1, 19; 16:1, 3, 5; 21:23; 66:8; 79:1; 108:17; 117:13
**main** [4] - 57:14; 58:6; 121:18
**maker** [1] - 124:3
**man** [1] - 8:4
**manual** [1] - 106:18
**March** [7] - 82:19-21; 84:1, 4; 86:21; 102:22
**MARCH** [1] - 5:1
**mark** [1] - 124:16
**marked** [1] - 120:12
**Mason** [2] - 111:24
**material** [1] - 118:12
**materials** [7] - 58:9; 117:19, 21, 25; 118:15; 128:25; 129:6
**math** [3] - 109:15, 17; 111:14
**matter** [4] - 36:24; 63:11; 126:25
**matters** [3] - 65:16; 128:19, 22
**mean** [12] - 7:11, 21; 33:25; 42:22; 56:6; 60:12; 64:13; 77:17; 82:4, 6; 92:18; 109:4
**meaning** [1] - 61:10
**means** [4] - 7:3; 27:11; 31:20; 60:13
**meant** [3] - 21:22; 45:19, 21
**meat** [2] - 18:14, 16
**medium** [1] - 49:4
**meet** [2] - 91:6; 100:23
**meeting** [10] - 71:11; 80:6, 13; 81:6, 8, 13, 25; 102:20
**members** [5] - 81:14; 108:11, 16; 115:6; 122:20
**mentioned** [6] - 90:6; 106:2; 111:14; 113:19, 25; 114:19
**menu** [1] - 127:20
**message** [4] - 26:15, 24; 27:13, 15
**met** [4] - 8:15; 72:2; 74:13; 108:15
**Miami** [3] - 2:4, 8, 12
**MICHAEL** [1] - 3:6
**Michael** [1] - 3:5
**middle** [11] - 24:19; 68:4; 72:12; 110:23; 112:17; 123:8, 18; 125:9;

126:1, 4
**Middle** [14] - 84:2; 102:15; 107:23; 109:21; 112:19, 22-23, 25; 113:20, 22; 114:9, 11; 119:17; 122:19
**might** [9] - 34:19; 36:19; 45:11; 62:11; 77:3; 99:13; 114:18; 124:20; 128:25
**Mike** [1] - 122:23
**military** [1] - 110:18
**Mills** [3] - 82:23, 25; 83:4
**mind** [2] - 64:1; 102:2
**mingled** [1] - 116:25
**minimum** [1] - 33:14
**minus** [1] - 110:5
**minute** [6] - 32:9, 17; 39:22; 62:6; 100:17
**minutes** [5] - 63:6; 76:20; 77:6; 106:13; 128:24
**minutes'** [1] - 63:17
**missed** [1] - 47:3
**missing** [2] - 45:10; 49:16
**misspells** [1] - 49:5
**misspoke** [2] - 21:22; 31:24
**misstate** [1] - 42:22
**misstates** [2] - 60:7; 79:18
**mistakes** [1] - 38:23
**mk@kinneyesq.com** [1] - 3:8
**Mom** [13] - 21:16; 22:2, 6; 56:4; 71:11; 74:13; 81:13; 87:19; 92:20; 93:22; 95:12, 15
**mom** [7] - 5:24; 21:1, 4, 11-12; 27:12; 51:22
**moment** [8] - 75:1, 18; 89:3; 96:11; 98:1; 100:10; 101:20; 122:16
**months** [2] - 49:15; 78:4
**morning** [2] - 17:8; 75:1
**most** [2] - 75:2; 118:11
**mother** [2] - 94:13; 108:15
**motion** [4] - 12:19; 13:1; 33:2; 87:7
**move** [8] - 5:7; 10:10; 14:19; 19:4; 29:5; 42:7; 66:17; 129:6
**movies** [1] - 24:20
**moving** [1] - 47:17
**MR** [274] - 4:4; 5:3, 5, 14, 18, 21, 23; 6:5; 8:1, 18, 21, 23; 9:1, 8, 17; 10:24; 11:2, 5, 11, 18; 12:3, 5, 8, 20; 13:6, 9, 20; 14:3-5, 8, 15-16, 19, 24; 15:1, 11, 21; 16:9, 11, 14; 17:3, 5-6, 21, 23-24; 18:4, 25; 19:4, 8; 20:16, 19; 23:1, 4, 8, 11-12; 25:6; 26:3, 17, 20; 28:7; 29:4, 7, 9, 24; 30:2, 13; 31:3, 5, 10-11, 13; 32:7, 9, 13, 19, 23-25; 33:2, 22; 34:11, 13; 35:1, 14; 36:2, 7, 10-11, 13; 37:6, 9, 11; 38:3, 6, 10, 16, 20; 39:1, 5, 11, 14-15, 20; 40:18; 41:19, 22, 24; 42:2, 5, 7-8; 44:1, 6, 20, 24; 46:7, 23, 25; 47:11; 48:19, 22, 24; 52:3, 9; 55:6, 8, 23; 56:17, 19; 58:4, 22; 60:1, 4, 7; 61:5, 13-14, 24; 62:2; 63:3; 64:9, 17, 21, 24; 65:1, 3, 6, 9, 18, 20; 66:17, 19, 22; 68:16, 18; 70:15; 71:1, 3; 72:5, 21;

73:3, 6; 74:11, 14, 24; 75:20; 76:25; 77:4; 79:5, 10, 18-20; 80:11, 22; 84:10; 85:1, 3, 25; 86:14, 20; 87:3, 6, 9, 12, 21; 88:13, 20, 24; 89:2, 10, 14, 20; 90:2, 10, 12, 20, 22; 91:18; 92:4, 11, 15; 93:2, 6, 15, 23, 25; 94:9, 12, 18, 25; 95:8, 11, 15, 17, 19, 22, 25; 96:1, 11, 13; 97:17; 98:9, 12, 14, 21, 24; 99:20; 100:1, 15, 18; 101:11, 18-19; 102:1, 4, 23; 104:20; 105:18; 108:23, 25; 109:1, 6-7, 19; 110:10; 115:17; 119:20, 24; 120:2, 7, 10, 13, 16, 21, 24; 121:12; 122:1, 4, 12; 126:14, 19; 129:12
**MS** [18] - 6:3, 6, 13, 19, 24; 7:10, 16; 9:18, 25; 10:3, 5, 7, 20; 15:23; 37:24; 38:4, 9; 80:9
**multiple** [1] - 57:5
**Muslims** [1] - 75:11
**must** [2] - 70:8

# N

**name** [16] - 24:2, 7-8; 25:15; 40:4; 54:18; 55:12; 56:2, 23; 57:7; 68:10; 69:20; 70:2; 100:5; 104:12
**name-calling** [1] - 24:2, 7-8; 25:15; 54:18; 55:12; 56:2, 23; 57:7; 68:10; 69:20; 70:2
**named** [1] - 11:5; 42:11; 49:9
**names** [5] - 10:21; 30:5; 53:17, 21; 106:24
**names)** [1] - 73:17
**narrow** [1] - 55:6
**nature** [3] - 17:1; 33:14; 42:4
**nearly** [2] - 78:14, 17
**necessarily** [1] - 91:6
**necessary** [2] - 80:5; 81:3
**need** [29] - 5:6; 6:17; 8:5; 11:10; 15:24; 25:20; 47:7; 57:22; 60:25; 62:7, 11, 13; 64:13; 65:4, 6; 69:1; 80:8, 12; 88:7; 89:1; 91:6; 98:3, 7; 99:7; 101:17; 103:2; 111:3; 129:11
**needed** [3] - 99:15; 103:5; 125:11
**needs** [4] - 5:8; 7:13; 25:17; 99:5
**negligence** [1] - 90:13
**neighborhood** [6] - 64:12; 107:25; 108:8, 12, 17, 21
**Neighborhood** [1] - 111:7
**never** [17] - 14:14; 15:17; 49:5; 68:3, 14; 69:1, 16, 22, 24; 70:6, 12; 79:21; 81:14; 82:2; 110:22; 118:21
**Never** [1] - 110:23
**new** [5] - 47:17; 52:14; 57:9; 95:20; 114:5
**news** [1] - 64:10
**next** [22] - 9:1; 10:18; 23:20; 26:4; 29:6; 51:11; 62:1; 71:10; 75:20; 76:16; 78:25; 79:2, 5; 80:6, 13; 82:10; 102:25; 104:8; 113:12

**nice** [3] - 70:9; 75:22; 99:22
**night** [5] - 9:19; 12:9, 22; 16:18; 17:7
**nine** [4] - 92:5; 109:12; 110:5; 122:24
**none** [1] - 61:19
**normal** [1] - 125:19
**north** [1] - 127:10
**notation** [1] - 33:4
**note** [3] - 34:12; 63:15; 64:7
**notes** [1] - 8:11
**nothing** [13] - 11:8; 13:14; 14:12, 22; 71:24; 91:5, 23; 97:8, 17, 19; 99:17; 129:12
**notice** [14] - 11:13; 33:24; 34:4, 21; 35:10; 36:22; 37:2; 88:14; 89:3-5; 91:12, 19
**notwithstanding** [1] - 71:8
**November** [2] - 20:20; 46:10; 77:19; 84:6; 102:10; 103:17
**number** [10] - 46:2; 62:11; 73:12; 103:21; 106:10; 111:16; 123:4, 15; 125:23
**NW** [5] - 1:16; 2:15, 18, 22; 3:3

## O

**O.B** [6] - 54:19; 55:24; 56:3, 5, 15, 22
**oath** [1] - 44:11
**object** [3] - 34:2; 38:16; 60:1
**objecting** [2] - 9:10; 60:1
**objection** [35] - 8:2; 9:9; 17:18; 23:3; 26:17; 29:24; 31:5, 7, 10; 37:22; 42:5; 46:23; 48:19; 50:17; 52:3; 60:7; 66:19; 68:16; 70:15; 79:18; 80:9; 84:10; 85:1; 100:15; 101:11; 102:1; 108:25; 119:22; 120:2; 122:2
**objects** [1] - 74:19
**obligation** [5] - 84:24; 85:13; 96:17, 22; 97:3
**obligations** [1] - 91:7
**observed** [1] - 75:2
**obvious** [1] - 109:20
**obviously** [3] - 35:23; 83:23; 127:12
**occurred** [12] - 14:1; 28:23; 41:7; 87:24; 88:21; 90:20; 94:22; 102:18; 107:12, 22, 25; 108:21
**October** [4] - 23:16, 18; 32:19; 77:19
**ODIN** [1] - 3:10
**OF** [7] - 1:1, 11; 3:6; 4:3, 5; 19:7; 99:19
**O██** [1] - 30:6
**offensive** [3] - 29:13, 21; 30:9
**offering** [1] - 16:7
**OFFICE** [1] - 3:6
**office** [9] - 19:21; 26:14; 28:24; 48:1, 12; 51:20; 83:21; 101:24; 104:9
**officer** [13] - 14:8; 51:25; 84:13; 87:15; 92:16, 18-19; 93:19; 101:6; 102:20, 24
**Officer** [3] - 84:20; 100:22, 25
**offices** [1] - 20:8
**Official** [1] - 3:13

**officials** [1] - 103:6
**oftentimes** [1] - 99:4
**old** [2] - 18:15
**Olivia** [1] - 54:18
**once** [6] - 45:6, 20; 76:12; 84:12; 106:5, 12
**one** [71] - 5:3, 5; 6:9; 7:18, 22; 9:5, 15, 22; 11:11; 12:13; 14:17; 15:8, 18-19; 16:19; 17:2; 18:18; 20:10; 24:20; 26:22; 27:13; 28:8, 10, 12-13; 29:19; 33:8; 34:16; 36:18, 24; 38:7, 13; 42:23; 44:21; 45:18; 46:1; 47:25; 49:3; 51:11; 53:9; 54:25; 55:24; 63:10, 12; 64:21; 65:25; 71:6; 73:14; 75:22; 79:8; 80:10; 82:10; 83:25; 91:18; 100:22; 103:21; 112:15; 117:14; 121:4, 16; 123:15; 124:21; 125:23; 127:3
**one-and-a-half** [1] - 112:15
**one-sided** [1] - 17:2
**ones** [2] - 54:15; 119:25
**open** [6] - 26:25; 87:21; 90:15; 94:12; 96:20; 97:23
**opened** [9] - 89:10, 12; 93:9; 94:18; 97:18, 23; 113:6
**operating** [1] - 13:21
**opportunity** [3] - 39:8; 96:8; 99:13
**opposed** [1] - 9:13
**options** [1] - 27:15
**order** [3] - 15:7; 97:10, 18
**orders** [1] - 12:16
**original** [1] - 7:24
**otherwise** [1] - 8:3
**outcomes** [1] - 20:3
**outdoor** [1] - 111:9
**outline** [1] - 5:5
**outreach** [1] - 112:1
**outset** [1] - 18:2
**outside** [8] - 83:24; 85:19; 87:16; 91:15; 99:8; 100:20; 101:22; 126:10
**overruled** [1] - 102:2
**Overruled** [1] - 85:2
**overview** [1] - 106:3
**overwhelmingly** [2] - 8:18, 21
**own** [3] - 84:9, 25; 94:6

## P

**P.A** [1] - 22:12
**P.A.H** [1] - 3:6
**p.m** [9] - 1:6; 5:2; 18:8; 62:18; 63:8; 65:11; 128:10; 129:15
**page** [21] - 30:16; 38:4, 7; 39:3, 10-11, 18; 50:10, 14; 51:13; 54:1; 56:14; 66:1, 24-25; 67:6, 23; 79:2, 6; 122:5
**Page** [4] - 4:2; 43:25; 61:14; 67:13
**pages** [2] - 37:25; 122:7
**painted** [1] - 87:12
**painting** [1] - 97:19
**panel** [1] - 124:6

**paragraph** [8] - 23:11, 20; 26:4; 40:6; 67:23; 75:1, 20; 76:16
**pardon** [1] - 85:5
**parent** [4] - 9:20; 21:19; 28:22; 47:15; 106:25
**parents** [3] - 37:18; 81:8, 25
**Park** [1] - 1:20
**part** [16] - 8:9; 12:24; 13:3; 17:12, 14; 29:6; 39:2; 40:14; 42:24; 46:10; 47:3; 50:23; 92:10; 95:2; 122:22
**part-time** [1] - 122:22
**partial** [2] - 42:12
**partially** [1] - 35:4; 72:11
**participate** [2] - 83:17; 126:2
**particular** [14] - 33:14, 20-21; 34:3; 36:20; 40:10, 22; 71:20; 83:5; 85:21; 86:9; 92:23; 103:20; 104:5
**particularly** [2] - 64:2; 128:22
**parties** [2] - 64:10; 87:3
**parts** [4] - 27:24; 29:19; 38:18; 60:24
**passed** [1] - 118:5
**past** [2] - 33:20; 45:3
**pattern** [3] - 13:18; 24:5
**pause** [2] - 38:11; 86:19
**PC** [1] - 3:10
**peace** [1] - 75:23
**pending** [2] - 115:10; 128:8
**Pennsylvania** [4] - 2:15, 18, 22; 3:3
**people** [14] - 6:14; 7:17, 22; 8:12; 11:24; 42:11; 57:6, 20; 74:9; 78:10; 98:25; 125:18; 129:8
**people's** [1] - 64:1
**per** [1] - 74:1
**percent** [1] - 63:1
**perception** [1] - 76:6
**perceptions** [2] - 75:16
**perfectly** [2] - 16:2; 89:11
**performance** [2] - 16:3
**perhaps** [1] - 34:4
**period** [9] - 20:2, 6; 63:13; 75:2; 105:9; 106:4; 107:7, 12, 15
**permanent** [1] - 40:15
**person** [9] - 21:13; 27:1; 32:20; 82:12; 84:1; 107:22; 115:20; 124:8
**personal** [2] - 77:15; 126:24
**personally** [2] - 59:23; 100:23
**persons** [1] - 55:3
**perspective** [3] - 25:4, 25
**persuasive** [2] - 27:1, 3
**pertained** [1] - 115:21
**pertaining** [1] - 116:1
**pertinent** [2] - 54:11, 15
**P██** [9] - 22:12; 80:3, 12, 17; 81:2, 5; 83:4, 8
**phone** [15] - 26:5, 12-13, 16, 22; 27:2, 4, 12, 15; 29:17, 22; 30:15; 43:13, 16; 115:2
**photograph** [1] - 15:8
**photos** [2] - 119:21; 120:2

**phrase** [1] - 117:25
**physical** [21] - 25:14; 68:9, 14, 19, 21-22; 69:2, 14, 19, 22; 70:1, 7, 19, 23; 71:5, 8, 10, 20, 25; 115:25
**physically** [4] - 43:16; 54:5; 69:17, 21
**pick** [4] - 19:12; 62:12; 101:9
**picked** [4] - 51:19; 95:23; 96:13
**picture** [8] - 33:7; 35:4; 87:12; 97:19; 120:15; 121:14, 20
**pictures** [3] - 120:17; 121:1, 6
**pictures-wise** [1] - 121:6
**piece** [5] - 7:6; 30:21; 31:15; 34:3
**pieces** [1] - 30:17
**PITTLEMAN** [1] - 3:10
**place** [8] - 29:25; 34:24; 44:21; 83:14; 114:3; 118:10; 126:16, 18
**placed** [1] - 118:9
**plaintiff** [5] - 5:6; 13:11, 21; 14:2; 129:12
**Plaintiff** [3] - 1:4, 15; 2:2
**Plaintiff's** [10] - 4:9-13; 23:7; 31:8; 42:1; 48:21; 66:21
**playground** [1] - 24:24
**playing** [1] - 24:25
**PLC** [1] - 3:6
**PLLC** [1] - 1:16
**plus** [2] - 110:12; 124:11
**PM** [1] - 1:7
**pod** [6] - 121:4, 7, 9, 21-22; 126:10
**podium** [2] - 19:4; 21:12
**pods** [1] - 121:4
**point** [14] - 6:20; 9:11; 15:16; 34:25; 36:8; 40:17; 54:4; 55:16, 19; 62:7; 69:25; 76:13; 98:7; 110:25
**pointed** [2] - 11:13; 16:23
**Police** [1] - 101:4
**police** [54] - 35:17; 84:22; 85:13, 15; 87:15, 17-18, 23-24; 88:5, 13, 17-18, 20, 22, 24; 89:9, 15, 22, 24; 90:6, 9; 91:5, 15, 23; 92:1, 8, 17-19, 25; 93:12, 15, 18-19; 94:3, 7, 14, 16, 21; 95:1; 96:15, 19-21; 97:9, 14, 25; 101:2
**policies** [5] - 6:25; 9:21; 24:11; 25:7; 85:12
**policy** [4] - 7:3; 25:16, 22; 84:24
**portal** [2] - 59:19
**portals** [4] - 59:13, 15, 22; 60:15
**Porter** [2] - 44:18; 45:17
**portions** [1] - 17:16
**position** [10] - 15:24; 112:7, 14, 20; 113:9, 12; 114:1; 124:16; 125:19
**positions** [4] - 111:4, 11-12; 112:16
**postdate** [1] - 13:11
**posting** [1] - 30:5
**postretirement** [1] - 110:12
**posts** [4] - 29:13, 21; 30:10
**Potbelly** [2] - 127:24
**potentially** [1] - 117:18
**prayers** [1] - 64:15

**pre** [1] - 32:21
**precise** [1] - 101:15
**preclude** [1] - 91:6
**precluded** [3] - 92:22, 25
**predicate** [2] - 33:19; 101:14
**prejudicial** [4] - 34:13; 35:16; 36:3, 7
**prepared** [2] - 97:18; 126:1
**prerequisites** [1] - 8:15
**present** [3] - 28:23; 99:15
**presented** [2] - 65:16; 84:18
**preserved** [3] - 59:25; 61:11, 21
**pretty** [5] - 24:9; 26:9; 75:14; 77:18, 22
**previous** [1] - 79:6
**principal** [40] - 8:8; 13:14; 22:13; 26:23; 30:15; 33:20; 43:9, 11; 44:18; 45:5, 17; 47:12, 14, 25; 57:10; 67:16; 68:23; 69:10; 70:10; 73:19, 23; 74:15; 75:15; 80:18; 109:15, 21; 111:17, 20; 112:12, 17; 113:9, 12-14, 20, 22; 114:1; 119:3
**principals** [9] - 22:6, 20; 30:20; 71:11; 72:2; 73:21; 74:13; 124:15
**printed** [1] - 117:11
**probable** [2] - 88:9; 91:10
**probative** [1] - 36:3
**problem** [6] - 6:2; 11:20; 16:19; 18:2; 21:25; 88:1, 5; 90:4; 91:14; 127:1
**problematic** [1] - 110:16
**problems** [1] - 23:14
**proceed** [3] - 37:6; 44:4; 65:18
**proceeding** [1] - 96:6
**Proceedings** [2] - 3:17; 129:15
**proceedings** [2] - 38:11; 86:19
**PROCEEDINGS** [1] - 1:11
**process** [7] - 73:25; 106:4; 107:10; 117:24; 123:16; 124:5; 127:19
**produced** [3] - 3:17; 11:2; 116:17
**professional** [1] - 16:15
**program** [3] - 82:23; 83:1; 106:2
**programs** [4] - 106:11; 112:1, 4; 115:5
**promise** [2] - 14:13; 65:21
**promised** [1] - 73:9
**promoted** [1] - 113:11
**prong** [1] - 91:20
**proper** [1] - 40:5
**proposal** [1] - 77:22
**propose** [1] - 44:2
**protect** [1] - 98:22
**prove** [1] - 35:9
**proven** [1] - 23:24
**proves** [1] - 35:10
**provide** [8] - 58:23; 72:13; 83:13; 103:9; 110:19; 116:7; 124:19, 22
**provided** [3] - 29:17; 84:15; 85:19
**provocative** [3] - 33:15; 34:19; 35:3
**Public** [4] - 37:17; 39:9, 25; 41:17
**publish** [8] - 20:17; 23:1, 6; 31:11; 41:22; 48:22; 120:3
**publishing** [1] - 41:20

**pull** [7] - 23:11; 30:16; 59:16; 106:24; 119:20; 120:21; 126:14
**pulled** [1] - 59:12
**pulling** [1] - 30:17
**purpose** [3] - 34:1; 36:18
**purposes** [4] - 5:17; 36:21; 80:17; 99:12
**pursuant** [2] - 85:18; 89:23
**put** [14] - 10:11; 14:10; 18:6; 35:6, 18; 38:7; 39:2; 54:12; 63:19; 84:22; 117:21; 118:5; 122:18; 123:24
**Put** [1] - 96:15
**puts** [2] - 36:4; 76:13
**putting** [4] - 60:15; 84:22; 86:7; 96:21
**pyramid** [1] - 45:23

**Q**

**qualify** [1] - 124:16
**QUESTION** [10] - 44:15, 19; 45:1, 14, 16; 50:16; 54:4; 61:17, 19
**questions** [15] - 11:25; 25:2; 36:9; 38:23; 43:4; 44:13; 54:2; 100:8; 109:5, 24; 114:17; 117:18; 122:24; 123:1; 124:19
**quick** [3] - 56:12; 82:10; 106:3
**quickly** [1] - 121:2
**quiet** [1] - 49:8
**quote** [4] - 26:24; 48:5; 50:21, 23

**R**

**Rachel** [30] - 19:17; 20:6; 23:15; 57:10; 66:14; 68:24; 82:15; 83:2, 12, 16, 19; 84:2; 102:15; 107:23; 109:21; 112:25; 113:6, 20, 22; 114:1, 9, 11; 119:17; 120:18; 122:19; 123:1; 124:1, 4; 125:4; 126:3
**racist** [1] - 75:9
**raise** [2] - 87:9; 100:11
**raised** [2] - 93:17; 114:17
**raising** [2] - 13:6; 68:1
**Ramadan** [1] - 64:5
**ran** [1] - 82:23
**rang** [1] - 49:2
**rape** [9] - 84:9, 25; 85:14; 87:14; 89:8, 16; 90:20; 94:21; 101:22
**raped** [4] - 84:6; 100:20; 102:9, 12; 108:7, 11, 17, 21
**rapist** [2] - 89:17; 91:23
**rather** [1] - 100:14
**Rawari** [1] - 87:7
**rbates@hunton.com** [1] - 2:16
**RCMS** [4] - 67:4, 9; 78:14, 17
**RDR** [1] - 3:13
**reached** [1] - 64:11
**reaching** [1] - 70:10
**react** [2] - 11:14

**read** [8] - 12:15; 15:7; 67:22; 78:16, 23; 79:19; 80:25; 81:1
**reading** [2] - 51:8; 74:25
**reads** [1] - 72:16
**real** [4] - 11:20; 18:1; 89:23; 128:1
**reality** [1] - 78:8
**realize** [1] - 118:4
**really** [9] - 13:4; 15:19; 18:14; 56:12; 63:3, 15; 73:3; 123:9; 127:18
**reason** [5] - 28:1; 41:18; 46:22; 93:7; 99:14
**reasonable** [2] - 34:21; 77:22
**reasonably** [2] - 12:1, 16
**reasons** [2] - 106:8; 114:23
**received** [6] - 17:10; 76:19; 77:6; 84:12; 87:13; 98:5
**recognize** [3] - 34:18; 72:18; 121:2
**recollection** [2] - 20:21; 23:17
**record** [29] - 7:12; 11:9; 17:13; 21:21; 23:7; 31:8; 32:14; 34:11; 38:7; 39:2, 5; 40:15; 41:11; 42:1, 14, 17; 48:21; 56:12; 66:21; 87:5; 95:4; 96:7; 98:22; 99:2; 119:13; 120:1, 6
**records** [25] - 8:8, 11, 14; 19:23; 52:15; 60:22; 107:6; 115:21, 25; 116:7, 10, 16, 19-20, 25; 117:1, 10, 15; 118:2, 11-12; 119:5
**recreation** [1] - 83:24
**redaction** [1] - 29:11
**reduce** [1] - 58:19
**reference** [8] - 40:3; 56:15; 70:19; 71:20; 97:9; 105:15
**referral** [1] - 39:21
**referred** [1] - 40:5
**referring** [4] - 105:14, 19
**reflect** [1] - 96:7
**reformulate** [1] - 77:2
**refresh** [2] - 20:21; 23:17
**regard** [12] - 17:14; 34:23; 36:20; 37:3; 41:12; 43:21; 83:4; 98:23; 117:24; 118:16, 23
**regarding** [15] - 28:2; 35:25; 39:10; 40:11; 41:11, 13-14; 42:4; 53:16, 20; 55:2; 66:13; 71:24; 92:25
**regardless** [1] - 85:12
**regards** [1] - 99:10
**regular** [3] - 7:8; 8:14; 123:21
**reimage** [4] - 59:8; 60:11, 14; 115:4
**reimaged** [2] - 59:6; 60:18
**reimaging** [1] - 60:18
**relate** [1] - 107:11
**related** [8] - 9:14; 38:23; 40:10; 117:9, 19, 21; 118:19; 119:13
**relationship** [1] - 35:4
**relationships** [2] - 123:18; 125:11
**relay** [1] - 108:16
**relayed** [2] - 103:14; 104:23
**relaying** [3] - 108:4, 6, 10
**relays** [1] - 104:7

**relevance** [4] - 7:20; 8:2; 10:22; 11:21
**relevant** [6] - 11:15; 13:18; 15:3; 33:8, 10; 36:25
**religious** [1] - 64:17
**rely** [1] - 96:18
**remaining** [2] - 117:13; 118:8
**remember** [17] - 20:23; 21:8, 10, 17, 19; 22:4; 38:12; 42:25; 73:9; 78:25; 79:16, 24; 83:9; 102:18; 112:6; 113:3; 128:5
**remind** [1] - 32:17
**remove** [1] - 118:1
**repeat** [5] - 47:3; 52:8, 22; 53:18; 100:11
**repetitive** [3] - 25:13, 17, 21
**rephrase** [4] - 26:19; 46:24; 68:17; 108:5
**reply** [3] - 80:4; 81:2, 23
**report** [19] - 16:7; 20:7, 14; 49:20; 50:18-20; 51:14; 68:25; 69:1, 5, 15-16; 71:5, 8; 87:14; 108:7, 11, 20
**reported** [7] - 3:17; 19:21; 49:14; 68:14, 19; 69:22; 70:6; 74:1; 84:19; 94:21
**REPORTER** [3] - 58:2; 98:11, 13
**reporter** [3] - 56:14; 57:19; 96:10
**Reporter** [2] - 3:13; 58:1
**reporting** [5] - 49:23; 68:21, 23; 69:3; 73:25
**reports** [4] - 20:3; 55:17; 58:20; 75:6
**represent** [1] - 100:5
**representative** [1] - 105:16
**republish** [1] - 29:7
**repurpose** [1] - 59:7
**repurposed** [1] - 115:5
**request** [6] - 116:7, 10, 12, 14, 17; 128:12
**requested** [2] - 83:18, 20
**requests** [1] - 103:15
**requirement** [1] - 9:15
**requires** [2] - 25:12; 84:8
**reserved** [1] - 15:7
**resolve** [3] - 52:1, 10; 63:7
**resolved** [1] - 12:1
**resolving** [1] - 51:24
**resource** [2] - 51:25; 101:6
**respect** [4] - 12:17; 125:23
**respond** [2] - 79:25; 116:14
**responding** [1] - 82:2
**response** [8] - 9:9; 30:24; 31:16; 46:10; 74:5; 75:17; 80:3, 15
**responsibility** [6] - 14:21; 85:20; 91:4; 92:10; 94:3; 117:14
**responsible** [1] - 89:23
**responsibly** [1] - 93:14
**rest** [3] - 49:8; 128:9; 129:14
**Reston** [2] - 3:8, 11
**result** [3] - 87:24; 91:16; 97:24
**results** [1] - 88:13

**retain** [1] - 53:10
**retained** [4] - 60:19, 22, 24
**retire** [2] - 109:10; 118:8
**retired** [25] - 59:3, 5, 24; 60:5; 96:8; 109:8; 110:5; 113:20; 114:7; 115:7, 11; 118:1, 5; 119:15; 122:24
**retirement** [4] - 110:12; 113:25; 114:19; 115:1
**retires** [1] - 114:23
**retrieve** [2] - 27:20; 28:20
**review** [3] - 53:23; 58:24; 124:13
**reviewed** [4] - 53:15, 19; 54:13, 17
**REWARI** [18] - 6:3, 6, 13, 19, 24; 7:10, 16; 9:18, 25; 10:3, 5, 7, 20; 15:23; 37:24; 38:4, 9; 80:9
**rewari** [2] - 17:17; 38:14
**Rewari** [1] - 2:17
**ride** [1] - 106:6
**rides** [1] - 106:6
**ridiculous** [1] - 75:9
**righty** [1] - 58:3
**rings** [1] - 106:5
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:13
**road** [3] - 88:7; 89:1; 112:25
**roadblock** [2] - 9:7; 12:12
**roadblocks** [1] - 45:7
**Robert** [2] - 2:10; 3:7
**role** [1] - 112:11
**roll** [1] - 74:20
**room** [2] - 116:20; 119:5
**ROSSIE** [1] - 1:11
**round** [1] - 77:17
**rude** [1] - 73:17
**rule** [4] - 8:5; 12:25; 13:3; 95:19
**ruled** [4] - 12:11; 32:16; 33:16; 97:8
**Rules** [1] - 48:14
**ruling** [4] - 15:7; 93:9; 97:12, 14
**rulings** [1] - 14:11
**rumors** [2] - 31:18; 32:5
**run** [4] - 5:24; 9:20; 78:19; 127:14
**running** [1] - 45:7
**rush** [1] - 63:21
**Ryan** [2] - 2:14; 100:5
**résumé** [1] - 111:4
**résumés** [1] - 124:14

---

## S

**S.T** [2] - 3:6; 22:7
**sad** [4] - 76:5-7; 78:8
**safe** [2] - 123:10; 125:9
**sake** [1] - 71:23
**sandwiches** [1] - 18:18
**sanitize** [1] - 34:15
**sat** [3] - 26:13, 25; 124:7
**satisfied** [1] - 42:20
**satisfy** [1] - 15:12
**saved** [2] - 58:9; 59:9, 25

**saw** [2] - 54:7; 128:17
**scanner** [1] - 107:5
**scanning** [1] - 107:3
**scared** [1] - 73:15
**scenario** [2] - 124:20, 24
**scenarios** [1] - 124:20
**SCHILLER** [4] - 1:20; 2:2, 6, 10
**School** [37] - 5:15; 24:11; 25:16, 21; 34:22; 37:2; 39:25; 41:17; 43:4, 7, 10; 44:17; 82:25; 84:2, 24; 85:11; 88:18, 20, 23-24; 91:1; 96:17; 100:6; 102:15; 107:23; 109:21; 112:19, 22-23; 113:1, 20, 22; 114:9, 11; 119:18; 122:20
**school** [153] - 6:25; 7:17; 8:12, 19-20; 9:24; 10:2; 11:24; 13:11, 22, 24; 14:2; 19:14, 20; 21:11; 24:19; 27:19; 32:19; 34:4, 24; 35:18; 37:2; 40:19; 41:7; 42:24; 43:20; 45:3-5; 46:12, 21; 47:1, 5, 19; 48:8; 51:5, 25; 52:1, 10, 19-20, 25; 53:1, 4, 10, 16, 20; 57:7, 11, 13, 18; 58:6, 11, 14, 23; 59:3, 5; 60:21; 67:16; 68:4, 9; 69:11, 14-15, 19; 72:6, 8, 12, 17, 19; 73:10, 15; 74:9; 75:1, 22; 76:2; 78:20; 83:14, 23-24; 84:8, 16-17, 23-24; 86:3-5, 9-10, 23; 87:17; 88:15; 89:17; 91:20; 92:10, 20; 94:25; 95:2; 96:17; 100:21, 23; 101:6, 22-23; 103:5, 15, 17, 22; 104:3; 105:3, 6, 9-10, 15; 106:2, 4-5, 7, 10, 14; 107:1, 7, 17; 108:15; 109:10; 110:23; 112:12, 17-18, 25; 114:2, 23; 115:2, 8, 11; 116:14, 16; 117:9; 118:23; 123:5, 19; 124:9, 12; 125:9, 12; 126:1
**school's** [3] - 46:10; 52:15; 89:2
**school-issued** [2] - 57:13; 58:6
**schoolers** [2] - 123:18
**schooling** [2] - 115:20, 22
**schools** [8] - 45:22, 25; 111:16; 119:6; 123:8; 126:4
**Schools** [3] - 37:18; 39:9, 25
**science** [2] - 109:17; 111:14
**science/art** [1] - 112:13
**scores** [2] - 59:16; 118:12
**Scott** [2] - 2:21; 3:13
**scottwallace.edva@gmail.com** [1] - 3:16
**screen** [1] - 120:11
**scroll** [1] - 67:11
**SE** [3] - 2:3, 7, 11
**search** [1] - 118:3
**searches** [1] - 117:12
**seat** [2] - 18:9; 65:12
**second** [13] - 39:11, 18; 44:21; 66:23; 67:23; 69:10; 70:18; 82:10; 84:23; 107:13; 120:14; 124:17; 125:10
**seconds** [1] - 32:7
**section** [1] - 82:10
**sections** [1] - 65:21
**see** [36] - 13:17; 15:11; 18:23; 19:2; 26:24; 33:8; 38:10; 49:11; 52:6; 56:20;

63:7; 66:2; 67:4, 9; 68:6; 71:21; 75:4, 12, 17; 76:13; 79:2, 23; 80:4, 14; 81:2, 6; 101:23; 107:1; 120:22; 121:20; 122:10; 128:2, 13; 129:7
**seeing** [1] - 20:13
**seek** [1] - 93:11
**seem** [2] - 6:23; 109:20
**sees** [1] - 14:11
**sematic** [1] - 15:6
**send** [2] - 13:2; 51:14
**sending** [2] - 17:12; 68:23
**sends** [2] - 13:3; 51:5
**sense** [2] - 19:19; 73:8
**sent** [14] - 8:12; 12:9, 22; 20:8; 21:14; 33:7; 51:15, 17, 21, 23; 52:2, 11; 108:15
**sentence** [2] - 29:10; 72:16
**separate** [1] - 91:7
**separately** [1] - 79:25
**serious** [1] - 89:16
**service** [1] - 64:17
**services** [6] - 63:14, 23; 67:17; 68:24; 116:24
**SESSION** [2] - 1:7; 5:1
**set** [8] - 12:11, 13; 101:13; 102:14; 124:17; 125:3, 13, 15
**setting** [2] - 83:15; 85:19
**settle** [1] - 127:10
**settles** [1] - 127:13
**seventh** [1] - 40:5
**several** [2] - 55:2, 17
**severely** [1] - 67:25
**sexual** [23] - 19:21; 20:8; 23:14; 24:11, 13; 25:1, 9, 12, 16; 42:4; 52:16, 20; 53:1, 11, 17, 21; 54:18; 55:12; 68:9; 69:19; 70:1; 71:13; 96:18
**sexually** [8] - 23:24; 26:24; 27:13, 18; 33:15; 35:3; 100:20
**shadow** [1] - 46:11
**shadowed** [1] - 47:6
**shadowing** [2] - 47:1, 9
**share** [2] - 64:7; 78:11
**shield** [1] - 88:14
**shielding** [1] - 91:21
**shoot** [2] - 62:3, 16
**shortages** [1] - 123:24
**shortening** [1] - 35:19
**shorthand** [1] - 3:17
**show** [5] - 13:18; 15:13; 33:7; 38:8
**sic** [3] - 21:16; 31:21; 122:23
**sic]** [1] - 112:10
**side** [4] - 8:17; 19:3; 34:16; 89:15
**sidebar** [1] - 87:5
**Sidebar** [2] - 36:15; 99:1
**sided** [1] - 17:2
**sign** [1] - 26:25
**sign-off** [1] - 26:25
**significance** [1] - 94:6
**significant** [1] - 15:19

**similar** [3] - 117:1; 127:9
**simple** [3] - 16:12; 52:5; 93:19
**simpler** [1] - 9:13
**simplest** [1] - 38:22
**simply** [2] - 17:13; 62:14
**sing** [1] - 14:17
**single** [5] - 20:7; 24:7, 14; 78:8; 119:13
**sit** [4] - 20:4; 28:14; 124:14
**sites** [1] - 60:21
**situation** [6] - 9:15; 25:18, 23; 29:2; 41:14; 62:13
**six** [1] - 45:25
**sixth** [5] - 32:24; 33:2, 5-6; 111:21
**slightly** [2] - 91:19; 97:22
**slip** [1] - 12:18
**slow** [1] - 74:20
**slut** [1] - 24:9
**small** [2] - 11:12; 112:23
**smelled** [1] - 18:16
**smoked** [2] - 18:14, 16
**sneak** [1] - 14:12
**snitch** [1] - 73:17
**so..** [1] - 114:10
**social** [1] - 123:25
**someone** [17] - 5:8; 7:6; 10:15; 21:6, 14; 27:7; 28:14; 34:19; 49:7, 18-19; 50:22; 59:18; 70:9; 97:7; 99:23
**sometime** [1] - 63:22
**sometimes** [7] - 24:21; 54:8; 57:23; 58:12, 15; 59:1
**somewhat** [1] - 93:10
**somewhere** [3] - 64:12; 102:22
**Sona** [1] - 2:17
**Sorry** [1] - 90:19
**sorry** [37] - 5:18; 7:11; 8:7; 10:3; 21:24; 25:3; 30:8; 32:1; 43:14; 44:15; 47:20; 48:16; 56:6, 15; 57:21; 59:14; 60:1; 67:6; 70:5; 71:1; 73:23; 74:21, 23; 78:15; 80:15; 86:3; 94:24; 95:14; 98:13; 101:1; 102:9; 105:17; 113:12; 121:7; 125:14; 126:11
**sort** [18] - 18:13; 42:9; 64:2; 70:16; 116:25; 128:21
**sound** [3] - 22:10; 110:11; 123:17
**sounds** [1] - 22:11
**speaking** [4] - 38:12; 110:1; 111:3; 115:24
**specialist** [3] - 105:4; 106:14; 115:3
**specific** [9] - 13:7; 17:16; 84:19; 85:16; 94:21; 103:14; 116:22; 126:10
**specifically** [6] - 33:17; 45:14; 56:4; 81:13; 117:17
**speculation** [2] - 46:23; 68:16
**speeding** [1] - 33:12
**spend** [2] - 64:14; 114:5
**spitting** [1] - 11:9
**spoken** [1] - 107:10
**spun** [1] - 13:12
**Square** [1] - 3:15

srewari@huntonak.com [1] - 2:20
SRO [1] - 101:6
SRS [1] - 79:22
staff [12] - 55:3; 69:2, 4; 81:14, 24; 110:23; 115:6; 117:15; 122:20; 125:5, 24
Stafford [1] - 127:6
stage [1] - 102:14
stairwell [1] - 121:18
stamp [1] - 39:5
stand [3] - 19:3; 90:16; 99:14
standard [4] - 88:8, 10-11; 91:11
standpoint [1] - 91:12
start [14] - 19:13; 23:9; 44:22; 50:14; 61:15; 66:23; 100:13; 101:12; 122:9; 127:14; 128:3, 18
started [7] - 19:15; 23:18; 42:25; 44:21; 94:19; 110:3; 123:9
starting [2] - 64:21; 127:1
starts [3] - 29:10; 65:25; 67:24
state [4] - 38:6; 98:4; 102:2; 112:2
statement [22] - 7:3; 10:16; 11:6; 20:20; 21:1, 9-10; 22:24; 29:14, 16; 30:23; 31:22; 32:4; 48:8, 12, 15, 25; 49:16, 18; 56:1; 68:10, 14
statements [36] - 9:20; 10:3, 7, 13; 11:5; 13:10; 53:4, 11, 16, 19, 24; 54:5-8, 11, 16; 55:9-11, 18, 20; 56:4, 10, 23; 57:6; 58:12, 15-16, 18, 24; 118:19, 21, 23
STATES [2] - 1:1, 12
States [1] - 3:14
states [1] - 71:10
stationed [1] - 101:7
stay [8] - 37:7; 86:4, 22; 101:15; 105:2; 106:7, 11; 128:13
stayed [10] - 49:8; 103:17, 24; 104:3, 5, 10, 14; 105:3; 106:25
step [4] - 43:19; 62:19
stepped [1] - 21:12
steps [1] - 34:22
stick [2] - 122:5; 129:2
still [8] - 13:23; 26:16; 59:22; 65:4; 71:6; 82:14; 110:8
stipulate [2] - 37:19, 23
stipulated [1] - 41:10
stipulation [2] - 15:19; 17:10
stipulations [4] - 16:17, 24; 17:1; 64:12
stop [16] - 47:1, 6, 9; 57:19; 62:8; 78:19; 88:3, 18, 23; 89:24; 100:24; 102:11; 106:16; 123:20; 126:17, 19
stopped [5] - 20:5; 46:21; 82:11; 95:12, 15
stories [2] - 73:16; 78:10
story [6] - 78:11; 89:5, 7-8, 15; 101:9
strategy [1] - 35:23
streamline [1] - 9:12
Street [4] - 1:16; 2:3, 7, 11

strengths [1] - 124:9
stretch [2] - 90:17; 94:11
strong [2] - 125:8, 11
struggle [3] - 55:5; 72:15
stuck [2] - 12:2; 127:15
student [61] - 9:20, 24; 10:1, 3-4, 7, 13, 16, 19-20, 24; 11:3, 6, 9; 13:10; 16:1; 20:5, 20; 25:1; 35:4; 45:9, 13; 53:10; 54:16; 56:1; 57:5; 58:12, 15-16, 18; 59:12, 15; 61:3; 67:17; 68:24; 74:13; 82:15; 83:12, 16, 22; 84:2; 102:13; 106:25; 107:1, 23; 114:8; 116:12, 20, 24; 117:1, 25; 118:2, 7, 12, 19, 21-22; 124:21; 126:1
student's [4] - 42:24; 45:3; 80:14; 116:8
students [35] - 9:21; 10:8; 11:3; 12:6; 46:3; 49:23; 50:16; 53:4, 16, 20; 54:5, 7; 55:11, 19; 56:22; 73:15; 74:1; 77:23; 78:14, 17; 81:14; 83:23; 105:5; 106:5, 7; 111:10; 112:2, 24; 118:18; 123:10; 125:5, 22-23; 126:9
students' [6] - 10:13, 21; 52:16; 53:15, 19; 58:24
studies [1] - 123:25
stuff [7] - 5:8, 15-16, 23; 59:17; 97:4
subject [10] - 12:19; 15:10; 23:23; 47:17; 66:13; 67:4, 9; 94:15
subset [1] - 17:18
substantiated [1] - 13:4
substantive [1] - 34:6
success [1] - 77:15
successful [2] - 45:13; 125:25
sudden [1] - 49:3
suddenly [1] - 49:6
suggest [5] - 5:16, 19, 21; 7:11; 63:21; 71:14; 93:12
suggested [3] - 21:16; 92:23; 97:23
suggesting [7] - 6:17; 36:23; 55:1; 88:17; 92:9; 95:7, 10
suggestion [2] - 13:25
Suite [7] - 1:17, 21; 2:3, 7, 11; 3:7, 11
sum [2] - 86:6, 8
summer [2] - 45:8; 112:3
superintendent [2] - 83:21; 113:2
surmise [1] - 94:5
suspension [2] - 35:14; 41:13
suspicion [1] - 93:18
Sustained [1] - 42:6
sustained [1] - 42:6
switching [1] - 46:8
S███ [1] - 22:7
system [11] - 6:25; 8:9; 13:23; 41:18; 88:15; 109:10; 114:23; 115:8, 11; 116:14, 16
systematically [1] - 114:4
systems [1] - 59:15

T

T.B [1] - 3:6
tab [1] - 37:25
table [1] - 9:2
tables [1] - 128:25
tall [1] - 49:4
tangentially [1] - 9:14
targeted [1] - 75:10
tattletale [1] - 16:14
taught [1] - 109:17
teach [1] - 111:19
teacher [17] - 45:4; 84:19; 86:5; 95:4; 103:16, 20, 25; 104:5, 9, 12; 105:3; 106:9; 111:14; 123:23; 124:12
teachers [10] - 45:9; 110:21; 123:5, 17; 124:4, 6; 125:14, 16, 24; 126:8
teachers' [1] - 126:11
teaching [5] - 111:11; 123:21; 125:10, 19
team [2] - 121:5; 126:8
teams [5] - 12:24; 106:12; 121:5, 23; 126:7
technology [2] - 115:3; 120:13
ten [3] - 17:15; 62:6; 63:6
ten-minute [1] - 62:6
term [8] - 33:12; 60:9-11; 70:23; 72:15; 90:4
terms [3] - 54:18; 55:12; 125:22
terrible [1] - 78:10
T███ [8] - 21:1; 22:7, 20; 28:9, 11; 31:21; 42:18
terry [1] - 10:11
T███ [1] - 22:7
testified [3] - 13:14; 61:7; 94:14
testifies [1] - 10:11
testify [4] - 7:6; 9:15; 46:20; 97:7
testifying [2] - 7:17; 10:9
testimony [14] - 26:14; 44:2; 45:19; 46:17; 51:3, 16; 52:13; 54:10, 16; 57:5; 69:15; 70:22; 71:9; 77:3
testing [1] - 118:12
theory [1] - 6:22
there'll [1] - 121:22
Thereupon [1] - 63:8
thinking [1] - 64:2
third [1] - 74:25
thirsty [1] - 126:11
threat [8] - 49:13; 50:6, 24-25; 51:1, 24; 52:1, 10
threatened [1] - 50:16
threatening [1] - 33:7
threats [1] - 49:24
three [13] - 8:2; 11:18; 65:21; 73:9; 80:7; 106:12; 112:21; 114:12; 118:5; 124:21; 127:23, 25
throw [1] - 32:23
timeframe [2] - 15:4; 123:2
timeline [2] - 20:9; 84:15

timing [1] - 92:4
Title [13] - 33:19; 34:20; 84:8; 87:25; 88:10; 89:24; 91:3, 7, 12; 92:1; 93:14; 94:4; 96:16
today [5] - 20:4; 34:25; 62:8, 16; 127:19
together [7] - 14:10, 17-18; 18:7; 64:10; 75:19; 79:25
tomorrow [8] - 14:25; 64:22; 127:2, 20; 128:2, 18-19; 129:5
took [6] - 43:19; 95:1; 103:22; 107:9; 117:14; 126:24
top [7] - 66:23; 67:19, 21-22; 80:16; 117:4
topic [4] - 52:14; 57:9; 62:1; 119:10
topics [1] - 46:8
TORCHINSKY [1] - 1:15
total [3] - 86:6, 8; 123:4
totally [1] - 72:10
touching [5] - 68:11, 14, 19, 22; 91:14
tough [1] - 73:3
toward [1] - 55:14
towards [2] - 55:12; 107:21
Tracy [2] - 105:20, 23
traffic [3] - 127:10, 15
tragedy [1] - 128:1
trail [2] - 66:25; 80:23
TRANSCRIPT [1] - 1:11
transcript [1] - 3:17
transcription [1] - 3:18
transferred [1] - 113:1
transition [1] - 68:3
transitioning [1] - 46:3
transitions [2] - 125:7
translation [1] - 115:16
tread [1] - 94:16
tree [1] - 121:20
trial [2] - 14:19; 35:19
TRIAL [1] - 1:11
tries [1] - 27:12
trip [1] - 127:12
Trish [1] - 127:22
trouble [1] - 46:3
troubling [3] - 15:20; 73:19
true [5] - 68:15; 72:20; 76:7; 118:22; 123:23
trust [1] - 18:10
truth [2] - 87:15; 95:24
try [14] - 12:18; 18:6; 25:20; 52:23; 55:6; 57:22; 62:16; 63:23; 70:19; 109:4; 127:19; 128:3, 20
trying [24] - 5:9; 8:16; 12:11; 14:12, 19; 15:14; 16:16; 19:19; 26:14, 25; 33:23; 37:20; 38:7; 40:16, 20; 52:3; 62:12; 71:2; 73:7; 81:22; 110:17; 126:2
turn [2] - 115:1
turned [1] - 110:17
turning [1] - 118:13
tutoring [1] - 106:9

two [37] - 7:17; 18:16; 22:7, 20; 26:13, 25; 27:12-15, 20, 24; 29:11, 19; 46:11, 21; 47:2, 6; 48:4; 49:3, 23; 50:16; 67:19; 71:11, 15; 72:2; 73:21; 74:12, 15-16; 103:22; 120:14; 121:5, 23; 124:18, 21
two-day-old [1] - 18:16
type [5] - 58:12, 15; 111:4; 124:11; 125:18
types [3] - 11:25; 68:8; 69:13
typewriter [1] - 58:20
typically [2] - 64:7; 114:22

## U

ultimate [1] - 124:3
um-hmm [3] - 69:7; 79:12; 93:5
unable [3] - 19:2; 21:17; 27:20
unblock [1] - 26:14
under [8] - 8:13; 22:19; 25:21; 32:15, 25; 39:5; 44:11; 65:23; 84:23; 85:11; 90:9; 91:3, 7, 12; 93:14; 94:3; 116:7
understood [5] - 15:21; 35:1; 84:23; 85:11; 101:18
unduly [1] - 34:13; 35:16
unfair [1] - 59:17
unfortunately [2] - 114:25; 128:24
unfounded [7] - 35:17; 87:18; 88:6; 90:24; 91:25; 92:21; 93:22
United [1] - 3:14
UNITED [2] - 1:1, 12
universities [1] - 111:23
University [1] - 111:24
unless [2] - 13:18; 83:24
unlock [1] - 27:12
unverified [2] - 21:15; 28:15
up [62] - 5:3; 12:12; 15:6, 14; 18:10, 22, 24; 20:4, 16; 23:11; 30:16; 32:23; 38:24; 41:24; 48:4; 51:20; 58:12; 60:3; 62:12; 65:7, 15; 66:8; 71:2, 25; 72:1; 74:9; 79:3, 5; 81:11; 82:2; 83:20; 88:2; 94:11, 16; 95:19, 23, 25; 96:13; 97:24; 98:7, 17, 25; 100:13; 101:9, 20; 106:25; 110:21; 111:8, 19; 112:25; 119:20; 120:21; 121:12; 124:17; 127:21
upstairs [3] - 121:19, 23; 122:11
uses [1] - 59:7
utilized [2] - 60:16; 115:4

## V

VA [3] - 3:8, 11, 15
value [1] - 36:3
variety [3] - 6:13, 25; 106:7
vast [1] - 106:10
verbal [1] - 25:15
verbally [1] - 30:4
verified [3] - 19:21; 20:7; 28:13

verify [3] - 45:2; 103:21; 104:2
versus [1] - 36:3
victim [1] - 73:14
Virginia [1] - 3:14
VIRGINIA [1] - 1:1
VOGEL [1] - 1:15
voice [2] - 38:13; 100:11
voicemail [18] - 20:23; 21:2, 5-6, 13-14, 20, 22, 24; 27:2, 4, 10, 17; 28:5, 9, 17-18, 22
voicemails [1] - 21:23
voices [1] - 18:22
VOLUME [1] - 1:7
volunteer [2] - 98:2
vulgar [11] - 22:3; 24:7, 9-10, 21; 25:15; 30:4; 53:17, 21; 56:23; 57:6

## W

wait [5] - 32:17; 39:22; 46:4; 120:25
waiting [3] - 36:11; 51:9; 65:14
walk [1] - 121:19
walked [1] - 49:7
walking [2] - 49:3; 120:7
wall [6] - 29:13, 21; 30:10; 102:11
Wallace [1] - 3:13
wander [2] - 101:16
wants [4] - 9:5; 17:19; 97:14
Washington [5] - 1:17; 2:15, 19, 22; 3:3
waste [2] - 5:9; 11:22
watch [2] - 24:20; 99:13
ways [3] - 13:5; 123:11, 15
Weaver [18] - 66:5, 8, 10-11; 67:1; 69:3; 70:20; 78:23; 79:1, 11, 21; 80:1, 4, 24; 81:5, 8, 11
week [2] - 107:16
weight [1] - 33:15
welcome [2] - 18:10; 123:10
whatnot [7] - 59:13; 60:15, 22; 71:13; 102:12; 119:7
whatsoever [1] - 14:6
whole [5] - 16:21; 81:1; 86:2
whore [5] - 24:9; 29:14; 30:12; 49:10, 14
wide [1] - 89:12
widely [1] - 97:23
wider [1] - 94:12
Wiehle [1] - 3:10
wife [1] - 114:6
willing [1] - 78:11
wind [1] - 12:12
wing [2] - 116:24
wipe [1] - 59:6
wiped [5] - 59:5, 24; 61:10, 17, 20
wiping [1] - 60:5
wise [2] - 98:15; 121:6
withdrawn [2] - 92:20, 25
withdrew [2] - 92:13, 15

**witness** [34] - 6:7, 14; 7:2, 4, 9; 8:6;
9:3; 10:8-10; 15:25; 19:2; 28:25; 29:5;
38:14; 39:15; 40:20; 59:24; 61:18;
63:23; 64:14; 65:4; 87:8, 13; 92:24;
96:2; 97:6; 98:14, 17; 99:3; 101:16;
119:1

**WITNESS** [61] - 10:4; 25:3; 26:2; 28:3,
5; 29:2; 30:8, 11; 37:20; 39:18, 21, 23;
40:2, 7, 9, 12, 16, 23, 25; 41:3, 8;
44:23; 46:6; 47:10; 52:8; 55:21; 57:21,
25; 58:21; 60:10, 13, 21; 61:2, 23;
62:21, 24; 70:17, 21, 24; 71:22; 72:1, 4,
20; 73:5; 74:12, 21, 23; 80:18, 20;
84:13; 85:17, 22, 24; 99:24; 102:21;
104:19; 105:17; 109:17; 110:8; 120:22;
122:11

**witness's** [1] - 11:22

**witnessed** [7] - 53:5; 54:17; 55:13;
56:2; 57:6; 60:5; 61:17

**witnesses** [4] - 6:17; 11:5; 18:21, 23

**witnessing** [2] - 56:23, 25

**word** [7] - 24:25; 25:8; 40:5; 57:3;
94:24; 95:18

**words** [5] - 10:1; 77:18; 103:23; 108:5;
125:14

**workplace** [1] - 34:23

**works** [1] - 34:17

**worry** [1] - 127:17

**worship** [1] - 63:17

**wrenching** [1] - 68:5

**write** [9] - 48:8; 54:8; 58:20; 70:13;
75:15; 80:3; 81:2

**writes** [3] - 79:21; 80:1; 81:5

**writing** [5] - 31:22; 56:15; 67:16;
69:10, 25

**written** [5] - 30:23; 31:15; 42:17;
58:20, 24

**wrote** [8] - 6:12; 48:25; 49:2; 53:5;
54:6, 17; 56:22; 70:11

---

## Y

**year** [22] - 19:14, 20; 33:6; 35:5; 41:7;
44:8; 67:25; 73:10, 13, 24; 74:3; 76:12;
82:17, 20; 101:7; 108:15; 109:10;
112:6; 113:3, 5, 11, 15

**years** [23] - 15:18; 19:13; 82:7; 92:5;
109:12; 110:1, 7, 11; 111:1; 112:14,
20-21; 113:8, 10; 114:5, 8, 12-13;
118:5; 119:7; 122:24

**yesterday** [2] - 18:5; 94:13

**yourself** [5] - 59:23; 70:9; 77:13;
104:24

**Ys** [1] - 73:3

---

## Z

**Zoll** [1] - 2:2