```
                 UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA


   B.R.,                            :
                                    :
               Plaintiff,           :   Civil Action
                                    :   No. 1:19-cv-00917-RDA-WEF
          v.                        :
                                    :   March 20, 2024
   F.C.S.B.,                        :   2:05 p.m.
               et al.,              :
                                    :
                                    :   VOLUME 3 - PM SESSION
               Defendants.          :
                                    :
   ............................ :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**


APPEARANCES:


  For the Plaintiff:          **Jonathan Fahey, Esq.**
                              HOLTZMAN VOGEL BARAN TORCHINSKY
                              & JOSEFIAK, PLLC
                              2300 N Street NW
                              Suite 643a
                              Washington, DC 20037
                              202-536-1702
                              Email: Jfahey@holtzmanvogel.com

                              **Alison Anderson, Esq.**
                              BOIES SCHILLER FLEXNER, LLP
                              2029 Century Park East
                              Suite 1520
                              Los Angeles, CA 90067
                              213-995-5720
                              Email: Alanderson@bsfllp.com

```
APPEARANCES:  (Cont.)

For the Plaintiff:          Brittany Zoll, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            Andrew Brenner, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            Robert Keefe, Esq.
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     Ryan Bates, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            Sona Rewari, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            Scott W. Burton, Esq.
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com
```

```
APPEARANCES:  (Cont.)
```

For Defendant F.C.S.B.: **Kevin Elliker, Esq.**
 HUNTON ANDREWS KURTH, LLP
 2200 Pennsylvania Avenue, NW
 Washington, DC 20037
 804-788-8200
 Email: Kelliker@huntonak.com

For the Defendants
S.T., A.F., P.A.H., T.B., **Michael E. Kinney, Esq.**
B.H., M.P.F., M.C., F.T., THE LAW OFFICE OF MICHAEL E.
J.F.: KINNEY, PLC.
 1801 Robert Fulton Drive
 Suite 120
 Reston, VA 20191
 Email:  Mk@kinneyesq.com

For the Defendant J.O.:

 **Bruce Blanchard, Esq.**
 ODIN, FELDMAN & PITTLEMAN, PC.
 1775 Wiehle Avenue
 Suite 400
 Reston, VA 20190
 Email:  Bruce.blanchard@ofplaw.com

Court Reporter: **Scott L. Wallace, RDR, RMR, CRR**
 Official Court Reporter
 United States District Court
 Eastern District of Virginia
 401 Courthouse Square
 Alexandria, VA  22314-5798
 Cell: 443-584-6558
 Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

1                    **C O N T E N T S**

2

3          <u>**EXAMINATIONS**</u>                                    <u>**Page**</u>

REDIRECT EXAMINATION OF A███████ F████████        7
BY MR. BRENNER

DIRECT EXAMINATION OF NANCY CANTALUPO            44
BY MS. ANDERSON
CROSS-EXAMINATION OF NANCY CANTALUPO             69
BY MR. ELLIKER

DIRECT EXAMINATION OF C███████████ K███          80
BY MR. KEEFE

9                         <u>**EXHIBITS**</u>

10         <u>**DESCRIPTION**</u>

11

12         **After review of the record and upon agreement of
           counsel and deputy clerk, all final exhibits can
           be found on CME at Docket #975.**

13

14         Plaintiff's Exhibit 149 admitted                108

<u>**AFTERNOON SESSION, March 20, 2024**</u>

(2:18 p.m.)

THE COURT:  Before we get started, I want to revisit some of the examination protocols that are with this case.  Because Mr. Bates, as he was entitled to as an agreement with all counsel and the party, was first questioning Mr. F███████, I assumed for purposes of the examination that he was associated with the school board who you represent, correct, Mr. Bates?

MR. BATES:  Correct.

THE COURT:  The way it should have worked, quite frankly, is that Mr. Kinney, who is Mr. F███████ actual representative, should have been the one who was precluded from a proper and appropriate form of examination and not you.

Again, it was inverted because you went out of order. And, you know, you took on the lead and I have no problem with that, but it sort of inverted the Court's analysis as to who was able to question who and how.

So, I don't think anything was actually lost because Mr. Brenner was actually pretty nice and let you lead a lot anyway, so it's all good.  But I did want to make sure the record was clean as far as that was concerned and that my analysis got inverted because of the way the questioning was structured.

MR. BRENNER:  And I should have been more -- of course, but when you said -- that's why I started to turn my head because I was trying to figure out how to make it work.

1          But I think the way we're at right now is the right way.

2     We said before, I actually think -- I know you said you're not

3     going to enforce it -- I actually think -- what's proper I

4     actually think Mr. Kinney should go first.  I don't think they

5     should get to follow up on someone else's --

6          THE COURT:  Theoretically, that's the way it should have

7     happened.  But again, these are the niceties of what we lawyers

8     know, so I don't think any harm was accomplished.  If anyone has

9     any harm, I suggest they can provide that statement on the

10    record.

11         Any harm to any of the defendants.

12         MR. BATES:  Nothing at all, Your Honor.

13         THE COURT:  Mr. Kinney.

14         MR. KINNEY:  No, Your Honor.

15         THE COURT:  Mr. Brenner.

16         MR. BRENNER:  Yes.  No, Your Honor.  The answer is no to

17    the question.

18         THE COURT:  Very good.  All right.  Are we ready to bring

19    the jury back in?

20         MR. BRENNER:  Oh, yes.

21         THE COURT:  Everybody stood up so I assumed that everybody

22    was on agreement on that.  Very good.

23         (Jury in at 2:21 p.m.)

24         THE COURT:  You may have a seat.  I was just watching to

25    see how the dog behaved whenever you did what you did.

1          A JUROR:  {Indiscernible}.

2          THE COURT:  I'm actually paying attention.  My daughter --

3     off the record.

4          (Thereupon, a discussion was had off the record

5     between Court and counsel.)

6          THE COURT:  Very good.  Next witness.

7          MR. BRENNER:  Redirect?

8          THE COURT:  Sure.  Mr. F█████.

9               REDIRECT EXAMINATION OF A█████ F██████

10    BY MR. BRENNER:

11    **Q.**    All right, Mr. F██████, we're in the homestretch.

12    **A.**    Good.

13    **Q.**    Because the judge was kind enough to let us take a lunch

14    break, I was able to cut this down.  Again, I'm going to tell

15    you when I'm changing subjects because they're all going to be

16    individual subjects.

17    **A.**    Okay.  Yes, sir.

18    **Q.**    And I understand maybe at times yesterday when I trailed

19    away or I moved back or maybe I just didn't talk loud enough, if

20    you don't remember, we discussed about this at the beginning, if

21    you don't hear me, raise the hand, say something, because I want

22    you to hear me and I want to hear you.

23    **A.**    Okay.

24    **Q.**    Okay?

25    **A.**    I appreciate it.

1    Q.    All right.  So, I was a little confused at a part of your

2    examination by Mr. Bates so I want to clarify it, okay?

3         You showed -- or Mr. Bates showed you some policy, and it

4    seemed to indicate that your reporting, meaning the school's

5    reporting, regarding sexual harassment was a "may" and not a

6    "shall."

7         Do you remember you went over that with Mr. Bates?

8    A.    Um, sir, could you --

9    Q.    Sure.

10   A.    -- clarify?

11   Q.    First he asked you, he asked you and we'll talk about

12   this, he said, Well, B█████ didn't report to the OCR, and you

13   said, Oh, no, she did not, right?

14        You testified to that, right?

15   A.    I said to my knowledge, she did not.

16   Q.    Right.  And then he asked you, he showed you something,

17   and he got you to agree with him that the reporting requirements

18   for the school to the -- at the time, which was the Office of

19   Equity and Compliance, which was a -- let's step back.

20        The Office of Equity and Compliance at the time was in

21   charge of Title IX compliance at the school board, correct?

22   A.    Correct.

23   Q.    Right.  It's not some separate thing.  It just has a

24   different name that ultimately gets melded into the Title IX

25   office, correct?

1    **A.**    Um, or the Equity and Compliance, at that time, Office.

2    **Q.**    Yes.  They're the ones that were running Title IX for the

3    School Board?

4    **A.**    Correct.

5    **Q.**    Now, you told us on Tuesday, or told me on Tuesday and

6    the jury, that if you found a complaint for sexual harassment or

7    sexual assault was verified, you had to report it to the OCR or

8    the office -- excuse me, not the OCR.  Let me ask the question

9    again.

10           You told us on Tuesday that if you determined, you,

11   Principal F██████, determined that a student's complaint for

12   sexual assault or sexual harassment was verified, it had to be

13   reported to the Office of Equity and Compliance.  Is that still

14   your testimony?

15   **A.**    I waited and reported to that.

16   **Q.**    Okay.  Now --

17   **A.**    First, I would call the cluster assistant superintendent

18   and verify.

19           (Reporter clarification.)

20   **A.**    The assistant cluster superintendent.

21   BY MR. BRENNER:

22   **Q.**    So you would have done two things.  You would have called

23   your boss --

24   **A.**    Yes, sir.

25   **Q.**    -- and then you would have reported it to the Office of

```
1    Equity and Compliance?

2    A.    Yes, sir.  Unless he told me otherwise, yes, sir.

3    Q.    Unless he told you otherwise?

4    A.    Yes, sir.

5    Q.    Okay.  At any point in this claim did you try to report

6    it --

7    A.    No.

8    Q.    Okay.  All right.  Next topic.

9          Okay.  Next topic.  Do you still have the notebook, the

10   black notebook up there?  Yes.  Okay.  Can you go to Exhibit 22,

11   please.

12         This is just another one of those -- we talked about one

13   on Tuesday.  This is another guidance from the OCR, correct?

14   The Office of Civil Rights at the Department of Education?

15   A.    Wait, sir, I just want to make sure I'm on the right --

16         MR. BATES:  Objection, Your Honor, this is beyond the

17   scope.  We had no cross questions on this.

18         MR. BRENNER:  And I will tie it up.

19         THE COURT:  Based on the predicate of the previous three

20   questions, I think I know where counsel is going, so I'm going to

21   give him a little latitude.

22   BY MR. BRENNER:

23   Q.    That's another one of those we talked about on Tuesday,

24   the Office of --

25   A.    Right.  I just saw the U.S. Department of Education but
```

1    then I did see the -- on the other page, it was the Office of

2    Civil Rights, U.S. Department of Education.

3         MR. BRENNER:  Your Honor, we would like to move this into

4    evidence at this point.

5         THE COURT:  Any objection?

6         MR. BATES:  Yes, yes, Your Honor, we object.

7         THE COURT:  Let me see it.

8         MR. BRENNER:  Do you want me to lay the predicate?  I can

9    lay the predicate.

10        THE COURT:  Is the objection foundational or substantive?

11        MR. BATES:  Substantive.  It's to form.

12        THE COURT:  Okay.  Let me see it first.

13        MR. BRENNER:  May we approach?

14        THE COURT:  You may approach.

15        (Following sidebar discussion had on the record:)

16        THE COURT:  All right.  Let's do it this way:

17   Mr. Brenner, why don't you make a proffer as to what you believe

18   it to be.

19        MR. BRENNER:  Right.  So on cross-examination by

20   Mr. Bates, he was asked -- the witness was asked whether he was

21   aware of any policies or was there any policy or any rule that

22   said you have to investigate assaults that take place off campus.

23        THE COURT:  Right.

24        MR. BRENNER:  He already admitted yesterday that there

25   was, but this one is directly on that, on page 4 of Exhibit 22,

1    and I'll read it into the record.  -- oh, no.  I have the wrong

2    one.  Oh, I have to get -- can I go back to my seat for a second?

3          THE COURT:  Sure.

4          MR. BRENNER:  Well, they're going to object to this one,

5    too, so we'll handle it while we're up here.  This is on a

6    slightly different issue.  This is the, he said that once the

7    police told him it was closed, that he had no obligation to do

8    anything else -- he didn't feel he had any obligation to do

9    anything else.  We have two exhibits on this.  One is already in

10   evidence.  This one specifically says -- the last one concludes,

11   goes on, Even if a school reports possible criminal --

12          (Reporter clarification.)

13          MR. BRENNER:  Even if a school does not -- even if a

14   school reports possible criminal conduct to the police, that does

15   not relieve the school of its responsibilities under Title IX.

16   We have another exhibit already in evidence that makes it clear

17   what they do when the investigation is closed.  So this was the

18   predicate for that.  The other one is already in evidence.

19          THE COURT:  Mr. Bates.

20          MR. BATES:  So there are two issues.  Number 1, this is

21   outside of the scope.  My question was limited to Fairfax County

22   School Board policies.  This is not a Fairfax County School Board

23   policy.  That's issue number one.

24          Issue number two is this is again confusing the jury with

25   not what the law requires and they will be instructed on, but

```
1    instead a nonbinding policy -- I'm sorry -- guidance document

2    from a governmental agency.

3         So he's trying to show this to the jury to make the

4    argument, See, they were supposed to do that, when that is not

5    what the standard is in this case.

6         MR. BRENNER:  We have the exact same argument with the

7    exact same document, just a different year, and that exact same

8    argument and what Your Honor's ruling was it comes in because he

9    testified that when the OCR issues guidance, Fairfax County sends

10   it to the principals and he understood that that's what he had to

11   consider and stuff, so --

12        THE COURT:  But does consideration -- you used the term

13   "consider," and I appreciate --

14        MR. BRENNER:  Yeah, I don't know -- I don't want to

15   paraphrase you exactly.

16        THE COURT:  But does that make it binding?

17        MR. BRENNER:  It makes it part of -- nothing -- there's

18   not one particular sentence that's binding on anything.  This all

19   goes to the constellation of stuff.

20        THE COURT:  Right.  All right.  So, in a way, why doesn't

21   that help him carry his argument? Because we don't want the jury

22   to be confused as to what the obligation of a person or an

23   individual who receives things or information or suggestions as

24   to criteria to fall within this --

25        MR. BRENNER:  Right --
```

```
1          THE COURT:  -- circumstance.

2          MR. BRENNER:  The problem is he's making -- he's telling

3     the jury -- he asked a blanket question, anything in Fairfax

4     County School Board policy, right?  All this stuff goes into

5     their policies.  He's already acknowledged that yesterday, so

6     it's not a written -- you don't have to have a written policy for

7     everything.  He's already testified -- we had the exact argument

8     yesterday.

9          And their position is they want to say, unless there's a

10    written policy that says X, you can't use it.  All I'm doing

11    is -- I would not have done this again on redirect, but he went

12    in and asked him this broad question, Is there anything in the

13    policies that says you should investigate things off campus?

14         Of course there is.  And we'll get to it.  It's in

15    their -- I'm going to show you it's in their policies, too.  It's

16    in their policies, so --

17         THE COURT:  But whether you believe it's specifically in

18    the policies is --

19         MR. BATES:  We have no objection to them inquiring about

20    policies on this subject, Fairfax County School Board policies,

21    but these are not that.

22         THE COURT:  All right.

23         MR. BRENNER:  Yeah, so, Your Honor, if you want me to go

24    to the document that's already admitted, I think I'll use the one

25    that's already admitted.
```

```
1          THE COURT:  All right.  But, again, let's make sure that

2    we focus on what the real issues in this case are.  And I get why

3    you wanted to put it in because it -- the examination that

4    Mr. Bates conducted might cause -- I don't know what the jury is

5    thinking -- but might cause the jury to believe that their

6    responsibility ended at that point.

7          The fact that the criminal investigation was closed, that

8    that was a finite circumstance and ended all things.

9          MR. BRENNER:  Correct.

10         THE COURT:  Okay.  We'll see what you do.

11         MR. BRENNER:  Okay.

12         MR. BATES:  Judge, and if he raises this on a different

13   document, I just want to have the right to raise an objection as

14   to scope.

15         THE COURT:  Sure.  Sure.

16         MR. BATES:  Thank you.

17         (Sidebar discussion concluded.)

18         MR. BRENNER:  May I just consult with Mr. Brown for a

19   second?

20         THE COURT:  You may.

21         (Brief pause in proceedings.)

22   BY MR. BRENNER:

23   Q.    You testified -- you answered a question for Mr. Bates

24   about -- that you said that once you learned that the police

25   investigation had been closed, you felt there was nothing more
```

1    you needed to do.

2         Do you recall that?

3    **A.**    Yes, sir.

4    **Q.**    Okay.  So if we could bring up Exhibit 56, which is

5    already in evidence.

6         Just to orient you, this is from -- we talked about this

7    yesterday.  It's on page -- it's on page 10 where I'm going to

8    in that exhibit.  Let me know --

9         MR. BRENNER:  May I help him find it, Your Honor?

10        THE COURT:  You may.

11        THE WITNESS:  I see the pages, sir.  I'm there.  Page 10?

12   Yeah.

13   BY MR. BRENNER:

14   **Q.**     And so let's just -- let's just read -- so, do you see

15   that sentence?

16   **A.**    Yes, sir.  May I have a little time to read it?

17   **Q.**    Yes.

18   **A.**    Okay.

19   **Q.**    So, it says, "Although a school may need to delay

20   temporarily the fact-finding portion of a Title IX investigation

21   while police are gathering evidence, once notified that the

22   police department has completed its gathering of evidence,"

23   that's closed parentheses, "not the ultimate outcome of the

24   investigation or the filing of any charges, the school must

25   promptly resume and complete its fact-finding for Title IX

1    investigation."

2         Do you see that?

3    **A.**    Yes, sir.

4    **Q.**    And you disagree with that?

5    **A.**    Sir, I don't write the policies.  And I don't know how

6    they're interpreted by --

7    **Q.**    I'm just asking you, what your personal belief -- you're

8    the principal.  You were the one that was making the decision.

9    I'm just asking what you thought.

10        And is it your testimony that you thought that you needed

11   to do nothing more?  That's still your testimony?

12   **A.**    Sir, that's the guidance I received.

13   **Q.**    Okay.  The guidance you received from who?

14        Oh, wait.  Let's go back for a second.  You actually told

15   us you did two things.  I forgot.  You told us you got -- you

16   had done what you talked about about the after school and the

17   swiping.  That was one part.

18        The second thing you told us was you called the Fairfax

19   County School Board lawyer.

20        Is that the guidance you received to tell you not to do

21   anything else?

22   **A.**    Sir, I don't -- I can't discuss what I talked with

23   counsel --

24        MR. BATES:  I'm sorry.

25        THE COURT:  Mr. F█████, whenever you hear me speaking,

1    it's probably a good time --

2         THE WITNESS:  Sir, I didn't hear.  I'm sorry, I'm deaf in

3    this ear.

4         THE COURT:  All right.  Peek at me every now and then to

5    see if I'm saying anything.  Peek at me every now and again to

6    see if I'm saying something.

7         THE WITNESS:  Okay.

8         THE COURT:  It's probably a good idea.

9         THE WITNESS:  All right.

10        MR. BATES:  Your Honor, invading client-attorney

11   privilege, I'd ask that that question be rephrased.  And I would

12   also like to note an objection.  I think we're going towards the

13   line of the issue that I thought that we had --

14        THE COURT:  Let's make sure that the parties are aligned

15   correctly, is that your objection or Mr. Kinney's objection?

16        MR. BATES:  My objection.

17        THE COURT:  Okay.

18        MR. BATES:  As the school board's attorney.

19        THE COURT:  Now we're really getting into the weeds.

20        All right.  Did you receive guidance from your lawyer?

21   Yes or no?

22        THE WITNESS:  Am I allowed to --

23        MR. BATES:  Yes.

24        THE COURT:  If I ask a question -- usually I'm not going

25   to object or sustain an objection to my own question.

1          THE WITNESS:  Well, you won't yell at me later.

2          THE COURT:  I -- I rarely yell.

3          THE WITNESS:  Okay.  Yes.

4          THE COURT:  Did you receive guidance -- and did you do

5   something in reliance on that guidance?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  Let's go.  You can't ask him

8   specifically what that guidance was.  You might be able to figure

9   a way to get at the circumstances of it.

10  BY MR. BRENNER:

11  **Q.**    Well, without telling me -- just following up with one

12  more question with the judge, as Your Honor said, without

13  telling me the specifics of what the lawyer for Fairfax County

14  School Board told you to do, after receiving the guidance from

15  him or her, you decided that you didn't need to do anything

16  further with -- regarding the allegation?

17  **A.**    Correct.

18  **Q.**    Okay.  Okay.  Can we bring up -- next module, 93.

19         Oh, no.  You know what?  Hold on before you do that.  Let

20  me ask you a couple more questions on the module.

21         So I think it was Mr. Kinney, but it may have been

22  Mr. Bates.  They -- they said to you or asked you if you would

23  have welcomed B███ back to school after she was pulled out by

24  her parents and was on in-person learning.

25  **A.**    And she was homebound; is that correct?

1   **Q.**    Homebound.  Is that the right term?

2   **A.**    Yes.

3   **Q.**    Okay.  Thank you.

4        Now let's be clear.  You understand that pursuant to

5   Fairfax County School Board policy, one of the goals if a

6   student goes out on homebound is to get them back in school --

7   **A.**    Correct.

8   **Q.**    -- to in-person learning?

9   **A.**    Correct.

10  **Q.**    And in order for you to do that, you need to provide

11  the -- in this case, the student -- you need to provide the

12  student with a safe environment for them to come back to, right?

13  **A.**    Correct.

14  **Q.**    Okay.  And the environment -- was -- the environment that

15  B█████ would have come back to, was it an environment where C.K.

16  was still in school?

17  **A.**    Correct.

18  **Q.**    Right.  Now after the allegations, you never talked to

19  C.K., correct?  You or anyone at the school?

20  **A.**    Correct.

21  **Q.**    Never interviewed him, correct?

22  **A.**    Correct.

23       MR. BATES:  Objection, Your Honor.  We're -- now I feel

24  like we're crossing that line on that evidentiary issue, and

25  if --

1          THE COURT:  Be discreet, Mr. Brenner.

2          MR. BRENNER:  Okay.  Okay.  I'll move on to the next

3    topic, Your Honor.

4          Can we pull up 93?  It's already in evidence.  It's a

5    picture.  Defense Exhibit 93 -- 193.  Thank you.

6    BY MR. BRENNER:

7    **Q.**    So I just want to talk about the lockers just a little

8    bit.

9    **A.**    Yes, sir.

10   **Q.**    Did you say these are the lockers for just the Explorers?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  And the Explorers is about 140 or 150 kids?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  Do you have the ability to draw -- well, let me

15   ask you this:  In this picture -- if you're looking at the

16   picture, am I correct that to the right of the picture is where

17   the classrooms are?

18   **A.**    Yes, sir.

19   **Q.**    Okay.  So the teachers -- if you go down to all the

20   way -- if you look at all the way where the -- I guess those are

21   double doors at the end?

22   **A.**    Yes, sir.

23   **Q.**    Okay.  So where those are open, does the first classroom

24   start down that way?

25   **A.**    No, sir.  It's up farther.

1    **Q.**    Well, I guess it's first or last, right?

2         There's four of them, right?

3    **A.**    Yes, there's four.

4    **Q.**    Okay.  There's four classrooms?

5    **A.**    It goes like this:  One, two, three, four.

6    **Q.**    Okay.  Great numbering system.  Okay.

7         So -- and they go down that row.

8    **A.**    Yes, sir.

9    **Q.**    And what you said is the teachers would stand by their --

10   **A.**    Their doorways.  Or the last one would stand where the

11   window is to make sure that they have a good --

12        THE COURT:  That appears to be what looks like an exit

13   sign of some sort right there.

14        THE WITNESS:  Yes.

15        THE COURT:  Is that what you're talking about?

16        THE WITNESS:  Yes, sir.  It's near the exit sign.

17   BY MR. BRENNER:

18   **Q.**    Okay.  So three teachers are going to be in the hallway

19   across the hall from the lockers, right?

20   **A.**    Correct.

21   **Q.**    One --

22   **A.**    Or they could -- the third one might see that corner, but

23   still be able to see between a couple of those lockers.

24   **Q.**    Right.  And whether it be between class periods or before

25   school, kids tend to go to the lockers at the same time.  That's

1    the system, right?

2         They're on the same schedule.

3    **A.**    Some.

4    **Q.**    The Explorer team, the whole Explorer team is going to be

5    there at the same time between first to second, second to third,

6    third to fourth, fourth to fifth, basically; except for lunch

7    sometimes gets a little bit staggered?

8    **A.**    Sir, normally what the students did was when they went to

9    their lockers they would take material for like three, four

10   classes so they wouldn't be returning to the lockers.

11   **Q.**    Okay.  Fair enough.  So they may go twice a day instead

12   of four times a day or something like that?

13   **A.**    Something like that.

14   **Q.**    And when they would be there they would be congregated in

15   their lockers in those long rows, right?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  Where is -- where was B███████ locker?  Was it one

18   of the ones --

19   **A.**    I believe it's --

20   **Q.**    Can you draw on there?

21   **A.**    I believe it was in this row (indicating), but that was a

22   long time ago and I'm not a hundred percent sure.

23   **Q.**    Okay.  Okay.  You believe it's in that row facing, for

24   lack of a better word, towards -- this way (indicating), right?

25   **A.**    Yes, sir.

1    **Q.**    Okay.  And you happen to put an X next to one of the ones

2    that's really close to being in view.  It wasn't there, was it?

3          Her locker wasn't near --

4    **A.**    No, I don't believe so, sir.

5    **Q.**    No.  It was kind of -- and, actually, it wasn't in that

6    row either, but she'll testify.

7    **A.**    Okay.  When she testifies, that's fine.

8    **Q.**    It's kind of buried back behind where all the kids are,

9    right?

10   **A.**    Pardon me?

11   **Q.**    It's kind of buried back against this last row blocked by

12   all these kids, right, if it's there?

13         MR. ELLIKER:  Your Honor, I'm going to object to the form

14   of that question.

15         THE COURT:  Sir, you put a mark on the second row of

16   lockers there; is that correct?

17         THE WITNESS:  Correct, sir.

18         THE COURT:  All right.  Are you suggesting, by placing the

19   marking there, that that was the specific location of B.R.'s

20   locker?

21         THE WITNESS:  No, sir.

22         THE COURT:  And the question that Mr. Brenner is trying to

23   get at is that the lockers in what would be called in Row 1

24   actually block a little bit of Row 2.

25         Do you agree with that?

1        If you are looking straight at locker Row 1, can you see

2   what's going on in the lockers behind Row 1 that are behind that?

3        THE WITNESS:  Sir, there is nothing behind Row 1 except

4   for -- oh, wait a minute, sir.  I'm sorry.

5        That's the third row, and then there's a back row against

6   the wall.

7        THE COURT:  Right.

8   BY MR. BRENNER:

9   Q.   Okay.  So, if you're in the back row, the back row

10  leaning against the wall, either the lockers against the wall or

11  the other side of the aisle, no one can see those lockers

12  from --

13       MR. BRENNER:  Can I draw here?  How do I draw?

14  BY MR. BRENNER:

15  Q.   No one can see them from here (indicating), right?  You

16  can't see through the lockers, right?  Assume B████ locker is

17  back, all the way back here (indicating), okay?

18       THE COURT:  Let's just -- let's make it simple.  Sir,

19  we've seen -- the lockers closest to us, let's call that Row 1.

20       THE WITNESS:  Yes.

21       THE COURT:  Okay?  And then there appears to me -- and

22  correct me if I'm wrong -- to be a bay of lockers behind Row 1.

23       THE WITNESS:  Yes, sir.

24       THE COURT:  Okay.  If you're standing in front of the

25  lockers on Row 1, can you see what is going on entirely in the

 1   Row 2 of lockers.

 2        THE WITNESS:  Sir, there are three teachers that monitor

 3   those lockers.

 4        THE COURT:  And my question was, from standing in front of

 5   the lockers at Row 1, can you see everything that's happening

 6   everything that's happening in Row 2 and/or Row 3?

 7        THE WITNESS:  No, sir.

 8        THE COURT:  Okay.

 9   BY MR. BRENNER:

10   **Q.**    Second question, if there are kids that are at their

11   locker -- let's assume B███████ locker is in that last row -- if

12   there are kids at these lockers all here (indicating), they're

13   also blocking the view of B███████ locker, aren't they?

14        THE WITNESS:  If kids are blocking the view or they're not

15   moving toward their class, the teachers would move them.

16   BY MR. BRENNER:

17   **Q.**    Those kids, the kids in the front are not allowed to be

18   in their locker?

19   **A.**    No, sir, I thought you said they were just standing

20   there.

21   **Q.**    The whole --

22   **A.**    That's what you said.

23   **Q.**    If they're at their locker using the locker as they're --

24   **Q.**    Right.

25   **A.**    -- supposed to do, as they're required to do --

1  **A.**     Fine.  Fine.

2  **Q.**     -- you can't see anyone back here.  The teacher here,

3  here, here and the window has no clue what's going on in the

4  locker.

5  **A.**     Sir, they monitor the lockers.

6  **Q.**     From their door, sir.

7         (Reporter clarification.)

8         THE WITNESS:  They do not stand exactly at the door.  They

9  monitor the locker.

10        THE COURT:  Sir, the court reporter wanted everyone to

11  speak one at a time so that he can keep up with the testimony,

12  so, just pause a little bit, everyone.

13  BY MR. BRENNER:

14  **Q.**     Sir, are you finished or do you want me -- are you

15  finished with your answer?  You --

16  **A.**     Oh, can I talk?

17  **Q.**     Yeah.

18  **A.**     All right.  Yes, they stand outside the vicinity of their

19  door.  You know, if they can't see something -- these lockers

20  are low.  They're not high like high schools where you're not

21  going to see things going on.  They move themselves to help kids

22  unlock their lockers.  If they're stuck, they're able to see

23  that.  They're able to -- if something is going on over here,

24  they will rotate over to that area.

25         They're not statues.  They monitor those lockers.  That's

1    their job.

2    Q.    So, when we started with Mr. Bates and today when you and

3    I just started, they were standing at their doors and they were

4    by the -- they were standing at their doors and they were by the

5    window.  Now --

6         THE COURT:  Use proper names.  This is five pronouns you

7    said "they."

8    BY MR. BRENNER:

9    Q.    Okay.  When we testified previously with Mr. Bates and

10   actually, you testified with me five minutes ago, you identified

11   where they stood:  Three of them in front of their classrooms,

12   one by the window.

13        Now, now, what you're telling us every time, always,

14   they're actually -- they're going through the aisles, they're

15   clearing kids -- excuse me --

16   A.    I didn't say that.

17   Q.    -- let me finish any question, sir.  Let me finish my

18   question, sir.  I'll let you finish your answer; just please let

19   me finish my question.

20        Is it your testimony when the kids are doing what they're

21   supposed to do, they're in their lockers, the teachers were

22   coming and they were moving and they were standing above, or no?

23   A.    No.

24   Q.    Okay.

25   A.    They weren't in the lockers unless they had to be there

1    to open the locker or to help a student.

2    **Q.**    Okay.

3    **A.**    Or to break up anything that was inappropriate.

4    **Q.**    Correct.  So in the everyday, normal environment they

5    were by their doors; they weren't climbing through the lockers,

6    correct?

7    **A.**    They were in the vicinity of their door.  I mean, we're

8    not talking about a space here where they're (indicating), you

9    know, "We demand you stay there; you don't move."

10    MR. BRENNER:  Okay.  If we could take that down.  Let's

11    bring up Exhibit 77 already in evidence.

12    BY MR. BRENNER:

13    **Q.**    Now, we talked about this a lot.  And can we clear up the

14    marks somehow?  Have I got to do it?  You can do it?  Thank you.

15    Thank you.

16    I'm not going to go through this whole document again,

17    but you gave an answer that I wasn't sure what you meant, so

18    Mr. Bates asked you specifically about the November incident,

19    which I assume this is what you're talking about, right?

20    **A.**    Um, okay.  This is a locker, around the locker area,

21    correct.

22    **Q.**    Okay.  So that's what I was going to get at.  What you

23    said was -- and I wrote it down.  You said, We were, quote,

24    unable to -- well, kind of quote.  It's my handwriting so it's

25    always risky.  "You were unable to validate the part about the

1    locker?"

2    **A.**      Correct.

3    **Q.**      Okay.  There's a lot more in this statement than the

4    locker, don't you agree, sir?

5    **A.**      Yes, that's B███████ statement.

6    **Q.**      Well, it talks a lot --

7    **A.**      Well --

8    **Q.**      Go ahead, sir?

9    **A.**      B.R., I'm sorry.

10   **Q.**      That's okay.

11   **A.**      I said it.

12   **Q.**      Are you done?

13   **A.**      Yeah.

14   **Q.**      So your testimony today was, for Mr. Bates, We're unable

15   to validate -- are we using "validate" the same way as "verify"?

16   **A.**      Sure.

17   **Q.**      Okay.  So you were unable to validate the part about the

18   locker, okay, which is the first, um, first sentence, first two

19   sentences, right?  After she says, I'm scared to come to school

20   for the following reasons, and then she says, C.K. and D.M. come

21   to my locker every morning before first pod.  They come very

22   close to me, they say, Hey, B████, they laugh at me, harass me,

23   tease me, and give me seductive looks," right?

24   **A.**      Correct.

25   **Q.**      That's the end of the lockers, right?

 1    **A.**      Correct.

 2    **Q.**      And so when you answered Mr. Bates' question and said

 3    that we're unable to validate the parts about the locker, are

 4    you also saying that you were unable to validate everything in

 5    this statement or just the parts about the locker?

 6    **A.**      Sir, you're going to have to talk to the principal who

 7    did this, because I'm not seeing -- you're showing me her

 8    statement, but I'm not seeing the other statements.

 9    **Q.**      Okay.  Just so we're clear on that, we'll do that.

10          With Mr. Bates you were able to tell him, under oath,

11    that you were unable to validate the locker part, but you want

12    me to ask the other assistant principals about the rest?

13    **A.**      Correct.

14    **Q.**      Okay.

15    **A.**      Because you may just have the statements, but there's

16    other material and information that they most likely collected.

17    **Q.**      Okay.  We've got three more, I think.

18          Okay.  I want to go back to -- in your testimony under

19    examination from Mr. Bates, you recall you were talking about

20    the time where you -- where B████ was crying, do you remember

21    that?

22    **A.**      Yes, sir.

23    **Q.**      And so then you sort of -- after that you started talking

24    about an incident where she had exchanged words with another

25    boy, right?

1    **A.**    Yes, sir.

2    **Q.**    Those incidents were actually backwards from the way that

3    you said it so let's clear the timeline up.  Okay?  Let's clear

4    the timeline up.

5          MR. BATES:  Objection to the colloquy, Your Honor.

6          THE COURT:  I think he's fine.

7    BY MR. BRENNER:

8    **Q.**    Let's clear the timeline up.

9          There was an incident between B████ and another boy in or

10    around -- I think it's in the cafeteria.

11    **A.**    Correct.

12    **Q.**    And that's the incident that Ms. B████ investigated?

13    **A.**    Correct.

14    **Q.**    Okay.  That is not when you found B████ crying, correct?

15    **A.**    No, it was the -- I think it was possibly the same day,

16    but that was in the afternoon.

17    **Q.**    Okay.  When you found B███ crying is when she told --

18    well, ultimately when she got to you, she told you that she

19    had -- two girls had said to her that everybody hated her

20    because she was a whore, I think is that one, and that they were

21    going to -- Someone is going to kill you?

22          MR. BATES:  Objection, he's misstating the testimony.

23          THE COURT:  Why don't you rephrase that.  I think it might

24    have been a little --

25          MR. BRENNER:  When she got -- I'm sorry.

```
 1          THE COURT:  Might have been a little mixing of

 2   circumstances, so --

 3   BY MR. BRENNER:

 4   Q.     When she got to you, she told you that she -- that people

 5   said, Someone is going to kill you; is that right?

 6   A.     Um, she -- she wrote a statement in Ms. Ferrell's room,

 7   who was a counselor, and she wrote that statement, yes, sir.

 8   Q.     She didn't tell you that?

 9   A.     After she wrote the statement, Ms. Ferrell -- remember I

10   had kind of changed it around.  I was a little confused.

11   Q.     Yeah.

12   A.     So, after she saw Ms. Ferrell, Ms. Ferrell asked her to

13   write a statement and it was concerning, and then she called me

14   down to --

15   Q.     "She" meaning Ms. Ferrell?

16   A.     Ms. Ferrell.

17   Q.     And then did you talk to B____?

18   A.     Yes, in Ms. Ferrell's office.

19   Q.     In Ms. Ferrell -- not in your office?

20   A.     No, because I was reading the statement at that time.

21   Q.     Okay.  And she told you that she had received death

22   threats, right?

23   A.     Correct.

24   Q.     She told you -- she described what the two -- the two

25   girls who said it and to her looked like?
```

```
 1   A.      Correct.

 2   Q.      She told you what they were wearing?

 3   A.      Correct, but that did change with the discussion.

 4   Q.      Okay.  So she's crying?

 5   A.      Correct.

 6   Q.      She's upset?

 7   A.      Correct.

 8   Q.      She tells you two girls said that someone is going to

 9   kill -- made death threats to her?

10   A.      Correct.

11   Q.      She tells you what they look like?

12   A.      Correct.

13   Q.      She tells you what they're wearing?

14   A.      Correct.

15   Q.      And you refer to Ms. B███████?

16   A.      Before I refer to Ms. B██████, I talk to her about a plan.

17   Q.      Who, talk to who?

18   A.      Pardon me?

19   Q.      Talk to who?

20   A.      To B.L. -- I'm sorry, B.R.

21   Q.      You talked to her about a plan?

22   A.      That I asked her if she could identify the students and

23   she said, Well, I don't think so.

24   Q.      Right.

25   A.      And then I said, Well, if I provide you a yearbook, would
```

1    you be able to select these students if they were 8th graders?

2         And she said, I don't think so.

3         Then after that, I said, Well, I'm going to tell you a

4    plan, but I want to check with the school resource officer, so

5    why don't we go out the same time that occurred and see if those

6    girls walk up in that hallway and we'll have a couple of adults

7    around and we'll have a signal if you see these girls.

8    **Q.**    And this, unlike -- this one you have a crystal clear

9    memory of?

10   **A.**    That's what I remember.

11   **Q.**    Okay.  Are you sure B████ didn't ask you to show her

12   yearbook?

13   **A.**    No.

14   **Q.**    Okay.  You are sure?

15   **A.**    I'm sure.

16   **Q.**    Okay.  So that you're positive on?

17   **A.**    Right.

18   **Q.**    Okay.  You said -- new topic.

19        You said that you build trust in your students by, quote,

20   being available?

21   **A.**    Yes, sir.

22   **Q.**    Okay.  B████  complaint started in November of 2021

23   [sic], correct?

24   **A.**    Correct.

25   **Q.**    Oh, excuse me.  That's the school's -- the school says

1    B███████ complaint started in November 2021 [sic], right?

2    **A.**     Correct.

3           MS. REWARI:  Your Honor, for the record, I think it's

4    2011.

5           THE COURT:  Yeah.

6    BY MR. BRENNER:

7    **Q.**     The school -- according to the school, B█████ first made a

8    complaint in November 2011, correct?

9    **A.**     Correct.

10   **Q.**     You never make any affirmative effort to reach her -- to

11   speak with her at any time before her last day when she's pulled

12   out of school?

13          You never do, right?

14   **A.**     Sir, I talked to her on that incident we just talked

15   about.

16   **Q.**     Right.  You talked to her on February 9th when someone

17   else brought her to you, right?

18   **A.**     No, sir.

19   **Q.**     Okay.  Let me back up.

20          Let's go to February 8th first.  From the time she makes

21   her first -- from the time she makes her first complaint --

22   whenever that is, we'll talk to other witnesses about that --

23   you make no affirmative effort whatsoever to reach out to B█████

24   before February 8th, right?

25   **A.**     No, but I tried to reach out to her mother and she said

1   she didn't want to meet with me.

2   **Q.**    Okay.  We'll -- I'm sorry?

3   **A.**    I said that's okay.  I mean, did you hear?

4   **Q.**    Oh, yeah.  I heard you.  Now you may not hear sometimes

5   as well but you talk plenty clearly.  I can hear you.

6   **A.**    Okay.  I just want to make sure because I was pulling

7   away.

8   **Q.**    And then the February 9th incident is the only time that

9   you meet with B███ while she's an in-person student, correct?

10  **A.**    I might have talked to her in the hallway or seen her in

11  the hallway or walked in -- you know, I go into classrooms.

12  **Q.**    You may have seen her.  You never -- other than you

13  happen to say hi to her like any of the other 1200 students that

14  walk, you had no meetings with B███ or any conversations with

15  her before February 9th to talk about any of the complaints she

16  was making about what was happening to her in school?

17  **A.**    I can't say that for sure because I go in the cafeteria;

18  I go in the classrooms; I talk to students.

19          THE COURT:  Let's put it another way, sir.

20          Other than the dates that's been referenced by counsel,

21  did you, other than casual situations with B.R., have any

22  substantive conversations with her about anything which may be

23  part of this circumstance?

24          THE WITNESS:  Yes, except for the last incident.

25  BY MR. BRENNER:

1    **Q.**    Okay.  So except for February 9th?

2    **A.**    Yeah.

3    **Q.**    Okay.  Let's go to the last topic.  If we can bring up

4    already in evidence the -- it's Defense Exhibit 254.

5        Sir, you went over this with Mr. Bates.  This is the

6    Bullying and Prevention Practices at Rachel Carson 2011/2012.

7    **A.**    Yes, sir.

8    **Q.**    Okay.  Mr. Bates went through many of these bullet points

9    with you, but I want to go over one that we didn't get a chance

10   to look at.  Okay?

11   **A.**    Okay.

12       MR. BRENNER:  So I think it's the seventh one down.  Yep,

13   that one.  Yeah.  Maybe it's eight.  If you could just make that

14   a little -- okay.

15   BY MR. BRENNER:

16   **Q.**    So this one was also part of the same policy, right?

17   Right?

18   **A.**    Sir, could I have time to read it?

19   **Q.**    Oh, sure.  Sure.

20       MR. BATES:  I would just object to the word "policy" and

21   ask for him to rephrase.

22       THE COURT:  The term that's referenced on here is

23   "practices," so --

24   BY MR. BRENNER:

25   **Q.**    Did you consider this as part of the policy you were

```
 1   trying to implement on behalf of the school board to prevent

 2   bullying at Rachel Carson Middle School?

 3   A.     Sir, I feel this went beyond this school board policy and

 4   what we were trying to do at the school.

 5   Q.     So you think the school board policy required less than

 6   this and the school added some stuff to it?

 7          I just want to know what you mean by "beyond."

 8   A.     Yes, we wanted to make sure like the part -- an

 9   established mentor program is in place, which offers additional

10   adults to report to and seek out guidance.  That's not in the

11   school board policy.

12   Q.     Okay.  All right.  So I want to ask you about -- so

13   there's things in Exhibit 254 that the school board policy did

14   not include.  Is that fair?

15   A.     Sir, could you please repeat?  My hand is up.

16   Q.     Of course.  Of course.

17          There are things in Exhibit 254 that Rachel Carson

18   decided to do that were not included in the school board policy?

19   A.     Yes, sir.

20   Q.     Okay.  So now I'm going to ask you about this one and you

21   first tell me if it's part of the school board policy.  Okay?

22   A.     Oh, this -- okay.

23   Q.     This one you told me yesterday, but, "Administrators and

24   counselors immediately and thoroughly investigate reports of

25   bullying and harassment."
```

1           That is part of school board policy, correct?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  "Students, both targets and bystanders..."

4           So that means people that are --

5    **A.**    They see an event happening and they --

6    **Q.**    That's bystanders.  Targets are people that are the

7    recipient of the -- whether it's harassment, abuse, whatever it

8    is.

9           That's the target, right?

10   **A.**    Right.

11   **Q.**    Right?

12   **A.**    Sure.  Yes, sir.

13   **Q.**    Okay.  And the bystanders are another word for

14   "witnesses"?

15   **A.**    Witnesses.  That's what I thought you were talking about.

16   **Q.**    "Students, both targets and bystanders, are encouraged to

17   report incidents to an administrator, counselor, parent, or

18   another staff member."

19           Is that also --

20   **A.**    Correct.

21   **Q.**    Is that consistent and part of Fairfax County School

22   Board's policy?

23   **A.**    It was part of the -- when the counselors went in to

24   speak with the students, that that was part of the student

25   lesson.  So, yes, it was part of their policy.

1    **Q.**    Fairfax County policy?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  So I want to focus in on, "Students are encouraged

4    to report incidents to administrators, counselors, parents, or

5    another staff member."

6    **A.**    Right.

7    **Q.**    You wanted students to feel that they should report,

8    either as a bystander or a target, incidences of, for example,

9    sexual harassment or sexual abuse, correct?

10   **A.**    Absolutely.

11   **Q.**    And that's exactly what B█████ did, right?

12   **A.**    She did.

13   **Q.**    Right.  And part of the bargain is you expected and, as

14   it's in this policy, the student had a right to expect that

15   their reports would be immediately and thoroughly investigated,

16   right?

17   **A.**    Correct.

18   **Q.**    Okay.

19   **A.**    But are you -- how are you defining "immediately"?

20   **Q.**    I don't know.  Well, did you -- who wrote this?

21   **A.**    It was a collaboration between school members.

22   **Q.**    Did "immediately" mean within a day?  Within two days?

23          What did it mean?

24   **A.**    No, as soon as we can get to it.

25   **Q.**    As soon as you can get to it.  Okay.

```
 1         Now, would it be consistent with school board policy if

 2    the student wrote a statement for administrators to try to get

 3    them to change it?

 4         That would not be consistent with policy, right?

 5    A.   Sir, as --

 6         MR. BATES:  Beyond the scope, Your Honor.

 7         THE COURT:  Just a moment.

 8         THE WITNESS:  As the administrators -- oh, I'm sorry.

 9         THE COURT:  Overruled.  He can answer.

10         The question is, would it be consistent with school board

11    policy if a student wrote a statement for administrators to try

12    to get them to change it?

13         THE WITNESS:  Sir, when administrators are investigating,

14    they talk to a number of students.  Sometimes many students.  So,

15    as new information comes in, they may have to call back a student

16    to present them that piece to see, Hey, did you see this or did

17    this happen?

18         If the student says, Oh, yeah, you know, then they change.

19    If they didn't, they don't change.  We don't force any student to

20    change a statement if they believe it's not correct.

21    BY MR. BRENNER:

22    Q.   So, as I understand your testimony, it is consistent with

23    Fairfax County school policy when a student makes a written

24    statement for administrators to ask them to reconsider and

25    reevaluate it based on evidence the school found and ask them to
```

```
1   change their statement if appropriate?

2          MR. BATES:  Objection, asked and answered.

3          THE COURT:  Overruled.

4   BY MR. BRENNER:

5   Q.    Is that right?

6   A.    If -- if the student is agreeable to do that and they

7   say, Yes, this changed.

8          So we need all the information that we can possibly get

9   from all the witnesses to make a fair judgment.

10  BY MR. BRENNER:

11  Q.    Thank you, Mr. F█████, or Principal F█████.

12         Thank you.

13  A.    Thank you, sir.

14         MR. BRENNER:  No further questions, Your Honor.

15         THE COURT:  Thank you.

16         All right, sir, you can go ahead and have a seat next to

17  the gentleman in the red tie.  I'm sorry, I forgot his name.  But

18  you can go back and have a seat there.

19         THE WITNESS:  And, sir, I'm sorry my bad ear was toward

20  you.

21         THE COURT:  That's fine.

22         MS. ANDERSON:  The plaintiff, B.R., calls Professor Nancy

23  Cantalupo.

24         I'm going to move this a little bit, if that's okay.

25         (NANCY CANTALUPO, PLAINTIFF'S WITNESS, SWORN)
```

1      THE COURT:  Ma'am, listen to the questions of counsel.

2  Answer them as best you can.  If you hear an objection or you

3  hear the Court speaking, it might be a good time to pause your

4  testimony so that the Court can rule on any circumstances which

5  may arise.

6              DIRECT EXAMINATION OF NANCY CANTALUPO

7  BY MS. ANDERSON:

8  **Q.**    Good afternoon, Professor Cantalupo.

9      MS. ANDERSON:  Oh, and for the court reporter, Alison

10  Anderson on behalf of plaintiff.  Good afternoon.

11  BY MS. ANDERSON:

12  **Q.**    Can you please state your name and spell it for the

13  record?

14  **A.**    Sure.  It's Nancy Chi Cantalupo.  N-A-N-C-Y, C-H-I,

15  C-A-N-T-A-L-U-P-O.

16  **Q.**    And, Professor Cantalupo, are you here today to give

17  expert testimony?

18  **A.**    I am.

19  **Q.**    And is that on the topics of Title IX and concepts of

20  sexual harassment and gender-based violence?

21  **A.**    Correct.

22  **Q.**    I want to talk a little bit about your background.

23      What are you doing now?

24  **A.**    So, I am now an associate professor of law at Wayne State

25  University Law School in Detroit, Michigan.

```
 1          I teach a series of courses, including Criminal Law, and
 2   a course that I developed called Sexual Violence in the Law.
 3   Q.     And before teaching at Wayne State University -- I just
 4   want to take a step back -- where did you get your J.D. or your
 5   juris doctorate?
 6   A.     Um, I got it at Georgetown University law school or Law
 7   Center, is the proper name.
 8   Q.     And is that the degree that someone needs to be a
 9   quote-unquote lawyer?
10   A.     Yes.
11   Q.     And separately, did you also get a Master's?
12   A.     I did.  I got a Master's of Laws at -- an LL.M. degree at
13   Temple University in Philadelphia.
14   Q.     And after obtaining those degrees, can you walk us
15   through what you did next in your professional clear?
16   A.     Sure, so the LL.M. degree was a part of a teaching
17   fellowship.  I was training to become a professor.  And as a
18   part of that I was also conducting legal research and writing,
19   but actually before that I had -- before my LL.M. degree I had
20   already begun researching and writing on the field that I had
21   before I went to law school, which was in higher ed
22   administration, and I continued in that field, both during law
23   school and after law school.
24   Q.     Okay.  And after law school, what law schools did you end
25   up teaching at?  We won't go through every single step, but if
```

```
 1   you want to just walk through what law schools you have ended up

 2   being a professor at.

 3   A.    Sure.  So I taught -- I've taught at -- prior to my LL.M.

 4   degree, I taught at both Georgetown and George Washington.  And

 5   then after my LL.M. degree -- so while I was in the LL.M.

 6   program, I was at Temple University teaching students at Temple

 7   in their law school.  And then after that I went to Barry

 8   University School of Law in Orlando, Florida.  And then I was

 9   briefly at California Western School of Law in San Diego,

10   California.

11   Q.    And can you generally describe what areas of the law you

12   were teaching and researching in?

13   A.    Sure.  So my specialty is in Civil Rights law, and so a

14   lot of what I taught was related to Civil Rights laws and how

15   they apply to sexual harassment and gender-based violence and

16   other forms of discriminatory violence.

17         THE COURT:  Ms. Anderson, you can take down the exhibit.

18         MR. BRENNER:  Sure.  So, this is the demonstrative that --

19         THE COURT:  Yeah, but it's been up for about five minutes.

20         MS. ANDERSON:  Oh.

21         THE COURT:  I think we've all read it by now.

22         MS. ANDERSON:  Okay.  I was going to click to the next,

23   but we'll just leave it like that.  Is that okay?

24         THE COURT:  Yes.  That's the Court's preference.  I'm not

25   of a mind to allow things to just sort of sit and percolate as
```

```
 1    we're doing examinations.
 2         MS. ANDERSON:  Okay.  It's a PowerPoint so it's a little
 3    more difficult for me to -- but I will -- does this work with the
 4    blank -- we'll have the blank --
 5         THE COURT:  That's fine.
 6         MS. ANDERSON:  Okay.
 7         THE WITNESS:  So I was also asked to teach, over the
 8    course of my time, property, and international law, and criminal
 9    law, and criminal procedure.
10    BY MS. ANDERSON:
11    Q.    And what has been the topic or topics of your research?
12    A.    My research has focused on civil rights laws and human
13    rights laws and how they apply to gender-based violence, sexual
14    harassment, and other forms of discriminatory violence.
15    Q.    Okay.  And when you say Civil Rights laws, does that
16    include Title IX?
17    A.    Yes.  It's actually -- most of my focus has been on
18    Title IX, but Title IX uses some of the same methods as other
19    Civil Rights laws, so the other Civil Rights laws come in.
20    Q.    I'm going to talk a little bit about some of the speaking
21    engagements.  And we won't go through all of them, but I just
22    want to highlight some of them that you have done.
23         And if you could just walk through some of your speaking
24    engagements, some of the more recent ones, and we'll start with
25    the, "Invited to be a keynote speaker," the top bullet.
```

A.      Right, so the UC Berkley Center for Comparative Quality &
Anti-Discrimination Law is an organization out of UC Berkley's
law school that has asked me over the years to speak there a
number of different times.

        And, you know, I sort of started out as a panel speaker
and then they started asking me to be a keynote speaker, and so
that actually might have been the second time I've served as a
keynote speaker.  I can't actually remember.

Q.      Okay.

A.      And then Northwestern was doing a 50th anniversary
celebration, so that was actually a -- that didn't come from the
law school.  That was a main university sort of effort.  And so
they asked me to be a panelist on the programs dealing with
sexual harassment and gender-based violence.

Q.      And what about the Association of Title IX Administrators
annual conference?

A.      Yeah, so ATIXA is an association of folks who work for
colleges and universities primarily, although there are some K
through 12 folks, who are working with Title IX from inside the
school.  They're administrators inside the school.  And they're
doing things like investigating complaints, you know, providing
accommodations to students who have needs that involve their
Title IX rights.

        And I've -- ATIXA has sort of followed my work for years
and years, and so they've invited me to speak on different

1    occasions.  In this case they particularly wanted me to speak

2    because of it being the 50th anniversary of Title IX but also

3    because there's lots of activity going on in the policy space,

4    and so they wanted me to give a keynote lecture to kind of

5    address the things that could be coming down the pike and to

6    help prepare their folks.

7    **Q.**    Okay.  And what about the Title IX 50th Anniversary

8    Symposium?

9    **A.**    So that's -- that was another -- Boston University's Law

10   Review had wanted to do a Title IX anniversary celebration, and

11   they were particularly focused on sexual harassment and

12   gender-based violence, so they asked me to join that.

13        And the University of Hawaii, that was similar, although

14   in that case it was actually -- it was sort of at the tail end

15   of the pandemic, so I did an initial speaking engagement online

16   for them because Patsy Mink, who was a senator from Hawaii for

17   many years, was one of the key sponsors or, you know, key movers

18   of getting Title IX passed.

19        And so they were doing --

20        THE COURT:  Is there any objection to the professor being

21   qualified as an expert in the purpose of Title IX?

22        MR. ELLIKER:  For purposes of preserving our earlier

23   objection?

24        THE COURT:  Yes.

25        MR. ELLIKER:  We'll preserve that objection, but otherwise

 1    we're fine to -- we can skip the qualification portion.

 2           THE COURT:  Very good.

 3           MS. ANDERSON:  Except, Your Honor, I will reduce it, but

 4    it obviously goes to the weight and credibility --

 5           THE COURT:  You don't have to go through every bullet

 6    point she's got on her curriculum.

 7           MS. ANDERSON:  We'll reduce it but it obviously goes to

 8    the credibility and weight of the testimony.

 9           THE COURT:  It does but I just hope --

10           MS. ANDERSON:  Okay.

11           THE COURT:  -- we're not going to pore through 13 pages of

12    who she spoke to and what time she spoke to them and all of that.

13           MS. ANDERSON:  No, we're moving on to research and

14    publications.

15           THE COURT:  All right.

16    BY MS. ANDERSON:

17    Q.    Ms. Cantalupo, and maybe highlight a couple of the top

18    ones, but can you please walk us through -- well, and I

19    apologize, just one last question on the last slide is so, those

20    say 2022 and 2023.  Have you been going to speaking engagements

21    for a long time?

22    A.    I think the first time I spoke was in maybe 2007 on these

23    sorts of topics.

24    Q.    Have you published extensively on the topics of Title IX

25    and assessment and gender-based violence?

 1  **A.**    Yes.

 2  **Q.**    And on the screen, are these some examples of some of

 3  those publications?

 4  **A.**    Yeah, these are some of the most recent ones, but I think

 5  I published my first piece on Title IX in 2009.

 6  **Q.**    And can you just give us sort of a high level of what

 7  some of these publications have discussed?

 8  **A.**    Sure.  So, they actually are all from a sort of similar

 9  perspective.

10          MR. ELLIKER:  Objection to the relevance of the content of

11  the journals.

12          THE COURT:  Keep her focused as best you can, Counsel.

13          THE WITNESS:  Um, so there --

14          THE COURT:  Wait a minute, wait a minute.  Let her ask you

15  a question.

16          THE WITNESS:  Okay.

17          THE COURT:  All right.

18  BY MS. ANDERSON:

19  **Q.**    So, are these articles about Title IX, some of them?

20  **A.**    Yeah, they're all about Title IX.

21  **Q.**    Okay.  And do you also do research and write articles and

22  writing about sexual harassment and gender-based violence?

23  **A.**    Yes, so how Title IX applies to those problems.

24  **Q.**    And again, we see some examples on the screen, but how

25  long have you been researching and publishing?

1    **A.**    Well, I've been researching and publishing since about

2    2008.  My first piece was in -- was published in 2009 but, of

3    course, I started reaching and writing it prior to its

4    publication date.  And -- but prior to that I had done about 15

5    years as an administrator doing the work from a policy-based

6    perspective, and a lot of that, you know, has factored into the

7    later writing and research that I've done.

8    **Q.**    And just to be clear, when you say "an administrator

9    doing the work," what do you mean by "the work"?

10   **A.**    I mean the work of helping institutions to combat sexual

11   violence and sexual harassment, gender -- other forms of

12   gender-based violence that are happening and that affect their

13   students or other members of their community.

14   **Q.**    Okay.  Have you also been asked to consult on these

15   topics for government agencies?

16   **A.**    Yeah.  So, in about 2013-2014, this became a big issue, a

17   big issue in the sense that it got a lot of press attention and

18   national government attention.  And so I was pulled in, I was

19   asked by a lot of these governmental organizations to consult

20   with them on various things that they -- you know, when they

21   went and looked for someone who was writing on these topics,

22   they found my research and they asked me to help them with

23   various things.

24   **Q.**    Okay.  And does that include both federal and state

25   government agencies?

1   **A.**    Yes.

2   **Q.**    And what are some of the states that you helped consult

3   with?

4   **A.**    Yeah.  So, Virginia and Maryland were particular states

5   because I was living in northern Virginia at the time and sort

6   of, you know, everyone kind of knew that I was local.  And so --

7   so, so I was with Virginia -- I testified and worked with both

8   the Virginia legislature and the Maryland legislatures on things

9   that they were trying to put together related to campus sexual

10  harassment and gender-based violence.

11  **Q.**    Now, have you been an expert before in previous

12  litigation?

13  **A.**    Yes.

14  **Q.**    About how many times?

15  **A.**    In litigation, about five.

16  **Q.**    And can you just give us a high-level sense of what some

17  of those matters were?

18  **A.**    Sure.  So, I should say that some of them were

19  prelitigation and they never got to litigation, so oftentimes

20  what I would do -- what I was asked to do was to write a report,

21  to talk to the various folks involved, and to look at whatever

22  evidence and documents were available and, you know, render my

23  opinion as to what had happened and whether or not the standard

24  of care had been followed by the -- from my perspective as a,

25  you know, 15-year administrator in campuses -- or on a campus.

1    **Q.**    And is this your first time testifying in a trial?

2    **A.**    This is my first time testifying in court, yes.

3         MS. ANDERSON:  Your Honor, plaintiff offers Ms. Cantalupo

4    as an expert on Title IX as well as sexual harassment and

5    gender-based violence, and I believe that was --

6         THE COURT:  Subject to the objection lodged earlier.

7    BY MS. ANDERSON:

8    **Q.**    Ms. Cantalupo -- or Professor Cantalupo, are you being

9    paid to be here today?

10   **A.**    No.

11   **Q.**    And today your testimony, will it be to a reasonable

12   degree of certainty in your field?

13   **A.**    Yes.

14   **Q.**    Based on the experience that you have?

15   **A.**    Yes.

16   **Q.**    Okay.  What is Title IX?

17   **A.**    So Title IX is groundbreaking Civil Rights legislation

18   from 1972 that basically prohibits institutions or educational

19   programs that receive federal funds from engaging in

20   discrimination on the basis of sex or gender.

21   **Q.**    So I think we may have covered this in the answer, but

22   just to be clear, what is the purpose of Title IX?

23   **A.**    So, it's supposed to make sure that everyone in the

24   school, regardless -- or in the educational program, regardless

25   of their sex or gender, receives an equal education.

1    **Q.**    And you had mentioned sex discrimination.

2         What types of sex discrimination does Title IX seek to

3    address?

4    **A.**    Yeah.  So -- so there's a whole range of things that

5    qualify as sex discrimination.  Probably the most well known,

6    prior to sexual harassment and gender-based violence becoming a

7    big thing, was gender and -- sex in athletics, like equal

8    athletic opportunities for girls and boys.

9         But my expertise is on sexual harassment, which is -- has

10   long been understood as being conduct that is unwelcome, and

11   that if schools do not take the right approach to dealing with a

12   hostile environment that could be created, that the student

13   would not be able to participate or benefit from the school's

14   educational program on an equal basis.

15   **Q.**    And when we're talking about sexual discrimination or

16   harassment under Title IX, is that focused on by other students,

17   administrators, faculty and staff, anyone in particular or --

18   **A.**    No, it's everyone because Title IX rights are held by the

19   person who is experiencing the discrimination.  So it doesn't

20   matter who's discriminating against them.  Title IX applies

21   because of who they are.

22   **Q.**    And under Title IX, what's the definition of sexual

23   harassment?

24   **A.**    So, under Title IX, sexual harassment is going to be

25   unwelcomed sexual conduct of some kind or conduct that

1    unwelcomed sort of gender-based conduct that the -- that the

2    victim of the discrimination or the harassment finds to be

3    unwelcome.

4         And it also, at the institutional level or at the

5    educational program level, is about having created a hostile

6    environment or there being a hostile environment.

7    **Q.**    And what schools are required to adhere to Title IX?

8    **A.**    All schools that receive federal funds.

9    **Q.**    And how do schools know or come to understand what some

10   of the requirements of Title IX are?

11   **A.**    Well, the most important source of that information is

12   the U.S. Department of Education, and specifically the Office

13   for Civil Rights in the Department of Education, which has both

14   rules that they -- that they pass through a particular process.

15        And they also produce guidance documents that are -- that

16   don't go through a particular law-making process, but they are

17   kind of like technical assistants to schools and to educational

18   programs that gives them advice proactively about what they can

19   do to meet Title IX.

20   **Q.**    I think we covered that.

21        Does Title IX's regulations require a prompt and

22   equitable grievance procedure?

23   **A.**    Yes.

24   **Q.**    And what is the purpose of a prompt and equitable

25   grievance procedure?

1   **A.**     Well, a prompt and equitable grievance procedure is

2   designed to provide a mechanism for both the school and for

3   students and parents and other members of the community to sort

4   of have a way to communicate with the school about things that

5   are happening at the school.

6        So, you know, if there is an issue with sex

7   discrimination, including sexual harassment or gender-based

8   violence, this would be the way that a parent or a student would

9   look at the -- whatever the school has produced to inform people

10  about the grievance procedure.

11       They would look at that and say, Well, okay, now I know

12  how to get this information to the school, and this is some

13  sense of how the school is going to address it.

14  **Q.**     Okay.  And when you say "gender-based violence," just so

15  that we're clear what's being in that category, what are you

16  putting in the category of gender-based violence?

17  **A.**     So gender-based violence can be -- it's really anything

18  that involves physical contact that is gender-based, right?

19       So it could include sexual harassment that involves

20  physical contact, like groping or things of that sort.

21       It could include the kinds of conduct that many people

22  would probably use sexual assault as the terminology for.

23       It could also include things like dating violence or

24  relationship violence.

25       And it can also include things that are directed at

```
 1   people because of their perceived gender, rather than, you know,

 2   their actual gender, if that makes sense.

 3   Q.    Okay.  It makes sense.

 4         And has your area of study -- so has that included

 5   researching the basis and impact of gender-based stereotypes on

 6   victims of sexual harassment and sexual assault?

 7   A.    Yeah.  So, I've actually done a lot of work on this

 8   because the more you get into the research, the more you realize

 9   that there are these longstanding -- actually, centuries old, in

10   some cases they're as old as a millennium, like a thousand years

11   old -- that are, you know, these attitudes that originally based

12   in the criminal law but they're now no longer a part of the

13   criminal law.

14         But they sort of remain with us in the form of

15   stereotypes of primarily women and girls and gender minorities

16   who are the vast majority of the folks who end up being --

17   having gender-based violence directed at them.

18   Q.    Let's walk through some of these -- some of these origins

19   that you had talked about.  Can you just walk through with us

20   what some of these origins are and what you mean for each?

21   A.    Right.  So, these are all things that victims of sexual

22   assault had to prove, sort of extra requirements that they had

23   to prove in order to be believed.  So they had to go immediately

24   to law enforcement.  They had to have corroboration in the form

25   of, you know, injuries, torn clothing, third-party witnesses,
```

1    those types of things.

2         One of the really old ones is that they had to basically

3    be a virgin.  If they weren't a virgin, then they were viewed as

4    being sexually active and, therefore, promiscuous and,

5    therefore, you know, essentially not rapeable.

6         And they had to resist the assailant like screaming,

7    fighting, and, you know, just trying to draw as much attention

8    to themselves as possible if there were other people around.

9    And then, of course, for a long time, until the 1990s, actually,

10   there were -- in most places a husband could not rape his wife.

11   **Q.**    And what about just in general how a victim of sexual

12   assault -- their testimony was to be perceived?

13   **A.**    Well, all of these sort of were along the same theme,

14   which is that, you know, people were basically told you should

15   be extra skeptical of a person who's saying that they have been

16   sexually assaulted or raped, and that -- and you know, sort of

17   expect them to lie.

18   **Q.**    And, to be clear, these are now reformed criminal laws

19   that are no longer the case for the most part?

20   **A.**    Yeah.  For the most part they're reformed out of the

21   criminal law, but they remain very much, in terms of the

22   attitudes that many people have, continue to have.

23   **Q.**    And how do these gender-based stereotypes become relevant

24   to a potential victim's vulnerability?

25   **A.**    Well, so, there are a number of ways in which they can

```
 1    make a victim more vulnerable.

 2          So, first, is that potential perpetrators or harassers,

 3    assailants, are going to look for potential victims who they

 4    think are less likely to be believed.  And so, you know, so if

 5    there is a -- if there is a stereotype in place that victims

 6    lie, then that makes them more vulnerable to having that conduct

 7    directed at them, because the harasser knows that they're not

 8    going to be held accountable for having done that.

 9          And the more a person has a reputation for being -- for

10    lying, right?  So if, for instance, they're being viewed as

11    being promiscuous, then they're viewed as being particularly not

12    credible, then they're going to be more and more vulnerable to

13    being sexually harassed and having this violence directed at

14    them because the potential perpetrators understand that they're

15    the least likely to be believed if they come forward and say,

16    This is what happened to me.

17    Q.    And, Professor Cantalupo, what impact if any --

18          THE COURT:  Just a moment, Ms. Anderson.

19          MS. ANDERSON:  I'm sorry.

20          MR. BLANCHARD:  May we approach?

21          THE COURT:  Sure.

22          (Following sidebar discussion had on the record:)

23          MR. BLANCHARD:  Your Honor, I didn't understand that the

24    testimony would get to a level where it is now where the

25    plaintiff is putting on a witness to tell the jury what to
```

1   believe and how they should view evidence.

2       I think this is way beyond the scope of what's

3   appropriate.

4       THE COURT:  Well, I think what may have been lost -- I

5   don't know what the fact-finder heard, but we were talking

6   originally in the context of historically, and that's what -- and

7   as far as I've been able to discern, she's staying within the

8   confines that the Court proposed.

9       She said the term "historically."  There was a bit of an

10  uneasy transition as to whether she's talking about things right

11  now, but obviously you'll get an opportunity on cross to clean

12  that up.

13      MR. BLANCHARD:  But I think they moved beyond historical

14  and what things were in the past and are telling this jury this

15  is how you should view any testimony that comes in in this case.

16  And these are -- in essence, it's like another voir dire of this

17  jury, and saying, you know, you have to believe these things or

18  these things were believed in the past and they're all wrong.

19      And now we're talking about criminal law.  This is a civil

20  case, and we're talking about gender-based.  I've got a

21  12-year-old girl that -- I don't know what this has to do with my

22  client at all who is alleged to have been involved in the assault

23  with the plaintiff.

24      And so there's no issue of all these things as it pertains

25  to my client.  C.K. is not in this case.  I don't -- I just think

1    this has gone way far afield and I object to it.

2        THE COURT:  I understand your point, but I don't think

3    it's crossed the line yet with regard to the Court's

4    determination as to what's appropriate under *Coastal Carolina*.

5        I would be careful, Ms. Anderson, with this witness

6    volunteering too much information.  She needs to stay within the

7    confines of the questions.  Obviously she's worked with you in

8    preparation of her testimony and she understands what her

9    responsibility is, but she doesn't need to vary it.

10        I understand Mr. Blanchard's point.  I don't think we've

11    gotten to the point now where it's objectionable, but we're

12    getting too close if she volunteers any information.  And you

13    don't want to run the risk of her volunteering something that's

14    inconsistent with the Court's determination, which would then

15    cause me to strike her entire testimony.

16        MS. ANDERSON:  Completely.  And I think we're tying to do

17    that.  I tried to also ask an additional question to clarify that

18    these are past laws.  But, also, I understand if Your Honor wants

19    to do an instruction, but I think -- we're trying very hard.

20        THE COURT:  She's okay now, but Mr. Blanchard is making a

21    very good point and it may become more salient later.  So she

22    needs to be careful.

23        MR. BLANCHARD:  I also think with respect to my client

24    personally I need a limiting instruction.

25        THE COURT:  Well, you can propose that at the -- during

1    the general instructions that we give at the end of the case, but

2    I would suggest -- and this is just me speaking from

3    experience -- that giving some sort of limitin themg instruction

4    right now might muddy the waters more than you want to muddy.

5        MR. BLANCHARD:  I understand.  And I -- in that regard --

6        THE COURT:  -- wedge.

7        MR. BLANCHARD:  Yeah.  What is before this jury are

8    policies with the school and whether they had notice of things.

9    And my client is the only one charged with an assault, and she

10    has nothing to do with any of this.

11        THE COURT:  Okay.  As I said, a limiting instruction may

12    well be appropriate, and that's what I would be inclined to do.

13    All right.  Make sure your witness stays on course.

14        MS. ANDERSON:  We're trying very hard.  I think we're

15    doing it, but I will keep trying.

16        THE COURT:  Okay.

17        MR. BLANCHARD:  Thank you, Your Honor.

18        (Sidebar discussion concluded.)

19        THE COURT:  Just a moment.  We're taking a quick break.

20        MS. ANDERSON:  I'm never going to interrupt a judge and a

21    jury getting candy, so I will wait.

22        THE COURT:  All right.  Go ahead, Ms. Anderson.

23        MS. ANDERSON:  Thank you, Your Honor.

24    BY MS. ANDERSON:

25    Q.    Ms. Cantalupo, what, if any -- what impact, if any, do

```
 1   these gender-based stereotypes have on a victim's willingness to

 2   come forward and report sexual harassment or sexual assault?

 3   A.    Well, I think to the extent that a victim knows that

 4   these kinds of gender-based stereotypes are out there, they're

 5   less likely to report to anyone who's in authority if they think

 6   that the people who are -- who they would normally reach out to

 7   for help aren't going to hold these kinds of stereotypes.

 8   Q.    Okay.  And if a victim of sexual harassment or

 9   gender-based violence reports the sexual harassment or sexual

10   assault and is not believed, what impact does that have?

11   A.    So that's -- you know, there may be some -- some -- I

12   mean, we're talking about a lot of people, right?

13        So, you know, some may come forward and decide to report.

14   But if they're faced with the kind of stereotypes -- if they're

15   basically faced with accusations that they're lying, that then

16   they're going to be -- they're not going to want to ever talk to

17   that person again.

18        THE COURT:  Go ahead.  Move on, Ms. Anderson.

19   BY MS. ANDERSON:

20   Q.    Thank you.  Thank you, Professor Cantalupo.

21        And does a victim's age impact their vulnerability to

22   sexual abuse?

23   A.    Absolutely.  So, you know, the research shows that youth,

24   people who are either children or adolescents, or young adults,

25   are most vulnerable and they're often purposely targeted by
```

1    sexual perpetrators and abusers and harassers because --

2         THE COURT:  Next question.

3         THE WITNESS:  -- they're sort of innocent.

4         THE COURT:  Stop.  Next question.

5    BY MS. ANDERSON:

6    Q.    Professor Cantalupo, based on your research into Title IX

7    and the available rules, regulations, and guidance from the

8    federal government, in 2011, what were some of the minimum

9    standards of care that schools were expected to adhere to under

10   Title IX?

11   A.    Right.  So, at this point I was actually still an

12   administrator, so the things that I knew at that time was that

13   you had to have an established grievance procedure for students

14   to use.  That was the way that you communicated to parents and

15   students about what they could do, but also it gave you a reason

16   to train your employees as to what the grievance procedure was,

17   and that was a kind of prompt to also train them about sexual

18   harassment and things like that.

19        So, if you didn't have that in place, then you wouldn't

20   have -- you often didn't also have the training; and if you

21   didn't have either the grievance procedure or the training,

22   then, you know, essentially you were leaving your employees

23   to --

24        THE COURT:  Next question.

25        THE WITNESS:  -- act on gender stereotypes.

1        THE COURT:  Next question.

2   BY MS. ANDERSON:

3   **Q.**     Professor Cantalupo, were there any minimum standards of

4   care related to retaliation?

5   **A.**     Yeah.  So, all of the information out there says that you

6   can't -- you have to protect students who come forward from

7   retaliation, and that retaliation could come from employees and

8   from the school district itself or it could come from other

9   students.  And the school district is responsible for protecting

10  the Title IX recipient from both of those kinds of retaliation.

11  **Q.**     Okay.  And what about in relation to having someone

12  publicly identified that people can go to about sexual

13  harassment or sexual misconduct?

14        MR. ELLIKER:  Your Honor, I don't --

15        MS. ANDERSON:  That's the -- we can --

16        THE COURT:  Rephrase your question just a bit.

17        MS. ANDERSON:  Okay.

18  BY MS. ANDERSON:

19  **Q.**     Were there any minimum standards of care related to there

20  being someone publicly identified for parents, teachers, and

21  students?

22  **A.**     Yes, that was clear -- that's been clear since 1975, that

23  you had to have someone who was identified, you know, in

24  multiple places on Websites, et cetera.

25  **Q.**     Okay.  And what about as far as conducting an

```
1    investigation?

2    A.    Um, so you had to be able to listen to a student who, you

3    know, comes forward to report sexual harassment or abuse, you

4    know, find out what they experienced, and, you know, credit it,

5    take them seriously.  And that was true regardless of the type

6    of harassment that they were reporting, right?  It could be

7    something verbal or it could be something physical.  It didn't

8    matter.  It was -- the content -- it was the fact that it was

9    unwelcome to them that made it sexual harassment, and so you had

10   to listen and take that seriously.  And you had to --

11         THE COURT:  Next question.  Stop.  Next question.

12   BY MS. ANDERSON:

13   Q.    Okay.  And was -- in performing a non-bias and

14   non-perfunctory investigation, is there an expectation about

15   asking about welcomeness or consensualness?

16   A.    Yeah, well, that would be --

17         THE COURT:  Yes or no?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.

20   BY MS. ANDERSON:

21   Q.    What else does Title IX allow for besides just potential

22   discipline for the accused?

23   A.    Title IX actually involves a whole range of things.  It's

24   not actually -- discipline is not the primary thing.  It's also

25   that schools need to provide services and accommodations and
```

 1   resources so that students can get to -- as close to the

 2   educational environment and experience that they were having

 3   prior to experiencing the harassment or the violence.

 4        So, you know, they need to be able to feel safe going

 5   into the classroom, to not have whatever trauma they've already

 6   experienced triggered when they go into the classroom because of

 7   who's also there or other things that might, you know, cause

 8   them to have a traumatic response and then not be able to

 9   concentrate in class, not be able to, you know, do what they're

10   in school to do, which is learn.

11   **Q.**   And what's the goal of those accommodations and

12   resources?

13   **A.**   It's to reestablish the -- an equal educational

14   environment and experience and, you know, help the student to

15   feel safe enough so that they can learn.

16        MS. ANDERSON:  Okay.  One moment, Your Honor.  Court's

17   indulgence.

18        THE COURT:  Yes.

19   BY MS. ANDERSON:

20   **Q.**   Thank you, Professor.

21        And just to be clear, the opinions that you've given

22   today, are they within a reasonable degree of certainty in your

23   field of expertise?

24   **A.**   Yes.

25        MS. ANDERSON:  Thank you.

```
 1            THE COURT:  Thank you, Counsel.

 2            Cross-examination.  Who's taking the lead and who are you

 3    representing, so I make sure I don't mess things up.

 4            MR. ELLIKER:  Yes, Your Honor.  Good afternoon.  I'm Kevin

 5    Elliker.  I'm here on behalf of the school board.

 6                 CROSS-EXAMINATION OF NANCY CANTALUPO

 7    BY MR. ELLIKER:

 8    Q.     Professor Cantalupo, you have a J.D., right?

 9    A.     Yes.

10    Q.     And that's a law degree?

11    A.     Yes.

12    Q.     You consider yourself an advocate, right?

13    A.     I consider myself a researcher and a scholar primarily

14    and someone who helps both schools and survivors to

15    problem-solve in this -- with this -- with regard to this

16    particular problem, sexual harassment and gender-based violence.

17    Q.     But you do consider yourself a victims' rights advocate,

18    right?

19    A.     I consider myself to be a victims' rights advocate, yes.

20    Q.     And you consider the plaintiff in this case to be a

21    victim?

22    A.     Yes.

23    Q.     And so you're here to advocate for her case?

24    A.     I am here to provide expertise on how schools should be

25    dealing with cases like hers and how the school dealt with -- my
```

1   opinion based on my expertise of how the school dealt with her

2   case.

3   **Q.**    Now, do you remember who first contacted you about

4   becoming an expert witness in this case?

5   **A.**    Yes.  It was her brother.

6   **Q.**    And you didn't know the plaintiff's brother before he

7   reached out to you, did you?

8   **A.**    No.

9   **Q.**    And you didn't know anything about this case before the

10   plaintiff's brother contacted you?

11   **A.**    I don't believe so, no.

12   **Q.**    Did the plaintiff's brother tell you that he might also

13   be a witness in this case when he reached out to you?

14   **A.**    I -- he -- I don't remember, but I assumed that he would

15   be.

16   **Q.**    And you've had maybe about a half a dozen phone calls

17   with the plaintiff's brother, haven't you?

18   **A.**    Less than half a dozen.

19   **Q.**    But the plaintiff's brother called you out of the blue

20   the day before you were deposed in this case, didn't he?

21   **A.**    Yes, he did.

22   **Q.**    And you had about an hour-long conversation about your

23   personal life with him?

24   **A.**    Yes.

25   **Q.**    And how many times have you had a conversation with the

1   plaintiff's brother since your deposition?

2   **A.**    I can remember one.

3   **Q.**    And how long was that phone call?

4   **A.**    It was very brief.

5   **Q.**    Was it about the case?

6   **A.**    Um, it was in the period of time when the plaintiff was

7   *pro se.*

8   **Q.**    So, it was about the case?

9   **A.**    It was about the case because I needed to be informed

10  that she had gone *pro se.*

11  **Q.**    Now, you're a law professor at Wayne State, and if

12  I listened correctly --

13      THE COURT:  Ma'am, you need to answer "yes" or "no" for

14  the court reporter.  So the court reporter knows your response,

15  you need to answer "yes" or "no" as opposed to nod your head.

16      MR. ELLIKER:  I'm sorry --

17      THE WITNESS:  Oh, sorry.  Yes.

18      MR. ELLIKER:  Your Honor, I think I may have actually been

19  in the middle of a compound question so --

20      THE COURT:  All right.  Well, don't do that.

21      MR. ELLIKER:  I won't.

22      THE COURT:  All right.

23  BY MR. ELLIKER:

24  **Q.**    You've had about three or four positions at different law

25  schools; is that right?

1  **A.**      (Nodded head affirmatively.)  Correct.

2          THE COURT:  I didn't hear your --

3          THE WITNESS:  Yes.

4  BY MR. ELLIKER:

5  **Q.**      And actually, before we move on, you mentioned the

6  plaintiff was *pro se*.  That means that she didn't have a lawyer,

7  correct?

8  **A.**      She did not have a lawyer at that moment.

9          MS. ANDERSON:  Objection to relevance, Your Honor.

10          THE COURT:  Well, the witness provided that statement, so

11  I think that's an appropriate clarification.

12  BY MR. ELLIKER:

13  **Q.**      So as a law professor, your students are adults, right?

14  **A.**      Yes.

15  **Q.**      Okay.  And you've never had students who are middle

16  schoolers, have you?

17  **A.**      I have not had students who were middle schoolers.

18  I've -- in a previous job, prior to being a law professor, I had

19  students who were adolescents, or I worked with students who are

20  adolescents.

21  **Q.**      You're referring to your time working at a university?

22  **A.**      Yeah.

23  **Q.**      And so when you're saying "adolescents," do you mean

24  maybe freshmen and sophomores in college?

25  **A.**      I mean primarily freshmen in their very first weeks on

1    campus because that's the Red Zone -- the quote-unquote Red Zone

2    for when sexual assaults most often happen.

3    **Q.**    I see.  And you earlier in your testimony talked about

4    being an administrator in 2011.  That was as an administrator at

5    a college or university, correct?

6    **A.**    That was -- yes.

7    **Q.**    And you've never worked in a middle school, have you?

8    **A.**    No.

9    **Q.**    Or in a high school?

10    **A.**    No.

11    **Q.**    Or in an elementary school?

12    **A.**    No.

13    **Q.**    You've never held any position at a K through 12 school,

14    have you?

15    **A.**    No, not within the school.  I've worked with people who

16    are in those schools but not for the school.

17    **Q.**    As a researcher and expert in the field, right?

18    **A.**    I've worked with folks in K through 12.  As a researcher

19    and expert in the field, folks have reached out to me to get my

20    expertise on who are working at schools, but I myself have never

21    worked for a school.

22    **Q.**    Do you agree that the role of an elementary school

23    administrator is different than the role of a college

24    administrator?

25    **A.**    Yes.

1    **Q.**    Okay.  And so would you also agree that the role of a

2    middle school administrator is different from the role of a

3    college administrator?

4    **A.**    Yes.  And I should just make it clear that, you know,

5    when you say "role," that encompasses a huge amount of stuff, so

6    I do think that, yes, when you're dealing with elementary school

7    and middle school children, there is -- there are a whole set of

8    different issues than you would deal with at the college or

9    university level.

10   **Q.**    Right.  Children are not adults, right?

11   **A.**    Right.

12   **Q.**    Now, when it comes to your research, you do not focus

13   your research on K through 12 schools, do you?

14   **A.**    I have incorporated K through 12 in my research in close

15   to two-thirds of the articles that I've written, articles and

16   book chapters, and there's two articles that have been almost

17   entirely focused on K through 12.

18   **Q.**    And -- but you've never published any research on how

19   K through 12 schools are operated, have you?

20   **A.**    I'm not sure what you mean by that.  I mean, that's

21   not my -- my field is not to talk about how schools operate --

22   **Q.**    Right.

23   **A.**    -- at any level.  I have discussed how sexual harassment

24   and gender-based violence manifests and is, you know, the

25   phenomenon or the dynamics of it, the scope of it, at all levels

1   of education, including K through 12.

2   Q.    Okay.  But you've never given trainings to high school

3   administrators, have you?

4   A.    No, I've never been asked to do that.  I would have been

5   willing to if I had been asked, but I've never been asked.

6   Q.    Sure.  But you've never given trainings to high school

7   administrators?

8   A.    No.

9   Q.    Or to middle school administrators?

10  A.    No.

11  Q.    Or elementary school administrators?

12  A.    No.

13  Q.    Because your expertise is not in the operations of K

14  through 12 schools, is it?

15  A.    Well, I have been -- there have been people who have

16  reached out to me to ask me to weigh in on things related to K

17  through 12.  So they have definitely seen my expertise as

18  relevant, but --

19  Q.    Well --

20  A.    But the fact that schools haven't reached out to me

21  has -- you know, I can't speak to that.

22  Q.    Okay.  You don't consider yourself an expert in the

23  operations of K through 12 schools, do you?

24  A.    I do not.  And I also don't consider myself to be an

25  expert in the operations of colleges and universities --

1    **Q.**    Okay.

2    **A.**    -- because that's not my work.

3    **Q.**    Now, you're aware that the facts of this case focus on

4    the plaintiff's time at Rachel Carson Middle School, right?

5    **A.**    Yes.

6    **Q.**    And for this case you didn't do any research into Rachel

7    Carson Middle School, did you?

8            MS. ANDERSON:  Objection, Your Honor, sidebar.

9            (Following sidebar discussion had on the record:)

10           MS. ANDERSON:  I think he's starting to imply she didn't

11   do any research into the facts of this case, and she was

12   literally precluded from talking about the research and the facts

13   of this case.

14           THE COURT:  You might want to be careful here.

15           MS. ANDERSON:  Well, Your Honor, I'll tell you --

16           MR. ELLIKER:  She was asked that question in deposition

17   and she said no, and that's the last question I have for her in

18   my cross-examination.

19           THE COURT:  Okay.

20           MR. ELLIKER:  All right.

21           (Sidebar discussion concluded.)

22   BY MR. ELLIKER:

23   **Q.**    Let me be more particular in my question.

24           In this case, prior to being deposed, you did not do any

25   research into Rachel Carson Middle School, did you?

1    **A.**    Not -- no independent research.  I looked at the

2    documents that were in evidence related to Rachel Carson Middle

3    School.

4    **Q.**    Sorry.

5         To clarify, you didn't do any independent research at

6    Rachel Carson Middle School, that's what you're saying?

7    **A.**    Yes.

8         MR. ELLIKER:  Thank you, Your Honor.

9         THE COURT:  Mr. Kinney.

10        MR. KINNEY:  No questions from me, Your Honor.

11        THE COURT:  Mr. Blanchard.

12        MR. BLANCHARD:  I have no questions.

13        THE COURT:  Any redirect?

14        MS. ANDERSON:  No, Your Honor.

15        THE COURT:  No redirect.  The professor is excused?

16        MS. ANDERSON:  Yes, Your Honor.

17        THE COURT:  Is she subject to recall by anyone?

18        MR. ELLIKER:  No, Your Honor.

19        THE COURT:  All right.  Professor, you're free to leave.

20    You're actually free to leave the state, so --

21        THE WITNESS:  Thank you.

22        THE COURT:  Have a safe trip.

23        MR. KEEFE:  Your Honor, the plaintiffs have a witness

24    ready if you'd like to proceed.

25        THE COURT:  I'm sorry, I couldn't hear you.

```
 1        MR. KEEFE:  Your Honor, Robby Keefe on behalf of the

 2   plaintiff.

 3        THE COURT:  Yes.

 4        MR. KEEFE:  Our next witness is ready if you would like to

 5   proceed.

 6        THE COURT:  Okay.  How long do you anticipate for this

 7   witness?

 8        MR. KEEFE:  I think we could get him off the stand in an

 9   hour.

10        THE COURT:  Okay.  Ladies and gentlemen, I'm going to give

11   you a comfort break.

12        MR. KEEFE:  I'm sorry.

13        THE COURT:  Does anyone have a problem --

14        MR. KEEFE:  Your Honor, I'm sorry.

15        THE COURT:  Uh-oh.

16        MR. KEEFE:  That was just my portion of the witness.

17        THE COURT:  All right.  We're going to, if you don't mind,

18   take a shot.  Try to get out of here by 5:00 or so.  I've been

19   making this travel down I-95 for a long time, and basically you

20   can leave at 6:00 and arrive at the same time you leave at 5:15.

21        So why don't we go ahead and take a ten-minute break and

22   then we'll see how far we can get with this witness?

23        (Jury out at 4:03 p.m.)

24        THE COURT:  All right.  You may have a seat.  On the

25   record, I want to compliment both counsel in the way that the
```

```
 1    last examination was handled.  I'm sure that both sides were not

 2    satisfied entirely with the determination that I made, but both

 3    of you tried as best you could to stay within the confines of the

 4    Court's determination, and I compliment you on that.

 5         We'll come back in at about 10 minutes after 4:00.

 6         (Thereupon, a recess in the proceedings occurred from

 7    4:03 p.m. until 4:14 p.m.)

 8         THE COURT:  How long do you anticipate on your

 9    examination?

10         MR. KEEFE:  Your Honor, I think it will probably take us

11    to the end of the day.

12         THE COURT:  That wasn't my question.

13         MR. KEEFE:  Your Honor, if you give me until 5:15, I can

14    have him done by 5:15.

15         THE COURT:  Okay.

16         (Jury in at 4:15 p.m.)

17         THE COURT:  Thank you.  You may have a seat.

18         Before we get started with the witness, just a general

19    question of counsel, and this is my first one, but have any of

20    you had case where a juror had a service dog?

21         MR. BRENNER:  No, I have not, Your Honor.

22         MR. BLANCHARD:  I have not, Your Honor.  I would like to.

23         THE COURT:  There you go.

24         We will all remember you and your dog.  I was telling my

25    wife about that yesterday and I told her it's my first experience
```

```
 1   with having a service dog and it's been a very positive

 2   experience because you always wonder if the dog is going to

 3   distract from the proceeding, but that dog has been incredible.

 4   Also, I heard about a little document -- read a little

 5   documentary the other day about people in prisons training

 6   service dogs.  Now that's pretty exciting, too.

 7        Next witness.

 8        MR. KEEFE:  Your Honor, the plaintiff calls

 9   Mr. C███████ K██.

10        THE COURT:  Mr. K██.  All right, sir.  Please place your

11   hand on the Bible.

12        (CONSTANTINE K██, PLAINTIFF'S WITNESS, SWORN)

13        THE COURT:  Please have a seat and listen to the questions

14   of counsel.  Answer them as best you can.  If there comes a point

15   in time where the Court is speaking and you hear an objection, it

16   might be a good time to pause.

17        MR. KEEFE:  May I proceed, Your Honor?

18        THE COURT:  You may.

19             DIRECT EXAMINATION OF CONSTANTINE K██

20   BY MR. KEEFE:

21   Q.   Good afternoon, sir.  Can you please introduce yourself

22   to the jury?

23   A.   My name is C████████ Dennis K██.

24   Q.   Mr. K██, where did you go to middle school?

25   A.   I went to Rachel Carson Middle School.
```

1    **Q.**    Did you attend Rachel Carson during the 2011 to 2012

2    school year?

3    **A.**    I did.

4    **Q.**    What grades were you in in that year?

5    **A.**    I was in 8th grade.

6    **Q.**    And do you know a woman named B████ R.?

7    **A.**    I do.

8    **Q.**    Did you know B████ during that school year?

9    **A.**    Yes, I did.

10   **Q.**    So, before we talk about your time at Rachel Carson, I

11   just have a few general questions for you.

12   **A.**    Okay.

13   **Q.**    First, how old are you?

14   **A.**    I am 25.

15   **Q.**    Do you serve in the United States Army?

16   **A.**    I do.

17   **Q.**    When did you join the Army?

18   **A.**    I enlisted in 2016.

19   **Q.**    Was that after you graduated high school?

20   **A.**    That was while I was still a senior in high school.

21   **Q.**    Okay.  Did you graduate high school?

22   **A.**    I did.

23   **Q.**    And what did you do after you graduated high school?

24   **A.**    So, I enlisted as a reservist.  So first I attended basic

25   combat training and advanced individual training, then I came

1   home and started college at James Madison University.

2   **Q.**    Did you deploy to the Middle East?

3   **A.**    I did.

4   **Q.**    Was that before you started at James Madison University?

5   **A.**    No, it was after I started.

6   **Q.**    Okay.  So, while you're at James Madison University, you

7   deployed to the Middle East.

8           Did you return to James Madison?

9   **A.**    I did.

10  **Q.**    Did you graduate?

11  **A.**    Yes, I did.

12  **Q.**    What was your major?

13  **A.**    My major was international affairs.

14  **Q.**    Do you know what ROTC is?

15  **A.**    Yes, I do.

16  **Q.**    What is it?

17  **A.**    It is the Reserve Officer Training Corps.

18  **Q.**    And were you at -- in Army ROTC at James Madison?

19  **A.**    Yes, I was.

20  **Q.**    Did you receive an Army ROTC scholarship?

21  **A.**    Yes, I did.

22  **Q.**    And what year did you graduate from James Madison?

23  **A.**    That was 2022.

24  **Q.**    After graduation, did you commission in the Army National

25  Guard?

```
 1   A.     I did.

 2          THE COURT:  Counsel, can you pick your volume up just a

 3   bit?

 4          MR. KEEFE:  Yes, Your Honor.

 5          THE COURT REPORTER:  And if you can slow down just a

 6   little bit.

 7          MR. KEEFE:  Yes, Your Honor -- or, yes, sir.

 8          THE COURT:  Anything else anybody wants?

 9          (Laughter.)

10   BY MR. KEEFE:

11   Q.     What is your job in the Army National Guard?

12   A.     I'm currently a rifle platoon leader for an infantry

13   company.

14   Q.     Is that the Virginia National Guard?

15   A.     Yes.

16   Q.     Are you also pursuing any postgraduate degrees?

17   A.     I am.

18   Q.     Where?

19   A.     George Mason University.

20   Q.     And what postgraduate degree are you persuing?

21   A.     It's a master of arts in global commerce and policy.

22   Q.     Do you also hold a civilian job?

23   A.     I do.

24   Q.     Where do you work?

25   A.     So I'm employed by Logistics Management Institute, also
```

```
 1   known as LMI.

 2   Q.      And, generally speaking, what does LMI do?

 3   A.      They do logistics, contracting for the Department of

 4   Defense.

 5           THE COURT:  Counsel, approach.

 6           (Following sidebar discussion had on the record:)

 7           THE COURT:  I'm always of a mind to make full disclosures

 8   on all kinds of things.  One of my very best friends is the CEO

 9   at LMI.  I don't know anything about this case, I don't know

10   anything about this gentleman, but I wanted to make sure that

11   that disclosure and obviously my friend has not talked to me

12   about the case.

13           Is everyone comfortable with that?

14           MR. KEEFE:  Yes, Your Honor.

15           MR. KINNEY:  Yes, Your Honor.

16           THE COURT:  Very good.

17           MR. KEEFE:  May I proceed?

18           THE COURT:  You may.

19   BY MR. KEEFE:

20   Q.      Mr. K██, do you have a federal security clearance?

21   A.      I do.

22   Q.      What level security clearance do you have?

23   A.      It's a secret level.

24   Q.      Did you have to undergo a background investigation to

25   obtain that security clearance?
```

```
 1    A.    I did.

 2    Q.    And as part of that background investigation, were you

 3    required to answer all of the federal government's questions

 4    completely and truthfully?

 5    A.    Yes, absolutely.

 6    Q.    Are you being paid for your time testifying here today?

 7    A.    No.

 8    Q.    Do you have any financial interest in the outcome of this

 9    case?

10    A.    Absolutely not.

11    Q.    Do you currently have any relationship to any of the

12    parties in this case?

13    A.    None.

14    Q.    Was the last time you spoke with B███ R. maybe ten years

15    ago?

16    A.    Maybe even more than that.

17    Q.    If it's all right, I would like to talk to you about some

18    things that happened during the 2011 to 2012 school year.

19          When was the first time you met B███?

20    A.    Uh, we met in December of 2011.

21    Q.    Do you remember how you were introduced?

22    A.    We were introduced by a mutual friend.

23    Q.    Okay.  And do you remember where you were when you were

24    introduced to B███?

25    A.    I remember it was at school, but I couldn't tell you
```

1    where specifically at school.

2    **Q.**    Were you in the same grade as B____?

3    **A.**    I was not.

4    **Q.**    Okay.  So was B____ in the 7th grade?

5    **A.**    Yes, she was.

6    **Q.**    And I think you said already you were in the 8th grade?

7    **A.**    Yes.

8    **Q.**    Did you have any classes with B____?

9    **A.**    I did not.

10    **Q.**    Did you have the same lunch period as --

11    **A.**    Yes.

12    **Q.**    -- B____?  Sorry.

13    **A.**    Yes, we did.

14    **Q.**    Would you see B____ at her locker?

15    **A.**    Yes, I would.

16    **Q.**    And would B____ come to your locker?

17    **A.**    Yes.

18    **Q.**    So, 7th grade and 8th grade students at Rachel Carson

19    would interact during the school day; is that right?

20    **A.**    Absolutely.

21    **Q.**    After you were introduced, did you and B____ become

22    friends?

23    **A.**    Yes, we did.

24    **Q.**    And at some point did you and B____ become boyfriend and

25    girlfriend?

1   **A.**     Yes, we did.

2   **Q.**     Do you remember when it was that you became boyfriend and

3   girlfriend?

4   **A.**     I'm going to say it was January of 2012.

5   **Q.**     And when you and B███ were boyfriend and girlfriend,

6   would you see each other at school?

7   **A.**     Yes, we would.

8   **Q.**     Did there come a time when you and B███ eventually

9   stopped being boyfriend and girlfriend?

10  **A.**     Yes.

11  **Q.**     So before I ask you about B███, just have a few

12  questions about Rachel Carson during that school year.  So, just

13  to frame my questions, all of them will be that 2011 to 2012

14  school year; is that okay?

15  **A.**     Yes.

16  **Q.**     Did the school provide laptops for students to use during

17  class?

18  **A.**     During class, yes.

19  **Q.**     Would they allow the students to take those laptops home

20  with them at night?

21  **A.**     No.

22  **Q.**     Did the school offer after-school programs?

23  **A.**     Yes.

24  **Q.**     Did you attend any of those after-school programs?

25  **A.**     I attended a handful while I was at Rachel Carson.

1    Q.    Did after-school programs take place in classrooms in the

2    school building?

3    A.    Yes, they did.

4    Q.    And when you attended an after-school program, would you

5    have to swipe into the classroom?

6    A.    No.

7    Q.    When you would attend an after-school program, did you

8    use any type of electronic device to access the after-school

9    program?

10   A.    No.

11   Q.    Do you know what I mean when I say "cyber bullying"?

12   A.    Yes.

13   Q.    So the same timeframe.  Were you aware of students cyber

14   bullying other students at Rachel Carson?

15   A.    Absolutely.

16   Q.    Can you give the jury some examples of the cyber bullying

17   you observed?

18   A.    So some really common types of cyber bullying were

19   Facebook hate pages or people would post on each others' walls

20   just hateful comments or harassing comments and then, of course,

21   direct messages.

22   Q.    During that school year, did you observe students

23   sexually harassing other students?

24   A.    Yes.

25   Q.    Did you observe students calling female students sluts?

1    **A.**    Yes.

2    **Q.**    Did you observe students calling female students whore?

3    **A.**    Yes.

4    **Q.**    Based on your observations while you were at Rachel

5    Carson, did school officials crack down on students calling

6    female students sluts and whores?

7              MR. BATES:  Object, I allowed a lot of leading but --

8              THE COURT:  Okay.  Try to not lead as much.

9              MR. KEEFE:  Is --

10             THE COURT:  Typically, as you know, a leading question is

11   one that suggests a response, and some -- the pace of your

12   question might suggest a response.

13   BY MR. KEEFE:

14   **Q.**    Based on your observations, how did school officials

15   handle students calling female students sluts and whores?

16   **A.**    To my recollection, they didn't handle it at all.

17   **Q.**    Does the word "scooping" mean anything to you?

18   **A.**    Yes.

19   **Q.**    Could you tell the jury what scooping is?

20   **A.**    So, scooping is a form of physical sexual harassment, so

21   usually boys would come up to other girls and basically scoop

22   their breasts, either to be funny or to harass them.

23   **Q.**    Based on your observations while you were at the school,

24   was scooping a fairly common occurrence?

25   **A.**    Yes.

```
 1   Q.    Based on your observations, how did school officials

 2   react to scooping?

 3   A.    I don't remember them doing anything about it.

 4   Q.    All right.  Moving now to B███ in particular.

 5   A.    Okay.

 6   Q.    Did there come a time when B███ left in-person learning

 7   at Rachel Carson?

 8   A.    Yes.

 9   Q.    Do you remember when that was?

10   A.    That was February of 2012.

11   Q.    Okay.  So I'm going to ask you some questions and I'm

12   limiting the timeframe to when you were introduced to B███ in

13   December of 2011 until she left in-person learning in February

14   of 2012, okay?

15   A.    Okay.

16   Q.    So, first, could you describe for the jury B████

17   emotional state as you observed it during this time?

18   A.    Um, during this time, it would range from like the normal

19   set of emotions, like, just any normal day, but she was also

20   very depressed.  She would have these mood swings.  Sometimes

21   she would get very upset out of nowhere.  And then it also -- it

22   was combined with suicidal ideations.

23   Q.    When you say "suicidal ideations," can you describe what

24   you mean by that?

25   A.    I mean, to put it very directly, I mean she was telling
```

1    me that she felt like killing herself, that she didn't feel like

2    it was worth living anymore, that she felt abandoned and nobody

3    believed her, and it was just those things over and over.

4    **Q.**    Do you have an understanding why B███ felt that way?

5    **A.**    My understanding is she felt that way because of the

6    situation.

7        MR. BATES:  Your Honor, could we have some foundation,

8    please.

9        THE COURT:  You need to provide a foundation and you have

10   to be very careful as to the ability of this witness to testify

11   about someone else's state of mind.

12       MR. KEEFE:  Yes, Your Honor.

13   BY MR. KEEFE:

14   **Q.**    At the time you observed these suicidal ideations, as you

15   put it, were you also observing B███ being subjected to sexual

16   harassment?

17   **A.**    Yes.

18   **Q.**    Were you concerned about B█████ emotional state?

19   **A.**    I was.

20   **Q.**    Why were you concerned?

21   **A.**    I mean, think about it.  Someone you know, close friend,

22   girlfriend at the time, right, she's saying that she is

23   depressed, she doesn't feel happiness, she wants to kill

24   herself, I mean, how could you not be concerned, you know?  It's

25   just as simple as that.

```
 1    Q.    When you observed these suicidal ideations, did you also

 2    observe B████ being subjected to rumors at the school?

 3    A.    Absolutely.

 4    Q.    Did those rumors -- what did those rumors include?

 5    A.    So, those rumors included mostly that she was easy, that

 6    she was a slut, and then the main rumors floating around were

 7    the ones about her and David Neill and the ones about her and

 8    C████████ C████████.

 9          THE COURT:  Sir, if you could at this point, whenever

10    you're referring to any of the other people involved, if you

11    could use initials to the extent you could.

12          THE WITNESS:  Initials?

13          MR. KEEFE:  And, Your Honor, if I may, your initials are

14    also C.K.; is that right?

15          THE WITNESS:  Yes.

16    BY MR. KEEFE:

17    Q.    When I refer to "C.K." as opposed to Mr. K██, understand

18    I'm talking about C████████ K.?

19    A.    Gotcha.

20    Q.    And do you have an understanding of what those rumors

21    about C.K. were?

22    A.    The rumor -- there were two sets of rumors floating

23    around, kind of a dueling set.  One was that B████ had slept or

24    had consensual sex with C██████.  The other that was also

25    flying around the school was that he had raped her.
```

**Q.**     Did you have an understanding of what the rumor was about David N.?

**A.**     For David N., it was, again, kind of dual set of rumors. One was that she had given him a blow job after this trip to Bradley Farm.  The other was that he had forced her to make out with him.

**Q.**     Were there other -- I'm sorry.

So, these rumors, were they different than the normal middle school name-calling, based on your observation?

**A.**     Yes.  They were.

**Q.**     Why is that?

**A.**     I think what was different about them -- I mean -- I'll say this:  Middle schoolers are naturally mean to each other, it's the puberty, right.  And not only that, but with a lot of phone access, unfettered Internet access, I think people just didn't know how to control what middle schoolers were reading online, seeing online, stuff of that nature.

And it was normal for people to make stuff up about each other, like, "So-and-so is a slut," "So-and-So is a whore," but these were really, like, targeted specific rumors.  I mean, saying that B█████ was easy, people saying that they claimed to know -- that, "Oh, yeah, I know B█████ lying.  She definitely gave David Neill" -- I'm sorry -- "David N. a blow job."  It was stuff like that.

**Q.**     When you say "stuff like that," I mean, can you give

1  particular examples?

2  **A.**    I couldn't give you specific examples, right, but it was

3  to that nature.

4  **Q.**    Did you tell school officials about these rumors?

5  **A.**    I did.

6  **Q.**    Which school officials did you tell?

7        THE WITNESS:  Excuse me, Your Honor.

8        THE COURT:  You can use --

9        THE WITNESS:  Full names?

10        THE COURT:  -- full names there.

11        THE WITNESS:  Okay.  That would be S███ T███, T███

12  B███, and P███ H███.

13  BY MR. KEEFE:

14  **Q.**    Were each of those three individuals assistant principals

15  at the school?

16  **A.**    Yes.

17  **Q.**    Did you ever witness B███ crying at school because other

18  students were saying these things and her?

19        MR. BATES:  Objection, leading.

20        THE COURT:  Sustained.

21  BY MR. KEEFE:

22  **Q.**    Did you ever witness B███ crying at school?

23  **A.**    Yes.

24  **Q.**    Did you have an understanding about why B███ was crying

25  at school?

1  **A.**    Yes, I did.

2  **Q.**    What was your understanding?

3  **A.**    My understanding was she was crying at school due to the

4  daily bullying, the rumors floating around about her constantly.

5  **Q.**    Do you recall how many times you witnessed B███ crying

6  at school?

7  **A.**    At least -- I'm going to stay a handful.  I couldn't

8  pinpoint an exact number.

9  **Q.**    Was in an particular occasion when you saw B███ crying

10 outside of the school's cafeteria?

11 **A.**    Yes.

12 **Q.**    Can you describe what happened?

13 **A.**    So that time, I was trying to catch up with B███ after

14 lunch because she was going to her next class, I was going to my

15 next class.  When I saw her, I saw that she was crying.  Tears

16 going down her face.

17        And I asked her, "Hey, what's wrong?  What happened?"

18        And she said that three girls had approached her, three

19 girls she didn't know at all, and basically called her like a

20 bitch or a slut and some other things of that nature, and then

21 they just walked away.

22 **Q.**    Did you tell school officials about what had happened?

23 **A.**    I did.

24 **Q.**    And, in fact, did you write a statement about witnessing

25 what had happened?

```
 1   A.      I did.

 2   Q.      Did you give that written statement to school officials?

 3   A.      Yes, I did.

 4   Q.      Which school officials did you give your written

 5   statement to?

 6   A.      I gave a few written statements to S███ T████, P██

 7   H█████, T█████ B█████.

 8   Q.      Did you ever witness another student call B███ a lesbian

 9   at school in the locker pad?

10   A.      Yes, I did.

11           MR. BATES:  Objection.

12           THE COURT:  Overruled.

13           You can answer that.

14           THE WITNESS:  Yes, I did.

15   BY MR. KEEFE:

16   Q.      Can you describe what happened?

17   A.      So basically, I think it was after school, we were about

18   to all go home, so I was on my way to say goodbye to B███ for

19   the day.  And I was with my friend Cat as well.  We came

20   downstairs.  We saw this kid was kind of harassing B███ and

21   calling her a lesbian for some reason, which, in hindsight, it's

22   like, why is that even an insult?

23           But, anyways.  So we told him, "Go away.  Just go away.

24   Walk away.  You don't need to be here."

25           And he did.
```

1    **Q.**    Did any school official -- was any school official there

2    to stop what was happening?

3    **A.**    No.

4    **Q.**    Only you and your friend Cat?

5    **A.**    Yes.

6          THE COURT:  That's leading.

7    BY MR. KEEFE:

8    **Q.**    Were there times when there was no school official there

9    in the locker pod?

10   **A.**    Sometimes, yes.

11   **Q.**    Did you ever witness a male student call B█████ a bitch, a

12   slut, and whore?

13   **A.**    Yes.

14   **Q.**    Can you describe what happened on that occasion?

15   **A.**    So, that occasion, it was in the cafeteria during lunch.

16   My recollection, I came out of the lunch line.  I saw this kid

17   was talking to B████.  I came up to say, "Hey, what's up?"

18          And he turned to me and he said, "Hey, is this your

19   girlfriend?"

20          I said, "Yeah."

21          He said, "She's a slut," and kind of things of that

22   nature.

23          And, again, like, these insults kind of sound the same,

24   but these are what the kids were saying at the time.

25          And I told him again, like, "Hey, you know what, stop.

1   Like B███ is, like, a nice person.  Just walk away," you know.

2   And I think he just went and sat down.

3   **Q.**    Did you tell school officials -- and I'm sorry, do you

4   know the name of that boy?

5   **A.**    Yeah, that was Ben Flowers.

6   **Q.**    Did you tell school officials about what you saw Ben

7   Flowers do?

8   **A.**    I did.

9   **Q.**    Which school officials did you tell?

10  **A.**    I told T███ B████, S███ T███, and P██ H████.

11  **Q.**    Were you aware of any death threats against B███ made by

12  other students?

13  **A.**    I was.

14  **Q.**    What was your understanding of those death threats?

15  **A.**    My understanding of those death threats was C██████ K.

16  had threatened B██ and her family, kind of in order to

17  prevent --

18         MR. BLANCHARD:  Objection.

19         MR. BATES:  Objection.

20         THE COURT:  Sustained.  Sustained.  That really isn't in

21  response to the question.

22  BY MR. KEEFE:

23  **Q.**    Did you report the death threats to the school?

24  **A.**    I believe I did, yes.

25  **Q.**    Who did you report the death threats to?

1          MR. BATES:  Objection, foundation.

2          THE COURT:  Did you hear the death threats yourself?

3          THE WITNESS:  I did not.

4          THE COURT:  Okay.  Sustained.

5     BY MR. KEEFE:

6     Q.     Did you see the death threats?  Written?

7          MR. KINNEY:  Objection.

8          MR. KEEFE:  May I approach, Your Honor?

9          THE COURT:  Sure.

10         (Following sidebar discussion had on the record:)

11         THE COURT:  Okay.

12         MR. KEEFE:  Your Honor, the issue is what the school knew,

13    not about whether it's true or not.  Mr. K███ had an understanding

14    of what the death threats were.  He communicated that to the

15    school.  It was used for the purpose of showing the school had

16    notice of what he is going to say the death threats were.

17         MR. BATES:  We're not objecting on relevance.  He hasn't

18    testified to any personal knowledge of any death threats.

19         THE COURT:  Well, I think he testified -- and the record

20    can correct me if I'm wrong -- that he was aware of some death

21    threats being lodged against B.R.  I think he's testified to

22    that.

23         Do we agree on that?

24         MR. BLANCHARD:  Well, I think he said that -- I was

25    objecting and then you asked him if he had actually heard any and

1    then he said, "No."

2         THE COURT:  Yeah, but that's actually a subset of the

3    question.  Whether he heard them or not actually buttresses his

4    position.  I was asking him, was he aware of them.

5         That's actually not objectionable either.  And if a person

6    is aware of them, then he probably is in a position to report

7    them.  Now, the substance of them he's never going to be able to

8    get into because he doesn't have any firsthand knowledge.

9         MR. BLANCHARD:  But he's aware of them from the plaintiff,

10   then --

11        THE COURT:  It goes to weight.

12        MR. BATES:  I think we need to understand how he's aware

13   of them.  I don't -- that's not been established.  That's why I

14   said "foundation."

15        MR. KEEFE:  Your Honor, the relevance is he communicated

16   his understanding of the content of the death threats to the

17   school.

18        THE COURT:  From a position of trying to support the

19   theory of your case, you're okay there, but I think the main

20   concern by your former colleagues is how did he know, where did

21   he get the information from.

22        Basically it goes to the -- the weight that one should

23   give that particular information that he received from another

24   source.

25        MR. KEEFE:  I agree it goes to the weight, Your Honor, not

1    the admissibility.

2         THE COURT:  So you need to kind of buttress it up a bit,

3    you know, who told you, B.R. told him, then, you know --

4         MR. KEEFE:  I understand.

5         THE COURT:  -- the jury might consider that one way.  If

6    someone else told him, the jury might consider it another way.

7    But don't get into specifically what was said.

8         "Are you aware of the death threats?

9         "Yes, I was.

10        "Without telling me what was said, what did you do in

11   response to the death threats that you believed might be out

12   there?"

13        MR. KEEFE:  May I ask him what he told the school the

14   death threats were, the content of the death threats?

15        THE COURT:  No, because he doesn't have any firsthand

16   knowledge.  All he's aware of is that there's an allegation that

17   there were death threats out there, but he doesn't get to tell

18   the jury what someone else told him the death threats were.  That

19   takes it through a separate baffler of, I guess, hearsay and

20   materiality.

21        MR. BATES:  That's our concern, is he's relating death

22   threats from B.R.

23        MR. KEEFE:  But it's not for the truth -- the death

24   threats not the truth that this person wanted to kill her, but

25   what the school board knew.

1        THE COURT:  The only way -- the only thing that comes

2   close to allowing you to get it in through a hearsay exemption

3   exception is state of mind, his state of mind as to what he heard

4   based upon what he was told.  But he doesn't get to tell --

5   speaking about the particulars or the specific things that were

6   said in these death threats, who lodged them.

7        He doesn't get to say those things because someone

8   apparently told him something.

9        MR. KEEFE:  My goal, Your Honor, is I want to be able to

10   put in what the school was on notice of.

11        THE COURT:  Yeah, and you can ask him that question

12   afterwards.

13        "Did you tell the school?

14        "Yes, I did.

15        "Do you know if anything happened because of it, yes or

16   no?"

17        MR. KEEFE:  But did you tell the school that C.K. was

18   making death threats against --

19        THE COURT:  But he doesn't know that.

20        MR. KEEFE:  Okay.

21        THE COURT:  Okay.

22        (Sidebar discussion concluded.)

23   BY MR. KEEFE:

24   Q.    Mr. K█ --

25        MR. BATES:  Can you give me one moment?

1          MR. KEEFE:  Oh, I'm sorry.

2          THE COURT:  Whenever I see you rolling around it brings

3    memory of the movie *Porgy and Bess*, you know, when he was taking

4    his wagon up to New York.

5          MR. KEEFE:  I'll give it a shot.

6          THE COURT:  Yes, sir.

7    BY MR. KEEFE:

8    **Q.**    Mr. K███, did you report the death threats to the school?

9    **A.**    I believe --

10         MR. BATES:  Objection, Your Honor.

11         THE COURT:  Overruled.

12         THE COURT:  Did you report them, yes or no?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.

15   BY MR. KEEFE:

16   **Q.**    Who did you report them to?

17   **A.**    I reported them to the same assistant principals.

18   **Q.**    Can you remind me who they were?

19   **A.**    S███ T███, P██ H████, T████ B████.

20   **Q.**    And I would like to ask you now about some cyber

21   bullying.

22         Based on your observations, was B████ being cyber bullied

23   while you were dating?

24   **A.**    Yes.

25   **Q.**    Can you describe the cyber bullying that you observed?

1    **A.**    I observed people leaving comments directly on her page,

2    her Facebook page.  I observed hate pages dedicated to bullying

3    her created.  And I observed direct messages sent to her.

4    **Q.**    Can you describe the direct messages you saw?

5    **A.**    Yeah.  They were hateful, harassing in nature.  I mean,

6    really along the same lines as the insults I mentioned

7    previously.  But, also, a lot of them accusing her of being a

8    liar and -- I'll --

9    **Q.**    Do you recall who accused her on these direct messages of

10   being a liar?

11   **A.**    I do not.

12   **Q.**    Do you recall ever seeing on B███ phone a message from

13   an individual you recognized?

14   **A.**    Yes.

15   **Q.**    What was that message you saw?

16   **A.**    I believe that I saw messages from David N.  He was

17   saying that B███ was lying about him, that she knew what they

18   really did, and that he was going to continue to tell people

19   that she had given him a blow job.

20   **Q.**    How did you feel when you saw what David N. had sent to

21   B███?

22   **A.**    It made me angry.  It made me really upset.

23   **Q.**    Did you tell any school officials about the cyber

24   bullying?

25   **A.**    I did.

1    **Q.**    Which school officials did you tell?

2    **A.**    S███ T███, B██ H█████, T████ B████.

3    **Q.**    Do you remember someone with the Facebook account under

4    the name Jenny Taylor?

5    **A.**    Yes, I do.

6    **Q.**    And did this Jenny Taylor Facebook account message you

7    about B████?

8    **A.**    Yes, that account did.

9    **Q.**    When you first received those messages, did you know who

10   Jenny Taylor was?

11   **A.**    No, I did not.

12   **Q.**    Did you know any student named Jenny Taylor at Rachel

13   Carson?

14   **A.**    I did not.

15   **Q.**    When you received the messages did you suspect that a

16   student at Rachel Carson was behind the fake account?

17   **A.**    I did.

18   **Q.**    Who did you suspect was behind that account?

19   **A.**    At the time I thought it was either C██████ K. or

20   David N.

21   **Q.**    Sitting here today do you have an understanding of who

22   was actually behind the Jenny Taylor Facebook account?

23   **A.**    Yes, I do.

24   **Q.**    Who?

25   **A.**    I now understand that it was B████ R.

1    **Q.**    So I would like to ask you some questions about the

2    written statements you gave to the school officials.

3         First, how many written statements about what was

4    happening to B███ did you give school officials?

5    **A.**    I believe I gave four.

6    **Q.**    We'll take them in chronological order.  When did you

7    give your first written statement to school officials?

8    **A.**    The first written statement I gave around the middle of

9    February of 2012.

10   **Q.**    And on the day you gave that written statement, can you

11   describe what happened?

12   **A.**    So, I was in class.  I believe Ms. B███ came and pulled

13   me out.  She took me to her office, and she wanted to ask me

14   about what was going on with B███ and what I had seen and

15   heard.

16   **Q.**    Okay.  Who was in the office with you?

17   **A.**    From what I remember, it was just myself and Ms. B███.

18   **Q.**    Okay, and what did you say to Ms. B███ about what was

19   happening?

20   **A.**    I told her that I had seen B███ crying in the hallways,

21   that she was subject to the rumors I had previously mentioned,

22   that she was being bullied in the school but also that cyber

23   bullying was taking place.

24   **Q.**    Did you tell Ms. B███ about the rumors going on about

25   C.K. and B███?

1   **A.**     I believe I did, yes.

2   **Q.**     Did you tell Ms. B███ about the rumors going on about

3   B███ and David N.?

4          MR. BATES:  Objection, leading again, Your Honor.

5          THE COURT:  Sustained.

6   BY MR. KEEFE:

7   **Q.**     Did you tell Ms. B███ that you had witnessed bullying?

8          MR. BATES:  Same objection, your Honor.

9          THE COURT:  Overruled.  He can answer that.

10          THE WITNESS:  Yes, I did.

11  BY MR. KEEFE:

12  **Q.**     Based on your observation, how did Ms. B███ react when

13  you told her these things?

14  **A.**     I don't really remember her reaction one way or the

15  other.  There was no sense of surprise.

16  **Q.**     Did Ms. B███ ask you to write a written statement?

17  **A.**     Yes, she did.

18          MR. KEEFE:  May I approach, Your Honor?

19          THE COURT:  You may.  Show it to the other side.  Has

20  everybody had a chance on the other side to see it?

21          MR. KEEFE:  Your Honor, my understanding is that the

22  defendants stipulate to the admission of Plaintiff's Exhibit 149.

23          THE COURT:  You agree?

24          MR. BATES:  That's correct, Your Honor.

25          THE COURT:  Very good.

1          MR. KEEFE:  Permission to publish?

2          THE COURT:  You may.

3          (Plaintiff's Exhibit 149 admitted into the record.)

4     BY MR. KEEFE:

5     Q.    Mr. K█, do you recognize this?

6     A.    I do.

7     Q.    What is this document?

8     A.    So this is the first statement I wrote for Ms. B█████.

9     Q.    All right.  And in this statement, if you look maybe four

10    or five lines down, the sentence in quotation marks, what did

11    you write there?

12    A.    Four or five lines down, in quotation marks you said?

13    Q.    Starting with -- you can start at the beginning.  On

14    Wednesday.

15    A.    Starting with -- yeah, it's -- I wrote, "She's a douche,

16    a bitch, a slut, and a whore."

17    Q.    And in your statement did you tell.  Did you identify who

18    said that?

19    A.    I identified it as Ben Flowers.

20    Q.    And did you sign this statement?

21    A.    I did.

22    Q.    Is that now redacted under "C.K."?

23    A.    Yes.

24    Q.    Did you give the statement to Ms. B█████?

25    A.    I did.

1    **Q.**     Did Ms. B████ give you a copy of the statement?

2    **A.**     No.

3    **Q.**     Let's move on to your second written statement.

4          Did there come a time when school officials pulled you

5    out of class again?

6    **A.**     Yes.

7    **Q.**     Do you remember how long it was after that first meeting

8    with Ms. B█████?

9    **A.**     It was about a week or two after our first meeting.

10   **Q.**     Do you remember -- do you remember who it was who pulled

11   you out of class?

12   **A.**     That was S█████ T████.

13   **Q.**     And where did Ms. T████ take you?

14   **A.**     She took me to what I believe was her office, her

15   assistant principal office.

16   **Q.**     All right.  And who was in that office?

17   **A.**     So, myself, S█████ T████, and then we met Mr. H██████

18   there.

19   **Q.**     Um, did Ms. T█████ or Mr. H█████ ask you any questions

20   when you were in the office?

21   **A.**     Yes, they did.

22   **Q.**     What questions did they ask you?

23   **A.**     So they asked me about my first statement.  But they also

24   wanted to know some background about the rumors that were

25   floating around the school, what I had seen in person, and

1    B█████ emotional state.

2    **Q.**    Did you give them specific examples of the rumors?

3    **A.**    Yes, I did.

4    **Q.**    Do you recall which examples those were?

5    **A.**    So, the rumors I heard.  I told them about the same

6    rumors about C████████ K. and the same rumors about David N.

7    that I previously told you.

8    **Q.**    And what did you tell them about B█████ emotional state?

9    **A.**    I told them that -- I mean, the same thing as before.

10   She's very depressed, she's suicidal, and she didn't want to

11   come to school anymore.

12   **Q.**    Based on your observations of Ms. T█████ and Mr. H███████,

13   how did they react to what you told them?

14   **A.**    The same as Ms. B██████, I mean not really surprised.

15   **Q.**    Did Ms. T██████ and Mr. H██████ ask you about the written

16   statement you had given to Ms. B██████?

17   **A.**    They did.

18   **Q.**    Did they have a copy of it?

19   **A.**    Yes.

20   **Q.**    And if you could, for the jury, describe in this office,

21   where were you located and where were they located?

22   **A.**    From what I remember, it was Ms. T██████ desk, so she's

23   in front of me, I'm behind the desk, and Mr. H██████ was to the

24   side.

25   **Q.**    Okay.  And then you mentioned they had a copy of your

1    first statement; is that right?

2    **A.**    Yes.

3    **Q.**    Did they show you the copy?

4    **A.**    I believe so, but I couldn't say.

5    **Q.**    Did they ask you questions about that statement?

6    **A.**    Yes.

7    **Q.**    What questions did they ask you about that statement?

8    **A.**    I mean, they said they wanted to know, um -- they wanted

9    to know if everything that I wrote in there was accurate.  They

10   wanted to know why this had occurred, like what led to the

11   situation.

12   **Q.**    And what was your understanding of what they were asking

13   you to do?

14   **A.**    My understanding was they were asking me to rethink,

15   maybe reevaluate my statement.

16   **Q.**    And you understood that Mr. H███████ and Ms. T████ were

17   both assistant principals at the time, right?

18   **A.**    Yes.

19   **Q.**    And how old were you?

20   **A.**    Thirteen.

21   **Q.**    And you were alone in that office with them; is that

22   right?

23   **A.**    Yes.

24           THE COURT:  Sustained.  Watch your form.

25   BY MR. KEEFE:

1   **Q.**    Did you change your first statement?

2   **A.**    I don't think so.

3   **Q.**    Did you write another statement?

4   **A.**    I did.

5   **Q.**    What did you write in your second statement?

6   **A.**    It was more of the same, basically.  From what I

7   remember, I reworded some things.  I added context that wasn't

8   in this first statement as to why rumors were floating around

9   about B████.  Um, things like that.

10  **Q.**    Do you recall specific examples of the rumors you wrote

11  in your second statement?

12  **A.**    The same ones I mentioned previously about C██████ K.

13  and David N.

14  **Q.**    Did you write in your second statement what you had told

15  them about B██████ emotional state?

16  **A.**    I believe I did, yes.

17  **Q.**    And in your second statement, did you write about the

18  death threats that you had --

19         MR. BATES:  Objection, leading.

20         THE COURT:  Well, you can answer that.

21  BY MR. KEEFE:

22  **Q.**    In your second written statement, did you write about the

23  death threats that people were making against B████?

24  **A.**    I don't remember.

25  **Q.**    In your second written statement, did you write about

1    cyber bullying?

2    **A.**    I believe so, yes.

3    **Q.**    Did you sign your second written statement?

4    **A.**    I did.

5    **Q.**    Do you recall how long it was?

6    **A.**    I want to say about two pages.

7    **Q.**    Did you give that second statement to anyone?

8    **A.**    I gave it and to Mr. H███████ and Ms. T██████.

9    **Q.**    Did they give you a copy back?

10   **A.**    No.

11   **Q.**    Let's talk about the third statement.  So, after the

12   second time that you had been pulled out of class, did there

13   come a time when you were pulled out of class again?

14   **A.**    Yes.

15   **Q.**    Do you recall who pulled you out of class?

16   **A.**    Yes.  It was Ms. B██████.

17   **Q.**    Where did Ms. B██████ take you?

18   **A.**    To her office again.

19   **Q.**    Who else was in the office?

20   **A.**    It was just her.

21   **Q.**    And did Ms. B██████ say anything to you in her office?

22   **A.**    Yes.  She pulled out the second statement I had written,

23   the one I had given to Ms. T██████ and Mr. H██████, and she asked

24   me to reevaluate it.  One thing I noticed on the statement was

25   there were checkmarks over portions of the statement.

1    **Q.**    Did you have an understanding of what those checkmarks

2    indicated?

3    **A.**    So, she referred to them -- she pointed at them and said,

4    "I placed checkmarks where I want you to reevaluate and confirm

5    and make sure this is what you are saying, that this is what you

6    want to go with."

7    **Q.**    So, just to make sure I understand your testimony,

8    Ms. B███████ came to your class.

9    **A.**    Yes.

10   **Q.**    Took you back to her office?

11          MR. BATES:  Objection, leading, Your Honor.

12          THE COURT:  He's just providing a predicate for his next

13   question, overruled.

14          Go ahead.

15   BY MR. KEEFE:

16   **Q.**    Took you back to her office, and it was just the two of

17   you in her office together; is that correct?

18   **A.**    Yes.

19   **Q.**    And how old were you at the time?

20   **A.**    Still 13.

21   **Q.**    And what was Ms. Ballou's position at the time?

22   **A.**    Assistant principal.

23   **Q.**    And Ms. B█████, was it a -- do you remember what parts of

24   your second written statement Ms. B█████ had put checkmarks next

25   to?

**A.**      So in the second statement -- I forgot to mention this

previously -- I did write about the time where I came upon

B████, she was crying in the hallway after we left the

cafeteria, and I think there was some confusion over whether I

saw the girls or not, but then there was also doubt about the

cyber bullying and the rumors being spread about B████.

**Q.**      Do you recall where on the written statement Ms. B████

had placed checkmarks?

**A.**      There were multiple throughout the sheet.

**Q.**      What was your understanding of what Ms. B████ wanted you

to do with your second written statement?

            MR. BATES:  Objection.

            THE COURT:  Sustained.

BY MR. KEEFE:

**Q.**      Did you have an understanding of the way Ms. B████ --

did you have an understanding of what the checkmarks meant?

            MR. BATES:  Objection.  It calls for speculation, Your

Honor.

            THE COURT:  Did Mrs. B████ ever say anything to you about

what those checkmarks on this statement meant?

            THE WITNESS:  Yes, sir.  She said she wanted me to

reevaluate those parts of the statement.

            THE COURT:  And what did you do in response to her

suggestion?

            THE WITNESS:  Again, reword it, but the message was the

1    same in the third statement.

2         THE COURT:  That's about as far as you're going to be able

3    to get, Counsel.

4         MR. KEEFE:  Your Honor, this is a --

5    BY MR. KEEFE:

6    **Q.**    How did you feel about what Ms. B███ was doing?

7    **A.**    I felt like I was being pressured to change my statement.

8    **Q.**    In what way did you feel you were being pressured to

9    change your statement?

10   **A.**    Let's put it this way:  You're a student.  You have an

11   assistant principal putting your statement in front of you.  It

12   has checkmarks on it.  And she's saying, I want you to

13   reevaluate these parts of your statement.  Are you sure about

14   this?  Are you sure about this?

15        So, to me, it felt like I was being pressured to change

16   my statement.

17   **Q.**    Did you comply with Ms. Ballou's pressure to change your

18   second written statement?

19   **A.**    No.

20   **Q.**    Did you write a third statement?

21   **A.**    I did.

22   **Q.**    What did you write in that third statement?

23   **A.**    Again, it was really similar to the second statement, but

24   the message was the same.  B███ being bullied.  These rumors

25   about C███ K., David N. were in there.  And, again, I

1    talked about the incident in the hallway after lunch.

2    **Q.**    Did you sign that third written statement?

3    **A.**    I did.

4    **Q.**    Did you give it back to Ms. B█████?

5    **A.**    I did.

6    **Q.**    Did she give you a copy of it?

7    **A.**    No.

8    **Q.**    All right.  Let's talk about the fourth time.  So, after

9    you had written the first three statements, did there come a

10   time when you wrote a fourth statement?

11   **A.**    Yes.

12   **Q.**    Can you describe for the jury what happened on that

13   occasion?

14   **A.**    So, Ms. T████ came and pulled me out of class, again this

15   time, and she took me to her office again.  Mr. H█████ was

16   there.  And we discussed the third statement, whether I wanted

17   to add anything or reevaluate anything.  And that was about it.

18        THE COURT:  Were there any checkmarks on that third

19   statement?

20        THE WITNESS:  No, sir.

21        THE COURT:  Okay.

22   BY MR. KEEFE:

23   **Q.**    Did you make any changes to your statement at that

24   meeting?

25   **A.**    I don't think so.

1    **Q.**    Did you write a fourth statement at that meeting?

2    **A.**    Yes.

3    **Q.**    What did you write in your fourth statement?

4    **A.**    Very similar to the third statement.

5    **Q.**    Do you recall any particulars?

6    **A.**    Um, not at this time.

7    **Q.**    Did you sign that fourth statement?

8    **A.**    Yes.

9    **Q.**    And did you give that fourth statement to Ms. T█████ and

10   Mr. H██████?

11   **A.**    Yes.

12   **Q.**    Did they give you a copy back?

13   **A.**    No.

14   **Q.**    Did school officials pull you out of class again after

15   that fourth time?

16   **A.**    They did not.

17   **Q.**    Did you have an understanding as to why?

18   **A.**    So I came home, told my mother, Hey, I've been pulled out

19   a fourth time today.

20        At this point she had enough, so she called the school.

21   She said, Stop pulling my son out of class.  You're pulling him

22   out in the middle of class, in the middle of a test even, and

23   enough is enough.

24        And I know she was also concerned about my safety at the

25   time.

1    Q.    Mr. K███, based on your observations during that timeframe

2    from December to February --

3         THE COURT:  Observations of what?

4    BY MR. KEEFE:

5    Q.    -- observations of school officials during that

6    timeframe, did you feel like school officials were interested in

7    hearing what you had to say about what was happening to B███?

8    A.    They were interested in hearing what I had to say.  But

9    once I told them what I had to say, I don't -- they didn't seem

10   very interested in listening to what I had to say, if that makes

11   sense.

12        MR. KEEFE:  I pass the witness, Your Honor.

13        THE COURT:  All right.  I anticipate that it's going to be

14   a longer examination.

15        MR. BATES:  That's correct.

16        THE COURT:  All right.  What we're going to do, ladies and

17   gentlemen, is break for the day.  Thank you again for your

18   willingness to come in early.  I'm going to look directly at my

19   friend from Stafford over here, do you think maybe we can try to

20   get you here by 9:30 tomorrow?

21        A JUROR:  (Raised thumb.)

22        THE COURT:  All right, ma'am.  What we'll do is we'll

23   shoot to start around 9:30 tomorrow.

24        Does that inconvenience anyone else?

25        Okay.  Remember, ladies and gentlemen, the instructions of

```
 1    the Court.  And that is, do not discuss the case or any aspect of

 2    the case with anyone.

 3         Thank you.  You may go with Ms. Tinsley.

 4         (Jury out at 5:00 p.m.)

 5         THE COURT:  You may be seated.  You can step down, sir.

 6    Step down, sir.

 7         Just a couple of little housekeeping matters.  I'm glad

 8    that the jurors are willing to start their day at 9:30 tomorrow.

 9    I always like to make counsel aware of any interactions that the

10    jury may have had with the Court.

11         Through Ms. Tinsley, my court security officer, one of the

12    jurors indicated that his employer was giving him a hard time

13    about being here for this trial.  I said to Ms. Tinsley, and she

14    communicated that through Ms. Barry, my chief of staff, if there

15    was a problem with that employer, we could take care of it.  And

16    the gentleman suggested that he would like to tri to take care of

17    it himself before the Court became involved which I thought was

18    pretty sage on his part, but I just wanted to make you aware of

19    that because that was a minor interaction and I try as best I can

20    to make sure you all understand what I'm doing sometimes behind

21    the scenes, all right.  Anything we need to do before we adjourn

22    for the day?

23         MR. BRENNER:  Nothing from the plaintiff.

24         MR. BATES:  Nothing from the school board, Your Honor.

25         THE COURT:  Very good.  You have an extra 15 or 20 minutes
```

1    that the last examiner didn't have to use so you want to use some

2    of that time to try to come up with some stipulations and

3    agreements, that's a good time to do so.  So, we have the

4    courtroom to ourselves tomorrow.  I don't have any intervening

5    matters that I need to take care of so we can focus pretty much

6    on this case tomorrow.

7         THE COURT:  Anything else.

8         MR. BRENNER:  Not for the plaintiff.

9         MR. BATES:  Will the witness be instructed to return at

10   9:30 tomorrow morning.

11        THE COURT:  Yes, he's your witness, so if you can tell him

12   to be here on time.

13        MR. KEEFE:  I will do so.

14        THE COURT:  Thank you.  That would be great.

15        (Proceedings adjourned at 5:02 p.m.)

16                    **C E R T I F I C A T E**

17

18                    I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
         proceedings in the above-entitled matter.

19

20        /s/ Scott L. Wallace                3/20/24
          ----------------------------       ----------------
21        **Scott L. Wallace, RDR, CRR**         **Date**
             **Official Court Reporter**

22

23

24

25

| / |
| --- |

**/s** [1] - 121:20

| 1 |
| --- |

**1** [9] - 12:20; 24:23; 25:1-3, 19, 22, 25; 26:5
**10** [3] - 16:7, 11; 79:5
**100** [3] - 2:3, 7, 11
**108** [1] - 4:11
**12** [11] - 48:19; 73:13, 18; 74:13, 17, 19; 75:1, 14, 17, 23
**12-year-old** [1] - 61:21
**120** [1] - 3:7
**1200** [1] - 37:13
**13** [2] - 50:11; 114:20
**140** [1] - 21:12
**149** [3] - 4:11; 107:22; 108:3
**15** [2] - 52:4; 120:25
**15-year** [1] - 53:25
**150** [1] - 21:12
**1520** [1] - 1:21
**1775** [1] - 3:10
**1801** [1] - 3:7
**193** [1] - 21:5
**1972** [1] - 54:18
**1975** [1] - 66:22
**1990s** [1] - 59:9
**1:19-cv-00917-RDA-WEF** [1] - 1:4

| 2 |
| --- |

**2** [3] - 24:24; 26:1, 6
**20** [3] - 1:5; 5:1; 120:25
**20037** [5] - 1:17; 2:15, 19, 22; 3:3
**2007** [1] - 50:22
**2008** [1] - 52:2
**2009** [2] - 51:5; 52:2
**2011** [9] - 36:4, 8; 65:8; 73:4; 81:1; 85:18, 20; 87:13; 90:13
**2011/2012** [1] - 38:6
**2012** [7] - 81:1; 85:18; 87:4, 13; 90:10, 14; 106:9
**2013-2014** [1] - 52:16
**2016** [1] - 81:18
**20190** [1] - 3:11
**20191** [1] - 3:8
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:19
**2021** [2] - 35:22; 36:1
**2022** [2] - 50:20; 82:23
**2023** [1] - 50:20
**2024** [2] - 1:5; 5:1
**2029** [1] - 1:20

**213-995-5720** [1] - 1:22
**22** [2] - 10:10; 11:25
**2200** [4] - 2:15, 18, 22; 3:3
**22314-5798** [1] - 3:15
**2300** [1] - 1:16
**25** [1] - 81:14
**254** [3] - 38:4; 39:13, 17
**2800** [3] - 2:3, 7, 11
**2:05** [1] - 1:6
**2:18** [1] - 5:2
**2:21** [1] - 6:23
**2nd** [3] - 2:3, 7, 11

| 3 |
| --- |

**3** [2] - 1:7; 26:6
**3/20/24** [1] - 121:20
**305-539-8400** [1] - 2:8
**33131** [3] - 2:4, 8, 12

| 4 |
| --- |

**4** [1] - 11:25
**400** [1] - 3:11
**401** [1] - 3:15
**44** [1] - 4:5
**443-584-6558** [1] - 3:16
**4:00** [1] - 79:5
**4:03** [2] - 78:23; 79:7
**4:14** [1] - 79:7
**4:15** [1] - 79:16

| 5 |
| --- |

**50th** [3] - 48:10; 49:2, 7
**56** [1] - 16:4
**5:00** [2] - 78:18; 120:4
**5:02** [1] - 121:15
**5:15** [1] - 78:20; 79:13

| 6 |
| --- |

**610-804-1787** [1] - 2:4
**643a** [1] - 1:17
**69** [1] - 4:6
**6:00** [1] - 78:20

| 7 |
| --- |

**7** [1] - 4:3
**77** [1] - 29:11
**7th** [2] - 86:4, 18

| 8 |
| --- |

**80** [1] - 4:7

**804-788-8200** [1] - 3:4
**850-585-3414** [1] - 2:12
**8th** [6] - 35:1; 36:20, 24; 81:5; 86:6, 18

| 9 |
| --- |

**90067** [1] - 1:21
**93** [1] - 19:18; 21:4
**9:30** [4] - 119:20, 23; 120:8; 121:10
**9th** [4] - 36:16; 37:8, 15; 38:1

| A |
| --- |

**A.F** [1] - 3:5
**abandoned** [1] - 91:2
**ability** [2] - 21:14; 91:10
**able** [17] - 5:17; 7:14; 19:8; 22:23; 27:22; 31:10; 35:1; 55:13; 61:7; 67:2; 68:4, 8-9; 100:7; 102:9; 116:2
**above-entitled** [1] - 121:18
**abrenner@bsfllp.com** [1] - 2:9
**absolutely** [7] - 41:10; 64:23; 85:5, 10; 86:20; 88:15; 92:3
**abuse** [4] - 40:7; 41:9; 64:22; 67:3
**abusers** [1] - 65:1
**access** [3] - 88:8; 93:15
**accommodations** [3] - 48:22; 67:25; 68:11
**accomplished** [1] - 6:8
**according** [1] - 36:7
**account** [6] - 105:3, 6, 8, 16, 18, 22
**accountable** [1] - 60:8
**accurate** [1] - 111:9
**accusations** [1] - 64:15
**accused** [2] - 67:22; 104:9
**accusing** [1] - 104:7
**acknowledged** [1] - 14:5
**act** [1] - 65:25
**Action** [1] - 1:4
**active** [1] - 59:4
**activity** [1] - 49:3
**actual** [2] - 5:11; 58:2
**add** [1] - 117:17
**added** [2] - 39:6; 112:7
**additional** [2] - 39:9; 62:17
**address** [3] - 49:5; 55:3; 57:13
**adhere** [2] - 56:7; 65:9
**adjourn** [1] - 120:21
**adjourned** [1] - 121:15
**administration** [1] - 45:22
**administrator** [11] - 40:17; 52:5, 8; 53:25; 65:12; 73:4, 23-24; 74:2
**Administrators** [2] - 39:23; 48:15
**administrators** [12] - 41:4; 42:2, 8, 11, 13, 24; 48:20; 55:17; 75:3, 7, 9, 11
**admissibility** [1] - 101:1
**admission** [1] - 107:22
**admitted** [5] - 4:11; 11:24; 14:24;

108:3
**adolescents** [4] - 64:24; 72:19, 23
**adults** [5] - 35:6; 39:10; 64:24; 72:13; 74:10
**advanced** [1] - 81:25
**advice** [1] - 56:18
**advocate** [4] - 69:12, 17, 19, 23
**affairs** [1] - 82:13
**affect** [1] - 52:12
**affirmatively** [1] - 72:1
**afield** [1] - 62:1
**after-school** [6] - 87:22, 24; 88:1, 4, 7
**afternoon** [5] - 32:16; 44:8, 10; 69:4; 80:21
**AFTERNOON** [1] - 5:1
**afterwards** [1] - 102:12
**age** [1] - 64:21
**agencies** [2] - 52:15, 25
**agency** [1] - 13:2
**ago** [3] - 23:22; 28:10; 85:15
**agree** [8] - 8:17; 24:25; 30:4; 73:22; 74:1; 99:23; 100:25; 107:23
**agreeable** [1] - 43:6
**agreement** [2] - 5:5; 6:22
**agreements** [1] - 121:3
**ahead** [6] - 30:8; 43:16; 63:22; 64:18; 78:21; 114:14
**aided** [1] - 3:18
**aisle** [1] - 25:11
**aisles** [1] - 28:14
**al** [1] - 1:6
**alanderson@bsfllp.com** [1] - 1:22
**Alexandria** [1] - 3:15
**aligned** [1] - 18:14
**Alison** [2] - 1:19; 44:9
**allegation** [2] - 19:16; 101:16
**allegations** - 20:18
**alleged** [1] - 61:22
**allow** [3] - 46:25; 67:21; 87:19
**allowed** [3] - 18:22; 26:17; 89:7
**allowing** [1] - 102:2
**almost** [1] - 74:16
**alone** [1] - 111:21
**ALSTON** [1] - 1:11
**amount** [1] - 74:5
**analysis** [2] - 5:16, 21
**Anderson** [7] - 1:19; 44:10; 46:17; 60:18; 62:5; 63:22; 64:18
**ANDERSON** [41] - 4:5; 43:22; 44:7, 9, 11; 46:20, 22; 47:2, 6, 10; 50:3, 7, 10, 13, 16; 51:18; 54:3, 7; 60:19; 62:16; 63:14, 20, 23-24; 64:19; 65:5; 66:2, 15, 17-18; 67:12, 20; 68:16, 19, 25; 72:9; 76:8, 10, 15; 77:14, 16
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:14, 18, 21; 3:2
**Angeles** [1] - 1:21
**angry** [1] - 104:22
**anniversary** [3] - 48:10; 49:2, 10

**Anniversary** [1] - 49:7
**annual** [1] - 48:16
**answer** [14] - 6:16; 27:15; 28:18; 29:17; 42:9; 44:2; 54:21; 71:13, 15; 80:14; 85:3; 96:13; 107:9; 112:20
**answered** [3] - 15:23; 31:2; 43:2
**Anti** [1] - 48:2
**Anti-Discrimination** [1] - 48:2
**anticipate** [3] - 78:6; 79:8; 119:13
**anyway** [1] - 5:20
**anyways** [1] - 96:23
**apologize** [1] - 50:19
**APPEARANCES** [3] - 1:13; 2:1; 3:1
**applies** [2] - 51:23; 55:20
**apply** [2] - 46:15; 47:13
**appreciate** [2] - 7:25; 13:13
**approach** [7] - 11:13; 55:11; 60:20; 84:5; 99:8; 107:18
**approached** [1] - 95:18
**appropriate** [6] - 5:13; 43:1; 61:3; 62:4; 63:12; 72:11
**area** [3] - 27:24; 29:20; 58:4
**areas** [1] - 46:11
**argument** [5] - 13:4, 6, 8, 21; 14:7
**arise** [1] - 44:5
**Army** [6] - 81:15, 17; 82:18, 20, 24; 83:11
**arrive** [1] - 78:20
**articles** [5] - 51:19, 21; 74:15
**arts** [1] - 83:21
**aspect** [1] - 120:1
**assailant** [1] - 59:6
**assailants** [1] - 60:3
**assault** [10] - 9:7, 12; 57:22; 58:6, 22; 59:12; 61:22; 63:9; 64:2, 10
**assaulted** [1] - 59:16
**assaults** [2] - 11:22; 73:2
**assessment** [1] - 50:25
**assistant** [9] - 47:20; 31:12; 94:14; 103:17; 109:15; 111:17; 114:22; 116:11
**assistants** [1] - 56:17
**associate** [1] - 44:24
**associated** [1] - 5:7
**Association** [1] - 48:15
**association** [1] - 48:17
**assume** [3] - 25:16; 26:11; 29:19
**assumed** [3] - 5:6; 6:21; 70:14
**athletic** [1] - 55:8
**athletics** [1] - 55:7
**ATIXA** [2] - 48:17, 24
**attend** [3] - 81:1; 87:24; 88:7
**attended** [3] - 81:24; 87:25; 88:4
**attention** [4] - 7:2; 52:17; 59:7
**attitudes** [2] - 58:11; 59:22
**attorney** [2] - 18:10, 18
**A██████** [2] - 4:3; 7:9
**authority** [1] - 64:5
**available** [3] - 35:20; 53:22; 65:7
**Ave** [1] - 2:22

**Avenue** [2] - 2:15, 18; 3:3, 10
**aware** [13] - 11:21; 76:3; 88:13; 98:11; 99:20; 100:4, 6, 9, 12; 101:8, 16; 120:9, 18

# B

**B.H** [1] - 3:6
**B.L** [1] - 34:20
**B.R** [8] - 1:3; 30:9; 34:20; 37:21; 43:22; 99:21; 101:3, 22
**B.R.'s** [1] - 24:19
**background** [4] - 44:22; 84:24; 85:2; 109:24
**backwards** [1] - 32:2
**bad** [1] - 43:19
**baffler** [1] - 101:19
**B████** [34] - 32:12; 34:15; 94:12; 96:7; 98:10; 103:19; 105:2; 106:12, 17-18, 24; 107:2, 7, 12, 16; 108:8, 24; 109:1, 8; 110:14, 16; 113:16, 21; 114:8, 23-24; 115:7, 10, 15, 19; 116:6; 117:4
**Ballou's** [2] - 114:21; 116:17
**BARAN** [1] - 1:15
**bargain** [1] - 41:13
**Barry** [2] - 46:7; 120:14
**based** [43] - 10:19; 42:25; 44:20; 46:15; 47:13; 48:14; 49:12; 50:25; 51:22; 52:5, 12; 53:10; 54:5, 14; 55:6; 56:1; 57:7, 14, 16-18; 58:5, 11, 17; 59:23; 61:20; 64:1, 4, 9; 65:6; 69:16; 70:1; 74:24; 89:4, 14, 23; 90:1; 93:9; 102:4; 103:22; 107:12; 110:12; 119:1
**basic** [1] - 81:24
**basis** [3] - 54:20; 55:14; 58:5
**Bates** [19] - 2:14; 5:5, 8; 8:2, 7; 11:20; 12:19; 15:4, 23; 19:22; 28:2, 9; 29:18; 30:14; 31:10, 19; 38:5, 8
**BATES** [41] - 5:9; 6:12; 10:16; 11:6, 11; 12:20; 14:19; 15:12, 16; 17:24; 18:10, 16, 18, 23; 20:23; 32:5, 22; 38:20; 42:6; 43:2; 89:7; 91:7; 94:19; 96:11; 98:19; 99:1, 17; 100:12; 101:21; 102:25; 103:10; 107:4, 8, 24; 112:19; 114:11; 115:12, 17; 119:15; 120:24; 121:9
**Bates'** [1] - 31:2
**bay** [1] - 25:22
**became** [2] - 52:16; 87:2; 120:17
**become** [5] - 45:17; 59:23; 62:21; 86:21, 24
**becoming** [2] - 55:6; 70:4
**BEFORE** [1] - 1:11
**beginning** [2] - 7:20; 108:13
**begun** [1] - 45:20
**behalf** [4] - 39:1; 44:10; 69:5; 78:1
**behaved** [1] - 6:25
**behind** [10] - 24:8; 25:2, 22; 105:16, 18, 22; 110:23; 120:20

**belief** [1] - 17:7

**B████** [69] - 8:12; 19:23; 20:15; 30:22; 31:20; 32:9, 14, 17; 33:17; 35:11; 36:7, 23; 37:9, 14; 41:11; 81:6, 8; 85:14, 19, 24; 86:2, 4, 8, 12, 14, 16, 21, 24; 87:5, 8, 11; 90:4, 6, 12; 91:4, 15; 92:2, 23; 93:21; 94:17, 22, 24; 95:5, 9, 13; 96:8, 18, 20; 97:11, 17; 98:1, 11, 16; 103:22; 104:17, 21; 105:7, 25; 106:4, 14, 20, 25; 107:3; 112:9, 23; 115:3, 6; 116:24; 119:7

**B████** [14] - 23:17; 25:16; 26:11, 13; 30:5; 35:22; 36:1; 90:16; 91:18; 93:22; 104:12; 110:1, 8; 112:15

**Ben** [3] - 98:5; 108:19

**benefit** [1] - 55:13

**Berkley** [1] - 48:1

**Berkley's** [1] - 48:2

**Bess** [1] - 103:3

**best** [6] - 44:2; 51:12; 79:3; 80:14; 84:8; 120:19

**better** [1] - 23:24

**between** [6] - 7:5; 22:23; 23:5; 32:9; 41:21

**beyond** [6] - 10:16; 39:3, 7; 42:6; 61:2, 13

**bias** [1] - 67:13

**Bible** [1] - 80:11

**big** [3] - 52:16; 55:7

**B████** [1] - 105:2

**binding** [2] - 13:16, 18

**bit** [12] - 21:8; 23:7; 24:24; 27:12; 43:24; 44:22; 47:20; 61:9; 66:16; 83:3, 6; 101:2

**bitch** [1] - 95:20; 97:11; 108:16

**black** [1] - 10:10

**BLANCHARD** [12] - 60:20, 23; 61:13; 62:23; 63:5, 7, 17; 77:12; 79:22; 98:18; 99:24; 100:9

**Blanchard** [3] - 3:9; 62:20; 77:11

**Blanchard's** [1] - 62:10

**blank** [2] - 47:4

**blanket** [1] - 14:3

**block** [1] - 24:24

**blocked** [1] - 24:11

**blocking** [2] - 26:13

**blow** [3] - 93:4, 23; 104:19

**blue** [1] - 70:19

**board** [15] - 5:8; 8:21; 39:1, 3, 5, 11, 13, 18, 21; 40:1; 42:1, 10; 69:5; 101:25; 120:24

**Board** [8] - 9:3; 12:22; 14:4, 20; 17:19; 19:14; 20:5

**Board's** [1] - 40:22

**board's** [1] - 18:18

**BOIES** [4] - 1:20; 2:2, 6, 10

**book** [1] - 74:16

**boss** [1] - 9:23

**Boston** [1] - 49:9

**boy** [3] - 31:25; 32:9; 98:4

**boyfriend** [4] - 86:24; 87:2, 5, 9

**boys** [2] - 55:8; 89:21

**Bradley** [1] - 93:5

**break** [6] - 7:14; 29:3; 63:19; 78:11, 21; 119:17

**breasts** [1] - 89:22

**Brenner** [6] - 2:6; 5:19; 6:15; 11:17; 21:1; 24:22

**BRENNER** [57] - 4:4; 5:23; 6:16, 20; 7:7, 10; 9:21; 10:18, 22; 11:3, 8, 13, 19, 24; 12:4, 13; 13:6, 14, 17, 25; 14:2, 23; 15:9, 11, 18, 22; 16:9, 13; 19:10; 21:2, 6; 22:17; 25:8, 13-14; 26:9, 16; 27:13; 28:8; 29:10, 12; 32:7, 25; 33:3; 36:6; 37:25; 38:12, 15, 24; 42:21; 43:4, 10, 14; 46:18; 79:21; 120:23; 121:8

**Brief** [1] - 15:21

**brief** [1] - 71:4

**briefly** [1] - 46:9

**bring** [5] - 6:18; 16:4; 19:18; 29:11; 38:3

**brings** [1] - 103:2

**Brittany** [1] - 2:2

**britzoll@gmail.com** [1] - 2:5

**broad** [1] - 14:12

**brother** [7] - 70:5, 10, 12, 17, 19; 71:1

**brought** [1] - 36:17

**brown** [1] - 15:18

**Bruce** [1] - 3:9

**bruce.blanchard@ofplaw.com** [1] - 3:12

**build** [1] - 35:19

**building** [1] - 88:2

**bullet** [1] - 38:8; 47:25; 50:5

**bullied** [3] - 103:22; 106:22; 116:24

**Bullying** [1] - 38:6

**bullying** [15] - 39:2, 25; 88:11, 14, 16, 18; 95:4; 103:21, 25; 104:2, 24; 106:23; 107:7; 113:1; 115:6

**buried** [2] - 24:8, 11

**Burton** [1] - 2:21

**burtons@huntonak.com** [1] - 2:23

**buttress** [1] - 101:2

**buttresses** [1] - 100:3

**BY** [72] - 4:4-6, 8; 7:10; 9:21; 10:22; 15:22; 16:13; 19:10; 21:6; 22:17; 25:8, 14; 26:9, 16; 27:13; 28:8; 29:12; 32:7; 33:3; 36:6; 37:25; 38:15, 24; 42:21; 43:4, 10; 44:7, 11; 47:10; 50:16; 51:18; 54:7; 63:24; 64:19; 65:5; 66:2, 18; 67:12, 20; 68:19; 69:7; 71:23; 72:4, 12; 76:22; 80:20; 83:10; 84:19; 89:13; 91:13; 92:16; 94:13, 21; 96:15; 97:7; 98:22; 99:5; 102:23; 103:7, 15; 107:6, 11; 108:4; 111:25; 112:21; 114:15; 115:14; 116:5; 117:22; 119:4

**bystander** [1] - 41:8

**bystanders** [3] - 40:6, 13, 16

**bystanders..** [1] - 40:3

# C

**C-A-N-T-A-L-U-P-O** [1] - 44:15

**C.K** [10] - 20:15, 19; 30:20; 61:25; 92:14, 17, 21; 102:17; 106:25; 108:22

**CA** [1] - 1:21

**cafeteria** [5] - 32:10; 37:17; 95:10; 97:15; 115:4

**California** [2] - 46:9

**campus** [5] - 11:22; 14:13; 53:9, 25; 73:1

**campuses** [1] - 53:25

**candy** [1] - 63:21

**CANTALUPO** [5] - 4:5; 43:25; 44:6; 69:6

**Cantalupo** [14] - 43:23; 44:8, 14, 16; 50:17; 54:3, 8; 60:17; 63:25; 64:20; 65:6; 66:3; 69:8

**care** [7] - 53:24; 65:9; 66:4, 19; 120:15; 121:5

**careful** [4] - 62:5, 22; 76:14; 91:10

**Carolina** [1] - 62:4

**carry** [1] - 13:21

**Carson** [19] - 38:6; 39:2, 17; 76:4, 7, 25; 77:2, 6; 80:25; 81:1, 10; 86:18; 87:12, 25; 88:14; 89:5; 90:7; 105:13, 16

**case** [35] - 5:4; 13:5; 15:2; 20:11; 49:1, 14; 59:19; 61:15, 20, 25; 63:1; 69:20, 23; 70:2, 4, 9, 13, 20; 71:5, 8-9; 76:3, 6, 11, 13, 24; 79:20; 84:9, 12; 85:9, 12; 100:19; 120:1; 121:6

**cases** [2] - 58:10; 69:25

**casual** [1] - 37:21

**Cat** [2] - 96:19; 97:4

**catch** [1] - 95:13

**category** [2] - 57:15

**celebration** [2] - 48:11; 49:10

**Cell** [1] - 3:16

**Center** [2] - 45:7; 48:1

**centuries** [1] - 58:9

**Century** [1] - 1:20

**CEO** [1] - 84:8

**certainty** [2] - 54:12; 68:22

**certify** [1] - 121:17

**cetera** [1] - 66:24

**chance** [2] - 38:9; 107:20

**change** [12] - 34:3; 42:3, 12, 18-20; 43:1; 112:1; 116:7, 9, 15, 17

**changed** [2] - 33:10; 43:7

**changes** [1] - 117:23

**changing** [1] - 7:15

**chapters** [1] - 74:16

**charge** [1] - 8:21

**charged** [1] - 63:9

**charges** [1] - 16:24

**check** [1] - 35:4

**checkmarks** [9] - 113:25; 114:1, 4, 24; 115:8, 16, 20; 116:12; 117:18

**Chi** [1] - 44:14

CHI [1] - 44:14
chief [1] - 120:14
children [3] - 64:24; 74:7, 10
C█████ [8] - 92:8, 18, 24; 98:15; 105:19; 110:6; 112:12; 116:25
chronological [1] - 106:6
circumstance [3] - 14:1; 15:8; 37:23
circumstances [3] - 19:9; 33:2; 44:4
civil [2] - 47:12; 61:19
Civil [10] - 1:4; 10:14; 11:2; 46:13; 47:15, 19; 54:17; 56:13
civilian [1] - 83:22
claim [1] - 10:5
claimed [1] - 93:21
clarification [4] - 9:19; 12:12; 27:7; 72:11
clarify [4] - 8:2, 10; 62:17; 77:5
class [18] - 22:24; 26:15; 68:9; 87:17; 95:14; 106:12; 109:5, 11; 113:12, 15; 114:8; 117:14; 118:14, 21
classes [2] - 23:10; 86:8
classroom [4] - 21:23; 68:5; 88:5
classrooms [6] - 21:17; 22:4; 28:11; 37:11, 18; 88:1
clean [2] - 5:21; 61:11
clear [17] - 12:16; 20:4; 29:13; 31:9; 32:3, 8; 35:8; 45:15; 52:8; 54:22; 57:15; 59:18; 66:22; 68:21; 74:4
clearance [3] - 84:20, 22, 25
clearing [1] - 28:15
clearly [1] - 37:5
click [1] - 46:22
client [5] - 18:10; 61:22, 25; 62:23; 63:9
client-attorney [1] - 18:10
climbing [1] - 29:5
close [7] - 24:2; 30:22; 62:12; 68:1; 74:14; 91:21; 102:2
closed [5] - 12:7, 17; 15:7, 25; 16:23
closest [1] - 25:19
clothing [1] - 58:25
clue [1] - 27:3
cluster [2] - 9:17, 20
Coastal [1] - 62:4
collaboration [1] - 41:21
colleagues [1] - 100:20
collected [1] - 31:16
college [6] - 72:24; 73:5, 23; 74:3, 8; 82:1
colleges [2] - 48:18; 75:25
colloquy [1] - 32:5
combat [2] - 52:10; 81:25
combined [1] - 90:22
comfort [1] - 78:11
comfortable [1] - 84:13
coming [2] - 28:22; 49:5
comments [3] - 88:20; 104:1
commerce [1] - 83:21
commission [1] - 82:24

common [2] - 88:18; 89:24
communicate [1] - 57:4
communicated [4] - 65:14; 99:14; 100:15; 120:14
community [2] - 52:13; 57:3
company [1] - 83:13
Comparative [1] - 48:1
complaint [6] - 9:6, 11; 35:22; 36:1, 8, 21
complaints [2] - 37:15; 48:21
complete [1] - 16:25
completed [1] - 16:22
completely [2] - 62:16; 85:4
Compliance [1] - 8:19; 9:1, 13; 10:1
compliance [1] - 8:21
compliment [1] - 78:25; 79:4
comply [1] - 116:17
compound [1] - 71:19
computer [1] - 3:18
computer-aided [1] - 3:18
concentrate [1] - 68:9
concepts [1] - 44:19
concern [2] - 100:20; 101:21
concerned [5] - 5:21; 91:18, 20, 24; 118:24
concerning [1] - 15:17; 63:18; 76:21; 102:22
concludes [1] - 12:10
conduct [7] - 12:14; 55:10, 25; 56:1; 57:21; 60:6
conducted [1] - 15:4
conducting [1] - 45:18; 66:25
conference [1] - 48:16
confines [3] - 61:8; 62:7; 79:3
confirm [1] - 114:4
confused [3] - 8:1; 13:22; 33:10
confusing [1] - 12:24
confusion [1] - 115:4
congregated [1] - 23:14
consensual [1] - 92:24
consensualness [1] - 67:15
consider [12] - 13:11, 13; 38:25; 69:12, 17, 19-20; 75:22, 24; 101:5
consideration [1] - 13:12
consistent [5] - 40:21; 42:1, 4, 10, 22
C██████ [2] - 80:9, 23
CONSTANTINE [3] - 4:7; 80:12, 19
constantly [1] - 95:4
constellation [1] - 13:19
consult [4] - 15:18; 52:14, 19; 53:2
Cont [2] - 2:1; 3:1
contact [2] - 57:18, 20
contacted [2] - 70:3, 10
content [4] - 51:10; 67:8; 100:16; 101:14
context [2] - 61:6; 112:7
continue [2] - 59:22; 104:18
continued [1] - 45:22

contracting [1] - 84:3
control [1] - 93:16
conversation [2] - 70:22, 25
conversations [2] - 37:14, 22
copy [7] - 109:1; 110:18, 25; 111:3; 113:9; 117:6; 118:12
C████ [1] - 92:8
corner [1] - 22:22
Corps [1] - 82:17
correct [61] - 5:8; 8:21, 25; 9:4; 10:13; 15:9; 19:17, 25; 20:7, 9, 13, 17, 19-22; 21:16; 22:20; 24:16; 25:22; 29:4, 6, 21; 30:2, 24; 31:1, 13; 32:11, 13-14; 33:23; 34:1, 3, 5, 7, 10, 12, 14; 35:23; 36:2, 8-9; 37:9; 40:1, 20; 41:9, 17; 42:20; 44:21; 72:1, 7; 73:5; 99:20; 107:24; 114:17; 119:15; 121:18
correctly [2] - 18:15; 71:12
corroboration [1] - 58:24
counsel [12] - 5:5; 7:5; 10:20; 17:23; 37:20; 44:1; 78:25; 79:19; 80:14; 83:2; 84:5; 120:9
Counsel [3] - 51:12; 69:1; 116:3
counselor [2] - 33:7; 40:17
counselors [3] - 39:24; 40:23; 41:4
County [11] - 12:21; 13:9; 14:4, 20; 17:19; 19:13; 20:5; 40:21; 41:1; 42:23
couple [5] - 19:20; 22:23; 35:6; 50:17; 120:7
course [10] - 5:23; 14:14; 39:16; 45:2; 47:8; 52:3; 59:9; 63:13; 88:20
courses [1] - 45:1
Court [12] - 3:13; 7:5; 44:3; 61:8; 80:15; 120:1, 10, 17; 121:21
court [6] - 27:10; 44:9; 54:2; 71:14; 120:11
Court's [5] - 5:16; 46:24; 62:3, 14; 68:16; 79:4
Courthouse [1] - 3:15
courtroom [1] - 121:4
covered [2] - 54:21; 56:20
crack [1] - 89:5
created [3] - 55:12; 56:5; 104:3
credibility [2] - 50:4, 8
credible [1] - 60:12
credit [1] - 67:4
criminal [10] - 12:11, 14; 15:7; 47:8; 58:12; 59:18, 21; 61:19
Criminal [1] - 45:1
criteria [1] - 13:24
cross [5] - 10:17; 11:19; 61:11; 69:2; 76:18
CROSS [2] - 4:6; 69:6
cross-examination [1] - 11:19; 69:2; 76:18
CROSS-EXAMINATION [2] - 4:6; 69:6
crossed [1] - 62:3
crossing [1] - 20:24
CRR [3] - 3:13; 121:17, 21

**crying** [13] - 31:20; 32:14, 17; 34:4; 94:17, 22, 24; 95:3, 5, 9, 15; 106:20; 115:3
**crystal** [1] - 35:8
**curriculum** [1] - 50:6
**cut** [1] - 7:14
**cyber** [11] - 88:11, 13, 16, 18; 103:20, 22, 25; 104:23; 106:22; 113:1; 115:6

## D

**D.M** [1] - 30:20
**daily** [1] - 95:4
**date** [1] - 52:4
**Date** [1] - 121:21
**dates** [1] - 37:20
**dating** [2] - 57:23; 103:23
**daughter** [1] - 7:2
**David** [12] - 92:7; 93:2, 23; 104:16, 20; 105:20; 107:3; 110:6; 112:13; 116:25
**days** [1] - 41:22
**DC** [5] - 1:17; 2:15, 19, 22; 3:3
**deaf** [1] - 18:2
**deal** [1] - 74:8
**dealing** [4] - 48:13; 55:11; 69:25; 74:6
**dealt** [2] - 69:25; 70:1
**death** [27] - 33:21; 34:9; 98:11, 14-15, 23, 25; 99:2, 6, 14, 16, 18, 20; 100:16; 101:8, 11, 14, 17-18, 21, 23; 102:6, 18; 103:8; 112:18, 23
**December** [3] - 85:20; 90:13; 119:2
**decide** [1] - 64:13
**decided** [2] - 19:15; 39:18
**decision** [1] - 17:8
**dedicated** [1] - 104:2
**Defendant** [3] - 2:14; 3:2, 9
**defendants** [2] - 6:11; 107:22
**Defendants** [2] - 1:8; 3:5
**Defense** [3] - 21:5; 38:4; 84:4
**defining** [1] - 41:19
**definitely** [2] - 75:17; 93:22
**definition** [1] - 55:22
**degree** [10] - 45:8, 12, 16, 19; 46:4; 54:12; 68:22; 69:10; 83:20
**degrees** [2] - 45:14; 83:16
**delay** [1] - 16:19
**demand** [1] - 29:9
**demonstrative** [1] - 46:18
**Dennis** [1] - 80:23
**Department** [6] - 10:14, 25; 11:2; 56:12; 84:3
**department** [1] - 16:22
**deploy** [1] - 82:2
**deployed** [1] - 82:7
**deposed** [2] - 70:20; 76:24
**deposition** [2] - 71:1; 76:16
**depressed** [3] - 90:20; 91:23; 110:10
**describe** [11] - 46:11; 90:16, 23; 95:12; 96:16; 97:14; 103:25; 104:4; 106:11;

110:20; 117:12
**described** [1] - 33:24
**DESCRIPTION** [1] - 4:10
**designed** [1] - 57:2
**desk** [2] - 110:22
**determination** [4] - 62:4, 14; 79:2, 4
**determined** [2] - 9:10
**Detroit** [1] - 44:25
**developed** [1] - 45:2
**device** [1] - 88:8
**Diego** [1] - 46:9
**different** [12] - 8:24; 12:6; 13:7; 15:12; 48:4, 25; 71:24; 73:23; 74:2, 8; 93:8, 12
**difficult** [1] - 47:3
**dire** [1] - 61:16
**DIRECT** [4] - 4:5, 7; 44:6; 80:19
**direct** [4] - 88:21; 104:3, 9
**directed** [4] - 57:25; 58:17; 60:7, 13
**directly** [4] - 11:25; 90:25; 104:1; 119:18
**disagree** [1] - 17:4
**discern** [1] - 61:7
**discipline** [2] - 67:22, 24
**disclosure** [1] - 84:11
**disclosures** [1] - 84:7
**discreet** [1] - 21:1
**discriminating** [1] - 55:20
**Discrimination** [1] - 48:2
**discrimination** [8] - 54:20; 55:1, 5, 15, 19; 56:2; 57:7
**discriminatory** [2] - 46:16; 47:14
**discuss** [2] - 17:22; 120:1
**discussed** [4] - 7:20; 51:7; 74:23; 117:16
**discussion** [11] - 7:4; 14:15; 15:17; 34:3; 60:22; 63:18; 76:9, 21; 84:6; 99:10; 102:22
**distract** [1] - 80:3
**District** [2] - 3:14
**district** [2] - 66:8
**DISTRICT** [3] - 1:1, 12
**doctorate** [1] - 45:5
**document** [7] - 13:1, 7; 14:24; 15:13; 29:16; 80:4; 108:7
**documentary** [1] - 80:5
**documents** [3] - 53:22; 56:15; 77:2
**dog** [6] - 6:25; 79:20, 24; 80:1
**dogs** [1] - 80:6
**done** [10] - 9:22; 14:11; 17:16; 30:12; 47:22; 52:4, 7; 58:7; 60:8; 79:14
**door** [4] - 27:6, 8, 19; 29:7
**doors** [4] - 21:21; 28:3; 29:5
**doorways** [1] - 22:10
**double** [1] - 21:21
**doubt** [1] - 115:5
**douche** [1] - 108:15
**down** [19] - 7:14; 21:19, 24; 22:7; 29:10, 23; 33:14; 38:12; 46:17; 49:5; 78:19; 83:5; 89:5; 95:16; 98:2; 108:10,

12; 120:5
**downstairs** [1] - 96:20
**dozen** [2] - 70:16, 18
**draw** [5] - 21:14; 23:20; 25:13; 59:7
**Drive** [1] - 3:7
**dual** [1] - 93:3
**due** [1] - 95:3
**dueling** [1] - 92:23
**during** [15] - 45:22; 62:25; 81:1, 8; 85:18; 86:19; 87:12, 16, 18; 88:22; 90:17; 97:15; 119:1, 5
**dynamics** [1] - 74:25

## E

**ear** [2] - 18:3; 43:19
**early** [1] - 119:18
**East** [3] - 1:20; 82:2, 7
**EASTERN** [1] - 1:1
**Eastern** [1] - 3:14
**easy** [2] - 92:5; 93:21
**ed** [1] - 45:21
**education** [2] - 54:25; 75:1
**Education** [5] - 10:14, 25; 11:2; 56:12
**educational** [7] - 54:18, 24; 55:14; 56:5, 17; 68:2, 13
**effort** [3] - 36:10, 23; 48:12
**eight** [1] - 38:13
**either** [8] - 24:6; 25:10; 41:8; 64:24; 65:21; 89:22; 100:5; 105:19
**electronic** [1] - 88:8
**elementary** [4] - 73:11, 22; 74:6; 75:11
**ELLIKER** [19] - 4:6; 24:13; 49:22, 25; 51:10; 66:14; 69:4, 7; 71:16, 18, 21, 23; 72:4, 12; 76:16, 20, 22; 77:8, 18
**Elliker** [2] - 3:2; 69:5
**Email** [12] - 1:18, 22; 2:5, 9, 13, 16, 20, 23; 3:4, 8, 12, 16
**emotional** [5] - 90:17; 91:18; 110:1, 8; 112:15
**emotions** [1] - 90:19
**employed** [1] - 83:25
**employees** [3] - 65:16, 22; 66:7
**employer** [2] - 120:12, 15
**encompasses** [1] - 74:5
**encouraged** [2] - 40:16; 41:3
**end** [7] - 21:21; 30:25; 45:24; 49:14; 58:16; 63:1; 79:11
**ended** [3] - 15:6, 8; 46:1
**enforce** [1] - 6:3
**enforcement** [1] - 58:24
**engagement** [1] - 49:15
**engagements** [3] - 47:21, 24; 50:20
**engaging** [1] - 54:19
**enlisted** [2] - 81:18, 24
**entire** [1] - 62:15
**entirely** [3] - 25:25; 74:17; 79:2
**entitled** [2] - 5:5; 121:18
**environment** [10] - 20:12, 14-15; 29:4;

55:12; 56:6; 68:2, 14
**equal** [4] - 54:25; 55:7, 14; 68:13
**equitable** [3] - 56:22, 24; 57:1
**Equity** [5] - 8:19; 9:1, 13; 10:1
**Esq** [11] - 1:15, 19; 2:2, 6, 10, 14, 17, 21; 3:2, 5, 9
**essence** [1] - 61:16
**essentially** [2] - 59:5; 65:22
**established** [3] - 39:9; 65:13; 100:13
**et** [2] - 1:6; 66:24
**event** [1] - 40:5
**eventually** [1] - 87:8
**everyday** [1] - 29:4
**evidence** [14] - 11:4; 12:10, 16, 18; 16:5, 21-22; 21:4; 29:11; 38:4; 42:25; 53:22; 61:1; 77:2
**evidentiary** [1] - 20:24
**exact** [5] - 13:6; 14:7; 95:8
**exactly** [3] - 13:15; 27:8; 41:11
**EXAMINATION** [8] - 4:3, 5-7; 7:9; 44:6; 69:6; 80:19
**examination** [12] - 5:4, 7, 13; 8:2; 11:19; 15:3; 31:19; 69:2; 76:18; 79:1, 9; 119:14
**EXAMINATIONS** [1] - 4:2
**examinations** [1] - 47:1
**examiner** [1] - 121:1
**example** [1] - 41:8
**examples** [8] - 51:2, 24; 88:16; 94:1; 110:2, 4; 112:10
**except** [5] - 23:6; 25:3; 37:24; 38:1; 50:3
**exception** [1] - 102:3
**exchanged** [1] - 31:24
**exciting** [1] - 80:6
**excuse** [4] - 9:8; 28:15; 35:25; 94:7
**excused** [1] - 77:15
**exemption** [1] - 102:2
**Exhibit** [11] - 4:11; 10:10; 11:25; 16:4; 21:5; 29:11; 38:4; 39:13, 17; 107:22; 108:3
**exhibit** [3] - 12:16; 16:8; 46:17
**EXHIBITS** [1] - 4:9
**exhibits** [1] - 12:9
**exit** [2] - 22:12, 16
**expect** [2] - 41:14; 59:17
**expectation** [1] - 67:14
**expected** [2] - 41:13; 65:9
**experience** [6] - 54:14; 63:3; 68:2, 14; 79:25; 80:2
**experienced** [2] - 67:4; 68:6
**experiencing** [2] - 55:19; 68:3
**expert** [9] - 44:17; 49:21; 53:11; 54:4; 70:4; 73:17, 19; 75:22, 25
**expertise** [7] - 55:9; 68:23; 69:24; 70:1; 73:20; 75:13, 17
**Explorer** [2] - 23:4
**Explorers** [2] - 21:10, 12
**extensively** [1] - 50:24

**extent** [2] - 64:3; 92:11
**extra** [3] - 58:22; 59:15; 120:25

# F

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**face** [1] - 95:16
**Facebook** [5] - 88:19; 104:2; 105:3, 6, 22
**faced** [2] - 64:14
**facing** [1] - 23:23
**fact** [7] - 15:7; 16:20, 25; 61:5; 67:8; 75:20; 95:24
**fact-finder** [1] - 61:5
**fact-finding** [2] - 16:20, 25
**factored** [1] - 52:6
**facts** [3] - 76:3, 11
**faculty** [1] - 55:17
**Fahey** [1] - 1:15
**fair** [3] - 23:11; 39:14; 43:9
**Fairfax** [11] - 12:21; 13:9; 14:3, 20; 17:18; 19:13; 20:5; 40:21; 41:1; 42:23
**fairly** [1] - 89:24
**fake** [1] - 105:16
**fall** [1] - 13:24
**family** [1] - 98:16
**far** [6] - 5:21; 61:7; 62:1; 66:25; 78:22; 116:2
**Farm** [1] - 93:5
**February** [10] - 36:16, 20, 24; 37:8, 15; 38:1; 90:10, 13; 106:9; 119:2
**federal** [5] - 52:24; 54:19; 56:8; 65:8; 84:20; 85:3
**FELDMAN** [1] - 3:10
**fellowship** [1] - 45:17
**felt** [7] - 15:25; 91:1, 4-5; 116:7, 15
**female** [4] - 88:25; 89:2, 6, 15
**Ferrell** [6] - 33:9, 12, 15-16, 19
**Ferrell's** [2] - 33:6, 18
**few** [3] - 81:11; 87:11; 96:6
**field** [7] - 45:20, 22; 54:12; 68:23; 73:17, 19; 74:21
**fifth** [1] - 23:6
**fighting** [1] - 59:7
**figure** [2] - 5:25; 19:8
**filing** [1] - 16:24
**financial** [1] - 85:8
**finder** [1] - 61:5
**fine** [7] - 24:7; 27:1; 32:6; 43:21; 47:5; 50:1
**finish** [4] - 28:17
**finished** [2] - 27:14
**finite** [1] - 15:8
**first** [43] - 5:6; 6:4; 8:11; 9:17; 11:12; 21:23; 22:1; 23:5; 30:18, 21; 36:7, 20-21; 39:21; 50:22; 51:5; 52:2; 54:1; 60:2; 70:3; 72:25; 79:19, 25; 81:13, 24; 85:19; 90:16; 105:9; 106:3, 7-8; 108:8;

109:7, 9, 23; 111:1; 112:1, 8; 117:9
**firsthand** [2] - 100:8; 101:15
**five** [6] - 28:6, 10; 46:19; 53:15; 108:10, 12
**FL** [3] - 2:4, 8, 12
**FLEXNER** [4] - 1:20; 2:2, 6, 10
**floating** [5] - 92:6, 22; 95:4; 109:25; 112:8
**Florida** [1] - 46:8
**Flowers** [3] - 98:5, 7; 108:19
**flying** [1] - 92:25
**focus** [6] - 15:2; 41:3; 47:17; 74:12; 76:3; 121:5
**focused** [5] - 47:12; 49:11; 51:12; 55:16; 74:17
**folks** [7] - 48:17, 19; 49:6; 53:21; 58:16; 73:18
**follow** [1] - 6:5
**followed** [2] - 48:24; 53:24
**following** [2] - 19:11; 30:20
**Following** [5] - 11:15; 60:22; 76:9; 84:6; 99:10
**FOR** [1] - 1:1
**force** [1] - 42:19
**forced** [1] - 93:5
**foregoing** [1] - 121:18
**forgot** [3] - 17:15; 43:17; 115:1
**form** [7] - 5:13; 11:11; 24:13; 58:14, 24; 89:20; 111:24
**former** [1] - 100:20
**forms** [3] - 46:16; 47:14; 52:11
**forward** [5] - 60:15; 64:2, 13; 66:6; 67:3
**foundation** [4] - 91:7, 9; 99:1; 100:14
**foundational** [1] - 11:10
**four** [10] - 22:2-5; 23:9, 12; 71:24; 106:5; 108:9, 12
**fourth** [10] - 23:6; 117:8, 10; 118:1, 3, 7, 9, 15, 19
**frame** [1] - 87:13
**frankly** [1] - 5:10
**F███████** [4] - 4:3; 7:9
**F███████** [7] - 5:6; 7:8, 11; 9:11; 17:25; 43:11
**F███████** [1] - 5:11
**free** [2] - 77:19
**freshmen** [1] - 72:24
**friend** [6] - 84:11; 85:22; 91:21; 96:19; 97:4; 119:19
**friends** [2] - 84:8; 86:22
**front** [6] - 25:24; 26:4, 17; 28:11; 110:23; 116:11
**full** [3] - 84:7; 94:9
**Fulton** [1] - 3:7
**funds** [2] - 54:19; 56:8
**funny** [1] - 89:22

# G

**gathering** [2] - 16:21
**gender** [34] - 44:20; 46:15; 47:13; 48:14; 49:12; 50:25; 51:22; 52:11; 53:10; 54:5, 20, 25; 55:6; 56:1; 57:7, 14, 16-18; 58:1, 5, 15, 17; 59:23; 61:20; 64:1, 4, 9; 65:25; 69:16; 74:24
**gender-based** [26] - 44:20; 46:15; 47:13; 48:14; 49:12; 50:25; 51:22; 52:12; 53:10; 54:5; 55:6; 56:1; 57:7, 14, 16-18; 58:5, 17; 59:23; 61:20; 64:1, 4, 9; 69:16; 74:24
**general** [4] - 59:11; 63:1; 79:18; 81:11
**generally** [2] - 46:11; 84:2
**gentleman** [3] - 43:17; 84:10; 120:16
**gentlemen** [3] - 78:10; 119:17, 25
**George** [2] - 46:4; 83:19
**Georgetown** [2] - 45:6; 46:4
**girl** [1] - 61:21
**girlfriend** [6] - 86:25; 87:3, 5, 9; 91:22; 97:19
**girls** [11] - 32:19; 33:25; 34:8; 35:6; 55:8; 58:15; 89:21; 95:18; 115:5
**given** [7] - 68:21; 75:2, 6; 93:4; 104:19; 110:16; 113:23
**glad** [1] - 120:7
**global** [1] - 83:21
**goal** [2] - 68:11; 102:9
**goals** [1] - 20:5
**goodbye** [1] - 96:18
**gotcha** [1] - 92:19
**government** [4] - 52:15, 18, 25; 65:8
**government's** [1] - 85:3
**governmental** [2] - 13:2; 52:19
**grade** [6] - 81:5; 86:2, 4, 6, 18
**graders** [1] - 35:1
**grades** [1] - 81:4
**graduate** [3] - 81:21; 82:10, 22
**graduated** [2] - 81:19, 23
**graduation** [1] - 82:24
**great** [2] - 22:6; 121:14
**grievance** [7] - 56:22, 25; 57:1, 10; 65:13, 16, 21
**groping** [1] - 57:20
**groundbreaking** [1] - 54:17
**Guard** [3] - 82:25; 83:11, 14
**guess** [3] - 21:20; 22:1; 101:19
**guidance** [14] - 10:13; 13:1, 9; 17:12, 20; 18:20; 19:4, 8, 14; 39:10; 56:15; 65:7

# H

**half** [2] - 70:16, 18
**hall** [1] - 22:19
**hallway** [6] - 22:18; 35:6; 37:10; 115:3; 117:1

**hallways** [1] - 106:20
**hand** [3] - 7:21; 39:15; 80:11
**handful** [2] - 87:25; 95:7
**handle** [3] - 12:5; 89:15
**handled** [1] - 79:1
**handwriting** [1] - 29:24
**happiness** [1] - 91:23
**harass** [2] - 30:22; 89:22
**harassed** [1] - 60:13
**harasser** [1] - 60:7
**harassers** [2] - 60:2; 65:1
**harassing** [4] - 88:20, 23; 96:20; 104:5
**harassment** [37] - 8:5; 9:6, 12; 39:25; 40:7; 41:9; 44:20; 46:15; 47:14; 48:14; 49:11; 51:22; 52:11; 53:10; 54:4; 55:6, 9, 16, 23-24; 56:2; 57:7, 19; 58:6; 64:2, 8-9; 65:18; 66:13; 67:3, 6, 9; 68:3; 69:16; 74:23; 89:20; 91:16
**hard** [3] - 62:19; 63:14; 120:12
**harm** [3] - 6:8, 11
**hate** [2] - 88:19; 104:2
**hated** [1] - 32:19
**hateful** [2] - 88:20; 104:5
**Hawaii** [2] - 49:13, 16
**head** [3] - 5:24; 71:15; 72:1
**hear** [4] - 7:21; 17:25; 18:2; 37:3-5; 44:2; 72:2; 77:25; 80:15; 99:2
**heard** [8] - 37:4; 61:5; 80:4; 99:25; 100:3; 102:3; 106:15; 110:5
**hearing** [2] - 119:7
**hearsay** [2] - 101:19; 102:2
**held** [3] - 55:18; 60:8; 73:13
**help** [8] - 13:21; 16:9; 27:21; 29:1; 49:6; 52:22; 64:7; 68:14
**helped** [1] - 53:2
**helping** [1] - 52:10
**helps** [1] - 69:14
**herself** [2] - 91:1, 24
**hi** [1] - 37:13
**high** [11] - 27:20; 51:6; 53:16; 73:9; 75:2, 6; 81:19-21, 23
**high-level** [1] - 53:16
**higher** [1] - 45:21
**highlight** [2] - 47:22; 50:17
**himself** [1] - 120:17
**hindsight** [1] - 96:21
**historical** [1] - 61:13
**historically** [2] - 61:6, 9
**hold** [3] - 19:19; 64:7; 83:22
**HOLTZMAN** [1] - 1:15
**home** [4] - 82:1; 87:19; 96:18; 118:18
**homebound** [3] - 19:25; 20:1, 6
**homestretch** [1] - 7:11
**Honor** [68] - 6:12, 14, 16; 10:16; 11:3, 6; 14:23; 16:9; 18:10; 19:12; 20:23; 21:3; 24:13; 32:5; 36:3; 42:6; 43:14; 50:3; 54:3; 60:23; 62:18; 63:17, 23; 66:14; 68:16; 69:4; 71:18; 72:9; 76:8, 15; 77:8, 10, 14, 16, 18, 23; 78:1, 14;

79:10, 13, 21-22; 80:8, 17; 83:4, 7; 84:14; 91:7, 12; 92:13; 94:7; 99:8, 12; 100:15, 25; 102:9; 103:10; 107:4, 8, 18, 21, 24; 114:11; 115:18; 116:4; 119:12; 120:24
**Honor's** [1] - 13:8
**HONORABLE** [1] - 1:11
**hope** [1] - 50:9
**hostile** [3] - 55:12; 56:5
**hour** [2] - 70:22; 78:9
**hour-long** [1] - 70:22
**housekeeping** [1] - 120:7
**H███** [15] - 94:12; 96:7; 98:10; 103:19; 105:2; 109:17, 19; 110:12, 15, 23; 111:16; 113:8, 23; 117:15; 118:10
**huge** [1] - 74:5
**human** [1] - 47:12
**hundred** [1] - 23:22
**HUNTON** [3] - 2:14, 18, 21; 3:2
**husband** [1] - 59:10

# I

**I-95** [1] - 78:19
**idea** [1] - 18:8
**ideations** [4] - 90:22; 91:14; 92:1
**identified** [5] - 28:10; 66:12, 20, 23; 108:19
**identify** [1] - 34:22; 108:17
**immediately** [5] - 39:24; 41:15, 19, 22; 58:23
**impact** [5] - 58:5; 60:17; 63:25; 64:10, 21
**implement** [1] - 39:1
**imply** [1] - 76:10
**important** [1] - 56:11
**in-person** [5] - 19:24; 20:8; 37:9; 90:6, 13
**inappropriate** [1] - 29:3
**incidences** [1] - 41:8
**incident** [8] - 29:18; 31:24; 32:9, 12; 36:14; 37:8, 24; 117:1
**incidents** [3] - 32:2; 40:17; 41:4
**inclined** [1] - 63:12
**include** [8] - 39:14; 47:16; 52:24; 57:19, 21, 23, 25; 92:4
**included** [3] - 39:18; 58:4; 92:5
**including** [3] - 45:1; 57:7; 75:1
**inconsistent** [1] - 62:14
**inconvenience** [1] - 119:24
**incorporated** [1] - 74:14
**incredible** [1] - 80:3
**independent** [2] - 77:1, 5
**indicate** [1] - 8:4
**indicated** [2] - 114:2; 120:12
**indicating** [6] - 23:21, 24; 25:15, 17; 26:12; 29:8
**indiscernible}** [1] - 7:1
**individual** [4] - 7:16; 13:23; 81:25;

104:13
**individuals** [1] - 94:14
**indulgence** [1] - 68:17
**infantry** [1] - 83:12
**inform** [1] - 57:9
**information** [11] - 13:23; 31:16; 42:15; 43:8; 56:11; 57:12; 62:6, 12; 66:5; 100:21, 23
**informed** [1] - 71:9
**initial** [1] - 49:15
**initials** [3] - 92:11
**injuries** [1] - 58:25
**innocent** [1] - 65:3
**inquiring** [1] - 14:19
**inside** [2] - 48:19
**instance** [1] - 60:10
**instead** [2] - 13:1; 23:11
**Institute** [1] - 83:25
**institutional** [1] - 56:4
**institutions** [2] - 52:10; 54:18
**instructed** [1] - 12:25; 121:9
**instruction** [4] - 62:19, 24; 63:3, 11
**instructions** [2] - 63:1; 119:25
**insult** [1] - 96:22
**insults** [2] - 97:23; 104:6
**interact** [1] - 86:19
**interaction** [1] - 120:19
**interactions** [1] - 120:9
**interest** [1] - 85:8
**interested** [3] - 119:6, 8, 10
**international** [2] - 47:8; 82:13
**Internet** [1] - 93:15
**interpreted** [1] - 17:6
**interrupt** [1] - 63:20
**intervening** [1] - 121:4
**interviewed** [1] - 20:21
**introduce** [1] - 80:21
**introduced** [5] - 85:21, 24; 86:21; 90:12
**invading** [1] - 18:10
**inverted** [3] - 5:14, 16, 22
**investigate** [3] - 11:22; 14:13; 39:24
**investigated** [2] - 32:12; 41:15
**investigating** [2] - 42:13; 48:21
**investigation** [10] - 12:17; 15:7, 25; 16:20, 24; 17:1; 67:1, 14; 84:24; 85:2
**invited** [2] - 47:25; 48:25
**involve** [1] - 48:22
**involved** [4] - 53:21; 61:22; 92:10; 120:17
**involves** [3] - 57:18; 67:23
**issue** [10] - 12:6, 23-24; 18:13; 20:24; 52:16; 57:6; 61:24; 99:12
**issues** [4] - 12:20; 13:9; 15:2; 74:8
**itself** [1] - 66:8
**IX** [41] - 8:21, 24; 9:12; 12:15; 16:20, 25; 44:19; 47:16, 18; 48:15, 19, 23; 49:2, 7, 10, 18, 21; 50:24; 51:5, 19-20, 23; 54:4, 16-17, 22; 55:2, 16, 18, 20, 22, 24;

56:7, 10, 19; 65:6, 10; 66:10; 67:21, 23
**IX's** [1] - 56:21

## J

**J.D** [2] - 45:4; 69:8
**J.F** [1] - 3:6
**J.O** [1] - 3:9
**James** [6] - 82:1, 4, 6, 8, 18, 22
**January** [1] - 87:4
**Jenny** [5] - 105:4, 6, 10, 12, 22
jfahey@holtzmanvogel.com [1] - 1:18
**job** [7] - 28:1; 72:18; 83:11, 22; 93:4, 23; 104:19
**join** [2] - 49:12; 81:17
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**journals** [1] - 51:11
**JR** [1] - 1:11
**judge** [4] - 7:13; 15:12; 19:12; 63:20
**JUDGE** [1] - 1:12
**judgment** [1] - 43:9
**juris** [1] - 45:5
**JUROR** [2] - 7:1; 119:21
**juror** [1] - 79:20
**jurors** [2] - 120:8, 12
**JURY** [1] - 1:11
**jury** [23] - 6:19; 9:6; 12:24; 13:3, 21; 14:3; 15:4; 60:25; 61:14, 17; 63:7, 21; 80:22; 88:16; 89:19; 90:16; 101:5, 18; 110:20; 117:12; 120:10
**Jury** [4] - 6:23; 78:23; 79:16; 120:4

## K

**Keefe** [2] - 2:10; 78:1
**KEEFE** [62] - 4:8; 77:23; 78:1, 4, 8, 12, 14, 16; 79:10, 13; 80:8, 17, 20; 83:4, 7, 10; 84:14, 17, 19; 89:9, 13; 91:12; 92:13, 16; 94:13, 21; 96:15; 97:7; 98:22; 99:5, 8, 12; 100:15, 25; 101:4, 13, 23; 102:9, 17, 20, 23; 103:1, 5, 7, 15; 107:6, 11, 18, 21; 108:1, 4; 111:25; 112:21; 114:15; 115:14; 116:4; 117:22; 119:4, 12; 121:13
**keep** [3] - 27:11; 51:12; 63:15
kelliker@huntonak.com [1] - 3:4
**Kevin** [2] - 3:2; 69:4
**key** [2] - 49:17
**keynote** [4] - 47:25; 48:6, 8; 49:4
**kid** [2] - 96:20; 97:16
**kids** [13] - 21:12; 22:25; 24:8, 12; 26:10, 12, 14, 17; 27:21; 28:15, 20; 97:24
**kill** [5] - 32:21; 33:5; 34:9; 91:23; 101:24
**killing** [1] - 91:1
**kind** [19] - 7:13; 24:5, 8, 11; 29:24;

33:10; 49:4; 53:6; 55:25; 56:17; 64:14; 65:17; 92:23; 93:3; 96:20; 97:21, 23; 98:16; 101:2
**kinds** [5] - 57:21; 64:4, 7; 66:10; 84:8
**Kinney** [6] - 3:5; 5:11; 6:4, 13; 19:21; 77:9
**KINNEY** [5] - 3:6; 6:14; 77:10; 84:15; 99:7
**Kinney's** [1] - 18:15
**K█** [4] - 4:7; 80:12, 19
**K█** [2] - 80:9, 23
**K█** [9] - 80:10, 24; 84:20; 92:17; 99:13; 102:24; 103:8; 108:5; 119:1
**knowledge** [4] - 8:15; 99:18; 100:8; 101:16
**known** [2] - 55:5; 84:1
**knows** [3] - 60:7; 64:3; 71:14
**KURTH** [4] - 2:14, 18, 21; 3:2

## L

**lack** [1] - 23:24
**ladies** [3] - 78:10; 119:16, 25
**laptops** [2] - 87:16, 19
**last** [14] - 12:10; 22:1, 10; 24:11; 26:11; 36:11; 37:24; 38:3; 50:19; 76:17; 79:1; 85:14; 121:1
**latitude** [1] - 10:21
**laugh** [1] - 30:22
**Laughter** [1] - 83:9
**LAW** [1] - 3:6
**law** [27] - 12:25; 44:24; 45:6, 21-24; 46:1, 7, 11, 13; 47:8; 48:3, 12; 56:16; 58:12, 24; 59:21; 61:19; 69:10; 71:11, 24; 72:13, 18
**Law** [4] - 44:25; 45:1, 6; 46:8; 48:2; 49:9
**law-making** [1] - 56:16
**laws** [8] - 46:14; 47:12, 15, 19; 59:18; 62:18
**Laws** [1] - 45:12
**lawyer** [6] - 17:19; 18:20; 19:13; 45:9; 72:6, 8
**lawyers** [1] - 6:7
**lay** [2] - 11:8
**lead** [4] - 5:15, 19; 69:2; 89:8
**leader** [1] - 83:12
**leading** [7] - 89:7, 10; 94:19; 97:6; 107:4; 112:19; 114:11
**leaning** [1] - 25:10
**learn** [2] - 68:10, 15
**learned** [1] - 15:24
**learning** [4] - 19:24; 20:8; 90:6, 13
**least** [2] - 60:15; 95:7
**leave** [4] - 46:23; 77:19; 78:20
**leaving** [2] - 65:22; 104:1
**lecture** [1] - 49:4
**led** [1] - 111:10
**left** [3] - 90:6, 13; 115:3

**legal** [1] - 45:18
**legislation** [1] - 54:17
**legislature** [1] - 53:8
**legislatures** [1] - 53:8
**lesbian** [2] - 96:8, 21
**less** [4] - 39:5; 60:4; 64:5; 70:18
**lesson** [1] - 40:25
**level** [9] - 51:6; 53:16; 56:4; 60:24; 74:9, 23; 84:22
**levels** [1] - 74:25
**liar** [2] - 104:8, 10
**lie** [2] - 59:17; 60:6
**life** [1] - 70:23
**likely** [4] - 31:16; 60:4, 15; 64:5
**limited** [1] - 12:21
**limitin** [1] - 63:3
**limiting** [3] - 62:24; 63:11; 90:12
**line** [4] - 18:13; 20:24; 62:3; 97:16
**lines** [3] - 104:6; 108:10, 12
**listen** [4] - 44:1; 67:2, 10; 80:13
**listened** [1] - 71:12
**listening** [1] - 119:10
**literally** [1] - 76:12
**litigation** [2] - 53:12, 15, 19
**living** [2] - 53:5; 91:2
**LL.M** [6] - 45:12, 16, 19; 46:3, 5
**LLP** [8] - 1:20; 2:2, 6, 10, 14, 18, 21; 3:2
**LMI** [3] - 84:1, 9
**local** [1] - 53:6
**located** [2] - 110:21
**location** [1] - 24:19
**locker** [27] - 23:17; 24:3, 20; 25:1, 16; 26:11, 13, 18, 23; 27:4, 9; 29:1, 20; 30:1, 4, 18, 21; 31:3, 5, 11; 86:14, 16; 96:9; 97:9
**lockers** [29] - 21:7, 10; 22:19, 23, 25; 23:9, 15; 24:16, 23; 25:2, 10-11, 16, 19, 22, 25; 26:1, 3, 5, 12; 27:5, 19, 22, 25; 28:21, 25; 29:5; 30:25
**lodged** [3] - 54:6; 99:21; 102:6
**Logistics** [1] - 83:25
**logistics** [1] - 84:3
**longstanding** [1] - 58:9
**look** [9] - 21:20; 34:11; 38:10; 53:21; 57:9, 11; 60:3; 108:9; 119:18
**looked** [3] - 33:25; 52:21; 77:1
**looking** [2] - 21:15; 25:1
**looks** [2] - 22:12; 30:23
**Los** [1] - 1:21
**lost** [2] - 5:18; 61:4
**loud** [1] - 7:19
**low** [1] - 27:20
**lunch** [7] - 7:13; 23:6; 86:10; 95:14; 97:15; 117:1
**lying** [4] - 60:10; 64:15; 93:22; 104:17

## M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [3] - 44:1; 71:13; 119:22
**machine** [1] - 3:17
**Madison** [6] - 82:1, 4, 6, 8, 18, 22
**main** [3] - 48:12; 92:6; 100:19
**major** [2] - 82:12
**majority** [1] - 58:16
**male** [1] - 97:11
**Management** [1] - 83:25
**manifests** [1] - 74:24
**March** [2] - 1:5; 5:1
**mark** [1] - 24:15
**marking** [1] - 24:19
**marks** [3] - 29:14; 108:10, 12
**Maryland** [2] - 53:4, 8
**Mason** [1] - 83:19
**master** [1] - 83:21
**Master's** [2] - 45:11
**material** [2] - 23:9; 31:16
**materiality** [1] - 101:20
**matter** [3] - 55:20; 67:8; 121:18
**matters** [3] - 53:17; 120:7; 121:5
**mean** [28] - 29:7; 37:3; 39:7; 41:22; 52:9; 58:20; 64:12; 72:23, 25; 74:20; 88:11; 89:17; 90:24; 91:21, 24; 93:12, 20, 25; 104:5; 110:9, 14; 111:8
**meaning** [2] - 8:4; 33:15
**means** [2] - 40:4; 72:6
**meant** [2] - 29:17; 115:16, 20
**mechanism** [1] - 57:2
**meet** [3] - 37:1, 9; 56:19
**meeting** [4] - 109:7, 9; 117:24; 118:1
**meetings** [1] - 37:14
**melded** [1] - 8:24
**member** [2] - 40:18; 41:5
**members** [3] - 41:21; 52:13; 57:3
**memory** [2] - 35:9; 103:3
**mention** [1] - 115:1
**mentioned** [6] - 55:1; 72:5; 104:6; 106:21; 110:25; 112:12
**mentor** [1] - 39:9
**mess** [1] - 69:3
**message** [3] - 104:12, 15; 105:6; 115:25; 116:24
**messages** [7] - 88:21; 104:3, 9, 16; 105:9, 15
**met** [3] - 85:19; 109:17
**methods** [1] - 47:18
**Miami** [3] - 2:4, 8, 12
**MICHAEL** [1] - 3:6
**Michael** [1] - 3:5
**Michigan** [1] - 44:25
**Middle** [9] - 39:2; 76:4, 7, 25; 77:2, 6; 80:25; 82:2, 7
**middle** [14] - 71:19; 72:15, 17; 73:7;

74:2, 7; 75:9; 80:24; 93:9, 13, 16; 106:8; 118:22
**might** [18] - 15:4; 19:8; 22:22; 32:23; 33:1; 37:10; 44:3; 48:7; 63:4; 68:7; 70:12; 76:14; 80:16; 89:12; 101:5, 11
**millennium** [1] - 58:10
**mind** [6] - 46:25; 78:17; 84:7; 91:11; 102:3
**minimum** [3] - 65:8; 66:3, 19
**Mink** [1] - 49:16
**minor** [1] - 120:19
**minorities** [1] - 58:15
**minute** [4] - 25:4; 51:14; 78:21
**minutes** [4] - 28:10; 46:19; 79:5; 120:25
**misconduct** [1] - 66:13
**misstating** [1] - 32:22
**mixing** [1] - 33:1
**mk@kinneyesq.com** [1] - 3:8
**module** [2] - 19:18, 20
**moment** [4] - 42:7; 60:18; 63:19; 68:16; 72:8; 102:25
**monitor** [4] - 26:2; 27:5, 9, 25
**mood** [1] - 90:20
**morning** [2] - 30:21; 121:10
**most** [10] - 31:16; 47:17; 51:4; 55:5; 56:11; 59:10, 19-20; 64:25; 73:2
**mostly** [1] - 92:5
**mother** [2] - 36:25; 118:18
**move** [9] - 11:3; 21:2; 26:15; 27:21; 29:9; 43:24; 64:18; 72:5; 109:3
**moved** [2] - 7:19; 61:13
**movers** [1] - 49:17
**movie** [1] - 103:3
**moving** [4] - 26:15; 28:22; 50:13; 90:4
**MR** [195] - 4:4, 6, 8; 5:9, 23; 6:12, 14, 16, 20; 7:7, 10; 9:21; 10:16, 18, 22; 11:3, 6, 8, 11, 13, 19, 24; 12:4, 13, 20; 13:6, 14, 17, 25; 14:2, 19, 23; 15:9, 11-12, 16, 18, 22; 16:9, 13; 17:24; 18:10, 16, 18, 23; 19:10; 20:23; 21:2, 6; 22:17; 24:13; 25:8, 13-14; 26:9, 16; 27:13; 28:8; 29:10, 12; 32:5, 7, 22, 25; 33:3; 36:6; 37:25; 38:12, 15, 20, 24; 42:6, 21; 43:2, 4, 10, 14; 46:18; 49:22, 25; 51:10; 60:20, 23; 61:13; 62:23; 63:5, 7, 17; 66:14; 69:4, 7; 71:16, 18, 21, 23; 72:4, 12; 76:16, 20, 22; 77:8, 10, 12, 18, 23; 78:1, 4, 8, 12, 14, 16; 79:10, 13, 21-22; 80:8, 17, 20; 83:4, 7, 10; 84:14, 17, 19; 89:7, 9, 13; 91:7, 12-13; 92:13, 16; 94:13, 19, 21; 96:11, 15; 97:7; 98:18, 22; 99:1, 5, 7-8, 12, 17, 24; 100:9, 12, 15, 25; 101:4, 13, 21, 23; 102:9, 17, 20, 23, 25; 103:1, 5, 7, 10, 15; 107:4, 6, 8, 11, 18, 21, 24; 108:1, 4; 111:25; 112:19, 21; 114:11, 15; 115:12, 14, 17; 116:4; 117:22; 119:4, 12, 15; 120:23; 121:8, 13
**MS** [42] - 4:5; 36:3; 43:22; 44:7, 9, 11;

46:20, 22; 47:2, 6, 10; 50:3, 7, 10, 13, 16; 51:18; 54:3, 7; 60:19; 62:16; 63:14, 20, 23-24; 64:19; 65:5; 66:2, 15, 17-18; 67:12, 20; 68:16, 19, 25; 72:9; 76:8, 10, 15; 77:14, 16

**muddy** [2] - 63:4
**multiple** [2] - 66:24; 115:9
**must** [1] - 16:24
**mutual** [1] - 85:22

## N

**name** [8] - 8:24; 43:17; 44:12; 45:7; 80:23; 93:9; 98:4; 105:4
**name-calling** [1] - 93:9
**named** [2] - 81:6; 105:12
**names** [3] - 28:6; 94:9
**Nancy** [2] - 43:22; 44:14
**NANCY** [6] - 4:5; 43:25; 44:6, 14; 69:6
**national** [1] - 52:18
**National** [3] - 82:24; 83:11, 14
**naturally** [1] - 93:13
**nature** [5] - 93:17; 94:3; 95:20; 97:22; 104:5
**near** [2] - 22:16; 24:3
**need** [17] - 16:19; 19:15; 20:10; 43:8; 62:9, 24; 67:25; 68:4; 71:13, 15; 91:9; 96:24; 100:12; 101:2; 120:21; 121:5
**needed** [3] - 16:1; 17:10; 71:9
**needs** [4] - 45:8; 48:22; 62:6, 22
**Neill** [2] - 92:7; 93:23
**never** [17] - 20:18, 21; 36:10, 13; 37:12; 53:19; 63:20; 72:15; 73:7, 13, 20; 74:18; 75:2, 4-6; 100:7
**New** [1] - 103:4
**new** [2] - 35:18; 42:15
**next** [21] - 7:6; 10:8; 19:18; 21:2; 24:1; 43:16; 45:15; 46:22; 65:2, 4, 24; 66:1; 67:11; 78:4; 80:7; 95:14; 114:12, 24
**nice** [2] - 5:19; 98:1
**niceties** [1] - 6:7
**night** [1] - 87:20
**nobody** [1] - 91:2
**non** [2] - 67:13
**non-bias** [1] - 67:13
**non-perfunctory** [1] - 67:14
**nonbinding** [1] - 13:1
**none** [1] - 85:13
**normal** [5] - 29:4; 90:18; 93:8, 18
**normally** [2] - 23:8; 64:6
**northern** [1] - 53:5
**Northwestern** [1] - 48:10
**note** [1] - 18:12
**notebook** [2] - 10:9
**nothing** [8] - 6:12; 13:17; 15:25; 17:11; 25:3; 63:10; 120:23
**notice** [3] - 63:8; 99:16; 102:10
**noticed** [1] - 113:24
**notified** [1] - 16:21

**November** [4] - 29:18; 35:22; 36:1, 8
**nowhere** [1] - 90:21
**number** [7] - 12:20, 23-24; 42:14; 48:4; 59:25; 95:8
**numbering** [1] - 22:6
**NW** [5] - 1:16; 2:15, 18, 22; 3:3

## O

**oath** [1] - 31:10
**object** [7] - 11:6; 12:4; 18:25; 24:13; 38:20; 62:1; 89:7
**objecting** [2] - 99:17, 25
**objection** [36] - 10:16; 11:5, 10; 14:19; 15:13; 18:12, 15-16, 25; 20:23; 32:5, 22; 43:2; 44:2; 49:20, 23, 25; 51:10; 54:6; 72:9; 76:8; 80:15; 94:19; 96:11; 98:18; 99:1, 7; 103:10; 107:4, 8; 112:19; 114:11; 115:12, 17
**objectionable** [2] - 62:11; 100:5
**obligation** [3] - 12:7; 13:22
**observation** [2] - 93:9; 107:12
**observations** [9] - 89:4, 14, 23; 90:1; 103:22; 110:12; 119:1, 3, 5
**observe** [4] - 88:22, 25; 89:2; 92:2
**observed** [8] - 88:17; 90:17; 91:14; 92:1; 103:25; 104:1
**observing** [1] - 91:15
**obtain** [1] - 84:25
**obtaining** [1] - 45:14
**obviously** [5] - 50:4, 7; 61:11; 62:7; 84:11
**occasion** [4] - 95:9; 97:14; 117:13
**occasions** [1] - 49:1
**occurred** [3] - 35:5; 79:6; 111:10
**occurrence** [1] - 89:24
**OCR** [5] - 8:12; 9:7; 10:13; 13:9
**ODIN** [1] - 3:10
**OF** [1] - 1:1, 11; 3:6; 4:3, 5-7; 7:9; 44:6; 69:6; 80:19
**offer** [1] - 87:22
**offers** [2] - 39:9; 54:3
**Office** [9] - 8:18, 20; 9:1, 13, 25; 10:14, 24; 11:1; 56:12
**OFFICE** [1] - 3:6
**office** [19] - 8:25; 9:8; 33:18; 106:13, 16; 109:14-16, 20; 110:20; 111:21; 113:18, 21; 114:10, 16-17; 117:15
**officer** [2] - 35:4; 120:11
**Officer** [1] - 82:17
**official** [3] - 97:1, 8
**Official** [2] - 3:13; 121:21
**officials** [20] - 89:5, 14; 90:1; 94:4, 6; 95:22; 96:2, 4; 98:3, 6, 9; 104:23; 105:1; 106:2, 4, 7; 109:4; 118:14; 119:5
**often** [3] - 64:25; 65:20; 73:2
**oftentimes** [1] - 53:19
**old** [7] - 58:9-11; 59:2; 81:13; 111:19; 114:19

**once** [4] - 12:6; 15:24; 16:21; 119:9
**one** [54] - 5:12; 10:12, 23; 11:25; 12:2, 4, 9-10, 18, 23; 13:18; 14:24; 17:8, 17; 19:11; 20:5; 22:5, 10, 21-22; 23:17; 24:1; 25:11, 15; 27:11; 28:12; 32:20; 35:8; 38:9, 12-13, 16; 39:20, 23; 49:17; 50:19; 59:2; 63:9; 68:16; 71:2; 79:19; 84:8; 89:11; 92:23; 93:4; 100:22; 101:5; 102:25; 107:14; 113:23; 120:11
**ones** [10] - 9:2; 23:18; 24:1; 47:24; 50:18; 51:4; 59:2; 92:7; 112:12
**online** [3] - 49:15; 93:17
**open** [2] - 21:23; 29:1
**operate** [1] - 74:21
**operated** [1] - 74:19
**operations** [3] - 75:13, 23, 25
**opinion** [2] - 53:23; 70:1
**opinions** [1] - 68:21
**opportunities** [1] - 55:8
**opportunity** [1] - 61:11
**opposed** [2] - 71:15; 92:17
**order** [5] - 5:14; 20:10; 58:23; 98:16; 106:6
**organization** [1] - 48:2
**organizations** [1] - 52:19
**orient** [1] - 16:6
**originally** [2] - 58:11; 61:6
**origins** [2] - 58:18, 20
**Orlando** [1] - 46:8
**others'** [1] - 88:19
**otherwise** [3] - 10:2; 49:25
**ourselves** [1] - 121:4
**outcome** [2] - 16:23; 85:8
**outside** [3] - 12:21; 27:18; 95:10
**Overruled** [2] - 42:9; 43:3
**overruled** [4] - 96:12; 103:11; 107:9; 114:13
**own** [1] - 18:25

## P

**P.A.H** [1] - 3:5
**p.m** [9] - 1:6; 5:2; 6:23; 78:23; 79:7, 16; 120:4; 121:15
**pace** [1] - 89:11
**pad** [1] - 96:9
**Page** [2] - 4:2; 16:11
**page** [6] - 11:1, 25; 16:7; 104:1
**pages** [5] - 16:11; 50:11; 88:19; 104:2; 113:6
**paid** [2] - 54:9; 85:6
**pandemic** [1] - 49:15
**panel** [1] - 48:5
**panelist** [1] - 48:13
**paraphrase** [1] - 13:15
**pardon** [2] - 24:10; 34:18
**parent** [2] - 40:17; 57:8
**parentheses** [1] - 16:23
**parents** [5] - 19:24; 41:4; 57:3; 65:14;

66:20
**Park** [1] - 1:20
**part** [24] - 8:1; 13:17; 17:17; 29:25; 30:17; 31:11; 37:23; 38:16, 25; 39:8, 21; 40:1, 21, 23-25; 41:13; 45:16, 18; 58:12; 59:19; 85:2; 120:18
**participate** [1] - 55:13
**particular** [11] - 13:18; 53:4; 55:17; 56:14, 16; 69:16; 76:23; 90:4; 94:1; 95:9; 100:23
**particularly** [3] - 49:1, 11; 60:11
**particulars** [2] - 102:5; 118:5
**parties** [2] - 18:14; 85:12
**parts** [5] - 31:3, 5; 114:23; 115:22; 116:13
**party** [2] - 5:6; 58:25
**pass** [2] - 56:14; 119:12
**passed** [1] - 49:18
**past** [3] - 61:14, 18; 62:18
**Patsy** [1] - 49:16
**pause** [4] - 15:21; 27:12; 44:3; 80:16
**paying** [1] - 7:2
**PC** [1] - 3:10
**peek** [2] - 18:4
**Pennsylvania** [4] - 2:15, 18, 22; 3:3
**people** [24] - 33:4; 40:4, 6; 57:9, 21; 58:1; 59:8, 14, 22; 64:6, 12, 24; 66:12; 73:15; 75:15; 80:5; 88:19; 92:10; 93:15, 18, 21; 104:1, 18; 112:23
**perceived** [2] - 58:1; 59:12
**percent** [1] - 23:22
**percolate** [1] - 46:25
**performing** [1] - 67:13
**perfunctory** [1] - 67:14
**period** [2] - 71:6; 86:10
**periods** [1] - 22:24
**permission** [1] - 108:1
**perpetrators** [3] - 60:2, 14; 65:1
**person** [14] - 13:22; 19:24; 20:8; 37:9; 55:19; 59:15; 60:9; 64:17; 90:6, 13; 98:1; 100:5; 101:24; 109:25
**personal** [3] - 17:7; 70:23; 99:18
**personally** [1] - 62:24
**perspective** [3] - 51:9; 52:6; 53:24
**persuing** [1] - 83:20
**pertains** [1] - 61:24
**phenomenon** [1] - 74:25
**P███** [4] - 94:12; 96:6; 98:10; 103:19
**Philadelphia** [1] - 45:13
**phone** [4] - 70:16; 71:3; 93:15; 104:12
**physical** [4] - 57:18, 20; 67:7; 89:20
**pick** [1] - 83:2
**picture** [4] - 21:5, 15
**piece** [3] - 42:16; 51:5; 52:2
**pike** [1] - 49:5
**pinpoint** [1] - 95:8
**PITTLEMAN** [1] - 3:10
**place** [7] - 11:22; 39:9; 60:5; 65:19; 80:10; 88:1; 106:23

**placed** [2] - 114:4; 115:8
**places** [2] - 59:10; 66:24
**placing** [1] - 24:18
**plaintiff** [13] - 43:22; 44:10; 54:3; 60:25; 61:23; 69:20; 71:6; 72:6; 78:2; 80:8; 100:9; 120:23; 121:8
**Plaintiff** [3] - 1:4, 15; 2:2
**Plaintiff's** [4] - 4:11; 107:22; 108:3
**PLAINTIFF'S** [2] - 43:25; 80:12
**plaintiff's** [7] - 70:6, 10, 12, 17, 19; 71:1; 76:4
**plaintiffs** [1] - 77:23
**plan** [3] - 34:16, 21; 35:4
**platoon** [1] - 83:12
**PLC** [1] - 3:6
**plenty** [1] - 37:5
**PLLC** [1] - 1:16
**PM** [1] - 1:7
**pod** [2] - 30:21; 97:9
**point** [13] - 10:5; 11:4; 15:6; 50:6; 62:2, 10-11, 21; 65:11; 80:14; 86:24; 92:9; 118:20
**pointed** [1] - 114:3
**points** [1] - 38:8
**police** [5] - 12:7, 14; 15:24; 16:21
**policies** [11] - 11:21; 12:22; 14:5, 13, 15-16, 18, 20; 17:5; 63:8
**policy** [29] - 8:3; 11:21; 12:23; 13:1; 14:4, 6, 10; 20:5; 38:16, 20, 25; 39:3, 5, 11, 13, 18, 21; 40:1, 22, 25; 41:1, 14; 42:1, 4, 11, 23; 49:3; 52:5; 83:21
**policy-based** [1] - 52:5
**pore** [1] - 50:11
**Porgy** [1] - 103:3
**portion** [3] - 16:20; 50:1; 78:16
**portions** [1] - 113:25
**position** [6] - 14:9; 73:13; 100:4, 6, 18; 114:21
**positions** [1] - 71:24
**positive** [2] - 35:16; 80:1
**possible** [3] - 12:11, 14; 59:8
**possibly** [2] - 32:15; 43:8
**post** [1] - 88:19
**postgraduate** [2] - 83:16, 20
**potential** [5] - 59:24; 60:2, 14; 67:21
**PowerPoint** [1] - 47:2
**practices** [1] - 38:23
**Practices** [1] - 38:6
**precluded** [5] - 5:12; 76:12
**predicate** [5] - 10:19; 11:8; 12:18; 114:12
**preference** [1] - 46:24
**prelitigation** [1] - 53:19
**preparation** [1] - 62:8
**prepare** [1] - 49:6
**present** [1] - 42:16
**preserve** [1] - 49:25
**preserving** [1] - 49:22
**press** [1] - 52:17

**pressure** [1] - 116:17
**pressured** [3] - 116:7, 15
**pretty** [4] - 5:19; 80:6; 120:18; 121:5
**prevent** [2] - 39:1; 98:17
**Prevention** [1] - 38:6
**previous** [3] - 10:19; 53:11; 72:18
**previously** [6] - 28:9; 104:7; 106:21; 110:7; 112:12; 115:2
**primarily** [4] - 48:18; 58:15; 69:13; 72:25
**primary** [1] - 67:24
**Principal** [2] - 9:11; 43:11
**principal** [5] - 17:8; 31:6; 109:15; 114:22; 116:11
**principals** [5] - 13:10; 31:12; 94:14; 103:17; 111:17
**prisons** [1] - 80:5
**privilege** [1] - 18:11
**pro** [3] - 71:7, 10; 72:6
**proactively** [1] - 56:18
**problem** [6] - 5:15; 14:2; 69:15; 78:13; 120:15
**problem-solve** [1] - 69:15
**problems** [1] - 51:23
**procedure** [8] - 47:9; 56:22, 25; 57:1, 10; 65:13, 16, 21
**proceed** [4] - 77:24; 78:5; 80:17; 84:17
**proceeding** [1] - 80:3
**Proceedings** [2] - 3:17; 121:15
**PROCEEDINGS** [1] - 1:11
**proceedings** [3] - 15:21; 79:6; 121:18
**process** [2] - 56:14, 16
**produce** [1] - 56:15
**produced** [2] - 3:17; 57:9
**professional** [1] - 45:15
**Professor** [10] - 43:22; 44:8, 16; 54:8; 60:17; 64:20; 65:6; 66:3; 68:20; 69:8
**professor** [9] - 44:24; 45:17; 46:2; 49:20; 71:11; 72:13, 18; 77:15, 19
**proffer** [1] - 11:17
**program** [8] - 39:9; 46:6; 54:24; 55:14; 56:5; 88:4, 7, 9
**programs** [6] - 48:13; 54:19; 56:18; 87:22, 24; 88:1
**prohibits** [1] - 54:18
**promiscuous** [2] - 59:4; 60:11
**prompt** [4] - 56:21, 24; 57:1; 65:17
**promptly** [1] - 16:25
**pronouns** [1] - 28:6
**proper** [4] - 5:12; 6:3; 28:6; 45:7
**property** [1] - 47:8
**propose** [1] - 62:25
**proposed** [1] - 61:8
**protect** [1] - 66:6
**protecting** [1] - 66:9
**protocols** [1] - 5:4
**prove** [1] - 58:22
**provide** [9] - 6:9; 20:10; 34:25; 57:2; 67:25; 69:24; 87:16; 91:9

**provided** [1] - 72:10
**providing** [2] - 48:21; 114:12
**puberty** [1] - 93:14
**publication** [1] - 52:4
**publications** [3] - 50:14; 51:3, 7
**publicly** [2] - 66:12, 20
**publish** [1] - 108:1
**published** [4] - 50:24; 51:5; 52:2; 74:18
**publishing** [2] - 51:25; 52:1
**pull** [2] - 21:4; 118:14
**pulled** [12] - 19:23; 36:11; 52:18; 106:12; 109:4, 10; 113:12, 15, 22; 117:14; 118:18
**pulling** [3] - 37:6; 118:21
**purpose** [4] - 49:21; 54:22; 56:24; 99:15
**purposely** [1] - 64:25
**purposes** [2] - 5:7; 49:22
**pursuant** [1] - 20:4
**pursuing** [1] - 83:16
**put** [10] - 15:3; 24:1, 15; 37:19; 53:9; 90:25; 91:15; 102:10; 114:24; 116:10
**putting** [3] - 57:16; 60:25; 116:11

## Q

**qualification** [1] - 50:1
**qualified** [1] - 49:21
**qualify** [1] - 55:5
**Quality** [1] - 48:1
**questioning** [2] - 5:6, 22
**questions** [19] - 10:17, 20; 19:20; 43:14; 44:1; 62:7; 77:10, 12; 80:13; 81:11; 85:3; 87:12; 90:11; 106:1; 109:19, 22; 111:5, 7
**quick** [1] - 63:19
**quite** [1] - 5:10
**quotation** [2] - 108:10, 12
**quote** [5] - 29:23; 35:19; 45:9; 73:1
**quote-unquote** [2] - 45:9; 73:1

## R

**Rachel** [19] - 38:6; 39:2, 17; 76:4, 6, 25; 77:2, 6; 80:25; 81:1, 10; 86:18; 87:12, 25; 88:14; 89:4; 90:7; 105:12, 16
**raise** [2] - 7:21; 15:13
**Raised** [1] - 119:21
**raises** [1] - 15:12
**range** [3] - 55:4; 67:23; 90:18
**rape** [1] - 59:10
**rapeable** [1] - 59:5
**raped** [2] - 59:16; 92:25
**rarely** [1] - 19:2
**rather** [1] - 58:1
**rbates@hunton.com** [1] - 2:16
**RDR** [3] - 3:13; 121:17, 21

**RDR-CRR** [1] - 121:17
**reach** [4] - 36:10, 23, 25; 64:6
**reached** [5] - 70:7, 13; 73:19; 75:16, 20
**reaching** [1] - 52:3
**react** [3] - 90:2; 107:12; 110:13
**reaction** [1] - 107:14
**read** [6] - 12:1; 16:14, 16; 38:18; 46:21; 80:4
**reading** [2] - 33:20; 93:16
**ready** [5] - 6:18; 77:24; 78:4
**real** [1] - 15:2
**realize** [1] - 58:8
**really** [13] - 18:19; 24:2; 57:17; 59:2; 88:18; 93:20; 98:20; 104:6, 18, 22; 107:14; 110:14; 116:23
**reason** [2] - 65:15; 96:21
**reasonable** [2] - 54:11; 68:22
**reasons** [1] - 30:20
**receive** [5] - 18:20; 19:4; 54:19; 56:8; 82:20
**received** [7] - 17:12, 20; 33:21; 100:23; 105:9, 15
**receives** [2] - 13:23; 54:25
**receiving** [1] - 19:14
**recent** [2] - 47:24; 51:4
**recess** [1] - 79:6
**recipient** [2] - 40:7; 66:10
**recognize** [1] - 108:5
**recognized** [1] - 104:13
**recollection** [2] - 89:16; 97:16
**reconsider** [1] - 42:24
**record** [16] - 5:20; 6:10; 7:3; 11:15; 12:1; 36:3; 44:13; 60:22; 76:9; 78:25; 84:6; 99:10, 19; 108:3; 121:18
**red** [1] - 43:17
**Red** [2] - 73:1
**redacted** [1] - 108:22
**redirect** [4] - 7:7; 14:11; 77:13, 15
**REDIRECT** [2] - 4:3; 7:9
**reduce** [2] - 50:3, 7
**reestablish** [1] - 68:13
**reevaluate** [7] - 42:25; 111:15; 113:24; 114:4; 115:22; 116:13; 117:17
**refer** [3] - 34:15; 92:17
**referenced** [2] - 37:20; 38:22
**referred** [1] - 114:3
**referring** [2] - 72:21; 92:10
**reformed** [2] - 59:18, 20
**regard** [3] - 62:3; 63:5; 69:15
**regarding** [2] - 8:5; 19:16
**regardless** [2] - 54:24; 67:5
**regulations** [2] - 56:21; 65:7
**related** [6] - 46:14; 53:9; 66:4, 19; 75:16; 77:2
**relating** [1] - 101:21
**relation** [1] - 66:11
**relationship** [2] - 57:24; 85:11
**relevance** [4] - 51:10; 72:9; 99:17;

100:15
**relevant** [2] - 59:23; 75:18
**reliance** [1] - 19:5
**relieve** [1] - 12:15
**remain** [2] - 58:14; 59:21
**remember** [27] - 7:20; 8:7; 31:20; 33:9; 35:10; 48:8; 70:3, 14; 71:2; 79:24; 85:21, 23, 25; 87:2; 90:3, 9; 105:3; 106:17; 107:14; 109:7, 10; 110:22; 112:7, 24; 114:23; 119:25
**remind** [1] - 103:18
**render** [1] - 53:22
**repeat** [1] - 39:15
**rephrase** [3] - 32:23; 38:21; 66:16
**rephrased** [1] - 18:11
**report** [18] - 8:12; 9:7; 10:5; 39:10; 40:17; 41:4, 7; 53:20; 64:2, 5, 13; 67:3; 98:23, 25; 100:6; 103:8, 12, 16
**reported** [3] - 3:17; 9:13, 15, 25; 103:17
**reporter** [4] - 27:10; 44:9; 71:14
**Reporter** [6] - 3:13; 9:19; 12:12; 27:7; 121:21
**REPORTER** [1] - 83:5
**reporting** [4] - 8:4, 17; 67:6
**reports** [5] - 12:11, 14; 39:24; 41:15; 64:9
**represent** [1] - 5:8
**representative** [1] - 5:11
**representing** [1] - 69:3
**reputation** [1] - 60:9
**require** [1] - 56:21
**required** [4] - 26:25; 39:5; 56:7; 85:3
**requirements** [3] - 8:17; 56:10; 58:22
**requires** [1] - 12:25
**research** [20] - 45:18; 47:11; 50:13; 51:21; 52:7, 22; 58:8; 64:23; 65:6; 74:12-14, 18; 76:6, 11-12, 25; 77:1, 5
**researcher** [3] - 69:13; 73:17
**researching** [5] - 45:20; 46:12; 51:25; 52:1; 58:5
**Reserve** [1] - 82:17
**reservist** [1] - 81:24
**resist** [1] - 59:6
**resource** [1] - 35:4
**resources** [2] - 68:1, 12
**respect** [1] - 62:23
**response** [7] - 68:8; 71:14; 89:11; 98:21; 101:11; 115:23
**responsibilities** [1] - 12:15
**responsibility** [2] - 15:6; 62:9
**responsible** [1] - 66:9
**rest** [1] - 31:12
**Reston** [2] - 3:8, 11
**resume** [1] - 16:25
**retaliation** [4] - 66:4, 7, 10
**rethink** [1] - 111:14
**return** [2] - 82:8; 121:9
**returning** [1] - 23:10

**Review** [1] - 49:10
**revisit** [1] - 5:3
**Rewari** [1] - 2:17
**REWARI** [1] - 36:3
**reword** [1] - 115:25
**reworded** [1] - 112:7
**rifle** [1] - 83:12
**Rights** [9] - 10:14; 11:2; 46:13; 47:15, 19; 54:17; 56:13
**rights** [6] - 47:12; 48:23; 55:18; 69:17, 19
**risk** [1] - 62:13
**risky** [1] - 29:25
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:13
**Robby** [1] - 78:1
**Robert** [2] - 2:10; 3:7
**role** [5] - 73:22; 74:1, 5
**rolling** [1] - 103:2
**room** [1] - 33:6
**ROSSIE** [1] - 1:11
**rotate** [1] - 27:24
**ROTC** [3] - 82:14, 18, 20
**row** [11] - 22:7; 23:21, 23; 24:6, 11, 15; 25:5, 9; 26:11
**Row** [12] - 24:23; 25:1-3, 19, 22, 25; 26:1, 5
**rows** [1] - 23:15
**rule** [2] - 11:21; 44:4
**rules** [2] - 56:14; 65:7
**ruling** [1] - 13:8
**rumor** [2] - 92:22; 93:1
**rumors** [24] - 92:2, 4-6, 20, 22; 93:3, 8, 20; 94:4; 95:4; 106:21, 24; 107:2; 109:24; 110:2, 5-6; 112:8, 10; 115:6; 116:24
**run** [1] - 62:13
**running** [1] - 9:2
**Ryan** [1] - 2:14

## S

**S.T** [1] - 3:5
**safe** [4] - 20:12; 68:4, 15; 77:22
**safety** [1] - 118:24
**sage** [1] - 120:18
**salient** [1] - 62:21
**San** [1] - 46:9
**sat** [1] - 98:2
**satisfied** [1] - 79:2
**saw** [13] - 10:25; 33:12; 95:9, 15; 96:20; 97:16; 98:6; 104:4, 15-16, 20; 115:5
**scared** [1] - 30:19
**scenes** [1] - 120:21
**schedule** [1] - 23:2
**SCHILLER** [4] - 1:20; 2:2, 6, 10
**scholar** [1] - 69:13
**scholarship** [1] - 82:20

**school** [152] - 5:8; 8:18, 21; 12:11, 13-15; 16:19, 24; 17:16; 18:18; 19:23; 20:6, 16, 19; 22:25; 30:19; 35:4, 25; 36:7, 12; 37:16; 39:1, 3-6, 11, 13, 18, 21; 40:1; 41:21; 42:1, 10, 23, 25; 45:6, 21, 23-24; 46:7; 48:3, 12, 20; 54:24; 57:2, 4-5, 9, 12-13; 63:8; 66:8; 68:10; 69:5, 25; 70:1; 73:7, 9, 11, 13, 15-16, 21-22; 74:2, 6-7; 75:2, 6, 9, 11; 80:24; 81:2, 8, 19-21, 23; 85:18, 25; 86:1, 19; 87:6, 12, 14, 16, 22, 24; 88:1, 4, 7-8, 22; 89:5, 14, 23; 90:1; 92:2, 25; 93:9; 94:4, 6, 15, 17, 22, 25; 95:3, 6, 22; 96:2, 4, 9, 17; 97:1, 8; 98:3, 6, 9, 23; 99:12, 15; 100:17; 101:13, 25; 102:10, 13, 17; 103:8; 104:23; 105:1; 106:2, 4, 7, 22; 109:4, 25; 110:11; 118:14, 20; 119:5; 120:24
**School** [19] - 9:3; 12:22; 14:4, 20; 17:19; 19:14; 20:5; 39:2; 40:21; 44:25; 46:8; 76:4, 7, 25; 77:3, 6; 80:25
**school's** [4] - 8:4; 35:25; 55:13; 95:10
**schoolers** [4] - 72:16; 93:13, 16
**schools** [21] - 27:20; 45:24; 46:1; 55:11; 56:7-9, 17; 65:9; 67:25; 69:14, 24; 71:25; 73:16, 20; 74:13, 19, 21; 75:14, 20, 23
**scoop** [1] - 89:21
**scooping** [5] - 89:17, 19-20, 24; 90:2
**scope** [6] - 10:17; 12:21; 15:14; 42:6; 61:2; 74:25
**Scott** [5] - 2:21; 3:13; 121:17, 20
**scottwallace.edva@gmail.com** [1] - 3:16
**screaming** [1] - 59:6
**screen** [2] - 51:2, 24
**se** [3] - 71:7, 10; 72:6
**SE** [3] - 2:3, 7, 11
**seat** [7] - 6:24; 12:2; 43:16, 18; 78:24; 79:17; 80:13
**seated** [1] - 120:5
**second** [25] - 12:2; 15:19; 17:14, 18; 23:5; 24:15; 26:10; 48:7; 109:3; 112:5, 11, 14, 17, 22, 25; 113:3, 7, 12, 22; 114:24; 115:1, 11; 116:18, 23
**secret** [1] - 84:23
**security** [4] - 84:20, 22, 25; 120:11
**seductive** [1] - 30:23
**See** [1] - 13:4
**see** [35] - 6:25; 11:1, 7, 12; 15:10; 16:11, 14; 17:2; 18:5; 22:22; 25:1, 11, 15-16, 25; 26:5; 27:2, 19, 21-22; 35:5, 7; 40:5; 42:16; 51:24; 73:3; 78:22; 86:14; 87:6; 99:6; 103:2; 107:20
**seeing** [4] - 31:7; 93:17; 104:12
**seek** [2] - 39:10; 55:2
**seem** [1] - 119:9
**select** [1] - 35:1
**senator** [1] - 49:16
**sends** [1] - 13:9

**senior** [1] - 81:20
**sense** [7] - 52:17; 53:16; 57:13; 58:2; 107:15; 119:11
**sent** [2] - 104:3, 20
**sentence** [4] - 13:18; 16:15; 30:18; 108:10
**sentences** [1] - 30:19
**separate** [2] - 8:23; 101:19
**separately** [1] - 45:11
**series** [1] - 45:1
**seriously** [2] - 67:5, 10
**serve** [1] - 81:15
**served** [1] - 48:7
**service** [3] - 9:20; 80:1, 6
**services** [1] - 67:25
**SESSION** [2] - 1:7; 5:1
**set** [4] - 74:7; 90:19; 92:23; 93:3
**sets** [1] - 92:22
**seventh** [1] - 38:12
**sex** [8] - 54:20, 25; 55:1, 5, 7; 57:6; 92:24
**sexual** [47] - 8:5; 9:6, 12; 41:9; 44:20; 46:15; 47:13; 48:14; 49:11; 51:22; 52:10; 53:9; 54:4; 55:6, 9, 15, 22, 24-25; 57:7, 19, 22; 58:6, 21; 59:11; 64:2, 8-9, 22; 65:1, 17; 66:12; 67:3, 9; 69:16; 73:2; 74:23; 89:20; 91:15
**Sexual** [1] - 45:2
**sexually** [4] - 59:4, 16; 60:13; 88:23
**shall** [1] - 8:6
**sheet** [1] - 115:9
**shoot** [1] - 119:23
**shorthand** [1] - 3:17
**shot** [2] - 78:18; 103:5
**show** [5] - 13:3; 14:15; 35:11; 107:19; 111:3
**showed** [2] - 8:3, 16
**showing** [2] - 31:7; 99:15
**shows** [1] - 64:23
**sic** [2] - 35:23; 36:1
**side** [4] - 25:11; 107:19; 110:24
**Sidebar** [4] - 15:17; 63:18; 76:21; 102:22
**sidebar** [6] - 11:15; 60:22; 76:8; 84:6; 99:10
**sides** [1] - 79:1
**sign** [6] - 22:13, 16; 108:20; 113:3; 117:2; 118:7
**signal** [1] - 35:7
**similar** [4] - 49:13; 51:8; 116:23; 118:4
**simple** [2] - 25:18; 91:25
**single** [1] - 45:25
**sit** [1] - 46:25
**sitting** [1] - 105:21
**situation** [2] - 91:6; 111:11
**situations** [1] - 37:21
**skeptical** [1] - 59:15
**skip** [1] - 50:1
**slept** [1] - 92:23

slide [1] - 50:19
slightly [1] - 12:6
slow [1] - 83:5
slut [6] - 92:6; 93:19; 95:20; 97:12, 21;
108:16
sluts [3] - 88:25; 89:6, 15
so-and-so [1] - 93:19
So-and-So [1] - 93:19
solve [1] - 69:15
someone [16] - 6:5; 33:5; 34:8; 36:16;
45:8; 52:21; 66:11, 20, 23; 69:14;
91:11, 21; 101:6, 18; 102:7; 105:3
Someone [1] - 32:21
sometimes [6] - 23:7; 37:4; 42:14;
90:20; 97:10; 120:20
son [1] - 118:21
Sona [1] - 2:17
soon [2] - 41:24
sophomores [1] - 72:24
sorry [23] - 13:1; 17:24; 18:2; 25:4;
30:9; 32:25; 34:20; 37:2; 42:8; 43:17,
19; 60:19; 71:16; 77:4, 25; 78:12, 14;
86:12; 93:7, 23; 98:3; 103:1
sort [20] - 5:16; 22:13; 31:23; 46:25;
48:5, 12, 24; 49:14; 51:6, 8; 53:5; 56:1;
57:3, 20; 58:14, 22; 59:13, 16; 63:3;
65:3
sorts [1] - 50:23
sound [1] - 97:23
source [2] - 56:11; 100:24
space [2] - 29:8; 49:3
speaker [4] - 47:25; 48:5, 8
speaking [10] - 17:25; 44:3; 47:20, 23;
49:15; 50:20; 63:2; 80:15; 84:2; 102:5
specialty [1] - 46:13
specific [6] - 24:19; 93:20; 94:2; 102:5;
110:2; 112:10
specifically [7] - 12:10; 14:17; 19:8;
29:18; 56:12; 86:1; 101:7
specifics [1] - 19:13
speculation [1] - 115:17
spell [1] - 44:12
sponsors [1] - 49:17
spread [1] - 115:6
Square [1] - 3:15
srewari@huntonak.com [1] - 2:20
staff [4] - 40:18; 41:5; 55:17; 120:14
Stafford [1] - 119:19
staggered [1] - 23:7
stand [5] - 22:9; 27:8, 18; 78:8
standard [2] - 13:5; 53:23
standards [3] - 65:9; 66:3, 19
standing [6] - 25:24; 26:4, 19; 28:3, 22
start [5] - 21:24; 47:24; 108:13;
119:23; 120:8
started [14] - 5:3, 24; 28:2; 31:23;
35:22; 36:1; 48:5; 52:3; 79:18; 82:1, 4
starting [3] - 76:10; 108:13, 15
state [11] - 44:12; 52:24; 77:20; 90:17;

91:11, 18; 102:3; 110:1, 8; 112:15
State [3] - 44:24; 45:3; 71:11
statement [77] - 6:9; 30:3, 5; 31:5, 8;
33:6, 9, 13, 20; 42:2, 11, 20, 24; 43:1;
72:10; 95:24; 96:2, 5; 106:7, 10;
107:16; 108:8, 17, 20, 24; 109:1, 3, 23;
110:16; 111:1, 5, 7, 15; 112:1, 3, 5, 8,
11, 14, 17, 22, 25; 113:3, 7, 11, 22,
24-25; 114:24; 115:1, 7, 11, 20, 22;
116:1, 7, 9, 11, 13, 16, 18, 20, 22-23;
117:2, 10, 16, 19, 23; 118:1, 3-4, 7, 9
statements [6] - 31:8, 15; 96:6; 106:2;
117:9
States [2] - 3:14; 81:15
STATES [2] - 1:1, 12
states [2] - 53:2, 4
statues [1] - 27:25
stay [4] - 29:9; 62:6; 79:3; 95:7
staying [1] - 61:7
stays [1] - 63:13
step [5] - 8:19; 45:4, 25; 120:5
stereotype [1] - 60:5
stereotypes [8] - 58:5, 15; 59:23; 64:1,
4, 7, 14; 65:25
still [8] - 9:13; 10:9; 17:11; 20:16;
22:23; 65:11; 81:20; 114:20
stipulate [1] - 107:22
stipulations [1] - 121:2
stood [2] - 6:21; 28:11
Stop [1] - 118:21
stop [4] - 65:4; 67:11; 97:2, 25
stopped [1] - 87:9
straight [1] - 25:1
Street [4] - 1:16; 2:3, 7, 11
strike [1] - 62:15
structured [1] - 5:22
stuck [1] - 27:22
student [23] - 20:6, 11-12; 29:1; 37:9;
40:24; 41:14; 42:2, 11, 15, 18-19, 23;
43:6; 55:12; 57:8; 67:2; 68:14; 96:8;
97:11; 105:12, 16; 116:10
student's [1] - 9:11
Students [1] - 41:3
students [45] - 23:8; 34:22; 35:1, 19;
37:13, 18; 40:3, 16, 24; 41:7; 42:14;
46:6; 48:22; 52:13; 55:16; 57:3; 65:13,
15; 66:6, 9, 21; 68:1; 72:13, 15, 17, 19;
86:18; 87:16, 19; 88:13, 22-23, 25;
89:2, 5-6, 15; 94:18; 98:12
study [1] - 58:4
stuff [9] - 13:11, 19; 14:4; 39:6; 74:5;
93:17, 24
subject [4] - 14:20; 54:6; 77:17;
106:21
subjected [2] - 91:15; 92:2
subjects [2] - 7:15
subset [1] - 100:2
substance [1] - 100:7
substantive [3] - 11:10; 37:22
suggest [3] - 6:9; 63:2; 89:12

suggested [1] - 120:16
suggesting [1] - 24:18
suggestion [1] - 115:24
suggestions [1] - 13:23
suggests [1] - 89:11
suicidal [5] - 90:22; 91:14; 92:1;
110:10
Suite [7] - 1:17, 21; 2:3, 7, 11; 3:7, 11
superintendent [2] - 9:17, 20
support [1] - 100:18
supposed [4] - 13:4; 26:25; 28:21;
54:23
surprise [1] - 107:15
surprised [1] - 110:14
survivors [1] - 69:14
suspect [2] - 105:15, 18
sustain [1] - 18:25
Sustained [5] - 94:20; 99:4; 107:5;
111:24; 115:13
sustained [2] - 98:20
swings [1] - 90:20
swipe [1] - 88:5
swiping [1] - 17:17
SWORN [2] - 43:25; 80:12
S█████ [7] - 94:11; 96:6; 98:10; 103:19;
105:2; 109:12, 17
Symposium [1] - 49:8
system [2] - 22:6; 23:1

## T

T.B [1] - 3:5
tail [1] - 49:14
talks [1] - 30:6
T█████ [5] - 94:11; 96:7; 98:10;
103:19; 105:2
target [2] - 40:9; 41:8
targeted [2] - 64:25; 93:20
targets [3] - 40:3, 6, 16
taught [2] - 46:3, 14
Taylor [5] - 105:4, 6, 10, 12, 22
teach [2] - 45:1; 47:7
teacher [1] - 27:2
teachers [7] - 21:19; 22:9, 18; 26:2,
15; 28:21; 66:20
teaching [5] - 45:3, 16, 25; 46:6, 12
team [2] - 23:4
tears [1] - 95:15
tease [1] - 30:23
technical [1] - 56:17
Temple [3] - 45:13; 46:6
temporarily [1] - 16:20
ten [2] - 78:21; 85:14
ten-minute [1] - 78:21
tend [1] - 22:25
term [4] - 13:12; 20:1; 38:22; 61:9
terminology [1] - 57:22
terms [1] - 59:21
T█████ [16] - 94:11; 96:6; 98:10; 103:19;

105:2; 109:12, 17, 19; 110:12, 15;
111:16; 113:8, 23; 117:14; 118:9

T███████ [1] - 110:22

**test** [1] - 118:22

**testified** [10] - 8:14; 13:9; 14:7; 15:23;
28:9; 53:7; 99:18, 21

**testifies** [1] - 24:7

**testify** [2] - 24:6; 91:10

**testifying** [3] - 54:1; 85:6

**testimony** [20] - 9:14; 17:10; 27:11;
28:20; 30:14; 31:18; 32:22; 42:22; 44:4,
17; 50:8; 54:11; 59:12; 60:24; 61:15;
62:8, 15; 73:3; 114:7

**theme** [1] - 59:13

**themg** [1] - 63:3

**themselves** [2] - 27:21; 59:8

**theoretically** [1] - 6:6

**theory** [1] - 100:19

**therefore** [2] - 59:4

**Thereupon** [2] - 7:4; 79:6

**they've** [2] - 48:25; 68:5

**thinking** [1] - 15:5

**third** [13] - 22:22; 23:5; 25:5; 58:25;
113:11; 116:1, 20, 22; 117:2, 16, 18;
118:4

**third-party** [1] - 58:25

**thirds** [1] - 74:15

**thirteen** [1] - 111:20

**thoroughly** [2] - 39:24; 41:15

**thousand** [1] - 58:10

**threatened** [1] - 98:16

**threats** [27] - 33:22; 34:9; 98:11,
14-15, 23, 25; 99:2, 6, 14, 16, 18, 21;
100:16; 101:8, 11, 14, 17-18, 22, 24;
102:6, 18; 103:8; 112:18, 23

**three** [12] - 10:19; 22:5, 18; 23:9; 26:2;
28:11; 31:17; 71:24; 94:14; 95:18;
117:9

**throughout** [1] - 115:9

**thumb** [1] - 119:21

**tie** [2] - 10:18; 43:17

**timeframe** [4] - 88:13; 90:12; 119:1, 6

**timeline** [3] - 32:3, 8

**Tinsley** [3] - 120:3, 11, 13

**Title** [42] - 8:21, 24; 9:2; 12:15; 16:20,
25; 44:19; 47:16, 18; 48:15, 19, 23;
49:2, 7, 10, 18, 21; 50:24; 51:5, 19-20,
23; 54:4, 16-17, 22; 55:2, 16, 18, 20,
22, 24; 56:7, 10, 19, 21; 65:6, 10;
66:10; 67:21, 23

**today** [9] - 28:2; 30:14; 44:16; 54:9,
11; 68:22; 85:6; 105:21; 118:19

**together** [2] - 53:9; 114:17

**tomorrow** [6] - 119:20, 23; 120:8;
121:4, 6, 10

**took** [6] - 5:15; 106:13; 109:14;
114:10, 16; 117:15

**top** [2] - 47:25; 50:17

**topic** [6] - 10:8; 21:3; 35:18; 38:3;
47:11

**topics** [6] - 44:19; 47:11; 50:23; 52:15,
21

**TORCHINSKY** [1] - 1:15

**torn** [1] - 58:25

**toward** [2] - 26:15; 43:19

**towards** [2] - 18:12; 23:24

**trailed** [1] - 7:18

**train** [2] - 65:16

**Training** [1] - 82:17

**training** [6] - 45:17; 65:20; 80:5; 81:25

**trainings** [2] - 75:2, 6

**TRANSCRIPT** [1] - 1:11

**transcript** [2] - 3:17; 121:18

**transcription** [1] - 3:18

**transition** [1] - 61:10

**trauma** [1] - 68:5

**traumatic** [1] - 68:8

**travel** [1] - 78:19

**tri** [1] - 120:16

**trial** [2] - 54:1; 120:13

**TRIAL** [1] - 1:11

**tried** [3] - 36:25; 62:17; 79:3

**triggered** [1] - 68:6

**trip** [2] - 77:22; 93:4

**true** [2] - 67:5; 99:13

**trust** [1] - 35:19

**truth** [2] - 101:23

**truthfully** [1] - 85:4

**try** [8] - 10:5; 42:2, 11; 78:18; 89:8;
119:19; 120:19; 121:2

**trying** [12] - 5:25; 13:3; 24:22; 39:1, 4;
53:9; 59:7; 62:19; 63:14; 95:13; 100:18

**Tuesday** [5] - 9:5, 10; 10:13, 23

**turn** [1] - 5:24

**turned** [1] - 97:18

**twice** [1] - 23:11

**two** [18] - 9:22; 12:9, 20, 24; 17:15;
22:5; 30:18; 32:19; 33:24; 34:8; 41:22;
74:15; 92:22; 109:9; 113:6; 114:16

**two-thirds** [1] - 74:15

**tying** [1] - 62:16

**type** [2] - 67:5; 88:8

**types** [3] - 55:2; 59:1; 88:18

**typically** [1] - 89:10

## U

**U.S** [3] - 10:25; 11:2; 56:12

**UC** [2] - 48:1

**uh-oh** [1] - 78:15

**ultimate** [1] - 16:23

**ultimately** [2] - 8:24; 32:18

**unable** [7] - 29:24; 30:14, 17; 31:3, 11

**under** [10] - 12:15; 31:10, 18; 55:16,
22, 24; 62:4; 65:9; 105:3; 108:22

**undergo** [1] - 84:24

**understood** [3] - 13:10; 55:10; 111:16

**uneasy** [1] - 61:10

**unfettered** [1] - 93:15

**United** [2] - 3:14; 81:15

**UNITED** [2] - 1:1, 12

**universities** [2] - 48:18; 75:25

**University** [11] - 44:25; 45:3, 6, 13;
46:6, 8; 49:13; 82:1, 4, 6; 83:19

**university** [4] - 48:12; 72:21; 73:5;
74:9

**University's** [1] - 49:9

**unless** [4] - 10:2; 14:9; 28:25

**unlike** [1] - 35:8

**unlock** [1] - 27:22

**unquote** [2] - 45:9; 73:1

**unwelcome** [3] - 55:10; 56:3; 67:9

**unwelcomed** [2] - 55:25; 56:1

**up** [36] - 6:5, 21; 10:10, 18; 12:5; 16:4;
19:11, 18; 21:4, 25; 27:11; 29:3, 11, 13;
32:3, 8; 35:6; 36:19; 38:3; 39:15; 45:25;
46:1, 19; 58:16; 61:12; 69:3; 83:2;
89:21; 93:18; 95:13; 97:17; 101:2;
103:4; 121:2

**upset** [3] - 34:6; 90:21; 104:22

**uses** [1] - 47:18

## V

**VA** [3] - 3:8, 11, 15

**validate** [7] - 29:25; 30:15, 17; 31:3, 11

**various** [3] - 52:20, 23; 53:21

**vary** [1] - 62:9

**vast** [1] - 58:16

**verbal** [1] - 67:7

**verified** [2] - 9:7, 12

**verify** [2] - 9:18; 30:15

**vicinity** [2] - 27:18; 29:7

**victim** [6] - 56:2; 59:11; 60:1; 64:3, 8;
69:21

**victim's** [3] - 59:24; 64:1, 21

**victims** [4] - 58:6, 21; 60:3, 5

**victims'** [2] - 69:17, 19

**view** [5] - 24:2; 26:13; 61:1, 15

**viewed** [3] - 59:3; 60:10

**violence** [26] - 44:20; 46:15; 47:13;
48:14; 49:12; 50:25; 51:22; 52:11;
53:10; 54:5; 55:6; 57:8, 14, 16-17,
23-24; 58:17; 60:13; 64:9; 68:3; 69:16;
74:24

**Violence** [1] - 45:2

**virgin** [2] - 59:3

**VIRGINIA** [1] - 1:1

**Virginia** [6] - 3:14; 53:4, 7-8; 83:14

**VOGEL** [1] - 1:15

**voir** [1] - 61:16

**volume** [1] - 83:2

**VOLUME** [1] - 1:7

**volunteering** [2] - 62:6, 13

**volunteers** [1] - 62:12

**vulnerability** [2] - 59:24; 64:21

**vulnerable** [4] - 60:1, 6, 12; 64:25

## W

**wagon** [1] - 103:4
**wait** [6] - 10:15; 17:14; 25:4; 51:14; 63:21
**waited** [1] - 9:15
**walk** [10] - 35:6; 37:14; 45:14; 46:1; 47:23; 50:18; 58:18; 96:24; 98:1
**walked** [2] - 37:11; 95:21
**wall** [3] - 25:6, 10
**Wallace** [4] - 3:13; 121:17, 20
**walls** [1] - 88:19
**wants** [3] - 62:18; 83:8; 91:23
**Washington** [6] - 1:17; 2:15, 19, 22; 3:3; 46:4
**watch** [1] - 111:24
**watching** [1] - 6:24
**waters** [1] - 63:4
**Wayne** [3] - 44:24; 45:3; 71:11
**ways** [1] - 59:25
**wearing** [2] - 34:2, 13
**Websites** [1] - 66:24
**wedge** [1] - 63:6
**Wednesday** [1] - 108:14
**weeds** [1] - 18:19
**week** [1] - 109:9
**weeks** [1] - 72:25
**weigh** [1] - 75:16
**weight** [5] - 50:4, 8; 100:11, 22, 25
**welcomed** [1] - 19:23
**welcomeness** [1] - 67:15
**Western** [1] - 46:9
**whatsoever** [1] - 36:23
**whole** [6] - 23:4; 26:21; 29:16; 55:4; 67:23; 74:7
**whore** [5] - 32:20; 89:2; 93:19; 97:12; 108:16
**whores** [2] - 89:6, 15
**Wiehle** [1] - 3:10
**wife** [2] - 59:10; 79:25
**willing** [2] - 75:5; 120:8
**willingness** [2] - 64:1; 119:18
**window** [4] - 22:11; 27:3; 28:5, 12
**WITNESS** [46] - 16:11; 18:2, 7, 9, 22; 19:1, 3, 6; 22:14, 16; 24:17, 21; 25:3, 20, 23; 26:2, 7, 14; 27:8; 37:24; 42:8, 13; 43:19, 25; 47:7; 51:13, 16; 65:3, 25; 67:18; 71:17; 72:3; 77:21; 80:12; 92:12, 15; 94:7, 9, 11; 96:14; 99:3; 103:13; 107:10; 115:21, 25; 117:20
**witness** [23] - 7:6; 11:20; 60:25; 62:5; 63:13; 70:4, 13; 72:10; 77:23; 78:4, 7, 16, 22; 79:18; 80:7; 91:10; 94:17, 22; 96:8; 97:11; 119:12; 121:9, 11
**witnessed** [2] - 95:5; 107:7
**witnesses** [5] - 36:22; 40:14; 43:9; 58:25
**witnessing** [1] - 95:24
**woman** [1] - 81:6

**women** [1] - 58:15
**wonder** [1] - 80:2
**word** [4] - 23:24; 38:20; 40:13; 89:17
**words** [1] - 31:24
**worth** [1] - 91:2
**write** [18] - 17:5; 33:13; 51:21; 53:20; 95:24; 107:16; 108:11; 112:3, 5, 14, 17, 22, 25; 115:2; 116:20, 22; 118:1, 3
**writing** [6] - 45:18, 20; 51:22; 52:3, 7, 21
**written** [27] - 14:6, 10; 42:23; 74:15; 96:2, 4, 6; 99:6; 106:2, 7-8, 10; 107:16; 109:3; 110:15; 112:22, 25; 113:3, 22; 114:24; 115:7, 11; 116:18; 117:2, 9
**wrote** [12] - 29:23; 33:6, 9; 41:20; 42:2, 11; 108:8, 15; 111:9; 112:10; 117:10

## Y

**year** [9] - 13:7; 81:2, 4, 8; 82:22; 85:18; 87:12, 14; 88:22
**yearbook** [2] - 34:25; 35:12
**years** [7] - 48:3, 24-25; 49:17; 52:5; 58:10; 85:14
**yell** [2] - 19:1
**yesterday** [7] - 7:18; 11:24; 14:5, 8; 16:7; 39:23; 79:25
**York** [1] - 103:4
**young** [1] - 64:24
**yourself** [5] - 69:12, 17; 75:22; 80:21; 99:2
**youth** [1] - 64:23

## Z

**Zoll** [1] - 2:2
**Zone** [2] - 73:1