UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **B.R.,** | : | |
| | : | |
| **Plaintiff,** | : | Civil Action |
| | : | No. 1:19-cv-00917-RDA-WEF |
| **v.** | : | |
| | : | March 27, 2024 |
| **F.C.S.B.,** | : | 12:28 p.m. |
| **et al.,** | : | |
| | : | |
| | : | VOLUME 8 - PM SESSION |
| **Defendants.** | : | |
| | : | |
| ............................. | : | |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:    **Jonathan Fahey, Esq.**
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK, PLLC
2300 N Street NW
Suite 643a
Washington, DC 20037
202-536-1702
Email: Jfahey@holtzmanvogel.com

**Alison Anderson, Esq.**
BOIES SCHILLER FLEXNER, LLP
2029 Century Park East
Suite 1520
Los Angeles, CA 90067
213-995-5720
Email: Alanderson@bsfllp.com

```
APPEARANCES:   (Cont.)

For the Plaintiff:           Brittany Zoll, Esq.
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             610-804-1787
                             Email: Britzoll@gmail.com

                             Andrew Brenner, Esq.
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             305-539-8400
                             Email: Abrenner@bsfllp.com"

                             Robert Keefe, Esq.
                             BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
                             Suite 2800
                             Miami, FL 33131
                             850-585-3414
                             Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:      Ryan Bates, Esq.
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1596
                             Email: Rbates@hunton.com

                             Sona Rewari, Esq.
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             202-955-1974
                             Email: Srewari@huntonak.com

                             Scott W. Burton, Esq.
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Ave NW
                             Washington, DC 20037
                             202-955-1664
                             Email: Burtons@huntonak.com
```

APPEARANCES:   (Cont.)

For Defendant F.C.S.B.:       **Kevin Elliker, Esq.**
                             HUNTON ANDREWS KURTH, LLP
                             2200 Pennsylvania Avenue, NW
                             Washington, DC 20037
                             804-788-8200
                             Email: Kelliker@huntonak.com

For the Defendants           **Michael E. Kinney, Esq.**
S.T., A.F., P.A.H., T.B.,    THE LAW OFFICE OF MICHAEL E.
B.H., M.P.F., M.C., F.T.,    KINNEY, PLC.
J.F.:                        1801 Robert Fulton Drive
                             Suite 120
                             Reston, VA 20191
                             Email:  Mk@kinneyesq.com

For the Defendant J.O.:      **Bruce Blanchard, Esq.**
                             ODIN, FELDMAN & PITTLEMAN, PC.
                             1775 Wiehle Avenue
                             Suite 400
                             Reston, VA 20190
                             Email:  Bruce.blanchard@ofplaw.com

Court Reporter:              **Scott L. Wallace, RDR, RMR, CRR**
                             Official Court Reporter
                             United States District Court
                             Eastern District of Virginia
                             401 Courthouse Square
                             Alexandria, VA  22314-5798
                             Cell: 443-584-6558
                             Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C O N T E N T S

2

3     **EXAMINATIONS**                                              **Page**

4     CONTINUED CROSS-EXAMINATION OF B.R.                        34
      BY MS. REWARI

5
                              **EXHIBITS**
6
      **DESCRIPTION**
7
      **After review of the record and upon agreement of**
8     **counsel and deputy clerk, all final exhibits can be**
      **found on CME at Docket #975.**
9

10    Defendants' Exhibit 64 admitted                           57

11    Defendants' Exhibit 6 admitted                            64

12    Defendants' Exhibit 118 admitted                          107

13    Defendants' Exhibit 43 admitted                           109

14    Defendants' Exhibit 52 admitted                           114

15    Defendants' Exhibit 53 admitted                           116

16    Defendants' Exhibit 54 admitted                           126

17
      (Defendants' Exhibit 305 admitted)                        126
18

19

20

21

22

23

24

25

1                **AFTERNOON SESSION, MARCH 27, 2024**

2  (12:28 p.m.)

3        THE COURT:  Good afternoon.

4        ALL PARTIES PRESENT:  Good afternoon.

5        THE COURT:  I understand that there's some issues we need

6  to take up before we bring the jury in.

7        MR. BRENNER:  Yes, Judge.  I wanted to follow up first --

8  let me go to the podium.

9        First, I wanted to follow up on the issue that you asked

10  me about yesterday, and I said I would look into.

11        THE COURT:  Yes, sir.

12        MR. BRENNER:  Although the transcript was -- we talked

13  over each other a little bit, I think what you asked me was, is

14  there anything in the Chambers interview of B.R. that would

15  indicate what was done in the investigation or how it was, I

16  think to that -- to that effect.

17        THE COURT:  Um-hmm.

18        MR. BRENNER:  I think.  So what I would say is there --

19  there is a little.  Can I hand something up?

20        THE COURT:  Yes.

21        (Discussion had off the record.)

22        MR. BRENNER:  So, Your Honor, I've handed you what's a

23  transcript Ms. Rewari reminded me that it's not -- there's --

24  it's not complete, but it's -- this is of the -- a transcript of

25  the interview that was audio recorded -- or video recorded.

7

1    THE COURT:  Um-hmm.

2    MR. BRENNER:  If you go to the second two flags, Your

3    Honor, towards the back, the first flag is on a different issue.

4    MR. BLANCHARD:  Your Honor, may I just walk up to look

5    over?

6    THE COURT:  Sure.

7    MR. BRENNER:  The second to last flag is he's starting to

8    explain to her some of the concepts of reasonable doubt and

9    guilt.  He's talking about an investigation.

10    And then the last flag is also where he says, I promise to

11    do a fair investigation.  So that's -- there's nowhere in here

12    where he says it's founded/unfounded, I just wanted to answer

13    your question as completely as I could.

14    THE COURT:  Okay.

15    MR. BRENNER:  Can we address the issue more broadly, the

16    interview?

17    THE COURT:  Sure.

18    MR. BRENNER:  So what -- what I heard yesterday was two

19    intended uses of the -- of this transcript.

20    So, one, what I heard was, if -- if she's asked a

21    question, did you ever say X, and then she says, I never said X,

22    and X is in the transcript, then I believe they could try to make

23    a prior consistent statement, and we would try to figure out how

24    to do that in a way that doesn't get into the police realm.

25    And I think we've talked -- from my perspective, we've

```
1    made our view on that known and how it should be done, and Your
2    Honor has taken that under advisement.
3            But the second thing I heard, which is a little troubling,
4    is that they were going to try to use this to also say, well, you
5    never told the police X, Y and Z, right, you never said this to
6    them, you never said this to them.  And if you look at the first
7    flag, and it's really -- it's in the first five minutes of the
8    interview, and this is Detective Chambers, and it should be the
9    second entry from the bottom.
10           THE COURT:  "Obviously the reason"?
11           MR. BRENNER:  Yeah.
12           THE COURT:  Okay.
13           MR. BRENNER:  If you want to -- should I let you read it
14   for a moment?
15           THE COURT:  Okay.  And this is B.R. being deposed by?
16           MR. BRENNER:  Yeah, not deposed, interviewed by --
17           THE COURT:  Interviewed by the detective.
18           MR. BRENNER:  Correct.
19           THE COURT:  Okay.
20           MR. BRENNER:  And so he makes pretty clear at the
21   beginning that he's there to talk about one specific instance
22   with -- with C.K., so it's -- and if you read through the whole
23   thing, which I'm asking you to do now, you'll see there's times
24   where she starts to veer into other things.
25           THE COURT:  Um-hmm.
```

```
 1        MR. BRENNER:  And he brings her back.  And I'm not being
 2   critical of him for that.  I'm just saying that -- that's what
 3   happened.
 4        So I think it's an unfair use of the transcript to point
 5   out things that are not in there because he's controlling the
 6   interview.  She's there answering his questions.  So there -- and
 7   he made it pretty clear to her at the beginning, I don't want to
 8   get into the other stuff.
 9        Just so you know by way of background, by this point, he's
10   been to the school, at least for a day or two, and you can tell
11   this from the interview.
12        So I think it's -- I think that's an improper and unfair
13   use to say you didn't say X, Y, or Z.  If they're going to say --
14   if there is an inconsistency by what she did say, you know, I
15   think -- I think there's a way to handle that without getting the
16   police.
17        And then there's -- there's one other issue I wanted to
18   raise, but it's not regarding Chambers, so maybe we should hear
19   from defense counsel on Chambers.
20        THE COURT:  Okay.  Who wants to take the lead on this?
21        MR. ELLIKER:  Good morning, Your Honor.  Kevin Elliker
22   for --
23        THE COURT:  Good afternoon.
24        MR. ELLIKER:  -- the school -- I apologize, good
25   afternoon.
```

1          I want to -- I want to address specifically the two issues

2     that Mr. Brenner raised, but I think that to level set about -- I

3     spent a lot of time yesterday, last evening going back through

4     all of the daily transcripts that we've gotten trying to find

5     every instance of a mention of a police and looking at sidebars

6     and sort of how we have arrived at the point where we are now.

7          The starting point was a motion in limine from the

8     plaintiff to not exclude any mention of the police but to only

9     exclude the ultimate findings and the conclusions of the police

10    department.

11         And you granted that motion.  And in a motion the

12    limine -- or in the order on that you stated that the

13    defendants -- that you denied the motion to the extent it

14    attempts to exclude the entire police report.  At the time, it

15    was about a particular report.

16         THE COURT:  Um-hmm.

17         MR. ELLIKER:  But the defendants are directed to redact

18    the unfounded conclusion and any statements that remark on the

19    credibility of a witness in this case, including both C.K. and

20    plaintiff.  And I was, I think, all the parties understanding

21    coming in to trial.

22         During -- the way that the evidence has come in, there

23    have been a few, I think, variables that through the -- through

24    the last week or so, as you know, we think have opened the door

25    to go beyond that.  The first instance was on the direct of

1    Mrs. R.

2         Mr. Brenner asked:

3         "QUESTION:  Did you go to the police?

4         "ANSWER:  I did.

5         "QUESTION:  And did your daughter speak to the police?

6         "Answer:  She did."

7         The reason I emphasize that is because the conversations

8    that we had yesterday have started to suggest that we can't say

9    the word "police" or that there's an issue with even bringing up

10    the fact that there was a police investigation.  The plaintiffs

11    have already put that into the case with their very first

12    witness.

13         THE COURT:  Well, I don't -- well, even if it was the

14    Court's determination that the word "police" could not be said,

15    it's been said anyway.  And it's there, and I think that a

16    reasonable jury listening to the evidence presented would be able

17    to discern that somehow the police were involved.

18         MR. ELLIKER:  Right.  And the reason I raise that is

19    because at least there's issues for today, the cross-examination

20    today, with respect to the statements that the plaintiff made to

21    the police.  There was a suggestion yesterday during our sort of

22    closing colloquy that perhaps we need to sanitize what kind of

23    interview it was, and I think our position is, not only is the

24    cat out of the bag, but that cat -- I don't want to butcher a

25    metaphor, but that wasn't -- that wasn't what we -- what everyone

1    was on the same page about coming into court in the first

2    instance based on the motion in limine.

3         There was no suggestion by the Court or the parties that

4    we shouldn't talk about the fact that there was a police

5    investigation, just the conclusions and credibility

6    determinations.

7         THE COURT:  But I think that it would be a reasonable

8    assessment that the Court is trying its best it can to make sure

9    that the jury is focusing on what it needs to focus on.  And,

10   obviously, we cannot take out completely the fact that a police

11   investigation was done.

12        I think that a reasonable reading of the Title IX

13   requirements suggest that the police sometimes need to be

14   involved.

15        So we can't remove the concept of the police out

16   altogether, but what I don't want to get into is allowing the --

17   anyone to suggest that the credibility findings made by the

18   police in the context of its investigation in any way intrude

19   into the province of the jury in making its determination as to

20   who they want to believe.

21        MR. ELLIKER:  I think that's absolutely right, Your Honor,

22   and -- and we don't take any issue with -- with, you know, the

23   Court instructing the jury to say, you're the fact-finder here

24   for the case and the issues and the legal principles on which you

25   are instructed by the Court, and you are not to, you know, seed

1    any of those credibility determinations over to anybody else.

2    It's for the jury to decide.

3         The second issue, though, about when we talk about the

4    door being opened during trial, that's coming down the road to us

5    on Monday, because on Monday we are -- the plaintiffs are

6    allowing us to call a defense witness out of turn, the assistant

7    superintendent, Dr. Zuluaga, who the Court has heard the

8    plaintiff and her family went to.  And there are -- the -- as

9    best I understand it, the plaintiff's argument for deliberate

10   indifference doesn't stop with when the plaintiff withdrew from

11   school.  There's an argument that the School Board continued to

12   be deliberately indifferent during that year when she's on

13   homebound education.

14        Dr. Zuluaga's testimony and, in fact, the evidentiary

15   record shows that he engaged with the plaintiff, and he wrote

16   Mrs. -- Mrs. R. a letter explaining, we understand the police

17   were involved.  He says that he understands the police's

18   conclusion, that they were informed that the allegations were

19   unfounded.  That was something that we originally anticipated

20   having to redact out from that record and to work our way around

21   with the witness.

22        Also understood that Mrs. R. asked the police to close the

23   investigation.

24        The reason that we think the door has been opened, during

25   the testimony of Mr. F████████, there was -- that was the first

1    moment we talk about when the police come on the scene after the

2    plaintiff has withdrawn from in-person education, makes the

3    police report, Detective Chambers reaches out to Mr. F███████,

4    and there's the cooperation with the investigation.

5        There's a sidebar that we had during court where you

6    allowed on the School Board's cross-examination of Mr. F███████

7    that he could talk about what he did in response to the police

8    investigation, and Mr. F███████ testified about Detective

9    Chambers came to him, said that there was this allegation of

10   rape, explained the details.  Mr. F███████ talked about what he

11   did in response to that.

12       And then there was a sidebar that talk -- that where we --

13   you were very particular about saying -- making sure that all

14   that -- all that -- making sure the testimony came out to say

15   that what he testified to was -- in response to -- this is

16   exactly the question that was asked on cross by Mr. Bates:

17       "QUESTION:  You mention the police told you the

18   investigation was closed; is that correct?

19       "ANSWER:  Correct.

20       "QUESTION:  Okay.  In light of what the police told you,

21   did you believe that any additional steps needed to be taken?

22       "ANSWER:  At that point, after he said it was closed, no,

23   we didn't feel like we had taken additional steps."

24       THE COURT:  But is that the standard under Title IX?

25       MR. ELLIKER:  Well -- and I'm -- and that's exactly the

```
 1    point that we lead to.  On the redirect, Mr. Brenner asked him,

 2    "What you said was after the police closed their investigation,

 3    you felt there was nothing else you needed to do; is that right?"

 4         And he asked him essentially where in the standards and

 5    the guidance is that.

 6         Mr. Frattali's testimony would not have been that just

 7    because the police told him that they closed the investigation we

 8    don't have to do anything.  It was the substantive conversation

 9    about what Mr. -- what Detective Chambers informed the school,

10    and, indeed, what the school then -- what the police department

11    then informed Dr. Zuluaga about the nature of their

12    investigation, that they then determined the report to the police

13    was an off-campus incident between students that didn't happen at

14    school.  It wasn't reported directly to the school.  The police

15    came to the school to say, we're investigating this off-campus

16    incident that involves a student who's not in the building with

17    you anymore.

18         And -- and they cooperated with that.  And to the extent,

19    then, that -- I mean, I think Mr. F███████ even testified that

20    even after we gathered the information that the police asked for,

21    we continued to look into it because we knew that --

22         THE COURT:  But couldn't a reasonable fact-finder conclude

23    that the off-campus incident, if alleged to be true, was a

24    predicate for the alleged sexual harassment and bullying on

25    campus?
```

```
 1          In other words, let me state it more directly, and I'm not
 2     comfortable saying this but I have to say it:  The allegation is
 3     that something happened off campus regarding C.K. and B.R.  What
 4     happened off campus generated, theoretically, some bullying and
 5     sexual harassment on campus because of the allegation that B.R.
 6     was not responsive to C.K. or D.N.'s advances.
 7          In other words, all of these things sort of theoretically
 8     lead into other things which formed the basis for the Title IX
 9     complaint.  If you just had an off-campus incident without any
10     connection whatsoever to the school, we would be in a different
11     situation, but one sort of theoretically begot another.
12          MR. ELLIKER:  Sure.  And I think I understand -- this is
13     being -- it's almost like retrospectively being filled in after
14     the fact:  Oh, we know that we've been doing these things during
15     the school year, and now in March we get this information about
16     something that happened way back then and whether that should
17     inform what we do going forward, right?
18          THE COURT:  Sure.
19          MR. ELLIKER:  Because again, the school can only be liable
20     for what it knows about, right.
21          THE COURT:  Right.
22          MR. ELLIKER:  And at that point in March, what they know
23     about is this allegation that's been made.  The question then is,
24     for the jury to consider under Title IX:  Is what the school did
25     after getting that information objectively unreasonable --
```

1          THE COURT:  Yes.

2          MR. ELLIKER:  -- the deliberate indifference standard.

3    Well, in order to understand whether what they did is reasonable

4    or not, we tried to cut it off to say the police investigation

5    closed.  But then once the question gets asked, you stopped

6    investigating just because the police -- I mean that's -- he

7    didn't -- it wasn't exactly the tone he used, but I think the

8    inference is --

9          THE COURT:  The phraseology is, yeah.

10         MR. ELLIKER:  Yeah.  The inference is, you stopped just

11   because the police closed their investigation even though there's

12   this allegation of rape?  And in fact, the last question on the

13   principal's -- Mr. Frattali's direct was:

14         "QUESTION:  From March of 2012 forward, C.K. was allowed

15   to stay in school, right?

16         "ANSWER:  Correct."

17         And he even brought that up again on redirect.  And again,

18   the inference to the jury is, you have an accused rapist in the

19   halls of your school and you're not doing anything about it?  But

20   what the police told --

21         THE COURT:  I understand your point.  I understand your

22   point and I think the best way of handling it and this is the way

23   we're going to handle it is that we're not going to play this

24   videotape and audiotape now.  Because you are entitled as part of

25   your case-in-chief to call Mr. F█████ to the stand, I'll give

```
1    you some latitude to fill in any blanks that you think you need

2    to fill in.  Obviously they called them in their case-in-chief,

3    but it doesn't preclude you from calling Mr. F████████ in your

4    case-in-chief.

5        MR. ELLIKER:  I understand that, Your Honor.  I think -- I

6    understand the direction.  Let me just make the point then for

7    what we have to make sure we're on all fours about today.

8        Confirming that we're not in a position where we have to

9    try to sanitize the fact that there were statements, there was an

10   interview given to police, right?

11       THE COURT:  Yep.

12       MR. ELLIKER:  I think that's in line with what the order

13   was before.

14       THE COURT:  And it's in line with what the Title IX

15   jurisprudence suggests, that that has to happen in an appropriate

16   context, and I think we can all agree that this is an appropriate

17   context for this to happen.

18       MR. ELLIKER:  And I would also submit, Your Honor, that

19   what we're talking about is just is a -- what I think is straight

20   down the strike zone of a credibility and impeachment issue,

21   right?

22       If the plaintiff testifies or makes allegations that are

23   of particular detail in one way and then the -- and this then

24   feeds into the issues that Mr. Brenner has raised this morning

25   and I apologize for taking so much time on this, but the purpose
```

1    of -- that he raised today, right, I understood when he said

2    there's these two issues.

3         One is, if asked, did you say this, what was the answer,

4    right, straight impeachment.  I think the parties are all in

5    agreement that there's not an issue with using the police

6    interview for that.

7         The second point, though, to say if the question is well,

8    you never told the police X -- and what I understood Mr. Brenner

9    to say is there's sort of this prefatory conversation between

10   Detective Chambers that suggests that there's a limitation on

11   what it is that he's really trying to get out of her.  My

12   understanding is, under deposition, the plaintiff talks about

13   conversations she had with the police that weren't captured by

14   this interview, and that the disclosure that she made to the

15   police was greater than what it was that is in the interview, and

16   the other point is that Mrs. R. was interviewed by the police as

17   well.  And all of these conversations -- I don't think that there

18   is such a limitation on what it is, and if --

19        THE COURT:  Well, that's sometimes difficulty and the

20   Court struggles with motions in limine because you don't know

21   what the factual predicates are going to be to allow you to fully

22   address it.  And what this Court tries to do, to the extent it

23   can, if something is fact dependent, I hold it in reserve, I take

24   it under advisement to make sure that I know the facts that I

25   need to know before I make a call, and this, quite frankly, may

1    be one time or one of several times that we need to take a look

2    and see how the evidence develops, and then I may need to make an

3    evidentiary determination on the fly, so to speak.

4         MR. ELLIKER:  So I understand, Your Honor, and I think we

5    understand evidence comes in a particular way and circumstances

6    change.  Everybody was working in a theoretical mind set on

7    March 6th.  But I think as long as we're in a position where

8    there's not a restriction on saying -- I guess maybe if we can

9    all agree that the state of play for today is what the order on

10   the motion in limine was, we're not going to say unfounded and

11   we're not going to say what, you know, Detective Chambers made a

12   credibility determination about, I think that's fine for our

13   purposes but the point still being that the defense position

14   still is that the door, based on the testimony as it's come in

15   through the plaintiff's case, has been opened wider.

16        THE COURT:  It may well open the door further.  I

17   understand.  Do you want to address this issue again?

18        MR. BRENNER:  Yeah, and I wanted to raise one more issue.

19   But I would just say on that issue we can deal with Mr. F██████

20   when his testimony is, but just to remind the Court -- we

21   actually talked about this in detail -- the reason that the

22   F██████ questioning was allowed to proceed is because the

23   predicate was laid with Mr. F██████, his understanding of Title

24   IX or their obligations, where the School Board had to do an

25   independent investigation regardless of what the police did.

```
 1   That's why we were able to ask Mr. F███████ what he did after

 2   March whatever it was.

 3         So that -- just to -- as Mr. Elliker likes to say, at a

 4   level set, that's the level set.  That's what happened.

 5         THE COURT:  Okay.  Another thing that was raised, the

 6   Court is going to raise and sort of make everyone aware of,

 7   yesterday, Mr. Brenner, you suggested that a -- I don't remember

 8   the individual's name but a sociologist was going to opine,

 9   maybe -- you have to make a decision whether you're going to call

10   her or not -- as to the methodology and focus of the interview

11   that was held with -- apparently held with B.R.

12         I would suggest to you that depending on what that expert

13   wants to opine, that may open the door to a whole lot more

14   information from the police officer -- the detective, excuse

15   me -- regarding the nature of his investigation, why he concluded

16   what he concluded.  So I'm not going to tell you what to do, but

17   I would suggest that you might run a great risk if you go down

18   that road and may actually undermine your victory on the motion

19   in limine.

20         MR. BRENNER:  Understood.

21         THE COURT:  All right.

22         MR. BRENNER:  So one other issue I wanted to raise.  It's

23   on -- we've been exchanging exhibits so we know what's coming up

24   on each other's examination.  So there's an exhibit on the --

25   133.  There's an exhibit that the defendant has provided that
```

1    they presumably intend to use on the cross-examination of my

2    client.  I can give you a -- do you want me to give you a copy

3    or --

4         THE LAW CLERK:  I found it.

5         MR. BRENNER:  So, this is a -- this is a document from the

6    records of one of plaintiff's therapists who she mentioned

7    yesterday, Dr. Rachel Ward.

8         THE COURT:  Yes.

9         MR. BRENNER:  Okay.  And this is her doing what's called a

10   trauma timeline, she's just sort of trying to lay out for the

11   doctor things that happened and didn't happen.  And I think a lot

12   of it is -- I think most of it is fair game, but I have a concern

13   about two areas.  So, if you go to page -- if you go to page --

14   the Bates stamp is 259.  So, if you will recall --

15        THE COURT:  Just a second.

16        MR. BRENNER:  I'm sorry.

17        THE COURT:  Does it also reference, at the top, page 10?

18        MR. BRENNER:  Yes, yes, on the fax page there.

19        THE COURT:  Okay.

20        MR. BRENNER:  So, Your Honor, you've seen this in this

21   trial already.  The plaintiff completed her direct examination,

22   and the opening, too, this is true.  The plaintiff made no -- no

23   effort or -- did not put into evidence or before the jury one of

24   the allegations which was in her complaint regarding alleged

25   rapes that took place in a closet on Rachel Carson Middle School

1    campus.

2         Without getting too much into the legal strategy, the fact

3    of the matter is there is not really good evidence that that was

4    reported to the school, okay?  So we have not made that an issue

5    in the case.  We don't intend to make that an issue in the case,

6    but if you look at this exhibit, it's clear to me that

7    defendant -- and they've already done it.  They keep saying

8    "men" -- and this came up at a sidebar, too, Your Honor, during

9    the opening statement.  Ms. Rewari used the term "gang rape."  I

10   objected, we went to the sidebar.  You understood the issue and

11   you said, "Well, the term 'gang rape' itself is, albeit not the

12   best use of the term, it doesn't necessarily mean gangs in the

13   sense of gangs," but you told them essentially to move on but

14   they could say gang rape.

15        Ms. Rewari did I think largely just move on at that point,

16   but I think at that sidebar she said, "Well, I have to be able to

17   say they had teardrop tattoos," and you'll see on page 10 that's

18   specifically in here.  I think the redactions -- I have to -- I

19   think the redactions -- that the defendant just redacted the word

20   "gang."

21        You'll recall we dealt with this at the motion in limine

22   stage.  The defendant took the position that this whole gang

23   issue -- and you'll recall Detective Woolf was a proposed

24   witness, was irrelevant, it was not -- the school didn't know

25   anything about it, and Your Honor on that particular motion did

1    grant the issue regarding gangs.

2         And so our concern is that -- is the defendant is trying

3    to say what the plaintiff's case is and then trying to knock it

4    down.  The fact that you -- for example, if you brought up a

5    seven-count complaint and you decided you're going to -- or you

6    said they breached an auto case.  You said, you know, the

7    negligence was X, Y, and Z and you present to the jury X and Y,

8    the case doesn't become about Z.  The case becomes about X and Y.

9         So what they're trying to do is --

10        THE COURT:  But sometimes people in the context of civil

11   cases will agree to dismiss portions of their allegations.

12   Wouldn't you agree?

13        MR. BRENNER:  Yeah, but these are not separate counts.

14   So, you can strike certain allegations, which I don't really know

15   the procedure for that.  I've never done that.  But that's

16   essentially what we've done.  We've excised that part of the

17   case.  And it's been clear to us and I've sat there on my hands a

18   little bit and occasionally said things, so I know what they're

19   getting at.  They have Mr. F█████ testify about the chemicals

20   in the closet, but they haven't quite gone where this document is

21   clear that they intend to go, which is to confront the plaintiff

22   to say, "You once said this," and then knock it down.

23        I will say to you, the plaintiff's, had we presented that

24   case if Your Honor had let that go forward and we decided to do

25   it, would have involved -- I mean, she believes they were -- this

1    whole idea that it's "men," although she uses "men," she would

2    explain that they're people older than middle school students.

3    But she believes that she was in a situation where she was

4    being -- I don't mean to use the term wrong and maybe I do, but

5    she was being groomed for gang sex trafficking.  That's what she

6    believes.  She believes that based on what some of the things

7    that C███████ told her.  But we didn't present that case because

8    it's not -- I don't have evidence that I thought met the burden

9    that the school board was on notice of it and, therefore, it's

10   irrelevant to the Title IX claim, but we can't then use it as a

11   sword against the plaintiff.

12       So, we're asking the Court to not allow that stuff.  I

13   just have it in this document because it's coming up, but it's

14   clear to me that this is where the defendant is going by their

15   multiple references like, "Did you see men around" --

16       THE COURT:  Well, one of the theories that I believe came

17   from B.R. relates to this allegation.  Oftentimes -- it's not

18   necessarily responsive to a question, things just sort of come

19   out.  And is it fair for her to suggest things and then prevent

20   defendants from inquiring about them if she has said something or

21   done something inconsistent with her own testimony or her own

22   approach?  Is that fair?

23       MR. BRENNER:  I didn't catch the last part, Judge.

24       THE COURT:  Is that fair, for the theory to be sort of out

25   there --

1          MR. BRENNER:  So in her -- you mean in her testimony?

2          THE COURT:  Yeah.

3          MR. BRENNER:  So my recollection of her testimony is what

4     she told the school about -- as relates to sexual assault as --

5     I'm trying to parse words between what's going on, the touching

6     and the sexual assault.

7          THE COURT:  Right.

8          MR. BRENNER:  I think they're both sexual assault, but

9     let's talk about the actual more common parlance of sexual

10    assault, is -- is she was saying things like, C████████ is

11    hurting me, he's coming inside of me.

12         I don't believe she ever said in her testimony there were

13    these other men or older people that were hurting me and raping.

14    I don't think she said it.  In fact, I'm quite certain she didn't

15    say it.

16         So if Your Honor's question is had she said that, would

17    they be entitled to cross-examine on it?  Yeah, of course, I

18    don't know how I could tell you otherwise.  But I don't think

19    that was done, and it was done -- it was not done from my

20    perspective.  I'm the one asking the questions on purpose.

21         THE COURT:  All right.  Let me hear from the other side,

22    and then I'll come back to you.

23         MR. BRENNER:  And just one more thing on this document

24    just so you can dispose of it, I think.  I don't know which way

25    you're going to dispose of it, but we can deal with it.

1          There's also stuff in this document about her hiring of

2     lawyers, there's a whole section on the police, which is on 264,

3     page 15 in the upper right-hand corner.  There's a whole section

4     on that.

5          In fact, there's two -- two and a half -- two and a

6     quarter pages just on the police.  We think that would run afoul

7     of what we're trying to do here.

8          And then there's a section on lawyers.  It starts on

9     page 21 of the fax page.  Interestingly enough, the defendant

10    kept in the hiring lawyers but didn't say what the lawyers were

11    for.  They redacted out that it was actually to file an OCR

12    complaint.

13         I don't think any of it should come in, but certainly if

14    you're going to suggest that she was hiring lawyers, you might as

15    well tell them what she was hiring lawyers for.  That's what I

16    think all those redactions are on the bottom of page 21.

17         But so we just -- it's really three issues that come

18    through this document, and I would say an order -- well, there

19    are three issues that I think run afoul of what should be done

20    here.

21         Thank you.

22         MS. REWARI:  Good afternoon.

23         THE COURT:  Good afternoon.

24         MS. REWARI:  Sona Rewari for the Fairfax County School

25    Board.

1        Your Honor, first of all, this is an exhibit to which

2   there is no objection.  When we exchanged exhibits, it was also

3   on their list, it was on our list, no objection was made.  There

4   was no motion in limine on this.

5        And I think Mr. Brenner's memory of our motion in limine

6   on the sex trafficking is different than I believe what the

7   motion was.  The motion was to exclude evidence of sex

8   trafficking cases in this court because we said there's no

9   evidence tying those criminal prosecutions to this student --

10       THE COURT:  I recall that.

11       MS. REWARI:  -- to this school.

12       And then there was also just general gang activity in the

13  northern Virginia area.  We never filed a motion to say you can't

14  talk about your allegation, which is in this case.  We expected

15  it to be presented.  She's testified about it in her deposition.

16  And, in fact, all of her experts have --

17       THE COURT:  Let me ask you this:  Even though she may have

18  testified about it in her deposition, do you have anything to

19  suggest that she's testified about it before this jury, the

20  fact-finder?  Because a lot of things are said and done in

21  deposition that have no relevance to what we need to do in the

22  actual trial.

23       MS. REWARI:  Well, I would have to go back and look at all

24  the testimony from yesterday, but I will say that the -- the

25  questions yesterday were, were there -- is there any issue with

1    your memory?  Do you have -- do you create false memories?  Do

2    you have the experience of believing things happened and then

3    finding out they didn't?

4         And so in this document she has told us under oath that

5    all of these things happened, so we are entitled to test her

6    credibility.  She is as confident about these closet rapes as she

7    is about what she is saying about C.K.

8         And the question in this case is -- turns -- the very

9    first question on the Title IX claim against the school system

10   turns on credibility.  Who do you believe as to what happened?

11        And if you believe her about the C.K. rapes, you also have

12   to believe her about the closet rapes.  So she has put this

13   document together, she has said that this is her trauma timeline

14   of all the things that happened to her.

15        THE COURT:  Help me with that last statement, that if you

16   are to believe her on the C.K. circumstance, you necessarily have

17   to believe her on the closet circumstance?

18        MS. REWARI:  Well --

19        THE COURT:  Help me on that one.

20        MS. REWARI:  You can -- she is as confident.  So in terms

21   of her credibility and her ability to remember, and her

22   statements under oath as to what happened, it -- they have not

23   struck these allegations from the second amended complaint.  She

24   has alleged them, they're still part of this case.  They're part

25   of her story.  And regardless of whether she admits what was

1    reported to the school or not, the rape wasn't reported to the

2    school.

3         THE COURT:  Isn't the standard, though, when you instruct

4    the jury to essentially say that you're entitled to listen to the

5    testimony of any witness, and you can assess what credibility you

6    want to in the context of that witness?  You can believe portions

7    of testimony and disbelieve portions of other testimony, isn't

8    that the traditional instruction we give?

9         MS. REWARI:  Absolutely, and -- but her memory of what

10   happened in 7th grade includes these incidents.  And -- and the

11   jury can be instructed, if they would like and they want to take

12   that out of the case, they're not presenting it, the jury can be

13   instructed that they're not claiming that these were reported to

14   the school.  But in order to assess her credibility, her ability

15   to remember -- and, Your Honor, this is very important because

16   she is the only witness to any of these sexual assaults.  There's

17   no other witness.

18        THE COURT:  Well, the thing is -- and this is the Court's

19   ruling as far as this is concerned -- okay.  Come on up,

20   Mr. Blanchard.

21        MR. BLANCHARD:  Look, I think the parties are bound by

22   these pleadings, and they always have been.  Under Virginia law

23   and under federal law, I think you -- you put in your pleadings,

24   and you don't strike it, you haven't moved to remove it before

25   the trial starts.  The trial starts, people make opening

```
 1    statements based upon the pleadings that they've relied on by the

 2    opposing party.

 3        To then say we're going to -- and we've had conversations

 4    about sanitizing cases.  This a monstrous attempt to sanitize.

 5    This is something that not only the plaintiff has testified about

 6    in this case, but I think that she told almost every one of her

 7    treaters after a certain point in time.  This is part of her

 8    damages that tie into everything against my client and -- and

 9    everybody else, that, you know, this -- this is part of her --

10    her -- it's a trauma timeline because it's her story.

11        And now they're saying, well, we don't want to tell part

12    of that story, and we don't want you to be able to ask part about

13    that story, even though it happens at the same time period in

14    this October to -- to early February time period.  Because I

15    believe they think it has severe credibility problems.

16        And that is important to me because my client is accused

17    of something that didn't happen in school and that there is no --

18    it's all plaintiff's story.  And so to say -- you can't -- they

19    haven't struck it, they didn't make a motion and tell everybody

20    it was out.  They left it in this pleading for four-and-a-half

21    years, and let us depose on it and -- and come right up here, and

22    then not say anything before opening and strike it, and let

23    people base their defense on it.  And then to come up and say now

24    we want to take it out, I think that's just totally unfair.

25        THE COURT:  Mr. Kinney.  I'm sorry.  He's moving.
```

```
1         MR. BLANCHARD:  Your Honor, just on the transcript, too,
2    if you look through that, while there may have been the note that
3    was referred to originally about we're going to talk about that
4    day, if you look through the -- very quickly you see they talked
5    about the entire relationship, other events, and my client.
6         THE COURT:  Mr. Kinney.
7         MR. KINNEY:  Your Honor, Michael Kinney for the individual
8    school defendants.
9         I'm glad to hear this morning that there's no evidence to
10   support those allegations.  My clients have said that from the
11   very beginning of this case.  And they've had to live under a
12   cloud for four-and-a-half years that they're accused of having
13   knowledge of these -- excuse me, these -- these gang rapes in
14   closets, and that they did nothing to help this girl.  And
15   they've been talked about in the electronic media.  And it's
16   unfair now to say, well, we -- you know, we didn't mean that, we
17   don't have any evidence for it.
18        THE COURT:  All right.  The Court's going to continue to
19   take the matter under advisement.  The Court's of the view simply
20   as this, this is all going to be dependent upon in main instances
21   what B.R. does or does not say or what other witnesses do or do
22   not say.
23        In addition to that, at least for purposes of keeping the
24   issue alive, I believe that the testimony by Mr. F███████ with
25   regard to his information regarding what may or may not have
```

```
 1    happened in a closet at the school and his testimony about the

 2    size of the closet and the like, at least raises the issue as to

 3    whether or not there should be further defined through testimony.

 4         But, again, I am -- I am instructing that we focus on the

 5    things that we need to focus on that are part of this litigation,

 6    and, again, not get caught up in things which have nothing to do

 7    with what we need to resolve in the context of this case.

 8         So essentially the motion in limine, which now has sort of

 9    developed a little bit more, remains under advisement, and we'll

10    see how people testify.  And the Court will make a determination

11    on a question-by-question basis.  All right.

12         MR. BRENNER:  May I get the witness?

13         THE COURT:  Yes.

14         MR. BRENNER:  And, Your Honor, just to let you know --

15         THE COURT:  We -- we took care of that.

16         MR. BRENNER:  -- so the jury won't be --

17         THE COURT:  Yeah, we took care of that.

18         MR. BRENNER:  Okay.

19         (Jury in at 1:06 p.m.)

20         THE COURT:  Okay.  Thank you.  You may be seated.

21         Good afternoon, ladies and gentlemen.

22         JURORS:  Good afternoon.

23         THE COURT:  I apologize for starting a little later.  We

24    oftentimes have to take care of businesses that does not relate

25    to what you need to be concerned about, and the Court's criminal
```

```
 1   docket ran a little longer than we thought, but we're glad that

 2   you're here, we appreciate you being on time.

 3        Were all of you able to live up to the Court's instruction

 4   not to discuss the case or any aspect of the case with anyone?

 5        All acknowledging yes.

 6        And I take it all that you stayed away to the extent you

 7   can from social media and print media.

 8        Very good.  Thank you for your attention, and we'll get

 9   started.

10        MS. REWARI:  Good afternoon.

11               CONTINUED CROSS-EXAMINATION OF B.R.

12   BY MS. REWARI:

13   Q.   Sona Rewari for the Fairfax County School Board.  Good

14   afternoon.

15   A.   Good afternoon, Ms. Rewari.

16   Q.   When we left off yesterday, we were talking about when

17   you first started seeing a therapist?

18   A.   Yes.

19   Q.   And that was in the middle of February 2012, correct?

20   A.   That sounds about right.

21   Q.   Okay.  And -- and his name was Alan Pachter?

22   A.   Yes.

23   Q.   And you saw him for the first time on February 17th of

24   2012, correct?

25   A.   I'm not sure if that's exactly, but I trust you on that
```

1    one.

2    Q.    Okay.  There's a binder in front of you, it's white, it

3    says Plaintiff's Exhibits.  If you could turn to the tab that is

4    Plaintiff's Exhibit 451?

5    A.    Is there a specific page?

6    Q.    If you could take a look at the page that's numbered

7    NOVA 22.  The numbers are a little overlapping at the bottom,

8    but it has a -- at the top it says 2-17-2012.

9         THE COURT:  Ms. Barry, if you could help her.

10        THE WITNESS:  Okay.  I -- I'm sorry.

11        MS. REWARI:  Yeah, may I show her?

12        THE COURT:  I think she found it.

13        THE WITNESS:  I can look at it.  Sorry.  Thank you.

14   BY MS. REWARI:

15   Q.    All right.  So looking at this, does this refresh your

16   recollection that the first time you saw Mr. Pachter was

17   February 17th, 2012?

18   A.    Um, I mean, that's what the note in front of me says.

19   Q.    Okay.  And it says "initial evaluation" there, right?

20   A.    Um --

21   Q.    Down under procedure code/type of service?

22   A.    I see that, yes.

23   Q.    Okay.  And so in this initial meeting with Mr. Pachter,

24   you reviewed the school situation and discussed bullying, right?

25   A.    Um, I don't recall exactly what I spoke to him about, but

1    it sounds about right.

2    Q.    Right.  And Mr. Pachter did not note in his records that

3    you had discussed any kind of touching or improper sexual

4    touching happening to you, right?

5    A.    Um, I don't really recall what I talked about in that

6    meeting.  I'm sorry.  I don't really -- what was your question

7    again?

8    Q.    In his notes, he doesn't -- he doesn't discuss that you

9    talked to him about any kind of improper touching happening to

10   you at school, right?

11   A.    I mean, these are his notes so that's what his notes say,

12   yes.

13   Q.    The discussion is about bullying, correct?

14   A.    I don't recall what the conversation is but that's what

15   it says in his notes, so --

16   Q.    Okay.  And in fact, there's no discussion of any sexual

17   assault on campus or off campus in that meeting with

18   Mr. Pachter, right?

19   A.    I'm not sure because his note is only a sentence.

20   Q.    Okay.  And then you went back to see him again five days

21   later on February 22nd, correct?

22   A.    Um, do you want me to flip a page?  Is there --

23   Q.    Do you recall that you went back to see him?

24   A.    I don't recall.  I've been to therapy a lot over the

25   years, so I don't have a specific.

1    Q.    Sure.  And if you want to look at the next page, that's

2    perfectly fine.

3    A.    Okay.

4    Q.    And you discussed with Mr. Pachter more details about the

5    bullying, right?

6    A.    Um, that's what it says here.

7    Q.    All right.  And you explored with him the possibility

8    that there are ways in which you contributed to the incidents,

9    right?

10   A.    Um, I think that's fair to say, that I questioned that,

11   yeah.

12   Q.    Okay.  And you discussed with him that you were not yet

13   ready to be dating and how that had backfired on you, right?

14   A.    I don't really know what context this note is in, but

15   that's what the note says.

16   Q.    Well, do you recall what you discussed with him?

17   A.    No, I don't recall what I discussed with him.

18   Q.    Okay.  And then you saw him again a third time on

19   February 27th, 2012, right?

20   A.    That's what it says, yes.

21   Q.    Okay.  And this -- in this session your mom was in the

22   room with you when you met with Mr. Pachter, correct?

23   A.    That's what it says in the note.

24   Q.    And then you discussed -- you and your mom discussed with

25   him the procedures for filing a police complaint about bullying

1    and threats, right?

2    **A.**    I mean, that's what it says in the notes.  I mean, do you

3    want me to expand on that?  I'm happy to expand on that.

4    **Q.**    Do you recall discussing with him that -- the procedure,

5    filing a police complaint for bullying and threats?

6    **A.**    No, because in here it says that I had suicidal

7    ideations, so I recall feeling rather suicidal on this.

8    **Q.**    Okay.  And that was on February 27th, 2012 that we're

9    just talking about, right?

10   **A.**    Yes, ma'am.

11   **Q.**    Okay.  And that is the night when you started messaging

12   C███████ K. as Jenni Taylor?

13   **A.**    That sounds about right, yes.

14   **Q.**    Okay.  In fact, if you look at Defendants' Exhibit 73,

15   which is in evidence -- and it's in the black binder.

16        MS. REWARI:  Your Honor, I'm sorry.  I believe this is in

17   evidence.  Permission to publish?

18        THE COURT:  I would suggest or request that even if

19   someone believes something is already in evidence, to ask the

20   Court before it's published.

21        MS. REWARI:  Yes, yes, I'm sorry.

22        THE COURT:  Thank you.

23        MS. REWARI:  Miscommunication on our end.  Sorry about

24   that.

25        May I publish.

```
 1            THE COURT:  No problem.

 2       You may publish.

 3            MS. REWARI:  Thank you.

 4  BY MS. REWARI:

 5  Q.      And these are the messages between you and C████████,

 6  K. as Jenni Taylor, right?

 7  A.      Yes.

 8  Q.      Okay.  And they start at 9:47 p.m. on the night of

 9  February 27th.

10  A.      That's correct.

11  Q.      Okay.  And when you were talking with Mr. Brenner on your

12  direct examination, you gave a couple of explanations for these

13  messages to C███████, K. and why you send them as Jenni

14  Taylor, right?

15  A.      That's correct.

16  Q.      You said you created Jenni Taylor to get C.K. to confess

17  to all the things that he was doing to you, and it didn't work

18  because he figured out it was you, right?

19  A.      That's correct.

20  Q.      And you said that you contacted C.K. first as Jenni

21  Taylor?

22  A.      That's correct.

23  Q.      And then you said that you messaged C███████, K. as a

24  second alternative so that he would take the message to the

25  administration and they could figure out what C.K. was doing to
```

1  you?

2  **A.**    I know that part of that sounds about right, but I

3  think -- I think that you're on the right track with what you're

4  saying.

5  **Q.**    Okay.  Well, what part of that is wrong?

6  **A.**    Can you repeat the second part of it that you said that

7  I -- what was it about the administrators?

8  **Q.**    Well, you wanted C███████ to take these messages to

9  the administration so then they could figure out what C.K. was

10  doing to you, right?

11  **A.**    I mean, I wasn't asking them to figure anything out.  I

12  was telling them for months that C█████ was harassing me,

13  touching me, threatening me, and I wanted help.

14  **Q.**    Okay.  And you were focused on C.K. then, right?

15  **A.**    In terms of what?  I'm sorry, can you clarify that

16  question?

17  **Q.**    Sure.  You wanted the administration to focus their

18  attention on C.K., right?

19  **A.**    Yes, that would make sense.

20  **Q.**    Okay.  Now, you said that C.K. already knew you were

21  Jenni Taylor by the time you contacted C████████, right?

22  **A.**    That's correct.

23  **Q.**    But C.K. posted on his Facebook page the next day

24  February 28th, 2012, "Who is the Jenni Taylor person saying" --

25  excuse my language -- "shit about me?"

```
 1   A.      Is that a question?  I'm not really sure.
 2   Q.      Okay.  Well, let me give you Defendants' Exhibit 36.  I
 3   don't think it's in the binder.
 4           MR. BRENNER:  Did you say 36?
 5           MS. REWARI:  Yes.
 6           THE COURT:  Any objection to 36?
 7           MR. BRENNER:  I'm just finding it, Judge.
 8           MS. REWARI:  I have an additional copy for your law
 9   clerks.
10           MR. BRENNER:  Judge, I think she needs -- and counsel
11   needs to lay a foundation for this.
12           THE COURT:  Let me see it.
13           MR. BRENNER:  For this witness.
14           THE COURT:  Okay.  Lay a foundation.
15   BY MS. REWARI:
16   Q.      Well, you looked at C.K.'s Facebook page on and off over
17   the years, correct?
18   A.      Yes.
19   Q.      Yeah, you continued to check it?
20   A.      I mean, I don't think that's really a correct
21   characterization of what I do with making sure that he's not
22   anywhere near me.
23   Q.      Okay.  But you produced messages off his Facebook wall in
24   this case, right?
25   A.      Yes, anything that was responsive to your subpoena I
```

1    produced.

2    Q.    All right.  And so do you recognize these two posts that

3    are on Defendants' Exhibit 36 as messages from C.K. with his

4    current picture?

5    A.    Given the BO Bates stamp, I'm assuming that I produced

6    these.  I don't -- I mean, I've -- I see what you're showing me.

7    Q.    Okay.

8         MR. BRENNER:  Just for the record, Your Honor, obviously

9    she's not a lawyer.  That's not -- it's not a Bates stamp, I

10   believe, a production from B.R.  It's a Bates stamp for

11   production from the school.

12        THE WITNESS:  I'm sorry, that's what I meant.

13   BY MS. REWARI:

14   Q.    So, but these -- this is what his profile picture looked

15   like recently, right?

16   A.    I don't know what his profile looked like recently.

17        THE COURT:  Let's do this.  Show her the document, ask her

18   if she recognizes the document, and then you can ask her how does

19   she recognize the document.

20   BY MS. REWARI:

21   Q.    Do you have the document there?

22   A.    I do have the document here, yes.

23   Q.    And you recognize these as printouts of C.K.'s Facebook,

24   two posts from his Facebook, February 28th and February 29th,

25   2012, right?

 1    **A.**     That's what it says here, yes.

 2          MS. REWARI:  Your Honor, I move to admit Defendants'

 3    Exhibit 36.

 4          THE COURT:  I think the exhibit is still lacking in

 5    foundation because essentially you're asking her to testify about

 6    something that came from somebody else's Facebook account, so I

 7    think the foundation is not there.

 8          MS. REWARI:  Okay.  All right.  Well, may I refresh her

 9    recollection with it?

10          THE COURT:  You may.

11          MS. REWARI:  Okay.

12    BY MS. REWARI:

13    **Q.**     Isn't it true that C.K. was asking everyone on February

14    28th who is the Jenni Taylor person saying things about me?

15    **A.**     How am I supposed to know what C███████ is telling

16    people?  You're showing me this post and that makes sense.

17    **Q.**     Okay.  All right.

18    **A.**     And I can only tell you about the interaction that I had

19    with him.

20    **Q.**     And isn't it true that he asked again on February 29th,

21    "Whoever made the Jenni Taylor account, stop, because people are

22    saying that it's me when I have this profile."

23          MR. BRENNER:  Objection, Your Honor, counsel is leading.

24    Counsel can lay the foundation for the evidence so she's just

25    reading into the record.

```
 1          THE COURT:  All right.  Let's do it simply.

 2          Ma'am, do you see the document before you?

 3          THE WITNESS:  Yes, I do.

 4          THE COURT:  Is this the first time that you've ever seen

 5   this document?

 6          THE WITNESS:  It is the first time that I've seen it.

 7   It's possible that I've seen it, but I don't have a recollection

 8   of it.

 9          THE COURT:  During the time that these circumstances were

10   occurring, were you aware of any Facebook posts being made by any

11   of the individuals associated with these circumstances?

12          THE WITNESS:  No, I was not.

13          THE COURT:  Okay.

14   BY MS. REWARI:

15   Q.     Did you look at C.K.'s Facebook page when you were in 7th

16   grade?

17   A.     I'm sure I did.

18   Q.     And you were Facebook friends with him for some time in

19   7th grade?

20   A.     I don't have a vivid recollection, but that's possible.

21   Q.     Okay.  And so if he made posts on his wall, they would be

22   visible to you, right?

23   A.     That doesn't mean that I saw it.  I don't have a

24   recollection of seeing this.

25   Q.     All right.  So, you said that you wanted C██████████ to
```

```
 1    take the Jenni Taylor messages to administration, right?  And

 2    so, when you first started chatting --

 3            THE COURT:  Let her answer the question.

 4            MS. REWARI:  Sorry.  I'm jumping ahead.

 5    BY MS. REWARI:

 6    Q.      You said you wanted C████████ to take the Jenni Taylor

 7    messages to administration, right?

 8    A.      Yes, I've been very clear about that.

 9    Q.      Okay.  And so you first started chatting with C████████

10    under the Jenni Taylor fake name, but you told him that it was

11    not C.K. in the messages, right?

12    A.      Um, that's possible.

13    Q.      Well, on Defendants' Exhibit 73, which are the messages

14    we were just looking at, if you go to the second page.  And I

15    put a little flag in your copies, because I know you're looking

16    at it on a hard copy.  We're going to look at it on the screen.

17            The first flag, do you see that on the second page there?

18    A.      Yes.

19    Q.      Okay.  So I put a little highlighter there so you can

20    see.

21    A.      Thank you for doing that.  I appreciate that.

22    Q.      Yeah, it's hard -- it's hard to read these because it's

23    black, so -- so you see that C.K. says -- excuse me, C████████

24    says, "I swear this is C.K.  I'm going to slit your wrist."

25            And you wrote back, "Haha, good luck, bro.  And nah, it's
```

```
 1   not C▮▮▮▮▮▮"?
 2   A.    I do see that, yes.
 3   Q.    All right.  So you were telling him actually it's not
 4   C.K.?
 5         MR. BRENNER:  Objection.
 6         THE COURT:  Rephrase.  What did you -- what did you say
 7   after "Haha, good luck, bro," what was the next thing said?
 8         It starts with "And."
 9         THE WITNESS:  I said, yeah, that's correct, I didn't say
10   it's C▮▮▮▮▮.
11   BY MS. REWARI:
12   Q.    You said, "Nah, it's not C▮▮▮▮▮?
13   A.    That's -- that's correct, yes.
14   Q.    Okay.  Let's go to the next flag, which is on page, I
15   think -- I'm sorry, on page 8 of the -- you have a flag there.
16         MS. REWARI:  For -- for Grady, it's on page 8.
17         THE COURT:  Joanna, help her find page 8.
18         THE LAW CLERK:  She's on page 8.
19         THE COURT:  Okay.
20   BY MS. REWARI:
21   Q.    And what did you tell him there at the top of page 8?
22   A.    I told him a reply.
23   Q.    Where you said, "Hahaha, wow."  What did you say after
24   that?
25   A.    Wait, I might not be -- I'm not sure -- I'm not sure what
```

```
 1    you're referring to.

 2           MS. REWARI:  Your Honor, may I approach?

 3           THE COURT:  You may.

 4           MS. REWARI:  Thank you.

 5           THE WITNESS:  This is where your flag is for the next one.

 6           I don't think there's a flag there, no.

 7           (Brief pause in proceedings.)

 8           THE WITNESS:  Okay.  I see it.

 9    BY MS. REWARI:

10    Q.    Okay.  And so what did you tell him here after "Hahaha,

11    wow"?

12    A.    I gave him the name of a few people maybe it could be.  I

13    was not trying to identify my rapist because I was scared of

14    him.

15    Q.    Okay.  And the people whose name you gave him were Kate,

16    Alex, and Caitlin, right?

17    A.    Yes, that's what it says here.

18    Q.    Okay.  And Kate was a friend of Constantine's, correct?

19    A.    I don't remember any of these people.  Like I told you in

20    my deposition, I don't know.

21    Q.    Caitlin was a friend of Constantine's, right?

22    A.    If that's what you tell me, I would assume that's true.

23    I don't -- I don't have a vivid recollection of this.

24    Q.    Okay.  None of these three students had harassed you,

25    correct.
```

1    **A.**    I don't -- I don't have a recollection of it.

2    **Q.**    Okay.  None of these students had assaulted you, correct?

3    **A.**    Yeah, that's fair to say.

4    **Q.**    Okay.  And so you're sending messages to your boyfriend,

5    hateful messages about yourself self, and you're telling him it

6    may be any of these three kids?

7    **A.**    Um, I don't know if you're characterizing it correctly, I

8    can give you a yes or no answer, like yes, that's what it says

9    on the paper, but I don't think you're characterizing my

10   intention correctly.

11   **Q.**    Well, please tell me what your intention was.

12   **A.**    My intention was I reached out to my rapist, right, and

13   when I -- when he figured out it was me, I was absolutely

14   terrified that he was going to kill me or my family.

15        As you also saw from a therapy note from February 27th, I

16   was not in a good place.  I was suicidal.  I'm not proud of

17   these messages, but I was asking for help.  I was afraid of

18   C███████.  It's not rational.  It's not -- none of this is

19   rational.  None of these messages.  But I was doing the best I

20   could.  I was 12 years old, and I was a victim.

21   **Q.**    There's some really graphically sexual terms in here,

22   right?

23   **A.**    Yes, we went through them in depth in my deposition.

24   **Q.**    Okay.  And I'm not going to do that here.

25   **A.**    Thank you, I appreciate that.

```
 1   Q.    All right.  You'd agree there's sexual acts discussed in

 2   these messages?

 3   A.    Yes.  The language that I used in here was to describe

 4   the extent of the abuse and rapes that I endured.

 5   Q.    Okay.  Would you please turn to the next tab on page 16?

 6         There under March 1, 2012, at 9:39 a.m., you wrote some

 7   things under -- under that smiley face, right?

 8   A.    That's correct, yes.

 9   Q.    Okay.  And last summer when you told us about these

10   messages, you said that you were writing about -- the things you

11   wrote about here are things that had happened to you?

12   A.    That's correct, ma'am, yes.

13   Q.    Okay.  And is that still your testimony?

14   A.    That was still my testimony.

15   Q.    And was it -- it wasn't C.K. who had done that to you,

16   right?

17         MR. BRENNER:  Your Honor, may we approach?

18         THE COURT:  No, let's just stay on task here.

19         Make sure you give her context, and then ask her a

20   question about the context.

21         MS. REWARI:  Okay.

22   BY MS. REWARI:

23   Q.    Well, here you're talking about having -- about sex toys,

24   right?

25   A.    Um, if you recall in my deposition that I said that
```

 1    C███████ did use sex toys on me.

 2    **Q.**    You said he wasn't the only person, right?

 3    **A.**    Yes, that's correct.

 4    **Q.**    Okay.  And are you standing by that testimony?

 5    **A.**    Yes, ma'am, I am standing.

 6          MR. BRENNER:  May we approach, Your Honor?

 7          MS. REWARI:  And --

 8          THE COURT:  Yes, let's figure out what's going on.

 9          (Following sidebar discussion had on the record:)

10          THE COURT:  Mr. Brenner.

11          MR. BRENNER:  Yeah, on Your Honor's ruling this morning,

12    they're forcing her to try to open the door to say, ah-ha, she

13    opened the door to other sex things that were done with her.

14          THE COURT:  Well, I think the reasonable assessment of the

15    circumstances that we have now is that she suggested in her

16    earlier examination that she was chased, that she didn't know

17    anything about anything, that she had never kissed a boy.

18          MR. BRENNER:  Right.

19          THE COURT:  She had never done anything.  And it's being

20    suggested now that at least she's able to use pejorative

21    language.

22          MR. BRENNER:  That is fair game.  That's not -- I assure

23    you that's not what Ms. Rewari is doing.

24          THE COURT:  What are you doing, Ms. Rewari?

25          MS. REWARI:  The testimony was that she said that she's --

```
1    these things because this was happening to her at school, and she

2    wanted C▮▮▮▮▮▮ to let the school know that this was happening

3    to her.  And it was happening to her in a closet.

4          THE COURT:  It was happening to her where?

5          MS. REWARI:  Excuse me?

6          THE COURT:  It was happening to her where, in a closet, is

7    that what you're saying?

8          MS. REWARI:  Yeah, in a closet.  She's saying -- she

9    testified that C.K. did this but also unknown people did this to

10   her in the closet at school.

11         And so, again, she just testified that she sent these

12   messages to her boyfriend because of what was happening to her.

13   And, again, we're going on credibility here --

14         THE COURT:  Okay.  This is what you can do.  You can draw

15   her attention to the text messages that she allegedly gave, and

16   you can ask her what were these text messages in reference to,

17   and we'll see what she says.

18         MS. REWARI:  Okay.

19         THE COURT:  All right.

20         MR. BRENNER:  I mean, I can -- I'll go back to what I was

21   saying.  She believes this stuff?

22         THE COURT:  I don't know.

23         MR. BRENNER:  No.  I -- and you can't force a party to

24   open the door on cross-examination.

25         THE COURT:  Oh, no, she's only going to be able to go so
```

1    far.  We need to hear what she's going to say.

2         Again, I don't know what she's going to say.  If she says

3    something that is -- opens the door to something else, then we'll

4    see.

5         MR. BRENNER:  But they're asking her a leading question to

6    get her to open the door.

7         THE COURT:  All I can say is that she can simply ask her,

8    did she send these messages.

9         MR. BRENNER:  Agreed.

10        THE COURT:  Okay.  And what did these messages relate to,

11   and we'll see what she says.  And, then, depending on what she

12   says, it may open the door to something else.

13        MS. REWARI:  Your Honor, I'm not allowed to ask her who

14   was doing this to her?  Because it -- again, if the argument is

15   that other people --

16        THE COURT:  Well, she is -- if you ask her what is this in

17   relation to, we'll see what she says.

18        MS. REWARI:  Okay.

19        THE COURT:  Okay.

20        MR. BRENNER:  Just over objection.

21        THE COURT:  Yes, sir.

22        MR. BRENNER:  Can I have a standing objection on this

23   issue?

24        THE COURT:  Yes, sir.

25        (Sidebar discussion concluded.)

```
 1   BY MS. REWARI:
 2   Q.    All right.  Ms. R., when you sent these messages that are
 3   on page 16, and then we'll look at the top of page 17 because
 4   this continues.  I'll give you a chance to look at those.
 5   A.    I don't have page numbers on these.
 6         THE COURT:  You may approach.
 7         MS. REWARI:  Thank you.
 8         THE WITNESS:  Sorry.  Oh, okay.  Thank you.
 9   BY MS. REWARI:
10   Q.    You're welcome.
11         MS. REWARI:  If you can go to the next page, Grady.
12   BY MS. REWARI:
13   Q.    What were these messages in relation to?
14   A.    Other abuse that I endured.
15   Q.    And what was that abuse?
16   A.    Um, there were other assaults at school.
17   Q.    Can you describe those assaults?
18   A.    I don't know how you want me to -- I don't know what I'm
19   allowed to say.
20         THE COURT:  I'll stop you when it's inappropriate for you
21   to say anything else.  So go ahead, what was it in relation to?
22         THE WITNESS:  They were assaults that happened in a closet
23   at school.
24         THE COURT:  You may continue.
25         MS. REWARI:  Okay.
```

```
 1    BY MS. REWARI:

 2    Q.    And who were the -- well, who was involved in this

 3    closet?

 4    A.    There was a student named Patrick that was involved.  And

 5    there were other people involved.

 6    Q.    And who were the other people?

 7          THE COURT:  Well --

 8          MS. REWARI:  Sorry.

 9          THE COURT:  Move on.

10    BY MS. REWARI:

11    Q.    Now -- so you said that these messages also related to

12    C.K.?

13    A.    Yes.

14    Q.    Okay.  And you claimed that C.K. used these kinds of sex

15    toys on you in your neighborhood?

16    A.    Um-hmm, yes.

17    Q.    And you -- you claimed that he brought them to your

18    neighborhood in a backpack?

19    A.    I think so.

20    Q.    And you also claim that he brought the clothespins in the

21    backpack?

22    A.    Um-hmm, yes.

23    Q.    And you testified, I think, on direct about what you say

24    he did with the clothespins?

25    A.    Yes.
```

 1    **Q.**    And -- and there's a lot of sexual terms in these

 2    messages, right?

 3    **A.**    A hundred percent.

 4    **Q.**    Yeah.  And where did you learn these terms?

 5    **A.**    From my abusers.

 6    **Q.**    Could you be more specific?

 7    **A.**    Um, again, I'm not sure how much I can say, but what I

 8    will say is they would often say this to me as they were

 9    assaulting me, C█████████ would say these things.  He would tell

10    me this stuff.  Um, this is concerning stuff to come out of a

11    12-year-old's mouth, very concerning.  I'm concerned reading it

12    for this 12-year-old.  I learned it from my abusers.

13    **Q.**    Anyone other than C.K.?

14    **A.**    As I mentioned, some of the other assaults that we just

15    touched upon.

16          THE COURT:  Move on.

17    BY MS. REWARI:

18    **Q.**    Your mother took these messages to the police department,

19    correct?

20    **A.**    I believe she did.  I'm not a hundred percent sure.

21    **Q.**    Well, you didn't tell her that you were the one sending

22    these messages as Jenni Taylor before she went to the police,

23    right?

24    **A.**    I didn't realize that she gave the messages to the

25    police.  That's fair to say.

1    **Q.**    Right.  But then you talked to the police about these

2    messages yourself, right?

3    **A.**    I don't recall being asked about an account with Jenni

4    Taylor.

5    **Q.**    Well, you talked to the police about really horrible

6    Facebook messages that were scaring you, right?

7    **A.**    If you remember what I said during my direct examination,

8    that there was many other messages that were being sent to me.

9    **Q.**    Now, you let your mom -- well, let me ask you this:  Did

10   your mom have your Facebook password during this school year?

11   **A.**    I feel like at some point she did, later on when I was

12   pulled out of school, but I don't know exactly at what point in

13   time.

14   **Q.**    Okay.  Your mom provided to the police Facebook messages

15   that you received from your friend Olivia about Jenni Taylor,

16   right?

17   **A.**    I don't know what my mom gave to the police.  But my mom

18   did ask me about the Jenni Taylor account.  I had nothing to

19   hide.  I wasn't hiding this from my mom.  It was a cry for help.

20   **Q.**    Okay.  You received Facebook messages from Olivia,

21   expressing concern for you because of what Jenni Taylor was

22   saying right?

23   **A.**    I don't know if that's the case, but it wouldn't surprise

24   me.  This was a cry for help.

25   **Q.**    Would you please take a look at Defendants' Exhibit 64 in

1    the black binder.

2    **A.**    Okay.

3    **Q.**    Okay.  And do you recognize this as a private message you

4    received to your own Facebook account on the Tuesday before

5    March 2nd, 2012?

6    **A.**    I do recognize this message, yes.

7    **Q.**    Right.  And Olivia B. was the person who messaged you it

8    in this message, right?

9    **A.**    Yes.

10         MS. REWARI:  Your Honor, I move to admit Defendants'

11   Exhibit 64.

12         MR. BRENNER:  No objection.

13         THE COURT:  Without objection.  You may publish.

14         MS. REWARI:  Thank you.

15         (Defendants' Exhibit 64 admitted into the record.)

16   BY MS. REWARI:

17   **Q.**    And so March 2nd, 2012 is a Friday, correct?

18   **A.**    I trust you, Ms. Rewari, if that's what you say.

19   **Q.**    All right.  And so the message next to -- from Olivia is

20   on Tuesday, if you --

21         MS. REWARI:  Grady, if you could Zoom a little bit to

22   the right, showing the time, the date.

23   BY MS. REWARI:

24   **Q.**    Okay.  And so this message is a few days old by the time

25   it's printed on March 2, 2012, right?

```
 1   A.     I guess so.  I don't know when it was printed, but if

 2   that's what you're telling me that makes sense.

 3   Q.     Well, there's a date, 3/2/2012, up in the left-hand

 4   corner, right?

 5   A.     Okay.  I see that, yes.

 6   Q.     Okay.  And Olivia writes to you, "Hey, are you okay?  I

 7   reported the hate group today and they took it down, and I told

 8   them the name of the Jenni Taylor fake chick.  Love you, B.R.

 9   Don't give in.  Be strong, babe."

10   A.     Yes, I see that.

11   Q.     Okay.  And this document has an FCPD Bates number down at

12   the bottom.  Do you see that?

13   A.     I do see that, yes.

14   Q.     Okay.  FCPD stands for Fairfax County Police Department,

15   right?

16   A.     That's correct, ma'am.

17   Q.     Okay.  Now, you never told Olivia that you were Jenni

18   Taylor, right?

19   A.     I -- that would make a lot of sense if I didn't.  I can

20   elaborate if you want me to.

21   Q.     There's a friend list, right, on the side of this

22   printout?

23   A.     Um-hmm.

24   Q.     And that shows who you were still friends with -- or who

25   were in your friends list in Facebook at the date that this was
```

1  printed.

2  **A.**    Okay.

3  **Q.**    And one of the names listed there on the right five names

4  from the bottom is Patrick W.

5         Do you see that?

6  **A.**    Yes, I do see that, Ms. Rewari.

7  **Q.**    Okay.  And that's the student you just talked about as

8  the person who took you into the closet?

9  **A.**    That's correct.

10  **Q.**    And you were still friends with him on March 2nd, 2012?

11  **A.**    That's what it looks like on this paper.

12  **Q.**    Okay.

13  **A.**    I don't have a recollection of it specifically.

14  **Q.**    Now, you did not post a status update on Jenni Taylor's

15  page revealing that you were her, correct?

16  **A.**    I don't recall because as soon as I talked to my mom

17  about it, I was getting help that I needed.

18  **Q.**    You told your mom, but you didn't tell all the people who

19  had looked at the Jenni Taylor Facebook page, did you?

20  **A.**    I have a lot of responses to this, but I'll answer

21  shortly:  No, I did not reveal -- I did not reveal it to the

22  people that were bullying, harassing, and didn't care about me.

23  **Q.**    You didn't tell all the students who had seen the status

24  updates about hating B.R. that Jenni Taylor was you?

25  **A.**    So, I just can speak to the direct messages that you

 1   showed me.  I don't have a recollection exactly of statuses.

 2   I'm not sure what exactly you're referring to.

 3   **Q.**    Well, if you go back to Defendants' Exhibit 73, those

 4   were the messages -- let's look at the first page.

 5   **A.**    Okay.  I see it.

 6   **Q.**    And what are your first messages to C████████?

 7   **A.**    So, yeah, you say -- I do say -- I do see the deleted

 8   status, but I said I don't recall.  I can only speak to the

 9   messages.  I don't know what I posted.

10   **Q.**    Well, the first thing you asked him is, "So, um, do you

11   hate B.R.," right?

12   **A.**    Yes.

13   **Q.**    And then you said, "Haha, read my status," right?

14   **A.**    Right, that's what it says in the messages here.

15   **Q.**    And your status that you posted as Jenni Taylor was about

16   hating B.R.?

17   **A.**    Um, that's probably correct.  This was a very concerning

18   page.  I don't disagree with you on that one.

19   **Q.**    Okay.  And you also posted a comment that everyone could

20   see that said, "B.R, Go die," as -- posing as Jenni Taylor,

21   right?

22   **A.**    Again, as you've been hearing about that for months, that

23   sounds about logical, yeah.

24   **Q.**    Okay.  And you never told any fellow students who saw

25   that comment that Jenni Taylor was you?

```
 1   A.     I mean, it would make sense that I would tell them.  I

 2   mean, this is kind of embarrassing, that this was my cry for

 3   help.

 4   Q.     Now, you said that you sent messages to C.K. from the

 5   Jenni Taylor account?

 6   A.     Yes, ma'am.

 7   Q.     Okay.  You didn't produce any of those messages in this

 8   case, did you?

 9   A.     I don't think I did.

10   Q.     Okay.  You didn't produce these messages in this case,

11   the messages you sent to C███████, right?

12   A.     I don't know if that's true.  I believe they were

13   produced to you.

14   Q.     But you didn't produce them yourself, correct?

15         MR. BRENNER:  Objection to what happened in the discovery

16   process.

17         THE COURT:  Did you or your counsel provide these

18   messages?

19         THE WITNESS:  My mom provided them to you.

20         THE COURT:  Okay.

21   BY MS. REWARI:

22   Q.     This Defendants' Exhibit 73, it's not from your phone,

23   right?

24   A.     No, this is from what C█████████ produced, but my mom

25   provided it to you as well.
```

62

```
 1    Q.    All right.  Would you please take a look at Defendants'
 2   Exhibit 18 in your binder.
 3          THE COURT:  18 is in evidence.
 4          MS. REWARI:  Thank you.
 5          THE COURT:  It's in evidence.
 6          MS. REWARI:  Is it okay if we put it up?
 7          THE COURT:  Yes.
 8          MS. REWARI:  Thank you.
 9   BY MS. REWARI:
10    Q.    Ms. R., this is an e-mail from C_____, K. to your
11   mother with the Jenni Taylor messages, correct?
12    A.    Yes, that's exactly what I was talking about.
13    Q.    Okay.  And it has a message date up at the top of March
14   1, 2012, right?
15    A.    Yes, that's what it says.
16    Q.    Okay.  And if you go down to the bottom and you look at
17   that Bates number --
18    A.    Okay.
19    Q.    -- that's an FCPD number, isn't it?
20    A.    That's what it says.
21    Q.    Right.  It's not your family's production number, right?
22    A.    If my mom gave it to the police, how is that my mom not
23   giving it to you?
24    Q.    She gave it to the police in March 2012, correct?
25    A.    That's correct.
```

```
 1   Q.     Okay.

 2   A.     But I feel like you're intentionally trying to confuse me

 3   at this point.  I'm not a lawyer.  I don't know.

 4          THE COURT:  Just listen to the question.

 5          THE WITNESS:  I'm sorry, it's confusing.

 6          THE COURT:  Yes, ma'am.

 7   BY MS. REWARI:

 8   Q.     You haven't produced anything else from the Jenni Taylor

 9   account in this case, right?

10   A.     I don't think so.  I don't know what happened.

11   Q.     All right.  So, let's talk for a bit about the police

12   investigation, okay?

13          On March 2nd, 2012, your mom went to the police station

14   to make a complaint, right?

15   A.     Um, that sound about right, yep.

16   Q.     You did not go to the station with her?

17   A.     Eventually I did.

18   Q.     Right.  You were called down to the station?

19   A.     My mom had asked me to come down to the station, that's

20   correct.

21   Q.     After she spoke to an officer?

22   A.     After she spoke to an officer.

23   Q.     And then when you arrived there, you spoke to an officer,

24   correct?

25   A.     I did, yes.
```

1   **Q.**    And he spoke to you for a while, right?

2   **A.**    For a very long time.  I was very upset.

3   **Q.**    Okay.  And then you wrote a statement for him?

4   **A.**    I did, yes.

5   **Q.**    Okay.  Would you please take a look at Defendants'

6   Exhibit 6.

7           And that's your handwriting on this exhibit, right?

8   **A.**    Yes, ma'am.

9   **Q.**    And that's your signature on the third page?

10  **A.**    Yes.

11  **Q.**    Okay.

12          MS. REWARI:  Your Honor, we move to admit Defendants'

13  Exhibit 6.

14          THE COURT:  Without objection?

15          MR. BRENNER:  I don't think it's consistent with what we

16  discussed before, Your Honor.

17          THE COURT:  Let me see it.

18          MS. REWARI:  Your Honor, there was no objection made to

19  this document.

20          THE COURT:  Just a second.  Let me read it.

21          (Brief pause in proceedings.)

22          THE COURT:  Over objection.

23          (Defendants' Exhibit 6 admitted into the record.)

24          MS. REWARI:  May we publish?

25          THE COURT:  Yes.

```
 1   BY MS. REWARI:

 2   Q.     All right.  Ms. R., I'm going to have Grady take us

 3   through this document on the screen, but you're welcome to look

 4   at it on the screen or in your book, whichever is easier for

 5   you.  Ready?

 6   A.     I'm sorry, yeah.

 7   Q.     Okay.  So, this is your statement to the police on March

 8   2nd, 2012, correct?

 9   A.     Yes.

10   Q.     Okay.  And in this statement, you wrote -- you started

11   with, "In late October I was hanging out with my neighbor, Alice

12   L., and we walked to a park in our community.  By chance we saw

13   C.K. there.  He said 'Hey.'  We replied back, 'Hey.'  Alice

14   received a call from someone, I believe her mother.  C.K. then

15   said, quote, 'I like you better than my girlfriend J.O.'  I

16   didn't reply.  And then he said, 'Will you send naked pics?'  I

17   said, quote, 'I'm not that kind of a girl.'  Then me and Alice

18   left.  Alice said, quote, 'I saw C.K. trying to pull some things

19   on you.'  Then she said, 'I don't like C.K. either.  He scares

20   me'."

21          Okay.  So that was the first meeting that you described

22   to the police as having had with C.K., right?

23   A.     That's not correct.

24   Q.     Well, that's what you wrote in your statement, correct?

25   A.     If you want to talk about my statement, yeah, but you
```

1    just said what I reported to the police.  That's not what I

2    reported to the police as the first thing.

3    **Q.**    Okay.  Fair enough.

4         So that's what you wrote in this statement?

5    **A.**    Yes, when I was very upset, that's what I wrote in my

6    statement.

7    **Q.**    Okay.  And then -- then you said, "When the weekend was

8    over, C.K. started spreading rumors about me that were very

9    sexual."

10         Did I read that correctly?

11   **A.**    You did read that correctly, yes.

12   **Q.**    Okay.  And then you wrote, "In earlyish November, I

13   stayed after school for math, took the late bus home, which

14   arrived at about 4:15 p.m.  I was only person getting off at my

15   stop, beginning of Middleton Farms.  The bus had driven away.

16   To me, it appeared that C.K. was crossing the street.  Though,

17   all of a sudden he said, hey, I said hi, but kept walking."

18         Did I read that correctly?

19   **A.**    Yes.

20   **Q.**    Okay.  And then you wrote, "All of a sudden, then he

21   said, 'You have to give me $50 by tomorrow or I'm going to kill

22   you and your family.'  He then knocked a binder I had in my

23   hands.  I bent down to pick it up, but he then pushed me to the

24   ground and put a lot of his body weight on my body, tried

25   putting my hands under my back.  He then tried lifting my shirt

1    up above my bra.  He tried to get under my bra and started

2    touching my breast.  I was screaming, and then he tried getting

3    in my pants, and I kept moving away.  He tried this about four

4    times.  I finally kicked him off.  He said, 'You owe me $50 by

5    tomorrow, loser, or I'm gonna kill your family and it's gonna be

6    cruel'."

7           Did I read that correctly?

8    **A.**    That's what it appears to say.

9    **Q.**    And then you wrote, "Then I went home, and my mom said

10   something looked wrong, but I just said, 'I don't feel good'."

11          Did I read that correctly?

12   **A.**    You did read it correctly.

13   **Q.**    Okay.  And so this is the only incident in this statement

14   involving C.K. in your neighborhood, correct?

15   **A.**    I'm sorry, can you repeat that one more time?

16   **Q.**    This statement only describes this incident with C.K. in

17   your neighborhood at the bus stop, right?  One incident?

18   **A.**    I don't believe that's actually a correct interpretation

19   of this statement, I did explain it in my deposition, I'm happy

20   to explain it again, but --

21   **Q.**    Okay.  Then you went on in this statement, "When I went

22   back to school, he started" -- I think you meant --

23   "intimidating me by my locker saying sexual, racial, rude things

24   to me.  People on a daily basis said, C.K. is gonna shoot you or

25   C.K. is gonna get revenge and it's going to be horrible.  I told

1    my parents about these threats.  They went to Officer Genus."

2          Did I read that correctly?

3    **A.**    Um-hmm.

4    **Q.**    And Officer Genus is the name of the SRO at the school,

5    correct?

6    **A.**    Yeah.

7    **Q.**    And then you wrote, "He said not to worry, he's not going

8    to hurt you," parenthesis, "me.  I believed it was going to

9    stop, but it didn't.  Instead of using C███████" -- excuse

10   me -- "C.K.'s name, they," parenthesis, "random people said

11   someone's going to kill you.  C.K. would give me dirty looks in

12   the hallways."

13         Did I read that correctly?

14   **A.**    Yes.

15   **Q.**    And would you agree there's no touching described there?

16   **A.**    In this statement.

17   **Q.**    I'm just asking what's in the statement, ma'am.

18   **A.**    I just said in the statement.

19   **Q.**    Okay.  And then you wrote, "On March 1st, I found out

20   from a friend named C███████ K., he said, 'B.R., some started

21   a fake Facebook about you.'  I told my mom and she asked him to

22   show her the chat that he had.  My mom said it was horrible.  I

23   have been terrified to step outside my house because I am

24   scared."

25         Did I read that correctly?

1    **A.**    You did.

2    **Q.**    And the March 1st e-mail to your mom is the Jenni Taylor

3    text that we just looked at in Defendants' Exhibit 18, right?

4    **A.**    I mean, I don't know if I would connect it to this

5    statement, but yes, that's what it said on -- in that e-mail.

6    **Q.**    Well, did you tell your mom about other fake Facebook

7    accounts that C█████████ K. had told you about that were about

8    you?

9    **A.**    I told my mom about other Facebook accounts.

10    **Q.**    Okay.  And then you wrote, "My life has drastically

11    changed because I'm so scared to move on because I have no idea

12    where C.K. is or if he's seriously meaning he is gonna kill me"?

13    **A.**    100 percent correct.

14    **Q.**    Okay.  Your mom on this day, March 2nd, 2012, reported to

15    the police that C.K. had sent those Jenni Taylor messages,

16    right?

17    **A.**    I don't know what my mom reported.  I can only talk about

18    what I reported.

19    **Q.**    Please take a look at Defendants' Exhibit 5.

20        MR. BRENNER:  Your Honor, I think we're going to need to

21    approach.  I'm just letting you know.

22        THE COURT:  Approach.

23        (Following sidebar discussion had on the record:)

24        THE COURT:  Well, it looks like we're trying to go down

25    the police report road again.

```
1          MS. REWARI:  Well, I was going refresh her recollection,

2     but the police interview --

3          THE COURT:  Well, first tell me what you're going to --

4     what you propose to do with it.

5          MS. REWARI:  I'm going to show that the police report was

6     filed against C.K. as the sender of these messages on this day.

7     It is a --

8          THE COURT:  And what do you -- what do you intend to do

9     with the narratives in this report?

10         MS. REWARI:  Well, I believe what she -- she is going to

11    say is that she reported to this police officer much more than

12    what she wrote in this statement, and so this police report is --

13    that's what she's been trying to talk about, and I'm going to let

14    her in a minute, but what she's saying is that no matter --

15    despite what she wrote in this statement that she orally reported

16    multiple assaults.

17         THE COURT:  And so you're going to go -- once again --

18    again, this is a concern that I've raised throughout this

19    litigation.  You intend to go down the narrative in this report

20    and question her regarding the specifics regarding the police

21    report that she filed?

22         MS. REWARI:  Well, Your Honor, yes, because it's

23    inconsistent.

24         THE COURT:  I won't let you do that.  I'm not going to let

25    you do that.
```

1          I will let you ask her based upon the information that she

2    knows, if she doesn't know or does know, I don't know what she's

3    going to say, was a police report filed as a result of the

4    allegations that you made under the name Jenni Taylor.  I'll let

5    you ask her that, but if she says, I don't know, then you may be

6    able to get it in another way.

7          MS. REWARI:  May I refresh her recollection without

8    moving --

9          THE COURT:  You can show her the report, but you're not

10   going to read the report out loud.

11         MS. REWARI:  No, I understand.  Refreshing recollection.

12   I won't read it.

13         THE COURT:  Yeah, that's all.

14         MR. BRENNER:  And, Your Honor, I would just point out that

15   the complainant in this situation is not B.R., it's B.R.'s mom.

16   If she wants to try to do this again with B.R.'s mom, they can.

17   B.R.'s mom is --

18         THE COURT:  But I can -- I can ask -- she can ask her

19   simply is she aware that a police report was filed as a result of

20   complaints that she made under the name Jenni Taylor.  Let's see

21   what she says.

22         And then you can have the opportunity if you need to clean

23   it up on redirect by saying, well, this report was ultimately

24   filed by your mother, wasn't it, did you have anything to do with

25   it directly.

1          She's probably going to say no, but I think the jury's

2    going to be able to assess that she indirectly had something to

3    do with it because it came under the name of Jenni Taylor, which

4    was her pseudonym.

5          MR. BRENNER:  I guess my only concern is that

6    rehabilitation is, what did you actually tell the police, and she

7    goes through and says, I told them this, this, this, this, and

8    this, and we'll --

9          THE COURT:  Well, I don't think you're going to be able to

10   get there unless she's going to open up the door and allow this

11   whole thing to come in.

12         MR. BRENNER:  Well, we're conflating two things.

13         THE COURT:  All right.

14         MR. BRENNER:  What she just showed the witness is a

15   statement to Officer Boaz.

16         THE COURT:  All right.

17         MR. BRENNER:  It's interesting that -- well, we'll see how

18   it cleans up, but what she -- what they're saying that she's

19   going to say more, she's going to say, if asked about that

20   witness statement, not about the Jenni Taylor, she's going to

21   say --

22         THE COURT:  Well, no the question is going to be more

23   specific and precise, are you aware or did you know that because

24   of the statements made on the Jenni Taylor Facebook account that

25   C.K. was arrested.

1        MS. REWARI:  He wasn't arrested.

2        THE COURT:  Yeah.

3        MR. BRENNER:  There was an investigation.

4        THE COURT:  An investigation.

5        MR. BRENNER:  My point is it's -- it's confusing.  There's

6   two different allegations made about C.K.

7        One allegation against C.K. is the sexual assault

8   allegation.

9        THE COURT:  Right.

10       MR. BRENNER:  This -- this document, DX 005, has to do

11  with, I guess you would say cyberbullying.  She calls it

12  telephone harassment.  They're not the same thing.

13       What I will make clear based on what's already been done

14  in the Boaz.

15       THE COURT REPORTER:  I'm sorry?

16       MR. BRENNER:  It's Boaz, B-O-A-Z.

17       THE COURT:  That's the officer.

18       MR. BRENNER:  Officer Boaz, I'm sorry.  I will make clear

19  what she was trying to do, but it's on cross, I can do it on

20  redirect, what else she told Officer Boaz about the C.K. sexual

21  assault, I'm not going into the Jenni Taylor stuff.  But if they

22  want to ask her if she's aware that there is a -- she's going to

23  get confused unless you say to her was there a report filed about

24  Jenni Taylor to the police.  Because if you just say if there's a

25  report filed about C.K., she's going to say yes, absolutely.  But

1    this is Jenni Taylor.

2         THE COURT:  Her description is sexual offenses,

3    forcible -- forcible fondling.

4         MR. BRENNER:  I'm just telling you -- let's see what she

5    says, but I believe they're conflating two issues, but I

6    understand Your Honor's ruling of what she's not going to be able

7    to do, not put the document but ask her what she knew.

8         MS. REWARI:  Your Honor, just so we're not back up here,

9    there's one report.  There's one report against C.K.  It's this

10   one.  And it came in as a report of telephone harassment.  And in

11   the conversation with the mom, it turned into a report of an

12   attempted assault, so that's what she described in this

13   statement.

14        Then on Monday -- this is on a Friday.  And then on

15   Monday, it became a report of a rape.  It's all in this -- it's

16   all the same report.

17        THE COURT:  Again -- again, and I appreciate your zeal in

18   trying to get this police report in, but it's not coming in.

19        MS. REWARI:  Well --

20        MR. BLANCHARD:  It's not the report, Judge, it's the

21   stories that are told.

22        THE COURT:  The Court's ruled.

23        (Sidebar discussion concluded.)

24   BY MS. REWARI:

25   Q.   Ms. R., do you have an understanding as to whether a

1    complaint was made with the police against C.K.?

2    **A.**    I do, yes.

3    **Q.**    And what is your understanding of what that complaint was

4    about?

5    **A.**    That he raped me.

6    **Q.**    Did it also include an allegation that he was Jenni

7    Taylor?

8    **A.**    I don't know what it would include.  I can only tell you

9    what I reported.

10   **Q.**    Okay.  And --

11          THE COURT:  To the best of your knowledge, was the

12   information shared under the Jenni Taylor account part of the

13   investigation that was conducted?

14          THE WITNESS:  It's hard to answer this because there's

15   part that was with my mom and part that was with me.  I can only

16   answer the part that had to do with me, and I don't recall that

17   being the case.

18   BY MS. REWARI:

19   **Q.**    Do you recall meeting with a detective from the police

20   department?

21   **A.**    I do, yes.

22   **Q.**    And do you recall that you were interviewed by that

23   detective?

24   **A.**    I do, yes.

25   **Q.**    Okay.  And do you recall talking to him about Facebook

1    messages?

2    **A.**    I recall vaguely some things about Facebook generally,

3    but I don't recall what specifically I said to him.

4    **Q.**    Okay.  In your first -- in your first conversation on

5    March 2nd, 2012 with an officer about C.K., did you tell him

6    that -- in this incident in earlyish November that you described

7    in your written statement that he never touched your genitals

8    and there was no penetration?

9    **A.**    I'm sorry, can you please repeat that question?

10   **Q.**    I'm sorry.  It was a long question.  Let me try again.

11   **A.**    You're good.  No worries.

12   **Q.**    In the first conversation on March 2nd, 2012 that you had

13   with the police about C.K., did you tell the officer that C.K.

14   never penetrated you or even touched your genitals?

15   **A.**    You're saying that I said -- I'm sorry, it's -- can you

16   repeat that last part?  That I never did or I did?

17   **Q.**    Did you tell the officer on March 2nd, 2012 that C.K.

18   never penetrated you and never even touched even your genitals?

19   **A.**    I did tell him that that is in fact what happened

20   verbally.  That's why I got a SANE exam.

21   **Q.**    On March 2nd, though, you told him that there was no

22   penetration and he never even touched your genitals, right?

23   **A.**    When I verbally was speaking to the intake officer at the

24   Fairfax County Police station, I told them that I had been hurt

25   by C_____, that I had been touched, that I had been

1    penetrated by C█████████, yes, verbally, I told them that.

2    **Q.**    In the statement that we just looked at, you didn't say

3    that.

4    **A.**    You're a hundred percent right.  In the statement I

5    didn't.

6    **Q.**    Okay.  You just talked about your SANE exam.  That SANE

7    exam was on March 5th, 2012, right?

8    **A.**    I believe so.  If that's the date that you say, then that

9    makes sense.

10   **Q.**    Before you went to that exam, you saw Mr. Pachter again

11   that day, right?

12   **A.**    I -- I don't recall that being the case, but I mean, I

13   trust you if that's what the record says.

14        THE COURT:  Refresh the record as to who Mr. Pachter is.

15        MS. REWARI:  Sure.

16   BY MS. REWARI:

17   **Q.**    If you could take a look back in the white binder under

18   tab 451, Plaintiff's Exhibit 451, and go to page number NOVA 16.

19        Does that refresh your recollection that you met with

20   Mr. Pachter that afternoon, March 5th, 2012?

21   **A.**    Yes.

22        THE COURT:  Who is Mr. Pachter?

23        MS. REWARI:  Thank you.

24   BY MS. REWARI:

25   **Q.**    And Mr. Pachter was your therapist, right?

1    **A.**    For a very short time, yes.

2    **Q.**    At this time he was your only therapist?

3    **A.**    For two or three weeks, yes.

4    **Q.**    Okay.  And you told him that you had just revealed to

5    your parents that you had been raped during an incident that you

6    had previously described as only verbal?

7    **A.**    I don't recall that being the case.  These are his notes,

8    but I don't recall that being the case.

9    **Q.**    Okay.  You also told -- well, your mother was in this

10   meeting with Mr. Pachter, too, right?

11   **A.**    Um, I mean, I would have to read.  I'm not sure.  I don't

12   remember this meeting vividly.

13   **Q.**    Okay.  Why don't you take a look.

14          (Brief pause in proceedings.)

15          THE WITNESS:  Okay.

16   BY MS. REWARI:

17   **Q.**    And you or your mother informed him that your family had

18   decided to hire lawyers and file a lawsuit against the school

19   system, right?

20   **A.**    That's a mischaracterization of what happened.  I'm happy

21   to go further.  It was really to secure an individual education

22   plan and file a Department of Education complaint against the

23   Fairfax County School Board.

24   **Q.**    For Title IX, right?

25   **A.**    Well, you guys were not accommodating my basic needs.

1    You weren't following Title IX so --

2         THE COURT:  Let's get focused.

3         MS. REWARI:  Okay.

4    BY MS. REWARI:

5    **Q.**    And then it was after the session with Mr. Pachter that

6    you went with your family for the SANE exam, right?

7    **A.**    Um, that sounds about right.

8    **Q.**    And during the SANE exam, you were asked to give a

9    description of what had happened with C.K., right?

10   **A.**    I vaguely recall that, yes.

11   **Q.**    Okay.  And what you told the nurse who did the exam was

12   about a single incident with C.K., right?

13   **A.**    I don't know what exactly I told them, but that wouldn't

14   surprise me if that's what I told the nurse giving me my rape

15   exam.

16   **Q.**    Well, do you still have Mr. Brenner's binder up there?

17   **A.**    I don't know.

18        (Brief pause in proceedings.)

19        THE COURT:  Ladies and gentlemen, you may hear from time

20   to time that either me or my deputy clerk will turn on white

21   noise.  Typically that is to make sure conversations that are not

22   part of the record are not overheard by you.

23   BY MS. REWARI:

24   **Q.**    If you could just please, without reading it -- and we're

25   not going to put it on the screen -- take a look at Exhibit 581,

1    Plaintiff's Exhibit 581.

2         And look at page Inova 14.

3    **A.**    Okay.

4         THE COURT:  Ladies and gentlemen, I think this might be a

5    good time for us to go ahead and take our short break.

6         Are there lunches back there?  Okay.  Very good.

7         Your lunches are back there, so what we're going to do is

8    let you go ahead and enjoy your lunch.  We'll come back in at

9    3:00.

10        (Jury out at 2:15 p.m.)

11        THE COURT:  All right, ladies and gentlemen, we'll come

12   back in at 3:00.

13        MR. BRENNER:  Thank you, Judge.

14        (Thereupon, a luncheon recess was had held from

15   2:16 p.m. to 3:08 p.m.)

16        MR. BLANCHARD:  Judge, and this is to try and avoid time

17   in the future.  The Court knows my position with respect to the

18   opening door on the police reports and all.  I don't want to keep

19   having to get up and -- can I have a continuing objection I guess

20   is what I'm asking?

21        THE COURT:  Sure.  I think we're all clear that for

22   whatever reason, your team wants to get in the police reports and

23   they do not want them to come in and the Court's made a ruling.

24        MR. BLANCHARD:  But mine is not, Your Honor, to the

25   reports themselves.  It's to the content in the statements, and

```
 1    that's the issue I have.  And as I say, I just -- I understand

 2    the Court's ruling and will abide by it.  I just -- I'm concerned

 3    about the record, so I just wanted to --

 4         THE COURT:  That's fine.

 5         MR. BLANCHARD:  Thank you.

 6         THE COURT:  I understand.

 7         Do you concur?

 8         MR. KINNEY:  I do concur.

 9         THE COURT:  Okay.  Thank you.

10         MS. REWARI:  And, Your Honor, before we bring the jury

11    back in, just so I'm clear, I understood your ruling from this

12    morning that I'm still permitted to ask about what she told the

13    detective, right?

14         THE COURT:  Yes, but be aware that if I think you're

15    drifting too far close to the line, I'm going to stop you.

16         MS. REWARI:  Sure, absolutely.

17         THE COURT:  Okay.

18         MS. REWARI:  I'm going to try not to.

19         THE COURT:  Okay.

20         MS. REWARI:  Thank you.

21         (Jury in at 3:10 p.m.)

22         THE COURT:  You may be seated.  Thank you.  Ladies and

23    gentlemen, were you able to live up to the Court's instruction

24    not to discuss the case or any aspect of the case with anyone?

25         Very good.  Let me kind of get a sense of the jury.  Can
```

1    we go somewhere between 4:30 and 5:00 today?  Are we good with

2    that?  It's raining outside.  It's not a very nice day, but 4:30,

3    5:00?  Tomorrow we'll start at 10:00, and we'll try to go as far

4    as we can.  And then as we know, we have Friday as a holiday.

5    And then we'll start next week, all right?

6          Ms. Rewari.

7          MS. REWARI:  Thank you.

8    BY MS. REWARI:

9    Q.    Ms. R., before the lunch break we were talking about the

10   SANE exam that you had on March 5th, 2012.  And do you recall

11   that in the exam the nurse asked for a description of what the

12   incident -- or incidents were that you were there about, right?

13   A.    I vaguely recall that.

14   Q.    Okay.  And you recall that she asked how many incidents

15   there were, right?

16   A.    I don't recall that.

17   Q.    Okay.  Do you recall that what you reported during this

18   exam was that a 13-year old male had sexual contact with you in

19   November, 2011?

20         MR. BRENNER:  Misstates -- well -- go ahead.

21         THE WITNESS:  Is there a page that you want me to go to?

22   BY MS. REWARI:

23   Q.    No, I'm just asking your recollection.  Do you recall

24   reporting to the nurse that --

25         THE COURT:  Let's -- let's -- so there's no objections and

```
 1    we can keep it cleaner, why don't you just read specifically the

 2    terminology that was used so there's no misunderstanding.

 3         MS. REWARI:  Sure.

 4    BY MS. REWARI:

 5    Q.    Do you recall that you reported that a 13-year old male

 6    had sexual contact with you in November 2011?

 7         MR. BRENNER:  Again, Your Honor, it's -- if she can just

 8    read what it actually says instead of characterizing it, it

 9    would --

10         THE COURT:  I thought she read -- I directed her to read

11    directly from it.

12         MR. BRENNER:  That's not -- that's -- no, no.

13         (Discussion had off the record.)

14         MS. REWARI:  All right.  Thank you.

15    BY MS. REWARI:

16    Q.    Do you recall telling the detective -- excuse me, telling

17    the nurse that a 13-year-old boy from your school touched your

18    breasts and penetrated your anus with his penis.

19    A.    I do recall telling her that.  I don't remember giving a

20    timeframe.

21    Q.    Okay.  You also told her that he penetrated your vagina

22    with his fingers and tried to put his penis in your mouth, but

23    you held your mouth shut to prevent it.

24    A.    If that's what it says, that's what it says.

25    Q.    And you also reported that you had anal pain and
```

1   difficulty passing stools for a few days after the incident; is

2   that correct?

3   **A.**     I mean, I don't really -- I don't know how to answer that

4   question.

5          THE COURT:  At this time I would also like to continue to

6   instruct the media that this personal and private information

7   that's shared in the context of this case, and I would hope that

8   we would be discrete in the revealing of that information in any

9   news media accounts.

10  BY MS. REWARI:

11  **Q.**     If you would take a look at the document in front of you,

12  Plaintiff's Exhibit 581 at page Inova 14?

13  **A.**     Okay.

14  **Q.**     I direct your attention paragraph that's labeled "Per

15  patient/caregiver."

16  **A.**     Okay.

17  **Q.**     Okay.  And just take a look and take a moment to review

18  it and let me know when you're finished.

19         (Brief pause in proceedings.)

20  **A.**     Okay.

21  **Q.**     Okay.  And so you reported to the nurse a single incident

22  of assault, of rape, right?

23  **A.**     If I'm understanding your question, are you asking me if

24  I just reported that I was raped only once?  I'm a little

25  confused.

1    **Q.**    Yes, did you report one incident?

2    **A.**    Well, I don't really recall the memory of telling her

3    much.  I was very upset, and I -- I don't have a vivid

4    recollection of what I told her.

5    **Q.**    Okay.  Do you -- you told her that you had not had sexual

6    contact with anyone else, right?

7    **A.**    Um, I mean if that's what it says on here, that's what it

8    says.  I don't have a vivid recollection of it.

9    **Q.**    Okay.  The day after the SANE exam, you saw your

10   pediatrician, Dr. Weaver, correct?

11   **A.**    I think so.

12   **Q.**    And you also told him only about a single incident of

13   rape, right?

14   **A.**    I think that might be a fair characterization.  My -- it

15   just was really hard to talk about it.  I was very embarrassed

16   and felt really ashamed.

17   **Q.**    And you reported to him also that the incident involved

18   anal penetration, right?

19   **A.**    Um, yes, that was repeated and it happened to me.

20   **Q.**    Okay.  And then two days after that, you met with the

21   detective from the police department, right?

22   **A.**    Um, I don't know, some time in that week.  I'm not sure

23   exactly when.

24   **Q.**    And the detective was a member of the child abuse unit of

25   the police department, right?

```
 1   A.     I guess so.  I remember he was the former SRO of the
 2   school.
 3   Q.     You met with him at Child Help?
 4   A.     Yes, I did.
 5   Q.     Okay.  And so this was not at the police station,
 6   correct?
 7   A.     That's correct.
 8   Q.     You were interviewed in a room that was comfortable,
 9   right?
10   A.     I was interviewed in a room that appearance-wise looked
11   comfortable.
12   Q.     It had a couch; you were seated on a couch, right?
13   A.     I was seated on a couch, yes.
14   Q.     And he was seated on a chair?
15   A.     He was sitting on something.
16   Q.     Okay.  And he spoke to your mother first?
17   A.     I think so, yeah.  That would make sense.
18   Q.     And your mom was waiting outside the room for you when
19   you were finished?
20   A.     I'm a little confused by that question.  So you just
21   asked me about him talking to my mom and then you said --
22   Q.     Yeah, thank you.  Thank you.
23          So he spoke to your mom first, and then he interviewed
24   you by yourself, right?
25   A.     He interviewed my mom a few days earlier after I got my
```

1   rape exam.

2   **Q.**    Okay.

3   **A.**    And then he interviewed me a few days later.

4   **Q.**    Okay.  And when you were being interviewed, your mom was

5   waiting outside the room for you, right?

6   **A.**    She was forced to wait outside against her will, yes.

7   **Q.**    Can you explain what you mean by that?

8   **A.**    I wanted my mother to be present in that meeting.  I

9   asked for my mother to be present there, and she was not allowed

10  to be present.

11  **Q.**    What's the basis of your belief that she was not allowed

12  to be present?

13  **A.**    Detective Chambers told my mom and me that.

14  **Q.**    And you heard him say that?

15  **A.**    I was there, yes.

16  **Q.**    Okay.  So, then, the interview with Detective Chambers

17  was video recorded, right?

18  **A.**    To my understanding, yes.

19  **Q.**    And he told you that it was being video recorded, right?

20  **A.**    I'm sure I don't have as vivid a recollection of that,

21  but that would make sense.

22  **Q.**    And you've seen the video in the last year, right?

23  **A.**    I may have.  I feel like at some point, but I don't

24  recall, like, the extent of why.  It was very upsetting to me.

25  **Q.**    You talked to him for over an hour, correct?

1   **A.**    It felt like for a long time.  I don't know the exact

2   time.

3   **Q.**    He went over a diagram of your body parts with you?

4   **A.**    I don't recall the details of that.

5   **Q.**    Well, when you talked to him, you knew the names for all

6   your body parts, right?

7   **A.**    I think so.

8   **Q.**    And he was polite to you, right?

9   **A.**    Um, I wouldn't describe him as being polite.

10  **Q.**    I'm sorry?

11  **A.**    I'm sorry, I said I wouldn't describe him as being polite

12  necessarily.  I mean, outwardly you could say that, but there

13  was a lot going on in that room.

14  **Q.**    Okay.  He didn't raise his voice with you, correct?

15  **A.**    I don't know if I would put it that way, but I guess in

16  the context that you want it to sound like, sure.

17  **Q.**    Well, how would you put it?

18  **A.**    It's a very lured question.  I don't really know where to

19  start with it.

20          THE COURT:  Ma'am, if you could not comment on the

21  questions, you just simply need to answer them as best you can.

22          THE WITNESS:  I just don't understand your question.

23  BY MS. REWARI:

24  **Q.**    He didn't yell at you in the interview, did he?

25  **A.**    No, but he lectured me that boys will be boys, so I took

1    that as being lectured.

2    Q.     You heard him say, "Boys will be boys" in that interview?

3    A.     I didn't -- that's not that I said that he exactly said

4    that, but that's a summary for what he basically said.

5    Q.     He did not cut you off when you were talking, right?

6    A.     I don't recall.

7    Q.     He asked you for the whole story, didn't he?

8    A.     I don't feel like he gave me a chance to tell him my

9    entire story.

10   Q.     He asked you to tell the truth, didn't he?

11   A.     And I did my best.

12   Q.     Okay.  And he told you that he wanted the whole story,

13   didn't he?

14   A.     I don't recall what Detective Chambers did and said.

15   Q.     Okay.  The description you gave him in that interview

16   about your sexual contact with C.K. was the same description

17   that's in the SANE exam report, right?

18   A.     I don't -- I don't recall.

19   Q.     Okay.  Well, you described to him one incident in

20   November in which you said C.K. anally penetrated you, right?

21   A.     I mean, sure.

22   Q.     And you also described to him one incident, same incident

23   in November, in which he digitally penetrated you, right?

24   A.     I'm confused.  Are you now saying there's two times?

25   Q.     No.  I'm saying you described to him one incident with

1  C.K. near a bus stop that had happened in November?

2  **A.**    Again --

3  **Q.**    Correct?

4  **A.**    I'm sorry, can you please repeat it?  I'm sorry.  I'm --

5  it's hard for me.

6  **Q.**    It's fine.  And I want to make sure you understand the

7  questions, so if it's --

8  **A.**    Thank you, I appreciate it.

9  **Q.**    If it's confusing, please tell me.

10  **A.**    Thank you.

11  **Q.**    Okay.  So in that meeting with Detective Chambers, you

12  described one incident of sexual contact with C.K., correct?

13  **A.**    I'm sure that if that's -- I don't recall specifically

14  what I told Detective Chambers.  I'm -- but if that's what you

15  say, that would make sense.  I don't know.

16  **Q.**    And would you please look in your binder at Defendants'

17  Exhibit 9?

18  **A.**    Okay.

19  **Q.**    Okay.  And I'm going to ask you some questions about the

20  interview, and if you'll refer to this document -- I may refer

21  you to pages in this to refresh your recollection, okay?

22  **A.**    Okay.

23  **Q.**    Now, when you met with Detective Chambers, you told him

24  that this incident happened in mid-November, correct?

25  **A.**    Is there -- is there a page -- you said you would give me

1    a page number, right?

2    Q.    Well, I'm asking your recollection, but if you want to --

3    if you want to look at the document, that's fine.  Page 41.

4    A.    I don't remember.  I -- this is very difficult for me.

5    Q.    Sure.  I'm perfectly fine if you want to look at that

6    first.  Page 41, line 23.

7    A.    Okay.

8    Q.    And you told Detective Chambers that before this incident

9    there were no problems at school, right?

10   A.    I mean, that's what it says.

11   Q.    Well --

12   A.    I'm just telling -- saying that's what it says in the

13   transcript.  I don't remember from my active recollection, but

14   I'm reading what is in the transcript to you.  That sounds

15   right.

16   Q.    And you also told him that you stopped staying after

17   school after the incident occurred, right?

18   A.    Again, I don't recall actively what I told Detective

19   Chambers.

20   Q.    Let me see if I can direct you to a page.

21        MS. REWARI:  With the Court's indulgence, let me see if I

22   can direct her to a page.

23        THE COURT:  Yes, ma'am.

24   BY MS. REWARI:

25   Q.    Page 56, line 20.

1    **A.**     Okay.

2    **Q.**     And so you told Detective Chambers that this incident had

3    occurred in mid-November, right?

4    **A.**     I mean, like -- that's what it says in the transcript.

5    **Q.**     Okay.  And then you told him that you had stayed after

6    school about three times before that incident, right?

7    **A.**     That's what it says in the transcript.

8    **Q.**     Okay.  And then -- I'm looking at the top of page 57.

9    You told him that you stopped staying after school after that

10   point, right?

11   **A.**     If that's what it says in the transcript.

12   **Q.**     And you told him that this incident occurred the week

13   before Thanksgiving, correct?  You can look at page 64, if you'd

14   like.

15   **A.**     Okay.  What was your question again?  I'm sorry.

16   **Q.**     Well, you told Detective Chambers that this incident

17   occurred the week before Thanksgiving, correct?

18   **A.**     I don't know.  It looks like I'm very confused about

19   dates if you read through the entire page of the transcript.

20   **Q.**     Um, well, he asked you, do you remember a date, right?

21   **A.**     You're on page 64?

22   **Q.**     Yes.

23   **A.**     Yes, but then if you go further down on the page, it says

24   a different date.  And then if you go on another page, it says

25   another date.  So I don't think I clearly knew what date.

1    **Q.**    So if you keep reading to page 66 --

2    **A.**    Okay.

3    **Q.**    Go ahead, go ahead and read to page 66, and then I'll ask

4    you the question.

5    **A.**    Okay.

6    **Q.**    And so you told him that it happened the week before

7    Thanksgiving, and -- because your parents and you went to the

8    school on the 22nd, right?

9    **A.**    Yes, I was talking about a week that happened, yes.

10    **Q.**    Okay.  And so -- and you said, "I think it was a

11    Wednesday," right?  I'm on page 64, line 18.

12    **A.**    Okay.

13         MR. BRENNER:  For the rule of completeness, can you let

14    the witness read a few more lines.

15         MS. REWARI:  I'm happy to have her read anything she

16    wants.

17         THE WITNESS:  Alright.

18    BY MS. REWARI:

19    **Q.**    And the Wednesday before Thanksgiving -- the Wednesday

20    the week before Thanksgiving was the 16th of November, 2011,

21    right?

22    **A.**    I'm confused by your question.

23    **Q.**    Um, you went to school and wrote that statement that we

24    looked at in Plaintiff's Exhibit 77.

25    **A.**    The one where I said I'm afraid to come to school.  That

94

1   one, right?

2   **Q.**      Right.

3   **A.**      Okay.  Got it.

4   **Q.**      In that exhibit, that was written on November 21st?

5   **A.**      Um-hmm.

6   **Q.**      And that was a Monday, right?

7   **A.**      If -- I guess that makes sense, yep.

8   **Q.**      So five days before that?

9   **A.**      Um-hmm.

10  **Q.**      The Wednesday before that was November 16th.

11  **A.**      Okay.

12  **Q.**      And you told Detective Chambers that this incident had

13  occurred, you thought, on a Wednesday, right?

14  **A.**      I said I think it's a Wednesday.  I don't say with a

15  hundred percent definitive certainness that it happened on a

16  Wednesday.

17  **Q.**      Okay.  But you told him that your parents came to school

18  the following week after the incident, right?

19  **A.**      That would make sense, yes.

20  **Q.**      Okay.  And we know the date your parents came to school

21  and that was November 21st, 2011, right?

22  **A.**      Yes.

23  **Q.**      Okay.  And then you told Detective Chambers that the

24  rumors at school started about a day after this incident during

25  which C.K. allegedly assaulted you, right?

1    **A.**      Okay.

2    **Q.**      And I'm looking at page 40.

3    **A.**      Wait.  Now you're at page 40?

4    **Q.**      Yes.

5    **A.**      Hold on.

6    **Q.**      Read from line 22 to page 41.  Well, you can start there.

7    You can read as much as you want, but start at line -- page 40,

8    line 22.

9    **A.**      Got it.

10        MR. BRENNER:  40, line 22 or 41?

11        MS. REWARI:  Starting at page 40, line 22.

12        MR. BRENNER:  Thank you.

13   BY MS. REWARI:

14   **Q.**      And you told him the rumor started about a day after he

15   assaulted you, right?

16   **A.**      I'm very confused by this interview, generally speaking.

17   That's what it says, but, yeah.

18   **Q.**      Okay.  And then on the same page you told him there were

19   no problems at school before that incident, right?

20   **A.**      Okay.  If that's what it says.

21   **Q.**      And so the timeline that you gave Detective Chambers was

22   meeting C.K. in the park in late October, early November, and

23   then an assault on a Wednesday the week before Thanksgiving, and

24   rumors that started the next day.

25   **A.**      I -- is there -- am I supposed to answer?  What's the

1    question?

2    **Q.**    Is that the timeline you gave Detective Chambers?

3    **A.**    That's, perhaps, the timeline that I gave him, but I had

4    just gotten a rape kit.  It was traumatic for me.

5    **Q.**    And then you told Detective Chambers that the problems at

6    school had been going on for about a week by the time your

7    parents went to the school, right?  And you can look at page 63,

8    line 5.

9    **A.**    Okay, we're back to 63.  Got it.

10          (Brief pause in proceedings.)

11   BY MS. REWARI:

12   **Q.**    And you told him, "I think it lasted about a week until

13   my parents went to the school on November 22nd," right?

14   **A.**    That's what it says in the transcript.

15   **Q.**    Your legal team also had this interview transcribed,

16   right?

17   **A.**    I don't know.

18   **Q.**    Detective Chambers asked you if anything else had

19   happened between you and C.K.  Do you remember that?

20   **A.**    No.

21   **Q.**    Okay.  Well, take a look at page 31, line 1.

22   **A.**    All right.

23   **Q.**    And you told him, "No, not that I remember, no," right?

24   **A.**    That's what it says in the transcript.

25   **Q.**    He then asked you whether you and C.K. ever had any kind

1   of a relationship before this incident, right?

2   **A.**     Sure.

3   **Q.**     And you told him, "Not any kind of relationship.  I

4   never -- like I never had a conversation with him before this.

5   I only knew who he was by face and like his name.  That was all

6   I knew."

7   **A.**     Okay.

8   **Q.**     Detective Chambers asked you about texting and calls with

9   C.K., right?

10  **A.**     I don't remember.

11  **Q.**     Okay.  Well, take a look at page 32.

12  **A.**     Okay.

13  **Q.**     Go ahead and read that page to yourself.

14         (Brief pause in proceedings.)

15         THE WITNESS:  Okay.

16  BY MS. REWARI:

17  **Q.**     And you denied ever texting with C.K., correct?

18  **A.**     Yeah, that's what it says in the transcript, and I think

19  that would be fair given the circumstances I was in.

20  **Q.**     And you denied ever talking to C.K. on the phone, right?

21  **A.**     Yeah, that would be fair to say based off of this

22  transcript.

23  **Q.**     And you told him that you got an inappropriate voicemail

24  after this incident with C.K., right?

25  **A.**     Sure.  That's what the transcript says.

```
 1   Q.    And he asked you, "Before you met him in the park, had he
 2   ever tried to talk to you in school or anything before," right?
 3   A.    If that's what the transcript says.
 4   Q.    Well, take a look at page 32 -- excuse me, page 33.
 5   A.    This transcript doesn't make much sense to me so that's
 6   why I'm just going to keep saying, "That's what the transcript
 7   says."
 8   Q.    Okay.  Well, would you like to see the transcript that
 9   your attorneys prepared?  Would that be easier?
10   A.    I mean, the transcript is a transcript.  I don't know
11   what my attorneys prepared.
12   Q.    Okay.
13   A.    I just generally mean the transcript is confusing.
14   Q.    Okay.  You told him that C.K. recorded this very rude
15   sexual message to you, right?
16   A.    I don't recall that.
17   Q.    Well, look at page 32.
18   A.    Okay.
19   Q.    Line 23.
20   A.    Could you repeat your question?  I don't think that's
21   what you just said.
22   Q.    You told him that C.K. had recorded a very rude sexual
23   message to you, right?
24   A.    Did you say "reported" or "recorded"?  I'm sorry.
25   Q.    Recorded.  He left you a very rude sexual voicemail,
```

1    right?

2    **A.**      Yes.

3    **Q.**      And that's what you told Detective Chambers.

4    **A.**      Yes.

5    **Q.**      And you told him that he recorded this very rude sexual

6    message after he assaulted you.

7    **A.**      If that's what the transcript says.

8    **Q.**      And you said that it was very graphic, you didn't hear it

9    personally but your mom did, right?

10   **A.**      Sounds about right.

11   **Q.**      And then you told him that you could tell it was C.K. who

12   did it, and then your mom blocked the phone number after she

13   heard the voicemail, and that's why it got erased, right?

14   **A.**      Okay.

15   **Q.**      And then he asked you, "Was your [sic] number saved in

16   your phone before that?"

17          And you told him, "Not before that.  I never had any

18   connection with C.K. before that."

19   **A.**      Okay.  I mean, there's a lot I could say, but I'm just --

20   I don't know if you just want me to say "yes" or "no" from the

21   transcript.

22   **Q.**      Well, would you like to take a look?  It's page 33, line

23   10 to line 13.

24   **A.**      I mean, there's a lot of things that I think as a

25   12-year-old I'm speaking in code as, but -- if you would like me

1    to dissect that further I will, but as of right now I'm just

2    trying to be respectful and answer "yes" or "no" for you.

3    **Q.**    I appreciate that.

4         And then he asked you whether you were saying that your

5    mom saved the phone number -- C.K.'s phone number in your phone,

6    correct?

7    **A.**    Okay.

8    **Q.**    And then you told him, "Yes, my mom saved it, and we

9    never had any kind of connection or had never talked to him or

10   had any kind of connection."

11   **A.**    Okay.

12   **Q.**    That's what you said, right?

13   **A.**    I don't think being raped by someone is a connection,

14   Ms. Rewari.  I'm just going to put that out there.

15   **Q.**    Detective Chambers specifically asked you, "What did the

16   school do to help you at the school once your parents came to

17   the school about C.K. the week of Thanksgiving," right?

18   **A.**    What page are you on now?

19   **Q.**    I'm looking at page 45.

20   **A.**    Okay.  Where on page 45?

21   **Q.**    You can start at line 4.

22   **A.**    Okay.

23   **Q.**    And so, Detective Chambers asked you, "What other things

24   did the administration do to help you at the school?  Do you

25   remember anything that they may have done," right?

**A.**     I only see where it says, "They just had told C▇▇▇▇

to stay away from me."

**Q.**     Right.  And that's what you told him.  The school

administration told C▇▇▇▇ to stay away from you, right?

**A.**     Sure.

**Q.**     Yeah.  And then you added, "And he respected that, except

he had like his friends, you know, he would have his friends

deliver messages to me."  Correct?

**A.**     I think, again, that's what it says in the transcript,

but I don't think you're reading the full context where

delivering the message was death threats and also that I was

still afraid of my rapist, so that would make sense as to why I

was scared to say everything.

**Q.**     You -- and Detective Chambers specifically asked you

whether you had any other communication or interaction with

C.K., right?

**A.**     I'm sorry, can you repeat that question?

**Q.**     Detective Chambers asked you whether you'd had any other

communication or interaction with C.K.?

**A.**     Where are you now?

**Q.**     I'm looking at page 36, line 1.

**A.**     Okay.

**Q.**     And your answer was a flat "No," right?

**A.**     Okay.

**Q.**     And then he -- then he asked you about David N., right?

1    A.    That's what the transcript says.

2    Q.    And you -- that was the other student, other male student

3    that you had written a statement about on November 21st, 2011,

4    right?

5    A.    Yes.

6    Q.    And he asked you to tell him about what had happened with

7    David.

8    A.    Okay.

9    Q.    And if you read from page 36 to page 39, line 5, then

10    I'll ask you a question.

11    A.    36 -- what was that again?  I'm sorry.

12    Q.    Page 36, line 1, to page 39, line 5.

13          (Brief pause in proceedings.)

14          THE WITNESS:  Okay.

15    BY MS. REWARI:

16    Q.    Okay.  And Detective Chambers there asks you about the

17    incident at the pumpkin patch and the incident in David's

18    basement, right?

19    A.    I mean, I think I told him about the pumpkin patch.

20    Q.    Right.  And then you -- because -- he's asking what are

21    the problems with David, and then you and he talk about going to

22    the pumpkin patch and going into his basement, and his mom going

23    to do the laundry and leaving you and David alone in his

24    basement, right?

25    A.    That's what it says.

```
 1   Q.    Okay.  And then -- what you describe to him as having
 2   happened in the basement is that David asked if he could touch
 3   you, and you said, "I was like, I was like I'm not that kind of
 4   person.  I'm sorry.  It's just not -- it's not in my comfort
 5   zone, and he respected that."  Right?
 6   A.    I think that's what I've always been consistent in saying
 7   that.
 8   Q.    You didn't describe any exposure that he did to you of
 9   his penis in his basement to Detective Chambers, correct?
10   A.    I wasn't excusing David of sexually assaulting me.
11   Q.    Okay.  And you --
12   A.    At that point in the basement.
13   Q.    But you've accused him in this case of exposing his penis
14   to you in the basement.
15         MR. BRENNER:  Objection, argumentative.  She hasn't
16   accused David in this case of anything.
17         THE COURT:  Overruled.  She can answer if she can.
18         THE WITNESS:  I'm sorry, could you rephrase?
19   BY MS. REWARI:
20   Q.    In this case you have testified to this jury that David
21   exposed his penis to you in his basement, right?
22   A.    I think you're taking it completely out of context of how
23   I've told it to you.  What I've said to you is that David showed
24   me his penis, and then he stopped, right, and then he went to
25   school the next day and he started spreading rumors about me.
```

1   **Q.**     You alleged in your lawsuit that he touched you in your

2   intimate body parts in his basement, correct?

3   **A.**     I don't know what exactly you're referring to.

4   **Q.**     Do you still have the second amended complaint up there?

5   **A.**     No.

6   **Q.**     Okay.  I have an extra copy.  This will be just easier.

7          And this is the lawsuit you filed as amended in June

8   2022, right?

9   **A.**     I filed a lawsuit.

10  **Q.**     Okay.  And this is -- if you would please take a look at

11  paragraph 104.

12  **A.**     Okay.

13  **Q.**     And you alleged in this lawsuit that while at D.N.'s home

14  and outside the direct --

15         THE COURT:  Let's do it this way.  Why don't you have her

16  read 104 to herself and then ask her a question about it.

17         MS. REWARI:  That's fine.  Thank you.

18         THE WITNESS:  Okay.

19  BY MS. REWARI:

20  **Q.**     All right.  And so you've alleged in this lawsuit that

21  while you were in the basement with D.N., after the pumpkin

22  patch, that he sexually battered you by touching you sexually on

23  or near your intimate body parts without your consent, right?

24  **A.**     He attempted to, but I never reviewed the complaint.  I

25  was never given a chance to review my complaint before it was

```
 1   filed.
 2   Q.    Okay.  Have you reviewed any of the complaints?  There
 3   were three versions, right?
 4   A.    There's three?
 5   Q.    Yes.
 6   A.    I mean, at certain points, yes.
 7   Q.    And you hired your lawyers, right?
 8         MR. BRENNER:  Relevance.  Objection, relevance.
 9         THE COURT:  Sustained.
10         MS. REWARI:  Okay.
11   BY MS. REWARI:
12   Q.    Now, you told Detective Chambers that -- you also talked
13   to Detective Chambers in the pages we're looking at in the
14   transcript -- this is back on Defendants' Exhibit 9 --
15   A.    Can I put this away now?
16   Q.    Yes.
17   A.    Thank you.
18   Q.    You also talked to him about what was happening at your
19   locker at school, right?
20   A.    What page are we on again?  I'm sorry.
21   Q.    Page 38.
22   A.    Okay.
23   Q.    And you told him that David N. and C.K. would come by
24   your locker, "but he never touched me or anything like that."
25         Do you see that?
```

1    **A.**    I do see that, yep.

2    **Q.**    And when you said, "He would just come by intimidating

3    me, laughing at me, slamming my locker door.  That was really

4    all that David N. had to do with anything," right?

5    **A.**    I'll leave it at okay, but there's a lot I could say.

6    **Q.**    Well, that's what you told Detective Chambers, right?

7    **A.**    Again, there's a lot that I could say about Detective

8    Chambers, but you didn't ask me, so I'll leave it at that.

9    **Q.**    And Detective Chambers even asked you whether you had had

10   any physical contact, even as much as kissing, with David N.,

11   right?

12   **A.**    I mean, I think so.  From what we've read, that sounds

13   about right.

14   **Q.**    And you said that there was no touching between the two

15   of you, right?

16   **A.**    I'm sorry, could you please restate that?

17   **Q.**    Well, you told Detective Chambers there was no touching

18   between you and David N., right?

19   **A.**    Are you now -- I'm just lost by your question.  Is there

20   a page or --

21   **Q.**    Sure.  Look at page 39, starting at line 1.

22   **A.**    In that context, it looks like I'm talking about the

23   pumpkin patch incident.

24   **Q.**    Right.  But you told him on page 48 that he was not

25   touching you at your locker, and then on page 39 you told him he

1    didn't touch you in his basement, right?

2    **A.**    Okay.

3    **Q.**    Okay.  I'm going to switch gears for a moment.  Let's

4    talk about your grades.

5        Mr. Brenner talked to you about your grades, and I think

6    you talked to him about your interest in science and math,

7    right?

8    **A.**    Um-hmm.

9    **Q.**    Science and math were your most difficult subjects for

10   you, even before 7th grade, right?

11   **A.**    I don't recall what was the most difficult.  Just because

12   something is difficult doesn't mean you don't enjoy it.

13   **Q.**    Okay.  Well, take a look at Defendants' Exhibit 118 in

14   the black binder.

15       MR. BRENNER:  One-one-eight?

16       MS. REWARI:  Yes.

17       MR. BRENNER:  I have no objection to that.

18       THE COURT:  Without objection?

19       MR. BRENNER:  We'll have no objection.

20       THE COURT:  Without objection.

21       (Defendants' Exhibit 118 admitted into the record.)

22       THE COURT:  Do you want to publish it?

23       MS. REWARI:  Yes.

24       THE COURT:  Okay.

25       MS. REWARI:  Thank you.

1    BY MS. REWARI:

2    **Q.**    And this is your elementary school report card?

3    **A.**    Yes, that appears to be what it is.

4    **Q.**    And it's probably more accurate to call it a transcript,

5    right, because it's just end of the year grades?

6    **A.**    I mean, whatever you want to refer to it.  That's totally

7    fine if that's --

8    **Q.**    Okay.  And so you were at Floris Elementary from 2nd to

9    6th grade, correct?

10   **A.**    Um-hmm, yes.

11   **Q.**    And so you -- would you agree that your grade in math,

12   for example, in 2nd grade was satisfactory, whereas the rest of

13   your grades were either G or O, which is good or outstanding?

14   **A.**    I'm sorry, can you -- I'm sorry, can you repeat that one

15   more time?

16   **Q.**    Look at your 2nd grade report card --

17        THE COURT:  Ms. Rewari, where are we going with this?

18        MS. REWARI:  Well, I believe the testimony yesterday was

19   that -- that math and science were her strongest subjects, and I

20   believe what this -- they intend to put on evidence that --

21   that --

22        THE COURT:  Well, whether -- whether math and science were

23   her strong subjects or not, we need to make whatever evidence

24   we're eliciting relevant to the issues that the jury has to

25   decide, so let's move along on this.

1           MS. REWARI:  Okay.

2    BY MS. REWARI:

3    **Q.**    Well, why don't we take a look at Defendants' Exhibit 43.

4    **A.**    43, you said?

5    **Q.**    Yeah, 43.

6    **A.**    Okay.

7           MS. REWARI:  Any objection?

8           MR. BRENNER:  There will be no objection.

9           THE COURT:  Without objection.

10          (Defendants' Exhibit 43 admitted into the record.)

11          THE COURT:  You may publish.

12   BY MS. REWARI:

13   **Q.**    And these are your progress reports, and if you go to --

14   I want to direct your attention to the page that is

15   FCSB-BR 5907.

16          And this is your report card or progress reports for your

17   7th grade year at Rachel Carson, right?

18   **A.**    Okay.

19   **Q.**    Now, the first quarter of 2nd grade ended on

20   November 4th, 2011, do you recall that?

21   **A.**    No, but I trust you if that's when it ended.  That makes

22   sense.

23   **Q.**    You're welcome to flip to -- no need to put it on the

24   screen --

25   **A.**    I trust you.  If that's what you say, that's fine.  I

1    don't believe you have a reason to not tell me that.

2    Q.    Okay.  And you had a C in math even before the start of

3    the second quarter, right?

4    A.    Well, I mean, that would make sense if my abuse started

5    in October.

6    Q.    Okay.  And you're claiming in this case that your grades

7    in math and science went down because of what you allege

8    happened, right?

9    A.    That's not at all what I claim.  I said my entire

10    academic situation declined.  I never also said math and science

11    were what I did best in.  Math and science was what I enjoyed

12    the most.

13    Q.    I see.  Okay.

14         And so if we look at your 7th grade report card, there's

15    no change from -- in the math grade from first to second

16    quarter, right?

17    A.    Yes, that -- that's what it appears to say.

18    Q.    And the class where you were being asked to take the back

19    staircase up to was the Spanish class, right?

20    A.    That -- that's not the only class, so it was just to

21    clarify, just so I understand what you're saying, I took the

22    back staircase to Spanish class and then to my history class

23    afterwards, just so we're clear.

24    Q.    And your grades in Spanish and your grades in history

25    didn't change all year, right?

1    **A.**    Okay.

2    **Q.**    And after -- well, you stayed on homebound instruction

3    from -- for the last two quarters of 7th grade, correct?

4    **A.**    Yes.

5    **Q.**    Okay.  And so the second quarter started the first week

6    of -- excuse me.  The third quarter, the second semester,

7    started the first week of February, 2012, right?

8    **A.**    I'm sorry.  So you said the third quarter started that?

9    Okay.  If that's what you said, I trust you, Ms. Rewari.

10   **Q.**    Okay.  And then -- so what we see here in the third and

11   fourth quarter, those are the grades that you got on home

12   instruction, right?

13   **A.**    Yes.

14   **Q.**    And then the next page are your grades for 8th grade

15   until you withdrew or your parents withdrew you to attend a

16   boarding school, right?

17   **A.**    Yes.

18   **Q.**    And the next school you attended after that was The Storm

19   King School?

20   **A.**    Yes.

21   **Q.**    And that was in upstate New York?

22   **A.**    Yes.

23   **Q.**    Was it a co-ed or an all girls boarding school?

24   **A.**    I believe it was a co-ed.

25   **Q.**    Okay.  And so you were living away from home at that

1   time?

2   **A.**      Yes.

3   **Q.**      Okay.  And then you completed high school early; is that

4   right?

5   **A.**      Like, I think I want to call it a semester, but yeah.  I

6   mean, basically like a semester early.

7   **Q.**      Okay.  And you started taking classes at John Jay College

8   even before you had gotten your high school diploma, right?

9   **A.**      That's -- I don't know if that's a correct

10  characterization of what exactly transpired, but I can tell you

11  when I started taking classes.  I started taking classes in

12  about -- I think it was January of 2017.

13  **Q.**      And --

14  **A.**      Technically, I had graduated.  It just -- I don't know

15  administratively how the school district -- the school district

16  I was with was very flexible and supportive of my needs, so I

17  believe that they issued my diploma later, but technically I

18  graduated.

19  **Q.**      Okay.  So your diploma says --

20          THE COURT:  The point she's trying to make is when she

21  earned it versus when it was awarded.

22          MS. REWARI:  Okay.

23  BY MS. REWARI:

24  **Q.**      And so you were not taking high school classes in 2017,

25  you were just taking college classes?

```
 1          THE WITNESS:  That sounds about right, yes.
 2   BY MS. REWARI:
 3   Q.     And on your diploma, you have the class of 2017 for high
 4   school, right?
 5   A.     That would make sense as to when I had my diploma given
 6   to me.
 7   Q.     Now, Mr. Brenner asked you about your admission to
 8   Columbia University.
 9   A.     Yes.
10   Q.     That was your second application to Columbia?
11   A.     That's correct.
12   Q.     And you applied -- the second time you applied to
13   Columbia was in the fall of 2017; is that right?
14   A.     That sounds about right.
15   Q.     And you asked to be admitted as a nontraditional student,
16   right?
17   A.     Yes -- well, actually, I'm sorry.  I didn't ask to.  I
18   was told by Columbia that I was a nontraditional student.  I
19   went to Columbia College, and they looked at my academic
20   circumstances and my disabilities, all of that, and then they
21   told me I had to apply to be in the school at Columbia for
22   nontraditional students.
23   Q.     Okay.  And so when you applied to Columbia in the fall of
24   2017, you put in an application there, right?
25   A.     I'm sorry.  Can you repeat that?
```

1    **Q.**    You had to apply a second time for admission, correct?

2    **A.**    I got rejected the first time, so that would make sense,

3    yes.

4    **Q.**    Okay.  And you provided them a résumé when you applied?

5    **A.**    I did provide them a résumé, yes.

6    **Q.**    Can you please take a look at Defendants' Exhibit 52?

7          THE COURT:  Any objection?

8          MR. BRENNER:  I didn't hear the number, Your Honor.

9          THE COURT:  52.

10         MR. BRENNER:  Five two?

11         THE COURT:  Yes, sir.

12         MR. BRENNER:  Is that in the first set or the second set?

13         Your Honor, I'd rather the witness just identify whether

14   this is --

15         THE COURT:  Sure.

16   BY MS. REWARI:

17   **Q.**    This is the résumé you provided to Columbia, right?

18   **A.**    It looks about right, yep.

19   **Q.**    And --

20         MR. BRENNER:  No objection, then, to admission, Your

21   Honor.

22         THE COURT:  Without objection.

23         (Defendants' Exhibit 52 admitted into the record.)

24         THE COURT:  Do you want to publish?

25         MS. REWARI:  Yes.

1          THE COURT:  You may.

2    BY MS. REWARI:

3    Q.     And so when you applied to Columbia, the experiences that

4    you represented to Columbia on your résumé included an associate

5    position at PricewaterhouseCoopers, correct?

6    A.     Yes.

7    Q.     And an associate position is different than an

8    internship, right?

9    A.     I had had an internship the summer before and was

10   extended a job offer, that's correct.

11   Q.     Okay.  And you were extended a full-time job offer?

12   A.     I was, yes.

13   Q.     Okay.  And you also represented to Columbia that you were

14   in the Army ROTC, a contracting cadet in the process of becoming

15   an Army cybersecurity officer?

16   A.     That's correct, I was a cadet at John Jay College, that

17   is correct.

18   Q.     And you said that you participated in physical fitness,

19   field training exercises, military, science/leadership courses,

20   right?

21   A.     That's correct.

22   Q.     You also stated in this résumé that you were the state

23   doubles champion in tennis, right?

24   A.     That's correct.

25   Q.     And what year was that?

1    **A.**    I don't recall what year that was.  I think in 2000

2    and -- I'm not sure.  I'm speculating.

3    **Q.**    Okay.  Well, it was after 2013, right?

4    **A.**    No.

5    **Q.**    Well, are you -- do you recall winning a state tennis

6    championship?

7    **A.**    I do, but I don't recall the year.

8    **Q.**    All right.  And so you talked about this job at

9    PricewaterhouseCoopers and this Army ROTC position in your

10   application essay to Columbia, too, correct?

11   **A.**    Yes, I believe you saw my letter of recommendation from

12   my ROTC captain, Emma Schiller.

13   **Q.**    Okay.  And if you take a look at Exhibit 53 --

14   Defendants' Exhibit 53, this is your required essay for

15   application to Columbia, right?

16   **A.**    Yes, that's correct.

17   **Q.**    Okay.

18        MS. REWARI:  Your Honor, I move to admit Defendants'

19   Exhibit --

20        MR. BRENNER:  No objection.

21        THE COURT:  Without objection.  You may post.

22        MS. REWARI:  Okay.  Thank you.

23        (Defendants' Exhibit 53 admitted into the record.)

24   BY MS. REWARI:

25   **Q.**    So in the second paragraph of this application, you

1   stated that "Last time we met, I shared my sad and heavy story

2   of sexual assault and abuse in middle school and how my

3   education was nearly a casualty of that tragedy."  Right?

4   **A.**     It was, yes.

5   **Q.**     Yeah.  And so you discussed what had happened in middle

6   school in your first application to Columbia, right?

7   **A.**     I recall that, yes.

8   **Q.**     Okay.  And then in this essay in the third paragraph you

9   said, "When I applied to general studies last year I had

10  finished high school early and was taking time off to work full

11  time at Memorial Sloan Kettering cancer center doing research on

12  acute myeloid leukemia and exercise oncology," right?

13  **A.**     That's correct.

14  **Q.**     And was that a true statement?

15  **A.**     Absolutely it was a true statement, but I actually had to

16  quit my job after my PTSD became flared up.

17  **Q.**     Okay.  And then if we turn to the next page, at the

18  bottom of this essay on the second page, you said in the last

19  paragraph, "There are several reasons GS continues to tug at me.

20  First, I would like to be in a more scholastically challenging

21  environment with like-minded peers," right?

22  **A.**     Sounds about right.

23  **Q.**     And you said, "While John Jay is a good college, it does

24  not really offer me the academic rigor I need to reach my

25  fullest potential," right?

1    **A.**     Yes.

2    **Q.**     And on the next page under "Third," you said, "I've been

3    blessed with an unexpected opportunity to work full time with

4    PricewaterhouseCoopers," correct?

5    **A.**     That's correct.

6    **Q.**     And you wrote, "Over this past summer my academic advisor

7    nominated me for an extremely competitive internship at PwC in

8    the world-renowned, Risk Assurance, Cybersecurity & Privacy

9    practice," correct?

10   **A.**     That's correct.

11   **Q.**     "Only ten college students were selected from across the

12   country to work in the New York City Metro office.  All were

13   rising seniors in college, except for me.  It was an exciting

14   summer of training, travel, and client facing consulting for two

15   of the largest companies in the world, one in the financial

16   sector and the other in communications.  Projects I worked on

17   included network security, third-party risk management, and

18   threat modeling," correct?

19   **A.**     Yes.

20   **Q.**     And then you wrote, "My team and I were responsible for

21   auditing and reporting on the clients' potential cyber

22   weaknesses."

23   **A.**     That's what it says, yes.

24   **Q.**     And were these true statements?

25   **A.**     Absolutely.

1    **Q.**    And when you were doing this cybersecurity work, was it

2    all on a computer screen?

3    **A.**    At times it was, but sometimes it was client facing.

4    There was a lot of meetings.  It really varied what my work was.

5    **Q.**    All right.  And then on the next page you wrote, "At the

6    end of the summer I was offered a position to become a permanent

7    associate at PwC this January."

8    **A.**    Okay.

9    **Q.**    Right?  And you did get a full-time job offer from

10   Pricewaterhouse?

11   **A.**    I did, yes.

12   **Q.**    And on the next page -- well, actually, in the next

13   paragraph you wrote that "GS is the only institution of higher

14   learning that offers me the structure, course work, and support

15   I need in order to achieve my professional aspirations, a

16   traditional and rigorous liberal arts education, diversity of

17   courses and the possibility of combining majors and tracks and

18   flexible scheduling for students who work," right?

19   **A.**    That's correct.

20   **Q.**    And so, what you told Columbia in this application was

21   that you intended to go to school full time and work full time,

22   right?

23   **A.**    That's not correct.

24   **Q.**    Okay.  Well, you intended to -- you told Columbia that

25   you were intending to work full time at Pricewaterhouse while

1 you were in college, right?

2 **A.** So, I don't know if that's -- just again, you can cut me

3 off at any point in time if you think I'm deviating, but the

4 School of General Studies is very different than any school in

5 regard that you can take one class, you can take two classes,

6 you can take three classes, you can take a full-time class

7 amount.  So, I wasn't saying that I wanted to be a full-time

8 student working full-time.  That's an assumption made by you.

9 **Q.** You had told Columbia that you accepted a full-time job

10 as an associate at PwC, right?

11 **A.** Well, where did I say I was taking classes full-time.

12 That's what you asked me.

13 **Q.** So, you intended to go to college part time but work full

14 time, right?

15 **A.** That was my goal, but that didn't work out to be the

16 case.

17 **Q.** Okay.  And then in the next page, in the second

18 paragraph, you wrote that -- about your plans to join Army ROTC

19 and to become a second lieutenant in the United States Army

20 Reserves and lead a cybersecurity platoon, right?

21 **A.** Um, that was a very short-lived goal.  I could not

22 because of my condition.

23 **Q.** And in the next paragraph you said, "I'd like to continue

24 working at PwC while completing my undergraduate degree at GS,"

25 right?

1    **A.**    That's what it says.

2    **Q.**    And, again, on the next page, you again told Columbia

3    that you need to work while attending college -- I'm looking at

4    the second full paragraph on this page -- right?

5    **A.**    Okay.

6    **Q.**    And you said, "Employment military benefits are the only

7    way I can pursue a higher education," right?

8    **A.**    That's correct.

9    **Q.**    Okay.  And when you obtained the internship at PwC, you

10   were 17 years old, right?

11   **A.**    Yeah, I was, actually.

12   **Q.**    And please take a look at Defendants' Exhibit 54.

13   **A.**    Okay.

14   **Q.**    And this is PwC's file for your résumé for that

15   internship, right?

16       MR. BRENNER:  Your Honor, Ms. Rewari is testifying.  She

17   can ask the witness what she knows this to be.

18       THE COURT:  Rephrase your question, ma'am.

19       MS. REWARI:  Well --

20       THE COURT:  Just rephrase your question.

21   BY MS. REWARI:

22   **Q.**    This is your résumé from PwC's records --

23       MR. BRENNER:  Same objection, because of the --

24       THE COURT:  What does this look like you to, ma'am?

25       THE WITNESS:  I have never submitted this application.

```
 1   BY MS. REWARI:

 2   Q.    This is your name on this application, correct?

 3   A.    It does say my name.

 4   Q.    And your phone number, right?

 5   A.    This form does not look familiar, but it does say my

 6   phone number.

 7   Q.    Right.  And your e-mail address, right?

 8   A.    Yes.

 9   Q.    And it's your high school listed there.

10   A.    It does, but I was still a student at Rachel Carson, so

11   this makes no sense.

12         MS. REWARI:  Your Honor, this is a document that's been

13   authenticated by a records custodian.

14         MR. BRENNER:  Your Honor -- I'm just asking Ms. Rewari not

15   to testify about something.

16         THE COURT:  Let me ask you this:  Does this purport to be

17   a résumé associated with her?

18         MS. REWARI:  Yes.

19         THE COURT:  Okay, and was it part of the discovery

20   process?

21         MS. REWARI:  Yes.

22         THE COURT:  Okay.  You can simply ask her questions as to

23   whether she recognizes the document and if -- her answer might

24   generate some other additional questions from you.

25         MS. REWARI:  Okay.  May I ask her questions about what's
```

1    on the document?

2         THE COURT:  You can ask her if she knows what it is.

3         MS. REWARI:  This is an application for an internship at

4    PwC for the summer of 2017, right?

5         THE WITNESS:  No.

6    BY MS. REWARI:

7    **Q.**    Well, what is the document?

8    **A.**    I mean, you're showing me that that's a document, but as

9    I explained to you in my deposition, that's not how I applied

10   for this internship.

11   **Q.**    Well, take a look at Defendants' Exhibit 305.

12   **A.**    All right.

13   **Q.**    And that's your name at the top of this document, right?

14   **A.**    That's -- this is literally the same form that you just

15   had me look at before.

16   **Q.**    No.  It actually has a different date on it, right?  If

17   you go to the last page, this one's dated September 12, 2017?

18   **A.**    That's not what it says at the top of mine.

19        MS. REWARI:  Look at the last page.

20        THE COURT:  You can approach her to orient her.

21        THE WITNESS:  That's not at the top of my page.

22   BY MS. REWARI:

23   **Q.**    Sorry if I misspoke.

24        There's a submission agreement there, "I agree."  Do you

25   see that?

```
 1    A.     I do see that, but this form does not look familiar to me

 2    again.

 3    BY MS. REWARI:

 4    Q.     Okay.  But you agree that it has a date of September

 5    12th, 2017, on it, right?

 6    A.     That's correct but this one doesn't look familiar to me.

 7    Q.     Okay.  And that's your name on the front page?

 8    A.     So, you want me to flip back to the front page now?

 9    Q.     Yeah.

10    A.     It says my name, but I don't recognize this form.

11    Q.     Okay.  And that's your phone number, right?

12    A.     That's my phone number, but again, I told you how I

13    applied for this job in my deposition.

14    Q.     Well, this is a different application than what we talked

15    about in your deposition.  This is for the permanent position,

16    right?

17    A.     I don't recall filling out a form.

18    Q.     Well, you accepted a permanent position at PwC, right?

19    A.     I did.

20    Q.     Okay.  And this looks like your résumé -- a résumé on

21    your behalf, right?

22    A.     No.

23           MS. REWARI:  Your Honor, if I may have a moment.  I would

24    like to move this in, but I have the records custodian affidavit

25    if there's a question about the authenticity.
```

1          THE COURT:  Do you have any authenticity issue,

2     Mr. Brenner?

3          MR. BRENNER:  I don't want to make a speaking objection,

4     Your Honor.  I can explain at sidebar if you want.

5          THE COURT:  I think it's a simple question.  Do you think

6     that based upon the information that Ms. Rewari has provided you

7     that the document has been properly authenticated by affidavit?

8          MR. BRENNER:  I believe it's authenticated in the sense

9     that it is properly from the files of PwC.  It's not

10    authenticated in the sense that this witness isn't the author of

11    it.

12         THE COURT:  Well --

13         MR. BRENNER:  I'm not challenging --

14         THE COURT:  As I understand the affidavit process for

15    authentication purposes, if it meets the requirements under the

16    statute for authentication pursuant to affidavit, then the

17    custodian of records doesn't need to be here.  So --

18         MR. BRENNER:  Right.  I'm not challenging -- just to be

19    clear, I'm not challenging that it's from PwC's files.  That's

20    not the objection.

21         THE COURT:  Okay.

22         MR. BRENNER:  The objection is that there's no foundation

23    laid that it's this witness's résumé.  It's not authenticity

24    as to where PwC's concerned.  I accept the affidavit.

25         THE COURT:  The objection is overruled.  You can ask her

```
1    questions about it.

2         MS. REWARI:  So, I would move to publish Defendants'

3    Exhibit 54.

4         THE COURT:  You may.

5         (Defendants' Exhibit 54 admitted into the record.)

6         MS. REWARI:  And if we could also -- I believe 305 is the

7    same --

8         THE COURT:  That's fine.  As an officer of the Court, do

9    you represent that it's gone through the same authentication

10   process?

11        MS. REWARI:  Yes.

12        THE COURT:  All right.  Very good.  You may publish.

13        MS. REWARI:  Okay.  We'll start with 54.  Okay.

14   BY MS. REWARI:

15   Q.   If you could please take a look at this document.

16        MS. REWARI:  And, Grady, if you could zoom at the top of

17   this.

18   BY MS. REWARI:

19   Q.   And at the top it says, "Cybersecurity" -- or "Cyber sec

20   intern summer 2017 nationwide," right?

21   A.   I don't -- I don't have this.

22   Q.   On Defendants' Exhibit 54?

23   A.   Oh, I thought you said 354.

24   Q.   Oh, I'm sorry, no.  Defendant's 54, please.

25   A.   Okay.
```

1    Q.    Okay.  And that's -- and we've talked about, that's your

2    name, that's your phone number, that's your e-mail address,

3    right?

4    A.    I can speak to those things, but nothing else on the

5    page.

6    Q.    Okay.  And you'd agree that this document states,

7    "Columbia University/John Jay College" under education, right?

8    A.    I don't even think this makes sense, Ms. Rewari.

9    Q.    I'm just asking what the document says, ma'am.

10   A.    If you want me to read what's on the document, sure, it

11   says "Columbia" on it.

12   Q.    Okay.  And you were not a student in Columbia in the

13   spring of 2017, correct?

14   A.    That's exactly my point I'm making to you.

15   Q.    Okay.  And it says, "Fort Lee High School, class of

16   2013," correct?

17   A.    That's kind of funny, but yes.

18   Q.    Okay.  And you went to Fort Lee High School, correct?

19   A.    I did.  These are things on the actual résumé that I gave

20   PwC.

21   Q.    Okay.  And you didn't produce that résumé, though, in

22   this case, have you?

23   A.    I produced it at least 15 times to you.

24   Q.    Okay.  I'm sure your attorney will show it to us.

25         So let's look at under -- under distinctions and

1    performances.

2          Okay.  Well, while -- while we're on Fort Lee High

3    School, you graduated from Fort Lee High School, your diploma

4    says 2017, you finished classes in 2016, right?

5    **A.**     Yes.  This résumé says 2013, which would still make me an

6    8th grader in Fairfax County Public Schools.

7    **Q.**     Correct.  And under distinctions and performances, it

8    lists Columbia University, dean's list, right?

9    **A.**     Yes, but I wasn't a student at Columbia.

10   **Q.**     And it also lists nomination for national recognition of

11   women in STEM at Columbia University 2016, right?

12   **A.**     If that's what it says it says, but I don't recognize

13   this document.

14   **Q.**     Okay.  And it also lists nomination for the National

15   Academy of Future Physicians and Medical Scientists in 2016

16   right?

17   **A.**     If that's what it says.  I don't recognize this document.

18   **Q.**     Well, it does list the state doubles championship also

19   under distinctions and performances, right?

20   **A.**     If that's what it says, but I don't recognize this

21   document.

22   **Q.**     Well, you just told us that you were the state doubles

23   champion, right?

24   **A.**     Right.  But I produced my résumé that I applied to with

25   every job.  You have every job that I've applied to.

```
1    Q.    Okay.  Well, under -- it also has the state geography bee
2    championship.  That's in the last résumé we saw, right, for
3    Columbia?
4    A.    Okay.  Sure.  I trust you.  Whatever -- whatever you say,
5    that sounds good.
6    Q.    Well, the Columbia résumé doesn't say state geography bee
7    champion, if you look at Exhibit 52.  It just says geography bee
8    champion 2011 on that one, right?
9    A.    Yeah, I know it's very suspect.  I keep telling you I
10   don't recognize this document.
11   Q.    Okay.  And then under experience, it says, "New York City
12   Department of Family and Children Services, 2015 to present."
13         Do you see that?
14   A.    I do see it, but I don't recognize this document.
15   Q.    And you never worked for the New York City Department of
16   Family and Children Services, right?
17   A.    I've never claimed to.
18   Q.    Okay.  And in 2015 you were 16 years old?
19   A.    Yeah.  That's when I had an eating disorder.  I don't
20   recognize this document.
21   Q.    All right.  The next one, it says, "Tiffany & Co."  And
22   you did work at Tiffany & Co., right?
23   A.    I did.  That was on my résumé if you go to the other one.
24   Q.    Yeah, and -- but you worked -- and you did work at
25   Tiffany & Co. in 2016, according to the résumé for Columbia,
```

1    right?

2    **A.**    If that's what you say, sure.

3    **Q.**    Well, please take a look, Defendants' Exhibit 52 in your

4    book.

5    **A.**    Okay.  That's what it says, sure.

6    **Q.**    Okay.  And then the next thing on Defendants' Exhibit 54

7    is you've listed U.S. Army Reserves, 2014 to present.

8    **A.**    I don't even know how this makes any sense.  I don't --

9    but that's what it says.  I don't recognize this document.

10   **Q.**    Okay.  And it says, "Cybersecurity and military

11   intelligence analyst for the United States Army Reserves

12   commissioning as a second lieutenant in 2018," right?

13   **A.**    That would be pretty impressive if I was old enough, but

14   I don't recognize this document.

15   **Q.**    Right.  Because in 2014 you were 15 years old, right?

16   **A.**    Yeah, I was 15 years old.  I don't recognize this

17   document.

18   **Q.**    And these are the same words that you used in the

19   Columbia application about the U.S. Army Reserves, right?

20   **A.**    I feel like you're misconstruing --

21         MR. BRENNER:  Objection, misstates the document.

22         THE COURT:  Rephrase.  Let's work from the document.

23   BY MS. REWARI:

24   **Q.**    Well, you talked about being in the U.S. military

25   reserves in your application to Columbia, right?

1    **A.**    That's not at all what I said.  I talked about being an

2    Army ROTC, which is a true statement.  That is on my Columbia

3    application, that is on my essay, that is on my Columbia résumé.

4         You saw that I was awarded a scholarship for ROTC, I know

5    that you subpoenaed it, and you received it.  That's true.  I

6    never said I was part of the military ever.  I would never do

7    that.

8         MR. BRENNER:  Do you want to show her the Columbia one

9    that you represented said --

10        MS. REWARI:  Yeah, I'm going to -- I'm going to --

11   BY MS. REWARI:

12   **Q.**    Please take a look at Defendants' Exhibit 53.

13   **A.**    Okay.

14   BY MS. REWARI:

15   **Q.**    Page CU192.

16        THE COURT:  You may publish.

17   BY MS. REWARI:

18   **Q.**    Page 192, second paragraph?

19   **A.**    Okay.

20   **Q.**    And five lines down, you said --

21        MR. BRENNER:  Rule of completeness, can we start with the

22   first line, please, or second line?

23        MS. REWARI:  Sure.

24   BY MS. REWARI:

25   **Q.**    "I joined Army ROTC as I discovered the military is on

1    the cutting edge of cybersecurity programs.  I'm in the process

2    of becoming contracted, which means after I finish college, I

3    will commission as a second lieutenant in the United States Army

4    Reserves and lead a cybersecurity platoon."

5    **A.**    So, if you may recall, actually the person that wrote my

6    letter of recommendation, I know you guys tried to contact her,

7    Major Emma Schiller.  She wrote a letter of recommendation on my

8    behalf.  I'm explaining to you this paragraph right here, which

9    she gave me a contract to be commissioned if I stayed in the

10   program at ROTC.  But I was not able to because of my PTSD.  And

11   it was a cybersecurity opportunity.  That's true.  But ROTC is

12   very different than actually being in the military.

13   **Q.**    Okay.

14   **A.**    And that's offensive.

15   **Q.**    All right.  Let's go back to Defendants' Exhibit 54.

16       And under U.S. Army Reserves, it again -- strike that.

17   Excuse me.

18       Under U.S. Army Reserves, it says, "Commissioning as a

19   second lieutenant in 2018," right?

20   **A.**    That's what it says on the document.  I don't recognize

21   this document.  Like I told you in my deposition, I did not

22   submit an application this way.  I gave my application -- I gave

23   my résumé to an academic advisor.

24   **Q.**    Okay.  Underneath that position, it says, "Memorial

25   Sloan-Kettering Cancer Center."

1    **A.**     Okay.

2    **Q.**     "Cardio-oncology department researcher, 2016 to 2017,"

3    right?

4    **A.**     I don't know how any of these dates make sense, but

5    that's what it says.

6    **Q.**     Well, in the résumé that you provided Columbia, that's

7    Defendants' Exhibit 52, you list a job at Memorial

8    Sloan-Kettering cancer center in 2016, right?

9    **A.**     What I don't understand is why I would give Columbia

10   University one résumé and give PwC a different one.  That never

11   fails to baffle me.

12   **Q.**     All right.  The description on Defendants' Exhibit 54 of

13   the work at Memorial Sloan-Kettering Cancer Center, do you see

14   that?

15   **A.**     I think so, where -- 54?

16   **Q.**     Yes.

17   **A.**     There's two.  Which one?

18   **Q.**     Thank you for pointing that out.

19        Yes, so the second one says Memorial Sloan-Kettering

20   Cancer Center, 2013 to 2016, right?

21   **A.**     Again, that's what it says, but I don't recognize this

22   document.

23   **Q.**     Okay.  And it says summer intern in 2013, right?

24   **A.**     I would be like 13 years old.  That's what it says.  I

25   don't recognize that document.

1    Q.    But you were a summer intern at Memorial Sloan-Kettering

2    Cancer Center while you were in high school, right?

3    A.    Yes.  In fact, I'm very proud of it.  My junior year of

4    high school.

5    Q.    And you did work in -- with respect to research on acute

6    myeloid leukemia in that internship, right?

7    A.    Well, that's -- I did work on it, but you're

8    mischaracterizing what it says in this résumé entry.  It says,

9    "Published first author in multiple medical journals."  That is

10   insane.

11   Q.    Okay.  All right.  Below that it says, "Nordstrom

12   board/ambassador program," right?

13   A.    Yep.

14   Q.    And that is something that is also on your résumé to

15   Columbia in Defendants' Exhibit 52, right?

16   A.    Yes, that would make sense.  It's on my real résumé.

17   Like I said to you in my deposition, I have no idea what this

18   document is, and I maintain that.

19   Q.    Okay.  And the years that are listed on Defendants'

20   Exhibit 54 as the time that you worked at the Nordstrom

21   board/ambassador program are the same as what you listed in your

22   résumé to Columbia in Defendants' Exhibit 52, right?

23   A.    I'm not checking that, but sure, that sounds about right.

24   Q.    Okay.  And Equality Now, which is listed below that in

25   this résumé on Defendants' Exhibit 54, that's also on your

1    résumé to Columbia, right?

2    **A.**    If you say it is.  I can't keep flipping back and forth,

3    but that sounds about right.

4    **Q.**    Except this one says, "Co-president at Columbia

5    University," right?

6    **A.**    Yeah, that's -- I know it's insane.  I don't even think

7    as a student at Colombia there was a club such as that, so I'm

8    not even sure what this is referring to.

9    **Q.**    Okay.  And then below that, it says, "Model United

10   Nations, Rutgers University Conference 2014, representative from

11   Columbia University."

12   **A.**    Again, I'm not sure how that would even make sense.  If

13   that's what it says, that's what it says, but none of this makes

14   any sense, and I continue to maintain that.

15   **Q.**    Okay.  Well, go back to Exhibit 52, and your résumé for

16   Columbia does say, "Model United Nations, Rutgers University

17   Conference 2014" --

18   **A.**    When I was in school.

19   **Q.**    Right.  You were your high school's representative?

20   **A.**    When I was at the academy of the Holy Angels in the 10th

21   grade I was in Model UN for a very short period of time until I

22   was pulled out for an eating order.  This résumé that you're

23   showing me makes no sense to me, and I don't recognize it

24   because this is not how I submitted my application.

25   **Q.**    Okay.  The next line, and we're on the second page now,

1    "Medical enthusiast determined to succeed, copresident," right?

2    **A.**    Sure.

3    **Q.**    And that is -- that group is also listed on your Columbia

4    résumé in Defendants' Exhibit 52, right?

5    **A.**    If you say so, sure.

6    **Q.**    If you'd like to take a look it Defendants' --

7    **A.**    I trust you.  I don't recognize this résumé at all.  I've

8    been the first one to tell you, I don't recognize it, so

9    whatever is on there I don't recognize.

10   **Q.**    All right.  And "D.C. Bar" -- we're back on Defendants'

11   Exhibit 54, "D.C. Bar, 2013, nominated as a judge for mock

12   trial."

13        That's also on the résumé for Columbia, but with a

14   different year, 2012, right?

15   **A.**    It's pretty impressive, but no, I didn't -- I don't

16   recognize this document.

17   **Q.**    Right, but you -- you put that on your résumé for

18   Columbia, right?

19   **A.**    I mean, I did take part of a mock trial the D.C. Bar ran

20   in like 2012 -- that sounds about right -- but, again, I don't

21   recognize the document that you're showing me.  I told you how I

22   submitted my application numerous times.  I had no role in this

23   application.

24   **Q.**    Below that "Additional Skills," it says, "JavaScript,

25   C++, Python, HTML, SQL, Scala and C#."  Those are all computer

1    programming --

2    **A.**    I'm sorry, which one are you on now?

3    **Q.**    I'm sorry, Defendants' Exhibit 54.

4    **A.**    Okay.

5    **Q.**    Those are all computer programming languages, right?

6    **A.**    Sure.

7    **Q.**    And two below that, "Conversant in Spanish and Hindi?

8    **A.**    Well, I'm just a little bit confused.  Are you saying for

9    the -- I'm sorry, the one that you just read about the computer

10   languages, can you go back to that.  Which one are you on?

11   **Q.**    Okay.  Sure.  Yeah, let's take a look at those computer

12   languages, JavaScript, C++, Python, HTML, SQL, right?

13   **A.**    Yeah, the problem is I don't know a lot of those

14   languages that are on this fake résumé.

15   **Q.**    All right.  Well, but these languages are also listed on

16   your résumé for Columbia in Defendants' Exhibit 52, right?

17   **A.**    Yeah, there's a few of them that's on there, I'm not

18   disputing that; however, there's a bunch more that are listed.

19   **Q.**    Right.  Well -- C++ is on your Columbia résumé, right?

20   **A.**    That's correct.

21   **Q.**    And Python?

22   **A.**    That's correct.

23   **Q.**    And HTML?

24   **A.**    That's correct.

25   **Q.**    And SQL, right?

**A.**     Yes, but that's not -- I mean, there's like a bunch more

on here.  I don't recognize this document, ma'am.

**Q.**     Okay.  And, "Conversant in Spanish and Hindi."  Do you

see that on Defendants' Exhibit 54?

**A.**     Hold on for just a second.  Is 54 -- I'm sorry, which one

is -- where is that?

**Q.**     On the second page.

**A.**     Okay.

**Q.**     Two lines below the computer languages.

**A.**     I wish I was conversant and fluent in Hindi.

**Q.**     That's what your mom speaks, right?

**A.**     That's what my mom speaks, but my mom never spoke it at

home.

        THE COURT:  How much longer, Ms. Rewari?

        MS. REWARI:  I just have a couple of more minutes on this

document and then we can --

        THE COURT:  No, no, no.  How much longer generally?

        MS. REWARI:  Oh, generally?  I have a few more topics.

        THE COURT:  All right.  I'm going to let you go to a

quarter of 5 today, but we need as best we can to stay within the

timeframes that we suggest so that we can get through what we

need to do so that everyone who wants to testify can have a

chance and plaintiff can call its witnesses and you may have the

opportunity to call yours, but --

        MS. REWARI:  I understand.  I will speed it up.

1    BY MS. REWARI:

2    **Q.**    Now, you never did work ultimately at PwC as an

3    associate, right?

4    **A.**    That's correct.  I turned the job down.

5    **Q.**    And you told them that you turned the job down because

6    you were going to get a master's degree, right?

7    **A.**    No.

8    **Q.**    Oh.

9         MS. REWARI:  Your Honor, may I approach the witness?

10        THE COURT:  Give it to Ms. Barry.

11        MS. REWARI:  Thank you.

12        THE WITNESS:  Thank you.

13   BY MS. REWARI:

14   **Q.**    If you could please read that first e-mail to yourself.

15   **A.**    Which side?

16   **Q.**    Well, you can read the whole chain if you'd like.  I'm

17   looking at the most recent e-mail in time.

18   **A.**    Which is which one?

19        THE COURT:  You can approach her and show her where you're

20   trying to focus her.

21        MS. REWARI:  All right.  This one.

22        THE WITNESS:  I can't see that.

23        MS. REWARI:  Oh, sorry.

24        THE WITNESS:  Okay.  So I don't know, is there a question?

25   What would you like me to say about this document?

1    BY MS. REWARI:

2    **Q.**    Well, do you recall telling your contact at PwC that you

3    had been accepted into the Columbia master's program and

4    wouldn't be starting your job?

5    **A.**    I recall telling them I was accepted to the School of

6    General Studies and I provided them my transcript from the

7    School of General Studies.

8    **Q.**    Okay.  And if you had been -- if you had graduated from

9    high school in 2013 and you would have been a senior in 2017,

10   right?

11   **A.**    If that's what you say, sure.

12   **Q.**    But in fact, in 2017 you were a freshman in college,

13   right?

14   **A.**    Yeah.  I never denied that.

15        THE COURT:  I think this is a good spot to end our day.

16        All right, ladies and gentlemen.  I'm going to go ahead

17   and release you for the day.  Again, remember the instruction of

18   the Court.  Do not discuss the case or any aspect of the case

19   with anyone.  Stay away from print and social media.

20        Tomorrow we'll start at 10 a.m., 10 a.m.  So if you could

21   try to get here at 9:45.  I don't have an intervening docket

22   tomorrow, so we should start pretty much on time.

23        Enjoy the rest of your day.  It's real slick outside, so

24   drive carefully.

25        (Jury out at 4:42 p.m.)

```
 1              THE COURT:  You may be seated.

 2              Ms. Rewari, please listen to these questions precisely so

 3     that I can get an accurate answer.

 4              You can step down.  I'm sorry.

 5              I need an accurate representation as to how long the rest

 6     of your examination is going to be.

 7              MS. REWARI:  May I just confer with Mr. Bates?

 8              (Brief pause in proceedings.)

 9              MR. BLANCHARD:  If it helps, while they're talking, I

10     think I'm going to have a half hour or less.

11              THE COURT:  Thank you.

12              MR. KINNEY:  I'm still at a half hour.

13              (Reporter clarification.)

14              THE COURT:  He said he's still at half an hour.

15              MS. REWARI:  Your Honor, accepting your ruling about that

16     we cannot get into the issues about the closet, I think I have an

17     hour left.

18              THE COURT:  Okay.  Thank you.  And.

19              For the record, Mr. Kinney says he needs about a half an

20     hour.  And Mr. Blanchard said he needs about a half an hour?

21              MR. BLANCHARD:  Yes, sir.

22              THE COURT:  Okay.  What we also need to do is sort of plan

23     for next witnesses, and so how long do you anticipate on your

24     redirect, I guess?

25              MR. BRENNER:  Right now, where we are, I'd be surprised if
```

```
 1    I was an hour.  I would be surprised if I was an hour and
 2    hopefully less.
 3         THE COURT:  Okay.
 4         MR. BRENNER:  But I can remind the Court about some
 5    scheduling issues?
 6         THE COURT:  Yes.
 7         MR. BRENNER:  We had discussed yesterday at the end of
 8    court we have two doctors that need to go on tomorrow first
 9    thing.
10         THE COURT:  And that's why I'm trying to, to the extent
11    that I can, push the examinations because I don't want people who
12    are expensive to just sort of be sitting out there cooling their
13    heels while we try to get through what we need to get through.
14         MR. BRENNER:  Right.  So, I would really like to -- I
15    mean, we brought this up.  So I would really like to put them on,
16    interrupt the examination, and go back to the cross.
17         Although it's not ideal for our client, but I have these
18    two witnesses -- one is leaving town.  So, tomorrow is her last
19    day.  She's gone.  The other we have moved like four times.  He's
20    here in town.  He's a doctor, although retired.  I just can't
21    keep -- I'm trying --
22         THE COURT:  How long do you anticipate those doctors
23    testifying?
24         MR. BRENNER:  Ms. Pedersen is doing the witnesses, but she
25    thinks an hour to an hour and a half of direct for each.  So not
```

```
 1   long.  They shouldn't be long witnesses, but so far we're not

 2   having a great ratio of direct to cross.

 3        THE COURT:  Who is likely doing the cross on these two

 4   doctors?  That might give me a better assessment as to how much

 5   time we're talking about.

 6        MS. REWARI:  I'm doing one of them and Mr. Bates is doing

 7   the other.

 8        THE COURT:  Okay.

 9        MR. BLANCHARD:  Your Honor, I anticipate my questions for

10   Dr. Weaver would be brief.

11        THE COURT:  All right.  Let's do this:  Unless I hear an

12   objection from someone -- and I will consider the objections --

13   let's let Mr. Rewari finish her cross-examination and the two

14   defense attorneys do their examinations, and then we'll circle

15   back to the experts before your redirect of Ms. B.R.

16        MR. BRENNER:  I think, if they were locked to their time.

17   It just hasn't happened, Judge.  So, what happens if they go

18   late?  I have a witness who's literally gone for the rest of the

19   trial.

20        THE COURT:  I get it.  And obviously we need to give

21   everybody an opportunity to present their case and I really have

22   no control over that, but if you all can come to an agreement

23   that you will take the experts out of turn and interrupt the

24   cross-examination and the redirect examination of B.R., I

25   probably won't have any struggle with that because then we could
```

```
 1     move those witnesses along and get them done tomorrow.

 2          MR. BRENNER:  I'm quite confident at the end of the day

 3     yesterday we got that agreement on the record, so that's why I'm

 4     a little surprised that this is -- I don't know that it is an

 5     issue with them.

 6          MS. REWARI:  It's not an issue, Your Honor.

 7          THE COURT:  Okay.

 8          MS. REWARI:  We can start with them.

 9          THE COURT:  What I will do tomorrow, and I don't remember

10     but I'm sure I will, remind me to instruct the jury that we are

11     all in agreement that we're going to take witnesses out of turn

12     for considerations -- I'll probably come up with a better word --

13     and then we'll circle back to the other examination.

14          MR. BRENNER:  I would appreciate that, Your Honor.

15          THE COURT:  All right.  Very good.  Anything else we need

16     to do?

17          MR. BRENNER:  Nothing from the plaintiff, Your Honor.

18          THE COURT:  Thank you.

19          MS. REWARI:  Nothing further from us, Your Honor.  Thank

20     you.

21          THE COURT:  Okay.  I saw more conversation, so I was

22     expecting something else.  So, all right.

23          Ladies and gentlemen, we're going to go ahead and adjourn

24     for the day.  As I indicated to the jury, please be careful out

25     there.  It's real slick.  And things are not good on 495.  I
```

1    looked out my window and it wasn't pretty out there so, everyone,

2    please be careful.  All right.  We'll see you tomorrow.

3        (Proceedings adjourned at 4:48 p.m.)

4

5                    **C E R T I F I C A T E**

6                    I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
7    proceedings in the above-entitled matter.

8

        /s/ Scott L. Wallace                3/27/24
9       ---------------------------        ----------------
        **Scott L. Wallace, RDR, CRR**              **Date**
10         **Official Court Reporter**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| $ |
| --- |

**$50** [2] - 66:21; 67:4

| ' |
| --- |

**'B.R** [1] - 68:20
**'gang** [1] - 23:11
**'Hey** [1] - 65:13
**'Will** [1] - 65:16
**'You** [2] - 66:21; 67:4

| / |
| --- |

**/s** [1] - 145:8

| 0 |
| --- |

**005** [1] - 73:10

| 1 |
| --- |

**1** [6] - 49:6; 62:14; 96:21; 101:21; 102:12; 106:21
**10** [5] - 22:17; 23:17; 99:23; 140:20
**100** [4] - 2:3, 7, 11; 69:13
**104** [2] - 104:11, 16
**107** [1] - 5:10
**109** [1] - 5:11
**10:00** - 82:3
**10th** [1] - 135:20
**114** [1] - 5:12
**116** [1] - 5:13
**118** [3] - 5:10; 107:13, 21
**12** [2] - 48:20; 123:17
**12-year-old** [2] - 55:12; 99:25
**12-year-old's** [1] - 55:11
**120** [1] - 3:7
**126** [1] - 5:14
**12:28** [2] - 1:6; 6:2
**12th** [1] - 124:5
**13** [2] - 99:23; 133:24
**13-year** [2] - 82:18; 83:5
**13-year-old** [1] - 83:17
**133** [1] - 21:25
**14** [2] - 80:2; 84:12
**15** [4] - 27:3; 127:23; 130:15
**1520** [1] - 1:21
**16** [4] - 49:5; 53:3; 77:18; 129:18
**16th** [2] - 93:20; 94:10
**17** [2] - 53:3; 121:10
**1775** [1] - 3:10
**17th** [2] - 34:23; 35:17
**18** [4] - 62:2; 69:3; 93:11
**1801** [1] - 3:7
**192** [1] - 131:18

**1:06** [1] - 33:19
**1:19-cv-00917-RDA-WEF** [1] - 1:5
**1st** [2] - 68:19; 69:2

| 2 |
| --- |

**2** [1] - 57:25
**2-17-2012** [1] - 35:8
**20** [1] - 91:25
**2000** [1] - 116:1
**20037** [5] - 1:18; 2:16, 19, 23; 3:3
**2011** [7] - 82:19; 83:6; 93:20; 94:21; 102:3; 109:20; 129:8
**2012** [27] - 17:14; 34:19, 24; 35:17; 37:19; 38:8; 40:24; 42:25; 49:6; 57:5, 17, 25; 59:10; 62:14, 24; 63:13; 65:8; 69:14; 76:5, 12, 17; 77:7, 20; 82:10; 111:7; 136:14, 20
**2013** [7] - 116:3; 127:16; 128:5; 133:20, 23; 136:11; 140:9
**2014** [4] - 130:7, 15; 135:10, 17
**2015** [2] - 129:12, 18
**2016** [7] - 128:4, 11, 15; 129:25; 133:2, 8, 20
**2017** [14] - 112:12, 24; 113:3, 13, 24; 123:4, 17; 124:5; 126:20; 127:13; 128:4; 133:2; 140:9, 12
**2018** [2] - 130:12; 132:19
**20190** [1] - 3:11
**20191** [1] - 3:8
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:20
**2022** [1] - 104:8
**2024** [2] - 1:6; 6:1
**2029** [1] - 1:21
**21** [2] - 27:9, 16
**213-995-5720** [1] - 1:22
**21st** [3] - 94:4, 21; 102:3
**22** [5] - 35:7; 95:6, 8, 10
**2200** [4] - 2:15, 19, 22; 3:3
**22314-5798** [1] - 3:15
**22nd** [3] - 36:21; 93:8; 96:13
**23** [2] - 91:6; 98:19
**2300** [1] - 1:17
**259** [1] - 22:14
**264** [1] - 27:2
**27** [2] - 1:6; 6:1
**27th** [4] - 37:19; 38:8; 39:9; 48:15
**2800** [3] - 2:4, 8, 12
**28th** [3] - 40:24; 42:24; 43:14
**29th** [2] - 42:24; 43:20
**2:15** [1] - 80:10
**2:16** [1] - 80:15
**2nd** [17] - 2:3, 7, 11; 57:5, 17; 59:10; 63:13; 65:8; 69:14; 76:5, 12, 17, 21; 108:8, 12, 16; 109:19

| 3 |
| --- |

**3/2/2012** [1] - 58:3
**3/27/24** [1] - 145:8
**305** [2] - 123:11; 126:6
**305-539-8400** [1] - 2:9
**31** [1] - 96:21
**32** [3] - 97:11; 98:4, 17
**33** [2] - 98:4; 99:22
**33131** [3] - 2:4, 8, 12
**34** [1] - 5:4
**354** [1] - 126:23
**36** [9] - 41:2, 4, 6; 42:3; 43:3; 101:21; 102:9, 11
**38** [1] - 105:21
**39** [4] - 102:9, 12; 106:21, 25
**3:00** [2] - 80:9, 12
**3:08** [1] - 80:15
**3:10** [1] - 81:21

| 4 |
| --- |

**4** [1] - 100:21
**40** [5] - 95:2, 7, 10
**400** [1] - 3:11
**401** [1] - 3:15
**41** [4] - 91:3, 6; 95:6, 10
**43** [5] - 5:11; 109:3-5, 10
**443-584-6558** [1] - 3:16
**45** [2] - 100:19
**451** [3] - 35:4; 77:18
**48** [1] - 106:24
**495** [1] - 144:25
**4:15** [1] - 66:14
**4:30** [2] - 82:1
**4:42** [1] - 140:25
**4:48** [1] - 145:3
**4th** [1] - 109:20

| 5 |
| --- |

**5** [5] - 69:19; 96:8; 102:9, 12; 138:20
**52** [12] - 5:12; 114:6, 9, 23; 129:7; 130:3; 133:7; 134:15, 22; 135:15; 136:4; 137:16
**53** [5] - 5:13; 116:13, 23; 131:12
**54** [17] - 5:14; 121:12; 126:3, 5, 13, 22, 24; 130:6; 132:15; 133:12, 15; 134:20, 25; 136:11; 137:3; 138:4
**56** [1] - 91:25
**57** [2] - 5:8; 92:8
**581** [3] - 79:25; 80:1; 84:12
**5907** [1] - 109:15
**5:00** [2] - 82:1, 3
**5th** [3] - 77:7, 20; 82:10

## 6

**6** [4] - 5:9; 64:6, 13, 23
**610-804-1787** [1] - 2:5
**63** [2] - 96:7, 9
**64** [8] - 5:8; 56:25; 57:11, 15; 92:13, 21; 93:11
**643a** [1] - 1:17
**66** [2] - 93:1, 3
**6th** [2] - 20:7; 108:9

## 7

**73** [4] - 38:14; 45:13; 60:3; 61:22
**77** [1] - 93:24
**7th** [7] - 30:10; 44:15, 19; 107:10; 109:17; 110:14; 111:3

## 8

**8** [6] - 1:8; 46:15-18, 21
**804-788-8200** [1] - 3:4
**850-585-3414** [1] - 2:13
**8th** [2] - 111:14; 128:6

## 9

**9** [2] - 90:17; 105:14
**90067** [1] - 1:22
**9:39** [1] - 49:6
**9:45** [1] - 140:21
**9:47** [1] - 39:8

## A

**A.F** [1] - 3:6
**a.m** [3] - 49:6; 140:20
**abide** [1] - 81:2
**ability** [2] - 29:21; 30:14
**able** [13] - 11:16; 21:1; 23:16; 31:12; 34:3; 50:20; 51:25; 71:6; 72:2, 9; 74:6; 81:23; 132:10
**above-entitled** [1] - 145:7
**abrenner@bsfllp.com** [1] - 2:9
**absolutely** [7] - 12:21; 30:9; 48:13; 73:25; 81:16; 117:15; 118:25
**abuse** [6] - 49:4; 53:14; 85:24; 110:4; 117:2
**abusers** [2] - 55:5, 12
**academic** [5] - 110:10; 113:19; 117:24; 118:6; 132:23
**academy** [1] - 135:20
**Academy** [1] - 128:15
**accept** [1] - 125:24
**accepted** [4] - 120:9; 124:18; 140:3, 5
**accepting** [1] - 141:15

**accommodating** [1] - 78:25
**according** [1] - 129:25
**account** [9] - 43:6, 21; 56:3, 18; 57:4; 61:5; 63:9; 72:24; 75:12
**accounts** [3] - 69:7, 9; 84:9
**accurate** [3] - 108:4; 141:3, 5
**accused** [5] - 17:18; 31:16; 32:12; 103:13, 16
**achieve** [1] - 119:15
**acknowledging** [1] - 34:5
**Action** [1] - 1:4
**active** [1] - 91:13
**actively** [1] - 91:18
**activity** [1] - 28:12
**acts** [1] - 49:1
**actual** [3] - 26:9; 28:22; 127:19
**acute** [2] - 117:12; 134:5
**added** [1] - 101:6
**addition** [1] - 32:23
**additional** [4] - 14:21, 23; 41:8; 122:24
**Additional** [1] - 136:24
**address** [6] - 7:15; 10:1; 19:22; 20:17; 122:7; 127:2
**adjourn** [1] - 144:23
**adjourned** [1] - 145:3
**administration** [7] - 39:25; 40:9, 17; 45:1, 7; 100:24; 101:4
**administratively** [1] - 112:15
**administrators** [1] - 40:7
**admission** [3] - 113:7; 114:1, 20
**admit** [4] - 43:2; 57:10; 64:12; 116:18
**admits** [1] - 29:25
**admitted** [15] - 5:8-14; 57:15; 64:23; 107:21; 109:10; 113:15; 114:23; 116:23; 126:5
**advances** [1] - 16:6
**advisement** [4] - 8:2; 19:24; 32:19; 33:9
**advisor** [2] - 118:6; 132:23
**affidavit** [5] - 124:24; 125:7, 14, 16, 24
**afoul** [2] - 27:6, 19
**afraid** [1] - 48:17; 93:25; 101:12
**AFTERNOON** [1] - 6:1
**afternoon** [7] - 6:3; 9:23, 25; 27:22; 33:21; 34:10, 14-15; 77:20
**afterwards** [1] - 110:23
**agree** [10] - 18:16; 20:9; 24:11; 49:1; 68:15; 108:11; 123:24; 124:4; 127:6
**agreed** [1] - 52:9
**agreement** [5] - 19:5; 123:24; 143:22; 144:3, 11
**ah-ha** [1] - 50:12
**ahead** [10] - 45:4; 53:21; 80:5, 8; 82:20; 93:3; 97:13; 140:16; 144:23
**aided** [1] - 3:18
**al** [1] - 1:7
**Alan** [1] - 34:21
**alanderson@bsfllp.com** [1] - 1:23
**albeit** [1] - 23:11

**Alex** [1] - 47:16
**Alexandria** [1] - 3:15
**Alice** [4] - 65:11, 13, 17
**Alison** [1] - 1:20
**alive** [1] - 32:24
**ALL** [1] - 6:4
**allegation** [10] - 14:9; 16:2, 5, 23; 17:12; 25:17; 28:14; 73:7; 75:6
**allegations** [9] - 13:18; 18:22; 22:24; 24:11, 14; 29:23; 32:10; 71:4; 73:6
**allege** [1] - 110:7
**alleged** [7] - 15:23; 22:24; 29:24; 104:1, 13, 20
**allegedly** [2] - 51:15; 94:25
**allow** [3] - 19:21; 25:12; 72:10
**allowed** [7] - 14:6; 17:14; 20:22; 52:13; 53:19; 87:9, 11
**allowing** [2] - 12:16; 13:6
**almost** [2] - 16:13; 31:6
**alone** [1] - 102:23
**Alright** [1] - 93:17
**ALSTON** [1] - 1:12
**alternative** [1] - 39:24
**altogether** [1] - 12:16
**amended** [3] - 29:23; 104:4, 7
**amount** [1] - 120:7
**anal** [2] - 83:25; 85:18
**anally** [1] - 89:20
**analyst** [1] - 130:11
**Anderson** [1] - 1:20
**Andrew** [1] - 2:6
**ANDREWS** [4] - 2:15, 18, 22; 3:2
**Angeles** [1] - 1:22
**Angels** [1] - 135:20
**answer** [15] - 7:12; 19:3; 45:3; 48:8; 59:20; 75:14, 16; 84:3; 88:21; 95:25; 100:2; 101:23; 103:17; 122:23; 141:3
**ANSWER** [4] - 11:4; 14:19, 22; 17:16
**Answer** [1] - 11:6
**answering** [1] - 9:6
**anticipate** [3] - 141:23; 142:22; 143:9
**anticipated** [1] - 13:19
**anus** [1] - 83:18
**anyway** [1] - 11:15
**apologize** [3] - 9:24; 18:25; 33:23
**appearance** [1] - 86:10
**appearance-wise** [1] - 86:10
**APPEARANCES** [3] - 1:14; 2:1; 3:1
**appeared** [1] - 66:16
**application** [19] - 113:10, 24; 116:10, 15, 25; 117:6; 119:20; 121:25; 122:2; 123:3; 124:14; 130:19, 25; 131:3; 132:22; 135:24; 136:22
**applied** [10] - 113:12, 23; 114:4; 115:3; 117:9; 123:9; 124:13; 128:24
**apply** [2] - 113:21; 114:1
**appreciate** [5] - 34:2; 45:21; 48:25; 74:17; 90:8; 100:3; 144:14
**approach** [10] - 25:22; 47:2; 49:17;

50:6; 53:6; 69:21; 123:20; 139:9, 19
**appropriate** [2] - 18:15
**area** [1] - 28:13
**areas** [1] - 22:13
**argument** [3] - 13:9, 11; 52:14
**argumentative** [1] - 103:15
**Army** [13] - 115:14; 116:9; 120:18; 130:7, 11, 19; 131:2, 25; 132:3, 16, 18
**arrested** [2] - 72:25; 73:1
**arrived** [3] - 10:6; 63:23; 66:14
**arts** [1] - 119:16
**ashamed** [1] - 85:16
**aspect** [3] - 34:4; 81:24; 140:18
**aspirations** [1] - 119:15
**assault** [11] - 26:4, 6, 8, 10; 36:17; 73:7, 21; 74:12; 84:22; 95:23; 117:2
**assaulted** [4] - 48:2; 94:25; 95:15; 99:6
**assaulting** [2] - 55:9; 103:10
**assaults** [6] - 30:16; 53:16, 22; 55:14; 70:16
**assess** [3] - 30:5, 14; 72:2
**assessment** [3] - 12:8; 50:14; 143:4
**assistant** [1] - 13:6
**associate** [5] - 115:4, 7; 119:7; 120:10; 139:3
**associated** [2] - 44:11; 122:17
**assume** [1] - 47:22
**assuming** [1] - 42:5
**assumption** [1] - 120:8
**Assurance** [1] - 118:8
**assure** [1] - 50:22
**attempt** [1] - 31:4
**attempted** [2] - 74:12; 104:24
**attempts** [1] - 10:14
**attend** [1] - 111:15
**attended** [1] - 111:18
**attending** [1] - 121:3
**attention** [5] - 34:8; 40:18; 51:15; 84:14; 109:14
**attorney** [1] - 127:24
**attorneys** [2] - 98:9, 11; 143:14
**audio** [1] - 6:25
**audiotape** [1] - 17:24
**auditing** [1] - 118:21
**authenticated** [4] - 122:13; 125:7, 10
**authentication** [2] - 125:15; 126:9
**authenticity** [3] - 124:25; 125:1, 23
**author** [2] - 125:10; 134:9
**auto** [1] - 24:6
**Ave** [1] - 2:22
**Avenue** [4] - 2:15, 19; 3:3, 10
**avoid** [1] - 80:16
**awarded** [2] - 112:21; 131:4
**aware** [6] - 21:6; 44:10; 71:19; 72:23; 73:22; 81:14

# B

**B-O-A-Z** [1] - 73:16
**B.H** [1] - 3:6
**B.R** [19] - 1:3; 5:4; 6:14; 8:15; 16:3, 5; 21:11; 25:17; 32:21; 34:11; 42:10; 58:8; 59:24; 60:11, 16, 20; 71:15; 143:15, 24
**B.R.'s** [3] - 71:15
**babe** [1] - 58:9
**backfired** [1] - 37:13
**background** [1] - 9:9
**backpack** [2] - 54:18, 21
**baffle** [1] - 133:11
**bag** [1] - 11:24
**Bar** [1] - 136:10, 19
**BARAN** [1] - 1:16
**Barry** [2] - 35:9; 139:10
**base** [1] - 31:23
**based** [8] - 12:2; 20:14; 25:6; 31:1; 71:1; 73:13; 97:21; 125:6
**basement** [11] - 102:18, 22, 24; 103:2, 9, 12, 14, 21; 104:2, 21; 107:1
**basic** [1] - 78:25
**basis** [4] - 16:8; 33:11; 67:24; 87:11
**Bates** [10] - 2:14; 14:16; 22:14; 42:5, 9-10; 58:11; 62:17; 141:7; 143:6
**battered** [1] - 104:22
**became** [2] - 74:15; 117:16
**become** [3] - 24:8; 119:6; 120:19
**becomes** [1] - 24:8
**becoming** [2] - 115:14; 132:2
**bee** [3] - 129:1, 6
**BEFORE** [1] - 1:12
**beginning** [4] - 8:21; 9:7; 32:11; 66:15
**begot** [1] - 16:11
**behalf** [2] - 124:21; 132:8
**belief** [1] - 87:11
**believes** [6] - 24:25; 25:3, 6; 38:19; 51:21
**below** [6] - 134:11, 24; 135:9; 136:24; 137:7; 138:9
**benefits** [1] - 121:6
**bent** [1] - 66:23
**best** [10] - 12:8; 13:9; 17:22; 23:12; 48:19; 75:11; 88:21; 89:11; 110:11; 138:20
**better** [3] - 65:15; 143:4; 144:12
**between** [8] - 15:13; 19:9; 26:5; 39:5; 82:1; 96:19; 106:14, 18
**beyond** [1] - 10:25
**binder** [10] - 35:2; 38:15; 41:3; 57:1; 62:2; 66:22; 77:17; 79:16; 90:16; 107:14
**bit** [6] - 6:13; 24:18; 33:9; 57:21; 63:11; 137:8
**black** [4] - 38:15; 45:23; 57:1; 107:14
**BLANCHARD** [10] - 7:4; 30:21; 32:1; 74:20; 80:16, 24; 81:5; 141:9, 21; 143:9
**Blanchard** [3] - 3:9; 30:20; 141:20

**blanks** [1] - 18:1
**blessed** [1] - 118:3
**blocked** [1] - 99:12
**BO** [1] - 42:5
**board** [1] - 25:9
**Board** [5] - 13:11; 20:24; 27:25; 34:13; 78:23
**Board's** [1] - 14:6
**board/ambassador** [2] - 134:12, 21
**boarding** [1] - 111:16, 23
**Boaz** [5] - 72:15; 73:14, 16, 18, 20
**body** [6] - 66:24; 88:3, 6; 104:2, 23
**BOIES** [4] - 1:20; 2:3, 7, 11
**book** [2] - 65:4; 130:4
**bottom** [7] - 8:9; 27:16; 35:7; 58:12; 59:4; 62:16; 117:18
**bound** [1] - 30:21
**boy** [2] - 50:17; 83:17
**boyfriend** [2] - 48:4; 51:12
**boys** [3] - 88:25; 89:2
**Boys** [1] - 89:2
**BR** [1] - 109:15
**bra** [2] - 67:1
**breached** [1] - 24:6
**break** [2] - 80:5; 82:9
**breast** [1] - 67:2
**breasts** [1] - 83:18
**Brenner** [12] - 2:6; 10:2; 11:2; 15:1; 18:24; 19:8; 21:7; 39:11; 50:10; 107:5; 113:7; 125:2
**BRENNER** [103] - 6:7, 12, 18, 22; 7:2, 7, 15, 18; 8:11, 13, 16, 18, 20; 9:1; 20:18; 21:20, 22; 22:5, 9, 16, 18, 20; 24:13; 25:23; 26:1, 3, 8, 23; 33:12, 14, 16, 18; 41:4, 7, 10, 13; 42:8; 43:23; 46:5; 49:17; 50:6, 11, 18, 22; 51:20, 23; 52:5, 9, 20, 22; 57:12; 61:15; 64:15; 69:20; 71:14; 72:5, 12, 14, 17; 73:3, 5, 10, 16, 18; 74:4; 80:13; 82:20; 83:7, 12; 93:13; 95:10, 12; 103:15; 105:8; 107:15, 17, 19; 109:8; 114:8, 10, 12, 20; 116:20; 121:16, 23; 122:14; 125:3, 8, 13, 18, 22; 130:21; 131:8, 21; 141:25; 142:4, 7, 14, 24; 143:16; 144:2, 14, 17
**Brenner's** [2] - 28:5; 79:16
**brief** [1] - 143:10
**Brief** [9] - 47:7; 64:21; 78:14; 79:18; 84:19; 96:10; 97:14; 102:13; 141:8
**bring** [2] - 6:6; 81:10
**bringing** [1] - 11:9
**brings** [1] - 9:1
**Brittany** [1] - 2:2
**britzoll@gmail.com** [1] - 2:5
**bro** [2] - 45:25; 46:7
**broadly** [1] - 7:15
**brought** [5] - 17:17; 24:4; 54:17, 20; 142:15
**Bruce** [1] - 3:9
**bruce.blanchard@ofplaw.com** [1] -

3:12
**building** [1] - 15:16
**bullying** [8] - 15:24; 16:4; 35:24; 36:13; 37:5, 25; 38:5; 59:22
**bunch** [2] - 137:18; 138:1
**burden** [1] - 25:8
**Burton** [1] - 2:21
**burtons@huntonak.com** [1] - 2:24
**bus** [4] - 66:13, 15; 67:17; 90:1
**businesses** [1] - 33:24
**butcher** [1] - 11:24
**BY** [71] - 5:4; 34:12; 35:14; 39:4; 41:15; 42:13, 20; 43:12; 44:14; 45:5; 46:11, 20; 47:9; 49:22; 53:1, 9, 12; 54:1, 10; 55:17; 57:16, 23; 61:21; 62:9; 63:7; 65:1; 74:24; 75:18; 77:16, 24; 78:16; 79:4, 23; 82:8, 22; 83:4, 15; 84:10; 88:23; 91:24; 93:18; 95:13; 96:11; 97:16; 102:15; 103:19; 104:19; 105:11; 108:1; 109:2, 12; 112:23; 113:2; 114:16; 115:2; 116:24; 121:21; 122:1; 123:6, 22; 124:3; 126:14, 18; 130:23; 131:11, 14, 17, 24; 139:1, 13; 140:1

## C

**C#** [1] - 136:25
**C.K** [76] - 8:22; 10:19; 16:3, 6; 17:14; 29:7, 11, 16; 39:16, 20, 25; 40:9, 14, 18, 20, 23; 42:3; 43:13; 45:11, 23-24; 46:4; 49:15; 51:9; 54:12, 14; 55:13; 61:4; 65:13, 18-19, 22; 66:8, 16; 67:14, 16, 24-25; 68:11; 69:12, 15; 70:6; 72:25; 73:6, 20, 25; 74:9; 75:1; 76:5, 13, 17; 79:9, 12; 89:16, 20; 90:1, 12; 94:25; 95:22; 96:19, 25; 97:9, 17, 20, 24; 98:14, 22; 99:11, 18; 100:17; 101:16, 19; 105:23
**C.K.'s** [5] - 41:16; 42:23; 44:15; 68:10; 100:5
**CA** [1] - 1:22
**cadet** [2] - 115:14, 16
**Caitlin** [2] - 47:16, 21
**campus** [11] - 15:13, 15, 23, 25; 16:3-5, 9; 23:1; 36:17
**Cancer** [4] - 132:25; 133:13, 20; 134:2
**cancer** [2] - 117:11; 133:8
**cannot** [2] - 12:10; 141:16
**captain** [1] - 116:12
**captured** [1] - 19:13
**card** [4] - 108:2, 16; 109:16; 110:14
**Cardio** [1] - 133:2
**Cardio-oncology** [1] - 133:2
**care** [4] - 33:15, 17, 24; 59:22
**careful** [2] - 144:24; 145:2
**carefully** [1] - 140:24
**Carson** [3] - 22:25; 109:17; 122:10
**case** [46] - 10:19; 11:11; 12:24; 17:25;

18:2, 4; 20:15; 23:5; 24:3, 6, 8, 17, 24; 25:7; 28:14; 29:8, 24; 30:12; 31:6; 32:11; 33:7; 34:4; 41:24; 56:23; 61:8, 10; 63:9; 75:17; 77:12; 78:7; 81:24; 84:7; 103:13, 16, 20; 110:6; 120:16; 127:22; 140:18; 143:21
**case-in-chief** [3] - 17:25; 18:2, 4
**cases** [3] - 24:11; 28:8; 31:4
**casualty** [1] - 117:3
**cat** [2] - 11:24
**catch** [1] - 25:23
**caught** [1] - 33:6
**Cell** [1] - 3:16
**center** [2] - 117:11; 133:8
**Center** [4] - 132:25; 133:13, 20; 134:2
**Century** [1] - 1:21
**certain** [4] - 24:14; 26:14; 31:7; 105:6
**certainly** [1] - 27:13
**certainness** [1] - 94:15
**certify** [1] - 145:6
**chain** [2] - 139:16
**chair** [1] - 86:14
**challenging** [4] - 117:20; 125:13, 18
**Chambers** [39] - 6:14; 8:8; 9:18; 14:3, 9; 15:9; 19:10; 20:11; 87:13, 16; 89:14; 90:11, 14, 23; 91:8, 19; 92:2, 16; 94:12, 23; 95:21; 96:2, 5, 18; 97:8; 99:3; 100:15, 23; 101:14, 18; 102:16; 103:9; 105:12; 106:6, 8-9, 17
**champion** [4] - 115:23; 128:23; 129:7
**championship** [3] - 116:6; 128:18; 129:2
**chance** [5] - 53:4; 65:12; 89:8; 104:25; 138:23
**change** [3] - 20:6; 110:15, 25
**changed** [1] - 69:11
**characterization** [3] - 41:21; 85:14; 112:10
**characterizing** [3] - 48:7, 9; 83:8
**chased** [1] - 50:16
**chat** [1] - 68:22
**chatting** [2] - 45:2, 9
**check** [1] - 41:19
**checking** [1] - 134:23
**chemicals** [1] - 24:19
**chick** [1] - 58:8
**chief** [3] - 17:25; 18:2, 4
**child** [1] - 85:24
**Child** [1] - 86:3
**Children** [2] - 129:12, 16
**C▇▇▇▇** [14] - 25:7; 26:10; 40:12; 43:15; 46:1, 10, 12; 48:18; 50:1; 55:9; 76:25; 77:1; 101:1, 4
**C▇▇▇▇** [1] - 68:9
**circle** [2] - 143:14; 144:13
**circumstance** [2] - 29:16
**circumstances** [6] - 20:5; 44:9, 11; 50:15; 97:19; 113:20
**City** [3] - 118:12; 129:11, 15

**civil** [1] - 24:10
**Civil** [1] - 1:4
**claim** [4] - 25:10; 29:9; 54:20; 110:9
**claimed** [3] - 54:14, 17; 129:17
**claiming** [2] - 30:13; 110:6
**clarification** [1] - 141:13
**clarify** [2] - 40:15; 110:21
**class** [9] - 110:18-20, 22; 113:3; 120:5; 127:15
**classes** [9] - 112:7, 11, 24-25; 120:5, 11; 128:4
**clean** [1] - 71:22
**cleaner** [1] - 83:1
**cleans** [1] - 72:18
**clear** [13] - 8:20; 9:7; 23:6; 24:17, 21; 25:14; 45:8; 73:13, 18; 80:21; 81:11; 110:23; 125:19
**clearly** [1] - 92:25
**clerk** [1] - 79:20
**CLERK** [2] - 22:4; 46:18
**clerks** [1] - 41:9
**client** [7] - 22:2; 31:8, 16; 32:5; 118:14; 119:3; 142:17
**clients** [1] - 32:10
**clients'** [1] - 118:21
**close** [2] - 13:22; 81:15
**closed** [6] - 14:18, 22; 15:2, 7; 17:5, 11
**closet** [15] - 22:25; 24:20; 29:6, 12, 17; 33:1; 51:3, 6, 8, 10; 53:22; 54:3; 59:8; 141:16
**closets** [1] - 32:14
**closing** [1] - 11:22
**clothespins** [2] - 54:20, 24
**cloud** [1] - 32:12
**club** [1] - 135:7
**Co** [4] - 129:21, 25; 135:4
**co** [1] - 111:23
**co-ed** [2] - 111:23
**Co-president** [1] - 135:4
**code** [1] - 99:25
**code/type** [1] - 35:21
**College** [4] - 112:7; 113:19; 115:16; 127:7
**college** [9] - 112:25; 117:23; 118:11, 13; 120:1, 13; 121:3; 132:2; 140:12
**colloquy** [1] - 11:22
**Colombia** [1] - 135:7
**Columbia** [46] - 113:8, 10, 13, 18-19, 21, 23; 114:17; 115:3, 13; 116:10, 15; 117:6; 119:20, 24; 120:9; 121:2; 127:7, 11-12; 128:8, 11; 129:3, 6, 25; 130:19, 25; 131:2, 8; 133:6, 9; 134:15, 22; 135:1, 4, 11, 16; 136:3, 13, 18; 137:16, 19; 140:3
**combining** [1] - 119:17
**comfort** [1] - 103:4
**comfortable** [3] - 16:2; 86:8, 11
**coming** [7] - 10:21; 12:1; 13:4; 21:23; 25:13; 26:11; 74:18

**comment** [3] - 60:19, 25; 88:20
**commission** [1] - 132:3
**commissioned** [1] - 132:9
**commissioning** [1] - 130:12
**Commissioning** [1] - 132:18
**common** [1] - 26:9
**communication** [2] - 101:15, 19
**communications** [1] - 118:16
**community** [1] - 65:12
**companies** [1] - 118:15
**competitive** [1] - 118:7
**complainant** [1] - 71:15
**complaint** [14] - 16:9; 22:24; 24:5;
27:12; 29:23; 37:25; 38:5; 63:14; 75:1,
3; 78:22; 104:4, 24
**complaints** [2] - 71:20; 105:2
**complete** [1] - 6:24
**completed** [2] - 22:21; 112:3
**completely** [3] - 7:13; 12:10; 103:22
**completeness** [2] - 93:13; 131:21
**completing** [1] - 120:24
**computer** [7] - 3:18; 119:2; 136:25;
137:5, 9, 11; 138:9
**computer-aided** [1] - 3:18
**concept** [1] - 12:15
**concepts** [1] - 7:8
**concern** [5] - 22:12; 24:2; 56:21;
70:18; 72:5
**concerned** [5] - 30:19; 33:25; 55:11;
81:2; 125:24
**concerning** [3] - 55:10; 60:17
**conclude** [1] - 15:22
**concluded** [4] - 21:15; 52:25; 74:23
**conclusion** [2] - 10:18; 13:18
**conclusions** [2] - 10:9; 12:5
**concur** [2] - 81:7
**condition** [1] - 120:22
**conducted** [1] - 75:13
**confer** [1] - 141:7
**Conference** [2] - 135:10, 17
**confess** [1] - 39:16
**confident** [3] - 29:6, 20; 144:2
**confirming** [1] - 18:8
**conflating** [2] - 72:12; 74:5
**confront** [1] - 24:21
**confuse** [1] - 63:2
**confused** [8] - 73:23; 84:25; 86:20;
89:24; 92:18; 93:22; 95:16; 137:8
**confusing** [4] - 63:5; 73:5; 90:9; 98:13
**connect** [1] - 69:4
**connection** [5] - 16:10; 99:18; 100:9,
13
**consent** [1] - 104:23
**consider** [2] - 16:24; 143:12
**considerations** [1] - 144:12
**consistent** [5] - 7:23; 64:15; 103:6
**C▮▮▮▮▮▮** [17] - 38:12; 39:5, 13, 23;
40:8, 21; 44:25; 45:6, 9, 23; 51:2; 60:6;
61:11, 24; 62:10; 68:20; 69:7

**Constantine's** [2] - 47:18, 21
**consulting** [1] - 118:14
**Cont** [2] - 2:1; 3:1
**contact** [8] - 82:18; 83:6; 85:6; 89:16;
90:12; 106:10; 132:6; 140:2
**contacted** [2] - 39:20; 40:21
**content** [1] - 80:25
**context** [14] - 12:18; 18:16; 24:10;
30:6; 33:7; 37:14; 49:19; 84:7; 88:16;
101:10; 103:22; 106:22
**continue** [3] - 32:18; 53:24; 84:5;
120:23; 135:14
**CONTINUED** [2] - 5:4; 34:11
**continued** [2] - 13:11; 15:21; 41:19
**continues** [2] - 53:4; 117:19
**continuing** [1] - 80:19
**contract** [1] - 132:9
**contracted** [1] - 132:2
**contracting** [1] - 115:14
**contributed** [1] - 37:8
**control** [1] - 143:22
**controlling** [1] - 9:5
**Conversant** [1] - 137:7
**conversant** [2] - 138:3, 10
**conversation** [8] - 15:8; 19:9; 36:14;
74:11; 76:4, 12; 97:4; 144:21
**conversations** [5] - 11:7; 19:13, 17;
31:3; 79:21
**cooling** [1] - 142:12
**cooperated** [1] - 15:18
**cooperation** [1] - 14:4
**copies** [1] - 45:15
**copresident** [1] - 136:1
**copy** [4] - 22:2; 41:8; 45:16; 104:6
**corner** [2] - 27:3; 58:4
**correct** [92] - 8:18; 14:18; 17:16;
34:19, 24; 36:13, 21; 37:22; 39:10, 15,
19, 22; 40:22; 41:17, 20; 46:9, 13;
47:18, 25; 48:2; 49:8, 12; 50:3; 55:19;
57:17; 58:16; 59:9, 15; 60:17; 61:14;
62:11, 24-25; 63:20, 24; 65:8, 23-24;
67:14, 18; 68:5; 69:13; 84:2; 85:10;
86:6; 87:25; 88:14; 90:3, 12, 24; 92:13,
17; 97:17; 100:6; 101:8; 103:9; 104:2;
108:9; 111:3; 112:9; 113:11; 114:1;
115:5, 10, 16-17, 21, 24; 116:10, 16;
117:13; 118:4, 9-10, 18; 119:19, 23;
121:8; 122:2; 124:6; 127:13, 16, 18;
128:7; 137:20, 22, 24; 139:4; 145:6
**correctly** [11] - 48:7, 10; 66:10, 18;
67:7, 11-12; 68:2, 13, 25
**couch** [3] - 86:12
**counsel** [5] - 9:19; 41:10; 43:23; 61:17
**count** [1] - 24:5
**country** [1] - 118:12
**counts** [1] - 24:13
**County** [6] - 27:24; 34:13; 58:14;
76:24; 78:23; 128:6
**couple** [2] - 39:12; 138:15
**course** [2] - 26:17; 119:14

**courses** [2] - 115:19; 119:17
**court** [4] - 12:1; 14:5; 28:8; 142:8
**Court** [20] - 3:13; 12:3, 8, 23, 25; 13:7;
19:20, 22; 20:20; 21:6; 25:12; 33:10;
38:20; 80:17; 126:8; 140:18; 142:4;
145:10
**Court's** [11] - 11:14; 30:18; 32:18;
33:25; 34:3; 74:22; 80:23; 81:2, 23;
91:21
**Courthouse** [1] - 3:15
**create** [1] - 29:1
**created** [1] - 39:16
**credibility** [13] - 10:19; 12:5, 17; 13:1;
18:20; 20:12; 29:6, 10, 21; 30:5, 14;
31:15; 51:13
**criminal** [2] - 28:9; 33:25
**critical** [1] - 9:2
**cross** [12] - 11:19; 14:6, 16; 22:1;
26:17; 51:24; 73:19; 142:16; 143:2, 13,
24
**CROSS** [2] - 5:4; 34:11
**cross-examination** [6] - 11:19; 14:6;
22:1; 51:24; 143:13, 24
**CROSS-EXAMINATION** [2] - 5:4;
34:11
**cross-examine** [1] - 26:17
**crossing** [1] - 66:16
**CRR** [3] - 3:13; 145:6, 9
**cruel'** [1] - 67:6
**cry** [3] - 56:19, 24; 61:2
**CU192** [1] - 131:15
**current** [1] - 42:4
**custodian** [3] - 122:13; 124:24; 125:17
**cut** [3] - 17:4; 89:5; 120:2
**cutting** [1] - 132:1
**cyber** [1] - 118:21
**Cyber** [1] - 126:19
**cyberbullying** [1] - 73:11
**cybersecurity** [6] - 115:15; 119:1;
120:20; 132:1, 4, 11
**Cybersecurity** [3] - 118:8; 126:19;
130:10

# D

**D.C** [3] - 136:10, 19
**D.N** [1] - 104:21
**D.N.'s** [2] - 16:6; 104:13
**daily** [2] - 10:4; 67:24
**damages** [1] - 31:8
**Date** [1] - 145:9
**date** [12] - 57:22; 58:3, 25; 62:13; 77:8;
92:20, 24-25; 94:20; 123:16; 124:4
**dated** [1] - 123:17
**dates** [2] - 92:19; 133:4
**dating** [1] - 37:13
**daughter** [1] - 11:5
**David** [13] - 101:25; 102:7, 21, 23;
103:2, 10, 16, 20, 23; 105:23; 106:4,

10, 18
**David's** [1] - 102:17
**days** [7] - 36:20; 57:24; 84:1; 85:20; 86:25; 87:3; 94:8
**DC** [5] - 1:18; 2:16, 19, 23; 3:3
**deal** [2] - 20:19; 26:25
**dealt** [1] - 23:21
**dean's** [1] - 128:8
**death** [1] - 101:11
**decide** [2] - 13:2; 108:25
**decided** [2] - 24:5, 24; 78:18
**decision** [1] - 21:9
**declined** [1] - 110:10
**Defendant** [3] - 2:14; 3:2, 9
**defendant** [7] - 21:25; 23:7, 19, 22; 24:2; 25:14; 27:9
**defendant's** [1] - 126:24
**defendants** [4] - 10:13, 17; 25:20; 32:8
**Defendants** [2] - 1:8; 3:5
**Defendants'** [55] - 5:8-14; 38:14; 41:2; 42:3; 43:2; 45:13; 56:25; 57:10, 15; 60:3; 61:22; 62:1; 64:5, 12, 23; 69:3, 19; 90:16; 105:14; 107:13, 21; 109:3, 10; 114:6, 23; 116:14, 18, 23; 121:12; 123:11; 126:2, 5, 22; 130:3, 6; 131:12; 132:15; 133:7, 12; 134:15, 19, 22, 25; 136:4, 6, 10; 137:3, 16; 138:4
**defense** [5] - 9:19; 13:6; 20:13; 31:23; 143:14
**defined** [1] - 33:3
**definitive** [1] - 94:15
**degree** [2] - 120:24; 139:6
**deleted** [1] - 60:7
**deliberate** [2] - 13:9; 17:2
**deliberately** [1] - 13:12
**deliver** [1] - 101:8
**delivering** [1] - 101:11
**denied** [4] - 10:13; 97:17, 20; 140:14
**Department** [4] - 58:14; 78:22; 129:12, 15
**department** [7] - 10:10; 15:10; 55:18; 75:20; 85:21, 25; 133:2
**dependent** [2] - 19:23; 32:20
**depose** [1] - 31:21
**deposed** [2] - 8:15
**deposition** [13] - 19:12; 28:15, 18, 21; 47:20; 48:23; 49:25; 67:19; 123:9; 124:13, 15; 132:21; 134:17
**depth** [1] - 48:23
**deputy** [1] - 79:20
**describe** [6] - 49:3; 53:17; 88:9, 11; 103:1, 8
**described** [9] - 65:21; 68:15; 74:12; 76:6; 78:6; 89:19, 22, 25; 90:12
**describes** [1] - 67:16
**description** [6] - 74:2; 79:9; 82:11; 89:15; 133:12
**DESCRIPTION** [1] - 5:6
**despite** [1] - 70:15

**detail** [2] - 18:23; 20:21
**details** [3] - 14:10; 37:4; 88:4
**Detective** [37] - 8:8; 14:3, 8; 15:9; 19:10; 20:11; 23:23; 87:13, 16; 89:14; 90:11, 14, 23; 91:8, 18; 92:2, 16; 94:12, 23; 95:21; 96:2, 5, 18; 97:8; 99:3; 100:15, 23; 101:14, 18; 102:16; 103:9; 105:12; 106:6, 9, 17
**detective** [8] - 8:17; 21:14; 75:19, 23; 81:13; 83:16; 85:21, 24
**determination** [5] - 11:14; 12:19; 20:3, 12; 33:10
**determinations** [2] - 12:6; 13:1
**determined** [2] - 15:12; 136:1
**developed** [1] - 33:9
**develops** [1] - 20:2
**deviating** [1] - 120:3
**diagram** [1] - 88:3
**die** [1] - 60:20
**different** [12] - 7:3; 16:10; 28:6; 73:6; 92:24; 115:7; 120:4; 123:16; 124:14; 132:12; 133:10; 136:14
**difficult** [4] - 91:4; 107:9, 11
**difficulty** [2] - 19:19; 84:1
**digitally** [1] - 89:23
**diploma** [6] - 112:8, 17, 19; 113:3, 5; 128:3
**direct** [14] - 10:25; 17:13; 22:21; 39:12; 54:23; 56:7; 59:25; 84:14; 91:20, 22; 104:14; 109:14; 142:25; 143:2
**directed** [2] - 10:17; 83:10
**direction** [1] - 18:6
**directly** [4] - 15:14; 16:1; 71:25; 83:11
**dirty** [1] - 68:11
**disabilities** [1] - 113:20
**disagree** [1] - 60:18
**disbelieve** [1] - 30:7
**discern** [1] - 11:17
**disclosure** [1] - 19:14
**discovered** [1] - 131:25
**discovery** [2] - 61:15; 122:19
**discrete** [1] - 84:8
**discuss** [4] - 34:4; 36:8; 81:24; 140:18
**discussed** [12] - 35:24; 36:3; 37:4, 12, 16-17, 24; 49:1; 64:16; 117:5; 142:7
**discussing** [1] - 38:4
**discussion** [6] - 36:13, 16; 50:9; 52:25; 69:23; 74:23
**Discussion** [2] - 6:21; 83:13
**dismiss** [1] - 24:11
**disorder** [1] - 129:19
**dispose** [2] - 26:24
**disputing** [1] - 137:18
**dissect** [1] - 100:1
**distinctions** [3] - 127:25; 128:7, 19
**District** [2] - 3:14
**DISTRICT** [3] - 1:1, 12
**district** [2] - 112:15
**diversity** [1] - 119:16

**docket** [2] - 34:1; 140:21
**doctor** [2] - 22:11; 142:20
**doctors** [3] - 142:8, 22; 143:4
**document** [55] - 22:5; 24:20; 25:13; 26:23; 27:1, 18; 29:4, 13; 42:17-19, 21-22; 44:2, 5; 58:11; 64:19; 65:3; 73:10; 74:7; 84:11; 90:20; 91:3; 122:12, 23; 123:1, 7-8, 13; 125:7; 126:15; 127:6, 9-10; 128:13, 17, 21; 129:10, 14, 20; 130:9, 14, 17, 21-22; 132:20; 133:22, 25; 134:18; 136:16, 21; 138:2, 16; 139:25
**done** [18] - 6:15; 8:1; 12:11; 23:7; 24:15; 25:21; 26:19; 27:19; 28:20; 49:15; 50:13, 19; 73:13; 100:25; 144:1
**door** [15] - 10:24; 13:4, 24; 20:14, 16; 21:13; 50:12; 51:24; 52:3, 6, 12; 72:10; 80:18; 106:3
**doubles** [3] - 115:23; 128:18, 22
**doubt** [1] - 7:8
**down** [20] - 3:4; 18:20; 21:17; 24:4, 22; 35:21; 58:7, 11; 62:16; 63:18; 66:23; 69:24; 70:19; 92:23; 110:7; 131:20; 139:4; 141:4
**Dr** [6] - 13:7, 14; 15:11; 22:7; 85:10; 143:10
**drastically** [1] - 69:10
**draw** [1] - 51:14
**drifting** [1] - 81:15
**drive** [1] - 140:24
**Drive** [1] - 3:7
**driven** [1] - 66:15
**during** [15] - 10:22; 11:21; 13:4, 12, 24; 14:5; 16:14; 23:8; 44:9; 56:7, 10; 78:5; 79:8; 82:17; 94:24
**DX** [1] - 73:10

## E

**e-mail** [7] - 62:10; 69:2, 5; 122:7; 127:2; 139:14, 17
**early** [5] - 31:14; 95:22; 112:3, 6; 117:10
**earlyish** [2] - 66:12; 76:6
**earned** [1] - 112:21
**easier** [3] - 65:4; 98:9; 104:6
**East** [1] - 1:21
**EASTERN** [1] - 1:2
**Eastern** [1] - 3:14
**eating** [2] - 129:19; 135:22
**ed** [2] - 111:23
**edge** [1] - 132:1
**Education** [1] - 78:22
**education** [7] - 13:13; 14:2; 78:21; 117:3; 119:16; 121:7; 127:7
**effect** [1] - 6:16
**effort** [1] - 22:23
**eight** [1] - 107:15
**either** [3] - 65:19; 79:20; 108:13

**elaborate** [1] - 58:20
**electronic** [1] - 32:15
**Elementary** [1] - 108:8
**elementary** [1] - 108:2
**eliciting** [1] - 108:24
**ELLIKER** [15] - 9:21, 24; 10:17; 11:18; 12:21; 14:25; 16:12, 19, 22; 17:2, 10; 18:5, 12, 18; 20:4
**Elliker** [3] - 3:2; 9:21; 21:3
**Email** [12] - 1:19, 23; 2:5, 9, 13, 17, 20, 24; 3:4, 8, 12, 16
**embarrassed** [1] - 85:15
**embarrassing** [1] - 61:2
**Emma** [2] - 116:12; 132:7
**emphasize** [1] - 11:7
**Employment** [1] - 121:6
**end** [6] - 38:23; 108:5; 119:6; 140:15; 142:7; 144:2
**ended** [2] - 109:19, 21
**endured** [2] - 49:4; 53:14
**engaged** [1] - 13:19
**enjoy** [3] - 80:8; 107:12; 140:23
**enjoyed** [1] - 110:11
**enthusiast** [1] - 136:1
**entire** [5] - 10:14; 32:5; 89:9; 92:19; 110:9
**entitled** [5] - 17:24; 26:17; 29:5; 30:4; 145:7
**entry** [2] - 8:9; 134:8
**environment** [1] - 117:21
**Equality** [1] - 134:24
**erased** [1] - 99:13
**Esq** [11] - 1:15, 20; 2:2, 6, 10, 14, 18, 21; 3:2, 5, 9
**essay** [5] - 116:10, 14; 117:8, 18; 131:3
**essentially** [6] - 15:4; 23:13; 24:16; 30:4; 33:8; 43:5
**et** [1] - 1:7
**evaluation** [1] - 35:19
**evening** [1] - 10:3
**events** [1] - 32:5
**eventually** [1] - 63:17
**evidence** [19] - 10:22; 11:16; 20:2, 5; 22:23; 23:3; 25:8; 28:7, 9; 32:9, 17; 38:15, 17, 19; 43:24; 62:3, 5; 108:20, 23
**evidentiary** [2] - 13:14; 20:3
**exact** [1] - 88:1
**exactly** [15] - 14:16, 25; 17:7; 34:25; 35:25; 56:12; 60:1; 62:12; 79:13; 85:23; 89:3; 104:3; 112:10; 127:14
**exam** [14] - 76:20; 77:6, 10; 79:6, 8, 11, 15; 82:10, 18; 85:9; 87:1; 89:17
**EXAMINATION** [2] - 5:4; 34:11
**examination** [15] - 11:19; 14:6; 21:24; 22:1, 21; 39:12; 50:16; 51:24; 56:7; 141:6; 142:16; 143:13, 24; 144:13
**examinations** [2] - 142:11; 143:14

**EXAMINATIONS** [1] - 5:3
**examine** [1] - 26:17
**example** [2] - 24:4; 108:12
**except** [3] - 101:6; 118:13; 135:4
**exchanged** [1] - 28:2
**exchanging** [1] - 21:23
**excised** [1] - 24:16
**exciting** [1] - 118:13
**exclude** [4] - 10:8, 14; 28:7
**excuse** [10] - 21:14; 32:13; 40:25; 45:23; 51:5; 68:9; 83:16; 98:4; 111:6; 132:17
**excusing** [1] - 103:10
**exercise** [1] - 117:12
**exercises** [1] - 115:19
**exhibit** [7] - 21:24; 23:6; 28:1; 43:4; 64:7; 94:4
**Exhibit** [63] - 5:8-14; 35:4; 38:14; 41:2; 42:3; 43:3; 45:13; 56:25; 57:11, 15; 60:3; 61:22; 62:2; 64:6, 13, 23; 69:3, 19; 77:18; 79:25; 80:1; 84:12; 90:17; 93:24; 105:14; 107:13, 21; 109:3, 10; 114:6, 23; 116:13, 19, 23; 121:12; 123:11; 126:3, 5, 22; 129:7; 130:3, 6; 131:12; 132:15; 133:7, 12; 134:15, 20, 22, 25; 135:15; 136:4, 11; 137:3, 16; 138:4
**Exhibits** [1] - 35:3
**exhibits** [2] - 21:23; 28:2
**EXHIBITS** [1] - 5:5
**expand** [2] - 38:3
**expected** [1] - 28:14
**expecting** [1] - 144:22
**expensive** [1] - 142:12
**experience** [2] - 29:2; 129:11
**experiences** [1] - 115:3
**expert** [1] - 21:12
**experts** [3] - 28:16; 143:15, 23
**explain** [6] - 7:8; 25:2; 67:19; 87:7; 125:4
**explained** [2] - 14:10; 123:9
**explaining** [2] - 13:16; 132:8
**explanations** [1] - 39:12
**explored** [1] - 37:7
**exposed** [1] - 103:21
**exposing** [1] - 103:13
**exposure** [1] - 103:8
**expressing** [1] - 56:21
**extended** [2] - 115:10
**extent** [7] - 10:13; 15:18; 19:22; 34:6; 49:4; 87:24; 142:10
**extra** [1] - 104:6
**extremely** [1] - 118:7

**F**

**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**face** [2] - 49:7; 97:5

**Facebook** [22] - 40:23; 41:16, 23; 42:23; 43:6; 44:10, 15, 18; 56:6, 10, 14, 20; 57:4; 58:25; 59:19; 68:21; 69:6, 9; 72:24; 75:25; 76:2
**facing** [2] - 118:14; 119:3
**fact** [21] - 11:10; 12:4, 10, 23; 13:14; 15:22; 16:14; 17:12; 18:9; 19:23; 23:2; 24:4; 26:14; 27:5; 28:16, 20; 36:16; 38:14; 76:19; 134:3; 140:12
**fact-finder** [3] - 12:23; 15:22; 28:20
**facts** [1] - 19:24
**factual** [1] - 19:21
**Fahey** [1] - 1:15
**fails** [1] - 133:11
**fair** [13] - 7:11; 22:12; 25:19, 22, 24; 37:10; 48:3; 50:22; 55:25; 66:3; 85:14; 97:19, 21
**Fairfax** [6] - 27:24; 34:13; 58:14; 76:24; 78:23; 128:6
**fake** [5] - 45:10; 58:8; 68:21; 69:6; 137:14
**fall** [2] - 113:13, 23
**false** [1] - 29:1
**familiar** [2] - 122:5; 124:1, 6
**family** [8] - 13:8; 48:14; 66:22; 67:5; 78:17; 79:6; 129:12, 16
**family's** [1] - 62:21
**far** [5] - 30:19; 52:1; 81:15; 82:3; 143:1
**Farms** [1] - 66:15
**fax** [2] - 22:18; 27:9
**FCPD** [3] - 58:11, 14; 62:19
**FCSB** [1] - 109:15
**FCSB-BR** [1] - 109:15
**February** [15] - 31:14; 34:19, 23; 35:17; 36:21; 37:19; 38:8; 39:9; 40:24; 42:24; 43:13, 20; 48:15; 111:7
**federal** [1] - 30:23
**feeds** [1] - 18:24
**FELDMAN** [1] - 3:10
**fellow** [1] - 60:24
**felt** [3] - 15:3; 85:16; 88:1
**few** [9] - 10:23; 47:12; 57:24; 84:1; 86:25; 87:3; 93:14; 137:17; 138:18
**field** [1] - 115:19
**figure** [5] - 7:23; 39:25; 40:9, 11; 50:8
**figured** [2] - 39:18; 48:13
**file** [4] - 27:11; 78:18, 22; 121:14
**filed** [11] - 28:13; 70:6, 21; 71:3, 19, 24; 73:23, 25; 104:7, 9; 105:1
**files** [2] - 125:9, 19
**filing** [2] - 37:25; 38:5
**fill** [2] - 18:1
**filled** [1] - 16:13
**filling** [1] - 124:17
**finally** [1] - 67:4
**financial** [1] - 118:15
**finder** [3] - 12:23; 15:22; 28:20
**findings** [2] - 10:9; 12:17
**fine** [10] - 20:12; 37:2; 81:4; 90:6; 91:3,

5; 104:17; 108:7; 109:25; 126:8
**fingers** [1] - 83:22
**finish** [2] - 132:2; 143:13
**finished** [4] - 84:18; 86:19; 117:10; 128:4
**first** [45] - 6:7, 9; 7:3; 8:6; 10:25; 11:11; 12:1; 13:25; 28:1; 29:9; 34:17, 23; 35:16; 39:20; 44:4, 6; 45:2, 9, 17; 60:4, 6, 10; 65:21; 66:2; 70:3; 76:4, 12; 86:16, 23; 91:6; 109:19; 110:15; 111:5, 7; 114:2, 12; 117:6, 20; 131:22; 134:9; 136:8; 139:14; 142:8
**fitness** [1] - 115:18
**five** [6] - 8:7; 36:20; 59:3; 94:8; 114:10; 131:20
**FL** [3] - 2:4, 8, 12
**flag** [10] - 7:3, 7, 10; 8:7; 45:15, 17; 46:14; 47:5
**flags** [1] - 7:2
**flared** [1] - 117:16
**flat** [1] - 101:23
**flexible** [2] - 112:16; 119:18
**FLEXNER** [4] - 1:20; 2:3, 7, 11
**flip** [3] - 36:22; 109:23; 124:8
**flipping** [1] - 135:2
**Floris** [1] - 108:8
**fluent** [1] - 138:10
**fly** [1] - 20:3
**focus** [6] - 12:9; 21:10; 33:4; 40:17; 139:20
**focused** [2] - 40:14; 79:2
**focusing** [1] - 12:9
**follow** [2] - 6:7, 9
**Following** [1] - 50:9; 69:23
**following** [2] - 79:1; 94:18
**fondling** [1] - 74:3
**FOR** [1] - 1:2
**force** [1] - 51:23
**forced** [1] - 87:6
**forcible** [2] - 74:3
**forcing** [1] - 50:12
**foregoing** [1] - 145:6
**form** [5] - 122:5; 123:14; 124:1, 10, 17
**formed** [1] - 16:8
**former** [1] - 86:1
**Fort** [4] - 127:15, 18; 128:2
**forth** [1] - 135:2
**forward** [3] - 16:17; 17:14; 24:24
**foundation** [6] - 41:11, 14; 43:5, 7, 24; 125:22
**founded/unfounded** [1] - 7:12
**four** [4] - 31:20; 32:12; 67:3; 142:19
**four-and-a-half** [2] - 31:20; 32:12
**fours** [1] - 18:7
**fourth** [1] - 111:11
**frankly** [1] - 19:25
**F█████** [14] - 13:25; 14:3, 6, 8, 10; 15:19; 17:25; 18:3; 20:19, 22-23; 21:1; 24:19; 32:24

**Frattali's** [1] - 15:6; 17:13
**freshman** [1] - 140:12
**Friday** [3] - 57:17; 74:14; 82:4
**friend** [5] - 47:18, 21; 56:15; 58:21; 68:20
**friends** [6] - 44:18; 58:24; 59:10; 101:7
**front** [5] - 35:2, 18; 84:11; 124:7
**full** [15] - 101:10; 115:11; 117:10; 118:3; 119:9, 21, 25; 120:6-9, 11, 13; 121:4
**full-time** [7] - 115:11; 119:9; 120:6-9, 11
**fullest** [1] - 117:25
**fully** [1] - 19:21
**Fulton** [1] - 3:7
**funny** [1] - 127:17
**future** [1] - 80:17
**Future** [1] - 128:15

# G

**game** [2] - 22:12; 50:22
**gang** [7] - 23:9, 14, 20, 22; 25:5; 28:12; 32:13
**gangs** [2] - 23:12; 24:1
**gathered** [1] - 15:20
**gears** [1] - 107:3
**general** [2] - 28:12; 117:9
**General** [1] - 120:4; 140:6
**generally** [5] - 76:2; 95:16; 98:13; 138:17
**generate** [1] - 122:24
**generated** [1] - 16:4
**genitals** [4] - 76:7, 14, 18, 22
**gentlemen** [7] - 33:21; 79:19; 80:4, 11; 81:23; 140:16; 144:23
**Genus** [2] - 68:1, 4
**geography** [3] - 129:1, 6
**girl** [2] - 32:14; 65:17
**girlfriend** [1] - 65:15
**girls** [1] - 111:23
**given** [5] - 18:10; 42:5; 97:19; 104:25; 113:5
**glad** [2] - 32:9; 34:1
**goal** [2] - 120:15, 21
**gonna** [5] - 67:5, 24-25; 69:12
**good'** [1] - 67:10
**grade** [15] - 30:10; 44:16, 19; 107:10; 108:9, 11-12, 16; 109:17, 19; 110:14; 111:3, 14; 135:21
**grader** [1] - 128:6
**grades** [9] - 107:4; 108:5, 13; 110:6, 24; 111:11, 14
**graduated** [4] - 112:14, 18; 128:3; 140:8
**Grady** [5] - 46:16; 53:11; 57:21; 65:2; 126:16
**grant** [1] - 24:1
**granted** [1] - 10:11

**graphic** [1] - 99:8
**graphically** [1] - 48:21
**great** [2] - 21:17; 143:2
**greater** [1] - 19:15
**groomed** [1] - 25:5
**ground** [1] - 66:24
**group** [2] - 58:7; 136:3
**GS** [3] - 117:19; 119:13; 120:24
**guess** [9] - 20:8; 58:1; 72:5; 73:11; 80:19; 86:1; 88:15; 94:7; 141:24
**guidance** [1] - 15:5
**guilt** [1] - 7:9
**guys** [2] - 78:25; 132:6

# H

**Haha** [3] - 45:25; 46:7; 60:13
**Hahaha** [2] - 46:23; 47:10
**half** [9] - 27:5; 31:20; 32:12; 141:10, 12, 14, 19-20; 142:25
**halls** [1] - 17:19
**hallways** [1] - 68:12
**hand** [3] - 6:19; 27:3; 58:3
**handed** [1] - 6:22
**handle** [2] - 9:15; 17:23
**handling** [1] - 17:22
**hands** [3] - 24:17; 66:23, 25
**handwriting** [1] - 64:7
**hanging** [1] - 65:11
**happy** [4] - 38:3; 67:19; 78:20; 93:15
**harassed** [1] - 47:24
**harassing** [2] - 40:12; 59:22
**harassment** [4] - 15:24; 16:5; 73:12; 74:10
**hard** [6] - 45:16, 22; 75:14; 85:15; 90:5
**hate** [2] - 58:7; 60:11
**hateful** [1] - 48:5
**hating** [2] - 59:24; 60:16
**hear** [8] - 9:18; 26:21; 32:9; 52:1; 79:19; 99:8; 114:8; 143:11
**heard** [7] - 7:18, 20; 8:3; 13:7; 87:14; 89:2; 99:13
**hearing** [1] - 60:22
**heavy** [1] - 117:1
**heels** [1] - 142:13
**held** [4] - 21:11; 80:14; 83:23
**Help** [1] - 86:3
**help** [13] - 29:15, 19; 32:14; 35:9; 40:13; 46:17; 48:17; 56:19, 24; 59:17; 61:3; 100:16, 24
**helps** [1] - 141:9
**herself** [1] - 104:16
**hi** [1] - 66:17
**hide** [1] - 56:19
**hiding** [1] - 56:19
**High** [4] - 127:15, 18; 128:2
**high** [10] - 112:3, 8, 24; 113:3; 117:10; 122:9; 134:2, 4; 135:19; 140:9
**higher** [2] - 119:13; 121:7

**highlighter** [1] - 45:19
**Hindi** [3] - 137:7; 138:3, 10
**hire** [1] - 78:18
**hired** [1] - 105:7
**hiring** [4] - 27:1, 10, 14
**history** [2] - 110:22, 24
**hmm** [2] - 6:17; 7:1; 8:25; 10:16; 54:16, 22; 58:23; 68:3; 94:5, 9; 107:8; 108:10
**hold** [3] - 19:23; 95:5; 138:5
**holiday** [1] - 82:4
**HOLTZMAN** [1] - 1:16
**Holy** [1] - 135:20
**home** [6] - 66:13; 67:9; 104:13; 111:11, 25; 138:13
**homebound** [2] - 13:13; 111:2
**Honor** [53] - 6:22; 7:3; 8:2; 9:21; 12:21; 18:5, 18; 20:4; 22:20; 23:8, 25; 24:24; 28:1; 30:15; 32:1, 7; 33:14; 38:16; 42:8; 43:2, 23; 47:2; 49:17; 50:6; 52:13; 57:10; 64:12, 16, 18; 69:20; 70:22; 71:14; 74:8; 80:24; 81:10; 83:7; 114:8, 13, 21; 116:18; 121:16; 122:12, 14; 124:23; 125:4; 139:9; 141:15; 143:9; 144:6, 14, 17, 19
**Honor's** [3] - 26:16; 50:11; 74:6
**HONORABLE** [1] - 1:12
**hope** [1] - 84:7
**hopefully** [1] - 142:2
**horrible** [3] - 56:5; 67:25; 68:22
**hour** [11] - 87:25; 141:10, 12, 14, 17, 20; 142:1, 25
**house** [1] - 68:23
**HTML** [3] - 136:25; 137:12, 23
**hundred** [4] - 55:3, 20; 77:4; 94:15
**HUNTON** [4] - 2:15, 18, 22; 3:2
**hurt** [2] - 68:8; 76:24
**hurting** [2] - 26:11, 13

### I

**idea** [3] - 25:1; 69:11; 134:17
**ideal** [1] - 142:17
**ideations** [1] - 38:7
**identify** [2] - 47:13; 114:13
**impeachment** [2] - 18:20; 19:4
**important** [2] - 30:15; 31:16
**impressive** [2] - 130:13; 136:15
**improper** [3] - 9:12; 36:3, 9
**in-person** [1] - 14:2
**inappropriate** [2] - 53:20; 97:23
**incident** [37] - 15:13, 16, 23; 16:9; 67:13, 16-17; 76:6; 78:5; 79:12; 82:12; 84:1, 21; 85:1, 12, 17; 89:19, 22, 25; 90:12, 24; 91:8, 17; 92:2, 6, 12, 16; 94:12, 18, 24; 95:19; 97:1, 24; 102:17; 106:23
**incidents** [4] - 30:10; 37:8; 82:12, 14
**include** [2] - 75:6, 8

**included** [2] - 115:4; 118:17
**includes** [1] - 30:10
**including** [1] - 10:19
**inconsistency** [1] - 9:14
**inconsistent** [2] - 25:21; 70:23
**indeed** [1] - 15:10
**independent** [1] - 20:25
**indicate** [1] - 6:15
**indicated** [1] - 144:24
**indifference** [2] - 13:10; 17:2
**indifferent** [1] - 13:12
**indirectly** [1] - 72:2
**individual** [2] - 32:7; 78:21
**individual's** [1] - 21:8
**individuals** [1] - 44:11
**indulgence** [1] - 91:21
**inference** [3] - 17:8, 10, 18
**inform** [1] - 16:17
**information** [10] - 15:20; 16:15, 25; 21:14; 32:25; 71:1; 75:12; 84:6, 8; 125:6
**informed** [4] - 13:18; 15:9, 11; 78:17
**initial** [2] - 35:19, 23
**Inova** [2] - 80:2; 84:12
**inquiring** [1] - 25:20
**insane** [2] - 134:10; 135:6
**inside** [1] - 26:11
**instance** [4] - 8:21; 10:5, 25; 12:2
**instances** [1] - 32:20
**instead** [2] - 68:9; 83:8
**institution** [1] - 119:13
**instruct** [3] - 30:3; 84:6; 144:10
**instructed** [3] - 12:25; 30:11, 13
**instructing** [2] - 12:23; 33:4
**instruction** [6] - 30:8; 34:3; 81:23; 111:2, 12; 140:17
**intake** [1] - 76:23
**intelligence** [1] - 130:11
**intend** [6] - 22:1; 23:5; 24:21; 70:8, 19; 108:20
**intended** [4] - 7:19; 119:21, 24; 120:13
**intending** [1] - 119:25
**intention** [3] - 48:10
**intentionally** [1] - 63:2
**interaction** [3] - 43:18; 101:15, 19
**interest** [1] - 107:6
**interesting** [1] - 72:17
**interestingly** [1] - 27:9
**intern** [3] - 126:20; 133:23; 134:1
**internship** [8] - 115:8; 118:7; 121:9, 15; 123:3, 10; 134:6
**interpretation** [1] - 67:18
**interrupt** [2] - 142:16; 143:23
**intervening** [1] - 140:21
**interview** [20] - 6:14, 25; 7:16; 8:8; 9:6, 11; 11:23; 18:10; 19:6, 14-15; 21:10; 70:2; 87:16; 88:24; 89:2, 15; 90:20; 95:16; 96:15
**interviewed** [10] - 8:16; 19:16; 75:22;

86:8, 10, 23, 25; 87:3
**intimate** [2] - 104:2, 23
**intimidating** [2] - 67:23; 106:2
**intrude** [1] - 12:18
**investigating** [2] - 15:15; 17:6
**investigation** [22] - 6:15; 7:9, 11; 11:10; 12:5, 11, 18; 13:23; 14:4, 8, 18; 15:2, 7, 12; 17:4, 11; 20:25; 21:15; 63:12; 73:3; 75:13
**involved** [8] - 11:17; 12:14; 13:17; 24:25; 54:2, 4-5; 85:17
**involves** [1] - 15:16
**involving** [1] - 67:14
**irrelevant** [2] - 23:24; 25:10
**issue** [26] - 6:9; 7:3, 15; 9:17; 11:9; 12:22; 13:3; 18:20; 19:5; 20:17-19; 21:22; 23:4, 10, 23; 24:1; 28:25; 32:24; 33:2; 52:23; 81:1; 125:1; 144:5
**issued** [1] - 112:17
**issues** [12] - 6:5; 10:1; 11:19; 12:24; 18:24; 19:2; 27:17, 19; 74:5; 108:24; 141:16; 142:5
**itself** [1] - 23:11
**IX** [10] - 12:12; 14:24; 16:8, 24; 18:14; 20:24; 25:10; 29:9; 78:24; 79:1

### J

**J.F** [1] - 3:7
**J.O** [2] - 3:9; 65:15
**January** [2] - 112:12; 119:7
**JavaScript** [2] - 136:24; 137:12
**Jay** [4] - 112:7; 115:16; 117:23; 127:7
**Jenni** [40] - 38:12; 39:6, 13, 16, 20; 40:21, 24; 43:14, 21; 45:1, 6, 10; 55:22; 56:3, 15, 18, 21; 58:8, 17; 59:14, 19, 24; 60:15, 20, 25; 61:5; 62:11; 63:8; 69:2, 15; 71:4, 20; 72:3, 20, 24; 73:21, 24; 74:1; 75:6, 12
**jfahey@holtzmanvogel.com** [1] - 1:19
**Joanna** [1] - 46:17
**job** [13] - 115:10; 116:8; 117:16; 119:9; 120:9; 124:13; 128:25; 133:7; 139:4; 140:4
**John** [3] - 112:7; 115:16; 117:23
**join** [1] - 120:18
**joined** [1] - 131:25
**Jonathan** [1] - 1:15
**JOSEFIAK** [1] - 1:16
**journals** [1] - 134:9
**JR** [1] - 1:12
**Judge** [6] - 6:7; 25:23; 41:7; 74:20; 80:13; 143:17
**judge** [3] - 41:10; 80:16; 136:11
**JUDGE** [1] - 1:12
**jumping** [1] - 45:4
**June** [1] - 104:7
**junior** [1] - 134:3
**jurisprudence** [1] - 18:15

**JURORS** [1] - 33:22
**Jury** [3] - 80:10; 81:21; 140:25
**jury** [22] - 6:6; 11:16; 12:9, 19, 23; 13:2; 16:24; 17:18; 22:23; 24:7; 28:19; 30:4, 11-12; 33:16, 19; 81:10, 25; 103:20; 108:24; 144:10, 24
**JURY** [1] - 1:11
**jury's** [1] - 72:1

## K

**Kate** [2] - 47:15, 18
**Keefe** [1] - 2:10
**keep** [8] - 23:7; 80:18; 83:1; 93:1; 98:6; 129:9; 135:2; 142:21
**keeping** [1] - 32:23
**kelliker@huntonak.com** [1] - 3:4
**kept** [3] - 27:10; 66:17; 67:3
**Kettering** [6] - 117:11; 132:25; 133:8, 13, 19; 134:1
**Kevin** [2] - 3:2; 9:21
**kicked** [1] - 67:4
**kids** [1] - 48:6
**kill** [5] - 48:14; 66:21; 67:5; 68:11; 69:12
**kind** [12] - 11:22; 36:3, 9; 61:2; 65:17; 81:25; 96:25; 97:3; 100:9; 103:3; 127:17
**kinds** [1] - 54:14
**King** [1] - 111:19
**Kinney** [5] - 3:5; 31:25; 32:6; 141:19
**KINNEY** [4] - 3:6; 32:7; 81:8; 141:12
**kissed** [1] - 50:17
**kissing** [1] - 106:10
**kit** [1] - 96:4
**knock** [2] - 24:3, 22
**knocked** [1] - 66:22
**knowledge** [2] - 32:13; 75:11
**known** [1] - 8:1
**knows** [5] - 16:20; 71:2; 80:17; 121:17; 123:2
**KURTH** [4] - 2:15, 18, 22; 3:2

## L

**labeled** [1] - 84:14
**lacking** [1] - 43:4
**ladies** [7] - 33:21; 79:19; 80:4, 11; 81:22; 140:16; 144:23
**laid** [2] - 20:23; 125:23
**language** [3] - 40:25; 49:3; 50:21
**languages** [6] - 137:5, 10, 12, 14-15; 138:9
**largely** [1] - 23:15
**largest** [1] - 118:15
**Last** [1] - 117:1
**last** [17] - 7:7, 10; 10:3, 24; 17:12; 25:23; 29:15; 49:9; 76:16; 87:22; 111:3;

117:9, 18; 123:17, 19; 129:2; 142:18
**lasted** [1] - 96:12
**late** [4] - 65:11; 66:13; 95:22; 143:18
**latitude** [1] - 18:1
**laughing** [1] - 106:3
**laundry** [1] - 102:23
**LAW** [3] - 3:6; 22:4; 46:18
**law** [3] - 30:22; 41:8
**lawsuit** [6] - 78:18; 104:1, 7, 9, 13, 20
**lawyer** [2] - 42:9; 63:3
**lawyers** [8] - 27:2, 8, 10, 14-15; 78:18; 105:7
**lay** [4] - 22:10; 41:11, 14; 43:24
**lead** [5] - 9:20; 15:1; 16:8; 120:20; 132:4
**leading** [2] - 43:23; 52:5
**learn** [1] - 55:4
**learned** [1] - 55:12
**learning** [1] - 119:14
**least** [6] - 9:10; 11:19; 32:23; 33:2; 50:20; 127:23
**leave** [2] - 106:5, 8
**leaving** [2] - 102:23; 142:18
**lectured** [2] - 88:25; 89:1
**Lee** [4] - 127:15, 18; 128:2
**left** [6] - 31:20; 34:16; 58:3; 65:18; 98:25; 141:17
**left-hand** [1] - 58:3
**legal** [3] - 12:24; 23:2; 96:15
**less** [2] - 141:10; 142:2
**letter** [4] - 13:16; 116:11; 132:6
**letting** [1] - 69:21
**leukemia** [2] - 117:12; 134:6
**level** [3] - 10:2; 21:4
**liable** [1] - 16:19
**liberal** [1] - 119:16
**lieutenant** [4] - 120:19; 130:12; 132:3, 19
**life** [1] - 69:10
**lifting** [1] - 66:25
**light** [1] - 14:20
**like-minded** [1] - 117:21
**likely** [1] - 143:3
**limine** [10] - 10:7, 12; 12:2; 19:20; 20:10; 21:19; 23:21; 28:4; 33:8
**limitation** [2] - 19:10, 18
**line** [25] - 18:12, 14; 81:15; 91:6, 25; 93:11; 95:6-8, 10-11; 96:8, 21; 98:19; 99:22; 100:21; 101:21; 102:9, 12; 106:21; 131:22; 135:25
**lines** [3] - 93:14; 131:20; 138:9
**list** [7] - 28:3; 58:21, 25; 128:8, 18; 133:7
**listed** [9] - 59:3; 122:9; 130:7; 134:19, 21, 24; 136:3; 137:15, 18
**listen** [3] - 30:4; 63:4; 141:2
**listening** [1] - 11:16
**lists** [3] - 128:8, 10, 14
**literally** [2] - 123:14; 143:18

**litigation** [2] - 33:5; 70:19
**live** [3] - 32:11; 34:3; 81:23
**lived** [1] - 120:21
**living** [1] - 111:25
**LLP** [8] - 1:20; 2:3, 7, 11, 15, 18, 22; 3:2
**locked** [1] - 143:16
**locker** [5] - 67:23; 105:19, 24; 106:3, 25
**logical** [1] - 60:23
**look** [64] - 6:10; 7:4; 8:6; 15:21; 20:1; 23:6; 28:23; 30:21; 32:2, 4; 35:6, 13; 37:1; 38:14; 44:15; 45:16; 53:3; 56:25; 60:4; 62:1, 16; 64:5; 65:3; 69:19; 77:17; 78:13; 79:25; 80:2; 84:11, 17; 90:16; 91:3, 5; 92:13; 96:7, 21; 97:11; 98:4, 17; 99:22; 104:10; 106:21; 107:13; 108:16; 109:3; 110:14; 114:6; 116:13; 121:12, 24; 122:5; 123:11, 15, 19; 124:1, 6; 126:15; 127:25; 129:7; 130:3; 131:12; 136:6; 137:11
**looked** [11] - 41:16; 42:14, 16; 59:19; 67:10; 69:3; 77:2; 86:10; 93:24; 113:19; 145:1
**looking** [11] - 10:5; 35:15; 45:14; 92:8; 95:2; 100:19; 101:21; 105:13; 121:3; 139:17
**looks** [7] - 59:11; 68:11; 69:24; 92:18; 106:22; 114:18; 124:20
**Los** [1] - 1:22
**loser** [1] - 67:5
**lost** [1] - 106:19
**loud** [1] - 71:10
**love** [1] - 58:8
**luck** [2] - 45:25; 46:7
**lunch** [2] - 80:8; 82:9
**luncheon** [1] - 80:14
**lunches** [2] - 80:6
**lured** [1] - 88:18

## M

**M.C** [1] - 3:6
**M.P.F** [1] - 3:6
**ma'am** [15] - 38:10; 44:2; 49:12; 50:5; 58:16; 61:6; 63:6; 64:8; 68:17; 88:20; 91:23; 121:18, 24; 127:9; 138:2
**machine** [1] - 3:17
**mail** [7] - 62:10; 69:2, 5; 122:7; 127:2; 139:14, 17
**main** [1] - 32:20
**maintain** [2] - 134:18; 135:14
**Major** [1] - 132:7
**majors** [1] - 119:17
**male** [3] - 82:18; 83:5; 102:2
**management** [1] - 118:17
**March** [25] - 16:6; 16:15, 22; 17:14; 20:7; 21:2; 49:6; 57:5, 17, 25; 59:10; 62:13, 24; 63:13; 65:7; 68:19; 69:2, 14;

76:5, 12, 17, 21; 77:7, 20; 82:10
**MARCH** [1] - 6:1
**master's** [2] - 139:6; 140:3
**math** [11] - 66:13; 107:6, 9; 108:11, 19, 22; 110:2, 7, 10-11, 15
**matter** [4] - 23:3; 32:19; 70:14; 145:7
**me'** [1] - 65:20
**mean** [43] - 15:19; 17:6; 23:12; 24:25; 25:4; 26:1; 32:16; 35:18; 36:11; 38:2; 40:11; 41:20; 42:6; 44:23; 51:20; 61:1; 69:4; 77:12; 78:11; 84:3; 85:7; 87:7; 88:12; 89:21; 91:10; 92:4; 98:10, 13; 99:19, 24; 102:19; 105:6; 106:12; 107:12; 108:6; 110:4; 112:6; 123:8; 136:19; 138:1; 142:15
**meaning** [1] - 69:12
**means** [1] - 132:2
**meant** [2] - 42:12; 67:22
**media** [6] - 32:15; 34:7; 84:6, 9; 140:19
**medical** [1] - 134:9
**Medical** [2] - 128:15; 136:1
**meeting** [10] - 35:23; 36:6, 17; 65:21; 75:9; 78:10, 12; 87:8; 90:11; 95:22
**meetings** [1] - 119:4
**meets** [1] - 125:15
**member** [1] - 85:24
**Memorial** [6] - 117:11; 132:24; 133:7, 13, 19; 134:1
**memories** [1] - 29:1
**memory** [4] - 28:5; 29:1; 30:9; 85:2
**men** [5] - 23:8; 25:1, 15; 26:13
**mention** [3] - 10:5, 8; 14:17
**mentioned** [2] - 22:6; 55:14
**message** [11] - 39:24; 57:3, 6, 8, 19, 24; 62:13; 98:15, 23; 99:6; 101:11
**messaged** [2] - 39:23; 57:7
**messages** [47] - 39:5, 13; 40:8; 41:23; 42:3; 45:1, 7, 11, 13; 48:4, 17, 19; 49:2, 10; 51:12, 15-16; 52:8, 10; 53:2, 13; 54:11; 55:2, 18, 22, 24; 56:2, 6, 8, 14, 20; 59:25; 60:4, 6, 9, 14; 61:4, 7, 10-11, 18; 62:11; 69:15; 70:6; 76:1; 101:8
**messaging** [1] - 38:11
**met** [8] - 25:8; 37:22; 77:19; 85:20; 86:3; 90:23; 98:1; 117:1
**metaphor** [1] - 11:25
**methodology** [1] - 21:10
**Metro** [1] - 118:12
**Miami** [3] - 2:4, 8, 12
**MICHAEL** [1] - 3:6
**Michael** [2] - 3:5; 32:7
**mid** [2] - 90:24; 92:3
**mid-November** [2] - 90:24; 92:3
**middle** [4] - 25:2; 34:19; 117:2, 5
**Middle** [1] - 22:25
**Middleton** [1] - 66:15
**might** [7] - 21:17; 27:14; 46:25; 80:4; 85:14; 122:23; 143:4
**military** [7] - 115:19; 121:6; 130:10, 24; 131:6, 25; 132:12

**mind** [1] - 20:6
**minded** [1] - 117:21
**mine** [2] - 80:24; 123:18
**minute** [1] - 70:14
**minutes** [2] - 8:7; 138:15
**mischaracterization** [1] - 78:20
**mischaracterizing** [1] - 134:8
**miscommunication** [1] - 38:23
**misconstruing** [1] - 130:20
**misspoke** [1] - 123:23
**misstates** [2] - 82:20; 130:21
**misunderstanding** [1] - 83:2
**mk@kinneyesq.com** [1] - 3:8
**mock** [2] - 136:11, 19
**Model** [3] - 135:9, 16, 21
**modeling** [1] - 118:18
**mom** [43] - 37:21, 24; 56:9, 14, 17, 19; 59:16, 18; 61:19, 24; 62:22; 63:13, 19; 67:9; 68:21; 69:2, 6, 9, 14, 17; 71:15-17; 74:11; 75:15; 86:18, 21, 23, 25; 87:4, 13; 99:9, 12; 100:5, 8; 102:22; 138:11
**moment** [5] - 8:14; 14:1; 84:17; 107:3; 124:23
**Monday** [5] - 13:5; 74:14; 94:6
**monstrous** [1] - 31:4
**months** [2] - 40:12; 60:22
**morning** [5] - 9:21; 18:24; 32:9; 50:11; 81:12
**most** [5] - 22:12; 107:9, 11; 110:12; 139:17
**mother** [9] - 55:18; 62:11; 65:14; 71:24; 78:9, 17; 86:16; 87:8
**motion** [16] - 10:7, 11, 13; 12:2; 20:10; 21:18; 23:21, 25; 28:4, 7, 13; 31:19; 33:8
**motions** [1] - 19:20
**mouth** [3] - 55:11; 83:22
**move** [13] - 23:13, 15; 43:2; 54:9; 55:16; 57:10; 64:12; 69:11; 108:25; 116:18; 124:24; 126:2; 144:1
**moved** [2] - 30:24; 142:19
**moving** [3] - 31:25; 67:3; 71:8
**MR** [131] - 6:7, 12, 18, 22; 7:2, 4, 7, 15, 18; 8:11, 13, 16, 18, 20; 9:1, 21, 24; 10:17; 11:18; 12:21; 14:25; 16:12, 19, 22; 17:2, 10; 18:5, 12, 18; 20:4, 18; 21:20, 22; 22:5, 9, 16, 18, 20; 24:13; 25:23; 26:1, 3, 8, 23; 30:21; 32:1, 7; 33:12, 14, 16, 18; 41:4, 7, 10, 13; 42:8; 43:23; 46:5; 49:17; 50:6, 11, 18, 22; 51:20, 23; 52:5, 9, 20, 22; 57:12; 61:15; 64:15; 69:20; 71:14; 72:5, 12, 14, 17; 73:3, 5, 10, 16, 18; 74:4, 20; 80:13, 16, 24; 81:5, 8; 82:20; 83:7, 12; 93:13; 95:10, 12; 103:15; 105:8; 107:15, 17, 19; 109:8; 114:8, 10, 12, 20; 116:20; 121:16, 23; 124:14; 125:3, 8, 13, 18, 22; 130:21; 131:8, 21; 141:9, 12, 21, 25; 142:4, 7, 14, 24; 143:9, 16; 144:2,

14, 17
**MS** [176] - 5:4; 27:22, 24; 28:11, 23; 29:18, 20; 30:9; 34:10, 12; 35:11, 14; 38:16, 21, 23; 39:3; 41:5, 8, 15; 42:13, 20; 43:2, 8, 11-12; 44:14; 45:4; 46:11, 16, 20; 47:2, 4, 9; 49:21; 50:7, 25; 51:5, 8, 18; 52:13, 18; 53:1, 7, 9, 11-12, 25; 54:1, 8, 10; 55:17; 57:10, 14, 16, 21, 23; 61:21; 62:4, 6, 8-9; 63:7; 64:12, 18, 24; 65:1; 70:1, 5, 10, 22; 71:7, 11; 73:1; 74:8, 19, 24; 75:18; 77:15, 23-24; 78:16; 79:3, 23; 81:10, 16, 18, 20; 82:7, 22; 83:3, 14-15; 84:10; 88:23; 91:21, 24; 93:15, 18; 95:11, 13; 96:11; 97:16; 102:15; 103:19; 104:17, 19; 105:10; 107:16, 23, 25; 108:1, 18; 109:1, 7, 12; 112:22; 113:2; 114:16, 25; 115:2; 116:18, 22, 24; 121:19, 21; 122:1, 12, 18, 21, 25; 123:3, 6, 19, 22; 124:3, 23; 126:2, 6, 11, 13-14, 16, 18; 130:23; 131:10, 14, 17, 23-24; 138:15, 18, 25; 139:1, 9, 11, 13, 21, 23; 140:1; 141:7, 15; 143:6; 144:6, 8, 19
**multiple** [3] - 25:15; 70:16; 134:9
**myeloid** [2] - 117:12; 134:6

## N

**nah** [1] - 45:25
**Nah** [1] - 46:12
**naked** [1] - 65:16
**name** [18] - 21:8; 34:21; 45:10; 47:12, 15; 58:8; 68:4, 10; 71:4, 20; 72:3; 97:5; 122:2; 123:13; 124:7, 10; 127:2
**named** [2] - 54:4; 68:20
**names** [3] - 59:3; 88:5
**narrative** [1] - 70:19
**narratives** [1] - 70:9
**national** [1] - 128:10
**National** [1] - 128:14
**Nations** [2] - 135:10, 16
**nationwide** [1] - 126:20
**nature** [2] - 15:11; 21:15
**near** [3] - 41:22; 90:1; 104:23
**nearly** [1] - 117:3
**necessarily** [4] - 23:12; 25:18; 29:16; 88:12
**need** [29] - 6:5; 11:22; 12:13; 18:1; 19:25; 20:1; 28:21; 33:5, 7, 25; 52:1; 69:20; 71:22; 88:21; 108:23; 109:23; 117:24; 119:15; 121:3; 125:17; 138:20, 22; 141:5, 22; 142:8, 13; 143:20; 144:15
**needed** [3] - 14:21; 15:3; 59:17
**needs** [7] - 12:9; 41:10; 78:25; 112:16; 141:19
**negligence** [1] - 24:7
**neighbor** [1] - 65:11
**neighborhood** [4] - 54:15, 18; 67:14,

17
**network** [1] - 118:17
**never** [35] - 7:21; 8:5; 19:8; 24:15; 28:13; 50:17, 19; 58:17; 60:24; 76:7, 14, 16, 18, 22; 97:4; 99:17; 100:9; 104:24; 105:24; 110:10; 121:25; 129:15, 17; 131:6; 133:10; 138:12; 139:2; 140:14
**New** [1] - 111:21; 118:12; 129:11, 15
**news** [1] - 84:9
**next** [25] - 37:1; 40:23; 46:7, 14; 47:5; 49:5; 53:11; 57:19; 82:5; 95:24; 103:25; 111:14, 18; 117:17; 118:2; 119:5, 12; 120:17, 23; 121:2; 129:21; 130:6; 135:25; 141:23
**nice** [1] - 82:2
**night** [2] - 38:11; 39:8
**noise** [1] - 79:21
**nominated** [2] - 118:7; 136:11
**nomination** [2] - 128:10, 14
**none** [3] - 47:24; 48:2, 18-19; 135:13
**nontraditional** [3] - 113:15, 18, 22
**Nordstrom** [2] - 134:11, 20
**northern** [1] - 28:13
**note** [8] - 32:2; 35:18; 36:2, 19; 37:14, 23; 48:15
**notes** [6] - 36:8, 11, 15; 38:2; 78:7
**nothing** [15] - 15:3; 32:14; 33:6; 56:18; 127:4; 144:17, 19
**notice** [1] - 25:9
**NOVA** [2] - 35:7; 77:18
**November** [17] - 66:12; 76:6; 82:19; 83:6; 89:20, 23; 90:1, 24; 92:3; 93:20; 94:4, 10, 21; 95:22; 96:13; 102:3; 109:20
**nowhere** [1] - 7:11
**number** [16] - 58:11; 62:17, 19, 21; 77:18; 91:1; 99:12, 15; 100:5; 114:8; 122:4, 6; 124:11; 127:2
**numbered** [1] - 35:6
**numbers** [2] - 35:7; 53:5
**numerous** [1] - 136:22
**nurse** [6] - 79:11, 14; 82:11, 24; 83:17; 84:21
**NW** [5] - 1:17; 2:15, 19, 22; 3:3

**O**

**oath** [2] - 29:4, 22
**objected** [1] - 23:10
**objection** [35] - 28:2; 41:6; 43:23; 46:5; 52:20, 22; 57:12; 61:15; 64:14, 18, 22; 80:19; 103:15; 105:8; 107:17-20; 109:7-9; 114:7, 20, 22; 116:20; 121:23; 125:3, 20, 22, 25; 130:21; 143:12
**objections** [2] - 82:25; 143:12
**objectively** [1] - 16:25
**obligations** [1] - 20:24

**obtained** [1] - 121:9
**obviously** [5] - 8:10; 12:10; 18:2; 42:8; 143:20
**occasionally** [1] - 24:18
**occurred** [5] - 91:17; 92:3, 12, 17; 94:13
**occurring** [1] - 44:10
**OCR** [1] - 27:11
**October** [4] - 31:14; 65:11; 95:22; 110:5
**ODIN** [1] - 3:10
**OF** [5] - 1:2, 11; 3:6; 5:4; 34:11
**off-campus** [4] - 15:13, 15, 23; 16:9
**offenses** [1] - 74:2
**offensive** [1] - 132:14
**offer** [4] - 115:10; 117:24; 119:9
**offered** [1] - 119:6
**offers** [1] - 119:14
**OFFICE** [1] - 3:6
**office** [1] - 118:12
**officer** [13] - 21:14; 63:21-23; 70:11; 73:17; 76:5, 13, 17, 23; 115:15; 126:8
**Officer** [4] - 68:1, 4; 72:15; 73:20
**Official** [2] - 3:13; 145:10
**often** [1] - 55:8
**oftentimes** [2] - 25:17; 33:24
**old** [10] - 48:20; 57:24; 82:18; 83:5; 121:10; 129:18; 130:13, 15-16; 133:24
**older** [2] - 25:2; 26:13
**Olivia** [6] - 56:15, 20; 57:7, 19; 58:6, 17
**once** [5] - 17:5; 24:22; 70:17; 84:24; 100:16
**oncology** [2] - 117:12; 133:2
**one** [59] - 7:20; 8:21; 9:17; 16:11; 18:23; 19:3; 20:1, 18; 21:22; 22:6, 23; 25:16; 26:20, 23; 29:19; 31:6; 35:1; 47:5; 55:21; 59:3; 60:18; 67:15, 17; 73:7; 74:9; 85:1; 89:19, 22, 25; 90:12; 93:25; 94:1; 107:15; 108:14; 118:15; 120:5; 124:6; 129:8, 21, 23; 131:8; 133:10, 17, 19; 135:4; 136:8; 137:2, 9-10; 138:5; 139:18, 21; 142:18; 143:6
**one's** [1] - 123:17
**one-one-eight** [1] - 107:15
**open** [7] - 20:16; 21:13; 50:12; 51:24; 52:6, 12; 72:10
**opened** [5] - 10:24; 13:4, 24; 20:15; 50:13
**opening** [5] - 22:22; 23:9; 30:25; 31:22; 80:18
**opens** [1] - 52:3
**opine** [2] - 21:8, 13
**opportunity** [5] - 71:22; 118:3; 132:11; 138:24; 143:21
**opposing** [1] - 31:2
**orally** [1] - 70:15
**order** [8] - 10:12; 17:3; 18:12; 20:9; 27:18; 30:14; 119:15; 135:22
**orient** [1] - 123:20

**originally** [2] - 13:19; 32:3
**otherwise** [1] - 26:18
**outside** [7] - 68:23; 82:2; 86:18; 87:5; 104:14; 140:23
**outstanding** [1] - 108:13
**outwardly** [1] - 88:12
**overheard** [1] - 79:22
**overlapping** [1] - 35:7
**overruled** [2] - 103:17; 125:25
**owe** [1] - 67:4
**own** [3] - 25:21; 57:4

**P**

**P.A.H** [1] - 3:6
**p.m** [11] - 1:6; 6:2; 33:19; 39:8; 66:14; 80:10, 15; 81:21; 140:25; 145:3
**Pachter** [14] - 34:21; 35:16, 23; 36:2, 18; 37:4, 22; 77:10, 14, 20, 22, 25; 78:10; 79:5
**page** [103] - 12:1; 22:13, 17-18; 23:17; 27:3, 9, 16; 35:5; 36:22; 37:1; 40:23; 41:16; 44:15; 45:14, 17; 46:14-18, 21; 49:5; 53:3, 5, 11; 59:15, 19; 60:4, 18; 64:9; 77:18; 80:2; 82:21; 84:12; 90:25; 91:1, 3, 6, 20, 22, 25; 92:8, 13, 19, 21, 23-24; 93:1, 3, 11; 95:2, 6-7, 11, 18; 96:7, 21; 97:11, 13; 98:4, 17; 99:22; 100:18-20; 101:21; 102:9, 12; 105:20; 106:20, 24-25; 109:14; 111:14; 117:17; 118:2; 119:5, 12; 120:17; 121:2, 4; 123:17, 19, 21; 124:7; 127:5; 131:15, 18; 135:25; 138:7
**Page** [1] - 5:3
**pages** [3] - 27:6; 90:21; 105:13
**pain** [1] - 83:25
**pants** [1] - 67:3
**paper** [2] - 48:9; 59:11
**paragraph** [11] - 84:14; 104:11; 116:25; 117:8, 19; 119:13; 120:18, 23; 121:4; 131:18; 132:8
**parenthesis** [2] - 68:8, 10
**parents** [9] - 68:1; 78:5; 93:7; 94:17, 20; 96:7, 13; 100:16; 111:15
**park** [3] - 65:12; 95:22; 98:1
**Park** [1] - 1:21
**parlance** [1] - 26:9
**parse** [1] - 26:5
**part** [23] - 17:24; 24:16; 25:23; 29:24; 31:7, 9, 11-12; 33:5; 40:2, 5-6; 75:12, 15-16; 76:16; 79:22; 120:13; 122:19; 131:6; 136:19
**participated** [1] - 115:18
**particular** [5] - 10:15; 14:13; 18:23; 20:5; 23:25
**PARTIES** [1] - 6:4
**parties** [4] - 10:20; 12:3; 19:4; 30:21
**parts** [4] - 88:3, 6; 104:2, 23
**party** [3] - 31:2; 51:23; 118:17

**passing** [1] - 84:1
**password** [1] - 56:10
**past** [1] - 118:6
**patch** [5] - 102:17, 19, 22; 104:22;
106:23
**patient/caregiver** [1] - 84:15
**Patrick** [2] - 54:4; 59:4
**pause** [9] - 47:7; 64:21; 78:14; 79:18;
84:19; 96:10; 97:14; 102:13; 141:8
**PC** [1] - 3:10
**Pedersen** [1] - 142:24
**pediatrician** [1] - 85:10
**peers** [1] - 117:21
**pejorative** [1] - 50:20
**penetrated** [7] - 76:14, 18; 77:1; 83:18,
21; 89:20, 23
**penetration** [3] - 76:8, 22; 85:18
**penis** [6] - 83:18, 22; 103:9, 13, 21, 24
**Pennsylvania** [4] - 2:15, 19, 22; 3:3
**people** [20] - 24:10; 25:2; 26:13; 30:25;
31:23; 33:10; 43:16, 21; 47:12, 15, 19;
51:9; 52:15; 54:5; 59:18, 22; 67:24;
68:10; 142:11
**Per** [1] - 84:14
**percent** [5] - 55:3, 20; 69:13; 77:4;
94:15
**perfectly** [2] - 37:2; 91:5
**performances** [3] - 128:1, 7, 19
**perhaps** [2] - 11:22; 96:3
**period** [3] - 31:13; 135:21
**permanent** [3] - 119:6; 124:15, 18
**permission** [1] - 38:17
**permitted** [1] - 81:12
**person** [9] - 14:2; 40:24; 43:14; 50:2;
57:7; 59:8; 66:14; 103:4; 132:5
**personal** [1] - 84:6
**personally** [1] - 99:9
**perspective** [2] - 7:25; 26:20
**phone** [12] - 61:22; 97:20; 99:12, 16;
100:5; 122:4, 6; 124:11; 127:2
**phraseology** [1] - 17:9
**physical** [2] - 106:10; 115:18
**Physicians** [1] - 128:15
**pick** [1] - 66:23
**pics** [1] - 65:16
**picture** [2] - 42:4, 14
**PITTLEMAN** [1] - 3:10
**place** [2] - 22:25; 48:16
**plaintiff** [16] - 10:8, 20; 11:20; 13:8,
10, 15; 14:2; 18:22; 19:12; 22:21;
24:21; 25:11; 31:5; 138:23; 144:17
**Plaintiff** [3] - 1:4, 15; 2:2
**plaintiff's** [6] - 13:9; 20:15; 22:6; 24:3,
23; 31:18
**Plaintiff's** [6] - 35:3; 77:18; 80:1;
84:12; 93:24
**plaintiffs** [2] - 11:10; 13:5
**plan** [2] - 78:22; 141:22
**plans** [1] - 120:18

**platoon** [2] - 120:20; 132:4
**play** [2] - 17:23; 20:9
**PLC** [1] - 3:6
**pleading** [1] - 31:20
**pleadings** [3] - 30:22; 31:1
**PLLC** [1] - 1:16
**PM** [1] - 1:8
**podium** [1] - 6:8
**point** [26] - 9:4, 9; 10:6; 14:22; 15:1;
16:22; 17:21; 18:6; 19:7, 16; 20:13;
23:15; 31:7; 56:11; 63:3; 71:14; 73:5;
87:23; 92:10; 103:12; 112:20; 120:3;
127:14
**pointing** [1] - 133:18
**points** [1] - 105:6
**Police** [2] - 58:14; 76:24
**police** [83] - 7:24; 8:5; 9:16; 10:5, 8-9,
14; 11:3, 5, 9-10, 14, 17, 21; 12:4, 10,
13, 15, 18; 13:16, 22; 14:1, 3, 7, 17, 20;
15:2, 7, 10, 12, 14, 20; 17:4, 6, 11, 20;
18:10; 19:5, 8, 13, 15-16; 20:25; 21:14;
27:2, 6; 37:25; 38:5; 55:18, 22, 25;
56:1, 5, 14, 17; 62:22, 24; 63:11, 13;
65:7, 22; 66:1; 69:15, 25; 70:2, 5,
11-12, 20; 71:3, 19; 72:6; 73:24; 74:18;
75:1, 19; 76:13; 80:18, 22; 85:21, 25;
86:5
**police's** [1] - 13:17
**polite** [2] - 88:8, 11
**portions** [3] - 24:11; 30:6
**posing** [1] - 60:20
**position** [9] - 11:23; 18:8; 20:7, 13;
23:22; 80:17; 115:5, 7; 116:9; 119:6;
124:15, 18; 132:24
**possibility** [2] - 37:7; 119:17
**possible** [3] - 44:7, 20; 45:12
**post** [3] - 43:16; 59:14; 116:21
**posted** [4] - 40:23; 60:9, 15, 19
**posts** [4] - 42:2, 24; 44:10, 21
**potential** [2] - 117:25; 118:21
**practice** [1] - 118:9
**precise** [1] - 72:23
**precisely** [1] - 141:2
**preclude** [1] - 18:3
**predicate** [2] - 15:24; 20:23
**predicates** [1] - 19:21
**prefatory** [1] - 19:9
**prepared** [2] - 98:9, 11
**present** [4] - 24:7; 25:7; 87:8-10, 12;
129:12; 130:7; 143:21
**PRESENT** [1] - 6:4
**presented** [3] - 11:16; 24:23; 28:15
**presenting** [1] - 30:12
**president** [1] - 135:4
**presumably** [1] - 22:1
**pretty** [6] - 8:20; 9:7; 130:13; 136:15;
140:22; 145:1
**prevent** [2] - 25:19; 83:23
**previously** [1] - 78:6

**Pricewaterhouse** [2] - 119:10, 25
**PricewaterhouseCoopers** [3] - 115:5;
116:9; 118:4
**principal's** [1] - 17:13
**principles** [1] - 12:24
**print** [2] - 34:7; 140:19
**printed** [3] - 57:25; 58:1; 59:1
**printout** [1] - 58:22
**printouts** [1] - 42:23
**Privacy** [1] - 118:8
**private** [2] - 57:3; 84:6
**problem** [2] - 39:1; 137:13
**problems** [5] - 31:15; 91:9; 95:19;
96:5; 102:21
**procedure** [3] - 24:15; 35:21; 38:4
**procedures** [1] - 37:25
**proceed** [1] - 20:22
**Proceedings** [2] - 3:17; 145:3
**proceedings** [10] - 47:7; 64:21; 78:14;
79:18; 84:19; 96:10; 97:14; 102:13;
141:8; 145:7
**PROCEEDINGS** [1] - 1:11
**process** [6] - 61:16; 115:14; 122:20;
125:14; 126:10; 132:1
**produce** [4] - 61:7, 10, 14; 127:21
**produced** [9] - 3:17; 41:23; 42:1, 5;
61:13, 24; 63:8; 127:23; 128:24
**production** [3] - 42:10; 62:21
**professional** [1] - 119:15
**profile** [3] - 42:14, 16; 43:22
**program** [4] - 132:10; 134:12, 21;
140:3
**programming** [2] - 137:1, 5
**programs** [1] - 132:1
**progress** [2] - 109:13, 16
**projects** [1] - 118:16
**promise** [1] - 7:10
**properly** [2] - 125:7, 9
**propose** [1] - 70:4
**proposed** [1] - 23:23
**prosecutions** [1] - 28:9
**proud** [2] - 48:16; 134:3
**provide** [2] - 61:17; 114:5
**provided** [9] - 21:25; 56:14; 61:19, 25;
114:4, 17; 125:6; 133:6; 140:6
**province** [1] - 12:19
**pseudonym** [1] - 72:4
**PTSD** [2] - 117:16; 132:10
**Public** [1] - 128:6
**publish** [11] - 38:17, 25; 39:2; 57:13;
64:24; 107:22; 109:11; 114:24; 126:2,
12; 131:16
**Published** [1] - 134:9
**published** [1] - 38:20
**pull** [1] - 65:18
**pulled** [2] - 56:12; 135:22
**pumpkin** [5] - 102:17, 19, 22; 104:21;
106:23
**purport** [1] - 122:16

**purpose** [2] - 18:25; 26:20
**purposes** [3] - 20:13; 32:23; 125:15
**pursuant** [1] - 125:16
**pursue** [1] - 121:7
**push** [1] - 142:11
**pushed** [1] - 66:23
**put** [20] - 11:11; 22:23; 29:12; 30:23; 45:15, 19; 62:6; 66:24; 74:7; 79:25; 83:22; 88:15, 17; 100:14; 105:15; 108:20; 109:23; 113:24; 136:17; 142:15
  **putting** [1] - 66:25
**PwC** [12] - 118:7; 119:7; 120:10, 24; 121:9; 123:4; 124:18; 125:9; 127:20; 133:10; 139:2; 140:2
  **PwC's** [4] - 121:14, 22; 125:19, 24
**Python** [3] - 136:25; 137:12, 21

## Q

**quarter** [9] - 27:6; 109:19; 110:3, 16; 111:5, 8, 11; 138:20
**quarters** [1] - 111:3
**QUESTION** [5] - 11:3, 5; 14:17, 20; 17:14
**question-by-question** [1] - 33:11
**questioned** [1] - 37:10
**questioning** [1] - 20:22
**questions** [12] - 9:6; 26:20; 28:25; 88:21; 90:7, 19; 122:22, 24-25; 126:1; 141:2; 143:9
**quickly** [1] - 32:4
**quit** [1] - 117:16
**quite** [4] - 19:25; 24:20; 26:14; 144:2
**quote** [3] - 65:15, 17

## R

**Rachel** [4] - 22:7, 25; 109:17; 122:10
**racial** [1] - 67:23
**raining** [1] - 82:2
**raise** [6] - 9:18; 11:18; 20:18; 21:6, 22; 88:14
**raised** [5] - 10:2; 18:24; 19:1; 21:5; 70:18
**raises** [1] - 33:2
**ran** [2] - 34:1; 136:19
**random** [1] - 68:10
**rape** [11] - 14:10; 17:12; 23:9, 14; 30:1; 74:15; 79:14; 84:22; 85:13; 87:1; 96:4
**rape'** [1] - 23:11
**raped** [4] - 75:5; 78:5; 84:24; 100:13
**rapes** [6] - 22:25; 29:6, 11-12; 32:13; 49:4
**raping** [1] - 26:13
**rapist** [4] - 17:18; 47:13; 48:12; 101:12
**rather** [2] - 38:7; 114:13
**ratio** [1] - 143:2
**rational** [1] - 48:18

**rbates@hunton.com** [1] - 2:17
**RDR** [3] - 3:13; 145:6, 9
**RDR-CRR** [1] - 145:6
**reach** [1] - 117:24
**reached** [1] - 48:12
**reaches** [1] - 14:3
**read** [35] - 8:13, 22; 45:22; 60:13; 64:20; 66:10, 18; 67:7, 11-12; 68:2, 13, 25; 71:10, 12; 78:11; 83:1, 8, 10; 92:19; 93:3, 14-15; 95:6; 97:13; 102:9; 104:16; 106:12; 127:10; 137:9; 139:14, 16
**reading** [7] - 12:12; 43:25; 55:11; 79:24; 91:14; 93:1; 101:10
**ready** [2] - 37:13; 65:5
**real** [3] - 134:16; 140:23; 144:25
**realize** [1] - 55:24
**really** [24] - 8:7; 19:11; 23:3; 24:14; 27:17; 36:5; 37:14; 41:1, 20; 48:21; 56:5; 78:21; 84:3; 85:2, 15-16; 88:18; 106:3; 117:24; 119:4; 142:14; 143:21
**realm** [1] - 7:24
**reason** [7] - 8:10; 11:7, 18; 13:24; 20:21; 80:22; 110:1
**reasonable** [7] - 7:8; 11:16; 12:7, 12; 15:22; 17:3; 50:14
**reasons** [1] - 117:19
**received** [5] - 56:15, 20; 57:4; 65:14; 131:5
**recent** [1] - 139:17
**recently** [2] - 42:15
**recess** [1] - 80:14
**recognition** [1] - 128:10
**recognize** [25] - 42:2, 19, 23; 57:3, 6; 124:10; 128:12, 17, 20; 129:10, 14, 20; 130:9, 14, 16; 132:20; 133:21, 25; 135:23; 136:7-9, 16, 21; 138:2
**recognizes** [1] - 42:18; 122:23
**recollection** [21] - 26:3; 35:16; 43:9; 44:7, 20, 24; 47:23; 48:1; 59:13; 60:1; 70:1; 71:7, 11; 77:19; 82:23; 85:4, 8; 87:20; 90:21; 91:2, 13
**recommendation** [3] - 116:11; 132:6
**record** [22] - 6:21; 13:15, 20; 42:8; 43:25; 50:9; 57:15; 64:23; 69:23; 77:13; 79:22; 81:3; 83:13; 107:21; 109:10; 114:23; 116:23; 126:5; 141:19; 144:3; 145:6
**recorded** [9] - 6:25; 87:17, 19; 98:14, 22, 24-25; 99:5
**records** [6] - 22:6; 36:2; 121:22; 122:13; 124:24; 136:17
**redact** [2] - 10:17; 13:20
**redacted** [2] - 23:19; 27:11
**redactions** [3] - 23:18; 27:16
**redirect** [7] - 15:1; 17:17; 71:23; 73:20; 141:24; 143:15, 24
**refer** [3] - 90:20; 108:6
**reference** [2] - 22:17; 51:16
**references** [1] - 25:15
**referred** [1] - 32:3

**referring** [4] - 47:1; 60:2; 104:3; 135:8
**refresh** [7] - 35:15; 43:8; 70:1; 71:7; 77:14, 19; 90:21
**refreshing** [1] - 71:11
**regard** [2] - 32:25; 120:5
**regarding** [8] - 9:18; 16:3; 21:15; 22:24; 24:1; 32:25; 70:20
**regardless** [2] - 20:25; 29:25
**rehabilitation** [1] - 72:6
**rejected** [1] - 114:2
**relate** [2] - 33:24; 52:10
**related** [1] - 54:11
**relates** [2] - 25:17; 26:4
**relation** [3] - 52:17; 53:13, 21
**relationship** [3] - 32:5; 97:1, 3
**release** [1] - 140:17
**relevance** [3] - 28:21; 105:8
**relevant** [1] - 108:24
**relied** [1] - 31:1
**remains** [1] - 33:9
**remark** [1] - 10:18
**remember** [17] - 21:7; 29:21; 30:15; 47:19; 56:7; 78:12; 83:19; 86:1; 91:4, 13; 92:20; 96:19, 23; 97:10; 100:25; 140:17; 144:9
**remind** [3] - 20:20; 142:4; 144:10
**reminded** [1] - 6:23
**remove** [2] - 12:15; 30:24
**renowned** [1] - 118:8
**repeat** [9] - 40:6; 67:15; 76:9, 16; 90:4; 98:20; 101:17; 108:14; 113:25
**repeated** [1] - 85:19
**rephrase** [5] - 46:6; 103:18; 121:18, 20; 130:22
**replied** [1] - 65:13
**reply** [2] - 46:22; 65:16
**report** [31] - 10:14; 14:3; 15:12; 69:25; 70:5, 9, 12, 19, 21; 71:3, 9-10, 19, 23; 73:23, 25; 74:9-11, 15-16, 18, 20; 85:1; 89:17; 108:2, 16; 109:16; 110:14
**reported** [22] - 3:17; 15:14; 23:4; 30:1, 13; 58:7; 66:1; 69:14, 17-18; 70:11, 15; 75:9; 82:17; 83:5, 25; 84:21, 24; 85:17; 98:24
**REPORTER** [1] - 73:15
**Reporter** [4] - 3:13; 141:13; 145:10
**reporting** [2] - 82:24; 118:21
**reports** [5] - 80:18, 22, 25; 109:13, 16
**represent** [1] - 126:9
**representation** [1] - 141:5
**representative** [2] - 135:10, 19
**represented** [3] - 115:4, 13; 131:9
**request** [1] - 38:18
**required** [1] - 116:14
**requirements** [2] - 12:13; 125:15
**research** [2] - 117:11; 134:5
**researcher** [1] - 133:2
**reserve** [1] - 19:23
**reserves** [1] - 130:25

**Reserves** [7] - 120:20; 130:7, 11, 19; 132:4, 16, 18
**resolve** [1] - 33:7
**respect** [3] - 11:20; 80:17; 134:5
**respected** [2] - 101:6; 103:5
**respectful** [1] - 100:2
**response** [3] - 14:7, 11, 15
**responses** [1] - 59:20
**responsible** [1] - 118:20
**responsive** [3] - 16:6; 25:18; 41:25
**rest** [4] - 108:12; 140:23; 141:5; 143:18
**restate** [1] - 106:16
**Reston** [2] - 3:8, 11
**restriction** [1] - 20:8
**result** [2] - 71:3, 19
**retired** [1] - 142:20
**retrospectively** [1] - 16:13
**reveal** [2] - 59:21
**revealed** [1] - 78:4
**revealing** [2] - 59:15; 84:8
**revenge** [1] - 67:25
**review** [2] - 84:17; 104:25
**reviewed** [3] - 35:24; 104:24; 105:2
**REWARI** [176] - 5:4; 27:22, 24; 28:11, 23; 29:18, 20; 30:9; 34:10, 12; 35:11, 14; 38:16, 21, 23; 39:3; 41:5, 8, 15; 42:13, 20; 43:2, 8, 11-12; 44:14; 45:4; 46:11, 16, 20; 47:2, 4, 9; 49:21; 50:7, 25; 51:5, 8, 18; 52:13, 18; 53:1, 7, 9, 11-12, 25; 54:1, 8, 10; 55:17; 57:10, 14, 16, 21, 23; 61:21; 62:4, 6, 8-9; 63:7; 64:12, 18, 24; 65:1; 70:1, 5, 10, 22; 71:7, 11; 73:1; 74:8, 19, 24; 75:18; 77:15, 23-24; 78:16; 79:3, 23; 81:10, 16, 18, 20; 82:7, 22; 83:3, 14-15; 84:10; 88:23; 91:21, 24; 93:15, 18; 95:11, 13; 96:11; 97:16; 102:15; 103:19; 104:17, 19; 105:10; 107:16, 23, 25; 108:1, 18; 109:1, 7, 12; 112:22; 113:2; 114:16, 25; 115:2; 116:18, 22, 24; 121:19, 21; 122:1, 12, 18, 21, 25; 123:3, 6, 19, 22; 124:3, 23; 126:2, 6, 11, 13-14, 16, 18; 130:23; 131:10, 14, 17, 23-24; 138:15, 18, 25; 139:1, 9, 11, 13, 21, 23; 140:1; 141:7, 15; 143:6; 144:6, 8, 19
**Rewari** [22] - 2:18; 6:23; 23:9, 15; 27:24; 34:13, 15; 50:23; 57:18; 59:6; 82:6; 100:14; 108:17; 111:9; 121:16; 122:14; 125:6; 127:8; 138:14; 141:2; 143:13
**right-hand** [1] - 27:3
**rigor** [1] - 117:24
**rigorous** [1] - 119:16
**rising** [1] - 118:13
**risk** [2] - 21:17; 118:17
**Risk** [1] - 118:8
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:13
**road** [3] - 13:4; 21:18; 69:25

**Robert** [2] - 2:10; 3:7
**role** [1] - 136:22
**room** [6] - 37:22; 86:8, 10, 18; 87:5; 88:13
**ROSSIE** [1] - 1:12
**ROTC** [9] - 115:14; 116:9, 12; 120:18; 131:2, 4, 25; 132:10
**rude** [5] - 67:23; 98:14, 22, 25; 99:5
**rule** [2] - 93:13; 131:21
**ruled** [1] - 74:22
**ruling** [7] - 30:19; 50:11; 74:6; 80:23; 81:2, 11; 141:15
**rumor** [1] - 95:14
**rumors** [4] - 66:8; 94:24; 95:24; 103:25
**run** [3] - 21:17; 27:6, 19
**Rutgers** [2] - 135:10, 16
**Ryan** [1] - 2:14
**résumé** [38] - 114:4, 17; 115:4, 22; 121:14, 22; 122:17; 124:20; 125:23; 127:19, 21; 128:5, 24; 129:2, 6, 23, 25; 131:3; 132:23; 133:6, 10; 134:8, 14, 16, 22, 25; 135:1, 15, 22; 136:4, 7, 13, 17; 137:14, 16, 19

## S

**S.T** [1] - 3:6
**sad** [1] - 117:1
**SANE** [8] - 76:20; 77:6; 79:6, 8; 82:10; 85:9; 89:17
**sanitize** [3] - 11:22; 18:9; 31:4
**sanitizing** [1] - 31:4
**sat** [1] - 24:17
**satisfactory** [1] - 108:12
**saved** [3] - 99:15; 100:5, 8
**saw** [14] - 34:23; 35:16; 37:18; 44:23; 48:15; 60:24; 65:12, 18; 77:10; 85:9; 116:11; 129:2; 131:4; 144:21
**Scala** [1] - 136:25
**scared** [4] - 47:13; 68:24; 69:11; 101:13
**scares** [1] - 65:19
**scaring** [1] - 56:6
**scene** [1] - 14:1
**scheduling** [2] - 119:18; 142:5
**SCHILLER** [4] - 1:20; 2:3, 7, 11
**Schiller** [2] - 116:12; 132:7
**scholarship** [1] - 131:4
**scholastically** [1] - 117:20
**School** [15] - 13:11; 14:6; 20:24; 22:25; 27:24; 34:13; 78:23; 111:19; 120:4; 127:15, 18; 128:3; 140:5, 7
**school** [86] - 9:10, 24; 13:11; 15:9, 14-15; 16:10, 15, 19, 24; 17:15, 19; 23:4, 24; 25:2, 9; 26:4; 28:11; 29:9; 30:1, 14; 31:17; 32:8; 33:1; 35:24; 36:10; 42:11; 51:1, 10; 53:16, 23; 56:10, 12; 66:13; 67:22; 68:4; 78:18; 83:17; 86:2; 91:9, 17; 92:6, 9; 93:8, 23,

25; 94:17, 20, 24; 95:19; 96:6, 13; 98:2; 100:16, 24; 101:3; 103:25; 105:19; 108:2; 111:16, 18, 23; 112:3, 8, 15, 24; 113:4, 21; 117:2, 6, 10; 119:21; 120:4; 122:9; 134:2, 4; 135:18; 140:9
**school's** [1] - 135:19
**Schools** [1] - 128:6
**science** [7] - 107:6, 9; 108:19, 22; 110:7, 10
**science/leadership** [1] - 115:19
**Scientists** [1] - 128:15
**Scott** [5] - 2:21; 3:13; 145:6, 8
**scottwallace.edva@gmail.com** [1] - 3:16
**screaming** [1] - 67:2
**screen** [6] - 45:16; 65:3; 79:25; 109:24; 119:2
**SE** [3] - 2:3, 7, 11
**seated** [6] - 33:20; 81:22; 86:12-14; 141:1
**sec** [1] - 126:19
**second** [36] - 7:2, 7; 8:3, 9; 13:3; 19:7; 22:15; 29:23; 39:24; 40:6; 45:14, 17; 64:20; 104:4; 110:3, 15; 111:5; 113:10, 12; 114:1, 12; 116:25; 117:18; 120:17, 19; 121:4; 130:12; 131:18, 22; 132:3, 19; 133:19; 135:25; 138:5, 7
**section** [3] - 27:2, 8
**sector** [1] - 118:16
**secure** [1] - 78:21
**security** [1] - 118:17
**see** [50] - 8:23; 20:2; 23:17; 25:15; 32:4; 33:10; 35:22; 36:20, 23; 41:12; 42:6; 44:2; 45:17, 20, 23; 46:2; 47:8; 51:17; 52:4, 11, 17; 58:5, 10, 12-13; 59:5; 60:5, 7, 20; 64:17; 71:20; 72:17; 74:4; 91:20; 98:8; 101:1; 105:25; 106:1; 110:13; 111:10; 123:25; 124:1; 129:13; 133:13; 138:4; 139:22; 145:2
**seed** [1] - 12:25
**seeing** [2] - 34:17; 44:24
**selected** [1] - 118:11
**self** [1] - 48:5
**semester** [3] - 111:6; 112:5
**send** [3] - 39:13; 52:8; 65:16
**sender** [1] - 70:6
**sending** [2] - 48:4; 55:21
**senior** [1] - 140:9
**seniors** [1] - 118:13
**sense** [29] - 23:13; 40:19; 43:16; 58:2, 19; 61:1; 77:9; 81:25; 86:17; 87:21; 90:15; 94:7, 19; 98:5; 101:12; 109:22; 110:4; 113:5; 114:2; 122:11; 125:8, 10; 127:8; 130:8; 133:4; 134:16; 135:12, 14, 23
**sent** [6] - 51:11; 53:2; 56:8; 61:4, 11; 69:15
**sentence** [1] - 36:19
**separate** [1] - 24:13
**September** [2] - 123:17; 124:4

seriously [1] - 69:12
service [1] - 35:21
Services [2] - 129:12, 16
session [2] - 37:21; 79:5
SESSION [2] - 1:8; 6:1
set [6] - 10:2; 20:6; 21:4; 114:12
seven [1] - 24:5
seven-count [1] - 24:5
several [2] - 20:1; 117:19
severe [1] - 31:15
sex [7] - 25:5; 28:6; 49:23; 50:1, 13; 54:14
sexual [27] - 15:24; 16:5; 26:4, 6, 8-9; 30:16; 36:3, 16; 48:21; 49:1; 55:1; 66:9; 67:23; 73:7, 20; 74:2; 82:18; 83:6; 85:5; 89:16; 90:12; 98:15, 22, 25; 99:5; 117:2
sexually [3] - 103:10; 104:22
shared [3] - 75:12; 84:7; 117:1
shirt [1] - 66:25
shit [1] - 40:25
shoot [1] - 67:24
short [4] - 78:1; 80:5; 120:21; 135:21
short-lived [1] - 120:21
shorthand [1] - 3:17
shortly [1] - 59:21
show [8] - 35:11; 42:17; 68:22; 70:5; 71:9; 127:24; 131:8; 139:19
showed [3] - 60:1; 72:14; 103:23
showing [6] - 42:6; 43:16; 57:22; 123:8; 135:23; 136:21
shows [2] - 13:15; 58:24
shut [1] - 83:23
sic [1] - 99:15
side [3] - 26:21; 58:21; 139:15
Sidebar [2] - 52:25; 74:23
sidebar [8] - 14:5, 12; 23:8, 10, 16; 50:9; 69:23; 125:4
sidebars [1] - 10:5
signature [1] - 64:9
simple [1] - 125:5
simply [6] - 32:19; 44:1; 52:7; 71:19; 88:21; 122:22
single [3] - 79:12; 84:21; 85:12
sitting [2] - 86:15; 142:12
situation [5] - 16:11; 25:3; 35:24; 71:15; 110:10
size [1] - 33:2
Skills [1] - 136:24
slamming [1] - 106:3
slick [2] - 140:23; 144:25
slit [1] - 45:24
Sloan [6] - 117:11; 132:25; 133:8, 13, 19; 134:1
Sloan-Kettering [5] - 132:25; 133:8, 13, 19; 134:1
smiley [1] - 49:7
social [2] - 34:7; 140:19
sociologist [1] - 21:8
someone [4] - 38:19; 65:14; 100:13;

143:12
sometimes [4] - 12:13; 19:19; 24:10; 119:3
somewhere [1] - 82:1
Sona [3] - 2:18; 27:24; 34:13
soon [1] - 59:16
sorry [47] - 22:16; 31:25; 35:10, 13; 36:6; 38:16, 21, 23; 40:15; 42:12; 45:4; 46:15; 53:8; 54:8; 63:5; 65:6; 67:15; 73:15, 18; 76:9, 15; 88:10; 90:4; 92:15; 98:24; 101:17; 102:11; 103:4, 18; 105:20; 106:16; 108:14; 111:8; 113:17, 25; 123:23; 126:24; 137:2, 9; 138:5; 139:23; 141:4
sort [12] - 10:6; 11:21; 16:7, 11; 19:9; 21:6; 22:10; 25:18, 24; 33:8; 141:22; 142:12
sound [2] - 63:15; 88:16
sounds [16] - 34:20; 36:1; 38:13; 40:2; 60:23; 79:7; 91:14; 99:10; 106:12; 113:1, 14; 117:22; 129:5; 134:23; 135:3; 136:20
Spanish [5] - 110:19, 22, 24; 137:7; 138:3
speaking [4] - 76:23; 95:16; 99:25; 125:3
speaks [2] - 138:11
specific [5] - 8:21; 35:5; 36:25; 55:6; 72:23
specifically [8] - 10:1; 23:18; 59:13; 76:3; 83:1; 90:13; 100:15; 101:14
specifics [1] - 70:20
speculating [1] - 116:2
speed [1] - 138:25
spent [1] - 10:3
spot [1] - 140:15
spreading [2] - 66:8; 103:25
spring [1] - 127:13
SQL [3] - 136:25; 137:12, 25
Square [1] - 3:15
srewari@huntonak.com [1] - 2:20
SRO [2] - 68:4; 86:1
stage [1] - 23:22
staircase [2] - 110:19, 22
stamp [4] - 22:14; 42:5, 9
stand [1] - 17:25
standard [3] - 14:24; 17:2; 30:3
standards [1] - 15:4
standing [3] - 50:4; 52:22
stands [1] - 58:14
start [13] - 39:8; 82:3, 5; 88:19; 95:6; 100:21; 110:2; 126:13; 131:21; 140:20, 22; 144:8
started [22] - 11:8; 34:9, 17; 38:11; 45:2, 9; 65:10; 66:8; 67:1, 22; 68:20; 94:24; 95:14, 24; 103:25; 110:4; 111:5, 7-8; 112:7, 11
starting [5] - 7:7; 10:7; 33:23; 95:11; 106:21; 140:4
starts [5] - 8:24; 27:8; 30:25; 46:8

state [8] - 16:1; 20:9; 115:22; 116:5; 128:18, 22; 129:1, 6
statement [31] - 7:23; 23:9; 29:15; 64:3; 65:7, 10, 24-25; 66:4, 6; 67:13, 16, 19, 21; 68:16-18; 69:5; 70:12, 15; 72:15, 20; 74:13; 76:7; 77:2, 4; 93:23; 102:3; 117:14; 131:2
statements [8] - 10:18; 11:20; 18:9; 29:22; 31:1; 72:24; 80:25; 118:24
states [1] - 127:6
States [4] - 3:14; 120:19; 130:11; 132:3
STATES [2] - 1:1, 12
station [6] - 63:13, 16, 18-19; 76:24; 86:5
status [5] - 59:14, 23; 60:8, 13, 15
statuses [1] - 60:1
statute [1] - 125:16
stay [6] - 17:15; 49:18; 101:2, 4; 138:20; 140:19
stayed [5] - 34:6; 66:13; 92:5; 111:2; 132:9
staying [2] - 91:16; 92:9
STEM [1] - 128:11
step [2] - 68:23; 141:4
steps [2] - 14:21, 23
still [16] - 20:13; 29:24; 43:4; 49:13; 58:24; 59:10; 79:16; 81:12; 101:12; 104:4; 122:10; 128:5; 141:12, 14
stools [1] - 84:1
stop [8] - 13:10; 43:21; 53:20; 66:15; 67:17; 68:9; 81:15; 90:1
stopped [5] - 17:5, 10; 91:16; 92:9; 103:24
stories [1] - 74:21
Storm [1] - 111:18
story [9] - 29:25; 31:10, 12-13, 18; 89:7, 9, 12; 117:1
straight [2] - 18:19; 19:4
strategy [1] - 23:2
Street [4] - 1:17; 2:3, 7, 11
street [1] - 66:16
strike [5] - 18:20; 24:14; 30:24; 31:22; 132:16
strong [2] - 58:9; 108:23
strongest [1] - 108:19
struck [2] - 29:23; 31:19
structure [1] - 119:14
struggle [1] - 143:25
struggles [1] - 19:20
student [13] - 15:16; 28:9; 54:4; 59:7; 102:2; 113:15, 18; 120:8; 122:10; 127:12; 128:9; 135:7
students [9] - 15:13; 25:2; 47:24; 48:2; 59:23; 60:24; 113:22; 118:11; 119:18
studies [1] - 117:9
Studies [3] - 120:4; 140:6
stuff [7] - 9:8; 25:12; 27:1; 51:21; 55:10; 73:21
subjects [3] - 107:9; 108:19, 23

**submission** [1] - 123:24
**submit** [2] - 18:18; 132:22
**submitted** [3] - 121:25; 135:24; 136:22
**subpoena** [1] - 41:25
**subpoenaed** [1] - 131:5
**substantive** [1] - 15:8
**succeed** [1] - 136:1
**sudden** [2] - 66:17, 20
**suggest** [10] - 11:8; 12:13, 17; 21:12, 17; 25:19; 27:14; 28:19; 38:18; 138:21
**suggested** [3] - 21:7; 50:15, 20
**suggestion** [2] - 11:21; 12:3
**suggests** [2] - 18:15; 19:10
**suicidal** [3] - 38:6; 48:16
**Suite** [7] - 1:17, 21; 2:4, 8, 12; 3:7, 11
**summary** [1] - 89:4
**summer** [9] - 49:9; 115:9; 118:6, 14; 119:6; 123:4; 126:20; 133:23; 134:1
**superintendent** [1] - 13:7
**support** [2] - 32:10; 119:14
**supportive** [1] - 112:16
**supposed** [2] - 43:15; 95:25
**surprise** [2] - 56:23; 79:14
**surprised** [3] - 141:25; 142:1; 144:4
**suspect** [1] - 129:9
**sustained** [1] - 105:9
**swear** [1] - 45:24
**switch** [1] - 107:3
**sword** [1] - 25:11
**system** [2] - 29:9; 78:19

## T

**T.B** [1] - 3:6
**tab** [3] - 35:3; 49:5; 77:18
**talks** [1] - 19:12
**task** [1] - 49:18
**tattoos** [1] - 23:17
**Taylor** [39] - 38:12; 39:6, 14, 16, 21; 40:21, 24; 43:14, 21; 45:1, 6, 10; 55:22; 56:4, 15, 18, 21; 58:8, 18; 59:19, 24; 60:15, 20, 25; 61:5; 62:11; 63:8; 69:2, 15; 71:4, 20; 72:3, 20, 24; 73:21, 24; 74:1; 75:7, 12
**Taylor's** [1] - 59:14
**team** [3] - 80:22; 96:15; 118:20
**teardrop** [1] - 23:17
**technically** [2] - 112:14, 17
**telephone** [2] - 73:12; 74:10
**ten** [1] - 118:11
**tennis** [2] - 115:23; 116:5
**term** [4] - 23:9, 11-12; 25:4
**terminology** [1] - 83:2
**terms** [5] - 29:20; 40:15; 48:21; 55:1, 4
**terrified** [2] - 48:14; 68:23
**test** [1] - 29:5
**testified** [11] - 14:8, 15; 15:19; 28:15, 18-19; 31:5; 51:9, 11; 54:23; 103:20
**testifies** [1] - 18:22

**testify** [5] - 24:19; 33:10; 43:5; 122:15; 138:22
**testifying** [2] - 121:16; 142:23
**testimony** [22] - 13:14, 25; 14:14; 15:6; 20:14, 20; 25:21; 26:1, 3, 12; 28:24; 30:5, 7; 32:24; 33:1, 3; 49:13; 50:4, 25; 108:18
**text** [3] - 51:15; 69:3
**texting** [2] - 97:8, 17
**Thanksgiving** [7] - 92:13, 17; 93:7, 19-20; 95:23; 100:17
**themselves** [1] - 80:25
**theoretical** [1] - 20:6
**theoretically** [3] - 16:4, 7, 11
**theories** [1] - 25:16
**theory** [1] - 25:24
**therapist** [3] - 34:17; 77:25; 78:2
**therapists** [1] - 22:6
**therapy** [2] - 36:24; 48:15
**therefore** [1] - 25:9
**Thereupon** [1] - 80:14
**they've** [4] - 23:7; 31:1; 32:11, 15
**thinks** [1] - 142:25
**third** [7] - 37:18; 64:9; 111:6, 8, 10; 117:8; 118:17
**Third** [1] - 118:2
**third-party** [1] - 118:17
**threat** [1] - 118:18
**threatening** [1] - 40:13
**threats** [4] - 38:1, 5; 68:1; 101:11
**three** [9] - 27:17, 19; 47:24; 48:6; 78:3; 92:6; 105:3; 120:6
**throughout** [1] - 70:18
**tie** [1] - 31:8
**Tiffany** [3] - 129:21, 25
**timeframe** [1] - 83:20
**timeframes** [1] - 138:21
**timeline** [6] - 22:10; 29:13; 31:10; 95:21; 96:2
**Title** [10] - 12:12; 14:24; 16:8, 24; 18:14; 20:23; 25:10; 29:9; 78:24; 79:1
**today** [8] - 11:19; 18:7; 19:1; 20:9; 58:7; 82:1; 138:20
**together** [1] - 29:13
**tomorrow** [10] - 66:21; 67:5; 82:3; 140:20, 22; 142:8, 18; 144:1, 9; 145:2
**tone** [1] - 17:7
**took** [10] - 22:25; 23:22; 33:15, 17; 55:18; 58:7; 59:8; 66:13; 88:25; 110:21
**top** [11] - 22:17; 35:8; 46:21; 53:3; 62:13; 92:8; 123:13, 18, 21; 126:16, 19
**topics** [1] - 138:18
**TORCHINSKY** [1] - 1:16
**totally** [2] - 31:24; 108:6
**touch** [2] - 103:2; 107:1
**touched** [9] - 55:15; 76:7, 14, 18, 22, 25; 83:17; 104:1; 105:24
**touching** [11] - 26:5; 36:3, 9; 40:13; 67:2; 68:15; 104:22; 106:14, 17, 25

**towards** [1] - 7:3
**town** [2] - 142:18, 20
**toys** [3] - 49:23; 50:1; 54:15
**track** [1] - 40:3
**tracks** [1] - 119:17
**traditional** [2] - 30:8; 119:16
**trafficking** [3] - 25:5; 28:6, 8
**tragedy** [1] - 117:3
**training** [2] - 115:19; 118:14
**transcribed** [1] - 96:15
**TRANSCRIPT** [1] - 1:11
**transcript** [34] - 3:17; 6:12, 23-24; 7:19, 22; 9:4; 32:1; 91:13; 92:4, 7, 11, 19; 96:14, 24; 97:18, 22, 25; 98:3, 5-6, 8, 10, 13; 99:7, 21; 101:9; 102:1; 105:14; 108:4; 140:6; 145:6
**transcription** [1] - 3:18
**transcripts** [1] - 10:4
**transpired** [1] - 112:10
**trauma** [3] - 22:10; 29:13; 31:10
**traumatic** [1] - 96:4
**travel** [1] - 118:14
**treaters** [1] - 31:7
**trial** [10] - 10:21; 13:4; 22:21; 28:22; 30:25; 136:12, 19; 143:19
**TRIAL** [1] - 1:11
**tried** [9] - 17:4; 66:24; 67:1-3; 83:22; 98:2; 132:6
**tries** [1] - 19:22
**troubling** [1] - 8:3
**true** [12] - 15:23; 22:22; 43:13, 20; 47:22; 61:12; 117:14; 118:24; 131:2, 5; 132:11
**trust** [8] - 34:25; 57:18; 77:13; 109:21, 25; 111:9; 129:4; 136:7
**truth** [1] - 89:10
**try** [12] - 7:22; 8:4; 18:9; 50:12; 71:16; 76:10; 80:16; 81:18; 82:3; 140:21; 142:13
**trying** [21] - 10:4; 12:8; 19:11; 22:10; 24:2, 9; 26:5; 27:7; 47:13; 63:2; 65:18; 69:24; 70:13; 73:19; 74:18; 100:2; 112:20; 139:20; 142:10, 21
**Tuesday** [2] - 57:4, 20
**tug** [1] - 117:19
**turn** [7] - 13:6; 35:3; 49:5; 79:20; 117:17; 143:23; 144:11
**turned** [3] - 74:11; 139:4
**turns** [2] - 29:8, 10
**two** [29] - 7:2, 18; 9:10; 10:1; 19:2; 22:13; 27:5; 42:2, 24; 72:12; 73:6; 74:5; 78:3; 85:20; 89:24; 106:14; 111:3; 114:10; 118:14; 120:5; 133:17; 137:7; 138:9; 142:8, 18; 143:3, 13
**tying** [1] - 28:9
**typically** [1] - 79:21

## U

**U.S** [5] - 130:7, 19, 24; 132:16, 18
**ultimate** [1] - 10:9
**ultimately** [2] - 71:23; 139:2
**Um-hmm** [4] - 6:17; 7:1; 8:25; 68:3
**um-hmm** [8] - 10:16; 54:16, 22; 58:23; 94:5, 9; 107:8; 108:10
**UN** [1] - 135:21
**under** [35] - 8:2; 14:24; 16:24; 19:12, 24; 29:4, 22; 30:22; 32:11, 19; 33:9; 35:21; 45:10; 49:6; 66:25; 67:1; 71:4, 20; 72:3; 75:12; 77:17; 118:2; 125:15; 127:7, 25; 128:7, 19; 129:1, 11; 132:16, 18
**undergraduate** [1] - 120:24
**undermine** [1] - 21:18
**underneath** [1] - 132:24
**understood** [6] - 13:22; 19:1, 8; 21:20; 23:10; 81:11
**unexpected** [1] - 118:3
**unfair** [4] - 9:4, 12; 31:24; 32:16
**unfounded** [3] - 10:18; 13:19; 20:10
**unit** [1] - 85:24
**United** [6] - 3:14; 120:19; 130:11; 132:3; 135:9, 16
**UNITED** [2] - 1:1, 12
**University** [8] - 113:8; 128:8, 11; 133:10; 135:5, 10-11, 16
**University/John** [1] - 127:7
**unknown** [1] - 51:9
**unless** [3] - 72:10; 73:23; 143:11
**unreasonable** [1] - 16:25
**up** [34] - 6:6, 9, 19; 7:4; 11:9; 17:17; 21:23; 23:8; 24:4; 25:13; 30:19; 31:21, 23; 33:6; 34:3; 58:3; 62:6, 13; 66:23; 67:1; 71:23; 72:10, 18; 74:8; 79:16; 80:19; 81:23; 104:4; 110:19; 117:16; 138:25; 142:15; 144:12
**update** [1] - 59:14
**updates** [1] - 59:24
**upper** [1] - 27:3
**upset** [3] - 64:2; 66:5; 85:3
**upsetting** [1] - 87:24
**upstate** [1] - 111:21
**uses** [2] - 7:19; 25:1

## V

**VA** [3] - 3:8, 11, 15
**vagina** [1] - 83:21
**vaguely** [3] - 76:2; 79:10; 82:13
**variables** [1] - 10:23
**varied** [1] - 119:4
**veer** [1] - 8:24
**verbal** [1] - 78:6
**verbally** [3] - 76:20, 23; 77:1
**versions** [1] - 105:3

**versus** [1] - 112:21
**victim** [1] - 48:20
**victory** [1] - 21:18
**video** [4] - 6:25; 87:17, 19, 22
**videotape** [1] - 17:24
**view** [2] - 8:1; 32:19
**VIRGINIA** [1] - 1:2
**Virginia** [3] - 3:14; 28:13; 30:22
**visible** [1] - 44:22
**vivid** [5] - 44:20; 47:23; 85:3, 8; 87:20
**vividly** [1] - 78:12
**VOGEL** [1] - 1:16
**voice** [1] - 88:14
**voicemail** [3] - 97:23; 98:25; 99:13
**VOLUME** [1] - 1:8

## W

**wait** [3] - 46:25; 87:6; 95:3
**waiting** [2] - 86:18; 87:5
**walk** [1] - 7:4
**walked** [1] - 65:12
**walking** [1] - 66:17
**wall** [2] - 41:23; 44:21
**Wallace** [4] - 3:13; 145:6, 8
**wants** [6] - 9:20; 21:13; 71:16; 80:22; 93:16; 138:22
**Ward** [1] - 22:7
**Washington** [5] - 1:18; 2:16, 19, 23; 3:3
**ways** [1] - 37:8
**weaknesses** [1] - 118:22
**Weaver** [2] - 85:10; 143:10
**Wednesday** [8] - 93:11, 19; 94:10, 13-14, 16; 95:23
**week** [15] - 10:24; 82:5; 85:22; 92:12, 17; 93:6, 9, 20; 94:18; 95:23; 96:6, 12; 100:17; 111:5, 7
**weekend** [1] - 66:7
**weeks** [1] - 78:3
**weight** [1] - 66:24
**welcome** [3] - 53:10; 65:3; 109:23
**whatsoever** [1] - 16:10
**whereas** [1] - 108:12
**whichever** [1] - 65:4
**white** [3] - 35:2; 77:17; 79:20
**whole** [10] - 8:22; 21:13; 23:22; 25:1; 27:2; 72:11; 89:7, 12; 139:16
**wider** [1] - 20:15
**Wiehle** [1] - 3:10
**window** [1] - 145:1
**winning** [1] - 116:5
**wise** [1] - 86:10
**wish** [1] - 138:10
**withdrawn** [1] - 14:2
**withdrew** [3] - 13:10; 111:15
**witness** [19] - 10:19; 11:12; 13:6, 21; 23:24; 30:5, 16-17; 33:12; 41:13; 72:14, 20; 93:14; 114:13; 121:17; 125:10;

139:9; 143:18
**WITNESS** [29] - 35:10, 13; 42:12; 44:3, 6, 12; 46:9; 47:5, 8; 53:8, 22; 61:19; 63:5; 75:14; 78:15; 82:21; 88:22; 93:17; 97:15; 102:14; 103:18; 104:18; 113:1; 121:25; 123:5, 21; 139:12, 22, 24
**witness's** [1] - 125:23
**witnesses** [8] - 32:21; 138:23; 141:23; 142:18, 24; 143:1; 144:1, 11
**women** [1] - 128:11
**Woolf** [1] - 23:23
**word** [4] - 11:9, 14; 23:19; 144:12
**words** [4] - 16:1, 7; 26:5; 130:18
**world** [2] - 118:8, 15
**world-renowned** [1] - 118:8
**worries** [1] - 76:11
**worry** [1] - 68:7
**wow** [2] - 46:23; 47:11
**wrist** [1] - 45:24
**writes** [1] - 58:6
**writing** [1] - 49:10
**written** [3] - 76:7; 94:4; 102:3
**wrote** [25] - 13:15; 45:25; 49:6, 11; 64:3; 65:10, 24; 66:4, 12, 20; 67:9; 68:7, 19; 69:10; 70:12, 15; 93:23; 118:6, 20; 119:5, 13; 120:18; 132:5, 7

## Y

**year** [13] - 13:12; 16:15; 56:10; 87:22; 108:5; 109:17; 110:25; 115:25; 116:1, 7; 117:9; 134:3; 136:14
**years** [11] - 31:21; 32:12; 36:25; 41:17; 48:20; 121:10; 129:18; 130:15; 133:24; 134:19
**yell** [1] - 88:24
**yesterday** [13] - 6:10; 7:18; 10:3; 11:8, 21; 21:7; 22:7; 28:24; 34:16; 108:18; 142:7; 144:3
**York** [4] - 111:21; 118:12; 129:11, 15
**yourself** [6] - 48:5; 56:2; 61:14; 86:24; 97:13; 139:14

## Z

**zeal** [1] - 74:17
**Zoll** [1] - 2:2
**zone** [2] - 18:20; 103:5
**zoom** [1] - 126:16
**Zoom** [1] - 57:21
**Zuluaga** [2] - 13:7; 15:11
**Zuluaga's** [1] - 13:14