UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

```
B.R.,                             :
                                  :
            Plaintiff,            :   Civil Action
                                  :   No. 1:19-cv-00917-RDA-WEF
        v.                        :
                                  :   April 17, 2024
F.C.S.B.,                         :   10:05 a.m.
            et al.,               :
                                  :
                                  :   VOLUME 21 - AM and PM
            Defendants.          :   SESSION
                                  :
.............................. :
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

  For the Plaintiff:          **Jonathan Fahey, Esq.**
                              HOLTZMAN VOGEL BARAN TORCHINSKY
                              & JOSEFIAK, PLLC
                              2300 N Street NW
                              Suite 643a
                              Washington, DC 20037
                              202-536-1702
                              Email: Jfahey@holtzmanvogel.com

                              **Alison Anderson, Esq.**
                              BOIES SCHILLER FLEXNER, LLP
                              2029 Century Park East
                              Suite 1520
                              Los Angeles, CA 90067
                              213-995-5720
                              Email: Alanderson@bsfllp.com

APPEARANCES:  (Cont.)

For the Plaintiff:          **Brittany Zoll, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            610-804-1787
                            Email: Britzoll@gmail.com

                            **Andrew Brenner, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            305-539-8400
                            Email: Abrenner@bsfllp.com"

                            **Robert Keefe, Esq.**
                            BOIES SCHILLER FLEXNER, LLP
                            100 SE 2nd Street
                            Suite 2800
                            Miami, FL 33131
                            850-585-3414
                            Email: Rkeefe@bsfllp.com

For Defendant F.C.S.B.:     **Ryan Bates, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1596
                            Email: Rbates@hunton.com

                            **Sona Rewari, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Avenue, NW
                            Washington, DC 20037
                            202-955-1974
                            Email: Srewari@huntonak.com

                            **Scott W. Burton, Esq.**
                            HUNTON ANDREWS KURTH, LLP
                            2200 Pennsylvania Ave NW
                            Washington, DC 20037
                            202-955-1664
                            Email: Burtons@huntonak.com

```
APPEARANCES:  (Cont.)

For Defendant F.C.S.B.:        Kevin Elliker, Esq.
                              HUNTON ANDREWS KURTH, LLP
                              2200 Pennsylvania Avenue, NW
                              Washington, DC 20037
                              804-788-8200
                              Email: Kelliker@huntonak.com

For the Defendants            Michael E. Kinney, Esq.
S.T., A.F., P.A.H., T.B.,     THE LAW OFFICE OF MICHAEL E.
B.H., M.P.F., M.C., F.T.,     KINNEY, PLC.
J.F.:                         1801 Robert Fulton Drive
                              Suite 120
                              Reston, VA 20191
                              Email:  Mk@kinneyesq.com

For the Defendant J.O.:       Bruce Blanchard, Esq.
                              ODIN, FELDMAN & PITTLEMAN, PC.
                              1775 Wiehle Avenue
                              Suite 400
                              Reston, VA 20190
                              Email:  Bruce.blanchard@ofplaw.com

Court Reporter:               Scott L. Wallace, RDR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              Eastern District of Virginia
                              401 Courthouse Square
                              Alexandria, VA  22314-5798
                              Cell: 443-584-6558
                              Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                                **Page**

DIRECT EXAMINATION OF DR. SETH TUWINER          8
BY MS. REWARI
CROSS-EXAMINATION OF DR. SETH TUWINER           30
BY MR. KEEFE
REDIRECT EXAMINATION OF DR. SETH TUWINER        37
BY MS. REWARI

DIRECT EXAMINATION OF TIFFANY ESTRELLA          38
BY MS. REWARI
CROSS-EXAMINATION OF TIFFANY ESTRELLA           61
BY MS. ZOLL
REDIRECT EXAMINATION OF TIFFANY ESTRELLA        68
BY MS. REWARI

DIRECT EXAMINATION OF AMY MOIR                  70
BY MS. REWARI
CROSS-EXAMINATION OF AMY MOIR                   88
BY MS. ZOLL
REDIRECT EXAMINATION OF AMY MOIR                94
BY MS. REWARI

DIRECT EXAMINATION OF T██████ B██████           99
MR. BATES
DIRECT EXAMINATION OF T██████ B██████           191
BY MR. KINNEY
CROSS-EXAMINATION OF T██████ B██████            192
BY MR. BRENNER

5

**<u>EXHIBITS</u>**

**<u>DESCRIPTION</u>**                                                                                       **<u>Page</u>**

**After review of the record and upon agreement of counsel and deputy clerk, all final exhibits can be found on CME at Docket #975.**

| Description | Page |
|---|---|
| Defendants' Exhibit 148 admitted | 45 |
| Defendants' Exhibit 227 admitted | 49 |
| Defendants' Exhibit 392 admitted | 51 |
| Defendants' Exhibit 155 admitted | 53 |
| Plaintiff's Exhibit PX-642A admitted | 89 |
| Defendants' Exhibit 274 admitted | 114 |
| Defendants' Exhibit 275 admitted | 123 |
| Defendants' Exhibit 283 admitted | 132 |
| Defendants' Exhibit 116 admitted | 143 |
| Defendants' Exhibit 232 admitted | 145 |
| Defendants' Exhibit 212 admitted | 151 |
| Defendants' Exhibit 213 admitted | 153 |
| Defendants' Exhibit 45 admitted | 158 |
| Defendants' Exhibit 128 admitted | 161 |
| Defendants' Exhibit 220 admitted | 165 |
| Defendants' Exhibit 223 admitted | 171 |
| Defendants' Exhibit 161 admitted | 177 |
| Defendants' Exhibit 159 admitted | 179 |
| Plaintiff's Exhibit 541 admitted | 247 |



1              **MORNING SESSION, APRIL 17, 2024**

2    (10:05 a.m.)

3         THE COURT:  Good morning.

4         ALL PARTIES PRESENT:  Good morning.

5         THE COURT:  Do we need to do anything before we bring the

6    jury in?

7         MR. BRENNER:  Nothing for the plaintiff, Your Honor.

8         MS. REWARI:  Nothing for the defense.

9         THE COURT:  Very good.  You can go ahead and get your next

10   witness and I'll bring the jury in.

11        (Jury in at 10:05 a.m.)

12        THE COURT:  You may be seated.  Thank you, ladies and

13   gentlemen.

14        Good morning, ladies and gentlemen.

15        ALL PARTIES PRESENT:  Good morning, Your Honor.

16        THE COURT:  Thank you again for your time and attention to

17   this matter.

18        I have to ask you this question as I always do:  Have all

19   of you lived up to the Court's instruction not to discuss the

20   case or any aspect of the case with anyone?  And to the extent

21   you can, you've stayed away from social media and print media?

22   Very good.  I appreciate that.

23        We have a few witnesses today.  We also have something

24   that's a bit unusual that you'll get to experience, but I'll

25   explain that more to you when we get to that point.

1        Next witness.

2        MS. REWARI:  Thank you.

3         (DR. SETH TUWINER, DEFENDANTS' WITNESS, SWORN)

4        THE COURT:  Sir, please have a seat.  Listen to the

5   questions of counsel, answer them as best you can.  If you hear

6   the court interrupt or the counsel interrupt, please hesitate

7   before you answer.

8             DIRECT EXAMINATION OF DR. SETH TUWINER

9   BY MS. REWARI:

10  **Q.**    Good morning.

11  **A.**    Good morning.

12  **Q.**    Dr. Tuwiner, would you please introduce yourself to the

13  jury?

14  **A.**    Yes.  My name is Dr. Seth Tuwiner.

15  **Q.**    Would you slide the mic a little bit closer to yourself?

16  **A.**    Is this better?

17  **Q.**    That's better, thank you.

18  **A.**    Okay.

19  **Q.**    And, Dr. Tuwiner, what do you do for a living?

20  **A.**    I'm a neurologist.

21  **Q.**    Are you licensed to practice medicine in Virginia?

22  **A.**    Yes.

23  **Q.**    How many years have you practiced medicine as a

24  neurologist?

25  **A.**    Approximately 22 years.

1  **Q.**    Okay.  And is your residence also in Virginia?

2  **A.**    Yes.

3  **Q.**    Okay.  Where is your office?

4  **A.**    My office is in Lansdowne, which is technically Leesburg,

5  Virginia.

6          MS. REWARI:  Can everyone hear me okay?

7  BY MS. REWARI:

8  **Q.**    All right.  Are you here today to address the opinions of

9  plaintiff's expert, Dr. Cisler, about -- that PTSD is produced

10 by structural changes to the brain?

11 **A.**    Yes.

12 **Q.**    Okay.  And did you work with me to prepare a slideshow

13 for use today in your testimony?

14 **A.**    Yes.

15 **Q.**    Okay.

16         MS. REWARI:  Your Honor, if we may publish that?

17         MR. KEEFE:  Without objection.

18         THE COURT:  Without objection.

19         MS. REWARI:  Thank you.

20 BY MS. REWARI:

21 **Q.**    All right.  Let's just start with your background, if we

22 go to the second page of the slide.  Could you give the jury a

23 brief overview of your formal education?

24 **A.**    Yes.  I did my undergraduate education at the University

25 of Maryland, College Park.  I completed a Masters of Science in

1   New York, at Touro School of Health Sciences.  I completed my

2   doctorate of medicine at Technion Faculty of Medicine -- so I

3   have to turn -- I did my internship at the University of

4   Southern California, LA County Medical Center, and then my

5   residency, my three-year neurology residency, also at the

6   University of Southern California, LA County Medical Center.

7          Subsequently after I completed my residency in neurology

8   at LA County Medical Center, I went to Thomas Jefferson Medical

9   Center for a fellowship in something called clinical

10  neurophysiology, and then I did another year fellowship or

11  approximate one-year fellowship in neuromuscular disease at

12  Thomas Jefferson Medical Center.

13         MS. REWARI:  Your Honor, may I hand Dr. Tuwiner a hard

14  copy?

15         THE COURT:  You may.

16         THE WITNESS:  Thank you.

17  BY MS. REWARI:

18  **Q.**    All right.  Can you just explain what a residency is?

19  **A.**    So doctors, after they finish medical school, they are --

20  they have to be exposed to patients in clinical scenarios.  So

21  doctors will go to hospitals.  They will be over -- their

22  clinical exposure will be overseen by tending physicians, and

23  then that will evolve to where they are independent, and every

24  sub-specialty is different, but you have to see a lot of

25  patients, and then, once you complete your residency, you take a

1    board examination.

2    **Q.**    Okay.  And during your residency, did you treat patients

3    as a neurologist?

4    **A.**    Yes.  So at LA County Medical Center, it's a large, huge

5    tertiary hospital.  We had -- a lot of it was, you know, acute

6    conditions.  We had patients with strokes, patients with

7    intracranial bleeds.  We had a lot of AIDS patients at the time

8    who had neurological complications of AIDS, infectious disease

9    of the brain.  We had patients with gunshot wounds because it's

10   a trauma center.  We had all sorts of autoimmune diseases we

11   would see.  Anybody could go to the hospital, but it was a big,

12   big tertiary center.

13   **Q.**    And can you just explain what a fellowship is?

14   **A.**    So after doctors do their residency, they will do extra

15   specialization.  So neurologists, there's different fellowships,

16   but the one I did -- one of them is something called clinical

17   neurophysiology, and what we do is it was for electrical testing

18   of peripheral nerve and brain functioning.

19         So we do -- for example, some studies, we had an epilepsy

20   surgical unit, so patients who had intractable epilepsy who

21   needed a resection after they failed medications, we -- you

22   know, we had something called EEG analysis where they put

23   electrodes on your head, they look at your brainwaves.

24         That was about a year, and that also included other

25   electrical diagnostic tests such as a volt potential to assess

1    the integrity of the central nervous system of the brain and

2    spinal cord.

3         Also during that fellowship we did peripheral nerve

4    testing, so there's something called a nerve conduction study

5    where you put electrodes on the extremity, you shock the

6    person -- not literally shock, but it's a small electrical

7    exposure.  You measure the nerve function, and then you put a

8    needle in different muscles and analyze the muscle activity.

9         So that was also part of the clinical neurology

10   fellowship, but the next year was focused on neuromuscular

11   disease, and again, for neuromuscular disease, it's patients

12   who -- it's diseases of the peripheral nervous systems such as

13   muscular dystrophy or somebody who has a pinched nerve in the

14   neck or back, or any autoimmune nerve disorder, so it was

15   inclusive of that.

16   Q.   Okay.  And in a fellowship, are you also treating actual

17   patients?

18   A.   Yes.  So in a fellowship, you are examining patients,

19   treating patients.  Of course, there's oversight by board

20   certified attendings.  Patients are seen both in hospital and

21   clinic setting.

22   Q.   Okay.  Let's go to the next slide, if we may.

23        What is a medical board certification?

24   A.   So, doctors are expected to sit -- once you finish your

25   training, residency, and/or fellowship and you are in good

1    standing, you sit for a board examination in your discipline.

2         So, to do a board certification, typically during my time

3    it was a written test followed by an oral test.  So when I took

4    my boards, I had to take an exam, and once you pass, you have to

5    go examine a person, a mock patient with attendings or

6    neurologists observing you, and then you pass.

7         Now it's a written exam, but you have to master your

8    discipline, take an examination, and then after you get your

9    board certification, we have to maintain it, we have to --

10   previously we would take the exam every ten years, but there's a

11   process where we have to maintain the certification so we're

12   current.  So we don't fall back -- because obviously medicine

13   evolves and changes.  We have to keep up with literature.

14   **Q.**    Okay.  And are you board certified?

15   **A.**    Yes, yes, I am.

16   **Q.**    Okay.  In which areas of medicine are you board

17   certified?

18   **A.**    So my primary board certification is neurology, but in

19   addition to that, I have several other sub-specialty board

20   certifications which include brain injury medicine, stroke, or

21   vascular neurology, clinical neurophysiology, which is the

22   electrical testing of the brains through EEGs and something

23   called -- I discussed before, volt potentials.  Neuromuscular

24   disease or diseases of the peripheral nervous system, including

25   the nerve and muscle.

1          I have what's called the American Board

2     of Electrodiagnostic Medicine, which is testing of the nerves

3     and muscle, and also treating and diagnosing these types of

4     diseases.  And not listed here, I'm also certified by the

5     American Society of Neuroimaging, which is a board for

6     neurologists to do carotid ultrasound, so we look at the waves

7     of the carotid arteries in a method called transcranial doppler

8     ultrasound.  There's a probe that's placed on the head.

9          We look at the arteries and the flow in the head.  And

10    these are for patients who, for example, have strokes or

11    something called subarachnoid hemorrhage or other vascular

12    disorders.

13    **Q.**    And the first board that's listed on this slide, American

14    Board of Psychiatry and Neurology, can you explain what that

15    board is, to your understanding?

16    **A.**    So the American Board of Psychiatry and Neurology is an

17    entity that oversees the primary certification of neurologists

18    and psychiatrists.

19         So when we take the exam, psychiatrists go in one lane

20    and neurologists go in the other lane.  On our board for

21    neurology, although I'm a neurologist, we have a lot of

22    psychiatric content because there are neurological diseases that

23    have psychiatric manifestations.

24         For example, a person who is demented may hallucinate or

25    a person that has a brain tumor may have -- if it's in a certain

1    area of the brain, may have mental health problems.  And we also

2    had patients, for example, who have epilepsy or multiple

3    sclerosis, and they may have depression or anxiety, so we have

4    to treat these people.  So there is some -- it's neurology, but

5    there's a psychiatric content on our boards.

6          Now, the American Board of Psychiatry and Neurology

7    oversees these four listed subspecialty certifications as well,

8    brain injury, vascular neurology, clinical neuropsychology, and

9    neuromuscular medicine, and again, those have, again,

10   psychiatric content on the exams.

11   Q.    As part of your board certification in neurology, do you

12   have to have some understanding of how psychiatry interrelates

13   to your work?

14   A.    Yes, because it's -- it's relevant because for the first

15   reason that there are people who have organic brain disease that

16   may have psychiatric symptoms, and as neurologists we have to

17   make sure that there's nothing objective that causes those

18   psychiatric symptoms, but also we have people that come -- we

19   see people in the hospital and the office that may have

20   physical, meaning sensory, motor, vision, physical symptoms that

21   they convey, but also cognitive symptoms such as memory or

22   concentration, and our task is to do tests to ensure there's no

23   neurological cause.

24         So we will have to work these people up, so, for

25   example -- and some of these people may have psychiatric

1    conditions where there's no physical finding, but we're all

2    created different, so some people express a distress through --

3    I'm not saying I'm depressed or anxious, but my arm is numb, or

4    I'm weak on one side.  So this isn't a differential diagnosis.

5    As neurologists, we have to consider that.

6         So that's why it's so relevant that that's tested on our

7    boards, and we're expected to when we -- this is a routine part

8    of my practice.  When you work up a patient, we have to think of

9    these things so we can think of that as a list of possible

10   causes of the person's complaint.

11   **Q.**    You mentioned organic brain disease.  What is organic

12   brain disease?

13   **A.**    It's a very global term.  So, organic brain disease means

14   there's some biological cause.  For example, a person has, let's

15   say, ultra mental status and hallucinates.  We do an MRI, we see

16   a biomarker on the MRI or CAT scan of some disease process, so

17   we can say this tumor, this mass, is causing a person's

18   symptoms.

19        Or let's say an elderly person who comes from a nursing

20   home and they hallucinate, they're agitated, they're not at

21   their baseline, that normally they play cards or bingo, and they

22   interact with their peers.  And we may do blood work or do a

23   spinal tap to look at the body fluid to see if there's a

24   tangible cause like an infection or something in their blood

25   chemistry that alters their behavior.

1          So that's another biomarker, another objective basis, or

2     we have, for example, let's say an epilepsy patient who is

3     delirious and confused and having recurring seizures, we do an

4     EEG with an MRI to look at the brainwaves to see if there's a

5     alteration to explain their behavior.  So these are objective

6     tests to see if there's a biologic or organic tangible basis.

7     **Q.**     Thank you.  All right.  Let's look at the next slide.

8          Are you the member of any professional organizations in

9     the field of neurology?

10    **A.**     Yes.  So these are organizations that I'm a member of.  I

11    pay dues.  For example, American Academy of Neurology is my main

12    professional organization.  There's the American Association of

13    Neuromuscular and Electrodiagnostic Medicine.  It's for nerve

14    testing.  I have to do continuing medical education for that.

15    So these are all just entities that I'm associated with and I

16    pay yearly dues and I may go to conferences.

17    **Q.**     Okay.  Let me ask about your private practice.  When did

18    you first enter private practice?

19    **A.**     So, when I finished my fellowship, I had to -- you know,

20    I applied for hospital privileges.  I started effectively my

21    private practice independent alone roughly February of 2008.

22    **Q.**     Okay.  And have you maintained a private practice

23    continuously since that time?

24    **A.**     Yes, I have.

25    **Q.**     Okay.  And in your office, how many patients do you see a

1  week?

2  **A.**    So, for example, I'll give you this week.  Yesterday I

3  had, I think, about 18.  The day before I had 26, the day before

4  I had 23 patients.  I have seven -- about seven rooms, and so

5  these are people I treat.

6       I see on average at least 20 patients a day going from

7  room to room, and some of these are established, I've had for

8  years, because I've been established since 2008, and some of

9  these are new patients.  Some of these may be hospital patients,

10  but it's a very busy practice.

11  **Q.**    Do you also have call at a hospital?

12  **A.**    Since 2008, I have been on call at Loudoun County

13  Hospital in Leesburg.  What that consists of is that every fifth

14  week we are responsible for seeing patients in the intensive

15  care unit or emergency room or obstetrical gynecology ward or

16  just the medical floor.

17       We can get called during the day or in the middle of the

18  night.  I did that every fifth week since 2008.

19       That, as of October 2022, the density of calls decreased,

20  and I'm still on call, but I don't have a rotating call because

21  the hospital has employed neurologists.  They have their own

22  that are actually there, but I will cover if somebody's out, and

23  I still have hospital privileges as of -- this is as of October

24  of 2022.

25  **Q.**    All right.  Let's look at the next slide.  Do you treat

1    patients outside of your private practice as well?

2    **A.**    Yes.  So I've been established in Loudoun County.  I have

3    a relationship in the community, so I participate in the free

4    clinic.  I have patients from there.  I used to go to their

5    site, but now they come to my office, but that's existed since

6    2015.

7    **Q.**    Okay.  And then could you talk about the chief of the

8    neuroscience division at the hospital?

9    **A.**    So, I was chief of the neuroscience division at the

10   hospital, which ended this past December, December 31st.  It's a

11   two-year term, so doctors rotate.

12          What our role is we oversee people that want to be --

13   have privileges at the hospital, so if they have, for example,

14   anything -- I want to just use the global term baggage or any

15   problems we have to look at that to see if they can be

16   credentialed.  We look at their background, if there's

17   disciplinary action with another doctor, that's something --

18   within my area, that's something we do.

19          We also help develop what's called service lines in the

20   hospital.  For example, we have a stroke service line, we have

21   an epilepsy service line, so we work with other doctors who are,

22   you know, in different specialties in the hospital as well as

23   administrators in developing these different service lines in

24   the hospital.

25   **Q.**    And could you explain what the brain injury boards are?

1    **A.**     Yes.  So, I'm certified in brain injury medicine, and I

2    was requested to write questions -- so I became certified in

3    2014.  So I was requested to write questions for the board for

4    people who want to sit for the board as of 2016, so we write

5    questions, we discuss amongst colleagues, we have quality

6    review, we meet once or twice a year, typically once a year

7    to -- excuse me, to review questions to see if the quality

8    content is appropriate, and this is an ongoing process, so I'm

9    still involved.

10   **Q.**     Okay.  And so do you also have a consulting practice?

11   **A.**     Yes.  So, in addition to my regular practice, since -- I

12   have a consulting practice, so in this situation where we have

13   today, I may review case -- medical records, examine an

14   individual in this type of context.

15   **Q.**     Okay.  And are you paid for your time in that regard?

16   **A.**     Yes, I am.

17   **Q.**     And how are you paid?

18   **A.**     Well, I'm paid per hour, so my hourly rate is -- for this

19   particular case is $650 an hour, and then I'm paid for my time

20   to be present in court.

21   **Q.**     And do you -- and in that consulting practice, do you

22   sometimes work for the defense and sometimes work for the

23   plaintiff?

24   **A.**     Yes.  So, I work for both.  Most of my exposure has been

25   with the defense, but I also testified in court for plaintiff.

1  I did a case recently, so I do have plaintiff cases, or I may

2  discuss things on -- you know, without things going to court,

3  but I do for the plaintiff as well.

4  **Q.**    And so over the last 20-plus years, can you estimate the

5  number of people you've examined, whether as a treating doctor

6  or as part of your consulting work who have experienced some

7  type of brain disorder?

8  **A.**    So most of my time is seeing patients, but I -- in my

9  practice I -- I mean, I see over a hundred a week.  You could do

10  the math, but thousands of people, thousands of souls that I

11  examine and treat.

12  **Q.**    Were you asked by my firm to evaluate the plaintiff in

13  this case?

14  **A.**    Yes, yes.

15  **Q.**    And have you ever been engaged by my firm for any other

16  case?

17  **A.**    This is the first time.

18  **Q.**    Okay.  And did you review her -- did you review her

19  medical records?

20  **A.**    Yes.

21  **Q.**    Okay.  And did you meet with her personally to evaluate

22  her?

23  **A.**    Yes.

24  **Q.**    And are the opinions you're going to offer here today

25  based on your knowledge, training, and experience in your

1    evaluation of her?

2    **A.**     Yes.

3    **Q.**     Okay.  And are your opinions made to a reasonable degree

4    of medical certainty?

5    **A.**     Yes.

6          MS. REWARI:  Your Honor, we offer Dr. Tuwiner as an expert

7    in neurology and brain injury medicine.

8          THE COURT:  Mr. Keefe?

9          MR. KEEFE:  No objection.

10          THE COURT:  I was thinking it was your witness because you

11    said --

12          MR. KEEFE:  He is, Your Honor.  No objection.

13          THE COURT:  All right.  So certified.

14          MS. REWARI:  Thank you.

15    BY MS. REWARI:

16    **Q.**     So, we've been talking about neurology.  Can you just --

17    I think you touched on this, but can you give a basic overview

18    of what a neurologist does?

19    **A.**     So we don't do surgery.  We don't operate.  That's a

20    neurosurgeon, but neurologists, it has to do -- any disease

21    affecting the brain.  So there's a central nervous system and

22    peripheral nervous system.

23          The central nervous system is the brain and the spinal

24    cord.  The spinal cord is like a gelatinous mass that comes from

25    the brain.  It -- and so that's the central nervous system, and

1    also -- so that's the peripheral nervous system or the nerve

2    roots, so it's after the nervous central system.

3        We treat -- so, for example, peripheral nervous system

4    could be a pinched nerve in the neck or the back or carpal

5    tunnel or something tingling in the hand or muscle disease.

6        We evaluate and treat disorders of the peripheral and

7    central nervous systems.  So we talk to people, we examine

8    individuals, we do imaging studies, and then if we have a

9    diagnosis, we treat with medication.

10        We see patients in the office or in the hospital.

11    There's a wide variety of conditions, stroke, seizures, migraine

12    headaches, epilepsy, dementia, Parkinson's disease, multiple

13    sclerosis, autoimmune nerve disorders, just a wide -- brain

14    injuries, traumatic brain injuries, there's a wide spectrum of

15    diagnoses that we evaluate and treat.

16    Q.    You've talked some earlier about objective biomarkers?

17    A.    Yes.

18    Q.    So what are the types of objective biomarkers that you

19    use to investigate whether a patient's symptoms have a

20    neurological cause?

21    A.    So the way neurologists smell, and I'm saying this in a

22    figurative sense is brain imaging.  So we have CAT scans like a

23    lung doctor has a chest x-ray.  We have CAT scans or brain MRIs.

24        So if a person has neurological symptoms, whether

25    sensory, motor, vision, cognitive, anything, depending on our

1    exam, we'll order a CAT scan or a brain MRI to see if there's

2    anything tangible that localizes or is correlated with their

3    symptoms.

4        We may also order other tests like a blood test.  For

5    example, if a person, let's say, has thyroid disease and they're

6    tired -- they have mental fog, we have to order thyroid.  We

7    order -- in a hospital patient who's altered and confused, we

8    look at their white count to see if they have an infection.  We

9    look at their electrolytes to see if they have liver failure or

10   renal failure.

11       Some patients will present with delirium and confusion.

12   It could be liver or kidney failure.  So these are some of the

13   things we look for.  We may do -- we may order or do a spinal

14   tap where we put a needle in the back and look at the fluid that

15   covers the spinal cord and brain, and so in meningitis, that's

16   something that we would have to analyze.  These are objective

17   findings.

18       We may get other tests like an electrode encephalogram

19   where we put electrodes on the head and see if a person is --

20   there's abnormality.

21       So these are a culmination of tests that guide us to find

22   the cause or causation of a person's objective cause or a

23   person's condition.  That's how we practice.

24   Q.    And can you see changes to a person's brain on an MRI?

25   A.    Well, if there's a stroke, if they have cancer, if they

1    have multiple sclerosis, if they struck their head and have a

2    skull -- a contusion, like somebody, for example, had a skull

3    fracture, there may be scar tissue, so -- or if they have a

4    developmental finding that, you know, explains their condition.

5         In some patients that have epilepsy, there's

6    developmental problems that cause abnormalities in the brain

7    that cause seizures.  So we look to see -- for the presence of

8    focal findings on a brain MRI.

9         MS. REWARI:  All right.  If we could put the slideshow

10   back up and look at the last slide.

11   BY MS. REWARI:

12   **Q.**    Now, I want to talk about PTSD.  Can an MRI tell you

13   whether a person has PTSD?

14   **A.**    No, it cannot.

15   **Q.**    And can you explain why?

16   **A.**    Well, um, so, PTSD is similar to other mental health

17   disorders like depression, bipolar, anxiety.  It's diagnosed in

18   accordance with criteria, typically the DSM-5.  That's a manual

19   that has criteria, and these criteria evolve.

20        We do not, to my knowledge, and we -- we don't diagnose

21   PTSD, anxiety depression, bipolar, schizophrenia, we don't

22   diagnose that with an MRI.  It would be nice to.  That would be

23   convenient because it would make our job easier, but it's not

24   conventional practice.

25        We -- these things -- when a patient sees me and there's

1    a concern of mental health problems, we order imaging to make

2    sure there's nothing objective, and if everything is -- and the

3    blood tests are normal and the other tests are normal, we send

4    it to psychiatry because we rule out objective causes for a

5    person's mental health presentation.

6         So, we can't diagnose PTSD or even other mental health

7    disorders on an MRI.  I have never in my boards, my training, my

8    certification, there's no guidelines that I'm aware of that

9    we -- that's what we do.  It's just not consistent with the

10   practice on -- conventional neurological practice.

11   **Q.**    You've said several times objective findings.  The

12   psychiatric conditions that you're talking about, PTSD and other

13   mental health disorders, do they rely on a subjective report?

14   **A.**    Yes.  There's no -- we can't take a brain biopsy.  We

15   can't do an MRI.  There's no blood test to substantiate a person

16   has a primary -- we say primary mental health disorder.  There's

17   no way to diagnose it.  It's based on their subjective report,

18   how their symptoms -- what they tell a psychiatrist, what

19   they -- how they behave, how they think.  That data is

20   contextualized in their diagnostic manual to see if it aligns

21   with a diagnosis.

22        So, for example, if a person has manic depression or

23   severe -- you know, let's say generalized anxiety disorder,

24   these are behaviors and symptoms that are reported, and the

25   psychiatrist talks to them, they take notes and they look at

1    their manual to see how it aligns and then they treat these

2    individuals accordingly.  That's standard practice.

3         If these people come to me, the psychiatrist will refer

4    these people to me and say, Doctor, please rule out any

5    objective findings, brain tumor, something in the brain, or EEG.

6         My job is to do that to clear them objectively, and then

7    I send them back to psychiatry, and the psychiatrist says,

8    Great, you've been cleared by neurology, we don't find anything.

9    So that further helps them treat a person.

10   **Q.**    Now, do you agree -- well, do you have an opinion as to

11   whether PTSD is caused by structural changes to the brain?

12   **A.**    I've never heard of such a guideline or an opinion that

13   I, as a neurologist, would rely upon.  There's no findings on an

14   MRI that in accordance with even updated guidelines within my

15   field that we would use that to diagnose a person with PTSD.

16        You can't diagnose PTSD or other mental health disorders

17   by an MRI.  That's just not conventional practice.

18   **Q.**    Okay.

19   **A.**    That would be -- I mean, candidly, that would be just

20   amongst my colleagues, I mean -- it just would not be normal.

21   That's not normal.

22   **Q.**    Okay.  Do the structures of a person's brain change

23   naturally as they age?

24   **A.**    Yes.  When I see patients, a 20-year-old or a

25   60-year-old, I review the MRI with them.  They will come in for

1    any complaint, and I show them the MRI and I say, you know, if I

2    have a 70-year-old, I'll say, well, your MRI is normal for age.

3    There's shrinkage.  This is normal aging.  They may have

4    cognitive complaints, and I'll say, well, a 20-year-old brain

5    doesn't look like this.

6         So every -- when we look at a brain in line, we have to

7    put it in context in a person's age because over time the brain

8    shrinks.  There's also age-related changes that we see as well.

9    **Q.**    And does the structure of a person's brain change as a

10   child goes from adolescence to adulthood?

11   **A.**    Yes, it does.  It develops, correct.

12   **Q.**    Which of the structures of the brain will that change?

13   **A.**    So the myelin changes, that's the wire network of the

14   brain, the frontal cortex.  So children are very emotional.

15   They don't know how to self-control.  You know, they don't know

16   how to suppress their emotions, and that's a development thing.

17   So the frontal lobes controls that.  That develops -- and even

18   structures such as the amygdala or the emotional centers, all

19   these develop as a child develops, grows or, you know, ascends

20   in age.

21   **Q.**    Is it possible to measure the extent of any physical

22   changes in a person's brain without an MRI?

23   **A.**    Repeat the question.

24   **Q.**    Is it possible for you to measure the degree or extent of

25   any changes, physical changes in a person's brain without doing

1  an MRI?

2  **A.**     The only way is sometimes we'll do an EEG, and so these

3  are our transient changes.  For example, if a person, let's say,

4  is -- comes to -- they were a few days normal -- a few days ago

5  normal, and then they're combative and aggressive or

6  hallucinating, and we look at their blood work and we see that

7  their sodium or liver function is abnormal, we'll do an EEG and

8  the EEG shows transient changes, but beyond that, a CAT scan can

9  show -- you know, can show if there's changes, but there's no

10  other method objectively that we can use to substantiate any

11  changes in a person.

12  **Q.**     Are there any other, I guess, biomarkers or testing that

13  you can do for PTSD other than an MRI?

14  **A.**     No, there's no --

15  **Q.**     Excuse me, let me make that a better question.

16       I think you've said that you can't see PTSD -- PTSD on an

17  MRI?

18  **A.**     No, it doesn't exist.  We don't -- a person doesn't come

19  in my office and then I show them the MRI and then I say, ma'am,

20  sir, you have PTSD based on this specific finding in the brain.

21  That is -- that doesn't exist.

22       I could only say it -- it's very bizarre if I know of a

23  doctor -- it's just not conventional practice.  We don't have an

24  MRI and counsel the patient, well, you have PTSD because of your

25  brain, how it appears.  That is not accepted within my world.

 1    I've never seen that on an examination.

 2          My peers, I'm not familiar with my peers in neurology

 3    doing that.  You can't do that.

 4          It's a psychiatric diagnosis like depression, anxiety.

 5    It's based on diagnostic manuals.  There's no -- you don't see

 6    findings on an MRI for these -- for these types of mental health

 7    disorders.

 8    Q.    And did you review the report of Dr. Cisler?

 9    A.    Yes, I did.

10    Q.    And is he a neurologist?

11    A.    No, no, no, he's a Ph.D. -- he has a doctorate.

12    Q.    But he's not a medical doctor?

13    A.    No, he's not a medical doctor.

14    Q.    Have you reviewed B.R.'s medical records in this case?

15    A.    Yes.

16    Q.    Has she -- to your knowledge, has she ever had an MRI?

17    A.    No.

18          MS. REWARI:  Thank you.  No further questions.

19          THE COURT:  Mr. Keefe?  Mr. Blanchard, I'm sorry.

20          MR. BLANCHARD:  No questions.

21          THE COURT:  Mr. Kinney?

22          MR. KINNEY:  No questions.

23                CROSS-EXAMINATION OF DR. SETH TUWINER

24    BY MR. KEEFE:

25    Q.    Good morning, Dr. Tuwiner.

1    **A.**    Good morning.

2    **Q.**    Do you have a copy of your deposition and report up there

3    with you?

4    **A.**    I don't.

5         MR. KEEFE:  May I approach, Your Honor?

6         THE COURT:  You may.

7    BY MR. KEEFE:

8    **Q.**    So, Dr. Tuwiner, I want to start off by just making clear

9    for the jury what you are not offering an opinion on in this

10   case, okay?

11   **A.**    Yes.

12   **Q.**    You were retained by the School Board's lawyers; is that

13   right?

14   **A.**    Yes.

15   **Q.**    Okay.  And they never asked you to determine whether or

16   not B█████ had experienced or is experiencing PTSD, correct?

17   **A.**    That is correct.

18   **Q.**    Okay.  So you're not offering an opinion about whether

19   B█████ is currently suffering from PTSD, correct?

20   **A.**    Yes.

21   **Q.**    And you're not offering an opinion about whether B█████

22   has ever suffered from PTSD, correct?

23   **A.**    Correct.

24   **Q.**    Okay.  In fact -- and are you working in a forensic

25   capacity today --

1   **A.**    Yes, I --

2   **Q.**    -- in this case?

3   **A.**    Yes, I am.

4   **Q.**    And then when working in your forensic capacity, you

5   would never put yourself out there to render an opinion on PTSD,

6   correct?

7   **A.**    To the ex- -- well, in a forensic capacity, no.  If, for

8   example, a person has -- and this is just in general terms, to

9   be clear, to answer your question.

10       If a person, let's say, has cognitive symptoms, and I

11  think it's due to a mental health disorder, to the extent that

12  may be related to a mental health disorder, I'll opine on that,

13  but specifically to further -- beyond that, no.

14  **Q.**    Sure.  And in your clinical practice, you do not diagnose

15  patients with PTSD, right?

16  **A.**    I will refer them -- as I said in my deposition, I will

17  refer them to a psychologist and a neuropsychologist to confirm

18  my suspicion, but I'm not the one where they come and I say, you

19  have PTSD and I'm going to treat you.  I will suspect it, based

20  on just experience and guidelines, but I'm not the one formally

21  who would treat it.

22  **Q.**    Okay.  And I think you mentioned on direct that in

23  forming your opinions in this case, you reviewed B████ medical

24  records that the lawyers provided you?

25  **A.**    Yes, extensive records, thousands of pages.

1    Q.     Fair to say in those -- in your review of those thousands

2    of pages of medical records, you saw that multiple physicians

3    have diagnosed B████ with PTSD?

4    A.     Yes.  That was their opinion, yes.

5    Q.     So I think moving to, I think the opinion you offered

6    today, and correct me if I'm wrong, but I think on direct you

7    were very careful to say that -- to say only that you don't use

8    an MRI to diagnose -- or physicians do not use MRIs to diagnose

9    PTSD?

10   A.     Correct, we do not.

11   Q.     I'll represent to you that no one has testified that an

12   MRI was used to diagnose PTSD.  Will you accept my

13   representation?

14   A.     Yes.

15   Q.     Okay.  And on direct, I think I heard you testify that it

16   is important to keep up with the medical literature because

17   medicine evolves and changes.  Did I hear you correctly?

18   A.     Yes, yes.

19   Q.     Okay.  And you reviewed Dr. Cisler's expert report?

20   A.     Yes, I did, correct.

21   Q.     Did you review the peer-reviewed scientific studies cited

22   in Dr. Cisler's expert report?

23   A.     I may have at the time of my deposition, but not for

24   today.

25   Q.     Okay.  But you looked at Dr. Cisler's report and the

1   studies?

2   **A.**     Yes.  I recall, yes.  I don't remember verbatim, but the

3   general gist I recall.

4   **Q.**     Sure.  And so you know that those peer-reviewed

5   scientific studies demonstrate that PTSD is caused by physical

6   changes in the brain resulting from trauma exposure, correct?

7   **A.**     That's their opinion, but I'm aware of the opinions of

8   the articles, but these articles have not -- these opinions or

9   viewpoints have not evolved into standard practice, and also

10  some of those -- some of the articles -- that's their opinions.

11  I may not agree with them, but that was their opinion.

12  **Q.**     Well, sure.  So, as I understand it, your opinion is just

13  you don't -- you use a person's emotional -- a psychiatrist

14  would diagnose PTSD using the DSM, correct?

15  **A.**     Yes.

16  **Q.**     And not an MRI, right?

17  **A.**     Not an MRI, no.

18  **Q.**     But are you -- but looking at those studies, whether or

19  not they determine how one is diagnosed with PTSD, do you agree

20  that those studies show that the symptoms of PTSD are driven by

21  physical changes in the brain?

22  **A.**     Well, when we say physical, I want to be very clear.

23  When a person -- whether it's PTSD, anxiety, or depression, all

24  these mental health disorders, and this was even during my

25  deposition.  I would not disagree that there's biochemical

1    changes in the brain with mental health disorders.

2         I've stated that, and so we give medications to change

3    that, you know, chemical imbalance -- so we give medications,

4    not because of a structural change, but a neurotransmitter or

5    biochemical change.  So -- and if you -- in that term, that's

6    the context that makes sense to me, and I would agree with.

7         But I don't agree that there's structural changes in the

8    brain tissue, meaning there's no damage to the brain tissue.

9    There's biochemical changes.

10   **Q.**    Right.  And so, that includes -- those changes that

11   happen in the brain are what drive the symptoms that are used to

12   diagnose PTSD, correct?

13   **A.**    Partially, yeah.  So if a person has anxiety, we give

14   certain drugs that affect chloride channels or affect a

15   substance called serotonin.

16        So there's behaviors or thought processes that alter

17   the -- that alter the brain chemistry, and this is not

18   permanent.  It alters the brain chemistry and we give

19   medication.

20        So on that basis we acknowledge that, yes, there's

21   biochemical and neurotransmitter changes based on behavior and

22   thought processes, or -- but these are not structural changes

23   that are ingrained and burned like a hard drive on a person's

24   brain.  These are changes that are like depression, anxiety,

25   PTSD, they change with therapy medications.

1    **Q.**    Are you aware of any treatment for -- that cures PTSD?

2    **A.**    Well, most people, like any other mental health disorder,

3    most people get better with therapy and medication.

4         There are people -- there are people who don't get

5    better, I'm going to acknowledge that.  There are people who

6    have depression who don't get better or anxiety.  These are not

7    unique to mental health disorders, but the premise within the

8    medical community is that these -- PTSD, like anxiety, there's

9    chemical changes, and we treat that with therapy medication to

10   fix that.

11        The thinking, the behavior, therefore, the chemical

12   changes will be resurrect or fixed or reversed, and then the

13   person's emotional state is better.

14   **Q.**    Dr. Tuwiner, are you familiar with what a meta-analysis

15   is in the context of scientific studies?

16   **A.**    Yes.

17   **Q.**    Did you see in Dr. Cisler's report his discussion of the

18   meta-analyses?

19   **A.**    Yes, I did.

20   **Q.**    And in your report did you cite any scientific study to

21   the contrary?

22   **A.**    I didn't feel it was necessary because -- because in

23   disagreeing with his opinion, you know, my boards are based on

24   thousands of publications.  My continuing medical education is

25   based on thousands of publications.

1        So for me to opine on something that's so inherently

2    basic in method of practice, I just -- to substantiate my

3    opinion, I didn't feel it was necessary.  So I didn't, to answer

4    your question.

5    **Q.**    Thank you very much, Dr. Tuwiner.

6    **A.**    Yes.

7        MR. KEEFE:  No further questions, Your Honor.

8        THE COURT:  Any redirect?

9            REDIRECT EXAMINATION OF DR. SETH TUWINER

10   BY MS. REWARI:

11   **Q.**    Dr. Tuwiner, does eating change brain chemistry?  I mean,

12   are there other activities other than mental health problems

13   that change brain chemistry?

14   **A.**    People who run, they get -- they get changes in their

15   brain called endorphins.  You get a high when you run or you do

16   physical activity.

17        When people pray, that affects their -- there's brain

18   chemistry to -- they feel -- one, they feel a sense of harmony.

19   So these are biochemical changes.

20        If a bear jumps in front of a person, they're scared, of

21   course, there's physiological and biochemical changes.  This is

22   how the human body works.

23        MS. REWARI:  No further questions.

24        THE COURT:  Is the doctor subject to recall?

25        MS. REWARI:  Not from us.

1          MR. KEEFE:  Not from us, Your Honor.

2          THE COURT:  All right.  Sir, you can step down.  Please do

3     not discuss the case or any aspect of the case with anyone until

4     the case is over.

5          Next witness?

6          MS. REWARI:  Defendants call Tiffany Estrella.

7          THE COURT:  Ms. Estrella.

8           (TIFFANY ESTRELLA, DEFENDANTS' WITNESS, SWORN)

9          THE COURT:  Ma'am, please have a seat.  Listen to the

10    questions of counsel.  Answer them as best you can.  If you hear

11    the Court interrupt or the lawyers interrupt, please hesitate

12    before providing your response.

13              DIRECT EXAMINATION OF TIFFANY ESTRELLA

14    BY MS. REWARI:

15    **Q.**    Good morning.

16    **A.**    Good morning.

17    **Q.**    Would you come closer to the mic and please introduce

18    yourself to the jury.

19    **A.**    My name is Tiffany Estrella.

20    **Q.**    And, Ms. Estrella, are you currently employed?

21    **A.**    I'm a substitute teacher with Loudoun County Public

22    Schools.

23    **Q.**    Did you previously work for the Fairfax County Public

24    Schools?

25    **A.**    I did.

1    **Q.**    And when did you work for the Fairfax County Public

2    Schools?

3    **A.**    The 2005-2006 school year through the 2012-2013 school

4    year.

5    **Q.**    And where were you assigned when you were with FCPS?

6    **A.**    I was at Pimmit Hills Alternative High School for about

7    five years, and then my last three years were at Rachel Carson

8    Middle School.

9    **Q.**    And when you were at Rachel Carson Middle School, what

10   did you teach?

11   **A.**    English.

12   **Q.**    Did you teach a particular grade?

13   **A.**    7th grade.

14   **Q.**    Okay.  How would you describe the school, Rachel Carson,

15   to someone who's not familiar with the school?

16   **A.**    Um, it's a great Fairfax County middle school, 7th and

17   8th grade split up into different teams, so that each subject

18   matter teacher has the same students for the most part that go

19   through.  It makes it a very collaborative environment, very

20   team focused as far as the staff goes.  Wonderful students.  It

21   was a great place to work.

22   **Q.**    Let's focus on the 2011-2012 school year, if we can.

23   **A.**    Um-hmm.

24   **Q.**    Do you recall what pod or team you were on?

25   **A.**    I was on the Explorers.

1    **Q.**    Okay.  And was that in the A pod?

2    **A.**    I don't remember.

3    **Q.**    Okay.  That's fine.  If I could show you Defendants'

4    Exhibit 61.

5         MS. REWARI:  Your Honor, if I may?

6         THE COURT:  You may.

7         MS. REWARI:  Thank you.

8    BY MS. REWARI:

9    **Q.**    Mrs. Estrella, if you could just look at that screen, and

10   I'm going to have -- ask Mr. Grady to focus in on Pod A.

11        And do you recall where your classroom was?

12   **A.**    A107.

13   **Q.**    Okay.  Can you just circle that on the -- you should be

14   able to indicate it on the screen there.

15   **A.**    (Indicating).

16   **Q.**    Okay.  And who was in the classroom next to yours?

17   **A.**    M███  C███.

18   **Q.**    Math teacher M███  C███?

19   **A.**    Yes.

20   **Q.**    Okay.  And then who was in the classroom next to her?

21   **A.**    M███  F███.

22   **Q.**    Okay.  All right.  And who was -- who was the science

23   teacher on the team that year?

24   **A.**    F███  T███.

25   **Q.**    Okay.  And can you just indicate where his room was?

1    **A.**    A112.

2    **Q.**    Okay.  Thank you.  Can you just describe the working

3    relationship on the team that year?

4    **A.**    We all got along really well.  We worked well together.

5    **Q.**    Did you meet regularly?

6    **A.**    Yes.

7    **Q.**    How would you describe the school administration?

8    **A.**    Very supportive.

9    **Q.**    And can you explain what you mean by that?

10   **A.**    They were very supportive of the staff and students, very

11   responsive.  If we ever -- if the staff had questions or

12   concerns, as well as students.

13   **Q.**    Do you recall the plaintiff, B.R.?

14   **A.**    I do.

15   **Q.**    Okay.  And how did you know her?

16   **A.**    She was a student in my English class.

17   **Q.**    What do you recall about her generally?

18   **A.**    In general, I remember her being a good student.  I

19   remember her being a good writer.  I remember there being some

20   struggles.  I don't remember what they were specifically.  I

21   want to say towards the beginning of the school year, but

22   overall in general, I mean, a good, pleasant student.

23   **Q.**    Okay.  Do you remember what kind of rapport you had with

24   her as your student?

25   **A.**    We had a good rapport.

1    **Q.**     Okay.  I'd like to show you Defendants' Exhibit 77.

2         MS. REWARI:  Your Honor, I believe this was admitted

3    earlier.

4         THE COURT:  You may.

5    BY MS. REWARI:

6    **Q.**     And there's a copy in your book if it's easier, whichever

7    is easier to read for you.  And do you recognize this exchange?

8    **A.**     Yes.

9    **Q.**     Okay.  If we start with the email below, the one I think

10   starts at the bottom of the page?

11   **A.**     Yes.

12   **Q.**     Is that an email from B.R.'s mother to you?

13   **A.**     Yes, it appears so.

14   **Q.**     Dated October 25, 2011?

15   **A.**     Yes.

16   **Q.**     Okay.  And it's marked "high importance"?

17   **A.**     Yes.

18   **Q.**     What is your understanding why she was contacting you?

19   **A.**     It looks like they were supposed to print the assignment

20   out in color, and she was not able to print it out at home.

21   **Q.**     And when you say "she," who's the "she"?

22   **A.**     B███████.

23   **Q.**     Okay.  So mom was writing to you in the morning before

24   school?

25   **A.**     Yes, it looks like it.

1    **Q.**    Okay.  Do you recall ever meeting B.R.'s mother in person

2    before you got this email from her?

3    **A.**    I don't.

4    **Q.**    Do you know how she got your email address?

5    **A.**    It would have been available to all parents and students

6    as well.

7    **Q.**    Okay.  And how is that publicized at the school?

8    **A.**    I believe it's on the Website, but also we would have had

9    a back-to-school night where we would have sent out, like, all

10   of our contact information as well as, I want to say we used

11   Blackboard at the time for communication as well.  So it would

12   have been posted there as well.

13   **Q.**    Blackboard?

14   **A.**    Yeah, Blackboard, I think.  I don't remember exactly.

15   **Q.**    All right.  Let's, if we may -- actually, did you write

16   her back the same morning, on October 25th?

17   **A.**    It looks like I did.

18   **Q.**    Okay.  All right.  Let's take a look at Defendants'

19   Exhibit 393 in your book.

20   **A.**    393?

21   **Q.**    393.  It should be at the back.

22   **A.**    Okay.

23   **Q.**    All right.  And can you identify what this is?

24   **A.**    It was B████ letting -- it looks like all of us know --

25   all of the teachers, including music, PE -- I don't remember

 1   what Hannah Jordan taught -- letting us know that she was not

 2   going to be in school, that she would be returning Monday with

 3   an excused absence.

 4        MS. REWARI:  Before we talk more about that, Your Honor,

 5   we move to admit Defendants' Exhibit 393.

 6        MS. ZOLL:  No objection.

 7        THE COURT:  Without objection.

 8        MS. REWARI:  May we publish?

 9        THE COURT:  You may publish.

10        MS. REWARI:  Thank you.

11   BY MS. REWARI:

12   **Q.**   So we're all looking at the same thing you're looking at,

13   this is an email from B.R. to you and all the other teachers on

14   November 22nd, 2011?

15   **A.**   Yes.

16   **Q.**   Okay.  At 11:00 p.m.?

17   **A.**   That's what it looks like, yeah.

18   **Q.**   Okay.  Was this -- the email address that she sent this

19   from, was this an FCPS email address?

20   **A.**   It doesn't look like it, no.

21   **Q.**   Was it her personal email address?

22   **A.**   I believe so.

23   **Q.**   Okay.  And so were students also given your email

24   address -- your email address as a teacher for them to contact

25   you directly?

1    **A.**    Yes.

2    **Q.**    Okay.  All right.  And how were students told the ways to

3    contact you?

4    **A.**    They could email, they could come by the classroom.

5    Either one would have been fine.

6    **Q.**    Okay.  Was it unusual for a student to email you rather

7    than coming by?

8    **A.**    No.

9    **Q.**    All right.  Let's take a look at Defendants' Exhibit 148

10    in your book.

11        Is this a set of emails with B.R.'s mother?

12    **A.**    Yes, it appears so.

13        MS. REWARI:  All right.  Your Honor, we move to admit

14    Defendants' Exhibit 148.

15        MS. ZOLL:  No objection.

16        THE COURT:  Without objection.  You may publish.

17        MS. REWARI:  Thank you.

18        (Defendants' Exhibit 148 admitted into the record.)

19    BY MS. REWARI:

20    **Q.**    You can look at the second and third pages quickly just

21    to see what the rest of this is.

22        What is that that we're looking at on pages 2 and 3?

23    **A.**    The initial email would have been a progress report.

24    **Q.**    Okay.  And did you send out regular progress reports to

25    parents?

1    **A.**    Yes.

2    **Q.**    Okay.  All right.  Let's go back to the first page.  What

3    is the date of this progress report?

4    **A.**    Tuesday, January 31st, 2012.

5    **Q.**    Okay.  And do you recall which quarter this pertained to?

6    **A.**    I believe it would be second quarter, the end of second

7    quarter in January.  Yes, second quarter.

8    **Q.**    Okay.  Do you recall when the second quarter ended that

9    year?

10   **A.**    I do not.

11        MS. REWARI:  Okay.  We can put Defendants' Exhibit 81 up,

12   if we may, Your Honor.  That's the school calendar.

13        THE COURT:  You may publish.

14        MS. REWARI:  Thank you.

15   BY MS. REWARI:

16   **Q.**    All right.  I don't know if it's too small for you, but

17   can you tell from there when the second quarter ended?

18        MS. REWARI:  Let's see if we can focus in on January,

19   Grady.

20        THE WITNESS:  Looks like the 27th of January.

21   BY MS. REWARI:

22   **Q.**    Okay.

23   **A.**    There we go.  Much better.

24   **Q.**    So the 31st is a student or staff development day?

25   **A.**    Yes.

1    **Q.**    So a student holiday?

2    **A.**    Yes.

3    **Q.**    Okay.  And so if we can go back to Defendants'

4    Exhibit 148, and the -- what is B.R.'s mom writing to you on the

5    night of Tuesday, January 31st?

6    **A.**    So, it looks like she was missing two assignments, which,

7    looking at the progress report, a P would have been just was

8    missing, but didn't count as a zero.  And I guess the other one

9    was the extra credit that's blank.

10   **Q.**    Okay.  And then let's look at the email at the top.  Is

11   that your response to her the next day?

12   **A.**    Yes.

13   **Q.**    Okay.  And you don't have to read the email into the

14   record, but what were you informing her mother?

15   **A.**    That I had given her an additional opportunity to

16   present -- I guess it was the homework that she was missing, and

17   the way I graded homework in class was they would bring it in,

18   show me.  They would have the stamp sheet.  I would stamp it,

19   and then at the end of the quarter, they would turn it in, and

20   then that would count as a grade.

21        So I did not have her stamp sheet.  From the email, it

22   looks like I gave her a blank one and gave her the opportunity

23   to present those homework assignments with the blank stamp

24   sheet, I would stamp it, and put it in the grade book.

25   **Q.**    Do you recall whether you received any other emails from

1    B.R.'s mother between the October 25th, 2011, email and the one

2    we're looking at here on January 31st, 2012?

3    **A.**    I don't remember.

4    **Q.**    Okay.  Do you recall whether her mother told you why B.R.

5    had been out the -- on the prior week for an excused absence?

6    **A.**    No.

7    **Q.**    Okay.  Let's take a look at Defendants' Exhibit 227 in

8    your book.  Can you identify what that is?

9    **A.**    I believe we were asked by admin to write a statement

10   about turning in assignments, and this would have been regarding

11   the missing homework stamp sheet.

12   **Q.**    Okay.  And so, is this a statement that you wrote

13   regarding the missing homework stamp sheet that we just looked

14   at --

15   **A.**    Yes.

16   **Q.**    -- in the last exhibit?  Okay.

17          And did you -- did you write this statement around the

18   time of that homework stamp sheet issue?

19   **A.**    I believe so.

20   **Q.**    Okay.  Is everything in the statement accurate, to the

21   best of your knowledge and recollection?

22   **A.**    It is.

23   **Q.**    Okay.

24          MS. REWARI:  Your Honor, we move to admit Defendants'

25   Exhibit 227.

1          THE COURT:  Without objection?

2          MS. ZOLL:  No objection.

3          THE COURT:  Without objection.  You may publish.

4          MS. REWARI:  Thank you.

5          (Defendants' Exhibit 227 admitted into the record.)

6     BY MS. REWARI:

7     **Q.**    All right.  So, do you recall what the issue was that led

8     you to write this statement?

9     **A.**    I don't.

10    **Q.**    Okay.  Was there any concern raised, to your

11    recollection, about why the homework stamp sheet was missing?

12    **A.**    I don't believe so.

13    **Q.**    Okay.  Did you ever hear that there was -- that B.R. had

14    suggested that someone had taken her homework stamp sheet?

15    **A.**    I vaguely remember that being said --

16    **Q.**    Okay.

17    **A.**    -- but I wouldn't --

18    **Q.**    All right.  And then you stated in here -- well, first of

19    all, did this homework stamp sheet issue happen the week before

20    that email that we were just looking at, January 31st?

21    **A.**    I believe so.

22    **Q.**    Okay.  And then you said, "For the second quarter, I made

23    the decision to excuse the homework stamp sheet for B.R.," at

24    the end of this statement.

25    **A.**    Yes.

1    **Q.**    Okay.  And so, ultimately, you gave her credit for the

2    homework stamp sheet; is that right?

3    **A.**    Yes.

4    **Q.**    And so the grade she received counted as if it was turned

5    in?

6    **A.**    I believe so.  I don't remember if it counted as it was

7    turned in or if it just took it out of consideration towards her

8    grade, but I don't believe it hurt or helped her grade either

9    way.

10   **Q.**    And so did you give her multiple -- I guess did you give

11   her more than one chance to turn in the homework stamp sheet?

12   **A.**    Yes, I believe so.

13   **Q.**    And did she ever do that?

14   **A.**    Not this particular stamp sheet.

15   **Q.**    Okay.  All right.  All right.  Let's take a look at

16   Defendants' Exhibit 392 in your book.

17         And are these emails between you and B.R.'s mother?

18   **A.**    Yes.

19   **Q.**    On February 14th, 2012?

20   **A.**    Yes.

21         MS. REWARI:  Your Honor, we move to admit Defendants'

22   Exhibit 392.

23         MS. ZOLL:  No objection.

24         THE COURT:  Without objection.  You may publish.

25         MS. REWARI:  Thank you.

1              (Defendants' Exhibit 392 admitted into the record.)

2    BY MS. REWARI:

3    Q.    All right.  Let's look at the second email on the first

4    page.  And this one is marked "high importance."  And it's dated

5    February 14, 2012?

6    A.    Yes.

7    Q.    And I understand it's been 12 years, and I'm going to

8    just represent to you that it's been agreed in this case that

9    the last day that B.R. was in in-person instruction at Rachel

10   Carson Middle School was February -- Thursday, February 9th,

11   2012.

12   A.    Okay.

13   Q.    And so, do you recall whether you spoke orally or by

14   email with B.R.'s mother before -- between the 9th of February

15   and this email on Tuesday, February 14th?

16   A.    I don't believe so.

17   Q.    Okay.  So, looking at the second paragraph where B.R.'s

18   mother wrote, "We are writing to let you know that B.R. will not

19   be in school this week due to the increased bullying and

20   harassment she has been experiencing at school.  Please see

21   letter below for details."

22         Did you know what she was talking about when she said

23   "increased bullying and harassment"?

24   A.    Not in detail.

25   Q.    Okay.  Did you recall anything with regard to B.R. that

1  year and concerns about bullying and harassment?

2  **A.**    It was a long time ago, but I do remember there were

3  issues, but I don't remember any details.

4  **Q.**    Okay.  Do you remember whether any steps were being taken

5  by the team or by the administration to address those issues?

6  **A.**    Yes.  At one point during the year, she was being

7  escorted, I believe, from class to class by either the

8  counselors or administration, but someone on faculty was

9  escorting her from classroom to classroom during the day.

10  **Q.**    Okay.  Do you recall why that was being done?

11  **A.**    I don't.

12  **Q.**    Okay.  All right.  And then in the second paragraph there

13  she wrote -- B.R.'s mother wrote:  "We also very much appreciate

14  the support and guidance you offered her last week.  You were

15  the one person who we feel took the situation seriously enough

16  and took appropriate steps.  For that, we are grateful."

17        Do you recall what she's referring to there?

18  **A.**    I believe it was -- there was a day that she came into my

19  classroom, she was visibly upset, and I pulled her aside and

20  asked her what was wrong.  I don't remember what she said, and I

21  believe I either had somebody walk her to the counselor -- I

22  believe I got her in touch with the counselors that day.

23  **Q.**    All right.  And if we look at the second page of this

24  email, which includes the one that she referenced below, and I

25  see -- if I could just direct your attention to the paragraph

1    that says, "During Period 4, the English teacher, Ms. Estrella."

2    **A.**    Yes.

3    **Q.**    "In a discreet and commendable manner asked B.R. to go

4    see Ms. B███████."

5          Do you see that?

6    **A.**    Yes.

7    **Q.**    Okay.  And is it your understanding that this is what she

8    was complimenting you on?

9    **A.**    I believe so.  I'm not sure.

10   **Q.**    All right.  Would you please take a look at Defendants'

11   Exhibit 155?

12   **A.**    Yes.

13   **Q.**    Is that an email between you and Ms. B██████?

14   **A.**    It is.

15         MS. REWARI:  Your Honor, we move to admit Defendants'

16   Exhibit 155.

17         MS. ZOLL:  No objection.

18         THE COURT:  Without objection.  You may publish.

19         (Defendants' Exhibit 155 admitted into the record.)

20   BY MS. REWARI:

21   **Q.**    All right.  If we go to the top there.

22   **A.**    Yes.

23   **Q.**    And who is Ms. B██████ again?

24   **A.**    She was one of the administrators.

25   **Q.**    Okay.  And what was she asking you to do on the morning

1    of February 9th, 2012?

2    **A.**    To please discreetly send B.R. to her at the beginning of

3    4th period.

4    **Q.**    Okay.  And do you recall what 4th period was that year?

5    **A.**    I believe it was learning seminar, which was sort of like

6    a study hall.

7    **Q.**    Study hall?

8    **A.**    In a way, yes.

9    **Q.**    Okay.  And so you would have B.R. for that period in

10    addition to having her for your English class?

11    **A.**    I believe so, based -- I don't remember, but based on

12    this email, I would say yes, she was in my class.

13    **Q.**    Is it a floating learning seminar, meaning it's, like, a

14    different period you go to when you have learning seminars or is

15    it always in your classroom?

16    **A.**    It's sort of like a homeroom, so it would always be in my

17    classroom, the same students.

18    **Q.**    Okay.  And so Ms. B████ asked you to discreetly send

19    B.R. to her at the beginning of 4th period?

20    **A.**    I believe so.

21    **Q.**    Okay.  And -- so, if we go back to -- well, let me ask

22    you this.  Would it be unusual for an administrator to ask you

23    to send a student discreetly to her?

24    **A.**    I don't think so.

25    **Q.**    Okay.  Do you recall why Ms. B████ was asking you that?

1    **A.**    I do not.

2    **Q.**    All right.  And you said that you recalled seeing B.R.

3    upset?

4    **A.**    Yes.

5    **Q.**    Okay.  Do you recall whether she told you why she was

6    upset?

7    **A.**    I don't remember.

8    **Q.**    Okay.  Do you recall anything about that conversation

9    with B.R. at that time?

10   **A.**    I don't.

11   **Q.**    Okay.  All right.  So, the whole time that you had her,

12   B.R., as a student in your classroom, did she ever complain to

13   you that she had been sexually assaulted in any manner?

14   **A.**    Not that I remember.

15   **Q.**    Did she ever complain to you that she had been physically

16   assaulted?

17   **A.**    No.

18   **Q.**    Did she ever report to you that she was being bullied by

19   other students?

20   **A.**    No.

21   **Q.**    Did you ever receive an email from her mother or her

22   telling you -- other than the one we just looked at on February

23   14th, 2012, telling you that she had been bullied or harassed?

24   **A.**    No.

25   **Q.**    Did -- that entire year, did B.R. ever tell you that she

```
 1  had been touched in an unwanted way at school?

 2  A.     No.

 3  Q.     Did she ever tell you that any students were sexually

 4  assaulting her at school?

 5  A.     No.

 6  Q.     Did you ever observe any students touching her in an

 7  unwanted way?

 8  A.     No.

 9  Q.     Did you ever observe students saying vulgar things to

10  her?

11  A.     No.

12  Q.     At any point while she was a student, did you ever

13  observe students calling her names -- bad names?

14  A.     No.

15  Q.     What would you have done if you had seen that kind of

16  behavior?

17  A.     I would have reported it to administration.

18  Q.     Do you recall how much time there was between classes

19  that year?

20  A.     I want to say somewhere around five minutes.

21  Q.     Okay.  And did you have any instructions from

22  administration regarding what you were supposed to do with

23  regard to that transition time?

24  A.     Yeah.  We were, for the most part, supposed to be in the

25  hallway or standing at our classroom door.
```

1    **Q.**    And did you do that?

2    **A.**    I did.

3    **Q.**    And did you notice whether your colleagues on the team

4    were doing that?

5    **A.**    Yes, they were.

6    **Q.**    Did you always stand at your door or did you sometimes

7    stand in any other locations?

8    **A.**    For the most part, I stood by my door.  I mean, there

9    certainly were times where I would pop over and speak to my

10   colleagues who were also out in the hallway, but for the most

11   part, I would have been down by my classroom.

12   **Q.**    Okay.  Do you recall seeing any students doing --

13   touching other students inappropriately?

14   **A.**    I do not.

15   **Q.**    What was the school administration's approach to peer

16   conflicts or bullying issues?

17   **A.**    I believe that the approach would be to take the students

18   and speak to them.  I'm not a hundred percent sure what their

19   exact procedure was.

20   **Q.**    Was it something that was taken seriously at the school?

21   **A.**    Absolutely.

22   **Q.**    As a teacher, were you made privy to a disciplinary

23   investigation that might be ongoing by administration?

24   **A.**    I believe so.  I don't know.

25   **Q.**    Okay.  Were there times when an administration might be

1    dealing with a student on a disciplinary matter and you weren't

2    made aware of the information they were collecting?

3    **A.**    Yes.  I believe if I wasn't involved or if I wasn't -- I

4    want to say it would be like a need-to-know basis.  If it wasn't

5    something that involved me, then they wouldn't tell me.

6    **Q.**    Can you explain what you mean by "need-to-know basis"?

7    **A.**    Well, if it was something that, let's say, occurred in my

8    classroom or something that someone said I had witnessed, then I

9    would be involved, but if it wasn't something that occurred in

10   my classroom, then they may not tell me that there was an

11   investigation going on.

12   **Q.**    Did you have an understanding as to whether -- I'll go

13   back to that.

14          Did you ever stay after school?

15   **A.**    Yes, often.

16   **Q.**    And how often did you stay after school?

17   **A.**    Pretty much every day.

18   **Q.**    Okay.  And how late would you stay when you stayed after

19   school?

20   **A.**    So most days probably anywhere between 4:00 and 5:00.

21   **Q.**    Do you recall B.R. staying after school with you?

22   **A.**    I don't recall.

23   **Q.**    Did you oversee any clubs, after-school clubs?

24   **A.**    I did.

25   **Q.**    What clubs were those?

```
 1   A.      I was in charge of the literary magazine, and then I also

 2   helped with -- I don't remember what we called it.  It was sort

 3   of like a homework help-type club, I guess you could call it,

 4   where teachers could sign their students up to come and complete

 5   a test, or if they needed help on writing an essay or homework

 6   or something like that, they could sign up to come to that and

 7   be, you know, supervised by a teacher.

 8   Q.      Did you keep -- typically keep your door open after

 9   school?

10   A.      Yes.

11   Q.      Was there -- was there an attendance process?  Was there

12   a process to take attendance after school?

13   A.      Yes.

14   Q.      Okay.  What was the process, as you recall it?

15   A.      I believe that year they had like a -- like a UPC code on

16   a card, and somebody would come around with a card and scan -- I

17   would collect the cards at the beginning of -- the beginning of

18   the end of the day, and like when they came into my classroom

19   for after school, I would collect the cards.  Someone would come

20   around with like a scanner and scan them into a computer, I

21   believe.

22   Q.      Okay.  Were students free to, you know, roam or wander

23   the halls in the after-school period?

24   A.      No, they should not have.

25   Q.      Okay.  And what security measures were in place in the
```

1    school after school officially ended?

2    **A.**    I don't remember.

3    **Q.**    The door was locked?

4    **A.**    Yes, the doors would have been locked.

5    **Q.**    And was it still -- did you still have to buzz in to get

6    into the building?

7    **A.**    Yes.

8    **Q.**    Okay.  Did you ever have occasion to see or encounter

9    adults in the building who weren't supposed to be there?

10   **A.**    No, not that I remember.

11   **Q.**    Okay.  Did you ever see any students going into custodial

12   closets?

13   **A.**    No.

14   **Q.**    Did you ever see the plaintiff being pulled into a

15   closet?

16   **A.**    No.

17   **Q.**    Your -- your room was the last one at the end of the

18   hall, right?

19   **A.**    At the end of that hallway, and then it went to the left,

20   and then there were four more courtrooms, like a triangle.

21          MS. REWARI:  If we could just put Defendants' Exhibit 61

22   up for a moment.

23          THE COURT:  You may.

24          MS. REWARI:  All right.  If we could just zoom in on Pod A

25   again, Grady.

1    BY MS. REWARI:

2    **Q.**    Is this a janitor's closet?

3    **A.**    I don't remember --

4    **Q.**    Okay.

5    **A.**    -- if it's on the map.

6    **Q.**    Okay.  If B.R. had been assaulted in a closet near your

7    classroom, is that something that you think you would have

8    heard?

9         MS. ZOLL:  Objection, speculation.

10        THE COURT:  Sustained.

11        MS. REWARI:  No further questions.

12        THE COURT:  Mr. Kinney?

13        MR. KINNEY:  Nothing to add, Your Honor.

14        THE COURT:  Mr. Blanchard?

15        MR. BLANCHARD:  No, sir.

16        THE COURT:  Cross-examination?

17        MS. ZOLL:  Your Honor, may I approach?

18        THE COURT:  You may.

19        MS. ZOLL:  Thank you.

20             CROSS-EXAMINATION OF TIFFANY ESTRELLA

21   BY MS. ZOLL:

22   **Q.**    Hi, Ms. Estrella.

23   **A.**    Hi.

24   **Q.**    My name is Brittany Zoll, and I represent the plaintiff,

25   B████.

1        I'd like to pull up that schematic that you just looked

2   at.

3        MS. ZOLL:  Mr. Brown, could you pull up DX-61, please.

4   BY MS. ZOLL:

5   **Q.**    I believe you testified that your classroom was 108?

6   **A.**    107.

7   **Q.**    107.  Got it.  And you also testified that between

8   classes, you would stand usually outside your classroom?

9   **A.**    Yes.

10  **Q.**    Would you mind looking at either the screen there or you

11  could flip in your -- I'm not sure if you have it in your

12  binder.  If you wouldn't mind looking at the screen.

13  **A.**    Yeah.

14  **Q.**    From your classroom, could you see the locker area, the

15  locker pod?

16  **A.**    Yes.  The Explorers lockers?

17  **Q.**    Yes.

18  **A.**    Yes.  Like I could see some of them.  Like I would be

19  able to see the ones that were facing, like, 109 and 112, but

20  then there would have been lockers on the other side, too, that

21  I would not have been able to see.

22  **Q.**    Okay.  And would you just mind marking on the

23  schematic -- you can draw on it -- where the Explorers locker

24  pod was?

25  **A.**    (Indicating).

1    **Q.**     Got it.  Okay.  Thank you.

2         MS. ZOLL:  Mr. Brown, you can take that down.

3    BY MS. ZOLL:

4    **Q.**    I believe you were also shown on your direct examination

5    an email that showed B███████ would be out of school around

6    November 22nd through that Thanksgiving week?

7    **A.**    I believe so.

8    **Q.**    Yeah.  I can pull it back up for you.  If you could flip

9    in your binder to -- there's a tab that says PX-83.

10        So this is a slightly different email chain.  There is

11   not maybe the top email that Ms. Rewari showed you.

12   **A.**    Thank you.

13   **Q.**    And this is an email from B██████ to, you said a bunch of

14   teachers, yourself included?

15   **A.**    Yes.

16        MS. ZOLL:  This is already in evidence, Your Honor.

17   Permission to publish Plaintiff's Exhibit 83?

18        THE COURT:  You may.

19        MS. ZOLL:  Thank you.

20   BY MS. ZOLL:

21   **Q.**    So, the date here is November 22nd?

22   **A.**    Yes.

23   **Q.**    And it says in the email that she'll be returning Monday

24   with an excused absence?

25   **A.**    Yes.

1    Q.    Were you ever informed that B███████ mom was keeping her

2    home that week from Thanksgiving -- excuse me, keeping her home

3    that week due to bullying concerns or anything?

4    A.    I was not.

5    Q.    Okay.

6          MS. ZOLL:  Mr. Brown, you can take that down.  Thank you.

7    BY MS. ZOLL:

8    Q.    All right.  You were also shown during your direct

9    examination a statement that you signed related to the homework

10   sheets?

11   A.    Yes.

12   Q.    Okay.  I have that in your binder that's in front of you

13   at Plaintiff's 744, if you can flip there.

14   A.    Yes.

15   Q.    Thank you.

16         MS. ZOLL:  Mr. Brown -- I believe this is already in

17   evidence, too, Your Honor, and we definitely just admitted the

18   Defendants' version on her direct.

19         THE COURT:  To be consistent, you can refer her to any one

20   you want.  That's fine.

21         MS. ZOLL:  Permission to publish?

22         THE COURT:  You may.

23         MS. ZOLL:  Thank you.

24   BY MS. ZOLL:

25   Q.    Were you asked to write this statement?

```
 1    A.      I believe so.

 2    Q.      And have you ever been asked to write any similar-type

 3    statement?

 4    A.      Not that I remember.

 5            MS. ZOLL:  Okay.  Mr. Brown, you can take that down.

 6    BY MS. ZOLL:

 7    Q.      All right.  One last subject.  Could you flip in your

 8    binder, please, to the tab that says 146?

 9    A.      146?

10    Q.      Yeah.  It says Plaintiff's Exhibit 146.

11            THE COURT:  You can approach her and help her out.

12            THE WITNESS:  Okay.  Yes.  Sorry.

13    BY MS. ZOLL:

14    Q.      Okay.  This is, again, another version of an email chain

15    you saw with Ms. Rewari?

16    A.      Yes.

17    Q.      Okay.

18            MS. ZOLL:  Your Honor, this one has also already been

19    previously admitted.  Permission to publish?

20            THE COURT:  You may.

21            MS. ZOLL:  Thank you.

22    BY MS. ZOLL:

23    Q.      So you recalled in your direct examination with

24    Ms. Rewari that at one point you saw B█████ visibly upset in your

25    class?
```

1   **A.**    Yes.

2   **Q.**    And I think you said that you pulled her aside and asked

3   her what was wrong?

4   **A.**    I believe so.

5   **Q.**    And Ms. Rewari showed you in this email chain, if you

6   turn to page 2 of the document, she showed you a paragraph that

7   says, "During period 4, the English teacher, Ms. Estrella --" is

8   that right?

9   **A.**    Yes.

10   **Q.**    Okay.  If you could look at the very last bullet in

11   that -- on that page.  It says "disheartened, frustrated, and

12   scared"?

13   **A.**    Yes, I see it.

14   **Q.**    Okay.  And would you mind just reading that paragraph for

15   the jury?

16   **A.**    "Disheartened, frustrated, and scared.  B&#9608;&#9608;&#9608; goes to

17   her next class, English, where thankfully her teacher

18   Ms. Estrella, has the wisdom, intuition, courage and sensitivity

19   to know something was wrong, asked B&#9608;&#9608; what it was and upon

20   learning of the serious threat intervened on B&#9608;&#9608; behalf and

21   called your offices."

22   **Q.**    And does that refresh your recollection that she told you

23   about a serious threat?

24   **A.**    I don't remember what it was.

25   **Q.**    Okay.  And then if you wouldn't mind just flipping back

1    to the first page of that document?

2    **A.**    Okay.

3    **Q.**    This same email with the italics here that we've been

4    looking at.  This is an email -- and at the bottom email here

5    from R███████ to A██████ F█████████?

6    **A.**    Yes.

7    **Q.**    And Mr. F███████ is the principal?

8    **A.**    Yes.

9    **Q.**    And I'm sorry, flipping back and forth, but if you

10   wouldn't mind flipping back again to that same bullet we just

11   read on the following page.

12   **A.**    The last one or the one about 4th grade?

13   **Q.**    The last one.

14   **A.**    The last one.  Okay.

15   **Q.**    Thank you.

16           It says at the bottom, "intervened on B█████ behalf and

17   called your office."

18           Does that refresh your recollection that you called

19   Mr. F█████████ office?

20   **A.**    It would have been administration.  I don't know if it

21   would have been directly to the principal or not.

22   **Q.**    Got it.  But upon hearing whatever B████ told you, then,

23   and seeing her upset you called the administration?

24   **A.**    I don't remember if I called or if I -- like, called down

25   or had someone come get her.  I don't remember exactly what the

1  details were or the steps.

2  **Q.**    A long time ago?

3  **A.**    Yes, very.

4  **Q.**    And I just want to confirm you're not a defendant in this

5  case?

6  **A.**    I am not.

7  **Q.**    And you've never been a defendant in this case?

8  **A.**    No.

9  **Q.**    Okay.

10         MS. ZOLL:  Your Honor, may I have your indulgence for a

11  moment?

12         THE COURT:  Sure.

13         MS. ZOLL:  No further questions.  Thank you.

14         THE COURT:  Redirect?

15              REDIRECT EXAMINATION OF TIFFANY ESTRELLA

16  BY MS. REWARI:

17  **Q.**    Mrs. Estrella, you were just asked whether you were a

18  defendant in this case?

19  **A.**    Yes.

20  **Q.**    Are you aware that every other core teacher that B.R. had

21  that year has been sued as a defendant in this case?

22  **A.**    I am.

23  **Q.**    Did you witness any wrongdoing on their part with regard

24  to B.R.?

25  **A.**    I did not.

```
1   Q.     Did you -- did you see them treating B.R. any differently

2   than you treated her?

3   A.     I did not.

4          MS. REWARI:  Thanks.  No further questions.

5          THE COURT:  Thank you.

6          Is this witness subject to recall?

7          MS. REWARI:  No, Your Honor.

8          MS. ZOLL:  No, Your Honor.

9          THE COURT:  All right.  Thank you, ma'am.  You may step

10  down.  Please do not discuss the case or any aspect of the case

11  with anyone.  You're free to leave.

12         THE WITNESS:  Thank you.

13         THE COURT:  Thank you.

14         Next witness.

15         MS. REWARI:  Your Honor, we call Amy Moir.

16         THE COURT:  Okay.  How long do you anticipate on this

17  witness?

18         MS. REWARI:  Maybe on direct, 20 minutes.

19         THE COURT:  All right.

20             (AMY MOIR, DEFENDANTS' WITNESS, SWORN)

21         THE COURT:  Ma'am, please listen to the questions of the

22  lawyer.  Answer the best you can.  If you hear the Court

23  interrupt or if the lawyers interrupt, please hesitate before

24  providing your answer.

25
```

<u>DIRECT EXAMINATION OF AMY MOIR</u>

<u>BY MS. REWARI</u>:

Q.    Good morning.

A.    Good morning.

Q.    Could you slide a little bit closer to the mic.

      Thank you.

      And would you please introduce yourself to the jury.

A.    My name is Amy Moir.

Q.    And Ms. Moir, where are you employed?

A.    I'm currently employed with Fairfax County Public Schools
at Woodson High School.

Q.    And what is your position at Woodson High School?

A.    Music teacher.

Q.    Okay.  How long have you worked there?

A.    I would say this is my eighth year.

Q.    Where did you work before that?

A.    Before Woodson I was at Rachel Carson Middle School.

Q.    Okay.  What was your position at Rachel Carson?

A.    Music teacher.

Q.    How long were you at Rachel Carson?

A.    Eleven years.

Q.    Could you just do the math for us, what years you were at
Rachel Carson?

A.    I started in the fall of 2005 and was there until the
spring of 2016.

1    **Q.**    Okay.  Can you give the jury just a brief overview of

2    your educational background?

3    **A.**    I received my bachelor's in music education from James

4    Madison University.  I graduated in 2001.  And then I received

5    my master's, also in music education, from Florida State

6    University, and I have an additional 30 graduate-level classes

7    in education as well.

8    **Q.**    And are you licensed as a teacher by the State of

9    Virginia?

10    **A.**    Yes.

11    **Q.**    What areas are you licensed?

12    **A.**    My licensure is NK through 12, music education.

13    **Q.**    Okay.  When you were at Rachel Carson, which classes did

14    you teach?

15    **A.**    I taught -- for a couple of years, I taught some of the

16    music lab classes.  There were two of those.  And then I also

17    taught all the choral classes, and after a few years, the choral

18    program grew enough that I taught only chorus.

19    **Q.**    Okay.  And in a year -- in a given academic year, how

20    many classes did you typically teach?

21    **A.**    I taught five classes each year.

22    **Q.**    What was the size of the class?

23    **A.**    The overwhelming majority of years that I was there, I

24    taught about 200 students a year, so the classes would range in

25    size.  I estimate between 25 and 70.

1    Q.    Okay.  And did you teach all of your classes in the same

2    room?

3    A.    Yes.  I was in the same room for all 11 years.

4    Occasionally I would go across the hall to the band room to do a

5    sectional, but the main classroom I taught in was the choral

6    room.

7    Q.    And how does the size of your class compare to a typical

8    class?

9    A.    Student size?  Typically, the majority of teachers have

10   fewer than -- 30 or fewer students, so I typically had quite a

11   bit more than that, depending on the ensemble, but classes would

12   oftentimes range into the 40, 50, and then some years even more

13   than that, up to 70.  I think 78 was the largest class I taught.

14   Q.    Can you just describe a little bit how the chorus class

15   works differently than maybe other classrooms?

16   A.    Certainly.  Running the choral program, I am typically

17   considered a general education teacher, so students that I would

18   get in my ensembles would come from a wide variety of learning

19   styles and backgrounds, and I have the distinct advantage and

20   pleasure of then working and collaborating with all the

21   counselors, administrators, and teachers across the building.  I

22   typically see the same students that everybody else sees.

23         It's also unique because it doesn't have in-class

24   support, so a lot of students who either are running through the

25   AAP program, the honors program, will be in the same classes as

1   your students that are general education and also students who

2   may have some learning difficulties that are in other classes

3   where they have in-class support.  I typically do it all with

4   few exceptions.

5   **Q.**    Could you describe what your teaching style or philosophy

6   is?

7   **A.**    I -- especially because of the sheer number of students

8   that I teach, I have to run a very structured classroom.

9   There's little time for students to, you know, socialize

10  individually.  You have a lot of students coming in, a lot of

11  students coming out.  They have to do so efficiently while still

12  reaching their learning targets.

13       It's a really collaborative class due to the nature of

14  singing.  Singing is a very vulnerable experience, and creating

15  music is a very vulnerable experience, so we work a lot on

16  trying to help the students feel comfortable in the classroom.

17  I do a lot of making sure that they -- I have to make sure that

18  I'm covering all of the 504s and IEPs, just naturally the way

19  the classroom runs.  So it's to make sure I'm meeting those

20  standards and those guidelines, which, you know, are required

21  for me to meet, and benefit the student.

22       I make sure that they have all of their materials that

23  are needed.  They always have a place to put their materials, to

24  put it back.  I have ways for getting their attention.  I don't

25  like being yelled at, and I know my students don't like being

1    yelled at, so I have ways for getting their attention that gets

2    all of their attention really quickly but in a positive way.

3            And then I also have a lot of routines that I build from

4    the start of the school year that help students be able to

5    communicate with each other, to talk through some things in a

6    structured manner, and we do a lot of pair sharing.  I'll

7    also -- because of the nature of students, I'll use seating

8    charts.  That's how I get attendance done really quickly for 78

9    kids, and I rotate that seating every -- at least once every

10   quarter, so that they get to know other members of their

11   ensemble, and so they can also talk through, in a structured

12   format, some of the things they may be learning and needing to

13   process to help delve into the music and, you know, learn

14   everything that we can get them to learn in whatever timeframe

15   that I have that day.

16   **Q.**    You mentioned 504 plans.  Just for everyone who may not

17   have experience with a 504 plan, can you just explain what that

18   is?

19   **A.**    Sure.  It's a plan you would make.  Students would have

20   504 plans for various needs.  It could be anything from a

21   medical need, to a social or emotional need.  So, for example, a

22   student who is diabetic might have a 504 plan because they need

23   to have access to their cell phone so they can check their sugar

24   levels.  A student who has ADHD might have a 504 plan so that

25   they can have, you know, a -- depending on how long the class

1    is -- for example, like a 90-minute class, a student might need

2    a short mental break for about five minutes, and that's designed

3    into their plan.  They might also need notes from class given

4    out or available digitally.

5         There are a lot of different needs that a 504 plan could

6    cover.  There's a wide variety of guidelines that you have to

7    then cover.  And as an educator, you're supposed to meet those

8    requirements in the 504 plan or the IEP plan, which is an

9    individual educational plan.

10   Q.    And so both the 504 plan and IEP are ways to accommodate

11   learning differences for students?

12   A.    Yes.  Yeah.  And they can run anything from, I guess, a

13   medical need or anxiety or depression to some kind of learning

14   challenge that they might have developmentally.

15   Q.    Okay.  Have you, from time to time, seen bullying

16   behavior amongst students in your class?

17   A.    Occasionally, yes.

18   Q.    And how do you address such behavior when you see it?

19   A.    The first thing to do is to start talking to the student

20   who you may see that looks like they're being impacted by that.

21   And also separately talking to the student that is doing the

22   bullying.  In that kind of situation, you would also call the

23   parents, alert school counselors and administration.

24   Q.    Have you ever observed students calling each other names

25   or using vulgar language?

1 **A.** Yes.

2 **Q.** And what is your practice to address those types of

3 situations?

4 **A.** To the student who is saying the language, I address it

5 with them immediately.  There's not a place for that in

6 education, so I have to have that conversation with them

7 immediately.  And then also check in on the student who may have

8 been on the receiving end of the unkind word.  And if it

9 continues after that first time, then you would address it to

10 the student again, and then alert the parents, the counselor,

11 et cetera.

12 **Q.** In your experience as a teacher, how effective is that

13 strategy?

14 **A.** It's very effective as long as you have parents who are

15 supportive.

16 **Q.** Do you also try to ensure the safety of the children in

17 your classroom?

18 **A.** Yes.  That is first and foremost.  Students can't learn

19 as well if they don't feel comfortable in the environment and

20 the space they're in.  That includes helping them stay

21 organized.  That includes making sure that you're helping them

22 develop friendships with people or relationships with people in

23 the class.

24 Some students are a little bit more comfortable, a little

25 bit more extroverted.  They have an easier time making those

1    friendships, and some students aren't necessarily as comfortable

2    doing that.  So a lot of times, I'll use, like, targeted

3    questions that will help them start the conversation so that

4    they get used to speaking to other people and practicing

5    speaking with people that, you know, might not be always the

6    first person that they might talk to, so...

7    **Q.**    Do -- when you were at Rachel Carson, did you ever work

8    with the counselors at the school?

9    **A.**    Yes.

10   **Q.**    Can you tell us a little bit about that?

11   **A.**    Oh, gosh.  I worked with them regularly, and I was

12   fortunate enough to work with all of them, since I did have

13   students that were in, like, all the caseloads of the

14   counselors.

15        We'd work on everything from some kind of social thing

16   that was going on with a student to medical, to something --

17   maybe their grades were suffering and how to get them reaching

18   their highest potential as much as we can.

19   **Q.**    And were the counselors that you worked with, did they

20   include Ms. H███████ and Ms. F███████?

21   **A.**    Yes.

22   **Q.**    And how were they to deal with?

23   **A.**    They were some of the best counselors that I worked with

24   in my career.  They were regularly receptive.  I could go in and

25   talk with them about a student frequently, if needed, and it

1    was -- this is 23 years that I've been in FCPS, and they were

2    some of the best counselors that I've worked with.

3    Q.    Let's talk a little bit about the duties you had when you

4    were a music teacher.  In addition to your classroom instruction

5    duties, did you have duties in the building?

6    A.    Yes.  Yeah, I had lunch duty every day.  If I'm

7    remembering correctly, it was 25 minutes for lunch, so when it

8    was lunch duty, I would go down and work with the other teachers

9    and counselors that were assigned.  An administrator on lunch

10   duty always had a couple of teachers.  The counselor was

11   frequently in there unless they were called on for an emergency,

12   and an administrator was always in there.

13       And I also had what was called an unofficial duty, in the

14   music department, what we affectionately called fish bowl duty,

15   where we would hold the students in the music room, music

16   students who had to drop off their instruments before the school

17   day started.  We didn't want them out and about in the halls

18   before all the staff was there.  So we wanted to make sure that

19   they were monitored.

20       And then about twice a year I would have bus duty.  I was

21   assigned a week usually like in the fall and in the spring, and

22   so I would be outside while the students were getting on their

23   buses, making sure they were getting on them and, you know,

24   making good choices.

25   Q.    All right.  If we could take a look at Defendants'

```
 1   Exhibit 61.
 2         MS. REWARI:  Your Honor, if we may publish?
 3         THE COURT:  You may.
 4         MS. REWARI:  And, Grady, if you can zoom it in on the top.
 5   BY MS. REWARI:
 6   Q.    Ms. Moir, on this map, can you show the jury where your
 7   classroom was?
 8   A.    Sure.  It's choral room N130.
 9   Q.    Okay.  It's an interactive screen, so if you could just
10   circle it.
11   A.    (Indicating).
12   Q.    And the music room that you said where you did fish bowl
13   duty, where is that?
14   A.    I would -- it would be the whole team of music teachers,
15   so I generally would stay in the choral room so that students
16   wouldn't exit the tiny door outside, the tiny chorus door.  I
17   say tiny because it was a single door versus the double door on
18   the other side.
19         So I often would be in the choral room before the school
20   day.  And then we would have the band director welcoming
21   students outside of A129.
22         On the exterior door we'd have somebody in the hallway
23   here, but it was in the music room, and then the orchestra
24   director would be usually at her double doors in the center of
25   the music room because she was very tall and could see all the
```

1   way to the other door.  She's 6 feet, so...

2   **Q.**    Okay.  And in the mornings, where did you -- where did

3   you stand again?

4   **A.**    Um, before all the students were released into the

5   building, I would stand usually in the choral room.

6   **Q.**    Okay.

7   **A.**    A130.

8   **Q.**    And then did you stand anywhere during transitions

9   between classes?

10  **A.**    Yeah.  Most of the time I would be outside the choral

11  room across from A115.  I'll circle that one so you can see

12  (indicating).  There's a small door, a single door that was --

13  to the choral room that looks over the locker bay.  That's

14  usually where I would be.

15      MS. REWARI:  And if we could, Your Honor, publish

16  Defendants' Exhibit 192, which are the photographs?

17      THE COURT:  You may.

18      MS. REWARI:  All right.  And, Grady, if you could take us

19  to page 6 of this exhibit.

20  BY MS. REWARI:

21  **Q.**    And can you tell us what this view shows?

22  **A.**    That would typically be the view when I was standing

23  outside of the choral room at that single door.

24  **Q.**    Okay.  And so, is this sort of the vantage point if you

25  come out of the choral room and you're looking into the locker

1   bay?

2   **A.**    Yes, and I could see more of the hall -- the hallway to

3   my right and left, but yes, that would be where I was.

4       Now, I typically tried to stand close to that doorway so

5   I could look out on the locker pod, but also glance into the

6   room as students were coming in as well to make sure -- just to

7   have a view as much as I could as I was scanning.

8   **Q.**    Let's take a look at page 10 of this exhibit.  And in

9   this photograph, are we looking sort of at the locker pod as

10   you're coming down the hall?

11   **A.**    Yeah.  It would be from the main entrance, and my door is

12   beyond that purple pillar.  I'll put a little red line where my

13   door was (indicating).

14   **Q.**    All right.  So can you indicate on this photograph where

15   you typically stood?

16   **A.**    About where that red line is.

17   **Q.**    Okay.  All right.  And were you required to stand there?

18   **A.**    Yes.  We were reminded regularly to be on hall duty.

19   **Q.**    Okay.  And how strictly was that enforced?

20   **A.**    Pretty strictly.  I remember I was pregnant towards -- I

21   was pregnant that year, and I remember towards the second half I

22   really had to use the restroom, and I remember Mr. F&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

23   being like, where were you.  I was, like, I really had to go to

24   the bathroom.  So, yes, it was pretty strictly enforced.

25   **Q.**    And did you say that there was a teacher across the hall

1    from you from the choral room?

2    **A.**    Yes.  There is typically -- what is that classroom, A113,

3    if I remember correctly.  Yes, there was typically a teacher

4    there.  That year, I can't remember if it was Lauren Hamilton,

5    Elena James, or {indiscernible} Getz, but it was one of those

6    three.

7    **Q.**    And can you on this photograph show kind of where their

8    door would have been?

9    **A.**    Just behind that other purple pillar.  I'll put an X on

10   that purple pillar, and their door is just behind that

11   (indicating).

12   **Q.**    And was that a teacher that was also required to stand

13   outside?

14   **A.**    Yes.

15   **Q.**    Would you from time to time ever leave your door and go

16   into the locker bay?

17   **A.**    Yes, yes.

18   **Q.**    What types of things would lead you to go into the locker

19   bay?

20   **A.**    Um, there'd be, gosh, a number of things.  Say if a

21   student dropped a bunch of things, I would stop and help them

22   pick them up, or if it looked like there was kind of like a

23   little more of a ruckus going on, you would walk through the

24   students, because that -- it's amazing how many times students

25   will make better choices when an adult is walking through them,

```
 1    and, you know, kind of parts the seas.

 2            Occasionally, like -- I didn't have a locker key, but if

 3    a student was having difficulty with a locker, I might help them

 4    with their locker, especially -- there's only three minutes

 5    between classes, so sometimes they would get a little over --

 6    overanxious about opening their locker and just be doing it too

 7    fast, and I'd just slow it down for them, open it up, or they

 8    would have paper stuck in it if it was messy.  But those would

 9    be the things when I would go through.

10    Q.    And when you were standing at your door or going into the

11    locker bay, did you ever see a student sexually assaulting

12    another student?

13    A.    No.

14    Q.    Did you ever see a student putting their hands down

15    another student's pants?

16    A.    No.

17    Q.    Did you ever see a student putting their hands up another

18    student's shirt?

19    A.    No.

20    Q.    All right.  Let's talk about after school.  Would you

21    ever stay after school?

22    A.    Yes.

23    Q.    And what would be the reason that you would stay after

24    school?

25    A.    There would be a few reasons.  If we had an after-school
```

1    rehearsal, which I would have set in advance.  I also would have

2    students audition for all-state -- middle school all-state

3    chorus, so I would stay after school to help with audition

4    recordings.

5          And then I would also stay after school, I helped out

6    with the musical for years, so I would also stay after school

7    for musical rehearsals.  And concert days, I would be after

8    school.  Those typically would be 12- to 14-hour workdays for

9    me, so --

10   Q.    So, during the 2011-2012 school year, do you recall which

11   class you would have B.R. for?

12   A.    Yes.  It was intermediate women's chorus, I believe.

13   Q.    Okay.  Was that an all-female class?

14   A.    Yes.

15   Q.    And did students have to audition to get into that class?

16   A.    Yes.

17   Q.    And do you recall whether B.R. had friends in that class?

18   A.    Yes, I believe so.

19   Q.    And do you recall whether there was a choral concert that

20   fall?

21   A.    We had one at least that December.  I can't remember if

22   we did one in October or not.  I believe -- I believe the first

23   one was in December.  I don't remember the exact date, but...

24   Q.    Sure.  And is the choral concert in the evening?

25   A.    Yes.

1    **Q.**    Okay.

2    **A.**    So students will typically go home on the bus or picked

3    up from Kiss and Ride, and then they would have a call time back

4    to the concert, which was typically an hour before.

5         So if the concert started at 7:00, the call time would be

6    6:00, and we'd meet in the lecture hall for vocal warm-ups, the

7    ensemble would meet, and then the choirs were too big at that

8    point to have a concert in the lecture hall.  It wasn't large

9    enough, so we would warm up voices in the lecture hall and then

10   go over to the gymnasium for the concert.

11   **Q.**    And are these choral concerts typically attended by

12   parents?

13   **A.**    Yes.

14   **Q.**    Do parents sometimes come and speak to you after the

15   concert?

16   **A.**    Yes.

17   **Q.**    Do you recall whether B.R. participated in that December

18   concert that year?

19   **A.**    I believe she did.

20   **Q.**    Okay.  Do you recall ever meeting her mother or her

21   father?

22   **A.**    I don't.

23   **Q.**    Do you recall receiving any emails from her mother?

24   **A.**    Um, no.

25   **Q.**    Do you recall receiving any emails from her father?

1    **A.**    No.

2    **Q.**    What's the Broadway Night show at South Lakes?

3    **A.**    South Lakes High School does a Broadway review night show

4    that you audition for, and a lot of the high school directors --

5    Rachel Carson feeds into four different high schools.  So a lot

6    of the high school directors would send information to me to

7    pass out to the students about some additional opportunities

8    that they could participate in.

9         And so South Lakes had a Broadway review show called

10   Broadway Nights, and students could audition for it.  I believe

11   every student who auditioned was placed in it, and they did a

12   number or two with either -- depending on how -- Mrs. Gigliotti

13   ran it at that time, but they would do a number or two as middle

14   schoolers, and then join the big group or join in some other

15   kind of number of some sort.

16   **Q.**    And do you recall whether B.R. participated in that show

17   that year?

18   **A.**    I believe she did.

19   **Q.**    Okay.  Do you recall when that show ultimately puts on

20   the performance?

21   **A.**    It's usually in January.  I don't remember the exact

22   date, but it's usually towards the end of January.

23   **Q.**    Is it more than one night?

24   **A.**    I think she does two or three nights or -- she's no

25   longer at South Lakes High School, but I think it was two or

 1  three nights.  It changed a little bit throughout the years for

 2  how many nights, but I believe it was for more than one night at

 3  that point.

 4  **Q.**    Did she have regular rehearsals, to your knowledge?

 5  **A.**    Yes.

 6  **Q.**    Okay.  The whole time that you had B.R. as your student

 7  that school year, did she ever report to you any type of

 8  bullying or sexual harassment?

 9  **A.**    No.

10  **Q.**    Okay.  Did she ever report to you that she'd been

11  sexually assaulted?

12  **A.**    No.

13  **Q.**    Did she ever report to you that she'd been physically

14  assaulted?

15  **A.**    No.

16  **Q.**    Do you recall someone at the school asking you to keep an

17  eye out for anyone bothering her?

18  **A.**    I do remember having to keep an extra eye.  I don't

19  remember who it was.  It would be either her counselor or the

20  administrator, but I do remember keeping an extra eye out for

21  her.

22  **Q.**    And when you kept an extra eye out, did you notice

23  anything out of the ordinary?

24  **A.**    I didn't.  If I did, I would have reported it.

25        MS. REWARI:  Okay.  No further questions.

```
 1              THE COURT:  Mr. Kinney?

 2              MR. KINNEY:  Nothing from me.

 3              THE COURT:  Mr. Blanchard?

 4              MR. BLANCHARD:  No, sir, Your Honor.

 5              MS. ZOLL:  May I just have a moment?

 6              THE COURT:  Absolutely.  Absolutely.

 7              MS. ZOLL:  Permission to approach, Your Honor?

 8              THE COURT:  You may.

 9                    CROSS-EXAMINATION OF AMY MOIR

10    BY MS. ZOLL:

11    Q.    Hi, Ms. Moir.

12    A.    Hi.

13    Q.    My name is Brittany Zoll, and I represent the plaintiff,

14    B███.   I just want to get out front here.

15          You are not a defendant in this case, right?

16    A.    No, I am not.

17    Q.    Okay.  And you've never been a defendant in this case?

18    A.    No, I have not.

19    Q.    And you were B█████ chorus teacher in the fall of 2011

20    in the 7th grade?

21    A.    Yes.

22    Q.    Could you turn in that binder to PX-642A.  I think it's

23    the last tab.  It should be a photo.

24    A.    Yes.

25    Q.    Is that a photo approximately of what B████ looked like
```

```
 1   when you taught her?
 2   A.    This would have been 6th grade.  It looks like it's all
 3   county chorus.
 4   Q.    Yes.
 5   A.    I had recently met her at that point.
 6         MS. ZOLL:  Permission to publish, Your Honor?
 7         THE COURT:  You may.
 8   BY MS. ZOLL:
 9   Q.    You said this was all county choral.  Is that what you
10   said?
11         THE COURT:  If I could just stop you, I don't think
12   there's going to be any objection, but have you moved the
13   admissibility of this?
14         MS. ZOLL:  Permission to move it into evidence, Your
15   Honor?
16         THE COURT:  Without objection?
17         MS. REWARI:  No objection.
18         THE COURT:  Okay.
19         (Plaintiff's Exhibit PX-642A admitted into the record.)
20         THE WITNESS:  It's the 6th Grade All-County Choral
21   Festival.  That's what it looks like by the sheer number of
22   bleachers pulled out.
23   BY MS. ZOLL:
24   Q.    And did I hear just say that you had met her at this
25   point?
```

 1   **A.**     It would have been sometime around the spring.  All

 2   county chorus usually happens in April, and I would have held

 3   auditions sometime in April, May, or June, depending on when it

 4   would have worked with their elementary school.  So it was close

 5   in time, in a lifetime span, to when I would have met her, yes.

 6   **Q.**     Got it.

 7          And B▇▇▇▇ looks pretty happy in that photo?

 8   **A.**     I would say so.

 9          MS. ZOLL:  Mr. Brown, you can take that down.

10          THE COURT:  Before you take it down, who is that other

11   person?

12          THE WITNESS:  I have no idea.

13   BY MS. ZOLL:

14   **Q.**     Do you remember B▇▇▇ enjoying chorus?

15   **A.**     Yes, I do.

16   **Q.**     And do you remember her being a good student in your

17   class?

18   **A.**     Yes.

19   **Q.**     And chorus is an elective at Rachel Carson; is that

20   right?

21   **A.**     Yes.

22   **Q.**     And I think you said -- well, I won't put words in your

23   mouth, but did you say she had to audition to be in your class?

24   **A.**     To be in advanced level, yeah.

25   **Q.**     Got it.

1   **A.**    She was in the most advanced level she could be in in 7th

2   grade for chorus.

3   **Q.**    She was good at chorus?

4   **A.**    She was a good singer, yeah.

5   **Q.**    What's an elective class?

6   **A.**    Elective classes are classes that students can choose.

7   They can learn anything from art to music to computer science to

8   home economics.  So it's a class that they choose to fill out

9   their schedule.  They are required to take PE, English, math,

10  science, history, and then the others are electives.

11  **Q.**    Thank you.

12         Electives are part of the school's educational program?

13  **A.**    Yes.

14  **Q.**    And students receive grades for electives?

15  **A.**    Yeah, and they have program studies.  They have

16  curriculums, everything.

17  **Q.**    I think you said -- how many years have you been a chorus

18  teacher?

19  **A.**    This is my 23rd year in Fairfax County Public Schools.

20  **Q.**    Okay.  Got it.

21         MS. ZOLL:  I would like to pull up, Your Honor, previously

22  admitted Defendants' Exhibit 80.

23         THE COURT:  You may.

24  BY MS. ZOLL:

25  **Q.**    Do you recognize this as a report card?

1    **A.**    Yes.

2    **Q.**    For B████ R██████?

3    **A.**    Yes.

4    **Q.**    Okay.  For chorus, first quarter, she got an A?

5    **A.**    Yes.

6    **Q.**    Second quarter, she got an A?

7    **A.**    Yes.

8    **Q.**    And then third quarter, says WP?

9    **A.**    That stands for a withdraw pass, so when a student is

10   pulled to homebound services, they can't take chorus from home,

11   and actually, they usually can't do any of their electives.

12   Hence why you see speech theater arts is no mark, because that's

13   a semester elective.  Some electives are only half-year.  Chorus

14   is a full year.  So she wouldn't have been able to start that.

15   Spanish is also generally an elective but can be taught at home

16   when you're on homebound services.

17   **Q.**    Got it.

18          And the fact that those classes can't be taught on

19   homebound is a decision the administration makes?

20   **A.**    Um, I mean it -- it's from -- it's not from our

21   administration.  It's from top of the district on down.

22   There's -- choral -- chorus is a collaborative class, so there's

23   no way for a student to really participate in the ensemble when

24   they're not able to rehearse with the ensemble.

25          MS. ZOLL:  Okay.  You can take that down, Mr. Brown.

```
 1   BY MS. ZOLL:

 2   Q.    So, you testified on your direct -- we looked at a

 3   schematic.

 4         MS. ZOLL:  It was Defendants' Exhibit 61, Your Honor.

 5   Permission to publish?

 6         THE COURT:  You may.

 7         MS. ZOLL:  Thank you.

 8   BY MS. ZOLL:

 9   Q.    I believe you testified on your direct that you were

10   pregnant that year, right?

11   A.    Yes.

12   Q.    Okay.  And I believe you also testified that you

13   sometimes had to go to the bathroom and Mr. F██████ would ask

14   you where you were?

15   A.    There was one time where that happened, yes.  I went in

16   between classes, and he just happened to be walking by.

17   Q.    Got it.  So he knew you weren't in the hall at that time?

18   A.    For about a minute and 30 seconds, I was around the

19   corner at the restroom, and then I came back.

20   Q.    You had to really go to the bathroom?

21   A.    Yes.

22   Q.    Okay.  And there were two doors to chorus, right?

23   A.    Yes.

24         MS. ZOLL:  Okay.  You can take that down, Mr. Brown.

25   BY MS. ZOLL:
```

1    **Q.**    Did the administration ever inform you that B████ had

2    reported she was being sexually harassed at school?

3    **A.**    No.

4    **Q.**    Okay.

5         MS. ZOLL:  Permission to confer with counsel?

6         THE COURT:  You may.

7         MS. ZOLL:  No further questions.

8         THE COURT:  Redirect?

9              REDIRECT EXAMINATION OF AMY MOIR

10   BY MS. REWARI:

11   **Q.**    Ms. Moir, you were shown the picture of the 6th grade

12   choral concert?

13   **A.**    Yes.

14   **Q.**    Do parents typically also take pictures at the December

15   choral concert for your chorus?

16   **A.**    Typically, yes.  Yeah.

17   **Q.**    Do parents typically take photos at Broadway Night?

18   **A.**    Yes.

19   **Q.**    Okay.

20        MS. REWARI:  Thank you.

21        THE COURT:  Is this witness subject to recall?  Ms. Zoll?

22        MS. ZOLL:  No, Your Honor.

23        THE COURT:  Ms. Rewari?

24        MS. REWARI:  Yes.

25        THE COURT:  She's subject to recall?

1    MS. REWARI:  No.

2    THE COURT:  Thank you.

3    Ma'am, please step down, do not discuss the case or any

4    aspect of the case with anyone while the case is pending.

5    THE WITNESS:  Okay.

6    THE COURT:  Thank you.  All right.  I think we can go

7    ahead and take our morning break at this point.  It's 12:03.

8    Let's go to 12:15.

9    (Jury out at 12:03 p.m.)

10    THE COURT:  Thank you.  You all may be seated.

11    Who do you anticipate your next witness being?

12    MR. BATES:  Your Honor, we're going to call T█ B███████,

13    who's a long witness.

14    THE COURT:  And after that?

15    MR. BATES:  That will be the deposition designation

16    reading, and I believe we'll rest after that.

17    THE COURT:  Let me go ahead, so that we can have some

18    fluidity.  I'm going to read into the record the Court's

19    determination, with regard to motion to preclude under 30(b)(6).

20    This matter comes before the Court on plaintiff's motion to

21    preclude 30(b)(6) deposition of PricewaterhouseCoopers Docket 944

22    and defendants' opposition at Docket 945.

23    The defendant intends to introduce the deposition

24    testimony of a Rule 30(b)(6) PwC deponent and to admit various

25    exhibits in conjunction with the deposition testimony.

1    The plaintiff argues that the deposition testimony of PwC

2    along with the exhibits are cumulative because of the Defendants'

3    extensive cross-examination of plaintiff on her employment with

4    the PwC and the alleged submission of inaccurate resume,

5    Docket 944 at 1 to 2.

6    Plaintiff also argues that the deposition testimony

7    related to exhibits violates Federal Rule of Evidence 608 because

8    under Rule 608, quote, "Extrinsic evidence is not admissible to

9    prove specific instances of a witness's conduct in order to

10   attack or support the witness's character for truthfulness."

11   It's Docket 944 at 1.

12   Plaintiff also contends that Rule 608(b) does not allow

13   defendants to call a separate witness in their case-in-chief to

14   prove specific instances of untruthfulness that are ancillary to

15   plaintiff's case.  That's Docket 944-2.

16   But as Defendants' note in their opposition, the Fourth

17   Circuit has held that Rule 608(b) should not be read so broadly

18   as to disallow the presentation of extrinsic evidence that is

19   probative of a material issue in the case, citing *United States*

20   *versus Smith and Grady*.

21   Further, while the Rule 608 focuses on the admissibility

22   of extrinsic evidence that impeaches a witness's character for

23   truthfulness, it did not preclude the, quote, "admissibility of

24   extrinsic evidence offered for other grounds of impeachment, such

25   as contradiction, prior inconsistent statements, bias, and mental

1    capacity" as recognized in the case of *United States versus Nixon*

2    of the Sixth Circuit's Case of 2012.  Here plaintiff discussed

3    her employment history with PwC during her case in chief and

4    testified she was not able to maintain full employment.

5         The introduction of the PwC deposition is therefore

6    probative of plaintiff's claim of inability to maintain

7    employment, which is a material issue in this case.

8         Additionally, the defendants intend to use portions of the

9    deposition testimony to try to impeach plaintiff on the other

10   grounds with respect to employment experiences, which is not

11   foreclosed by Rule 608, again, citing the Nixon case.

12        Plus defendant is not precluded from introducing the

13   deposition testimony.  The parties informed the Court that the

14   motion was denied.  They agreed upon designations and

15   counter-designations of the deposition.

16        Accordingly, the Court will limit the deposition testimony

17   solely to the parties' agreed-upon designations and

18   counter-designations that are attached to this order.

19        Additionally, the parties have agreed that if the motion

20   is denied with respect to the deposition, then the relevant

21   exhibits are admissible.

22        Accordingly, it's hereby ordered that plaintiff's motion

23   Docket 944 is denied.

24        With respect to the deposition of testimony of PwC, the

25   Court will permit defendants to introduce PwC's deposition

1    testimony, but the Court will limit the presentation of the

2    deposition to the parties' agreed-upon designations and

3    counter-designations, and that order will be entered today.

4        I believe Ms. Barry provided everyone a copy of that

5    order.  Ms. Barry, did you give --

6        THE LAW CLERK:  I have it right here.

7        MR. BRENNER:  One unrelated issue, Your Honor.  I realize

8    that during the examination of Dr. Tuwiner, I had stepped out of

9    the well.  I was trying to do it unobtrusively, but that's not

10   the right decor.  I should have asked your permission, so I

11   apologize.  I meant to disrespect.

12       THE COURT:  Absolutely, and I don't think anybody has done

13   anything to disrespect this particular judge.  I'm real low

14   maintenance.

15       All right.  We'll see everybody back at about 12:15.

16       (Thereupon, a recess in the proceedings occurred from

17   12:08 p.m. until 12:19 p.m.)

18       THE COURT:  Please be seated.

19       (Jury in at 12:20 p.m.)

20       THE COURT:  Thank you.  You may be seated.

21       Next witness?

22       MR. BATES:  Your Honor, the defendants call T███████ B██████.

23       THE COURT:  Ms. B██████.

24       (T███████ B██████, WITNESS IN THE CASE, SWORN)

25

1          <u>DIRECT EXAMINATION OF T███████ B██████</u>

2    <u>MR. BATES:</u>

3    **Q.**    Good afternoon, ma'am.

4    **A.**    Good afternoon.

5    **Q.**    Could you please state your name for the record?

6    **A.**    T███████ B██████.

7    **Q.**    And for the record, I'm Ryan Bates.  I represent Fairfax

8    County School Board.

9          Where were you employed during the 2011-2012 year?

10   **A.**    Rachel Carson Middle School.

11   **Q.**    And what was your position that year?

12   **A.**    Assistant principal and Assistant Principal II.

13   **Q.**    And are you employed now?

14   **A.**    No.

15   **Q.**    Okay.  Are you retired?

16   **A.**    Yes.

17   **Q.**    And what year did you retire?

18   **A.**    2016.

19   **Q.**    Okay.  So you've been retired for about eight years?

20   **A.**    Almost eight years.

21   **Q.**    Okay.  And prior to your retirement, ballpark, how many

22   years were you in education?

23   **A.**    38.

24   **Q.**    What was the first school system that you worked for?

25   **A.**    The City of Falls Church Public Schools.

1   **Q.**    Okay.  Is the City of Falls Church Public Schools

2   different than Fairfax County Public Schools?

3   **A.**    Yes.  It's an independent school system.

4   **Q.**    Okay.  And just briefly, let's walk through what you did

5   for Falls Church Public Schools.  What was your first position

6   there?

7   **A.**    I was a teacher in the 6th grade in the middle school.

8   **Q.**    Okay.  And how many years were you a teacher?

9   **A.**    Well, I was a teacher for 24 years, but I started out as

10  a 6th grade teacher for 12 years.

11  **Q.**    Okay.  Did you teach any other subjects while you were a

12  teacher?

13  **A.**    I taught English in the 6th grade, and then there was a

14  class that we called Life Skills that included sex education.

15  **Q.**    Okay.  And how many years did you teach those Life Skills

16  courses?

17  **A.**    Well, I taught Life Skills while I was a 6th grade

18  English teacher, and then I moved into a position that was

19  full-time family life education at the 7th through the 12th --

20  the 10th grade level.

21  **Q.**    Okay.  Can you just explain for the jury what family life

22  education, what that entails?

23  **A.**    Well, it incorporates what we traditionally call sex ed,

24  which is reproduction, puberty education, that sort of thing,

25  but in 19 -- in the late '80s the State of Virginia mandated

1    that every school system have a comprehensive K10 family life

2    education, and they incorporated other topics into that such

3    as -- well, we had always done things like sexual harassment,

4    sexual assault prevention, child sexual abuse prevention, but

5    then the State required that we incorporate things like drug

6    education, bullying education, and that sort of thing into that

7    program.

8    **Q.**    Okay.  Did you move into a different position after being

9    a teacher?

10   **A.**    In Falls Church city?

11   **Q.**    Yes.

12   **A.**    No.  I taught the whole 24 years, but for my last 12

13   years -- so I was 12 years as the English and sex ed teacher,

14   and then my second 12 years I was an FLE teacher, family life

15   education teacher at the 7th to 10th grade level, and then I was

16   the curriculum coordinator for K-12 family life education for

17   the city school system.

18   **Q.**    What does that mean to be a curriculum coordinator?

19   **A.**    Well, I wrote curriculum, I worked with teachers to

20   develop curriculum, I trained all the teachers in family life

21   education topics, and then we also did a lot of parent

22   education, we published a parent handbook that went over -- the

23   family life education in Virginia is an opt outable.  That means

24   parents can decide not to have their children in it.

25          So every parent, every family in both Falls Church city

1    and Fairfax County gets a booklet at the beginning of the year

2    that explains all of the standards for family life education,

3    and the curriculum outline for the grade level, and then there

4    are several pages of parent suggestions on how to support kids

5    in those topics.  Many of them are kind of sensitive topics.

6    And so we work with parents to help them support their children

7    in that way.

8    **Q.**    Okay.  And when you were writing this curriculum, did

9    that include the topics that you mentioned earlier of bullying

10   and harassment training?

11   **A.**    Yes.

12   **Q.**    And education?

13   **A.**    Um-hmm.

14   **Q.**    Okay.  So, after your 24 years at Falls Church, where did

15   you go after that?

16   **A.**    I went to Fairfax County in the central office.  My

17   position was called curriculum instruction special programs

18   administrator.  I was housed in the middle school office of

19   instruction.

20   **Q.**    What year did you come to Fairfax County Public Schools?

21   **A.**    2002.

22   **Q.**    Okay.  And what did you do in that curriculum and

23   instruction position?

24   **A.**    I was the coordinator for the K-10 family life education

25   in Fairfax County, and then I was also the director of the AVID

1   program, which is why they gave it the special projects name,

2   because those are two very different programs.

3       The AVID program, which stands for Advancement Via

4   Individual Determination, was a program designed to get

5   underrepresented groups or students who were the first in their

6   family to attend college into honors, advanced placement and

7   international baccalaureate classes and then into college.  So

8   it was very much a college-bound support program.

9   **Q.**    And how many years did you hold these positions?

10  **A.**    I was a family life education coordinator for four years.

11  Then my fifth year in the central office, I moved entirely into

12  AVID because the program had grown in those four years from a

13  hundred students in the county to close to a thousand students

14  in the county, and so we needed full time there, and so I moved

15  into that.

16  **Q.**    Okay.  So you told us what you did in the Falls Church

17  family life role, but I don't think you've told us what you've

18  done in the Fairfax County Public Schools family life role.

19  **A.**    Okay.  So, the -- in the Falls Church system, I actually

20  wrote the K-12 curriculum.  In Fairfax County there was a

21  curriculum already in place because the State mandate had come

22  out in 1990.

23      So my job was to update that curriculum to add topics as

24  they were needed, as they came to our attention.  I worked with

25  the office that put out the SR&R, which was at the time Clarence

1  Jones, and I worked with the guidance office and the health and

2  PE office to make sure that our efforts in things like sexual

3  harassment were coordinated so that we weren't just teaching the

4  same thing over and over again, that we were -- and we -- you

5  know, that we used similar vocabulary and that kind of thing.

6      So we worked on curriculum development, and then I

7  also -- every teacher who teaches family life education in

8  Fairfax County has to have training, so that you go through the

9  whole curriculum with them and they have, you know, experience

10  with the language and the approach and the actual lessons.

11      So I trained hundreds of teachers because we were

12  converting to an all elementary school teacher model so that

13  every elementary school teacher had to be trained so that we

14  weren't pulling kids to have these sensitive topics dealt with

15  by a person they didn't know, a teacher they didn't know.  We

16  wanted it moved into the classroom.

17      So I trained hundreds of teachers at the elementary,

18  middle, and high school level.

19  Q.   Okay.  I think -- I think that's covered -- the training

20  aspect, but when you said your responsibilities with regard to

21  curriculum, is this curriculum that's developed at the school

22  system -wide level and is kind of -- is broken down or passed

23  along to the various schools within the school district?

24  A.   Yes.

25  Q.   Okay.  And would that include middle schools?

1    **A.**    Yes.

2    **Q.**    Okay.  And what was your next position after -- I think

3    you said you held that position until 2006.  What did you do

4    after 2006?

5    **A.**    I went to Glasgow Middle School in a teacher resource

6    position as an assistant principal.

7    **Q.**    Okay.  And how long were you at Glasgow Middle School?

8    **A.**    Just one year.

9    **Q.**    And where did you go after Glasgow?

10   **A.**    Rachel Carson.

11   **Q.**    And what position did you take at Rachel Carson?

12   **A.**    Assistant principal.

13   **Q.**    Tell us about how you came about finding your way to

14   Rachel Carson.

15   **A.**    As I said before, I had worked in the office of middle

16   school instruction, which was where my special projects

17   administrator position was housed, and when I decided I wanted

18   to get back into schools with kids and teachers, because that's

19   something you really miss at the central office level, I talked

20   to the director about opportunities, and she told me that Rachel

21   Carson was open, and I said, you know, that's 30 minutes away, I

22   don't really want to commute, and she said, T███, it's Rachel

23   Carson, and she told me -- I mean, it was kind of known as one

24   of the jewels in the crown, and she thought it was a great

25   opportunity.

1          And then when I went to the interview, I remember that

2    many of the questions had to do with relationships,

3    relationships with students, relationships with teachers, how to

4    partner with parents in educating children, and that aligned so

5    clearly with what I valued that I took that opportunity.

6    **Q.**     And who hired you at Rachel Carson?

7    **A.**     A██████ -- I mean, Mr. F████████.

8    **Q.**     And what years -- how many years were you an assistant

9    principal at Rachel Carson?

10   **A.**     Five.

11   **Q.**     Okay.  What was your last year at Rachel Carson?

12   **A.**     2011-2012.

13   **Q.**     Okay.  So, the year that we've been talking about

14   throughout this trial, was that your last year at Rachel Carson

15   Middle School?

16   **A.**     Yes.

17   **Q.**     Okay.  Where did you go after Rachel Carson Middle

18   School?

19   **A.**     I was an interim principal at Dogwood Elementary School

20   for one year.

21   **Q.**     Okay.  And what did you do after that?

22   **A.**     I became the principal at Graham Road Elementary School

23   for three years.

24   **Q.**     Okay.  And did you retire after that?

25   **A.**     Yes.

1    **Q.**    Did any -- did anything with regard to this case have any

2    bearing on you moving from Rachel Carson into the principal role

3    at these other schools?

4    **A.**    No.

5    **Q.**    Okay.  Last question on your background.  Have you been a

6    recipient of any awards during your time as an educator?

7    **A.**    Yes.

8    **Q.**    Tell us about those.

9    **A.**    I was the -- I was the *Washington Post* Agnes Meyer

10   Outstanding Teacher.  I have won that award as a middle school

11   teacher.  And then as a high school teacher, I was recognized as

12   the educator of the year by the American Association of

13   University Women in the City of Falls Church.

14   **Q.**    Great.  Thank you.  So.

15        Let's transition to talking about Rachel Carson, and if

16   we can, to the extent possible, hone in on that last year you

17   had there at Rachel Carson.

18        Can you describe for the jury what -- just generally

19   speaking, what your responsibilities were as an assistant

20   principal?

21   **A.**    We were responsible for student safety.  We were

22   responsible for instructional leadership.  So that included

23   teacher evaluations.  We were responsible for certain

24   departments, so I had music and special education.  Then we met

25   with collaborative learning teams, the multi-disciplinary team,

1    but we also each had a couple of subject area teams, so I did

2    7th grade -- I'm sorry, 7th grade science and 8th grade English

3    that year.

4        I think that pretty much covers it.

5    **Q.**    Okay.  And just generally speaking, how would you

6    describe yourself as an administrator?  Sort of what is your

7    style?  What is your characteristics?

8    **A.**    Well, I think I would always describe myself, first of

9    all, as a child advocate.  And then I -- again that relationship

10   thing was very critical to me, so building relationships with

11   teachers.  I had been a teacher for 24 years, so I really could

12   identify with what being a teacher was like.

13       In the family life education program, relationships with

14   the parents are critical because you're dealing with such

15   sensitive topics, and so -- and I was in Falls Church city,

16   which was a very small school system where we knew the families

17   well.  I lived in the city, you know.  And so, those community

18   and parent relationships were very important to me.

19       I think I was considered pretty thorough and attentive to

20   detail.  My -- I was an English teacher, so I was a writer, so

21   when we divided up duties, I often got the things that involved

22   writing.  So -- but, you know, it was the relationships and just

23   supporting the learning through those relationships.

24   **Q.**    So can you walk us through what a typical day looked like

25   for you as an assistant principal at Rachel Carson and sort of

1    start with the time you put your car in park and walk into the

2    building.

3    **A.**    I usually got there before most people.  I just like to

4    be in the building because you want to check emails, check in

5    with people, that sort of thing, and then I had cafeteria

6    duty --

7    **Q.**    Can I just ask, by the way, how many minutes before

8    students arrived would you arrive at school?

9    **A.**    I don't know.  I think I arrived around 7:00, and I think

10   school started at 7:50 or something.  I can't remember that.

11   **Q.**    Okay.  I'm sorry.  Go ahead.

12   **A.**    And then I would go to the cafeteria because some

13   students -- most students would get off the bus and go into the

14   main entrance, but some students would eat breakfast at school.

15   So we would be at the --  myself and a couple of teachers would

16   be in the cafeteria to supervise that relatively small group of

17   people -- students.  It might be 50 kids.  And we would just

18   stand at the door.  The door was always locked, so we would let

19   kids in as they came to the cafeteria, and we supervised that

20   until it was time to go to class.

21   **Q.**    If you recall earlier, we looked at a duties schedule

22   that had certain assignments.  Was that cafeteria duty your

23   morning assignment?

24   **A.**    Yes, yes.

25   **Q.**    Okay.  All right.  So pick it up from there after, you

1    know, cafeteria, kids are eating breakfast.  What happens from

2    there?

3    **A.**    Well, there's not really a typical day for an assistant

4    principal.  It's very much, you know, lots of different things

5    happening.  We would be in the hallways with the kids.  We

6    would -- and interacting with the kids and the teachers at that

7    time.  We had team meetings, so we had the multidisciplinary

8    team meetings, and then we met with our content area teams.

9        I would do teacher observations in the classroom and then

10   meet with teachers about those observations or do their

11   evaluations.

12       Because I was a special education administrator, I also

13   attended the IEP meetings, whether it was a local screening

14   committee, an eligibility meeting or an IEP meeting, I would be

15   involved in those.

16       And then I had lunch duty every single day, and I was in

17   fourth-period lunch the year we're talking about, and then --

18   the other thing that we did was, throughout the day, we would

19   walk through the building as we're going from meeting to meeting

20   or whatever, checking doors, you know, just checking -- stepping

21   into the bathrooms during the -- I would do the women's

22   bathrooms -- to make sure that there wasn't anybody, you know,

23   doing anything in there because that's one area that's not

24   supervised well all the time.

25       And then after school, we were all assigned to be out

1    with the buses because the kids would come out of the building,

2    and their inclination was to kind of clump up and socialize

3    because their only real time to socialize was, you know, during

4    the lunch period or whatever.  And we would have to move them

5    on.  I mean, we were very strict about that, you have to get

6    right on the buses, because we wanted the buses filled and out

7    quickly.  We had 30-something buses.

8         And so there would be streams of kids, and so we were all

9    stationed along the way, and there was a sign that showed where

10   the buses were so kids knew, if they were on Bus 31, they should

11   turn right, and if they were on Bus 1, they should turn left

12   because the buses came in at different times.

13        And then after school, I usually stayed until about 6:00,

14   and there were after-school programs some days.  There were

15   meetings, you know, administration meetings or whatever, and

16   that would be a time when you would get some other kinds of work

17   done.

18   Q.   So I want to just break down a few things in there before

19   we move on.  So, ballpark, how many students were at Rachel

20   Carson?

21   A.   I think that year about 1,250.

22   Q.   Okay.  So would it be -- and how many students were on

23   teams that you supervised?

24   A.   You know, I think I supervised three teams that year, so

25   there were about 140 to 160 students per team.

1    **Q.**    So about 450 students were on teams under your

2    supervision that year?

3    **A.**    Yes, yes.

4    **Q.**    Okay.  And do you have an estimate of how many teachers

5    were sort of under your supervision that you evaluated and were

6    on teams that you oversaw?

7    **A.**    I evaluated the music department, the special ed

8    department, and I'm not sure what -- I think that was my

9    responsibility in terms of valuation, but we all did

10   observations of different teachers because we wanted -- the

11   county -- and we wanted to make sure that different people gave

12   feedback to different teachers because we all had different

13   strengths and we all notice different things.  So I certainly

14   did observations and observation conferences with teachers that

15   were not my direct -- I wasn't their evaluator.

16   **Q.**    Okay.  I may have missed this in your answer, but what,

17   if any, responsibilities did you have with regard to student

18   discipline for those 450 students that were on your teams?

19   **A.**    I should have mentioned that, because that was a part --

20   a big part of the job.  If they were on my team -- I mean, what

21   we typically did was we would deal with the discipline for the

22   students on our team.  So if a student on one of my teams did

23   something, you know, was cheating or something like that, I

24   would be the one that would deal with it.  It wouldn't be the

25   administrator of the team that the cheating was reported in or,

1   say, it was in a music class or something.

2       So -- but if administrators were out of the building or

3   whatever, then I would step in, and they would do the same for

4   me.

5   **Q.**    Okay.  By the way, is there any particular reason why you

6   might -- you, personally might remember the 2011-2012 year

7   better than the 2009 to 2010 year or any of the other years that

8   you had at Rachel Carson?

9   **A.**    Well, it was my last year as an assistant principal.  So

10  it's kind of frozen in time for me in a way, and all the

11  documents I had that I updated every year were updated for that

12  year.  So, for instance, the SR&R PowerPoint that you have is

13  the one from that year because I never updated it after that.

14  **Q.**    Okay.  If we can, I'm going to ask one question since

15  it's been thoroughly covered with other witnesses, but just very

16  briefly, what was the expectation of the teachers with regard to

17  monitoring the halls of the teams that -- just generally

18  speaking, in your experience?

19  **A.**    Well, it was a nonnegotiable.  They had needed to be in

20  the halls, and they were usually standing near their classroom

21  because students were coming into their classrooms.  They would

22  be monitoring the hallway and monitoring the classroom at the

23  same time.  So they stayed right around their door, but they

24  were expected to be out there.

25      And Mr. F███████ made sure that they were.  A lot of

1    schools, that's the expectation, but nobody really enforces it

2    or the teachers are very resistant.  It wasn't negotiable at

3    Rachel Carson.

4    **Q.**    Okay.

5         MR. BATES:  Your Honor, I would like to move to admit

6    Defendants' Exhibit 274, which the parties have stipulated to,

7    but it's not officially in the record yet.

8         THE COURT:  Who's doing the examination?

9         MR. BRENNER:  I am, Your Honor.

10        I'll have to get that list, but I accept Mr. Bates'

11   representation.

12        THE COURT:  Very good.  It's admitted.  You may publish.

13        (Defendants' Exhibit 274 admitted into the record.)

14   BY MR. BATES:

15   **Q.**    Ms. B█████, you can look at this in the binder in front

16   of you or on the screen in front of you, and I'll represent to

17   you that this is a -- and you can see in the binder -- a

18   two-page document.

19        Just generally, what is this document that we're looking

20   at?

21   **A.**    This is from the teacher handbook for Rachel Carson.

22   **Q.**    If you can come a little closer to the mic?

23   **A.**    It's from the teacher handbook for Rachel Carson.

24   **Q.**    What's the teacher handbook?

25   **A.**    It was at this time an electronic handbook that teachers

1    could go into, and, I mean, they were expected to be familiar

2    with everything that was in it.  It had to do with school

3    safety, instructional responsibilities, duty responsibilities

4    and that sort of thing.

5    **Q.**    Okay.  If you can -- I can direct your attention to page

6    2 at the top.  It's also on your screen.  What are we looking at

7    here?

8    **A.**    This is the expectation for teacher supervision in the

9    hall -- in the hallways.

10   **Q.**    Okay.  So this was laid out in the teacher handbook?

11   **A.**    Yes.

12   **Q.**    And if you can un-zoom that.

13         The rest of this document, the bottom three sections,

14   does this deal with the sort of morning, lunch, and bus duty

15   responsibilities?

16   **A.**    That's correct.

17         MR. BATES:  Okay.  We can take that down.  If you can --

18         Your Honor, if we can publish the most published exhibit,

19   Defendants' 61, the school map?

20         THE COURT:  You may.

21         MR. BATES:  And if we can zoom in to our favorite corner

22   of the school.

23   BY MR. BATES:

24   **Q.**    And if you can just circle, Ms. B███████, where your office

25   was.  And you were located on the Explorer -- your office was

 1  located in the Explorers pod?

 2  **A.**      That's correct.

 3  **Q.**      And that's even despite the fact that the Explorers team

 4  was not one of your teams that you had responsibility for?

 5  **A.**      Yes, yes.

 6  **Q.**      Okay.  And would it -- okay.

 7          MR. BATES:  We can take that down.  If we can also publish

 8  the picture exhibit, which is Defendants' Exhibit 192, please?

 9          THE COURT:  You may.

10          MR. BATES:  And if we can have Grady go to page --

11  Mr. Grady go to page 13.

12  BY MR. BATES:

13  **Q.**      What are we looking at here?

14  **A.**      That's my office.

15  **Q.**      It says "staff lounge" there.  At the time at this school

16  year, it was your office?

17  **A.**      Yes.

18  **Q.**      Okay.  We can flip to the next page.  Actually, can we

19  stay on that page for a moment.  The next page is fine.  That's

20  a better angle.

21          Is that still your office in the middle?

22  **A.**      Yes.

23  **Q.**      And do you recognize the classroom to the right of yours?

24  **A.**      That's F███ T█████████ room.

25  **Q.**      Okay.  And to the left of yours?

1    **A.**      M███████ F███████ room.

2    **Q.**      Okay.  And if we can flip forward, we can keep going.

3    What angle are we looking at here?

4    **A.**      That's if you were standing in the doorway to my office

5    looking out to the locker pod.

6    **Q.**      Okay.  We've heard about what the teachers were supposed

7    to do with regard to monitoring.  Did you engage in that same

8    type of monitoring?

9    **A.**      I was in the halls.  Sometimes I was in an IEP meeting or

10   something and I didn't get into the halls, so the teachers were

11   really responsible for monitoring the halls, but whenever we

12   were able to, we were out mingling.  We didn't stay in one spot

13   typically.  We would walk through to make sure that everything

14   was going well.

15         MR. BATES:  Can we go forward one more page.  And actually

16   if we can go to page 23 of the PDF.

17         Okay.  We can take that down.

18         Your Honor, at this time I would like to show, I believe

19   it's about a 60-second video of the pod area.  My understanding

20   is there's no objection to this.

21         MR. BRENNER:  No objection, Your Honor.

22         THE COURT:  Very good.

23         MR. BATES:  So for the record, this is Defendants'

24   Exhibit 194A.  And there's no audio to this.

25         (Videotape played.)

1        THE COURT:  And make sure the court reporter caught you,

2   Mr. Bates.  There's no audio associated with this?

3        MR. BATES:  Correct.

4        Mr. Grady, can you pause it right there for just a moment.

5   BY MR. BATES:

6   **Q.**    Were you here when this video was taken?

7   **A.**    Yes.

8   **Q.**    Okay.  Those benches that we're looking at right there --

9   well, let me ask first, before we panned over to the benches,

10  what were we looking at?

11  **A.**    The main entrance.

12       MR. BATES:  Okay.  Can we restart this video?

13  BY MR. BATES:

14  **Q.**    Okay.  And then the benches that we see, are those

15  benches normally there?

16       (Videotape played.)

17  **A.**    No.  They were put there because they were waxing the

18  floors, and so they were making sure that people weren't walking

19  in certain parts of the building.

20  **Q.**    Okay.  And is this the Explorers pod in front of us?

21  **A.**    It is.

22  **Q.**    And that right there is a little hallway to where your

23  office is?

24  **A.**    That's correct.

25  **Q.**    Okay.  Is that the hallway where the Explorers core

1   classes are on the right?

2   **A.**     Yes.

3   **Q.**     And what's that door right to the left that we're looking

4   at?

5   **A.**     That's the girls' restroom.

6   **Q.**     All right.  You can take that down.

7          We can switch to a different topic.  Ms. B█████, we heard

8   a lot of testimony about how different administrators and

9   teachers address bullying, but please tell the jury what your

10  approach is with regard to addressing bullying and harassment.

11  **A.**     Well, I think with any behavioral learning, it's like any

12  other kind of learning.  I -- the way I define my approach is

13  the head, the heart, and the hand, it's called the 3H.

14         The head is the information and knowledge that kids need

15  to, in this case, behave well, and the heart is what we call the

16  affect, the emotions that they need.

17         For instance, empathy, trust, courage, in a way, good

18  self-esteem, resilience, and those are all things that you have

19  to incorporate into any behavioral learning program.

20         And then the hand is how you get kids to take that

21  knowledge and those emotions and actually act on them, so that

22  you can teach kids about bullying, for instance, and all the

23  information about how to report and what it is and how to

24  recognize it, and then you can instill in them trust that you

25  are going to take care of it, or empathy in, you know, seeing as

1    a bystander that someone is being harmed, but if they don't do

2    anything about it, then you're not completing the learning.

3        So you also need to teach kids skills and control the

4    environment so that you're supporting positive behavior.

5        And so that's how I articulate what I -- my approach to

6    any kind of learning because it applies in math class.  It

7    applies to any behavioral learning as well.

8    **Q.**    Okay.  Speaking of positive behavioral, I think we've

9    heard some testimony of the acronym PBIS, and the PBIS program.

10   What does that stand for?

11   **A.**    Positive Behavior Intervention and Support.

12   **Q.**    Okay.  And was that a program that was implemented in

13   Rachel Carson during this school year?

14   **A.**    Yes.

15   **Q.**    Okay.  Explain for us what that -- what the purpose of

16   that program and what it essentially is.

17   **A.**    Well, its purpose is to encourage positive behavior, but

18   it's a pretty extensive program in that we spent the year before

19   we implemented it looking at all our data in terms of, you know,

20   discipline, where things were happening, what types of incidents

21   were happening, what grade levels, all those kind of things, and

22   analyzing that, and then setting goals for ourselves for how we

23   wanted to implement the program.

24       And then during implementation, there's an oversight

25   committee, and I was the administrator on that committee, and we

1  would constantly be looking at the -- we learned our -- our tech

2  specialists learned how to download all this data, and we would

3  meet regularly and examine the data, and -- but the way it was

4  implemented in the school is you've seen the readiness, respect,

5  and responsibility.  Those were our key words, and then we

6  would, with the students, look at every setting in the school

7  and, say, for instance, what does respect look like in the

8  cafeteria, what does readiness look like in the classroom, what

9  does responsibility look like in the hallways.

10        And so every environment was kind of dissected in that

11  way, and students were provided with lessons, and there were

12  posters and things that would remind them of those things.

13  Q.    Okay.  We'll get into that in a moment, but let's talk to

14  you specifically, and I'm not talking about any specific

15  situation right now, but generally speaking, how did you address

16  bullying-related issues that came to your attention?  What steps

17  would you generally take?

18  A.    Well, of course, I would -- you want to make sure that

19  the student who's reporting is comfortable, so you -- it's

20  very -- there are lots of steps, so I'm trying to think of a way

21  to go through this.

22  Q.    Just generally speaking.  We don't need to get into too

23  many details.

24  A.    Well, you have two or more students that you're working

25  with.  So you want to investigate thoroughly, find out what

1    happened, and then you want to make sure that the student who

2    has been bullied, if you find that there's been bullying, is

3    supported, and also understands that they need to re-report if

4    anything else happens, and I go through a little list with the

5    students.

6        You know, if they say anything to you, if they call you a

7    snitch, if they start talking about the fact that you went to

8    the administration, if they give you a nasty look, any of those

9    things, you need to come back, because I tell the student who

10   was engaged in the bullying the same thing.  If you do any of

11   these things, then the consequence will be much more serious.

12       But there were things that we did with the students who

13   were bullying that were much beyond, you know, a consequence and

14   a warning, if you will.

15   **Q.**    What do you mean by that, we do things beyond just a

16   consequence and a warning?

17   **A.**    Well, I'll tell you -- when I had a student who was found

18   to have been bullying, I would typically say to them, are you a

19   bully, and they would almost always say, no, because, I think

20   that as a culture and not just at the school, that we have

21   sufficiently vilified bullying, that they don't want to be seen

22   that way, and that's part of their self-image.

23       And so I would say, well, here are the behaviors you

24   engaged in.  What do you call that?

25       And they would usually say, bullying, and I would say,

1    well, do you want to be seen as a bully?  And they would say,

2    no, I don't, and I would talk to them about how they could

3    change their behavior.

4        We also use some restorative justice practices.  For

5    instance, I would say, how could you make this right?  Because

6    most of the time students are remorseful.  I mean, you hear

7    things about middle school kids being mean and all this stuff.

8    They really aren't most of the time.

9        So they would often say, I would like to apologize, and

10   then I would say to them, well, if I were being bullied by you

11   and you walked up to me with your intent to apologize, how would

12   that come across?

13       And they would say, well, you know, it wouldn't really

14   work out well.  So they would suggest usually that they would

15   write an apology if they wanted to apologize, and if they did,

16   we'd talk about how to get that -- how they could get that to

17   the person, and I had these little cards that I would give them

18   that had the four parts of a good apology.

19       So they would have to -- you know, so that we would talk

20   through, you can't just say, I'm sorry.  You need to say what

21   you're sorry for, and why it was a problem, and that you're not

22   going to do it anymore.

23       And so -- and then, of course, I would say, if you do any

24   of these things and you come back to me, then there's going to

25   be a much more serious consequence than the one you're receiving

1    now.

2    **Q.**     Understood.  Thank you, ma'am.

3          MR. BATES:  If we can, I would like to move to admit

4    Defendants' Exhibit 275.

5          THE COURT:  275?

6          MR. BATES:  It has not been stipulated to, but it's in the

7    book.

8          MR. BRENNER:  No objection.

9          THE COURT:  Without objection, you may publish.

10         MR. BATES:  Thank you.

11   BY MR. BATES:

12   **Q.**     Ma'am, you're looking at a one-page document.  What is

13   this document, or where does it come from?

14   **A.**     It's a page from the student handbook.

15   **Q.**     What's the student handbook?

16   **A.**     It was another version of the Student Rights and

17   Responsibilities, but it was specific to Carson.  It was very

18   much student friendly because it was printed in the DAB, what we

19   called DAB.  It was a daily assignment book.

20   **Q.**     How do students get the DAB?  I'm sorry.

21   **A.**     Everybody gets the DAB, and the teachers go over how to

22   record your assignments and that kind of thing.  So there's an

23   agenda section, and then in the back is about, I think, about 11

24   or 12 pages of student handbook.

25   **Q.**     So to be clear, every student at the beginning of the

1    year gets this DAB book, and within that DAB is this document?

2    A.    Yes.

3    Q.    Okay.  If we can focus in on that second behavior

4    expectations -- above that, behavior expectations, if you can

5    zoom in on that.  And if you can highlight that middle sentence.

6    "Respect for the rights, safety."  Is this one of the

7    messages -- and one more sentence, is this one of the messages

8    that were relayed to students in this document?

9    A.    Yes.

10   Q.    Okay.  And if we can -- does this document go on to list

11   various types of inappropriate behavior right under there, the

12   following sentences?

13   A.    Yes.  I would say this that document was meant to be --

14   to have a more positive tone than the Student Rights and

15   Responsibilities.  So it's a little different approach.

16   Q.    Okay.  And it says, "Students who do not conduct

17   themselves properly will be counseled and/or disciplined.  This

18   includes students who participate in such inappropriate

19   activities such as name-calling, teasing," and it continues.

20         Do you see that?

21   A.    Yes.

22   Q.    And is this one way that students were communicated about

23   their behavior expectations?

24   A.    Yes.  The teachers actually went over this in learning

25   seminar.

1    **Q.**    Okay.  And we can zoom out of this and go down to the

2    next section.  This section saying, "Bullying prevention," is

3    this -- just tell us about this section.

4    **A.**    This one, of course, highlights bullying prevention

5    because that was a major focus of the whole school system, and

6    just -- so, you know, hones in on that part of the behavior that

7    we were trying to prevent.

8    **Q.**    Okay.

9         MR. BATES:  Okay.  We can take that down.  You can take

10   the document down.

11   BY MR. BATES:

12   **Q.**    And, ma'am, we heard some testimony about the Student

13   Rights and Responsibilities Training.  Can you just, again, just

14   kind of briefly remind for us how students were trained on the

15   students' Rights and Responsibilities Booklet that we've talked

16   about?

17   **A.**    The students, how they were trained on it?

18   **Q.**    Yeah.

19   **A.**    Well, during the learning seminar, the first week or two

20   of school, the teachers went through the -- that document

21   there -- there were lessons that were provided by the County

22   that the teachers could use during learning seminar, and then

23   the students took a test, and they had to pass the test.  So if

24   a student didn't pass the test, then the teacher would go back

25   and reteach, which is a typical method.  Then --

1    **Q.**    Let me stop you there.  Were you one of the

2    administrators that taught the training?

3    **A.**    No.  This was done by the classroom teachers.

4    **Q.**    Okay.  So, Exhibit 280 --

5        MR. BATES:  If we can have permission to publish 281,

6    which has been admitted into evidence?

7        THE COURT:  You may.

8    BY MR. BATES:

9    **Q.**    Is this the presentation that you were talking about that

10   the students received?

11   **A.**    No, that's the -- this is the one the administrators

12   gave.  So I was talking about the ones that the learning seminar

13   teachers, so those were all the team teachers.  The first couple

14   of weeks of school went through the Student Rights and

15   Responsibilities, had lessons on that, and then the students

16   took the test.

17   **Q.**    Okay.  I appreciate that clarification.  So there's

18   essentially two phases of education of the Student Rights and

19   Responsibilities:  One in the class setting, and then one

20   presented by the administrators?

21   **A.**    At the beginning of the year, yes.

22   **Q.**    And we're looking at the presentation done by the

23   administration?

24   **A.**    Yes.

25   **Q.**    Okay.  And I know we looked at this very briefly with

```
1    Mr. H████ yesterday, but I just want to dial in on a few pages.

2    If we can go to page 4 and 5 of this presentation.  And if you

3    can just tell us, just generally --

4         MR. BATES:  If you can flip to the second -- page 5,

5    Grady, so she can see what's --

6    BY MR. BATES:

7    Q.    What are these two pages addressing?

8    A.    Behaviors that would result in disciplinary action if the

9    student engaged in these.

10   Q.    Okay.  And if we can go back to that first page, page --

11   I'm sorry, page 4.

12        And is harassment referenced in verbal abuse in that

13   first bullet point?

14   A.    Yes.

15   Q.    And is profane language in that second bullet point?

16   A.    Yes.

17   Q.    Okay.  If we can go to the next page.

18        Is threatening students addressed in that second bullet

19   point?

20   A.    Yes.

21   Q.    And improper touching or sexual assault?

22   A.    Yes.

23   Q.    And third from the bottom, assaulting or threatening to

24   assault a student addressed?

25   A.    Yes.
```

1    Q.    And the last section, threatening or bullying behavior?

2    A.    Yes.

3    Q.    Okay.  If we can then turn to page 12 of this

4    presentation.

5         THE COURT:  Mr. Bates, I have scheduled a meeting with the

6    United States Attorney, and I've already broken that meeting with

7    her once during the course of this trial, so if this is a good

8    point for you to stop for right now, I would like to go ahead and

9    take that break.

10        MR. BATES:  Certainly, yes.

11        THE COURT:  As I said, ladies and gentlemen, I have a

12   meeting with another individual associated with the Court family,

13   and that meeting should take about 15 minutes, but we're going to

14   go ahead and work your lunch break in.  So let's go from 1:00 to

15   2:00.

16        (Jury out at 1:04 p.m.)

17        THE COURT:  You may step down, ma'am.

18        All right.  You may be seated, ladies and gentlemen.

19   Mr. Bates and all, thank you for the accommodation, but this is a

20   meeting I have to take.

21        MR. BATES:  Certainly.

22        THE COURT:  Very good.  We'll see everyone back at 2:00.

23        (Thereupon, a recess in the proceedings occurred from

24   1:04 p.m. until 2:03 p.m.)

25        (Jury in at 2:03 p.m.)

1          THE COURT.  You may be seated.  Mr. Bates.

2          MR. BATES:  May I proceed?

3          THE COURT:  You may.

4    BY MR. BATES:

5    **Q.**     Ms. B██████, do you recall, when we left off, we were

6    looking at the administrator's presentation of the Student

7    Rights and Responsibilities PowerPoint?

8    **A.**     Yes.

9    **Q.**     And we had just looked at the slides with regard to

10   disciplines.  Do you recall that?

11   **A.**     Yes.

12   **Q.**     If I could have Mr. Grady put up on the screen precisely

13   those two pages, could you take a look at these two slides and

14   tell us about what were you trying to convey with these slides

15   in this presentation?

16   **A.**     Well, I should say this was an animated PowerPoint, so

17   each thing showed up separately that we talked about, and we put

18   emphasis on some of the key terms, but we, of course, defined

19   "bullying," gave examples from what we had dealt with.  We made

20   sure that they knew that it wouldn't be tolerated and that there

21   would be consequences for bullying.

22   **Q.**     Okay.  And this presentation, was this -- how many times

23   a year was this presentation or a version of this presentation

24   given to students at Rachel Carson?

25   **A.**     Twice.

1          MR. BATES:  Okay.  You can take this down, and if we can

2    publish Exhibit 150, which has been admitted into evidence.

3          THE COURT:  You may.

4    BY MR. BATES:

5    **Q.**    Ms. B████, you testified earlier about a test that was

6    given following the -- or in conjunction with the SR&R training.

7    Do you recall that?

8    **A.**    Yes.

9    **Q.**    And is this essentially the test that was given?

10   **A.**    Yes, that's the first page of itself.

11   **Q.**    Okay.  Can we go to the second page?

12          And what was the required score on that test?

13   **A.**    A hundred percent.

14   **Q.**    Okay.  What happened if a student did not get a hundred

15   percent on the test?

16   **A.**    The teacher would reteach the concepts and then re-test.

17   **Q.**    Okay.  And was there a video -- and just for the record,

18   that was Defendants' Exhibit 150.

19          Was there a -- you can take this down.

20          Was there a video played in conjunction with the Student

21   Rights and Responsibilities training?

22   **A.**    Yes, there was one every year that focused on some aspect

23   of bullying that was critical at the time.

24   **Q.**    Okay.  And was that video like the training?  Were there

25   two videos a year?

1    **A.**    I don't remember.

2    **Q.**    Okay.  That's fine.

3            MR. BATES:  Your Honor, at this time, we would ask to --

4    Defendants' Exhibit 283 is an exhibit that the parties have

5    stipulated to, although it's not been admitted, and we would like

6    permission to play about 90 seconds of the video.

7            THE COURT:  Mr. Brenner?

8            MR. BRENNER:  Your Honor, my understanding is just the 90

9    seconds is what's being offered for evidence, and we don't have

10   an objection to the 90 seconds.

11           THE COURT:  90 seconds.

12           (Defendants' Exhibit 283 is admitted.)

13           MR. BATES:  And so just for the record, if we can have --

14   and this does have audio.  If we can have Mr. Grady start at

15   about the 7:05 --

16           THE COURT:  I thought he told me his name was Mr. Walters?

17           MR. BATES:  For continuity, I'm just calling him

18   Mr. Grady.

19           THE COURT:  All right.  Fine.  I like Mr. Walters and

20   Mr. Brown.

21           MR. BATES:  Okay.  We'll do Mr. Walters.

22           THE COURT:  It's like calling me Mr. Rossie.

23           MR. BATES:  I didn't want any questions about who

24   Mr. Walters was, but, okay, we can do that.

25           If I can have Mr. Walters, we're going to start this video

1    at the 7:05 mark.

2        Go ahead.

3        (Videotape played.)

4    BY MR. BATES:

5    **Q.**    You can stop it there, and you can take it down.

6        Do you know, Ms. B████, those videos, that segment of

7    that video, is that produced by Fairfax County Public School

8    students?

9    **A.**    Yes.

10   **Q.**    Okay.  So, we talked about the SR&R training that

11   teachers gave in the classroom; we talked about the

12   administrator training.  Just very briefly, in what other way --

13   and we also talked about what was in the student DAB, daily

14   agenda book.

15       In what other ways was the anti-bullying messages

16   conveyed to students during your last year at Rachel Carson?

17   **A.**    Well through the Positive Behavior Intervention and

18   Support program, the PBIS program, so there were posters.  There

19   were lots of different things that we did through that program.

20   Of course, we did some parent presentations on cyberbullying,

21   for instance through the PTA.

22       I'm trying to think what else.  A lot of it was, you

23   know, working individually with students.

24   **Q.**    Okay.  Was there any training as well provided in health

25   classes?

1    **A.**     Yes.  Both health and FLE.  They complemented one

2    another.  So when the state mandated that we have drug education

3    and bullying education and family life education, we tailored

4    those subjects to the kinds of subjects that were in family life

5    education, and then there was also drug and alcohol and bullying

6    education in the health curriculum.

7    **Q.**     Okay.  Thank you.  All right.  Let's turn to talking

8    about the plaintiff B.R.

9          So, to be clear, B.R. was not on your team?

10   **A.**     Correct.

11   **Q.**     Okay.  Did you have any interaction with her?  Do you

12   recall having any interaction with her at all before the winter

13   break of that 2011-2012 school year?

14   **A.**     I remember her coming up the first day of school in the

15   cafeteria, I covered her lunch, and introducing herself.

16   **Q.**     Okay.  Other than that, did you have any interaction with

17   her that you recall?

18   **A.**     No, not that I recall.

19   **Q.**     And so what was the first -- when did you first become

20   involved in anything with regard to B.R.?

21   **A.**     Directly, it would have been on January 27th.

22   **Q.**     Okay.  How did you become involved in -- at that moment?

23   **A.**     Well, Mr. H████ had been working on the issues with

24   missing assignments, and he had made arrangements for the mother

25   to come in on the 27th in the afternoon.  Earlier on the 27th,

1    Mr. F█████ and Mrs. Weaver got the letter from B████.  That's

2    an email, the long letter that we've looked at before, and when

3    he saw that, he called me to his office and said, I'd like you

4    to sit in on this meeting, because he was concerned.

5    **Q.**    Okay.  And so, did you sit in on that meeting with

6    Mr. H████ and -- was it plaintiff's mother?

7    **A.**    And father.

8    **Q.**    And father.  Okay.  You sat in on that meeting?

9    **A.**    Yes.

10    **Q.**    Okay.  What do you recall about that meeting?

11    **A.**    They -- we actually talked about the letter and how

12    aggressive it was, that she communicated with the school.  We

13    talked about the missing work and what Mr. H████ found out in

14    terms of those three situations, with the vocabulary book and

15    the missing assignment sheets.  And then Mom in this case

16    expressed some concerns about social skills, just that her

17    daughter was having issues with other kids.  And so we talked

18    about maybe getting her some social skills, a group or

19    something, in terms of some counseling or something.

20         And then she also expressed that she was uncomfortable

21    being called out of class so often, and so we wanted to make

22    sure that we addressed that concern, because we didn't want her

23    singled out.  Then also we had given -- Mrs. H██████ had given

24    Mrs. R. a list of counselors because she had requested them

25    earlier in the school year, and Mrs. R. told us at this meeting

1    that she really wanted positive -- I'm sorry, cognitive behavior

2    therapists, so could we give her a list of cognitive behavior

3    therapists.  So I told her I would work with Ms. H████ to get

4    a list of those kinds of specialists.

5         And then we talked about what we could put in place in

6    order to make sure that B.R. felt comfortable.  So we put things

7    in place -- you know, we typically wouldn't single a child out

8    when we came to get them, but she was uncomfortable with

9    counselors or anyone coming to class, so we made arrangements

10   for her to get pulled out on a pass or an email to a teacher

11   saying could you just discreetly send B.R. my way, and -- and

12   I'm trying to think what else.

13        I made arrangements for the list of counselors, and we

14   talked about her turning her work directly in to the teacher.

15   The habit was -- or the procedure was to put the homework in the

16   homework box for that period in the teacher's classroom, and it

17   was decided that she would hand it directly to the teacher so

18   there was no question of it getting lost or stolen or anything

19   like that.

20   **Q.**    Okay.

21        MR. BATES:  Your Honor, permission to publish Defendants'

22   Exhibit 152, which has already been admitted?

23        THE COURT:  You may.

24   BY MR. BATES:

25   **Q.**    If we can zoom in on that bottom email.  What is this

 1   email that we're looking at, Ms. B██████?

 2   **A.**     This is an email from Mr. H█████ to Mrs. R. just

 3   summarizing that meeting.

 4   **Q.**     Okay.  And those bullet points, are those essentially

 5   part of the plan that's put in place following this meeting?

 6   **A.**     Yes.

 7   **Q.**     If we can zoom out.  Above that is her mom's response and

 8   then Mr. H██████ response?

 9   **A.**     Yes.

10   **Q.**     Okay.  And then in that top response --

11          MR. BATES:  If you can highlight that third sentence,

12   Grady.  No, the one before that.  Where it says, "Our goal."

13   BY MR. BATES:

14   **Q.**     When Mr. H█████ says, "Our goal is to make sure she feels

15   supported and has the ability to express her concerns," was that

16   your goal as well?

17   **A.**     Yes.

18          MR. BATES:  Okay.  We can take that down.

19   BY MR. BATES:

20   **Q.**     What was the next time you recall being involved in

21   anything with regard to B.R.?

22   **A.**     On February 9th.

23   **Q.**     Okay.  So, between that email, which -- it was February

24   2nd and February 9th, did you -- do you recall hearing anything

25   from B.R. about issues that she was having at school?

1  **A.**    No.

2  **Q.**    Okay.  So what happened on February 9th that led you to

3  become involved again?

4  **A.**    On February 9th, B███ H████ got in touch with me to

5  tell me that B███ had come into her office after breakfast --

6  during first period, and had written a statement about a boy

7  saying some things to her in the cafeteria.

8         And so she showed me the statement, and I -- I don't

9  remember why I waited a period.  I don't know if B███ was

10 taking a test or whatever, but I decided to go ahead and start,

11 because when you're doing bullying things or whatever, you have

12 to get right on it.  So I --

13 **Q.**    Hold on.  Let me actually stop you there.  What was --

14 and let's just use maybe first name and first initial.  Do you

15 recall the name of the student who B███ alleged had engaged in

16 some name-calling?

17 **A.**    Yeah, Ben F.

18 **Q.**    And was Ben F. a student of yours?

19 **A.**    Yes.  He was on the Champions team, I believe.

20 **Q.**    Okay.  So why -- why did you become involved in this

21 incident?

22 **A.**    Because he was on one of the teams that I supported.

23 **Q.**    Okay.  So what was your role in -- with regard to this

24 incident?

25 **A.**    So, once Mrs. H████ had identified --

1    **Q.**     If I could rephrase that question.  Maybe be more

2    specific.

3         Were you essentially assigned to investigate this matter?

4    **A.**     Yes.

5    **Q.**     Okay.  And had you -- before we get into what you did,

6    maybe just quickly to get a little background on Ben F., had you

7    had some previous interactions with him?

8    **A.**     Yes, a number.

9    **Q.**     Tell us about Ben.

10   **A.**     Ben was a 7th grader.  If you know 7th graders, some of

11   them are small, and some are big, and he was one that looked

12   like he still belonged in elementary school.

13        And the reason I worked with him is because he was a

14   student we were evaluating for an emotional disability, and that

15   disability entailed misreading social situations.

16        For instance, if a couple of kids -- you know, the

17   teacher said, let's work in pairs, and a couple of kids already

18   had a pair, and they said, we've already got a pair, he would

19   think that they were trying to exclude him, and so I worked a

20   lot with him on that.

21        And he also overreacted to those kinds of things.  So

22   when he felt like he had been mistreated or something, then he

23   tended to overreact.  So I met with him regularly and had him on

24   a system of coming to me before he reacted.

25        So we were working on realizing when he was getting

1    worked up, and he and the -- we had a system with the teachers

2    so that they could send him or he could come down to see me, and

3    we'd talk through what had happened.

4          And sometimes he got sent to me because -- or he came

5    because he had already done something, and we would talk it

6    through, and then he would have a consequence if that was

7    appropriate.

8          So I had an ongoing relationship with Ben.

9    Q.    Was that due in part to your special education background

10   or specialty?

11   A.    Well, yeah.  I mean, I was working with the special ed

12   department to get him identified.  He hadn't been identified as

13   emotional disability.  He'd been identified as kind of defiant,

14   and once we saw the behaviors as, you know, misreading and

15   reacting, then we realized that we were probably dealing with an

16   emotional disability.

17   Q.    Okay.  And with that background, I'll allow you to walk

18   us through chronologically, you know -- you already mentioned

19   you were contacted by Ms. H███████.

20         Pick it up from there, and maybe we'll take it

21   step-by-step, and I may interrupt you, but take it step-by-step

22   and walk us through what you did to investigate this allegation

23   between B.R. and Ben in the cafeteria.

24   A.    Okay.  So the first thing I did, of course, was talk to

25   Mrs. H██████ and to read the statement that B.R. had written.

1         Then I immediately interviewed Olivia B., who was her

2    main witness that she had mentioned, and then I attempted to

3    meet with B.R., and the way that worked out is that I had sent

4    an email to Mrs. Estrella, asking her to discreetly send B.R. to

5    me at the beginning of 4th period, which would have been her

6    learning seminar and lunch.

7    **Q.**    Can I stop you right there?  And Ms. Estrella, she was

8    the teacher who had just testified --

9    **A.**    Yes, the English teacher.

10   **Q.**    -- two people ago?

11   **A.**    Yes, the team English teacher.

12   **Q.**    Okay.  Thank you.

13        MR. BATES:  If I can have permission to publish

14   Defendants' 155.  I believe it was admitted this morning.

15        MR. BRENNER:  I think that's correct, Your Honor.

16        THE COURT:  Without objection.

17   BY MR. BATES:

18   **Q.**    So you said -- if we can zoom in on the top, you said you

19   sent an email to Ms. Estrella.  Is this the email that you sent

20   to her?

21   **A.**    Yes.

22   **Q.**    And why did you ask her to discreetly send B███ to you?

23   **A.**    Because I didn't want B███ to be singled out.

24   **Q.**    Okay.  And by the way, at this time, this is February

25   9th, and maybe to flash forward, this is the last day that B███

1   was in in-person schooling at Rachel Carson?

2   **A.**    Yes, yes.

3   **Q.**    Okay.  And in B███████ statement, had she reported --

4   what -- what were the dates of the incidences that she had

5   reported that you were investigating?

6   **A.**    She had reported that during the lunch period on the 8th,

7   she had had an interaction with this boy, and he had said some

8   inappropriate things to her.

9        And then she reported that on the morning of the 9th at

10  breakfast that he had said some other things to her, and that

11  she had called attention to herself by raising her voice, and

12  the teacher had come over and told her to, you know, watch her

13  language and to settle down, and so she decided to come to

14  Mrs. H███████ to report it during 1st period.

15  **Q.**    Okay.  So I had interrupted you again.  So you send this

16  email to Ms. Estrella in 4th period.  By the way, do you know

17  what was in B███████ -- where she was in 4th period?

18  **A.**    She was in learning seminar.

19  **Q.**    Okay.  And so what happened after you sent this email to

20  Ms. Estrella?

21  **A.**    So at the beginning of 4th period, B.R. came to me and

22  said there was going to be a team picture for counselor

23  appreciation week, so they were going to do a picture of the

24  team with signs and things for Mrs. H███████, and she wanted to

25  be a part of that picture, so would it be okay if she came back

 1   after that.

 2   **Q.**    Okay.  Can I --

 3           MR. BATES:  Your Honor, permission -- I move to admit

 4   Defendants' Exhibit 116, which is a one-page photo.

 5           THE COURT:  Without objection?

 6           MR. BRENNER:  No objection.

 7           THE COURT:  Without objection.  You may publish.

 8           (Defendants' Exhibit 116 admitted into the record.)

 9           MR. BATES:  Thank you.

10   BY MR. BATES:

11   **Q.**    Is this the photo that she asked you if she could

12   participate in?

13   **A.**    Yes.

14   **Q.**    Okay.  And if we could zoom in on the P in H██████.

15           And is that B████ holding the P?

16   **A.**    I believe so, yes.

17   **Q.**    Okay.  Okay.  So -- we can take that photo down.

18           So, she goes to get this photo taken, and what happens

19   after that?

20   **A.**    Well, learning seminar is only 19 minutes long.  So when

21   she came back, we were both getting ready to go up to lunch.  I

22   had lunch duty, and she had to eat, so I asked her if she was

23   comfortable coming back after lunch to my office, which was on

24   the pod, and she said yes.  So we went up to lunch, and when I

25   came back from lunch, she was there waiting for me.

1    **Q.**    Okay.  And did you speak -- what did you do next with

2    her?

3    **A.**    I interviewed her about her statement, so we went through

4    her statement.  I asked questions to clarify.  As we do, I asked

5    her if she could think of any more witnesses.  I asked her who

6    was sitting around them in the cafeteria, that sort of thing,

7    and then I asked her if she was comfortable going back to class,

8    and she said she was, and I sent her back to class, or I walked

9    her.  I don't remember.

10   **Q.**    And you mentioned you had already interviewed Olivia.

11   Did you continue to interview students after you met with B███?

12   **A.**    I did several students.  I didn't finish the

13   investigation that day.

14   **Q.**    Well, ballpark, how many students did you interview about

15   this interaction in the cafeteria?

16   **A.**    About ten, and I re-interviewed two, I think.

17   **Q.**    Okay.  How did you determine who to interview?

18   **A.**    Um, B███ had identified some kids, and then each kid I

19   talked to identified other people, and then I also got the

20   cafeteria seating chart for the table that they sat at to make

21   sure that I talked to all the students at the table.  And then,

22   of course --

23   **Q.**    Let me stop you right there.

24        MR. BATES:  Your Honor, I move to admit Defendants'

25   Exhibit 232, which is a one-page seating chart in the cafeteria.

1          MR. BRENNER:  One moment, Your Honor.  No objection.

2          THE COURT:  Without objection.  You may publish.

3          (Defendants' Exhibit 232 admitted into the record.)

4     BY MR. BATES:

5     Q.    What are we looking at here?

6     A.    This is the seating chart from the cafeteria for the

7     table that was involved in this.

8     Q.    Okay.  So is this the seating chart that you gathered in

9     conjunction with your investigation?

10    A.    Yes.

11    Q.    Okay.  And what -- what is in that Number 7 block, if we

12    can zoom in on that?

13    A.    That's where B████ sat.  Although I should say that

14    sometimes kids moved around, but they couldn't move around to a

15    different table.  Sometimes they weren't sitting right where

16    they were supposed to.

17    Q.    Okay.  And I imagine that under those redactions with

18    T.H., that's a student's name who's initials is T.H., for

19    example?

20    A.    Yes.

21    Q.    Okay.  So did you use this document to identify who else

22    to interview?

23    A.    That one, and then I also, as I interviewed witnesses, I

24    asked them to draw me a diagram of the table and the lunch line

25    and tell me if there was anybody else, identify anybody else

1    that was around.

2    **Q.**    Okay.  And I'm sorry, can you remind me again what the

3    total ballpark of students in conjunction with this?

4    **A.**    Nine or ten, and then I re-interviewed some.

5    **Q.**    Okay.  And why would you re-interview some?

6    **A.**    Because something might come out during the investigation

7    that I had some question about that I didn't know to ask them

8    when they were with me before.

9    **Q.**    Okay.  Did you obtain statements from all or most of the

10   students that you interviewed?

11   **A.**    Yes.  I didn't obtain statements from two, I think,

12   because one of them said, you know, I wasn't at the table at

13   that time, and another one might have been out that day.  I

14   don't remember specifically.

15   **Q.**    So, is that consistent with your normal practice, if you

16   interview somebody and they say, well, I wasn't even there at

17   the time, that you would not get a statement from them?

18   **A.**    Yeah.  I'm not sure what they would write a statement

19   about.

20   **Q.**    Okay.  And did you record anywhere the students -- as

21   you're meeting with students and regardless of whether you get a

22   statement from them or not, are you recording this somewhere?

23   **A.**    Yes.  I mean, sometimes if I didn't get a statement

24   because there was no information, I didn't record it.  If I was

25   in the hallway, for instance.  But I had a discipline log that I

1    kept, and I wrote down every student I saw, the date, what

2    brought them to me, who referred them, what team they were on,

3    what the resolution was, and whether or not I contacted a

4    parent.

5    **Q.**    Okay.  Based on your investigation, were you able to,

6    meeting with these ten or so students, including B.R., were you

7    able to piece together what occurred in the cafeteria on these

8    two days?

9    **A.**    Yes.

10   **Q.**    Okay.  Can you -- can you explain for us, based on your

11   interviews, what you found had occurred?

12   **A.**    So, during lunch on the 8th, Ben was standing in the line

13   to go in to get his lunch, and B███ was sitting at the table

14   that was perpendicular to that line.

15   **Q.**    Can I stop you there.

16       MR. BATES:  Your Honor, can we publish Defendants'

17   Exhibit 193, which are some school pictures.

18       THE COURT:  You may.

19   BY MR. BATES:

20   **Q.**    And if we can go to page 12.  I think it might be better

21   to visualize this while you're explaining it.

22       What are we looking at here?

23   **A.**    This is the cafeteria.

24   **Q.**    Okay.  And where is the door that students enter -- if

25   you can circle the door where students enter to go get their

1    lunch if they're buying lunch that day.

2    **A.**    So there are three doors.  There's two lunch lines and

3    one snack line.  So this is a lunch line, this is a lunch line,

4    and this is a snack line.

5    **Q.**    Okay.  You can --

6         MR. BATES:  Grady, if you can erase those.

7    BY MR. BATES:

8    **Q.**    Can you show us where the line was -- you were telling us

9    that Ben was standing in a line.

10        Where was the line where Ben was standing?

11   **A.**    So it was for this lunch line (indicating).  So it would

12   go down among the tables like that (indicating).

13   **Q.**    Okay.

14   **A.**    There's a space between the tables right there.

15   **Q.**    Okay.  So if you're in the lunch line, there's tables to

16   the left and tables to the right of you?

17   **A.**    Correct.

18   **Q.**    Okay.  Do you recall, just ballpark maybe, where the

19   table was that we just looked at the seating chart where B███

20   was sitting?

21   **A.**    You know, I don't remember specifically, but I have some,

22   some inkling that it was right around here (indicating).  So it

23   was like the second or third table back, but I'm not sure about

24   that.

25   **Q.**    Okay.  So, if you can -- and maybe if we can keep this up

1    for a moment, as we might need it.

2         If you can walk us through, then -- you said Ben was in

3    the lunch line, and then pick us up there.

4    **A.**    So, as a result of the investigation, what I determined

5    was that Ben was standing in the lunch line, talking to his

6    friend -- friends or whatever, and B███ was seated or standing,

7    I don't know which, right by the lunch line at her table.

8         And she said, Hey, are you Justin F's brother?

9         And he said, Yes.

10        And she said, Tell him to suck his dick.

11        And then they got into it.

12        He said, F you, bitch.

13        And they got into a back-and-forth.

14        And then B███ said, I'm going to go get my boyfriend.

15        So she went to get C███████ to bring him over to deal

16   with Ben, and Ben was concerned about that.  He left the lunch

17   line and said, Tell your girlfriend she's a douchebag.

18   **Q.**    Who did she say that to?

19   **A.**    He said that to C███████.

20   **Q.**    Okay.  Ben said that to C████████?

21   **A.**    Yes.

22   **Q.**    Okay.

23   **A.**    And then there may or may not have been some interaction

24   between C███████ and Ben, but he was high-tailing it out of

25   in because he was concerned.  He left a lunch line, which is a

1   big deal for a 7th grader, and he went over to tell his brother,

2   who --

3   **Q.**     I'm sorry.  Just for the purposes of the record, if you

4   can use proper names instead of he and she so -- we're saying

5   C▮▮▮▮▮ was high-tailing it out of there?

6   **A.**     Okay.  No, I'm sorry.  Ben was.

7   **Q.**     Okay.

8   **A.**     Okay.  So C▮▮▮▮▮ -- B▮▮▮ went to get C▮▮▮▮▮,

9   who's an 8th grader, her boyfriend, and brought him over to Ben.

10  Ben saw this 8th grader and decided he was getting out of there,

11  so he said, Tell your girlfriend she's a douchebag, and went to

12  his brother who's an 8th grader and told him what had happened.

13        And his brother said, Just leave it alone, forget about

14  it, which Ben did at that point.

15        So then the next morning in the cafeteria, B▮▮▮ is

16  sitting with J▮▮▮, who is her good friend at that time, and as

17  you know that changed here and there.  It went back and forth.

18  But she was sitting with J▮▮▮ at a table, and Conner R. was

19  sitting somewhere near them.  Ben and his brother and some other

20  people were sitting at a different table, and they said, Ben, go

21  get Conner and tell him to come sit with us.

22        So Conner went over there -- I mean Ben went over to get

23  Conner, and according to Ben, B▮▮▮ said to him, Are you the boy

24  who called me a -- and he said douchebag.

25        And she said, You're an asshole, loudly enough for

1    Mrs. Bryant to come over and to put an end to that.

2         So Ben went back to his table as he had been told to do.

3         And when Mrs. Bryant came over, she said, You need to

4    watch your language or I'm going to write a referral.

5         And she said, You don't need to write a referral, I'm

6    going to report it myself.

7    **Q.**    Okay.  And I don't think we have the time to go over all

8    of the statements that you retrieved, but did you receive

9    statements from students who claim that B.R. had started the

10   altercation?

11   **A.**    No.  Oh, I'm sorry, yes, B.R., not Ben.

12   **Q.**    I'll use the word "B███."  Let me rephrase it with

13   B█████ name since there are a lot of students.

14        Did you receive statements from students who claimed that

15   B████ had started that altercation?

16   **A.**    Yes.

17   **Q.**    Okay.  If we can --

18        MR. BATES:  Your Honor, I move to admit Defendants'

19   Exhibit 212, which is a student statement.

20        THE COURT:  Without objection?

21        (Defendants' Exhibit 212 admitted into the record.)

22        MR. BATES:  Can we publish, please.

23        THE COURT:  Wait a minute.

24        MR. BRENNER:  No objection, Your Honor.

25        THE COURT:  Without objection.  You may publish.

1    BY MR. BATES:

2    **Q.**    Let's publish Defendants' 212.

3         Is this a -- one moment.

4         Okay, is this the statement you received from J.F.?

5    **A.**    Yes.

6    **Q.**    And he wrote the statement on February 10th, 2012?

7    **A.**    Yes.

8         MR. BATES:  Okay.  Grady, if you can highlight the second

9    line in this statement.

10   BY MR. BATES:

11   **Q.**    It says "I saw her" -- I'll just read it from the first

12   line.

13        "I know B█████ through C█████████.  I at the lunch room

14   two days ago.  I saw her go and get up out of her seat and go up

15   to Ben in the lunch line."

16        Did I read that correctly?

17   **A.**    Yes, that's correct.

18        MR. BRENNER:  Could we, if the witness knows, could the

19   witness identify who J.F. is?

20        THE COURT:  Do you know who J.F. is, ma'am?

21        THE WITNESS:  Yes.  That's --

22        THE COURT:  Was it a student at the school?

23        THE WITNESS:  Yes.

24        THE COURT:  Was it a 7th or 8th grader?

25        THE WITNESS:  8th grader.

1          THE COURT:  Was it a person who was able to observe

2     things?

3          THE WITNESS:  Yes.

4          MR. BRENNER:  Your Honor, the witness mentioned before

5     that B.F. had a brother named J.F.  I wanted to know if this is

6     B.F.'s brother.

7          THE COURT:  Is this B.F.'s brother?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.

10    BY MR. BATES:

11    Q.     And -- okay.  And so according to -- is this Justin --

12    A.     Yes.

13    Q.     -- statement?

14           According to Justin's statement, he saw B███ get up out

15    of her seat and approach Ben; is that correct?

16    A.     Yes.

17           MR. BATES:  Okay.  And if I can move to admit Defendants'

18    213, actually, which I believe may have been admitted earlier,

19    but --

20           THE COURT:  It's not in.

21           MR. BRENNER:  No objection.

22           THE COURT:  Without objection.

23           (Defendants' Exhibit 213 admitted into the record.)

24    BY MR. BATES:

25    Q.     Ms. B█████, is this a statement you received in

1    conjunction with your investigation?

2    **A.**    Yes.

3    **Q.**    And was this received on February 10th, 2012?

4    **A.**    It was.

5    **Q.**    Do you know the first name of the student who wrote this

6    statement?

7    **A.**    Jake.

8    **Q.**    Okay.  And actually, if we can go to the second page,

9    it's a little bit easier to read because it's written in

10    chronological order.

11          According to Jake, was B█████ seated at the lunch table,

12    and she asked Ben if he was Justin's brother, and then Ben said

13    yes?

14    **A.**    Yes.

15    **Q.**    And did Jake tell you that Ben was just standing in the

16    lunch line, and then B████ called Ben's brother a D?

17    **A.**    Yes.

18    **Q.**    And then Ben called B████ a F'ing B?

19    **A.**    Yes.

20    **Q.**    And then B████ walked over to Ben and they started

21    fighting?

22    **A.**    Yes.

23    **Q.**    That's consistent with what Jake told you in person?

24    **A.**    Yes.

25    **Q.**    Okay.  You can take that down.

1        Now, did you also receive statements from these ten or so

2   kids that verified that Ben had engaged in some name-calling?

3   **A.**    Yes.

4   **Q.**    Okay.  So, at the conclusion of your investigation --

5   well, by the way, let me ask you this:  Some of those statements

6   were dated February 10; is that right?

7   **A.**    Yes.

8   **Q.**    And B██████ was not in school on February 10th, correct?

9   **A.**    No.

10  **Q.**    And she was not in school after that date?

11  **A.**    Correct.

12  **Q.**    Why did you continue to investigate the matter even if

13  she wasn't in school?

14  **A.**    Well, because we needed to resolve it, for one thing, and

15  have consequences, if they were necessary, and make sure it

16  didn't happen again, and because we expected her to come back to

17  school.

18  **Q.**    Okay.  And so what action did you take at the conclusion

19  of your investigation based on what you found with regard to

20  discipline of students?

21  **A.**    Ben received three days in learning seminar and lunch

22  detention, and then B██████ did not receive a consequence because

23  she never returned to school.

24  **Q.**    Okay.  Did you find that B██████ had engaged in -- or she

25  had some culpability or responsibly for what occurred in that

1    incident?

2    **A.**     Yeah.  They both exchanged inappropriate language and

3    name-calling, but she had initiated the exchange.

4    **Q.**     Okay.  So, we can move on from that investigation.  So,

5    while you're investigating what happened in the cafeteria on

6    those two days, did alleged threats to B.R. come to your

7    attention?

8    **A.**     Yes.

9    **Q.**     And walk us through how you learned about this.

10   **A.**     So I had talked to B████ on -- 4th -- the beginning

11   of 5th period and sent her back to class, and then I got a call

12   on the walkie-talkie from Mr. F██████ a bit later, saying that

13   B███ had -- that he had had an interaction with B████, and she

14   had said that she had -- some girls had told her on the way out

15   of the cafeteria that somebody hates you and somebody wants to

16   kill you, I believe it was.  I'd have to look at the statement

17   to see what was actually said.

18         So he was concerned that we had a threat, and so I -- and

19   I can't remember if he took the statement or if I took the

20   statement.  I believe I interviewed her in the principal's

21   conference room, and she was unable to identify the student.

22   She said the hair color and height, and so we were formulating a

23   plan to figure out who those students were.

24         And she wanted to go back to class, so I let her go back

25   to class.  I watched her walk back -- you could see from the

1    office.  You can see the pod.  So I let her go back to class.  I

2    said, Are you sure you're comfortable going back to class, and

3    she said yes.  So she went back, and then she had -- she had

4    told us she couldn't pick these kids out of a yearbook, but we

5    were going to still try to figure out maybe the next day someone

6    could shadow her from the lunchroom, and she could discreetly

7    point them out.  We were trying to figure out how to identify

8    these students.

9    **Q.**    And were you ever able to identify the students that

10   B███ said had engaged in this behavior?

11   **A.**    No.

12   **Q.**    Okay.  And why is that?

13   **A.**    Because she didn't come back to school.  Her mother

14   pulled her out that afternoon.

15   **Q.**    What effect did her mother pulling her out of school have

16   on your ability to investigate it?

17   **A.**    Well, at that point the mother basically told me I wasn't

18   to call her any more or email her anymore.  So I couldn't --

19   actually that was later.  I couldn't work with B███ to identify

20   these students because she wasn't there.  I mean, you know, I

21   needed to figure out who they were.

22   **Q.**    All right.  Let me make sure I get the timing of this

23   correct.

24        So February 9th, you are investigating what happens in

25   the cafeteria, and then later on that day you find out about

1    these alleged threats being made by B████ [sic]?

2    **A.**    Yes.

3    **Q.**    Was there anything odd about the timing that you learned

4    of this, considering the -- your meetings with B████?

5    **A.**    Yes.  So, I had met with B████ at the beginning of 5th

6    period, right after the lunch, because she met me when she got

7    back from lunch -- or when we got back from lunch.

8            Then I got the call from Mr. F████ sometime during 5th

9    period, so it would have been the same period.

10   **Q.**    Can I stop you there?  I think this will be a little bit

11   helpful.

12           MR. BATES:  If we can -- if we can do a side-by-side.  If

13   we can publish Defendants' Exhibit 233, which is already in

14   evidence.  It's the bell schedule.  Permission to publish that,

15   Your Honor?

16           THE COURT:  You may.

17           MR. BATES:  And can we also -- Defendants' Exhibit 45, see

18   if that is in evidence.

19           THE COURT:  45 is not in.

20           MR. BRENNER:  Your Honor, I believe it was stipulated.

21   We'll stipulate to 45.

22           MR. BATES:  Yes.

23           THE COURT:  Okay.  Without objection.

24           MR. BATES:  If we can put 233 and 45 side-by-side.

25           (Defendants' Exhibit 45 admitted into the record.)

1          MR. BATES:  And if it's possible to zoom in on the right

2     one, and maybe slide it over to the side, to the right.

3     BY MR. BATES:

4     Q.     Okay.  So let's try to break down this timing.

5     A.     And I realize I got the period wrong for the lunch.

6     Q.     Why is that?  It says, "Lunch on 4th period"?

7     A.     5th period for Team E.

8     Q.     But on B███████ schedule on the right, do you see it

9     says --

10    A.     It says 4th, yeah.

11    Q.     -- "Lunch on 4th period"?

12    A.     Yeah.  I'm trying to figure out why we switched it.

13    Q.     You had mentioned earlier that B█████ had come to your

14    office, but she wanted to take that photo?

15    A.     Right.

16    Q.     So if we can look at the bell schedule on the left, you

17    said that she had come to you at the beginning of her learning

18    seminar, which according to the bell schedule, would that be

19    about 10:39?

20    A.     Yes, yes.

21    Q.     Okay.  And was it at that time that you had told her

22    that -- that she had requested to go take the photo?

23    A.     Yes.

24    Q.     Okay.  And she -- you had referenced earlier that she

25    returned at the end of learning seminar at the conclusion of the

```
 1   photo.  So that's about 10:58 a.m.?

 2   A.    Yes.

 3   Q.    Okay.  And what --

 4   A.    It might have been a little earlier because we both

 5   needed to walk to the cafeteria.

 6   Q.    Okay.  And remind us again, so when she returns to your

 7   office around 10:58, what the two of you decide to do.

 8   A.    I asked her if she was comfortable coming back after

 9   lunch, and she said yes.  So we decided to go on to lunch.

10   Q.    Okay.  And that's because she had lunch at that time, and

11   you had lunch, too; is that right?

12   A.    Right, right, right.

13   Q.    And so looking at that time right under learning seminar,

14   that 11:01 to 11:26, are the two of you in lunch at that moment?

15   A.    Yes.

16   Q.    Okay.  And then what -- you testified you had asked her

17   to come back after lunch?

18   A.    Yes.

19   Q.    Okay.  And that would have been the start of 5th period?

20   A.    Yes.

21   Q.    So that would be 11:30 p.m.?

22   A.    Yes.

23   Q.    I'm sorry, a.m.?

24   A.    Yes.

25   Q.    Okay.  And was B████ at your office at the time that you
```

```
1    had got there?

2    A.     Yes.  I had a couple of chairs in that hallway that you

3    saw.

4    Q.     Okay.

5    A.     She was there.

6    Q.     Okay.  So B████ comes back from lunch and meets you at

7    11:30 at your office; is that right?

8    A.     Correct.

9    Q.     And you interviewed her about what occurred that morning

10   and yesterday in the cafeteria; is that right?

11   A.     Correct.

12   Q.     Okay.  At any point in that conversation did B████ tell

13   you that she had been threatened coming back from lunch?  So in

14   other words, five minutes earlier?

15   A.     No.

16          MR. BATES:  Okay.  Grady, can you take down what's on the

17   right, and if we can publish Defendants' Exhibit 128, which is

18   one of B█████ statements.

19          THE COURT:  128?

20          MR. BRENNER:  1-2-8?

21          MR. BATES:  Yeah.

22          MR. BRENNER:  I don't have it here, but if you represent

23   it's one of B█████ statements, we don't particularly have a --

24          MR. BATES:  Yes, it's B█████ second statement from that

25   day.
```

```
 1          THE COURT:  We don't have that.  We might have a similar

 2   one that's a plaintiff's exhibit.  Do you have that reference

 3   number?

 4          MR. BATES:  One moment, Your Honor.

 5          THE COURT:  Yes, sir.

 6          MR. BATES:  I believe it's Plaintiff's 122.  Permission

 7   to publish Plaintiff's 122?

 8          THE COURT:  We have 122 as B.R.'s second statement.  So

 9   you want to pull up Plaintiff's 122?

10          MR. BATES:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MR. BATES:  If we can pull up Plaintiff's 122, and if we

13   can put that bell schedule on the left, 233.

14          Actually, Your Honor, it's come to my attention that the

15   one, Plaintiff's 122, I think it was, is a typewritten version,

16   and we would like the handwritten version.  So if we can move to

17   admit Defendants' 128, which is B█████ handwritten version of

18   that same statement.

19          MR. BRENNER:  I'll accept Mr. Bates' representation if

20   that's what it is.

21          THE COURT:  You may publish.  It's admitted.

22          MR. BATES:  Let's put Defendants' 128 on the right.

23          Okay.  So, Grady, if you can highlight the period on the

24   top in the middle under B█████ name on the right where it says,

25   "4th going into 5th."
```

```
 1   BY MR. BATES:

 2   Q.     Okay.  Ms. B███, is the statement on the right the

 3   second statement that B███ had given on that day?

 4   A.     On the 9th, yes.

 5   Q.     Okay.  And is she reporting what had allegedly -- these

 6   threats that had been made to her after 4th period?

 7   A.     Yes.

 8   Q.     Okay.  And you met with her after 4th period; is that

 9   correct?

10   A.     Yes.

11   Q.     She was waiting for you at your office?

12   A.     That's correct.

13   Q.     And what is in this statement on the right, how much

14   later in the day was what was reported in the right reported to

15   the school?

16   A.     I think it was later in 5th period, but it might have

17   been 6th period.

18   Q.     Do you have any understanding why B███ did not report to

19   you what had apparently just happened a couple of minutes ago

20   when you met with her in 5th period?

21          MR. BRENNER:  Objection, foundation, speculation.

22          THE COURT:  Sustained.

23   BY MR. BATES:

24   Q.     Did B███ report to you, when you came back and met with

25   her -- when you met with her in 5th period, what were you
```

1    meeting with her about?

2    **A.**    The cafeteria incident.

3    **Q.**    Okay.  That had occurred that morning and the day before?

4    **A.**    Correct.

5    **Q.**    Okay.  Did she report to you at all in that conversation

6    that she had just been allegedly threatened to be killed in the

7    hallway?

8    **A.**    No.

9    **Q.**    So what was your reaction to later finding out in the day

10   that this had happened minutes before you just met with her?

11   **A.**    You know, I don't think I even realized that at the time.

12   I was just dealing with what was said in the statement.  I don't

13   think I realized it was 4th going to 5th.  I knew it was, you

14   know, in the hallway.

15   **Q.**    Okay.  So we can take these down.

16       So, maybe to end on this subject of the threats, were you

17   ever able to identify the students who had allegedly made these

18   threats?

19   **A.**    No.

20   **Q.**    Okay.  Did you continue, outside of what we've just

21   spoken about, did your interviews lead to other information that

22   you continued to investigate?

23   **A.**    Yes.  As I was investigating -- actually the cafeteria

24   incident, because that continued past the 10th on to the 13th, I

25   believe, a student started reporting to me that there were --

1    that people were hacking B████ Facebook page.

2    **Q.**    Okay.  Actually, before we get to that, you mentioned

3    that you had disciplined Ben F. for the incident in the

4    cafeteria, correct?

5    **A.**    Yes, right.

6    **Q.**    Do you recall disciplining any other students other than

7    Ben for matters that you had learned related to B████ at that

8    time?

9    **A.**    Yes, but that was afterwards.

10    MR. BATES:  Okay.  Let me -- if we can -- I'd like to move

11    into evidence Defendants' 220.

12    MR. BRENNER:  No objection.

13    THE COURT:  Without objection.  You may publish.

14    (Defendants' Exhibit 220 admitted into the record.)

15    MR. BATES:  Thank you.  Defendants' 220.

16    BY MR. BATES:

17    **Q.**    Do you know the first name of the student that we're --

18    whose material we're looking at here?

19    **A.**    Kevin.

20    **Q.**    Okay.  And do you know of any relationship between --

21    well, is that your handwriting on the bottom of this page?

22    **A.**    Yes.

23    **Q.**    What are you documenting here?

24    **A.**    That Kevin was spreading rumors.

25    **Q.**    What type of rumors was Kevin spreading?

1   **A.**     About kids jumping B█████.

2   **Q.**     Okay.  Did you interview Kevin in conjunction with this

3   or any of these incidents?

4   **A.**     Yes.

5   **Q.**     Okay.  And what led you to issue this discipline?

6   **A.**     Well, every student I talked to --

7          MR. BRENNER:  Objection, Your Honor.

8          THE COURT:  Hold on.

9          MR. BRENNER:  Objection to the extent it calls for

10  hearsay.

11         MR. BATES:  I can rephrase that, Your Honor.

12         THE COURT:  Rephrase it.  That's the best thing.

13  BY MR. BATES:

14  **Q.**     Without stating what anybody else told you, what led you

15  to issue this warning to Kevin?

16  **A.**     When I met with each of the students, I told them that

17  even -- whether they were -- you know, whoever they were, that

18  when there are rumors going around, we need to stop them so

19  that, you know -- if people ask you why you came in, you can say

20  Mrs. B█████ needed to talk to me about it, but I'm not going to

21  talk to you about it.

22         I said, you can talk to your parents, you can talk to

23  your teachers or counselors or to an administrator, but you need

24  to stop the rumors here, which is a real issue in middle school.

25         So I told every student that they weren't to spread

```
 1   rumors.  If they heard something, they needed to come to an

 2   adult.

 3   Q.    Okay.  And Kevin was spreading rumors?

 4   A.    Yes.

 5         MR. BATES:  Okay.  You can take this down.  If we can

 6   publish -- permission to publish Defendants' 221, which has

 7   already been admitted into evidence.

 8         THE COURT:  You may.

 9         MR. BATES:  Thank you.

10   BY MR. BATES:

11   Q.    Ms. B████, take a moment to take a look at this and tell

12   us what we're looking at here.

13   A.    This is an in-school suspension letter.

14   Q.    And what's the date of this document?

15   A.    February 16th.

16   Q.    Okay.  So this is about a week after B████ left school?

17   A.    Yes.

18   Q.    Okay.  And why did you -- who did you issue this

19   discipline to?  If you can just say her first name?

20   A.    J████.

21   Q.    Is that the former student who had testified earlier in

22   this case who was pregnant?

23   A.    Yes, yes.

24   Q.    And why did you issue that discipline to her?

25   A.    Because I had talked to her about not spreading these
```

1  rumors, and then I was in the cafeteria, and I heard her talking

2  about it again, so I called her aside.

3      THE COURT:  When you say these rumors:  What rumors were

4  you talking about?

5      THE WITNESS:  I don't remember which specific rumors, but

6  there were rumors going around at that time about B████ -- well,

7  and other students, okay.

8      And so I -- I called her aside in the cafeteria and said,

9  Remember, I told you you need to stop it now, because it's making

10  it worse for everybody, and it's not fair to the other kids.  And

11  then I was coming out of my office into the pod, I believe, and I

12  heard her doing it again.  So I assigned her to a day of

13  in-school suspension.

14  BY MR. BATES:

15  **Q.**    Okay.  What are we looking at here?  This is the second

16  page of that same exhibit?

17  **A.**    This is J████ discipline record.

18  **Q.**    Okay.  And you don't recall right now what the nature of

19  the rumors were?

20  **A.**    No, I don't remember.

21  **Q.**    And you said you had issued two warnings to J████ before

22  you disciplined her for this?

23  **A.**    Yes.

24  **Q.**    What instruction did you give J████ in conjunction with

25  this discipline with regard to reporting matters?

1    **A.**    You mean -- well, I told her if she heard rumors, she

2    needed to report them to an adult in the building, to me or to

3    Mr. H███ or Ms. T███ or one of her teachers or one of her

4    parents, that they could let us know, but that she shouldn't be

5    reporting them to other students.

6    **Q.**    You can take this down.

7         You had mentioned that, while you were investigating

8    this, you had heard something about alleged Facebook hacking.

9    Is that what you said?

10   **A.**    Correct.

11   **Q.**    Okay.  Were you ever able to determine whether anybody

12   had engaged in any Facebook hacking?

13   **A.**    No.

14   **Q.**    Later that month, did anything else come to your

15   attention with regard to Facebook?

16   **A.**    Yes.

17   **Q.**    And what was that?

18   **A.**    Two students separately reported to me that there were

19   messages on Facebook from a student -- they assumed a student --

20   named Jenni Taylor.

21        MR. BATES:  Your Honor, permission to publish

22   Defendants' 221, which has already been admitted.

23        THE COURT:  You may.

24        MR. BATES:  I'm sorry, 222, which has already been

25   admitted?

1        THE COURT:  You may.

2    BY MR. BATES:

3    **Q.**    What are we looking at here, Ms. B████?

4    **A.**    This is a statement from J████.

5    **Q.**    Okay.  Is this the same J████ you had disciplined a

6    couple of weeks earlier?

7    **A.**    Yes.

8    **Q.**    Okay.  So she came directly to you this time?

9    **A.**    Yes.

10   **Q.**    Okay.  And what did J███ tell you in this statement?

11   **A.**    That people had told her that there was a slam site --

12   just give me a second to read it and see here.

13       Oh, okay.  Initially, she told me that her friend Lauren

14   was texting with B███, and B███ said to Lauren to take a look

15   at the Jenni Taylor site.

16   **Q.**    Okay.  And what did J███ tell you was there when Lauren

17   looked this up?

18   **A.**    She looked at it, and she called it a slam site about

19   B███.

20   **Q.**    What's your understanding of when a slam site is?

21   **A.**    It's a bullying site where you're saying bad things about

22   somebody.

23   **Q.**    Okay.  So J███ had reported this to you that somebody

24   had created this -- that Jenni Taylor had created this slam

25   site?

```
 1   A.     Right.

 2   Q.     Okay.  Did you hear -- you can take that down.

 3          Did you hear from any other students about this Jenni

 4   Taylor?

 5   A.     Yes, Olivia B. came to me, actually, I think, before

 6   this, and told me about it.

 7   Q.     Okay.  Can we take --

 8          MR. BATES:  I would move to admit -- it's not been

 9   admitted yet, Defendants' 223, which is Olivia's statement.

10          MR. BRENNER:  No objection.

11          THE COURT:  Without objection.  You may publish.

12          (Defendants' Exhibit 223 admitted into the record.)

13          MR. BATES:  Thank you.

14   BY MR. BATES:

15   Q.     What is the date of this statement?

16   A.     2-28.

17   Q.     Okay.  Is that the same date as the J███ statement we

18   just saw?

19          If you don't remember, that's fine.

20   A.     I don't remember.

21   Q.     That's fine.

22          Okay.  And what was -- by the way, what's your

23   understanding of J█████ relationship with B████?

24   A.     I guess they were friends.  You know, they weren't close

25   friends.
```

1    **Q.**    Okay.  What's your understanding with Olivia's

2    relationship at the time?

3    **A.**    Olivia was one of her two best friends that year.

4    **Q.**    So what did Olivia report to you about this Jenni Taylor

5    page?

6    **A.**    I need to read it.  She reported to me that a friend had

7    told her that there was a site, a hate site, on Facebook.

8    **Q.**    And what's that last sentence say in that statement?

9    **A.**    "The student who supposedly put the hate group was called

10   Jenni Taylor."

11   **Q.**    Okay.  And we can take that down.

12        What did you do after you got this information about this

13   site that was -- Jenni Taylor was bullying B███?

14   **A.**    Well, we tried to -- I say "we."  I think I worked with

15   Officer Genus on this, but we tried to find the Jenni Taylor

16   Facebook page, and we couldn't find one.  So I called all the

17   surrounding middle schools and high schools.  We didn't have a

18   Jenni Taylor in Rachel Carson.  So I called all the surrounding

19   high schools and middle schools to see if they had a student who

20   had a name anything like Jenni Taylor, and there weren't any.

21   And so we kind of -- we couldn't find it.

22   **Q.**    Okay.  So did your investigation basically come to a

23   dead-end there?

24   **A.**    Yes.

25   **Q.**    Did plaintiff ever -- she was still a student at Rachel

1  Carson at this time, right?

2  **A.**    She was on homebound.

3  **Q.**    Okay.  Did she ever tell you that she was Jenni Taylor?

4  **A.**    No.

5  **Q.**    Did plaintiff's mom ever tell you that B███ was Jenni

6  Taylor?

7  **A.**    No.

8  **Q.**    When did you find out who was behind the Jenni Taylor

9  account?

10  **A.**    During discovery for this trial.

11  **Q.**    And who did you find out was behind that?

12  **A.**    B███.

13       MR. BATES:  Okay.  If we can -- if we can -- Your Honor,

14  if we can publish Defendants' 157 which is already admitted in

15  evidence.

16       THE COURT:  You may.

17  BY MR. BATES:

18  **Q.**    Ms. B████, if you can take a look at the bottom email

19  string on this.

20       MR. BATES:  If Grady can just zoom in on -- just the top

21  half of the document, you can zoom in on.  Mr. Walters, I

22  apologize.

23  BY MR. BATES:  And this bottom email is -- who is that email

24  from?

25  **A.**    That's from Dr. Dreyfuss, the cluster director.

1    **Q.**    Does she work with Dr. Zuluaga?

2    **A.**    Yes.

3    **Q.**    And who did she send this email to?

4    **A.**    She sent it to me and Mr. F▇▇▇▇▇.

5    **Q.**    Okay.  And in that last full sentence of that email, she

6    tells you "Once we have that meeting, I would like to review the

7    information you have and talk about next steps."

8         Do you see that?

9    **A.**    Yes.

10   **Q.**    Okay.  And in the top email, in that first sentence, you

11   say, "We are in the process of writing up all of the actions we

12   are taking"?

13   **A.**    Yes.

14   **Q.**    What was your role in that process?

15   **A.**    I was actually tasked with writing up all the incidents

16   and how we investigated them.

17   **Q.**    Okay.  And what did you do in conjunction with that?

18   **A.**    You mean how did I do it or?

19   **Q.**    Yeah, just generally speaking, what did you do to create

20   that summary?

21   **A.**    Okay.  So, initially, we had a meeting of all the

22   administrators.  It was about three hours after school, three

23   and a half hours after school on the 13th, and Mr. F▇▇▇▇▇ had

24   asked everybody to bring everything they had related to any

25   investigations that were done, student statements, notes,

```
 1   anything like that.  And we sat, and I worked directly into the

 2   computer writing notes to myself and starting to create a

 3   narrative of what had happened.

 4       Then we realized we needed some information from some

 5   teachers, and teachers aren't available for meetings, so I

 6   don't -- I think it was Mr. H███ who went to the teachers

 7   because they were on his team and asked them for a written

 8   statement about what had happened with the missing work and with

 9   Mr. Kappatos, with the ball, because those were things that had

10   been reported to us.

11       And so we wanted to make sure we had all the information

12   possible.  We talked to Mrs. H████.  We talked to Mrs. --

13   Dr. Weaver.  We talked to Ms. F█████.  And so basically

14   over the next two days I interviewed people; I circled back to

15   clarify, because some of this stuff had happened a while back,

16   and I was trying to understand everything that had happened.

17   Q.    Okay.  And was it your intention to create a summary of

18   what had happened that entire school year or to list every

19   single detail?

20       MR. BRENNER:  Objection, leading

21       THE WITNESS:  Well, it was a summary.

22       THE COURT:  Sustained.

23       THE WITNESS:  It was a summary -- I'm sorry.

24   BY MR. BATES:

25   Q.    Let me ask another question.
```

1          What was your intention with creating this document?

2    **A.**    We wanted to give as thorough a picture as we could as

3    how we had investigated what the series of events was and how we

4    had investigated all the incidents so that Dr. Zuluaga and

5    Dr. Dreyfuss would have accurate information.

6          MR. BATES:  Okay, Your Honor.  If we could have permission

7    to publish Defendants' Exhibit 200, which is in evidence.

8          THE COURT:  You may.

9          MR. BATES:  And if we can go to the first page of the

10   document that says "B███████ R. incidents."

11         THE COURT:  You may.

12   BY MR. BATES:

13   **Q.**    Is this the document that you were tasked with putting

14   together?

15   **A.**    Yes, this is one of the drafts.  It looks like we might

16   have fixed a couple of things on it.

17   **Q.**    Actually, if we can go back to the first page of this

18   document.  This is -- this is actually what you faxed to

19   Dr. Zuluaga; is that correct?

20   **A.**    Yes, yes.

21         MR. BATES:  Okay.  So if we can go back to the first page

22   of the -- Grady, if you can flip through to page 14.

23   BY MR. BATES:

24   **Q.**    Is this the last page of the summary?

25   **A.**    Yes.

1    **Q.**     Okay.  So this is a 14-page document?

2    **A.**     Yes.

3    **Q.**     Okay.

4          MR. BATES:  All right.  You can take that down.

5          And if we can publish -- I would move to admit Defendants'

6    Exhibit 161, which was stipulated by the parties, but hasn't

7    officially been moved in yet.

8          THE COURT:  Without objection.

9          MR. BRENNER:  What was the number?

10         MR. BATES:  161.

11         MR. BRENNER:  That's correct.  It's stipulated to, Your

12   Honor.

13         MR. BATES:  Permission to publish?

14         THE COURT:  You may.

15         (Defendants' Exhibit 161 admitted into the record.)

16   BY MR. BATES:

17   **Q.**     If we can zoom in on the top half of this email, and

18   let's focus in on the bottom part.

19         Is this an email from Principal F████████ to you?

20   **A.**     Yes.

21   **Q.**     And what is he saying thanks for doing?

22   **A.**     For writing up that document, and doing the investigation

23   that needed to be done.

24   **Q.**     And he asks you, "Any surprises?"

25   **A.**     Yes.

1    **Q.**    Okay.  And what's your response to that?

2    **A.**    "No."

3    **Q.**    Okay.  And what's the second sentence mean that says,

4    "Looks like S████ did talk to the student.  I thought she might

5    have missed"?

6    **A.**    When I was going through all the documents and things,

7    there was a student's name who's mentioned as a witness, and I

8    didn't see that there was documentation that she had talked to

9    that person, and I had mentioned that to Dr. -- I mean,

10   Mr. F████████.

11   **Q.**    And you ended up finding out that she did speak with this

12   individual?

13   **A.**    Yes.

14        MR. BRENNER:  Objection, leading, Your Honor.

15        THE COURT:  Sustained.

16   BY MR. BATES:

17   **Q.**    Okay.  And what did you mean in that lapse sentence that

18   says, "I don't think we could have been more thorough without

19   being super human"?

20   **A.**    I felt like after I had looked at all of the documents

21   and all of the things that we had done, that we really couldn't

22   have done more.

23   **Q.**    Okay.  And this was just a private email between you and

24   Principal F████████?

25   **A.**    Yes.

```
 1    Q.      Okay.  Do you still hold that position, that belief that
 2    you don't think you could have done anything more without being
 3    super human with regard to --
 4    A.      I think we thoroughly investigated these incidents.
 5            MR. BATES:  And you can take that down.  If we can -- I
 6    would like to move in Defendants' Exhibit 159, which has been
 7    stipulated by the parties.
 8            MR. BRENNER:  That's correct, Your Honor.
 9            THE COURT:  Without objection.  You may publish.
10            MR. BATES:  Thank you.
11            (Defendants' Exhibit 159 admitted into the record.)
12    BY MR. BATES:
13    Q.      If we can maybe zoom in on that bottom email.
14            And what's the date of this email -- I'm sorry, who is
15    this email from?
16    A.      From Mrs. R.
17    Q.      And to you?
18    A.      Yes.
19    Q.      Okay.  And this is four days after our -- after B█████
20    pulled from in-person schooling?
21    A.      Yes.
22    Q.      Okay.  And in the highlighted sentence there, Ms. R.
23    tells you, "Now I've sent my concerns to the school district,
24    there is no reason to continue to go in circles about what you
25    are doing at the school."  Do you see that?
```

1    A.     Yes.

2    Q.     And you received this email -- at the time that you

3    received this email, did you stop investigating anything with

4    regard to B█████?

5    A.     No, no.

6    Q.     Why not?

7    A.     Because we wanted to find out if these things had

8    happened, what was going on.  We wanted to make sure that when

9    she came back to school, she would be safe.  You know, it's just

10   what we did.

11   Q.     Okay.  And did you do that, despite Mom's instruction to

12   stop going in circles?

13   A.     Yes.

14   Q.     You can zoom out.  And if you can zoom in on the top

15   email, it looks like you had forwarded this to Jane Dreyfuss; is

16   that correct?

17   A.     Correct.

18   Q.     What did you mean -- so you say, "Here's what we've got

19   today.  I have not been able to talk to Ms. R. despite my

20   efforts to contact her.  Evidently she has decided not to take

21   my calls."

22          What did you mean that she has decided not to take your

23   calls?

24   A.     Well, she had not returned my voicemail -- my message,

25   and she had told me basically that she didn't want to talk about

```
 1   it anymore.

 2   Q.    Okay.  You can take that down.  I'll move on to a

 3   different subject.

 4         THE COURT:  How much longer are you going to need with the

 5   witness?

 6         MR. BATES:  I would say no more than 15 more minutes, Your

 7   Honor.

 8         THE COURT:  Ladies and gentlemen, let's go ahead and take

 9   our afternoon break at this point.  It's about 3:15.  We'll see

10   you back in at 3:30.

11         (Jury out at 3:13 p.m.)

12         THE COURT:  You may be seated.  You can step down, ma'am.

13         Mr. Blanchard, do you anticipate -- I'm sorry, Mr. Kinney,

14   do you anticipate any questioning?

15         MR. KINNEY:  Just a few questions.

16         THE COURT:  Okay.  I'll circle back to Mr. Blanchard.

17   About how long do you anticipate on the cross?

18         MR. BRENNER:  60 to 90.

19         THE COURT:  Okay.  I thought that might be the case.  What

20   we'll do is we'll get through Mr. Bates' examination.  We'll see

21   how much we can get through yours today.  I would like to not

22   stop it in the middle, so --

23         MR. BRENNER:  Yeah.  What is Your Honor's pleasure with

24   that, assuming I get the witness at 3:45 or close to 4:00?

25   Because if Mr. Bates goes 15 more minutes and maybe 3:50, I
```

1    don't -- I --

2        THE COURT:  What I -- if we can get the jury reseated by

3    3:30 and ready to go by 3:30, and Mr. Bates can finish his

4    examination by 3:45, what I'm going to try to do is see if I can

5    talk the jury into 5:00 or so.  That gives you about an hour and

6    15 minutes.  It doesn't get you to 90 minutes, but it gets you

7    somewhere between 60 and 90.  As I said, it's my preference not

8    to end anybody's examination in the middle.

9        MR. BRENNER:  Yeah, that's what I'm concerned with.  I

10   guess we'll have to see when the witness actually gets turned

11   over.

12       THE COURT:  Okay.  We'll see, and actually I've sort of

13   done some calculations too about how we're going to do things

14   going forward, because obviously we're not going to get to the *de*

15   *bene esse* deposition today.

16       MR. BRENNER:  Right.  Right.

17       THE COURT:  All right.  Let's see where we are.

18       MR. BRENNER:  Thank you.

19       (Thereupon, a recess in the proceedings occurred from

20   3:15 p.m. until 3:32 p.m.)

21       THE COURT:  Have a seat, please.

22       I thought we would talk about a couple of things and take

23   advantage of this time.  As I was working my calculus here, I

24   forgot to factor in what Mr. Bates may want to do on redirect

25   examination.  So I'm like, my calculus has sort of changed, and

```
1    this is what I propose, and again, I'm taking this time because

2    we're going to keep the jury as long as we can, is that we

3    obviously get through your direct examination, we get through as

4    much of your cross-examination as we can.  Hopefully we'll be

5    able to get it done, and if we can't, we'll work around that.

6         We take Friday to go through the de bene esse deposition,

7    and then we would sort of work through the instructions and the

8    Rule 50s on Monday morning, say from 9:00 to 1:00, and then we

9    would do the instructions and the closings on Tuesday.  That's

10   assuming plaintiff doesn't have a rebuttal case.  If plaintiff

11   has a rebuttal case, then I need to go to work again.

12        MR. BRENNER:  At the risk of begging, that just seems like

13   a lot of built-in time that I don't think we need.  Can I give a

14   different suggestion?

15        THE COURT:  Sure.

16        MR. BRENNER:  What I was suggest is we finish up with the

17   evidence, so that will be either the remainder of Ms. B█████

18   testimony, and -- the de bene esse -- is that how --

19        THE COURT:  De bene esse.

20        MR. BRENNER:  -- de bene esse deposition on Friday morning

21   with the jury.

22        I don't believe we're going to need a rebuttal case.  We

23   may want to move in a few documents, but at this point, that's my

24   guess, so let's, for planning purposes, assume that.

25        THE COURT:  Okay.
```

1        MR. BRENNER:  And then we do the Rule 50 and the charge

2   conference or the jury instructions that afternoon and we close

3   on Monday.

4        THE COURT:  We can try.  That's assuming you all stay

5   within the structure of your own thing.  I know we have that

6   other thing that we're trying to work around.

7        We're also trying to work around this particular courtroom

8   being available on Monday for something else, which has been long

9   planned, but let's see where we are, and then we'll reevaluate.

10        MR. BRENNER:  And then as far as today --

11        THE COURT:  I'm going to try to talk them into staying

12   until 5:00.

13        MR. BRENNER:  So I'm going to go until 5:00?

14        THE COURT:  If they don't have a problem.

15        MR. BRENNER:  I know you're hopeful I'll finish, but 5:00

16   is the hard stop?

17        THE COURT:  Let's say that.

18        MR. BRENNER:  Within a few minutes either way at a

19   breaking point.

20        THE COURT:  Within an hour or so.

21        MR. BRENNER:  All right.  As long as the record reflects

22   that I begged, my wife would appreciate it knowing that that's on

23   the record.  So --

24        THE COURT:  I'm not touching that.  I'm not touching that.

25        Mr. Blanchard.

```
1           MR. BLANCHARD:  Your Honor, I'm sorry, I had to step out.

2     I don't anticipate much cross in terms of what I've heard.

3     Depending on what Mr. Brenner brings up, I may have something,

4     one or two questions.  That's all.

5           THE COURT:  Okay.  All right.  We'll reevaluate.  Thank

6     you.

7           (Jury in at 3:36 p.m.)

8           THE COURT:  All right.  You may be seated.  Ladies and

9     gentlemen of the jury, as you have heard me say from time to

10    time, while you all are taking your breaks, we're working on some

11    things to try to make this matter more efficiently presented to

12    you.  And if you could work with me today and stay until 5:00, it

13    is likely we'll be able to get through this witness.  Is

14    everybody okay with that?  Very good.  I appreciate it.

15          MR. BATES:  May I proceed?

16          THE COURT:  You may.

17          MR. BATES:  Your Honor, permission to publish Defendants'

18    156, which is already admitted.

19          THE COURT:  You may.

20          MR. BATES:  Page 2, if we can go to, and if we can zoom in

21    on that bottom email.

22    BY MR. BATES:

23    Q.    Ms. B██████, is this an email that plaintiff's mother sent

24    to Principal F███████ on the day after plaintiff left

25    in-schooling at Rachel Carson?
```

1    **A.**      Yes.  Yes.

2    **Q.**      Okay.  And in this highlighted bullet below, it says, "A

3    male student D.R. in PE deliberately threw a ball at her that

4    afternoon, hitting her in the stomach."

5          Do you see that?

6    **A.**      Yes.

7    **Q.**      And this is, again, B.R.'s mother claiming that this was

8    another incident that had occurred at school?

9    **A.**      Yes.

10   **Q.**      And it goes on to say the teacher, Mr. Kappatos, saw the

11   incident and had this student sit out for class, and it

12   continues.  Do you see that?

13   **A.**      Yes.

14   **Q.**      When you met with plaintiff the day before this, on two

15   occasions, you met with her, correct?

16   **A.**      Correct.

17   **Q.**      Did she report this ball being thrown at her and hitting

18   her in the stomach to you?

19   **A.**      No.

20   **Q.**      I'm sorry, could you say that again?

21   **A.**      No.

22   **Q.**      Okay.  And is Mr. Kappatos the physical education teacher

23   that testified yesterday?

24   **A.**      Yes.

25   **Q.**      Okay.  We can take that document down.

1        Do you recall C███████ K██, the former student,

2   testifying here in court?

3   **A.**    Yes.

4   **Q.**    Did you interview C██████ this 2011-2012 school year?

5   **A.**    Yes.

6   **Q.**    Do you recall how many times you interviewed him?

7   **A.**    Two, I believe.

8   **Q.**    Sitting here today, do you know why you interviewed

9   him -- well, let me ask you this first.

10       Do you know what the subject of the interview was?

11  **A.**    The first one was the cafeteria incident.

12  **Q.**    Okay.  What was the subject of the second one?

13  **A.**    You know, I don't remember that one.  In my discipline

14  log it says B██████ R██████ -- something about B█████.

15  **Q.**    Okay.  And would it be unusual for you to interview a

16  student more than once when you're doing an investigation?

17  **A.**    No.

18  **Q.**    Did you at any time ask Mr. K██ to change his statement?

19  **A.**    No.

20  **Q.**    Is that something that you would ever do as an

21  administrator?

22  **A.**    I would never ask a student to change a statement.

23  **Q.**    Okay.  I just want to ask a few questions about the

24  after-school program, switching to another topic.

25       During that school year, who was in charge of the

1    after-school program?

2    **A.**    Tracy -- I'm trying to think of her last name.  It starts

3    with a B, I'm trying to remember.

4    **Q.**    Is it Tracy Bromberg?

5    **A.**    Yes.

6    **Q.**    Were there any other staff members that worked in the

7    after-school program?

8    **A.**    Yes.  She had some of our staff -- she paid them extra to

9    stay after so that they could monitor the front door in case the

10   office staff had to leave.

11   **Q.**    Okay.  So there was somebody at the front door?

12   **A.**    At the desk.

13   **Q.**    At the desk.

14        Was there any other staff members that also worked the

15   program?

16   **A.**    I don't remember.

17   **Q.**    Okay.  And outside of the after-school staff with

18   Ms. Bromberg, et cetera, who else was in the school in that hour

19   after school?

20   **A.**    Probably most of the teachers, certainly the ones that

21   were running clubs or doing academic support; the

22   administrators; the counselors.

23   **Q.**    Was there any custodial staff there as well?

24   **A.**    Yes, but the second shift -- well, I guess -- there was

25   only one custodian on during the day, as I recall, and then a

1   second shift came sometime in the late afternoon.

2   Q.    During this school year, was attendance taken of students

3   in the after-school program?

4   A.    Yes.

5   Q.    And why is that?

6   A.    Because we wanted to make sure all students were

7   accounted for.

8   Q.    Were students -- when they stayed after, were they --

9   what, if any, restrictions were there on movement throughout the

10  building during that hour or so period?

11  A.    So they had to stay in the courtrooms until the buses

12  were loaded, and then they had three minutes to get to their

13  after-school location.  And after that three minutes, nobody was

14  allowed in the halls, unless they had a pass to go to the

15  bathroom.

16  Q.    So it's similar to the --

17  A.    During the school day, um-hmm.

18  Q.    New topic.

19        At any point did B.R. ever tell you that she had been

20  sexually assaulted at school?

21  A.    No.

22  Q.    At any point did she ever insinuate to you that she had

23  been sexually assaulted at school?

24  A.    No.

25  Q.    Did any of B.R.'s family members ever tell you that B.R.

1    had been sexually assaulted at school?

2    **A.**    No.

3    **Q.**    Would you ever turn a blind eye to a sexual assault of a

4    student?

5    **A.**    Absolutely not.

6    **Q.**    Do you have any reason to believe that any of your former

7    colleagues would do that?

8    **A.**    No, absolutely not.

9    **Q.**    Ms. B██████, due to the nature of these questions, I would

10   just ask that you give a yes-or-no answer.

11   **A.**    Okay.

12   **Q.**    Are you aware that the second amended complaint alleges

13   that B.R. was taken into a closet at school and raped by three

14   unknown males?

15   **A.**    Yes.

16   **Q.**    Okay.  Are you aware that the complaint alleges that

17   these occurred numerous times during after-school hours?

18   **A.**    Yes.

19   **Q.**    Are you aware that it also alleges that this happened

20   between November 2011 and February 2012?

21   **A.**    Yes.

22   **Q.**    Did you ever witness anything happening to B.R. after

23   school involving closets?

24   **A.**    No.

25   **Q.**    Did you ever encounter groups of unknown men wandering

```
 1   the school during the after-school period?
 2   A.      No.
 3           MR. BATES:  No further questions, Your Honor.
 4           THE COURT:  Mr. Kinney.  Cross-examination.
 5           MR. KINNEY:  Thank you, Your Honor, may I proceed?
 6           THE COURT:  You may.
 7                  DIRECT EXAMINATION OF T██████ B██████
 8   BY MR. KINNEY:
 9   Q.      Good afternoon, Ms. B█████.
10   A.      Good afternoon.
11   Q.      For the record, I'm Michael Kinney, and I've got just a
12   few questions.
13           Ms. B██████, at any point, beginning with your first
14   involvement in late January of 2012 until you concluded your
15   investigations, did you ever observe anyone bully, harass, or
16   touch B.R. in any inappropriate way?
17   A.      No.
18   Q.      At any point did you ever observe any threat to B.R.'s
19   safety?
20   A.      No.
21   Q.      Did you witness anyone hurting her?
22   A.      No.
23   Q.      Did you witness anyone making any inappropriate conduct
24   toward her at all?
25   A.      No.
```

1   **Q.**    Were you aware of any threat at all to B.R.'s safety?

2   **A.**    No.

3   **Q.**    Would you ever stand idly by while a child in your care

4   was being harmed?

5   **A.**    Absolutely not.

6   **Q.**    Ms. B█████, do you believe that the allegations that have

7   been made against you in this case individually are false?

8   **A.**    Yes.

9         MR. KINNEY:  Ms. B█████, thank you.

10        Thank you, Your Honor.  That's all I've got.

11        THE COURT:  Mr. Blanchard?

12        MR. BLANCHARD:  Nothing, Your Honor.

13        THE COURT:  Cross-examination.

14        MR. BRENNER:  Thank you, Judge.

15        May I approach the witness, Your Honor.

16        THE COURT:  You may.

17                CROSS-EXAMINATION OF T█████ B█████

18   BY MR. BRENNER:

19   **Q.**    Good afternoon, Ms. B████.

20   **A.**    Good afternoon.

21   **Q.**    My name is Andrew Brenner, and I'm one of the lawyers

22   that's representing B███ in this case.  I'll ask you a few

23   questions.

24        Let me start off with some basics.  You define "sexual

25   harassment" as unwanted sexual advances, as part of it, right?

1   **A.**    Yes.

2   **Q.**    Unwanted sexual conduct, correct?

3   **A.**    Yes.

4   **Q.**    It could be verbal, correct?

5   **A.**    Yes.

6   **Q.**    It could be physical?

7   **A.**    Yes.

8   **Q.**    It could be words?

9   **A.**    Yes.

10  **Q.**    It could be tone of voice?

11  **A.**    Yes.

12  **Q.**    It could also just be a look or a gesture?

13  **A.**    Yes.

14  **Q.**    You're aware of that -- well, back in 2011-2012, were you

15  aware that the Fairfax County School System had an office

16  dedicated to -- or that handled Title IX complaints?

17  **A.**    Yes.

18  **Q.**    And what was that office called?

19  **A.**    The Office of Equity and Compliance.

20  **Q.**    And you were aware that -- well, strike that.

21          During -- remind me again what years you were at Rachel

22  Carson.

23  **A.**    2007 to 2012.

24  **Q.**    Was that five school years or six school years?

25  **A.**    Five.

1    **Q.**    Five school years.

2         In your entire history at Rachel Carson, you never

3    remember elevating a sexual harassment claim to the Title IX

4    office, correct?

5    **A.**    That's not quite correct.

6    **Q.**    Okay.  Well, let's see what you told us before, and then

7    you can tell me how it's changed, okay?

8         MR. BLANCHARD:  Objection, Your Honor.

9         THE COURT:  Sustained.

10   BY MR. BRENNER:

11   **Q.**    I'm on page 58 -- let me give you a copy of your

12   deposition.

13        MR. BRENNER:  May I approach.

14        THE COURT:  You may.

15   BY MR. BRENNER:

16   **Q.**

17        MR. BRENNER:  One second, Ms. B███████.

18        If you look at the deposition -- do you recall that you

19   were deposed twice in this case?

20   **A.**    Yes.

21   **Q.**    One time you were deposed in your individual capacity as

22   Ms. B███████, correct?

23   **A.**    Correct.

24   **Q.**    And the second time, do you recall you were deposed --

25   you were designated by Fairfax County School Board to be their

1   representative on certain topics?

2   **A.**    Yes.

3   **Q.**    Okay.  And just so you know where I'm going, the first

4   deposition in May of 2023 is the one where you're in your

5   individual capacity.

6   **A.**    Yes.

7   **Q.**    Okay.  So that's the one we're going to look at first.

8   You were asked on page 58 of that deposition when you were under

9   oath:

10          "Do you remember ever -- at Rachel Carson, do you

11   remember ever elevating a sexual harassment case to the Title IX

12   office?"

13          And your answer was no.

14  **A.**    Can you tell me which one of the --

15  **Q.**    I'm sorry, the May one, which I think is the thicker one.

16  **A.**    Okay.  I don't see a date on it.  Okay.  I see it.  Okay.

17   Tell me the page again?

18  **Q.**    Sure.  I'm on page 58.

19          You tell me when you're there.

20  **A.**    I will.

21          Okay.

22  **Q.**    I know it's a little confusing with the page numbers

23   sometimes.

24          Tell me when you're there.

25  **A.**    I'm there.

1    Q.    On page 58, line 2 to 5, you were asked the following

2    question:

3         "Do you remember ever -- at Rachel Carson, do you

4    remember ever elevating a sexual harassment case to the Title IX

5    office?"

6         And your answer was no, correct?

7    A.    Correct.

8    Q.    You don't know if there was any one person at Rachel

9    Carson who was tasked with investigating claims that could be

10   sexual harassment?

11   A.    I do know.

12   Q.    Was there one person at the school who was tasked with

13   investigating claims that could be sexual harassment?

14   A.    No.

15   Q.    There was no such person; correct?

16   A.    We were all tasked with investigating sexual harassment.

17   Q.    Right.  Rachel Carson Middle School did not designate an

18   administrator or teacher to handle Title IX issues, correct?

19   A.    Correct.

20   Q.    There was no published grievance procedures that students

21   could use if they thought someone had violated Title IX,

22   correct?

23   A.    Not specific to Title IX.  There were grievance

24   procedures for students.

25   Q.    But not specific as to Title IX, which is sexual

1   harassment?

2   **A.**    You mean, that said "Title IX" on it?

3   **Q.**    Yeah, that said, if someone thought that Title IX was

4   violated, was there a grievance procedure -- a published

5   grievance procedure that students could use?

6   **A.**    There were grievance procedures in the Student Rights and

7   Responsibilities.  The legal Title IX was not listed.

8   **Q.**    All right.  At no point in time -- and now we're segueing

9   off of general questions.  I'm not going to segue into questions

10  about B████, okay?

11  **A.**    Um-hmm.

12  **Q.**    At no point in time did anyone from the Rachel Carson

13  administration explain to B████ parents how to make a formal

14  Title IX report if they wanted to do so, correct?

15  **A.**    I did not.

16  **Q.**    Well, let me show you your deposition again.  This was

17  when you were designated as the representative.  This is the

18  second one.  This is the August one.

19  **A.**    Okay.

20  **Q.**    And I'm going to go to page 51.

21         THE COURT:  Let me interrupt you, Mr. Brenner.

22         Ladies and gentlemen of the jury, from time to time you

23  may see some of the lawyers leave or take care of personal

24  business.  The Court has authorized them to do that.

25         MR. BRENNER:  Thank you, Judge.

```
 1    BY MR. BRENNER:

 2    Q.      We're on the August transcript, which is the thinner one.

 3    A.      Right.

 4    Q.      And I'm on page 51, and you were asked the following

 5    questions and gave the following answer:  "At any point in time

 6    either during that meeting or before or after that meeting, do

 7    you know if anybody from administration explained to Mrs. R. how

 8    they could make a formal Title IX report if they wanted to do

 9    so?"

10            And your answer was:  "I don't believe that was done."

11    A.      Correct.

12    Q.      Okay.  Neither B███ or her family were ever provided any

13    contact information for the Fairfax County Title IX coordinator?

14    A.      I believe that's in the SR&R.

15    Q.      Okay.  You never provided that, correct?

16    A.      Correct.

17    Q.      You don't think any administrator provided that, correct?

18    A.      Not that I'm aware of.

19    Q.      Okay.  Usually it was your practice to have no hesitation

20    to giving out information about calling various offices if a

21    parent felt like they wanted or needed it, correct?

22    A.      Correct.

23    Q.      And the reason -- excuse me.  You did not provide any

24    Title IX contact information to B███ or her family in this case

25    because, quote, you felt that they were pleased with what was
```

1   happening?

2   **A.**    Yes.  On a regular basis, they came back and said things

3   were fine.

4   **Q.**    That's your recollection of the interactions with the R.

5   family in the fall and into the -- I guess it's the winter of

6   2012, was that they were pleased with how the school was

7   handling things?

8          MR. BATES:  Objection, misstates her testimony.

9          THE COURT:  Rephrase.

10  BY MR. BRENNER:

11  **Q.**    Is it your testimony that the family was pleased with how

12  the school was handling the complaints about their daughter?

13  **A.**    They -- Mrs. R. periodically e-mailed to say, thank you,

14  things are much better, you can take the shadowing off, that

15  kind of thing.

16  **Q.**    Okay.  I understand.  Was your conclusion, based on your

17  involvement in these issues, that the R. family was pleased with

18  how the school was handling the complaints about their daughter?

19  **A.**    I think they were satisfied with how the school was --

20  **Q.**    Okay.  And because of that, you just did not feel -- all

21  of you did not feel like the family needed to contact anyone

22  else outside of the school, correct?

23         MR. KINNEY:  Objection.

24         THE COURT:  Overruled.

25  BY MR. BRENNER:

1    **Q.**    Is that correct?

2    **A.**    I didn't see a need to contact anyone outside of the

3    school.

4    **Q.**    No, no.  My question is a little different.

5         Not whether you felt the need to contact anyone else.

6    You felt, because you felt the family was satisfied, the

7    administrators believed that the family didn't need to contact

8    anyone else outside of the school; is that correct?

9         THE COURT:  I think you can ask her what she thought, but

10   not administrators.

11        MR. BRENNER:  Your Honor, I believe the testimony that I'm

12   using is that as a corporate representative, so she was on behalf

13   of the administrators.

14        THE COURT:  Well, what was the status of her corporate

15   representation?

16   BY MR. BRENNER:

17   **Q.**    Let me ask you this:  You, yourself, did not feel like --

18   because, as you said, the family was satisfied, did not feel

19   like the family needed to contact anyone else outside of the

20   school, correct?

21   **A.**    I didn't decide whether they needed to.  They didn't let

22   me know that they wanted to.

23   **Q.**    I'm asking about what you felt.  Let me ask my question

24   again.

25        Because you just told us you felt the family was

```
1    satisfied with what the school was doing, you did not feel like

2    the family needed to contact anyone else?

3    A.    I'm not sure what you mean, "needs to."  I mean, if they

4    indicated that they were dissatisfied, I would have given them

5    the information about how to contact someone.

6    Q.    Okay.  So let's just -- let's look at your deposition

7    again.

8          This is the thinner one.

9    A.    Um-hmm.

10         MR. BATES:  Your Honor, I'd object to attempting to

11   impeach a witness on a 30(b)(6).  She's here as an individual,

12   not as the corporate representative.

13         THE COURT:  I think, from what I've been told, and someone

14   correct me if I'm wrong, that she has somewhat of a dual status

15   in the context of this litigation.  So if she has a dual status,

16   then the questions are legitimate.

17         MR. BATES:  For purposes of discovery responding to a

18   30(b)(6) request, she was designated to testify about certain

19   topics, but she's here has an individual, and I think it's

20   certainly proper to impeach her on her individual testimony, but

21   on --

22         THE COURT:  Theoretically, then, if you want to do it that

23   way, theoretically we could have her testify in her individual

24   capacity.  She can step down and then have her testify in her

25   corporate capacity as part of a rebuttal case if plaintiff
```

1    chooses to do that.

2        MR. BATES:  He can do that, but he didn't call her as a

3    witness.

4        THE COURT:  Well, we haven't gotten to that point.  So

5    I'll overrule the objection.

6        MR. BRENNER:  Okay.

7    BY MR. BRENNER:

8    Q.    If you go to page 47 of the thinner deposition, I'll

9    start at line 19, okay?

10   A.    Which page?

11   Q.    I'm sorry, 47.  You just tell me when you're there, and

12   I'm just going to read some lines into the record.

13   A.    Okay.

14   Q.    "QUESTION:  Did you know at any point in time before B.R.

15   was pulled out of the school whether her or her family were

16   provided with the contact information for the Fairfax County

17   Title IX coordinator?

18       "ANSWER:  Not -- I didn't provide it.

19       "QUESTION:  Okay, do you know?

20       "ANSWER:  And I don't -- I don't think an administrator

21   did.

22       "QUESTION:  Okay.

23       "ANSWER:  And again, before she was pulled out, we had a

24   meeting with the parents, and they were pleased with what was

25   happening, so we didn't feel like they needed" -- excuse me, "we

```
 1    didn't feel like they felt like they needed to contact anyone

 2    else.  We -- we had no hesitation about saying you can call this

 3    office or that office, if we felt like the parent wanted or

 4    needed it."

 5          The questioner says:  "When?"

 6          And then you say:  "But we didn't in this situation."

 7          Did I read that correctly?

 8    A.    Correct.

 9    Q.    Okay.  So, let's go -- you said your first direct

10    involvement -- or your first direct involvement with B█████ is

11    that she came up and introduced herself very early in the school

12    year?

13    A.    I think so, yeah.

14    Q.    And then there's a gap of time between when you have

15    any -- you can close the deposition.  Sorry about that.

16          And then there was a gap in time till about late January

17    until you had any other direct involvement with her; is that

18    fair to say?

19    A.    Correct.

20    Q.    Okay.  And you told Mr. Bates that that direct

21    involvement came about because B█████ had written a letter to

22    Mr. F███████ and -- is Ms. Weaver Dr. Weaver or is she

23    Ms. Weaver?  Do you know?

24    A.    I don't know.

25    Q.    We had another Dr. Weaver.  I'm going to call her
```

1    Ms. Weaver, but if she is a doctor, I don't mean any disrespect.

2    **A.**    Okay.

3    **Q.**    Okay.  B████ had written an email at the end of

4    January -- I think you knew the date.  You said January 27th --

5    **A.**    Um-hmm.

6    **Q.**    -- to Mr. F████████ and Ms. Weaver, correct?

7    **A.**    Correct.

8    **Q.**    And you were asked by Mr. F███████ to sit in on that

9    conference with B█████ parents, correct?

10   **A.**    Correct.

11   **Q.**    By the way, you said Mrs. R██████ -- Mrs. R. was there --

12   I'm sorry, Mrs. R. was there, who's B█████ mom, correct?

13   **A.**    Correct.

14   **Q.**    And Mr. R. was there, who's B█████ father?

15   **A.**    I think so.

16   **Q.**    And was B████ there?

17   **A.**    No, I don't think she was.

18   **Q.**    Okay.  You're not sure, or she was not there?

19   **A.**    I don't think she was there.

20   **Q.**    Okay.  Although this was your first interaction with her

21   other than the meeting at the beginning of the school year, you

22   were aware before you walked into that meeting of the reports of

23   behavior towards B████ that were very concerning?

24   **A.**    I was aware of the November/December -- in general.

25   **Q.**    Yeah.  You were aware that in November and December --

1    and we'll get to the exact dates a little later, but you were

2    aware that there were reports of behavior that you were, quote,

3    very concerned about?

4    **A.**     I was concerned about them, yes.

5    **Q.**     Okay.

6    **A.**     And I was aware.

7    **Q.**     And you were aware that those -- that that behavior had

8    been going on for some period of time, correct?

9    **A.**     My understanding is that it covered about a week and a

10   half, two-week span in terms of when the mother came in and then

11   when she said, things are going well, we can take off the

12   shadowing.

13   **Q.**     Well, let me be a little more direct about it.

14         When you're meeting in January -- the end of January,

15   January 27th, and you have heard reports of behavior that was

16   very concerning, you knew that behavior had started months

17   earlier; is that fair?

18   **A.**     I knew that it had happened months earlier.

19   **Q.**     Okay.  You were aware at the time of that meeting that

20   B███ had complained about bullying, right?

21   **A.**     Yes.

22   **Q.**     And you were aware prior to that meeting that B███ had

23   reported that students were doing things to her at her locker?

24   **A.**     Saying things to her at her locker, yeah.

25   **Q.**     Not doing things to her?

1    A.     Doing things, I'm not sure -- again, at that point I

2    didn't know all of the details of what had happened.  I knew it

3    had been resolved.  I know the general outline.

4    Q.     Around this time you knew that B███ had made complaints

5    about sexual harassment?

6    A.     Back in November.

7    Q.     Yeah.  We're getting our months a little mixed.  It's my

8    fault.  In January when you met with her, you know that she had

9    been making complaints about sexual harassment going back to

10   November?

11   A.     No, not going back to November.  In November.

12   Q.     Just November?

13   A.     Yes.  I mean, that's what I was aware of.

14   Q.     Okay.

15   A.     Yes.

16   Q.     You can only tell me what you were aware of.

17          Now, when you went to the meeting that Mr. F██████ asked

18   you to go to, you had seen the letter that B███ had written,

19   correct?

20   A.     Yes.

21          MR. BRENNER:  Your Honor, may we publish -- it's already

22   in evidence -- Plaintiff's Exhibit 111?

23          THE COURT:  You may.

24   BY MR. BRENNER:

25   Q.     Okay.  It's on the next page.  So that's the letter to

1    Mr. F███████ and Ms. Weaver that we were just talking about with

2    Ms. Weaver?

3    **A.**    Yes.

4    **Q.**    Okay.  Now, you showed a series -- when you testified

5    about this, you said in this meeting, you guys talked about the

6    lab notebook, the science notebook, right?

7    **A.**    We talked in general about the missing work.

8    **Q.**    The missing work.

9    **A.**    Yeah.

10   **Q.**    Which included the science notebook, or no?

11   **A.**    I believe so.  I think that was the topic of the meeting.

12   I don't remember specifically talking about that.

13   **Q.**    Okay.  So this letter -- this letter says nothing about a

14   science notebook or missing work, does it?

15   **A.**    No.

16   **Q.**    This letter talks about -- that B██████ been subject to,

17   quote, "sexual harassment, physical harassment, name-calling"

18   correct?

19   **A.**    Correct.

20   **Q.**    All on the grounds of Rachel Carson, supposedly a, quote,

21   "bully-free school"?

22   **A.**    Yes.

23   **Q.**    And she showed the jury that -- was Rachel Carson a

24   bully-free school?

25   **A.**    Well, there's no such thing as a bully-free school.

1    **Q.**    She says there's constant bullying at the school, right?

2    **A.**    Yes, she does say that.

3    **Q.**    She says that students are scared to speak out?

4    **A.**    She does say that.

5    **Q.**    She says they're afraid of being made fun of or being

6    called a snitch or more rude names, right?

7    **A.**    Correct.  She does say that.

8    **Q.**    She says -- and she's talking about other students at

9    this point -- they suffer quietly while bearing -- excuse me --

10    hurtful words and sneers?

11    **A.**    That's what it says.

12    **Q.**    And she talks about these three R's.  She says, "Rachel

13    Carson has the model of ready, respectful and responsible, and

14    that's not demonstrated in our hallways at all," right?

15    **A.**    She does say that.

16    **Q.**    She tells you that these are empty words, correct?

17    **A.**    She does.

18    **Q.**    In any of the follow-up that you had to this meeting, did

19    you address -- when you went through them with Mr. Bates, did

20    you address any of the things I just read?

21    **A.**    What do you mean the "follow-up"?

22    **Q.**    Well you showed Mr. Bates a couple of emails back and

23    forth from Mr. H███ -- I think one may have been from you --

24    to the family right after this meeting?

25    **A.**    This came out before the meeting.  So we talked about it

1    at the meeting.

2    **Q.**    Right.  And the meeting was on the same day as this

3    email, correct?

4    **A.**    Yes.

5    **Q.**    And afterwards, you write things about science notebooks,

6    right?

7    **A.**    You mean when I made up the incident report?

8    **Q.**    No, before that.  You showed emails with Mr. Bates where

9    you wrote about what happened at the meeting.  You don't

10   remember that?

11   **A.**    I -- I, yes.  I mean, I've seen a lot of things.  You may

12   want to show it to me again.

13   **Q.**    Okay.  Let me see if I can find that for you.

14          MR. BRENNER:  May I publish Your Honor, DX-152?

15          THE COURT:  You may.

16   BY MR. BRENNER:

17   **Q.**    This is the follow-up -- some of the follow-up to one of

18   the meeting?

19   **A.**    Yes.

20   **Q.**    Okay.  Nothing about essentially what her whole letter

21   was about, right?

22   **A.**    No.  This is in response to -- I mean, this was our plan

23   for what we were going to do moving forward.

24   **Q.**    Okay.  Nowhere in this plan do you discuss the bulk of

25   the letter which talked about one of their -- well, let me go

1    back one second.

2        When you testify about this letter at the beginning, you

3    said, "One of the things we talked about," "we," meaning the

4    administrators, "was" -- and I think you said you told the

5    family this -- "that you were impressed that a student had

6    written this to the school"?

7    **A.**    I think that that was part of that meeting.

8    **Q.**    Okay.

9        MR. BRENNER:  You can take that down, Mr. Brown.

10   BY MR. BRENNER:

11   **Q.**    That letter is impressive, right?

12   **A.**    Yes, it's very impressive.

13   **Q.**    It takes a lot of guts, right?

14   **A.**    I don't know what do you mean, "it takes a lot of guts."

15   **Q.**    Do you think it takes a lot of guts for a 12-year-old

16   student to write that to her principal and her second-in-command

17   at the school to tell them that the school's got a problem, and

18   they need to fix it?

19   **A.**    Yeah.  It takes some courage to do that.

20   **Q.**    Right.  Have you seen another letter like that.  Are you

21   aware of another one?

22   **A.**    You know, I've had a long career, so I've seen -- I have

23   seen things like that.  Not from a 7th grader.  That doesn't

24   look like it's from a 7th grader to me.

25   **Q.**    7th grader.  You can argue that that's a cry for help,

```
1    couldn't you?

2    A.    The tone of the letter is not a cry for help.  I wouldn't

3    say that.

4          MR. BRENNER:  Okay.  Let's pull up PX-111 again.

5          Your Honor, may we publish?

6          THE COURT:  You may.

7          MR. BRENNER:  And go to the second page.

8          MR. BATES:  I would ask that Mr. Brenner not cut off the

9    witness.  It's happened a couple of times.

10         THE COURT:  All right.  Everyone's going to behave.

11   BY MR. BRENNER:

12   Q.    Ms. B██████, if at any time I cut you off -- and I

13   probably will, but I'm just telling you it's unintentional --

14   you just tell me I cut you off, and I will let you finish, okay?

15   A.    Sure.

16   Q.    Okay?

17   A.    Okay.

18   Q.    If we can go to the second page again.

19         So is it fair to say that in this letter that B████ is

20   telling the school that maybe -- maybe what the school is seeing

21   is happening is different than what the students are seeing is

22   happening.  Is that a fair read of that?

23   A.    She's saying what she thinks the students are seeing is

24   happening.

25   Q.    Right.  She's saying -- not to you personally, but she's
```

1    saying to the Rachel Carson Middle School administration, the

2    top of the heap -- the two top people, right?

3  **A.**     Yes.

4  **Q.**     All right.  She's saying to the two top people that the

5    students are being subjected to pretty extreme bullying, right?

6  **A.**     Yes.

7  **Q.**     She's saying that they're afraid to speak up because

8    they'll be called a snitch or other rude names?

9  **A.**     Yes, yes.

10 **Q.**     Okay.  And that should be -- it should be concerning to

11   the administration, right?

12 **A.**     It was concerning to the administration.

13 **Q.**     Okay.  And in any of the follow-ups between then and

14   February 9th, were there any communications from the school that

15   said to B█████ or her parents, Hey, we hear you.  We understand

16   your concerns, and here's what we're going to do to change.  Are

17   you aware of any such communication?  In writing, we'll start.

18 **A.**     No.

19 **Q.**     Okay.  So in any emails you write back, you focus on lab

20   books and things like that, but there's never anything like, Oh,

21   I see that maybe the students are seeing a different picture

22   than all the teachers and administrators?  There's no kind of

23   recognition of that, is there?

24 **A.**     In a written form?

25 **Q.**     Was there in a verbal form to them?

1    **A.**    I think we always acknowledged that there were issues

2    that we needed to address, and we welcome parents' input about

3    that and students' input about that.

4    **Q.**    I'm sorry.  You sat through the whole trial so far,

5    right?

6    **A.**    Yes.

7    **Q.**    You watched each of your fellow teachers and

8    administrators testify, right?

9    **A.**    Yes.

10   **Q.**    And they all testified, pretty much to a person that, for

11   example, there was no sexual harassment at Rachel Carson, didn't

12   they?

13   **A.**    Are you asking me what I would say to that?

14   **Q.**    I know what you're going to say.  I'm asking what they

15   said.

16   **A.**    I'm not comfortable characterizing what they said because

17   it's been five weeks.  So, some of them said they didn't witness

18   sexual harassment at Rachel Carson.

19   **Q.**    You think some of them said they did?

20        THE COURT:  She said didn't.

21        MR. BRENNER:  I know I'm asking.

22        THE WITNESS:  Again, again --

23   BY MR. BRENNER:

24   **Q.**    I'm asking you, you said --

25        THE COURT:  Let's -- let's -- let's all slow our roll down

1    just a little bit.  And when we ask a question, let's make sure

2    that the context of the question is consistent with the context

3    of the answer.  So, let's make sure we're clear when we do that,

4    and if you don't know what the response was, you can ask the

5    court reporter to read into the record what the response was.

6         MR. BRENNER:  Okay.

7    BY MR. BRENNER:

8    Q.    Ms. B███████, what I was asking you was, before we get to

9    your own experience, as you sat here, I asked you if your fellow

10   administrators and teachers and counselors had testified that

11   they had not witnessed any sexual harassment at Rachel Carson,

12   and I think your answer was you said some of them didn't.

13   A.    I think what the teachers said was, based on behaviors

14   that could be considered sexual harassment, if you looked into

15   it, but -- they said individual name-calling and things like

16   that was not sexual harassment.

17   Q.    Okay.  Is your answer the same for the counselors and

18   your fellow assistant principals and principal?

19   A.    If you want to show me their testimony again -- I, you

20   know, sat through multiple people testifying, so.

21   Q.    Okay.  You testified on direct examination that you put

22   together --

23        MR. BRENNER:  Your Honor, may I just publish 200 so I have

24   the title of the document correct.

25        THE COURT:  You may.

BY MR. BRENNER:

Q.    Go to the first page of which there's text.  There you

go.

       So that's -- the -- the B.R. incidents memo, I think, is

how we've been referring to it?

A.    Right.

Q.    And you were the author of this, right?

A.    Yes.

Q.    Okay.  And I want to go through it a little bit with you,

but I want to make sure I understood one thing you said.  You

said that there was a meeting on February 13th where I think you

said you sat in front of a computer, and you were the one who

was typing things into the computer?

A.    I had my laptop at the meeting.

Q.    Okay.  And remind me who was at that meeting?

A.    I don't know.  I think people came in and out.  Certainly

the administrative team.  Might have had Mrs. Weaver and

Mrs. H███████ in, Mrs. F█████████.  I'm just not sure.

Q.    Okay.  Was there anyone -- first of all, when you use the

term "administrative team," what does that mean to you?

A.    Mr. F██████, the three assistant principals, including

myself, sometimes Mrs. Weaver, it depends on the situation.

Q.    Okay.  So the assistant principals, the principal, and

sometimes the director of student services?

A.    Yes.

**Q.**    And do you know during that meeting whether Mr. H███ and Ms. T████ were there the whole time with you?

**A.**    People were in and out because we would say go get your student statements.  I would be working with one person trying to kind of take notes and get it all in, and somebody would not be there.

**Q.**    Understood.  Now, you testified -- Mr. Bates reminded you that it was in the context of Mr. Kappatos, and he said that Mr. Kappatos put together a statement about a ball-throwing incident.  Do you remember that?

**A.**    Yes.

**Q.**    I think he asked you how that came about, and correct me if I'm wrong, your testimony was that you had -- Mr. H███ had gone around and asked to get these sort of typed-up statements in connection with this memo?

**A.**    I think what I said was I wasn't sure who did it.  It might have been me; it might have been Mr. H████.

**Q.**    Okay.  Fair enough.

**A.**    It might have been Mrs. T████.  I'm just not sure who got the statements.  I know we needed them.

**Q.**    Right.  And the purpose of the statements was to help you complete what we have up on the screen.

        MR. BRENNER:  You can take that down, Mr. Brown.

        THE WITNESS:  The purpose of the statement was to make sure that the summary that I was doing was accurate.

1     BY MR. BRENNER:

2     **Q.**     Right.  Yeah, I didn't mean to suggest otherwise.

3          The B.R. incident summary, you were getting the

4     statements in connection with that in the middle part of

5     February of 2012?

6     **A.**     It was on the 13th.

7     **Q.**     On the 13th.  You got all the statements on the 13th?

8     **A.**     I might have gotten them on the 14th, but we had to turn

9     that in right away.

10    **Q.**     Right.  You remember you got a statement from

11    Mr. T█████?

12    **A.**     T█████, yes.

13    **Q.**     T█████, excuse me.  You got a statement from Ms. Weaver?

14    **A.**     No.  That was a contemporaneous document from when she

15    met with the parents in December.

16    **Q.**     Okay.  When she met in December?

17    **A.**     Yes.  It's dated.

18    **Q.**     Ms. Estrella?

19    **A.**     Yes.

20    **Q.**     Mr. Kappatos?

21    **A.**     Yes.

22    **Q.**     Ms. T████?

23    **A.**     We don't have a written statement from Ms. T███.

24    **Q.**     You don't?

25    **A.**     I don't believe so.

1   **Q.**    Okay.  Let's put up --

2        MR. BRENNER:  Your Honor, these are all in evidence, and I

3   would just like to publish them quickly.

4        THE COURT:  You may.

5        MR. BRENNER:  The first one's -- the first one I'm going

6   to put up is Ms. Weaver.

7        THE COURT:  What number is that?

8        MR. BRENNER:  I'm sorry, DX-138.

9        THE COURT:  You may publish.

10        MR. BRENNER:  May I publish?

11        THE COURT:  You may.

12   BY MR. BRENNER:

13   **Q.**    Okay.  So that one is Ms. Weaver's statement?

14   **A.**    Yes.

15   **Q.**    And you say it's dated, but it's actually --

16   **A.**    Well, she said she did it contemporaneously in her

17   testimony, I believe.

18   **Q.**    Is that your recollection, that hers was done --

19   **A.**    I don't know.  I -- if she said she did it at the time,

20   that's what I'll credit.

21        MR. BRENNER:  Okay.  Let's go to the next one, which will

22   be Ms. Estrella, I'm sorry, DX-227.

23        THE COURT:  You may publish.

24   BY MR. BRENNER:

25   **Q.**    Okay.  Not dated, but you would say it's February 13th or

1   14th?

2   **A.**     Yes.

3   **Q.**     Okay.  And is it your testimony that -- well, what is

4   your testimony?  Did Ms. Estrella sit down at your computer and

5   type this, or how did that work?

6   **A.**     No.  As I said before, teachers don't have time to sit

7   down with us, and so someone asked her, you know, when she had a

8   chance during the day to sit down and write that up.

9   **Q.**     Okay.  And then the next one we'll look at is PX-545.

10  Again, pretty similar looking as far as the formatting, right?

11  **A.**     Yes.

12  **Q.**     Okay.  And that's from Mr. T██████ -- or T██████, I'm

13  sorry, my bad.

14  **A.**     Yes.

15  **Q.**     And your testimony is Mr. T██████ did this independent of

16  Ms. Estrella, and also did it on February 13th or 14th?

17  **A.**     We got them then.  We asked for it and got it within a

18  day or so.

19  **Q.**     If we could go to DX-205.  That one is Mr. Kappatos,

20  right?

21  **A.**     Correct.

22  **Q.**     And you think that was done also February 13th or 14th?

23  **A.**     I believe so.

24  **Q.**     Okay.  And then we can do -- and that's all in

25  anticipation of getting your memo to Dr. Zuluaga, right?

1    **A.**    Yes.

2    **Q.**    You know there was another meeting with Dr. Zuluaga -- or

3    do you know that there was another meeting with Dr. Zuluaga and

4    the family in August of 2012?

5    **A.**    I was not at Rachel Carson at that time.

6    **Q.**    Are you not aware of that meeting?

7    **A.**    Well, it's been brought up.

8    **Q.**    Other than from the courtroom, I'm sorry.

9    **A.**    No, no.

10   **Q.**    Okay.  Let's look at Ms. T██████, 229.  Also same --

11   exact same formatting, right?

12   **A.**    That one's from August.

13   **Q.**    Right, that one's August.  So you think that one -- you

14   think this one was -- you think the others were all done in

15   February, and this one was done in August?

16   **A.**    Well, I know -- I used the other ones to do this incident

17   report.

18   **Q.**    All right.  The other witnesses have been asked -- it's

19   an unusual thing for teachers to do these types of statements,

20   correct?

21   **A.**    Yes, but not unheard of.

22   **Q.**    Okay.  Now, the incidents report, the B.R. incidents

23   report is divided up into four separate issues, right?

24   **A.**    Yeah.

25   **Q.**    And Issue Number 1 is the -- as far as date is concerned,

1    it's the November 21-22 area, right?

2    **A.**    Yes.

3    **Q.**    Okay.

4         MR. BRENNER:  If we just could pull up, Your Honor, and

5    publish Plaintiff's Exhibit 77 already in evidence.

6         THE WITNESS:  You may.

7    BY MR. BRENNER:

8    **Q.**    Are you familiar with that document?

9    **A.**    Yes.

10   **Q.**    You would have reviewed that document in connection with

11   doing the incidents memo?

12   **A.**    Yes.

13   **Q.**    This is the document that -- was this the document that

14   set forth at least in a written form B████ complaints in the

15   November 21 timeframe?

16   **A.**    Yes.

17   **Q.**    Now, in there, and the jury has seen this, so we won't

18   belabor it, but B████ identifies three students that she says

19   are engaged in misconduct towards her, correct?

20   **A.**    Correct.

21   **Q.**    And that's J.O., right?

22   **A.**    Yes.

23   **Q.**    C████████?

24   **A.**    Yes.

25   **Q.**    And David N.?

```
1    A.    Yes.

2    Q.    Okay.  She says that they are -- well, not -- she says

3    that C████████ and David are the ones that are bothering her at

4    her locker, right?

5    A.    Yes.

6    Q.    She says that David and J.O. are the ones that are

7    spreading -- that J.O. is the one that's calling her names,

8    right?

9    A.    Yes.

10   Q.    Bitch and whore, right?

11   A.    Yes.

12   Q.    Okay.  And David is spreading rumors about her

13   promiscuity; is that fair to say?

14   A.    Yes.

15   Q.    Okay.  And on the second page, if we can go to the second

16   page, please, she identifies specific witnesses, right?

17   A.    Correct.

18   Q.    Okay.  Now, you weren't personally involved in

19   investigating this, correct?

20   A.    Correct.

21   Q.    Your involvement comes in February in connection with the

22   incidents memo?

23   A.    Yes.

24   Q.    Okay.  You were tasked, and I think you said -- you can

25   take that down, please -- you were tasked by Mr. F████████ to
```

1    produce an accurate account of everything related to B███ over

2    the few months that led up to February 2012, right?

3    **A.**    Correct.

4    **Q.**    Okay.  Essentially, the task was to compile all the

5    school's responses to the concerns she had raised, right?

6    **A.**    Yes.

7    **Q.**    It was your goal to make it as accurate as possible?

8    **A.**    Yes.

9    **Q.**    It was because it was intended to be the record of the

10   school's response?

11   **A.**    It was intended to inform the cluster superintendent what

12   we had done.

13   **Q.**    Of the school's response, correct?

14   **A.**    Yes.

15   **Q.**    You did not leave anything out of the document?

16   **A.**    Again, it was a summary, so there are places where I

17   summarized what had happened.

18   **Q.**    You did not interview any students in creating that

19   document?

20   **A.**    No.

21   **Q.**    You don't remember interviewing any teachers in creating

22   that document?

23   **A.**    Um, I don't think we actually interviewed any teachers.

24   **Q.**    You don't remember interviewing the school resource

25   officer?

```
 1    A.     I don't remember, no.

 2    Q.     You never talked to B█████ directly about the contents of

 3    that document?

 4    A.     She was not in school at the time, and this was not about

 5    B█████, per se.  It was about our response.

 6    Q.     It was about the school's response to B█████?

 7    A.     Right, right, but it wouldn't have been appropriate --

 8    Q.     You didn't talk to her parents about it, correct?

 9    A.     No.

10    Q.     Now, you did talk to Mr. H█████ about it?

11    A.     Yes.  He was involved in putting it together.

12    Q.     You talked to Ms. T█████ about it?

13    A.     Yes.

14    Q.     And what you did is when you completed your draft, you

15    sent it to Ms. T█████ and to Mr. H█████?

16    A.     Yes.

17    Q.     So they could review and approve it?

18    A.     Just to make sure it was accurate from their experience,

19    yes.

20    Q.     Okay.  And you ultimately sent the document to

21    Mr. F████████, right?

22    A.     Yeah.

23    Q.     Okay.  And then ultimately it got sent on to Dr. Zuluaga?

24    A.     I sent it to --

25    Q.     Mr. Zuluaga?
```

1    **A.**     No, to Jane Dreyfuss.

2    **Q.**     Jane Dreyfuss, who worked with Dr. Zuluaga?

3    **A.**     Yes.

4    **Q.**     Okay.  Now, if we could go to DX-200, again.  Do you have

5    it up there in your book?

6    **A.**     I haven't used my book yet.

7             THE COURT:  It's also on the screen.

8    BY MR. BRENNER:

9    **Q.**     All right.  Well, we can go to the text on the screen,

10   either one.

11   **A.**     Okay.

12   **Q.**     So, you know that -- we looked at before the -- we looked

13   at before the B███ statement, and she had identified three

14   specific witnesses, right?

15   **A.**     Yes.

16   **Q.**     And that was A.J., M.J., and J.H.?

17   **A.**     Yes.

18   **Q.**     There's no mention in this memo of anyone ever speaking

19   to A.J., M.J., or J.H., correct?

20   **A.**     Not by name.

21   **Q.**     Not by name?

22   **A.**     Right.

23   **Q.**     Okay.  So, you did name in your memo the people -- you

24   did name the students that were -- you did name the students

25   that were talked to, right?  For example, J.O. is named by name,

1    correct?

2    **A.**    Yes.

3    **Q.**    It says, "We talked to J.O.; this is what she said,"

4    right?

5    **A.**    Um-hmm.

6    **Q.**    It says, "We talked to C.K.; this is what he said"?

7    **A.**    Yes.

8    **Q.**    It says, "We talked to O.B.; this is what she said"?

9    **A.**    Yes.

10   **Q.**    It says, "We talked to D.N.; this is what he said"?

11   **A.**    Yes.

12   **Q.**    It says, "We talked to D.M.; this is what he said"?

13   **A.**    Yes.

14   **Q.**    It does not say, we talked to A.J.; this is what he said?

15   **A.**    No.  It says she interviewed witnesses, I believe.  Now,

16   I would have to read this if you want to give me time to do

17   that.

18   **Q.**    If you -- if you're not comfortable with your -- you can

19   look if you see any mention of A.J.

20   **A.**    You know, I don't know if it's in there.  I know that we

21   put in the critical pieces there, because this is a summary.

22   **Q.**    Right.  So let me make sure -- well, first of all, let me

23   just complete the string there.  No mention of M.J., which is

24   another witness --

25   **A.**    I don't know.  I mean, if you want me to look at it, I

1    will do that.

2    Q.    Yes.  I just need to repeat my question for the court

3    reporter.

4    A.    I'm sorry.

5    Q.    No, you're doing fine.

6          In DX-200, there's no mention of speaking to M.J., who

7    was one of the witnesses specifically identified by B█████,

8    correct?

9    A.    I am not sure.  I haven't memorized this incident report.

10   Q.    Okay.  To your memory, there's no mention in DX-200 of

11   anyone speaking to J.H., another witness specifically identified

12   by B████?

13   A.    I don't know.  I would have to --

14   Q.    You were here when Ms. T████ testified.  She said, not

15   only did she speak with those three, she spoke with -- I think

16   she said up to a total of a dozen people, right?

17   A.    I don't know how many she said.

18   Q.    Well, in your memo, there's no one else mentioned that

19   Ms. T████ spoke to other than J████, C.K., O.B., D.N., and D.M.;

20   correct?

21   A.    Those are the ones that are specifically mentioned, yes.

22         MR. BRENNER:  Now, in your -- if we could go to PX-77

23   again, Your Honor.

24         THE COURT:  PX-77.  You may publish.

25         MR. BRENNER:  Thank you.

BY MR. BRENNER:

**Q.**     So, if you look about -- it's about half the way down

where it starts with the word "J████." Do you see that?  Maybe

two lines above the D.M.?

**A.**     Yes, I see that.  Yes.

**Q.**     And just to recall, it says:  J███ O. calls me a bitch

and makes offensive wall posts on my Facebook, calling me bitch

and whore," right?

**A.**     Yes, that's what it says.

          MR. BRENNER:  Can we take that down and bring up

Plaintiff's Exhibit 529, Your Honor, which is also in evidence.

          THE COURT:  You may.

          MR. BRENNER:  May I publish?

          THE COURT:  You may.

BY MR. BRENNER:

**Q.**     This is a statement for C██████ for that incident,

right?

**A.**     Yes.

**Q.**     He confirms -- well, he confirms that he -- well, not --

he says that at the very bottom that J████ called B████, saying

she was a slut, right?

**A.**     He says he thinks that, yes.

**Q.**     Okay.  By the way, Ms. T████ said this, too.

          Is the fact that he wrote "I think" mean you would

disregard his statement?

1    **A.**    No, you would ask about that in an interview.

2    **Q.**    Now, she also -- she also says that D.N. -- I think he

3    starts with D.N. -- called her back and said, "Leave me alone,

4    and you're a whore and a slut," right?

5    **A.**    That's what it says.

6    **Q.**    Now, if we can take that down and go back to DX-200.

7    You confirm in there, do you not, that B███ was being

8    called names, right?

9    **A.**    I reported what is in those statements.

10   **Q.**    Well, kind of.  You reported what B███ said, but what

11   you reported what the others said, you leave out the sexual term

12   "slut" and "whore," and you just say that J███ called her a

13   bitch, right?

14   **A.**    That's what it says there, yes.

15   **Q.**    Right.  So you left out -- you -- was it inadvertent that

16   you left out the "slut" and "whore" part, or what is that on

17   purpose?

18   **A.**    I was trying to summarize what had happened.  It's much

19   less detailed than the part that I did because that was at that

20   time, and I had records of all those things.  So they were

21   talking about things that happened some months before.

22   **Q.**    Well, you have a situation here where you have a student

23   saying people are calling her a slut and a whore.  You have the

24   other students saying, yes, people are calling her a slut and a

25   whore, and you chose --

```
 1        MR. BLANCHARD:  Your Honor, objection, that's

 2   mischaracterization.

 3        THE COURT:  Stay within the confines of her response and

 4   ask questions consistent with that.

 5        MR. BRENNER:  Could we put up 529 back up, Your Honor,

 6   please.

 7        THE COURT:  You may.

 8   BY MR. BRENNER:

 9   Q.   Can you confirm for me in C███████ statement that he

10   says that B███ is being called a slut and a whore?

11   A.   I'm confused now.  Okay.  So, yes.

12   Q.   Okay.  Okay.  And can you confirm for me that, when you

13   write up DX-200, which is the incidents memo, you leave out

14   those terms?

15   A.   I did not intentionally leave them out.

16   Q.   Okay.  I didn't ask intentionally.  I will ask you that.

17   Let's just get the facts first.

18   A.   Okay.

19   Q.   Can you confirm for me that, when you write it up, you

20   leave the term "slut" and "whore," what the other students were

21   confirming, were left out of the memo?

22   A.   Yes, they're not in the memo.

23        MR. BLANCHARD:  Objection.

24        THE COURT:  Ma'am, is it your testimony that the verbiage

25   in the first exhibit that you saw is not the same verbiage in the
```

1    report that you wrote?

2         THE WITNESS:  Yes.

3    BY MR. BRENNER:

4    **Q.**    Okay.

5         MR. BLANCHARD:  For the record, my objection is he says

6    "confirming," and both of those statements he's pointing to the

7    witnesses are saying I think someone else did this.  So when he

8    uses the word "confirming" --

9         THE COURT:  Well, the documents speak for themselves, and

10   as I said, I would appreciate it if the questioning and the

11   answering is germane to the exchange we're supposed to be having

12   with regard to these things.  We just need to be consistent.

13        I would ask you, Mr. Brenner, don't try to put words in

14   her mouth, and I'm asking you, ma'am, listen to the questions and

15   answer them as best you can.

16        MR. BRENNER:  Your Honor, can I bring back up PX77 again?

17        THE COURT:  You may.

18        He's trying.

19        MR. BRENNER:  I know.

20   BY MR. BRENNER:

21   **Q.**    If you could just -- Ms. B████, if you could just focus

22   on the very bottom of the statement there.

23   **A.**    Um-hmm.

24   **Q.**    Even under -- it even appears under the signature line?

25   **A.**    Yes.

```
 1    Q.     Okay.  At least according to B████, what she's saying in

 2    this statement is that the stuff she's describing in 77 in this

 3    statement started about three weeks ago and got really escalated

 4    two weeks to present, right?

 5    A.     Yes.

 6    Q.     Okay.  And you know -- is it your testimony that the

 7    first the school heard of anything like what's in 77 that B████

 8    was complaining about was at the time of this November 21

 9    statement?

10    A.     That's my understanding, yes.

11           MR. BRENNER:  Now, if we could bring up, Your Honor,

12    PX-529 again?

13           THE COURT:  You may.

14    BY MR. BRENNER:

15    Q.     When C███████ does his statement, he also said -- and

16    I'm just reading from the top, when he's describing what's

17    happening or what he's observing, he says, "About a month ago

18    David came up to me in the hallway and said that B████ gave me a

19    hand job and a blow job," right?

20    A.     Yes.

21    Q.     Basically the same thing B████ is saying in 77; right?

22           MR. BATES:  Objection, mischaracterizes --

23           THE WITNESS:  I'm not sure that's the same thing.

24    BY MR. BRENNER:

25    Q.     Okay.  We'll go back to 77.
```

```
 1        B███ says on the bottom, "David Neill says I gave him

 2   oral sex," so that part -- those two statements, "oral sex" and

 3   "blow job," did you understand those to be the -- talking about

 4   the same thing?

 5        MR. BATES:  We would just ask that Mr. Brenner read the

 6   full sentence into the record and not half the sentence, and

 7   maybe that will help.

 8   BY MR. BRENNER:

 9   Q.   Sure.  "David Neill said I gave him oral sex, which is

10   completely false, and I sent him naked pictures, which, again,

11   isn't true."

12        MR. BATES:  That's not the full sentence.  It starts

13   before that.  There's no period before that.

14        MR. BRENNER:  Okay.  I'll read the whole sentence with

15   Your Honor's indulgence?

16        THE COURT:  Go ahead.

17   BY MR. BRENNER:

18   Q.   "J.O. calls me bitch and makes offensive wall posts on my

19   Facebook, calling me bitch and whore.  On DM bus, he told

20   everyone David Neil said that I gave him oral sex, which is

21   completely false, and I sent naked pictures which, again, isn't

22   true."  Okay?  Did I read that right?

23   A.   I see that sentence, yeah.

24   Q.   So both B███ statement and C███████ statement talk

25   about, starting sometime either a month before or a few weeks
```

1    before, that rumors were going around that she gave David Neill

2    oral sex?

3    **A.**    I don't think that C█████ said there were rumors going

4    around.  He said David Neill told him.

5    **Q.**    Okay.  So, on the one statement David -- B████ is saying

6    people are saying, and the distinction you're drawing is that

7    you think that David just told him?

8    **A.**    You know, I was not involved in this investigation, and

9    you're asking very detailed questions about it, so I'm not sure

10   that I'm the right person to answer those questions.

11   **Q.**    Well, did you capture this in your incident report?

12   **A.**    I did not re-investigate the incidents.  I summarized

13   what the administrators -- they brought and they talked through

14   what they had from three or four months before.  So I think

15   you're just asking the wrong person about all these details.

16   **Q.**    Will you confirm for me in your incidents memo, your

17   memo, that you make no reference to the misconduct -- the

18   alleged misconduct taking place towards B███ having started

19   either weeks or a month before November 21st.

20   **A.**    I don't remember that being in there.

21   **Q.**    Right.  If you read your memo, it would indicate that

22   everything started on or about November 21st, right?

23   **A.**    That's the first report we got.

24   **Q.**    Okay.  You heard Ms. F█████████ testimony, did you

25   not?

```
 1    A.      Yes.

 2    Q.      And she said that she met with B███ -- found a crying

 3    B███ in October.  Do you remember that?

 4    A.      I'm not sure it was October.

 5    Q.      You're not sure she said it, or you're not sure --

 6    A.      I'm not sure if it was October or not.  I don't remember

 7    when it was.

 8    Q.      Okay.

 9    A.      But she did not say that B███ reported bullying and

10    harassment at that -- in that instance.

11            MR. BRENNER:  Okay.  You can take that down, please,

12    Mr. Brown.

13    BY MR. BRENNER:  Incident Number 2, you also -- we're going back

14    to the incidents memo.  Just so you know, so when I say Incident

15    Number 2 or Incident 2, I'm talking about in that memo.

16    A.      I've got the memo.

17    Q.      Okay.  You weren't involved in investigating that?

18    A.      No.

19    Q.      And you weren't involved in investigating Issue Number 3,

20    correct?

21    A.      Let me make sure I have the right incident numbers here.

22    Q.      Sure.

23    A.      Incident Number 2.

24            Yeah, I was not involved in the investigation of that.

25    Q.      Right.  The only one that you were involved in directly
```

1    was incident -- Issue Number 4, Incident Number 4?  -

2    **A.**    Yes.

3    **Q.**    Okay.  So let's talk about that one.  So Incident

4    Number 4 involves two separate things, right?  One, it involves

5    the B.F. or the Ben issue?

6    **A.**    Um-hmm.

7    **Q.**    And the other thing it involves is the alleged threat of

8    physical harm or death threat?

9    **A.**    Yes.

10   **Q.**    Okay.  And those are both lumped together in Issue

11   Number 4?

12   **A.**    Yes.

13   **Q.**    Okay.  And they're lumped together, I assume, but correct

14   me if I'm wrong because they happened on the same day or the

15   same --

16   **A.**    Yeah, it was all kind of happening at the same time.

17   **Q.**    And you get involved in Issue 4 because Ben is your --

18   you're assigned his group or support his group?

19   **A.**    Yes.

20   **Q.**    Okay.  Now, what's going on at the same time when Issue

21   Number 4 happens is when the family has now for the first time

22   gone, so to speak, outside of the school.  They've gone to the

23   higher-ups to the superintendent's office; right?

24   **A.**    These things were reported before that happened.

25   **Q.**    Correct.  They were reported on -- I think you said

1    something was on the 8th but then the --

2    **A.**    No, just the 9th.

3    **Q.**    Just the 9th?

4    **A.**    They were both reported on the 9th.

5    **Q.**    But one of the things happened on the 8th?

6    **A.**    Well, part of one of the things happened on the 8th.

7    **Q.**    Right.  Just so we're on the same page, there was an

8    incident at lunch time on the 8th?

9    **A.**    That continued into the cafeteria on the morning of the

10   9th.

11   **Q.**    For breakfast?

12   **A.**    Yes.

13   **Q.**    And then the death threat incident happened on the 9th?

14   **A.**    It was reported on the 9th, yes, yes.  Yes.

15   **Q.**    Okay.  I'm not trying to trick you, I promise.

16   **A.**    No, I know, I'm just trying to --

17   **Q.**    I'm just trying to set the date --

18   **A.**    Because things were going back and forth and back and

19   forth all day long.

20   **Q.**    Sure.  But at the same time is also when -- meaning the

21   same time, by the 10th that the family has gone to the

22   superintendent's office?

23   **A.**    I think it was the 13th, but I'm not sure.

24   **Q.**    Okay.

25   **A.**    You know, so --

1    **Q.**    Let me see if I can find it for you.

2    **A.**    We got notification of it of the 13th, I think.  So

3    Mrs. R███████ may have told us on the 10th that she was going.

4    **Q.**    Say that again.  I'm sorry.

5    **A.**    I say, Mrs. R███████ may have told us on the 10th that she

6    was going.  I don't remember.

7    **Q.**    Right, right.  And it's kind of a big deal when a student

8    gets pulled from school and they go to the superintendent's

9    office.  That's not an everyday event, right?

10   **A.**    Well, we didn't know she was pulled from school at that

11   point.  Sometimes people go to the superintendent's office.

12   **Q.**    That's something that certainly got the attention of

13   Mr. F████████, right?

14   **A.**    Well, yeah.

15   **Q.**    He called you in because you're -- he called you in to do

16   a full write-up of it, right?

17   **A.**    He called us all in, and then I wound up doing the

18   write-up.

19   **Q.**    You got charged with the primary responsibility of being

20   the person to be in charge of the effort; is that fair to say?

21   **A.**    I'm not sure how that happened.  I might have just

22   started typing.

23   **Q.**    Okay.  Part of the reason he pulled you in, you told us,

24   is because you were a copious notetaker?

25   **A.**    I think so, yeah.

1    **Q.**    Right.  And you took a bunch of notes, right?

2    **A.**    I did.

3    **Q.**    Those notes don't exist anymore, right?

4    **A.**    Some of them do, and some of them don't.  Do you want me

5    to go through the types of notes I took?

6    **Q.**    Well, let me just ask you:  You had notes related to the

7    preparation of this memo that were not retained when you retired

8    in 2016?

9    **A.**    I believe what I said in my deposition was I thought that

10    I typed the notes into the document on my laptop.

11    **Q.**    So, you think when you were interviewing or talking to

12    the administrators and gathering information, you only took

13    notes into the laptop?

14    **A.**    I was sitting right in front of my laptop typing.

15    **Q.**    Typing notes or typing the document?

16    **A.**    Typing notes, but the way I write is I put the notes in,

17    and then as I eliminate a note, I take it out and, you know,

18    once I incorporate it into the narrative, then I take the note

19    out.  So I would want to make sure that everything that I had

20    taken was included.

21    **Q.**    Okay.  So, the R████ on -- the 10th, the school

22    knows -- excuse me, the R. family is either going or has gone to

23    the superintendent's office?

24    **A.**    I don't know when the school found that out.

25    **Q.**    Okay.  And you would agree with me the -- and then,

1    although the investigation of the -- what we'll call Issue

2    Number 4 had begun on the 9th, you would agree with me that it

3    kicks into overdrive on the 10th and afterwards?

4    **A.**    No.

5    **Q.**    Okay.  You take 12 statements --

6    **A.**    Right.

7    **Q.**    -- from students on or after February 10th, right?

8    **A.**    Right.

9    **Q.**    Okay.  This is for an incident where two kids had a

10   verbal exchange of profanity in a lunch line?

11   **A.**    Right.

12   **Q.**    Okay.  And for that statement, now that when you're in

13   the process of putting together your memo for the

14   superintendent, you take 12 student statements?

15   **A.**    Yes.

16   **Q.**    You draw diagrams, right?

17   **A.**    Yes.  That -- that was how I approached these kinds of

18   things.

19   **Q.**    Right.  If one were to go back and look at the

20   note-taking or anything regarding any of the incidents before

21   the superintendent was involved, they'd find nothing like the

22   Ms. B████ investigation that takes place on February 10th?

23   **A.**    I don't think that's correct.

24   **Q.**    For example, Ms. T████ claim that she spoke with up to

25   ten other students reflected nowhere in notes; you have never

1    seen those, right?

2    **A.**    I -- no.

3    **Q.**    Right.  There's no statements from students, these

4    students that Ms. T███ said she talked to, correct?

5    **A.**    She didn't need to take statements because they didn't

6    have anything to report is what I was told.

7    **Q.**    So if the student says, as B███ did, these people

8    witnessed what happened to me?

9    **A.**    Yes.

10   **Q.**    And you went to that student and they said, I did not

11   witness that?

12   **A.**    Yes.

13   **Q.**    You would say to them, we don't need to take a note of

14   that because they have nothing to say.  Is that your testimony?

15   **A.**    That was common, yeah, with kids.

16   **Q.**    Okay.  So, there could be --

17   **A.**    Again, I didn't investigate that, so, you know --

18   **Q.**    Well, I'm just asking you, because you did -- you asked

19   them to bring you all your notes, all the student statements,

20   right?

21   **A.**    Yes.

22   **Q.**    So on this Incident Number 1, Ms. T███ brought you no

23   student statements beyond the ones we already went through?

24   **A.**    She brought me all the student statements she had taken

25   was my understanding.

1   **Q.**    Correct.

2   **A.**    Yes.

3   **Q.**    The J████, the David, the D.M., the C██████, and the --

4   **A.**    The Olivia.

5   **Q.**    -- Olivia, right?

6   **A.**    Um-hmm.

7   **Q.**    She didn't bring you notes that said, I talked to all

8   these people, and here's what they said?

9   **A.**    No.  She told me that.

10  **Q.**    She told you.  There's no record of it.  She was telling

11  you that?

12  **A.**    Yeah, I don't know what her system is for keeping track

13  of things.  I have a very different system from the other

14  administrators.

15  **Q.**    Okay.  Let's talk a little bit about --

16          MR. BRENNER:  Can I see -- can you bring up -- is it 220,

17  PX-220?  Your Honor, can I publish DX-220?  I believe it was

18  admitted during direct examination.

19          THE COURT:  You may.

20          MR. BRENNER:  Am I right about that?  Okay.

21  BY MR. BRENNER:

22  **Q.**    Okay.  So this is -- you talked to Mr. Bates about this,

23  right?

24  **A.**    Yes.

25  **Q.**    We'll call him K.M., what K.M. -- and K.M. was a boy, did

```
 1   you say?

 2   A.     A friend of Bellami's, yes, sir.

 3   Q.     A boy, though?  I just want to get --

 4   A.     Yes.

 5   Q.     What happened with K.M. was that you -- you gave him a

 6   warning because he was telling people that people were

 7   threatening to jump B███, right?

 8   A.     Yes.  And this was related to the supposed Facebook

 9   hacking.

10   Q.     Well, what you write is:  "Spreading rumors about kids

11   'jumping' B█████," right?

12   A.     Yes.

13   Q.     So a student is telling you he's hearing rumors that kids

14   are saying that people are going to jump B█████?

15   A.     No.  That's not what this means.

16   Q.     Okay.

17   A.     Okay.

18   Q.     Okay.  Let's go to 221.

19          MR. BRENNER:  Your Honor, may I publish?

20          THE COURT:  You may.

21   BY MR. BRENNER:

22   Q.     You talked with about this with Mr. Bates, too.  If you

23   go to the next page --

24          MR. BRENNER:  And can we make that just a little bigger?

25   Thank you.
```

1  BY MR. BRENNER:

2  **Q.**    Okay.  So you talked about this.  This is J███, the jury

3  heard from her.  She was the former student who was pregnant

4  when she testified, so she's memorable?

5  **A.**    Yes.

6  **Q.**    And you remember she testified that the quote-unquote

7  rumors she was being suspended for is she was reporting the

8  issues, the, um -- the, um, sexual and other rumors that were

9  being spread about B████, right?

10 **A.**    Say that again.

11 **Q.**    Sure.  What J████ said -- J████ testified about being

12 suspended for this, right?

13 **A.**    Um-hmm.

14 **Q.**    And her testimony was that what the quote-unquote rumors

15 that was she was reporting what was being said about B████?

16 **A.**    I remember her saying several times that they weren't

17 rumors because they were true.

18 **Q.**    Okay.

19 **A.**    But you're conflating two things.  There are

20 investigations of what the rumors are saying, and then there

21 are -- and this is a consequence of the students not stopping

22 spreading the rumors.  So they're two different things.  It

23 doesn't mean we didn't investigate what they were spreading

24 rumors about.

25 **Q.**    Okay.  In all of your statements that you took -- and

1    this document is dated what, February 15th, so this is right in

2    the middle of your investigation of Incident Number 4?

3    **A.**    Yes.

4    **Q.**    Is that true?

5    **A.**    Tell me what the date is again.

6    **Q.**    2-15.

7    **A.**    Yes.

8    **Q.**    Okay.  Did you -- did you open an investigation into

9    whether what J█████ was saying were rumors were true?

10   **A.**    I was investigating the whole thing.

11   **Q.**    Okay.  Now, you took a statement from Co.K. about the Ben

12   incident, Co.K. meaning Mr. K██ --

13   **A.**    Um-hmm.

14   **Q.**    -- right?  Now, Mr. K██ then testified that he wrote a

15   second statement.  Do you remember that?

16   **A.**    Yes.

17   **Q.**    And you don't -- you have no memory of that, right?

18   **A.**    No memory or record.

19   **Q.**    Okay.  We'll get to that in a -- okay.  And he said the

20   second statement was about this stuff, he was saying about B████

21   being called sexual slurs, right?

22   **A.**    And I can tell you that he never reported that.

23   **Q.**    Okay.  So you keep what you call a student log, right?

24   **A.**    Yes, a discipline log.

25   **Q.**    A discipline log, excuse me.  And that log is meant to --

1    is it meant to memorialize or to record whenever you meet with a

2    student?

3    **A.**     It's for me.  It's my personal recordkeeping.

4    **Q.**     Right.  And you keep it as part of the school records?

5    **A.**     No, no.  I -- at the end of the year, we have to put all

6    our discipline files into the vault, and I just stick my

7    discipline record in there because it goes with that stuff.

8    **Q.**     Right.  It goes into the school discipline --

9    **A.**     Yeah.  So I stuck it in the -- yeah.  But that's not a

10   procedure or anything.  It's just something I did because I

11   thought it made sense.

12   **Q.**     Yeah, your personal practice?

13   **A.**     Yes.

14   **Q.**     Yeah.  I didn't mean to infer otherwise.

15          Now, at the time you were investigating the lunchroom

16   incident, and I'm going to call it the Ben incident, you were

17   aware that there were other -- that other students -- excuse me.

18   You were aware that B&#9608;&#9608;&#9608; had previously complained about

19   bullying.  We just went through that, right?

20   **A.**     Yes.

21   **Q.**     You were aware that she had previously complained about

22   being called sexual slurs?

23   **A.**     Yes.

24   **Q.**     Okay.  But as you investigated the lunch incident, you

25   treated that as a separate incident, right?

1    A.    I eventually treated it as a separate incident.  When I

2    went into it, my assumption was that this kid did this to her.

3    I mean, you don't want to assume.  You know, you kind of go into

4    it, but no, I was investigating what she told me.

5         MR. BRENNER:  Your Honor, can we bring up Plaintiff's

6    Exhibit 149, which is in evidence?

7         THE COURT:  You may.

8         MR. BRENNER:  Oh, it's not in evidence?  Plaintiff's.

9         I believe it's in evidence.

10   BY MR. BRENNER:

11   Q.    Okay.  This says C.K., but this is Mr. --

12   A.    This is Co.K, C███████████.

13   Q.    And this is the one statement you say he wrote, correct,

14   in February?

15   A.    Yes.

16   Q.    And you don't remember him after this statement writing

17   to or changing this statement, correct?

18   A.    No, I mean, I never ask a student to change a statement.

19   He did come -- I did see him again on my log.

20   Q.    Okay.

21   A.    But a good bit later.

22   Q.    You were here when he testified that you actually did ask

23   him to write a second, a third --

24   A.    Yes, I was here when he testified to that.

25   Q.    And is it your testimony that he is wrong or you're not

```
 1   sure?

 2   A.     I am sure I didn't take another statement; otherwise it

 3   would have been in my discipline file.

 4   Q.     Okay.  So let's, if we could -- if you could look in your

 5   book at 541?

 6          Are you there, Ms. B████?

 7   A.     Yes.

 8   Q.     Can you just confirm for the jury that that is, in fact,

 9   what you are referring to as your discipline log?

10   A.     Yes.

11   Q.     That is your handwriting?

12   A.     Yes.

13   Q.     Okay.

14          MR. BRENNER:  And, Your Honor, at this point we'll move

15   into evidence Plaintiff's Exhibit 541.

16          MR. BATES:  No objection, Your Honor.

17          But I'd like to note that the parties may need to confer

18   on some redactions on this document per some of the Court's

19   earlier orders.

20          MR. BRENNER:  That's fine.  And let me just show him the

21   page that I'm going to show so we don't --

22          THE COURT:  Is the page that needs to be redacted

23   implicated?

24          MR. BRENNER:  I'm going to look.  I don't think so, but if

25   I can confirm this page?
```

1          MR. BLANCHARD:  I'll wait until he finishes.

2          MR. BRENNER:  This page is okay, and we'll work with

3     counsel to put in the redactions.

4          THE COURT:  You agree, Mr. Blanchard?

5          MR. BLANCHARD:  Yes, sir.

6          THE COURT:  Okay.

7     BY MR. BRENNER:

8     **Q.**    If we could bring up just PDF page 4.  Okay.  Just to

9     orient, although we're not going to show the whole thing to the

10    jury, this starts -- if you go to the first page, starts on

11    1-23, January 23rd?

12    **A.**    Yes.

13    **Q.**    It goes through -- appears about the end of the school

14    year?

15    **A.**    Yes.

16    **Q.**    So did you keep one for each half of the school year?  Is

17    that how it worked?

18    **A.**    No.  I think the whole discipline log was -- I think they

19    just produced this part, perhaps because that's the only thing

20    that applied.

21    **Q.**    That's fine, that's fine.  So, if you would -- if we

22    could highlight the entry on March 5th that says C.K.

23         Do you see that?

24    **A.**    Yes.

25    **Q.**    You agree with me that that's Co.K. right?

1    **A.**    Yes.

2    **Q.**    And according to you, you, in fact, did meet with Co.K.

3    on March 5th?

4    **A.**    Yes.

5    **Q.**    There's no way it makes on the discipline log unless that

6    meeting happened.  You wouldn't just make it up, right?

7    **A.**    Correct, yeah.

8    **Q.**    It says "witness to bullying," and then it has B███████

9    last name right?

10   **A.**    Yes.

11   **Q.**    And then it says "added to statement"?

12   **A.**    Yes.

13   **Q.**    Does that refresh your recollection that you met with

14   Mr. K██ on March 5th and he added to his statement just as he

15   testified to?

16   **A.**    As I said earlier, I met with him twice.

17   **Q.**    Right, but you told me you only have one statement from

18   him?

19   **A.**    Right, right.

20   **Q.**    So does this refresh your recollection on March 5th that

21   he added to that statement, just as he testified to?

22   **A.**    He must have added to that statement or someone else had

23   taken his statement, and I was interviewing about that.  I don't

24   know.

25   **Q.**    You never seen a statement, either an add to or an

```
 1   additional statement on March 5th of --

 2   A.    I don't know if he added to the statement that you've

 3   already shown.  I don't remember that.

 4   Q.    Okay.  And he testified that he met with you a third time

 5   in --

 6   A.    -- He, did --

 7   Q.    -- in another statement?

 8   A.    He did.

 9         THE COURT REPORTER:  I'm sorry.

10         THE COURT:  I was getting ready to say, if you all don't

11   slow down, Scott's going to say something, so....

12   BY MR. BRENNER:

13   Q.    He testified he met with you a third time and gave you --

14   gave you an additional statement, right?

15   A.    He did testify to that.

16   Q.    And a fourth time, correct?

17   A.    He did.

18   Q.    And that his mom had to eventually call and ask that he

19   stopped being pulled out of class to give statements?

20   A.    I believe he did testify to that.

21   Q.    And the only statement you're aware of is the one from

22   February 15th?

23   A.    That I took, yes.

24   Q.    That you took?

25   A.    Yeah.  I don't know if there are other statements.
```

1    **Q.**    Well, when you did the incidents memo -- first of all, if

2    there were additional statements, by the time you did the

3    incidents memo, you would have included them?

4    **A.**    If they were about those incidents, but I don't know if

5    he was called about anything else.  If you look at this

6    discipline log, we talked to different kids about lot of

7    different things and some of them recurred.

8    **Q.**    Right.  Well, he testified what he was called about was

9    about B███, right?

10   **A.**    Yes, he did.

11   **Q.**    And this discipline log entry is about B███, right?

12   **A.**    It is.

13   **Q.**    Okay.  You can take that down, please.

14           MR. BRENNER:  Your Honor, could we approach for 30

15   seconds.

16           THE COURT:  You may.

17           (Following sidebar discussion had on the record:)

18           MR. BRENNER:  Just because I've been through this drill

19   before, I'm going to do a section on the discipline of J███,

20   which is her student.  So usually that prompts Mr. Blanchard to

21   request a sidebar, so I'm trying to get a little ahead of that so

22   we don't have --

23           THE COURT:  I appreciate that.

24           Mr. Blanchard, why don't you take a look at --

25           MR. BRENNER:  I'm going to use the one that's already in

1    evidence, this one, and I'm going to use his or her disciplines

2    of J▮▮▮▮, just one more.

3            MR. BLANCHARD:  Let me see it.  What are the dates?

4            MR. BRENNER:  This one is from elementary school, the year

5    before, and this is the --

6            MR. BLANCHARD:  This is the one -- and, Judge, here's the

7    issue I have here, is this is on 3-27-12, and that's after B▮▮▮

8    is no longer in school, and it deals with the things that we have

9    talked about that are inadmissible.

10           MR. BRENNER:  I blocked that out.  Your Honor, we've had

11   this argument many times.  She's a student at Rachel Carson

12   Middle School until March 2013, so you wouldn't let us use this

13   with other witnesses because they weren't the ones who did the

14   disciplining.  I now have the witness who's doing the

15   disciplining.

16           MR. BLANCHARD:  And, Your Honor, I think it's a question

17   of what the order in the motion in limine is.  I understood --

18   and I think the language of the order, when you wrote it, says --

19   and I may be -- I may lose this, but I think it says when she

20   leaves Fairfax County Public Schools, but I think the transcript

21   from the argument --

22           THE COURT:  -- I'm listening.  I'm multitasking.

23           MR. BLANCHARD:   When the Court was questioning -- when

24   Mr. Brenner was asking about is after his client leaves school,

25   what is an unrelated name-calling incident --

1          THE COURT:  Let me take a quick look.

2          MR. BLANCHARD:  Sure.

3          (Brief pause in proceedings.)

4          THE COURT:  This is what the order reads, and,

5     Mr. Brenner, I'm going to go to you.  It's further ordered that

6     the motion in limine by Defendant J.O. -- so this particular

7     phrase or paragraph deals specifically with J.O.  The motion is

8     granted with respect to, one, school disciplinary records that

9     relate to {indiscernible}.

10          THE COURT REPORTER:  I'm sorry, Judge.

11          THE COURT:  I'm sorry.  One, school disciplinary records

12     that relate to J.O.'s grades, health and administrative records;

13     two, general disciplinary records pertaining to J.O., except to

14     the extent that plaintiff may use the records that predate

15     plaintiff's withdrawal from Fairfax County Public Schools to

16     establish notice to defendant FCSB, and social media posts by

17     J.O. at the time of the relevant period.

18          So we're dealing with number 2, the general disciplinary

19     records pertaining to J.O., except to the extent that plaintiff

20     may use disciplinary records that predate plaintiff's withdrawal

21     from the Fairfax County Public School system to establish notice

22     to Defendant FCSB.  Okay.

23          MR. BRENNER:  She withdraws from Fairfax County Public

24     Schools in March of 2013.

25          THE COURT:  When was that?

1          MR. BRENNER:  March of 2012.

2          MR. BLANCHARD:  My point is, Your Honor, that that's why I

3     appreciate Mr. Brenner bringing this up.  We argued this.  I

4     don't think we were looking, and I think the Court was thinking

5     that it postdates the plaintiff's departure from the school.  I

6     don't know what this would have to do with --

7          (Discussion had off the record.)

8          THE LAE CLERK:  It specifically says the motion is granted

9     with respect to the School Board's policy and regulations that

10    postdate plaintiff's March 2013 withdrawal from Fairfax County

11    Public Schools unless FCPS opens the door by arguing feasibility.

12    The motion is denied with respect to School Board policy and

13    regulations that predate plaintiff's March 2013 withdrawal from

14    Fairfax County Public Schools.

15         MR. BLANCHARD:  Understood.  And what I'm saying is from

16    my client's perspective -- I don't know what this -- this has

17    nothing to do with --

18         THE COURT:  What is the specific incident?  Let me hear

19    what the specific incident is, because that may cause me to go

20    one way or another.

21         MR. BLANCHARD:  Sure.  Name-calling.

22         MR. BRENNER:  Bullying.  That's the subject.  That's what

23    she's disciplined for.  Disciplined for making dis- -- I think

24    this says anti-Semitic, Your Honor's ruling, disparaging,

25    threatening comments to and about other students in class in the

1    halls and classroom and Facebook, exactly what B█████ is claiming

2    she was doing to her.  So this is a perfect -- this is another

3    example of trying to sanitize the record, and this goes to the

4    notice to the School Board.  And if Mr. Blanchard wants to

5    propose a limiting instruction, which he has before and Your

6    Honor said he would entertain, I don't have a problem with that.

7         MR. KINNEY:  Two things, Your Honor.

8         THE COURT:  This is Mr. Kinney.

9         MR. KINNEY:  Thank you.  The plaintiff is no longer --

10        THE COURT:  Tell them they can stretch.

11        MR. KINNEY:  The plaintiff is no longer in attendance in

12   person, for purposes of my client's supervision, after February

13   9th.

14        THE COURT:  Um-hmm.

15        MR. KINNEY:  The second thing, at this point there's no

16   complaint about any conduct of J.O.  So this -- if this is

17   intended to provide notice to the School Board, it doesn't do

18   that because there was no -- there was no pending complaint about

19   J.O.

20        MR. BATES:  Your Honor, this is after she left in-person

21   schooling, so the argument that, you know, the School Board was

22   still on notice when she left, all the issues at issue in this

23   case stopped on February 9th.  The fact that they're trying to

24   bring in this discipline of a student that happened after this

25   time when she never stepped foot in school -- and I understand

1    the Court's order.

2         THE COURT:  Let me ask you this generally to all of you:

3    When the motion in limine was made, why didn't you in the context

4    of the motion in limine and in response to the motion in limine

5    focus on B.R.'s withdrawal date as opposed to some later date?

6         MR. BLANCHARD:  Your Honor, I do believe that's what I

7    argued in my brief.

8         MR. KINNEY:  I did as well, Your Honor.

9         MR. BRENNER:  I'm sorry, I don't have it.  And the School

10   Board did not because the School Board indicated the end date is

11   March 2013, which Your Honor ruled.

12        MS. REWARI:  As the person who wrote this motion in

13   limine, may I address that?

14        THE COURT:  No, no.  Mr. Bates.  I know you want to get

15   involved, but go ahead, Mr. Bates.

16        MR. BATES:  Your Honor, I think when --

17        (Discussion had off the record.)

18        THE COURT:  Just for the record, the juror needs to use

19   the restroom.  I told her to go.

20        MR. BATES:  If the issue is notice, what the School Board

21   is on notice of while she's in school, I do not understand when

22   she's out of school what that has to do with notice to the School

23   Board when there's zero interaction -- at the time that this

24   incident happens, there's no interaction with J.O. and B.R.

25   whatsoever.  We're bringing in incidents when these two hadn't

1     seen each other in months.

2          THE COURT:  The question then, I guess, for Mr. Brenner is

3     this:  When does it end?  Obviously, you're going to say March

4     2013, but are you allowed to bring in any incidents even though

5     they're unrelated to B.R. that happened after 2013?

6          MR. BRENNER:  I think it goes to March 2013, but this is

7     literally -- first of all, I believe this investigation is going

8     on in February, and it results in a suspension in March, but

9     that's up for debate because I can't tell you when it started.

10          The point of it is the idea of homebound.  The point is

11     the idea is to bring her back to school, which everyone has

12     acknowledged.  And so that's why it matters what they're doing to

13     not deal with these people.  That's why it matters what they're

14     doing when she's out on homebound.

15          THE COURT:  What is -- help me on that one, Mr. Brenner.

16     What does the fact that J.O. may have been doing some bullying,

17     or assuming, if this happens, for the sake of discussion that

18     this happens, have anything to do with B.R. while she's on

19     homebound, unless you can show that this bullying was directed at

20     B.R. while she was on homebound?

21          MR. BRENNER:  It's not directed -- the point is, Judge --

22     their position is that -- our position is that she's out on

23     homebound, right?  They clearly -- as you can see in this trial,

24     they clearly have made a decision that everything she was

25     complaining about is false.

```
 1        THE COURT:  I don't think that that's --

 2        MR. BRENNER:  A lot of it was false.  They may go with me

 3   on that one, Judge.  But the fact that now in March when she's

 4   out and they're supposed to be trying to bring her back in, they

 5   are learning -- they're learning, they're aware, they're on

 6   notice of exactly what she was complaining about.  That's who

 7   J.O. is.  I'm sorry to say it.  She was engaged in this type of

 8   conduct.  And what concerns me, and maybe I shouldn't have come

 9   to sidebar, this issue has already been decided in March 2013,

10   and we're just rehashing the same issue.

11        THE COURT:  Well, "rehashing" is a big word, too.  So I

12   think at some point then it becomes cumulative.

13        What I'm going to do is allow you to do this.  Are you

14   aware -- and you can ask this witness here, and obviously you're

15   stuck with the answer if she knows.  If she doesn't know, you can

16   try to refresh her recollection, but are you aware that post the

17   time that B.R. left traditional instruction and was on homebound,

18   that there was another incident of discipline regarding J.O.

19        MR. BRENNER:  Your Honor, if I can't say -- if I can't --

20   discipline doesn't give me anything.  I have to say what the

21   discipline is for, which is the same types of things that she was

22   accused of by B.R.  They made a big deal like, oh, C█████ was

23   playing on the bus and --

24        THE COURT:  And you got all that out pretty much.  You got

25   most of it out.  You said -- we did get to the point of what he
```

1    did on the bus, and I believe at some point you wanted to bring

2    in something about him in 1st grade saying that he had a gun.

3         MR. BRENNER:  And you didn't let that come in, and I

4    understand.  But for me to say that she was disciplined doesn't

5    mean anything.  It literally means nothing.

6         THE COURT:  Mr. Blanchard, last word.

7         MR. BLANCHARD:  Your Honor, this is subsequent conduct

8    involving other kids after the plaintiff was no longer there.

9         He's book-ending it with going back again to an unrelated

10   incident with another person, a boy in 6th grade, and then he's

11   going to put in that she was disciplined for bullying afterwards.

12   But if it's supposedly to say the school isn't doing their job

13   and they were -- and it's not safe for her to come back, this

14   record shows she was disciplined.  This proves nothing for them,

15   other than they're trying to use it as a bad act to show my

16   client was a bad actor subsequently.

17        THE COURT:  Okay.

18        MR. BLANCHARD:  It's a subsequent bad act that they're

19   trying to use unrelated to her and unrelated to notice, and it

20   shows --

21        MR. BRENNER:  Do you want to see the record?

22        MR. BLANCHARD:  -- it shows that she was disciplined.

23        THE COURT:  What date was B.R. officially removed from

24   school, from the Fairfax County Public School system, whether

25   homebound or --

1           MR. BRENNER:  March 1, 2013.

2           THE COURT:  March 1, 2013.

3           All right.  This is what we're going to do, and I know

4     this is going to make some people unhappy, but this is what we're

5     going to do.

6           I'm going to allow you to ask questions about whether or

7     not she was disciplined on March 27, 2012, what was the

8     discipline for, and who did it, but you're not going to be able

9     to get into the specifics of what it was about, and you're not

10    going to be able to get this exhibit in.

11          MR. BRENNER:  So I can ask her what the discipline was

12    for?

13          THE COURT:  Yes.

14          MR. BRENNER:  And I can refresh her recollection if she

15    doesn't remember?

16          THE COURT:  Exactly.

17          MR. BRENNER:  Judge, I don't really like keeping the jury

18    here.  I'm going to have to do redirect on Friday anyway.  I

19    prefer to stop and --

20          THE COURT:  Okay.  That's what we'll do.  And I'll tell

21    you what I will do for the defense side.  I will take another

22    look at it some time in the next two days to see if I'm going to

23    revisit it.

24          MR. BRENNER:  I should have done this before the break.

25    That's really bad lawyering.

```
 1            THE COURT:  Well, I'll take another look at it.

 2            MR. BRENNER:  Sure.

 3            MR. BLANCHARD:  Your Honor, as a preventive act, should we

 4    talk to the witness?

 5            THE COURT:  I have no problem with you saying to --

 6            MR. BRENNER:  We're not going to do it now anyway.

 7            MR. BLANCHARD:  I just don't want --

 8            THE COURT REPORTER:  I'm sorry.

 9            THE COURT:  So it will be a violation of the Court's

10    instruction to discuss the case or any aspect of the case with

11    anyone.

12            You're allowed to say to her that you believe that

13    eventually the Court is going to allow Mr. Brenner to ask you

14    certain questions about J.O. being disciplined in March of 2012.

15    You're not allowed to say what the discipline is specifically

16    about.  You're only allowed to say it related to bullying.

17            MR. BLANCHARD:  Okay.

18            THE COURT:  And I appreciate your concern of letting it

19    happen, and I'll take a look at it again, but that's where I am

20    right now.

21            MR. BRENNER:  So we're going to break now?

22            THE COURT:  Yeah.

23            (Sidebar discussion concluded.)

24            THE COURT:  You're probably thinking me standing up is a

25    good sign.  We, the lawyers and judges, sometimes have to work
```

 1    through some very difficult legal issues as we go through about

 2    presenting the case to you as laypersons, and there's some legal

 3    issue that we need to resolve, but we also think that this is a

 4    good time for you to break for the day, all right.

 5         Tomorrow -- or not tomorrow -- Friday, Friday we'll start

 6    again at 10:00.  We're working through right now a format for

 7    getting this case presented to you, but there's a lot of work

 8    that we need to do to prepare this case finally to be presented

 9    to you, and so I'll be able to provide you some additional

10    information on Friday what our timeframe looks like, okay?

11         Please remember the Court's instruction not to discuss the

12    case or any aspect of the case with anyone.  Stay away from

13    social media and print media, and we'll see you on Friday at

14    10:00.

15         (Jury out at 5:11 p.m.)

16         THE COURT:  You may be seated.

17         Mr. Brenner, you heard the Court's anticipated ruling --

18    excuse me, ma'am.  You may step down.

19         You heard the Court's anticipated rule on the issue that

20    we discussed at sidebar.  If you could, provide me the precise

21    questions that you want to ask this witness in light of what the

22    Court said so that I can be aware of it, and as I've indicated to

23    all counsel, I am giving the defense team an opportunity to speak

24    with the witness on that particular issue so she stays within the

25    framework of what the Court has decided.

```
 1          MR. BRENNER:  I assume I can just do that with copying

 2   defense counsel and sending it on to Ms. Barry?

 3          THE COURT:  Send it to Ms. Barry, and we'll look at it

 4   from there.

 5          All right, everybody, I think the sun is trying to come

 6   out, so enjoy the rest of your evening.

 7          MS. ANDERSON:  And, Your Honor, can I just confirm that

 8   we're doing exhibits Friday morning at 9:00?  It was sort of

 9   thrown out there last time, so I just want to confirm if we're

10   doing that or not doing that.

11          THE COURT:  We'll see what we see.  Ms. Armentrout and I

12   discussed this yesterday, and you all have been doing a very good

13   job of meeting with her after court each day to go over things,

14   and so I don't think the work is going to be as hard as it might

15   be if we waited until the very end to try to sort things out.

16          So any time that you have an opportunity or advantage of

17   the situation, take advantage of Ms. Armentrout, feel free to do

18   so.  She's very accommodating with regard to those kinds of

19   things.

20          MR. BATES:  Judge, pardon me.  Is it fair to assume, based

21   on your comments earlier, that there will not be a closing on

22   Friday?

23          THE COURT:  I don't think we're going to get anywhere

24   close to that.

25          MR. BATES:  Okay.  I just wanted to make clear.
```

```
1          MR. BLANCHARD:  And, Your Honor, just one request.  I was

2     wondering if my client, starting once the case goes to the jury,

3     could bring her phone.  I haven't filed a request for her to

4     bring a phone, but if she's going to be sitting around, I thought

5     I would make that request for her.

6          THE COURT:  Well, we'll do it on a trial basis.  That

7     phone better not go off.  We've had the phone go off twice.  I

8     think it's the same individual.  I won't implicate him on the

9     record, but we need to make sure that the phones are secure, and

10    as you know, in the Federal District Court, Eastern District of

11    Virginia we have basically a no phone policy, and there has to be

12    a specific order for those phones to be brought in.

13         And I'm making this determination simply because of the

14    length of the trial, the fact that people have things going on

15    that they may need to attend to, be able to deal with emergent

16    situations and the like.

17         And so for those purposes, they can be brought in, but

18    again, please try to keep the phones secure because it does take

19    away from the proceeding.

20         MR. BLANCHARD:  Then she's -- I'm comfortable that she's

21    much better with a phone than I am, and I won't take it

22    personally --

23         THE COURT:  That won't take very much.

24         MR. BLANCHARD:  I understand.  I know it doesn't give you

25    great comfort, but at least she's risen above that.
```

1        THE COURT:  People who are part of our generation are

2    possible for the past indiscretions in this particular phone

3    issue, so --

4        MR. BLANCHARD:  I don't see a need to go there.

5        THE COURT:  All right, sir.

6        MR. BLANCHARD:  But thank you, Your Honor.  Should I just

7    check with the clerk?

8        THE COURT:  Yes, check with Ms. Barry.

9        MR. BLANCHARD:  Thank you.

10       THE COURT:  No need to gavel me out.  We're done.

11       (Proceedings adjourned at 5:14 p.m.)

12                    **C E R T I F I C A T E**

13

14            I, Scott L. Wallace, RDR-CRR, certify that the
     foregoing is a correct transcript from the record of proceedings
15   in the above-entitled matter.

16

         /s/ Scott L. Wallace             4/17/24
17   ----------------------------      ----------------
     **Scott L. Wallace, RDR, CRR          Date**
18   **Official Court Reporter**

19

20

21

22

23

24

25

| $ |
| --- |

**$650** [1] - 19:19

| ' |
| --- |

**'80s** [1] - 99:25
**'jumping'** [1] - 242:11

| / |
| --- |

**/s** [1] - 265:16

| 1 |
| --- |

**1** [7] - 95:5, 11; 110:11; 219:25; 240:22; 260:1
**1,250** [1] - 110:21
**1-2-8** [1] - 160:20
**1-23** [1] - 248:11
**10** [2] - 80:8; 154:6
**100** [3] - 2:3, 7, 11
**107** [2] - 61:6
**108** [1] - 61:5
**109** [1] - 61:19
**10:00** [2] - 262:6, 14
**10:05** [3] - 1:6; 6:2, 11
**10:39** [1] - 158:19
**10:58** [2] - 159:1, 7
**10th** [13] - 99:20; 100:15; 151:6; 153:3; 154:8; 163:24; 236:21; 237:3, 5; 238:21; 239:3, 7, 22
**11** [2] - 71:3; 123:23
**111** [1] - 205:22
**112** [1] - 61:19
**113** [1] - 5:8
**116** [3] - 5:10; 142:4, 8
**11:00** [1] - 43:16
**11:01** [1] - 159:14
**11:26** [1] - 159:14
**11:30** [2] - 159:21; 160:7
**12** [12] - 50:7; 70:12; 83:8; 99:10; 100:12-14; 123:24; 128:3; 146:20; 239:5, 14
**12-year-old** [1] - 209:15
**120** [1] - 3:7
**122** [6] - 161:6-9, 12, 15
**128** [4] - 160:17, 19; 161:17, 22
**12:03** [2] - 94:7, 9
**12:08** [1] - 97:17
**12:15** [2] - 94:8; 97:15
**12:19** [1] - 97:17
**12:20** [1] - 97:19
**12th** [1] - 99:19
**13** [1] - 115:11
**131** [1] - 5:9
**13th** [11] - 163:24; 173:23; 214:11;

216:6; 217:25; 218:16, 22; 236:23; 237:2
**14** [2] - 50:5; 175:22
**14-hour** [1] - 83:8
**14-page** [1] - 176:1
**140** [1] - 110:25
**142** [1] - 5:10
**144** [1] - 5:11
**146** [3] - 64:8
**148** [5] - 5:3; 44:9, 14, 18; 46:4
**149** [1] - 246:6
**14th** [7] - 49:19; 50:15; 54:23; 216:8; 218:1, 16, 22
**15** [4] - 128:13; 180:6, 25; 181:6
**150** [3] - 5:12; 130:2, 18
**152** [2] - 5:13; 135:22
**1520** [1] - 1:21
**155** [5] - 5:6; 52:11, 16, 19; 140:14
**156** [1] - 184:18
**157** [2] - 5:14; 172:14
**159** [3] - 5:18; 178:6, 11
**15th** [2] - 244:1; 250:22
**160** [1] - 110:25
**161** [4] - 5:17; 176:6, 10, 15
**164** [1] - 5:15
**16th** [1] - 166:15
**17** [2] - 1:5; 6:1
**170** [1] - 5:16
**176** [1] - 5:17
**1775** [1] - 3:10
**178** [1] - 5:18
**18** [1] - 17:3
**1801** [1] - 3:7
**19** [3] - 99:25; 142:20; 201:9
**190** [1] - 4:15
**191** [1] - 4:16
**192** [2] - 79:16; 115:8
**193** [1] - 146:17
**194A** [1] - 116:24
**1990** [1] - 102:22
**1:00** [2] - 128:14; 182:8
**1:04** [2] - 128:16, 24
**1:19-cv-00917-RDA-WEF** [1] - 1:4
**1st** [2] - 141:14; 259:2

| 2 |
| --- |

**2** [11] - 44:22; 65:6; 95:5; 114:6; 184:20; 195:1; 234:13, 15, 23; 253:18
**2-15** [1] - 244:6
**2-28** [1] - 170:16
**20** [2] - 17:6; 68:18
**20-plus** [1] - 20:4
**20-year-old** [2] - 26:24; 27:4
**200** [3] - 70:24; 175:7; 213:23
**2001** [1] - 70:4
**2002** [1] - 101:21
**20037** [5] - 1:17; 2:15, 19, 22; 3:3

**2005** [1] - 69:24
**2005-2006** [1] - 38:3
**2006** [2] - 104:3
**2007** [1] - 192:23
**2008** [4] - 16:21; 17:8, 12, 18
**2009** [1] - 112:7
**2010** [1] - 112:7
**2011** [5] - 41:14; 43:14; 47:1; 87:19; 189:20
**2011-2012** [8] - 38:22; 83:10; 98:9; 105:12; 112:6; 133:13; 186:4; 192:14
**2012** [20] - 45:4; 47:2; 49:19; 50:5, 11; 53:1; 54:23; 96:2; 151:6; 153:3; 189:20; 190:14; 192:23; 198:6; 216:5; 219:4; 222:2; 254:1; 260:7; 261:14
**2012-2013** [1] - 38:3
**2013** [11] - 252:12; 253:24; 254:10, 13; 256:11; 257:4-6; 258:9; 260:1
**2014** [1] - 19:3
**2015** [1] - 18:6
**2016** [4] - 19:4; 69:25; 98:18; 238:8
**20190** [1] - 3:11
**20191** [1] - 3:8
**202-536-1702** [1] - 1:18
**202-955-1596** [1] - 2:16
**202-955-1664** [1] - 2:23
**202-955-1974** [1] - 2:19
**2022** [2] - 17:19, 24
**2023** [1] - 194:4
**2024** [2] - 1:5; 6:1
**2029** [1] - 1:20
**21** [3] - 1:7; 220:15; 231:8
**21-22** [1] - 220:1
**212** [4] - 5:12; 150:19, 21; 151:2
**213** [3] - 5:13; 152:18, 23
**213-995-5720** [1] - 1:22
**21st** [2] - 233:19, 22
**22** [1] - 7:25
**220** [5] - 5:15; 164:11, 14-15; 241:16
**2200** [4] - 2:15, 18, 22; 3:3
**221** [3] - 166:6; 168:22; 242:18
**222** [1] - 168:24
**223** [2] - 5:16; 170:9, 12
**22314-5798** [1] - 3:15
**227** [4] - 5:4; 47:7, 25; 48:5
**229** [1] - 219:10
**22nd** [3] - 43:14; 62:6, 21
**23** [3] - 17:4; 77:1; 116:16
**2300** [1] - 1:16
**232** [3] - 5:11; 143:25; 144:3
**233** [3] - 157:13, 24; 161:13
**23rd** [2] - 90:19; 248:11
**24** [4] - 99:9; 100:12; 101:14; 107:11
**25** [3] - 41:14; 70:25; 77:7
**25th** [2] - 42:16; 47:1
**26** [1] - 17:3
**27** [1] - 260:7
**274** [3] - 5:8; 113:6, 13
**275** [2] - 123:4

**27th** [6] - 45:20; 133:21, 25; 203:4; 204:15
**280** [1] - 126:4
**2800** [3] - 2:3, 7, 11
**281** [1] - 126:5
**283** [3] - 5:9; 131:4, 12
**29** [1] - 4:4
**2:00** [2] - 128:15, 22
**2:03** [2] - 128:24
**2nd** [4] - 2:3, 7, 11; 136:24

### 3

**3** [2] - 44:22; 234:19
**3-27-12** [1] - 252:7
**30** [5] - 70:6; 71:10; 92:18; 104:21; 251:14
**30(b)(6** [3] - 94:21, 24; 200:18
**30(b)(6)** [2] - 94:19; 200:11
**30-something** [1] - 110:7
**305-539-8400** [1] - 2:8
**31** [1] - 110:10
**31st** [6] - 18:10; 45:4, 24; 46:5; 47:2; 48:20
**33131** [3] - 2:4, 8, 12
**36** [1] - 4:5
**37** [1] - 4:7
**38** [1] - 98:23
**392** [4] - 5:5; 49:16, 22; 50:1
**393** [4] - 42:19-21; 43:5
**3:13** [1] - 180:11
**3:15** [2] - 180:9; 181:20
**3:30** [3] - 180:10; 181:3
**3:32** [1] - 181:20
**3:36** [1] - 184:7
**3:45** [2] - 180:24; 181:4
**3:50** [1] - 180:25
**3H** [1] - 118:13

### 4

**4** [13] - 52:1; 65:7; 127:2, 11; 235:1, 4, 11, 17, 21; 239:2; 244:2; 248:8
**4/17/24** [1] - 265:16
**40** [1] - 71:12
**400** [1] - 3:11
**401** [1] - 3:15
**44** [1] - 5:3
**443-584-6558** [1] - 3:16
**45** [6] - 5:14; 157:17, 19, 21, 24
**450** [2] - 111:1, 18
**47** [2] - 201:8, 11
**48** [1] - 5:4
**4:00** [2] - 57:20; 180:24
**4th** [16] - 53:3, 19; 66:12; 140:5; 141:16, 21; 155:10; 158:6, 10-11; 161:25; 162:6, 8; 163:13

### 5

**5** [3] - 127:2, 4; 195:1
**50** [4] - 5:5; 71:12; 108:17; 183:1
**504** [8] - 73:16, 20, 22, 24; 74:5, 8, 10
**504s** [1] - 72:18
**50s** [1] - 182:8
**51** [2] - 196:20; 197:4
**52** [1] - 5:6
**529** [2] - 227:11; 229:5
**541** [2] - 247:5, 15
**58** [4] - 193:11; 194:8, 18; 195:1
**5:00** [6] - 57:20; 181:5; 183:12, 15; 184:12
**5:11** [1] - 262:15
**5:14** [1] - 265:11
**5th** [15] - 155:11; 157:5, 8; 158:7; 159:19; 161:25; 162:16, 20, 25; 163:13; 248:22; 249:3, 14, 20; 250:1

### 6

**6** [2] - 79:1, 19
**60** [3] - 4:8; 180:18; 181:7
**60-second** [1] - 116:19
**60-year-old** [1] - 26:25
**608** [4] - 95:7, 21; 96:11
**608(b** [2] - 95:12, 17
**61** [5] - 39:4; 59:21; 78:1; 92:4; 114:19
**610-804-1787** [1] - 2:4
**643a** [1] - 1:17
**67** [1] - 4:9
**69** [1] - 4:10
**6:00** [2] - 84:6; 110:13
**6th** [9] - 88:2, 20; 93:11; 99:7, 10, 13, 17; 162:17; 259:10

### 7

**7** [2] - 4:3; 144:11
**70** [2] - 70:25; 71:13
**70-year-old** [1] - 27:2
**744** [1] - 63:13
**77** [6] - 41:1; 220:5; 231:2, 7, 21, 25
**78** [2] - 71:13; 73:8
**7:00** [2] - 84:5; 108:9
**7:05** [2] - 131:15; 132:1
**7:50** [1] - 108:10
**7th** [15] - 38:13, 16; 87:20; 90:1; 99:19; 100:15; 107:2; 138:10; 149:1; 151:24; 209:23

### 8

**80** [1] - 90:22
**804-788-8200** [1] - 3:4
**81** [1] - 45:11

**83** [1] - 62:17
**850-585-3414** [1] - 2:12
**87** [1] - 4:11
**88** [1] - 5:7
**8th** [13] - 38:17; 107:2; 141:6; 146:12; 149:9, 12; 151:24; 236:1, 5-6, 8

### 9

**90** [7] - 131:6, 8, 10-11; 180:18; 181:6
**90-minute** [1] - 74:1
**90067** [1] - 1:21
**93** [1] - 4:12
**944** [4] - 94:21; 95:5, 11; 96:23
**944-2** [1] - 95:15
**945** [1] - 94:22
**98** [1] - 4:14
**9:00** [2] - 182:8; 263:8
**9th** [21] - 50:10, 14; 53:1; 136:22, 24; 137:2, 4; 140:25; 141:9; 156:24; 162:4; 211:14; 236:2-4, 10, 13-14; 239:2; 255:13, 23

### A

**A.F** [1] - 3:6
**A.J** [4] - 224:16, 19; 225:14, 19
**a.m** [5] - 1:6; 6:2, 11; 159:1, 23
**A107** [1] - 39:12
**A112** [1] - 40:1
**A113** [1] - 81:2
**A115** [1] - 79:11
**A129** [1] - 78:21
**A130** [1] - 79:7
**AAP** [1] - 71:25
**ability** [2] - 136:15; 156:16
**able** [22] - 39:14; 41:20; 61:19, 21; 73:4; 91:14, 24; 96:4; 116:12; 146:5, 7; 152:1; 156:9; 163:17; 168:11; 179:19; 182:5; 184:13; 260:8, 10; 262:9; 264:15
**abnormal** [1] - 28:7
**abnormalities** [1] - 24:6
**abnormality** [1] - 23:20
**above-entitled** [1] - 265:15
**abrenner@bsfllp.com** [1] - 2:9
**absence** [3] - 43:3; 47:5; 62:24
**absolutely** [5] - 56:21; 87:6; 97:12; 189:5, 8; 191:5
**abuse** [2] - 100:4; 127:12
**academic** [2] - 70:19; 187:21
**Academy** [1] - 16:11
**accept** [3] - 32:12; 113:10; 161:19
**accepted** [1] - 28:25
**access** [1] - 73:23
**accommodate** [1] - 74:10
**accommodating** [1] - 263:18
**accommodation** [1] - 128:19
**accordance** [2] - 24:18; 26:14

**according** [7] - 149:23; 152:11, 14; 153:11; 158:18; 231:1; 249:2
**accordingly** [3] - 26:2; 96:16, 22
**account** [2] - 172:9; 222:1
**accounted** [1] - 188:7
**accurate** [6] - 47:20; 175:5; 215:25; 222:1, 7; 223:18
**accused** [1] - 258:22
**acknowledge** [2] - 34:20; 35:5
**acknowledged** [2] - 212:1; 257:12
**acronym** [1] - 119:9
**act** [4] - 118:21; 259:15, 18; 261:3
**Action** [1] - 1:4
**action** [3] - 18:17; 127:8; 154:18
**actions** [1] - 173:11
**activities** [2] - 36:12; 124:19
**activity** [2] - 11:8; 36:16
**actor** [1] - 259:16
**actual** [2] - 11:16; 103:10
**acute** [1] - 10:5
**add** [3] - 60:13; 102:23; 249:25
**added** [5] - 249:11, 14, 21-22; 250:2
**addition** [4] - 12:19; 19:11; 53:10; 77:4
**additional** [7] - 46:15; 70:6; 85:7; 250:1, 14; 251:2; 262:9
**additionally** [2] - 96:8, 19
**address** [18] - 8:8; 42:4; 43:18, 21, 24; 51:5; 74:18; 75:2, 4, 9; 118:9; 120:15; 207:19; 212:2; 256:13
**addressed** [3] - 127:18, 24; 134:22
**addressing** [2] - 118:10; 127:7
**ADHD** [1] - 73:24
**adjourned** [1] - 265:11
**admin** [1] - 47:9
**administration** [21] - 40:7; 51:5, 8; 55:17, 22; 56:23, 25; 66:20, 23; 74:23; 91:19, 21; 93:1; 110:15; 121:8; 126:23; 196:13; 197:7; 211:1, 11
**administration's** [1] - 56:15
**administrative** [3] - 214:17, 20; 253:12
**administrator** [16] - 53:22; 77:9, 12; 86:20; 101:18; 104:17; 107:6; 109:12; 111:25; 119:25; 132:12; 165:23; 186:21; 195:18; 197:17; 201:20
**administrator's** [1] - 129:6
**administrators** [20] - 18:23; 52:24; 71:21; 112:2; 118:8; 126:2, 11, 20; 173:22; 187:22; 199:7, 10, 13; 209:4; 211:22; 212:8; 213:10; 233:13; 238:12; 241:14
**admissibility** [3] - 88:13; 95:21, 23
**admissible** [2] - 95:8; 96:21
**admit** [15] - 43:5; 44:13; 47:24; 49:21; 52:15; 94:24; 113:5; 123:3; 142:3; 143:24; 150:18; 152:17; 161:17; 170:8; 176:5
**admitted** [51] - 5:3-18; 41:2; 44:18; 48:5; 50:1; 52:19; 63:17; 64:19; 88:19; 90:22; 113:12; 126:6; 130:2; 131:5, 12; 135:22; 140:14; 142:8; 144:3; 150:21;

152:18, 23; 157:25; 161:21; 164:14; 166:7; 168:22, 25; 170:9, 12; 172:14; 176:15; 178:11; 184:18; 241:18
**adolescence** [1] - 27:10
**adult** [3] - 81:25; 166:2; 168:2
**adulthood** [1] - 27:10
**adults** [1] - 59:9
**advance** [1] - 83:1
**advanced** [3] - 89:24; 90:1; 102:6
**Advancement** [1] - 102:3
**advances** [1] - 191:25
**advantage** [4] - 71:19; 181:23; 263:16
**advocate** [1] - 107:9
**affect** [3] - 34:14; 118:16
**affecting** [1] - 21:21
**affectionately** [1] - 77:14
**affects** [1] - 36:17
**afraid** [2] - 207:5; 211:7
**after-school** [12] - 57:23; 58:23; 82:25; 110:14; 186:24; 187:1, 7, 17; 188:3, 13; 189:17; 190:1
**afternoon** [12] - 98:3; 133:25; 156:14; 180:9; 183:2; 185:4; 188:1; 190:9; 191:19
**afterwards** [4] - 164:9; 208:5; 239:3; 259:11
**age** [5] - 26:23; 27:2, 7-8, 20
**age-related** [1] - 27:8
**agenda** [2] - 123:23; 132:14
**aggressive** [2] - 28:5; 134:12
**aging** [1] - 27:3
**agitated** [1] - 15:20
**Agnes** [1] - 106:9
**ago** [8] - 28:4; 51:2; 67:2; 140:10; 151:14; 162:19; 231:3, 17
**agree** [6] - 26:10; 33:11, 19; 34:6; 238:25; 239:2; 248:4, 25
**agreed** [5] - 50:8; 96:14, 17, 19; 97:2
**agreed-upon** [2] - 96:17; 97:2
**ahead** [12] - 6:9; 94:7, 17; 108:11; 128:8, 14; 132:2; 137:10; 180:8; 232:16; 251:21; 256:15
**aided** [1] - 3:18
**AIDS** [1] - 10:7
**al** [1] - 1:6
**alanderson@bsfllp.com** [1] - 1:22
**alcohol** [1] - 133:5
**alert** [2] - 74:23; 75:10
**Alexandria** [1] - 3:15
**aligned** [1] - 105:4
**aligns** [2] - 25:20; 26:1
**Alison** [1] - 1:19
**ALL** [2] - 6:4, 15
**All-County** [1] - 88:20
**all-female** [1] - 83:13
**all-state** [2] - 83:2
**allegation** [1] - 139:22
**allegations** [1] - 191:6
**alleged** [7] - 95:4; 137:15; 155:6;

157:1; 168:8; 233:18; 235:7
**allegedly** [3] - 162:5; 163:6, 17
**alleges** [3] - 189:12, 16, 19
**allow** [5] - 95:12; 139:17; 258:13; 260:6; 261:13
**allowed** [5] - 188:14; 257:4; 261:12, 15
**almost** [2] - 98:20; 121:19
**alone** [3] - 16:21; 149:13; 228:3
**ALSTON** [1] - 1:11
**alter** [2] - 34:16
**alteration** [1] - 16:5
**altercation** [2] - 150:10, 15
**altered** [1] - 23:7
**Alternative** [1] - 38:6
**alters** [2] - 15:25; 34:18
**AM** [1] - 1:7
**amazing** [1] - 81:24
**amended** [1] - 189:12
**American** [8] - 13:1, 5, 13, 16; 14:6; 16:11; 106:12
**Amy** [2] - 68:15; 69:8
**AMY** [7] - 4:10-12; 68:20; 69:1; 87:9; 93:9
**amygdala** [1] - 27:18
**analyses** [1] - 35:18
**analysis** [2] - 10:22; 35:14
**analyze** [2] - 11:8; 23:16
**analyzing** [1] - 119:22
**ancillary** [1] - 95:14
**Anderson** [1] - 1:19
**ANDERSON** [1] - 263:7
**Andrew** [2] - 2:6; 191:21
**ANDREWS** [4] - 2:14, 18, 21; 3:2
**Angeles** [1] - 1:21
**angle** [2] - 115:20; 116:3
**animated** [1] - 129:16
**answer** [19] - 7:5, 7; 31:9; 36:3; 37:10; 68:22, 24; 111:16; 189:10; 194:13; 195:6; 197:5, 10; 213:3, 12, 17; 230:15; 233:10; 258:15
**ANSWER** [2] - 201:18, 20, 23
**answering** [1] - 230:11
**anti** [2] - 132:15; 254:24
**anti-bullying** [1] - 132:15
**anti-Semitic** [1] - 254:24
**anticipate** [6] - 68:16; 94:11; 180:13, 17; 184:2
**anticipated** [2] - 262:17, 19
**anticipation** [1] - 218:25
**anxiety** [11] - 14:3; 24:17, 21; 25:23; 29:4; 33:23; 34:13, 24; 35:6, 8; 74:13
**anxious** [1] - 15:3
**anyway** [2] - 260:18; 261:6
**apologize** [5] - 97:11; 122:9, 11, 15; 172:22
**apology** [2] - 122:15, 18
**APPEARANCES** [3] - 1:13; 2:1; 3:1
**applied** [2] - 16:20; 248:20
**applies** [2] - 119:6

**appreciate** [9] - 6:22; 51:13; 126:17; 183:22; 184:14; 230:10; 251:23; 254:3; 261:18
**appreciation** [1] - 141:23
**approach** [15] - 30:5; 56:15, 17; 60:17; 64:11; 87:7; 103:10; 118:10, 12; 119:5; 124:15; 152:15; 191:15; 193:13; 251:14
**approached** [1] - 239:17
**appropriate** [4] - 19:8; 51:16; 139:7; 223:7
**approve** [1] - 223:17
**approximate** [1] - 9:11
**April** [3] - 1:5; 89:2
**APRIL** [1] - 6:1
**area** [8] - 14:1; 18:18; 61:14; 107:1; 109:8, 23; 116:19; 220:1
**areas** [2] - 12:16; 70:11
**argue** [1] - 209:25
**argued** [2] - 254:3; 256:7
**argues** [2] - 95:1, 6
**arguing** [1] - 254:11
**argument** [3] - 252:11, 21; 255:21
**arm** [1] - 15:3
**Armentrout** [2] - 263:11, 17
**arrangements** [3] - 133:24; 135:9, 13
**arrive** [1] - 108:8
**arrived** [2] - 108:8
**art** [1] - 90:7
**arteries** [2] - 13:7, 9
**articles** [3] - 33:8, 10
**articulate** [1] - 119:5
**arts** [1] - 91:12
**ascends** [1] - 27:19
**aside** [4] - 51:19; 65:2; 167:2, 8
**aspect** [8] - 6:20; 37:3; 68:10; 94:4; 103:20; 130:22; 261:10; 262:12
**assault** [4] - 100:4; 127:21, 24; 189:3
**assaulted** [8] - 54:13, 16; 60:6; 86:11, 14; 188:20, 23; 189:1
**assaulting** [3] - 55:4; 82:11; 127:23
**assess** [1] - 10:25
**asshole** [1] - 149:25
**assigned** [7] - 38:5; 77:9, 21; 109:25; 138:3; 167:12; 235:18
**assignment** [4] - 41:19; 108:23; 123:19; 134:15
**assignments** [6] - 46:6, 23; 47:10; 108:22; 123:22; 133:24
**assistant** [11] - 98:12; 104:6, 12; 105:8; 106:19; 107:25; 109:3; 112:9; 213:18; 214:21, 23
**Assistant** [1] - 98:12
**associated** [3] - 16:15; 117:2; 128:12
**Association** [2] - 16:12; 106:12
**assume** [5] - 182:24; 235:13; 246:3; 263:1, 20
**assumed** [1] - 168:19
**assuming** [4] - 180:24; 182:10; 183:4; 257:17

**assumption** [1] - 246:2
**attached** [1] - 96:18
**attack** [1] - 95:10
**attempted** [1] - 140:2
**attempting** [1] - 200:10
**attend** [2] - 102:6; 264:15
**attendance** [5] - 58:11; 73:8; 188:2; 255:11
**attended** [2] - 84:11; 109:13
**attendings** [2] - 11:20; 12:5
**attention** [13] - 6:16; 51:25; 72:24; 73:1; 102:24; 114:5; 120:16; 141:11; 155:7; 161:14; 168:15; 237:12
**attentive** [1] - 107:19
**Attorney** [1] - 128:6
**audio** [3] - 116:24; 117:2; 131:14
**audition** [6] - 83:2, 15; 85:4, 10; 89:23
**auditioned** [1] - 85:11
**auditions** [1] - 89:3
**A[redacted]** [1] - 105:7
**A[redacted]** [7] - 66:5; 196:18; 197:2; 219:4, 12-13, 15
**author** [1] - 214:7
**authorized** [1] - 196:24
**autoimmune** [3] - 10:10; 11:14; 22:13
**available** [4] - 42:5; 74:4; 174:5; 183:8
**Ave** [1] - 2:22
**Avenue** [4] - 2:15, 18; 3:3, 10
**average** [1] - 17:6
**AVID** [3] - 101:25; 102:3, 12
**award** [1] - 106:10
**awards** [1] - 106:6
**aware** [34] - 25:8; 33:7; 35:1; 57:2; 67:20; 189:12, 16, 19; 191:1; 192:14, 20; 197:18; 203:22, 24-25; 204:2, 6-7, 19, 22; 205:13, 16; 209:21; 211:17; 219:6; 245:17, 21; 250:21; 258:5, 14, 16; 262:22

# B

**B.F** [2] - 152:5; 235:5
**B.F.'s** [2] - 152:6
**B.H** [1] - 3:6
**B.R** [59] - 1:3; 40:13; 43:13; 47:4; 48:13, 23; 50:9, 18, 25; 52:3; 53:2, 9, 19; 54:2, 9, 12, 25; 57:21; 60:6; 67:20, 24; 68:1; 83:11, 17; 84:17; 85:16; 86:6; 133:8, 20; 135:6, 11; 136:21, 25; 139:23, 25; 140:3; 141:21; 146:6; 150:9, 11; 155:6; 188:19, 25; 189:13, 22; 190:16; 201:14; 214:4; 216:3; 219:22; 256:24; 257:5, 18, 20; 258:17, 22; 259:23
**B.R.'s** [16] - 29:14; 41:12; 42:1; 44:11; 46:4; 47:1; 49:17; 50:14, 17; 51:13; 161:8; 185:7; 188:25; 190:18; 191:1; 256:5
**baccalaureate** [1] - 102:7

**bachelor's** [1] - 70:3
**back-and-forth** [1] - 148:13
**back-to-school** [1] - 42:9
**background** [7] - 8:21; 18:16; 70:2; 106:5; 138:6; 139:9, 17
**backgrounds** [1] - 71:19
**bad** [7] - 55:13; 169:21; 218:13; 259:15, 18; 260:25
**baggage** [1] - 18:14
**ball** [4] - 174:9; 185:3, 17; 215:9
**ball-throwing** [1] - 215:9
**B[redacted]** [4] - 4:14-16; 97:24; 98:1; 190:7; 191:17
**B[redacted]** [36] - 52:4, 13, 23; 53:18, 25; 94:12; 97:22; 98:6; 113:15; 114:24; 118:7; 129:5; 130:5; 132:6; 136:1; 152:25; 162:2; 165:20; 166:11; 169:3; 172:18; 184:23; 189:9; 190:9, 13; 191:6, 9, 19; 193:17, 22; 210:12; 213:8; 230:21; 239:22; 247:6
**B[redacted]** [2] - 182:17
**ballpark** [5] - 98:21; 110:19; 143:14; 145:3; 147:18
**band** [2] - 71:4; 78:20
**BARAN** [1] - 1:15
**Barry** [5] - 97:4; 263:2; 265:8
**based** [16] - 20:25; 25:17; 28:20; 29:5; 31:19; 34:21; 35:23, 25; 53:11; 146:5, 10; 154:19; 198:16; 213:13; 263:20
**baseline** [1] - 15:21
**basic** [2] - 21:17; 36:2
**basics** [1] - 191:24
**basis** [7] - 16:1, 6; 34:20; 57:4, 6; 198:2; 264:6
**BATES** [135] - 4:14; 94:12, 15; 97:22; 98:2; 113:5, 14; 114:17, 21, 23; 115:7, 10, 12; 116:15, 23; 117:3, 5, 12-13; 123:3, 6, 10-11; 125:9, 11; 126:5, 8; 127:4, 6; 128:10, 21; 129:2, 4; 130:1, 4; 131:3, 13, 17, 21, 23; 132:4; 135:21, 24; 136:11, 13, 18-19; 140:13, 17; 142:3, 9-10; 143:24; 144:4; 146:16, 19; 147:6; 150:18, 22; 151:1, 8, 10; 152:10, 17, 24; 157:12, 17, 22, 24; 158:1, 3; 160:16, 21, 24; 161:4, 6, 10, 12, 22; 162:1, 23; 164:10, 15-16; 165:11, 13; 166:5, 9-10; 167:14; 168:21, 24; 169:2; 170:8, 13-14; 172:13, 17, 20, 23; 174:24; 175:6, 9, 12, 21, 23; 176:4, 10, 13, 16; 177:16; 178:5, 10, 12; 180:6; 184:15, 17, 20, 22; 190:3; 198:8; 200:10, 17; 201:2; 210:8; 231:22; 232:5, 12; 247:16; 255:20; 256:16, 20; 263:20, 25
**Bates** [18] - 2:14; 98:7; 117:2; 128:5, 19; 129:1; 180:25; 181:3, 24; 202:20; 207:19, 22; 208:8; 215:7; 241:22; 242:22; 256:14
**Bates'** [3] - 113:10; 161:19; 180:20
**bathroom** [4] - 80:24; 92:13, 20;

188:15
**bathrooms** [2] - 109:21
**bay** [5] - 79:13; 80:1; 81:16, 19; 82:11
**bear** [1] - 36:20
**bearing** [2] - 106:2; 207:9
**became** [2] - 19:2; 105:22
**become** [4] - 133:19, 22; 137:3, 20
**becomes** [1] - 258:12
**BEFORE** [1] - 1:11
**begged** [1] - 183:22
**begging** [1] - 182:12
**beginning** [16] - 40:21; 53:2, 19; 58:17; 101:1; 123:25; 126:21; 140:5; 141:21; 155:10; 157:5; 158:17; 190:13; 203:21; 209:2
**begun** [1] - 239:2
**behalf** [3] - 65:20; 66:16; 199:12
**behave** [3] - 25:19; 118:15; 210:10
**Behavior** [2] - 119:11; 132:17
**behavior** [24] - 15:25; 16:5; 34:21; 35:11; 55:16; 74:16, 18; 119:4, 17; 122:3; 124:3, 11, 23; 125:6; 128:1; 135:1; 156:10; 203:23; 204:2, 7, 15
**behavioral** [4] - 118:11, 19; 119:7
**behaviors** [6] - 25:24; 34:16; 121:23; 127:8; 139:14; 213:13
**behind** [4] - 81:9; 172:8, 11
**belabor** [1] - 220:18
**belief** [1] - 178:1
**bell** [4] - 157:14; 158:16, 18; 161:13
**B**▬ [119] - 30:16, 19, 21; 32:3; 42:24; 60:25; 62:5, 13; 64:24; 65:19; 66:22; 87:14, 25; 89:7, 14; 91:2; 93:1; 134:1; 137:5, 9, 15; 140:22, 25; 142:15; 143:11, 18; 144:13; 146:13; 147:19; 148:6, 14; 149:8, 15, 23; 150:12, 15; 151:13; 152:14; 153:11, 16, 18, 20; 154:8, 22, 24; 155:13; 156:10, 19; 157:1, 4-5; 158:13; 159:25; 160:6, 12; 162:3, 18, 24; 164:7; 166:16; 167:6; 169:14, 19; 170:23; 171:13; 172:5, 12; 179:4; 191:22; 196:10; 197:12, 24; 202:10, 21; 203:6, 23; 204:20, 22; 205:4, 18; 210:19; 211:15; 220:18; 222:1; 223:2, 5-6; 224:13; 226:7, 12; 227:20; 228:7, 10; 229:10; 231:1, 7, 18, 21; 232:1; 233:5, 18; 234:2, 9; 240:7; 242:7; 243:9, 15; 244:20; 245:18; 251:9, 11; 252:7; 255:1
**B**▬ [24] - 31:23; 63:1; 65:20; 66:16; 87:19; 141:3, 17; 150:13; 158:8; 160:18, 23-24; 161:17, 24; 164:1; 178:19; 196:13; 203:9, 12, 14; 206:16; 220:14; 232:24; 249:8
**B**▬ [8] - 41:22; 65:16; 165:1; 175:10; 186:14; 242:11, 14
**Bellami's** [1] - 242:2
**belonged** [1] - 138:12
**below** [4] - 41:9; 50:21; 51:24; 185:2
**Ben** [41] - 137:17; 138:6, 9-10; 139:8,

23; 146:12; 147:9; 148:2, 5, 16, 20, 24; 149:6, 9-10, 14, 19-20, 22-23; 150:2, 11; 151:15; 152:15; 153:12, 15, 18, 20; 154:2, 21; 164:3, 7; 235:5, 17; 244:11; 245:16
**Ben's** [1] - 153:16
**benches** [4] - 117:8, 14
**bene** [5] - 181:15; 182:6, 18
**benefit** [1] - 72:21
**best** [9] - 7:5; 37:10; 47:21; 68:22; 76:23; 77:2; 165:12; 171:3; 230:15
**better** [15] - 7:16; 28:15; 35:3, 5-6, 13; 45:23; 81:25; 112:7; 115:20; 146:20; 198:14; 264:7, 21
**between** [21] - 47:1; 49:17; 50:14; 52:13; 55:18; 57:20; 61:7; 70:25; 79:9; 82:5; 92:16; 136:23; 139:23; 147:14; 148:24; 164:20; 177:23; 181:7; 189:20; 202:14; 211:13
**beyond** [6] - 28:8; 31:13; 80:12; 121:13, 15; 240:23
**bias** [1] - 95:25
**big** [10] - 10:11; 84:7; 85:14; 111:20; 138:11; 149:1; 237:7; 258:11, 22
**bigger** [1] - 242:24
**binder** [7] - 61:12; 62:9; 63:12; 64:8; 87:22; 113:15, 17
**bingo** [1] - 15:21
**biochemical** [6] - 33:25; 34:5, 9, 21; 36:19, 21
**biologic** [1] - 16:6
**biological** [1] - 15:14
**biomarker** [2] - 15:16; 16:1
**biomarkers** [3] - 22:16, 18; 28:12
**biopsy** [1] - 25:14
**bipolar** [2] - 24:17, 21
**bit** [17] - 6:24; 7:15; 69:5; 71:11, 14; 75:24; 76:10; 77:3; 86:1; 153:9; 155:12; 157:10; 213:1; 214:9; 241:15; 246:21
**bitch** [7] - 148:12; 221:10; 227:6; 228:13; 232:18
**bizarre** [1] - 28:22
**Blackboard** [2] - 42:11, 14
**blackboard** [1] - 42:13
**Blanchard** [13] - 3:9; 29:19; 60:14; 87:3; 180:13, 16; 183:25; 191:11; 248:4; 251:20, 24; 255:4; 259:6
**BLANCHARD** [32] - 29:20; 60:15; 87:4; 184:1; 191:12; 193:8; 229:1, 23; 230:5; 248:1, 5; 252:3, 6, 16, 23; 253:2; 254:2, 15, 21; 256:6; 259:7, 18, 22; 261:3, 7, 17; 264:1, 20, 24; 265:4, 6, 9
**blank** [3] - 46:9, 22
**bleachers** [1] - 88:22
**bleeds** [1] - 10:7
**blind** [1] - 189:3
**block** [1] - 144:11
**blocked** [1] - 252:10
**blood** [6] - 15:22, 24; 23:4; 25:3, 15; 28:6

**blow** [2] - 231:19; 232:3
**board** [17] - 10:1; 11:19, 23; 12:1, 9, 14, 16, 18-19; 13:5, 13, 15, 20; 14:11; 19:3
**Board** [14] - 13:1, 14, 16; 14:6; 98:8; 193:25; 254:12; 255:4, 17, 21; 256:10, 20, 23
**Board's** [2] - 30:12; 254:9
**boards** [6] - 12:4; 14:5; 15:7; 18:25; 25:7; 35:23
**body** [2] - 15:23; 36:22
**BOIES** [4] - 1:20; 2:2, 6, 10
**book** [15] - 41:6; 42:19; 44:10; 46:24; 47:8; 49:16; 123:7, 19; 124:1; 132:14; 134:14; 224:5; 247:5; 259:9
**book-ending** [1] - 259:9
**booklet** [1] - 101:1
**Booklet** [1] - 125:15
**books** [1] - 211:20
**bothering** [2] - 86:17; 221:3
**bottom** [15] - 41:10; 66:4, 16; 114:13; 127:23; 135:25; 164:21; 172:18, 23; 176:18; 178:13; 184:21; 227:20; 230:22; 232:1
**bound** [1] - 102:8
**bowl** [2] - 77:14; 78:12
**box** [1] - 135:16
**boy** [6] - 137:6; 141:7; 149:23; 241:25; 242:3; 259:10
**boyfriend** [2] - 148:14; 149:9
**brain** [56] - 8:10; 10:9, 18; 11:1; 12:20; 13:25; 14:1, 8, 15; 15:11-13; 18:25; 19:1; 20:7; 21:7, 21, 23, 25; 22:13, 22-23; 23:1, 15, 24; 24:6, 8; 25:14; 26:5, 11, 22; 27:4, 6-7, 9, 12, 14, 22, 25; 28:20, 25; 33:6, 21; 34:1, 8, 11, 17-18, 24; 36:11, 13, 15, 17
**brains** [1] - 12:22
**brainwaves** [2] - 10:23; 16:4
**break** [11] - 74:2; 94:7; 110:18; 128:9, 14; 133:13; 158:4; 180:9; 260:24; 261:21; 262:4
**breakfast** [5] - 108:14; 109:1; 137:5; 141:10; 236:11
**breaking** [1] - 183:19
**breaks** [1] - 184:10
**B**▬ [1] - 137:4
**Brenner** [15] - 2:6; 131:7; 184:3; 191:21; 196:21; 210:8; 230:13; 232:5; 252:24; 253:5; 254:3; 257:2, 15; 261:13; 262:17
**BRENNER** [143] - 4:16; 6:7; 97:7; 113:9; 116:21; 123:8; 131:8; 140:15; 142:6; 144:1; 150:24; 151:18; 152:4, 21; 157:20; 160:20, 22; 161:19; 162:21; 164:12; 165:7, 9; 170:10; 174:20; 176:9, 11; 177:14; 178:8; 180:18, 23; 181:9, 16, 18; 182:12, 16, 20; 183:1, 10, 13, 15, 18, 21; 191:14, 18; 193:10, 13, 15, 17; 196:25; 197:1; 198:10, 25;

199:11, 16; 201:6; 205:21, 24; 208:14,
16; 209:9; 210:4, 7, 11; 212:21, 23;
213:6, 23; 214:1; 215:23; 216:1; 217:2,
5, 8, 10, 12, 21, 24; 220:4, 7; 224:8;
226:22, 25; 227:1, 10, 13, 15; 229:5, 8;
230:3, 16, 19-20; 231:11, 14, 24; 232:8,
14, 17; 234:11, 13; 241:16, 20-21;
242:19, 21, 24; 243:1; 246:5, 8, 10;
247:14, 20, 24; 248:2, 7; 250:12;
251:14, 18, 25; 252:4, 10; 253:23;
254:1, 22; 256:9; 257:6, 21; 258:2, 19;
259:3, 21; 260:1, 11, 14, 17, 24; 261:2,
6, 21; 263:1
  **Brief** [1] - 253:3
  **brief** [3] - 8:23; 70:1; 256:7
  **briefly** [5] - 99:4; 112:16; 125:14;
126:25; 132:12
  **bring** [20] - 6:5, 10; 46:17; 148:15;
173:24; 227:10; 230:16; 231:11;
240:19; 241:7, 16; 246:5; 248:8;
255:24; 257:4, 11; 258:4; 259:1; 264:3
  **bringing** [2] - 254:3; 256:25
  **brings** [1] - 184:3
  **Brittany** [3] - 2:2; 60:24; 87:13
  **britzoll@gmail.com** [1] - 2:5
  **broadly** [1] - 95:17
  **Broadway** [5] - 85:2, 9-10; 93:17
  **broken** [2] - 103:22; 128:6
  **Bromberg** [1] - 187:4
  **bromberg** [1] - 187:18
  **brother** [10] - 148:8; 149:1, 12-13, 19;
152:5-7; 153:12, 16
  **brought** [8] - 146:2; 149:9; 219:7;
233:13; 240:22, 24; 264:12, 17
  **Brown** [2] - 63:16; 91:25
  **brown** [10] - 61:3; 62:2; 63:6; 64:5;
89:9; 92:24; 131:20; 209:9; 215:23;
234:12
  **Bruce** [1] - 3:9
  **bruce.blanchard@ofplaw.com** [1] -
3:12
  **Bryant** [2] - 150:1, 3
  **build** [1] - 73:3
  **building** [14] - 59:6, 9; 71:21; 77:5;
79:5; 107:10; 108:2, 4; 109:19; 110:1;
112:2; 117:19; 168:2; 188:10
  **built** [1] - 182:13
  **built-in** [1] - 182:13
  **bulk** [1] - 208:24
  **bullet** [7] - 65:10; 66:10; 127:13, 15,
18; 136:4; 185:2
  **bullied** [4] - 54:18, 23; 121:2; 122:10
  **bully** [6] - 121:19; 122:1; 190:15;
206:21, 24
  **bully-free** [3] - 206:21, 24
  **bullying** [42] - 50:19, 23; 51:1; 56:16;
63:3; 74:15, 22; 86:8; 100:6; 101:9;
118:9, 22; 120:16; 121:2, 10, 13, 18,
21, 25; 125:4; 128:1; 129:19, 21;
130:23; 132:15; 133:3, 5; 137:11;

169:21; 171:13; 204:20; 207:1; 211:5;
234:9; 245:19; 249:8; 254:22; 257:16,
19; 259:11; 261:16
  **Bullying** [1] - 125:2
  **bullying-related** [1] - 120:16
  **bunch** [3] - 62:13; 81:21; 238:1
  **burned** [1] - 34:23
  **Burton** [1] - 2:21
  **burtons@huntonak.com** [1] - 2:23
  **bus** [7] - 77:20; 84:2; 108:13; 114:14;
232:19; 258:23; 259:1
  **Bus** [2] - 110:10
  **buses** [8] - 77:23; 110:1, 6-7, 10, 12;
188:11
  **business** [1] - 196:24
  **busy** [1] - 17:10
  **but..** [1] - 83:23
  **buying** [1] - 147:1
  **buzz** [1] - 59:5
  **BY** [132] - 4:4-9, 11-13, 15-16; 7:9; 8:7,
20; 9:17; 21:15; 24:11; 29:24; 30:7;
36:10; 37:14; 39:8; 41:5; 43:11; 44:19;
45:15, 21; 48:6; 50:2; 52:20; 60:1, 21;
61:4; 62:3, 20; 63:7, 24; 64:6, 13, 24;
67:16; 69:2; 78:5; 79:20; 87:10; 88:8,
23; 89:13; 90:24; 92:1, 8, 25; 93:10;
113:14; 114:23; 115:12; 117:5, 13;
123:11; 125:11; 126:8; 127:6; 129:4;
130:4; 132:4; 135:24; 136:13, 19;
140:17; 142:10; 144:4; 146:19; 147:7;
151:1, 10; 152:10, 24; 158:3; 162:1, 23;
164:16; 165:13; 166:10; 167:14; 169:2;
170:14; 172:17, 23; 174:24; 175:12, 23;
176:16; 177:16; 178:12; 184:22; 190:8;
191:18; 193:10, 15; 197:1; 198:10, 25;
199:16; 201:7; 205:24; 208:16; 209:10;
210:11; 212:23; 213:7; 214:1; 216:1;
217:12, 24; 220:7; 224:8; 227:1, 15;
229:8; 230:3, 20; 231:14, 24; 232:8, 17;
234:13; 241:21; 242:21; 243:1; 246:10;
248:7; 250:12
  **bystander** [1] - 119:1

# C

  **C.K** [4] - 225:6; 226:19; 246:11; 248:22
  **CA** [1] - 1:21
  **cafeteria** [30] - 108:5, 12, 16, 19, 22;
109:1; 120:8; 133:15; 137:7; 139:23;
143:6, 15, 20, 25; 144:6; 146:7, 23;
149:15; 155:5, 15; 156:25; 159:5;
160:10; 163:2, 23; 164:4; 167:1, 8;
186:11; 236:9
  **calculations** [1] - 181:13
  **calculus** [2] - 181:23, 25
  **calendar** [1] - 45:12
  **California** [2] - 9:4, 6
  **cancer** [1] - 23:25
  **candidly** [1] - 26:19

  **cannot** [1] - 24:14
  **capacity** [8] - 30:25; 31:4, 7; 96:1;
193:21; 194:5; 200:24
  **capture** [1] - 233:11
  **car** [1] - 108:1
  **card** [3] - 58:16; 90:25
  **cards** [4] - 15:21; 58:17, 19; 122:17
  **care** [4] - 17:15; 118:25; 191:3; 196:23
  **career** [2] - 76:24; 209:22
  **careful** [1] - 32:7
  **carotid** [2] - 13:6
  **carpal** [1] - 22:4
  **C███** [2] - 39:17
  **Carson** [56] - 38:7, 9, 14; 50:10; 69:17,
20, 23; 70:13; 76:7; 85:5; 89:19; 98:10;
104:10, 14, 21, 23; 105:6, 9, 11, 14, 17;
106:2, 15, 17; 107:25; 110:20; 112:8;
113:3, 21, 23; 119:13; 123:17; 129:24;
132:16; 141:1; 171:18; 172:1; 184:25;
192:22; 193:2; 194:10; 195:3, 9, 17;
196:12; 206:20, 23; 207:13; 211:1;
212:11, 18; 213:11; 219:5; 252:11
  **case** [58] - 6:20; 19:13, 19; 20:1, 13,
16; 29:14; 30:10; 31:2, 23; 37:3; 50:8;
67:5, 7, 18, 21; 68:10; 87:15, 17; 94:3;
95:13, 15, 19; 96:1, 3, 7, 11; 106:1;
118:15; 134:15; 166:22; 180:19;
182:10, 22; 187:9; 191:7, 22; 193:19;
194:11; 195:4; 197:24; 200:25; 255:23;
261:10; 262:2, 7-8, 12; 264:2
  **Case** [1] - 96:2
  **CASE** [1] - 97:24
  **case-in-chief** [1] - 95:13
  **caseloads** [1] - 76:13
  **cases** [1] - 20:1
  **CAT** [5] - 15:16; 22:22; 23:1; 28:8
  **caught** [1] - 117:1
  **causation** [1] - 23:22
  **caused** [2] - 26:11; 33:5
  **causes** [3] - 14:17; 15:10; 25:4
  **causing** [1] - 15:17
  **cell** [1] - 73:23
  **Cell** [1] - 3:16
  **Center** [6] - 9:4, 6, 8-9, 12; 10:4
  **center** [3] - 10:10, 12; 78:24
  **centers** [1] - 27:18
  **central** [9] - 11:1; 21:21, 23, 25; 22:2,
7; 101:16; 102:11; 104:19
  **Century** [1] - 1:20
  **certain** [8] - 13:25; 34:14; 106:23;
108:22; 117:19; 194:1; 200:18; 261:14
  **certainly** [6] - 56:9; 71:16; 111:13;
128:10, 21; 187:20; 200:20; 214:16;
237:12
  **certainty** [1] - 21:4
  **certification** [8] - 11:23; 12:2, 9, 11,
18; 13:17; 14:11; 25:8
  **certifications** [2] - 12:20; 14:7
  **certified** [7] - 11:20; 12:14, 17; 13:4;
19:1; 21:13

**certify** [1] - 265:14
**cetera** [2] - 75:11; 187:18
**chain** [3] - 62:10; 64:14; 65:5
**chairs** [1] - 160:2
**challenge** [1] - 74:14
**Champions** [1] - 137:19
**chance** [2] - 49:11; 218:8
**change** [14] - 26:22; 27:9, 12; 34:2, 4-5, 25; 36:11, 13; 122:3; 186:18, 22; 211:16; 246:18
**changed** [4] - 86:1; 149:17; 181:25; 193:7
**changes** [28] - 8:10; 12:13; 23:24; 26:11; 27:8, 13, 22, 25; 28:3, 8-9, 11; 32:17; 33:6, 21; 34:1, 7, 9-10, 21-22, 24; 35:9, 12; 36:14, 19, 21
**changing** [1] - 246:17
**channels** [1] - 34:14
**character** [2] - 95:10, 22
**characteristics** [1] - 107:7
**characterizing** [1] - 212:16
**charge** [4] - 58:1; 183:1; 186:25; 237:20
**charged** [1] - 237:19
**chart** [5] - 143:20, 25; 144:6, 8; 147:19
**charts** [1] - 73:8
**cheating** [2] - 111:23, 25
**check** [6] - 73:23; 75:7; 108:4; 265:7
**checking** [1] - 109:20
**chemical** [3] - 34:3; 35:9, 11
**chemistry** [6] - 15:25; 34:17; 36:11, 13, 18
**chest** [1] - 22:23
**chief** [4] - 18:7, 9; 95:13; 96:3
**child** [6] - 27:10, 19; 100:4; 107:9; 135:7; 191:3
**children** [5] - 27:14; 75:16; 100:24; 101:6; 105:4
**chloride** [1] - 34:14
**choices** [2] - 77:24; 81:25
**choirs** [1] - 84:7
**choose** [2] - 90:6, 8
**chooses** [1] - 201:1
**choral** [20] - 70:17; 71:5, 16; 78:8, 15, 19; 79:5, 10, 13, 23, 25; 81:1; 83:19, 24; 84:11; 88:9; 91:22; 93:12, 15
**Choral** [1] - 88:20
**chorus** [19] - 70:18; 71:14; 78:16; 83:3, 12; 87:19; 88:3; 89:2, 14, 19; 90:2, 17; 91:4, 10, 13, 22; 92:22; 93:15
**chose** [1] - 228:25
**C█████** [7] - 220:23; 221:3; 227:16; 231:15; 233:3; 241:3; 258:22
**C█████** [2] - 229:9; 232:24
**chronological** [1] - 153:10
**chronologically** [1] - 139:18
**Church** [10] - 98:25; 99:1, 5; 100:10, 25; 101:14; 102:16, 19; 106:13; 107:15
**circle** [6] - 39:13; 78:10; 79:11; 114:24;

146:25; 180:16
**circled** [1] - 174:14
**circles** [2] - 178:24; 179:12
**Circuit** [1] - 95:17
**Circuit's** [1] - 96:2
**Cisler** [2] - 8:9; 29:8
**Cisler's** [4] - 32:19, 22, 25; 35:17
**cite** [1] - 35:20
**cited** [1] - 32:21
**citing** [2] - 95:19; 96:11
**City** [3] - 98:25; 99:1; 106:13
**city** [5] - 100:10, 17, 25; 107:15, 17
**Civil** [1] - 1:4
**claim** [4] - 96:6; 150:9; 193:3; 239:24
**claimed** [1] - 150:14
**claiming** [2] - 185:7; 255:1
**claims** [2] - 195:9, 13
**Clarence** [1] - 102:25
**clarification** [1] - 126:17
**clarify** [2] - 143:4; 174:15
**class** [47] - 40:16; 46:17; 51:7; 53:10, 12; 64:25; 65:17; 70:22; 71:7, 13-14, 23; 72:3, 13; 73:25; 74:1, 3, 16; 75:23; 83:11, 13, 15, 17; 89:17, 23; 90:5, 8; 91:22; 99:14; 108:20; 112:1; 119:6; 126:19; 134:21; 135:9; 143:7; 155:11, 24-25; 156:1; 185:11; 250:19; 254:25
**classes** [22] - 55:18; 61:8; 70:6, 13, 16-17, 20-21, 24; 71:1, 11, 25; 72:2; 79:9; 82:5; 90:6; 91:18; 92:16; 102:7; 118:1; 132:25
**classroom** [37] - 39:11, 16, 20; 44:4; 51:9, 19; 53:15, 17; 54:12; 55:25; 56:11; 57:8, 10; 58:18; 60:7; 61:5, 8, 14; 71:5; 72:8, 16, 19; 75:17; 77:4; 78:7; 81:2; 103:16; 109:9; 112:20, 22; 115:23; 120:8; 126:3; 132:11; 135:16; 255:1
**classrooms** [2] - 71:15; 112:21
**clear** [8] - 26:6; 30:8; 31:9; 33:22; 123:25; 133:9; 213:3; 263:25
**cleared** [1] - 26:8
**clearly** [3] - 105:5; 257:23
**CLERK** [2] - 97:6; 254:8
**clerk** [1] - 265:7
**client** [3] - 252:24; 259:16; 264:2
**client's** [2] - 254:16; 255:12
**clinic** [2] - 11:21; 18:4
**clinical** [8] - 9:9, 20, 22; 10:16; 11:9; 12:21; 14:8; 31:14
**close** [8] - 80:4; 89:4; 102:13; 170:24; 180:24; 183:2; 202:15; 263:24
**closer** [4] - 7:15; 37:17; 69:5; 113:22
**closet** [2] - 59:15; 60:2, 6; 189:13
**closets** [2] - 59:12; 189:23
**closing** [1] - 263:21
**closings** [1] - 182:9
**club** [1] - 58:3
**clubs** [4] - 57:23, 25; 187:21

**clump** [1] - 110:2
**cluster** [2] - 172:25; 222:11
**Co.K** [5] - 244:11; 246:12; 248:25; 249:2
**code** [1] - 58:15
**cognitive** [6] - 14:21; 22:25; 27:4; 31:10; 135:1
**collaborating** [1] - 71:20
**collaborative** [4] - 38:19; 72:13; 91:22; 106:25
**colleagues** [5] - 19:5; 26:20; 56:3, 10; 189:7
**collect** [2] - 58:17, 19
**collecting** [1] - 57:2
**college** [3] - 102:6
**College** [1] - 8:25
**college-bound** [1] - 102:8
**color** [2] - 41:20; 155:22
**combative** [1] - 28:5
**comfort** [1] - 264:25
**comfortable** [13] - 72:16; 75:19, 24; 76:1; 120:19; 135:6; 142:23; 143:7; 156:2; 159:8; 212:16; 225:18; 264:20
**coming** [13] - 44:7; 72:10; 80:6, 10; 112:21; 133:14; 135:9; 138:24; 142:23; 159:8; 160:13; 167:11
**command** [1] - 209:16
**commendable** [1] - 52:3
**comments** [2] - 254:25; 263:21
**committee** [3] - 109:14; 119:25
**common** [1] - 240:15
**communicate** [1] - 73:5
**communicated** [1] - 124:22; 134:12
**communication** [2] - 42:11; 211:17
**communications** [1] - 211:14
**community** [3] - 18:3; 35:8; 107:17
**commute** [1] - 104:22
**compare** [1] - 71:7
**compile** [1] - 222:4
**complain** [2] - 54:12, 15
**complained** [3] - 204:20; 245:18, 21
**complaining** [1] - 231:8; 257:25; 258:6
**complaint** [6] - 15:10; 27:1; 189:12, 16; 255:16, 18
**complaints** [7] - 27:4; 192:16; 198:12, 18; 205:4, 9; 220:14
**complemented** [1] - 133:1
**complete** [4] - 9:25; 58:4; 215:22; 225:23
**completed** [4] - 8:25; 9:1, 7; 223:14
**completely** [2] - 232:10, 21
**completing** [1] - 119:2
**Compliance** [1] - 192:19
**complications** [1] - 10:8
**complimenting** [1] - 52:8
**comprehensive** [1] - 100:1
**computer** [7] - 3:18; 58:20; 90:7; 174:2; 214:12; 218:4
**computer-aided** [1] - 3:18

**concentration** [1] - 14:22
**concepts** [1] - 130:16
**concern** [4] - 25:1; 48:10; 134:22; 261:18
**concerned** [8] - 134:4; 148:16, 25; 155:18; 181:9; 204:3; 219:25
**concerning** [4] - 203:23; 204:16; 211:10, 12
**concerns** [9] - 40:12; 51:1; 63:3; 134:16; 136:15; 178:23; 211:16; 222:5; 258:8
**concert** [11] - 83:7, 19, 24; 84:4, 8, 10, 15, 18; 93:12, 15
**concerts** [1] - 84:11
**concluded** [2] - 190:14; 261:23
**conclusion** [4] - 154:4, 18; 158:25; 198:16
**condition** [2] - 23:23; 24:4
**conditions** [4] - 10:6; 15:1; 22:11; 25:12
**conduct** [7] - 95:9; 124:16; 190:23; 192:2; 255:16; 258:8; 259:7
**conduction** [1] - 11:4
**confer** [2] - 93:5; 247:17
**conference** [3] - 155:21; 183:2; 203:9
**conferences** [2] - 16:16; 111:14
**confines** [1] - 229:3
**confirm** [11] - 31:17; 67:4; 228:7; 229:9, 12, 19; 233:16; 247:8, 25; 263:7, 9
**confirming** [3] - 229:21; 230:6, 8
**confirms** [2] - 227:19
**conflating** [1] - 243:19
**conflicts** [1] - 56:16
**confused** [3] - 16:3; 23:7; 229:11
**confusing** [1] - 194:22
**confusion** [1] - 23:11
**conjunction** [9] - 94:25; 130:6, 20; 144:9; 145:3; 153:1; 165:2; 167:24; 173:17
**connection** [4] - 215:15; 216:4; 220:10; 221:21
**Conner** [4] - 149:18, 21
**consequence** [7] - 121:11, 13, 16; 122:25; 139:6; 154:22; 243:21
**consequences** [2] - 129:21; 154:15
**consider** [1] - 15:5
**consideration** [1] - 49:7
**considered** [3] - 71:17; 107:19; 213:14
**considering** [1] - 157:4
**consistent** [7] - 25:9; 63:19; 145:15; 153:23; 213:2; 229:4; 230:12
**consists** [1] - 17:13
**constant** [1] - 207:1
**C_____** [11] - 148:15, 19-20, 24; 149:5, 8; 151:13; 186:1, 4; 246:12
**constantly** [1] - 120:1
**consulting** [4] - 19:10, 12, 21; 20:6
**Cont** [2] - 2:1; 3:1

**contact** [15] - 42:10; 43:24; 44:3; 179:20; 197:13, 24; 198:21; 199:2, 5, 7, 19; 200:2, 5; 201:16; 202:1
**contacted** [2] - 139:19; 146:3
**contacting** [1] - 41:18
**contemporaneous** [1] - 216:14
**contemporaneously** [1] - 217:16
**contends** [1] - 95:12
**content** [5] - 13:22; 14:5, 10; 19:8; 109:8
**contents** [1] - 223:2
**context** [19] - 19:14; 27:7; 34:6; 35:15; 200:15; 213:2; 215:8; 256:3
**contextualized** [1] - 25:20
**continue** [4] - 143:11; 154:12; 163:20; 178:24
**continued** [3] - 163:22, 24; 236:9
**continues** [3] - 75:9; 124:19; 185:12
**continuing** [2] - 16:14; 35:24
**continuity** [1] - 131:17
**continuously** [1] - 16:23
**contradiction** [1] - 95:25
**contrary** [1] - 35:21
**control** [2] - 27:15; 119:3
**controls** [1] - 27:17
**contusion** [1] - 24:2
**convenient** [1] - 24:23
**conventional** [4] - 24:24; 25:10; 26:17; 28:23
**conversation** [5] - 54:8; 75:6; 76:3; 160:12; 163:5
**converting** [1] - 103:12
**convey** [2] - 14:21; 129:14
**conveyed** [1] - 132:16
**coordinated** [1] - 103:3
**coordinator** [6] - 100:16, 18; 101:24; 102:10; 197:13; 201:17
**copious** [1] - 237:24
**copy** [5] - 9:14; 30:2; 41:6; 97:4; 193:11
**copying** [1] - 263:1
**cord** [4] - 11:2; 21:24; 23:15
**core** [2] - 67:20; 117:25
**corner** [2] - 92:19; 114:21
**corporate** [4] - 199:12, 14; 200:12, 25
**correct** [105] - 27:11; 30:16, 19, 22-23; 31:6; 32:6, 10, 20; 33:6, 14; 34:12; 114:16; 115:2; 117:3, 24; 133:10; 140:15; 147:17; 151:17; 152:15; 154:8, 11; 156:23; 160:8, 11; 162:9, 12; 163:4; 164:4; 168:10; 175:19; 176:11; 178:8; 179:16; 185:15; 192:2, 4; 193:4, 22-23; 195:6, 15, 18-19, 22; 196:14; 197:11, 15-17, 21-22; 198:22; 199:1, 8, 20; 200:14; 202:8, 19; 203:6, 9-10, 12-13; 204:8; 205:19; 206:18; 207:7, 16; 208:3; 213:24; 215:12; 218:21; 219:20; 220:19; 221:17, 19-20; 222:3, 13; 223:8; 224:19; 225:1; 226:8, 20; 234:20; 235:13, 25; 239:23; 240:4;

241:1; 246:13, 17; 249:7; 250:16; 265:14
**correctly** [5] - 32:17; 77:7; 81:3; 151:16; 202:7
**correlated** [1] - 23:2
**cortex** [1] - 27:14
**counsel** [8] - 7:5; 28:24; 37:10; 93:5; 248:3; 262:23; 263:2
**counseled** [1] - 124:17
**counseling** [1] - 134:19
**counselor** [5] - 51:21; 75:10; 77:10; 86:19; 141:22
**counselors** [17] - 51:8, 22; 71:21; 74:23; 76:8, 14, 19, 23; 77:2, 9; 134:24; 135:9, 13; 165:23; 187:22; 213:10, 17
**count** [3] - 23:8; 46:8, 20
**counted** [2] - 49:4, 6
**counter** [2] - 96:15, 18; 97:3
**counter-designations** [3] - 96:15, 18; 97:3
**County** [35] - 9:4, 6, 8; 10:4; 17:12; 18:2; 37:21, 23; 38:1, 16; 69:10; 88:20; 90:19; 98:8; 99:2; 101:1, 16, 20, 25; 102:18, 20; 103:8; 125:21; 132:7; 192:15; 193:25; 197:13; 201:16; 252:20; 253:15, 21, 23; 254:10, 14; 259:24
**county** [6] - 88:3, 9; 89:2; 102:13; 111:11
**couple** [14] - 70:15; 77:10; 107:1; 108:15; 126:13; 138:16; 160:2; 162:19; 169:6; 175:16; 181:22; 207:22; 210:9
**courage** [2] - 65:18; 118:17; 209:19
**course** [10] - 11:19; 36:21; 120:18; 122:23; 125:4; 128:7; 129:18; 132:20; 139:24; 143:22
**courses** [1] - 99:16
**Court** [19] - 3:13; 37:11; 68:22; 94:20; 96:13, 16, 25; 97:1; 128:12; 196:24; 252:23; 254:4; 261:13; 262:22, 25; 264:10; 265:18
**court** [9] - 7:6; 19:20, 25; 20:2; 117:1; 186:2; 213:5; 226:2; 263:13
**Court's** [6] - 6:19; 94:18; 247:18; 256:1; 261:9; 262:11, 17, 19
**Courthouse** [1] - 3:15
**courtroom** [2] - 183:7; 219:8
**courtrooms** [2] - 59:20; 188:11
**cover** [3] - 17:22; 74:6
**covered** [4] - 103:19; 112:15; 133:15; 204:9
**covering** [1] - 72:18
**covers** [2] - 23:15; 107:4
**create** [3] - 173:19; 174:2, 17
**created** [3] - 15:2; 169:24
**creating** [4] - 72:14; 175:1; 222:18, 21
**credentialed** [1] - 18:16
**credit** [3] - 46:9; 49:1; 217:20
**criteria** [3] - 24:18
**critical** [4] - 107:10, 14; 130:23;

225:21

**CROSS** [8] - 4:4, 8, 11, 16; 29:23; 60:20; 87:9; 191:17

**cross** [7] - 60:16; 95:3; 180:17; 182:4; 184:2; 190:4; 191:13

**CROSS-EXAMINATION** [8] - 4:4, 8, 11, 16; 29:23; 60:20; 87:9; 191:17

**cross-examination** [5] - 60:16; 95:3; 182:4; 190:4; 191:13

**crown** [1] - 104:24

**CRR** [3] - 3:13; 265:14, 17

**cry** [2] - 209:25; 210:2

**crying** [1] - 234:2

**culmination** [1] - 23:21

**culpability** [1] - 154:25

**culture** [1] - 121:20

**cumulative** [2] - 95:2; 258:12

**cures** [1] - 35:1

**current** [1] - 12:12

**curriculum** [16] - 100:16, 18-20; 101:3, 8, 17, 22; 102:20, 23; 103:6, 9, 21; 133:6

**curriculums** [1] - 90:16

**custodial** [2] - 59:11; 187:23

**custodian** [1] - 187:25

**cut** [3] - 210:8, 12, 14

**cyberbullying** [1] - 132:20

## D

**D.M** [4] - 225:12; 226:19; 227:4; 241:3

**D.N** [4] - 225:10; 226:19; 228:2

**D.R** [1] - 185:3

**DAB** [7] - 123:18-21; 124:1; 132:13

**daily** [2] - 123:19; 132:13

**damage** [1] - 34:8

**data** [4] - 25:19; 119:19; 120:2

**date** [19] - 45:3; 62:21; 83:23; 85:22; 146:1; 154:10; 166:14; 170:15, 17; 178:14; 194:16; 203:4; 219:25; 236:17; 244:5; 256:5, 10; 259:23

**Date** [1] - 265:17

**dated** [7] - 41:14; 50:4; 154:6; 216:17; 217:15, 25; 244:1

**dates** [3] - 141:4; 204:1; 252:3

**daughter** [3] - 134:17; 198:12, 18

**David** [13] - 220:25; 221:3, 6, 12; 231:18; 232:1, 9, 20; 233:1, 4-5, 7; 241:3

**days** [12] - 28:4; 57:20; 83:7; 110:14; 146:8; 151:14; 154:21; 155:6; 174:14; 178:19; 260:22

**DC** [5] - 1:17; 2:15, 19, 22; 3:3

**de** [5] - 181:14; 182:6, 18

**dead** [1] - 171:23

**dead-end** [1] - 171:23

**deal** [10] - 76:22; 111:21, 24; 114:14; 148:15; 149:1; 237:7; 257:13; 258:22; 264:15

**dealing** [5] - 57:1; 107:14; 139:15; 163:12; 253:18

**deals** [2] - 252:8; 253:7

**dealt** [2] - 103:14; 129:19

**death** [2] - 235:8; 236:13

**debate** [1] - 257:9

**December** [9] - 18:10; 83:21, 23; 84:17; 93:14; 203:25; 216:15

**decide** [3] - 100:24; 159:7; 199:21

**decided** [10] - 104:17; 135:17; 137:10; 141:13; 149:10; 159:9; 179:20, 22; 258:9; 262:25

**decision** [3] - 48:23; 91:19; 257:24

**decor** [1] - 97:10

**decreased** [1] - 17:19

**dedicated** [1] - 192:16

**Defendant** [5] - 2:14; 3:2, 9; 253:6, 22

**defendant** [9] - 67:4, 7, 18, 21; 87:15, 17; 94:23; 96:12; 253:16

**defendants** [5] - 37:6; 95:13; 96:8, 25; 97:22

**Defendants** [2] - 1:8; 3:5

**defendants'** [1] - 94:22; 164:15

**Defendants'** [81] - 5:3-6, 8-18; 39:3; 41:1; 42:18; 43:5; 44:9, 14, 18; 45:11; 46:3; 47:7, 24; 48:5; 49:16, 21; 50:1; 52:10, 15, 19; 59:21; 63:18; 77:25; 79:16; 90:22; 92:4; 95:2, 16; 113:6, 13; 114:19; 115:8; 116:23; 123:4; 130:18; 131:4, 12; 135:21; 140:14; 142:4, 8; 143:24; 144:3; 146:16; 150:18, 21; 151:2; 152:17, 23; 157:13, 17, 25; 160:17; 161:17, 22; 164:11, 14; 166:6; 168:22; 170:9, 12; 172:14; 175:7; 176:5, 15; 178:6, 11; 184:17

**DEFENDANTS'** [2] - 7:3; 37:8; 68:20

**defense** [6] - 6:8; 19:22, 25; 260:21; 262:23; 263:2

**defiant** [1] - 139:13

**define** [2] - 118:12; 191:24

**defined** [1] - 129:18

**definitely** [1] - 63:17

**degree** [2] - 21:3; 27:24

**deliberately** [1] - 185:3

**delirious** [1] - 16:3

**delirium** [1] - 23:11

**delve** [1] - 73:13

**demented** [1] - 13:24

**dementia** [1] - 22:12

**demonstrate** [1] - 33:5

**demonstrated** [1] - 207:14

**denied** [4] - 96:14, 20, 23; 254:12

**density** [1] - 17:19

**department** [4] - 77:14; 111:7; 139:12

**departments** [1] - 106:24

**departure** [1] - 254:5

**deponent** [1] - 94:24

**deposed** [3] - 193:19, 21, 24

**deposition** [31] - 30:2; 31:16; 32:23;

33:25; 94:15, 21, 23, 25; 95:1, 6; 96:5, 9, 13, 15-16, 20, 24-25; 97:2; 181:15; 182:6, 20; 193:12, 18; 194:4, 8; 196:16; 200:6; 201:8; 202:15; 238:9

**depressed** [1] - 15:3

**depression** [9] - 14:3; 24:17, 21; 25:22; 29:4; 33:23; 34:24; 35:6; 74:13

**describe** [8] - 38:14; 40:2, 7; 71:14; 72:5; 106:18; 107:6, 8

**describing** [2] - 231:2, 16

**DESCRIPTION** [1] - 5:2

**designate** [1] - 195:17

**designated** [3] - 193:25; 196:17; 200:18

**designation** [1] - 94:15

**designations** [6] - 94:16, 17-18; 97:2

**designed** [1] - 74:2; 102:4

**desk** [2] - 187:12

**despite** [3] - 115:3; 179:11, 19

**detail** [3] - 50:24; 107:20; 174:19

**detailed** [2] - 228:19; 233:9

**details** [6] - 50:21; 51:3; 67:1; 120:23; 205:2; 233:15

**detention** [1] - 154:22

**Determination** [1] - 102:4

**determination** [2] - 94:19; 264:13

**determine** [4] - 30:15; 33:19; 143:17; 168:11

**determined** [1] - 148:4

**develop** [4] - 18:19; 27:19; 75:22; 100:20

**developed** [1] - 103:21

**developing** [1] - 18:23

**development** [3] - 27:16; 45:24; 103:6

**developmental** [2] - 24:4, 6

**developmentally** [1] - 74:14

**develops** [3] - 27:11, 17, 19

**diabetic** [1] - 73:22

**diagnose** [12] - 24:20, 22; 25:6, 17; 26:15; 31:14; 32:8, 12; 33:14; 34:12

**diagnosed** [3] - 24:17; 32:3; 33:19

**diagnoses** [1] - 22:15

**diagnosing** [1] - 13:3

**diagnosis** [4] - 15:4; 22:9; 25:21; 29:4

**diagnostic** [3] - 10:25; 25:20; 29:5

**diagram** [1] - 144:24

**diagrams** [1] - 239:16

**dial** [1] - 127:1

**dick** [1] - 148:10

**differences** [1] - 74:11

**different** [36] - 9:24; 10:15; 11:8; 15:2; 18:22; 38:17; 53:14; 62:10; 74:5; 85:5; 99:2; 100:8; 102:2; 109:4; 110:12; 111:10-13; 118:7; 124:15; 132:19; 144:15; 149:20; 180:3; 182:14; 199:4; 210:21; 211:21; 241:13; 243:22; 251:6

**differential** [1] - 15:4

**differently** [2] - 68:1; 71:15

**difficult** [1] - 262:1

**difficulties** [1] - 72:2
**difficulty** [1] - 82:3
**digitally** [1] - 74:4
**direct** [21] - 31:22; 32:6, 15; 51:25; 62:4; 63:8, 18; 64:23; 68:18; 92:2, 9; 111:15; 114:5; 182:3; 202:9, 17, 20; 204:13; 213:21; 241:18
**DIRECT** [10] - 4:3, 7, 10, 14-15; 7:8; 37:13; 69:1; 98:1; 190:7
**directed** [2] - 257:19, 21
**directly** [9] - 43:25; 66:21; 133:21; 135:14, 17; 169:8; 174:1; 223:2; 234:25
**director** [6] - 78:20, 24; 101:25; 104:20; 172:25; 214:24
**directors** [2] - 85:4, 6
**dis** [1] - 254:23
**disability** [4] - 138:14; 139:13, 16
**disagree** [1] - 33:25
**disagreeing** [1] - 35:23
**disallow** [1] - 95:18
**disciplinary** [3] - 18:17; 56:22; 57:1; 106:25; 127:8; 253:8, 11, 13, 18, 20
**discipline** [32] - 12:1, 8; 111:18, 21; 119:20; 145:25; 154:20; 165:5; 166:19, 24; 167:17, 25; 186:13; 244:24; 245:6-8; 247:3, 9; 248:18; 249:5; 251:6, 11, 19; 255:24; 258:18, 20-21; 260:8, 11; 261:15
**disciplined** [12] - 124:17; 164:3; 167:22; 169:5; 254:23; 259:4, 11, 14, 22; 260:7; 261:14
**disciplines** [2] - 129:10; 252:1
**disciplining** [3] - 164:6; 252:14
**discovery** [2] - 172:10; 200:17
**discreet** [1] - 52:3
**discreetly** [7] - 53:2, 18, 23; 135:11; 140:4, 22; 156:6
**discuss** [9] - 6:19; 19:5; 20:2; 37:3; 68:10; 94:3; 208:24; 261:10; 262:11
**discussed** [4] - 12:23; 96:2; 262:20; 263:12
**discussion** [4] - 35:17; 251:17; 257:17; 261:23
**Discussion** [2] - 254:7; 256:17
**disease** [14] - 9:11; 10:8; 11:11; 12:24; 14:15; 15:11-13, 16; 21:20; 22:5, 12; 23:5
**diseases** [5] - 10:10; 11:12; 12:24; 13:4, 22
**disheartened** [2] - 65:11, 16
**disorder** [7] - 11:14; 20:7; 25:16, 23; 31:11; 35:2
**disorders** [11] - 13:12; 22:6, 13; 24:17; 25:7, 13; 26:16; 29:7; 33:24; 34:1; 35:7
**disparaging** [1] - 254:24
**disregard** [1] - 227:25
**disrespect** [3] - 97:11, 13; 203:1
**dissatisfied** [1] - 200:4
**dissected** [1] - 120:10
**distinct** [1] - 71:19

**distinction** [1] - 233:6
**distress** [1] - 15:2
**DISTRICT** [3] - 1:1, 12
**district** [3] - 91:21; 103:23; 178:23
**District** [4] - 3:14; 264:10
**divided** [2] - 107:21; 219:23
**division** [2] - 18:8
**DM** [1] - 232:19
**Docket** [6] - 94:21; 95:5, 11, 15; 96:23
**doctor** [8] - 18:17; 20:5; 22:23; 28:23; 29:12; 36:24; 203:1
**Doctor** [1] - 26:4
**doctorate** [2] - 9:2; 29:11
**doctors** [6] - 9:19, 21; 10:14; 11:24; 18:11, 21
**document** [38] - 65:6; 66:1; 113:18; 114:13; 123:12; 124:1, 8, 10, 13; 125:10, 20; 144:21; 166:14; 172:21; 175:1, 10, 13, 18; 176:1, 22; 185:25; 213:24; 216:14; 220:8, 10, 13; 222:15, 19, 22; 223:3, 20; 238:10, 15; 244:1; 247:18
**documentation** [1] - 177:8
**documenting** [1] - 164:23
**documents** [5] - 112:11; 177:6, 20; 182:23; 230:9
**Dogwood** [1] - 105:19
**done** [25] - 51:10; 55:15; 73:8; 97:12; 100:3; 102:18; 110:17; 126:3, 22; 139:5; 173:25; 176:23; 177:21; 178:2; 181:13; 182:5; 197:10; 217:18; 218:22; 219:14; 222:12; 260:24; 265:10
**door** [29] - 55:25; 56:6, 8; 58:8; 59:3; 78:16, 22; 79:1, 12, 23; 80:11, 13; 81:8, 10, 15; 82:10; 108:18; 112:23; 118:3; 146:24; 187:9, 11; 254:11
**doors** [5] - 59:4; 78:24; 92:22; 109:20; 147:2
**doorway** [2] - 80:4; 116:4
**doppler** [1] - 13:7
**double** [2] - 78:17, 24
**douchebag** [3] - 148:17; 149:11, 24
**down** [64] - 37:2; 56:11; 62:2; 63:6; 64:5; 66:24; 68:10; 77:8; 80:10; 82:7, 14; 89:9; 91:21, 25; 92:24; 94:3; 103:22; 110:18; 114:17; 115:7; 116:17; 118:6; 125:1, 9-10; 128:17; 130:1, 19; 132:5; 136:18; 139:2; 141:13; 142:17; 146:1; 147:12; 153:25; 158:4; 160:16; 163:15; 166:5; 168:6; 170:2; 171:11; 176:4; 178:5; 180:2, 12; 185:25; 200:24; 209:9; 212:25; 215:23; 218:4, 7-8; 221:25; 227:2, 10; 228:6; 234:11; 250:11; 251:13; 262:18
**download** [1] - 120:2
**dozen** [1] - 226:16
**DR** [7] - 4:3-5; 7:3, 8; 29:23; 36:9
**Dr** [31] - 7:12, 14, 19; 8:9; 9:13; 21:6; 29:8, 25; 30:8; 32:19, 22, 25; 35:14, 17; 36:5, 11; 97:8; 172:25; 173:1; 174:13;

175:4, 19; 177:9; 202:22, 25; 218:25; 219:2; 223:23; 224:2
**draft** [1] - 223:14
**drafts** [1] - 175:15
**draw** [3] - 61:23; 144:24; 239:16
**drawing** [1] - 233:6
**Dreyfuss** [5] - 172:25; 175:5; 179:15; 224:1
**drill** [1] - 251:18
**Drive** [1] - 3:7
**drive** [2] - 34:11, 23
**driven** [1] - 33:20
**drop** [1] - 77:16
**dropped** [1] - 81:21
**drug** [3] - 100:5; 133:2, 5
**drugs** [1] - 34:14
**DSM** [1] - 33:14
**DSM-5** [1] - 24:18
**dual** [2] - 200:14
**due** [6] - 31:11; 50:19; 63:3; 72:13; 139:9; 189:9
**dues** [2] - 16:11, 16
**during** [41] - 10:2; 11:3; 12:2; 17:17; 33:24; 51:6, 9; 63:8; 79:8; 83:10; 96:3; 97:8; 98:9; 106:6; 109:21; 110:3; 119:13, 24; 125:19, 22; 128:7; 132:16; 137:6; 141:6, 14; 145:6; 146:12; 157:8; 172:10; 186:25; 187:25; 188:2, 10, 17; 189:17; 190:1; 192:21; 197:6; 215:1; 218:8; 241:18
**During** [2] - 52:1; 65:7
**duties** [5] - 77:3, 5; 107:21; 108:21
**duty** [14] - 77:6, 8, 10, 13-14, 20; 78:13; 80:18; 108:6, 22; 109:16; 114:3, 14; 142:22
**DX-138** [1] - 217:8
**DX-152** [1] - 208:14
**DX-200** [5] - 224:4; 226:6, 10; 228:6; 229:13
**DX-205** [1] - 218:19
**DX-220** [1] - 241:17
**DX-227** [1] - 217:22
**DX-61** [1] - 61:3
**dystrophy** [1] - 11:13

**E**

**e-mailed** [1] - 198:13
**early** [1] - 202:11
**easier** [5] - 24:23; 41:6; 75:25; 153:9
**East** [1] - 1:20
**EASTERN** [1] - 1:1
**Eastern** [2] - 3:14; 264:10
**eat** [2] - 108:14; 142:22
**eating** [2] - 36:11; 109:1
**economics** [1] - 90:8
**ed** [4] - 99:23; 100:13; 111:7; 139:11
**educating** [1] - 105:4
**education** [40] - 8:23; 16:14; 35:24;

70:3, 5, 7, 12; 71:17; 72:1; 75:6; 98:22; 99:14, 19, 22, 24; 100:2, 6, 15-16, 21-23; 101:2, 12, 24; 102:10; 103:7; 106:24; 107:13; 109:12; 126:18; 133:2, 5-6; 139:9; 185:22

**educational** [3] - 70:2; 74:9; 90:12

**educator** [3] - 74:7; 106:6, 12

**EEG** [6] - 10:22; 16:4; 26:5; 28:2, 7

**EEGs** [1] - 12:22

**effect** [1] - 156:15

**effective** [2] - 75:12, 14

**effectively** [1] - 16:20

**efficiently** [2] - 72:11; 184:11

**effort** [1] - 237:20

**efforts** [2] - 103:2; 179:20

**eight** [2] - 98:19

**eighth** [1] - 69:15

**either** [16] - 44:5; 49:8; 51:7, 21; 61:10; 71:24; 85:12; 86:19; 182:17; 183:18; 197:6; 224:10; 232:25; 233:19; 238:22; 249:25

**elderly** [1] - 15:19

**elective** [5] - 89:19; 90:5; 91:13, 15

**electives** [5] - 90:10, 12, 14; 91:11, 13

**electrical** [4] - 10:17, 25; 11:6; 12:22

**electrode** [1] - 23:18

**electrodes** [3] - 10:23; 11:5; 23:19

**Electrodiagnostic** [2] - 13:2; 16:13

**electrolytes** [1] - 23:9

**electronic** [1] - 113:25

**Elementary** [2] - 105:19, 22

**elementary** [6] - 89:4; 103:12, 17; 138:12; 252:4

**Elena** [1] - 81:5

**elevating** [3] - 193:3; 194:11; 195:4

**eleven** [1] - 69:21

**eligibility** [1] - 109:14

**eliminate** [1] - 238:17

**Elliker** [1] - 3:2

**Email** [12] - 1:18, 22; 2:5, 9, 13, 16, 20, 23; 3:4, 8, 12, 16

**email** [66] - 41:9, 12; 42:2, 4; 43:13, 18-19, 21, 23-24; 44:4, 6, 23; 46:10, 13, 21; 47:1; 48:20; 50:3, 14-15; 51:24; 52:13; 53:12; 54:21; 62:5, 10-11, 13, 23; 64:14; 65:5; 66:3; 134:2; 135:10, 25; 136:1, 23; 140:4, 19; 141:16, 19; 156:18; 172:18, 23; 173:3, 5, 10; 176:17, 19; 177:23; 178:13-15; 179:2, 15; 184:21, 23; 203:3; 208:3

**emails** [9] - 44:17; 46:25; 49:17; 84:23, 25; 108:4; 207:22; 208:8; 211:19

**emergency** [2] - 17:15; 77:11

**emergent** [1] - 264:15

**emotional** [8] - 27:14, 18; 33:13; 35:13; 73:21; 138:14; 139:13, 16

**emotions** [3] - 27:16; 118:16, 21

**empathy** [2] - 118:17, 25

**emphasis** [1] - 129:18

**employed** [6] - 17:21; 37:20; 69:9;

98:9, 13

**employment** [5] - 95:3; 96:3, 7, 10

**empty** [1] - 207:16

**encephalogram** [1] - 23:18

**encounter** [2] - 59:8; 189:25

**encourage** [1] - 119:17

**end** [20] - 45:6; 46:19; 48:24; 58:18; 59:17, 19; 75:8; 85:22; 150:1; 158:25; 163:16; 171:23; 181:8; 203:3; 204:14; 245:5; 248:13; 256:10; 257:3; 263:15

**ended** [5] - 18:10; 45:8, 17; 59:1; 177:11

**ending** [1] - 259:9

**endorphins** [1] - 36:15

**enforced** [2] - 80:19, 24

**enforces** [1] - 113:1

**engage** [1] - 116:7

**engaged** [11] - 20:15; 121:10, 24; 127:9; 137:15; 154:2, 24; 156:10; 168:12; 220:19; 258:7

**English** [14] - 38:11; 40:16; 52:1; 53:10; 65:7, 17; 90:9; 99:13, 18; 100:13; 107:2, 20; 140:9, 11

**enjoy** [1] - 263:6

**enjoying** [1] - 89:14

**ensemble** [5] - 71:11; 73:11; 84:7; 91:23

**ensembles** [1] - 71:18

**ensure** [4] - 14:22; 75:16

**entailed** [1] - 138:15

**entails** [1] - 99:22

**enter** [3] - 16:18; 146:24

**entered** [1] - 97:3

**entertain** [1] - 255:6

**entire** [3] - 54:25; 174:18; 193:2

**entirely** [1] - 102:11

**entities** [1] - 16:15

**entitled** [1] - 265:15

**entity** [1] - 13:17

**entrance** [3] - 80:11; 108:14; 117:11

**entry** [2] - 248:22; 251:11

**environment** [4] - 38:19; 75:19; 119:4; 120:10

**epilepsy** [7] - 10:19; 14:2; 16:2; 18:21; 22:12; 24:5

**Equity** [1] - 192:19

**erase** [1] - 147:6

**escalated** [1] - 231:3

**escorted** [1] - 51:7

**escorting** [1] - 51:9

**especially** [2] - 72:7; 82:4

**Esq** [11] - 1:15, 19; 2:2, 6, 10, 14, 17, 21; 3:2, 5, 9

**essay** [1] - 58:5

**esse** [5] - 181:15; 182:6, 18

**essentially** [7] - 119:16; 126:18; 130:9; 136:4; 138:3; 208:20; 222:4

**establish** [2] - 253:16, 21

**established** [3] - 17:7; 18:2

**esteem** [1] - 118:18

**estimate** [3] - 20:4; 70:25; 111:4

**ESTRELLA** [7] - 4:7-9; 37:8, 13; 60:20; 67:15

**Estrella** [19] - 37:6, 19-20; 39:9; 52:1; 60:22; 65:7, 18; 67:17; 140:4, 7, 19; 141:16, 20; 216:18; 217:22; 218:4, 16

**et** [3] - 1:6; 75:11; 187:18

**evaluate** [4] - 20:12, 21; 22:6, 15

**evaluated** [2] - 111:5, 7

**evaluating** [1] - 138:14

**evaluation** [1] - 21:1

**evaluations** [2] - 106:23; 109:11

**evaluator** [1] - 111:15

**evening** [2] - 83:24; 263:6

**event** [1] - 237:9

**events** [1] - 175:3

**eventually** [3] - 246:1; 250:18; 261:13

**everyday** [1] - 237:9

**evidence** [26] - 62:16; 63:17; 88:14; 95:8, 18, 22, 24; 126:6; 130:2; 131:9; 157:14, 18; 164:11; 166:7; 172:15; 175:7; 182:17; 205:22; 217:2; 220:5; 227:11; 246:6, 8-9; 247:15; 252:1

**Evidence** [1] - 95:7

**evidently** [1] - 179:20

**evolve** [2] - 9:23; 24:19

**evolved** [1] - 33:9

**evolves** [2] - 12:13; 32:17

**ex** [1] - 31:7

**exact** [5] - 56:19; 83:23; 85:21; 204:1; 219:11

**exactly** [5] - 42:14; 66:25; 255:1; 258:6; 260:16

**exam** [5] - 12:4, 7, 10; 13:19; 23:1

**examination** [21] - 10:1; 12:1, 8; 29:1; 60:16; 62:4; 63:9; 64:23; 95:3; 97:8; 113:8; 180:20; 181:4, 8, 25; 182:3; 190:4; 191:13; 213:21; 241:18

**EXAMINATION** [24] - 4:3-5, 7-12, 14-16; 7:8; 29:23; 36:9; 37:13; 60:20; 67:15; 69:1; 87:9; 93:9; 98:1; 190:7; 191:17

**EXAMINATIONS** [1] - 4:2

**examine** [5] - 12:5; 19:13; 20:11; 22:7; 120:3

**examined** [1] - 20:5

**examining** [1] - 11:18

**example** [24] - 10:19; 13:10, 24; 14:2, 25; 15:14; 16:2, 11; 17:2; 18:13, 20; 22:3; 23:5; 24:2; 25:22; 28:3; 31:8; 73:21; 74:1; 144:19; 212:11; 224:25; 239:24; 255:3

**examples** [1] - 129:19

**exams** [1] - 14:10

**except** [2] - 253:13, 19

**exceptions** [1] - 72:4

**exchange** [4] - 41:7; 155:3; 230:11; 239:10

**exchanged** [1] - 155:2

exclude [1] - 138:19
excuse [12] - 19:7; 28:15; 48:23; 63:2; 197:23; 201:25; 207:9; 216:13; 238:22; 244:25; 245:17; 262:18
excused [3] - 43:3; 47:5; 62:24
exhibit [10] - 47:16; 79:19; 80:8; 114:18; 115:8; 131:4; 161:2; 167:16; 229:25; 260:10
**Exhibit** [77] - 5:3-18; 39:4; 41:1; 42:19; 43:5; 44:9, 14, 18; 45:11; 46:4; 47:7, 25; 48:5; 49:16, 22; 50:1; 52:11, 16, 19; 59:21; 62:17; 64:10; 78:1; 79:16; 88:19; 90:22; 92:4; 113:6, 13; 115:8; 116:24; 123:4; 126:4; 130:2, 18; 131:4, 12; 135:22; 142:4, 8; 143:25; 144:3; 146:17; 150:19, 21; 152:23; 157:13, 17, 25; 160:17; 164:14; 170:12; 175:7; 176:6, 15; 178:6, 11; 205:22; 220:5; 227:11; 246:6; 247:15
exhibits [5] - 94:25; 95:2, 7; 96:21; 263:8
**EXHIBITS** [1] - 5:1
exist [3] - 28:18, 21; 238:3
existed [1] - 18:5
exit [1] - 78:16
expectation [3] - 112:16; 113:1; 114:8
expectations [3] - 124:4, 23
expected [5] - 11:24; 15:7; 112:24; 114:1; 154:16
experience [11] - 6:24; 20:25; 31:20; 72:14; 73:17; 75:12; 103:9; 112:18; 213:9; 223:18
experienced [2] - 20:6; 30:16
experiences [1] - 96:10
experiencing [2] - 30:16; 50:20
expert [4] - 8:9; 21:6; 32:19, 22
explain [14] - 6:25; 9:18; 10:13; 13:14; 16:5; 18:25; 24:15; 40:9; 57:6; 73:17; 99:21; 119:15; 146:10; 196:13
explained [1] - 197:7
explaining [1] - 146:21
explains [2] - 24:4; 101:2
**Explorer** [1] - 114:25
**Explorers** [7] - 38:25; 61:16, 23; 115:1, 3; 117:20, 25
exposed [1] - 9:20
exposure [4] - 9:22; 11:7; 19:24; 33:6
express [2] - 15:2; 136:15
expressed [2] - 134:16, 20
extensive [3] - 31:25; 95:3; 119:18
extent [8] - 6:20; 27:21, 24; 31:11; 106:16; 165:9; 253:14, 19
exterior [1] - 78:22
extra [6] - 10:14; 46:9; 86:18, 20, 22; 187:8
extreme [1] - 211:5
extremity [1] - 11:5
**Extrinsic** [1] - 95:8
extrinsic [3] - 95:18, 22, 24
extroverted [1] - 75:25

eye [5] - 86:17, 20, 22; 189:3

# F

F'ing [1] - 153:18
F's [1] - 148:8
**F.C.S.B** [3] - 1:6; 2:14; 3:2
**F.T** [1] - 3:6
**Facebook** [11] - 164:1; 168:8, 12, 15, 19; 171:7, 16; 227:7; 232:19; 242:8; 255:1
facing [1] - 61:19
fact [11] - 30:24; 91:18; 115:3; 121:7; 227:24; 247:8; 249:2; 255:23; 257:16; 258:3; 264:14
factor [1] - 181:24
facts [1] - 229:17
**Faculty** [1] - 9:2
faculty [1] - 51:8
**Fahey** [1] - 1:15
failed [1] - 10:21
failure [1] - 23:9, 12
fair [10] - 32:1; 167:10; 202:18; 204:17; 210:19, 22; 215:18; 221:13; 237:20; 263:20
**Fairfax** [26] - 37:23; 38:1, 16; 69:10; 90:19; 98:7; 99:2; 101:1, 16, 20, 25; 102:18, 20; 103:8; 132:7; 192:15; 193:25; 197:13; 201:16; 252:20; 253:15, 21, 23; 254:10, 14; 259:24
fall [6] - 12:12; 69:24; 77:21; 83:20; 87:19; 198:5
**Falls** [10] - 98:25; 99:1, 5; 100:10, 25; 101:14; 102:16, 19; 106:13; 107:15
false [5] - 191:7; 232:10, 21; 257:25; 258:2
familiar [5] - 29:2; 35:14; 38:15; 114:1; 220:8
families [1] - 107:16
family [39] - 99:19, 21; 100:1, 14, 16, 20, 23, 25; 101:2, 24; 102:6, 10, 17-18; 103:7; 107:13; 128:12; 133:3; 188:25; 197:12, 24; 198:5, 11, 17, 21; 199:6, 18-19, 25; 200:2; 201:15; 207:24; 209:5; 219:4; 235:21; 236:21; 238:22
far [5] - 38:20; 183:10; 212:4; 218:10; 219:25
F▮▮▮▮ [1] - 39:21
F▮▮▮▮ [1] - 116:1
fast [1] - 82:7
father [5] - 84:21, 25; 134:7; 203:14
fault [1] - 205:8
favorite [1] - 114:21
faxed [1] - 175:18
**FCPS** [4] - 38:5; 43:19; 77:1; 254:11
**FCSB** [2] - 253:16, 22
feasibility [1] - 254:11
**February** [39] - 16:21; 49:19; 50:5, 10, 14-15; 53:1; 54:22; 136:22-24; 137:2, 4;

140:24; 151:6; 153:3; 154:6, 8; 156:24; 166:15; 189:20; 211:14; 214:11; 216:5; 217:25; 218:16, 22; 219:15; 221:21; 222:2; 239:7, 22; 244:1; 246:14; 250:22; 255:12, 23; 257:8
**Federal** [2] - 95:7; 264:10
feedback [1] - 111:12
feeds [1] - 85:5
feet [1] - 79:1
**FELDMAN** [1] - 3:10
fellow [3] - 212:7; 213:9, 18
fellowship [10] - 9:9-11; 10:13; 11:3, 10, 16, 18, 25; 16:19
fellowships [1] - 10:15
felt [12] - 135:6; 138:22; 177:20; 197:21, 25; 199:5, 23, 25; 202:1, 3
female [1] - 83:13
**Festival** [1] - 88:21
few [16] - 6:23; 28:4; 70:17; 72:4; 82:25; 110:18; 127:1; 180:15; 182:23; 183:18; 186:23; 190:12; 191:22; 222:2; 232:25
fewer [2] - 71:10
field [2] - 16:9; 26:15
fifth [3] - 17:13, 18; 102:11
fighting [1] - 153:21
figurative [1] - 22:22
figure [5] - 155:23; 156:5, 7, 21; 158:12
file [1] - 247:3
filed [2] - 264:3
files [1] - 245:6
fill [1] - 90:8
filled [1] - 110:6
finally [1] - 262:8
findings [6] - 23:17; 24:8; 25:11; 26:5, 13; 29:6
fine [13] - 39:3; 44:5; 63:20; 115:19; 131:2, 19; 170:19, 21; 198:3; 226:5; 247:20; 248:21
finished [7] - 9:19; 11:24; 143:12; 181:3; 182:16; 183:15; 210:14
finished [1] - 16:19
finishes [1] - 248:1
firm [2] - 20:12, 15
first [60] - 13:13; 14:14; 16:18; 20:17; 45:2; 48:18; 50:3; 66:1; 74:19; 75:9, 18; 76:6; 83:22; 91:4; 98:24; 99:5; 102:5; 107:8; 117:9; 125:19; 126:13; 127:10, 13; 130:10; 133:14, 19; 137:6, 14; 139:24; 151:11; 153:5; 164:17; 166:19; 173:10; 175:9, 17, 21; 186:9, 11; 190:13; 194:3, 7; 202:9; 203:20; 214:2, 19; 217:5; 225:22; 229:17, 25; 231:7; 233:23; 235:21; 248:10; 251:1; 257:7
fish [2] - 77:14; 78:12
five [10] - 38:7; 55:20; 70:21; 74:2; 105:10; 160:14; 192:24; 193:1; 212:17
fix [2] - 35:10; 209:18
fixed [2] - 35:12; 175:16

**FL** [3] - 2:4, 8, 12
**flash** [1] - 140:25
**FLE** [2] - 100:14; 133:1
**FLEXNER** [4] - 1:20; 2:2, 6, 10
**flip** [8] - 61:11; 62:8; 63:13; 64:7; 115:18; 116:2; 127:4; 175:22
**flipping** [3] - 65:25; 66:9
**floating** [1] - 53:13
**floor** [1] - 17:16
**floors** [1] - 117:18
**Florida** [1] - 70:5
**flow** [1] - 13:9
**fluid** [2] - 15:23; 23:14
**fluidity** [1] - 94:18
**focal** [1] - 24:8
**focus** [9] - 38:22; 39:10; 45:18; 124:3; 125:5; 176:18; 211:19; 230:21; 256:5
**focused** [3] - 11:10; 38:20; 130:22
**focuses** [1] - 95:21
**fog** [1] - 23:6
**follow** [5] - 201:18, 21; 208:17; 211:13
**follow-up** [4] - 207:18, 21; 208:17
**follow-ups** [1] - 211:13
**followed** [1] - 12:3
**following** [7] - 66:11; 124:12; 130:6; 136:5; 195:1; 197:4
**Following** [1] - 251:17
**foot** [1] - 255:25
**FOR** [1] - 1:1
**foreclosed** [1] - 96:11
**foregoing** [1] - 265:14
**foremost** [1] - 75:18
**forensic** [3] - 30:24; 31:4, 7
**forget** [1] - 149:13
**forgot** [1] - 181:24
**form** [3] - 211:24; 220:14
**formal** [2] - 8:23; 196:13; 197:8
**formally** [1] - 31:20
**format** [2] - 73:12; 262:6
**formatting** [2] - 218:10; 219:11
**former** [4] - 166:21; 186:1; 189:6; 243:3
**forming** [1] - 31:23
**formulating** [1] - 155:22
**forth** [7] - 66:9; 148:13; 149:17; 207:23; 220:14; 236:18
**fortunate** [1] - 76:12
**forward** [5] - 116:2, 15; 140:25; 181:14; 208:23
**forwarded** [1] - 179:15
**foundation** [1] - 162:21
**four** [9] - 14:7; 59:20; 85:5; 102:10, 12; 122:18; 178:19; 219:23; 233:14
**fourth** [2] - 109:17; 250:16
**Fourth** [1] - 95:16
**fourth-period** [1] - 109:17
**fracture** [1] - 24:3
**framework** [1] - 262:25
**F▇▇** [2] - 39:24; 115:24

**F▇▇** [24] - 66:5, 7; 80:22; 92:13; 105:7; 112:25; 134:1; 155:12; 157:8; 173:4, 23; 176:19; 177:10, 24; 184:24; 202:22; 203:6, 8; 205:17; 206:1; 214:21; 221:25; 223:21; 237:13
**F▇▇** [1] - 66:19
**F▇▇** [3] - 76:20; 174:13; 214:18
**F▇▇** [1] - 233:24
**free** [7] - 18:3; 58:22; 68:11; 206:21, 24-25; 263:17
**frequently** [2] - 76:25; 77:11
**Friday** [9] - 182:6, 20; 260:18; 262:5, 10, 13; 263:8, 22
**friend** [5] - 148:6; 149:16; 169:13; 171:6; 242:2
**friendly** [1] - 123:18
**friends** [5] - 83:17; 148:6; 170:24; 171:3
**friendships** [2] - 75:22; 76:1
**front** [10] - 36:20; 63:12; 87:14; 113:15; 117:20; 187:9, 11; 214:12; 238:14
**frontal** [2] - 27:14, 17
**frozen** [1] - 112:10
**frustrated** [2] - 65:11, 16
**full** [8] - 91:14; 96:4; 99:19; 102:14; 173:5; 232:6, 12; 237:16
**full-time** [1] - 99:19
**Fulton** [1] - 3:7
**fun** [1] - 207:5
**function** [2] - 11:7; 28:7
**functioning** [1] - 10:18

**G**

**gap** [2] - 202:14, 16
**gathered** [1] - 144:8
**gathering** [1] - 238:12
**gavel** [1] - 265:10
**gelatinous** [1] - 21:24
**general** [12] - 31:8; 33:3; 40:18, 22; 71:17; 72:1; 196:9; 203:24; 205:3; 206:7; 253:13, 18
**generalized** [1] - 25:23
**generally** [13] - 40:17; 78:15; 91:15; 106:18; 107:5; 112:17; 113:19; 120:15, 17, 22; 127:3; 173:19; 256:2
**generation** [1] - 265:1
**gentlemen** [7] - 6:13; 128:11, 18; 180:8; 184:9; 196:22
**Genus** [1] - 171:15
**germane** [1] - 230:11
**gesture** [1] - 192:12
**Getz** [1] - 81:5
**Gigliotti** [1] - 85:12
**girlfriend** [2] - 148:17; 149:11
**girls** [1] - 155:14
**girls'** [1] - 118:5

**gist** [1] - 33:3
**given** [11] - 43:23; 46:15; 70:19; 74:3; 129:24; 130:6, 9; 134:23; 162:3; 200:4
**glance** [1] - 80:5
**Glasgow** [3] - 104:5, 7, 9
**global** [2] - 15:13; 18:14
**goal** [4] - 136:12, 14, 16; 222:7
**goals** [1] - 119:22
**gosh** [2] - 76:11; 81:20
**Grade** [1] - 88:20
**grade** [26] - 38:12, 17; 46:20, 24; 49:4, 8; 66:12; 87:20; 88:2; 90:2; 93:11; 99:7, 10, 13, 17, 20; 100:15; 101:3; 107:2; 119:21; 259:2, 10
**graded** [1] - 46:17
**grader** [10] - 138:10; 149:1, 9-10, 12; 151:24; 209:23
**graders** [1] - 138:10
**grades** [3] - 76:17; 90:14; 253:12
**graduate** [1] - 70:6
**graduate-level** [1] - 70:6
**graduated** [1] - 70:4
**Grady** [20] - 39:10; 45:19; 59:25; 78:4; 79:18; 95:20; 115:10; 117:4; 127:5; 129:12; 131:14, 18; 136:12; 147:6; 151:8; 160:16; 161:23; 172:20; 175:22
**Graham** [1] - 105:22
**granted** [2] - 253:8; 254:8
**grateful** [1] - 51:16
**Great** [1] - 26:8
**great** [5] - 38:16, 21; 104:24; 106:14; 264:25
**grew** [1] - 70:18
**grievance** [5] - 195:20, 23; 196:4
**grounds** [3] - 95:24; 96:10; 206:20
**group** [6] - 85:14; 108:16; 134:18; 171:9; 235:18
**groups** [2] - 102:5; 189:25
**grown** [1] - 102:12
**grows** [1] - 27:19
**guess** [12] - 28:12; 46:8, 16; 49:10; 58:3; 74:12; 170:24; 181:10; 182:24; 187:24; 198:5; 257:2
**guidance** [2] - 51:14; 103:1
**guide** [1] - 23:21
**guideline** [1] - 26:12
**guidelines** [5] - 25:8; 26:14; 31:20; 72:20; 74:6
**gun** [1] - 259:2
**gunshot** [1] - 10:9
**guts** [3] - 209:13
**guys** [1] - 206:5
**gymnasium** [1] - 84:10
**gynecology** [1] - 17:15

**H**

**habit** [1] - 135:15
**hacking** [4] - 164:1; 168:8, 12; 242:9

**hair** [1] - 155:22
**half** [9] - 80:21; 91:13; 172:21; 173:23; 176:17; 204:10; 227:2; 232:6; 248:16
**half-year** [1] - 91:13
**hall** [13] - 53:6; 59:18; 71:4; 80:2, 10, 18, 25; 84:6, 8-9; 92:17; 114:9
**halls** [6] - 58:23; 77:17; 112:17, 20; 116:9-11; 188:14; 255:1
**hallucinate** [2] - 13:24; 15:20
**hallucinates** [1] - 15:15
**hallucinating** [1] - 28:6
**hallway** [13] - 55:25; 56:10; 59:19; 78:22; 80:2; 112:22; 117:22, 25; 145:25; 160:2; 163:7, 14; 231:18
**hallways** [4] - 109:5; 114:9; 120:9; 207:14
**Hamilton** [1] - 81:4
**hand** [6] - 9:13; 22:5; 118:13, 20; 135:17; 231:19
**handbook** [9] - 100:22; 113:21, 23-25; 114:10; 123:14, 24
**handle** [1] - 195:18
**handled** [1] - 192:16
**handling** [3] - 198:7, 12, 18
**hands** [2] - 82:14, 17
**handwriting** [2] - 164:21; 247:11
**handwritten** [2] - 161:16
**Hannah** [1] - 43:1
**happy** [1] - 89:7
**harass** [1] - 190:15
**harassed** [2] - 54:23; 93:2
**harassment** [27] - 50:20, 23; 51:1; 86:8; 100:3; 101:10; 103:3; 118:10; 127:12; 191:25; 193:3; 194:11; 195:4, 10, 13, 16; 196:1; 205:5, 9; 206:17; 212:11, 18; 213:11, 14, 16; 234:10
**hard** [4] - 9:13; 34:23; 183:16; 263:14
**harm** [1] - 235:8
**harmed** [2] - 119:1; 191:4
**harmony** [1] - 36:18
**hate** [2] - 171:7, 9
**hates** [1] - 155:15
**head** [7] - 10:23; 13:8; 23:19; 24:1; 118:13
**headaches** [1] - 22:12
**Health** [1] - 9:1
**health** [21] - 14:1; 24:16; 25:1, 5-6, 13, 16; 26:16; 29:6; 31:11; 33:24; 34:1; 35:2, 7; 36:12; 103:1; 132:24; 133:1, 6; 253:12
**heap** [1] - 211:2
**hear** [12] - 7:5; 8:6; 32:17; 37:10; 48:13; 68:22; 88:24; 122:6; 170:2; 211:15; 254:18
**heard** [20] - 26:12; 32:15; 60:8; 116:6; 118:7; 119:9; 125:12; 166:1; 167:1, 12; 168:1, 8; 184:2, 9; 204:15; 231:7; 233:24; 243:3; 262:17, 19
**hearing** [3] - 66:22; 136:24; 242:13
**hearsay** [1] - 165:10

**heart** [2] - 118:13, 15
**height** [1] - 155:22
**held** [3] - 89:2; 95:17; 104:3
**help** [17] - 18:19; 58:3, 5; 64:11; 72:16; 73:4, 13; 76:3; 81:21; 82:3; 83:3; 101:6; 209:25; 210:2; 215:21; 232:7; 257:15
**help-type** [1] - 58:3
**helped** [3] - 49:8; 58:2; 83:5
**helpful** [1] - 157:11
**helping** [2] - 75:20
**helps** [1] - 26:9
**hemorrhage** [1] - 13:11
**hence** [1] - 91:12
**hereby** [1] - 96:22
**herself** [3] - 133:15; 141:11; 202:11
**hesitate** [3] - 7:6; 37:11; 68:23
**hesitation** [2] - 197:19; 202:2
**hi** [1] - 60:22; 87:11
**high** [12] - 36:15; 41:16; 50:4; 85:4-6; 103:18; 106:11; 148:24; 149:5; 171:17, 19
**High** [5] - 38:6; 69:11; 85:3, 25
**high-tailing** [2] - 148:24; 149:5
**higher** [1] - 235:23
**higher-ups** [1] - 235:23
**highest** [1] - 76:18
**highlight** [5] - 124:5; 136:11; 151:8; 161:23; 248:22
**highlighted** [2] - 178:22; 185:2
**highlights** [1] - 125:4
**Hills** [1] - 38:6
**hired** [1] - 105:6
**history** [3] - 90:10; 96:3; 193:2
**hitting** [2] - 185:4, 17
**hmm** [13] - 38:23; 101:13; 188:17; 196:11; 200:9; 203:5; 225:5; 230:23; 235:6; 241:6; 243:13; 244:13; 255:14
**hold** [5] - 77:15; 102:9; 137:13; 165:8; 178:1
**holding** [1] - 142:15
**holiday** [1] - 46:1
**HOLTZMAN** [1] - 1:15
**home** [8] - 15:20; 41:20; 63:2; 84:2; 90:8; 91:10, 15
**homebound** [11] - 91:10, 16, 19; 172:2; 257:10, 14, 19-20, 23; 258:17; 259:25
**homeroom** [1] - 53:16
**homework** [17] - 46:16, 23; 47:11, 13, 18; 48:11, 14, 19, 23; 49:2, 11; 58:3, 5; 63:9; 135:15
**hone** [1] - 106:16
**hones** [1] - 125:6
**Honor** [112] - 6:7, 15; 8:16; 9:13; 21:6, 12; 30:5; 36:7; 37:1; 39:5; 41:2; 43:4; 44:13; 45:12; 47:24; 49:21; 52:15; 60:13, 17; 62:16; 63:17; 64:18; 67:10; 68:7, 15; 78:2; 79:15; 87:4, 7; 88:6, 15; 90:21; 92:4; 93:22; 94:12; 97:7, 22;

113:5, 9; 114:18; 116:18, 21; 131:3, 8; 135:21; 140:15; 142:3; 143:24; 144:1; 146:16; 150:18, 24; 152:4; 157:15, 20; 161:4, 10, 14; 165:7, 11; 168:21; 172:13; 175:6; 176:12; 177:14; 178:8; 180:7; 184:1, 17; 190:3, 5; 191:10, 12, 15; 193:8; 199:11; 200:10; 205:21; 208:14; 210:5; 213:23; 217:2; 220:4; 226:23; 227:11; 229:1, 5; 230:16; 231:11; 241:17; 242:19; 246:5; 247:14, 16; 251:14; 252:10, 16; 254:2; 255:6, 20; 256:6, 8, 11, 16; 258:19; 259:7; 261:3; 263:7; 264:1; 265:6
**Honor's** [3] - 180:23; 232:15; 254:24
**HONORABLE** [1] - 1:11
**honors** [2] - 71:25; 102:6
**hopeful** [1] - 183:15
**hopefully** [1] - 182:4
**hospital** [17] - 10:5, 11; 11:20; 14:19; 16:20; 17:9, 11, 21, 23; 18:8, 10, 13, 20, 22, 24; 22:10; 23:7
**Hospital** [1] - 17:13
**hospitals** [1] - 9:21
**hour** [7] - 19:18; 84:4; 181:5; 183:20; 187:18; 188:10
**hourly** [1] - 19:18
**hours** [2] - 173:22; 189:17
**housed** [2] - 101:18; 104:17
**H████** [14] - 127:1; 133:23; 134:6, 13; 136:2, 14; 168:3; 174:6; 207:23; 215:1, 13, 17; 223:10, 15
**H████** [1] - 136:8
**huge** [1] - 10:4
**human** [3] - 36:22; 177:19; 178:3
**H████** [12] - 76:20; 134:23; 135:3; 137:4, 25; 139:19, 25; 141:14, 24; 142:14; 174:12; 214:18
**hundred** [5] - 20:9; 56:18; 102:13; 130:13
**hundreds** [2] - 103:11, 17
**HUNTON** [4] - 2:14, 18, 21; 3:2
**hurt** [1] - 49:8
**hurtful** [1] - 207:10
**hurting** [1] - 190:21

### I

**idea** [3] - 89:12; 257:10
**identified** [9] - 137:25; 139:12; 143:18; 224:13; 226:7, 11
**identifies** [2] - 220:18; 221:16
**identify** [11] - 42:23; 47:8; 107:12; 144:21, 25; 151:19; 155:21; 156:7, 9, 19; 163:17
**idly** [1] - 191:3
**IEP** [5] - 74:8, 10; 109:13; 116:9
**IEPs** [1] - 72:18
**II** [1] - 98:12
**image** [1] - 121:22

**imagine** [1] - 144:17
**imaging** [3] - 22:8, 22; 25:1
**imbalance** [1] - 34:3
**immediately** [3] - 75:5, 7; 140:1
**impacted** [1] - 74:20
**impeach** [3] - 96:9; 200:11, 20
**impeaches** [1] - 95:22
**impeachment** [1] - 95:24
**implement** [1] - 119:23
**implementation** [1] - 119:24
**implemented** [3] - 119:12, 19; 120:4
**implicate** [1] - 264:8
**implicated** [1] - 247:23
**importance** [2] - 41:16; 50:4
**important** [2] - 32:16; 107:18
**impressed** [1] - 209:5
**impressive** [2] - 209:11
**improper** [1] - 127:21
**IN** [1] - 97:24
**in-class** [2] - 71:23; 72:3
**in-person** [4] - 50:9; 141:1; 178:20; 255:20
**in-school** [2] - 166:13; 167:13
**in-schooling** [1] - 184:25
**inability** [1] - 96:6
**inaccurate** [1] - 95:4
**inadmissible** [1] - 252:9
**inadvertent** [1] - 228:15
**inappropriate** [6] - 124:11, 18; 141:8; 155:2; 190:16, 23
**inappropriately** [1] - 56:13
**incidences** [1] - 141:4
**Incident** [6] - 234:14; 235:1, 3; 240:22; 244:2
**incident** [35] - 137:21, 24; 155:1; 163:2, 24; 164:3; 185:8, 11; 186:11; 208:7; 215:10; 216:3; 219:16; 226:9; 227:16; 233:11; 234:13, 21, 23; 235:1; 236:8, 13; 239:9; 244:12; 245:16, 24-25; 246:1; 252:25; 254:18; 256:24; 258:18; 259:10
**incidents** [21] - 119:20; 165:3; 173:15; 175:4, 10; 178:4; 214:4; 219:22; 220:11; 221:22; 229:13; 233:12, 16; 234:14; 239:20; 251:1, 3-4; 256:25; 257:4
**inclination** [1] - 110:2
**include** [4] - 12:20; 76:20; 101:9; 103:25
**included** [7] - 10:24; 62:14; 99:14; 106:22; 206:10; 238:20; 251:3
**includes** [5] - 34:10; 51:24; 75:20; 124:18
**including** [4] - 12:24; 42:25; 146:6; 214:21
**inclusive** [1] - 11:15
**inconsistent** [1] - 95:25
**incorporate** [3] - 100:5; 118:19; 238:18

**incorporated** [1] - 100:2
**incorporates** [1] - 99:23
**increased** [2] - 50:19, 23
**independent** [4] - 9:23; 16:21; 99:3; 218:15
**indicate** [4] - 39:14, 25; 80:14; 233:21
**indicated** [3] - 200:4; 256:10; 262:22
**indicating)** [9] - 39:15; 61:25; 78:11; 79:12; 80:13; 81:11; 147:11, 22
**indiscernible** [1] - 81:5
**indiscernible}** [1] - 253:9
**indiscretions** [1] - 265:2
**Individual** [1] - 102:4
**individual** [12] - 19:14; 74:9; 128:12; 177:12; 193:21; 194:5; 200:11, 19-20, 23; 213:15; 264:8
**individually** [1] - 72:10; 132:23; 191:7
**individuals** [2] - 22:8; 26:2
**indulgence** [2] - 67:10; 232:15
**infection** [1] - 15:24; 23:8
**infectious** [1] - 10:8
**infer** [1] - 245:14
**inform** [2] - 93:1; 222:11
**information** [19] - 42:10; 57:2; 85:6; 118:14, 23; 145:24; 163:21; 171:12; 173:7; 174:4, 11; 175:5; 197:13, 20, 24; 200:5; 201:16; 238:12; 262:10
**informed** [2] - 63:1; 96:13
**informing** [1] - 46:14
**ingrained** [1] - 34:23
**inherently** [1] - 36:1
**initial** [2] - 44:23; 137:14
**initials** [1] - 144:18
**initiated** [1] - 155:3
**injuries** [2] - 22:14
**injury** [5] - 12:20; 14:8; 18:25; 19:1; 21:7
**inkling** [1] - 147:22
**input** [2] - 212:2
**insinuate** [1] - 188:22
**instance** [12] - 112:12; 118:17, 22; 120:7; 122:5; 132:21; 138:16; 145:25; 234:10
**instances** [2] - 95:9, 14
**instead** [1] - 149:4
**instill** [1] - 118:24
**instruction** [13] - 6:19; 50:9; 77:4; 101:17, 19, 23; 104:16; 167:24; 179:11; 255:5; 258:17; 261:10; 262:11
**instructional** [2] - 106:22; 114:3
**instructions** [4] - 55:21; 182:7, 9; 183:2
**instruments** [1] - 77:16
**integrity** [1] - 11:1
**intend** [1] - 96:8
**intended** [3] - 222:9, 11; 255:17
**intends** [1] - 94:23
**intensive** [1] - 17:14
**intent** [1] - 122:11

**intention** [2] - 174:17; 175:1
**intentionally** [2] - 229:15
**interact** [1] - 15:22
**interacting** [1] - 109:6
**interaction** [10] - 133:11, 16; 141:7; 143:15; 148:23; 155:13; 203:20; 256:23
**interactions** [2] - 138:7; 198:4
**interactive** [1] - 78:9
**interim** [1] - 105:19
**intermediate** [1] - 83:12
**international** [1] - 102:7
**internship** [1] - 9:3
**interrelates** [1] - 14:12
**interrupt** [8] - 7:6; 37:11; 68:23; 139:21; 196:21
**interrupted** [1] - 141:15
**intervened** [2] - 65:20; 66:16
**Intervention** [2] - 119:11; 132:17
**interview** [13] - 105:1; 143:11, 14, 17; 144:22; 145:5, 16; 165:2; 186:4, 10, 15; 222:18; 228:1
**interviewed** [14] - 140:1; 143:3, 10, 16; 144:23; 145:4, 10; 155:20; 160:9; 174:14; 186:6, 8; 222:23; 225:15
**interviewing** [4] - 222:21, 24; 238:11; 249:23
**interviews** [2] - 146:11; 163:21
**intracranial** [1] - 10:7
**intractable** [1] - 10:20
**introduce** [5] - 7:12; 37:17; 69:7; 94:23; 96:25
**introduced** [1] - 202:11
**introducing** [2] - 96:12; 133:15
**introduction** [1] - 96:5
**intuition** [1] - 65:18
**investigate** [10] - 22:19; 120:25; 138:3; 139:22; 154:12; 156:16; 163:22; 233:12; 240:17; 243:23
**investigated** [5] - 173:16; 175:3; 178:4; 245:24
**investigating** [15] - 141:5; 155:5; 156:24; 163:23; 168:7; 179:3; 195:9, 13, 16; 221:19; 234:17, 19; 244:10; 245:15; 246:4
**investigation** [1] - 56:23; 57:11; 143:13; 144:9; 145:6; 146:5; 148:4; 153:1; 154:4, 19; 155:4; 171:22; 176:22; 186:16; 233:8; 234:24; 239:1, 22; 244:2, 8; 257:7
**investigations** [3] - 173:25; 190:15; 243:20
**involved** [22] - 19:9; 57:3, 5, 9; 107:21; 109:15; 133:20, 22; 136:20; 137:3, 20; 144:7; 221:18; 223:11; 233:8; 234:17, 19, 24-25; 235:17; 239:21; 256:15
**involvement** [7] - 190:14; 198:17; 202:10, 17, 21; 221:21
**involves** [3] - 235:4, 7
**involving** [4] - 189:23; 259:8
**issue** [21] - 47:18; 48:7, 19; 95:19;

96:7; 97:7; 165:5, 15, 24; 166:18, 24;
235:5; 252:7; 255:22; 256:20; 258:9;
262:3, 19, 24; 265:3
  **Issue** [7] - 219:25; 234:19; 235:1, 10,
17, 20; 239:1
  **issued** [1] - 167:21
  **issues** [14] - 51:3, 5; 56:16; 120:16;
133:23; 134:17; 136:25; 195:18;
198:17; 212:1; 219:23; 243:8; 255:22;
262:1
  **italics** [1] - 66:3
  **itself** [1] - 130:10
  **IX** [16] - 192:16; 193:3; 194:11; 195:4,
18, 21, 23, 25; 196:2, 7, 14; 197:8, 13,
24; 201:17


## J

  **J.F** [5] - 3:7; 151:4, 19-20; 152:5
  **J.H** [3] - 224:16, 19; 226:11
  **J.O** [19] - 3:9; 220:21; 221:6; 224:25;
225:3; 232:18; 253:6, 13, 17, 19;
255:16, 19; 256:24; 257:16; 258:7, 18;
261:14
  **J.O.'s** [1] - 253:12
  **Jake** [4] - 153:7, 11, 15, 23
  **James** [2] - 70:3; 81:5
  **Jane** [3] - 179:15; 224:1
  **janitor's** [1] - 60:2
  **January** [19] - 45:4, 7, 18, 20; 46:5;
47:2; 48:20; 85:21; 133:21; 190:14;
202:16; 203:4; 204:14; 205:8; 248:11
  **J█████** [13] - 166:20; 167:21, 24; 169:4,
10, 16, 23; 170:17; 243:2, 11; 244:9
  **J█████** [2] - 167:17; 170:23
  **Jefferson** [2] - 9:8, 12
  **J█████** [10] - 149:16, 18; 226:19; 227:3,
6, 20; 228:12; 241:3; 251:19; 252:2
  **Jenni** [13] - 168:20; 169:15, 24; 170:3;
171:4, 10, 13, 15, 18, 20; 172:3, 5, 8
  **jewels** [1] - 104:24
  **jfahey@holtzmanvogel.com** [1] - 1:18
  **job** [9] - 24:23; 26:6; 102:23; 111:20;
231:19; 232:3; 259:12; 263:13
  **join** [2] - 85:14
  **Jonathan** [1] - 1:15
  **Jones** [1] - 103:1
  **Jordan** [1] - 43:1
  **JOSEFIAK** [1] - 1:16
  **JR** [1] - 1:11
  **Judge** [6] - 191:14; 196:25; 252:6;
253:10; 257:21; 258:3
  **judge** [9] - 97:13; 260:17; 263:20
  **JUDGE** [1] - 1:12
  **judges** [1] - 261:25
  **jump** [2] - 242:7, 14
  **jumping** [1] - 165:1
  **jumps** [1] - 36:20
  **June** [1] - 89:3

  **juror** [1] - 256:18
  **jury** [27] - 6:6, 10; 7:13; 8:22; 30:9;
37:18; 65:15; 69:7; 70:1; 78:6; 99:21;
106:18; 118:9; 181:2, 5; 182:2, 21;
183:2; 184:9; 196:22; 206:23; 220:17;
243:2; 247:8; 248:10; 260:17; 264:2
  **JURY** [1] - 1:11
  **Jury** [8] - 6:11; 94:9; 97:19; 128:16,
25; 180:11; 184:7; 262:15
  **justice** [1] - 122:4
  **Justin** [2] - 148:8; 152:11
  **Justin's** [2] - 152:14; 153:12


## K

  **K-10** [1] - 101:24
  **K-12** [1] - 100:16; 102:20
  **K.M** [4] - 241:25; 242:5
  **K10** [1] - 100:1
  **Kappatos** [7] - 174:9; 185:10, 22;
215:8; 216:20; 218:19
  **Keefe** [3] - 2:10; 21:8; 29:19
  **KEEFE** [9] - 4:5; 8:17; 21:9, 12; 29:24;
30:5, 7; 36:7; 37:1
  **keep** [13] - 12:13; 32:16; 58:8; 86:16,
18; 116:2; 147:25; 182:2; 244:23;
245:4; 248:16; 264:18
  **keeping** [5] - 63:1; 86:20; 241:12;
260:17
  **kelliker@huntonak.com** [1] - 3:4
  **kept** [2] - 86:22; 146:1
  **Kevin** [7] - 3:2; 164:19, 24-25; 165:2,
15; 166:3
  **key** [3] - 82:2; 120:5; 129:18
  **kicks** [1] - 239:3
  **kid** [2] - 143:18; 246:2
  **kidney** [1] - 23:12
  **kids** [32] - 73:9; 101:4; 103:14; 104:18;
108:17, 19; 109:1, 5-6; 110:1, 8, 10;
118:14, 20, 22; 119:3; 122:7; 134:17;
138:16; 143:18; 144:14; 154:2; 156:4;
165:1; 167:10; 239:9; 240:15; 242:10,
13; 251:6; 259:8
  **kill** [1] - 155:16
  **killed** [1] - 163:6
  **kind** [30] - 40:23; 55:15; 74:13, 22;
76:15; 81:7, 22; 82:1; 85:15; 101:5;
103:5, 22; 104:23; 110:2; 112:10;
118:12; 119:6, 21; 120:10; 123:22;
125:14; 139:13; 171:21; 198:15;
211:22; 215:5; 228:10; 235:16; 237:7;
246:3
  **kinds** [6] - 110:16; 133:4; 135:4;
138:21; 239:17; 263:18
  **Kinney** [8] - 3:5; 29:21; 60:12; 87:1;
180:13; 190:4, 11; 255:8
  **KINNEY** [13] - 3:6; 4:15; 29:22; 60:13;
87:2; 180:15; 190:5, 8; 191:9; 198:23;
255:7, 9, 11, 15; 256:8

  **Kiss** [1] - 84:3
  **K██** [5] - 186:1, 18; 244:12, 14; 249:14
  **knowing** [1] - 183:22
  **knowledge** [7] - 20:25; 24:20; 29:16;
47:21; 86:4; 118:14, 21
  **known** [1] - 104:23
  **knows** [3] - 151:18; 238:22; 258:15
  **KURTH** [4] - 2:14, 18, 21; 3:2


## L

  **LA** [4] - 9:4, 6, 8; 10:4
  **lab** [3] - 70:16; 206:6; 211:19
  **ladies** [7] - 6:12, 14; 128:11, 18; 180:8;
184:8; 196:22
  **LAE** [1] - 254:8
  **laid** [1] - 114:10
  **Lakes** [4] - 85:2, 9, 25
  **lane** [2] - 13:19
  **language** [8] - 74:25; 75:4; 103:10;
127:15; 141:13; 150:4; 155:2; 252:18
  **Lansdowne** [1] - 8:4
  **lapse** [1] - 177:17
  **laptop** [4] - 214:14; 238:10, 13
  **large** [2] - 10:4; 84:8
  **largest** [1] - 71:13
  **last** [29] - 20:4; 24:10; 38:7; 47:16;
50:9; 51:14; 59:17; 64:7; 65:10;
66:12-14; 87:23; 100:12; 105:11, 14;
106:5, 16; 112:9; 128:1; 132:16;
140:25; 171:8; 173:5; 175:24; 187:2;
249:9; 259:6; 263:9
  **late** [5] - 57:18; 99:25; 188:1; 190:14;
202:16
  **Lauren** [4] - 81:4; 169:13, 16
  **LAW** [2] - 3:6; 97:6
  **lawyer** [1] - 68:22
  **lawyering** [1] - 260:25
  **lawyers** [7] - 30:12; 31:24; 37:11;
68:23; 191:21; 196:23; 261:25
  **laypersons** [1] - 262:2
  **lead** [2] - 81:18; 163:21
  **leadership** [1] - 106:22
  **leading** [2] - 174:20; 177:14
  **learn** [4] - 73:13; 75:18; 90:7
  **learned** [5] - 120:1; 155:9; 157:3;
164:7
  **learning** [31] - 53:5, 13-14; 65:20;
71:18; 72:2, 12; 73:12; 74:11, 13;
106:25; 107:23; 118:11, 19; 119:2, 6-7;
124:24; 125:19, 22; 126:12; 140:6;
141:18; 142:20; 154:21; 158:17, 25;
159:13; 258:5
  **least** [6] - 17:6; 73:9; 83:21; 220:14;
231:1; 264:25
  **leave** [10] - 68:11; 81:15; 149:13;
187:10; 196:3; 222:15; 228:11;
229:13, 15, 20
  **Leave** [1] - 228:3

**leaves** [2] - 252:20, 24
**lecture** [3] - 84:6, 8
**led** [5] - 48:7; 137:2; 165:5, 14; 222:2
**Leesburg** [2] - 8:4; 17:13
**left** [19] - 59:19; 80:3; 110:11; 115:25; 118:3; 129:5; 147:16; 148:16, 25; 158:16; 161:13; 166:16; 184:24; 228:15; 229:21; 255:20, 22; 258:17
**legal** [3] - 196:7; 262:1
**legitimate** [1] - 200:16
**length** [1] - 264:14
**less** [1] - 228:19
**lessons** [4] - 103:10; 120:11; 125:21; 126:15
**letter** [18] - 50:21; 134:1, 11; 166:13; 202:21; 205:18, 25; 206:13, 16; 208:20, 25; 209:2, 11, 20; 210:2, 19
**letting** [3] - 42:24; 43:1; 261:18
**level** [9] - 70:6; 89:24; 90:1; 99:20; 100:15; 101:3; 103:18, 22; 104:19
**levels** [2] - 73:24; 119:21
**licensed** [3] - 7:21; 70:8, 11
**licensure** [1] - 70:12
**Life** [3] - 99:14, 17
**life** [16] - 99:19, 21; 100:1, 14, 16, 20, 23; 101:2, 24; 102:10, 17-18; 103:7; 107:13; 133:3
**lifetime** [1] - 89:5
**light** [1] - 262:21
**likely** [1] - 184:13
**limine** [6] - 252:17; 253:6; 256:3, 13
**limit** [2] - 96:16; 97:1
**limiting** [1] - 255:5
**line** [30] - 18:20; 27:6; 80:12, 16; 144:24; 146:12, 14; 147:3, 8-11, 15; 148:3, 5, 7, 17, 25; 151:9, 12, 15; 153:16; 195:1; 201:9; 230:24; 239:10
**lines** [5] - 18:19, 23; 147:2; 201:12; 227:4
**list** [9] - 15:9; 113:10; 121:4; 124:10; 134:24; 135:2, 4, 13; 174:18
**listed** [4] - 13:4, 13; 14:7; 196:7
**listen** [4] - 7:4; 37:9; 68:21; 230:14
**listening** [1] - 252:22
**literally** [3] - 11:6; 257:7; 259:5
**literary** [1] - 58:1
**literature** [2] - 12:13; 32:16
**litigation** [1] - 200:15
**lived** [2] - 6:19; 107:17
**liver** [3] - 23:9, 12; 28:7
**living** [1] - 7:19
**LLP** [8] - 1:20; 2:2, 6, 10, 14, 18, 21; 3:2
**loaded** [1] - 188:12
**lobes** [1] - 27:17
**local** [1] - 109:13
**localizes** [1] - 23:2
**located** [2] - 114:25; 115:1
**location** [1] - 188:13

**locations** [1] - 56:7
**locked** [1] - 59:3; 108:18
**locker** [18] - 61:14, 23; 79:13, 25; 80:5, 9; 81:16, 18; 82:2-4, 6, 11; 116:5; 204:23; 221:4
**lockers** [2] - 61:16, 20
**log** [12] - 145:25; 186:14; 244:23-25; 246:19; 247:9; 248:18; 249:5; 251:6, 11
**look** [66] - 10:23; 13:6, 9; 15:20; 16:4, 7; 17:25; 18:15; 23:8, 13-14; 24:7, 10; 25:25; 27:5; 28:6; 39:9; 42:18; 43:20; 44:9, 20; 46:10; 47:7; 49:15; 50:3; 51:23; 52:10; 65:10; 77:25; 80:5, 8; 113:15; 120:6-9; 121:8; 129:13; 155:16; 158:16; 166:11; 169:14; 172:18; 192:12; 193:18; 194:7; 200:6; 209:24; 218:9; 219:10; 225:19, 25; 227:2; 239:19; 247:4, 24; 251:5, 24; 253:1; 260:22; 261:1, 19; 263:3
**looked** [20] - 32:25; 47:13; 54:22; 61:1; 81:22; 87:25; 92:2; 107:24; 108:21; 126:25; 129:9; 134:2; 138:11; 147:19; 169:17; 177:20; 213:14; 224:12
**looking** [36] - 33:18; 43:12; 44:22; 46:7; 47:2; 48:20; 50:17; 61:10, 12; 66:4; 79:25; 80:9; 113:19; 114:6; 115:13; 116:3, 5; 117:8, 10; 118:3; 119:19; 120:1; 123:12; 126:22; 129:6; 136:1; 144:5; 146:22; 159:13; 164:18; 166:12; 167:15; 169:3; 218:10; 254:4
**looks** [16] - 41:19, 25; 42:17, 24; 43:17; 45:20; 46:6, 22; 74:20; 79:13; 88:2, 21; 89:7; 175:15; 179:15; 262:10
**Looks** [1] - 177:4
**Los** [1] - 1:21
**lose** [1] - 252:19
**lost** [1] - 135:18
**loudly** [1] - 149:25
**Loudoun** [3] - 17:12; 18:2; 37:21
**lounge** [1] - 115:15
**low** [1] - 97:13
**lumped** [2] - 235:10, 13
**Lunch** [2] - 158:6, 11
**lunch** [52] - 77:6-9; 109:16; 110:4; 114:14; 128:14; 133:15; 140:6; 141:6; 142:21-25; 144:24; 146:12; 147:1-3, 11, 15; 148:3, 5, 7, 16, 25; 151:13, 15; 153:11, 16; 154:21; 157:6; 158:5; 159:9-11, 14, 17; 160:6, 13; 236:8; 239:10; 245:24
**lunchroom** [2] - 156:6; 245:15
**lung** [1] - 22:23

---

# M

**M.C** [1] - 3:6
**M.J** [4] - 224:16, 19; 225:23; 226:6
**M.P.F** [1] - 3:6
**ma'am** [15] - 28:19; 37:9; 68:9, 21;

94:3; 98:3; 123:2, 12; 125:12; 128:17; 151:20; 180:12; 229:24; 230:14; 262:18
**machine** [1] - 3:17
**Madison** [1] - 70:4
**magazine** [1] - 58:1
**mailed** [1] - 198:13
**main** [6] - 16:11; 71:5; 80:11; 108:14; 117:11; 140:2
**maintain** [4] - 12:9, 11; 96:4, 6
**maintained** [1] - 16:22
**maintenance** [1] - 97:14
**major** [1] - 125:5
**majority** [2] - 70:23; 71:9
**male** [1] - 185:3
**males** [1] - 189:14
**mandate** [1] - 102:21
**mandated** [2] - 99:25; 133:2
**manic** [1] - 25:22
**manifestations** [1] - 13:23
**manner** [3] - 52:3; 54:13; 73:6
**manual** [2] - 24:18; 25:20; 26:1
**manuals** [1] - 29:5
**map** [3] - 60:5; 78:6; 114:19
**March** [20] - 248:22; 249:3, 14, 20; 250:1; 252:12; 253:24; 254:1, 10, 13; 256:11; 257:3, 6, 8; 258:3, 9; 260:1, 7; 261:14
**mark** [2] - 91:12; 132:1
**marked** [2] - 41:16; 50:4
**marking** [1] - 61:22
**Maryland** [1] - 8:25
**mass** [2] - 15:17; 21:24
**master** [1] - 12:7
**master's** [1] - 70:5
**Masters** [1] - 8:25
**material** [3] - 95:19; 96:7; 164:18
**materials** [2] - 72:22
**math** [5] - 20:10; 39:18; 69:22; 90:9; 119:6
**matter** [8] - 6:17; 38:18; 57:1; 94:20; 138:3; 154:12; 184:11; 265:15
**matters** [4] - 164:7; 167:25; 257:12
**mean** [48] - 20:9; 26:19; 36:11; 40:9, 22; 56:8; 57:6; 91:20; 100:18; 104:23; 105:7; 110:5; 111:20; 114:1; 121:15; 122:6; 139:11; 145:23; 149:22; 156:20; 168:1; 173:18; 177:3, 9, 17; 179:18, 22; 196:2; 200:3; 203:1; 205:13; 207:21; 208:7, 11, 22; 209:14; 214:20; 216:2; 225:25; 227:24; 243:23; 245:14; 246:3, 18; 259:5
**meaning** [6] - 14:20; 34:8; 53:13; 209:3; 236:20; 244:12
**means** [4] - 15:13; 100:23; 242:15; 259:5
**meant** [4] - 97:11; 124:13; 244:25; 245:1
**measure** [3] - 11:7; 27:21, 24
**measures** [1] - 58:25

**media** [5] - 6:21; 253:16; 262:13
**medical** [18] - 9:19; 11:23; 16:14; 17:16; 19:13; 20:19; 21:4; 29:12-14; 31:23; 32:2, 16; 35:8, 24; 73:21; 74:13; 76:16
**Medical** [6] - 9:4, 6, 8, 12; 10:4
**medication** [4] - 22:9; 34:19; 35:3, 9
**medications** [4] - 10:21; 34:2, 25
**medicine** [10] - 7:21, 23; 9:2; 12:12, 16, 20; 14:9; 19:1; 21:7; 32:17
**Medicine** [3] - 9:2; 13:2; 16:13
**meet** [12] - 19:6; 20:21; 40:5; 72:21; 74:7; 84:6; 109:10; 120:3; 140:3; 245:1; 249:2
**meeting** [53] - 42:1; 72:19; 84:20; 109:14, 19; 116:9; 128:5, 12-13, 20; 134:4, 8, 10, 25; 136:3, 5; 145:21; 146:6; 163:1; 173:6, 21; 197:6; 201:24; 203:21; 204:14, 19, 22; 205:17; 206:5, 11; 207:18, 24-25; 208:1, 9, 18; 209:7; 214:11, 14-15; 215:1; 219:2, 6; 249:6; 263:13
**meetings** [7] - 109:7, 13; 110:15; 157:4; 174:5
**meets** [1] - 160:6
**M**[redacted] [2] - 39:17
**member** [2] - 16:8, 10
**members** [4] - 73:10; 187:6, 14; 188:25
**memo** [21] - 214:4; 215:15; 218:25; 220:11; 221:22; 224:18, 23; 226:18; 229:13, 21-22; 233:16, 21; 234:14-16; 238:7; 239:13; 251:1, 3
**memorable** [1] - 243:4
**memorialize** [1] - 245:1
**memorized** [1] - 226:9
**memory** [4] - 14:21; 226:10; 244:17
**men** [1] - 189:25
**meningitis** [1] - 23:15
**mental** [20] - 14:1; 15:15; 23:6; 24:16; 25:1, 5-6, 13, 16; 26:16; 29:6; 31:11; 33:24; 34:1; 35:2, 7; 36:12; 74:2; 95:25
**mention** [1] - 224:18; 225:19, 23; 226:6, 10
**mentioned** [16] - 15:11; 31:22; 73:16; 101:9; 111:19; 139:18; 140:2; 143:10; 152:4; 158:13; 164:2; 168:7; 177:7, 9; 226:18, 21
**message** [1] - 179:24
**messages** [4] - 124:7; 132:15; 168:19
**messy** [1] - 82:8
**met** [25] - 88:5, 24; 89:5; 106:24; 109:8; 138:23; 143:11; 157:5; 162:8, 20, 24-25; 163:10; 165:16; 185:14; 205:8; 216:15; 234:2; 249:13, 16; 250:4, 13
**meta** [2] - 35:14, 18
**meta-analyses** [1] - 35:18
**meta-analysis** [1] - 35:14
**method** [4] - 13:7; 28:10; 36:2; 125:25

**Meyer** [1] - 106:9
**Miami** [3] - 2:4, 8, 12
**mic** [4] - 7:15; 37:17; 69:5; 113:22
**Michael** [2] - 3:5; 190:11
**MICHAEL** [1] - 3:6
**Middle** [12] - 38:8; 50:10; 69:17; 98:10; 104:5, 7; 105:15, 17; 195:17; 211:1; 252:12
**middle** [21] - 17:17; 38:16; 83:2; 85:13; 99:7; 101:18; 103:18, 25; 104:15; 106:10; 115:21; 122:7; 124:5; 161:24; 165:24; 171:17, 19; 180:22; 181:8; 216:4; 244:2
**might** [30] - 56:23, 25; 73:22, 24; 74:1, 3, 14; 76:5; 82:3; 108:17; 112:6; 145:6, 13; 146:20; 148:1; 159:4; 161:1; 162:16; 175:15; 177:4; 180:19; 214:17; 215:17, 19; 216:8; 237:21; 263:14
**migraine** [1] - 22:11
**mind** [6] - 61:10, 12, 22; 65:14, 25; 66:10
**mingling** [1] - 116:12
**minute** [2] - 92:18; 150:23
**minutes** [15] - 55:20; 68:18; 74:2; 77:7; 82:4; 104:21; 108:7; 128:13; 142:20; 160:14; 162:19; 163:10; 180:6, 25; 181:6; 183:18; 188:12
**mischaracterization** [1] - 229:2
**mischaracterizes** [1] - 231:22
**misconduct** [3] - 220:19; 233:17
**misreading** [2] - 138:15; 139:14
**miss** [1] - 104:19
**missed** [2] - 111:16; 177:5
**missing** [13] - 46:6, 8, 16; 47:11, 13; 48:11; 133:24; 134:13, 15; 174:8; 206:7, 14
**misstates** [1] - 198:8
**mistreated** [1] - 138:22
**mixed** [1] - 205:7
**mk@kinneyesq.com** [1] - 3:8
**mock** [1] - 12:5
**model** [2] - 103:12; 207:13
**MOIR** [7] - 4:10-12; 68:20; 69:1; 87:9; 93:9
**Moir** [6] - 68:15; 69:8; 78:6; 87:11; 93:11
**mom** [6] - 41:23; 46:4; 63:1; 172:5; 203:12; 250:18
**Mom** [1] - 134:15
**Mom's** [1] - 179:11
**mom's** [1] - 136:7
**moment** [13] - 59:22; 67:11; 87:5; 115:19; 117:4; 120:13; 133:22; 144:1; 148:1; 151:3; 159:14; 161:4; 166:11
**Monday** [5] - 43:2; 62:23; 182:8; 183:3, 8
**M**[redacted] [2] - 39:21; 116:1
**monitor** [1] - 187:9
**monitored** [1] - 77:19
**monitoring** [6] - 112:17, 22; 116:7, 11

**month** [4] - 168:14; 231:17; 232:25; 233:19
**months** [7] - 204:16, 18; 205:7; 222:2; 228:21; 233:14; 257:1
**MORNING** [1] - 6:1
**morning** [27] - 6:3, 14-15; 7:10; 29:25; 30:1; 37:15; 41:23; 42:16; 52:25; 69:3; 94:7; 108:23; 114:14; 140:14; 141:9; 149:15; 160:9; 163:3; 182:8, 20; 236:9; 263:8
**mornings** [1] - 79:2
**most** [19] - 19:24; 20:8; 35:2; 38:18; 55:24; 56:8, 10; 57:20; 79:10; 90:1; 108:3, 13; 114:18; 122:6, 8; 145:9; 187:20; 258:25
**mother** [21] - 41:12; 42:1; 44:11; 46:14; 47:1, 4; 49:17; 50:14, 18; 51:13; 54:21; 84:20, 23; 133:24; 134:6; 156:13, 15, 17; 184:23; 185:7; 204:10
**motion** [14] - 94:19; 96:14, 19, 22; 252:17; 253:6; 254:8, 12; 256:3, 12
**motor** [2] - 14:20; 22:25
**mouth** [2] - 89:23; 230:14
**move** [25] - 43:5; 44:13; 47:24; 49:21; 52:15; 88:14; 100:8; 110:4, 19; 113:5; 123:3; 142:3; 143:24; 144:14; 150:18; 152:17; 155:4; 161:16; 164:10; 170:8; 176:5; 178:6; 180:2; 182:23; 247:14
**moved** [7] - 88:12; 99:18; 102:11, 14; 103:16; 144:14; 176:7
**movement** [1] - 188:9
**moving** [3] - 32:5; 106:2; 208:23
**MR** [333] - 4:5, 14-16; 6:7; 8:17; 21:9, 12; 29:20, 22, 24; 30:5, 7; 36:7; 37:1; 60:13, 15; 87:2, 4; 94:12, 15; 97:7, 22; 98:2; 113:5, 9, 14; 114:17, 21, 23; 115:7, 10, 12; 116:15, 21, 23; 117:3, 5, 12-13; 123:3, 6, 8, 10-11; 125:9, 11; 126:5, 8; 127:4, 6; 128:10, 21; 129:2, 4; 130:1, 4; 131:3, 8, 13, 17, 21, 23; 132:4; 135:21, 24; 136:11, 13, 18-19; 140:13, 15, 17; 142:3, 6, 9-10; 143:24; 144:1, 4; 146:16, 19; 147:6; 150:18, 22, 24; 151:1, 8, 10, 18; 152:4, 10, 17, 21, 24; 157:12, 17, 20, 22, 24; 158:1, 3; 160:16, 20-22, 24; 161:4, 6, 10, 12, 19, 22; 162:1, 21, 23; 164:10, 12, 15-16; 165:7, 9, 11, 13; 166:5, 9-10; 167:14; 168:21, 24; 169:2; 170:8, 10, 13-14; 172:13, 17, 20, 23; 174:20, 24; 175:6, 9, 12, 21, 23; 176:4, 9-11, 13, 16; 177:14, 16; 178:5, 8, 10, 12; 180:6, 15, 18, 23; 181:9, 16, 18; 182:12, 16, 20; 183:1, 10, 13, 15, 18, 21; 184:1, 15, 17, 20, 22; 190:3, 5, 8; 191:9, 12, 14, 18; 193:8, 10, 13, 15, 17; 196:25; 197:1; 198:8, 10, 23, 25; 199:11, 16; 200:10, 17; 201:2, 6-7; 205:21, 24; 208:14, 16; 209:9; 210:4, 7-8, 11; 212:21, 23; 213:6, 23; 214:1; 215:23; 216:1; 217:2,

5, 8, 10, 12, 21, 24; 220:4, 7; 224:8;
226:22, 25; 227:1, 10, 13, 15; 229:1, 5,
8, 23; 230:3, 5, 16, 19-20; 231:11, 14,
22, 24; 232:5, 8, 12, 14, 17; 234:11, 13;
241:16, 20-21; 242:19, 21, 24; 243:1;
246:5, 8, 10; 247:14, 16, 20, 24; 248:1,
5, 7; 250:12; 251:14, 18, 25; 252:3, 6,
10, 16, 23; 253:2, 23; 254:1, 15, 21-22;
255:7, 9, 11, 15, 20; 256:6, 8-9, 16, 20;
257:6, 21; 258:2, 19; 259:3, 7, 18,
21-22; 260:1, 11, 14, 17, 24; 261:2, 6-7,
17, 21; 263:1, 20, 25; 264:1, 20, 24;
265:4, 6, 9

**MRI** [27] - 15:15; 16:4; 23:1, 24; 24:8,
12, 22; 25:7, 15; 26:14, 17, 25; 27:1,
22; 28:1, 13, 17, 19, 24; 29:6, 16; 32:8,
12; 33:16

**MRIs** [2] - 22:23; 32:8

**MS** [130] - 4:4, 6-9, 11-13; 6:8; 7:2, 9;
8:6, 16, 19-20; 9:13, 17; 21:6, 14-15;
24:9, 11; 29:18; 36:10, 23, 25; 37:6, 14;
39:5, 7-8; 41:2, 5; 43:4, 6, 8, 10-11;
44:13, 15, 17, 19; 45:11, 14-15, 18, 21;
47:24; 48:2, 4, 6; 49:21, 23, 25; 50:2;
52:15, 17, 20; 59:21, 24; 60:1, 9, 11,
17, 19, 21; 61:3; 62:2, 16, 19-20; 63:6,
16, 21, 23-24; 64:5, 13, 18, 21-22;
67:10, 13, 16; 68:4, 7-8, 15, 18; 69:2;
78:2, 4-5; 79:15, 18, 20; 86:25; 87:5, 7,
10; 88:6, 8, 14, 17, 23; 89:9, 13; 90:21,
24; 91:25; 92:1, 4, 7-8, 24-25; 93:5, 7,
10, 20, 22, 24; 94:1; 256:12; 263:7

**multi** [1] - 106:25

**multi-disciplinary** [1] - 106:25

**multidisciplinary** [1] - 109:7

**multiple** [6] - 14:2; 22:12; 24:1; 32:2;
49:10; 213:20

**multitasking** [1] - 252:22

**muscle** [4] - 11:8; 12:25; 13:3; 22:5

**muscles** [1] - 11:8

**muscular** [1] - 11:13

**music** [21] - 42:25; 69:13, 19; 70:3, 5,
12, 16; 72:15; 73:13; 77:4, 14-15;
78:12, 14, 23, 25; 90:7; 106:24; 111:7;
112:1

**musical** [2] - 83:6

**must** [1] - 249:22

**myelin** [1] - 27:13

---

# N

**N130** [1] - 78:8

**naked** [2] - 232:10, 21

**name** [35] - 7:14; 37:19; 60:24; 69:8;
87:13; 98:5; 102:1; 124:19; 131:16;
137:14-16; 144:18; 150:13; 153:5;
154:2; 155:3; 161:24; 164:17; 166:19;
171:20; 177:7; 187:2; 191:21; 206:17;
213:15; 224:20, 23-25; 249:9; 252:25;

254:21

**name-calling** [8] - 124:19; 137:16;
154:2; 155:3; 206:17; 213:15; 252:25;
254:21

**named** [3] - 152:5; 168:20; 224:25

**names** [8] - 55:13; 74:24; 149:4; 207:6;
211:8; 221:7; 228:8

**narrative** [2] - 174:3; 238:18

**nasty** [1] - 121:8

**naturally** [2] - 26:23; 72:18

**nature** [4] - 72:13; 73:7; 167:18; 189:9

**near** [3] - 60:6; 112:20; 149:19

**necessarily** [1] - 76:1

**necessary** [3] - 35:22; 36:3; 154:15

**neck** [2] - 11:14; 22:4

**need** [42] - 6:5; 57:4, 6; 73:21; 74:1, 3,
13; 118:14, 16; 119:3; 120:22; 121:3, 9;
122:20; 148:1; 150:3, 5; 165:18, 23;
167:9; 171:6; 180:4; 182:11, 13, 22;
199:2, 5, 7; 209:18; 226:2; 230:12;
240:5, 13; 247:17; 262:3, 8; 264:9, 15;
265:4, 10

**need-to-know** [2] - 57:4, 6

**needed** [25] - 10:21; 58:5; 72:23;
76:25; 102:14, 24; 112:19; 154:14;
156:21; 159:5; 165:20; 166:1; 168:2;
174:4; 176:23; 197:21; 198:21; 199:19,
21; 200:2; 201:25; 202:1, 4; 212:2;
215:20

**needing** [1] - 73:12

**needle** [2] - 11:8; 23:14

**needs** [5] - 73:20; 74:5; 200:3; 247:22;
256:18

**negotiable** [1] - 113:2

**Neil** [1] - 232:20

**Neill** [4] - 232:1, 9; 233:1, 4

**nerve** [11] - 10:18; 11:3, 7, 13-14;
12:25; 16:13; 22:1, 4, 13

**nerves** [1] - 13:2

**nervous** [11] - 11:1, 12; 12:24;
21:21-23, 25; 22:1-3, 7

**network** [1] - 27:13

**neuroimaging** [1] - 13:5

**neurological** [6] - 10:8; 13:22; 14:23;
22:20, 24; 25:10

**neurologist** [7] - 7:20, 24; 10:3; 13:21;
21:18; 26:13; 29:10

**neurologists** [10] - 10:15; 12:6; 13:6,
17, 20; 14:16; 15:5; 17:21; 21:20; 22:21

**neurology** [15] - 9:5, 7; 11:9; 12:18,
21; 13:21; 14:4, 8, 11; 16:9, 11; 21:7,
16; 26:8; 29:2

**Neurology** [3] - 13:14, 16; 14:6

**Neuromuscular** [1] - 16:13

**neuromuscular** [5] - 9:11; 11:10;
12:23; 14:9

**neurophysiology** [3] - 9:10; 10:17;
12:21

**neuropsychologist** [1] - 31:17

**neuropsychology** [1] - 14:8

**neuroscience** [2] - 18:8

**neurosurgeon** [1] - 21:20

**neurotransmitter** [2] - 34:4, 21

**never** [19] - 25:7; 26:12; 29:1; 30:15;
31:5; 67:7; 87:17; 112:13; 154:23;
186:22; 193:2; 197:15; 211:20; 223:2;
239:25; 244:22; 246:18; 249:25; 255:25

**New** [1] - 9:1

**new** [2] - 17:9; 188:18

**next** [30] - 6:9; 7:1; 11:10, 22; 16:7;
17:25; 37:5; 39:16, 20; 46:11; 65:17;
68:14; 94:11; 97:21; 104:2; 115:18;
125:2; 127:17; 136:20; 143:1; 149:15;
156:5; 173:7; 174:14; 205:25; 217:21;
218:9; 242:23; 260:22

**nice** [1] - 24:22

**night** [6] - 17:18; 42:9; 46:5; 85:3, 23;
86:2

**Night** [2] - 85:2; 93:17

**Nights** [1] - 85:10

**nights** [3] - 85:24; 86:1

**nine** [1] - 145:4

**Nixon** [2] - 96:1, 11

**NK** [1] - 70:12

**nobody** [2] - 113:1; 188:13

**nonnegotiable** [1] - 112:19

**normal** [9] - 25:3; 26:20; 27:2; 28:4;
145:15

**normally** [2] - 15:21; 117:15

**note** [6] - 95:16; 238:17; 239:20;
240:13; 247:17

**note-taking** [1] - 239:20

**notebook** [4] - 206:6, 10, 14

**notebooks** [1] - 208:5

**notes** [17] - 25:25; 74:3; 173:25; 174:2;
215:5; 238:1, 3, 5-6, 10, 13, 15-16;
239:25; 240:19; 241:7

**notetaker** [1] - 237:24

**nothing** [6] - 6:7; 14:17; 25:2; 60:13;
87:2; 191:12; 206:13; 208:20; 239:21;
240:14; 254:17; 259:5, 14

**notice** [13] - 56:3; 86:22; 111:13;
253:16, 21; 255:4, 17, 22; 256:20-22;
258:6; 259:19

**notification** [1] - 237:2

**November** [15] - 43:14; 62:6, 21;
189:20; 203:25; 205:6, 10-12; 220:1,
15; 231:8; 233:19, 22

**November/December** [1] - 203:24

**nowhere** [2] - 208:24; 239:25

**numb** [1] - 15:3

**Number** [14] - 144:11; 219:25; 234:13,
15, 19, 23; 235:1, 4, 11, 21; 239:2;
240:22; 244:2

**number** [12] - 20:5; 72:7; 81:20; 85:12,
15; 88:21; 138:8; 161:3; 176:9; 217:7;
253:18

**numbers** [2] - 194:22; 234:21

**numerous** [1] - 189:17

**nursing** [1] - 15:19

**NW** [5] - 1:16; 2:15, 18, 22; 3:3

# O

**O.B** [2] - 225:8; 226:19
**oath** [1] - 194:9
**object** [1] - 200:10
**Objection** [1] - 174:20
**objection** [55] - 8:17; 21:9, 12; 43:6;
44:15; 48:1-3; 49:23; 52:17; 60:9;
88:12, 16-17; 116:20; 123:8; 131:10;
140:16; 142:5-7; 144:1; 150:20, 24-25;
152:21; 157:23; 162:21; 164:12; 165:7,
9; 170:10; 176:8; 177:14; 178:9; 193:8;
198:8, 23; 201:5; 229:1, 23; 230:5;
231:22; 247:16
**objective** [11] - 14:17; 16:1, 5; 22:16,
18; 23:16, 22; 25:2, 4, 11; 26:5
**objectively** [2] - 26:6; 28:10
**observation** [1] - 111:14
**observations** [4] - 109:9; 111:10, 14
**observe** [6] - 55:6, 9, 13; 152:1;
190:15, 18
**observed** [1] - 74:24
**observing** [2] - 12:6; 231:17
**obstetrical** [1] - 17:15
**obtain** [2] - 145:9, 11
**obviously** [5] - 12:12; 181:14; 182:3;
257:3; 258:14
**occasion** [1] - 59:8
**occasionally** [3] - 71:4; 74:17; 82:2
**occasions** [1] - 185:15
**occurred** [12] - 57:7, 9; 97:16; 128:23;
146:7, 11; 154:25; 160:9; 163:3;
181:19; 185:8; 189:17
**October** [9] - 17:19, 23; 41:14; 42:16;
47:1; 83:22; 234:3, 6
**odd** [1] - 157:3
**ODIN** [1] - 3:10
**OF** [27] - 1:1, 11; 3:6; 4:3-5, 7-12,
14-16; 7:8; 29:23; 36:9; 37:13; 60:20;
67:15; 69:1; 87:9; 93:9; 98:1; 190:7;
191:17
**offensive** [2] - 227:7; 232:18
**offer** [2] - 20:24; 21:6
**offered** [4] - 32:5; 51:14; 95:24; 131:9
**offering** [3] - 30:9, 18, 21
**Office** [1] - 192:19
**OFFICE** [1] - 3:6
**office** [47] - 8:3; 14:19; 16:25; 18:5;
22:10; 28:19; 66:17, 19; 101:16, 18;
102:11, 25; 103:1; 104:15, 19; 114:24;
115:14, 16, 21; 116:4; 117:23; 134:3;
137:5; 142:23; 156:1; 158:14; 159:7,
25; 160:7; 162:11; 167:11; 187:10;
192:15, 18; 193:4; 194:12; 195:5;
202:3; 235:23; 236:22; 237:9, 11;
238:23
**officer** [1] - 222:25

**Officer** [1] - 171:15
**offices** [2] - 65:21; 197:20
**Official** [2] - 3:13; 265:18
**officially** [4] - 59:1; 113:7; 176:7;
259:23
**often** [6] - 57:15; 78:19; 107:21; 122:9;
134:21
**oftentimes** [1] - 71:12
**Olivia** [7] - 140:1; 143:10; 170:5;
171:3; 241:4
**Olivia's** [2] - 170:9; 171:1
**once** [12] - 9:25; 11:24; 12:4; 19:6;
73:9; 128:7; 137:25; 139:14; 186:16;
238:18; 264:2
**Once** [1] - 173:6
**one** [148] - 9:11; 10:16; 13:19; 15:4;
31:18, 20; 32:11; 33:19; 36:18; 41:9;
44:5; 46:8, 22; 47:1; 49:11; 50:4; 51:6,
15, 24; 52:24; 54:22; 59:17; 63:19;
64:7, 18, 24; 66:12-14; 79:11; 81:5;
83:21-23; 85:23; 86:2; 92:15; 97:7;
104:8, 23; 105:20; 109:23; 111:22, 24;
112:13; 115:4; 116:12, 15; 122:25;
123:12; 124:6, 22; 125:4; 126:1, 11, 19;
130:22; 133:1; 136:12; 137:22; 138:11;
142:4; 143:25; 144:1, 23; 145:12;
147:3; 151:3; 154:14; 158:2; 160:18,
23; 161:2, 4, 15; 168:3; 171:3, 16;
175:15; 184:4; 186:11-13; 187:25;
191:21; 193:17, 21; 194:4, 7, 14-15;
195:8, 12; 196:18; 197:2; 200:8;
207:23; 208:17, 25; 209:1, 21; 214:10,
12; 215:4; 217:5, 13, 21; 218:9, 19;
219:13-15; 221:7; 224:10; 226:7, 18;
233:5; 234:25; 235:3; 236:5; 239:19;
246:13; 248:16; 249:17; 250:21;
251:25; 252:1, 4, 6; 253:8, 11; 254:20;
257:15; 258:3; 264:1
**One** [1] - 209:3
**one's** [3] - 217:5; 219:12
**one-page** [3] - 123:12; 142:4; 143:25
**one-year** [1] - 9:11
**ones** [6] - 61:19; 126:12; 187:20;
219:16; 221:3, 6; 226:21; 240:23;
252:13
**ongoing** [3] - 19:8; 56:23; 139:8
**open** [4] - 58:8; 82:7; 104:21; 244:8
**opening** [1] - 82:6
**opens** [1] - 254:11
**operate** [1] - 21:19
**opine** [2] - 31:12; 36:1
**opinion** [13] - 26:10, 12; 30:9, 18, 21;
31:5; 32:4; 33:7, 11-12; 35:23; 36:3
**opinions** [7] - 8:8; 20:24; 21:3; 31:23;
33:7, 10
**opportunities** [2] - 85:7; 104:20
**opportunity** [6] - 46:15, 22; 104:25;
105:5; 262:23; 263:18
**opposed** [1] - 256:5
**opposition** [2] - 94:22; 95:16

**opt** [1] - 100:23
**oral** [6] - 12:3; 232:2, 9, 20; 233:2
**orally** [1] - 50:13
**orchestra** [1] - 78:23
**order** [17] - 23:1, 4, 6-7, 13; 25:1; 95:9;
96:18; 97:3, 5; 135:6; 153:10; 252:17;
253:4; 256:1; 264:12
**ordered** [2] - 96:22; 253:5
**orders** [1] - 247:19
**ordinary** [1] - 86:23
**organic** [5] - 14:15; 15:11, 13; 16:6
**organization** [1] - 16:12
**organizations** [2] - 16:8, 10
**organized** [1] - 75:21
**orient** [1] - 248:9
**otherwise** [3] - 216:2; 245:14; 247:2
**ourselves** [1] - 119:22
**outable** [1] - 100:23
**outline** [2] - 101:3; 205:3
**outside** [15] - 18:1; 61:8; 77:22; 78:16,
21; 79:10, 23; 81:13; 163:20; 187:17;
198:22; 199:2, 8, 19; 235:22
**Outstanding** [1] - 106:10
**overall** [1] - 40:22
**overanxious** [1] - 82:6
**overdrive** [1] - 239:3
**overreact** [1] - 138:23
**overreacted** [1] - 138:21
**overrule** [1] - 201:5
**Overruled** [1] - 198:24
**oversaw** [1] - 111:6
**oversee** [2] - 18:12; 57:23
**overseen** [1] - 9:22
**oversees** [2] - 13:17; 14:7
**oversight** [2] - 11:19; 119:24
**overview** [3] - 8:23; 21:17; 70:1
**overwhelming** [1] - 70:23
**own** [3] - 17:21; 183:5; 213:9

# P

**P.A.H** [1] - 3:6
**p.m** [16] - 43:16; 94:9; 97:17, 19;
128:16, 24-25; 159:21; 180:11; 181:20;
184:7; 262:15; 265:11
**Page** [2] - 4:2; 5:2
**page** [70] - 8:22; 41:10; 45:2; 50:4;
51:23; 65:6, 11; 66:1, 11; 79:19; 80:8;
113:18; 114:5; 115:10, 18-19; 116:15;
123:12, 14; 127:2, 4, 10-11, 17; 128:3;
130:10; 142:4; 143:25; 146:20; 153:8;
164:1, 21; 167:16; 171:5, 16; 175:9, 17,
21-22, 24; 184:20; 193:11; 194:8,
17-18, 22; 195:1; 196:20; 197:4; 201:8,
10; 205:25; 210:7, 18; 214:2; 221:15;
236:7; 242:23; 247:21, 25; 248:2, 8, 10
**pages** [9] - 31:25; 32:2; 44:20, 22;
101:4; 123:24; 127:1, 7; 129:13
**paid** [5] - 19:15, 17-19; 187:8

**pair** [3] - 73:6; 138:18
**pairs** [1] - 138:17
**panned** [1] - 117:9
**pants** [1] - 82:15
**paper** [1] - 82:8
**paragraph** [6] - 50:17; 51:12, 25; 65:6, 14; 253:7
**pardon** [1] - 263:20
**parent** [9] - 100:21, 25; 101:4; 107:18; 132:20; 146:4; 197:21; 202:3
**parents** [21] - 42:5; 44:25; 74:23; 75:10, 14; 84:12, 14; 93:14, 17; 100:24; 101:6; 105:4; 107:14; 165:22; 168:4; 196:13; 201:24; 203:9; 211:15; 216:15; 223:8
**parents'** [1] - 212:2
**park** [1] - 108:1
**Park** [2] - 1:20; 8:25
**Parkinson's** [1] - 22:12
**part** [30] - 11:9; 14:11; 15:7; 20:6; 38:18; 55:24; 56:8, 11; 67:23; 90:12; 111:19; 121:22; 125:6; 136:5; 139:9; 141:25; 176:18; 191:25; 200:25; 209:7; 216:4; 228:16, 19; 232:2; 236:6; 237:23; 245:4; 248:19; 265:1
**partially** [1] - 34:13
**participate** [5] - 18:3; 85:8; 91:23; 124:18; 142:12
**participated** [2] - 84:17; 85:16
**particular** [9] - 19:19; 38:12; 49:14; 97:13; 112:5; 183:7; 253:6; 262:24; 265:2
**particularly** [1] - 160:23
**parties** [7] - 96:13, 19; 113:6; 131:4; 176:6; 178:7; 247:17
**PARTIES** [2] - 6:4, 15
**parties'** [2] - 96:17; 97:2
**partner** [1] - 105:4
**parts** [3] - 82:1; 117:19; 122:18
**pass** [8] - 12:4, 6; 85:7; 91:9; 125:23; 135:10; 188:14
**passed** [1] - 103:22
**past** [3] - 18:10; 163:24; 265:2
**patient** [6] - 12:5; 15:8; 16:2; 23:7; 24:25; 28:24
**patient's** [1] - 22:19
**patients** [29] - 9:20, 25; 10:2, 6-7, 9, 20; 11:11, 17-20; 13:10; 14:2; 16:25; 17:4, 6, 9, 14; 18:1, 4; 20:8; 22:10; 23:11; 24:5; 26:24; 31:15
**pause** [2] - 117:4; 253:3
**pay** [2] - 16:11, 16
**PBIS** [3] - 119:9; 132:18
**PC** [1] - 3:10
**PDF** [2] - 116:16; 248:8
**PE** [4] - 42:25; 90:9; 103:2; 185:3
**peer** [3] - 32:21; 33:4; 56:15
**peer-reviewed** [2] - 32:21; 33:4
**peers** [3] - 15:22; 29:2
**pending** [2] - 94:4; 255:18

**Pennsylvania** [4] - 2:15, 18, 22; 3:3
**people** [58] - 14:4, 15, 18-19, 24-25; 15:2; 17:5; 18:12; 19:4; 20:5, 10; 22:7; 26:3; 35:2-5; 36:14, 17; 75:22; 76:4; 108:3, 5, 17; 111:11; 117:18; 140:10; 143:19; 149:20; 164:1; 165:19; 169:11; 174:14; 211:2, 4; 213:20; 214:16; 215:3; 224:23; 226:16; 228:23; 233:6; 237:11; 240:7; 241:8; 242:6, 14; 257:13; 260:4; 264:14; 265:1
**per** [4] - 19:18; 110:25; 223:5; 247:18
**percent** [2] - 56:18; 130:13, 15
**perfect** [1] - 255:2
**performance** [1] - 85:20
**perhaps** [1] - 248:19
**Period** [1] - 52:1
**period** [39] - 53:3, 9, 14, 19; 58:23; 65:7; 109:17; 110:4; 135:16; 137:6, 9; 140:5; 141:6, 14, 16-17, 21; 155:11; 157:6, 9; 158:5-7, 11; 159:19; 161:23; 162:6, 8, 16-17, 20, 25; 188:10; 190:1; 204:8; 232:13; 253:17
**periodically** [1] - 198:13
**peripheral** [8] - 10:18; 11:3, 12; 12:24; 21:22; 22:1, 3, 6
**permanent** [1] - 34:18
**permission** [21] - 62:17; 63:21; 64:19; 87:7; 88:6, 14; 92:5; 93:5; 97:10; 126:5; 131:6; 135:21; 140:13; 142:3; 157:14; 161:6; 166:6; 168:21; 175:6; 176:13; 184:17
**permit** [1] - 96:25
**perpendicular** [1] - 146:14
**person** [46] - 11:6; 12:5; 13:24; 15:14, 19; 22:24; 23:5, 19; 24:13; 25:15, 22; 26:9, 15; 28:3, 11, 18; 31:8, 10; 33:23; 34:13; 36:20; 42:1; 50:9; 51:15; 76:6; 89:11; 103:15; 122:17; 141:1; 152:1; 153:23; 177:9; 178:20; 195:8, 12, 15; 212:10; 215:4; 233:10, 15; 237:20; 255:12, 20; 258:12; 259:10
**person's** [14] - 15:10, 17; 23:22-24; 25:5; 26:22; 27:7, 9, 22, 25; 33:13; 34:23; 35:13
**personal** [4] - 43:21; 196:23; 245:3, 12
**personally** [5] - 20:21; 112:6; 210:25; 221:18; 264:22
**perspective** [1] - 254:16
**pertained** [1] - 45:5
**pertaining** [2] - 253:13, 19
**Ph.D** [1] - 29:11
**phases** [1] - 126:18
**philosophy** [1] - 72:5
**phone** [8] - 73:23; 264:3, 7, 11, 21; 265:2
**phones** [3] - 264:9, 12, 18
**photo** [10] - 87:23, 25; 89:7; 142:4, 11, 17-18; 158:14, 22; 159:1
**photograph** [2] - 80:9, 14; 81:7
**photographs** [1] - 79:16

**photos** [1] - 93:17
**phrase** [1] - 253:7
**physical** [13] - 14:20; 15:1; 27:21, 25; 33:5, 21-22; 36:16; 185:22; 192:6; 206:17; 235:8
**physically** [2] - 54:15; 86:13
**physicians** [3] - 9:22; 32:2, 8
**physiological** [1] - 36:21
**pick** [5] - 81:22; 108:25; 139:20; 148:3; 156:4
**picked** [1] - 84:2
**picture** [7] - 93:11; 115:8; 141:22, 25; 175:2; 211:21
**pictures** [4] - 93:14; 146:17; 232:10, 21
**piece** [1] - 146:7
**pieces** [1] - 225:21
**pillar** [3] - 80:12; 81:9
**Pimmit** [1] - 38:6
**pinched** [2] - 11:13; 22:4
**PITTLEMAN** [1] - 3:10
**place** [10] - 38:21; 58:25; 72:23; 75:5; 102:21; 135:5, 7; 136:5; 233:18; 239:22
**placed** [2] - 13:8; 85:11
**placement** [1] - 102:6
**places** [1] - 222:16
**Plaintiff** [3] - 1:4, 15; 2:2
**plaintiff** [28] - 6:7; 19:23, 25; 20:1, 3, 12; 40:13; 59:14; 60:24; 87:13; 95:1, 3, 6, 12; 96:2, 9; 133:8; 171:25; 182:10; 184:24; 185:14; 200:25; 253:14, 19; 255:9, 11; 259:8
**plaintiff's** [15] - 8:9; 94:20; 95:15; 96:6, 12; 134:6; 161:2; 172:5; 184:23; 246:8; 253:15, 20; 254:5, 10, 13
**Plaintiff's** [15] - 5:7; 62:17; 63:13; 64:10; 88:19; 161:6, 9, 12, 15; 205:22; 220:5; 227:11; 246:5; 247:15
**plan** [14] - 73:17, 19, 22, 24; 74:3, 5, 8-10; 136:5; 155:23; 208:22, 24
**planned** [1] - 183:9
**planning** [1] - 182:24
**plans** [2] - 73:16, 20
**play** [3] - 15:21; 131:6
**played** [4] - 116:25; 117:16; 130:20; 132:3
**playing** [1] - 258:23
**PLC** [1] - 3:6
**pleasant** [1] - 40:22
**pleased** [5] - 197:25; 198:6, 11, 17; 201:24
**pleasure** [2] - 71:20; 180:23
**PLLC** [1] - 1:16
**plus** [1] - 96:12
**PM** [1] - 1:7
**pod** [18] - 38:24; 39:1; 61:15, 24; 80:5, 9; 115:1; 116:5, 19; 117:20; 142:24; 156:1; 167:11
**Pod** [2] - 39:10; 59:24

**point** [42] - 6:25; 51:6; 55:12; 64:24; 79:24; 84:8; 86:3; 88:5, 25; 94:7; 127:13, 15, 19; 128:8; 149:14; 156:7, 17; 160:12; 180:9; 182:23; 183:19; 188:19, 22; 190:13, 18; 196:8, 12; 197:5; 201:4, 14; 205:1; 207:9; 237:11; 247:14; 254:2; 255:15; 257:10, 21; 258:12, 25; 259:1
**pointing** [1] - 230:6
**points** [1] - 136:4
**policy** [3] - 254:9, 12; 264:11
**pop** [1] - 56:9
**portions** [1] - 96:8
**position** [16] - 69:12, 18; 98:11; 99:5, 18; 100:8; 101:17, 23; 104:2, 6, 11, 17; 178:1; 257:22
**positions** [1] - 102:9
**positive** [6] - 73:2; 119:4, 8, 17; 124:14; 135:1
**Positive** [2] - 119:11; 132:17
**possible** [8] - 15:9; 27:21, 24; 106:16; 158:1; 174:12; 222:7; 265:2
**post** [1] - 258:16
**Post** [1] - 106:9
**postdate** [1] - 254:10
**postdates** [1] - 254:5
**posted** [1] - 42:12
**posters** [2] - 120:12; 132:18
**posts** [3] - 227:7; 232:18; 253:16
**potential** [2] - 10:25; 76:18
**potentials** [1] - 12:23
**PowerPoint** [3] - 112:12; 129:7, 16
**practice** [27] - 7:21; 15:8; 16:17, 21-22; 17:10; 18:1; 19:10-12, 21; 20:9; 23:23; 24:24; 25:10; 26:2, 17; 28:23; 31:14; 33:9; 36:2; 75:2; 145:15; 197:19; 245:12
**practiced** [1] - 7:23
**practices** [1] - 122:4
**practicing** [1] - 76:4
**pray** [1] - 36:17
**precise** [1] - 262:20
**precisely** [1] - 129:12
**preclude** [3] - 94:19, 21; 95:23
**precluded** [1] - 96:12
**predate** [3] - 253:14, 20; 254:13
**prefer** [1] - 260:19
**preference** [1] - 181:7
**pregnant** [5] - 80:20; 92:10; 166:22; 243:3
**premise** [1] - 35:7
**preparation** [1] - 238:7
**prepare** [2] - 8:12; 262:8
**presence** [1] - 24:7
**present** [5] - 19:20; 23:11; 46:16, 23; 231:4
**PRESENT** [2] - 6:4, 15
**presentation** [12] - 25:5; 95:18; 97:1; 126:9, 22; 127:2; 128:4; 129:6, 15, 22

**presentations** [1] - 132:20
**presented** [4] - 126:20; 184:11; 267:7
**presenting** [1] - 262:2
**pretty** [11] - 57:17; 80:20, 24; 89:7; 107:4, 19; 119:18; 211:5; 212:10; 218:10; 258:24
**prevent** [1] - 125:7
**prevention** [4] - 100:4; 125:2, 4
**preventive** [1] - 261:3
**previous** [1] - 138:7
**previously** [6] - 12:10; 37:23; 64:19; 90:21; 245:18, 21
**PricewaterhouseCoopers** [1] - 94:21
**primary** [3] - 13:17; 25:16; 237:19
**principal** [16] - 66:7, 21; 98:12; 104:6, 12; 105:9, 19, 22; 106:2, 20; 107:25; 109:4; 112:9; 209:16; 213:18; 214:23
**Principal** [4] - 98:12; 176:19; 177:24; 184:24
**principal's** [1] - 155:20
**principals** [3] - 213:18; 214:21, 23
**print** [4] - 6:21; 41:19; 262:13
**printed** [1] - 123:18
**private** [6] - 16:17, 21-22; 18:1; 177:23
**privileges** [3] - 16:20; 17:23; 18:13
**privy** [1] - 56:22
**probative** [2] - 95:19; 96:6
**probe** [1] - 13:8
**problem** [5] - 122:21; 183:14; 209:17; 255:6; 261:5
**problems** [5] - 14:1; 18:15; 24:6; 25:1; 36:12
**procedure** [5] - 56:19; 135:15; 196:4; 245:10
**procedures** [3] - 195:20, 24; 196:6
**proceed** [3] - 129:2; 184:15; 190:5
**proceeding** [1] - 264:19
**Proceedings** [2] - 3:17; 265:11
**proceedings** [5] - 97:16; 128:23; 181:19; 253:3; 265:14
**PROCEEDINGS** [1] - 1:11
**process** [10] - 12:11; 15:16; 19:8; 58:11, 14; 73:13; 173:11, 14; 239:13
**processes** [2] - 34:16, 22
**produce** [1] - 222:1
**produced** [4] - 3:17; 8:9; 132:7; 248:19
**profane** [1] - 127:15
**profanity** [1] - 239:10
**professional** [2] - 16:8, 12
**program** [27] - 70:18; 71:16, 25; 90:12, 15; 100:7; 102:1, 3-4, 8, 12; 107:13; 118:19; 119:9, 12, 16, 18, 23; 132:18; 186:24; 187:1, 7, 15; 188:3
**programs** [3] - 101:17; 102:2; 110:14
**progress** [4] - 44:23; 45:3; 46:7
**projects** [2] - 102:1; 104:16
**promiscuity** [1] - 221:13
**promise** [1] - 236:15

**prompts** [1] - 251:20
**proper** [2] - 149:4; 200:20
**properly** [1] - 124:17
**propose** [2] - 182:1; 255:5
**prove** [2] - 95:9, 14
**proves** [1] - 259:14
**provide** [5] - 197:23; 201:18; 255:17; 262:9, 20
**provided** [9] - 31:24; 97:4; 120:11; 125:21; 132:24; 197:12, 15, 17; 201:16
**providing** [2] - 37:12; 68:24
**psychiatric** [9] - 13:22; 14:5, 10, 16, 18, 25; 25:12; 29:4
**psychiatrist** [5] - 25:18, 25; 26:3, 7; 33:13
**psychiatrists** [2] - 13:18
**psychiatry** [6] - 13:14, 16; 14:6, 12; 25:4; 26:7
**psychologist** [1] - 31:17
**PTA** [1] - 132:21
**PTSD** [33] - 8:9; 24:12, 16, 21; 25:6, 12; 26:11, 15-16; 28:13, 16, 20, 24; 30:16, 19, 22; 31:5, 15, 19; 32:3, 9, 12; 33:5, 14, 19-20, 23; 34:12, 25; 35:1, 8
**puberty** [1] - 99:24
**Public** [17] - 37:21, 23; 38:1; 69:10; 90:19; 98:25; 99:1, 5; 101:20; 102:18; 132:7; 252:20; 253:15, 21, 23; 254:11, 14; 259:24
**publications** [2] - 35:24
**publicized** [1] - 42:7
**publish** [58] - 8:16; 43:8; 44:16; 45:13; 48:3; 49:24; 52:18; 62:17; 63:21; 64:19; 78:2; 79:15; 88:6; 92:5; 113:12; 114:18; 115:7; 123:9; 126:5; 130:2; 135:21; 140:13; 142:7; 144:2; 146:16; 150:22, 25; 151:2; 157:13; 160:17; 161:7, 21; 164:13; 166:6; 168:21; 170:11; 172:14; 175:7; 176:5, 13; 178:9; 184:17; 205:21; 208:14; 210:5; 213:23; 217:3, 9-10, 23; 220:5; 226:24; 227:13; 241:17; 242:19
**published** [4] - 100:22; 114:18; 195:20; 196:4
**pull** [6] - 61:1, 3; 62:8; 90:21; 161:9, 12; 210:4; 220:4
**pulled** [14] - 51:19; 59:14; 65:2; 88:22; 91:10; 135:10; 156:14; 178:20; 201:15, 23; 237:8, 10, 23; 250:19
**pulling** [2] - 103:14; 156:15
**purple** [3] - 80:12; 81:9
**purpose** [5] - 119:15, 17; 215:21, 24; 228:17
**purposes** [5] - 149:3; 182:24; 200:17; 255:12; 264:17
**put** [41] - 10:22; 11:5, 7; 23:14, 19; 24:9; 27:7; 31:5; 45:11; 46:24; 59:21; 72:23; 80:12; 81:9; 89:22; 102:25; 108:1; 117:17; 129:12, 17; 135:5, 15; 136:5; 150:1; 157:24; 161:13, 22;

171:9; 213:21; 215:9; 217:1, 6; 225:21; 229:5; 230:13; 238:16; 245:5; 248:3; 259:11
**puts** [1] - 85:19
**putting** [5] - 82:14, 17; 175:13; 223:11; 239:13
**PwC** [6] - 94:24; 95:1, 4; 96:3, 5, 24
**PwC's** [1] - 96:25
**PX-111** [1] - 210:4
**PX-220** [1] - 241:17
**PX-529** [1] - 231:12
**PX-545** [1] - 218:9
**PX-642A** [3] - 5:7; 87:22; 88:19
**PX-77** [2] - 226:22, 24
**PX-83** [1] - 62:9
**PX77** [1] - 230:16

**Q**

**quality** [2] - 19:5, 7
**quarter** [12] - 45:5-8, 17; 46:19; 48:22; 73:10; 91:4, 6, 8
**QUESTION** [3] - 201:14, 19, 22
**questioner** [1] - 202:5
**questioning** [3] - 180:14; 230:10; 252:23
**questions** [40] - 7:5; 19:2, 5, 7; 29:18, 20, 22; 36:7, 23; 37:10; 40:11; 60:11; 67:13; 68:4, 21; 76:3; 86:25; 93:7; 105:2; 131:23; 143:4; 180:15; 184:4; 186:23; 189:9; 190:3, 12; 191:23; 196:9; 197:5; 200:16; 229:4; 230:14; 233:9; 260:6; 261:14; 262:21
**quick** [1] - 253:1
**quickly** [6] - 44:20; 73:2, 8; 110:7; 138:6; 217:3
**quietly** [1] - 207:9
**quite** [2] - 71:10; 193:5
**quote** [8] - 95:8, 23; 197:25; 204:2; 206:17, 20; 243:6, 14
**quote-unquote** [2] - 243:6, 14

**R**

**R's** [1] - 207:12
**Rachel** [55] - 38:7, 9, 14; 50:9; 69:17, 20, 23; 70:13; 76:7; 85:5; 89:19; 98:10; 104:10, 14, 20, 22; 105:6, 9, 11, 14, 17; 106:2, 15, 17; 107:25; 110:19; 112:8; 113:3, 21, 23; 119:13; 129:24; 132:16; 141:1; 171:18, 25; 184:25; 192:21; 193:2; 194:10; 195:3, 8, 17; 196:12; 206:20, 23; 207:12; 211:1; 212:11, 18; 213:11; 219:5; 252:11
**R██████** [6] - 66:5; 91:2; 186:14; 203:11; 237:3, 5
**R██████** [1] - 238:21
**raised** [2] - 48:10; 222:5

**raising** [1] - 141:11
**ran** [1] - 85:13
**range** [2] - 70:24; 71:12
**raped** [1] - 189:13
**rapport** [2] - 40:23, 25
**rate** [1] - 19:18
**rather** [1] - 44:6
**ray** [1] - 22:23
**rbates@hunton.com** [1] - 2:16
**RDR** [3] - 3:13; 265:14, 17
**RDR-CRR** [1] - 265:14
**re** [1] - 121:3; 130:16; 143:16; 145:4; 233:12
**re-interview** [1] - 145:5
**re-interviewed** [2] - 143:16; 145:4
**re-investigate** [1] - 233:12
**re-report** [1] - 121:3
**re-test** [1] - 130:16
**reaching** [2] - 72:12; 76:17
**reacted** [1] - 138:24
**reacting** [1] - 139:15
**reaction** [1] - 163:9
**read** [21] - 41:7; 46:13; 66:11; 94:18; 95:17; 139:25; 151:11, 16; 153:9; 169:12; 171:6; 201:12; 202:7; 207:20; 210:22; 213:5; 225:16; 232:5, 14, 22; 233:21
**readiness** [2] - 120:4, 8
**reading** [3] - 65:14; 94:16; 231:16
**reads** [1] - 253:4
**ready** [4] - 142:21; 181:3; 207:13; 250:10
**real** [3] - 97:13; 110:3; 165:24
**realize** [2] - 97:7; 158:5
**realized** [4] - 139:15; 163:11, 13; 174:4
**realizing** [1] - 138:25
**really** [21] - 40:4; 72:13; 73:2, 8; 80:22; 91:23; 92:20; 104:19, 22; 107:11; 109:3; 113:1; 116:11; 122:8, 13; 135:1; 177:21; 231:3; 260:17, 25
**reason** [8] - 14:15; 82:23; 112:5; 138:13; 178:24; 189:6; 197:23; 237:23
**reasonable** [1] - 21:3
**reasons** [1] - 82:25
**rebuttal** [4] - 182:10, 22; 200:25
**recalled** [2] - 54:2; 64:23
**receive** [6] - 54:21; 90:14; 150:8, 14; 154:1, 22
**received** [11] - 46:25; 49:4; 70:3; 126:10; 151:4; 152:25; 153:3; 154:21; 179:2
**receiving** [4] - 75:8; 84:23, 25; 122:25
**recently** [2] - 20:1; 88:5
**receptive** [1] - 76:24
**recess** [3] - 97:16; 128:23; 181:19
**recipient** [1] - 106:6
**recognition** [1] - 211:23
**recognize** [4] - 41:7; 90:25; 115:23; 118:24

**recognized** [2] - 96:1; 106:11
**recollection** [10] - 47:21; 48:11; 65:22; 66:18; 198:4; 217:18; 249:13, 20; 258:16; 260:14
**record** [49] - 44:18; 46:14; 48:5; 50:1; 52:19; 88:19; 94:18; 98:5, 7; 113:7, 13; 116:23; 123:22; 130:17; 131:13; 142:8; 144:3; 145:20, 24; 149:3; 150:21; 152:23; 157:25; 164:14; 167:17; 170:12; 176:15; 178:11; 183:21, 23; 190:11; 201:12; 213:5; 222:9; 230:5; 232:6; 241:10; 244:18; 245:1, 7; 251:17; 254:7; 255:3; 256:17; 259:14, 21; 264:9; 265:14
**recording** [1] - 145:22
**recordings** [1] - 83:4
**recordkeeping** [1] - 245:3
**records** [19] - 19:13; 20:19; 29:14; 31:24; 32:2; 228:20; 245:4; 253:8, 11-14, 19
**recurred** [1] - 251:7
**recurring** [1] - 16:3
**red** [2] - 80:12, 16
**redacted** [1] - 247:22
**redactions** [3] - 144:17; 247:18; 248:3
**redirect** [5] - 36:8; 67:14; 93:8; 181:24; 260:18
**REDIRECT** [6] - 4:5, 9, 12; 36:9; 67:15; 93:9
**reevaluate** [2] - 183:9; 184:5
**refer** [4] - 26:3; 31:16; 63:19
**reference** [2] - 161:2; 233:17
**referenced** [3] - 51:24; 127:12; 158:24
**referral** [2] - 150:4
**referred** [1] - 146:2
**referring** [3] - 51:17; 214:5; 247:9
**reflected** [1] - 239:25
**reflects** [1] - 183:21
**refresh** [6] - 65:22; 66:18; 249:13, 20; 258:16; 260:14
**regard** [22] - 19:15; 50:25; 55:23; 67:23; 94:19; 103:20; 106:1; 111:17; 112:16; 116:7; 118:10; 129:9; 133:20; 136:21; 137:23; 154:19; 167:25; 168:15; 178:3; 179:4; 230:12; 263:18
**regarding** [5] - 47:10, 13; 55:22; 239:20; 258:18
**regardless** [1] - 145:21
**regular** [4] - 19:11; 44:24; 86:4; 198:2
**regularly** [6] - 40:5; 76:11, 24; 80:18; 120:3; 138:23
**regulations** [2] - 254:9, 13
**rehashing** [1] - 258:10
**rehearsal** [1] - 83:1
**rehearsals** [2] - 83:7; 86:4
**rehearse** [1] - 91:24
**relate** [2] - 253:9, 12
**related** [11] - 27:8; 31:12; 63:9; 95:7; 120:16; 164:7; 173:24; 222:1; 238:6; 242:8; 261:16

**relationship** [7] - 18:3; 40:3; 107:9; 139:8; 164:20; 170:23; 171:2
**relationships** [9] - 75:22; 105:2; 107:10, 13, 18, 22
**relatively** [1] - 108:16
**relayed** [1] - 124:8
**released** [1] - 79:4
**relevant** [4] - 14:14; 15:6; 96:20; 253:17
**rely** [2] - 25:13; 26:13
**remainder** [1] - 182:17
**Remember** [1] - 167:9
**remember** [80] - 33:2; 39:2; 40:18-20, 23; 42:14, 25; 47:3; 48:15; 49:6; 51:2-4, 20; 53:11; 54:7, 14; 58:2; 59:2, 10; 60:3; 64:4; 65:24; 66:24; 80:20-22; 81:3; 83:21, 23; 85:21; 86:18-20; 89:14, 16; 105:1; 108:10; 112:6; 131:1; 133:14; 137:9; 143:9; 145:14; 147:21; 155:19; 167:5, 20; 170:19; 186:13; 187:3, 16; 193:3; 194:10; 195:3; 206:12; 208:10; 215:10; 216:10; 222:21, 24; 223:1; 233:20; 234:3, 6; 237:6; 243:6, 16; 244:15; 246:16; 250:3; 260:15; 262:11
**remembering** [1] - 77:7
**remind** [6] - 120:12; 125:14; 145:2; 159:6; 192:21; 214:15
**reminded** [2] - 80:18; 215:7
**remorseful** [1] - 122:6
**removed** [1] - 259:23
**renal** [1] - 23:10
**render** [1] - 31:5
**repeat** [2] - 27:23; 226:2
**rephrase** [5] - 138:1; 150:12; 165:11; 198:9
**report** [38] - 25:13, 17; 29:8; 30:2; 32:19, 22, 25; 35:17, 20; 44:23; 45:3; 46:7; 54:18; 86:7, 10, 13; 90:25; 118:23; 121:3; 141:14; 150:6; 162:18, 24; 163:5; 168:2; 171:4; 185:17; 196:14; 197:8; 208:7; 219:17, 22-23; 226:9; 230:1; 233:11, 23; 240:6
**reported** [26] - 3:17; 25:24; 55:17; 86:24; 93:2; 111:25; 141:3, 5-6, 9; 162:14; 168:18; 169:23; 171:6; 174:10; 204:23; 228:9-11; 234:9; 235:24; 236:4, 14; 244:22
**reporter** [3] - 117:1; 213:5; 226:3
**REPORTER** [3] - 250:9; 253:10; 261:8
**Reporter** [3] - 3:13; 265:18
**reporting** [7] - 120:19; 162:5; 163:25; 167:25; 168:5; 243:7, 15
**reports** [4] - 44:24; 203:22; 204:2, 15
**represent** [7] - 32:11; 50:8; 60:24; 87:13; 98:7; 113:16; 160:22
**representation** [4] - 32:13; 113:11; 161:19; 199:15
**representative** [4] - 194:1; 196:17; 199:12; 200:12

**representing** [1] - 191:22
**reproduction** [1] - 99:24
**request** [5] - 200:18; 251:21; 264:1, 3, 5
**requested** [4] - 19:2; 134:24; 158:22
**required** [6] - 72:20; 80:17; 81:12; 90:9; 100:5; 130:12
**requirements** [1] - 74:8
**reseated** [1] - 181:2
**resection** [1] - 10:21
**residence** [1] - 8:1
**residency** [8] - 9:5, 7, 18, 25; 10:2, 14; 11:25
**resilience** [1] - 118:18
**resistant** [1] - 113:2
**resolution** [1] - 146:3
**resolve** [2] - 154:14; 262:3
**resolved** [1] - 205:3
**resource** [2] - 104:5; 222:24
**respect** [9] - 96:10, 20, 24; 120:4, 7; 124:6; 253:8; 254:9, 12
**respectful** [1] - 207:13
**responding** [1] - 200:17
**response** [9] - 37:12; 46:11; 136:7, 10; 177:1; 208:22; 213:4; 222:10, 13; 223:5; 229:3; 256:4
**responses** [1] - 222:5
**Responsibilities** [9] - 123:17; 124:15; 125:13, 15; 126:15, 19; 129:7; 130:21; 196:7
**responsibilities** [6] - 103:20; 106:19; 111:17; 114:3, 15
**responsibility** [5] - 111:9; 115:4; 120:5, 9; 237:19
**responsible** [6] - 17:14; 106:21-23; 116:11; 207:13
**responsibly** [1] - 154:25
**responsive** [1] - 40:11
**rest** [4] - 44:21; 94:16; 114:13; 263:6
**restart** [1] - 117:12
**Reston** [2] - 3:8, 11
**restorative** [1] - 122:4
**restrictions** [1] - 188:9
**restroom** [4] - 80:22; 92:19; 118:5; 256:19
**result** [2] - 127:8; 148:4
**resulting** [1] - 33:6
**results** [1] - 257:8
**resume** [1] - 95:4
**resurrect** [1] - 35:12
**retained** [2] - 30:12; 238:7
**reteach** [2] - 125:25; 130:16
**retire** [2] - 98:17; 105:24
**retired** [3] - 98:15, 19; 238:7
**retirement** [1] - 98:21
**retrieved** [1] - 150:8
**returned** [3] - 154:23; 158:25; 179:24
**returning** [2] - 43:2; 62:23
**returns** [1] - 159:6

**reversed** [1] - 35:12
**review** [13] - 19:6, 13; 20:18; 26:25; 29:8; 32:1, 21; 85:3, 9; 173:6; 223:17
**reviewed** [6] - 29:14; 31:23; 32:19, 21; 33:4; 220:10
**revisit** [1] - 260:23
**REWARI** [75] - 4:4, 6-7, 9, 11, 13; 6:8; 7:2, 9; 8:6, 16, 19-20; 9:13, 17; 21:6, 14-15; 24:9, 11; 29:18; 36:10, 23, 25; 37:6, 14; 39:5, 7-8; 41:2, 5; 43:4, 8, 10-11; 44:13, 17, 19; 45:11, 14-15, 18, 21; 47:24; 48:4, 6; 49:21, 25; 50:2; 52:15, 20; 59:21, 24; 60:1, 11; 67:16; 68:4, 7, 15, 18; 69:2; 78:2, 4-5; 79:15, 18, 20; 86:25; 88:17; 93:10, 20, 24; 94:1; 256:12
**Rewari** [6] - 2:17; 62:11; 64:15, 24; 65:5; 93:23
**Ride** [1] - 84:3
**Rights** [9] - 123:16; 124:14; 125:13, 15; 126:14, 18; 129:7; 130:21; 196:6
**rights** [1] - 124:6
**risen** [1] - 264:25
**risk** [1] - 182:12
**rkeefe@bsfllp.com** [1] - 2:13
**RMR** [1] - 3:13
**Road** [1] - 105:22
**roam** [1] - 58:22
**Robert** [2] - 2:10; 3:7
**role** [6] - 18:12; 102:17; 106:2; 137:23; 173:14
**roll** [1] - 212:25
**room** [20] - 17:7, 15; 39:25; 59:17; 71:2-4, 6; 77:15; 78:8, 12, 15, 19, 23, 25; 79:5, 11, 13, 23, 25; 80:6; 81:1; 115:24; 116:1; 151:13; 155:21
**rooms** [1] - 17:4
**roots** [1] - 22:2
**ROSSIE** [1] - 1:11
**Rossie** [1] - 131:22
**rotate** [2] - 18:11; 73:9
**rotating** [1] - 17:20
**roughly** [1] - 16:21
**routine** [1] - 15:7
**routines** [1] - 73:3
**ruckus** [1] - 81:23
**rude** [2] - 207:6; 211:8
**rule** [3] - 25:4; 26:4; 262:19
**Rule** [9] - 94:24; 95:7, 12, 17, 21; 96:11; 182:8; 183:1
**ruled** [1] - 256:11
**ruling** [2] - 254:24; 262:17
**rumors** [26] - 164:24; 165:18, 24; 166:1, 3; 167:1, 3, 5-6, 19; 168:1; 221:12; 233:1, 3; 242:10, 13; 243:7, 14, 17, 20, 22, 24; 244:9
**run** [4] - 36:14; 72:8; 74:12
**running** [3] - 71:16, 24; 187:21
**runs** [1] - 72:19
**Ryan** [2] - 2:14; 98:7

# S

**S.T** [1] - 3:6
**safe** [2] - 179:9; 259:13
**safety** [6] - 75:16; 106:21; 114:3; 124:6; 190:19; 191:1
**sake** [1] - 257:17
**sanitize** [1] - 255:3
**sat** [8] - 134:8; 143:20; 144:13; 174:1; 212:4; 213:9, 20; 214:12
**satisfied** [4] - 198:19; 199:6, 18; 200:1
**saw** [14] - 32:2; 64:15, 24; 134:3; 139:14; 146:1; 149:10; 151:11, 14; 152:14; 160:3; 170:18; 185:10; 229:25
**scan** [5] - 15:16; 23:1; 28:8; 58:16, 20
**scanner** [1] - 58:20
**scanning** [1] - 80:7
**scans** [2] - 22:22
**scar** [1] - 24:3
**scared** [4] - 36:20; 65:12, 16; 207:3
**scenarios** [1] - 9:20
**schedule** [7] - 90:9; 108:21; 157:14; 158:8, 16, 18; 161:13
**scheduled** [1] - 128:5
**schematic** [3] - 61:1, 23; 92:3
**SCHILLER** [4] - 1:20; 2:2, 6, 10
**schizophrenia** [1] - 24:21
**school** [182] - 9:19; 38:3, 14-16, 22; 40:7, 21; 41:24; 42:7, 9; 43:2; 45:12; 50:19; 55:1, 4; 56:15, 20; 57:14, 16, 19, 21, 23; 58:9, 12, 19, 23; 59:1; 62:5; 73:4; 74:23; 76:8; 77:16; 78:19; 82:20, 24-25; 83:2, 5-6, 8, 10; 85:4, 6; 86:7, 16; 89:4; 93:2; 98:24; 99:3, 7; 100:1, 17; 101:18; 103:12, 18, 21, 23; 104:16; 106:10; 107:16; 108:8, 10, 14; 109:25; 110:13; 114:2, 19, 22; 115:15; 119:13; 120:4, 6; 121:20; 122:7; 125:5, 20; 126:14; 133:13; 134:12, 25; 136:25; 138:12; 146:17; 151:22; 154:8, 10, 13, 17, 23; 156:13, 15; 162:15; 165:24; 166:13, 16; 167:13; 173:22; 174:18; 178:23, 25; 179:9; 185:8; 186:4, 24-25; 187:1, 7, 17-19; 188:2, 13, 17, 20, 23; 189:1, 13, 17, 23; 190:1; 192:24; 193:1; 195:12; 198:6, 12, 18-19, 22; 199:3, 8, 20; 200:1; 201:15; 202:11; 203:21; 206:21, 24-25; 207:1; 209:6, 17; 210:20; 211:14; 222:24; 223:4; 231:7; 235:22; 237:8, 10; 238:21, 24; 245:4, 8; 248:13, 16; 252:4, 8, 24; 253:8, 11; 254:5; 255:25; 256:21; 257:11; 259:12, 24
**School** [36] - 9:1; 30:12; 38:6, 8-9; 50:10; 69:11, 17; 85:3, 25; 98:8, 10; 104:5, 7; 105:15, 18-19, 22; 132:7; 192:15; 193:25; 195:17; 211:1; 252:12; 253:21; 254:9, 12; 255:4, 17, 21; 256:9, 20, 22; 259:24

**school's** [6] - 90:12; 209:17; 222:5, 10, 13; 223:6
**schoolers** [1] - 85:14
**schooling** [4] - 141:1; 178:20; 184:25; 255:21
**Schools** [16] - 37:22, 24; 38:2; 69:10; 90:19; 98:25; 99:1, 5; 101:20; 102:18; 252:20; 253:15, 24; 254:11, 14
**schools** [10] - 85:5; 103:23, 25; 104:18; 106:3; 113:1; 171:17, 19
**Science** [1] - 8:25
**science** [8] - 39:22; 90:7, 10; 107:2; 206:6, 10, 14; 208:5
**Sciences** [1] - 9:1
**scientific** [4] - 32:21; 33:5; 35:15, 20
**sclerosis** [4] - 14:3; 22:13; 24:1
**score** [1] - 130:12
**Scott** [5] - 2:21; 3:13; 265:14, 16
**Scott's** [1] - 250:11
**scottwallace.edva@gmail.com** [1] - 3:16
**screen** [11] - 39:9, 14; 61:10, 12; 78:9; 113:16; 114:6; 129:12; 215:22; 224:7, 9
**screening** [1] - 109:13
**se** [1] - 223:5
**SE** [3] - 2:3, 7, 11
**seas** [1] - 82:1
**seat** [5] - 7:4; 37:9; 151:14; 152:15; 181:21
**seated** [11] - 6:12; 94:10; 97:18, 20; 128:18; 129:1; 148:6; 153:11; 180:12; 184:8; 262:16
**seating** [7] - 73:7, 9; 143:20, 25; 144:6, 8; 147:19
**second** [46] - 8:22; 44:20; 45:6-8, 17; 48:22; 50:3, 17; 51:12, 23; 80:21; 91:6; 100:14; 124:3; 127:4, 15, 18; 130:11; 147:23; 151:8; 153:8; 160:24; 161:8; 162:3; 167:15; 169:12; 177:3; 186:12; 187:24; 188:1; 189:12; 193:17, 24; 196:18; 209:1, 16; 210:7, 18; 221:15; 244:15, 20; 246:23; 255:15
**second-in-command** [1] - 209:16
**seconds** [4] - 92:18; 131:6, 9-11; 251:15
**section** [6] - 123:23; 125:2; 128:1; 251:19
**sectional** [1] - 71:5
**sections** [1] - 114:13
**secure** [2] - 264:9, 18
**security** [1] - 58:25
**see** [101] - 9:24; 10:11; 14:19; 15:15, 23; 16:4, 6, 25; 17:6; 18:15; 19:7; 20:9; 22:10; 23:1, 8-9, 19, 24; 24:7; 25:20; 26:1, 24; 27:8; 28:6, 16; 29:5; 35:17; 44:21; 45:18; 50:20; 51:25; 52:4; 59:8, 11, 14; 61:14, 18-19, 21; 65:13; 68:1; 71:22; 74:18, 20; 78:25; 79:11; 80:2; 82:11, 14, 17; 91:12; 97:15; 113:17; 117:14; 124:20; 127:5; 128:22; 139:2;

155:17, 25; 156:1; 157:17; 158:8; 169:12; 171:19; 173:8; 177:8; 178:25; 180:9, 20; 181:4, 10, 12, 17; 183:9; 185:5, 12; 193:6; 194:16; 196:23; 199:2; 208:13; 211:21; 225:19; 227:3, 5; 232:23; 237:1; 241:16; 246:19; 248:23; 252:3; 257:23; 259:21; 260:22; 262:13; 263:11; 265:4
**seeing** [10] - 17:14; 20:8; 54:2; 56:12; 66:23; 118:25; 210:20, 23; 211:21
**sees** [2] - 24:25; 71:22
**segment** [1] - 132:6
**segue** [1] - 196:9
**segueing** [1] - 196:8
**seizures** [3] - 16:3; 22:11; 24:7
**self** [3] - 27:15; 118:18; 121:22
**self-control** [1] - 27:15
**self-esteem** [1] - 118:18
**self-image** [1] - 121:22
**semester** [1] - 91:13
**seminar** [3] - 53:5, 13; 124:25; 125:19, 22; 126:12; 140:6; 141:18; 142:20; 154:21; 158:18, 25; 159:13
**seminars** [1] - 53:14
**Semitic** [1] - 254:24
**send** [14] - 25:3; 26:7; 44:24; 53:2, 18, 23; 85:6; 135:11; 139:2; 140:4, 22; 141:15; 173:3; 263:3
**sending** [1] - 263:2
**sense** [4] - 22:22; 34:6; 36:18; 245:11
**sensitive** [3] - 101:5; 103:14; 107:15
**sensitivity** [1] - 65:18
**sensory** [2] - 14:20; 22:25
**sent** [18] - 42:9; 43:18; 139:4; 140:3, 19; 141:19; 143:8; 155:11; 173:4; 178:23; 184:23; 223:15, 20, 23-24; 232:10, 21
**sentence** [14] - 124:5, 7; 136:11; 171:8; 173:5, 10; 177:3, 17; 178:22; 232:6, 12, 14, 23
**sentences** [1] - 124:12
**separate** [5] - 95:13; 219:23; 235:4; 245:25; 246:1
**separately** [3] - 74:21; 129:17; 168:18
**series** [2] - 175:3; 206:4
**serious** [4] - 65:20, 23; 121:11; 122:25
**seriously** [2] - 51:15; 56:20
**serotonin** [1] - 34:15
**service** [4] - 18:19-21, 23
**services** [3] - 91:10, 16; 214:24
**SESSION** [2] - 1:8; 6:1
**set** [4] - 44:11; 83:1; 220:14; 236:17
**Seth** [1] - 7:14
**SETH** [7] - 4:3-5; 7:3, 8; 29:23; 36:9
**setting** [4] - 11:21; 119:22; 120:6; 126:19
**settle** [1] - 141:13
**seven** [2] - 17:4
**several** [5] - 12:19; 25:11; 101:4; 143:12; 243:16

**severe** [1] - 25:23
**sex** [8] - 99:14, 23; 100:13; 232:2, 9, 20; 233:2
**sexual** [29] - 86:8; 100:3; 103:2; 127:21; 189:3; 191:24; 192:2; 193:3; 194:11; 195:4, 10, 13, 16, 25; 205:5, 9; 206:17; 212:11, 18; 213:11, 14, 16; 228:11; 243:8; 244:21; 245:22
**sexually** [8] - 54:13; 55:3; 82:11; 86:11; 93:2; 188:20, 23; 189:1
**shadow** [1] - 156:6
**shadowing** [2] - 198:14; 204:12
**sharing** [1] - 73:6
**sheer** [2] - 72:7; 88:21
**sheet** [13] - 46:18, 21, 24; 47:11, 13, 18; 48:11, 14, 19, 23; 49:2, 11, 14
**sheets** [2] - 63:10; 134:15
**shift** [2] - 187:24; 188:1
**shirt** [1] - 82:18
**shock** [2] - 11:5
**short** [1] - 74:2
**shorthand** [1] - 3:17
**show** [25] - 27:1; 28:9, 19; 33:20; 39:3; 41:1; 46:18; 78:6; 81:7; 85:2, 9, 16, 19; 116:18; 147:8; 196:16; 208:12; 213:19; 247:20; 248:9; 257:19; 259:15
**showed** [11] - 62:5, 11; 65:5; 110:9; 129:17; 137:8; 206:4, 23; 207:22; 208:8
**shown** [4] - 62:4; 63:8; 93:11; 250:3
**shows** [5] - 28:8; 79:21; 259:14, 20, 22
**shrinkage** [1] - 27:3
**shrinks** [1] - 27:8
**sic** [1] - 157:1
**side** [9] - 15:4; 61:20; 78:18; 157:12, 24; 158:2; 260:21
**side-by-side** [2] - 157:12, 24
**sidebar** [4] - 251:17, 21; 258:9; 262:20
**Sidebar** [1] - 261:23
**sign** [4] - 58:4, 6; 110:9; 261:25
**signature** [1] - 230:24
**signed** [1] - 63:9
**signs** [1] - 141:24
**similar** [6] - 24:16; 64:2; 103:5; 161:1; 188:16; 218:10
**similar-type** [1] - 64:2
**simply** [1] - 264:13
**singer** [1] - 90:4
**singing** [2] - 72:14
**single** [6] - 78:17; 79:12, 23; 109:16; 135:7; 174:19
**singled** [2] - 134:23; 140:23
**sit** [11] - 11:24; 12:1; 19:4; 134:4; 149:21; 185:11; 203:8; 218:4, 6, 8
**site** [10] - 18:5; 169:11, 15, 18, 20-21, 25; 171:7, 13
**sitting** [11] - 143:6; 144:15; 146:13; 147:20; 149:16, 18-20; 186:8; 238:14; 264:4
**situation** [8] - 19:12; 51:15; 74:22;

120:15; 202:6; 214:22; 228:22; 263:17
**situations** [4] - 75:3; 134:14; 138:15; 264:16
**six** [1] - 192:24
**Sixth** [1] - 96:2
**size** [4] - 70:22, 25; 71:7, 9
**Skills** [3] - 99:14, 17
**skills** [3] - 119:3; 134:16, 18
**skull** [2] - 24:2
**slam** [4] - 169:11, 18, 20, 24
**slide** [9] - 7:15; 8:22; 11:22; 13:13; 16:7; 17:25; 24:10; 69:5; 158:2
**slides** [3] - 129:9, 13
**slideshow** [2] - 8:12; 24:9
**slightly** [1] - 62:10
**slow** [3] - 82:7; 212:25; 250:11
**slurs** [2] - 244:21; 245:22
**slut** [8] - 227:21; 228:4, 12, 16, 23-24; 229:10, 20
**small** [6] - 11:6; 45:16; 79:12; 107:16; 108:16; 138:11
**smell** [1] - 22:21
**Smith** [1] - 95:20
**snack** [2] - 147:3
**sneers** [1] - 207:10
**snitch** [3] - 121:7; 207:6; 211:8
**so...** [2] - 76:6; 79:1
**so...** [1] - 250:11
**social** [8] - 6:21; 73:21; 76:15; 134:16, 18; 138:15; 253:16; 262:13
**socialize** [3] - 72:9; 110:2
**Society** [1] - 13:5
**sodium** [1] - 28:7
**solely** [1] - 96:17
**someone** [16] - 38:15; 48:14; 51:8; 57:8; 58:19; 66:25; 86:16; 119:1; 156:5; 195:21; 196:3; 200:5, 13; 218:7; 230:7; 249:22
**sometime** [5] - 89:1, 3; 157:8; 188:1; 232:25
**sometimes** [17] - 19:22; 28:2; 56:6; 82:5; 84:14; 92:13; 116:9; 139:4; 144:14; 145:23; 194:23; 214:22, 24; 237:11; 261:25
**somewhat** [1] - 200:14
**somewhere** [4] - 55:20; 145:22; 149:19; 181:7
**Sona** [1] - 2:17
**sorry** [38] - 29:19; 64:12; 66:9; 107:2; 108:11; 122:20; 123:20; 127:11; 135:1; 145:2; 149:3, 6; 150:11; 159:23; 168:24; 174:23; 178:14; 180:13; 184:1; 185:20; 194:15; 201:11; 202:15; 203:12; 212:4; 217:8, 22; 218:13; 219:8; 226:4; 237:4; 250:9; 253:10; 256:9; 258:7; 261:8
**sort** [21] - 53:5, 16; 58:2; 79:24; 80:9; 85:15; 99:24; 100:6; 107:6, 25; 108:5; 111:5; 114:4, 14; 143:6; 181:12, 25; 182:7; 215:14; 263:8, 15

**sorts** [1] - 10:10
**souls** [1] - 20:10
**South** [4] - 85:2, 9, 25
**Southern** [2] - 9:4, 6
**space** [2] - 75:20; 147:14
**span** [2] - 89:5; 204:10
**Spanish** [1] - 91:15
**speaking** [12] - 76:4; 106:19; 107:5; 112:18; 119:8; 120:15, 22; 173:19; 224:18; 226:6, 11
**special** [8] - 101:17; 102:1; 104:16; 106:24; 109:12; 111:7; 139:9, 11
**specialists** [2] - 120:2; 135:4
**specialization** [1] - 10:15
**specialties** [1] - 18:22
**specialty** [3] - 9:24; 12:19; 139:10
**specific** [14] - 28:20; 95:9, 14; 120:14; 123:17; 138:2; 167:5; 195:23, 25; 221:16; 224:14; 254:18; 264:12
**specifically** [12] - 31:13; 40:20; 120:14; 145:14; 147:21; 206:12; 226:7, 11, 21; 253:7; 254:8; 261:15
**specifics** [1] - 260:9
**spectrum** [1] - 22:14
**speculation** [2] - 60:9; 162:21
**speech** [1] - 91:12
**spent** [1] - 119:18
**spinal** [6] - 11:2; 15:23; 21:23; 23:13, 15
**split** [1] - 38:17
**spoken** [1] - 163:21
**spot** [1] - 116:12
**spread** [2] - 165:25; 243:9
**spreading** [9] - 164:24; 166:3, 25; 221:7, 12; 242:10; 243:22
**spring** [3] - 69:25; 77:21; 89:1
**Square** [1] - 3:15
**SR&R** [5] - 102:25; 112:12; 130:6; 132:10; 197:14
**srewari@huntonak.com** [1] - 2:20
**staff** [12] - 38:20; 40:10; 45:24; 77:18; 115:15; 187:6, 8, 10, 14, 17, 23
**stamp** [15] - 46:18, 21, 23-24; 47:11, 13, 18; 48:11, 14, 19, 23; 49:2, 11, 14
**stand** [12] - 56:6; 61:8; 79:3, 5, 8; 80:4, 17; 81:12; 108:18; 119:10; 191:3
**standard** [2] - 26:2; 33:9
**standards** [2] - 72:20; 101:2
**standing** [13] - 12:1; 55:25; 79:22; 82:10; 112:20; 116:4; 146:12; 147:9; 148:5; 153:15; 261:24
**stands** [2] - 91:9; 102:3
**start** [17] - 8:21; 30:8; 41:9; 73:4; 74:19; 76:3; 91:14; 108:1; 121:7; 131:14, 25; 137:10; 159:19; 191:24; 201:9; 211:17; 262:5
**started** [16] - 16:20; 69:24; 77:17; 84:5; 99:9; 108:10; 150:9, 15; 153:20; 163:25; 204:16; 231:3; 233:18, 22; 237:22; 257:9

**starting** [3] - 174:2; 232:25; 264:2
**starts** [7] - 41:10; 187:2; 227:3; 228:3; 232:12; 248:10
**State** [5] - 70:5, 8; 99:25; 100:5; 102:21
**state** [5] - 35:13; 83:2; 98:5; 133:2
**statement** [85] - 47:9, 12, 17, 20; 48:8, 24; 63:9, 25; 64:3; 137:6, 8; 139:25; 141:3; 143:3; 145:17, 22-23; 150:19; 151:4, 6, 9; 152:13, 25; 153:6; 155:16, 19-20; 160:24; 161:8, 18; 162:2, 13; 163:12; 169:4, 10; 170:9, 15, 17; 171:8; 174:8; 186:18, 22; 215:9, 24; 216:10, 13, 23; 217:13; 224:13; 227:16, 25; 229:9; 230:22; 231:2, 9, 15; 232:24; 233:5; 239:12; 244:11, 15, 20; 246:13, 16-18; 247:2; 249:11, 14, 17, 21-23, 25; 250:1, 7, 14, 21
**statements** [32] - 95:25; 145:9, 11; 150:8, 14; 154:1, 5; 160:18, 23; 173:25; 215:4, 14, 20-21; 216:4, 7; 219:19; 228:9; 230:6; 232:2; 239:5, 14; 240:3, 5, 19, 23-24; 243:25; 250:19, 25; 251:2
**STATES** [2] - 1:1, 12
**States** [4] - 3:14; 95:19; 96:1; 128:6
**stating** [1] - 165:14
**stationed** [1] - 110:9
**status** [4] - 15:15; 199:14; 200:14
**stay** [18] - 57:14, 16, 18; 75:20; 78:15; 82:21, 23; 83:3, 5-6; 115:19; 116:12; 183:4; 184:12; 187:9; 188:11; 229:3; 262:12
**stayed** [5] - 6:21; 57:18; 110:13; 112:23; 188:8
**staying** [2] - 57:21; 183:11
**stays** [1] - 262:24
**step** [13] - 37:2; 68:9; 94:3; 112:3; 128:17; 139:21; 180:12; 184:1; 200:24; 262:18
**step-by-step** [2] - 139:21
**stepped** [2] - 97:8; 255:25
**stepping** [1] - 109:20
**steps** [5] - 51:4, 16; 67:1; 120:16, 20; 173:7
**stick** [1] - 245:6
**still** [12] - 17:20, 23; 19:9; 59:5; 72:11; 115:21; 138:12; 156:5; 171:25; 178:1; 255:22
**stipulate** [1] - 157:21
**stipulated** [7] - 113:6; 123:6; 131:5; 157:20; 176:6, 11; 178:7
**stolen** [1] - 135:18
**stomach** [2] - 185:4, 18
**stood** [2] - 56:8; 80:15
**stop** [18] - 81:21; 88:11; 126:1; 128:8; 132:5; 137:13; 140:7; 143:23; 146:15; 157:10; 165:18, 24; 167:9; 179:3, 12; 180:22; 183:16; 260:19
**stopped** [2] - 250:19; 255:23
**stopping** [1] - 243:21

**strategy** [1] - 75:13
**streams** [1] - 110:8
**Street** [4] - 1:16; 2:3, 7, 11
**strengths** [1] - 111:13
**stretch** [1] - 255:10
**strict** [1] - 110:5
**strictly** [1] - 80:19, 24
**strike** [1] - 192:20
**string** [2] - 172:19; 225:23
**stroke** [4] - 12:20; 18:20; 22:11; 23:25
**strokes** [2] - 10:6; 13:10
**struck** [1] - 24:1
**structural** [5] - 8:10; 26:11; 34:4, 7, 22
**structure** [2] - 27:9; 183:5
**structured** [3] - 72:8; 73:6, 11
**structures** [3] - 26:22; 27:12, 18
**struggles** [1] - 40:20
**stuck** [3] - 82:8; 245:9; 258:15
**student** [97] - 40:16, 18, 22, 24; 44:6; 45:24; 46:1; 53:23; 54:12; 55:12; 57:1; 71:9; 72:21; 73:22, 24; 74:1, 19, 21; 75:4, 7, 10; 76:16, 25; 81:21; 82:3, 11-12, 14, 17; 85:11; 86:6; 89:16; 91:9, 23; 106:21; 111:17, 22; 120:19; 121:1, 9, 17; 123:14, 18, 24-25; 125:24; 127:9, 24; 130:14; 132:13; 137:15, 18; 138:14; 146:1; 150:19; 151:22; 153:5; 155:21; 163:25; 164:17; 165:6, 25; 166:21; 168:19; 171:9, 19, 25; 173:25; 177:4; 185:3, 11; 186:1, 16, 22; 189:4; 209:5, 16; 214:24; 215:4; 228:22; 237:7; 239:14; 240:7, 10, 19, 23-24; 242:13; 243:3; 244:23; 245:2; 246:18; 251:20; 252:11; 255:24
**Student** [8] - 123:16; 124:14; 125:12; 126:14, 18; 129:6; 130:20; 196:6
**student's** [4] - 82:15, 18; 144:18; 177:7
**students** [146] - 38:18, 20; 40:10, 12; 42:5; 43:23; 44:2; 53:17; 54:19; 55:3, 6, 9, 13; 56:12, 17; 58:4, 22; 59:11; 70:24; 71:10, 17, 22, 24; 72:1, 7, 9-11, 16, 25; 73:4, 7, 19; 74:11, 16, 24; 75:18, 24; 76:1, 13; 77:15, 22; 78:15, 21; 79:4; 80:6; 81:24; 83:2, 15; 84:2; 85:7, 10; 90:6, 14; 102:5, 13; 105:3; 108:8, 13-14, 17; 110:19, 22, 25; 111:1, 18, 22; 112:21; 120:6, 11, 24; 121:5, 12; 122:6; 123:20; 124:8, 18, 22; 125:14, 17, 23; 126:10, 15; 127:18; 129:24; 132:8, 16, 23; 143:11, 14, 21; 145:3, 10, 20-21; 146:6, 24-25; 150:9, 13-14; 154:20; 155:23; 156:8, 20; 163:17; 164:6; 165:16; 167:7; 168:5, 18; 170:3; 188:2, 6, 8; 195:20, 24; 196:5; 204:23; 207:3, 8; 210:21, 23; 211:5, 21; 220:18; 222:18; 224:24; 228:24; 229:20; 239:7, 25; 240:3; 243:21; 245:17; 254:25
**Students** [1] - 124:16
**students'** [2] - 125:15; 212:3

**studies** [9] - 10:19; 22:8; 32:21; 33:1, 5, 18, 20; 35:15; 90:15
**study** [4] - 11:4; 35:20; 53:6
**stuff** [5] - 122:7; 174:15; 231:2; 244:20; 245:7
**style** [2] - 72:5; 107:7
**styles** [1] - 71:19
**sub** [2] - 9:24; 12:19
**sub-specialty** [2] - 9:24; 12:19
**subarachnoid** [1] - 13:11
**subject** [13] - 36:24; 38:17; 64:7; 68:6; 93:21, 25; 107:1; 163:16; 180:3; 186:10, 12; 206:16; 254:22
**subjected** [1] - 211:5
**subjective** [2] - 25:13, 17
**subjects** [3] - 99:11; 133:4
**submission** [1] - 95:4
**subsequent** [2] - 259:7, 18
**subsequently** [2] - 9:7; 259:16
**subspecialty** [1] - 14:7
**substance** [1] - 34:15
**substantiate** [3] - 25:15; 28:10; 36:2
**substitute** [1] - 37:21
**suck** [1] - 148:10
**sued** [1] - 67:21
**suffer** [1] - 207:9
**suffered** [1] - 30:22
**suffering** [2] - 30:19; 76:17
**sufficiently** [1] - 121:21
**sugar** [1] - 73:23
**suggest** [3] - 122:14; 182:16; 216:2
**suggested** [1] - 48:14
**suggestion** [1] - 182:14
**suggestions** [1] - 101:4
**Suite** [7] - 1:17, 21; 2:3, 7, 11; 3:7, 11
**summarize** [1] - 228:18
**summarized** [2] - 222:17; 233:12
**summarizing** [1] - 136:3
**summary** [9] - 173:20; 174:17, 21, 23; 175:24; 215:25; 216:3; 222:16; 225:21
**sun** [1] - 263:5
**super** [2] - 177:19; 178:3
**superintendent** [3] - 222:11; 239:14, 21
**superintendent's** [5] - 235:23; 236:22; 237:8, 11; 238:23
**supervise** [1] - 108:16
**supervised** [5] - 58:7; 108:19; 109:24; 110:23
**supervision** [4] - 111:2, 5; 114:8; 255:12
**support** [9] - 51:14; 71:24; 72:3; 95:10; 101:4, 6; 102:8; 187:21; 235:18
**Support** [1] - 119:11; 132:18
**supported** [3] - 121:3; 136:15; 137:22
**supporting** [2] - 107:23; 119:4
**supportive** [3] - 40:8, 10; 75:15
**supposed** [10] - 41:19; 55:22, 24; 59:9; 74:7; 116:6; 144:16; 230:11;

242:8; 258:4

**supposedly** [3] - 171:9; 206:20; 259:12

**suppress** [1] - 27:16

**surgery** [1] - 21:19

**surgical** [1] - 10:20

**surprises** [1] - 176:24

**surrounding** [2] - 171:17

**suspect** [1] - 31:19

**suspended** [2] - 243:7, 12

**suspension** [3] - 166:13; 167:13; 257:8

**suspicion** [1] - 31:18

**sustained** [1] - 193:9

**Sustained** [4] - 60:10; 162:22; 174:22; 177:15

**switch** [1] - 118:7

**switched** [1] - 158:12

**switching** [1] - 186:24

**SWORN** [4] - 7:3; 37:8; 68:20; 97:24

**S** ▮ [1] - 177:4

**symptoms** [13] - 14:16, 18, 20-21; 15:18; 22:19, 24; 23:3; 25:18, 24; 31:10; 33:20; 34:11

**system** [23] - 11:1; 12:24; 21:21-23, 25; 22:1-3; 98:24; 99:3; 100:1, 17; 102:19; 103:22; 107:16; 125:5; 138:24; 139:1; 241:12; 253:21; 259:24

**System** [1] - 192:15

**systems** [2] - 11:12; 22:7

---

## T

**T.B** [1] - 3:6

**T.H** [2] - 144:18

**tab** [3] - 62:9; 64:8; 87:23

**table** [14] - 143:20; 144:7, 15, 24; 145:12; 146:13; 147:19, 23; 148:7; 149:18, 20; 150:2; 153:11

**tables** [4] - 147:12, 14

**tailing** [2] - 148:24; 149:5

**tailored** [1] - 133:3

**talkie** [1] - 155:12

**talks** [3] - 25:25; 206:16; 207:12

**tall** [1] - 78:25

**T** ▮ [2] - 94:12; 104:22

**T** ▮ [2] - 4:15; 190:7

**T** ▮ [2] - 97:22; 98:6

**T** ▮ [5] - 4:14, 16; 97:24; 98:1; 191:17

**tangible** [3] - 15:24; 16:6; 23:2

**tap** [2] - 15:23; 23:14

**targeted** [1] - 76:2

**targets** [1] - 72:12

**T** ▮ [7] - 39:24; 216:11-13; 218:12, 15

**T** ▮ [1] - 115:24

**task** [2] - 14:22; 222:4

**tasked** [7] - 173:15; 175:13; 195:9, 12,

16; 221:24

**taught** [16] - 43:1; 70:15, 17-18, 21, 24; 71:5, 13; 88:1; 91:15, 18; 99:13, 17; 100:12; 126:2

**Taylor** [13] - 168:20; 169:15, 24; 170:4; 171:4, 10, 13, 15, 18, 20; 172:3, 6, 8

**teach** [10] - 38:10, 12; 70:14, 20; 71:1; 72:8; 99:11, 15; 118:22; 119:3

**Teacher** [1] - 106:10

**teacher** [62] - 37:21; 38:18; 39:18, 23; 43:24; 52:1; 56:22; 58:7; 65:7, 17; 67:20; 69:13, 19; 70:8; 71:17; 75:12; 77:4; 80:25; 81:3, 12; 87:19; 90:18; 99:7-10, 12, 18; 100:9, 13-15; 103:7, 12-13, 15; 104:5; 106:11, 23; 107:11, 20; 109:9; 113:21, 23-24; 114:8, 10; 125:24; 130:16; 135:10, 14, 17; 138:17; 140:8, 11; 141:12; 185:10, 22; 195:18

**teacher's** [1] - 135:16

**teachers** [52] - 42:25; 43:13; 58:4; 62:14; 71:9, 21; 77:8, 10; 78:14; 100:19; 103:11, 17; 104:18; 105:3; 107:11; 108:15; 109:6, 10; 111:4, 10, 12, 14; 112:16; 113:2, 25; 116:6, 10; 118:9; 123:21; 124:24; 125:20, 22; 126:3, 13; 132:11; 139:1; 165:23; 168:3; 174:5; 187:20; 211:22; 212:7; 213:10, 13; 218:6; 219:19; 222:21, 23

**teaches** [1] - 103:7

**teaching** [2] - 72:5; 103:3

**Team** [1] - 158:7

**team** [26] - 38:20, 24; 39:23; 40:3; 51:5; 56:3; 78:14; 106:25; 109:7; 110:25; 111:20, 22, 25; 115:3; 126:13; 133:9; 137:19; 140:11; 141:22, 24; 146:2; 174:7; 214:17, 20; 262:23

**teams** [13] - 38:17; 106:25; 107:1; 109:8; 110:23; 111:1, 6, 18, 22; 112:17; 115:4; 137:22

**teasing** [1] - 124:19

**tech** [1] - 120:1

**technically** [1] - 8:4

**Technion** [1] - 9:2

**ten** [6] - 12:10; 143:16; 145:4; 146:6; 154:1; 239:25

**tended** [1] - 138:23

**tending** [1] - 9:22

**term** [7] - 15:13; 18:11, 14; 34:5; 214:20; 228:11; 229:20

**terms** [9] - 31:8; 111:9; 119:19; 129:18; 134:14, 19; 184:2; 204:10; 229:14

**T** ▮ [12] - 168:3; 215:2, 19; 216:22; 223:12, 15; 226:14, 19; 227:23; 240:4, 22

**T** ▮ [1] - 219:10; 239:24

**tertiary** [2] - 10:5, 12

**test** [15] - 12:3; 23:4; 25:15; 58:5; 125:23; 126:16; 130:5, 9, 12, 15-16; 137:10

**tested** [1] - 15:6

**testified** [30] - 19:25; 32:11; 61:5, 7; 92:2, 9, 12; 96:4; 130:5; 140:8; 159:16; 166:21; 185:23; 206:4; 212:10; 213:10, 21; 215:7; 226:14; 243:4, 6, 11; 244:14; 246:22, 24; 249:15, 21; 250:4, 13; 251:8

**testify** [8] - 32:15; 200:18, 23-24; 209:2; 212:8; 250:15, 20

**testifying** [2] - 186:2; 213:20

**testimony** [30] - 8:13; 94:24; 95:1, 6; 96:9, 13, 16, 24; 97:1; 118:8; 119:9; 125:12; 182:18; 198:8, 11; 199:11; 200:20; 213:19; 215:13; 217:17; 218:3, 15; 229:24; 231:6; 233:24; 240:14; 243:14; 246:25

**testing** [6] - 10:17; 11:4; 12:22; 13:2; 16:14; 28:12

**tests** [8] - 10:25; 14:22; 16:6; 23:4, 18, 21; 25:3

**text** [2] - 214:2; 224:9

**texting** [1] - 169:14

**thankfully** [1] - 65:17

**Thanksgiving** [2] - 62:6; 63:2

**theater** [1] - 91:12

**themselves** [2] - 124:17; 230:9

**theoretically** [2] - 200:22

**therapists** [2] - 135:2

**therapy** [3] - 34:25; 35:3, 9

**there'd** [1] - 81:20

**therefore** [2] - 35:11; 96:5

**Thereupon** [3] - 97:16; 128:23; 181:19

**they've** [1] - 235:22

**thicker** [1] - 194:15

**thinking** [4] - 21:10; 35:11; 254:4; 261:24

**thinks** [2] - 210:23; 227:22

**thinner** [3] - 197:2; 200:8; 201:8

**third** [8] - 44:20; 91:8; 127:23; 136:11; 147:23; 246:23; 250:4, 13

**Thomas** [2] - 9:8, 12

**thorough** [3] - 107:19; 175:2; 177:18

**thoroughly** [3] - 112:15; 120:25; 178:4

**thousand** [1] - 102:13

**thousands** [6] - 20:10; 31:25; 32:1; 35:24

**threat** [8] - 65:20, 23; 155:18; 190:18; 191:1; 235:7; 236:13

**threatened** [2] - 160:13; 163:6

**threatening** [5] - 127:18, 23; 128:1; 242:7; 254:25

**threats** [5] - 155:6; 157:1; 162:6; 163:16, 18

**three** [24] - 9:5; 38:7; 81:6; 82:4; 85:24; 86:1; 105:23; 110:24; 114:13; 134:14; 147:2; 154:21; 173:22; 188:12; 189:13; 207:12; 214:21; 220:18; 224:13; 226:15; 231:3; 233:14

**three-year** [1] - 9:5

**threw** [1] - 185:3

**throughout** [4] - 86:1; 105:14; 109:18; 188:9

**throwing** [1] - 215:9

**thrown** [2] - 185:17; 263:9

**Thursday** [1] - 50:10

**thyroid** [2] - 23:5

**TIFFANY** [7] - 4:7-9; 37:8, 13; 60:20; 67:15

**Tiffany** [2] - 37:6, 19

**timeframe** [2] - 73:14; 220:15; 262:10

**timing** [3] - 156:22; 157:3; 158:4

**tingling** [1] - 22:5

**tiny** [3] - 78:16

**tired** [1] - 23:6

**tissue** [3] - 24:3; 34:8

**Title** [16] - 192:16; 193:3; 194:11; 195:4, 18, 21, 23, 25; 196:2, 7, 14; 197:8, 13, 24; 201:17

**title** [1] - 213:24

**today** [15] - 6:23; 8:8, 13; 19:13; 20:24; 30:25; 32:6, 24; 97:3; 179:19; 180:21; 181:15; 183:10; 184:12; 186:8

**together** [9] - 40:4; 146:7; 175:14; 213:22; 215:9; 223:11; 235:10, 13; 239:13

**tolerated** [1] - 129:20

**tomorrow** [2] - 262:5

**tone** [3] - 124:14; 192:10; 210:2

**took** [16] - 12:3; 49:7; 51:15; 105:5; 125:23; 126:16; 155:19; 238:1, 5, 12; 243:25; 244:11; 250:23

**top** [17] - 46:10; 52:21; 62:11; 78:4; 91:21; 114:6; 136:10; 140:18; 161:24; 172:20; 173:10; 176:17; 179:14; 211:2, 4; 231:16

**topic** [4] - 118:7; 186:24; 188:18; 206:11

**topics** [10] - 100:2, 21; 101:5, 9; 102:23; 103:14; 107:15; 194:1; 200:19

**TORCHINSKY** [1] - 1:15

**total** [2] - 145:3; 226:16

**touch** [3] - 51:22; 137:4; 190:16

**touched** [2] - 21:17; 55:1

**touching** [5] - 55:6; 56:13; 127:21; 183:24

**Touro** [1] - 9:1

**toward** [1] - 190:24

**towards** [8] - 40:21; 49:7; 80:20; 85:22; 203:23; 220:19; 233:18

**track** [1] - 241:12

**Tracy** [2] - 187:2, 4

**traditional** [1] - 258:17

**traditionally** [1] - 99:23

**trained** [6] - 100:20; 103:11, 13, 17; 125:14, 17

**Training** [1] - 125:13

**training** [13] - 11:25; 20:25; 25:7; 101:10; 103:8, 19; 126:2; 130:6, 21, 24; 132:10, 12, 24

**transcranial** [1] - 13:7

**TRANSCRIPT** [1] - 1:11

**transcript** [4] - 3:17; 197:2; 252:20; 265:14

**transcription** [1] - 3:18

**transient** [2] - 28:3, 8

**transition** [2] - 55:23; 106:15

**transitions** [1] - 79:8

**trauma** [2] - 10:10; 33:6

**traumatic** [2] - 22:14

**treat** [14] - 10:2; 14:4; 17:5, 25; 20:11; 22:3, 6, 9, 15; 26:1, 9; 31:19, 21; 35:9

**treated** [3] - 68:2; 245:25; 246:1

**treating** [5] - 11:16, 19; 13:3; 20:5; 68:1

**treatment** [1] - 35:1

**trial** [7] - 105:14; 128:7; 172:10; 212:4; 257:23; 264:6, 14

**TRIAL** [1] - 1:11

**triangle** [1] - 59:20

**trick** [1] - 236:15

**tried** [3] - 80:4; 171:14

**true** [5] - 232:11, 22; 243:17; 244:4, 9

**trust** [2] - 118:17, 24

**truthfulness** [2] - 95:10, 23

**try** [12] - 75:16; 96:9; 156:5; 158:4; 181:4; 183:4, 11; 184:11; 230:13; 258:16; 263:15; 264:18

**trying** [28] - 72:16; 97:9; 120:20; 125:7; 129:14; 132:22; 135:12; 138:19; 156:7; 158:12; 174:16; 183:6; 187:2; 215:4; 228:18; 230:18; 236:15-17; 251:21; 255:3, 23; 258:4; 259:15, 19; 263:5

**Tuesday** [4] - 45:4; 46:5; 50:15; 182:9

**tumor** [3] - 13:25; 15:17; 26:5

**tunnel** [1] - 22:5

**turn** [11] - 9:3; 46:19; 49:11; 65:6; 87:22; 110:11; 128:3; 133:7; 189:3; 216:8

**turned** [3] - 49:4, 7; 181:10

**turning** [2] - 47:10; 135:14

**TUWINER** [7] - 4:3-5; 7:3, 8; 29:23; 36:9

**Tuwiner** [11] - 7:12, 14, 19; 9:13; 21:6; 29:25; 30:8; 35:14; 36:5, 11; 97:8

**twice** [6] - 19:6; 77:20; 129:25; 193:19; 249:16; 264:7

**two** [47] - 18:11; 46:6; 70:16; 85:12, 24-25; 92:22; 102:2; 113:18; 120:24; 125:19; 126:18; 127:7; 129:13; 130:25; 140:10; 143:16; 145:11; 146:8; 147:2; 151:14; 155:6; 159:7, 14; 167:21; 168:18; 171:3; 174:14; 184:4; 185:14; 186:7; 204:10; 211:2, 4; 227:4; 231:4; 232:2; 235:4; 239:9; 243:19, 22; 253:13; 255:7; 256:25; 260:22

**two-page** [1] - 113:18

**two-week** [1] - 204:10

**two-year** [1] - 18:11

**type** [9] - 19:14; 20:7; 58:3; 64:2; 86:7; 116:8; 164:25; 218:5; 258:7

**typed** [2] - 215:14; 238:10

**typed-up** [1] - 215:14

**types** [10] - 13:3; 22:18; 29:6; 75:2; 81:18; 119:20; 124:11; 219:19; 238:5; 258:21

**typewritten** [1] - 161:15

**typical** [4] - 71:7; 107:24; 109:3; 125:25

**typically** [26] - 12:2; 19:6; 24:18; 58:8; 70:20; 71:9, 16, 22; 72:3; 79:22; 80:4, 15; 81:2; 83:8; 84:2, 4, 11; 93:14, 16-17; 111:21; 116:13; 121:18; 135:7

**typing** [6] - 214:13; 237:22; 238:14

---

## U

**ultimately** [4] - 49:1; 85:19; 223:20, 23

**ultra** [1] - 15:15

**ultrasound** [2] - 13:6, 8

**um-hmm** [12] - 38:23; 188:17; 196:11; 200:9; 203:5; 225:5; 230:23; 235:6; 241:6; 243:13; 244:13; 255:14

**Um-hmm** [1] - 101:13

**un-zoom** [1] - 114:12

**unable** [1] - 155:21

**uncomfortable** [2] - 134:20; 135:8

**under** [11] - 94:19; 95:8; 111:1, 5; 124:11; 144:17; 159:13; 161:24; 194:8; 230:24

**undergraduate** [1] - 8:24

**underrepresented** [1] - 102:5

**understood** [5] - 123:2; 214:10; 215:7; 252:17; 254:15

**unhappy** [1] - 260:4

**unheard** [1] - 219:21

**unintentional** [1] - 210:13

**unique** [2] - 35:7; 71:23

**unit** [2] - 10:20; 17:15

**UNITED** [2] - 1:1, 12

**United** [4] - 3:14; 95:19; 96:1; 128:6

**University** [6] - 8:24; 9:3, 6; 70:4, 6; 106:13

**unkind** [1] - 75:8

**unknown** [2] - 189:14, 25

**unless** [5] - 77:11; 188:14; 249:5; 254:11; 257:19

**unobtrusively** [1] - 97:9

**unofficial** [1] - 77:13

**unquote** [2] - 243:6, 14

**unrelated** [6] - 97:7; 252:25; 257:5; 259:9, 19

**untruthfulness** [1] - 95:14

**unusual** [5] - 6:24; 44:6; 53:22; 186:15; 219:19

**unwanted** [4] - 55:1, 7; 191:25; 192:2

**up** [85] - 6:19; 12:13; 14:24; 15:8; 24:10; 30:2; 32:16; 38:17; 45:11; 58:4, 6; 59:22; 61:1, 3; 62:8; 71:13; 81:22; 82:7, 17; 84:3, 9; 90:21; 107:21;

108:25; 110:2; 122:11; 129:12, 17;
133:14; 139:1, 20; 142:21, 24; 147:25;
148:3; 151:14; 152:14; 161:9, 12;
169:17; 173:11, 15; 176:22; 177:11;
182:16; 184:3; 202:11; 207:18, 21;
208:7, 17; 210:4; 211:7; 215:14, 22;
217:1, 6; 218:8; 219:7, 23; 220:4;
222:2; 224:5; 226:16; 227:10; 229:5,
13, 19; 230:16; 231:11, 18; 237:16-18;
239:24; 241:16; 246:5; 248:8; 249:6;
254:3; 257:9; 261:24
  **UPC** [1] - 58:15
  **update** [1] - 102:23
  **updated** [4] - 26:14; 112:11, 13
  **ups** [3] - 84:6; 211:13; 235:23
  **upset** [5] - 51:19; 54:3, 6; 64:24; 66:23
  **uses** [1] - 230:8

## V

  **VA** [3] - 3:8, 11, 15
  **vaguely** [1] - 48:15
  **valuation** [1] - 111:9
  **valued** [1] - 105:5
  **vantage** [1] - 79:24
  **variety** [3] - 22:11; 71:18; 74:6
  **various** [5] - 73:20; 94:24; 103:23;
124:11; 197:20
  **vascular** [3] - 12:21; 13:11; 14:8
  **vault** [1] - 245:6
  **verbal** [4] - 127:12; 192:4; 211:25;
239:10
  **verbatim** [1] - 33:2
  **verbiage** [1] - 229:24
  **verified** [1] - 154:2
  **version** [7] - 63:18; 64:14; 123:16;
129:23; 161:15
  **versus** [3] - 78:17; 95:20; 96:1
  **Via** [1] - 102:3
  **video** [9] - 116:19; 117:6, 12; 130:17,
20, 24; 131:6, 25; 132:7
  **videos** [2] - 130:25; 132:6
  **Videotape** [3] - 116:25; 117:16; 132:3
  **view** [3] - 79:21; 80:7
  **viewpoints** [1] - 33:9
  **vilified** [1] - 121:21
  **violated** [2] - 195:21; 196:4
  **violates** [1] - 95:7
  **violation** [1] - 261:9
  **Virginia** [8] - 3:14; 7:21; 8:1, 5; 70:9;
99:25; 100:23; 264:11
  **VIRGINIA** [1] - 1:1
  **visibly** [2] - 51:19; 64:24
  **vision** [2] - 14:20; 22:25
  **visualize** [1] - 146:21
  **vocabulary** [2] - 103:5; 134:14
  **vocal** [1] - 84:6
  **VOGEL** [1] - 1:15
  **voice** [2] - 141:11; 192:10

  **voicemail** [1] - 179:24
  **voices** [1] - 84:9
  **volt** [2] - 10:25; 12:23
  **VOLUME** [1] - 1:7
  **vulgar** [2] - 55:9; 74:25
  **vulnerable** [2] - 72:14

## W

  **wait** [2] - 150:23; 248:1
  **waited** [2] - 137:9; 263:15
  **waiting** [2] - 142:25; 162:11
  **walk** [13] - 51:21; 81:23; 99:4; 107:24;
108:1; 109:19; 116:13; 139:17, 22;
148:2; 155:9, 25; 159:5
  **walked** [4] - 122:11; 143:8; 153:20;
203:22
  **walkie** [1] - 155:12
  **walkie-talkie** [1] - 155:12
  **walking** [2] - 81:25; 92:16; 117:18
  **wall** [2] - 227:7; 232:18
  **Wallace** [4] - 3:13; 265:14, 16
  **Walters** [6] - 131:16, 19, 21, 24-25;
172:21
  **wander** [1] - 58:22
  **wandering** [1] - 189:25
  **wants** [2] - 155:15; 255:4
  **ward** [1] - 17:15
  **warm** [2] - 84:6, 9
  **warm-ups** [1] - 84:6
  **warning** [4] - 121:14, 16; 165:15;
242:6
  **warnings** [1] - 167:21
  **Washington** [6] - 1:17; 2:15, 19, 22;
3:3; 106:9
  **watch** [2] - 141:12; 150:4
  **watched** [2] - 155:25; 212:7
  **waves** [1] - 13:6
  **waxing** [1] - 117:17
  **ways** [5] - 44:2; 72:24; 73:1; 74:10;
132:15
  **weak** [1] - 15:4
  **Weaver** [14] - 134:1; 174:13; 202:22,
25; 203:1, 6; 206:1; 214:17, 22; 216:13;
217:6
  **Weaver's** [1] - 217:13
  **Website** [1] - 42:8
  **week** [18] - 17:1, 14, 18; 20:9; 47:5;
48:19; 50:19; 51:14; 62:6; 63:2; 77:21;
125:19; 141:23; 166:16; 204:9
  **weeks** [7] - 126:14; 169:6; 212:17;
231:3; 232:25; 233:19
  **welcome** [1] - 212:2
  **welcoming** [1] - 78:20
  **whatsoever** [1] - 256:25
  **whichever** [1] - 41:6
  **white** [1] - 213:8
  **whole** [13] - 54:11; 78:14; 86:6;
100:12; 103:9; 125:5; 208:20; 212:4;

215:2; 232:14; 244:10; 248:9, 18
  **whore** [10] - 221:10; 227:8; 228:4, 12,
16, 23, 25; 229:10, 20; 232:19
  **wide** [6] - 22:11, 13-14; 71:18; 74:6;
103:22
  **Wiehle** [1] - 3:10
  **wife** [1] - 183:22
  **winter** [2] - 133:12; 198:5
  **wire** [1] - 27:13
  **wisdom** [1] - 65:18
  **withdraw** [1] - 91:9
  **withdrawal** [5] - 253:15, 20; 254:10,
13; 256:5
  **withdraws** [1] - 253:23
  **witness** [39] - 6:10; 7:1; 21:10; 37:5;
67:23; 68:6, 14, 17; 93:21; 94:11, 13;
95:13; 97:21; 140:2; 151:18; 152:4;
177:7; 180:5, 24; 181:10; 184:13;
189:22; 190:21, 23; 191:15; 200:11;
201:3; 210:9; 212:17; 225:24; 226:11;
240:11; 249:8; 252:14; 258:14; 261:4;
262:21, 24
  **WITNESS** [24] - 7:3; 9:16; 37:8; 45:20;
64:12; 68:12, 20; 88:20; 89:12; 94:5;
97:24; 151:21, 23, 25; 152:3, 8; 167:5;
174:21, 23; 212:22; 215:24; 220:6;
230:2; 231:23
  **witness's** [1] - 95:9, 22
  **witnessed** [2] - 57:8; 213:11; 240:8
  **witnesses** [11] - 6:23; 112:15; 143:5;
144:23; 219:18; 221:16; 224:14;
225:15; 226:7; 230:7; 252:13
  **Women** [1] - 106:13
  **women's** [2] - 83:12; 109:21
  **won** [1] - 106:10
  **wonderful** [1] - 38:20
  **wondering** [1] - 264:2
  **Woodson** [2] - 69:11, 17
  **word** [6] - 75:8; 150:12; 227:3; 230:8;
258:11; 259:6
  **words** [7] - 89:22; 120:5; 160:14;
192:8; 207:10, 16; 230:13
  **workdays** [1] - 83:8
  **works** [2] - 36:22; 71:15
  **world** [1] - 28:25
  **worse** [1] - 167:10
  **wound** [1] - 237:17
  **wounds** [1] - 10:9
  **WP** [1] - 91:8
  **write** [24] - 19:2-4; 42:15; 47:9, 17;
48:8; 63:25; 64:2; 122:15; 145:18;
150:4; 208:5; 209:16; 211:19; 218:8;
229:13, 19; 237:16, 18; 238:16; 242:10;
246:23
  **write-up** [2] - 237:16, 18
  **writer** [2] - 40:19; 107:20
  **writing** [12] - 41:23; 46:4; 50:18; 58:5;
101:8; 107:22; 173:11, 15; 174:2;
176:22; 211:17; 246:16
  **written** [13] - 12:3, 7; 137:6; 139:25;

153:9; 174:7; 202:21; 203:3; 205:18;
209:6; 211:24; 216:23; 220:14
**wrongdoing** [1] - 67:23
**wrote** [16] - 47:12; 50:18; 51:13;
100:19; 102:20; 146:1; 151:6; 153:5;
208:9; 227:24; 230:1; 244:14; 246:13;
252:18; 256:12

# X

**x-ray** [1] - 22:23

# Y

**year** [85] - 9:5, 10-11; 10:24; 11:10;
18:11; 19:6; 38:3, 22; 39:23; 40:3, 21;
45:9; 51:1, 6; 53:4; 54:25; 55:19; 58:15;
67:21; 69:15; 70:19, 21, 24; 73:4;
77:20; 80:21; 81:4; 83:10; 84:18; 85:17;
86:7; 90:19; 91:13; 92:10; 98:9, 11, 17;
101:1, 20; 102:11; 104:8; 105:11,
13-14, 20; 106:12, 16; 107:3; 109:17;
110:21, 24; 111:2; 112:6, 9, 11-13;
115:16; 119:13, 18; 124:1; 126:21;
129:23; 130:22, 25; 132:16; 133:13;
134:25; 171:3; 174:18; 186:4, 25;
188:2; 202:12; 203:21; 245:5; 248:14,
16; 252:4
**yearbook** [1] - 156:4
**yearly** [1] - 16:16
**years** [43] - 7:23, 25; 12:10; 17:8; 20:4;
38:7; 50:7; 69:21; 70:15, 17, 23; 71:3,
12; 77:1; 83:6; 86:1; 90:17; 98:19, 22;
99:8-10, 15; 100:12-14; 101:14; 102:9,
12; 105:8, 23; 107:11; 112:7; 192:21,
24; 193:1
**yelled** [2] - 72:25; 73:1
**yes-or-no** [1] - 189:10
**yesterday** [5] - 17:2; 127:1; 160:10;
185:23; 263:12
**York** [1] - 9:1
**yourself** [8] - 7:12, 15; 31:5; 37:18;
62:14; 69:7; 107:6; 199:17

# Z

**zero** [2] - 46:8; 256:23
**Zoll** [4] - 2:2; 60:24; 87:13; 93:21
**ZOLL** [54] - 4:8, 12; 43:6; 44:15; 48:2;
49:23; 52:17; 60:9, 17, 19, 21; 61:3;
62:2, 16, 19-20; 63:6, 16, 21, 23-24;
64:5, 13, 18, 21-22; 67:10, 13; 68:8;
87:5, 7, 10; 88:6, 8, 14, 23; 89:9, 13;
90:21, 24; 91:25; 92:1, 4, 7-8, 24-25;
93:5, 7, 22
**zoom** [19] - 59:24; 78:4; 114:12, 21;
124:5; 125:1; 135:25; 136:7; 140:18;
142:14; 144:12; 158:1; 172:20; 176:17;

178:13; 179:14; 184:20
**Zuluaga** [9] - 173:1; 175:4, 19; 218:25;
219:2; 223:23, 25; 224:2